**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 1 of 16, Pages 1-292**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

Query Reports Utilities Help Log Out

CLOSED,APPEAL,ETT-2D,MJLC3

# U.S. District Court
# DISTRICT OF KANSAS (Wichita)
# CIVIL DOCKET FOR CASE #: 6:24-cv-01027-TC

Cozy Inn, Incorporated et al v. Salina, Kansas, City of
Assigned to: District Judge Toby Crouse
Case in other court: 10CCA, 25-03225
Cause: 42:1983 Civil Rights Act

Date Filed: 02/19/2024
Date Terminated: 01/07/2026
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Cozy Inn, Incorporated**
*doing business as*
Cozy Inn, The

represented by **Jeffrey Shaw**
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5121
Email: jeff@kansasjusticeinstitute.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel G. MacRoberts**
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
Email:
sam.macroberts@kansasjusticeinstitute.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Stephen Howard**

represented by **Jeffrey Shaw**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Samuel G. MacRoberts**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Salina, Kansas, City of** represented by

**Aaron O. Martin**
Clark, Mize & Linville, Chtd.
129 South 8th Street
PO Box 380
Salina, KS 67402-0380
785-823-6325
Fax: 785-823-1868
Email: aomartin@cml-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amanda C. Jokerst**
Fairfield and Woods, PC
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
Fax: 303-830-1033
Email: ajokerst@fwlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Todd G. Messenger**
Fairfield and Woods, PC
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
Fax: 303-830-1033
Email: tmessenger@fwlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/19/2024 | 1 | COMPLAINT with trial location of Wichita (Filing fee $405, Internet Payment Receipt Number AKSDC-6277267.), filed by Cozy Inn, Incorporated, Stephen Howard. (Attachments: # 1 Verification, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C) (MacRoberts, Samuel) (Entered: 02/19/2024) |
| 02/19/2024 | 2 | CIVIL COVER SHEET by Plaintiffs Cozy Inn, Incorporated, Stephen Howard. (MacRoberts, Samuel) (Entered: 02/19/2024) |

| | | |
|---|---|---|
| 02/19/2024 | 3 | CORPORATE DISCLOSURE STATEMENT by Cozy Inn, Incorporated, Stephen Howard identifying None as corporate parent. (MacRoberts, Samuel) (Entered: 02/19/2024) |
| 02/19/2024 | 4 | ENTRY OF APPEARANCE by Jeffrey Shaw on behalf of Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) (Entered: 02/19/2024) |
| 02/20/2024 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Toby Crouse and Magistrate Judge Angel D. Mitchell for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)<br><br>**NOTICE OF MAGISTRATE JUDGE AVAILABILITY: A United States magistrate judge is available to conduct all proceedings in this civil action if all parties voluntarily consent. Information & consent forms are available at http://www.uscourts.gov/forms/civil-forms/notice-consent-and-reference-civil-action-magistrate-judge (jk) (Entered: 02/20/2024)** |
| 02/20/2024 | | SUMMONS ISSUED as to Salina, Kansas, City of (issued to Attorney for service). Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (jk) (Entered: 02/20/2024) |
| 02/26/2024 | 5 | SUMMONS RETURNED EXECUTED -- Personal Service by Cozy Inn, Incorporated, Stephen Howard upon Salina, Kansas, City of served on 2/21/2024, answer due 3/13/2024. (MacRoberts, Samuel) (Entered: 02/26/2024) |
| 03/08/2024 | 6 | ENTRY OF APPEARANCE by Aaron O. Martin on behalf of Salina, Kansas, City of. (Martin, Aaron) (Entered: 03/08/2024) |
| 03/08/2024 | 7 | CLERKS ORDER EXTENDING TIME until 3/27/2024 for Defendant Salina, Kansas, City of to answer or otherwise plead. Signed by deputy clerk on 3/08/2024. (jk) (Entered: 03/11/2024) |
| 03/12/2024 | 10 | AMENDED CLERKS ORDER EXTENDING TIME until 3/27/2024 for Defendant Salina, Kansas, City of to answer or otherwise plead. Signed by deputy clerk on 3/12/2024. (jk) (Entered: 03/14/2024) |
| 03/13/2024 | 8 | MOTION for attorney Amanda C. Jokerst to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6298055.) by Defendant Salina, Kansas, City of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Martin, Aaron) (Entered: 03/13/2024) |
| 03/13/2024 | 9 | MOTION for attorney Todd G. Messenger to appear pro hac vice (Pro hac vice fee $50, Internet Payment Receipt Number AKSDC-6298080.) by Defendant Salina, Kansas, City of. (Motion referred to Magistrate Judge Angel D. Mitchell.) (Martin, Aaron) (Entered: 03/13/2024) |
| 03/18/2024 | 11 | ORDER granting 8 Motion to Appear Pro Hac Vice of Amanda C. Jokerst for Salina, Kansas, City of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 3/18/2024. (This is a |

| | | |
|---|---|---|
| | | TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 03/18/2024) |
| 03/18/2024 | 12 | ORDER granting 9 Motion to Appear Pro Hac Vice of Todd G. Messenger for Salina, Kansas, City of pursuant to D. Kan. Rule 83.5.4 for purposes of this case only. Signed by Magistrate Judge Angel D. Mitchell on 3/18/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 03/18/2024) |
| 03/27/2024 | 13 | MOTION to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 03/27/2024) |
| 03/27/2024 | 14 | BRIEF IN SUPPORT of 13 Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 03/27/2024) |
| 03/28/2024 | 15 | INITIAL ORDER REGARDING PLANNING AND SCHEDULING: Scheduling Conference set for 5/16/2024 at 11:30 AM by Telephone ADM - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 3977627 before Magistrate Judge Angel D. Mitchell. Rule 26 Planning Conference Deadline 4/26/2024. Rule 26 Initial Disclosures Deadline set for 5/6/2024. Proposed Scheduling Order Deadline 5/6/2024. Signed by Magistrate Judge Angel D. Mitchell on 3/28/2024. (ca) (Entered: 03/28/2024) |
| 04/10/2024 | 16 | AMENDED COMPLAINT against Salina, Kansas, City of, filed by Cozy Inn, Incorporated, Stephen Howard. (Attachments: # 1 Verification, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(MacRoberts, Samuel) (Entered: 04/10/2024) |
| 04/10/2024 | 17 | NOTICE of Filing of Verified Amended Complaint by Cozy Inn, Incorporated, Stephen Howard re 14 Memorandum in Support of Motion, 13 Motion to Dismiss Plaintiffs' Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (MacRoberts, Samuel) (Entered: 04/10/2024) |
| 04/10/2024 | | SUMMONS ISSUED as to Salina, Kansas, City of (issued to Attorney for service). Notice, Consent, and Reference of a Civil Action to a Magistrate Judge Form provided to counsel for service with complaint. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (jk) (Entered: 04/10/2024) |
| 04/11/2024 | 18 | ORDER. Salina's motion to dismiss, Doc. 13 , is denied as moot. Signed by District Judge Toby Crouse on 4/11/2024. (mam) (Entered: 04/11/2024) |
| 04/11/2024 | 19 | SUMMONS RETURNED EXECUTED -- Personal Service by Cozy Inn, Incorporated, Stephen Howard upon Salina, Kansas, City of (MacRoberts, Samuel) Modified on 4/12/2024 to add party served (ca). (Entered: 04/11/2024) |
| 04/18/2024 | 20 | CLERKS ORDER EXTENDING TIME until 5/9/2024 for Defendant Salina, Kansas, City of to answer or otherwise plead re 16 Amended Complaint. Signed by deputy clerk on 4/18/2024. (jsh) (Entered: 04/18/2024) |

| | | |
|---|---|---|
| 04/19/2024 | 21 | STIPULATION by Salina, Kansas, City of. (Martin, Aaron) (Entered: 04/19/2024) |
| 04/26/2024 | 22 | MOTION for Leave to File Excess Pages *for Brief in Support of Motion to Dismiss* by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 04/26/2024) |
| 04/29/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 22 MOTION for Leave to File Excess Pages *for Brief in Support of Motion to Dismiss*. The motion will be resolved by the District Judge.(alh)** (Entered: 04/29/2024) |
| 04/30/2024 | 23 | ORDER denying 22 Motion for Leave to File Excess Pages. Signed by District Judge Toby Crouse on 4/30/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 04/30/2024) |
| 05/06/2024 | 24 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Initial Disclosures and Documents 1-156. (Shaw, Jeffrey) (Entered: 05/06/2024) |
| 05/06/2024 | 25 | NOTICE OF SERVICE by Salina, Kansas, City of of Initial Disclosures. (Martin, Aaron) (Entered: 05/06/2024) |
| 05/09/2024 | 26 | MOTION to Dismiss for Failure to State a Claim by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 05/09/2024) |
| 05/09/2024 | 27 | BRIEF IN SUPPORT of 26 Motion to Dismiss by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 05/09/2024) |
| 05/16/2024 | 28 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: SCHEDULING CONFERENCE was held on 5/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 05/16/2024) |
| 05/16/2024 | 29 | SCHEDULING ORDER: estimated trial time 2-4 days. Discovery deadline 10/18/2024. Proposed Pretrial Order due by 11/4/2024. Final Pretrial Conference set for 11/14/2024 at 01:30 PM by Telephone ADM - CONFERENCE LINE 1-888-363-4749 ACCESS CODE 3977627 before Magistrate Judge Angel D. Mitchell. Dispositive motion deadline 12/20/2024. Jury Trial set for 9/9/2025 at 09:00 AM in Wichita before District Judge Toby Crouse. Signed by Magistrate Judge Angel D. Mitchell on 5/16/2024. (kas) (Entered: 05/16/2024) |
| 05/22/2024 | 30 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Supplemental Initial Disclosures and Documents 157-216. (Shaw, Jeffrey) (Entered: 05/22/2024) |
| 05/30/2024 | 31 | RESPONSE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard re 26 Motion to Dismiss for Failure to State a Claim (MacRoberts, Samuel) (Entered: 05/30/2024) |
| 06/05/2024 | 32 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Plaintiffs' First Set of Interrogatories Pursuant to Fed. R. Civ. P. 33; Requests for Admission Pursuant to Fed. R. Civ. P. 36; Request for Production of Documents Pursuant to Fed. R. Civ. P. 34 (Shaw, Jeffrey) (Entered: 06/05/2024) |

| | | |
|---|---|---|
| 06/13/2024 | 33 | REPLY TO RESPONSE TO MOTION by Defendant Salina, Kansas, City of re: 26 Motion to Dismiss for Failure to State a Claim (Martin, Aaron) (Entered: 06/13/2024) |
| 06/18/2024 | 34 | MOTION Motion to Disregard Newly Raised Argument or for Leave to File Sur-Reply re 33 Reply to Response to Motion by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (Attachments: # 1 Exhibit 1 (Proposed Sur-reply)) (MacRoberts, Samuel) (Entered: 06/18/2024) |
| 06/18/2024 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 34 MOTION Motion to Disregard Newly Raised Argument or for Leave to File Sur-Reply re 33 Reply to Response to Motion . The motion will be resolved by the District Judge.(alh)** (Entered: 06/18/2024) |
| 06/18/2024 | 35 | ORDER denying motion to disregard, Doc. 34 . Plaintiffs filed a motion to disregard a newly raised argument, essentially asserting that a defendant cannot succeed on an argument raised for the first time in a reply and seeking leave to file a sur-reply. There is no need for such a motion: if the argument is proper, it will be considered; if it is not, it will not be; and, if any additional briefing is needed, it will be requested. Both requests are denied. Signed by District Judge Toby Crouse on 6/18/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 06/18/2024) |
| 07/18/2024 | 36 | NOTICE OF SERVICE by Salina, Kansas, City of of Responses to Plaintiffs' Written Discovery Requests (Martin, Aaron) (Entered: 07/18/2024) |
| 07/26/2024 | 37 | NOTICE OF SERVICE by Salina, Kansas, City of of Defendant's Privilege Log (Martin, Aaron) (Entered: 07/26/2024) |
| 08/01/2024 | 38 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Second Set of Interrogatories and Second Set of Requests for Production of Documents (Shaw, Jeffrey) (Entered: 08/01/2024) |
| 08/02/2024 | 39 | NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition (MacRoberts, Samuel) (Entered: 08/02/2024) |
| 08/05/2024 | 40 | MOTION for Discovery Hearing. Via an email to the court on August 2, 2024, the parties moved the court to schedule a Discovery Hearing. (referred to Magistrate Judge Angel D. Mitchell) (alh) (Entered: 08/05/2024) |
| 08/05/2024 | 41 | ORDER granting 40 Motion for Discovery Hearing. A Discovery Hearing/Conference is set for 8/14/2024 at 01:30 PM by Telephone before Magistrate Judge Angel D. Mitchell. The parties are directed to call in to the CONFERENCE LINE at 1-888-363-4749 and enter ACCESS CODE 3977627. Signed by Magistrate Judge Angel D. Mitchell on 8/5/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 08/05/2024) |
| 08/05/2024 | 42 | ***DISREGARD - ENTERED IN ERROR*** MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: FINAL PRETRIAL CONFERENCE was held on 8/5/2024. (This is a TEXT ENTRY |

| | | |
|---|---|---|
| | | ONLY. There is no.pdf document associated with this entry.) (alh) (Modified on 8/6/2024 per ADM chambers (heo)) (Entered: 08/05/2024) |
| 08/06/2024 | | DOCKET ANNOTATION: Please disregard 42 Minute Entry re Final Pretrial Conference; entry made in error. (heo) (Entered: 08/06/2024) |
| 08/14/2024 | 43 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: DISCOVERY HEARING was held on 8/14/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 08/14/2024) |
| 08/14/2024 | 44 | ORDER: Parties to further meet and confer about the disputed discovery responses by August 21, 2024. Defendants wish to supplement those responses, they must do so by August 23, 2024. Plaintiffs' motion to compel is due by August 30, 2024. Defendant's response is due by September 9, 2024. Plaintiffs' reply is due by September 12, 2024. Signed by Magistrate Judge Angel D. Mitchell on 8/14/24. (msb) (Entered: 08/14/2024) |
| 08/16/2024 | 45 | NOTICE OF SERVICE by Salina, Kansas, City of of Defendant's First Set of Written Discovery Requests to Plaintiffs (Martin, Aaron) (Entered: 08/16/2024) |
| 08/16/2024 | 46 | NOTICE OF SERVICE by Salina, Kansas, City of of Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2) (Martin, Aaron) (Entered: 08/16/2024) |
| 08/22/2024 | 47 | NOTICE OF SERVICE by Salina, Kansas, City of of Defendant's First Supplemental Disclosures (Martin, Aaron) (Entered: 08/22/2024) |
| 08/29/2024 | 48 | (VIEW RESTRICTED - WITHDRAWN PER DOCKET ENTRY 49) OBJECTION(S) to *Defendant's Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2)* by Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) Modified text and restriction on 9/6/2024 (msb). (Entered: 08/29/2024) |
| 08/30/2024 | 49 | NOTICE of Withdrawal of Filed Objection to Defendant's Expert Disclosure and Report by Cozy Inn, Incorporated, Stephen Howard re 48 Objection(s) (Shaw, Jeffrey) (Entered: 08/30/2024) |
| 08/30/2024 | 50 | NOTICE OF SERVICE by Salina, Kansas, City of of Amended Discovery Responses and Privilege Log (Martin, Aaron) (Entered: 08/30/2024) |
| 09/03/2024 | 51 | MOTION for Discovery Hearing. Via an email to the court on August 29, 2024, the parties moved the court to schedule a Discovery Hearing. (referred to Magistrate Judge Angel D. Mitchell) (alh) (Entered: 09/03/2024) |
| 09/03/2024 | 52 | ORDER granting 51 Motion for Discovery Hearing. A Discovery Hearing/Conference is set for 9/18/2024 at 10:00 AM by Telephone before Magistrate Judge Angel D. Mitchell. The parties are directed to call in to the CONFERENCE LINE at 1-888-363-4749 and enter ACCESS CODE 3977627. Signed by Magistrate Judge Angel D. Mitchell on 9/3/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 09/03/2024) |
| 09/03/2024 | 53 | NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition of 30(b)(6) Representative on September 30, 2024 (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit A)(Shaw, Jeffrey) (Entered: 09/03/2024) |
| 09/04/2024 | 54 | NOTICE of Second Supplemental Initial Disclosures and Documents 217-301 by Cozy Inn, Incorporated, Stephen Howard (Shaw, Jeffrey) (Entered: 09/04/2024) |
| 09/05/2024 | 55 | NOTICE OF SERVICE by Salina, Kansas, City of of Response to Plaintiffs' Second Discovery Requests, and Defendant's Supp. Privilege Log (Martin, Aaron) (Entered: 09/05/2024) |
| 09/06/2024 | 56 | NOTICE OF SERVICE of Third Supplemental Initial Disclosures and Documents 302-315 by Cozy Inn, Incorporated, Stephen Howard (Shaw, Jeffrey) Modified title on 9/9/2024. (kmc) (Entered: 09/06/2024) |
| 09/08/2024 | 57 | NOTICE OF SERVICE of Fourth Supplemental Initial Disclosures and Documents 316-325 by Cozy Inn, Incorporated, Stephen Howard (Shaw, Jeffrey) Modified title on 9/9/2024. (kmc) (Entered: 09/08/2024) |
| 09/08/2024 | 58 | NOTICE OF SERVICE of Fifth Supplemental Initial Disclosures and Documents 326-334 by Cozy Inn, Incorporated, Stephen Howard (Shaw, Jeffrey) Modified title on 9/9/2024. (kmc) (Entered: 09/08/2024) |
| 09/13/2024 | 59 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Plaintiffs' Response to Defendant's First Set of Interrogatories; Verification; Plaintiffs' Response to Defendant's First Set of Requests for Admission; Plaintiffs' Response to Defendant's First Set of Requests for Production of Documents; Documents 0335-0373; Privilege Log (Shaw, Jeffrey) (Entered: 09/13/2024) |
| 09/16/2024 | 60 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Third Set of Requests for Production of Documents (Shaw, Jeffrey) (Entered: 09/16/2024) |
| 09/18/2024 | 61 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: DISCOVERY HEARING was held on 9/18/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 09/18/2024) |
| 09/18/2024 | 62 | NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition of Dean Andrew on September 30, 2024 (Shaw, Jeffrey) (Entered: 09/18/2024) |
| 09/18/2024 | 63 | AMENDED NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition of 30(b)(6) Representative on October 17, 2024 (Attachments: # 1 Exhibit A)(Shaw, Jeffrey) (Entered: 09/18/2024) |
| 09/20/2024 | 64 | NOTICE OF SERVICE by Cozy Inn, Incorporated, Stephen Howard of Rebuttal Expert Disclosure; Expert Report; and Expert Curriculum Vitae (Shaw, Jeffrey) (Entered: 09/20/2024) |
| 09/20/2024 | 65 | NOTICE OF SERVICE by Salina, Kansas, City of of Second Supplemental Disclosures (Martin, Aaron) (Entered: 09/20/2024) |

| | | |
|---|---|---|
| 09/24/2024 | 66 | NOTICE OF SERVICE by Salina, Kansas, City of of Third Supplemental Disclosures (Martin, Aaron) (Entered: 09/24/2024) |
| 09/27/2024 | 67 | NOTICE OF SERVICE by Salina, Kansas, City of of Fourth Supplemental Disclosures (Martin, Aaron) (Entered: 09/27/2024) |
| 10/03/2024 | 68 | NOTICE OF SERVICE by Salina, Kansas, City of of Notice of Deposition of Colin Benson (Martin, Aaron) (Entered: 10/03/2024) |
| 10/03/2024 | 69 | NOTICE OF SERVICE by Salina, Kansas, City of of Notice of Deposition of Jess Blase (Martin, Aaron) (Entered: 10/03/2024) |
| 10/04/2024 | 70 | Joint MOTION for extension of time *to conduct expert depositions* by Defendant Salina, Kansas, City of (referred to Magistrate Judge Angel D. Mitchell) (Martin, Aaron) (Entered: 10/04/2024) |
| 10/07/2024 | 71 | ORDER granting 70 joint motion to extend expert discovery deadline. For good cause shown in the motion, the court extends the discovery deadline to November 13, 2024, for the limited purpose of conducting expert depositions. Signed by Magistrate Judge Angel D. Mitchell on 10/7/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 10/07/2024) |
| 10/08/2024 | 72 | MOTION for Discovery Hearing. Via an email to the court on October 7, 2024, the parties moved the court to schedule a Discovery Hearing. (referred to Magistrate Judge Angel D. Mitchell) (alh) (Entered: 10/08/2024) |
| 10/08/2024 | 73 | ORDER granting 72 Motion for Discovery Hearing. A Discovery Hearing/Conference is set for 10/16/2024 at 11:00 AM by Telephone before Magistrate Judge Angel D. Mitchell. The parties are directed to call in to the CONFERENCE LINE at 1-888-363-4749 and enter ACCESS CODE 3977627. Signed by Magistrate Judge Angel D. Mitchell on 10/8/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 10/08/2024) |
| 10/09/2024 | 74 | NOTICE OF SERVICE by Salina, Kansas, City of of Notice of Deposition of Andrea Windholz (Martin, Aaron) (Entered: 10/09/2024) |
| 10/14/2024 | 75 | NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition of Mark White on October 31, 2024 (Shaw, Jeffrey) (Entered: 10/14/2024) |
| 10/16/2024 | 76 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: DISCOVERY HEARING was held on 10/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 10/16/2024) |
| 10/16/2024 | 77 | ORDER: On October 16, 2024, the court convened a discovery conference at the parties' request to discuss plaintiff's Rule 30(b)(6) notice to defendant. During the conference, the court provided guidance on various topics so that the parties could proceed with defendant's Rule 30(b)(6) deposition. The court directed the parties to contact chambers for an additional discovery conference if, after the |

| | | |
|---|---|---|
| | | deposition, disputes remain unresolved. Signed by Magistrate Judge Angel D. Mitchell on 10/16/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(alh) (Entered: 10/16/2024) |
| 10/16/2024 | 78 | NOTICE OF SERVICE by Salina, Kansas, City of of Technical Objections to Plaintiffs' Expert Disclosure and Report (Martin, Aaron) (Entered: 10/16/2024) |
| 10/18/2024 | 79 | NOTICE OF SERVICE by Salina, Kansas, City of of Responses to Plaintiffs' Third Request for Production of Documents (Martin, Aaron) (Entered: 10/18/2024) |
| 10/18/2024 | 80 | SECOND AMENDED NOTICE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard of taking deposition of 30(b)(6) Representative on October 30, 2024 (Attachments: # 1 Exhibit A)(Shaw, Jeffrey) (Entered: 10/18/2024) |
| 10/21/2024 | 81 | MOTION for Discovery Hearing. Via an email to the court on October 16, 2024, the parties moved the court to schedule a Discovery Hearing. (referred to Magistrate Judge Angel D. Mitchell) (alh) (Entered: 10/21/2024) |
| 10/21/2024 | 82 | ORDER granting 81 Motion for Discovery Hearing. A Discovery Hearing/Conference is set for 10/23/2024 at 02:30 PM by Telephone before Magistrate Judge Angel D. Mitchell. The parties are directed to call the CONFERENCE LINE at 1-888-363-4749 and enter ACCESS CODE 3977627. Signed by Magistrate Judge Angel D. Mitchell on 10/21/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 10/21/2024) |
| 10/23/2024 | 83 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: DISCOVERY HEARING was held on 10/23/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 10/23/2024) |
| 10/23/2024 | 84 | ORDER. On 10/23/2024, the court convened a discovery conference at defendant's request to discuss plaintiffs' responses to defendant's written discovery requests. As set forth in more detail on the record, the parties agreed to continue meeting and conferring on these discovery issues. Should any issues remain unresolved, the court set the following briefing schedule and page limits for defendant to file a motion to compel-- Defendant's motion to compel is due by 11/6/2024, and is limited to 7 pages. Plaintiffs' response is due by 11/13/2024, and is limited to 7 pages. Defendant's reply is due by 11/15/2024, and is limited to 2 pages. Signed by Magistrate Judge Angel D. Mitchell on 10/23/2024. (mam) (Entered: 10/23/2024) |
| 10/31/2024 | 85 | Joint MOTION for extension of time *to file pretrial order* by Defendant Salina, Kansas, City of (referred to Magistrate Judge Angel D. Mitchell) (Martin, Aaron) (Entered: 10/31/2024) |
| 11/01/2024 | 86 | ORDER granting 85 joint motion for extension of time to submit proposed pretrial order. The parties must submit their proposed pretrial order by **November 8, 2024**. The pretrial conference is rescheduled for **November 19, 2024, at 1:30 pm**. (CONFERENCE LINE 1-888-363-4749/ACCESS CODE 3977627). Signed by Magistrate Judge Angel D. Mitchell on 11/1/2024. (This is |

| | | |
|---|---|---|
| | | a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 11/01/2024) |
| 11/19/2024 | 87 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: FINAL PRETRIAL CONFERENCE was held on 11/19/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 11/19/2024) |
| 11/20/2024 | 88 | ORDER. The court will reconvene the final pretrial conference on 12/4/2024 at 03:30 PM by Telephone ADM - CONFERENCE LINE 913-423-1010 ACCESS CODE 172 480 243 before Magistrate Judge Angel D. Mitchell. During the conference, the court also discussed defendant's contention that plaintiffs' expert report exceeded the scope of a proper rebuttal expert disclosure. The court set the following deadlines and parameters for an anticipated motion to strike: Defendant's motion is due by December 3, 2024, and is limited to 10 pages. Plaintiffs' response is due by December 13, 2024, and is limited to 10 pages. Defendant's reply is due by December 18, 2024, and is limited to 3 pages. Signed by Magistrate Judge Angel D. Mitchell on 11/19/2024. (kmc) (Entered: 11/20/2024) |
| 12/03/2024 | 89 | MOTION to Strike *Plaintiffs' Rebuttal Expert* by Defendant Salina, Kansas, City of (referred to Magistrate Judge Angel D. Mitchell) (Attachments: # 1 Exhibit List Index of Exhibits to Defendant's Motion to Strike Plaintiffs' Rebuttal Expert, # 2 Exhibit Exhibit A - City Expert Disclosure, # 3 Exhibit Exhibit B - White Expert Report, # 4 Exhibit Exhibit C - Plaintiffs' Rebuttal Expert Disclosure, # 5 Exhibit Exhibit D - Taylor Expert Report, # 6 Exhibit Exhibit E - Taylor Depo Excerpts)(Martin, Aaron) (Entered: 12/03/2024) |
| 12/04/2024 | 90 | MINUTE ENTRY for proceedings held before Magistrate Judge Angel D. Mitchell: FINAL PRETRIAL CONFERENCE was held on 12/4/2024. The parties must submit any additional proposed changes to the pretrial order by 5:00 PM on Friday, December 6. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 12/04/2024) |
| 12/04/2024 | 91 | ORDER denying 89 motion to strike plaintiffs' rebuttal expert report. As explained on the record during the December 4, 2024 pretrial conference, the Scheduling Order defined the scope of rebuttal expert disclosures as those offered "to contradict or rebut evidence on the same subject matter identified by another party." (ECF 29, at 3-4.) The court finds that the report of plaintiffs' expert falls within this scope. The parties may file any other Daubert-based motions to exclude expert testimony by the December 20 deadline set in the Scheduling Order. Signed by Magistrate Judge Angel D. Mitchell on 12/4/2024. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (alh) (Entered: 12/04/2024) |
| 12/09/2024 | 92 | PRETRIAL ORDER ENTERED estimated trial time 2 days; Dispositive motion deadline 12/20/2024. Court Trial set for 9/9/2025 at 09:00 AM in Wichita, Kansas before District Judge Toby Crouse. Signed by Magistrate Judge Angel D. Mitchell on 12/9/2024. (ca) (Entered: 12/09/2024) |

| | | |
|---|---|---|
| 12/13/2024 | 93 | MOTION for extension of time *to file their Motion for Summary Judgment* by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (MacRoberts, Samuel) (Entered: 12/13/2024) |
| 12/13/2024 | 94 | NOTICE OF TELEPHONE CONFERENCE: Telephone Conference set for 12/16/2024 at 09:30 AM by Telephone TC - CONFERENCE: 785-337-8299; ACCESS CODE: 890 312 185 before District Judge Toby Crouse. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(ta) (Entered: 12/13/2024) |
| 12/16/2024 | 95 | MINUTE ENTRY for proceedings held before District Judge Toby Crouse: TELEPHONE CONFERENCE held on 12/16/2024. Order to follow. (Court Reporter Kelli Stewart.) (ta) (Entered: 12/16/2024) |
| 12/17/2024 | 96 | ORDER denying motion for extension of time, Doc. 93 . A few days after the pretrial order was entered, defendant amended its guidelines that at are at the heart of this dispute. Plaintiffs seek and defendants do not oppose additional time to evaluate what those amendments do to the issues in dispute. Following a telephone hearing, the summary judgment deadline and trial setting are cancelled. The parties should contact the Magistrate Judge by January 10, 2025 to address management of this dispute. As a result, the motion for extension of time, Doc. 93, is DENIED as moot. Signed by District Judge Toby Crouse on 12/17/24. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 12/17/2024) |
| 12/20/2024 | 97 | MOTION to Exclude Expert Testimony *or Strike* by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (Attachments: # 1 Exhibit List, # 2 Exhibit A - Defendant's Expert Disclosure, # 3 Exhibit B - Defendant's Expert Report: Mark White, # 4 Exhibit C - Deposition Excerpts: Defendant's Expert Witness Mark White, # 5 Exhibit D - S. Mark White, Content-Neutral Sign Codes After Reed And Austin, Sign Research Foundation (Nov. 2022), # 6 Exhibit E - Plaintiffs' Expert Report: Charles R. Taylor, Ph.D., # 7 Exhibit F - Deposition Excerpts: Plaintiffs' Expert Charles R. Taylor, Ph.D.)(Shaw, Jeffrey) (Entered: 12/20/2024) |
| 12/20/2024 | 98 | MOTION to Exclude Expert Testimony by Defendant Salina, Kansas, City of (Attachments: # 1 Exhibit List Index of Exhibits to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert, # 2 Exhibit Exhibit A - Defendant's Expert Disclosure, # 3 Exhibit Exhibit B - Expert Report of S. Mark White, # 4 Exhibit Exhibit C - Plaintiffs' Rebuttal Expert Disclosure, # 5 Exhibit Exhibit D - Expert Report of Charles R. Taylor, Ph.D., # 6 Exhibit Exhibit E - Excerpts from Deposition of Charles R. Taylor, Ph.D., # 7 Exhibit Exhibit F - Cozy Responses to First RPD)(Martin, Aaron) (Entered: 12/20/2024) |
| 01/10/2025 | 99 | RESPONSE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard re 98 Motion to Exclude Expert Testimony,, (Attachments: # 1 Exhibit List Index of Exhibits, # 2 Exhibit A - Rebuttal Expert Disclosure, # 3 Exhibit B - Taylor Report, # 4 Exhibit C - Taylor CV, # 5 Exhibit D - Salina Expert Disclosure, # 6 Exhibit E - White Report, # 7 Exhibit F - Taylor Depo Excerpts, # 8 Exhibit G - White Depo Excerpts, # 9 Exhibit H - Response to Second Set of Interrogatories, # 10 Exhibit I - Herrs 30(b)(6) Depo Excerpts)(Shaw, Jeffrey) (Entered: 01/10/2025) |

| | | |
|---|---|---|
| 01/10/2025 | 100 | RESPONSE by Defendant Salina, Kansas, City of re 97 Motion to Exclude Expert Testimony,, (Attachments: # 1 Exhibit List Index of Exhibits, # 2 Ex Ex. 1 - Mark White Deposition Excerpts)(Martin, Aaron) (Entered: 01/10/2025) |
| 01/16/2025 | 101 | AMENDED PRETRIAL ORDER ENTERED: estimated trial time 2 days. Dispositive motion deadline 2/7/2025. Court Trial set for 10/7/2025 at 09:00 AM in Wichita, Kansas before District Judge Toby Crouse. Signed by Magistrate Judge Angel D. Mitchell on 1/16/2025. (kas) (Entered: 01/16/2025) |
| 01/24/2025 | 102 | REPLY TO RESPONSE TO MOTION by Plaintiffs Cozy Inn, Incorporated, Stephen Howard re: 97 Motion to Exclude Expert Testimony,, (Attachments: # 1 Exhibit List Index of Exhibits, # 2 Exhibit A - White Deposition Excerpts)(Shaw, Jeffrey) (Entered: 01/24/2025) |
| 01/24/2025 | 103 | REPLY TO RESPONSE TO MOTION by Defendant Salina, Kansas, City of re: 98 Motion to Exclude Expert Testimony,, (Attachments: # 1 Exhibit List Index of Exhibits, # 2 Ex. Ex. A - Excerpts from Deposition of Charles Taylor, Ph.D, # 3 Ex. Ex. B - Westlaw Docket for Borden Park, L.P. v. City of San Antonio, # 4 Ex. Ex. C - Westlaw Docket for Peterson et al v. Downers Grove, The Village of, # 5 Ex. Ex. D - Westlaw Docket for Lamar OCI South Corporation v. City of Oxford, Mississippi, # 6 Ex. Ex. E - Expert Report of Charles R. Taylor, Ph.D., # 7 Ex. Ex. F - Relevant Portions of Stutts Report - The Role of Driver Distraction in Traffic Crashes)(Martin, Aaron) (Entered: 01/24/2025) |
| 02/07/2025 | 104 | MOTION for Summary Judgment by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (MacRoberts, Samuel) (Entered: 02/07/2025) |
| 02/07/2025 | 105 | MEMORANDUM IN SUPPORT of 104 MOTION for Summary Judgment by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (Attachments: # 1 Ex. A, # 2 Ex. B, # 3 Ex. C, # 4 Ex. D, # 5 Ex. E, # 6 Ex. F, # 7 Ex. G, # 8 Ex. H, # 9 Ex. I, # 10 Ex. J, # 11 Ex. K, # 12 Ex. L, # 13 Ex. M, # 14 Ex. N, # 15 Ex. O, # 16 Ex. P, # 17 Ex. Q, # 18 Ex. R, # 19 Ex. S, # 20 Ex. T, # 21 Ex. U, # 22 Ex. V, # 23 Ex. W, # 24 Ex. X, # 25 Ex. Y, # 26 Ex. Z, # 27 Ex. AA, # 28 Ex. BB, # 29 Ex. CC, # 30 Ex. DD, # 31 Ex. EE, # 32 Ex. FF, # 33 Ex. GG, # 34 Ex. HH, # 35 Ex. II, # 36 Ex. JJ, # 37 Ex. KK, # 38 Ex. LL, # 39 Exhibit List)(MacRoberts, Samuel) (Entered: 02/07/2025) |
| 02/07/2025 | 106 | MOTION for Summary Judgment by Defendant Salina, Kansas, City of (Martin, Aaron) (Entered: 02/07/2025) |
| 02/07/2025 | 107 | MEMORANDUM IN SUPPORT of 106 MOTION for Summary Judgment by Defendant Salina, Kansas, City of (Attachments: # 1 Exhibit List Index of Exhibits to Defendant's Motion for Summary Judgment, # 2 A - Dean Andrew Affidavit with Affidavit Exs. 1 and 2, # 3 B - City's Responses to Plaintiffs' First Set of Interrogatories, # 4 C - Relevant Sections of Salina Municipal Code, # 5 D - Dean Andrew Deposition Excerpts, # 6 E - Dustin Herrs Deposition Excerpts, # 7 F - Dustin Herrs Affidavit, # 8 G - Amended Pretrial Order (ECF 101), # 9 H - Stephen Howard Deposition Excerpts, # 10 I - Andrea Windholz Deposition Excerpts, # 11 J - Colin Benson Deposition Excerpts, # 12 K - Dustin Herrs 30(b)(6) Deposition Excerpts, # 13 L - Photo of Cozy Sign (Plaintiffs Bates 58), |

| | | |
|---|---|---|
| | | # 14 M - Sign Permit Application, # 15 N - Dean Andrew 30(b)(6) Deposition Excerpts, # 16 O - Cozy Inn Sign Analysis, # 17 P - Michael Schrage Deposition Excerpts, # 18 Q - Photo of Cozy Sign alleged Final Rendering (Plaintiffs Bates 51), # 19 R - Mark White Affidavit with Affidavit Ex. 1, # 20 S - Photo of sign at Jenni's Liquors (Exhibit Y to S. Howard Depo.), # 21 T - Charles Taylor, Ph.D. Deposition Excerpts)(Martin, Aaron) (Entered: 02/07/2025) |
| 02/28/2025 | 108 | RESPONSE by Plaintiffs Cozy Inn, Incorporated, Stephen Howard re 106 Motion for Summary Judgment (Attachments: # 1 Ex. A - Andrew Deposition Excerpts, # 2 Ex. B - Driscoll Deposition Excerpts, # 3 Ex. C - Andrew 30(b)(6) Deposition Excerpts, # 4 Ex. D - Defendant's Answers to Plaintiffs' First Set of Interrogatories, # 5 Ex. E - Herrs 30(b)(6) Deposition Excerpts, # 6 Ex. F - Salina City Commission Transcript, # 7 Ex. G - Schrage Deposition Excerpts, # 8 Ex. H - City Commission Minutes, # 9 Ex. I - Art Center DRB Packet, # 10 Ex. J - Talking Points, # 11 Ex. K - Sign Permit Submittal Procedure, # 12 Ex. L - Schrage Email 11/8/23, # 13 Ex. M - Schrage Email 11/9/23, # 14 Ex. N - Schrage Email 2/20/24, # 15 Ex. O - Benson Deposition Excerpts, # 16 Ex. P - Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories, # 17 Ex. Q - Herrs Deposition Excerpts, # 18 Ex. R - Sign Permit Application, # 19 Ex. S - Howard Deposition Excerpts, # 20 Ex. T - Howard Declaration, # 21 Ex. U - On-Hold Letter, # 22 Ex. V - Michelson Deposition Excerpts, # 23 Ex. W - Defendant's Amended Response to Plaintiffs' First Set of Interrogatories, # 24 Ex. X - Windholz Deposition Excerpts, # 25 Ex. Y - 4/17/17 Salina City Commission Meeting Minutes, # 26 Ex. Z - 4/17/17 Salina City Commission Meeting Documents, # 27 Ex. AA - 5/15/17 Salina City Commission Meeting Minutes, # 28 Ex. BB - 5/15/17 Salina City Commission Meeting Documents, # 29 Ex. CC - 6/26/17 Salina City Commission Meeting Minutes, # 30 Ex. DD - 6/26/17 Salina City Commission Meeting Documents, # 31 Ex. EE - 7/10/17 Salina City Commission Meeting Minutes, # 32 Ex. FF - 7/10/17 Salina City Commission Meeting Documents, # 33 Ex. GG - Taylor Declaration and Report, # 34 Ex. HH - Cozy Photos, # 35 Ex. II - Mural Photos, # 36 Ex. JJ - Photos, # 37 Ex. KK - White Declaration and Report, # 38 Ex. LL - Defendant's Answers to Second Set of Interrogatories, # 39 Ex. MM - Content-Neutral Sign Codes After Reed and Austin, # 40 Ex. NN - White Deposition Excerpts, # 41 Ex. OO Shaw Declaration, # 42 Exhibit List)(MacRoberts, Samuel) (Entered: 02/28/2025) |
| 02/28/2025 | 109 | RESPONSE by Defendant Salina, Kansas, City of re 104 Motion for Summary Judgment (Attachments: # 1 Exhibit List Index of Exhibits to Defendant's Response to Plaintiffs' Motion for Summary Judgment, # 2 Exhibit 1-Howard Deposition, # 3 Exhibit 2-Amended Pretrial Order, # 4 Exhibit 3-White Affidavit, # 5 Exhibit 4-Dustin Herrs Deposition, # 6 Exhibit 5-Anderson Deposition, # 7 Exhibit 6-Exhibit V to Howard Depo, # 8 Exhibit 7-Exhibit Y to Howard Depo, # 9 Exhibit 8-Benson Depo, # 10 Exhibit 9-Exhibit C to Benson Depo, # 11 Exhibit 10-Driscoll Depo, # 12 Exhibit 11-Dean Andrew Depo, # 13 Exhibit 12-Response to First Set of Interrogatories, # 14 Exhibit 13-Dean Andrew Corporate (30(b)(6)) Depo, # 15 Exhibit 14-Schrage Depo, # 16 Exhibit 15-Dustin Herrs Corporate (30(b)(6)) Depo, # 17 Exhibit 16-Meeting Transcript, |

| | | |
|---|---|---|
| | | # 18 Exhibit 17-Sign Analysis, # 19 Exhibit 18-Sign Code Excerpts, # 20 Exhibit 19-Response to Requests for Admission, # 21 Exhibit 20-White Deposition, # 22 Exhibit 21-Dean Andrew Affidavit, # 23 Exhibit 22-Stutts Article, # 24 Exhibit 23-Windholz Deposition, # 25 Exhibit 24-Dustin Herrs Affidavit)(Martin, Aaron) (Entered: 02/28/2025) |
| 03/05/2025 | 110 | MOTION to Supplement *or Correct Plaintiffs' Memorandum in Support of Motion for Summary Judgment* by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (Attachments: # 1 Ex. MM - Defendant's Answer to Second Set of Interrogatories, # 2 Exhibit List)(Shaw, Jeffrey) (Entered: 03/05/2025) |
| 03/06/2025 | 111 | ORDER granting 110 Motion to Supplement to Memorandum in Support 105 of Motion for Summary Judgment 104 by Plaintiffs Cozy Inn. Signed by District Judge Toby Crouse on 3/6/25. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 03/06/2025) |
| 03/14/2025 | 112 | REPLY TO RESPONSE TO MOTION by Plaintiffs Cozy Inn, Incorporated, Stephen Howard re 104 Motion for Summary Judgment. (Attachments: # 1 Ex. A - Howard Declaration, # 2 Ex. B - Howard Deposition, # 3 Ex. C - Benson Deposition, # 4 Ex. D - Blase Deposition, # 5 Ex. E - Andrew Deposition, # 6 Ex. F - Herrs 30(b)(6) Deposition, # 7 Ex. G - On-Hold Letter, # 8 Ex. H - Michelson Deposition, # 9 Ex. I - Herrs Deposition, # 10 Ex. J - Windholz Deposition, # 11 Ex. K - Art Center DRB Packet, # 12 Ex. L - Mural Photos, # 13 Ex. M - Def. Amend. Ans. First Set of Rogs, # 14 Ex. N - White Deposition, # 15 Ex. O - Schrage Email 11/8/23, # 16 Ex. P - Talking Points, # 17 Ex. Q - Schrage Email 11/9/23, # 18 Ex. R - Commission Transcript, # 19 Ex. S - Schrage Deposition, # 20 Ex. T - Schrage Email 2/20/24, # 21 Ex. U - Plt. First Amend. Resp. First Set of Rogs, # 22 Ex. V - Driscoll Deposition, # 23 Ex. W - Andrew 30(b)(6) Deposition, # 24 Ex. X - Yard DRB Packet, # 25 Ex. Y - Def. Ans. Second Set of Rogs, # 26 Ex. Z - Def. Ans. First Set of Rogs, # 27 Ex. AA - Taylor Deposition, # 28 Exhibit List)(Shaw, Jeffrey) (Entered: 03/14/2025) |
| 03/14/2025 | 113 | REPLY TO RESPONSE TO MOTION by Defendant Salina, Kansas, City of re 106 Motion for Summary Judgment. (Attachments: # 1 Index of Exhibits, # 2 Ex. A - City's Response to Requests for Admissions, # 3 Ex. B - Dustin Herrs Deposition Transcript Excerpts, # 4 Ex. C - Dean Andrew 30(b)(6) Corp. Deposition Transcript Excerpts, # 5 Ex. D - Dean Andrew Deposition Transcript Excerpts, # 6 Ex. E - Mark White Deposition Transcript Excerpts, # 7 Ex. F - Relevant Salina Code Excerpts, # 8 Ex. G - The Sign Code Analysis, # 9 Ex. H - City Commission Meeting Transcript, # 10 Ex. I - Stephen Howard Deposition Transcript Excerpts, # 11 Ex. J - Other Jurisdiction Municipal Code Citations, # 12 Ex. K - Dustin Herrs 30(b)(6) Corp. Deposition Transcript Excerpts, # 13 Ex. L - Stutts Report, # 14 Ex. M - Dean Andrew Affidavit, # 15 Ex. N - Mark White Affidavit)(Martin, Aaron) (Entered: 03/14/2025) |
| 03/28/2025 | 114 | MOTION to Supplement *or Correct Defendant's Response to Plaintiffs' Motion for Summary Judgment [ECF 109]* by Defendant Salina, Kansas, City of (Attachments: # 1 Exhibit 13 - Dean Andrew Corporate (30(b)(6)) Depo)(Martin, Aaron) (Entered: 03/28/2025) |

| | | |
|---|---|---|
| 03/28/2025 | 115 | ORDER granting 114 Motion to Supplement Defendant City of Salina, Kansas's Response, Doc. 109, to Plaintiffs' Motion for Summary Judgment, Doc. 104. Signed by District Judge Toby Crouse on 3/28/25. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 03/28/2025) |
| 04/17/2025 | 116 | TRIAL ORDER: SEE ORDER FOR ADDITIONAL DEADLINE INFORMATION. Estimated trial time 2 days. Bench Trial set for 10/7/2025 at 09:00 AM in Wichita Courtroom (TBD) before District Judge Toby Crouse. In Limine Conference set for 9/15/2025 at 10:00 AM in Wichita Courtroom (TBD) before District Judge Toby Crouse. Signed by District Judge Toby Crouse on 4/17/25. (ta) (Entered: 04/17/2025) |
| 05/30/2025 | 117 | NOTICE OF SUPPLEMENTAL AUTHORITY by Cozy Inn, Incorporated, Stephen Howard re: MOTION for Summary Judgment 106 filed by Defendant Salina, Kansas, City of, MOTION for Summary Judgment 104 filed by Plaintiff Stephen Howard, Plaintiff Cozy Inn, Incorporated (MacRoberts, Samuel) (Entered: 05/30/2025) |
| 06/04/2025 | 118 | RESPONSE to 117 Notice of Supplemental Authority, 109 Response to Motion,,,, by Defendant Salina, Kansas, City of. (Martin, Aaron) (Entered: 06/04/2025) |
| 06/20/2025 | 119 | ORDER denying without prejudice 26 Motion to Dismiss for Failure to State a Claim. The parties' motions for summary judgment, Docs. 104 & 106, and their motions to exclude expert testimony, Docs. 97 & 98, will be decided in the ordinary course. Signed by District Judge Toby Crouse on 6/20/2025. (ca) (Entered: 06/20/2025) |
| 06/30/2025 | 120 | NOTICE of Regarding Non-Party Injunctive Relief by Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) (Entered: 06/30/2025) |
| 07/07/2025 | 121 | ANSWER to 16 Amended Complaint by Salina, Kansas, City of. (Martin, Aaron) (Entered: 07/07/2025) |
| 08/12/2025 | 122 | Final WITNESS LIST by Cozy Inn, Incorporated, Stephen Howard.(Shaw, Jeffrey) (Entered: 08/12/2025) |
| 08/12/2025 | 123 | Final EXHIBIT LIST by Cozy Inn, Incorporated, Stephen Howard.(Shaw, Jeffrey) (Entered: 08/12/2025) |
| 08/12/2025 | 124 | Amended Final WITNESS LIST by Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) (Entered: 08/12/2025) |
| 08/12/2025 | 125 | Final WITNESS LIST by Salina, Kansas, City of.(Martin, Aaron) (Entered: 08/12/2025) |
| 08/12/2025 | 126 | Final EXHIBIT LIST by Salina, Kansas, City of.(Martin, Aaron) (Entered: 08/12/2025) |
| 08/19/2025 | 127 | NOTICE of Telephone Conference: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Telephone Conference set for 8/21/2025 at 03:30 PM. Participants are directed to call into Conference Line: 785-337-8299; ACCESS |

| | | |
|---|---|---|
| | | CODE 890 312 185. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 08/19/2025) |
| 08/19/2025 | 128 | OBJECTION(S) to *Defendant's Final Exhibit Disclosures* *126* by Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) Modified to add link on 8/20/2025 (msb). (Entered: 08/19/2025) |
| 08/19/2025 | 129 | OBJECTION(S) to *Defendant's Final Witness Disclosures* *125* by Cozy Inn, Incorporated, Stephen Howard. (Shaw, Jeffrey) Modified to add link on 8/20/2025 (msb). (Entered: 08/19/2025) |
| 08/19/2025 | 130 | OBJECTION(S) to 123 Exhibit List by Salina, Kansas, City of. (Martin, Aaron) (Entered: 08/19/2025) |
| 08/19/2025 | 131 | OBJECTION(S) to 124 Witness List by Salina, Kansas, City of. (Martin, Aaron) (Entered: 08/19/2025) |
| 08/21/2025 | 132 | MINUTE ENTRY for proceedings held before District Judge Toby Crouse: TELEPHONE CONFERENCE held on 8/21/2025. Upon agreement of the parties and in light of the anticipation that all the issues presented in the parties' summary judgment papers are legal questions that can be resolved without a trial, the parties' remaining pretrial obligations are suspended and the current trial setting is cancelled. An in-person status conference is set to occur on 10/22/2025 at 09:00 AM in Topeka Courtroom 401 (TC) before District Judge Toby Crouse to address any remaining claims surviving the anticipated summary judgment ruling. (ta) (Entered: 08/21/2025) |
| 10/14/2025 | 133 | NOTICE OF RESCHEDULED HEARING: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Status Conference rescheduled for 11/19/2025 at 09:00 AM in Topeka Courtroom 401 (TC) before District Judge Toby Crouse. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 10/14/2025) |
| 11/18/2025 | 134 | NOTICE OF TELEPHONE CONFERENCE: Telephone Conference set for 11/19/2025 at 12:00 PM. Participants are directed to call into the CONFERENCE LINE: 785-337-8299; ACCESS CODE: 890 312 185. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(ta) (Entered: 11/18/2025) |
| 11/18/2025 | 135 | NOTICE OF CANCELLED IN-PERSON STATUS CONFERENCE previously set for 11/19/25 at 9:00 a.m. A Telephone Conference has been set on 11/19/25 at 12:00 PM. See DE 134. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 11/18/2025) |
| 11/19/2025 | 136 | MEMORANDUM AND ORDER granting in part and denying in part 104 & 106 Motions for Summary Judgment; denying 97 & 98 Motions to Exclude Expert Testimony. Signed by District Judge Toby Crouse on 11/19/2025. (msb) (Entered: 11/19/2025) |
| 11/19/2025 | 137 | NOTICE OF CANCELLED HEARING. The telephone conference scheduled for November 19, 2025, at 12:00 PM is cancelled. (This is a TEXT ENTRY |

| | | |
|---|---|---|
| | | ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 11/19/2025) |
| 12/03/2025 | 138 | MOTION for Attorney Fees *and Costs* by Plaintiffs Cozy Inn, Incorporated, Stephen Howard (MacRoberts, Samuel) (Entered: 12/03/2025) |
| 12/18/2025 | 139 | NOTICE OF APPEAL as to 136 Order on Motion to Exclude Expert Testimony,, Order on Motion for Summary Judgment, by Defendant Salina, Kansas, City of. Filing fee $ 605, Internet Payment Receipt Number AKSDC-6854931. (Martin, Aaron) (Entered: 12/18/2025) |
| 12/18/2025 | 140 | Joint MOTION to Stay Case re 136 Order on Motion to Exclude Expert Testimony,, Order on Motion for Summary Judgment, by Defendant Salina, Kansas, City of (Attachments: # 1 Exhibit Stipulation During Pendency of Appeal)(Martin, Aaron) (Entered: 12/18/2025) |
| 12/19/2025 | 141 | NOTICE OF TELEPHONE CONFERENCE: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING. Telephone Conference set for 12/23/2025 at 10:00 AM. Participants are directed to call into the Conference Line: 785-337-8299; ACCESS CODE 890 312 185. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ta) (Entered: 12/19/2025) |
| 12/22/2025 | 142 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 139 Notice of Appeal. (Attachments: # 1 Preliminary Packet)(ca) (Entered: 12/22/2025) |
| 12/22/2025 | 143 | APPEAL DOCKETED in 10CCA on 12/22/2025 and assigned Appeal No. 25-3225 re 139 Notice of Appeal. (ca) (Entered: 12/22/2025) |
| 12/23/2025 | 144 | MINUTE ENTRY for proceedings held before District Judge Toby Crouse: TELEPHONE CONFERENCE held on 12/23/2025. The Court sets a Telephone Conference for 1/6/2026 at 02:30 PM. Participants are to call into the conference line: 785-337-8299; Access Code: 890 312 185. (Court Reporter Kelli Stewart.) (ta) (Entered: 12/24/2025) |
| 01/06/2026 | 145 | MINUTE ENTRY for proceedings held before District Judge Toby Crouse: TELEPHONE CONFERENCE held on 1/6/2026. The 140 joint motion is denied without prejudice as reflected on the record. Plaintiffs orally move to stay the motion for attorney fees, Doc. 138. The City does not oppose. The Court GRANTS the oral motion.(Court Reporter Kelli Stewart.) (kmc) (Entered: 01/07/2026) |
| 01/07/2026 | 146 | ORDER of 10CCA abating appeal. (Appeal No. 25-3225) (jal) (Entered: 01/07/2026) |
| 01/07/2026 | 147 | LETTER TO 10CCA stating record is complete re 139 Notice of Appeal (Appeal No. 25-3225). (ca) (Entered: 01/07/2026) |

| | | |
|---|---|---|
| 01/07/2026 | 148 | JUDGMENT. Pursuant to the Court's 136 Memorandum and Order filed on November 19, 2025 and modified by a telephone conference held on January 6, 2026, the Court finds in favor of plaintiffs Cozy Inn, Inc., d/b/a, The Cozy Inn and Stephen Howard on Claims 1 and 2 and in favor of Defendant City of Salina, Kansas on Claim 3. Signed by deputy clerk on 01/07/2026. (kmc) (Entered: 01/07/2026) |
| 01/08/2026 | 149 | TRANSCRIPT OF TELEPHONE STATUS CONFERENCE (19 pgs) held 01/06/2026 before Judge Toby Crouse, Court Reporter Kelli Stewart, 785-338-5354, kelli_stewart@ksd.uscourts.gov. Transcript purchased by: Fairfield and Woods, PC.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: Within 7 calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal data identifiers from the electronic transcript of the court proceeding. The policy is located on our website at www.ksd.uscourts.gov. Please read this policy carefully. If no Notice of Intent to Redact is filed within the allotted time, this transcript will be made electronically available on the date set forth below.**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Release of Transcript Restriction set for 4/8/2026. (ks) (Entered: 01/08/2026) |
| 01/12/2026 | 150 | ORDER of 10CCA Lifting Abatement as to 139 Notice of Appeal (Appeal No. 25-3225). (ca) (Entered: 01/12/2026) |


## PACER Service Center

### Transaction Receipt

| 02/05/2026 16:11:01 | | | |
|---|---|---|---|
| **PACER Login:** | lgoldstein407 | **Client Code:** | 16628.002 |
| **Description:** | Docket Report | **Search Criteria:** | 6:24-cv-01027-TC |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D. |

**Verified Amended Complaint for Declaratory Judgment and Injunctive Relief**

Stephen Howard and his business Cozy Inn, Incorporated, d/b/a The Cozy Inn, bring this civil rights lawsuit for non-monetary, prospective relief against the City of Salina, Kansas.[1]

## Introduction

1. This is a civil rights lawsuit challenging the City of Salina's mural-sign code regime—both the written code and as it's enforced—that prevents Steve Howard from completing and displaying an artistic, whimsical mural on the side of the iconic business he owns, The Cozy Inn.

2. In November 2023, Mr. Howard hired a local artist to paint a whimsical mural on The Cozy's wall that reflected The Cozy and Mr. Howard's personality. Three days later, Salina told Mr. Howard he couldn't finish painting the mural. It remains unfinished.

3. Beautiful murals adorn buildings throughout Salina. But Salina picks and chooses which murals it allows and which murals it doesn't based solely on the murals' content and the identity of the speaker—and that's plainly unconstitutional. There's more on this later, but as one city official put it in a November 2023, City Commission meeting, a

[1] This Verified Amended Complaint is filed as a matter of course under Fed. R. Civ. P. 15(a)(1)(B).

hypothetical coffee shop is free to paint its entire outside wall with a dove and an olive branch because Salina considers that an unregulated mural, not a regulated sign; but the same hypothetical coffee shop can't paint its entire wall with a steaming cup of coffee because Salina considers that a regulated sign, not an unregulated mural.

4. Salina's mural-sign code regime—both the written code and the unwritten policy and practice—violate the free speech clause of the First Amendment and the void for vagueness doctrine under the Fourteenth Amendment.

5. Mr. Howard and The Cozy aren't suing Salina for money. Instead, this case seeks to vindicate their constitutional rights.

**Parties**

6. Stephen Howard ("Steve Howard") is a citizen of Kansas and the United States. He is a resident of Saline County. Mr. Howard owns, operates, and is President of Cozy Inn, Incorporated, d/b/a The Cozy Inn. Mr. Howard files this suit in his capacity as the President of Cozy Inn, Incorporated, d/b/a/ The Cozy Inn, and in his individual capacity.

7. Cozy Inn, Incorporated, d/b/a The Cozy Inn ("The Cozy" or "The Cozy Inn") is a Kansas for profit corporation. The Cozy is located at 108 N. 7th Street in Salina, Kansas.

8. Defendant City of Salina, Kansas ("City" or "Salina" or "government") is a municipal corporation organized under the laws of the State of Kansas, is sued for non-monetary, prospective relief, and is capable of being sued as such. KSA § 12-101.

9. Salina may be served with process by serving the city clerk or the mayor. KSA§ 60-304(d)(3).

10. The Attorney General will be served with a copy of the proceedings.

**Jurisdiction and Venue**

11. The Plaintiffs bring this civil rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution, pursuant to 42 U.S.C. § 1983, the Declaratory Judgments Act, 28 U.S.C. § 2201, 28 U.S.C. § 2202, and under 42 U.S.C. § 1988 to award attorney fees.

12. The Plaintiffs seek temporary, preliminary, and/or permanent prospective relief, and a declaratory judgment, all arising from Salina's mural-sign code regime—which includes the Salina's written sign code, Salina's unwritten policies and practices, Salina's Sign Permit requirement, Salina's Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and it's concomitant enforcement penalties ("mural-sign code regime")—as described throughout the lawsuit, that constitute violations of the First and Fourteenth Amendments to the United States Constitution. As more fully developed throughout and below, the Plaintiffs seek 1) a judgment declaring Salina's mural-sign code regime unconstitutional on its face and as applied; and 2) permanent prospective injunctive relief prohibiting enforcement of Salina's mural-sign code regime.

13. This Court has jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 42 U.S.C. § 1983.

14. Venue lies in this Court under 28 U.S.C. § 1391 because, among other things, the events giving rise to the Plaintiffs' claims occurred in this district.

## Facts

Steve Howard, The Cozy Inn, and Their Unfinished Mural

15. The Cozy Inn is an institution. Located in downtown Salina, it has proudly served sliders for more than 100 years.

16. Described as a "global treasure," "landmark," "destination," and "anchor," The Cozy serves around 45,000 customers a year.[2]

17. The Cozy's owner, Steve Howard, was raised in Saline County. After spending years as a maintenance worker at the local school district, he bought the iconic business in 2007.

18. Mr. Howard has been "blessed with a sense of homespun marketing and imagination, intense work ethic, and a sincere passion for the fare."[3]

---

[2] Tim Unruh, *Cozy Inn a global treasure in downtown Salina*, Salina Post (March 7, 2022), available at https://salinapost.com/posts/0ba8fc2d-d1f7-4605-a9b4-e5d50a63efe7

[3] Tim Unruh, *Cozy Inn a global treasure in downtown Salina*, Salina Post (March 7, 2022), available at https://salinapost.com/posts/0ba8fc2d-d1f7-4605-a9b4-e5d50a63efe7

19. Since he bought The Cozy, it has been featured on Travel Channel's "101 Tastiest Places to Chown Down," and "America's Top Ten Hamburgers." USA Today has picked it as the "Best Burger Joint in Kansas."

20. For decades—at least since Mr. Howard bought it—The Cozy's walls were white, as depicted below.




21. In November 2023, Mr. Howard decided the bare walls didn't reflect his or The Cozy's personality, so he hired local artist Colin Benson to paint a mural.

22. The Cozy is small—the dining area is around 192 square feet—and every burger is famously served with onions. The Cozy's distinctive "pungent onion-esque aroma" "evokes thoughts of home and tradition, a special charm[.]"[4]

23. With that in mind, Mr. Howard decided the mural should include the phrase "Don't fear the smell! The fun is inside!!"

24. The whimsical mural would depict burger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard.

25. With a handshake and a promise to pay, Mr. Benson started the mural almost immediately, on Friday, November 3, 2023.

[4] Tim Unruh, *Cozy Inn a global treasure in downtown Salina*, Salina Post (March 7, 2022), available at https://salinapost.com/posts/0ba8fc2d-d1f7-4605-a9b4-e5d50a63efe7

26. By Monday, November 6, 2023, a Salina representative ordered Mr. Howard to stop or pause painting the mural—because it perceived the mural as a regulated sign, rather than an unregulated mural.

27. This is the unfinished mural:




28. Below is a rendition of what the mural would look like, once completed:




29. Mr. Howard does not want to change, alter, or deviate from the rendition directly above ("completed rendition"). As stated in a news article, "[I]t's artwork[.] It's my expression. It's my character going on my wall. I want to paint my wall." Nate King, *Cozy Inn Hamburgers 'sign' put on hold pending city approval*, Salina Post (Nov. 14, 2023).[5]

[5] Available at https://salinapost.com/posts/343e570a-c5e2-4f10-af08-9fc6537d086c

30. Salina's position is that the mural violates the law because it pertains to The Cozy's business—selling hamburgers.

Salina's Mural-Sign Code Regime
Overview

31. Salina regulates signs—and their sizes—through its written sign code, its permitting process, its Downtown Salina Business Improvement District review process, its Certificate of Compatibility requirement, and its concomitant enforcement penalties.

32. Under its unwritten policy and practice though, Salina *doesn't* regulate what it considers to be murals. Put differently, Salina's written sign code doesn't mention "murals" at all, but in practice, Salina allows them—unregulated—based solely on the murals' content or the speaker. Salina takes the position that if the content of a mural "includes a message that pertains to the goods or services for sale" the mural is not a mural but "a sign and makes it subject to the sign code." Asia Cymone Smith, *City puts pause on Salina mural, restaurant owner says, 'I believe we'll work through this,'* KSN (Nov. 13, 2023).

33. Salina's Director of Community and Development Services verbalized Salina's unwritten policy and practice of differentiating between unregulated murals and regulated signs when she explained at a Salina City Council meeting that "[i]f the coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign," but is instead an unregulated mural. Exhibit A, pg. 23, ln. 13-15. By contrast, "if we had a steaming cup of coffee and a coffee pot on the side," that would be a regulated wall sign. Exhibit A, pg. 23, ln. 24-25 – pg. 24, ln. 1-4. What's more, this very same mural of "a steaming cup of coffee" would be considered an unregulated mural if it was painted a building "on the other side of town unrelated to anything" at that location. Exhibit A pg. 26, ln. 17-22.

34. Salina's distinction between murals and signs—based solely on the artwork's content or the speaker—is not found anywhere in its written codes.

Salina's Written Sign Code and Unwritten Policies and Practices

35. Salina regulates signs through Article X of its zoning code. Salina City Code § 42-500 *et seq*. Relevant portions of the City Code are attached as Exhibit B.

36. Under Section 42-764 of the City Code, a "sign" is broadly defined as:

Sec. 42-764. - Sign.

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

37. Under the Code's text, "any writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public" is considered a regulated "sign."

38. Under the Code's text, a catch-all provision exists for "any other figure of similar character" to the above types of signs, which (1) is a part of or attached to a structure, (2) is used to announce, direct attention to, or advertise, and (3) is not located inside a building."

39. Under the Code's text, the catch-all provision doesn't apply to "any writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public." Instead, it is a stand-alone definition of what constitutes a "sign."

40. Among many other exemptions, the Code's text exempts the following types of signs from the code's requirements: "[n]oncommercial flags displayed on private property," "[s]coreboards in athletic stadiums," and "[w]indow signs affixed to the interior that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall." Section 42-504(1),(8),(9).

41. Under Section 42-781 of the Code, a "wall sign" is:

**Sec. 42-781. - Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

42. Wall signs are permitted in every zoning district in the city. Salina City Code §§ 42-516 through 42-524.

43. Each zoning district has different size-restrictions. *Id.*

44. When determining size restrictions, Salina's written sign code doesn't distinguish between signs that contain messages pertaining to the goods or services sold, and signs that contain messages that are unrelated to any goods or services sold.

45. When determining size restrictions, Salina's written sign code doesn't distinguish between signs that "announce, direct attention to, or advertise" and those that do *not* "announce, direct attention to, or advertise."

46. Under the written sign code's text, every wall sign is supposed to be subjected to the same size limitations, within the corresponding district.

47. The written sign code does not define the following: "display," "pictorial representation," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech."

48. Salina's written code doesn't mention, define, or describe "mural" either.

49. Under its ordinary definition, a "mural" is a "painting executed directly on to a wall or ceiling as part of a scheme of decoration,"[6] or "a large picture that has been painted on the wall of a room or building."[7]

50. Based on the Code's text, *any* outdoor mural is a wall sign. A mural is a "pictorial representation," "emblem," or "display that is calculated to attract the attention of the

---

[6] The Oxford English Dictionary, available at https://www.oed.com/search/dictionary/?scope=Entries&q=mural

[7] The Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/mural

public," after all. Alternatively, every outdoor mural would fall within the catch-all provision since it is painted on a building or structure and directs attention to the mural or the building on which it is located.

51. Salina, however, has created an unwritten policy and practice which exempts what it deems to be "murals" from the regulation of the sign code, even though they fit the definition of a wall sign under its written code.

52. Under Salina's unwritten policy and practice, if a mural's content doesn't pertain to the business on which it sits, it's an exempt "mural."

53. On the other hand, under Salina's unwritten policy and practice, if the mural's content *does* pertain to the business, it's a regulated sign, not an unregulated mural.

54. Under Salina's unwritten policy and practice, if the content of a mural "includes a message that pertains to the goods or services for sale," then the mural is a regulated sign; but if the artwork conveys any other content or message, then it's unregulated. Asia Cymone Smith, *City puts pause on Salina mural, restaurant owner says, 'I believe we'll work through this,'* KSN (Nov. 13, 2023).

55. In addition to the size limitations found in the sign code, no regulated sign may be created without first obtaining a sign permit from the city. Salina City Code §§ 42-501 & 42-502.

56. Salina must issue or refuse a sign permit within 10 days after receipt of the application. Salina City Code § 42-502(b).

57. On good faith belief, Salina does not require murals exempted by Salina's unwritten policy and practice to obtain a sign permit.

58. Salina has also created the Downtown Salina Business Improvement District Number 1, which Salina alleges includes The Cozy.

59. Salina requires property owners in the Downtown Salina Business Improvement District Number 1 to submit applications to a Design Review Board (DRB) for a Certificate of Compatibility before they "change the existing exterior design, material, color, texture, finish, or appearance of any building" or "[i]ntroduce, change, substitute, or remove any physical feature affecting the appearance of real property." Salina City Code § 2-207(a).

60. Per Salina City Code § 2-208, the DRB may only approve a Certificate of Compatibility if it finds one of the following:

(1) The general design, material and color of the proposed construction or change present an aesthetically pleasing overall image.
(2) Environmentally harmful effects caused by the clash of contemporary materials with those of older origin, are avoided.
(3) The distinguishing original qualities or character of a building, structure or site and its environment are not to be destroyed and the removal or alteration of any historical material or distinctive architectural features is avoided where possible.
(4) The proposed use of banners, awnings, or canopies incorporates the use of appropriate materials, colors and graphics, and is compatible with the overall building design.
(5) Any proposed demolition includes appropriate grading and landscaping of the building site in a manner compatible with the adjoining buildings and streetscape.

61. On information and good faith belief, numerous murals exist within the Downtown Salina Business Improvement District Number 1.

62. On information and good faith belief, it is the policy and practice of Salina to exempt murals in the Downtown Salina Business Improvement District Number 1 that it considers "art" from the requirement of obtaining a Certificate of Compatibility from the Design Review Board, while it requires that murals it considers "signs" to obtain a Certificate of Compatibility from the Design Review Board.

63. For instance, in 2015, when the Salina Arts Center installed a ceramic tile mural on its exterior façade, Salina took the position that "an art installation does not fall within the scope of authority of the DRB." Exhibit C, Design Review Board 04-23-2015 Agenda and Packet.

64. On information and good faith belief, under Salina's unwritten policy and practice, if a mural's content doesn't pertain to the business on which it sits, it's a "mural" or "art installation" and doesn't need a permit or Certificate of Compatibility.

65. On the other hand, on information and good faith belief, under Salina's unwritten policy and practice, if Salina thinks the mural's content *does* pertain to the business, it's a regulated sign, not an unregulated "mural" or "art installation," and requires a permit and Certificate of Compatibility.

<u>Salina's Civil and Criminal Enforcement Penalties</u>

66. Violations of the zoning code, of which the sign code is a part, are a misdemeanor, punishable by a fine of between $50 and $500, with each day being considered a new offense. Salina City Code § 42-599.

67. Section 2-200, *et seq.*, relating to the requirement to obtain a Certificate of Compatibility from the Downtown Salina Business Improvement District Number 1, contains no specific penalty for violations. As a result, the general penalty for violations of the City Code, § 1-10, applies. Under § 1-10, any violation is a misdemeanor punishable by a fine of not more than $500 and/or a period of imprisonment not exceeding six months, with each day being considered a new offense.

<u>Salina Encourages Murals—Just Not The Cozy's: Salina Unconstitutionally Discriminates through its Mural-Sign Code Regime.</u>

68. Salina is home to a thriving and dynamic mural scene.

69. Indeed, the proliferation of murals throughout Salina is now used to attract visitors to Salina:




70. Many of the murals are supported with public resources.[8] Photographs of many of these publicly supported murals are attached. Exhibit D. On good faith belief, the murals depicted in Exhibit D do not comply with the size restrictions for wall signs in the sign code.

[8] https://www.salinaarts.com/public_art/artwork-alley/

71. On good faith belief, Salina did not require a sign permit or Certificate of Compatibility for the murals in Exhibit D.

72. Plaintiffs don't want Salina to remove or otherwise restrict the beautiful murals throughout Salina, even though, on good faith belief, the murals are not compliant with the size restrictions of the Sign Code and were painted without permits or Certificates of Compatibility.

73. For example, Salina owns and operates Fire Station # 2, located at 1110 S. Santa Fe Avenue, which features a mural that "honors the services and allegiance of those firefighters who diligently serve Salina."[9]

74. This is a depiction of the mural at Fire Station # 2:



75. On good faith belief, Fire Station # 2's mural doesn't comply with Salina's sign code size restrictions.

76. On good faith belief, Fire Station # 2's mural was painted without a sign permit or Certificate of Compatibility.

77. The mural at Fire Station # 2 is a "pictorial representation" or "display calculated to attract the attention of the public" and it's "painted on" a structure.

[9] https://www.salinaarts.com/public_art/fire-station-2/

78. The mural at Fire Station # 2 "directs attention to" Fire Station # 2.

79. Based on a plain reading of the Sign Code, the mural at Fire Station # 2 is considered a sign.

80. Based on the ordinary dictionary meaning of "mural" and Salina's definition of a "sign" and "wall sign," the mural at Fire Station #2 is classified as a sign.

81. Salina is host to the Boom! Salina Street Art and Mural Festival,[10] and the Salina Kanvas Project,[11] where many of the murals are showcased.

82. On good faith belief, the murals from the Boom! Festival and the Salina Kanvas Project do not comply with the size restrictions for wall signs in the sign code.

83. On good faith belief, the murals of the Boom! Festival and the Salina Kanvas Project were painted without a sign permit or Certificate of Compatibility.

84. For example, one mural showcased by the Salina Kanvas Project is found at The Yard,[12] a private "first class training facility for baseball and softball players of all ages":[13]




85. On good faith belief, the mural at The Yard doesn't comply with Salina's sign code size restrictions.

86. On good faith belief, the mural at The Yard wasn't painted with a sign permit or Certificate of Compatibility.

[10] https://www.boomsalina.art/
[11] https://www.kanvasproject.com/
[12] https://www.kanvasproject.com/projects/the-yard
[13] https://sikestyle.myportfolio.com/the-yard-murals

87. The mural at The Yard is a "pictorial representation" or "display calculated to attract the attention of the public" and it's "painted on" a structure.

88. The mural at The Yard "directs attention to" The Yard.

89. Based on a plain reading of the Sign Code, the mural at The Yard is considered a sign.

90. The University of Kansas School of Medicine and School of Nursing have a mural at the Salina Campus:[14]




91. On good faith belief, the mural at the KU Salina Campus doesn't comply with Salina's sign code size restrictions.

92. On good faith belief, the mural at KU Salina Campus wasn't painted with a sign permit or Certificate of Compatibility.

93. The mural at KU Salina Campus is a "pictorial representation" or "display calculated to attract the attention of the public" and it's "painted on" a structure.

94. The mural at KU Salina Campus "directs attention to" the KU Salina Campus.

95. Based on a plain reading of the Sign Code, the mural at KU Salina Campus is considered a sign.

96. The Salina Art Center has a ceramic tile mural:

[14] https://www.facebook.com/photo/?fbid=816942050219919&set=a.559319332648860&locale=ms_MY




97. Salina considers this ceramic tile mural "similar in function to a sign or logogram that will direct the public to the gallery and educational activities within the Art Center building." Exhibit C.

98. On good faith belief, the mural at the Salina Art Center doesn't comply with Salina's sign code size restrictions.

99. On good faith belief, the mural at Salina Art Center wasn't created with a sign permit.

100. Salina exempted the mural at Salina Art Center from the Certificate of Compatibility requirement because it considered the mural to be "art." Exhibit C.

101. The mural at Salina Art Center is a is a "pictorial representation" or "display calculated to attract the attention of the public" and it is "attached to" a structure.

102. The mural at the Art Center "directs attention to" the Art Center.

103. Based on a plain reading of the Sign Code, the mural at Salina Art Center is considered a sign.

104. One iconic mural is the Mural at the Mill, by world-renowned Australian artist Guido Van Helten, depicted below.[15]

[15] https://www.kanvasproject.com/projects/mural-at-the-mill



105. The Mural at the Mill towers over Salina. Described by some as the "intersection of art and commerce," the hope was the roughly 100-foot tall mural would cause outsiders to spend more time in Salina, and in turn, spend their money there.[16]

106. On good faith belief, the Mural at the Mill doesn't comply with Salina's sign code size restrictions.

107. On good faith belief, the Mural at the Mill wasn't painted with a sign permit or Certificate of Compatibility.

108. The Mural at the Mill is a "pictorial representation" or "display calculated to attract the attention of the public" and it's "painted on" a structure.

109. The Mural at the Mill "directs attention to" the mill.

110. Based on a plain reading of the Sign Code, the Mural at the Mill is considered a sign.

[16] Charles Rankin, *'Mural at the Mill' celebrates completion with ribbon-cutting in downtown Salina*, Salina Journal (Oct. 21, 2021); 'Mural at the Mill', Salina, Kansas, Atlas Obscura, available at https://www.atlasobscura.com/places/mural-at-the-mill-salina-kansas (last viewed April 2, 2024); https://www.kanvasproject.com/projects/mural-at-the-mill

111. On good faith belief, Salina has never enforced its mural-sign code regime against the murals at Fire Station # 2, The Yard, KU Salina Campus, Salina Art Center, or the Mural at the Mill.

112. On good faith belief, Salina has never enforced its mural-sign code regime against any of the murals showcased in the Salina Kanvas Project or Boom! Festival.

113. Even though the murals at Fire Station # 2, The Yard, KU Salina Campus, Salina Art Center, and The Mural at the Mill, all meet the definition of a too-large wall signs, and even though each of the above murals are "pictorial representation[s]," "display[s] calculated to attract the attention of the public," and "direct attention"—and thus regulated signs—Salina treats them differently because Salina doesn't perceive them to "pertain" to goods or services for sale. Salina thus treats unregulated murals and regulated wall signs differently based on their content.

114. Salina officials make these determinations "all on the basis of a commercial message." Exhibit A pg. 10, ln. 4-5.

115. Salina believes that it is a "misunderstanding" for businesses such as The Cozy to believe that "signs and commercial speech" qualify as "art." Exhibit A pg. 5, ln 23-25. According to Salina, "[t]he important distinction here relates to commercial speech and our ability to regulate commercial speech or signs," Exhibit A pg. 5, ln. 2-4, "[a]nd I would reiterate, it's all on the basis of a commercial message," Id. at pg. 10, ln. 4-5.

116. Plaintiffs, like most residents, take pride in the beauty and creativity of the murals throughout Salina.

117. Again, Plaintiffs don't want Salina to remove or otherwise restrict the beautiful murals throughout Salina.

118. Instead, Plaintiffs want to participate in this thriving part of Salina culture through a mural on the side of The Cozy.

The Cozy, Mr. Howard, and Salina's Mural-Sign Code Regime

119. Following intense media coverage of Salina's decision to enforce the mural-sign code regime against Steve's mural at The Cozy, the City Commission held a hearing to discuss the application of the mural-sign code regime.[17]

120. On November 13, 2023, Salina officials appeared before a meeting of the Salina City Commission to discuss Salina's unwritten policy and practice exempting murals from the sign code and how they applied to The Cozy.

121. A transcript of the relevant portion of the City Commission meeting is attached as "Exhibit A."

122. The Cozy is located in the C-4 commercial zoning district.

123. In the C-4 commercial zoning district, the maximum sign area allowed is 3 square feet of sign for each lineal food of building frontage. Salina City Code § 42-521(b).

124. Salina contends that The Cozy has 21 lineal feet of building frontage, resulting in a maximum sign area of 63 square feet. Exhibit A pg. 16, ln. 24 – pg. 17, ln. 3.

125. Salina contends that The Cozy's existing signs already constitute 52.88 square feet of sign area, leaving 10.12 square feet of remaining square footage for an additional sign. Exhibit A pg. 17, ln. 4-11.

126. Salina contends that The Cozy's mural is approximately 528 square feet and violates the mural-sign code regime. Exhibit A pg. 17, ln. 12-18.

127. Under Salina's unwritten policy and practice, it is not relevant to the distinction between wall signs and murals whether the painting is purely images or if text is used. A mural could be purely text and a wall sign could be purely imagery. "[I]f the wording's not commercial in any way or does not have an attachment to a commercial operation," then text does not transform an unregulated mural into a regulated sign. Exhibit A pg. 27, ln 3-5; pg. 26, ln. 23 – pg. 27, ln. 6; *id.* at pg. 28, ln. 16-21.

[17] See generally https://salinapost.com/posts/343e570a-c5e2-4f10-af08-9fc6537d086c; https://www.kwch.com/2023/11/10/art-or-an-ad-city-salina-pauses-project-historic-cozy-inn-restaurant/; https://www.ksn.com/news/state-regional/city-puts-pause-on-salina-mural-restaurant-owner-says-i-believe-well-work-through-this/; https://www.ksal.com/art-or-advertising/.

128. According to the City Manager, under Salina's unwritten policy and practice, if the content of a mural "includes a message that pertains to the goods or services for sale" the mural is not a mural but "a sign and makes it subject to the sign code." Asia Cymone Smith, *City puts pause on Salina mural, restaurant owner says, 'I believe we'll work through this,'* KSN (Nov. 13, 2023).[18]

129. To illustrate this distinction, the Director of Community and Development Services discussed a mural on the outside of a hypothetical coffee house. She explained that "[i]f the coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign," but is instead an unregulated mural. Exhibit A pg. 23, ln. 13-15.

130. By contrast, "if we had a steaming cup of coffee and a coffee pot on the side," that would be a regulated wall sign. Exhibit A pg. 23, ln. 24-25 – pg. 24, ln. 1-4.

131. What's more, this very same mural of "a steaming cup of coffee" would be considered an unregulated mural if it was painted "on the other side of town unrelated to anything" at that location. Exhibit A pg. 26, ln. 17-22.

132. The supposed justification for this distinction is that "the dove, the olive branch, the peace are not a part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction. Where if we had a steaming cup of coffee and a coffee pot on the side, those are things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction." Exhibit A pg. 23, ln. 19 – pg. 24, ln. 4.

133. In other words, whenever someone paints any text, image, or emblem on an outside wall, Salina officials must evaluate the contents of the mural to determine if they sufficiently pertain to any business activity taking place at the location.

134. Under Salina's mural-sign code regime, if Salina officials perceive a mural's content to pertain to the goods or services for sale at the location where the mural sits, it's

[18] Available at https://www.ksn.com/news/state-regional/city-puts-pause-on-salina-mural-restaurant-owner-says-i-believe-well-work-through-this/

classified as a wall sign, and is subject to the code's size limitations, requires a sign permit, and Certificate of Compatibility.

135. Conversely, under Salina's mural-sign code regime, if Salina officials perceive a mural's content does *not* pertain to the goods or services for sale, then it's classified as a mural, is exempt from the code's size limitations, and does not require a sign permit or Certificate of Compatibility.

136. Members of the City Commission discussed how Plaintiffs could "turn this into a mural rather than a sign" by changing its content. Exhibit A pg. 27, ln 25 – pg. 28, ln. 8.

137. Salina tries justifying its unwritten policy and practice of discriminating against the content of murals it perceives pertain to a business because it allegedly fears that "sign wars" will harm "the aesthetic character of your community." Olivia Bergmeier, *Blacksmith Coffee continues conversation on small building signs in town*, Salina Post (Jan. 25, 2024).[19]

138. Salina has never defined a "sign war."

139. Salina has never explained how allowing Plaintiffs to paint a mural would trigger a "sign war."

140. Salina has never explained how a "sign war" would cause any harm to the aesthetic character of the community.

141. On good faith belief, Salina does not possess any evidence that The Cozy's mural would trigger a "sign war."

142. On good faith belief, Salina does not possess any evidence that The Cozy's mural would harm the aesthetic character of the community. On the contrary. Ex. A pg. 30, ln. 10; pg. 32, ln. 3-4 (describing mural as "beautiful," and artist's work as "high energy," and "it pops.").

143. On good faith belief, Salina does not possess any evidence that The Cozy's mural would harm property values.

144. On good faith belief, Salina does not possess any evidence that The Cozy's mural causes any safety concerns.

[19] Available at https://salinapost.com/posts/06567217-4e0d-49be-9a97-b05ef4b7ec7d

145. On good faith belief, Salina does not possess any evidence that murals that include a message that pertains to the goods or services for sale are more likely to trigger a "sign war" than murals that do not include a message that pertains to the goods or services for sale.

146. On good faith belief, Salina does not possess any evidence that murals that include a message that pertains to the goods or services for sale are more likely to harm the aesthetic character of the community than murals that do not include a message that pertains to the goods or services for sale.

147. On good faith belief, Salina does not possess any evidence that murals that include a message that pertains to the goods or services for sale are more likely to harm property values than murals that do not include a message that pertains to the goods or services for sale.

148. On good faith belief, Salina does not possess any evidence that murals that include a message that pertains to the goods or services for sale are more likely to cause safety concerns than murals that do not include a message that pertains to the goods or services for sale.

**Salina's Mural-Sign Code Regime and its Enforcement Injures the Plaintiffs**

149. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

150. Salina's mural-sign code regime, and Salina's policies and practices regarding the enforcement of its mural-sign code regime, violate the Plaintiffs' right to free speech as guaranteed by the First Amendment to the United States Constitution and are void for vagueness.

151. The Plaintiffs want to complete and display the mural as shown in the rendition above, without any changes.

152. Salina has ordered Plaintiffs to halt work on the mural.

153. Salina has explained that the Plaintiffs cannot complete the mural as it is reflected in the rendition because Salina believes it's larger than allowed by the City Code. Exhibit A pg. 17, ln. 12-18.

154. Salina also informed Plaintiffs that it cannot complete the mural without first obtaining a sign permit and a Certificate of Compatibility.

155. On or about November 13, 2023, at the request of Salina, Plaintiffs submitted an application for a sign permit and for a Certificate of Compatibility to complete the mural as shown in the rendition above.

156. Salina was required to issue or deny the sign permit application within ten days. Salina City Code 42-502.

157. Salina was required to hold a public hearing of the Design Review Board to consider the Certificate of Compatibility application within 23 calendar days, Salina City Code § 2-209(2)(a), and to either approve or deny the application at the hearing, Salina City Code § 2-209(2)(d).

158. Rather than issue or deny the permit and Certificate of Compatibility in a timely manner—as required by law—Salina waited until February 8, 2024, to send Mr. Howard a letter which neither granted nor expressly denied a permit, and neither granted nor expressly denied a Certificate of Compatibility, to complete the mural as shown in the rendition above.

159. Instead, Salina acknowledged "receipt of [the Plaintiffs'] Certificate of Compatibility application" and "sign permit application." After explaining in the letter a "Certificate of Compatibility" was required, Salina placed the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete."

160. If or when Salina chooses to amend the sign code, "Staff will then be able to facilitate a Certificate of Compatibility application to be considered by the DRB, as well as review your sign permit application."

161. According to a news report, the City Manager has indicated that in light of this lawsuit, Salina intends to pause conversations about code amendments. Jeff Garretson, *Commissioners Briefed on Cozy Legal Response*, KSAL (April 9, 2024).[20]

[20] Available at https://www.ksal.com/commissioners-briefed-on-cozy-legal-response/

162. According to a news report, Salina enforces the mural-sign code regime against other businesses, based on their content. Oliver Bergmeier, *Blacksmith Coffee continues conversation on small building signs in town*, Salina Post (Jan. 25, 2024).[21]

163. Other businesses, such as The Yard, appear to have been exempted from Salina's mural-sign code regime, even though the content of that mural appears to pertain to the goods or services sold by the business.

164. Salina's publicly available statements, its order to halt work on the mural, and its placement of the permit and Certificate of Compatibility application on-hold, presents a clear and continual threat of enforcement of Salina's mural-sign code regime against the Plaintiffs if they renew work on the mural.

165. Salina's enforcement of its mural-sign code regime against the Plaintiffs means they cannot finish the mural.

166. The Plaintiffs would be able to complete the mural if it expressed a different message Salina perceives as not pertaining to the Plaintiffs' business.

167. The Plaintiffs' speech is being chilled by Salina's enforcement of its mural-sign code regime against the Plaintiffs' mural.

168. The Plaintiffs stopped completion of the mural because of Salina's enforcement of its mural-sign code regime.

169. But for Salina's mural-sign code regime and its enforcement, the Plaintiffs' First and Fourteenth Amendment rights would not be violated.

170. The same day Salina's mural-sign code regime is enjoined and/or declared unconstitutional, or as soon as reasonably possible thereafter, the painting of the mural will continue; the Plaintiffs will not be subjected to First and Fourteenth Amendment violations.

171. But for Salina's mural-sign code regime and its enforcement, the Plaintiffs would have suffered none of these harms or injuries in the past and would suffer none of them in the future.

[21] Available at https://salinapost.com/posts/06567217-4e0d-49be-9a97-b05ef4b7ec7d

172. Salina's mural-sign code regime is ongoing, continuous, and repetitive, as are the violations of federal law, and is an ongoing, continuous, and repetitive violation of the Plaintiffs' rights under the United States Constitution.

173. Absent a judgment declaring Salina's mural-sign code regime unconstitutional, and absent issuing injunctive relief enjoining its enforcement, the Plaintiffs will continue to be subjected to an abridgement of their First and Fourteenth Amendment rights.

174. A judgment declaring Salina's mural-sign code regime unconstitutional, as described above and throughout, and an injunction prohibiting its enforcement, would allow the Plaintiffs to freely complete the mural at The Cozy.

175. There is no administrative remedy available that would provide Plaintiffs with the relief they seek.

176. The Plaintiffs have no other adequate remedy at law, other than to file this lawsuit for prospective, non-monetary relief.

**Declaratory Judgment and Injunctive Relief**

177. Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

178. An actual controversy has arisen and now exists between the Plaintiffs and Defendant concerning the Plaintiffs' rights under the United States Constitution. A judicial declaration is necessary and appropriate at this time.

179. The Plaintiffs' injuries result from Salina's mural-sign code regime and its enforcement.

180. The Plaintiffs' injuries are concrete, particularized, and cognizable.

181. The Plaintiffs require a judicial determination of their rights against Salina as it pertains to Salina's mural-sign code regime.

182. It's appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57, declaring unconstitutional all relevant portions of Salina's mural-sign code regime at issue in this case, including Salina's written sign code, Salina's unwritten policies and practices, Salina's sign permit requirements, Salina's Downtown Salina Business Improvement District review process, the Certificate of

Compatibility requirement, and it's concomitant enforcement penalties, as described throughout.

183. Pursuant to 28 U.S.C. § 2201, 28 U.S.C. § 2202, and Fed. R. Civ. P. 65, it's appropriate and requested that this Court issue temporary, preliminary, and permanent relief prohibiting enforcement of Salina's mural-sign code regime at issue in this case.

**Constitutional Violations**
**Claim One: First Amendment Violations**

184. The Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

185. The First Amendment provides, in part, that that "Congress shall make no law … abridging the freedom of speech." U.S. Const. amend. I. "By incorporation through the Fourteenth Amendment, this prohibition applies to states and their political subdivisions," and "applies not only to legislative enactments, but also to less formal governmental acts, including city policies." *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 979 (10th Cir. 2020) (cleaned up).

186. Murals and signs are protected by the First Amendment. *Morris v. City of New Orleans*, 399 F. Supp. 3d 624, 633 (E.D. La. 2019).

187. The First Amendment protects the rights of individuals, entrepreneurs, and businesses to express themselves through murals with content that a government perceives to pertain their business in some way.

188. The First Amendment also protects the rights of rights of individuals, entrepreneurs, and businesses to express themselves through murals with content that actually pertains to their business in some way.

189. The Plaintiffs' artistic mural is protected by the First Amendment, incorporated *via* the Fourteenth Amendment.

190. The Plaintiffs want to complete and display their artistic mural as reflected in the rendition above, without threat of criminal charges or fines hanging over their heads.

<u>Salina's mural-sign code regime is a content-based and speaker-based regulation of speech</u>

191. Salina's mural-sign code regime is a content-based regulation of speech under *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), subject to strict scrutiny, because it regulates murals differently based solely on their communicative content.

192. Salina's mural-sign code regime is also a speaker-based restriction on speech, subject to strict scrutiny, because it "favor[s] some speakers over others" and this "speaker preference reflects a content preference." *Id.* at 170.

193. Under *Reed*'s "commonsense" test, laws are content based if they "target speech based on its communicative content," if the "law applies to particular speech because of the topic discussed or the idea or message expressed," *id.* at 163 (relying in part on *Sorrell v. IMS Health, Inc.*, 564 U.S. 552 (2011)), or if it's "targeted at specific subject matter," *id.* at 169. If the law "draws distinctions based on the message a speaker conveys," it's a content-based regulation. *Id.* at 163.

194. It doesn't matter, for example, whether the content-based regulations were adopted for "benign" reasons, "content-neutral" justifications, or even "a lack of animus" toward the ideas expressed, they're still content based. *Reed*, 576 U.S at 165.

195. Second, laws are content-based regulations of speech if they "cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys." *Id.* at 164 (cleaned up).

196. Third, if the application of an ordinance "turn[s] on whether the speech is commercial or not, the law is content-based" as well. *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 982 (10th Cir. 2020).

197. Outside the context of off-premises, "location-based," regulations, *see City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69, (2022), if a code enforcement officer must "read the sign"—or in this case, look at the mural—to determine whether the artwork is allowed or not, it's a content-based regulation. *Reed*, 576 U.S. at 162.

198. Under *Reed,* Salina's mural-sign code regime is a content-based, speaker-based regulation of speech.

199. Even though all murals meet the definition of a "sign" under §§ 42-764 and 42-781, Salina exempts some murals from regulation, depending on the content of the mural and the identity of the speaker.

200. Even though all murals exceed the size restrictions of the written sign code, Salina exempts some murals from the size restrictions, depending on the content of the mural and the identify of the speaker.

201. Even though the mural at The Cozy meets the regular dictionary definition of a mural, Salina insists that it is not a mural, all because Salina officials are opposed to its allegedly commercial content.

202. Even though all murals meet the definition of "sign" under §§ 42-764 and 42-781, Salina exempts some murals from regulation, depending on the content of the mural and the identity of the speaker.

203. Even though all murals "change the existing exterior design, material, color, texture, finish or appearance of any building" and "affect the appearance of real property" under § 2-207(a), Salina exempts some murals from regulation, depending on the content of the mural and the identity of the speaker.

204. The mural-sign code regime as written and enforced permits murals that don't pertain to goods or services sold.

205. That is because Salina doesn't consider murals as "signs," so long as the content of the mural doesn't pertain to goods or services sold.

206. Under Salina's mural-sign code regime, both the written code and the unwritten policy and practice, individuals or businesses can display a mural if Salina perceives the mural's subject matter as not pertaining to goods or services being sold.

207. Under Salina's mural-sign code regime, both the written code and the unwritten policy and practice, Salina allows murals which Salina does not believe pertain to goods or services sold without requiring a permit, Certificate of Compatibility, fee, or size limitations, and without demanding they be taken down.

208. Under Salina's mural-sign code regime, both the written code and the unwritten policy and practice, whether City officials deem a mural to pertain to goods or services sold, or to be artistic based on its subject matter or message, is a content-based distinction on speech.

209. If Plaintiffs were to change the content of the mural such that Salina does not consider its message to pertain to the goods sold at The Cozy—perhaps by removing any reference to hamburgers or their smell—Salina would not consider it to be a regulated sign but an unregulated mural.

210. This demonstrates Salina's antipathy toward content related to a business and commercial speech. This also demonstrates Salina's preference for content unrelated to a business and noncommercial speech.

211. When City officials deem that a mural pertains or does not pertain to goods or services sold that is also a speaker-based restriction on free speech, as it turns on the identity of who is displaying that mural.

212. Plaintiffs are prohibited from displaying the mural depicted above because Salina alleges that mural contains a message that pertains to goods sold at The Cozy—presumably because Plaintiffs sell hamburgers and the mural depicts burger-esque flying saucers—while a different individual who does not sell hamburgers, or an individual who gives hamburgers away for free, could display the exact same mural.

213. Imposing different burdens on speech depending on who is speaking and what is being said is content-based and speaker-based restriction on free speech.

214. Imposing different size restrictions on murals depending on the content of the mural and the person displaying the mural is a content-based and speaker-based restriction on free speech.

215. Additionally, murals within the Downtown Salina Business Improvement District Number 1 are subjected to additional content-based review by the Design Review Board.

216. First, murals with contents that Salina considers "art" are completely exempt from the Design Review Board process, while murals with contents that Salina does not consider "art" are subjected to the Design Review Board process.

217. Then the Design Review Board determines whether a mural "presents an aesthetically pleasing overall image," "clash[es]" with older materials or harms the "distinguishing original qualities or character of a building."

218. These determinations by the Design Review Board are based on the content of the mural under review.

219. In the alternative, if Salina believes that the sign code only applies to a "display" which is "used to announce, direct attention to, or advertise," then this too would be a content-based restriction on speech.[22]

220. If Salina officials determine that the content of a mural somehow "announces," "directs attention to," or "advertises" something, then they enforce the mural-sign code regime.

221. Conversely, if Salina officials determine that the content of a mural does not "announce," "direct attention to," or "advertise" anything, then they do not enforce the mural-sign code regime.

222. The only way Salina officials can make such a distinction is by analyzing the content of murals and applying different rules based on the content of the mural.

223. Content-based and speaker-based restrictions on speech are subject to strict scrutiny. *Reed*, 576 U.S. at 164, 170.

224. Content-based regulations of speech "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (when government restricts speech, it "bears the burden of proving the constitutionality of its actions"). It's "rare that a regulation restricting speech because of its content will ever be permissible." *Playboy Ent. Grp., Inc.*, 529 U.S. at 818.

225. Salina cannot meet this burden.

[22] As explained above, the Plaintiffs do not believe that the language of Salina City Code § 42-764(2) is a requirement of all signs, rather, this is a catch-all provision intended to cover items that were not already covered by § 42-764.

226. Salina has no evidence that Salina's mural-sign code regime is narrowly tailored to further a compelling government interest.

227. Salina also has no evidence that its discrimination against messages that pertain to the goods or services for sale is narrowly tailored to further a compelling government interest.

228. Nor does Salina have evidence that its discrimination against messages that it does not consider to be "art" is narrowly tailored to further a compelling government interest.

229. Thus, the different treatment of speech based on speakers and content under Salina's mural-sign code regime, is an unconstitutional content-based and speaker-based restriction on speech under the First Amendment.

<u>Even if Salina's mural-sign code regime is content- and speaker-neutral, it is still unconstitutional.</u>

230. Even if Salina's discrimination against messages related to a business were somehow not content based or speaker based, Salina's enforcement of its mural-sign code regime against the Plaintiffs still violates the First Amendment.

231. Salina does not have sufficient justification for either its regulation of Plaintiffs' mural specifically, or its regulation of messages it perceives are related to business generally.

232. Salina's regulation of Plaintiffs' mural does not directly or materially advance a substantial, important, or compelling government interest.

233. Salina's general regulation of messages related to business does not directly or materially advance a substantial, important, or compelling government interest.

234. The Plaintiffs' mural does not present a safety hazard.

235. The Plaintiffs' mural does not present a health hazard.

236. The Plaintiffs' mural does not have a negative impact on the public welfare.

237. The Plaintiffs' mural does not present a traffic control hazard.

238. The Plaintiffs' mural does not harm the aesthetics of the surrounding area.

239. The Plaintiffs' mural does not propose a commercial transaction.

240. The Plaintiffs' mural is not related solely to the economic interests of Plaintiffs or their customers.

241. The Plaintiffs' mural is not commercial speech. *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009).

242. The Plaintiffs' mural is not false.

243. The Plaintiffs' mural is not deceptive.

244. The Plaintiffs' mural does not pose any risk of misleading the public.

245. Salina's mural-sign code regime does not serve Salina's interests in public safety, public health, or public welfare.

246. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, is not narrowly tailored to serve any substantial, important, or compelling government interest.

247. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, does not directly or materially advance any substantial, important, or compelling government interest.

248. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, is not substantially related to any substantial, important, or compelling government interest.

249. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, is more extensive than necessary to serve any substantial, important, or compelling government interest.

250. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, does not leave open alternative channels of communication.

251. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, is not rationally related to any legitimate government interest.

252. Salina's mural-sign code regime, and its enforcement of its mural-sign code regime against the Plaintiffs, is not narrowly tailored, and cannot survive a less-restrictive-means analysis.

253. On information or good faith belief, Salina does not have actual evidence justifying any of its First Amendment restrictions.

254. On information or good faith belief, Salina does not have any evidence justifying any of its First Amendment restrictions.

255. On information or good faith belief, Salina cannot prove that any of the alleged harms it seeks to remediate are real, or that its First Amendment restrictions will alleviate them to a material degree.

256. Salina cannot satisfy its heavy First Amendment burdens.

257. The Plaintiffs' mural is not commercial speech. But even if it were, strict scrutiny still applies. The "regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 703 (6th Cir. 2020).[23] But even if *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980) applies to this case, Salina's mural-sign code regime is still unconstitutional, for at least all of the reasons set forth above and throughout.

258. To the extent that Salina's mural-sign code regime is held to be a valid restriction on commercial speech, Plaintiffs preserve the right to argue that the commercial speech doctrine is incompatible with the text, history, tradition, and original public meaning of the First Amendment and must be overturned.

<u>Unconstitutional Prior Restraint on Speech</u>

259. The Plaintiffs reallege and incorporate by reference all the preceding paragraphs.

260. Salina's requirement that property owners first obtain a sign permit and Certificate of Compatibility before painting a mural on a wall is an unconstitutional prior restraint on speech.

261. In the area of free expression, a licensing law placing unbridled discretion in the hands of a government official or agency is an unconstitutional prior restraint because it may result in censorship.

[23] On this point—whether *Reed* applies to content-based restrictions of commercial speech—*Aptive* doesn't control. In *Aptive*, unlike here, the plaintiffs didn't challenge the application of *Central Hudson* to their case. Instead, the plaintiffs specifically *requested* its application in its motion for preliminary injunction, 1:17-cv-01545-MSK-MJW (Doc. 23) (pages 11-12), in its motion for summary judgment (Doc. 93) (page 1), and before trial, stipulated the test applied there too (Doc. 105 page 2).

262. Salina's unwritten policy and practice of distinguishing between unregulated murals and regulated signs places complete and unbridled discretion in Salina officials to analyze the content of the proposed mural and determine if it pertains to the goods or services for sale.

263. Nothing in either the written sign code or Salina's unwritten policy and practice provide Salina officials with any guidelines or criteria for judging whether or not a mural pertains to the goods or services for sale.

264. The mural-sign code regime constitutes unconstitutional prior restraint in that it doesn't contain narrow, objective, and definite standards to guide Salina, for at least all of the following reasons, whether considered individually or collectively:

a. "Mural" is not defined.
b. "Pictorial representation" is not defined.
c. "Display," is not defined.
d. "Calculated to attract the attention of the public," is not defined.
e. "Figure or similar character," is not defined.
f. "Announce," is not defined.
g. "Direct attention to," is not defined.
h. "Advertise," is not defined.
i. "Pertains to," is not defined.
j. "Goods or services sold," is not defined.
k. "Art," is not defined.
l. "Commercial speech," is not defined.
m. "Noncommercial speech," is not defined.

265. The fact that Salina appears to believe that burger-esque flying saucers painted on The Cozy pertain to the hamburgers sold at The Cozy, while the baseball themed mural at The Yard does not pertain to the baseball training services sold at The Yard exemplifies the extent of Salina's discretion.

266. The absence of express standards makes it virtually impossible to distinguish between a legitimate denial of a permit and an illegitimate abuse of censorial power.

267. Similarly, there are no established guidelines or criteria for judging whether or not a mural is "art" and exempt from the Design Review Board process.

268. Salina's determination that the mural at the Salina Art Center was "art" and exempt from the Design Review Board process, while the Plaintiffs' mural is not "art" but a regulated sign lacks any neutral standards to distinguish between legitimate regulation and illegitimated and discriminatory censorship.

269. The Downtown Salina Business Improvement District Number 1 Design Review Board lacks any established neutral criteria to ensure that its decision to grant or deny a Certificate of Compatibility is not based on the content or viewpoint of the speech being considered in the mural.

270. Indeed, its written criteria for granting or denying a Certificate, such as whether or not the mural "present[s] an aesthetically pleasing overall image," "clash[es]" with older materials or preserves the "distinguishing original qualities and character of a building" are inherently subjective, arbitrary, and capricious. Salina City Code § 2-208.

271. Additionally, Salina's decision to ignore the written deadlines for either granting or denying Plaintiffs' application for a sign permit and Certificate of Compatibility, and instead placing the application "on-hold" indefinitely, shows that Salina views its authority to issue or deny permits to be entirely unconstrained even by the terms of the written city code.

272. This total disregard for the one clear constraint on Salina's discretion – a hard deadline – concerning the Plaintiffs' application would render this prior restraint on speech to be unconstitutional even if it were otherwise completely content-neutral, speaker-neutral, and constrained by clear, neutral criteria.

273. The mural-sign code regime lacks any established neutral criteria to ensure that the licensing decision is not based on the content or viewpoint of the speech being considered.

274. The First Amendment does not allow the government to possess unbridled discretion in determining when to impose a prior restraint on speech.

275. Salina's enforcement of its mural-sign code regime is an unconstitutional restriction of speech under the First Amendment.

276. On its face and as applied, Salina's mural-sign code regime violates the First Amendment.

277. The Plaintiffs' First Amendment rights have been and will continue to be violated by Salina's mural-sign code regime.

278. Salina oversees, implements, and enforces the mural-sign code regime violating Plaintiffs' First Amendment rights and causing Plaintiffs' First Amendment injuries.

279. As a consequence of Salina's actions or inactions in the implementation and enforcement of the mural-sign code regime, Plaintiffs have been and will continue to be injured, and are therefore entitled to, among other things, declaratory judgment and prospective injunctive relief, and any other equitable or other legal relief as the court deems just or appropriate.

280. Plaintiffs have no other legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their First Amendment rights, other than to file this lawsuit for non-monetary, prospective relief.

281. Unless the mural-sign code regime's unconstitutional ordinances, regulations, rules, and policies are declared unconstitutional and their enforcement permanently enjoined, Plaintiffs and others who are similarly situated will continue to suffer great and irreparable harm. Plaintiffs therefore seek such declaratory and injunctive relief.

**Claim Two: Fourteenth Amendment Due Process Clause Violation**
**(Void for Vagueness)**

282. Plaintiff realleges and incorporates by reference all preceding paragraphs.

283. An enactment is void for vagueness if it "is so standardless that it authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Welch v. United States*, 578 U.S. 120 (2016).

284. The mural-sign code regime is unconstitutionally vague in that it doesn't provide fair notice as to the conduct proscribed and because it doesn't provide explicit standards for enforcement to protect against arbitrary enforcement, for at least all of the following reasons, whether considered individually or collectively:

a. "Mural" is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.

b. "Pictorial representation" is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
c. "Display," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
d. "Calculated to attract the attention of the public," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
e. "Figure or similar character," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
f. "Announce," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
g. "Direct attention to," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
h. "Advertise," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
i. "Pertains to," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
j. "Goods or services sold," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
k. "Art," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
l. "Commercial speech," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.
m. "Noncommercial speech," is not defined, doesn't provide fair notice, and is susceptible to arbitrary enforcement.

285. The mural-sign code regime, and Salina's unwritten policy and practice of distinguishing between unregulated murals and regulated signs, do not define or otherwise establish sufficient standards necessary to prohibit or discourage seriously discriminatory enforcement.

286. Instead, Salina officials are required to examine the content of murals and determine if they believe the artwork somehow pertains to the goods or services sold in the vicinity.

287. If they believe the mural pertains to the goods or services sold then officials enforce the sign code.

288. Salina officials are also required to examine the content of murals and determine if they believe the mural is "art."

289. If they believe the mural is not "art" then officials enforce the Design Review Board process.

290. For the reasons stated in Claim One above, the criteria utilized by the Downtown Salina Business Improvement District Number 1 Design Review Board to grant or deny Certificates of Compatibility are so standardless that it authorizes or encourages seriously discriminatory enforcement.

291. In the alternative, if Salina believes that the sign code only applies to a "display" which is "used to announce, direct attention to, or advertise," then this too would be void for vagueness.[24]

292. The terms "display," "announce," "direct attention to," and "advertise," are all undefined.

293. This alternative interpretation requires City officials to examine the content of every mural and determine if it is a "display" that "announces," "directs attention to," or "advertises" something.

294. Salina lacks any standards for making these determinations, risking serious discriminatory enforcement.

295. As a consequence of Salina's standardless, unwritten policy and practice, Plaintiffs cannot know what murals may permissibly be painted on the side of The Cozy, and are injured by Salina's arbitrary enforcement, and are therefore entitled to, among other things, entry of a temporary restraining order, prospective injunctive relief, and any other equitable or legal relief as the court deems appropriate.

296. Salina's enforcement of its mural-sign code regime is unconstitutionally vague under the Fourteenth Amendment

297. On its face and as applied, Salina's mural-sign code regime violates the void for vagueness doctrine of the Fourteenth Amendment.

[24] As explained above, the Plaintiffs do not believe that the language of Salina City Code § 42-764(2) is a requirement of all signs, rather, this is a catch-all provision intended to cover items that were not already covered by § 42-764.

298. The Plaintiffs' Fourteenth Amendment rights have been and will continue to be violated by Salina's mural-sign code regime.

299. Salina oversees, implements, and enforces the mural-sign code regime violating Plaintiffs' Fourteenth Amendment rights and causing Plaintiffs' Fourteenth Amendment injuries.

300. As a consequence of Salina's actions or inactions in the implementation and enforcement of the mural-sign code regime, Plaintiffs have been and will continue to be injured, and are therefore entitled to, among other things, declaratory judgment and prospective injunctive relief, and any other equitable or other legal relief as the court deems just or appropriate.

301. Plaintiffs have a liberty interest in their speech and a property interest in the wall of The Cozy that is protected by the Fourteenth Amendment.

302. Plaintiffs have no other legal, administrative, or other remedy by which to prevent or minimize the continuing irreparable harm to their Fourteenth Amendment rights, other than to file this lawsuit for non-monetary, prospective relief.

303. Unless the mural-sign code regime's unconstitutional ordinances, regulations, rules, and policies are declared unconstitutional and their enforcement permanently enjoined, Plaintiffs and others who are similarly situated will continue to suffer great and irreparable harm. Plaintiffs therefore seek such declaratory and injunctive relief.

304. Plaintiffs have no other remedy by which to prevent or minimize the continuing irreparable harm to their constitutional rights, other than to file this lawsuit for non-monetary, prospective relief.

305. Unless the mural-sign code regime and unwritten policy and practices are declared unconstitutional and permanently enjoined, Plaintiffs will continue to suffer great and irreparable harm.

## Request for Relief

Plaintiffs respectfully request the Court grant the following relief:

306. Plaintiffs reallege and incorporate by reference all preceding paragraphs.

307. Declaratory judgment that Salina's mural-sign code regime, as written and enforced, is an unconstitutional content-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated.

308. Declaratory judgment that Salina's mural-sign code regime, as written and enforced, is an unconstitutional speaker-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated.

309. Alternatively, if Salina's mural-sign code regime is ruled to be content-neutral and speaker-neutral, a declaratory judgment that Salina's mural-sign code regime, as written and enforced, fails to satisfy intermediate scrutiny, on its face and as applied to Plaintiffs and others similarly situated.

310. Declaratory judgment that Salina's mural-sign code regime, as written and enforced, is an unconstitutional prior restraint on speech, on its face and as applied to Plaintiffs and others similarly situated.

311. Declaratory judgment that Salina's mural-sign code regime, as written and enforced, is void for vagueness, on its face and as applied to Plaintiffs and others similarly situated.

312. For entry of temporary, preliminary, and/or permanent prospective injunctive relief, enjoining Defendant, Defendant's officers, agents, employees, attorneys, servants, assigns, and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing the enforcement of Salina's mural-sign code regime—which includes the Salina's written sign code, Salina's unwritten policies and practices, Salina's Sign Permit requirement, Salina's Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and it's concomitant enforcement penalties ("mural-sign code regime")—as described throughout the lawsuit, that constitute violations of the First and Fourteenth Amendments to the United States Constitution, on their face and as applied to Plaintiffs and other similarly situated.

313. A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their mural in its current position on The Cozy Inn, or for completing the mural on The Cozy Inn.

314. Reasonable costs and attorney fees under 42 U.S.C. § 1988; and

315. Such other legal or equitable relief as this Court deems appropriate and just.

**Jury Demand and Designation of Place of Trial**

316. Plaintiffs request a jury trial on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure. Plaintiffs request the trial be held in Wichita, Kansas, due to the proximity of the parties.

Kansas Justice Institute

Dated: April 10, 2024.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
(913) 213-5018
Attorney for Plaintiffs

Dated: April 10, 2024.

/s/ Jeffrey Shaw
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verification |

**Verification**

I, Stephen Howard, have personal knowledge of myself, my activities, and my intentions, including those set out in the Amended Verified Complaint. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Verified Complaint concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Cozy Inn, Incorporated, d/b/a The Cozy Inn. Matters alleged on information and belief I reasonably believe to be true in good faith.

Dated: 4-8, 2024.

[signature]
Stephen Howard, individually and
On behalf of Cozy Inn, Incorporated,
d/b/a The Cozy Inn

Exhibit A

SALINA CITY COMMISSION MEETING

held on
November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

# C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter

Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

ARTICLE X. - SALINA BUSINESS IMPROVEMENT DISTRICT DESIGN REVIEW BOARD

Exhibit B

Sec. 2-200. - Created.

By authority of the home rule powers granted to cities by the Kansas Constitution and consistent with the Kansas Business Improvement District Act, there is hereby created the design review board of the Salina Business Improvement District Number 1.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 91-9471, § 1, 10-28-91; Ord. 07-10432, § 1-14-08; Ord. No. 17-10907 , § 1, 11-13-17)

Sec. 2-201. - Membership.

The board shall consist of seven (7) members recommended by the board of advisors of the Salina Business Improvement District Number 1 and appointed by the mayor with the consent of the governing body. Membership shall at all times include at least one (1) representative of the following categories:

(1) Representative of a business within the Salina Business Improvement District Number 1.

(2) Property owner within the Salina Business Improvement District Number 1.

(3) Design professional, including but not limited to a licensed professional engineer, architect or landscape architect.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 07-10432, § 1, 1-14-08; Ord. No. 17-10907 , § 2, 11-13-17)

Sec. 2-202. - Appointment and term.

Those persons first appointed as members of the board shall be appointed for the following terms:

(1) Two (2) members for a term of one (1) year.

(2) Two (2) members for a term of two (2) years.

(3) Three (3) members for a term of three (3) years.

Upon the expiration of the term of each board member, subsequent terms shall be for a period of three (3) years. Any vacancy occurring among the membership of the board shall be filled by appointment of the mayor with the consent of the governing body.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-203. - Compensation.

The members of the board shall serve without compensation.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-204. - Officers.

The officers of the board shall be chair, vice-chair and secretary. The chair and vice-chair shall be elected at the annual meeting and shall serve for a term of one (1) year, or until their successors are elected. The director of planning, or his designee, shall serve as secretary, and he or she may appoint a staff member assistant secretary. No person shall be eligible to hold the office of chair or vice-chair for more than two (2) full, consecutive one-year terms.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 91-9471, § 2, 10-28-91; Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-205. - Quorum.

A simple majority of the members of the board appointed and qualified at any given time shall constitute a quorum for the purpose of conducting the board's business.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 91-9471, § 3, 10-28-91; Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-206. - Purpose.

The purpose of the board shall be:

(1) To advise and make recommendations to the board of city commissioners or Salina Business Improvement District Number 1 board of advisors on such matters as, from time to time, may be referred to the board.

(2) To protect and enhance the exterior appearance of property located within the Salina Business Improvement District Number 1 by regulating, according to proper architectural principles, the design, use of materials, finished grade lines, and orientation of new building construction and the alteration, improvement, repair, or demolition of existing buildings through the issuance of certificates of compatibility when proposed plans and specifications warrant.

(3) Issue notice of decision on signage and other matters referred by other duly constituted city boards, commissions, and committees.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 88-9298, § 1, 1-9-89; Ord. No. 91-9471, § 4, 10-28-91; Ord. No. 07-10432, § 1, 1-14-08; Ord. No. 17-10907 , § 3, 11-13-17)

Sec. 2-207. - Certificate of compatibility.

(a) No person shall perform or cause to be performed any work to:

(1) Construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of any building or any other improvement to real property in the Salina Business Improvement District Number 1; or

(2) Introduce, change, substitute, or remove any physical feature affecting the appearance of real property in the Salina Business Improvement District Number 1;

without first applying for and obtaining a certificate of compatibility, subject only to the exclusions outlined in subsection (b).

(b) A certificate of compatibility shall not be required:

(1) If the work includes only routine maintenance and results in no change to the existing design, material, color, texture, finish, or appearance of a building or other improvement to real property; or

(2) If circumstances warrant authorization of emergency repairs of a pre-approved nature and scope, in the sole discretion of the building official.

(c) If the work requiring a certificate of compatibility requires any other type of permit, the permit shall not be issued unless a certificate of compatibility has been issued for the work.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 88-9298, § 2, 1-9-89; Ord. No. 07-10432, § 1, 1-14-08, Ord. 16-10819, § 1, 2-1-16; Ord. No. 17-10907 , § 4, 11-13-17)

Sec. 2-208. - Authorization and findings.

Any application for a building permit which relates to property included within the Salina Business Improvement District Number 1 shall, in conjunction with the standard building permit review process, be referred by the city's chief building official to the board. The board is hereby authorized to grant any applicant a certificate of compatibility if, upon the vote of a majority of board members present and voting, any of the following findings can be made:

(1) The general design, material and color of the proposed construction or change present an aesthetically pleasing overall image.

(2) Environmentally harmful effects caused by the clash of contemporary materials with those of older origin, are avoided.

(3) The distinguishing original qualities or character of a building, structure or site and its environment are not to be destroyed and the removal or alteration of any historical material or distinctive architectural features is avoided where possible.

(4) The proposed use of banners, awnings, or canopies incorporates the use of appropriate materials, colors and graphics, and is compatible with the overall building design.

(5) Any proposed demolition includes appropriate grading and landscaping of the building site in a manner compatible with the adjoining buildings and streetscape.

In considering applications for certificates of compatibility, the board's decisions shall be based upon the adopted Design Guidelines for Downtown Salina as approved and amended from time to time by resolution of the governing body.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 07-10432, § 1, 1-14-08; Ord. No. 17-10907 , § 5, 11-13-17)

Sec. 2-209. - Review process.

Upon submission of a complete application, administrative staff will make a determination of the scope of the project using the design review board matrix as approved and amended from time to time by resolution of the governing body. Projects determined to be minor will undergo a "minor" review process. All other projects requiring a certificate of compatibility shall undergo a "full" review process.

(1) *Minor review.* Upon the filing in the development services department of a completed application for a certificate of compatibility for a project qualifying for a minor review, the following process shall occur:

a. No more than three (3) working days (Monday through Friday, excluding holidays) after the date the completed application is filed, the project will be reviewed by administrative staff.

b. Administrative staff shall either approve or deny the application unless staff determines that a full review should be scheduled. Written notice of the decision of the administrative staff, including the certificate of compatibility if approved, shall be provided to the applicant and the building services division within seven (7) calendar days after the date the completed application is filed.

c. If a project is determined to require a full review, the project will be placed on the agenda of the next regularly scheduled meeting of the design review board as set out in subsection (2), full review, a. through d. below.

(2) *Full review.* Upon the filing in the development services department of a completed application for a certificate of compatibility for a project requiring a full review, the following process shall occur:

a. No more than twenty-three (23) calendar days after the date the completed application is filed, the project will be scheduled for review at a public hearing by no less than a quorum of the board.

b. No less than seven (7) calendar days prior to the hearing, notice of the date, time, and place of the hearing and a statement of the nature of the proposed application shall be mailed by first class mail to the record owners of the property immediately adjacent to the subject property. ("Adjacent properties" shall mean those properties that share a property line with the subject property, excluding any street rights-of-way).

c. The hearing shall be conducted and a record of the proceedings shall be preserved in such a manner and according to such procedures as the board may prescribe by its own rule. Any interested person or party may appear and be heard at the hearing in person, by agent, or by attorney. The board may request a report on any proposed application from any governmental official or agency, or any other person, firm or corporation. If such a report is made, a copy shall be made available to the applicant and any other interested person in the development services department.

d. The board shall either approve or deny the application at the hearing, unless the board determines that compelling circumstances require that the hearing be continued. Written notice of the decision of the board, including the certificate of compatibility, if approved, shall be provided to the applicant and the building services division within seven (7) days after the date of the board's decision.

(3) *Denial of a certificate of compatibility.* Any denial of a certificate of compatibility by either administrative staff or the board shall be accompanied by a statement of the reason(s) for the denial, which shall include recommendations to the applicant concerning changes in the proposed project, if any, that would allow the administrative staff or board to

reconsider the denial. An applicant may submit an amended application that takes into consideration the recommendations of administrative staff or the board.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. No. 88-9298, § 3, 1-9-89; Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-210. - Appeal.

(a) *Appeal from an administrative decision.* Any person dissatisfied with an administrative decision to either grant or deny a certificate of compatibility may appeal the decision to the board by filing a notice of appeal in the development services department on a form provided by that office. The notice of appeal must be filed within five (5) calendar days of the date of the administrative decision. The board shall consider the appeal within fourteen (14) calendar days in the same manner as a full review of a new application.

(b) *Appeal from a board decision.* Any person dissatisfied with a decision by the board to either grant or deny a certificate of compatibility may appeal the decision to the board of city commissioners by filing a notice of appeal in the office of the city clerk on a form provided by that office. The notice of appeal must be filed within fourteen (14) calendar days of the date of the board's decision. The board of city commissioners shall conduct a public hearing on the appeal and shall within thirty (30) calendar days of the date the appeal was filed:

(1) Uphold the decision of the design review board.

(2) Reverse the decision of the design review board.

(3) Refer the matter back to the design review board for further consideration, with or without specific instructions.

(Ord. No. 86-9163, § 1, 10-20-86, Ord. No. 07-10432, § 1, 1-14-08)

Sec. 2-211. - Stop work orders.

Whenever any work is being done contrary to the provisions of this article, or other pertinent laws or ordinances implemented through the enforcement of this article, the building official may order the work stopped by notice in writing served on any person involved in the performance of such work or the owner of record of the property. Any such person or owner of record shall immediately stop such work and shall not resume work until the building official has determined that the project is in compliance with any applicable requirements of this article.

(Ord. No. 86-9163, § 1, 10-20-86; Ord. 07-10432, § 1, 1-14-08)

Secs. 2-212—2-224. - Reserved.

**Editor's note—** Ord. No. 07-10432 repealed § 2-212 pertaining to decision on appeal.

## ARTICLE X. - SIGNS

> *Footnotes:*
>
> *--- (**10**) ---*
>
> ***Cross reference—*** *Sign code, § 8-381 et seq.*

## DIVISION 1. - GENERALLY

### Sec. 42-500. - Purpose.

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

### Sec. 42-501. - Permits.

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

Sec. 42-502. - Zoning certificate (sign permit) required.

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

Sec. 42-503. - Sign standards.

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e)

Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l)

No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

Sec. 42-504. - Exemptions generally.

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

**Editor's note—** Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

Sec. 42-505. - Exemption from zoning certificate requirement.

The following signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the other requirements of this article and of the applicable district regulations;

(1) Illuminated nameplate signs not exceeding two (2) square feet in gross surface area accessory to a single-family or two-family dwelling;

(2) Illuminated identification signs not exceeding forty (40) square feet in gross surface area accessory to a multiple-family dwelling;

(3) Illuminated bulletin board signs not exceeding forty (40) square feet in gross surface area accessory to a church, school or public or nonprofit institution; subject to the provisions of section 42-503(d);

(4) Illuminated business signs when located on property used for agricultural purposes and pertaining to the sale of agricultural products produced on the premises.

(Code 1966, § 36-904)

Sec. 42-506. - Classification of signs—Functional types.

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6)

*Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

**Editor's note—** Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

Sec. 42-507. - Same—Structural types.

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag*. A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9)

*Inflatable sign*. Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign*. A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign*. A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

Sec. 42-508. - Temporary signs, banner signs, and mobile signs.

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) Notwithstanding any other provision in this article:

(1) An unlimited number of temporary signs may be placed and displayed on private property either by or with the permission of the owner or tenant of such private property in any zoning district for a period of up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the private property is located or involving an issue on the ballot of an election within the district in which the private property is located. In years during which a primary election is held, any signs authorized under this subsection with respect to the primary election may continue to be placed and displayed during the period between the primary election and immediately following the general election, except to the extent that displaying a sign is in violation of applicable electioneering laws.

(2) To comply with K.S.A. 25-2711 (even though the unpaved area of platted right-of-way for city streets is city property and not private property), an unlimited number of temporary signs may also be placed and displayed in the unpaved public right-of-way immediately abutting private property either by or with the permission of the owner or tenant of such private property during the same periods of time described in subsection (1) above. The area referred to as "the unpaved public right-of-way immediately abutting private property" shall include any unpaved public right-of-way physically separated from such private property by an intervening pedestrian sidewalk or hike-bike path but shall not include (i) any unpaved public right-of-way physically separated from such private property by an intervening public street, alleyway, drive, or other public use (other than a pedestrian sidewalk or hike-bike path), (ii) any median separating lanes of traffic in public roadways or (iii) any interstate interchange.

(3) Temporary signs placed and displayed pursuant to this subsection shall comply with the following requirements:

a. Temporary signs must be removed within two (2) days following the election except in years during with a primary election is held, in which case the signs shall be removed within two (2) days following the general election.

b. No temporary sign shall exceed six (6) feet in height or eight (8) square feet of sign area.

c. In all areas on private or public property at any corner formed by intersecting public streets or public streets intersecting private driveways, all temporary signs shall comply with setback requirements contained in section 35-51, so as not to impede sight lines or sight distance for safety reasons.

(e) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn, or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn, or damaged.

(f) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(g) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h) Except for temporary signs allowed pursuant to subsection (d), no sign authorized under this section shall be placed or displayed within the public right-of-way.

(Ord. No. 88-9283, § 2, 11-14-88; Ord. No. 96-9776, § 1, 1-6-97; Ord. No. 17-10882 , § 4, 7-10-17; Ord. No. 19-11016 , § 1, 9-23-19; Ord. No. 22-11135 , § 1, 10-17-22)

Sec. 42-509. - Maintenance and safety.

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

Sec. 42-510. - Abandoned signs.

Any sign which no longer advertises a bona fide business conducted, product sold or service provided shall be deemed to be abandoned and shall be removed at the expense of the owner. Sign panels shall be removed within ninety (90) days of the vacation of the premises or discontinuance of the advertised activity. Sign frames and poles shall be removed within one (1) year of vacation of the premises or discontinuance of the advertised activity unless new sign panels are installed advertising a bona fide activity. Provided however, an appeal for an extension of up to one (1) year for removal of sign frames and poles may be granted by the design review board or board of zoning appeals when found to be justified. The installation of new sign panels on the same sign frame and pole shall not require the issuance of a new sign permit. If however, a new permit shall be required then the sign shall comply with the provisions of this article.

(Ord. No. 90-9381, § 7, 5-14-90; Ord. No. 98-9897, § 1, 11-2-98)

Sec. 42-511. - Sign substitution.

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

Sec. 42-512. - Electronic changeable copy advertising signs.

Advertising signs located within the city limits shall not incorporate any of the following types of displays: electronic changeable copy signs, digital graphic signs or digital animated signs; except for advertising signs lawfully constructed and maintained within two hundred (200) feet of an interstate highway right-of-way.

(Ord. No. 18-10982 , § 1, 10-22-18)

Secs. 42-513—42-515. - Reserved.

DIVISION 2. - DISTRICT REGULATIONS

Sec. 42-516. - A-1 agricultural district.

The following sign regulations shall apply in the A-1 agricultural district:

(1) Functional types permitted: any type listed in section 42-506, except advertising signs and electronic changeable copy signs.

(2) Structural types permitted:

a. Ground signs;

b. Wall signs.

(3) Number of signs permitted: One (1) per zoning lot.

(4) Maximum gross surface area: thirty-two (32) square feet.

(5) Maximum height: thirty (30) feet.

(6) Required setback: None required, except that in no case shall a sign project over public property.

(Code 1966, § 36-907(1); Ord. No. 19-10990 , § 2, 1-14-19)

Sec. 42-517. - RS, R, R-1, R-2, R-2.5, R-3 and MH residential districts.

The following sign regulations shall apply in the RS, R, R-1, R-2, R-2.5, R-3 and MH residential districts:

(1) Functional types permitted:

a. Bulletin board signs;

b. Business signs;

c. Construction signs;

d. Identification signs;

e. Nameplate signs;

f. Real estate signs.

(2) Structural types permitted:

a. Ground signs;

b. Wall signs;

c. Awning, canopy and marquee signs (when used in conjunction with a conditional use along a collector or arterial street only).

(3) Number of signs permitted:

a. Ground sign: one (1) per zoning lot.

b. Wall signs: two (2) per zoning lot.

c. Awning, canopy and marquee signs: one (1) per zoning lot.

d. A maximum of three (3) signs is permitted per zoning lot.

(4) Maximum gross surface area:

a. Bulletin board signs: thirty-two (32) square feet.

b. Business signs: eight (8) square feet.

c. Construction signs: thirty-two (32) square feet.

d. Identification signs: thirty-two (32) square feet.

e. Nameplate signs: two (2) square feet.

f. Real estate signs: eight (8) square feet per lot, provided that one sign of not more than one hundred (100) square feet in area announcing the sale of lots and/or homes in a subdivision may be located on such development. Such signs shall be removed at the end of three (3) years from the date of issuance of permit, or when seventy-five (75) percent of the lots in the subdivision or development have been sold, whichever occurs sooner.

g. Business signs: when used in conjunction with a conditional use and only along a collector or arterial street; one (1) square foot of sign area for each lineal foot of building frontage, not to exceed thirty-two (32) square feet.

(5) Maximum height:

a. All signs shall be placed flat against a building or designed as part of an architectural feature thereof except that signs may be detached if they do not exceed a height of eight (8) feet or project into any required building setback area.

b. No height limit is specified for signs placed flat against or painted on the wall of a building, or other attached signs provided all other provisions of this section are complied with.

(6) Required setback:

a. All signs, except real estate and construction signs, shall maintain the same setback required for principal structures.

b. Detached grounds signs used in conjunction with a conditional use shall be set back at least ten (10) feet from the front property line.

(7) Illumination: No sign shall be illuminated, except that identification signs and bulletin board signs may be internally or externally illuminated, provided that no direct light shall be cast upon any residential property. In addition, churches, schools, nursing homes, rehabilitation centers, assisted living facilities, governmental facilities, YMCAs and parks and recreational facilities and athletic fields, may have one (1) freestanding electronic changeable copy identification or bulletin board sign subject to the following limitations:

a. The electronic message center portion of the sign may not exceed fifty (50) percent of the total sign area.

b. The sign must set back at least ten (10) feet from the front property line and must be set perpendicular to the adjoining public street, provided that signs on corner lots may be set at a forty-five (45) degree angle at street intersections.

c. The sign may not exceed a height of eight (8) feet.

d. All electronic message center signs must be equipped with a photo cell dimmer or some other automatic dimmer control and may not operate between 10:00 p.m. and 6:00 a.m.

e. No minimum hold time or interval of change shall be required.

f. Text and moving pictorial images shall be permitted, however, no sign shall have blinking, flashing or fluttering lights or any other illuminating device that changes the intensity, brightness or color of the sign background.

(Code 1966, § 36-907(2); Ord. No. 80-8825, § 1, 12-15-80; Ord. No. 85-9074, § 1, 6-3-85; Ord. No. 91-9424, § 1, 2-4-91; Ord. No. 03-10126, § 1, 1-13-2003; Ord. No. 09-10517, § 1, 9-28-09)

Sec. 42-518. - U University district.

The following sign regulations shall apply in the university district:

(1) Functional types permitted:

a. Bulletin board signs;

b. Construction signs;

c. Identification signs;

d. Nameplate signs.

(2) Functional types conditional:

a. Advertising signs facing outward on the rear side of a scoreboard structure.

(3) Structural types permitted:

a. Ground signs;

b. Pole signs;

c. Scoreboard mounted signs;

d. Wall signs.

(4) Structural types conditional:

a. Signs mounted on the rear side of a scoreboard structure with a gross surface area and sign height in excess of the maximum size and height specified in subsections (6) and (7) and/or with a setback that is less than the minimum setback in subsection (8).

(5) Number of signs permitted: no limitation except as specified in subsection (4).

(6) Maximum gross surface area:

a. One (1) square foot for each six (6) lineal feet of building frontage except as noted in b. below.

b. Outdoor football/soccer stadiums shall be permitted no more than two (2) signs not to exceed one hundred sixty (160) square feet each. These signs shall be located within fifty (50) feet of the outdoor stadium and separated by a minimum of fifty (50) feet.

(7)

Maximum height: No height limit is specified for signs placed flat against a building, painted on the wall of a building or designed as a part of an architectural feature thereof. Detached signs shall not exceed ten (10) feet in height.

(8) Required setback:

a. All signs of thirty-two (32) square feet or less shall maintain a minimum setback of ten (10) feet.

b. All signs larger than thirty-two (32) square feet in area shall maintain the required setback for principal structures in the "U" university district.

(9) Illumination: No signs shall be illuminated, except the following:

a. Identification signs and bulletin board signs may be internally or externally illuminated, provided that no direct light shall be cast upon any residential property.

b. Electronic changeable copy signs not associated with advertising signs facing outward on the rear side of scoreboard structures subject to the following limitations:

1. All electronic message center signs must be equipped with a photo cell dimmer or some other automatic dimmer control and may not operate between 10:00 p.m. and 6:00 a.m., except when a scheduled public event extends beyond 10:00 p.m., the sign may operate no later than 30 minutes after the conclusion of the event.
2. No minimum hold time or interval of change shall be required.
3. Text and moving pictorial images shall be permitted, however, no sign shall have blinking, flashing or fluttering lights or any other illuminating device that changes intensity, brightness or color of the sign background.
4. The electronic message center portion of the sign shall not exceed fifty (50) percent of the total sign area.
5. The sign shall not exceed a height of ten (10) feet.
6. Educational institutions may have a maximum of one (1) freestanding electronic changeable copy identification or bulletin board sign for the institution and one (1) freestanding electronic changeable copy identification or bulletin board sign for an associated athletic stadium.

c. Electronic changeable copy signs associated with advertising signs facing outward on the rear side of the scoreboard structure provided that:

1. An electronic changeable copy sign conditional use permit must first be approved by the planning commission.
2. The sign shall be subject to the area, sign height limitations and setback requirements established under subsection 42-518(4)a.

(Ord. No. 80-8825, § 2, 12-15-80; Ord. No, 12-10664, § 1, 12-17-12; Ord. No. 15-10801, § 1, 9-21-2015)

Sec. 42-518.1. - Reserved.

Sec. 42-518.2. - P district.

The following sign regulations shall apply in the P district:

(1) *Functional types permitted:* Any type listed in section 42-506, except advertising signs, which shall only be allowed in accordance with subsection (7).

(2) *Structural types permitted:*

a. Ground signs;

b. Pole signs when used in conjunction with an approved conditional use, on properties located on a collector or arterial street, athletic stadiums, or public arenas; and

c. Wall signs.

(3) *Number of signs permitted:*

a. Ground sign:

1. Secondary schools (high schools) shall have a maximum of one (1) sign per street frontage.

2. All other zoning lots shall have a maximum of one (1) ground sign.

b. Pole signs: Each zoning lot shall have a maximum of one (1) pole sign as allowed in subsection (2).b.

c. Wall signs:

1. Secondary schools (high schools) shall have no limit on the total number of wall signs.

2. All other zoning lots shall have a maximum of two (2) wall signs.

d. Total number of signs: A maximum of four (4) signs is permitted per zoning lot, except that secondary schools (high schools) shall have no limit on the total number of wall signs.

(4) *Maximum gross surface area:*

a. Ground signs:

1. When used in conjunction with an approved conditional use or on properties located on an arterial or collector street, the maximum gross surface area shall be sixty-four (64) square feet.

2. For secondary schools (high schools) located on an arterial street, the maximum gross surface area shall be one hundred (100) square feet.

3. For all other zoning lots, the maximum gross surface area shall be thirty-two (32) square feet, except as provided in subsection (d) below.

b. Pole signs:

1. When used in conjunction with an approved conditional use or on properties located on an arterial or collector street, the maximum gross surface area shall be sixty-four (64) square feet.
2. For all other zoning lots, the maximum gross surface area shall be thirty-two (32) square feet, except as provided in subsection (d) below.

c. Wall signs:

1. For secondary schools (high schools), the maximum gross surface area for all wall signs combined shall be one (1) square foot of sign area for each one (1) foot of building frontage.
2. For all other zoning lots, the maximum gross surface area for each wall sign shall be thirty-two (32) square feet.

d. Athletic stadiums and public arenas shall be permitted to have one (1) either ground or pole sign on the same zoning lot as the athletic stadium or public arena with a maximum gross surface area of one hundred (100) square feet.

(5) *Maximum height:* No height limit is specified for signs placed flat against or painted on the wall of a building, or other attached signs provided all other provisions of this section are complied with. Detached signs may not exceed eight (8) feet in height, except that pole signs for approved conditional uses, properties located on a collector or arterial street, athletic stadiums, or public arenas may be up to twenty (20) feet in height.

(6) *Required setback:* Detached ground signs and pole signs shall be set back at least ten (10) feet from the front property line.

(7) *Illumination:* Signs may be internally or externally illuminated, provided that no direct light shall be cast upon any residential property. In addition, schools, athletic stadiums, public arenas, community centers, convention centers, governmental buildings and offices, aquatic centers, and parks and recreation facilities may have as its permitted ground or pole sign one (1) freestanding electronic changeable copy sign subject to the following limitations:

a. The electronic message center portion of the sign may not exceed fifty (50) percent of the allowable sign area, except for secondary schools (high schools), where the electronic message center portion of the sign may cover up to sixty-seven (67) percent of the allowable sign area.

b. The sign must set back at least ten (10) feet from the front property line and must be set perpendicular to the adjoining public street, provided that signs on corner lots may be set at a forty-five-degree angle at street intersections.

c. The sign may not exceed a height of eight (8) feet, except that pole signs for approved conditional uses, properties located on a collector and arterial street and at athletic stadiums and public arenas may be up to twenty (20) feet in height.

d. All electronic message center signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day/night brightness. The sign owner or sign installer shall provide written certification from the equipment manufacturer that the sign is so equipped.

e. The sign shall only operate between 7:00 a.m. to 10:00 p.m., with the exception of scheduled public events.

f. No minimum hold time or interval of change shall be required.

g. Text and moving pictorial images shall be permitted, however, no sign shall have blinking, flashing or fluttering lights or any other illuminating device that changes the intensity, brightness or color of the sign background.

h. The sign may be used as an advertising sign if the sign location is eligible for a pole sign.

(Ord. No. 12-10640, § 1, 6-11-12; Ord. No. 18-10929 , §§ 1, 2, 3-19-18)

Sec. 42-519. - C-1 restricted business district.

The following sign regulations shall apply in the C-1 restricted business district:

(1) *Functional types permitted:* Any type listed in section 42-506, except advertising signs.

(2) *Structural types permitted:* Any type listed in section 42-507, except roof signs, projecting signs and mobile signs.

(3) *Number of signs permitted:*

a. *Ground sign:* One (1) per zoning lot.

b. *Pole sign:* One (1) per zoning lot.

c. *Others:* Two (2) per zoning lot.

(4) *Maximum gross surface area:* One (1) square foot of sign area for each lineal foot of building frontage, not to exceed thirty-two (32) square feet.

(5) *Maximum height:*

a. All signs shall be placed flat against a building or designed as part of an architectural feature thereof except that signs may be detached it they do not exceed a height of eight (8) feet or project into any required building setback area.

b. No height limit is specified for signs placed flat against or painted on the wall of a building, or for other attached signs provided all other provisions of this section are complied with.

(6) *Required setback:* Entire sign shall be set back ten (10) feet.

(7) *Illumination:* Illuminated signs shall be permitted.

(Code 1966, § 36-907(3))

Sec. 42-520. - C-2 neighborhood shopping district.

The following sign regulations shall apply in the C-2 neighborhood shopping district:

(1) *Functional types permitted:* Any type listed in section 42-506, except advertising signs.

(2) *Structural types permitted:* Any type listed in section 42-507, except mobile signs, projecting signs, and roof signs.

(3) *Number of signs permitted:* Two (2) per business.

(4) *Maximum gross surface area:* One (1) square foot of sign area for each lineal foot of building frontage.

(5) *Maximum height:* Thirty (30) feet.

(6) *Required setback:* No minimum setback, except that pole sign supports must maintain a ten-foot setback.

(7) *Illumination:* Illuminated signs shall be permitted.

(Code 1966, § 36-907(4))

Sec. 42-521. - C-3 and C-4 commercial districts.

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a.

In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

Sec. 42-522. - C-5, C-6 and C-7 commercial districts.

The following sign regulations shall apply in the C-5, service commercial, C-6, heavy commercial and C-7, highway commercial districts:

(1) Functional types permitted: any type listed in section 42-506.

(2) Structural types permitted: any type listed in section 42-507.

(3) Maximum gross surface area:

a. Four (4) square feet of sign area for each lineal foot of building frontage.

b. Where no building frontage exists, four (4) square feet of sign area for each lineal foot of street frontage.

(4) Maximum height:

a. Signs located on an arterial, collector or residential street: Fifty (50) feet.

b. Signs oriented toward a designated interstate highway and located on property within six hundred sixty (660) feet of the interstate right-of-way: Fifty (50) feet above the interstate roadbed and associated bridges and ramps, with a maximum sign height of seventy (70) feet. Where the interstate roadbed is below the grade elevation of adjoining property, the maximum sign height shall be fifty (50) feet.

c. Artificially raising the ground level through filling or berming for the sole purpose of increasing sign height shall not be permitted.

(5) Required setback: none required, except that any sign which exceeds two hundred (200) square feet in gross surface area shall maintain the same setback required for principal structures, and in no case shall a sign project over public property.

(6) Illumination: illuminated signs shall be permitted.

(Code 1966, § 36-907(6); Ord. No. 95-9708, § 1, 10-16-95)

Sec. 42-523. - I-1 industrial park district.

The following sign regulations shall apply in the I-1 industrial park district:

(1) Functional types permitted: any type listed in section 42-506, except advertising signs.

(2) Structural types permitted: any type listed in section 42-507, except roof signs.

(3) Number of signs permitted: two (2) per establishment.

(4) Maximum gross surface area: one (1) square foot for each lineal foot of street frontage.

(5) Maximum height: thirty (30) feet.

(6) Required setback: ten (10) feet.

(7) Illumination: illuminated signs shall be permitted.

(Code 1966, § 36-907(7); Ord. No. 08-10467, § 1 9-29-08)

Sec. 42-524. - I-2 and I-3 industrial districts.

The following sign regulations shall apply in the I-2 light industrial and I-3 heavy industrial districts:

(1) Functional types permitted: any type listed in section 42-506.

(2) Structural types permitted: any type listed in section 42-507.

(3) Number of signs permitted: no limitation.

(4) Maximum gross surface area: four (4) square feet for each lineal foot of street frontage.

(5) Maximum height:

a. Roof sign: thirty (30) feet above the highest point of the structure on which the sign is located.

b. All other signs: thirty (30) feet.

(6) Required setback: none required.

(7) Illumination: illuminated signs shall be permitted.

(Code 1966, § 36-907(8))

Sec. 42-525. - Historic signs.

(a) Specific provisions of this sign ordinance may be waived by the board of city commissioners for designated historic signs upon application by the owner or by city-initiated application.

(b) Upon filing of said application, the heritage commission, with or without review and recommendation from the Salina Business District Number 1 Design Review Board, may recommend, and the city commission may declare, a sign to be of "historic significance" by making findings according to the guidelines below. Except for requirement pertaining to safety, structural integrity or maintenance, a sign so designated shall be deemed to conform to this article.

(c) To be designated "historically significant," a sign must be found to comply with all of the following guidelines:

(1) The sign has been in continuous existence at the present location for not less than twenty-five (25) years.

(2) The sign possesses such exemplary design, technology, craftsmanship, materials and/or a means of illumination that it significantly enhances the cultural, historical and/or aesthetic quality of the community.

(3) The sign has not been significantly altered from its historic period or, if altered, is restorable to its historic function and appearance.

(d) Once designated "historically significant," removal of the sign shall be subject to the provisions of article IX, regarding demolition or removal of heritage landmarks.

(Ord. No. 90-9381, § 8, 5-14-90)

Secs. 42-526—42-540. - Reserved.

Sec. 42-764. - Sign.

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

Sec. 42-765. - Sign, advertising.

*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

Sec. 42-766. - Sign, awning, canopy, and marquee.

*Awning, canopy and marquee sign* is a sign that is mounted or painted on, or attached to, an awning, canopy, or marquee that is otherwise permitted by these regulations. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy, or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(Code 1966, § 36-1301(147))

Sec. 42-767. - Sign, bulletin board.

*Bulletin board sign* is a sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events, or activities occurring at the institution. Such signs may also present a greeting or similar message.

(Code 1966, § 36-1301(148))

Sec. 42-768. - Sign, business.

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(Code 1966, § 36-1301(149))

Sec. 42-769. - Sign, canopy.

See "sign, awning, canopy, and marquee."

(Code 1966, § 36-1301(150))

Sec. 42-770. - Sign, construction.

*Construction sign* is a temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

(Code 1966, § 36-1301(151))

Sec. 42-771. - Sign, ground.

*Ground sign* is any sign placed upon, or supported by, the ground independently of the principal building or structure on the property. Signs on accessory structures shall be considered ground signs.

(Code 1966, § 36-1301(152))

Sec. 42-772. - Sign, identification.

*Identification sign* is a sign giving the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(Code 1966, § 36-1301(153))

Sec. 42-773. - Sign, marquee.

See "sign, awning, canopy, and marquee."

(Code 1966, § 36-1301(154))

Sec. 42-774. - Sign, mobile.

*Mobile sign* is a sign which is designed to be easily transported and is attached to a trailer or other nonmotive powered vehicle.

(Code 1966, § 36-1301(155))

Sec. 42-775. - Sign, nameplate.

*Nameplate sign* is a sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, § 36-1301(156))

Sec. 42-776. - Sign, off-premise.

See "sign, advertising."

(Code 1966, § 36-1301(157))

Sec. 42-777. - Sign, pole.

*Pole sign* is a sign that is mounted on a free-standing pole, the bottom edge of which sign is six (6) feet or more above ground level.

(Code 1966, § 36-1301(158))

Sec. 42-778. - Sign, projecting.

*Projecting sign* is a sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building

(Code 1966, § 36-1301(159))

Sec. 42-779. - Sign, real estate.

*Real estate sign* is a sign pertaining to the sale or lease of the lot or tract of land on which the sign is located, or to the sale or lease of one or more structures, or a portion thereof located thereon.

(Code 1966, § 36-1301(160))

Sec. 42-780. - Sign, roof.

*Roof sign* is a sign erected, constructed and maintained wholly upon or over the roof of a building and having the roof as the principal means of support.

(Code 1966, § 35-1301(161))

Sec. 42-781. - Sign, wall.

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

# DESIGN REVIEW BOARD

Exhibit C

LEE DISTRICT SALINA DOWNTOWN INC.

**DESIGN REVIEW BOARD**
**4:00 P.M., Thursday, April 23, 2015**
**City Conference Room 107**
**City-County Building, 300 West Ash Street**

## AGENDA

1. Administration:
   A. Call to Order/Roll Call.
   B. Additions or corrections to the agenda.
   C. Review of Minutes for March 26, 2015 meeting.
   D. Introduction of guests.

2. New Business:

2A. The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review and receive public comments regarding a façade improvement project that has been planned for the Art Center's South Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the South Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

3. Other Business:

4. The next regular meeting, if scheduled, will be on May 14, 2015.

5. A motion to adjourn is in order.

***An applicant or his representative is required to attend the hearing in order for the Design Review Board to take action on an application.***

City of Salina/Development Services Planning Division City-County Building 300 W. Ash Street, Room 201
Salina, KS 67402-0736 785/309-5720 FAX 785/309-5713 email: john.burger@salina.org

***Design Review Board Members:*** Michael Trow – ***Chair***
Daniel Baffa, Larry Bunker, Maggie Gillam, Tina Lewis – Vice Chair

***Salina Downtown Inc.*** 120 West Ash Street PO Box 1065 Salina, Kansas 67401 785-825-0535
***Interim Executive Director:*** Penny Bettles Email: pbettles@salinadowntown.com

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion.

Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address, and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant, and/or citizens as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

Any person dissatisfied with a decision by the board to either grant or deny a certificate of compatibility may appeal the decision to the Board of City Commissioners by filing a written protest with the City Clerk on a form provided by that office. The notice of appeal must be filed within fourteen (14) calendar days after the conclusion of the public hearing. If you have any questions or concerns, please contact the Development Services Department in Room 201 of the City-County Building, 309-5720.

(7-16-14)

City of Salina

# Application for a Certificate of Compatibility
## Lee District - Design Review Board

| | |
|---|---|
| *Please return the completed application to:*<br>**Development Services Department**<br>300 W. Ash, City-County Building, Room #201<br>Salina, KS 67402-0736<br>785-309-5720 FAX 785-309-5713<br>Email: john.burger@salina.org | *The City Planning Department:*<br>• *Provides technical assistance to the applicant*<br>• *Receives the completed application*<br>• *Provides a copy of the application to the SDI Office for input*<br>• *Schedules the Design Review Board hearing*<br>• *Presents the application to Design Review Board* |

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. The applicant must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 242 S. Santa Fe Ave.
2. Name of Business Salina Art Center
3. Applicant's Name Salina Art Center (Bill North) 4. Applicant Ph. 827-1431
5. Applicant's Address same 6. Email bnorth@salinaartcenter.org

7. Property Owner Name (if different) _____
8. Property Owner Address _____ 9. Owner Ph. _____
9. Contractor/Architect Conrad Snider 10. Phone 316-288-8694
11. Contractor/Architect Address 310 W. Fourth, Newton, KS 12. Email conrad@southwind.net

13. What kind of work is proposed? (please check all that apply)
☐ Renovation or repair ☐ Demolition ☐ Sign or Canopy ☐ New Construction ☐ Paint
☒ Other, please describe Ceramic tile mural
14. Approximate cost of project (including labor and material) $18,250

**Please attach the following materials to the application:**

1. Representative color photographs showing the existing structure and the location for the proposed work.
2. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
3. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
4. Material samples or product specifications indicating color, form, profile and texture.
   See also the attached *Guide to Completing a Certificate of Compatibility Application* for required submittal material for project types: new construction, renovation or repair, sign or canopy or demolition.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**
See attached

Applicant Signature: Bill North Date 4/10/2015

Property Owner Signature (if different): _____ Date _____

**For Staff Use:** **Application** DIP15-1
Legal Description of Property LOTS 158 & 160 ON SANTA FE, ORIGINAL TOWN

Current Zoning C-4 Current Use ART GALLERY/EDUCATION
Date Filed 4-10-15 Accepted by J BURGER
Date of Publication NA Building/Sign Permit No. NA
Property Owner Notice Sent 4-15-15 Heritage Commission Review (y/n) NO
Date of Hearing 4-23-15 Approval Notification Sent _____

Attachment, Salina Art Center, Application for a Certificate of Compatibility, Lee District, Design Review Board

The proposed project is a ceramic tile mural along the Art Center's Santa Fe Avenue façade. The specific location is the 12 x 23 ft. bay between the Art Center's original Santa Fe entrance and the current entrance. Ceramic artist Conrad Snider will create and install the mural. A three-time SculptureTour Salina exhibitor, Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be fired to Cone 10 (2,300 degrees Fahrenheit), which will vitrify the clay, making it resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with an epoxy grout.

The mural design will take into consideration the exterior of the building, including colors and surfaces of the brick, ceramic elements on the center pillar, and roof tiles. The space allowed for the tile mural is approximately 12 feet by 23 feet, for a total of 230 square feet (see attached photo).

# STAFF REPORT
# LEE DISTRICT DESIGN REVIEW BOARD

Hearing Date: **April 23, 2015**

## ITEM

The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review a proposed façade improvement/art installation project that has been planned for the Art Center's Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

## BACKGROUND

Conrad Snider, a Newton, Kansas ceramic artist has been commissioned to create and install a mural comprised of handmade ceramic tiles that would be attached to the stucco wall in the Art Center façade. The art installation will become a permanent feature of the Art Center's Santa Fe façade. The mural will be comprised of sculptural elements existing on the exterior of the building, including the brick, terra cotta and the Spanish Tile roof. Mr. Snider's work is found throughout the state and includes the *Points of Contact* ceramic mural located in the Salina's First Presbyterian Church, and the *Woven* terra cotta figures in front of Salina's Municipal Court Building.

A Ceramic Workshop has been scheduled by the Salina Arts and Humanities Department under the Horizon Grants Program that will involve up to 12 participants of the community. Under the direction of the artist, Conrad Snider, participants will assist in the creation of a scale model of a ceramic tile mural for the exterior of the Art Center. The series of workshops at the Art Center Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Mr. Snider's permanent sculptural mural. The art installation would become an important feature of the Art Center's visual identity and downtown Salina's streetscape. The workshop is open to high school students and adults with no experience in ceramics required. A call for the Ceramics Workshop is attached to this report.

## PHYSICAL CHARACTERISTICS

Records indicate that the one-story storefront building on Lot 160, addressed as 240-241 S. Santa Fe was originally constructed of brick with a Mission Revival cornice and Spanish Tile roof in 1929. A one-story storefront building addressed as 236-238 S. Santa Fe was constructed on Lot 158 in 1946. The Knights Sporting Goods Company and various storefronts occupied 238 and 240 S. Santa Fe until 1987. A building permit was issued in August 11, 1987 to convert the space at 240-242 S. Santa Fe to the Salina Art Center at a cost of $237,000. The space was opened to the public on January 11, 1988. Architect Donnie Marrs enclosed the storefront facing Santa Fe with two bays, having arched stone surrounds, a building base and terra cotta tile columns.

The Art Center expanded into the space at 236-238 S. Santa Fe in 1992, establishing an open floor plan education wing that included additional gallery and work space, restrooms and storage. Jones-Gillam Architects designed an all glass storefront with a sculptured metal canopy on the Santa Fe façade and a covered courtyard at the rear of the building.

An artist in residence warehouse was established in a commercial space at 149 S. 4th Street in 2008. The space is occupied by an open work area and an apartment for Artist-in-Residence exhibitors at the Salina Art Center. This space is utilized as a workshop and for various activities and projects of the Art Center throughout the year.

**PROPOSAL**

The proposed project would include the installation of a ceramic tile mural along the Art Center's Santa Fe façade. The work would be located in the northern one-half of the original Art Center building. The specific location is the 12 ft. by 23 ft. bay between the original Art Center entrance on the south and the education wing to the north. This area is delineated by the arched stone surround and the stone building base at the sidewalk.

Ceramic artist Conrad Snider will create and install the mural. Mr. Snider is a three-time Sculpture Tour Salina exhibitor and maintains a work studio in a renovated 1920's feed mill in Newton, Kansas. A summary description of Mr. Snider's work is maintained on his website, a copy of which is attached to this report.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be formed and fired in a kiln to vitrify the clay and make it water resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with epoxy grout to match the tile

The mural design will take into consideration work done at a Ceramic Workshop being sponsored by the Salina Arts and Humanities Horizon Program where a scaled prototype will be designed and constructed. The composition of the proposed mural will utilize the colors and surface textures of the brick, ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. The space allowed for the tile mural is approximately 12 feet by 23 feet, totaling 230 sq. ft. This blank stucco area on the Art Center façade has been utilized in the past for temporary art installations.

**STAFF ANALYSIS**

Installation of public art does not require a Certificate of Compatibility however; a public hearing has been scheduled before the Lee District Design Review Board in order to receive comments on the compatibility of the art piece to submit as part of a grant application to the Façade Development Incentive Program (DIP) of Salina Downtown, Incorporated. The grant program is designed for large and small scale projects for new

construction, renovation of building facades and interiors of existing historic buildings. The program is designed primarily for façade improvements to the exteriors of buildings in the Lee District. The amount of any grant is contingent on the scale of the project and available funds. Non-profit Salina Downtown, Inc. partner businesses located in the Lee District boundary are eligible to apply for DIP funds.

The proposed project appears eligible for the DIP program as a façade renovation and restoration project. Work found to comply with the Salina Downtown Guidelines (contingent on Design Review Board approval) is an eligible use of funds.

> The Design Guidelines for Downtown Salina, 2008 contains the following Policies relating to Architectural Character:
>
> ***Building materials should be visually compatible with the predominate materials of the downtown area.***

The historical use of terra cotta and ceramic tile accents and trim is consistent throughout the Blocks of North and South Santa Fe. Evidence of this can be found at 117-119 S. Santa Fe and 111-125 East Iron Avenue, among others. It is integral to the Spanish Revival style of architecture used by Salina architects, such as Charles Shaver during the 1930's. Much of this is attributed to the influence of J. C. Nichols' development of the Country Club Plaza in Kansas City. The 200 Block of South Santa Fe West elevation contains several Spanish Revival style facades.

It appears that the mural design program will utilize the colors and surface textures of the brick, terra cotta and ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. This would appear to be consistent with the Design Guidelines.

**<u>REQUESTED ACTION</u>**

Similar to the addition of a new storefront, awning or other permanent improvement or renovation of an existing architectural element, it is appropriate for owners and residents potentially affected by such an activity in the Lee District to receive notice and an opportunity to be heard on the matter.

A public hearing was been scheduled for the Design Review Board to receive public comments and input about the mural design and installation. As a general rule, an art installation does not fall within the scope of authority of the DRB, however in this case the DRB is being asked to make a recommendation on this proposed art project for use with an application being made under the Façade Development Incentive Program of SDI.

The art installation is intended to be a permanent element similar in function to a sign or logogram that will direct the public to the gallery and educational activities within the Art Center building. It is also intended to enrich and engage members of the public visiting

or doing business within the Downtown area. Letters of notice were sent to surrounding property owners announcing this public hearing. Since the Lee District Design Review Board customarily reviews exterior improvements in the Lee District, it is appropriate for this Board to receive comments from the public at the hearing concerning the art installation as a requirement of the Façade Development Incentive Program. A description of the DIP Program is attached to this report.

A record of the proceedings and any verbal or written comments received will be provided to the Façade Development Incentive Program (DIP) Review Committee for their use in analyzing a potential grant award for this project. Grant awards are made during May and September of each calendar year.


Facade Improvement
Salina Art Center
242 S. Santa Fe Avenue
SALINA ART
CENTER
Santa Fe Ave
Request Area
Mulberry St
N
W
E
S

# CALL FOR
# CERAMIC WORKSHOP
# SALINA ART CENTER MURAL

# CERAMIC WORKSHOP PARTICIPANTS NEEDED

Modeling Community: Salina Art Center Façade Mural Project

Limited to 12 participants - **SIGN UP TODAY!**

Under the direction of acclaimed ceramic artist Conrad Snider, participants will assist in creating a scale model of a ceramic tile mural for the exterior of the Art Center's Santa Fe Avenue façade. A series of workshops at the Art Center's Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Snider's permanent sculptural mural, which will become an important feature of the Art Center's visual identity and downtown Salina's streetscape.

This project was funded in part by the Horizons Grants Program of the Salina Arts and Humanities Foundation. Funding is provided by Horizons, a private donor group.

Three-time SculptureTour Salina exhibitor Conrad Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

**WHAT:** Ceramic mural workshop with Conrad Snider.

**WHO:** The workshop is open to high school students and adults. No experience with ceramics necessary.

**WHEN:** Wednesday, **April 22, 4-6 p.m.**; Thursday, **April 23, 4-7 p.m.**; and 3 sessions before May 6 (dates and times TBD on April 22).

**WHERE:** The Salina Art Center Warehouse, 149 S. 4th St.

**HOW:** Register online (http://goo.gl/QjqeDn), by email (info@salinaartcenter.org), or by phone (827-1431). Participation in the workshop is FREE OF CHARGE. Registration is on a first-come, first-served basis and limited to 12 participants. There will be a waiting list.

For more information, call 827-1431.

SALINA ARTS & HUMANITIES Horizons Grants Program

SALINA art center




Salina Art Center, 242 S. Santa Fe, proposed mural site




Salina Art Center, 242 S. Santa Fe, proposed mural site



Sample Mural Design

# CONRAD SNIDER
# STUDIO WEBSITE



**Conrad Snider**
*Large Scale Ceramic Sculpture, Hand Made Tile Murals, and Wheel Thrown Vessels*

*Write to me here*

Visit Soldner Equipment

# Conrad Snider

Welcome to my website. Thank you for visiting and come back again, new photos are added periodically.

Here you will be able to visit my studio, see one-of-a-kind large scale ceramic sculptures and vessels, and see how the vessels are made.

Click on the images below to see other pieces. Scroll down to read about my work.


Figures


Tile Murals


Wheel Thrown Vessels


Public and Private Projects


Hand Built Vessels


Studio and Home

My work is all large scale and ranges from clay vessels, both thrown on the potter's wheel and hand built, to figurative pieces and hand-pounded tile murals. Each of these aspects is important to me and feeds a different part of my personality. When I work on a piece I try to let the clay speak, sharing its natural behaviors, sensuality, visual strength, and power. I want each piece to have its own individual presence.

The process from wet clay to a finished piece takes 6 months to a year, ending with the final glaze firing in a gas reduction kiln to 2300 degrees Fahrenheit. Some pieces will be fired multiple times to enhance the glazed surfaces and textures. The surfaces are equally important to the form for the overall effect of the piece. High fired clay is impervious to fingerprints, water, and paints, which allows tactile exploration to be as much a part of the viewers' experience as visual interpretation. These same attributes also make clay ideal for public art installations.

I make most of my pieces ahead and find homes for them later on. Most of my sales are to individuals, though I have done a number of public commissions, and have pieces in several Public and Corporate collections. Because each piece is personal to me, and they spend so much time in the studio, they become like my children. I want them to go to good homes where they will be appreciated for years to come.

Read more Resume

This page is currently being modified. Some links are not yet completed. Please bear with us and come back soon.

## Tile Murals

*Back to Home*



These tile wall murals are ideal for architectural accents and can be custom commissioned. Most of the tiles are made to fit on a one foot grid, including grout lines. These tiles are hand-pounded individually and fired to Cone 10, 2300 degrees Fahrenheit.



72" X 96"



72" X 96" X 5"



98" X 147"



72" X 96"



72" X 120"



72" x 96"

# SALINA DOWNTOWN, INC.
# DEVELOPMENT INCENTIVE PROGRAM

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects**

This grant program is designed for *large* scale projects for new construction, and for renovation of façades and interiors of existing historic buildings (see definition below) within the Lee District. Salina Downtown, Inc. recognizes that property owners and tenants may need assistance making costly improvements and enhancements to the exterior of their buildings and to the interior of historic buildings. This program is designed primarily for façade improvements and new construction. However, interior improvements to historical or locally historically significant buildings (50 years or older) may qualify. The amount of any grant is contingent on the scale of the project and available funds through the Development Incentive Program.

**ELIGIBILITY:** Property owners and/or tenants who are in good standing with the Lee District (service fees are current) are eligible to apply. However, non-profit Salina Downtown, Inc. partner businesses located within the Lee District boundary are also eligible to apply for DIP funds.

**AVAILABLE FUNDS**: $35,000 annually 2008-2010. Maximum single project award $15,000.

**MATCHING REQUIREMENT**: All applications are competitive and require a minimum cash only match of 1.5:1 private to Development Incentive Program (DIP) grant funds. In-kind contributions will NOT count towards the required match. This is a reimbursement program. Upon completion of the project the applicant is required to pay the full amount of the project up front and submit proof of paid bills before reimbursement will be made. (See Reimbursement Policy)

**ELIGIBLE USE OF FUNDS**: Projects may include but are not limited to:

- New building construction
- Building expansion
- Vacant building redevelopment
- Facade renovation and restoration (emphasis on removal of metal siding and metal awnings) and/or replacement with new coverings or roll-ups
- * Work complying with Salina Downtown Design Guidelines, contingent on Design Review Board approval
- Pressure cleaning
- Stucco: new or restoration
- Painting
- Window, Door or transom replacements or repairs.
- Re-pointing of mortar joints for brick or stone
- Awnings (including the removal/installation of old awnings and canopies)
- Alley entry way improvements
- Entry way tile in exterior doorways
- Interior code related work.
- Interior work to historical buildings or buildings deemed to be historically significant (50 years or older) and work preserves historical interior aspects of the building

**INELIGIBLE USE OF FUNDS:**

- Signage
- Projects with no minimum 1.5:1 match
- Projects outside the Lee District boundaries
- Any in-kind expenses including labor of property/business owners
- Roofing
- HVAC

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**SELECTION CRITERIA:** All projects will be judged on their individual merits and components. The following criteria will serve as the basis of consideration:

- Ratio of matching funds minimum 1.5 private to 1 DIP. Additional consideration given to applicants providing more than the minimum match requirements.
- Projects creating new businesses and/or additional employment in downtown will receive additional consideration or priority.
- Project's adherence to Salina Downtown Design Guidelines
- Improvements to façade given priority
- Interior work may be included at the discretion of the review committee if the building is Historic or deemed historically significant (at least 50 years old) and the interior work preserves historic characteristics.

**APPROVAL:**

Applications are subject to review and approval by the DIP Review Committee with final approval of the Salina Downtown, Inc. Board of Directors. The DIP Grant Review Committee includes two members of the SDI Business Support and Recruitment Committee, one SDI Board member, one Design Review Board member and one member appointed by the Salina City Commission. Applications awarded DIP funding will officially be notified by letter.

**ADDITIONAL REQUIREMENTS**:

- Provide an architectural drawing or sketch
- Provide a five minute oral presentation to the application review committee.
- All projects awarded grants must be completed within one calendar year from the award letter date.
- Two professional contractor estimates of the cost of the intended improvements are required.
- Application must include a professional architectural design including color and material choices.
- All work must meet all City Building code requirements.
- All applicants are responsible for acquiring and completing all necessary city permits.
- Taxes and Lee District Fees must be current.
- Written approval of building owner, specifying work, must be included in application (if applicable).
- A contract must be signed between Salina Downtown, Inc. and applicant within three months of approval from SDI Board and prior to work commencing.
- The SDI office will be notified in advance of commencement of all work on the project
- Representatives of SDI will be allowed on the work site at all reasonable times.
- Environmental assessment must be completed
- Work must be completed within one year of signed Grant Reimbursement contract.

**APPLICATION DEADLINE:** Application forms are available from Salina Downtown, Inc. (SDI), PO Box 1065, 205 West Ash Street, Salina, Kansas 67401 and on line at www.salinadowntown.com. Completed applications are due at the SDI office by 12:00 noon the third Wednesday of April and August. Awards will be made twice annually in May and September. Applications awarded DIP funding will officially be notified by letter.

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**REIMBURSEMENT POLICY**

Successful applicants receive disbursement of DIP funds after completion of project, approval of work by a final City inspection, receipt of Certificate of Completion, and submittal of copies of paid invoices for approved expenses to the SDI Executive Director. To receive reimbursement, the property owner must sign an agreement to maintain the funded building improvements for a period of at least 3 years for a DIP Forgivable Loan Program for Major Projects ($3,500 and above). This agreement shall provide for a lien against the property in an amount equal to the reimbursement amount.

**REPAYMENT/GRANT FORGIVENESS POLICY**

For reimbursement totaling $3,500 and above, one third (33.3%) of said lien for improvements shall be forgiven annually on the anniversary date of the Certificate of Completion. Should the property be sold or refinanced prior to the full forgiveness of the lien, the remaining amount of the lien shall be paid to SDI upon sale, or closing of the refinancing Grant. The agreement shall be filed with Saline County Register of Deeds and transferred upon sale of the property.

Exhibit D

## Greater Downtown Artwork List

(Approximately 70 permanent and temporary pieces and 4 SculptureTour ballot boxes which contain all the current sculptures on display along Santa Fe)

**Santa Fe from South to North (Prescott to Elm)**

1. SW corner of Santa Fe and Prescott- Fish Tale, Gregory Johnson, purchased 2011 by Bank of Tescott. Bronze sculpture of boy with fishing pole.

2. Front of Tammy Walker Cancer Center-511 S. Santa Fe- Bronze sculpture of running girl. Private commission. Artwork inside the building includes four local artists commissioned to personalize and warm the space.



3. NW corner of South St. and Santa Fe (in front of the Temple) Mixed Media sculpture on pedestal by Jodie Bliss. "Picasso's Violin". 2018 People's Choice purchase by City of Salina. (First abstract or non-representational work selected in the 8th year of the program)

4. NE Corner of Santa Fe and Mulberry- "Off the Merry-Go-Round" by Jodie Bliss. Rearing horse sculpture in front of Starbucks. Private ScultpureTour purchase in 2019.

Conrad Snider, Newton, KS tile wall tile sculpture at the Salina Art Center (242 S. Santa Fe). Snider and community members collaborated on this mural. Impressions are from downtown architecture and prairie ecosystem. Snider did multiple sculptures and tile additions to the law enforcement center and municipal court buildings in the early phases of the public art program.

5. 200 block of S. Santa Fe- mid-block crosswalk has ballots for sculpture tour. Spillman Plaza mixed media sculpture, "Clarence the Catfish", the 2022 People's Choice award winner by Joe and Terry Malesky, Springfield, Missouri.

6. Spillman Plaza south facing wall across from Seraphim- Super Girl painted stencil on brick wall. Joe Lurato, New Jersey. (2022 Boom mural Festival)



7. Campbell Plaza-100 block- Large mural "Open Book", by Telmo-Miel for the 2022 Boom! Mural Festival. On the back of the Campbell Plaza Stage is the "Love Salina" mural by Salina artist Eric Montoy. Amelia Earhart mural by Logan Hicks and Jo Lurato on back wall of Prickly Pear during the 2022 Boom! Mural Festival, and red fox mural on back wall of Lauren Quinn floral shop by Brady Scott from Hutchinson, KS during 2022 Boom! (This plaza has been granted to Prickly Pear in license agreement, but City still has first-use rights for the stage)

  

*September 2023*



8. Across the street in Strand Plaza- large butterfly mural by Mantra. The mid-block crossing has SculptureTour ballots. Also an additional sculpture is in the seating area behind Barollo Grill. This was a Friends of SculptureTour purchase and donation. (The four downtown plazas were named for early founders or early business leaders.)



9. Behind 100 S. Santa Fe- native prairie mural by Mona Caron (2022 Boom Mural Festival) Directly north in the alley north of Iron Ave is a wall mural by the KC artist Gear.



10. Mid-block crosswalk in 100 N. block has sculpture tour ballots.

11. Arcade tunnel between 137 and 141 N. Santa Fe also has two paintings by the mural artist Gear. No title info at this time. (The Smoky Hill River Festival regularly commissions mural artists who create work that is placed elsewhere in the community. Schools, animal shelter, arcades, and other public spaces.)



Parking lot north of 141 N. Santa Fe- 67401 painted mural by Salina artists Robin and Julie Cates. City Lights Stage, mural by Dave Lowenstein, Lawrence, KS completed in June of 2022. Across the street on the north wall of the KU Medical School is a 2023 Boom mural by Add Fuel, a Portuguese artist.



12. 217 N. Santa Fe “Three Kinds of Sons”, Acrylic and latex sprayed mural by Tony Sjoman, Manhattan, NY. (2022 Boom Mural Festival)

13. Mid-block crossing has SculptureTour ballots

14. 249 N. Santa Fe- “For the Love of Steel” motorcycle sculpture. Sonny Corbett, Salina Kansas. 2020 SculptureTour People’s Choice purchase by the City of Salina. Sonny passed away a few months before his work was selected for the 2020-21 show. His friends submitted the work on his behalf. (Point out the reuse of historic Lee Buildings for apartments and commercial retail space. 53 apartments are complete and another 70 will commence soon. Ground floor space for restaurants, retail, or professional office space is also being developed.)

15. Approximately 341 N. Santa Fe- “Mural at the Mill” by Guido Van Helton. Completed in the fall of 2021. Privately funded project by the Salina Kanvas Project. (This was the first major mural project as part of the private Kanvas Project initiative. Based on a photo taken of kids playing Ring Around the Rosie. Mention that the same kids are featured on all sides of the building.) One block north on the east side of the street is a mural of a railroad worker by Chris Stain and a portrait of Martha Cooper by Joe Lurato. In the 500 block of N. Santa Fe on the west side of the street is a mural by PichiAvo from Valencia, Spain.

*September 2023*

**5th Street from Ash to Mulberry**

16. Mid-block west side parking lot. Steel and limestone untitled sculpture by Richie Bergen (harmonica). Friends of SculptureTour purchase as part of pre-tour workshop. Three-bladed steel sculpture "Silver Streaks" by Oklahoma artist Jim Stewart. SculptureTour purchase by Rotary Club gifted to the City.

17. Salina Field House- Perforated metal wall. Designed by Lawrence and Kansas City artist Jeremy Rockwell and fabricated by Zahner, Kansas City, MO Capital Improvement Project Public artwork. (CAD Committee formed a site committee that commissioned a designer to integrate art that also served as a sun block (functional purpose) as well as an aesthetic enhancement to the building.

18. In the 100 block of S. 5th St. at the west entrance of The Garage- large tire sculpture. Artist unknown. More sculpture on the 4th St. entrance of The Garage. A mural by Salina artist Eric Montoy is also featured on a west facing wall of the Garage. Directly across the street to the west in a parking lot behind Campbell Plaza is a mural by Mad C, a German artist from the 2023 Boom Mural Festival.

19. Behind the Stiefel Theatre is Artwork Alley. This is a pre-Festival event completed in May of 2022. with 9 murals by nine different artists. Left to right facing West: Ray Albarez (Saeb), Jeremy Fields (Sadat), Brady Scott, Darren Morawitz, Kamela Eaton, Anthony Parker (Amp), Hannah Scott, north wall "Symphony of Sunflowers" by Brady Scott who also curated the event, and the trash corral by Colin Benson and Chase Wheeler. A majority of funds for this project came from private sources and the Kansas Creative Arts Industries Commission Reimagined Spaces Grant. Additionally, the small figure by the Stiefel Theatre back door is by Joe Lurato. He has another pop-up just to the south in a niche across the alley. At the end of the alley at Walnut is another mural by Mindy Allen, Junction City, KS. On the back wall of the Stiefel Theatre is a 2023 Boom mural by California artist El Mac.





*September 2023*

20. Approximately 215 S 5th. Large buffalo mural on wall at back of vacant lots. Artist unknown.

21. SE Corner of South Street and 5th Salina Water Treatment Plant- Public art installation. Found on Salina Arts & Humanities public art page. Artist/fabricator Kent Williams, Wichita, KS.

**Additional locations in the greater downtown area**

22. Corner of 7th and Elm St. Fire Station #1 Salina Firefighter Tribute Plaza. Artist: Bejamin Victor Custom bronze sculpture of a firefighter.

23. City/County/Library grounds. Butterfly Tree, 2021 People's Choice sculpture at South Library entrance; "Trifinity" bronze by Salinan, Richard Bergen in Caldwell Plaza, and "Wheat Harvest", by James Mages of Hays, KS wheat sculpture in the south drive of the government building. Inside the building is the bronze sculpture "Daughters of Peace", by Benjamin Victor, the 2015 People's Choice.

24. Salina Senior Center (across from "Trifinity" sculpture) on west side 9th St. "Farmer", 2013 People's Choice bronze statue by Lawrence Starck.

25. 211 W. Iron Ave (Smoky Hill Museum) "Patches"-a mixed media sculpture of a hippo by Dale Lewis. The 2018 People's Choice award winner.

26. 232 N. 3rd St is a mural by Pat Perry featuring a collection of images from Salina and Saline, County.

27. 805 The Midway (north side of complex) "We're Better Together" mural by Queen Andrea.

**Additional items of interest:**

- More than $250 million in public and private investment is taking place throughout the greater downtown in less than 10 years.
- Each of the four blocks of sidewalk downtown have a different art deco inspired design.
- The KU Med Center Salina held a nationwide competition to commission original work for the new medical school.
- The local school district recently included $120,000 (1%) of a school improvement bond project and integrated art in all 16 buildings in the district. They have an articulation agreement stating their intent to include art when they do capital projects.
- Eight new mural artists will be coming to Salina in the first week of October for Boom!
- Funds through Salina Arts & Humanities and Salina Downtown Inc. help provide support for businesses, artists, or performers to make the arts unavoidable throughout the community.
- Since SculptureTour began in 2011, there are now more than 50 pieces of art throughout the community in publicly visible spaces. (This is a private program)
- A new ACE District (Arts, Commerce, and Entertainment) was recently formed and encourages creative acts and more commerce outside of buildings throughout the greater downtown area.
- The Smoky Hill River renewal is underway which will include 7 miles of urban waterway and trails to be completed within the next 8 years. New plazas, artwork, and a restored river with boating and fishing is being developed.
- Salina is projecting $1 billion in capital projects citywide over the next 10 years.
- The first series of murals by Boom! artists intentionally developed content that reflected aspects of the people or geography of this place.

*September 2023*

**Resources for further study:**

Boom! Mural Festival

https://www.boomsalina.art/

Salina Arts & Humanities public art webpage:

https://www.salinaarts.com/public-art/

A page with links to multiple local and regional cultural arts offerings:

https://www.salinaarts.com/resources/

SculptureTour Salina website

https://www.sculpturetoursalina.net/

Salina Art Center

https://www.salinaartcenter.org/

Salina Community Theatre

https://salinatheatre.com/

Stiefel Theatre for the Performing Arts

https://www.stiefeltheatre.org/

Salina Symphony

https://www.salinasymphony.org/main/

Travel and Tourism information:

https://www.salinakansas.org/visit-salina.html

*September 2023*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn; Stephen Howard,<br><br>Plaintiffs,<br><br>v.<br><br>City of Salina, Kansas,<br><br>Defendant.** | ) | **CIVIL ACTION<br>CASE NO. 6:24-cv-01027-TC-ADM** |

**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys of record, Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully moves to dismiss with prejudice the Amended Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") filed by Plaintiffs, Cozy Inn, Incorporated (d/b/a The Cozy Inn) and Stephen Howard ("Plaintiffs"), pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), and in support thereof states:

This matter involves Plaintiffs' constitutional challenge to certain provisions of the Salina Code of Ordinances ("Salina Code"), specifically: (1) Chapter 42, Article X ("Sign Code"), which promotes the "public health, safety and welfare . . . through a comprehensive system of reasonable, effective, consistent, content-neutral and non discriminatory sign standards and requirements . . .," (Sign Code § 42-500); and (2) Chapter 2, Article X, Salina Code ("BID Code"), which contains a design review process that the City adopted for new construction, building alterations, demolitions, and exterior aesthetic changes to buildings in its downtown Business Improvement District No. 1.

As set forth more fully in the accompanying *Defendant's Brief in Support of Defendant's Motion to Dismiss* ("Brief"), the Complaint must be dismissed in its entirety because Plaintiffs

cannot satisfy the standing requirement. Plaintiffs cannot satisfy their burden respecting the redressability element of standing.

Further, as set forth more fully in the Brief, Plaintiffs' "Claim One" must be dismissed in its entirety because it fails to state a plausible claim that the Sign Code and BID Code are content based on their face or as-applied to Plaintiffs, that in the alternative, the Sign Code and the BID Code fail "intermediate scrutiny," or that either the Sign Code or BID Code are an impermissible prior restraint. In the alternative, if the Court finds the Sign Code distinguishes between commercial and noncommercial speech, the distinction is not a classification that renders the Sign Code content based, the Sign Code passes the "commercial speech test," and as-applied challenges to commercial speech regulations are not justiciable. Finally, Plaintiffs' "Claim Two" must be dismissed in its entirety because it fails to state a plausible claim that the Sign Code or BID Code are void for vagueness, as the Sign Code fairly warns of what is proscribed and Plaintiffs' speech is clearly within the scope of the City's regulation. Accordingly, Defendant respectfully requests the Complaint be dismissed with prejudice pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for Plaintiffs' lack of standing and failure to state a claim upon which relief may be granted.

Respectfully submitted this 9th day of May, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for
Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for
Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for
Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2024, I caused the foregoing **DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

Jeffrey Shaw and Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

s/ Aaron O. Martin
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | **CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

Defendant, City of Salina, Kansas ("City"), respectfully requests that Plaintiffs' Verified Amended Complaint for Declaratory Judgment and Injunctive Relief ("Complaint") be dismissed pursuant to F.R.C.P. 12(b)(1) and 12(b)(6), and in support thereof states as follows:

## I. NATURE OF THE CASE

This First Amendment Action arises from Plaintiffs' desire to construct a wall sign that is about nine times the allowable size. K.S.A. § 12-101 empowers the City to regulate its local affairs, and like "tens of thousands" of other jurisdictions across the United States, the City regulates signs. *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 (2022). The City has regulated signs for about 58 years, and its regulations are currently codified at Salina Code of Ordinances ("Salina Code"), Chapter 42, Article X ("Sign Code"). The City has also adopted a design review process for new construction, building alterations, demolition, and exterior aesthetic changes to buildings in its downtown Business Improvement District No. 1 ("BID"). That process is codified at Chapter 2, Article X, Salina Code ("BID Code"). When it applies, BID Code review is integrated into other permit review procedures. A Design Review Board conducts BID Code reviews. BID Code § 2-208.

The Sign Code and the definition of "sign" that is the central issue of this case are content-neutral on their face and as-applied. Despite the Complaint's allegations to the contrary, not all displays (including the "murals" that are shown for comparative purposes) are signs. To this end, the Complaint misconstrues the Sign Code. Consequently, its claims are constructed upon logical fallacies. Specifically, displays (writing, graphics, etc.) located outside of a building that "attract attention of the public" in order to "announce, direct attention to, or advertise" are defined as "signs" that are regulated by the Sign Code. Sign Code § 42-764(2)[1]. Such displays (including Plaintiffs' display) require sign permits. Displays that do not meet the content neutral criteria of this definition are, by definition, not signs.

The Sign Code easily passes First Amendment scrutiny. Plaintiffs' display is obviously a "sign," and the City appropriately applied the content neutral size restrictions of the Sign Code to it. Since a sign permit plainly could not be issued for Plaintiffs' sign, there was no need for additional review for a Certificate of Compatibility ("COC"). As such, the Complaint and its attached Exhibits[2] fail to state plausible claims regarding First Amendment violations (Claim One) and vagueness (Claim Two). It follows that this Court should dismiss the Complaint.

## II. <u>STATEMENT OF FACTS</u>

The face of the Sign Code and BID Code neither regulate based on the topic discussed or the idea or message expressed, nor target speech based on its communicative content. Compl. at ¶¶ 36, 41, 60 (BID Code §§ 2-207, 2-208; Sign Code §§ 42-764, 42-781). To be a sign, a display must, *inter alia*, be "used to announce, direct attention to, or advertise." *Id.* at ¶ 36. Plaintiffs' display is a sign as defined by the Sign Code. *Id.* at ¶¶ 27-28, 36. Signs are subject to size limits

---

[1] Complaint Ex. B contains the Sign Code and BID Code excerpts and will be cited herein as "Sign Code" or "BID Code" as appropriate, unless otherwise noted.

[2] All citations to "Ex." refer to the Complaint's exhibits, which are lettered A, B, C, and D.

and permit requirements. *Id.* at ¶ 31, 55. Plaintiffs' sign is too big to qualify for a permit. *Id.* at ¶¶ 122-26. Plaintiffs began work on their sign prior to obtaining a permit. *Id.* at ¶¶ 25, 155. The City requested that Plaintiffs stop work on the sign because they perceived it as a sign that exceeded the size limit set out in the Sign Code. *Id.* at ¶¶ 26, 153. The City did not apply the BID Code to Plaintiffs' sign. *Id.* at ¶¶ 155-59. Application of the BID Code to a sign that cannot be permitted under the Sign Code would be futile. *Id.* at ¶¶ 153-54, 160; BID Code § 2-207(c).

## III. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). Plausibility is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. F.R.C.P. 8(a)(2) requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. "[C]onclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Courts may "consider not only the complaint, but also the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Prop. Advocs., LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d 1194, 1201 (10th Cir. 2011). Federal court jurisdiction is limited to cases and controversies. *Altas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022). Plaintiffs "bear[] the burden of establishing" standing. *Id.*

## IV. ARGUMENT

### A. The Complaint Must be Dismissed Because Plaintiffs Lack Standing.

Plaintiffs have not alleged facts to show that a favorable decision respecting the challenged provisions of the Sign Code and BID Code would redress their injuries. Standing requires "injury

in fact," that is not "'conjectural' or 'hypothetical,'" a causal link "between the injury and the conduct complained of," and a likelihood that "the injury will be 'redressed by a favorable decision.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). When a plaintiff cannot "put up its sign even if it achieved total victory," the plaintiff lacks standing to challenge a sign or zoning code. *Harp Advert. Illinois, Inc. v. Chicago Ridge*, 9 F.3d 1290 (7th Cir. 1993).

Here, Plaintiffs lack standing to challenge the BID Code. Even if the City issued an approval under the BID Code (a "COC"), Plaintiffs' sign still exceeds the Sign Code's size limit, thus the sign would not qualify for a permit and Plaintiffs would still be unable to display it. Compl. at ¶¶ 122-26. The Complaint includes no factual allegations that Plaintiffs could not obtain a COC under the BID Code. The BID Code directs that a COC be reviewed along with a sign permit. *See* BID Code § 2-207(c) ("If the work requiring a [COC] requires any other type of permit, the permit shall not be issued unless [COC] has been issued for work") and § 2-208 (requiring COC review in conjunction with the standard building permit review process). The Complaint fails to allege that the sign could not meet one of the permissive requirements of BID Code § 2-208(1)-(5), or that the City made such a determination. Finally, Plaintiffs' as-applied challenge to the BID Code is not ripe because the BID Code was not applied to Plaintiffs. A City representative asked Plaintiffs to pause work on the sign because the representative perceived it as a regulated sign that exceeded Sign Code size limits. *Id.* at ¶¶ 26, 126, 153. The City did not address whether the sign qualified for a COC. *Id.* at ¶¶ 122-26, 158-59.

Moreover, Plaintiffs lack standing to challenge definition provisions in the Sign Code. The Complaint alleges that the definition of "sign" must also include all "murals," but it specifically does not seek to "remove or otherwise restrict" murals. Compl. at ¶¶ 50, 72. As such, even if Plaintiffs prevail on this point, they are without a remedy because the unchallenged size limits are

what precludes their sign. The Complaint does not challenge the constitutionality of the size limit. *See generally*, Compl. Even if Plaintiffs successfully persuade this Court that all murals must be considered "signs," Plaintiffs will not be able to put up their sign.

**B. <u>The Complaint Fails to State a Plausible Claim that the Sign Code or BID Code is Content-Based or Constitutes an Impermissible Prior Restraint.</u>**

1. *The Sign Code is Content-Neutral on its Face.*

"To find a provision facially unconstitutional, [courts] must conclude that any attempt to enforce such legislation would create an unacceptable risk of the suppression of ideas.*" Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1246–47 (10th Cir. 2000) (quotations omitted). Under *Reed v. Town of Gilbert*, a regulation is content based if: (1) its text draws distinctions among signs based on "the topic discussed or the idea or message expressed"; or (2) if the regulations "cannot be 'justified without reference to the content of the regulated speech,' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'" 576 U.S. 155, 163-64 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). A regulation is not content based and subject to heightened scrutiny merely because it requires a reading of the sign to determine who is speaking and what they are saying to apply the regulation. *Austin*, 596 U.S. at 69. Rather, a regulation remains "agnostic as to content" when a "reading of the sign" is only necessary to draw a content neutral line. *Id*.

The text of the challenged definition of "sign" does not refer to content at all. It simply defines "sign" in a way that is consistent with common understandings, recognizing that unlike architectural features, gazebos, trellises, statuary, and other displays that provide visual interest, signs are "used to announce, direct attention to, or advertise." Compl. at ¶¶ 36, 41; Sign Code § 42-764. The text makes no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any

advertisement. *See Austin*, 596 U.S. at 71. As such, the Sign Code is "justified without reference to the content of the regulated speech." *Ward*, 491 U.S. at 791 (citations omitted).

The Complaint's argument that the Sign Code is unconstitutional merely because a person must read a display to determine whether the regulation applies is "too extreme." Compl. at ¶ 197; *Austin*, 596 U.S. at 69. While there are many unsupported conclusory allegations to the contrary, the Complaint fails to allege any factual allegations that the face of the Sign Code and the BID Code regulate based on "topic discussed or the idea or message expressed" or target speech "based on its communicative content." *Austin*, 596 U.S. at 69, 73-74. In fact, the Complaint confesses that the Sign Code text is content neutral regarding the distinctions it complains about: "Salina's written sign code doesn't distinguish between signs that contain messages pertaining to the goods or services sold, and signs that contain messages that are unrelated to any goods or services sold, when determining size restrictions." Compl. at ¶ 44.

Further, the purpose statements in the Sign Code and BID Code are content neutral. *See* Sign Code § 42-500, BID Code § 2-206. As to the Sign Code, if the display fits the definition of sign, then it requires a permit and must satisfy the time, place, or manner restrictions of sections 42-501, 42-502, 42-503, and 42-521(4)b. The BID Code is a set of architectural design standards that do not reference content at all. BID Code § 2-200, *et seq*. Generally, the BID Code is implicated when permits are requested for construction, alteration, demolition, or exterior aesthetic changes of buildings. *See* BID Code §§ 2-207 and 2-208. Since the Sign Code addresses only the "time, place, and manner" of speech, and the BID Code only incidentally affects speech in a content neutral manner, and because neither the Sign Code nor the BID Code cross any threshold into content based territory, they are both content neutral. *See Ward*, 491 U.S. at 791.

Moreover, the Complaint's "speaker based" contentions misstate the applicable law.

Compl. at ¶¶ 192, 198. Characterizing a regulation as speaker based is "the beginning—not the end—of the inquiry." *Reed*, 576 U.S. at 170. A speaker based regulation demands strict scrutiny only when the "speaker preference reflects a content preference." *Id*. Regulations that merely target advertising do not "target speech based on its communicative content." *Id*. at 163.

2. *The Sign Code is Content-Neutral As-Applied.*

The Complaint fails to state a plausible as-applied claim because the City applied the facially content neutral Sign Code, as written, to Plaintiffs' sign. Compl. at ¶¶ 122-26, 153. It is "an uncontroversial principle . . . that a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014).

Here, Plaintiffs state conclusory allegations that, "as applied," the Sign Code violates the First Amendment. Compl. at ¶¶ 12, 276, 307-12. The BID Code was not applied to Plaintiffs. *Id.* at ¶¶ 155-59. Because Plaintiffs' sign is too big to qualify for a sign permit under the Sign Code, it makes no difference whether Plaintiffs obtain a COC for their sign. *Id.* ¶¶ 29, 122-26, 151, 153. Plaintiffs have not alleged that their sign would not qualify for a COC, but instead provide evidence suggesting that a COC could be issued—several City Commissioners consider the sign to be aesthetically pleasing. *See* Ex. A at 30:9-10, 32:4; BID Code § 2-208.

Even if this Court finds the City applied the BID Code to Plaintiffs' sign, the crux of Plaintiffs' as-applied challenge is that, since Plaintiffs' display "advertises," it is a sign that is subject to regulation. The Complaint fails to allege facts that the City's determination that Plaintiffs' sign is an advertisement (and therefore regulated under the Sign Code) is incorrect or discriminatory based on the actual content of Plaintiffs' sign. *See generally,* Compl. None of the allegations in the Complaint provide any facts to support a claim that the City discriminated against

the specific contents of Plaintiffs' advertisement. Indeed, the Complaint suggests that the City likes the Plaintiffs and their sign, and would have liked Plaintiffs to "stay and join the conversation" to work out "what would it take for [Mr. Howard] to turn this into a mural rather than a sign." Ex. A at 27:24-25 and 28:1-8. The Complaint shows the City works diligently to advance its legitimate interests in a way that is content neutral, fundamentally fair, and standards-based across the board. *See, e.g.*, Ex. A at 4:8-24, 5:8-6:11, 7:4-9:16, 9:23-10:10.

3. *The Sign Code Satisfies the Intermediate Scrutiny Test.*

Because the Sign Code is content neutral, the applicable test is "intermediate scrutiny." *Ward,* 491 U.S. at 797.[3] Under this test, a regulation must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (quotation omitted). The narrowly tailored requirement is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id*. at 799. As to "ample alternatives," "[t]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). An alternative mode of communication is constitutionally adequate if the speaker's ability to "communicate effectively" is not "threatened." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

As a matter of law, the City's interests in aesthetics and property values are "substantial" and "legitimate." *Taxpayers for Vincent*, 466 U.S. at 795. Sign clutter is akin to a "visual assault,"

[3] This is germane because the Complaint asks this Court to find that "[e]ven if [the City's] discrimination of messages related to a business" (that is, commercial speech) "were somehow not content based or speaker based, [the City's] enforcement of its mural-sign code regime against Plaintiffs still violates the First Amendment." Compl. at ¶ 230.

and is therefore a "significant substantive evil within the City's power to prohibit." *Id.* at 807-08; Compl. at ¶¶ 137-141. Yet both the Complaint and the law recognize that public art is a different animal—and one that provides significant public benefits. *See, e.g.,* Compl. at ¶¶ 3, 69, 72, and 116-17 (noncommercial murals—that is, public art displays—in the City are "beautiful," "attract visitors," and contribute to "pride"); Ex. D at 4 (public art helped create a climate for more than $250 million in investment in less than 10 years); *Bldg. Ind. Ass'n-Bay Area v. Oakland*, 289 F. Supp. 3d 1056, 1060 (N.D. Cal. 2018) ("It is reasonable to believe that . . . public art . . . will both improve the city's aesthetics and increase property values.").

The Complaint shows that the Sign Code is effective. The sign wars that degrade community character have been avoided, and the murals that are not signs are a beautiful and vibrant part of the community. Compl. at ¶¶ 3, 72, 116-17; Ex. D at 4. The Complaint shows Plaintiffs have ample alternative channels to communicate. Without this sign, the Cozy has generated local, national, and international media attention. *Id.* at ¶¶ 16, 16 n. 2, 19, 20-21, 25, 29, 29 n. 5. Moreover, Plaintiffs could simply reduce the size of their sign. *Id.* at ¶ 125. The Complaint provides no factual allegations that create any doubt whether the Sign Code passes intermediate scrutiny. Rather, it offers only "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action," which "will not do." *Iqbal*, 556 U.S. at 678.

4. *The Complaint Misconstrues the Definition of Sign.*

Statutory construction begins with "the plain language of the law." *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991). Indeed, "absent ambiguity or irrational result, the literal language of a statute controls." *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir.1986). Words must be construed in their "ordinary, everyday sense." *Crane v. Commissioner*, 331 U.S. 1, 6 (1947). "In ascertaining the plain meaning," the court "must look to the particular . . . language

at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The Court must "choose the reasonable result over the 'absurd' one." *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006).

Here, the plain language of the definition of sign is limited in application to only those displays (and "any other figure[s] of similar character") that are "a structure or any part thereof, or a portable display, or [are] attached to, painted on, or in any other manner represented on a building or other structure or on the ground," are "used to announce, direct attention to, or advertise," and are "not located inside a building." Compl. at ¶ 36. The Complaint's argument that the three subparagraphs of § 42-764(1)-(3) apply only to "any other figure of similar character" is a fundamentally incorrect take on the plain text, and one that robs it of common sense. *Id.* at ¶¶ 38-9. For example, the Complaint's construction of the definition of sign would result in sign permit requirements for displays *inside of buildings*. *Id.*[4]

The Complaint's alternative construction is also misplaced. Compl. ¶¶ 50, 219. This one departs from the plain language by suggesting that the phrase "attract attention" is redundant to the phrase "direct attention to." Compl. at ¶¶ 50, 78, 94, 102, 109. The phrase "attract attention" is synonymous with "stand out," "be conspicuous," and "be noticeable." *See Attract Attention*, CAMBRIDGE DICTIONARY (https://dictionary.cambridge.org/us/thesaurus/attract-attention). By contrast, the phrase "direct attention to" is synonymous with "indicate," "point to," "point out," and "specify." *Direct Attention*, CAMBRIDGE DICTIONARY

[4] The Complaint's reference to The Yard is an example of this mistake. The "mural" shown at Compl. ¶ 84 is located inside a building. *See* Salina Code § 42-637 ("*Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.") (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXIVDE_S42-637BU). *See North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1221 n.3 (10th Cir. 2021) (federal courts can take judicial notice of provisions in municipal ordinances).

(https://dictionary.cambridge.org/us/thesaurus/direct-attention-to). Plaintiffs' display "stands out" and "points to" to the door to the Cozy. It also "advertises" and "announces." By contrast, the "murals" identified in the Complaint (except The Yard (*see* note 4, *supra*)) simply "attract attention" to themselves. They do not "indicate," "point to," "point out," or "specify" anything else. Likewise, these "mural" comparators do not "advertise" or "announce." The City's reasonable construction of the definition of the term "sign," which was applied to Plaintiffs' sign in a content neutral way, is both constitutionally sound and supported by common understandings and long experience.[5]

5. *Neither the Sign Code Nor the BID Code Are an Impermissible Prior Restraint.*

Prior restraints "are not unconstitutional per se." *Se. Promotions, LTD v. Conrad*, 420 U.S. 546, 558 (1975). They are permissible if the permitting system includes "procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* at 559. Procedural safeguards regarding timing "are not required for content-neutral time, place, and manner permit schemes" like the Sign Code. *Epona v. Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017) (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322-23 (2002)). Still, there must be "standards limiting the licensor's discretion." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

Here, the standard in the Sign Code is whether the display (among other possible things) advertises. That standard is ubiquitous in sign regulations. *See Austin,* 596 U.S. at 64-65. It is also constitutionally sufficient. It is particularly clear when the advertisements pertain to "goods or services for sale." Consider the strikingly similar case of *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012). In *Wag More Dogs*, a doggy day care facility painted a "mural" on an exterior wall that faced a municipally owned dog park. *Id.* at 363. The "mural"

[5] *Sign*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/signs)

depicted "happy cartoon dogs, bones, and paw prints," and incorporated some of the cartoon dogs from the logo. *Id*. Wag More Dogs argued, *inter alia*, that the display was not an "advertisement," but instead "noncommercial speech." *Id*. at 369. The Fourth Circuit was not persuaded. It held that the display was commercial speech because it "was meant to attract customers," it included dogs from the company's logo (which, it held, was "analogous to referencing a specific product"), and it sought to create goodwill with potential customers. *Id*. at 370 (emphasis added).

The Complaint is misguided in using The Yard as an example of "the extent of [the City's] discretion." Compl. ¶ 265. That display is "located inside a building," thus, not a sign. *Id*. at ¶¶ 36, 84. The BID Code does not relate to advertisements. Under the BID Code, a COC is issued if any one of five criteria set out in BID Code § 2-208(1)-(5) are met. These criteria are clear, *permissive*, and constitutionally sufficient in their own right. The Sign Code and BID Code both include sufficient standards to bridle the discretion of the decision-maker.

**C. In the Alternative, Plaintiffs' Content Based Claim Must be Dismissed Because the Sign Code Passes the Commercial Speech Test.**

Assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and public art based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a classification of speech that implicates strict scrutiny. Commercial speech is an advertisement that refers to a particular product, whose speaker has an economic motivation. *See Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983); *Wag More Dogs*, 680 F.3d at 363, 370. As shown by the depictions and factual allegations in the Complaint, the sign displays commercial speech. Compl. ¶¶ 22-24, 27-28.

Commercial speech enjoys "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Bd. of Tr. of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989). Regulations that differentiate between commercial and

noncommercial speech, without more, are not content based. *See Metromedia v. San Diego,* 453 U.S. 490, 504-06 (1981). Commercial speech is subject to an intermediate standard of review, that is, such regulations "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)). The test is similar to the intermediate scrutiny applied to content neutral regulations. *See Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021). As-applied commercial speech challenges are not justiciable. *See U.S. v. Edge Broad. Co*., 509 U.S. 418, 431 (1993).

Nothing in *Reed* (which dealt only with content based classifications of noncommercial speech) or *Austin* prohibits the City from regulating commercial speech differently from noncommercial speech. The constitutional command is simply that commercial speech cannot be favored over noncommercial speech. *See Metromedia*, 453 U.S. at 504-06. The Complaint goes so far as to allege that "Plaintiffs preserve the right to argue that the commercial speech doctrine . . . must be overturned." Compl. ¶ 258.[6] But arguably, the "commercial speech doctrine," is the only protection commercial speech has. *See generally, Valentine v. Chrestensen* 316 U.S. 52 (1942).

The City's asserted aesthetic interests are substantial. *Taxpayers for Vincent*, 466 U.S. at 807. The Complaint provides allegations of fact that the City's sign regulations are working to advance the City's substantial interests and that they are narrowly-tailored. *See* Section B(3), *supra* at 9. The Sign Code allows for a generous amount of commercial signage. Prior to Plaintiffs' decision to paint the sign, the Cozy had not fully utilized its sign allowance. Compl. at ¶ 125.

---

[6] Indeed, the Supreme Court has stated multiple times that to "require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech." *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623 (1995) (citations omitted).

**D. Plaintiffs' Second Claim for Relief Must be Dismissed as the Sign Code and the BID Code Are Not Unconstitutionally Vague.**

An ordinance is "unconstitutionally vague for one of two reasons: it either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or it 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Dr. John's, Inc. v. Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006) (quotation omitted). Essentially, the Complaint argues the City is not equipped to identify a display that "announces, directs attention to, or advertises," and the standards in BID Code § 2-208 are similarly unintelligible. But the task of identifying business advertising, is a "very basic test" that is "not unconstitutionally standardless or vague . . . ." *Wag More Dogs, LLC*, 795 F. Supp. 2d at 390.

Ordinarily, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" *U.S. v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494–495, n. 6 and 7 (1982)). However, the Supreme Court has "relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id.* As a matter of law, Plaintiffs cannot avail themselves to that relaxed standard because their display is commercial speech, and "the overbreadth doctrine does not apply to commercial speech." *Hoffman Estates*, 455 U.S. at 497. As Plaintiffs' speech is clearly within the scope of the City's regulation, Plaintiffs cannot be heard on their vagueness claim against the Sign Code.

As to the BID Code (and alternatively the Sign Code), "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. "What renders a statute vague is not the possibility that it will sometimes be difficult to

determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306. The BID Code and the Sign Code provide clear standards that ordinary people can understand and, therefore, do not encourage arbitrary enforcement.

## V. CONCLUSION

For the above stated reasons, Plaintiffs' Complaint fails to establish standing and state plausible claims, and therefore the Complaint should be dismissed in its entirety.

Dated this 9th day of May, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2024, I caused the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

Jeffrey Shaw and Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130, Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

s/ Aaron O. Martin
Aaron O. Martin

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Opposition to Defendant's Motion to Dismiss.<br><br>Oral Argument Requested. |

**Plaintiffs' Opposition to Defendant's Motion to Dismiss**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers The Cozy's artwork a regulated sign instead of an unregulated mural. The difference between the two turns on the artwork's content: if it "pertains" to a business, Salina considers it a regulated sign subject to size limitations, not an unregulated mural which doesn't. That distinction isn't specified in the written code. Since The Cozy sells sliders, Salina insists Mr. Howard can't finish his mural because it depicts burger-esque UFOs blasting the wall with ketchup and mustard. But if it depicted flying pizza slices, Mr. Howard could. The First Amendment protects against these types of content-based, speaker-based, regulations of speech. So, the Plaintiffs filed a civil rights lawsuit challenging Salina's mural-sign code regime so they can finish what they started. Doc. 16.

At this stage, the *only* question is whether the Plaintiffs' amended complaint adequately gives Salina notice of their claims, not whether they will ultimately succeed. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319 (2007). Based upon the facts as alleged, taken as true and considered in the Plaintiffs' favor, the Plaintiffs have stated plausible constitutional claims. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *see also NRA v. Vullo*, 602 U.S. ___ (2024) (decided May 30, 2024). After all, Salina picks and chooses which murals it allows and which murals it doesn't based on their content, and that's plainly unconstitutional.

It's precisely *because* the Plaintiffs have stated plausible claims that Salina tries to argue the merits—that its archaic mural-sign code regime, greatly unchanged since 1966, survives constitutional scrutiny. *See* Doc. 27. But that's a fact-dependent inquiry that requires Salina to produce *actual evidence* justifying its restrictions, which could almost never be resolved at this stage. For that reason, "courts typically do not reach the merits of a First Amendment challenge at the motion-to-dismiss stage." *Brown v. District of Columbia*, 390 F. Supp. 3d 114, 123 (D.D.C. 2019).

<u>Summary of the Facts</u>

The Cozy is a Salina landmark that's served sliders for more than 100 years. Doc. 16 ¶¶ 15, 16.[1] The dining area is small, about 192 square feet, and every slider is served with onions. ¶ 22. The Cozy's famous for its distinctive "pungent onion-esque aroma." ¶ 22.

Mr. Howard hired a local artist to paint a mural that reflected his and The Cozy's personality. ¶¶ 20-21. Once completed, the mural will read "Don't Fear the Smell!! The Fun is Inside!!" and will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard, ¶¶ 23-24, 28:




The mural is "artwork," "[i]t's my expression. It's my character going on my wall," Mr. Howard says. ¶ 29. Days later, Salina told Mr. Howard he couldn't finish the mural. ¶ 26. Mr. Howard wants to finish what he started. ¶¶ 118, 151, 170, 190. "I want to paint my wall." ¶ 29.

On paper, Salina regulates signs—including their sizes—through its written sign code, its permit process, its design review process, its certificate of compatibility requirement, and its enforcement penalties. ¶¶ 12, 31, 50, 312. The written sign code treats *all* outdoor murals as wall signs, and *every* wall sign is supposed to be subjected to the same size restrictions. ¶¶ 36-38, 42-46. But that's not how it works in practice. If artwork "pertains" to a business, or if it's "part of a

---

[1] The factual assertions come from Verified First Amended Complaint, Doc. 16, which is fully incorporated here. Unless noted, all paragraph citations refer to Doc. 16.

commercial transaction," Salina considers it a regulated sign subject to its restrictive size limitations. ¶¶ 26, 30, 32-34, 52-54, 128, 132. But if it doesn't pertain to the business, Salina considers it an unregulated mural that can take up an entire wall, ¶¶ 31, 39, 55-58, or in one instance, an entire grain elevator, ¶¶104-105. The difference between an unregulated mural and a regulated sign turns on the artwork's content. ¶¶ 3, 32, 34, 52-54, 62-65, 113-15, 127-37, 199-210, 216-22.

Salina's Director of Community and Development explained the unwritten policy to the City Council, saying that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign;" instead, the government treats it as an unregulated mural. ¶¶ 33, 129. But, the Director continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated wall sign. ¶¶ 33, 130. If that same "steaming cup of coffee" happened to be painted "on the other side of town unrelated to anything" there, the government confirmed that it would be unregulated. ¶¶ 33, 131.

Salina either applies the written code or doesn't on the "basis of a commercial message," ¶ 114. Salina doesn't apply its size restrictions and permit or certificate requirements to things it considers "art." ¶¶ 62-65, 135, 203-207, 215-216, 218.

In The Cozy's circumstance, the City Manager explained that The Cozy's mural "includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." ¶¶ 32, 54, 128.

The phrase "pertains to the goods or services for sale" is not contained anywhere in the city code. ¶¶ 44, 47, 128, 264, 284. Neither is "art," "commercial speech," or "mural." ¶¶ 47, 264, 284. Salina's unwritten distinction between murals and signs—based on the artwork's content—is not found in any written code or regulation. ¶¶ 1, 3, 31-34, 51-54, 57, 64-65, 120-35.

Salina's content-based discrimination is seen throughout the city. Even though the following murals are "signs" under the code, Salina exempts them from their size restrictions, and the permit and certificate regulations as well, because of their content, ¶ 113: Fire Station #2, ¶¶ 73-80; The Yard, ¶¶ 84-89; KU's School of Medicine, ¶¶ 90-95; Salina Art Center, ¶¶ 96-103; Mural at the Mill, ¶¶ 104-10. There are dozens more. *See* Doc. 16-4.

## I. The Plaintiffs have standing to challenge the mural-sign code regime.

The Plaintiffs want to finish their whimsical mural but can't. ¶¶ 118, 151, 190. Salina's mural-sign code regime[2] stands in the way. ¶¶ 1-3, 26, 30-34, 150-158, 164-176. Nonetheless, Salina's standing argument appears to focus on "redressability," and seems to suggest that even if the Plaintiffs secured a favorable judgment, they couldn't finish painting their full-sized mural. *See* Doc. 27 at 4.[3] Redressability only requires that "a favorable judgment would meaningfully redress the alleged injury." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006). The Plaintiffs clear that low hurdle. The Plaintiffs have requested a judgment declaring the *entire* mural-sign code regime unconstitutional and seek its permanent enjoinment, including the size, permit, and certificate regulations. ¶¶ 1, 12, 173-174, 182, 214, 300, 303, 305, 307-313. A successful outcome would allow the Plaintiffs to finish their mural. ¶¶ 164-176. The Plaintiffs *will* finish the mural "the same day Salina's mural-sign code regime is enjoined and/or declared unconstitutional[.]" ¶ 170. The requested relief would redress the Plaintiffs' constitutional injuries. *Aptive Envtl., LLC v. Town of Castle Rock, Colorado,* 959 F.3d 961, 978 (10th Cir. 2020) (enjoining enforcement of ordinance establishes redressability); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1229 (10th Cir. 2005) (plaintiffs' injury" "would be redressed by a judicial conclusion that the Ordinance is unconstitutional.")

Salina also passingly suggests the Plaintiffs can't challenge the written and unwritten definitions used to prohibit The Cozy's artwork. Doc. 27 at 4-5. But the Plaintiffs "have standing to challenge those portions of the Code which provide the basic definitional structure for the terms used," "and which more generally define the scope of signs allowed." *Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369, 1379 (M.D. Fla. 2014). The Plaintiffs have standing to challenge Salina's unwritten definitions and policies that prevent them from finishing their mural as well. *See*

---

[2] Salina's mural-sign code regime includes the written sign code, the unwritten policies and practices, the permit requirement, the business improvement district review process, the certificate of compatibility requirement, and the concomitant enforcement penalties. ¶¶ 12, 31-32, 312.

[3] For context, the Plaintiffs recited Salina's unsupported allegations that the mural is too big. Salina hasn't cited *any* evidence about the accuracy of its measurements or even *what* it's measuring. Discovery will sort that out.

*id*; *Aptive*, 959 F.3d at 979 (First Amendment applies to "city policies."); *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 616 (E.D. Pa. 2014) (standing exists to challenge "unwritten policy" that prevented speech), aff'd sub nom. *NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016).

Salina's suggestion that "the BID Code was not applied to Plaintiffs," Doc. 27 at 4, and therefore that issue isn't ripe, is demonstrably false. Salina told Plaintiffs that they couldn't complete the mural without a certificate of compatibility, told Mr. Howard to file for it, and then sent him a letter saying it wouldn't give him one, *even though it's required*. ¶¶ 154-155, 157-160, 164. Salina's refusal to hold a certificate of compatibility hearing, as required by § 2-209(2), further shows that Plaintiffs have suffered a justiciable constitutional injury. Salina can't game ripeness by ignoring its own code. ¶¶ 266-281.

In sum, the Plaintiffs have standing. They've suffered a redressable constitutional injury caused by the defendant. *Aptive,* 959 F.3d at 978; ¶¶ 150-176, 178-80, 277-281, 299-305.

## II. The Plaintiffs have stated a plausible First Amendment claim.

### A. The mural-sign code regime is a content- and speaker-based restriction on speech.

Salina's entire mural-sign code regime is a content-based restriction on speech because it "target[s] speech based on its communicative content," it "applies to particular speech because of the topic discussed or the idea or message expressed," and because it's "targeted at specific subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 169 (2015). The regime "draws distinctions based on the message," "cannot be justified without reference to the content of the regulated speech," and because Salina "disagree[s] with [certain] messages." *Id.* at 163, 164 (cleaned up). After all, the difference between an unregulated mural and a regulated sign turns on the whether the artwork "pertains" to the business or if it's "part of a commercial transaction." ¶¶ 3, 32-34, 52-54, 64-65, 113-115, 127-137, 199-210, 216-217, 219-222.

Likewise, in Salina's *own words*, the mural-sign code regime is content based because it applies its written regulations—or doesn't—based entirely on whether Salina believes artwork contains "a commercial message," ¶ 114, or if it believes it's just "art," ¶¶ 115, 62-65, 135, 203-207,

215-216, 218. Indeed, Salina only applied the code's size restrictions to The Cozy because of its perceived "message." ¶¶ 32, 54, 128.[4] That's plainly content based. Consider *Aptive,* where the Tenth Circuit soundly rejected the argument that a commercial door-to-door solicitors' curfew was content neutral. 959 F.3d at 966, 970, 999. The curfew "*is* content-based," the Tenth Circuit held, because it "applies by distinguishing between the commercial and noncommercial content of the solicitors' speech," a "conclusion dictated by the Supreme Court's decision in *Discovery Network*. There, the Court struck down a law that banned commercial but not noncommercial newsracks. In so doing, the Court concluded that the regulation was not content-neutral because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech." *Id.* at 982 (internal quotes cleaned up, italics in original).

Separately, the regime is content based because—as the Director of Community Development said herself—Salina has to "read the sign," or in this case, review the mural and its content to determine whether its restrictions apply. *See* ¶¶ 33, 129-132; *Reed*, 576 U.S. at 162; *Clark v. City of Williamsburg, Kan.*, 388 F. Supp. 3d 1346, 1358 (D. Kan. 2019), *aff'd,* 844 F. App'x 4 (10th Cir. 2021); *Quinly v. City of Prairie Vill., Kan.*, 446 F. Supp. 2d 1233, 1239 (D. Kan. 2006); *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015); *Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728, 736 (8th Cir. 2011).[5]

Based on Salina's own words and litigation positions, Plaintiffs' allegations that the mural-sign code regime is content based are plausible. *See also,* ¶¶ 31-34, 51-54, 57, 62-65, 120-135. Further consider three analogous mural cases, all of which have rebuked the virtually identical arguments Salina makes here.

In *Kerston v. City of Mandan,* owners of a western bar painted a mural depicting mountains, cowboys, and the bar's name, which the city claimed was a regulated sign, not an unregulated

---

[4] *See also* Doc. 27 at 7, where Salina admits it's "target[ing]" The Cozy's mural because it perceives it to be an advertisement, misquoting *Reed*, *supra*, in the process.

[5] The longstanding "read the sign" analysis wasn't obviated in *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022). Besides, *Austin* is limited to off-premises, "location-based," regulations for billboards, *id.* at 69, which have almost always been treated differently by courts.

mural. 389 F. Supp. 3d 640, 642, 644 (D.N.D. 2019). "Cleary," the court wrote, the "regulation is based on the content of the speech," and "is not content neutral," *Id.* at 646.

In *Complete Angler, LLC v. City of Clearwater, Fla.*, the owners of a bait and tackle shop painted a fish mural. 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009). The city argued that murals displayed "in conjunction with" a business were not "art work," but "commercial signage" subject to size regulations. *Id.* at 1331. But murals of "kids playing in the park" or of "first responders" were unregulated art. *Id.* at 1333-34. That wasn't content neutral, the court held. The city "necessarily examined [the mural's] content" to determine whether it was "subject to the permit requirement or spatial constraints." *Id.* at 1333. Further, the city's "statements by its own representatives" and its "condoning of" the other murals showed the regime was "not content-neutral." *Id.* at 1334.

In *Morris v. City of New Orleans*, a painting with "a non-commercial message," was considered a mural; but if it had "a commercial message, it was considered a 'sign,'" and subjected to different regulations. 399 F. Supp. 3d 624, 635 (E.D. La. 2019). That was "undeniably" "content-based" because it "separates out commercial and non-commercial speech." *Id.* at 636.

With that, it's no wonder Salina struggles to justify why it allows the Mural at the Mill but not the mural at The Cozy, arguing the latter prohibition isn't content based, it's merely a definitional issue. *See* Doc. 27 at 2. A "sign," it argues, is defined narrowly and only covers a commercial thing that is "used to announce, direct attention to, or advertise." *See* Doc. 27 at 2. But that contortion renders the other "sign" definitional verbiage meaningless. ¶¶ 36-40, 50. Besides, Salina's unnatural reading *still* "turn[s] on whether the speech is commercial or not," and is therefore a "content-based" regulation. *Aptive*, 959 F.3d at 982; *see also id.* at 983.

Under *Reed*, *Aptive*, *Discovery Network*, *Kerston*, *Complete Angler*, and *Morris*, Salina's mural-sign code regime is content based.[6] Because Salina applies the mural-sign code regime to

[6] It's irrelevant even if Salina treats all murals pertaining to businesses the same—it's still a "content-based" regulation because it's a "regulation targeted at specific subject matter" "even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169.

artwork that "references a product or service," but "exempt[s] works of art" from its code "that in no way identify or specifically relate to a product or service," it's a content-based regulation. *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up).[7] It's a speaker-based regulation too. Whether a business can paint a "steaming cup of coffee" mural turns on the nature of the business. ¶¶ 3, 33, 129-132.

In sum, "[b]oth on its face and in its practical operation," Salina's entire mural-sign code regime "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination." *Reed*, 576 U.S. at 169.

**1. Salina's content-based regulations trigger strict scrutiny.**

Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. That requires Salina to prove—*with evidence*—its restrictions actually advance its stated interests, that its restrictions are not over- or under-inclusive, and that it used the least restrictive means possible. *See generally id.* at 171–72 (underinclusive); *United States v. Williams*, 553 U.S. 285, 292-97 (2008) (overbroad); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000) (least restrictive means required to address a real problem).

Salina can't clear its initial First Amendment hurdle. Its only stated interests, "aesthetics and property values," Doc. 27 at 8, aren't compelling ones. *Ficker v. Talbot Cnty., Maryland*, 553 F.Supp.3d 278, 283 (D. Md. 2021) (aesthetics not a compelling interest); *Int'l Outdoor, Inc. v. City of Troy*, No. 17-10335, 2021 WL 2275977, at *3 (E.D. Mich. Apr. 6, 2021) (maintaining property values not a compelling interest). But even if they were, given Salina's substantive evidentiary burdens, its 12(b)(6) motion "cannot be" granted. *See Smith v. District of Columbia*, 387 F. Supp. 3d 8, 30 (D.D.C. 2019) (strict-scrutiny claim "cannot be resolved" on a motion to dismiss given

[7] *See also Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278, 285 (D. Md. 2021) (size limit based on subject is content based); *Morris,* 399 F. Supp. 3d at 636 (code that turns on message is "undeniably" content based); *Neighborhood Enterprises*, 644 F.3d at 736; *Clark*, 388 F.Supp. 3d at 1359; *Quinly*, 446 F.Supp. 2d at 1239.

government's burden of proof). Besides, Salina can't satisfy a less-rigorous burden, *see* Section I.B. below, which necessarily means it can't satisfy the heavier one.

**a. The Cozy's mural isn't "commercial speech." But even if it were, strict scrutiny still applies.**

Salina incorrectly argues that The Cozy's mural is "commercial speech," and intermediate scrutiny applies. Doc. 27 at 12-13 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm' of New York*, 447 U.S. 557 (1980)). On this record, the Cozy's mural depicting ketchup-blasting, burger-esque flying saucers piloted by aliens isn't "commercial speech." ¶¶ 23-24, 28, 239-240, 241, 257. "Commercial speech" is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). If a mural is "not limited to merely proposing commercial transactions," it's not "commercial speech," even *if* the mural "may occasionally inspire" commercial transactions. *Complete Angler*, 607 F. Supp. 2d at 1332. Just as in *Complete Angler*, The Cozy's mural doesn't propose a commercial transaction and isn't commercial speech. It doesn't say, for example, "five burgers for a dollar." Instead, it's "artwork," "express[ive]," and conveys Mr. Howard and The Cozy's "character." ¶¶ 2, 21-24, 27-29. A mural is still a mural—and properly considered artwork, not "commercial speech"—even *if* it somehow pertains to a business. *Id.* at 1332. Indeed, Salina hasn't articulated *why* it thinks the mural is "commercial speech" either, it just says that it *is*. But Salina "may not skirt First Amendment protections by applying a definition of commercial speech that better suits its tastes." *Id.*

Similarly, Salina hasn't explained how it concludes—for the first time—that "Plaintiffs' sign is an advertisement (and therefore regulated under the sign code)" or that such a label would even matter. Doc. 27 at 7. The Plaintiffs' lawsuit didn't allege that the mural was commercial speech, ¶¶ 241, 257, or an advertisement, and the terms "commercial speech" and "advertisement" aren't defined in the code either, ¶¶ 47, 264, 284, 292. In short, Salina hasn't satisfied its burden of proving The Cozy's mural is *in fact* "commercial speech" or an advertisement. *Aptive,* 959 F.3d at 987–88 (describing government's burdens).

Finally, because the "commercial speech" doctrine is inconsistent with the First Amendment's original public meaning, susceptible to arbitrary application, and made-up, *see* Alex Kozinski and Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627 (1990), *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 518 (1996) (Thomas, J., concurring), *id.* at 517 (Scalia, J., concurring), Deborah J. La Fetra, *Kick It Up A Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004), it should only apply to the narrow circumstances involving consumer protection from false or misleading advertising, its underlying policy justification, which don't exist here.

Even *if* the mural is "commercial speech" though,[8] intermediate scrutiny doesn't apply, strict scrutiny does. ¶ 257. The "regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor*, 974 F.3d at 703; *see also*, *Norton*, 806 F.3d at 412 (After *Reed*, "[a]ny law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification"); *cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-31 (1993) (applying strict scrutiny); *cf. Sorrell*, 564 U.S. at 565-66 (heighted scrutiny of commercial speech regulation). In *Aptive*, the Tenth Circuit only applied *Central Hudson*'s test because the plaintiffs requested it, both on appeal and in the district court.[9] Not so here. ¶ 257.

Based upon a collective reading of *Reed*, *Discovery Network, Sorrell, Int'l Outdoor*, and *Norton*, content-based restrictions on commercial speech trigger strict scrutiny.

**B. Even under Central Hudson, the mural-sign code regime is unconstitutional.**

Even *if Central Hudson*'s test applies, Salina's 12(b)(6) motion should *still* be denied.[10] Salina has the burden of proving 1) its interests in restricting speech are "substantial;" 2) the restriction "advances those interests in a direct and material way;" and 3) the restriction "is in

[8] Plaintiffs reserve the right to challenge the doctrine in its entirety, should it apply to their case. ¶ 258.
[9] *See, Brief of Appellee*, 18-1166 at page 26; *Aptive*, 1:17-cv-01545-MSK-MJW (D. Colo.), Doc. 23 at 11-12, Doc. 93 at 1, Doc. 105 at 2.
[10] The test for a content-neutral time, place, and manner restriction is similar to *Central Hudson*'s. *See Aptive*, 959 F.3d at 987. As shown in this section, Salina can't satisfy its evidentiary burdens under either one.

reasonable proportion to the interests served," meaning it must be "narrowly tailored." *Aptive*, 959 F.3d at 987–88; *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1252–53 (10th Cir. 2021) (same); *see also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1072 (10th Cir. 2001). All three factors must be proven with actual evidence. *Aptive*, 959 F.3d at 996 ("[c]onjectural harms and suppositions" are insufficient); *id.* at 995 ("asserted interests" in "the abstract" not enough); *id.* at 998 ("harms" must be "real and that its restrictions will *in fact* alleviate them to a material degree") (cleaned up) (emphasis added); *id.* at 990 (record requires "a concrete, nonspeculative harm"); *Morris*, 399 F. Supp. 3d at 637 ("[b]lindly intoning" theoretical civic interests not enough); *Complete Angler*, 607 F. Supp. 2d at 1334 ("abstract notions will not suffice").

On this record, Salina's justifications are *nothing but* speculation and conjecture, *see* Doc. 27 at 8, 9-13. There is *no evidence*, for example, that a mural pertaining to a business is not aesthetically pleasing, or that it decreases property values, or that would initiate some theoretical, undefined sign war. ¶¶ 138-148, 230-238, 242-245, 253. If anything, Salina's litigation position that "sign wars" "degrade community character," Doc. 27 at 9, further proves that it unconstitutionally prohibits speech based on its content. After all, a "sign war" is little more than "friendly one-upmanship" between organizations using "witt[y]" messages. Wikipedia, *Sign War.*[11] Salina's argument that its regulations "are working," Doc. 27 at 13, is just as flawed and is nearly verbatim to the one rejected by the Tenth Circuit in *Aptive*, 959 F. 3d at 990-991 (rejecting argument that the "Curfew is working" as "unadorned assertion" and "self defeating" given its evidentiary burdens).

Salina's "visual assault" on aesthetics argument and its reliance on *Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) is equally misplaced. *See* Doc. 27 at 8-9. That ordinance banned all signs on the government's *own* property to prevent the accumulation of temporary signs. *Id.* at 807. It didn't try to regulate the aesthetics of speech on private property, an important distinction Salina misses. *Id.* at 811. Indeed, regulating speech for "purely esthetic" reasons raises "serious First Amendment concerns." *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989).

[11] Permanently available at https://en.wikipedia.org/w/index.php?title=Sign_war&oldid=1175609932

Because there "is nothing in the record" to credibly "suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork," Salina's mural-sign code regime is "unconstitutional insofar as it distinguishes between commercial and non-commercial artwork." *Morris*, 399 F. Supp. 3d at 637; *see also*, *Discovery Network*, 507 U.S. at 425 (commercial newsracks "no greater eyesore" than noncommercial newsracks); *Neighborhood Enterprises*, 644 F.3d at 737-38 (aesthetics not narrowly tailored when exemptions are content-based); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) (city may not "promot[e] aesthetics" "by restricting speech depending upon the message expressed"); *Ficker* 553 F. Supp. 3d at 284-85 (sign code not narrowly tailored); *Reed,* 576 U.S. at 172 (same); *Bee's Auto,* 8 F. Supp. 3d at 1380.

Salina's speculative musings about aesthetics and property values lack any evidentiary support *at all*, are plainly insufficient, and unquestionably *not* narrowly tailored. In *Aptive*, that the Town of Castle Rock couldn't produce enough evidence justifying its speech regulations, *after a bench trial,* means it's virtually impossible Salina could meet its burden at the 12(b)(6) stage. 959 F.3d at 966, 970. Instead of proving its case with *evidence*, Salina tries justifying its restrictions *just because* it's perceived to be commercial speech. *See* Doc. 27 at 13 ("Nothing" "prohibits the City from regulating commercial speech differently from noncommercial speech"). But a regulation is unconstitutional when there is "no justification for [a] particular regulation other than the city's naked assertion that commercial speech has low value." *Discovery Network* at 429-430 (cleaned up); *see Aptive*, 959 F.3d at 980-81. Salina hasn't even tried justifying its content-based exemptions from the size, permit, and certificate regulations either. ¶¶ 62-65, 135, 203-207, 215-216, 218.

At bottom, because Salina hasn't satisfied its evidentiary burdens for treating the Mural at the Mill—and the dozens of other murals—differently from the mural at The Cozy, and vice versa, the motion to dismiss should be denied.

**III. The Plaintiffs have stated a plausible prior restraint claim.**

Salina's mural-sign code regime is an unconstitutional prior restraint because it lacks "narrow, objective, and definite standards," and because it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion." *Forsyth Cnty., Ga. v. Nationalist Movement*,

505 U.S. 123, 131 (1992) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)).[12] Salina unconstitutionally wields "unbridled discretion" in deciding which murals to allow; and it ignores the deadlines in its code. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (plurality opinion).

Salina's distinctions between murals and signs are not found in the written code or regulations. ¶¶ 31-34, 51-54, 57, 64-65, 120-135. Neither are "pertains to the goods or services for sale," "art," "commercial speech," and "mural." ¶¶ 44, 47, 48, 128, 264, 284. Nearly every word Salina relies on is undefined, leaving officials free to pick and choose which murals to allow and which to regulate, ¶¶ 264(a-m), 284(a-m), which is reflected throughout the city, ¶¶ 73-80, 84-89, 90-95, 96-103, 104-110, *see also* Doc. 16-4. Salina's design review board process is even worse. It makes decisions based purely on subjective matters such as whether a mural "presents an aesthetically pleasing overall image," "clash[es]" with older materials, or harms the "distinguishing original qualities or character of a building," Code § 2-208; ¶¶ 60, 217, 270, none of which is defined. The unbridled discretion is exemplified in Salina's disregard for its own deadlines found in Salina City Code §§ 2-209(2) and 42-502(b). Salina placed Plaintiffs' application "on-hold" indefinitely rather than follow its code. ¶¶ 154-161, 271-272. Salina hasn't attempted to justify ignoring its deadlines or challenged Plaintiffs' allegations that constitutes an unconstitutional prior restraint, *FW/PBS*, 493 U.S. at 227, which precludes a piecemeal motion to dismiss, *Fed. Trade Comm'n v. Nudge, LLC*, 430 F. Supp. 3d 1230, 1246 (D. Utah 2019).

Salina insists that "signs and commercial speech" do not qualify as unregulated "art," ¶ 115, it doesn't apply its size, permit, and certificate regulations to "art," ¶¶ 62-65, 135, 203-207, 215-218, and it claims that "public art is a different animal." Doc. 27 at 9. But the question, "What is art?" has been described as "one of the most elusive of the traditional problems of human culture," Richard Wollheim, *Art and Its Objects* 1 (1980), and courts have found the term "works of

[12] *See also*, *Saia v. New York*, 334 U.S. 558, 560 (1948) (invalidating city's standardless discretion to permit loud speakers); *Lovell v. City of Griffin*, 303 U.S. 444, 450–51 (1938) (same; leaflets); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (same; parades); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988).

art" inherently vague. *E.g., Household Goods Carriers' Bureau v. ICC*, 584 F.2d 437, 440 (D.C. Cir. 1978). Salina has not given any explanation of how it limits its discretion or avoids content-based discrimination when it distinguishes "public art" from "signs."

Salina relies on *Wag More Dogs, LLC., v. Cozart*, 680 F.3d 359 (4th Cir. 2012), to show that the regime isn't prior restraint. But *Wag More Dogs* isn't controlling or persuasive: it pre-dated *Reed* and the Fourth Circuit has abandoned it. *Cent. Radio Co. Inc. v. City of Norfolk, Va.* is instructive. There, the Fourth Circuit initially relied heavily on *Wag More Dogs* to uphold a sign code, 776 F.3d 229 (4th Cir. 2015), but the case was vacated and remanded after *Reed*. On remand, the Fourth Circuit declared the sign code unconstitutional without mentioning *Wag More Dogs*. 811 F.3d 625 (4th Cir. 2016). Besides, *Wag More Dogs* was poorly reasoned, lacked limiting principles, and was contrary to the First Amendment—as the Fourth Circuit eventually recognized by abandoning it.

The Yard's artwork exemplifies Salina's unconstitutional discretion. It's a baseball-themed mural at a commercial baseball training facility, after all, but Salina doesn't regulate it. ¶¶ 84, 84 n.12, 84 n.13, 85-89, 111, 113, 163, 265. Salina's position that the mural is located "inside a building," Doc. 27 at 12, is demonstrably false. It's plainly *not* inside. It's painted on the exterior of an outside wall that is adjacent to a covered baseball field. ¶ 84, n.12 (the mural "livens up the outdoor portion of their facility by adding a pop of color and interest"), n.13 (last two images demonstrating space between wall and covering).[13]

Salina's ever-shifting position on when and how it applies its mural-sign code regime demonstrates the extent of its unbridled, unconstitutional discretion. The Yard is free to add a baseball mural, but The Cozy can't paint burger-esque UFOs.

## IV. The Plaintiffs have stated a plausible void for vagueness claim.

Salina's mural-sign code regime "is so standardless that it authorizes or encourages seriously discriminatory enforcement," in violation of the Due Process Clause. *F.C.C. v. Fox*

[13] Salina again misreads its code to justify its actions. Doc. 27 at 2, 12 (sign code applies only to outdoor signs). That's incorrect, the code also regulates *indoor* signs. Doc. 16-3, *see* § 42-504(9) (regulation of indoor signs).

*Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Welch v. United States*, 578 U.S. 120 (2016). The mural-sign code regime is so vague "that regulated parties [do not] know what is required of them," and fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox Television Stations, Inc.*, 567 U.S. at 253–54 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108–109 (1972)). Vague speech laws are particularly disfavored and "rigorous adherence" to the vagueness doctrine is required. *Id.*

The fact that "mural," "art," "pertains to," "commercial speech," "advertise," and most other key terms of the mural-sign code regime are undefined—and manipulated by Salina to serve its whims—proves the regime doesn't provide constitutionally adequate guidance. ¶¶ 31-34, 44, 47-48, 51-54, 57, 62-65, 120-135, 264, 284. It's so vague, Salina even tried changing the mural's content to "turn this into a mural rather than a sign." ¶ 136. This vagueness is on display throughout Salina, with dozens of murals being considered unregulated "art," but the mural at The Cozy somehow being classified as a regulated "sign." ¶¶ 73-80, 84-89, 90-95, 96-103, 104-10; *see also* Doc. 16-4.

**Conclusion**

The Plaintiffs have plausibly alleged Salina's mural-sign code regime is unconstitutional. They've put Salina on notice of their claims, their legal theories, and the factual bases for them, and that's all that is required at this stage of the proceedings. This Court should deny Salina's motion.[14]

**Statement Regarding Oral Argument**

Given the importance of these constitutional issues, the Plaintiffs request oral argument pursuant to Local Rule 7.2.

---

[14] If the Court is inclined to grant Salina's motion, the Plaintiffs request the opportunity to move for leave to amend; or in the alternative, dismissal without prejudice so the Plaintiffs can re-file.

Dated: May 30, 2024.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam.MacRoberts@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on May 30, 2024, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

In a First Amendment case, the "plaintiff bears certain burdens to demonstrate an infringement of his rights . . . ." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). Only after the Plaintiffs carry these burdens does the evidentiary burden shift. *Id.* Moreover, First Amendment claims, including challenges to sign regulations, are routinely resolved at the pleading stage for failure to state a claim. *See, e.g., StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1247 (10th Cir. 2023); *Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359, 374 (4th Cir. 2012); *Contest Promotions, LLC v. San Francisco*, 874 F.3d 597, 604 (9th Cir. 2017). This Court does not need additional evidence to resolve the issues. The legal standards are clear. Plaintiffs have failed to state a plausible First or Fourteenth Amendment claim, and Plaintiffs' Complaint should be dismissed.

## I. Plaintiffs Lack Standing and the As-Applied BID Code Challenge Is Not Ripe

As to standing, the Complaint alleges "*any* outdoor mural is a wall sign," which if taken as true, makes the Plaintiffs alleged "mural" a "sign." The Sign Code's size limitations are what prohibit Plaintiffs' sign, causing the "particular injury" the Complaint alleges. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220-21 (1974); Compl. at ¶ 153 ("Plaintiffs cannot complete the mural . . . because Salina believes it's larger than allowed . . . ."). Yet the Complaint does not challenge the size limits. Other displays are not germane to Plaintiffs' alleged

injuries. When an "unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision" a plaintiff fails to establish redressability. *Bishop v. Smith*, 760 F.3d 1070, 1078 (10th Cir. 2014). The Sign Code's size limits are a distinct regulation from the BID Code (which does not have size limits). Compl. at ¶¶ 122-26, 153. No decision on a COC was ever reached, so the BID Code challenge is neither ripe nor redressable. Compl. at ¶¶ 152-53, 159.

## II. The Sign Code and BID Code Are Content Neutral

The Complaint manufactures an absurd construction of the definition of "sign" to conflate Plaintiffs' sign with "dozens" of displays that are not signs. Compl. at ¶¶ 36-39. Nevertheless, the Response neither refutes the City's legal argument regarding the construction of the term "sign" in § 42-764(1)-(3), nor provides legal authority to support Plaintiffs' illogical construction. Courts may consider the failure to address an argument in response to a Motion to Dismiss to concede the unanswered argument. *See Cincinnati Ins. Co. v. Eastern Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001). And despite the Response's reliance on *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020), it is not pertinent here. *Aptive* dealt with "oral speech." Signs "pose distinctive problems" from oral speech, and "take up space and may obstruct views . . . and pose other problems . . . ." *Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).

In evaluating facial content neutrality, courts review challenged text to determine if it is content neutral. *See Harmon v. Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020) (citing *Reed v. Gilbert*, 576 U.S. 155, 163-64 (2015)). The text of the Sign Code and the BID Code are not concerned with the things that are "announced," with the things that a sign "directs attention to," or the things that a sign "advertises." *See Austin v. Reagan*, 596 U.S. 61, 69 (2022). It is a far cry from the level of detail that could discriminate among "topics," "ideas," or "viewpoints." *See id.* at 74. Further, the aesthetic and traffic safety justification for the Sign Code (found in the purpose

statement at § 42-500 and Compl. at ¶ 137) is unrelated to the content of the regulated speech. *Stockinger*, 79 F.4th at 1251 (recognizing aesthetic and traffic safety justification as unrelated to content). Moreover, there are no allegations that the City adopted its Sign Code because it disagrees with Plaintiffs' message. The Complaint alleges only that the City has "antipathy toward content related to a business and commercial speech," and surmises that the City has a "preference for content unrelated to a business and noncommercial speech." Compl. at ¶ 210. These allegations are not legally meaningful because it is axiomatic that commercial speech may be subordinated to noncommercial speech. *See Metromedia v. San Diego*, 453 U.S. 490 (1981); *Outdoor Systems, Inc. v. Lenexa*, 67 F. Supp. 2d 1231, 1236-39 (D. Kan. 1999) (recognizing that under the intermediate scrutiny commercial speech test, government may establish elements with common sense and/or legal precedent).

Based on legal precedent and common sense, the Sign Code and the BID Code pass intermediate scrutiny, whether cast as "time, place, and manner," or "commercial speech" review.[1] Legal precedent says that the aesthetic harm, identified in the Sign Code's purpose statement, is real and a substantial government interest as a matter of law. *See Austin*, 596 U.S. at 65; *Stockinger*, 79 F.4th at 1255 (recognizing "reducing visual clutter" as a legitimate interest)*; Metromedia,* 453 U.S. at 510 ("It is not speculative to recognize that billboards . . . wherever located and however constructed, can be perceived as an 'esthetic harm.'"); *Members of City Council of Los Angeles v.*

---

[1]The Response argues that the Sign Code and BID Code are content based using unauthoritative, unpersuasive, and distinguishable pre-*Austin* cases. *See Complete Angler, LLC v. Clearwater*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009) (taking issue with examining the contents of the display to determine whether regulation applied, inconsistent with *Austin*); *Morris v. New Orleans*, 399 F. Supp. 3d 624, 635-37 (E.D. La. 2019) (rejecting reasoning of *Austin* trial court that found reading a sign to determine if rules apply does not make a regulation content based, said reasoning ultimately affirmed by Supreme Court, and finding City failed to indicate any substantial government interest—such as traffic safety or aesthetics); *Kersten v. Mandan*, 389 F. Supp. 3d 640, 646 (D.N.D. 2019) (addressing only an *ex parte* motion for temporary restraining order).

*Taxpayers for Vincent*, 466 U.S. 789, 806, 808 (1984). Moreover, the Sign Code and BID Code are narrowly tailored to further the City's interest in aesthetics as the "size and location restrictions 'd[o] no more than eliminate the exact source of the evil it sought to remedy,'" and anything short of a total ban is narrowly tailored to "directly advance" the City's interest in aesthetics. *Wag More Dogs,* 680 F.3d at 369 (citing *Taxpayers*, 466 U.S. at 808)[2]; *Ladue*, 512 U.S. at 48; *Metromedia*, 453 U.S. at 502.

An as-applied challenge "consists of a challenge to the statute's application only as-applied to the party before the court." *Minn. Majority v. Mansky*, 708 F.3d 1051, 1059 (8th Cir. 2013). Here, the City applied the content neutral Sign Code as written when it asked Plaintiffs to stop the installation of their sign and told Plaintiffs they cannot complete the sign because it is too big. Compl. at ¶ 152-53; Ex. A at 15:2-25 ("And these are calculated to attract the attention of the public . . . two, used to announce, direct attention to or advertise . . . It's [Cozy sign] welcoming you to come into the building--that's part of the sign--and is not located inside the building," "from that pure definition, this [Cozy sign] starts to tick all the boxes that make it a sign, before we even get into the discussion of commercial speech, noncommercial speech."), 16:1-25 ("this particular property is in C4 . . . So how big can the sign be . . . We also do a collective surface area . . . you can have 3 square feet of signage for every foot of frontage."), 17:1-18 ("In Cozy's situation . . . it's approximately 528 square feet, which is significantly greater than the allotted amount . . . .").

### III. The Sign Code and BID Code are not impermissibly vague and do not constitute an impermissible prior restraint

"[P]erfect clarity and precise guidance have never been required even of regulations that

[2] *Wag More Dogs* is still good law, the Fourth Circuit continues to cite it, and the reasoning--that a regulation is not content based when "officials must superficially evaluate a sign's content to determine the extent of applicable restrictions" (680 F.3d at 368)--is right on par with *Austin*, which held that the City can read a sign to determine if the regulation applies. 596 U.S. at 69.

restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). It is reasonable to infer Plaintiffs understand the Sign Code and BID Code, as Plaintiffs already have signs taking up 83.9% of the available sign area. Compl. at ¶¶ 124-25. The Complaint demonstrates the Sign Code and BID Code properly bridle the discretion of the City and the City had clear standards to identify and apply to the sign. Compl. at ¶¶ 121-126; Ex. A at 15:2-25, 16:1-25, 17:1-18. Indeed, the City's definition of "sign," is not materially different from the definition approved in *Austin*, which includes the phrases "directing attention to . . ." and "commercial message[s]" (phrases that are strikingly similar to "direct attention to, or advertise"). *Austin*, 596 U.S. at 85 n.3 (concurring in part). Moreover, the City informed Plaintiffs that they could not finish the sign due to its size--three days after Mr. Howard hired the sign painter, and on the same day Mr. Howard submitted the sign and COC permit. Compl. at ¶¶ 2, 120-21, 153, 155.

Dated this 12th day of June, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of June, 2024, I caused the foregoing **REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record, including to: Jeffrey Shaw and Samuel G. MacRoberts.

s/ Aaron O. Martin

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-F; Certificate of Service. |

**Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers The Cozy's artwork a regulated sign instead of an unregulated mural. The difference between the two turns on the artwork's content: if it pertains to a business, contains a commercial message, or is part of a commercial transaction, Salina considers it a regulated sign subject to size limitations, permitting requirements, and certificate of compatibility process, not an unregulated mural which is exempt from these requirements. The distinction between regulated signs and unregulated murals isn't specified anywhere in the written code. A rendition of the mural is below, if completed:



Plaintiffs filed a civil rights lawsuit challenging Salina's mural-sign code regime on the grounds it's a content- and speaker-based restriction on speech, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Doc. 16. Salina proffers attorney Mark White as an expert witness in support of its mural-sign code regime. *See* Ex. A, Expert Disclosure; Ex. B, White Report at 39 (curriculum vitae). Although he's described as an expert in urban planning and zoning, Mr. White renders seven *legal opinions* in his written report, all of which invade the province of this Court. Mr. White's legal opinions—all seven of them—are inadmissible expert testimony under Federal Rule of Evidence 702 and should be stricken or excluded.

But even if Mr. White's opinions aren't improper legal conclusions, they are not based on sufficient facts or data and are not the product of reliable principles and methods. Mr. White's opinions are devoid of *any* specific fact, study, or evidence directly related to the impact of Salina's mural-sign code regime in Salina. Furthermore, the opinions Mr. White expresses in *this case* are directly contradicted by the learned treatise he authored, titled *Content-Neutral Sign Codes After Reed and Austin*, Sign Research Foundation (Nov. 2022). Ex. D. Mr. White's own learned treatise demonstrates the unreliability of the principles and methods he utilized in this case.

In short, either Mr. White improperly renders legal opinions, or the opinions aren't based on sufficient facts or data, aren't based on reliable principles and methods, and aren't reliably applied to this case. Either way, they are inadmissible and should be stricken or excluded.

## I. Legal Standard

Rule 702 of the Federal Rules of Evidence establishes the standards for determining the admissibility of expert testimony. The proponent of the expert testimony bears the burden of establishing its admissibility. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). The testimony must be relevant and reliable. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999).

Under Rule 702, the expert's opinion testimony must "help the trier of fact to understand the evidence or to determine a fact in issue," it must be "based on sufficient facts or data," it must be "the product of reliable principles and methods," and it must "reflect a reliable application of

the principles and methods to the facts of the case." If the proponent can't satisfy each of the requirements, the testimony is unreliable, irrelevant, and inadmissible. *Nacchio*, 555 F.3d at 1241.

## II. Analysis

### A. White's opinions are inadmissible legal opinions.

Salina can't meet its burden of establishing the admissibility of its proffered expert's testimony. Mr. White's opinions are inadmissible because "expert testimony on legal matters is not admissible." *United States v. Bull*, 8 F.4th 762, 768 (8th Cir. 2021). Expert testimony is only admissible when it "will help the trier of *fact* to understand the *evidence* or to determine a *fact* in issue." Rule 702(a) (emphasis added). Experts are prohibited from providing "legal testimony, such as legal conclusions," because it doesn't aid the trier of fact. Instead, it "invades the province of the trial judge" to determine questions of law. *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *10 (10th Cir. Aug. 6, 2024). "There is a significant difference" between proffering "an attorney" as an expert to offer opinions "touching upon nearly every element of plaintiffs' burden of proof under § 1983" and "any other expert witness." *Specht v. Jensen*, 853 F.2d 805, 80 (10th Cir. 1988).[1]

As in *Specht*, the opinions offered in Mr. White's report touches upon nearly every element of Plaintiffs' § 1983 claims and violates this long-standing prohibition. Each of Mr. White's opinions is a legal conclusion directly related to the elements of Plaintiffs' case. Ex. B, White Report at 3.

a. Opinion 1: "The Sign Code establishes time, place and manner metrics that are not content-based."

In *Ward v. Rock Against Racism*, the Court held that "the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for

[1] *See also United States v. Vreeken*, 803 F.2d 1085, 1091 (10th Cir. 1986) ("questions of law" are "not the subject of expert testimony"); *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998) (testimony about "legal standards" and "legal conclusions" improper)

communication of the information." 491 U.S. 781, 791 (1989) (cleaned up). Mr. White's opinion is nothing more than a conclusory assertion that the mural-sign code regime fits the definition of a content-neutral time, place, and manner restriction as established in *Ward*. Indeed, he wrote in his report that the "the allegations by plaintiff are incorrect to the extent that they relate to content neutrality." Ex. B, White Report at 3; Ex. C, White Dep. 63:16-25—64:1-2. Tellingly, even Mr. White admits that whether a sign code is content-neutral is a question of law. Ex. C, White Dep. 61:9-15.

b. Opinion 2: "The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration."

Content-based restrictions on speech must "serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Restrictions on commercial speech must serve a "substantial interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 564 (1980). Mr. White asserts that the mural-sign code regime "serves a number of compelling and substantial" interests such as "comprehensive plan implementation," "traffic safety," "aesthetics," "urban design and travel behavior," "public health and safety," and "compromise." Ex. B, White Report at 5 (cleaned up).

Whether an asserted government interest is considered "compelling" or "substantial" is a legal question for this Court to decide, without any need for expert testimony from a lawyer. Mr. White agrees. Ex. C, White Dep. 102:22-25—103:7. Mr. White's extensive citation to legal cases and authorities, as seen below, Ex. B, White Report at 5, demonstrates that his opinion is based on his legal expertise as an attorney:[2]

> *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of

[2] *See also* Ex. B, White Report at 7-8: stating "*Georgia Outdoor Advertising, Inc. v. City of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive

c. Opinions 3 and 4: "The Sign Code directly and materially furthers its recited purposes" and "The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals."

When analyzing a regulation of commercial speech, the Court must ask "[1] whether the State's interests in proscribing it are substantial, [2] whether the challenged regulation advances these interests in a direct and material way, and [3] whether the extent of the restriction on protected speech is in reasonable proportion to the interests served." *Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 987 (10th Cir. 2020) (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)). Mr. White's third and fourth opinions are bald assertions that the challenged law satisfies the second and third elements of the *Aptive* test. Once again, Mr. White's report extensively cites legal cases[3] and authorities.[4] But, whether the evidence directly or materially furthers the government interests and is in reasonable proportion to the interests served are legal questions properly answered by the Court, not an attorney testifying as an expert witness. *See Aptive*, 959 F.3d at 989-999.

d. Opinion 5: "The Sign Code is not vague."

Plaintiffs have alleged that the mural-sign code regime is void for vagueness under the Fourteenth Amendment. *See* Doc. 16. Mr. White's fifth opinion is simply a denial of the Plaintiffs' vagueness claim.

Mr. White's opinion provides nothing more than legal argument that various words or phrases used in the mural-sign code regime are also used in the sign codes of other municipalities

---

method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981)."

[3] *See* Ex. B, White Report at 10 (citing *State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)); *see also* Ex. B, White Report at 13 n.9:

> [9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."

[4] *See* Ex. B, White Report at 15-16 citing Ithaca Zoning Ordinance § 270-5; Arlington County Zoning Ordinance Art. 13, § 13.2.3.D; Lake Placid Code § 154-5; Las Vegas Unified Development Code § 19.06.140.G.3.b.IV.

or are found in dictionaries. *See* Ex. B, White Report at 16-18. This type of legal analysis is the hallmark of legal advocacy, not expert testimony.

e. Opinion 6: "The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs."

Whether something is "reasonable" is a quintessential question of law that is not the proper subject of expert opinion testimony. *Est. of Smart v. City of Wichita*, No. 14-2111-JPO, 2020 WL 3618850, at *4 (D. Kan. July 2, 2020) (whether an officer's use of force was "reasonable" is an improper legal conclusion); *see also Fetty v. City of Baton Rouge*, 518 F. Supp. 3d 923, 932 (M.D. La. 2021) (same); *see id.* at 930-31 (collecting cases about the impropriety of expert testimony on the "reasonableness of an officer's use of deadly force," "whether an estate executor had acted reasonably," and the "'reasonableness' of the police officer's actions in arresting the plaintiff."). Mr. White's opinion simply restates the restrictions created by the mural-sign code regime and concludes that these legal restrictions are "reasonable," "flexible," and "generous." Ex. B, White Report at 19. This opinion is an improper legal conclusion.

f. Opinion 7: "The Sign Code has numerous procedural safeguards."

In prior restraint cases, the government must provide "procedural safeguards designed to obviate the dangers" of the prior restraint of speech. *Freedman v. State of Md.*, 380 U.S. 51, 58 (1965). Whether the procedural safeguards of the mural-sign code regime are sufficient to obviate the dangers of Salina's prior restraint on speech is a question of law for the Court to determine. Mr. White's opinion simply points out that the written code allows property owners to seek a variance or appeal to the Board of Zoning Appeals, a task that Defense counsel is more than capable of undertaking without the aid of expert testimony from an attorney.

Conclusion

All seven of Mr. White's opinions are legal arguments improperly framed as expert testimony that infringe on the role of the Court. Mr. White's report is little more than a "brief in support of" Salina's arguments. *Rural Water Dist. No. 4, Douglas Cnty., Kansas v. City of Eudora,*

*Kan.*, 604 F. Supp. 2d 1298, 1307 (D. Kan. 2009) *aff'd in part, rev'd in part on other grounds*, 659 F.3d 969 (10th Cir. 2011).

**B. Mr. White's opinions are not supported by sufficient facts or data and are not the product of reliable principles and methods.**

Expert testimony is only admissible if the opinions are based on sufficient facts or data and are the product of reliable principles and methods. *Nacchio*, 555 F.3d at 1241. Mr. White's opinions are not. Instead, Mr. White's opinions are based on inappropriate speculation and conjecture. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996). Throughout his report, Mr. White defines a "mural" as "an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise." Ex. B, White Report at 3 n.2. White's definition of a "mural" corresponds with his definition of a "sign", "[a]s defined by Salina's Zoning Code, 'signs' are outdoor displays that are 'used to announce direct attention to, or advertise' (Salina City Code § 42-764)," Ex. B, White Report at 15. But throughout his report, none of the reports or studies cited by Mr. White use these idiosyncratic definitions of murals and signs. Ex. C, White Dep. 59:7-21. Mr. White is, in effect, comparing apples to oranges throughout his opinions.

a. Opinion 1: "The Sign Code establishes time, place and manner metrics that are not content-based."

Mr. White's report doesn't contain any explanation of the basis for this opinion, unlike the other opinion sections. *See* Ex. B, White Report at 5-9 (section on Opinion 2); 9-14 (section on Opinion 3); 15-16 (section on Opinion 4); 16-19 (section on Opinion 5); 19 (section on Opinion 6); 19-20 (section on Opinion 7). Mr. White doesn't state in his report what facts, data, principles, or methods he utilized to reach this opinion. Without this information, Salina can't meet its burden of establishing this opinion is admissible.

Furthermore, Mr. White authored a learned treatise[5] on content-neutral signage. *See* Exhibit D, S. Mark White, *Content-Neutral Sign Codes After Reed and Austin*, Sign Research

[5] Ex. C, White Dep. 191:19-25—192:2: Q: "You agree that your publication is a reliable authority?" A: "Yes."; *see also* Federal Rule of Evidence 803(18).

Foundation (Nov. 2022). In his treatise, Mr. White points out that "sign codes that either exempt" or "regulate works of art or murals" based on criteria such as "commercial messages" or "advertising" are content based. Ex. D, *Content-Neutral Sign Codes* at 14-15; *see also* Ex. C, White Dep. 71:15-22.

Based on his learned treatise, Salina's mural-sign code regime is content based. For example, Mr. White defines, in his report, a "mural" as "an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise." Ex. B, White Report at 3 n.2. White also states, "[a]s defined by Salina's Zoning Code, 'signs' are outdoor displays that are 'used to announce direct attention to, or advertise' (Salina City Code § 42-764)," Ex. B, White Report at 15. Under the principles and methods articulated in the treatise, Salina's mural-sign code regime is content based. For example, based on his own principles articulated in his treatise, Salina's code which exempts a painted display which "does not announce, direct attention to, or advertise," but regulates a painted display which does "announce, direct attention to, or advertise," is content based.

Given the total lack of facts or data to support Opinion 1, and that the methodology utilized contradicts Mr. White's own learned treatise, it must be excluded.

b. Opinion 2: "The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration."

Mr. White's opinion does not contain any facts or data regarding Salina's stated government interests or Salina's mural-sign code regime. Ex. B, White Report at 5-9. The only data related to Salina contained in Mr. White's report is a reference to Salina's 2010 Comprehensive Plan.[6] Mr. White asserts that "[a]ppropriate sign restrictions are critical to implementing these policies." Ex. B, White Report at 7. Yet Mr. White buries in a footnote, Ex. B, White Report at 7 n.5, that the only discussion of sign restrictions in the 168 pages of the Comprehensive Plan is an unimplemented proposal to create an Urban Industrial Overlay District in a different part of Salina with "standards

[6] Available at https://www.salina-ks.gov/media/Community%20Development/Planning%20&%20Zoning/ComprehensivePlan_Adopted.pdf

that address site design, transition areas, connectivity and signage." This lack of facts and data specific to Salina and Salina's mural-sign code regime shows that there is no proper factual basis for Opinion 2.

Mr. White's opinion fails to identify the principle or method used to determine what government interests are substantial and compelling. When pressed, Mr. White testified that he used the legal term of art "substantial and compelling interests" "in a general sense in terms of how people would normally use those terms," Ex. C, White Dep. 107:4-6, and "the words compelling and the word substantial outside of their use in the case law I think have generally understood meanings. So if you went to the dictionary, for example, you'd probably find a definition of compelling and you'd probably find a definition of substantial." Ex. C, White Dep. 106:11-23. Mr. White considered the general sense of the term and the legal term of art to be like "a Venn diagram, there would be some – there would be some intersection between" the way he used the terms and the way the case law did. Ex. C, White Dep. 104:1-8. This confuses the issues in the case and does not provide any reliable methodology for determining what interests are compelling or substantial.

Indeed, the opinion does not even articulate which proffered government interests are compelling and which are substantial. Two of the "compelling and substantial interests" he identifies are traffic safety and aesthetics. Ex. B, White Report at 5. But his treatise states that "aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently 'compelling' to support content-based regulations. *See Clark v. City of Williamsburg*, 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied*, 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268 (11th Cir. 2005)." Ex. D, *Content-Neutral Sign Codes* at 6; *see also* Ex. C, White Dep. 113:8-16.

Because Mr. White's own learned treatise reaches a different conclusion than his report, the opinion is not the product of reliable principles and methods.

c. Opinion 3: "The Sign Code directly and materially furthers its recited purposes."

In his learned treatise, Mr. White discussed how regulations of commercial speech must "directly and materially serve" the government's asserted interest and that "the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny." Ex. D, *Content-Neutral Sign Codes* at 14; *see also* Ex. B, White Dep. 192:4-12. Mr. White's opinion, however, fails to meet this heavy burden with sufficient facts and data. The report has only generalized assertions that some regulation of signage may advance a government interest in theory. The report does not contain any data showing how *Salina's* mural-sign code regime has *actually* advanced traffic safety, pedestrian safety, aesthetics, or property values in *Salina*. The report does not contain a single fact showing that a traffic or pedestrian accident has been prevented by Salina's mural-sign code regime, or that property values have risen because of Salina's mural-sign code regime, or any quantifiable metric to prove that Salina's mural-sign code regime enhances aesthetics. The report simply lacks the facts and data needed to provide the basis for this opinion that *Salina's* mural-sign code regime directly and materially furthers *Salina's* recited purposes. Mr. White testified that he is not aware of the existence of these facts either. See Ex. C, White Dep. 46:25-47:1-5; 47:12-19; 47:21-48:4; 116:13-18; 120:10-17; 121:10-14; 123:7-14; 123:16-22; 124:13-19; 125:7-12.

Not only does Mr. White's opinion lack sufficient facts and data, the rebuttal report of Charles R. Taylor, Ph.D., conclusively shows that there is no evidence showing that the mural-sign code regime advances Salina's claimed interests. See. Ex. E, Taylor Report. The Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. E, Taylor Report at 12. "Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety." Ex. E, Taylor Report at 13. "The argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." Ex. E, Taylor Report at 10. As Professor Taylor succinctly said, it is "pretty much settled science that on-premises signs don't cause traffic accidents." Ex. F, Taylor Dep. 119:12-13.

Similarly, Mr. White's opinion does not explain the principle and method utilized to reach a conclusion that his own treatise considers "unlikely." Mr. White lists several other municipal sign codes that he says, "demonstrate a range of approaches to regulating signs while accommodating the benefits of murals." Ex. B, White Report at 12-13. But in Mr. White's learned treatise, he instead recommends that municipalities "[r]emove restrictions that exempt or target artwork, along with limits on commercial advertising." Ex. D, *Content-Neutral Sign Codes* at 15. Nor does he explain what methodology he used to choose the twenty-one particular municipalities listed in the report, out of the thousands of possible municipalities in America. Instead, his report simply states, in general, that regulating signs while promoting art advances a city's interests, without any explanation of the methodology utilized to reach the opinion that *Salina's* mural-sign code regime directly and materially furthers *Salina's* recited purposes.

d. Opinion 4: "The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals."

The section of Mr. White's report addressing Opinion 4, Ex. B, White Report at 15-16, is based almost entirely on a comparison of Salina City Code § 42-764 to Ithaca Zoning Ordinance § 270-5, Arlington County Zoning Ordinance Art. 13, § 13.2.3.D, Lake Placid Code § 154-5, and Las Vegas Unified Development Code § 19.06.140.G.3.b.IV. The only other facts or data cited in this section are cited simply for the proposition that "public art (as do public spaces such as parks, or buildings with architectural significance) can <u>attract</u> people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023)." Ex. B, White Report at 16 (emphasis in original). The opinion does not contain any facts or data showing that the sign codes in Ithaca, Arlington, Lake Placid, or Las Vegas have in fact advanced any government interest or that Salina's mural-sign code regime in fact advances any government interest. This does not provide a factual basis for the opinion that Salina's mural-sign code regime is reasonable in scope.

Mr. White's report does not describe any principle or methodology that he utilized to reach Opinion 4. Mr. White simply compares the Salina City Code to Ithaca, NY, Arlington County, VA, Lake Placid, NY, and Las Vegas, NV. But he does not explain how he chose these particular

municipal codes, or why, of the thousands of municipalities in America, these particular municipalities are an appropriate comparison to Salina. There is no explanation of what, if anything, Salina, KS, has in common with Ithaca, NY, Arlington County, VA, Lake Placid, NY, or Las Vegas, NV. Given the lack of any explanation, there is no way to know if this opinion is the product of reliable principles and methods, or simply cherry picking a handful of municipalities whose codes happened to be similar to Salina's. Nor does the report explain the principle or method used to compare these municipal ordinances to form Opinion 4.

e. Opinion 5: "The Sign Code is not vague."

The section of Mr. White's report dealing with Opinion 5, Ex. B, White Report at 16-19 is devoid of facts or data as contemplated by Rule 702(b). Instead, Mr. White simply cites various undefined terms in the Salina mural-sign code regime and compares them to other municipal codes or a dictionary. Ordinary dictionaries and municipal codes are not sufficient facts or data for an expert to formulate a reliable opinion. Nor does Mr. White's report describe any principle or methodology that he utilized to reach Opinion 5. Mr. White simply cites various undefined terms in the Salina mural-sign code regime and compares them to other municipal codes, but he does not explain how he chose these particular municipal codes or why, of the thousands of municipalities in America, these particular municipalities are an appropriate comparison to Salina. Given the lack of any explanation, there is no way to know if this opinion is the product of reliable principles and methods, or simply cherry picking a handful of municipalities whose codes happened to be similar to Salina's.

f. Opinion 6: "The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs."

Opinion 6 is not based on any facts specific to Salina or data related to conditions in Salina. The opinion cites a handful of studies to argue that limiting the maximum number and size of signs is desirable, but, crucially, the studies Mr. White cites do not support the contention that painted murals should be treated differently than painted wall signs. Ex. B, White Report at 19. The opinion contains no facts that would indicate it is reasonable to restrict the size, shape, placement, and

design of signs painted on walls differently than the size, shape, placement, and design of murals painted on walls because of the content.

This opinion is not the product of reliable principles or methods. The report contends that it is reasonable to regulate the size, shape, placement, and design of painted wall signs while also exempting murals painted on walls from regulation. Yet Mr. White's own learned treatise recommends the exact opposite course of action: "Remove restrictions that exempt or target artwork, along with limits on commercial advertising." Ex. D, *Content-Neutral Sign Codes* at 15; *see also* Ex. C, White Dep. 77:11-20. Mr. White's report does not explain what method or principle was utilized to reach an opinion that is diametrically opposed to the recommendations he gives in his treatise. Defendant is not able to meet its burden of proving that this opinion is the product of reliable principles or methods.

g. Opinion 7: "The Sign Code has numerous procedural safeguards."

Mr. White's report does not contain facts or data to support this opinion. The report only describes the variance and appeal process in Salina City Code § 42-597. The Salina City Code is not fact or data that can be the basis of an expert opinion, it is simply a law. Defense counsel can easily cite, and the Court can easily understand and interpret, the provision of § 42-597.

Mr. White's report does not explain what reliable principles and methods he utilized to produce this opinion. All his opinion does is cite to the variance and appeal provisions of the Salina City Code to conclude that the mural-sign code regime contains procedural safeguards. Yet he fails to note other procedural safeguards written in the Salina City Code, such as time limits to issue or deny permits or certificates, §§ 42-502 & 2-209, or the requirement for a written statement of the reason for denial of a permit or certificate, §§ 42-596(c)(2) & 2-209. Mr. White didn't address these procedural safeguards precisely because Salina failed to comply with these safeguards and instead placed Plaintiffs' applications for a sign permit and certificate of compatibility "on-hold" indefinitely. It is difficult to imagine what reliable principle and method could produce the opinion

that the mural-sign code regime has numerous procedural safeguards while also ignoring the procedural safeguards that Salina violated.

**III. Conclusion**

Mark White's expert report and testimony should be excluded because he provides legal conclusions and "invades the province of the trial judge" to determine questions of law. *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *10 (10th Cir. Aug. 6, 2024). Additionally, his opinions are not based on sufficient facts and data or the product of reliable principles and methods. As a result, the Court should exclude Mr. White's report, opinions, and testimony entirely because they are neither relevant nor reliable. In the alternative, the Court should exclude any portions of Mr. White's report, opinions, and testimony that are legal conclusions or that are not based on sufficient facts and data or the product of reliable principles and methods.

Dated: December 20, 2024.

Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on December 20, 2024, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Jeffrey Shaw
Jeffrey Shaw

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard**

**v.**

**City of Salina, Kansas**

**Civil Action No. 6:24-cv-01027-TC-ADM**

**Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Defendant's Expert Disclosure |
| **Exhibit B** | Defendant's Expert Report: Mark White |
| **Exhibit C** | Deposition Excerpts: Defendant's Expert Mark White |
| **Exhibit D** | S. Mark White, *Content-Neutral Sign Codes After Reed And Austin*, Sign Research Foundation (Nov. 2022) |
| **Exhibit E** | Plaintiffs' Expert Report: Charles R. Taylor, Ph.D. |
| **Exhibit F** | Deposition Excerpts: Plaintiffs' Expert Charles R. Taylor, Ph.D. |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

Defendant City of Salina, Kansas (the "City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville, Chartered, hereby submits its Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2) as follows:

**RETAINED EXPERT**

The City identifies the following retained expert pursuant to Fed. R. Civ. P. 26(a)(2)(B) as follows:

1. Mark White, Esq., AICP, White & Smith, LLC, 200 NE Missouri Road, Suite 200, Lee's Summit, MO 64086, (816) 221-8700. Mr. White is an expert in urban and regional planning, zoning, form-based zoning and New Urbanism, and land use. He is expected to testify pursuant to Fed. R. Civ. P. 26(a)(2)(B) consistently with, and in support of, his opinions and statements as detailed in his expert report submitted herewith and attached as **Exhibit A**. Mr. White's curriculum vitae, a list of his publications in the last 10 years, and a statement of his compensation to be paid for his study, report and testimony are submitted with his report, and also attached as **Exhibit A**. Mr. White has not testified as an expert at trial or by deposition in

Exhibit A

Mark White
EXHIBIT NO. 1
APPINO & BIGGS

the last 4 years. Additionally, research, analysis and other assistance undertaken by Mr. White's colleagues is to be compensated as follows: Tyson Smith - $350/hr.; Sean Scoopmire - $200/hr.; and Justin Wallace and Caitlin Cameron - $150/hr.

In addition to the opinions and statements outlined in the expert report attached as **Exhibit A**, Mr. White may also provide rebuttal testimony to any other matters raised by any expert endorsed by Plaintiffs in the same or related fields of expertise as Mr. White.

Mr. White may offer opinion evidence at trial under Federal Rules of Evidence 702, 703, and/or 705. He may also provide deposition testimony or affidavit testimony concerning the subject maters and opinions expressed by him in deposition, this expert report, supplemental expert reports, and/or affidavits as part of his endorsement and disclosure under Fed. R. Civ. P. 26.

As discovery in this matter is ongoing, and as authorized pursuant to Fed. R. Civ. P. 26(e)(2), the City reserves the right to supplement this disclosure.

Respectfully submitted this 16th day of August, 2024.

*s/ Aaron O. Martin*
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

*s/ Todd G. Messenger*
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

*s/ Amanda C. Jokerst*
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of August, 2024, I caused the foregoing **DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(A)(2)** to be served on counsel of record for Plaintiffs, by electronic mail as follows:

Jeffrey Shaw
Sam MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: (913) 213-5121; (913) 213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org
*Attorneys for Plaintiffs*

*s/ Amanda C. Jokerst*
Amanda C. Jokerst, Esq.

# ANALYSIS OF SALINA SIGN CODE

---

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

Mark White
EXHIBIT NO. 2
APPINO & BIGGS

Exhibit B

EXHIBIT A

Contents

***Introduction*** ________ ***2***
***Basis of Opinions*** ________ ***3***
***Statement of Opinions*** ________ ***3***
***Compensation*** ________ ***20***
***Conclusions*** ________ ***21***
***Documents Reviewed*** ________ ***22***
***Exhibits*** ________ ***30***
***Resume and Qualifications*** ________ ***39***

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

## DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):




*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.
- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.
- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
    - ◊ A storefront
    - ◊ Display case
    - ◊ **Public art**
    - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

---

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

## URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

## PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

---

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

---

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer critical benefits to residents, such as improved public safety and well-being" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

## OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.



*Figure 3 Salina Art Center Mural*



*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

**THE SIGN CODE IS NOT VAGUE**

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to …."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.
- The variance will not adversely affect the rights of adjacent property owners or residents.
- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.
- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.
- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

Digitally signed by Mark White
Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions) https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs) https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119 https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art) https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2 https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U)
https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance.* 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024.
https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance.* November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017.
https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture.* 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals.* CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land.* 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, “Traditional Neighborhood Development-Will the Traffic Work?” American Society of Civil Engineers, (ASCE 1990);

Bookout, “Neotraditional Town Planning: Cars, Pedestrians & Transit,” Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, “Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, “Land-Use Mixing and Suburban Mobility,” Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**
*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**
*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**
*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

## RESUME AND QUALIFICATIONS

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

### BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

**SELECTED CITATIONS**

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

**SELECTED EXPERIENCE**

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance | 2000-2002 |
| | Inclusionary Zoning Ordinance | 2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing | 2005 |
| | Land Development Regulations update | 2007-2013 |
| | Master Mobility Plan | |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district) | 2004-2005 |
| | Land Management Code | |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

Page 1

.
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
.
.
COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.
DEPOSITION OF
MARK WHITE,
taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.
.

Page 2

APPEARANCES
.
.
ON BEHALF OF THE PLAINTIFFS:
.
Mr. Samuel G. MacRoberts
Mr. Jeffrey Shaw
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
sam.macroberts@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org
.

Exhibit C

Page 3

ON BEHALF OF THE DEFENDANT:
.
Mr. Aaron O. Martin (via Zoom)
Clarke Mize & Linville
129 S. 8th Street
Salina, KS 67402
785-823-6325
aomartin@cml-law.com
.
Ms. Amanda C. Jokerst (via Zoom)
Fairfield and Woods
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
ajokerst@fwlaw.com
.
ALSO PRESENT:
.
Mr. Tim Faulhaber, Zoom technician
.

Page 4

INDEX
.
.
Certificate------------------------------- 204
.
.
WITNESS


| ON BEHALF OF THE PLAINTIFFS: | PAGE |
|---|---|
| MARK WHITE | |
| Direct-Examination by Mr. MacRoberts | 5 |
| Cross-Examination by Ms. Jokerst | 192 |
| Redirect-Examination by Mr. MacRoberts | 198 |


EXHIBITS


| WHITE DEPO EX. NO: | MARKED |
|---|---|
| No 1 Defendant's Expert Disclosure | 5 |
| No 2 Expert Report | 5 |
| No 3 Content-Neutral Sign Codes After Reed and Austin article by White | 5 |
| No 4 Sign Permit Application | 94 |
| No 5 Photo of Mural at the Mill | 94 |
| No 6 Conclusion/Next Steps Bloomberg article | 188 |

Page 45

A. Because I'm testifying as an urban planner and a zoning expert and not as an attorney. The legal principals I assume you will argue through with the counsel in this case.

**Q. Do you think a reasonable person could disagree with the opinions expressed in your report?**

MS. JOKERST: Object to form.

A. I believe it -- I believe in another expert could object to the opinions in this report.

BY MR. MACROBERTS:

**Q. But what about a reasonable person?**

MS. JOKERST: Object to form.

A. I'm not familiar with this reasonable person standard you're talking about.

BY MR. MACROBERTS:

**Q. Have you included references or materials that can undermine your opinions?**

MS. JOKERST: Object to form.

A. I believe there are things in the documents cited that somebody could cite in a way that disputes some of my conclusions and discussion in the report.

BY MR. MACROBERTS:

Page 46

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**

MS. JOKERST: Object to form.

A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.

BY MR. MACROBERTS:

**Q. Did you include any disputed facts or any facts that could undermine your opinion?**

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. -- in your report?**

MS. JOKERST: Object to form.

A. Not that I recall.

MR. MACROBERTS: Can we take a five-minute break?

THE WITNESS: Yes. I was going to ask the same thing.

MR. MACROBERTS: Yeah.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, do you know whether the**

Page 47

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

Page 48

**code?**

MS. JOKERST: Object to form.

A. I am not aware that there were or were not studies specific to Salina's sign code.

BY MR. MACROBERTS:

**Q. So one way or the another, you're not aware?**

A. Correct.

MS. JOKERST: Object to form.

THE WITNESS: Sorry, Amanda. Go ahead. Amanda objected.

MR. MACROBERTS: It is noted. I am certain of that.

BY MR. MACROBERTS:

**Q. All right. So for purposes of your report, you used the word mural to mean, quote, an outdoor exhibit painted on a wall that does not fall with the sign code's parameters and that may include art but does not announce, direct attention to or advertise. You meant within. Is that right? Does not fall within the sign code's parameters?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. And for reference --**

Page 57

BY MR. MACROBERTS:
**Q. For purposes of your report, you did not specifically define the term announce?**
MS. JOKERST: Object to form.
A. That's incorrect. I don't know whether to say no or yes.
BY MR. MACROBERTS:
**Q. Is that in the vagueness section of your report?**
A. Yes.
**Q. All right. Besides the vagueness section, you did not specifically define the term announce for purposes of your report?**
MS. JOKERST: Object to form.
A. I would say that's incorrect.
BY MR. MACROBERTS:
**Q. Why do you say that is incorrect?**
A. Because the way that's used in the -- I took the customary understood meaning of announce as it's defined in the dictionary and in best practices, and that's how I would have used that in the report.
**Q. So you did not put a footnote in your report defining announce the same way you did with the term mural. Is that fair to say?**

Page 58

A. It's fair to say that that was not in a footnote.
**Q. And outside of that vagueness section of your report, you didn't put in the report explaining to the reader how you are using the word announce?**
A. I didn't use that in the introduction to the report. But implicit in the discussion of vagueness, that's how that's generally understood by planners when they're not defined.
**Q. What is implicit? Maybe I misunderstood you.**
A. The definitions that I used in the vagueness section are how those terms are typically used and defined by persons administering the sign code, for example.
**Q. Starting at page 22 of your report and going through page 29, you cite a number of documents that you've reviewed?**
A. Um-hum.
**Q. Of those documents you reviewed, which ones use the same exact mural definition that you use in your report?**
MS. JOKERST: Object to form.
A. I don't recall the definition of mural

Page 59

use -- the specific word-for-word definition of mural used in those --
BY MR. MACROBERTS:
**Q. Of the studies you reviewed -- I'm sorry. Were you --**
A. In those documents.
**Q. Of the studies you've reviewed, which ones used the exact same definition of mural that you use in your report?**
MS. JOKERST: Object to form.
A. I do not recall the definition of mural used in those studies.
BY MR. MACROBERTS:
**Q. Of the documents that you've reviewed, which ones use the exact same sign definition as Salina's City Code?**
MS. JOKERST: Object to form.
A. I don't recall the documents that use the exact same definition, although the definition Salina uses is very consistent generally with other definitions of sign.
BY MR. MACROBERTS:
**Q. Of the legal cases that you've cited, are there any that use the same exact definition of mural that you use in your report?**

Page 60

MS. JOKERST: Object to form.
A. I don't recall how and if any of those cases defined mural.
BY MR. MACROBERTS:
**Q. How about legal cases on signs? Of the legal cases that you have cited, which ones use the same definition of sign that the Salina City Code uses?**
MS. JOKERST: Object to form.
A. I don't recall what specific definition of sign was used in those cases.
BY MR. MACROBERTS:
**Q. Going back to your report on page 3, and just to be transparent, what I'm going to try to do is go through your statement of opinions in order. So we're just going work our way through them. I may have to bounce around a little bit, but I'm going to do the best I can just so you have an idea of what we're doing. Hopefully, that will make things easier for you.**
**You have expressed an opinion that the sign code establishes time, place and manner metrics that are not content-based. Do you see that?**
A. Yes.
**Q. Do you agree that content neutrality is a**

Page 61

**question of law?**
A. I believe that it's partially a question of law and partially a question of fact.
**Q. Why do you think that?**
A. Because the facts of the case are how the sign code is written, and so those facts will lead to whether the sign code is content-based or content neutral.
**Q. Do you agree the conclusion whether a code is content neutral is a question of law?**
MS. JOKERST: Object to form.
A. I believe in the courts it's a legal conclusion. It's also something planners need to consider when they draft and administer sign codes.
BY MR. MACROBERTS:
**Q. Why is it that planners need to consider content neutrality when writing sign codes?**
A. They need to consider that because those codes are subject to the constitution. You know, like policemen or police persons, law enforcement personnel, they have to understand the law when they administer, and in the case of planners more so than law enforcement personnel I believe when they actually draft regulations within the

Page 62

parameters of that legal structure.
**Q. In your report, on your opinion section, it seems to me like you list your Statement of Opinions 1 through 7, and then there's a corresponding section later in the report outlining more about your opinions. Is that a fair way of expressing the breakdown of your report?**
A. Yes.
**Q. So on Statement of Opinion 2, the sign code is supported by substantial and compelling interests in the area of urban planning and code administration, you later have a section explaining that opinion?**
A. Yes.
**Q. 2, 3, 4, 5, 6 and 7 opinions, or the opinions listed 2 through 7, have a corresponding section, right?**
A. Yes.
**Q. Why is it that you don't have a corresponding section for opinion 1, that the sign code establishes time, place and manner metrics that are not content-based?**
MS. JOKERST: Object to form.
A. I believe there's statements throughout

Page 63

the report that get to whether that is content-based or not.
BY MR. MACROBERTS:
**Q. But do you know why there wasn't a section explaining your opinion No. 1 like there was for opinions 2 through 7?**
A. I don't recall why that wasn't organized into a specific section of the report.
**Q. You I think just mentioned that there were some statements about content neutrality within the report. Is that how you said it?**
A. I believe so, yes.
**Q. I'm not trying to trick you. I'm just trying to remember.**
A. Okay.
**Q. It seems like you made three statements about content neutrality in your report, and we'll go through them. The first appears to be on page 3 of your report where it says it is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the sign code. Did I read that correctly?**
A. Is that on page 3?

Page 64

**Q. Yes.**
A. Oh, I see. It's up at the top. Yes.
**Q. The second time was also on page 3. The Salina sign code furthers substantial content neutral interests?**
A. Yes.
**Q. And the -- as I understand it, the last opinion or statement on content neutrality was I believe page 4, quote, the total sign area is based on the location and structural characteristics of signs and not their content. Do you see that on the bottom of page 4?**
A. Yes.
**Q. Other than those three statements, do you have any other statements about content neutrality that I have missed?**
MS. JOKERST: Object to form.
A. Not that I can recall off the top of my head.
BY MR. MACROBERTS:
**Q. Do you -- would you take a moment to review the report?**
A. Yes. I don't see anything specific other than what you mentioned.
**Q. You -- I want to go now to your**

Page 69

**Q. Do you agree that few sign codes are free of content-based provisions under the court's content neutrality standard both for temporary signs and permanent signs?**
MS. JOKERST: Object to form.
A. Are you reading that from a section of the report?
BY MR. MACROBERTS:
**Q. Yes, sir.**
A. Awe.
**Q. I apologize. It's at the top of --**
A. Gotcha. Yes. At the time I wrote the report, I believe that to be true.
**Q. Do you agree that every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of Reed, if necessary?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. You agree that to comply with Reed, a code should establish three broad sign categories based upon their physical characteristics?**
MS. JOKERST: Object to form.
A. Yes.

Page 70

BY MR. MACROBERTS:
**Q. What are those three -- I'll just say it, freestanding signs --**
A. Yes.
**Q. -- attached signs and incidental signs?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree that to ensure that a sign code is content neutral, a community should begin by removing all references to the content of sign types or sign messages that trigger permitting or related sign regulations?**
MS. JOKERST: Object to form.
A. Generally speaking, yes.
BY MR. MACROBERTS:
**Q. Do you agree --**
A. What page are we on now?
**Q. 10.**
A. Okay.
**Q. My apologize. Do you agree that a sign code that gives a zoning administrator unlimited discretion to deny or condition a sign permit can intrude on First Amendment rights even if the regulations are facially neutral?**

Page 71

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. In your publication, you wrote about artwork and murals. Is that right?**
A. I believe I wrote about murals. I don't recall if I specifically addressed -- actually, I think I did address art, yes.
**Q. Let's turn to page 14.**
A. Okay. Yes, I did.
**Q. In this publication, you pose the question can cities distinguish art and murals from commercial signs. Do you see that?**
A. Yes.
**Q. And you wrote several cases have ruled that sign codes that either exempt (Central Radio v. City of Norfolk, 4th Circuit, 2016) or regulate (Kersten v. City of Mandan, 389 F.Supp3d 640, District of North Dakota, 2019) works of art or murals that did not display commercial messages are content-based. Did I read that correctly?**
A. Yes. That's what I wrote.
**Q. And you wrote before Reed, courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message**

Page 72

**conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. Did I read that correctly?**
A. Yes.
**Q. You went on to describe Kersten. In Kersten, quote, the court -- you wrote this.**
A. Um-hum.
**Q. The court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. Did I read that correctly?**
A. Yes.
**Q. You also referenced a case called Complete Angler vs. City of Clearwater, correct?**
A. Correct.
**Q. You describe complete Angler vs. City of Clearwater as, parens, but I'm quoting, bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for non-commercial works of art and holiday decorations were content-based. Did I read that correctly?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:

Page 77

MS. JOKERST: I'll object to form. I don't know what exhibit we're on.
BY MR. MACROBERTS:
**Q. Do you understand what exhibit we're on?**
A. Would you like to clarify it for the record?
**Q. Sure. Exhibit 3.**
A. Could you repeat the question?
**Q. Yes.**
A. Okay.
**Q. On page 15 of Exhibit 3, you wrote a community who wants to regulate murals can consider the following options: Remove restrictions that exempt or target artwork along with limits on commercial advertising. The regulations could consider a restriction on text if the message is not restricted, for example, limiting the text to the artist's signature. Did I read that -- did I read that correctly?**
A. Yes.
**Q. And you wrote consider mural subcategories based on their physical characteristics such as a wall sign or paint wall sign. An issue with this approach is that murals often occupy entire building walls which exceed**

Page 78

**typical wall sign limits. Did I read that correctly?**
A. Yes.
**Q. If the Salina zoning administrator looks at renditions of paintings that are to be displayed to determine whether or not that painted display is an unregulated mural or a regulated wall sign, the regulations are likely content-based, correct?**
MS. JOKERST: Object to form.
A. Not necessarily.
BY MR. MACROBERTS:
**Q. Why is that?**
A. Because the Salina planner that you mentioned is only applying the content neutral wall sign standards is Salina's sign regulations as written.
**Q. Why do you say that?**
A. I say that because as defined in the sign regulations, a painting that occupies any part of a wall that announces, directs attention to or advertises is considered a sign.
**Q. How do you know whether a painting advertises without looking at the content?**
MS. JOKERST: Object to form.

Page 79

A. You would know that because as with the City of Austin case, for example, the planner in this case is only reviewing and reading that presentation in terms of where that sign is directing people to. So it's a form of location restriction as was the off-premise sign in the City of Austin.
BY MR. MACROBERTS:
**Q. My question was not about directions or on or off-premises. My question was about advertising.**
MS. JOKERST: I'll state an objection. Object to form to the extent that's a question.
A. Yes. Could you repeat the question?
BY MR. MACROBERTS:
**Q. How would you know whether or not a painting advertises without looking at the painting?**
MS. JOKERST: Object to form.
A. Well, you would have to look at the painting to see what is being advertised and where that -- where that's located. Where that's located I think is bound up with advertising.
BY MR. MACROBERTS:
**Q. Why is that?**

Page 80

A. Well, I know in this case the painting points to something that's right on site. So that's how you know that this painting advertises something that's inside.
**Q. And given the lack of a definition of advertising, how is one to determine whether or not it, indeed, advertises?**
MS. JOKERST: Object to form.
A. Absent a definition, a planner or an applicant or anyone else can turn to a dictionary to determine how that's customarily defined.
BY MR. MACROBERTS:
**Q. You would agree that Mr. Howard does not sell UFOs, right?**
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. I mean that would be absurd?**
THE WITNESS: Amanda, did you...
MS. JOKERST: Yeah, I am. Sorry.
THE WITNESS: You're about to talk.
MS. JOKERST: Keep my mouth shut while you finish your question. I apologize, Mr. MacRoberts.
MR. MACROBERTS: No, you're fine.
A. Did you want to repeat the question?

Page 101

Salina calls it. But, yeah, those regulations that administers -- that administer those long-term planning policies.

**Q. So when you reference urban planning and code administration, is that what's listed in page 5 of your report, the comprehensive plan implementation, the traffic safety, aesthetics, urban design and travel behavior, public health and safety and compromise?**

A. I'm sorry, are you asking whether those things are urban planning or what are you asking?

**Q. So on your Statement of Opinion 2, you say urban planning and code administration. It appears to me that then the urban planning and code administration is broken out on page 5 of those things, comprehensive planning implementation, traffic safety, aesthetics and so on. I just want to make sure I understand so I could ask you questions about it. So it's more foundational than anything.**

A. Okay.

**Q. So I'll rephrase it then.**

A. Okay.

**Q. When you reference urban planning and code administration on your Statement of Opinion**

Page 102

**on page 3, is that broken down on page 5?**

MS. JOKERST: Object to form.

A. Urban planning isn't broken down, but all of those interests listed on page 5 are interests that are related to urban planning.

BY MR. MACROBERTS:

**Q. So in your Statement of Opinion on page 3, the totality of that opinion is broken out on page 5?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. In other words, are there any other urban planning and code administration interests that are not listed on page 5?**

A. There could be, but these are the ones that seemed germane to this, what's going on here, so that's why I listed. That's not to say I won't think of something else eight hours after we're done with our deposition, but those are the ones that were germane to what's going on in this case.

**Q. Do you agree that whether or not something qualifies as a compelling interest is a question of law?**

MS. JOKERST: Object to form.

Page 103

A. In a court of law it is.

BY MR. MACROBERTS:

**Q. And what about whether something qualifies as a substantial interest? That is also a question of law in a court?**

MS. JOKERST: Object to form.

A. It is a question of law in courts, yes.

BY MR. MACROBERTS:

**Q. So on page 5, is it your opinion that comprehensive plan implementation is both a substantial and compelling interest?**

A. I'm not speaking to the legal conclusion here but as a planner. To me, it is the most -- one of the most important interests in writing any -- any zoning or land development code, including a sign code.

**Q. So when you use the term substantial and compelling interest, you're not talking about the legal test that use the same phraseology?**

MS. JOKERST: Object to form.

A. I'm not making a legal conclusion.

BY MR. MACROBERTS:

**Q. You're using terms, though, that are in case law, right?**

A. Those terms do appear in case law.

Page 104

**Q. So when you use the term substantial and compelling interests, you're not using those terms the same way that case law does?**

MS. JOKERST: Object to form.

A. I'd say if you had a Venn diagram, there would be some -- there would be some intersection between the two, but that's -- I'm speaking to the importance of those interests to a sign code.

BY MR. MACROBERTS:

**Q. So as you drafted this report, what you may consider a substantial and compelling interest may not be the same thing as a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

A. It may end up being that and that's something that you all and the attorneys in the case will argue. I'm only speaking about how important they are to urban planners when they draft sign codes.

BY MR. MACROBERTS:

**Q. So what may be a substantial and compelling interest to a planner, you would agree may not be a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

Page 105

A. That could happen.

BY MR. MACROBERTS:

**Q. In a First Amendment free speech case involving signs or murals, has any federal court ever held that a comprehensive plan implementation is a compelling government interest?**

MS. JOKERST: Object to form.

A. I don't know. I didn't do legal research as part of this. So I wasn't writing a legal brief, so I didn't search my sources for that.

BY MR. MACROBERTS:

**Q. But you did do some legal research because you cited legal cases, right?**

MS. JOKERST: Object to form.

A. Those are cases that describe what planners typically consider to be the role of a comprehensive plan in cases I was already aware of. I didn't -- I didn't jump on Fastcase, for example, and find a case for the purposes of this report. These are things that planners typically consider when they write comprehensive plans and when they write regulations and implement them.

BY MR. MACROBERTS:

**Q. In a First Amendment free speech case involving signs and murals, has any federal court**

Page 106

**ever held that a comprehensive plan implementation is a substantial government interest?**

MS. JOKERST: Object to form.

A. Again, I didn't research that specifically, because I'm not expressing opinion about -- an opinion about what the legal conclusions are. I'm only expressing an opinion about the importance of a comprehensive plan to regulations like Salina's sign code.

BY MR. MACROBERTS:

**Q. How would the reader of the report know when you use terms like substantial interest or compelling interest that you are not talking about those terms in the same way the legal cases use those terms?**

MS. JOKERST: Object to form.

A. I be -- words -- the words compelling and the words substantial outside of their use in the case law I think have generally understood meanings. So if you went to the dictionary, for example, you'd probably find a definition of compelling and you'd probably find a definition of substantial.

BY MR. MACROBERTS:

**Q. So when you use the terms compelling and**

Page 107

**substantial interests, you're using the common dictionary definition version of those terms?**

MS. JOKERST: Object to form.

A. I'm using them in a general sense in terms of how people would normally use those terms. They're very important interests.

BY MR. MACROBERTS:

**Q. Do people normally use the term substantial interest underlying a sign code?**

MS. JOKERST: Object to form.

A. I know outside of my practice, I don't usually -- that doesn't come up in ordinary conversation because I usually don't talk to people outside of my office about sign codes specifically. But I do know that at a professional level, planners do talk about the relative importance of interests that underlay any regulation that they write.

BY MR. MACROBERTS:

**Q. And earlier, you had testified about making sure that planners understood the Reed case, for example. You remember that?**

A. Yes.

**Q. And the Reed case uses things like compelling interest, right?**

Page 108

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. So it's important that readers or planners know what compelling interest means, right?**

MS. JOKERST: Object to form.

A. Generally speaking, yes.

BY MR. MACROBERTS:

**Q. So a planner who wants to make sure they're not drafting an unconstitutional code needs to know what a compelling interest is, right?**

MS. JOKERST: Object to form.

A. Generally speaking, yes.

BY MR. MACROBERTS:

**Q. In your comprehensive plan implementation section, you cited concerned citizens of Calaveras County. Do you see that?**

A. Yes.

**Q. That was not a First Amendment case, correct?**

A. Not that I recall.

**Q. You also cited the Machado case?**

A. Yes.

Page 113

A. I don't recall all of the cases that I cited in this publication but, you know, I could refresh my memory. I can be convinced that I cited it.
**Q. I don't want to belabor this, but page 6, if you would --**
A. Okay.
**Q. -- on your publication. I'll just read it so we can --**
A. Okay.
**Q. Courts have held that aesthetics and traffic safety, the traditional interests that support sign regulations, are not sufficiently compelling to support content-based regulations. Did I read that correctly?**
A. Yes.
**Q. On page 7 of your report, you testified the sign clutter contributes to decline and traffic safety and that public art does not create this type of distraction?**
A. I'm sorry.
**Q. Switching around here.**
A. Okay. Could you repeat the question? I was going back between documents.
**Q. Yes. Absolutely. You wrote that sign**

Page 114

**clutter contributes to decline and traffic safety and in the same paragraph write public art does not create this type of distraction. Do you see that?**
A. Yes.
**Q. You don't define what public art is in that, correct?**
MS. JOKERST: Object to form.
A. I do not have a footnote on that page that defines what public art is.
BY MR. MACROBERTS:
**Q. There's no citation in your report for the proposition that public art can't create clutter?**
MS. JOKERST: Object to form.
A. I don't think that there's any documents cited in the report that says that public art could never create clutter.
BY MR. MACROBERTS:
**Q. Are you aware of any evidence that establishes that private art is more dangerous than public art?**
MS. JOKERST: Object to form.
A. Well, I don't have a definition of those two, but that said, I'm not aware of a report that

Page 115

gets into the distinctions between those two and their impacts.
BY MR. MACROBERTS:
**Q. Are you aware of any studies that establish private art is more dangerous than public art?**
MS. JOKERST: Object to form.
A. Not off the top of my head, no.
BY MR. MACROBERTS:
**Q. Are there any cases that establish private art is more dangerous than public art?**
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. That you're aware of?**
A. Not that I'm aware of.
MR. MACROBERTS: It's 12:10, do you want to take a break.
THE WITNESS: Certainly.
MR. MACROBERTS: All right.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

Page 116

**wall?**
MS. JOKERST: Object to form.
A. I'm not aware of anything that specific.
BY MR. MACROBERTS:
**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**
MS. JOKERST: Object to form.
A. Again, I can't think of anything that specific.
BY MR. MACROBERTS:
**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**
MS. JOKERST: Object to form.
A. Again, I can't think of anything that specific.
BY MR. MACROBERTS:
**Q. Same with studies and case law. There are no studies in cases that would say that?**
A. I --
MS. JOKERST: Object to form.
A. Oh, go ahead.
MS. JOKERST: Just object to form.

Page 117

A. Okay. I certainly can't think of any cases that deal with burgers and UFOs, whether or not it deals -- whether they're more dangerous or not.
BY MR. MACROBERTS:
**Q. You cited an asphalt art -- it's hard to say, asphalt art report in your report. Do you recall that?**
A. Yes.
**Q. Is that the McMahon, 2022 report?**
A. I -- give me a second here. I can't recall off the top of my head, the name of the author, but I do recall the asphalt art report.
**Q. Okay.**
A. It's in here.
**Q. Maybe it's the Schwartz, 2022 report on page 7?**
A. Page 7?
**Q. Of your report?**
A. Awe, here we go. Yes.
**Q. That's the Asphalt Art Safety Study, Historical Crash Analysis and Observational Behavioral Assessment at Asphalt Art Sites?**
A. Yes.
**Q. Did you read the Asphalt Art Study that**

Page 118

**was conducted?**
A. Yes.
**Q. All right. And you would agree that that was an observational study?**
MS. JOKERST: Object to form.
A. I don't know what you mean by observational study.
BY MR. MACROBERTS:
**Q. In the report, it says it's an observational study, meaning people observed what was going on. Do you agree with that characterization?**
A. Yes, I do believe that they did observe what was going on.
**Q. Yeah. The Schwartz asphalt art report was not peer reviewed, correct?**
MS. JOKERST: Object to form.
A. That I can't recall.
BY MR. MACROBERTS:
**Q. It was published in Bloomberg Philanthropies, correct?**
A. Just a second to look up the citation because it would tell you where it was. Yes.
**Q. Do you agree that the asphalt art report did not have control groups to account for random**

Page 119

**variations in crash rates?**
MS. JOKERST: Object to form.
A. I don't remember that level of detail in the report.
BY MR. MACROBERTS:
**Q. Would it help if I printed out that -- or is it sufficient for me to -- we'll just print it out.**
A. Excuse me?
**Q. We'll just print it out.**
A. Okay.
**Q. So it will be just a moment. I've got it pulled up, so I will try to do that here in just a second.**
MS. JOKERST: While we're doing that, Sam, your voice is trailing just a little bit. It wasn't earlier, so I don't know if you're sitting someplace different in the room or if the mic got moved.
MR. MACROBERTS: No, I'm in the same spot, same mic.
MS. JOKERST: Okay. Well, right there you're very clear, so I'll keep you apprised if it goes back down again.
MR. MACROBERTS: Sounds good.

Page 120

BY MR. MACROBERTS:
**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**
MS. JOKERST: Object to form.
A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.
BY MR. MACROBERTS:
**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**
A. No.
**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**
MS. JOKERST: Object to form.
A. Not that I know of.
BY MR. MACROBERTS:
**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**
MS. JOKERST: Object to form.
A. I would have to know more about the business itself to assess its own land use impacts.

Page 121

BY MR. MACROBERTS:
**Q. Not talking about land use impacts.**
A. It's a very generic term, daycare business.
**Q. Sure. Let's say that this mural is still at the mill and let's say a daycare business started operating inside the mill, compliant with the code, the kids are inside, they're not running out in the streets, things like that. Okay. Does the mural become dangerous simply because a business was operating inside of that that pertained to the mural?**
MS. JOKERST: Object to form.
A. Not that I know of.
MS. JOKERST: Sorry. Did I miss a question? I heard like a cough and then what sounded like maybe someone said why.
MR. MACROBERTS: No. There was no question.
MS. JOKERST: Oh, okay.
BY MR. MACROBERTS:
**Q. You testified in your report that aesthetics is a substantial and compelling interest, correct?**
A. Yes. I testified that it's either one.

Page 122

**Q. What do you mean either one?**
A. You could characterize it either way.
**Q. I see. But you used the word compelling and substantial, right?**
A. I'm sorry, where is that?
**Q. At the -- the sign -- so page 5, the sign code serves a number of compelling and substantial. And then up above in the bold heading says substantial and compelling interest. And then the -- page 3 of your report, the sign code is supported by substantial and compelling interest?**
A. Right. That's all of those interests collectively. That doesn't mean they're all both substantial and compelling.
**Q. Do you agree that many courts have concluded that aesthetics is not a compelling government interest?**
MS. JOKERST: Object to form.
A. I'm aware that I believe some courts have held that in the context of the regulations that were under consideration in those cases.
BY MR. MACROBERTS:
**Q. I just didn't hear that last part.**
A. In the context of the regulations that

Page 123

were at issue in those cases.
**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**
A. No, I'm not aware of any -- any complaints that were filed.
**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**
MS. JOKERST: Object to form.
A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.
BY MR. MACROBERTS:
**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**
MS. JOKERST: Object to form.
A. Not that I can recall.
BY MR. MACROBERTS:
**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

Page 124

**aesthetically pleasing than a pizza-esque UFO mural?**
MS. JOKERST: Object to form.
A. Not that I can recall.
BY MR. MACROBERTS:
**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**
MS. JOKERST: Object to form.
A. I can't recall anything that specific.
BY MR. MACROBERTS:
**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**
MS. JOKERST: Object to form.
A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.
BY MR. MACROBERTS:
**Q. Well --**
A. So --
**Q. -- I appreciate that.**

Page 125

A. Okay.
**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**
MS. JOKERST: Object to form.
A. To me personally, it is.
BY MR. MACROBERTS:
**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**
MS. JOKERST: Object to form.
A. I don't have a basis for saying that it would.
BY MR. MACROBERTS:
**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**
A. Yes.
**Q. Did you read the Cheng, 2023 study?**
A. Yes.
**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**
A. There is a statement in the study to that effect that I believe cites another study.

Page 126

**Q. Okay. So that's different than the study -- the Cheng, 2023 study did not say that, correct?**
MS. JOKERST: Object to form.
A. It's incorrect. It did state that.
BY MR. MACROBERTS:
**Q. That is -- so in the Cheng, 2023 study, they're citing a different study, right?**
A. That is my recollection.
**Q. So there's one sentence in the Cheng, 2023 study that could be even considered close to your statement on page 8 of your report?**
MS. JOKERST: Object to form.
A. Yeah. To my recollection, there is one statement that says that.
BY MR. MACROBERTS:
**Q. And that statement references a different report, right?**
MS. JOKERST: Object to form.
A. That is my recollection.
BY MR. MACROBERTS:
**Q. You would agree that the Cheng, 2023 study examined the preferences while viewing abstract and figurative public art, right?**
MS. JOKERST: Object to form.

Page 127

A. Yes.
BY MR. MACROBERTS:
**Q. And that between abstract and figurative public art, people were supposed to respond with key presses according to their personal preferences?**
A. That is my recollection, yes.
**Q. So an individual, as I understand the report, an individual would look at either figurative or abstract public art and then they would press a button on which one they liked better?**
A. That is my recollection.
**Q. And so they weren't deciding whether or not they liked public art versus commercial logos, for example, correct?**
MS. JOKERST: Object to form.
A. That is my recollection.
BY MR. MACROBERTS:
**Q. Do you agree that the study, the Cheng, 2023 study, positive that there were limitations to it?**
MS. JOKERST: Object to form.
A. That I can't recall, but most studies do.
BY MR. MACROBERTS:

Page 128

**Q. Do you -- do you recall that one of the limitations they said was that they only used 40 participants?**
A. I don't recall off the top of my head how many participants they used.
**Q. And that all 40 participants were at school in China?**
MS. JOKERST: Object to form.
A. I don't recall whether they -- it said they were at school in China.
BY MR. MACROBERTS:
**Q. Do you recall that all the participants were in China?**
A. That is my recollection.
**Q. And one of the limitations was that it did not consider the impact of cultural background on the aesthetic appreciation of public art?**
MS. JOKERST: Object to form.
A. I believe that statement was in the report.
BY MR. MACROBERTS:
**Q. The report or at least the reference, the one sentence reference within the Cheng, 2023 report, you did not cite that study in your report, correct?**

Page 189

marked for identification by the reporter.)
BY MR. MACROBERTS:
**Q. Earlier, we talked about that asphalt study, and I mentioned I was going print off a copy for you.**
A. Yes.
**Q. I did do that during the break. And, Amanda, I've marked it now as Exhibit 6, and it's page 44 of the asphalt report. And I think we only printed off one copy, so do you mind if I come near you?**
A. Certainly.
**Q. Okay. Sorry. So, earlier, I was talking about some of the limitations and I asked you about control groups. So on page 44, the report says it will also be critical to have control groups to account for the random variation in crash rates over time. This would determine a crash modification factor for asphalt art projects and provide the research grounding that some transportation professionals have requested. Did I read that correctly?**
A. Yes.
**Q. All right. And then I just got one other. I think it's going to be quick.**

Page 190

MS. JOKERST: I do want to address I have an objection to entering Exhibit 6. It looks like he -- Mr. White only has one page. He hasn't had an opportunity to review it to determine that it is exactly the correct and complete copy of that draft. And so I recognize that the question is okay that he read it along with you, but I would object to admitting that into the record.
BY MR. MACROBERTS:
**Q. Do you need to -- do you need or want to see a copy of the full report?**
A. I -- if you want to print it out, you could.
**Q. Do you -- in order to answer the question about the control or the limitations to that report, do you need to see the whole report?**
A. I would think to answer -- I don't recall specifically what your question was, but I would think that this sentence by itself does not answer that.
**Q. Okay. My question is or was about the limitations to the asphalt art report that you mentioned in your report.**
A. Um-hum.
**Q. And my recollection is you weren't sure**

Page 191

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**
MS. JOKERST: I'll object to form again. It's not a complete copy.
A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.
BY MR. MACROBERTS:
**Q. So as you're sitting --**
A. Without reading the whole report, I would not know.
**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**
A. Not off the top of my head.
**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**
A. Okay.
**Q. You agree that your publication is a reliable authority?**

Page 192

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
MR. MACROBERTS: I have no other questions.
MS. JOKERST: I have some follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**
A. Um-hum.
**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**
A. Um-hum.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 1 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant City of Salina, Kansas*