**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS
Volume 2 of 16, Pages 1-275**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant
City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

SIGN RESEARCH FOUNDATION™




Photo by Joe Ravi CC-BY-SA 3.0

# CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Mark White
EXHIBIT NO. 3
APPINO & BIGGS

Exhibit D

Sign Research Foundation 2022 Analysis
Mark White, White & Smith, LLC

Published November 2022

# TABLE OF CONTENTS


| | |
|---|---|
| CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN* | 03 |
| WHAT ARE CONTENT-BASED REGULATIONS | 04 |
| WHAT LEGAL TEST APPLIES TO CONTENT-BASED | 06 |
| WHAT ARE CONTENT-NEUTRAL SIGN CODES? | 07 |
| TIPS TO COMPLY WITH *REED* | 09 |
| REGULATING SPECIFIC SIGN TYPES | 11 |
| TEMPORARY, INCIDENTAL AND YARD SIGNS | 11 |
| POLITICAL SIGNS | 12 |
| SPECIAL EVENT SIGNS | 13 |
| HUMAN SIGNS/SIGN WALKERS | 13 |
| COMMERCIAL SIGNS | 14 |
| ARTWORK AND MURALS | 14 |
| ON- VS. OFF-PREMISE SIGNS | 16 |
| PUBLIC FORUM | 19 |
| *REED*'S TOP 10 TAKEAWAYS | 20 |
| ABOUT THE AUTHOR | 21 |

# AFTER *REED* AND *AUSTIN*

Local governments throughout the United States regulate signs to promote aesthetics and traffic safety. These sign codes typically address the location, dimensions and physical design of signs. Sign regulations often classify signs based on what they say – i.e., their messages.

In 2015, the United States Supreme Court issued its seminal First Amendment decision in *Reed v. Town of Gilbert* that, for all practical purposes, rendered message categories unconstitutional. The *Reed* decision opens a number of grey areas in drafting sign regulations that lower courts have attempted to sort out. One questionable area was resolved nearly seven years after *Reed* to address the issue of on- versus off-premise signs, in *City of Austin vs. Reagan National Advertising.*

This article summarizes the state of the law, sorts through the practical issues in complying with content-neutrality, and offers pointers for local governments considering a sign code update.



# What are Content-Based Regulations?

To comply with *Reed*, sign regulations should be "content-neutral" – in other words, agnostic about the sign's message or who is expressing it. While content-neutrality is deceptively simple on its face, it raises practical issues in defining and implementing sign codes.

## Content-Neutral Sign Regulation: When a sign is regulated without regard to the message or the speaker.

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics.

While the First Amendment has permitting and language precision implications for sign codes, the *Reed* decision deals with the issue of message control. *Reed* holds that "content-based" regulations are subject to "strict scrutiny" in the courts. A "content-based" regulation controls the topic of communication, and in some instances the speaker. For, example, in *Reed* the Town of Gilbert, Arizona established a sign category known as a "Temporary Directional Signs Relating to a Qualifying Event," which were signs directing the public to a nonprofit group meeting (such as a church service at a school).

## *THE TEMPORARY DIRECTIONAL SIGN THAT STARTED IT ALL!*

When Pastor Clyde *Reed* wanted people to know where services for his Good News Community Church were located, he was relegated to using these kinds of small temporary directional signs to get the word out. The small church in Gilbert, Arizona, often rented different spaces in temporary locations, making visible and effective signage critical in directing the community. But the Town of Gilbert severely restricted the size, location, number and duration that temporary directional signs could be, especially compared to other signs with political and ideological messages. For example, political signs could be up to 32 square feet and displayed for up to 5 months, but Pastor *Reed*'s signs could only be up to 6 square feet and out for just 12 hours before the services, and taken down after 1 hour afterwards.

*Image Source: AZCentral.com (https://www.azcentral.com/story/news/local/gilbert/2015/01/12/gilbert-church-signs-supreme-court-arguments/21636837/)*



A temporary directional sign was limited to 6 square feet in area, could stay up 12 hours before and one 1 hour after an event, and only 4 temporary directional signs were allowed on public or private property. By contrast, other temporary sign categories such as "political signs" – defined as temporary signs designed to influence the public elections – were allowed 16 square feet in residential and 32 square feet in commercial districts, could stay up 60 days before a primary and 15 after a general election. The only difference between temporary directional signs and political signs is the kind of message they display.




| Display Time Before | Event | Display Time After |
|---|---|---|
| UNLIMITED | Ideological Sign | UNLIMITED |
| 4 1/2 MONTHS | Election | 15 DAYS |
| 30 DAYS | HOA Event | 48 HOURS |
| 16 HOURS | Real Estate Sale | 36 HOURS |
| 12 HOURS | Religious Event | 1 HOUR |

Therefore, the regulations are content-based, i.e., they turn on the sign's content (message), as opposed to its physical characteristics (such as whether it not it is erected on a freestanding pole or attached to a building). This is the case even if the regulations do not discriminate among viewpoints; simply controlling the type of message renders a regulation content-based even when it does not favor some viewpoints over others.

A sign regulation is content-based if the message displayed on a sign has a regulatory impact. Generally, if the zoning administrator has to read the sign to determine what regulations apply, the regulation is likely content-based – with the exception of the on-premise/off-premise distinction, as per *Austin*. Even if the regulation restricts or favors a category of speech for a benign reason (such as to allow churches to guide congregants to services in temporary locations), the regulation is still considered content-based. An innocuous justification cannot transform a content-based law into one that is content-neutral. In addition, the *Reed* decision intimated that content-neutral regulations that target or favor speakers is content-based if it impacts the message.

## What Legal Test Applies to Content-Based Regulations?

Content-based regulations are subject to "strict scrutiny" in the courts. This means several things: First, the regulation must serve a *compelling* government interest. A compelling interest is one that exceeds the substantial or legitimate interests supporting a conventional zoning regulation (such as a protecting property rights), and few interests are deemed compelling. Courts have held that aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently "compelling" to support content-based regulations. See *Clark v. City of Williamsburg,* 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied,* 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1268 (11th Cir. 2005). Second, the regulation must be narrowly tailored to that interest.

If other sign categories burden those interests more but are less restricted because of what they say, the restriction is not narrowly tailored. For example, in *Reed,* the Town limited the number and size of temporary directional signs to control clutter, but political signs were unlimited in number and had significantly larger sign allowances. Therefore, political signs were allowed to intrude on the Town's aesthetic interests to a greater extent than temporary directional signs based only on what they said. This was not narrowly tailored to the Town's aesthetic interests. Finally, the regulation is presumed unconstitutional, and the local government has the burden to prove that it meets the first two tests.



**Therefore, content-based regulations, or facially-content-neutral regulations justified in relation to content, rarely survive a constitutional challenge when subject to strict scrutiny.**

As noted in *Reed*, few sign codes are free of content-based provisions under the Court's content-neutrality standard, both for temporary signs and permanent signs. Every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of *Reed*, if necessary.

## What are Content-Neutral Sign Codes?

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics. In other words, a sign code that regulates only the "*time, place, and manner*" of signs is considered content-neutral. Content-neutral regulations are subject to intermediate, rather than strict, scrutiny. Courts also apply intermediate scrutiny to regulations that affect only commercial speech.



Intermediate scrutiny requires that a sign regulation is narrowly tailored to serve a *substantial* governmental interest and leave ample alternative avenues of communication. Some lower courts have found that aesthetics and traffic safety are not "compelling" interests under the strict scrutiny standard. However, aesthetics and traffic safety typically meet the "substantial government interest" standard and courts are more deferential in assessing whether those regulations are tailored sufficiently to meet their stated objectives than they are when strict scrutiny applies.

**Both the majority and concurring opinions in *Reed* summarized the types of regulations that are considered content-neutral.**

**Content-Neutral Regulations Include:**

1. MAXIMUM SIGN SIZE
2. MATERIALS
3. LIGHTING
4. MOVING PARTS
5. PORTABILITY
6. BANNING OR REGULATING SIGNS IN THE PUBLIC RIGHT-OF-WAY
7. LOCATIONS
8. DISTINGUISHING FREESTANDING AND ATTACHED SIGNS
9. DISTINGUISHING FIXED VERSUS CHANGEABLE ELECTRONIC SIGNS
10. REGULATING SIGNS DIFFERENTLY BY ZONING DISTRICT
11. TOTAL NUMBER OF SIGNS ALLOWED PER FRONTAGE OR AREA
12. TIME RESTRICTIONS ON ADVERTISING A ONE-TIME EVENT
13. GOVERNMENTAL SIGNS

Keep in mind that the regulatory matters listed here are content-neutral only if they are not triggered by the sign's message or user (a possible exception is government signs, which remains a grey area). For example, setting a maximum footcandle brightness for digital signs is, on its face, content-neutral. However, allowing digital signs only for gas prices or churches could be content-based.




Notably, the concurring opinion in *Reed* stated that regulating off-premise signs differently from on premise signs, a traditional element of local and state billboard regulation, is content-neutral. However, this did not preclude billboard operators from litigating against on-premise/off-premise distinctions in cities and states across the country over the next several years. The U.S. Supreme Court recently clarified that issue (see discussion of Off-Premise Sign Regulations, below).

# Tips to Comply with *Reed*

To comply with the principles announced in *Reed*, a sign code should establish three (3) broad sign categories based on their physical characteristics. These typically include freestanding signs, attached signs, and incidental signs.

## Three Sign Categories Based on Physical Characteristics

**FREESTANDING SIGNS**

Signs that are not attached to any other structure, ie. pole signs and monument signs.

**ATTACHED SIGNS**

Signs that are attached to a building or structure, ie. wall signs, window signs and murals.

**INCIDENTAL SIGNS**

Smaller signs that are physically subordinate to the principal freestanding or attached signs on the site, ie. directional signs, historic markers, temporary signs. (The sign code can break temporary signs into a separate category).

To ensure that a sign code is content-neutral, a community should begin by removing all references to the content of sign types, or sign messages that trigger permitting or related sign regulations. For example, a community could replace project identification sign categories with regulations for a single monument or pole sign for properties in a commercial zoning district. This replaces a message trigger (i.e., whether the sign identifies the site) with the physical parameters of the monument or pole sign. A possible exception is sign categories that directly relate to public safety issues. The majority opinion in *Reed* stated that "[a] sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers--such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses-well might survive strict scrutiny."

By contrast, all provisions in a sign code that refer to number, area, structure, location and lighting of signs are content-neutral and unaffected by *Reed* if those categories do not relate to what the sign says. However, keep in mind that other First Amendment requirements apply. For example, a content-neutral regulation that inadvertently chokes off too much speech (see discussion of yard signs below), or that gives a zoning administrator unlimited discretion to deny or condition a sign permit, can intrude on First Amendment rights even if the regulations are facially neutral. Therefore, even if the regulations are content-neutral, a community should make sure that sign allowances are not overbroad and consider how sign permits are processed.

**Sign codes should also include severability and substitution clauses.**

A severability clause is common to most zoning and land development codes and simply provides that if any part of the code is invalidated in court, the rest of the code remains valid. This is important because there are many grey areas in sign regulations, and both the U.S. Supreme Court and lower courts are still fleshing out the parameters of content-neutrality. A substitution clause simply allows a sign to substitute a noncommercial message on any sign that permits a commercial or another noncommercial message. For a truly content-neutral code, this may seem superfluous. However, this simply clarifies that a sign code regulates only the physical characteristics of the sign and not its message.



# Regulating Specific Sign Types

While *Reed's* principles are deceptively simple, there are unsettled issues in its application to specific sign types. These range from traditional temporary placards (such as political yard signs) to lighted projections on buildings. This section explores how the lower courts have treated various, common sign categories and how to address them in your sign codes.

## Temporary, Incidental and Yard Signs

Temporary signs are difficult to codify as they are traditionally identified by their message or function. For example, real estate signs relate to the sale of property, and political signs relate to an election. However, a community can regulate the time, place and manner of temporary signs if they are not called out by their message. For example, a sign code can regulate signs based on temporary materials (such as cloth, canvas, vinyl, cardboard, wallboard, or other temporary materials), or temporary types such as feather signs. In addition, the sign code can fold temporary signs into an overall allocation of incidental signs for a site, remaining agnostic about how those signs are used.




For temporary signs, the community should consider a flat time allocation, rather than one tied to specific events. For example, a city amended its sign code after *Reed* to cap the number of temporary signs on any property, with an allocation of 5 additional signs 45 days before and 14 days after an election. This allocation did not restrict the message of the additional signs. In an unreported federal district court opinion, the court ruled that this was impermissibly user-based even though it did not regulate the additional sign's message (www.ricardopacheco.com *et al. v. City of Baldwin Park,* No. 16-CV-09167-CAS, 2017 WL 2962772 (C.D. CA. July 10, 2017)). The court suggested that the community could, for example, allow additional signs for a limited number of times per year not tied to specific events. "For example, the City could authorize five additional signs of up to 12 square feet for 60 days one time per year at the time of the speaker's choosing."

Instead of defining signs by message or function, the sign code should establish overall allocations for incidental or temporary signs. How those signs are used - whether to sell the property, advertise their favorite political candidate, or to express an opinion - is up to the property owner. For example, the City of Indianapolis established a set of standards for "noncommercial opinion signs." After that was found to violate content-neutrality principles, the city replaced that with an overall allocation for yard signs. This was found consistent with content-neutrality requirements (*Geft Outdoor LLC v. Consolidated City of Indianapolis* (S.D. Ind. 2016)). As is mentioned above, however, the overall allocation of yard signs must allow a sufficient amount of speech even if it is content-neutral. Several federal court decisions have invalidated sign codes allowing only one or two yard signs as restricting too much speech, even when those restrictions are content-neutral (*Willson v. City of Bel-Nor* (E.D. Mo. 2020); *Arlington County Republican Committee v. Arlington County* (4th Cir. 1993)).

To avoid administrative and enforcement issues with having to identify whether a sign as "temporary" and enforcing time limits, communities can also fold temporary signs into an overall sign number allocation for incidental signs. If the community believes regulation of temporary signs is needed, it can require stickers that identify when the sign was placed to document compliance with any time restrictions.

A common issue with sign regulations written before *Reed* is regulations that limit flags to those with government or institutional symbols. This is content-based (*Willson v. City of Bel-Nor* (E.D. Mo. 2020)), and any definition of flags should include only their physical description with no limitation to government or other symbols.

## Political Signs

Political signs fall into two major categories, including traditional handheld political message signs (picketing, panhandling, "save the turtles") and campaign election signs. Sign codes are traditionally limited to the latter. Political signs are not only a content-based category, but political speech enjoys the highest level of protection in First Amendment case law. Therefore, sign regulation should never target political signs, but rather fold them into incidental and temporary sign allowances. For yard signs, it is advisable to allow additional incidental or temporary signs for a given number of days per year to allow for occasions (such as elections, holidays, or similar times) where additional signs are needed to accommodate speech.




[1]The City later amended its sign regulations to a content-neutral allocation of the number and area of temporary signs, which was upheld on appeal. *Baldwin Park Free Speech Coal. v. City of Baldwin Park,* No. 20-55244 (9th Cir. 2021).

An emerging issue is state preemption of state preemption of political sign regulations. Several states, such as Arizona and Kansas, limit how local governments can regulate political signs during election season. This preemption does not extend to signs that display other forms of speech. How should a local government comply with state law without itself engaging in unconstitutional discrimination between types of speech? At least one federal court case has ruled that the exemption of government signs or signs exempt from state regulation is not content-based (*Signs for Jesus v. Town of Pembroke* (D.N.H. 2017)). Because local governments typically cannot supersede state law, that type of exemption is not itself content-based but rather a recognition that the local government is powerless to supersede state law. In the context of panhandling, a federal district court found that a local regulation that did not incorporate a content-based exemption for solicitations by municipal employees such as firefighters was not content-based even where the city announced an intention to enforce the regulations consistent with state law (*Watkins v. City of Arlington* (N.D. Tex. 2015)).

## Special Event Signs

Some sign codes include special regulations or allowances for signs at special events. If those regulations do not require the signs to advertise the special event or something occurring there, it is arguably content-neutral. However, it is unclear whether that would constitute a user preference. Under the current state of the law, it is likely not to constitute a user preference if a special event itself does not restrict expressive conduct. *In Act Now to Stop War & End Racism Coal. v. Dist. of Columbia* (D.C. Cir. 2017), the court upheld a regulation allowing signs posted a public lamppost to remain for up to 180 days, but requiring signs for special events to be removed within 30 days. The court held the regulation was content-neutral because it only regulated where some speech may occur and did not distinguish between events by topic, and was narrowly tailored to the government's interest in controlling clutter. Another court, however, found that an exemption for special and civic event signs (including grand openings) was content-based because one must assess the communicative content of the sign to determine whether the exemption applies (*International Outdoor v. City of Troy* (E.D. Mich. 2017)). More recently, the U.S. Supreme Court in City of *Austin* v. *Reagan National Advertising* (discussed below) distinguished regulations that regulated special event signs generally (which are content-neutral) and those that regulate specific kinds of special events (which are content-based).

## Human Signs/Sign Walkers

Some sign codes attempt to regulate signs carried by persons, i.e., the stereotypical costumed Statue of Liberty advertising a tax preparer. Regulating hand-held signs or costumes does not necessarily trigger content concerns, but raises difficulties in distinguishing things like costumes that advertise (e.g., the omnipresent Statue of Liberty) from those that do not (for example, a Statue of Liberty costume designed to send a political message). This also raises difficulties in defining costuming and hand-held signs in a way that meets First Amendment tests for language precision. A pre-*Reed* decision invalidated sign walker regulations based on the *Central Hudson* test (*Kitsap County v. Mattress Outlet* (Wash. 2005)), and at least one state statute (Arizona) addresses sign walkers. Many post-*Reed* cases address panhandling, which does not directly involve a sign display but could involve the same principles of content-neutrality.



## Commercial Signs

It remains unclear whether strict scrutiny applies to sign regulations that affect only commercial signs. Sign regulations cannot preference commercial over noncommercial speech (*Metromedia v. City of San Diego* (U.S. 1981)). For regulations that affect only commercial speech, courts have traditionally applied a test announced in *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n* (1980) that asks (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. While this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny. As is discussed below in the context of murals and billboards, communities are finding that limits on commercial signs may not survive judicial review if they wander beyond the sign's physical parameters.




## Artwork and Murals

Is artwork a sign? Can cities distinguish art and murals from commercial signs? Artwork (including murals) is expressive conduct protected by the First Amendment. Several cases have ruled that sign codes that either exempt (*Central Radio v. City of Norfolk* (4th Cir. 2016)) or regulate (*Kersten v. City of Mandan,* 389 F.Supp.3d 640 (D. N.D. 2019)) works of art or murals that did not display commercial messages are content-based. Before *Reed,* courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. In *Kersten,* the court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. See also *Complete Angler, LLC v. City of Clearwater* (M.D. Fla. 2009)(bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for noncommercial works of art and holiday decorations were content-based). *In Morris v. City of New Orleans* (E.D. La. 2019), the city defined murals separately from signs and prohibited commercial advertising on them.

**A community who wants to regulate murals can consider the following options:**

- **Remove restrictions that exempt or target artwork, along with limits on commercial advertising. The regulations could consider a restriction on text, if the message is not restricted (for example, limiting the text to the artists' signature).**

- **Consider mural subcategories based on their physical characteristics, such as a "wall sign" or "painted wall sign." An issue with this approach is that murals often occupy entire building walls, which exceed typical wall sign limits.**

- **Consider a review process for murals, such as an arts commission review, that examines the artistic quality of the mural. This approach should involve clear standards, time limits, and an express prohibition on considering the mural's content.**

Applying intermediate scrutiny, the court invalidated the mural regulations, finding that "there is nothing in the record to suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork."

There is also an emerging issue as to whether artistic embellishments are protected. This could involve signs that are embedded in a building's architectural features, or regulating a sign's design elements (such as materials). *In Burns v. Town of Palm Beach* (11th Cir. 2021), the court rejected a First Amendment challenge to in architectural review commissions denial of a building permit to replace a traditional beachfront mansion with a much larger midcentury modern house. Over a strong dissent, the court declined to decide that architecture is expressive conduct. This leaves open common design controls for signs, such as requiring masonry or materials compatible with the principal building style for monument signs. However, if courts were to apply intermediate or strict scrutiny to those types of regulations, local governments would need to examine the basis and regulatory efficacy of sign design controls.



# On- vs. Off-Premise Signs:

Off-premise signs advertise products not located on the same premise as the sign, or direct people to off-premise locations. It is common for local sign regulations and state billboard regulations to distinguish on- from off-premise signs. The federal Highway Beautification Act of 1965 (23 U. S. C. § 131) conditions highway funding on outdoor sign regulation, while exempting on-premise signs (i.e., "signs … advertising the sale or lease of property upon which they are located" and "signs, displays, and devices . . . advertising activities conducted on the property on which they are located"). At least two-thirds of state highway beautification regulations and tens of thousands of local sign codes either ban off-premise signs, or subject them to spacing, permitting, and size requirements. Those regulations do not apply to signs that advertise or communicate a business or activity that occurs on the same premise.[2] In *Reed,* a concurring opinion characterized this type of regulation as content-neutral. This is consistent with Supreme Court precedent upholding off-premise sign regulation (*Metromedia, Inc. v. City of San Diego* (1981)).

**Both these signs are digital and advertise the same company, but communities are allowed to regulate them differently based on where they are located, according to the U.S. Supreme Court in *Austin* v. Reagan (2022).**




*Many communities, such as in Austin, TX, prohibit these kinds of digital off-premise signs, or billboards.*




*Many communities, such as in Austin, TX, allow these kinds of digital on-premise signs, or electronic message centers (EMCs), in the parlance of the on-premises sign industry.*

*Image Source: Daktronics*

[2]In response to concerns that off-premise classifications were content-based, after *Reed* several states revised their outdoor advertising statutes or regulations to replace the premises category with a category for signs that are erected for compensation. See Colorado Rev. Stat. § 43-1-403(1)( "Advertising devices" include signs "for which compensation is directly or indirectly paid or earned in exchange for its erection or existence by any person or entity"); Kentucky Rev. Stat. § 177.830(5)("advertising device" means a sign "[o]perated or owned by a person or entity who is earning compensation directly or indirectly from a third party or parties for the placement of a message on the device"); Tennessee Code Ann. § 54-21-102(18)("[o]utdoor advertising device" is "a sign that is operated or owned by a person or entity that is earning compensation directly or indirectly from a third party or parties for the placement of a message on the sign"). A federal district court found the Colorado legislation content-neutral in *StreetMediaGroup, LLC v. Stockinger*, No. No. 1:20-cv-03602-RBJ (D. Colo. 2021), because the state transportation department "need not be aware of a sign's content to determine whether compensation was received for its erection."

The United State Supreme Court recently confirmed that off-premise sign regulations subject to intermediate, not strict, scrutiny. In *City of Austin v. Reagan National Advertising,* 142 S.Ct. 1464 (U.S. 2022), the court considered a sign code that prohibited the digitization of off-premise signs. Plaintiffs claimed that off-premise sign categories are content-based because persons (especially regulators) have to read the signs to determine whether the message related to things occurring on-or-off the site. The U.S. Supreme Court rejected this argument, ruling that the distinction relates to the location of signs and is not inherently directed at the sign's message. Essentially, the court held that the need to read the sign is directed to its location rather than its message. Therefore, off-premise sign regulations that do not preference commercial over non-commercial speech are subject to intermediate rather than strict scrutiny.

While off-premise sign regulations are not presumed unconstitutional, they remain subject to First Amendment challenge. In drafting off-premise sign restrictions, local governments should consider the following:

1 ***Reed's*** **"Need to Read" Test Does Not Apply to Off-Premise Sign Regulations.** *Austin* reasons that conventional off-premise sign categories require "examination of speech only in service of drawing neutral, location-based lines" rather than controlling the sign's communicative content. However, central to its holding is that the off-premise category did not trigger a specific or substantive category of speech, such as political messages, ideological messages, or directional messages concerning specific events (*Austin*, at 8). Therefore, off-premise sign categories that regulate specific types of off-premise messages or users could implicate higher scrutiny and jeopardize the regulations in court (see paragraphs 3 and 5, below) because they affect the sign's topic, idea or message.

2 **Billboards versus Off-Premise Signs. While many billboards are off-premise signs, the two concepts are distinct.** A billboard is a physical category – typically, a large, freestanding panel sign. By comparison, an off-premise sign can occur in any configuration – including a billboard, a wall sign, or on digital copy. Communities can choose to regulate billboards as physical entities regardless of their message, removing the need to justify distinctions between off-premise commercial messages under intermediate scrutiny. For example, a sign code could define a "billboard" as a panel-type sign mounted on posts or steel frames (see, for example, Westminster, Colorado Sign Code § 11-11-16(D)), or as a freestanding smaller than typical bulletin specifications (672 square feet in area or 14 feet in height).

3 **Off-Premise Distinctions that Regulate Non-Commercial Messages May Trigger Strict Scrutiny.** The *Austin* opinion assumed that the sign regulations at issue regulated only commercial speech. Because non-commercial speech receives a higher degree of protection under the First Amendment, regulations that implicate non-commercial messages (such as political campaign or religious messages) will trigger strict scrutiny. However, regulations that affect any off-premise message – whether or not those messages are commercial in nature – will trigger only intermediate scrutiny.

4 **Limiting Off-Premise Regulations to Commercial Messages is Subject to Intermediate Scrutiny.** Both the majority opinion and dissent in *Austin* recognized that regulations targeting only commercial speech (i.e., advertising or directing customers to a business) are subject to intermediate, not strict, scrutiny (*Austin* at 10 [majority opinion], Thomas, dissenting, at 2, note 1).

[3] *Austin*'s sign regulations, as described in the majority opinion, did not exempt noncommercial speech. *Austin* at 5, note 3.

5 **Off-Premise Regulations that Regulate Commercial Messages Differently may Fail Intermediate Scrutiny.** It is one thing to regulate off-premise advertisements, and another to carve out special treatment for specific businesses. For example, some sign regulations have special permissions for off-premise real estate signs, hospital, or farms. Car dealerships, hospitals, bookstores, or other businesses do not qualify for those exemptions. What government interest justifies not allowing a car dealership to display a sign at an off-premise location while allow that permission for a homebuilder? Why would a general regulation or allowance for off-premise signs – coupled with size, spacing and design restrictions – not promote those interests as effectively? A local government with those categories would need to show how those distinctions are narrowly tailored to serve a significant government interest.

6 **Facially Content-Neutral Off-Premise Sign Regulations Trigger Strict Scrutiny if they have an Impermissible Purpose or Justification.** The majority opinion in *Austin* stated that an impermissible purpose could sink a content-neutral off-premise sign regulation, but gave no examples. One example could include, for example, a regulation that allows for billboards only during election season – where the regulation allows for any form of off-site message, but is designed to favor a particular form of speech (see www.ricardopacheco.com, *supra*).

In drafting off-premise sign regulations, the most conservative approach legally is to regulate only commercial speech (which triggers only intermediate scrutiny), and at least to ensure that the regulations do not explicitly or implicitly favor commercial over non-commercial speech. In addition, regulating only the billboard structure with no off-premise sign restriction is a viable approach legally, but also potentially exposes more locations to off-premise advertising. However, the *Austin* decision clarifies that none of these approaches (without more) will trigger strict scrutiny.







*Image Source: Watchfire*

# Public Forum

Local governments retain wider discretion over the display of their own signs and those on their own property than they do for private signs on private property. However, free speech protections apply when the government opens public property to private expression. In 2022, the U.S. Supreme Court addressed the issue of signs in the public forum. In *Shurtleff v. City of Boston,* No. 20–1800 (U.S., May 2, 2022), the City routinely allowed the display of flags on a flagpole at City Hall with no guidelines or control over who could display them or their content. The City denied the display of a religious flag based on concerns that it would violate the Establishment Clause by endorsing a set of religious beliefs. The City's lack of involvement in selecting flags for display at that location meant that the display was private (not public) speech. Therefore, denying permission to display the flag amounted to viewpoint discrimination in violation of the First Amendment. Local governments should exercise clear control over signs in public spaces where only government speech is allowed, and adopt content-neutral rules for permitted private displays (other than exempt government signs, such as traffic directional signs) in the public forum.



# *Reed's* Top 10 Takeaways

**The *Reed* decision changed the way communities and courts look at sign regulations, and its impact is still being felt (and litigated) across the nation. Local jurisdictions applying the content-neutrality principles of *Reed* to their sign code should consider the following:**

1. While the facts in *Reed* involve temporary signs, content-neutrality is not limited to temporary signs. The First Amendment protections at issue in *Reed* apply to any form of communicative content - whether the sign is a cardboard election sign in a yard, a large monument sign at the entry to a shopping center, or a mural subject to design review.

2. If a regulation affects the topic or message conveyed, the regulation is content-based and likely subject to strict scrutiny. This applies whether the regulation appears in a sign code, a zoning ordinance, design guidelines, or some other regulation.

3. A sign code should identify all signs (permanent or temporary) by their structure or design (such as the sign's materials, configuration, and presentation – i.e., whether or not it has changeable or digital copy, lighting, and similar visual features), rather than what they say.

4. Communities do not usually run into trouble simply because they regulate a sign's dimensional standards or design features. Instead, sign codes trigger strict scrutiny when they create either: (1) exemptions for preferred categories of speech, or (2) target categories of speech for regulation through their sign code.

5. Communities who want to specifically regulate temporary signs can continue to do so, but should base their regulations on the signs structure type (such as feather signs, windblown signs, or cardboard placards mounted on a metal frame) and uniform event triggers (such as 5 to 10 temporary signs along a frontage for up to 30 days four times a year).

6. Traditionally, courts have given more deference regulation of commercial content through intermediate scrutiny. However, some lower courts have started to apply strict scrutiny to commercial content categories and it is fair to say that the state of the law is unclear.

7. *Reed* does not require signs to be bigger, cluttered, brighter, or otherwise an obstacle to a community's aesthetic or traffic safety objectives. It simply advises communities to focus carefully on the physical characteristics of signs that they truly need to regulate, and to avoid interfering with a sign's message.

**8** To control clutter and driver distraction, sign codes can use allocation-based systems that allow persons and property owners to allocate messages as they see fit within the parameters established by the sign code's dimensional standards.

**9** There are other First Amendment requirements and constitutional issues to consider, such as overbreadth, vagueness, and how long it takes to issue a sign permit. Those are beyond the purview of this article but remain important considerations.

**10** Distinctions between on- and off-premise signs are sufficient under *Austin*, if they do not involve other content-based categories (for example, allowing off-premise signs for some messages but not others).

**Communities applying these content-neutral principles can develop and implement sign codes that promote community character, traffic safety, and economic development.**

## About the Author:

Mark White is a senior partner with White & Smith, LLC – a multi-disciplinary law firm based in Kansas City and Charleston that specializes in zoning and sign code updates. White & Smith, LLC has led or participated in over 150 zoning and sign code updates in 36 states. Mr. White is a nationally-recognized expert on planning and law presents frequently on sign law and regulations at planning and law conferences, and has spearheaded numerous zoning and sign code updates. Mr. White has over forty publications appearing in books, law journals, and planning literature.

IS YOUR COMMUNITY EXPLORING SIGN CODE CHANGES?

CONTACT
**signhelp@signs.org**
FOR COMPLIMENTARY ANSWERS

**PUBLISHED BY:**

SIGN RESEARCH FOUNDATION™

**WWW.SIGNRESEARCH.ORG**

**© Sign Research Foundation**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,
Defendant.**

# Expert Report of Charles R. Taylor, Ph.D.

**September 20, 2024**

Exhibit E

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research*, *Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

    - Comprehensive plan implementation
    - Traffic safety
    - Aesthetics
    - Urban design and travel behavior
    - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   i) **Comprehensive plan implementation;**
   ii) **Traffic safety;**
   iii) **Aesthetics**
   iv) **Urban design and travel behavior; or**
   v) **Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on–premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024
Date

Charles R. Taylor, Ph.D.
Charles R. Taylor, Ph.D.

## REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityofeastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, *3*(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard, Plaintiffs, | :CIVIL ACTION :CASE NO. : :6:24-cv-01027-TC-ADM |
| -vs.- | : |
| City of Salina, Kansas, Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

Exhibit F

traffic safety, the common citizens of Salina?
A. I -- I don't think you need to be an expert in traffic safety to know that that sign wouldn't cause traffic accidents.
Q. So as a layperson, you need no expertise in traffic safety to evaluate traffic safety impacts?
A. I -- I think laypeople can have an opinion as to what would cause them to have an accident and what would not. And I think the weight of the evidence in the academic literature, tons and tons of studies -- less so recently because it's, in my opinion, pretty much settled science that on-premise signs don't cause traffic accidents.
Q. If laypeople opinions on traffic safety are adequate, why do we have all of this scientific research on traffic safety?
A. I never said they were adequate. You're putting words in my mouth.
MR. MESSENGER: Well, can --
Court Reporter, can you read back the testimony with respect to common citizens believing that the sign does not cause traffic safety problems.
- - -
(Whereupon, the stenographer read

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | ) | **CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |

**DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' REBUTTAL EXPERT PURSUANT TO F.R.E. 702**

Defendant City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, hereby submits the following Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702. In support thereof, the City states as follows:

**Specific Relief Sought**

The City seeks to exclude the testimony of Plaintiffs' rebuttal expert Charles Taylor pursuant to F.R.E. 702 as he is not qualified to render the expert opinions set forth in his report, his testimony is not based on sufficient facts or data, his testimony is not a product of reliable principles and methods, his testimony does not reflect a reliable application of the principles and methods to the facts of the case, and his testimony is not helpful to the trier of fact.

**Nature of the Matter and Statement of Facts**

The central issues of this First Amendment case are (1) whether the text of Salina Code Chapter 42 Article X ("Sign Code") is content-neutral, specifically as it relates to the definition of "sign" (codified at Salina Code § 42-764) upon which the applicability of the Sign Code relies, and (2) whether the Sign Code passes intermediate scrutiny, which involves the question of whether it advances the City's substantial government interests in aesthetics, traffic and pedestrian safety, and property values. The Court decides whether the Sign Code is content neutral as a matter of law. *Austin v. Reagan*, 596 U.S. 61, 64, 76 (2022); *Harmon v. Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020). The City submits that the Sign Code, and specifically the definition of "sign"--a definition that is substantially similar to the definition of sign upheld in *Austin*--is content-neutral.

The Court also decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon*, 981 F.3d at 1148-49. One of the factors courts consider in making such a determination is whether the regulations at issue serve the City's substantial government interests. *Harmon*, 981 F.3d at 1148-49. Salina Code § 42-500 enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. Under Tenth Circuit precedent, community aesthetics and traffic safety are substantial government interests that are content neutral as a matter of law. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251. Under Supreme Court precedent, property values (and again, community aesthetics) are substantial and legitimate government interests. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 795, 805-06 (1984). The City submits that as a matter of law the Sign

Code advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values.

Supreme Court and Tenth Circuit precedent do not require the City to set forth evidence to support a finding that the Sign Code advances its stated, substantial government interest. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 509-10 (1981); *Taxpayers for Vincent,* 466 U.S. at 805-808; *Harmon*, 981 F.3d at 1148-49; *Stockinger*, 79 F.4th at 1252. Nonetheless, Plaintiffs have alleged that under a case related to oral speech, *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020), the City is required to set forth such evidence and the City has no evidence to show its Sign Code advances its substantial government purposes. *Aptive* is not pertinent here as it dealt with "oral speech." *Aptive*, 959 F.3d at 966. Signs "pose distinctive problems" compared to oral speech, because they "take up space and may obstruct views . . . and pose other problems . . . ." *Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). The City does not concede that any evidence is necessary for the Court to find that the Sign Code is content-neutral and passes the intermediate scrutiny test by, among other things, advancing the City's substantial government interests in in community aesthetics, traffic and pedestrian safety, and property values. However, in an abundance of caution and in the unlikely event that this Court determines evidence is necessary, the City wanted to show that it can support such a finding with evidence.

As part of that effort, the City retained Mark White, an urban planning expert, to opine on its Sign Code and certain substantial government interests that are advanced by the Sign Code. *See* Exhibit A. Mr. White is an expert in urban and regional planning, zoning, form-based zoning and New Urbanism, and land use. *Id*. Mr. White is a member of the American Institute of Certified

Planners ("AICP") and the American Planning Association. *See* Exhibit B at p. 39. As part of a practice with national reach, Mr. White writes land use codes, including sign codes. Ex. B at pp. 3, 42-45. As part of his report, Mr. White evaluated the text of the Sign Code and the sign on the North wall of the Cozy Inn that is the subject of the lawsuit ("Cozy Sign"). Ex. B. Then, he applied urban planning principles and methodologies to find that the Sign Code is content neutral, advances the City's substantial interests, and follows standard industry practice in the fields of urban planning and land use. Ex. B at pp. 3, 4, 7, 12.

Plaintiffs served their Rebuttal Expert Disclosures identifying Charles Taylor, a marketing and advertising professional, as an expert in "signage." *See* Exhibit C. Dr. Taylor's experience and education is actually in marketing and advertising. *See* Exhibit C, Exhibit D. His report is focused on business marketing and advertising. Ex. D. His report generally addresses the value of signs to a business, and the few opinions that relate to urban planning matters are conclusory. Ex. D. His testimony includes opinions outside his area of expertise (marketing and advertising) such as the Sign Code does not advance the City's stated interests, "on-premise signs do not represent 'clutter,'" and "the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest." *See* Exhibit D at pp. 8, 18.

F.R.E. 702 provides that an expert must be qualified, an expert's testimony must assist the trier of fact, the testimony must be "based on sufficient facts or data," the testimony must be "the product of reliable principles and methods," and the expert's opinions must reflect "a reliable application of such principles and methods." Fed. R. Evid. 702. Plaintiffs "bear[] the burden of showing that" Dr. Taylor's testimony is admissible. *United States v. Nacchio*, 555 F.3d 1234, 1241

(10th Cir. 2009). Plaintiffs cannot meet that burden. Dr. Taylor admits he is not qualified to testify in urban planning or any other field that is pertinent to whether the City's articulated interests are advanced. Ex. E at 42:13-15, 68:12-19. Further, his testimony regarding sign clutter, advancing government interests through sign regulations, and whether the sign code is content-based is unreliable as it is not based on sufficient facts or data, he does not employ reliable principles and methods, and he does not reliably apply any principles and methods to the facts of the case. Indeed, Dr. Taylor does not even understand the mechanics of how the Sign Code works. Ex. E at 83:7-11. Rather, his testimony presents mere conclusory opinions in an effort to "rebut" Mr. White's testimony. Without any reliable principles or methods, he cannot and did not reliably apply any principles and methods to the facts of the case. And his opinions regarding the marketing and advertising value of signs, which are not at issue in this case, are not helpful to the trier of fact. Accordingly, Dr. Taylor's testimony is properly excluded under F.R.E. 702.

## Argument

### A. *Charles Taylor is Not Qualified to Testify as an Expert.*

Dr. Taylor lacks the requisite knowledge, skill, experience, training, or education to testify regarding urban planning concepts such as time, place, and manner sign regulations, sign clutter, substantial government interests in regulating signs (including but not limited to aesthetics, traffic and pedestrian safety, and property values), and the content neutrality of sign regulations. Ex. C, Ex. D at pp. 1-3. "Federal Rule of Evidence 702 requires the district court to ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (quotations omitted).

"Under Rule 702, the court must first decide whether the proffered expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Id.* (citing Fed. R. Evid. 702). Where a witness relies "solely or primarily on experience" the witness must "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *United States v. Fredette*, 315 F.3d 1235, 1240 (10th Cir. 2003).

Where, as here, a proposed expert witness fails to conduct any case specific testing and admits they are not an expert in the field in which they seek to testify, they are not qualified to testify. *See generally Taylor v. Cooker Tire & Rubber Co.*, 130 F.3d 1395 (10th Cir. 1997). In *Taylor*, the District Court found, and the Tenth Circuit affirmed, that the proposed witness was not "sufficiently qualified to testify on the critical issue of the case." *Id.* at 1397. The *Taylor* case involved the cause of a tire failure. *Id.* The proposed expert in *Taylor* did not conduct any testing of the tire, and admitted that he was not an expert in tire manufacturing. *Id.* The proposed expert also admitted that although he expressed an opinion on the cause of the tire failure, his only evaluation was looking at the tire and taking photographs. *Id.*

Here, Dr. Taylor's education and experience is limited to marketing and advertising. Ex. C, Ex. D at pp. 1-3. His Ph.D. is in marketing. Ex. D at p. 1. He admitted he is not an urban planning expert, and that his educational background did not include any classes in urban planning, regional planning, urban design, landscape architecture, traffic engineering, land use, zoning, or architecture. Ex. E at 12: 23-25, 14:1-15, 17:8-10, 21:10-12, 31:12-13, 32:12-14, 42:13-15, 68:12-19, 69:5-12. The majority of his work experience is in academia, where he teaches marketing and

advertising, and researches issues related to marketing and advertising. Ex. E at 24:19-25, 25: 1-8, 27:4-6, 31-5-25, 32:1-25. His work experience outside of academia, specifically at General Motors, was focused on market analysis respecting buyer behavior. Ex. E at 18:12-20. While he has published in advertising journals, he has never published in a planning journal, such as The Journal of the American Planning Association. Ex. E at 19:24-25, 20:1-2. Like the excluded expert in *Taylor*, Dr. Taylor did not conduct any testing, or in this case any holistic analysis respecting the Sign Code, how the Sign Code's regulations control the size and proliferation of signs City-wide, or how the Sign Code relates to the Cozy Sign. Ex. E at 68:12-25, 69:1-20, 83:7-11, 83:19-23, 92:8-11, 128:4-12. He has never administered a sign code and he does not understand the mechanics of how the Salina sign code works on a particular site. Ex. E 83:5-11.

While Dr. Taylor may have the education and experience to testify regarding "signage" as it relates to advertising and marketing principles that are not at issue in the case, like buyer behavior, effective advertising, or business profits, he does not have the requisite qualifications to testify regarding urban planning principles. Put another way, Dr. Taylor may be an expert in informing a business if their sign effectively advertises to increase profits, but he is not an expert in determining whether a city's sign code's setback requirements, size and number limitations, illumination standards, or proportionality metrics are content-neutral and advance government interests in community aesthetics, traffic and pedestrian safety, or property values. Dr. Taylor could not answer questions as to why a sign code would allocate signage based on the frontage of a building--a regulatory technique that Mr. White describes as "state of the art" in the industry. Ex. B at p. 4, 19; Ex. E at 68:12-25, 69:1-20. Accordingly, Dr. Taylor is not qualified to testify as

an expert respecting the relevant issues of content-neutrality in sign regulations and whether the Sign Code advances the City's substantial interests in community aesthetics, traffic and pedestrian safety, and property values. Consequently, his testimony is properly excluded.

*B. <u>Dr. Taylor's Testimony is Unreliable</u>*

Dr. Taylor's testimony that the Sign Code is content based and does not advance the City's interests in community aesthetics, traffic safety or pedestrian safety, is unreliable. The second step of the F.R.E. 702 analysis determines if the expert's opinions are reliable. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180-81 (10th Cir. 2022). Under the reliability inquiry, courts assess whether the expert testimony is "based on sufficient data, sound methods, and the facts of the case." *Id.* at1181. A "failure to consider industry standards" is "relevant to a reliability determination under Rule 702." *Heer v. Costco Wholesale Corp.*, 589 Fed.Appx. 854, 862 (10th Cir. 2014). Expert testimony is also unreliable where there is a "complete absence of data supporting" the testimony. *See U.S. v. Medina-Copete*, 757 F.3d 1092, 1103-04 (10th Cir. 2014).

In addition to assessing reliability based on sufficient facts and data, "the court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology, as set forth in *Daubert*." *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 770 (10th Cir. 2019) (citing *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*)). When a court is unable to "assess the reasoning and methodology underlying the expert's opinion" the testimony fails to meet the reliability requirement. *U.S. v. Rodriguez-Felix*, 450 F.3d 1117, 1123 (10th Cir. 2006) (citation omitted). Expert testimony is properly excluded when "there

is simply too great an analytical gap between the data and the opinion offered." *Heer v. Costco Wholesale Corp.*, 589 Fed.Appx. 854, 861 (10th Cir. 2014).

Here, Dr. Taylor's proposed testimony that the Sign Code is content-based is not based on any facts or data. Dr. Taylor makes one conclusory opinion regarding content-neutrality, opining "the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest." Ex. D at 18. Not only is Dr. Taylor's report devoid of any facts or data to support such an opinion, but it does not even address what "content based" means, let alone what constitutes a content-based regulation. *See generally* Ex. D.

Further, Dr. Taylor's proposed testimony that the Sign Code does not advance the City's substantial interests is not based on sufficient facts or data. His opinions that the Sign Code does not advance the City's interests in community aesthetics, traffic safety, or pedestrian safety are also devoid of sufficient facts or data. Ex. D at pp. 10-20. Indeed, his report does not address the metrics of the Sign Code (setbacks, proportionality allocations, size and number limitations, placement, design) *See generally* Ex. D; Ex. E at 69: 5-20, 83:7-11, 83:19-23. That is because, as he admitted at his deposition, he does not independently evaluate sign codes to determine if they advance a government interest like aesthetics, he does not understand how the Sign Code works, he is not an urban planner, he is not qualified to address urban planning issues, and he does not know how the various approaches to sign regulation (like addressing sign area in proportion to the width of building walls) relate to community design and community aesthetics. *See* Exhibit E at 68:12-25; 69:1-20, 83:7-11, 92:8-11; 93:2-12.

Not only does Dr. Taylor not understand how the Sign Code works, he also does not understand how the Sign Code was developed as he admits he did not review the legislative history of the Sign Code. Ex. E at 79:23, 80:1-2, 86:20-25. Ironically, Dr. Taylor admits that he does not evaluate the metrics of the Sign Code, understand the mechanics of the Sign Code or understand the legislative history, but he opines the Sign Code does not advance the City's interests in aesthetics, traffic safety, and pedestrian safety. Ex. E at 83:7-11, 83:12-23. This is rank speculation and is too great of an analytical gap to satisfy the reliability requirements of F.R.E. 702.

While Dr. Taylor's report addresses some studies regarding signs and traffic safety, he does not reliably apply these principles and methods to the facts of this case. Ex. E at 83:7-11, 83:19-23, 121:25, 122:1-5. He cannot do so because he does not understand how the mechanics of the Sign Code operate, and he does not analyze the metrics of the Sign Code. Ex. E at 83:7-11, 83:19-23. Instead, he makes conclusory opinions such as "properly regulated signage does not pose a threat to traffic safety." Ex. D at pp. 10-11. He does not explain what properly regulated signage means, or whether the Sign Code contains the necessary metrics and mechanics to be a "proper" regulation. He also does not examine the Cozy Sign and evaluate whether the Cozy Sign is such a "properly regulated" sign, or is "readable and conspicuous." Ex. D, Ex. E at 128:4-12. He admitted he did not study how tall the letters were on the Cozy Sign, he did not evaluate how much signage the Cozy Inn could have under the Sign Code, he did not know the speed limit in the area by the Cozy Inn, and he was not "offering an opinion on the conspicuity . . . of the Cozy's signs." Ex. E at 83:7-21, 121:25, 122:1-5, 128:4-12, 162:3-7. When Dr. Taylor actually cited a study with

data regarding signs and traffic accidents, his conclusion that the study "concluded that signs are not significant distractions that lead to highway accidents" directly contradicts the study's findings that signs are in "one of the highest categories" of distractions. Ex. D at p. 12, Ex. E 105:3-19. The Tenth Circuit has affirmed the exclusion of expert testimony on reliability grounds where "the peer-reviewed literature suggests the opposite" of the expert's opinions. *Ho v. Michelin North America, Inc.*, 520 Fed.Appx 658, 664-65 (10th Cir. 2013).

### *C. <u>Dr. Taylor's Opinions Regarding Marketing and Advertising are Not Relevant and Will Not Assist the Trier of Fact</u>*

F.R.E. 702(a) requires the expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This factor "goes primarily to relevance." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993). "Expert testimony which does not relate to any issue in the case is not relevant and . . . non-helpful." *Id.* (quotations omitted).

Here, the issues relevant to this First Amendment inquiry are whether the Sign Code is content-neutral and whether the Sign Code passes the intermediate scrutiny test; that is, whether the Sign Code advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values. Marketing, advertising, and the value of signs to a particular business are not germane. Nevertheless, Dr. Taylor's opinions focus on the value of individual signs from a marketing perspective, as illustrated by his contention that "Signage plays an important role in . . . performing marketing functions that enhance a business' chance of being profitable and thriving." Ex. D at p. 10. Even Dr. Taylor's conclusory statements regarding "sign clutter" (an urban planning principle Mr. White evaluates when addressing the City's

interests in community aesthetics, and traffic and pedestrian safety) are linked back to advertising and marketing. He states that referring to signs as "clutter" is "indicative of a willingness to inhibit businesses based on a subjective view of aesthetics," and, without any review or understanding of the legislative history of the Sign Code, suggests that the "marketing functions of signage should not simply be dismissed." Ex. D at pp. 7, 10. Dr. Taylor's report goes on about plainly irrelevant topics at length, under the headings "communicating the location of the business," "branding the site," "enhancing the image of a store or business," and "integrated marketing communications." Ex. D at pp. 6-10. In objecting to the City's discovery request for Cozy Inn profit and loss statements, Plaintiffs argued that such a request was not relevant to any party's claim or defense. Exhibit F at Resp. to RFP No. 13.

Accordingly, Dr. Taylor's opinions regarding marketing, advertising, and the value of signs to a business are not germane to the issues in this case, and therefore, not helpful to the trier of fact.

## Conclusion

Dr. Taylor is not qualified to provide expert opinion testimony regarding matters related to urban planning. Further, Dr. Taylor's testimony is not reliable or relevant, and is properly excluded pursuant to F.R.E. 702.

Respectfully submitted this 20th day of December 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of December, 2024, I caused the foregoing **DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' REBUTTAL EXPERT PURSUANT TO F.R.E. 702** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Aaron O. Martin*
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION<br>CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**INDEX OF EXHIBITS TO DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' REBUTTAL EXPERT PURSUANT TO F.R.E.702**

Exhibit A – Defendant's Expert Disclosure

Exhibit B – Expert Report of S. Mark White

Exhibit C – Plaintiffs' Rebuttal Expert Disclosure

Exhibit D – Expert Report of Charles R. Taylor, Ph.D.

Exhibit E – Excerpts from Deposition of Charles R. Taylor, Ph.D.

Exhibit F - Cozy Responses to First RPD

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **Civil Action No. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

Defendant City of Salina, Kansas (the "City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville, Chartered, hereby submits its Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2) as follows:

**RETAINED EXPERT**

The City identifies the following retained expert pursuant to Fed. R. Civ. P. 26(a)(2)(B) as follows:

1. Mark White, Esq., AICP, White & Smith, LLC, 200 NE Missouri Road, Suite 200, Lee's Summit, MO 64086, (816) 221-8700. Mr. White is an expert in urban and regional planning, zoning, form-based zoning and New Urbanism, and land use. He is expected to testify pursuant to Fed. R. Civ. P. 26(a)(2)(B) consistently with, and in support of, his opinions and statements as detailed in his expert report submitted herewith and attached as **Exhibit A**. Mr. White's curriculum vitae, a list of his publications in the last 10 years, and a statement of his compensation to be paid for his study, report and testimony are submitted with his report, and also attached as **Exhibit A**. Mr. White has not testified as an expert at trial or by deposition in

**EXHIBIT A**

the last 4 years. Additionally, research, analysis and other assistance undertaken by Mr. White's colleagues is to be compensated as follows: Tyson Smith - $350/hr.; Sean Scoopmire - $200/hr.; and Justin Wallace and Caitlin Cameron - $150/hr.

In addition to the opinions and statements outlined in the expert report attached as **Exhibit A**, Mr. White may also provide rebuttal testimony to any other matters raised by any expert endorsed by Plaintiffs in the same or related fields of expertise as Mr. White.

Mr. White may offer opinion evidence at trial under Federal Rules of Evidence 702, 703, and/or 705. He may also provide deposition testimony or affidavit testimony concerning the subject maters and opinions expressed by him in deposition, this expert report, supplemental expert reports, and/or affidavits as part of his endorsement and disclosure under Fed. R. Civ. P. 26.

As discovery in this matter is ongoing, and as authorized pursuant to Fed. R. Civ. P. 26(e)(2), the City reserves the right to supplement this disclosure.

Respectfully submitted this 16th day of August, 2024.

*s/ Aaron O. Martin*
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

*s/ Todd G. Messenger*
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

*s/ Amanda C. Jokerst*
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2024, I caused the foregoing **DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(A)(2)** to be served on counsel of record for Plaintiffs, by electronic mail as follows:

Jeffrey Shaw
Sam MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: (913) 213-5121; (913) 213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org
*Attorneys for Plaintiffs*

*s/ Amanda C. Jokerst*
Amanda C. Jokerst, Esq.

# ANALYSIS OF SALINA SIGN CODE

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

EXHIBIT B

Contents

***Introduction*** ____ ***2***

***Basis of Opinions*** ____ ***3***

***Statement of Opinions*** ____ ***3***

***Compensation*** ____ ***20***

***Conclusions*** ____ ***21***

***Documents Reviewed*** ____ ***22***

***Exhibits*** ____ ***30***

***Resume and Qualifications*** ____ ***39***

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

**1.** The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

**2.** The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

---

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

---

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

**DESCRIPTION OF SIGN CODE**

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

### SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

#### COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):



*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.
- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.
- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
    - ◊ A storefront
    - ◊ Display case
    - ◊ **<u>Public art</u>**
    - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer <u>critical</u> benefits to residents, such as improved <u>public safety</u> and <u>well-being</u>" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

---

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."



*Figure 2 Supergraphics in Los Angeles*

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.



*Figure 3 Salina Art Center Mural*



*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

**THE SIGN CODE IS NOT VAGUE**

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to ….."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

---

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

S. Mark White Digitally signed by Mark White Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions) https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs) https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119 https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art) https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2 https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI; https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising) https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054; https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12; https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U)
https://ecode360.com/42692992#42692992

### MODEL CODES

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance.* 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024.
https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017.
https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

### RESOURCES RELATED TO PUBLIC ART

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land.* 2023; 12(10):1883.
https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, "Traditional Neighborhood Development-Will the Traffic Work?" American Society of Civil Engineers, (ASCE 1990);

Bookout, "Neotraditional Town Planning: Cars, Pedestrians & Transit," Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, "Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, "Land-Use Mixing and Suburban Mobility," Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**

*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

**RESUME AND QUALIFICATIONS**

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

**BACKGROUND**

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

## SELECTED CITATIONS

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

## SELECTED EXPERIENCE

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| **Maryland** | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| **Pulaski County (Little Rock), Arkansas** | Watershed zoning regulations | 2009-2011 |
| **Queen Creek, Arizona** | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| **Raleigh, North Carolina** | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| **Roanoke, Virginia** | Zoning Ordinance with urban design standards | 2002-2004 |
| **San Antonio, Texas** | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| **San Diego, California** | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| **Sparks, Nevada** | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| **St. Petersburg, Florida** | Land Development Regulations | 2002 - 2004 |
| **Spokane Regional Transportation Commission** | Regional concurrency study | 2006-2007 |
| **Suffolk, Virginia** | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| **Summit County, Utah** | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| **Sunnyvale, Texas** | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| **Topeka, Kansas** | Unified Development Code | 2006-2009 |
| **Unified Government of Kansas City-Wyandotte County, Kansas** | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| **Union County, North Carolina** | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| **Washington, DC** | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| **Whiteside County, Illinois** | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| **Winchester, Virginia** | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas,**<br><br>Defendant. | Case No. No. 6:24-cv-01027<br><br>Plaintiffs' Rebuttal Expert Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2) |

**Plaintiffs' Rebuttal Expert Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2)**

Plaintiffs, through counsel, provide the following disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. Plaintiffs reserve the right to supplement these disclosures and to introduce new information in connection with any amended pleading, answer, motion, hearing, and/or trial as discovery proceeds. These disclosures do not constitute waiver of any privilege or work product protection and are without prejudice to any other objection.

1. **Retained Rebuttal Expert**

Plaintiffs retained Charles R. Taylor, Ph.D., to provide expert rebuttal testimony. Taylor is the John A. Murphy Professor of Marketing and a Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. Professor Taylor is an expert in signage and will provide expert testimony about the report and deposition testimony of Defendant's retained expert, Mark White. He has authored an expert rebuttal report, attached as Exhibit A, and is expected to testify consistent with the facts and opinions detailed in his report. Mr. Taylor will opinion evidence consistent with Federal Rule of Evidence 702, 703, and 705. Taylor's curriculum vitae and list of all publications authored in the previous ten years are attached as Exhibit B. A list of all other cases in which, during the previous four years, Mr. Taylor has testified as an expert is contained in the report. A statement of the compensation to be paid for the study and testimony in the case is contained in the report.

Kansas Justice Institute

Dated: September 20, 2024.

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,**
**Defendant.**

# Expert Report of Charles R. Taylor, Ph.D.

**September 20, 2024**

**EXHIBIT D**

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research*, *Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

    - Comprehensive plan implementation
    - Traffic safety
    - Aesthetics
    - Urban design and travel behavior
    - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   i) **Comprehensive plan implementation;**
   ii) **Traffic safety;**
   iii) **Aesthetics**
   iv) **Urban design and travel behavior; or**
   v) **Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.



Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 127

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on–premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.



Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 137

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less



Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 139

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024

Date

Charles R. Taylor, Ph.D.

Charles R. Taylor, Ph.D.

Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 143

Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 144

## REFERENCES


Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityofeastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, *3*(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.



Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 145

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.

Appellate Case: 25-3225 Document: 16-2 Date Filed: 02/23/2026 Page: 147

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn;<br>Stephen Howard,<br>Plaintiffs,<br>-vs.-<br>City of Salina, Kansas,<br>Defendants. | :CIVIL ACTION<br>:CASE NO.<br>:<br>:6:24-cv-01027-TC-ADM |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

What sort of engineering were you doing?
A. Nuclear engineering.
Q. Nuclear engineering? Okay.
Okay. What was your course of study to obtain that general degree?
A. It's -- it's through the College of Liberal Arts. So as I was taking the engineering courses, you know, early on, I got to take some electives and took business courses, and especially a marketing course that I really liked. So I realized that -- that I wanted to go on and -- and do a business degree, but by the time I made that decision, it was a little bit late in the game to try to switch over to the business school.
Q. Okay. So the coursework you took was mostly related to business, then?
A. I would say it was -- it was a real mix because of starting in engineering, and then -- ultimately it was liberal arts degree and so a majority of them weren't business. I think I had five business courses as an undergrad.
Q. Okay. Did you ever take a course in urban planning?
A. No.

Q. Okay. And what was the focus of that degree?
A. It's -- I had a marketing concentration. It's a general management and business degree.
Q. Okay.
Okay. And what was the course of study during that program?
A. Business, including finance, accounting, management, marketing, economics.
Q. And what classes did you take?
A. Well, courses in those areas, the -- you know, that I -- that I just mentioned. Just a variety of different -- a variety of different business courses.
Q. Okay. Any classes in urban planning?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.
Q. Transportation planning?
A. No.

A. I minored in advertising and communication. So I had multiple courses in -- in both of those areas. Also, there was a core -- there was a core group of courses, so, like one economics course, one finance course, one accounting course. And then a variety of other marketing courses, statistics courses, methods courses.
Q. Okay. Did you take any classes in urban planning in your Ph.D. program?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.
Q. Transportation planning?
A. No.
Q. And by this, I mean, yeah, roads. Like the design of roads and multi-modal networks, if that makes sense.
A. Yeah.
Q. Not things like trucking logistics and

whatnot.
A. Well, logistic classes certainly covered like multi-modal forms of transportation, but I didn't -- you had asked about transportation planning, and I would say the answer to that is no.
Q. Okay. And land use?
A. No.
Q. Zoning?
A. No.
Q. Architecture?
A. No.
Q. Do you have any professional experience outside of academia?
A. Yes.
Q. And what would that be?
A. I -- I worked for General Motors, you know, between degrees and -- and, from time to time, I've done consulting.
Q. So in -- at General Motors, what did you do?
A. Worked in market analysis.
Q. Tell me more.
MR. SHAW: Objection.
THE WITNESS: We -- we used advanced statistical techniques to analyze buyer behavior. We worked on projects like

engine choice modeling, customer satisfaction studies.

BY MR. MESSENGER:

Q. Okay. And as a consultant, what kind of consulting do you do?

A. We consulted ad agencies and companies about advertising, and in some -- in some cases, signage.

Q. And what's the nature of the signage consulting?

A. I've done work for the outdoor advertising companies helping them understand what the -- what's effective with -- with billboard advertising.

Q. Okay. Have you -- do you have any other professional work outside of being an expert witness, being a consultant, working at GM?

A. Yeah. I edit a leading academic journal, and I get a stipend from doing that.

Q. And tell me about that journal.

A. It's -- it's called The International Journal of Advertising. And it's a social science citation listed academic journal. And I'm in charge of the review -- review process. It's basically a peer-reviewed academic journal.

Q. Okay. Have you published in any planning journal like the Journal of the American Planning

Association or any other publication?
A. No.
Q. Okay. What journals have you published in?
A. I think I've published something on the order of 120 or more peer-reviewed articles. So -- so the Journal of Advertising, the -- The International [sic] Journal of Signage and Wayfinding. Got published in the Journal of Public Policy and Marketing, Journal of Advertising Research, Journal of Current Issues in Research and Advertising, and there is a lot more listed on my vitae.
Q. Okay. I looked at your articles in the Journal of Signage and Wayfinding, and it seemed like they were advocating for bringing stakeholders to the table to discuss sign regulation.
Is that accurate?
A. No, I wouldn't characterize it that way.
Q. How would you characterize it?
A. I -- I -- I think it's -- it's important to -- to balance various factors in signage regulation. I also think it's very important to look at the impact of signage on businesses and the economic vitality of the community. And I think that's a particularly important factor.
Q. Does that factor relate to safety,

aesthetics, or property values?
A. I would think the economic vitality of the community would relate to property values.
Q. But does it relate to safety or aesthetics?
A. I think it relates to aesthetics in the sense that sometimes some planners and organizations like Scenic America put aesthetics above economics in -- in drafting the codes, in my opinion.
Q. Okay. Let's see.
Have you ever published an article on urban design?
A. No, although my -- my -- the book that I coauthored in 2005 certainly goes -- covers some aspects of urban design.
Q. Okay. Have you ever published a -- an article on transportation systems?
A. No.
Q. Traffic safety?
A. Again, the -- you know, the book has a whole chapter on traffic safety.
Q. Okay.
MR. MESSENGER: So to the court reporter, Michelle, I -- I have a bunch of exhibits that I think probably the best way to do it would be to -- to upload them

\- - -

(Whereupon, Exhibit A was marked for identification.)

\- - -

MR. MESSENGER: Let me know if that worked.

Did everybody get it in the chat?

THE STENOGRAPHER: I see it in the chat.

MR. MESSENGER: Okay. And will you mark that as Exhibit A electronically?

THE STENOGRAPHER: Yep.

MR. MESSENGER: Thank you.

BY MR. MESSENGER:

Q. So do you see here that it -- it represents that you're the John A. Murphy, professor of marketing?

A. Yes.

Q. And a senior research fellow at the Center for Marketing and Consumer Insights at Villanova?

A. Yes.

Q. Is that accurate?

A. Yes.

Q. So in your role as a professor of marketing in the Center for Marketing, what -- what do you do?

A. Responsible for encouraging and fostering research on -- on marketing -- marketing consumer insights, especially among the Villanova faculty.
Q. Among faculty? How does that work?
A. We have some budget to support academic research, and the center as a whole interacts with people in -- in industry as well, but my role in the center is more on the research side.
Q. Okay. How does that center get funded?
A. Basically donations, mostly from alumni.
Q. Are there any corporate contributions?
A. I -- I think there have been some.
Q. What sorts of companies are funding that?
A. I -- I honestly don't know.
Q. Does your research get funded independently of these funding sources sometimes?
A. There are -- there are times when -- when I've had research funded by -- by an outside group.
Q. Have you ever had research funded by the International Sign Association?
A. I believe so, yes.
Q. What about The Signage Foundation or its precursor organization, which I think was something like the Signage Foundation for Excellence or something like this.

board. The -- the chairman of it was a gentleman named Robert James Claus, who, as far as I know, didn't run a sign company.

Q. What classes do you teach?

A. Branding -- branding, advertising, and global marketing.

Q. In your branding classes, what does the curriculum look like?

A. We teach about how to -- you know, how to build brands and -- and various different attributes of what makes -- makes a good brand. Steps you need to go through to develop the deeper connection with the -- with the consumer.

Q. Okay. What about in your advertising courses?

A. Well, really go over advertising pretty holistically from a communications -- you know, communications and marketing perspective. And it's really broadly a promotion class, so it does cover -- it does cover signage, for example, and related forms of promotion.

Q. How does it cover signage?

A. Two different PowerPoint decks where I go over -- one of them is on the marketing functions of on-premise signs, and one of them is on the

report says that you're responsible for teaching marketing courses right here, I guess, at both the undergraduate and graduate levels; is that correct?
A. Yes.
Q. And did we go over the full range of courses that you taught in the questioning that we just did?
A. In terms of courses I've taught in recent years, yes.
Q. And that's at both the undergraduate and the graduate levels?
A. Yes.
Q. Do you teach any classes in urban planning?
A. No.
Q. Do you teach any classes in regional planning?
A. No.
Q. Do you teach any classes in urban design?
A. No.
Q. Do you teach any classes in landscape architecture?
A. No.
Q. Do you teach any classes in traffic engineering?
A. No.
Q. Do you teach any classes in transportation

planning?
A. No.
Q. Do you teach any classes in land use?
A. No.
Q. Do you teach any classes in land use planning?
A. No.
Q. Do you teach any classes in zoning?
A. No.
Q. Do you teach any classes in architecture?
A. No.
Q. Have you ever taught any classes in urban planning?
A. No.
Q. Have you ever taught any classes in land use planning?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.

Q. Have you ever been excluded as an expert witness in a case?
A. No.
Q. Have you ever had your report excluded or parts of it stricken?
A. The -- in the Guantanamera case, I think there was -- there was one paragraph that I wasn't allowed to testify on out of a 25-page report.
Q. Okay. Have you ever been proffered or tendered as an expert witness, but failed to be admitted as an expert witness?
A. No.
Q. Have you ever been admitted as an expert witness in urban planning?
A. No.
Q. Traffic safety?
A. I don't think I've been formally designated that way, but I have -- I have provided testimony on traffic safety and signage cases.
Q. But never formally designated as a traffic safety expert, correct?
A. I don't think so, no.
Q. Have you ever testified in defense of a municipal sign code?
A. No.

BY MR. MESSENGER:
Q. Did you review how the City of Salina developed its current sign regulations?
A. No.
Q. Do you know who was involved in those determinations?
A. No.
Q. Have you reviewed sign codes in your professional capacity over the last 25 years, other than the City of Salina?
A. Yeah. I've read -- I've read some, yes.
Q. Okay. Is it common for a sign code to have a -- an allocation of signage based on the frontage of a lot or a building?
MR. SHAW: Objection to scope.
THE WITNESS: Again, you know, I'm not an urban planning expert. So I can -- you know, I can say I've seen codes that do that.
BY MR. MESSENGER:
Q. Okay. And how is Salina's code different from those codes?
MR. SHAW: Objection to scope.
THE WITNESS: Yeah, again, I'm -- I'm not -- I'm not putting myself forward an

urban planning expert. The -- the codes vary a lot from one -- you know, from one municipality to another.

BY MR. MESSENGER:

Q. Is Salina's code more or less permissive than average in terms of the amount of area of wall sign an owner can have based on the front footage of their building?

MR. SHAW: Objection to scope.

THE WITNESS: I don't -- I'm not an urban planning expert, and so I -- I can't say for sure.

BY MR. MESSENGER:

Q. Do you know why a municipality would tie the amount in signage on a wall to the front footage of the building?

MR. SHAW: Objection to scope.

THE WITNESS: Yeah, again, that's -- that's an urban planning question. And I'm not -- not testifying in that area.

BY MR. MESSENGER:

Q. So Mark White talked about urban planning issues, and your report is a rebuttal to Mark White's report; is that correct?

A. Yes, to the extent that Mr. White argued that

A. Yeah. I don't think -- I don't know that I knew that the district court dismissed it, but...

Q. Okay. Would you read for me the highlighted text?

A. "It need not try to prove that aesthetic judgments are right."

Q. Okay. And here, would you go ahead and read that highlighted text for me?

A. "Likewise, with size, many people view signs as a necessary evil and believe that smaller equals less evil. Unless the government has engaged in content or viewpoint discrimination, the aesthetic judgment supports legislation."

Q. Were you familiar with this case when you prepared your report?

A. I didn't -- I hadn't read that decision. No.

Q. Okay. Now, you -- you opine that there's no evidence that the City considered aesthetics in terms of drafting its sign code; is that right?

A. I don't know that I said that exactly. Main point is that aesthetics -- aesthetics are subjective.

Q. Okay. Now, with respect to the documents that you reviewed in preparation of your rebuttal report, did you review the legislative history of

the City's sign code?
A. No.
Q. Okay. And yet you concluded that the City didn't reflect proper opinions when determining whether to regulate signs in the way that it does?
A. My memory of what I said is that -- is that aesthetics -- aesthetics are a matter of opinion and -- and are subjective in terms of -- in terms of how important they are.
Q. But you have no idea what opinions went into the formulation of the City sign code; is that correct?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Do you understand the question, Dr. Taylor?
A. I didn't review the whole history of how they developed the sign code, no. I did read -- I did read a little bit -- saw a hearing, read a hearing that -- that got into it just a little bit.
Q. About how the sign code was adopted? You read the adoption ordinance hearing?
A. I don't remember if it was the adoption ordinance hearing.
Q. Did you read a hearing from November of 2023?
A. It might have been. It's been a while.

department of transportation --
A. No.
Q. -- as an employee?
A. No.
Q. Have you ever administered a sign code?
A. No.
Q. Do you understand the mechanics of how the Salina sign code works on a particular site?
MR. SHAW: Objection to form.
THE WITNESS: I wouldn't have any detailed knowledge of that, no.
BY MR. MESSENGER:
Q. If you were to buy a building in Salina, would you be able to read the sign code and independently figure out how much signage could go on that --
Actually, let me ask you a different question.
Did you evaluate how much signage the Cozy Inn could have independently?
A. Didn't do any holistic analysis. I think I -- I think I read something that -- that said how much space could be allocated to a painting.
Q. All right. And can you tell me how much income you make doing expert witness reports?

Charles R Taylor PhD
November 13, 2024

that the public interest -- the public individuals, that you would have to survey the public in order to find out what's aesthetically appropriate?

A. Well, the businesses and the employees of those businesses matter as well. And I'm saying I think they should take it into account.

Q. But what if they don't? Does the Downers Grove case say they have to?

MR. SHAW: Objection to form and scope.

THE WITNESS: Well, you know, the -- the Downers Grove case was five years ago, and while I'm not a legal expert, it's my understanding that there's been some other important cases related to -- to signage decisions. And I -- I -- I don't agree with the opinion in the Downers Grove case.

BY MR. MESSENGER:

Q. Now, you said, though, that you don't have any idea what the legislative history of this Salina sign code is; is that correct?

MR. SHAW: Objection to form.

THE WITNESS: I -- I didn't study the legislative history, no.

the area of signs where you opined that aesthetics was a legitimate government interest?
A. It's -- I mean, my -- my point is that it should be -- that it should be balanced. And given the specific facts of the case, the cases I've been involved in, I haven't -- I don't think it's been -- it's been a legitimate interest.
Q. Have you ever reviewed a sign code and independently evaluated whether that sign code advances aesthetics?
A. No.
Q. Have you ever turned away work on the basis that the sign code actually advances traffic safety or aesthetics?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Let me -- let me ask that as two separate questions.
Have you ever turned away a request to be an expert witness in a sign case?
A. I -- I think I have.
Q. And what was the basis for doing that?
A. I -- I really don't remember. But, in general, before I take any expert witness case, I have to -- I have to agree with the side of the case

that I'm on.
Q. Okay. So in that capacity, do you do an independent review of the sign code to make sure that it advances or does not advance aesthetic interests?
A. No.
Q. Do you do a review of the legislative record of the sign code to make sure that it reflects public opinion of the stakeholders you've identified?
A. Given the scope of what I do, there wouldn't be any reason to do that.
Q. And why is that?
A. Because I'm just saying it -- it's not a case that the -- it's not a case that, you know, communities, you know, don't have an interest in -- in promoting aesthetics. What I'm questioning is whether the code really does promote aesthetics. And I think this is -- this is a good example where this particular restriction, in my opinion, does not do -- there's not evidence that it contributes to aesthetics.
Q. Which particular restriction are you talking about?
A. This -- the issue of -- of businesses --

codes?
No.
Q. Now, I want to go back to the Stutts article really quick. Let's see.
So now I'm not really interested in what Professor Stutts would say at a conference, as that's not in your report.
Can you just tell me here, again, that -- is outside person, object, and event a major source of distraction compared to the other distractions that Stutts studied in this report?
A. It -- it's one of the highest categories, yes.
Q. And in that -- on the same page, it says that such distractions include signs; is that right?
A. It doesn't specify what type of sign, but it says "signs."
Q. It does say "signs," right?
A. It does, yes.
Q. Okay.
Okay. I want to get into your -- your book a little bit here so we can understand the citations to that in your expert report. I'm going to stop sharing this and I'm going to bring your book up.

effectively deliver its message; is that correct?
MR. SHAW: Objection to form.
THE WITNESS: It does, but that doesn't mean that the driver is going to take that time to -- to read it.
BY MR. MESSENGER:
Q. But the business owner benefits if the driver does, correct?
MR. SHAW: Objection to form and scope.
THE WITNESS: You know, it depends on whether the driver has any interest in -- in that business.
But the key point is that drivers are not going to allow themselves to be distracted to the point where it compromises traffic safety.
BY MR. MESSENGER:
Q. But your authoritative work on this topic suggests that a sign with six words on it at 30 miles an hour takes approximately two seconds to read; is that correct?
A. Well, it -- what it -- what it's saying is that's how long it would take to read it.
Q. Did you study how tall the letters were on

the Cozy sign?
A. No.
Q. Do you know what the speed limit is on the road in front of the Cozy Inn?
A. No.
Q. Would it surprise you if I said it was 30 miles per hour?
A. No, it wouldn't surprise me.
Q. All right. Let's go back to your book.
And I'm going to stop share for a second, just so I can find the proper page.
Okay. Can you see the highlighted text here?
A. Yes.
Q. Will you read that to me?
MR. SHAW: Hold on. Can you tell me what page that's at?
MR. MESSENGER: Oh. Yeah, certainly, Mr. Shaw. That would be -- and these are only page numbered on the right-hand side.
So it would be page 8.2. Chapter 8, page 8.2. It's on page 20 of the PDF.
MR. SHAW: Thank you.
BY MR. MESSENGER:
Q. Dr. Taylor, do you need me to zoom in on

on -- on the specific area and -- and also what specific -- what signs they have.

BY MR. MESSENGER:

Q. Does it matter how many other signs they have?

MR. SHAW: Objection to form and scope.

THE WITNESS: It's -- you know, I'm not -- it's -- you know, in my report, I'm not offering an opinion on the conspicuity of -- you know, of Cozy's -- of Cozy's signs.

BY MR. MESSENGER:

Q. But you are offering an opinion that conspicuity is important, correct?

A. It's -- the -- the signage is important.

Q. The conspicuity of signage is important?

MR. SHAW: Objection to form.

THE WITNESS: The -- the opinion is that the signage plays important marketing functions that should be taken into account in -- in formulating sign codes and specific aspects of sign codes.

BY MR. MESSENGER:

Q. Can you say that again?

representation of the graphic that we used in that discussion when we were talking about conspicuity?
A. Yeah. It's -- I mean, it's modified from the book and I would note that I -- in the report, I don't offer any opinion on the conspicuity of the Cozy Inn sign. But that is a mod- -- that is a modified version of the picture from the book.
Q. And you agree that you the watched me draw this red rectangle with the white filling in realtime as we were discussing whether that sign would become more conspicuous if it got larger; is that correct?
A. Yes.
Q. All right. I think that objection is resolved as well, so we can move on.
MR. SHAW: I mean, I'll renew the objection to Exhibit H in that it is not the complete article and it contains highlights that have changed the pages that are included.
MR. MESSENGER: Okay.
BY MR. MESSENGER:
Q. Let me see here. Let's -- let's stop this share.
I want to talk about -- hang on a

In the United States District Court
for the
District of Kansas

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

Plaintiffs,

v.

**City of Salina, Kansas,**

Defendant.

Case No. No. 6:24-cv-01027

Plaintiffs' Response to Defendant's First Set of Interrogatories; Verification

**Plaintiffs' Response to Defendant's First Set of Interrogatories**

Instructions

1. Pursuant to Fed.R.Civ.P. 26 and 33, Plaintiffs are required to answer the following discovery requests within thirty (30) days after service hereof.

2. In your answer or response, please restate each numbered Interrogatory prior to your response to that request.

3. Plaintiffs are required to make a reasonable and good faith effort to obtain the information requested by each interrogatory. If you are unable to answer or respond fully to any request, answer or respond to the extent possible and explain why you cannot answer or respond in full.

4. If you do not have enough personal knowledge to fully answer a request, say so, but make a reasonable and good faith effort to get the information by making inquiry within your organization.

5. In case of doubt as to the scope of a clause including "and," "or," "any," "all," "each" or "every," the intended meaning is inclusive rather than exclusive.

6. If you find the meaning of any term in these discovery requests to be unclear, then you

should either request clarification or assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

7. These discovery requests are continuing in nature and you are requested to furnish amended or supplemental responses and additional documents in accordance with Fed.R.Civ.P. 26(e).

8. Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to promptly amend a prior response to a request if you learn that the prior response is in some material respect incomplete or incorrect and the additional or corrective information has not otherwise been made known to the defendant during the discovery process.

9. If you assert a privilege (*e.g.*, attorney-client privilege) as the reason for refusing to answer or respond or as the basis of an objection to any discovery request, state the specific grounds therefor, separately and specifically identify each individual discovery request as to which such privilege is claimed, and describe the facts upon which you base the assertion of privilege. If the claim of privilege involves a **Communication**, please identify each person present at that **Communication**. Please produce a privilege log identifying each document withheld or redacted pursuant to any alleged privilege.

## 1. DEFINITIONS

1. **"Communication"** or "**Communications**" refers to all means of exchanging information, whether verbal, on paper, or via any electronic means, including but not limited to all inquiries, discussions, conferences, conversations, negotiations, agreements, interviews, telephone conversations, letters, correspondence, e-mail, text messages, SMS texts, iMessages, private electronic messaging apps, file sharing, and notes.

2. **"Document"** or "**Documents**" shall be defined in their broadest sense under

Fed.R.Civ.P. 34, and they mean the original and all copies any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy of the following items, however produced or reproduced, including without limitation: writings, books, invoices, shipping forms, accounting records of any nature whatsoever, agreements, correspondence, SMS texts, iMessages, emails, memoranda, recordings, summaries or records of telephone conversations, summaries of records of personal conversations or interviews, diaries, calendars, day-timers, time sheets and other time records, letters, forecasts, graphs, notebooks, charts, plans, sketches, drawings, video and audio tapes, films, slides, photographs, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, summaries of investigations, opinions or reports of consultants, reprints and drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, and other data compilations, including those stored on computer drives, tapes, smartphones, smart watches, tablets, solid-state devices (whether fixed or removable), or internet-based file sharing, file storage, or backup services, from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The term "**Document**" shall include all drafts, as well as final versions of any **Document**.

3. "**Sign Code**" means the following provisions of the Salina Code of Ordinances: (a) Chapter 42, Article X; (b) the definitions found in Chapter 42, Article XIV for words and phrases that are used in Chapter 42, Article X; (c) Section 42-581; (d) Section 42-596 to Section 42-597.1, inclusive; (e) Section 42-598 to Section 42-600, inclusive.

4. "**BID Code**" means Chapter 2, Article X of the Salina Code of Ordinances.

5. "**Cozy Sign**" or "**Plaintiffs' Sign**" means the sign that is the subject matter of this lawsuit, also identified as the display painted on the exterior wall of the Cozy Inn as shown in paragraphs 27 and 28 (the "completed rendition") of Plaintiffs' Amended Complaint.

6. "**Plaintiffs**," "**You**," or "**Your**" means the Plaintiffs identified in Civil Action No. 6:24-cv-01027-TC-ADM collectively, and individually, including Plaintiffs' representatives, attorneys, officers, directors, employees, agents, affiliates, and persons or entities acting or purporting to act on Plaintiffs' behalf.

7. "**Sign**" means a sign as defined in Salina Code of Ordinances § 42-764.

8. "**Person**" or "**Persons**" mean, where contextually appropriate, any individual, corporation, partnership, association, group or entity of any kind.

9. "**Related**" or "**Relating**" means supports, proves, evidences, describes, is associated with, provides background for, explains, concerns or regards.

10. The term "**Identify**" shall mean, where contextually appropriate:

A. With respect to a Person, the name, current or last known address and telephone number for such Person; or

B. With respect to a Document, the title, type (letter, memorandum, etc.), author, recipient and current or last known location of such Document.

11. Any reference to the singular shall include the plural, and references to the plural shall include the singular.

**2. Requests for Produuction**

1. Produce all **Documents You** received, relied upon, or utilized to respond to Defendant's First Set of Interrogatories.

ANSWER: None

2. Produce all **Documents You** received, relied upon, or utilized to respond to Defendant's First Set of Request for Admissions.

ANSWER: None

3. Produce all **Communications** in the possession of **Plaintiffs Related to** this lawsuit, entitled Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard vs. City of Salina, Kansas.

ANSWER: OBJECTION – Attorney-client privilege, per the stipulation in the Scheduling Order (Doc. 29) we will produce a privilege log for communications prior to February 19, 2024, but not for subsequent communications; all non-privileged communications are produced.

4. Produce all **Communications** received by Plaintiffs, from January 1, 2019 to present, **Related to** complaints about the **Cozy Sign**.

ANSWER: None

5. Produce all **Communications** between **Plaintiffs** and Colin Benson, from January 1, 2019 to present, **Related to** the **Cozy Sign**.

ANSWER: See response to request 3.

6. Produce all **Communications** between **Plaintiffs** and Colin Benson, from January 1, 2019 to present, **Related to** the City's application of the **Sign Code** to the **Cozy Sign**.

ANSWER: See response to request 3.

7. Produce all **Communications** between **Plaintiffs** and Colin Benson from January 1, 2019 to present **Related to** the allegations set forth in the Amended Complaint.

ANSWER: See response to request 3.

8. Produce all **Communications Plaintiffs** sent or received, from January 1, 2019 to present, **Related to** the **Cozy Sign**.

ANSWER: See response to request 3. See Bates CITY000004-5; CITY000020, 24, 24; CITY000031-32; Plaintiffs 0004.

9. Produce all **Communications Plaintiffs** sent or received, from January 1, 2019 to present, **Related to** the City's application of the **Sign Code** or **BID Code** to the **Cozy Sign**.

ANSWER: See response to request 3. See Bates CITY000004-5; CITY000020, 24, 24; CITY000031-32; Plaintiffs 0004.

10. Produce all **Communications Plaintiffs** sent or received from January 1, 2019 to present **Related to** the allegations set forth in the Amended Complaint.

ANSWER: See response to request 3. See Bates CITY000004-5; CITY000020, 24, 24; CITY000031-32; Plaintiffs 0004.

11. Produce all **Communications Plaintiffs** sent or received from January 1, 2019 to present **Related to** the **Sign Code** or **BID Code**.

ANSWER: See response to request 3.

12. Produce all financial records **Related to** the **Cozy Sign**, from January 1, 2019 to present, including but not limited to any invoices for services performed, or equipment or products purchased.

ANSWER: A check to Mr. Benson is produced.

13. Produce all financial records of the Cozy Inn from January 1, 2017 to present, including but not limited to any profit and loss statements, balance sheets, revenue or profit, and future earning projections.

ANSWER: OBJECTION – Requested documents are not relevant to any party's claim or defense and are disproportional to the needs of the case, not reasonably limited in time or scope, confidential business information.

14. Produce all **Documents Related to** the advertising of the Cozy Inn.

ANSWER: OBJECTION – Requested documents are not relevant to any party's claim or defense and are disproportional to the needs of the case, not reasonably limited in time or scope.

15. Produce all social media posts made by **Plaintiffs Related to** the **Cozy Sign**.

ANSWER: A Facebook post is produced.

16. Produce all social media posts made by **Plaintiffs Related to** this lawsuit, entitled Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard vs. City of Salina, Kansas

ANSWER: None.

17. Produce all interviews (whether in video, audio, or written format) **Plaintiffs** participated in **Related to** the **Cozy Sign**.

ANSWER: Many different news organizations have interviewed Mr. Howard following the City's decision to halt work on the mural at The Cozy Inn. These interviews are not in the possession or control of Plaintiffs but are the property of those media organizations.

18. Produce all design and planning **Documents Related to** the **Cozy Sign**, including drafts.

ANSWER: Renditions of the mural were included in text messages from Mr. Benson.

Dated: September 13, 2024.

Kansas Justice Institute

By: Jeffrey Shaw, 29767

/s/ Jeffrey Shaw

Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Jeff@KansasJusticeInstitute.org
(913) 213-5121
Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-I; Certificate of Service. |

**Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert**

In this case, Plaintiffs began painting a whimsical mural depicting hamburger-esque flying saucers piloted by aliens attacking The Cozy Inn, an iconic local restaurant, with blasts of ketchup and mustard. The City of Salina ordered Plaintiffs to stop work on the mural, insisting that the mural was in fact a sign because the content of the mural pertained to the business. Plaintiffs filed this suit, arguing that Salina's mural-sign code regime is an unconstitutional content- and speaker-based restriction on speech, a prior restraint on speech, and is void for vagueness. Salina retained an attorney, Mark White, to provide expert testimony defending Salina's mural-sign code regime. Plaintiffs retained Professor Charles Taylor, a noted expert on signage, to rebut the opinions of Mr. White. The report, opinions, and testimony of Professor Taylor are relevant, reliable, and proper under Federal Rule of Evidence 702. Salina argues that facts don't matter in First Amendment cases, and that because facts don't matter, Professor Taylor's expertise is irrelevant. That's fundamentally wrong under First Amendment case law and the Rules of Evidence.

Professor Taylor is a widely recognized expert in signage, his testimony will help the trier of fact, is based on sufficient facts or data, is the product of reliable principles, and reflects a reliable application of the principles and methods to the facts of the case. Professor Taylor satisfies the

requirements for expert witnesses under Rule 702 and Defendant's Motion to Exclude should be denied.

## I. Defendant improperly equates its merits argument with the standard for experts

Salina devotes a significant amount of its brief to its peculiar understanding of the merits of First Amendment sign code cases. In short, Salina argues that if a municipality argues that a sign regulation advances an interest in traffic safety or aesthetics, then a court must, as a matter of pure law, find that the challenged regulation advances a substantial government interest and satisfies intermediate scrutiny. Doc. 98 at 2-3. Salina does not believe that "any evidence is necessary," because no matter what the evidence suggests, the Court must find Salina's mural-sign code regime advances the governments claimed interests "as a matter of law." Doc. 98 at 2-3.

This fact-free view of the merits of the case has shaded Salina's understanding of the standard for experts under Rule 702. Salina's own expert, attorney Mark White, offers little more than legal opinions that are not supported by sufficient facts or a reliable methodology, but Salina contends that this is acceptable because the expert was only proffered "in an abundance of caution and in the unlikely event that this Court determines evidence is necessary." Doc. 98 at 3. Conversely, here, where Plaintiffs' rebuttal expert testified that Mr. White's opinions are unsupported by evidence and contradicted by significant evidence, Salina argues that these facts are irrelevant and unhelpful to the trier of fact. In other words, Salina believes that the merits of a First Amendment challenge to a sign regulation create a sort of sliding scale for Rule 702 evidence, with the standards significantly reduced for experts proffered by the government, while experts testifying against the government face an almost insurmountable hurdle. Salina is wrong both about the merits of the First Amendment and the requirements for expert testimony under Rule 702.

Salina's fact-free understanding of First Amendment jurisprudence is more deferential to the government than even rational-basis review. While a law may pass rational-basis review even if "no empirical evidence supports the assumptions underlying," the law, *Powers v. Harris*, 379 F.3d 1208, 1217 (10th Cir. 2004), a plaintiff must at least be given the opportunity to create a factual record that would "negative every conceivable basis which might support" the challenged law. *Id.*

(upholding challenged law only after bench trial with evidence). Shockingly, Salina here argues not only that the government does not bear *any* burden to justify its speech restriction with evidence, but it also argues that *any* evidence presented by Plaintiffs undercutting the government's alleged interests are irrelevant and inadmissible, and Plaintiffs are not even allowed to attempt to use evidence to negative every conceivable basis which might support a sign regulation.

Salina insists that the case of *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), mandates this outcome and holds that aesthetics and traffic safety are content neutral interests and are advanced as a matter of law under intermediate scrutiny without regard to any facts. But the Tenth Circuit in *StreetMedia* made clear that it was "skeptical" that the challenged sign regulation advanced the government's claimed interest in aesthetics and traffic safety. *Id.* at 1252. The Tenth Circuit upheld the district court's dismissal only because the StreetMedia plaintiffs failed to "allege with any specificity that the Act and rules fail to meet intermediate scrutiny." *Id.* at 1252. Far from holding that facts are simply unnecessary under intermediate scrutiny, the Tenth Circuit held that facts are necessary in determining the constitutionality of a sign regulation. Plaintiffs in this matter clearly alleged that Salina's mural-sign code regime would fail intermediate scrutiny. *See* Doc. 16 at ¶¶ 230-258; 309. This is in keeping with Tenth Circuit precedent placing the burden on government to justify restrictions on speech with factual evidence, even under intermediate scrutiny. *See Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 989 (10th Cir. 2020); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071 (10th Cir. 2020); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021).

Even if Salina were correct about the merits of the First Amendment claim, that would not change the standards for expert testimony under Rule 702. The rule only requires that a qualified expert's testimony "help the trier of fact to understand the evidence or to determine a fact in issue," be "based on sufficient facts or data," be "the product of reliable principles and methods," and "reflect a reliable application of the principles and methods to the facts of the case." There is no basis for the idea that the merits of a First Amendment claim, or any of the tiered scrutiny tests, demand a different standard than the one established in Rule 702.

## II. Professor Taylor is Qualified to Provide Expert Testimony on Signage

Professor Taylor is a recognized signage expert, and Plaintiffs disclosed him as a rebuttal expert to provide testimony about the report and opinions of Defendant's expert, Mark White. Ex. A, Plaintiffs' Expert Disclosure. Salina argues that because Mr. White was designated as an expert in "urban and regional planning," only an expert in urban and regional planning can serve as a rebuttal expert. Doc. 98 at 6. But Professor Taylor was not retained to rebut Salina's Rule 26(a)(2) disclosure, he was retained to rebut the opinions provided by Mr. White's report and testimony, all of which are about signage. *See* Ex. E, White Report at 3. What matters is whether an expert is qualified to provide the substance of his opinions, not the language used by lawyers to disclose the expert.

Professor Taylor is the John A. Murphy Professor of Marketing at Villanova University and has spent more than three decades researching signage. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 1. He is the author of more than 100 peer reviewed academic articles. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 12-23. He served as Chairman of the Board of the Academic Advisory Council for Signage Research and Education. Ex. B, Taylor Report at 2; Ex. C, Taylor CV at 7. He has given presentations on the regulatory issues relating to signage at the Transportation Research Board, the American Marketing Association, the Association of Consumer Research, the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Sign Foundation. Ex. B, Taylor Report at 2-3; Ex. C, Taylor CV at 3, 39-42. He is also the lead-author of a book published by the U.S. Small Business Administration titled *On-Premise Signs as Storefront Marketing Devices* (2005). Ex. B, Taylor Report at 3.

He has testified regarding his signage research before the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Ex. B, Taylor Report at 3; Ex. C, Taylor CV at 9. Professor Taylor was an expert informant for the Federal Highway Administration's Assessment / Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway

Administration in conjunction with fact finding on policy toward signage in 2010. Ex. B, Taylor Report at 3.

Professor Taylor has qualified as an expert witness in numerous cases involving signage regulation. Ex. F, Taylor Depo. 9:3-12; 37:24-38:13. Examples of federal cases in which Professor Taylor has provided expert testimony in the area of signage regulation include, *Peterson v. Village of Downers Grove*, Case No. 14-c-9851 (N.D. Ill., 2014), *Lamar OCI South Corp. v. City of Oxford*, Case No. 3-12-CV-002-A-A (N.D. Miss., 2012), and *Borden Park, L.P. v. City of San Antonio*, Case No. SA-03-CA-491-RF (W.D. Tex., 2005).

Salina attempts to limit Professor Taylor's expertise to "informing a business if their sign effectively advertises to increase profits," Doc. 98 at 7, but as is explained above, Professor Taylor's expertise on signage goes far beyond just "advertising to increase profits." He has testified to numerous government bodies regarding the impact (or lack thereof) of signage on traffic safety. Ex. B, Taylor Report at 3; Ex. C, Taylor CV at 9; *see also* Ex. F, Taylor Depo. 35:8-11 (explaining that his research and writing on signage go beyond marketing and advertising and include societal issues, planning issues, and traffic safety); 42:18-19 ("I have provided testimony on traffic safety and signage cases").

Salina attempts to equate this case to the case of *Taylor v. Cooker Tire & Rubber Co.*, 130 F.3d 1395 (10th Cir. 1997), where a proffered expert was not allowed to testify about the cause of a tire failure because he had not conducted any testing on the tire at issue. Apart from the fact that the cause of a tire failure has absolutely nothing to do with whether Salina's mural-sign code regime actually advances any compelling, substantial, or legitimate government interest, Salina ignores the fact that its own expert did not conduct any sort of testing or research on any actual impact of Salina's mural-sign code regime on aesthetics, traffic and pedestrian safety, or property values in Salina. It is disingenuous for Salina to insist that a rebuttal expert must be excluded because he did not conduct any testing to rebut Salina's proffered expert who also did not conduct any testing.

Professor Taylor is a widely recognized expert in signage. His expertise on the impact of signs on aesthetics, traffic and pedestrian safety, and property values has been utilized by multiple

federal courts and the Federal Highway Administration. He is qualified by training, experience, knowledge, skill, and education to provide expert opinions rebutting Mark White's opinions about signage.

**III. Professor Taylor's opinions are reliable**

Professor Taylor's report and testimony show that he based his opinions on sound methodology and sufficient facts and data. Salina repeatedly attempts to read snippets of Professor Taylor's report in isolation, taking them out of context and ignoring the fact that Professor Taylor's opinions are provided in response to the opinions found in Mr. White's report.

Salina objects to Professor Taylor's statement that "the City of Salina's content based restriction on on-premises signs does not advance an aesthetic interest," Ex. B, Taylor Report at 19, and insists that it is a "conclusory opinion" and "devoid of any facts or data to support such an opinion." Doc 98 at 9. Salina leaves out that this supposedly objectionable sentence is simply the concluding sentence to a three and a quarter-page section rebutting Mr. White's opinion that Salina's mural-sign code regime advances the governmental interest in aesthetics. Ex. B, Taylor Report at 16-19.

In those three and a quarter-pages, Professor Taylor points out that Mr. White offers no empirical evidence to support his assertion that the mural-sign code regime advances aesthetics, that aesthetics is an inherently subjective matter, and that the only empirical evidence relating to the subjective view of the aesthetics of signage—opinion polling—shows that the public views signage positively. Ex. B, Taylor Report at 16. Professor Taylor then devotes three pages, Ex. B, Taylor Report at 16-19, to explaining the multiple studies of opinions on signage that contradict Mr. White's baseless assertion that "[s]ign clutter is considered unattractive by most planning professionals and the general public." Ex. E, White Report at 7.

Nor is it relevant that Professor Taylor's statement "does not even address what 'content based' means, let alone what constitutes a content-based regulation." Doc. 98 at 9. Professor Taylor's opinion in this section is not about whether Salina's mural-sign code regime is content based or content neutral (a purely legal question that is not the subject of expert testimony) but that

the mural-sign code regime "does not advance an aesthetic interest." Ex. B, Taylor Report at 19. It is Mr. White who offers the legal opinion that "[t]he Sign Code establishes time, place and manner metrics that are not content-based," Ex. D, White Report at 3, and then fails to provide any explanation, much less "address what 'content based' means, let alone what constitutes a content-based regulation." Doc. 98 at 9.

Salina argues that it is fatal to Professor Taylor's report that he "does not understand how the Sign Code was developed as he admits he did not review the legislative history of the Sign Code." Doc. 98 at 10. But Professor Taylor's report rebuts Mr. White's report, which includes no review of how Salina's mural-sign code regime was developed or any legislative history. Ex. E, White Report at 22-38 (documents reviewed includes no legislative history); Ex. G, White Depo at 46:25-48:4; 165:4-13; 185:23-186:15. Given that Mr. White did not undertake any review of the legislative history or discuss how Salina's mural-sign code regime was developed, it is unsurprising that Professor Taylor did not attempt to rebut hypothetical legislative history that Salina's expert did not address. Rebutting an opinion that has never been expressed is an impossible task. If the lack of legislative history is indeed fatal to an expert's testimony, then Mr. White's testimony is just as deficient as Professor Taylor's—more so given that Mr. White is being offered in Salina's case-in-chief, while Professor Taylor is simply rebutting Mr. White's opinions.

Salina argues that Professor Taylor's "opinion that the Sign Code does not advance the City's interest in community aesthetics, traffic safety, or pedestrian safety are also devoid of sufficient facts or data." Doc. 98 at 9 (citing Ex. B, Taylor Report at 10-20). Yet these ten pages of Professor Taylor's report consist of an extensive review of the academic literature and provide extensive factual support for Professor Taylor's opinions.

Professor Taylor reviews years of research on the impact of signage on traffic safety, including numerous studies from the Federal Highway Administration, and explains that the Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. B, Taylor Repot at 11. Salina mischaracterizes Professor Taylor's analysis of a study by Stutts, et al., *The Role of Driver*

*Distraction in Traffic Accidents* (2001), stating that Professor Taylor's opinion "directly contradicts the study's findings that signs are in 'one of the highest categories' of distractions." Doc. 98 at 11. Yet this "highest category" in the Stutts report is a generic category of "outside person, object, event," which includes everything in the world outside the vehicle, signs included. Ex. F, Taylor Depo. 105:9. Needless to say, this is "a very broad category," Ex. F, Taylor Depo. 102:3-5, and Professor Tayor explained that the academic consensus, including Professor Stutts herself, Ex. F, Taylor Depo. 99:12-15, is that signage is not a significant contributor to driver distraction, even if it happens to fall within the broad, generic category of "outside person, object, event." *See* Ex. F, Taylor Depo. 119:7-13 ("And I think the weight of the evidence in the academic literature, tons and tons of studies -- less so recently because it's, in my opinion, pretty much settled science that on-premise signs don't cause traffic accidents.").

Salina concedes that Professor Taylor's report extensively discuses "studies regarding signs and traffic safety," but the Defendant complains that Professor Taylor "does not reliably apply these principles and methods to the facts of this case" because he "does not analyze the metrics of the Sign Code." Doc 98 at 10. This once again ignores the fact that Professor Taylor's report is a rebuttal of Mr. White's report—a report that does not contain any Salina-specific evidence about how "the metrics" of Salina's mural-sign code regime advances traffic safety in Salina. Not only did Mr. White not conduct any studies about the efficacy of Salina's mural-sign code regime, he is also not aware of any studies by anyone about the efficacy of Salina's mural-sign code regime. *See* Ex. G, White Depo. 47:17-19; 48:3-4; 83:22-23. Neither is Salina itself aware of any studies by anyone about the metrics or efficacy of Salina's mural-sign code regime. *See* Ex. I, Herrs 30(b)(6) Depo. 73:13-21; 73:23-74:3; 74:5-15; 74:17-75:8; 76:19-23; 76:25-77:10; 77:23-78:3. Professor Taylor does not need a Salina-specific report analyzing the efficacy of the mural-sign code regime at promoting traffic safety in Salina to rebut Mr. White's fact-free assertion that the Salina sign code advances its interest in traffic safety in Salina. Ex. E, White Report at 7. It is enough to point out that Mr. White does not cite to any evidence to support his opinion and that based on "tons and

tons of studies," it is "pretty much settled science that on-premise signs don't cause traffic accidents." Ex. F, Taylor Depo. 119:7-13.

## IV. Professor Taylor's opinions are relevant

Salina contends that portions of Professor Taylor's report are not relevant because "[m]arketing, advertising, and the value of signs to a particular business are not germane." Doc. 98 at 11. This mischaracterizes the nature of Professor Taylor's opinion and the context in which it was given. Throughout his report, Mr. White denigrates signs, and the messages they communicate, as "sign clutter," and insists that controlling "sign clutter" is the primary purpose for Salina's mural-sign code regime.[1] Salina itself has repeatedly insisted that controlling "sign clutter" is the primary purpose of the mural-sign code regime. *See* Ex. H, Def. Response to Second Set of Interrogatories, Rog. 1 ("By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions)"); *see also* Ex. I, Herrs 30(b)(6) Depo. 20:10-19; 26:13-17; 41:12-18; 45:7-10; 51:14-18; 62:1-8; 71:12-25; 72:19-73:9.

Neither Mr. White nor Salina ever defines "sign clutter" or identifies any empirical data substantiating the supposed evils of "sign clutter." Instead, the pejorative dismissal of signs—and the messages they communicate—as "clutter" that needs to be controlled reflects a subjective and

---

[1] *See* Ex E, White Report at 4 ("This is a state of the art, and generally accepted, technique for controlling sign clutter"); *id.* at 4-5 ("Plaintiff's [sic] lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter"); *id.* at 7 ("Sign clutter contributes to a decline in traffic safety"); *id.* at 7 ("Sign clutter is considered unattractive by most planning professionals and the general public"); *id.* at 9 ("it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues."); *id.* at 9 ("Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter"); *id.* at 9 ("By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade"); *id.* at 10 ("This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter"); *id.* at 13 ("Controlling painted wall signs is an important way to control sign clutter."); *id.* at 19 ("A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site").

hostile view that the messages communicated by signs are of no value to society. Professor Taylor's report responds to this hostility to the messages of signs by explaining the functions served by signs - "functions that are valuable both to businesses within the community and consumers alike." Ex. B, Taylor Report at 7. Because signs and their messages are valuable to "businesses and to the community at large," Ex. B, Taylor Report at 6, "signage should not be dismissed as clutter without evidence." Ex. B, Taylor Report at 7.

Both Mr. White and Salina have identified "sign clutter" as the chief evil that the mural-sign code regime seeks to control. Professor Taylor's report shows that "sign clutter" is an undefined, subjective concept, which is not supported by empirical data and ignores the important function performed by signs in communicating messages that are valuable to society. Professor Taylor's opinion is relevant to the issues of this case and helpful to the trier of fact.

**Conclusion**

Professor Taylor is qualified as an expert in signage and his opinions are reliable and relevant to the issues in this case. Professor Taylor's opinions meet the requirements of Federal Rule of Evidence 702 and Defendant's Motion to Exclude should be denied.

Dated: January 10, 2025.

Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on January 10, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Jeffrey Shaw
Samuel G. MacRoberts

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard**

**v.**

**City of Salina, Kansas**

**Civil Action No. 6:24-cv-01027-TC-ADM**

**Plaintiffs' Response to Defendant's Motion to Strike Plaintiffs' Rebuttal Expert**

**Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Plaintiffs' Expert Disclosure |
| **Exhibit B** | Plaintiffs' Expert Report: Charles Taylor, Ph.D. |
| **Exhibit C** | Plaintiffs' Expert Curriculum Vitae: Charles Taylor, Ph.D. |
| **Exhibit D** | Defendant's Expert Disclosure |
| **Exhibit E** | Defendant's Expert Report: Mark White, Esq. |
| **Exhibit F** | Deposition Excerpts: Plaintiffs' Expert Charles R. Taylor, Ph.D. |
| **Exhibit G** | Deposition Excerpts: Defendant's Expert Mark White, Esq. |
| **Exhibit H** | Defendant's Response to Plaintiffs' Second Set of Interrogatories |
| **Exhibit I** | Deposition Excerpts: Dustin Herrs as 30(b)(6) Representative |

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas,**<br><br>Defendant. | Case No. No. 6:24-cv-01027<br><br>Plaintiffs' Rebuttal Expert Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2) |

**Plaintiffs' Rebuttal Expert Disclosures Pursuant to Fed. R. Civ. P. 26(a)(2)**

Plaintiffs, through counsel, provide the following disclosures pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure. Plaintiffs reserve the right to supplement these disclosures and to introduce new information in connection with any amended pleading, answer, motion, hearing, and/or trial as discovery proceeds. These disclosures do not constitute waiver of any privilege or work product protection and are without prejudice to any other objection.

1. **Retained Rebuttal Expert**

Plaintiffs retained Charles R. Taylor, Ph.D., to provide expert rebuttal testimony. Taylor is the John A. Murphy Professor of Marketing and a Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. Professor Taylor is an expert in signage and will provide expert testimony about the report and deposition testimony of Defendant's retained expert, Mark White. He has authored an expert rebuttal report, attached as Exhibit A, and is expected to testify consistent with the facts and opinions detailed in his report. Mr. Taylor will opinion evidence consistent with Federal Rule of Evidence 702, 703, and 705. Taylor's curriculum vitae and list of all publications authored in the previous ten years are attached as Exhibit B. A list of all other cases in which, during the previous four years, Mr. Taylor has testified as an expert is contained in the report. A statement of the compensation to be paid for the study and testimony in the case is contained in the report.

Kansas Justice Institute

Dated: September 20, 2024.

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,
Defendant.**

# Expert Report of Charles R. Taylor, Ph.D.

**September 20, 2024**

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research*, *Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

    - Comprehensive plan implementation
    - Traffic safety
    - Aesthetics
    - Urban design and travel behavior
    - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   i) **Comprehensive plan implementation;**
   ii) **Traffic safety;**
   iii) **Aesthetics**
   iv) **Urban design and travel behavior; or**
   v) **Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2O17; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on–premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024
Date

Charles R. Taylor, Ph.D.
Charles R. Taylor, Ph.D.

## REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityofeastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, *3*(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.

# *Charles R. Taylor*

Villanova School of Business .
Department of Marketing
Villanova University
Villanova, PA 19085-1678

Phone: (610) 519-4386
Fax: (610) 519-5364
E-Mail: raymond.taylor@villanova.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D. in Marketing, Michigan State University, East Lansing, MI. |
| 1987 | M.B.A., Michigan State University, East Lansing, MI. |
| 1984 | B.G.S., University of Michigan, Ann Arbor, MI. |

## ACADEMIC EMPLOYMENT

| | |
|---|---|
| 2004- present | John A. Murphy Endowed Chair in Marketing, Villanova University and Senior Research Fellow, Center for Marketing and Public Policy Research |
| 2007 (Fall) | Visiting Distinguished Professor, Ludwig Maximilians University, Munich Germany |
| 2004-2016 | Professor, IIE & Global MBA Program, Korea University, Seoul, Korea |
| 2000 - Present | Professor of Marketing, Villanova University |
| 1998 - 1999 | Associate Professor of Marketing, Villanova University |
| 1992 - 1997 | Assistant Professor of Marketing, Villanova University<br>Courses Taught: Advertising (MBA), Branding (MBA), International Marketing (MBA and Undergraduate), Strategic Marketing Management (MBA), Principles of Marketing (Undergraduate). |
| 1988 - 1992 | Associate Instructor and Research Assistant, Michigan State University<br>Courses Taught: International Marketing, Marketing Strategy, Retailing |

## RESEARCH INTERESTS

Advertising, Branding, and Integrated Marketing Communications - Advertising effects research; Online product reviews; Super Bowl and big event advertising; Consumer behavior and decision making; Digital advertising; Branding and equity; Outdoor advertising and on-premise signage

Marketing and Public Policy Issues Related to Advertising and Consumer Behavior - Consumer decision making, Consumer privacy; Advertising regulation; Digital advertising effectiveness; commerce; Tobacco and alcohol marketing; Pharmaceutical marketing; Trademark issues.

Global Advertising and Marketing - Marketing and advertising in Asia and Europe; International marketing and public policy issues including: "Made in" labeling and its effects; Factors involved on foreign market entry mode choice; Methodological issues, including techniques for enhancing data equivalence, comparability, and reliability; Advertising effects in diverse cultures.

## INDUSTRY EXPERIENCE/ CONSULTING

Consulting clients have included Peloton, ADT Alarm Systems, LLC, General Motors, GNC Holdings, Inc., Next-Gen, Inc., Swedish Match, Inc., Philip Morris USA, Samsung Electronics, Swedish Match, Inc., Live Nation, Inc., Walker Furniture, McCann Erickson Worldwide, Clear Channel Communications, Infinity Broadcasting, ClubCom Media, Inc., Magic Media, Inc., Eller Media, Centre for Information on Beverage Alcohol (London), Lamar Outdoor, Interstate Outdoor, Craig Realty, Borden Park, L.P., Dechert L.L.P., Greenberg Traurig, L.L.P., Sussman Godfrey, L.L.P., Arnold and Porter L.L.P., Winston & Strawn, Brown Rudnick, L.L.P., Mattioni and Associates, The Rossbacher Firm, The International Sign Association, The Signage Foundation for Communication Excellence, M of Toms River, Outdoor Advertising Association of America, Missouri Outdoor Advertising Association, Texas Outdoor Advertising Association. Held positions with R.L. Polk and Company, and General Motors prior to entering academia.

## MEDIA COMMENTATOR

Commentator in numerous media outlet on advertising and other marketing and branding issues. Senior contributor for Forbes.com. Frequently quoted in outlets such as the Associated Press, MSNBC television, Fox television, NBC television, CBS television, Cheddar TV, CBS.com, ABC.com, Reuters, Forbes, Business Week, the Wall Street Journal, the New York Times, USA Today, Arirang Television, the Washington Post, the Philadelphia Inquirer, San Francisco Examiner, the Los Angeles Times, Advertising Age, Brandweek, Adweek, Variety, Mashable, Yahoo.com, Accesshollywood.com, Sportsillustrated.cnn.com, French Foreign Press Association, the Boston Globe, the Dallas Morning News, the New York Post, China Daily.com, and many others.

## INVITED SPEECHES

Presentations at several Universities and industry associations. Universities include Harvard, Columbia, Tuck School of Business (Dartmouth), Yonsei University, Korea University, University of Texas at Austin, Rutgers, University of Antwerp (Belgium), University of Amsterdam (Netherlands), University of Munich (Germany), King's College London, Harbin Institute of Technology (China), Seoul National University (Korea), University of Klagenfurt (Austria), University of Madrid (Spain), Masaryk University (Czech Republic), Shanghai Jiao Tong University, East China Normal University, Seoul National University, Ewha Women's University, and Changwon National University. Featured/keynote speaker at meetings of ICORIA (European Advertising Association), Emerging Markets Conference Board, ICAMA (Asian Marketing Association, China Advertising Association, the Korea Advertising Society, International Sign Association, Conference on Corporate and Marketing Communications, the Signage Foundation, Asia Pacific Law Students Association, the Outdoor Advertising Association of America, and the U.S. Transportation Research Board.

## REVIEWING AND EDITING

***Editor in Chief***

International Journal of Advertising (2008 – present, SSCI)

***Associate Editor***

Journal of Public Policy and Marketing (2006 – 2009, SSCI)

Journal of Advertising (2008 – 2009, SSCI)

***Editorial Review Board Member***:

Journal of Advertising (2003 – present, SSCI); Senior Advisory Board

Journal of Public Policy and Marketing (1997 – present, SSCI)

Journal of Advertising Research (2001-2004 and 2016-present SSCI)

International Journal of Advertising, (2006 – 2008. SSCI)

International Marketing Review, (2005-present, SSCI); Senior Advisory Board

Journal of Business Research (2000 – 2015, SSCI)

Journal of Current Issues and Research in Advertising (2001 - present)

Journal of Consumer Affairs (2002 – present, SSCI)

Psychology and Marketing (1994 – 2022, SSCI)

Journal of International Marketing (2000- present)

Advances in International Marketing (1996 - present)

Journal of Marketing Communications (2006 – present)

Journal of Marketing Theory and Practice (2007 – present); Senior Advisory Board

***Special Issue Editor****:*

European Journal of Marketing, The Janus Face of Customer Service (2020)

Journal of Advertising, Special Issue on Advertising Regulation and Self Regulation, (2008).

International Journal of Advertising, Special Issue on Advertising in Asia Pacific (2008)

Psychology and Marketing, Special Issues on E-Commerce and Mobile Commerce, with Doo Hee Lee (2008).

Advances in International Marketing, Cross-Cultural Buyer Behavior (2007).

Journal of Advertising, Special Issue on International Advertising (2005).

Advances in International Marketing, "New Directions in International Advertising Research," 2002.

Journal of Public Policy and Marketing, Section including best conference papers, 2001.

Psychology and Marketing, "Emerging Issues in Advertising," 2000.

Advances in International Marketing, Special issue on "Marketing in Asia Pacific," 1996.

Journal of Public Policy and Marketing, Section including best conference papers, 1996.

***Ad hoc reviewer:***

Journal of Marketing
Journal of Marketing Research
International Marketing Review
Journal of International Marketing
Journal of Interactive Marketing
Journal of Services Marketing
Journal of Macromarketing
Journal of Marketing Theory and Practice
Asian Journal of Communication
Sex Roles
Proposal reviewer for the Government of Hong Kong's Competitive Grant program and the United Kingdom's Economic and Social Research Council.

***Conference Organization***

Academic Excellent Chair, 2024 Global Marketing Conference, Seoul

Academic Excellence Chair, 2019, Global Fashion Management Conference, Paris

Academic Excellence Chair, 2018, Global Marketing Conference at Tokyo

Academic Excellence Chair, 2016 Global Marketing Conference at Hong Kong

Academic Excellence Chair, 2014 Global Marketing Conference at Singapore

Academic Excellence Chair, 2012 Global Marketing Conference at Seoul

Co-Chair, 2010 Global Marketing Conference at Tokyo

Co-Chair, 2008 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 2008 Global Marketing Conference, Shanghai Jiao Tong University, Shanghai, China.

Co-Chair, 2007 American Academy of Advertising Asia Pacific Conference, Korea University, Seoul, Korea

Co-Chair, 2006 Academy of Marketing Science Cultural Perspectives in Marketing Conference.

Co-Chair, 2003 American Academy of Advertising Conference

Co-Chair, 2001 American Academy of Advertising Conference

Co-Chair, 2001 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1996 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1992 Joint Conference of the American Marketing Association and Korean Marketing Association

***Reviewer for Annual Conferences***

American Academy of Advertising Annual Conference
American Marketing Association Summer Educators' Conference
American Marketing Association Winter Educators' Conference
American Marketing Association Public Policy and Marketing Conference
Academy for International Business Conference
Society for Marketing Advances Conference
Academy of Marketing Science Conference

## AWARDS AND HONORS

"Measuring Hard Sell and Soft Sell Advertising Appeals," Journal of Advertising, 39 (2), 5-20. Voted as one of the best 15 articles to appear in the 50 year history of Journal of Advertising (reprinted in 50th anniversary issue).

Listed in Research.com's Top Scientists in Business and Management (2022 and 2023).

Keynote Speaker, ICAMA Conference, Jeju, Korea (2022)

Outstanding Paper Award "The Future of Advertising Research: New Directions and Research Needs." Voted best paper to appear in Journal of Marketing Theory and Practice in 2021.

Keynote Speaker, Global Fashion Management Conference 2021

Emerging Markets Conference Board Distinguished Speaker, 2018 (Johannesburg, South Africa), 2019 (Delhi India), 2020 (Llujbiana, Slovenia), 2021 (Puebla, Mexico)

Keynote Speaker, Korean Marketing Association Annual Conference (2020)

Keynote Speaker, ICAMA Conference (2020)

Faculty Speaker, 2014, 2015, 2016, and 2017, Doctoral Consortium, International Conference on Research in Advertising (European Advertising Academy)

Faculty Speaker, 2008, 2011, 2016, and 2017 American Academy of Advertising Doctoral Consortium Emerging Scholars Symposium.

Flemming Hansen Award for Outstanding Lifetime Achievement to Advertising Research, presented by European Advertising Academy, 2017.

Ivan L. Preston Outstanding Contribution to Research Award (for outstanding lifetime contribution to advertising research, presented by American Academy of Advertising), 2012.

Best Paper Award "Measuring Soft-Sell Versus Hard-Sell Advertising Appeals," Selected as best paper to appear in *Journal of Advertising* in 2010.

Chairman of the Executive Board, Academic Advisory Council for Signage Research, 2019-2021 (served a Vice-Chair 2017-2019)

Villanova Outstanding Faculty Research Award 2009 (lifetime achievement)

President, American Academy of Advertising 2005.

Vice President, American Academy of Advertising, 2001.

**AWARDS AND HONORS (Cont.)**

Treasurer, American Academy of Advertising 2002-2003.

Chairman of the American Academy of Advertising's Research Committee, 1998-2000.

Best Paper Award, "Cigarette Advertising Bans' Effect on Consumption: A Meta Analysis," Journal of Advertising, Selected as best paper to appear in *Journal of Advertising* in 2008.

Best Paper Award, "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," Winner of Hans B. Thorelli Award for Best Paper that Advances International Marketing Theory and Thought in 1998, Journal of International Marketing.

Best Paper Award, "A Comparison of Alternative Paradigms for Describing Economic Development," - Winner of the Charles C. Slater award for the best paper to appear in Journal of Macromarketing in 1994

Best Paper Award, "A Review of the Effects of Cigarette Advertising Bans," 2006 *American Marketing Association Marketing and Public Policy Conference*, Long Beach, CA.

Best Conference Paper Award, "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective,"2012 Global Marketing Conference- Seoul.

Finalist, Best Paper Award, *Journal of Advertising*, 2006.

Outstanding Reviewer Award, *Journal of Advertising*, 2004.

Outstanding Reviewer Award, 1999 Society for Marketing Advances Conference.

Who's Who in the World; Who's Who in American Education; Who's Who in the East.

Fulbright Senior Specialist, 2001 (taught class at Masaryk University, Brno, Czech Republic)

Invited Speaker, Marketing and Public Policy Conference Doctoral Consortium, 2002, 2003, 2007, 2009.

Invited Speaker, Society for Marketing Advances Doctoral Consortium, 2002.

Member of Board of Directors, American Marketing Association Marketing and Society Special Interest Group 2000- 2003.

Winner of American Academy of Advertising Competitive Research Fellowship Award, 1994.

"The Effectiveness of Brand Differentiating Strategies in Korean Advertising," Chosen as Best Paper in Advertising Track at the International Academy of Business Disciplines Conference.

## AWARDS AND HONORS (Cont.)

Richard D. Irwin Foundation Dissertation Fellowship, 1991.

American Marketing Doctoral Consortium Fellow, 1990, University of Florida.

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," chosen as Outstanding Paper in the Promotion Track at the 1989 Conference of the Southern Marketing Association.

Member of Beta Gamma Sigma, Michigan State University Chapter.

Member of Phi Beta Phi, Villanova University Chapter.

## CONGRESSIONAL TESTIMONY

Charles R. Taylor (2003), "The Importance of the Availability of Billboards to Rural Businesses in America," Testimony to the U.S. House of Representatives Committee on Small Business, Subcommittee on Rural Enterprise, Agriculture and Technology, May 15, 2003.

## BOOKS/ EDITED VOLUMES

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), *The SAGE Handbook of Marketing Ethics*, London: Sage.

Marc G. Weinberger, Charles S. Gulas, and Charles R. Taylor (2021), *Humor in Advertising. Classic Perspectives and New Insights*. London: Routledge.

Sukki Yoon, Yung-Kyun Choi, and Charles R. Taylor (2021), *Leveraged Marketing Communications: The Importance of Studying the Transfer of Object-to-Brand Associations*, London: Routledge.

Shu-Chuan Chu, Juran Kim, and Charles R. Taylor (2019), *Electronic Word of Mouth as a Promotional Technique: New Insights from Social Media*. London: Routledge.

Zotos, Yorgos C., Stacy Landreth Grau, and Charles R. Taylor (2018), *Current Research on Gender Issues in Advertising*, London: Routledge.

Marko Sarstedt, Manfred Schwaiger, and Charles R. Taylor (2011), *Measurement and Research Methods in International Marketing*, (S. Zou., Series Editor). London: Elsevier. (special issue of *Advances in International Marketing*).

John C. Kozup, Charles R. Taylor and Ronald Paul Hill (2008), *Proceedings of the 2008 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor and Doo-Hee Lee (2007), Cross-Cultural Buyer Behavior (special issue of *Advances in International Marketing*), London: Elsevier.

Charles R. Taylor, Doo Hee Lee, Robert King and Changjo Yoo (2007), *Proceedings of the 2007 American Academy of Advertising/ Korea Advertising Society Asia Pacific Conference*, Seoul: Dongguk University.

Charles R. Taylor, Susan Claus and Thomas Claus (2005), *The Marketing Functions of Signs: Understanding Signage and Its Impact on the Economy*, Washington: U.S. Small Business Administration.

Charles R. Taylor (2002), *New Directions in International Advertising*, (special issue of Advances in International Marketing). London: Elsevier Science.

Charles R. Taylor (2001), *Proceedings of the American Academy of Advertising Conference*. Villanova, PA: Villanova University.

Ronald Paul Hill and Charles R. Taylor (2001), Proceedings of the 2001 Marketing and Public Policy Conference, Chicago, IL: American Marketing Association.

## BOOKS/ EDITED VOLUMES

Charles R. Taylor (1996), *Marketing in Asia Pacific: and Beyond*. Greenwich, CT: JAI Press.

Ronald Paul Hill and Charles R. Taylor (1996), *Proceedings of the 1996 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor, S.W. Kopp, T. Nevett, and Stanley C. Hollander (1991), *Marketing History: It's Many Dimensions: Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*. East Lansing, MI: Michigan State University Press.

## REPRINTED ARTICLES

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Charles R. Taylor and Shintaro Okazaki, "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," from *Journal of International Marketing* (2006).

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Matthew B. Myers, Roger J. Calantone, Thomas J. Page Jr. and Charles R. Taylor, "Academic Insights: An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," from *Journal of International Marketing* (2000).

Readings in Advertising, Society, and Consumer Culture (2007), Roxanne Hovland, Joyce Wolburg, and Eric Haley, Eds. CA: M.E. Sharpe, Inc.: Charles R. Taylor and Barbara B. Stern, "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," reprinted from *Journal of Advertising* (2006).

## BOOK REVIEWS

Taylor, Charles R. (2003), "Review of *Cross-Cultural Survey Methods*," by Janet A. Harkness, Fons J.R. Van de Vijver, and Peter Ph. Mohler, Wiley-Interscience, *Journal of Marketing Research*, 40 (August), 246-247.

Taylor, Charles R. (1994), "Review of *New and Improved: The Story of Mass Marketing in America*," by Richard Tedlow, *Journal of Marketing,* 58 (3), 123-126.

**JOURNAL ARTICLES**

Taylor, Charles R., Benjamin Borenstein, and Aniruddha Pangarkar (2024), "What, No Logos? Why Some Minimalists Prefer Quiet Luxury," *Psychology & Marketing*, forthcoming.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8(1), 5-22.

Milfeld, Tyler, Matthew Pittman and Charles R. Taylor (2024), "Green with Arrogance: Dominant Brands Benefit from Arrogant Appeals," *Journal of Current Issues & Research in Advertising*, 1–23. https://doi.org/10.1080/10641734.2024.2346711.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "The Use of Non-fungible Tokens (NFTs) as Promotional Devices to Build Brands: An Application of Lovemark Theory." *Journal of Global Fashion Marketing*, forthcoming.

Benjamin E. Borenstein and Charles R. Taylor (2024) "The Effects of Targeted Digital Advertising on Consumer Welfare," *Journal of Strategic Marketing*, 32(3), 317-332.

Rathee, Shelly, Charles R. Taylor and Akash Gupta (2024), "The Appeal of Blurred Imagery: Enhancing Advertising and Brand Attitudes for Luxury Goods," *Journal of Business Research*, 182, 114795.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "Do Non-fungible Tokens Create Long-Term Value for Luxury Brands? The Effect of NFT Promotions on Customer Equity." *Computers in Human Behavior*, 108347, forthcoming.

Charles R. Taylor, Mahdi Rajabi, Shelly Rathee and Somayeh Zamani (2023) The Impact of Self-Identification with Global Consumer Culture on eWOM Generation: A Test of Global Consumer Culture Theory, *Journal of Marketing Communications*, 1-27. DOI: 10.1080/13527266.2023.2227646.

Tae-Hyun Baek, Jungkyeun Kim, Sukki Yoon, Yung Kyun Choi and Charles R. Taylor (2023), "The COVID-19 Threat and Luxury Advertising." *Journal of Consumer Behaviour*, 22(3), 582–596.

Chen Lou, Charles R. Taylor & Xuan Zhou (2023), "Influencer Marketing on Social Media: How Different Social Media Platforms Afford Influencer–Follower Relation and Drive Advertising Effectiveness," *Journal of Current Issues & Research in Advertising*, 44(1) 60-87.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2023), "Don't Touch the Merchandise! Factors Associated with Consumer Preference for Contact Free Shopping," *Journal of Business Research*, 154 (January), 113261.

## JOURNAL ARTICLES

Marla Royne Stafford & Charles R. Taylor (2022), "Analyzing the Impact of the Leading Articles in the Journal of Advertising from Its First 50 Years: An Integrative Framework," *Journal of Advertising*, 51 (5), 624–642.

Biswajiti Parita, Charles R. Taylor and Abhishek Abhishek (2022), "Introducing Roadblock Advertising in the Digital Context: Does Paying to Limit Competing Messages Pay Off?" *Journal of Advertising Research*," 62 (3), 271-288.

Sophia Mueller, Sandra Diehl, Charles R. Taylor, Ralf Terlutter and Barbara Mueller (2022), "Do CSR Ads with Public Health Messages Pertaining to Covid-19 Actually Help Consumers, Advertisers, and Society? Insights from the United States and Germany" *Journal of Current Issues and Research in Advertising*, 43 (4), 337-359.

Charles R. Taylor (2022), "Academic Research on Signage: Research Directions to Add Value to Stakeholders," 6 (1) *Interdisciplinary Journal of Signage and Wayfinding*, 21-26.

Lars Bergkvist and Charles R. Taylor (2022), "Reviving and Improving Brand Awareness as a Construct in Advertising Research," *Journal of Advertising*, 51, 294-307.

Yuli Zhang, Hyokjin Kwak, Puzakova Marina, and Charles R. Taylor (2021), "Space between Products on Display: The Impact of Interspace on Consumer Estimation of Product Size," *Journal of the Academy of Marketing Science*, 49(6), 1109-1131.

Alexander Mafael, Sascha Raithel, Charles R. Taylor and David W. Stewart (2021), "Measuring the Role of Uniqueness and Consistency to Develop Effective Advertising," *Journal of Advertising*, 50(4), 494-504.

Aniruddah Pangarkar, Paurav Shukla, and Charles R. Taylor (2021), "Minimalism in Consumption: A Typology and Brand Engagement Strategies," *Journal of Business Research,* 127 (April), 167-178.

Charles R. Taylor and Les Carlson (2021), "The Future of Advertising: New Directions and Research Needs," *Journal of Marketing Theory and Practice*, 29(1), 51-62.

Sukki Yoon, Kacy Kim, Ashok K. Lawani, Patrick T. Vargas, and Charles R. Taylor (2021), "Culture and Health Persuasion," *Journal of Current Issues and Research in Advertising*, 42(1), 83-101.

Charles R. Taylor, Philip J. Kitchen, Matthew Sarkees and Christian Lolk (2020), "Addressing the Janus Face of Customer Service: A Typology of New Age Service Failures," *European Journal of Marketing*, 54 (10), 2295-2316.

Yoon-Na Cho and Charles R. Taylor (2020), "The Role of Ambiguity and Skepticism in the Effectiveness of Sustainability Labeling," *Journal of Business Research*, 120 (11) 379-388.

## JOURNAL ARTICLES

Yuli Zheng, Hyokjin Kwak, Marina Puzakova, and Charles R. Taylor (2020), "When Distraction May Be a Good Thing: The Role of Distraction in Low-Fit Brand Extension Evaluations," *Psychology and Marketing*, 37 (4), 604-621.

Yoon-Na Cho, Yohan Kim and Charles R. Taylor (2020), "Does Feeling Guilt Facilitate "Green" Purchases: Insights on a Global Issue from a U.S. Consumer Survey," *Advances in International Marketing*, vol. 27, forthcoming.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee & Charles R. Taylor (2020) Can Premium Private Labels Compete with Luxury Brands: The Impact of Advertising on Perceived Luxuriousness, *International Journal of Advertising*, 39 (6), 761-782.

Charles R. Taylor, Alexander Mafael, Sascha Raithel, Carissa M. Anthony, and David W. Stewart (2019), "Portrayals of Minorities and Women in Super Bowl Advertising," *Journal of Consumer Affairs*, 51 (4), 1535–1572.

Shintaro Okazaki, Charles R. Taylor, Patrick Vargas, and Jorg Henseler, (2019) "Disasters, Hope, and Globalization: Exploring Self-identification with Global Consumer Culture in Japan," *International Marketing Review*, 36 (5), 726-747.

Eunju Ko, John P. Costello, and Charles R. Taylor (2019), "What is a Luxury Brand? A New Definition and Review of the Literature," *Journal of Business Research*, 99 (9), 405-413

Charles R. Taylor, Yoon-Na Cho, Carissa M. Anthony, and Danielle B. Smith. (2018), "Photoshopping of Models in Advertising: A Review of the Literature and Future Research Agenda." *Journal of Global Fashion Marketing* 9 (4), 379-398.

Aronte M. Bennett, John C. Kozup, and Charles R. Taylor (2018), "Country-of-Origin Effects and Consumer Evaluations of Ads within the Context of Economic Crises," *Journal of Current Issues and Research in Advertising*, 39 (1), 52-56.

Schirmer, Nadine A., Manfred Schwaiger, Charles R. Taylor, and John P. Costello (2018), "Consumer Response to Disclosures in Digitally Retouched Advertisements." *Journal of Public Policy & Marketing*, 37 (1), 131-141.

George R. Franke and Charles R. Taylor (2017), "Public Perceptions of Billboards: A Meta-Analysis," *Journal of Advertising*, 46 (3), 395-410.

Jieun Choi, Charles R. Taylor, and Doo-Hee Lee (2017), "Do Resonant Ads Resonate with Consumers? The Interaction of Wordplay, Regulatory Focus, and Need for Cognition and its Impact on Persuasion," *Journal of Advertising Research*, 57 (1), 82-93.

## JOURNAL ARTICLES

Charles R. Taylor & John P. Costello (2017), "What Do We Know About Fashion Advertising? A Review of the Literature and Suggested Research Directions," *Journal of Global Fashion Marketing*, 7 (1), 1-20.

Lars Bergkvist and Charles R. Taylor (2016), "Leveraged Marketing Communications: A Framework for Explaining the Effects of Secondary Brand Associations," *Academy of Marketing Science Review*, 6 (3), 157–175.

Aronté M. Bennett, Stacey Menzel Baker, Samantha Cross, J.P. James, Gregory Bartholomew, Akon E. Ekpo, Geraldine Rosa Henderson, Martina Hutton, Apoorv Khare, Abhijit Roy, Tony Stovall and Charles Ray Taylor (2016), "Omission and Commission as Marketplace Trauma," *Journal of Public Policy and Marketing*, 35 (2), 280-291.

Charles R. Taylor and Matthew Sarkees (2016), "Do Bans on Illuminated On-Premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses," *International Journal of Advertising*, 35 (1), 61-73

Sascha Raithel, Charles R. Taylor, and Stefan Hock (2016), "Are Super Bowl Ads a Super Waste of Money? Examining the Intermediary Roles of Customer-based Brand Equity and Customer Equity Effects," *Journal of Business Research*, 69 (9), 3788-3794.

Jieun Choi, Doo-Hee Lee and Charles R. Taylor (2016), "The Influence of Purchasing Context and Reversibility of Choice on Consumer Responses Toward Personalized Products and Standardized Products," *Psychological Reports*, 18 (2), 510-26

Charles R. Taylor and Shintaro Okazaki (2015), "Do Global Brands Use Similar Executional Styles Across Cultures? A Comparison of U.S. and Japanese Television Advertising," *Journal of Advertising*, 44 (3), 276-288.

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2015), "How Character Presence in Advergames Affects Brand Attitude and Game Performance: A Cross-cultural Comparison," *Journal of Consumer Behaviour*, 14 (6), 357-368.

Juran Kim, Charles R. Taylor, Kyung Hoon Kim, and Ki Hoon Lee (2015), "Measures of Perceived Sustainability," *Journal of Global Scholars of Marketing Science*," 25 (2), 182-193

Yung Kyun Choi and Charles R. Taylor (2014), "How Do 3-Dimensional Images Promote Products on the Internet?" *Journal of Business Research*, 67 (10), 2164-2170.

Johnny JiungYee Lee, Michael L. Capella, Charles R. Taylor, Mi (Meg) Luo and Colin B. Gabler (2014), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Journal of Business Research*, 67 (10), 2139–2146.

## JOURNAL ARTICLES

Marina Puzakova, Hyokjin Kwak and Charles R. Taylor (2013), "The Role of Geography of Self in "Filling In" Brand Personality Traits: Consumer Inference of Unobservable Attributes," *Journal of Advertising*, 42 (1), 16-29.

Juran Kim, Ki Hoon Lee and Charles R. Taylor (2013), "Effects of Mobile Direct Experience on Perceived Interactivity and Attitude toward Smartphone Applications," *Journal of Global Scholars of Marketing Science*, 23 (3), 282-296.

Minsun Yeu, Hee-Sook Yoon, Charles R. Taylor and Doo-Hee Lee (2013), "Are Banner Advertisements in Online Games Effective," *Journal of Advertising,* 42 (2/3), 241-250.

Shintaro Okazaki and Charles R. Taylor (2013), "Social Media and International Advertising: Theoretical Challenges and Future Directions," *International Marketing Review*, 30 (1) 56-71.

Charles R. Taylor, Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Sophie Hieke and Charles R. Taylor (2012), "A Critical Review of the Literature on Nutritional Labeling: Conceptual and Methodological Directions for Future Research," *Journal of Consumer Affairs*, 46 (1), 120-156.

Christian M. Ringle, Marko Sarstedt, Rainer Schlittgen and Charles R. Taylor (2012), "PLS Path Modelling and Evolutionary Segmentation," 66 (9), *Journal of Business Research*, 1318-1324.

Eunju Ko, Charles R. Taylor, Heewon Sung, Jooyeon Lee, Udo Wagner, David Martin-Consuegra Navarro, Fanghua Wang (2012), "Global Marketing Segmentation Usefulness in the Sportswear Industry," *Journal of Business Research*, (65) 11, 1565-1575.

John C. Kozup, Charles R. Taylor, Michael L. Capella, and Jeremy Kees (2012), "Sound Disclosures: Assessing When a Disclosure is Worthwhile," *Journal of Public Policy and Marketing*, 31 (2), 313-322.

Michael L. Capella, Charles R. Taylor and Jeremy Kees (2012), "Tobacco Harm Reduction Advertising in the Presence of a Government Mandated Warning" *Journal of Consumer Affairs*, 46 (2), 235-259.

Charles R. Taylor and C. Luke Bowen (2012), "New Developments for Measuring Return on Investment (ROI) for Internet Advertising: Building Toward a 'Brand Scorecard Approach," *Journal of Advertising and Promotion Research*, 1 (1), 9-38.

Charles R. Taylor, C. Luke Bowen, and Hae-Kyong Bang (2011), "The State of Methodological Practice in International Marketing Research," *Advances in International Marketing*, 22 (1), 143-167.

## JOURNAL ARTICLES

John B. Ford, Barbara Mueller, and Charles R. Taylor (2011), "The Tension between Strategy and Execution: Challenges for International Advertising Research," *Journal of Advertising Research*, 51 (1), 27-41.

Sascha Raithel, Sebastian Scharf, Charles R Taylor, Manfred Schwaiger, Lorenz Zimmermann (2011), "Marketing Accountability: Applying Data Envelopment Analysis to Assess the Impact of Advertising Efficiency on Shareholder Value," *Advances in International Marketing*, 22 (1), 115-139.

Karen L. Becker-Olsen, Charles R. Taylor, Ronald Paul Hill, and Goksel Yalcinkaya (2011), "A Cross Cultural Look at Corporate Social Responsibility Marketing Communications in Mexico and the United States: Strategies for Global Brands," *Journal of International Marketing*, 19 (2) 30-44.

Hyun Joung Lee, Doo-Hee Lee, Charles R. Taylor, and Jong-Ho Lee (2011), Do Online Brand Communities Help Build and Maintain Relationships with Consumers? A Network Theory Approach," *Journal of Brand Management*, 19 (3), 213-227.

Hao Zhang, Eunju Ko, and Charles R. Taylor (2011)," Advertising Appeals Strategy: Moderating Effect on the Relationship between Innovation and Customer Equity Drivers in China," *Advances in International Marketing*, 22, 111–136.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Measuring Hard Sell and Soft Sell Advertising Appeals," *Journal of Advertising*, 39 (2), 5-20.

Schwaiger, Manfred, Marko Sarstedt and Charles R. Taylor (2010), "Art for the Sake of the Corporation: Audi, BMW Group, DaimlerChrysler, Montblanc, Siemens, and Volkswagen Help Explore the Effect of Sponsorship on Corporate Reputations," *Journal of Advertising Research*, 50 (1), 77-89.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Global Consumer Culture Positioning: Testing Perceptions of Soft-Sell and Hard-Sell Advertising Appeals Between U.S. and Japanese Consumers," *Journal of International Marketing*, 18 (2), 20-34.

Herbert Jack Rotfeld and Charles R. Taylor (2009). "The Advertising Regulation and Self-Regulation Issues Ripped from the Headlines with (sometimes missed) Opportunities for Disciplined Multi-disciplinary Research*," Journal of Advertising*, 38 (4), 5-14.

Charles R. Taylor (2009), "Editorial: The Six Principles of Digital Advertising*," International Journal of Advertising*, 28 (3), 411-418.

Michael L. Capella, Charles R. Taylor, Randall C. Campbell, and Lance S. Longwell (2009), "Do Pharmaceutical Marketing Activities Raise Prices? Evidence from Five Major Therapeutic Classes," *Journal of Public Policy and Marketing*, 28 (2), 146-161.

**JOURNAL ARTICLES**

Mary Anne Raymond, Jong Won Lim, Charles R. Taylor, and Roger Gomes (2009), "Hyundai Motor Company's Paradigm for Success in World Markets," *Journal for Global Business Development*, Volume 1 (9), 27 – 36.

Charles R. Taylor and Michael L. Capella (2008), "A Model of Harm Reduction in the Context of Marketing," *Journal of Public Policy and Marketing*, 27 (2), 187-196.

Charles R. Taylor, Kyung Hoon Kim, Eunju Ko, Myung Hwan Park, Dong Ryul Kim and Hak Il Moon (2008), "Does Having a Market Orientation Lead to Higher Levels of Relationship Commitment and Business Performance for Industrial Robot Sales Engineers? Evidence from the Korean Robotics Industry," *Industrial Marketing Management*, 37 (7), 825-832.

Doo-Hee Lee, Seunghee Im and Charles R. Taylor (2008), "Voluntary Self-Disclosure of Information on the Internet: A Multi-method Study of Motivations and Consequences of Disclosing Information on Blogs," *Psychology and Marketing*, 25 (7) 692-710.

Michael L. Capella, Charles R. Taylor and Cynthia Webster (2008), "Cigarette Advertising Bans' Effect on Consumption: A Meta Analysis," *Journal of Advertising*, 37 (2), 7-18. (Selected as Best Paper to appear in *Journal of Advertising* in 2008)

Shintaro Okazaki and Charles R. Taylor (2008), "What is SMS Advertising and Why Do Multinationals Adopt It? An Empirical Study in European Markets," *Journal of Business Research*, 61 (1), 4-12.

Beibei Dong, Shaoming Zou and Charles R. Taylor (2008), "Factors that Influence Multinational Corporations' Control of Their Operations in Foreign Markets: An Empirical Investigation," *Journal of International Marketing*, 16 (1), 98-119.

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Catherine D'Orazio (2008), "The Influence of Consumer Self-Disclosure on Web Sites on Advertising Response," *Journal of Interactive Advertising*, 9 (1).

Shintaro Okazaki, Charles R. Taylor and Jonathan Doh (2008), Market Convergence and Advertising Standardization in the European Union, *Journal of World Business*, 43 (1), 384-400.

Eunju Ko, Charles R. Taylor, Udo Wagner, and Hyun-Ah Ji, (2008) "Relationships Among CEO Image, Corporate Image and Employment Brand Value in the Fashion Industry," *Journal of the Global Academy of Marketing Science*, 18 (4), 307-331.

Charles R. Taylor, Michael L. Capella, and John C. Kozup (2007), "Does DTC Advertising Provide Information or Create Market Power? Evidence from the U.S. and New Zealand," *Advances in International Marketing*, 1-30.

## JOURNAL ARTICLES

Eunju Ko, Eunyoung Kim, Charles R. Taylor, Kyung Hoon Kim, and Ie Jeong Kang (2007), "Cross-National Market Segmentation in the Fashion Industry: A Study of European, Korean, and US Consumers," *International Marketing Review*, 24 (5), 629-651 .

Manfred Schwaiger, Carsten Renhak, Charles R. Taylor and Hugh M. Cannon (2007), "Can Comparative Advertising be Effective in Germany? A Tale of Two Campaigns," *Journal of Advertising Research*, 47 (1), 2-13.

Stacy Landreth, Georgina Roselli and Charles R. Taylor (2007), "Where's Tamika Catchings? A Content Analysis of Female Athlete Endorsers in Magazine Advertisements," *Journal of Current Issues and Research in Advertising*, 29 (Spring), 55-65.

Koo Won Suh, Charles R. Taylor, and Doo Hee Lee (2007), "A Typology of the Marketing Communications Functions of Web Sites: A Cross-National Comparison, *Advances in International Marketing*, 18 (1), 271-292.

Steven W. Kopp, John C. Kozup, Tracy A. Suter, and Charles R. Taylor (2007), "Protecting the Global Brand in the European Union," *Journal of Euromarketing*, 17 (1), 23-34.

Charles R. Taylor, George R. Franke and Hae-Kyong Bang (2006), "Use and Effectiveness of Billboards: Perspectives from Selective-Perception Theory and Retail-Gravity Models," *Journal of Advertising*, 35 (Winter), 21-34.

Shintaro Okazaki, Charles R. Taylor and Shaoming Zou (2006), "Advertising Standardization's Positive Impact on the Bottom Line: A Model of When and How Standardization Improves Financial and Strategic Performance," *Journal of Advertising*, 35 (Fall), 17-33.

Charles R. Taylor and Shintaro Okazaki (2006), "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," *Journal of International Marketing*, 14 (1), 98-120.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "Asian Americans in Magazine Advertising: Portrayals of the "Model Minority" *Journal of Macromarketing*, 25 (2), 153-162.

Charles R. Taylor (2005), "How Excessive Restrictions on Signage Backfire," *Journal of Consumer Marketing*, 22 (6), 304-305.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Journal of Advertising*, 34 (Winter), 7-16.

Charles R. Taylor, Barry J. Babin and Kyung Hoon Kim (2005), "Marketing to Asian Americans: The Impact of Acculturation and Interpersonal Influence on Ethnocentric Consumer Preferences," *Journal of the Global Academy of Marketing Science*, 15 (3), 187-210.

## JOURNAL ARTICLES

Hae-Kyong Bang, Mary Anne Raymond, Charles R. Taylor, and Young Sook Moon (2005), "A Comparison of Service Quality Dimensions Conveyed in Advertisements for Service Providers in the U.S. and Korea: A Content Analysis," *International Marketing Review*, 22 (3), 309-326.

Charles R. Taylor and P. Greg Bonner (2003), "Comment on American Media and the Smoking-related Behaviors of Asian Adolescents." *Journal of Advertising Research*, 43, (December), 419-430.

Shaoming Zou, Charles R. Taylor, and Er Fang (2003), "MNC Control over Foreign Market Ventures: Do Host Governments Still Play a Major Role?" *Advances in International Marketing*, 14, 35-48.

Charles R. Taylor and George R. Franke (2003), "Business Perceptions of Billboards in the U.S. Economy," *Journal of Advertising Research*, (June), 150-161.

Charles R. Taylor, Michael G. Walsh, and Christopher A. Lee (2003), "The Challenge Posed by Product Standards Disputes in International Trade: The U.S./EU Beef Controversy and a Proposed Framework for Resolving Standards Disputes," *Journal of Consumer Affairs*, 37 (1), 101-122.

Charles R. Taylor (2002), "What's Wrong with International Advertising Research?" *Journal of Advertising Research*, 42 (6), 48-54.

Charles R. Taylor and Michael G. Walsh (2002), "Legal Strategies for Protecting Brands From Genericide: Recent Trends in Evidence Weighted in Court Cases," *Journal of Public Policy & Marketing*, 21 (1), 160-167.

Charles R. Taylor, P. Greg Bonner, and Michael Dolezal (2002) "Advertising in the Czech Republic: Czech Perceptions of Effective Advertising and Advertising Clutter," *Advances in International Marketing*, 12, 137-149.

Charles R. Taylor and Chad Johnson (2002), "Research on Standardization vs. Specialization of Advertising in the 1990s: A Review and Directions for Further Research," *Advances in International Marketing*, 12, 45-66.

Charles R. Taylor, Kyung Hoon Kim, Dong Yul Kim, and Hak Il Moon (2002), "Antecedents of Brand Loyalty in South Korean Rice Market," *Journal of the Global Academy of Marketing Science*, 9 (1) 175-188.

Gregory E. Osland, Charles R. Taylor, and Shaoming Zou (2001), "Selecting International Modes of Entry and Expansion," *Marketing Intelligence and Planning*, 19 (3), 153-161.

Charles R. Taylor (2000), "Emerging Issues in Marketing," *Psychology and Marketing*, 17 (6), 441-448.

**JOURNAL ARTICLES**

Charles R. Taylor, George R. Franke and Michael L. Maynard (2000), "Attitudes Toward Direct Marketing and its Regulation: A Comparison of the United States and Japan," *Journal of Public Policy & Marketing*, 19 (2), 228-237.

Charles R. Taylor and Mary Anne Raymond (2000), "An Analysis of Product Category Restrictions in Advertising in Four East Asian Markets," *International Marketing Review*, 17 (3), 287-304.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (2000), "Foreign Market Entry Strategies of Japanese MNCs," *International Marketing Review*, 17 (2), 146-163.

Matthew B. Meyers, Roger J. Calantone, Thomas J. Page, Jr. and Charles R. Taylor (2000), "An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," *Journal of International Marketing*, 8 (4), 108-121.

Alan Shao, Mary Anne Raymond, and Charles R. Taylor (1999), "Shifting Advertising Appeals in Taiwan," *Journal of Advertising Research*, 39 (6), 61-69.

Michael Maynard and Charles R. Taylor, (1999), "Girlish Images Across Cultures: Analyzing Japanese vs. U.S. *Seventeen Magazine* Ads," *Journal of Advertising*, 28 (1), 39-48.

Charles R. Taylor and Glenn S. Omura (1999), "A Political Economy Interpretation of the Economic Growth and Subsequent Crisis in the Republic of Korea," *Journal of Global Focus*, 11 (4), 49-62.

Shaoming Zou, Charles R. Taylor, and Gregory E. Osland, (1998) "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," *Journal of International Marketing*, 6(3), 37-58.

Charles R. Taylor, Shaoming Zou, and Gregory Osland (1998), "International Market Entry Mode Choice By U.S. and Japanese Firms: A Test of Transaction Cost Economics Theory," *Thunderbird International Business Review*, 40 (4), 389-412.

Charles R. Taylor and Hae-Kyong Bang (1997), "Portrayals of Latinos in Magazine Advertising," *Journalism and Mass Communication Quarterly*, 74 (2), 285-303.

Charles R. Taylor and Barbara B. Stern (1997), "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," *Journal of Advertising*, 26 (2), 1-15.

Charles R. Taylor, R. Dale Wilson, and Gordon E. Miracle (1997), "The Impact of Information Level Strategies on the Effectiveness of Korean vs. U.S. Television Commercials," *Journal of Advertising*, 26 (1), 1-18.

## JOURNAL ARTICLES

Charles R. Taylor (1997), "A Technology Whose Time Has Come or The Same Old Litter on a Stick? An Analysis of Changeable Message Billboards," *Journal of Public Policy & Marketing*, 16 (Spring), 179-186.

Charles R. Taylor, Shaoming Zou and Aysegul Ozsomer (1996), "Advertising and Its Effect on Industrial Concentration: A Contingency Perspective," *Journal of Current Issues and Research in Advertising*, 18 (Spring), 35-44.

Charles R. Taylor and Gordon E. Miracle (1996), "Foreign Elements in Korean and U.S. Television Advertising," *Advances in International Marketing*, 7, 175-195.

Michael Maynard and Charles R. Taylor (1996), "A Comparative Analysis of Japanese and U.S. Attitudes toward Direct Marketing," *Journal of Direct Marketing*, 10 (1), 34-44.

Charles R. Taylor and Glenn S. Omura (1995), "Analyzing Economic Development in The Republic of Korea: An Evaluation of Paradigms of Marketing and Economic Development," *Journal of Macromarketing*, 15 (2), 66-91.

Charles R. Taylor, Ju Yung Lee, and Barbara B. Stern (1995), "Portrayals of African, Hispanic, and Asian Americans in Magazine Advertising," *American Behavioral Scientist*, 38 (4), 608-621.

Charles R. Taylor and Weih Chang (1995), "The History of Outdoor Advertising Regulation in the United States," *Journal of Macromarketing*, 15 (1), 47-59.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising." *Journal of Public Policy & Marketing*, 13 (2), 239-245.

Charles R. Taylor, Gordon E. Miracle, and R. Dale Wilson (1994), "The Impact of Brand Differentiating Messages on Effectiveness in Korean Advertising," *Journal of International Marketing*, 2 (4), 31-52.

Charles R. Taylor and John C. Taylor (1994) "Regulatory Issues in Outdoor Advertising: A Content Analysis of Billboards," *Journal of Public Policy & Marketing*, 13 (Spring), 97-107.

Steve W. Kopp and Charles R. Taylor (1994), "Games, Contests, Sweepstakes, and Lotteries: Prize Promotion and Public Policy," *Research in Marketing*, 12, (Fall), 151-166.

Charles R. Taylor and Glenn S. Omura (1994), "A Comparison of Alternative Paradigms for Describing Economic Development," *Journal of Macromarketing*, 14 (2), 6-20.

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1992), "Culture and Advertising Executions: A Comparison of Selected Characteristics of Japanese and US Television Commercials," *Journal of International Consumer Marketing*, 4 (4), 89-113.

## JOURNAL ARTICLES

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1992) "Culture and Advertising Executions: A Comparison of Selected Characteristics of Korean and US Television Commercials," *International Marketing Review*, 9 (4), 5-17.

Jay L. Laughlin and Charles R. Taylor (1991), "An Approach to Industrial Market Segmentation," *Industrial Marketing Management*, 20 (2), 127-136.

Charles R. Taylor and Steve W. Kopp (1991), "Games, Contest, and Sweepstakes Run Afoul: A State of Legal Disorder," *Journal of Public Policy & Marketing*, 10 (1), 199-213.

## BOOK CHAPTERS

Mueller, Sophia, Charles R. Taylor and Barbara Mueller (2022), "Managing Change Related to Consumer Privacy Laws: Targeting and Personal Data Use in a More Regulated Environment." In: Karmasin, M., Diehl, S., Koinig, I. (eds) Media and Change Management. Springer, Cham. https://doi.org/10.1007/978-3-030-86680-8_15

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), "Introduction to Marketing Ethics," in Sage Handbook of Marketing Ethics, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 3-19.

Charles R Taylor and Mivena Pantequi (2021), "Religious and Cross-Cultural Perspectives on Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 43-57.

Christian Lolk and Charles R. Taylor (2021), "Pharmaceutical Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 326-338.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2019), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in Advertising Theory, 2nd ed. (S. Rodgers and E. Thorson, eds.). New York: Routledge.

Charles R. Taylor (2018), "How Does Your Advertising Affect Consumers?" in Mapping Out Marketing: Navigating Lessons from the Ivory Trenches, Ronald Paul Hill, Catherine Mary Lamberton and Jennifer Swartz (eds.), London: Routledge.

Charles R. Taylor and John P. Costello (2017), "International Digital Advertising: Lessons from Around the World,"in *Digital Advertising: Theory and Research* (3rd ed.). Shelly Rodgers and Esther Thorson (eds.), New York: Routlege. 345-361.

Charles R. Taylor and John P. Costello (2017), "Corporate Social Responsibility and the Portrayal of Minority Groups in Advertising," in *Handbook of Integrated Corporate Social Responsibility Communication*. Sandra Diehl, et al. (eds.). Springer International Publishing, 361-375.

Charles R. Taylor, C. Luke Bowen and Hoin Ryu (2014), "Corporate Social Responsibility: A Look at Eastern Nations," in *Handbook of Marketing and Corporate Social Responsibility*. (Ronald P. Hill and Ryan Langan, eds.), 234-251.

Charles R. Taylor and John B. Ford (2014), "Research Methods for International Advertising Studies: A Practical Guide," in *The Handbook of International Advertising Research*, (Hong Cheng, ed.), New York: John Wiley and Sons, 32-47.

## BOOK CHAPTERS

Barbara Mueller and Charles R. Taylor (2013), "Convergence in Global Markets: The Great Standardization vs. Localization Debate is Finally Put to Rest," in *Media Convergence and Management*, Sandra Diehl and Matthias Karmasin (eds.), Springer, 89-106.

Charles R. Taylor (2013), "Seven Simple Rules to Better Customer Service," in *The Dominant Influence of Marketing in the 21st Century: The Marketing Leviathan*. (Philip Kitchen, ed.), New York: Palgrave McMillan.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in *Advertising and Society: An Introduction*. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor and C. Luke Bowen (2012), "Best Practices for Cross-Cultural Advertising Research: Are the Rules Being Followed?" in *Handbook of Research on International Advertising*. (Shintaro Okazaki, ed.). London: Edward Elgar.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2011), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in *Advertising Theory*, (S. Rodgers and E. Thorson, eds.). New York: Routledge.

Charles R. Taylor and George R. Franke (2011), "Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, ed.). Heidelber, Germany: Gabler.

Charles R. Taylor (2011), "The Role of Signage in Marketing: Outdoor Advertising, Out-of home Media, and On-Premise Signs," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, M.A. Belch, and G.E.Belch, eds.), West Sussex, UK: Wiley, 197-202.

Charles R. Taylor (2011), "Standardization/Adaptation of International Marketing Strategy," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, D.C. Bello, and D.A..Griffiths, eds.), West Sussex, UK: Wiley, 97-102.

Charles R. Taylor (2006), "The Future of International Advertising Research: Suggestions for Moving the Discipline Forward," *International Advertising and Communication: Current Insights and Empirical Findings*, (Sandra Diehl and Ralf Terlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 491-506.

Shintaro Okazaki and Charles R. Taylor (2006), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions, *International Advertising and Communication: Current Insights and Empirical Findings*,(Sandra Diehl and Ralf Turlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 439-454.

**BOOK CHAPTERS**

Shaoming Zou, Charles R. Taylor, and S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," *Handbook of Marketing Research*, Subhash Jain, ed., Cornwall, UK: MPG Books, 134-147.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in Advertising and Society: An Introduction. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor, Gordon E. Miracle, and Kyu Yeol Chang (1994), "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, Korean, and U.S. Television Advertising. *Global and Multinational Advertising*, Basil Englis, ed., Hillsdale, NJ: Lawrence Erlbaum, 171-191.

## CONFERENCE PROCEEDINGS

Cho, Minjung., Eunju Ko and Charles R. Taylor (2023) The Effect of NFT Marketing Activities on Customer Equity and Satisfaction Regarding Luxury Brands. Proceedings of the Global Marketing Conference, Seoul, Korea.

Charles R. Taylor (2023) "Major Research Needs and Common Pitfalls in Publishing Advertising and Society Research, Proceedings of the American Academy of Advertising, p.73.

Chen Lou, Charles R. Taylor and Xuan Zhou (2022), Context is the New King: The Role of Different Social Media Platforms in Influencer-Follower Relation and Influencer Advertising Effectiveness, Proceedings of the 2022 Annual Conference of the American Academy of Advertising, p.51.

Sophia Mueller, Charles R. Taylor, Barbara Mueller, Sandra Diehl and Ralf Terlutter (2021) Covid-19 Advertising: Are Corporate Social Responsibility Appeals Beneficial to Consumers? Proceedings of the International Conference on Research in Advertising.

Louisa Ha, Yang Yang, Liselot Hudders, Steffi De Jans, Chen Lou, Eva A. van Reijmersdal, Tatiana Domingues-Aguiar, Charles Ray Taylor, Yoon-Na Cho, and Mivena Panteqi (2021), The New Rich and Famous: The Status Quo of Research in Influence Advertising, Theoretical Implications and Opportunities. Proceedings of the Annual Conference of the American Academy of Advertising.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2020), "A New Perspective on Digital Well-Being and Distancing Behavior," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho, Mivena Panteqi, and Charles Taylor (2020), "Do Instagram Influencers Need to be Perfect? The Changing Role of Social Norms on the Effectiveness of Influencers," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho and Charles R. Taylor, (2018), "The Role of Ambiguity in the Effectiveness of Sustainability Labeling," Proceedings of the 2018 Global Marketing Conference at Tokyo, 223-224

Bradley James Wilson, David Roca, Charles R. Taylor and Camilo Villegas (2018), "The Dark Side of the Cannes Awards: 'Truchos' or Fake Ads as Seen by Colombian Creative Agency Staff," *Proceedings of the 2018 ICORIA Conference*, Valencia, Spain.

Hyerinne Hahn, Jong-Ho Lee, Charles R. Taylor, and Jung Min Jang (2017), How Do the Characteristics of Premium Private Label Affect Perceived Luxuriousness? The Moderating Role of Change Seeking, Price Consciousness and Vulnerability. *Proceedings of the 2017 Mystique of Luxury Brands Conference*, Seoul, Korea.

Katharina Ninaus, Sandra Diehl, Charles R. Taylor and Ralf Terlutter (2017), "Always-On? Persuading Technology Users To Disconnect From Work: The Effects Of Message Frame, Regulatory Focus And Self Efficacy On The Effectiveness Of Health Messages," *Proceedings of the 2017 International Conference on Research in Advertisin*g, Ghent, Belgium.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee, and Charles R. Taylor (2017), "Advertising's Influence on Perceived Luxuriousness of a Premium Private Label," *Proceedings of the Global Fashion Marketing Conference of the of Global Alliance of Marketing and Management Associations*. Vienna, Austria.

Nadine Schirmer, Manfred Schwaiger, Charles R. Taylor and John P. Costello. (2016), "Consumer Response to Disclaimers in Digitally Retouched Advertisements," Proceedings of 2016 Global Marketing Conference, Hong Kong. Seoul: Global Alliance of Management and Marketing Scholars.

Seoyoung Kim, Sungkyu Lee, Jong-Ho, and Charles R. Taylor (2016) "Drivers of Perceived Luxuriousness of a Premium Private Label Product," *Proceedings of 2016 Global Marketing Conference, Hong Kong*. Seoul: Global Alliance of Management and Marketing Scholars.

Charles R. Taylor (2016) "How Much Should Teaching be Adapted to Local Markets," Proceedings of the American Academy of Advertising Annual Conference, Seattle, WA. 184-185.

Charles R. Taylor, John P. Costello and Eunju Ko. (2015), The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," *Proceedings of the Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations*, Florence, Italy.

Antigone G. Kyrousi, Charles R. Taylor and George G. Panigyrakis (2015), "That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," *Proceedings of the 2015 International Conference on Research in Advertising*, London, England.

Sascha Raithel, Charles R. Taylor & Stefan (2014), "Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations*, 5(1).

Juran Kim, Charles R.Taylor, and Kyung Hoon Kim. (2014), "Measures of Perceived Sustainability," *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations* 4(1).

Charles R. Taylor and Shintaro Okazaki (2013) "Culture and Advertising Executions Revisited," *Proceedings of the 2013 International Conference on Research in Advertising*, Zagreb, Croatia.

Taylor, Charles R. (2012), "The Future of Advertising is Solid as a BRIC," *Proceedings of the American Academy of Advertising Annual Conference*, Myrtle Beach, SC. "

Johnny Jiung Lee, Michael L. Capella, Charles R. Taylor, Mi Luo and Colin Gabler (2012), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Proceedings of the 2012 Global Marketing Conference at Seoul.*

Yung Kyun Choi and Charles R. Taylor (2012), "Persuasive Effects of 3D Advertising: Role of Product Type, Need for Touch, and Mental Imagery," *Proceedings of the 2012 Global Marketing Conference at Seoul.*

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2011), Spokes-character Effects in Advergaming: The Influence of Character Presence, Product Type, and National Culture on Consumers' Brand Evaluation and Performance," *Proceedings of the American Academy of Advertising Conference*, p.114

Charles R. Taylor and Michael L. Capella (2010), "Measuring the Effects of Marketing Smokeless Tobacco as Harm Reduction," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Jinkyung Goo (2010), "Cultural Differences in Emotional Advertising," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Christian Ringle, Marko Sarstedt, Rainer Schlitginn, and Charles R. Taylor (2010) "Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Charles R. Taylor (2010), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," *Proceedings of the 9th International Conference on Research in Advertising*, Madrid, Spain: European Academy of Advertising.

Sophie Hieke and Charles R. Taylor (2010), "An Empirical Study on the Effectiveness of Nutritional Labelling in Germany," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, 28-29.

Charles R. Taylor and Peter Neijens (2009). "Trends in European Advertising: Cross Media Campaigns, Advertising during Events, Brand Placement, Advertising Strategies in the New EU Member States and Emotional Brand Experiences," *Proceedings of the 2009 Conference of the American Academy of Advertising*, Cincinatti, Ohio.

Charles R. Taylor et al. (2008), "The View from Europe: Insights on Cutting Edge Issues in Europe." *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, forthcoming.

Charles R. Taylor, et al. (2008), "The Influence of Consumer's Self-Disclosure on Advertising Response." *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Examination of Smart Clothing Attributes, Perceived Risk and Intention to Adopt between Two Cultural Groups." *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Segmentation and Targeting Sportswear Consumers in Global Markets." *Proceedings of the Global Marketing Conference.* Shanghai: Korean Academy of Marketing Science.

Manfred Schwaiger, Marko Sarstedt, Charles R. Taylor (2008), "Long-Term Effects of Culture Sponsoring on Corporate Reputation – An Experimental Study". *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Michael L. Capella, Charles R. Taylor, and Randall Campbell (2008), "Does DTC Advertising Raise the Price of Sleeping Pills? The Impact of Pharmaceutical Advertising on Price Sensitivity," *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, 219-225.

Charles R. Taylor (2007), "Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go," *Proceedings of the 2007 Conference of the American Academy of Advertising.*

Koo-Won Suh, Doo-Hee Lee, and Charles R. Taylor (2007), "Dimensions of Advertising Creativity," Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University. Seoul: Korea Advertising Society.

Charles R. Taylor and Changjo Yoo (2007), "Special Session on Social Responsibility of Tobacco Firms." *Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University*. Seoul: Korea Advertising Society.

Charles R. Taylor, et al. (2006), "Impact of Nationality and Fashion Lifestyle on Attitudes toward Advertising and Brand." *Proceedings of the Cultural Perspectives in Marketing Conference,* Academy of Marketing Science Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2006), "Relationship between Marketing Orientation and Business Performance of Sales Engineers of Industrial Robots." *Proceedings of the Cultural Perspectives in Marketing Conference,* Academy of Marketing Science Korean Academy of Marketing Science.

Michael L. Capella and Charles R. Taylor (2006), "A Review of the Effect of Cigarette Advertising Bans," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, pps. 188-189.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, p.14.

Shintaro Okazaki and Charles R. Taylor (2005), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, pps. 145-152.

Okazaki, Shintaro and Charles R. Taylor, (2005), "Understanding Advertising Standardization in an European Context: An Empirical Model", in Proceedings of the 34th European Marketing Academy (EMAC) Conference 2005 "Rejuvenating Marketing: Contamination, Innovation, Integration", Milan, Italy: Bocconi University.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" *Proceedings of the 30th Annual Macromarketing Conference*, (Mark Peterson and Ronald Paul Hill, eds), p. 63.

Charles R. Taylor and Michael Walsh (2005), "What Does 'Made in the USA' Mean? A Review of Legislation and Litigation Pertaining to Country of Origin Claims," *Proceedings of the 2005 Marketing and Public Policy Conference*, forthcoming.

Charles R. Taylor and George R. Franke (2004), "An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," *Proceedings of the 2004 Marketing and Public Policy Conference*, 83-85.

Charles R. Taylor, (2003) "What's Wrong with International Advertising Research (and What's Right)," *Proceedings of the 2003 Conference of the American Academy of Advertising*, (Les Carlson, ed.), p.3.

Charles R. Taylor, (2003) "Meet the Editors: Journal of Advertising and Some Journals You Might Not Have Considered but Should," (special session) *Proceedings of the 2003 Conference of the American Academy of Advertising*, (Les Carlson, ed.), p.147.

Charles R. Taylor and Michael Walsh (2003), "Resolving Product Standards Disputes," portion of special session on "Challenges to Public Policy: Emerging Issues in International Markets," *Proceedings of the 2003 Marketing and Public Policy Conference*, p.59.

Garrett, Jason, Shaoming Zou, and Charles R. Taylor (2003), "International Advertising: A Review of the Empirical Research from 1990 to 2002," *Proceedings of the American Marketing Association Summer Educators' Conference,* Chicago, IL.

Shaoming Zou, Charles R. Taylor, S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," The State of the Art Research in International Marketing, Subhash Jain, ed., University of Connecticut - CIBER.

Charles R. Taylor (2002), "Publishing Public Policy Research: Journals and Their Editors," *Proceedings of the 2002 Marketing and Public Policy Conference*, Chicago: American Marketing Association.

Mary Anne Raymond and Charles R. Taylor (2000) "Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan," *Proceedings of the 2000 Marketing and Public Policy Conference*, p.22-23.

Charles R. Taylor and Michael Maynard (1999), "Attitudes Toward Direct Marketing and Its Regulation: A Comparison of the U.S. and Japan," *Proceedings of the 1999 Marketing and Public Policy Conference*.

Charles R. Taylor and Michael Maynard (1999), "The Impact of a Culture's Communication Style on Attitudes Toward Direct Marketing: Comparing Japan and The United States" *Proceedings of the American Academy of Advertising Conference*, p.194-195.

Charles R. Taylor (1998), "Agency Perspectives on Cultural Factors Influencing Advertising in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.316.

Charles R. Taylor and Alan Shao (1998), "Advertising Strategies in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.315.

Mary Anne Raymond, Charles R. Taylor, and Alan Shao (1998), "Socio-Cultural Factors Understanding Restrictions and Regulations Affecting Advertising across Product Types in Taiwan," *Proceedings of the 1998 Marketing and Public Policy Conference*, p.67.

Michael B. Mazis and Charles R. Taylor (1998), "The Regulation of Advertising in Sensitive Product Categories: Global Perspectives," *Proceedings of the 1998 Marketing and Public Policy Conference*, p.64-65.

Charles R. Taylor and John C. Taylor, (1997) "The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," *Proceedings of the American Marketing Association Marketing Communications Conference*, p.56-58.

Charles R. Taylor and Barbara B. Stern, (1997), "Advertising Portrayals of Asian Americans:

The Asian American View," *Proceedings of the 1997 Conference of the American Academy of Advertising,* p.269-271.

Barbara B. Stern, Charles R. Taylor, Hae-Kyong Bang, Wei-Na Lee, and Hairong Li (1997), "Asian-Americans: Insights for Advertisers on Appealing to an Attractive, Yet Misunderstood Demographic Group," *Proceedings of the 1997 Conference of the American Academy of Advertising*, p.269.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (1996), "International Market Entry Mode Choice by U.S. and Japanese MNCs: A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," *Proceedings of the 1996 American Marketing Association Summer Educators' Conference*, C. Droge and R. Calantone (eds.), p.402.

Charles R. Taylor (1996), "Televised Portrayals of Asian Americans," *Proceedings of the 1996 American Academy of Advertising Conference,* p.119-120.

Charles R. Taylor (1995), "Brand Differentiation and Advertising Effectiveness," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil, (eds.), p.302-321.

Charles R. Taylor and Gordon E. Miracle (1995), "Foreign Elements in Korean and U.S. Television Advertising," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil (eds.), p.93-94.

Charles R. Taylor and Thomas J. Page, Jr. (1994), "A Comparison of the Effectiveness of Brand Differentiating Messages in Korean and U.S. Television Advertising," *Proceedings of the Fourth Symposium on Cross-Cultural Consumer and Business Studies*, p.179-182.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," *Proceedings of the 1994 Marketing and Public Policy Conference*, p.158.

Charles R. Taylor, Doo Hee Lee, and Hae-Kyong Bang (1993), "Advertising Strategies in Korea and the United States," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.788-791.

Charles R. Taylor and Doo Hee Lee (1993), "A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.776-779.

Charles R. Taylor and Jay L. Laughlin (1993), "The Effectiveness of Brand Differentiating Strategies in Korean Advertising," *Proceedings of the International Academy of Business Disciplines Conference*, F. V. Mastrianna and Abass Alhahfaji (eds.), p.414-418.

Charles R. Taylor and Weih Chang (1993), “The History of Outdoor Advertising Regulation in the United States,” *Proceedings of the Sixth Conference on Historical Research in Marketing and Marketing Thought*, p.283-299

Charles R. Taylor and Glenn S. Omura (1992), "Back to the Political Economy Paradigm in the Study of Marketing in Economic Development: A Case Analysis of South Korea," in *Proceedings of the Macromarketing Seminar*, Breukelen, Netherlands, p.551-576.

Charles R. Taylor and Shaoming Zou, (1992) "Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," *Proceedings of the Conference of the American Academy of Advertising*, p.42-43.

Steven W. Kopp and Charles R. Taylor (1991), “Try Your Luck! A History of Prize Promotions!,” *Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*, p.285-299

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1990) "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, U.S. and South Korea Television Advertising,” *Proceedings of the Advertising & Consumer Psychology Conference*, p.5.

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1989) "Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference,* R.L. King (ed.), p.347-351.

Charles R. Taylor and John C. Taylor (1989), "Towards a General Theory of the Effects of Deregulation on Competitive Structure and Performance," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference*, R.L. King (ed.), p.438-442.

John C. Taylor and Charles R. Taylor (1989), "Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of an Historical Context Approach,” *Proceedings of the Fourth Conference on Historical Research in Marketing and Marketing Thought*, T. Nevett, K. Whitney, and S. Hollander, (eds.), p.213-236.

**PRESENTATIONS**

"Meet the Editors" American Marketing Association (February 2023).

"Building a Successful Academic Career: The Role of Research," Keynote presentation to the Business Association of Latin America (BALAS), Lisbon, Portugal. (August, 2022)

"How to Publish in Advertising Journals," Emerging Markets Conference Board, Lllujbiana, Slovenia. April (2022)

"New Issues in Advertising Research," Keynote Presentation to ICAMA Conference, Jeju, Korea. (October, 2023)

"Meet the Editors," International Conference on Research in Advertising, (June 2022).

"Meet the Editors," American Academy of Advertising Conference, (April 2022).

"Strategies for Publishing in Top Functional Area Journals," Keynote speech presented to Emerging Marketing Conference Board Annual Conference, Puebla, Mexico. (November 2021)

"Hot Topics in Advertising and Luxury Brand Research in 2021," Keynote speech presented to GAMMA Global Fashion Marketing Conference, Seoul, Korea. (November 2021).

"Meet the Editors," Society for Marketing Advances Conference, Orlando (November, 2021).

"Meet the Editors," International Conference on Research in Advertising, (June 2021).

"Meet the Editors," American Academy of Advertising Conference, (April 2021).

"Meet the Editors," Society for Marketing Advances Conference, New Orleans (November, 2020).

"Meet the Editors," Global Marketing Conference (GAMMA), Seoul, Korea, (virtual). (November, 2020).

"Developing an Effective Research Stream in Marketing," Keynote speech to 6th International AR & VR Conference, (virtual: Lisbon, Portugal), November 2020.

"Advertising in Emerging Markets," (2020) Keynote speech to ICAMA Conference, (virtual-Bangkok, Thailand).

"Key Trends in Advertising Research," (2020) Keynote speech to Korean Marketing Association, September 2020 (virtual- Seoul, Korea)

"The Future of Advertising in Emerging Markets," Keynote session at the Emerging Markets Conference Board, May, 2020 (virtual- Lllujbiana, Slovenia)

"Meet the Editors," Society for Marketing Advances Conference, New Orleans (November, 2019).

"Meet the Editors." Global Fashion Management Conference at Paris (July, 2019).

"Hot Topics in Advertising Research," Keynote speech presented at Asian Advertising Summit, Singapore (June 2019).

"How to Be a Better Reviewer and Why You Should Care," Presenter in panel session at the 2019 American Academy of Advertising Conference, Dallas, TX.

"Building a Successful Publishing Career." Keynote speech presented at Business Association of Latin American Studies, Lima, Peru (April, 2019).

"Meet the Editors," 2019 Annual Conference of the Emerging Markets Conference Board, "Driving Marketing Excellence through Experiences in Emerging Economies," Delhi, India (January 2019)

"Big Event Advertising Effectiveness: Can it Still Impact Brands? Evidence from Super Bowl Advertising," Keynote speech presented at the Asian Advertising Summit, Hong Kong Baptist University. Hong Kong (May, 2018).

"Super Bowl Advertising: Is it Effective in Brand Building?" Keynote speech presented at ICAMA Conference, Bangkok. Thailand (April 2018).

"Tips for Publishing Your Work and Building a Career," Keynote speech at Emerging Marketing Conference Board conference, Johannesburg, South Africa (April, 2018).

"Technology Innovation and Advertising: Implications for Education and Research," Special session panelist. American Academy of Advertising Annual Conference. New York, NY, (March, 2018).

"Meet the Editors," Part of panel at 2018 ICORIA Conference, Ghent, Belgium (June, 2017).

"Strategies for Building a Career in Advertising Research," Presented at Doctoral Consortium of American Academy of Advertising, Boston. Mass. (April, 2017)

"Consumer Response to Disclaimers in Digitally Retouched Advertisements," Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"Drivers of Perceived Luxuriousness of a Premium Private Label Product," Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"How Much Should Teaching be Adapted to Local Markets," Presented at the 2016 American Academy of Advertising Annual Conference, Seattle, WA. (April 2016)

"Meet the Editors" Panel at 2016 Global Marketing Conference at Hong Kong.

"Meet the Editors" International Conference on Research in Advertising. Doctoral Symposium, Llujbiana, Slovenia. (June 2016)

Global Branding Strategies," Yonsei University special lecture, (October 2016).

"Meet the Editors," Society for Marketing Advances Annual Conference (2015), San Antonio, TX. (November).

"Building a Research Agenda and Publishing in Top Advertising Journals," Doctoral Consortium of European Advertising Academy. London, England (July 2015).
"Meet the Editors," ICORIA Conference, London, England (July, 2015).

"Meet the Editors," Global Fashion Marketing Conference of GAMMA (June, 2015).

"The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations (June 2015).

"That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," ICORIA Conference, London, England, (July 2015).

"Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." Presented at the 2014 Global Marketing Conference of the Global Alliance of Marketing and Management Associations.

"Culture and Advertising Executions Revisited," Presented at 2013 ICORIA Conference, Zagreb, Croatia.

"Meet the Editors," Presented at the 2012 ICORIA Conference, Stockholm, Sweden, (June, 2012).

"Cultural Differences in Emotional Advertising," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Meet the Editors." Presented as part of special session at the 2010 Global Marketing Conference at Tokyo (Semptember, 2010).

"Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Designing Effective Digital Advertising: Current State of Knowledge and Thoughts on Digital Advertising in China," Keynote session speaker at the First Annual Academic Symposium of the

Chinese Advertising Education Committee of the Chinese Association of Higher Education. (August, 2010).

"Meet the Editors," Presentation in Meet the Editors Panel at the 9th Conference on Research in Advertising, Madrid, Spain, (June 2010).

"Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," Presented at the 9th International Conference on Research in Advertising, Madrid, Spain. (June, 2010).

"Publishing in the International Journal of Advertising," Presented in the Meet the Editors Session of the International Conference on Research in Advertising, hosted by European Advertising Academy, Klagenfurt, Austria (June 2009).

"Six Principles of Effective Digital Advertising," Presented at Dongguk University, Seoul, Korea, (May, 2009).

"Effective Advertising in New Media," Presented at Yonsei University, Seoul, Korea.

"Designing Effective Interactive Advertising." Presented at Ewha Womens' University, Seoul, Korea (May, 2009).

"Designing Effective Interactive Advertising," Presented to the Marketing Science Institute's Mobile Marketing Symposium, Cambridge, MA (December 2008).

"What Should I Do with This Review," Presented to 2008 American Academy of Advertising Emerging Scholar Symposium, San Mateo, CA.

"Principles of Interactive Advertising," Presented at the Autonomous University of Madrid, Spain, December 2008.

"Current Issues in Internet Advertising" Presented at Ludwig Maximillians University, Munich, Germany, October 2008.

Advertising and the Internet: Principles and Best Practices: Presented at University of Amsterdam, October 2008.

"Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go," 2007 Conference of the American Academy of Advertising, Burlington, VT.

Key Trends in Advertising Research: Key Research Topics, Presented to the Korea Advertising Society, Seoul, Korea, August, 2007.

"The Marketing Functions of On-Premise Signs" Presented at the 2006 National Signage Research Symposium at the International Sign Association Conference, September, 2006, Las Vegas, Nevada.

"Portrayals of Asian Americans in Advertising." (2006), Special presentation at the University of Texas at Austin.

"Smoke and Mirrors: Advertising and Tobacco" panelist in session at the National Center for Addiction and Substance Abuse (Columbia University) panel "Up in Smoke: Tobacco and American Youth," moderated by Jackie Judd, (September 2006), New York.

"A Review of the Effect of Cigarette Advertising Bans," American Marketing Association's Marketing and Public Policy Conference, June, 2006, Long Beach, CA.

"Marketing Trends and the New Media: It's Still All About the Brand," Featured speech to ADKOR 2005, The 2005 Korea Advertising Congress. Organized by the Korean Federation of Advertising Agencies. Seoul, Korea, November 8, 2005.

"Hot Topics in U.S. Advertising," Special Presentation to the Korean Advertising Society, Seoul Korea, July 6, 2005.

"Moving International Advertising Research Forward: A New Research Agenda," Presented at the 4th International Conference on Research in Advertising, June 2005, Saarbrucken, Germany: Saarland University, p.14 (keynote speaker).

"The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" (2005) Presented at the 30th Annual Marketing Conference, St. Petersburg, FL. (plenary session).

"On-Premise Signs as Storefront Marketing Devices and Systems," Presented at the 2005

National Signage Research Symposium at the International Sign Association Conference, May, 2005, Las Vegas, Nevada. (plenary session).

"Asian Americans in Advertising: Portrayals of the Model Minority," Presented to the 11th Asia Pacific Law Students Association Conference on Law and Public Policy, Harvard University, March 2005, Cambridge, MA.

"Advertising Standardization and its Impact on Financial and Strategic Performance: Evidence from Japanese and U.S. Subsidiaries Operating in the EU," Presented at the Korean Academy of Marketing Science Fall Meeting, November 2004, Jeonju, Korea.

"Deceptive Advertising and Corporate Responsibility: The Role of Self-Regulation," Presentation to the Philadelphia Advertising Club, Philadelphia, PA, November 2004.

"An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," Presented at the 2004 Marketing and Public Policy Conference, Salt Lake City, Utah.

"Regulation of On-Premise and Off-Premise Signs: Perspectives from Three Research Studies," Presented to the Transportation Research Board Meeting, January, 2004, Washington, DC.

"Building a Career in Marketing and Public Policy Research," Presented at the Doctoral Consortium of the 2003 Marketing and Public Policy Conference," Washington, DC.

"Resolving Product Standards Disputes," Presented at the 2003 Marketing and Public Policy Conference, Washington, DC.

"The Impact of Sign Regulation on Marketing Activities and Business Valuation," Presented at the 1st National Signage Research Association, Las Vegas, NV.

"What's Wrong (and What's Right) with International Advertising Research," Presented at the 2003 meeting of the American Academy of Advertising, Broomfield, CO.

"A Survey of Alternatives to Billboards and 30 Years of Public Opinion towards Billboards," part of "Billboard Experts" panel, 2002 Outdoor Advertising Legal Seminar, Washington DC.

"Making Good Decisions Pertaining to Departmental, College, and External Service Early in an Academic Career," Presented to the Doctoral Consortium of the 2001 Conference of the Society from Marketing Advances, New Orleans, LA.

“Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan,” Presented at the 2000 Marketing and Public Policy Conference, Washington, DC.

“Attitudes Toward Direct Marketing and its Regulation: A Comparison of the U.S. and Japan,” Presented at the 1999 meeting of the American Academy of Advertising, Albuquerque, NM.

“Advertising Strategies in Taiwan,” Presented at the 1998 meeting of the American Academy of Advertising, Lexington, KY.

“The Regulation of Advertising in Sensitive Product Categories: Global Perspectives,” Presented at the 1998 Marketing and Public Policy Conference, Washington, DC.

"Foreign Market Entry Mode Strategies of Japanese and U.S. Firms," Presented at the 1998 meeting of the Academy of Marketing Science, Norfolk, VA.

"The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," Presented at the 1998 American Marketing Association Marketing Communications Conference, Dublin, Ireland.

"Advertising Portrayals of Asian Americans: The Asian American View," Presented at the 1997 Conference of the American Academy of Advertising, St. Louis, MO.

"A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," Presented at the 1996 American Marketing Association Summer Educators' Conference, San Diego, CA.

"Regulatory Issues in Direct Marketing: A Comparison of the U.S. and Japan," Presented at the 1996 Marketing and Public Policy Conference, Arlington, VA.

"Televised Portrayals of Asian Americans," Presented at the 1996 American Academy of Advertising Conference, Vancouver.

"Brand Differentiation and Advertising Effectiveness," Presented at the 1995 Joint Conference of the American Marketing Association and the Korean Marketing Association.
"Magazine Portrayals of Ethnic Minorities," Presented at the 1995 Conference of the American Academy of Advertising, Tuscon, AZ.

"Culture's Consequences in Advertising: The Impact of Information Level Strategies on the Effectiveness of Korean and U.S. Advertising," Presented at the 1994 Conference of the American Academy of Advertising, Tuscon, AZ.

"Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," Presented at the 1994 Marketing and Public Policy Conference, Arlington, VA.

"A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

"Advertising Strategies in Korea and the United States," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

Guest Speaker on the Topic of, "Implications of Marketing and Public Relations for Parks and Recreation Programs," at Taegu University, Taegu, Korea.

"Litter on a Stick or the Lifeblood of Small Business: Regulatory Issues in Outdoor Advertising, presented at the 1993 Marketing and Public Policy Conference, East Lansing, MI.

"The History of Outdoor Advertising Regulation in the United States," Presented at the Sixth Conference on Historical Research in Marketing and Marketing Thought (April 1993).

"Journal Special Sections and the Advancement of Knowledge: A Product Life Cycle Case Study," Presented at the 1992 AMA Winter Educators Conference, San Antonio, TX.

"Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," Presented at the 1992 Conference of the American Academy of Advertising, San Antonio, TX.

Guest speaker on the topic of, "Comparing Television Advertising in Korea and the United States," at the Korea University, Seoul, Korea (September, 1991).

"Retail Television Advertising: Is it Really Unsophisticated?" Presented at the Symposium on Patronage Behavior and Retail Strategy, Baton Rouge, LA (1991).

"Try Your Luck: A History of Prize Promotions in the United States," Presented at the Fifth Conference on Historical Research in Marketing and Marketing Thought, East Lansing, MI (May 1991).

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," Presented at the 1989 Southern Marketing Association Conference, New Orleans, LA.

"Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of a Historical Context Approach," Presented at the Fourth Conference on Historical Research in Marketing and Marketing Thought, Charleston, SC (May, 1989).

Served as Panelist on the "Advertising in the 21st Century" session at the 1989 Southern Marketing Association Conference, New Orleans.

## EDITORIALS

Charles R. Taylor (2024), "Understanding Podcast Advertising: The Need for More Research," *International Journal of Advertising* 43(6), 931-932.

Charles R. Taylor (2024), "Ad Skipping, The 'Ad Free Internet' and Privacy: A Call for Research," *International Journal of Advertising* 43(3), 403-404.

Charles R. Taylor (2023) "Sonic Branding as a Promotional Tool: A Concept Whose Time Has Come and a Call for Research," *International Journal of Advertising*, 42(8), 1239-1241.

Charles R. Taylor (2023) "Thoughts on Cross-cultural Advertising Research in 2023," *International Journal of Advertising*, 42(6), 969-971.

Charles R. Taylor (2023) "Non-fungible Tokens (NFTs) as Promotional Devices: Research Needs and Future Projections," *International Journal of Advertising*, 42(5), 799-800.

Charles R. Taylor (2023) "Digging Deeper on Diversity and Inclusion in Advertising Research: A Call to Action," *International Journal of Advertising*, 42(4), 639-640.

Charles R. Taylor (2023) Getting Sentimental About the Need for More Research on Nostalgia in Advertising," *International Journal of Advertising*, 42(3), 459-460.

Charles R. Taylor (2023) "New Thoughts on Advertising's Impact on Consumer Prices," International Journal of Advertising, 42(2), 261-262.]

Charles R. Taylor, Douglas C. West, Colin McDonald & Michael Waterson (2023) "Reflections on the *International Journal of Advertising* on the Journal's History and First 40 years, *International Journal of Advertising*, 42(1), 13-17.

Charles R. Taylor (2022), "Hitting the Mark with Active Agers: A Call for More Research on Older Consumers," *International Journal of Advertising*, 41(7), 1179-1180.

Charles R. Taylor (2022) "Future Needs in Gender and LGBT Advertising Portrayals," *International Journal of Advertising*, 41(6), 971-973.

Charles R. Taylor (2022) Advertising and Small Businesses: The Need for More Research, *International Journal of Advertising*, 41(4), 589-590.

Charles R. Taylor (2022), "Research on Advertising in the Metaverse: A Call to Action," *International Journal of Advertising*, 41(3), 383-384.

Charles R. Taylor (2021) "A Call for More Research on Authenticity in Corporate Social Responsibility Programs", *International Journal of Advertising*, 40(7), 969-971.

Charles R. Taylor (2021), "Generational Research and Advertising to Various Age Cohorts," *International Journal of Advertising*, 40(5), 683-685,

Charles R. Taylor (2021), Charting the Path Forward for the International Journal of Advertising, *International Journal of Advertising*, 40(2), 145-147.

Charles R. Taylor (2021), "On Hideki Matsuyama and the Need for More Study of Global Brand Equity," *International Journal of Advertising*, 40(3), 325-326.

Charles R. Taylor (2020) "The Urgent Need for More Research on Influencer Marketing,"*International Journal of Advertising*, 39(7), 889-891,

Charles R. Taylor (2020), "Advertising and Covid-19," *International Journal of Advertising*, 39(5), 587-589.

Charles R. Taylor (2020), "Common Mistakes Made in Submissions to Leading Advertising Journals," *International Journal of Advertising,* 39(3), 329-331.

Charles R. Taylor (2019) "What the Business Roundtable's Statement on the Purpose of a Corporation Means for the Study of Corporate Social Responsibility in Advertising, *International Journal of Advertising*, 38 (8), 1067-1069.

Charles R. Taylor (2019) Editorial: Artificial intelligence, Customized Communications, Privacy, and the General Data Protection Regulation (GDPR), *International Journal of Advertising*, 38 (5), 649-650,

Charles R. Taylor (2019), "Over the Top, Connected, Programmatic and Addressable Television! What Does It All Mean? Definitions and a Call for Research." *International Journal of Advertising*, 38 (3), 343–344

Charles R. Taylor (2019), "The International Journal of Advertising Now Welcomes 'Perspectives' Papers," *International Journal of Advertising*, 38 (2), 171-172,

Charles R. Taylor (2019), Taylor's theorem part II: advice for socially responsible advertisers, *International Journal of Advertising*, 38 (1), 1-4.

Charles R. Taylor (2018), "The New Era of Electronic Word of Mouth (eWOM): 'Be More Chill' Overrules the Critics," *International Journal of Advertising*, 37 (5), 849-851.

Charles R. Taylor (2018), "Global Consumer Culture and Advertising Research," *International Journal of Advertising*, 37 (4), 505-507.

Charles R. Taylor (2018), "Red Alert: On The Need for More Research on Corporate Social Responsibility Appeals in Advertising," *International Journal of Advertising*, 37 (3), 337-339.

Charles R. Taylor (2018), "Generational Research and Advertising to Millennials*, International Journal of Advertising*, 37 (2), 165-167.

Charles R. Taylor (2017), "How to Avoid Marketing Disasters: Back to the Basic Communications Model, but with Some Updates Illustrating the Importance of E-word-of-mouth Research," *International Journal of Advertising*, 36 (4), 515-519.

Charles R. Taylor (2017), "Where Has the Research on Client–agency Relationships gone? The Need for a Deeper Understanding of the Future of Account Management, International Journal of Advertising," 36 (3), 393-395.

Charles R. Taylor (2017), "Native Advertising: The Black Sheep of the Marketing Family," *International Journal of Advertising*, 36 (2), 207-209.

Charles R. Taylor (2017), "The Importance of Research by Cross-national Teams," *International Journal of Advertising*, 36 (1), 1-2

Charles R. Taylor (2016), "On to a New Year," International Journal of Advertising, 35 (6), 907-908.

Charles R. Taylor (2016), "How Much Does an NCAA Basketball Championship Matter: A Call for Research on the Public Relations Impact of Athletic Success," *International Journal of Advertising*, 35 (4), 617-621.

Charles R. Taylor (2016), "Advertising for Luxury and Fashion Goods: An Emerging Area," *International Journal of Advertising*, 35 (3), 389-390.

Charles R. Taylor (2016), "Some Interesting Findings about Super Bowl Advertising," *International Journal of Advertising*, 35 (2), 167-170.

Charles R. Taylor (2015), "The Imminent Return of the Advertising Jingle*," International Journal of Advertising*, 34 (5), 717-719.

Charles R. Taylor (2015), "A Call for More Research on 'Ggreen'or Environmental Advertising," *International Journal of Advertising*, 34 (4), 573-575.

Charles R. Taylor (2015), "On the New Era of Zipping and Zapping: The Need for Research on How Advertisers Deal with an Era of Time-shifted Television Program Viewing on a Variety of Devices," *International Journal of Advertising*, 34 (3), 403-405.

Charles R. Taylor (2015), "Creating Win–win Situations via Advertising: New Developments in

Digital Out-of-home Advertising," *International Journal of Advertising*, 34 (2), 177-180.
Charles R. Taylor (2015), "The International Journal of Advertising in 2015 and Beyond," *International Journal of Advertising*, 34 (1), 1-2.

Charles R. Taylor (2014), "Conducting State-of-the-art Cross-cultural Research," *International Journal of Advertising*, 33 (4), 627-631.
Charles R. Taylor (2014), "Should Tax Deductibility for Advertising be Eliminated? The Research Evidence says No," *International Journal of Advertising*, 33 (2),197-202.

Charles R. Taylor (2014), "Corporate Social Responsibility and Advertising: Does it Extend to Taking Stances on Social Issues?" *International Journal of Advertising*, 33 (1), 11-15.

Charles R. Taylor (2013), "Customised Communications: Relevance vs Privacy in Targeted Messaging," *International Journal of Advertising*, 32 (4), 483-485.

Charles R. Taylor (2013), "On the Economic Effects of Advertising – Evidence that Advertising = Information,". *International Journal of Advertising,* 32 (3), 339-342.

Charles R. Taylor (2013), "The Advertising Literature and the Role of the *International Journal of Advertising*," *International Journal of Advertising,* 32 (2)*, 179-182.*

Charles R. Taylor (2013), "Hot Topics in Advertising Research," *International Journal of Advertising,* 32 (1), 7-12.

Charles R. Taylor (2012), "Back to the Future: Some Topics We Should Not Forget About in Advertising research," *International Journal of Advertising*, 31(4), 699-702.

Charles R. Taylor (2012), "The London Olympics 2012: What Advertisers Should Watch," *International Journal of Advertising*, 31 (3), 459-464.

Charles R. Taylor (2012), "On Advertising in the BRICs and Other Emerging Markets," *International Journal of Advertising*, 31 (2), 227-230.

Charles R. Taylor (2011) Making Academic Research on Advertising More Managerially Relevant," *International Journal of Advertising,* 30 (5), 739-742.

Charles R. Taylor (2011), "New Directions for Research on Targeting Minority G*roups*," *International Journal of Advertising,* 30 (4), 553-558.

Charles R. Taylor (2011), "On Advertising Research that Makes an I*mpact*," *International Journal of Advertising,* 30 (3), 369-371.

Charles R. Taylor (2011), "On Puffery, Professor Preston, and the Societal Effects of Advertising," *International Journal of Advertising*, 30 (2), 201-204.

Charles R. Taylor (2010), "Campaigning for More Research on Political Advertising," *International Journal of Advertising*, 29 (5), 681-685.

Charles R. Taylor (2010), "Innovation in Traditional Media: Keeping Our 'Eyes On' An Innovative New Measurement System for Out of Home Advertising," *International Journal of Advertising*, 29 (4), 521-525.

Charles R. Taylor (2010) Measuring Return on Investment from Advertising: 'Holy Grail' or Necessary Tool? *International Journal of Advertising*, 29 (3), 345-348.

Charles R. Taylor (2010), "Integrated Marketing Communications in 2010 and Beyond," *International Journal of Advertising*, 29 (2), 161-164.

Charles R. Taylor (2010), "Toward Stronger Theory Development in International Advertising Research," *International Journal of Advertising*, 29 (1), 9-14.

Charles R. Taylor (2009), "Product Placement: A Hot Topic Gets Hotter," *International Journal of Advertising*, 28 (5), 753-756.

Charles R. Taylor (2009), "On the Need for Advertising and Public Policy Research," *International Journal of Advertising*, 28 (4), 601-604.

Charles R. Taylor (2009), "Looking Ahead: The Future of the International Journal of Advertising," *International Journal of Advertising*, 28 (2), 195-197.

**POPULAR BUSINESS PRESS COLUMNS**

Forbes Senior Contributor (Forbes.com) . Available at:
https://www.forbes.com/sites/charlesrtaylor/?sh=2d8f63ac3bef

## REFERENCES

Available on request.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action No. 6:24-cv-01027-TC-ADM** |

**DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(a)(2)**

Defendant City of Salina, Kansas (the "City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville, Chartered, hereby submits its Expert Disclosure Pursuant to Fed. R. Civ. P. 26(a)(2) as follows:

**RETAINED EXPERT**

The City identifies the following retained expert pursuant to Fed. R. Civ. P. 26(a)(2)(B) as follows:

1. Mark White, Esq., AICP, White & Smith, LLC, 200 NE Missouri Road, Suite 200, Lee's Summit, MO 64086, (816) 221-8700. Mr. White is an expert in urban and regional planning, zoning, form-based zoning and New Urbanism, and land use. He is expected to testify pursuant to Fed. R. Civ. P. 26(a)(2)(B) consistently with, and in support of, his opinions and statements as detailed in his expert report submitted herewith and attached as **Exhibit A**. Mr. White's curriculum vitae, a list of his publications in the last 10 years, and a statement of his compensation to be paid for his study, report and testimony are submitted with his report, and also attached as **Exhibit A**. Mr. White has not testified as an expert at trial or by deposition in

the last 4 years. Additionally, research, analysis and other assistance undertaken by Mr. White's colleagues is to be compensated as follows: Tyson Smith - $350/hr.; Sean Scoopmire - $200/hr.; and Justin Wallace and Caitlin Cameron - $150/hr.

In addition to the opinions and statements outlined in the expert report attached as **Exhibit A**, Mr. White may also provide rebuttal testimony to any other matters raised by any expert endorsed by Plaintiffs in the same or related fields of expertise as Mr. White.

Mr. White may offer opinion evidence at trial under Federal Rules of Evidence 702, 703, and/or 705. He may also provide deposition testimony or affidavit testimony concerning the subject maters and opinions expressed by him in deposition, this expert report, supplemental expert reports, and/or affidavits as part of his endorsement and disclosure under Fed. R. Civ. P. 26.

As discovery in this matter is ongoing, and as authorized pursuant to Fed. R. Civ. P. 26(e)(2), the City reserves the right to supplement this disclosure.

Respectfully submitted this 16th day of August, 2024.

*s/ Aaron O. Martin*
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

*s/ Todd G. Messenger*
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

*s/ Amanda C. Jokerst*
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2024, I caused the foregoing **DEFENDANT'S EXPERT DISCLOSURE PURSUANT TO FED. R. CIV. P. 26(A)(2)** to be served on counsel of record for Plaintiffs, by electronic mail as follows:

Jeffrey Shaw
Sam MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: (913) 213-5121; (913) 213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org
*Attorneys for Plaintiffs*

*s/ Amanda C. Jokerst*
Amanda C. Jokerst, Esq.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 2 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*