**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 3 of 16, Pages 1-288**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# ANALYSIS OF SALINA SIGN CODE

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

EXHIBIT A

Contents

*Introduction* 2
*Basis of Opinions* 3
*Statement of Opinions* 3
*Compensation* 20
*Conclusions* 21
*Documents Reviewed* 22
*Exhibits* 30
*Resume and Qualifications* 39

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the “Sign Code”).[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City’s Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code’s maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff’s free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as “mural” or “commercial speech.”

Plaintiff’s Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)(“Complaint”) would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the “heart of the community” – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

## DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):




*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.

- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.

- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
    - ◊ A storefront
    - ◊ Display case
    - ◊ **Public art**
    - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

## URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

## PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer <u>critical</u> benefits to residents, such as improved <u>public safety</u> and <u>well-being</u>" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

---

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.




*Figure 3 Salina Art Center Mural*




*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

**THE SIGN CODE IS NOT VAGUE**

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to …."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

S. Mark White Digitally signed by Mark White Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions) https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs) https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119 https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art) https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2 https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U)
https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024.
https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017.
https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, "Traditional Neighborhood Development-Will the Traffic Work?" American Society of Civil Engineers, (ASCE 1990);

Bookout, "Neotraditional Town Planning: Cars, Pedestrians & Transit," Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, "Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, "Land-Use Mixing and Suburban Mobility," Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

## *DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height*. In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**

*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

**RESUME AND QUALIFICATIONS**

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

**BACKGROUND**

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

## SELECTED CITATIONS

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

## SELECTED EXPERIENCE

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| **Maryland** | Master plan amendment procedures<br>Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance<br>Permit streamlining study | <br><br>2006-2007 |
| **Pulaski County (Little Rock), Arkansas** | Watershed zoning regulations | 2009-2011 |
| **Queen Creek, Arizona** | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| **Raleigh, North Carolina** | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| **Roanoke, Virginia** | Zoning Ordinance with urban design standards | 2002-2004 |
| **San Antonio, Texas** | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| **San Diego, California** | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| **Sparks, Nevada** | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| **St. Petersburg, Florida** | Land Development Regulations | 2002 - 2004 |
| **Spokane Regional Transportation Commission** | Regional concurrency study | 2006-2007 |
| **Suffolk, Virginia** | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| **Summit County, Utah** | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations<br>Housing Element to General Plan | 1992-1994 |
| **Sunnyvale, Texas** | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| **Topeka, Kansas** | Unified Development Code | 2006-2009 |
| **Unified Government of Kansas City-Wyandotte County, Kansas** | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| **Union County, North Carolina** | Adequate public facilities ordinance<br>Litigation defense | 2006-2010 |
| **Washington, DC** | Zoning Regulations Reengineering Study (Office of Zoning)<br>Zoning Best Practices Study (Office of Planning) | 2007-2008 |
| **Whiteside County, Illinois** | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| **Winchester, Virginia** | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard, | :CIVIL ACTION :CASE NO. |
| Plaintiffs, | :6:24-cv-01027-TC-ADM |
| -vs.- | : |
| City of Salina, Kansas, | : |
| Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

say maybe -- I think I've testified in court seven or eight times. Something like that.
Q. And were these all sign cases?
A. No.
Q. How many of them were sign cases?
A. Given my best estimate, I would say maybe something like 12.
Q. And of those, were some on premise and some off premise?
A. Yes.
Q. How many were on premise?
A. I think -- I think at least -- five or six.
Q. Okay. So before we get too much further, I'm sure you're already familiar with this, but I don't know how long it's been since the last time you were deposed. But we just want to point out a couple of rules for the deposition going forward, and we're doing great so far.
There is a court reporter taking down everything that we say. So in order to create a clean record, we need to try to not talk over each other. And notwithstanding the coffee I've had this morning, try not to talk too fast. This way, the court reporter can understand and record everything that we say. So consequently, if I ask you to wait

deep understanding of signage and its -- and its functions.
Q. What is the scope of that expertise?
A. I mean, I -- I think if you looked at -- at my -- at my book, which is probably the -- arguably the most authoritative source on -- on functions of signs, you'd see the scope of it. It's -- it certainly -- it covers marketing and advertising issues, it covers societal issues. It does get into some -- some planning, some planning issues as well. It covers traffic safety.
Q. So with respect to that, did you write all of that material yourself?
A. My memory is I did the first draft of five of the chapters.
Q. Okay. Do you endorse everything in that book and stand by it?
A. I -- I stand by it as of the time it was written. It was written in 2005, and it's possible some conditions have changed since 2005. But I believe it to be accurate at the time it was written.
Q. Well, you cited in your report today for certain propositions.
Do you stand by it with respect to

Charles R Taylor PhD
November 13, 2024

focused on -- and some of it is focused on the marketing focus of signs. And, like, with an IJSW article I was involved with recently, we focused on the impact of signage broadly on stakeholders.

Q. Now, when you talk about regulatory issues, what is the focus with respect to those regulatory issues? What -- what point does your research try to make?

A. You know, essentially with -- with the outdoor studies, the -- the research looked at whether outdoor advertising contains information that provides value to consumers. With some of the on-premise work, we looked at the impact -- we looked at the impact of signage on the businesses. I did one study that had to do with whether lighting signs makes a difference -- makes a difference in the success of a business, like whether they would lose sales or not.

Q. Okay. So the design of individual signs is a component?

A. Yeah. We didn't really look specifically at the design of individual signs in -- in the study I was talking about.

Q. Okay. Have you ever been admitted in a court as an expert in the field of signage?


U.S. Legal Support | www.uslegalsupport.com

Charles R Taylor PhD
November 13, 2024

A. Multiple times, yes.
Q. And did the court designate you as a signage expert or something else?
A. I don't remember for sure, but the cases dealt squarely with signage.
Q. Can you tell me which cases you may have been admitted as an expert in signage?
A. There was the Walker case in Las Vegas. There's one called Borden Park in San Antonio. Two billboard cases in Mississippi. The one billboard case in Myrtle Beach. A signage case in Downers Grove, Illinois. There's others I can't remember right now.
Q. Okay. And in -- okay. Turning back to your expert report, let me just -- now we've got this on a tab, so we're going back to Exhibit B, as I recall.
I wanted to direct your attention to page 5 here. So it's actually page 6 of the PDF, page 5 as they're marked. You have four cases listed here, right? Sorry.
It's the lower -- these four cases. These four cases listed here.
A. Yes.
Q. Okay. And we've already gone over how many


U.S. Legal Support | www.uslegalsupport.com 38

MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Is that how you understand this table?
A. I -- to be honest, I'm not certain, based on -- it could be described in a little bit more detail.
Can we take a look at the footnote?
Q. Certainly.
A. Standard error column -- okay. It is -- that is the column percent. So that's correct.
Q. Okay.
A. Although I will -- I will say I've seen Professor Stutts present this work and say that signage is not in that category of outside person, object, or event based on the reports.
Q. Okay. Let's look at table 7.
So do you recall reading -- looking at this table?
A. It's -- it's been a long time, so I don't recall it very well, but I can take a look at it.
Q. So here we see "outside distraction," right?
A. Yes.
Q. And I can probably zoom out a little bit so you can see this better. Oh, sorry.
Can you see that okay?

in terms of table 8; is that correct?
MR. SHAW: Objection.
THE WITNESS: It's a -- yeah. It's a very broad category you're talking about there.
BY MR. MESSENGER:
Q. Did you see Professor Stutts present this material prior to your first opinion --
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. -- that is cited in this article?
A. Prior to what?
Q. Okay. We'll skip that.
Now, on page -- let's see. Let's get to your book.
Hold on. Let me stop sharing.
A. Is it okay if we take a brief bathroom break?
Q. Absolutely.
Five minutes? Ten minutes?
A. Five minutes is plenty.
Q. Okay. We'll see you in five.
MR. MESSENGER: We'll go off record.
- - -
(Whereupon, a recess was taken from 12:26 p.m. to 12:36 p.m. Eastern, after

codes?
No.
Q. Now, I want to go back to the Stutts article really quick. Let's see.
So now I'm not really interested in what Professor Stutts would say at a conference, as that's not in your report.
Can you just tell me here, again, that -- is outside person, object, and event a major source of distraction compared to the other distractions that Stutts studied in this report?
A. It -- it's one of the highest categories, yes.
Q. And in that -- on the same page, it says that such distractions include signs; is that right?
A. It doesn't specify what type of sign, but it says "signs."
Q. It does say "signs," right?
A. It does, yes.
Q. Okay.
Okay. I want to get into your -- your book a little bit here so we can understand the citations to that in your expert report. I'm going to stop sharing this and I'm going to bring your book up.

traffic safety, the common citizens of Salina?
A. I -- I don't think you need to be an expert in traffic safety to know that that sign wouldn't cause traffic accidents.
Q. So as a layperson, you need no expertise in traffic safety to evaluate traffic safety impacts?
A. I -- I think laypeople can have an opinion as to what would cause them to have an accident and what would not. And I think the weight of the evidence in the academic literature, tons and tons of studies -- less so recently because it's, in my opinion, pretty much settled science that on-premise signs don't cause traffic accidents.
Q. If laypeople opinions on traffic safety are adequate, why do we have all of this scientific research on traffic safety?
A. I never said they were adequate. You're putting words in my mouth.
MR. MESSENGER: Well, can --
Court Reporter, can you read back the testimony with respect to common citizens believing that the sign does not cause traffic safety problems.
- - -
(Whereupon, the stenographer read

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED, d/b/a THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

vs. Civil Action No. 6:24-cv-01027-TC-ADM

CITY OF SALINA, KANSAS,
Defendant.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.



APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

Mr. Samuel G. MacRoberts
Mr. Jeffrey Shaw
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
sam.macroberts@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org



ON BEHALF OF THE DEFENDANT:

Mr. Aaron O. Martin (via Zoom)
Clarke Mize & Linville
129 S. 8th Street
Salina, KS 67402
785-823-6325
aomartin@cml-law.com

Ms. Amanda C. Jokerst (via Zoom)
Fairfield and Woods
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
ajokerst@fwlaw.com

ALSO PRESENT:

Mr. Tim Faulhaber, Zoom technician



INDEX

Certificate------------------------------- 204

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | PAGE |
|---|---|
| MARK WHITE | |
| Direct-Examination by Mr. MacRoberts | 5 |
| Cross-Examination by Ms. Jokerst | 192 |
| Redirect-Examination by Mr. MacRoberts | 198 |


EXHIBITS


| WHITE DEPO EX. NO: | MARKED |
|---|---|
| No 1 Defendant's Expert Disclosure | 5 |
| No 2 Expert Report | 5 |
| No 3 Content-Neutral Sign Codes After Reed and Austin article by White | 5 |
| No 4 Sign Permit Application | 94 |
| No 5 Photo of Mural at the Mill | 94 |
| No 6 Conclusion/Next Steps Bloomberg article | 188 |

Page 45

A. Because I'm testifying as an urban planner and a zoning expert and not as an attorney. The legal principals I assume you will argue through with the counsel in this case.
**Q. Do you think a reasonable person could disagree with the opinions expressed in your report?**
MS. JOKERST: Object to form.
A. I believe it -- I believe in another expert could object to the opinions in this report.
BY MR. MACROBERTS:
**Q. But what about a reasonable person?**
MS. JOKERST: Object to form.
A. I'm not familiar with this reasonable person standard you're talking about.
BY MR. MACROBERTS:
**Q. Have you included references or materials that can undermine your opinions?**
MS. JOKERST: Object to form.
A. I believe there are things in the documents cited that somebody could cite in a way that disputes some of my conclusions and discussion in the report.
BY MR. MACROBERTS:

Page 46

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**
MS. JOKERST: Object to form.
A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.
BY MR. MACROBERTS:
**Q. Did you include any disputed facts or any facts that could undermine your opinion?**
MS. JOKERST: Object --
BY MR. MACROBERTS:
**Q. -- in your report?**
MS. JOKERST: Object to form.
A. Not that I recall.
MR. MACROBERTS: Can we take a five-minute break?
THE WITNESS: Yes. I was going to ask the same thing.
MR. MACROBERTS: Yeah.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. All right. Mark, do you know whether the**

Page 47

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**
MS. JOKERST: Object to form.
A. I am not aware of any.
BY MR. MACROBERTS:
**Q. Do you have any knowledge about why the sign code had been amended at any point?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**
MS. JOKERST: Object to form.
A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.
BY MR. MACROBERTS:
**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

Page 48

**code?**
MS. JOKERST: Object to form.
A. I am not aware that there were or were not studies specific to Salina's sign code.
BY MR. MACROBERTS:
**Q. So one way or the another, you're not aware?**
A. Correct.
MS. JOKERST: Object to form.
THE WITNESS: Sorry, Amanda. Go ahead. Amanda objected.
MR. MACROBERTS: It is noted. I am certain of that.
BY MR. MACROBERTS:
**Q. All right. So for purposes of your report, you used the word mural to mean, quote, an outdoor exhibit painted on a wall that does not fall with the sign code's parameters and that may include art but does not announce, direct attention to or advertise. You meant within. Is that right? Does not fall within the sign code's parameters?**
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. And for reference --**

BY MR. MACROBERTS:
**Q. Yes. You did look at the permit application in this case?**
A. Yes.
**Q. You're aware that the display contains UFOs, burger-esque UFOs. Is that right?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. Why do you say that?**
A. What I saw in the application were hamburgers and condiments.
**Q. Did you look at the color rendition of the to-be-completed mural?**
MS. JOKERST: Object to form.
A. I believe so, but I can't recall specifically that. I know -- I think there was a color rendition and a black and white in the record.
BY MR. MACROBERTS:
**Q. In the complaint that you reviewed in preparation for the report, there was a color rendition of the to-be-completed display? We'll call it a display.**
A. Not specifically to my recollection, but



it wouldn't surprise me if that's in the complaint.
**Q. Well, if you -- I'm not trying to be difficult. But why are you -- if you don't recall, why are you saying you thought it was just hamburgers and not hamburger-esque UFOs?**
A. Well, the pictures I saw in the application and, again, whether they were color or whether they were black and white to me looked like hamburgers.
**Q. Is that your opinion with respect to the picture that is contained in the Verified Amended Complaint?**
A. I can't recall specifically where I called it. I did review the picture that was in the application, and I can't recall if that was black and white or color. But so I don't -- and I don't even know whether that makes a difference or not.
**Q. Would it help you for this line of questioning if we printed off the picture?**
A. Certainly.
MR. MACROBERTS: Okay. Can we go off the record just for a second?
THE REPORTER: Um-hum.



(THEREUPON, a short recess was taken.)
BY MR. MACROBERTS:
**Q. Do you have any empirical evidence in your report that I have missed that supports an opinion that the sign code is content neutral?**
MS. JOKERST: Object to form.
A. Define empirical.
BY MR. MACROBERTS:
**Q. Do you have any -- we'll break it down a little bit. Do you have any studies that you have cited in your report that support the opinion that the sign code is content neutral?**
A. There are documents in the report that I believe would support that conclusion.
**Q. My question is specific to studies, and then we're going to break it down to other things.**
A. Okay.
**Q. So are you -- have you cited any studies in your report that will support the contention that the sign code is content neutral?**
MS. JOKERST: Object to form.
A. I'm not aware of any studies related to the sign code, Salina's sign code at all.
BY MR. MACROBERTS:
**Q. What about any studies that would help**



**support the contention that the Salina sign code is content neutral?**
A. I'm not aware of any like statistical studies that speak to that.
**Q. Are you aware of any studies, statistical or otherwise, that would support the contention that the Salina sign code is content neutral in your report?**
A. I'm not aware of any studies that speak to the existence or absence of content neutrality --
**Q. Have you --**
A. -- in this context.
**Q. I did not mean to interrupt. I'm sorry.**
A. That's okay.
**Q. Did you cite any cases in your report that would support the contention that the Salina sign code is content neutral?**
MS. JOKERST: Object to form.
A. I think so, but I didn't look at the case law for that specific issue.
BY MR. MACROBERTS:
**Q. What legal citations in your report would support the contention that the Salina sign code is content neutral?**

up.
A. Not to my knowledge.
BY MR. MACROBERTS:
**Q. Did the City of Salina ever make that finding when they drafted their sign code?**
MS. JOKERST: Object to form.
A. What finding?
BY MR. MACROBERTS:
**Q. That artistic murals promote the public safety objectives, thereby justifying their exclusion from the sign code?**
MS. JOKERST: Same objection.
A. Not to my knowledge.
BY MR. MACROBERTS:
**Q. On page 21 of your report, you stated that the sign code does not extend its reach to artistic murals. Are you familiar with that statement?**
A. On page 21?
**Q. Yes.**
A. That's not all it says.
**Q. What's that?**
A. That is not all it says.
**Q. Oh, sure, yeah, got it. How about this. The sign code does not extend it's reach to**



**decorative and artistic building elements such as artistic murals as that is not the sign code's mission. Do you see that?**
A. Yes.
**Q. Where in the text of the sign code does it mention artistic murals anywhere?**
A. To my recollection, it doesn't mention artistic murals specifically.
**Q. Is it your opinion that painted displays that you deem a wall sign cannot promote aesthetics or safety?**
A. It's my opinion that signs that constitute wall signs are consistent with the goals of health and safety subject to their management in the sign code if they comply with the metrics in the sign code.
**Q. As you're sitting here, can you define what is art?**
MS. JOKERST: Object to form.
A. I can -- I consider art something that's displayed purely because of its aesthetic interest and cultural significance.
BY MR. MACROBERTS:
**Q. When you say -- I think you said purely because of its aesthetic interest. Is that how**



**you phrased it?**
A. Yes.
**Q. So as you're sitting here, if there is -- if it's -- what do you mean purely aesthetic interest?**
A. In my opinion, it's something where the motivating factor for this is just of something that's just to decorate. It's just an embellishment, something that enhances the interest in a building or a site or an area.
**Q. So when you're talking about art, you're only talking about buildings?**
MS. JOKERST: Object to form.
A. No. Art, obviously, is -- could be a painting or a sculpture that's inside or outside of a building or just sitting on its own.
BY MR. MACROBERTS:
**Q. Music is art?**
MS. JOKERST: Object to form.
A. A lot of music is, yes.
BY MR. MACROBERTS:
**Q. Is it your opinion that if there is -- that it's only the intent of the artist that makes it art?**
A. No, it's whether the function is that or



not. An intent usually feeds into the function that the art provides.
**Q. How do you determine the function of art?**
A. You would look at the context.
**Q. And what about the context matters?**
A. The context would tell you what, if anything, the art points to, whether it's decorative or whether it's designed to attract your attention to a specific thing. And so you'd look at the location, you would look at the specific figures, illustrations and other components of the art.
**Q. What about the context of that green, white and red painting matters to you whether that's art or not?**
MS. JOKERST: Object to form.
A. Well, the contents of the picture that I've shown is that it's a restaurant. It also has text painted on the wall that points specifically to the restaurant. And in your hypothetical earlier, if it's an Italian restaurant or a pizza restaurant, certainly it has a picture of a pizza. I don't think it's a flying saucer pizza, but it is a pizza that somebody's holding that could be something that's sold in that restaurant.

Page 185

**Q. Is it factually possible for public art to announce something?**
MS. JOKERST: Object to form.
A. It could, I suppose.
BY MR. MACROBERTS:
**Q. What is the dictionary definition of a mural?**
MS. JOKERST: Object to form.
A. I don't know specifically without going to a dictionary.
BY MR. MACROBERTS:
**Q. Do you know what the common meaning of a mural is?**
MS. JOKERST: Object to form.
A. I would say the common meaning of a mural is however the dictionary defines it is probably the best resource we have for what a mural is.
BY MR. MACROBERTS:
**Q. Do you understand the common definition to be a painting on a wall?**
A. I can't answer that question without a dictionary in front of me.
**Q. Did you conduct any research or studies to determine the meaning of words in the Salina City Code at the time they were written?**

Page 186

MS. JOKERST: Object to form.
A. I don't know of any studies that relate specifically to the words that Salina used in its specific sign ordinance, no.
BY MR. MACROBERTS:
**Q. Did you conduct any historical research in the meaning of the words in the Salina City Code at the time they were written?**
A. No, I didn't look at historic records or anything like that.
**Q. Do you know if the definition of -- or do you know if the word mural was ever in the Salina City Code?**
A. I'm not aware of whether it was once upon a time or not.
**Q. Do you think the public has a common understanding of what a mural is?**
MS. JOKERST: Object to form.
A. I don't know how I would determine that. I imagine when I -- when you use the word mural, people think of a certain thing. They have an image in their mind of what that is.
BY MR. MACROBERTS:
**Q. And what is that? Is it a painted wall?**
A. I believe a mural would be more than just

Page 187

painting on a wall.
**Q. I don't mean your opinion of it but the public's understanding. Do you have any idea what the public envisions when they think of a mural? Like have you conducted any surveys or looked at surveys among communities?**
A. I haven't looked at surveys of what people think a mural is.
**Q. You had -- you at some point wrote in your report about procedural safeguards. Do you recall that section?**
A. Yes.
**Q. Is it important to follow the timelines that are in the Salina City Code?**
MS. JOKERST: Object to form.
A. It depends.
BY MR. MACROBERTS:
**Q. On what?**
A. First of all, it would be whether the timelines are mandatory or whether they're just guidelines. And secondly, it's often dependent on the complexity of the case. If it's something straightforward, decisions can come quicker. If it's something more complex that requires discussion, it could take longer.

Page 188

**Q. If a timeline is mandatory, is it appropriate in your opinion to not follow it?**
MS. JOKERST: Object to form.
A. In my opinion, no, I think a mandatory, non-binding time limit is something that applicants and cities should both follow.
BY MR. MACROBERTS:
**Q. Is that to protect procedural rights?**
MS. JOKERST: Object to form.
A. That could be one of the reasons.
BY MR. MACROBERTS:
**Q. And substantive rights?**
A. I'm sorry, I didn't --
**Q. And substantive rights?**
A. Oh, substantive rights.
MS. JOKERST: Form.
A. It could be.
**Q. I think we are close to being done. Do you mind if I take a five or ten- minute break just to look through my notes to make sure I don't miss anything?**
A. Certainly.
MR. MACROBERTS: All right.
(THEREUPON, a recess was taken; WHEREUPON, White Deposition Exhibit No 6 was

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville Chartered, hereby submits the following Responses to Plaintiffs' Second Set of Interrogatories:

**OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

3. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

4. Defendant's responses are based on a reasonable and diligent search for information

and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

5. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*6.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

7. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**Second Set of Interrogatories**

1. Please identify the factual basis for the City's belief that "[t]he government interest served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998). Subject to and without waiving this objection, as the request states "factual**

**basis" and does not seek "all facts" Defendant interprets this to mean the material facts and will respond to this request with the material facts.**

**As explained in its prior response to Plaintiffs' first set of interrogatories, the Sign Code regulates all signs, not just the Cozy Sign, and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. As a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics.**

**The City's substantial interests are advanced by regulating signs (including wall signs like the Cozy Sign) because restrictions on the time, place and manner of the display of signs serve to limit the size, number, and location of signs on individual properties and in the larger community. By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions). Further, the character of the environment affects the quality of life and the property values in the City.**

**The facts and opinions set forth in Defendant's retained expert's report also support the factual basis that the Sign Code advances the City's interest in aesthetics, pedestrian and traffic safety, and property values. The City refers Plaintiffs to the Defendant's Expert Disclosure Statement. *See* F.R.C.P. 33(d).**

Respectfully submitted this 3rd day of September 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of September 2024, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** to be by electronic mail to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org;
sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

.
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
.
.
COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.
DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,
taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.
.



APPEARANCES
.
.
ON BEHALF OF THE PLAINTIFFS:
.
Mr. Jeffrey Shaw
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
jeff@kansasjusticeinstitute.org
. . . . . . . . . . . . . .



ON BEHALF OF THE DEFENDANT:
.
Mr. Aaron O. Martin
Clarke Mize & Linville
129 S. 8th Street
Salina, KS 67401
785-823-6325
aomartin@cml-law.com
.
Ms. Amanda C. Jokerst (via Zoom)
Fairfield and Woods
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
ajokerst@fwlaw.com
.
.
ALSO PRESENT:
.
Mr. Tim Faulhaber, Zoom technician
. . . . .



INDEX
.
.
Certificate------------------------------ 133
.
.

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | PAGE |
|---|---|
| DUSTIN HERRS | |
| Direct-Examination by Mr. Shaw | 7 |
| Cross-Examination by Ms. Jokerst | 126 |

.
.

EXHIBITS


| 30(b)(6) DEPOSITION EXHIBIT NO: | MARKED |
|---|---|
| No 1 Sign code | 7 |
| No 2 Downtown Design Guidelines | 7 |
| No 3 E-mail, CITY219 | 7 |
| No 4 E-mail, CITY261-263 | 7 |
| No 5 E-mail, CITY220 | 7 |
| No 6 E-mail, CITY221-222 | 7 |
| No 7 Cozy Inn Sign Analysis | 7 |
| No 8 Sign Permit Application | 7 |
| No 9 Certificate of Compatibility Application | 7 |


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Page 17

that nature, oriented towards interstate traffic and commerce. And the characteristics of those properties are you typically have taller signs, like 50 foot signs, pole signs, maybe a little bit larger signs. You're going to have larger parking lots for off-street parking.

If you contrast that with the C-4 district which is our downtown district, it's going to have different characteristics, different requirements for those characteristics. The downtown area is going to be more pedestrian. It's going to have wider sidewalks. The buildings are going to be shoulder to shoulder where they have common walls in between them that they share. The buildings are going to take up the entire property. The signage, you're not going to typically see pole signs. You're going to see more pedestrian scale pole -- or pedestrian scale signs where you have projection signs and wall signs that are maybe a little bit smaller because you have more of a pedestrian environment.

Residential zoning districts, you may have some institutional type uses. Most residential neighborhoods are houses where people live and dwell and have their families, but there are

Page 18

schools or churches that are not uncommon to have those types of uses in those residential districts. And signage for those properties is going to be a smaller scale. You're going to have shorter ground signs, monument signs that are 32 square feet or less, and the character of those properties is going to be more in line with the residential character that surrounds them versus again like the C-7 where you have a lot of commercial activity, a lot of automobile movement or the downtown where you have a lot of pedestrian activity in a dense urban fabric.

And in the downtown district, you'll also have the requirements for DRB which is downtown review board review, and there are additional design requirements and standards that impact the character and the visual environment of the downtown area.

BY MR. SHAW:

**Q. All right. Is there a way for the city to measure or quantify what is compatible with the character and visual environment of the community?**

MS. JOKERST: Object to scope.

A. When you say quantify, what do you mean in the sense? I'm not understanding the question.

Page 19

BY MR. SHAW:

**Q. All right. Is there a way to objectively determine what is and is not compatible with the character and visual environment of the community?**

A. Well, I think from an objective standpoint in our role in administering the sign code, it becomes an equation of does the proposed signage meet the requirements of that zoning district. Because the zoning district requirements are designed to have the specific character that's intended for that zoning district.

**Q. All right. I'll move on. So for subsection 2 where it says balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages, did I read that correctly?**

A. I believe so. I was getting a drink so I wasn't reading with you, but I think you did.

**Q. All right. What are the public objectives that are referenced in this subsection?**

A. So I'm going to start with -- I will answer that question, but I want to start with the kind of the end of the sentence or end of the statement there where it says allowing adequate

Page 20

avenues for both commercial and non-commercial messages. So the City of Salina has what we would call a content neutral sign code where we have a substitution clause where if you have a commercial sign or a non-commercial sign, commercial message or non-commercial message, it doesn't matter. Like you can literally just swap them out because we don't -- we don't really concern ourselves with the content of those signs.

Now, the objectives and the balance, when we're talking about balance the public and the private objectives, some of the public objectives are making sure that we don't have signs that create a lot of clutter that might be distracting or a lot of clutter where it's difficult to discern messages of the signage because there's so much of it or clutter in the way that it blocks or impairs visibility for motorists or pedestrians along the street front. We also want to make sure that we don't have distractive signs, signs that are flashing or blinking or maybe are so large that they draw our attention longer than they should or they're illegible, you can't read them and so it draws our attention longer than it should and, therefore, creating potential traffic

Page 25

some examples.
Q. Okay.
A. Not all inclusive, but those are some of the ideas.
Q. Can a painted wall sign be unsecured?
MS. JOKERST: Object to scope.
A. Probably not.
BY MR. SHAW:
Q. Does the city have any records of the number of accidents caused by unsecured signs?
MS. JOKERST: Object to scope.
A. I don't know.
BY MR. SHAW:
Q. Can a painted wall sign be less secure than a painted mural?
MS. JOKERST: I'll object to scope.
A. No.
BY MR. SHAW:
Q. Okay. How does the city define the term clutter as used in this subsection?
MS. JOKERST: Object to scope.
BY MR. SHAW:
Q. Let me rephrase it then. What is a cluttered sign?
MS. JOKERST: I'll object to form of the

Page 26

question on that one.
A. So the statement of this particular provision is unsecured clutter distracting and/or illegal -- or illegible signage. And so clutter typically is not a single sign. Clutter is having multiple signs and having many of them to the point where it becomes distracting or blocks vision.
BY MR. SHAW:
Q. Is the city aware of any facts that cluttered signs are a danger to motorist s, pedestrians or property?
A. I'm aware that traffic safety is a concern when it comes to regulating signage and that clutter can play into that because signs are specifically by their nature and what they are designed to pull your eye or attract your eye. They wouldn't function if they didn't. And by having -- the more signs you have, the more your eye is pulled away from either driving or walking and potentially creating a safety hazard.
Q. Is the city aware of any traffic accidents that have been caused in the City of Salina by cluttered signage?
MS. JOKERST: Object to scope.

Page 27

A. I don't know.
BY MR. SHAW:
Q. How does the city determine the number of signs that constitute clutter?
A. So each zoning district has a requirement on number of signs, how big the signs can be and where they can be located. And those requirements are designed to limit clutter so we don't have accidents.
Q. Is the city aware of any published studies on traffic safety that support the numbers that are in the code of what constitutes clutter?
MS. JOKERST: Object to scope.
A. I don't know. Sorry. I was prepared to answer the questions that were in the topics.
BY MR. SHAW:
Q. Okay. I'm just trying to understand what the city's purpose as laid out in the code is.
Does the -- how does the city determine what constitutes a distracting sign?
A. So what we do is we apply the code from each zoning district. So each zoning district has a number of signs that are allowed, the size of signs that are allowed, the location of any freestanding signs, what limitation there might be

Page 28

on location as well as height. And those district regulations are designed to reduce any kind of distraction that there might be. There's also prohibitions on flashing signs or blinking signs or strobing, things of that nature, that might be distracting. So the code itself is designed to reduce distraction as much as possible.
Q. Does the city have -- is the city aware of any facts showing that distracting signs are a danger to motorist, pedestrians or property?
MS. JOKERST: Object to scope.
A. I don't know.
BY MR. SHAW:
Q. Is the city aware of any accidents that have been caused by distracting signs in the City of Salina?
MS. JOKERST: Object to scope.
A. I don't know.
BY MR. SHAW:
Q. How does the city determine what is an illegible sign?
A. So if a sign is faded where it requires additional staring at it, looking at it to discern the sign or if it's like ripped or tattered or if it's -- if it's written in a way where -- it's

establishes a new precedent, it could establish a new precedent that causes injuries in other locations just by virtue of changing laws if it set a precedent.
BY MR. SHAW:
**Q. I'm not sure I'm following you. How does it setting a precedent cause property damage elsewhere?**
A. Sure. So we -- we regulate sign codes in the aggregate. So we don't just regulate Cozy Inn. Like that's not the only -- our only concern. And if we were to say that -- change the regulations to where additional signage, additional clutter, larger signage is allowed, then perhaps that could create a situation where there's other distractions, other clutter, other accidents in other locations by virtue of treating Cozy different and setting a different precedent.
**Q. Can murals that do not meet the definition of sign also cause distraction?**
MS. JOKERST: Object to scope.
A. I don't know. The reason I don't know is because if they don't meet the definition of a sign, they're not announcing or proclaiming or making any kind of statements or declarations.



They're not directing your attention to anything or pointing towards other things. They're not advertising businesses, products, encouraging commerce, so they don't have the same function and, therefore, they don't -- they don't behave the same way.
BY MR. SHAW:
**Q. I understand that they -- the city believes they are different from a painted wall sign. I guess what I'm asking, though, is why is a painted wall sign considered more distracting than a mural by the city?**
A. Because by virtue of their nature, they have writings, pictorial references, emblems and symbols that are designed to announce, direct attention to and advertise. And so their nature is different.
**Q. Why is that nature more distracting?**
A. I mean signs are designed to catch your attention, they're designed to catch your eye. They don't function if they don't.
**Q. Are murals designed to attract attention?**
MS. JOKERST: Object to form and to scope.
A. Are they designed to do what, direct --



BY MR. SHAW:
**Q. Attract attention?**
A. Attract attention? I can't tell you the intention of each individual artist and what they intend.
**Q. Can the city determine the intention of any business that wants to put up a sign?**
MS. JOKERST: Object to scope.
A. We can determine that a sign is a sign by its character and elements.
BY MR. SHAW:
**Q. What do you mean by its character and elements?**
A. Does it have writings or pictorial images, representations, emblems, symbols that announce, direct attention to or advertise.
**Q. So by reviewing the potential sign for those elements being contained within it, that is how the city can determine if it is a sign?**
A. Yes.
MS. JOKERST: Object to form. Sorry. I'm trying to follow your question and I'm not trying to interrupt.
BY MR. SHAW:
**Q. All right. I'll try to rephrase this.**



**Does the city determine that a sign or a potential sign is, in fact, a sign by reviewing its content for elements that announce, direct attention to or advertise?**
MS. JOKERST: Object to form.
A. We determine whether or not a display is a sign by looking at the writings, the pictorial representations, the emblem, symbols and whether or not those work together to announce anything or make any proclamations, if they are identifying anything, if they're pointing towards anything or directing to anything or if they're advertising any products or services or highlight any brands or encouraging commerce of some kind.
BY MR. SHAW:
**Q. Okay. So in subsection 5 here, apart from the potential for distraction or for setting a city-wide precedent, is there any other way that a painted wall sign can cause property damage?**
A. Well, I think it could impact the aesthetic appearance. So if you had -- for instance, if you're in a residential district and you had somebody that wanted to put up a giant billboard that's a painted sign in between House A and House B, it could impact the aesthetic and the

Page 45

character of that neighborhood. It could also impact property values. So there are examples of painted signs that could have negative impacts.
**Q. Okay. But so section 5 here, subsection 5 here, does the property damage that is discussed include aesthetic harms?**
A. Okay. Okay. I understand your question better now. You could also have multiple signs, I guess, that could create litter and clutter if you had a lot of painted signs. So I think -- I think it's -- I don't know that whether it's a painted sign or a non-painted sign it makes much of a difference according to our sign code. It's about the time, place and manner, where the signs, how many signs are there, how large are the signs, how tall are the signs.
**Q. Okay. But subsection 5 here, is that dealing with the aesthetics of signs?**
A. No. This is property damage, personal injury.
**Q. Okay. I guess at least I'll explain what I'm thinking when I read this.**
A. Okay.
**Q. When I think, okay, an improperly constructed sign that could cause property damage**

Page 46

**or personal injury or litter, I'm thinking like a pole sign falls down on someone or something like that. Is -- and maybe I'm just reading this wrong.**
A. No, no, that would be correct.
**Q. Okay. So I guess what I'm getting at is can a painted wall sign cause that kind of property damage?**
A. Probably not.
**Q. Okay. And could it cause that kind of personal injury?**
A. I doubt it.
**Q. Okay. And could it cause litter?**
A. If it's not well-maintained and starts flacking off.
**Q. It's like paint chips you mean?**
A. Um-hum.
**Q. Would that be true just of any paint? If you just had a white wall, if it's not maintained well, it could start flaking?**
A. Sure.
**Q. Okay.**
MS. JOKERST: Hey, Jeff, can we take a brief break for restroom?
MR. SHAW: Yeah. Five minutes?

Page 47

MS. JOKERST: Yep, that works.
MR. SHAW: So back at 10:30?
MS. JOKERST: Yes. 10:31?
MR. SHAW: Sure.
(THEREUPON, a recess was taken.)
BY MR. SHAW:
**Q. Is the city aware of any facts showing that the painting on the side of The Cozy Inn was improperly constructed?**
A. No.
**Q. Is the city aware of any facts that the -- that would show the painting on the side of The Cozy Inn is poorly maintained?**
A. No.
**Q. Okay. So in subsection 6, you see where it says protect property values, the local economy and quality of life by preserving and enhancing the appearance of the streetscape?**
A. Yes.
**Q. Is the city aware of any facts that the sign code has enhanced property values?**
A. I think it protects property values. And an example of that would be one I've already kind of presented where if you had a residential neighborhood and there was a empty lot between two

Page 48

houses and somebody came in and put a giant billboard might impact the property values or the desire for people to want to live in that neighborhood.
In the downtown district where we have specific design guidelines for signs, there is a higher standard of development. And there has been in the last ten years transformative investment that's taken place in the millions if not hundreds of millions, kind of transformative investment. And part of those improvements, certainly anything that's on the exterior, front facade or signage gets reviewed by the DRB to make sure that the design fits within the design guidelines of the DRB and is of a certain character and quality that ensures that the property values in the downtown are kept up and that the economy in the downtown is strong because it becomes a desirable area with a perceived quality of life that people enjoy and it has an attractive streetscape appearance because of that.
**Q. Has the city done any sort of studies of property values within the city and how the sign code has impacted those property values?**
MS. JOKERST: Object to scope.

Page 49

A. I don't know.
BY MR. SHAW:
**Q. Okay. And is the city aware of any facts showing that the sign code has protected the local economy?**
A. Have there been any studies that show that the sign code protects the local economy? Is that what you said? Did I understand that?
**Q. I think what I said was is the city aware of any facts that show that the sign code has protect the local economy. So a study would be an example of that.**
A. Okay.
MS. JOKERST: Well, I'll object to form on that. If we're talking about facts, that's within scope. If we're talking about studies, then I'll object out of scope. So can we get a question on?
BY MR. SHAW:
**Q. My question was is the city aware of facts showing that the sign code protects the local economy?**
A. Okay. If I'm understanding the question correctly, I think this is an example, that the downtown within the last, you know, five, ten

Page 50

years has had substantial growth and that the property values in the downtown area have gone up substantially because of it.
**Q. Is the city aware of any facts that that show that that growth in the downtown was caused by the sign code?**
MS. JOKERST: Object to scope.
A. It's probably a contributing factor. I don't know if it's directly a cause and -- causation or cause and effect.
BY MR. SHAW:
**Q. Subsection 6 talks about protecting the quality of life. How does the city measure quality of life?**
MS. JOKERST: Object to scope.
A. Well, I think if you look at the overarching theme of the comprehensive plan, the overarching theme is to improve the quality of life. That is the No. 1 public goal I would say that encompasses everything that's in there, because we want to improve the quality of our community for its citizens and for its visitors. And so I think you drill down from there where the comprehensive plan sets out the ideals of having an aesthetic community, of having a safe

Page 51

community. And so then you have policies such as these that are in this purpose statement that promote the public health, safety and welfare, and that includes having an attractive and enhanced visual streetscape which is what we're talking about in No. 6 here.
BY MR. SHAW:
**Q. So you see where it says both preserving and enhancing the appearance of the streetscape?**
A. I do.
**Q. What is the difference between preserving the streetscape and enhancing the streetscape?**
MS. JOKERST: Object to scope.
A. So preserving the appearance of the streetscape is not endangering the current visual aesthetic by cluttering it up with excessive signage or signage that maybe is too large or out of character for the property. And enhancing the appearance of the streetscape is making sure that all new proposed signage meets the requirements of the zoning district in which the sign is being proposed.
BY MR. SHAW:
**Q. Apart from the city's belief that the painting on the side of the Cozy isn't in**

Page 52

**compliance with the code, is the city aware of any facts showing that the painting at The Cozy has harmed property values?**
A. No. Neither have we done that research.
**Q. Apart from the city's belief that the painting at The Cozy is not in compliance with the code, is the city aware of any facts showing that the painting at The Cozy has harmed the local economy?**
MS. JOKERST: I'll object to scope there.
A. No, and we have not researched that, either.
BY MR. SHAW:
**Q. Okay. And same question. Is the city aware of any facts apart from the fact that the painting at The Cozy the city doesn't believe is in compliance with the code that that painting has harmed the quality of life in the city?**
MS. JOKERST: I'll object to scope.
A. I would say that it potentially does harm the quality of life by virtue of the fact that it's not adhering to the requirements of the downtown area. So the C-4 district and the BID --
BY MR. SHAW:
**Q. Okay. But apart from the city's position**

Page 61

of the interests of Section 42-500 and one of the purpose is to protect the aesthetic appearance of the city, both natural and built-in environment for it's citizens and visitors. One of the ways we do that is each zoning district has its own sign code requirements that limit the number of signs, the size of signs, the location of signs, how tall the signs can be to establish a certain visual character within that zoning district and protect the aesthetic appearance of that district through those regulations.
**Q. But what facts show that regulating signs like The Cozy sign enhances aesthetics?**
A. It's one of the desires of the community set forth in the comprehensive plan.
**Q. So are there any facts that the city relies on in stating that regulating these signs enhances aesthetics apart from the comprehensive plan?**
A. Are you asking if there are other reasons other than the comprehensive plan that having aesthetic standards is a good thing or --
**Q. I'm asking what facts the city contends show that regulating signs like The Cozy sign enhances aesthetics?**

Page 62

A. So we regulate signs in the aggregate across the entire community. And if we didn't, there would be a potential that you could have a lot more signs producing sign clutter which could enhance the aesthetic of the community. You can have signs that are very large and possibly distracting which could impact the aesthetics of the community.
**Q. Sorry. Let me stop you. I'm not asking about the sign code as a whole right now --**
A. Sure.
**Q. -- and how that may or may not enhances aesthetics. What I'm getting at is this. Interrogatory 4 here --**
A. Yes.
**Q. -- specifically claims that the interests served by regulating the specific types of signs like The Cozy sign include aesthetics. And so I'm asking what facts support that contention that regulating signs like The Cozy sign enhances aesthetics?**
A. Well, it says the sign code regulates all signs, and so that's what I was answering to. I guess I'm still not -- I'm sorry.
**Q. Right now, I'm focusing here on the last**

Page 63

**sentence --**
A. Okay.
**Q. -- that says the government interests served by regulating signs like The Cozy sign --**
A. Yeah.
**Q. -- include aesthetics, pedestrian and traffic safety and property values?**
A. Right.
**Q. So I'm asking not about the code as a whole but about that very specific claim by the city that its interests are served in regulating signs like The Cozy sign because it enhances aesthetics?**
A. Okay.
**Q. Are there any facts that you're aware of that support that contention?**
MS. JOKERST: Object to form and scope. Mr. Shaw, if you'd like, I think that you misstated what's in there.
BY MR. SHAW:
**Q. All right. Does this read, the last sentence there --**
A. Okay.
**Q. -- the government interests served by regulating signs like The Cozy sign include**

Page 64

**aesthetics?**
A. Yes.
**Q. What facts is the city contending show that regulating signs like The Cozy sign enhances aesthetics?**
A. Well, if you don't regulate the number of signs and you don't regulate the size of signs and you don't regulate where they're located, it could change the aesthetic of any zoning category, any zoning district.
**Q. The code doesn't prevent changing aesthetics. Is that correct?**
MS. JOKERST: Object to scope.
A. I don't know what you mean by changing aesthetic.
BY MR. SHAW:
**Q. I guess my question was about facts showing that regulating signs like The Cozy sign enhances aesthetics.**
A. Okay.
**Q. But you answered about changing aesthetics, and that's not the same thing as enhances aesthetics. So my question is what facts does the government contend supports its allegation here that regulating signs like The**

Page 69

designed to bring out the aesthetic that is considered to be an enhanced aesthetic.
BY MR. SHAW:
**Q. But if they disagree with the assessment in that zoning district of what is the desired aesthetic --**
A. Sure.
**Q. -- is there any factual basis to say they are wrong?**
MS. JOKERST: Object to scope.
A. I mean they could change the aesthetic -- or what is considered to be the appropriate aesthetic and character for the zoning district by -- through a text amendment with the city commission if they disagreed and could change what the aesthetic standard is.
BY MR. SHAW:
**Q. I mean I understand if what you're saying is they could go to the city commission and ask for a change?**
A. Right. And it's always possible to just change the requirements or the desired aesthetic. But the code is designed to bring out the acquired aesthetic.
**Q. All right. I guess what I'm getting at**

Page 70

**is there any objective right answer of what the correct aesthetic for any given district should be?**
MS. JOKERST: Object to scope.
A. Like are you asking if the governing body that adopted the regulations that are bringing out the aesthetic that they desired if they were right objectively?
BY MR. SHAW:
**Q. I guess what I'm saying is, is there any reason to believe that a member of the public would be factually incorrect to disagree with the assessment of the governing body in what the governing body determines to be the appropriate aesthetic for a district?**
MS. JOKERST: Object to form and scope.
A. They could -- I mean if they disagreed with the city commission's idea of what an enhanced aesthetic was and wanted to change the regulations, they can make their case certainly, and it could be changed if they were found to be more objectively correct than the city commission.
BY MR. SHAW:
**Q. So if the city commission changed its mind on what is aesthetically pleasing in a given**

Page 71

**district, is there any reason to believe that that change would be factually incorrect?**
MS. JOKERST: Object to form and scope.
A. That's very similar to earlier when you asked me if I think what is -- well, I don't remember the exact question. But I think it's -- yeah, that's something I couldn't answer.
BY MR. SHAW:
**Q. Okay. What facts does the government contend show that regulating signs like The Cozy sign enhances pedestrian safety?**
A. So if you have -- the idea is that the sign regulations are designed to, again, for each district limit the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter. We don't want a lot of sign clutter because that can become distracting. It could impair the visual sight lines for motor vehicles as well as pedestrians. Sign sizes, we want to limit them so they don't become a distraction. We don't want signs that hold the eye longer than they should. We want to make sure that signs are effective. Again, that comes down to clutter where if you have too many signs, it becomes --

Page 72

**Q. I don't want to interrupt you, but is the city aware of any factual data showing its regulating the specific type of signs that The Cozy Inn has enhances pedestrian safety?**
MS. JOKERST: Object to scope.
A. You're asking if The Cozy Inn enhances traffic safety? Is that what you said?
BY MR. SHAW:
**Q. No. I'm asking is the city aware of any like factual data showing that regulating this type of sign enhances pedestrian safety?**
MS. JOKERST: Object to scope.
A. I don't know.
BY MR. SHAW:
**Q. Is the city aware of any -- let me rephrase. What facts does the city contend support the allegation that regulating signs like The Cozy sign enhances traffic safety?**
A. So our regulations, again, are designed to limit the number of signs, the location of signs, the size of signs so that businesses have opportunities or property owners, if they are not even businesses, have opportunities to have signs that give them opportunities to display and post those while at the same time limiting the number

Page 73

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --
**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**
MS. JOKERST: Object to scope.
A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.
BY MR. SHAW:
**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

Page 74

**fact, enhanced traffic safety?**
MS. JOKERST: Object to scope.
A. Yeah, I don't -- I don't know.
BY MR. SHAW:
**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**
MS. JOKERST: Object to scope.
A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.
BY MR. SHAW:
**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**
MS. JOKERST: Object to scope.
A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

Page 75

after picture, like this is what the property values used to be. Here's what they are. I can tell you in the downtown area where we have had a lot of redevelopment that property values have gone up. We can certainly -- we could do a study as to what property values were five, ten years ago and what they are now. That exercise has not been completed but we could do that.
BY MR. SHAW:
**Q. Okay.**
A. And I'm sure it would show property values have gone up.
**Q. But the sign code in the business -- or in the downtown area, that was in effect before this increase in property value, correct?**
MS. JOKERST: Object to scope.
A. So the sign code in the downtown business -- or downtown Business Improvement District, you're asking if they predate the downtown or --
BY MR. SHAW:
**Q. You mentioned how in the past I think you said ten years or so the downtown has seen a lot of development, correct?**
A. Yes. Absolutely, yes.
**Q. And so what I'm asking is the sign code,**

Page 76

**though, long predates that boom in development. Is that correct?**
MS. JOKERST: Object to scope.
A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.
BY MR. SHAW:
**Q. Okay. Section 42-500, when was that enacted?**
MS. JOKERST: Object to scope.
A. 2017.
BY MR. SHAW:
**Q. Was there a different purpose section in effect before 2017?**
MS. JOKERST: Object to scope.
A. I don't know. I didn't research that.
BY MR. SHAW:
**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**
MS. JOKERST: Object to scope.
A. No.
BY MR. SHAW:
**Q. Is the city aware of any facts that would**

Page 77

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**
MS. JOKERST: Object to scope.
A. Any specific studies or like...
BY MR. SHAW:
**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**
MS. JOKERST: Object to scope.
A. No.
BY MR. SHAW:
**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**
MS. JOKERST: Object to scope.
A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.
BY MR. SHAW:
**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

Page 78

**traffic safety?**
MS. JOKERST: Object to scope.
A. I didn't research that in preparation.
BY MR. SHAW:
**Q. Okay. And same question there for is the government aware of any facts showing that painted wall signs have a more detrimental affect on property values than paint murals?**
MS. JOKERST: Object to scope.
A. Yeah, I wasn't aware to research that particular topic, so I haven't prepared for that.
BY MR. SHAW:
**Q. All right. So we're mainly talking about the sign code here, Section 42-500 and subsequent sections here. I want to pivot now to the Business Improvement District regulations, so that's Section 2 -- I think like 201 of the city code?**
A. I don't have that one.
**Q. You don't have it?**
A. No, I don't.
**Q. Oh, okay. So --**
A. Which -- I guess where are we at because like I'm trying to figure out --
**Q. I'm talking about the BID code section**

Page 79

**now.**
A. Yeah.
**Q. So that would be in Exhibit 1 --**
A. We're still on 40, on Exhibit 40 or no.
**Q. Well, I'm pivoting now.**
A. Okay. I'll just listen. I'm just not following you yet.
**Q. So the BID code process, you're familiar with that, right?**
A. The process?
**Q. Yes.**
A. Yes.
**Q. What is the purpose of the Business Improvement District's review process?**
MS. JOKERST: Object to scope.
A. Do you have like an exhibit for that that I can --
BY MR. SHAW:
**Q. So if you go to Exhibit 1 at the very front --**
A. Put this -- put this one away then?
**Q. Yeah. That way it's just in order.**
A. Okay. You said it was Exhibit 1, Jeff?
**Q. Yeah, so the very front. So the Business Improvement District's review process, is that**

Page 80

**created by city code Section 2-200 through 2-211?**
MS. JOKERST: Object to scope.
A. Which topic are we on on the list?
BY MR. SHAW:
**Q. This would be falling under -- let me bring up my topics list. It's Topic 1, second bullet point, the facts supporting the government's contention that the application of the mural side code regime promotes the following claimed government interests. Do you see that?**
A. Yeah.
**Q. And do you see in the definition section up above where it says mural sign code regime means Salina's written code, Salina's unwritten policies and practices, Salina's sign permit requirement, Salina's downtown Salina's Business Improvement District review process, the Certificate of Compatibility requirement and its concomitant enforcement penalties?**
A. Okay.
**Q. So --**
MR. SHAW: Yes.
MS. JOKERST: Jeff, can we take a break and we'll go off the record? Dustin can leave, but we can have a conference here.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE OPINIONS OF ATTORNEY MARK WHITE**

Defendant City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, hereby submits its Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White and states as follows:

## I. Introduction

The crux of this case is (1) whether the text of Salina Code Chapter 42 Article X ("Sign Code") is content-neutral, specifically as it relates to the definition of "sign" (codified at Salina Code § 42-764) upon which the applicability of the Sign Code relies, and (2) whether the Sign Code passes intermediate scrutiny. As Plaintiffs argue in their Motion to Strike or Exclude Opinions of Attorney Mark White [Dkt. No. 97] ("Plaintiffs' Motion"), whether the Sign Code is content-neutral is a legal matter for the Court to decide. *Austin v. Reagan*, 596 U.S. 61, 64, 76 (2022); Pls.' Mot. at 3-4. Indeed, the United States Supreme Court determined—without evidence

other than its text–that a substantially similar sign regulation was content-neutral in the case of *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 (2022). Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 1469. While it is technically a legal determination, the phrase "content-neutral" is also shorthand for the existence of a specific set of facts—that is, whether the regulation is justified without reference to the regulated speech. That factual justification is what Mr. White's expert opinion addresses.

The Court also decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon v. Norman*, 981 F.3d 1141, 1148-49 (10th Cir. 2020). The intermediate scrutiny test requires a regulation be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quotation omitted). Whether a governmental interest is substantial "is a legal question for this Court to decide . . . ." *Harmon*, 981 F.3d at 1148-49. The United States Supreme Court and Tenth Circuit precedent direct that as a matter of law the governmental interests provided by the City in regulating signs–community aesthetics, traffic safety and property values–are substantial government interests. *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 795, 805-06 (1984); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023).

Whether a regulation is "narrowly tailored to serve a significant governmental interest" is also a matter of law determined by the Court and is satisfied "so long as the . . . regulation promotes

a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799-800. To satisfy the intermediate standard of review, the Supreme Court and Tenth Circuit do not require the City to set forth evidence supporting a finding that the Sign Code serves its stated, substantial government interests. *See Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 508-10 (1981) (Court did not weigh evidence and deferred to the city's "sufficient basis for believing that billboards are traffic hazards and are unattractive"); *Taxpayers for Vincent,* 466 U.S. at 805-808; *StreetMediaGroup, LLC v. Stockinger*, 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021), aff'd, 79 F.4th 1243 (10th Cir. 2023) (Without hearing evidence held "the general assembly finds and declares the act 'necessary to further . . . substantial state interests," and "[p]reventing crashes caused by distracted drivers is a substantial state interest, and the state would less effectively prevent these crashes if it took down signs after they caused motor accidents instead of establishing a prophylactic permitting scheme.").

The Court does not need any evidence to find that the Sign Code is content-neutral and that it passes the intermediate scrutiny test by, among other things, advancing the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values. That is, *per force*, these substantial interests would be "achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Plaintiffs have alleged that under a commercial speech case related to oral speech (door-to-door solicitation), *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020), the City is required to set forth evidence that its Sign Code advances its substantial government purposes. *Aptive* does not control here. It was decided before a more recent Tenth Circuit sign case, *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th

Cir. 2023). *Aptive*, 959 F.3d at 966. Notably, *Stockinger* did not cite to or address *Aptive*. Further, the United States Supreme Court has found that signs "pose distinctive problems" compared to oral speech, because they "take up space and may obstruct views . . . and pose other problems . . . ." *Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).

Even though it is not required to submit such evidence, the City can support such a finding with evidence. In the unlikely event that this Court determines evidence is necessary, the City wanted to reserve its right to make such a showing. Accordingly, in addition to producing record evidence showing the Sign Code serves its stated evidence, the City disclosed Mark White, an urban planning expert, who will provide opinion testimony analyzing how the Sign Code serves the City's substantial interests. If the presentation of evidence regarding the advancement of governmental interests is required, then Mr. White's expert opinion does not usurp the Court's determinations as a matter of law. Rather, Mr. White's testimony would assist the trier of fact in evaluating whether the Sign Code does advance its stated interests, utilizing urban planning and zoning industry standards and metrics.

Moreover, Mr. White's opinions are admissible and satisfy the requirements of F.R.E. 702 because they are helpful, reliable, and are not improper legal conclusions. Mr. White's report addresses the "state of the art" national practice respecting regulation of signs and "decorative building features such as murals," and conducts a comparison of model and sample codes. Pls.' Mot. Ex. B at 12. Precedent establishes that such references aid the trier of fact. Indeed, the *Austin* court looked to information not unlike that provided by Mr. White in this case, and found that the definition at issue in *Austin* "was materially analogous to the one used in the Federal Highway

Beautification Act and many other state and local codes . . . ." *Austin*, 596 U.S. at 66. Further, the *Austin* Court recognized sign regulation approvingly as a "tradition" dating back more than 150 years and observed that for the past century-and-a-half, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." *Id.* at 65. Finally, Mr. White's opinions expressed in his promotional article are not germane to evaluating the reliability of his testimony. Pls.' Mot. Ex. D. There, he merely offered "pointers for local governments considering a sign code update." *Id.* at 3. Mr. White testified that these pointers are not the exclusive way that a local government can bring its sign code within constitutional limits. Ex. 1 at 193:16-21.

## II. Argument

### *A. Mark White's Opinions are Helpful and Within the Proper Scope of Expert Testimony*

While Mr. White is an urban planner and an attorney, the City proffers Mr. White only as an urban planning and zoning expert. Ex. 1 at 44:24-25; 45:1-4 ("Q: Why is [ ] that you were more interested in the facts? A: Because I'm testifying as an urban planner and a zoning expert and not as an attorney."). Mr. White's testimony is helpful to the trier of fact to understand the technical terms, methodology, and metrics of the Sign Code, the "industry standard" as it relates to sign regulations, how the Sign Code functions in general and as applied to the Cozy Sign, and how the Sign Code serves the governmental interests that are articulated in its purpose statement. Indeed, if the Court finds that evidence must be considered to determine whether the City can satisfy intermediate scrutiny, this is exactly the type of evidence a fact finder must evaluate and weigh to determine whether the Sign Code serves the City's stated governmental interests.

Expert testimony is admissible when the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). An expert witness can "testify in the form of an opinion or inference even if that opinion or inference embraces an ultimate issue to be determined by the trier of fact." *U.S. v. Bedford*, 536 F.3d 1148, 1158 (10th Cir. 2008) (quotations omitted). An expert can "refer to the law in expressing his or her opinion." *Id.* (quotations omitted). Indeed, courts "do not exclude all testimony regarding legal issues." *Specht v. Jenson*, 853 F.2d 805, 809 (10th Cir. 1988).

The narrow line drawn in *Specht* recognized expert testimony is within the proper scope of F.R.E. 702 "if the expert does not attempt to define the legal parameters within which the jury must exercise its fact-finding function." *MCC Management of Naples, Inc. v. International Bancshares Corp.*, 468 Fed.Appx. 816, 821 (10th Cir. 2012). In *MCC Management*, the Tenth Circuit held that a tax attorney "did not overstep this line" when he "discussed the 'common methodology' that tax lawyers use interpreting phrases like the one at issue–'net of any related tax benefits, in respect of the FDIC counterclaim'–and suggested three possible readings: 'narrow,' 'intermediate,' or 'broad.'" *Id.* at 821-822. Certainly, the court recognized that this testimony was helpful where "intricate arrangements and technical tax jargon" was "illuminated" by the expert's "knowledge of industry custom, tax law, and authorities in the field." *Id.* at 822. Even though the expert opined "it was 'reasonable to conclude' that the agreement was drafted in a 'very broad manner' . . . a conclusion touching the heart of [the] dispute," the opinion was "not objectionable because it embraces an ultimate issue to be decided by the trier of fact." *Id.*

Here, Mr. White's opinions focus on the methodology and metrics of the Sign Code, and how the Sign Code functions in general and in this case. Urban planners are concerned with the design and development of cities and communities, by way of comprehensive plans and local land use regulations, including zoning codes and sign regulations. Mr. White's testimony explains from an urban planning perspective, how and why the Sign Code regulates the size, number, shape, and placement of signs in each zoning district, and how those regulations advance the City's substantial interests. Pls.' Mot. Ex. B. Mr. White's report cites case law because urban planners need to know about certain legal principles "when they write and administer sign codes." Ex. 1 at 44:10-23.

*i. Opinion 1. The Sign Code establishes time, place and manner metrics that are not content-based.*

This opinion relates to the methodology and metrics of the Sign Code. Mr. White addresses the "height, size and design" regulations of the Sign Code, explains how such metrics are "state of the art, and generally accepted" in the industry for "controlling sign clutter." Pls.' Mot. Ex. B at 4. He goes on to specifically address proportionality metrics, detailing how the "total sign area is based on the location and structural characteristics of signs, and not their content." *Id*. Mr. White's opinions address how the methodology and metrics of the Sign Code advance its stated purposes using specific data from the Sign Code and facts of this case in the context of urban planning and zoning industry standards. Pls.' Mot. Ex. B at 4, 12-13 ("These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals . . . This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.").

*ii. Opinion 2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.*

Mr. White properly supports this opinion on his expertise in urban planning; it is not a legal conclusion. The case citation in this section does not incorporate legal analysis regarding what constitutes a substantial or compelling interests for First Amendment purposes, it provides case law finding the importance of a comprehensive plan to urban planning and development. Pls.' Mot. Ex. B at 5. As Mr. White testified, when he used the term "substantial and compelling interests" he was "not making a legal conclusion," he was "speaking about how important they are to urban planners when they draft sign codes." Ex. 1 at 103:9-25; 104:1-19.

*iii. Opinion 3 and 4. The Sign Code directly and materially furthers its recited purposes, and the Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.*

Again, Mr. White opines, among other things, that "restrictions on the height, spacing, location, and size of signs" reduces sign clutter and promotes traffic safety and aesthetics. Pls.' Mot. Ex. B at 7. Citing to supportive publications, he opines regarding the importance of proportionality, namely that: (1) "[l]imiting wall sign size keeps the sign form overwhelming a facade and limiting the number of signs prohibits clutter," and (2) proportionality keeps a sign in scale with a building's context. Pls.' Mot. Ex. B at 9-10. This proportionality, derived from the metrics from the Sign Code ("67 percent of the cumulative sign area on a wall") and supporting literature, "protects aesthetics and architectural integrity." *Id.* at 19. He opines that "[s]ign clutter contributes to a decline in traffic safety" (at 7) and "[c]ontrolling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs," which in turn promotes traffic safety. *Id.* at 10. He bases this opinion on his extensive planning experience and professional judgment (at 3), the literature he cites in his report, and the "experience in other communities" (at

13-14). This specialized knowledge leads him to conclude that "[a]s the number of signs increased . . . [t]his can create traffic safety issues, because it then takes motorist vision off the road, [and] lengthens the time it takes for them to scan information . . . ." *Id*. at 10.

*iv. Opinion 5. The Sign Code is not vague.*

Mr. White's opinion regarding the robustness of the Sign Code language is not a legal conclusion. Mr. White's opinion evaluates the Sign Code and its definitions within the context of the urban planning and zoning industry standard to opine that urban planners need not define every single word of a Sign Code to understand its meaning and methodology. In using his urban planning and zoning expertise, he compares the language of the Sign Code to sample codes to show that that the terms and phrases used in the Sign Code are commonplace in urban planning. Pls.' Mot. Ex. B at 16-18.

*v. Opinion 6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.*

Opinion testimony is not objectionable because it touches on the ultimate issue and reasonableness. *See MCC Management*, 468 Fed.Appx. at 822 (tax attorney opined "it was 'reasonable to conclude.'"). Here, Mr. White utilizes his urban planning expertise to assess the applicable metrics where the Cozy Sign is located, opine that the Sign Code permits a generous wall sign allowance "without overwhelming the scale of the building or site" and on that basis opines that such regulations are generally accepted and reasonable. Pls.' Mot. Ex. B at 19.

*vi. Opinion 7. The Sign Code has numerous procedural safeguards.*

Mr. White's opinion addresses the administrative procedures and safeguards utilized by urban planners such as permitting processes, variances, and appeals. Based on his professional

experience, Mr. White opines that flexible case-by-case review, as found in the Sign Code, is a common process. Pls.' Mot. Ex. B at 19. Accordingly, Mr. White's opinions are within the permissible scope of expert witness testimony under F.R.E. 702.

*B. <u>Mr. White's Opinions are Reliable</u>*

F.R.E. 702 requires the expert's opinions to be reliable. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180-81 (10th Cir. 2022). Under the reliability inquiry, courts assess whether the expert testimony is "based on sufficient data, sound methods, and the facts of the case." *Id*. at1181. Here, Mr. White reviews and evaluates the specific text and metrics of the Sign Code, the methodology regarding how the Sign Code functions in general and as applied to the Cozy Sign, comparable sign regulations, and industry-specific publications related to sign regulations and governmental interests.

i. *Opinion 1. The Sign Code establishes time, place and manner metrics that are not content-based.*

Though this opinion was organized differently than the others, as Mr. White pointed out during his deposition, he addressed the opinion throughout the report. Ex. 1 at 62:20-25; 63:1-8. Mr. White opines, based on the specific data from the Sign Code, the "total sign area is based on the location and structural characteristics of signs, and not their content." Pls.' Mot. Ex. B at 4. Mr. White evaluated the metrics of the Sign Code for the C-4 district, noted that the Code "limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage" and applied this methodology to the Cozy Sign to conclude the Cozy Sign was too big and didn't qualify for a permit based on its physical characteristics, not its content. *Id*. He further opined that it is common industry standard to adjust metrics "by zoning districts in

a way that protects the area's character." *Id*. at 10. In acknowledging why the metric adjustments are common in the industry, Mr. White opined that "[s]uburban style signage that is designed for highly trafficked roadway corridors is inappropriate for" the downtown district. *Id*. at 7.

ii. *Opinion 2 and 3. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration, and the Sign Code directly and materially furthers its recited purposes.*

Mr. White's opinions address the "comprehensive purpose statement" set forth in Salina Code § 42-500 (where the City identifies its interests). He specifically identifies substantial and compelling interests from an urban planning and code administration perspective, including Comprehensive Plan implementation, traffic safety, aesthetics, urban design and travel behavior, public health and safety, and compromise. Pls.' Mot. Ex. B at 4 (all of which are reflected in the Sign Code's purpose statement). Mr. White need not identify for the Court which interests are substantial or compelling from a First Amendment perspective. Mr. White's opinion utilizes the metrics of the sign code, compares those to industry specific publications regarding signs and traffic safety and aesthetics, and concludes that the Sign Code does advance the City's stated interests. *Id*. 7-8. *See* discussion *supra* Section II(A)(iii) and *infra* Section II(B)(v).

iii. *Opinion 4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.*

Evaluating and opining on industry custom is within the proper scope of expert testimony. *MCC Management*, 468 Fed.Appx. at 821-22. Here, Mr. White utilizes his specialized knowledge to opine that "Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals." Pls.' Mot. Ex. B at 12. He evaluates the industry custom of wall sign regulations, cites to industry specific

publications, and compares other jurisdictions' sign codes to explain that how the Sign Code regulates signs and not other displays, such as public art (which can "attract people to a place," but "does not direct people to a place") is a common and acceptable urban planning practice. *Id*. at 12, 15-16. This is important from an urban planning perspective because "most sign codes (including model codes) limit the size and number of walls signs" and the City's Sign Code offers flexible regulations that allow wall signs while ensuring the signs do not overwhelm a façade or contribute to sign clutter. *Id*. at 9. The Sign Code does this within a limited scope that does not overextend into the regulation of building embellishment (which includes public art and murals). *Id*. at 15-16. As Mr. White opines, this method effectively regulates "a specific medium of communication, and not a specific type of message." *Id*. at 16.

iv. *Opinion 5. The Sign Code is not vague.*

Here, Mr. White uses the specific facts of the Sign Code (terms and phrases from the actual text), data from dictionary references and sample sign codes (terms and phrases from the text of other sign codes), to support his conclusion that the "terms and phrases are well understood and in common use in sign regulations through the nation and in Kansas." *Id*. at 18. Mr. White then demonstrates how the specific facts of this case fall square within the "well-understood" meaning of such terms and phrases. Pls.' Mot. Ex. B at 16-19. Mr. White then utilizes his specialized knowledge and data from several other sample codes to show how other "sign codes use similar language in their sign definitions" and demonstrates how Salina's Sign Code can be generally understood and applied. *Id*. at 16-19.

v. *Opinion 6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.*

While this section may provide a truncated summary of that data and Mr. White's conclusions, the facts and data are discussed in detail throughout the report. Specifically, Mr. White's opinions address wall sign regulations. Pls' Mot. Ex. B at 9 (citing to "Weinstein, 2000, at 32 and Kelly, 1989, at 6-7."). He analyzes the data in detail, comparing the recommendations in the Kelly publication (a numerical limit on "freestanding signs" and a limit on wall sign area versus the number of wall signs) to the City's metrics (which limit "all signs per business"). *Id.* at 9, n. 7. He opines that the City's approach is flexible and effective because it "allows the business to choose how to allocate its signs within the total sign limit." *Id.* This method not only prevents sign clutter and "protects aesthetics and architectural integrity," but also allows a business to "allocate its signs across the building wall as it sees fit." *Id.* at 19.

Mr. White's report details how it is generally acceptable to regulate signs and not regulate decorative embellishments like murals. *Id.* at 9-14. He cites to publications that support his opinion that "[a]rtist murals," which are "distinct from signs that announce, direct attention to, or advertise," actually "promote public safety objectives." *Id.* at 10-11. He further cites to publications that support his opinion that the Sign Code advances traffic safety as "public art does not create" the same type of "distraction" as signs and that public art can "reduce traffic accidents and collisions with pedestrians." *Id.* at 7.

In fact, Mr. White's opinions regarding "how sign regulations interact with decorative building features such as murals" is based on an examination of "sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where [Mr. White] was the principal consultant on the sign regulations drafts . . . [or] was part of

the consulting team for the Development Code update." *Id*. at 12. Plaintiffs' focus on Mr. White's single promotional article that provided some generalized "pointers" is irrelevant. Pls.' Mot. Ex. D. That is particularly the case as Mr. White referred to several sign codes wherein he was the principal consultant or part of the consulting team to support the expert opinion that Salina's Sign Code "is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals." *Id*. at 12-13.

vi. *Opinion 7. The Sign Code has numerous procedural safeguards.*

Mr. White's opinion specifically details the provisions of the Sign Code that constitute the "procedural safeguards" utilized by urban planners. Pls. Mot. Ex. B at 19-20. He does not specifically address the time limits to issue a permit as he is not attempting to provide a legal conclusion regarding Plaintiffs' prior restraint claim. Rather, his opinion focuses on the "common process" utilized by urban planners in sign code administration that provide flexible and "case-by-case review" in instances where an applicant cannot satisfy the Sign Code requirements or does not agree with how the City administered the Sign Code. *Id*. at 20.

## III. Conclusion

Although the City maintains that its definition of "sign" is rooted in more than 150 years of regulatory tradition and common understanding and that the Sign Code passes intermediate scrutiny as a matter of law–in the event that this Court requires fact-finding with regard to any of the elements of the intermediate scrutiny test, then Mr. White brings the requisite expertise, and his expert opinion with regard to the operation of the Sign Code in the context of sign regulation nationally is reliable, relevant, admissible, and helpful to the trier of fact. The City has met its

burden of establishing the admissibility of Mark White's expert testimony. As such, the City respectfully requests that Plaintiffs' Motion be denied.

Respectfully submitted this 10th day of January 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of January, 2025, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE OPINIONS OF ATTORNEY MARK WHITE** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Aaron O. Martin*
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**<u>INDEX OF EXHIBITS TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE OPINIONS OF ATTORNEY MARK WHITE</u>**

Exhibit 1 – Excerpts from Deposition of Mark White

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

MS. JOKERST: Object to form.
A. I was not citing them as an attorney.
BY MR. MACROBERTS:
**Q. I guess what I mean is your legal training helped you form the basis or helped you prepare the report?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. How did you decide which legal cases to cite in your report?**
A. No. 1, those are cases that are typically in my experience as somebody who writes sign codes, cases like Reed vs. Gilbert and the Austin case that are well known to planners. The principals are well known to planners because they have to -- they have to know about them when they write and administer sign codes. And there was one case that involved just a factual statement about graffiti in Kansas. So and there are factual -- court cases as you know have both statements of fact and legal principals, and I was more interested in the facts of those cases.
**Q. Why is that that you were more interested in the facts?**

A. Because I'm testifying as an urban planner and a zoning expert and not as an attorney. The legal principals I assume you will argue through with the counsel in this case.

**Q. Do you think a reasonable person could disagree with the opinions expressed in your report?**

MS. JOKERST: Object to form.

A. I believe it -- I believe in another expert could object to the opinions in this report.

BY MR. MACROBERTS:

**Q. But what about a reasonable person?**

MS. JOKERST: Object to form.

A. I'm not familiar with this reasonable person standard you're talking about.

BY MR. MACROBERTS:

**Q. Have you included references or materials that can undermine your opinions?**

MS. JOKERST: Object to form.

A. I believe there are things in the documents cited that somebody could cite in a way that disputes some of my conclusions and discussion in the report.

BY MR. MACROBERTS:

parameters of that legal structure.

**Q. In your report, on your opinion section, it seems to me like you list your Statement of Opinions 1 through 7, and then there's a corresponding section later in the report outlining more about your opinions. Is that a fair way of expressing the breakdown of your report?**

A. Yes.

**Q. So on Statement of Opinion 2, the sign code is supported by substantial and compelling interests in the area of urban planning and code administration, you later have a section explaining that opinion?**

A. Yes.

**Q. 2, 3, 4, 5, 6 and 7 opinions, or the opinions listed 2 through 7, have a corresponding section, right?**

A. Yes.

**Q. Why is it that you don't have a corresponding section for opinion 1, that the sign code establishes time, place and manner metrics that are not content-based?**

MS. JOKERST: Object to form.

A. I believe there's statements throughout

the report that get to whether that is content-based or not.

BY MR. MACROBERTS:

**Q. But do you know why there wasn't a section explaining your opinion No. 1 like there was for opinions 2 through 7?**

A. I don't recall why that wasn't organized into a specific section of the report.

**Q. You I think just mentioned that there were some statements about content neutrality within the report. Is that how you said it?**

A. I believe so, yes.

**Q. I'm not trying to trick you. I'm just trying to remember.**

A. Okay.

**Q. It seems like you made three statements about content neutrality in your report, and we'll go through them. The first appears to be on page 3 of your report where it says it is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the sign code. Did I read that correctly?**

A. Is that on page 3?

A. In a court of law it is.

BY MR. MACROBERTS:

**Q. And what about whether something qualifies as a substantial interest? That is also a question of law in a court?**

MS. JOKERST: Object to form.

A. It is a question of law in courts, yes.

BY MR. MACROBERTS:

**Q. So on page 5, is it your opinion that comprehensive plan implementation is both a substantial and compelling interest?**

A. I'm not speaking to the legal conclusion here but as a planner. To me, it is the most -- one of the most important interests in writing any -- any zoning or land development code, including a sign code.

**Q. So when you use the term substantial and compelling interest, you're not talking about the legal test that use the same phraseology?**

MS. JOKERST: Object to form.

A. I'm not making a legal conclusion.

BY MR. MACROBERTS:

**Q. You're using terms, though, that are in case law, right?**

A. Those terms do appear in case law.

**Q. So when you use the term substantial and compelling interests, you're not using those terms the same way that case law does?**

MS. JOKERST: Object to form.

A. I'd say if you had a Venn diagram, there would be some -- there would be some intersection between the two, but that's -- I'm speaking to the importance of those interests to a sign code.

BY MR. MACROBERTS:

**Q. So as you drafted this report, what you may consider a substantial and compelling interest may not be the same thing as a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

A. It may end up being that and that's something that you all and the attorneys in the case will argue. I'm only speaking about how important they are to urban planners when they draft sign codes.

BY MR. MACROBERTS:

**Q. So what may be a substantial and compelling interest to a planner, you would agree may not be a substantial or compelling interest in a legal case?**

MS. JOKERST: Object to form.

**Q. Do you see it's like on the left-hand side vertical in green?**

A. Yes.

**Q. And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?**

A. Yes.

MR. MACROBERTS: I'm sorry. I did not hear it.

THE REPORTER: She said, "And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?"

BY MS. JOKERST:

**Q. Mr. White, are these the -- are the options presented here in your article, do they represent the only way a local government can bring their sign code within constitutional bounds?**

A. No.

**Q. Okay. I want to direct your attention to the report which is that Exhibit 2? Is that what it's marked?**

A. Yes. Yes.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED
d/b/a The Cozy Inn and
STEPHEN HOWARD,

Plaintiffs,

v. Case No. 24-1027-TC-ADM

CITY OF SALINA, KANSAS,

Defendant.

**AMENDED PRETRIAL ORDER**

On November 19 and December 4, 2024, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone. Plaintiffs Cozy Inn, Inc. d/b/a The Cozy Inn and Stephen Howard appeared through counsel Jeffrey Shaw and Samuel G. MacRoberts. Defendant City of Salina, Kansas, appeared through counsel Amanda C. Jokerst, Todd G. Messenger, and Aaron O. Martin. After the court entered the pretrial order (ECF 92), the parties notified the court that the City of Salina amended its BID Code and Design Guidelines, thereby mooting a portion of plaintiffs' claims. On the parties' request to amend the pretrial order to reflect these developments, the court now enters this amended pretrial order to supersede the previous version.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

**1. PRELIMINARY MATTERS.**

**a. Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 2201, 2202, and is not disputed.

**b.** **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by federal law interpreting the First and Fourteenth Amendments.

**2. STIPULATIONS.**

**a.** The following facts are stipulated:[1]

**i.** Cozy Inn, Incorporated d/b/a The Cozy Inn is a Kansas for-profit corporation registered and in good standing with the Secretary of State of Kansas.

**ii.** Steve Howard is the 90% shareholder of Cozy Inn, Incorporated. His daughter, Andrea Windholz, owns the remaining 10%.

**iii.** Cozy Inn, Incorporated owns and operates The Cozy Inn, a restaurant located in Salina, Kansas.

**iv.** Plaintiffs seek to paint a display on the exterior north wall of The Cozy Inn.

**v.** Plaintiffs started painting the display on November 3, 2023.

**vi.** The photos found at Plaintiffs Bates 50, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63 and 64 represent the unfinished display as currently painted on the north wall at The Cozy Inn.

**vii.** The City of Salina, Kansas (the "City") determined the display painted on the north wall of The Cozy Inn is a "sign" as defined by Salina Code § 42-764 and, more specifically, a "wall sign" as defined by Salina Code § 42-781. The City determined the sign was too large to qualify for a sign permit and that the display Plaintiffs intend to be the final display painted on the north wall at The Cozy Inn (Plaintiffs Bates 51) is a "sign" as defined

---

[1] The parties agree to further confer about factual stipulations and the admissibility of certain exhibits for trial after dispositive motions have been decided, as they believe the court's decision on summary judgment may eliminate the need for certain evidence and the parties may be able to further narrow the issues for trial. The parties will confer and file any additional stipulations no later than 2 weeks before trial is scheduled to commence.

by Salina Code § 42-764, and more specifically, a "wall sign" as defined by Salina Code § 42-781.

**viii.** The Cozy Inn is located within the C-4 zoning district and the Salina Downtown Business Improvement District No. 1.

**ix.** On November 6, 2023, the City asked Howard to stop painting the display.

**x.** On December 9, 2024, the Board of City Commissioners of the City of Salina ("Board") adopted Ordinance No. 24-11230, amending Salina Code Sections 2-206 through 2-211, and adding Section 2-212, pertaining to the Design Review Board (collectively, "Amended BID Code").

**xi.** On December 9, 2024, the Board adopted Resolution No. 24-8264, updating the Design Guidelines for Downtown Salina Business Improvement District No. 1 ("Updated Design Guidelines").

**xii.** Salina has determined that the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix), above, "involves only painting or repainting of a building wall" on a side elevation of the Cozy Inn building that is not a "storefront, primary façade, or secondary façade (as defined by the [Updated] Design Guidelines)," and does not "modify the color or finish of any character-defining features (as defined by the [Updated] Design Guidelines)."

**xiii.** Pursuant to the Amended BID Code Section 2-207(b)(4), a Certificate of Compatibility is not required for the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix) above, and consequently DRB review is also not required.

**xiv.** For the purposes of this litigation, the Sign Code, Salina Code § 42-500, *et seq.*, is not affected by the Amended BID Code and the Updated Design Guidelines.

**xv.** In light of the amendments described in paragraphs (x) and (xi) above, the parties agree that the BID Code controversy is moot and therefore the BID Code is no longer at issue.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

**i.** Photos found at Plaintiffs' Bates 50, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 64.

3. **FACTUAL CONTENTIONS.**

**a. Plaintiffs' Factual Contentions.**[2]

Overview

Howard operates The Cozy Inn, a Salina landmark that has served sliders for more than 100 years. It is renowned for its "pungent onion-esque aroma." After observing the vibrant proliferation of murals throughout Salina, Howard commissioned a mural for the side of The Cozy Inn. The mural would feature burger-esque flying saucers attacking The Cozy Inn with blasts of ketchup and mustard and says "Don't Fear the Smell!! The Fun is Inside!!" After reviewing the mural's content, the City came to the conclusion that it pertained to the goods for sale at The Cozy Inn and was considered a regulated sign because it "announced, directed attention to, or advertised" The Cozy Inn. City officials ordered Howard to halt work on the mural and instructed him to file an application for a sign permit. When Howard filed the application, the City refused to either grant or deny the application but instead placed the application "on-hold." Plaintiffs allege violations of the Free Speech Clause of the First Amendment and the Void-for-Vagueness Doctrine of the Fourteenth Amendment.

Summary of the Facts

Around November of 2023, Howard hired a well-known, experienced muralist, Colin Benson, to paint a mural that reflected his and The Cozy Inn's personality as depicted below:

[2] The City objected to several sentences in Plaintiffs' factual contentions on the grounds that they misrepresent the discovery record and/or exceed the scope of the allegations in the Amended Complaint. The court overrules these objections. As the instructions on the court's Pretrial Order form explain, at this stage of the proceedings Plaintiffs need only set forth "a concise statement of the factual contentions that they believe support their respective theories of the case," so it is Plaintiffs' prerogative to frame their own factual contentions. Further, the allegations in the Amended Complaint provided the City with ample notice that Plaintiffs would be relying on these types of factual allegations to support their claims.




On or about November 6, 2023, City officials learned that Plaintiffs were painting a mural at The Cozy Inn. After reviewing the mural's substance, and without speaking with Howard, City officials concluded that the mural "announced, directed attention to, or advertised" The Cozy Inn, and thus the City believed it fit the definition of a sign under the City code. City officials then told Howard he could not finish the mural and instructed him to submit applications for a sign permit and a Certificate of Compatibility. Howard complied with this request on or about November 13, 2023. City code contains mandatory deadlines for the City to respond to applications, but the City failed to meet these deadlines. Instead, in a letter dated February 8, 2024, the City placed the applications "on-hold." City code does not authorize placing applications "on-hold."

The mural is not an advertisement. Instead, it is an artistic expression intended to tell a story about travel. "It's not a billboard; it's artwork," Howard said. "It's my expression. It's my character going on my wall. I want to paint my wall."

The City regulates signs—including their sizes—through its written sign code, its unwritten policies and practices, its Sign Permit requirement, its Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and its

concomitant enforcement penalties.[3] Plaintiffs describe this as the "mural-sign code regime." In response to this lawsuit, the City amended its BID code and Design Review Guidelines, and determined that a Certificate of Compatibility is not required. As a result, the BID code is no longer at issue in this matter, while the controversy over Salina's written sign code and its unwritten policies and practices remains in dispute.

The written sign code treats all outdoor murals as wall signs and purports to subject every wall sign to the same size restrictions because all murals are "displays calculated to attract the attention of the public." But that is not how it works in practice. If artwork "pertains" to a business, or if it's "part of a commercial transaction," the City considers it a regulated sign subject to its restrictive size limitations because of the content. But if the content doesn't pertain to the business, Salina considers the mural to be unregulated art that is exempt from the mural-sign code regime and can take up an entire wall. The difference between an unregulated mural and a regulated sign turns on the artwork's content. City officials have repeatedly admitted that they must review a display's contents to determine whether the display is a regulated sign or an unregulated mural.

The City determines whether a display is a regulated sign by reviewing the display for content that announces, directs attention to, or advertises. When asked to identify the factual basis for its assertion that Plaintiffs' mural "is obviously a sign," the City stated that "the Cozy Sign *contains* a tag line announcing the infamous smell of the Cozy, it *has* an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy *by depicting representations* of them." It is clear that the City

[3] Violations constitute misdemeanors, punishable by a fine with each day being considered a new offense.

reviewed the contents of the mural at The Cozy Inn and considers the mural to be a sign because of its content.

The City Manager explained that The Cozy Inn's mural "includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." The City's Director of Community and Development explained the unwritten policy to the City Council, saying that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign"; instead, the government treats it as an unregulated mural. But, the Director continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated wall sign. If that same "steaming cup of coffee" happened to be painted "on the other side of town unrelated to anything" there, the government confirmed that it would be unregulated. During depositions, City officials admitted The Cozy Inn could paint an airplane mural, or a pizza mural, and could even paint an exact replica of Andy Warhol's world-famous Campbell soup can—unless The Cozy Inn started offering travel agency services, sold pizzas, or started serving tomato soup. What's more, if a different business on the other side of town that had no relationship with The Cozy Inn or hamburgers were to paint the exact same mural that Plaintiffs painted, Salina would not consider it to be a regulated sign.

Much of the mural-sign code regime is ill defined and vague. The text of the zoning code (which includes the sign code) grants the zoning administrator the discretion to issue binding interpretations of the code. The City code allows the substitution of the conjunctive "and" with the disjunctive "or" and vice versa as "the sense requires it." Zoning Administrator Dean Andrew testified that he believes this gives him the unilateral discretion to substitute "and" for "or" at will. The phrases "pertains to the goods or services for sale," "art," "commercial speech," "mural," and much more is not anywhere in the City code. The City's use of these terms and its emphasis on

the commercial nature of goods or services for sale to distinguish between murals and signs—based on the artwork's content—is found only in the City's unwritten policies and practices.

Andrew uses this authority to implement numerous unwritten policies. For example, the City employs a different methodology of measuring the area of signs than the one written in the code if Andrew decides that it is "practical." As a result, for murals at The Yard and Sharp Performance, Andrew found it "practical" to measure the area of the mural by measuring individual elements of the mural, while excluding the background paint, while he found it to be "impractical" to measure the individual elements of The Cozy Inn mural and simply calculated the area of the entire wall, including the background paint. Andrew has utilized this discretion to determine that a mural painted on an exterior brick wall at The Yard is not considered a regulated sign because it is "inside" even though it is plainly not inside a building. Andrew testified that he ignores the portion of the sign code defining a "sign" regarding "displays calculated to attract the attention of the public." Yet the City, in response to an interrogatory, asserted that "The Cozy Sign is a display calculated to attract the attention of the public," without providing further explanation. Directly across the parking lot from The Cozy Inn's mural is a mural advertising Bull Durham Tobacco, but Andrew created an exemption to the mural-sign code regime out of whole cloth for the tobacco mural, while strictly applying the regime to The Cozy Inn. The City ignores the deadlines for responding to applications in the code if Andrew places the applications "on-hold," as happened to Plaintiffs' applications, which remain on hold.

The City's content-based discrimination is seen throughout the city. Salina exempts the following murals that are "signs" under the code from the size restrictions, and the permit regulations, because of their content: Fire Station #2; The Yard side mural; KU's School of Medicine; Salina Art Center; Mural at the Mill; and the water tower mural. The City considers

other murals to be signs but finds them to be compliant with the mural-sign code regime based on the City's unwritten policies and practices: Bull Durham; Sharp Performance; The Yard front mural; and Schlotzsky's. Dozens of other murals throughout Salina are exempt. The City is host to the Boom Salina Art & Mural Festival, which has painted murals all around Salina. The City even sponsors murals throughout town through the Salina Arts & Humanities Department. The murals throughout Salina are popular and tourist attractions, and Howard painted the mural at The Cozy Inn to be a part of this thriving cultural scene. No member of the public has complained about the mural at The Cozy Inn. However, numerous members of the public have complained about the City's decision to order The Cozy Inn to halt work on the mural.

Salina has not disclosed any evidence or factual basis to support the alleged purposes of the mural-sign code regime. There is no factual basis for the belief that regulated murals are more aesthetically displeasing than unregulated murals. There is no factual basis for the belief that regulated murals are more dangerous to pedestrians than unregulated murals. There is no factual basis for the belief that regulated murals create a greater danger of traffic accidents than unregulated murals. There is no factual basis for the belief that regulated murals are more likely to harm property values than unregulated murals. There is no factual basis to treat artwork differently based on its content. Plaintiffs' expert rebuttal witness, Charles Taylor, has demonstrated that the report of Defendant's proffered expert, Mark White, is not credible or reliable, and does not provide a factual basis for the mural-sign code regime.

b. **Defendant City of Salina's Factual Contentions.**[4]

Overview

The *Austin* court recognized sign regulation approvingly as a "tradition" dating back more than 150 years—and observed that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." The City has regulated signs in like fashion for about 58 years. The City's regulations are currently codified at Salina Code of Ordinances ("Salina Code"), Chapter 42, Article X ("Sign Code").

The definition of "Sign" in Salina Code § 42-764 is agnostic as to content. It turns on whether a display is used to "announce, direct attention to, or advertise" and is "not located inside a building." If a display is located outside of a building and is used to "announce, direct attention to, or advertise," then it is a "Sign" and subject to the Sign Code's size limitations. Displays that fall outside of the definition of "Sign" are not signs and are therefore not regulated as such.

Plaintiffs allege a different interpretation of the City's definition of "Sign." Under Plaintiffs' interpretation of § 42-764, a sign is *anything* that is "calculated to attract the attention of the public." Plaintiffs' interpretation is absurd, ignores the plain language of § 42-764, is not how the City interprets § 42-764, and is not how the City applied § 42-764 to The Cozy Inn sign. Plaintiffs' suggested interpretation would mean that all displays – including murals – are signs under the Sign Code.

Yet Plaintiffs' interpretation does not alter the content-neutrality analysis. The text of the Sign Code remains content-neutral. Even if Plaintiffs have the correct interpretation, they are

---

[4] Plaintiffs are currently unable to object to the City's factual contentions on the grounds that they exceed the scope of the pleadings because the City has not yet filed a pleading. If and when the City does so, Plaintiffs will raise any such objection at that time. Further, Plaintiffs object to the City's factual contentions on other grounds, but will raise those objections on summary judgment or at trial.

without relief that would address their alleged injury. Indeed, even if this Court adopts Plaintiffs' interpretation of "sign" and finds that all displays are regulated signs, the legal status of Plaintiffs' display would not change—it would still be a sign that is too large to qualify for a permit.

The sign code is concerned with what a display does, not what it says. The text of the sign code makes no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. While in some circumstances City officials may have to look at a display to determine if it is a Sign, a sign code is not content-based merely because it requires a reading of the sign to determine if a content-neutral regulation applies. Structurally, the Cozy Inn sign is a wall sign as defined in Salina Code § 42-781. Salina Code § 42-781 also makes no reference to content and is concerned with the physical structure of a sign; to be a wall sign, the display must also fit within the definition of Sign in § 42-764.

<u>The Sign Code is Content-Neutral</u>

On its face, the definition of "Sign" is not content-based. There are no unwritten policies and procedures. City officials, including the Zoning Administrator, do not have unbridled discretion. City officials, including the Zoning Administrator, follow the Sign Code provisions.

The purposes set forth in Salina Code § 42-500 are also content-neutral. As such, intermediate scrutiny applies, and the Sign Code is constitutional because: (1) the purposes articulated in Salina Code § 42-500 (particularly traffic safety, pedestrian safety, property values, and aesthetics) are substantial government interests; (2) the Sign Code is narrowly tailored to advance those interests because the interests are furthered more effectively under the Sign Code than in the absence of regulation; and (3) Plaintiffs have ample alternative channels of communication of their information. In fact, Plaintiffs can display the exact same sign in a smaller

size, Plaintiffs have other existing signs on the Cozy Inn premises that fit within the allowable sign area, and Plaintiffs already communicate information through a number of other channels including radio, billboards, and social media.[5]

In considering whether the Sign Code is content-based as-applied to the Cozy Inn, the Court only considers how the sign code was applied to the Plaintiffs' sign. No other display is germane to Plaintiffs' case. The City applied the definition of "Sign" as written to the Cozy Inn sign. The City outlined its application of the Sign Code to the Cozy Inn sign in a document entitled the "Cozy Inn Sign Analysis." The City provided this memorandum to Howard and explained why the Sign was too large to qualify for a sign permit. On November 13, 2023, City staff informed the City Commission why Howard's display was a "Sign" under the Sign Code. The deposition testimony of City staff also supports the City's position that it applied the definition of Sign as written to the Cozy Inn sign.

Plaintiffs appear to make the argument that the Sign Code represents a commercial speech regulation that is unconstitutional. The Sign Code is not a commercial speech regulation. However, assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and displays that are not signs based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a classification of speech that is content-based or otherwise implicates strict scrutiny. Commercial speech is subject to an intermediate standard of review (discussed above). The Sign Code does not favor commercial speech over noncommercial speech. Indeed, Plaintiffs' Amended Complaint concedes this at ¶ 210 ("This demonstrates Salina's antipathy toward content related to a business and commercial speech. This

---

[5] Although the City's purposes are substantial government interests as a matter of law and require no evidence, the City has disclosed evidence, including its expert report, that the Sign Code actually advances the City's interests.

also demonstrates Salina's preference for content unrelated to a business and noncommercial speech."). Interestingly, Plaintiffs complain that noncommercial speech is favored and simultaneously allege that their sign displays noncommercial speech. However, Plaintiffs do not request declaratory judgment that the Sign Code does not apply to their sign.

<u>The City Determined Howard's Display was a "Sign"</u>

Salina Code § 42-501 directs a property owner to obtain a sign permit before a sign is painted, constructed, erected, remodeled, relocated, or expanded. The sign permit application form identifies the information required to be submitted for review. Plaintiffs did not seek a sign permit before beginning construction of the wall sign. Plaintiffs knew the City regulated signs, but did not review the regulations. Plaintiffs testified that they have no intent to read the regulations. On November 3, 2023, Plaintiffs started painting the wall sign. On November 6, 2023, the City reviewed the wall sign that was fully outlined and partially painted on the wall. The City determined that Plaintiffs' display is a wall sign under Salina Code §§ 42-764 and 42-781.

The Cozy Inn wall sign announces (among other things, the infamous onion smells of The Cozy Inn that Howard admitted "tag" anyone who enters). It "directs attention to" by way of a large arrow that points to the building entrance and ordering window. The sign also advertises, by way of pictorial representations, the hamburgers and hamburger toppings (ketchup, mustard, pickles, onions) that are available for sale at The Cozy Inn. Salina Code § 42-521 provides the sign area and number limitations for signs in the C-4 district (where The Cozy Inn is located). Using the dimensions of The Cozy Inn north wall (which the City obtained from a prior application submitted by The Cozy Inn for an awning sign and software the City has to assist in measuring the height of buildings), and noting the sign occupied the entire north wall, the City determined The Cozy Inn sign was too large to qualify for a sign permit under the sign area limitations in § 42-521.

Given the existing sign inventory, the Cozy Inn had approximately 10 square feet of remaining sign allowance, but the wall sign was approximately 528 square feet in size.

On November 6, the City contacted Howard and asked him to pause the painting, advising him that the painting was a wall sign under the sign code, it needed a sign permit, and it was too big to qualify for a sign permit as proposed. Howard did not administratively appeal this determination. The City met with Howard again on November 13. At this meeting, the City provided Howard with the Cozy Inn Sign Analysis memorandum that outlined the specific provisions of the sign code the City applied to Howard's sign to determine it was a sign and that it was too large to qualify for a sign permit. Howard did not administratively appeal this determination either.

The City understood that Howard was upset by the City's determination, and the City wanted to work with him to see if a code-based solution could be reached. In doing so, the City explained to Howard that it was going to engage a sign consultant that would help the City evaluate if the Salina community was in favor of permitting wall signs as large as The Cozy Inn sign on the sides of smaller buildings, and if the City could amend the Sign Code in a content-neutral fashion while continuing to advance its content-neutral purposes. While uncertain if this was possible, the City wanted to try to work with Howard, and the City understood that Howard was interested in pursuing this option. The City did not have any official submission from Howard regarding the sign, so it invited him to submit a sign permit application.[6] Unbeknownst to the City, Howard had already contacted the Kansas Justice Institute on November 11, 2023 to ask about representation in this case.

[6] Howard submitted this application, which included a rendering of the proposed final wall-sign that was different than the wall sign painted on the side of the Cozy Inn. After a review of the allegedly final rendering, the City confirmed the display was a sign.

<u>The Sign Code Is Not an Impermissible Prior Restraint</u>

With respect to Plaintiffs' prior-restraint claim, the Sign Code, on its face, does not promote arbitrary enforcement because it provides sufficient standards to limit the City and its officials' discretion. The Sign Code has numerous procedural safeguards including avenues for variances and appeals to resolve issues with the City. Further, the standard in the Sign Code is whether the display:

> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.

City staff under the supervision of the zoning administrator are capable of determining whether the structure or display is attached to, painted on, or represented on a building or other structure or on the ground. City staff under the supervision of the zoning administrator are capable of determining whether a display announces, directs attention to, or advertises. The City has been interpreting the definition of sign consistently for decades. The City applies the plain language and ordinary use of the words and phrases "announce, direct attention to, or advertise." The word "advertise" – which the Cozy Inn sign does – is widely used in defining "sign" for regulatory purposes. It is particularly clear when, as here, the advertisements pertain to or reference "goods or services for sale." "Building" is also a defined term in the Salina Code, and City staff under the supervision of the zoning administrator are capable of determining when a display is not located inside of a building. These criteria are constitutionally sufficient.

Further, the Sign Code provides for a brief, specified period of time within which the City must issue or deny a sign permit. In this case, the City informed Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. In an effort to cooperate with Howard regarding a possible code-based solution, and understanding that he was interested

in pursuing this option, the City placed the Plaintiffs' application "on-hold" instead of outright denying it. This approach was intended to be collaborative and helpful, and while it was relatively novel, it was neither illegal nor unconstitutional. The City did not need to again inform Howard that the sign was too large for a sign permit. He already knew that, and indicated as much on the sign permit application.

The Sign Code Is Not Unconstitutionally Vague

As to Plaintiffs' vagueness claim, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. During depositions, both Howard and Windholz testified that they had not read the Sign Code, did not attempt to read the Sign Code, and do not intend to read the Sign Code.

The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases enumerated by Plaintiffs that are simply not pertinent to regulating signs. Other words and phrases that are used in the Sign Code need no definition and do not render the Sign Code vague as they have well-understood meanings.

**4. LEGAL CLAIMS AND DEFENSES.**

**a. Plaintiffs' Claims.**

**i.** Violation of the First Amendment Free Speech Clause: Salina's mural-sign code regime (which includes Salina's written sign code, § 42-500 et seq., Salina's unwritten policies and practices, Salina's Sign Permit requirement, and their concomitant enforcement penalties) violate Plaintiffs' First Amendment rights because, both on its face and as applied to the mural at The Cozy Inn, it is a content-based restriction on speech, a speaker-based restriction on speech, and a prior restraint of speech. The mural-sign code regime is unconstitutional under strict scrutiny, intermediate scrutiny, or rational basis review. Plaintiffs also contend, to preserve the issue for appellate review, that the "commercial speech"

doctrine is inconsistent with the First Amendment and should be overturned.

**ii.** Void-for-Vagueness Doctrine of the Fourteenth Amendment: the mural-sign code regime is void for vagueness under the Fourteenth Amendment. Salina's mural-sign code regime "is so standardless that it authorizes or encourages seriously discriminatory enforcement," in violation of the Due Process Clause. The mural-sign code regime is so vague "that regulated parties [do not] know what is required of them," and fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way.

**b. Defendant the City's Defenses.**

The City asserts the following defenses:

**i.** Plaintiffs have not sought declaratory judgment from this Court to declare that their display is not a sign under the Sign Code, so Plaintiffs have not requested a declaration that will redress their asserted injuries.

**ii.** The Sign Code is content-neutral on its face and as applied to the Plaintiffs because the germane provisions of the Sign Code are not concerned with the idea, topic, subject, or viewpoint of the message displayed, the Sign Code is justified without reference to the content of the regulated speech, and the Sign Code was applied as it is written.

**iii.** The Sign Code passes intermediate scrutiny because it is narrowly tailored to advance the City's substantial interests of traffic safety, pedestrian safety, aesthetics, and property values, and it leaves open ample alternative channels because Plaintiffs can communicate the information with the exact same sign in a smaller size, with other existing signs on the Cozy Inn premises that fit within the allowable sign area, and through a number of other alternative channels.

**iv.** The Sign Code is not a prior restraint because it provides sufficient standards to limit the City and its officials' discretion, so it does not promote arbitrary enforcement.

**v.** The Sign Code is not a prior restraint because it provides for a brief, specified period of time within which the City must issue or deny a sign permit, and the City informed Mr. Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. The unique circumstances of this case, in which the City attempted to collaborate with the Plaintiffs to achieve a legislative solution, do not transmogrify the Sign Code into an unconstitutional prior restraint.

**vi.** Plaintiffs may not seek relief on behalf of "others similarly situated."

**vii.** The Sign Code is not vague because it provides people of ordinary intelligence with a reasonable opportunity to understand what conduct is prohibited.

**viii.** The Sign Code is not vague because it provides narrow, objective, and definite standards that properly guide the City and its permitting officials.

**ix.** The "overbreadth" doctrine, which relates to vagueness, does not apply to commercial speech.

**5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiffs seek the following relief:

**a.** A declaratory judgment that the City's mural-sign code regime—which includes the City's written sign code, unwritten policies and practices, Sign Permit requirement, and its concomitant enforcement of penalties ("mural-sign code regime")—as written and enforced:

**i.** is an unconstitutional content-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**ii.** is an unconstitutional speaker-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**iii.** (alternatively, if the mural-sign code regime is ruled to be content-neutral and speaker-neutral) fails to satisfy intermediate scrutiny, on its face and as applied to Plaintiffs and others similarly situated;

**iv.** is an unconstitutional prior restraint on speech, on its face and as applied to Plaintiffs and others similarly situated; and

**v.** is void for vagueness, on its face and as applied to Plaintiffs and others similarly situated.

**b.** A prospective permanent injunction enjoining the City, its officers, agents, employees, attorneys, servants, assigns, and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing the enforcement of the City's mural-sign code regime on its face and as applied to Plaintiffs and other similarly situated.

**c.** A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their mural in its current position on The Cozy Inn, or for completing the mural on The Cozy Inn.

**d.** Should plaintiffs prevail, they will seek their attorney fees and costs pursuant to 42 U.S.C. § 1988.

Defendant seeks the following relief:

**a.** Should the City prevail, it will seek its attorney fees and costs pursuant to 42 U.S.C. § 1988 on the grounds that Plaintiffs' case is frivolous, vexatious, harassing, and/or groundless.

**6. AMENDMENTS TO PLEADINGS.**

The parties do not anticipate any amendments to the pleadings. Should the Court deny the motion to dismiss in whole or in part, Defendant will file an answer to the amended complaint.

**7. DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by **October 18, 2024**. All discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8. MOTIONS.**

**a. Pending Motions.**

**i.** Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF 26).

**ii.** Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White.

**iii.** Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702.

**b. Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

**i.** Plaintiffs intend to file a motion for summary judgment and any necessary motions in limine.

**ii.** Defendant intends to file a motion for summary judgment and any necessary motions in limine.

The original dispositive-motion deadline, as established in the scheduling order and any amendments, was vacated on December 17, 2024 (ECF 96). The dispositive-motion deadline is now re-set for **February 7, 2025**. The parties must follow the summary-judgment guidelines on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**c. Motions Regarding Expert Testimony.** The parties have both filed motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, as of the filing deadline of **December 20, 2024**.

**9. TRIAL.**

The trial date was vacated on December 17, 2024. The trial date is re-set for **October 7, 2025, at 9:00 a.m., in Wichita, Kansas**. This case will be tried by the court sitting without a jury. Trial is expected to take approximately 2 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition

testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

10. **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties have not participated in mediation. They currently believe the prospects for settlement of this case are poor and they do not believe that court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

**IT IS SO ORDERED.**

Dated January 16, 2025, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service. |

**Plaintiffs' Reply Brief**

The Plaintiffs moved to exclude or strike the opinions of Salina's proffered expert, attorney Mark White, on the grounds his opinions are improper legal conclusions, that they weren't based on sufficient facts or data, they weren't the product of reliable principles or methods, and they weren't reliably applied to this case. Doc. 97. The Defendant responded by devoting nearly one third of its space to the mistaken belief that *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), turned the First Amendment analysis into a fact-free, government-deferential inquiry where the government gets to restrict speech because it says so. *See* Doc. 100. Sure enough, the district court and Tenth Circuit dismissed the plaintiffs' billboard case at the 12(b)(6) stage. But that's only because the plaintiffs didn't plead "with any specificity" the billboard regulation "faile[ed] to meet intermediate scrutiny." *Id.* at 1252.[1]

But even *if* Salina is correct—that courts analyzing First Amendment cases don't care about the facts—Rule 702 *still* doesn't authorize opinions based on insufficient data, or legal conclusions. In short, Salina has failed to meet its burden of establishing the admissibility of its proffered expert,

[1] *See also Aptive Env't, LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961, 989 (10th Cir. 2020) (fact based First Amendment inquiry); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071 (10th Cir. 2020) (same); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1221 (10th Cir. 2021) (same).

and Mr. White's report and testimony should be excluded. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

**I. White's opinions are inadmissible legal opinions.**

"[E]xpert testimony on legal matters is not admissible." *United States v. Bull*, 8 F.4th 762, 768 (8th Cir. 2021). Salina's suggestion that Mr. White's opinions are admissible because they are nothing more than opinion testimony that embraces the ultimate issue to be decided is incorrect. Doc. 100 at 6, 9. "While expert witnesses may testify as to the ultimate matter at issue, Fed. R. Evid. 704(a), this refers to testimony on ultimate facts; testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored." *Anderson v. Suiters*, 499 F.3d 1228, 1237 (10th Cir. 2007) (citing *Specht v. Jensen*, 853 F.2d 805, 808 (10th Cir.1988)).

*Anderson* involved a woman's tort claim against the local TV station for airing excerpts of a video allegedly depicting the woman's rape by her estranged husband. A key element of the claim turned on whether the publication of the video was "not of legitimate concern to the public." *Anderson*, 499 F.3d at 1235. The plaintiff retained an expert to render an opinion that the video was not "newsworthy" or an issue of "public concern." *Id.* at 1237. The Tenth Circuit explained that whether the video was an issue of public concern was "the ultimate question of law" and that such legal conclusions were improper. *Id.*

Salina contends that *MCC Mgmt. of Naples, Inc. v. Int'l Bancshares Corp.*, 468 F. App'x 816, 822 (10th Cir. 2012), shows that Mr. White's opinions are admissible. But the expert testimony in *MMC Management* is nothing like what is at issue in this case. That case involved a contract for the acquisition of a bank, and whether "entitlement to $16 million in tax benefits accruing over a period of years," was one of the assets of the bank included in the acquisition contract. *Id.* at 818. The proffered expert tax attorney testified about the specialized meaning of contract terms like "net of any related tax benefits, in respect of the FDIC counterclaim," and that the jury could conclude that this term in the contract could be interpreted in a "very broad manner." *MCC Mgmt.*, 468 F. App'x at 821-22. The *MMC Management* expert did not provide any testimony about the law, or the elements of the claim, he just testified about the meaning of phrases in the tax industry. The

opinions and testimony in *MMC Management* are nothing like Mr. White's opinions and testimony in this case. Mr. White's opinions and testimony do not define or explain technical terms of art utilized in a contract.

Instead, Mr. White's opinions are legal conclusions on the ultimate question of law before the Court. Mr. White's opinions do far more than simply "refer to the law in expressing his [] opinion," as the government contends. Doc. 100 at 6. His opinions are not just explanations of the facts of the matter with only a casual reference to the law. As in *Anderson* and *Specht*, Mr. White's opinions directly track with the elements of the claims, offer nothing more than a conclusory statement about the ultimate questions of law in this case, and are little more than an amicus "brief in support of" Salina. *Rural Water Dist. No. 4, Douglas Cnty., Kansas v. City of Eudora, Kan.*, 604 F. Supp. 2d 1298, 1307 (D. Kan. 2009) *aff'd in part, rev'd in part on other grounds*, 659 F.3d 969 (10th Cir. 2011). Such "testimony" is not helpful to the trier of fact, usurps the authority of the Court to decide questions of law, and is inadmissible under Rule 702.

## II. White's opinions are not reliable.

Mr. White's opinions are not based on sufficient facts or data and are not the product of reliable principles and methods. *Nacchio*, 555 F.3d at 1241. Rather, his opinions are little more than inappropriate speculation and conjecture. *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996). They are contradicted by evidentiary record in this case as well. *See* Doc. 97-6, Professor Taylor's Report; Doc. 97-7, Professor Taylor's testimony. And they are contradicted by Mr. White's own published learned treatise, *Content-Neutral Sign Codes After Reed and Austin*, Sign Research Foundation (Nov. 2022). Doc. 97-5.

Mr. White's report is devoid of facts from *Salina* showing that *Salina's* mural-sign code regime *actually* advances any of *Salina's* claimed interests. While Mr. White's report often references various sections of the Salina City Code, the City Code itself is simply a law, not facts or data. A proffered expert may not provide "expert" opinion simply by reading the law and opining on whether or not the law survives First Amendment scrutiny. Proper expert testimony would need facts and data about Salina itself and how the law actually impacts Salina. Mr. White's report and

opinions lack the required facts and data, and Mr. White testified that he doesn't know whether these facts even exist. *See* Doc. 97-4, White Dep. 46:25-47:1-5; 47:12-19; 47:21-48:4; 116:13-18; 120:10-17; 121:10-14; 123:7-14; 123:16-22; 124:13-19; 125:7-12. Without Salina-specific facts and data, Mr. White's opinions are no more than speculation and conjecture about whether or not Salina's mural-sign code regime violates the First Amendment. That is improper.

The government hasn't pointed to any facts or data in Mr. White's report that would contradict the facts in Professor Taylor's rebuttal report, either. As Professor Taylor pointed out, the Federal Highway Administration has conducted extensive studies on the impact of signage on traffic safety and these "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Doc. 97-6, Taylor Report at 12. Mr. White's opinion that Salina's mural-sign code regime will enhance traffic safety "is not supported by scientific evidence," Doc. 97-6, Taylor Report at 10, and it is "pretty much settled science that on-premises signs don't cause traffic accidents." Doc. 97-7, Taylor Dep. 119:12-13.

Mr. White published a learned treatise on sign regulations, *Content-Neutral Sign Codes After Reed and Austin*, Sign Research Foundation (Nov. 2022), Doc. 97-5, that repeatedly contradicts the opinions he offers in this case. Defendant attempts to dismiss Mr. White's treatise as a "promotional article," that provides no more than "generalized pointers," and is "irrelevant" and "not germane." Doc. 100 at 5, 14. Defendant offers no evidence for its claim that Mr. White's treatise was a "promotional article," what it allegedly promotes, or why the analysis in the article is any less accurate because it is a "promotional article." Instead, Mr. White testified that it is a "reliable authority," and that he stood by his analysis in *Content-Neutral Sign Codes After Reed and Austin*. Ex. A, White Dep. 65:19-22.

But even if *Content-Neutral Sign Codes After Reed and Austin* is only a "promotional article," that would still cast doubt on Mr. White's proffered expert opinions. If Mr. White publicly promotes himself as holding the opinions in *Content-Neutral Sign Codes After Reed and Austin*, but then privately expresses different and contradictory opinions as a retained expert, that casts doubt

upon the reliability of Mr. White's methodology in reaching his opinions as well as his credibility as a witness.

**III. Conclusion.**

Mark White's expert report and testimony provide nothing more than conclusory opinions on the ultimate questions of law in this case. Such opinions are improper and "invade[] the province of the trial judge" to determine questions of law. *United States v. Boutte*, No. 22-2079, 2024 WL 3665536, at *10 (10th Cir. Aug. 6, 2024). Additionally, his opinions are not based on sufficient facts and data, are not the product of reliable principles and methods, and are contradicted by the record in this case, Professor Taylor's rebuttal testimony, and Mr. White's own learned treatise. Mr. White's opinions are neither relevant nor reliable and should be excluded. Alternatively, the Court should exclude any portions of Mr. White's report, opinions, and testimony that are legal conclusions or that are not based on sufficient facts and data or the product of reliable principles and methods.

Dated: January 24, 2025.

Kansas Justice Institute
/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on January 24, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Jeffrey Shaw
Jeffrey Shaw

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard**

**v.**

**City of Salina, Kansas**

**Civil Action No. 6:24-cv-01027-TC-ADM**

**Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Deposition Excerpts: Defendant's Expert Mark White |

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

vs. Civil Action No. 6:24-cv-01027-TC-ADM

CITY OF SALINA, KANSAS,
Defendant.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFFS:

Mr. Samuel G. MacRoberts
Mr. Jeffrey Shaw
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
913-213-5018
sam.macroberts@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org

Page 3

ON BEHALF OF THE DEFENDANT:

Mr. Aaron O. Martin (via Zoom)
Clarke Mize & Linville
129 S. 8th Street
Salina, KS 67402
785-823-6325
aomartin@cml-law.com

Ms. Amanda C. Jokerst (via Zoom)
Fairfield and Woods
1801 California Street, Suite 2600
Denver, CO 80202
303-830-2400
ajokerst@fwlaw.com

ALSO PRESENT:

Mr. Tim Faulhaber, Zoom technician

Page 4

INDEX

Certificate------------------------------- 204

WITNESS


| ON BEHALF OF THE PLAINTIFFS: | PAGE |
|---|---|
| MARK WHITE | |
| Direct-Examination by Mr. MacRoberts | 5 |
| Cross-Examination by Ms. Jokerst | 192 |
| Redirect-Examination by Mr. MacRoberts | 198 |


EXHIBITS


| WHITE DEPO EX. NO: | MARKED |
|---|---|
| No 1 Defendant's Expert Disclosure | 5 |
| No 2 Expert Report | 5 |
| No 3 Content-Neutral Sign Codes After Reed and Austin article by White | 5 |
| No 4 Sign Permit Application | 94 |
| No 5 Photo of Mural at the Mill | 94 |
| No 6 Conclusion/Next Steps Bloomberg article | 188 |

**Deposition Exhibit 3, the article. What do you call that, an article, a publication? I just want to make sure we're on the same page. What is Exhibit 3?**
A. You can call it a publication.
**Q. That's a good word. All right. Let's go to the publication you authored, the title being Content Neutral Sign Codes After Reed and Austin. Do you have it in front of you?**
A. Yes.
**Q. You -- who was the intended audience for this publication?**
THE REPORTER: What was your objection, Amanda?
MS. JOKERST: To form.
THE REPORTER: Thank you.
A. Urban planners.
BY MR. MACROBERTS:
**Q. Do you stand by the analysis in the publication at Exhibit 3?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. In the area of content neutrality, it's important to know about the cases of Reed and**



**Austin?**
MS. JOKERST: Is there a question pending?
MR. MACROBERTS: Yes.
MS. JOKERST: Okay. Then I'll object to form.
A. That sounded like a statement. Do you have a question?
BY MR. MACROBERTS:
**Q. Yeah. It was my inflection makes that a question. Do you think it's important to know about Reed and Austin?**
MS. JOKERST: Object to form.
A. For whom?
BY MR. MACROBERTS:
**Q. Planners.**
A. Planners. Yes.
MS. JOKERST: Same --
THE WITNESS: Go ahead, Amanda. I'm sorry.
MS. JOKERST: Same objection.
A. Yes.
BY MR. MACROBERTS:
**Q. Let's work our way through the report -- I'm sorry, the publication. We'll start on page 6**



**of your publication. It's your opinion that a sign regulation is content-based if the message displayed on a sign has a regulatory impact?**
MS. JOKERST: Object to form.
A. Generally speaking, yes.
BY MR. MACROBERTS:
**Q. Do you agree still that if the zoning administrator, excuse me, has to read the sign to determine what regulations apply, the regulation is likely content-based with the exception of the on-premise off-premise distinction as per Austin?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree that if the regulation redistricts or favors a category of speech for a benign reason such as to allow churches to guide congregants to services and temporary locations, the regulation is still considered content-based?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree an innocuous justification cannot transform a content-based law into one that is content neutral?**



MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree that the Reed decision intimated that content neutral regulations that target or favor speakers is content-based if it impacts the message?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. On page 9 of your publication, you posed somewhat of a hypothetical. Do you agree that allowing a digital sign only for gas prices or churches could be content-based?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. Do you agree on page 7 that content-based regulations or facially-content-neutral regulations justified in relation to content rarely survive a constitutional challenge when subject to strict scrutiny?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,** **d/b/a The Cozy Inn; Stephen Howard,** **Plaintiffs,** | ) ) ) ) **CIVIL ACTION** ) **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) ) ) |
| **City of Salina, Kansas,** **Defendant.** | ) ) ) ) |

**<u>DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE (ECF 98)</u>**

Defendant City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, hereby submits its Reply in Support of its Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 (ECF 98) as follows:

Plaintiffs' Response (ECF 99) misrepresents the City's arguments. Supreme Court and Tenth Circuit precedent do not require *evidence* beyond the text of the regulation to support a finding that a sign regulation advances its stated, substantial government interests. Sign regulations are rooted in 150 years of "tradition," and time, place, and manner restrictions *per force* address the "distinct safety and esthetic challenges" posed by signs. *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 64, 71, 75 (2022). Plaintiffs' cited cases are inapposite because they address oral speech and panhandling—not the distinct challenges posed by signs. *See McGraw v. City of Oklahoma*, 973 F.3d 1057 (10th Cir. 2020) (panhandlers); *Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021) (panhandlers and political advocates).

Indeed, "[u]nlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43 (1994). Trial courts have decided these issues, and the Supreme Court has affirmed such findings, without requiring an evidentiary showing beyond the text of the code itself. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."); *StreetMediaGroup, LLC v. Bd. Of Cnty. Comm'rs*, No. 21-CV-1232-RMR-KLM, 2023 WL 5613018 (D. Colo. Mar. 30, 2023) ("Plaintiffs argue that the County should be required to produce specific evidence that the Regulations actually relate to and advance the County's aesthetic and traffic goals. But the question before the Court is whether the Regulations directly advance the County's interests in traffic safety and aesthetics, not whether each provision of the Regulations is absolutely necessary to do so."); *StreetMediaGroup, LLC v. Stockinger*, No. 1:20-CV-03602-RBJ, 2021 WL 5770231 (D. Colo. Dec. 6, 2021) ("state's interest in promoting safe driving alone satisfies the narrow-tailoring requirement . . . the state would less effectively prevent these crashes if it took down signs after they caused motor accidents instead of establishing a prophylactic permitting scheme.").

Facts do matter, and the germane facts here are that: (1) the Sign Code sets forth the City's interests in regulating signs (including traffic safety and aesthetics); (2) the City's Sign Code regulates the number, size, and placement of signs; (3) the legislative body found that the regulation of the number, size, and placement of signs advances the City's interests; and (4)

Plaintiffs have ample alternative channels for communication, including 10 square feet on the wall that is at issue in this case. Even Dr. Taylor agreed that in terms of marketing, the Cozy's existing signs (which comply with the Sign Code) provide adequate "conspicuity." Ex. A at 177:20-23.

The City did not argue that because "facts don't matter," Dr. Taylor's expertise is irrelevant. The City simply argued that under germane precedent, evidence outside of the text of the sign regulations is unnecessary to support the relevant determinations of law. In that context, the City disclosed Mark White in an "abundance of caution," in the unlikely event that the Court disagreed with the City's interpretation of the pertinent case law. Still, Dr. Taylor's testimony is properly excluded under F.R.E. 702 because he is not qualified, his testimony is unreliable, and his opinions are not helpful to the trier of fact.

Dr. Taylor is not qualified to testify regarding whether the Sign Code's size, number, and placement limitations advance the Sign Code's purposes. He admitted that he is not an urban planning expert, and that his educational background did not include any classes in urban planning, regional planning, urban design, landscape architecture, traffic engineering, land use, zoning, or architecture. Ex. A at 12: 23-25, 14:1-15, 17:8-10, 21:10-12, 31:12-13, 32:12-14, 42:13-15, 68:12-19, 69:5-12. He admitted he has never administered a sign code, and he does not understand the mechanics of how the Salina sign code works on a particular site. Ex. A 83:5-11. It is telling that Plaintiffs designated Dr. Taylor as a "signage" expert, not a sign regulation expert, but he opines that the Sign Code does not advance its stated interests. "Signage" is not a field of expertise, and if it is, it does not extend into the realm of urban planning, zoning, traffic engineering, or land use. Dr. Taylor is aware of his inadequate qualifications as he refused to directly answer the question

of whether the Sign Code advanced community aesthetics, dancing around the issue and testifying "they don't have *evidence that*—that aesthetics are—are being advance by that code." Ex. A at 60:19-25, 61:1-19. Moreover, the Response overstates Dr. Taylor's involvement with courts as an expert in "signage." ECF 99 at 5. Of the "examples" cited it appears only one went to trial, and in that case, the docket includes no motion practice as to Dr. Taylor's qualifications. Exs. B, C, D. Either way, it is entirely up to *this Court* to decide whether Dr. Taylor's testimony is reliable for the purposes of *this case*. *See Kumho Tire. Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

Dr. Taylor's testimony is unreliable because glaringly absent from his report is any methodology or case-specific facts or data. A vague assertion that based on "tons and tons" of studies "on-premise signs don't cause traffic accidents" does not satisfy the reliability requirement, especially where the report Dr. Taylor cites to support his opinion that "signs are not a traffic safety hazard" does not actually state what Dr. Taylor claims. Ex. E at 11-12; Ex. A 97:1-25, 98:1-25, 99:1-25, 100:1-25, 101:1-25, 102:1-5, 105:3-19, 119:9-12; Ex. F at p. 15-16 Table 6 (driver distraction—"objects and events outside the vehicle (other vehicles, *signs*, animals, etc.)"). The City does not concede that Dr. Taylor's report "extensively discusses" any relevant topic, rather the City noted he addressed "some studies" regarding signs and traffic safety but, likely due to his expertise being limited to marketing and advertising, he did not reliably apply any relevant principles or methods to the facts of this case to opine whether the Sign Code's size, number, and placement limitations advance its stated interests. ECF 99 at 8, ECF 98 at 10. Dr. Taylor also fails

to provide any case-specific analysis. He admitted he does not "offer any opinion on the conspicuity of the Cozy Inn sign," yet his report claims that "on-premise signs located at high traffic intersections increased traffic safety, provide they met FHWA standards for legibility, conspicuity, [and] readability [sic]." Ex. E at 14; Ex. A at 128:8-12; 162:3-7. Notably, his report does not say what the FHWA standards for legibility, conspicuity, and readability are, let alone whether the Cozy Sign meets those standards. In sum, Dr. Taylor provides no reliable application of principles to the facts of the case to support the basis for his testimony.

Dr. Taylor's opinions are not helpful to the trier of fact because the value of a sign (to which he speaks extensively) is not at issue, and nowhere in his report does he address or rebut Mr. White's opinions regarding how the Sign Code's size, number, and placement limitations advance the City's articulated interests. While Dr. Taylor opines planners should "acknowledge that on-premise signs do not represent 'clutter,'" he testified that his "opinion is that the signage plays important marketing functions that should be taken into account [] in formulating sign codes and specific aspects of sign code," and that "conspicuity comes into play . . . in terms of the sign being able to play its marketing function." Ex. A at 128:14-23, 129:1-17. Dr. Taylor did not examine the legislative history, so he does not know what was "taken into account." *Id.* at 79:23-25, 80:1-2. More importantly, the "marketing functions" of signs are not relevant to any First Amendment inquiry. Dr. Taylor is not qualified to provide expert opinion testimony regarding issues germane to this case, his testimony is not reliable or relevant, and it is properly excluded under F.R.E. 702.

Respectfully submitted this 24th day of January 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on January 24, 2024, the **DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE (ECF 98)** was filed using the CM/ECF system, which will send notification of such filing to: Jeffrey Shaw and Samuel G. MacRoberts.

*/s/ Aaron O. Martin*
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**INDEX OF EXHIBITS TO**
**DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION TO EXCLUDE (ECF 98)**

Exhibit A – Excerpts from Deposition of Charles R. Taylor, Ph.D.

Exhibit B – Westlaw Docket for Borden Park, L.P. v. City of San Antonio

Exhibit C – Westlaw Docket for Peterson et al v. Downers Grove, The Village of

Exhibit D – Westlaw Docket for Lamar OCI South Corporation v. City of Oxford, Mississippi

Exhibit E – Expert Report of Charles R. Taylor, Ph.D.

Exhibit F – Relevant Portions of Stutts Report–The Role of Driver Distraction in Traffic Crashes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard, | :CIVIL ACTION :CASE NO. : :6:24-cv-01027-TC-ADM |
| Plaintiffs, | : |
| -vs.- | : |
| City of Salina, Kansas, | : |
| Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

until I finish my question before you answer, I'm not being rude. I'm just trying to get a clean transcript.
Does that make sense?
A. Yes.
Q. Okay. So I will ask that you wait until I finish my questions, and I'll wait until you're done answering them before I ask another one.
We also need answers to be audible. So in conversation, one might say "uh-huh" or, you know, shake their head or give a thumbs up or something like that. But here we have to say "yes" or "no" so that the transcript can reflect that. Sometimes I might ask you to clarify your response if we get to that level of conversation. And if I do, again, I'm not being rude. I just want to make sure that our transcript is clear.
We can take breaks as needed, and I understand from the heads-up that we got about your hospitalization that you may need those. Just let us know. But before we do, if there is a question pending, we're going to need you to answer it. And then we can take a break.
Other than that, from time to time, Mr. Shaw may object to one of our questions. If you



hear an objection, you can still answer the question after the objection. And you're actually required to do so unless you're directed not to.
Okay?
A. Yes.
Q. Great.
So that was the head shake, but you said "yes," so we're on a great start. Appreciate that.
So what is your educational background?
A. I did my undergraduate degree at the University of Michigan. It's a general studies degree. And then I did an MBA at Michigan State University, and a Ph.D. in marketing at Michigan State University.
Q. So tell me about the undergraduate degree.
What is a general studies degree?
A. It -- it's a liberal arts degree. Essentially I -- I'd started out in engineering, but changed my mind partway through and ended up wanting -- you know, wanting to finish in four years and -- and go on to do -- you know, go on to do an MBA.
Q. Great.



What sort of engineering were you doing?
A. Nuclear engineering.
Q. Nuclear engineering? Okay.
Okay. What was your course of study to obtain that general degree?
A. It's -- it's through the College of Liberal Arts. So as I was taking the engineering courses, you know, early on, I got to take some electives and took business courses, and especially a marketing course that I really liked. So I realized that -- that I wanted to go on and -- and do a business degree, but by the time I made that decision, it was a little bit late in the game to try to switch over to the business school.
Q. Okay. So the coursework you took was mostly related to business, then?
A. I would say it was -- it was a real mix because of starting in engineering, and then -- ultimately it was liberal arts degree and so a majority of them weren't business. I think I had five business courses as an undergrad.
Q. Okay. Did you ever take a course in urban planning?
A. No.



Q. In regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.
Q. Transportation planning?
A. In my Ph.D. program, I had multiple logistics courses.
Q. But in your undergrad, no courses in transportation planning?
A. No.
Q. Land use?
A. No.
Q. Zoning?
A. No courses in it, no.
Q. Architecture?
A. No.
Q. Okay. You said that you have a master's degree as well?
A. Yeah. It's an MBA.
Q. MBA?
A. Yeah.

Page 14

Q. Okay. And what was the focus of that degree?
A. It's -- I had a marketing concentration. It's a general management and business degree.
Q. Okay.
Okay. And what was the course of study during that program?
A. Business, including finance, accounting, management, marketing, economics.
Q. And what classes did you take?
A. Well, courses in those areas, the -- you know, that I -- that I just mentioned. Just a variety of different -- a variety of different business courses.
Q. Okay. Any classes in urban planning?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.
Q. Transportation planning?
A. No.

Charles R Taylor PhD
November 13, 2024

Page 15

Q. Land use?
A. No.
Q. Zoning?
A. No.
Q. Architecture?
A. No.
Q. Okay. Do you have a Ph.D. as well, sir?
A. Yes.
Q. And what was your course of study to obtain that degree?
A. My Ph.D. is in marketing.
Q. Okay. And what was your Ph.D. thesis?
Actually, let me go back really quick to your master' degree.
Did you have a thesis program?
A. No.
Q. The Capstone Project?
A. No. The -- like a lot of MBA programs, Michigan State's wasn't structured that way.
Q. Okay. What about your Ph.D.? What was your Ph.D. thesis?
A. It was -- it was on techniques to differentiate advertising effectively.
Q. Tell me more.
MR. SHAW: Objection to form.

Page 16

THE WITNESS: We looked at the impact of brand differentiating messages in -- in -- in advertising effectiveness and tested different types, different types of brand differentiating messages in terms of their impact on independent variables like attitude towards the ad and towards the brand and purchase intention.
BY MR. MESSENGER:
Q. Was that across different media?
A. My dissertation focused on television advertising.
Q. So only television advertising?
A. Yeah. This was 1992, the -- so advertising over the internet didn't exist at the time.
Q. We did have out-of-home advertising, though, yes?
A. Yes.
Q. You didn't try -- approach home advertising?
A. I was doing other work on outdoor advertising and published a few papers in peer-reviewed academic journals at the time, but it wasn't the focus of my dissertation.
Q. Okay. What classes did you take in your Ph.D. program?

U.S. Legal Support | www.uslegalsupport.com

Page 17

A. I minored in advertising and communication. So I had multiple courses in -- in both of those areas. Also, there was a core -- there was a core group of courses, so, like one economics course, one finance course, one accounting course. And then a variety of other marketing courses, statistics courses, methods courses.
Q. Okay. Did you take any classes in urban planning in your Ph.D. program?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.
Q. Transportation planning?
A. No.
Q. And by this, I mean, yeah, roads. Like the design of roads and multi-modal networks, if that makes sense.
A. Yeah.
Q. Not things like trucking logistics and

whatnot.
A. Well, logistic classes certainly covered like multi-modal forms of transportation, but I didn't -- you had asked about transportation planning, and I would say the answer to that is no.
Q. Okay. And land use?
A. No.
Q. Zoning?
A. No.
Q. Architecture?
A. No.
Q. Do you have any professional experience outside of academia?
A. Yes.
Q. And what would that be?
A. I -- I worked for General Motors, you know, between degrees and -- and, from time to time, I've done consulting.
Q. So in -- at General Motors, what did you do?
A. Worked in market analysis.
Q. Tell me more.
MR. SHAW: Objection.
THE WITNESS: We -- we used advanced statistical techniques to analyze buyer behavior. We worked on projects like



engine choice modeling, customer satisfaction studies.
BY MR. MESSENGER:
Q. Okay. And as a consultant, what kind of consulting do you do?
A. We consulted ad agencies and companies about advertising, and in some -- in some cases, signage.
Q. And what's the nature of the signage consulting?
A. I've done work for the outdoor advertising companies helping them understand what the -- what's effective with -- with billboard advertising.
Q. Okay. Have you -- do you have any other professional work outside of being an expert witness, being a consultant, working at GM?
A. Yeah. I edit a leading academic journal, and I get a stipend from doing that.
Q. And tell me about that journal.
A. It's -- it's called The International Journal of Advertising. And it's a social science citation listed academic journal. And I'm in charge of the review -- review process. It's basically a peer-reviewed academic journal.
Q. Okay. Have you published in any planning journal like the Journal of the American Planning



Association or any other publication?
A. No.
Q. Okay. What journals have you published in?
A. I think I've published something on the order of 120 or more peer-reviewed articles. So -- so the Journal of Advertising, the -- The International [sic] Journal of Signage and Wayfinding. Got published in the Journal of Public Policy and Marketing, Journal of Advertising Research, Journal of Current Issues in Research and Advertising, and there is a lot more listed on my vitae.
Q. Okay. I looked at your articles in the Journal of Signage and Wayfinding, and it seemed like they were advocating for bringing stakeholders to the table to discuss sign regulation.
Is that accurate?
A. No, I wouldn't characterize it that way.
Q. How would you characterize it?
A. I -- I -- I think it's -- it's important to -- to balance various factors in signage regulation. I also think it's very important to look at the impact of signage on businesses and the economic vitality of the community. And I think that's a particularly important factor.
Q. Does that factor relate to safety,



aesthetics, or property values?
A. I would think the economic vitality of the community would relate to property values.
Q. But does it relate to safety or aesthetics?
A. I think it relates to aesthetics in the sense that sometimes some planners and organizations like Scenic America put aesthetics above economics in -- in drafting the codes, in my opinion.
Q. Okay. Let's see.
Have you ever published an article on urban design?
A. No, although my -- my -- the book that I coauthored in 2005 certainly goes -- covers some aspects of urban design.
Q. Okay. Have you ever published a -- an article on transportation systems?
A. No.
Q. Traffic safety?
A. Again, the -- you know, the book has a whole chapter on traffic safety.
Q. Okay.
MR. MESSENGER: So to the court reporter, Michelle, I -- I have a bunch of exhibits that I think probably the best way to do it would be to -- to upload them

Page 30

record.
And if the court reporter could mark this as Exhibit B, I will upload it to the chat here.
- - -
(Whereupon, Exhibit B was marked for identification.)
- - -
MR. MESSENGER: And let me know when that's confirmed and marked.
MR. SHAW: It's downloading now, so I'll let you know when it's here.
MR. MESSENGER: Thank you, sir.
And does the court reporter have it? Is it marked?
THE STENOGRAPHER: I have it.
Thank you.
MR. MESSENGER: Thank you.
BY MR. MESSENGER:
Q. Okay. Let's go back up to the beginning here. So I just want to take a few minutes to go through your report to make sure that I understand, you know, where you're coming from. And I need to resize some windows here to effectively do that.
Okay. So on page 2 here in your

Charles R Taylor PhD
November 13, 2024

Page 31

report says that you're responsible for teaching marketing courses right here, I guess, at both the undergraduate and graduate levels; is that correct?
A. Yes.
Q. And did we go over the full range of courses that you taught in the questioning that we just did?
A. In terms of courses I've taught in recent years, yes.
Q. And that's at both the undergraduate and the graduate levels?
A. Yes.
Q. Do you teach any classes in urban planning?
A. No.
Q. Do you teach any classes in regional planning?
A. No.
Q. Do you teach any classes in urban design?
A. No.
Q. Do you teach any classes in landscape architecture?
A. No.
Q. Do you teach any classes in traffic engineering?
A. No.
Q. Do you teach any classes in transportation

Page 32

planning?
A. No.
Q. Do you teach any classes in land use?
A. No.
Q. Do you teach any classes in land use planning?
A. No.
Q. Do you teach any classes in zoning?
A. No.
Q. Do you teach any classes in architecture?
A. No.
Q. Have you ever taught any classes in urban planning?
A. No.
Q. Have you ever taught any classes in land use planning?
A. No.
Q. Regional planning?
A. No.
Q. Urban design?
A. No.
Q. Landscape architecture?
A. No.
Q. Traffic engineering?
A. No.

U.S. Legal Support | www.uslegalsupport.com

Page 33

Q. Transportation planning?
A. No.
Q. Land use?
A. No.
Q. Zoning?
A. Haven't -- haven't taught a whole class in it, but we do -- in the advertising course, we -- I cover some zoning issues related to outdoor advertising.
Q. Which issues?
A. Basically differences in regulation based on whether under Highway Beautification Act whether an area is zoned residential versus commercial.
Q. So cotton areas and Bonus areas and that? Other areas?
A. Well, the -- you know, essentially under the Highway Beautification Act, the zoning of -- the zoning effects -- effects the regulation at -- at the federal level, and then, you know, local communities have additional authority.
Q. Do you know what a cotton area is under the Outdoor Advertising Act?
A. What is the term?
Q. The cotton area.
A. No.

Q. Have you ever been excluded as an expert witness in a case?
A. No.
Q. Have you ever had your report excluded or parts of it stricken?
A. The -- in the Guantanamera case, I think there was -- there was one paragraph that I wasn't allowed to testify on out of a 25-page report.
Q. Okay. Have you ever been proffered or tendered as an expert witness, but failed to be admitted as an expert witness?
A. No.
Q. Have you ever been admitted as an expert witness in urban planning?
A. No.
Q. Traffic safety?
A. I don't think I've been formally designated that way, but I have -- I have provided testimony on traffic safety and signage cases.
Q. But never formally designated as a traffic safety expert, correct?
A. I don't think so, no.
Q. Have you ever testified in defense of a municipal sign code?
A. No.

Charles R Taylor PhD
November 13, 2024



Q. Did you prepare an expert report in the case of Guantanamerica [sic] Cigars Company versus SMCI Holdings?
A. Yes.
Q. Okay. Let me-- let me stop this share. Give me just a minute here to --
Do you recognize this document?
A. I don't know that I actually saw it before, but it looks like the expert designation from that -- from the Guantanamera case.
Q. So I'll represent to you that this is plaintiff's reply in support of its Daubert motion to exclude expert report, testimony, and declaration of Charles Taylor as same, as reprinted by Westlaw.
Do you have any reason to dispute the accuracy or authenticity of this document?
A. No.
Q. Okay.
MR. MESSENGER: I move to formally enter this document into the deposition record. I will upload it and ask that the court reporter mark it as Exhibit C.
\- - -
(Whereupon, Exhibit C was marked for identification.)



\- - -
MR. MESSENGER: And we will pause, I guess, while we do that. Hang on.
If everybody could confirm that they got it, and if the court reporter can confirm that it's marked.
THE STENOGRAPHER: I got it and it's marked.
MR. MESSENGER: Mr. Shaw?
MR. SHAW: It is downloading now. Okay. I have it.
BY MR. MESSENGER:
Q. Okay. So here it says:
"Dr. Taylor was tasked with evaluating the market realities of premium cigars as compared to mass-market cigars based on established marketing principles, which Dr. Taylor has learned, developed, and applied over his 30 years of experience with a particular focus on branding and legal issues associated with the tobacco industry."
Is that right?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Is that an accurate statement of what it says here?

U.S. Legal Support | www.uslegalsupport.com



A. Could you repeat the question, please?
Q. Sure.
In this report -- I'm sorry.
Could you read the text that I highlighted here?
A. Yeah.
"Dr. Taylor was tasked with evaluating the market realities of premium cigars, (plaintiff's products) as compared to mass-market cigars (defendants' products) based on established marketing principles which Dr. Taylor has learned, developed, and applied over his 30 years of experience with a particular focus on branding and legal issues associated with the tobacco industry."
Q. Is that accurate?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Is this statement in this -- in this document accurate as to your experience?
A. Yeah, I -- I think what it says as applies to this case is true, yes.
Q. So you have 30 years of experience on branding and legal issues associated with the tobacco industry?
A. I -- I -- yeah. Over that time period, I've

Page 58

conspicuity."
Q. Okay. And I would imagine in signage -- so in -- in real estate, there's a saying that there are three factors that influence the value of real estate.
Are you familiar with those three factors?
A. No.
Q. Location, location, and location.
Now, in signage, it seems like conspicuity might be that, right? Because it's conspicuity and readability and conspicuity; is that right?
A. Yes.
Q. Conspicuity being a very important factor?
A. All three; legibility, conspicuity, and readability are important.
Q. "Conspicuity" is listed twice here in this report and in your current report; is that true?
A. Yeah. That's -- that's a mistake, a typo on my part.
Q. Now, what is it about conspicuity that's so important?
MR. SHAW: Objection to form.
You can answer.

Charles R Taylor PhD November 13, 2024

Page 59

THE WITNESS: Well, conspicuity refers to the sign's ability to stand out from -- from the rest of the environment that it's in.
BY MR. MESSENGER:
Q. And why is that important?
A. You want people to be able to see the sign.
Q. And everyone wants that, correct? Every sign owner?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. And every sign owner wants people to be able to see their sign?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Is that correct?
A. Well, it's -- to -- business owners, you know, that get on-premise signs should want them to be conspicuous, yes.
Q. Okay. And even municipalities would want their traffic signs to be visible, yes?
MR. SHAW: Objection to form.
THE WITNESS: That -- are we talking about traffic signs here?
///

Page 60

BY MR. MESSENGER:
Q. Yes.
In terms of traffic control signs, a municipality would want their traffic control signs to be legible, conspicuous, and readable; is that correct?
A. Yes.
Q. And why is that?
A. You want -- you want the sign to be noticed and -- and the person to be able to process the information that's in it.
Q. Okay. And is there a -- a competition for attention between on-premise signs, off-premise signs, and municipal traffic control signs?
A. I wouldn't call it a competition for attention, no.
Q. Okay. On page 7 of this report, you opine that:
"There is no evidence supporting a claim that signs painted on walls along the railway and properties and signs of a certain number and size are aesthetic harms."
Is that right?
A. Yes.
Q. Did you also give an opinion in this case

U.S. Legal Support | www.uslegalsupport.com

Page 61

that the city sign code doesn't prevent aesthetic harms in the instant case?
A. That the city's -- my -- my -- yeah. My opinion was a rebuttal to Mr. White's report that argued -- argued in favor of aesthetics, in favor of the sign code. And -- and my opinion is there's not evidence that aesthetics -- there is not -- there is not evidence that aesthetics support the sign code.
Q. So I guess the question is: Is it your opinion that the city sign code does not advance the city's interest in community aesthetics?
A. I -- I don't think there's evidence that the general public or business owners believe that.
Q. Is it your expert opinion that the City of Salina sign code does not advance the governmental interest in community aesthetics?
A. Aesthetics are subjective, and it -- it is my -- it's my opinion that they don't have evidence that -- that aesthetics are -- are being advanced by that code.
Q. How many years of experience do you have in municipal sign regulation?
A. I -- I have testified in some local municipalities considering sign codes.
Q. How many years?

Page 66

BY MR. MESSENGER:
Q. How many opinions do they need in order to make that judgment as policymakers?
MR. SHAW: Objection to scope.
THE WITNESS: Yeah. I don't -- I mean, I don't regard myself as an expert on -- on writing codes -- codes themselves. You know, in the planning context, I -- I would certainly say they should -- you know, they should get opinions. They should get opinions from various stakeholders in the community. I can't say exactly how many.
BY MR. MESSENGER:
Q. In your IJSW article you advocated for this type of participatory framework; is that correct?
MR. SHAW: Objection to form.
THE WITNESS: In that article we do talk about balancing the needs of stakeholders.
BY MR. MESSENGER:
Q. Did that article say how many stakeholders that you should have as a local government in your process?
MR. SHAW: Objection to form.

Charles R Taylor PhD
November 13, 2024

Page 67

BY MR. MESSENGER:
Q. In your sign code development process?
A. It listed out the various different -- different stakeholders. It didn't -- I mean, it didn't give a specific number, but it certainly -- it certainly talked at length about -- about needing to consider the different stakeholders.
Q. And in different communities, would those stakeholder groups be different?
MR. SHAW: Objection to scope.
THE WITNESS: I think -- to say -- it should be the same general categories of -- of stakeholders.
BY MR. MESSENGER:
Q. Is it possible that within those stakeholder groups that different representatives would have different aesthetic judgments?
A. Yes. That's certainly possible.
Q. And that in different communities they may come the different conclusions?
MR. SHAW: Objection. Scope.
THE WITNESS: Yeah, yeah. I -- you know, I'm not -- I'm not offering an opinion specifically on that process of -- of how the code is determined.

Page 68

BY MR. MESSENGER:
Q. Did you review how the City of Salina developed its current sign regulations?
A. No.
Q. Do you know who was involved in those determinations?
A. No.
Q. Have you reviewed sign codes in your professional capacity over the last 25 years, other than the City of Salina?
A. Yeah. I've read -- I've read some, yes.
Q. Okay. Is it common for a sign code to have a -- an allocation of signage based on the frontage of a lot or a building?
MR. SHAW: Objection to scope.
THE WITNESS: Again, you know, I'm not an urban planning expert. So I can -- you know, I can say I've seen codes that do that.
BY MR. MESSENGER:
Q. Okay. And how is Salina's code different from those codes?
MR. SHAW: Objection to scope.
THE WITNESS: Yeah, again, I'm -- I'm not -- I'm not putting myself forward an

U.S. Legal Support | www.uslegalsupport.com

Page 69

urban planning expert. The -- the codes vary a lot from one -- you know, from one municipality to another.
BY MR. MESSENGER:
Q. Is Salina's code more or less permissive than average in terms of the amount of area of wall sign an owner can have based on the front footage of their building?
MR. SHAW: Objection to scope.
THE WITNESS: I don't -- I'm not an urban planning expert, and so I -- I can't say for sure.
BY MR. MESSENGER:
Q. Do you know why a municipality would tie the amount in signage on a wall to the front footage of the building?
MR. SHAW: Objection to scope.
THE WITNESS: Yeah, again, that's -- that's an urban planning question. And I'm not -- not testifying in that area.
BY MR. MESSENGER:
Q. So Mark White talked about urban planning issues, and your report is a rebuttal to Mark White's report; is that correct?
A. Yes, to the extent that Mr. White argued that

an aside before you answer, Dr. Taylor, the scope objections would be for a 30(b)(6) deposition as I understand it, and there -- we're just trying to delve into Dr. Taylor's expertise and understanding of his own report, and so I think a scope objection and the prior ones would be inappropriate.
BY MR. MESSENGER:
Q. Dr. Taylor, are you familiar with how this case turned out?
A. My understanding is that the court ruled in favor of Downers Grove.
Q. And the district court dismissed that case; is that correct?
MR. SHAW: Objection to form and scope.
THE WITNESS: Yeah, I --
BY MR. MESSENGER:
Q. You can -- I'm sorry, Dr. Taylor. If we could --
MR. MESSENGER: Again, scope objections would be improper.
BY MR. MESSENGER:
Q. Dr. Taylor, you may continue.



A. Yeah. I don't think -- I don't know that I knew that the district court dismissed it, but...
Q. Okay. Would you read for me the highlighted text?
A. "It need not try to prove that aesthetic judgments are right."
Q. Okay. And here, would you go ahead and read that highlighted text for me?
A. "Likewise, with size, many people view signs as a necessary evil and believe that smaller equals less evil. Unless the government has engaged in content or viewpoint discrimination, the aesthetic judgment supports legislation."
Q. Were you familiar with this case when you prepared your report?
A. I didn't -- I hadn't read that decision. No.
Q. Okay. Now, you -- you opine that there's no evidence that the City considered aesthetics in terms of drafting its sign code; is that right?
A. I don't know that I said that exactly. Main point is that aesthetics -- aesthetics are subjective.
Q. Okay. Now, with respect to the documents that you reviewed in preparation of your rebuttal report, did you review the legislative history of



the City's sign code?
A. No.
Q. Okay. And yet you concluded that the City didn't reflect proper opinions when determining whether to regulate signs in the way that it does?
A. My memory of what I said is that -- is that aesthetics -- aesthetics are a matter of opinion and -- and are subjective in terms of -- in terms of how important they are.
Q. But you have no idea what opinions went into the formulation of the City sign code; is that correct?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Do you understand the question, Dr. Taylor?
A. I didn't review the whole history of how they developed the sign code, no. I did read -- I did read a little bit -- saw a hearing, read a hearing that -- that got into it just a little bit.
Q. About how the sign code was adopted? You read the adoption ordinance hearing?
A. I don't remember if it was the adoption ordinance hearing.
Q. Did you read a hearing from November of 2023?
A. It might have been. It's been a while.



Q. At which the Cozy sign was discussed, correct?
A. I -- I think so. I don't remember for sure.
Q. And at the end of that hearing, there was no motion to adopt a sign code; is that correct?
A. I don't remember.
Q. Okay. So you don't recall any of the legislative history of the sign code?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Do you understand the question, Dr. Taylor?
A. I wasn't -- yeah. I wasn't asked to study that in...
Q. But you did opine that the opinions that went into that were insufficient to make a determination that the sign code advances community aesthetics; is that correct?
MR. SHAW: Objection to form.
THE WITNESS: I don't think that's what my opinion says. I mean, I'd have to go to my report for the exact wording.
BY MR. MESSENGER:
Q. Okay. Let's -- let's do that.
We're going to go back to the expert report, which I believe is Exhibit B. And please

correct me if I'm wrong about the exhibit lettering on this. I believe this is Exhibit B.
So in Exhibit B, you say "While some" -- this is your expert opinion here in the highlighted text; is that correct?
A. Yeah. I think the opinion would be on -- on the top of this section. The --
Q. Wait. Let's find the opinion, and then we can work through it.
And, again, sir, we just want to understand. "Comprehensive Plan Implementation, Aesthetics" in sub 3. Okay. So let's find sub 3.
Is that where it is?
Here. So when you're ready, sir.
A. Can you ask the question again?
Q. Yeah. Well, let me start with another question.
Have you ever worked in a municipality?
A. I've never been employed by a municipality, no.
Q. Have you ever been employed by a county or a township?
A. No.
Q. Have you ever been employed by a state

Charles R Taylor PhD
November 13, 2024



department of transportation --
A. No.
Q. -- as an employee?
A. No.
Q. Have you ever administered a sign code?
A. No.
Q. Do you understand the mechanics of how the Salina sign code works on a particular site?
MR. SHAW: Objection to form.
THE WITNESS: I wouldn't have any detailed knowledge of that, no.
BY MR. MESSENGER:
Q. If you were to buy a building in Salina, would you be able to read the sign code and independently figure out how much signage could go on that --
Actually, let me ask you a different question.
Did you evaluate how much signage the Cozy Inn could have independently?
A. Didn't do any holistic analysis. I think I -- I think I read something that -- that said how much space could be allocated to a painting.
Q. All right. And can you tell me how much income you make doing expert witness reports?



A. This -- it -- it would vary, you know, from year to year. But over the last five years, I probably average making about 50,000 a year, something on that order.
Q. And how much of that is on sign cases over the last five or ten years?
MR. SHAW: Objection to form.
THE WITNESS: Probably -- probably -- over the last ten years, probably something like 15 percent --
BY MR. MESSENGER:
Q. Okay. So can you tell me --
A. -- of my -- of my consulting income, which is probably less than 5 percent of my overall income.
Q. Can you tell me how the City of Salina's code compares to the local codes in the cities where you have offered expert testimony against the on-premise sign regulations?
A. I -- I'm not offering an opinion on that.
Q. Because you're not qualified as an urban planner?
MR. SHAW: Objection to form.
THE WITNESS: I'm just -- I wasn't asked to offer an opinion on that.
///

U.S. Legal Support | www.uslegalsupport.com



BY MR. MESSENGER:
Q. Okay. Now, is it your opinion that the City of Salina sign code does not advance a community interest in aesthetics?
A. A general interest, yes.
Q. So there's a governmental interest in aesthetics; is that correct?
MR. SHAW: Objection to scope.
THE WITNESS: Yeah, that's -- that's a legal question.
BY MR. MESSENGER:
Q. Okay. If Salina asserts an interest in aesthetics as a basis for its sign code, does the sign code further that interest in aesthetics? Yes or no?
MR. SHAW: Objection to form.
THE WITNESS: In this case, I think it generally doesn't. In -- what's at issue here is whether -- whether businesses can have paintings on -- on walls. And I think there are -- there are people in the public there that wouldn't find that objectionable.
BY MR. MESSENGER:
Q. Now, does that -- so, again, you're saying

Page 94

murals versus -- versus on-premise signs that's the fundamental issue in this case.
Q. What's the -- okay.
So did you review any other documents in this case other than the -- the -- let me move to your report here.
This says that you -- can you read this right here?
A. "I am familiar with the facts in this case and have reviewed the relevant documents, including the first amended complaint, the City of Salina sign code, and defendant's response to plaintiffs' first set of interrogatories."
Q. Did you review any other documents in this case?
A. There's a reference list at the end that shows documents that I reviewed. And I also relied on my years of experience studying signage.
Q. Did you review the motion to dismiss or the response or the reply?
A. I don't believe so, no.
Q. Now, let me go back to page 13 here.
MR. SHAW: Did you say "13"?
MR. MESSENGER: Yeah. So this is up on screen now.

Page 95

BY MR. MESSENGER:
Q. Now, here you say -- can you read this to me? The blue highlighted text.
A. "The study's goal was to identify sources of distraction for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents."
Q. Now, you've repeatedly cited the Stutts article for this proposition, correct, in different expert reports?
A. A few, yes.
Q. So I want to bring that up really quick. If you'll forgive me for the -- again, the Zoom business that we have to do.
Okay. Can you see that?
A. Yes.
Q. Okay. Do you recognize that document?
A. Yes. It looks like the article we're talking about, yes.
Q. Okay. I'll represent to you that this is an article called "The Role of Driver Distraction in Traffic Crashes" from January 2001 by Stutts and Rothman.
Do you have any reason to dispute the

Page 96

authenticity of this document?
A. No.
Q. Okay. Do you have any reason to dispute the accuracy of this document?
A. No.
Q. Okay.
MR. MESSENGER: I move to formally enter this exhibit into the deposition record.
I think we're on G; is that correct? Exhibit G?
THE STENOGRAPHER: I think it was F.
MR. SHAW: F was the Seventh Circuit opinion, at least on my notes.
THE STENOGRAPHER: You can count them in the chat too, if that helps.
MR. MESSENGER: Yeah. I think we're on G now. F was the -- was the --
THE STENOGRAPHER: I got it. I got it. Okay. Yeah. We're on G.
- - -
(Whereupon, Exhibit G was marked for identification.)
- - -
MR. MESSENGER: Okay. I'm going to

Page 97

go ahead and upload this to the chat.
And if you can do the same confirmation.
BY MR. MESSENGER:
Q. So, Dr. Taylor, this is the same article that you referred to?
A. Yes. I've also seen Stutts present her work.
Q. Okay. So on page 16 here, are you familiar with this table 6?
A. It's been a while since I read this, but I -- I see it.
Q. Okay. Can you tell me what this table 6 means?
A. It says it's the distribution of specific driver distractions within categories of driver age based on 1995 to 1999 data.
Q. Do you have any reason to believe that in 2024, this may be different?
A. Probably not really substantially. It could -- it could be a little bit different.
Q. Okay. And this shows that people age 65 and up -- what does this 42.8 mean?
A. It's distribution of specific driver -- driver distractions.
Q. Distribution in what way? Events?

Page 98

Percentages?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. What does that number measure?
A. I'm not sure without looking at the text --
Q. Okay. That --
A. -- that's associated with --
Q. Okay.
A. That does help.
Q. Okay. What does that number measure?
A. It appears to be the percentage, the percentage of times people are in each of those age categories report that they've been distracted.
Q. And in -- in this case, by an outside person, object, or event?
A. Yes.
Q. Will you read this first part of the table here that's highlighted?
A. Okay.
"Outside person, object, or event, less than 20 to 27 percent. 20 to 29, 29.0. 30 to 49, 27.5. 50 to 64, 33.3. 65 plus 42.8."
Q. So one-third of the time, somebody who is 50 to 64 could be distracted by an outside person, object, or event?

Charles R Taylor PhD
November 13, 2024

Page 99

MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. Is that how you understand this table?
A. I -- to be honest, I'm not certain, based on -- it could be described in a little bit more detail.
Can we take a look at the footnote?
Q. Certainly.
A. Standard error column -- okay. It is -- that is the column percent. So that's correct.
Q. Okay.
A. Although I will -- I will say I've seen Professor Stutts present this work and say that signage is not in that category of outside person, object, or event based on the reports.
Q. Okay. Let's look at table 7.
So do you recall reading -- looking at this table?
A. It's -- it's been a long time, so I don't recall it very well, but I can take a look at it.
Q. So here we see "outside distraction," right?
A. Yes.
Q. And I can probably zoom out a little bit so you can see this better. Oh, sorry.
Can you see that okay?

Page 100

A. Yes.
Q. So outside distractions are frequent, is that right, based on this table, compared to even cell phone use?
MR. SHAW: Objection to form.
THE WITNESS: Yeah. This -- this table is showing outside distractions higher than cell phone use.
BY MR. MESSENGER:
Q. It says cell phone use is less than 5 percent, and outside distractions are more than 25 and -- and north of 30 in the terms of animals?
MR. SHAW: Objection to form.
THE WITNESS: This is what the chart says, but it doesn't say anything about signage.
BY MR. MESSENGER:
Q. We'll get to that.
Okay. So here, outside person, this talks about -- table 8 basically reflects figure 5.
Is that how that looks to you?
A. It looks like the same categories, yes.
Q. Okay. Now, moving on to -- hold on one second -- 26. Table 6 -- page 16.
Okay. So, here, this says:

U.S. Legal Support | www.uslegalsupport.com

Page 101

"Drivers age 50 to 64 were overrepresented with respect to eating and drinking distractions. Below 65 and older were more likely to have been distracted by objects and events outside the vehicle."
Is that correct?
A. Yes.
Q. And here, it says:
"Other vehicles, signs, animals, et cetera."
Is that not true?
A. It says that, yes.
Q. It does.
And this is the report that you cite for the proposition that signs aren't distracting; is that correct?
A. It gives no -- it gives no breakdown of the percentage of signs there. It doesn't say anything about the type of sign either. And I've seen the author say that on-premise signs aren't a significant factor.
Q. But what we see here is outside person, object, and event, which includes signs, is a material and significant factor based on the tables shown in terms of table 6, in terms of figure 5, and

Page 102

in terms of table 8; is that correct?
MR. SHAW: Objection.
THE WITNESS: It's a -- yeah. It's a very broad category you're talking about there.
BY MR. MESSENGER:
Q. Did you see Professor Stutts present this material prior to your first opinion --
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. -- that is cited in this article?
A. Prior to what?
Q. Okay. We'll skip that.
Now, on page -- let's see. Let's get to your book.
Hold on. Let me stop sharing.
A. Is it okay if we take a brief bathroom break?
Q. Absolutely.
Five minutes? Ten minutes?
A. Five minutes is plenty.
Q. Okay. We'll see you in five.
MR. MESSENGER: We'll go off record.
- - -
(Whereupon, a recess was taken from 12:26 p.m. to 12:36 p.m. Eastern, after

Charles R Taylor PhD November 13, 2024

Page 103

which time the deposition resumed.)
- - -
BY MR. MESSENGER:
Q. Okay. Dr. Taylor, I want to go back to this question about turning down cases for expert witness reports.
Have you ever turned down a case based on reviewing it and figuring out that the sign code advanced a governmental interest in traffic safety?
A. I don't think I've turned down a case on that basis, no.
Q. Have you ever turned down a case because you reviewed the materials and opined that -- that the code actually advanced in interest and aesthetics?
A. I -- I don't remember such a case, no.
Q. So are you saying you've never turned down a case because you opined that you couldn't agree with the plaintiffs with respect to whether the code advanced in interest and aesthetics?
MR. SHAW: Objection to form.
BY MR. MESSENGER:
Q. You can answer.
A. I -- I don't remember turning down a case for that reason.

Page 104

Q. Have you ever turned down a case in terms of writing an expert report on the basis that you reviewed the code and the supporting materials and made a determination that it actually does advance the governmental interest and property values?
A. I don't think I've turned down a case on that basis, no.
Q. Have you ever been in a municipality where businesses are thriving?
A. I -- yes.
Q. Have you ever looked at that municipality's sign code to determine why those businesses are thriving?
MR. SHAW: Objection to form.
THE WITNESS: It -- haven't -- haven't, you know, explicitly, you know, reviewed a sign code for -- word for word for that purpose, no.
BY MR. MESSENGER:
Q. Have you reviewed a sign code at all in a community where businesses are thriving?
A. There have been some, yes.
Q. Have you ever done a study of sign codes in communities where businesses are thriving?
A. A -- the formal study of like multiple sign

U.S. Legal Support | www.uslegalsupport.com

Page 105

codes?
No.
Q. Now, I want to go back to the Stutts article really quick. Let's see.
So now I'm not really interested in what Professor Stutts would say at a conference, as that's not in your report.
Can you just tell me here, again, that -- is outside person, object, and event a major source of distraction compared to the other distractions that Stutts studied in this report?
A. It -- it's one of the highest categories, yes.
Q. And in that -- on the same page, it says that such distractions include signs; is that right?
A. It doesn't specify what type of sign, but it says "signs."
Q. It does say "signs," right?
A. It does, yes.
Q. Okay.
Okay. I want to get into your -- your book a little bit here so we can understand the citations to that in your expert report. I'm going to stop sharing this and I'm going to bring your book up.

Page 118

that competes for a driver's attention wants more than two seconds of that time; is that correct?
A. That assumes that -- that assumes that the driver would just -- you know, would just read every single sign that they pass, which is not a reasonable assumption whatsoever.
Q. If a driver read the sign at the Cozy and spent two seconds or more reading the sign at the Cozy because it has eight words, would that single-glance duration exceed two seconds?
MR. SHAW: Objection to form.
THE WITNESS: That -- I don't think -- I don't think drivers would do that if they were driving past it quickly.
I think in the formula you showed in my book, you also -- you need -- part of that formula involves the size of the lettering of the sign. And -- and I think if you ask common citizens of Salina, Kansas, whether that sign would cause traffic accidents, they would -- they would say that it wouldn't -- it wouldn't cause them to get into a traffic accident.
BY MR. MESSENGER:
Q. And is that because they're experts in

Charles R Taylor PhD
November 13, 2024

Page 119

traffic safety, the common citizens of Salina?
A. I -- I don't think you need to be an expert in traffic safety to know that that sign wouldn't cause traffic accidents.
Q. So as a layperson, you need no expertise in traffic safety to evaluate traffic safety impacts?
A. I -- I think laypeople can have an opinion as to what would cause them to have an accident and what would not. And I think the weight of the evidence in the academic literature, tons and tons of studies -- less so recently because it's, in my opinion, pretty much settled science that on-premise signs don't cause traffic accidents.
Q. If laypeople opinions on traffic safety are adequate, why do we have all of this scientific research on traffic safety?
A. I never said they were adequate. You're putting words in my mouth.
MR. MESSENGER: Well, can --
Court Reporter, can you read back the testimony with respect to common citizens believing that the sign does not cause traffic safety problems.
- - -
(Whereupon, the stenographer read

Page 120

back the record as requested.)
- - -
BY MR. MESSENGER:
Q. So the Cozy sign has eight words on it, correct?
A. Yes.
Q. And we have previously established that your authoritative work on the topic suggests that a sign that captured a driver's attention to read six words would take the driver approximately six seconds to read at 30 miles an hour; is that correct?
A. It is, but you're conflating real-world conditions with how long it would take to read the sign. A driver driving past it at speed wouldn't just take their eyes off the road to read every word of the sign.
Q. But that's what you say in your book, that a driver that's going 30 miles an hour requires approximately two seconds to read six words; is that not correct?
A. That's how -- that's how long it would take, yes.
Q. Yes.
And you also make the case that a sign needs to capture its viewer in order to

U.S. Legal Support | www.uslegalsupport.com

Page 121

effectively deliver its message; is that correct?
MR. SHAW: Objection to form.
THE WITNESS: It does, but that doesn't mean that the driver is going to take that time to -- to read it.
BY MR. MESSENGER:
Q. But the business owner benefits if the driver does, correct?
MR. SHAW: Objection to form and scope.
THE WITNESS: You know, it depends on whether the driver has any interest in -- in that business.
But the key point is that drivers are not going to allow themselves to be distracted to the point where it compromises traffic safety.
BY MR. MESSENGER:
Q. But your authoritative work on this topic suggests that a sign with six words on it at 30 miles an hour takes approximately two seconds to read; is that correct?
A. Well, it -- what it -- what it's saying is that's how long it would take to read it.
Q. Did you study how tall the letters were on

THE WITNESS: They -- I mean, the business owner tries to make the sign conspicuous so -- so it can be seen.

BY MR. MESSENGER:

Q. So they try to make the sign more conspicuous if it has become essentially invisible?

MR. SHAW: Objection to form.

THE WITNESS: Yeah, I don't understand -- I don't understand the question.

BY MR. MESSENGER:

Q. If a sign has become essentially invisible because of the competition for other visual elements of the landscape, what does the sign owner do to make it visible again?

MR. SHAW: Objection to form.

THE WITNESS: I mean, the sign owner might not have many other options if there is a lot of other things -- a lot of other things going on. Because the point of conspicuity is that it stands out from the environment. So a lot of times the issue is when you consider a place of -- of business, you want adequate -- you want adequate signage.



BY MR. MESSENGER:

Q. What would you recommend to a business owner who needs to post a sign in a place with a lot of visual clutter?

MR. SHAW: Objection to form and scope.

THE WITNESS: I'd have to know -- I'd have to know the specifics of the situation. You know, it's possible that that might not be the best place to do business if -- if the sign can't be noticed.

MR. MESSENGER: Okay.

Wow, I'm having a little trouble with my screen here. Hold on.

BY MR. MESSENGER:

Q. Would you advise the sign owner to make their sign more conspicuous if they can if their sign has become essentially invisible?

MR. SHAW: Objection to form and scope.

THE WITNESS: I'd need to more -- know more details. And it's a hypothetical as to something becoming in- -- invisible. I'd need more detail



on -- on the specific area and -- and also what specific -- what signs they have.

BY MR. MESSENGER:

Q. Does it matter how many other signs they have?

MR. SHAW: Objection to form and scope.

THE WITNESS: It's -- you know, I'm not -- it's -- you know, in my report, I'm not offering an opinion on the conspicuity of -- you know, of Cozy's -- of Cozy's signs.

BY MR. MESSENGER:

Q. But you are offering an opinion that conspicuity is important, correct?

A. It's -- the -- the signage is important.

Q. The conspicuity of signage is important?

MR. SHAW: Objection to form.

THE WITNESS: The -- the opinion is that the signage plays important marketing functions that should be taken into account in -- in formulating sign codes and specific aspects of sign codes.

BY MR. MESSENGER:

Q. Can you say that again?



A. Can the -- can we get it from the court reporter?

MR. MESSENGER: Certainly.

\- - -

(Whereupon, the stenographer read back the record as requested.)

\- - -

BY MR. MESSENGER:

Q. Okay. So the opinion doesn't relate to the fact that the sign code should or should not address conspicuity?

MR. SHAW: Objection to form.

THE WITNESS: Well, I mean, conspicuity comes into play in terms -- you know, in terms of the sign being able to play its marketing function. And to that extent, it's part of my opinion.

BY MR. MESSENGER:

Q. Because in -- if a sign is conspicuous, it's more readily identified and perceived, correct?

A. That's correct. Yes.

Q. Okay. So if somebody wanted a sign to be conspicuous, what would they do?

MR. SHAW: Objection to form and scope.

Page 162

representation of the graphic that we used in that discussion when we were talking about conspicuity?
A. Yeah. It's -- I mean, it's modified from the book and I would note that I -- in the report, I don't offer any opinion on the conspicuity of the Cozy Inn sign. But that is a mod- -- that is a modified version of the picture from the book.
Q. And you agree that you the watched me draw this red rectangle with the white filling in realtime as we were discussing whether that sign would become more conspicuous if it got larger; is that correct?
A. Yes.
Q. All right. I think that objection is resolved as well, so we can move on.
MR. SHAW: I mean, I'll renew the objection to Exhibit H in that it is not the complete article and it contains highlights that have changed the pages that are included.
MR. MESSENGER: Okay.
BY MR. MESSENGER:
Q. Let me see here. Let's -- let's stop this share.
I want to talk about -- hang on a

Page 163

second. I want to talk about your experience in terms of how signs are used in marketing.
The core of your signage expertise is about how signs assist marketing; is that right?
MR. SHAW: Objection to form.
THE WITNESS: I mean, I think, you know, I wrote a -- I wrote a book on this topic that I do think is the first place a lot of people go. That it encompasses marketing and a lot of -- a lot of related issues.
BY MR. MESSENGER:
Q. But marketing is the center piece of the book, would you agree?
MR. SHAW: Objection to form.
THE WITNESS: That's -- I'd say it's the core of it, but there's other important topics as well.
BY MR. MESSENGER:
Q. How are signs useful in terms of marketing?
A. Again, I'd go back to the four functions. And it's come back to me.
The -- the enhancing store image is -- is the function I didn't recall earlier.
But they -- they can help identify

Page 164

the location of the -- of the business, they can serve as a promo- -- as a form of promotion in conjunction with other forms of integrated marketing communication. They can help brand the site, and they can help enhance the store image.
Q. Can they tell you what's available in the store for sale? Do signs do that?
MR. SHAW: Objection to form.
THE WITNESS: Yeah. Some -- some signs do identify what's available for sale in the store.
BY MR. MESSENGER:
Q. Which of the four functions that you just articulated would that one be?
A. The most -- most directly, ident- -- most directly related to -- to, like, the -- the promoting integrated marketing communications function is communicating what they sell.
Q. Okay. So I -- I -- I'm not trying to get free legal advice, sir, I'm not -- or not legal advice, but free marketing advice here. I am definitively not going to do this.
But if I wanted to open a -- a taco shop, what methodology would you suggest I do to identify that brand?

Page 165

MR. SHAW: Objection to form and scope.
THE WITNESS: I mean, depends on the taco shop and whether -- whether it's already well-known or whether it's a small business, where it's located. There's really lot of factors in -- that would be involved.
BY MR. MESSENGER:
Q. It's a brand-new family business and we specialized in Colorado Pueblo Green Chile sauce, and we use soft taco shells.
MR. SHAW: Objection to form and scope.
MR. MESSENGER: Wrong kind of peppers, Jeff?
MR. SHAW: Oh, I'm a big fan of Chipotle peppers, but...
MR. MESSENGER: Oh, you're missing out.
BY MR. MESSENGER:
Q. Go ahead, Dr. Taylor.
You can answer.
A. Yeah.
Okay. Well, I -- you know, I think

Page 174

to the -- to the interior of the -- of the restaurant, the -- you know, branding the site goes beyond just traditional, you know, on-premise signs. It's the building has something to do with it as well.
Q. Okay.
A. Other -- other elements that are re- -- you know, related to signage as well, like, if you have -- if you have banners, you know, internal de- -- interior displays and stuff play into it as well.
Q. You want that stuff to be consistent, yeah?
MR. SHAW: Objection to form.
THE WITNESS: Consistent with --
BY MR. MESSENGER:
Q. Complementary --
A. Yeah, consistent with the brand.
Q. Okay. So my taco and my green chili and my Kansas' Best Tacos, if I put the name of the company and the logo for the company on that sign as well, then have I done a better job of branding the site?
MR. SHAW: Objection to form.
THE WITNESS: I don't think -- I don't think it goes a real long way to branding the site. It's better -- it's

Charles R Taylor PhD November 13, 2024

Page 175

better than nothing. If the -- a lot of the best branding of the site goes on directly on the exterior of the -- of the building or inside the building.
BY MR. MESSENGER:
Q. So if I were to paint that taco and that Pueblo Green Chile and that tagline and then hang a sign over it that said, you know "Messenger Taco Stand. The best tacos in Kansas," like is that -- on the building, is that better for branding the site?
A. It would be part of -- it would be part of branding the site and it would supplement the signage in that regard.
Q. And the festive interior that suggests the irony of a white guy with an English decent-selling Mexican food would be --
MR. SHAW: Objection to form.
THE WITNESS: You know, I -- I think generally it's a good idea, you know, to -- to use the tools at -- at the company's disposal to brand the site.
BY MR. MESSENGER:
Q. Okay. Now, does that sign that I just mentioned, which would include my company name, a

Page 176

tag line that says "The best tacos in Kansas," and then a picture of a taco on a Pueblo Green Chile, does that give a visual cue to my customer what they might expect when they come and visit me?
MR. SHAW: Objection to form.
THE WITNESS: Well, I mean, if they read the sign, it's showing, you know -- it's showing an image of a taco, so they would get -- you know, they would get an idea the -- the -- that a taco was being sold there.
BY MR. MESSENGER:
Q. Okay. Okay. I want to bring up another exhibit really quick. Give me a second.
Sorry. Apologies.
Okay. I'd like to go back to exhibit -- if anybody can help me with this. Exhibit I?
MR. SHAW: I have it as "I" as well.
MR. MESSENGER: Thank you.
BY MR. MESSENGER:
Q. So this is Exhibit I.
Have you seen this exhibit before?
A. Yes.
Q. Okay. Now, I want to focus in on the -- the

U.S. Legal Support | www.uslegalsupport.com

Page 177

image that is under the text that says "Don't fear the smell" and over the text that says "The fun is i-n-s" -- because the rest of that word "inside" is to the right of that image.
Do you see that image?
A. Yes.
Q. Can you describe to me what that image is?
A. Well, I mean, I read in the complaint that the -- it's -- the artist intended it to be an image of, you know, a burger in the form of a flying saucer squirting ketchup and mustard, and the owner says it's designed to get across a whimsical and fun atmosphere of Cozy Inn.
Q. Did it brand the site?
A. You know, in the sense of communicating that there's, you know, a fun and whimsical atmosphere, I do think that it helps to brand the site. And I -- from -- from the quote I read from the owner, that's exactly what he wants to do with this.
Honestly, his -- his signs are conspicuous enough before this. So there's not much incentive to increase cons- -- conspicuity. I think it certainly meets the threshold. So what he's saying makes a lot of sense to me, that he's trying to communicate something about the store atmosphere.

TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 06/21/2019**

Today's Date: 1/24/2025
Source: U.S. District Court, Western District of Texas (San Antonio)

| | |
|---|---|
| **Court:** | U.S. District Court, Western District of Texas (San Antonio) |
| **Case Title:** | Borden Park, L.P. v. City of San Antonio |
| **Case:** | 5:03-CV-00491 |
| **Judge:** | Judge W. Royal Furgeson, Jr |
| **Date Filed:** | 06/11/2003 |
| **Date Closed/Terminated:** | 08/16/2006 |
| **Case Status:** | CLOSED |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 5:03CV00491 |
| **Jury Demand:** | Both |
| **Demand:** | $0 |
| **Nature of Suit:** | Other Statutes: Other Statutory Actions (890) |
| **Key Nature of Suit:** | Other Federal Statutes; Other Federal Statutory Actions (340.75) |
| **Jurisdiction:** | Federal Question |
| **Cause:** | 28 USC 1331 Federal Question: Other Civil Rights |

## PARTICIPANT INFORMATION

### Borden Park, L.P.

| | |
|---|---|
| **Party Description:** | Doing Business As Star Storage-Downtown San Antonio |
| **Type:** | Plaintiff |
| **Attorney:** | Andrew Harper Estes |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Lynch, Chappell & Alsup, PC |
| **Attorney Address:** | 300 N. Marienfeld, # 700<br>Midland, TX 79701 |
| **Attorney Phone:** | 432-683-3351 |
| **Attorney Fax:** | 432-683-2587 |
| **Email Address:** | hestes@lcalawfirm.com |
| **Attorney:** | Dawn M. Knepper |
| **Status:** | LEAD ATTORNEY |
| **Attorney Terminated:** | TERMINATED: 07/11/2005 |
| **Firm Name:** | Ogletree Deakins Nash Smoak & Stewart, P.C. |
| **Attorney Address:** | 695 Town Center Drive<br>Suite 1500<br>Costa Mesa, CA 92626 |
| **Attorney Phone:** | 714-800-7938 |
| **Attorney Fax:** | 714-754-1298 |
| **Email Address:** | dawn.knepper@odnss.com |
| **Attorney:** | Gay Gueringer |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Richie & Gueringer, P.C. |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| **Attorney Address:** | 112 E. Pecan Street<br>Suite 1420<br>San Antonio, TX 78205 |
| **Attorney Phone:** | 210-220-1080 |
| **Attorney Fax:** | 210-220-1088 |
| **Email Address:** | gg@rg-sanantonio.com |
| **Attorney:** | Matthew F. Wymer |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Akerman LLP |
| **Attorney Address:** | 112 East Pecan<br>Suite 2750<br>San Antonio, TX 78205 |
| **Attorney Phone:** | 210-582-0217 |
| **Attorney Fax:** | 210-582-0231 |
| **Email Address:** | matthew.wymer@akerman.com |

## Steve Arronge

| | |
|---|---|
| **Type:** | Movant |
| **Attorney:** | J. Stephen Weakley |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | LAW OFFICE OF STEVE WEAKLEY, P.C. |
| **Attorney Address:** | 5150 Broadway, No. 403<br>San Antonio, TX 78209 |
| **Attorney Phone:** | 210-364-7406 |
| **Attorney Fax:** | 210-587-6537 |
| **Email Address:** | stevew@steveweakleylawyer.com |

## Habib Erkan

| | |
|---|---|
| **Type:** | Movant |
| **Attorney:** | J. Stephen Weakley |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | LAW OFFICE OF STEVE WEAKLEY, P.C. |
| **Attorney Address:** | 5150 Broadway, No. 403<br>San Antonio, TX 78209 |
| **Attorney Phone:** | 210-364-7406 |
| **Attorney Fax:** | 210-587-6537 |
| **Email Address:** | stevew@steveweakleylawyer.com |

## City of San Antonio

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Fred Riley Jones |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Goode Casseb Jones Riklin Choate & Watson, P.C. |
| **Attorney Address:** | 2122 North Main Avenue<br>P.O. Box 120480<br>San Antonio, TX 78212-9680 |
| **Attorney Phone:** | 210-733-6030 |
| **Attorney Fax:** | 210-733-0330 |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| **Email Address:** | jones@goodelaw.com |
| **Attorney:** | Michael R. Hedges |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Goode Casseb Jones Riklin Choate & Watson |
| **Attorney Address:** | 2122 North Main Avenue<br>P.O. Box 120480<br>San Antonio, TX 78212-9680 |
| **Attorney Phone:** | 210-733-6030 |
| **Attorney Fax:** | 210-733-0330 |
| **Email Address:** | hedges@goodelaw.com |

**DOCKET PROCEEDINGS (292)**

| Entry #: | Date: | Description: | |
|---|---|---|---|
| 247 | 08/16/2006 | Final JUDGMENT in favor of defendant against plaintiff. Signed by Judge W. Royal Furgeson Jr.. (rg1, ) (Entered: 08/17/2006) | View Add to request |
| 246 | 08/16/2006 | Opinion dismissing plaintiff's claims and denying 237 defendant's Motion for Attorney Fees Signed by Judge W. Royal Furgeson Jr.. (rg1, ) (Entered: 08/17/2006) | View Add to request |
| 245 | 06/02/2006 | RESPONSE to Motion re 237 MOTION for Attorney Fees MOTION for Declaratory Judgment MOTION for Permanent Injunction , filed by City of San Antonio. (rg1, ) (Entered: 06/05/2006) | View Add to request |
| 244 | 05/26/2006 | Sealed Document filed by Borden Park, L.P.. (rg1, ) (Entered: 05/31/2006) | Send Runner to Court |
| 243 | 05/19/2006 | Sealed Document filed by City of San Antonio. (rf) (Entered: 05/22/2006) | Send Runner to Court |
| | 05/19/2006 | Received one copy of exhibits to SEALED DOCUMENT # 243, which has been forwarded to Court. (rf) (Entered: 05/22/2006) | Send Runner to Court |
| 242 | 05/16/2006 | RESPONSE to Plaintiff's Motion 237 for Attorney Fees MOTION for Declaratory Judgment MOTION for Permanent Injunction , filed by City of San Antonio. (rg1, ) (Entered: 05/18/2006) | View Add to request |
| 241 | 05/05/2006 | Memorandum of law on the issue of 237 MOTION for Attorney Fees - declaratory judgment by City of San Antonio. (rg1, ) (Entered: 05/08/2006) | View Add to request |

| | | | |
|---|---|---|---|
| 240 | 05/05/2006 | Memorandum of law on the issue of 237 MOTION for Attorney Fees MOTION for Declaratory Judgment MOTION for Permanent Injunction by City of San Antonio. (rg1, ) (Entered: 05/08/2006) | View Add to request |
| 239 | 05/05/2006 | Memorandum of Law on plaintiff's "vested rights" claim by City of San Antonio. (rg1, ) (Entered: 05/08/2006) | View Add to request |
| 238 | 05/05/2006 | MOTION to enter judgment on the jury verdict by City of San Antonio. (rg1, ) (Entered: 05/08/2006) | View Add to request |
| 237 | 05/05/2006 | MOTION for Attorney Fees, MOTION for Declaratory Judgment, MOTION for Permanent Injunction (PDF document is not available electronically at this time) by Borden Park, L.P.. (rg1, ) (Entered: 05/08/2006) | Send Runner to Court |
| 236 | 04/25/2006 | Minutes of proceedings for Status Conference conducted on 4/25/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/26/2006) | View Add to request |
| | 04/25/2006 | Status conference held (rg1) (Entered: 04/26/2006) | Send Runner to Court |
| 235 | 04/21/2006 | Order setting status conference to 5:00 4/25/06 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/24/2006) | View Add to request |
| 234 | 04/21/2006 | Order sequestering jury during deliberations. signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/24/2006) | View Add to request |
| 233 | 04/21/2006 | Jury verdict for City of San Antonio Unredacted Jury Verdict sealed pursuant to E-Government Act of 2002 (rg1) (Entered: 04/24/2006) | View Add to request |
| 232 | 04/21/2006 | Jury note No. 3 filed Jury note sealed pursuant to E-Government Act of 2002 (rg1) (Entered: 04/24/2006) | View Add to request |
| 231 | 04/21/2006 | Court's Response to jury note number 2 [225-1] (rg1) (Entered: 04/24/2006) | View Add to request |
| 230 | 04/21/2006 | Court Response to jury note number 2 [229-1] (rg1) (Entered: 04/24/2006) | View Add to request |
| 229 | 04/21/2006 | Jury note number 2 filed Jury note sealed pursuant to E- | View Add to request |

| | | | |
|---|---|---|---|
| | | Government Act of 2002 (rg1) (Entered: 04/24/2006) | |
| 228 | 04/21/2006 | Court's Charge/Instructions to the Jury signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/24/2006) | View Add to request |
| 227 | 04/21/2006 | Minutes of proceedings for Jury Trial conducted on 4/21/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) Modified on 04/24/2006 (Entered: 04/24/2006) | View Add to request |
| 226 | 04/21/2006 | Court's Response to jury note number one [225-1] (rg1) (Entered: 04/24/2006) | View Add to request |
| | 04/21/2006 | Jury trial held. Jury resumes deliberation. Jury note number one and two addressed in open court. Judge Mathy receives verdict in light of Judge Furgeson's absence. Verdict in favor of defendant City of San Antonio. Jurors discharged. Court in recess. (rg1) (Entered: 04/24/2006) | Send Runner to Court |
| | 04/21/2006 | Jury trial concluded (rg1) (Entered: 04/24/2006) | Send Runner to Court |
| 225 | 04/20/2006 | Jury note no. 1 filed Jury note sealed pursuant to E-Government Act of 2002 (rg1) (Entered: 04/24/2006) | View Add to request |
| 224 | 04/20/2006 | Order sequestering jury during deliberations. signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |
| 223 | 04/20/2006 | Order refusing City of San Antonio's Request for Jury Charge/Instruction - Substantive Due Process signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |
| 222 | 04/20/2006 | Order refusing City of San Antonio's Request for Jury Charge/Instruction - Damages. signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |
| 221 | 04/20/2006 | Order refusing City of San Antonio's Request for Jury Charge/Instruction - ordinance in question... signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |

| | | | |
|---|---|---|---|
| 220 | 04/20/2006 | Order refusing City of San Antonio's Request for Jury Charge/Instruction - Substantive Due Process signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |
| 219 | 04/20/2006 | Order refusing City of San Antonio's Request for Jury Charge/Instruction - Burden of Proof signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 04/21/2006) | View Add to request |
| 218 | 04/20/2006 | Minutes of proceedings for Jury Trial conducted on 4/20/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/21/2006) | View Add to request |
| 217 | 04/20/2006 | Minutes of proceedings for Jury Trial conducted on 4/19/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) Modified on 04/21/2006 (Entered: 04/21/2006) | View Add to request |
| | 04/20/2006 | Jury trial held. Partie argue charge before the Court. Court takes up proffer with the parties. Court charges jury. Opening statment heard. Jury retires to deliberate. Court in recess to until 4/21/06. (rg1) (Entered: 04/21/2006) | Send Runner to Court |
| 216 | 04/19/2006 | Transcript filed for dates of 4/13/06 (Proceedings Transcribed: Redirect Testimony of Bobby Michael McGlone) (Court Reporter: Denver B. Roden) (rg1) (Entered: 04/20/2006) | View Add to request |
| | 04/19/2006 | Jury trial held. Jurors excused for today. Court has charge conference with the parties. Court would like parties here at 8:30 am to argue jury charge. Court in recess to until 4/20/06. (rg1) (Entered: 04/21/2006) | Send Runner to Court |
| 215 | 04/17/2006 | Minutes of proceedings for Jury Trial conducted on 4/17/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/18/2006) | View Add to request |
| 214 | 04/17/2006 | Motion by City of San Antonio for judgment as a | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | matter of law (rg1) (Entered: 04/18/2006) | |
| | 04/17/2006 | Jury trial held. Witnesses Michael Clack, Nicholas Harris, Martyn Glen testimony heard. Witness Kelly Skinner heard before the court but testimony was found to be not relevant and will not be heard before the jury. Trial to continue 4/18/06, 9:00am. (rg1) (Entered: 04/18/2006) | Send Runner to Court |
| 213 | 04/14/2006 | Minutes of proceedings for Jury Trial conducted on 4/13/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/17/2006) | View Add to request |
| 212 | 04/13/2006 | Response by Borden Park, L.P. to defendant's motion for judgment as a matter of law (rg1) (Entered: 04/14/2006) | View Add to request |
| | 04/13/2006 | Jury trial held. Direct and cross examination of Mr. Simpson held. Plaintiff rest. Defendant's oral motion for judgment as a matter of law denied. Defense calls Ann McGlone, Jo Souter. Court in recess until April 17, 2006, 10:00am. (rg1) (Entered: 04/17/2006) | Send Runner to Court |
| 211 | 04/12/2006 | Minutes of proceedings for Jury Trial conducted on 4/12/06 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/13/2006) | View Add to request |
| | 04/12/2006 | Jury trial held. Ms. Gueringer calls Charles Taylor to the stand. Mr. Hedges on cross- examination of Mr. Taylor. Mr. Estes calls David Simpson to the stand. Court in recess until 4/13/06, 9:00am. (rg1) (Entered: 04/13/2006) | Send Runner to Court |
| 210 | 04/11/2006 | Minutes of proceedings for Jury trial conducted on 4/11/06 by Judge Furgeson. Court Reporter: Denver Roden (rf) (Entered: 04/11/2006) | View Add to request |
| 209 | 04/11/2006 | Minutes of proceedings for Jury Trial conducted on 4/10/06 by Judge | View Add to request |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| | | Furgeson. Court Reporter: Denver Roden (rf) (Entered: 04/11/2006) | |
| 208 | 04/10/2006 | Minutes of proceedings for Jury trial conducted on 4/5/06 by Judge Furgeson. Court Reporter: Denver Roden (rf) (Entered: 04/10/2006) | View Add to request |
| | 04/10/2006 | Jury trial held. Mr. Hedges on cross-examination of Mr. Erkan, Mr. Estes on re-cross. Mr. Gueringer calls Andrea DeLaune (sworn in) to the stand. Mr. Hedges on cross-examination of Ms. DeLaune. Mr. Estes calls Larry Gottsman (sworn in) to the stand. Mr. Hedges on cross-examination of Mr. Gottsman. Mr. Estes calls Florencio Pena (sworn in) to the stand. Mr. Hedges on cross-examniation of Ms. Pena. Court's in recess until tomorrow at 9:00 a.m. (rf) (Entered: 04/11/2006) | Send Runner to Court |
| | 04/10/2006 | Jury trial held. Mr. Estes calls Paul Grafe (sworn in) to the stand. Mr. Hedges on cross-examination. Mr. Estes calls Mr. Pena back to the stand. Mr. Jones on cross-examination of Mr. Pena. Court's in recess until tomorrow at 9:00 a.m. (rf) (Entered: 04/11/2006) | Send Runner to Court |
| 207 | 04/05/2006 | Minutes of proceedings for Jury trial conducted on 4/4/06 by Judge Furgeson. Court Reporter: Denver Roden (rf) (Entered: 04/05/2006) | View Add to request |
| | 04/05/2006 | Jury trial held. Mr. Hedges on cross-examination of Mr. Banes. Ms. Gueringer calls Mark Morehead (sworn in) to the stand. Mr. Jones on cross-examination. Mr. Estes call Habib Erkan (sworn in) to the stand. Court's in recess until Monday at 9:00 a.m. (rf) (Entered: 04/10/2006) | Send Runner to Court |
| | 04/04/2006 | Jury trial held. Juror's sworn in, Court gives preliminary instructions. Opening statements heard from Mr. | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | Estes and Mr. Hedges. Mr. Estes calls David Arrington (sworn in) to the stand. Mr. Hedges on cross-examination. Court admits plaintiff's and defendant's exhibits. Ms. Gueringer calls Jeff Bane (sworn in) to the stand. Mr. Hedges on cross-examination. Court's in recess until tomorrow at 9:00 a.m. (rf) (Entered: 04/05/2006) | |
| 206 | 04/03/2006 | Minutes of proceedings for Jury Selection/Trial conducted on 4/3/6 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/04/2006) | View Add to request |
| | 04/03/2006 | Jury selection held . Voir dire begins. Jury selected. (rg1) (Entered: 04/04/2006) | Send Runner to Court |
| | 04/03/2006 | Voir dire begins (rg1) (Entered: 04/04/2006) | Send Runner to Court |
| | 04/03/2006 | Jury trial begun (rg1) (Entered: 04/04/2006) | Send Runner to Court |
| 205 | 03/31/2006 | Notice by Borden Park, L.P. of: Proposed Jury Questionnaire (rg1) (Entered: 04/03/2006) | View Add to request |
| 204 | 03/31/2006 | Response by Borden Park, L.P. to Defendant's objections to trial exhibits [201-1] (rg1) (Entered: 04/03/2006) | View Add to request |
| 203 | 03/31/2006 | Proposed partial Jury instructions by Borden Park, L.P. (rg1) (Entered: 04/03/2006) | View Add to request |
| 202 | 03/31/2006 | Minutes of proceedings for Pretrial Conference conducted on 3/31/6 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 04/03/2006) | View Add to request |
| | 03/31/2006 | Pretrial conference held. Trial issues/causes of action, jury questionnaire, voir dire, jury selection, number of jurors, motions in limine discussed with the parties. (rg1) (Entered: 04/03/2006) | Send Runner to Court |
| 201 | 03/30/2006 | Submission for the Court's Review of Exhibits to which it objects by City of San Antonio (rg1) (Entered: 03/31/2006) | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| 200 | 03/30/2006 | Notice by City of San Antonio of: Defendant's Draft Proposed Charge of the Court (rg1) (Entered: 03/31/2006) | View | Add to request |
| 199 | 03/29/2006 | Trial Brief by City of San Antonio (rg1) (Entered: 03/30/2006) | View | Add to request |
| 198 | 03/27/2006 | Exhibit list by City of San Antonio (rg1) (Entered: 03/28/2006) | View | Add to request |
| 197 | 03/27/2006 | Motion by City of San Antonio in limine (rg1) (Entered: 03/28/2006) | View | Add to request |
| 196 | 03/24/2006 | Motion by Borden Park, L.P. in limine (rg1) (Entered: 03/27/2006) | View | Add to request |
| 195 | 03/22/2006 | Objections by Borden Park, L.P. to Trial Exhibit List (rg1) (Entered: 03/23/2006) | View | Add to request |
| 194 | 03/22/2006 | Amended Trial Exhibit list by Borden Park, L.P. (rg1) (Entered: 03/23/2006) | View | Add to request |
| 193 | 03/20/2006 | Trial Brief by Borden Park, L.P. (rg1) (Entered: 03/21/2006) | View | Add to request |
| 192 | 03/20/2006 | Designation of Trial Witnesses and Testifying experts filed by Borden Park, L.P. (rg1) (Entered: 03/21/2006) | View | Add to request |
| 191 | 03/20/2006 | Trial Exhibit list by Borden Park, L.P. (rg1) (Entered: 03/21/2006) | View | Add to request |
| 190 | 03/20/2006 | Third Amended Disclosure and Designation of Potential Witnesses and Testifying experts filed by City of San Antonio (rg1) (Entered: 03/21/2006) | View | Add to request |
| 189 | 03/17/2006 | Minutes of proceedings for Status Conference conducted on 3/17/6 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 03/20/2006) | View | Add to request |
| 188 | 03/17/2006 | Pretrial disclosures and Designation of Potential Trial Exhibits filed by City of San Antonio (rg1) (Entered: 03/20/2006) | View | Add to request |
| 187 | 03/17/2006 | Order setting miscellaneous hearing to 9:00 3/22/06 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 03/20/2006) | View | Add to request |
| 186 | 03/17/2006 | Order setting pretrial conference to 2:00 3/31/06 | View | Add to request |

signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 03/20/2006)

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | 03/17/2006 | Status conference held. Court to hold hearing on objectins to exhibits on 3/22/06 and pretrial hearing set for 3/31/06. (rg1) (Entered: 03/20/2006) | Send Runner to Court |
| 185 | 03/10/2006 | Order set status conference for 10:00 3/17/06 signed by Hon. W. R. Furgeson Jr. (rf) (Entered: 03/10/2006) | View Add to request |
| 184 | 01/09/2006 | Order Motion hearing re motion for protective order [183-1] set for 4:00 1/17/06 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 01/09/2006) | View Add to request |
| 183 | 12/16/2005 | Objections, Motion by City of San Antonio for protective order and Response to Plaintiff's Fifth Set of Requests for Production (rg1) (Entered: 12/19/2005) | View Add to request |
| 182 | 12/09/2005 | Minutes of proceedings for Motion hearing conducted on 12/9/05 by Judge Furgeson. Court Reporter: Roden (tm) (Entered: 12/12/2005) | View Add to request |
| 181 | 12/09/2005 | Order DENYING motion for partial summary judgment of first amendment and Texas Constitution article I, section 8 [136-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 12/12/2005) | View Add to request |
| 180 | 12/09/2005 | Order DENYING motion for clarification of the Court's order on plaintiff's second motion for partial summary judgment regarding re-facing signs without a permit [168-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 12/12/2005) | View Add to request |
| | 12/09/2005 | Motion hearing held for motion for clarification [168-1] (tm) (Entered: 12/12/2005) | Send Runner to Court |
| 179 | 12/02/2005 | Reply by Borden Park, L.P. to response to motion for partial summary judgment of first amendment and Texas Constitution article I, section 8 claims [136-1] (tm) (Entered: 12/05/2005) | View Add to request |
| 178 | 11/21/2005 | Response by City of San Antonio motion for partial summary judgment of first amendment and Texas Constitution article I, section 8 claims [136-1] (ga) (Entered: 11/22/2005) | View Add to request |
| 177 | 11/17/2005 | Order setting hearing on plaintiff's motion for clarification | View Add to request |

| | | | |
|---|---|---|---|
| | | of the Court's order on plaintiff's second motion for partial summary judgment regarding re-facing signs without a permit [168-1] for 9:30 12/9/05 signed by Hon. W. R. Furgeson (tm) (Entered: 11/18/2005) | |
| 176 | 11/14/2005 | Order DENYING motion to exclude opinions of Lawrence C. Clark [159-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 11/15/2005) | View Add to request |
| 175 | 11/14/2005 | Order DENYING motion to exclude opinions of Dr. Charles F. Floyd and brief in support [157-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 11/15/2005) | View Add to request |
| 174 | 11/10/2005 | Minutes of proceedings for Motion hearing conducted on 11/10/05 by Judge Furgeson. Court Reporter: Roden (tm) (Entered: 11/14/2005) | View Add to request |
| 173 | 11/10/2005 | Sur-reply by City of San Antonio to plaintiff's reply to defendant's response to motion to exclude opinions of Dr. Charles F. Floyd [169-1] (tm) (Entered: 11/14/2005) | View Add to request |
| | 11/10/2005 | Motion hearing held for motion to exclude [157-1], [159-1] (tm) (Entered: 11/14/2005) | Send Runner to Court |
| 172 | 11/09/2005 | Order GRANTING defendant's second motion for enlargement of time [170-1]. Deadline is extended to 11/21/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 11/10/2005) | View Add to request |
| 171 | 11/07/2005 | Response by City of San Antonio to plaintiff's motion for clarification of the Court's order on plaintiff's second motion for partial summary judgment regarding re-facing signs without a permit [168-1] (ga) (Entered: 11/08/2005) | View Add to request |
| 170 | 11/07/2005 | Unopposed second amended motion by City of San Antonio for enlargement of time (ga) (Entered: 11/08/2005) | View Add to request |
| 169 | 11/02/2005 | Reply by Borden Park, L.P. to defendant's response to plaintiif's motion to exclude opinions of Dr. Charles F. Floyd and brief in support [157-1] (ga) (Entered: 11/03/2005) | View Add to request |
| 168 | 10/26/2005 | Motion by Borden Park, L.P. for clarification of the Court's | View Add to request |

| | | | | |
|---|---|---|---|---|
| | | order on plaintiff's second motion for partial summary judgment regarding re-facing signs without a permit (tm) (Entered: 10/27/2005) | | |
| 167 | 10/24/2005 | Order setting motion to exclude [159-1] [157-1] for 3:30 11/10/05 signed by Hon. W. R. Furgeson Jr. (ga) (Entered: 10/26/2005) | View | Add to request |
| 166 | 10/24/2005 | Response by City of San Antonio to motion to exclude opinions of Lawrence C. Clark [159-1] (tm) (Entered: 10/25/2005) | View | Add to request |
| 165 | 10/24/2005 | Response by City of San Antonio to motion to exclude opinions of Dr. Charles F. Floyd and brief in support [157-1] (tm) (Entered: 10/25/2005) | View | Add to request |
| 164 | 10/24/2005 | Agreed Order on motion of Habib Erkan to quash notice of intention to take deposition and request for protective order signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 10/25/2005) | View | Add to request |
| 163 | 10/19/2005 | Order denying as moot motion for hearing on docket no.122 [149-1] signed by Hon. W. R. Furgeson Jr. (ga) (Entered: 10/20/2005) | View | Add to request |
| 162 | 10/19/2005 | Order denying motion to disregard defendant's response to plaintiff's objections to report and recommendations of the United States Magistrate Judge [110-1] signed by Hon. W. Furgeson Jr. (ga) (Entered: 10/20/2005) | View | Add to request |
| 161 | 10/17/2005 | Order GRANTING defendant's unopposed amended motion to exceed response to dispositive motion page limit [156-1], and motion for enlargement time [156-2]. Deadline is extended to 11/8/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 10/18/2005) | View | Add to request |
| 160 | 10/17/2005 | Appendix by Borden Park, L.P. d/b/a Star Storage - Downtown, San Antonio (ga) (Entered: 10/18/2005) | View | Add to request |
| 159 | 10/17/2005 | Motion by Borden Park, L.P. with memorandum in support to exclude opinions of Lawrence C. Clark (ga) (Entered: 10/18/2005) | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 158 | 10/14/2005 | Appendix for motion to exclude opinions of Dr. Charles F. Floyd and brief in support [157-1] by Borden Park, L.P. (rg1) (Entered: 10/17/2005) | View Add to request |
| 157 | 10/14/2005 | Motion by Borden Park, L.P. to exclude opinions of Dr. Charles F. Floyd and brief in support (rg1) (Entered: 10/17/2005) | View Add to request |
| 156 | 10/13/2005 | Unopposed amended motion by City of San Antonio to exceed response to dispositive motion page limit 'amended' , and for enlargement time 'amended' [137-1] [137-2] (tm) (Entered: 10/14/2005) | View Add to request |
| | 10/11/2005 | Mail addressed to Steve Arronge, Habib Erkan : order [155-1] : returned by post office marked RTS / No Forward On File (ga) (Entered: 10/20/2005) | Send Runner to Court |
| 155 | 09/30/2005 | Order denying motion to exclude testimony of plaintiff's designated expert Claus [120-1] signed by Hon. W. R. Furgeson Jr. (ga) (Entered: 09/30/2005) | Docket Status View Add to request |
| 154 | 09/28/2005 | Minutes of proceedings for Hearing on Mag appeal; motion to quash and plaintiff's advisory to the court conducted on 9/28/05 by Judge Furgeson. Court Reporter: Roden (tm) (Entered: 09/29/2005) | View Add to request |
| | 09/28/2005 | Hearing on appeal of Magistrate's order; motion to quash and plaintiff's advisory to the court held. (tm) (Entered: 09/29/2005) | Send Runner to Court |
| 153 | 09/27/2005 | Fourth amended scheduling order extending Discovery cutoff 12/16/05 ; Jury Selection set for 9:30 4/3/06 ; Jury trial set for 9:30 4/3/06 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/28/2005) | View Add to request |
| 152 | 09/26/2005 | Response by City of San Antonio to Plaintiff's "Advisory" Seeking to Alter Plaintiff's Signs by Refacing Without a Permit [148-1] (ga) (Entered: 09/26/2005) | View Add to request |
| 151 | 09/23/2005 | Reply by City of San Antonio to plaintiff's response to motion to quash notices of intention to take oral depositions on Sept 13 and 14, 2005 [131-1], | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | motion for protective order (ga) (Entered: 09/26/2005) | |
| 150 | 09/23/2005 | Order setting hearing on plaintiff's Advisory to the Court [148-1] to 4:30 9/28/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/26/2005) | View Add to request |
| 149 | 09/22/2005 | Unopposed motion by Borden Park, L.P. for hearing on docket no.122 (ga) (Entered: 09/22/2005) | View Add to request |
| 148 | 09/22/2005 | Advisory to the court filed by Borden Park, L.P. (ga) (Entered: 09/22/2005) | View Add to request |
| 147 | 09/16/2005 | Response by Borden Park, L.P. to Erkan's motion to quash notices of intention to take oral depositions on Sept 13 and 14, 2005 [131-1], and motion for protective order [131-2] (tm) (Entered: 09/19/2005) | View Add to request |
| 146 | 09/14/2005 | Order granting motion to quash notices of intention to take oral depositions on Sept 13 and 14, 2005 [131-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/15/2005) | View Add to request |
| | 09/14/2005 | Mooted motions motion for protective order [131-2] (tm) (Entered: 09/15/2005) | Send Runner to Court |
| 145 | 09/13/2005 | Order REINSTATING Borden Park's motion for partial summary judgment [136-1] and San Antonio's motion for leave to file response to dispositive motion out of page limit [137-1], and motion to extend time to file response to Borden Park's third motion for partial summary judgment [137-2] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/14/2005) | View Add to request |
| 144 | 09/08/2005 | Minutes of proceedings for Status Conference conducted on 9/7/05 by Judge Furgeson. Court Reporter: Roden (tm) (Entered: 09/09/2005) | View Add to request |
| | 09/07/2005 | Status conference held. Court moves trial date to 2/13/06 at 9:00. Hearing set for appeal of magistrate's order and motion to quash for 9/28/05 at 4:30 (tm) (Entered: 09/09/2005) | Send Runner to Court |
| 143 | 09/06/2005 | Joint advisory to the court filed by Borden Park, L.P., City of San Antonio regarding the dispositive motion deadline (tm) (Entered: 09/07/2005) | View Add to request |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| 142 | 09/06/2005 | Reply by City of San Antonio to defendant's appeal of Magistrate's order on motion to exclude claus [134-1] (tm) (Entered: 09/07/2005) | View Add to request |
| 141 | 09/01/2005 | Response by Borden Park, L.P. to Magistrate appeal [134-1] (ct) (Entered: 09/02/2005) | View Add to request |
| 140 | 09/01/2005 | Order setting status conference to 3:00 9/7/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/02/2005) | View Add to request |
| 139 | 09/01/2005 | Order striking motion for partial summary judgment of first amendment and Texas Constitution article I, section 8 [136-1], denying motion for leave to file response to dispositive motion out of page limit [137-1], denying to extend time to file response to Borden Park's third motion for partial summary judgment [137-2] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/02/2005) | View Add to request |
| 138 | 09/01/2005 | Order VACATING order referring matters to Magistrate Judge signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/02/2005) | View Add to request |
| | 09/01/2005 | CASE NO LONGER REFERRED TO Judge Pamela A. Mathy (tm) (Entered: 09/02/2005) | Send Runner to Court |
| 137 | 08/31/2005 | Motion by City of San Antonio for leave to file response to dispositive motion out of page limit , and to extend time to file response to Borden Park's third motion for partial summary judgment (ct) (Entered: 09/01/2005) | View Add to request |
| 136 | 08/26/2005 | Third motion by Borden Park, L.P. with memorandum in support for partial summary judgment of first amendment and Texas Constitution article I, section 8 claims (tm) (Entered: 08/29/2005) | View Add to request |
| 135 | 08/26/2005 | Order granting motion for leave to file third motion for partial summary judgment out of page limit [133-1] signed by Judge Pamela A. Mathy (tm) (Entered: 08/29/2005) | View Add to request |
| | 08/26/2005 | Appendix for motion for partial summary judgment of first amendment and Texas | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | Constitution article I, section 8 claims [136-1] by Borden Park, L.P. received marked and placed with file (tm) (Entered: 08/29/2005) | |
| 134 | 08/25/2005 | Appeal of Magistrate Judge's order on defendant's motion to exclude testimony of plaintiff's designated expert James Claus [130-1] (tm) (Entered: 08/26/2005) | View Add to request |
| 133 | 08/25/2005 | Motion by Borden Park, L.P. for leave to file third motion for partial summary judgment out of page limit (third motion for summary judgment receive stamped) (ct) (Entered: 08/26/2005) | View Add to request |
| 132 | 08/19/2005 | Memorandum by Steve Arronge, Habib Erkan in support of motion to quash notices of intention to take oral depositions on Sept 13 and 14, 2005 [131-1], motion for protective order [131-2] (tm) (Entered: 08/22/2005) | View Add to request |
| 131 | 08/19/2005 | Motion by Steve Arronge, Habib Erkan to quash notices of intention to take oral depositions on Sept 13 and 14, 2005 , and for protective order (tm) (Entered: 08/22/2005) | View Add to request |
| 130 | 08/15/2005 | Order denying motion to exclude testimony of plaintiff's designated expert Claus [120-1] signed by Judge Pamela A. Mathy (tm) (Entered: 08/16/2005) | View Add to request |
| 129 | 08/11/2005 | Order granting motion for protective order [126-2], denying motion to quash deposition notice and subpoena duces tecum [126-1] signed by Judge Pamela A. Mathy (tm) (Entered: 08/12/2005) | View Add to request |
| | 08/11/2005 | Mooted motions motion to modify deposition notice and subpoena duces tecum [126-3] pursuant to Court's Order doc. no. 129 (tm) (Entered: 08/22/2005) | Send Runner to Court |
| 128 | 08/09/2005 | Supplement filed by Borden Park, L.P. Re: motion to quash deposition notice and subpoena duces tecum [126-1], motion for protective order [126-2], motion to modify deposition notice and | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | subpoena duces tecum [126-3] (ct) (Entered: 08/10/2005) | | |
| 127 | 08/09/2005 | Response by City of San Antonio motion to quash deposition notice and subpoena duces tecum [126-1], motion for protective order [126-2], motion to modify deposition notice and subpoena duces tecum [126-3] (ct) (Entered: 08/10/2005) | View | Add to request |
| 126 | 08/08/2005 | Motion by Borden Park, L.P. to quash deposition notice and subpoena duces tecum , and for protective order , and in the alternative to modify deposition notice and subpoena duces tecum (ct) (Entered: 08/09/2005) | View | Add to request |
| 125 | 08/08/2005 | Order WITHDRAWING and VACATING order setting jury selection/trial [124-1] filed on 8/5/05. The Jury selection will remain at 9:30 12/5/05 , as well as the Jury trial to remain at 9:30 12/5/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 08/09/2005) | View | Add to request |
| 124 | 08/05/2005 | Order setting Jury selection to 9:00 10/24/05 , and setting Jury trial to 9:00 10/24/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 08/08/2005) | View | Add to request |
| 123 | 08/05/2005 | Order granting in part, denying in part Defendant's motion to dismiss [84-1] signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 08/08/2005) | View | Add to request |
| 122 | 08/05/2005 | Order granting in part, denying in part Plaintif's second motion for partial summary judgment [87-1]. Plaintiff's request for attorney's fees is DENIED signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 08/08/2005) | View | Add to request |
| 121 | 07/29/2005 | Response by Borden Park, L.P. motion to exclude testimony of plaintiff's designated expert Claus [120-1] (ct) (Entered: 08/01/2005) | View | Add to request |
| 120 | 07/18/2005 | Motion by City of San Antonio to exclude testimony of plaintiff's designated expert Claus (ct) (Entered: 07/19/2005) | View | Add to request |
| 119 | 07/11/2005 | Notice of withdrawal of counsel and notice of attorney appearance for Borden Park, | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | L.P. by Matthew F. Wymer (tm) (Entered: 07/12/2005) | |
| 118 | 06/06/2005 | Reply by City of San Antonio to response to motion to enlarge number of interrogatories [114-1] (tm) (Entered: 06/07/2005) | View Add to request |
| 117 | 06/02/2005 | Order granting motion to enlarge number of interrogatories [114-1] signed by Judge Pamela A. Mathy (tm) (Entered: 06/06/2005) | View Add to request |
| | 06/02/2005 | Mooted motions motion for production to plaintiff [115-1] pursuant to Court's Order dkt no. 117 (tm) (Entered: 06/09/2005) | Send Runner to Court |
| 116 | 05/31/2005 | Response by Borden Park, L.P. and objections to defendant's motion to enlarge number of interrogatories [114-1], and objections to defendant's motion for production to plaintiff [115-1] (tm) (Entered: 06/01/2005) | View Add to request |
| 115 | 05/19/2005 | Second interrogatoties and motion by City of San Antonio for production to plaintiff (tm) (Entered: 05/20/2005) | View Add to request |
| 114 | 05/19/2005 | Motion by City of San Antonio to enlarge number of interrogatories (tm) (Entered: 05/20/2005) | View Add to request |
| 113 | 04/06/2005 | Amended designation of potential witnesses and testifying experts filed by City of San Antonio (tm) (Entered: 04/07/2005) | View Add to request |
| 112 | 03/10/2005 | Agreed third amended scheduling order setting: Discovery cutoff 10/25/05; Pretrial order to be submitted on or before 11/4/05 ; Jury Selection set for 9:30 12/5/05 ; Jury trial set for 9:30 12/5/05 signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 03/11/2005) | View Add to request |
| 111 | 03/07/2005 | Response by City of San Antonio to plaintiff's motion to disregard defendant's response to plaintiff's objections to report recommendations of the United States Magistrate Judge [110-1] (tm) (Entered: 03/08/2005) | View Add to request |
| 110 | 03/04/2005 | Motion by Borden Park, L.P. to disregard defendant's response to plaintiff's objections to report | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | and recommendations of the United States Magistrate Judge (tm) (Entered: 03/07/2005) | |
| 109 | 02/25/2005 | Response by City of San Antonio to plaintiff's report & recommendation objection [105-1] (tm) (Entered: 02/28/2005) | View Add to request |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| 108 | 02/24/2005 | Combined Witness, Exhibit and Expert List by City of San Antonio (tm) (Entered: 02/25/2005) | View Add to request |
| 107 | 02/24/2005 | Third amended privilege log filed by City of San Antonio (tm) (Entered: 02/25/2005) | View Add to request |
| 106 | 02/22/2005 | Notice of attorney appearance for Borden Park, L.P. by Andrew Harper Estes as co-counsel (tm) (Entered: 02/23/2005) | View Add to request |
| 105 | 02/15/2005 | Objections to report and recommendations [103-1] by Borden Park, L.P. (tm) (Entered: 02/16/2005) | View Add to request |
| 104 | 02/11/2005 | Objections to report and recommendations [103-1] by City of San Antonio (tm) (Entered: 02/14/2005) | View Add to request |
| | 02/04/2005 | Acknowledgment receipt of Fred Jones magistrate report and recommendations (tm) (Entered: 02/07/2005) | Send Runner to Court |
| | 02/04/2005 | Acknowledgment receipt of City of San Antonio's attorney Michael Hedges magistrate report and recommendations (tm) (Entered: 02/07/2005) | Send Runner to Court |
| | 02/02/2005 | Acknowledgment receipt of Gay Gueringer magistrate report and recommendations (tm) (Entered: 02/02/2005) | Send Runner to Court |
| | 02/02/2005 | Acknowledgment receipt of Dawn M. Knepper magistrate report and recommendations (tm) (Entered: 02/02/2005) | Send Runner to Court |
| 103 | 01/28/2005 | Report and recommendation of Judge Mathy recommending that defendant's motion for summary judgment [84-2] be granted ini part and denied in part, [84-1], and Borden Park's second motion for partial summary judgment [87-1] should be denied without prejudice. (Sent copies by certified mail of faxed if authorization is on file.) (tm) (Entered: 04/11/2005) | View Add to request |
| 102 | 01/11/2005 | Reply by Borden Park, L.P. to response to motion for partial summary judgment [87-1] (tm) (Entered: 01/12/2005) | View Add to request |
| 101 | 01/11/2005 | Reply by City of San Antonio to response to motion to dismiss [84-1], motion for summary | View Add to request |

| | | | | |
|---|---|---|---|---|
| | | judgment [84-2] (tm) (Entered: 01/12/2005) | | |
| 100 | 01/11/2005 | Order granting plaintiff's unopposed motion for leave to exceed page limit [98-1] signed by Judge Pamela A. Mathy (tm) (Entered: 01/12/2005) | View | Add to request |
| 99 | 01/11/2005 | Order granting motion for leave to enlarge page limits for reply to response to second amended motion to dismiss or, the alternative, for summary judgment [97-1] signed by Judge Pamela A. Mathy (tm) (Entered: 01/12/2005) | View | Add to request |
| 98 | 01/10/2005 | Unopposed motion by Borden Park, L.P. for leave to exceed page limit (Reply to defendant's response to second motion for partial summary judgment placed on left side of file) (tm) (Entered: 01/11/2005) | View | Add to request |
| 97 | 01/10/2005 | Unopposed motion by City of San Antonio for leave to enlarge page limits for reply to response to second amended motion to dismiss or, in the alternative, for summary judgment (Reply placed on left side of file) (tm) (Entered: 01/11/2005) | View | Add to request |
| 96 | 01/10/2005 | Exhibit list by Borden Park, L.P. (tm) (Entered: 01/11/2005) | View | Add to request |
| 95 | 01/10/2005 | Designation of potential witness and expert witness filed by Borden Park, L.P. (tm) (Entered: 01/11/2005) | View | Add to request |
| 94 | 12/29/2004 | Response by City of San Antonio in opposition to motion for leave to file response exceeding page limit (Reponse to second motion to dismiss placed with file) [88-1] (rg1) (Entered: 01/03/2005) | View | Add to request |
| 92 | 12/27/2004 | Response by Borden Park, L.P. to defendant's second motion for partial summary judgment [87-1] (tm) (Entered: 12/28/2004) | View | Add to request |
| 91 | 12/27/2004 | Order granting motion for leave to file response exceeding page limit [88-1] signed by Judge Pamela A. Mathy (tm) (Entered: 12/28/2004) | View | Add to request |
| 90 | 12/22/2004 | Objections by City of San Antonio to statement of facts and summary judgment | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | evidence [87-1] (tm) (Entered: 12/27/2004) | |
| 89 | 12/22/2004 | Response by City of San Antonio to plaintiff's second motion for partial summary judgment [87-1] (tm) (Entered: 12/27/2004) | View Add to request |
| 88 | 12/22/2004 | Motion by Borden Park, L.P. for leave to file response exceeding page limit (Reponse to second motion to dismiss placed with file) (tm) (Entered: 12/27/2004) | View Add to request |
| 87 | 11/23/2004 | Second Motion by Borden Park, L.P. for partial summary judgment (rg) (Entered: 11/29/2004) | View Add to request |
| 86 | 11/23/2004 | Order granting motion for leave to file second motion for partial summary judgment [85-1] signed by Judge Pamela A. Mathy (rg) (Entered: 11/24/2004) | View Add to request |
| 85 | 11/22/2004 | Motion by Borden Park, L.P. for leave to file second motion for partial summary judgment (rg) (Entered: 11/23/2004) | View Add to request |
| 84 | 11/22/2004 | Second Motion by City of San Antonio to dismiss , or/ alt for summary judgment (lp) (Entered: 11/23/2004) | View Add to request |
| 83 | 11/22/2004 | Second Amended answer by City of San Antonio : answer [11-1] (lp) (Entered: 11/23/2004) | View Add to request |
| | 11/22/2004 | Received plaintiff's second motion for partial summary judgment along with statement of facts supporting the motion (rg) (Entered: 11/23/2004) | Send Runner to Court |
| 82 | 11/10/2004 | Order denying motion for more definite statement [80-1] signed by Judge Pamela A. Mathy (tm) (Entered: 11/12/2004) | View Add to request |
| 81 | 10/25/2004 | Response by Borden Park, L.P. motion for more definite statement [80-1] (tm) (Entered: 10/26/2004) | View Add to request |
| 80 | 10/12/2004 | Motion by City of San Antonio for more definite statement (tm) (Entered: 10/13/2004) | View Add to request |
| 79 | 10/08/2004 | Order granting in part, denying in part motion third amended Scheduling order [60-1] [78-1] resetting scheduling order deadlines: Discovery deadline on 4/11/05 ; Deadline for filing of all motions by 4/25/05 signed | View Add to request |

| | | | |
|---|---|---|---|
| | | by Judge Pamela A. Mathy (tm) (Entered: 10/12/2004) | |
| 78 | 10/06/2004 | Unopposed motion by City of San Antonio to enter third amended Scheduling order [60-1] (tm) (Entered: 10/07/2004) | View Add to request |
| 77 | 09/23/2004 | Order denying without prejudice amended motion 'amended' to dismiss [45-1], denying without prejudice amended motion for summary judgment [45-2], denying witout prejudice motion for partial summary judgment [27-1]. New briefing schedule shall be applied to Borden Park: new dispositive motions due 10/21/04, response due 11/22/04, and reply due 12/6/04. Jury selection and trial set for 1/10/05 is VACATED until further ordered by this court. Order which abates all discovery is VACATED without prejudice [75-1]. Motion for leave to serve in excess of thirty requests for admission [68-1] is GRANTED and plaintiff is allowed to propound 19 additional requests for admission on defendant signed by Hon. W. R. Furgeson Jr. (tm) (Entered: 09/24/2004) | View Add to request |
| 76 | 09/20/2004 | ORDER referring case to U.S. Magistrate Judge Mathy. It is finally ORDERED that the Order entered on 9/17/04, referring specific motions to the Magistrate Judge is VACATED. signed by Hon. W. R. Furgeson Jr. (rg) (Entered: 09/21/2004) | View Add to request |
| | 09/20/2004 | Case referred to Judge Pamela A. Mathy (rg) (Entered: 09/21/2004) | Send Runner to Court |
| 93 | 09/17/2004 | Amended complaint by Borden Park, L.P. , amending complaint [1-1] (Pages: 29) (tm) (Entered: 01/03/2005) | View Add to request |
| 75 | 09/17/2004 | Ordered that Plaintiff's Motion for Leave teo Serve in Excess of Thirty Requests for Admissions is abated. signed by Hon. W. R. Furgeson Jr. (mj) (Entered: 09/20/2004) | View Add to request |
| 74 | 09/17/2004 | Order granting motion for leave to file second amended complaint [65-1] signed by | View Add to request |

| | | | |
|---|---|---|---|
| | | Hon. W. R. Furgeson Jr. (mj) (Entered: 09/20/2004) | |
| 73 | 09/17/2004 | Order referring motions : referred amended motion 'amended' to dismiss [45-1] to Judge Pamela A. Mathy, referred amended motion for summary judgment [45-2] to Judge Pamela A. Mathy, referred motion for partial summary judgment [27-1] to Judge Pamela A. Mathy signed by Hon. W. R. Furgeson Jr. (mj) (Entered: 09/20/2004) | View Add to request |
| 72 | 09/16/2004 | Reply by Borden Park, L.P. to response to motion for leave to file second amended complaint [65-1] (ct) (Entered: 09/17/2004) | View Add to request |
| 71 | 09/16/2004 | Minutes of proceedings for Motion for Leave to Amend conducted on September 16, 2004 by Judge Furgeson. Court Reporter: Denver Roden (ct) (Entered: 09/17/2004) | View Add to request |
| 70 | 09/15/2004 | Response by City of San Antonio in opposition to motion for leave to serve in excess of thirty requests for admission [68-1] (rg) (Entered: 09/16/2004) | View Add to request |
| 69 | 09/14/2004 | Order Motion hearing motion for leave to serve in excess of thirty requests for admission [68-1] for 2:30 9/16/04, motion for leave to file second amended complaint [65-1] for 2:30 9/16/04 signed by Hon. W. R. Furgeson Jr. (ct) (Entered: 09/15/2004) | View Add to request |
| 68 | 09/10/2004 | Motion by Borden Park, L.P. for leave to serve in excess of thirty requests for admission (ct) (Entered: 09/13/2004) | View Add to request |
| 67 | 09/07/2004 | Notice by Borden Park, L.P. of: Certificate of Conference concerning Plaintiff's Motion for Leave to File Second Amended Complaint (ct) (Entered: 09/08/2004) | View Add to request |
| 66 | 09/07/2004 | Response by City of San Antonio in opposition to motion for leave to file second amended complaint [65-1] (ct) (Entered: 09/08/2004) | View Add to request |
| 65 | 08/26/2004 | Motion by Borden Park, L.P. for leave to file second amended | View Add to request |

| | | | |
|---|---|---|---|
| | | complaint (tm) (Entered: 08/27/2004) | |
| 64 | 05/14/2004 | Advisory to the court filed by Borden Park, L.P., City of San Antonio regarding the status of this case. (rg1) (Entered: 05/17/2004) | Send Runner to Court |
| 63 | 04/16/2004 | Transcript filed for dates of 3/23/04 (Proceedings Transcribed: Motion Hearing) (Court Reporter: Denver Roden) (fe) (Entered: 04/19/2004) | Send Runner to Court |
| 62 | 03/23/2004 | Minutes of proceedings for Motion for Summary Judgment Hearing conducted on 03/23/04 by Judge Furgeson. Court Reporter: Roden (rg1) (Entered: 03/24/2004) | Send Runner to Court |
| 61 | 03/23/2004 | Order staying pending amended motion for summary judgment [45-2], motion for partial summary judgment [27-1]. Plaintiff shall advise the court by 5/14/04 of the s tatus of its claims. signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 03/24/2004) | View Add to request |
| | 03/23/2004 | Motion hearing held for the following motions: [45-2], [27-1] motion for summary judgment. parties are ordered to report back in 45 days. If matters are not worked out, then the Court will hold hearing on pending motions. (rg1) (Entered: 03/24/2004) | Send Runner to Court |
| 60 | 03/12/2004 | Scheduling order setting Discovery cutoff 12/10/04 Pretrial order to be submitted on or before 12/17/04 ; Jury Selection set for 9:30 1/10/05; Jury trial set for 9:30 1/10/05. signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 03/15/2004) | View Add to request |
| 59 | 03/12/2004 | Order granting unopposed motion to enter second amended scheduling order [58-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 03/15/2004) | View Add to request |
| 58 | 03/11/2004 | Unopposed Motion by Borden Park, L.P. to enter second amended scheduling order (fe) (Entered: 03/12/2004) | Send Runner to Court |
| 57 | 02/12/2004 | Reply by City of San Antonio to response to amended motion 'amended' to dismiss [45-1], | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | amended motion for summary judgment [45-2] (rg1) (Entered: 02/12/2004) | |
| 56 | 02/12/2004 | Order granting defendant's motion to enlarge page limits for reply to plaintiff's response to defendant's amended motion to dismiss... [55-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 02/12/2004) | View Add to request |
| 55 | 02/10/2004 | Unopposed Motion by City of San Antonio to enlarge page limits for reply to plaintiff's response to defendant's amended motion to dismiss... (Reply attached) (rg1) (Entered: 02/11/2004) | Send Runner to Court |
| 54 | 02/10/2004 | Reply by Borden Park, L.P. to response to plaintiff's motion for partial summary judgment [27-1] (rg1) (Entered: 02/11/2004) | Send Runner to Court |
| 52 | 02/09/2004 | Order Motion hearing regarding amended motion for summary judgment [45-2] set for 10:30 3/23/04, motion for summary judgment for 10:30 3/23/04, motion for partial summary judgment [27-1] for 10:30 3/23/04 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 02/09/2004) | View Add to request |
| 53 | 02/06/2004 | Advisory to the court filed by City of San Antonio regarding withdrawal of motions filed 11/13/03. (rg1) (Entered: 02/09/2004) | Send Runner to Court |
| | 02/06/2004 | Advisory to the Court regarding Withdrawal motion to dismiss [51-1], motion for summary judgment [51-2] filed 11/13/03. (rg1) (Entered: 02/09/2004) | Send Runner to Court |
| 50 | 02/03/2004 | Response by Borden Park, L.P. to City of San Antonio's amended motion 'amended' to dismiss [45-1], amended motion for summary judgment [45-2] (fe) (Entered: 02/04/2004) | Send Runner to Court |
| 49 | 02/03/2004 | Order granting plaintiff's motion to exceed page limits for plaintiff's response to defendant's amended motion to dismiss or, in alternative for sumary judgment [47-1] signed by Hon. W. R. Furgeson Jr. (fe) (Entered: 02/04/2004) | View Add to request |

| | | | |
|---|---|---|---|
| 48 | 02/03/2004 | Defendant City of San Antonio's First Supplemental Rule 26 Initial Disclosures. (fe) (Entered: 02/04/2004) | Send Runner to Court |
| 47 | 01/30/2004 | Unopposed Motion by Borden Park, L.P. to exceed page limits for plaintiff's response to defendant's amended motion to dismiss or, in the alternative for sumary judgment (response attached) (rg1) (Entered: 02/02/2004) | Send Runner to Court |
| 46 | 01/30/2004 | Response by City of San Antonio to plaintiff's motion for partial summary judgment [27-1] (rg1) (Entered: 02/02/2004) | Send Runner to Court |
| 45 | 01/23/2004 | Amended motion by City of San Antonio : 'amended' to dismiss , or in the alternative for summary judgment and supporting brief (kc) (Entered: 01/26/2004) | Send Runner to Court |
| 44 | 01/23/2004 | Order granting motion to enlarge page limits for de fendant's amended motion to dismiss... (amended motion attached) [42-1] signed by Hon. W. R. Furgeson Jr. (kc) (Entered: 01/26/2004) | View Add to request |
| 43 | 01/21/2004 | Supplement filed by Borden Park, L.P. Re: motion for partial summary judgment [27-1] (rg1) (Entered: 01/22/2004) | Send Runner to Court |
| 42 | 01/21/2004 | Motion by City of San Antonio to enlarge page limits for de fendant's amended motion to dismiss... (amended motion attached) (rg1) (Entered: 01/22/2004) | Send Runner to Court |
| 41 | 12/17/2003 | Answer by City of San Antonio to amended complaint; jury demand (rg1) (Entered: 12/19/2003) | Send Runner to Court |
| 40 | 12/17/2003 | First Amended complaint by Borden Park, L.P. , amending complaint [1-1] (Pages: 24) (rg1) (Entered: 12/19/2003) | View Add to request |
| 39 | 12/17/2003 | Amended Scheduling order setting Joining of parties, amending of pleadings on 12/15/03 Discovery cutoff 5/14/04 ; Jury Selection set for 9:30 5/24/04 ; Jury trial set for 9:30 5/24/04 , termed motions signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 12/18/2003) | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 38 | 12/17/2003 | Order granting motion to enter amended scheduling order [35-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 12/18/2003) | View Add to request |
| 37 | 12/17/2003 | Order granting motion to amend complaint [1-1] (First Amended Complaint attached) [33-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 12/18/2003) | View Add to request |
| 36 | 12/17/2003 | Order granting motion for leave to file amended answer [34-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 12/18/2003) | View Add to request |
| 35 | 12/15/2003 | Unopposed Motion by Borden Park, L.P. to enter amended scheduling order (rg1) (Entered: 12/16/2003) | Send Runner to Court |
| 34 | 12/15/2003 | Motion by City of San Antonio for leave to file amended answer (amended answer attached) (rg1) (Entered: 12/16/2003) | Send Runner to Court |
| 33 | 12/11/2003 | Unopposed Motion by Borden Park, L.P. to amend complaint [1-1] (First Amended Complaint attached) (rg1) (Entered: 12/12/2003) | Send Runner to Court |
| 51 | 11/13/2003 | Motion by City of San Antonio to dismiss , or, in the alternative, for summary judgment (rg1) (Entered: 02/06/2004) | Send Runner to Court |
| 32 | 11/13/2003 | First Supplemental Answer by City of San Antonio (rg1) (Entered: 11/17/2003) | Send Runner to Court |
| 31 | 11/13/2003 | Minutes of proceedings for pending motions hearing conducted on 11/13/03 by Judge Furgeson. Court Reporter: Roden (rg1) (Entered: 11/14/2003) | Send Runner to Court |
| 30 | 11/13/2003 | Order denying motion for sanctions [21-2], denying motion to compel dft to respond to requests for production [21-1] granting motion for leave to file first supplemental answer [23-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 11/14/2003) | View Add to request |
| 29 | 11/13/2003 | Order granting motion for leave to file motion for partial summary judgment in excess of page limit [26-1] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 11/14/2003) | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | 11/13/2003 | Motion hearing held for the following motions: [23-1], [21-1], [21-2]. Order to be entered. (rg1) (Entered: 11/14/2003) | Send Runner to Court |
| 28 | 11/12/2003 | Statement of Facts by Borden Park, L.P. in support of motion for partial summary judgment [27-1] (rg1) (Entered: 11/13/2003) | Send Runner to Court |
| 27 | 11/12/2003 | Motion by Borden Park, L.P. for partial summary judgment (rg1) Modified on 11/13/2003 (Entered: 11/13/2003) | Send Runner to Court |
| 26 | 11/12/2003 | Motion by Borden Park, L.P. for leave to file motion for partial summary judgment in excess of page limit (rg1) Modified on 11/13/2003 (Entered: 11/13/2003) | Send Runner to Court |
| 25 | 11/04/2003 | Order Motion hearing on motion for leave to file first supplemental answer [23-1] for 1:30 11/13/03 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 11/05/2003) | View Add to request |
| 24 | 11/03/2003 | Response by City of San Antonio motion to compel dft to respond to requests for production [21-1] (rg1) (Entered: 11/04/2003) | Send Runner to Court |
| 23 | 10/30/2003 | Motion by City of San Antonio for leave to file first supplemental answer (fe) (Entered: 10/31/2003) | Send Runner to Court |
| | 10/30/2003 | Received "Defendant's First Supplemental Answer". (fe) (Entered: 10/31/2003) | Send Runner to Court |
| 22 | 10/23/2003 | Order hearing on motion to compel dft to respond to requests for production [21-1] set for 2:30 11/4/03 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 10/23/2003) | View Add to request |
| 21 | 10/20/2003 | Motion by Borden Park, L.P. to compel dft to respond to requests for production , for sanctions (rg1) (Entered: 10/21/2003) | Send Runner to Court |
| 20 | 08/29/2003 | Alternate Dispute Resolution Report filed by Borden Park, L.P., Party(s) do not agree to Alternate Dispute Resolution (rg1) (Entered: 09/02/2003) | Send Runner to Court |
| 19 | 08/20/2003 | Alternate Dispute Resolution Report filed by City of San Antonio, Party(s) do not agree | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | to Alternate Dispute Resolution (rg1) (Entered: 08/21/2003) | |
| 18 | 08/14/2003 | Scheduling order setting Joining of parties, amending of pleadings on 10/30/03 Deadline for filing of all motions 2/13/04 Discovery cutoff 1/23/04 ; Alternate Dispute Resolution Report due by 8/29/03 ; Jury Selection set for 9:00 4/5/04 ; Jury trial set for 9:00 4/5/04 , termed motions signed by Hon. W. R. Furgeson Jr. (lp) (Entered: 08/15/2003) | View Add to request |
| 17 | 08/14/2003 | Notice of filing initial disclosures by City of San Antonio (lp) (Entered: 08/15/2003) | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | 08/05/2003 | Terminated motion to vacate briefing schedule for plaintiff's motion for temporary injunction [16-1].Per order document # 15. (mj) (Entered: 08/05/2003) | Send Runner to Court |
| | 08/04/2003 | Terminated motion for permanent injunction [1-4]; Scheduling order entered - relief requested in complaint. (mj) (Entered: 08/04/2003) | Send Runner to Court |
| 16 | 08/01/2003 | Joint Motion by Borden Park, L.P. to vacate briefing schedule for plaintiff's motion for temporary injunction (rg1) (Entered: 08/04/2003) | Send Runner to Court |
| | 07/30/2003 | Terminated motion for Writ of Certiorari [1-1] (mj) (Entered: 07/30/2003) | Send Runner to Court |
| 15 | 07/29/2003 | Order mooting joint motion to extend briefing schedule for plaintiff's motion for temporary injunction [12-1], mooting motion for temporary injunction [1-3] signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 07/30/2003) | View Add to request |
| 14 | 07/23/2003 | Answer by Borden Park, L.P. (lp) (Entered: 07/24/2003) | Send Runner to Court |
| 13 | 07/21/2003 | Transcript filed for dates of 05/28/03 (Proceedings Transcribed: Hearing on motion for Temporary Injunction) (Court Reporter: Denver B. Roden) (rg1) (Entered: 07/23/2003) | Send Runner to Court |
| 12 | 07/09/2003 | Joint motion by Borden Park, L.P., City of San Antonio to extend briefing schedule for plaintiff's motion for temporary injunction (fe) (Entered: 07/09/2003) | Send Runner to Court |
| 11 | 07/03/2003 | Answer by City of San Antonio; jury demand (rg1) (Entered: 07/03/2003) | Send Runner to Court |
| 10 | 06/30/2003 | Briefing Scheduling for Plaintiff's Motion for Temporary Injunction - mooting motion for temporary restraining order [1-2] setting answer due to 7/3/03 for City of San Antonio , discovery deadline 7/14/03 , Alternate Dispute Resolution Report Deadline 7/23/03 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 07/01/2003) | View Add to request |
| 9 | 06/30/2003 | Order hearing on motion for temporary injunction [1-3] set for 2:30 8/14/03 signed by | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | Hon. W. R. Furgeson Jr. (rg1) (Entered: 07/01/2003) | |
| 8 | 06/25/2003 | Minutes of proceedings for Status Conference conducted on 06/25/03 by Judge Furgeson. Court Reporter: Denver Roden (rg1) (Entered: 06/27/2003) | Send Runner to Court |
| | 06/25/2003 | Status conference held. Temporary injunction addressed. Scheduling deadlines set. (rg1) (Entered: 06/27/2003) | Send Runner to Court |
| 7 | 06/24/2003 | Response by Borden Park, L.P. to defendant's motion for continuance of preliminary injunction hearing [4-1] (rg1) (Entered: 06/26/2003) | Send Runner to Court |
| 6 | 06/24/2003 | Response by Borden Park, L.P. to defendant's motion for continuance of preliminary injunction hearing, or in the alternative, motion to reconsider. [4-1] (fe) (Entered: 06/25/2003) | Send Runner to Court |
| 5 | 06/23/2003 | Order granting motion for continuance of preliminary injunction hearing [4-1] set status conference for 10:30 6/25/03 signed by Hon. W. R. Furgeson Jr. (fe) (Entered: 06/25/2003) | View Add to request |
| 4 | 06/23/2003 | Motion by City of San Antonio for continuance of preliminary injunction hearing (fe) (Entered: 06/25/2003) | Send Runner to Court |
| 3 | 06/16/2003 | Return of service executed as to City of San Antonio on 6/13/03 by personal service on Yolanda L. Ledesma (rg) (Entered: 06/18/2003) | Send Runner to Court |
| 2 | 06/13/2003 | Order Motion hearing for motion for temporary restraining order [1-2] for 10:30 6/25/03 signed by Hon. W. R. Furgeson Jr. (rg1) (Entered: 06/16/2003) | View Add to request |
| 1 | 06/11/2003 | Complaint filed. Filing Fee: $ 150.00 Receipt # 183450 (Pages: 25) (ct) (Entered: 06/12/2003) | Send Runner to Court |
| 1 | 06/11/2003 | Demand for jury trial by Borden Park, L.P. (ct) (Entered: 06/12/2003) | Send Runner to Court |
| 1 | 06/11/2003 | Motion by Borden Park, L.P. for Writ of Certiorari , and for temporary restraining order , and for temporary injunction , | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | |
|---|---|---|
| | and for permanent injunction (ct) Modified on 06/12/2003 (Entered: 06/12/2003) | |
| 06/11/2003 | Case assigned to Hon. W. R. Furgeson Jr. (ct) (Entered: 06/12/2003) | Send Runner to Court |

TO ORDER COPIES OF ANY DOCUMENTS LISTED
ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TO ORDER COPIES OF ANY DOCUMENTS LISTED BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 10/16/2019**

Today's Date: 1/24/2025
Source: U.S. District Court, Northern District of Illinois (Chicago)

| | |
|---|---|
| **Court:** | U.S. District Court, Northern District of Illinois (Chicago) |
| **Case Title:** | Peterson et al v. Downers Grove, The Village of |
| **Case:** | 1:14-CV-09851 |
| **Judge:** | Honorable Edmond E. Chang |
| **Date Filed:** | 12/08/2014 |
| **Other Dockets:** | Case in other court: 16-03055 |
| **Date Closed/Terminated:** | 02/04/2016 |
| **Case Status:** | KIM, TERMED |

## SYNOPSIS INFORMATION

| | |
|---|---|
| **Allegations:** | Plaintiff sought a declaration stating defendant to limit the maximum allowable wall signs area facing the driveway in accordance with the ordinance. |
| **Damages:** | Declaratory judgment, nominal damages, permanent and preliminary relief, expenses, fees and costs. |
| **COMPLAINT (MANUALLY RETRIEVED)** | Original Image of this Document (PDF) |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 1:14CV09851 |
| **Jury Demand:** | None |
| **Demand:** | $1,000 |
| **Nature of Suit:** | Civil Rights: Other Civil Rights (440) |
| **Key Nature of Suit:** | Civil Rights; Other Federal Civil Rights (110.45) |
| **Jurisdiction:** | Federal Question |
| **Cause:** | 42 USC 1983 Civil Rights Act |

## PARTICIPANT INFORMATION

### Robert Peterson

| | |
|---|---|
| **Party Description:** | Owner of Liebundguth Moving & Storage, Inc. |
| **Type:** | Plaintiff |
| **Attorney:** | Jacob Huebert |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 S. LaSalle Street, Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jhuebert@libertyjusticecenter.org |
| **Attorney:** | Jeffrey M. Schwab |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 South LaSalle Street<br>Suite 1500 |

| | |
|---|---|
| | Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jschwab@libertyjusticecenter.org |

## Leibundguth Moving & Storage, Inc.

| | |
|---|---|
| **Type:** | Plaintiff |
| **Party Terminated:** | TERMINATED: 01/30/2015 |
| **Attorney:** | Jacob Huebert |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 S. LaSalle Street, Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jhuebert@libertyjusticecenter.org |
| **Attorney:** | Jeffrey M. Schwab |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 South LaSalle Street<br>Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jschwab@libertyjusticecenter.org |

## Leibundguth Storage & Van Service, Inc.

| | |
|---|---|
| **Type:** | Plaintiff |
| **Attorney:** | Jeffrey M. Schwab |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 South LaSalle Street<br>Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jschwab@libertyjusticecenter.org |

## The Village of Downers Grove

| | |
|---|---|
| **Party Description:** | an Illinois municipal corporation |
| **Type:** | Counter Claimant |
| **Attorney:** | Scott M. Day |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Attorney at Law |
| **Attorney Address:** | 300 East 5th Avenue<br>Suite 365<br>Naperville, IL 60563 |
| **Attorney Phone:** | 708-637-9811 |
| **Email Address:** | smd@dayrobert.com |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## The Village of Downers Grove

| | |
|---|---|
| **Party Description:** | an Illinois municipal corporation |
| **Type:** | Defendant |
| **Attorney:** | Scott M. Day |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Attorney at Law |
| **Attorney Address:** | 300 East 5th Avenue<br>Suite 365<br>Naperville, IL 60563 |
| **Attorney Phone:** | 630-637-9811 |
| **Email Address:** | smd@drm.law |

## Leibundguth Storage & Van Service, Inc.

| | |
|---|---|
| **Type:** | Counter Defendant |
| **Attorney:** | Jeffrey M. Schwab |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 South LaSalle Street<br>Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jschwab@libertyjusticecenter.org |

## Robert Peterson

| | |
|---|---|
| **Party Description:** | Owner of Liebundguth Moving & Storage, Inc. |
| **Type:** | Counter Defendant |
| **Attorney:** | Jacob Huebert |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 S. LaSalle Street, Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jhuebert@libertyjusticecenter.org |
| **Attorney:** | Jeffrey M. Schwab |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | Liberty Justice Center<br>190 South LaSalle Street<br>Suite 1500<br>Chicago, IL 60603 |
| **Attorney Phone:** | 312-263-7668 |
| **Email Address:** | jschwab@libertyjusticecenter.org |

## CALENDAR INFORMATION

**View Calendar Information**

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

DOCKET PROCEEDINGS (92)

| Entry #: | Date: | Description: | | |
|---|---|---|---|---|
| 91 | 10/16/2019 | CERTIFIED COPY OF OPINION from the USCA for the 7th Circuit; Argued 3/27/17; Decided 9/24/19 in USCA case no. 16-3055; AFFIRMED. (gcy, ) (Entered: 10/16/2019) | View | Add to request |
| 90 | 10/16/2019 | CERTIFIED COPY OF USCA FINAL JUDGMENT dated 9/24/19 regarding notice of appeal 76 ; USCA No. 16-3055; The judgment of the District Court is AFFIRMED, with costs, in accordance with the decision of this court entered on this date. (gcy, ) (Entered: 10/16/2019) | View | Add to request |
| 89 | 10/16/2019 | MANDATE of USCA dated 10/16/19 regarding notice of appeal 76 ;USCA No.16-3055 ; No record to be returned. (gcy, ) (Entered: 10/16/2019) | View | Add to request |
| 88 | 02/14/2017 | CERTIFIED copy of order dated 2/14/2017 from the 7th Circuit regarding notice of appeal 76 ; Appellate case no. : 16-3055; This matter comes before the court for its consideration of the MOTION TO RESCHEDULE ORAL ARGUMENT, filed on February 13, 2017, by counsel for Appellee Village of Downers Grove, Although the court will ordinarily respect requests by counsel made in advance of the scheduling of an appeal for oral argument, that the court avoid scheduling argument for a particular day or week, Circuit Rule 34(b)(3), postponement of oral argument, once oral argument is scheduled, will be granted only in extraordinary circumstances. Circuit Rule 34(e). Such circumstances have not been demonstrated in this instance. Accordingly, the motion is DENIED and oral argument will proceed as | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | scheduled. (jh, ) (Entered: 02/14/2017) | | |
| 87 | 02/13/2017 | USCA RECEIVED on 2/13/2017 the long record regarding notice of appeal 76 (ek, ) (Entered: 02/14/2017) | View | Add to request |
| 86 | 02/13/2017 | CERTIFIED and transmitted to the USCA for the 7th Circuit the long record on appeal 76 (USCA no. 16-3055) (ek, ) (Entered: 02/13/2017) | View | Add to request |
| 85 | 02/13/2017 | NOTICE to Transmit Record on Appeal regarding notice of appeal 76 ; USCA Case No. 16-3055. (jh, ) (Entered: 02/13/2017) | View | Add to request |
| 84 | 08/15/2016 | DESIGNATION by Downers Grove, The Village of of record on appeal : USCA Case No. 16-3055 (Day, Scott) (Entered: 08/15/2016) | View | Add to request |
| 83 | 08/05/2016 | SEVENTH CIRCUIT transcript information sheet by Leibundgduth Storage & Van Service, Inc. (Schwab, Jeffrey) (Entered: 08/05/2016) | View | Add to request |
| 82 | 08/05/2016 | DESIGNATION by Leibundgduth Storage & Van Service, Inc. of record on appeal : USCA Case No. 16-3055. (jh, ) (Entered: 08/05/2016) | View | Add to request |
| 81 | 07/29/2016 | ACKNOWLEDGMENT of receipt of short record on appeal regarding notice of appeal 76 ; USCA Case No. 16-3055. (jh, ) (Entered: 07/29/2016) | View | Add to request |
| 80 | 07/28/2016 | NOTICE of Correction regarding 79 (ek, ) (Entered: 07/28/2016) | View | Add to request |
| 79 | 07/28/2016 | TRANSMITTED to the 7th Circuit the short record on notice of appeal 76 . Notified counsel (ek, ) (Main Document 79 replaced on 7/28/2016) (ek, ). (Entered: 07/28/2016) | View | Add to request |
| 78 | 07/28/2016 | NOTICE of Appeal Due letter sent to counsel of record regarding notice of appeal 76 (ek, ) (Entered: 07/28/2016) | View | Add to request |
| 77 | 07/28/2016 | DOCKETING Statement by Leibundgduth Storage & Van Service, Inc. regarding notice of appeal 76 | View | Add to request |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | |
|---|---|---|---|
| | | (Schwab, Jeffrey) (Entered: 07/28/2016) | |
| 76 | 07/28/2016 | NOTICE of appeal by Leibundguth Storage & Van Service, Inc. regarding orders 53 , 75 Filing fee $ 505, receipt number 0752-12196409. (Schwab, Jeffrey) (Entered: 07/28/2016) | View Add to request |
| 75 | 06/29/2016 | ENTERED AMENDED JUDGMENT on 6/29/2016:Emailed notice(slb, ) (Entered: 06/29/2016) | View Add to request |
| 74 | 06/29/2016 | MEMORANDUM Opinion and Order signed by the Honorable Edmond E. Chang. For the reasons stated in the Opinion, Plaintiffs' motion to alter judgment 63 is denied. The Court will enter, however, an amended judgment to reflect that Leibundguth's challenge to Section 9.050(C)(5)s size restriction is not moot for Article III purposes, but that its claim is still dismissed for the same reasons Leibundguth's challenge to the other size restriction in § 9.050(A) was dismissed.Emailed notice(slb, ) (Entered: 06/29/2016) | View Add to request |
| 73 | 05/27/2016 | MINUTE entry before the Honorable Edmond E. Chang: The parties will be notified of the decision on the Rule 59 motion via posting on the docket. The status hearing of 05/31/2016 is vacated. Emailed notice (slb, ) (Entered: 05/27/2016) | View Add to request |
| 72 | 04/19/2016 | MINUTE entry before the Honorable Edmond E. Chang: Plaintiff's Rule 59 motion 63 is fully briefed and under advisement. Status hearing of 04/21/2016 is reset to 05/31/2016 at 9:30 AM.Emailed notice (slb, ) (Entered: 04/19/2016) | View Add to request |
| 71 | 03/17/2016 | REPLY by Plaintiff Leibundguth Storage & Van Service, Inc. to motion to alter judgment 63 | Docket Status View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | (Schwab, Jeffrey) (Entered: 03/17/2016) | |
| 70 | 03/03/2016 | RESPONSE by Downers Grove, The Village ofin Opposition to MOTION by Plaintiff Leibundguth Storage & Van Service, Inc. to alter judgment 63 (Day, Scott) (Entered: 03/03/2016) | View Add to request |
| 69 | 02/04/2016 | MINUTE entry before the Honorable Edmond E. Chang: On Plaintiff's Rule 59 motion 63 , Defendant shall respond by 03/03/2016. Plaintiffs shall reply by 03/17/2016. To track the case, a status hearing is set for 04/21/2016 at 9 a.m.Emailed notice (slb, ) (Entered: 02/04/2016) | View Add to request |
| 68 | 02/04/2016 | ENTERED JUDGMENT on 2/4/2016:Emailed notice(slb, ) (Entered: 02/04/2016) | View Add to request |
| 67 | 02/04/2016 | MEMORANDUM Opinion and Order signed by the Honorable Edmond E. Chang. For the reasons stated in the Opinion, Plaintiffs' motion to stay 54 is denied and the Court relinquishes jurisdiction over Downers Grove's state-law counterclaim, which is dismissed without prejudice. A separate AO-450 judgment shall be entered. Civil case terminated. Emailed notice(slb, ) (Entered: 02/04/2016) | Docket Status View Add to request |
| 66 | 02/04/2016 | MINUTE entry before the Honorable Edmond E. Chang: The status hearing of 02/04/2016 is vacated. The Court will be issuing, today, an order via posting on the docket. Emailed notice (Chang, Edmond) (Entered: 02/04/2016) | View Add to request |
| 65 | 02/03/2016 | NOTICE of Motion by Jeffrey M. Schwab for presentment of motion to alter judgment 63 before Honorable Edmond E. Chang on 2/8/2016 at 08:30 AM. (Schwab, Jeffrey) (Entered: 02/03/2016) | View Add to request |

| | | | | |
|---|---|---|---|---|
| 64 | 02/03/2016 | MEMORANDUM by Leibundguth Storage & Van Service, Inc. in support of motion to alter judgment 63 (Attachments: # 1 Exhibit A) (Schwab, Jeffrey) (Entered: 02/03/2016) | View | Add to request |
| 63 | 02/03/2016 | MOTION by Plaintiff Leibundguth Storage & Van Service, Inc. to alter judgment (Schwab, Jeffrey) (Entered: 02/03/2016) | View | Add to request |
| 62 | 01/29/2016 | MINUTE entry before the Honorable Edmond E. Chang:Attached to this minute entry is the parties' letter agreement on scheduling, which the Court adopts: the position papers or motions on retaining supplemental jurisdiction over Defendant Village's counterclaim due by 01/21/2016, with cross responses on 01/28/2016. Plaintiffs' motion for stay of the 54(b) judgment and prosecution due 01/21/2016. Defendant Village's response to the stay motion due by 01/28/2016. The Court will endeavor to decide the stay motion on 02/04/2016. The Village agrees to waive the right to prosecute violations through 02/04/2016.Emailed notice (Attachments: # 1 Exhibit Letter) (slb, ) (Entered: 01/29/2016) | View | Add to request |
| 61 | 01/28/2016 | Defendant's Response to Plaintiff's Motion to Stay Enforcement of the Sign Ordinance During Post-Judgment Motions and Pending Appeal by Downers Grove, The Village of (Day, Scott) (Entered: 01/28/2016) | View | Add to request |
| 60 | 01/28/2016 | Defendant's Response to Plaintiff's Brief in Support of the Court Relinquishing Supplemental Jurisdiction by Downers Grove, The Village of (Day, Scott) (Entered: 01/28/2016) | View | Add to request |
| 59 | 01/28/2016 | RESPONSE by Plaintiff Leibundguth Storage & Van Service, Inc. to other 57 | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | Defendant's Memorandum of Law Addressing Supplemental Jurisdiction (Schwab, Jeffrey) (Entered: 01/28/2016) | | |
| 58 | 01/28/2016 | NOTICE of Motion by Jeffrey M. Schwab for presentment of motion to stay,, motion for relief, 54 before Honorable Edmond E. Chang on 2/8/2016 at 08:30 AM. (Schwab, Jeffrey) (Entered: 01/28/2016) | View | Add to request |
| 57 | 01/21/2016 | Defendant's Memorandum of Law Addressing Supplemental Jurisdiction Over State Law Counterclaim by Downers Grove, The Village of (Day, Scott) (Entered: 01/21/2016) | View | Add to request |
| 56 | 01/21/2016 | MEMORANDUM by Leibundguth Storage & Van Service, Inc. in support of the Court relinquishing supplemental jurisdiction (Schwab, Jeffrey) (Entered: 01/21/2016) | View | Add to request |
| 55 | 01/21/2016 | MEMORANDUM by Leibundguth Storage & Van Service, Inc. in support of motion to stay, motion for relief,, 54 (Schwab, Jeffrey) (Entered: 01/21/2016) | View | Add to request |
| 54 | 01/21/2016 | MOTION by Plaintiff Leibundguth Storage & Van Service, Inc. to stay regarding entered judgment 53 During Post-Judgment Motions and Pending Appeal (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Schwab, Jeffrey) (Entered: 01/21/2016) | View | Add to request |
| 53 | 01/07/2016 | ENTERED JUDGMENT. Mailed notice (meg, ) (Entered: 01/07/2016) | View | Add to request |
| 52 | 01/07/2016 | MINUTE entry before the Honorable Edmond E. Chang: Status hearing held. After a substantial discussion of the various lingering issues, the Court decided as follows: first, the Court will enter a Rule 54(b) judgment on the federal claims and corresponding federal counterclaim, | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | because there is no just reason for delay of entry of judgment on those claims. Second, with regard to the state-law claims, over which jurisdiction was exercised under supplemental jurisdiction, the parties shall file position papers, by 01/21/2016, on whether the Court should relinquish supplemental jurisdiction over the claims. The parties may cross-respond by 01/28/2016. Status hearing continued to 02/04/2016 at 9:00 a.m. Mailed notice (meg, ) (Entered: 01/07/2016) | |
| 51 | 12/14/2015 | MEMORANDUM Opinion and Order signed by the Honorable Edmond E. Chang. For the reasons stated in the Opinion, Defendant's motion for summary judgment 35 is granted and Plaintiff's motion for summary judgment 39 is denied. A separate AO-450 shall be entered. As explained in the conclusion of the Opinion, a temporary stay of the judgment is entered until 12/28/2015, in order to allow the parties to confer on a possible agreement about fines pending appeal, or absent that, for Plaintiffs to file a motion for stay pending appeal. The status hearing of 12/17/2015 is reset to 01/07/2016 at 10:00 a.m.Emailed notice(slb, ) (Entered: 12/15/2015) | Docket Status View Add to request |
| 50 | 11/30/2015 | MINUTE entry before the Honorable Edmond E. Chang: The Court has the cross-motions for summary judgment under advisement, so the status hearing of 12/02/2015 is reset to 12/17/2015 at 9:45 a.m.Emailed notice (slb, ) (Entered: 11/30/2015) | View Add to request |
| 49 | 10/27/2015 | MINUTE entry before the Honorable Edmond E. Chang: In light of the fully | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | briefed cross-motions for summary judgment, the status hearing of 10/29/2015 is reset to 12/02/2015 at 9:15 AM.Emailed notice (slb, ) (Entered: 10/27/2015) | | |
| 48 | 10/05/2015 | RULE 56 (a) Statement Reply to Defendant's Response to Plaintiff's Statement of Facts (Schwab, Jeffrey) (Entered: 10/05/2015) | View | Add to request |
| 47 | 10/05/2015 | REPLY by Plaintiff Leibundguth Storage & Van Service, Inc. to motion for summary judgment 39 (Schwab, Jeffrey) (Entered: 10/05/2015) | View | Add to request |
| 46 | 09/21/2015 | RULE 56 (a) Statement Reply to Plaintiff's Response to Defendant's Statement of Facts and Response to Plaintiff's Statement of Facts (Attachments: # 1 Exhibit 1)(Day, Scott) (Entered: 09/21/2015) | View | Add to request |
| 45 | 09/21/2015 | REPLY by Defendant Downers Grove, The Village of in support of its Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Day, Scott) (Entered: 09/21/2015) | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 44 | 09/04/2015 | MINUTE entry before the Honorable Edmond E. Chang: Defendant's unopposed extension motion 42 is granted: Defendant's combined reply and response is due on 09/21/2015 and the Plaintiff's reply on its own motion is due on 10/05/2015.Emailed notice (Chang, Edmond) (Entered: 09/04/2015) | View Add to request |
| 43 | 08/31/2015 | Extend Briefing Schedule NOTICE of Motion by Scott M. Day for presentment of motion by filer to set a briefing schedule 42 before Honorable Edmond E. Chang on 9/9/2015 at 08:30 AM. (Day, Scott) (Entered: 08/31/2015) | View Add to request |
| 42 | 08/31/2015 | MOTION by Defendant Downers Grove, The Village of to set a briefing schedule Extend (Day, Scott) (Entered: 08/31/2015) | View Add to request |
| 41 | 08/24/2015 | MEMORANDUM by Leibundguth Storage & Van Service, Inc. in support of motion for summary judgment 39 and response to defendant's motion for summary judgment (Schwab, Jeffrey) (Entered: 08/24/2015) | Docket Status View Add to request |
| 40 | 08/24/2015 | RULE 56 (a)(3) Statement by Leibundguth Storage & Van Service, Inc. regarding motion for summary judgment 39 (Attachments: # 1 List of Exhibits, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K) (Schwab, Jeffrey) (Entered: 08/24/2015) | View Add to request |
| 39 | 08/24/2015 | MOTION by Plaintiff Leibundguth Storage & Van Service, Inc. for summary judgment and response to defendant's motion for summary judgment (Schwab, Jeffrey) (Entered: 08/24/2015) | View Add to request |
| 38 | 07/24/2015 | Statement of Uncontested Material Facts (Attachments: # 1 Exhibit 2 2005 Sign Ord, # 2 Exhibit 3 2015 Sign Ord, # 3 Exhibit 4 Staff Report, # 4 Exhibit 5 Dep Peterson, # | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | 5 Exhibit 6 Dep Taylor, # 6 Exhibit 7 Dep Popovich, # 7 Exhibit 8 Dep Ainsworth, # 8 Exhibit 9 Dep Pointner, # 9 Exhibit 10 SOS, # 10 Exhibit 11 Aff Popovich, # 11 Exhibit 12 Community Sign Regs, # 12 Exhibit 13 Summary Chart, # 13 Exhibit 14 Treatises)(Day, Scott) Modified on 7/27/2015 by the clerk's office (jl). (Entered: 07/24/2015) | |
| 37 | 07/24/2015 | Statement of Uncontested Material Facts (Attachments: # 1 Exhibit 1A - Aff Holden w docs, # 2 Exhibit 1B - Aff Holden w docs, # 3 Exhibit 1C - Aff Holden w docs, # 4 Exhibit 1 D - Aff Holden w docs, # 5 Exhibit 2 - 2005 Sign Ord)(Day, Scott) Modified on 7/27/2015 by the clerk's office (jl). (Entered: 07/24/2015) | View Add to request |
| 36 | 07/24/2015 | Memorandum in Support of its Motion for Summary Judgment. (Attachments: # 1 Exhibit A - 2005 Sign Ord, # 2 Exhibit B - 2015 Sign Ord, # 3 Exhibit C - Staff Report, # 4 Exhibit D - Affidavit Popovich, # 5 Exhibit E - Summary Chart)(Day, Scott) Modified by the clerks office on 7/27/2015 (jl, ). (Entered: 07/24/2015) | View Add to request |
| 35 | 07/24/2015 | MOTION by Defendant Downers Grove, The Village of for summary judgment (Day, Scott) (Entered: 07/24/2015) | Docket Status View Add to request |
| 34 | 07/15/2015 | MINUTE entry before the Honorable Edmond E. Chang: Plaintiff's motion to bar expert 31 Pete Pointner is denied without prejudice. A briefing schedule is already set on the cross motions for summary judgment. That is the proper place to brief the issue of the admissibility of expert evidence that is relied on by Defendants, because the defense motion will be specific on what opinions, if any (or a subset), the defense actually relies on in moving for (or responding to) summary judgment. Then there will be a concrete dispute to decide, rather than just a wholesale attack on the | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | opinions. Additionally, the expert dispute will be in the actual context of the motions that matter, namely, the summary judgment motions. The Court strove to set the 4-brief schedule to maximize efficiency for both the parties and the Court; this expert-related motion upends that. If Plaintiff needs extra pages (beyond the 20-page limit already granted) in briefing the summary judgment motion, Plaintiff can ask for that when appropriate. Emailed notice (slb, ) (Entered: 07/15/2015) | |
| 33 | 07/13/2015 | NOTICE of Motion by Jeffrey M. Schwab for presentment of motion to bar 31 before Honorable Edmond E. Chang on 7/16/2015 at 08:30 AM. (Schwab, Jeffrey) (Entered: 07/13/2015) | View Add to request |
| 32 | 07/13/2015 | MEMORANDUM by Leibundguth Storage & Van Service, Inc. in support of motion to bar 31 Defendant's Expert Report and Testimony (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C) (Schwab, Jeffrey) (Entered: 07/13/2015) | View Add to request |
| 31 | 07/13/2015 | MOTION by Plaintiff Leibundguth Storage & Van Service, Inc. to bar Defendant's Expert Report and Testimony (Schwab, Jeffrey) (Entered: 07/13/2015) | Docket Status View Add to request |
| 30 | 05/22/2015 | MINUTE entry before the Honorable Edmond E. Chang: Status hearing held. Both parties reported that they will be filing a motion for summary judgment. The Court sets a briefing schedule to have four briefs instead of six: Defendant's opening motion for summary judgment due 07/24/2015. Plaintiff's combined cross-motion for summary judgment and response to Defendant's motion for summary judgment due 08/24/2015 (do not notice it for presentment). Defendant's combined reply on its own motion and Defendant's | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | response to Plaintiff's cross-motion due 09/14/2015. Plaintiff's reply on its own motion due 09/28/2015. Each brief may use 20 pages. Status hearing set for 10/29/2015 at 9:30 a.m. Emailed notice (slb, ) (Entered: 05/22/2015) | |
| 29 | 04/27/2015 | MEMORANDUM Opinion and Order signed by the Honorable Edmond E. Chang on April 27, 2015. For the reasons stated in the Opinion, Defendant's motion to dismiss 13 is denied. Emailed notice (slb, ) (Entered: 04/27/2015) | Docket Status View Add to request |
| 28 | 04/03/2015 | TRANSCRIPT OF PROCEEDINGS held on 1-30-15 before the Honorable Edmond E. Chang. Court Reporter Contact Information: Krista Burgeson, Krista_Burgeson@ilnd.uscourts.gov, 312-435-5567. IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings. Redaction Request due 4/24/2015. Redacted Transcript Deadline set for 5/4/2015. Release of Transcript Restriction set for 7/2/2015. (Burgeson, Krista) (Entered: 04/03/2015) | View Add to request |
| 27 | 03/25/2015 | MINUTE entry before the Honorable Edmond E. Chang: Status hearing held. Counsel for both sides reported that all fact discovery has been completed and Plaintiff will be making an expert-report disclosure. Plaintiff's expert report to be submitted to Defendant by 04/20/2015. The deposition of Plaintiff's expert to be completed by 05/11/2015. | View Add to request |

| | | | | |
|---|---|---|---|---|
| | | For the reasons stated in open Court, Defendant may hold off on disclosing any rebuttal expert. Status hearing set for 05/22/2015 at 9:00 a.m.Emailed notice (slb, ) (Entered: 03/26/2015) | | |
| 26 | 03/18/2015 | AFFIDAVIT of Service filed by Defendant Downers Grove, The Village of regarding Subpoena served on ATG Trust Company on 03/13/2015 (Day, Scott) (Entered: 03/18/2015) | View | Add to request |
| 25 | 03/12/2015 | REPLY by Defendant Downers Grove, The Village of to Motion to Dismiss for Failure to State a Claim 13 , memorandum in support of motion 14 (Day, Scott) (Entered: 03/12/2015) | View | Add to request |
| 24 | 03/11/2015 | Answer to Affirmative Defenses to Counterclaim by Downers Grove, The Village of (19) (Day, Scott) (Entered: 03/11/2015) | View | Add to request |
| 23 | 03/04/2015 | RESPONSE by Leibundguth Storage & Van Service, Inc., Robert Petersonin Opposition to MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM 13 (Schwab, Jeffrey) (Entered: 03/04/2015) | View | Add to request |
| 22 | 03/04/2015 | MINUTE entry before the Honorable Edmond E. Chang: Plaintiffs' motion to file instanter 17 response to dismissal motion is granted. Plaintiffs shall file it as a separate docket entry. Emailed notice (slb, ) (Entered: 03/04/2015) | View | Add to request |
| 21 | 03/02/2015 | AFFIDAVIT of Service filed by Defendant Downers Grove, The Village of regarding Subpoena served on ATG Trust Company on 02/17/2015 (Day, Scott) (Entered: 03/02/2015) | View | Add to request |
| 20 | 02/27/2015 | Rule 7.1 Disclosure Statement by Leibundguth Storage & Van Service, Inc. (Schwab, Jeffrey) (Entered: 02/27/2015) | View | Add to request |
| 19 | 02/27/2015 | Plaintiffs' ANSWER to counterclaim and Affirmative Defenses by Leibundguth Storage & Van Service, Inc., Robert Peterson(Schwab, Jeffrey) (Entered: 02/27/2015) | View | Add to request |
| 18 | 02/27/2015 | NOTICE of Motion by Jeffrey M. Schwab for presentment of motion for leave to file 17 before Honorable Edmond E. Chang | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | on 3/5/2015 at 08:30 AM. (Schwab, Jeffrey) (Entered: 02/27/2015) | |
| 17 | 02/27/2015 | MOTION by Plaintiffs Leibundguth Storage & Van Service, Inc., Robert Peterson for leave to file Response to Defendant's Motion to Dismiss (Attachments: # 1 Exhibit A) (Schwab, Jeffrey) (Entered: 02/27/2015) | View Add to request |
| 16 | 02/13/2015 | MINUTE entry before the Honorable Edmond E. Chang: On Defendant's motion to dismiss 13 , Plaintiffs shall respond by 02/26/2015. Defendant may reply by 03/12/2015. Emailed notice (slb, ) (Entered: 02/13/2015) | View Add to request |
| 15 | 02/10/2015 | NOTICE of Motion by Scott M. Day for presentment of Motion to Dismiss for Failure to State a Claim 13 before Honorable Edmond E. Chang on 2/17/2015 at 08:30 AM. (Day, Scott) (Entered: 02/10/2015) | View Add to request |
| 14 | 02/05/2015 | MEMORANDUM by Downers Grove, The Village of in support of Motion to Dismiss for Failure to State a Claim 13 (Attachments: # 1 Exhibit Exhibit A)(Day, Scott) (Entered: 02/05/2015) | View Add to request |
| 13 | 02/05/2015 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Day, Scott) (Entered: 02/05/2015) | Docket Status View Add to request |
| 12 | 02/05/2015 | Verified ANSWER to amended complaint , COUNTERCLAIM filed by Downers Grove, The Village of against All Plaintiffs . by Downers Grove, The Village of(Day, Scott) (Entered: 02/05/2015) | View Add to request |
| 11 | 01/30/2015 | MINUTE entry before the Honorable Edmond E. Chang: Status hearing held. The Court commends the parties on a productive conferral to advance the litigation in an expeditious way. The first-round of written discovery request must be issued by 02/06/2015. Both sides shall respond to the discovery requests by 02/27/2015. Rule 26(a)(1) disclosures due by | View Add to request |

| | | | |
|---|---|---|---|
| | | 02/13/2015. Fact discovery to be completed by 03/31/2015. Leave of Court is given to Plaintiffs to file an amended complaint. Status hearing set for 03/25/2015 at 9:30 a.m., at which time the parties will discuss a potential expert discovery schedule, and if appropriate, the Court also will set the briefing schedule on the cross-motions for summary judgment (with 4 briefs rather than 6). As represented by defense counsel during the hearing, Defendant has agreed not to enforce the sign ordinance against Plaintiffs' sign until the decision on the cross-motions, including no accrual of daily fines during this pendency. Emailed notice (slb, ) (Entered: 02/04/2015) | |
| 10 | 01/30/2015 | First AMENDED complaint by Robert Peterson, Leibundgth Storage & Van Service, Inc. against All Defendants and terminating Leibundgth Moving & Storage, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E) (Schwab, Jeffrey) (Entered: 01/30/2015) | View Add to request |
| 9 | 01/29/2015 | MINUTE entry before the Honorable Edmond E. Chang: On review of the status report, and in advance of the status hearing, the Court asks the parties to consider whether an accelerated trial on the merits (under Rule 65(a)(2) or otherwise), after appropriate discovery, is a more sensible way to proceed rather than a preliminary-injunction hearing, which offers only a preliminary resolution to the case. This plan would almost surely require a longer forbearance period, beyond 04/17/2015. Emailed notice (slb, ) (Entered: 01/29/2015) | View Add to request |
| 8 | 01/23/2015 | STATUS Report of all Parties by Leibundgth Moving & Storage, Inc., Robert Peterson (Schwab, Jeffrey) (Entered: 01/23/2015) | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 7 | 12/29/2014 | ATTORNEY Appearance for Defendant Downers Grove, The Village of by Scott M. Day; Notice. (as, ) (Entered: 01/05/2015) | View Add to request |
| 6 | 12/23/2014 | WAIVER OF SERVICE returned executed by Robert Peterson, Leibundguth Moving & Storage, Inc.. Downers Grove, The Village of waiver sent on 12/9/2014, answer due 2/9/2015. (Schwab, Jeffrey) (Entered: 12/23/2014) | View Add to request |
| 5 | 12/12/2014 | MINUTE entry before the Honorable Edmond E. Chang: Status hearing set for 01/30/2015 at 9:30 a.m. The parties must file a joint initial status report with the content described in the attached status report requirements at least 3 business days before the initial status hearing. Plaintiff must still file the report even if not all Defendants have been served or have responded to requests to craft a joint report. Additionally, the parties must read Judge Chang's Case Management Procedures on the Court's website; those Procedures are considered standing orders in this case. Emailed notice (Attachments: # 1 Status Report Requirements) (slb, ) (Entered: 12/12/2014) | View Add to request |
| 4 | 12/08/2014 | ATTORNEY Appearance for Plaintiffs Leibundguth Moving & Storage, Inc., Robert Peterson by Jacob Horst Huebert (Huebert, Jacob) (Entered: 12/08/2014) | View Add to request |
| 3 | 12/08/2014 | ATTORNEY Appearance for Plaintiffs Leibundguth Moving & Storage, Inc., Robert Peterson by Jeffrey M. Schwab (Schwab, Jeffrey) (Entered: 12/08/2014) | View Add to request |
| 2 | 12/08/2014 | CIVIL Cover Sheet (Schwab, Jeffrey) (Entered: 12/08/2014) | View Add to request |
| 1 | 12/08/2014 | COMPLAINT filed by Robert Peterson, Leibundguth Moving & Storage, Inc.; Filing fee $ 400, receipt number 0752-10133188. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Schwab, Jeffrey) (Entered: 12/08/2014) | View Add to request |

| | | |
|---|---|---|
| 12/08/2014 | CASE ASSIGNED to the Honorable Edmond E. Chang. Designated as Magistrate Judge the Honorable Young B. Kim. (daj, ) (Entered: 12/09/2014) | Send Runner to Court |

TO ORDER COPIES OF ANY DOCUMENTS LISTED
ABOVE, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TO ORDER COPIES OF ANY DOCUMENTS LISTED
BELOW, CALL WESTLAW COURTEXPRESS
1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

**This docket is current through 12/06/2023**

Today's Date: 1/24/2025
Source: U.S. District Court, Northern District of Mississippi (Western)

| | |
|---|---|
| **Court:** | U.S. District Court, Northern District of Mississippi (Western) |
| **Case Title:** | Lamar OCI South Corporation v. City of Oxford, Mississippi |
| **Case:** | 3:12-CV-00002 |
| **Judge:** | District Judge Sharion Aycock |
| **Date Filed:** | 01/09/2012 |
| **Date Closed/Terminated:** | 12/09/2013 |
| **Case Status:** | CLOSED, SAA2 |

## CASE INFORMATION

| | |
|---|---|
| **Case Number:** | 3:12CV00002 |
| **Referred To:** | Magistrate Judge David A. Sanders |
| **Jury Demand:** | None |
| **Nature of Suit:** | Civil Rights: Other Civil Rights (440) |
| **Key Nature of Suit:** | Civil Rights; Other Federal Civil Rights (110.45) |
| **Jurisdiction:** | Diversity |
| **Cause:** | 28 USC 1343 Violation of Civil Rights |

## PARTICIPANT INFORMATION

### Lamar OCI South Corporation

| | |
|---|---|
| **Type:** | Plaintiff |
| **Attorney:** | Jeffrey Dean Leathers |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | GREER, RUSSELL, DENT & LEATHERS, PLLC |
| **Attorney Address:** | P.O. Box 907<br>Tupelo, MS 38802-0907 |
| **Attorney Phone:** | 662-842-5345 |
| **Attorney Fax:** | 662-842-6870 |
| **Email Address:** | jleathers@greerlawfirm.com |
| **Attorney:** | Lisa A. Reppeto |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Attorney Address:** | P. O. Box 1005<br>39215-1005<br>Jackson, MS 39201 |
| **Attorney Phone:** | 601-592-1010 |
| **Attorney Fax:** | 601-592-6060 |
| **Email Address:** | lreppeto@cwplaw.com |
| **Attorney:** | Mark D. Herbert |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Taggart, Rimes & Wiggins |
| **Attorney Address:** | 1022 Highland Colony Pkwy<br>Ste 101<br>Ridgeland, MS 39157 |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | |
|---|---|
| **Attorney Phone:** | 601-898-8400 |
| **Email Address:** | mark@trwlawyers.com |
| **Attorney:** | Sabrina B. Ruffin |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | JONES, WALKER, WAECHTER, POITEVENT, CARRERE & DENEGRE LLP |
| **Attorney Address:** | P.O. Box 427<br>Jackson, MS 39205-0427 |
| **Attorney Phone:** | 601-949-4900 |
| **Email Address:** | sruffin@joneswalker.com |

## City of Oxford, Mississippi

| | |
|---|---|
| **Type:** | Defendant |
| **Attorney:** | Pope S. Mallette |
| **Status:** | LEAD ATTORNEY; ATTORNEY TO BE NOTICED |
| **Firm Name:** | Mayo Mallette PLLC |
| **Attorney Address:** | 5 University Office Park<br>2094 Old Taylor Road<br>Suite 200<br>Oxford, MS 38655 |
| **Attorney Phone:** | 662-236-0055 |
| **Attorney Fax:** | 662-236-0035 |
| **Email Address:** | pmallette@mayomallette.com |
| **Attorney:** | Elise Kilpatrick Atkins |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | MAYO MALLETTE, PLLC |
| **Attorney Address:** | P.O. Box 1456<br>Oxford, MS 38655 |
| **Attorney Phone:** | 662-236-0055 |
| **Email Address:** | eatkins@mayomallette.com |
| **Attorney:** | J. Cal Mayo, Jr. |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | MAYO MALLETTE, PLLC |
| **Attorney Address:** | P.O. Box 1456<br>Oxford, MS 38655 |
| **Attorney Phone:** | 662-236-0055 |
| **Attorney Fax:** | 662-236-0035 |
| **Email Address:** | cmayo@mayomallette.com |
| **Attorney:** | Paul Bowie Watkins, Jr. |
| **Status:** | ATTORNEY TO BE NOTICED |
| **Firm Name:** | Mayo Mallette PLLC |
| **Attorney Address:** | 5 University Office Park<br>2094 Old Taylor Road<br>Suite 200<br>Oxford, MS 38655 |
| **Attorney Phone:** | 662-236-0055 |
| **Attorney Fax:** | 662-236-0035 |
| **Email Address:** | pwatkins@mayomallette.com |

## CALENDAR INFORMATION

**View Calendar Information**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**DOCKET PROCEEDINGS (165)**

| Entry #: | Date: | Description: | Docket Status |
|---|---|---|---|
| 151 | 12/09/2013 | ORDER DISMISSING CASE BY REASON OF SETTLEMENT. CASE CLOSED. Signed by District Judge Sharion Aycock on 12/09/13. (gs) | View Add to request |
| 150 | 08/07/2013 | ORDER Governing Pretrial Conference and Preparation of Final Pretial Order. Signed by Mag. Judge David A. Sanders on 8/7/2013. (egs) | View Add to request |
| 149 | 08/07/2013 | NOTICE of Final Pretrial Conference set for 12/13/2013 at 10:00 AM in Judge Sanders Chambers before Mag. Judge David A. Sanders. (egs) | View Add to request |
| 148 | 08/07/2013 | NOTICE of Trial: Non-Jury Trial reset for 1/13/2014 09:00 AM in Aberdeen Courtroom 1 before District Judge Sharion Aycock. (gs) | View Add to request |
| | 08/07/2013 | TEXT ORDER granting 147 Motion to Continue. The trial date is hereby TERMINATED and the STAY is extended in this case. The trial shall be reset by separate notice. No further order shall issue from the court. Signed by District Judge Sharion Aycock on 8/7/2013. (psk)(no document attached) | Send Runner to Court |
| | 08/07/2013 | Trial deadlines terminated by Text Order. Signed by District Judge Sharion Aycock on 8/7/2013. (psk) | Send Runner to Court |
| 147 | 08/01/2013 | Joint MOTION to Continue and to Extend Temporary Stay by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 146 | 05/02/2013 | NOTICE of Final Pretrial Conference set for 9/20/2013 at 10:00 AM in Judge Sanders Chambers before Mag. Judge David A. Sanders. (egs) | View Add to request |
| 145 | 05/02/2013 | NOTICE of Trial: Non-Jury Trial reset for 10/7/2013 09:00 AM in Aberdeen Courtroom 1 before District Judge Sharion Aycock. (gs) | View Add to request |
| 144 | 04/30/2013 | Joint MOTION to Continue and Temporary Stay | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | by Lamar OCI South Corporation. (Reppeto, Lisa) | |
| | 04/30/2013 | TEXT ORDER granting 144 Motion to Continue. Trial currently scheduled June 3, 2013, is continued until October 7, 2013. The case is temporarily stayed. The parties shall provide a status update to the court on or before August 1, 2013. No further order shall issue from the court. Signed by District Judge Sharion Aycock on 4/30/2013. (psk) (no document attached) | Send Runner to Court |
| 143 | 04/29/2013 | RESPONSE to Motion re 131 MOTION in Limine filed by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 142 | 04/29/2013 | RESPONSE in Opposition re 135 MOTION to Seal Third Motion in Limine filed by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 141 | 04/29/2013 | RESPONSE in Opposition re 134 Second MOTION in Limine filed by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 140 | 04/29/2013 | RESPONSE in Opposition re 133 First MOTION in Limine filed by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 139 | 04/25/2013 | ORDER TO SHOW CAUSE on Article III standing. Show Cause Response due by 5/3/2013. Signed by District Judge Sharion Aycock on 4/25/2013. (psk) | View Add to request |
| 138 | 04/24/2013 | MEMORANDUM IN SUPPORT re 121 Memorandum in Support, 120 MOTION to Strike 110 Response in Opposition to Motion, [Exhibit B]. (Reppeto, Lisa) | View Add to request |
| 137 | 04/24/2013 | REPLY to Response to Motion re 120 MOTION to Strike 110 Response in Opposition to Motion, [Exhibit B] filed by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 136 | 04/22/2013 | MEMORANDUM IN SUPPORT re 135 MOTION to Seal Third Motion in | View Add to request |

| | | | |
|---|---|---|---|
| | | Limine (Non-Confidential). (Watkins, Paul) | |
| 135 | 04/22/2013 | MOTION to Seal Third Motion in Limine by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 134 | 04/22/2013 | Second MOTION in Limine by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 133 | 04/22/2013 | First MOTION in Limine by City of Oxford, Mississippi. (Attachments: # 1 Exhibit Watkins Email, # 2 Exhibit Ruffin Email) (Watkins, Paul) | View Add to request |
| 132 | 04/22/2013 | MEMORANDUM IN SUPPORT re 131 MOTION in Limine . (Reppeto, Lisa) | View Add to request |
| 131 | 04/22/2013 | MOTION in Limine by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 130 | 04/19/2013 | BRIEF re 129 Response to Motion, . (Watkins, Paul) | View Add to request |
| 129 | 04/19/2013 | RESPONSE to Motion re 120 MOTION to Strike 110 Response in Opposition to Motion, [Exhibit B] filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Declaration of Paul Watkins Jr., # 2 Exhibit B - Excerpts from Akers Depo) (Watkins, Paul) | View Add to request |
| | 04/17/2013 | NOTICE OF RECEIPT re 123 Notice of Conventional Filing - 1 CD labeled "Exhibit 29 to Rebuttal in Support of Motion for Summary Judgment" received and on file in Oxford clerk's office (jtm) | Send Runner to Court |
| 128 | 04/15/2013 | MEMORANDUM IN SUPPORT re 127 Reply to Response to Motion, . (Reppeto, Lisa) | View Add to request |
| 127 | 04/15/2013 | REPLY to Response to Motion re 95 MOTION for Summary Judgment filed by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - April 15, 2010 Notice, # 2 Exhibit B - March 20, 2009 Notice, # 3 Exhibit C - February 19, 2013 Minutes) (Reppeto, Lisa) | View Add to request |
| 126 | 04/15/2013 | MEMORANDUM IN SUPPORT re 125 Reply | View Add to request |

| | | | |
|---|---|---|---|
| | | to Response to Motion, . (Reppeto, Lisa) | |
| 125 | 04/15/2013 | REPLY to Response to Motion re 94 MOTION to Strike 77 Notice of Service filed by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - Exerpts from Deposition of J. Wachtel, # 2 Exhibit B - Affidavit of M. McFall) (Reppeto, Lisa) | View Add to request |
| 124 | 04/15/2013 | REPLY to Response to Motion re 92 MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts filed by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 123 | 04/15/2013 | NOTICE OF CONVENTIONAL FILING of Exhibit 29 to Rebuttal in Support of Motion for Summary Judgment by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 122 | 04/15/2013 | REPLY to Response to Motion re 87 MOTION for Summary Judgment filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit 30 - Oxford Eagle page) (Watkins, Paul) | View Add to request |
| 121 | 04/15/2013 | MEMORANDUM IN SUPPORT re 120 MOTION to Strike 110 Response in Opposition to Motion, [Exhibit B]. (Reppeto, Lisa) | View Add to request |
| 120 | 04/15/2013 | MOTION to Strike 110 Response in Opposition to Motion, [Exhibit B] by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - 1-4-13 Letter, # 2 Exhibit B - 1-7-13 Email, # 3 Exhibit C - Responses to Request for Production) (Reppeto, Lisa) | View Add to request |
| | 04/10/2013 | TEXT ORDER granting 116 Motion for Leave to File Excess Pages. The Court allows ten pages over the 35 page limit as imposed by the Local Rules for the Defendant's Reply. No further order shall issue from the court. Signed by District Judge Sharion | Send Runner to Court |

| | | | |
|---|---|---|---|
| | | Aycock on 4/10/2013. (psk) (no document attached) | |
| 119 | 04/09/2013 | REPLY to Response to Motion re 116 MOTION for Leave to File Excess Pages filed by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 118 | 04/08/2013 | RESPONSE in Opposition re 116 MOTION for Leave to File Excess Pages filed by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 117 | 04/08/2013 | EXHIBIT re 105 Response in Opposition to Motion,,, Corrected EXHIBIT F. (Reppeto, Lisa) | View Add to request |
| | 04/08/2013 | NOTICE OF CORRECTION re 105 Response in Opposition to Motion - corrected Exhibit F to be refiled (jtm) | Send Runner to Court |
| 116 | 04/05/2013 | MOTION for Leave to File Excess Pages by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Email Reppeto and Watkins) (Watkins, Paul) | View Add to request |
| | 04/05/2013 | NOTICE of Receipt of Exhibits (8 DVD's and 1 CD) re 107 Notice of Conventional Filing - on file in Oxford Clerk's office (jtm) (Entered: 04/08/2013) | Send Runner to Court |
| 115 | 04/04/2013 | BRIEF re 110 Response in Opposition to Motion, . (Watkins, Paul) | View Add to request |
| 114 | 04/04/2013 | EXHIBIT re 110 Response in Opposition to Motion, . (Attachments: # 1 Exhibit J - Oxford Eagle pages, # 2 Exhibit K - Oxford Eagle pages, # 3 Exhibit L - Excerpts from Land Development Code, # 4 Exhibit M - Declaration of Tim Akers) (Watkins, Paul) | View Add to request |
| 113 | 04/04/2013 | EXHIBIT re 110 Response in Opposition to Motion, . (Attachments: # 1 Exhibit F - 10.26.04 minutes and notice, # 2 Exhibit G - 11.10.04 minutes and notice, # 3 Exhibit H - Declaration of Janice Antonow, # 4 Exhibit I - Declaration of Jon Fisher) (Watkins, Paul) | View Add to request |
| 112 | 04/04/2013 | EXHIBIT re 110 Response in Opposition to Motion, . | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | (Attachments: # 1 Exhibit E - 10.07.04 minutes and notice) (Watkins, Paul) | |
| 111 | 04/04/2013 | EXHIBIT re 110 Response in Opposition to Motion, . (Attachments: # 1 Exhibit C - Declaration of Lucy Schultze, # 2 Exhibit D - 9.20.04 minutes and notice) (Watkins, Paul) | View Add to request |

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

| | | | | |
|---|---|---|---|---|
| 110 | 04/04/2013 | RESPONSE in Opposition re 95 MOTION for Summary Judgment filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Excerpts from Deposition of Michael McFall, # 2 Exhibit B - 9.23.04 Minutes and Notice) (Watkins, Paul) | View | Add to request |
| 109 | 04/04/2013 | BRIEF re 108 Response to Motion, . (Watkins, Paul) | View | Add to request |
| 108 | 04/04/2013 | RESPONSE to Motion re 94 MOTION to Strike 77 Notice of Service filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Excerpts from Wachtel Deposition, # 2 Exhibit B - Ex. 12 to Wachtel Deposition, # 3 Exhibit C - Wachtel Expert Report, # 4 Exhibit D - 2009 AASHTO Report, # 5 Exhibit E - 2009 FHWA Report) (Watkins, Paul) | View | Add to request |
| 107 | 04/04/2013 | NOTICE OF CONVENTIONAL FILING of Exhibits E, F & T to Plaintiff's Response to Defendant's Motion for Summary Judgment [Doc. 103] by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation. (Reppeto, Lisa) | View | Add to request |
| 106 | 04/04/2013 | MEMORANDUM IN SUPPORT re 93 Brief, 105 Response in Opposition to Motion,,, 92 MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts. (Reppeto, Lisa) | View | Add to request |
| 105 | 04/04/2013 | RESPONSE in Opposition re 92 MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts filed by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - Michael McFall Affidavit, # 2 Exhibit B - Taylor Expert Reports, # 3 Exhibit C - Declaration of Taylor, # 4 Exhibit D - Wachtel Deposition Excerpts, # 5 Exhibit E - 2007 VTTI Study, # 6 Exhibit F - 2009 FHWA Study, # 7 Exhibit G.1 - 100 Car Study, # 8 Exhibit G.2 - 100 Car Study, # 9 Exhibit G.3 - 100 Car Study, # 10 Exhibit G.4 - 100 Car Study, # 11 Exhibit G.5 - 100 Car Study, # 12 Exhibit G.6 - 100 Car Study, | View | Add to request |

| | | | |
|---|---|---|---|
| | | # 13 Exhibit H - 1993 Gibbons Paper, # 14 Exhibit I - 2002 Harbluk Study, # 15 Exhibit J - Johnson & Cole Study, # 16 Exhibit K - Wachtel Expert Report) (Reppeto, Lisa) | |
| 104 | 04/04/2013 | MEMORANDUM IN SUPPORT re 103 Response in Opposition to Motion,,, 91 Brief, 89 Exhibits to Other Document, 88 Exhibits to Other Document,, 87 MOTION for Summary Judgment , 90 Exhibits to Other Document, . (Reppeto, Lisa) | View Add to request |
| 103 | 04/04/2013 | RESPONSE in Opposition re 87 MOTION for Summary Judgment filed by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - Oxford Eagle Article - 4/13/90, # 2 Exhibit B - Oxford Eagle Article - 9/20/90, # 3 Exhibit C - 1990 Ordinance, # 4 Exhibit D - Oxford Eagle Article - 5/17/90, # 5 Exhibit G - 2004 Ordinance, # 6 Exhibit H - Michael McFall Affidavit, # 7 Exhibit I - October 2011 Lamar Letter, # 8 Exhibit J - Taylor Expert Reports, # 9 Exhibit K - Gibbons Expert Reports, # 10 Exhibit L - Oxford Eagle Article - 8/14/90, # 11 Exhibit M - Akers Deposition excerpts, # 12 Exhibit N - Antonow Deposition excerpts, # 13 Exhibit Oliver Deposition excerpts, # 14 Exhibit P - Patterson Deposition excerpts, # 15 Exhibit Q - Taylor Deposition excerpts, # 16 Exhibit R - Howell Deposition excerpts, # 17 Exhibit S - Baker Deposition excerpts, # 18 Exhibit U - PowerPoint - Lamar Proposal) (Reppeto, Lisa) | View Add to request |
| | 03/28/2013 | TEXT ORDER granting 101 Motion for Extension of Time to File Response/Reply re Motion for Summary Judgment and Daubert motion. Responses due by 4/4/2013. No further order shall issue from the court. Signed by District Judge Sharion Aycock on 3/28/2013. (psk)(no document attached) | Send Runner to Court |
| | 03/28/2013 | Set/Reset Deadlines: Responses to motions for summary judgment 87 , 95 , and | Send Runner to Court |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | motions to strike 92 , 94 , due 4/4/2013. (psk) | |
| 102 | 03/26/2013 | JOINDER re 101 Joint MOTION for Extension of Time to File Response/Reply as to 91 Brief, 93 Brief, 89 Exhibits to Other Document, 88 Exhibits to Other Document,, 94 MOTION to Strike 77 Notice of Service , 96 Memorandum in Support, [8 . (Watkins, Paul) | View Add to request |
| 101 | 03/25/2013 | Joint MOTION for Extension of Time to File Response/ Reply as to 91 Brief, 93 Brief, 89 Exhibits to Other Document, 88 Exhibits to Other Document,, 94 MOTION to Strike 77 Notice of Service , 96 Memorandum in Support, 87 MOTION for Summary Judgment , 90 Exhibits to Other Document, 95 MOTION for Summary Judgment , 97 Memorandum in Support, 92 MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts, 99 Exhibits to Other Document by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 100 | 03/18/2013 | NOTICE OF SERVICE of Errata Sheet for the 30(b)(6) Deposition of Lamar given by M. McFall on 2/6/13 by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to Defendant. (Reppeto, Lisa) | View Add to request |
| 99 | 03/14/2013 | EXHIBIT re 87 MOTION for Summary Judgment Ex. 10, pages 9-12. (Watkins, Paul) | View Add to request |
| 98 | 03/14/2013 | NOTICE OF CORRECTION: Pages 9-12 sideways, atty asked to re-file pages 9 -12 only re 87 MOTION for Summary Judgment (tab) | Send Runner to Court |
| 97 | 03/13/2013 | MEMORANDUM IN SUPPORT re 94 MOTION to Strike 77 Notice of Service . (Reppeto, Lisa) | View Add to request |
| 96 | 03/13/2013 | MEMORANDUM IN SUPPORT re 95 MOTION for Summary Judgment . (Reppeto, Lisa) | View Add to request |
| 95 | 03/13/2013 | MOTION for Summary Judgment by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - Public Notice of Hearing and Proof of Publication, # 2 Exhibit B - Public Hearing Transcript, # | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | 3 Exhibit C - Public Notice of Special Meeting, # 4 Exhibit D - Special Meeting Transcript, # 5 Exhibit E - Ordinance 2009-4) (Reppeto, Lisa) | |
| 94 | 03/13/2013 | MOTION to Strike 77 Notice of Service by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - City of Oxford Ordinance 2009-4, # 2 Exhibit B - Affidavit of Michael McFall, # 3 Exhibit C - Expert Report of Jerry Wachtel, # 4 Exhibit D - R. Gibbons curriculum vitae, # 5 Exhibit E - Taylor curriculum vitae, # 6 Exhibit F - Expert Report of Taylor, # 7 Exhibit G - Expert Report of Gibbons, # 8 Exhibit H - Collective Excerpts from 2009 Wachtel Deposition, # 9 Exhibit I - Supplemental Report of Taylor, # 10 Exhibit J - Collective Excerpts from 2013 Wachtel Deposition, # 11 Exhibit K - Excerpts from 2009 AASHTO Report, # 12 Exhibit L - Excerpts from 2009 - FHAR Report, # 13 Exhibit M - Research Study by J. Wachtel, # 14 Exhibit N - Metro Fuel Expert Report, # 15 Exhibit O - 2009 FHAR Report, # 16 Exhibit P. Supplemental Expert Report of Gibbons) (Reppeto, Lisa) | View Add to request |
| 93 | 03/13/2013 | BRIEF re 92 MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts. (Watkins, Paul) | View Add to request |
| 92 | 03/13/2013 | MOTION to Strike 86 Notice of Service, 85 Notice of Service, 52 Notice of Service Experts by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Sign Ordinance, # 2 Exhibit B - Ordinance 1990-13, # 3 Exhibit C - PC Minutes 8.13.90, # 4 Exhibit D - Taylor Expert Report, # 5 Exhibit E - Gibbons Expert Report, # 6 Exhibit F - Gibbons Supp Report, # 7 Exhibit G - Excerpts from Wachtel Depo, # 8 Exhibit H - Excerpts from McFall Depo, # 9 Exhibit I - Excerpts from Taylor transcript (Gulfport), # 10 Exhibit J - Taylor Expert Report (Gulfport), # 11 Exhibit K - Excerpts from Gibbons | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | transcript (Gulfport)) (Watkins, Paul) | |
| 91 | 03/13/2013 | BRIEF re 87 MOTION for Summary Judgment . (Watkins, Paul) | View Add to request |
| 90 | 03/13/2013 | EXHIBIT re 87 MOTION for Summary Judgment 24 - 28. (Attachments: # 1 Exhibit 24 - Minutes and notice re 9.20.04, # 2 Exhibit 25 - Minutes and notice re 10.7.04, # 3 Exhibit 26 - Minutes and notice re 10.26.04, # 4 Exhibit 27 - Minutes and notice re 11.10.04, # 5 Exhibit 28 - Excerpts from 2004 LDC) (Watkins, Paul) | View Add to request |
| 89 | 03/13/2013 | EXHIBIT re 87 MOTION for Summary Judgment 21 - 23. (Attachments: # 1 Exhibit 21 - Taylor Expert Report (Gulfport), # 2 Exhibit 22 - Circuit Ct Complaint, # 3 Exhibit 23 - Minutes and notice re 8.23.04) (Watkins, Paul) | View Add to request |
| 88 | 03/13/2013 | EXHIBIT re 87 MOTION for Summary Judgment 11 - 20. (Attachments: # 1 Exhibit 11 - Ordinance 2013-3, # 2 Exhibit 12 - Excerpts from McFall Depo, # 3 Exhibit 13 - Lamar Billboard Photos w Specs, # 4 Exhibit 14 - Declaration of Tim Akers, # 5 Exhibit 15 - Minutes re 1990 Ordinance amendments, # 6 Exhibit 16 - Email from Watkins, # 7 Exhibit 17 - Email from Herbert, # 8 Exhibit 18 - Taylor Expert Report, # 9 Exhibit 19 - Gibbons Expert Report, # 10 Exhibit 20 - Gibbons Supp. Report) (Watkins, Paul) | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 87 | 03/13/2013 | MOTION for Summary Judgment by City of Oxford, Mississippi. (Attachments: # 1 Exhibit 1 - Sign Ordinance, # 2 Exhibit 2 - Minutes re psg of 1990 ordinance, # 3 Exhibit 3 - Ordinance 1990-13, # 4 Exhibit 4 - Declaration of City Clerk, # 5 Exhibit 5 - PC 8.13.90 minutes, # 6 Exhibit 6 - 1990 Cir Ct Case, # 7 Exhibit 7 - Excerpts from Vision 20-20, # 8 Exhibit 8 - Declaration of Janice Antonow, # 9 Exhibit 9 - Declaration of Jon Fisher, # 10 Exhibit 10 - Declaration of Randy Barber) (Watkins, Paul) | View Add to request |
| | 03/11/2013 | Set/Reset Deadlines: Motions due by 3/13/2013. (egs) | Send Runner to Court |
| 86 | 02/26/2013 | NOTICE OF SERVICE of Supplemental Expert Report of Dr. Ronald Gibbons by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to Defendant. (Reppeto, Lisa) | View Add to request |
| 85 | 02/26/2013 | NOTICE OF SERVICE of Supplemental Expert Report of Charles R. Taylor, Ph.D. by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to Defendant. (Reppeto, Lisa) | View Add to request |
| 84 | 02/22/2013 | ORDER denying 54 Motion to Amend/Correct. Signed by U.S. Magistrate Judge David A. Sanders on 2/22/13. (def) | View Add to request |
| 83 | 02/20/2013 | ORDER granting 81 Motion to Extend CMO. Discovery due by 2/26/2013. Motions due by 3/12/2013. Signed by U.S. Magistrate Judge David A. Sanders on 2/20/13. (def) | View Add to request |
| 82 | 02/18/2013 | NOTICE OF SERVICE of Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Request for Production of Documents by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to City of Oxford, Mississippi. (Reppeto, Lisa) | View Add to request |
| 81 | 02/15/2013 | MOTION to Extend CMO Deadlines by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A - 1/25/13 Email, # 2 Exhibit B - 1/28/13 Email, # 3 Exhibit C - 2/4/13 Email, | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | # 4 Exhibit D - 2/5/13 Email, # 5 Exhibit E - 2/14/13 Email, # 6 Exhibit F - 2/15/13 Email) (Ruffin, Sabrina) | | |
| 80 | 02/07/2013 | ORDER granting in part and denying in part 47 Motion to Compel. Signed by U.S. Magistrate Judge David A. Sanders on 2/7/13. (def) | View | Add to request |
| 79 | 02/06/2013 | NOTICE to Take Deposition of Jerry Wachtel by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation (Reppeto, Lisa) | View | Add to request |
| 78 | 01/25/2013 | NOTICE OF SERVICE of Supplemental Initial Disclosures by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi. (Watkins, Paul) | View | Add to request |
| 77 | 01/25/2013 | NOTICE OF SERVICE of Designation of Expert by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi. (Watkins, Paul) | View | Add to request |
| 76 | 01/25/2013 | REPLY to Response to Motion re 54 MOTION to Amend/Correct 24 Answer to Amended Complaint filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit 13.01.04 E-mail, # 2 Exhibit B - 13.01.17 Email, # 3 Exhibit C - Notice of 30(b)(6) depo, # 4 Exhibit D - Ordinance 1990-13, # 5 Exhibit E - 09.18.90 minutes, # 6 Exhibit F - 09.20.90 article) (Watkins, Paul) | View | Add to request |
| 75 | 01/23/2013 | NOTICE to Take Deposition by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi (Watkins, Paul) | View | Add to request |
| 74 | 01/23/2013 | NOTICE to Take Deposition of Michael McFall by Pope S. Mallette on behalf of City of Oxford, Mississippi (Mallette, Pope) | View | Add to request |
| 73 | 01/23/2013 | SEALED Reply in Support of its 47 Motion to Compel Complete Responses to City's First Set of Discovery Requests. (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit I, # 4 Exhibit J) (tab) | View | Add to request |
| 72 | 01/23/2013 | NOTICE OF CONVENTIONAL FILING of Reply in Support of Motion to Compel by Paul | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | Bowie Watkins, Jr on behalf of City of Oxford, Mississippi. (Watkins, Paul) | | |
| 71 | 01/22/2013 | ORDER granting 56 Motion to Seal. Signed by U.S. Magistrate Judge David A. Sanders on 1/22/13. (def) | View | Add to request |
| 70 | 01/18/2013 | NOTICE to Take Deposition of City of Oxford, Mississippi pursuant to Rule 30(b)(6) by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 69 | 01/18/2013 | NOTICE to Take Deposition of Ernest "E.O." Oliver by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 68 | 01/18/2013 | NOTICE to Take Deposition of George "Pat" Patterson by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 67 | 01/18/2013 | NOTICE to Take Deposition of Dr. Janice Antonow by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 66 | 01/18/2013 | NOTICE to Take Deposition of Preston E. Taylor by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 65 | 01/18/2013 | NOTICE to Take Deposition of Ulysses "Coach" Howell by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 64 | 01/18/2013 | NOTICE to Take Deposition of Richard Devoe by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 63 | 01/18/2013 | NOTICE to Take Deposition of Dr. Baker by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View | Add to request |
| 62 | 01/18/2013 | JOINDER re 59 Notice (Other) . (Ruffin, Sabrina) | View | Add to request |
| 61 | 01/17/2013 | MEMORANDUM IN SUPPORT re 60 Response in Opposition to Motion . (Ruffin, Sabrina) | View | Add to request |
| 60 | 01/17/2013 | RESPONSE in Opposition re 54 MOTION to Amend/Correct 24 Answer to Amended Complaint filed by Lamar OCI South Corporation. (Ruffin, Sabrina) | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| 59 | 01/17/2013 | NOTICE by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi, Lamar OCI South Corporation of Joint Stipulation (Watkins, Paul) | View | Add to request |
| 58 | 01/11/2013 | NOTICE to Take Deposition of Lamar OCI South Corporation 30(b)(6) by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi (Watkins, Paul) | View | Add to request |
| 57 | 01/07/2013 | MEMORANDUM IN SUPPORT re 56 MOTION to Seal Rebuttal to Motion to Compel. (Watkins, Paul) | View | Add to request |
| 56 | 01/07/2013 | MOTION to Seal Rebuttal to Motion to Compel by City of Oxford, Mississippi. (Watkins, Paul) | View | Add to request |
| 55 | 01/04/2013 | MEMORANDUM IN SUPPORT re 54 MOTION to Amend/ Correct 24 Answer to Amended Complaint . (Watkins, Paul) | View | Add to request |
| 54 | 01/04/2013 | MOTION to Amend/Correct 24 Answer to Amended Complaint by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - 1990 Circuit Court Case, # 2 Exhibit B - Proposed Amended Answer, # 3 Exhibit Defendant's First Interrogs, RFP, RFA) (Watkins, Paul) | View | Add to request |
| 53 | 01/04/2013 | NOTICE OF SERVICE of Plaintiff's Second Supplemental Response to Defendant's First Set of Interrogatories and Request for Production of Documents by Sabrina B. Ruffin on behalf of Lamar OCI South Corporation to City of Oxford, Mississippi. (Ruffin, Sabrina) | View | Add to request |
| 52 | 12/28/2012 | NOTICE OF SERVICE of Plaintiff's Designation of Experts by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to Defendant. (Reppeto, Lisa) | View | Add to request |
| 51 | 12/27/2012 | MEMORANDUM IN SUPPORT re 47 MOTION to Compel Complete Responses to Discovery Requests, 50 Response in Opposition to Motion, 48 Brief . (Ruffin, Sabrina) | View | Add to request |
| 50 | 12/27/2012 | RESPONSE in Opposition re 47 MOTION to Compel Complete Responses to Discovery | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | Requests filed by Lamar OCI South Corporation. (Ruffin, Sabrina) | |
| 49 | 12/14/2012 | NOTICE OF SERVICE of Plaintiff's Supplemental Responses to Defendant's First Set of Interrogatories and Request for Production of Documents by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to Defendant. (Reppeto, Lisa) | View Add to request |
| 48 | 12/10/2012 | BRIEF re 47 MOTION to Compel Complete Responses to Discovery Requests. (Watkins, Paul) | View Add to request |
| 47 | 12/10/2012 | MOTION to Compel Complete Responses to Discovery Requests by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A - Good Faith Certificate, # 2 Exhibit B - City's Discovery, # 3 Exhibit C - Lamar's Discovery Responses, # 4 Exhibit D - Good Faith Letter, # 5 Exhibit E - Response to Good Faith Letter, # 6 Exhibit F - Lamar's Initial Disclosures) (Watkins, Paul) | View Add to request |
| 46 | 11/21/2012 | PROTECTIVE ORDER. Signed by U.S.Magistrate Judge David A. Sanders on 11/21/12. (def) | View Add to request |
| 45 | 11/14/2012 | NOTICE of Attorney Appearance by Sabrina B. Ruffin on behalf of Lamar OCI South Corporation (Ruffin, Sabrina) | View Add to request |
| | 11/09/2012 | Reset Case Management Order Deadlines: Discovery due by 2/19/2013. Motions due by 3/5/2013. Plaintiffs Designation of Experts due by 12/28/2012. Defendants Designation of Experts due by 1/25/2013. (tab) | Send Runner to Court |
| 44 | 11/08/2012 | ORDER denying 42 Motion to Stay, but granting in part, motion to amend the case managment order. Signed by U.S. Magistrate Judge David A. Sanders on 11/8/12. (def) | View Add to request |
| 43 | 11/08/2012 | RESPONSE to Motion re 42 MOTION to Stay Or in the Alternative, for Extension of Time filed by City of Oxford, Mississippi. (Attachments: # 1 Exhibit A (12.10.31 good faith letter), # 2 Exhibit B (12.11.06 | View Add to request |

| | | | |
|---|---|---|---|
| | | Reppeto to Watkins), # 3 Exhibit C (Email thread Mallette - Herbert)) (Mallette, Pope) | |
| 42 | 11/06/2012 | MOTION to Stay Or in the Alternative, for Extension of Time by Lamar OCI South Corporation. (Attachments: # 1 Exhibit A (Amended Case Management Order)) (Herbert, Mark) | View Add to request |
| 41 | 10/10/2012 | ORDER granting 38 Motion for Extension of Time. Signed by U.S. Magistrate Judge David A. Sanders on 10/10/12. (def) | View Add to request |
| | 10/10/2012 | Set/Reset Case Management Order Deadlines: Plaintiffs Designation of Experts due by 11/26/2012. Defendants Designation of Experts due by 12/31/2012. (def) | Send Runner to Court |
| 40 | 10/05/2012 | NOTICE OF SERVICE of Responses to Plaintiff's First Set of Interrogatories by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 39 | 10/05/2012 | NOTICE OF SERVICE of Responses to Plaintiff's First Set of Requests for Production of Documents by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 38 | 10/02/2012 | MOTION for Extension of Time to Designate Experts (Unopposed) by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 37 | 10/01/2012 | ORDER granting 35 Motion for Extension of Time. Defendant given until 10/5/2012 to respond to outstanding discovery referred to in this motion. Signed by Mag. Judge David A. Sanders on 10/1/2012. (jkj) | View Add to request |
| 36 | 09/26/2012 | NOTICE OF SERVICE of Response to Requests for Admissions by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 35 | 09/26/2012 | MOTION for Extension of Time to Respond to First Set of Interrogatories and Requests for Production of Documents by City of Oxford, Mississippi. | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | | |
|---|---|---|---|---|
| | | (Attachments: # 1 Exhibit A) (Watkins, Paul) | | |
| 34 | 08/24/2012 | NOTICE OF SERVICE of Requests for Admissions by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to City of Oxford, MS. (Reppeto, Lisa) | View | Add to request |
| 33 | 08/24/2012 | NOTICE OF SERVICE of Requests for Production of Documents by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to City of Oxford, MS. (Reppeto, Lisa) | View | Add to request |
| 32 | 08/24/2012 | NOTICE OF SERVICE of Interrogatories by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation to City of Oxford, MS. (Reppeto, Lisa) | View | Add to request |
| 31 | 08/09/2012 | NOTICE OF SERVICE of Response to Requests for Admissions by Mark D. Herbert on behalf of Lamar OCI South Corporation to Defendant. (Herbert, Mark) | View | Add to request |
| 30 | 08/09/2012 | NOTICE OF SERVICE of Plaintiff's Responses to Defendant's Request for Production of Documents by Mark D. Herbert on behalf of Lamar OCI South Corporation to Defendant. (Herbert, Mark) | View | Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| 29 | 08/09/2012 | NOTICE OF SERVICE of Response to Defendant's First Set of Interrogatories by Mark D. Herbert on behalf of Lamar OCI South Corporation to Defendant. (Herbert, Mark) | View Add to request |
| 28 | 07/31/2012 | ORDER granting 27 Motion for Extension of Time. Responses to interrogatories, requests for production and admission due by August 9, 2012. Signed by U.S. Magistrate Judge David A. Sanders on 7/31/12. (def) | View Add to request |
| 27 | 07/26/2012 | MOTION for Extension of Time (Unopposed) by Lamar OCI South Corporation. (Reppeto, Lisa) | View Add to request |
| 26 | 07/12/2012 | NOTICE of Attorney Appearance by Lisa Anderson Reppeto on behalf of Lamar OCI South Corporation (Reppeto, Lisa) | View Add to request |
| 25 | 07/12/2012 | NOTICE of Attorney Appearance by Mark D. Herbert on behalf of Lamar OCI South Corporation (Herbert, Mark) | View Add to request |
| 24 | 06/27/2012 | ANSWER to 23 Amended Complaint by City of Oxford, Mississippi. (Watkins, Paul) | View Add to request |
| 23 | 06/27/2012 | AMENDED COMPLAINT For Declaratory Judgment Injunctive and Compensatory Relief against All Plaintiffs,, filed by Lamar OCI South Corporation. (Leathers, Jeffrey) | View Add to request |
| 22 | 06/26/2012 | NOTICE OF SERVICE of Requests for Admissions by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 21 | 06/26/2012 | NOTICE OF SERVICE of Interrogatories and Requests for Production by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 20 | 06/21/2012 | ORDER granting 19 Motion for Leave to File. Amended complaint to be filed within 14 days. Signed by U.S. Magistrate Judge David A. Sanders on 6/21/12. (def) | View Add to request |
| 19 | 05/29/2012 | MOTION for Leave to File Amended Complaint by Lamar OCI South Corporation. (Attachments: # 1 Exhibit | View Add to request |

| | | | |
|---|---|---|---|
| | | proposed Amended Complaint) (Leathers, Jeffrey) | |
| 18 | 05/24/2012 | ORDER granting 17 Motion to Extend CMO. Amendments/ Joinder of Parties due by 5/29/2012. Signed by U.S. Magistrate Judge David A. Sanders on 5/24/12. (def) | View Add to request |
| 17 | 05/18/2012 | MOTION to Extend CMO Deadlines by Lamar OCI South Corporation. (Leathers, Jeffrey) | View Add to request |
| 16 | 04/19/2012 | ORDER Governing Pretrial Conference and Preparation of Final Pretrial Order. Signed by Mag. Judge David A. Sanders on 4/19/2012. (egs) | View Add to request |
| 15 | 04/19/2012 | NOTICE of Final Pretrial Conference set for 5/6/2013 at 10:00 AM in Judge Sanders Chambers before Mag. Judge David A. Sanders. (egs) | View Add to request |
| 14 | 04/18/2012 | NOTICE of Trial: Non-Jury Trial set for 6/3/2013 09:00 AM in Aberdeen Courtroom 1 before District Judge Sharion Aycock. (gs) | View Add to request |
| 13 | 04/18/2012 | CASE MANAGEMENT ORDER Final Pretrial Conference set for 5/6/2013 10:00 AM in Judge Sanders Chambers before David A. Sanders. Discovery due by 1/21/2013. Amendments/Joinder of Parties due by 5/18/2012. Plaintiffs Designation of Experts due by 10/22/2012. Defendants Designation of Experts due by 11/22/2012. Motions due by 2/4/2013. Signed by S. Allan Alexander on 4/18/12. (wsm) | View Add to request |
| 12 | 04/18/2012 | Minute Entry for proceedings held before S. Allan Alexander: Case Management Conference held on 4/18/2012. (wsm) | View Add to request |
| | 04/18/2012 | Case Reassigned to David A. Sanders. S. Allan Alexander no longer assigned to the case. (jtm) | Send Runner to Court |
| 11 | 04/13/2012 | NOTICE OF SERVICE of Initial Disclosures by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi to Plaintiff. (Watkins, Paul) | View Add to request |
| 10 | 04/13/2012 | NOTICE OF SERVICE of pre-discovery disclosure by Jeffrey Dean Leathers on behalf of Lamar OCI South Corporation | View Add to request |

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

| | | | |
|---|---|---|---|
| | | to Defendants. (Leathers, Jeffrey) | |
| 9 | 03/28/2012 | INITIAL ORDER - RULE 16.1 Case Management Conference set for 4/18/2012 10:00 AM in Judge Alexander Chambers before S. Allan Alexander. Signed by S. Allan Alexander on 3/28/12. (wsm) | View Add to request |
| 8 | 02/03/2012 | NOTICE of Attorney Appearance by Pope S. Mallette on behalf of City of Oxford, Mississippi (Mallette, Pope) | View Add to request |
| 7 | 02/03/2012 | ANSWER to 1 Complaint and Affirmative Defenses by City of Oxford, Mississippi. (Mallette, Pope) | View Add to request |
| 6 | 01/27/2012 | NOTICE of Attorney Appearance by Elise Kilpatrick Atkins on behalf of City of Oxford, Mississippi (Atkins, Elise) | View Add to request |
| 5 | 01/27/2012 | NOTICE of Attorney Appearance by J. Cal Mayo, Jr on behalf of City of Oxford, Mississippi (Mayo, J.) | View Add to request |
| 4 | 01/27/2012 | NOTICE of Attorney Appearance by Paul Bowie Watkins, Jr on behalf of City of Oxford, Mississippi (Watkins, Paul) | View Add to request |
| 3 | 01/19/2012 | SUMMONS Returned Executed by Jeffrey Dean Leathers on behalf of Lamar OCI South Corporation City of Oxford, Mississippi served on 1/13/2012. (Leathers, Jeffrey) | View Add to request |
| 2 | 01/09/2012 | Summons Issued as to City of Oxford, Mississippi. (jtm) | View Add to request |
| 1 | 01/09/2012 | COMPLAINT, Filing fee $ 350, receipt number MSN300007071, filed by Lamar OCI South Corporation. (Attachments: # 1 Civil Cover Sheet) (jtm) | View Add to request |
| | 01/09/2012 | NOTICE OF ASSIGNMENT. Case assigned to Judge Sharion Aycock and Magistrate Judge S. Allan Alexander. (jtm) | Send Runner to Court |

TO ORDER COPIES OF ANY DOCUMENTS LISTED ABOVE, CALL WESTLAW COURTEXPRESS 1-877-DOC-RETR (1-877-362-7387) (Additional Charges Apply)

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 235

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,**
**Defendant.**

# Expert Report of Charles R. Taylor, Ph.D.

**September 20, 2024**

EXHIBIT E

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research*, *Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues



Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 238

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

   - Comprehensive plan implementation
   - Traffic safety
   - Aesthetics
   - Urban design and travel behavior
   - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   **i) Comprehensive plan implementation;**
   **ii) Traffic safety;**
   **iii) Aesthetics**
   **iv) Urban design and travel behavior; or**
   **v) Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on–premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people



Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 244

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less



Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 252

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024

Date

Charles R. Taylor, Ph.D.

Charles R. Taylor, Ph.D.

## REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityof eastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, *3*(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.



Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 258

Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 259

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.



Appellate Case: 25-3225 Document: 16-3 Date Filed: 02/23/2026 Page: 260

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/247981075

# The Role of Driver Distraction in Traffic Crashes

**Article** · January 2001

CITATIONS
504

READS
2,459

**4 authors**, including:



Jane S Stutts
University of North Carolina at Chapel Hill
**54** PUBLICATIONS **3,703** CITATIONS
SEE PROFILE



Eric A Rodgman
University of North Carolina at Chapel Hill
**24** PUBLICATIONS **2,397** CITATIONS
SEE PROFILE

All content following this page was uploaded by Eric A Rodgman on 13 January 2015.

The user has requested enhancement of the downloaded file.

EXHIBIT
EX G
Charles R. Taylor, Ph...
11.13.2024

# THE ROLE OF DRIVER DISTRACTION IN TRAFFIC CRASHES



Prepared by
Jane C. Stutts, Ph.D.
Donald W. Reinfurt, Ph.D.
Loren Staplin, Ph.D.
Eric A. Rodgman, B.S.
University of North Carolina
Highway Safety Research Center
Chapel Hill, NC

Prepared for
**AAA Foundation for Traffic Safety**
1440 New York Avenue, N.W., Suite 201
Washington, DC 20005
202/638-5944
www.aaafoundation.org

May 2001

Cover Photos
**Top row**: Kristin Oguntoyinbo/UNC Highway Safety Research Center
**Bottom**: J. Scott Osberg/AAA Foundation for Traffic Safety

# TABLE OF CONTENTS

LIST OF TABLES ..... ii

LIST OF FIGURES ..... iii

FOREWORD ..... 1

ACKNOWLEDGMENTS ..... 2

EXECUTIVE SUMMARY ..... 3

INTRODUCTION ..... 6

CDS DATA ANALYSIS ..... 7

- Driver Factors ..... 13
- Other Factors Impacting Driver Distraction ..... 19
  - Roadway Factors ..... 19
  - Environmental and Vehicle Factors ..... 21
  - Crash Factors ..... 23

CDS NARRATIVE ANALYSIS ..... 25

NORTH CAROLINA NARRATIVE ANALYSIS ..... 30

SUMMARY AND CONCLUSIONS ..... 34

REFERENCES ..... 38

APPENDIX A. CDS Driver Inattention/Distraction Variables ..... 39

APPENDIX B. Supporting Graphs ..... 43

APPENDIX C. Sample CDS Narrative Printout ..... 57

APPENDIX D. Sample NC Narrative Printout ..... 59

# LIST OF TABLES:

Table 1: Driver attention status based on the unweighted CDS data ........................8

Table 2: Driver attention status based on the weighted CDS data ...........................9

Table 3: Yearly trends in specific driving distractions based on weighted CDS data ....................................................................................11

Table 4: Distribution of driver attention status within categories of driver age ..........................................................................13

Table 5: Distribution of driver age within categories of driver attention status .................................................................................15

Table 6: Distribution of specific driver distractions within categories of driver age ..........................................................................16

Table 7: Distribution of driver attention status for males and females ....................17

Table 8: Distribution of specific driver distractions for males and females ............18

Table 9: Roadway effects on driver attention status .............................................20

Table 10: Roadway effects on specific nature of driver distraction ..........................21

Table 11: Environmental and vehicle effects on driver attention status.................... 22

Table 12: Environmental and vehicle effects on specific nature of driver distraction .........................................................................................23

Table 13: Effects of crash characteristics on driver attention status ........................24

Table 14: Effects of crash characteristics on specific nature of driver distraction ....................................................................................25

Table 15. Analysis of narrative data from 1997 and 1998 CDS data files............26-27

Table 16. Results of Narrative Key Word Search for Driver Distraction Cases on 1998 N.C. Crash File..............................30-31

Table 17. Results of More Restricted Narrative Key Word Search for Driver Distraction Cases on 1994 North Carolina Crash File ..............................32

# LIST OF FIGURES:

Figure 1: Overall distribution of driver attention status ....................................10
Figure 2: Overall distribution of specific driver distractions ................................12
Figure 3: Percentage of drivers identified as distracted by age group..................14
Figure 4: Age distribution of drivers identified as distracted ...............................14
Figure 5: Distribution of specific driver distractions for males and females ..........17
Figure 6: Growth in cell phone use as measured by millions of subscribers........35
Figure B.1: Effect of number of travel lanes on driver attention status ...................44
Figure B.2: Effect of number of travel lanes on specific driver distraction .............44
Figure B.3: Effect of speed limit on driver attention status ....................................45
Figure B.4: Effect of speed limit on specific driver distraction.................................45
Figure B.5: Effect of road grade on driver attention status ....................................46
Figure B.6: Effect of road grade on specific driver distraction.................................46
Figure B.7: Effect of intersection status on driver attention status .........................47
Figure B.8: Effect of intersection status on specific driver distraction .....................47
Figure B.9: Effect of light condition on driver attention status .................................48
Figure B.10: Effect of light condition on specific driver distraction ...........................48
Figure B.11: Effect of weather condition on driver attention status...........................49
Figure B.12: Effect of weather condition on specific driver distraction .....................49
Figure B.13: Effect of vehicle type on driver attention status ..................................50
Figure B.14: Effect of vehicle type on specific driver distraction ..............................50
Figure B.15: Effect of other occupants in vehicle on driver attention status .............51
Figure B.16: Effect of other occupants in vehicle on specific driver distraction ........51
Figure B.17: Effect of number of vehicles on driver attention status.........................52
Figure B.18: Effect of number of vehicles on specific driver distraction ...................52
Figure B.19: Effect of pre-crash vehicle maneuver on driver attention status............53
Figure B.20: Effect of pre-crash vehicle maneuver on specific driver distraction ......53
Figure B.21: Effect of region of impact on driver attention status .............................54
Figure B.22: Effect of region of impact on specific driver distraction.........................54
Figure B.23: Effect of driver injury on driver attention status.....................................55
Figure B.24: Effect of driver injury on specific driver distraction ...............................55

# FOREWORD

This study was funded by the AAA Foundation for Traffic Safety. Founded in 1947, the AAA Foundation is a not-for-profit, publicly supported charitable research and educational organization dedicated to saving lives and reducing injuries by preventing traffic crashes.

This peer-reviewed report documents the relative reported frequency of serious crashes caused by various forms of driver distraction. It should be of interest to legislators, licensing agencies, law enforcement, and traffic safety organizations. It is available in published paper format and as an electronic file on the AAA Foundation for Traffic Safety's web site at http://www.aaafoundation.org.

Funding for this study was provided by voluntary contributions from the American Automobile Association and its affiliated motor clubs; from individual AAA members; and from AAA club-affiliated insurance companies.

This publication is distributed at no charge as a public service. It may not be resold or used for commercial purposes without explicit written permission from the AAA Foundation for Traffic Safety. It may, however, be copied in whole or in part and distributed at no charge via any medium, provided that the AAA Foundation is given appropriate credit as the source of the material.

The opinions, findings, and conclusions expressed in this publication are those of the authors and are not necessarily those of the AAA Foundation or of any individual who peer-reviewed the report. The AAA Foundation for Traffic Safety assumes no liability for the use or misuse of any information, opinions, findings, or conclusions contained in this report.

© 2001, AAA Foundation for Traffic Safety

# ACKNOWLEDGMENTS

The authors express appreciation to the AAA Foundation for Traffic Safety for their financial support of this project, and especially to David Willis and Scott Osberg for their helpful guidance and input. We would also like to thank Neil Lerner, Robert Scopatz, and Jing Wang for their thoughtful review and comments on the draft report. Anna Waller at the UNC School of Medicine provided valuable assistance to the narrative analysis portions of the project, and Mike Bowling with the UNC Survey Research Unit provided timely assistance with the statistical analyses.

# EXECUTIVE SUMMARY

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration estimates that at least 25% of police-reported crashes involve some form of driver inattention. Driver distraction is one form of inattention and is a factor in over half of these crashes. Distraction occurs when a driver "is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compels or induces the driver's shifting attention away from the driving task." The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or "lost in thought."

The AAA Foundation for Traffic Safety awarded a contract to the University of North Carolina Highway Safety Research Center to conduct research on the role of driver distraction in traffic crashes. The goal of the project is to identify the major sources of distraction to drivers and the relative importance of the distractions as potential causes of crashes. This report presents the results of Phase I of the project. Included is a descriptive analysis of five years of the National Accident Sampling System (NASS) Crashworthiness Data System (CDS) data, along with an analysis of narratives for two years for both CDS and North Carolina data. The descriptive analyses and the narrative analysis were done to provide input for developing a more comprehensive taxonomy of driver distractions; the taxonomy will guide future field data collection efforts.

The CDS is an annual probability sample of approximately 5,000 police-reported crashes involving at least one passenger vehicle that has been towed from the crash scene. Data are collected by trained, professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, as well as from available medical records. Beginning in 1995, a variable for coding the "Driver's Distraction/Inattention to Driving" was added to the CDS. The variable contains codes for attentive, looked but did not see, and sleepy, along with more than a dozen specific distractions (eating or drinking, other occupants, moving object in vehicle, talking on cellular phone, etc.).

For the current analyses two variables were defined – one identifying the attention status of the driver (attentive, distracted, looked but did not see, sleepy/asleep, or unknown), and the second the specific distracting event for those drivers identified as distracted. The CDS driver distraction data is vehicle rather than crash oriented and consequently it underestimates the role of distraction in actual crashes.

For the overall 1995-1999 CDS data, 48.6% of the drivers were identified as attentive at the time of their crash; 8.3% were identified as distracted, 5.4% as "looked but did not see," and 1.8% as sleepy or asleep. The remaining 35.9% were coded either as unknown or no driver present. This high percentage of drivers with unknown attention status has the effect of diluting the percentages in the other categories. Without the unknowns, the percentage of drivers identified as distracted increases to 12.9%. The percentage of actual *crashes* involving driver distraction would be still higher.

**The specific sources of distraction among distracted drivers were:**

| **Specific Distraction** | **% of Drivers** |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette, CD | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.3 |
| Other device/object brought into vehicle | 2.9 |
| Adjusting vehicle/climate controls | 2.8 |
| Eating or drinking | 1.7 |
| Using/dialing cell phone | 1.5 |
| Smoking related | 0.9 |
| Other distraction | 25.6 |
| Unknown distraction | 8.6 |
| | 100.0 |

Percentages for the different types of distractions should be viewed as preliminary estimates that are likely biased by differential underreporting. These are research results that will be useful in building a broader understanding of driver distraction. The percentages for the different types of distractions should not be used to guide policy development.

Young drivers (under 20 years of age) were the most likely to be involved in distraction-related crashes. In addition, certain types of distractions were more prominent in certain age groups, for example, adjusting the radio, cassette or CD among the under 20-year-olds; other occupants (e.g., young children) among 20-29 year-olds; and outside objects and events among those age 65 and older. Variations by driver sex were less pronounced, although males were slightly more likely than females to be categorized as distracted at the time of their crash.

In addition to these driver factors, a number of roadway, environmental, vehicle, and crash characteristic variables were also examined to determine their relationship to driver distraction. Although these results were less conclusive, they nevertheless underscore the importance of taking into account specific contextual factors in collecting and analyzing driver distraction data. A few illustrative examples include the higher proportion of adjusting radio/cassette/CD events occurring in nighttime crashes, the higher proportion of moving object in vehicle events occurring in crashes on non-level grade roadways, and the higher proportion of other occupant distractions occurring at intersection crashes.

To obtain further insight into the specific events falling into each of the identified CDS categories, two years of narrative CDS data were reviewed. In addition, a computerized search was made of two years of North Carolina police-reported crash narratives. Both activities proved helpful in developing a more complete taxonomy of events distracting drivers.

When interpreting the results of this Phase I analysis, it is important to keep in mind both the purpose for which it was conducted, and the limita-

tions inherent in the data. The primary purpose of the analysis was to provide input for the development of a more comprehensive taxonomy of driver distractions and to understand important contextual variables. The data limitations are considerable and include potential underreporting of distracted driving in general as well as differential underreporting of specific distracting events.

These results suggest that demographic and situational factors are related to driver distraction. Additional research is needed to quantify the frequency and intensity of different driver distractions and to understand how other variables affect distractability and willingness to engage in distracting behaviors. As roads grow more congested and the demands on drivers increase, it seems likely that new in-vehicle technologies will add even more potential distracters.

# INTRODUCTION

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration (NHTSA) estimates that approximately 25% of police-reported crashes involve some form of driver inattention – the driver is distracted, asleep or fatigued, or otherwise “lost in thought” (Wang, Knipling and Goodman, 1996; Ranney, Mazzae, Garrott and Goodman, 2000). Estimates from other sources are as high as 35-50% (Sussman, Bishop, Madnick and Walter, 1995; NHTSA, 1997).

The AAA Foundation for Traffic Safety (AAAFTS) is committed to educating the public about issues affecting safety on the roadway. A contract was awarded to the University of North Carolina Highway Safety Research Center to conduct research on “The Role of Driver Distraction in Traffic Crashes.” The goal of the project is to identify the major sources of distraction to drivers and the relative importance of different types of distractions in causing crashes. The project involves a number of distinct yet interrelated tasks, including: analysis of crash data from the NASS Crashworthiness Data System (CDS) data file; analysis of narrative data from CDS and North Carolina crash reports; and collection and analysis of field data to determine the prevalence and implications of selected driving distractions in real-world driving.

This report documents the work carried out to date on the project, focusing on the CDS and North Carolina data analyses.

AAAFTS has chosen to focus its efforts specifically on driver distraction, rather than the broader category of driver inattention. It defines distraction as “when a driver is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compelled or tended to induce the driver’s shifting attention away from the driving task.” The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or “lost in thought.”

Safety problems related to driver inattention and distraction are expected to escalate in the future as more technologies become available for use in personal vehicles. During the summer of 2000, NHTSA hosted an Internet Forum on the safety implications of driver distraction when using in-vehicle technologies including cell phones, in-vehicle navigation systems, night vision systems, and wireless Internet (Llaneras, 2000). The Forum attracted broad international participation from both the public and private sectors.

While cellular telephones and other in-vehicle technologies have been the focus of considerable research within the highway safety community, much less attention has been given to identifying other, non-technological, distractions within the vehicle and their potential role in causing crashes.

The last in-depth crash causation research was sponsored by NHTSA and conducted at Indiana University during the mid-1970s (Treat, Tumbas, McDonald et al., 1979). This study, frequently referred to as the Indiana Tri-Level Study because of the three levels of crash investigation employed, examined the human, environmental, and vehicular factors in traffic crashes.

Study results identified human factors as probable causes in 93% of the investigated crashes, environmental factors as probable causes in 34%, and vehicular factors as probable causes in 13%. Internal distraction was cited as a causal factor in 9% of the crashes and driver inattention in an additional 15%. No information was reported on the frequency of external distractions.

## CDS DATA ANALYSIS

The National Highway Traffic Safety Administration initiated the Crashworthiness Data System (CDS) in 1988. It is intended to complement the General Estimates System (GES) data, which is based entirely on information derived from police crash reports. The CDS collects much more detailed information on an annual probability sample of approximately 5,000 police-reported traffic crashes involving at least one passenger vehicle that has been towed from the crash scene. The CDS employs trained professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, and from available medical records.

The CDS captures information on passenger vehicles, which includes automobiles, pickup trucks, light vans, and sport utility vehicles, and on a few non-passenger vehicles whose air bag may have deployed in the crash. These vehicle types comprise 93% of all crash-involved vehicles and are the target of the current investigation. Only passenger vehicles damaged seriously enough to require towing from the crash scene are included in the CDS; about a fourth of all police-reported crashes involve vehicles this seriously damaged. This towaway selection criterion has the advantage of limiting the sample to those crashes that have the most serious consequences in terms of injury and/or property damage: nearly half of the drivers of vehicles reported in the CDS are injured, compared to a third of drivers in the GES. This criterion also standardizes the reporting threshold across states rather than requiring investigators to estimate the cost of vehicle repairs or to make other subjective judgments about whether a vehicle should be included in the sample.

Both the focus on passenger vehicles and the restriction to more serious crashes make the CDS a potentially useful source of data for the current project. The primary reason for using the CDS, however, is the level of detail contained for each reported crash, including a variable describing the attention status of the driver – “Driver’s Distraction/Inattention to Driving” (see Appendix A). The variable was added to the data collection protocol beginning in 1995. In addition to specific driver distraction and inattention codes, it includes optional narrative information that gives a fuller picture of an identified distraction and can be used to record new and unspecified distractions.

The current analysis is based on 1995-1999 CDS data obtained from the NHTSA National Center for Statistics and Analysis. For this analysis two variables were created from the original “Driver’s Distraction/Inattention to Driving” variable shown in Appendix A.

**DRIVER ATTENTION STATUS**
**has five categories:**

1. Attentive
2. Distracted
3. Looked but didn't see
4. Sleepy or fell asleep
5. Unknown or no driver

**DRIVER DISTRACTION**
**has 13 categories:**

1. Eating or drinking
2. Outside person, object or event
3. Adjusting radio, cassette, or CD
4. Other occupants in vehicle
5. Moving object in vehicle
6. Smoking related
7. Talking or listening on cellular phone
8. Dialing cellular phone
9. Using device/object brought into vehicle
10. Using device/controls integral to vehicle
11. Adjusting climate controls
12. Other distraction
13. Unknown distraction

Table 1. Driver attention status based on the unweighted CDS data[1]

| Driver Attention Status | 1995 | 1996 | 1997 | 1998 | 1999 | Total |
|---|---|---|---|---|---|---|
| Attentive | 3030 (46.5)[2] | 3204 (48.0) | 2451 (37.8) | 2877 (44.5) | 2598 (42.2) | 14160 (43.8) |
| Distracted | 557 (8.6) | 476 (7.1) | 393 (6.1) | 468 (7.2) | 486 (7.9) | 2380 (7.4) |
| **Looked but didn t see** | **347 (5.3)** | **347 (5.2)** | **288 (4.4)** | **275 (4.3)** | **305 (5.0)** | **1562 (4.8)** |
| Sleepy or fell asleep | 188 (2.9) | 195 (2.9) | 113 (1.7) | 151 (2.3) | 150 (2.4) | 797 (2.5) |
| Unknown/no driver | 2390 (36.7) | 2457 (36.8) | 3247 (50.0) | 2691 (41.6) | 2619 (42.5) | 13404 (41.5) |
| TOTAL | 6512 | 6679 | 6492 | 6462 | 6158 | 32303 |

[1] The unweighted data includes some special study cases (e.g., redesigned air bag and truck underride) that are not included in the weighted tables that follow.
[2] Column percent

**Table 1** shows the recorded attention status of drivers on the unweighted (or raw) data files. The information in Table 1 is vehicle, not crash, oriented. In other words, there is one record for each vehicle that was towed from the crash scene.

For these unweighted data files involving approximately 6,500 vehicles/drivers annually, instances of driver distraction are coded for 7.4% of the overall sample. It should also be noted, however, that the attention status of the driver just prior to the crash is reported as unknown (or no driver present) in a large proportion of the vehicles (41.5%), despite the in-depth nature of the crash investigations.[1]

**Table 2** presents the same percentage distributions of driver attention status, but based on the weighted CDS data files; instead of 6,500 crash-involved vehicles per year, the table reflects an average of 3.4 million crash-involved vehicles annually. The weighting factor assigned to a given case is determined by (1) the probability of the primary sampling unit being selected, (2) the probability of the particular police agency being selected, and (3) the

Table 2. Driver attention status based on the weighted CDS data (column percents and standard errors)

| Driver Attention Status | 1995 (N=3.4 M) | 1996 (N=3.5 M) | 1997 (N=3.7 M) | 1998 (N=3.3 M) | 1999 (N=3.2M) | Overall (N=17.1 M) |
|---|---|---|---|---|---|---|
| Attentive | 50.9[1] (3.1)[2] | 54.4 (3.7) | 40.4 (5.2) | 51.0 (3.6) | 46.9 (2.0) | 48.6 (2.7) |
| **Distracted** | **9.6 (1.1)** | **8.0 (0.8)** | **4.9 (1.1)** | **11.1 (1.4)** | **8.2 (1.2)** | **8.3 (0.6)** |
| Looked but didn t see | 6.4 (1.3) | 5.7 (0.9) | 3.9 (0.9) | 4.4 (1.4) | 6.8 (0.8) | 5.4 (0.7) |
| Sleepy or fell asleep | 2.0 (0.8) | 2.5 (0.8) | 0.9 (0.3) | 1.2 (0.3) | 2.3 (0.8) | 1.8 (0.4) |
| Unknown/no driver | 31.1 (1.8) | 29.4 (2.9) | 49.9 (6.1) | 32.3 (3.5) | 35.9 (2.7) | 35.9 (2.8) |

[1]Column percent
[2]Standard error

probability of the crash being selected for that day. The weighted frequencies reflect the same sampling base as the unweighted frequencies — passenger vehicles involved in towaway crashes. However, the frequencies are extrapolated to represent the total population of such crash-involved vehicles in the U.S.

With the weighting factors in place, the percentage of vehicles involving a distracted driver increases to 8.3%, and the percentage of unknown or no driver cases drops to 35.9%. Although this table only shows the percentage distributions, the overall projected numbers of vehicles can be calculated by multiplying the percentages by the sample sizes shown at the top of the table. For example, 8.3% of 17.1 million vehicles/drivers is 1.4 million cases over the 5-year study period, or an annual average of 284,000 distracted

[1] The percentage of unknown cases was especially high in 1997, due to fewer occupant interviews and vehicle inspections being conducted while data collection procedures were being converted to a new electronic system.

drivers in towed vehicles.

Having such a large proportion of unknown cases in the data dilutes the overall proportion of drivers identified as distracted at the time of their crash. Also, the fact that the percentage of unknown cases varies widely across years (from 29 to almost 50%) makes it difficult to draw comparisons in the percentage of distraction cases occurring from one year to the next. If one assumes that the unknown cases are distributed like the known cases[2], the overall percentage of crash-involved vehicles with distracted drivers is 12.9%. The yearly percentages are 13.9% for 1995, 11.3% for 1996, 9.9% for 1997, 16.5% for 1998, and 12.7% for 1999.

Because the CDS are weighted sample data, each of the percentage estimates presented in Table 2 has a corresponding standard error. Percentage estimates and standard errors were calculated using SUDAAN, a statistical software package that handles multi-level and multi-year sample data (Shah, Barnwell, and Bieler, 1997). By multiplying the standard error by 1.96 and then adding and subtracting this number from the estimate, one can obtain upper and lower 95% confidence limits for each of the estimates.

**Figure 1** shows the overall estimates of driver attention status contained in Table 2 along with their associated 95% confidence intervals. Based on the data, we can conclude with 95% certainty that, if *all* towaway crashes in the U.S. were examined following the CDS protocol, 7.1% to 9.4% of the drivers in those vehicles would be identified as distracted. An additional 30.4% to 41.5% would have unknown or not applicable attention status.

As was described earlier, the CDS data also contains more detailed




Figure 1. Overall distribution of driver attention status based on the weighted 1995-1999 CDS data.

[2] Analyses showed unknown cases to be similar to known cases with respect to driver age, gender, and other important variables. However, unknown cases were more likely to occur at nighttime, and were less likely to involve occupants other than the driver.

Table 3. Yearly trends in specific driving distractions based on weighted CDS data (column percents and standard errors)

| Driver Distraction | 1995 (N=322K) | 1996 (N=279K) | 1997 (N=182K) | 1998 (N=371K) | 1999 (N=265) | Overall (N=1,420K) |
|---|---|---|---|---|---|---|
| Outside person, object, event | 28.1[1] (6.9)[2] | 35.1 (4.7) | 35.4 (6.4) | 19.8 (5.5) | 34.3 (4.1) | 29.4 (2.4) |
| Adjusting radio/cassette/CD | 14.1 (1.6) | 4.7 (1.5) | 0.4 (0.3) | 23.5 (12.5) | 5.7 (2.4) | 11.4 (3.7) |
| Other occupant | 11.8 (1.7) | 12.8 (4.3) | 10.6 (5.6) | 7.5 (2.4) | 12.7 (3.0) | 10.9 (1.7) |
| Moving object in vehicle | 3.5 (2.5) | 6.2 (3.1) | 2.5 (1.0) | 2.2 (1.0) | 7.6 (4.0) | 4.3 (1.6) |
| Other device/object | ---[3] | 2.6 (1.1) | 4.1 (2.5) | 5.3 (3.2) | 2.7 (1.2) | 2.9 (0.8) |
| Vehicle/climate controls[4] | 4.1 (1.2) | 1.6 (0.9) | 3.4 (1.0) | 2.4 (1.4) | 2.7 (0.8) | 2.8 (0.6) |
| Eating, drinking | 1.8 (0.6) | 1.3 (0.5) | 0.3 (0.2) | 1.6 (0.7) | 3.3 (1.8) | 1.7 (0.3) |
| Using/dialing cell phone[5] | 1.2 (0.6) | 2.8 (1.7) | 3.5 (1.4) | 0.3 (0.1) | 0.8 (0.7) | 1.5 (0.5) |
| Smoking related | 1.6 (0.9) | 0.5 (0.4) | 1.6 (0.5) | 0.01 (0.01) | 1.2 (0.7) | 0.9 (0.2) |
| Other distraction | 17.1 (6.0) | 19.7 (3.0) | 35.0 (7.2) | 35.3 (9.4) | 21.9 (5.7) | 25.6 (3.1) |
| Unknown distraction | 16.7 (7.5) | 12.9 (3.1) | 3.0 (2.0) | 2.1 (0.9) | 7.2 (2.3) | 8.6 (2.7) |

[1] Column percent
[2] Standard error
[3] Variable not available in 1995
[4] Combination of using device/controls integral to vehicle and adjusting climate controls
[5] Combination of talking or listening on cellular phone and dialing cellular phone

information on the specific nature of distracting events. This information is summarized in **Table 3**, again based on the weighted data. The total number of projected crash-involved vehicles with distracted drivers is shown at the top of each column, and the percentage distribution by type of distraction is given below, along with their standard errors. Percentages in each column total 100%. Two of the distraction categories represent combined categories from the original list of 13: “Using device/controls integral to vehicle” and “adjusting climate controls” have been combined into a single “vehicle/climate control” category, and “talking or listening on cellular phone” and “dialing cellular phone” have been combined into “using/dialing cell phone.” This was done because of very small numbers of raw cases for the adjusting climate controls and dialing cell phone categories.

Based on the Table 3 results, the most frequently reported source of distraction for drivers of vehicles in towaway crashes is outside persons, objects, or events (29.4%), followed by adjusting the radio, cassette or CD (11.4%), and other occupants in vehicle (10.9%). All other identified distractions – moving objects in vehicle, objects brought into the vehicle, adjusting vehicle or climate controls, eating and drinking, using a cellular phone, and smoking – each

account for only 1% to 4% of the total. In addition, there is a large category of "other" distracting events (25.6%) and "unknown" distractions (8.6%). More detailed information on the specific types of events is included in the section on the CDS Narrative Analysis and Table 15 later in this document.

It should be noted that there is large year-to-year variability in the generated percentages. This is true even for some categories (such as adjusting the radio, cassette or CD player) that are based on relatively large annual counts. In addition, the weighting process substantially alters some of the percentages. Consequently, the results contained in this report are primarily based on the combined, five-year weighted data.

**Figure 2** is similar to Figure 1, and shows the overall estimates for the




Figure 2. Overall distribution of specific driver distractions based on the weighted 1995-1999 CDS data.

various distractions and their 95% confidence intervals. In many cases the confidence intervals are quite large, a reflection of the heavily weighted data. Nevertheless, outside distractions; distractions involving a radio, CD or tape player; and distractions by other occupants in the vehicle generally stand out as most important.

The remainder of this section presents tables based on the overall weighted CDS data, examining the impact on driver distraction of various driver, roadway, environmental, vehicle, and crash characteristics. In describing these tables, we have not limited ourselves to only those results that are statistically significant. In part, this is because each table presents many possible comparisons. In addition, some results, even though not statistically significant (such as those pertaining to cell phones or other specific

Table 4. Distribution of driver attention status within categories of driver age based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | AGE | | | | |
|---|---|---|---|---|---|
| | <20 | 20-29 | 30-49 | 50-64 | 65+ |
| Attentive | 48.6 [1]<br>(2.7) [2] | 47.4<br>(2.9) | 50.7<br>(2.8) | 53.6<br>(5.1) | 47.8<br>(3.9) |
| **Distracted** | **11.7**<br>**(1.9)** | **7.6**<br>**(0.7)** | **8.0**<br>**(0.9)** | **7.5**<br>**(0.8)** | **7.9**<br>**(1.4)** |
| Looked but didn t see | 5.4<br>(0.7) | 4.6<br>(1.2) | 4.2<br>(1.0) | 4.4<br>(0.9) | 16.5<br>(2.8) |
| Sleepy or fell asleep | 1.7<br>(0.5) | 1.9<br>(0.6) | 1.9<br>(0.6) | 2.0<br>(0.6) | 1.1<br>(0.3) |
| Unknown/no driver | 32.6<br>(2.8) | 38.6<br>(3.3) | 35.2<br>(3.3) | 32.6<br>(4.4) | 26.7<br>(2.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Column percent
[2] Standard error

distractions based on small sample sizes), may still have important research implications. In many instances significance can be determined by a quick comparison of the confidence intervals shown in the figure accompanying a table. For readers interested in more detailed comparisons, having standard errors included in the tables allows this flexibility.

## Driver Factors

**Table 4** presents information on driver attention status by the age of the driver. The table shows that drivers under age 20 were more likely than older drivers to be identified as distracted at the time of their crash: 11.7% of drivers under age 20 were found to be distracted, compared to 8.0% or less for each of the other age groups. When the “unknown” cases are subtracted from the totals, the percentage of young drivers identified as distracted climbs to 17.3%. The proportion of distracted drivers was fairly consistent across all age groups above the youngest. These same results are shown graphically in **Figure 3**. From the graph, it is easy to see that while the youngest age group is more likely to be identified as distracted, this difference is not statistically significant since its confidence interval overlaps with those of the other categories.

In contrast, it is the oldest age group of drivers, those age 65 and above, who stand out with regard to the two other forms of driver inattention identified in Table 4: “looked but didn’t see” and “sleepy or fell asleep.” Drivers age 65 and older were three to four times more likely to have “looked but didn’t see,” and almost half as likely to have been sleepy or asleep prior




Figure 3. Percentage of drivers identified as distracted by age group.




Figure 4. Age distribution of drivers identified as distracted.

Table 5. Distribution of driver age within categories of driver attention status based on weighted 1995-1999 CDS data (row percents and standard errors)

| Driver Attention Status | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Attentive | 16.6 [1] (0.9) [2] | 28.7 (1.6) | 36.4 (1.7) | 10.8 (0.8) | 7.6 (0.6) |
| **Distracted** | **23.3 (3.1)** | **26.9 (1.9)** | **33.7 (3.5)** | **8.8 (1.0)** | **7.3 (1.1)** |
| Looked but didn t see | 16.5 (1.8) | 24.9 (3.1) | 27.3 (5.1) | 8.0 (1.9) | 23.4 (4.8) |
| Sleepy or fell asleep | 16.3 (3.3) | 31.5 (4.8) | 36.7 (5.5) | 10.8 (4.7) | 4.7 (1.8) |
| Unknown/no driver | 15.8 (1.4) | 33.2 (1.8) | 35.8 (1.2) | 9.3 (1.0) | 6.0 (0.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Row percent
[2] Standard error

to crashing.

**Table 5** and **Figure 4** examine driver age from a different perspective, by presenting row percents rather than column percents. The question of interest here is, “What is the age distribution of drivers involved in distraction crashes, compared to other types of crashes?” Here we can see that half (50.2%) of drivers involved in distraction crashes are under 30 years of age and 83.9% are under 50. While this is a relatively youthful population of drivers, it is not too different from the overall age distribution of drivers involved in crashes serious enough to require towing from the scene. Meanwhile, drivers age 50 and above are involved in only 16.1% of distraction crashes.

**Table 6** provides more detailed information on the specific types of distractions for the various age groupings of drivers. Drivers under age 20 were much more likely than older drivers to have been distracted while adjusting a radio, cassette, or CD player. For drivers in the 20-29 year age group, other occupants were especially likely to be a source of distraction,

**Table 6**. Distribution of specific driver distractions within categories of driver age based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Distraction | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Outside person, object, event | 27.0 [1] (5.9) [2] | 29.0 (4.3) | 27.5 (2.1) | 33.3 (9.2) | 42.8 (13.5) |
| Adjusting radio/cassette/CD | 28.9 (12.1) | 7.9 (3.3) | 7.3 (3.3) | 0.6 (0.4) | 0.2 (0.2) |
| Other occupant | 10.7 (2.0) | 17.8 (4.7) | 9.8 (2.4) | 1.5 (1.0) | 2.6 (1.0) |
| Moving object in vehicle | 5.0 (4.4) | 2.4 (0.9) | 6.5 (4.1) | 3.6 (2.1) | 0.1 (0.1) |
| Other device/object | 1.3 (0.6) | 2.7 (0.9) | 4.2 (1.6) | 4.4 (3.2) | 1.4 (1.0) |
| Vehicle/climate controls | 3.1 (1.5) | 2.1 (0.5) | 3.3 (1.2) | 3.4 (2.0) | 1.8 (1.7) |
| Eating, drinking | 1.1 (0.5) | 1.4 (0.6) | 1.1 (0.4) | 7.9 (2.1) | 0.5 (0.6) |
| Using/dialing cell phone | 0.1 (0.1) | 0.7 (0.4) | 3.3 (1.2) | 0.1 (0.1) | 2.3 (2.1) |
| Smoking related | 0.9 (0.4) | 1.1 (0.3) | 1.0 (0.5) | 0.3 (0.3) | 0.0 (0.0) |
| Other distraction | 19.4 (4.2) | 22.6 (4.5) | 25.7 (3.1) | 34.5 (6.0) | 45.0 (11.7) |
| Unknown distraction | 2.5 (0.6) | 12.4 (2.9) | 10.5 (3.8) | 10.3 (6.0) | 3.2 (1.5) |
| OVERALL | 23.0 | 26.8 | 34.0 | 9.2 | 7.1 |

[1] Column percent
[2] Standard error

while for those ages 30-49, dialing and using a cell phone was more frequently cited (although still only a small percentage of the cases overall). Drivers ages 50-64 were overrepresented with respect to eating and drinking distractions, while those ages 65 and older were more likely to have been distracted by objects and events outside the vehicle (other vehicles, signs, animals, etc.) and by other (unspecified) distractions.

With regard to driver sex, males were slightly more likely than females to be involved in crashes involving driver distraction, but the difference was not statistically significant (**Table 7**). The specific types of distractions were also similar for male and female drivers (**Table 8** and **Figure 5**). Overall, 63% of the distracted drivers were male and 37% were female (compared to 56% and 44%, respectively, for all drivers in the CDS database).

It should again be emphasized that these percentages are vehicle or

Table 7. Distribution of driver attention status for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | Male | Female |
|---|---|---|
| Attentive | 46.6 [1]<br>(3.1) [2] | 52.6<br>(2.7) |
| **Distracted** | **8.8**<br>**(0.7)** | **7.8**<br>**(0.6)** |
| Looked but didn t see | 4.9<br>(0.6) | 6.2<br>(1.0) |
| Sleepy or fell asleep | 2.7<br>(0.8) | 0.7<br>(0.1) |
| Unknown/no driver | 37.0<br>(2.8) | 32.8<br>(3.3) |
| OVERALL | 56.2 | 43.8 |

[1] Column percent
[2] Standard error




Figure 5. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data.

Table 8. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Distraction | Male | Female |
|---|---|---|
| Outside person, object, event | 28.9[1] (3.7)[2] | 30.5 (2.7) |
| Adjusting radio/cassette/CD | 10.3 (2.4) | 13.1 (8.4) |
| Other occupant | 11.2 (2.4) | 10.6 (2.0) |
| Moving object in vehicle | 4.2 (2.5) | 4.7 (2.0) |
| Other device/object | 2.2 (0.9) | 4.1 (1.7) |
| Vehicle/climate controls | 2.3 (0.9) | 3.6 (1.3) |
| Eating, drinking | 2.0 (0.7) | 1.3 (0.6) |
| Using/dialing cell phone | 1.7 (0.5) | 1.2 (0.7) |
| Smoking related | 0.9 (0.2) | 0.9 (0.4) |
| Other distraction | 28.3 (3.1) | 22.0 (4.1) |
| Unknown distraction | 8.0 (3.1) | 8.1 (2.9) |
| OVERALL | 63.1 | 36.9 |

[1] Column percent
[2] Standard error

driver oriented, rather than crash oriented. To the extent that young and/or male drivers are more likely to be "at fault" in their collisions, one might also anticipate higher incidences of distracted or inattentive driving. The percentages also underestimate the importance of distraction as a contributing factor to *crashes*. This is because it is unlikely that more than one of the drivers involved in two (or more) vehicle crashes is distracted at the time of the crash: if 10 out of 100 two-vehicle crashes are caused by distracted drivers, then 10% of the crashes involve a distracted driver, but only 5% (10 out of 200) of the vehicles had distracted drivers.

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service. |

**Plaintiffs' Motion for Summary Judgment**

Plaintiffs Cozy Inn, Incorporated, d/b/a The Cozy Inn, and Stephen Howard, respectfully move this Court for an Order granting them summary judgment, on all of their claims, against the Defendant, the City of Salina, Kansas.

The motion is based on the memorandum in support, which is incorporated here as if set forth fully. As detailed in the memorandum, there is no genuine dispute about any of the material facts, and the Plaintiffs are entitled to judgment as a matter of law, as well as declaratory and injunctive relief. This motion is made pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1

Given the importance of these constitutional issues, the Plaintiffs request oral argument pursuant to Local Rule 7.2

Dated: February 7, 2025.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on February 7, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 3 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*