**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 4 of 16, Pages 1-262**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Memorandum in Support of their Motion for Summary Judgment;<br>Exhibits A-LL.<br><br>Oral Argument Requested. |

**Plaintiffs' Memorandum in Support of their Motion for Summary Judgment**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers it a regulated sign instead of an unregulated mural. The difference between the two turns on the artwork's content: if the display relates to the entity putting it up, Salina considers it a regulated sign subject to size limitations and permitting requirements. But if the artwork isn't related to the entity, Salina treats it as a completely unregulated mural. The distinction between regulated signs and unregulated murals isn't specified anywhere in the written code. Since The Cozy sells sliders, Mr. Howard can't finish the painting because it depicts burger-esque UFOs blasting the wall with ketchup and mustard. Salina deems that a regulated sign. But if Mr. Howard changed the content to depict pizza-esque UFOs shooting the wall with pizza sauce, he could. In Salina, that's an unregulated mural.

Under Salina's idiosyncratic mural-sign code regime, Mr. Howard could paint an exact, wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), unless he started selling soup, a church can display a cross, but not a wall-sized "Turn to Jesus" painting, a coffee shop could paint a wall-sized olive tree mural, but not one depicting a coffee tree, and a taco shop can paint a wall-sized mural of a dove, unless it started selling "dove tacos."

Salina doesn't have *any* evidence justifying its peculiar restrictions on speech. It's not as though a painted display is more likely to fall off a wall because it pertains to a business, for instance.

Indeed, The Cozy's UFO-themed mural doesn't become less pleasing, cause car wrecks, hurt pedestrians, or destroy property values because The Cozy sells sliders on the inside.

The Plaintiffs filed a civil rights lawsuit challenging Salina's mural-sign code regime on the grounds it's a content- and speaker-based restriction on speech, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Doc. 16. The record proves what the Plaintiffs have alleged all along: Mr. Howard can't finish painting his one-of-a-kind UFO-themed mural because of its content and because of who he is. Salina has no *actual evidence* justifying *any* of its First Amendment restrictions either, including its permitting requirements and size restrictions. Salina's mural-sign code regime is plainly unconstitutional under *any level* of First Amendment scrutiny, there are no genuine disputes about the material facts, and therefore, this Court should grant Mr. Howard and The Cozy summary judgment. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-325 (1986); *Hicks v. City of Watonga*, 942 F.2d 737, 743 (10th Cir. 1991); *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008).

## Statement of Facts

### A. The Cozy Inn and its whimsical UFO-themed mural.

1. The Cozy Inn is a downtown Salina "institution" and "landmark" that's served sliders for more than 100 years. Doc. 16 ¶¶ 15, 16;[1] Ex. C, Cozy Proclamation at CITY000026.

2. The Cozy has about 40 sq. ft. for diners. ¶ 22; Ex. D, Howard Dep. 44:11-16.

3. Inside, The Cozy displays historical pictures and articles, including underneath the countertop where customers sit. Ex. B, Cozy Photos at 0065; Ex. A, Howard Dec. ¶ 2.

4. After spending nearly 14 years as a maintenance worker at the local school district, Steve Howard bought The Cozy in 2007. Ex. D, Howard Dep. 9:16-18, 10:17:19.

5. The Cozy is a family business. Ex. D, Howard Dep. 13:8-9, 12; Doc. 101 at 2.a.i-iii.

6. In Salina, murals are prolific. ¶ 68; Ex. E, Comm. Tran. 18:13-16, 22:7-12 (City Commissioner acknowledging "proliferation of mural art everywhere"); Ex. KK, Photos.

---

[1] Except where noted, paragraph citations refer to Doc. 16, the Verified Amended Complaint.

7. Salina hosts and supports "Boom!," an annual mural festival, as well as the "Salina Kanvas Project," which funds murals. Ex. G, Anderson Dep. 21:18-23; 22:16-19; 26:2-11.

8. Plaintiffs are proud of the murals in Salina. ¶ 116; Ex. A, Howard Dec. ¶ 3.

9. In 2023, Mr. Howard decided The Cozy's plain-white wall didn't reflect his or The Cozy's personality. *See* ¶ 21; Ex. D, Howard Dep. 91:19-23; 128:11-13; Ex. B, Cozy Photos at 0049.

10. Plaintiffs wanted to participate in this "part of Salina culture," ¶ 118, and "paint a mural." Ex. D, Howard Dep. 96:10; *see* Ex. H, Windholz Dep. 57:25—58:1-2 ("just wanted to be part of" the murals scene); Ex. I, Schrage Email 11/9/23 at CITY000221 (Mr. Howard "views it as a mural and feels he was just joining in on the mural activity taking place in the downtown."); Ex. E, Comm. Tran. 31:20-24 ("this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural").

11. Mr. Howard's "vision" and "dream" for The Cozy's artwork came from the "art all over town." Ex. G, Anderson Dep. 47:18-25—48:1-4; Ex. A, Howard Dec. ¶¶ 5-6.

12. Mr. Howard hired Colin Benson to "paint a story" showing Plaintiffs' personality. Ex. D, Howard Dep. 93:17-18; ¶¶ 20-21; Ex. J, Benson Dep. 60:24-25, 63:24-25—64:1-6.

13. Mr. Howard is a "Sci-Fi" fan and liked the idea of having a science fiction themed mural at The Cozy. Ex. D, Howard Dep. 252:19-23; 253:1-5.

14. Once completed, the UFO-themed mural will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard and will read "Don't Fear the Smell!! The Fun is Inside!!" ¶¶ 23-24, 28; Ex. A, Howard Dec. ¶ 9; Ex. J, Benson Dep. 25:12; 135:3-5; 137:6-7; 139:15-21 ("spaceship burgers" with "see through" cockpits and a "big burger" "mothership); Ex. D, Howard Dep. 145:24; Ex. K, Blase Dep. 14:2-4.

15. This is what the finished mural will look like. ¶ 28; Ex. D, Howard Dep. 253:20-24; Howard Dec. ¶ 10.



16. The mural tells a "story" about travelers, both alien and human: "I have a map inside the store that people write in -- they pin where they're from or they have -- they write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here." Ex. D, Howard Dep. 105:9, 253:10-18.

17. The painting was partially inspired by a Sci-Fi video Mr. Howard thought was "cool," is "artwork," "express[ive]," and conveys Mr. Howard and The Cozy's "character." ¶¶ 2, 21-24, 27-29; Ex. A, Howard Dec. ¶ 12; Ex. D, Howard Dep. 252:22-25—253:1-5.

18. The UFO-themed mural is Mr. Howard's "vision" and "dream for The Cozy Inn," and part of Mr. Howard's "heart and soul." Ex. D, Howard Dep. 105:4-7; Ex. G, Anderson Dep. 47:21-23; Ex. A, Howard Dec. ¶ 6, 8, 12, 13.

19. Mr. Howard didn't paint the mural to maximize profits. Ex. A, Howard Dec. ¶ 14.

20. The Cozy has a walk-up window for customers. During the summer, about half of The Cozy's customers use it. Ex. D, Howard Dep. 42:1-3.

21. For Mr. Howard, the walk-up window is "not as personal because you don't get the feel of – our entertaining is inside. You know, all of us talk with everybody." If "you use the walk-up window, you're just kind of missing the whole point." Ex. D, Howard Dep. 41:6-12.

22. Inside, customers can "see the history within Salina. Like we are one of Salina's oldest running businesses, of Salina's oldest restaurants. We want people to come in and see our history. And then, also, we encourage them to shop downtown. We tell them all the time like we have an amazing ice cream shop right around the corner. We have really cute boutiques. We tell people all the time about our local brewery right around the corner from us. So we just – we really want them to just come stop in and see what Salina has to offer." Ex. H, Windholz Dep. 33:3-16.

23. If people come inside to look around, The Cozy will sometimes offer free burgers so they can "see what we're all about, see what people talk about. We don't encourage them to purchase, no. We like – we will give a burger to them." Ex. H, Windholz Dep. 33:23-25—34:1-3.

24. Since The Cozy only has 6 stools inside, and unlimited space outside, The Cozy is no better off, fiscally, if people come inside. Ex. A, Howard Dec. ¶ 16; Ex. B, Cozy Photos at 0065.

25. Having people come inside is more personal, more fun, more enjoyable for Mr. Howard, the people who come inside, and is better for Salina's reputation. Ex. A, Howard Dec. ¶¶ 15, 17.

**B. Salina orders The Cozy to stop painting its whimsical UFO-themed mural.**

26. Colin Benson started painting The Cozy's mural on Friday, November 3, 2023. ¶ 25; *see* Ex. D, Howard Dep. 248:14; Ex. B, Cozy Photos at 0054.

27. On Sunday, November 5, 2023, Mr. Benson posted a photo of the incomplete mural on social media, and "a lot of people had already seen it, loved it, and wanted more of it." Ex. J, Benson Dep. 115:4-9. Ex. E, Comm. Tran. 14:1-3; Ex. L, Schrage Dep. 26:19-25—27:1-6; 68:16-18.

28. On Sunday, after seeing a picture of the mural on social media, Salina officials began texting each other, and City Manager Mike Schrage was informed that night. Ex. G, Anderson Dep. 31:13-16,43:14—19; Ex. M, Driscoll Dep. 28:6-8; Ex. L, Schrage Dep. 25:7-8, 13-14.

29. The next day, Monday, November 6, 2023, Salina officials had "collective[ly]" decided The Cozy's painting was a regulated sign. Ex. N, Herrs 30(b)(6) Dep. 86:3-5, 85:7-10, 20-25; Ex. O, Herrs Dep. 31:19-23; Ex. M, Driscoll Dep. 70:6-13 (describing collective process).

30. This "collective" "viewed [the unfinished mural] and [determined] it had met the definition of a sign." Ex. N, Herrs 30(b)(6) Dep. 86:4-5, 13-18; *see* Ex. M, Driscoll Dep. 67:22-25.

31. For displays that Salina considers regulated signs, Salina's written sign code imposes size limits, *see* §§ 42-516–524; and permit requirements, *see* §§42-501, 502. Doc. 16-3.

32. Because Salina considers The Cozy's mural a regulated sign, it claims the display is "about nine times the allowable size." Ex. E, Comm. Tran. 7:9-10.

33. City Planner Dustin Herrs told Mr. Howard he couldn't finish the display even though there had been no public complaints about it and only city officials took issue with the mural at The Cozy. ¶ 26, Ex. L, Schrage Dep. 127:24-25; Ex. M, Driscoll Dep. 151:20-25—152:1-4; Ex. N, Herrs 30(b)(6) Dep. 85:7-25; Ex. G, Anderson Dep. 43:14-19.

### C. Salina's mural-sign code regime:[2] an overview.

34. Under the text of Salina's written sign code, "any writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public" is considered a regulated "sign." Salina City Code § 42-764; Doc. 16-3 at 28.

35. Under the text of Salina's written sign code, a "sign" also includes "any other figure of similar character" to the above types of signs "which (1) is a part of or attached to a structure, (2) is used to announce, direct attention to, or advertise, and (3) is not located inside a building." Salina City Code § 42-764; Doc. 16-3 at 28.

36. Under the text of the written code, all murals are signs, and every sign is supposed to be subjected to the same size restrictions since they are a "writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display that is calculated to attract the attention of the public." Salina City Code § 42-764; Doc. 16-3 at 28.

37. Notwithstanding the sign code's written text, Salina officials say murals aren't regulated. Ex. P, Andrew Dep. 91:3 ("we don't regulate murals"); Ex. M, Driscoll Dep. 93:12-14 ("[i]f you want to talk about murals, then that's a whole another thing[.]")

38. In practice, Salina's Zoning Administrator Dean Andrew ignores the written sign code's definition of a "sign" which is a "display that is calculated to attract the attention of the public." Ex. Q, Andrew 30(b)(6) Dep. 13:17-20 ("Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public? A. No."); *see also* Ex. P, Andrew Dep. 64:14-15, 18-20 ("Q. Is a mural calculated to attract the attention of the public?" "A. I think the word calculated goes to intent, and it's not my job to interpret someone's intent."); 69:23-24—70:1 ("Q: How do you know if something is "calculated to attract the attention?" "A: I don't look at that."); 46:13-19 (admitting that even though the Mural at the Mill "attracts your attention," it's not considered a sign).

[2] The mural-sign code regime includes the written sign code, the unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties. Doc. 16 ¶¶ 12, 31-32, 312; Doc. 101 at 3.a. at 4-5, 4.a.i. at 16.

39. Zoning Administrator Andrew says the difference between the undefined terms "attracting attention" and "directing attention" is that "[a]ttracting attention might briefly pull your eyes off the road or off the sidewalk to see what it is. Directing attention is for something that someone wants you to read or look at for an extended period." Ex. P, Andrew Dep. 46:6-12.

40. Zoning Administrator Andrew has been a Salina City Planner for 37 years and has been the Zoning Administrator since 2009. Ex. P, Andrew Dep. 9:15-16, 18-19.

41. The written code does not distinguish between murals and signs. *See* Doc. 16-3.

42. The distinction between murals and signs is based on the display's content and the identity of the speaker. Ex. X, Def. Ans. to First Set of Interrog., Rog 5, 11; Ex. N, Herrs 30(b)(6) Dep. 88:21-24; Ex. E, Comm Tran. 10:4-5; Ex. L, Schrage Dep. 80:24-81:10.

**D. Salina orders The Cozy to stop painting the mural because of its content.**

43. City Manager Schrage wrote a memo to the City Commissioners about The Cozy's mural. Ex. R, Schrage Email 11/8/23; *see also* Ex. L, Schrage Dep. 35:23-25—36:1-10.

44. City Manager Schrage is the CEO of Salina, oversees city personnel, and has spent 18 years either as the Deputy City Manager or City Manager. Ex. L, Schrage Dep. 12:3-6, 15-25.

45. City Manager Schrage told City Commissioners that although The Cozy's mural "aesthetically might look similar to murals in the downtown elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes." Ex. R, Schrage Email 11/8/23; *see also* Ex. L, Schrage Dep. 35:23-25—36:1-10.

46. City Manager Schrage said that Salina officials had "coordinate[d] closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes." Ex. R, Schrage Email 11/8/23.

47. By November 9, Salina's decision to regulate The Cozy's mural as a sign generated intense media coverage and public commentary. Ex. Z, News Articles at 0223-0227, 0217-0222;[3]

[3]Roman Campa, *Art or Ad?: City of Salina pauses project at historic Cozy Inn Restaurant*, KWCH (Nov. 9, 2023); Jeff Garretson, *Art or Advertising*, KSAL (Nov. 9, 2023).

Ex. M, Driscoll Dep. 39:1-7 (Salina was "getting kind of a lot of political and external communication both on social media").

48. City Manager Schrage sent a "Cozy Inn Talking Points" memo saying "[a] distinction is commonly made between murals and art when compared to commercial speech," and "[w]e regulate the size of commercial signs through a permit process." Ex. S, Talking Points.

49. City Manager Schrage called Mr. Howard to "calm things down," avoid a "social media fire storm," and "have the conversation to be at our level." Ex. L, Schrage Dep. 58:15-25.

50. After City Manager Schrage called Mr. Howard, he wrote another memo to the City Commissioners on November 9, 2023, where he explained that Salina "regulate[s] the size of commercial signs through a permit process." Ex. I, Schrage Email 11/9/23 at CITY000221.

51. City Manager Schrage continued, "I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown. He also indicated he does not do any kind of social media and he is trying to 'go soft' in his interviews with the media suggesting he thinks we will be pleased with his comments." Ex. I, Schrage Email 11/9/23 at CITY000221.

52. On the morning of November 13, 2023, Salina officials held a meeting with Mr. Howard and Mr. Benson. Ex. J, Benson Dep. 79:8-13; Ex. D, Howard Dep. 176:9-12; Ex. L, Schrage Dep. 69:4-7; Ex. M, Driscoll Dep. 37:18-25.

53. Mr. Benson told the officials that his work was art and that he didn't "believe it was a signage being put up," but he "was shut down pretty quick." Ex. J, Benson Dep. 82:4-7.

54. Salina's officials told Mr. Benson the art was a sign because "the hamburgers are basically the same thing he sells, and therefore, it would be signage." Ex. J, Benson Dep. 82:9-17.

55. That afternoon, City Manager Schrage "brought forward discussion on a mural being painted on the side of Cozy's Inn" at a City Commission meeting where he explained that "[t]here had been misunderstandings surrounding the mural as its content falls under sign provisions in the City Code rather than art[.]" Ex. T, City Commission Minutes at CITY000173.

56. At the Commission meeting, City Manager Schrage explained to the Commissioners that "[t]he important distinction here, relates to commercial speech and our ability to regulate commercial speech or signs." Ex. E, Comm. Tran. 5:2-5.

57. City Manager Schrage explained that "there is certainly is a misunderstanding between art and signs and commercial speech." Ex. E, Comm. Tran. 5:23-25.

58. City Manager Schrage explained that the distinction between an unregulated mural and a regulated sign is based on whether the display contains a commercial or non-commercial message. Ex. E, Comm. Tran. 27:3-6 ("if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier."); *id.* at 28:16-21 ("if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.").

59. City Manager Schrage explained to the Commissioners that "I would reiterate, it's all on the basis of a commercial message." Ex. E, Comm Tran. 10:4-5; Ex. L, Schrage Dep. 80:24-81:10.

60. Salina's Director of Community Development Services, Lauren Driscoll, also told the City Commissioners that Mr. Howard couldn't finish the mural under Salina's mural-sign code regime. *See* Ex. E, Comm. Tran. 17:17-18; Ex. M, Driscoll Dep. 78:15-79:11.

61. Director Driscoll oversees code compliance, zoning, and permitting, including sign permits, Ex. M, Driscoll Dep. 13:9-15, is a certified planner who has "worked in the profession for about 20 years," *id.* 18:12-13, and supervises the zoning administrator and planners, *id.* 16:18-23.

62. Director Driscoll was part of the "collective" who decided The Cozy's mural was a regulated sign, not an unregulated mural. Ex. N, Herrs 30(b)(6) Dep. 86:3-5, 85:7-25; Ex. O, Herrs Dep. 31:19-23; Ex. M, Driscoll Dep. 70:6-13.

63. At the City Commission meeting, Director Driscoll "walk[ed] [the Commissioners] through the specifics as it relates to Cozy's." *See* Ex. E, Comm. Tran. 6:23-25.

64. Director Driscoll explained, through a hypothetical, that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign." Ex. E, Comm. Tran. 23:13-16.

65. Director Driscoll continued, "in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction." Ex. E, Comm. Tran. 23:19-23.

66. But, Director Driscoll continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated sign because "[e]ven without a word, that illustration can suggest that commercial transaction." Ex. E, Comm. Tran. 23:19-24:4.

67. City Manager Schrage built upon the hypothetical, explaining that if the same "steaming cup of coffee" was painted "on the other side of town unrelated to anything," it would not be a regulated sign. Ex. E, Comm. Tran. 26:17-22; *see also* Ex. L, Schrage Dep. 81:12-82:8.

68. Ms. Driscoll explained the difference between a regulated sign and an unregulated mural is whether the display is "expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction[.]" Ex. E, Comm. Tran. 23:4-12.

69. At the City Commission meeting, a Commissioner said, "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Ex. E, Comm. Tran. 22:24-23:2.

70. Another Commissioner said, "if [Mr. Howard] intended to get in on the whole mural trend – and it is – you pointed out well the distinction between art and murals and commercial sign," "what would it take for him to turn this into a mural rather than a sign." Ex. E, Comm. Tran. 28:1-8.

71. News outlets covered the November 13, 2023, City Commission meeting. *See, e.g.*, Ex. Z, News Articles at 0285-0295, Bates 0250-271.[4]

72. City Manager Schrage publicly told reporters that if a display "includes a message that pertains to the goods or services for sale," "that makes it a sign and makes it subject to the sign code." Ex. L, Schrage Dep. 61:1-3, 18-23, 62:1-5; Ex. Z, News Articles at 0285-0295.

73. In an email to the organizer of the Boom! Festival, City Manager Schrage said that his "intended response" to The Cozy's lawsuit "is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Ex. U, Schrage Email 2/20/24; Ex. L, Schrage Dep. 85:20-87:19.

74. Salina doesn't regulate displays it considers "art." Ex. V, Art Center DRB Packet at 7; Ex. S, Talking Points; Ex. T, City Commission Minutes at CITY000173; Ex. E, Comm. Tran. 5:23-25; Ex. E, Comm. Tran. 22:24-23:2; Ex. E, Comm. Tran. 28:1-8.

75. Salina's mural-sign code regime demonstrates its antipathy toward content related to business and commercial speech and its preference for content unrelated to business and noncommercial speech. Ex. JJ, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6.

**E. Salina's officials admit the mural-sign code regime is content based.**

76. Salina's 30(b)(6) Representative testified it has to "look at the character and elements" of the display to determine it's a regulated sign. Ex. N, Herrs 30(b)(6) Dep. 88:21-24.

77. Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because "it proclaims or declares to not fear the smell," and "I mean, The Fun is inside is make a proclamation of sort[.]" Ex. N, Herrs 30(b)(6) Dep. 89:5-10.

78. Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because it contained an "arrow that points towards the pickup window and the entry door," which Salina considers as "directing attention." Ex. N, Herrs 30(b)(6) Dep. 89:18-22.

---

[4] Asia Cymone Smith, *City puts pause on Salina mural, restaurant owner says, "I believe we'll work through this"*, KSN (Nov. 13, 2023); Nate King, *Cozy Inn Hamburgers 'sign' put on hold pending city approval*, Salina Post (Nov. 19, 2023)

79. Salina's 30(b)(6) Representative testified The Cozy's mural is a sign because it contained "pictorial representations of burgers," which it considers advertisements. Ex. N, Herrs 30(b)(6) Dep. 90:7-13.

80. Zoning Administrator Andrew testified that that if customers didn't go inside The Cozy, and it only delivered food, a display that had the phrase "don't fear the smell" is a regulated sign because "it's not a non-commercial message." Ex. P, Andrew Dep. 170:7-25—171:1-20.

81. Salina officials must review a display's contents before determining whether it is a regulated sign. Ex. L, Schrage Dep. 71:11-15; Ex. M, Driscoll Dep. 67:19-25, 68:13-18, 88:4-12; Ex. P, Andrew Dep. 86:11-23; 88:20-24—89:1-9, 89:11-18; 176:22-25—177:1-3; 176:14-20

82. When asked whether a mural depicting little green men piloting traditional science fiction, non-burger flying saucers would still be considered a sign, if placed on The Cozy's wall, Zoning Administrator Andrew testified, "I'd have to see a rendering of what it looked like to make that determination." Ex. P, Andrew Dep. 176:22-177:3.

83. When asked whether a mural depicting a pasture with cows and mustard plants, tomatoes, and onions growing in the field would be considered a sign, if placed on The Cozy's wall, Zoning Administrator Andrew said, "I'd have to see a rendering." Ex. P, Andrew Dep. 178:16-22.

84. When asked if officials must "be able to look at the potential sign to determine if it's a sign," Salina's 30(b)(6) Representative said, "Yes." Ex. N, Herrs 30(b)(6) Dep. 88:21-23.

85. In its permitting process, Salina requires the submission of a "shop drawing" and the display's "proposed copy." Ex. W, Sign Permit Submittal Procedure at CITY000661; *see* Ex. Q, Andrew 30(b)(6) Dep. 27:7-20.

86. Salina officials testified that Mr. Howard would be allowed to paint a wall-sized mural of a silver airplane on the side of The Cozy—unless he sold airplanes or travel services. Then it would be considered a regulated sign, not an unregulated mural. *See* Ex. L, Schrage Dep. 121:24-25—122:1-23; Ex. M, Driscoll Dep. 106:6-11; Ex. P, Andrew Dep. 177:5-17, 24-25—178:1-3.

87. Zoning Administrator Andrew testified that a mural of "a blank white wall with a pizza symbol" on The Cozy would be unregulated. *See* Ex. P, Andrew Dep. 172:11-25—173:1-20.

88. The same display on a pizza shop would be a sign. *See* Ex. P, Andrew Dep. 175:2-6.

89. Salina officials testified that Mr. Howard could paint a wall-sized mural replicating Andy Warhol's famous Campbell's soup can on The Cozy—unless he started selling Campbell's soup. *See* Ex. L, Schrage Dep. 124:9-11, 14; *see* Ex. P, Andrew Dep. 179:20-25—180:1-10.

90. Conversely, Warhol's Campbell's soup can on a grocery store would be considered a regulated sign, not an unregulated mural. *See* Ex. L, Schrage Dep. 124:20-24; 125:1-8.

91. City Manager Schrage testified that if a coffee shop painted a dove and an olive branch on its wall, that would be an unregulated mural, but if the display contained a dove and *a coffee branch*, that would be considered a regulated sign. Ex. L, Schrage Dep. 122:25—123:1-8.

92. Director Driscoll testified that if a taco shop painted a dove, that would be unregulated—unless it sold dove tacos or sold doves. *See* Ex. M, Driscoll Dep. 155:6-24—156:12.

93. Director Driscoll would need legal counsel to determine if a mural on The Cozy depicting a coffee pot, a dove, and the word peace is a sign. Ex. M, Driscoll Dep. 98:20-100:11-13.

94. Director Driscoll would need legal counsel to determine if the Stiefel theatre mural depicting a woman with instruments would be a regulated sign. Ex. M, Driscoll Dep. 112:15-116:4, Ex. F, Mural Photos at 0119.

95. Salina contends The Cozy's mural is a regulated sign, but if the display were painted on a different business that didn't sell hamburgers or have any connection to The Cozy, then it would not be considered a regulated sign. Ex. E, Comm. Tran. 26:16-22.

96. Salina contends a mural is a regulated sign if the content of the display "is used to 'announce, direct attention to, or advertise.'" Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

97. Zoning Administrator Andrew testified that the "function" of a regulated sign is to announce, direct attention to, or advertise. Ex. P., Andrew Dep. 285:1-4.

98. Salina says it decides whether a mural "is used to 'announce' by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

99. Salina says it determines whether a mural "is used to 'direct attention to' by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window)." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

100. Salina says it determines whether a mural "is used to 'advertise' by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, 'sliders, 5 for $5.00'); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall." Ex. X, Def. Ans. to First Set of Interrog., Rog 5.

101. Salina says that the mural at The Cozy Inn is a sign is because it "contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them." Ex. X, Def. Ans. to First Set of Interrog., Rog 11.

**F. Salina places Mr. Howard's sign permit application on-hold, indefinitely.**

102. When Mr. Howard arrived at the November 13, 2023, meeting with Salina officials, "there were sign permits put in front of us before I even got into the room or put on the table, and [the meeting] was about why we didn't get a sign permit." Ex. J, Benson Dep. 80:10-13.

103. Salina told Mr. Howard to submit a sign permit application. Ex. N, Herrs 30(b)(6) Dep., 111:1-3; ¶ 155; see also Ex. E, Comm. Tran. 7:17-23.

104. Mr. Howard submitted the application on November 13, 2023. Ex. E. Comm. Tran. 41:22-24; Ex. M, Driscoll Dep. 63:9-10; Ex. Y, Sign Permit Application.

105. Salina did not respond within the written code's 10-day deadline. Ex. A, Howard Dec. ¶ 23; Ex. N, Herrs 30(b)(6) Dep. 109:24-110:2; Ex. AA, On-Hold Letter at CITY000031; Salina City Code § 42-502(b) at Doc. 16-3 at 6.

106. Salina's 30(b)(6) Representative testified that Mr. Howard's permit application was neither granted nor denied. Ex. N, Herrs 30(b)(6) Dep. 109:24-110:2.

107. As such, Salina did not provide a written notice or statement of reasons for denial. Ex. N, Herrs 30(b)(6) Dep. 116:2-15; Ex. A, Howard Dec. ¶ 24; *see* §§ 42-596(c)(2), 42-597(d).

108. In a letter dated February 8, 2024, Salina put the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete." Ex. AA, On-Hold Letter at CITY000031.

109. City Planner Dustin Michelson says Director Driscoll instructed him to write the letter and told him what it was supposed to say. Ex. BB, Michelson Dep. 15:2-23.

110. Planner Michelson says that *he* did not place the application "on-hold," but simply that he was instructed by Director Driscoll to inform Mr. Howard that the application was "on-hold." Ex. BB, Michelson Dep. 17:8-20.

111. Director Driscoll says she "didn't draft it" and "did not" have any input on the February 8, 2024, letter. Ex. M, Driscoll Dep. 64:11-24.

112. Zoning Administrator Andrew says Director Driscoll instructed Planner Michelson to write the letter, and she told Zoning Administrator Andrew to work with Planner Michelson on it. Ex. P, Andrew Dep. 269:2-8, 273:8-10, 13.

113. Zoning Administrator Andrew says both that the application was placed "on-hold" on November 6, 2023, (seven days before it was submitted), Ex. P, Andrew Dep. 271:3-8, and that it was placed "on-hold" on November 13, 2023, (right after it was submitted), Ex. P, Andrew Dep. 229: 4-8, 267:21-25.

114. The Salina 30(b)(6) Representative says that the application was placed on hold "when it came in," on November 13, 2023. Ex. N, Herrs 30(b)(6) Dep. 112:25-113:1, 107:19-25.

115. Salina has placed other applications "on-hold." Ex. BB, Michelson Dep. 18:14-25.

116. Mr. Howard never consented to Salina placing his application on-hold. Ex. A, Howard Dec. ¶ 26; Ex. P, Andrew Dep. 233:2-6.

**G. Salina's content-based discrimination is plainly evident throughout the city.**

117. Salina has a firefighter mural at Fire Station #2. Ex. G, Anderson Dep. 69:8-21; Ex. F, Mural Photos at 0099.

118. Even though the firefighter mural pertains to and identifies the activities of the fire station, Salina officials are unsure if the firefighter mural is a sign. Ex. L, Schrage Dep. 110:8-13

119. Director Driscoll said that "it's one that I don't think is cut and dry, and I think it would be worth a discussion with legal counsel." Ex. M, Driscoll Dep. 121:3-5.

120. Salina's 30(b)(6) Representative testified that the firefighter mural is not a regulated sign. Ex. Q, Andrew 30(b)(6) Dep. 58:24-59:6.

121. The Salina Art Center installed a ceramic tile mural, which city staff determined was "similar in function to a sign" and "will direct the public to the gallery," but was deemed exempt from regulation because Salina determined that the content was art, and "as a general rule, an art installation" is not a regulated. Ex. V, Art Center DRB Packet at 7; Ex. F, Mural Photos at 0098.

122. In Salina, the iconic Mural at the Mill depicts children playing ring-around-the-rosie on an abandoned grain elevator. Ex. G, Anderson Dep. 76:16-24; Ex. F, Mural Photos at 0082, 0088.

123. The Mural at the Mill "bolster[s] business opportunities and support[s] the amazing institutions we already have here in Salina." Ex. Z, News Articles at 0279.

124. Salina does not consider the Mural at the Mill to be a regulated sign, because of its content. Ex. M, Driscoll Dep. 126:19-128:7; Ex. L, Schrage Dep. 108:1-13.

125. If Mr. Howard painted a replica of the Mural at the Mill on The Cozy's wall, Salina would not consider it a sign. Ex. P, Andrew Dep. 210:17-211:6.

126. But if an indoor playground or daycare began operating on the property where the Mural at the Mill is located, it would change Salina's analysis. Ex. M, Driscoll Dep. 129:2-20.

127. City Manager Schrage would need to "seek legal counsel to answer" whether a playground would transform the Mural at the Mill into a sign. Ex. L, Schrage Dep. 109:1-14.

128. Salina does not consider the murals from the Boom! Festival to be signs because Salina confirmed that their content did not "intentionally or unintentionally include commercial speech subject to our sign codes." Ex. R, Schrage Email 11/8/23 at CITY000261.

129. Around Salina, there are dozens of murals that have been exempted from regulation because of their content. See Ex. KK, Photos.

130. Salina considers other murals to be "signs" but deems them compliant with the mural-sign code regime based on its unwritten policies and practices. Ex. Q, Andrew 30(b)(6) Dep. 69:1-6; 88:16-24; 91:10-24; Ex. O, Herrs Dep. 84:12-13; 84:16-22; 101:14-21; Ex. M, Driscoll Dep. 124:8-125:5; Ex. P, Andrew Dep. 311:13-20; 322:25-323:4; Ex. L, Schrage Dep. 98:25-99:9.

131. Salina City Code § 42-503(a) states that the area of a wall sign is calculated as "the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols."

132. Salina has created an unwritten policy of measuring the area by drawing multiple rectangles around each individual element and adding the area up, while excluding the area of the background, but only "[w]here it's practical." Ex. Q, Andrew 30(b)(6) Dep. 91:10-24.

133. Salina utilized this alternative method of measuring a wall sign for the front mural at The Yard. Ex. Q, Andrew 30(b)(6) Dep. 88:16-24; Ex. F, Mural Photos at 0095.

134. Salina utilized this alternative method of measuring a wall sign for the mural at Sharp Performance. Ex. O, Herrs Dep. 101:14-21; Ex. F, Mural Photos at 0103.

135. Salina utilized this alternative method of measuring a wall sign for the mural at the KU School of Medicine. Ex. M, Driscoll Dep. 124:8-125:1; Ex. F, Mural Photos at 0083.

136. Salina refused to use this alternative method of measuring a wall sign for the mural at The Cozy. Ex. Q, Andrew 30(b)(6) Dep. 100:10-22; Ex. O, Herrs Dep. 101:25-102:12.

137. Schlotzsky's sandwich shop has a sandwich mural on a side façade that Salina considers a sign. Ex. Q, Andrew 30(b)(6) Dep. 69:1-6; Ex. F, Mural Photos at 0100.

138. Since the side façade of Schlotzsky's faces a large parking lot that cars drive through, Salina created an unwritten policy of considering the parking lot to be a private road, and the side lot line that faces the parking lot to be a part of the building's frontage for purposes of calculating the total sign area allowed. Ex. P, Andrew Dep. 311:13-20.

139. The side façade of The Cozy also faces a large parking lot that cars drive through, but Salina refused to consider this a road for calculating sign area. Ex. O, Herrs Dep. 33:12-15.

140. The Yard is a baseball facility with a baseball mural on the side of one of its buildings. Ex. O, Herrs Dep. 68:6-11; 81:11-16; Ex. F, Mural Photos at 0091, 0123, 0124, 0301.

141. When it was first built, city staff wrote that The Yard would consist of three buildings. Ex. CC, Yard DRB Packet at 0166, 183.

142. Building A is described as "[t]he brick building on the north that would house indoor batting cages." Ex. CC, Yard DRB Packet at 0166, 183.

143. Building B is described as "[t]he outdoor structure and turf infield." Ex. CC, Yard DRB Packet at 0166, 183. Building B is described as "a new metal structure between [Buildings A and C] that would cover a turf practice infield."

144. The baseball mural at The Yard is painted on the exterior wall of Building A, facing the "adjacent building," Building B, the covered practice field. Ex. O, Herrs Dep. 86:1-3.

145. Salina created an unwritten policy of considering this mural at The Yard to be inside a building because it was "oriented" towards the covered practice field and thus was not considered a regulated sign. Ex. O, Herrs Dep. 84:12-13; 84:16-22; Ex. P, Andrew Dep. 322:25-323:4; Ex. L, Schrage Dep. 98:25-99:9.

146. The orientation of a sign is not anywhere in the code. Ex. P, Andrew Dep. 323:1-4.

147. A bike shop, Bike Tek, hired Mr. Benson to paint two bike themed murals: "Pedals on one side and cranks on the other." Ex. J, Benson Dep. 69:9-16; Ex. F, Mural Photos at 300.

148. Salina has not enforced the mural-sign code regime against Bike Tek. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

149. A music studio next to the Salina Symphony rehearsal hall has a music themed mural, titled Symphony of Sunflowers. Ex. G, Anderson Dep. 62:13-64:3, Ex. F, Mural Photos at 0120.

150. Salina has not enforced the mural-sign code regime involving the Symphony of Sunflowers. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

151. The mural at Salina Art Center was exempt from the mural-sign code regime even though Salina believes it is "similar in function to a sign" and "will direct the public," because

Salina considers it an "art installation." Ex. V, Art Center DRB Packet at 7; Ex. F, Mural Photos at 0098.

152. Salina has not enforced the mural-sign code regime against the Salina Art Center. Ex. DD, Def. Amend. Ans. to First Set of Interrog., Rog 8.

153. The Salina City Code does not define "art installation," and the Zoning Administrator would need "to see a rendering of what they would like to do" to determine if a proposed mural qualified as an exempt "art installation." Ex. P, Andrew Dep. 280:6-16.

154. When asked to explain how Salina identifies "art" that is exempt from the mural-sign code regime, Salina claimed that "'art' may be used from time to time as an imprecise short-hand for 'not sign'." Ex. X, Def. Ans. to First Set of Interrog., Rog 6.

155. Across the parking lot from The Cozy is a mural, owned by a current City Commissioner who was then the Mayor, advertising Bull Durham Tobacco. Ex. P, Andrew Dep. 303:11-20; Ex. F, Mural Photos at 0093.

156. Salina City Code § 42-510 says that any sign "which no longer advertises a bona fide business conducted, product sold or service provided shall be deemed abandoned and shall be removed at the expense of the owner."

157. Bull Durham is no longer a bona fide business, but Salina does not consider this mural to be an abandoned sign. Ex. Q, Andrew 30(b)(6) Dep. 53:7-9.

158. Instead, Salina created an unwritten policy that the Bull Durham mural was exempt from the mural-sign code regime "[b]ecause it was originally an internal sign on the wall of an enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall." Ex. P, Andrew Dep. 301:21-25.

159. Salina owns a water tower with a large mural stating "Visit Salina.org, Right Place, Right Reason, Right Now." Ex. Q, Andrew 30(b)(6) Dep. 73:6-21.

160. VisitSalina.org is the website of a private organization, the Salina Chamber of Commerce. Ex Q Andrew 30(b)(6) Dep. 76:18-20.

161. Salina City Code § 42-504(2) exempts government signs placed "for the protection of the public health, safety, and general welfare" such as "a. Emergency and warning signs necessary for public safety; b. Traffic and wayfinding signs; c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare."

162. Salina determined that the Chamber of Commerce website qualifies for this government public safety exemption because "attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public." Ex. Q, Andrew 30(b)(6) Dep. 77:12-15.

163. Salina determined that one side of the Kansas Wesleyan University scoreboard was an exempt scoreboard and not a regulated billboard, even if it contains advertisements, because it conveys information "directed at people that in the stadium." Ex. P, Andrew Dep. 105:6-23

164. The opposite side of the scoreboard was determined to be a regulated billboard because it is "oriented towards Cloud Street and not the stadium." Ex. P, Andrew Dep. 104:9-14.

165. The orientation of a sign is not anywhere in the code. Ex. P, Andrew Dep. 323:1-4.

166. Zoning Administrator Andrew testified that if a church put up a cross this "would be considered a symbol, not a sign." Ex. P, Andrew Dep. 22:21-23:4.

167. Even though Salina City Code § 42-764 includes "symbols" in the definition of a sign, Mr. Andrew testified that "[i]t has been the longstanding interpretation for the City of Salina that those are symbols just as flags don't count towards a sign allocation for a property." Ex. P, Andrew Dep. 24:12-15.

168. If the same church, however, painted a mural saying, "Turn to Jesus," Salina would consider that a regulated sign because "[t]hey would be advertising their desire for the public to turn to Jesus." Ex. P, Andrew Dep. 54:18-22, 55:7-8.

169. If a property owner flew a Kansas City Chiefs flag, Zoning Administrator Andrew would not consider this to be a sign, because "they are just expressing that property owner's support for their team." Ex. P, Andrew Dep. 33:22-34:6.

170. Zoning Administrator Andrew believed this even though flags are expressly considered a sign under § 42-764, and a Chiefs flag "could be interpreted as announcing the Kansas City Chiefs." Ex. P, Andrew Dep. 35:4-5.

171. If a business painted a mural of the Chief's Arrowhead logo and the phrase "Let's Go Chiefs!" Zoning Administrator Andrew would "interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs." Ex. P, Andrew Dep. 89:11-24.

172. But if the Kansas City Chiefs themselves had a training facility in Salina and wanted to paint the exact same mural, Zoning Administrator Andrew testified that he now considers the mural to be "advertising and directing attention." Ex. P, Andrew Dep. 89:25-90:3.

173. If a property owner painted "I Like Ike," or "Vote Eisenhower 1952," Zoning Administrator Andrew would not consider this a regulated election sign, but "simply an expression of whoever the sign holder is that they like Ike." Ex. P, Andrew Dep. 114:19-20, 115:7-13.

174. Conversely, a display saying "Mitt Romney 2012" must be removed because it's "an election sign that was up seven days after the election." Ex. P, Andrew Dep. 113:9-15.

175. Zoning Administrator Andrew distinguishes the two because Eisenhower is dead, Ex. P, Andrew Dep. 114:17-19, even though the written code says nothing about a candidate being alive when requiring election signs be removed after the election. Salina City Code § 42-508(d).

176. Zoning Administrator Andrew testified that "[a]ccording to the rules of construction of our city code, or and and are interchangeable." Ex. P, Andrew Dep. 72:2-3.

177. Zoning Administrator Andrew testified that to know if "or" means "and" or vice versa "[y]ou have to look at the context in which its used." Ex. P, Andrew Dep. 72:18-19.

178. If a member of the public wanted to know whether "or" means "and" or vice versa in the code "then they could contact the city to see how the city has historically interpreted it." Ex. P, Andrew Dep. 81:23-24.

### H. Salina can't explain how its mural-sign code regime advances its interests.

179. Salina said the "interests served by regulating signs" are traffic safety, pedestrian safety, aesthetics, and property values. Doc. 101 at 4(b)(iii); Ex. X, Def. Ans. to Interrog. No. 4,

180. When asked for the factual basis supporting its purported interests in aesthetics, pedestrian and traffic safety, and property values, Salina responded that "[a]s a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics." Ex. DD, Def. Ans. To Second Set. Interrog. 1.

181. Salina continued by referencing an expert report, but ultimately, didn't provide any factual basis for any of its purported interests. *See* Ex. DD, Def. Ans. To Second Set. Interrog. 1.

182. Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code enhances traffic safety or has succeeded in its objectives. Ex. N, Herrs 30(b)(6) Dep. 73:13-21.

183. Salina's 30(b)(6) Representative isn't aware of any municipality that has conducted a before-and-after study to show its sign code has, in fact, enhanced traffic safety. Ex. N, Herrs 30(b)(6) Dep. 73:23—74:3.

184. Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code enhances pedestrian safety. Ex. N, Herrs 30(b)(6) Dep. 74:5-15.

185. Salina's 30(b)(6) Representative isn't aware of any facts showing that its sign code has succeeded in promoting property values. Ex. N, Herrs 30(b)(6) Dep. 74:17-25—75:1-8.

186. Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals. Ex. N, Herrs 30(b)(6) Dep. 76:19-23.

187. Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more detrimental to pedestrian safety than painted murals. Ex. N, Herrs 30(b)(6) Dep. 76:25-77:1-10; 25:14-17 (admitting a painted wall sign can't be less secure than a painted mural)

188. Salina's 30(b)(6) Representative isn't aware of any facts showing that painted wall signs are more detrimental to traffic safety than painted murals. Ex. N, Herrs 30(b)(6) Dep. 77:23-25—78:1-10; 25:14-17 (admitting a painted wall sign can't be less secure than a painted mural)

189. City Manager Schrage believes Colin Benson's artwork is "high energy" and The Cozy's mural "pops." Ex. E, Comm. Tran. 32:2-5.

190. City Manager Schrage is not aware of any traffic accidents that have resulted from The Cozy's display. Ex. L, Schrage Dep. 126:15-20.

191. City Manager Schrage is not aware of any pedestrian accidents that have resulted from The Cozy's display. Ex. L, Schrage Dep. 126:22-25.

192. City Manager Schrage is not aware of property values decreasing as a result of The Cozy's display. Ex. L, Schrage Dep. 127:8-11.

193. Director Driscoll is not aware of any traffic or pedestrian accidents that have resulted from The Cozy's display. Ex. M, Driscoll Dep. 167:16-22.

194. Director Driscoll is not aware of facts showing that property values have decreased as a result of The Cozy's display. Ex M Driscoll Dep. 167:23-25.

195. Director Driscoll is not aware of facts showing that the local economy has gotten worse because of The Cozy's display. Ex. M, Driscoll Dep. 168:1-3.

196. Director Driscoll received several emails suggesting The Cozy's display was aesthetically pleasing. Ex. M, Driscoll Dep. 168:9-25; Ex. EE, Emails from Public.

197. Salina retained attorney Mark White as an expert. Ex. FF, White Dep. 18:2-14.

198. Mr. White isn't aware of any studies commissioned or conducted before Salina drafted any version of its sign code. Ex. FF, White Dep. 46:25-47:1-5.

199. Mr. White doesn't have any knowledge about why the sign code had been amended. Ex. FF, White Dep. 47: 7-10;

200. Mr. White is not aware of any peer reviewed study that has analyzed the efficacy of the sign code in promoting the goals, objectives, and policies of Salina's comprehensive plan. Ex. FF, White Dep. 47:12-19.

201. Mr. White is not aware of any studies at all that have analyzed the efficacy of Salina's code. Ex. FF, White Dep. 47:21-48:4.

202. Mr. White is not aware of any evidence or studies that establish that private art is more dangerous than public art. Ex. FF, White Dep. 114:20-25—115:1-8.

203. Mr. White is unaware of any evidence showing that commercial content painted on a wall is more dangerous than non-commercial content. Ex. FF, White Dep. 115:22-25—116:5-11.

204. Mr. White is not aware of any evidence or studies that establishes that burger-esque UFOs are more dangerous than pizza-esque UFOs. Ex. FF, White Dep. 116:13-18.

205. According to Mr. White, the Mural at the Mill is not dangerous. Ex. FF, White Dep. 120:10-12.

206. The Mural at the Mill would not become dangerous, according to Mr. White, if a daycare business started operating inside the building. Ex. FF, White Dep. 121:10-14.

207. Likewise, the exact same painting at the Mural at the Mill would not become dangerous if it were painted on a daycare wall. Ex. FF, White Dep. 120:13-17.

208. Mr. White is not aware of any research or studies showing that the public would find painted signs less pleasing than other painted displays. *See* Ex. FF, White Dep. 123:7-14.

209. Mr. White is not aware of any research or studies showing that one type of wall painting is more aesthetically pleasing than another type. Ex. FF, White Dep. 123: 16-22.

210. Mr. White is unaware of any evidence proving that commercial content painted on a wall is less aesthetically pleasing than non-commercial content. Ex. FF, White Dep. 124:13-19.

211. Mr. White admits the Mural at the Mill is aesthetically pleasing and concedes the mural would not become less aesthetically pleasing at a daycare. Ex. FF, White Dep. 125:7-12.

212. Mr. White is the author of a learned treatise, "*Content-Neutral Sign Codes After Reed And Austin*, (Sign Research Foundation 2022). Ex. FF, White Dep. 191:19-192:2; Ex. GG, *Content Neutral Sign Codes After Reed and Austin*.

213. Mr. Howard hired Charles Taylor as a rebuttal expert. Ex. II, Taylor Dep. 34:16-23.

214. The Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." Ex. HH, Taylor Dec., Rpt. at 12.

215. Properly constructed and positioned signs are not a safety hazard. Ex. HH, Taylor Dec., Rpt. at 10-14; *id.* at 13 (The "research [has] demonstrated that properly placed signs are not a safety hazard"); *id.* at 10 ("[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence.")

216. There is "no evidence" Salina's sign code "promotes an interest in aesthetics[.]" Ex. HH, Taylor Dec., Rpt. at 15-18.

217. There is no scientific or evidentiary support undergirding any of Salina's stated interests. Ex. HH, Taylor Dec., Rpt., 1-25.

**I. Mr. Howard wants to finish painting the mural.**

218. Mr. Howard is "very passionate" about his whimsical UFO-themed mural. Ex. G, Anderson Dep. 48:1-2; Ex. A, Howard Dec. ¶ 6, 7, 8, 12, 13, 27, 31, 32.

219. Mr. Howard was "moved to tears" because Salina wouldn't let him finish his mural. Ex. L, Schrage Dep. 59:9-12, 20-25; Ex. A, Howard Dec. ¶ 28.

220. Mr. Howard left another meeting "crying" because he couldn't finish his mural. Ex. L, Schrage Dep. 59:9-25.

221. Not being able to finish the mural made Mr. Howard feel "that [he] didn't have a voice." Ex. D, Howard Dep. 252:14-16; Ex. A, Howard Dec. ¶ 30.

222. Mr. Howard doesn't want to alter the mural's content as shown in the rendition shown above. ¶ 29; Ex. D, Howard Dep. 253:20-24; Ex. M, Driscoll Dep. 49:16-18; Ex. A, Howard Dec. ¶ 31.

223. Mr. Howard wants to finish what he started. ¶¶ 118, 151, 170, 190. "I didn't get to finish my story." Ex. D, Howard Dep. 146:4. "I want to paint my wall." ¶¶ 29, 151-153, 155-156, 158-160, 165-173, 278-281, 298-305; Ex. A, Howard Dec. ¶ 32.

224. There is "no basis to doubt" that Mr. Howard will finish the mural as shown in the rendition above, if allowed. Ex. P, Andrew Dep. 356:21-357:2; Ex. A, Howard Dec. ¶ 31-32.

225. Nobody has told Mr. Howard they dislike the mural. Many people have told Mr. Howard they like it. Ex. A., Howard Dec. ¶ 29.

## Argument

### I. Salina's mural-sign code regime violates the First Amendment.

#### A. The mural-sign code regime is content- and speaker-based.

Salina's idiosyncratic mural-sign code regime regulates speech based on content. It "target[s] speech based on its communicative content," it "applies to particular speech because of the topic discussed or the idea or message expressed," and it targets "specific subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 169 (2015). The regime also "draws distinctions based on the message," "cannot be justified without reference to the content of the regulated speech," "defin[e]s regulated speech by its function or purpose," and because Salina "disagree[s] with [certain] message[s]." *Id.* at 163, 164 (cleaned up).

Under the text of the sign code—largely unchanged since 1966—*all* outdoor murals are regulated wall signs, and every wall sign is supposed to be subjected to the same size restrictions and permit requirements. *Statement of Facts* (*SOF*) ¶¶ 34-36. A mural is a "pictorial representation" or a "display that is calculated to attract the attention of the public," after all.[5] *SOF* ¶¶ 34-36. But for decades, that's not how it's worked in practice. Salina doesn't apply its size and permitting requirements to displays it considers murals. *SOF* ¶ 37; *see also SOF* ¶¶ 31-32, 46, 48, 50, 72, 86-92, 95, 102-104, 120, 121, 124, 128, 129, 151, 154. In practice, the difference between an unregulated mural and a regulated sign turns on the display's content. If it relates to the entity putting it up, is "part of a commercial transaction," contains a "commercial message," or if it "includes a message that pertains to the goods or services for sale," Salina considers it a regulated sign subject to size limitations and permitting requirements. *SOF* ¶¶ 42, 45, 48, 54, 55, 56-59, 63-68, 71-73, 80, 100, 168-172; *see also*, *SOF* ¶ 48 (a "distinction is commonly made between murals and art when compared to commercial speech").

Salina's preoccupation and disagreement with that content explains why Mr. Howard could paint an exact, wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), unless he started selling soup, *SOF* ¶¶ 89-90; why he could paint a wall-sized airplane mural, unless he

---

[5] Alternatively, every mural "directs attention" to the mural or the building on which it is located.

offered travel services (or sold airplanes), *SOF* ¶ 86; why he could paint wall-sized pizza slices, since he doesn't sell pizza, *SOF* ¶ 87; why a city commissioner wanted to know "what it would take for him to turn this into a mural," *SOF* ¶ 70, and explains why he can't paint his burger-esque, UFO-themed mural, *SOF* ¶¶ 45, 48, 50, 54, 55, 56-59, 63-68, 71-73, 75, 80, 100, 168-172; *see also SOF* ¶ 95 (Cozy's display wouldn't be a regulated sign if it were painted on a business that didn't sell hamburgers). Under the mural-sign code regime, moreover, a church can display a cross, but not a wall-sized "Turn to Jesus" painting, *SOF* ¶¶ 167-168; a coffee shop could paint a wall-sized olive branch mural, but not one depicting a coffee branch, *see SOF* ¶¶ 63-66, 68, 91; and a taco shop can paint a wall-sized mural of a dove, unless it started selling "dove tacos," *SOF* ¶ 92. *See also*, *SOF* ¶¶ 7, 46, 73, 228 (coordinating with festival on content), *SOF* ¶¶ 120, 121, 122-124, 128, 129, 130, 169-172, 173-175 (more content-based examples).

Indeed, Salina admits it regulated The Cozy's display because of its content, saying it was "all on the basis of a commercial message." *SOF* ¶¶ 57-59; *see also SOF* ¶ 55 (Cozy's "content falls under sign provisions in the City Code rather than art"); *SOF* ¶ 54 (Cozy's artwork is a regulated sign because "the hamburgers are basically the same thing [Mr. Howard] sells, and therefore, it would be signage"); *see also SOF* ¶¶ 75, 77, 79, 95, 100, 101. That's plainly content based under *Reed*; and under *Aptive Envtl., LLC v. Town of Castle Rock, Colorado* too, where the Tenth Circuit rejected the argument that a commercial door-to-door solicitors' curfew was content neutral. 959 F.3d 961, 966, 970, 999 (10th Cir. 2020). The curfew "*is* content-based," the Tenth Circuit held, because it "applies by distinguishing between the commercial and noncommercial content of the solicitors' speech," a conclusion "dictated by the Supreme Court's decision in *Discovery Network*. There, the Court struck down a law that banned commercial but not noncommercial newsracks. In so doing, the Court concluded that the regulation was not content-neutral because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech." *Id.* at 982 (internal quotes cleaned up, italics in original); *see also SOF* ¶ 212; Ex. GG at 6 (regulation is "content-based if the message displayed" "has a regulatory impact").

Separately, the regime is content based because, as Salina officials have also repeatedly admitted, Salina has to "read the sign," or in this case, look at the mural's content to determine whether its restrictions apply. *SOF* ¶¶ 28-30, 45-46, 54, 56-59, 68-70, 72, 76-79, 81-85, 86-92, 96-101; *Reed*, 576 U.S. at 162; *Clark v. City of Williamsburg, Kan.*, 388 F. Supp. 3d 1346, 1358 (D. Kan. 2019), *aff'd,* 844 F. App'x 4 (10th Cir. 2021); *Quinly v. City of Prairie Vill., Kan.*, 446 F. Supp. 2d 1233, 1239 (D. Kan. 2006); *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412 (7th Cir. 2015); *Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728, 736 (8th Cir. 2011).[6]

Three analogous mural cases further demonstrate the regime is content based. In *Complete Angler, LLC v. City of Clearwater, Fla.*, the owners of a bait and tackle shop painted a fish mural. 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009). The city argued that murals displayed "in conjunction with" a business were not "art work," but commercial signage subject to size regulations. *Id.* at 1331. But murals showing "first responders" or "kids playing in the park" were unregulated art. *Id.* at 1333-34. The court held that was content based. The city "necessarily examined [the mural's] content" to determine whether it was "subject to the permit requirement or spatial constraints." *Id.* at 1333. Further, the city's "statements by its own representatives" and its "condoning of" the other murals showed the regime was "not content-neutral." *Id.* at 1334.

In *Kerston v. City of Mandan,* owners of a western bar painted a mural depicting mountains, cowboys, and the bar's name, which the city claimed was a regulated sign, not an unregulated mural. 389 F. Supp. 3d 640, 642, 644 (D.N.D. 2019). "Clearly," the court wrote, the "regulation is based on the content of the speech," and "is not content neutral," *Id.* at 646.

In *Morris v. City of New Orleans*, a painting with "a non-commercial message," was considered a mural; but if it had "a commercial message," it was considered a "sign," and subjected to different regulations. 399 F. Supp. 3d 624, 635 (E.D. La. 2019). That was

[6] The longstanding "read the sign" analysis wasn't obviated in *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73-74 (2022). Besides, *Austin* was limited to off-premises, "location-based and content-agnostic" regulations for billboards that didn't "single out any topic or subject matter for differential treatment." *Id.* at 76. What's more, billboards have always been treated differently by courts because of their unique characteristics. *See, e.g., Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1285 (11th Cir. 2004) (the "law of billboards" is "a law unto itself").

"undeniably" "content-based" because it "separates out commercial and non-commercial speech." *Id.* at 636.

The results of Salina's content-based decisions are plainly evident. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155. And just like the city in *Complete Angler*, because Salina considers displays showing fire fighters (at the fire station) and kids playing (Mural at the Mill), as unregulated artwork, rather than regulated signs, proves the regime is content based. 607 F. Supp. 2d at 1331; *SOF* ¶¶ 122-124, 117, 120.

Salina can't credibly explain *why* the mural at The Cozy is a regulated sign, but the Mural at the Mill isn't, even under its preferred reading of the code. *SOF* ¶ 38-39, 122-127, 205-207, 211. The latter covers an entire grain elevator, it's a "pictorial representation," it "attract[s] the attention of the public," it "direct[s] attention to" itself, and it "direct[s] attention to" downtown Salina. Even though it's a "sign" as the code defines it, *SOF* ¶¶ 34-36, Salina considers it an unregulated mural, *SOF* ¶ 124. Besides, whether something is "used to announce, direct attention to, or advertise" is still content based because it "defin[es] regulated speech by particular subject matter," and "defin[es] regulated speech by its function or purpose," *Reed*, 576 U.S. at 163, *SOF* ¶ 97, or "turn[s] on whether the speech is commercial or not." *Aptive*, 959 F.3d at 982; *see also id.* at 983.

Under *Reed*, *Aptive*, *Discovery Network*, *Kerston*, *Complete Angler*, and *Morris*, Salina's mural-sign code regime is content based.[7] Because Salina applies the mural-sign code regime to artwork that "reference[s] a product or service," but "exempt[s] works of art" from its code "which in no way identify or specifically relate to a product or service," it's a content-based regulation. *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up).[8] It's a speaker-based regulation too. For instance, a pizza shop could paint an exact replica of

[7] Even if Salina treats all murals pertaining to businesses the same, it's still a "content-based" regulation because it's a "regulation targeted at specific subject matter" "even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169.
[8] *See also Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278, 285 (D. Md. 2021) (size limit based on subject is content based); *Morris,* 399 F. Supp. 3d at 636 (code that turns on message is "undeniably"

The Cozy's mural, but The Cozy can't. *SOF* ¶ 95; *see also SOF* ¶¶ 87-90, 92. That "favor[s] some speakers over others" and "reflects a content preference." *Reed*, 567 U.S. at 170.

"Both on its face and in its practical operation," Salina's mural-sign code regime "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination," *Reed*, 576 U.S. at 169.

**B. Strict scrutiny applies, which Salina can't satisfy.**

Content-based regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* at 163. That requires Salina to prove, *with evidence*, its restrictions actually advance its stated interests, that its restrictions are not over- or under-inclusive, and that it used the least restrictive means possible. *See generally id.* at 171–72 (underinclusive); *United States v. Williams*, 553 U.S. 285, 292-97 (2008) (overbroad); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 827 (2000) (least restrictive means required to address a real problem).

Salina can't clear its initial First Amendment hurdle. None of its stated interests, "traffic safety, pedestrian safety, aesthetics, and property values," Doc. 101 at 4.b.iii., are compelling ones. *Clark*, 388 F. Supp. 3d at 1361 (aesthetics and traffic safety not compelling interest); *Ficker*, 553 F.Supp.3d 278, 283 (D. Md. 2021) (aesthetics not a compelling interest); *Int'l Outdoor, Inc. v. City of Troy*, No. 17-10335, 2021 WL 2275977, at *3 (E.D. Mich. Apr. 6, 2021) (maintaining property values not a compelling interest). But even if they are compelling, that Salina can't satisfy less rigorous tests, *see* Section I.C. below, necessarily means it can't satisfy the heavier one.

**1. Even if the mural is considered commercial speech, strict scrutiny applies.**

Salina officials have repeatedly claimed The Cozy's mural is commercial speech, *SOF* ¶¶ 44, 48, 50, 56-59, 65-68, 73, 80, 100, 128, and Salina itself argues the mural-sign code regime "passes the commercial speech test" under *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'of*

content based); *Neighborhood Enterprises*, 644 F.3d at 736; *Clark*, 388 F.Supp. 3d at 1359; *Quinly*, 446 F.Supp. 2d at 1239.

*New York*, 447 U.S. 557 (1980). Doc. 27 at 13 (cleaned up); *see also* Doc. 27 at 14 ("display is commercial speech"). "Commercial speech" is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Because The Cozy's mural is "not limited to merely proposing commercial transactions," it isn't commercial speech, even *if* it "may occasionally inspire" commercial transactions. *Complete Angler*, 607 F. Supp. 2d at 1332. The Cozy's mural doesn't say, for example, "five burgers for a dollar." The mural is "artwork," "express[ive]," conveys Mr. Howard and The Cozy's "character," and tells a story about alien travelers visiting The Cozy by burger-esque UFOs. *SOF* ¶¶ 9-13, 15-18. Mr. Howard wants people to come inside, even though there's an outside walk-up window and unlimited outside space, because it's more personal, more fun, better for Salina's reputation, and because people get to "see the history within Salina," not to maximize profits. *SOF* ¶¶ 2, 3, 19-22, 24-25. Inside, employees encourage people to explore downtown, spend their money *elsewhere*, and sometimes even give away free burgers so people can "see what [The Cozy's] all about, see what people talk about." *SOF* ¶¶ 22, 23.

Salina has "impermissibly treated Plaintiffs' noncommercial speech as commercial speech," but the "City may not skirt First Amendment protections by applying a definition of commercial speech that better suits its tastes." *Complete Angler*, 607 F. Supp. 2d at 1332. There's no *reason* to apply the commercial speech doctrine either. It contradicts the First Amendment's original public meaning, is prone to arbitrary application, is unfounded,[9] its underlying policy justification—consumer protection—doesn't exist here, and Salina can't prove the mural is, in fact, commercial speech.

Even *if* the mural is commercial speech,[10] the "regulation of commercial speech that is not content-neutral is still subject to strict scrutiny under *Reed*." *Int'l Outdoor, Inc. v. City of Troy,*

---

[9] *See* Alex Kozinski and Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627 (1990), *see also 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 518 (1996) (Thomas, J., concurring), *id.* at 517 (Scalia, J., concurring), Deborah J. La Fetra, *Kick It Up A Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004).

[10] If the doctrine applies, Plaintiffs reserve the right to challenge it. Doc. 16 ¶ 258; Doc. 101 at 4.a.i.

*Michigan*, 974 F.3d 690, 703 (6th Cir. 2020); *see also*, *Norton*, 806 F.3d at 412 (After *Reed*, a "law distinguishing one kind of speech from another by reference to its meaning now requires a compelling justification"); *cf. City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429-31 (1993) (applying strict scrutiny); *cf. Sorrell*, 564 U.S. at 565-66 (applying heightened scrutiny to commercial speech regulation).[11]

Based upon a collective reading of *Reed*, *Discovery Network, Sorrell, Int'l Outdoor*, and *Norton*, content-based restrictions on commercial speech trigger strict scrutiny. That Salina can't satisfy less rigorous tests, *see* Section I.C. below, necessarily means it can't satisfy the heavier one.

### C. Salina's restrictions can't survive *any* form of heightened scrutiny.

The Plaintiffs are still entitled to summary judgment even if strict scrutiny doesn't apply. Salina doesn't have any evidence that its restrictions on speech advance its stated, theoretical interests. A painted wall display isn't more likely to fall off a wall, or block views, because it pertains to a business, for instance. The Cozy's burger-esque UFO-themed mural doesn't become an eyesore, cause car wrecks, hurt pedestrians, or destroy property values because The Cozy sells sliders on the inside either. Andy Warhol's *Campbell's Soup Cans* (1962) don't suddenly become less beautiful because someone sells soup on the inside, and there's no reason a church can display a cross, but not a "Turn to Jesus" painting.

#### 1. Even under *Central Hudson*, the mural-sign code regime is unconstitutional.

The Plaintiffs are entitled to summary judgment even if *Central Hudson*'s test applies. Salina can't prove that its stated interests are "substantial," that its restrictions advance its interests "in a direct and material way," and that its restrictions are "narrowly tailored." *Aptive*, 959 F.3d at 987–88, 982 (cleaned up); *see also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1072 (10th Cir. 2001). All of that requires *actual evidence*, which Salina doesn't have. *Aptive*, 959 F.3d at 996 ("[c]onjectural harms and suppositions" are insufficient); *id.* at 995 ("asserted

---

[11] In *Aptive*, the Tenth Circuit only applied *Central Hudson*'s test because the plaintiffs requested it. *See, Brief of Appellee*, 18-1166 at page 26; *Aptive*, 1:17-cv-01545-MSK-MJW (D. Colo.), Doc. 23 at 11-12, Doc. 93 at 1, Doc. 105 at 2. Not so here. Doc. 16 ¶ 257.

interests" in "the abstract" not enough); *id.* at 999 ("harms" must be "real and that its restriction will in fact alleviate them to a material degree") (cleaned up); *id.* at 990 (record requires "a concrete, nonspeculative harm"); *Morris*, 399 F. Supp. 3d at 637 ("blindly intoning" theoretical civic interests not enough); *Complete Angler*, 607 F. Supp. 2d at 1334 ("abstract notions will not suffice").

In the Tenth Circuit, the commercial speech test isn't a fact-free, government deferential inquiry. In *Aptive*, for example, the Tenth Circuit independently reviewed the evidentiary record after a bench trial. 959 F.3d at 966. The Town of Castle Rock produced complaints involving registered and unregistered solicitors, solicitors visiting homes after the curfew time, testimonial evidence from council members, town employees, the police chief and its former mayor, statistical evidence, and much more. *Id.* at 990-992. That was not enough to satisfy the government's First Amendment burdens, the court held. *Id.* at 996 (The town "has failed to demonstrate that the Curfew directly advances in a material way its substantial interest").

Salina doesn't have anything close to the evidence that Castle Rock did, which still wasn't enough. For *each* of Salina's asserted interests—even assuming they're substantial in the *abstract*—it "fails to carry its burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 989 (cleaned up).

Starting with its theoretical interest in "traffic" and "pedestrian" safety, *SOF* ¶ 179, Salina's doesn't have *any* evidence, let alone "studies," "supportive evidence-based findings," "survey results," statistics, or other credible evidence, justifying its First Amendment restrictions on safety grounds. *Id.* at 993; *SOF* ¶¶ 180-184, 187, 188, 190-191, 193, 197-207, 214-215. There is no evidence that the sign code has actually succeeded in those objectives, *SOF* ¶¶ 180-184, 187, 188, 190-191, 193, 197-207, 214-215; that a mural pertaining to a business is unsafe, *SOF* ¶¶ 180-181, 187, 203-207; that it would cause a traffic accident, *SOF* ¶¶ 180-183, 188, 190, 193; or a pedestrian accident, *SOF* ¶¶ 180-181, 184, 187, 193. There is no evidence that a painted mural will fall off the wall, *see SOF* ¶¶ 187-188; that burger-esque UFOs are more dangerous than flying pizza slices, *SOF* ¶ 204; that commercial art is more dangerous than non-commercial art, *SOF* ¶ 203; or

that private art is more dangerous than public art, *SOF* ¶ 202. There is no evidence The Cozy's mural has caused any safety issues at all. *SOF* ¶ 190-191, 193. That Salina doesn't have any credible, real-world evidence supporting its theoretical safety interests isn't surprising: "[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." *SOF* ¶¶ 213-215. Just like the Town of Castle Rock, Salina doesn't have the evidence to support any of its safety arguments. *Aptive*, 959 F.3d at 993.

Salina's theoretical interest in "aesthetics" is not supported by any studies, statistics, or credible evidence either. *SOF* ¶¶ 180-181, 186, 196, 197-201. There is *no evidence* that a mural pertaining to a business is not aesthetically pleasing. *SOF* ¶ 208-211. In fact, the opposite is true. The public enjoys The Cozy's mural. *SOF* ¶¶ 196, 225; *see also*, *SOF* ¶ 189 (The Cozy's mural "pops."). That Salina doesn't have any credible evidence supporting its theoretical interests in aesthetics isn't altogether surprising either, the scientific evidence doesn't support it. *SOF* ¶ 216. Because there "is nothing in the record" to credibly "suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork," Salina's mural-sign code regime is "unconstitutional insofar as it distinguishes between commercial and non-commercial artwork." *Morris*, 399 F. Supp. 3d at 637; *see also*, *Discovery Network*, 507 U.S. at 425 (commercial newsracks "no greater an eyesore" than noncommercial newsracks); *Neighborhood Enterprises*, 644 F.3d at 737-38 (aesthetics not narrowly tailored when exemptions are content-based); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) (city may not "promot[e] aesthetics" "by restricting speech depending upon the message expressed"); *Ficker* 553 F. Supp. 3d at 284-85 (sign code not narrowly tailored); *Reed,* 576 U.S. at 172 (same); *Bee's Auto, Inc. v. City of Clermont,* 8 F. Supp. 3d 1369, 1380 (M.D. Fla 2014).

Salina doesn't have any evidence for its claimed interest in "property values," that the code actually succeeds in advancing property values, or that The Cozy's mural impacts property values. *SOF* ¶¶ 180-181, 185, 192, 194, 195, 196-201. To the extent Salina claims other interests, they're either not "substantial," or they're irrelevant. *SOF* ¶¶ 179. Besides, they're still not supported by actual evidence. *SOF* ¶ 217.

Salina retained attorney Mark White to help supply the evidence it doesn't have.[12] *See SOF* 180. But just like Salina, Mr. White doesn't have *any* evidence that Salina's alleged "harms" are "real and that its restriction will in fact alleviate them to a material degree" either. *Aptive,* 959 F.3d at 999; *SOF* ¶¶ 197-217. If anything, Mr. White's learned treatise demonstrates the regime is content based and doesn't pass *any* level of scrutiny. *SOF* ¶ 212; *see* Ex. GG at 9-10, 20-21 (regime violates "Tips to Comply with *Reed*" and "*Reed*'s Top 10 Takeaways"). Salina's argument that it doesn't need evidence, *SOF* ¶ 180, is plainly wrong. *Aptive*, 959 F.3d at 987-988; *id.* at 996 ("talismanic invocation" of interest not enough); *id.* at 988 (substantial interests "in the abstract" not enough); *see id.* 988-999.

Salina can't credibly explain why it treats murals differently from signs, why flying pizza slices are safe and aesthetically pleasing but burger-esque UFOs aren't, and all the other content-based exemptions from the size and permitting regulations either. Because Salina doesn't have *any* evidence of real-life, tangible harms, or evidence justifying its restrictions, or that the restrictions directly and materially advance its alleged interests, or evidence that its restrictions are not over- or under-inclusive, and that it considered less restrictive alternatives, this Court should grant the Plaintiffs summary judgment.

**2. Even if it's content neutral, the mural-sign code regime is unconstitutional.**

Even *if* the regime is content neutral, the Tenth Circuit's fact-intensive content-neutral test proves too much for Salina as well. *See, e.g., McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071-1072 (10th Cir. 2020) (describing and applying content-neutral test). In *Brewer v. City of Albuquerque*, for example, the city restricted certain pedestrian activities on the theory it "was necessary to address persistent and troubling pedestrian safety concerns stemming from high rates of vehicular accidents[.]" 18 F.4th 1205, 1209 (10th Cir. 2021). The district court entered summary judgment against the city, which appealed. *Id.* at 1214. The Tenth Circuit explained that even under a content neutral analysis, "the burden falls on the City to show that its recited harms,

[12] Plaintiffs have filed a motion to strike and/or exclude. *See* Docs. 97, 103.

specifically defined, are real and that the Ordinance will in fact alleviate them in a direct and material way—and if the City is unable to demonstrate that the Ordinance provides more than ineffective or remote support for the City's stated purpose, or sufficiently serves those public interests in a direct and effective i.e., material way, then we are constrained to conclude that the Ordinance is not narrowly tailored and, consequently, contravenes the First Amendment." *Brewer*, 18 F.4th at 1227 (cleaned up); *id.* at 1221 (government required to consider less restrictive means); *id.* at 1220 (government must leave open ample alternative channels of communication).

The Tenth Circuit independently reviewed the evidentiary record, *id.* at 1227, which included the city's production of 900 accident and police reports, statistical information from the ordinance's preamble describing injury and fatality numbers, anecdotes from city councilors, police officers, and constituents, and much more. *Id.* at 1232, 1227. That was not enough, the Tenth Circuit held, because "as the record evidence reflects, the Ordinance neither alleviates any real, non-speculative harms in a direct and material (i.e., effective) way, nor otherwise advances the City's more abstract safety rationales." *Id.* at 1226. The Tenth Circuit repeatedly emphasized that even under a content neutral framework, the government *needs concrete evidence* justifying its First Amendment restrictions. *E.g., id.* at 1226 (First Amendment violation "unmistakable" when "juxtaposed against the paltry record evidence of real, non-speculative harms"); *id.* at 1238 (describing "paucity of evidence proffered by the City"); *id.* at 1243 (government "required" to have "evidence demonstrating" the ordinance "ameliorates real, not speculative, harms"); *id.* at 1245 (City's "largely evidence-free approach" to establishing the ordinance's constitutionality "an approach that is unavailing—is emblematic of its efforts, more broadly, to demonstrate the Ordinance's constitutionality—efforts that are also unavailing").

As shown in Section I.C.1. above, Salina doesn't have *any* evidence, let alone anything close to the evidence that Albuquerque did, which *still* wasn't enough. Again, Salina's argument that it doesn't need evidence, *SOF* ¶ 180, is plainly wrong under *McCraw* and *Brewer;* and any suggestion that *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), turned the Tenth Circuit's First Amendment analysis into a fact-free, government-deferential inquiry where the

government gets to restrict speech because it says so, is terribly mistaken. *See* Doc. 101. In *StreetMedia*, the plaintiffs argued that treating billboards "differently depending on whether the message was paid for or not" was unconstitutional. 79 F.4th at 1247. Although the Tenth Circuit was "skeptical" the regulatory regime could survive *Brewer*'s rigorous evidentiary requirements, the billboard plaintiffs did "not allege with any specificity that the Act and rules fail to meet intermediate scrutiny," and "[t]hus conclude[d] that the district court properly dismissed" the claim. *Id.* at 1252. Unlike the billboard companies, the Plaintiffs have consistently, and with specificity, alleged that Salina's regime fails under *any* level of First Amendment scrutiny.

Salina doesn't have any credible evidence of any real-life harms it's trying to address, that its speech restrictions alleviate even its theoretical interests in a direct and material way, that its speech restrictions are narrowly tailored to serve real-life, content-neutral interests, that it has left open ample alternative channels of communication, or that it considered less-restrictive means. Salina can't prove any of the Tenth Circuit's content-neutral requirements from *McCraw* and *Brewer*. This Court should therefore award the Plaintiffs summary judgment.

## II. Salina's mural-sign code regime is an unconstitutional prior restraint.

Salina's mural-sign code regime is an unconstitutional prior restraint. In addition to being content based, it lacks "narrow, objective, and definite standards," it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (cleaned up),[13] it gives "unbridled discretion" to its officials, including its Zoning Administrator, and because its unwritten policies and practices authorize sign permit applications to be placed "on hold" indefinitely, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990) (plurality opinion).

Salina says signs require permits, murals don't. Salina's *preferred* definition of a "sign" is a display that is "used to announce, direct attention to, or advertise." By not clearly defining those

[13] *See also Saia v. New York*, 334 U.S. 558, 560 (1948); *Lovell v. City of Griffin*, 303 U.S. 444, 450–51 (1938); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769–70 (1988).

terms, or the term "mural," Salina fails to give clear guidelines to both the permit applicant and the Zoning Administrator tasked with making the permitting decision. Deciding whether a display is a regulated sign, or an unregulated mural, plainly requires the exercise of judgment and the formation of an opinion. For instance, Zoning Administrator Andew has thirty-seven years of experience in Salina's planning department, and he couldn't answer whether a more traditional looking UFO mural would be considered a regulated sign without first looking at a rendering of it; and couldn't answer whether cows grazing in fields of mustard plants, tomatoes, and onions would be a regulated sign without first seeing a rendering of it as well. *SOF* ¶¶ 82, 83. Salina officials don't agree whether its firefighter display is a mural or a sign, *SOF* ¶¶ 117-120, and can't determine whether other displays are signs or murals without seeking legal advice, *SOF* ¶¶ 93, 94, 118-119, 127. All of that demonstrates that judgment must be exercised, and opinions must be formed, the hallmarks of an unconstitutional prior restraint.

Salina doesn't regulate things it considers "art." *SOF* ¶¶ 55, 69, 74, 121, 151-154; *see also SOF* ¶ 57 ("signs and commercial speech" can't be considered "art"). But the question, "What is art?" has been described as "one of the most elusive of the traditional problems of human culture," Richard Wollheim, *Art and Its Objects* 1 (1980), and courts have found the term "works of art" inherently vague. *E.g., Household Goods Carriers' Bureau v. ICC*, 584 F.2d 437, 440 (D.C. Cir. 1978).

Zoning Administrator Andrew's unbridled discretion can be seen in the decades of uneven application of the regime. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155. He alone gets to decide whether the words "and" and "or" can be substituted for one another. *SOF* ¶¶ 176-178. The Zoning Administrator is empowered by Salina's unwritten policies and practices to ignore the code's text, *SOF* ¶ 38-39; and invent code exemptions. *SOF* ¶ 163-164 (inward "oriented" displays not regulated); *SOF* ¶ 140-146 (exterior wall painting deemed inside because it faced an adjacent, outdoor structure); *SOF* ¶¶ 160-162 (Chamber of Commerce website unregulated because it's necessary to protect public safety); *SOF* ¶¶ 131-136 (unwritten policy of measuring displays differently when he thinks it's "practical"); *SOF* ¶ 158 (displays that used to be inside

still considered "inside" even when they've been outside for decades); *SOF* ¶¶ 169-172 (flag with Chiefs emblem not a sign, but wall with painted Chiefs emblem is); *SOF* ¶¶ 173-175 (Eisenhower display unregulated, Romney display regulated); *SOF* ¶¶ 166-168 (cross on a church wall is deemed an unregulated symbol—despite the code's text—but a display that says "turn to Jesus" is a regulated sign). Salina can even exempt from regulation the displays it prefers if it thinks they're good for tourism. *SOF* ¶¶ 159-162. By that logic, Salina can exempt *any* display it likes. What's more, Salina considers The Cozy's burger-esque display a regulated sign but considers The Yard's baseball themed display an unregulated mural, *SOF* ¶¶ 140-146, the Fire Station's display an unregulated mural, *SOF* ¶ 120, apparently considers BikeTek's bike-themed display a mural, *SOF* ¶ 148, and the Art Center's art display a mural, *SOF* ¶ 121.

The written code requires permitting decisions to be made within 10 days. If denied, Salina is required to provide written notice of the reasons for the denial and inform the applicant about a right to appeal. But Salina's unwritten policies and practices have replaced the written code, because now planners are authorized to put applications on hold, indefinitely. *SOF* ¶¶ 102-116.

Salina's ever-shifting positions on when and how it applies its mural-sign code regime demonstrates the extent of its unbridled, unconstitutional discretion. The regime's subjectivity strikes at the very core of the freedom of speech, which, as the Supreme Court has held for decades, "has a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951).

## III. Salina's mural-sign code regime is unconstitutionally void for vagueness.

Salina's mural-sign code regime is unconstitutionally vague. It "authorizes or encourages seriously discriminatory enforcement," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), *see also Welch v. United States*, 578 U.S. 120, 124 (2016), "regulated parties [can't] know what is required of them," and it fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way," *Fox Television*, 567 U.S. at 253–54 (cleaned up).

The regime is so vague, officials invented code exemptions, *see above*, placed applications on hold indefinitely, *see above*, and invented definitions for "attracts attention," and "directs attention," *SOF* ¶ 38-39. The Zoning Administrator can unilaterally decide whether "or" means "and" and vice versa, and the only way for the public to know what the law means is to "contact the city to see how the city has historically interpreted it." *SOF* ¶¶ 176-178. It's so vague, Salina officials don't agree whether its firefighter display is a mural or a sign, *SOF* ¶¶ 117-120, and can't determine whether certain displays are signs or murals without seeking legal advice, *SOF* ¶¶ 93, 94, 118-119, 127. Key terms like "mural," "art," "pertains to," "commercial speech," "advertise," and most other key terms of the mural-sign code regime are undefined—and manipulated by Salina to prohibit displays it doesn't like—proves the regime doesn't provide constitutionally adequate guidance as well. And again, that code hasn't been uniformly applied *for decades* is evident throughout Salina. *SOF* ¶¶ 6, 19, 117, 121, 122, 129, 133, 147, 149, 155.

**Conclusion**




In Salina, the mural on top is regulated, the murals on bottom aren't. The only difference between them is the content. But The Cozy's mural is not more likely to fall off the wall, block views, cause car wrecks, destroy Salina's tax base, or harm passersby, because it sells sliders on the inside. There is no legitimate, non-content-based reason why Salina applied its size and permitting restrictions to The Cozy's mural.

Salina's mural-sign code regime is plainly unconstitutional under *any form* of heightened First Amendment scrutiny, it's an unconstitutional prior restraint, and it's unconstitutionally vague. Because there are no genuine disputes about the material facts, Mr. Howard and The Cozy ask this Court to grant them summary judgment.

Dated: February 7, 2025.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

# Exhibit A
# Howard Declaration

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment |

**Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment**

I, Stephen Howard, have personal knowledge of myself, my activities and my intentions as set out in this Declaration. I verify under penalty of perjury under the laws of the United States of America the following concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Cozy Inn, Incorporated, d/b/a The Cozy Inn:

1. The Cozy Inn is small. The dining area is about 192 square feet, and only around 40 square feet are accessible to customers.

2. Inside, The Cozy displays historical pictures and articles, including underneath the countertop where customers sit.

3. The Cozy and I are proud of the murals in Salina.

4. In 2023, I decided that The Cozy's plain-white wall didn't reflect my personality or The Cozy's personality.

5. I wanted to participate in this part of Salina culture and I wanted to paint a mural on The Cozy's side wall.

6. My vision and dream for The Cozy's artwork came from the art all over town.

7. I hired Colin Benson to paint a story that would show my personality and The Cozy's personality.

8. I am a "Sci-Fi" fan and I liked the idea of having a science fiction themed mural at The Cozy.

9. Once completed, the UFO-themed mural will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard and will read "Don't Fear the Smell!! The Fun is Inside!!"

10. This is what the finished mural will look like.




11. The mural tells a "story" about travelers, both alien and human: I have a map of the United States inside the store that people can place a pin where they're from or foreign visitors can write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here.

12. The painting, which was partially inspired by a Sci-Fi video I thought was cool. It is expressive artwork and conveys my character and The Cozy's character.

13. The UFO-themed mural is my vision and dream for The Cozy Inn, and part of my heart and soul.

14. I didn't paint the mural to maximize profits.

15. I prefer when customers come inside to order, rather than use the walk-up window, because the walk-up window is not as personal, and the experience of our entertainment is inside. We talk with everybody. If you use the walk-up window, you're just kind of missing the whole point.

16. Because The Cozy only has 6 stools inside, and unlimited space outside, The Cozy is no better off, financially, if people come inside.

17. Having people come inside is more personal, more fun, more enjoyable for myself and the people who come inside, and it is better for Salina's reputation.

18. Colin Benson started painting The Cozy's mural on Friday, November 3, 2023.

19. On Monday, November 6, 2023, City Planner Dustin Herrs told me that I couldn't finish the display even though there had been no public complaints about it and only city officials took issue with the mural at The Cozy.

20. On the morning of November 13, 2023, Salina officials held a meeting with me and Mr. Benson.

21. Salina told me to submit a sign permit.

22. I submitted the completed sign permit application on November 13, 2023.

23. Salina did not respond to the application within the written code's 10-day deadline.

24. Salina failed to provide a written notice or statement of reasons of denial of the sign permit application.

25. I received a letter dated February 8, 2024, from Salina that put the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete."

26. I did not consent to Salina placing my application on-hold.

27. I am very passionate about my one-of-a-kind UFO-themed mural.

28. I was moved to tears at a City Commission meeting because Salina wouldn't let me finish my mural or explain myself at the Commission meeting.

29. I speak to countless customers a week and no one have ever told me they dislike my design for my UFO-themed mural. Many people have told me that they like the mural.

30. Not being able to finish the mural made me feel like I didn't have a voice.

31. I don't want to alter the mural's content as shown in the rendition shown above.

32. I want to finish what I started. I didn't get to finish my story. I want to paint my wall.

33. I will testify at trial or for other purposes consistent with the contents of this declaration.

Dated: 2-4, 2025

[signature]
Stephen Howard, individually and on behalf of Cozy Inn, Incorporated, d/b/a The Cozy Inn

Galaxy S22

# Exhibit B
# Cozy Photos


111 7th St


Don't Fear the Smell!
The Fun is inside!!
HAMBURGERS


No Cheese!!
All burgers served with onions!
NO SMOKING
REVIEW US

# Exhibit C
# Cozy Proclamation

# Proclamation
# Cozy Inn

Whereas, the Cozy Inn was established in 1922 and is celebrating 100 Years of continued operation at its location of 108 N. 7th Street Salina, Kansas;

Whereas, the Cozy Inn founder Bob Kinkel began frying his onion-laden, coin-sized burgers at 108 N. 7th Street;

Whereas, upon Bob Kinkel's passing in 1960, Cozy Inn was owned and operated by his wife Katherine and her husband Richard Pickering. Upon their passing in 1997, it was operated by Max Holthaus, Gregg Boyle, and Monte Shadwick until 2007. Since 2007, Steve and Kris Howard, the current owners and operators have continued the strong tradition of owning and operating the Cozy Inn;

Whereas, the Cozy Inn survived and thrived through the depression of the 30's, local impact of WWII of the 40's and the advent of the fast food market that has been part of the American way of life for the past 60 years;

Whereas, the Cozy Inn has received the honor of recognition as one of the 8 wonders of Kansas Cuisine;

Whereas, the Cozy Inn is known nationally as one of the last remaining six-stool diners in America;

Whereas, the Cozy Inn has been featured on the Travel Channel's "101 Tastiest Places to Chow Down" and as one of "America's Top Ten Hamburgers";

Whereas, the Cozy Inn was picked by USA Today as "Best Burger Joint in Kansas" and has received the Diamond Award from AAA;

Now, therefore I, Trent W. Davis, M.D., Mayor, do hereby proclaim the month of March 2022 as

Cozy Inn Month

and encourage all citizens to support a nationally recognized local institution, which has been a fixture of downtown Salina for 100 years. We wish continued success to current and future caretakers of a local landmark.

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the City of Salina, Kansas, to be affixed this 7th day of March, 2022.

Trent W. Davis, M.D., Mayor

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**March 7, 2022**
**4:00 p.m.**

Mayor Davis asked the Clerk for verification that notice had been sent for today's City Commission meeting. The Clerk replied yes.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. A roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Mayor Trent W. Davis, M.D. (presiding), Michael L. Hoppock, Greg Lenkiewicz, Bill Longbine and Karl Ryan.

Also present: Mike Schrage, City Manager, Jacob Wood, Deputy City Manager, Shawn Henessee, Assistant City Manager, Greg Bengtson, City Attorney; and JoVonna A. Rutherford, City Clerk.

## AWARDS AND PROCLAMATIONS

(3.1) Recognition of March 7th through March 11th, 2022, as Entrepreneurial Week in the city of Salina. Mitch Robinson, Executive Director of the Salina Community Economic Development Organization, read the proclamation and announced related activities.

(3.2) Recognition of the month of March, 2022, as Cozy Inn Month in the city of Salina. Eric Brown, President of the Salina Area Chamber of Commerce, read the proclamation. Steve Howard, owner of Cozy Inn, announced related activities.

## PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME

None.

## CONSENT AGENDA

(5.1) Approve the minutes of February 28, 2022.

(5.2) Award the bid for Project Number 22013, 2022 Chip Seal, to Circle C Paving and Construction of Goddard in the amount of $149,279.40 with a 5% construction contingency for a total project authorization not to exceed $156,743.37 and authorize the City Manager to execute a contract with Circle C Paving and Construction of Goddard upon fulfillment of all prerequisites under the bid documents.

22-0058 Moved by Commissioner Hoppock, seconded by Commissioner Longbine, to approve consent agenda as presented. Aye: (5). Nay (0). Motion carried.

## ADMINISTRATION

(6.1) Approve Resolution No. 22-8024, amending the City of Salina Classified Pay Plan to add a new classification to the wage/salary schedule.

Jeff Hammond, Director of Parks and Recreation, explained the request, fiscal impact and action options.

A discussion followed regarding finding applicants, labor market, contracts, and location and maintenance of downtown bathrooms.

22-0059 Moved by Commissioner Ryan, seconded by Commissioner Lenkiewicz, to approve Resolution No. 22-8024. Aye: (5). Nay (0). Motion carried.

(6.2) Approve Ordinance No. 22-11101, on first reading, amending the Salina Finance Ordinance to remove portions of Section 2-240 and 2-241 to make the establishment and amendment of Petty Cash and Working Cash (Change) funds for all funds except utilities related funds an item actionable by resolution.

Debbie Pack, Director of Finance and Administration, explained the request, fiscal impact and action options.

22-0060 Moved by Commissioner Lenkiewicz, seconded by Commissioner Hoppock, to approve Ordinance No. 22-11101 on first reading. Aye: (5). Nay (0). Motion carried.

**DEVELOPMENT BUSINESS**

(7.1) Property 6, LLC

(7.1a) Approve Ordinance No. 22-11104, on first reading, amending Section 42-415.2 to add travel center and/or truck stop, short term recreational vehicle parking area accessory to hotel, motel, truck stop or travel plaza and mini warehouses to the list of conditional uses allowed in the South Ninth Street Corridor Overlay District.

(7.2b) Approve Ordinance No. 22-11105, on first reading, changing the zoning district classification from A-1 (Agricultural) zoning district to PC-5 (Planning Service Commercial) zoning district on a 25.10 acre tract of land located at the southwest corner of 9th Street and Water Well Road.

Mike Hoppock recused himself from the meeting.

Dean Andrew, Director of Planning, explained the request, fiscal impact and action options.

A discussion followed which included mini warehouses, Planning Commission denial of mini warehouses, aesthetics of mini warehouses, space for warehouses and RV parking, flood zone and drainage.

Mark Augustine, Property 6, LLC, Salina, Kansas, provided his thoughts on the aesthetics of the proposed project, current use of nearby property, letters of support, sustainable use and the need for additional storage in south Salina.

Additional discussion followed concerning possible actions to be taken by the Governing Body.



DRAFT

Norman Mannel, Salina, Kansas, suggested the planting of trees next to the property in question.

Dalton McDowell, Salina, Kansas, expressed his concern with expansion in south Salina and response time of the fire department.

A brief discussion ensued related to the development process and fire department coverage.

Chad Farber, Salina, Kansas, stated the main concern seemed to be with aesthetics from the interstate and suggested the project could be a benefit to the city.

Further discussion ensued on support of the project and the aesthetics of the project.

22-0061 Moved by Commissioner Ryan, seconded by Commissioner Lenkiewicz, to approve Ordinance No. 22-11104, amended to add mini-warehouses to the list of conditional uses in the South Ninth Street Corridor Overlay District, on first reading. Aye: (4). Nay (0). Motion carried.

22-0062 Moved by Commissioner Ryan, seconded by Commissioner Lenkiewicz, to approve Ordinance No. 22-11105 to include mini-warehouses as a permitted use in the district, on first reading. Aye: (4). Nay (0). Motion carried.

Commissioner Hoppock rejoined the meeting.

## OTHER BUSINESS

Commissioner Longbine revisited Resolution No. 22-8027 related to citizens forum and shared a concern with when executive sessions are scheduled. It was discussed that executive sessions were placed at the end of the meeting, as they were not an actual agenda item, and would remain at the end of the meeting.

Commissioner Longbine also acknowledged the loss of life and homes in Reno County over the past weekend.

## CITIZENS FORUM

Debrah Corrales, Salina, Kansas, provided information on and referenced articles related to pitbulls.

Norman Mannel, Salina, Kansas, stated his concerns on water shortage.

Dalton McDowell, Salina, Kansas, suggested the use of brine in lieu of salt to treat roads.

Ben Windholz, Salina, Kansas, provided his thoughts on Resolution No. 22-8027, related to citizens forum.

Chad Farber, Salina, Kansas, piggybacked on Mr. Windholz's statements and further provided his thoughts on the matter.

Carol Reed, Salina, Kansas, agreed with Mr. Windholz and Mr. Farber related to Resolution No. 22-8027. Ms. Reed also inquired about an Implicit Bias Test, touched on immoral content of books in the school system and provided a copy of a statute related to promoting obscenity to minors.

Cheri Harp, Salina, Kansas, suggested the community was not concentrating on children and it was detrimental to have immoral books in the school system.

Mayor Davis provided information on submission of written information to the Governing Body.

**ADJOURNMENT**

22-0063 Moved by Commissioner Ryan, seconded by Commissioner Hoppock, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (5). Nay: (0). Motion carried. The meeting adjourned at 5:34 p.m.

Trent W. Davis, M.D., Mayor

[SEAL]

ATTEST:

JoVonna A. Rutherford, City Clerk

DRAFT

# Exhibit D
# Howard Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

Heating -- well, before this, let me back up. After Vo-Tech when I graduated, I started a job in Wichita working as a refrigeration technician. And they laid off all the new people in September.

So I came back to Salina, and one of the guys I graduated with was a manager with McDonald's. And he goes I can get you working here for a while. And so all right. So I started working there, kind of like it. Then I started working -- my hours were set during the day 7 to 1. So in the afternoon, I went to work for Gage's Plumbing and Heating. They went out of business. So I put all my efforts into McDonald's, kind of left that away side.

After 14 years, I decided I didn't want to do that no more, and I got hired on with USD 305 working as maintenance for the school district and spent a month shy of 14 years with them.

And then during this time, about the last ten years from like '97, '98, I was working up at the country club for Max Holthaus. He was one of the guys that owned The Cozy at that time. And for years, he was trying to get me down to The Cozy to manage it, but I wouldn't leave my school district job. And then one night he goes what

about owning it? I go you really want me in there, don't you? He goes you're a perfect fit. So he made it to where I couldn't say no.

**Q. All right. So it sounds like you prior to owning the Cozy, you've had some restaurant experience when you were working at McDonald's?**

A. Yes. You could almost say I have 50 years in the restaurant industry. My oldest sister, I grew up a couple miles from what they used to call the Nickerson Farms restaurants. And she was 14 when she started working there. I'm six years younger than her, so I've been hanging out up at the restaurant when she was working. And then that was my first job, too, when I turned 14 or 15. And so I've always been in the restaurant industry one way or another.

**Q. Okay. And so when did you become the owner of The Cozy?**

A. April 7th of 2007.

**Q. And did you --**

A. It was a -- it was a -- sorry. It was a Monday, either October -- either November -- oh, my God, April 6th. It was a Monday in 2007.

**Q. Okay. And that's because Max and -- what did you say Max's last name was?**

**hearing some hammering. We have some construction going on, and they like to only start the hammering outside of my door when I am on Zoom. So I'll apologize for that in advance. Hopefully, it's not too disrupting.**

**So when was Andrea made a shareholder of The Cozy?**

A. Maybe two years ago September. I can't remember the date.

**Q. And why was she brought in as a shareholder?**

A. She's going to be my successor.

**Q. All right. And you mentioned that Jenni's Liquor, that's in Brookville, Kansas?**

A. Yes.

**Q. And where do you currently reside?**

A. 8822 South Sunnyside Road, Brookville, Kansas.

**Q. And let's talk about that. How long have you been living in Brookville, Kansas?**

A. Brookville is my high school and my grade school. We didn't live in Brookville ever. We lived in the district. Actually, where I live now, we're not in the district, but we're able to keep my kids -- let me kids graduate there from

**Q. Okay. So when someone comes inside, you can talk to them and suggest how many they should have?**

A. Yes.

**Q. Okay. What about at the ordering window?**

A. It is -- at the walk-up window, it's not as personal because you don't get the feel of -- our entertaining is inside. You know, all of us talk with everybody, and the conversations are always appropriate. They are timely. Walk up -- if you use the walk-up window, you're just kind of missing the whole point.

**Q. Okay. Do you feel like you're able to upsell better for customers that come inside?**

A. Yes.

**Q. Okay. Does that increase your sales for customers that come inside?**

A. Not always.

**Q. Okay. But does it typically?**

A. No. Because the walk-up window can get every bit as busy as the inside. And if it's snowing, they're probably going to come inside to order and not the walk-up window which won't be very many because wintertime is slow.

**Q. Okay. Well, what about in the summer?**

A. Summertime's my busy season, and it's about half and half. I don't know, I guess, what...

**Q. Okay. So of your customers, approximately 50 percent use the walk-up window and 50 percent go inside?**

A. I don't have any numbers to prove, but just by experience, yeah, 50/50.

**Q. Okay. Do you ever track that? I know you said you don't have the numbers, but do you ever track that --**

A. No.

**Q. -- in your head?**

A. No.

**Q. No. So it's --**

A. I have a very simple cash register. It tells me how many transactions I do and that's it. Doesn't tell me window or inside.

**Q. Okay. But you said coming up to the walk-up window is impersonal?**

A. Yeah. You're missing the whole point of going to The Cozy Inn.

**Q. Okay. Well, tell me about. What's the whole point of going to The Cozy Inn?**

A. You go inside, you get tagged right away

**Q. Okay. So if someone came -- you're asking people to come inside The Cozy to purchase something, correct?**
A. Yes.
**Q. Okay. And I mean because it would be -- how would you as a business make money if people just came into The Cozy and just congregated there and didn't buy anything, right?**
A. Well, that would be a problem. I don't have very much room.
**Q. Okay. What's the square foot for the customers?**
A. Maybe 40 square feet.
**Q. 40 square feet where the customers can sit?**
A. Yeah. I have six stools.
**Q. Okay. And another than the six stools, is there really anyplace else for people to hang out inside The Cozy?**
A. Behind the stools against the wall.
**Q. Okay.**
A. I've fit 12 to 15 people in there before.
**Q. Okay.**
A. Some sitting and most standing.
**Q. Okay. So other than the six people who**

it's there.

**Q. At some point, were you displaying that, though?**

A. Oh, yeah.

**Q. Okay.**

A. Just up until last week somebody knocked it off. I asked one of my people, I said what happened to that picture that was there. And they said, well, it fell and broke. It's in the office.

**Q. So I want to talk to you about the painting on the side of The Cozy. And what I'm talking about is the sign that's the subject of this lawsuit?**

MR. SHAW: Objection to form.

MS. JOKERST: Well, it wasn't a question. I was telling him what I'm referring to.

BY MS. JOKERST:

**Q. When did you first get the idea of painting that side wall at the Cozy?**

A. October of last year.

**Q. So October of 2023?**

A. Yeah.

**Q. Okay. And what led to that idea?**

A. Well, I had a couple about my age come to

**Colin Benson? Tell me about that.**

A. Well, I had a contractor doing some work at my house, and I told him I said like to find an artist to paint my north wall. I said, you know, I'd pay 500 bucks for someone to paint it. I had no idea that his boy -- him and his boy's an artist.

**Q. Okay. So was that Rick Benson you were talking to?**

A. Yes.

**Q. Okay. So you told Rick Benson that you wanted to paint the wall?**

A. Yes.

**Q. Is that right?**

A. Yes.

**Q. Okay.**

A. And I told him I said I'd pay somebody 500 bucks to paint a story on my wall.

**Q. Okay. What did Rick Benson say to you then?**

A. Nothing. A couple days later Colin showed up at the restaurant, introduced himself and there you go. That's the beginning.

**Q. Okay. So when Colin came over and introduced himself, what did you guys talk about?**

A. Yes.
BY MS. JOKERST:
**Q. Okay. Okay. So why did you include the burger?**
A. Because I wanted to.
**Q. Okay. Is that because it references the product that's available for sale at The Cozy?**
MR. SHAW: Objection to form.
A. I don't know the rules. I don't know the codes. I just wanted to paint a mural. I thought I was falling in line with the City of Salina.
BY MS. JOKERST:
**Q. Okay. Well, I'm not asking you about the codes. So we're not there. I'm asking you why you included the burger on the paper that you gave to Colin Benson?**
A. It was part of my idea.
**Q. Okay. And was your idea to advertise The Cozy?**
MR. SHAW: Objection to form.
A. No.
BY MS. JOKERST:
**Q. Okay. Then why did you include the burger on that?**

**Q. You don't remember what you talked about?**
A. No. It's been over a year ago.
**Q. Okay. Well, not quite a year ago, right, because that's October. It's October now. Well, you've said this painting was your heart and soul, right?**
A. In a way.
**Q. In a way. Okay.**
A. It's a story.
**Q. Okay. But it's important to you, right?**
A. Yes.
**Q. Okay. So weren't the conversations you had with Colin Benson about this painting, weren't those important?**
MR. SHAW: Objection to form.
A. Why would I think that I needed to remember that?
BY MS. JOKERST:
**Q. Well, usually when something is important it can be memorable. So that's why I was kind of asking you, you know, if these were important. Is there something that might refresh your recollection about the communications you had with Colin if they were in person versus text?**
A. No. My wife would tell people I'd forget

Q. Okay. And then on the next page, 347, you stated -- I'll wait till you get there. Sorry. You stated I like it. Wife thinks it's too much. Do you see that?
A. Um-hum, yes.
Q. That's what you told Colin?
A. Yes.
Q. Okay. So you said that on October 31st to Colin, right?
A. Yes.
Q. Okay. So then on November 1st, you said let's go for it to Colin?
A. Yes.
Q. So what changed between October 31st and November 1st?
A. I don't know.
Q. Well, did something happen because you went from saying wife thinks it's too much to let's go for it?
A. Because I liked it. My wife didn't like it.
Q. Okay. So let's scroll back up to 346. And do you have the color copy of this exhibit now?
A. Yes.

was taken on.

**Q. Okay. Well, I don't know, either, because I'll represent to you that this was disclosed by you in this case, by your attorneys. So I can't tell you specifically. But when you look at this, does this look like what the painting looks like on your wall right now?**

A. I don't know. I see it every day, but I don't know.

**Q. Okay. Well, is there a more up-to-date photo of what the wall looks like right now?**

A. Not in my possession.

**Q. Okay. All right. So let's stay on the photo on page 54 of Exhibit S. Okay. The big burger in the middle. There's no UFO or alien depiction on that, right?**

A. Right.

**Q. Okay.**

A. Not yet.

**Q. Not yet, but there's never been a rendering that shows an alien depicted on that one, right?**

MR. SHAW: Objection to form.

A. That's the mothership.

BY MS. JOKERST:

**Q. Okay. Well, there's no indication that it's anything other than a burger, right?**
MR. SHAW: Objection to form.
A. I didn't get to finish my story.
BY MS. JOKERST:
**Q. Okay.**
A. The mural.
**Q. All right. Well, Mr. Howard, that's the burger you drew up and sent to Colin and said this is what I want in that initial rendering, right?**
MR. SHAW: Objection to form.
A. I did not draw a burger. I drew a circle.
BY MS. JOKERST:
**Q. You drew a circle that was supposed to indicate a burger?**
A. Yeah.
**Q. Right?**
A. Yes.
**Q. Okay. And you didn't tell Colin, oh, this is the mothership, right?**
A. After the fact, after he started.
**Q. After he started?**
A. Yes.
**Q. Okay. But when you were doing the**

**depiction of what's on the wall right now?**

A. Yes.

**Q. Okay. And let's go down to the next page, page 6. It's marked 0065. Do you recognize this photo?**

A. Yes.

**Q. Okay. What does this photo depict?**

A. The inside of my restaurant.

**Q. Okay. Is that an accurate depiction of the inside of The Cozy restaurant?**

A. Other than the price change.

**Q. Okay. Other than that, the stools --**

A. Yeah.

**Q. -- the countertop, all look the same?**

A. Yes.

**Q. And I'll move you down to the next page?**

MR. SHAW: I'm going to renew my objection to the use of these last two photographs as they were not disclosed in accordance with the scheduling order.

BY MS. JOKERST:

**Q. Okay. Mr. Howard, is this -- what is -- what's this photo depicting?**

A. Part of my menu board.

**Q. Okay. That's a menu board that's on the**

**Hill Museum on November 13th?**
A. I don't remember.
**Q. You don't remember. But you do remember going to a meeting at the Smoky Hill Museum?**
A. Yes.
**Q. Okay. Do you remember who was at that meeting?**
A. Maybe.
**Q. Okay. There was city personnel at that meeting?**
A. Yeah. Lauren Driscoll, Mike Schrage and Brad Anderson, I believe.
**Q. Okay. And was Dustin Herrs there?**
A. I don't remember.
**Q. Okay. Other than city staff, were there other people present?**
A. There were.
**Q. Okay. Who else was present?**
A. My wife.
**Q. Okay.**
A. And Kris and Grant Johanson.
**Q. Okay. Kris and Grant?**
A. Um-hum. I think that's it.
**Q. Okay. Well, was Colin Benson there?**
A. Oh, yeah, he was right beside me.

A. They know what's going on.
**Q. Okay.**
A. That's about it.
**Q. So your employees are aware of what's going on?**
A. Yes.
**Q. Okay. And were your employees there while Colin was painting the wall sign?**
A. I don't remember --
MR. SHAW: Objection to form.
A. -- who was there.
BY MS. JOKERST:
**Q. Was he there painting business hours?**
A. He started Friday night. I don't remember how early he started Saturday or Sunday but, yeah, he had customers talking to him.
**Q. Okay. So customers stopped and talked to him?**
A. Yes.
**Q. Did any of your employees talk to him?**
A. Only when he comes inside to eat.
**Q. Okay.**
A. They probably talk about tattoos.
**Q. Okay. I want to talk about the wall side -- or the painting on the side of the wall. The**

come up with a story.
**Q. And is that what made you want to create another mural at Jenni's Liquor?**
A. Yes.
**Q. Okay. Is there any other part of the story that you feel like expressing?**
A. No.
**Q. Okay. And how do you feel that you have been told you cannot complete the Mural at the Mill Cozy Inn?**
A. By voice and letter.
**Q. I'm sorry. I didn't hear you.**
A. I've been told and gotten a letter.
**Q. I mean how does it make you feel when you were told that you could not complete the mural?**
A. That I didn't have a voice.
**Q. Okay. Why did you decide you wanted to have a mural with burger-esque flying saucers?**
A. I'm into Wi-Fi -- Sci-Fi.
**Q. Okay. So you like science fiction?**
A. Yes.
**Q. All right. And so you just liked the idea have having a science fiction themed mural?**
A. A few years ago, I had a customer from Salina did a video of aliens landing on -- coming

to Salina in their ships. It's really cool. I think I might have sent it to you, Sam. And then they beam onto the roof of Cozy, and they beam down and then they beam up with burgers and then they fly away.

**Q. Okay. And is the Cozy a reference -- is the Cozy Inn mural a reference to travelers?**

A. Yes.

**Q. Okay. How does it refer to travelers?**

A. Okay. I have a map inside the store that people write in -- they pin where they're from or they have -- they write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here. Over 90 percent of my business are travelers. I don't know if I said that.

**Q. And the rendering that was attached to your sign permit application, is that what you desire for Mr. Benson to paint on the side of the wall if he's allowed to complete the mural?**

A. Yes.

MR. SHAW: Okay. I have no further

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 17th day of October, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS
STATE OF KANSAS
CERTIFIED SHORTHAND REPORTER

# Exhibit E
# City Commission Meeting Transcript

Exhibit A

SALINA CITY COMMISSION MEETING

held on

November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a

Registered Professional Reporter

Certified in Kansas and Missouri.

APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 11 of 45



situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 15 of 45



chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 18 of 45



let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 21 of 45



something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

Transcript of Proceedings - 11/13/2023


does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 27 of 45



definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 28 of 45



well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 30 of 45



location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 32 of 45



Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 39 of 45



have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 40 of 45



that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

Case 6:24-cv-01027-TC-ADM Document 16-2 Filed 04/10/24 Page 41 of 44


place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 43 of 45


it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

Case 6:24-cv-01027-TC Document 105-5 Filed 02/07/25 Page 44 of 45



MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter



Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

# Exhibit F
# Mural Photos


E Elm St
STOP


KU
SCHOOL OF MEDICINE
SCHOOL OF NURSING
SALINA
The University of Kansas




MAJOR LEAGUE CITIZENS
Salina


A Famous
Trade Mark
Over
300,000,000 bags
sold last year
He stands for thrift
RESERVED
PARKING
10¢
GENUINE
"BULL" DURHAM
TOBACCO
Thos Cusack Co.


THE YARD
THE ARK CHURCH


HUTTON




Schlotzsky's
CINNABON
TIME TO PUT ON YOUR EATIN' SOCKS
EVERY SATURDAY
PEOPLE WHO LOVE TO EAT are always THE BEST PEOPLE


SHARP TRANING CENTER
SUPPLEMENTS


The Stiefel Theatre For
the Performing Arts
STAGE
DOOR
JOE IURATO




GOOD GAME!
Salina
I AM OUT!
OUTTA THE PARK!
ALWAYS COMPETE!


3UP
3DOWN
MAJOR
LEAGUE
CITIZENS


THE ORIGINAL GRANDE™
TACOS & BURRITOS
FUEL YOUR INNER FIESTA
WELCOMING NEW LOAN OFFICERS
FIRST BANK KANSAS



# Exhibit G
# Anderson
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

LAWRENCE BRADLEY ANDERSON,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:01 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

possible of both public and private projects that are -- might be of interest to the public in the greater downtown area.

BY MR. SHAW:

**Q. Okay. So it's safe to say that not everything listed on here was either funded or organized by your department. Is that correct?**

MS. JOKERST: Object to form.

A. That is correct.

BY MR. SHAW:

**Q. Okay. Do you see in paragraph 15 where it makes reference to something called the Salina Kanvas Project?**

A. Yes.

**Q. Do you know what the Salina Kanvas Project is?**

A. Could you be more specific?

**Q. Are you familiar with what this project does?**

A. I'm familiar with the administrative organization of the Salina Kanvas Project and then one of their subsidiaries that they work under with the Boom! mural festival.

**Q. Okay.**

A. In terms of what exactly they do, no.

**Q. Okay. Do you know who runs the Salina Kanvas Project?**
A. I'm familiar with the team of three individuals, but the CEO at the local business that first conceived the Kanvas Project.
**Q. Is that CEO you're referring to, is that Travis Young?**
A. Yes, it is.
**Q. Okay. And who are the other individuals you referenced there?**
A. Two of his employees, Tanner Colvin and Eric Montoy.
**Q. Okay. And do they all work for some business called Vortex Global?**
A. Yes.
**Q. Okay. Has Salina Kanvas Project funded the painting of murals around the City of Salina?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay.**
A. As far as -- yes, I think they're responsible for that, yes.
**Q. Has any funding from the City of Salina gone to assist in any of their projects?**

project through our foundation.

**Q. Okay. So if I understand it, there's -- I believe you said it was the Salina Arts & Humanities Foundation. And then there's the -- was it Greater Salina Arts?**

A. Community Foundation.

**Q. Community Foundation. Okay. And that 501(c)(3) is what accepted donations for the Boom! festival, and your office through the foundation just kind of gave administrative support to that?**

A. That is correct.

**Q. Okay. Thank you. Going back to paragraph 15 here, it references the Mural at the Mill. Are you familiar with that mural?**

A. Yes, I am.

**Q. Okay. And that was funded by Salina Kanvas Project?**

A. Yes.

**Q. Okay. And in paragraph seven here, do you see where it makes reference to the 2022 Boom!?**

A. Yes.

**Q. Is that referencing the 2022 Boom! festival?**

MS. JOKERST: Object to form and

foundation.

A. Not specifically.

BY MR. SHAW:

**Q. Okay. Do you know what department?**

A. Development Services.

**Q. Okay. All right. Shift gears now to talk specifically about The Cozy Inn. When did you first learn about the mural on the side of The Cozy Inn?**

MS. JOKERST: Object to form.

A. I don't remember the specific date, but I remember one of two things happening first. I either saw a picture on social media of the work in progress, or on a downtown drive, I came down 7th Street and saw it first and then saw it on social media. But those two things happened at about -- within hours of each other. I just don't remember --

BY MR. SHAW:

**Q. Okay.**

A. -- which order.

**Q. It's my understanding that your office is like a hundred yards or so away from The Cozy Inn. Is that correct?**

A. That is correct.

**recall, you said you don't know who initiated it. Is that correct?**

A. Correct. I'm pretty sure that I initiated the inquiry.

**Q. Okay.**

A. The same we would on any other business that might have a mutual impact.

**Q. Got it. And so if Exhibit 7 is with Leslie Bishop, is it then fair to say that Exhibit 6 would be between you and Lauren Driscoll?**

A. Yes.

**Q. Okay. Why did you inform those two individuals?**

A. I informed Lauren because that -- she is the person responsible for the staff that we rely on to provide us feedback on projects that might be in violation of either a city code or to get guidance on proper procedures to follow, and so that was the reason I reached out to her.

I reached out to Leslie because we work closely, as some of the text flow indicated, on other ancillary projects, including Artwork Alley. Leslie was involved as the business liaison to the businesses where we were going to paint and/or to help keep area merchants informed of our use of

to reach Colin and work with SDI, was just to be of help for a staff that had a lot of -- a lot of things in the air at that time. And so having known Steve for a number of years, I reached out to see if I could be of any assistance or help diffuse some of the negativity that was going on around the notice to suspend any further work on the mural.

**Q. Okay. Do you see here where you -- the sentence where it says he just wants his vision and dream to be permitted?**

A. Yes.

**Q. And vision and dream are in quotation marks. What did he describe his vision and dream as being?**

MS. JOKERST: Object to form and foundation.

A. Again, I can't remember kind of the introductory thing that led to our conversation -- or to that comment, but he just said why can't you just let me paint what I want to paint. This is my vision and this is my dream for The Cozy Inn, and Colin has captured what I wanted to say. And you've got art all over town. Why can't this, you know, be there. And so that's where the vision

and dream came. He was very passionate about this work and said similar things in two other meetings that I attended on -- one other meeting, I guess, that I attended that he said a similar thing.

BY MR. SHAW:

**Q. Is it fair to say that Mr. Howard believed that this was artwork?**

MS. JOKERST: Object to form and foundation.

A. I don't know what he -- yes, I think he may have considered it to be art.

BY MR. SHAW:

**Q. Do you believe he was trying to express some of his character and personality and ideas through artwork on the wall?**

MS. JOKERST: Object to form and foundation.

A. I can't speak to his character or personality.

BY MR. SHAW:

**Q. Okay.**

A. That wasn't ever made clear.

**Q. You mention here in the e-mail that Steve wanted to have some friends attend Monday's meeting. Was that a reference to the Monday**

MS. JOKERST: Object to form.
A. The mural entitled Symphony of Sunflowers is located on the right side of the -- of the illustration and is parallel with the bottom frame of the photograph and the top.
BY MR. SHAW:
**Q. Okay.**
A. And it kind of contains five large sunflowers, leaves and some birds, I think.
**Q. All right. If you could go to Exhibit 28 which would be the last one in your binder.**
A. Okay.
**Q. Does this exhibit depict a larger photograph of Symphony of Sunflowers?**
A. Yes, it does.
**Q. And in addition to the sunflowers you described earlier, does it also contain music notes?**
A. Yes.
**Q. Okay. Do you know what building this mural is painted on?**
A. What do you mean by what building?
**Q. Do you know what goes on inside this building?**
MS. JOKERST: Object to form and

foundation.
A. I don't know specifically what happens inside that building. I know next door is a symphony rehearsal hall.
BY MR. SHAW:
**Q. Okay.**
A. And I've used the back of that building. We used it as a store room for our Artwork Alley paint storage, but I don't recall that I've ever been in that building.
**Q. Okay.**
A. I think there may be a studio of some kind, a music studio possibly, but I can't say for sure.
**Q. Okay. Do you know who owns that building?**
MS. JOKERST: Object to form and foundation.
A. I believe it's owned by Gus and Hannah Applequist.
BY MR. SHAW:
**Q. Who are they?**
A. Gus is a -- well, it was formally -- I don't know that he plays now, but he owns Fili Creative, a multi-media video production firm in

Salina, and Hannah is a percussionist with the Salina Symphony. And I believe she also has some private students.

**Q. Okay. And the private students that she has, do those lessons take place in this building with the mural on it?**

MS. JOKERST: Object to form and foundation.

A. I don't know where she teaches her private students or if she even has any now. I haven't kept up with that.

BY MR. SHAW:

**Q. You said you believed a music studio of some sort was present in this building. Is that correct?**

MS. JOKERST: Object to form and foundation.

A. Yes.

BY MR. SHAW:

**Q. Would the musical notes in this mural relate to that business?**

MS. JOKERST: Object to form and foundation.

A. I am thankfully not a musician, and I can't read a note. I just love listening to

BY MR. SHAW:
**Q. Okay. All right. Let's move on to Exhibit 16.**
A. Okay. 16. Okay. This looks like a collection of screenshots from the Salina Arts & Humanities public art resource pages at our website.
**Q. Okay. And does this exhibit feature a specific piece of public art?**
A. It does.
**Q. And what piece of public art is that?**
MS. JOKERST: Object to form.
A. It references a photo mural at Fire Station No. 2.
BY MR. SHAW:
**Q. Okay. And is this one of the pieces of art that is like actually in the Salina Arts & Humanities Department's portfolio, I guess would be the word?**
MS. JOKERST: Form.
A. Yes.
BY MR. SHAW:
**Q. Okay. And so this was owned and funded by Salina Arts & Humanities?**
MS. JOKERST: Object to form.

**Q. I'm sorry. I wanted the picture of the Mural at the Mill, not the article about it. Let's go back to Exhibit 2. Sorry about that.**

A. 2?

**Q. Yeah.**

A. Okay. Okay.

**Q. And then in paragraph 2, that depicts -- I'm sorry. I'm all mixed up. Give me one second.**

MS. JOKERST: What exhibit number are you on?

BY MR. SHAW:

**Q. Let me just start this over. You're familiar with the Mural at the Mill, correct?**

A. Yes, I am.

**Q. Do you know if any business activity is currently occurring at that building?**

A. I am aware that the building is vacant and not engaged in a commercial activity.

**Q. And the Mural at the Mill depicts children playing Ring Around The Rosie. Is that correct?**

MS. JOKERST: Object to form.

A. That is correct.

BY MR. SHAW:

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs
_______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit H
# Windholz
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
ANDREA WINDHOLZ,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 2:00 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**come into The Cozy is to make a sale?**

MR. SHAW: Objection to form.

A. We just -- we don't really -- we don't really look for people to come in and purchase anything. We want them to come in and see the history within Salina. Like we are one of Salina's oldest running businesses, one of Salina's oldest restaurants. We want people to come in and see our history. And then, also, we encourage them to shop downtown. We tell them all the time like we have an amazing ice cream shop right around the corner. We have really cute boutiques. We tell people all the time about our local brewery right around the corner from us. So we just -- we really want them to just come stop in and see what Salina has to offer.

BY MS. JOKERST:

**Q. When customers come into The Cozy, do you encourage them to buy a burger?**

A. If they come in and they're like -- kind of like, oh, we just ate, blah, blah, blah, and we're like how about if you guys -- I mean we'll give you a burger on us. You're here, you should try, see what we're all about, see what people talk about. We don't encourage them to purchase,

no. We like -- we will give a burger to them. We won't make them purchase it most of the time. Like we'll just give it to them to try.

**Q. Okay. But if everyone came into The Cozy and you gave them a free burger, how would that affect The Cozy's business?**

A. We don't offer it to everyone. If we're busy, busy and don't have time to do that, then we won't obviously offer it. But if they come in and they're like, oh, we're just looking. We'll be like okay. Well, let us know if we can get you anything. We obviously don't give a free burger to everyone that comes in. It's just like when we're slow and we're talking to people and they're like, oh, we just came in to look. And we're like okay. Well, you know, this is what we're about, whatnot. And they're like, oh, we just ate. And then we can offer it. If they turn it down, they turn it down. But if they would like a burger to munch on and we're not busy at all and there's no one in the store, we'll do it that way. But we don't give them to everyone.

**Q. Okay. I'm going to talk a little bit about the merchandise sales at The Cozy. How much merchandise on average does The Cozy sell each**

A. I'm sure it was shortly -- shortly after.

**Q. Okay. Did your dad ask you -- well, let me ask this question. Did your dad show you any renderings of what the display was supposed to look like before it was painted on the wall?**

A. No.

**Q. Okay. Did your dad ask you for any input, for your input on the display?**

MR. SHAW: Objection to form.

A. No.

BY MS. JOKERST:

**Q. But from your post on Facebook, and I don't want to put words in your mouth, but was it your opinion that you thought the city was wrong for enforcing the sign code against that display on the north wall. Is that right?**

MR. SHAW: Objection to form.

A. I -- I mean I -- we didn't know there was a sign code when we started this.

BY MS. JOKERST:

**Q. Okay. But then you learned there was a sign code?**

MR. SHAW: Objection to form.

A. Yeah. Eventually, we did learn. We didn't know it was there, because we saw all the

others that were going around downtown and we just wanted to be a part of it.

BY MS. JOKERST:

**Q. Okay. Were you involved in your dad's Certificate of Compatibility application back in 2021 for the sign awning?**

A. No, because I was not in Salina.

**Q. Okay. So let's see. When were you not in Salina? What years were you out of town?**

A. 2017 to 2022.

**Q. Okay. And where were you residing then?**

A. Ellis County.

**Q. Okay. How far away from Salina is that?**

A. About an hour and a half.

**Q. Okay. So during that time, were you not working at The Cozy?**

A. I know at the beginning of the times of me being out there like 2017 to '19-ish, I did go back and forth every and again to work just for some extra cash. But other than that, no, I did not work there.

**Q. Okay. And your parents own Jenni's Liquor. Is that right?**

MR. SHAW: Objection to form.

A. Yes, they do.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs

________________________

Sandra S. Biggs, C.C.R No. 0716

# Exhibit I
# Schrage Email
# 11/8/23

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 5:17:40 PM
**To:** Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC:** jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject:** Cozy Inn Wall Sign #2
**Attachments:** Cozy Inn Code Summary.docx; APA-Ohio Sign Presentation 9-23.pdf; NH Article.pdf

Mayor Hoppock & City Commissioners:

Staff was in contact with Mr. Howard multiple times again today and thought that we had gained his understanding that we would meet with him on Monday to discuss the issue and options further. Lauren was recently contacted by KWCH requesting her to go on camera following their interview with Mr. Howard; she ultimately spoke with them by phone; we have been interviewed by Salina311 and we have seen social media posts indicating that Mr. Howard will be going on KSAL tomorrow morning.

Our intended message is that this question is not unique to Salina (see attached article). We regulate the size of commercial signs through a permit process. We were not contacted in advance (Mr. Howard asserts that it is a mural not a sign). The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code (see attached code summary). We are willing to work with Mr. Howard, but this is going to be a code revision and policy decision that will take some time. We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

IMPORTANT NOTE: Sharp Performance in the NE corner of 9th and Elm (north of the library) has a large wall sign that did not go through any type of permit process and has been unintentionally overlooked in terms of code enforcement.

I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown. He also indicated he does not do any kind of social media and he is trying to "go soft" in his interviews with the media suggesting he thinks we will be pleased with his comments.

Lauren has reached out to a consultant who is a planner and an attorney with a specialization in this topic who has assisted communities throughout the Midwest including Omaha. She will be submitting a proposal for our consideration. I have attached a slide show that she presented recently at a planning conference. I haven't attached the presentation as a proposes solution or an on-point discussion of our issue at hand. My primary points in attaching the presentation are that this is not unique to Salina, there are several legal considerations, it is very nuanced and complex and outside consulting would be very helpful if we want to quickly (a few months) develop a policy amendment that is similarly nuanced and takes in to account Salina specific feedback and direction.

Lauren is prepared to provide an overview of this issue during Other Business on Monday.

You are certainly welcome to contact me on my cell Friday and over the weekend.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Sincerely,

Mike Schrage
City Manager

Schrage
EXHIBIT NO. 26
APPINO & BIGGS

City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov

# The Cozy Inn Sign Analysis

## Sign Definitions

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

## C-4 Sign Regulations

**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.
   c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**The Cozy Inn Information and Background**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food “Hamburger Joint” in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.

The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building’s exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**Existing Conditions**

Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

1. North facing wall sign: 24.00 sq. ft.
2. 7th Street projection sign: 24.00 sq. ft.
3. 7th Street awning sign: 4.88 sq. ft.

   Total Sign Area: 52.88 sq. ft.

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**Proposed Hamburger Sign Analysis**

The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.




# FLAGS & MURALS OH MY!

CHALLENGING SIGN ISSUES POST-REED

2023 APA-Ohio State Conference

# AGENDA

How did we get here and what is going in the courts?



How can we deal with the tricky sign issues like flags, murals, and holiday decorations?



"It is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations."

*Granite State Outdoor Advertising, Inc. v. Clearwater*, 213 F. Supp. 2d 1312 (M.D. Fla. 2002).






© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

"Congress shall make no law . . . abridging the freedom of speech . . ."

frostbrowntodd.com © 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Judicial Review of Speech Regulations

Is the law content based or content neutral?

Based → **Strict Scrutiny**

- Narrowly tailored
- **Compelling** government interest

Neutral → **Intermediate Scrutiny**

- Narrowly tailored
- **Significant** government interest

**Usually unconstitutional**


© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Reed v. City of Gilbert, Arizona

- SCOTUS, June 2015.
- Permit required for ALL signs but several exempted categories:
  - Political signs.
  - Ideological signs.
  - Temporary directional signs.
- "Some facial distinctions based on a message are obvious . . . Others are more subtle, defining regulated speech by its function or purpose."
- Content-based → strict scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# City of Austin, Texas v. Reagan National Advertising, LLC

- SCOTUS, April 2022.
- On-premises v. off-premises signs.
- Not content based.
- "Unlike the regulations at issue in *Reed*, the City's off-premises distinction requires an examination of speech only in service of drawing **neutral, location-based lines. It is agnostic as to content.**"
- Content neutral → Intermediate scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Norton Outdoor Advertising, Inc. v. Village of St. Bernard, Ohio

- S.D. Ohio, June 2022.
- Sign regulation distinguished between on-premises and off-premises signs.
- Village's safety and aesthetics goals were substantial government interests.
- The sign regulations are designed to "protect the safety and general welfare of the public who travel I-75 within the Village."
- In *City of Austin*, the Supreme Court concluded that on/off-premises distinctions are content-neutral.

Detail at 1:1 from center of the map.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000233

# LaCroix v. Town of Fort Myers Beach, Florida




- 11th Circuit 2022.
- "Laundry list" of prohibited signs, including "portable" signs.
- "There is no dispute that portable, handheld signs often convey **political, religious, or personal** messages."
- Highly protected speech.
- No alternative channels of communication.
- Content neutral, but still unconstitutional.


© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Willson v. City of Bel-Nor, Missouri

- E.D. Missouri, 2020.
- One yard sign and one flag per residence.
- No window or wall signs.
- Expansive definition of "sign."
- Overbroad and not narrowly tailored.
- Under the ordinance, all banned:
  - Christmas lights.
  - Happy birthday balloons on mailbox.
  - Security system sticker on window.
  - "Welcome Home" banner.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# The bottom line.

- Categorizing types of speech can get you into trouble.
- Leave open "ample" channels of communication.
- Examine your sign laws: do they prohibit more than intended?

frostbrowntodd.com © 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# WENDY E. MOELLER, FAICP



WENDY E. MOELLER, FAICP

Principal and Owner

Compass Point Planning







1
2

CITY000237

# NOW WHAT?

You have the legal background, which is critical to understanding the risks…but now but?

Even with the legal restrictions, there is still a lot you can't do.

Keep in mind…

1. **There is no perfect sign code model.**
2. There is always going to be a little grey area.



# PERMANENT SIGNS

## THE EASY PART




**A permanent sign is a structure much like a fence, shed, or building – Establish the types allowed**

- Wall signs
- Projecting signs
- Monument signs
- Pole signs
- Window signs
- Awning signs
- Digital signs
- And so on…









CITY000239

# PERMANENT SIGNS

## THE EASY PART




**Set up the rules for height, area, location, lighting, materials, digital, etc.**

- All are forms of content neutral regulations
- All are going to be based on community policy




CITY000240

# PERMANENT SIGNS

## THE EASY PART

SCOTUS gave communities the ability to make on-premise versus off-premise distinction so easy to deal with billboards.

Prior to this, many communities simply dropped the distinction. If no signs were large enough to be billboards, then billboards are essentially prohibited







CITY000241

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

- No simple solution
- Art is a form of a message
- Some communities simply prohibit any painted wall sign, regardless of whether it would be considered art or a sign.






CITY000242

# PERMANENT SIGNS

## THE CHALLENGE - MURALS

**Some communities take a calculated risk of making a commercial vs. noncommercial message distinction.**

- Focus on the facades that can be painted
- Materials (paint or banners)
- % of coverage
- General design principles




CITY000243

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

**Some communities have a special design review.**

- Sometimes by a government-based board but others by an arts group/board
- The design criteria can be written in a content-neutral manner
- But happens when that group doesn't like the message?




CITY000244

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

**Keep in mind…**

- Art is in the eye of the beholder
- Most communities do not regulate how you paint a home
- Graffiti – Illegally placed art but not always terrible and sometimes encouraged



Noncommercial message on a residential garage door




"Graffiti" along the Donaukanal in Vienna

CITY000245

# PERMANENT SIGNS

## THE CHALLENGE - FLAGS ?

- Flags can be signs too…
- Many sign codes exempt US, State, and religious flags. **Don't do that!!**
- Focus on the support structure (poles/posts)
- At the most – commercial versus noncommercial distinction








CITY000246

# TEMPORARY SIGNS

## THE KIND OF EASY PART







Definitely temporary signs!

**Temporary signs are a little more challenging…**

- The entire structure is temporary or portable, and not intended to be a permanent installation.
- However, tough to place time limits on every temporary signs because some need longer time frames
  - Real estate signs?
  - Political/opinion signs – Free Speech is year-round!




Temporary Sign?

CITY000247

# TEMPORARY SIGNS

## THE EASY PART

**You can pick and choose what TYPES of temporary sign structures to allow or prohibit!**

- Yard Signs
- Banner Signs
- Feather Signs
- Air-Activated Graphics
- Balloon Signs
- Sidewalk Signs
- And so on…












CITY000248

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT

- Temporary signs are where the vast majority of content-based regulations are found.
- There is no easy solution – all approaches have pros and cons
- It is a matter or risk, and to some extent, the level of things you want to deal with in your job.












CITY000249

# TEMPORARY SIGNS




## THE CHALLENGE - CONTENT ?

### Door #1 – 100% Content-Neutral

- Safest bet from a legal standpoint
- Most communities establish the maximum number, size, and aggregate area of temporary signage allowed, as well as set the types
- Have to allow a reasonable amount of signage to accommodate all temporary sign and speech needs – There is no magic number.

No matter how much signage you allow, it is very likely it will be an enforcement nightmare at elections.

TABLE <> TEMPORARY SIGN ALLOWANCES

| Zoning Districts | Residential | Nonresidential | |
|---|---|---|---|
| Time Limit | Unrestricted | Unrestricted | 30 Days per Quarter [1] |
| Maximum Number or Area per Lot | 40 Square Feet | 40 Square Feet | 20% of Permanent Building Signage Allowed or 36 Square Feet, whichever is Less |
| Maximum Sign Area per Sign | 6 Square Feet | 16 Square Feet | |
| Maximum Height | 4 Feet | 6 Feet | 6 Feet |
| Permitted Sign Types | Window or Yard | Banner, Sidewalk, or Yard | Banner, Feather, or Yard |
| Zoning Permit Required | No | No | No |

[1] A quarter shall be defined as evenly timed quarter of the calendar year (January to March, April to June, July to September, and October to December).

CITY000250

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT

### Door #2 – Commercial versus Noncommercial Distinction

- Slight legal risk because it is unclear if communities can make the distinction
- Cannot be more restrictive on the noncommercial message signs
- Cannot go beyond commercial versus noncommercial distinction
- Makes administration and enforcement easier, especially around elections

**Table 1163.13-1: Temporary Sign Allowances**

| Message | Non-Commercial Message | Commercial Message | | | |
|---|---|---|---|---|---|
| Zoning | All Districts | Residential Districts[1] | Nonresidential Districts | Nonresidential Districts | Nonresidential Districts (New Use)[2] |
| Time Limit | Unrestricted | Unrestricted | Unrestricted | 30 days, twice per year | 60 days |
| Maximum Number or Area per Lot | Unlimited | 2 signs | 12 sq. ft. per each 100 lineal feet of frontage | 64 sq. ft. | Equal to number of existing permanent signs |
| Maximum Area per Sign | 32 sq. ft. | 8 sq. ft. | 12 sq. ft. | 64 sq. ft. | Equal to area of permanent sign to be covered |
| Maximum Height | 4 ft. | 4 ft. | 6 ft. | 6 ft. | Equal to height of existing sign to be covered |
| Permitted Types | Yard, Window | Yard, Window | Yard, Banner | Yard, Banner, Vehicle[3] | Banner |
| Permit Required | No | No | No | Yes | Yes |

Note 1: Any conditionally permitted use located in a residential zoning district shall be permitted the same amount of temporary signs with a commercial message as allowed in nonresidential zoning districts.

Note 2: Regulations applicable to the establishment of a new use within an existing building where there is existing permanent sign to be covered by a temporary sign.

Note 3: Notwithstanding the provisions of *Section 1163.06.Q*, temporary signs may be permitted on vehicles (not trailers) that are operable, display current plates and registration and are parked in paved parking areas in a manner not obstructing traffic circulation.

# TEMPORARY SIGNS

## THE CHALLENGES

- **Obscenity**
  - Don't do it. You can try the "neighborly" way and ask for items to be removed but avoid governmental enforcement
- **Holiday celebrations**
  - Some communities maintain an exemption but that could still be considered content-based exemptions.
  - Other communities just avoid having regulations related to them.










CITY000252

# TEMPORARY SIGNS

## THE CHALLENGES ?

- **Human signs and vehicle signs**
  - A lot of communities just avoid regulations and hope for the best.
  - Some focus on location.
  - The toughest part is when is it intended to be a sign?













CITY000253




# QUESTIONS?

**Scott D. Phillips**
sphillips@fbtlaw.com
513.870.8206

**Wendy E. Moeller, FAICP**
wmoeller@compasspointplanning.com
513-543-8651


LEAVITT'S
COUNTRY
BAKERY
OPEN
NOW
ACCEPTING
VISA

72°

TRENDING 24/7 streaming news Clear the Shelters Red Sox trades? Guide to College...

LOCAL

In-depth news coverage of the Greater Boston Area.

ART

# Pastry Mural Pits Bakery Against NH Town in Free Speech Suit

Where is the line between art, and advertising? The unresolved question is testing the direct democracy of a small New England town, where a painting of pastries has led to zoning dispute, a First Amendment lawsuit and a local vote

By Kathy McCormack and Robert F. Bukaty • Published April 18, 2023 • Updated on April 18, 2023 at 11:42 am

Bakery owner Sean Young was thrilled when high school art students covered the big blank wall over his doorway last spring with a painting of the sun shining over a mountain range made of sprinkle-covered chocolate and strawberry donuts, a blueberry muffin, a cinnamon roll and other pastries.

The display got rave reviews, and Young looked forward to collaborating with the school on more mural projects at his roadside bakery in Conway, New Hampshire.

Then the town zoning board got involved, deciding that the pastry painting was not so much art as advertising, and so could not remain as is because of its size. Faced with modifying or removing the mural, or possibly dealing with fines and criminal charges, Young sued, saying the town is violating his freedom of speech rights.

The painting could stay right where it is if it showed actual mountains, instead of pastries suggesting mountains, or if the building wasn't a bakery.

**_Get Boston local news, weather forecasts, lifestyle and entertainment stories to your inbox. Sign up for NBC Boston's newsletters._**

“They said it would be art elsewhere,” Young told The Associated Press in an interview. “It's just not art here.”

“The town should not have the right to police art,” he said.

The controversy has residents of this town of 10,000 grappling with big questions about creativity and liberty as it tries to preserve its rural character. Like other White Mountain communities that draw skiers, nature lovers and shoppers, Conway is under development pressure, making the sign dispute fraught with worries that any concession to commerce could change what they hold dear.

Many — including the zoning board members — applauded the students' colorful work, but said rules must be followed, even if they're old and outdated. At about 90 square feet (8.6 square meters), the mural is four times bigger than the sign code allows.

5:53
Here's a Sneak Peak of ‘Life, Liberty and the Pursuit of New Hampshire' – Streaming Now on NBC10 Boston

Life, Liberty, and the Pursuit of New Hampshire follows a libertarian political migration known as the Free State Project. Twenty years ago, one man penned a manifesto encouraging 20,000 libertarians to sign a pledge and move to the Granite State for more freedom. Now "The Free State Project" is shaking up politics and communities in New Hampshire and growing in strength and numbers.

Following a longstanding democratic tradition of New England town meetings, residents deliberated how to define a sign before ultimately voting down changes last week. The local newspaper said the proposed wording wasn't clear. Ultimately, a judge may have to resolve what remains an open debate in town.

"Those kids put their heart in it," retiree Steve Downing said. He thinks the painting should stay.

"Everyone has to comply with the ordinance," said Charlie Birch, a former U.S. Forest Service worker. "And even though it was done by the students, which was well done, and I give them a lot of credit for it ... if you have the ordinance, 'One for all,' that's where we are. You can't really make any exceptions, otherwise everybody else will want the exception."

Art teacher Olivia Benish, who worked with three students on the project, apologized to the board in September for not doing "due diligence" to make sure the mural would comply. She didn't respond to requests for an interview. But she told the board members that there has to be a way to give students the opportunity to create positive public works of art "without upsetting the law and the powers that be," according to the town minutes.

The lawsuit Young filed in January argues that the town is unconstitutionally discriminating against him. He asked a judge to prevent the town from enforcing its sign code.

And now other businesses have been drawn into the controversy.

**More New Hampshire news**



**APR 17**

Trump Holding April Campaign Event in Manchester, NH



**APR 17**

Mass. Woman Arrested After Leading Police on Chase Through Several NH Towns



APR 12

Catalytic Converter Theft Ring That Sawed Thru Mass., NH Is Busted, Feds Say

Long before the pastry painting was installed, the town had allowed other murals at a local shopping center, but in December the town found that three of those artworks are, indeed, signs that violate size limits. They go before the zoning board on Wednesday.

Young, who is being represented by the Virginia-based Institute for Justice, asked for $1 in damages. Meanwhile, he's selling T-shirts as a high school art department fundraiser, saying "This is Art" with the artwork on the front, and "This is a Sign" of a roadside "Leavitt's Country Bakery" sign on the back.

"As Conway officials have confirmed, the town does not consider a painting to be a "sign" if it does not convey what town officials perceive to be a commercial message," the lawsuit says. "But the town's perception is that any mural depicting anything related to a business is a 'sign.' This is governmental discrimination based on the content of the speech" and the speaker's identity, it said.

The lawsuit says the town's sign definition is "incredibly broad," with no mention of murals in the code: A sign in Conway is "any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of any person or entity, or to communicate information of any kind to the public, whether commercial or noncommercial."

> ***Get updates on what's happening in Massachusetts to your inbox. Sign up for our News Headlines newsletter.***

Board member Luigi Bartolomeo said he thinks the pastry painting is art, not advertising. He read the definition out loud at the board's meeting in August, and said he agrees with a local attorney who called it "unconstitutionally vague."

"I think it's a very badly written piece of code here," said Bartolomeo, who recently retired. But Board Chairperson John Colbath said the board has to work with the ordinance, which was approved by voters, and that there is a process to change that.

"If they had done a seasonal mural on the wall — covered bridges and sunflowers and what have you — and it did not represent what your business is in, then it would be more likely to be a well-respected piece of art and not construed as a sign," Colbath said at the August meeting.

He said to Young, "I understand the art thing — and you look and you see a mountain — but the general public sees donuts on the front of the bakery."

"I think most of the people said it's art," Young responded.

In its denial of Young's appeals, the board concluded that the bakery won't be negatively affected without the display.

"This supposed distinction between murals and signs shouldn't matter," attorney Betsy Sanz of the Institute said in a news release. "After all, nothing in the First Amendment distinguishes between art and commercial signs — or commercial speech of any kind."

The town and Young agreed in February to pause court proceedings — and any potential fines or charges — pending a vote on a revised definition that would allow the painting to stay. But it failed in last week's elections, with 805 to 750 voting against it, according to the town clerk's office. The judge now wants to hear from both sides by May 10.

"We're ready to keep going," Young said.

Town Manager John Eastman declined an interview, referring questions to town lawyer Jason Dennis, who said he would soon meet with town officials to discuss next steps.

The Conway Daily Sun offered its analysis in an editorial last week: "Voters smartly concluded that the proposed new definition of signs would only further complicate enforcement. That said, it is not a stretch to conjecture that most voters are fine with the murals at Leavitt's Country Bakery and Settlers Green. We suggest the town figure out a way to back off enforcement until a clearer definition can be written, one that accommodates 'art.'"

Copyright AP - Associated Press

This article tagged under:

# Exhibit J
# Benson Deposition

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
COLIN BENSON,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:26 a.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**Q. -- and we're good. I don't expect you to have, you know, absolute perfect memory of everything that was said. But okay. So that's helpful. So you added the burger. Do you know if -- I mean kind of thinking back on this looking at these photos that you initially sent Steve, can you recall if Steve was the one who told you he wanted the burger --**

A. No.

**Q. -- and the lettering?**

A. No. This -- the burger invasion is all me. I created the whole burger invasion. He told me his story of the burgers coming from Saline, you know, and everything. After that, I took it on my note to do the whole wall.

**Q. Okay.**

A. This was not his -- he was not wanting to do anything like that at first.

**Q. Okay. And what I'm talking about now, though, are these initial photos. So I don't think, and I'm looking at this, it doesn't appear to me that this was referred to, these initial, and I'm looking at like page 1 and 2, the photo renderings that were sent there that were initially referred to as the burger invasion. Is**

A. Yes.
**Q. Okay. And he said he should unload his gun and back off. Do you see that?**
A. Yes.
**Q. What did he mean by that?**
MR. SHAW: Objection to form.
A. Honestly, I don't know what he was -- what he was saying or thinking on that.
BY MS. JOKERST:
**Q. Okay. But you responded. You said LOL, right. Do you see that?**
A. Yes.
**Q. Okay. That means laugh out loud?**
A. Yes.
**Q. Okay. So why did you respond LOL if you didn't know what he meant?**
A. The whole -- the whole meeting we had was about a sign, and, therefore, there was no mural spoken of any of this with the city. And to me, it's funny because it is artwork. I don't work for a sign place. And all of the negativity maybe would have been the guns, what he was referring to. But, again, I have no clue what he was thinking. But I think of my murals as artwork, not signage, even how it is.

**Q. Okay. Was there -- is there a business inside the building that you painted on?**
A. Oh, yes.
**Q. Okay. Do you know what that business was?**
A. No.
**Q. Okay. Did the sign that -- or, I'm sorry, the project that you painted at the alleyway in Junction City, did it contain any lettering?**
A. No.
**Q. Did it contain any identification of the name of a business or product?**
A. No.
**Q. Okay. Did -- was that a part of like an art fair or something that was sponsored by the city --**
A. No.
**Q. -- of Junction City?**
A. No.
**Q. Okay.**
A. Just a -- maybe a cleanup of the city, add some color to, you know, the alleyways.
**Q. Okay. And in Salina, what kind of projects have you done other than The Cozy?**

A. The Riverfest -- the Smoky Hill Riverfestival.
**Q. Okay.**
A. I've done the mural there 20 years.
**Q. Okay. Every year for 20 years?**
A. Every year.
**Q. Okay. The Riverfest, is that something that's done by the City of Salina?**
A. Yes. It's held by the city.
**Q. Okay. Are you paid for that work?**
A. Yes.
**Q. Okay. And so does the City of Salina like contract you to do work for that festival?**
A. Yes.
**Q. Okay. And they've done that for 20 years?**
A. Yes.
**Q. Okay. Who do you work with on that project?**
A. The new director. I'm trying to remember her name. Leslie Bishop is the main director of the Arts Center. Then it was Crystal. I don't remember her last name that goes through the Riverfestival part.
**Q. Okay. And Crystal works for the city?**

A. Yeah.
**Q. They reached out to you. And did you fly back from -- or travel back from Denver to Salina to do that?**
A. Yes.
**Q. Okay. All right. So we've got Sharp Performance, Cozy, Riverfest. Anything else in Salina?**
A. Bike Tek.
**Q. What's that?**
A. Bike. Yeah, Bike Tek.
**Q. Bike Tek?**
A. Um-hum.
**Q. Okay. What did you do there?**
A. Pedals on one side and cranks on the other.
**Q. Okay. And was that on the outside of the building?**
A. Absolutely.
**Q. Okay. All right. For Bike Tek, did they -- did they also just reach out to you by word of mouth or how did they get in touch with you?**
A. I've known the owner since a kid -- since I was a kid.
**Q. Okay. So they already knew that you**

A. Yes.
**Q. Okay. Where was that meeting held?**
A. The Salina Arts Center, I believe, is what it's called. Salina Arts Center Museum.
**Q. Was it the Smoky Hill Museum?**
A. Smoky Hill Museum. There you go.
**Q. Okay. And who was at that meeting?**
A. Leslie Bishop, Brad Anderson, two city workers or city people that I do not remember, Michael -- Michael somebody with the -- he was the head of the permit. Mike, Michael something. And maybe one or two other people that I don't remember their names.
**Q. Was there someone from the city named Dustin Herrs there?**
A. What did you say?
**Q. Was there someone from the city named Dustin Herrs there?**
A. Dustin. Maybe.
**Q. Okay. Other than people from the city, who was in attendance at that meeting?**
A. Steve, myself and two other -- two other people that were sitting against the wall.
**Q. Okay. Was your dad there?**
A. Yeah, it was like I don't remember, but I

think he might have showed up later, because it was like a closed door open door deal. Like they said it was closed door and then they allowed people to come in, if that makes sense.

**Q. Okay.**

A. So, yeah. So I believe he did walk in at the end.

**Q. Okay. And what was discussed at that meeting?**

A. There were sign permits put in front of us before I even got into the room or put on the table, and it was about why we didn't get a sign permit is what I remember.

**Q. Okay. So did the city inform you at that meeting that they considered the display a sign?**

A. Correct.

**Q. Did the city inform you at the meeting that the display was too large to qualify for a sign permit?**

A. Correct.

**Q. Okay. Did the city give you a handout that had like an analysis about the sign and the size?**

A. Yes, I believe so.

**Q. Okay.**

**were at that meeting?**

A. Yes.

**Q. Okay. What did you say?**

A. I don't believe it was a signage being put up. I believe it's a mural. It had nothing to do with what we were there for. And I was shut down pretty quick. So that was about all I had to say.

**Q. Okay. Did they explain to you at the Smoky Hill Museum, and by they I'm talking about representatives of the city, why they considered it a sign?**

A. Yes.

**Q. Okay. What did they tell you?**

A. The hamburgers are basically the same thing he sells and, therefore, it would be signage.

**Q. Okay. Prior to this meeting at Smoky Hill Museum, had you already heard that the city considered that display a sign?**

A. No.

**Q. Okay. So Steve didn't tell you the conversations -- did Steve talk to you about the conversations he'd had with the city prior to that meeting?**

formally admit Exhibit B into the deposition record.

BY MS. JOKERST:

**Q. Let's have you look at Exhibit C. There's two pages there. I'll just have you flip through them. Okay. Are these -- what's in this document? Are these your Facebook posts?**

A. Yes. Those are Facebook posts that I put out there about the mural.

**Q. Okay. And are these true and accurate depictions of the post that you placed on Facebook?**

A. Absolute -- yes.

MS. JOKERST: Okay. I'll move to formally admit Exhibit C into the record, the deposition record.

BY MS. JOKERST:

**Q. Okay. So let's look at page 2. And we've talked about there before on the other exhibit. This one's a little more clearer, so we'll look at this one. This is your post from November 5th, 2023 and you said, oh, you can smell the love I'm throwing down on the Cozy?**

THE REPORTER: She's on C.

A. Oh, C. My bad.

**Q. Okay. So why did you send this rendering to Mr. Howard?**

A. This is -- this is the ending of all of it. The mothership is the big burger, and basically the lights weren't done on that. But this is the end rendering of all the spaceship burgers on the whole building.

**Q. Okay. But this is different than the rendering that you started painting on the building, right?**

A. No.

**Q. Well, you told me that you had outlined everything by the 5th, right?**

A. On that section. I wasn't able to do the whole building.

**Q. Okay. On that section --**

A. Yeah, I started doing the section.

**Q. Okay. But you're talking about the section on the left, right?**

A. Yeah, the big burger, yes.

**Q. Yeah. Okay. So let's take a look at Exhibit F. Okay. Go ahead and take -- there's four photos there. Do you recognize these photos?**

A. Absolutely.

**Q. Okay. What are they?**

**Q. Okay. That's painted in, right?**
A. Partial.
**Q. Okay. Well what -- what's not painted in there?**
A. The meat, the pickles, pretty much none of the top because that -- the cockpits are all see through, so I have to paint everything before I can do a see through cockpit on top of it because it's transparent. Therefore, if I would paint through transparency, it wouldn't be transparent. So I would paint the burger first. Then I add the cool details and stuff afterwards as kind of the rendering of the very last Exhibit N.
**Q. Okay. Well, aren't the cockpits at Jenni's Liquor, those are transparent, right?**
A. Yeah.
**Q. Okay. So then why were those outlined in the painting at Jenni's Liquor? So let's take a look at that. I want you to take a look at Exhibit I.**
A. I used the background color as they're see through.
**Q. Okay. But I want you to look at Exhibit I. That stencil is complete, right?**

A. Yes.
**Q. And there's no outline there of any depiction that could be considered a UFO driver of, is there?**
A. No.
**Q. Okay. One second. And on the big burger in the middle, there's no outline of a depiction of what could be a UFO driver there, right?**
A. No, there is not.
**Q. So I want to go back to. Actually --**
MS. JOKERST: Okay. I actually don't have any further questions.
RECROSS-EXAMINATION
BY MR. SHAW:
**Q. Was it your intention when this mural was finished to have cockpits and aliens on the burger UFOs?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. You may answer.**
A. Every single one.
**Q. Okay.**
A. I stated earlier that it was the mother ship, and it was going to have lights and everything. When you do transparent stuff, you

# CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit K
# Blase Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
JESSICA BLASE,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 3:56 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

A. Um-hum.
**Q. Okay. And what did he tell you that it was supposed to depict?**
A. Spaceships that looked like hamburgers.
**Q. Okay. When you talked to Colin about the painting, was there anyone else around?**
A. Not that I can remember.
**Q. Okay. Prior to Colin starting the painting, did he -- I understand that he came into The Cozy to talk to Steve about the display. Were you around when Colin was in The Cozy talking to Steve?**
A. I was there at work, yes.
**Q. Okay. Did you hear what they were talking about?**
A. No. They were mainly in the back. I was busy working.
**Q. Okay. Okay. And then at some point, did someone from the city call The Cozy?**
A. Someone did call, yes.
**Q. Okay.**
A. I don't know -- I can't remember his name. I know it was a male. He called, asked if Steve was at work. I said he wasn't. He said that he needed to call him ASAP and to not paint

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit L
# Schrage Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
MICHAEL SCHRAGE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:09 a.m. on the 11th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

A. City manager.
**Q. What do you do as city manager?**
A. I guess you'd say the chief executive officer of the organization. I oversee all of the personnel, the various departments of the city, and then I answer to the governing body.
**Q. And the governing body, do you mean the city commission?**
A. Yes, mayor and city commissioners.
**Q. How many departments are there?**
A. 13-ish.
**Q. And how many employees, roughly?**
A. 450 full-time. It doesn't count classified part-time or seasonal part-time.
**Q. How long have you been city manager?**
A. Since middle of 2018, so going on five and a half -- five years.
**Q. What did you do before becoming city manager here?**
A. I was deputy city manager.
**Q. At the City of Salina?**
A. Yes.
**Q. Excuse me. How long were you deputy city manager?**
A. 13 and a half years, 2005 -- December of

**Q. So turning to around November 3rd, 2023, when was the first time you were made aware of the artwork at the Cozy?**

A. The reason I laugh, is I'm not good -- I'm good at generalities but not specifics. My recollection is I was sitting in my recliner one evening. I think it was Sunday night kind of piecing together some of the other conversation and was made aware that it was being painted and they'd been contacted and had the concern conveyed.

**Q. Do you remember who contacted you?**

A. It was either Brad Anderson or Lauren Driscoll, but I'm not sure.

**Q. I think you said piecing together a conversation. What did you mean by that?**

A. Just in terms of the date of it being a Sunday evening.

**Q. What was your reaction?**

A. I knew it was going to be a difficult, confusing, emotional conversation.

**Q. Why is that?**

A. I've been doing city management for 35 years. It just -- that was my instinct. And so my reaction was how do we -- how do we prepare to

have a productive conversation managing up, down and out, as I described before.

**Q. Do you recall if whoever notified you whether it was Brad or Lauren, did they call you or text you or e-mail you? Do you recall?**

A. I guess I don't. I thought it was a text, but in reviewing my texts in response to this previously, I didn't find it. So maybe it was a phone call.

**Q. Is that typical for a staff member to call you on a Sunday night?**

A. It's not uncommon. Not typical, but between texts, e-mails, phone calls, yeah, multiple times a week.

**Q. Why -- or was this a little bit out of the ordinary that somebody would reach out to you on a Sunday evening about --**

A. Yeah. I mean it -- yes.

**Q. Is it because of the nature of the Cozy Inn?**

A. Combination of that, and I think by the time they contacted me, they had a sense that it had kind of taken on a public level of conversation that was going to get ahead of myself, city commission, others and they wanted me

to know that.
**Q. What does that mean, get ahead of you?**
A. Social media conversation. Generally, I want to be aware as much as I can be, and then I want to make the city commission aware rather than hear about it secondhand and be caught off guard.
**Q. When either Brad or Lauren contacted you Sunday night, did they tell you that a determination had been made about whether it was a sign or not?**
A. No. I mean I think the -- what they conveyed to me was the concern that it was and that there was going to need to be a conversation with the owner.
**Q. The owner being?**
A. Steve Howard.
**Q. Got it. So had you seen the display by Sunday evening?**
A. No.
**Q. When was the first time you saw the display?**
A. Driving into work about 6:30 Monday morning, I think.
**Q. All right. And do you drive past the Cozy every day?**

**Q. What else?**
A. I think that was it.
**Q. A printout of the codes and how they're interpreted. Is that what you said?**
A. For the purpose of having a conversation with Steve and his artist about how -- what the applicable code was relative to what he had started.
**Q. Did you -- and forgive me, you think you saw Dustin Herrs give that packet?**
A. Yeah, that's my recollection.
**Q. Okay. So going back to Deposition Exhibit 19, I just want to make sure I understand, the determination had already been made by November 8th that the artwork was a regulated sign?**
MS. JOKERST: Object to form and foundation.
A. Yeah. I would say my preliminary opinion based on what I saw was that it met the definition of a wall sign.
BY MR. MACROBERTS:
**Q. On the next sentence, what did you mean when you said while it aesthetically might look similar to murals in the downtown elsewhere, it**

**contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things?**

MS. JOKERST: Object to form.

A. So I was trying to boil down the applicable portion of the sign code definition and how it is that the Cozy sign met the definition of a sign by our code and then became subject to the applicable size limits.

BY MR. MACROBERTS:

**Q. And what part of the code were you trying to boil down?**

MS. JOKERST: Object to form.

A. All the content of the definition of a sign or at least parse out what was applicable in this case.

BY MR. MACROBERTS:

**Q. And what was your understanding of what was applicable on November 8th?**

A. Advertising --

MS. JOKERST: Object to form.

A. Advertising among -- I don't have the definition committed to memory but directing attention to and advertising.

**Q. Would you please say that again?**
A. I believe the commercial signs, advertising signs, are a subset of the signs that we regulate.
**Q. If you look a little bit down below, underneath the part that says Important Note. That's the easiest way to kinds of reference it. You wrote to the city commission that I recently spoke with Mr. Howard?**
A. So apparently I did, yes.
**Q. And I'm hoping maybe that jogs your memory.**
A. Yeah. So I have a better recollection I guess of how this timeline played out relative to becoming aware, being contacted by the media, having a conversation with Mr. Howard and then in preparation for -- well, and then him going on the radio and fielding comments about his comments on the radio and then having a conversation with him.
**Q. Did you call Mr. Howard?**
A. Yeah, I probably did.
**Q. Do you recall why you did?**
A. Really just trying to calm things down a bit, have the conversation be at our level rather than have it be a social media fire storm possibly

uninformed, trying to have some collaborative dialogue and have cooler heads prevail.

**Q. I think you mentioned a couple of times either today or through e-mails that you thought this was an emotional conversation?**

A. Um-hum. For him. For Steve it was.

**Q. Is that a yes?**

A. Yes.

**Q. Steve in your estimation was upset he couldn't finish his display?**

A. He -- I don't know what upset him, but he was moved to tears.

**Q. On the phone or in person?**

A. In person and at the city commission meeting.

**Q. Was he actually crying or just he had tears in his eyes?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. I'm just trying to figure out what you meant, moved to tears.**

A. Yeah. My recollection of him leaving the city commission meeting was that he was crying. The meeting we had at Arts & Humanities may have been tears in his eyes, but he was emotional.

**Q. Do you recall giving a media interview to KSN?**

A. Yes.

**Q. Have you reviewed -- did you see the version that was aired?**

MS. JOKERST: Object to form and foundation.

A. At the time.

BY MR. MACROBERTS:

**Q. If you would, please, turn to Deposition Exhibit 92.**

A. Okay.

**Q. I can't tell from my electronic version whether this is 304 or 305. But there's a quote that's attributed to you?**

A. Okay. There's one at the bottom -- starts at the bottom of 304 and rolls over to 305.

**Q. I'll read to you the quote. It includes a message that pertains to the good or services for sale and that makes it a sign and makes it subject to the sign code said Mike Schrage, Salina City Manager. Do you see where --**

A. Yes.

**Q. -- that is?**

A. Yeah.

**Q. You said that to the reporter?**
A. Yeah, I believe so.
**Q. There's no reason to think you didn't say that, right?**
A. Right.
**Q. Okay. If you could please turn to Deposition Exhibit 39.**
A. Okay.
**Q. What is -- and you might laugh at this question. What is a City Manager Update?**
MS. JOKERST: Object to form.
A. It's a document that I draft most weeks. I haven't been doing nearly as well lately. But just trying to summarize various things that come up to keep the city commission informed.
BY MR. MACROBERTS:
**Q. Is it typically a weekly summary?**
A. That's the goal. Yeah, that's the goal.
**Q. Did you author -- I know I'm already laughing at this question, but did you author the City Manager Update that's at Deposition Exhibit 39?**
A. Fair question. If I could get somebody else to, I would but, yes, I did.
**Q. Including the e-mail?**

A. Okay.

**Q. I'm just trying to get a timeline of things. On page 3, you told the city commission that, quote, we met with Mr. Howard and his artist this morning. Were you in that meeting?**

MS. JOKERST: Object to form.

A. Yes. That was the meeting at Arts & Humanities, I believe. The look on your face makes me wonder, but I believe.

BY MR. MACROBERTS:

**Q. I'll represent to you that the city commission meeting that we're talking about is -- and you can go to Deposition Exhibit 2, page 1 held on November 13th.**

A. Yeah. My recollection, I'd have to piece it back together, I guess, is when I first became aware, there already was social media, community conversation going on. Brad Anderson had already offered to convene a meeting, and we met at Arts & Humanities that Monday morning.

**Q. So that Sunday that you talked about that you first heard about it was November 5th, right?**

A. Off the top of my head, I don't know. Without some other documents, I don't know for sure.

**Q. Did you meet with Steve the day of the city commission meeting on November 13th?**
MS. JOKERST: Object to form.
A. Yes. On line 24, I said we met with Mr. Howard and his artist this morning, so I presume that November 13th was the date, and I met with him the morning of November 13th.
BY MR. MACROBERTS:
**Q. Part of why I'm asking this question, sometimes people say we and they're speaking about other people?**
A. Sure.
**Q. So --**
A. No. This reference is intended to include me.
**Q. On page 4, lines 13 through 15, you were telling the city commission you wanted to clarify a couple of things. And you told the city commission that, quote, the issue is not about the art. What did you mean by that?**
A. I was --
MS. JOKERST: Object to form.
A. I was trying to proactively respond to the accusations that were flying about the community that we had vetoed this particular

**Q. Based upon your understanding of the code, the display or the art does factor into whether it's deemed a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why is that?**

A. It's not about the art. It's about the definition of a sign.

**Q. And when you're talking about the definition of a sign, you need to look at the display to figure that out. Is that right?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. What are the -- so we're going to stick with page 4 for a little bit here. What are the examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated. What are those examples?**

A. Well, the one --

MS. JOKERST: Form and foundation. I've got to get my objection in.

station was conflating a lot of broad topics not applying our code.

BY MR. MACROBERTS:

**Q. So as you understand the city code, that display is a regulated sign?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. What did you mean when you said we do not regulate based on aesthetics?**

MS. JOKERST: Object to form.

A. Again, I was trying to confirm that we -- this was not an opinion of whether we like the aesthetic aspects of the sign. It was purely a question of is it a sign and does it meet our codes.

BY MR. MACROBERTS:

**Q. And I think later on you commented that the mural popped?**

MS. JOKERST: Object to form.

A. I did or a commissioner did. I've got to confirm that a commissioner did.

BY MR. MACROBERTS:

**Q. Later on you told the city commission, quote, and I would reiterate it's all on the basis**

**of a commercial message. Do you remember saying that?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. And that was truthful and accurate?**

MS. JOKERST: Object to form and foundation.

A. As it applied to my understanding of the Cozy sign, yes.

BY MR. MACROBERTS:

**Q. At some point, Ms. Driscoll, which you just referenced, talked about the coffee shop hypothetical. Do you remember that hypothetical?**

A. Yes.

**Q. Do you agree with that hypothetical as it relates to the Salina city code?**

MS. JOKERST: Object to form and foundation.

A. That's consistent with my understanding of the case in question, and I think it is illustrative of how we have an example that would -- we would have to parse our code to make a determination as she described.

BY MR. MACROBERTS:

**Q. So do you agree with the hypothetical as it relates to the city code?**

MS. JOKERST: Object to form and foundation.

A. My recollection is that a coffee cup on the side of a coffee shop would be deemed to be -- meet our sign code definition and, yeah, I would agree with that.

BY MR. MACROBERTS:

**Q. You -- do you recall continuing Ms. Driscoll's hypothetical about the coffee shop later on with the city commission?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. I'll show you the page. I'm just wondering if you recall it?**

A. Vaguely.

**Q. And I believe it's page 26. So it's your -- so lines probably 16 through 22, but certainly 17 through 22. Just using that coffee shop hypothetical, it's your understanding of the Salina city code, again, that if a coffee shop paints a coffee cup on the side of its wall, that's considered a sign?**

MS. JOKERST: Object to form and

foundation.
A. Among others, but yeah.
BY MR. MACROBERTS:
**Q. Is it popular?**
A. It's not unpopular. It's not widely popular but, yeah, it's appreciated by most.
**Q. As I understand it, it does generate enthusiasm and energy?**
A. Yeah. It generates conversation and tourism. It's not without its detractors.
MR. MACROBERTS: All right. I would like a two-minute break. We can go longer if somebody would like.
MS. JOKERST: Yeah, take five minutes. Two is a little long for me to go grab some water.
MR. MACROBERTS: Yep, sounds good.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. If you would please turn to Exhibit 93?**
A. Okay.
**Q. Do you recognize it?**
A. Yes.
**Q. Did you author it?**
A. Yeah.

**Q. Is Deposition Exhibit 93 the same as the electronic version?**
A. I believe so, yes.
**Q. And no reason to think it's not?**
A. No.
**Q. Do you know why you authored this e-mail?**
MS. JOKERST: Object to form.
A. I wasn't sure whether he was even aware of the conversation and that Boom! Salina might get caught up in the conversation. I was just trying to make him aware of what had taken place and where things stood.
BY MR. MACROBERTS:
**Q. Did you write this e-mail on your own initiative?**
A. Yes.
**Q. When you say he, who do you mean?**
A. I'm sorry. Do I say it in the e-mail or I just said it verbally?
**Q. As I heard your answer, you were saying he and I'm assuming --**
A. Oh, Travis Young, the recipient of the e-mail.
**Q. Why are you telling Travis what your intended response is?**

MS. JOKERST: Object to form.

A. He, as I mentioned earlier, is the organizer of Boom! Salina and they had been kind caught up -- that project had been caught up in the conversation. It's just good form to try to keep people informed.

BY MR. MACROBERTS:

**Q. You tell Travis that your intended response is to stress that we have been very mindful of the Reed v. Gilbert case as well as applicable case law regarding what constitutes commercial speech. What applicable case law constitutes commercial speech were you referencing?**

A. Those --

MS. JOKERST: Object to form.

A. Those examples that I shared earlier, general understanding of the various litigation that had gone on previously.

BY MR. MACROBERTS:

**Q. If you would, please turn to Deposition Exhibit 52. Do you know who authored Deposition Exhibit 52?**

A. Based on the letterhead, it appears that Dustin Michelson as well as the signature block.

A. Yes.
**Q. What is it?**
A. It's the batting -- or the -- I don't even know how to describe it but kind of an indoor athletic area for The Yard.
**Q. The Yard, are you familiar with The Yard?**
A. Yes.
**Q. What do they do on the inside of The Yard?**
A. Baseball, softball instruction.
**Q. If you look to the right where it says Salina, do you see the Royals crown vision --**
MS. JOKERST: Object to form and foundation.
BY MR. MACROBERTS:
**Q. -- board?**
A. Yes.
**Q. Is that what you understand that to be, the Royals crown vision board?**
A. I don't know if they have avoided trademark infringement enough, but it generally represents it, yes.
**Q. You've been to Royals games, right?**
A. Yeah.
**Q. Okay. As you are looking at the right**

**side, based upon your understanding of the city code, is that a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

A. Interior -- inside versus outside orientation.

**Q. And help me understand why that matters under your understanding of the city code?**

MS. JOKERST: Object to form.

A. It's one of the provisions of our definition of a sign.

BY MR. MACROBERTS:

**Q. Is it your understanding that anything that is inside is unregulated?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. What is your understanding?**

A. If there's an outward orientation, if it's on the inside of a plate glass window, it's applied at the staff level, but it's not -- there

**Q. Based upon your understanding of the city code, is the display at Deposition Exhibit 73, and we'll just talk about page 80 because it's a little bit easier, does that constitute a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

MS. JOKERST: Object to form and foundation.

A. It doesn't meet any of the definitional elements of a sign by our code.

BY MR. MACROBERTS:

**Q. Does it bring people to Salina?**

MS. JOKERST: Object to form and foundation.

A. I believe so.

BY MR. MACROBERTS:

**Q. It's my -- correct me if I'm wrong, but it's my understanding that the inside of the grain elevator is defunct, right? There's nothing going on on the inside?**

A. Yeah, that's my understanding as well, yeah.

**Q. If a playground, an indoor playground was built inside of that grain silo today, based upon your understanding of the city code, would that be a sign?**

MS. JOKERST: Object to form and foundation.

A. I would seek legal counsel to answer that question.

BY MR. MACROBERTS:

**Q. Because you could not determine it on your own?**

MS. JOKERST: Object to form and foundation.

A. Correct.

BY MR. MACROBERTS:

**Q. If you would please turn to Deposition Exhibit 71. Do you recognize it?**

A. Hang on.

**Q. Sorry.**

A. Yes.

**Q. What is it?**

A. It is a graphical image on Fire Station No. 2.

**Q. Do you know if that's a painting or photographs or what is the display made of, if you**

**know?**

MS. JOKERST: Object to form.

A. It's a metal core board. I don't know what they call it exactly, but it's like a structural metal panel with this etched on it in some way.

BY MR. MACROBERTS:

**Q. Based upon your understanding of the city code, is that -- are the displays considered signs?**

MS. JOKERST: Object to form and foundation.

A. They could be, yes.

BY MR. MACROBERTS:

**Q. What about that makes it a sign or could be -- could make it a sign?**

MS. JOKERST: Object to form and foundation.

A. It -- I'm trying to think of the definition, but it's calling attention to the fire station. It may not be the exact wording in the definition but...

BY MR. MACROBERTS:

**Q. Do you know whether a permit or Certificate of Compatibility was applied for for**

guess that's the extent of it.

BY MR. MACROBERTS:

**Q. Do you know what goes on the inside of the building where that display is painted?**

A. It's a Land Title company.

**Q. Do you know who owns the Land Title company?**

A. Mike Hoppock.

**Q. At the time this was repainted, was Mr. Hoppock a city commissioner?**

A. Yes.

**Q. Did Mr. Hoppock apply for a permit?**

MS. JOKERST: Object to form and foundation.

A. I believe so, yes.

BY MR. MACROBERTS:

**Q. And did Mr. Hoppock go to the Design Review Board?**

A. I believe so, yes.

MS. JOKERST: Sorry. I wasn't sure if your question was finished. Object to form and foundation.

BY MR. MACROBERTS:

**Q. Going back to your -- or going back to Ms. Driscoll's coffee shop hypothetical and the**

**one that you referenced, based upon your understanding of the city code and thinking about the coffee shop hypothetical, if Mr. Howard painted an airplane on the side of his wall with no verbiage at all, was just a silver airplane, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

MS. JOKERST: Object to form and foundation.

A. It doesn't rise to the criteria specified in our sign code definition.

BY MR. MACROBERTS:

**Q. Is that because Mr. Howard does not sell airplanes on the inside of his business?**

MS. JOKERST: Object to form and foundation.

A. Not just airplanes but, yeah, no direct connection to his business and the depiction of an airplane.

BY MR. MACROBERTS:

**Q. On the coffee shop hypothetical, if a**

**coffee shop painted a dove on the side of its wall and instead of having an olive branch had painted a coffee branch, based upon your understanding of the code, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. I would seek legal counsel on that but, yes, I believe so.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol's works?**

A. Marilyn Monroe and the tomato cans maybe.

**Q. Yeah. On the tomato can, have you seen that one before?**

A. Quite sometime ago.

**Q. If Mr. Howard had painted an exact replica of Andy Warhol's Campbell's Soup can on the side of his wall, exact replica, would that be considered a sign under your understanding of the city code?**

MS. JOKERST: Object to form and foundation.

A. Applying on my understanding of the definitional criteria, no, I don't believe it would be a sign.

BY MR. MACROBERTS:
**Q. Why not?**
MS. JOKERST: Object to form and foundation.
A. I don't know that it advertises, calls attention to, directs anything pertaining -- as you've described it, anything that he does.
BY MR. MACROBERTS:
**Q. If Mr. Howard started selling Campbell's Soup inside, would that change the analysis for you?**
MS. JOKERST: Object to form and foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. If -- and forgive me. I think there's a grocery store. Is it called DG Grocery Store in town?**
A. Dollar General.
**Q. Okay. Let's just use as a hypothetical a grocery store. If a grocery store paints an exact replica of Andy Warhol's Campbell's Soup can on the side of its wall, would that be considered a sign under your understanding of the code?**
MS. JOKERST: Object to form and

foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. Why?**
MS. JOKERST: Object to form and foundation.
A. Directing attention to and advertising products that they sell.
MR. MACROBERTS: I think we are close if not maybe done. If I could get maybe five minutes just to double-check that I've asked everything I wanted to.
MS. JOKERST: Yeah, that works for me because I would like a little break, too. I might have a couple of questions here, so I can organize my thoughts.
MR. MACROBERTS: Can we go off the record just for a moment.
MS. JOKERST: Yeah.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. Was there one person who made the decision that the display at the Cozy was a sign or not?**
MS. JOKERST: Object to form.

A. Not to my -- I think it was a collective staff analysis and conclusion.

BY MR. MACROBERTS:

**Q. And for the collective staff analysis and conclusion, who do you mean?**

A. I presume -- certainly Lauren Driscoll and Dean Andrew, and then possibly their planning staff.

**Q. I'm sorry?**

A. Possibly additional planning staff.

**Q. Like who?**

A. Dustin Herrs, I don't even know if Gage Roberts was employed at that point, but we've got a couple planners.

**Q. Are you aware if there have been any traffic accidents as a result of the -- as a direct result of the display on the side of the Cozy?**

MS. JOKERST: Object to form.

A. No, I'm not.

BY MR. MACROBERTS:

**Q. Are you aware of any pedestrian accidents as a direct result of the display at the Cozy?**

MS. JOKERST: Object to form.

A. No, I'm not.

BY MR. MACROBERTS:
**Q. Is there any health hazard that you can think of as a direct result of the display at the Cozy?**
MS. JOKERST: Object to form.
A. Direct result, no.
BY MR. MACROBERTS:
**Q. Are you aware that property valuations have gone down as a direct result of the Cozy?**
MS. JOKERST: Object to form.
A. I'm not aware either way.
BY MR. MACROBERTS:
**Q. When you're out and about in the community, has the public been generally in favor of the Cozy's display?**
MS. JOKERST: Object to form and foundation.
A. It's been mixed.
BY MR. MACROBERTS:
**Q. Have you received any complaints about the Cozy's display?**
A. Complaints -- I've received critical feedback, criticism.
**Q. Formal complaints?**
A. No.

# CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 4 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant City of Salina, Kansas*