**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 5 of 16, Pages 1-275**

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit M
# Driscoll Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
LAUREN DRISCOLL,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:06 a.m. on the 10th day of September, 2024, at the law offices of Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**the discovery questions?**

A. I provided information as part of the documents prepared to be provided to you guys.

**Q. Great. Please tell me what your current role is with the city?**

A. I'm the director of Community & Development Services for the City of Salina, Kansas.

**Q. And what does that department do?**

A. We handle planning, both current and long range, zoning. We also handle property maintenance, code compliance, building inspections and permitting along with civil rights enforcement for the city and then the administration components that go along with that.

**Q. And what is the difference between long-term and short-term planning?**

A. Long range would be like comprehensive plan and visions and goals for a city that go into a plan and how those are then implemented, and current planning is like day-to-day permit processing.

**Q. Is there a division above you that you report to?**

A. I report to the city manager.

regulations, both what happens in the C4 and the downtown design review standards.

**Q. Do you interact at all with the Design Review Board?**

A. No.

**Q. Does your department?**

A. Yes.

**Q. Who in your department would interact?**

A. That would also be the Planning Division.

**Q. Dean, Dustin, Dustin and Gage?**

A. Correct.

**Q. When somebody applies for Certificate of Compatibility, does it go to your division?**

A. You mean does it go to Planning Division?

**Q. Does it go to the Community Services, whatever your director of, I apologize?**

A. Well, it comes into the department, so all those things are under the department. And it runs through Admin to make sure the application is complete, all the attachments are there, they've done those things, and then it goes to the Planning Division, which is Dean, Dustin, Dustin and Gage, for actual review and moving forward with the boards.

**Q. And what does that mean, moving forward**

**Q. Would you -- do you know if Crystal was talking to Brad Anderson by any chance about this issue?**

A. I --

MS. JOKERST: Object to form.

THE REPORTER: Your answer?

A. I do not know.

THE REPORTER: Thank you.

BY MR. MACROBERTS:

**Q. Did you meet with Steve about this issue?**

A. Yes. Not on that day.

**Q. When was the first time you met with Steve about the issue?**

A. It would have been the Thursday of that week. So Monday, Tuesday, Wednesday, Thursday we met with him.

**Q. When you say we, who was there?**

A. It was myself, Dustin Herrs, Mike Schrage, Steve Howard, the artist who had painted the wall, and then Mr. Howard had invited other people. There were -- I think there was -- they were just like concerned friends. I think there were three of them, like a husband and a wife and another person. And then Brad was there. I can't remember if Crystal was there.

A. Because we were already getting kind of a lot of political and external communication both on social media. I think the city commissioners were concerned just, you know, misunderstanding that the Cozy is -- it's the Cozy. It's been there for a hundred years. It's a favorite restaurant. You know, what's the problem. Well, it's a sign. I mean that's the problem. And trying to work through that process with Mr. Howard was the conversation we had to have.

**Q. Does Mr. Schrage typically get involved in those types of conversations?**

A. No. But he does get involved when, you know, something gets the attention of the elected body or he wants to be there firsthand to here something.

**Q. Did Crystal ask you or anyone in your department to put together legal papers?**

MS. JOKERST: Object to form and foundation.

A. What are legal papers?

BY MR. MACROBERTS:

**Q. Do you recall talking to Crystal about providing advice to her?**

THE REPORTER: Providing what?

**say for a sign, what is the standard turnaround to either approve or deny the permit?**

A. I'd have to look in code, but I mean we try to be as expeditious as possible. We have some very hard well known ones that are building permits which we usually try for ten days. But, you know, sign permits, I can't remember if there's something in code or in policy that gives a specific date turnaround time. If there was, Dean and his team respond to that timeline.

**Q. In December of 2023, is it fair to say that the permit hadn't been either approved or denied?**

A. That is true.

**Q. Why is that?**

A. Because after -- Mr. Howard made it clear on the Thursday meeting that we had with him that he had no desire to change his sign at all. And I explained to him, everybody else explained to him those were the rules that were on the books. If he felt that the community wanted those rules to change, we would need to amend the code. I told him that I already had a sign code rewrite project scheduled for the coming year. This would speed it up significantly, but I was willing to

This one assigns it a permit number, gives the location, and it is being put into the system for Planning staff it looks like to review and act on. So this would have -- probably the permit techs would have entered this in. So the permit technicians when the applications come in review for completeness, and then they put it in the digital system if it doesn't come in digitally. So, as I mentioned earlier, Mr. Howard dropped his off in paper. So the techs would have taken those and put them into LAMA.

**Q. Just to make sure I understand you, so a tech gets the application. They manually type it into the LAMA permit software?**

A. If the applicant dropped it off in paper.

**Q. Do you know -- do you see these regularly?**

A. No.

**Q. Have you ever seen one of these?**

A. I have seen them before but not this one per se.

**Q. Do you know why there's a permit summary for February 5th of 2024?**

A. No.

**Q. Is it typical for a permit to generate --**

**a permit application to generate a LAMA summary months after the permit application?**

A. Will you please ask me that question again?

**Q. Yeah. Is it typical to have a month's delay after a permit application has been made?**

MS. JOKERST: Object to form and foundation.

A. It is not typical.

BY MR. MACROBERTS:

**Q. If you would, please, turn to Deposition Exhibit 52.**

A. Okay.

**Q. Are you familiar with this?**

A. Yes.

**Q. Do you know who drafted this?**

A. I believe Dustin Michelson. He's the one that signed it.

**Q. Well, just because he signed it, does that mean he drafted it?**

A. I can tell you I didn't draft it.

**Q. Got it. Did you have any input on Deposition Exhibit 52?**

A. I did not.

**Q. Did you know this got sent out?**

there's a total allowed amount.

**Q. Did you initially think this was a mural or a sign?**

A. I mean it -- it's painted on a wall. It -- the question was we had to sit down and start to look at those pieces and just start to pull them together. I don't like to make an off-the-cuff determination. We sat down with code, pulled the definition, said, yep, it met those components. And then we looked at that location and did the math to show like not only is it a sign but its size does not fit this location.

**Q. On Sunday night when you received the text, it was still up in the air whether it was a sign or not, correct?**

A. Correct.

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. And what is -- what do you have to look at to figure out if it's a sign or not?**

A. Salina municipal code.

**Q. And you still have to look at what the artwork is, correct?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. Why do you have to look at it?**

MS. JOKERST: Object to form.

A. Well, one, you're going to look at it for its time and place and manner characteristics as per code, right? And you're going look at it to see if it meets the definition of a sign which talks about announce, direct attention or advertise.

THE REPORTER: Talks about?

A. Announce, directs attention or advertise.

BY MR. MACROBERTS:

**Q. Are you able to do that with -- in other words, are you able to determine whether or not it announce, directs attention to or advertise without looking at the artwork?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Is that why the permit process requires a picture or a rendering of what the artwork's going to look like?**

MS. JOKERST: Object to form and foundation.

A. Ask me that question one more time,

BY MR. MACROBERTS:
**Q. Correct.**
A. No.
**Q. Who did?**
A. Dustin Herrs.
**Q. Who made the ultimate determination that this was a sign, not a mural?**
MS. JOKERST: Object to form and foundation.
A. The Zoning administrator makes that final determination, but both myself, Zoning administrator and the planner were in agreeance on the calculations done by Mr. Herrs.
BY MR. MACROBERTS:
**Q. By calculations, are you referencing the size?**
A. Yes.
**Q. How did you measure or how did you come to an agreeance on the size of the artwork?**
MS. JOKERST: Object to form.
A. We have historical applications that they've submitted, so we know the dimensions of the building. And the code says what ratio of square footage allows for total sign square footage. So based on those dimensions and that

**page.**

A. Okay. Okay.

**Q. Do you recall saying that you needed a chance to look at it?**

A. Yes, I said we needed a chance when we found out to look at...

**Q. You said you needed a chance to look at it, right?**

A. Yes.

**Q. Are you referencing the Cozy artwork?**

MS. JOKERST: Object to form.

A. I'm referencing the painted wall sign at the Cozy.

BY MR. MACROBERTS:

**Q. And why did you tell the city commission about having Steve pausing the creation of the artwork?**

MS. JOKERST: Object to form and foundation.

A. Without an application, which is actually what I say here, without an application, we don't have any details, right? What is the full size? I mean there were some outlines and stuff on the wall, but we didn't have a rendering or anything. So, at that time, it was, Steve, don't paint

anymore, because if for some reason this isn't allowed, I don't want you to go further and can we just halt -- have some information so that you're aware of how the rules would impact this artwork, this sign and then you can make some choices. So I just didn't want him going further and spending money or doing something that he may have to change or would choose not to go forward with. And because we didn't have any of that information, we needed a few minutes to get more information from him.

BY MR. MACROBERTS:

**Q. When you say a few minutes, is that just a --**

A. Yeah, I'm sorry. We needed a couple of days just to get that additional information.

**Q. When you gave the -- do you remember giving a coffee house hypothetical to the city commission?**

A. I do. Somewhere in here, yes.

**Q. And I just want to make sure that I'm not missing a case. In there you mentioned that it was a Supreme Court case. Do you remember that?**

A. I do.

**Q. Was that correct?**

the commission that it's more than just a word or a picture, that all these pieces lay together.

BY MR. MACROBERTS:

**Q. So in order to make your coffee house/dove/peace hypothetical work, you would need to know what the artwork is on the outside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. We would have a rendering that was submitted that would describe what was going on the side of the building.

BY MR. MACROBERTS:

**Q. Or somebody did it without a permit you would have to look at the artwork?**

A. Yes.

MS. JOKERST: Object to form and foundation.

BY MR. MACROBERTS:

**Q. And you need to know what's going on on the inside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. In some cases, yes.

BY MR. MACROBERTS:

BY MR. MACROBERTS:

**Q. And what did you mean when you said so it's like if you can't say this one thing, do you identify the others?**

MS. JOKERST: Object to form.

A. That's what I kind of just said. Like we have a definition of sign. It either is that or it's not. If you want to talk about the things it's not, then you have to find rules for those things and we don't have rules for those things. So that may be something the commission wants. Right now, we deal with signs. If you want to talk about murals, then that's a whole another thing, but it's not on the books right now.

BY MR. MACROBERTS:

**Q. The regulation of murals is not on the books?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Bad question. You don't regulate murals?**

A. Correct.

**Q. And maybe you've answered this so forgive me if you have. On page 25, you say sometimes saying something isn't something, maybe you need a**

**Q. Let's start with your memory and then we will -- I'm confident we have it. I just don't want to spend ten minutes digging through it.**

A. Okay.

**Q. So why is it?**

MS. JOKERST: Object to form.

A. So, from my memory, which, you know, is not always a great way to review code, you should always look at it every time, it basically indicates that, you know, if it's something attention grabbing, it talks about the myriad of forms, whether it's text, emblem, pictorial, and that if it is on the outside of a building, if it announces, directs attention and advertises and is affixed, is near in the ground or portable, however, it kind of gives a list of those, if it's got those features and those all lead into it being a sign.

BY MR. MACROBERTS:

**Q. I want to go back to your coffee house hypothetical. If Mr. Howard painted a coffee pot on the side of his wall with a picture of a dove and the word peace and it took up the entire wall, and assume he does not sell coffee, is that a sign?**

MS. JOKERST: Object to form.
A. So I want to make sure I'm understanding you. You're giving me a hypothetical where we have a wall -- okay. We're going to use the Cozy and there's a coffee pot painted on it, a dove and olive branch and the word peace?
BY MR. MACROBERTS:
**Q. Yes.**
A. And he doesn't sell --
**Q. Let's assume he does not sell coffee?**
A. -- coffee at all.
**Q. And he doesn't sell doves or --**
A. And it's not --
THE REPORTER: Hold on. Hold on. One at a time. Give me your question. Let's assume?
BY MR. MACROBERTS:
**Q. And he does not sell doves or olives.**
MS. JOKERST: Object to form.
A. I guess I would say I could answer your hypothetical, but I'm not the one who's going to make that final determination, right. That stuff would come in the office and I would work with our planning staff. So I could tell you that answer, but it still is also going to come down to Dean Andrew standing behind that determination as

Zoning administrator. So I can pontificate all that I want, but it's not -- I'm not making that determination.

BY MR. MACROBERTS:

**Q. Based upon your understanding of the code, keeping in mind what you told the city commission, is that artwork considered a sign that I just described to you?**

MS. JOKERST: Object to form and foundation.

A. I would question whether it's a sign and then work with my staff and our legal counsel to verify my interpretation.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol?**

A. Yes. He's a mid century artist.

**Q. Are you familiar with his Campbell's Soup artwork?**

A. Yes.

**Q. Assuming the Cozy Inn did not sell Campbell's Soup, if Mr. Howard painted an exact replica of Andy Warhol's Cambell's Soup can on the side and it took up the entire wall, based upon your understanding of the code, is that a sign?**

A. I am not comfortable making that --

just an airplane? What's the size of it? What's it say on the airplane? Is there text with the airplane? What's the size of the airplane? All those things feed into it being a sign.

BY MR. MACROBERTS:

**Q. No text. Just a big silver airplane?**

MS. JOKERST: Object to form and foundation.

A. There's no text. From the very limited information you've given me, it might not be a sign. But, again, I also am not the only person that would make that determination.

BY MR. MACROBERTS:

**Q. I think you've told me the other people who helped make that determination. Have you mentioned everyone who makes that determination?**

A. Yes.

**Q. Does Mr. Schrage have any input into that determination?**

A. No.

**Q. Did he have any input into whether or not the Cozy was deemed a sign?**

A. No. He was made aware of the situation as it evolved and as staff did its research, but he did not have influence on that decision.

It meets into a lot of different things.
**Q. What else besides the two you just mentioned?**
A. Well, it attracts attention and it announces and it's part of advertising.
**Q. What does it announce?**
A. The smell of the burgers.
**Q. And is it your position or what you're in agreeance with that the burger-esque UFOs are too similar to the hamburgers that Mr. Howard sells on the inside?**
MS. JOKERST: Object to form.
A. Yes, they're burgers.
BY MR. MACROBERTS:
**Q. If you would, please turn to page -- or, excuse me, Exhibit 74.**
A. Okay.
**Q. Page 119?**
A. I don't know if these have --
**Q. They do. I'm sorry. They're kind of hard to see.**
A. Oh, yeah, yeah, yeah. Okay. What page number?
**Q. 119, please.**
A. Okay.

**Q. Do you recognize this?**
A. Yes.
**Q. What is it?**
A. It looks like the back stage door for the Stiefel Theatre.
**Q. Do you know when this painting was placed on the back side of the Stiefel Theatre?**
A. I don't. I would -- I could hazard a guess, but I don't -- I don't know when it was placed there.
**Q. Was it since you've been here in Salina?**
A. Yes.
**Q. Was it before or after November of '23, if you know?**
A. I don't know. I think it was probably during a Boom! festival.
**Q. So sometime in the last three years?**
A. Um-hum.
**Q. Excuse me. The Stiefel Theatre has concerts, right?**
A. Um-hum.
**Q. I'm sorry, yes or no?**
A. Yes. I'm sorry.
**Q. And during those concerts, performers oftentimes have guitars or ukuleles?**

A. Um-hum. Yes.
MS. JOKERST: Object to form and foundation.
A. Yes, they could have guitars or ukuleles.
BY MR. MACROBERTS:
**Q. This deposition exhibit page 119, a sign permit was not applied for for this artwork, was it?**
A. No, it was not.
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. And it's your -- is it your position that page 119 that artwork is not a sign?**
MS. JOKERST: Object to form.
A. I typically wouldn't take a position on this. Like it would normally come into Dean. He would review it and then give me feedback or if he even thought it needed to come to my attention.
BY MR. MACROBERTS:
**Q. As you're sitting here now --**
A. Okay.
**Q. -- knowing what you know, page 119, that artwork is not a sign, right?**
MS. JOKERST: Object.
THE WITNESS: Are you good, Amanda?

MS. JOKERST: Go.

A. Okay. I would have questions. I mean you're right, music can be performed with instruments, but, one, is it attracting your attention? Okay. It's something different. It's not part of the original wall. But is it directing you to something. The public can't get into that door. It's a stage door, and the front door is to access and make any kind of purchase on the other side of the building. So I don't know what it would be directing your attention to. Even if you tried to take the ukulele and kind of point it to something or guitar or whatever it is, they also don't sell instruments inside. They don't sell musical classes of any sort. She's also not playing the instrument which is usually what somebody would be doing with the instrument inside at a concert. And those are my first thoughts. There's no text that's, you know, saying anything or giving a direct message. Stage door, you're allowed in buildings to have, you know, egress type signage that denotes exits and stuff like that. And we have a minimal signage, a requirement, so that's -- that piece is allowed. So if we look at just the girl, the instrument and

the bird, at this glance of asking me in this situation, I don't think it would be a sign. But if that were a question, we -- you know, that's something we would talk about with legal.

BY MR. MACROBERTS:

**Q. Bear with me for a moment. If you could, please, turn to Deposition Exhibit 77.**

A. Okay. Okay.

**Q. Do you recognize this?**

A. Yes.

**Q. What is it?**

A. Schlotzsky's Deli.

**Q. Is it the city's position that Exhibit No. 77, the artwork on the left-hand side, is a sign?**

A. Yes.

MS. JOKERST: Object to form and foundation.

THE WITNESS: Sorry, Amanda.

A. Yes, it is a sign.

BY MR. MACROBERTS:

**Q. Why is it a sign?**

MS. JOKERST: Object to form and foundation.

A. Because they have a sign permit. No, it

department is a public building, and it's not asking you to come in and get a service or make any type of transaction. But I -- it's one that I don't think is cut and dry, and I think it would be worth a discussion with legal counsel.

BY MR. MACROBERTS:

**Q. Which, again --**

A. Yeah. But I'm --

**Q. Yeah, yeah. Okay.**

A. That's where I would go with that because it's not cut and dry.

**Q. And what -- help me understand what's not cut and dry about this?**

MS. JOKERST: Object to form.

A. Well, I think the fact that it's a public service. So I don't -- I'm not familiar with a case where that may come into advertising. So we would -- my thought is I would research more and see where that's been viewed in the past with other decisions.

BY MR. MACROBERTS:

**Q. So if that picture or those pictures are deemed advertising, then it's a sign?**

MS. JOKERST: Object to form.

A. That's one way you could look at it. I

**Q. If you could turn to Deposition Exhibit 82, please. Are you there?**
A. Yes, sir.
**Q. Do you recognize this?**
A. I do.
**Q. What is it?**
A. It's the side of the KU Medical School.
**Q. It's the city's -- is it the city's position that the artwork on Deposition Exhibit 82 is not a sign?**
MS. JOKERST: Object to form and foundation.
A. So I just want to make sure I'm understanding that the city's position is that is the sign.
BY MR. MACROBERTS:
**Q. And because the court reporter can't take that down, if you could describe what you did to me or I can do it and then you can tell me if I'm wrong.**
A. No, I'm happy to describe it. There's a large blue K and a large blue U and then below that School of Medicine, School of Nursing, a large Salina in black underlined and in blue University of Kansas in smaller letters with three

large lights over the top.

**Q. That was a good description. Is that the only part of the wall at Deposition Exhibit 82 that is considered a sign?**

A. Yes. That is the permitted sign area.

THE REPORTER: Can I have that objection again?

MS. JOKERST: Form and foundation.

THE REPORTER: Thank you.

BY MR. MACROBERTS:

**Q. The colorful display that is both to the bottom right of the KU and the left of the KU, it's the city's position that that is not a sign?**

MS. JOKERST: Object to form and foundation.

A. That is correct.

BY MR. MACROBERTS:

**Q. Does -- in your opinion as you're sitting here and as director, does the artwork to the left of KU attract attention?**

MS. JOKERST: I'll object to form.

A. So you're asking me if the artwork to the left attracts attention?

BY MR. MACROBERTS:

**Q. Um-hum, that's correct.**

A. It could.
**Q. Does it?**
A. For some people, yes.
**Q. How about --**
A. Yes.
**Q. And same with the artwork to the bottom right of the KU, that attracts attention, also, correct?**
A. Yes.
MS. JOKERST: Object to form.
MR. MACROBERTS: Do you mind if we have a two-minute break? I've just got to use the restroom again.
MS. JOKERST: Yeah. I'm okay with that.
MR. MACROBERTS: Let's go off the record for just a moment.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. All right. I think we're back on. Thank you. If I could get you to turn to Exhibit No. 73, please. There's a series of photographs.**
A. Okay.
**Q. And I think it ends at 82?**
A. Yes, I agree.
**Q. Do you recognize it?**

A. Yes, I recognize it.
**Q. What is it?**
A. It's a large painting on the grain silos here in town.
**Q. Is that commonly referred to as the Mural at the Mill?**
A. It is, yes.
**Q. Was that -- forgive me if you answered this already. Was that painted before or after you coming to Salina?**
A. It's been my time here.
**Q. Okay. And based upon your understanding of the city code, that's not a sign, correct?**
A. Correct, it is not a sign.
**Q. And no permit was applied for, and there was no problem with them not applying for a permit, right?**
MS. JOKERST: Object to form and foundation.
MR. MACROBERTS: I'll restate it because I asked two questions at once.
BY MR. MACROBERTS:
**Q. You're not aware of anyone applying for a permit for this?**
A. Correct. And a permit was not applied

for. A sign permit was not applied for.

**Q. Why is this not considered a sign based upon your understanding of the code?**

A. It doesn't meet the definition of a sign. So I mean we didn't review it. I didn't make this determination. But using the definition of a sign, this did not meet that definition.

**Q. Forgive me because I've tried finding this and I don't know. Hopefully, you do. Is that grain elevator operational at all?**

A. I don't think so.

**Q. Is anything happening inside the grain elevator?**

A. No.

**Q. If somebody were to operate that grain elevator as a business and in the business they charged an admittance fee and kids were playing on the inside of that, based upon your understanding of the code that would be a sign then, correct?**

MS. JOKERST: Object to form and foundation.

A. So they've turned it into something where kids are playing on the inside and that you're saying is my determination that automatically makes it a sign?

BY MR. MACROBERTS:

**Q. No. I'll ask it again. If an operator charged money for kids to come inside, pick a daycare or a recess zone, something like that, this Mural at the Mill would then be considered a sign under your understanding of the code, correct?**

MS. JOKERST: Object to form and foundation.

A. It would be enough to catch my attention that I would bring it to my staff and ask them to research and make that determination.

BY MR. MACROBERTS:

**Q. Is it fair to say that the reason it would raise questions because in your mind it would encourage a commercial transaction?**

MS. JOKERST: Object to form.

A. No. I would say it would be advertising something because the use of the building had changed.

BY MR. MACROBERTS:

**Q. All right. I'm asking you to please turn to Deposition Exhibit 76.**

A. Okay.

**Q. Do you know what this is a picture of?**

together and that whole strip. But I mean that's my initial assessment without being there and seeing more details. But from this picture, that would be my initial thoughts.

**Q. The permit that was issued was after you said the Cozy case. Is that in November of 2023 or is that in February of 2024?**

A. It probably would have been in November. We got several calls from people around town as soon as social media had chatter about the Cozy case. Suddenly, everybody wanted to turn everybody in. So we got inundated with several different signs around town that we weren't aware of and went through and dealt with those.

**Q. Were you overwhelmed with calls?**

A. No. I mean it was a handful, though and ones we didn't know. But I mean they kind of came in a barrage probably within that following week the city commission meeting.

**Q. As far as you were aware, did anybody complain about the Cozy's artwork?**

MS. JOKERST: Object to form.

A. As in issue a formal complaint? Like in writing or something?

BY MR. MACROBERTS:

**Q. Well, let's start with that. In terms of did anybody file a formal complaint against the Cozy or Mr. Howard because of the mural?**

A. No.

**Q. If you would please turn to Deposition Exhibit 75. Let's start with page 300. Do you know what that's a picture of?**

A. The Original Grande.

**Q. Is that the same with pages -- well, the rest of the deposition exhibit?**

A. It looks like it, yes.

**Q. Is it the city's position that the -- well, let me direct you to page, oh, man, 298.**

A. Okay.

**Q. The Feelin' Taco-tastic and Fuel Your Inner Fiesta, do you see those?**

A. I do.

**Q. Is it the city's position that those two displays are considered signs?**

A. Yes.

**Q. Why is that?**

A. Because they directly relate -- well, they meet the definition of the sign code as we've talked about several times. They attract attention. They -- they're specifically

apologizing for cutting you off. I thought the question was done.

A. So you saying there's just two doves painted there at the Mexican restaurant?

BY MR. MACROBERTS:

**Q. Where the -- yes, where the Feelin' Taco-tastic and Fuel Your Inner Fiesta is in this exhibit?**

A. I would go back to the definition of the sign code, but it would probably not be a sign. I don't know what else more is there, if there's text, if it's just a dove, I don't know what's on the other side, but if they've got dove tacos, but I'm really hoping they don't, but probably -- probably not.

**Q. All right. Let's assume no dove tacos and no text, just pictures of a dove?**

MS. JOKERST: Object to form.

A. By my interpretation of the definition sitting here at this table with what I know, are you announcing something with the dove? Not really. I mean I suppose you've initially grabbed attention, but you're not announcing anything relevant. You're directing attention to, is the dove pointing to something or flying toward

something, let's say it's not. So you're not directing attention to. And what are you advertising? We're not advertising any good or service. I mean they don't have a -- they're not selling doves with every meal. I mean they're truly not related from what I know in this hypothetical.

BY MR. MACROBERTS:

**Q. So it would not be a sign?**

A. Based on the hypothetical you gave me, I would not make that -- I would not think that's a sign.

**Q. You mentioned previously that you were, and I'm paraphrasing, considering amending the code before the Cozy Inn issue?**

A. Um-hum.

**Q. Is that a yes?**

MS. JOKERST: Object to form.

A. I'm sorry. Yes.

BY MR. MACROBERTS:

**Q. And when did that originally come onto your radar?**

A. Within 2023, 2022. Technology's changed a lot around signs, too, particularly with lighting and lumens and materials being used for

**the purpose section of the sign code?**

A. Um-hum.

**Q. Is that a yes?**

A. Yes.

**Q. Is that Deposition Exhibit page -- well, we'll reference it this way. At the top, it will say document 16-3, page 5 of 31 in blue.**

A. What does it say in the blue, I'm sorry?

**Q. How about this. Try to go to section 42-500 of the code.**

A. Okay. I'm there.

**Q. Do you mind if I look real fast?**

A. Um-hum.

**Q. This is what I was referencing.**

A. Oh, okay. Thank you.

**Q. Are you aware of any traffic accidents that have resulted from the display that's at the Cozy?**

A. I am not.

**Q. Are you aware of any pedestrian accidents that have resulted from the display at the Cozy?**

A. I am not.

**Q. Are you aware of the property values decreasing as a result of the display at the Cozy?**

A. I am not.

**Q. Are you aware of the local economy getting worse because of the display at the Cozy?**

A. I am not.

**Q. Previously, you had mentioned aesthetics. Do you remember that?**

A. Um-hum.

**Q. Is that a yes?**

A. I do.

**Q. The e-mails that we talked about that were sent to the signs e-mail address, do you remember those?**

A. I do.

**Q. Is it fair to say that those e-mails suggested that the mural was aesthetically pleasing?**

MS. JOKERST: Object to form.

A. Several of those do. I don't know about every one of them. But in general, yes, that is a sentiment.

BY MR. MACROBERTS:

**Q. In any of those e-mails that we talked about, is there anybody who thought the mural at the Cozy was aesthetically displeasing?**

MS. JOKERST: Object to form.

A. Of those e-mails, no.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs

Sandra S. Biggs, C.C.R No. 0716

# Exhibit N
# Herrs 30(b)(6) Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

some examples.

**Q. Okay.**

A. Not all inclusive, but those are some of the ideas.

**Q. Can a painted wall sign be unsecured?**

MS. JOKERST: Object to scope.

A. Probably not.

BY MR. SHAW:

**Q. Does the city have any records of the number of accidents caused by unsecured signs?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Can a painted wall sign be less secure than a painted mural?**

MS. JOKERST: I'll object to scope.

A. No.

BY MR. SHAW:

**Q. Okay. How does the city define the term clutter as used in this subsection?**

MS. JOKERST: Object to scope.

BY MR. SHAW:

**Q. Let me rephrase it then. What is a cluttered sign?**

MS. JOKERST: I'll object to form of the

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --

**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**

MS. JOKERST: Object to scope.

A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.

BY MR. SHAW:

**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

**fact, enhanced traffic safety?**

MS. JOKERST: Object to scope.

A. Yeah, I don't -- I don't know.

BY MR. SHAW:

**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**

MS. JOKERST: Object to scope.

A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.

BY MR. SHAW:

**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**

MS. JOKERST: Object to scope.

A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

**though, long predates that boom in development. Is that correct?**

MS. JOKERST: Object to scope.

A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.

BY MR. SHAW:

**Q. Okay. Section 42-500, when was that enacted?**

MS. JOKERST: Object to scope.

A. 2017.

BY MR. SHAW:

**Q. Was there a different purpose section in effect before 2017?**

MS. JOKERST: Object to scope.

A. I don't know. I didn't research that.

BY MR. SHAW:

**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the city aware of any facts that would**

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

**traffic safety?**

MS. JOKERST: Object to scope.

A. I didn't research that in preparation.

BY MR. SHAW:

**Q. Okay. And same question there for is the government aware of any facts showing that painted wall signs have a more detrimental affect on property values than paint murals?**

MS. JOKERST: Object to scope.

A. Yeah, I wasn't aware to research that particular topic, so I haven't prepared for that.

BY MR. SHAW:

**Q. All right. So we're mainly talking about the sign code here, Section 42-500 and subsequent sections here. I want to pivot now to the Business Improvement District regulations, so that's Section 2 -- I think like 201 of the city code?**

A. I don't have that one.

**Q. You don't have it?**

A. No, I don't.

**Q. Oh, okay. So --**

A. Which -- I guess where are we at because like I'm trying to figure out --

**Q. I'm talking about the BID code section**

**Q. And is this the e-mail you sent to the planning group that you're referring to right now?**

A. Yes.

**Q. Okay. So it was there on November 6th that Mr. Anderson informed Miss Driscoll?**

A. That's my understanding.

**Q. All right. And what action did the city take upon learning about the mural being painted at The Cozy Inn?**

A. I contacted Mr. Howard and invited him to come to my office to speak about it. He did. He accepted my invitation. He came to my office and we talked. I explained to him our concerns with the sign that he was in the process of painting on his north wall of The Cozy Inn property and explained to him the sign limitations that are in the C-4 district and how it appeared his sign was exceeding the maximum allowable sign area for the C-4 district.

**Q. And that was all on November 6th?**

A. That was on November 6th.

**Q. All right. When you first contacted Mr. Howard, had the city already determined that the mural at the Cozy Inn was a sign?**

A. Yes.

**Q. When was that determination made?**
A. On the 6th of November.
**Q. And who made that determination?**
A. It was -- I assign it to a collective decision. We pulled up a photograph of it and --
**Q. Can I stop you real quick. When you say we pulled up, who is we?**
A. Sure. It would have been the planning staff that was in that meeting at the time which would have been Miss Driscoll, it would have been myself, it would have been Mr. Andrew and Mr. Michelson.
**Q. Okay. So go on. That group of people you just mentioned and you were at a meeting. You pulled up a picture of the kind of the mural. Then what happened?**
A. And we viewed it and it had met the definition of a sign. And we were all like we need to get ahold of Mr. Howard right away, make sure he's aware of this in case he wasn't aware of this, like we didn't want him to get the whole sign up and then that be a problem, so we wanted him to be aware of it as soon as possible since he was in the process of having the sign painted. So we contacted him right away just so that he

A. You could make the determination by walking up to it which I followed up with.

**Q. Fine. So I'll rephrase that. Could the city have made that determination without having seen the mural at the Cozy Inn, whether it's in a picture or in real life?**

A. I don't know.

**Q. I'm sorry. What was that?**

A. I'm not sure.

**Q. Okay.**

A. I mean we typically review signs by looking at the dimensions of the signs that are being proposed, and usually, its self-evident that it's a sign because it fits those attributes because of the character and elements of the sign which you have to look at to determine.

**Q. Just so I'm clear --**

A. Sure.

**Q. -- I'm not sure I was following.**

A. All right.

**Q. You have to be able to look at the potential sign to determine if it is a sign?**

A. Yes. You have to look at the character and elements of the sign.

**Q. Okay. Did the city determine that the**

**mural at the Cozy Inn announces something?**

A. Yes.

**Q. What did the city determine that it announced?**

A. It proclaims or declares to not fear the smell.

**Q. Okay. Was any other part of the mural determined to be an announcement?**

A. I mean The Fun is inside is making a proclamation of a sort, so that would be an announcement. It's announcing that there's burgers here because there's burgers on -- on the pictorials, representations of the sign.

**Q. Were any other elements of the mural considered an announcement by the city?**

A. I think those are the main ones that jump out at you anyway.

**Q. All right. Did the city determine that The Cozy mural directs attention to something?**

A. Yes. There's an arrow that points towards the pickup window and the entry door into the restaurant.

**Q. Okay. Did the city determine any element of the mural other than the arrow directed attention?**

A. Well, The Fun is inside directs you to inside, invites you inside and to go inside.

**Q. Okay. And did any other elements of the mural direct attention to something?**

A. Those would be the main ones I could think of.

**Q. Okay. And did the city determine that The Cozy mural advertises something?**

A. Yeah. So one of the products that they sell is burgers, and it has pictorial representations of burgers on the outside of the building.

**Q. Okay. Is any other element of the mural an advertisement in the city's estimation?**

MS. JOKERST: I'll object to form.

A. I mean the whole thing kind of works together as a cohesive composition for the sign -- for the sign as an advertisement, because there's a lot of burgers and there's a lot of ketchup and mustard.

BY MR. SHAW:

**Q. Okay. So then is it the city's position the entire mural is an advertisement?**

A. The city's position is the entire painting is a sign that has advertisement in it.

**painting would qualify as a sign under the code, it would need to see a rendition of the proposed painting?**

MS. JOKERST: Object to form and scope.

A. We would need to see a rendering of the proposed sign if it wasn't already there. I mean we'd have to see -- see it in some way to determine if the character and elements fit the definition of a sign.

BY MR. SHAW:

**Q. All right. If you could flip now to Exhibit 8.**

A. Are we done with 40? Keep it out or put it away.

**Q. You can keep it out.**

A. Okay.

**Q. We'll have to put it back.**

A. Sure. Okay. I'm at Exhibit 8.

**Q. Okay. Is Exhibit 8 a copy of a Sign Permit Application submitted by Mr. Howard on behalf of The Cozy Inn?**

A. Yes.

**Q. And what day did the city receive this application?**

A. It is dated 11/13/23 if that's the day we

different in this rendering than what's on the wall currently.

BY MR. SHAW:

**Q. What's on the wall currently is not complete, though. Is that correct?**

A. Correct. So that's why I don't know.

**Q. Okay. Is it the city's position that the mural depicted in that image does not depict burger-esque flying saucers piloting by aliens?**

A. The city's position is that we are indifferent to if it depicts burgers that are floating around, if they're being thrown around, if they're flying around, if they're being piloted by aliens or something, it doesn't matter to us.

**Q. All right. When that rendition was submitted to the city, did the city reevaluate whether or not the mural at the Cozy Inn was a sign?**

A. No.

**Q. Did the city grant this permit application?**

A. We put this permit application on hold and did not process it.

**Q. Okay. Just so I'm clear, by putting it on hold and not processing it, does that mean this**

**application was neither granted or denied?**

A. Correct. So when we met with Mr. Howard, we informed him, and when I say when we met with him, when we met with him on November -- I've got to get that, November 6 of 2023, we informed him that his proposed sign exceeded the sign maximum limitation in the C-4 district and that staff was unable to approve. And in talking with him about potential options, we expressed that we could potentially look at a text amend, and that was expressed at the meeting that we had with him later at the Smoky Hill Museum. And he seemed responsive to the idea of exploring a text amendment which would be a public process to potentially change the sign code to potentially allow signage like what Mr. Howard was proposing. And so we had -- even though we were not able to approve the sign and we informed Mr. Howard of that, we were open to trying to come up with a potential sign amendment that could allow something similar to what he was being -- what he was proposing.

**Q. So at that meeting, you mentioned at the Smoky Hill Museum?**

A. Um-hum.

**Q. Did the city tell Mr. Howard to submit a Sign Permit Application?**

A. Yes.

**Q. And at that same meeting, did the city tell Mr. Howard to submit a Certificate of Compatibility Application?**

A. Yes. So we wanted to have the sign application to know what his final vision was so that when we were working with the public we knew what the target was. Like this was his idea. We would have something real and applicable that when we were looking at potentially amending the sign code to apply it and say does this fit within the sign code, do we want it to fit in the sign code and to make sure that if we wanted this to be a permitted sign, when I say we, I mean the community at large because this would be a public conversation, what regulations would be appropriate and so that we had a target or a goal if this was something we wanted to permit to create our sign code around or our sign code amendment around.

**Q. So if I'm understanding, the city wanted to get his final, I guess, rendering so that they could have an idea of what his vision was which**

**would enable a code amendment to incorporate that vision? Is that what you're saying?**

A. Potentially. Yes. I mean that was going to be a public conversation. It wasn't going to be a decision by staff, but it was going to be a public conversation that we would have with a consultant that we had engaged in to go through this exercise to see if this is something that the city and the community wanted for the community in the downtown area or just anywhere in the community.

**Q. You just mentioned a consultant. Is that Wendy Moeller that you're referring to?**

A. Yes, that is correct.

**Q. Had she been retained on the date that that meeting at the Smoky Hill Museum took place?**

MS. JOKERST: Object to form and scope.

A. I do not believe so.

BY MR. SHAW:

**Q. Okay.**

A. She was hired at a later date with the understanding that Mr. Howard wanted to work through a public process of potentially looking at a sign code amendment that could allow his sign.

**Q. When was this application placed on hold?**

A. Well, when it came in, it was essentially put on hold because we couldn't approve it.

**Q. Okay. So the city placed it on hold immediately?**

A. Yes, because we could not approve it and we were looking at other solutions, potential solutions. City staff did not have the authority under the current sign code to permit the sign. And in order to permit the sign, it would require an amendment to the sign code.

**Q. So if you could turn to Exhibit -- give me one moment, Exhibit 9. Is Exhibit 9 a Certificate of Compatibility Application filed by The Cozy Inn?**

A. Yes.

**Q. And is it for a Certificate of Compatibility for the mural at the Cozy Inn?**

A. Yes.

MR. SHAW: We'll admit Exhibit 9.

BY MR. SHAW:

**Q. Was this submitted by Mr. Howard at the same time as the Sign Permit Application?**

A. It appears so. It has the same November 13th, 2023 date on it.

**Q. Okay. Was a -- I'm going to say DRB, but**

A. Yes.

**Q. Was The Cozy Inn ever provided with a written statement of the reasons of denial?**

MS. JOKERST: Object to form and scope.

A. The Cozy Inn was informed before the application was even applied for and the sign permit was applied for that the sign was -- did not conform to the C-4 regulations and is not something the staff had the authority to permit.

BY MR. SHAW:

**Q. Was that a written statement?**

A. It was not a written statement. It was a verbal statement in a meeting that I had with Mr. Howard on November 6th and then also at a later meeting that took place at the Smoky Hill Museum.

**Q. Was The Cozy Inn provided with any recommendations about potential changes to the project that might allow it to be approved?**

A. I did mention to Mr. Howard that he could reduce the signage -- the size of the signage to an area that would fit within the 63 total square feet that he had, that he could either reduce the proposed sign down to the remaining nominally 10 square feet that he has or he could remove some existing signs as well but reduce his total

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit O
# Herrs Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

A. I don't recall.
**Q. Were there further discussions within the planning staff about the Cozy Inn mural?**
MS. JOKERST: Object to form.
A. I guess I don't understand what you're asking.
BY MR. SHAW:
**Q. So after this e-mail was sent out on looks like November 6th --**
A. Okay.
**Q. -- were there further discussions amongst the planning staff about the Cozy Inn's mural?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Did any of those discussions involve reevaluating whether or not it was a sign?**
A. No.
**Q. Okay. So by the date of this e-mail, it was determined it was a sign and it was never reconsidered. Is that correct?**
MS. JOKERST: Object --
A. Correct.
THE REPORTER: Can I get that again, Amanda?

potentially a modified sign code if a text amendment were created. Specifically, if text amendment were added that not only counted the exterior wall of the building that faced the street but also the wall that faced the parking lot. If a text amendment were made to allow that frontage facing the parking lot which is where the painted mural sign is, if that were to be part of the equation, would it be sufficiently large enough to allow the sign that Mr. Howard was painting.

**Q. As the code is currently written, would it allow using that side lot line in the calculation of frontage?**

A. No.

**Q. Okay. So it's only the, for lack of a better term, the frontage on the front of the building?**

A. Correct.

**Q. Okay.**

A. So this would require a text amendment, but we were trying to look at potential options for Mr. Howard.

**Q. All right. So if I am reading the equation down there correctly, is that saying that**

**drafting this letter?**

A. No.

**Q. Okay. But you were aware that this letter had been sent to Mr. Howard?**

A. Yes.

**Q. Okay. Are you familiar with a business called The Yard?**

A. Yes.

**Q. Okay. Do you know what line of business The Yard runs?**

A. Baseball training.

**Q. Okay. Can you open Exhibit 25, please?**

A. Please tell me other people struggle with this. I'm feeling kind of foolish here. Oh, it's a big one. That's why.

**Q. Yeah.**

A. Okay. With this being a large document, is there something specific you want me to look at?

**Q. Yeah. So just as you look at those first couple of pages there, can you identify what this document is?**

A. It appears to be a staff report for the demolition and renovation of existing buildings located at the northwest corner of 4th Street and

Walnut.

**Q. What page were you looking at?**

A. The agenda page.

**Q. Okay.**

A. 158.

**Q. Do you know if you worked on the staff report for this Design Review Board meeting, starting at page 166?**

A. Thank you. I may have. I don't remember --

**Q. Okay.**

A. -- specifically.

**Q. Can you go to page 170?**

A. Yes.

**Q. Would you read the section titled Proposed Replacement Construction, and it runs onto the next page.**

A. Okay. Okay. So how far do you want me to read?

**Q. Until that section ends. So when it sentences Zoning Issues, you can stop.**

A. Okay. Okay.

**Q. Based on this proposed replacement construction that the staff report describes, how many buildings are there at this facility?**

A. Three, A, B and C.

**Q. All right. And are buildings A and C existing buildings that were being refurbished?**

MS. JOKERST: Object to form.

A. I don't recall. I'd have to -- is there an attachment that describes that?

BY MR. SHAW:

**Q. Maybe.**

A. Okay. I have it. Building A and building C are existing.

**Q. Okay.**

A. Building B was proposed.

**Q. All right. And there on page 170, is it saying that building B would be built in between those two buildings?**

A. Yes.

**Q. Are you looking at the site plan? What page?**

A. 183.

**Q. 183. Okay.**

A. Aaron, I need some more water.

**Q. All right. So, page 183, that is a overhead site plan. Is that a correct description?**

A. Yes.

**just say they owned that parking lot and they built a structure like this adjacent to the Cozy. Would that be -- would that transform the mural where it currently is to being inside of a building?**

A. I'd have to --

MS. JOKERST: Object to form and foundation.

A. I'd have to see the plans for that.

BY MR. SHAW:

**Q. I see. The murals depicted in Exhibit 32 here, do they depict baseball?**

A. Yes.

**Q. And I believe you testified that The Yard is a baseball training facility?**

A. Correct.

**Q. Does this mural announce The Yard?**

MS. JOKERST: Object to form and foundation.

A. (Pause).

BY MR. SHAW:

**Q. Are you thinking or --**

A. No, I am.

**Q. Okay.**

A. I'm just -- in what way?

MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Do you know if a Certificate of Compatibility was ever applied for this mural?**
MS. JOKERST: Object to form.
A. No.
BY MR. SHAW:
**Q. Do you know if a violation was ever -- or a citation was ever given to The Yard over this mural?**
MS. JOKERST: Object to form.
A. This sign is not in violation, because it is a sign oriented toward the inside of building B.
BY MR. SHAW:
**Q. Does the sign code use orientation at all in the regulation of signs?**
MS. JOKERST: Object to form.
A. That specific word?
BY MR. SHAW:
**Q. Yes.**
A. I don't know.
**Q. Does it use that concept?**
A. Yes.
**Q. Do you know where?**

**Q. So is it the staff's opinion that buildings A, B and C are all one building?**

A. No, they are adjacent buildings.

**Q. So they're adjacent buildings. Which building is the mural in Exhibit 32 located inside of?**

A. The north wall of building B.

**Q. I see. So the north wall of building B is this brick wall several feet away from building B?**

A. They are --

MS. JOKERST: Object to form.

A. They are adjacent and connected.

BY MR. SHAW:

**Q. Do you know if the structure of building B actually touches building A?**

A. There are elements of B that touch building A, yes.

**Q. Is that element just netting?**

MS. JOKERST: Object to form.

A. I don't know.

BY MR. SHAW:

**Q. Can you turn to Exhibit 25 and specifically page 183 of Exhibit 25?**

MS. JOKERST: Did you say 183?

MR. SHAW: Yes, 183.
MS. JOKERST: Thank you.
BY MR. SHAW:
**Q. Are you there?**
A. I have it, yes.
**Q. Is this rendering depicting a gap between buildings A and B?**
MS. JOKERST: Object to form and foundation.
A. Building B appears to be adjacent to building
A.
BY MR. SHAW:
**Q. When you say adjacent, what does that mean?**
A. Directly next to.
**Q. Okay. Does it mean touching?**
A. Like overlapping. They do touch.
**Q. Do the physical buildings touch?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Or I'll ask it this way. Do you see building B, does it depict where the pillars are?**
A. Yes.
**Q. Are any of those pillars touching**

BY MR. SHAW:

**Q. As well as the side wall that is depicted there.**

A. Okay. So as I recall, this property is zoned I-2 which doesn't --

THE REPORTER: I-2?

THE WITNESS: I-2.

THE REPORTER: Thank you.

A. Which is our light industrial zoning district and has different sign allowances and requirements and regulations than Mr. Howard's, for example. And one of the differences is there's not a limitation that I recall on the number of signs you can have. And so what was done is a rectangular box around the various elements and those were all added together into an aggregate.

BY MR. SHAW:

**Q. So you didn't do the entire mural, just the elements of the mural individually?**

A. Correct.

MS. JOKERST: Object to form and foundation.

BY MR. SHAW:

**Q. Did you perform a similar analysis at the**

**Cozy' mural where you took the different elements and calculated them individually?**

MS. JOKERST: Object to form and foundation.

A. No, because Cozy Inn was already up against their limit of the total signs they could have, and so I was trying to figure out a way to allow an additional sign. But I knew that if I did an analysis of all the different elements, one, it would be very, very difficult and, two, it would be unpermitable because the regulations have limits on number of signs in the C-4 district.

BY MR. SHAW:

**Q. If you had measured the Sharp mural as basically the whole wall, the rectangle the way you did with the Cozy, would it have been within the size limits for that district?**

MS. JOKERST: Object to form.

A. I don't know.

BY MR. SHAW:

**Q. Okay. How did you measure the frontage of this building?**

A. It has two frontages. It has frontages on 9th Street and the street to the east as well -- or excuse me, yeah, to the east.

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs
_______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit P
# Andrew Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

Q. Okay. Is there any reason you can't testify here today?
A. I can't think of any.
Q. All right.
A. Seasonal allergies have spiked, and I'll muddle through the best I can. If I lose my voice, I'll just need to drink some water.
Q. All right. And if at any time you need to take a break, that is fine. Just let me know. The only condition on that would be that if there's a question pending that you answer that question first and go to break.
A. Okay.
Q. What is your current job title?
A. I'm the Planning and Zoning administrator for the City of Salina.
Q. And how long have you had that job?
A. That specific job since 2009. I've been employed as a planner by the city for 37 years.
Q. Okay. So, since 2009, you've been the zoning administrator. Before that, you were just a planner?
A. I've had various titles.
Q. Okay.
A. But I've always worked in the Planning

**direct attention to or advertise?**

MS. JOKERST: Object to form.

A. A pictorial representation that had nothing to do with or no connection to a use or a business that is located on the premises where that pictorial representation is located.

BY MR. SHAW:

**Q. So I guess just for an example, would a picture of a cross be considered a pictorial representation?**

MS. JOKERST: Object --

A. A picture of a cross.

BY MR. SHAW:

**Q. Yes, or a painting, a image?**

A. Or a cross itself.

**Q. What does a cross itself mean? Do you mean like an actual physical --**

A. I'm talking about a physical cross. Most of our churches don't put up pictures of crosses. They put up crosses.

**Q. Okay. Well, if a church put up a cross, would that count as a pictorial representation or something else?**

A. It would count as a pictorial representation.

**Q. Okay. Would it also be considered a sign?**
A. It would be considered a symbol, not a sign.
**Q. Does a cross not typically convey a message about the building's religious affiliation?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. You may answer.**
A. Not exclusively. But primarily, churches of the Christian faith are the ones that are interested in placing a cross on their building or in another location on their property.
**Q. So if I understand a cross on a church is not considered a sign, just a symbol?**
A. It is something that our sign code does not count towards the sign area allocated to that church.
**Q. Why does it not count the cross?**
A. Because it's a symbol.
**Q. If you'll look at 42-764, does it not include symbol as part of the definition of emblem?**
A. It does.

**Q. So why are crosses not considered signs and only symbols?**

A. I didn't say they were not considered signs. I said they don't count towards a sign allocation for the church.

**Q. Okay. Why do they not count towards the sign allocation?**

A. Because our code says so.

**Q. Where does it say that?**

A. It doesn't say it in that section.

**Q. Do you know which section it says it in?**

A. It has been the longstanding interpretation for the City of Salina that those are symbols just as flags don't count towards a sign allocation for a property.

**Q. Well, why don't flags count towards the sign allocation?**

A. Because they're not included in the sign calculations.

**Q. But why are they not included in the sign allocations?**

A. Because there's no requirement to obtain a sign permit to erect a flag.

**Q. Why is there no requirement to obtain a sign permit to erect a flag?**

THE REPORTER: Thank you.
BY MR. SHAW:
**Q. Have you determined the difference between a commercial and non-commercial flag?**
A. Have I in my experience?
**Q. Well, yeah, I guess I can ask that question. Have you ever made that determination?**
A. No.
**Q. If a business were to fly a flag such as the McDonald's flag we discussed earlier, would that be exempt under the code?**
A. Not as subsection 1 is written.
**Q. Okay. So a business flag like the McDonald's flag would be regulated and require a sign permit. Is that correct?**
MS. JOKERST: Object to form.
A. I would just be speculating on that. Because in my 37 years, I've never seen a McDonald's or any commercial flag that has come before us.
BY MR. SHAW:
**Q. Okay. What about a -- well, let me ask you this. Have you ever seen a Kansas City Chiefs flag?**
A. I have. I drive by one.

**Q. Would those be considered commercial flags?**
A. No.
**Q. Why not?**
A. Because they are just expressing that property owner's support for their team.
**Q. Do you know if the Kansas City Chiefs are a commercial enterprise?**
MS. JOKERST: Object to form.
A. Well, I know that the Kansas City Chiefs is a sports franchise that desires to make money.
BY MR. SHAW:
**Q. Okay. Could those Chiefs flags be considered advertisements for the Chiefs?**
MS. JOKERST: Object to form.
A. Not in my opinion, no.
BY MR. SHAW:
**Q. So even though it is a commercial business displaying its logo, that is not an advertisement?**
MS. JOKERST: Object to form.
A. I would consider an individual owner who has a Chiefs flag to be displaying a non-commercial flag.
BY MR. SHAW:

**Q. Okay. Okay. Can we return to -- well, actually, let's stay here. Would the Chiefs flag be announcing the Kansas City Chiefs?**

A. It could be interpreted as announcing the Kansas City Chiefs.

**Q. Okay. Would the Chiefs flag be -- strike that. Can you please go back to the definition of sign. There we are. Do you see in subsection 3 where it states that the sign must be located inside -- or excuse me, is not located inside a building?**

A. That is one of the elements in the determination.

**Q. So are there any signs that are located inside a building?**

MS. JOKERST: Object to form.

A. The Tony's Pizza Events Center has a sign located inside its lobby.

BY MR. SHAW:

**Q. Okay. Is that a regulated sign?**

A. No.

**Q. Okay. Because it is inside. Is that --**

A. Because it's inside the building.

**Q. I see. If a sign is inside a building but clearly visible from the outside, would that**

**Q. Okay. Could a artwork viewable from the street direct attention?**

MS. JOKERST: Object to form.

A. It might attract attention.

BY MR. SHAW:

**Q. What is the difference between attracting and directing attention?**

A. Attracting attention might briefly pull your eyes off the road or off the sidewalk to see what it is. Directing attention is for something that someone wants you to read or look at for an extended period.

**Q. Are you familiar with the Mural at the Mill?**

A. I am.

**Q. Does that mural direct attention?**

A. No.

**Q. What does it do?**

A. It attracts your attention.

**Q. I see. Because the artist only intended someone to look at it briefly.**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is that what you're saying?**

MS. JOKERST: Same objection.

required a sign permit for.

**Q. Okay. And is that because it's an advertisement?**

A. It is announcing, directing attention to and advertising the Army Recruitment Center.

**Q. So it's doing all three?**

A. Yes.

**Q. Okay. What about a church or other house of worship? They put up a display saying services Sunday at 10 a.m. Is that a sign?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is that because it is announcing?**

A. It is announcing to the public that they are worship -- place of worship and letting the public know when they meet.

**Q. Okay. What if that same church displayed a message that said turn to Jesus. Would that be a sign?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Why is that?**

A. Well, you just described it as a -- they

would put up a structure, whether it was a banner or whether it's permanent sign, that would be something that is announcing, directing attention or advertising.

**Q. What would they be advertising?**

MS. JOKERST: Object to form.

A. They would be advertising their desire for the public to turn to Jesus.

BY MR. SHAW:

**Q. Okay. In subsection 3 where it says is not located inside of a building, what is considered a building under this section?**

A. A structure that meets the definition of building in the zoning ordinance.

**Q. Okay. Would you please turn to the section defining building?**

A. Appears to be 42-637.

**Q. All right. And does that define a building as any covered structure built for the support, shelter or enclosure of persons, animals, chattels or movable property of any kind and which is permanently affixed to the land?**

A. That is the definition that's in the zoning ordinance.

**Q. All right. What is the support, shelter**

**Q. Why is that?**
A. Because the definition says a wall sign is a sign, and a mural is not a sign.
**Q. What is a mural?**
MS. JOKERST: Object to form.
A. City of Salina does not have a definition for the term mural.
BY MR. SHAW:
**Q. Then how do you know it is not a sign?**
MS. JOKERST: Object to form.
A. A mural would not announce, direct attention to or advertise.
BY MR. SHAW:
**Q. Is a mural calculated to attract the attention of the public?**
MS. JOKERST: Object to form and foundation.
A. I think the word calculated goes to intent, and it's not my job to interpret somebody's intent.
BY MR. SHAW:
**Q. Is that not how the code uses the word calculated, though?**
MS. JOKERST: Object to form.
BY MR. SHAW:

language.

BY MR. SHAW:

**Q. What is the purpose then of having a section to cover things that aren't covered in the previous sections if you can't make the determination of what those things are?**

MS. JOKERST: Object to form.

A. I interpret it as a catch-all phrase.

BY MR. SHAW:

**Q. But is there anyway that you can determine what would fall within that catch-all?**

MS. JOKERST: Object to form.

A. There's probably different forms of expression that the code writers didn't or couldn't anticipate at the time it was written, so it was to catch all those.

BY MR. SHAW:

**Q. But does this catch-all require you to make a determination about intent?**

MS. JOKERST: Object to form.

A. No.

BY MR. SHAW:

**Q. How do you know if it's calculated to attract the attention?**

MS. JOKERST: Object to form.

A. I don't look at that.

BY MR. SHAW:

**Q. If you don't look at that, why is that word in here?**

A. You'll have to ask the person who drafted the definition.

THE REPORTER: Amanda, what was your objection?

MS. JOKERST: To form.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. I'm asking you because it is your job as zoning administrator to provide the city's definitive interpretations of this code.**

A. Then you give me a concrete example, and I'll make an interpretation.

**Q. I'm trying to understand what this section could ever apply to.**

A. It applies to signs.

**Q. I think this is defining signs. Is that not correct?**

MS. JOKERST: Object to form.

A. It is designed to inform the public and the people administering the code what the governing body wants to be regulated as a sign.

foundation.

A. According to the rules of construction of our city code, or and and are interchangeable, so I can't make that determination.

BY MR. SHAW:

**Q. Do you no where in the city code that is placed?**

A. In the rules of construction.

**Q. I see. So and and or are interchangeable?**

A. They can be, yes.

**Q. They can be or they are?**

A. Code says they can be.

**Q. How then is someone to know if it means and or or?**

MS. JOKERST: Object to form and foundation.

A. You have to look at the context in which its used.

MS. JOKERST:

BY MR. SHAW:

**Q. All right. In subsection 2 there, for instance, do you see the and after the semicolon?**

A. Yes.

**Q. Does that mean and or or?**

MR. SHAW: Required here.

THE REPORTER: And then your objection?

MS. JOKERST: Object to form.

THE REPORTER: Thank you. Sorry. Go ahead.

A. They used a series of commas followed by an or.

BY MR. SHAW:

**Q. Well, I understand that. But the code says and and or can be interchangeable. So how do you know that it means or and not and?**

MS. JOKERST: Object to form.

A. I didn't say that I know with certainty. I said that is the way I interpret the way it is drafted.

BY MR. SHAW:

**Q. Okay. Is there anyway a member of the public could know whether this means and or or without first getting your determination?**

MS. JOKERST: Object to form and foundation.

A. They could read it for themselves, and then they could contact the city to see how the city has historically interpreted it.

BY MR. SHAW:

**to look like and get a determination from you about whether it qualifies as a painted wall sign or a mural?**

MS. JOKERST: Object to form.

A. It is very commonplace for people who want to erect something or have a pictorial representation or some graphic to come into our office and say this is what I'm looking to do. Does this fit within your code.

BY MR. SHAW:

**Q. All right. And how would you help that person determine if it was a mural or a painted wall sign?**

A. By looking at whether it announces, directs attention to or advertises.

**Q. So you would need to see a rendition or plan of what it is they plan to paint?**

A. Yes.

**Q. Okay. And depending on the content of that rendition, you would make the determination if it is a mural or a wall sign?**

MS. JOKERST: Object to form.

A. I would look at it.

BY MR. SHAW:

**Q. You would look at the content to**

**is so as to not regulate it?**

MS. JOKERST: Object to form.

A. I don't understand the question.

BY MR. SHAW:

**Q. All right. You said that the city does not regulate the content. But if you don't know what the content means, how do you ensure you are not regulating content?**

MS. JOKERST: Object to form.

A. I would look at the graphic representation of what that individual owner wanted to display on their wall and I would determine, one, whether it announces, directs attention to or advertises. And then the second thing we would do is we would look at the extent of the wall that it covers and determine if that area is allowed within the sign code in the district that they're located.

BY MR. SHAW:

**Q. So let's say a business paints or comes to you with a rendition wanting to paint on its wall, and it would cover the entire wall, a -- just text saying, you know, buy our product. How would you determine if that is a sign or a mural?**

MS. JOKERST: Object to form.

A. I would look at the rendering that they provided. And if it was words or numbers, I would determine whether those words or numbers announce, direct attention to or advertise the business or the products at that premises, and we would attempt to draw a rectangular box around those letters and calculate the square footage of the display to determine whether it was too large or not too large to be located as proposed.

BY MR. SHAW:

**Q. And let's say that same business came to you with a proposal to paint on the side of their building the Arrowhead logo of the Kansas City Chiefs and text, you know, let's go Chiefs. How would you determine if that were a sign or not?**

MS. JOKERST: Object to form.

A. I would determine whether those graphics announced or directed attention to or advertised.

BY MR. SHAW:

**Q. How would you do that?**

A. Well, in the specific context you gave me, I would interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs.

**Q. What if that property was a training**

**facility for the Kansas City Chiefs?**

A. Then it would be the same thing except it's also advertising and directing attention.

**Q. Okay. Now, let's say the text on this mural, the letters are very widely spaced. Would you draw a rectangle around the entire display or only around each letter to determine its area?**

MS. JOKERST: Object to form.

A. The entire display.

BY MR. SHAW:

**Q. Okay. Would you also draw that rectangle around any other emblems that are related to that mural?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. So in the example I gave before, you've got the Chiefs Arrowhead and then the let's go Chiefs. Would you draw one rectangle or two separate rectangles?**

MS. JOKERST: Object to form.

A. Are we talking about painted wall signs or are we talking about murals?

BY MR. SHAW:

**Q. Well, either way. How would you determine the size?**

MS. JOKERST: Object to form.
A. I wouldn't determine the size on a mural because we don't regulate murals. But I would determine that if I determined it to be a painted wall sign.
BY MR. SHAW:
**Q. All right. If you have determined it to be a painted wall sign, how would you determine the size of that mural?**
A. I would determine the size of the painted wall sign by following the instruction in Section 42-503 (a), and we would construct a rectangular box around the display.
**Q. But would you consider that to be one display that includes both the Chiefs Arrowhead and the text let's go Chiefs, or do you consider it two displays one of the Arrowhead and one of the wording of let's go Chiefs?**
A. I would consider it to be an integral display.
**Q. Okay. So include both. Is that what that would mean?**
A. I would include both --
MS. JOKERST: Object to form.
A. -- of those in the calculation.

listed the home team, the visitor's team, the time and score.

BY MR. SHAW:

**Q. Is a billboard something more than a structure with changeable copy?**

MS. JOKERST: Object to form and foundation.

A. A billboard is synonymous with the term off-premises or advertising sign. And if Kansas Wesleyan University sells advertising space to area business that are not located on the premises and that sign is oriented towards Cloud Street and not the stadium, then that side of the structure is not a scoreboard. It is a off-premise sign.

BY MR. SHAW:

**Q. What does the orientation have to do with the sign?**

A. The presumption in exempting a scoreboard is that a scoreboard --

MS. JOKERST: Can I -- did my objection get on there?

THE REPORTER: No. Can you give it to me, please.

MS. JOKERST: Object to form.

A. Can you repeat the question?

MR. SHAW: Can you read that back, please?

THE REPORTER: "What does the orientation have to do with the sign?"

MS. JOKERST: I said object to form.

A. The adopted exemption for scoreboards is based partially on the fact that the information they convey is directed to people that are in the stadium. And the determination for taking that scoreboard structure and saying that it's an off-premise sign is because the advertising is not oriented towards or directed towards the people within the stadium.

BY MR. SHAW:

**Q. If the advertising copy were placed on the side of that scoreboard facing the audience, would that be a scoreboard or an advertising sign?**

MS. JOKERST: Object to form.

A. It would be a scoreboard.

BY MR. SHAW:

**Q. Even with the advertising copy?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. So it is the orientation of the**

of time.
BY MR. SHAW:
**Q. Okay. Does this section apply to non-commercial signs as well?**
MS. JOKERST: Object to form.
A. It appears to refer to signs that advertise a bona fide business.
BY MR. SHAW:
**Q. Okay. So let's say, for instance, someone put up a, you know, Mitt Romney 2012 sign, and it's still up here in 2024. Is that sign considered abandoned?**
MS. JOKERST: Object to form.
A. It would be considered an election sign that was up seven days after the election.
BY MR. SHAW:
**Q. So you're not allowed to have any election signs seven days after an election?**
A. Correct.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. If I were a -- not me. If any property owner were a big Dwight Eisenhower fan and they just wanted to put up a paint on the side of their wall, you know, I like Ike, would that be**

**allowed?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Is I like Ike a campaign slogan from the Eisenhower campaign?**
MS. JOKERST: Object to form and foundation.
A. I don't know.
BY MR. SHAW:
**Q. Okay. Why would the I like Ike sign be allowed but not the Mitt Romney 2012 sign not -- let me rephrase that. Why is an I like Ike sign not considered a political sign seven days after an election?**
MS. JOKERST: Object to form.
A. Well, for one, Mr. Eisenhower is deceased, so he couldn't be running for any elective office. And it is simply an expression of whoever the sign holder is that they like Ike.
**Q. But why can't the Mitt Romney fan continue expressing their admiration for Mitt Romney?**
MS. JOKERST: Object to form and foundation.

A. If he wants to strike all portions from the sign that deal with voting for Mr. Romney or have an election date in it, then he can all the signs he wants that shows that he loves Mitt Romney.

BY MR. SHAW:

**Q. Okay. So if the Eisenhower fan painted vote Eisenhower 1952, would that be considered a political sign that can't be up more than 7 days?**

MS. JOKERST: Object to form and foundation.

A. I would not consider that an election sign.

BY MR. SHAW:

**Q. Why wouldn't you consider it an election sign?**

A. Common sense tells me it's not an election sign. It's not left over from some election.

**Q. What if the sign had been painted in 1952 and it was just still around?**

MS. JOKERST: Object to form.

A. I would consider it a historic sign.

BY MR. SHAW:

**Q. I see and what is a historic sign?**

**smell but its neighbor did have a smell?**

MS. JOKERST: Object to form.

A. Because the sign is still inviting customers to come in and partake of their product and notwithstanding the smell of the chicken farm.

BY MR. SHAW:

**Q. If The Cozy Inn was not a restaurant or -- let's do a different one. Let's say The Cozy Inn only did delivery and so customers would never come to the Cozy Inn location, would the phrase Don't Fear the Smell still be a sign?**

MS. JOKERST: Object to form.

A. That would require me to speculate.

BY MR. SHAW:

**Q. I'm asking you to state how you would interpret this code in that scenario?**

A. I think you're asking me to speculate without the full context.

**Q. The full context is that this is a building that delivers food to customers but customers never come to that building, and it has a mural saying Don't Fear the Smell. Would that be interpreted as a sign under the code?**

MS. JOKERST: Object to form.

A. I'd have to see what's on the rest of the

wall of the building.

BY MR. SHAW:

**Q. It's a white wall except for those words?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Would it be a sign in that situation?**

A. My first --

MS. JOKERST: Object to form.

A. My first inclination would be to consider that a sign.

BY MR. SHAW:

**Q. Why is that?**

A. Because there's nothing else on the wall of the building.

**Q. Why does the presence of other things on the wall of the building change the determination one way or another?**

MS. JOKERST: Object to form.

A. Well, it's not -- it's not a non-commercial message.

BY MR. SHAW:

**Q. If it's referencing the smell of its neighbor, would that be a non-commercial message?**

MS. JOKERST: Object to form.

A. Not necessarily.

BY MR. SHAW:
**Q. What message would that be?**
A. The Don't Fear the Smell message could still be an invitation to partake of their food.
**Q. Even if no one would ever come to this building?**
A. Even if no one would ever come there, because their food -- they're telling the public their food is not affected by the smell of the chicken farm.
**Q. I see. If the mural depicted pizzas, would that be considered a sign for the Cozy Inn?**
MS. JOKERST: Object to form.
A. What else is on the wall?
BY MR. SHAW:
**Q. It is the white wall of The Cozy Inn, and there's just a big pizza mural on it?**
MS. JOKERST: Object to form.
A. Well, I think the first thing I would do is to determine whether it is off-premise advertising for some other establishment in the downtown area.
BY MR. SHAW:
**Q. How would you determine that?**
A. By looking at the pizza and seeing if it

made reference to any of the existing establishments in Salina or the downtown area.

**Q. And if it's just a pepperoni pizza with no sort of logo or wordage on it, is that a sign or a mural under the code?**

MS. JOKERST: Object to form.

A. I don't have to determine whether it's a mural. I only have to determine whether it's a regulated wall sign.

BY MR. SHAW:

**Q. Okay. Would you determine that that is a regulated wall sign?**

MS. JOKERST: Object to form.

A. Again, you're asking me to speculate. But if it was in the context of a blank white wall with a pizza symbol on it that had no association with announcing or directing attention to or advertising The Cozy Inn business and did not advertise another nearby establishment, then it would not be a regulated wall sign.

BY MR. SHAW:

**Q. If that exact same painting were painted on the wall across town at a pizza joint, would that then be a sign?**

MS. JOKERST: Object to form.

**Q. I'm sorry. That was not what I intended to convey. What I'm asking is if that picture of a pizza, just a pepperoni pizza and nothing else was painted on the side of a pizza shop, would you determine that to be a sign?**

A. Yes.

MS. JOKERST: Object to form. Let me get my objection in.

BY MR. SHAW:

**Q. Why would you determine that as a sign?**

A. Because it announces, directs attention to and advertises to the public that that is an establishment that offers pizza to its customers.

**Q. What if a picture of a cup of coffee and a steaming coffee pot were painted on the side of The Cozy Inn with no words. Would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. I would have to know whether The Cozy Inn served coffee to its customers.

BY MR. SHAW:

**Q. If it did not serve coffee to its customers, would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. If it did not announce, direct attention

to or advertise a product or service that was available inside The Cozy Inn establishment, then just by itself, a steaming coffee pot or steaming cup of coffee would not be associated with that business.

BY MR. SHAW:

**Q. If The Cozy Inn did sell coffee, though, would that change your calculus?**

A. Yes.

MS. JOKERST: Object to form. Did you answer, Dean? I didn't hear.

A. I did answer yes to that question.

BY MR. SHAW:

**Q. If The Cozy Inn painted a mural of flying saucers attacking the building, would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. I couldn't answer that question unless I saw a rendering of what they were -- what that looked like.

BY MR. SHAW:

**Q. Let's say it looked like a traditional science fiction movie of flying saucers with little green men attacking the building. Would you consider that to be a sign?**

MS. JOKERST: Object to form.

A. I'd have to see a rendering of what it looked like to make that determination.

BY MR. SHAW:

**Q. All right. What if there were just an airplane painted on the side of The Cozy Inn?**

MS. JOKERST: Object to form to the extent there's a question pending.

BY MR. SHAW:

**Q. Would that be a sign in your understanding?**

MS. JOKERST: Object to form.

A. There's no airline service or travel agency or anything associated inside that building, I wouldn't see the association between that graphic representation and The Cozy Inn business.

BY MR. SHAW:

**Q. Okay. What if there were a mural of baseball field with people playing baseball on the side of The Cozy Inn. Would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. I would give the same answer as I would to the coffee pot and the airplane.

BY MR. SHAW:
**Q. Is that a no?**
A. I would not consider it to be a sign.
**Q. Okay. And with the airplane hypothetical, did you also say you would not determine that to be a sign. I think I may have missed that?**
MS. JOKERST: Object to form.
A. I said if an airplane was painted on the north wall of The Cozy Inn building, it's not a travel agency, there's no product or service associated with airline travel within, I would not consider that to be something that announces, directs attention to or advertises The Cozy Inn.
BY MR. SHAW:
**Q. If there were a mural of a -- with a landscape of a pasture with cows grazing and mustard plants, tomatoes and onions growing in the field, would that be considered a sign for the Cozy Inn?**
MS. JOKERST: Object to form.
A. I'd have to see a rendering.
MS. JOKERST: Hey, Mr. Shaw?
MR. SHAW: Yes.
MS. JOKERST: I'm assuming -- well, I

guess I don't know. How much longer and would now be a good time to take a short lunch break?

MR. SHAW: Give me maybe five minutes. I'm almost done with this line of questioning. Then we can take a short break -- or we could take a lunch break, not just a short break.

BY MR. SHAW:

**Q. Are you familiar with the artist Andy Warhol?**

A. I think I know who he is.

**Q. Can you turn to Exhibit 38. It should be almost the last exhibit. It should be the second to the last page in the binder?**

A. Oh, the very last.

**Q. That's it right there.**

A. Right there. Okay.

**Q. So what's marked there as Exhibit 38, have you ever seen that painting before?**

A. I have not.

**Q. Okay. If that painting were painted on the side of The Cozy Inn, would that be considered a sign?**

MS. JOKERST: Object to form.

A. I would give the same answer I did with the airplane. That does refer to a specific

product. It borderline could be considered an off-premise sign directing people to a product that is available in other locations in Salina. But just standing by itself, it does not announce or direct attention to or advertise The Cozy Inn.

BY MR. SHAW:

**Q. If The Cozy Inn sold tomato soup, would that change your calculus?**

MS. JOKERST: Object to form.

A. It would.

BY MR. SHAW:

**Q. Okay. Would that make you determine that this is a sign?**

MS. JOKERST: Object to form.

A. I would determine that it advertises a product that they are making available to their customers inside.

MR. SHAW: Okay. All right. We can break for lunch now.

(THEREUPON, a recess was taken.)

BY MR. SHAW:

**Q. Mr. Andrew, before we took our lunch break, I believe you had said that you had attended a meeting on Monday, November 6th of 2023 when you were first informed about the painting on**

**Q. Okay. So is it the official position of the City of Salina that Section 2-207 does not require a Certificate of Compatibility for painting anything other than a front facade?**

MS. JOKERST: Object to form.

A. That has been the determination and interpretation.

BY MR. SHAW:

**Q. If Mr. Howard had called up the Boom! festival and said, hey, I would love a Boom! mural to be painted on the side of my wall, would that have required a Certificate of Compatibility?**

MS. JOKERST: Object to form and foundation.

A. It depends on what the end result was.

BY MR. SHAW:

**Q. Let's say it was just a mural similar to the Mural at the Mill, children playing Ring Around the Rosie?**

MS. JOKERST: Object to form.

A. If it were identical to the mural that's on the south wall of the building at the corner of Ash and Santa Fe, which was a Boom! festival mural and you picked that mural up and moved it to the north wall of The Cozy Inn, we would treat that

exactly the same as we treated the mural that's on the south wall of that building.

BY MR. SHAW:

**Q. Is that to say you would not require a Certificate of Compatibility in that scenario?**

A. We would not.

**Q. Okay. Do you know someone by the name of Travis Young?**

A. I do.

**Q. Who is Travis Young?**

A. He works for Salina Vortex, and he is one of the organizers, original instigators of the Boom! festival.

**Q. So was he at that meeting you referenced earlier to discuss the Boom! festival?**

A. I was at one meeting when the Boom! festival was first getting started. He was present along with Eric Montoy.

**Q. Okay. Have you had any other conversations with Mr. Young?**

A. I had one e-mail correspondence with him related to downtown. I correspond with him regularly in the course of the business that he owns which is Salina Vortex.

**Q. So you correspond with him about that**

artificial rectangles around it. We treated the entire north wall as part of the display area.

BY MR. SHAW:

**Q. Okay. After Mr. Howard submitted this application on November 13th or whenever he submitted it, what was done with this application by your department?**

A. It was placed on file and on hold.

**Q. What does it mean for it to be on hold?**

A. It means that we could not approve it, but we were going to try to continue to work with Mr. Howard to find a code-compliant code-based solution that might allow ultimately the sign to be installed.

**Q. Does the city code discuss procedures for placing a sign permit on hold?**

MS. JOKERST: Object to form.

A. It does not.

BY MR. SHAW:

**Q. So is placing a sign permit on hold just a unwritten practice?**

MS. JOKERST: Object to form.

A. It's not an unwritten practice. It's usually done in consultation with the applicant.

BY MR. SHAW:

BY MR. SHAW:
**Q. And at any point after he submitted his application, did Mr. Howard consent to it being placed on hold?**
MS. JOKERST: Object to form.
A. No. Because he already knew we couldn't approve it.
BY MR. SHAW:
**Q. Okay. But is that consent?**
MS. JOKERST: Object to form.
A. You tell me the difference between non-approval and denial and I'll answer your question.
BY MR. SHAW:
**Q. Well, a denial under the code triggers certain appeal rights. Is that correct?**
MS. JOKERST: Object to form.
A. What would he appeal?
BY MR. SHAW:
**Q. He could appeal to the Board of Zoning Appeals. Is that correct?**
MS. JOKERST: Object to form.
A. He could appeal to the Board of Zoning Appeals at any time.
BY MR. SHAW:
**Q. So your position is that he may appeal at**

**due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until our review of the sign regulations is complete. Is that sentence past tense or future tense?**

MS. JOKERST: Object to form.

A. I'm not sure I follow the question.

BY MR. SHAW:

**Q. Do you see where it says our office will be placing your Certificate of Compatibility application and sign permit application on hold?**

A. If I was writing it, it would say has been placed.

**Q. I see. Do you know why it was not written in that manner?**

MS. JOKERST: Object to form.

A. I do not have firsthand knowledge of that.

BY MR. SHAW:

**Q. When was the application placed on hold?**

A. When it was received.

**Q. So would that be November 13th, 2023?**

A. That would be the date it was received if that was in fact the date it was received.

BY MR. SHAW:
**Q. Who wrote this letter?**
A. Dustin Michelson.
**Q. Did you instruct Mr. Michelson to write this letter?**
A. Miss Driscoll and I -- Miss Driscoll instructed it, and I was asked to work with Dustin to get it out.
**Q. So did you review this before it was sent out?**
A. I did.
**Q. Is there a reason you did not change the wording so that it stated that it had been placed on hold?**
A. No, other than I probably didn't pay attention to that portion as much as I could have. I was mostly focused on the wording of the third paragraph.
**Q. The third paragraph saying as a part of the city's review of the sign regulations, are you referring to that paragraph?**
A. Yes.
**Q. Okay. Why was Mr. Michelson instructed to write this letter?**
A. One, he was just starting to get involved

department is involved with, including The Cozy Inn.

**Q. So just so I've got this straight, it's your position that The Cozy Inn's application was placed on hold on November 6th, 2023. Is that correct?**

MS. JOKERST: Object to form.

A. Yes. And we told Mr. Howard that we were going to work to try to come up with a code compliant solution that might ultimately end up with his permit being issued for his display and that that was going to take some amendments to our current sign code. And so we were trying to convey the message that we were going to continue to work with him as well as others in the community who had sign issues of their own.

BY MR. SHAW:

**Q. Does this letter make any reference to a determination made on November 6th?**

A. It does not.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Were you instructed to send this letter by Miss Driscoll?**

MS. JOKERST: Object to form.

question pending.
BY MR. SHAW:
**Q. What is the difference between her asking and her instructing you?**
MS. JOKERST: Object to form.
A. Her mode of operation, her mode of dealing with her subordinate staff. Her mode of operation is to ask. And as my direct supervisor and head of the department, ask, instruct, direct, they're all the same.
BY MR. SHAW:
**Q. Okay. So I was imagining emphasis --**
A. Ask is not a courtesy.
**Q. Okay. Could you please turn to Exhibit 13, -- I'm sorry, Exhibit 12.**
A. Okay.
**Q. Do you recognize this document?**
A. That is a planning -- or that is a Downtown Design Review Board then known as the Lee District agenda that was sent out for that meeting by Mr. Burger who's no longer with us.
**Q. Okay. And I think you just answered might have next question. Is the Lee District the same thing as the Downtown Salina Design Review District?**

**installations?**

MS. JOKERST: Object to form.

A. City code does not have a definition for a mural.

BY MR. SHAW:

**Q. Well, I understand that. Does it have a definition for art installation?**

A. It does not.

**Q. Okay. If a business came to you and said we would like to paint a mural, do we need a Certificate of Compatibility, what would you tell them?**

MS. JOKERST: Object to form.

A. I'd tell them I would like to see a rendering of what they would like to do so I could determine whether it's a regulated sign or not.

BY MR. SHAW:

**Q. And if you determined that it is not a regulated sign, what would you do then?**

A. If it was not on the front facade of the building, I would tell them that no regulatory approvals are required.

**Q. Is the mural at Salina Arts Center on the front facade of that building?**

A. It is.

sign or a historical sign.

**Q. Is it an abandoned sign?**

MS. JOKERST: Object to form -- no, I'm not going to object to that.

A. It is not an abandoned sign.

BY MR. SHAW:

**Q. What is it not an abandoned sign?**

A. Because it's a preexisting sign that was exposed when a building was demolished in 1986.

**Q. Earlier when we were discussing abandonment and non-conforming signs, you had stated that the only non-conforming sign that wasn't subject to abandonment was the theater marquee signs. Do you remember that?**

MS. JOKERST: Object to form.

A. I don't recall it exactly that way. I recall reviewing that code section.

BY MR. SHAW:

**Q. So why is this sign not subject to abandonment under 42-510?**

A. Because it was originally an internal sign on the wall of a enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall.

BY MR. SHAW:
**Q. Do you see the mural next to this Bull Durham mural?**
A. Not really.
**Q. Based on what you can see, has that been maintained?**
MS. JOKERST: Object to form.
A. I can't speak to it because I don't know what it is.
BY MR. SHAW:
**Q. Do you know who owns this building?**
A. I do know who owns that building. It's the home of Land Title Services.
**Q. Who runs Land Title Services?**
A. I believe the owner of Land Title Services is Mike Hoppock.
**Q. Does Mr. Hoppock have any role in the City of Salina?**
A. Mr. Hoppock is currently an elected city commissioner.
**Q. Okay. Please turn the page to Exhibit 16. Are you familiar with this letter?**
A. I am familiar with this letter.
**Q. Do you see in the paragraph where it says because the Treasure Chest facility discontinued**

A. It was.
**Q. Is that Schlotzsky's located inside of a large shopping center?**
A. It's an outlot that's located in the Mid State Plaza addition.
**Q. Do you know how the frontage for that building was calculated?**
A. I do.
**Q. How was it calculated?**
A. It was calculated based off their 9th Street frontage and the mall ring road on the south.
**Q. I see. So it wasn't just the street frontage. It was the parking lot of the large shopping center which had a path for cars to drive. That was considered street frontage?**
A. No, that --
MS. JOKERST: Object to form.
A. That was considered to be a private street that provided access to Schlotzsky's.
BY MR. SHAW:
**Q. Even though there's parking in between Schlotzsky's and that private road?**
A. Yes.
**Q. Okay. Go quickly to Exhibit 39, please.**

**Q. Would you please go to Exhibit 34. So that first page there of Exhibit 34, are you familiar with that mural?**

A. I am.

**Q. When did you first learn about that mural?**

A. When I saw it.

**Q. When was that?**

A. Don't recall, maybe 2022, maybe when I was there doing an inspection. Don't recall.

**Q. Okay. And is that mural outside?**

A. I consider that mural and we have considered that mural to be inside the practice facility.

**Q. On the third page of that exhibit, Bates No. 301, is that another angle depicting that mural?**

A. Yes.

**Q. And is that mural covered by anything in the facility?**

A. No. But it is enclosed, and that wall forms the north wall of the practice facility.

**Q. When was that determination made?**

A. Probably when we determined that it was there.

**front of The Yard, is that 4th Street?**
A. That is 4th Street.
**Q. Is that a public street?**
A. It is a public street. It's a public right-of-way.
**Q. Okay. And is the mural visible from 4th Street?**
MS. JOKERST: Object to form.
A. I think from this angle I can see a corner of it.
BY MR. SHAW:
**Q. Okay.**
A. The part that's -- I don't know if that fence has mesh in it or not, if that's what obscuring it, but I can see the very corner.
**Q. Okay. On the previous page with the Bates No. 301, is that taken from the public sidewalks?**
MS. JOKERST: Object to form.
A. It looks like it's taken from the public sidewalk.
BY MR. SHAW:
**Q. Okay. And is the mural visible there?**
A. It is.
**Q. Okay. Is there anywhere in the Salina**

**City Code where it discusses the orientation of a sign?**

A. It does not. I searched in vain for it and insisted that it did, but it does not.

**Q. Okay. And apart from your attorneys, I don't want to know about anything you may have spoken to with them, did you speak to anyone else in preparation for today's deposition?**

A. No.

MR. SHAW: Okay. I have no further questions for you.

MS. JOKERST: I'm going to have some follow-up, but I want to take like a 10-minute break to review my notes. It should be pretty quick.

MR. SHAW: All right. So back at 5:50?

MS. JOKERST: 4?

MR. SHAW: Yeah, sorry, 4:50.

MS. JOKERST: 3:51 my time, 4:51 your time, yes.

(THEREUPON, a recess was taken.)

CROSS-EXAMINATION

BY MS. JOKERST:

**Q. Mr. Andrew, I'm going direct your attention to Exhibit No. 7. Can you pull that up?**

**that Steve Howard is lying in his application?**

MS. JOKERST: Object to form and foundation.

A. I don't even know what that means.

BY MR. SHAW:

**Q. Is it the position of the City of Salina that Steve Howard has altered the rendition he submitted to be different than what he originally planned?**

MS. JOKERST: Object to form.

A. I have no firsthand knowledge of that.

BY MR. SHAW:

**Q. Okay. Do you have any reason to believe that the imagery he submitted with his application is not the imagery he intended to have painted on his wall?**

MS. JOKERST: Object to form.

A. I don't know who prepared and submitted that.

BY MR. SHAW:

**Q. Okay. But do you have any reason to believe that Mr. Howard did not intend to have that imagery placed on his wall?**

A. There is no basis --

MS. JOKERST: Object to form.

A. -- to doubt what his ultimate intentions were.

BY MR. SHAW:

**Q. Okay. Does your department have a tape measure?**

A. It does.

**Q. Is a tape measure an acceptable way to measure a wall?**

A. Not a wall that's too tall to measure for the tape measure.

**Q. Do you know how tall The Cozy Inn is?**

A. It's been determined to be -- those walls are determined to be about 12 feet tall.

**Q. How long is your tape measure that the department has?**

A. Nine feet.

**Q. Okay. Does the department never need to measure anything more than 9 feet?**

A. We have other tools for measuring things that are tall. But Pictometry is an acceptable way to measure side wall heights, measure the heights of houses and other things.

**Q. Okay. Regarding the Certificate of Compatibility for Eccentricity, do you know if Mr. or Mrs. Mattison filed that certificate?**

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 14th day of October, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs

______________________

Sandra S. Biggs, C.C.R No. 0716

# Exhibit Q
# Andrew 30(b)(6)
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**commercial location or can it be directing attention to a non-commercial location as well?**

A. It can direct attention to any particular location.

**Q. All right. And when the city determines if a display advertises, what methodology does the city use to make that determination?**

A. We look to see whether the visual display promotes or encourages some sort of product or service or invitation to enter into some form of commercial transaction or whether the visual display promotes a particular brand or a particular product.

**Q. Does the advertising have to be commercial in nature or can it be non-commercial?**

A. It does not have to be commercial.

**Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public?**

A. No.

**Q. Why doesn't the city determine that?**

A. Because in interpreting and applying Section 42-764, the city has interpreted that to be a catchall provision and to catch any type of display mechanism that's not mentioned in the

application, an inventory of any existing signs that are already on the property.

**Q. Will that maybe be called an elevation drawing, is that basically like a drawing of where the proposed sign would be on the property?**

A. No.

**Q. All right. What is the elevation drawing then?**

A. Elevation drawing is an -- a drawing prepared usually by a sign manufacturer that says this is the proposed sign, here's the materials it's made out of, this is its height and width and here is the information on whether it's designed to be illuminated or static. And it's a draw that depicts the appearance and the physical characteristics of that sign.

**Q. Would the elevation typically include the copy that will be placed on that sign if it is installed?**

A. Yes.

**Q. Okay. Is the copy required to be in the application?**

A. It is if you want us to measure the letters.

**Q. Is the city -- strike that. Does the**

A. No.
**Q. Why not?**
A. Because it's a non-conforming sign. As a non-conforming sign, the owner of the sign can maintain that sign. They just can't enlarge it or structurally modify it or expand it.
**Q. And has the city determined whether or not this sign is considered an abandoned sign?**
A. It is not considered an abandoned sign.
**Q. When did the city make that determination?**
A. Well, if it made that determination, it predated the abandoned sign code which I believe was adopted in 1990.
**Q. I'm confused by that. Before the code was adopted defining what an abandoned sign is, the city had determined it is not an abandoned sign?**
MS. JOKERST: I'll object to form.
A. This sign was inside a building. This sign's over a hundred years old and was inside a building. That building was torn down in 1985. That interior wall became an exterior wall when the building was removed to make way for the parking lot. So at that point in time when it

BY MR. SHAW:
**Q. So as long as a building is not vacant, a sign can't be abandoned?**
MS. JOKERST: Object to form.
A. The abandoned sign ordinance establishes time frames for certain parts, portions of signs or sign support structures to be removed. And the triggering for that is the date upon which the premises became vacant. If the premises is not vacant, there's no date to trigger that on.
BY MR. SHAW:
**Q. So even if the sign no longer advertises a bona fide business conducted, products sold or service provided, it isn't abandoned until the property has been vacated?**
MS. JOKERST: Object to form.
A. The time period the clock for removal starts when the premises is vacant.
BY MR. SHAW:
**Q. All right. We can move on to Exhibit 18. Are you familiar with Exhibit 18?**
A. It appears to be a photograph of Fire Station No. 2 on South Santa Fe.
**Q. Has the city made a determination about whether the mural at Fire Station No. 2 is**

**considered a sign?**

A. Yes.

**Q. What determination was made?**

A. The determination that it does not constitute a sign that announces, directs attention to or advertises.

**Q. What methodology did the city use to make that determination?**

A. It used the methodology found in Section 42-764 to determine whether the visual display on the front of the building announced or directed attention to or advertised. It does not announce or proclaim any fact, event, occurrence or entity, it does not direct attention to any specific location or opening or doorway or any physical location, and it does not advertise.

**Q. Does this mural depicted in the exhibit identify the building as a fire station?**

A. The city's position is that it does not. It could just as easily appear on a museum or library or anywhere else.

**Q. Does this mural pertain to the activities conducted at the fire station?**

MS. JOKERST: Object to form.

A. Not this fire station.

**Q. Where is that mural located?**
A. It's on the south wall of the Schlotzsky's sandwich shop.
**Q. And has the city determined that the mural depicted here is a sign?**
A. Yes.
**Q. When did the city make that determination?**
MS. JOKERST: Object to scope.
A. I can't tell you the exact time. I can tell you it was determined when the city became aware of it and went out and reviewed it. It determined it to be a regulated sign and contacted the owner of the business and the owner of the property to say that they needed to obtain a sign permit for that sign.
BY MR. SHAW:
**Q. What portions of this mural did the city consider to be triggering the sign code?**
MS. JOKERST: I'll object to form.
A. The city determined it to be a single composition and determined that the entire visual display was a sign.
BY MR. SHAW:
**Q. How did the city come to that**

**tower off of Magnolia Street?**

MS. JOKERST: I'll object to form.

A. There is a sign that's painted on the water tower.

BY MR. SHAW:

**Q. Okay. What does the sign on the water tower say?**

A. To the best of my recollection, it says Salina and it has Visit Salina.org underneath it, but I would have to refer to the graphic I brought to the deposition with me.

**Q. Okay. Referring to an image of it would refresh your recollection?**

A. Yes.

**Q. All right. Can you turn to Exhibit 39 then, please -- I'm sorry, not Exhibit 39. 34.**

A. Is it stand-alone or is it associated with other things? Some of these have multiple pages. It used to have Salina lettered on it, but now, it just says Visit Salina.org, Right Place, Right Reason, Right Now.

**Q. I'm sorry, it used to say what?**

A. Used to say Salina.

**Q. Okay. And so the city has determined that this is a sign. Is that what you testified**

A. The City of Salina, city commission, believes that putting that information on the water tower protects the public health, safety and welfare. It also provides wayfinding by letting visitors know, one, that they're in Salina and, two, where they can find information about Salina.

BY MR. SHAW:

**Q. What facts does the city have that show that the Chamber of Commerce website promotes the public health, safety or welfare?**

MS. JOKERST: Object to form and scope.

A. Because attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public.

BY MR. SHAW:

**Q. Are traffic and wayfinding signs -- let me rephrase that. Can any sign that might be used by a driver as a landmark be considered an exempt sign under this section?**

MS. JOKERST: Object to form and scope.

A. This exemption refers to signs that are placed or authorized by the city. This sign was both placed and authorized by the city by which I mean the governing body of the city.

**Q. And so each line of the pentagon was individually calculated as a separate sign?**

A. No.

MS. JOKERST: Object to scope.

A. You asked me how we calculated the area of it.

MS. JOKERST: Did we get my scope objection on the record here?

THE REPORTER: Yes.

MS. JOKERST: Okay.

A. All right. So I understood your question to be how the city calculated the size of that sign.

BY MR. SHAW:

**Q. Yes, that was the question.**

A. We drew a rectangle around The Yard and the bat, and we drew -- we measured the rectangle that forms the base of home plate, the rectangle that forms the left and right sides of home plate and the rectangles that form the point of the home plate, added those together and determined those to be what constituted the area of the sign. And the black -- entirely black backdrop of the paint wall was not considered to be part of the sign.

**Q. Okay. So if I understand you correctly,**

symbols.

BY MR. SHAW:

**Q. So for The Yard wall sign we were discussing, shouldn't there have been a single rectangle that encompassed the entire home base plate and the text saying The Yard?**

MS. JOKERST: Object to form and scope.

A. I do not believe so, no.

BY MR. SHAW:

**Q. So is it the city's position that each individual element of a painted wall sign may have a independent rectangle drawn around it and then all of those rectangles are added up to calculate the wall sign?**

MS. JOKERST: Object to form.

A. I'll let you calculate using your method and then I'll answer your question, because I don't understand what you're saying. Because what you're saying is exactly what we did.

BY MR. SHAW:

**Q. Yes, that's what I'm asking. It's the city's position that whenever there's a wall sign --**

A. Where it's practical.

**Q. Okay. Where it's practical?**

BY MR. SHAW:

**Q. What methodology did you utilize to determine that it was not practical to use this method for The Cozy Inn?**

MS. JOKERST: Object to scope and form.

A. A, it's a single composition and, B, there's no rectangles. It's not -- it all blends together.

BY MR. SHAW:

**Q. Why could you not draw individual rectangles around each burger and each element of the mural that is painted on the wall of The Cozy Inn?**

MS. JOKERST: Object to scope and form.

A. I don't think it's practical.

BY MR. SHAW:

**Q. Okay. And is that based on anything in the code or is that your determination as zoning administrator?**

MS. JOKERST: Object to form and scope.

A. That is my determination as a zoning administrator.

MS. JOKERST: Can we take a brief break to go off the record? I just want to get an official estimate on what we're doing for time

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs
_______________________

Sandra S. Biggs, C.C.R No. 0716

# Exhibit R
# Schrage Email
# 11/8/23

Message

**From**: mike.schrage@salina.org [mike.schrage@salina.org]
**Sent**: 11/8/2023 3:54:03 PM
**To**: Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC**: jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject**: Cozy Inn Wall Sign
**Attachments**: Cozy Inn Wall Sign.jpg

Schrage
EXHIBIT NO. 19
APPINO & BIGGS

Mayor Hoppock & City Commissioners:

If you aren't already aware, Cozy Inn has recently begun painting a *wall sign* on the south side of their building (see attached photo). While it aesthetically might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which include size limitations among other things.

There is considerable litigation surrounding the topic of art, free speech, commercial speech and disparate treatment of one sign in comparison to another. I know I sound like a broken record, but this is shaping up to become a city-wide precedent without further refinement of our applicable sign codes. Pick whatever example you like, but Applebee's could choose to paint the entirety of all four sides of their building as walls signs citing this as the precedent without further refinement of our codes. Another example is that more prominent brick walls along Santa Fe, Iron, Walnut, etc. could be utilized for commercial advertising signs painted on brick or otherwise.

Maybe we as a community are okay with that, but our current code doesn't reflect that and that is a difficult policy question to be deliberated on.

You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes.

Further addressing murals and the commercial speech question was already on Development Services' plan of work for 2024. Lauren Driscoll had already begun to identify consultants versed not only in the planning issues but the legal issues surrounding this topic.

With respect to Cozy Inn, we were not contacted in advance. Rather, we became aware as the painting was observed.

Staff has contacted them and asked them to pause. And, a meeting has been scheduled with them for Monday of next week.

The intended message is that we are willing to try to work with them to frame up the policy questions necessary for the community to decide whether they wish to permit wall signs such as theirs; trying to explain the significance and precedent setting nature of the question at hand; and explaining how their project is classified as a sign and not a mural. We fully anticipate likely responses of its already on social media and everyone loves it and what's the big deal reminiscent of the Toy Parade.

As much as we would like to resolve this quickly, that is just not a realistic expectation given the complexity of the topic, the outside assistance we are going to need and the policy review an adoption process that needs to take place.

In advance of the Monday meeting with staff, Mr. Howard has begun contacted City Commissioners and others. So, I am emailing to provide you with some background in advance. We will remain as customer service oriented as we can, but the crux of the issue is that they began painting a commercial wall sign without contacting us and we now find ourselves

playing catchup while trying to avoid being overly blunt saying it is prohibited by code and squarely placing blame with them.

In anticipation of the likely response that the Bull Durham sign on the Land Title building is commercial speech, it went through a DRB review and approval process based on its historical nature and it does not pertain to a product available for sale.

I would be happy to discuss this further if you have questions or are receiving additional feedback.

I will provide an update following Monday's meeting as well.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov




CITY000263

# Exhibit S
# Schrage Talking Points

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 3:53:08 PM
**To:** mike@landtitlesalina.com
**Subject:** Cozy Inn Talking Points

Our intended message is

this question is not unique to Salina.

A distinction is commonly made between murals and art when compared to commercial speech.

We regulate the size of commercial signs through a permit process.

We were not contacted in advance and a permit was not applied for.

The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code.

We are willing to work with Mr. Howard

this is going to be a code revision and policy decision that will take some time.

We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
TDD: 785-309-5747
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 25
APPINO & BIGGS

CITY000220

# Exhibit T
# Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**November 13, 2023**
**4:00 p.m.**

Vice-Mayor Longbine asked the Clerk for verification that notice had been sent for today's City Commission meeting. The Clerk replied yes.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. A roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Vice-Mayor Bill Longbine (presiding), Trent W. Davis, M.D., Greg Lenkiewicz, and Karl Ryan.

Also present: Mike Schrage, City Manager; Jacob Wood, Deputy City Manager; Shawn Henessee, Assistant City Manager; Greg Bengtson, City Attorney; and Nikki Goding, City Clerk.

**AWARDS AND PROCLAMATIONS**

(3.1) Proclamation of the month of November, 2023, as National Home Care and Hospice Month. Debra Bengston, President of Accessible Home Care and Gentiva Hospice, joined by Lyndsey Webb and Nikki Welsh, read the proclamation and discussed related activities.

**PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME**

None.

**CONSENT AGENDA**

(5.1) Award the bid for updated park trash receptacles in the amount of $147,895.10 and authorize the City Manager to authorize the purchase upon the fulfillment of all prerequisites under the purchasing policy.

(5.2) Award a quote for five (5) gas utility vehicles using cooperative purchasing in the amount of $68,011.76 and authorize the City Manager to authorize the purchase upon fulfillment of all prerequisites under the purchasing policy.

(5.3) Approve the minutes of the meeting of November 6, 2023.

23-0337 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve the consent agenda as presented. Aye: (4). Nay: (0). Motion carried.

**ADMINISTRATION**

(6.1) Approve Ordinance No. 23-11181 on second reading approving the execution of Amendment No. 1 to the Loan Agreement between the Kansas Department of Health and Environment and the City of Salina for the purpose of financing improvements to the Wastewater Treatment Plant (KWPCRF Project No. C20 2049 01).

Vice-Mayor Longbine stated Ordinance No. 23-11181 was passed on first reading on November 6, 2023. Since that time, no comments have been received.

Schrage
EXHIBIT NO. 33
APPINO & BIGGS



CITY000169

I 23-0338 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Ordinance No. 23-11181 on second reading. A roll call vote was taken. Aye: (4). Nay: (0). Motion carried.

(6.2) Approve Ordinance No. 23-11182 on second reading approving the execution of a Loan Agreement between the City of Salina and the State of Kansas for the purpose of financing drinking water service lines inventories to account for any lead service lines (Kansas Water Supply Loan Fund Project No. 3185).

Consolidated-Salina EPN111155

Vice-Mayor Longbine stated Ordinance No. 23-11182 was passed on first reading on November 6, 2023. Since that time, no comments have been received.

23-0339 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Ordinance No. 23-11182 on second reading. A roll call vote was taken. Aye: (4). Nay: (0). Motion carried.

(6.3) Authorize the City Manager to execute agreements with Fire Facilities, Inc. for the cost of materials in the amount of $35,836.00 and JTL Construction in an amount not to exceed $6,600.00 for labor associated with repairs to the City of Salina Fire Department Training Tower, for a total cost not to exceed $42,436.00.

Drew Sprague, Division Chief of Training for the Salina Fire Department, explained the request, fiscal impact, and action options.

A short discussion on the variance of pricing between bids was had, relating to travel expenses for recommended out-of-state repair contractors.

I 23-0340 Moved by Commissioner Ryan, seconded by Commissioner Davis, to authorize the City Manager to execute agreements with Fire Facilities, Inc. for the cost of materials and with JTL Construction for labor associated with repairs to the Training Tower, and to authorize the City Manager to reallocate the 2023 sub-CIP funds in the amount of $42,000 planned initially for bailout harnesses to Training Tower repairs. Aye: (4). Nay: (0). Motion carried.

(6.4) Award the low bid for construction of the new Sanitation equipment storage building.

Jim Kowach, Public Works Operations Manager, explained the request, fiscal impact, and action options.

The ensuing discussion focused mainly on the pros and cons of bonding versus paying up front in cash for the building construction and how the City will recoup funds from paying cash.

Mike McCall with M Squared Architects advised starting construction sooner rather than later as metal prices are set to rise again very soon.

E 23-0341 Moved by Commissioner Davis, seconded by Commissioner Ryan, to approve the target sanitation fund balance be increased from $500,000.00 to $750,000.00 and approve the low base bid and add-alternate 1 bid for the new Sanitation building and authorize the City Manager to execute a contract in the amount of $812,242.00 with Ponton Construction, Inc. from Salina, Kansas, funding out of cash reserves in the Sanitation Fund. Aye: (4). Nay: (0). Motion carried.

I

(6.5) Approve Charter Ordinance No. 43 on first reading exempting the City of Salina from certain parts of Chapter 308 (Senate Bill 508) of the Session Laws of 1937, as amended by Chapter 250 (Senate Bill 341) of the Session Laws of 1939, an act authorizing certain cities of the first class to convey certain property to the Board of Education of such city.

Shawn Henessee, Assistant City Manager, explained the request, fiscal impact, and action options.

A brief discussion on anecdotal history of the property was had among the City Commissioners and staff.

Greg Bengtson, City Attorney, highlighted that the residences bordering the land in question to the south are not part of this action.

23-0342 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Charter Ordinance No. 43 on first reading. A two-thirds vote was necessary to advance the motion. Aye: (4). Nay: (0). Motion carried.

**DEVELOPMENT BUSINESS**

None.

I

**OTHER BUSINESS**

Commissioner Longbine asked for updates on a proposed Safe Haven baby box at the Salina Fire Department, for which Fire Chief Tony Sneidar provided an update.

City Manager Mike Schrage brought forward discussion on a mural being painted on the side of Cozy's Inn. There had been misunderstandings surrounding the mural as its content falls under sign provisions in the City Code rather than art, and City staff met with the owner of Cozy's to discuss options. After background details were provided by Lauren Driscoll, Director of Community and Development Services, the City Commission felt it may be in the best interest of those involved to bring in outside consultants who are experts in sign codes and art as advertisement to find a way forward that's amenable to the public while still respecting Supreme Court rulings and code provisions.

**CITIZENS FORUM**

Norman Mannel, Salina, Kansas, shared his thoughts on governments regulating private businesses.

Ken Reitz, Salina, Kansas, gave his feelings on artists and murals around town.

I

Johnny Keller, Salina, Kansas, made a point that the murals around Salina serve to bring people into the City, effectively working much the same as the Cozy's mural aims to bring in customers to their business. He wondered if there was a way to evaluate situations such as this one on a case-by-case basis.

**EXECUTIVE SESSION**

**ADJOURNMENT**

23-0343 Moved by Commissioner Ryan, seconded by Commissioner Davis, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (4). Nay: (0). Motion carried. The meeting adjourned at 5:44 p.m.

Michael L. Hoppock, Mayor

[SEAL]

ATTEST:

Nikki Goding, City Clerk

# Exhibit U
# Schrage Email
# 2/20/24

Message

**From**: mike.schrage@salina.org [mike.schrage@salina.org]
**Sent**: 2/20/2024 10:23:56 AM
**To**: travis@vortexglobal.com
**Subject**: Cozy Inn Sign Code Lawsuit

Travis:

I am playing catchup to a federal lawsuit recently filed on behalf of The Cozy Inn equating their sign to the murals painted throughout the downtown. Apparently, it has hit the news media. I am in orientation training with the City Commission all day today. It is too soon to say if or how it might impact the Boom! Salina, but that is something will have to review. I will reach out to you further once we have had a chance to conduct our legal review and collect our thoughts a bit more.

My intended response is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation. I say all of that because we have felt confident of our policy and application this point, but it will now have to be litigated; I don't know how long that might take; and I don't know what that might mean about our code enforcement in the interim.

I will reach out just as soon as I know more and can discuss it further with you.
Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash Street, Room 202
Salina, KS 67402
Phone: 785-309-5700
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 93
APPINO & BIGGS

# Exhibit V
# Art Center DRB Packet

Historic Salina Downtown
Lee District

# DESIGN REVIEW BOARD

Exhibit C

LEE DISTRICT SALINA DOWNTOWN INC.

**DESIGN REVIEW BOARD**
**4:00 P.M., Thursday, April 23, 2015**
**City Conference Room 107**
**City-County Building, 300 West Ash Street**

## AGENDA

1. Administration:
   A. Call to Order/Roll Call.
   B. Additions or corrections to the agenda.
   C. Review of Minutes for March 26, 2015 meeting.
   D. Introduction of guests.

2. New Business:

2A. The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review and receive public comments regarding a façade improvement project that has been planned for the Art Center's South Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the South Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

3. Other Business:

4. The next regular meeting, if scheduled, will be on May 14, 2015.

5. A motion to adjourn is in order.

Andrew
EXHIBIT NO. 12
APPINO & BIGGS

***An applicant or his representative is required to attend the hearing in order for the Design Review Board to take action on an application.***

City of Salina/Development Services Planning Division City-County Building 300 W. Ash Street, Room 201
Salina, KS 67402-0736 785/309-5720 FAX 785/309-5713 email: john.burger@salina.org

***Design Review Board Members:*** Michael Trow – ***Chair***
Daniel Baffa, Larry Bunker, Maggie Gillam, Tina Lewis – Vice Chair

***Salina Downtown Inc.*** 120 West Ash Street PO Box 1065 Salina, Kansas 67401 785-825-0535
***Interim Executive Director:*** Penny Bettles Email: pbettles@salinadowntown.com

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion.

Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address, and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant, and/or citizens as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

Any person dissatisfied with a decision by the board to either grant or deny a certificate of compatibility may appeal the decision to the Board of City Commissioners by filing a written protest with the City Clerk on a form provided by that office. The notice of appeal must be filed within fourteen (14) calendar days after the conclusion of the public hearing. If you have any questions or concerns, please contact the Development Services Department in Room 201 of the City-County Building, 309-5720.

(7-16-14)

City of Salina

# Application for a Certificate of Compatibility
## Lee District - Design Review Board

| *Please return the completed application to:* | *The City Planning Department:* |
|---|---|
| **Development Services Department**<br>300 W. Ash, City-County Building, Room #201<br>Salina, KS 67402-0736<br>785-309-5720 FAX 785-309-5713<br>Email: john.burger@salina.org | • *Provides technical assistance to the applicant*<br>• *Receives the completed application*<br>• *Provides a copy of the application to the SDI Office for input*<br>• *Schedules the Design Review Board hearing*<br>• *Presents the application to Design Review Board* |

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. The applicant must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 242 S. Santa Fe Ave.
2. Name of Business Salina Art Center
3. Applicant's Name Salina Art Center (Bill North)
4. Applicant Ph. 827-1431
5. Applicant's Address same
6. Email bnorth@salinaartcenter.org
7. Property Owner Name (if different) ____
8. Property Owner Address ____
9. Owner Ph. ____
9. Contractor/Architect Conrad Snider
10. Phone 316-288-8694
11. Contractor/Architect Address 310 W. Fourth, Newton, KS
12. Email conrad@southwind.net
13. What kind of work is proposed? (please check all that apply)
    ☐ Renovation or repair ☐ Demolition ☐ Sign or Canopy ☐ New Construction ☐ Paint
    ☒ Other, please describe Ceramic tile mural
14. Approximate cost of project (including labor and material) $18,250

**Please attach the following materials to the application:**

1. Representative color photographs showing the existing structure and the location for the proposed work.
2. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
3. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
4. Material samples or product specifications indicating color, form, profile and texture.
   See also the attached *Guide to Completing a Certificate of Compatibility Application* for required submittal material for project types: new construction, renovation or repair, sign or canopy or demolition.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**

See attached

Applicant Signature: Date 4/10/2015

Property Owner Signature (if different): ____ Date ____

**For Staff Use:** **Application** DRB15-1

Legal Description of Property LOTS 158 & 160 ON SANTA FE, ORIGINAL TOWN

| | |
|---|---|
| Current Zoning C-4 | Current Use ART GALLERY/EDUCATION |
| Date Filed 4-10-15 | Accepted by J BURGER |
| Date of Publication NA | Building/Sign Permit No. NA |
| Property Owner Notice Sent 4-15-15 | Heritage Commission Review (y/n) NO |
| Date of Hearing 4-23-15 | Approval Notification Sent ____ |

Case 6:24-cv-01027-TC Document 105-22 Filed 02/07/25 Page 5 of 31

Attachment, Salina Art Center, Application for a Certificate of Compatibility, Lee District, Design Review Board

The proposed project is a ceramic tile mural along the Art Center's Santa Fe Avenue façade. The specific location is the 12 x 23 ft. bay between the Art Center's original Santa Fe entrance and the current entrance. Ceramic artist Conrad Snider will create and install the mural. A three-time SculptureTour Salina exhibitor, Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be fired to Cone 10 (2,300 degrees Fahrenheit), which will vitrify the clay, making it resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with an epoxy grout.

The mural design will take into consideration the exterior of the building, including colors and surfaces of the brick, ceramic elements on the center pillar, and roof tiles. The space allowed for the tile mural is approximately 12 feet by 23 feet, for a total of 230 square feet (see attached photo).

**STAFF REPORT**
**LEE DISTRICT DESIGN REVIEW BOARD**

Hearing Date: **April 23, 2015**

**ITEM**

The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review a proposed façade improvement/art installation project that has been planned for the Art Center's Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

**BACKGROUND**

Conrad Snider, a Newton, Kansas ceramic artist has been commissioned to create and install a mural comprised of handmade ceramic tiles that would be attached to the stucco wall in the Art Center façade. The art installation will become a permanent feature of the Art Center's Santa Fe façade. The mural will be comprised of sculptural elements existing on the exterior of the building, including the brick, terra cotta and the Spanish Tile roof. Mr. Snider's work is found throughout the state and includes the *Points of Contact* ceramic mural located in the Salina's First Presbyterian Church, and the *Woven* terra cotta figures in front of Salina's Municipal Court Building.

A Ceramic Workshop has been scheduled by the Salina Arts and Humanities Department under the Horizon Grants Program that will involve up to 12 participants of the community. Under the direction of the artist, Conrad Snider, participants will assist in the creation of a scale model of a ceramic tile mural for the exterior of the Art Center. The series of workshops at the Art Center Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Mr. Snider's permanent sculptural mural. The art installation would become an important feature of the Art Center's visual identity and downtown Salina's streetscape. The workshop is open to high school students and adults with no experience in ceramics required. A call for the Ceramics Workshop is attached to this report.

**PHYSICAL CHARACTERISTICS**

Records indicate that the one-story storefront building on Lot 160, addressed as 240-241 S. Santa Fe was originally constructed of brick with a Mission Revival cornice and Spanish Tile roof in 1929. A one-story storefront building addressed as 236-238 S. Santa Fe was constructed on Lot 158 in 1946. The Knights Sporting Goods Company and various storefronts occupied 238 and 240 S. Santa Fe until 1987. A building permit was issued in August 11, 1987 to convert the space at 240-242 S. Santa Fe to the Salina Art Center at a cost of $237,000. The space was opened to the public on January 11, 1988. Architect Donnie Marrs enclosed the storefront facing Santa Fe with two bays, having arched stone surrounds, a building base and terra cotta tile columns.

The Art Center expanded into the space at 236-238 S. Santa Fe in 1992, establishing an open floor plan education wing that included additional gallery and work space, restrooms and storage. Jones-Gillam Architects designed an all glass storefront with a sculptured metal canopy on the Santa Fe façade and a covered courtyard at the rear of the building.

An artist in residence warehouse was established in a commercial space at 149 S. 4th Street in 2008. The space is occupied by an open work area and an apartment for Artist-in-Residence exhibitors at the Salina Art Center. This space is utilized as a workshop and for various activities and projects of the Art Center throughout the year.

**PROPOSAL**

The proposed project would include the installation of a ceramic tile mural along the Art Center's Santa Fe façade. The work would be located in the northern one-half of the original Art Center building. The specific location is the 12 ft. by 23 ft. bay between the original Art Center entrance on the south and the education wing to the north. This area is delineated by the arched stone surround and the stone building base at the sidewalk.

Ceramic artist Conrad Snider will create and install the mural. Mr. Snider is a three-time Sculpture Tour Salina exhibitor and maintains a work studio in a renovated 1920's feed mill in Newton, Kansas. A summary description of Mr. Snider's work is maintained on his website, a copy of which is attached to this report.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be formed and fired in a kiln to vitrify the clay and make it water resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with epoxy grout to match the tile

The mural design will take into consideration work done at a Ceramic Workshop being sponsored by the Salina Arts and Humanities Horizon Program where a scaled prototype will be designed and constructed. The composition of the proposed mural will utilize the colors and surface textures of the brick, ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. The space allowed for the tile mural is approximately 12 feet by 23 feet, totaling 230 sq. ft. This blank stucco area on the Art Center façade has been utilized in the past for temporary art installations.

**STAFF ANALYSIS**

Installation of public art does not require a Certificate of Compatibility however; a public hearing has been scheduled before the Lee District Design Review Board in order to receive comments on the compatibility of the art piece to submit as part of a grant application to the Façade Development Incentive Program (DIP) of Salina Downtown, Incorporated. The grant program is designed for large and small scale projects for new

Case 6:24-cv-01027-TC Document 105-22 Filed 02/07/25 Page 8 of 31



construction, renovation of building facades and interiors of existing historic buildings. The program is designed primarily for façade improvements to the exteriors of buildings in the Lee District. The amount of any grant is contingent on the scale of the project and available funds. Non-profit Salina Downtown, Inc. partner businesses located in the Lee District boundary are eligible to apply for DIP funds.

The proposed project appears eligible for the DIP program as a façade renovation and restoration project. Work found to comply with the Salina Downtown Guidelines (contingent on Design Review Board approval) is an eligible use of funds.

> The Design Guidelines for Downtown Salina, 2008 contains the following Policies relating to Architectural Character:
>
> ***Building materials should be visually compatible with the predominate materials of the downtown area.***

The historical use of terra cotta and ceramic tile accents and trim is consistent throughout the Blocks of North and South Santa Fe. Evidence of this can be found at 117-119 S. Santa Fe and 111-125 East Iron Avenue, among others. It is integral to the Spanish Revival style of architecture used by Salina architects, such as Charles Shaver during the 1930's. Much of this is attributed to the influence of J. C. Nichols' development of the Country Club Plaza in Kansas City. The 200 Block of South Santa Fe West elevation contains several Spanish Revival style facades.

It appears that the mural design program will utilize the colors and surface textures of the brick, terra cotta and ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. This would appear to be consistent with the Design Guidelines.

**REQUESTED ACTION**

Similar to the addition of a new storefront, awning or other permanent improvement or renovation of an existing architectural element, it is appropriate for owners and residents potentially affected by such an activity in the Lee District to receive notice and an opportunity to be heard on the matter.

A public hearing was been scheduled for the Design Review Board to receive public comments and input about the mural design and installation. As a general rule, an art installation does not fall within the scope of authority of the DRB, however in this case the DRB is being asked to make a recommendation on this proposed art project for use with an application being made under the Façade Development Incentive Program of SDI.

The art installation is intended to be a permanent element similar in function to a sign or logogram that will direct the public to the gallery and educational activities within the Art Center building. It is also intended to enrich and engage members of the public visiting

or doing business within the Downtown area. Letters of notice were sent to surrounding property owners announcing this public hearing. Since the Lee District Design Review Board customarily reviews exterior improvements in the Lee District, it is appropriate for this Board to receive comments from the public at the hearing concerning the art installation as a requirement of the Façade Development Incentive Program. A description of the DIP Program is attached to this report.

A record of the proceedings and any verbal or written comments received will be provided to the Façade Development Incentive Program (DIP) Review Committee for their use in analyzing a potential grant award for this project. Grant awards are made during May and September of each calendar year.


Facade Improvement
Salina Art Center
242 S. Santa Fe Avenue
SALINA ART
CENTER
Request Area
Santa Fe Ave
Mulberry St
N
W
E
S

# CALL FOR
# CERAMIC WORKSHOP
# SALINA ART CENTER MURAL

# CERAMIC WORKSHOP PARTICIPANTS NEEDED

Modeling Community: Salina Art Center Façade Mural Project

Limited to 12 participants - **SIGN UP TODAY!**

Under the direction of acclaimed ceramic artist Conrad Snider, participants will assist in creating a scale model of a ceramic tile mural for the exterior of the Art Center's Santa Fe Avenue façade. A series of workshops at the Art Center's Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Snider's permanent sculptural mural, which will become an important feature of the Art Center's visual identity and downtown Salina's streetscape.

This project was funded in part by the Horizons Grants Program of the Salina Arts and Humanities Foundation. Funding is provided by Horizons, a private donor group.

Three-time SculptureTour Salina exhibitor Conrad Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

**WHAT:** Ceramic mural workshop with Conrad Snider.

**WHO:** The workshop is open to high school students and adults. No experience with ceramics necessary.

**WHEN:** Wednesday, **April 22, 4-6 p.m.**; Thursday, **April 23, 4-7 p.m.**; and 3 sessions before May 6 (dates and times TBD on April 22).

**WHERE:** The Salina Art Center Warehouse, 149 S. 4th St.

**HOW:** Register online (http://goo.gl/QjqeDn), by email (info@salinaartcenter.org), or by phone (827-1431). Participation in the workshop is FREE OF CHARGE. Registration is on a first-come, first-served basis and limited to 12 participants. There will be a waiting list.

For more information, call 827-1431.

SALINA ARTS & HUMANITIES Horizons Grants Program

SALINA art center




Salina Art Center, 242 S. Santa Fe, proposed mural site




Salina Art Center, 242 S. Santa Fe, proposed mural site



Sample Mural Design

# CONRAD SNIDER
# STUDIO WEBSITE



*Conrad Snider*
*Large Scale Ceramic Sculpture, Hand Made Tile Murals, and Wheel Thrown Vessels*

*Write to me here*

Visit Soldner Equipment

# Conrad Snider

Welcome to my website. Thank you for visiting and come back again, new photos are added periodically.

Here you will be able to visit my studio, see one-of-a-kind large scale ceramic sculptures and vessels, and see how the vessels are made.

Click on the images below to see other pieces. Scroll down to read about my work.



Figures



Tile Murals



Wheel Thrown Vessels



Public and Private Projects



Hand Built Vessels



Studio and Home

My work is all large scale and ranges from clay vessels, both thrown on the potter's wheel and hand built, to figurative pieces and hand-pounded tile murals. Each of these aspects is important to me and feeds a different part of my personality. When I work on a piece I try to let the clay speak, sharing its natural behaviors, sensuality, visual strength, and power. I want each piece to have its own individual presence.

The process from wet clay to a finished piece takes 6 months to a year, ending with the final glaze firing in a gas reduction kiln to 2300 degrees Fahrenheit. Some pieces will be fired multiple times to enhance the glazed surfaces and textures. The surfaces are equally important to the form for the overall effect of the piece. High fired clay is impervious to fingerprints, water, and paints, which allows tactile exploration to be as much a part of the viewers' experience as visual interpretation. These same attributes also make clay ideal for public art installations.

I make most of my pieces ahead and find homes for them later on. Most of my sales are to individuals, though I have done a number of public commissions, and have pieces in several Public and Corporate collections. Because each piece is personal to me, and they spend so much time in the studio, they become like my children. I want them to go to good homes where they will be appreciated for years to come.

Read more Resume

This page is currently being modified. Some links are not yet completed. Please bear with us and come back soon.

# Tile Murals

*Back to Home*



These tile wall murals are ideal for architectural accents and can be custom commissioned. Most of the tiles are made to fit on a one foot grid, including grout lines. These tiles are hand-pounded individually and fired to Cone 10, 2300 degrees Fahrenheit.



72" X 96"



72" X 96" X 5"



98" X 147"



72" X 96"



72" X 120"



72" x 96"

# SALINA DOWNTOWN, INC.
# DEVELOPMENT INCENTIVE PROGRAM

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects**

This grant program is designed for *large* scale projects for new construction, and for renovation of façades and interiors of existing historic buildings (see definition below) within the Lee District. Salina Downtown, Inc. recognizes that property owners and tenants may need assistance making costly improvements and enhancements to the exterior of their buildings and to the interior of historic buildings. This program is designed primarily for façade improvements and new construction. However, interior improvements to historical or locally historically significant buildings (50 years or older) may qualify. The amount of any grant is contingent on the scale of the project and available funds through the Development Incentive Program.

**ELIGIBILITY:** Property owners and/or tenants who are in good standing with the Lee District (service fees are current) are eligible to apply. However, non-profit Salina Downtown, Inc. partner businesses located within the Lee District boundary are also eligible to apply for DIP funds.

**AVAILABLE FUNDS**: $35,000 annually 2008-2010. Maximum single project award $15,000.

**MATCHING REQUIREMENT**: All applications are competitive and require a minimum cash only match of 1.5:1 private to Development Incentive Program (DIP) grant funds. In-kind contributions will NOT count towards the required match. This is a reimbursement program. Upon completion of the project the applicant is required to pay the full amount of the project up front and submit proof of paid bills before reimbursement will be made. (See Reimbursement Policy)

**ELIGIBLE USE OF FUNDS**: Projects may include but are not limited to:

- New building construction
- Building expansion
- Vacant building redevelopment
- Facade renovation and restoration (emphasis on removal of metal siding and metal awnings) and/or replacement with new coverings or roll-ups
- * Work complying with Salina Downtown Design Guidelines, contingent on Design Review Board approval
- Pressure cleaning
- Stucco: new or restoration
- Painting
- Window, Door or transom replacements or repairs.
- Re-pointing of mortar joints for brick or stone
- Awnings (including the removal/installation of old awnings and canopies)
- Alley entry way improvements
- Entry way tile in exterior doorways
- Interior code related work.
- Interior work to historical buildings or buildings deemed to be historically significant (50 years or older) and work preserves historical interior aspects of the building

**INELIGIBLE USE OF FUNDS:**

- Signage
- Projects with no minimum 1.5:1 match
- Projects outside the Lee District boundaries
- Any in-kind expenses including labor of property/business owners
- Roofing
- HVAC

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**SELECTION CRITERIA:** All projects will be judged on their individual merits and components. The following criteria will serve as the basis of consideration:

- Ratio of matching funds minimum 1.5 private to 1 DIP. Additional consideration given to applicants providing more than the minimum match requirements.
- Projects creating new businesses and/or additional employment in downtown will receive additional consideration or priority.
- Project's adherence to Salina Downtown Design Guidelines
- Improvements to façade given priority
- Interior work may be included at the discretion of the review committee if the building is Historic or deemed historically significant (at least 50 years old) and the interior work preserves historic characteristics.

**APPROVAL:**

Applications are subject to review and approval by the DIP Review Committee with final approval of the Salina Downtown, Inc. Board of Directors. The DIP Grant Review Committee includes two members of the SDI Business Support and Recruitment Committee, one SDI Board member, one Design Review Board member and one member appointed by the Salina City Commission. Applications awarded DIP funding will officially be notified by letter.

**ADDITIONAL REQUIREMENTS**:

- Provide an architectural drawing or sketch
- Provide a five minute oral presentation to the application review committee.
- All projects awarded grants must be completed within one calendar year from the award letter date.
- Two professional contractor estimates of the cost of the intended improvements are required.
- Application must include a professional architectural design including color and material choices.
- All work must meet all City Building code requirements.
- All applicants are responsible for acquiring and completing all necessary city permits.
- Taxes and Lee District Fees must be current.
- Written approval of building owner, specifying work, must be included in application (if applicable).
- A contract must be signed between Salina Downtown, Inc. and applicant within three months of approval from SDI Board and prior to work commencing.
- The SDI office will be notified in advance of commencement of all work on the project
- Representatives of SDI will be allowed on the work site at all reasonable times.
- Environmental assessment must be completed
- Work must be completed within one year of signed Grant Reimbursement contract.

**APPLICATION DEADLINE:** Application forms are available from Salina Downtown, Inc. (SDI), PO Box 1065, 205 West Ash Street, Salina, Kansas 67401 and on line at www.salinadowntown.com. Completed applications are due at the SDI office by 12:00 noon the third Wednesday of April and August. Awards will be made twice annually in May and September. Applications awarded DIP funding will officially be notified by letter.

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**REIMBURSEMENT POLICY**

Successful applicants receive disbursement of DIP funds after completion of project, approval of work by a final City inspection, receipt of Certificate of Completion, and submittal of copies of paid invoices for approved expenses to the SDI Executive Director. To receive reimbursement, the property owner must sign an agreement to maintain the funded building improvements for a period of at least 3 years for a DIP Forgivable Loan Program for Major Projects ($3,500 and above). This agreement shall provide for a lien against the property in an amount equal to the reimbursement amount.

**REPAYMENT/GRANT FORGIVENESS POLICY**

For reimbursement totaling $3,500 and above, one third (33.3%) of said lien for improvements shall be forgiven annually on the anniversary date of the Certificate of Completion. Should the property be sold or refinanced prior to the full forgiveness of the lien, the remaining amount of the lien shall be paid to SDI upon sale, or closing of the refinancing Grant. The agreement shall be filed with Saline County Register of Deeds and transferred upon sale of the property.

# Exhibit W
# Sign Permit Submittal Procedures

City of Salina

DEVELOPMENT SERVICES DEPARTMENT
City-County Building ● 300 West Ash Street - Room 205 ● P.O. Box 736
Salina, Kansas 67402-0736
TELEPHONE (785) 309-5715 OR 309-5720 ● FAX (785) 309-5713
TDD (785) 309-5747 ● E-MAIL building.services@salina.org

# SIGN PERMIT SUBMITTAL PROCEDURE

**All Sign Permit Applications Shall Include:**

1. **Site Plan of Zoning Lot*** - Use a scale of at least one inch to 50' or less and show the location of all structures, existing signs on premises and proposed sign(s). Also show the location of all property lines, streets, driveways and parking areas. Set-back measurements to property lines of signs and buildings are to be shown.

2. **Shop Drawings** – Submit drawings of proposed sign(s) drawn in detail showing the height, dimensions, proposed copy and structural type of sign. If sign is double faced, indicate the distance between sign faces. Also, indicate if sign will be lighted internally, externally or have flashing, pulsating or moving lights or lights which create the illusion of movement.

3. **Inventory of Existing Signs** – Provide the information requested (number, square footage, type and height etc.**) on the attached "Inventory of Existing Signs" form.

4. **Completed Application Form***** - Failure to provide all requested information will in most cases cause a delay in the review of the sign permit application.

***Zoning Lots** - A parcel of land that is designated by its owner or developer, at the time of applying for a zoning certificate as a tract all of which is to be used, developed or built upon as a unit under single ownership. Typically Shopping Centers and Malls are considered one zoning lot. The total building frontage determines the total allowable sign square footage.

****Gross Sign Surface Area** – The gross surface area of a sign shall be the sum of all surface areas of all the sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

*****Sign Contractor Licensing Requirement** – No person shall engage in the business of sign hanging, installation, erection, maintenance or repair of signs within the corporate limits of the city without complying with the provisions of the Salina Code which requires that all sign contractors be licensed.

PLF – 012, Rev. 2-12

*"Our Mission is to encourage and promote safe, quality Development and construction in the City of Salina"*

CITY000661

## Classification of Signs by Function and Structural Type

**The following signs are classified by function:**

1. ***Advertising Sign*** – A sign, which directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located or to which it is affixed (off-premise sign).

2. ***Bulletin Board Sign*** – A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events of activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

3. ***Business Sign*** – A sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

4. ***Construction Sign*** – A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

5. ***Identification Sign*** – A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

6. ***Nameplate Sign*** – A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

7. ***Real Estate Sign*** – A sign pertaining to a sale or lease of the lot or tract of land on which the sign is located, or to the sale or lease of one or more structures, or a portion thereof located thereon.

**The following signs are classified by structural type**:

1. ***Awning, Canopy and Marquee Si***gn – A sign that is mounted or painted on, or attached to an awning, canopy or marquee. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

2. ***Decorative Sign*** - A sign or display fabricated of canvas, cloth, fabric, plastic, plywood, or other light, impermanent material and designed or intended to be displayed in connection with an event for a short time period.

3. ***Ground Sign*** – Any sign placed upon, or supported by, the ground independently of the principal building or structure on the property. Signs on accessory structures shall be considered ground signs.

4. ***Mobile Sign*** – A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

5. ***Pole Sign*** – A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level (10' if it is in the vision triangle).

6. ***Projecting Sign*** – A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

7. ***Roof Sign*** – A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

8. ***Wall Sign*** – A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

# Exhibit X
# Defendant's Response to First Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

9. Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**FIRST SET OF INTERROGATORIES**

1. Please explain how the City first learned about the Plaintiffs' mural's existence.

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy sign that is the subject of this dispute ("Cozy Sign") as a mural or otherwise implies the Cozy sign is not a sign under the Salina Code of Ordinances ("Salina Code"), Chapter 42, Articles X ("Sign Code"). Subject to and without waiving this objection, the Cozy is located on a main street approximately one block from the City's offices. Due to the size and location of the sign, it is visible to passersby from the street. Brad Anderson noticed the Cozy Sign as he drove by the Cozy, and was the first City staff member to bring the sign to the City's attention.**

2. Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural and describe the extent of each official's involvement (i.e. whether the official directed Mr. Herrs to issue a citation against Plaintiffs).

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City further objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request as compound and seeks information regarding the "extent of each officials' involvement" that is not a discrete subpart of the initial interrogatory asking the City to identify the city officials who discussed the "enforcement of the" Sign Code against Plaintiffs' sign.**

**Subject to and without waiving these objections, the City responds to the first interrogatory contained in this request, that is "Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural" as follows: The City did not issue a notice of violation or citation to Plaintiffs regarding the Cozy Sign. The City determined the Cozy Sign was a sign under the Sign Code and therefore subject to the Sign Code and BID Code, evaluated the Cozy Sign under the Sign**

**Code and determined that the Cozy Sign was too big to qualify for a sign permit, and informed Mr. Howard of the same. The City staff members who discussed the evaluation of the Cozy Sign under the Sign Code with Dustin Herrs were Lauren Driscoll, Dean Andrew, and Mike Schrage.**

**Regarding the second interrogatory in this request, as to Ms. Driscoll's involvement with Mr. Herrs, while it is impossible to remember every detail of Ms. Driscoll's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Ms. Driscoll discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, follow-up and meeting with Mr. Howard and Mr. Benson, providing information to Mr. Howard regarding the applicability of the Sign Code to the Cozy sign, next steps regarding the Cozy Sign and sign permit application, and the agreement with Mr. Howard to pause the work on the Cozy Sign.**

**Regarding the third interrogatory in this request, as to Mr. Andrew's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Andrew's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Andrew discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, Mr. Howard's knowledge of the Sign Code and BID Code process, and next steps regarding the Cozy Sign.**

**Regarding the fourth interrogatory in this request, as to Mr. Schrage's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Schrage's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Schrage participated in discussions with Mr. Herrs, Mr. Andrew and Ms. Driscoll regarding the application of the Sign Code to the Cozy Sign, meeting with Mr. Howard and Mr. Benson, and next steps regarding the Cozy Sign.**

3. Please explain the changes the City believes Plaintiffs need to make to their mural in order to "turn this into a mural rather than a sign," as suggested by Vice Mayor Longbine at the November 13, 2023, Commission meeting, (Doc. 16 at ¶ 136.) and in the Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 8).

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City objects to this request to the extent it seeks information protected by the attorney-client or work product privileges as it relates to the Brief in Support of Defendant's Motion to Dismiss. The City further objects to this request as it seeks the City to explain or interpret the arguments made by the City's counsel in Doc. 27 to Plaintiffs. The City also objects to this request to the extent it misinterprets the argument in Doc. 27 at 8 as a suggestion. The City also objects as the request uses only an excerpt of Vice Mayor Longbine's statement and misinterprets the statement made by Vice Mayor**

**Longbine on November 13, 2023 as a suggestion. Mr. Longbine's full statement at the meeting was "So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign." The statement was phrased as a question, not a suggestion. That is because Mayor Longbine does not interpret or apply the Sign Code or BID Code on behalf of the City. The City will not respond to the request to the extent it seeks information "as suggested" by Vice Mayor Longbine or in the Brief in Support of Defendant's Motion to Dismiss.**

**Subject to and without waiving these objections, the City responds only to the non-objectionable portion of the request that asks "Please explain the changes the City believes Plaintiffs need to make to their mural in order to 'turn this into a mural rather than a sign.'" The City regulates signs as defined by Salina Code § 42-764. In order to remove the Cozy Sign from the applicability of the Sign Code regulations, Plaintiffs would have to change the Cozy Sign into a display that falls outside the definition of "sign" found at Salina Code § 42-764.**

**As the City does not know what changes Plaintiffs would be willing to consider (particularly considering Paragraph 29 of the Amended Complaint, which states, "Mr. Howard does not want to change, alter, or deviate from" the rendering shown in Paragraph 28 of the Amended Complaint), the City cannot (and does not) know all of the potential changes that could be made to the Cozy Sign that would take it outside of the scope of the definition of sign. It would be nearly impossible for the City to guess all of the changes that could be made to the Cozy Sign to turn it into a display outside the definition of sign. However, in general, Plaintiffs can change the Cozy Sign into a display that does not "announce, direct attention to, or advertise," which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(2) would no longer be met, or Plaintiffs could relocate the display to the inside of the Cozy building, which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(3) would no longer be met.**

4. Please identify every government interest served by regulating Plaintiffs' mural.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. Subject to and without waiving this objection, the purpose statement of the Sign Code, found at Salina Code § 42-500 (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXSI_DIV1GE_S42-500PU), sets forth the government interests served by regulating signs under the Sign Code. The City refers Plaintiffs to § 42-500 for a complete list of those interests. The Sign Code regulates all signs, not just the Cozy Sign and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. The government interests served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values.**

5. Please explain how the City determines if a mural is used to "announce, direct attention to, or advertise."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that cannot be found in the Salina Code. Subject to and without waiving this objection, the City applies the Sign Code as written. The City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to, in pertinent part, whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise."**

**The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event.**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window).**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall).**

6. Please explain how the City identifies "art" which is exempt from the mural- sign code regime. See (Doc. 16 at ¶¶ 62-65, 100, 115, 208, 216); (Doc. 16-2 at 4-6, 22-23, 28); (Doc. 16-4 at 6-7); (Doc. 27 at 9, 12).

**OBJECTION AND RESPONSE: The City objects to this requests to the extent it seeks information protected by the attorney-client, work product and anticipation of litigation**

**privileges respecting Defendant's Brief in Support of its Motion to Dismiss. The City further objects to this request to the extent it seeks the City to explain the arguments made by the City's counsel as set forth in Doc. 27 at 9 and 12. The City further objects to the extent the request incorporates allegations to the Amended Complaint as Plaintiffs made the allegations and no answer has been filed to determine whether the allegations are admitted or denied. Based on these objections, the City will only respond to the non-objectionable portion of the request "Please explain how the City identifies 'art' which is exempt from the mural-sign code regime."**

**The City objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or BID Code. Subject to and without waiving these objections, the Sign Code regulates "signs" as defined by § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code.**

**As to the term "art," the term "art" may be used from time to time as an imprecise short-hand for "not sign," but the term "art" is not included in the Sign Code and is not relevant to the determination of whether a display (whether it is artistic or not) is a "sign." This is because some artistic displays are also "signs," and some are not. To clarify, the artistic displays that are also signs are subject to regulation. The artistic displays that are not signs are just art, and because they are not also signs, they are not subject to regulation.**

**A "sign" under the sign code "is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.**

**Please see Response to Interrogatory No. 5 above for additional information responsive to this request.**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written. The City does not apply the**

**term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code. Displays that are not signs are not subject to the size limits of the Sign Code, and the City does not evaluate the size of such displays. Accordingly, the City does not have information about the location or sizes of displays that are not signs under the Sign Code. The City, does not have sufficient information to "identify" as requested. Moreover, "unregulated 'art'" (which the City interprets as displays that are not signs) cannot exceed the Sign Code's size restrictions because those restrictions only apply to regulated signs.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions that does not correspond to the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written, it does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**Pursuant to Request for Production No. 5, Defendant is producing citations issued within the last 5 years. Pursuant to F.R.C.P. 33(d), Defendant refers Plaintiffs to those documents produced in Defendant's forthcoming supplemental disclosure for information responsive to this request.**

9. Please explain how the City determines if a mural "pertains to the goods or services for sale." See Amended Complaint at ¶¶ 32, 44, 52-54, 64-65, 128.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving this objection, the City applies the Sign Code as written, it does not apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to**

**"announce, direct attention to, or advertise." Salina Code § 42-764 does not use the phrase "pertains to the goods or services for sale." Rather, Salina Code § 42-764 applies to a display if, among other things, it "announces, directs attention to, or advertises." One way to evaluate whether a display "advertises" is if it encourages the purchase of products or services, in that it pertains to or references the goods or services for sale.**

10. For any Request for Admission that you denied, please explain the reasons for your denial.

**OBJECTION: The City objects to this request to the extent it seeks to impose obligations outside the scope of, or different than, the Federal Rules of Civil Procedure. F.R.C.P. 36(4) requires a matter be admitted, or specifically deny the request or state in detail why the answering party cannot truthfully admit or deny it. Further, a denial must fairly respond to the substance of the matter.**

11. Please identify the factual basis for the claim made in your Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 2) that "Plaintiffs' display is obviously a sign".

**RESPONSE: The City refers Plaintiffs to the allegations in their Amended Complaint found at ¶¶ 15-29 for allegations showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. The City also refers Plaintiffs to the transcript attached as Exhibit A to Plaintiffs' Amended Complaint at 15:2-23 for additional facts showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. Plaintiffs sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building."**

**The Cozy Sign is a display calculated to attract the attention of the public, that is attached to or painted on a building. It is used to announce, direct attention to and advertise and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them.**

Respectfully submitted this 12th day of July , 2024.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin<br>Bar Number 24170<br>Attorney for Defendant City | Todd G. Messenger,<br>CO Bar Number 38783<br>Pro Hac Vice Attorney for | Amanda C. Jokerst<br>CO Bar Number 47241<br>Pro Hac Vice Attorney for |

of Salina, Kansas
CLARK, MIZE &
LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email:
aomartin@cml-law.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
tmessenger@fwlaw.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
ajokerst@fwlaw.com

**VERIFICATION**

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

Signature

Executed on July 12, 2024

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*<u>/s/ Amanda C. Jokerst</u>*
Amanda C. Jokerst

# Exhibit Y
# Sign Permit Application

Community & Development Services
Planning Division
300 West Ash | Room 205 | PO Box 736
Salina, Kansas 67402-0736

City of Salina

PHONE | 785.309.5720
FAX | 785.309.5713
TDD | 785.309.5747
WEB | www.salina-ks.gov

# SIGN PERMIT APPLICATION

**Site plan, elevation drawings with dimensions, & shop drawings are required with this submittal**

108 N. 7th — Address Where Sign(s) is / are to be installed
The Cozy Inn — Name of Business

Steve Howard — Name of Business Owner
8822 S Sunnyside Rd — Mailing Address (if different than above)
67425 — Zip Code
785-452-1163 — Phone Number

west 44.4 ft of the S. 20.8 ft of lot 103 on 7th St located at 108 N. 7th St — Legal Description (attach separate page if necessary)

Steve Howard — Property Owner of Record
8822 S Sunnyside Rd — Mailing Address
67425 — Zip Code
785-452-1163 — Phone Number

Same — Owner of ~~Sign~~ mural
Mailing Address
Zip Code
Phone Number

Colin Benson — Sign Installer / License #
117 S. Santa Fe — Mailing Address
67401 — Zip Code
X — Phone Number

## PROPOSED SIGN(S)

Class of Work: ☒ New ☒ Alteration Estimated Date of Installation: ______________

Illumination: ☐ Internal ☐ External ☐ Electronic Message Center ☒ None

Will any new electrical work be necessary? ☒ NO ☐ YES*- Electrical Contractor: ______________

**If YES, **separate permit is required** and will be issued to the electrical contractor at the time the sign permit is issued*

Are there overhead power lines within 10 feet of proposed location of sign? ☒ NO ☐ YES

Type of **Proposed Sign(s)** – Indicate number of signs next to sign type:

☐ Pole ☐ Ground ☒ Wall ☐ Awning ☐ Canopy ☐ Marquee

☐ Projecting ☐ Roof ☐ Decorative ☒ Other (Describe): Mural exceeding ~~the~~ allowable space for mural/sign ag

## EXISTING SIGN(S)

☐ Check box if there are no **existing signs** at this address at time of sign permit application or if existing sign(s) will be removed to install new sign(s).

*If box is not checked, provide the information requested in the following table for each existing sign. Do not include signs or square footage of the sign(s) listed as proposed signs above or sign(s) that will be removed to install new sign(s).*

30(b)6
EXHIBIT NO. 8
APPINO & BIGGS

See Next Page >

City of Salina
Sign Permit Application | Page 2

**INVENTORY OF EXISTING SIGNS**

| Type of Sign (Pole, Ground, Wall, Etc.) | Description | Square Footage (Per Individual Sign) | Height (If Applicable) |
|---|---|---|---|
| ~~Wall~~ | ~~See Attached~~ | ~~528 sq ft~~ | |
| | | | |
| Wall Sign | N. facing Wall Sign | 24 sq ft | |
| Projection Sign | 7th St Projection Sign | 24 sq ft | |
| Awning Sign | 7th St Awning Sign | 4.88 sq ft | |
| | | | |
| | | | |
| | | | |

Steve Howard
PRINTED Name of Applicant

The Cozy Inn
Applicant's Company / Employer Name

Steveh@Cozyburger.com
Applicant's Email Address

785-452-1153
Applicant's Phone Number

[signature]
SIGNATURE of Applicant

11-13-23
Date

**For Office Use Only Below Line**

Date Received: ____________ Sign Permit Number ________________

Is business part of a shopping center or zoning lot with multiple businesses? ☐ NO ☐ YES

| Zoning | Square Footage of Signs | Illumination Approved | SPECIAL CONDITIONS: |
|---|---|---|---|
| Historic District | New | Electrical Permit Required? | |
| B.I.D. | Existing | Contr. License Verified? | |
| Vision Triangle | Total | Proposed Set-back | |
| | Total Allowed | Required Set-back | |

| Approved for Issuance By | Date | Permit Fee | Receipt #, Staff Initials |
|---|---|---|---|
| | | | |

BLF-051, Rev. 10.2018

CITY000024

CITY000023



# Exhibit Z
# News Articles

KSAL.com

Buy tickets here Salina Tap October 5 | Downtown Salina

# Art or Advertising?

By Jeff Garretson | November 9, 2023




Is the mural art – or a billboard?

That's the question that has work paused on the north wall of the Cozy Inn in downtown Salina. Owner Steve Howard has made a million sliders and a million smiles at Salina's most recognized eatery since he bought the burger joint in 2007.

Now it may take a permit from the Department of Development Services to make him smile over the process he's learning about.

Howard tells KSAL News that he hired a local artist to paint a mural on an exterior wall of the restaurant but was told he needs to apply for a permit when commercial signage is involved.

According to Howard, he was told the work is a billboard because it advertises the burgers he sells inside.

Listen Friday at 8:35am to the KSAL Morning News Extra as Steve Howard joins Jeff and Bob in studio to give us an update.


Don't Fear the Smell!
The Fun is inside!!
HAMBURGERS


K-STATE AMONG BEST FOR
PPINESS, SUCCESS
READ MORE


City of Salina
Household Hazardous Waste Facility
Hours: Thursdays 7:30am–7pm
315 E Elm
1st Saturday of each month 8:00 am – noon
Reduce Reuse Recycle
Batteries Paint Pesticides Cleaners Oil & More...Click for more Info

## Featured Local Savings

Dollar General

Valid Aug 31 - Sep 7
5 Days Left




0219




See More




- LATEST STORIES



**Salina South Soccer opens with win ...**

September 3, 2024

**Kansas Nationally Ranked at No. 19,...**

September 3, 2024



**Week Zero MIAA Football Athletes of...**

September 3, 2024




## ABOUT US

131 N. Santa Fe Ave Ste 3, Salina KS, 67401

785-823-1111

## LATEST POST



Troopers Have Busy Labor Day Weeken......

September 3, 2024



Woman Steals Beer and Flashes Offic......

September 3, 2024



Verbal Threats, Fist-Fight and 2 Ar......

September 3, 2024



Sports, Music a Mix for Success at ......

September 3, 2024

## FCC PUBLIC NOTICES

- EEO
- KABI
- KSAL-AM
- KSAL-FM
- KYEZ
- FCC Public Notices

## EXTRA

- Kansas Lottery
- KSAL Line Up

Copyright © 2007 - 2024 All Rights Reserved.

ADVERTISEMENT

# Art or an ad?: City of Salina pauses project at historic Cozy Inn restaurant

A Salina restaurant owner had to stop his mural project after speaking with city officials.

By Roman Campa and KWCH Staff
*Published: Nov. 9, 2023 at 10:50 PM CST*

SALINA, Kan. (KWCH) - Salina's historic Cozy Inn restaurant faces an obstacle from the city with a controversy over an unfinished project. At the heart of the disagreement is the question of what distinguishes a work of art from an advertisement as it applies to city rules.

Salina is seeing a rise in painted murals on local businesses but when the Cozy Inn -- a staple of the city's restaurant community for more than a century -- decided to paint its own mural, it received pushback.

Cozy Inn owner Steve Howard is voicing frustration after being told not to finish the mural on the side of the restaurant that's sold its famous hamburger sliders since 1922.

correctly, I guess."

The City of Salina argues that the work isn't a mural but a sign that advertises for the restaurant. And because it's recognized as a sign, it must fit the required dimensions set by the city.

Howard argues the project is a mural that represents the feeling of Cozy's.

"I don't want change. I want to paint my wall," he said. "I want to get my character up on the wall. Not just my character. the Cozy character truly is the fun of going inside."

Customers are showing their support.

12 News talked with the City of Salina's development team about the Cozy's mural. The group said while the project doesn't follow policy, they are hoping to have a conversation next week with Howard.

"Now, I'm just kinda (like), 'Hey, let me finish my project, please,'" the restaurant owner said.

*Copyright 2023 KWCH. All rights reserved. To report a correction or typo, please email news@kwch.com*

**Revitalize Your Skin with Plexaderm's $14.95 Trial Pack**
As seen on TV. Uncover a radiant transformation as Plexaderm reduces the appearance of under-eye bags and wrinkles in minutes. Results last up to 10 hours! Try it now for only $14.95 + free shipping.
Plexaderm | Sponsored
Shop Now

**Who Has the Cheapest Car Insurance in Kansas (Check Zip Code)**
Ottoinsurance.com | Sponsored
Learn More

**Empty Alaska Cruises Departing From Kansas That Seniors Can Book For Dirt Cheap**
Favorite Searches | Sponsored

**See Why Seniors Are Switching To These SUVs (The Prices Might Surprise You)**
Seniors: Discover Discounts & Savings On New SUVs With These Searches.
Frequent Searches | Sponsored
Learn More

**Only 18% of Americans Can Pass This Quiz.**
Think you can tell these American states apart from each other? Lets find out
QuizGriz | Sponsored
Go To Quiz

**These Barefoot Shoes are Leaving Neuropathy Experts Baffled**
Barefoot Vitality | Sponsored
Learn More

Weather Local Livestream

ADVERTISEMENT

## Most Read

1 dead, 2 injured in UTV crash near Hoisington



5 injured in rollover crash near Colwich



Augusta community supporting couple as each faces cancer battle



A toddler cried non-stop during a flight. Two strangers locked her in the bathroom



'She was literally unrecognizable': Augusta man recalls finding mother dead in year-long investigation



Officials identify man found frozen in cave nearly 50 years ago



Woman hospitalized after Aggieville incident




Grandmother going on trip with husband dies after man jumps off overpass, lands on their car



## Latest News



Miss Pre-teen Kansas earns Helping Hand to support foster kids



WSU Tech Esports team recognized as national champions




Standoff in Greensburg ends peacefully




Small changes the next few days






[WSU Tech Esports team recognized as national champions]




[KHP Labor Day DUI arrests drop, speeding warnings increase]




[Get ready for delays: I-70 closure to force traffic down county roads]



KWCH
2815 E. 37th Street North
Wichita, KS 67219
(316) 838-1212



At Gray, our journalists report, write, edit and produce the news content that informs the communities we serve. Click here to learn more about our approach to artificial intelligence.

A Gray Local Media Station © 2002-2024

Salina Post

NOV 19, 2023

Copy Link




# Cozy Inn Hamburgers 'sign' put on hold pending city approval

*Posted Nov 19, 2023 7:02 PM*



*Cozy Inn Hamburgers' new "sign" was put on pause by the City of Salina because restaurant owner, Steve Howard, did not follow procedures set in place by the Salina City Design and Review Board. Photo by Olivia Bergmeier*

**By NATE KING**

*Salina Post*

In a bid to show off the sights, sounds and smells of Cozy Inn Hamburgers restaurant, owner Steve Howard rushed to get a new "sign" painted on the north exterior wall of his restaurant.

On the heels of BOOM 2023, a privately funded and crowd-sourced mural festival held annually in town, Howard sought to add his creative spirit to one of downtown's most iconic buildings while drawing people inside Salina's smallest burger joint.

"It's not a billboard; it’s artwork," Howard said. "It's my expression. It's my character going on my wall. I want to paint my wall."

The inspiration behind the "sign" stems from a couple Howard met when they visited The Cozy Inn for the first time.

"I had a couple come to the walk-up window, and I said, 'You need to come inside and experience the fun, experience the Cozy Inn,'" Howard said. "They said, 'Oh no, we were told not to go inside.' And I wanted to say so bad, but I didn't, 'You're 60-something years old, and you're still letting people tell you what to do?'"

Howard, the sole financier of the mural, sought the help of a local muralist Colin Benson to bring his greasy masterpiece to life. Work began on Nov. 3, one day before the much-anticipated Salina Crossroads Marathon.

According to Salina Downtown Inc. Executive Director Leslie Bishop Howard failed to complete the required paperwork mandated by the city of Salina.

"It's not just the Cozy Inn but all of the businesses in the downtown area have to fill out an application with the city for any changes to the exterior, whether it be an awning, a sign, that kind of thing," Bishop said. "That one piece (the application) did not happen in this case, and Steve has alluded to that and admitted to that."

Not long after Benson sketched the initial outlines and painted on the mustard and ketchup, videos made their way to social media, which alerted city staff.

"I think Sunday had a lot to play with that. People just videotaped and called, and then someone had to come in and say, 'Hey, this is what's happening there,'"Howard said. "Then I got a call from Dustin Herrs from Salina City Planning, and he's saying it's a billboard."

Howard said the mural is not a billboard.

"I don't have social media. I never reached out to anybody about anything — other than the artist," Howard said. "I'm not trying to stir anything out. I just want to paint a wall."

Bishop said Salina Downtown Inc. supports Howard.

"We're behind him 100%, and we will write Steve a letter of support if he needs it," Bishop said. "Today, we met with some city officials, and we're filling out all the proper paperwork."

Bishop also reiterated that the muralist is not the issue — the issue lies with filing the necessary

paperwork.

"Colin is fine to do this mural that it has nothing to with him as an artist, and he doesn't even have to be approved by the city. The mural itself needs to be approved before work can begin," Bishop said.

Howard said more than 45,000 customers visit the Cozy Inn location in downtown Salina every year.

"That is a lot of people coming to downtown," Howard said."This mural is going to just be one more thing to make people go 'Wow!'"

## Salina City commission eager to build consensus

During the Monday Salina City Commission meeting, Salina City Manager Mike Schrage provided context for why a code violation citation was issued.

City of Salina Codes Article X Section 42-521 for C-3 and C-4 commercial districts dictate a business's total area for advertisements or signs on its exterior.

The Cozy Inn is categorized in a C-4 commercial district, which Schrage said indicates a

"mathematical formula." The product of the formula determines a business's allotted sign space.

Each commercial zone has a unique formula that determines sign space — other zones, like C-5, 6 and 7, allow for four square feet of sign space for each foot of linear street space.

"Our codes in this particular case have been in effect since 1966 — that doesn't mean they can't be changed," Shrage said.

Schrage said Cozy's Hamburgers currently has three signs, which utilize 84% of their total sign allotment. The new mural would put it nine times over the allowable size.

"First and foremost is submitting a sign application so we have the specifics of what they intend, and we can look at that relative to the code," Schrage said.

Schrage clarified that city staff did not contact Howard with violation enforcement in mind.

"[It was] agreed to a pause on proceeding with the project so we can sort through the codes," Schrage said.

Based on the "sign" and art renderings Howard provided the city, Schrage said there is a disconnect between what Cozy intends and what the code allows.

Schrage outlined two possible avenues Cozy Inn can pursue to become compliant with or change the code. The first option is to go through a variance process with the Board of Zoning Adjustment, which Schrage said is rigorous.

The variance process requires the Board of Zoning Adjustments to reach conclusions based on five criteria, which can be problematic for Cozy Inn's case.

"There has to be something unique in terms of insurmountable challenge or something that the code might not have taken into account," Schrage said.

Schrage referenced a single case where city staff granted variance due to geographical challenges limiting the advertisement's effectiveness.

The other option is to amend the city code.

"We have a process whereby someone can make application requests for code amendment," Schrage

said. "To accommodate what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says."

Amending the code leads to possible future approvals to cover an exterior wall entirely or even all four sides of the business.

"That starts to get very customized, very detailed, and the key factor is that it has to be applicable across the board," Schrage said.

The code currently cannot bend to specific businesses, but an amendment could allow for consistent flexibility for downtown buildings' advertisements.

Schrage reminded commissioners that this type of exception could set a precedent for future, possibly less artistic signs. While The Cozy Inn's case is unique, amending the code for the mural would take time.

"That's pretty significant policy decision. It's going to take some work," Schrage said.

Schrage said city staff is prepared for code drafting and running the code amendment through the necessary committees for recommendations.

"The artist indicated this morning [Monday] they washed the building in preparation for painting and don't necessarily want to leave it half finished," Schrage said. "If it's going to take into the spring before they [the muralist] have an answer, their preference is to paint it white and start over again."

Repainting the exterior wall white is likely the cleanest way from a code standpoint but is not required to continue the process.

Lauren Driscoll, director of community and development services for the city of Salina, provided commissioners with criteria that categorize something as a sign. The definition of a sign includes anything with writing, including letters, numbers, words and a pictorial representation.

“This includes illustrations or decorations,” Driscoll said.

Driscoll further defined a sign as a message or image meant to attract the public's attention, including a

painting on a wall located on the exterior of a building.

"From that pure definition, this starts to tick all the boxes that make it a sign before we even get into a discussion of commercial speech versus non-commercial speech," Driscoll said.

The Office of Community Development received numerous calls asking about other signs in the community and whether or not they comply, Driscoll said.

Driscoll explained that in downtown, a business has three square feet of signage for every foot of frontage it has.

The formula utilizes the "frontage" length of a building, meaning the horizontal distance the building's foot takes up on a given street. The Cozy Inn's frontage area is only 20.8 feet, which amounts to a total sign area allowed of about 63 square feet.

"The Cozy building is a very little building," Driscoll said. "[Cozy Inn has used] 52.88 square feet, leaving just over 10 square feet of remaining surface area of signage allowed for the building."

In the Cozy's situation, when applying the square footage analysis to the new sign, it's approximately 528 square feet which is significantly greater than the allotted amount in the C-4 district.

Driscoll said downtown has a unique challenge, its various-sized and shaped buildings and can begin a domino effect from decisions made by Zoning and Planning.

Driscoll continued, "How the buildings work together, the scale of messaging of signage really does matter in that environment plus the C-4 district is also very pedestrian focused. For example, Ninth Street is not a pedestrian environment, but everything in the C-4 district is scaled for both cars and people. So that also has to do with some of our sign regulations."

During her remarks, Driscoll gave the example of a coffee house with a dove and peace sign to illustrate the point further.

"For example, if the coffee house has a dove with an olive branch and it says the word peace on the side of it, that's not a sign because even though the word peace is there, you're not selling peace inside, and

coffee may do that for some people, but in general, the dog, the olive branch, the peace is not part of a commercial transaction."

Driscoll contrasted her example by saying if the coffee house had a steaming cup of coffee, those images would draw you into the use of the building.

A different case focused on a mural depicting peaceful and calm scenes but still advertised the business it was painted on.

"There's actually a case law example of a mural, which is actually a sign of a bunch of puppies playing in a field, and it's across from a dog park," Driscoll said. "The mural happens to be on a building that is a doggy daycare. That was deemed commercial signage."

The case law involved a business named Wag More Dogs located next to a dog park in Arlington County, VA, where federal courts deemed the mural as an advertisement.

Salina Vice-Mayor Bill Longbine commented that The Cozy Inn is an essential staple in Salina's food

industry and that Howard's intentions for the artwork were not an advertisement.

"I think if this had been anything other than a 101-year-old, historic institution, it wouldn't be an issue," Vice-Mayor Bill Longbine said. "I really believe he intended to get in on the whole mural trend."

Salina City Commissioner Trent Davis said even with Cozy Inn's history in the community, allowing the mural to go up outside of city regulations would create a precedent for other businesses to use benevolently or maliciously.

Davis brought up an example of an adult store using sexually explicit imagery of their products on a building.

"Or if we had same-sex couples over the rainbow bridge on the side of the building, saying, 'Salina Friends of the LGBTQ Community, we'd have folks coming up on the other side saying, Well, how can you allow that?'" Davis said. "I mean, that's clearly a sign. So whatever we do, it's got to be something that stands the test, no matter who's coming up to the podium."

City Commissioner Greg Lenkiewicz stressed the importance of consistency for Planning and Zoning regulations but understands the artistic value and weight that Cozy Inn wants to add to the community.

"Unfortunately, we find ourselves in a situation where I think we all appreciate the art, but we are bound by laws [codes] of our governing body," Lenkiewicz said. “We can't just arbitrarily decide, yes, this rule we're not going to enforce, and this rule, we're going to apply. There's a sense of fairness and uniformity to how we do things."

Salina City Attorney Greg A. Bengtson said most of what a city regulates is subject to a relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose.

“The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediate scrutiny level,” Bengston said. “It’s higher than that just rational Nexus.”

Bengston provided counsel to city commissioners explaining what could be done in order to address the

issue in a legal and timely manner.

“We are in an area where we as your local general counsel recognize.... I think there are efficiencies even in terms of the cost of having the specialized expert handling those sorts of questions, rather than you all having to wonder if we've figured that out or not,” Bengston said.

Commissioner Karl Ryan voiced his support for hiring an outside consultant, citing the need for wisdom and experience surrounding codes for signage.

“There are people that have been following this law for periods of time and it's important that we have their wisdom and experience and I'm sure it'll be much cheaper than us plowing a new road in,” Ryan said. “I have a lot of confidence in our staff and figuring any kind of problem out and providing remedies but it looks like we'll get much quicker answers if we buy some expertise.”

Driscoll explained that changing code takes time including public input.

“One of the things that takes a little time versus me sitting in my office just going in one line at a time, is

there needs to be public process," Driscoll said.

Driscoll said the issue regarding signs and commercial speech is not confined to downtown.

"I mean, this is something that we're seeing, not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, how are these rules feeling and fitting as we've changed as a community over the last few years is an important part of that process."

According to Driscoll, Howard submitted the sign permit application Monday evening. A decision was not made by the commission on Monday regarding hiring an outside expert to answer questions commissioners may have.

**Salina Post will update this story as more information becomes available.**

Local




Ad removed. Details

**Taylor Swift, 34, Takes Off Makeup, Leaves Us With No Words**

**Finance Nemo** | Sponsored

**Everybody Wanted To Date Her In The 80's, This Is Her Recently**

Everybody Wanted To Date Her In The 80's, This Is Her Recently

**SportzBonanza** | Sponsored Read More

**Journal - Brown**

A hand-stitched, elegant cover for your daily notebook or travel journal.

**Satchel & Page** | Sponsored Buy now

27 One-Hit-Wonders Every '70s Kid Remembers, Ranked In Order
Magazine.Todo | Sponsored
Read More

Images That Prove History Repeats Itself
These Images Will Make You Feel Like History Goes In Circles
PlayJunkie | Sponsored
Read More

Shawshank Redemption Cast Explain What Most Fans Never Figured Out
Shawshank Redemption Cast Explain What Most Fans Never Figured Out
PlayJunkie | Sponsored
Read More

Seniors: New Electric Cars Come With Tiny Price Tags (Take A Look)
New electric cars | Search Ads | Sponsored

Tori Spelling's Inheritance Makes The Headlines
Magazine.Todo | Sponsored
Read More

The New 'Pocket' Scarf is Becoming Summer Trending Item 2024
It's so comfy...
FashionInUSA | Sponsored
Learn More

Carly Simon Finally Confirms Who "You're So Vain" Is Really About
Magazine.Todo | Sponsored
Read More

These Never-Driven Trucks In Olathe Are Selling For Dirt Cheap
Unsold Trucks | Search Ads | Sponsored

I Tried the $0.87 Generic Viagra and Here's What Happened!
Public Health Forum by Friday Plans | Sponsored

Empty Alaska Cruises Departing From Kansas That Seniors Can Book For Dirt Cheap
Favorite Searches | Sponsored

Microphone Robot Lamp: The Coolest Gift for Music Lovers in 2024
Can be used as a desk lamp & a good decoration on the table or at home
Microphone Robot Desk Lamp | Sponsored
Learn More

220-Year Search For Oak Island Treasure Is Over
The Discovered Oak Island Treasure Has The Brothers That Found It Completely Stunned
BeautifulTrendsToday | Sponsored
Read More

Who Has the Cheapest Car Insurance in Kansas (Check Zip Code)
Ottoinsurance.com | Sponsored
Learn More

White House urges developers to dump C and C++
InfoWorld | Sponsored

Olathe: Unsellable pergolas go for almost nothing
Pergola | Search Ads | Sponsored

Sheriff: Kan. driver was passing vehicles on the highway shoulder
Salina Post

Saline County Jail Bookings, Sept. 2 and 3
Salina Post

The New Sierra 1500 Is So Cheap Now (Take A Look)
FavoriteSearches | Sponsored

Why CVS Hides This Cheap 87¢ ED Medication
Public Health Forum by Friday Plans | Sponsored

**Most Powerful Historical Pictures Ever Captured**
Most Powerful Historical Pictures Ever Captured
**TravelerDreams** | Sponsored
Read More

**Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack**
This simple trick can save tons of money on Amazon, but most Prime members are ignoring it.
**Online Shopping Tools** | Sponsored

**37 Funny Southern Signs Too Funny Not To Laugh At**
**Magazine.Todo** | Sponsored
Read More

**The Guest That Johnny Carson Couldn't Stand**
The One Guest Johnny Carson Couldn't Stand
**TheDancingCucumber** | Sponsored
Read More

**He is chosen as the best guitarist of all time**
He is chosen as the best guitarist of all time
**SportzBonanza** | Sponsored
Read More

**Decades Later Carly Simon Finally Confirms Who "You're So Vain" Is Really About**
**Magazine.Todo** | Sponsored
Read More

Copyright © 2024 Salina Post - Powered by Eagle Radio

v4.5.0 | FCC Public Files | FCC Applications | EEO Public File| Contest Rules

SALINA JOURNAL

NEWS

# 'Mural at the Mill' celebrates completion with ribbon-cutting in downtown Salina



**Charles Rankin**
Salina Journal

Published 2:01 p.m. CT Oct. 21, 2021

Standing high about the skyline of downtown, "Mural at the Mill," the latest piece in the Salina Kanvas Project is now complete.

The mural, which was placed on the 100-foot tall H.D. Lee Flour Mill on North Santa Fe Avenue, was completed by Guido Van Helten of Australia, who has done similar, large-scale projects around the world.

## A vision for Salina

The Kanvas Project was the vision of Travis Young, CEO of Vortex Global. He said the hope is that the work done will be something to bring more murals and street art to the downtown area and to Salina as a whole.

"We want Salina to be a destination versus a spot to fill up with gas along the interstate", Young said on the project's website. "This will help bolster business opportunities and support the amazing institutions we already have here in Salina."

Young said his idea for the Kanvas project came after seeing the street art community while living in York, England before moving back to Salina.

He told his friends he was moving and asked them if there was a way to bring some of that culture with him.

"Maybe I can get one of your artists to paint something downtown, because we have these great big silos that are in disuse," Young told his friends in England.

At that point he was introduced to the work of Van Helten.

"It's been in my mind ever since," Young said.

He said when he moved here, things downtown were not ripe for this kind of work, but when the revitalization of the area and the Salina 2020 movement began to take shape, he knew it was time to get this project going.

"Once it got started and you started to see the difference, I was like, '(I need to) call Guido,'" Young said.

He said Van Helten came, agreed to do the work and started the process after a donation from John and Kim Vanier to underwrite the project.

## A mural about the future

Young said Van Helten spent time in the city, trying to get a feel for what the Salina community was about.

"It didn't matter if he was at a ball diamond, at a church or if he was just talking to people in the street, it all came down to one thing," Young said. "(Salina's) a great place to raise a family. That's where he was inspired by the children, by what they were doing."

The mural itself is of Salina children playing "Ring Around the Rosie." The entire mill building is encircled by the children, using a photocollage of them taken by one of the kids themselves.

"That makes it even more phenomenal, that it has this tight connection to the community, as it being a great place to raise a family," Young said.

## An big attraction to bringing people to Salina

During the celebration, Eric Brown, president and CEO of the Salina Area Chamber of Commerce, said things like the mural are a "catalyst" for the community, not only with its size, but because of the number of people and organizations that make them happen.

"We have so many assets in this community that are so much bigger than just one individual," Brown said.

Brown said this mural is something that will bring people to the community.

"We're already seeing people stopping by, coming off the interstate, taking pictures," Brown said.

He said the Kansas Department of Transportation shows 16 million cars passing along the interstate system every year. By bringing those people into the city with attractions like this, Brown said that increase the money that comes to the community.

"People coming down to take a picture, they're going to hit maybe the coffee shop, eat lunch downtown or maybe even shop at the local box stores," Brown said.

He said it will also put "heads in beds" and help to bring in revenue with the transient guest tax.

Finally, Brown said this mural, in its message and in its culmination to completion, is all about this community.

"Art is really in the eye of the beholder," Brown said. "When you look at this, this talks about the community spirit. It talks about what's happening. A lot of the things that happen downtown, down south (and) across the community don't happen by one individual or one group."

He said the game the children are playing is one engrained in the culture of society and speaks to how people come together.

"If they aren't playing together, they aren't happy and aren't smiling," Brown said. "We see the smiles."

77° SIGN UP




STATE / REGIONAL

# City puts pause on Salina mural, restaurant owner says, 'I believe we'll work through this'

by: Asia Cymone Smith
Posted: Nov 13, 2023 / 10:25 PM CST
Updated: Nov 14, 2023 / 02:29 PM CST

SHARE

SALINA, Kan. (KSNW) — The Cozy Inn restaurant in Salina has been told to pause work on a mural on the side of the building. The City says the painting violates Salina's sign code policy.

The Cozy Inn owner, Steve Howard, says the art was intended to share the culture of the over 100-year-old restaurant.

"When you order at the walk-up window, you don't get the true character … 'the show,' as you could say," explained Howard.

ADVERTISING


Stream Furiosa: A Mad Max Saga
Max - Sponsored
Sign Up

**Development around Riverfront could finally be on the way ›**

The artwork on the outside is meant to tell that story.

"You never know where the conversation is going to go in here, so my finished product on this mural are spaceships. They're hamburgers, but they're UFOs," he said.

Howard says downtown Salina has a growing popularity of murals. In October, they hosted Boom! Salina, where artists decorated the streets with artwork.

ADVERTISEMENT

"I thought I was doing the right thing for Salina downtown because it's all artsy. I didn't know it'd be this big of an issue," he explained.

However, the city manager says it's not just art.

"It includes a message that pertains to the good or service for sale, and that makes it a sign and makes it subject to the sign code," said Mike Schrage, Salina City Manager.

The current code states businesses in the C-4 district, like The Cozy Inn, are limited to four signs, which must fit into the zoning lot restrictions. Schrage says the mural is nearly 10 times larger than what the code allows.

ADVERTISEMENT

READ NEXT >

Why flags will be at half-staff on Wednesday


READ NEXT >

Next story in 5

Cancel

"It shouldn't matter where it is, what it is, as long as it's art. And I think it's art. I think that's pretty much art," said Benson.

In the City Commission meeting on Monday, there was a discussion about a solution to the unfinished art. Some commissioners considered bringing in an outside consultant to clarify the difference between a sign and art.

ADVERTISEMENT

Most Commissioners agreed that the 57-year-old code could use changes to adjust the growing artwork in Salina. They say they want to collaborate with The Cozy Inn to find a solution.

"Whatever we do in the way of a change in zoning code needs to apply to everyone. It can't be business specific or particular to that sign," explained Schrage.

**New area in downtown Hays allows for drinking outside of bars, restaurants ›**

There is no timeline for a possible change to the city sign code. Until a decision is made, the project is paused indefinitely.

"Even if it is next year, I get it. But man, it just kind of puts a thorn in my side going man, it's not finished," said Benson. He says he is willing to paint the wall back to white until they figure out how to proceed.

ADVERTISEMENT

"That wall's been blank for so many years. Just white wall, and I just want to add character to it," said Howard.

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SPONSORED CONTENT

Privacy Policy

Revitalize Your Skin with Plexaderm's $14.95 Trial Pack
Plexaderm
Shop Now

Doctors Picks of Best Blood Pressure Monitors of 2024

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5

Discover Youthful Radiance with Plexaderm - $14.95 Trial
Plexaderm
Shop Now

Top 10 Blood Pressure Monitors of 2024 Reviewed by Doctors
DocReviews
Learn More

Nina Hartley Steps Out With Her New Look And Stun Fans
Investment Guru

Images That Prove History Repeats Itself
PlayJunkie
Read More

The New 'Pocket' Scarf is Becoming Summer Trending Item 2024
FashionInUSA
Learn More

Fake Reality Shows That People Believed Were Real
Babamail
Read More

Who Has the Cheapest Car Insurance in Kansas (Check Zip Code)
Ottoinsurance.com
Learn More

27 One-Hit-Wonders Every '70s Kid Remembers, Ranked In Order
Magazine.Todo
Read More

SUBSCRIBE NOW

## Daily News

Enter Your Email

SIGN UP NOW >

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5



**All the fall nail colors trending this season**

NAIL COLOR & CARE / 2 Days Ago

Fall is here! Embrace the new season and its trends with the best fall nail colors of 2024.



READ NEXT >

**Why flags will be at half-staff on Wednesday**



READ NEXT >

Next story in 5



**Is there a difference between cheap and expensive ...**

COOKWARE / 5 Days Ago

Learn the difference here between cheap and expensive cast-iron cookware and how you can get started cooking all your favorite meals with it.

View All BestReviews

## TOP STORIES



Senior center in Wichita making crafts to honor fallen ...





READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5



4-year-old Kansan learns hard work through gardening




Ellis County opening winter shelter in Hays

Top Stories

## MORE STORIES

- 4 people killed on Chicago-area L train likely didn't …
- As Mexican protesters block Congress over judicial …
- Phoenix weathers 100 days of 100-plus degree temps …
- Shooting of San Francisco 49ers rookie renews attention …
- Christmas in Venezuela kicks off in October, President …
- Salvagers abandon effort to tow burning oil tanker …
- Senior center in Wichita making crafts to honor fallen …
- '1000-Lb Sisters' star arrested on drug charges

More Stories

Download the KSN News App and stay up-to-date wherever you are. You can even watch KSN News live for

READ NEXT >

Why flags will be at half-staff on Wednesday

READ NEXT >

Next story in 5

KSN-TV Video

Senior center in Wichita making crafts to hono... 1 hour ago

WSU Tech esports team wins national... 3 hours ago

Controversy arises at City Council meeting... 4 hours ago

Juvenile critically injured after being hit... 4 hours ago

Continuing coverage: Bird flu in dairy cattle ... 3 hours ago

Who pays at short-te

More Videos

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5

## TRENDING STORIES

1 **Why flags will be at half-staff on Wednesday**

2 **Detour off I-70 has emergency crews ready for anything**

3 **I-70 closed Wednesday, detour in northwest Kansas**

4 **Police give update on woman injured near Aggieville**

5 **Travis Kelce speaks on retirement ahead of season ...**

6 **Dodge City facility addresses mental and addiction ...**

Wichita Gas Prices

Metro State National

| | Price | 1-Week | 1-Year |
|---|---|---|---|
| Regular | $3.09 | -$0.08 | $-0.46 |
| Diesel | $3.36 | -$0.04 | -$0.65 |

Source: AAA Updated on 9/3

## BESTREVIEWS.COM - TOP PICKS TO MAKE EVERYONE HAPPY


**Ulta's 21 Days of Beauty sale is happening now**
Holiday • 2 days ago


**Amazon's best back-to-school deals for middle schoolers**
Holiday • 1 week ago


**Five Below is practically giving their 'spooky cute' ...**
Holiday • 1 week ago


**Amazon's Big Deal Days is returning — and only Prime ...**
Holiday • 1 week ago


**Walmart has 75% off pet essentials in this week's ...**
Holiday • 2 weeks ago


**Target's new Graveyard Décor Collection is a '90s ...**
Holiday • 2 weeks ago

View All BestReviews Picks

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5

ksn.com

Home

News

Contests

News App

Live Video

Weather

Weather App

Connect 3 Now!

833 N Main St. Wichita, KS 67203

FCC Public File (KSNC)

FCC Public File (KSNK)

FCC Children's Programming

FCC Public File (KSNW)

FCC Public File (KSNG)

EEO Report

Get News App

Download on the App Store

GET IT ON Google Play

Get Weather App

Download on the App Store

GET IT ON Google Play

Stay Connected

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5

Content Licensing

Nexstar Digital

Journalistic Integrity

Sitemap

Do Not Sell or Share My Personal Information

© 1998 - 2024 Nexstar Media Inc. | All Rights Reserved.

READ NEXT >

Why flags will be at half-staff on Wednesday



READ NEXT >

Next story in 5

# Exhibit AA
# On-Hold Letter

DEVELOPMENT SERVICES
PLANNING AND COMMUNITY DEVELOPMENT
Dustin Michelson, Planner I
300 West Ash · P.O. Box 736
Salina, Kansas 67402-0736

City of Salina

TELEPHONE · (785) 309-5720
FAX · (785) 309-5713
TDD · (785) 309-5747
E-MAIL · dustin.michelson@salina.org
WEBSITE · www.salina-ks.gov

February 8, 2024

Steve Howard
The Cozy Inn
108 N. 7th Street
Salina, KS 67401

RE: Existing Painted Wall Sign/Mural at 108 N. 7th Street

Dear Mr. Howard:

We are in receipt of your Certificate of Compatibility application dated November 13, 2023 and your sign permit application (#23-2221-SIGN) dated November 15, 2023, submitted on behalf of The Cozy Inn, requesting approval of an existing painted wall sign/mural at 108 N. 7th Street. As discussed in previous conversations regarding this sign/mural, the total square footage of the signage installed at 108 N. 7th Street exceeds the maximum gross surface area allowed on this property per the C-4 zoning district sign regulations (Sec. 42-521). Additionally, 108 N. 7th Street is located in the Downtown Salina Business Improvement District Number 1, which requires a Certificate of Compatibility to be approved by the Downtown Design Review Board (DRB) before City Staff may issue a permit for any work to construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of any building or any other improvement to real property in the Salina Business Improvement District Number 1 (Sec. 2-207).

This letter is to inform you that the City is engaging in a comprehensive review of the City's sign regulations, which will include a review of the regulations pertaining to painted wall signs. As a result of this, and due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on-hold until our review of the sign regulations is complete. Once we have completed that code review process, Staff will then be able to facilitate a Certificate of Compatibility application to be considered by the DRB, as well as review your sign permit application in the context of any sign regulations that may be revised during our code review. Additionally, during this period, the City will withhold any further zoning enforcement actions regarding the existing signs at The Cozy Inn until City Staff is able to further review the sign permit application under any changes to the sign regulations that may come out of this comprehensive review.

As part of the City's review of the sign regulations, we'll be bringing in an outside consultant who is experienced in assisting municipalities with updates and revisions to their sign regulations, an important component of the process will involve gaining insight from community stakeholders about the existing regulations relating to murals and painted wall signs and potential updates to the codes. Our office is in the process of scheduling a stakeholder meeting for Friday, February 16, 2024, and we will follow up with specific details of the meeting in hopes that you are able to attend.

30(b)6
EXHIBIT NO. 11
APPINO & BIGGS

CITY000031

Thank you for your cooperation in this matter. If you have any questions, please contact me or Dean Andrew, Zoning Administrator, at (785) 309-5720.

Sincerely,

Dustin Michelson
Planner I

CC: Dean Andrew, Zoning Administrator

# Exhibit BB
# Michelson
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

DUSTIN MICHELSON,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 5:08 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

I was given to write the letter was over that.

**Q. Okay. So you were given information by someone else in the Planning Department?**

A. Yes.

**Q. Who would that be?**

A. For the letter?

**Q. Yes.**

A. From Lauren Driscoll --

**Q. Okay.**

A. -- who told me to write the letter.

**Q. All right. Did she tell you what she wanted the letter to say?**

A. Yes.

MS. JOKERST: Object to form.

THE WITNESS: Sorry.

BY MR. SHAW:

**Q. What did she tell you that she wanted the letter to say?**

MS. JOKERST: Object to form.

A. That I needed to state that we were in receipt of it, that it was over the maximum area by the existing code and the rest of the stuff in the letter.

BY MR. SHAW:

**Q. Okay.**

A. I mean I can read right from the letter.

**Q. Is it fair to say -- well, let me take a step back. When you wrote this, did you review either the sign permit application or Certificate of Compatibility application?**

MS. JOKERST: Object to form.

A. I likely did.

BY MR. SHAW:

**Q. Okay. Did you conduct any independent analysis of the applications?**

MS. JOKERST: Object to form.

A. I don't recall if I specifically did any -- any calculate -- like calculating what the signage allowance is or not.

BY MR. SHAW:

**Q. Were you relying upon figures provided to you by Miss Driscoll?**

A. Yes.

**Q. Okay. Do you know why the city -- let me rephrase. Do you know what about the mural at the Cozy Inn makes it a sign?**

MS. JOKERST: Object to form.

A. I don't know specifically on this.

BY MR. SHAW:

**Q. Okay. Do you see on the second paragraph**

**where it says as a result of this and due to the unique nature of the existing signs at the Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until review of the sign regulation is complete?**

A. Yes.

**Q. Did Miss Driscoll tell you to place the applications on hold?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Do you know -- sorry. Were you going to say something?**

A. To clarify, I didn't place the permits on hold. This letter I was told to communicate what was happening.

**Q. Okay. So do you know who placed the applications on hold?**

A. No.

**Q. Okay. You were just told to communicate that to the applicant?**

A. Yes.

**Q. Okay. Do you know if the -- either the sign code or the building improvement district**

**code allow for applications to be placed on hold?**

MS. JOKERST: Object to form.

A. No, I don't know.

BY MR. SHAW:

**Q. Okay. Can we turn to Exhibit 14, please? Are you familiar with this exhibit?**

A. Yes.

**Q. What is this exhibit?**

A. It's a letter to Mike Sample written by me.

**Q. Do you know who Mike sample is?**

A. Only based on having putting the name on the letter.

**Q. Okay. Was this letter sent regarding a business known as Blacksmith Coffee?**

A. Yes.

**Q. Had blacksmith also applied for a sign permit?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. And in the second paragraph, do you also communicate to this applicant that the application was being placed on hold?**

A. Yes.

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 5 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*