**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 6 of 16, Pages 1-220**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit CC
# Yard DRB Packet

City of Salina

## BUSINESS IMPROVEMENT DISTRICT NO. 1

## DESIGN REVIEW BOARD

Design Review Board meetings will take place via Zoom until further notice. You can view the meetings at the City of Salina YouTube channel, https://www.youtube.com/cityofSalinaKansas

To participate in the meetings, citizens will need to use the Zoom link – https://us02web.zoom.us/j/82053180567

If citizens wish to speak, either during the public forum or when the Chair requests public comment on an item, citizens must raise their hand so that the meeting host can allow them to speak.

Citizens can also send written comments or questions to Design Review Board Members vie email at plangroup@salina.org

In order for the Board Members to have an opportunity to review comments in advance of the meeting, please email your comments or questions by 12:00 p.m. Thursday, prior to the 4:00 p.m. meeting.

Herrs
EXHIBIT NO. 25
APPINO & BIGGS

City of Salina

SALINA DOWNTOWN

# MEETING AGENDA

**DESIGN REVIEW BOARD**
MEETING VIA ZOOM
Thursday, January 14, 2021
4:00 P.M.

1. **CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION**
   (1.1) Call to Order
   (1.2) Roll Call
   (1.3) Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

2. **APPROVAL OF MINUTES**
   (2.1) Approval of the minutes of the regular meeting held on November 12, 2020.

3. **NEW BUSINESS**

   **Public Hearing Items**

   (3.1) Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

   **Administrative Items**
   None

   **Preliminary Discussion Items**
   None

4. **UNFINISHED OR OTHER BUSINESS**
   None

5. **PUBLIC FORUM**

6. **ADJOURNMENT**

**Record of this Meeting**
This public meeting will be recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive meeting packets by email, subscribe to *Email Notifications* at http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.

City of Salina

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion and during the Public Forum. Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant and/or citizens, as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

If an application is approved by the Design Review Board, a Certificate of Compatibility will be forwarded to the City Building Services Division and will allow a building/sign or demolition permit to be issued for that work. Any applicant may appeal a decision of the Board to the Salina City Commission. A protest or appeal must be filed with the City Clerk no later than fourteen (14) days following the Board's decision. Should you wish to file a protest or appeal on any application, forms may be obtained from the City Clerk's Office, Room 206, City-County Building, 309-5735. If you have any questions or concerns, please contact the Community and Development Services Department, Room 205 of the City-County Building, 309-5720.

City of Salina

SALINA DOWNTOWN

# MEETING MINUTES

**DESIGN REVIEW BOARD**
CITY-COUNTY BUILDING, ROOM 107
THURSDAY, NOVEMBER 12, 2020
4:00 P.M.

## 1. CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION

(1.1) Call to Order

Chair Martens called the meeting to order at 4:00 p.m.

(1.2) Roll Call

**Board Members Present:**
Gary Martens (Chair), Katherine Kitchen, Jennifer Noonan

**Board Members Absent:**
Haley Helzer

**City Staff Present:**
Dean Andrew, Zoning Administrator; Dustin Herrs, Assistant Planner

Mr. Andrew informed the Board that Vice-Chair Mukesh Patel has resigned from the Board.

(1.3) Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

Mr. Andrew confirmed that the packet was posted and the required notice of today's meeting was provided.

## 2. APPROVAL OF MINUTES

(2.1) Approval of the Minutes of the October 29, 2020 special meeting.

A motion was made to approve the minutes of the October 29, 2020 special meeting by Board Member Kitchen, seconded by Board Member Noonan and carried by vote.

## 3. NEW BUSINESS

**Public Hearing Items**

(3.1) Application #CC20-13, filed by Guy Walker on behalf of Blue Beacon International, Inc. requesting the approval of a Certificate of Compatibility to allow the construction of two new metal canopies and the installation of a new projecting sign

on the National Bank of America Building at the southwest corner of Santa Fe and Iron. The subject property is legally described as Lot 110 on Santa Fe Avenue in the Original Town (now City) of Salina, Saline County, Kansas and is addressed as 100 S. Santa Fe Avenue.

Mr. Andrew presented the staff report with visual graphics which are contained in today's meeting packet.

Chair Martens asked the Board if there were questions for staff.

Chair Martens asked for Mr. Andrew to clarify that the 52 sq. ft. sign exceeds the size limitations in C-4.

Mr. Andrew stated that because the sign exceeds 48 sq. ft., staff would not be able to issue a sign permit even with the Board's approval of the location and design. He continued that the applicant will need to reduce the size of the sign to the allowable size.

Chair Martens clarified that if the applicant wants the sign to be 52 sq. ft. they would have to go before the Board of Zoning Appeals or apply for a text amendment which Mr. Andrew confirmed.

Board Member Kitchen asked what staff's concern was for the wrapping of the pillars.

Mr. Andrew stated that in staff's experience with National Register properties and the Secretary of Interior's Standards for Rehabilitation, applicants are discouraged from covering up original materials. He continued that staff could have misinterpreted the application but the concern is that the Downtown Guidelines and the Secretary of Interior's Standards for Rehabilitation discourage covering up or obscuring original façade materials. He continued that if it was limestone today and then wrapped in metal cladding, it would be covering original materials. He stated that if it was already covered, then it would not be covering just replacing.

Chair Martens invited the applicant to address the Commission.

Guy Walker, 500 Graves Boulevard, stated that the building was built in the 1920's and did not have the glass storefront, but a stone facade. He stated that it was renovated in the 1960's which changed the building. He stated that the two columns have metal on them now and because they are exposed now with this construction, they are visible.

Ben Moore, architect for the representative, stated that the existing metal of the canopies matches those wrapped columns. He stated that they have looked at replacing the deteriorated metal in a complimentary fashion with a prefabricated color of charcoal gray.

Mr. Walker returned to the microphone and stated that the sign square footage can be reduced to 48 sq. ft. to conform with the size limitation.

Mr. Andrew asked for the applicant to provide an update on National and State Historic Tax Credits.

Mr. Walker stated that the review is still pending. He stated that they submitted this project as an amendment to their application. He stated that they will not be doing anything that would impact their tax credits because they need those to reimburse some of the costs from interior renovations.

Mr. Moore returned to the microphone and stated that their preservation consultant is working with the state on the review now.

Mr. Walker returned to the microphone and stated that the preservation consultant is well versed in what the State will accept. He stated that she gave them advice on what the State will agree with or decline. He stated that this is not a major change and the color change is just to update the storefront.

Mr. Walker stated that the renderings show a blue colored text for the UMB sign on the north canopy and asked Mr. Andrew if they would have to come back before the Board to change that text color to white.

Mr. Andrew stated that staff could approve that administratively through the sign permit application and it would not have to go back before the Board.

Mr. Andrew stated historically staff refers to this building as the National Bank of America Building although it is now occupied by UMB Bank.

Mr. Walker stated that the reason they are trying to name the building the Hoffman Building is to give the building a full identity instead of just for one specific tenant and the Hoffman family was one of the families connected to the National Bank of America building.

Chair Martens asked the Board if there were other questions for the applicant's representative. There were none.

Mr. Andrew stated that staff just wanted to call attention to the different aspects impacting historic properties because there is a higher level of scrutiny when National and State Register buildings are being looked at. He stated that if the applicant is using a preservation consultant then they are in good hands.

Chair Martens confirmed there were no comments or questions from members of the public, closed the public hearing and brought the item to the Board for discussion and action.

| | |
|---|---|
| MOTION: | Board Member Kitchen made a motion to approve Application #CC20-13 with the conditions listed in the staff report and that the projected sign be reduced to 48 sq. ft. and that if any major changes were made that the application be brought back before the Board for review. |
| SECOND: | Board Member Noonan |
| VOTE: | Motion passed 3-0. |

Mr. Andrew stated that they will provide the applicant with a letter describing the actions taken by the Board today and what the next steps to take are.

**Administrative Items**
None

**Preliminary Discussion Items**
None

4. **UNFINISHED OR OTHER BUSINESS**

The next regularly scheduled meeting of the Design Review Board is on December 10, 2020. Mr. Andrew stated that there are no applications filed at this time and that staff will notify the Board if the meeting will be held.

Mr. Andrew stated that staff will work with Salina Downtown Inc. and Penny Bettles to get interested citizens to submit an EOI if they are interested in joining the Design Review Board.

Board Member Kitchen asked if there are any specific openings on the Board or if the positions were for Community At Large members.

Mr. Andrew stated there is one spot available for a Design Professional, filling the spot of Maggie Gillam's whose term expired in August. He continued that there is another opening for a property owner but believes that Board Member Helzer may qualify for that position. He stated that they will work with Salina Downtown Inc.to help find interested citizens.

5. **PUBLIC FORUM**
None

6. **ADJOURNMENT**

A motion was made to adjourn the meeting by Board Member Noonan, seconded by Board Member Kitchen and carried by vote.

The meeting adjourned at 4:32 p.m.

Gary Martens, Chair

ATTEST:

Dean Andrew, Secretary

**Record of this Meeting**

This public meeting was recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive future meeting packets by email, subscribe to *Email Notifications* at: http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.

Salina Downtown — Salina

# Application for a Certificate of Compatibility
## Business Improvement District - Design Review Board

PLF -039 Certificate of Compatibility

*Please return the completed application to:*
**Development Services Department**
300 W. Ash, City-County Building, Room #205
Salina, KS 67402-0736
785-309-5720 FAX 785-309-5713
Email: john.burger@salina.org

*The City Planning Division:*

- *Provides technical assistance to the applicant*
- *Receives the completed application*
- *Provides a copy of the application to the SDI Office for input*
- *Schedules the Design Review Board hearing*
- *Presents the application to Design Review Board*
- *Provides notice of approval to applicant*

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. An applicant or his representative must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 211 E. Walnut & 138 S. 4th
2. Name of Business The Yard
3. Applicant's Name Jacob Wilson
4. Applicant Ph. 785-342-7545
5. Applicant's Address 210 E. Walnut
6. Email jacob@restorebuilds.com
7. Property Owner Name (if different) Restore Construction
8. Property Owner Address 210 E. Walnut
9. Owner Ph. 785-342-7545
9. Contractor/Architect Restore Construction
10. Phone
11. Contractor/Architect Address
12. Email jacob@restorebuilds.com
13. What kind of work is proposed? (please check all that apply)
    - [x] Renovation or repair [x] Demolition [x] Sign or Canopy [ ] New Construction [ ] Paint
    - [ ] Other, please describe
14. Approximate cost of project (including labor and material) $ 250,000.00

**Please attach the following materials to the application:**

1. ***Please include Certificate of Compatibility Application Fee of $35.00 payable to the "City of Salina".***
2. Representative color photographs showing existing structure(s) and the location for the proposed work.
3. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
4. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
5. Material samples or product specifications indicating color, form, profile and texture.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**

Renovation of 138 S. 4th for new business "The Yard". It will be a baseball & softball academy for youth kids. Demolition of metal building and construction of a new outdoor turf covered field. New siding & roof to corner building. New metal signage on 138 S. 4th.

Applicant Signature: [signature] Date 12/4/20

Property Owner Signature (if different): Date

**For Staff Use:** **Application No. #CC** 20-14

Legal Description of Property Lot 130, Lot 132, Lot 134, Lot 136 and Lot 138 on Fourth Street in the Original Town of Salina

| | |
|---|---|
| Current Zoning C-4 | Current Use Vacant contractor's office |
| Date Filed December 7, 2020 | Accepted by DA |
| Date of Publication N/A | Building/Sign Permit No. |
| Property Owner Notice Sent January 6, 2021 | Heritage Commission Review (y/n) |
| Date of Hearing January 14, 2021 | Approval Notification Sent |

**STAFF REPORT**
**BUSINESS IMPROVEMENT DISTRICT**
**DESIGN REVIEW BOARD**

Application: **#CC20-14** Hearing Date: **January 14, 2021**

**ITEM 3.1**

Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

**BACKGROUND**

The existing buildings at the northwest corner of Fourth and Walnut Streets in downtown Salina addressed as 211 East Walnut Street were constructed in 1929 for a lumber yard operation. In the 1960s the buildings were occupied by a heating and air contractor and later briefly as a solar energy product facility. From 1987 to the present this property was used as a construction warehouse for Bill Medina Construction.

There is a separate brick building on the property that is part of a 3 bay building facing South Fourth Street. The north two bays of this building are being incorporated into the Car Museum. The southernmost bay was leased by Medina Construction to Images Recycling and later to Prairieland Market. Prairieland Market has relocated to the building at the northeast corner of Fourth and Walnut Streets. This building is separately addressed as 138 S. Fourth Street.

**PROJECT PROPOSAL**

Fourth and Walnut, LLC (Guy and Katie Gross and Jacob Wilson and Bob Moeller) has purchased the former Medina Construction property at the northwest corner of Fourth and Walnut with plans to convert the property into a baseball training facility to be known as "The Yard". They plan to demolish the one large, white Morton building in the center of the lot to allow room for a turf infield area with a steel structure above it with netting inside the complex. In the brick building on the far north end they plan to have indoor batting cages (five to seven cages), restrooms, a pro shop, and a storage room. The building on the southeast corner of the lot is proposed to be dedicated for indoor pitching with five (5) lanes. Their hope for this facility is to allow Salina and surrounding area youth baseball / softball teams to use this facility and practice year-round. The facility is proposed to be set up as membership-based with a foundation being created to assist youth that might not be able to afford the use of the facility.

Fourth and Walnut, LLC plans to do the work and open the facility in phases. The brick building on the north (Building A) that would house indoor batting cages, would be completed first. The pitching building on the southeast corner of the Lot (Building C)

would be completed second. The outdoor structure (Building B) and turf infield would be completed last.

This proposed project involves three (3) elements that require review and approval by the Design Review Board:

(1) Demolition of an existing warehouse building
(2) Modifications to the exterior of two existing buildings
(3) New infill construction between two buildings facing Fourth Street.

The applicant has submitted a site plan, floor plan, black and white elevation drawings and some color renderings but the elevation drawings are lacking detail about exterior façade materials and colors.

The project developers and their architect met with the City's Development Review Team (DRT) on **September 30, 2020** to go over their conceptual plans for the baseball training facility. Planning staff informed the owners and their architect that an indoor/outdoor recreational facility is not listed as a permitted use in the Central Business District and requested that they submit a detailed narrative explaining how the use would operate to allow the Zoning Administrator to make an Administrative Interpretation as to whether the operating characteristics of this facility would be sufficiently similar to a YMCA so as to make it a permitted use in the C-4 district. Planning staff also informed the project representatives that a Certificate of Compatibility would have to be applied for and approved by the Downtown Design Review Board prior to the demolition of any buildings and prior to the issuance of a building permit for work involving exterior modifications or new construction.

Work is underway on the site but no Certificates of Compatibility or building permits have been approved or issued by the City. A demolition permit was issued in error by Building Services staff in October without approval of a Certificate of Compatibility and the center warehouse building has been removed from the site. This error was made by staff and not the applicant or their contractor.

**DESIGN GUIDELINES**

The Design Review Board is authorized to grant a Certificate of Compatibility if, upon a vote of a majority of its members, the project is found to comply with the Policies and Guidelines contained in the Design Guidelines for Downtown Salina, 2008.

**The Design Guidelines make the following recommendations in regard to Demolition:**

6.2 Demolition should be considered if a building, object, or structure:

a) Does not contribute to the historical or architectural character of the District, and

b) Detracts from and does not have the potential to contribute to the importance of the District, and

c) Its removal and the proposed site restoration plan, including any plans for new construction on the site, will result in a more positive, appropriate visual effect on the District

**The Design Guidelines make the following recommendations in regard to Alterations and New Construction.**

In regard to Building Mass, Scale and Form: A building should appear similar in scale to traditional commercial facades.

A.1 Develop a primary façade that is in scale and aligns with surrounding traditional buildings.

A.4 A building should maintain the alignment of horizontal elements along the block.

Window sills, moldings, and cornices are among those elements that may be seen to align.

A.6 Rectangular forms should be dominant on commercial facades.

The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

A.7 Use flat roof lines as the dominant roof form.

In regard to Architectural Character: New materials should be appropriate to the scale, durability, color and texture of the predominate materials in the area.

B.1 Building materials should be visually compatible with the predominate materials of the downtown area.

Buildings should be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

B.2 Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level.

Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

B.4 Orient the primary entrance of a building toward the street.

A building should have a clearly defined primary entrance. For most buildings, this should be a recessed entryway.

**The Design Guidelines make the following recommendations in regard to building additions:** Minimize the visual aspects of an addition.

E.1 An addition should be compatible in scale, material and character with the main building.

An addition should relate to the building in mass, scale and form. It should be designed to remain subordinate to the main structure.

**The Design Guidelines make the following recommendations in regard to color:** Use colors to create a coordinated color scheme for a building.

C.1 Use color schemes that are simple.

The use of contrasting colors to highlight architectural details and upper facades is encouraged.

**STAFF ANALYSIS**

In September, a demolition permit for the white metal building in the center of the site was applied for by Diehl Enterprises on behalf of Restore Construction but no Certificate of Compatibility application was submitted for the demolition request. City staff erroneously issued a demolition permit to Diehl Enterprises on October 26, 2020 without DRB approval and the building has been removed from the site.

Section 2-207 of the Salina Business Improvement District Design Review Board reads as follows:

Sec. 2-207. – Certificate of compatibility.

a) No person shall perform or cause to be performed any work to:

(1) Construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of **any building or any other improvement to real property in the Salina Business Improvement District Number 1;** or

(2) Introduce, change, substitute, or remove any physical feature affecting the appearance of real property in the Salina Business Improvement District Number 1;

**without first applying for and obtaining a certificate of compatibility,** subject only to the exclusions outlined in subsection (b).

b) A certificate of compatibility shall not be required:

(1) If the work includes only routine maintenance and results in no change to the existing design, material, color, texture, finish, or appearance of a building or other improvement to real property; or

(2) If circumstances warrant authorization of emergency repairs of a pre-approved nature and scope, in the sole discretion of the building official.

c) If the work requiring a certificate of compatibility requires any other type of permit, the permit shall not be issued unless a certificate of compatibility has been issued for the work.

Because no Certificate of Compatibility was approved, the October 26, 2020 demolition permit was not valid and the DRB needs to take action on this Certificate of Compatibility request to retroactively validate the permit.

In staff's opinion, this metal building met the criteria for demolition in the Downtown Design Guidelines. It was not a historically or architecturally significant building and its presence interfered with the owner's plans for redeveloping the project. However, it is ultimately up to the Board to decide whether the request to demolish this building was justified in this case and findings can be made to support its removal.

<u>Proposed Replacement Construction</u>

Fourth and Walnut, LLC is proposing to renovate the north building (Building A) and the south building (Building C) and to build a new metal structure between them (Building B) that would cover a turf practice infield. A building permit application and plans (site plan, floor plan and building elevations) have been submitted but the elevation drawings are lacking in detail.

Different drawings show different window sizes and styles and different exterior colors. None of the drawings clearly indicate what the exterior building material and roof materials would be, particularly on the south building which is already being renovated. The Board is supposed to review the applicant's plans to determine whether the proposed building design and materials will be compatible with the Fourth Street streetscape and the predominate building materials in the downtown area. In staff's view additional information is needed to make that determination.

Staff would request that the applicant and/or their architect provide additional information at the meeting about:

Building A – The proposed exterior building and roof material and whether the exterior color will be changed or continue to match the exterior masonry of the Car Museum to the north.

Building B – The proposed color of the metal roof and fencing.

Building C – The proposed exterior building and roof materials and the proposed exterior color of the building.

Some of the work that has occurred on this property has gotten ahead of the City's review processes. It is staff's hope that all proposed exterior improvements on this property that require review and action by the DRB can be addressed at the January 14, 2021 meeting.

Zoning Issues

The proposed baseball training facility is an indoor / outdoor recreation facility and is located on property that is part of the C-4 (Central Business) district. Neither indoor or outdoor recreation facilities are specifically listed as permitted uses in the C-4 district however, YMCA-type facilities are.

Section 42-302(79) of the C-4 district regulations lists YMCA, YWCA, and other similar organizations as a permitted use in the C-4 zoning district. Section 42-302(80) of the C-4 district regulations permits any use not specifically listed as a permitted use, if the Zoning Administrator determines under Section 42-596(a) that the characteristics or specific attributes of the use are sufficiently in common with a permitted use.

Like the Salina Fieldhouse project the Zoning Administrator has determined that the characteristics and attributes of this proposed baseball training facility are sufficiently in common with a YMCA, which would be a permitted use of the subject property. There fore this facility is permitted in the C-4 district.

Section 42-306(2) of the C-4 district use limitations states that *"All business, service, storage and display of goods shall be conducted within a completely enclosed building."* The Zoning Administrator has determined that the covered infield area is sufficiently enclosed by roof and fencing to conform with this requirement.

Addressing

The tax parcel / zoning lot at the northwest corner of Fourth and Walnut Street is currently addressed as 211 East Walnut Street. The brick building at the north edge of the property has had a separate address of 138 South Fourth Street. Because the proposed baseball training facility would have its main entrance facing Fourth Street,

the City's Fire Marshal is recommending that the current owners request an address assignment change from 211 East Walnut Street to a Fourth Street address.

Signage

Staff has identified only one proposed wall sign on the elevation drawings submitted with this Certificate of Compatibility application. If the Board wishes to approve the painted "THE YARD" wall sign as part of this application it needs to make sure it makes reference to the wall sign in any motion approving a Certificate of Compatibility.

## SUGGESTED FINDINGS

Staff believes that the following potential findings may be incorporated to support the approval of the following project components:

Demolition Request

1. The existing metal warehouse structure because of its physical condition and location detracts from and does not contribute to the architectural character of the downtown area.
2. The removal of the existing structure and the proposed baseball training facility and associated parking lot will result in a more positive, appropriate visual effect on the Fourth Street corridor.

Proposed Exterior Modifications / New Construction

1. The building design and materials will be compatible with the predominate materials along Fourth Street of the downtown area.
2. The design of the building exterior will be compatible with the traditional commercial context while retaining a contemporary appearance that does not imitate an older building style.
3. The building will have a clearly defined primary entrance and street level entrances and features that will be pedestrian friendly.
4. Construction of a curb line and sidewalk would enhance the Fourth Street streetscape.
5. The satellite parking lot will contain landscape plantings and buffers that will reduce the impact of the lot on neighboring residential properties.

**ALTERNATIVES – DEMOLITION REQUEST**

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1 Retroactively approve a Certificate of Compatibility for the demolition of the metal structure based upon staff's suggested findings that the demolition conforms with the Design Guidelines for Downtown Salina.

Option 2 Approve the proposed demolition of the requested structure based upon staff's suggested findings subject to any conditions identified and approved by a majority of Design Review Board members.

Option 3 Postpone consideration of the application, in order to obtain additional information concerning the proposal. The date of the future meeting must be included in the motion.

Option 4 Deny the demolition request as presented, upon making findings that would support the denial of the request and provide further direction to the applicant and staff.

If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Office of City Clerk within fourteen (14) days following the Design Review Board's decision.

**STAFF RECOMMENDATION**

Staff would recommend Option No. 1. Under this option, the Board would be authorizing the post-demolition issuance of the demolition permit for the identified metal structure.

**ALTERNATIVES – EXTERIOR MODIFICATIONS**

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1 Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, including or excluding the proposed wall sign, based upon staff's suggested findings that the proposed new construction will conform to the Design Guidelines for Downtown Salina.

Option 2 Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, based upon staff's suggested findings,

subject to any conditions or revisions to the plans identified and approved by a majority of Design Review Board members.

Option 3 Postpone consideration of the application in order to obtain additional design details and information about the proposed exterior changes. The date of the future meeting must be included in the motion.

Option 4 Deny the application as presented, upon making findings that would support the denial of the proposed project.

If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Development Services Department within fourteen (14) days following the Design Review Board's decision.

**STAFF RECOMMENDATION**

If the applicant and their architect provide the additional requested information to the satisfaction of the Board, staff would recommend Option No. 2. If no additional information is provided about exterior materials and colors, staff would recommend Option No. 3.

If the Board wishes to approve the proposed exterior improvements, staff would recommend that the Design Review Board attach the following conditions to their approval of the requested Certificate of Compatibility under Option No. 2.

1. Development of the site shall substantially conform to the site plan, floor plans and exterior elevation drawings presented to and reviewed by the Board.

2. That if there are any significant changes to the project as approved, Development Services staff will be notified to determine whether additional staff or DRB review will be required.




1 inch = 200 feet

# 211 E. Walnut Street




Business Improvement District Boundaries
City of Salina
HOSPITAL / MILL DISTRICT
SANTA FE DISTRICT
EMPLOYMENT DISTRICT
HOSPITAL / MILL DISTRICT
Santa Fe Ave
Elm St
Park St
Ash St
State St
Iron Ave
Walnut St
Mulberry St
South St
Morrison Ave
Washington St
Prescott Ave
Johnstown Ave
Gypsum Ave
Park Pl
Oakdale Dr
Oakdale Ave
Kenwood Park Dr
Center St
Ymca Dr
Guernsey Dr
University Pl
Baker St
Putnam Ave
Highland Ave
Front St
2nd St
3rd St
5th St
7th St
8th St
9th St
10th St
11th St
12th St
13th St
N
S
E
W
0 250 500 1,000 1,500 2,000
Feet


ELM ST
PARK ST
3 RD ST
2 ND ST
FRONT ST
11 TH ST
C-4
ASH ST
12 TH ST
STATE ST
JOHNSTOWN AV
IRON AV
5 TH ST
10 TH ST
GYPSUM AV
WALNUT ST
PARK PL
SANTA FE AV
4 TH ST
9 TH ST
8 TH ST
7 TH ST
OAKDALE DR
MULBERRY ST
SOUTH ST
PUTNAM AV
MORRISON AV
CENTER ST
WASHINGTON ST
PRESCOTT AV
N
W
E
S

# Attachment

Project Site Plan


REMOVE FENCE
EXISTING BUILDING TO REMAIN
REMOVE LEAN-TO STRUCTURE
REMOVE WOOD STAIR/LANDING
REMOVE STRUCTURE
REMOVE RETAINING WALL AND FENCE
REMOVE FENCE
REMOVE CONC. PAVING
EXISTING BUILDING TO REMAIN
ARCHITECTURAL DEMOLITION SITE PLAN
1" = 20'-0"

0180


PROVIDE ADA CONC LANDING AT DOOR (SLOPE MAX)
CONNECT TO EXIST. SIDEWALK
BUILDING A (EXISTING)
2' - 0"
1' - 0"
115' - 0"
4' - 0"
5' - 0"
120' - 0"
NEW TURF FIELD
BUILDING B (NEW)
RUN DOWNSPOUTS UNDER SIDEWALK AND THROUGH FACE OF CURB (TYP.)
DROP-OFF / PICK-UP
NEW CURB & GUTTER
4TH ST
"VAN ACCESSIBLE" H.C. PARKING SIGN
NEW FENCE
77' - 11 195/256"
8' - 6"
TYP. STALL WIDTH
LANDSCAPE AREA
BUILDING C (EXISTING)
18' - 0"
25' - 9"
18' - 0"
0'
10'
20'
40'
ARCHITECTURAL SITE PLAN
1" = 20'-0"
2
A0.00
EXISTING DRIVEWAY ENTRANCE
WALNUT ST
NEW CURB AND GUTTER AT REMOVED DRIVE
NEW SIDEWALK
NORTH

# Attachment

Floor Plan


ANDERSON KNIGHT ARCHITECTS
785.539.0806
Salina Baseball Academy
138 S 4th St.
Salina, KS 67401
BUILDING A
BUILDING B
BUILDING C
G2.01

0183

# Attachment

Proposed

Building Elevations




1 A1.02 EAST ELEVATION - BUILDING A
1/8" = 1'-0"




4 A1.02 WEST ELEVATION - BUILDING A
1/8" = 1'-0"




3 A1.02 SOUTH ELEVATION - BUILDING A
1/8" = 1'-0"




3 A1.04 EAST ELEVATION - BUILDING B
1/8" = 1'-0"




4 A1.04 WEST ELEVATION - BUILDING B
1/8" = 1'-0"




1 A1.04 SOUTH ELEVATION - BUILDING B
1/8" = 1'-0"




1 A1.06 ELEVATION - EAST
1/8" = 1'-0"

## BUILDING C




2 A1.06 ELEVATION - SOUTH
1/8" = 1'-0"




3 A1.06 ELEVATION - WEST
1/8" = 1'-0"


MAMMOTH


THE YARD

# Attachment

Street Views


MAMMOTH




0192






0194

# Attachment

Demolition

Design Guidelines

# Chapter 6. Guidelines for Demolition

## Essential Principles

Demolition is defined as the complete or partial tearing down or removal of a building, object, or structure from the Lee District.

**Generally, the demolition of a building, which contributes historically or architecturally to the character and significance of the district is unsuitable and should be avoided.**

Should the Design Review Board deem a proposed demolition appropriate, such demolition should proceed only when an immediate reuse is planned for the property, unless it has been considered a safety hazard. The proposed design of new construction should be submitted to, and reviewed by, the DRB in conjunction with the submission and review of the proposed demolition.

## Guidelines for Proposed Demolition

Demolition should only be considered under any of the following conditions:

1. If the City Building Official has ordered demolition for the public safety because of an unsafe or dangerous condition which constitutes an emergency;
2. If a building, object, or structure: a) does not contribute to the historical or architectural character and b) detracts from and does not have the potential to contribute to the importance of the District and c) its removal and the proposed new construction will result in a more positive, appropriate visual effect on the District.

Demolition should not be considered under any of the following conditions:

1. If a building, object, or structure is of such architectural or historical significance that its removal would be detrimental to the public interest and the objectives of the District;
2. If a building, object, or structure is of such architectural or historic character that it could not be reproduced without great difficulty and expense
3. If its proposed reuse, or new construction would make a less positive visual contribution to the District, would disrupt the character of the District, or would be visually incompatible; or
4. If the demolition of a building, object, or structure would negatively impact the character, streetscape, or other buildings, objects, or structures in the District.

# Attachment

## Façade
## Design Guidelines

# Chapter 4. Alterations and New Construction

While the Lee District has historic character, it is also a dynamic neighborhood in which existing buildings are altered and new buildings are constructed. Infill construction is encouraged on open lots in the District.

The design of a new building should not necessarily imitate historic buildings, but should be compatible with them. Creativity in design is especially encouraged when it also is compatible with the design objectives of the downtown.

New buildings should reinforce the basic character-defining features of the district. Such features include the way in which a building is located on its site, the manner in which it faces the street, its materials and the general alignment of architectural elements and details along a block. Arranging these design variables to be similar to those in the area creates visual compatibility.

The principal façade (front) and street related elevations of proposed new buildings will be more carefully reviewed than other facades. New construction facades should be consistent with the existing District buildings in terms of height, scale, rhythm, and other design characteristics.

New construction should not appear old. The intent of Lee district is not to "freeze" an area in time, but rather to encourage new buildings which fit contextually within the district. New construction should not attempt to replicate the old or to introduce a false "historic" appearance. For most new construction projects, the best approach is to **HARMONIZE** with and reinforce the context of existing buildings. The purpose of the design guidelines is to encourage new buildings that complement the best of the existing environment.

The dominant character should be pedestrian-friendly with an active street edge. New buildings should include the following key design aspects to help maintain that established District character:

- Buildings aligned at the sidewalk edge;
- Two-story traditional commercial buildings (some buildings reach greater heights);
- Masonry construction dominates;
- Transparent ground floor with smaller windows into predominantly solid upper floors;
- Flat-roof (low slope) buildings;
- Additions are compatible in size, form, materials, and design;
- Maintain traditional mass, size, form, and building materials;
- To design commercial buildings with storefront elements similar to those seen traditionally (e.g., recessed entry, display windows, bulkhead, transom windows, storefront cornices, upper cornices, and vertically oriented upper-story windows)
- To promote friendly, walkable streets.



Building materials should be compatible with materials of exiting buildings.

## Policy: A building should appear similar in scale to traditional commercial buildings

### A. Building Mass, Scale and Form

Building heights generally vary in the Lee District from one to four stories, yet there is a strong sense of similarity in scale. A variety in building heights is appropriate; however, the dominant scale of two stories should be maintained. New construction should blend in the streetscape and not stand out. Buildings used as infill should be similar in height to adjacent buildings, and of a height of no more than 15 feet higher than the tallest adjacent building, and should not overpower the character of the District. The infill buildings should line up with existing setbacks, reinforce the established horizontal lines of the elevations, and maintain the rhythm in the single lot widths of new buildings.

1. **Maintain the established building scale in height.**

- Develop a primary façade that is in scale and aligns with surrounding traditional buildings.
- Consider stepping the mass of a tall building down to a lower height as it approaches surrounding buildings.

2. **Buildings should appear similar in width to those historically in the block.**

- Facades of large buildings should reflect the 25 ft. storefront bays to be in scale to traditional buildings.
- When a larger building is divided into bays, these should be expressed three-dimensionally throughout the entire building façade.

3. **Floor-to-floor heights should appear to be similar to those seen in adjacent buildings.**

- In particular, those windows in a building should appear similar in height to those seen in adjacent buildings.

4. **A building should maintain the alignment of horizontal elements along the block.**

- This alignment occurs because many of the buildings are similar in height.
- Window sills, moldings, and cornices are among those elements that may be seen to align.

5. **Where appropriate, consider dividing larger buildings into bays that are similar in scale to buildings seen historically.**

- If a larger building is divided into bays these should be expressed three dimensionally, throughout the entire building.
- When considering a tall structure, the alignment of building elements is particularly important. Although a new building may tower above the surrounding buildings, the first stories should visually relate to the surrounding historic context.

One of the most prominent unifying elements of a downtown district is the similarity in building form. Commercial buildings are simple rectangular solids, deeper than they are wide. This characteristic is important and should be continued.

6. **Rectangular forms should be dominant on commercial facades.**

- Rectangular forms should be vertically oriented.
- The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

7. **Use flat roof lines as the dominant roof form.**

- Parapets of side facades should step down towards the rear of the building.

**Policy: Building materials should be visually compatible with the predominate materials of the downtown area**

## B. Architectural Character

New materials should be appropriate to the scale, durability, color, and texture of the predominate materials in the area.

**1. Material should appear similar to those used traditionally.**

- Brick was the traditional material and is preferred.
- Wood and metal were used for windows, door and storefront surrounds and should be continued.
- New materials will be considered on a case-by-case basis. If used, they should appear similar to those used traditionally and should be detailed to provide human scale.
- New materials should have a demonstrated durability. Some new materials are susceptible to weather and do not last as long as brick.
- Existing metal should be maintained. If it needs to be stripped, use a chemical paint designed for that purpose, not dry grit blasting.
- Preserve cast iron by maintaining and restoring original cast iron columns and pilasters. Do not conceal or obscure original cast iron columns or pilasters.
- When it is necessary to replace brick, it should match in color and size to the original, if at all possible.
- Unless necessary to protect the surface, masonry should be left unpainted.
- Previously painted surfaces should be repainted rather than chemically cleaned. Repoint mortar, if necessary, before painting brick.
- Sometimes missing details and appropriate materials can be recreated with a one-dimensional paint scheme.
- Brick and other masonry should not be coated with silicone-based water sealants. Water sealants or water repellents generally have the effect of keeping interior moisture from evaporating through the walls and thereby damaging the brick and mortar.
- Masonry should not be covered with stucco, wood siding, aluminum or other artificial materials.

It is important that buildings be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

**2. Maintain the distinction between the street level and upper floors.**

- The first floor of the primary façade should be predominantly transparent glass, not tinted.
- A minimum of sixty-five percent of a street level façade of all buildings (except civic and institutional) should be windows, doors, display areas, or similar architectural features.
- Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level. These will discourage pedestrian activity in the District.
- Upper floors should be perceived as more opaque than the lower floors.
- Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

**3. Upper-story windows with vertical emphasis are encouraged.**

- A typical, upper-story window is twice as tall as it is wide. Upper story windows should relate to historic window proportions.
- Windows, lintels, and their trim elements should align with those on adjacent historic buildings.

## Policy: Building materials should be visually compatible with the predominate materials of the downtown area (continued)

**4. Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be a recessed entryway.
- Original entrances should be maintained, restored, or replaced (do not enclose, cover, or alter) including the design, material, depth, and placement.
- Aluminum replacement doors and storefronts should be made compatible by painting a dark color.
- Do not use doors decorated with molding, cross bucks, or window grills. Do not use solid wood doors in storefronts, unless original.
- If original design of a door is unknown, replace with a plain wood door with plain glazing (glass area), as opposed to solid wood doors, decorative doors, or any kind of period reproduction door.
- New entrance openings should not be added to storefronts. If an additional entrance is required by codes, place it on the rear or side façade and not on the main façade.
- Doors added to storefronts should be replaced with doors to match the original in design and materials.

**5. Maintain all aspects of the storefront (including doors, windows, and details) when possible.**

- Preserve existing original storefronts elements (windows, transoms, lintels, sills, hoods, bulkheads, cornices, and parapets) by maintaining or restoring, do not remove or alter. It is better to repair than replace deteriorated storefront features. Covering or removing significant elements such as transoms, panels below store windows, or original doors results in a substantial loss of historic character.
- Use a traditional storefront arrangement with features, materials, and proportions typical of similar structures of the same (not earlier or later) architectural style or period when the original design and features can not be determined. Storefront material should be simple.
- Do not allow storefront design to stray out of its natural place within the façade. Generally, there should be more glass and fewer walls at the storefront level, balanced by more walls and less glass on the upper façade.
- Display windows which are new, should match the original in location, design, size, configuration, and materials.
- Display windows which are missing and the original design is unknown, should be replaced with traditionally scaled windows. Traditionally scaled windows have large glass lights and few structural divisions to maintain a traditional transparent storefront appearance. If aluminum frame windows are used, utilize dark anodized or baked enamel finishes.
- When replacing missing or damaged features and based on historic evidence such as photographs or "ghosts" marking or cornice locations or through newspaper or photographic research, base new building features from a similar building of the same design, use simple (but to scale) decoration.
- Windows which are not original should not be added.
- Windows should be repaired rather than replaced, but if replacement is necessary the replacement windows should fill the entire original opening and duplicate the original pattern, including dimensions, number and arrangements of lights in each sash, materials, and detailing. If aluminum framed windows are used, use dark anodized or baked enamel finishes.

## Policy: Building materials should be visually compatible with the predominate materials of the downtown area (continued)

- Storm windows should be painted to match the color of the window sash and window shape should be duplicated. It may be desirable, on the front of building, to install storm windows inside where they will not be seen. Storm windows use full view or sash proportionate, blind stop type of wood or aluminum with anodized or baked-on enamel finish.
- New display windows should match the original in location, design, size, configuration and materials.
- New windows should not have snapon or flush muntins. True divided muntins are preferred over these types of muntins. Properly sized muntins permanently attached to windows are acceptable.
- Decorative glass windows which are original should be preserved in their original location, size, and design and with their original materials and glass pattern.
- On the interior, should the building's ceiling interfere with the transom space, recess ceiling space slightly away from the transom, or paint rear (interior) of the transom black.
- Windows can not be blocked or filled in.

### 6. Roofs, Cornices, & Gutters

Roofs should be retained in their original shape and pitch, with original features, and, if possible, with original roof materials.

- New roofs covered with modern rolled composition, asphalt materials, or rubber membrane are appropriate. The installation of a higher pitched roof to improve water runoff is acceptable as long as the new roof is not visible on the primary elevation and is constructed below the roof parapet wall.
- Do not use mansard roof with wooden shingles.
- Metal flashing should be used with new roof materials extending along the brick walls to protect against leaks.
- Buildings with flat roofs should have cornices or decorative bands to "cap" the façade.
- Replacement gutters and downspouts should not result in the removal of significant architectural features on the building.
- Gutters and downspouts either of boxed or built-in type should be repaired rather than replaced if possible.

### 7. Foundations

- Preserve (maintain or restore, not enclose or alter) original foundation materials and design -- whether solid or pier, brick, stucco or stone, etc.
- Foundations should not be concealed with concrete block, plywood panels, corrugated metal, or other non-original materials.

## Policy: The street level of a building should be pedestrian friendly.

The Lee District should continue to develop as a pedestrian-oriented environment. Streets, sidewalks, and alleys should encourage walking, sitting and other outdoor activities. Buildings also should be visually interesting to invite exploration by pedestrians.

Existing pedestrian routes should be enhanced. A building should express human scale through material and forms that were used traditionally. This is important because buildings are experienced at close proximity by the pedestrian.

**8. Develop the ground floor level to encourage pedestrian activity.**

- A storefront should be used on the primary façade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
  - ◊A storefront
  - ◊Display case
  - ◊Public art
  - ◊Landscaping
  - ◊Decorative wall surfaces.
- Include traditional elements such as display windows, bulkheads and transoms on commercial storefront.
- Avoid a blank wall or vacant lot appearance.



Storefront has been redeveloped and is pedestrian friendly.

## Policy: Minimize the visual impact of balconies and roof decks as seen from the street.

Roof gardens, decks, and accessory structures can visually impact the design integrity of the building on which they are located, their visual impacts should be minimized.

**9. Set activities back such that they are not visible from the sidewalk across the street.**

- This includes potted plants, umbrellas, and tables.
- Roof terrace railings and furniture should be placed well behind the parapet.

**10. Avoid clutter on roofs that will be visible from the public's view.**

- Mechanical equipment shall not be visible from the public's view.

**11. A roof garden, deck, or accessory structure should be compatible with the building on which it is located.**

- This includes design, materials, scale, proportion, and color.
- A roof garden, deck, or accessory structure should not damage, destroy, or overshadow the character-defining features of the building on which it is located.

## Policy: Use colors to create a coordinated color scheme for a building.

### C. Color

Downtown buildings contain a variety of colors in elements such as upper facades, storefronts, sign, and awnings. The introduction and use of colors should not restricted but it is encouraged that colors complement each building and its neighbors. There is **not** a specific color pallet for the Lee District.

**A. The façade should "read" as a single composition.**

- Paint colors on storefronts, trim, and upper-story openings should be related to the overall color of the building as should added elements such as signs and awnings.
- In many cases these will be colors that complement or harmonize with the overall brick colors found on upper facades.

**B. Use color schemes that are simple.**

- Using one base color for the building is preferred.
- Using only one or two accent colors is also encouraged, although precedent does exist for using more than two colors in some situations.
- The use of contrasting colors to highlight architectural details or storefronts and upper facades is encouraged.

## Policy: Maintain the line of building fronts in the block.

### D. Site Planning

Structures in the Lee District should contribute to a "strong wall" along the street. A new building should align at the front lot line and be built out to the full width of the parcel, to the side lot lines.

**1. Maintain or enhance the alignment of buildings at the sidewalk edge.**

- Locate the front building wall at the sidewalk line when feasible.
- Where a building does set back from the sidewalk, use landscape elements to define the sidewalk edge.

**2. Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be recessed entryway.
- A secondary public entrance to commercial spaces is also encouraged on a large building.

**3. Rear entrances and side elevations.**

- Preserve original windows, doors, and architectural detailing on rear and side elevations.
- Rear and side entrances can be enhanced by adding simple signage, awnings, and lighting that is related to those of the front elevation.
- New windows and doors may be added when needed if in keeping with the size, design, materials, proportions, and location of the originals. Follow guidelines for windows and doors for new openings on the rear and side elevations.
- Locate any necessary exterior staircases, balconies, elevator shafts, and additions on rear elevations, whenever possible.



Maintain the alignment of buildings at the sidewalk edge.

## Policy: Minimize the visual aspects of an addition.

### E. Additions

There are three different types of additions that may be constructed. The ground-level addition is the first way to do an addition that involves expanding the footprint of the structure. This addition should be to the rear or side of a building where it will have the least impact on the character of a building.

The next option of constructing an addition is to the roof that can be simple and set back from the front of the building. Materials, window sizes, and alignment of trim elements on the addition should be compatible to those of the existing structure.

The third option is to design an addition within the wall plane of the existing building, which should be considered on a case-by-case basis. This is difficult and requires care to respect the relationship of the building to the street. Such an addition should provide a visual distinction between the existing building and its addition which can be done with the use of a storefront cornice element or a subtle change in building materials.

1. **An addition should be compatible in scale, material, and character with t h e main building.**

- An addition should relate to the building in mass, scale, and form. It should be designed to remain subordinate to the main structure.
- An addition to the front of a building is inappropriate.

2. **An addition may be made to the roof of a building if it does the following:**

- An addition should be set back from the primary façade, to preserve the perception of the historic scale of the building.
- Its design should be modest in character, so it will not attract attention from the historic façade.
- The addition should be distinguished as new, albeit in a subtle way.

3. **In limited circumstances, an addition may be made to the roof of a building and not be set back from character-defining facades, if it does the following:**

- An addition should be distinguished from the existing building. A change in material or a decorative band can be considered to accomplish this.
- An addition should maintain the alignment of storefront elements, molding, cornices, and upper-story windows that exist on the main part of the building.
- The addition should also be compatible in scale, texture, and materials with the original.

4. **An addition should not damage or obscure architecturally important features.**

- Loss or alteration of a cornice line should be avoided, for example.
- Additions should respond architecturally to adjacent buildings in general and to the building they are a part of in particular. They should blend in by using similar materials, shape, and rhythm and proportion of openings.
- If the original building is architecturally significant, the addition should take a respectful "back seat". The addition should not overpower the original. An addition may be taller than the original building if site consideration and design still allow the old building to remain dominant.
- In general, additions should follow the basic guidelines for new construction. They should appear contemporary but in context with the original. They addition should be sympathetic but not imitative in design.

# Attachment

Newspaper
Article

SALINA JOURNAL

# Holm Auto Good News: Championships are won at practice

By Randy Mathews, Special to The Salina Journal
Posted Nov 24, 2020 at 11:01 AM

For Salina dentist Guy Gross, the creation of a baseball and softball training facility has become a personal mission, as well as one more exciting project in the ongoing transformation of downtown Salina.

"This is something that I've seen as a need in our community for a long time," Gross said. "I've been coaching baseball and raising kids and seeing that there is just not a great place to go practice, especially in the winter."

Gross said The Salina Fieldhouse, a multipurpose recreational center that opened at 140 N. Fifth in 2017, is a great facility, but it isn't always set up for baseball or softball, as it is sometimes configured for basketball or volleyball courts instead.

Other area coaches share his concern about the need for a dedicated training facility. They believe not having one available puts local and area baseball and softball players at a distinct disadvantage, not only in developing their individual skills, but also when trying to compete in tournaments in other cities where teams have better access to such facilities.

"We'd go around the state or to other parts of the country and we'd compete against these teams from communities where they already have academies and facilities where kids are able to prepare and compete year-round, and we found that we have some awesome players from Salina but we weren't able to keep developing them as much as these other academies were," Gross said. "Sometimes we could see that we were falling behind because our kids may not be getting as much exposure or opportunities for scholarships."

So Gross and his wife and fellow dentist Kate Gross decided to build The Yard, a state-of-the-art, 20,000-square-foot baseball and softball training complex currently under construction at 158 S. Fourth, just south of where the American Classics Auto Museum will be located.

"We wanted to create a top-notch place for baseball and softball training that could happen year-round," Gross said. "If there are kids in our community who want to become great ballplayers and potentially have a shot at going on to college or beyond to play, we wanted them to have all the resources around them to be able to do so."

Under the umbrella of the Salina Baseball Academy, the concept for The Yard quickly took shape. Encompassing three separate but interconnected facilities, the complex will provide a wide range of training opportunities utilizing the latest in sports technology.

Two existing brick buildings — one at the northwest corner of Fourth and Walnut and the other about mid-block to the north — are being extensively renovated and will house a regulation pitching "bull pen" and batting cages, respectively. In between, in a space formerly occupied by an office building/warehouse and parking lot, a 115-foot by 120-foot outdoor turf infield will meet both high school and collegiate specifications. The covered infield will feature a tall roof structure and will be sloped and netted. Lighting will make it possible to use the infield after dark and portable heaters will allow for limited wintertime use.

Gross expects the two indoor facilities to be opened by the end of December. The outdoor infield should follow later in the winter or early spring. Architectural and engineering work is nearly completed, and groundbreaking is set to begin soon. The Salina Baseball Academy and Restore Properties are partners on the property acquisition and Restore's Jake Wilson and Gross are co-managing the project. Restore is handling most of the contracting work.

Meanwhile work is already well underway on the buildings housing the pitching and batting facilities. The Yard's head coach and director of operations Brian Guyett provided an overview of the planned set-up during a recent tour. Guyett, a native of Anaheim, Calif., came to Kansas by way of the Seattle area to play baseball at Bethany College, where he was a starting pitcher. He said for him, The Yard is like a dream that is coming true. He will oversee a team of local and area baseball and softball youth to manage The Yard, staff its operation and maintain the facility.

Guyett said the pitching "bullpen" in the south building will feature five lanes of pitching mounds set up across the north side. Pitching will be from north to south. Pitchers can bring their own catchers but that isn't necessary for bullpen sessions, as there will be targets to aim at. Windows will provide natural light and the space will be turfed, so the pitching mounds can be lifted to allow for ground ball practice. Nets will be installed but will not extend all the way around, so batting practice is not permitted in that building.

Batting will be the focus of the second building further north. Guyett said the space can be configured for up to eight batting cages, in a variety of sizes. Nets are mounted to tracks in the ceiling, allowing them to be opened to create a 50-foot by 50-foot square for ground ball practice.

Both Gross and Guyett are excited about the high-tech amenities that the pitching and batting facilities will offer.

In the pitching bullpen, a camera and sensor-based system called Rapsodo will provide pitchers with a variety of metrics, including spin ratio and miles per hour. A screen at the opposite end will display ball movement, showing where a pitch starts its trajectory and where it ends.

In the batting cage building, a similar system called HitTrax can be custom-set to match the layout of any stadium, even those that are home to Major League Baseball teams. Two HitTrax systems will be available for use.

Four batting cages will also have a Hack Attack pitching machine that can be set to accurately throw curveballs, sliders, knuckleballs or fastballs so batters can become more adept at hitting different kinds of pitches. Guyett said many professional and Division One college baseball teams use the Hack Attack system.

"What it allows us to do is have competitive hitting leagues in the wintertime, so that the players can not only practice in the winter, they can compete. Normally in Kansas, that's not possible," Gross said.

The Yard will also offer other services to help baseball and softball players improve. Guyett is developing training programs and will offer individual pitching and batting lessons, and he and Gross intend to schedule camps designed to enhance specific skill sets.

"Camps are a big part of it," Guyett said. "We are planning on doing full groups but also specialized camps, including some that are just for infielders, or just for outfielders. We'd like to have a catching camp and a pitching camp; maybe take an entire day and just work with middle infielders — second basemen and short stops."

"We'll have camps for kids of all ages and we'll have different specific track or training programs for kids that are a little older," Gross said.

The Yard won't just focus on players. Gross and Guyett both intend to offer help to baseball and softball coaches as well.

"We want to coach the coaches so their teams are well prepared to play ball," Gross said.

Guyett is developing a website, theyardsalina.com, where players and coaches can sign up for lessons, book practice times or purchase memberships. The site also details the facility's wide variety of services and programs.

"We already have a lot of coaches interested in having a membership to it," Gross said. "In addition to supporting the coaches at Kansas Wesleyan University, we've talked to the local and area high school coaches. We want to make it so that they have the resources available to develop their athletes."

Gross said he and Kate believe The Yard will not only be a great thing for the community, it will also provide an additional piece to the ongoing rebuilding of downtown Salina.

"We loved the idea of putting it right down there where there's already families going for other sports, for dance, for twirling, for yoga, for shopping and restaurants," he said.

Guyett said hearing from former players he has coached or trained is what he most enjoys, and what excites him about this new opportunity.

"The kids are great," he said. "It's fun to see them succeed. Every year I'll get a text message, 'Hey, I hit my first home run,' or 'Thank you for all you've done. I just pitched a heck of a ball game.' So that's what keeps me going is seeing the success these kids can have if they put their mind to it and work hard."

# Exhibit DD Defendant's Amended Response to First Set of Interrogatories

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,** | ) |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) |
| | ) |
| **Plaintiffs,** | ) **CIVIL ACTION** |
| | ) **CASE NO. 6:24-cv-01027-TC-ADM** |
| | ) |
| **v.** | ) |
| | ) |
| **City of Salina, Kansas,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Amended Responses to Plaintiff's First Set of Interrogatories. The selected responses are set forth below:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*9.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**FIRST SET OF INTERROGATORIES**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." Subject to and without waiving this objection, the City does not apply the term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code and it is not regulated under § 42-764 and the accompanying size limitations. The City does not have the necessary information regarding the size or measurements of such displays or the size and measurements of the location of such displays to make a determination regarding whether the size of such a display would exceed the size limits of the Sign Code. Accordingly, it cannot "identify" as requested.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." Subject to and without waiving this objection, the City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**The City has identified the following signs that it has determined exceed the applicable size limits of the Sign Code:**

- **The Cozy Sign**
- **Blacksmith Coffee Sign**
- **Original Grande Sign**
- **Library Bar Sign**
- **Temporary Sign at 1212 S Marymount Rd**
- **Temporary Sign at 684 Briarcliff Rd**
- **Temporary Sign at 1017 E. Magnolia Rd**

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

- **Temporary Sign at 2045 E. Crawford St.**
- **Temporary Sign at 1805 Lewis St.**
- **Banner Sign at 650 E. Crawford Ave**
- **Banner Sign at 1325 E. Cloud St.**
- **Wall Sign at 301 N. 9th St.**
- **Temporary sign at 701 Holly Ln**
- **Temporary sign at 662 S. 9th St.**
- **Temporary sign at 736 McAdams Rd**
- **Temporary sign at 708 W. Crawford Ave**
- **Temporary sign at 1212 S. Marymount Rd**
- **Temporary sign at 1008 E Elm St.**
- **Temporary sign at 2360 River Trail Rd**

Respectfully submitted this 23rd day of August, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

**VERIFICATION**

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S AMENDED RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

DocuSigned by:
6D0400503E2B494...
Signature

Executed on August 23, 2024

CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2024, I caused the foregoing **DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit EE
# Public Emails

Message

**From:** no.reply@govbuilt.net [no.reply@govbuilt.net]
**Sent:** 2/20/2024 12:58:35 PM
**To:** Michelle.martin@salina.org; lilian.morales@salina.org; marissa.patton@salina.org; holly.mcginnis@salina.org
**Subject:** Citizen Submission for Address: 108 North 7th Street, Salina, KS 67401 Case #: Requests-2024-000048

## City of Salina, Kansas

Hello,

A report a concern submission has been submitted. Click here to View Case. Below is the submission information.
**Issue Location:** 108 North 7th Street, Salina, KS 67401
**Type of Issue:** Discrimination
**Comments:** It's rediculous that you're not allowing Cozy to paint a mural on their building. It's anti-American to block them. Shame on the city.
**Submitter:** Adam Borst
**Email:** borst.adam@outlook.com
**Phone:** (178) 553-1973

Thanks,
City of Salina

GovBuilt only provides a platform to complete the application. To contact the City of Salina, Kansas call 785-833-8066.

Message

**From**: James Newton [jrnewton@cox.net]
**Sent**: 3/15/2024 12:43:58 PM
**To**: Trent.Davis@salina.org; mike@landtitlesalina.com; greglenkiewicz@gmail.com; Bill.Longbine@salina.org; Jerry.Ivey@salina.org
**Subject**: Cozy Inn

Good afternoon.

I and a lot of others don't quite understand what the big deal is about the Cozy painting on there building. Is the business's north of the Cozy Inn against the painting and get the smell from them cooking? Can't this be solved like human beings instead of wasting my tax dollars? Thanks Jim. 785-404-6721

Message

**From:** Gretchen Hunt [gretchenmhunt@gmail.com]
**Sent:** 3/6/2024 7:50:34 PM
**To:** Bill.Longbine@salina.org; Jerry.Ivey@salina.org; Trent.Davis@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com
**Subject:** Cozy Inn

I would like to voice that Salina is a town in which I am proud to be from. My family has had business here for many years. We have supported and funded many projects and continue to give back to the community. However, the current politics of the City of Salina are repulsive and embarrassing. A current example is evident in the City prohibiting a proprietor on how they choose to display their business.

The Cozy Inn is a landmark of Salina and the Council would be remiss to not acknowledge this. A mural/sign/billboard or whatever terminology you choose to assign the painting at The Cozy Inn could potentially bring people to town who want to simply see something interesting. Is it not true that the business owner is doing this at his own expense? As well the design is in no way offensive.

I encourage you to prudently change or make an exception to the current code so that this project may continue.

I have never been to the Cozy Inn and witness the building not being kept up, there be trash on the ground, or unkept landscaping. However, this is present at many other businesses in town. Perhaps after you dissolve this issue with The Cozy Inn owner you could focus on businesses cleaning up their property around the city.

Respectfully,

Gretchen M Hunt RN
Descendent of HJ and Paulina Berkley

Message

**From:** Marsha Taylor [biznotch4life@gmail.com]
**Sent:** 2/21/2024 7:20:56 AM
**To:** signs@salina.org
**Subject:** Cozy Inn

You could think that the art work on Cozy Inn building is genius. It bring people from out of town and out of state for a Cozy burger. What do most people do after eating?? They walk around visit downtown stores and spend money. It is a great way to bring in people and their money.

Unless you don't extra revenue for Salina!

Message

**From:** Manjeet Ranu [porcupineblur@me.com]
**Sent:** 2/20/2024 5:11:38 PM
**To:** signs@salina.org
**Subject:** Cozy Inn

Please adapt City regulations to accommodate their mural. The business is historically and culturally significant. And tasty. Thank you.

-Manjeet Ranu, AICP

Message

**From:** Mike Stanley [mikestanley028@gmail.com]
**Sent:** 3/20/2024 4:31:18 PM
**To:** Jerry Ivey [Jerry.Ivey@salina.org]
**Subject:** Cozy Inn Hamburgers & Artwork

Jerry,

Just an opinion. I think Salina should leave Cozy Inn alone. Looks like a lot of taxpayer money is being spent here. Everyone knows what they do. The mural they were working on could be advertising, but then again could be about their long history in Salina.

I am also not a fan of high dollar artwork. I read in the Salina Journal $20K was spent on an art piece. Tax and Spend has its limits. We do not need to try and emulate those on the federal level.

I think we need to keep spending in check.

Thanks,

Mike Stanley

Message

**From:** Brenda Collins [bscollins.77@hotmail.com]
**Sent:** 3/6/2024 10:26:09 PM
**To:** trent.davis@salina.org; mike@landtitlesalina.com; greglenkiewicz@gmail.com; bill.longbine@salina.org; jerry.ivey@salina.org
**Subject:** Cozy inn mural

I personally do not see what the big deal is about the mural. I believe we should allow him to finish it. It brings business to your downtown area which means more tax dollars for Salina. We have bigger issues to worry about in Salina - streets needing redone, street lights that do not work properly, etc. When those problems are taken care of maybe then you can concern yourselves about hassling the poor business owners over stupid things like this.
Also I do not appreciate my tax dollars being spent on murals. At least this business owner is paying for it himself.

Brenda Collins.

Sent via the Samsung Galaxy S22 Ultra 5G, an AT&T 5G smartphone
Get Outlook for Android

Message

**From**: stevenm2397@yahoo.com [stevenm2397@yahoo.com]
**Sent**: 2/20/2024 4:08:38 PM
**To**: signs@salina.org
**Subject**: Cozy Inn Sign Mural

We live in Derby Kansas, however, we lived in Abilene for 11 years. I taught at Roosevelt-Lincoln Middle School for those 11 years. My wife and I frequented the Cozy Inn for their burgers and because of their history.
We are both now retired and have traveled in 35 +/- states since our retirement. We enjoy passing through towns and cities and seeing Murals, having many times gone around the block to get a closer view. Cozy Inn has been around, if I have my history correct, since 1922. It is a historic place in Kansas; in Salina. We know there are other murals in Salina. Why not allow this one? We believe it simply adds to the charisma of Cozy Inn and Salina.
Thank you for this consideration.
Steve and Emily Murphy

Sent from my iPhone

Message

**From:** Chris Knight [kadvantage@gmail.com]
**Sent:** 11/14/2023 8:48:22 AM
**To:** Trent.Davis@salina.org; mike@landtitlesalina.com; greglenkiewicz@gmail.com; Bill.Longbine@salina.org; karlryan@ryanmortuary.com
**Subject:** Downtown art and business

I am surprised at the uproar over the COzy inn, one of Salina landmarks. I have seen the art or advertising and it is something that should be allowed. It is their Business to make decisions about. It should not be up to a group that has a dictatorship over what meets their standards. It is not their business. Everyone will be there taking selfies in front of it and drawing more people to the Downtown.
Chris Knight

Message

**From:** scott.gardner@salina.org [scott.gardner@salina.org]
**Sent:** 2/20/2024 3:16:18 PM
**To:** Signs@salina.org
**Subject:** FW:

I just got this.

Respectfully,

*Scott Gardner*
Director CT, CPI, Media
City of Salina
Phone: (785) 309-5755

**From:** Scott Smith <my2boys01@gmail.com>
**Sent:** Tuesday, February 20, 2024 4:14 PM
**To:** Signs <Signs@salina.org>
**Subject:**

You are about to become another Kansas town in National Spotlight as a laughing stick over the Muriel on Cozy Inns building. Is Thia how you spend your tax payers hard earned money? I don't know who the uptight individual(s) are, but try loosening your belt and go smell the flowers and leave small business owners and citizens alone who are expressing their right to free speech and expression.

Message

**From:** jamto4599 [jamto4599@yahoo.com]
**Sent:** 2/21/2024 6:51:48 PM
**To:** signs@salina.org
**Subject:** Let them have their mural!!

Let them have their mural! Cozy Inn is a wonderful bit of history and a draw for the city of Salina. This mural would cause no harm or any negative impact. Thank You

Sent from my Verizon, Samsung Galaxy smartphone

Message

**From:** Mary Weigel [weigelmj@icloud.com]
**Sent:** 2/22/2024 9:55:04 AM
**To:** signs@salina.org
**Subject:** Mural madness

Sent from my iPhone
We were sad to read about the dilemma of the mural at Cozy inn. Both of us grew up in Salina with Cozy Inn being part of our childhood. Passing thru or visiting Salina we usually always buy frozen ones to bring home after enjoying fresh ones. To focus on the sign as advertising in our opinion is an overstep.

So many things in this world bring filth, madness, lack of tolerance. Let's accept this as a sign of dedication to building and maintaining a strong link to Salina thru many generations. Fight this to the end, we want that mural!!
Don and Mary Weigel

Message

**From:** Amy Lagerman [amyl0321@yahoo.com]
**Sent:** 3/6/2024 9:13:11 PM
**To:** Trent.Davis@salina.org
**Subject:** Mural

Hello,
I will not be able to attend the meeting concerning the mural on the side of Cozy's. But here is my opinion.
First, I think that the this whole issue is ridiculous and waste of time.
Second, why is the city ok to pay thousands upon thousands on murals (from outside artist) but not from a local that isn't costing us anything? Because of "wording"?
Third, what is the difference between this mural compared to side of Scholtzkeys?
In conclusion, it's a private citizen painting HIS property. If you take away his RIGHT it just puts Salina & commissioners in a horrible light. (And let's face it, you guys already have bad relations with the community)
Sincerely,

Amy Lagerman

Yahoo Mail: Search, Organize, Conquer

Message

**From:** Helen Solle Conner [helenmsolle@gmail.com]
**Sent:** 3/19/2024 8:02:40 AM
**To:** signs@salina.org
**Subject:** Murals and Signage can commingle

As someone who lives in a city where signage and murals have existed next to one another for decades I understand the nuisances of the Cozy Inn signage discussion, but ultimately the murals will win.

Street murals (even when depicting the contents of a building's business) drive foot traffic by their very nature. People love the creative approach, AND they want a picture with the mural.

This very scenario played out here and became a completely revitalized downtown neighborhood and saved a couple dangerous areas on our bike trails from being abandoned.

When our local artists community started there were three old murals from the 1900s and 1970's that were refurbished, then an art gallery added a new one, and then after the loss of one our most beloved artists a mural dedicated to him went on another gallery wall.

Those 5 murals became a lifeline for businesses. Those 5 simple murals (2 of which would fail YOUR current signage regulations) began to generate foot traffic within days of paint brushes being picked up. News stories about the interest in them drove more folks downtown to peek.

THEN a few of our local artists went our amazing Arts Council proposed a mural festival - which we have now been holding each October for 9 years.

The SHINE Muralfest brings together artists from our local community and internationally recognized artists from across the world and we get the joy of 40 new works of public art each year! We now have more than 600 murals in our city, and more are planned every day.

It has completely transformed our community from downtown to our inner city bike trails. Crime in blighted and industrial areas has dropped SIGNIFICANTLY within the last 7 years of the project.

It also generates enough revenue that many of our artists have had to move on to other parts of the city, because the rest of the city wants one - and real estate values have tripled downtown since foot traffic has increased and crime has plummeted!

I'm a web developer and I built a website with 3 artists who were sign painters - that became muralists! They opened a gallery, sell supplies, and now teach sold out spray painting classes to students of all ages! A homegrown success story.

It's a simple win win for EVERYONE, and I HOPE your community will embrace the creativity the Cozy Inn mural has shown, and inspire others in your community.

Best wishes for you all.

Thanks for reading!
Helen Solle

Message

**From:** jerry.ivey@salina.org [jerry.ivey@salina.org]
**Sent:** 3/4/2024 7:43:40 AM
**To:** bretzr@st-tel.net
**Subject:** RE: visitor input

Thanks for emailing us your comments. Unfortunately we cant comment on this issue right now, because of the lawsuit on it.

Jerry Ivey
Salina City Commission
785-577-1058

**From:** Roberta Bretz
**Sent:** Tuesday, February 27, 2024 12:17 PM
**To:** Davis, Trent; Hoppock, Mike; Lenkiewicz, Greg; Longbine, Bill; Ivey, Jerry
**Subject:** visitor input

Dear Commissioners,

I just read a story about the Cozy Inn in Salina.

We love the Cozy Inn. What a wonderful example of a hard-working, enduring business. It is a definite asset to Salina.

I want to encourage you to just support your businesses --- especially your long-time, faithful businesses.

Please just let them finish their very cute, creative mural and not waste their time on 'arguments'. All these years they've served your community and millions of us who have come your way.

Thank you.

Sincerely, Roberta Bretz

Message

**From:** Keely Denning [kjdenning@outlook.com]
**Sent:** 11/13/2023 10:41:23 PM
**To:** Trent.Davis@salina.org; mike@landtitlesalina.com; greglenkiewicz@gmail.com; Bill.Longbine@salina.org; karlryan@ryanmortuary.com
**Subject:** Signs

Hello all,
I watched the issue concerning Cozy building.
I do enjoy the the bright colors in the area of which is rather a drab area of downtown.
What were laws concerning signs at the time Cozy Burgers opened? The business has always been in that spot, and I wonder if they are grandfathered into the law of when they opened.
Just to the north, one building had an old advertisement painted on the wall for Bull Durham Tobacco. At the time the mural was done, I believe tobacco was sold in that building.
If a business that has been in the same place for as many years as Cozy has been, they should be able to be grandfathered, which eliminates the issue of other stores painting murals in advertising.

Is Vernon's Jewelry as old of business as Cozy?

Keely Denning
Salina

Sent from my iPad

Message

**From:** Kate Copp [kathybishop.copp@gmail.com]
**Sent:** 3/6/2024 9:10:47 PM
**To:** bill.longbine@salina.org
**CC:** jerry.ivy@salina.org; trent.davis@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com
**Subject:** The Cozy Inn

100% let the painting go up on the Cozy Inn! The graphics are so amazing and fun! It would definitely bring folks off of 9th to check out the sign and maybe become a great place to take photos in front of which could also mean they would then explore downtown Salina. I always tell folks in my fb groups that are traveling I-70 to exit on 9th and hang a left on Iron to experience Cozies! The city and business owners want more taxes and money...and a very cool mural that the city does NOT have to pay for just might bring more money to downtown merchants. The Cozy Inn is an iconic Salina business.

Kathy Copp

834 Manor Rd, Salina, KS

# Exhibit FF
# White Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

BY MR. MACROBERTS:

**Q. If you -- so I have -- I've given you the exhibits for today's deposition. Exhibit 1 I'll represent to you is the expert disclosure that was filed. It might help you just to be able to look at that for a little bit. I see in the disclosure that Salina considers you an expert in urban and regional planning. Is that urban and regional planning the same thing that you got your master's in?**

A. Yes.

**Q. And Salina's considering you an expert in zoning. Do you see that?**

A. Yes.

**Q. What does that mean to be an expert in zoning?**

A. Well, zoning involves the regulation of land use and development of land use in a community, and that's something that we engage in and that I have engaged in for over three decades.

**Q. What is form-based zoning? It's mentioned here in Exhibit 1 if that's helpful.**

A. Yes. Form-based zoning is a type of zoning regulation that de-emphasizes the regulation of uses and focuses more on regulating

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**
MS. JOKERST: Object to form.
A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.
BY MR. MACROBERTS:
**Q. Did you include any disputed facts or any facts that could undermine your opinion?**
MS. JOKERST: Object --
BY MR. MACROBERTS:
**Q. -- in your report?**
MS. JOKERST: Object to form.
A. Not that I recall.
MR. MACROBERTS: Can we take a five-minute break?
THE WITNESS: Yes. I was going to ask the same thing.
MR. MACROBERTS: Yeah.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. All right. Mark, do you know whether the**

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

**code?**

MS. JOKERST: Object to form.

A. I am not aware that there were or were not studies specific to Salina's sign code.

BY MR. MACROBERTS:

**Q. So one way or the another, you're not aware?**

A. Correct.

MS. JOKERST: Object to form.

THE WITNESS: Sorry, Amanda. Go ahead. Amanda objected.

MR. MACROBERTS: It is noted. I am certain of that.

BY MR. MACROBERTS:

**Q. All right. So for purposes of your report, you used the word mural to mean, quote, an outdoor exhibit painted on a wall that does not fall with the sign code's parameters and that may include art but does not announce, direct attention to or advertise. You meant within. Is that right? Does not fall within the sign code's parameters?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. And for reference --**

**clutter contributes to decline and traffic safety and in the same paragraph write public art does not create this type of distraction. Do you see that?**

A. Yes.

**Q. You don't define what public art is in that, correct?**

MS. JOKERST: Object to form.

A. I do not have a footnote on that page that defines what public art is.

BY MR. MACROBERTS:

**Q. There's no citation in your report for the proposition that public art can't create clutter?**

MS. JOKERST: Object to form.

A. I don't think that there's any documents cited in the report that says that public art could never create clutter.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that establishes that private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Well, I don't have a definition of those two, but that said, I'm not aware of a report that

gets into the distinctions between those two and their impacts.

BY MR. MACROBERTS:

**Q. Are you aware of any studies that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Not off the top of my head, no.

BY MR. MACROBERTS:

**Q. Are there any cases that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. That you're aware of?**

A. Not that I'm aware of.

MR. MACROBERTS: It's 12:10, do you want to take a break.

THE WITNESS: Certainly.

MR. MACROBERTS: All right.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

**wall?**

MS. JOKERST: Object to form.

A. I'm not aware of anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Same with studies and case law. There are no studies in cases that would say that?**

A. I --

MS. JOKERST: Object to form.

A. Oh, go ahead.

MS. JOKERST: Just object to form.

BY MR. MACROBERTS:

**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**

MS. JOKERST: Object to form.

A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.

BY MR. MACROBERTS:

**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**

A. No.

**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**

MS. JOKERST: Object to form.

A. Not that I know of.

BY MR. MACROBERTS:

**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**

MS. JOKERST: Object to form.

A. I would have to know more about the business itself to assess its own land use impacts.

BY MR. MACROBERTS:

**Q. Not talking about land use impacts.**

A. It's a very generic term, daycare business.

**Q. Sure. Let's say that this mural is still at the mill and let's say a daycare business started operating inside the mill, compliant with the code, the kids are inside, they're not running out in the streets, things like that. Okay. Does the mural become dangerous simply because a business was operating inside of that that pertained to the mural?**

MS. JOKERST: Object to form.

A. Not that I know of.

MS. JOKERST: Sorry. Did I miss a question? I heard like a cough and then what sounded like maybe someone said why.

MR. MACROBERTS: No. There was no question.

MS. JOKERST: Oh, okay.

BY MR. MACROBERTS:

**Q. You testified in your report that aesthetics is a substantial and compelling interest, correct?**

A. Yes. I testified that it's either one.

were at issue in those cases.

**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**

A. No, I'm not aware of any -- any complaints that were filed.

**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**

MS. JOKERST: Object to form.

A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.

BY MR. MACROBERTS:

**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

**aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. I can't recall anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.

BY MR. MACROBERTS:

**Q. Well --**

A. So --

**Q. -- I appreciate that.**

A. Okay.

**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**

MS. JOKERST: Object to form.

A. To me personally, it is.

BY MR. MACROBERTS:

**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**

MS. JOKERST: Object to form.

A. I don't have a basis for saying that it would.

BY MR. MACROBERTS:

**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**

A. Yes.

**Q. Did you read the Cheng, 2023 study?**

A. Yes.

**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**

A. There is a statement in the study to that effect that I believe cites another study.

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**

MS. JOKERST: I'll object to form again. It's not a complete copy.

A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.

BY MR. MACROBERTS:

**Q. So as you're sitting --**

A. Without reading the whole report, I would not know.

**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**

A. Not off the top of my head.

**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**

A. Okay.

**Q. You agree that your publication is a reliable authority?**

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
MR. MACROBERTS: I have no other questions.
MS. JOKERST: I have some follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**
A. Um-hum.
**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**
A. Um-hum.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 4th day of November, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit GG
# Content Neutral Sign Codes After Reed and Austin

SIGN RESEARCH FOUNDATION™



Photo by Joe Ravi CC-BY-SA 3.0

# CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Mark White
EXHIBIT NO. 3
APPINO & BIGGS

Sign Research Foundation 2022 Analysis
Mark White, White & Smith, LLC

Published November 2022

# TABLE OF CONTENTS

| | |
|---|---|
| CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN* | 03 |
| WHAT ARE CONTENT-BASED REGULATIONS | 04 |
| WHAT LEGAL TEST APPLIES TO CONTENT-BASED | 06 |
| WHAT ARE CONTENT-NEUTRAL SIGN CODES? | 07 |
| TIPS TO COMPLY WITH *REED* | 09 |
| REGULATING SPECIFIC SIGN TYPES | 11 |
| TEMPORARY, INCIDENTAL AND YARD SIGNS | 11 |
| POLITICAL SIGNS | 12 |
| SPECIAL EVENT SIGNS | 13 |
| HUMAN SIGNS/SIGN WALKERS | 13 |
| COMMERCIAL SIGNS | 14 |
| ARTWORK AND MURALS | 14 |
| ON- VS. OFF-PREMISE SIGNS | 16 |
| PUBLIC FORUM | 19 |
| *REED*'S TOP 10 TAKEAWAYS | 20 |
| ABOUT THE AUTHOR | 21 |

# AFTER *REED* AND *AUSTIN*

Local governments throughout the United States regulate signs to promote aesthetics and traffic safety. These sign codes typically address the location, dimensions and physical design of signs. Sign regulations often classify signs based on what they say – i.e., their messages.

In 2015, the United States Supreme Court issued its seminal First Amendment decision in *Reed v. Town of Gilbert* that, for all practical purposes, rendered message categories unconstitutional. The *Reed* decision opens a number of grey areas in drafting sign regulations that lower courts have attempted to sort out. One questionable area was resolved nearly seven years after *Reed* to address the issue of on- versus off-premise signs, in *City of Austin vs. Reagan National Advertising.*

This article summarizes the state of the law, sorts through the practical issues in complying with content-neutrality, and offers pointers for local governments considering a sign code update.



# What are Content-Based Regulations?

To comply with *Reed*, sign regulations should be "content-neutral" – in other words, agnostic about the sign's message or who is expressing it. While content-neutrality is deceptively simple on its face, it raises practical issues in defining and implementing sign codes.

## Content-Neutral Sign Regulation: When a sign is regulated without regard to the message or the speaker.

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics.

While the First Amendment has permitting and language precision implications for sign codes, the *Reed* decision deals with the issue of message control. *Reed* holds that "content-based" regulations are subject to "strict scrutiny" in the courts. A "content-based" regulation controls the topic of communication, and in some instances the speaker. For, example, in *Reed* the Town of Gilbert, Arizona established a sign category known as a "Temporary Directional Signs Relating to a Qualifying Event," which were signs directing the public to a nonprofit group meeting (such as a church service at a school).

### *THE TEMPORARY DIRECTIONAL SIGN THAT STARTED IT ALL!*

When Pastor Clyde *Reed* wanted people to know where services for his Good News Community Church were located, he was relegated to using these kinds of small temporary directional signs to get the word out. The small church in Gilbert, Arizona, often rented different spaces in temporary locations, making visible and effective signage critical in directing the community. But the Town of Gilbert severely restricted the size, location, number and duration that temporary directional signs could be, especially compared to other signs with political and ideological messages. For example, political signs could be up to 32 square feet and displayed for up to 5 months, but Pastor *Reed*'s signs could only be up to 6 square feet and out for just 12 hours before the services, and taken down after 1 hour afterwards.

*Image Source: AZCentral.com (https://www.azcentral.com/story/news/local/gilbert/2015/01/12/gilbert-church-signs-supreme-court-arguments/21636837/)*



A temporary directional sign was limited to 6 square feet in area, could stay up 12 hours before and one 1 hour after an event, and only 4 temporary directional signs were allowed on public or private property. By contrast, other temporary sign categories such as "political signs" – defined as temporary signs designed to influence the public elections – were allowed 16 square feet in residential and 32 square feet in commercial districts, could stay up 60 days before a primary and 15 after a general election. The only difference between temporary directional signs and political signs is the kind of message they display.




| Display Time Before | Event | Display Time After |
|---|---|---|
| UNLIMITED | Ideological Sign | UNLIMITED |
| 4 1/2 MONTHS | Election | 15 DAYS |
| 30 DAYS | HOA Event | 48 HOURS |
| 16 HOURS | Real Estate Sale | 36 HOURS |
| 12 HOURS | Religious Event | 1 HOUR |

Therefore, the regulations are content-based, i.e., they turn on the sign's content (message), as opposed to its physical characteristics (such as whether it not it is erected on a freestanding pole or attached to a building). This is the case even if the regulations do not discriminate among viewpoints; simply controlling the type of message renders a regulation content-based even when it does not favor some viewpoints over others.

A sign regulation is content-based if the message displayed on a sign has a regulatory impact. Generally, if the zoning administrator has to read the sign to determine what regulations apply, the regulation is likely content-based – with the exception of the on-premise/off-premise distinction, as per *Austin*. Even if the regulation restricts or favors a category of speech for a benign reason (such as to allow churches to guide congregants to services in temporary locations), the regulation is still considered content-based. An innocuous justification cannot transform a content-based law into one that is content-neutral. In addition, the *Reed* decision intimated that content-neutral regulations that target or favor speakers is content-based if it impacts the message.

## What Legal Test Applies to Content-Based Regulations?

Content-based regulations are subject to "strict scrutiny" in the courts. This means several things: First, the regulation must serve a *compelling* government interest. A compelling interest is one that exceeds the substantial or legitimate interests supporting a conventional zoning regulation (such as a protecting property rights), and few interests are deemed compelling. Courts have held that aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently "compelling" to support content-based regulations. See *Clark v. City of Williamsburg,* 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied,* 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1268 (11th Cir. 2005). Second, the regulation must be narrowly tailored to that interest.

If other sign categories burden those interests more but are less restricted because of what they say, the restriction is not narrowly tailored. For example, in *Reed,* the Town limited the number and size of temporary directional signs to control clutter, but political signs were unlimited in number and had significantly larger sign allowances. Therefore, political signs were allowed to intrude on the Town's aesthetic interests to a greater extent than temporary directional signs based only on what they said. This was not narrowly tailored to the Town's aesthetic interests. Finally, the regulation is presumed unconstitutional, and the local government has the burden to prove that it meets the first two tests.



**Therefore, content-based regulations, or facially-content-neutral regulations justified in relation to content, rarely survive a constitutional challenge when subject to strict scrutiny.**

As noted in *Reed*, few sign codes are free of content-based provisions under the Court's content-neutrality standard, both for temporary signs and permanent signs. Every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of *Reed*, if necessary.

# What are Content-Neutral Sign Codes?

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics. In other words, a sign code that regulates only the "*time, place, and manner*" of signs is considered content-neutral. Content-neutral regulations are subject to intermediate, rather than strict, scrutiny. Courts also apply intermediate scrutiny to regulations that affect only commercial speech.



Intermediate scrutiny requires that a sign regulation is narrowly tailored to serve a *substantial* governmental interest and leave ample alternative avenues of communication. Some lower courts have found that aesthetics and traffic safety are not "compelling" interests under the strict scrutiny standard. However, aesthetics and traffic safety typically meet the "substantial government interest" standard and courts are more deferential in assessing whether those regulations are tailored sufficiently to meet their stated objectives than they are when strict scrutiny applies.

**Both the majority and concurring opinions in *Reed* summarized the types of regulations that are considered content-neutral.**

**Content-Neutral Regulations Include:**

1. MAXIMUM SIGN SIZE
2. MATERIALS
3. LIGHTING
4. MOVING PARTS
5. PORTABILITY
6. BANNING OR REGULATING SIGNS IN THE PUBLIC RIGHT-OF-WAY
7. LOCATIONS
8. DISTINGUISHING FREESTANDING AND ATTACHED SIGNS
9. DISTINGUISHING FIXED VERSUS CHANGEABLE ELECTRONIC SIGNS
10. REGULATING SIGNS DIFFERENTLY BY ZONING DISTRICT
11. TOTAL NUMBER OF SIGNS ALLOWED PER FRONTAGE OR AREA
12. TIME RESTRICTIONS ON ADVERTISING A ONE-TIME EVENT
13. GOVERNMENTAL SIGNS

Keep in mind that the regulatory matters listed here are content-neutral only if they are not triggered by the sign's message or user (a possible exception is government signs, which remains a grey area). For example, setting a maximum footcandle brightness for digital signs is, on its face, content-neutral. However, allowing digital signs only for gas prices or churches could be content-based.




Notably, the concurring opinion in *Reed* stated that regulating off-premise signs differently from on premise signs, a traditional element of local and state billboard regulation, is content-neutral. However, this did not preclude billboard operators from litigating against on-premise/off-premise distinctions in cities and states across the country over the next several years. The U.S. Supreme Court recently clarified that issue (see discussion of Off-Premise Sign Regulations, below).

## Tips to Comply with *Reed*

To comply with the principles announced in *Reed*, a sign code should establish three (3) broad sign categories based on their physical characteristics. These typically include freestanding signs, attached signs, and incidental signs.

### Three Sign Categories Based on Physical Characteristics

**FREESTANDING SIGNS**

Signs that are not attached to any other structure, ie. pole signs and monument signs.

**ATTACHED SIGNS**

Signs that are attached to a building or structure, ie. wall signs, window signs and murals.

**INCIDENTAL SIGNS**

Smaller signs that are physically subordinate to the principal freestanding or attached signs on the site, ie. directional signs, historic markers, temporary signs. (The sign code can break temporary signs into a separate category).

To ensure that a sign code is content-neutral, a community should begin by removing all references to the content of sign types, or sign messages that trigger permitting or related sign regulations. For example, a community could replace project identification sign categories with regulations for a single monument or pole sign for properties in a commercial zoning district. This replaces a message trigger (i.e., whether the sign identifies the site) with the physical parameters of the monument or pole sign. A possible exception is sign categories that directly relate to public safety issues. The majority opinion in *Reed* stated that "[a] sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers--such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses-well might survive strict scrutiny."

By contrast, all provisions in a sign code that refer to number, area, structure, location and lighting of signs are content-neutral and unaffected by *Reed* if those categories do not relate to what the sign says. However, keep in mind that other First Amendment requirements apply. For example, a content-neutral regulation that inadvertently chokes off too much speech (see discussion of yard signs below), or that gives a zoning administrator unlimited discretion to deny or condition a sign permit, can intrude on First Amendment rights even if the regulations are facially neutral. Therefore, even if the regulations are content-neutral, a community should make sure that sign allowances are not overbroad and consider how sign permits are processed.

**Sign codes should also include severability and substitution clauses.**

A severability clause is common to most zoning and land development codes and simply provides that if any part of the code is invalidated in court, the rest of the code remains valid. This is important because there are many grey areas in sign regulations, and both the U.S. Supreme Court and lower courts are still fleshing out the parameters of content-neutrality. A substitution clause simply allows a sign to substitute a noncommercial message on any sign that permits a commercial or another noncommercial message. For a truly content-neutral code, this may seem superfluous. However, this simply clarifies that a sign code regulates only the physical characteristics of the sign and not its message.



# Regulating Specific Sign Types

While *Reed's* principles are deceptively simple, there are unsettled issues in its application to specific sign types. These range from traditional temporary placards (such as political yard signs) to lighted projections on buildings. This section explores how the lower courts have treated various, common sign categories and how to address them in your sign codes.

# Temporary, Incidental and Yard Signs

Temporary signs are difficult to codify as they are traditionally identified by their message or function. For example, real estate signs relate to the sale of property, and political signs relate to an election. However, a community can regulate the time, place and manner of temporary signs if they are not called out by their message. For example, a sign code can regulate signs based on temporary materials (such as cloth, canvas, vinyl, cardboard, wallboard, or other temporary materials), or temporary types such as feather signs. In addition, the sign code can fold temporary signs into an overall allocation of incidental signs for a site, remaining agnostic about how those signs are used.




For temporary signs, the community should consider a flat time allocation, rather than one tied to specific events. For example, a city amended its sign code after *Reed* to cap the number of temporary signs on any property, with an allocation of 5 additional signs 45 days before and 14 days after an election. This allocation did not restrict the message of the additional signs. In an unreported federal district court opinion, the court ruled that this was impermissibly user-based even though it did not regulate the additional sign's message (www.ricardopacheco.com *et al. v. City of Baldwin Park,* No. 16-CV-09167-CAS, 2017 WL 2962772 (C.D. CA. July 10, 2017)). The court suggested that the community could, for example, allow additional signs for a limited number of times per year not tied to specific events. "For example, the City could authorize five additional signs of up to 12 square feet for 60 days one time per year at the time of the speaker's choosing."

Instead of defining signs by message or function, the sign code should establish overall allocations for incidental or temporary signs. How those signs are used - whether to sell the property, advertise their favorite political candidate, or to express an opinion - is up to the property owner. For example, the City of Indianapolis established a set of standards for "noncommercial opinion signs." After that was found to violate content-neutrality principles, the city replaced that with an overall allocation for yard signs. This was found consistent with content-neutrality requirements (*Geft Outdoor LLC v. Consolidated City of Indianapolis* (S.D. Ind. 2016)). As is mentioned above, however, the overall allocation of yard signs must allow a sufficient amount of speech even if it is content-neutral. Several federal court decisions have invalidated sign codes allowing only one or two yard signs as restricting too much speech, even when those restrictions are content-neutral (*Willson v. City of Bel-Nor* (E.D. Mo. 2020); *Arlington County Republican Committee v. Arlington County* (4th Cir. 1993)).

To avoid administrative and enforcement issues with having to identify whether a sign as "temporary" and enforcing time limits, communities can also fold temporary signs into an overall sign number allocation for incidental signs. If the community believes regulation of temporary signs is needed, it can require stickers that identify when the sign was placed to document compliance with any time restrictions.

A common issue with sign regulations written before *Reed* is regulations that limit flags to those with government or institutional symbols. This is content-based (*Willson v. City of Bel-Nor* (E.D. Mo. 2020)), and any definition of flags should include only their physical description with no limitation to government or other symbols.

## Political Signs

Political signs fall into two major categories, including traditional handheld political message signs (picketing, panhandling, "save the turtles") and campaign election signs. Sign codes are traditionally limited to the latter. Political signs are not only a content-based category, but political speech enjoys the highest level of protection in First Amendment case law. Therefore, sign regulation should never target political signs, but rather fold them into incidental and temporary sign allowances. For yard signs, it is advisable to allow additional incidental or temporary signs for a given number of days per year to allow for occasions (such as elections, holidays, or similar times) where additional signs are needed to accommodate speech.




[1]The City later amended its sign regulations to a content-neutral allocation of the number and area of temporary signs, which was upheld on appeal. *Baldwin Park Free Speech Coal. v. City of Baldwin Park,* No. 20-55244 (9th Cir. 2021).

An emerging issue is state preemption of state preemption of political sign regulations. Several states, such as Arizona and Kansas, limit how local governments can regulate political signs during election season. This preemption does not extend to signs that display other forms of speech. How should a local government comply with state law without itself engaging in unconstitutional discrimination between types of speech? At least one federal court case has ruled that the exemption of government signs or signs exempt from state regulation is not content-based (*Signs for Jesus v. Town of Pembroke* (D.N.H. 2017)). Because local governments typically cannot supersede state law, that type of exemption is not itself content-based but rather a recognition that the local government is powerless to supersede state law. In the context of panhandling, a federal district court found that a local regulation that did not incorporate a content-based exemption for solicitations by municipal employees such as firefighters was not content-based even where the city announced an intention to enforce the regulations consistent with state law (*Watkins v. City of Arlington* (N.D. Tex. 2015)).

## Special Event Signs

Some sign codes include special regulations or allowances for signs at special events. If those regulations do not require the signs to advertise the special event or something occurring there, it is arguably content-neutral. However, it is unclear whether that would constitute a user preference. Under the current state of the law, it is likely not to constitute a user preference if a special event itself does not restrict expressive conduct. *In Act Now to Stop War & End Racism Coal. v. Dist. of Columbia* (D.C. Cir. 2017), the court upheld a regulation allowing signs posted a public lamppost to remain for up to 180 days, but requiring signs for special events to be removed within 30 days. The court held the regulation was content-neutral because it only regulated where some speech may occur and did not distinguish between events by topic, and was narrowly tailored to the government's interest in controlling clutter. Another court, however, found that an exemption for special and civic event signs (including grand openings) was content-based because one must assess the communicative content of the sign to determine whether the exemption applies (*International Outdoor v. City of Troy* (E.D. Mich. 2017)). More recently, the U.S. Supreme Court in City of *Austin* v. *Reagan National Advertising* (discussed below) distinguished regulations that regulated special event signs generally (which are content-neutral) and those that regulate specific kinds of special events (which are content-based).

## Human Signs/Sign Walkers

Some sign codes attempt to regulate signs carried by persons, i.e., the stereotypical costumed Statue of Liberty advertising a tax preparer. Regulating hand-held signs or costumes does not necessarily trigger content concerns, but raises difficulties in distinguishing things like costumes that advertise (e.g., the omnipresent Statue of Liberty) from those that do not (for example, a Statue of Liberty costume designed to send a political message). This also raises difficulties in defining costuming and hand-held signs in a way that meets First Amendment tests for language precision. A pre-*Reed* decision invalidated sign walker regulations based on the *Central Hudson* test (*Kitsap County v. Mattress Outlet* (Wash. 2005)), and at least one state statute (Arizona) addresses sign walkers. Many post-*Reed* cases address panhandling, which does not directly involve a sign display but could involve the same principles of content-neutrality.



## Commercial Signs

It remains unclear whether strict scrutiny applies to sign regulations that affect only commercial signs. Sign regulations cannot preference commercial over noncommercial speech (*Metromedia v. City of San Diego* (U.S. 1981)). For regulations that affect only commercial speech, courts have traditionally applied a test announced in *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n* (1980) that asks (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. While this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny. As is discussed below in the context of murals and billboards, communities are finding that limits on commercial signs may not survive judicial review if they wander beyond the sign's physical parameters.




## Artwork and Murals

Is artwork a sign? Can cities distinguish art and murals from commercial signs? Artwork (including murals) is expressive conduct protected by the First Amendment. Several cases have ruled that sign codes that either exempt (*Central Radio v. City of Norfolk* (4th Cir. 2016)) or regulate (*Kersten v. City of Mandan,* 389 F.Supp.3d 640 (D. N.D. 2019)) works of art or murals that did not display commercial messages are content-based. Before *Reed,* courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. In *Kersten,* the court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. See also *Complete Angler, LLC v. City of Clearwater* (M.D. Fla. 2009)(bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for noncommercial works of art and holiday decorations were content-based). *In Morris v. City of New Orleans* (E.D. La. 2019), the city defined murals separately from signs and prohibited commercial advertising on them.

**A community who wants to regulate murals can consider the following options:**

- **Remove restrictions that exempt or target artwork, along with limits on commercial advertising. The regulations could consider a restriction on text, if the message is not restricted (for example, limiting the text to the artists' signature).**
- **Consider mural subcategories based on their physical characteristics, such as a "wall sign" or "painted wall sign." An issue with this approach is that murals often occupy entire building walls, which exceed typical wall sign limits.**
- **Consider a review process for murals, such as an arts commission review, that examines the artistic quality of the mural. This approach should involve clear standards, time limits, and an express prohibition on considering the mural's content.**

Applying intermediate scrutiny, the court invalidated the mural regulations, finding that "there is nothing in the record to suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork."

There is also an emerging issue as to whether artistic embellishments are protected. This could involve signs that are embedded in a building's architectural features, or regulating a sign's design elements (such as materials). *In Burns v. Town of Palm Beach* (11th Cir. 2021), the court rejected a First Amendment challenge to in architectural review commissions denial of a building permit to replace a traditional beachfront mansion with a much larger midcentury modern house. Over a strong dissent, the court declined to decide that architecture is expressive conduct. This leaves open common design controls for signs, such as requiring masonry or materials compatible with the principal building style for monument signs. However, if courts were to apply intermediate or strict scrutiny to those types of regulations, local governments would need to examine the basis and regulatory efficacy of sign design controls.



# On- vs. Off-Premise Signs:

Off-premise signs advertise products not located on the same premise as the sign, or direct people to off-premise locations. It is common for local sign regulations and state billboard regulations to distinguish on- from off-premise signs. The federal Highway Beautification Act of 1965 (23 U. S. C. § 131) conditions highway funding on outdoor sign regulation, while exempting on-premise signs (i.e., "signs … advertising the sale or lease of property upon which they are located" and "signs, displays, and devices . . . advertising activities conducted on the property on which they are located"). At least two-thirds of state highway beautification regulations and tens of thousands of local sign codes either ban off-premise signs, or subject them to spacing, permitting, and size requirements. Those regulations do not apply to signs that advertise or communicate a business or activity that occurs on the same premise.[2] In *Reed,* a concurring opinion characterized this type of regulation as content-neutral. This is consistent with Supreme Court precedent upholding off-premise sign regulation (*Metromedia, Inc. v. City of San Diego* (1981)).

**Both these signs are digital and advertise the same company, but communities are allowed to regulate them differently based on where they are located, according to the U.S. Supreme Court in *Austin* v. Reagan (2022).**




*Many communities, such as in Austin, TX, prohibit these kinds of digital off-premise signs, or billboards.*




*Many communities, such as in Austin, TX, allow these kinds of digital on-premise signs, or electronic message centers (EMCs), in the parlance of the on-premises sign industry.*

*Image Source: Daktronics*

[2]In response to concerns that off-premise classifications were content-based, after *Reed* several states revised their outdoor advertising statutes or regulations to replace the premises category with a category for signs that are erected for compensation. See Colorado Rev. Stat. § 43-1-403(1)( "Advertising devices" include signs "for which compensation is directly or indirectly paid or earned in exchange for its erection or existence by any person or entity"); Kentucky Rev. Stat. § 177.830(5)("advertising device" means a sign "[o]perated or owned by a person or entity who is earning compensation directly or indirectly from a third party or parties for the placement of a message on the device"); Tennessee Code Ann. § 54-21-102(18)("[o]utdoor advertising device" is "a sign that is operated or owned by a person or entity that is earning compensation directly or indirectly from a third party or parties for the placement of a message on the sign"). A federal district court found the Colorado legislation content-neutral in *StreetMediaGroup, LLC v. Stockinger*, No. No. 1:20-cv-03602-RBJ (D. Colo. 2021), because the state transportation department "need not be aware of a sign's content to determine whether compensation was received for its erection."

The United State Supreme Court recently confirmed that off-premise sign regulations subject to intermediate, not strict, scrutiny. In *City of Austin v. Reagan National Advertising,* 142 S.Ct. 1464 (U.S. 2022), the court considered a sign code that prohibited the digitization of off-premise signs. Plaintiffs claimed that off-premise sign categories are content-based because persons (especially regulators) have to read the signs to determine whether the message related to things occurring on-or-off the site. The U.S. Supreme Court rejected this argument, ruling that the distinction relates to the location of signs and is not inherently directed at the sign's message. Essentially, the court held that the need to read the sign is directed to its location rather than its message. Therefore, off-premise sign regulations that do not preference commercial over non-commercial speech are subject to intermediate rather than strict scrutiny.

While off-premise sign regulations are not presumed unconstitutional, they remain subject to First Amendment challenge. In drafting off-premise sign restrictions, local governments should consider the following:

1 ***Reed's* "Need to Read" Test Does Not Apply to Off-Premise Sign Regulations.** *Austin* reasons that conventional off-premise sign categories require "examination of speech only in service of drawing neutral, location-based lines" rather than controlling the sign's communicative content. However, central to its holding is that the off-premise category did not trigger a specific or substantive category of speech, such as political messages, ideological messages, or directional messages concerning specific events (*Austin*, at 8). Therefore, off-premise sign categories that regulate specific types of off-premise messages or users could implicate higher scrutiny and jeopardize the regulations in court (see paragraphs 3 and 5, below) because they affect the sign's topic, idea or message.

2 **Billboards versus Off-Premise Signs. While many billboards are off-premise signs, the two concepts are distinct.** A billboard is a physical category – typically, a large, freestanding panel sign. By comparison, an off-premise sign can occur in any configuration – including a billboard, a wall sign, or on digital copy. Communities can choose to regulate billboards as physical entities regardless of their message, removing the need to justify distinctions between off-premise commercial messages under intermediate scrutiny. For example, a sign code could define a "billboard" as a panel-type sign mounted on posts or steel frames (see, for example, Westminster, Colorado Sign Code § 11-11-16(D)), or as a freestanding smaller than typical bulletin specifications (672 square feet in area or 14 feet in height).

3 **Off-Premise Distinctions that Regulate Non-Commercial Messages May Trigger Strict Scrutiny.** The *Austin* opinion assumed that the sign regulations at issue regulated only commercial speech. Because non-commercial speech receives a higher degree of protection under the First Amendment, regulations that implicate non-commercial messages (such as political campaign or religious messages) will trigger strict scrutiny. However, regulations that affect any off-premise message – whether or not those messages are commercial in nature – will trigger only intermediate scrutiny.

4 **Limiting Off-Premise Regulations to Commercial Messages is Subject to Intermediate Scrutiny.** Both the majority opinion and dissent in *Austin* recognized that regulations targeting only commercial speech (i.e., advertising or directing customers to a business) are subject to intermediate, not strict, scrutiny (*Austin* at 10 [majority opinion], Thomas, dissenting, at 2, note 1).

[3] *Austin*'s sign regulations, as described in the majority opinion, did not exempt noncommercial speech. *Austin* at 5, note 3.

**5** **Off-Premise Regulations that Regulate Commercial Messages Differently may Fail Intermediate Scrutiny.** It is one thing to regulate off-premise advertisements, and another to carve out special treatment for specific businesses. For example, some sign regulations have special permissions for off-premise real estate signs, hospital, or farms. Car dealerships, hospitals, bookstores, or other businesses do not qualify for those exemptions. What government interest justifies not allowing a car dealership to display a sign at an off-premise location while allow that permission for a homebuilder? Why would a general regulation or allowance for off-premise signs – coupled with size, spacing and design restrictions – not promote those interests as effectively? A local government with those categories would need to show how those distinctions are narrowly tailored to serve a significant government interest.

**6** **Facially Content-Neutral Off-Premise Sign Regulations Trigger Strict Scrutiny if they have an Impermissible Purpose or Justification.** The majority opinion in *Austin* stated that an impermissible purpose could sink a content-neutral off-premise sign regulation, but gave no examples. One example could include, for example, a regulation that allows for billboards only during election season – where the regulation allows for any form of off-site message, but is designed to favor a particular form of speech (see www.ricardopacheco.com, *supra*).

In drafting off-premise sign regulations, the most conservative approach legally is to regulate only commercial speech (which triggers only intermediate scrutiny), and at least to ensure that the regulations do not explicitly or implicitly favor commercial over non-commercial speech. In addition, regulating only the billboard structure with no off-premise sign restriction is a viable approach legally, but also potentially exposes more locations to off-premise advertising. However, the *Austin* decision clarifies that none of these approaches (without more) will trigger strict scrutiny.







*Image Source: Watchfire*

# Public Forum

Local governments retain wider discretion over the display of their own signs and those on their own property than they do for private signs on private property. However, free speech protections apply when the government opens public property to private expression. In 2022, the U.S. Supreme Court addressed the issue of signs in the public forum. In *Shurtleff v. City of Boston,* No. 20–1800 (U.S., May 2, 2022), the City routinely allowed the display of flags on a flagpole at City Hall with no guidelines or control over who could display them or their content. The City denied the display of a religious flag based on concerns that it would violate the Establishment Clause by endorsing a set of religious beliefs. The City's lack of involvement in selecting flags for display at that location meant that the display was private (not public) speech. Therefore, denying permission to display the flag amounted to viewpoint discrimination in violation of the First Amendment. Local governments should exercise clear control over signs in public spaces where only government speech is allowed, and adopt content-neutral rules for permitted private displays (other than exempt government signs, such as traffic directional signs) in the public forum.



# *Reed's* Top 10 Takeaways

**The *Reed* decision changed the way communities and courts look at sign regulations, and its impact is still being felt (and litigated) across the nation. Local jurisdictions applying the content-neutrality principles of *Reed* to their sign code should consider the following:**

1. While the facts in *Reed* involve temporary signs, content-neutrality is not limited to temporary signs. The First Amendment protections at issue in *Reed* apply to any form of communicative content - whether the sign is a cardboard election sign in a yard, a large monument sign at the entry to a shopping center, or a mural subject to design review.

2. If a regulation affects the topic or message conveyed, the regulation is content-based and likely subject to strict scrutiny. This applies whether the regulation appears in a sign code, a zoning ordinance, design guidelines, or some other regulation.

3. A sign code should identify all signs (permanent or temporary) by their structure or design (such as the sign's materials, configuration, and presentation – i.e., whether or not it has changeable or digital copy, lighting, and similar visual features), rather than what they say.

4. Communities do not usually run into trouble simply because they regulate a sign's dimensional standards or design features. Instead, sign codes trigger strict scrutiny when they create either: (1) exemptions for preferred categories of speech, or (2) target categories of speech for regulation through their sign code.

5. Communities who want to specifically regulate temporary signs can continue to do so, but should base their regulations on the signs structure type (such as feather signs, windblown signs, or cardboard placards mounted on a metal frame) and uniform event triggers (such as 5 to 10 temporary signs along a frontage for up to 30 days four times a year).

6. Traditionally, courts have given more deference regulation of commercial content through intermediate scrutiny. However, some lower courts have started to apply strict scrutiny to commercial content categories and it is fair to say that the state of the law is unclear.

7. *Reed* does not require signs to be bigger, cluttered, brighter, or otherwise an obstacle to a community's aesthetic or traffic safety objectives. It simply advises communities to focus carefully on the physical characteristics of signs that they truly need to regulate, and to avoid interfering with a sign's message.

**8** **To control clutter and driver distraction, sign codes can use allocation-based systems that allow persons and property owners to allocate messages as they see fit within the parameters established by the sign code's dimensional standards.**

**9** **There are other First Amendment requirements and constitutional issues to consider, such as overbreadth, vagueness, and how long it takes to issue a sign permit. Those are beyond the purview of this article but remain important considerations.**

**10** **Distinctions between on- and off-premise signs are sufficient under *Austin*, if they do not involve other content-based categories (for example, allowing off-premise signs for some messages but not others).**

**Communities applying these content-neutral principles can develop and implement sign codes that promote community character, traffic safety, and economic development.**

## About the Author:

Mark White is a senior partner with White & Smith, LLC – a multi-disciplinary law firm based in Kansas City and Charleston that specializes in zoning and sign code updates. White & Smith, LLC has led or participated in over 150 zoning and sign code updates in 36 states. Mr. White is a nationally-recognized expert on planning and law presents frequently on sign law and regulations at planning and law conferences, and has spearheaded numerous zoning and sign code updates. Mr. White has over forty publications appearing in books, law journals, and planning literature.

# IS YOUR COMMUNITY EXPLORING SIGN CODE CHANGES?

CONTACT
**signhelp@signs.org**
FOR COMPLIMENTARY ANSWERS

**PUBLISHED BY:**

SIGN RESEARCH FOUNDATION™

**WWW.SIGNRESEARCH.ORG**

© Sign Research Foundation

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Charles R. Taylor, Ph.D. in Support of Plaintiffs' Motion for Summary Judgment |

**DECLARATION OF CHARLES R. TAYLOR, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Charles R. Taylor, was retained to testify as an expert by Plaintiffs in this matter. I verify under penalty of perjury under the laws of the United States of America the following:

1. A true and accurate copy of my expert report is attached as Exhibit 1 to this Declaration.
2. A true and accurate copy of my curriculum vitae is attached as Exhibit 2 to this Declaration.
3. I will testify at trial or for other purposes consistent with the contents of the expert report and my curriculum vitae.

Dated: February 3, 2025

Charles R. Taylor Ph.D.
Charles R. Taylor, Ph.D.

Taylor Declaration Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,**
**Defendant.**

**Expert Report of Charles R. Taylor, Ph.D.**

**September 20, 2024**

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising, Journal of Advertising Research, Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

    - Comprehensive plan implementation
    - Traffic safety
    - Aesthetics
    - Urban design and travel behavior
    - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   **i) Comprehensive plan implementation;**
   **ii) Traffic safety;**
   **iii) Aesthetics**
   **iv) Urban design and travel behavior; or**
   **v) Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on–premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024 Charles R. Taylor Ph.D.

Date Charles R. Taylor, Ph.D.

## REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityofeastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, 3(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.

Taylor Declaration Exhibit 2

***Charles R. Taylor***

Villanova School of Business .
Department of Marketing
Villanova University
Villanova, PA 19085-1678

Phone: (610) 519-4386
Fax: (610) 519-5364
E-Mail: raymond.taylor@villanova.edu

**EDUCATION**

| | |
|---|---|
| 1992 | Ph.D. in Marketing, Michigan State University, East Lansing, MI. |
| 1987 | M.B.A., Michigan State University, East Lansing, MI. |
| 1984 | B.G.S., University of Michigan, Ann Arbor, MI. |

**ACADEMIC EMPLOYMENT**

| | |
|---|---|
| 2004- present | John A. Murphy Endowed Chair in Marketing, Villanova University and Senior Research Fellow, Center for Marketing and Public Policy Research |
| 2007 (Fall) | Visiting Distinguished Professor, Ludwig Maximilians University, Munich Germany |
| 2004-2016 | Professor, IIE & Global MBA Program, Korea University, Seoul, Korea |
| 2000 - Present | Professor of Marketing, Villanova University |
| 1998 - 1999 | Associate Professor of Marketing, Villanova University |
| 1992 - 1997 | Assistant Professor of Marketing, Villanova University<br>Courses Taught: Advertising (MBA), Branding (MBA), International Marketing (MBA and Undergraduate), Strategic Marketing Management (MBA), Principles of Marketing (Undergraduate). |
| 1988 - 1992 | Associate Instructor and Research Assistant, Michigan State University<br>Courses Taught: International Marketing, Marketing Strategy, Retailing |

## RESEARCH INTERESTS

Advertising, Branding, and Integrated Marketing Communications - Advertising effects research; Online product reviews; Super Bowl and big event advertising; Consumer behavior and decision making; Digital advertising; Branding and equity; Outdoor advertising and on-premise signage

Marketing and Public Policy Issues Related to Advertising and Consumer Behavior - Consumer decision making, Consumer privacy; Advertising regulation; Digital advertising effectiveness; commerce; Tobacco and alcohol marketing; Pharmaceutical marketing; Trademark issues.

Global Advertising and Marketing - Marketing and advertising in Asia and Europe; International marketing and public policy issues including: "Made in" labeling and its effects; Factors involved on foreign market entry mode choice; Methodological issues, including techniques for enhancing data equivalence, comparability, and reliability; Advertising effects in diverse cultures.

## INDUSTRY EXPERIENCE/ CONSULTING

Consulting clients have included Peloton, ADT Alarm Systems, LLC, General Motors, GNC Holdings, Inc., Next-Gen, Inc., Swedish Match, Inc., Philip Morris USA, Samsung Electronics, Swedish Match, Inc., Live Nation, Inc., Walker Furniture, McCann Erickson Worldwide, Clear Channel Communications, Infinity Broadcasting, ClubCom Media, Inc., Magic Media, Inc., Eller Media, Centre for Information on Beverage Alcohol (London), Lamar Outdoor, Interstate Outdoor, Craig Realty, Borden Park, L.P., Dechert L.L.P., Greenberg Trauig, L.L.P., Sussman Godfrey, L.L.P., Arnold and Porter L.L.P., Winston & Strawn, Brown Rudnick, L.L.P., Mattioni and Associates, The Rossbacher Firm, The International Sign Association, The Signage Foundation for Communication Excellence, M of Toms River, Outdoor Advertising Association of America, Missouri Outdoor Advertising Association, Texas Outdoor Advertising Association. Held positions with R.L. Polk and Company, and General Motors prior to entering academia.

## MEDIA COMMENTATOR

Commentator in numerous media outlet on advertising and other marketing and branding issues. Senior contributor for Forbes.com. Frequently quoted in outlets such as the Associated Press, MSNBC television, Fox television, NBC television, CBS television, Cheddar TV, CBS.com, ABC.com, Reuters, Forbes, Business Week, the Wall Street Journal, the New York Times, USA Today, Arirang Television, the Washington Post, the Philadelphia Inquirer, San Francisco Examiner, the Los Angeles Times, Advertising Age, Brandweek, Adweek, Variety, Mashable, Yahoo.com, Accesshollywood.com, Sportsillustrated.cnn.com, French Foreign Press Association, the Boston Globe, the Dallas Morning News, the New York Post, China Daily.com, and many others.

## INVITED SPEECHES

Presentations at several Universities and industry associations. Universities include Harvard, Columbia, Tuck School of Business (Dartmouth), Yonsei University, Korea University, University of Texas at Austin, Rutgers, University of Antwerp (Belgium), University of Amsterdam (Netherlands), University of Munich (Germany), King's College London, Harbin Institute of Technology (China), Seoul National University (Korea), University of Klagenfurt (Austria), University of Madrid (Spain), Masaryk University (Czech Republic), Shanghai Jiao Tong University, East China Normal University, Seoul National University, Ewha Women's University, and Changwon National University. Featured/keynote speaker at meetings of ICORIA (European Advertising Association), Emerging Markets Conference Board, ICAMA (Asian Marketing Association, China Advertising Association, the Korea Advertising Society, International Sign Association, Conference on Corporate and Marketing Communications, the Signage Foundation, Asia Pacific Law Students Association, the Outdoor Advertising Association of America, and the U.S. Transportation Research Board.

## REVIEWING AND EDITING

***Editor in Chief***

International Journal of Advertising (2008 – present, SSCI)

***Associate Editor***

Journal of Public Policy and Marketing (2006 – 2009, SSCI)

Journal of Advertising (2008 – 2009, SSCI)

***Editorial Review Board Member***:

Journal of Advertising (2003 – present, SSCI); Senior Advisory Board

Journal of Public Policy and Marketing (1997 – present, SSCI)

Journal of Advertising Research (2001-2004 and 2016-present SSCI)

International Journal of Advertising, (2006 – 2008. SSCI)

International Marketing Review, (2005-present, SSCI); Senior Advisory Board

Journal of Business Research (2000 – 2015, SSCI)

Journal of Current Issues and Research in Advertising (2001 - present)

Journal of Consumer Affairs (2002 – present, SSCI)

Psychology and Marketing (1994 – 2022, SSCI)

Journal of International Marketing (2000- present)

Advances in International Marketing (1996 - present)

Journal of Marketing Communications (2006 – present)

Journal of Marketing Theory and Practice (2007 – present); Senior Advisory Board

***Special Issue Editor***:

European Journal of Marketing, The Janus Face of Customer Service (2020)

Journal of Advertising, Special Issue on Advertising Regulation and Self Regulation, (2008).

International Journal of Advertising, Special Issue on Advertising in Asia Pacific (2008)

Psychology and Marketing, Special Issues on E-Commerce and Mobile Commerce, with Doo Hee Lee (2008).

Advances in International Marketing, Cross-Cultural Buyer Behavior (2007).

Journal of Advertising, Special Issue on International Advertising (2005).

Advances in International Marketing, "New Directions in International Advertising Research," 2002.

Journal of Public Policy and Marketing, Section including best conference papers, 2001.

Psychology and Marketing, "Emerging Issues in Advertising," 2000.

Advances in International Marketing, Special issue on "Marketing in Asia Pacific," 1996.

Journal of Public Policy and Marketing, Section including best conference papers, 1996.

***Ad hoc reviewer:***

Journal of Marketing
Journal of Marketing Research
International Marketing Review
Journal of International Marketing
Journal of Interactive Marketing
Journal of Services Marketing
Journal of Macromarketing
Journal of Marketing Theory and Practice
Asian Journal of Communication
Sex Roles
Proposal reviewer for the Government of Hong Kong's Competitive Grant program and the United Kingdom's Economic and Social Research Council.

***Conference Organization***

Academic Excellent Chair, 2024 Global Marketing Conference, Seoul

Academic Excellence Chair, 2019, Global Fashion Management Conference, Paris

Academic Excellence Chair, 2018, Global Marketing Conference at Tokyo

Academic Excellence Chair, 2016 Global Marketing Conference at Hong Kong

Academic Excellence Chair, 2014 Global Marketing Conference at Singapore

Academic Excellence Chair, 2012 Global Marketing Conference at Seoul

Co-Chair, 2010 Global Marketing Conference at Tokyo

Co-Chair, 2008 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 2008 Global Marketing Conference, Shanghai Jiao Tong University, Shanghai, China.

Co-Chair, 2007 American Academy of Advertising Asia Pacific Conference, Korea University, Seoul, Korea

Co-Chair, 2006 Academy of Marketing Science Cultural Perspectives in Marketing Conference.

Co-Chair, 2003 American Academy of Advertising Conference

Co-Chair, 2001 American Academy of Advertising Conference

Co-Chair, 2001 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1996 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1992 Joint Conference of the American Marketing Association and Korean Marketing Association

***Reviewer for Annual Conferences***

American Academy of Advertising Annual Conference
American Marketing Association Summer Educators' Conference
American Marketing Association Winter Educators' Conference
American Marketing Association Public Policy and Marketing Conference
Academy for International Business Conference
Society for Marketing Advances Conference
Academy of Marketing Science Conference

**AWARDS AND HONORS**

"Measuring Hard Sell and Soft Sell Advertising Appeals," Journal of Advertising, 39 (2), 5-20. Voted as one of the best 15 articles to appear in the 50 year history of Journal of Advertising (reprinted in 50th anniversary issue).

Listed in Research.com's Top Scientists in Business and Management (2022 and 2023).

Keynote Speaker, ICAMA Conference, Jeju, Korea (2022)

Outstanding Paper Award "The Future of Advertising Research: New Directions and Research Needs." Voted best paper to appear in Journal of Marketing Theory and Practice in 2021.

Keynote Speaker, Global Fashion Management Conference 2021

Emerging Markets Conference Board Distinguished Speaker, 2018 (Johannesburg, South Africa), 2019 (Delhi India), 2020 (Llujbiana, Slovenia), 2021 (Puebla, Mexico)

Keynote Speaker, Korean Marketing Association Annual Conference (2020)

Keynote Speaker, ICAMA Conference (2020)

Faculty Speaker, 2014, 2015, 2016, and 2017, Doctoral Consortium, International Conference on Research in Advertising (European Advertising Academy)

Faculty Speaker, 2008, 2011, 2016, and 2017 American Academy of Advertising Doctoral Consortium Emerging Scholars Symposium.

Flemming Hansen Award for Outstanding Lifetime Achievement to Advertising Research, presented by European Advertising Academy, 2017.

Ivan L. Preston Outstanding Contribution to Research Award (for outstanding lifetime contribution to advertising research, presented by American Academy of Advertising), 2012.

Best Paper Award "Measuring Soft-Sell Versus Hard-Sell Advertising Appeals," Selected as best paper to appear in *Journal of Advertising* in 2010.

Chairman of the Executive Board, Academic Advisory Council for Signage Research, 2019-2021 (served a Vice-Chair 2017-2019)

Villanova Outstanding Faculty Research Award 2009 (lifetime achievement)

President, American Academy of Advertising 2005.

Vice President, American Academy of Advertising, 2001.

**AWARDS AND HONORS (Cont.)**

Treasurer, American Academy of Advertising 2002-2003.

Chairman of the American Academy of Advertising's Research Committee, 1998-2000.

Best Paper Award, "Cigarette Advertising Bans' Effect on Consumption: A Meta Analysis," Journal of Advertising, Selected as best paper to appear in *Journal of Advertising* in 2008.

Best Paper Award, "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," Winner of Hans B. Thorelli Award for Best Paper that Advances International Marketing Theory and Thought in 1998, Journal of International Marketing.

Best Paper Award, "A Comparison of Alternative Paradigms for Describing Economic Development," - Winner of the Charles C. Slater award for the best paper to appear in Journal of Macromarketing in 1994

Best Paper Award, "A Review of the Effects of Cigarette Advertising Bans," 2006 *American Marketing Association Marketing and Public Policy Conference*, Long Beach, CA.

Best Conference Paper Award, "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective,"2012 Global Marketing Conference- Seoul.

Finalist, Best Paper Award, *Journal of Advertising*, 2006.

Outstanding Reviewer Award, *Journal of Advertising*, 2004.

Outstanding Reviewer Award, 1999 Society for Marketing Advances Conference.

Who's Who in the World; Who's Who in American Education; Who's Who in the East.

Fulbright Senior Specialist, 2001 (taught class at Masaryk University, Brno, Czech Republic)

Invited Speaker, Marketing and Public Policy Conference Doctoral Consortium, 2002, 2003, 2007, 2009.

Invited Speaker, Society for Marketing Advances Doctoral Consortium, 2002.

Member of Board of Directors, American Marketing Association Marketing and Society Special Interest Group 2000- 2003.

Winner of American Academy of Advertising Competitive Research Fellowship Award, 1994.

"The Effectiveness of Brand Differentiating Strategies in Korean Advertising," Chosen as Best Paper in Advertising Track at the International Academy of Business Disciplines Conference.

**AWARDS AND HONORS (Cont.)**

Richard D. Irwin Foundation Dissertation Fellowship, 1991.

American Marketing Doctoral Consortium Fellow, 1990, University of Florida.

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," chosen as Outstanding Paper in the Promotion Track at the 1989 Conference of the Southern Marketing Association.

Member of Beta Gamma Sigma, Michigan State University Chapter.

Member of Phi Beta Phi, Villanova University Chapter.

**CONGRESSIONAL TESTIMONY**

Charles R. Taylor (2003), "The Importance of the Availability of Billboards to Rural Businesses in America," Testimony to the U.S. House of Representatives Committee on Small Business, Subcommittee on Rural Enterprise, Agriculture and Technology, May 15, 2003.

**BOOKS/ EDITED VOLUMES**

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), *The SAGE Handbook of Marketing Ethics*, London: Sage.

Marc G. Weinberger, Charles S. Gulas, and Charles R. Taylor (2021), *Humor in Advertising. Classic Perspectives and New Insights*. London: Routledge.

Sukki Yoon, Yung-Kyun Choi, and Charles R. Taylor (2021), *Leveraged Marketing Communications: The Importance of Studying the Transfer of Object-to-Brand Associations*, London: Routledge.

Shu-Chuan Chu, Juran Kim, and Charles R. Taylor (2019), *Electronic Word of Mouth as a Promotional Technique: New Insights from Social Media*. London: Routledge.

Zotos, Yorgos C., Stacy Landreth Grau, and Charles R. Taylor (2018), *Current Research on Gender Issues in Advertising*, London: Routledge.

Marko Sarstedt, Manfred Schwaiger, and Charles R. Taylor (2011), *Measurement and Research Methods in International Marketing*, (S. Zou., Series Editor). London: Elsevier. (special issue of *Advances in International Marketing*).

John C. Kozup, Charles R. Taylor and Ronald Paul Hill (2008), *Proceedings of the 2008 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor and Doo-Hee Lee (2007), Cross-Cultural Buyer Behavior (special issue of *Advances in International Marketing*), London: Elsevier.

Charles R. Taylor, Doo Hee Lee, Robert King and Changjo Yoo (2007), *Proceedings of the 2007 American Academy of Advertising/ Korea Advertising Society Asia Pacific Conference*, Seoul: Dongguk University.

Charles R. Taylor, Susan Claus and Thomas Claus (2005), *The Marketing Functions of Signs: Understanding Signage and Its Impact on the Economy*, Washington: U.S. Small Business Administration.

Charles R. Taylor (2002), *New Directions in International Advertising*, (special issue of Advances in International Marketing). London: Elsevier Science.

Charles R. Taylor (2001), *Proceedings of the American Academy of Advertising Conference*. Villanova, PA: Villanova University.

Ronald Paul Hill and Charles R. Taylor (2001), Proceedings of the 2001 Marketing and Public Policy Conference, Chicago, IL: American Marketing Association.

## BOOKS/ EDITED VOLUMES

Charles R. Taylor (1996), *Marketing in Asia Pacific: and Beyond*. Greenwich, CT: JAI Press.

Ronald Paul Hill and Charles R. Taylor (1996), *Proceedings of the 1996 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor, S.W. Kopp, T. Nevett, and Stanley C. Hollander (1991), *Marketing History: It's Many Dimensions: Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*. East Lansing, MI: Michigan State University Press.

## REPRINTED ARTICLES

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Charles R. Taylor and Shintaro Okazaki, "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," from *Journal of International Marketing* (2006).

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Matthew B. Myers, Roger J. Calantone, Thomas J. Page Jr. and Charles R. Taylor, "Academic Insights: An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," from *Journal of International Marketing* (2000).

Readings in Advertising, Society, and Consumer Culture (2007), Roxanne Hovland, Joyce Wolburg, and Eric Haley, Eds. CA: M.E. Sharpe, Inc.: Charles R. Taylor and Barbara B. Stern, "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," reprinted from *Journal of Advertising* (2006).

## BOOK REVIEWS

Taylor, Charles R. (2003), "Review of *Cross-Cultural Survey Methods*," by Janet A. Harkness, Fons J.R. Van de Vijver, and Peter Ph. Mohler, Wiley-Interscience, *Journal of Marketing Research*, 40 (August), 246-247.

Taylor, Charles R. (1994), "Review of *New and Improved: The Story of Mass Marketing in America*," by Richard Tedlow, *Journal of Marketing,* 58 (3), 123-126.

**JOURNAL ARTICLES**

Taylor, Charles R., Benjamin Borenstein, and Aniruddha Pangarkar (2024), "What, No Logos? Why Some Minimalists Prefer Quiet Luxury," *Psychology & Marketing*, forthcoming.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8(1), 5-22.

Milfeld, Tyler, Matthew Pittman and Charles R. Taylor (2024), "Green with Arrogance: Dominant Brands Benefit from Arrogant Appeals," *Journal of Current Issues & Research in Advertising*, 1–23. https://doi.org/10.1080/10641734.2024.2346711.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "The Use of Non-fungible Tokens (NFTs) as Promotional Devices to Build Brands: An Application of Lovemark Theory." *Journal of Global Fashion Marketing*, forthcoming.

Benjamin E. Borenstein and Charles R. Taylor (2024) "The Effects of Targeted Digital Advertising on Consumer Welfare," *Journal of Strategic Marketing*, 32(3), 317-332.

Rathee, Shelly, Charles R. Taylor and Akash Gupta (2024), "The Appeal of Blurred Imagery: Enhancing Advertising and Brand Attitudes for Luxury Goods," *Journal of Business Research*, 182, 114795.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "Do Non-fungible Tokens Create Long-Term Value for Luxury Brands? The Effect of NFT Promotions on Customer Equity." *Computers in Human Behavior*, 108347, forthcoming.

Charles R. Taylor, Mahdi Rajabi, Shelly Rathee and Somayeh Zamani (2023) The Impact of Self-Identification with Global Consumer Culture on eWOM Generation: A Test of Global Consumer Culture Theory, *Journal of Marketing Communications*, 1-27. DOI: 10.1080/13527266.2023.2227646.

Tae-Hyun Baek, Jungkyeun Kim, Sukki Yoon, Yung Kyun Choi and Charles R. Taylor (2023), "The COVID-19 Threat and Luxury Advertising." *Journal of Consumer Behaviour*, 22(3), 582–596.

Chen Lou, Charles R. Taylor & Xuan Zhou (2023), "Influencer Marketing on Social Media: How Different Social Media Platforms Afford Influencer–Follower Relation and Drive Advertising Effectiveness," *Journal of Current Issues & Research in Advertising*, 44(1) 60-87.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2023), "Don't Touch the Merchandise! Factors Associated with Consumer Preference for Contact Free Shopping," *Journal of Business Research*, 154 (January), 113261.

**JOURNAL ARTICLES**

Marla Royne Stafford & Charles R. Taylor (2022), "Analyzing the Impact of the Leading Articles in the Journal of Advertising from Its First 50 Years: An Integrative Framework," *Journal of Advertising*, 51 (5), 624–642.

Biswajiti Parita, Charles R. Taylor and Abhishek Abhishek (2022), "Introducing Roadblock Advertising in the Digital Context: Does Paying to Limit Competing Messages Pay Off?" *Journal of Advertising Research*," 62 (3), 271-288.

Sophia Mueller, Sandra Diehl, Charles R. Taylor, Ralf Terlutter and Barbara Mueller (2022), "Do CSR Ads with Public Health Messages Pertaining to Covid-19 Actually Help Consumers, Advertisers, and Society? Insights from the United States and Germany" *Journal of Current Issues and Research in Advertising*, 43 (4), 337-359.

Charles R. Taylor (2022), "Academic Research on Signage: Research Directions to Add Value to Stakeholders," 6 (1) *Interdisciplinary Journal of Signage and Wayfinding*, 21-26.

Lars Bergkvist and Charles R. Taylor (2022), "Reviving and Improving Brand Awareness as a Construct in Advertising Research," *Journal of Advertising*, 51, 294-307.

Yuli Zhang, Hyokjin Kwak, Puzakova Marina, and Charles R. Taylor (2021), "Space between Products on Display: The Impact of Interspace on Consumer Estimation of Product Size," *Journal of the Academy of Marketing Science*, 49(6), 1109-1131.

Alexander Mafael, Sascha Raithel, Charles R. Taylor and David W. Stewart (2021), "Measuring the Role of Uniqueness and Consistency to Develop Effective Advertising," *Journal of Advertising*, 50(4), 494-504.

Aniruddah Pangarkar, Paurav Shukla, and Charles R. Taylor (2021), "Minimalism in Consumption: A Typology and Brand Engagement Strategies," *Journal of Business Research,* 127 (April), 167-178.

Charles R. Taylor and Les Carlson (2021), "The Future of Advertising: New Directions and Research Needs," *Journal of Marketing Theory and Practice*, 29(1), 51-62.

Sukki Yoon, Kacy Kim, Ashok K. Lawani, Patrick T. Vargas, and Charles R. Taylor (2021), "Culture and Health Persuasion," *Journal of Current Issues and Research in Advertising*, 42(1), 83-101.

Charles R. Taylor, Philip J. Kitchen, Matthew Sarkees and Christian Lolk (2020), "Addressing the Janus Face of Customer Service: A Typology of New Age Service Failures," *European Journal of Marketing*, 54 (10), 2295-2316.

Yoon-Na Cho and Charles R. Taylor (2020), "The Role of Ambiguity and Skepticism in the Effectiveness of Sustainability Labeling," *Journal of Business Research*, 120 (11) 379-388.

## JOURNAL ARTICLES

Yuli Zheng, Hyokjin Kwak, Marina Puzakova, and Charles R. Taylor (2020), "When Distraction May Be a Good Thing: The Role of Distraction in Low-Fit Brand Extension Evaluations," *Psychology and Marketing*, 37 (4), 604-621.

Yoon-Na Cho, Yohan Kim and Charles R. Taylor (2020), "Does Feeling Guilt Facilitate "Green" Purchases: Insights on a Global Issue from a U.S. Consumer Survey," *Advances in International Marketing*, vol. 27, forthcoming.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee & Charles R. Taylor (2020) Can Premium Private Labels Compete with Luxury Brands: The Impact of Advertising on Perceived Luxuriousness, *International Journal of Advertising*, 39 (6), 761-782.

Charles R. Taylor, Alexander Mafael, Sascha Raithel, Carissa M. Anthony, and David W. Stewart (2019), "Portrayals of Minorities and Women in Super Bowl Advertising," *Journal of Consumer Affairs*, 51 (4), 1535–1572.

Shintaro Okazaki, Charles R. Taylor, Patrick Vargas, and Jorg Henseler, (2019) "Disasters, Hope, and Globalization: Exploring Self-identification with Global Consumer Culture in Japan," *International Marketing Review*, 36 (5), 726-747.

Eunju Ko, John P. Costello, and Charles R. Taylor (2019), "What is a Luxury Brand? A New Definition and Review of the Literature," *Journal of Business Research*, 99 (9), 405-413

Charles R. Taylor, Yoon-Na Cho, Carissa M. Anthony, and Danielle B. Smith. (2018), "Photoshopping of Models in Advertising: A Review of the Literature and Future Research Agenda." *Journal of Global Fashion Marketing* 9 (4), 379-398.

Aronte M. Bennett, John C. Kozup, and Charles R. Taylor (2018), "Country-of-Origin Effects and Consumer Evaluations of Ads within the Context of Economic Crises," *Journal of Current Issues and Research in Advertising*, 39 (1), 52-56.

Schirmer, Nadine A., Manfred Schwaiger, Charles R. Taylor, and John P. Costello (2018), "Consumer Response to Disclosures in Digitally Retouched Advertisements." *Journal of Public Policy & Marketing*, 37 (1), 131-141.

George R. Franke and Charles R. Taylor (2017), "Public Perceptions of Billboards: A Meta-Analysis," *Journal of Advertising*, 46 (3), 395-410.

Jieun Choi, Charles R. Taylor, and Doo-Hee Lee (2017), "Do Resonant Ads Resonate with Consumers? The Interaction of Wordplay, Regulatory Focus, and Need for Cognition and its Impact on Persuasion," *Journal of Advertising Research*, 57 (1), 82-93.

**JOURNAL ARTICLES**

Charles R. Taylor & John P. Costello (2017), "What Do We Know About Fashion Advertising? A Review of the Literature and Suggested Research Directions," *Journal of Global Fashion Marketing*, 7 (1), 1-20.

Lars Bergkvist and Charles R. Taylor (2016), "Leveraged Marketing Communications: A Framework for Explaining the Effects of Secondary Brand Associations," *Academy of Marketing Science Review*, 6 (3), 157–175.

Aronté M. Bennett, Stacey Menzel Baker, Samantha Cross, J.P. James, Gregory Bartholomew, Akon E. Ekpo, Geraldine Rosa Henderson, Martina Hutton, Apoorv Khare, Abhijit Roy, Tony Stovall and Charles Ray Taylor (2016), "Omission and Commission as Marketplace Trauma," *Journal of Public Policy and Marketing*, 35 (2), 280-291.

Charles R. Taylor and Matthew Sarkees (2016), "Do Bans on Illuminated On-Premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses," *International Journal of Advertising*, 35 (1), 61-73

Sascha Raithel, Charles R. Taylor, and Stefan Hock (2016), "Are Super Bowl Ads a Super Waste of Money? Examining the Intermediary Roles of Customer-based Brand Equity and Customer Equity Effects," *Journal of Business Research*, 69 (9), 3788-3794.

Jieun Choi, Doo-Hee Lee and Charles R. Taylor (2016), "The Influence of Purchasing Context and Reversibility of Choice on Consumer Responses Toward Personalized Products and Standardized Products," *Psychological Reports*, 18 (2), 510-26

Charles R. Taylor and Shintaro Okazaki (2015), "Do Global Brands Use Similar Executional Styles Across Cultures? A Comparison of U.S. and Japanese Television Advertising*," Journal of Advertising*, 44 (3), 276-288.

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2015), "How Character Presence in Advergames Affects Brand Attitude and Game Performance: A Cross-cultural Comparison," *Journal of Consumer Behaviour*, 14 (6), 357-368.

Juran Kim, Charles R. Taylor, Kyung Hoon Kim, and Ki Hoon Lee (2015), "Measures of Perceived Sustainability," *Journal of Global Scholars of Marketing Science*," 25 (2), 182-193

Yung Kyun Choi and Charles R. Taylor (2014), "How Do 3-Dimensional Images Promote Products on the Internet?" *Journal of Business Research*, 67 (10), 2164-2170.

Johnny JiungYee Lee, Michael L. Capella, Charles R. Taylor, Mi (Meg) Luo and Colin B. Gabler (2014), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Journal of Business Research*, 67 (10), 2139–2146.

## JOURNAL ARTICLES

Marina Puzakova, Hyokjin Kwak and Charles R. Taylor (2013), “The Role of Geography of Self in “Filling In” Brand Personality Traits: Consumer Inference of Unobservable Attributes,” *Journal of Advertising*, 42 (1), 16-29.

Juran Kim, Ki Hoon Lee and Charles R. Taylor (2013), “Effects of Mobile Direct Experience on Perceived Interactivity and Attitude toward Smartphone Applications,” *Journal of Global Scholars of Marketing Science*, 23 (3), 282-296.

Minsun Yeu, Hee-Sook Yoon, Charles R. Taylor and Doo-Hee Lee (2013), “Are Banner Advertisements in Online Games Effective,” *Journal of Advertising,* 42 (2/3), 241-250.

Shintaro Okazaki and Charles R. Taylor (2013), “Social Media and International Advertising: Theoretical Challenges and Future Directions,” *International Marketing Review*, 30 (1) 56-71.

Charles R. Taylor, Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes,” *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Sophie Hieke and Charles R. Taylor (2012), "A Critical Review of the Literature on Nutritional Labeling: Conceptual and Methodological Directions for Future Research," *Journal of Consumer Affairs*, 46 (1), 120-156.

Christian M. Ringle, Marko Sarstedt, Rainer Schlittgen and Charles R. Taylor (2012), “PLS Path Modelling and Evolutionary Segmentation,” 66 (9), *Journal of Business Research*, 1318-1324.

Eunju Ko, Charles R. Taylor, Heewon Sung, Jooyeon Lee, Udo Wagner, David Martin-Consuegra Navarro, Fanghua Wang (2012), “Global Marketing Segmentation Usefulness in the Sportswear Industry,” *Journal of Business Research*, (65) 11, 1565-1575.

John C. Kozup, Charles R. Taylor, Michael L. Capella, and Jeremy Kees (2012), “Sound Disclosures: Assessing When a Disclosure is Worthwhile,” *Journal of Public Policy and Marketing*, 31 (2), 313-322.

Michael L. Capella, Charles R. Taylor and Jeremy Kees (2012), "Tobacco Harm Reduction Advertising in the Presence of a Government Mandated Warning" *Journal of Consumer Affairs*, 46 (2), 235-259.

Charles R. Taylor and C. Luke Bowen (2012), “New Developments for Measuring Return on Investment (ROI) for Internet Advertising: Building Toward a ‘Brand Scorecard Approach,” *Journal of Advertising and Promotion Research*, 1 (1), 9-38.

Charles R. Taylor, C. Luke Bowen, and Hae-Kyong Bang (2011), “The State of Methodological Practice in International Marketing Research,” *Advances in International Marketing*, 22 (1), 143-167.

**JOURNAL ARTICLES**

John B. Ford, Barbara Mueller, and Charles R. Taylor (2011), "The Tension between Strategy and Execution: Challenges for International Advertising Research," *Journal of Advertising Research*, 51 (1), 27-41.

Sascha Raithel, Sebastian Scharf, Charles R Taylor, Manfred Schwaiger, Lorenz Zimmermann (2011), "Marketing Accountability: Applying Data Envelopment Analysis to Assess the Impact of Advertising Efficiency on Shareholder Value," *Advances in International Marketing*, 22 (1), 115-139.

Karen L. Becker-Olsen, Charles R. Taylor, Ronald Paul Hill, and Goksel Yalcinkaya (2011), "A Cross Cultural Look at Corporate Social Responsibility Marketing Communications in Mexico and the United States: Strategies for Global Brands," *Journal of International Marketing*, 19 (2) 30-44.

Hyun Joung Lee, Doo-Hee Lee, Charles R. Taylor, and Jong-Ho Lee (2011), Do Online Brand Communities Help Build and Maintain Relationships with Consumers? A Network Theory Approach," *Journal of Brand Management*, 19 (3), 213-227.

Hao Zhang, Eunju Ko, and Charles R. Taylor (2011)," Advertising Appeals Strategy: Moderating Effect on the Relationship between Innovation and Customer Equity Drivers in China," *Advances in International Marketing*, 22, 111–136.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Measuring Hard Sell and Soft Sell Advertising Appeals," *Journal of Advertising*, 39 (2), 5-20.

Schwaiger, Manfred, Marko Sarstedt and Charles R. Taylor (2010), "Art for the Sake of the Corporation: Audi, BMW Group, DaimlerChrysler, Montblanc, Siemens, and Volkswagen Help Explore the Effect of Sponsorship on Corporate Reputations," *Journal of Advertising Research*, 50 (1), 77-89.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Global Consumer Culture Positioning: Testing Perceptions of Soft-Sell and Hard-Sell Advertising Appeals Between U.S. and Japanese Consumers," *Journal of International Marketing*, 18 (2), 20-34.

Herbert Jack Rotfeld and Charles R. Taylor (2009). "The Advertising Regulation and Self-Regulation Issues Ripped from the Headlines with (sometimes missed) Opportunities for Disciplined Multi-disciplinary Research*," Journal of Advertising*, 38 (4), 5-14.

Charles R. Taylor (2009), "Editorial: The Six Principles of Digital Advertising*," International Journal of Advertising*, 28 (3), 411-418.

Michael L. Capella, Charles R. Taylor, Randall C. Campbell, and Lance S. Longwell (2009), "Do Pharmaceutical Marketing Activities Raise Prices? Evidence from Five Major Therapeutic Classes," *Journal of Public Policy and Marketing*, 28 (2), 146-161.

## JOURNAL ARTICLES

Mary Anne Raymond, Jong Won Lim, Charles R. Taylor, and Roger Gomes (2009), "Hyundai Motor Company's Paradigm for Success in World Markets," *Journal for Global Business Development*, Volume 1 (9), 27 – 36.

Charles R. Taylor and Michael L. Capella (2008), "A Model of Harm Reduction in the Context of Marketing," *Journal of Public Policy and Marketing*, 27 (2), 187-196.

Charles R. Taylor, Kyung Hoon Kim, Eunju Ko, Myung Hwan Park, Dong Ryul Kim and Hak Il Moon (2008), "Does Having a Market Orientation Lead to Higher Levels of Relationship Commitment and Business Performance for Industrial Robot Sales Engineers? Evidence from the Korean Robotics Industry," *Industrial Marketing Management*, 37 (7), 825-832.

Doo-Hee Lee, Seunghee Im and Charles R. Taylor (2008), "Voluntary Self-Disclosure of Information on the Internet: A Multi-method Study of Motivations and Consequences of Disclosing Information on Blogs," *Psychology and Marketing*, 25 (7) 692-710.

Michael L. Capella, Charles R. Taylor and Cynthia Webster (2008), "Cigarette Advertising Bans' Effect on Consumption: A Meta Analysis," *Journal of Advertising*, 37 (2), 7-18. (Selected as Best Paper to appear in *Journal of Advertising* in 2008)

Shintaro Okazaki and Charles R. Taylor (2008), "What is SMS Advertising and Why Do Multinationals Adopt It? An Empirical Study in European Markets," *Journal of Business Research*, 61 (1), 4-12.

Beibei Dong, Shaoming Zou and Charles R. Taylor (2008), "Factors that Influence Multinational Corporations' Control of Their Operations in Foreign Markets: An Empirical Investigation," *Journal of International Marketing*, 16 (1), 98-119.

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Catherine D'Orazio (2008), "The Influence of Consumer Self-Disclosure on Web Sites on Advertising Response," *Journal of Interactive Advertising*, 9 (1).

Shintaro Okazaki, Charles R. Taylor and Jonathan Doh (2008), Market Convergence and Advertising Standardization in the European Union, *Journal of World Business*, 43 (1), 384-400.

Eunju Ko, Charles R. Taylor, Udo Wagner, and Hyun-Ah Ji, (2008) "Relationships Among CEO Image, Corporate Image and Employment Brand Value in the Fashion Industry," *Journal of the Global Academy of Marketing Science*, 18 (4), 307-331.

Charles R. Taylor, Michael L. Capella, and John C. Kozup (2007), "Does DTC Advertising Provide Information or Create Market Power? Evidence from the U.S. and New Zealand," *Advances in International Marketing*, 1-30.

**JOURNAL ARTICLES**

Eunju Ko, Eunyoung Kim, Charles R. Taylor, Kyung Hoon Kim, and Ie Jeong Kang (2007), "Cross-National Market Segmentation in the Fashion Industry: A Study of European, Korean, and US Consumers," *International Marketing Review*, 24 (5), 629-651 .

Manfred Schwaiger, Carsten Renhak, Charles R. Taylor and Hugh M. Cannon (2007), "Can Comparative Advertising be Effective in Germany? A Tale of Two Campaigns," *Journal of Advertising Research*, 47 (1), 2-13.

Stacy Landreth, Georgina Roselli and Charles R. Taylor (2007), "Where's Tamika Catchings? A Content Analysis of Female Athlete Endorsers in Magazine Advertisements," *Journal of Current Issues and Research in Advertising*, 29 (Spring), 55-65.

Koo Won Suh, Charles R. Taylor, and Doo Hee Lee (2007), "A Typology of the Marketing Communications Functions of Web Sites: A Cross-National Comparison, *Advances in International Marketing*, 18 (1), 271-292.

Steven W. Kopp, John C. Kozup, Tracy A. Suter, and Charles R. Taylor (2007), "Protecting the Global Brand in the European Union," *Journal of Euromarketing*, 17 (1), 23-34.

Charles R. Taylor, George R. Franke and Hae-Kyong Bang (2006), "Use and Effectiveness of Billboards: Perspectives from Selective-Perception Theory and Retail-Gravity Models," *Journal of Advertising*, 35 (Winter), 21-34.

Shintaro Okazaki, Charles R. Taylor and Shaoming Zou (2006), "Advertising Standardization's Positive Impact on the Bottom Line: A Model of When and How Standardization Improves Financial and Strategic Performance," *Journal of Advertising*, 35 (Fall), 17-33.

Charles R. Taylor and Shintaro Okazaki (2006), "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," *Journal of International Marketing*, 14 (1), 98-120.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "Asian Americans in Magazine Advertising: Portrayals of the "Model Minority" *Journal of Macromarketing*, 25 (2), 153-162.

Charles R. Taylor (2005), "How Excessive Restrictions on Signage Backfire," *Journal of Consumer Marketing*, 22 (6), 304-305.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Journal of Advertising*, 34 (Winter), 7-16.

Charles R. Taylor, Barry J. Babin and Kyung Hoon Kim (2005), "Marketing to Asian Americans: The Impact of Acculturation and Interpersonal Influence on Ethnocentric Consumer Preferences," *Journal of the Global Academy of Marketing Science*, 15 (3), 187-210.

**JOURNAL ARTICLES**

Hae-Kyong Bang, Mary Anne Raymond, Charles R. Taylor, and Young Sook Moon (2005), "A Comparison of Service Quality Dimensions Conveyed in Advertisements for Service Providers in the U.S. and Korea: A Content Analysis," *International Marketing Review*, 22 (3), 309-326.

Charles R. Taylor and P. Greg Bonner (2003), "Comment on American Media and the Smoking-related Behaviors of Asian Adolescents." *Journal of Advertising Research*, 43, (December), 419-430.

Shaoming Zou, Charles R. Taylor, and Er Fang (2003), "MNC Control over Foreign Market Ventures: Do Host Governments Still Play a Major Role?" *Advances in International Marketing*, 14, 35-48.

Charles R. Taylor and George R. Franke (2003), "Business Perceptions of Billboards in the U.S. Economy," *Journal of Advertising Research*, (June), 150-161.

Charles R. Taylor, Michael G. Walsh, and Christopher A. Lee (2003), "The Challenge Posed by Product Standards Disputes in International Trade: The U.S./EU Beef Controversy and a Proposed Framework for Resolving Standards Disputes," *Journal of Consumer Affairs*, 37 (1), 101-122.

Charles R. Taylor (2002), "What's Wrong with International Advertising Research?" *Journal of Advertising Research*, 42 (6), 48-54.

Charles R. Taylor and Michael G. Walsh (2002), "Legal Strategies for Protecting Brands From Genericide: Recent Trends in Evidence Weighted in Court Cases," *Journal of Public Policy & Marketing*, 21 (1), 160-167.

Charles R. Taylor, P. Greg Bonner, and Michael Dolezal (2002) "Advertising in the Czech Republic: Czech Perceptions of Effective Advertising and Advertising Clutter," *Advances in International Marketing*, 12, 137-149.

Charles R. Taylor and Chad Johnson (2002), "Research on Standardization vs. Specialization of Advertising in the 1990s: A Review and Directions for Further Research," *Advances in International Marketing*, 12, 45-66.

Charles R. Taylor, Kyung Hoon Kim, Dong Yul Kim, and Hak Il Moon (2002), "Antecedents of Brand Loyalty in South Korean Rice Market," *Journal of the Global Academy of Marketing Science*, 9 (1) 175-188.

Gregory E. Osland, Charles R. Taylor, and Shaoming Zou (2001), "Selecting International Modes of Entry and Expansion," *Marketing Intelligence and Planning*, 19 (3), 153-161.

Charles R. Taylor (2000), "Emerging Issues in Marketing," *Psychology and Marketing*, 17 (6), 441-448.

**JOURNAL ARTICLES**

Charles R. Taylor, George R. Franke and Michael L. Maynard (2000), "Attitudes Toward Direct Marketing and its Regulation: A Comparison of the United States and Japan," *Journal of Public Policy & Marketing*, 19 (2), 228-237.

Charles R. Taylor and Mary Anne Raymond (2000), "An Analysis of Product Category Restrictions in Advertising in Four East Asian Markets," *International Marketing Review*, 17 (3), 287-304.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (2000), "Foreign Market Entry Strategies of Japanese MNCs," *International Marketing Review*, 17 (2), 146-163.

Matthew B. Meyers, Roger J. Calantone, Thomas J. Page, Jr. and Charles R. Taylor (2000), "An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," *Journal of International Marketing*, 8 (4), 108-121.

Alan Shao, Mary Anne Raymond, and Charles R. Taylor (1999), "Shifting Advertising Appeals in Taiwan," *Journal of Advertising Research*, 39 (6), 61-69.

Michael Maynard and Charles R. Taylor, (1999), "Girlish Images Across Cultures: Analyzing Japanese vs. U.S. *Seventeen Magazine* Ads," *Journal of Advertising*, 28 (1), 39-48.

Charles R. Taylor and Glenn S. Omura (1999), "A Political Economy Interpretation of the Economic Growth and Subsequent Crisis in the Republic of Korea," *Journal of Global Focus*, 11 (4), 49-62.

Shaoming Zou, Charles R. Taylor, and Gregory E. Osland, (1998) "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," *Journal of International Marketing*, 6(3), 37-58.

Charles R. Taylor, Shaoming Zou, and Gregory Osland (1998), "International Market Entry Mode Choice By U.S. and Japanese Firms: A Test of Transaction Cost Economics Theory," *Thunderbird International Business Review*, 40 (4), 389-412.

Charles R. Taylor and Hae-Kyong Bang (1997), "Portrayals of Latinos in Magazine Advertising," *Journalism and Mass Communication Quarterly*, 74 (2), 285-303.

Charles R. Taylor and Barbara B. Stern (1997), "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," *Journal of Advertising*, 26 (2), 1-15.

Charles R. Taylor, R. Dale Wilson, and Gordon E. Miracle (1997), "The Impact of Information Level Strategies on the Effectiveness of Korean vs. U.S. Television Commercials," *Journal of Advertising*, 26 (1), 1-18.

**JOURNAL ARTICLES**

Charles R. Taylor (1997), "A Technology Whose Time Has Come or The Same Old Litter on a Stick? An Analysis of Changeable Message Billboards," *Journal of Public Policy & Marketing*, 16 (Spring), 179-186.

Charles R. Taylor, Shaoming Zou and Aysegul Ozsomer (1996), "Advertising and Its Effect on Industrial Concentration: A Contingency Perspective," *Journal of Current Issues and Research in Advertising*, 18 (Spring), 35-44.

Charles R. Taylor and Gordon E. Miracle (1996), "Foreign Elements in Korean and U.S. Television Advertising," *Advances in International Marketing*, 7, 175-195.

Michael Maynard and Charles R. Taylor (1996), "A Comparative Analysis of Japanese and U.S. Attitudes toward Direct Marketing," *Journal of Direct Marketing*, 10 (1), 34-44.

Charles R. Taylor and Glenn S. Omura (1995), "Analyzing Economic Development in The Republic of Korea: An Evaluation of Paradigms of Marketing and Economic Development," *Journal of Macromarketing*, 15 (2), 66-91.

Charles R. Taylor, Ju Yung Lee, and Barbara B. Stern (1995), "Portrayals of African, Hispanic, and Asian Americans in Magazine Advertising," *American Behavioral Scientist*, 38 (4), 608-621.

Charles R. Taylor and Weih Chang (1995), "The History of Outdoor Advertising Regulation in the United States," *Journal of Macromarketing*, 15 (1), 47-59.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising." *Journal of Public Policy & Marketing*, 13 (2), 239-245.

Charles R. Taylor, Gordon E. Miracle, and R. Dale Wilson (1994), "The Impact of Brand Differentiating Messages on Effectiveness in Korean Advertising," *Journal of International Marketing*, 2 (4), 31-52.

Charles R. Taylor and John C. Taylor (1994) "Regulatory Issues in Outdoor Advertising: A Content Analysis of Billboards," *Journal of Public Policy & Marketing*, 13 (Spring), 97-107.

Steve W. Kopp and Charles R. Taylor (1994), "Games, Contests, Sweepstakes, and Lotteries: Prize Promotion and Public Policy," *Research in Marketing*, 12, (Fall), 151-166.

Charles R. Taylor and Glenn S. Omura (1994), "A Comparison of Alternative Paradigms for Describing Economic Development," *Journal of Macromarketing*, 14 (2), 6-20.

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1992), "Culture and Advertising Executions: A Comparison of Selected Characteristics of Japanese and US Television Commercials," *Journal of International Consumer Marketing*, 4 (4), 89-113.

**JOURNAL ARTICLES**

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1992) "Culture and Advertising Executions: A Comparison of Selected Characteristics of Korean and US Television Commercials," *International Marketing Review*, 9 (4), 5-17.

Jay L. Laughlin and Charles R. Taylor (1991), "An Approach to Industrial Market Segmentation," *Industrial Marketing Management*, 20 (2), 127-136.

Charles R. Taylor and Steve W. Kopp (1991), "Games, Contest, and Sweepstakes Run Afoul: A State of Legal Disorder," *Journal of Public Policy & Marketing*, 10 (1), 199-213.

**BOOK CHAPTERS**

Mueller, Sophia, Charles R. Taylor and Barbara Mueller (2022), "Managing Change Related to Consumer Privacy Laws: Targeting and Personal Data Use in a More Regulated Environment." In: Karmasin, M., Diehl, S., Koinig, I. (eds) Media and Change Management. Springer, Cham. https://doi.org/10.1007/978-3-030-86680-8_15

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), "Introduction to Marketing Ethics," in Sage Handbook of Marketing Ethics, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 3-19.

Charles R Taylor and Mivena Pantequi  (2021), "Religious and Cross-Cultural Perspectives on Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 43-57.

Christian Lolk and Charles R. Taylor (2021), "Pharmaceutical Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 326-338.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2019), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in Advertising Theory, 2nd ed. (S. Rodgers and E. Thorson, eds.).  New York: Routledge.

Charles R. Taylor (2018), "How Does Your Advertising Affect Consumers?" in Mapping Out Marketing: Navigating Lessons from the Ivory Trenches, Ronald Paul Hill, Catherine Mary Lamberton and Jennifer Swartz (eds.), London: Routledge.

Charles R. Taylor and John P. Costello (2017), "International Digital Advertising: Lessons from Around the World,"in *Digital Advertising: Theory and Research* (3rd ed.). Shelly Rodgers and Esther Thorson (eds.), New York: Routlege. 345-361.

Charles R. Taylor and John P. Costello (2017), "Corporate Social Responsibility and the Portrayal of Minority Groups in Advertising," in *Handbook of Integrated Corporate Social Responsibility Communication*.  Sandra Diehl, et al. (eds.). Springer International Publishing, 361-375.

Charles R. Taylor, C. Luke Bowen and Hoin Ryu (2014), "Corporate Social Responsibility: A Look at Eastern Nations," in *Handbook of Marketing and Corporate Social Responsibility*. (Ronald P. Hill and Ryan Langan, eds.), 234-251.

Charles R. Taylor and John B. Ford (2014), "Research Methods for International Advertising Studies: A Practical Guide," in *The Handbook of International Advertising Research*, (Hong Cheng, ed.), New York: John Wiley and Sons, 32-47.

**BOOK CHAPTERS**

Barbara Mueller and Charles R. Taylor (2013), "Convergence in Global Markets: The Great Standardization vs. Localization Debate is Finally Put to Rest," in *Media Convergence and Management*, Sandra Diehl and Matthias Karmasin (eds.), Springer, 89-106.

Charles R. Taylor (2013), "Seven Simple Rules to Better Customer Service," in *The Dominant Influence of Marketing in the 21st Century: The Marketing Leviathan*. (Philip Kitchen, ed.), New York: Palgrave McMillan.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in *Advertising and Society: An Introduction*. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor and C. Luke Bowen (2012), "Best Practices for Cross-Cultural Advertising Research: Are the Rules Being Followed?" in *Handbook of Research on International Advertising*. (Shintaro Okazaki, ed.). London: Edward Elgar.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2011), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in *Advertising Theory*, (S. Rodgers and E. Thorson, eds.). New York: Routledge.

Charles R. Taylor and George R. Franke (2011), "Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, ed.). Heidelber, Germany: Gabler.

Charles R. Taylor (2011), "The Role of Signage in Marketing: Outdoor Advertising, Out-of home Media, and On-Premise Signs," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, M.A. Belch, and G.E.Belch, eds.), West Sussex, UK: Wiley, 197-202.

Charles R. Taylor (2011), "Standardization/Adaptation of International Marketing Strategy," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, D.C. Bello, and D.A..Griffiths, eds.), West Sussex, UK: Wiley, 97-102.

Charles R. Taylor (2006), "The Future of International Advertising Research: Suggestions for Moving the Discipline Forward," *International Advertising and Communication: Current Insights and Empirical Findings*, (Sandra Diehl and Ralf Terlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 491-506.

Shintaro Okazaki and Charles R. Taylor (2006), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions, *International Advertising and Communication: Current Insights and Empirical Findings*,(Sandra Diehl and Ralf Turlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 439-454.

**BOOK CHAPTERS**

Shaoming Zou, Charles R. Taylor, and S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," *Handbook of Marketing Research*, Subhash Jain, ed., Cornwall, UK: MPG Books, 134-147.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in Advertising and Society: An Introduction. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor, Gordon E. Miracle, and Kyu Yeol Chang (1994), "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, Korean, and U.S. Television Advertising. _*Global and Multinational Advertising*, Basil Englis, ed., Hillsdale, NJ: Lawrence Erlbaum, 171-191.

**CONFERENCE PROCEEDINGS**

Cho, Minjung., Eunju Ko and Charles R. Taylor (2023) The Effect of NFT Marketing Activities on Customer Equity and Satisfaction Regarding Luxury Brands. Proceedings of the Global Marketing Conference, Seoul, Korea.

Charles R. Taylor (2023) "Major Research Needs and Common Pitfalls in Publishing Advertising and Society Research, Proceedings of the American Academy of Advertising, p.73.

Chen Lou, Charles R. Taylor and Xuan Zhou (2022), Context is the New King: The Role of Different Social Media Platforms in Influencer-Follower Relation and Influencer Advertising Effectiveness, Proceedings of the 2022 Annual Conference of the American Academy of Advertising, p.51.

Sophia Mueller, Charles R. Taylor, Barbara Mueller, Sandra Diehl and Ralf Terlutter (2021) Covid-19 Advertising: Are Corporate Social Responsibility Appeals Beneficial to Consumers? Proceedings of the International Conference on Research in Advertising.

Louisa Ha, Yang Yang, Liselot Hudders, Steffi De Jans, Chen Lou, Eva A. van Reijmersdal, Tatiana Domingues-Aguiar, Charles Ray Taylor, Yoon-Na Cho, and Mivena Panteqi (2021), The New Rich and Famous: The Status Quo of Research in Influence Advertising, Theoretical Implications and Opportunities. Proceedings of the Annual Conference of the American Academy of Advertising.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2020), "A New Perspective on Digital Well-Being and Distancing Behavior," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho, Mivena Panteqi, and Charles Taylor (2020), "Do Instagram Influencers Need to be Perfect? The Changing Role of Social Norms on the Effectiveness of Influencers," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho and Charles R. Taylor, (2018), "The Role of Ambiguity in the Effectiveness of Sustainability Labeling," Proceedings of the 2018 Global Marketing Conference at Tokyo, 223-224

Bradley James Wilson, David Roca, Charles R. Taylor and Camilo Villegas (2018), "The Dark Side of the Cannes Awards: 'Truchos' or Fake Ads as Seen by Colombian Creative Agency Staff," *Proceedings of the 2018 ICORIA Conference*, Valencia, Spain.

Hyerinne Hahn, Jong-Ho Lee, Charles R. Taylor, and Jung Min Jang (2017), How Do the Characteristics of Premium Private Label Affect Perceived Luxuriousness? The Moderating Role of Change Seeking, Price Consciousness and Vulnerability. *Proceedings of the 2017 Mystique of Luxury Brands Conference*, Seoul, Korea.

Katharina Ninaus, Sandra Diehl, Charles R. Taylor and Ralf Terlutter (2017), "Always-On? Persuading Technology Users To Disconnect From Work: The Effects Of Message Frame, Regulatory Focus And Self Efficacy On The Effectiveness Of Health Messages," *Proceedings of the 2017 International Conference on Research in Advertisin*g, Ghent, Belgium.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee, and Charles R. Taylor (2017), "Advertising's Influence on Perceived Luxuriousness of a Premium Private Label," *Proceedings of the Global Fashion Marketing Conference of the of Global Alliance of Marketing and Management Associations*. Vienna, Austria.

Nadine Schirmer, Manfred Schwaiger, Charles R. Taylor and John P. Costello. (2016), "Consumer Response to Disclaimers in Digitally Retouched Advertisements," Proceedings of 2016 Global Marketing Conference, Hong Kong. Seoul: Global Alliance of Management and Marketing Scholars.

Seoyoung Kim, Sungkyu Lee, Jong-Ho, and Charles R. Taylor (2016) "Drivers of Perceived Luxuriousness of a Premium Private Label Product," *Proceedings of 2016 Global Marketing Conference, Hong Kong*. Seoul: Global Alliance of Management and Marketing Scholars.

Charles R. Taylor (2016) "How Much Should Teaching be Adapted to Local Markets," Proceedings of the American Academy of Advertising Annual Conference, Seattle, WA. 184-185.

Charles R. Taylor, John P. Costello and Eunju Ko. (2015), The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," *Proceedings of the Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations*, Florence, Italy.

Antigone G. Kyrousi, Charles R. Taylor and George G. Panigyrakis (2015), "That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," *Proceedings of the 2015 International Conference on Research in Advertising*, London, England.

Sascha Raithel, Charles R. Taylor & Stefan (2014), "Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations*, 5(1).

Juran Kim, Charles R.Taylor, and Kyung Hoon Kim. (2014), "Measures of Perceived Sustainability," *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations* 4(1).

Charles R. Taylor and Shintaro Okazaki (2013) "Culture and Advertising Executions Revisited," *Proceedings of the 2013 International Conference on Research in Advertising*, Zagreb, Croatia.

Taylor, Charles R. (2012), "The Future of Advertising is Solid as a BRIC," *Proceedings of the American Academy of Advertising Annual Conference*, Myrtle Beach, SC. "

Johnny Jiung Lee, Michael L. Capella, Charles R. Taylor, Mi Luo and Colin Gabler (2012), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Proceedings of the 2012 Global Marketing Conference at Seoul*.

Yung Kyun Choi and Charles R. Taylor (2012), "Persuasive Effects of 3D Advertising: Role of Product Type, Need for Touch, and Mental Imagery," *Proceedings of the 2012 Global Marketing Conference at Seoul.*

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2011), Spokes-character Effects in Advergaming: The Influence of Character Presence, Product Type, and National Culture on Consumers' Brand Evaluation and Performance," *Proceedings of the American Academy of Advertising Conference*, p.114

Charles R. Taylor and Michael L. Capella (2010), "Measuring the Effects of Marketing Smokeless Tobacco as Harm Reduction," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Jinkyung Goo (2010), "Cultural Differences in Emotional Advertising," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Christian Ringle, Marko Sarstedt, Rainer Schlitginn, and Charles R. Taylor (2010) "Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Charles R. Taylor (2010), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," *Proceedings of the 9th International Conference on Research in Advertising*, Madrid, Spain: European Academy of Advertising.

Sophie Hieke and Charles R. Taylor (2010), "An Empirical Study on the Effectiveness of Nutritional Labelling in Germany," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, 28-29.

Charles R. Taylor and Peter Neijens (2009). "Trends in European Advertising: Cross Media Campaigns, Advertising during Events, Brand Placement, Advertising Strategies in the New EU Member States and Emotional Brand Experiences," *Proceedings of the 2009 Conference of the American Academy of Advertising*, Cincinatti, Ohio.

Charles R. Taylor et al. (2008), "The View from Europe: Insights on Cutting Edge Issues in Europe." *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, forthcoming.

Charles R. Taylor, et al. (2008), "The Influence of Consumer's Self-Disclosure on Advertising Response." *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Examination of Smart Clothing Attributes, Perceived Risk and Intention to Adopt between Two Cultural Groups." *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Segmentation and Targeting Sportswear Consumers in Global Markets." *Proceedings of the Global Marketing Conference.* Shanghai: Korean Academy of Marketing Science.

Manfred Schwaiger, Marko Sarstedt, Charles R. Taylor (2008), "Long-Term Effects of Culture Sponsoring on Corporate Reputation – An Experimental Study". *Proceedings of the Global Marketing Conference,* Shanghai: Korean Academy of Marketing Science.

Michael L. Capella, Charles R. Taylor, and Randall Campbell (2008), "Does DTC Advertising Raise the Price of Sleeping Pills? The Impact of Pharmaceutical Advertising on Price Sensitivity," *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, 219-225.

Charles R. Taylor (2007), "Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go," *Proceedings of the 2007 Conference of the American Academy of Advertising.*

Koo-Won Suh, Doo-Hee Lee, and Charles R. Taylor (2007), "Dimensions of Advertising Creativity," Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University. Seoul: Korea Advertising Society.

Charles R. Taylor and Changjo Yoo (2007), "Special Session on Social Responsibility of Tobacco Firms." *Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University.* Seoul: Korea Advertising Society.

Charles R. Taylor, et al. (2006), "Impact of Nationality and Fashion Lifestyle on Attitudes toward Advertising and Brand." *Proceedings of the Cultural Perspectives in Marketing Conference,* Academy of Marketing Science Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2006), "Relationship between Marketing Orientation and Business Performance of Sales Engineers of Industrial Robots." *Proceedings of the Cultural Perspectives in Marketing Conference,* Academy of Marketing Science Korean Academy of Marketing Science.

Michael L. Capella and Charles R. Taylor (2006), "A Review of the Effect of Cigarette Advertising Bans," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, pps. 188-189.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, p.14.

Shintaro Okazaki and Charles R. Taylor (2005), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, pps. 145-152.

Okazaki, Shintaro and Charles R. Taylor, (2005), "Understanding Advertising Standardization in an European Context: An Empirical Model", in Proceedings of the 34th European Marketing Academy (EMAC) Conference 2005 "Rejuvenating Marketing: Contamination, Innovation, Integration", Milan, Italy: Bocconi University.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" *Proceedings of the 30th Annual Macromarketing Conference*, (Mark Peterson and Ronald Paul Hill, eds), p. 63.

Charles R. Taylor and Michael Walsh (2005), "What Does 'Made in the USA' Mean? A Review of Legislation and Litigation Pertaining to Country of Origin Claims," *Proceedings of the 2005 Marketing and Public Policy Conference*, forthcoming.

Charles R. Taylor and George R. Franke (2004), "An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," *Proceedings of the 2004 Marketing and Public Policy Conference*, 83-85.

Charles R. Taylor, (2003) "What's Wrong with International Advertising Research (and What's Right)," *Proceedings of the 2003 Conference of the American Academy of Advertising*, (Les Carlson, ed.), p.3.

Charles R. Taylor, (2003) "Meet the Editors: Journal of Advertising and Some Journals You Might Not Have Considered but Should," (special session) *Proceedings of the 2003 Conference of the American Academy of Advertising*, (Les Carlson, ed.), p.147.

Charles R. Taylor and Michael Walsh (2003), "Resolving Product Standards Disputes," portion of special session on "Challenges to Public Policy: Emerging Issues in International Markets," *Proceedings of the 2003 Marketing and Public Policy Conference*, p.59.

Garrett, Jason, Shaoming Zou, and Charles R. Taylor (2003), "International Advertising: A Review of the Empirical Research from 1990 to 2002," *Proceedings of the American Marketing Association Summer Educators' Conference,* Chicago, IL.

Shaoming Zou, Charles R. Taylor, S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," The State of the Art Research in International Marketing, Subhash Jain, ed., University of Connecticut - CIBER.

Charles R. Taylor (2002), "Publishing Public Policy Research: Journals and Their Editors," *Proceedings of the 2002 Marketing and Public Policy Conference*, Chicago: American Marketing Association.

Mary Anne Raymond and Charles R. Taylor (2000) "Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan," *Proceedings of the 2000 Marketing and Public Policy Conference*, p.22-23.

Charles R. Taylor and Michael Maynard (1999), "Attitudes Toward Direct Marketing and Its Regulation: A Comparison of the U.S. and Japan," *Proceedings of the 1999 Marketing and Public Policy Conference*.

Charles R. Taylor and Michael Maynard (1999), "The Impact of a Culture's Communication Style on Attitudes Toward Direct Marketing: Comparing Japan and The United States" *Proceedings of the American Academy of Advertising Conference*, p.194-195.

Charles R. Taylor (1998), "Agency Perspectives on Cultural Factors Influencing Advertising in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.316.

Charles R. Taylor and Alan Shao (1998), "Advertising Strategies in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.315.

Mary Anne Raymond, Charles R. Taylor, and Alan Shao (1998), "Socio-Cultural Factors Understanding Restrictions and Regulations Affecting Advertising across Product Types in Taiwan," *Proceedings of the 1998 Marketing and Public Policy Conference*, p.67.

Michael B. Mazis and Charles R. Taylor (1998), "The Regulation of Advertising in Sensitive Product Categories: Global Perspectives," *Proceedings of the 1998 Marketing and Public Policy Conference*, p.64-65.

Charles R. Taylor and John C. Taylor, (1997) "The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," *Proceedings of the American Marketing Association Marketing Communications Conference*, p.56-58.

Charles R. Taylor and Barbara B. Stern, (1997), "Advertising Portrayals of Asian Americans:

The Asian American View," *Proceedings of the 1997 Conference of the American Academy of Advertising,* p.269-271.

Barbara B. Stern, Charles R. Taylor, Hae-Kyong Bang, Wei-Na Lee, and Hairong Li (1997), "Asian-Americans: Insights for Advertisers on Appealing to an Attractive, Yet Misunderstood Demographic Group," *Proceedings of the 1997 Conference of the American Academy of Advertising*, p.269.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (1996), "International Market Entry Mode Choice by U.S. and Japanese MNCs: A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," *Proceedings of the 1996 American Marketing Association Summer Educators' Conference*, C. Droge and R. Calantone (eds.), p.402.

Charles R. Taylor (1996), "Televised Portrayals of Asian Americans," *Proceedings of the 1996 American Academy of Advertising Conference,* p.119-120.

Charles R. Taylor (1995), "Brand Differentiation and Advertising Effectiveness," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil, (eds.), p.302-321.

Charles R. Taylor and Gordon E. Miracle (1995), "Foreign Elements in Korean and U.S. Television Advertising," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil (eds.), p.93-94.

Charles R. Taylor and Thomas J. Page, Jr. (1994), "A Comparison of the Effectiveness of Brand Differentiating Messages in Korean and U.S. Television Advertising," *Proceedings of the Fourth Symposium on Cross-Cultural Consumer and Business Studies*, p.179-182.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," *Proceedings of the 1994 Marketing and Public Policy Conference*, p.158.

Charles R. Taylor, Doo Hee Lee, and Hae-Kyong Bang (1993), "Advertising Strategies in Korea and the United States," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.788-791.

Charles R. Taylor and Doo Hee Lee (1993), "A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.776-779.

Charles R. Taylor and Jay L. Laughlin (1993), "The Effectiveness of Brand Differentiating Strategies in Korean Advertising," *Proceedings of the International Academy of Business Disciplines Conference*, F. V. Mastrianna and Abass Alhahfaji (eds.), p.414-418.

Charles R. Taylor and Weih Chang (1993), "The History of Outdoor Advertising Regulation in the United States," *Proceedings of the Sixth Conference on Historical Research in Marketing and Marketing Thought*, p.283-299

Charles R. Taylor and Glenn S. Omura (1992), "Back to the Political Economy Paradigm in the Study of Marketing in Economic Development: A Case Analysis of South Korea," in *Proceedings of the Macromarketing Seminar*, Breukelen, Netherlands, p.551-576.

Charles R. Taylor and Shaoming Zou, (1992) "Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," *Proceedings of the Conference of the American Academy of Advertising*, p.42-43.

Steven W. Kopp and Charles R. Taylor (1991), "Try Your Luck! A History of Prize Promotions!," *Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*, p.285-299

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1990) "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, U.S. and South Korea Television Advertising," *Proceedings of the Advertising & Consumer Psychology Conference*, p.5.

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1989) "Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference,* R.L. King (ed.), p.347-351.

Charles R. Taylor and John C. Taylor (1989), "Towards a General Theory of the Effects of Deregulation on Competitive Structure and Performance," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference*, R.L. King (ed.), p.438-442.

John C. Taylor and Charles R. Taylor (1989), "Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of an Historical Context Approach," *Proceedings of the Fourth Conference on Historical Research in Marketing and Marketing Thought*, T. Nevett, K. Whitney, and S. Hollander, (eds.), p.213-236.

## PRESENTATIONS

“Meet the Editors” American Marketing Association (February 2023).

“Building a Successful Academic Career: The Role of Research,” Keynote presentation to the Business Association of Latin America (BALAS), Lisbon, Portugal. (August, 2022)

“How to Publish in Advertising Journals,” Emerging Markets Conference Board, Lllujbiana, Slovenia. April (2022)

“New Issues in Advertising Research,” Keynote Presentation to ICAMA Conference, Jeju, Korea. (October, 2023)

“Meet the Editors,” International Conference on Research in Advertising, (June 2022).

“Meet the Editors,” American Academy of Advertising Conference, (April 2022).

“Strategies for Publishing in Top Functional Area Journals,” Keynote speech presented to Emerging Marketing Conference Board Annual Conference, Puebla, Mexico. (November 2021)

“Hot Topics in Advertising and Luxury Brand Research in 2021," Keynote speech presented to GAMMA Global Fashion Marketing Conference, Seoul, Korea. (November 2021).

“Meet the Editors,” Society for Marketing Advances Conference, Orlando (November, 2021).

“Meet the Editors,” International Conference on Research in Advertising, (June 2021).

“Meet the Editors,” American Academy of Advertising Conference, (April 2021).

“Meet the Editors,” Society for Marketing Advances Conference, New Orleans (November, 2020).

“Meet the Editors,” Global Marketing Conference (GAMMA), Seoul, Korea, (virtual). (November, 2020).

“Developing an Effective Research Stream in Marketing,” Keynote speech to 6th International AR & VR Conference, (virtual: Lisbon, Portugal), November 2020.

“Advertising in Emerging Markets,” (2020) Keynote speech to ICAMA Conference, (virtual- Bangkok, Thailand).

“Key Trends in Advertising Research,” (2020) Keynote speech to Korean Marketing Association, September 2020 (virtual- Seoul, Korea)

"The Future of Advertising in Emerging Markets," Keynote session at the Emerging Markets Conference Board, May, 2020 (virtual- Lllujbiana, Slovenia)

"Meet the Editors," Society for Marketing Advances Conference, New Orleans (November, 2019).

"Meet the Editors." Global Fashion Management Conference at Paris (July, 2019).

"Hot Topics in Advertising Research," Keynote speech presented at Asian Advertising Summit, Singapore (June 2019).

"How to Be a Better Reviewer and Why You Should Care," Presenter in panel session at the 2019 American Academy of Advertising Conference, Dallas, TX.

"Building a Successful Publishing Career." Keynote speech presented at Business Association of Latin American Studies, Lima, Peru (April, 2019).

"Meet the Editors," 2019 Annual Conference of the Emerging Markets Conference Board, "Driving Marketing Excellence through Experiences in Emerging Economies," Delhi, India (January 2019)

"Big Event Advertising Effectiveness: Can it Still Impact Brands? Evidence from Super Bowl Advertising," Keynote speech presented at the Asian Advertising Summit, Hong Kong Baptist University. Hong Kong (May, 2018).

"Super Bowl Advertising: Is it Effective in Brand Building?" Keynote speech presented at ICAMA Conference, Bangkok. Thailand (April 2018).

"Tips for Publishing Your Work and Building a Career," Keynote speech at Emerging Marketing Conference Board conference, Johannesburg, South Africa (April, 2018).

"Technology Innovation and Advertising: Implications for Education and Research," Special session panelist. American Academy of Advertising Annual Conference. New York, NY, (March, 2018).

"Meet the Editors," Part of panel at 2018 ICORIA Conference, Ghent, Belgium (June, 2017).

"Strategies for Building a Career in Advertising Research," Presented at Doctoral Consortium of American Academy of Advertising, Boston. Mass. (April, 2017)

"Consumer Response to Disclaimers in Digitally Retouched Advertisements," Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"Drivers of Perceived Luxuriousness of a Premium Private Label Product," Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"How Much Should Teaching be Adapted to Local Markets," Presented at the 2016 American Academy of Advertising Annual Conference, Seattle, WA. (April 2016)

"Meet the Editors" Panel at 2016 Global Marketing Conference at Hong Kong.

"Meet the Editors" International Conference on Research in Advertising. Doctoral Symposium, Llujbiana, Slovenia. (June 2016)

Global Branding Strategies," Yonsei University special lecture, (October 2016).

"Meet the Editors," Society for Marketing Advances Annual Conference (2015), San Antonio, TX. (November).

"Building a Research Agenda and Publishing in Top Advertising Journals," Doctoral Consortium of European Advertising Academy. London, England (July 2015).
"Meet the Editors," ICORIA Conference, London, England (July, 2015).

"Meet the Editors," Global Fashion Marketing Conference of GAMMA (June, 2015).

"The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations (June 2015).

"That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," ICORIA Conference, London, England, (July 2015).

"Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." Presented at the 2014 Global Marketing Conference of the Global Alliance of Marketing and Management Associations.

"Culture and Advertising Executions Revisited," Presented at 2013 ICORIA Conference, Zagreb, Croatia.

"Meet the Editors," Presented at the 2012 ICORIA Conference, Stockholm, Sweden, (June, 2012).

"Cultural Differences in Emotional Advertising," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Meet the Editors." Presented as part of special session at the 2010 Global Marketing Conference at Tokyo (Semptember, 2010).

"Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Designing Effective Digital Advertising: Current State of Knowledge and Thoughts on Digital Advertising in China," Keynote session speaker at the First Annual Academic Symposium of the

Chinese Advertising Education Committee of the Chinese Association of Higher Education. (August, 2010).

"Meet the Editors," Presentation in Meet the Editors Panel at the 9th Conference on Research in Advertising, Madrid, Spain, (June 2010).

"Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," Presented at the 9th International Conference on Research in Advertising, Madrid, Spain. (June, 2010).

"Publishing in the International Journal of Advertising," Presented in the Meet the Editors Session of the International Conference on Research in Advertising, hosted by European Advertising Academy, Klagenfurt, Austria (June 2009).

"Six Principles of Effective Digital Advertising," Presented at Dongguk University, Seoul, Korea, (May, 2009).

"Effective Advertising in New Media," Presented at Yonsei University, Seoul, Korea.

"Designing Effective Interactive Advertising." Presented at Ewha Womens' University, Seoul, Korea (May, 2009).

"Designing Effective Interactive Advertising," Presented to the Marketing Science Institute's Mobile Marketing Symposium, Cambridge, MA (December 2008).

"What Should I Do with This Review," Presented to 2008 American Academy of Advertising Emerging Scholar Symposium, San Mateo, CA.

"Principles of Interactive Advertising," Presented at the Autonomous University of Madrid, Spain, December 2008.

"Current Issues in Internet Advertising" Presented at Ludwig Maximillians University, Munich, Germany, October 2008.

Advertising and the Internet: Principles and Best Practices: Presented at University of Amsterdam, October 2008.

"Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go," 2007 Conference of the American Academy of Advertising, Burlington, VT.

Key Trends in Advertising Research: Key Research Topics, Presented to the Korea Advertising Society, Seoul, Korea, August, 2007.

"The Marketing Functions of On-Premise Signs" Presented at the 2006 National Signage Research Symposium at the International Sign Association Conference, September, 2006, Las Vegas, Nevada.

"Portrayals of Asian Americans in Advertising." (2006), Special presentation at the University of Texas at Austin.

"Smoke and Mirrors: Advertising and Tobacco" panelist in session at the National Center for Addiction and Substance Abuse (Columbia University) panel "Up in Smoke: Tobacco and American Youth," moderated by Jackie Judd, (September 2006), New York.

"A Review of the Effect of Cigarette Advertising Bans," American Marketing Association's Marketing and Public Policy Conference, June, 2006, Long Beach, CA.

"Marketing Trends and the New Media: It's Still All About the Brand," Featured speech to ADKOR 2005, The 2005 Korea Advertising Congress. Organized by the Korean Federation of Advertising Agencies. Seoul, Korea, November 8, 2005.

"Hot Topics in U.S. Advertising," Special Presentation to the Korean Advertising Society, Seoul Korea, July 6, 2005.

"Moving International Advertising Research Forward: A New Research Agenda," Presented at the 4th International Conference on Research in Advertising, June 2005, Saarbrucken, Germany: Saarland University, p.14 (keynote speaker).

"The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" (2005) Presented at the 30th Annual Marketing Conference, St. Petersburg, FL. (plenary session).

"On-Premise Signs as Storefront Marketing Devices and Systems," Presented at the 2005

National Signage Research Symposium at the International Sign Association Conference, May, 2005, Las Vegas, Nevada. (plenary session).

"Asian Americans in Advertising: Portrayals of the Model Minority," Presented to the 11th Asia Pacific Law Students Association Conference on Law and Public Policy, Harvard University, March 2005, Cambridge, MA.

"Advertising Standardization and its Impact on Financial and Strategic Performance: Evidence from Japanese and U.S. Subsidiaries Operating in the EU," Presented at the Korean Academy of Marketing Science Fall Meeting, November 2004, Jeonju, Korea.

"Deceptive Advertising and Corporate Responsibility: The Role of Self-Regulation," Presentation to the Philadelphia Advertising Club, Philadelphia, PA, November 2004.

"An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," Presented at the 2004 Marketing and Public Policy Conference, Salt Lake City, Utah.

"Regulation of On-Premise and Off-Premise Signs: Perspectives from Three Research Studies," Presented to the Transportation Research Board Meeting, January, 2004, Washington, DC.

"Building a Career in Marketing and Public Policy Research," Presented at the Doctoral Consortium of the 2003 Marketing and Public Policy Conference," Washington, DC.

"Resolving Product Standards Disputes," Presented at the 2003 Marketing and Public Policy Conference, Washington, DC.
"The Impact of Sign Regulation on Marketing Activities and Business Valuation," Presented at the 1st National Signage Research Association, Las Vegas, NV.

"What's Wrong (and What's Right) with International Advertising Research," Presented at the 2003 meeting of the American Academy of Advertising, Broomfield, CO.

"A Survey of Alternatives to Billboards and 30 Years of Public Opinion towards Billboards," part of "Billboard Experts" panel, 2002 Outdoor Advertising Legal Seminar, Washington DC.

"Making Good Decisions Pertaining to Departmental, College, and External Service Early in an Academic Career," Presented to the Doctoral Consortium of the 2001 Conference of the Society from Marketing Advances, New Orleans, LA.

“Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan,” Presented at the 2000 Marketing and Public Policy Conference, Washington, DC.

“Attitudes Toward Direct Marketing and its Regulation: A Comparison of the U.S. and Japan,” Presented at the 1999 meeting of the American Academy of Advertising, Albuquerque, NM.

“Advertising Strategies in Taiwan,” Presented at the 1998 meeting of the American Academy of Advertising, Lexington, KY.

“The Regulation of Advertising in Sensitive Product Categories: Global Perspectives,” Presented at the 1998 Marketing and Public Policy Conference, Washington, DC.

"Foreign Market Entry Mode Strategies of Japanese and U.S. Firms," Presented at the 1998 meeting of the Academy of Marketing Science, Norfolk, VA.

"The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," Presented at the 1998 American Marketing Association Marketing Communications Conference, Dublin, Ireland.

"Advertising Portrayals of Asian Americans: The Asian American View," Presented at the 1997 Conference of the American Academy of Advertising, St. Louis, MO.

"A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," Presented at the 1996 American Marketing Association Summer Educators' Conference, San Diego, CA.

"Regulatory Issues in Direct Marketing: A Comparison of the U.S. and Japan," Presented at the 1996 Marketing and Public Policy Conference, Arlington, VA.

"Televised Portrayals of Asian Americans," Presented at the 1996 American Academy of Advertising Conference, Vancouver.

"Brand Differentiation and Advertising Effectiveness," Presented at the 1995 Joint Conference of the American Marketing Association and the Korean Marketing Association.
"Magazine Portrayals of Ethnic Minorities," Presented at the 1995 Conference of the American Academy of Advertising, Tuscon, AZ.

"Culture's Consequences in Advertising: The Impact of Information Level Strategies on the Effectiveness of Korean and U.S. Advertising," Presented at the 1994 Conference of the American Academy of Advertising, Tuscon, AZ.

"Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," Presented at the 1994 Marketing and Public Policy Conference, Arlington, VA.

"A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

"Advertising Strategies in Korea and the United States," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

Guest Speaker on the Topic of, "Implications of Marketing and Public Relations for Parks and Recreation Programs," at Taegu University, Taegu, Korea.

"Litter on a Stick or the Lifeblood of Small Business: Regulatory Issues in Outdoor Advertising, presented at the 1993 Marketing and Public Policy Conference, East Lansing, MI.

"The History of Outdoor Advertising Regulation in the United States," Presented at the Sixth Conference on Historical Research in Marketing and Marketing Thought (April 1993).

"Journal Special Sections and the Advancement of Knowledge: A Product Life Cycle Case Study," Presented at the 1992 AMA Winter Educators Conference, San Antonio, TX.

"Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," Presented at the 1992 Conference of the American Academy of Advertising, San Antonio, TX.

Guest speaker on the topic of, "Comparing Television Advertising in Korea and the United States," at the Korea University, Seoul, Korea (September, 1991).

"Retail Television Advertising: Is it Really Unsophisticated?" Presented at the Symposium on Patronage Behavior and Retail Strategy, Baton Rouge, LA (1991).

"Try Your Luck: A History of Prize Promotions in the United States," Presented at the Fifth Conference on Historical Research in Marketing and Marketing Thought, East Lansing, MI (May 1991).

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," Presented at the 1989 Southern Marketing Association Conference, New Orleans, LA.

"Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of a Historical Context Approach," Presented at the Fourth Conference on Historical Research in Marketing and Marketing Thought, Charleston, SC (May, 1989).

Served as Panelist on the "Advertising in the 21st Century" session at the 1989 Southern Marketing Association Conference, New Orleans.

**EDITORIALS**

Charles R. Taylor (2024), "Understanding Podcast Advertising: The Need for More Research," *International Journal of Advertising* 43(6), 931-932.

Charles R. Taylor (2024), "Ad Skipping, The 'Ad Free Internet' and Privacy: A Call for Research," *International Journal of Advertising* 43(3), 403-404.

Charles R. Taylor (2023) "Sonic Branding as a Promotional Tool: A Concept Whose Time Has Come and a Call for Research," *International Journal of Advertising*, 42(8), 1239-1241.

Charles R. Taylor (2023) "Thoughts on Cross-cultural Advertising Research in 2023," *International Journal of Advertising*, 42(6), 969-971.

Charles R. Taylor (2023) "Non-fungible Tokens (NFTs) as Promotional Devices: Research Needs and Future Projections," *International Journal of Advertising*, 42(5), 799-800.

Charles R. Taylor (2023) "Digging Deeper on Diversity and Inclusion in Advertising Research: A Call to Action," *International Journal of Advertising*, 42(4), 639-640.

Charles R. Taylor (2023) Getting Sentimental About the Need for More Research on Nostalgia in Advertising," *International Journal of Advertising*, 42(3), 459-460.

Charles R. Taylor (2023) "New Thoughts on Advertising's Impact on Consumer Prices," International Journal of Advertising, 42(2), 261-262.]

Charles R. Taylor, Douglas C. West, Colin McDonald & Michael Waterson (2023) "Reflections on the *International Journal of Advertising* on the Journal's History and First 40 years, *International Journal of Advertising*, 42(1), 13-17.

Charles R. Taylor (2022), "Hitting the Mark with Active Agers: A Call for More Research on Older Consumers," *International Journal of Advertising*, 41(7), 1179-1180.

Charles R. Taylor (2022) "Future Needs in Gender and LGBT Advertising Portrayals," *International Journal of Advertising*, 41(6), 971-973.

Charles R. Taylor (2022) Advertising and Small Businesses: The Need for More Research, *International Journal of Advertising*, 41(4), 589-590.

Charles R. Taylor (2022), "Research on Advertising in the Metaverse: A Call to Action," *International Journal of Advertising*, 41(3), 383-384.

Charles R. Taylor (2021) "A Call for More Research on Authenticity in Corporate Social Responsibility Programs", *International Journal of Advertising*, 40(7), 969-971.

Charles R. Taylor (2021), "Generational Research and Advertising to Various Age Cohorts," *International Journal of Advertising*, 40(5), 683-685,

Charles R. Taylor (2021), Charting the Path Forward for the International Journal of Advertising, *International Journal of Advertising*, 40(2), 145-147.

Charles R. Taylor (2021), "On Hideki Matsuyama and the Need for More Study of Global Brand Equity," *International Journal of Advertising*, 40(3), 325-326.

Charles R. Taylor (2020) "The Urgent Need for More Research on Influencer Marketing,"*International Journal of Advertising*, 39(7), 889-891,

Charles R. Taylor (2020), "Advertising and Covid-19," *International Journal of Advertising*, 39(5), 587-589.

Charles R. Taylor (2020), "Common Mistakes Made in Submissions to Leading Advertising Journals," *International Journal of Advertising,* 39(3), 329-331.

Charles R. Taylor (2019) "What the Business Roundtable's Statement on the Purpose of a Corporation Means for the Study of Corporate Social Responsibility in Advertising, *International Journal of Advertising*, 38 (8), 1067-1069.

Charles R. Taylor (2019) Editorial: Artificial intelligence, Customized Communications, Privacy, and the General Data Protection Regulation (GDPR), *International Journal of Advertising*, 38 (5), 649-650,

Charles R. Taylor (2019), "Over the Top, Connected, Programmatic and Addressable Television! What Does It All Mean? Definitions and a Call for Research." *International Journal of Advertising*, 38 (3), 343–344

Charles R. Taylor (2019), "The International Journal of Advertising Now Welcomes 'Perspectives' Papers," *International Journal of Advertising*, 38 (2), 171-172,

Charles R. Taylor (2019), Taylor's theorem part II: advice for socially responsible advertisers, *International Journal of Advertising*, 38 (1), 1-4.

Charles R. Taylor (2018), "The New Era of Electronic Word of Mouth (eWOM): 'Be More Chill' Overrules the Critics," *International Journal of Advertising*, 37 (5), 849-851.

Charles R. Taylor (2018), "Global Consumer Culture and Advertising Research," *International Journal of Advertising*, 37 (4), 505-507.

Charles R. Taylor (2018), "Red Alert: On The Need for More Research on Corporate Social Responsibility Appeals in Advertising," *International Journal of Advertising*, 37 (3), 337-339.

Charles R. Taylor (2018), "Generational Research and Advertising to Millennials*, International Journal of Advertising*, 37 (2), 165-167.

Charles R. Taylor (2017), "How to Avoid Marketing Disasters: Back to the Basic Communications Model, but with Some Updates Illustrating the Importance of E-word-of-mouth Research," *International Journal of Advertising*, 36 (4), 515-519.

Charles R. Taylor (2017), "Where Has the Research on Client–agency Relationships gone? The Need for a Deeper Understanding of the Future of Account Management, International Journal of Advertising," 36 (3), 393-395.

Charles R. Taylor (2017), "Native Advertising: The Black Sheep of the Marketing Family," *International Journal of Advertising*, 36 (2), 207-209.

Charles R. Taylor (2017), "The Importance of Research by Cross-national Teams," *International Journal of Advertising*, 36 (1), 1-2

Charles R. Taylor (2016), "On to a New Year," International Journal of Advertising, 35 (6), 907-908.

Charles R. Taylor (2016), "How Much Does an NCAA Basketball Championship Matter: A Call for Research on the Public Relations Impact of Athletic Success," *International Journal of Advertising*, 35 (4), 617-621.

Charles R. Taylor (2016), "Advertising for Luxury and Fashion Goods: An Emerging Area," *International Journal of Advertising*, 35 (3), 389-390.

Charles R. Taylor (2016), "Some Interesting Findings about Super Bowl Advertising," *International Journal of Advertising*, 35 (2), 167-170.

Charles R. Taylor (2015), "The Imminent Return of the Advertising Jingle*," International Journal of Advertising*, 34 (5), 717-719.

Charles R. Taylor (2015), "A Call for More Research on 'Ggreen'or Environmental Advertising," *International Journal of Advertising*, 34 (4), 573-575.

Charles R. Taylor (2015), "On the New Era of Zipping and Zapping: The Need for Research on How Advertisers Deal with an Era of Time-shifted Television Program Viewing on a Variety of Devices," *International Journal of Advertising*, 34 (3), 403-405.

Charles R. Taylor (2015), "Creating Win–win Situations via Advertising: New Developments in

Digital Out-of-home Advertising," *International Journal of Advertising*, 34 (2), 177-180.
Charles R. Taylor (2015), "The International Journal of Advertising in 2015 and Beyond," *International Journal of Advertising*, 34 (1), 1-2.

Charles R. Taylor (2014), "Conducting State-of-the-art Cross-cultural Research," *International Journal of Advertising*, 33 (4), 627-631.
Charles R. Taylor (2014), "Should Tax Deductibility for Advertising be Eliminated? The Research Evidence says No," *International Journal of Advertising*, 33 (2),197-202.

Charles R. Taylor (2014), "Corporate Social Responsibility and Advertising: Does it Extend to Taking Stances on Social Issues?" *International Journal of Advertising*, 33 (1), 11-15.

Charles R. Taylor (2013), "Customised Communications: Relevance vs Privacy in Targeted Messaging," *International Journal of Advertising*, 32 (4), 483-485.

Charles R. Taylor (2013), "On the Economic Effects of Advertising – Evidence that Advertising = Information,". *International Journal of Advertising,* 32 (3), 339-342.

Charles R. Taylor (2013), "The Advertising Literature and the Role of the *International Journal of Advertising*," *International Journal of Advertising,* 32 (2)*, 179-182.*

Charles R. Taylor (2013), "Hot Topics in Advertising Research," *International Journal of Advertising,* 32 (1), 7-12.

Charles R. Taylor (2012), "Back to the Future: Some Topics We Should Not Forget About in Advertising research," *International Journal of Advertising*, 31(4), 699-702.

Charles R. Taylor (2012), "The London Olympics 2012: What Advertisers Should Watch," *International Journal of Advertising*, 31 (3), 459-464.

Charles R. Taylor (2012), "On Advertising in the BRICs and Other Emerging Markets," *International Journal of Advertising*, 31 (2), 227-230.

Charles R. Taylor (2011) Making Academic Research on Advertising More Managerially Relevant," *International Journal of Advertising,* 30 (5), 739-742.

Charles R. Taylor (2011), "New Directions for Research on Targeting Minority G*roups*," *International Journal of Advertising,* 30 (4), 553-558.

Charles R. Taylor (2011), "On Advertising Research that Makes an I*mpact*," *International Journal of Advertising,* 30 (3), 369-371.

Charles R. Taylor (2011), "On Puffery, Professor Preston, and the Societal Effects of Advertising," *International Journal of Advertising*, 30 (2), 201-204.

Charles R. Taylor (2010), "Campaigning for More Research on Political Advertising," *International Journal of Advertising*, 29 (5), 681-685.

Charles R. Taylor (2010), "Innovation in Traditional Media: Keeping Our 'Eyes On' An Innovative New Measurement System for Out of Home Advertising," *International Journal of Advertising*, 29 (4), 521-525.

Charles R. Taylor (2010) Measuring Return on Investment from Advertising: 'Holy Grail' or Necessary Tool? *International Journal of Advertising*, 29 (3), 345-348.

Charles R. Taylor (2010), "Integrated Marketing Communications in 2010 and Beyond," *International Journal of Advertising*, 29 (2), 161-164.

Charles R. Taylor (2010), "Toward Stronger Theory Development in International Advertising Research," *International Journal of Advertising*, 29 (1), 9-14.

Charles R. Taylor (2009), "Product Placement: A Hot Topic Gets Hotter," *International Journal of Advertising*, 28 (5), 753-756.

Charles R. Taylor (2009), "On the Need for Advertising and Public Policy Research," *International Journal of Advertising*, 28 (4), 601-604.

Charles R. Taylor (2009), "Looking Ahead: The Future of the International Journal of Advertising," *International Journal of Advertising*, 28 (2), 195-197.

**POPULAR BUSINESS PRESS COLUMNS**

Forbes Senior Contributor (Forbes.com) . Available at:
https://www.forbes.com/sites/charlesrtaylor/?sh=2d8f63ac3bef

## REFERENCES

Available on request.

# Exhibit II
# Taylor Deposition Excerpts

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn;<br>Stephen Howard,<br><br>Plaintiffs,<br><br>-vs.-<br><br>City of Salina, Kansas,<br><br>Defendants. | :CIVIL ACTION<br>:CASE NO.<br>:<br>:6:24-cv-01027-TC-ADM<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

Q. Do you know what a Kerr area is, K-e-r-r, under the Highway Beautification Act?
A. No.
Q. Do you know what the Highway Beautification's Act requirements for local zoning are?
A. There's -- there's restrictions on height, spacing, and lighting.
Q. But with respect to the local zoning of the property in which the billboard is located, do you know what the restrictions are in the Highway Beautification Act?
A. I don't remember a lot of detail, but there's differences based on whether it's commercial or residential.
Q. Turning back to the disclosure statement for a moment, let me just bring that up.
So this is, I suppose, Exhibit A.
So can you see this now?
A. Yes.
Q. Here it says that you're an expert in signage; is that right?
A. Yes.
Q. What is a signage expert?
A. It's somebody who studied and has a -- has a

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence, and objections are contained fully and accurately in the stenographic notes taken by me upon the deposition of CHARLES R. TAYLOR, Ph.D., taken on NOVEMBER 13, 2024, and that this is a true and correct transcript of same.

I FURTHER CERTIFY that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Michelle Keys
Stenographer
and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

# Exhibit JJ
# Plaintiffs' First Amended Response to First Set of Interrogatories

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas,**<br><br>Defendant. | Case No. No. 6:24-cv-01027<br><br>Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories; Verification |

**Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories**

Instructions

**1.** Pursuant to Fed.R.Civ.P. 26 and 33, Plaintiffs are required to answer the following discovery requests within thirty (30) days after service hereof.

**2.** In your answer or response, please restate each numbered Interrogatory prior to your response to that request.

**3.** Plaintiffs are required to make a reasonable and good faith effort to obtain the information requested by each interrogatory. If you are unable to answer or respond fully to any request, answer or respond to the extent possible and explain why you cannot answer or respond in full.

**4.** If you do not have enough personal knowledge to fully answer a request, say so, but make a reasonable and good faith effort to get the information by making inquiry within your organization.

**5.** In case of doubt as to the scope of a clause including "and," "or," "any," "all,"

"each" or "every," the intended meaning is inclusive rather than exclusive.

**6.** If you find the meaning of any term in these discovery requests to be unclear, then you should either request clarification or assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

**7.** These discovery requests are continuing in nature and you are requested to furnish amended or supplemental responses and additional documents in accordance with Fed.R.Civ.P. 26(e).

**8.** Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to promptly amend a prior response to a request if you learn that the prior response is in some material respect incomplete or incorrect and the additional or corrective information has not otherwise been made known to the defendant during the discovery process.

**9.** If you assert a privilege (*e.g.*, attorney-client privilege) as the reason for refusing to answer or respond or as the basis of an objection to any discovery request, state the specific grounds therefor, separately and specifically identify each individual discovery request as to which such privilege is claimed, and describe the facts upon which you base the assertion of privilege. If the claim of privilege involves a **Communication**, please identify each person present at that **Communication**. Please produce a privilege log identifying each document withheld or redacted pursuant to any alleged privilege.

**10.** Your answers to the Interrogatories must be verified, dated and signed.

## 1. DEFINITIONS

**1.** "**Communication**" or "**Communications**" refers to all means of exchanging information, whether verbal, on paper, or via any electronic means, including but not limited to all

inquiries, discussions, conferences, conversations, negotiations, agreements, interviews, telephone conversations, letters, correspondence, e-mail, text messages, SMS texts, iMessages, private electronic messaging apps, file sharing, and notes.

**2.** **"Document"** or "**Documents**" shall be defined in their broadest sense under Fed.R.Civ.P. 34, and they mean the original and all copies any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy of the following items, however produced or reproduced, including without limitation: writings, books, invoices, shipping forms, accounting records of any nature whatsoever, agreements, correspondence, SMS texts, iMessages, emails, memoranda, recordings, summaries or records of telephone conversations, summaries of records of personal conversations or interviews, diaries, calendars, day-timers, time sheets and other time records, letters, forecasts, graphs, notebooks, charts, plans, sketches, drawings, video and audio tapes, films, slides, photographs, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, summaries of investigations, opinions or reports of consultants, reprints and drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, and other data compilations, including those stored on computer drives, tapes, smartphones, smart watches, tablets, solid-state devices (whether fixed or removable), or internet-based file sharing, file storage, or backup services, from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The term "**Document**" shall include all drafts, as well as final versions of any **Document**.

**3.** "**Sign Code**" means the following provisions of the Salina Code of Ordinances:

(a) Chapter 42, Article X; (b) the definitions found in Chapter 42, Article XIV for words and phrases that are used in Chapter 42, Article X; (c) Section 42-581; (d) Section 42-596 to Section 42-597.1, inclusive; (e) Section 42-598 to Section 42-600, inclusive.

**4.** “**BID Code**” means Chapter 2, Article X of the Salina Code of Ordinances.

**5.** “**Cozy Sign**” or “**Plaintiffs' Sign**” means the sign that is the subject matter of this lawsuit, also identified as the display painted on the exterior wall of the Cozy Inn as shown in paragraphs 27 and 28 (the “completed rendition”) of Plaintiffs' Amended Complaint.

**6.** “**Plaintiffs**,” “**You**,” or “**Your**” means the Plaintiffs identified in Civil Action No. 6:24-cv-01027-TC-ADM collectively, and individually, including Plaintiffs' representatives, attorneys, officers, directors, employees, agents, affiliates, and persons or entities acting or purporting to act on Plaintiffs' behalf.

**7.** “**Sign**” means a sign as defined in Salina Code of Ordinances § 42-764.

**8.** “**Person**” or “**Persons**” mean, where contextually appropriate, any individual, corporation, partnership, association, group or entity of any kind.

**9.** “**Related**” or “**Relating**” means supports, proves, evidences, describes, is associated with, provides background for, explains, concerns or regards.

**10.** The term “**Identify**” shall mean, where contextually appropriate:

**A.** With respect to a Person, the name, current or last known address and telephone number for such Person; or

**B.** With respect to a Document, the title, type (letter, memorandum, etc.), author, recipient and current or last known location of such Document.

**11.** Any reference to the singular shall include the plural, and references to the plural

shall include the singular.

**2. INTERROGATORIES**

6. In Plaintiffs' Amended Complaint [Dkt. No. 16], Plaintiffs allege at ¶ 210 that "This demonstrates Salina's antipathy toward content related to a business and commercial speech. This also demonstrates Salina's preference for content unrelated to a business and noncommercial speech." Please describe in detail the basis for this allegation including specific standards of the **Sign Code** or **BID Code** imposed by City staff and the factual basis supporting the allegation in ¶ 210 of the Amended Complaint.

ANSWER: As described in the Amended Complaint, Salina exempts murals from regulation under the mural-sign code regime if Salina considers the mural's content to be noncommercial or "art." Conversely, if Salina perceives the content of the mural to be commercial or to pertain to goods or services sold, then Salina regulates the mural as a sign under the mural-sign code regime. In short, Salina encourages and promotes murals with a noncommercial message while strictly regulating murals it believes have a commercial message. This reflects a preference for noncommercial speech and a hostility toward commercial speech. Examples of this preference for noncommercial speech include:

- The City Manager's statement that "It includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." Bates 0285-295.
- A City Commissioner's statement that "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Doc. 16-2 at pg. 22, ln. 24 – pg. 23, ln. 2.

- Ms. Driscoll's hypothetical comparing a mural of a dove to a mural of a coffee pot at a coffee house: "But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction. Where if we had a steaming cup of coffee and a coffee pot on the side, those are things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction." Doc. 16-2 pg. 23, ln. 19 – pg. 24, ln. 4.
- The City Manager's statement that "You know, as we -- as we looked at murals, we had some conversation about this very question.· And the first reaction was, well, if it includes lettering, or if it includes wording. But it really -- if the wording's not commercial in any way or doesn't have an·attachment to a commercial operation, that in·and of itself isn't a disqualifier." Doc. 16-2 pg. 26, ln. 23 – pg. 27, ln. 6.
- The City Manager's statement that "And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign." Doc. 16-2 pg. 28, ln. 15-21.
- The City Manager's statement that "The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place." Doc. 16-2 pg. 5, ln. 2-7.
- The City Manager's statement that "And there certainly is a misunderstanding between art and signs and commercial speech." Doc. 16-2 pg. 5, ln. 23-25.

- The City Manager's statement that "And I would reiterate, it's all on the basis of a commercial message." Doc. 16-2 pg. 10, ln. 4-5.
- The City Manager's email to the City Commission stating that "While it might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things." Bates CITY000261-262. The email later states "You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes."
- The City Manager's email to the City Commission stating that "We regulate the size of commercial signs through a permit process." Bates CITY000221-222.
- The City Manager's email to a City Commissioner listing the City's talking points on the Cozy's mural which states "A distinction is commonly made between murals and art when compared to commercial speech," and "We regulate the size of commercial signs through a permit process." Bates CITY000220.
- The email of Mr. Anderson explaining that "Work is done to ensure that the Boom mural content does not contain content that could be interpreted as a sign. This is done through SDI, the building owner, the artist, Boom representatives, and city of Salina Development Services." Bates CITY000352.
- The City Manager's email stating that "My intended response is to stress that we have

been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Bates CITY000218.

- Salina City Code § 42-504(1) exempts noncommercial flags from regulation, but not commercial flags.
- Salina City Code § 42-504(5) exempts memorial signs and tablets from regulation, but not commercial signs or tablets.
- Salina City Code § 42-504(9) exempts window signs that do not display an advertising message, but not window signs that display an advertising message.
- Salina City Code § 42-511 authorizes the substitution of any noncommercial copy in lieu of any other copy, but it does not authorize the substitution of commercial copy in lieu of any other copy.
- Salina City Code § 42-521(1) authorizes advertising signs in the C-4 zoning district if the signs advertise "special public events sponsored by governmental, philanthropic and nonprofit organizations," while prohibiting advertising signs that convey a commercial message.
- Salina City Code § 45-506(1) classifies an advertising sign, which is more heavily restricted than other signs, as "A sign displaying a commercial message that directs attention to" an off-premises business, while a sign that displays a noncommercial message that advertises a off-premises non-commercial entity is not considered an advertising sign.

**9. Identify** any **Sign**, display, mural or art on the Cozy Inn property which was erected, constructed or displayed in the past 10 years for the purpose of noncommercial speech.

ANSWER: The only displays on the exterior of The Cozy that communicated noncommercial content in the past five years that Plaintiffs are aware of are: 1) the mural on the wall of The Cozy that is the subject of this lawsuit; and 2) a display celebrating the anniversary of The Cozy which has been updated regularly throughout the years to reflect The Cozy's age.

17. Do **You** contend the **Sign Code** does not advance the City's interest in traffic safety? If so, please state all material facts supporting **Your** contention.

ANSWER: The burden of proof is on the Government to show that a restriction on speech satisfies the strict demands of the First Amendment. To date Defendant has not produced evidence as to how the sign code advances its claimed interests in traffic safety, and Plaintiffs are not aware of any such evidence.

Nevertheless, Plaintiffs believe that portions of the sign code may conceivably advance the City's claimed interest in traffic safety. For instance, Plaintiffs could imagine how regulating the construction standards of pole signs might lessen the likelihood of a poorly constructed sign falling in the road. However, Plaintiffs are not aware of any factual evidence that would support this possibility.

Other aspects of the sign code may harm traffic safety. When signs are restricted in size, this makes it more difficult for pedestrians and motorists to find their destination, resulting in drivers and pedestrians who are distracted and more likely to get in an accident that harms themselves or others. Large, distinctive signs, on the other hand, will enhance traffic safety by making it easy for pedestrians and motorists to identify their destination, allowing them to fully focus on traffic safety.

Plaintiffs contend that there is no factual reason to believe that regulating the size and content of murals painted on private property will enhance traffic safety. Plaintiffs contend that there is no factual reason to believe that murals containing a commercial message, or that pertain to goods or services for sale, or with content that "announces," "directs attention to," or "advertises" (however the government choses to define those terms) will decrease traffic safety any more than murals which contain a different message would. Indeed, it seems likely that some non-commercial murals containing a controversial political, religious, or social message (a swastika mural, a gay pride mural, a "defund the police" mural, a Satanists mural, etc.) would be far more likely to upset and distract pedestrians and motorists and decrease safety than a mural of burger-esque flying saucers.

Dated: October 4, 2024.

Kansas Justice Institute

By: Jeffrey Shaw, 29767

/s/ Jeffrey Shaw

Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Jeff@KansasJusticeInstitute.org
(913) 213-5121
Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verification |

**Verification**

I, Stephen Howard, have personal knowledge of myself, my activities, and my intentions, including those set out in Plaintiffs First Amended Answers to Defendant's First Set of Interrogatories. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Answers to Interrogatories are true to the best of my current knowledge, information, and belief.

Dated: 11-5, 2024.

[signature]

Stephen Howard, individually and
On behalf of Cozy Inn, Incorporated,
d/b/a The Cozy Inn

Galaxy S22

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 6 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

**CERTIFICATE OF DIGITAL SUBMISSION**

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*