**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 7 of 16, Pages 1-278**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

**TABLE OF CONTENTS**

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit KK
# Photos

Exhibit D

## Greater Downtown Artwork List

(Approximately 70 permanent and temporary pieces and 4 SculptureTour ballot boxes which contain all the current sculptures on display along Santa Fe)

**Santa Fe from South to North (Prescott to Elm)**

1. SW corner of Santa Fe and Prescott- Fish Tale, Gregory Johnson, purchased 2011 by Bank of Tescott. Bronze sculpture of boy with fishing pole.

2. Front of Tammy Walker Cancer Center-511 S. Santa Fe- Bronze sculpture of running girl. Private commission. Artwork inside the building includes four local artists commissioned to personalize and warm the space.



3. NW corner of South St. and Santa Fe (in front of the Temple) Mixed Media sculpture on pedestal by Jodie Bliss. “Picasso’s Violin”. 2018 People’s Choice purchase by City of Salina. (First abstract or non-representational work selected in the 8th year of the program)

4. NE Corner of Santa Fe and Mulberry- “Off the Merry-Go-Round” by Jodie Bliss. Rearing horse sculpture in front of Starbucks. Private ScultpureTour purchase in 2019.

Conrad Snider, Newton, KS tile wall tile sculpture at the Salina Art Center (242 S. Santa Fe). Snider and community members collaborated on this mural. Impressions are from downtown architecture and prairie ecosystem. Snider did multiple sculptures and tile additions to the law enforcement center and municipal court buildings in the early phases of the public art program.

5. 200 block of S. Santa Fe- mid-block crosswalk has ballots for sculpture tour. Spillman Plaza mixed media sculpture, “Clarence the Catfish”, the 2022 People’s Choice award winner by Joe and Terry Malesky, Springfield, Missouri.

6. Spillman Plaza south facing wall across from Seraphim- Super Girl painted stencil on brick wall. Joe Lurato, New Jersey. (2022 Boom mural Festival)



7. Campbell Plaza-100 block- Large mural “Open Book”, by Telmo-Miel for the 2022 Boom! Mural Festival. On the back of the Campbell Plaza Stage is the “Love Salina” mural by Salina artist Eric Montoy. Amelia Earhart mural by Logan Hicks and Jo Lurato on back wall of Prickly Pear during the 2022 Boom! Mural Festival, and red fox mural on back wall of Lauren Quinn floral shop by Brady Scott from Hutchinson, KS during 2022 Boom! (This plaza has been granted to Prickly Pear in license agreement, but City still has first-use rights for the stage)







*September 2023*



8. Across the street in Strand Plaza- large butterfly mural by Mantra. The mid-block crossing has SculptureTour ballots. Also an additional sculpture is in the seating area behind Barollo Grill. This was a Friends of SculptureTour purchase and donation. (The four downtown plazas were named for early founders or early business leaders.)



9. Behind 100 S. Santa Fe- native prairie mural by Mona Caron (2022 Boom Mural Festival) Directly north in the alley north of Iron Ave is a wall mural by the KC artist Gear.



10. Mid-block crosswalk in 100 N. block has sculpture tour ballots.

11. Arcade tunnel between 137 and 141 N. Santa Fe also has two paintings by the mural artist Gear. No title info at this time. (The Smoky Hill River Festival regularly commissions mural artists who create work that is placed elsewhere in the community. Schools, animal shelter, arcades, and other public spaces.)



Parking lot north of 141 N. Santa Fe- 67401 painted mural by Salina artists Robin and Julie Cates. City Lights Stage, mural by Dave Lowenstein, Lawrence, KS completed in June of 2022. Across the street on the north wall of the KU Medical School is a 2023 Boom mural by Add Fuel, a Portuguese artist.



12. 217 N. Santa Fe “Three Kinds of Sons”, Acrylic and latex sprayed mural by Tony Sjoman, Manhattan, NY. (2022 Boom Mural Festival)

13. Mid-block crossing has SculptureTour ballots

14. 249 N. Santa Fe- “For the Love of Steel” motorcycle sculpture. Sonny Corbett, Salina Kansas. 2020 SculptureTour People’s Choice purchase by the City of Salina. Sonny passed away a few months before his work was selected for the 2020-21 show. His friends submitted the work on his behalf. (Point out the reuse of historic Lee Buildings for apartments and commercial retail space. 53 apartments are complete and another 70 will commence soon. Ground floor space for restaurants, retail, or professional office space is also being developed.)

15. Approximately 341 N. Santa Fe- “Mural at the Mill” by Guido Van Helton. Completed in the fall of 2021. Privately funded project by the Salina Kanvas Project. (This was the first major mural project as part of the private Kanvas Project initiative. Based on a photo taken of kids playing Ring Around the Rosie. Mention that the same kids are featured on all sides of the building.) One block north on the east side of the street is a mural of a railroad worker by Chris Stain and a portrait of Martha Cooper by Joe Lurato. In the 500 block of N. Santa Fe on the west side of the street is a mural by PichiAvo from Valencia, Spain.

**5th Street from Ash to Mulberry**

16. Mid-block west side parking lot. Steel and limestone untitled sculpture by Richie Bergen (harmonica). Friends of SculptureTour purchase as part of pre-tour workshop. Three-bladed steel sculpture “Silver Streaks” by Oklahoma artist Jim Stewart. SculptureTour purchase by Rotary Club gifted to the City.

17. Salina Field House- Perforated metal wall. Designed by Lawrence and Kansas City artist Jeremy Rockwell and fabricated by Zahner, Kansas City, MO Capital Improvement Project Public artwork. (CAD Committee formed a site committee that commissioned a designer to integrate art that also served as a sun block (functional purpose) as well as an aesthetic enhancement to the building.

18. In the 100 block of S. 5th St. at the west entrance of The Garage- large tire sculpture. Artist unknown. More sculpture on the 4th St. entrance of The Garage. A mural by Salina artist Eric Montoy is also featured on a west facing wall of the Garage. Directly across the street to the west in a parking lot behind Campbell Plaza is a mural by Mad C, a German artist from the 2023 Boom Mural Festival.

19. Behind the Stiefel Theatre is Artwork Alley. This is a pre-Festival event completed in May of 2022. with 9 murals by nine different artists. Left to right facing West: Ray Albarez (Saeb), Jeremy Fields (Sadat), Brady Scott, Darren Morawitz, Kamela Eaton, Anthony Parker (Amp), Hannah Scott, north wall “Symphony of Sunflowers” by Brady Scott who also curated the event, and the trash corral by Colin Benson and Chase Wheeler. A majority of funds for this project came from private sources and the Kansas Creative Arts Industries Commission Reimagined Spaces Grant. Additionally, the small figure by the Stiefel Theatre back door is by Joe Lurato. He has another pop-up just to the south in a niche across the alley. At the end of the alley at Walnut is another mural by Mindy Allen, Junction City, KS. On the back wall of the Stiefel Theatre is a 2023 Boom mural by California artist El Mac.





20. Approximately 215 S 5th. Large buffalo mural on wall at back of vacant lots. Artist unknown.

21. SE Corner of South Street and 5th Salina Water Treatment Plant- Public art installation. Found on Salina Arts & Humanities public art page. Artist/fabricator Kent Williams, Wichita, KS.

**Additional locations in the greater downtown area**

22. Corner of 7th and Elm St. Fire Station #1 Salina Firefighter Tribute Plaza. Artist: Bejamin Victor Custom bronze sculpture of a firefighter.

23. City/County/Library grounds. Butterfly Tree, 2021 People's Choice sculpture at South Library entrance; "Trifinity" bronze by Salinan, Richard Bergen in Caldwell Plaza, and "Wheat Harvest", by James Mages of Hays, KS wheat sculpture in the south drive of the government building. Inside the building is the bronze sculpture "Daughters of Peace", by Benjamin Victor, the 2015 People's Choice.

24. Salina Senior Center (across from "Trifinity" sculpture) on west side 9th St. "Farmer", 2013 People's Choice bronze statue by Lawrence Starck.

25. 211 W. Iron Ave (Smoky Hill Museum) "Patches"-a mixed media sculpture of a hippo by Dale Lewis. The 2018 People's Choice award winner.

26. 232 N. 3rd St is a mural by Pat Perry featuring a collection of images from Salina and Saline, County.

27. 805 The Midway (north side of complex) "We're Better Together" mural by Queen Andrea.

**Additional items of interest:**

- More than $250 million in public and private investment is taking place throughout the greater downtown in less than 10 years.
- Each of the four blocks of sidewalk downtown have a different art deco inspired design.
- The KU Med Center Salina held a nationwide competition to commission original work for the new medical school.
- The local school district recently included $120,000 (1%) of a school improvement bond project and integrated art in all 16 buildings in the district. They have an articulation agreement stating their intent to include art when they do capital projects.
- Eight new mural artists will be coming to Salina in the first week of October for Boom!
- Funds through Salina Arts & Humanities and Salina Downtown Inc. help provide support for businesses, artists, or performers to make the arts unavoidable throughout the community.
- Since SculptureTour began in 2011, there are now more than 50 pieces of art throughout the community in publicly visible spaces. (This is a private program)
- A new ACE District (Arts, Commerce, and Entertainment) was recently formed and encourages creative acts and more commerce outside of buildings throughout the greater downtown area.
- The Smoky Hill River renewal is underway which will include 7 miles of urban waterway and trails to be completed within the next 8 years. New plazas, artwork, and a restored river with boating and fishing is being developed.
- Salina is projecting $1 billion in capital projects citywide over the next 10 years.
- The first series of murals by Boom! artists intentionally developed content that reflected aspects of the people or geography of this place.

*September 2023*

Case 6:24-cv-01027-TC-ADM Document 16-5 Filed 04/10/24 Page 5 of 5

**Resources for further study:**

Boom! Mural Festival

https://www.boomsalina.art/

Salina Arts & Humanities public art webpage:

https://www.salinaarts.com/public-art/

A page with links to multiple local and regional cultural arts offerings:

https://www.salinaarts.com/resources/

SculptureTour Salina website

https://www.sculpturetoursalina.net/

Salina Art Center

https://www.salinaartcenter.org/

Salina Community Theatre

https://salinatheatre.com/

Stiefel Theatre for the Performing Arts

https://www.stiefeltheatre.org/

Salina Symphony

https://www.salinasymphony.org/main/

Travel and Tourism information:

https://www.salinakansas.org/visit-salina.html


Ash ST
LEFT TURN YIELD ON GREEN
SALINA AUTO PARTS
Mid-Kansas TITLE CO.

0085






In God
We Trust
est: 1788








HOLA
FROM VALENCIA TO SALINA








0111






0113



0114






0116




JOE IURATO


MAC
2023






0125

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Jeffrey Shaw in Support of Plaintiffs' Motion for Summary Judgment |

**Declaration of Jeffrey Shaw in Support of Plaintiffs' Motion for Summary Judgment**

I, Jeffrey Shaw, submit the following in support of Plaintiffs' Motion for Summary Judgment:

1. I am a citizen of the United States, a resident of Kansas, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I am an active member of the State Bar of Kansas in good standing. I am an attorney at the Kansas Justice Institute, and I represent the Plaintiffs in this case.

3. On August 2, 2024, the parties stipulated that the certified transcript of the November 13, 2023, Salina City Commission meeting (attached as Exhibit E of Plaintiffs' Motino for Summary Judgment and previously filed as Doc. 16-2) is an authentic transcript of the meeting.

4. On October 15, 2024, the parties stipulated to the authenticity of all documents produced by the City of Salina in response to Plaintiffs' First Request for Production of Documents. Some of these documents, such as external emails to Salina officials were only authenticated as authentic copies of what the City received and had in its possession.

5. The photographs in Exhibit B have all been authenticated through requests for admission, stipulation, or deposition testimony as authentic representations of The Cozy Inn.

6. The photographs Exhibit F and KK have all been authenticated through requests for admission, stipulation, or deposition testimony as authentic representations of murals in Salina, Kansas.

7. I declare under the penalty of perjury that the above is true and correct.

Dated: February 7, 2025

/s/ Jeffrey Shaw
Jeffrey Shaw

**Cozy Inn, Inc, et al. v. City of Salina, Kansas - Civil Action No. 6:24-cv-01027-TC-ADM**

**Plaintiffs' Motion for Summary Judgment – Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Howard Declaration |
| **Exhibit B** | Cozy Photos |
| **Exhibit C** | Cozy Proclamation |
| **Exhibit D** | Howard Deposition |
| **Exhibit E** | Commission Transcript |
| **Exhibit F** | Mural Photos |
| **Exhibit G** | Anderson Deposition |
| **Exhibit H** | Windholz Deposition |
| **Exhibit I** | Schrage Email 11/9/23 |
| **Exhibit J** | Benson Deposition |
| **Exhibit K** | Blase Deposition |
| **Exhibit L** | Schrage Deposition |
| **Exhibit M** | Driscoll Deposition |
| **Exhibit N** | Herrs 30(b)(6) Deposition |
| **Exhibit O** | Herrs Deposition |
| **Exhibit P** | Andrew Deposition |
| **Exhibit Q** | Andrew 30(b)(6) Deposition |
| **Exhibit R** | Schrage Email 11/8/23 |
| **Exhibit S** | Talking Points |
| **Exhibit T** | City Commission Minutes |
| **Exhibit U** | Schrage Email 2/20/24 |
| **Exhibit V** | Art Center DRB Packet |
| **Exhibit W** | Sign Permit Submittal Procedures |
| **Exhibit X** | Defendant's Response to First Set of Interrogatories |
| **Exhibit Y** | Sign Permit Application |
| **Exhibit Z** | News Articles |
| **Exhibit AA** | On-Hold Letter |
| **Exhibit BB** | Michelson Deposition |
| **Exhibit CC** | Yard DRB Packet |
| **Exhibit DD** | Defendant's Amended Response to First Set of Interrogatories |
| **Exhibit EE** | Public Emails |
| **Exhibit FF** | White Deposition |
| **Exhibit GG** | Content Neutral Sign Codes |
| **Exhibit HH** | Taylor Declaration & Report |
| **Exhibit II** | Taylor Deposition |
| **Exhibit JJ** | Plaintiffs' First Amended Response to First Set of Interrogatories |
| **Exhibit KK** | Photos of Murals Around Salina |
| **Exhibit LL** | Shaw Declaration |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys of record, Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests summary judgment in favor of the City on all claims pursuant to F.R.C.P. 56 and D. Kan. Rule 56.1, and states:

This matter involves Plaintiffs' constitutional challenge to certain provisions of the Salina Code of Ordinances ("Salina Code"), specifically Chapter 42, Article X, with related definitions in Chapter 42, Article XIV ("Sign Code"). As set forth more fully in the accompanying *Defendant's Brief in Support of Defendant's Motion for Summary Judgment* ("Brief"), summary judgment should be granted in the City's favor, dismissing this case for want of jurisdiction because Plaintiffs cannot make a sufficient showing as to the redressability element of the Article III standing requirement. Further, as set forth more fully in the Brief, the Sign Code a content-neutral regulation on its face and as-applied, and easily passes intermediate scrutiny. The Sign Code is content-neutral on its face because the Sign Code is agnostic as to ideas, messages, topics, or viewpoints and contains only "time, place, and manner" restrictions. The Sign Code is content-neutral as applied because it was applied to the letter with respect to the Cozy Sign. The Sign Code passes intermediate scrutiny on its face and as-applied because it advances substantial and

legitimate content-neutral interests of aesthetics, traffic and pedestrian safety, and property values, is narrowly tailored, and leaves open "ample alternative channels for communication of the information."

Moreover, the Sign Code does not constitute an impermissible prior restraint because it includes a brief, specified time period for decision-making, allows for prompt judicial review, and provides sufficient standards to constrain the discretion of the decision-maker. Likewise, the Sign Code is not unconstitutionally vague because it provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Finally, if the court determines the sign Code is a commercial speech regulation, then the Sign Code also passes the commercial speech test set forth in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of NY*, 447 U.S. 557, 564-67 (1980). Accordingly, Defendant respectfully requests summary judgment in its favor on all claims asserted by Plaintiffs.

Respectfully submitted this 7th day of February, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for
Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for
Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for
Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of February, 2025, I caused the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court

using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests judgment in favor of the City on all claims pursuant to F.R.C.P. 56, and in support thereof states as follows:

## I. INTRODUCTION

Recently, the Supreme Court approvingly described sign regulation as a "tradition" dating back more than 150 years—and observed that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 65 (2022). K.S.A. § 12-101 empowers the City to regulate its local affairs, and the City has specifically regulated signs for about 58 years. This First Amendment challenge stems from Plaintiffs painting of a sign on the North wall of the Cozy Inn ("Cozy Sign") that is more than 50 times larger than the Plaintiffs' available sign allowance under the City's sign regulations.

There are no material facts in dispute regarding the central issues of this First Amendment case: (1) whether the text of Salina Code of Ordinances ("Salina Code") Chapter 42 Article X (along

with related definitions in Chapter 42 Article XIV, "Sign Code") is content-neutral, specifically as it relates to the definition of "sign" (Salina Code § 42-764) upon which the applicability of the Sign Code relies; and (2) whether the Sign Code passes intermediate scrutiny, which involves the questions of whether: (a) the City's articulated interests in aesthetics, traffic and pedestrian safety, and property values are substantial (b) the Sign Code advances at least one of those interests in a manner that "would be achieved less effectively absent the regulation"; and (c) the Sign Code leaves open "ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 799 (1989).

The Court decides whether the face of the Sign Code is content neutral as a matter of law. *Austin*, 596 U.S. at 64, 76; *Harmon v. Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020). The Court also decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon*, 981 F.3d at 1148-49. To that end, the definition of "sign" that is the central issue of this case is agnostic as to content. It turns on whether a display is used to "announce, direct attention to, or advertise" and is "not located inside a building." Salina Code § 42-764. The Sign Code is not concerned with what is announced, to what attention is directed, or what is advertised. The City submits that the Sign Code, and specifically the definition of "sign"--a definition that is substantially similar to the definition of sign in the *Austin* case--is content-neutral. Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 1469.

The face of the Sign Code is content-neutral because it neither regulates based on the "topic discussed" or the "idea or message expressed," nor targets speech "based on its communicative

content" or "viewpoint." *Austin*, 596 U.S. at 69 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)); *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984); (Salina Code §§ 42-764, 42-781). The text of the challenged definition of "sign" does not refer to content at all. It simply defines "sign" in a way that is consistent with common understandings, recognizing that unlike architectural features, gazebos, trellises, statuary, and other decorative displays that provide visual interest, signs are "used to announce, direct attention to, or advertise." Salina Code § 42-764.

Salina Code § 42-500 enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. As a matter of law, these interests are both substantial and justified without reference to the content of the regulated speech (content-neutral). *Taxpayers for Vincent*, 466 U.S. at 795, 805-06 (property values and community aesthetics); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023) (aesthetics and traffic safety). Therefore, the Sign Code satisfies the first prong of the three-prong intermediate scrutiny test.

As a matter of law, the Sign Code advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values because it includes limitations upon the size, number, and placement of signs. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981); *Outdoor Sys., Inc. v. City of Lenexa*, 67 F. Supp. 2d 1231, 1238 (D. Kan. 1999); *see also Contest Promotions, LLC v. City and County of San Francisco*, 874 F.3d 597, 603 (9th Cir. 2017); *Wag More Dogs, Ltd. v. Cozart*, 680 F.3d 359, 369 (4th Cir. 2012); *CBS Outdoor, Inc. v. Village of Plainfield*, 959 F. Supp. 2d 1054, 1064 (E.D. Ill. 2013); *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 106 (1st Cir. 2020); *Naser Jewelers, Inc. v. City of Concord*,

513 F.3d 27, 35 (1st Cir. 2008). As the Court observed in *Metromedia*, it is not "speculative" that the substantial, content-neutral objectives of sign regulations would be achieved less effectively absent the regulations. *Id*. at 510-11. Therefore, the Sign Code satisfies the second prong of the three-prong intermediate scrutiny test.

It is clear that Plaintiffs have "ample alternative channels for communication of the information." First, Plaintiffs could have painted the exact same display, scaled to about 10 square feet, or if other signs were removed, about 63 square feet. Second, deposition testimony reveals that Plaintiffs communicate in many ways, including Facebook, branded merchandise worn or used by their customers, community events, radio advertising, interviews, banner advertising at indoor football events, billboards, bumper stickers, and a sign located at Jenni's Liquors in a nearby town. Therefore, the Sign Code satisfies the third prong of the three-prong intermediate scrutiny test.

There is no genuine dispute of material fact as to the content-neutrality of the Sign Code or three-pronged intermediate scrutiny test that the First Amendment requires for such regulations. Summary judgment for Defendant on the First Amendment claims is proper.

Further, the Sign Code is not a prior restraint. The Sign Code provides for a brief, specified period of time within which the City must issue or deny a sign permit. Salina Code § 42-502(b). Work on the Cozy Sign started on November 3, 2023, without a required permit. Three days later, the City asked Plaintiff, Mr. Howard, to stop the work, advising him that the display was a sign and that it was too large to qualify for a sign permit, and Mr. Howard thereafter submitted an application for the sign fully understanding that it could not be approved. The City's determination to ask Mr. Howard to stop the work was not "arbitrary enforcement." It was an application of the letter of the Sign Code, the plain language of which provides constitutionally sufficient standards to limit the

discretion of City officials.

Similarly, the Sign Code is not unconstitutionally vague because it provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Vagueness is not about "the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved." *U.S. v. Williams*, 553 U.S. 285, 306 (2008). Instead, it is about "the indeterminacy of precisely what that fact is." *Id.* The Sign Code is only concerned with outdoor displays that "announce," "direct attention to," or "advertise." These are uncomplicated words and phrases that ordinary people understand. The Sign Code is not concerned with whether a sign may also be artistic. The bottom line is that whether it is artistic or not, Plaintiffs' display is a sign because it "announces," "directs attention to," or "advertises," and the City's determination of that question is conclusive due to issue preclusion, and by Plaintiffs' own admission. *See B & B Hardware, Inc. v. Hargis Ind., Inc.*, 575 U.S. 138, 148 (2015).

Neither Mr. Howard nor Ms. Windholz (the Cozy Inn owners) have read or even tried to read the Sign Code, let alone make any effort to comply with it. In fact, the record of this case shows that they have no regard for the City's reasonable, content-neutral regulations. Upset about the Sign Code being applied to them, Plaintiffs ask this Court to second guess the City's administrative decision to stop the installation of the Cozy Sign. In the constitutional dimensions of this case, Plaintiffs' insistence that pictures of "burgers" are actually "burger-esque flying saucers," and that their sign is just "art" and not "advertisement" is immaterial. That is the stuff of ordinary disputes about code application. This Court should "decline to sit as '[a] zoning board[ ] of appeals'" where, as here, "'presented with claims which, although couched in constitutional language, at bottom amount only to the run of the mill dispute'" between the City and a business

owner. *Gunkel v. City of Emporia, Kan.*, 835 F.2d 1302, 1305 (10th Cir. 1987) (citations omitted).

There are no material facts in dispute. The constitutional claims presented are without merit. Summary judgment in the City's favor is appropriate.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1. The City regulates signs pursuant to Chapter 42 Article X of Salina Code of Ordinances along with related definitions in Chapter 42 Article XIV (collectively, "Sign Code"). **Ex. A** (Dean Andrew Aff'd) at ¶ 3.

2. The City applies the Sign Code as written. **Ex. B** at 6, Resp. to Int. No. 5. (City's Response to Plaintiffs' First Set of Interrogatories).

3. Sign is defined by Salina Code § 42-764 as:

> *Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building.

The City requests that pursuant to Federal Rule of Evidence 201, the Court take judicial notice of the municipal ordinance provisions cited herein. *See* Fed. R. Evid. 201; *North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1221 n.3 (10th Cir. 2021) ("Federal Rule of Evidence 201 authorizes federal courts to take judicial notice of adjudicative facts, including provisions in municipal ordinances, at any stage of the proceedings."). The relevant citations to Salina Code are attached hereto as **Ex. C**. The Salina Code may be accessed at https://library.municode.com/ks/salina/codes/code_of_ordinances.

4. The purposes of the Sign Code, codified at Salina Code § 42-500, set forth

the City's governmental interests in regulating signs:

> This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:
>
> (1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;
>
> (2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;
>
> (3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;
>
> (4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;
>
> (5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;
>
> (6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and
>
> (7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.
>
> (8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.
>
> (9) Enhance the city's ability to maintain its public rights-of-way.

**Ex. C**; **Ex. B** at 4, Resp. to Int. 4.

5. Wall sign is defined in Salina Code § 42-781 as:

> *Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**Ex. C**.

6. Salina Code § 42-501 requires a sign permit to be obtained before a sign is constructed or painted. It provides:

> No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

**Ex. C**.

7. Salina Code § 42-502(b) provides:

> A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

**Ex. C**.

8. Building is defined in Salina Code § 42-637 as:

> *Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.

**Ex. C**.

9. The applicable size limitations of the Sign Code are set forth in § 42-521(4)(b). They provide:

> (1) *Maximum gross surface area:* * * *
>
> b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a

> projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage.

**Ex. C**.

10. Salina Code § 1-11 articulates that intent: "If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code." **Ex. C**.

11. Dean Andrew is the City's Zoning Administrator and has been in that position since 2009. He has a Bachelor's and Master's degree from Kansas State University in urban geography and planning and a Juris Doctorate degree from the University of Iowa. He has been employed as a planner for 37 years. **Ex. D** (Dean Andrew Depo.) at 9:14-25, 10:1-8.

12. Dustin Herrs is a City Planner and has held that position since April 2006. Dustin Herrs is certified by the American Institute of Certified Planners. As part of that certification he has taken continuing education credits in planning law, which included sign regulations. Dustin Herrs studied Regional and Community Planning at Kansas State University. **Ex. E** (Dustin Herrs Depo.) at 8:15-21, 8:24-25, 9:1-6; **Ex. F** (Dustin Herrs Aff'd).

13. The Cozy Inn is owned by Steve Howard and his daughter, Andrea Windholz. **Ex. G** at 2, Stipulated Fact ii (Amended Pretrial Order, ECF 101)

14. On November 3, 2023, Plaintiffs started painting the Cozy Sign. **Ex. G** at 2, Stipulated Fact v.

15. Plaintiffs did not seek a sign permit before constructing the Cozy Sign. **Ex. H**

(Stephen Howard Depo.) at 91:11-17, 140:12-15, 19-21.

16. Plaintiffs knew the City regulated signs, but did not review the sign regulations. **Ex. H** at 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5, 240:15-17; 241:4-15; **Ex. I** (Andrea Windholz Depo.) at 71:7-12.

17. Plaintiffs have no intent to read the sign regulations. **Ex. H** at 240:15-17; 241:4-15.

18. Plaintiffs have no regard for the City's reasonable, content-neutral regulations. **Ex H** at 190:24-25; 191:1-25; 192:1-9; 233:1-25; **Ex. J** (Colin Benson Depo.) at 57:23-25; 58:1-24.

19. On November 6, 2023, the City reviewed the Cozy Sign, which at the time was fully outlined and partially painted on the North wall of the Cozy Inn. **Ex. K** (Dustin Herrs 30(b)(6) Depo.) at 82:1-20, 85:7-21; **Ex. L** (Photo of Cozy Sign Plaintiffs' Bates 58); **Ex. G** at 2, Stipulated Fact No. vi (stipulating to Plaintiffs' Bates 58).

20. On November 6, 2023, the City informed Plaintiff, Mr. Howard, that the Cozy Sign was too large to qualify for a sign permit and asked him to pause the Cozy Sign. **Ex. K** at 110:2-22, 85:7-21; **Ex. H** at 138:11-25, 139:4-18; **Ex. J** at 78:20-25, 79:1; 80:14-24.

21. On February 19, 2024, Plaintiffs filed suit against the City. *See* (ECF 1).

22. Before Mr. Howard even submitted a Sign Permit application, he knew the Cozy Sign, as proposed, was too large to qualify for a sign permit. **Ex. H** at 137:22-25, 138:1-25,139:1-18, 140:2-21, 180:3-14, 181:4-12, 182:7-25, 183:1-13; **Ex. M** (Cozy Sign Permit Application); **Ex. J** at 78:20-25, 79:1; 80:14-24.

23. Not only did the City inform Mr. Howard that the Cozy Sign would not qualify for a sign permit within the 10-day period of § 42-502(b), but the City also understood that Mr. Howard agreed that his sign permit application (submitted on November 13, 2023) would be placed on hold.

**Ex. D** at 229:4-24, 230:1-24, 231:1-25, 232:1-24.

24. The City determined the Cozy Sign was a sign as defined by Salina Code § 42-764 and, more specifically, as "wall sign" as defined by Salina Code § 42-781. **Ex. K** at 82:10-20; **Ex. B** at 10, Resp. to Int. No. 11; **Ex. D** at 63:18-24, 64:1-3, 159:1-25, 160:1-10, 234:13-21, 346:10-16.

25. The City interprets and applies Salina Code § 42-764 to require that subparagraphs (1), (2), and (3) therein be met for any display to be considered a "sign" that is subject to the regulations of the Sign Code. The City has interpreted Salina Code § 42-764 consistently for decades. **Ex. D** at 48:8-16, 50:5-11, 51:6-11, 55:10-24; 62:16-24. **Ex. N** (Dean Andrew 30(b)(6) Depo.) at 11:14-25, 12:1.

26. Applying Salina Code § 42-764, the City determined that the Cozy Sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building." **Ex. B** at 9, Resp. to Int. 11.

27. The Cozy Sign is used to announce, direct attention to, or advertise, and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them. **Ex. B** at 9, Resp. to Int. 11.

28. The City applies the plain language and ordinary use of the words and phrases

"announce," "direct attention to," and "advertise." The City determines whether a display is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event. The City determines whether a display is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window). The City determines whether display is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale. **Ex. B** at 6, Resp. to Int. 5.

29. The City prepared The Cozy Inn Sign Analysis. During the November 13, 2023 meeting with Mr. Howard at the Smoky Hill museum, the City provided The Cozy Inn Sign Analysis to Mr. Howard. **Ex. E** at 112:6-9; Ex. J at 81:4-24; **Ex. O** (Cozy Inn Sign Analysis); **Ex. P (**Michael Schrage Depo.) at 128:6-19.

30. The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing North Seventh Street. The building frontage occupies the entire property line. Thus, the building frontage of the Cozy Inn is 20.8 feet. The City rounded up, calculating the building frontage as 21 feet. Under Salina Code § 42-521(4)(b) the Cozy Inn had 63 square feet of allowable sign area. The City advised Mr. Howard if he wanted to erect the Cozy Sign he could reduce the size of the Cozy Sign down to the remaining 10 square feet, or remove existing signs to try to fit the sign within the allowable 63 square feet. **Ex. K** at 92:15-24, 93:1-16. 94:11-25, 96:3-25, 97:1-

8, 98:1-13, 116:16-25, 117:1-2; **Ex. E** at 117:1-25, 118:19-25, 119:1-9.

31. The Cozy Sign occupies the entirety of the North wall of the Cozy Inn. **Ex. E** at 27:25, 28:1-4; **Ex. Q** (Photo of Cozy Sign at Plaintiffs' Bates 51); **Ex. G** at 2, Stipulated Fact vii (stipulating to Plaintiffs' Bates 51); **Ex. J** at 121:1 and 130:6-8.

32. Prior to constructing the Cozy Sign, the Cozy Inn had three other signs, with a total sign area of 52.88 square feet. At the time of constructing the Cozy Sign, the Cozy Inn had 10.12 square feet of allowable sign area remaining. **Ex. E** at 117:19-25, 118:25, 119:1-9.

33. Using the dimensions of the North wall of the Cozy Inn, the City determined the Cozy Sign was approximately 528 square feet in area. **Ex. K** at 96:3-25, 97:1-8, 98:1-13.

34. Plaintiffs did not administratively appeal the City's determination that the Cozy Sign was a sign and therefore subject to the requirements of the Sign Code. **Ex D** at 234:11-21; **Ex. C** (Salina Code § 42-597).

35. The Cozy Inn sells hamburgers with chopped onions, pickles, ketchup, and mustard, but does not offer any other toppings or condiments. **Ex. H** at 36:9-15, 37:10-25, 38:1-9.

36. The smell of onions is distinct to the Cozy Inn. **Ex. H** at 42:23-25, 43:1-15.

37. The smell of onions at the Cozy Inn "tags" anyone who enters. **Ex. H** at 42:23-25, 43:1-15.

38. According to Mr. Howard the arrow on the Cozy Sign directs people to the entrance of the Cozy Inn. **Ex. H** at 136:2-11.

39. Mr. Howard admitted he could "upsell" better to customers who came inside of the Cozy Inn. **Ex. H** at 41:13-15; 43:22-25, 44:1-4; 48:2-9.

40. The Cozy Sign advertises hamburger, chopped onions, pickles, ketchup, and

mustard. The Cozy Sign directs attention to the front door of the Cozy Inn by way of an arrow that points to the front door of the Cozy Inn. The Cozy Sign announces the infamous onion smell by announcing, "Don't Fear the Small, the Fun is Inside." **Ex. H** at 76:1-14, 136:5-11, 142:20-25, 143:1-25, 144:1-25; **Ex. E** at 82:23-25, 83:1,115:3-10.

41. The City also reviewed the rendering of the Cozy Sign Mr. Howard submitted with the sign permit application, which Mr. Howard alleged was intended to be the final rendering of the Cozy Sign. The City confirmed the display that Mr. Howard intended to be the final rendering of the Cozy Sign was a sign under the Sign Code. **Ex. K** at 108:4-13, 127:22-25, 128:1-22; **Ex. D** at 246:10-16; **Ex. M**; **Ex. Q**.

42. The City, via its Zoning Administrator, reviewed industry specific publications in anticipation of the City of Salina's 2017 amendment to the Sign Code. The 2017 amendment, Ordinance Number 17-108882, was prompted by *Reed v. Town of Gilbert* (the City's Governing Body amended the Sign Code in order to ensure compliance with the First Amendment). The industry specific publications reviewed by the City addressed how signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics. **Ex. A**.

43. The City regulates signs in the aggregate. **Ex. K** at 62:1-2.

44. The City regulates the time, place, and manner of the display of signs. **Ex. D** at 127:1-2; **Ex. K** at 45:10-16.

45. These time, place, and manner regulations limit the size, number, height and location of signs pursuant to the specific zoning district wherein the sign is located. **Ex. K** at 45:10-16, 71:12-16, 72:19-21; **Ex. D** at 127:1-2; **Ex. R** (Mark White Aff'd) at ¶ 6.

46. Regulating the size, number, height, and location of signs helps to reduce clutter,

thereby reducing distractions, keeping visual sight lines for vehicles and pedestrians clear, and ensuring signs remain effective while not holding the eye of viewer for too long. **Ex. K** at 71:12-23.

47. The Sign Code seeks to protect the aesthetics of the community and quality of life, while reducing safety hazards that can result from sign clutter. **Ex. E** at 64:10-18.

48. Eliminating the risk of sign wars--where in order to have more prominent signage businesses compete by erecting additional signs and signs that are larger than the surrounding signs cluttering the area--also protects the aesthetics and safety of the community. **Ex. E** at 60:6-24, 61:2-25, 62:1-18.

49. Excessive amounts of "signage, both in terms of number of signs and size of signs" can become distracting and cause safety problems. **Ex. E** at 121:10-25.

50. The Sign Code seeks a balance by allowing "ample amount of signage for each property" allowing "effective and attractive" signs "without becoming a safety concern." **Ex. E** at 121:23-25, 122:1-2.

51. The Cozy Inn is located in the C-4 district. **Ex. G** at 3, Stipulated Fact viii.

52. In the C-4 District, the number of signs is limited to "four (4) signs per business." **Ex. C** (§ 42-521(4)(b)); **Ex. D** at 131:20-24.

53. In the C-4 District, the size and number limitations are designed to prevent safety problems. **Ex. E** at 62:16-19.

54. The C-4 district is a more pedestrian-oriented area where the buildings are shoulder to shoulder and share common walls. **Ex. E** at 17:7-21.

55. The Sign Code serves compelling and substantial urban planning purposes including

traffic safety and aesthetics. The Sign Code directly and materially furthers its recited purposes, set forth in Salina Code § 42-500. The Sign Code is consistent in practice with the state of the art nationally for how sign regulations interact with decorative building features such as murals. To that end, it is consistent with twenty-one sign and mural regulations in Kansas and Oklahoma, which demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs. **Ex. R** at ¶ 6.

56. The restrictions in the Sign Code are reasonable, generally accepted regulations of the size, number, placement and design of signs. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter. The Sign Code keeps signs in scale with the building's context which furthers the City's aesthetic interests. This is especially important in the historic downtown C-4 district, where the 67% limitation on the total sign area on any building wall or street frontage protects aesthetics and architectural integrity. **Ex. R** at ¶ 6.

57. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas. **Ex. R** at ¶ 6(g).

58. The Cozy Inn communicates via Facebook, branded merchandise worn or used by their customers, community events, radio advertising, banner advertising at indoor football events, billboards, bumper stickers, and a sign similar to the Cozy Sign on the wall of Jenni's Liquors in a nearby town. **Ex. I** at 19:5-25, 20:1-25, 21:1-25, 22:1-2, 23:8-25, 24:1-25, 26:7-25, 27:1-2, 29:12-25, 30:1-25, 59:2-25, 60:1-19; **Ex. H** at 89:11-24, 150:8-24; 213:3-13, 221:25, 222:1-12; **Ex. S**

(Photo from Stephen Howard Deposition Ex. Y).

59. Charles Taylor admitted that prior to construction of the Cozy Sign, the Cozy Inn signs that were already in place were "conspicuous enough," and did in fact "brand the site." **Ex. T** at 177:20-23; 180:1-2 (Charles Taylor Depo.).

60. Mr. Howard was upset about the City's determination that his display was a sign and that it was too large to qualify for a permit. **Ex. I** at 48:4-17.

61. Plaintiffs allege that they do not want to "remove or otherwise restrict" other murals in Salina. *See* (ECF 16 at ¶¶ 50, 72).

62. Plaintiffs contend that "The mural is not an advertisement. Instead, it is an artistic expression intended to tell a story about travel. 'It's not a billboard; it's artwork,' Howard said. 'It's my expression. It's my character going on my wall. I want to paint my wall.'" **Ex. G** at 5.

63. Plaintiffs contend that "The written sign code treats all outdoor murals as wall signs and purports to subject every wall sign to the same size restrictions because all murals are 'displays calculated to attract the attention of the public.'" **Ex. G** at 6

64. Plaintiffs contend that the Cozy Sign depicts, among other things, "burger-esque flying saucers attacking The Cozy Inn with blasts of ketchup and mustard." **Ex. G** at 4.

65. Plaintiffs contend that there is no "factual basis" to support the City's argument that the Sign Code advances its stated interests **Ex. G** at 9.

## III. STANDARD OF REVIEW

"Summary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008) (quoting Fed. R. Civ. P. 56(c)). "A

fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. *Id.* (quotations omitted). The moving party bears the burden of proof. *Id.*

## IV. ARGUMENT

### A. The Complaint Must be Dismissed Because Plaintiffs Lack Standing.

"Article III of the Constitution confines the federal judicial power to 'Cases' and 'Controversies.' Under Article III, a case or controversy can exist only if a plaintiff has standing to sue . . . ." *United States v. Texas*, 599 U.S. 670, 675 (2023). Standing is "a bedrock constitutional requirement . . . ." *Id.* "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *Id.* at 676. The element of redressability requires more than a "'merely speculative' showing that the court can grant relief to redress the plaintiff's injury." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006); *Friends of the Earth, Inc. v Laidlaw Env. Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "[S]tanding concerns the court's subject-matter jurisdiction and may be raised at any time." *Bertels v. Farm Bureau Property & Casualty Ins. Co.*, 123 F.4th 1068, 1074 (10th Cir. 2024).

Plaintiffs insist that the City's definition of "sign" includes all "murals" in the City.[1] Statement of Undisputed Material Fact ("SUMF") No. 63. Yet Plaintiffs specifically (and repeatedly) allege that (although they are challenging the City's regulations on their face), they do not want to "remove or otherwise restrict" those murals. SUMF No. 61.

This Court has held that "Severability will be assumed 'if the unconstitutional part can be severed without doing violence to legislative intent.'" *Clark v. City of Williamsburg, Kansas*, 388

[1] The term "murals" here refers to artistic displays that are located on exterior building walls, but that do not "announce," "direct attention to," or "advertise."

F. Supp. 3d 1346, 1362 (D. Kan. 2019). Salina Code § 1-11 articulates that intent: "If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code." SUMF No. 10. In Kansas, a severability clause "creates a presumption of severability." *City of Wichita v. Griffie*, 544 P.3d 776, 791 (Kan. 2024). However, even if the intentions stated in Salina Code § 1-11 are disregarded, severing any part of the definition of "sign" would simply mean that the sign code would not only continue to apply to Plaintiffs' sign, but also to additional displays that are not currently subject to its provisions. Such a situation would not be ideal, but it certainly would not do "violence to legislative intent." Severability therefore applies as a matter of law.

Consequently, even if Plaintiffs' argument is successful, they are without a remedy. If this Court finds any part of the challenged definition of sign unconstitutional, it is severable, and the resulting scope of what is regulated under the Sign Code would expand due to the severance of limiting language. What remains will be unchallenged, objective numerical size limits that are clearly constitutional. SUMF Nos. 2, 9, 61, 63. Those limitations will continue to preclude the Cozy Sign. *See Advantage Media*, 456 F.3d at 801 (Finding lack of standing to challenge sign regulations because in light of severability principles, "a favorable decision . . . even with respect to those sign code provisions which were factors in the denial of its permit applications would not allow it to build its proposed signs, for these would still violate other unchallenged provisions of the sign code like the restrictions on size, height, location, and setback."); *see also Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 893 (9th Cir. 2007); *Harp Adv. Ill., Inc. v. Village of Chicago Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993). In sum, if Plaintiffs are to be taken at their word

as expressed in the Amended Complaint and Pretrial Order, they will actually be worse off if they prevail than they were when they filed suit. SUMF Nos. 2, 9, 61, 63

Plaintiffs also lack standing to challenge the timing provisions of the Sign Code as an impermissible prior restraint. The Sign Code articulates a brief, specified time for decision-making. SUMF No. 7. Plaintiffs started painting the Cozy Sign without a permit. SUMF No. 15. By the time the permit application was submitted, Plaintiffs were well-aware that the Cozy Sign could not qualify for a sign permit. SUMF Nos. 20, 22, 23. Indeed, their permit application was submitted hours after discussing this issue with City Staff (a discussion supported by The Cozy Inn Sign Analysis), at which time they agreed to have their permit application held in abeyance. SUMF Nos. 20, 22, 23, 29. Because Plaintiffs knew the permit could not presently be issued, and agreed to delayed processing of their sign permit application, Plaintiffs have no cognizable injury-in-fact.

On this record, Plaintiffs have not made the required showing for standing. Consequently, the Complaint should be dismissed in its entirety for want of subject-matter jurisdiction.

**B. <u>The Sign Code is Content-Neutral</u>**

1. *The Sign Code is Content-Neutral on its Face.*

On its face, the Sign Code and definition of "sign" upon which the application of the Sign Code turns, are content-neutral. The City applies the Sign Code as written. SUMF No. 2. Courts look to the text of challenged provisions to determine if they are content-neutral on their face. *See Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163-64 (2015) (looking to the text of the challenged code to determine if its content-neutral) *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1148 (10th Cir. 2020) (looking to the text of the challenged code to determine if its content-neutral). "To find a provision facially unconstitutional, [courts] must conclude that any attempt to enforce such

legislation would create an unacceptable risk of the suppression of ideas.*" Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1246–47 (10th Cir. 2000) (quotations omitted). Under *Reed*, a regulation is content based if: (1) its text draws distinctions among signs based on "the topic discussed or the idea or message expressed"; or (2) if the regulations "cannot be 'justified without reference to the content of the regulated speech,' or . . . were adopted by the government 'because of disagreement with the message [the speech] conveys.'" 576 U.S. 155, 163-64 (2015) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If these two factors are not present, the government may "place restrictions on expression so long as it do[es] not regulate *what* is said, but merely [regulates] such matters as *when, where,* and *how loud*." *Ward v. Utah*, 398 F.3d 1239, 1254 (10th Cir. 2005) (quotations omitted).

A regulation is not content based and subject to heightened scrutiny merely because it requires a reading of the sign to determine who is speaking and what they are saying in order to apply the regulation. *Austin*, 596 U.S. at 69. Rather, a regulation remains "agnostic as to content" when a "reading of the sign" is incidental to the application of a content neutral regulation. *Id*. Indeed, the Supreme Court outright rejected the argument that a sign regulation is unconstitutional because a person must read a display to determine whether the regulation applies--characterizing that approach as "too extreme." *Austin*, 596 U.S. at 69.

Looking to the text of the Sign Code, there is no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. *See Austin*, 596 U.S. at 71; SUMF Nos. 3, 4, 5, 9. The Sign Code is agnostic as to content, and contains only "time, place and manner" restrictions. SUMF No. 3, 4, 5, 9, 44, 45, 53, 56. The definition of sign turns on whether a display is located

outside of a building and is used to "announce, direct attention to, or advertise." SUMF Nos. 3, 24, 25. That limitation, which constrains the application of the Sign Code by ruling out certain architectural embellishments that do not serve these functions, is in keeping with long-established common understandings regarding what signs are. SUMF No. 55. It does not involve content in a constitutional sense (that is, ideas, messages, topics, or viewpoints). Displays that fall within the definition are a "sign" and subject to the Sign Code's size, number, and placement limitations (time, place and manner provisions). Displays that fall outside of the definition of sign" are not signs and are therefore not regulated as such.

The United States Supreme Court determined that a substantially similar sign regulation was content-neutral in the case of *Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 66 (2022). Like Salina Code § 42-764, which subjects a display used to "announce, direct attention to, or advertise" to regulation as a "sign," the City of Austin's regulation also triggered regulation as a "sign" based on whether the display was used to "advertis[e]" or "direct[] persons to." *Austin*, 596 U.S. at 66; SUMF No. 3.

Just like the city officials in *Austin*, who had to read the display to determine if the applicable regulation applied (first, to determine whether a display is a "sign," and second, to determine whether it was an on-premise or off-premise sign), in some circumstances Salina City officials may have to look at a display to determine if it is a Sign. *Austin*, 596 U.S. at 71. But, like in *Austin*, a mere reading of the sign to determine if a regulation applies to it does not make the Sign Code content-based. *Austin*, 596 U.S. at 69. And like the noise regulation upheld as content-neutral by the Tenth Circuit Court of Appeals in *Harmon* (prohibiting "'loud or unusual sounds,' *without reference to the content* of the noise,") the Sign Code merely regulates the time, place, and manner

of the display of signs, but does not concern itself with what a sign *says*. *Harmon*, 981 F.3d at 1148 (quotations omitted) (emphasis added).

The government's purpose in the regulation is also used to assess its content-neutrality. *Harmon*, 981 F.3d at 1148 ("Whether a legislative enactment is content-neutral or instead content-based turns on 'the government's purpose.'"). "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Harmon*, 981 F.3d at 1148 (quotations omitted). Aesthetic and traffic safety purposes are unrelated to the content of the regulated speech. *Stockinger*, 79 F.4th at 1251 (recognizing aesthetic and traffic safety justification as unrelated to content).

Salina Code § 42-500 (purpose statement) enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. SUMF No. 4. The purpose statement does not reference content at all. Instead, it seeks to "promote the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, *content-neutral* and nondiscriminatory sign standards and requirements . . . ." SUMF No. 4. Since the Sign Code addresses only the "time, place, and manner" of speech, and because the Sign Code does not cross any threshold into content based territory, it is content neutral. *See Ward*, 491 U.S. at 791.

2. *The Sign Code is Content-Neutral As-Applied.*

The City applied the facially content neutral Sign Code, as written, to the Cozy Sign. It is "an uncontroversial principle . . . that a plaintiff generally cannot prevail on an *as-applied* challenge without showing that the law has in fact been (or is sufficiently likely to be) unconstitutionally *applied* to him." *McCullen v. Coakley*, 573 U.S. 464, 485 n.4 (2014). An "as-applied challenge

tests the application" of the regulation "to the facts of a plaintiff's concrete case." *Stockinger*, 79 F.4th at 1248-49. Thus, no other display is germane to the Plaintiffs' as-applied challenge. *Id.*

With regard to the Plaintiffs' "concrete case," the City applied the applicable, content-neutral provisions of the Sign Code to their letter when it determined that the Cozy Sign was a "sign" that was too big to qualify for a sign permit. SUMF Nos. 24-27, 29- 33, 35-41. Painting of the Cozy Sign commenced without a sign permit on November 3, 2023. SUMF Nos. 14-15. Three days later, the City reviewed the Cozy Sign that was fully outlined and partially painted on the North wall of the Cozy Inn, determined the Cozy Sign was a sign as defined by Sign Code § 42-764 and, more specifically, as "wall sign" as defined by Salina Code § 42-781 (the characterization of "wall sign" refers to its physical characteristics). SUMF No. 19. It then evaluated the size of the Cozy Sign against objective, numerical size limits of Salina Code § 42-521(4)(b). SUMF Nos. 20, 29-33.

The City determined that the Cozy Sign is a "writing" "pictorial representation" "emblem" "or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building," and therefore qualified as a "sign" under the Sign Code. SUMF Nos. 24-27. Specifically, the Cozy Sign announces the Cozy's infamous smells, directions attention to the building entrance and ordering window, it advertises the hamburgers and toppings available for sale at the Cozy, and it is painted on the outside wall of the building. SUMF Nos. 24-27.

The City was transparent about how it applied the Sign Code to the Cozy Sign, preparing

"The Cozy Inn Sign Analysis" and providing it to Mr. Howard on November 13, 2023. SUMF No. 29. Using the same approach, the City also reviewed the rendering Mr. Howard submitted with Plaintiffs' *post-hoc* sign permit application (submitted after receipt of "The Cozy Inn Sign Analysis"), which included a rendering that Mr. Howard alleged was the final rendering of the Cozy Sign. SUMF. No. 41. The City confirmed the final rendering of the Cozy Sign also depicted a sign that would be regulated by the Sign Code. *Id*.

The City's determination that the Cozy Sign is too big to qualify for a permit was based on objective content neutral standards. In the C-4 District where the Cozy Inn is located, the total allowable sign area is limited to three square feet for each linear foot of building frontage. SUMF. Nos. 9, 51, 52. The Cozy Inn has 21 feet of building frontage, so it is limited to 63 square feet of sign area in the aggregate. SUMF No. 30. Of that, three signs totaling 52.88 square feet of sign area were already in place, leaving 10.12 square feet of available sign area for additional signage. SUMF No. 32. The Cozy Sign takes up the entire North wall of the Cozy Inn, so the City estimated the size of the Cozy Sign by taking the height of the building (obtained from software available to the City) and the length of the North wall, concluding that the sign is approximately 528 square feet in area--more than 52 times the area that remained for additional signage. SUMF No. 30-33.

As such, on November 6, 2023, the City contacted Mr. Howard and asked him to pause the Cozy Sign, advising him that the Cozy Sign was a sign under the Sign Code, it needed a sign permit, and it was too big to qualify for a sign permit as proposed. SUMF No. 20. The City met with Mr. Howard again on November 13, 2023. SUMF No. 29. At that meeting, the City provided him with The Cozy Inn Sign Analysis. *Id*. Plaintiffs did not administratively appeal these determinations. SUMF No. 34.

The undisputed material facts show that Sign Code was applied as written to Plaintiffs. Thus, the Sign Code on its face, and as applied to Plaintiffs, is a content-neutral regulation.

3. *Plaintiffs Misconstrue the Definition of Sign.*

Plaintiffs allege a different interpretation of the City's definition of "Sign." Under Plaintiffs' interpretation of § 42-764, a sign is *anything* that is "calculated to attract the attention of the public." SUMF No.63. That interpretation is absurd, ignores the plain language of § 42-764, is not how the City interprets § 42-764, and is not how the City applied § 42-764 to the Cozy Sign. Statutory construction begins with "the plain language of the law." *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir. 1991). Indeed, "absent ambiguity or irrational result, the literal language of a statute controls." *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir.1986). Words must be construed in their "ordinary, everyday sense." *Crane v. Commissioner*, 331 U.S. 1, 6 (1947). "In ascertaining the plain meaning," the court "must look to the particular . . . language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988). The Court must "choose the reasonable result over the 'absurd' one." *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006).

Here, the plain language of the definition of sign is limited in application to only those displays (and "any other figure[s] of similar character") that are "a structure or any part thereof, or a portable display, or [are] attached to, painted on, or in any other manner represented on a building or other structure or on the ground," are "used to announce, direct attention to, or advertise," and are "not located inside a building." SUMF No. 3. The City interprets and applies Salina Code § 42-764 to displays and requires that subparagraphs (1), (2), and (3) be met to be a sign pursuant to the Sign Code. SUMF No. 25. The City's consistent and reasonable construction of the definition of

the term "sign," which was applied to Plaintiffs' sign in a content neutral way, is both constitutionally sound and supported by common understandings and long experience.[2] *Id*.

Plaintiffs' argument that the three subparagraphs of § 42-764(1)-(3) apply only to "any other figure of similar character" is a fundamentally incorrect take on the plain text, and one that robs it of common sense. For example, Plaintiffs' construction of the definition of sign would result in sign permit requirements for displays *inside of buildings*. Yet Plaintiffs' interpretation does not alter the content-neutrality analysis. The text of the Sign Code remains content neutral. Even if Plaintiffs have the correct interpretation, they are without relief that would address their alleged injury. See IV.A. and IV.B., *supra*. If all displays are "signs," the legal status of Plaintiffs' display would not change--it would still be a sign that is too large to qualify for a permit.

### C. The Sign Code Passes Intermediate Scrutiny

Because the Sign Code is content neutral, the applicable test is "intermediate scrutiny." *Ward,* 491 U.S. at 797. The Court decides as a matter of law whether the content-neutral Sign Code passes intermediate scrutiny. *Harmon*, 981 F.3d at 1148-49. The intermediate scrutiny test consists of three prongs: (1) the governmental interests must be substantial (2) the regulation must advance those interests in a manner that "would be achieved less effectively absent the regulation"; and (3) the regulation must leave open "ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791, 799 (quotation omitted).

As to the first prong, like thousands of other local governments, Salina's City Commission has determined that its Sign Code advances its substantial content-neutral interests of aesthetics, traffic and pedestrian safety, and property values. SUMF Nos. 3, 4, 42. Salina Code § 42-500

[2] *Sign*, MERRIAM-WEBSTER DICTIONARY (https://www.merriam-webster.com/dictionary/signs)

enumerates the City's governmental interests. SUMF No. 4. The City's interests in aesthetics and traffic safety are substantial government interests that are content neutral as a matter of law. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 The City's interests in property values (and, again, aesthetics) are "substantial" and "legitimate." *Taxpayers for Vincent*, 466 U.S. at 795. Sign clutter is akin to a "visual assault," and is therefore a "significant substantive evil within the City's power to prohibit." *Taxpayers for Vincent*, 466 U.S. at 807-08.

As to the second prong, the narrowly tailored requirement is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. Put another way, although the City submits that the Sign Code advances all its stated interests, the City need only show that the Sign Code advances one of its substantial government interests in order to pass intermediate scrutiny review. Additionally, the narrowly tailored requirement does not require the regulation be "the least restrictive or least intrusive means" of regulation. *Id*. at 798.

"Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43 (1994). In addressing these concerns, the City regulates the time, place and manner of the display of signs by limiting their size, number, height, and location based on the specific zoning district wherein individual signs are located. SUMF Nos. 44-46, 52-56. Time, place, and manner restrictions like these *per force* address the "distinct safety and esthetic challenges" posed by signs. *Austin*, 596 U.S. at 64, 71, 75. The United States Supreme Court defers to "common-sense judgments of local lawmakers" in determining such things as the traffic safety "hazards" presented by signs. *Metromedia*, 453 U.S. 508-509. It is axiomatic that regulating the

time, place and manner of the display of signs is more effective at advancing traffic safety, aesthetics, and property values than not regulating them.

As to the third prong, "ample alternatives," "[t]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). An alternative mode of communication is constitutionally adequate if the speaker's ability to "communicate effectively" is not "threatened." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).

Plaintiffs have ample alternative channels to communicate the information. First, the Sign Code regulates signs, but it does not prohibit them. Indeed, The Cozy Inn currently has three other signs installed on the building that are not at issue in this case. SUMF No. 32. These signs announce the Cozy Inn and advertise the hamburgers it sells. SUMF Nos. 32, 58. Plaintiffs' proffered expert admitted that they were "conspicuous enough" and served to "brand the site." SUMF No. 59. Since there is room for just over 10 square feet of additional signage under the Sign Code, Plaintiffs could simply reduce the size of the Cozy Sign to an allowable size so that the City could legally issue a sign permit for it. SUMF No. 30. Second, in addition to signage on its building, the Cozy Inn also uses a number of other alternative channels to communicate information, including Facebook, branded merchandise worn or used by their customers, community events, radio advertising, banner advertising at indoor football events, billboards, bumper stickers, and a sign similar to the Cozy Sign located at Jenni's Liquors in a nearby town. SUMF No. 58. The Sign Code, therefore, satisfies the third prong of intermediate scrutiny.

In sign cases it is common for courts at all levels to not require evidence beyond the text of

the regulation itself to determine if intermediate scrutiny is satisfied. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."); *StreetMediaGroup, LLC v. Stockinger, 1:20-CV-03602-RBJ, 2021 WL 5770231, at *5 (D. Colo. Dec. 6, 2021), aff'd, 79 F.4th 1243 (10th Cir. 2023)* ("state's interest in promoting safe driving alone satisfies the narrow-tailoring requirement . . . the state would less effectively prevent these crashes if it took down signs after they caused motor accidents instead of establishing a prophylactic permitting scheme."); *StreetMediaGroup, LLC v. Bd. Of Cnty. Comm'rs*, No. 21-CV-1232-RMR-KLM, 2023 WL 5613018 (D. Colo. Mar. 30, 2023) ("Plaintiffs argue that the County should be required to produce specific evidence that the Regulations actually relate to and advance the County's aesthetic and traffic goals. But the question before the Court is whether the Regulations directly advance the County's interests in traffic safety and aesthetics, not whether each provision of the Regulations is absolutely necessary to do so."). Despite this legal precedent, Plaintiffs contend the City must present evidence to support the City's arguments with regard to how the Sign Code advances its stated interests, and that there is no "factual basis" for such support. SUMF No. 65.

Yet even if this Court determines that additional evidence is necessary to support a holding that the Sign Code survives intermediate scrutiny, the summary judgment record demonstrates that the Sign Code advances aesthetics, traffic and pedestrian safety, and property values. To that end, the summary judgment record includes the following evidence: (1) industry specific publications the City considered; (2) testimony of City staff (who have extensive education and experience in

planning and sign regulations) (SUMF Nos. 11-12); and (3) expert testimony of Mark White.

The City, via its Zoning Administrator, reviewed industry specific publications in anticipation of the City of Salina's 2017 amendment of its Sign Code. SUMF No. 42. The 2017 amendment, Ordinance Number 17-108882, was prompted by *Reed v. Town of Gilbert*. *Id*. In response to *Reed*, the City's Governing Body amended the Sign Code to ensure compliance with First Amendment requirements. *Id*. The industry specific publications reviewed by the City at that time included material about how signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics. *Id*.

The Sign Code seeks to protect the aesthetics of the community and quality of life, while reducing safety hazards that can result from sign clutter. SUMF No. 47. Eliminating the risk of "sign wars"--where in order to have more prominent signage businesses compete by erecting additional signs and signs that are larger than the surrounding signs, cluttering the area--also protects the aesthetics of the community and the safety of motorists and pedestrians. SUMF No. 48. Excessive amounts of "signage, both in terms of number of signs and size of signs" can become distracting and cause safety problems. SUMF No. 49. The Sign Code seeks a balance by allowing "ample amount of signage for each property" allowing "effective and attractive" signs "without becoming a safety concern." SUMF No. 50. In the C-4 District, where the Cozy Sign is located, the size and number limitations are designed to prevent safety problems. SUMF Nos. 52, 54. Regulating the size, number, height, and location of signs helps to reduce clutter, thereby reducing distractions, keeping visual sight lines for vehicles and pedestrians clear, and ensuring signs remain effective while not holding the eye of viewer for too long. SUMF No. 46.

The Sign Code is consistent in practice with the state of the art nationally for how sign

regulations interact with decorative building features such as murals. SUMF No. 55. To that end, it is consistent with twenty-one sign and mural regulations in Kansas and Oklahoma, which demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. *Id*. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs. *Id*. The Sign Code directly and materially furthers its recited purposes in Salina Code § 42-500. *Id*. The Sign Code keeps signs in scale with the building's context, which furthers the City's aesthetic interests. SUMF No. 56. This is especially important in the historic downtown C-4 district, where the 67 percent limitation on the total sign area on any building wall or street frontage protects aesthetics and architectural integrity. *Id*.

Although the Court need not rely on evidence outside the text of the Sign Code to determine if the Sign Code passes intermediate scrutiny, the summary judgment record is replete with evidence justifying how the Sign Code advances the City's substantial government interests in aesthetics, traffic and pedestrian safety, and property values. Thus, summary judgment in the City's favor on Plaintiffs' content-based claims is appropriate.

**D. The Sign Code Does Not Constitute an Impermissible Prior Restraint**

Prior restraints "are not unconstitutional per se." *Se. Promotions, LTD v. Conrad*, 420 U.S. 546, 558 (1975). They are permissible if the permitting system includes "procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Id.* at 559. Prior restraints consist of two procedural safeguards: (1) timing and (2) limitations upon discretion. The general rules is that a brief, specified time period for decision-making that allows for prompt judicial review is required. *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1253 (10th Cir. 2000). However, persuasive case law from the Ninth Circuit has found that procedural safeguards regarding timing

"are not required for content-neutral time, place, and manner" regulations. *Epona v. Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017) (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322-23 (2002)). The prior restraint doctrine also requires "standards limiting the licensor's discretion." *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

Respecting the timing procedural safeguard (if applicable to the City's content-neutral time, place, and manner regulations), Salina Code § 42-502(b) provides a sign permit must be issued or refused within 10 days after receipt of an application, or within such further period as may be agreed to by the applicant. SUMF No. 7. That is both "brief" and "specified," so it meets constitutional requirements on its face.

As-applied, the City asked Plaintiffs to pause the painting of the Cozy Sign within three days after Plaintiffs started the work. SUMF No. 14, 15, 19, 20. At that time, Plaintiffs had not even sought a permit. SUMF No. 15. The City promptly told Plaintiffs that the Cozy Sign would not qualify for a permit because: (1) it was a sign; and (2) it was too big. SUMF No. 20. Consequently, before Mr. Howard even submitted a Sign Permit application, he already knew that the Cozy Sign, as proposed in his application, was too big to qualify for a sign permit. SUMF No. 22.

Not only did the City inform Mr. Howard that the Cozy Sign would not qualify for a sign permit within the 10-day period of Salina Code § 42-502(b), but the City also understood and Mr. Howard agreed that his sign permit application, which he submitted on November 13, 2023, would be held in abeyance. SUMF No. 23. That is an "agreement by the applicant" under Salnia Code § 42-502(b). SUMF No. 7.

But even if Mr. Howard had not agreed to hold the application in abeyance, the sign permit application was submitted seven days after he was asked to pause the Cozy Sign, and just hours

after he received The Cozy Inn Sign Analysis. SUMF Nos. 19-20, 22-23. The City did not need to again inform Mr. Howard about what he already knew--the sign he had painted (and subsequently applied for a permit) was too big, and the City could not legally issue a sign permit for it. SUMF No. 20. Holding the application was a courtesy, not a violation of his First Amendment rights. Moreover, approximately three months later, Mr. Howard filed this lawsuit. SUMF No. 21. On its face and as-applied, the Sign Code includes the proper procedural safeguard with regard to timing of decision-making.

Respecting the safeguard of limiting the "licensor's discretion," one standard in the Sign Code is whether the display (among other possible things) "advertises." SUMF No. 3. That standard is ubiquitous in sign regulations. *See Austin,* 596 U.S. at 64-65. It is also constitutionally sufficient. It is particularly clear when the advertisements pertain to "goods or services for sale." Consider the strikingly similar case of *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012). In *Wag More Dogs*, a doggy day care facility painted a "mural" on an exterior wall that faced a municipally owned dog park. *Id*. at 363. The "mural" depicted "happy cartoon dogs, bones, and paw prints," and incorporated some of the cartoon dogs from the logo. *Id*. Wag More Dogs argued, *inter alia*, that the display was not an "advertisement," but instead "noncommercial speech." *Id*. at 369. The Fourth Circuit was not persuaded. It held that the display was commercial speech because it "was meant to attract customers," it included dogs from the company's logo (which, it held, was "<u>analogous to referencing a specific product</u>"), and it sought to create goodwill with potential customers. *Id*. at 370 (emphasis added).

With respect to Plaintiffs' prior-restraint claim, the Sign Code, on its face, does not promote arbitrary enforcement because it provides sufficient standards to limit the City and its officials'

discretion. The Sign Code has numerous procedural safeguards including avenues for variances and appeals to resolve issues with the City. SUMF No. 34. Further, the standard in the Sign Code is whether the display:

> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.

SUMF No. 3. City staff under the supervision of the Zoning Administrator are capable of determining whether the structure or display is attached to, painted on, or represented on a building or other structure or on the ground. SUMF No. 28. City staff under the supervision of the Zoning Administrator are capable of determining whether a display announces, directs attention to, or advertises. *Id*. The City has been interpreting the definition of sign consistently for decades. SUMF No. 25.

As applied, on this record it is clear that the City applied the plain language and ordinary use of the words and phrases "announce, direct attention to, or advertise." The word "advertise" is widely used in defining "sign" for regulatory purposes. The Cozy Sign plainly "advertises." SUMF Nos. 31, 35-41. That is particularly clear since the advertisement pertains to or references goods or services for sale. *Id*. "Building" is also a defined term in the Salina Code, and City staff under the supervision of the zoning administrator are capable of determining when a display is "not located inside of a building." SUMF Nos. 8, 28. On their face and as-applied, the criteria of the Sign Code constrain the discretion of the decision-maker and therefore do not constitute an impermissible prior restraint. Summary judgment in favor of the City is proper.

**E. <u>The Sign Code Also Passes the Commercial Speech Test.</u>**

Assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and

displays that are not signs based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a content-based distinction. If the regulation is of commercial speech, then the commercial speech test set out in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of NY*, 447 U.S. 557, 564-67 (1980) applies.[3]

Commercial speech is an advertisement that refers to a particular product, whose speaker has an economic motivation. *See Bolger v. Youngs Drug Prod. Corp*., 463 U.S. 60, 66-67 (1983); *Wag More Dogs*, 680 F.3d at 363, 370. Commercial speech enjoys "a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values." *Bd. of Tr. of State Univ. of New York v. Fox*, 492 U.S. 469, 477 (1989). Regulations that differentiate between commercial and noncommercial speech, without more, are not content based. *See Metromedia v. San Diego,* 453 U.S. 490, 504-06 (1981). Under the commercial speech test, regulations "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)). The test is strikingly similar to the intermediate scrutiny applied to content neutral regulations. *See Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021). However, unlike the intermediate scrutiny test examined in Section IV.C., *supra*, as-applied commercial speech challenges are not justiciable. *See U.S. v. Edge Broad. Co*., 509 U.S. 418, 431 (1993).

Nothing in *Reed* (which dealt only with content based classifications of noncommercial speech) or *Austin* prohibits the City from regulating commercial speech differently from

---

[3] This test is also referred to as "intermediate scrutiny," but for clarity, this brief will refer to it as the "commercial speech test."

noncommercial speech. The constitutional command is simply that commercial speech cannot be favored over noncommercial speech. *See Metromedia*, 453 U.S. at 504-06.

The Cozy Sign displays commercial speech. SUMF Nos. 31, 35-40. While Plaintiffs seek to have the commercial speech doctrine overturned, Supreme Court precedent controls that question, and such precedent has outright rejected overturning the commercial speech doctrine. *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980); *Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021). Here again, Plaintiffs do not consider the consequences of their demands. The "commercial speech doctrine" what the Supreme Court had previously determined was unprotected speech, and is therefore arguably the only First Amendment protection that commercial speech has. *See generally, Valentine v. Chrestensen*, 316 U.S. 52 (1942).

For lawful, non-misleading speech, the commercial speech test requires substantial governmental interests, direct advancement of those interests, and narrow tailoring. The City's asserted aesthetic, traffic safety, and property values interests are substantial as a matter of law. *Metromedia*, 453 U.S. at 508; *Taxpayers for Vincent*, 466 U.S. at 807; *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th at 1251. The City's interests are directly advanced and narrowly tailored. SUMF Nos. 42-56; IV.C., *supra*; *See Metromedia*, 453 U.S. at 508 ("we reject appellants' claim that the ordinance is broader than necessary and, therefore, fails the fourth part of the *Central Hudson* test. If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all

billboards, but allows onsite advertising and some other specifically exempted signs."). Consequently, the Sign Code passes the commercial speech test.

Indeed, the Sign Code allows for a generous amount of commercial signage. By way of illustration (since as-applied commercial speech challenges are not justiciable), prior to Plaintiffs' decision to paint the Cozy Sign, the Cozy had not fully utilized its sign allowance. SUMF No. 32. According to Plaintiffs' proffered expert, at that time the Cozy Inn already had "enough" signs in place to be conspicuous and "brand the site and enhance the store image." SUMF No. 59. If this Court determines that the commercial speech test is appropriate and applicable, summary judgment in favor of the City is appropriate.

**F. The Sign Code is Not Unconstitutionally Vague.**

An ordinance is "unconstitutionally vague for one of two reasons: it either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or it 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Dr. John's, Inc. v. Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006) (quotation omitted). The task of identifying business advertising, is a "very basic test" that is "not unconstitutionally standardless or vague . . . ." *Wag More Dogs, LLC*, 795 F. Supp. 2d at 390. The vagueness doctrine is not based on "the mere fact that close cases can be envisioned." *United States v. Williams*, 533 U.S. 285, 305-06 (2008). "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

Ordinarily, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot

complain of the vagueness of the law as applied to the conduct of others.'" *U.S. v. Williams*, 553 U.S. 285, 304 (2008) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 494–495, n. 6 and 7 (1982)). However, the Supreme Court has "relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech." *Id*. As a matter of law, Plaintiffs cannot avail themselves to that relaxed standard because their display is commercial speech, and "the overbreadth doctrine does not apply to commercial speech." *Hoffman Estates*, 455 U.S. at 497.

Yet even if this challenge is available to Plaintiffs, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. SUMF Nos. 28, 57.

During depositions, both Howard and Windholz testified that they had not read the Sign Code and did not attempt to read the Sign Code. SUMF Nos. 16-18. The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases enumerated by Plaintiffs that are not used, and are simply not pertinent to the City's objective, content-neutral approach to identifying and regulating signs. Urban planning and zoning industry standards do not require a definition to be codified for every single word in a Sign Code to ensure understanding of its meaning and methodology. SUMF No. 57.

As Plaintiffs' commercial speech is clearly within the scope of the City's regulation, Plaintiffs cannot be heard on their vagueness claim against the Sign Code. But even if they could, the Sign Code provides clear standards that ordinary people can understand and, therefore, does not

encourage arbitrary enforcement. Consequently, the Sign Code is not impermissibly vague, and summary judgment in favor of the City on the Plaintiffs' vagueness claim is proper.

## V. CONCLUSION

For the above stated reasons, the Court should enter judgment in the City's favor on all claims, declare the Sign Code constitutional, and enter final judgment against Plaintiffs. Alternatively, this Court should dismiss Plaintiffs' Amended Complaint because Plaintiffs lack standing and the Court is therefore without subject-matter jurisdiction.

Dated this 7th day of February, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I caused the foregoing **BRIEF IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**INDEX OF EXHIBITS TO
DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT**

Exhibit A – Dean Andrew Affidavit with Affidavit Exs. 1 and 2

Exhibit B – City's Responses to Plaintiffs' First Set of Interrogatories

Exhibit C – Relevant Sections of Salina Municipal Code

Exhibit D – Dean Andrew Deposition Excerpts

Exhibit E – Dustin Herrs Deposition Excerpts

Exhibit F – Dustin Herrs Affidavit

Exhibit G – Amended Pretrial Order (ECF 101)

Exhibit H – Stephen Howard Deposition Excerpts

Exhibit I – Andrea Windholz Deposition Excerpts

Exhibit J – Colin Benson Deposition Excerpts

Exhibit K – Dustin Herrs 30(b)(6) Deposition Excerpts

Exhibit L – Photo of Cozy Sign (Plaintiffs Bates 58)

Exhibit M – Sign Permit Application

Exhibit N – Dean Andrew 30(b)(6) Deposition Excerpts

Exhibit O – Cozy Inn Sign Analysis

Exhibit P – Michael Schrage Deposition Excerpts

Exhibit Q – Photo of Cozy Sign alleged Final Rendering (Plaintiffs Bates 51)

Exhibit R – Mark White Affidavit with Affidavit Ex. 1

Exhibit S – Photo of sign at Jenni's Liquors (Exhibit Y to S. Howard Depo.)

Exhibit T – Charles Taylor, Ph.D. Deposition Excerpts

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |

**AFFIDAVIT OF DEAN ANDREW**

I, Dean Andrew, Zoning Administrator for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2. I am the City of Salina Zoning Administrator. I have held this position since 2009.

3. The City regulates signs pursuant to Chapter 42 Article X of the Salina Code of Ordinance, along with related definitions in Chapter 42 Article XIV.

4. The documents attached hereto as Affidavit Exhibit 1 are in my file as the Zoning Administrator and were considered by me in anticipation of the City of Salina's 2017 amendment to the sign code, set forth in Ordinance Number 17-10882.

5. Ordinance Number 17-10882 is attached hereto as Affidavit Exhibit 2.

6. Affidavit Exhibit 1 documents include:

EXHIBIT A

i. The Cardozo Law Review article entitled "Art or Signage?: The Regulation of Outdoor Murals and the First Amendment" [bates stamped CITY000673-702].

ii. Rocky Mountain Sign Law Blog article entitled "San Diego's Motion for Summary Judgment Granted in Mural Case" [bates stamped CITY001510-511].

iii. Relevant pages of the APA National Planning Conference presentation on "Regulating Digital Signs and Billboards" [bates stamped CITY001585, 1600-01, 1615-17

7. As stated in Ordinance Number 17-10882, the *Reed v. Town of Gilbert* decision prompted the Governing Body of the City of Salina to amend Article X, Chapter 42 of the Salina Code (referred to as the "Sign Code") in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City.

Signed: Dean Andrew
Dean Andrew

STATE OF Kansas )
) ss.
COUNTY OF Saline )

Subscribed and sworn to before me by Dean Andrew on the 7th day of February, 2025.

Witness my hand and official seal. My commission expires: 4/29/2028

(Seal)
SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4/29/2028

Shandi L Wicks
Notary Public

# Regulating Digital Signs and Billboards (S606)

Sponsored by *Zoning Practice*

APA National Planning Conference
Tuesday, April 28, 2009

ANDREW AFFIDAVIT EX. 1

CITY001585

# Driver Distraction #1 Cause of Crashes

| **Causal Category** | **Percentage of Drivers Contributing to Causation** |
|---|---|
| Driver Distraction | 22.7 |
| Vehicle Speed | 18.7 |
| Alcohol Impairment | 18.2 |
| Perceptual Errors | 15.1 |
| Decision Errors | 10.1 |
| Incapacitation | 6.4 |
| Other | 8.8 |

Source: National Highway Traffic Safety Administration, 2001; 2006.

# Specific Distraction: % of Drivers

| | |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.4 |
| Other device in vehicle | 2.9 |
| Adjusting vehicle/temp | 2.8 |
| Eating or drinking | 1.7 |
| Dialing/using cell phone | 1.5 |
| Smoking | 0.9 |
| Other distraction | 25.9 |
| Unknown distraction | 8.6 |



CITY001601

# Goals and Purpose

- The statement of purpose includes promoting traffic safety and community aesthetics. We look to the legislative body's statement of intent.

# Narrow Tailoring

- Concord's interests in traffic safety and community aesthetics would be achieved less effectively without the prohibition.

# Need for Studies

- NJI argues that Concord must perform studies to uphold the ban. Concord was under no obligation to do such studies or put them into evidence.

# Rocky Mountain Sign Law Blog

Regulatory, Best Practices and Other First Amendment News from Colorado's Leading Land Use Law Firm

## San Diego's Motion for Summary Judgment Granted in Mural Case

By Brian J. Connolly on May 1, 2017

In a **case that we reported on last year**, a federal district court in California granted summary judgment in favor of the City of San Diego in a case involving art murals.

Some of the facts of the case are reported in our prior post. The San Diego sign code exempts from permitting "[p]ainted graphics that are murals, mosaics, or any type of graphic arts that are painted on a wall or fence and do not contain copy, advertising symbols, lettering, trademarks, or other references to the premises, products or services that are provided on the premises where the graphics are located or any other premises." Otherwise, all signs visible from the right of way are required to obtain a permit, and signs on city-controlled property must obtain a permit as well. Messages on city-controlled property are limited to on-premises speech and "public interest" messages. As we previously noted, the plaintiff, a mural company, was granted approval to place two wall murals in San Diego, but

received a violation for the placement of a third mural. The plaintiff believes that the annual Comic-Con event was given special treatment by the city, because certain signs posted around the city during the event were not issued citations.

On the city's motion for summary judgment, the court treated the signs in question as commercial speech and analzyed the regulations under the *Central Hudson* test, finding that the regulations easily passed constitutional muster. In the court's view, the city had established that its interests in optimizing communication and aesthetics were substantial, and that the restrictions directly advanced these interests without going further than necessary. The court did not provide any analysis to support its conclusion that the speech in question was commercial. In response to the plaintiff's arguments that the mural exception undermined the city's asserted interests, the court disagreed. And consistent with other lower courts' recent holdings, the court rejected the plaintiff's argument that *Reed v. Town of Gilbert* had invalidated the on-premises/off-premises distinction.

Furthermore, responding to the plaintiff's claims that the San Diego sign code was unconstitutionally vague, the court, while noting that "the sign ordinance at issue is far from a paragon of clarity," found that the mural exception, public interest exception, and on-premises/off-premises distinction were sufficiently clear. The court also rejected the plaintiff's prior restraint, selective enforcement, due process, and intentional interference with prospective business advantage claims.

**ArchitectureArt, LLC v. City of San Diego, ___ F. Supp. 3d __, 2017 WL 1226913 (S.D. Cal. Jan. 6, 2017).**

# ART OR SIGNAGE?: THE REGULATION OF OUTDOOR MURALS AND THE FIRST AMENDMENT

*Christina Chloe Orlando*†

## TABLE OF CONTENTS

INTRODUCTION ....................868
I. BACKGROUND ....................871
A. *Sign Regulation* ....................871
1. Community Aesthetics and Traffic Safety ....................872
2. Content Neutrality ....................872
B. Metromedia, Inc. v. City of San Diego ....................874
C. *Post-*Metromedia *Developments in Free Speech Law* ....................876
II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION ....................879
A. *Sources of Inconsistency in Mural Case Law* ....................881
1. Defining Commercial Speech ....................881
2. Analyzing Content Neutrality ....................882
B. *Eliminating the Commercial/Noncommercial Speech Distinction* ....................885
1. Constitutional Flaws ....................885
2. Classifying Mural Speech ....................889
3. Classifying Mural Art ....................890
4. Murals as Art ....................892
III. A MODEL FOR REGULATING OUTDOOR MURALS ....................893
CONCLUSION ....................896

† Senior Articles Editor, *Cardozo Law Review*. J.D. Candidate (May 2014), Benjamin N. Cardozo School of Law; A.B., Harvard University, 2011. Many thanks to Professor Stewart Sterk for suggesting this topic and providing invaluable guidance throughout the research and writing process.

## INTRODUCTION

Sally Business Owner runs a successful flower and gift shop in a vibrant suburban town. She sells a wide variety of flowers and related items, including vases and balloons. One day, after deciding that she wants to give her shop a makeover, Sally commissions a local artist to paint a tasteful mural of colorful flowers on the exterior wall of her building. The mural covers the entire wall. Sally believes the mural to be a beautiful piece of art[1] that the community will greatly enjoy. The following week, Sally receives a notice from Wanda Zoning Administrator. According to the notice, Sally's flower mural is in violation of the town sign ordinance that prohibits any outdoor "sign" from exceeding sixty square feet. Because Sally's mural contains flowers and the mural is painted on a commercial shop that sells flowers, the mural qualifies as "advertising" and falls under the ordinance's definition of "sign."[2] Wanda notes that if the mural contained anything other than flowers, such as panda bears or palm trees, it would be deemed art rather than signage. Wanda orders Sally to remove the mural, or else face a hefty fine. Sally is perplexed, and believes that the zoning board has intruded upon her right to free speech.

---

1 The word "art," as used in this Note, indicates concrete works of visual art, such as paintings or sculptures. It does not include other art forms, such as films or productions of the performing arts.

2 This hypothetical is based on an earlier version of Arlington County's zoning ordinance at issue in *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012), discussed *infra*. That version of the ordinance defined a "business sign" as a sign "identifying the products or services available on the premises or advertising a use conducted thereon." *See id.* at 362 (internal quotation marks omitted) (citing ARLINGTON COUNTY, VA., ZONING ORDINANCE § 34(G)). Arlington County's current zoning ordinance exempts certain works of visual art (including murals) from regulation as signage; to be exempted, artwork cannot include a "picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the wall is located." ARLINGTON COUNTY, VA., ZONING ORDINANCE § 13.2.3(C)(2)(e) (2013). In other words, the artwork cannot contain "commercial speech." Many municipalities throughout the country have substantially similar language in their sign ordinances. *See, e.g.*, TEMECULA, CAL., MUNICIPAL CODE § 17.28.050(U) (2013) (exempting works of art from sign regulations only if they do not convey a commercial message); ST. PETERSBURG, FLA., CITY CODE § 16.40.120.19 (2013) (defining artwork as "drawings, pictures, symbols, paintings . . . or sculpture, which does not in any way identify a product, service or business sold or available on the premises"); MARION COUNTY, IND., REV. CODE § 734-501(b) (2012) (defining a mural as "[a] design or representation painted, drawn or similarly applied on the exterior surface of a structure and which does not advertise a business, product, service, or activity"); MINNEAPOLIS, MINN., ZONING CODE § 520.160 (2013) (defining a mural as "[a] work of graphic art painted on a building wall, which contains no commercial advertising or logos, and which does not serve to advertise or promote any business, product, activity, service, interest or entertainment"); LAS VEGAS, NEV., ZONING CODE § 19.14.030(B)(4) (2010) (exempting works of art "that do not include a commercial message and are not symbolic of . . . commercial activities taking place on the premises on which the graphic is located").

Sally's belief is not unfounded. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."[3] This restriction extends to state and local government through the Due Process Clause of the Fourteenth Amendment[4] and plays a fundamental role in a municipality's regulation of outdoor signage.[5] While a municipality may place general time, place, and manner restrictions[6] on outdoor signage in order to preserve community aesthetics and ensure traffic safety, it may not discriminate against signage that promotes a certain viewpoint or contains certain content.[7]

The regulation of outdoor art murals[8] as signage is a recent phenomenon.[9] To date, only four courts have expressly analyzed the constitutionality of regulating mural art pursuant to the terms of a municipal sign ordinance.[10] Although mural law is still in its infancy, the convoluted status of the limited case law has led to "a war . . . a real

---

3 U.S. CONST. amend. I.

4 U.S. CONST. amend. XIV, § 1; *see* Gitlow v. New York, 268 U.S. 652, 666 (1925) ("[F]reedom of speech and of the press—which are protected by the First Amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."); Lovell v. City of Griffin, Ga., 303 U.S. 444, 450 (1938) ("It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the [Fourteenth] amendment.").

5 For a general overview of the relationship between free speech law and outdoor signage, see DANIEL R. MANDELKER, FREE SPEECH LAW FOR ON PREMISE SIGNS (2012).

6 *See generally* 16B C.J.S. *Constitutional Law* § 828 (2012) (defining this term and providing case examples illustrating its application).

7 *See infra* Part I.A.

8 This Note focuses solely on murals that are independently commissioned. Cities throughout the United States have programs that allow for, and encourage, the public display of outdoor murals. *See, e.g.*, CITY PHILA. MURAL ARTS PROGRAM, http://www.muralarts.org (last visited Oct. 27, 2013); *Mural Program*, BEAVERTON ARTS COMMISSION, http://www.beavertonarts.org/index.aspx?NID=122 (last visited Oct. 27, 2013); *Public Art Murals Program*, REGIONAL ARTS & CULTURE COUNCIL, http://www.racc.org/public-art/mural-program (last visited Oct. 27, 2013); *Public Art Program*, CITY PASADENA, http://www.ci.pasadena.ca.us/arts/public_art_program (last visited Oct. 27, 2013). These public art mural programs are designed, in part, to enhance local aesthetics and foster community appreciation of the arts. Because municipalities implement and control these programs, issuing mural design guidelines to ensure adherence to local zoning requirements, zoning violations are rarely a concern.

9 *See* MANDELKER, *supra* note 5, at 69 ("Sign ordinances regulate a wide variety of [outdoor] signs, and some of the unique and/or specialized types of signs include digital signs, portable signs, . . . murals," and sculptures). For a brief overview of a dispute involving regulation of a "unique" type of sign, see Frederick Melo, *St. Paul City Council: Creative Kidstuff Wins Zoning Appeal for Sculptural Signs*, TWINCITIES.COM (Aug. 1, 2012, 12:01 AM), http://www.twincities.com/stpaul/ci_21213086/st-paul-city-council-creative-kidstuff-wins-zoning (discussing a dispute between a toy company and the city of St. Paul, Minnesota over whether two eighteen-foot-tall cat images were "sculptural art" or "signs").

10 *See infra* Part II. The four cases were decided in 2009, 2010, 2011, and 2012.

fight around the country."[11] Indeed, disputes between zoning administrators and mural owners over whether a particular mural is "art" or "signage" have become increasingly common.[12] These disputes are complicated, in part, because a legitimate work of art may also serve signage functions, oftentimes unintentionally.[13] In these cases, should the fact that an art mural contains "commercial speech" subject it to a lesser degree of constitutional protection?

This Note attempts to fit outdoor mural regulation into the broader scheme of constitutional law generally, and billboard and signage law specifically. In doing so, this Note argues that a municipality, in enacting a sign ordinance, may not distinguish between murals containing commercial speech and those containing noncommercial speech. The application of this distinction not only constitutes impermissible content-based regulation, but it also stands in stark contrast to the current state of free speech law. As an alternative, this Note proposes that all murals, regardless of their content, be regulated pursuant to the same set of restrictions.

Part I of this Note provides background on the purposes and mechanics of outdoor sign regulation. It then explores the landmark Supreme Court case addressing constitutional issues inherent in such regulation, *Metromedia Inc. v. City of San Diego*,[14] and surveys modern, post-*Metromedia* developments within free speech law. Part II of this Note turns to a narrow area of sign regulation: the regulation of outdoor murals. It discusses sources of inconsistency in current mural case law, and sets forth various legal and policy-based arguments for why the

---

[11] Tom Jackman, *Arlington's Wag More Dogs Mural Is No More*, WASH. POST (Sept. 25, 2012, 8:18 PM), http://www.washingtonpost.com/blogs/the-state-of-nova/post/arlingtons-wag-more-dogs-mural-is-no-more/2012/09/25/ed180e82-074c-11e2-a10c-fa5a255a9258_blog.html ("There's a war going on, . . . a real fight around the country about these sign laws . . . We don't usually require people to consult government bureaucrats before they express themselves." (second ellipsis in original) (internal quotation marks omitted)).

[12] *See, e.g.*, *id.*; Karen Boros, *Tough Mural 'Advertising' Rules? Minneapolis Council Member Gary Schiff Wants to Loosen Them*, MINNPOST (July 20, 2012), http://www.minnpost.com/two-cities/2012/07/tough-mural-%E2%80%98advertising%E2%80%99-rules-minneapolis-council-member-gary-schiff-wants-loos; Melo, *supra* note 9; *see also infra* Part II and the cases discussed therein

[13] Context is critical in determining whether a particular display is a work of art or signage. *See* Russ VerSteeg, *Iguanas, Toads and Toothbrushes: Land-Use Regulation of Art as Signage*, 25 GA. L. REV. 437, 469 (1991) ("The physical location of art can cause it to function as signage. A sculpture of Pegasus . . . is almost certainly a work of art when exhibited in an art museum. . . . [T]he same sculpture would function as a sign when placed in close proximity to a Mobil Oil gasoline station or perhaps Mobil's corporate offices. It functions as a sign because a reasonable person looking at the sculpture would recognize the connection between the image of a winged horse with the products and services of the Mobil Oil Corporation."); *see also* Shawn G. Rice, Comment, *Zoning Law: Architectural Appearance Ordinances and the First Amendment*, 76 MARQ. L. REV. 439, 453 (1993) ("The effect of the art on the viewing public is probably more important than the intent of the Presenter." (internal quotation marks omitted)).

[14] 453 U.S. 490 (1981).

distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation. Finally, Part III of this Note proposes a model for regulating outdoor murals whereby all murals, regardless of their content, are treated in the same manner. Such a model, Part III argues, best balances government regulatory interests with individual free speech interests, while offering a realistic solution for reducing mural disputes, mending interstate judicial conflict, and preserving judicial and municipal resources.

## I. BACKGROUND

### A. *Sign Regulation*

Outdoor signs come in different forms, shapes, and sizes.[15] They can be on-premise or off-premise, situated on private property or public property, and attached or detached to a building.[16] As a tangible medium of communication, outdoor signs contain both physical and constitutional dimensions.[17] Physical characteristics of signs include their size, height, shape, spacing, number, distance, and location.[18] The communicative features of signs, namely their content and messages, implicate their constitutional dimension.[19] The speech contained in signs is protected by the First and Fourteenth Amendments from unwarranted government regulation.[20]

---

15 *See generally* MANDELKER, *supra* note 5, at 69–88 (discussing a broad range of "specialized" on-premise signs, including digital signs, flags, freestanding signs, murals, portable signs, and time and temperature signs); Patricia E. Salkin, *Sign Regulation–Introduction*, 3 AM. LAW. ZONING § 26:1 (5th ed. 2013) (discussing the different types of signs and their functions).

16 Salkin, *supra* note 15.

17 *See* City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994) ("While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs." (citations omitted)); *see also* DEP'T OF STATE, N.Y. STATE, MUNICIPAL CONTROL OF SIGNS 2 (2006), *available at* http://www.dos.ny.gov/lg/publications/Municipal_Control_of_Signs.pdf.

18 DEP'T OF STATE, N.Y. STATE, *supra* note 17; MANDELKER, *supra* note 5, at 89.

19 DEP'T OF STATE, N.Y. STATE, *supra* note 17.

20 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 502 (1981) (plurality opinion) (noting that "the First and Fourteenth Amendments foreclose [an] interest in controlling the communicative aspects [of signs]"); DEP'T OF STATE, N.Y. STATE, *supra* note 17.

### 1. Community Aesthetics and Traffic Safety

Sign regulation, an exercise of a local government's police power, is warranted on the basis of two public purposes: community aesthetics and traffic safety.[21] In recent years, aesthetics has become the more common justification. In fact, the majority of courts today recognize that aesthetics alone is sufficient to justify constitutionally permissible sign control.[22] This stems, in part, from settled Supreme Court authority dictating that local government has the power to determine that a community is "beautiful."[23] In addition to aesthetics, municipalities enact sign ordinances to eliminate hazards to pedestrians and motorists brought about by distracting sign displays and to ensure clear visibility of traffic signs and signals.[24]

### 2. Content Neutrality

Regulations within a sign ordinance are characterized as either content-neutral or content-based.[25] This characterization is the single most crucial issue in evaluating the constitutionality of a sign ordinance.[26] Content-neutral regulations are those that restrict signage

---

[21] *See generally* AM. PLANNING ASS'N, PLANNING AND URBAN DESIGN STANDARDS 359 (2006); Alan Weinstein, *Legal Issues in the Regulation of On-Premise Signs*, *in* CONTEXT-SENSITIVE SIGNAGE DESIGN 119, 119–20 (Marya Morris et al. eds., 2001). Together, community aesthetics and traffic safety are often referred to as the "twin goals" of sign regulation. *See, e.g.*, *Metromedia*, 453 U.S. at 507; Interstate Outdoor Adver., L.P. v. Zoning Bd. of Mount Laurel, 706 F.3d 527, 529 (3rd Cir. 2013); Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 103 (2d Cir. 2010); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604, 611 (9th Cir. 1993).

[22] Stephanie L. Bunting, Note, *Unsightly Politics: Aesthetics, Sign Ordinances, and Homeowners' Speech in* City of Ladue v. Gilleo, 20 HARV. ENVTL. L. REV. 473, 480 (1996).

[23] Berman v. Parker, 348 U.S. 26, 33 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (citation omitted)).

[24] *See* AM. PLANNING ASS'N, *supra* note 21. Although little empirical data exists to confirm that sign control actually increases traffic safety, courts readily accept the justification. *See, e.g.*, *Metromedia*, 453 U.S. at 507–09. This is especially true in cases involving billboards, which "by their very nature . . . are designed to distract drivers." Major Media of Se., Inc. v. City of Raleigh, 621 F. Supp. 1446, 1451 (E.D.N.C. 1985).

[25] *See* MANDELKER, *supra* note 5, at 5, 12–14.

[26] *See* Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 S. CAL. L. REV. 49, 53 (2000) ("Today, virtually every free speech case turns on the application of the distinction between content-based and content-neutral laws."); Mark Tushnet, *The Supreme Court and Its First Amendment Constituency*, 44 HASTINGS L.J. 881, 882 (1993) ("Today the central organizing concept of First Amendment doctrine is the distinction between content-based regulations and content-neutral ones.").

without regard to the content of the speech contained in the signage.[27] The clearest examples of content-neutral regulations are general time, place, and manner restrictions.[28] For example, a sign ordinance may prohibit temporary signs from being posted for more than two months (time restriction); it may prohibit signs from being placed within fifteen feet of a road (place restriction); and it may require that all signs be limited in size to 200 square feet (manner restriction).[29] Content-neutral regulations, if challenged, are almost always upheld as constitutional.[30] These regulations are subject to a lenient, intermediate level of judicial scrutiny.[31] Under this standard, a municipality must demonstrate that the restrictions on speech further a substantial government interest, that the interest is unrelated to the suppression of speech, and that the restrictions are not significantly broader than necessary to further the interest or that ample alternative methods of communicating the message have been left open.[32] Courts routinely qualify community aesthetics and traffic safety as "substantial" government interests.[33]

By contrast, content-based regulations are those that restrict signage based on the message conveyed by the signage or the identity of the speaker displaying the signage.[34] An example of a content-based regulation is a sign ordinance that requires political signs to obtain a permit before being erected, but that exempts time and temperature signs from this permit requirement.[35] Content-based regulations are less favorable than content-neutral regulations, and are presumptively invalid.[36] While some content-based regulations of speech are permissible, the vast majority of these regulations, if challenged, are

---

[27] *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17.

[28] *Id.* at 2–3.

[29] *Id.*

[30] Tushnet, *supra* note 26 ("Content-neutral regulations come to the Court with a strong presumption in their favor[.]").

[31] *See* Weinstein, *supra* note 21, at 123.

[32] *See* Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989). However, to satisfy intermediate scrutiny, municipal sign regulation "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798.

[33] *See, e.g.*, Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08 (1981) (plurality opinion); Ballen v. City of Redmond, 466 F.3d 736, 742 (9th Cir. 2006).

[34] *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. Restrictions based on the identity of the speaker invoke the principle of "viewpoint neutrality." *See* Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004). This principle demands that the municipality not suppress speech "where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Id.*

[35] *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. This regulation is content-based because the municipality is subjecting one type of speech (that contained in political signs) to greater restrictions than another type of speech (that contained in time and temperature signs) based solely on the content of the message within the sign.

[36] Tushnet, *supra* note 26 ("Virtually all content-based regulations will be invalidated [by the Supreme Court.]").

declared unconstitutional.[37] Content-based regulations are subject to the strictest level of constitutional scrutiny and will be sustained only if a municipality meets its burden of proving that the restrictions on speech advance a compelling state interest and are narrowly tailored to serve that interest.[38] Courts have routinely held that traffic safety and community aesthetics do not qualify as "compelling" state interests.[39]

### B. Metromedia, Inc. v. City of San Diego

Although municipalities have been regulating outdoor signage since the early twentieth century, it was not until 1981 that the Supreme Court first grappled with the free speech issues raised by sign regulations.[40] The sign ordinance at issue in *Metromedia, Inc. v. City of San Diego* imposed substantial limitations on the display of outdoor billboards.[41] Specifically, the ordinance permitted on-premise commercial advertising, but prohibited most other forms of commercial advertising and most noncommercial communications.[42] Noncommercial messages were permitted only if they fell into one of twelve specified exemptions, which included signs with religious symbols and signs depicting time and temperature.[43] Metromedia, a leader in the outdoor advertising business, sued the city, arguing that the ordinance violated the First Amendment and that the ordinance's threatened destruction of the outdoor billboard industry was constitutionally prohibited.[44]

In an opinion delivered by Justice White and joined by Justices Stewart, Marshall, and Powell, a plurality of the Court found that the San Diego ordinance unconstitutionally discriminated among types of speech based on content.[45] First, the plurality held that by allowing on-premise commercial signs but not on-premise noncommercial signs, the ordinance impermissibly privileged commercial speech over

[37] *Id.* at 882 & n.4 (citing *Burson v. Freeman*, 504 U.S. 191 (1992), as a rare example of a decision upholding a content-based regulation); *see also* Weinstein, *supra* note 21, at 122.

[38] Boos v. Barry, 485 U.S. 312, 321 (1988); *see* Weinstein, *supra* note 21, at 123.

[39] *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 822–23 (1984); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1267–68 (11th Cir. 2005); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993), *aff'd*, 512 U.S. 43 (1994).

[40] Sign regulation cases in the early twentieth century did not involve the free speech concerns of modern sign cases. Instead, these earlier cases primarily involved due process and equal protection challenges. *See, e.g.*, Packer Corp. v. Utah, 285 U.S. 105 (1932); St. Louis Poster Adver. Co. v. St. Louis, 249 U.S. 269 (1919); Thomas Cusack Co. v. City of Chi., 242 U.S. 526 (1917).

[41] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 493 (1981) (plurality opinion).

[42] *Id.* at 494–96.

[43] *Id.* at 494–95.

[44] *Id.* at 496–98.

[45] *See id.* at 513–16, 521.

noncommercial speech.[46] The plurality noted that this approach was incompatible with then-recent First Amendment case law, which consistently afforded commercial speech less protection than noncommercial speech.[47] Second, the plurality held that by exempting only select categories of noncommercial signage, including religious and historical signs, from regulation, the ordinance impermissibly distinguished between various categories of noncommercial speech.[48] However, the plurality concluded that the ordinance's content-based distinctions within the category of commercial speech were permissible, because they directly advanced San Diego's aesthetic and safety interests.[49] In sum, the *Metromedia* plurality indicated that content-based distinctions within the category of commercial speech were permissible, but similar distinctions favoring commercial speech over noncommercial speech or favoring certain speech within the category of noncommercial speech were impermissible.

In a concurring opinion joined by Justice Blackman, Justice Brennan agreed with the plurality's conclusion that the San Diego ordinance was unconstitutional, but for a different reason.[50] Justice Brennan believed the ordinance to be in violation of the First Amendment because it had the practical effect of eliminating the billboard as a medium of communication within the city, and San Diego lacked a substantial government interest for the ban.[51] Perhaps most notable from Justice Brennan's opinion was his explicit rejection of the first basis for the plurality's holding—that is, that it was impermissible for a sign ordinance to favor commercial over noncommercial speech.[52] Justice Brennan seemed to suggest that content-based distinctions favoring noncommercial speech over commercial speech were the same as content-based distinctions within the category of noncommercial

46 *Id.* at 513.

47 *Id.* ("San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech. . . . [T]he city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.").

48 *See id.* at 514–15 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse . . . . Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.").

49 *Id.* at 507–12. The plurality's decision as to the regulation of commercial speech was expressly joined by Justice Stevens. *See id.* at 541 (Stevens, J., dissenting in part).

50 *See id.* at 521–40 (Brennan, J., concurring in the judgment).

51 *Id.* at 525–34 ("[T]he city has failed to show that its asserted interest in aesthetics is sufficiently substantial in the commercial and industrial areas of San Diego.").

52 *Id.* at 536 ("I cannot agree with the plurality's view that an ordinance totally banning commercial billboards but allowing noncommercial billboards would be constitutional. For me, such an ordinance raises First Amendment problems at least as serious as those raised by a total ban, for it gives city officials the right—before approving a billboard—to determine whether the proposed message is 'commercial' or 'noncommercial.'" (footnote omitted)).

speech or within the category of commercial speech.[53] This was especially true, Justice Brennan noted, because the distinction between the two forms of speech was usually "anything but clear."[54]

The three dissenting opinions—authored individually by Justice Stevens, Chief Justice Burger, and Justice Rehnquist—all rejected the plurality's views that the San Diego ordinance was content-based and that it resulted in an unconstitutional ban of an entire medium of communication.[55] Justice Stevens believed the prohibition of billboards to be a constitutionally permissible use of San Diego's police power.[56] Chief Justice Burger thought that the subject matter at hand, including protecting the safety and enhancing the environment of a city, was best left to local government.[57] Finally, Justice Rehnquist felt that a total prohibition on billboards within a community was justifiable on aesthetic grounds alone.[58]

*Metromedia* was a severely fractured decision, described by Justice Rehnquist as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn."[59] Nonetheless, the case remains the Supreme Court's leading authority on First Amendment issues in billboard and sign regulation. By approving a bifurcated approach to sign regulation based on whether the message of a sign is commercial or noncommercial in nature, the *Metromedia* plurality endorsed the distinction between commercial and noncommercial speech.[60] At the opposite end of the spectrum, Justice Brennan's concurrence strongly critiqued the distinction as content-based.[61] It is the latter view which has gained increasing popularity in Supreme Court case law.

### C. *Post-*Metromedia *Developments in Free Speech Law*

Modern Supreme Court cases indicate a trend in favor of elevating commercial speech to a similar constitutional status as noncommercial speech. Underlying this trend is the Court's demand for a stricter content-neutrality standard. In *City of Cincinnati v. Discovery Network,*

---

53 *Id.* at 534–40.
54 *Id.* at 536.
55 *See id.* at 540–55 (Stevens, J., dissenting in part); *id.* at 555–69 (Burger, C.J., dissenting); *id.* at 569–70 (Rehnquist, J., dissenting).
56 *Id.* at 542 (Stevens, J., dissenting in part) (answering affirmatively the plurality's question of "whether a city may entirely ban one medium of communication").
57 *Id.* at 569 (Burger, C.J., dissenting) ("The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution.").
58 *Id.* at 570 (Rehnquist, J., dissenting).
59 *Id.* at 569.
60 *See supra* text accompanying notes 45–49.
61 *See supra* notes 52–54 and accompanying text.

*Inc.*, the Court went as far as to hold that commercial speech must be regulated on par with noncommercial speech.[62] At issue in the case was a city ordinance which banned the dissemination of commercial handbills while allowing the dissemination of noncommercial handbills.[63] After commercial newsrack companies brought suit against the city on First Amendment grounds, the Court concluded that Cincinnati's categorical ban on commercial handbills attached too much importance to the distinction between commercial and noncommercial speech.[64] The Court observed that the city's noncommercial newsracks were just as damaging to community aesthetics as its commercial newsracks, and thus the ban on commercial handbills did not directly advance the city's purported aesthetic and safety interests.[65] For this reason, the Court held, in cases where neither commercial speech nor noncommercial speech is intrinsically more harmful to the public, the distinction between the two speech forms is impermissible.[66]

Three years later, the Court in *44 Liquormart, Inc. v. Rhode Island* invalidated a state law that banned the advertising of retail liquor prices.[67] The Court found that a complete prohibition on such commercial signage would not advance the substantial state interest in temperance.[68] Rather, Rhode Island's goal of promoting temperance would more likely be achieved by alternative forms of regulation that

---

[62] City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 430–31 (1993).

[63] *Id.* at 413 n.3 ("No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place." (quoting CINCINNATI, OHIO MUNICIPAL CODE § 714-23 (1992)) (internal quotation marks omitted)).

[64] *Id.* at 419 ("[T]he city's argument [regarding its aesthetic and safety interests] attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech.").

[65] *Id.* at 418 ("We accept the validity of the city's proposition, but consider [safety and community aesthetics] an insufficient justification for the discrimination against respondents' use of [commercial] newsracks that are no more harmful than the permitted [noncommercial] newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks.").

[66] *Id.* at 424 ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests [in community aesthetics and safety]."); *see also id.* at 437 (Blackmun, J., concurring) (noting that the valuable handbills at issue highlighted the "absurdity of treating all commercial speech as less valuable than all noncommercial speech," as it is "highly unlikely that according truthful, noncoercive commercial speech the full protection of the First Amendment will erode the level of that protection").

[67] 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516 (1996).

[68] *Id.* at 507 ("Thus, the State's own showing reveals that any connection between the ban and a significant change in alcohol consumption would be purely fortuitous. As is evident, any conclusion that elimination of the ban would significantly increase alcohol consumption would require us to engage in the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest.").

did not involve any restrictions on speech.[69] Critical to the Court's analysis was its view that commercial speech regulations are not all subject to a similar form of constitutional review simply because they target a similar category of expression.[70] The Court held that if a state regulates commercial speech to protect consumers from misleading or deceptive sales practices, then the traditional intermediate-scrutiny standard of review for regulations on commercial speech should apply.[71] However, if a state prohibits the dissemination of "truthful, nonmisleading commercial messages" for reasons unrelated to the preservation of a fair bargaining process, then a "special care" standard of review should apply.[72] The Court noted that the "typical reason" why commercial speech can be subject to greater government regulation than noncommercial speech is that a state has an interest in protecting its citizen consumers from harms that may result from commercial advertising.[73] Bans on speech that target truthful, nonmisleading commercial messages fail to advance this goal.[74]

*44 Liquormart* was the first case to question the soundness of the supposed "commonsense differences" used to justify affording less First Amendment protection to commercial speech than to noncommercial speech.[75] It announced "a standard reasonably close to strict scrutiny" that "would nearly equate the First Amendment status of commercial speech with that of noncommercial speech in cases involving . . . a content-based prohibition on communication."[76] Justice Thomas was perhaps the most overt when he opined that he did not see any "philosophical or historical basis" for affording less value to commercial speech than to noncommercial speech.[77] Echoing these sentiments, the Court most recently held in *Sorrell v. IMS Health Inc.* that content- and speaker-based restrictions on commercial speech should be subject to heightened scrutiny—a more stringent standard than the typical intermediate-scrutiny level of review for commercial speech.[78]

---

69 *See id.* (discussing alternative forms of regulation including higher prices by means of direct regulation or increased taxation and educational campaigns focused on the problems of drinking).

70 *Id.* at 501 ("The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them.").

71 *See id.*

72 *Id.* at 503–04; *see also id.* at 501 (noting that in these cases, "there is far less reason to depart from the rigorous review that the First Amendment generally demands").

73 *Id.* at 502 (citing Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993)).

74 *Id.* at 502–03.

75 *Id.* at 498–99; *see supra* text accompanying note 73.

76 Weinstein, *supra* note 21, at 128.

77 *44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring in part and concurring in the judgment).

78 131 S. Ct. 2653, 2664 (2011) (relying on *Discovery Network*, 507 U.S. 410, to support a heightened scrutiny standard).

In light of the continued elevation of commercial speech in modern Supreme Court case law, it is unclear whether the line between commercial and noncommercial speech remains an important or necessary distinction in sign regulation today. Modern commercial speech cases stand in stark contrast to the views espoused by the *Metromedia* plurality over three decades ago.[79] Although the *Metromedia* plurality endorsed the distinction between the two speech forms, it had done so relying on free speech cases from the 1970s, which supported a lower constitutional status for commercial speech.[80] The *Metromedia* Justices did not have *Discovery Network*, *44 Liquormart*, and *Sorrell* at their disposal in 1981. Moreover, in endorsing the different treatment of commercial and noncommercial speech, the *Metromedia* plurality emphasized the "common-sense" nature of the distinction between the two speech forms.[81] But in actuality, as Justice Brennan succinctly noted, the distinction was "anything but clear."[82] This statement holds even more true today, where modern advertising has further convoluted the status of the two speech forms.[83]

Part II of this Note argues that the distinction between commercial and noncommercial speech should be eliminated in at least one context: the regulation of outdoor murals.

## II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION

Outdoor murals—"painting[s] or other work[s] of art executed directly on a wall"[84]—are unique in that they can be classified as

---

[79] *See supra* text accompanying notes 45–49.

[80] *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505–06 (1981) (plurality opinion) (citing, for example, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), for the proposition that "commercial and noncommercial speech [are not equated] for First Amendment purposes"). At the time of the *Metromedia* decision, the commercial speech doctrine had been in existence for only six years.

[81] *Id.* at 506 ("[W]e again recognize[] the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech.").

[82] *Id.* at 536 (Brennan, J., concurring in the judgment). In fact, the Supreme Court recognized the difficulty with distinguishing between the two speech forms at the moment the commercial speech doctrine was born. *See Va. State Bd. of Pharmacy*, 425 U.S. at 787 (Rehnquist, J., dissenting) ("There are undoubted difficulties with an effort to draw a bright line between 'commercial speech' on the one hand and 'protected speech' on the other . . . .").

[83] *See, e.g.*, Darrel Menthe, *Writing on the Wall: The Impending Demise of Modern Sign Regulation Under the First Amendment and State Constitutions*, 18 GEO. MASON U. C.R. L.J. 1, 26 (2007) (noting that "there is, arguably, a complete lack of a standard by which to evaluate [the] distinction" between these two forms of speech).

[84] *Mural Definition*, OXFORD DICTIONARIES, http://oxforddictionaries.com/definition/english/mural?q=mural (last visited Oct. 27, 2013). This Note is limited in scope to outdoor murals located on private property. Murals located on government property face unique issues and are governed by different case law.

Appellate Case: 25-3225 Document: 16-7 Date Filed: 02/23/2026 Page: 105
Case 6:24-cv-01027-TC Document 107-2 Filed 02/07/25 Page 24 of 47



artwork, signage, or both, depending on their content and the municipality in which they reside. Most commonly, a municipality's sign ordinance will classify a mural as signage only when the mural contains "commercial speech."[85] For example, Arlington County's sign ordinance mandates that outdoor murals include "no picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the [mural] is located."[86] If a mural does include this prohibited commercial content, the county classifies the mural as signage and subjects it to all of the restrictions and requirements of the sign ordinance.[87] Conversely, if the mural contains solely "noncommercial speech," the county classifies the mural as a "work of visual art" and exempts the mural from the specifications of the sign ordinance.[88]

Disputes between mural owners and local zoning authorities over whether a particular outdoor mural qualifies as artwork or signage have become increasingly common in recent years.[89] Four of these disputes have made their way to court: *Complete Angler, LLC v. City of Clearwater, Florida*;[90] *City of Tipp City v. Dakin*;[91] *Neighborhood Enterprises, Inc. v. City of St. Louis*;[92] and *Wag More Dogs, Ltd. Liability Corp. v. Cozart*.[93] Decided respectively in 2009, 2010, 2011, and 2012, the four cases involve similar fact patterns; yet, the courts embarked on varied analyses and arrived at different holdings. Though the murals at issue in the first three cases were ultimately permitted to remain in place, the mural in the last of the four cases, *Wag More Dogs*, was ordered removed by the county.[94] The various inconsistencies among these four mural cases are predominantly attributable to two factors, neither of which is unique to mural case law, and both of which stem in

---

85 *See supra* note 2.

86 ARLINGTON, VA., ZONING ORDINANCE art. 13, § 13.2.3.C (2013), *available at* http://buildingarlington.s3.amazonaws.com/wp-content/uploads/2013/06/ACZO_Adopted-05-18-2013_op.pdf.

87 *See id.*

88 *See id.* Assuming, of course, that the other requirements for exemption are met. *Id.*

89 *See, e.g.*, *supra* notes 11–12. These disputes follow a typical pattern, reflected in the Sally/Wanda dispute from this Note's Introduction: The owner of a commercial shop commissions an artist to paint a mural on the exterior wall of her building. The owner believes the mural to be a work of art. "Artwork" is categorically exempted in the local sign ordinance from some or all of the stringent size and other restrictions placed on outdoor signage. A local zoning official believes the shop owner's mural falls outside the definition of "artwork," and is thus signage. Because the mural violates one or more of the restrictions in the sign ordinance, the zoning official orders its removal.

90 607 F. Supp. 2d 1326 (M.D. Fla. 2009).

91 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484.

92 644 F.3d 728 (8th Cir. 2011).

93 680 F.3d 359 (4th Cir. 2012).

94 For a discussion of the facts and holdings of these cases, see discussion *infra* Part II.A–B.

part from the divisive *Metromedia* decision, as well as post-*Metromedia* developments in free speech law.[95]

### A. *Sources of Inconsistency in Mural Case Law*

#### 1. Defining Commercial Speech

The first factor contributing to the inconsistency in mural case law is the manner in which courts define "commercial speech." Some courts have adopted very narrow definitions of commercial speech, such as "speech that does no more than propose a commercial transaction"[96] and "expression related solely to the economic interests of the speaker and its audience."[97] Other courts, by contrast, have recognized a broader definition of commercial speech as encompassing speech that "cannot be characterized merely as proposals to engage in commercial transactions."[98]

The two narrow definitions were used by the court in *Complete Angler* in holding that a marine-themed mural on the wall of a bait and tackle shop qualified as artwork rather than signage because the mural contained noncommercial speech.[99] The court reasoned that although the mural might occasionally inspire commercial activity, namely the purchase of bait and tackle from the mural owner's shop, the mural's function was not limited to this pursuit.[100] Rather, the mural also depicted a reflection of a local artist's impression of the environment

---

95 For a discussion of the five opinions in the *Metromedia* decision, see *supra* Part I.B. For a discussion of post-*Metromedia* developments in free speech law, namely the commercial speech and content neutrality doctrines, see *supra* Part I.C.

96 *See, e.g.*, United States v. United Foods, Inc., 533 U.S. 405, 409 (2001); *see also* Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) (providing same definition).

97 *See, e.g.*, El Dia, Inc. v. P.R. Dep't of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005) (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980)); Hoover v. Morales, 164 F.3d 221, 225 (5th Cir. 1998) (same).

98 *See, e.g.*, Spirit Airlines, Inc. v. U.S. Dep't of Transp., 687 F.3d 403, 412–13 (D.C. Cir. 2012) (quoting another source) (internal quotation marks omitted); *Wag More Dogs*, 680 F.3d at 369–70 (quoting another source) (internal quotation marks omitted); *see also* IMS Health Inc. v. Sorrell, 630 F.3d 263, 274 (2d Cir. 2010), *aff'd*, 131 S. Ct. 2653 (2011); United States v. Wenger, 427 F.3d 840, 846–47 (10th Cir. 2005). All of these cases rely on *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983) (adopting a more liberal and comprehensive approach to defining commercial speech that looks to a combination of factors).

99 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009).

100 *Id.*

surrounding the bait and tackle shop.[101] In this sense, the speech within the mural did "more than propose a commercial transaction."[102]

The Fourth Circuit in *Wag More Dogs* rejected this reasoning in favor of a broader definition of commercial speech.[103] The court easily could have found, similar to the court's finding in *Complete Angler*, that a dog-themed mural on the wall of a canine daycare center situated near a local dog park depicted an artist's reflection of the community's appreciation for dogs, and thus did more than simply propose a commercial transaction. Instead, the court stretched the definition of commercial speech to include speech beyond "the core notion of commercial speech."[104] The court held that the dog-themed imagery on the mural constituted commercial speech because the mural, which included cartoon dogs resembling the business's logo, was meant to attract potential customers from the nearby dog park, thus potentially economically benefiting the mural owner.[105]

### 2. Analyzing Content Neutrality

The second factor contributing to the inconsistency in mural case law is that courts are divided over the manner in which to analyze the content neutrality of a sign ordinance. While some courts have adopted a strict approach that looks solely at the language of the sign ordinance,[106] other courts have adopted a more liberal approach that looks to a municipality's asserted purpose for enacting a given regulation.[107]

---

101 *Id.*

102 Thus, it did not satisfy one of the narrow definitions of commercial speech: "speech that does no more than propose a commercial transaction." United States v. United Foods, Inc., 533 U.S. 405, 409 (2001).

103 *See Wag More Dogs*, 680 F.3d at 369–70 ("*Bolger* recognized a broader definition of commercial speech, encompassing speech that 'cannot be characterized merely as proposals to engage in commercial transactions.' . . . The three factors relied on by the Court in *Bolger* similarly counsel classifying Wag More Dogs' painting as commercial speech.").

104 *Id.* at 370.

105 *See id.*

106 *See, e.g.*, Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736–37 (8th Cir. 2011); Serv. Emps. Int'l Union, Local 5 v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010); Ballen v. City of Redmond, 466 F.3d 736, 742–44 (9th Cir. 2006); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1259–62 (11th Cir. 2005); Rappa v. New Castle Cnty., 18 F.3d 1043, 1053–54 (3d Cir. 1994); Nat'l Adver. Co. v. Town of Babylon, 900 F.2d 551, 556–57 (2d Cir. 1990).

107 *See, e.g.*, Asgeirsson v. Abbott, 696 F.3d 454, 460 n.6 (5th Cir. 2012); *Wag More Dogs*, 680 F.3d at 366–69; H.D.V.–Greektown, LLC v. City of Detroit, 568 F.3d 609, 621–23 (6th Cir. 2009); Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 183 (1st Cir. 1996); Scadron v. City of Des Plaines, 734 F. Supp. 1437, 1445–46 (N.D. Ill. 1990), *aff'd*, 989 F.2d 502 (7th Cir. 1993).

The strict approach to content neutrality is the majority approach in existing mural case law. Consider again the case of *Complete Angler*. At issue in the case was a marine-themed mural on the exterior wall of a bait and tackle shop.[108] The mural depicted sailfish, dolphins, and waterways.[109] Clearwater, a resort community, had a sign ordinance that prohibited various types of signs, required a permit and development review process for others, and exempted twenty-six categories of signs from review altogether.[110] One such exemption was made for artwork.[111] Believing the marine-themed mural to be commercial signage, the city issued plaintiffs a notice citing various violations of the sign ordinance and ordering the mural's removal.[112] The *Complete Angler* court held that Clearwater's application of its sign ordinance was content-based because a zoning official had to examine the content of the marine-themed mural in order to determine whether it was a sign or artwork.[113] After determining that the mural was a sign because it contained "commercial speech," the city then declined to extend protections that would have been extended to a mural containing alternative content, such as imagery of kids playing in a park.[114]

Following similar logic, the court in *Neighborhood Enterprises* held that the exemptions in St. Louis's sign ordinance were content-based because they made impermissible distinctions based solely on the content or message conveyed by a given sign.[115] St. Louis's sign ordinance exempted from regulation, among other things, "[w]orks of art which in no way identify a product."[116] Plaintiff, a critic of St. Louis's eminent domain practices, commissioned a mural on the wall of a building containing the words "End Eminent Domain Abuse" inside a red circle with a slash.[117] The city declared the mural an "illegal sign."[118]

---

108 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009).

109 *Id.* at 1328–29.

110 *Id.* at 1330–31.

111 *See id.* at 1331. The exemption defined artwork as "drawings, pictures, symbols, paintings or sculpture which do not identify a product or business and which are not displayed in conjunction with a commercial, for profit or nonprofit enterprise." *Id.* (citation omitted).

112 The city argued that the marine-themed mural was displayed "in conjunction with" plaintiffs' place of business, and thus was commercial speech, not artwork. *See id.* at 1332.

113 *Id.* at 1333 ("Yet in concluding that the [mural was] subject to the permit requirement or spatial constraints, [the city] necessarily examined [its] content and determined that [it was not] art work, a holiday decoration, or any other sign exempted under the Code.").

114 *See id.* at 1332–33.

115 Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736 (8th Cir. 2011) ("[T]he zoning code's definition of 'sign' is impermissibly content-based because . . . . to determine whether a particular object qualifies as a 'sign' . . . and is therefore subject to the regulations, or is instead a 'non-sign' . . . or [is otherwise] exempt from the sign regulations . . . one must look at the *content* of the object." (citations omitted)).

116 *Id.* at 739.

117 *Id.* at 731 (internal quotation marks omitted).

118 *Id.* (internal quotation marks omitted). The design of the mural was similar to the design

In holding that the ordinance's exemptions to the definition of "sign" were content-based, the Eighth Circuit noted that a mural in the same location and with the same size and dimensions as plaintiff's mural would not be subject to regulation if it contained alternative content, such as a religious subject.[119] The court reasoned that treating one mural as signage and another as artwork based solely on the content of the murals was a clear example of a content-based regulation on speech.[120]

In contrast to the strict approach to content neutrality seen in *Complete Angler* and *Neighborhood Enterprises* is the more liberal approach reflected in *Wag More Dogs*. This latter approach is the minority approach in existing mural case law. At issue in *Wag More Dogs* was Arlington County's sign ordinance, which, similar to St. Louis's, included various exemptions from the definition of "sign."[121] One such exemption was made for "decorative art," which was left wholly unregulated.[122] After determining that plaintiff's dog-themed mural qualified as signage rather than an exempt work of decorative art because it contained "commercial speech," the county zoning administrator subjected the mural to restrictions placed on signage that the mural would not have been subjected to had it contained alternative content.[123] Nonetheless, the Fourth Circuit held that the sign ordinance was content-neutral, both facially and as applied.[124] The court gave significant weight to the government's purpose in enacting the regulations, observing that Arlington County adopted the sign ordinance to regulate land use, not to prohibit a particular disfavored message.[125]

---

that the Missouri Eminent Domain Abuse Coalition, an organization with whom the plaintiff co-missioned the mural, used in its advertising and marketing materials. *See id.*

119 *See id.* at 736–37.

120 *Id.* at 737. The court refused to accept St. Louis's justification for enacting these content-based regulations on speech. *See id.* This disregard for government intent is one of the defining features of the "strict" approach to content neutrality. *See* cases cited *supra* note 106 and accompanying text.

121 *See* Brief of Appellant at 2, Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359 (4th Cir. 2012) (No. 11-1226), 2011 WL 2534178, at *2.

122 *Id.* (internal quotation marks omitted).

123 *See Wag More Dogs*, 680 F.3d at 369–70 (noting that plaintiff's mural would have been allowed to remain had it contained "noncommercial messages" but holding that the mural contained commercial speech).

124 *Id.* ("Deeming the Sign Ordinance content neutral, we now readily conclude that it satisfies intermediate scrutiny. . . . As applied to Wag More Dogs, the Sign Ordinance's regulation of commercial speech satisfies intermediate scrutiny.").

125 *Id.* at 368 ("On this score, then, the Sign Ordinance's content neutrality is incandescent.").

### B. *Eliminating the Commercial/Noncommercial Speech Distinction*

The aforementioned inconsistencies in mural case law can be significantly reduced by eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation. Regulating all murals, regardless of their content, in the same manner would render moot the first source of inconsistency (that is, the definition of commercial speech) while appealing to the majority, and better, judicial approach for the second source of inconsistency (that is, how to analyze the content neutrality of a sign ordinance). Moreover, it would reflect a more modern regulatory regime that appeals to recent advances in the commercial speech and content neutrality doctrines. This section elaborates on these points and sets forth additional legal and policy-based arguments for regulating all murals, regardless of the speech they contain, in an equal fashion.

#### 1. Constitutional Flaws

The principal reason why the distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation is that the distinction, when applied, constitutes a content-based regulation of speech. Explained simply, if a zoning official subjects one mural to stringent outdoor signage restrictions because the mural contains commercial speech, but exempts another mural from these restrictions because the latter mural contains noncommercial speech, this difference in treatment is a content-based regulation of speech.

The courts in three of the four mural cases—*Complete Angler*, *Neighborhood Enterprises*, and *Tipp City*—would support this view. Each of these courts embraced the stricter approach to evaluating the content neutrality of a sign ordinance.[126] This approach is the better approach in that it is more in line with modern Supreme Court case law, which indicates a desire for a stricter content-neutrality standard.[127] In *Discovery Network*, for instance, the Court embraced a strict approach to content neutrality in holding that Cincinnati's sign ordinance was content-based because a government official had to look at the content of the papers in a given newsrack in order to determine whether the

---

126 *See supra* Part II.A.2.

127 Brian J. Connolly, Note, *Environmental Aesthetics and Free Speech: Toward a Consistent Content Neutrality Standard for Outdoor Sign Regulation*, 2 MICH. J. ENVTL. & ADMIN. L. 185, 209 (2012) ("[S]ince *Metromedia*, there has been a gradual increase in the degree of content neutrality required of governmental regulations of speech. This gradual increase suggests that, to comply with the Supreme Court's recent statements on content neutrality, the content neutrality requirement in sign regulation should be more stringent . . . .").

newsrack was subject to the ordinance's ban.[128] The Court specifically rejected a content-neutrality analysis that looks to a government's justification for a given regulation, especially when that justification is the "naked assertion" that commercial speech has low value.[129] Similarly, the Court in *Sorrell* found that because the statute in question would require a government enforcement authority to examine the content of marketing materials before determining whether the protected information was being used for marketing or for some other purpose, the regulation of commercial speech was content-based.[130]

Not only does the strict approach to content neutrality embrace modern, post-*Metromedia* Supreme Court precedent, but this approach also avoids the reliance on community aesthetics and traffic safety as justifications for distinguishing between commercial and noncommercial speech. These justifications are successfully utilized only in those cases where a more liberal content-neutrality standard is applied (and thus, where sign ordinances are more likely to be upheld as content-neutral), because content-neutral ordinances need only satisfy a test of intermediate scrutiny where community aesthetics and traffic safety qualify as substantial government interests.[131] The problem with relying on community aesthetics and traffic safety, the so-called "twin goals" of sign regulation,[132] to justify the commercial/noncommercial speech distinction as applied to outdoor murals is that maintaining the distinction fails to advance either goal. At best, the distinction has a neutral effect on these goals. At worst, the distinction may be detrimental to these goals.

Consider *Wag More Dogs*, the sole mural case to embrace the more liberal content-neutrality standard.[133] After Arlington County's zoning administrator ordered plaintiff business owner to remove the dog-themed mural on the wall of her canine daycare shop because its

---

128 City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993) ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'"). For a more detailed discussion of *Discovery Network*, see *supra* Part I.C.

129 *See Discovery Network*, 507 U.S. at 429–30.

130 Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2663–64 (2011) ("Given the legislature's expressed statement of purpose, it is apparent that [the statute] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."). In embracing a strict approach to content neutrality, the *Sorrell* Court relied on *Discovery Network*. *See id.* at 2664 (citing *Discovery Network*, 507 U.S. at 418, to support the proposition that heightened judicial scrutiny is warranted when content-based restrictions are placed on commercial speech).

131 Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989); *see also supra* Part I.A.2 (explaining the differences between content-based and content-neutral regulations within sign ordinances).

132 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507 (1981) (plurality opinion); *see also supra* Part I.A.1 (discussing these two justifications for sign regulation).

133 *See supra* notes 121–25 and accompanying text.

imagery allegedly constituted commercial speech,[134] plaintiff commissioned two artists to paint a new mural in its place.[135] The replacement mural depicted large bird-like creatures nesting in tires hanging from a tree.[136] While the community adored the "attractive," original mural, deeming it a welcome and fitting addition to the nearby dog park,[137] many local residents expressed their dislike of the replacement mural.[138]

Perhaps most concerning with this case is that the Fourth Circuit relied entirely on the twin goals of sign regulation in holding that Arlington County's sign ordinance satisfied intermediate scrutiny.[139] Focusing heavily on the intent of Arlington County in enacting the ordinance, the court held that the ordinance was content-neutral because it "serve[d] purposes unrelated to the content of expression," "even if it ha[d] an incidental effect on some speakers or messages but not others."[140] Because the content-neutral ordinance advanced substantial government interests—the furtherance of traffic safety and the enhancement of aesthetics within the county—the court found that it satisfied intermediate scrutiny.[141] The failure of the ordinance to actually further either of these interests highlights a flaw in this minority approach to evaluating the content neutrality of a sign ordinance. Under the stricter, majority approach, Arlington County's ordinance would have been deemed content-based and subject to a strict scrutiny

---

134 *See supra* notes 103–05 and accompanying text. Arlington County's zoning administrator provided plaintiff with the following instructions:

> For the mural to NOT be considered a sign, it may depict anything you like EXCEPT something to do with dogs, bones, paw prints, pets, people walking their dogs, etc. In other [words], the mural [cannot] show anything that has any relationship with your business. If it does, then it becomes a sign.

Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 363 (4th Cir. 2012).

135 *See* Arin Greenwood, *Wag More Dogs Gets New Mural From Itinerant Artists Rob Fogle And Zack Weaver (PHOTOS)*, HUFFINGTON POST (Oct. 16 2012, 1:55 PM), http://www.huffingtonpost.com/2012/10/16/wag-more-dogs-mural-rob-fogle-zack-weaver_n_1962184.html.

136 For photos of the replacement mural, see *id.*

137 Wag More Dogs, LLC v. Artman, 795 F. Supp. 2d 377, 392 (E.D. Va. 2011) ("As murals go, Wag More Dogs' is a relatively attractive one, and . . . many patrons of the nearby local dog park quite enjoy it."), *aff'd*, 680 F.3d 359 (4th Cir. 2012).

138 *See, e.g.*, *New Dog Park Mural . . . Improved!?*, TWO DOG TALES (Oct. 15, 2012), http://twodogtales.wordpress.com/2012/10/15/new-dog-park-mural-improved ("[I]t's a shame the cute dogs had to go. They were much more appropriate for the space, and didn't elicit the comments overheard the past few days at the park, which generally [began] with, "What the heck ARE those things?").

139 *See Wag More Dogs*, 680 F.3d at 368–69.

140 *Id.* at 368 (acknowledging that Arlington had differentiated between different types of speech).

141 *Id.* at 369 ("[W]e now readily conclude that [the sign ordinance] satisfies intermediate scrutiny. . . . Arlington enacted the . . . [o]rdinance to, in part, promote traffic safety and enhance the County's aesthetics. Both are substantial government interests.").

analysis, under which traffic safety and community aesthetics are not compelling justifications.[142]

In a similar case from Arlington County (which did not make its way to court), the owner of a head shop that sold various paraphernalia, including pipes, hookahs, and cigars, commissioned an artist to paint a mural on the side of his building to beautify the block.[143] The finished artwork depicted a man holding a smoke-exuding cigar.[144] Upon investigating the mural, the county zoning administrator noted: "[T]he cigar must go; then the mural can stay. Without the cigar, it is not a sign . . . ."[145] Smokey Shope's owner decided to paint over the cigar, converting it into a blue whale.[146] The new mural was identical in all respects to the original mural, except that it contained a whale instead of a cigar.[147] Yet, replacing the "commercial speech" with "noncommercial speech" did absolutely nothing to enhance Arlington County's aesthetics or traffic safety. Rather, it seemed only to enforce the meaninglessness of distinguishing between the two speech forms.[148]

Outside of Arlington County, at least one court has commented on the failure of the distinction between commercial and noncommercial speech to enhance the twin goals of sign regulation. In *North Olmstead Chamber of Commerce v. City of North Olmsted*, the court addressed a sign ordinance which permitted noncommercial art murals, but banned murals with commercial messages, such as corporate products or logos.[149] The court held that these restrictions on commercial speech were content-based and unconstitutional.[150] The sign ordinance lacked "rationality" because the city failed to provide evidence that the restrictions directly and materially contributed to traffic safety and

142 *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 823 (1984) ("But a governmental interest in aesthetics cannot be regarded as sufficiently compelling to justify a restriction of speech based on an assertion that the content of the speech is, in itself, aesthetically displeasing."); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993) (holding that the city's interest in eliminating aesthetic, safety, and property value problems associated with signs was not sufficiently compelling), *aff'd*, 512 U.S. 43 (1994).

143 *See County to Head Shop: Cigar Mural Has Got to Go*, ARLNOW (Aug. 21, 2012, 1:50 PM), http://www.arlnow.com/2012/08/21/county-to-head-shop-cigar-mural-has-to-go.

144 For a photo of the mural, see *id.*

145 *Id.* According to the logic of the zoning administrator, if a mural painted on a cigar shop contains a cigar, the mural is a sign. If the cigar is converted into a whale, the mural transforms into a work of art. *See* Taylor Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, WASH. EXAMINER (Sept. 26, 2012, 4:30 PM), http://washingtonexaminer.com/when-a-cigar-becomes-a-whale-a-sign-becomes-art/article/2509136#.UORv1InjkoZ.

146 Holland, *supra* note 145.

147 For photos of the original and replacement murals, see *id.*

148 As the Smokey Shope store manager observed, "It doesn't make a lot of sense, but the county made us do it." *Id.*

149 86 F. Supp. 2d 755, 767 & n.7 (N.D. Ohio 2000).

150 *Id.* at 773 ("The City's content-based regulations on commercial speech are unconstitutional.").

community aesthetics.[151] Murals housing commercial content, the court reasoned, were no more distracting or less aesthetically pleasing than noncommercial murals.[152] As such, it was senseless to distinguish between the two speech forms.[153]

### 2. Classifying Mural Speech

Perhaps one of the reasons why maintaining the distinction between commercial and noncommercial speech in the context of outdoor mural regulation seems futile is that classifying mural speech is a transitory determination that has the potential to change overnight.

Consider the following hypothetical: The exterior wall of a local mom-and-pop cupcake shop features a lively mural with large cups of coffee in honor of the shop owner's favorite morning beverage. The mural has been on the building for five years, and is accepted and relished by the community as a lovely work of art. One day, the owner decides to start selling coffee at her cupcake shop. Although this decision converts the mural's coffee imagery from noncommercial to commercial speech, it would hardly seem necessary, fair, or prudent for the town to demand its removal after years of community enjoyment. Moreover, in light of the frequent product turnover within commercial establishments, a municipality would have to constantly reevaluate the products sold inside every building upon which is displayed an outdoor mural. This would be a foolish and wasteful use of government time and resources.

Further complications arise in cases where a given business sells a wide variety of products or services. The process of classifying mural speech is more conducive to businesses that sell only one key product or provide only one key service. Businesses such as gift shops or grocery stores, which may sell thousands of products, are placed at an unfair disadvantage if the distinction between commercial and noncommercial speech remains in place. Does a flower mural on the side of a gift shop, where fresh flowers comprise less than one percent of the store's total

---

151 *See id.* at 772–73 ("In fact, many of the City's content-based restrictions *completely fail* to contribute to safety and aesthetics and seem to be *unrelated to these goals.*" (emphasis added)).

152 *Id.* at 768, 772 ("It is also not evident why a mural may contain content that may be very distracting (such as sexually explicit but not obscene art) or aesthetically displeasing, but may not contain words, corporate products, or corporate images. Surely a mural containing the 'golden arches' of McDonalds is not more distracting than Botticelli's 'Venus' or more aesthetically displeasing than some modern works of art that may be reproduced on the side of a wall. . . . Signs with content other than identifying a business are not somehow safer. Nor is the content . . . more aesthetically pleasing.").

153 *See id.* at 771 (noting that making content-based distinctions among signs, including distinctions based on whether they contained commercial or noncommercial speech, did not further North Olmsted's goals "in any meaningful way").

inventory, contain commercial speech? Should a mural featuring fruits and vegetables on the wall of a Whole Foods Market—which also sells dairy, meat, grains, beverages, and even body care products and eating utensils—be considered signage, when the same mural outside of a butcher shop would be considered art? What if that same mural has been intact for fifteen years and has become a neighborhood landmark, as it has in the city of St. Paul, Minneapolis?[154] Eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation avoids these inevitable difficulties that arise when classifying mural speech.

### 3. Classifying Mural Art

Similar to the difficulties with classifying mural speech, it is likewise difficult to classify mural art. Maintaining the distinction between commercial and noncommercial speech only further complicates this matter. The current framework leaves unbridled discretion in government enforcement authorities to arbitrarily decide when, in their subjective opinions, a mural qualifies as a work of art or signage.[155] It is this broad discretion that Justice Brennan feared in his *Metromedia* concurrence when he noted the danger of permitting a government unit to decide whether a given outdoor display contains commercial or noncommercial speech.[156] This concern is especially strong in the context of regulating outdoor murals. The definition of art and the determination of whether something qualifies as art have long been the subject of vigorous debate, even among artists themselves.[157]

Courts too have certainly struggled with the determination of whether a given mural is art or signage. The court in *Tipp City*, for

---

[154] For a photo of the Whole Foods mural, see Curtis Gilbert, *Cities Debate Art vs. Advertising*, MPRNEWS (Aug. 1, 2012), http://minnesota.publicradio.org/display/web/2012/08/01/business/art-versus-advertising-in-twin-cities.

[155] *See* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 VA. L. REV. 627, 653 (1990) ("[T]he commercial speech doctrine . . . . gives government a powerful weapon to suppress or control speech by classifying it as merely commercial. If you think carefully enough, you can find a commercial aspect to almost any[thing] . . . .").

[156] *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 536–37 (1981) (Brennan, J., concurring in the judgment) ("Because making such determinations would entail a substantial exercise of discretion by a city's officials, it presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech.").

[157] David Leichtman & Avani Bhatt, *Federal Courts and the Communicative Value of Visual Art: Is an Intended Message Required for Strong Protection of Rights Under the First Amendment?*, FED. LAW., Sept. 2011, at 25, 25 ("Federal courts addressing the question of the appropriate level of First Amendment protection for art have sometimes agreed that the key to protection is the communicative value of the work at issue. Others—in both law and other disciplines—have argued, however, that to qualify as art, the work must carry some component that is aesthetically pleasing, lest a mere circle painted on a canvas be considered art.").

example, was vocal in its discomfort with classifying the mad scientist mural at issue as commercial signage.[158] The court emphasized that the "inherent difficulty" with the classification was due, in part, to the lack of a clear distinction between commercial and noncommercial speech.[159] Stressing that the issue was "a close one," the *Tipp City* court avoided making a determination of its own.[160] Instead, it adopted the reasoning of the trial court, which had concluded that the mural was a sign, not art.[161] The hesitation scattered throughout the *Tipp City* court's discussion of classifying the mad scientist mural—a classification that hinged entirely on the distinction between commercial and noncommercial speech—is evidence of the arbitrariness of this distinction as it pertains to outdoor mural regulation.[162]

A related issue arises when multiple murals within a given municipality are regulated under the same terms of a local sign ordinance but are subjected to different treatment. The court in *Complete Angler* critiqued this discriminatory practice within the city of Clearwater. Although the city had declared plaintiffs' marine-themed mural an illegal sign, it had allowed other businesses in the city to display murals that contained similar degrees of relatedness to their business.[163] For instance, it had permitted a mural on a daycare center depicting children running through a field and a mural on a seafood restaurant containing various images of marine life.[164]

Of course, zoning officials are not entirely to blame for this disparate treatment. Murals painted on commercial buildings contain varying degrees of relatedness to the business inside, and thus, when a municipality must determine whether a mural is art or signage, the process of line-drawing becomes unbearably difficult—and consequently, quite bapbazard.[165] Treating all outdoor murals the same,

158 City of Tipp City v. Dakin, 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484, at ¶ 31 ("Despite the straightforward nature of the issue, determining whether the appellants' mural constitutes commercial speech is not without difficulty.").

159 *Id.* ¶ 32 ("'The distinction between commercial and non-commercial speech was never obvious, and sophisticated advertising techniques can blur the lines even more.'" (quoting Menthe, *supra* note 83, at 6)).

160 *Id.* ¶ 33.

161 *See id.* This was likely a showing of deference to the trial court.

162 *See, e.g.*, *id.* n.3 ("Assuming, arguendo, that we are wrong and that the appellants' mural is noncommercial speech, we note that the outcome in this case would remain the same. Our ultimate conclusion . . . is that Tipp City's sign ordinance cannot be enforced against the appellants' mural."); *supra* notes 158–59.

163 *See* Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d. 1326, 1334 (M.D. Fla. 2009).

164 *Id.*

165 How close does the relationship have to be between the imagery contained in a mural and the business on whose wall the mural resides? Consider another case arising out of the city of Clearwater, Florida: An Egyptian-themed restaurant commissioned an artist to paint a mural depicting a repeating pattern of hieroglyphics over the entire front exterior wall of the building. The finished artwork was "eye-catching and appealing." But Clearwater, whose sign code

regardless of whether they contain commercial or noncommercial speech, would eliminate this inconsistency within a single municipality.

#### 4. Murals as Art

Lastly, eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation would restore all murals to their traditional status as artwork. Since its origination more than 30,000 years ago, mural art throughout history has been employed as a means of conveying artistic expression.[166] Mural art is a unique form of communication that is distinct from (and serves purposes different than) billboards, the prototype of commercial signage. Municipalities have used outdoor art murals, but not billboards, as a means of revitalizing urban communities.[167] Murals offer strong aesthetic pleasure in place of, or at least amongst, community blight, and they contribute to the cultural identity of a neighborhood.[168] By contrast, billboards generally clutter communities and elicit negative emotions from residents and tourists alike.[169] Treating murals housing commercial speech the same as those containing noncommercial speech would embrace the notion that all murals, no matter what their content,

---

forbids murals on commercial buildings if the mural relates to what the business is selling, declared the mural an illegal sign. Although the restaurant owner ultimately won the dispute on appeal, this case illustrates the danger of making broad determinations that jeopardize free speech interests. *See* Diane Steinle, *Murals Rules Create A Muddled Sign Code*, ST. PETERSBURG TIMES, Jan. 25, 2009, at 2.

166 For a discussion of the historical and artistic importance of public mural art, see Christian Ehret, *Mural Rights: Establishing Standing for Communities Under American Moral Rights Laws*, 10 U. PITT. J. TECH. L. & POL'Y 3 (2010).

167 *See id.* (noting that art allows "communities [to] take[] advantage of low cost, unused property and [attract] positive attention from outsiders"); Dana Cole, *Mural Project Gets Council's Green Light*, BENSONNEWS-SUN.COM (July 9, 2013, 6:00 PM), http://www.bensonnews-sun.com/news/article_d579d91c-e8e8-11e2-853d-001a4bcf887a.html (noting the success of mural projects in revitalizing communities, and indicating the intent of Benson, Arizona to launch a community-wide mural project to "make Benson a destination town for all tourists rather than a pass-through for travelers").

168 For example, Lake Placid, a small Florida town with a population of 2,000, is now known as the "Town of Murals." The community had a business district that was on the verge of collapse until the mid-1990s, when the town decided to paint murals on dilapidated buildings. Mural artists have since painted historical scenes, landscapes, and pictures of Lake Placid people and wildlife. Tourists travel from all over the world to see the beautiful paintings. *See* Steinle, *supra* note 165 (observing that "[e]ven the trash receptacles have been transformed by murals").

169 *See, e.g.*, Ballen v. City of Redmond, 466 F.3d 736, 744 (9th Cir. 2006) (defining billboards as "fixed, permanent structures that are . . . intrusive to community aesthetics"); Armin P. Langheimrich, *Letter: Ugly Highway Billboards Damage State's Image, Beauty*, DESERET NEWS (May 9, 2012, 12:00 AM), http://www.deseretnews.com/article/765574661/Ugly-highway-billboards-damage-states-image-beauty.html ("Because of [the abundance of ugly billboards all over the state of Utah], some labeled us as a third-world-country state. . . . This is . . . a big, ugly mess that distracts from the beauty of the state . . . .").

can contribute to society in a way that billboards and other commercial signage cannot.[170]

## III. A MODEL FOR REGULATING OUTDOOR MURALS

In light of the legal and policy-based reasons for eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation,[171] this Note proposes a model whereby all murals, regardless of their content, are regulated in the same manner. Under this model, municipalities would be able to regulate murals as they please in a content-neutral manner. Business owners interested in painting a mural on the exterior wall of their building would have sufficient notice of any time, place, and manner restrictions by which they must abide. If implemented correctly, this model would eliminate the number of disputes between mural owners and zoning administrators over whether a particular mural is artwork or signage.

The method of defining what exactly constitutes a "mural" is a process that would need to be undertaken by each individual municipality. For example, a mural could be defined as "[a] hand-produced work of visual art which is tiled or painted by hand directly upon, or affixed directly to an exterior wall of a building."[172] Notably absent from this definition is any mention of commercial or noncommercial speech. Once a definition is established, a municipality would then need to decide how it would like to regulate all outdoor

[170] Moreover, it would embrace the Supreme Court's oft-repeated view that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981) (plurality opinion) (internal quotation marks omitted); *see also* Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

[171] *See infra* Part II.B.

[172] This is the definition currently being used by the city of Portland, Oregon. *See* PORTLAND, OR., CITY CODE & CHARTER tit. 4, ch. 4.12.020(J) (2013), *available at* http://www.portlandonline.com/auditor/index.cfm?c=50808&a=257808; *see also id.* at ch. 4.10.010 ("The purpose of this Title and the policy of the City of Portland is to permit and encourage original art murals on a content-neutral basis on certain terms and conditions. Original art murals comprise a unique medium of expression which serves the public interest. Original art murals have purposes distinct from signs and confer different benefits. Such purposes and benefits include: improved aesthetics; avenues for original artistic expression; public access to original works of art; community participation in the creation of original works of art; community building through the presence of and identification with original works of art; and a reduction in the incidence of graffiti and other crime. Murals can increase community identity and foster a sense of place and enclosure if they are located at heights and scales visible to pedestrians, are retained for longer periods of time and include a neighborhood process for discussion.").

murals within its jurisdiction. Again, this process should be individualized to reflect the unique identity of each municipality.

Some municipalities may choose to exempt all murals from all forms of regulation. More likely, municipalities will choose to impose at least some restrictions on outdoor art. Bearing in mind aesthetic and traffic safety goals, as well as general community demands, each municipality should strive to create content-neutral time, place, and manner restrictions that are equally applicable to all outdoor murals. For instance, a municipality could require that all murals be less than 200 square feet (manner restriction), contain less than three percent text (manner restriction), be located on a commercial building at least fifty feet from a main highway (place restriction), and remain intact for a minimum of two years (time restriction). These restrictions would apply to all murals—those containing noncommercial speech, commercial speech, or a hybrid of both.

One potential concern with implementing such a regulatory model is that muralists would be inhibited in their artistic pursuits, at least in those municipalities which impose more stringent time, place, and manner restrictions on outdoor signage. A muralist who is otherwise accustomed to painting 600-square-foot murals may feel frustrated that he is now limited to painting murals one-third the size. Although one may be sympathetic to a muralist's concern, it is an insufficient basis for maintaining the content-based distinction between commercial and noncommercial murals. If an artist desires to paint large-scale murals, he can do so in a municipality that welcomes such murals. Just like most other facets of government regulation, every municipality will differ in the value it places on art. Fortunately, many, if not most, municipalities appreciate the value of outdoor murals. This appreciation is reflected in sign ordinances which "exempt" murals and similar works of art from the more stringent requirements placed on other forms of signage.[173] Of course, many of these ordinances maintain the distinction between commercial and noncommercial murals that this Note argues should be eliminated.[174] However, at least two cities are on the cusp of eliminating this distinction.

Minneapolis and St. Paul, Minnesota's two largest cities, are considering revisions to their sign ordinances that would relax the definition of "mural" to allow for imagery of products sold within the building on which a mural resides. In Minneapolis, council member Gary Schiff has been vocal in his desire to subject all murals, regardless of their content, to the same regulations.[175] Minneapolis's current sign ordinance bans all murals that "advertise or promote any business,

---

173 *See supra* note 2.
174 *See id.*
175 *See* Boros, *supra* note 12; Gilbert, *supra* note 154.

product, activity, service, interest or entertainment" (that is, murals that contain "commercial speech").[176] Calling the distinction between commercial and noncommercial speech as contained in murals "silly," Schiff has called for a more reasonable definition that better responds to community needs and wishes.[177] Similar considerations for change are being voiced in St. Paul, a city that has long encouraged the creation of murals and other forms of artwork to "enliven" the city and "improve visual interest."[178]

Another possible concern with implementing a model that regulates all outdoor murals in the same manner is that municipalities risk corporate entities transferring their advertising campaigns from billboards to murals, which would now be permitted to house even the most overt commercial speech.[179] This concern is strongest in those jurisdictions that ban billboards, such as Los Angeles.[180] This concern, however, can be eliminated by carefully constructing content-neutral time, place, and manner restrictions that would make traditional forms of corporate advertising impossible.

---

176 Gilbert, *supra* note 154 (internal quotation marks omitted).

177 *See id.* ("I think ever since Andy Warhol painted a Campbell's Soup can, there's been a blurring between American iconography and advertising, and we need a change . . . . If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly and this needs to be fixed." (internal quotation marks omitted)); Boros, *supra* note 12 ("You are not allowed to show any products that you sell in your mural, or your mural is deemed advertising . . . It's really gotten silly, and the enforcement and destruction of murals has got to stop." (internal quotation marks omitted)).

178 *See* CITY SAINT PAUL, CENTRAL CORRIDOR DEVELOPMENT STRATEGY 66 (2007), *available at* http://www.stpaul.gov/DocumentCenter/Home/View/4772 ("Blank walls create harsh pedestrian environments by limiting activity, removing a sense of connection between the building and the street and limiting 'eyes on the street.' Where the reconfiguration and reopening of blank walls is not possible, an opportunity exists to enliven the street and improve visual interest through the creation of a mural or other form of artwork."); *see also* Melo, *supra* note 9.

179 Various mural advertising companies are already in existence, so businesses would have no shortage of artists willing to paint their commercial murals. *See, e.g.*, ALT TERRAIN, http://www.altterrain.com/graffiti_advertising.htm (last visited Oct. 27, 2013) (noting that they work with street artists to "assist agencies in creating unique art-advertising outdoor painted billboard murals"); COLOSSAL, http://colossalmedia.com/about (last visited Oct. 27, 2013) (touting themselves as "the largest hand paint mural and outdoor advertising company in the world"); *see also* Kim Bhasin, *17 Awesome Graffiti Ads From Around the World*, BUS. INSIDER (Oct. 20, 2011, 10:54 AM), http://www.businessinsider.com/graffiti-mural-guerrilla-advertising-2011-10?op=1 (describing how brands are increasingly using graffiti and murals in urban areas to "amp up their marketing").

180 An earlier version of Los Angeles's sign ordinance exempted artwork from sign regulation. Specifically, it made all signs viewed mainly from a freeway illegal, with the exception of artwork. In an attempt to draw the line between art and advertising, murals with less than three percent text were allowed so long as they were first approved by the city. Patrick Media Group (PMG), one of Los Angeles's largest billboard companies at the time, painted a fifty-foot-tall mural in defiance of the sign ordinance. PMG insisted the mural was art. The city ultimately rejected PMG's argument, ordering it to remove the mural or face six months in jail or a $1,000 fine. *See* Kelly David, *Art or Advertising?: Controversy Over Oversize L.A. Murals Looms Large*, L.A. TIMES, Sept. 2, 1995, at D1.

## Conclusion

Sign ordinances throughout the nation continue to jeopardize the artistic expression of property owners who commission murals to be painted on their buildings. The continued reliance of municipalities on the outdated and content-based distinction between commercial and noncommercial speech has led to arbitrary enforcement of sign ordinances. Moreover, the inconsistent approaches taken by courts in their judicial review of these sign ordinances has resulted in art murals being subjected to different treatment based solely on the legal jurisdiction in which they reside. Even more concerning, the free speech rights of mural owners are being exposed to this same disparate treatment.

This Note argued in favor of a regulatory model whereby outdoor murals are divorced from the commercial/noncommercial speech distinction. Eliminating this distinction in the context of mural regulation renders moot the issue of how to define commercial speech. Moreover, it significantly diminishes the splitting effect of the contrasting judicial approaches to content neutrality. Altogether, such a model strikes the best balance between maintaining government regulatory power, preserving judicial resources, and safeguarding individual free speech.

(Summary published in *The Salina Journal* on July 14, 2017.)
(Published on the City of Salina's website for a minimum of one week from July 11 to July 25, 2017.)

Consolidated-Salina EPN111155

**ORDINANCE NUMBER 17-10882**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**ANDREW AFFIDAVIT EX. 2**

Consolidated-Salina EPN11155

WHEREAS, the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1.** **New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2.** **Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

Consolidated-Salina EPN111155

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

Section 3. **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**
The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

Consolidated-Salina EPN11155

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.
(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.
(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.
(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.
(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.
(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.
(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.
(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.
(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.
(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.
(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.
(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:
(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.
(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

Consolidated-Salina EPN11155

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), four (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

Consolidated-Salina EPN11155

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.
(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.
(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.
(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

Section 5. **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

Section 6. **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

Section 7. **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On July 10, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: June 26, 2017
Passed: July 10, 2017

Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

Consolidated-Salina EPN111155

Jason A. Gage, City Manager

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | <br><br><br>**CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |

**<u>DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

**EXHIBIT B**

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

9. Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**FIRST SET OF INTERROGATORIES**

1. Please explain how the City first learned about the Plaintiffs' mural's existence.

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy sign that is the subject of this dispute ("Cozy Sign") as a mural or otherwise implies the Cozy sign is not a sign under the Salina Code of Ordinances ("Salina Code"), Chapter 42, Articles X ("Sign Code"). Subject to and without waiving this objection, the Cozy is located on a main street approximately one block from the City's offices. Due to the size and location of the sign, it is visible to passersby from the street. Brad Anderson noticed the Cozy Sign as he drove by the Cozy, and was the first City staff member to bring the sign to the City's attention.**

2. Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural and describe the extent of each official's involvement (i.e. whether the official directed Mr. Herrs to issue a citation against Plaintiffs).

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City further objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request as compound and seeks information regarding the "extent of each officials' involvement" that is not a discrete subpart of the initial interrogatory asking the City to identify the city officials who discussed the "enforcement of the" Sign Code against Plaintiffs' sign.**

**Subject to and without waiving these objections, the City responds to the first interrogatory contained in this request, that is "Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural" as follows: The City did not issue a notice of violation or citation to Plaintiffs regarding the Cozy Sign. The City determined the Cozy Sign was a sign under the Sign Code and therefore subject to the Sign Code and BID Code, evaluated the Cozy Sign under the Sign**

EXHIBIT B

**Code and determined that the Cozy Sign was too big to qualify for a sign permit, and informed Mr. Howard of the same. The City staff members who discussed the evaluation of the Cozy Sign under the Sign Code with Dustin Herrs were Lauren Driscoll, Dean Andrew, and Mike Schrage.**

**Regarding the second interrogatory in this request, as to Ms. Driscoll's involvement with Mr. Herrs, while it is impossible to remember every detail of Ms. Driscoll's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Ms. Driscoll discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, follow-up and meeting with Mr. Howard and Mr. Benson, providing information to Mr. Howard regarding the applicability of the Sign Code to the Cozy sign, next steps regarding the Cozy Sign and sign permit application, and the agreement with Mr. Howard to pause the work on the Cozy Sign.**

**Regarding the third interrogatory in this request, as to Mr. Andrew's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Andrew's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Andrew discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, Mr. Howard's knowledge of the Sign Code and BID Code process, and next steps regarding the Cozy Sign.**

**Regarding the fourth interrogatory in this request, as to Mr. Schrage's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Schrage's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Schrage participated in discussions with Mr. Herrs, Mr. Andrew and Ms. Driscoll regarding the application of the Sign Code to the Cozy Sign, meeting with Mr. Howard and Mr. Benson, and next steps regarding the Cozy Sign.**

3. Please explain the changes the City believes Plaintiffs need to make to their mural in order to "turn this into a mural rather than a sign," as suggested by Vice Mayor Longbine at the November 13, 2023, Commission meeting, (Doc. 16 at ¶ 136.) and in the Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 8).

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City objects to this request to the extent it seeks information protected by the attorney-client or work product privileges as it relates to the Brief in Support of Defendant's Motion to Dismiss. The City further objects to this request as it seeks the City to explain or interpret the arguments made by the City's counsel in Doc. 27 to Plaintiffs. The City also objects to this request to the extent it misinterprets the argument in Doc. 27 at 8 as a suggestion. The City also objects as the request uses only an excerpt of Vice Mayor Longbine's statement and misinterprets the statement made by Vice Mayor**

**Longbine on November 13, 2023 as a suggestion. Mr. Longbine's full statement at the meeting was "So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign." The statement was phrased as a question, not a suggestion. That is because Mayor Longbine does not interpret or apply the Sign Code or BID Code on behalf of the City. The City will not respond to the request to the extent it seeks information "as suggested" by Vice Mayor Longbine or in the Brief in Support of Defendant's Motion to Dismiss.**

**Subject to and without waiving these objections, the City responds only to the non-objectionable portion of the request that asks "Please explain the changes the City believes Plaintiffs need to make to their mural in order to 'turn this into a mural rather than a sign.'" The City regulates signs as defined by Salina Code § 42-764. In order to remove the Cozy Sign from the applicability of the Sign Code regulations, Plaintiffs would have to change the Cozy Sign into a display that falls outside the definition of "sign" found at Salina Code § 42-764.**

**As the City does not know what changes Plaintiffs would be willing to consider (particularly considering Paragraph 29 of the Amended Complaint, which states, "Mr. Howard does not want to change, alter, or deviate from" the rendering shown in Paragraph 28 of the Amended Complaint), the City cannot (and does not) know all of the potential changes that could be made to the Cozy Sign that would take it outside of the scope of the definition of sign. It would be nearly impossible for the City to guess all of the changes that could be made to the Cozy Sign to turn it into a display outside the definition of sign. However, in general, Plaintiffs can change the Cozy Sign into a display that does not "announce, direct attention to, or advertise," which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(2) would no longer be met, or Plaintiffs could relocate the display to the inside of the Cozy building, which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(3) would no longer be met.**

4. Please identify every government interest served by regulating Plaintiffs' mural.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. Subject to and without waiving this objection, the purpose statement of the Sign Code, found at Salina Code § 42-500 (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXSI_DIV1GE_S42-500PU), sets forth the government interests served by regulating signs under the Sign Code. The City refers Plaintiffs to § 42-500 for a complete list of those interests. The Sign Code regulates all signs, not just the Cozy Sign and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. The government interests served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values.**

5. Please explain how the City determines if a mural is used to "announce, direct attention to, or advertise."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that cannot be found in the Salina Code. Subject to and without waiving this objection, the City applies the Sign Code as written. The City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to, in pertinent part, whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise."**

**The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event.**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window).**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall).**

6. Please explain how the City identifies "art" which is exempt from the mural- sign code regime. See (Doc. 16 at ¶¶ 62-65, 100, 115, 208, 216); (Doc. 16-2 at 4-6, 22-23, 28); (Doc. 16-4 at 6-7); (Doc. 27 at 9, 12).

**OBJECTION AND RESPONSE: The City objects to this requests to the extent it seeks information protected by the attorney-client, work product and anticipation of litigation**

EXHIBIT B

**privileges respecting Defendant's Brief in Support of its Motion to Dismiss. The City further objects to this request to the extent it seeks the City to explain the arguments made by the City's counsel as set forth in Doc. 27 at 9 and 12. The City further objects to the extent the request incorporates allegations to the Amended Complaint as Plaintiffs made the allegations and no answer has been filed to determine whether the allegations are admitted or denied. Based on these objections, the City will only respond to the non-objectionable portion of the request "Please explain how the City identifies 'art' which is exempt from the mural-sign code regime."**

**The City objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or BID Code. Subject to and without waiving these objections, the Sign Code regulates "signs" as defined by § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code.**

**As to the term "art," the term "art" may be used from time to time as an imprecise short-hand for "not sign," but the term "art" is not included in the Sign Code and is not relevant to the determination of whether a display (whether it is artistic or not) is a "sign." This is because some artistic displays are also "signs," and some are not. To clarify, the artistic displays that are also signs are subject to regulation. The artistic displays that are not signs are just art, and because they are not also signs, they are not subject to regulation.**

**A "sign" under the sign code "is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.**

**Please see Response to Interrogatory No. 5 above for additional information responsive to this request.**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written. The City does not apply the**

EXHIBIT B

**term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code. Displays that are not signs are not subject to the size limits of the Sign Code, and the City does not evaluate the size of such displays. Accordingly, the City does not have information about the location or sizes of displays that are not signs under the Sign Code. The City, does not have sufficient information to "identify" as requested. Moreover, "unregulated 'art'" (which the City interprets as displays that are not signs) cannot exceed the Sign Code's size restrictions because those restrictions only apply to regulated signs.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions that does not correspond to the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written, it does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**Pursuant to Request for Production No. 5, Defendant is producing citations issued within the last 5 years. Pursuant to F.R.C.P. 33(d), Defendant refers Plaintiffs to those documents produced in Defendant's forthcoming supplemental disclosure for information responsive to this request.**

9. Please explain how the City determines if a mural "pertains to the goods or services for sale." See Amended Complaint at ¶¶ 32, 44, 52-54, 64-65, 128.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving this objection, the City applies the Sign Code as written, it does not apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to**

**"announce, direct attention to, or advertise." Salina Code § 42-764 does not use the phrase "pertains to the goods or services for sale." Rather, Salina Code § 42-764 applies to a display if, among other things, it "announces, directs attention to, or advertises." One way to evaluate whether a display "advertises" is if it encourages the purchase of products or services, in that it pertains to or references the goods or services for sale.**

10. For any Request for Admission that you denied, please explain the reasons for your denial.

**OBJECTION: The City objects to this request to the extent it seeks to impose obligations outside the scope of, or different than, the Federal Rules of Civil Procedure. F.R.C.P. 36(4) requires a matter be admitted, or specifically deny the request or state in detail why the answering party cannot truthfully admit or deny it. Further, a denial must fairly respond to the substance of the matter.**

11. Please identify the factual basis for the claim made in your Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 2) that "Plaintiffs' display is obviously a sign".

**RESPONSE: The City refers Plaintiffs to the allegations in their Amended Complaint found at ¶¶ 15-29 for allegations showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. The City also refers Plaintiffs to the transcript attached as Exhibit A to Plaintiffs' Amended Complaint at 15:2-23 for additional facts showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. Plaintiffs sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building."**

**The Cozy Sign is a display calculated to attract the attention of the public, that is attached to or painted on a building. It is used to announce, direct attention to and advertise and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them.**

Respectfully submitted this 12th day of July , 2024.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin<br>Bar Number 24170<br>Attorney for Defendant City | Todd G. Messenger,<br>CO Bar Number 38783<br>Pro Hac Vice Attorney for | Amanda C. Jokerst<br>CO Bar Number 47241<br>Pro Hac Vice Attorney for |

**EXHIBIT B**

of Salina, Kansas
CLARK, MIZE &
LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email:
aomartin@cml-law.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
tmessenger@fwlaw.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
ajokerst@fwlaw.com

**EXHIBIT B**

**VERIFICATION**

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

Signature

Executed on July 12, 2024

EXHIBIT B

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

## Sec. 1-11. Severability.

If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code.

(Code 1966, § 1-9)



EXHIBIT C

## Sec. 42-500. Purpose.

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882, § 1, 7-10-17)

## Sec. 42-501. Permits.

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

## Sec. 42-502. Zoning certificate (sign permit) required.

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

## Sec. 42-521. C-3 and C-4 commercial districts.

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

## Sec. 42-597. Board of zoning appeals.

(a) *Authorization.* The board of zoning appeals for the city is hereby established in accordance with K.S.A. 12-714.

(b) *Membership.* The board shall consist of seven (7) members who shall be appointed by the mayor with the approval of the board of city commissioners. All members shall be residents of the city. None of the members appointed shall hold any other elected or appointed office or position in the city government, except that one member shall be a member of the planning commission.

(c) *Power and duties.* The board shall have the power to:

(1) Hear and decide appeals where it is alleged there is an error in any order, requirement, decision or determination made by the zoning administrator in the enforcement of the zoning regulations. The board may reverse or may modify the order, requirement, decision or determination and to that end shall have all the powers of the administrative official from whom the appeal is taken.

(2) Authorize in specific cases a variance from the specific terms of these zoning regulations which shall not be contrary to the public interest where, due to special conditions, a literal enforcement of the provisions of the regulations will result in unnecessary hardship for the applicant. The board shall be limited to granting variances on matters including, but not limited to, building height, setbacks, lot size and lot coverage, as provided by the zoning regulations. A request for a variance may be granted after a public hearing upon a finding by the board that all of the following conditions have been met:

a. The variance requested arises from such condition which is unique to the property in question and which is not ordinarily found in the same zone or district, and is not created by an action or actions of the property owner or applicant.

b. The granting of the permit for variance will not adversely affect the rights of adjacent property owners or residents.

c. The strict application of the provisions of the zoning regulations from which the variance is requested will constitute an unnecessary hardship upon the property owner represented in the application.

d. The variance requested will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

e. Granting the variance desired will not be opposed to the general spirit and intent of the zoning regulations.

(3) In permitting a variance, the board may impose appropriate conditions and safeguards including, but not limited to, planting screens, fencing, construction commencement and completion dates, lighting, road access restrictions, parking requirements or any other requirement which the board deems appropriate under the circumstances, upon a finding that they are necessary to fulfill the purpose and intent of the zoning regulations.

(4) The board is not authorized to issue the following types of variances:

a. A variance which would allow a use not otherwise permitted in the zoning district.

b. A variance to a zoning ordinance definition.

c. A variance to expand or enlarge a nonconforming use.

d. A variance that would increase residential density above the maximum allowed in a zoning district.

e. A variance that would create a zero lot line setback.

f. A variance to the owner of a substandard lot where such lot was created in violation of the zoning regulations.

g. A variance that would increase the number of permitted signs on a zoning lot.

(d) *Commencement of proceeding before the board.*

(1) *Appeals.*

a. By whom: appeals to the board may be taken by any person aggrieved, or by any officer, department, or board of the city, or any governmental agency or body affected by any decision or interpretation of the zoning administrator. Such appeal shall be filed with the secretary of the board within thirty (30) days from the date of the decision by the zoning administrator, and such appeal shall specify, in writing, the grounds for appeal of the administrator's decision. The zoning administrator, when notified by the board of zoning appeals, shall transmit to the board all the papers constituting the record upon which the action appealed from was taken, within the time period established by the rules of the board.

b. Effect of appeal: an appeal stays all proceedings in furtherance of the action appealed from, including a permittee's right to proceed with development or other activities under a building permit, the issuance of which is a subject of the appeal.

(2) *Variances.* Any person may apply to the board for a variance by filing an application with the secretary of the board. The application shall include the following:

a. The name, address, telephone number and signature of the property owner and applicant.

b. The name and address of the architect, professional engineer or contractor, if any.

c. A site plan of the property showing the following:

1. Property lines of the subject property.

2. Size and location of existing structures and the distance between all existing and proposed structures on the property.

3. Setbacks for all existing and proposed structures on the property.

4. Any other dimension and/or information that may be relevant to the request.

d. A survey or verification that property and structure dimensions on the site plan are correct.

e. The names and addresses of the record owners of all property adjoining the property in question.

f. A narrative statement of how the statutory requirements in K.S.A. 12-715 are met.

(3) *Representation.* An applicant must appear in person at the public hearing, or be represented by an agent or attorney, in order for the board to act on the application.

(e) *Written decisions.* The board shall render its decision and findings in writing within thirty (30) days of the conclusion of the hearing. Decisions shall be filed in a public office designated by the board of commissioners and shall be a public record.

(f) *Dissatisfaction with the determination of the board.* Any person, official or governmental body dissatisfied with any order or determination of the board of zoning appeals may bring an action in district court to determine the reasonableness of any such order or determination.

(Code 1966, § 36-1201; Ord. No. 88-9244, § 1, 4-11-88)

Cross reference(s)—Administration, ch. 2; boards and commissions generally, § 2-136 et seq.

**Sec. 42-637. Building.**

*Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.

(Code 1966, § 36-1301(21))

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

## Sec. 42-781. Sign, wall.

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**Q. Okay. Is there any reason you can't testify here today?**

A. I can't think of any.

**Q. All right.**

A. Seasonal allergies have spiked, and I'll muddle through the best I can. If I lose my voice, I'll just need to drink some water.

**Q. All right. And if at any time you need to take a break, that is fine. Just let me know. The only condition on that would be that if there's a question pending that you answer that question first and go to break.**

A. Okay.

**Q. What is your current job title?**

A. I'm the Planning and Zoning administrator for the City of Salina.

**Q. And how long have you had that job?**

A. That specific job since 2009. I've been employed as a planner by the city for 37 years.

**Q. Okay. So, since 2009, you've been the zoning administrator. Before that, you were just a planner?**

A. I've had various titles.

**Q. Okay.**

A. But I've always worked in the Planning

Department since I was hired.

**Q. All right. And what was your educational background before working for the City of Salina?**

A. I have a Bachelor's and Master's degree from Kansas State University in urban geography and planning. And I have a Juris Doctorate degree from the University of Iowa, and I've been admitted to the Iowa and Kansas bars.

**Q. All right. And in your role as zoning administrator, who do you report to?**

A. Lauren Driscoll is the director of Community and Development Services.

**Q. And does anyone report to you?**

A. I have three planners who report to me.

**Q. Other than those three planners, does anyone else report to you?**

A. No, just those three planners. That's the Planning Division.

**Q. Who are the three planners?**

A. Dustin Herrs, Dustin Michelson and Gage Roberts.

**Q. And when you make a determination as a zoning administrator, does anyone in the city have the authority to overrule you?**

A. The Board of Zoning Appeals can overrule

**correct?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. And after that, does it say or display calculated to attract the attention of the public?**

A. Yes.

**Q. Is the meaning of this section saying that any writing, pictorial representation, emblem, flag, banner, streamer, pendant, string of lights or display that is calculated to attract the attention of the public meets the definition of a sign?**

MS. JOKERST: Object to form.

A. That can't be read without reference to subsections 1, 2 and 3.

BY MR. SHAW:

**Q. Well, is there also an or after calculated to attract the attention of the public?**

A. Are you asking me if there's an or in front of it or after it.

**Q. Is there an or after calculated to attract the attention of the public?**

A. Yes.

**Q. So does that second or separate the any**

flag?
A. Flag, banner, streamer, pennant or string of lights.
BY MR. SHAW:
**Q. Okay. And such a display if it's calculated to attract the attention of the public would be a sign?**
MS. JOKERST: Object to form.
A. No, because, again, I can't make a determination without using subsections 1, 2 and 3.
BY MR. SHAW:
**Q. Why is the second or there, I guess?**
MS. JOKERST: Object to form.
A. You're speaking again to this or after the word public?
BY MR. SHAW:
**Q. Yes, that's correct?**
A. Well, if the code drafter was here, I would ask them, but my interpretation would be that it's somewhat redundant because display or any other figure seems to be somewhat repetitive.
**Q. Okay. So the display calculated to attract the attention of the public has to also be married with the three subsections?**

A. Yes.
**Q. So then a display would have to both attract the attention of the public and direct the attention of the public. Is that correct?**
A. No.
**Q. So a display that was only calculated to attract the attention of the public would be a sign?**
A. A display calculated to attract the attention of the public that was used to announce, direct attention to or advertise would be a sign.
**Q. Okay. So it would have to both attract the attention of the public and direct attention?**
A. That would be my interpretation.
**Q. Okay. And as I recall from what you said earlier, attract attention is a shorter duration than direct attention. Is that correct?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. And the term advertise here as used in subsection 2, can you define an advertisement as used here?**
A. I think I answered that question previously, but it is to promote what is going on

would put up a structure, whether it was a banner or whether it's permanent sign, that would be something that is announcing, directing attention or advertising.

**Q. What would they be advertising?**

MS. JOKERST: Object to form.

A. They would be advertising their desire for the public to turn to Jesus.

BY MR. SHAW:

**Q. Okay. In subsection 3 where it says is not located inside of a building, what is considered a building under this section?**

A. A structure that meets the definition of building in the zoning ordinance.

**Q. Okay. Would you please turn to the section defining building?**

A. Appears to be 42-637.

**Q. All right. And does that define a building as any covered structure built for the support, shelter or enclosure of persons, animals, chattels or movable property of any kind and which is permanently affixed to the land?**

A. That is the definition that's in the zoning ordinance.

**Q. All right. What is the support, shelter**

of sign as a structure.
BY MR. SHAW:
**Q. Okay.**
A. We're in the business of regulating structures, so a flag would be a structure.
**Q. Okay. Would an American flag be used to announce, direct attention to or advertise?**
MS. JOKERST: Object to form.
A. It is certainly announcing.
BY MR. SHAW:
**Q. Okay. Would it be announcing the United States?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. Has the City of Salina's definition of a sign changed any as a result of this lawsuit?**
MS. JOKERST: Object to form and foundation and -- yeah, those are my two objections.
A. To the best of my knowledge, the city's definition of sign has been this way since 1966 and is unchanged.
BY MR. SHAW:

**Q. Has the city's definition of a sign changed any since 2015?**

MS. JOKERST: Object to form.

A. I don't understand the date reference.

BY MR. SHAW:

**Q. The Supreme Court decided a case named Reed v. Town of Gilbert in 2015. That is the reference. Has the city's definition of sign -- or, excuse me, has the city's interpretation of the definition of sign changed any since the Reed v. Town of Gilbert decision in 2015?**

MS. JOKERST: Object to form.

A. Not the definition of sign, no.

BY MR. SHAW:

**Q. Okay. Have other parts of the code changed since then?**

A. Absolutely.

**Q. Okay. If you can go to Section 42-781. Does this provide the definition of a wall sign?**

A. Yes.

**Q. Under this definition, are murals considered wall signs?**

MS. JOKERST: Object to form.

A. My answer would be no.

BY MR. SHAW:

**Q. Why is that?**
A. Because the definition says a wall sign is a sign, and a mural is not a sign.
**Q. What is a mural?**
MS. JOKERST: Object to form.
A. City of Salina does not have a definition for the term mural.
BY MR. SHAW:
**Q. Then how do you know it is not a sign?**
MS. JOKERST: Object to form.
A. A mural would not announce, direct attention to or advertise.
BY MR. SHAW:
**Q. Is a mural calculated to attract the attention of the public?**
MS. JOKERST: Object to form and foundation.
A. I think the word calculated goes to intent, and it's not my job to interpret somebody's intent.
BY MR. SHAW:
**Q. Is that not how the code uses the word calculated, though?**
MS. JOKERST: Object to form.
BY MR. SHAW:

Gilbert is that we are regulating the size, the time, place and manner of signs. And if the sign is otherwise compliant with time, place and manner and somebody wishes to substitute a non-commercial message for their commercial message, then that is permitted.

BY MR. SHAW:

**Q. Why the distinction between commercial and non-commercial messages?**

MS. JOKERST: Object to form and foundation.

A. Section 42-511 says the purpose of this provision is to prevent any inadvertent favoring of any particular commercial or non-commercial message over any other non-commercial message.

BY MR. SHAW:

**Q. Does this provision allow the favoring of non-commercial messages over commercial messages?**

MS. JOKERST: Object to form.

A. It doesn't allow for any favoring of messages.

BY MR. SHAW:

**Q. So if a -- if the sign code allows a non-commercial message on a sign, can a commercial message be substituted in its place?**

**Q. Okay.**

A. So if I'm Wendy's restaurant and I want to cover up my Wendy's restaurant sign with a sign that promotes a particular candidate or ballot initiative, I may do so.

**Q. How does this provision interact with the different functional definitions of signs?**

MS. JOKERST: Object to form.

A. I'm not aware that it does.

BY MR. SHAW:

**Q. Okay. Let's move on to Section 42-521. Is this section the section regulating signage in the C-3 and C-4 commercial districts?**

A. These are the sign district regulations that apply in the C-3 and C-4 commercial districts.

**Q. All right. So for all these questions I'm about to ask, I'm only asking about the C-4 district. I'm not interested in the C-3.**

**What are the maximum number of signs allowed in the C-4 district?**

A. An individual building may have a maximum of ten signs on that zoning lot with a limit of four signs per business.

**Q. Okay. And does that include those signs**

**Q. Had anyone determined on that day that the painting at The Cozy Inn was a sign?**

MS. JOKERST: Object to form.

A. All the actions that were taken from that staff meeting on were based on the possibility that it would be determined to be a sign.

BY MR. SHAW:

**Q. Was it, in fact, determined to be a sign?**

A. It was.

**Q. When was that decision made?**

MS. JOKERST: Object to form.

A. Sometime during that week.

BY MR. SHAW:

**Q. Who made that determination?**

A. Mr. Herrs made the initial determination, and then I concurred.

**Q. Why did you concur?**

A. Because I agreed with his determination.

**Q. Why did you agree with his determination?**

A. Because I determined that the graphic display announced, directed attention to and advertised the business which was The Cozy Inn.

**Q. And you determined that within the first week?**

A. Yes.

**Q. What specifically did you determine announced, direct attention to or advertised?**

A. I determined that the graphic displays of the burgers that were available for sale in the building, the ketchup, mustard packets and particularly the words associated with Don't Fear the Smell and The Fun is inside with an arrow pointing directly to the north pickup window constituted a display that announced, directed attention to and advertised The Cozy Inn business.

**Q. Did it -- did you determine it did all three of those, announced, direct attention to and advertised?**

A. I believe it does, yes.

**Q. Okay. What part of the painting announces The Cozy Inn?**

A. The burgers that are on display.

**Q. How do they announce The Cozy Inn?**

A. Because they depict the product that's available inside that building.

**Q. How do the painting on the side of The Cozy Inn direct attention?**

A. The words Don't Fear the Smell is associated with the unique odor that emanates from that building and from their product the onion

artificial rectangles around it. We treated the entire north wall as part of the display area.

BY MR. SHAW:

**Q. Okay. After Mr. Howard submitted this application on November 13th or whenever he submitted it, what was done with this application by your department?**

A. It was placed on file and on hold.

**Q. What does it mean for it to be on hold?**

A. It means that we could not approve it, but we were going to try to continue to work with Mr. Howard to find a code-compliant code-based solution that might allow ultimately the sign to be installed.

**Q. Does the city code discuss procedures for placing a sign permit on hold?**

MS. JOKERST: Object to form.

A. It does not.

BY MR. SHAW:

**Q. So is placing a sign permit on hold just a unwritten practice?**

MS. JOKERST: Object to form.

A. It's not an unwritten practice. It's usually done in consultation with the applicant.

BY MR. SHAW:

**Q. Was this done in consultation with Mr. Howard?**

A. Absolutely.

**Q. Did Mr. Howard agree to having his permit being placed on hold?**

A. Yes.

**Q. When did he make that agreement?**

A. When he talked to Mr. Herrs.

**Q. Mr. Herrs told you that Steve Howard agreed to his application being played on hold?**

MS. JOKERST: Object to form.

A. Mr. Howard was informed on Monday the 6th that we were unable to issue a sign permit, and he was informed that we were going to continue to work with him on coming up with a code-compliant solution that might allow the sign to ultimately be installed.

BY MR. SHAW:

**Q. But he submitted this application after that date. Is that correct?**

A. That is correct.

**Q. And at any point after that, did Mr. Howard consent to his application being place on hold?**

MS. JOKERST: Object to form.

A. Mr. Howard had knowledge that we were not able to approve his sign permit application.

BY MR. SHAW:

**Q. I asked if he consented to his application being placed on hold?**

A. What's your definition of consent?

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Agreeing he would let you place his application on hold?**

A. That's not a definition. What is your definition of consent? Mr. Herrs talked to Mr. Howard face-to-face, handed him information face-to-face and told him face-to-face that we are unable to issue a sign permit for the sign as currently proposed under the current sign code. How is that not communication.

**Q. I'm asking if Mr. Howard consented to his application being placed on hold?**

A. What form would that consent take?

**Q. Saying I agree that you can take my application and place it on hold. Did he ever say anything along those lines to you or Mr. Herrs?**

MS. JOKERST: Object to form and foundation.

A. I guess I'll refer back to Mr. Herrs' e-mail of his conversation with him.

BY MR. SHAW:

**Q. Are you referring to Exhibit 3?**

A. Exhibit 3.

**Q. So what in this e-mail do you believe expresses Mr. Howard's consent that an application he had not yet submitted be placed on hold?**

MS. JOKERST: Object to form.

A. Mr. Herrs said that in his conversation with Mr. Howard he had asked the artist to stop work on the sign until staff had had a chance to talk more about if there are any possible text amendments that might be appropriate. And we kept Mr. Howard informed of that, that we couldn't approve it in its present form but that we would continue to explore options and work towards seeing if there was a code-based solution that would allow the sign to ultimately be installed.

BY MR. SHAW:

**Q. And a week passed between when Mr. Herrs spoke with Mr. Howard and when Mr. Howard submitted his application. Is that correct?**

A. Yes.

MS. JOKERST: Object to form.

**any time even while an application is pending?**

A. Absolutely. It happens all the time.

**Q. I see. And does the code not set out that it is only by a final determination of the zoning administrator that the Board of Zoning Appeals gains jurisdiction?**

MS. JOKERST: Object to form.

A. What is your definition of a final determination?

BY MR. SHAW:

**Q. What is your definition of a final determination?**

A. My determination was on Monday November 6th, I had determined this to be a sign that required a sign permit. That was my determination. It didn't change. It didn't change under any of the additional information that we had. Mr. Howard, if he disagreed with my determination that it was a sign could have appealed my determination as being incorrect to the Board of Zoning Appeals.

**Q. I believe earlier you had said when a sign permit was denied, a letter is sent out to the applicant. Is that correct?**

A. I did not say that. I said when a sign

**may not be issued unless the zoning administrator determines a permit could also be issued?**

MS. JOKERST: Object to form.

A. It says a permit cannot be issued without a Certificate of Compatibility.

BY MR. SHAW:

**Q. All right. So the permits are conditional on the Certificate of Compatibility. Is that correct?**

A. You cannot --

MS. JOKERST: Object to form.

A. You cannot obtain a sign permit.

BY MR. SHAW:

**Q. Is it the other way around, though? Are Certificate of Compatibilities conditional on the permit?**

MS. JOKERST: Object to form.

A. The zoning ordinance and the Kansas Planning and Zoning Enabling Act give the authority to grant variances to the Salina Board of Zoning Appeals, not the Downtown Design Review Board. The Downtown Design Review Board does not have the legal authority to approve a sign that exceeds the limits under the C-4 zoning district.

BY MR. SHAW:

complete unless we had elevation drawings and dimensions of the proposed sign. So at least to that point and the early points, no one had any knowledge of what the final intended product was. And so by submitting a sign permit application with a rendering of the proposed installation, that would at least inform us of what the full scope of the installation was. So there was a benefit from that standpoint.

**Q. And after reviewing the rendering of what Mr. Howard was proposing in its alleged final format, did you confirm your determination that that was, in fact, a sign under the sign code?**

A. I was furnished a copy of that rendering, and it did not change my determination that what was being proposed was a painted wall sign.

**Q. And you are aware that other city staff members, specifically Lauren Driscoll and Dustin Herrs, had conversations with Mr. Howard about the sign, correct?**

A. I'm aware that conversations took place, but I wasn't present at any of those meetings. I don't know how many total meetings there were or the whereabouts. I heard secondhand that there was a meeting at the Smoky Hill Museum.

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

No 29 Sign Allowance, The Yard 7
No 30 10/3/23 letter to The Yard
from Salina 7
No 31 1/2/24 letter to Gleason and
Son Signs from Salina 7
No 32 Photos, 095, 123, 91, 301 7
No 33 Photo, 120 7
No 34 Campbell's Soup photo 7
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.
.

(THEREUPON, Herrs Deposition Exhibit No 1 through No 34 were premarked for identification.)

DUSTIN HERRS,

called as a witness on behalf of the Plaintiff, was sworn and testified as follows:

DIRECT-EXAMINATION

BY MR. SHAW:

**Q. Good afternoon, Mr. Herrs. My name is Jeff Shaw. I represent the Cozy Inn and Stephen Howard in this lawsuit. With me is Sam McRoberts who also represents the plaintiffs.**

**Have you ever had to sit for a deposition before?**

A. I have not.

**Q. Okay. Some basic ground rules. Because we have a court reporter here trying to make a transcript of this, it's very important that we all try not to talk over each other. It can be difficult at times. So let's just all try to give each other a second or two before we start talking so that there's a clear transcript.**

**Along those lines, things like body language and, you know, shrugging, say huh-uh, it just doesn't come through, so try to avid this. If I**

**ask you, oh, is that a yes, is that a no, it's not me trying to kind of be mean about it. It's trying to get the transcript to clearly reflect what it is your answer is.**

**If at some point your attorney objects to one of my questions, you can go ahead and answer that question unless she specifically tells you do not answer that question. Otherwise, that's just her kind of noting her objection for the record. Does that make sense to you?**

A. Yes.

**Q. Okay. And is there any reason why you are unable to testify today?**

A. No, I can testify today.

**Q. Okay. What is your current job at the City of Salina?**

A. I am a city planner for the City of Salina.

**Q. Okay. And how long have you held that position?**

A. Since April of 2006.

**Q. Okay. And what was your job before that?**

A. Well, I was a student.

**Q. Okay. And where were you a student at?**

A. Before coming here, Kansas State

University.

**Q. Okay. What did you study there?**

A. Planning.

**Q. Okay.**

A. Regional and Community Planning is the title.

**Q. And did you attend any other universities?**

A. Fort Hays State.

**Q. What did you study there?**

A. Geography.

**Q. Okay. So as a planner, who do you report to within the City of Salina?**

A. Dean Andrew, Zoning administrator.

**Q. Okay. Do you have anyone that reports to you?**

A. No.

**Q. Okay. Are there other planners?**

A. We have other planners.

**Q. Okay. How many approximately, if you know?**

A. There are two other planners.

**Q. Okay. Is one of them Dustin Michelson?**

A. Michelson.

**Q. Michelson. Okay.**

Board of Zoning Appeals for a variance to have exceptional signage.

BY MR. SHAW:

**Q. Okay. All right. Let's kind of do the same thing with a Certificate of Compatibility application. That gets submitted. What happens next for the city?**

A. Yeah. So the Downtown Design Review Board is a board of appointed members, and so there's public hearings involved. We would do a public notification to the surrounding property owners of the nature of the Certificate of Compatibility request. We do a staff report that would then be sent to the members, and we would present that staff report at a DRB meeting and they would review the proposed signage for a Certificate of Compatibility based on the downtown design guidelines.

**Q. It's my understanding the Certificate of Compatibility is not just for signage. Is that correct?**

A. Correct.

**Q. Is it for kind of any external change to property?**

A. Yes.

A. Are you referring to the Cozy Inn sign analysis?

**Q. Are you on Exhibit 3?**

A. I could maybe use some assistance. Okay. Here we go. Here we go. Thank you. Okay. I do recognize Exhibit 3.

**Q. All right. What is Exhibit 3?**

A. It is an e-mail from myself to Lauren Driscoll regarding a interaction I had with Mr. Howard.

**Q. Okay. Is the e-mail also going to the Plan Group?**

A. Oh, it is. Sorry. Yes, it is.

**Q. Who all is included in the Plan Group?**

MS. JOKERST: Object to form and foundation.

A. At this point in time, it would have been planning staff, it would have been the development coordinator and perhaps our administrative staff supervisor. I'm not a hundred percent certain.

BY MR. SHAW:

**Q. Okay. Was this written after you had spoken to Steve Howard in your office?**

A. Yes.

**Q. Okay. So do you see where you say,**

A. Yes.
BY MR. SHAW:
**Q. On the page 319 there, does the article attribute quotes to you?**
A. Yes.
**Q. All right. Does the article attribute a quote to you saying that the purpose of the sign code is to aim to prevent sign wars between businesses?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Is that an accurate quote from you?**
MS. JOKERST: Object to form.
A. It's not the only -- the only characteristic or purpose of sign regulations.
BY MR. SHAW:
**Q. Okay.**
A. But it is --
**Q. It's --**
A. -- one factor.
**Q. I'm sorry for talking over you. Did you say it's a factor?**
A. Yes.
**Q. Okay. What is a sign war?**

MS. JOKERST: Object to form.

A. A sign war could be a scenario where you have a number of businesses along a corridor. And in order to become more prominent, they erect signs that are larger than the signs around them and so then -- or larger than the businesses around them. And the businesses around them in turn erect signs that are taller or larger than the original sign. And then more people have larger, bigger signs and additional signage, and it goes on to the point where the signage loses its effectiveness. You lose the trees for the forest, becomes confusing, becomes cluttered and there's so much signage that none of it is really effective any longer.

BY MR. SHAW:

**Q. I see. And is that a term used in the city code?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is sign wars a term used in the city code?**

A. No. It was a term I use in an allegory form.

**Q. Okay. So you did use the term sign wars**

**when speaking to the reporter for this article, correct?**

A. Correct.

**Q. That is a correct quotation?**

A. Correct.

**Q. And you said you were using it as -- did you say it was an allegory or...**

A. In the example of the scenario I gave you, a description of the scenario I gave you.

**Q. All right. And so one of the aims of the sign code is to prevent these sign wars?**

MS. JOKERST: Object to form.

A. One of the aims is to protect both the aesthetic feel and quality of life of the community through it's aesthetics as well as making sure that you don't create any safety hazards which a lot of sign clutter and large amounts of signage could potentially result in.

BY MR. SHAW:

**Q. Do you think a mural can potentially result in safety hazards?**

MS. JOKERST: Object to form and foundation.

A. Which kind of mural?

BY MR. SHAW:

**Q. Okay. All right. There's another quote attributed to you in that next paragraph. Can you please review that?**

A. Yes.

**Q. Is that an accurate quotation?**

A. Yes.

**Q. And the sign wars quotation is also accurate?**

A. Yes.

**Q. Okay. Can you go to Exhibit 14, please. Are you familiar with what this document is?**

A. This looks like a sign permit in LAMA.

**Q. When it says at the top the date of 2/5/2024, do you know is that the date that LAMA says the permit was submitted or is that the just the date this was generated?**

MS. JOKERST: Object to form.

A. I have no idea.

BY MR. SHAW:

**Q. Okay. So when you look at this, does it have any field in there somewhere saying like assigned to, you know, Dustin Herrs, for instance?**

A. When I receive a sign permit for review in our LAMA database, it looks nothing like this from my seat. The window I see is nothing like

A. I would characterize this mural as a sign given that it's with The Yard.

**Q. Okay.**

A. So cut to the chase. If that's where you're going, like this is a sign.

**Q. I do want to hit each of the --**

A. Yeah.

**Q. -- three categories, but yes. So does it announce The Yard?**

A. No.

**Q. Does it direct attention to The Yard?**

A. Maybe. Probably.

**Q. Does it advertise The Yard?**

A. No.

**Q. This does not advertise The Yard?**

A. I think it's -- there's a certain Nexus. I think it would fall under the definition of a sign. I don't know if it advertises anything. I mean maybe come play, have fun. Maybe but...

**Q. Do you believe the mural at the Cozy Inn advertises the Cozy Inn?**

A. Yes.

**Q. Okay. Why does that advertise the Cozy Inn?**

A. Because it has burgers and is pointing to

an arrow inviting you inside.

**Q. So is the arrow the determining factor there?**

A. I think it's --

MS. JOKERST: Object to form.

A. I think it's the summation of all the information there.

BY MR. SHAW:

**Q. All right. So a hamburger themed mural at the Cozy Inn is an advertisement, but a baseball theme mural at The Yard is not and advertisement. That is your understanding?**

A. It could be.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Okay. All right. As a whole, you would classify this as a sign, correct?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Do you know if a sign permit was ever applied for at this mural?**

A. No.

MS. JOKERST: Object to form.

BY MR. SHAW:

MR. SHAW: Okay. All right. I have no further questions for you.

MS. JOKERST: I have a couple follow-ups.

CROSS-EXAMINATION

BY MS. JOKERST:

**Q. Mr. Herrs, did you provide the Cozy Inn sign analysis to Mr. Howard?**

A. Yes, when we met at the Smoky Hill Museum. I believe I did if I remember correctly.

**Q. Did Mr. Howard ever propose an alternative measurement for his sign?**

A. I don't believe so.

**Q. And I want to turn your attention to Exhibit 3 if you can pull that up. Just let me know when you're there.**

A. I am there.

**Q. Okay. If you look about halfway down where it says I informed Steve that as it is currently written, do you see that?**

A. Yes.

**Q. Okay. And do you see the date there is November 6 of 2023?**

A. Yes.

**Q. So on November 6, 2023, did you tell Mr. Howard that the sign on the side of the Cozy would**

**that?**

A. I do.

**Q. Do you see any other traditional burger condiments depicted in that area of the sign?**

A. Pickles, onions, ketchup, mustard.

**Q. And what about the sign as a whole? I guess look towards the right, just scan the whole thing. Do you see condiments throughout the sign?**

A. Yeah. I see ketchup and mustard and other pickles floating around.

**Q. And those little like white things, that big burger in the middle, you can kind of -- or, I'm sorry, towards the left in the middle, Don't Fear the Smell and The Fun is inside, and then you can kind of see it like on the one to the top right, those little white -- I don't know how to describe them, little white --**

A. Looks like team.

**Q. -- morsels?**

THE REPORTER: What did you say, Amanda?

MS. JOKERST: Morsels.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. Do you know what those are?**

A. No.

A. Okay. I'm there.

**Q. Okay. Under that it says current allowable sign area, 63 square feet. Do you see that?**

A. I do.

**Q. Is that the allowable sign area in total for the Cozy?**

A. That is correct.

**Q. Okay. And then down on the proposed hamburger sign analysis, do you see there where it says the Cozy Inn is approximately -- or, I'm sorry, the proposed hamburger sign on the north wall of the Cozy Inn is approximately 528 square feet?**

A. Yes.

**Q. And is that the measurement that you took to determine how large that painted wall sign is?**

A. Yes.

**Q. And if you look at the current signage, it says total sign area, 52.88 square feet. Do you see that?**

A. I do.

**Q. Okay. Is that the total signage that the Cozy currently had not including this wall sign?**

A. That is correct.

**Q. So if you subtracted that total sign area, that 52.88, from the approximately 528 square feet --**
A. Um-hum.
**Q. -- would that still be small enough to fit within that 63 square foot allowance?**
A. No. Say the question again.
**Q. Yeah. If you --**
A. I'm trying to --
**Q. -- subtracted -- so say that that 52.88 square feet wasn't there. There were no other signs. You didn't calculate any other sign allowance against their total allowable sign area --**
A. I see what you're saying.
**Q. -- would the Cozy painted wall sign still be small enough to fit within their allowable sign area of 63 square feet?**
A. Okay. So to rephrase your question, if the Cozy painting sign on the building, if that was the only sign that was there, would it fit within the 63 square feet?
**Q. Correct.**
A. No.
**Q. And look at where it says the Cozy Inn**

has the ability to install a fourth sign with no more than 10.12 square feet of area. Do you see that?

A. I do.

Q. Okay. If the Cozy was somehow able to shrink that sign, like the exact sign that they have down to 10.1 square feet, would they be able to get a sign permit?

A. Yes.

Q. Okay. And if you were able to -- okay. So Mr. Shaw asked you a couple questions, right, about, well, what if you did this when you were measuring or if you seem to maybe not include the projection sign or the window or the awning. So if you did any of those things, say you, you know, tried to -- went and parse out like every window or awning, do you think that you'd be able to parse that enough to get 528 square feet down to 10.12 square feet?

A. No.

Q. Does the City of Salina just regulate the Cozy sign?

A. No.

Q. Okay. Do they regulate all signs?

A. Yes.

same sign allowances as other people in downtown central business zoning district, which is our C-4 zoning district. People in the C-5 zoning district are allowed the same sign allowances as other people in the C-5 district. People in residential zoning districts are allowed to have the same sign allowances as other people in residential zoning districts of that same district.

**Q. And I want to speak specifically to sign clutter. How does regulating signs in the aggregate advance -- prevent sign clutter?**

MR. SHAW: Objection.

A. If signs are not regulated in the aggregate, you could have one sign that's larger than others. Then other people get larger signs. And if you get a whole bunch of signage, an excessive amount of signage both in terms of number of signs and size of signs, it can lose its effect and become distracting and potentially cause safety problems. It could also damage the aesthetic of the community, the quality of life of the community. And so the goal of the sign regulations is to permit and allow ample amount of signage for each property while still establishing

a balance that makes that signage effective and attractive without becoming a safety concern.

BY MS. JOKERST:

**Q. And I want to direct your attention to Exhibit 31, and specifically page 2, item 8?**

A. Okay. I'm on page -- or Exhibit 31.

**Q. Yep, Exhibit 31, page 2, item 8. It's on the top of that page.**

A. Okay. Sure.

**Q. The wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Do you see that?**

A. Yes.

**Q. Okay. So earlier Mr. Shaw was asking you questions about this and the application, and you said you thought that the application was related to a JRI sign that was in on the vestibule portion inside of The Yard. Do you recall that?**

A. I do.

**Q. Okay. Now, I want you to read No. 8.**

A. Um-hum.

**Q. Okay. So you're going to read that, the wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Now, I want you to turn to Exhibit 32 and go to that**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF DUSTIN HERRS**

I, Dustin Herrs, a City Planner II for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2. I am a City Planner II for the City of Salina. I have been a City Planner for the City of Salina since April 2006.

3. I have an undergraduate degree in Geography from Fort Hays State University.

4. I have a Master's degree in Regional and Community Planning, which I received from Kansas State University.

5. I am certified by the American Institute of Certified Planners ("AICP").

6. My AICP certification requires 32 continuing education credit hours every two years.

7. Some of the continuing education credit hours I have taken as part of my certification are related to planning law classes and include education on sign regulations.

**EXHIBIT F**

Signed: Dustin Herrs
Dustin Herrs

STATE OF Kansas )
) ss.
COUNTY OF Saline )

Subscribed and sworn to before me by Dustin Herrs on the 7 day of February, 2025.

Witness my hand and official seal. My commission expires: 4/29/2028

(Seal)
SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4/29/2028

Shandi L Wicks
Notary Public

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED
d/b/a The Cozy Inn and
STEPHEN HOWARD,

Plaintiffs,

v. Case No. 24-1027-TC-ADM

CITY OF SALINA, KANSAS,

Defendant.

**AMENDED PRETRIAL ORDER**

On November 19 and December 4, 2024, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone. Plaintiffs Cozy Inn, Inc. d/b/a The Cozy Inn and Stephen Howard appeared through counsel Jeffrey Shaw and Samuel G. MacRoberts. Defendant City of Salina, Kansas, appeared through counsel Amanda C. Jokerst, Todd G. Messenger, and Aaron O. Martin. After the court entered the pretrial order (ECF 92), the parties notified the court that the City of Salina amended its BID Code and Design Guidelines, thereby mooting a portion of plaintiffs' claims. On the parties' request to amend the pretrial order to reflect these developments, the court now enters this amended pretrial order to supersede the previous version.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

**1. PRELIMINARY MATTERS.**

**a. Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 2201, 2202, and is not disputed.

**EXHIBIT G**

**b.** **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by federal law interpreting the First and Fourteenth Amendments.

**2. STIPULATIONS.**

**a.** The following facts are stipulated:[1]

**i.** Cozy Inn, Incorporated d/b/a The Cozy Inn is a Kansas for-profit corporation registered and in good standing with the Secretary of State of Kansas.

**ii.** Steve Howard is the 90% shareholder of Cozy Inn, Incorporated. His daughter, Andrea Windholz, owns the remaining 10%.

**iii.** Cozy Inn, Incorporated owns and operates The Cozy Inn, a restaurant located in Salina, Kansas.

**iv.** Plaintiffs seek to paint a display on the exterior north wall of The Cozy Inn.

**v.** Plaintiffs started painting the display on November 3, 2023.

**vi.** The photos found at Plaintiffs Bates 50, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63 and 64 represent the unfinished display as currently painted on the north wall at The Cozy Inn.

**vii.** The City of Salina, Kansas (the "City") determined the display painted on the north wall of The Cozy Inn is a "sign" as defined by Salina Code § 42-764 and, more specifically, a "wall sign" as defined by Salina Code § 42-781. The City determined the sign was too large to qualify for a sign permit and that the display Plaintiffs intend to be the final display painted on the north wall at The Cozy Inn (Plaintiffs Bates 51) is a "sign" as defined

[1] The parties agree to further confer about factual stipulations and the admissibility of certain exhibits for trial after dispositive motions have been decided, as they believe the court's decision on summary judgment may eliminate the need for certain evidence and the parties may be able to further narrow the issues for trial. The parties will confer and file any additional stipulations no later than 2 weeks before trial is scheduled to commence.

by Salina Code § 42-764, and more specifically, a "wall sign" as defined by Salina Code § 42-781.

**viii.** The Cozy Inn is located within the C-4 zoning district and the Salina Downtown Business Improvement District No. 1.

**ix.** On November 6, 2023, the City asked Howard to stop painting the display.

**x.** On December 9, 2024, the Board of City Commissioners of the City of Salina ("Board") adopted Ordinance No. 24-11230, amending Salina Code Sections 2-206 through 2-211, and adding Section 2-212, pertaining to the Design Review Board (collectively, "Amended BID Code").

**xi.** On December 9, 2024, the Board adopted Resolution No. 24-8264, updating the Design Guidelines for Downtown Salina Business Improvement District No. 1 ("Updated Design Guidelines").

**xii.** Salina has determined that the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix), above, "involves only painting or repainting of a building wall" on a side elevation of the Cozy Inn building that is not a "storefront, primary façade, or secondary façade (as defined by the [Updated] Design Guidelines)," and does not "modify the color or finish of any character-defining features (as defined by the [Updated] Design Guidelines)."

**xiii.** Pursuant to the Amended BID Code Section 2-207(b)(4), a Certificate of Compatibility is not required for the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix) above, and consequently DRB review is also not required.

**xiv.** For the purposes of this litigation, the Sign Code, Salina Code § 42-500, *et seq.*, is not affected by the Amended BID Code and the Updated Design Guidelines.

**xv.** In light of the amendments described in paragraphs (x) and (xi) above, the parties agree that the BID Code controversy is moot and therefore the BID Code is no longer at issue.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

**i.** Photos found at Plaintiffs' Bates 50, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 64.

3. **FACTUAL CONTENTIONS.**

**a. Plaintiffs' Factual Contentions.**[2]

Overview

Howard operates The Cozy Inn, a Salina landmark that has served sliders for more than 100 years. It is renowned for its "pungent onion-esque aroma." After observing the vibrant proliferation of murals throughout Salina, Howard commissioned a mural for the side of The Cozy Inn. The mural would feature burger-esque flying saucers attacking The Cozy Inn with blasts of ketchup and mustard and says "Don't Fear the Smell!! The Fun is Inside!!" After reviewing the mural's content, the City came to the conclusion that it pertained to the goods for sale at The Cozy Inn and was considered a regulated sign because it "announced, directed attention to, or advertised" The Cozy Inn. City officials ordered Howard to halt work on the mural and instructed him to file an application for a sign permit. When Howard filed the application, the City refused to either grant or deny the application but instead placed the application "on-hold." Plaintiffs allege violations of the Free Speech Clause of the First Amendment and the Void-for-Vagueness Doctrine of the Fourteenth Amendment.

Summary of the Facts

Around November of 2023, Howard hired a well-known, experienced muralist, Colin Benson, to paint a mural that reflected his and The Cozy Inn's personality as depicted below:

[2] The City objected to several sentences in Plaintiffs' factual contentions on the grounds that they misrepresent the discovery record and/or exceed the scope of the allegations in the Amended Complaint. The court overrules these objections. As the instructions on the court's Pretrial Order form explain, at this stage of the proceedings Plaintiffs need only set forth "a concise statement of the factual contentions that they believe support their respective theories of the case," so it is Plaintiffs' prerogative to frame their own factual contentions. Further, the allegations in the Amended Complaint provided the City with ample notice that Plaintiffs would be relying on these types of factual allegations to support their claims.




On or about November 6, 2023, City officials learned that Plaintiffs were painting a mural at The Cozy Inn. After reviewing the mural's substance, and without speaking with Howard, City officials concluded that the mural "announced, directed attention to, or advertised" The Cozy Inn, and thus the City believed it fit the definition of a sign under the City code. City officials then told Howard he could not finish the mural and instructed him to submit applications for a sign permit and a Certificate of Compatibility. Howard complied with this request on or about November 13, 2023. City code contains mandatory deadlines for the City to respond to applications, but the City failed to meet these deadlines. Instead, in a letter dated February 8, 2024, the City placed the applications "on-hold." City code does not authorize placing applications "on-hold."

The mural is not an advertisement. Instead, it is an artistic expression intended to tell a story about travel. "It's not a billboard; it's artwork," Howard said. "It's my expression. It's my character going on my wall. I want to paint my wall."

The City regulates signs—including their sizes—through its written sign code, its unwritten policies and practices, its Sign Permit requirement, its Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and its

concomitant enforcement penalties.[3] Plaintiffs describe this as the "mural-sign code regime." In response to this lawsuit, the City amended its BID code and Design Review Guidelines, and determined that a Certificate of Compatibility is not required. As a result, the BID code is no longer at issue in this matter, while the controversy over Salina's written sign code and its unwritten policies and practices remains in dispute.

The written sign code treats all outdoor murals as wall signs and purports to subject every wall sign to the same size restrictions because all murals are "displays calculated to attract the attention of the public." But that is not how it works in practice. If artwork "pertains" to a business, or if it's "part of a commercial transaction," the City considers it a regulated sign subject to its restrictive size limitations because of the content. But if the content doesn't pertain to the business, Salina considers the mural to be unregulated art that is exempt from the mural-sign code regime and can take up an entire wall. The difference between an unregulated mural and a regulated sign turns on the artwork's content. City officials have repeatedly admitted that they must review a display's contents to determine whether the display is a regulated sign or an unregulated mural.

The City determines whether a display is a regulated sign by reviewing the display for content that announces, directs attention to, or advertises. When asked to identify the factual basis for its assertion that Plaintiffs' mural "is obviously a sign," the City stated that "the Cozy Sign *contains* a tag line announcing the infamous smell of the Cozy, it *has* an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy *by depicting representations* of them." It is clear that the City

[3] Violations constitute misdemeanors, punishable by a fine with each day being considered a new offense.

reviewed the contents of the mural at The Cozy Inn and considers the mural to be a sign because of its content.

The City Manager explained that The Cozy Inn's mural "includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." The City's Director of Community and Development explained the unwritten policy to the City Council, saying that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign"; instead, the government treats it as an unregulated mural. But, the Director continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated wall sign. If that same "steaming cup of coffee" happened to be painted "on the other side of town unrelated to anything" there, the government confirmed that it would be unregulated. During depositions, City officials admitted The Cozy Inn could paint an airplane mural, or a pizza mural, and could even paint an exact replica of Andy Warhol's world-famous Campbell soup can—unless The Cozy Inn started offering travel agency services, sold pizzas, or started serving tomato soup. What's more, if a different business on the other side of town that had no relationship with The Cozy Inn or hamburgers were to paint the exact same mural that Plaintiffs painted, Salina would not consider it to be a regulated sign.

Much of the mural-sign code regime is ill defined and vague. The text of the zoning code (which includes the sign code) grants the zoning administrator the discretion to issue binding interpretations of the code. The City code allows the substitution of the conjunctive "and" with the disjunctive "or" and vice versa as "the sense requires it." Zoning Administrator Dean Andrew testified that he believes this gives him the unilateral discretion to substitute "and" for "or" at will. The phrases "pertains to the goods or services for sale," "art," "commercial speech," "mural," and much more is not anywhere in the City code. The City's use of these terms and its emphasis on

the commercial nature of goods or services for sale to distinguish between murals and signs—based on the artwork's content—is found only in the City's unwritten policies and practices.

Andrew uses this authority to implement numerous unwritten policies. For example, the City employs a different methodology of measuring the area of signs than the one written in the code if Andrew decides that it is "practical." As a result, for murals at The Yard and Sharp Performance, Andrew found it "practical" to measure the area of the mural by measuring individual elements of the mural, while excluding the background paint, while he found it to be "impractical" to measure the individual elements of The Cozy Inn mural and simply calculated the area of the entire wall, including the background paint. Andrew has utilized this discretion to determine that a mural painted on an exterior brick wall at The Yard is not considered a regulated sign because it is "inside" even though it is plainly not inside a building. Andrew testified that he ignores the portion of the sign code defining a "sign" regarding "displays calculated to attract the attention of the public." Yet the City, in response to an interrogatory, asserted that "The Cozy Sign is a display calculated to attract the attention of the public," without providing further explanation. Directly across the parking lot from The Cozy Inn's mural is a mural advertising Bull Durham Tobacco, but Andrew created an exemption to the mural-sign code regime out of whole cloth for the tobacco mural, while strictly applying the regime to The Cozy Inn. The City ignores the deadlines for responding to applications in the code if Andrew places the applications "on-hold," as happened to Plaintiffs' applications, which remain on hold.

The City's content-based discrimination is seen throughout the city. Salina exempts the following murals that are "signs" under the code from the size restrictions, and the permit regulations, because of their content: Fire Station #2; The Yard side mural; KU's School of Medicine; Salina Art Center; Mural at the Mill; and the water tower mural. The City considers

other murals to be signs but finds them to be compliant with the mural-sign code regime based on the City's unwritten policies and practices: Bull Durham; Sharp Performance; The Yard front mural; and Schlotzsky's. Dozens of other murals throughout Salina are exempt. The City is host to the Boom Salina Art & Mural Festival, which has painted murals all around Salina. The City even sponsors murals throughout town through the Salina Arts & Humanities Department. The murals throughout Salina are popular and tourist attractions, and Howard painted the mural at The Cozy Inn to be a part of this thriving cultural scene. No member of the public has complained about the mural at The Cozy Inn. However, numerous members of the public have complained about the City's decision to order The Cozy Inn to halt work on the mural.

Salina has not disclosed any evidence or factual basis to support the alleged purposes of the mural-sign code regime. There is no factual basis for the belief that regulated murals are more aesthetically displeasing than unregulated murals. There is no factual basis for the belief that regulated murals are more dangerous to pedestrians than unregulated murals. There is no factual basis for the belief that regulated murals create a greater danger of traffic accidents than unregulated murals. There is no factual basis for the belief that regulated murals are more likely to harm property values than unregulated murals. There is no factual basis to treat artwork differently based on its content. Plaintiffs' expert rebuttal witness, Charles Taylor, has demonstrated that the report of Defendant's proffered expert, Mark White, is not credible or reliable, and does not provide a factual basis for the mural-sign code regime.

b. **Defendant City of Salina's Factual Contentions.**[4]

<u>Overview</u>

The *Austin* court recognized sign regulation approvingly as a "tradition" dating back more than 150 years—and observed that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." The City has regulated signs in like fashion for about 58 years. The City's regulations are currently codified at Salina Code of Ordinances ("Salina Code"), Chapter 42, Article X ("Sign Code").

The definition of "Sign" in Salina Code § 42-764 is agnostic as to content. It turns on whether a display is used to "announce, direct attention to, or advertise" and is "not located inside a building." If a display is located outside of a building and is used to "announce, direct attention to, or advertise," then it is a "Sign" and subject to the Sign Code's size limitations. Displays that fall outside of the definition of "Sign" are not signs and are therefore not regulated as such.

Plaintiffs allege a different interpretation of the City's definition of "Sign." Under Plaintiffs' interpretation of § 42-764, a sign is *anything* that is "calculated to attract the attention of the public." Plaintiffs' interpretation is absurd, ignores the plain language of § 42-764, is not how the City interprets § 42-764, and is not how the City applied § 42-764 to The Cozy Inn sign. Plaintiffs' suggested interpretation would mean that all displays – including murals – are signs under the Sign Code.

Yet Plaintiffs' interpretation does not alter the content-neutrality analysis. The text of the Sign Code remains content-neutral. Even if Plaintiffs have the correct interpretation, they are

---

[4] Plaintiffs are currently unable to object to the City's factual contentions on the grounds that they exceed the scope of the pleadings because the City has not yet filed a pleading. If and when the City does so, Plaintiffs will raise any such objection at that time. Further, Plaintiffs object to the City's factual contentions on other grounds, but will raise those objections on summary judgment or at trial.

without relief that would address their alleged injury. Indeed, even if this Court adopts Plaintiffs' interpretation of "sign" and finds that all displays are regulated signs, the legal status of Plaintiffs' display would not change—it would still be a sign that is too large to qualify for a permit.

The sign code is concerned with what a display does, not what it says. The text of the sign code makes no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. While in some circumstances City officials may have to look at a display to determine if it is a Sign, a sign code is not content-based merely because it requires a reading of the sign to determine if a content-neutral regulation applies. Structurally, the Cozy Inn sign is a wall sign as defined in Salina Code § 42-781. Salina Code § 42-781 also makes no reference to content and is concerned with the physical structure of a sign; to be a wall sign, the display must also fit within the definition of Sign in § 42-764.

<u>The Sign Code is Content-Neutral</u>

On its face, the definition of "Sign" is not content-based. There are no unwritten policies and procedures. City officials, including the Zoning Administrator, do not have unbridled discretion. City officials, including the Zoning Administrator, follow the Sign Code provisions.

The purposes set forth in Salina Code § 42-500 are also content-neutral. As such, intermediate scrutiny applies, and the Sign Code is constitutional because: (1) the purposes articulated in Salina Code § 42-500 (particularly traffic safety, pedestrian safety, property values, and aesthetics) are substantial government interests; (2) the Sign Code is narrowly tailored to advance those interests because the interests are furthered more effectively under the Sign Code than in the absence of regulation; and (3) Plaintiffs have ample alternative channels of communication of their information. In fact, Plaintiffs can display the exact same sign in a smaller

size, Plaintiffs have other existing signs on the Cozy Inn premises that fit within the allowable sign area, and Plaintiffs already communicate information through a number of other channels including radio, billboards, and social media.[5]

In considering whether the Sign Code is content-based as-applied to the Cozy Inn, the Court only considers how the sign code was applied to the Plaintiffs' sign. No other display is germane to Plaintiffs' case. The City applied the definition of "Sign" as written to the Cozy Inn sign. The City outlined its application of the Sign Code to the Cozy Inn sign in a document entitled the "Cozy Inn Sign Analysis." The City provided this memorandum to Howard and explained why the Sign was too large to qualify for a sign permit. On November 13, 2023, City staff informed the City Commission why Howard's display was a "Sign" under the Sign Code. The deposition testimony of City staff also supports the City's position that it applied the definition of Sign as written to the Cozy Inn sign.

Plaintiffs appear to make the argument that the Sign Code represents a commercial speech regulation that is unconstitutional. The Sign Code is not a commercial speech regulation. However, assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and displays that are not signs based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a classification of speech that is content-based or otherwise implicates strict scrutiny. Commercial speech is subject to an intermediate standard of review (discussed above). The Sign Code does not favor commercial speech over noncommercial speech. Indeed, Plaintiffs' Amended Complaint concedes this at ¶ 210 ("This demonstrates Salina's antipathy toward content related to a business and commercial speech. This

---

[5] Although the City's purposes are substantial government interests as a matter of law and require no evidence, the City has disclosed evidence, including its expert report, that the Sign Code actually advances the City's interests.

also demonstrates Salina's preference for content unrelated to a business and noncommercial speech."). Interestingly, Plaintiffs complain that noncommercial speech is favored and simultaneously allege that their sign displays noncommercial speech. However, Plaintiffs do not request declaratory judgment that the Sign Code does not apply to their sign.

<u>The City Determined Howard's Display was a "Sign"</u>

Salina Code § 42-501 directs a property owner to obtain a sign permit before a sign is painted, constructed, erected, remodeled, relocated, or expanded. The sign permit application form identifies the information required to be submitted for review. Plaintiffs did not seek a sign permit before beginning construction of the wall sign. Plaintiffs knew the City regulated signs, but did not review the regulations. Plaintiffs testified that they have no intent to read the regulations. On November 3, 2023, Plaintiffs started painting the wall sign. On November 6, 2023, the City reviewed the wall sign that was fully outlined and partially painted on the wall. The City determined that Plaintiffs' display is a wall sign under Salina Code §§ 42-764 and 42-781.

The Cozy Inn wall sign announces (among other things, the infamous onion smells of The Cozy Inn that Howard admitted "tag" anyone who enters). It "directs attention to" by way of a large arrow that points to the building entrance and ordering window. The sign also advertises, by way of pictorial representations, the hamburgers and hamburger toppings (ketchup, mustard, pickles, onions) that are available for sale at The Cozy Inn. Salina Code § 42-521 provides the sign area and number limitations for signs in the C-4 district (where The Cozy Inn is located). Using the dimensions of The Cozy Inn north wall (which the City obtained from a prior application submitted by The Cozy Inn for an awning sign and software the City has to assist in measuring the height of buildings), and noting the sign occupied the entire north wall, the City determined The Cozy Inn sign was too large to qualify for a sign permit under the sign area limitations in § 42-521.

Given the existing sign inventory, the Cozy Inn had approximately 10 square feet of remaining sign allowance, but the wall sign was approximately 528 square feet in size.

On November 6, the City contacted Howard and asked him to pause the painting, advising him that the painting was a wall sign under the sign code, it needed a sign permit, and it was too big to qualify for a sign permit as proposed. Howard did not administratively appeal this determination. The City met with Howard again on November 13. At this meeting, the City provided Howard with the Cozy Inn Sign Analysis memorandum that outlined the specific provisions of the sign code the City applied to Howard's sign to determine it was a sign and that it was too large to qualify for a sign permit. Howard did not administratively appeal this determination either.

The City understood that Howard was upset by the City's determination, and the City wanted to work with him to see if a code-based solution could be reached. In doing so, the City explained to Howard that it was going to engage a sign consultant that would help the City evaluate if the Salina community was in favor of permitting wall signs as large as The Cozy Inn sign on the sides of smaller buildings, and if the City could amend the Sign Code in a content-neutral fashion while continuing to advance its content-neutral purposes. While uncertain if this was possible, the City wanted to try to work with Howard, and the City understood that Howard was interested in pursuing this option. The City did not have any official submission from Howard regarding the sign, so it invited him to submit a sign permit application.[6] Unbeknownst to the City, Howard had already contacted the Kansas Justice Institute on November 11, 2023 to ask about representation in this case.

---

[6] Howard submitted this application, which included a rendering of the proposed final wall-sign that was different than the wall sign painted on the side of the Cozy Inn. After a review of the allegedly final rendering, the City confirmed the display was a sign.

<u>The Sign Code Is Not an Impermissible Prior Restraint</u>

With respect to Plaintiffs' prior-restraint claim, the Sign Code, on its face, does not promote arbitrary enforcement because it provides sufficient standards to limit the City and its officials' discretion. The Sign Code has numerous procedural safeguards including avenues for variances and appeals to resolve issues with the City. Further, the standard in the Sign Code is whether the display:

> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.

City staff under the supervision of the zoning administrator are capable of determining whether the structure or display is attached to, painted on, or represented on a building or other structure or on the ground. City staff under the supervision of the zoning administrator are capable of determining whether a display announces, directs attention to, or advertises. The City has been interpreting the definition of sign consistently for decades. The City applies the plain language and ordinary use of the words and phrases "announce, direct attention to, or advertise." The word "advertise" – which the Cozy Inn sign does – is widely used in defining "sign" for regulatory purposes. It is particularly clear when, as here, the advertisements pertain to or reference "goods or services for sale." "Building" is also a defined term in the Salina Code, and City staff under the supervision of the zoning administrator are capable of determining when a display is not located inside of a building. These criteria are constitutionally sufficient.

Further, the Sign Code provides for a brief, specified period of time within which the City must issue or deny a sign permit. In this case, the City informed Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. In an effort to cooperate with Howard regarding a possible code-based solution, and understanding that he was interested

in pursuing this option, the City placed the Plaintiffs' application "on-hold" instead of outright denying it. This approach was intended to be collaborative and helpful, and while it was relatively novel, it was neither illegal nor unconstitutional. The City did not need to again inform Howard that the sign was too large for a sign permit. He already knew that, and indicated as much on the sign permit application.

The Sign Code Is Not Unconstitutionally Vague

As to Plaintiffs' vagueness claim, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. During depositions, both Howard and Windholz testified that they had not read the Sign Code, did not attempt to read the Sign Code, and do not intend to read the Sign Code.

The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases enumerated by Plaintiffs that are simply not pertinent to regulating signs. Other words and phrases that are used in the Sign Code need no definition and do not render the Sign Code vague as they have well-understood meanings.

**4. LEGAL CLAIMS AND DEFENSES.**

**a. Plaintiffs' Claims.**

**i.** Violation of the First Amendment Free Speech Clause: Salina's mural-sign code regime (which includes Salina's written sign code, § 42-500 et seq., Salina's unwritten policies and practices, Salina's Sign Permit requirement, and their concomitant enforcement penalties) violate Plaintiffs' First Amendment rights because, both on its face and as applied to the mural at The Cozy Inn, it is a content-based restriction on speech, a speaker-based restriction on speech, and a prior restraint of speech. The mural-sign code regime is unconstitutional under strict scrutiny, intermediate scrutiny, or rational basis review. Plaintiffs also contend, to preserve the issue for appellate review, that the "commercial speech"

doctrine is inconsistent with the First Amendment and should be overturned.

**ii.** Void-for-Vagueness Doctrine of the Fourteenth Amendment: the mural-sign code regime is void for vagueness under the Fourteenth Amendment. Salina's mural-sign code regime "is so standardless that it authorizes or encourages seriously discriminatory enforcement," in violation of the Due Process Clause. The mural-sign code regime is so vague "that regulated parties [do not] know what is required of them," and fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way.

**b. Defendant the City's Defenses.**

The City asserts the following defenses:

**i.** Plaintiffs have not sought declaratory judgment from this Court to declare that their display is not a sign under the Sign Code, so Plaintiffs have not requested a declaration that will redress their asserted injuries.

**ii.** The Sign Code is content-neutral on its face and as applied to the Plaintiffs because the germane provisions of the Sign Code are not concerned with the idea, topic, subject, or viewpoint of the message displayed, the Sign Code is justified without reference to the content of the regulated speech, and the Sign Code was applied as it is written.

**iii.** The Sign Code passes intermediate scrutiny because it is narrowly tailored to advance the City's substantial interests of traffic safety, pedestrian safety, aesthetics, and property values, and it leaves open ample alternative channels because Plaintiffs can communicate the information with the exact same sign in a smaller size, with other existing signs on the Cozy Inn premises that fit within the allowable sign area, and through a number of other alternative channels.

**iv.** The Sign Code is not a prior restraint because it provides sufficient standards to limit the City and its officials' discretion, so it does not promote arbitrary enforcement.

**v.** The Sign Code is not a prior restraint because it provides for a brief, specified period of time within which the City must issue or deny a sign permit, and the City informed Mr. Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. The unique circumstances of this case, in which the City attempted to collaborate with the Plaintiffs to achieve a legislative solution, do not transmogrify the Sign Code into an unconstitutional prior restraint.

**vi.** Plaintiffs may not seek relief on behalf of "others similarly situated."

**vii.** The Sign Code is not vague because it provides people of ordinary intelligence with a reasonable opportunity to understand what conduct is prohibited.

**viii.** The Sign Code is not vague because it provides narrow, objective, and definite standards that properly guide the City and its permitting officials.

**ix.** The "overbreadth" doctrine, which relates to vagueness, does not apply to commercial speech.

**5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiffs seek the following relief:

**a.** A declaratory judgment that the City's mural-sign code regime—which includes the City's written sign code, unwritten policies and practices, Sign Permit requirement, and its concomitant enforcement of penalties ("mural-sign code regime")—as written and enforced:

**i.** is an unconstitutional content-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**ii.** is an unconstitutional speaker-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**iii.** (alternatively, if the mural-sign code regime is ruled to be content-neutral and speaker-neutral) fails to satisfy intermediate scrutiny, on its face and as applied to Plaintiffs and others similarly situated;

**iv.** is an unconstitutional prior restraint on speech, on its face and as applied to Plaintiffs and others similarly situated; and

**v.** is void for vagueness, on its face and as applied to Plaintiffs and others similarly situated.

**b.** A prospective permanent injunction enjoining the City, its officers, agents, employees, attorneys, servants, assigns, and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing the enforcement of the City's mural-sign code regime on its face and as applied to Plaintiffs and other similarly situated.

**c.** A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their mural in its current position on The Cozy Inn, or for completing the mural on The Cozy Inn.

**d.** Should plaintiffs prevail, they will seek their attorney fees and costs pursuant to 42 U.S.C. § 1988.

Defendant seeks the following relief:

**a.** Should the City prevail, it will seek its attorney fees and costs pursuant to 42 U.S.C. § 1988 on the grounds that Plaintiffs' case is frivolous, vexatious, harassing, and/or groundless.

**6. AMENDMENTS TO PLEADINGS.**

The parties do not anticipate any amendments to the pleadings. Should the Court deny the motion to dismiss in whole or in part, Defendant will file an answer to the amended complaint.

**7. DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by **October 18, 2024**. All discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8. MOTIONS.**

**a. Pending Motions.**

**i.** Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF 26).

**ii.** Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White.

**iii.** Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702.

**b. Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

**i.** Plaintiffs intend to file a motion for summary judgment and any necessary motions in limine.

**ii.** Defendant intends to file a motion for summary judgment and any necessary motions in limine.

The original dispositive-motion deadline, as established in the scheduling order and any amendments, was vacated on December 17, 2024 (ECF 96). The dispositive-motion deadline is now re-set for **February 7, 2025**. The parties must follow the summary-judgment guidelines on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**c. Motions Regarding Expert Testimony.** The parties have both filed motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, as of the filing deadline of **December 20, 2024**.

**9. TRIAL.**

The trial date was vacated on December 17, 2024. The trial date is re-set for **October 7, 2025, at 9:00 a.m., in Wichita, Kansas**. This case will be tried by the court sitting without a jury. Trial is expected to take approximately 2 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition

testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

10. **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties have not participated in mediation. They currently believe the prospects for settlement of this case are poor and they do not believe that court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

**IT IS SO ORDERED.**

Dated January 16, 2025, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.



EXHIBIT H

**Q. Okay. So you call them burgers because they're too small to be called a hamburger?**
A. If you will.
**Q. Okay. But essentially, it's the same thing, right?**
A. It's the same thing, yes.
**Q. Okay.**
A. Burger's easier to say.
**Q. All right. So let's talk about the burgers. What is The Cozy burger made of?**
A. 90 percent or leaner ground beef, inside round is the trim we use, diced onions, salt and pepper and ketchup, mustard and pickle if you want. That's the only choice you get. All the burgers are cooked with onions.
**Q. Okay. And that's what I was going to ask you. You said chopped onions. Are those chopped onions put into the patty?**
A. Put on top and smacked into it.
**Q. Okay. So it's cooked into the patty itself?**
A. Yeah. Yeah.
**Q. All right. And then you mentioned that the toppings that you offer are pickles?**
A. Yep.

**Q. Okay. And the condiments are ketchup?**
A. Yes.
**Q. And mustard?**
A. Yes.
**Q. Okay. And that's it?**
A. That's it.
**Q. All right. And every burger comes with onions?**
A. Yes.
**Q. Do you ever have people walk up and say I want a burger without onions?**
A. Every day.
**Q. Okay. And what do you tell them?**
A. If you're willing to try one, you're going to eat four. If you're not willing to try one, I'm sorry, you're missing out. A lot of people say, well, I'm allergic. I'm sorry. This isn't the place for you then.
**Q. So there's no substitutions when it comes to the onions?**
A. Right. Not even if it's for your dog.
**Q. Okay. All right. So you don't offer cheese?**
A. No.
**Q. Okay. No mayonnaise?**

A. No.
**Q. No barbecue sauce?**
A. No.
**Q. No lettuce?**
A. No.
**Q. No tomatoes?**
A. No.
**Q. Okay.**
A. Very simple.
**Q. All right. And how are The Cozy burgers sold?**
A. Individually.
**Q. Okay. Are they also sold in sacks?**
A. Yes.
**Q. Okay. Tell me about the sacks. Like what -- are they sold in bundles? How are they sold in the sacks?**
A. Usually in bag of six.
**Q. Okay. Is the bag of six like the most popular bundle that you sell?**
A. Divisions of six are.
**Q. Okay. So when you say divisions of six, you mean six, 12?**
A. 18, 24, 36, 48, 72.
**Q. Okay.**

**Q. Okay. So when someone comes inside, you can talk to them and suggest how many they should have?**

A. Yes.

**Q. Okay. What about at the ordering window?**

A. It is -- at the walk-up window, it's not as personal because you don't get the feel of -- our entertaining is inside. You know, all of us talk with everybody, and the conversations are always appropriate. They are timely. Walk up -- if you use the walk-up window, you're just kind of missing the whole point.

**Q. Okay. Do you feel like you're able to upsell better for customers that come inside?**

A. Yes.

**Q. Okay. Does that increase your sales for customers that come inside?**

A. Not always.

**Q. Okay. But does it typically?**

A. No. Because the walk-up window can get every bit as busy as the inside. And if it's snowing, they're probably going to come inside to order and not the walk-up window which won't be very many because wintertime is slow.

**Q. Okay. Well, what about in the summer?**

A. Summertime's my busy season, and it's about half and half. I don't know, I guess, what...

**Q. Okay. So of your customers, approximately 50 percent use the walk-up window and 50 percent go inside?**

A. I don't have any numbers to prove, but just by experience, yeah, 50/50.

**Q. Okay. Do you ever track that? I know you said you don't have the numbers, but do you ever track that --**

A. No.

**Q. -- in your head?**

A. No.

**Q. No. So it's --**

A. I have a very simple cash register. It tells me how many transactions I do and that's it. Doesn't tell me window or inside.

**Q. Okay. But you said coming up to the walk-up window is impersonal?**

A. Yeah. You're missing the whole point of going to The Cozy Inn.

**Q. Okay. Well, tell me about. What's the whole point of going to The Cozy Inn?**

A. You go inside, you get tagged right away

by the onion smell. And that's the butt of all jokes with The Cozy. Hey, I went to -- you can't -- Aaron can't go to his friend and say, hey, I went to The Cozy Inn today. Did you go inside? No. That's not -- that's not -- that's enough. You can't brag to your friends if you don't go inside.

**Q. Okay.**

A. My opinion.

**Q. And is that because the onion smell in The Cozy is infamous?**

A. Yes.

**Q. Okay. And is the onion smell inside The Cozy distinctive?**

A. Yes.

**Q. And when someone -- let me see how I'm going to ask this. All right. So you had mentioned that -- well, let me ask you this. So the whole purpose or you said something like you want customers to come inside The Cozy, right?**

A. Yes.

**Q. Okay. And you want them to come inside of the Cozy because you want them to order food inside, correct?**

A. Yes.

**Q. Okay. So if someone came -- you're asking people to come inside The Cozy to purchase something, correct?**

A. Yes.

**Q. Okay. And I mean because it would be -- how would you as a business make money if people just came into The Cozy and just congregated there and didn't buy anything, right?**

A. Well, that would be a problem. I don't have very much room.

**Q. Okay. What's the square foot for the customers?**

A. Maybe 40 square feet.

**Q. 40 square feet where the customers can sit?**

A. Yeah. I have six stools.

**Q. Okay. And another than the six stools, is there really anyplace else for people to hang out inside The Cozy?**

A. Behind the stools against the wall.

**Q. Okay.**

A. I've fit 12 to 15 people in there before.

**Q. Okay.**

A. Some sitting and most standing.

**Q. Okay. So other than the six people who**

a good time.
**Q. You want them to -- the entertainment piece is you want them to remember you or remember The Cozy so that they can come back?**
A. Yes.
**Q. Okay. And is that so when they come back they can then purchase more products from you?**
MR. SHAW: Objection to form.
A. Yeah.
BY MS. JOKERST:
**Q. Okay. Do you -- are you selling cupcakes at The Cozy?**
A. Not anymore.
**Q. Okay. But you were for a time?**
A. I was.
**Q. Okay. How did that come to be?**
A. I found a bakery, a baker out of Blue Skye Brewery and I was like, hey, would you want to make some for me. So she goes okay. And so she was -- I'd order cupcakes from her.
**Q. Okay. And was it -- I guess how was that set up? Did you -- you bought them from her and then you resold them at The Cozy?**
A. Yes.
**Q. Okay. So it was not -- you didn't like**

**Q. Okay. And I'm done referencing Exhibit A for now.**

**In the community of Salina, is it known that if you go inside The Cozy, you'll carry that onion aroma with you after you leave?**

A. Yes.

MR. SHAW: Objection to form.

BY MS. JOKERST:

**Q. And is that why the painting on the side of The Cozy says Don't Fear the Smell?**

A. Yes.

**Q. So the phrase Don't Fear the Smell, it's referring to that distinctive onion aroma, right?**

A. Right.

**Q. Okay. And does The Cozy reference that distinctive onion aroma in its advertising?**

MR. SHAW: Objection to form.

A. Sometimes.

BY MS. JOKERST:

**Q. Okay. How does it do that?**

A. Some people ask me to hold their shirt or their hat above the grill so they get the extra steam on it.

**Q. That's a unique request.**

A. Yeah.

A. Yes.
**Q. And in 2021, you applied for a Certificate of Compatibility permit for an awning at The Cozy. Is that right?**
A. Yes.
**Q. Okay.**
A. As far as the date goes, I don't know. But, yes, I did do that.
**Q. It was 2021?**
A. Ish. I don't remember.
**Q. Okay. Well, why did you apply for a Certificate of Compatibility permit for the awning?**
A. Because I was told to.
**Q. Okay. Who told you that?**
A. I don't know.
**Q. You don't know who told you to apply for it?**
A. And then I was just going to put up a red awning to match what was going on beside me which they never ended up putting up their awnings anyway. And then I thought before that awning was made, I thought, man, that's wasted space. Put The Cozy Inn on it so people finally -- they know that they're there. And then that became a sign

to the city. So that's when somebody said, hey, you've got writing on it now. Now, you've got to do this.

**Q. Okay. So someone at the city told you to apply for the Certificate of Compatibility for the awning?**

A. Yes.

**Q. Okay. And then did you fill out that permit?**

A. That one I did, yes.

**Q. Okay. Was there another permit that you didn't fill out?**

A. No.

**Q. So I want to direct your attention to Exhibit H. You can flip there. Are you there?**

A. Yeah.

**Q. All right. So go ahead and take a look at this. You can see property, address, name of business. It says Cozy Inn. Top of that page says Certificate of Compatibility Application. At the bottom, it says property owner's signature and 4/27/21. Do you see that?**

MR. SHAW: Objection to form.

A. Where are you looking?

BY MS. JOKERST:

A. No.
**Q. Okay. And here it says that Design Review Board held a meeting on May 13th, 2021 to review Certificate of Compatibility Application No. CC21-6 filed by you on behalf of The Cozy Inn. Do you see that?**
A. Yes.
**Q. Okay. And -- all right. Go down to page 2, if you want to flip to page 2 at the top there. Okay. And do you see it says in approving this Certificate of Compatibility Application, the Design Review Board attached the following condition of approval. Do you see that?**
A. Yes.
**Q. Okay. So they approved this Certificate of Compatibility Application?**
MR. SHAW: Objection to form.
A. Are you waiting on an answer?
BY MS. JOKERST:
**Q. Yeah.**
A. What did you ask me?
**Q. I said so they did approve the Certificate of Compatibility Application for the awning, right?**
A. Yes.

MR. SHAW: Objection to form.

BY MS. JOKERST:

**Q. Okay. And underneath that, there's 1, 2, and then right under that it says because. Do you see that?**

A. Um-hum.

**Q. Okay. And it says because the proposed awning will contain lettering, including The Cozy Inn name, staff classifies this type of awning as a sign which requires a sign permit. Do you see that?**

A. Yes.

**Q. Okay. So when they approved this Certificate of Compatibility Application, they told you you needed to apply for a sign permit?**

MR. SHAW: Objection to form.

A. Apparently.

BY MS. JOKERST:

**Q. Okay. Well, it's right there.**

A. Yeah.

**Q. So did they tell you to apply for a sign permit?**

MR. SHAW: Objection to form.

A. Okay.

BY MS. JOKERST:

**Q. Well, that's a yes or no question. Did the city tell you to apply for a sign permit for the awning?**

MR. SHAW: Objection to form.

A. Yes.

BY MS. JOKERST:

**Q. Okay. Mr. Howard, you've -- The Cozy Inn has participated in community events throughout Salina, right?**

A. Yes.

**Q. Okay. And it's participated in some community events that are hosted by the city. Is that right?**

A. Probably.

**Q. Okay. Well, the Smoky Hill Museum, it has a street fair?**

A. Yes.

**Q. Are you familiar with that?**

A. Yes.

**Q. Okay. And then The Cozy Inn as part of that street fair held an eating contest?**

A. Yes.

**Q. Is that right?**

A. Yes.

**Q. Okay. And The Cozy Inn has been**

it's there.

**Q. At some point, were you displaying that, though?**

A. Oh, yeah.

**Q. Okay.**

A. Just up until last week somebody knocked it off. I asked one of my people, I said what happened to that picture that was there. And they said, well, it fell and broke. It's in the office.

**Q. So I want to talk to you about the painting on the side of The Cozy. And what I'm talking about is the sign that's the subject of this lawsuit?**

MR. SHAW: Objection to form.

MS. JOKERST: Well, it wasn't a question. I was telling him what I'm referring to.

BY MS. JOKERST:

**Q. When did you first get the idea of painting that side wall at the Cozy?**

A. October of last year.

**Q. So October of 2023?**

A. Yeah.

**Q. Okay. And what led to that idea?**

A. Well, I had a couple about my age come to

BY MS. JOKERST:
**Q. All right. And I hate to flip you around here, but let's go back down to page 346?**
A. Okay.
**Q. All right. So I want to talk about the arrow. Why was the arrow included in the painting?**
A. Showing people where the front door is.
**Q. Okay. So it was directing people to the front door?**
A. Yes.
**Q. Okay. All right. So when did Colin start working on the painting on the side wall?**
A. I thought it was the 3rd.
**Q. November 3rd?**
A. November 3rd.
**Q. Okay. And before November 3rd, he came by to talk to you about the final draft of what he was going to paint on the wall?**
A. Yes.
**Q. Okay. And that's when he brought like the printout of it?**
A. Yes.
**Q. Okay. So you had agreed to pay Colin for the work, right?**

A. Yes.
**Q. Okay. And what was the agreed upon amount?**
A. $500.
**Q. Okay. And who purchased the paint that was used?**
A. Colin did.
**Q. Okay. Do you know where he purchased it from?**
A. I do not.
**Q. Okay. Who supplied all the supplies that Colin needed to do the painting?**
A. He did.
**Q. He did. Okay. And what were the terms of the payment? Did you agree when you were going to pay Colin?**
A. No.
**Q. You didn't have --**
A. He started in without payment.
**Q. Okay. He started without payment?**
A. Right.
**Q. Okay. And you said he started on what you thought was November 3rd of 2023. Approximately how long was the painting supposed to take before it was completed?**

A. He said on the text, might be over the weekend.

**Q. Okay. So was he going to be done -- predicted to be done by Monday?**

A. He thought he was, but he actually fell behind. So he goes, yeah, I'll probably be done Wednesday. So that would be 6, 7, 8.

**Q. Okay. All right. So Colin started work on the painting. And then what happened?**

A. He started painting the wall.

**Q. Okay. He started painting the wall. And then -- and then at some point did he stop paint the wall?**

A. Monday.

**Q. Okay. And why did he stop painting the wall?**

A. Because I asked him to.

**Q. Okay. And why did you ask him to stop?**

A. Because I was told I couldn't do it.

**Q. Okay. Who told you that?**

A. City of Salina.

**Q. Okay. Was it a specific person?**

A. I don't remember who I talked to.

**Q. Was it Dustin Herrs?**

A. I did go his office, but it wasn't him --

I don't know who called. I didn't receive the first phone call. I just called him back. Yes, it was Dustin, though.

**Q. Okay. So Dustin Herrs told you to stop?**

A. Yes.

**Q. Okay. And why did he tell you to stop?**

A. That's where you're going to lose me, all this sign stuff. I have no idea what code is and this and this and this. He lost me.

**Q. Okay. Did he tell you that the painting was a sign?**

A. His opinion.

**Q. Okay. But he told you that it was the city's opinion that the painting was a sign?**

A. Yes.

**Q. Okay. Did he tell you that the painting was too large to qualify for a sign permit?**

A. Something like that, yes.

**Q. Okay. And is that why you reached an agreement to stop work on the painting?**

MR. SHAW: Objection to form.

A. I thought I had to get permission. So I don't know if I paid my $35 permit fee that day or if even if it's that commission meeting night that I went. I don't remember.

BY MS. JOKERST:

**Q. Okay. But you were told by the City of Salina that that painting was too big to qualify for a sign permit, right?**

A. Yes.

**Q. Okay.**

A. But I thought I was just painting a mural.

**Q. Okay. But the city told you that it was a sign?**

A. Yes.

**Q. So before Colin Benson went out and started painting the side wall, did you think to apply for a sign permit?**

A. No.

**Q. Okay. Did you think to apply for a Certificate of Compatibility?**

A. No.

**Q. Okay. So you -- before Colin started painting, you did not apply for a sign permit?**

A. No.

**Q. Before Colin started paint, you did not apply for a Certificate of Compatibility, right?**

A. No.

**Q. Okay. Well, in 2021 with the awning**

Amanda. We're going to exchange the colored ones.

MS. JOKERST: Okay. Perfect.

THE REPORTER: Thank you.

MS. JOKERST: Yeah. All right. Are we ready?

THE REPORTER: Yes.

BY MS. JOKERST:

**Q. Okay. Mr. Howard, are you on Exhibit S?**

A. Yes.

**Q. Okay. I'd like to direct your attention to the second page, and it's page 54. And I should say the Bates number on it is 54.**

A. Yes.

**Q. Okay. You might have to turn it. I don't know how it's positioned there, but you might have to turn it a quarter --**

A. I have.

**Q. -- so you can see it the right side up.**

A. I have.

**Q. Okay. Is this the painting that's on the wall at The Cozy?**

A. Currently.

**Q. Okay. And is this the current state of what that painting looks like?**

A. Yes. As of November 6th, he has not

touched the wall.

**Q. Okay. And so the Don't Fear the Smell, The Fun is inside is on the wall, right?**

A. Yes.

**Q. Okay. The arrow pointing to the door is on the wall, right?**

A. Yes.

**Q. Okay. The big burger is in the middle, right?**

A. Yes.

**Q. Okay. You can see the ketchup and mustard on the burger. Is that right?**

A. Yes.

**Q. Okay. And I want you to look down to the left of the big burger on the left side of that bench. Do you see that?**

A. Yes.

**Q. Okay. That's a smaller -- that's a depiction of a smaller burger, right?**

A. Right.

**Q. Okay. And I want you to go to kind of -- say kind of like to the ride or right underneath the arrow, the point of the arrow, do you see that?**

A. Yes.

**Q. Okay. And that's also a depiction of a burger?**

A. Yes.

**Q. Okay. I want you to go directly to the right of the big hamburger. Do you see that smaller depiction of the burger?**

A. Yes.

**Q. Okay. And straight up from there, above where it says the smell, that's another depiction of a smaller burger, right?**

A. Yes.

**Q. Okay. Okay. And on the depiction of the big burger in the middle, that's ketchup on that burger, right?**

A. Yes.

**Q. Okay. And on the right side of the big burger, that is a depiction of mustard on the burger, right?**

A. Yes.

**Q. Okay. And it looks like this outline is complete. Is that right?**

A. Not quite.

**Q. Okay. But Colin had started painting it in, right?**

A. Yes. I don't know what day this picture

**Q. Okay. All right. So is there -- we don't need to look at the exhibits anymore at this time. Is there a jingle about the infamous onion aroma at The Cozy?**
MR. SHAW: Objection to form.
A. On the radio?
BY MS. JOKERST:
**Q. On the radio. Okay. So do you do radio advertising for The Cozy?**
A. Yes.
**Q. Okay. And the radio advertising contains a jingle?**
A. Part of it.
**Q. Okay. And the jingle relates to the aroma, onion aroma emanating from The Cozy?**
A. No. My ads finish with mosey into The Cozy Inn.
**Q. Okay.**
A. It's a catchy jingle.
**Q. I'm sorry?**
A. It's a catchy jingle.
**Q. Okay. So your ads say mosey into the Cozy?**
A. Yeah.
**Q. Okay. So your radio --**

MR. SHAW: Objection to form.
BY MS. JOKERST:
**Q. Okay. All right. So then you had mentioned that you also showed up at the -- you also showed up at the Smokey -- or, I'm sorry, the city commission meeting, right?**
A. Yes.
**Q. Okay. And that was on November 13th?**
A. That's the day I paid my sign -- my permit.
**Q. Okay. Did you go down to the -- to the meeting on the day that you submitted your permit application?**
A. Yes.
**Q. Okay. So let's talk about that. So you -- you filled out a sign permit -- or scratch that. I'm going to turn our direction or your attention to Exhibit AA.**
A. Okay.
**Q. Okay. Is this the sign permit application you submitted for the wall sign?**
A. What's the date on it?
**Q. The date is on page 2 if you want to look.**
A. Yeah, I did.

MR. SHAW: What was your pending question?

BY MS. JOKERST:

**Q. I asked if this was the sign permit application he submitted for the wall sign?**

MR. SHAW: Objection to form.

A. Yes.

BY MS. JOKERST:

**Q. Okay. And is this a true and accurate depiction of the sign permit application you submitted?**

A. Yes.

MS. JOKERST: Okay. I will move to formally Exhibit AA into the deposition record.

BY MS. JOKERST:

**Q. Mr. Howard, who filled this sign permit out?**

A. I believe it was Leslie Bishop.

**Q. Okay. Leslie Bishop filled this out for you. And how did she come to fill out for you?**

A. I asked for help filling it out.

**Q. Okay. So did you contact Leslie Bishop?**

A. Yes.

**Q. Okay. And what did you say to Leslie Bishop?**

A. I don't remember. I just said I don't -- I think I said I don't remember -- I don't understand any of this.

**Q. Okay. And you just asked her for help to fill it out?**

A. Yes.

**Q. Okay. So I want you to look at page 2 on that signature of applicant. Is that your signature?**

A. Yes.

**Q. Okay. And I want you to look back up on page 1. Towards the bottom of page 1, it says Proposed Signs in the middle. On the bottom right the box Other is checked?**

MR. SHAW: Objection to form.

MS. JOKERST: I'm just directing him to it.

BY MS. JOKERST:

**Q. Do you see that there where the Other box is checked?**

A. Yeah. There's --

**Q. An X in it?**

A. Wall and Other, yeah.

**Q. Okay. Next to that, do you see where it says mural exceeding allowable space for**

**mural/signage?**

A. Yes.

**Q. Okay. So when you submitted this application, you had conceded that the painting on the wall exceeded the allowable space for signage?**

MR. SHAW: Objection to form.

A. I didn't see that that she wrote that.

BY MS. JOKERST:

**Q. Okay. You signed it, right?**

A. I signed it, yes.

**Q. Okay. So you submitted it to the city in that format?**

A. Yeah.

**Q. Okay. All right. I want to direct your attention to Exhibit F, and this is in black and white, so it's not supposed to be in color.**

A. Okay.

**Q. Okay. Is this the Certificate of Compatibility Application you submitted?**

A. Yes.

**Q. Okay. Who filled this application out?**

A. I don't know. I signed it.

**Q. Okay. Well, did you fill it out?**

A. That's not my writing.

**Q. Okay. Did Leslie fill this out?**

BY MS. JOKERST:

**Q. Well, did you have a meeting with Brad Anderson that wasn't at the Smoky Hill Museum?**

A. I don't remember.

**Q. Okay. Well, did Colin?**

A. I don't know.

**Q. Okay. Well, what was he talking about when he said he was all riled up?**

MR. SHAW: Objection to form.

A. I don't know.

BY MS. JOKERST:

**Q. Okay. So on November 6th, you told Colin to stop the mural, right?**

A. Yes, that was Monday.

**Q. You told him stop the sign -- stop the painting on the wall at The Cozy?**

A. Yes, on the 6th.

**Q. Okay. And you've said nothing's been done since the 6th, right?**

A. Right.

**Q. Okay. So I want to direct your attention to page 354 of Exhibit V, as in Victor?**

A. Okay.

**Q. Okay. And on November 7th, you sent Colin Benson and text and said finish the mural.**

**It's on me?**

MR. SHAW: Objection to form.

BY MS. JOKERST:

**Q. Did you send that to Colin?**

A. Yes.

**Q. Okay. Why did you say that?**

A. Because I was drunk.

**Q. Okay. And you wanted him to finish the painting?**

A. Yeah. I was being emotional.

**Q. Okay.**

A. Had no meaning behind it. Obviously, he did not finish.

**Q. Okay. And then you sent him a YouTube video, right?**

A. That was sent to me. I don't recall even opening it.

**Q. Well, look at those blue bubbles?**

A. Yes.

**Q. So you said finish the mural. It's on me, right?**

A. Yes.

**Q. And then the other blue bubble, that's from you as well, right?**

A. Yes.

**Q. Okay. So that's the YouTube link?**
A. Yeah, I don't know.
**Q. Okay. Well, do you remember you sent him a YouTube link to a clip from Animal House?**
A. I don't know if I remember that, but I think I saw that.
**Q. Okay. Why did you send him the clip from Animal House?**
A. Because it was funny.
**Q. Okay. All right. So I want to direct your attention to page 35 -- I'm sorry, Bates 356. It's page about 22 of Exhibit V. Okay. And you say -- you sent Colin a text that says starts with so find Doug Rempp. Okay. I want you to scroll down to the next one, the next page, 357. And then you say here, yep. He should unload his gun and back off. Do you see that?**
A. Yes.
**Q. Okay. So you sent that text message to Colin?**
A. Yes.
**Q. Okay. And what did you mean by he should unload his gun and back off?**
A. I don't remember why I would have said that.

**Q. Okay. Does Jenni's Liquor sell any food?**
A. No. Candy bars, snacks, sunflower seeds.
**Q. All right. And how long have you owned Jenni's Liquor?**
A. Maybe 2020.
**Q. Okay.**
A. Maybe 2021, June is when we took over, one of those years.
**Q. All right. And on the wall at Jenni's Liquor, you had a similar display painted. Is that right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. But it's not the exact same display, right?**
A. No.
**Q. Okay. So I want to direct your attention to Exhibit Y.**
MR. SHAW: I will object to the use of all these photos as they were not timely disclosed in accordance with the scheduling order.
MS. JOKERST: Okay. And I recall just note for the record on the purpose of this is that is our position they should have been disclosed

**Q. Okay.**
A. -- can't figure things out like that.
**Q. So your wife responded to the question is this a Cozy reference and said yes, right?**
A. She's her own person.
**Q. Okay. But she responded and she said yes, right?**
A. Yes.
**Q. Okay. And that's because this painting is a reference to The Cozy wall sign, right?**
MR. SHAW: Objection to form.
A. Sure, if you look at it like that.
BY MS. JOKERST:
**Q. Okay. Well, your wife looked at it like that?**
MR. SHAW: Objection to form.
BY MS. JOKERST:
**Q. Right?**
A. I just had fun with it.
**Q. Okay. But I'm saying your wife looked at it that way, right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. And so do you also look at it that**

**way as a reference to The Cozy?**

A. It's a continuation of my story.

**Q. Okay. You're talking about your story as it relates to the painting at The Cozy?**

MR. SHAW: Objection to form.

A. The ships had to come from somewhere.

BY MS. JOKERST:

**Q. Okay. Well, that's a yes or no question. You're saying that it relates to your story as it relates to the painting that's at The Cozy, right?**

MR. SHAW: Objection to form.

A. Yes.

MS. JOKERST: All right. I will formally move to admit Exhibit Y into the deposition record.

MR. SHAW: We will renew our objection.

MS. JOKERST: Okay. And we can, again, just for the court reporter, that can be noted, and that does not affect that the entire exhibit will be included with the deposition testimony.

BY MS. JOKERST:

**Q. All right. So I want to talk to you a little bit about the painting that's on the wall at Jenni's Liquor. I mean how did that come into existence?**

A. I've got a crazy mind.

**Q. Okay. It was your idea?**

A. Yes.

**Q. Okay. So did you talk to Colin Benson about it?**

A. After I asked the mayor if I could do that, the mayor of Brookville.

**Q. Oh so you asked the mayor of Brookville for --**

A. If I could paint a mural.

**Q. Okay. So you asked the mayor of Brookville whether or not you could paint that, and what did the mayor of Brookville say?**

A. You don't want to know, but, of course, he said yes.

**Q. Okay. Well, I don't want to know. Why don't I want to know?**

A. He goes I don't care what the fuck you do on your wall.

**Q. Okay. And so you decided that you were going to work with Colin again?**

A. Yes.

**Q. Okay. Did you call Colin up, did you text Colin? How did you get in touch with Colin?**

A. Probably called him.

**Rick Benson about the lawsuit?**
MR. SHAW: Objection to form.
A. Pretty much about everything.
BY MS. JOKERST:
**Q. Okay. Well, you told him that you thought the lawsuit was bullshit, right?**
MR. SHAW: Objection to form.
A. He thought it was.
BY MS. JOKERST:
**Q. Okay. Well, what part of the lawsuit do you think is bullshit?**
MR. SHAW: Objection to form.
A. None of it. None of it.
BY MS. JOKERST:
**Q. Okay. Well, you said that you don't understand the sign code, right?**
A. Right.
**Q. Okay. But then you told Rick Benson that this was bullshit?**
MR. SHAW: Objection to form.
A. I guess.
BY MS. JOKERST:
**Q. Okay. So what I'm trying to understand is when you were telling him this is bullshit, what's the this you were talking about?**

MR. SHAW: Objection to form.
A. That it went this far.
BY MS. JOKERST:
**Q. Okay. Have you read the Salina sign code?**
A. No.
**Q. Okay.**
A. I wouldn't understand it.
**Q. Okay. But you haven't even tried to read it?**
A. No.
**Q. Okay. And you don't care about reading it, do you?**
MR. SHAW: Objection to form.
A. No.
BY MS. JOKERST:
**Q. Okay. Have you spoken to anyone associated with Blacksmith Coffee about their sign on the Ohio Street building?**
A. I did.
**Q. Okay. Who did you talk to?**
A. I don't remember. Some girl.
**Q. Some girl. Was she a worker, an owner?**
A. I think a worker.
**Q. Okay. And how did you strike up a**

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD

Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,

Defendant.

.

.

DEPOSITION OF

ANDREA WINDHOLZ,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 2:00 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.



EXHIBIT I

A. Yes.

**Q. Do you handle any of the ordering for the meat?**

A. Sometimes if my dad is unavailable.

**Q. Okay. All right. And then I understand you handle the advertising for The Cozy. Is that right?**

A. Most of the time. Sometimes my dad will do it, but a lot of times I will just because I'm more tech savvy and whatnot. I run The Cozy Inn Facebook page.

**Q. Okay. And that's what I was going to ask, too. So what social media accounts does The Cozy have an account for?**

A. That I run is just Coz -- is just the Facebook page. If there's other ones out there, it's not from me.

**Q. Okay. So you don't run a Cozy Inn Instagram account?**

A. Huh-uh.

**Q. Okay. And what do you do as part of handling The Cozy Inn Facebook page? What does that involve?**

A. I'll post on there that we're hiring. I'll make posts of like if we're going to close

early for a holiday. Or for like when we had the really bad storm a few months ago, I posted on there that we were closing for the day to let our employees clean up their debris. It's pretty much there just to update customers. And also, like when we do fun things like with The Cozy Inn eating contest, I live streamed on there for that. It's just there to like stay with customers and keep them informed and keep them with The Cozy Inn.

**Q. Okay. Do you also handle the purchasing of Cozy merchandise?**

A. I do the ordering, yes.

**Q. Okay. And what does that entail?**

A. So I'll go through the shirts and I'll see which ones we're running low on, and I'll do the order for that. And if we're running low on like our hats or koozies, I'll decide -- like here in the next couple weeks, I'll be doing a hoodie order. So like I'll just go -- I'll go on -- I'll e-mail Messenger and tell them what sizes and colors of hoodies I want. And I'll change the colors of koozies up. I pretty much have free range on what I bring in as long as it's not like an astronomical price.

**Q. Okay. Do you help determine what designs go on the T-shirts?**

A. For the most part, yes.

**Q. Okay. And how do you determine what designs go on the T-shirts?**

A. We don't really change it up. We really keep it the same. But we did like any new shirts, new styles, my dad will tell me what he wants and I'll kind of do like a little draw-up of it and be like is this what you're envisioning. And he'll tell me yes or no or maybe do this or whatever. Then I'll take that into Messenger, and I'll talk to their designer there and we'll come up with the actual design that would go onto something.

**Q. Okay. Is Messenger, is that the vendor that you use?**

A. Yes.

**Q. Okay. And I assume they're just like a merchandise vendor. They screen print on T-shirts or hats?**

MR. SHAW: Objection to form.

A. Yes. They do the printing on the shirts. And then they have Salina Embroidery works with them and they embroider like our hats and stuff

like that. And then we get our koozies and stuff printed from Messenger as well.

BY MS. JOKERST:

**Q. Okay. So when's like the last time you guys have updated a T-shirt design?**

A. From my knowledge, I think my dad kept everything the same even when he bought it.

**Q. Okay.**

A. I'm not sure if he came up with any of the designs. I really -- I honestly don't know. I was nine.

**Q. Okay.**

A. So I'm assuming -- I mean, obviously, the logo itself stayed the same, but the designs on the shirts, I don't know if he came up with them or if they were already like that when he bought it.

**Q. Okay. Or than ordering merchandise, what do you do in your role -- let me reask that. Other than handling the Facebook account and ordering merchandise, what do you do in your role as handling the advertising for The Cozy?**

A. I -- I pretty much just kind of pay attention to what Salina, Downtown Salina is doing. And if we're able to participate, then I

will bring that up to dad. Or I will e-mail Chamber of Commerce maybe and kind of see what we could do to be a part of it. We just like to stay with the times of Downtown Salina and keep with just our name out there, letting them know that we're a part of Salina and we love being part of Downtown Salina. Like it's so much fun.

**Q. Okay. Do you also coordinate radio advertisement?**

A. Yes. I talk on the radio, yes.

**Q. Okay. You talk on the radio?**

A. Um-hum.

**Q. When you say that, do you do like radio interviews or do you have like a recording of yourself for a part of an advertisement?**

A. I have talked on the radio before, like answered -- like interview.

**Q. Okay.**

A. And then right now it's just a recording.

**Q. Okay. What does the recording say?**

A. It's pretty much saying football season is here and school's back in session, so let Cozy's help you with your tailgating and, you know, late night dinner needs. I think that's what one says. And the other one, I cannot recall

what it says. I recorded it a couple months ago.
**Q. Okay.**
A. A month ago.
**Q. And do either of these recordings have like a jingle that says mosey on in to The Cozy?**
A. Yes.
**Q. Okay. Do they both have it?**
A. Yes. I think each one has a different part of the jingle, but they both have it.
**Q. Okay. Does the jingle say more than mosey on in to The Cozy?**
A. It -- yeah. So for the most part, it says that -- I honestly haven't heard the entire jingle in a very long time, so I could not tell you. But I know that like the beginning of it's just like really upbeat and like -- yeah. It says it at the beginning, at the end. And in the middle, I cannot tell you what it says. I'm sorry.
**Q. Okay. So as part of like the radio advertisement, you record the audio. Do you also coordinate with the radio station regarding when the ads will air?**
A. They try to -- they kind of tell me like we're going to air it a little bit more during

envelope, and that way my dad knows to take it home and pay it. If I take it out, then we could lose it.

**Q. Okay. Do you -- does The Cozy have like an advertising plan?**

A. Could I ask what you mean by that?

**Q. Yeah. Do you or do you and your dad, I guess, get together and set out what kind of advertising you're planning to do for The Cozy?**

A. Oh, yeah. We will sit there and we'll talk at Cozy's or something. Like, hey, I heard this was going on. Do you want to do something for it? Or there's like indoor football. We always advertise there. We do a lot for them and whatnot. And then so, yeah, we just -- we keep our eye out for things that we're able to get our name out there with and do that. We do a lot of -- yeah, a lot of the just local advertisements and whatnot.

**Q. Okay. For indoor football, is that the Salina Liberty team?**

A. Um-hum, yes.

**Q. Yes. Okay. And what kind of advertising do you do with them?**

A. We have like a banner that they hang in

there, and we also throw burgers into the stands at the football games.

**Q. Okay. Do you launch them in one of those little machines?**

A. I wish. No. It's -- they hand throw it.

**Q. Okay.**

A. As hard they I can.

**Q. Okay. So what does the banner say that you hang? And I'm assuming you hang that banner in the stadium?**

A. Yes. It's just our logo.

**Q. Okay.**

A. Like it's just the red logo, and then it says since 1922, like literally, whatever you see on line for our logo is what the banner is.

**Q. Okay. So is it the red like neon sign logo?**

A. Yes.

**Q. Okay. Anything else like that that you do? I don't know if you have any other sports teams there, soccer teams, anything local to the area where you advertise with a specific organization or event?**

A. Not that I know of, no.

**Q. Okay. And then you participate in**

wear. It's just something that sets us a little different and makes it look a little nicer and put together.

**Q. Okay. So I know you said that you sit down and talk with your dad about what kind of advertising you want to do. Do you write out a plan for the year? Is there anything that you put on paper about that?**

A. No.

**Q. Okay. Do you do any TV commercials?**

A. No.

**Q. Do you buy any billboards?**

A. Yes.

**Q. Okay. Tell me about that.**

A. We have three of them. One when you're coming from I have to think of my direction, east to west, there's one. And that one I think is just -- it has like the four original workers that we have framed in Cozy's, and then it just has like something that says what we are and what we do and that we're like the best burger joint in Kansas voted by U.S.A. Today. And there's two coming from west to east. One of them is just like the one on the east side. And then the other one is closer to Salina. It says you're

almost there and it's pretty much the gist of it.

**Q. Okay. And when you're talking about east and west, are you referring to spaces that are off of I-70?**

A. Yes.

**Q. Okay. So the one that says you're almost there, is it just lettering or is there other images on that billboard?**

A. I think that one has the four original workers on it as well. I haven't been from -- I haven't been from Hays to Salina in a little bit, so I cannot remember. But that one is like you're almost there, and has like the four original workers I think and then our logo and then where to exit.

**Q. Okay. And what about the last one? Does that also just have the logo on it or what's on that one?**

A. The one that's also on the west side?

**Q. Um-hum, yes.**

A. Okay. That one I think is the one that says like best burger joint in Kansas, has our logo and then where to exit -- or where to exit off of to go to.

**Q. Okay. And were you responsible for**

**Q. Did you help him at all in filling out the Certificate of Compatibility application?**
A. No.
**Q. What was your dad's opinion about the city determining that the painting was a sign?**
MR. SHAW: Objection to form.
A. I'm -- I'm sure he was upset. I'm not -- I don't remember his exact reaction.
BY MS. JOKERST:
**Q. Well, did he tell you anything about his opinion?**
A. Oh, I mean sure he was upset, but he really didn't say much. He was just kind of bummed that the city put a stop to it and was -- yeah. He was just -- he was probably -- he was just upset. He didn't really tell me too much. And if he did, I don't remember.
**Q. When's the last time you talked to your dad about the display that's painted on the wall at The Cozy?**
A. I mean we get asked questions about it all the day -- all the time. But since all this started, we really haven't talked too much about it.
**Q. Okay. Well, let's go back to Exhibit B**

BY MS. JOKERST:

**Q. Have you ever worked at Jenni's Liquor?**

A. No.

**Q. Do you help out with the Jenni's Liquor Facebook page?**

A. Yes.

**Q. Okay. Do you run that Facebook page?**

A. Yes.

**Q. Do your parents pay you for that service?**

A. No.

**Q. And are you familiar with the burger display that was painted on the wall at Jenni's Liquors?**

MR. SHAW: Objection to form.

A. I am aware of it, yes.

BY MS. JOKERST:

**Q. Okay. How are you familiar with that display?**

A. I just know the concept of it. I've seen it a couple times, but I haven't been out there and really looked at it.

**Q. Okay. How do you know the concept of it?**

A. They told me it.

**Q. Okay. Who is they?**

A. My parents.

**Q. Okay. And when did they tell you about that display?**

A. I don't remember. I don't even remember when they finished it.

**Q. Approximately like the summer of 2024?**

A. I'm sure once they figured out that they were going to do it I knew about it, but I don't remember when I first found out about it.

**Q. Okay. And what did your parents tell you about that display?**

MR. SHAW: Objection to form.

A. They were just going to tell -- they were just trying to tie it to Jenni's -- tie what's painted on Jenni's to Cozy's just because it's both of my parents' restaurants -- or restaurants. I guess Jenni's isn't a restaurant. It's a liquor store. But it's both their businesses, both their businesses, so they were just trying to tie them together.

BY MS. JOKERST:

**Q. All right. And so you haven't gone out there to view it in person?**

A. Huh-uh. If I've gone out there, it wasn't to look at that. It would be my dad took something of mine. Like the last time I was out

questions.

MR. SHAW: Sounds good.

MS. JOKERST: All right. We'll go off the record.

(THEREUPON, a recess was taken.)

BY MS. JOKERST:

**Q. Okay. Miss Windholz, have you ever read the Salina sign code?**

A. No.

**Q. Have you ever attempted to read the Salina sign code?**

A. No.

**Q. And did you have any discussions with your dad about the design of the painted display on the north wall at The Cozy?**

A. No.

**Q. You said that at some point you saw a rendering of the design of the display on the north wall at The Cozy. Is that right?**

A. I saw like what it's supposed to look like finished.

**Q. Okay. And when did you see that rendering?**

A. I don't remember.

**Q. Okay. Did you see that rendering before**

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
COLIN BENSON,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:26 a.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

A. And maybe -- I don't -- I don't remember exactly, but I do, you know, think of the arts committee as being the Arts Center committee, and they are a part of everything that happens downtown Salina.

**Q. Okay.**

A. So I don't remember exactly who I spoke with about on this day. Obviously, it was not the city committee on the 11th or 13th, whatever.

**Q. 13th.**

A. Yeah, 13th. It was not part of that.

**Q. Okay. Is Eric Montoy a representative of the city?**

A. He's just part of the Boom! project maybe.

**Q. Okay.**

A. Or Arts Center part. Like when they need something done, he would contact me or, again, if I did something wrong, he did contact me about that, you know --

**Q. Okay.**

A. -- of like signage.

**Q. Okay. All right. So then let's scroll down to page 16. It's Bates 354. Okay. At the top of that page, Steve sent you -- or it looks**

**like Steve sent you a text saying finish the mural. It's on me. Do you see that?**

A. Yes.

**Q. Okay. And is it on November 7th at 8:42 p.m.?**

A. Yes.

**Q. Okay. Did Steve send you that text?**

A. Yes.

**Q. Okay. Did you finish the mural?**

A. No.

**Q. Okay. Did you take any action in response to this text you received from Steve?**

A. No.

**Q. Okay. So you didn't go back and start working on the mural?**

A. No.

**Q. Okay. And why not?**

A. It was already a problem. And until the problem got resolved, I definitely didn't need any repercussion of, you know, anything.

**Q. After you received this text from Steve, did you talk to him and say, hey, I'm not going to do any further work on that display?**

A. Yes.

**Q. Okay. When did you talk to him?**

A. I think of what people might like.

**Q. Okay.**

A. A lot of -- a lot of people like flowers. A lot of people like animals, stuff like that. And I add color to it to make it bright, exciting, stuff like, you know, whatever pops into my head that morning is normally what I put on paper.

**Q. All right. Let's back to -- or I guess I want to orient you back to the week of November 6. So you -- we had previously looked at your texts. And on November 6th, you had paused the painting, painted display at The Cozy, right? And if you want, we can go back to Exhibit L.**

A. Yes, yes.

**Q. Okay. And then at some point after November 6, you met with the city?**

MR. SHAW: Objection to form.

A. Yes.

BY MS. JOKERST:

**Q. Okay. And let's go back to Exhibit L, and we'll go to page 25 of 26, so it's Bates 363. Do you see that dated Monday, November 13th?**

A. Yes.

**Q. Okay. And this was the day that you went to the meeting with the city?**

A. Yes.

**Q. Okay. Where was that meeting held?**

A. The Salina Arts Center, I believe, is what it's called. Salina Arts Center Museum.

**Q. Was it the Smoky Hill Museum?**

A. Smoky Hill Museum. There you go.

**Q. Okay. And who was at that meeting?**

A. Leslie Bishop, Brad Anderson, two city workers or city people that I do not remember, Michael -- Michael somebody with the -- he was the head of the permit. Mike, Michael something. And maybe one or two other people that I don't remember their names.

**Q. Was there someone from the city named Dustin Herrs there?**

A. What did you say?

**Q. Was there someone from the city named Dustin Herrs there?**

A. Dustin. Maybe.

**Q. Okay. Other than people from the city, who was in attendance at that meeting?**

A. Steve, myself and two other -- two other people that were sitting against the wall.

**Q. Okay. Was your dad there?**

A. Yeah, it was like I don't remember, but I

think he might have showed up later, because it was like a closed door open door deal. Like they said it was closed door and then they allowed people to come in, if that makes sense.

**Q. Okay.**

A. So, yeah. So I believe he did walk in at the end.

**Q. Okay. And what was discussed at that meeting?**

A. There were sign permits put in front of us before I even got into the room or put on the table, and it was about why we didn't get a sign permit is what I remember.

**Q. Okay. So did the city inform you at that meeting that they considered the display a sign?**

A. Correct.

**Q. Did the city inform you at the meeting that the display was too large to qualify for a sign permit?**

A. Correct.

**Q. Okay. Did the city give you a handout that had like an analysis about the sign and the size?**

A. Yes, I believe so.

**Q. Okay.**

A. Of what he was able -- maybe they just told us of what he was able to do on the side of the building.

**Q. Okay. Let's take a look at Exhibit G in that binder. All right. Do you see that?**

A. Yes.

**Q. Is that something that you received?**

A. Yes, I believe this is -- this is part of that.

**Q. Okay. So you recognize this document?**

A. Yes.

**Q. Okay. And this document's entitled The Cozy Inn Sign Analysis?**

A. Yes.

**Q. Okay. And is this what you received from the city during that Smoky Hill Museum meeting?**

A. Yes.

MS. JOKERST: I will move to formally admit Exhibit G into the deposition record. All right.

BY MS. JOKERST:

**Q. So they gave this -- a copy to you. Did they also give a copy to Steve?**

A. I believe so.

**Q. Okay. Did you say anything while you**

so it became the whole wall.
**Q. Okay. And did you discuss the display at Jenni's Liquor with Mr. Howard?**
A. Yes.
**Q. Okay. Did you provide him with any renderings of what you were going to do on this wall?**
A. Yes.
**Q. Okay. And did he have feedback for you about what he wanted to include?**
A. Yes.
**Q. Okay. What was that feedback?**
A. The burger invasion that we talked about previously on The Cozy's, he wanted to take it to his hometown. And that's when I created the porthole and the burgers coming through it.
**Q. Okay. So what is the porthole supposed to do? You said the burgers coming through it, what do you mean by that?**
A. They're, again, as you can see on the exhibit, they're driven by aliens. So they're actually spacecrafts and they would come through a porthole through different dimensions. And the dimension would be The Cozy's.
**Q. Okay. So they were going to -- so are**

sure.

BY MR. SHAW:

**Q. Yeah. It was a bad question. It doesn't show the entire Cozy wall?**

A. It does not show the entire building.

**Q. And had you and Steve decided to have the mural cover the entire building?**

A. Yes.

**Q. Okay. And so this rendition that's here on this page, that wasn't the complete, I guess, vision of what the mural would look like. Is that correct?**

A. Correct.

MS. JOKERST: Object to form. Did we get my objection on the record.

THE REPORTER: Yes. You might pause just a little bit before you answer, because we've got that lag.

THE WITNESS: Oh.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. And was the intention for all of the burgers in the mural to all be UFOs?**

A. Yes.

MS. JOKERST: Object to form.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 7 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*