**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 8 of 16, Pages 1-266**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.



EXHIBIT K

character of that neighborhood. It could also impact property values. So there are examples of painted signs that could have negative impacts.

**Q. Okay. But so section 5 here, subsection 5 here, does the property damage that is discussed include aesthetic harms?**

A. Okay. Okay. I understand your question better now. You could also have multiple signs, I guess, that could create litter and clutter if you had a lot of painted signs. So I think -- I think it's -- I don't know that whether it's a painted sign or a non-painted sign it makes much of a difference according to our sign code. It's about the time, place and manner, where the signs, how many signs are there, how large are the signs, how tall are the signs.

**Q. Okay. But subsection 5 here, is that dealing with the aesthetics of signs?**

A. No. This is property damage, personal injury.

**Q. Okay. I guess at least I'll explain what I'm thinking when I read this.**

A. Okay.

**Q. When I think, okay, an improperly constructed sign that could cause property damage**

A. So we regulate signs in the aggregate across the entire community. And if we didn't, there would be a potential that you could have a lot more signs producing sign clutter which could enhance the aesthetic of the community. You can have signs that are very large and possibly distracting which could impact the aesthetics of the community.

**Q. Sorry. Let me stop you. I'm not asking about the sign code as a whole right now --**

A. Sure.

**Q. -- and how that may or may not enhances aesthetics. What I'm getting at is this. Interrogatory 4 here --**

A. Yes.

**Q. -- specifically claims that the interests served by regulating the specific types of signs like The Cozy sign include aesthetics. And so I'm asking what facts support that contention that regulating signs like The Cozy sign enhances aesthetics?**

A. Well, it says the sign code regulates all signs, and so that's what I was answering to. I guess I'm still not -- I'm sorry.

**Q. Right now, I'm focusing here on the last**

**district, is there any reason to believe that that change would be factually incorrect?**

MS. JOKERST: Object to form and scope.

A. That's very similar to earlier when you asked me if I think what is -- well, I don't remember the exact question. But I think it's -- yeah, that's something I couldn't answer.

BY MR. SHAW:

**Q. Okay. What facts does the government contend show that regulating signs like The Cozy sign enhances pedestrian safety?**

A. So if you have -- the idea is that the sign regulations are designed to, again, for each district limit the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter. We don't want a lot of sign clutter because that can become distracting. It could impair the visual sight lines for motor vehicles as well as pedestrians. Sign sizes, we want to limit them so they don't become a distraction. We don't want signs that hold the eye longer than they should. We want to make sure that signs are effective. Again, that comes down to clutter where if you have too many signs, it becomes --

**Q. I don't want to interrupt you, but is the city aware of any factual data showing its regulating the specific type of signs that The Cozy Inn has enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. You're asking if The Cozy Inn enhances traffic safety? Is that what you said?

BY MR. SHAW:

**Q. No. I'm asking is the city aware of any like factual data showing that regulating this type of sign enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Is the city aware of any -- let me rephrase. What facts does the city contend support the allegation that regulating signs like The Cozy sign enhances traffic safety?**

A. So our regulations, again, are designed to limit the number of signs, the location of signs, the size of signs so that businesses have opportunities or property owners, if they are not even businesses, have opportunities to have signs that give them opportunities to display and post those while at the same time limiting the number

**Q. All right. When did the city first learn about the mural painted on the side of The Cozy Inn?**

A. We received a -- Lauren Driscoll received a message from Brad Anderson who's a City of Salina employee and alerted her to the painting going up, didn't know if there was any problems with it per se but wanted us to be aware of it. Sent her a picture, we reviewed it, said that looks like a sign. I went and walked over and just looked at it and saw it and like, yes, this is -- has the elements of a sign for us. It has, excuse me, has writings, it has pictorial images and representations, emblems, symbols, it announces Don't Fear the Smell or makes that proclamation, invites you to come inside with an arrow and attracts attention to the walk-up window and the door to go into the building and has burgers on it that represent the products that they sell at The Cozy Inn.

**Q. So Mr. Anderson I believe you said he's a city employee, correct?**

A. Correct.

**Q. And he -- did you say he texted Miss Driscoll?**

**Q. And is this the e-mail you sent to the planning group that you're referring to right now?**

A. Yes.

**Q. Okay. So it was there on November 6th that Mr. Anderson informed Miss Driscoll?**

A. That's my understanding.

**Q. All right. And what action did the city take upon learning about the mural being painted at The Cozy Inn?**

A. I contacted Mr. Howard and invited him to come to my office to speak about it. He did. He accepted my invitation. He came to my office and we talked. I explained to him our concerns with the sign that he was in the process of painting on his north wall of The Cozy Inn property and explained to him the sign limitations that are in the C-4 district and how it appeared his sign was exceeding the maximum allowable sign area for the C-4 district.

**Q. And that was all on November 6th?**

A. That was on November 6th.

**Q. All right. When you first contacted Mr. Howard, had the city already determined that the mural at the Cozy Inn was a sign?**

A. Yes.

Q. Fun?
A. Yeah.
Q. Okay. And at any point, has the city reevaluated it's determination that the mural is a sign based on Mr. Howard's input?
A. No.
Q. Okay. So that determination that had been made even before speaking to Mr. Howard that it was a sign, that has never been reconsidered by the city. Is that correct?
A. Correct.
Q. Okay. Was Mr. Schrage involved in that determination?
A. The determination, no.
Q. Okay. When the city first contacted Mr. Howard, had a determination already been made that the mural was too large for the C-4 zoning district?
MS. JOKERST: Object to form.
A. Yes. We had already -- when I talked -- when I spoke with him, I had already did an estimate, if you will, of the size of the sign, an approximation.
BY MR. SHAW:
Q. Okay. How did that -- how do you

**calculate that approximation?**
A. The building has kind of -- well, what I would call -- what we would call a broken facade where it's got a flat roof and a facia that has different elevations to it because there's a parapet in the middle. What I did is I measured the height of the wall using Pictometry software which can get pretty close, at least for an estimation, it's good for that, where I can get the height of the wall of the lower parapet and the taller parapet. I think the lower parapet was like 11 feet and the top of the taller parapet was 13. So I took an average of like 12 feet, multiplied it by the length of the wall. And that gave me an estimate of how large that wall sign was.
**Q. Okay. Did you save that Pictometry analysis or file?**
A. No.
**Q. I don't know exactly how Pictometry works.**
A. No, I don't know if you can save but I didn't save.
**Q. All right. So there's no document showing that measurement?**

A. No.

**Q. Okay. At any point since then, has the city reevaluated whether the sign at The Cozy Inn or the painting at The Cozy Inn that we're fighting over here about whether or is or isn't a sign --**

A. Sure.

**Q. -- at any point has the city reevaluated whether or not that painting was too large for the C-4 zoning district?**

A. Well, we ran some -- a mental exercise to see if a text amendment could be approved to -- let me back up. The C-4 district allows for 3 square feet of sign area per lineal foot of building frontage. And The Cozy Inn is 20.8, nominally 21 feet of building frontage. So that comes out to nominally 63 total square foot of sign area that's allowed. We ran a scenario where if we were to propose a text amendment to allow a side wall to also be incorporated and function as a frontage of a building, even though it's not facing a street, would that provide sufficient square footage to allow the proposed Cozy Inn sign, and it was insufficient. That idea, that proposed text amendment would be insufficient for

**in this e-mail, you got those from the Pictometry software. Is that also correct?**
A. The height, the 12 feet is an estimate based on an average of the building. And the 20.8 is from the legal description. So, basically, the deed that shows the lot depth since the building is -- the building takes up the entire lot.
**Q. And that 44.4 feet measurement, how was that one taken?**
A. Yeah, I apologize. I said lot depth. The 20.8 is lot width and the 44.4 is the lot depth. And that's from the deed as well, from the legal description.
**Q. The 20.8 and the 44.4, those are both from the deed description?**
A. Um-hum. From the legal description of the property.
**Q. And 12 feet, you said that's from Pictometry?**
A. Yeah. It's an average estimate because it's got a broken facade or that has multiple heights to it.
**Q. Okay. Was any other measurement ever taken of The Cozy Inn?**
A. I think later on when we did a more

thorough analysis, I think rather than taking average height, I measured the height and width using Pictometry of like three -- there's three different sections. I have three different heights of the building. So I measured more accurately the area of the wall. So I think in my later analysis, it's a similar approximation but it's more accurate.

**Q. All right. Discussing your analysis, I believe what you're talking about will be Exhibit 7, so a few pages down.**

A. I have Exhibit 7.

**Q. Is this the analysis you were just referring to?**

A. Yes.

MR. SHAW: Okay. We'll go ahead and admit Exhibit 7.

BY MR. SHAW:

**Q. So I'm trying to find here is there -- you said somewhere in here you did a different calculation than the one that was in the previous exhibit?**

A. Yeah. So the previous exhibit, the e-mail that we were just discussing which was -- I forgot the exhibit number already, 3 maybe.

**Q. Yes, 3.**

A. Had 540 square feet. This analysis says 528. I wanted to make clear that I measured it differently and that I believe this is more accurate --

**Q. Okay.**

A. -- than the other one. The previous one was more estimated. This one, I was measuring the height of the portion, the east portion that's lower. And there's a central portion that's taller, measured that separate. And then there's a west portion that's lower again, I measured that and then added them together.

**Q. All right. Did this analysis subtract any wall area for the existing signs on that facade of The Cozy Inn?**

A. It did not subtract the area of the existing signs on that side.

**Q. Okay. Did it subtract any area for the service window or door on that facade of The Cozy Inn?**

A. It did not.

**Q. Did it subtract for any of the other architectural features on that facade of The Cozy Inn?**

received it on.
**Q. All right.**
A. That's the date he signed it anyway.
**Q. Okay. Can you confirm that the city has received this application?**
A. Yes.
MR. SHAW: Okay. I'll admit Exhibit 8.
BY MR. SHAW:
**Q. On the third page there of Exhibit 8, is that a rendition of the mural that the Cozy was attempting to paint on their wall?**
A. Yes. According to Mr. Howard, this is what he was proposing.
**Q. Okay. Does the city have any reason to doubt Mr. Howard when he says that this is what he was proposing?**
MS. JOKERST: Object to scope and form.
A. I don't know.
BY MR. SHAW:
**Q. Does the city have any reason to believe that this rendition is not the planned mural that The Cozy Inn was intending to paint?**
MS. JOKERST: Object to scope and form.
A. I'm not sure, but some of the outlines of some of the pictorial representations are

**application was neither granted or denied?**

A. Correct. So when we met with Mr. Howard, we informed him, and when I say when we met with him, when we met with him on November -- I've got to get that, November 6 of 2023, we informed him that his proposed sign exceeded the sign maximum limitation in the C-4 district and that staff was unable to approve. And in talking with him about potential options, we expressed that we could potentially look at a text amend, and that was expressed at the meeting that we had with him later at the Smoky Hill Museum. And he seemed responsive to the idea of exploring a text amendment which would be a public process to potentially change the sign code to potentially allow signage like what Mr. Howard was proposing. And so we had -- even though we were not able to approve the sign and we informed Mr. Howard of that, we were open to trying to come up with a potential sign amendment that could allow something similar to what he was being -- what he was proposing.

**Q. So at that meeting, you mentioned at the Smoky Hill Museum?**

A. Um-hum.

A. Yes.
**Q. Was The Cozy Inn ever provided with a written statement of the reasons of denial?**
MS. JOKERST: Object to form and scope.
A. The Cozy Inn was informed before the application was even applied for and the sign permit was applied for that the sign was -- did not conform to the C-4 regulations and is not something the staff had the authority to permit.
BY MR. SHAW:
**Q. Was that a written statement?**
A. It was not a written statement. It was a verbal statement in a meeting that I had with Mr. Howard on November 6th and then also at a later meeting that took place at the Smoky Hill Museum.
**Q. Was The Cozy Inn provided with any recommendations about potential changes to the project that might allow it to be approved?**
A. I did mention to Mr. Howard that he could reduce the signage -- the size of the signage to an area that would fit within the 63 total square feet that he had, that he could either reduce the proposed sign down to the remaining nominally 10 square feet that he has or he could remove some existing signs as well but reduce his total

signage down to the 63 square feet that he's allowed.

**Q. Was that -- you said that to him orally?**

A. Correct.

**Q. Okay. Was there any written --**

A. No.

**Q. -- statement of that to Mr. Howard?**

A. No. We did not record that. That was in our initial meeting.

**Q. All right. All right. Can we go back to Exhibit 11 which was Mr. Michelson's letter.**

A. I have Exhibit 11.

**Q. And so did this letter inform Mr. Howard that both his Sign Permit Application and Certificate of Compatibility Application had been placed on hold?**

A. Yes.

**Q. And when was this letter sent?**

A. February 8th, 2024.

**Q. Was any other written correspondence sent to Mr. Howard informing him that his applications were on hold?**

A. No. We thought we were of a common understanding from our verbal conversations that we were going through a comprehensive review of

**material facts. Do you see that?**
A. Oh, the very top. Yep, sorry. Defendant interprets this to mean the material facts and respond to this request with material facts.
**Q. Okay. So is it your understanding that this response encompasses the material facts as stated in that sentence right there?**
A. Yes.
**Q. All right. We can no longer need to refer to No. 42.**
**I have one clarification for you. So Mr. Howard when he submitted the sign permit and the Certificate of Compatibility Permit Application, and I'll wait for you to get that organized and then I'll ask?**
A. Okay. Can I shut the book?
**Q. Yeah.**
A. Okay.
**Q. Dustin, just shut the book. We've got to keep moving.**
A. Yeah. Sorry.
**Q. All right. So when Mr. Howard submitted the Certificate of Compatibility Application and the Sign Permit Application, he included a rendering of his proposed final -- what he said**

**was going to be his proposed final sign. Is that right?**

A. Correct.

**Q. Okay. And the city looked at the photo of the final proposal that Mr. Howard submitted, correct?**

A. Yes.

**Q. Okay. And the city after looking at that photo confirmed that the proposed final rendering was still a sign, correct?**

A. Yeah. It was not only the same as what is up there, all the elements and character of the sign that cause it to be a sign are in place.

**Q. Okay. And the city didn't like redo a whole sign analysis, though, after receipt of that, right?**

A. No. The area was still nominally the entire wall, the entire north face, and it still exceeded the 10 square feet that he would -- surplus area that he still had in terms of additional signage that he could add. And, therefore, we were not able to permit it.

MS. JOKERST: That's all I have.

MR. SHAW: That's all we have for you, Mr. Herrs. Thank you for your time.




0058

EXHIBIT L

Community & Development Services
Planning Division
300 West Ash | Room 205 | PO Box 736
Salina, Kansas 67402-0736

City of Salina

PHONE | 785.309.5720
FAX | 785.309.5713
TDD | 785.309.5747
WEB | www.salina-ks.gov

## SIGN PERMIT APPLICATION

**Site plan, elevation drawings with dimensions, & shop drawings are required with this submittal**

108 N. 7th — Address Where Sign(s) is / are to be installed
The Cozy Inn — Name of Business

| Name of Business Owner | Mailing Address (if different than above) | Zip Code | Phone Number |
|---|---|---|---|
| Steve Howard | 8822 S Sunnyside Rd | 67425 | 785-452-1163 |

Legal Description (attach separate page if necessary): west 44.4 ft of the S. 20.8 ft of lot 103 on 7th St located at 108 N. 7th St

| Property Owner of Record | Mailing Address | Zip Code | Phone Number |
|---|---|---|---|
| Steve Howard | 8822 S Sunnyside Rd | 67425 | 785-452-1163 |

| Owner of ~~Sign~~ mural | Mailing Address | Zip Code | Phone Number |
|---|---|---|---|
| Same | | | |

| Sign Installer / License # | Mailing Address | Zip Code | Phone Number |
|---|---|---|---|
| Colin Benson | 117 S. Santa Fe | 67401 | X |

**PROPOSED SIGN(S)**

Class of Work: ☒ New ☒ Alteration Estimated Date of Installation: ______

Illumination: ☐ Internal ☐ External ☐ Electronic Message Center ☒ None

Will any new electrical work be necessary? ☒ NO ☐ YES*- Electrical Contractor: ______

**If YES, **separate permit is required** and will be issued to the electrical contractor at the time the sign permit is issued*

Are there overhead power lines within 10 feet of proposed location of sign? ☒ NO ☐ YES

Type of **Proposed Sign(s)** – Indicate number of signs next to sign type:

☐ Pole ☐ Ground ☒ Wall ☐ Awning ☐ Canopy ☐ Marquee

☐ Projecting ☐ Roof ☐ Decorative ☒ Other (Describe): Mural exceeding ~~the~~ allowable space for mural/sign ag

**EXISTING SIGN(S)**

☐ Check box if there are no **existing signs** at this address at time of sign permit application or if existing sign(s) will be removed to install new sign(s).

*If box is not checked, provide the information requested in the following table for each existing sign. Do not include signs or square footage of the sign(s) listed as proposed signs above or sign(s) that will be removed to install new sign(s).*

See Next Page >

BLF_051_Rev. 05-2017

EXHIBIT AA

CITY000020

EXHIBIT M

City of Salina
Sign Permit Application | Page 2

**INVENTORY OF EXISTING SIGNS**

| Type of Sign (Pole, Ground, Wall, Etc.) | Description | Square Footage (Per Individual Sign) | Height (If Applicable) |
|---|---|---|---|
| X ~~Wall~~ | ~~See Attached~~ | ~~528 sq ft~~ | |
| | | | |
| Wall Sign | N. facing wall sign | 24 sq ft | |
| Projection sign | 7th St Projection sign | 24 sq ft | |
| awning sign | 7th St awning sign | 4.88 sq ft | |
| | | | |
| | | | |
| | | | |

Steve Howard
PRINTED Name of Applicant

The Cozy Inn
Applicant's Company / Employer Name

steveh@cozyburger.com
Applicant's Email Address

785-452-1153
Applicant's Phone Number

[signature]
SIGNATURE of Applicant

11-13-23
Date

**For Office Use Only Below Line**

Date Received: ________________ Sign Permit Number ____________________

Is business part of a shopping center or zoning lot with multiple businesses? ☐ NO ☐ YES

| Zoning | Square Footage of Signs | Illumination Approved | SPECIAL CONDITIONS: |
|---|---|---|---|
| Historic District | New | Electrical Permit Required? | |
| B.I.D. | Existing | Contr. License Verified? | |
| Vision Triangle | Total | Proposed Set-back | |
| | Total Allowed | Required Set-back | |

| Approved for Issuance By | Date | Permit Fee | Receipt #, Staff Initials |
|---|---|---|---|
| | | | |

BLF-051, Rev. 10.2018

CITY000024

CITY000023



.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

maybe rather than have him go through each one, is there anything in there that hasn't been disclosed by either party?

MS. JOKERST: No, I don't believe so.

MR. SHAW: Okay.

MS. JOKERST: Dean, you have what I sent you?

A. It is what you sent me. It includes the set of Interrogatories, the responses to those, the Requests For Admissions, the things that I was supposed to be questioned about under the topics list.

BY MR. SHAW:

**Q. All right. So we will start off kind of just discussing how the city defines a sign under the sign code. So if you can open the binder in Exhibit 1 there, we have excerpts of the code. Go to Section 42-764.**

A. The methodology in using something is a sign is determined whether it's a structure or part of a structure or portable display, whether it's either attached to the ground or painted onto a building or structure on the ground. And then we determined whether it announces, directs attention to or advertises. And then we confirm

whether it is inside or outside of a building.

**Q. Give me one second here. So when you, and when I say you, I mean the city, determine if a display is used to announce, what methodology does the city use to make that determination?**

A. We look to see whether it declares some fact or occurrence or event or some entity.

**Q. And does that announcement have to be of a commercial nature, or can it be any announcement?**

A. It could be any type of announcement.

**Q. Okay. And does the city need to review the proposed display in order to determine if it announces or not?**

A. Yes.

**Q. Okay. And when the city determines if a display directs attention to something, what methodology does the city use to make that determination?**

A. We look to see if there is something in the visual display that points to or directs attention to a particular location or position or something that's occurring in their building if there is one.

**Q. And does it have to direct attention to a**

# The Cozy Inn Sign Analysis

**<u>Sign Definitions</u>**
**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**<u>C-4 Sign Regulations</u>**
**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.



*Document Prepared by the Community and Development Services Department on 11/09/2023*

EXHIBIT
G
Benson Deposition

**CITY000001**
**EXHIBIT O**

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**<u>The Cozy Inn Information and Background</u>**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food “Hamburger Joint” in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.
The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building’s exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with

landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**Existing Conditions**

Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

1. North facing wall sign: 24.00 sq. ft.
2. 7th Street projection sign: 24.00 sq. ft.
3. 7th Street awning sign: 4.88 sq. ft.

Total Sign Area: 52.88 sq. ft.

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**Proposed Hamburger Sign Analysis**

The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.



*Document Prepared by the Community and Development Services Department on 11/09/2023*

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

MICHAEL SCHRAGE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:09 a.m. on the 11th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.



EXHIBIT P

MR. MACROBERTS: That's all I have.
MS. JOKERST: I have a couple of follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. Okay. Mr. Schrage, earlier you mentioned something about a sign handout that was provided to Mr. Howard. Do you recall mentioning something about that?**
A. Yes.
**Q. Okay. What handout were you referring to?**
A. My recollection is a sign code analysis that was a summary of the applicable sign code and then staff's analysis of the Cozy zoning category, lot size, math, relative to the size what was being proposed.
**Q. Did you prepare that sign analysis?**
A. No.
**Q. All right. Do you -- in your position as city manager, do you apply the sign code?**
MR. MACROBERTS: I'm sorry. I just -- I didn't hear the question.
BY MS. JOKERST:
**Q. I said in your position as city manager,**


Don't Fear the Smell!
The Fun is inside!!
COZY INN
HAMBURGERS

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF MARK WHITE**

I, Steven Mark White, a retained expert for the City of Salina, Kansas in the above-entitled action, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts and opinions.

2. I was retained as an expert by the City of Salina in the above-entitled matter.

3. I authored an expert report dated August 16, 2024 and attached hereto as Affidavit Exhibit 1.

4. I make this Affidavit in support of the City's Motion for Summary Judgment.

5. The opinions contained in my expert report are my opinions that I intend to testify to at trial in this matter, are based on facts and data of the type reasonably relied on by experts in my field of urban planning and zoning, and are true to the best of my knowledge and opinion. All statements I have made in my expert report are incorporated into this Affidavit by reference.

6. Specifically, I intend to testify at trial in this matter to the following facts and opinions:

**EXHIBIT R**

a. The restrictions established in the City of Salina's sign code ("Sign Code") are reasonable, generally accepted regulations of the size, number, placement and design of signs.

b. The Sign Code serves several compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500):

   i. Comprehensive Plan implementation
   ii. Traffic safety
   iii. Aesthetics
   iv. Urban Design and travel behavior
   v. Public Health and Safety
   vi. Compromise

c. Based upon my review of the Sign Code, my knowledge, experience, and education in urban planning and zoning, and the facts and data of the type reasonably relied upon by experts in my field of urban planning and zoning, it is my opinion that the Sign Code directly and materially furthers its recited purposes.

d. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter.

e. In the C-4 district, where the Cozy Sign is located, the Sign Code allows 67% of the total sign area on any building wall or street frontage. This proportionality limitation protects aesthetics and architectural integrity.

f. Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. In reaching this conclusion I examined sign and mural regulations for twenty-one sign codes along with several in Kansas and Oklahoma where I was the principal consultant on the sign regulation drafts and Manhattan (KS), where I was part of the consulting team for the Development Code update. The sample codes I reviewed and cited in my expert report demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

g. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas.

Signed: Steven Mark White
Steven Mark White

STATE OF Florida )
) ss.
COUNTY OF Okaloosa )

Subscribed and sworn to before me by Steven Mark White on the 7th day of February, 2025. Type of ID produced: MO DL

Witness my hand and official seal. My commission expires: 06/13/2027

NOTARY PUBLIC • STATE OF FLORIDA •
OZELLA MAE MOORE
Notary Public - State of Florida
Commission # HH 391605
Expires on June 13, 2027

Ozella Mae Moore OZELLA MAE MOORE
Notary Public

Notarized remotely online using communication technology via Proof.

# ANALYSIS OF SALINA SIGN CODE

---

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

**AFFIDAVIT EXHIBIT 1**

Contents

***Introduction*** ___ ***2***
***Basis of Opinions*** ___ ***3***
***Statement of Opinions*** ___ ***3***
***Compensation*** ___ ***20***
***Conclusions*** ___ ***21***
***Documents Reviewed*** ___ ***22***
***Exhibits*** ___ ***30***
***Resume and Qualifications*** ___ ***39***

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

**DESCRIPTION OF SIGN CODE**

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):



*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.

- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.

- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
  - ◊ A storefront
  - ◊ Display case
  - ◊ **<u>Public art</u>**
  - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

---

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

---

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

### COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

### WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

---

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

---

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id*.). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer critical benefits to residents, such as improved public safety and well-being" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

---

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.




*Figure 3 Salina Art Center Mural*




*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

---

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

### THE SIGN CODE IS NOT VAGUE

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to …."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

---

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

S. Mark White Digitally signed by Mark White Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C
https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions)
https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944_on_2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs)
https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119
https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art)
https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2
https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U) https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024. https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017. https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, “Traditional Neighborhood Development-Will the Traffic Work?” American Society of Civil Engineers, (ASCE 1990);

Bookout, “Neotraditional Town Planning: Cars, Pedestrians & Transit,” Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, “Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, “Land-Use Mixing and Suburban Mobility,” Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**
*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**
*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**
*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

## RESUME AND QUALIFICATIONS

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

### BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

## SELECTED CITATIONS

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

## SELECTED EXPERIENCE

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.




EXHIBIT
Y

CITY001777

EXHIBIT S

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard, | :CIVIL ACTION :CASE NO. |
| Plaintiffs, | :6:24-cv-01027-TC-ADM |
| -vs.- | : |
| City of Salina, Kansas, | : |
| Defendants. | : |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.



EXHIBIT T

Charles R Taylor PhD
November 13, 2024

image that is under the text that says "Don't fear the smell" and over the text that says "The fun is i-n-s" -- because the rest of that word "inside" is to the right of that image.

Do you see that image?

A. Yes.

Q. Can you describe to me what that image is?

A. Well, I mean, I read in the complaint that the -- it's -- the artist intended it to be an image of, you know, a burger in the form of a flying saucer squirting ketchup and mustard, and the owner says it's designed to get across a whimsical and fun atmosphere of Cozy Inn.

Q. Did it brand the site?

A. You know, in the sense of communicating that there's, you know, a fun and whimsical atmosphere, I do think that it helps to brand the site. And I -- from -- from the quote I read from the owner, that's exactly what he wants to do with this.

Honestly, his -- his signs are conspicuous enough before this. So there's not much incentive to increase cons- -- conspicuity. I think it certainly meets the threshold. So what he's saying makes a lot of sense to me, that he's trying to communicate something about the store atmosphere.


U.S. Legal Support | www.uslegalsupport.com

it was my belief that he's using it to brand the site and enhance the store image. That's why.

Q. Okay. Well, the top part of that image is a top part of a bun.

Can we agree on that?

MR. SHAW: Objection to scope.

THE WITNESS: I -- I think this is art, and art can be abstract. And I think this is -- my interpretation is that this is -- this is an effort by the artist to create a flying saucer somewhat in the form of a hamburger.

BY MR. MESSENGER:

Q. Okay. Is that image abstract to you as it stands now today?

MR. SHAW: Objection to scope.

THE WITNESS: I would -- I would say it's -- it's kind of abstract. I don't know that I've seen a hamburger with those kind of indentations on -- on the top. And it certainly looks to me like it could be a flying saucer shape.

BY MR. MESSENGER:

Q. And why would indentations suggest flying saucer to you?

In the United States District Court
for the
District of Kansas

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**

Plaintiffs,

v.

**City of Salina, Kansas.**

Defendant.

Civil Action No. 6:24-cv-01027-TC-ADM

Plaintiffs' Response to Salina's
Motion for Summary Judgment;
Exhibits A-OO; Certificate of Service.

Oral Argument Requested.

**Plaintiffs' Response to Salina's Motion for Summary Judgment**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. That's because Salina considers it a regulated sign instead of an unregulated mural. Even though all painted wall-displays are the same *thing* (paint on walls), Salina treats displays differently depending on *what* is displayed and *who* is saying it. Salina's content- and speaker-based restrictions are plainly evident. The Cozy's mural, on top, is regulated. The murals below it (and the dozens of others around the city) aren't.




Because the mural-sign code regime is content- and speaker-based, this Court should apply strict scrutiny, reject Salina's motion for summary judgment, and grant the Plaintiffs' motion instead. *See* Doc. 105. But even *if* the regime is content-neutral or a regulation of commercial speech, Salina *still* loses. Salina has no *actual evidence* justifying *any* of its arguments. The Cozy's mural isn't more likely to fall off the wall, block views, destroy Salina's tax base, or harm passersby, because it sells sliders on the inside. Calling it a "sign" doesn't change the analysis.

## Facts

**A. Uncontested Statements of Fact.**

Paragraphs 1, 5, 7, 11, 12, 13, 21, 29, 35, 36, 37, 51, 61, 62, 63, 64, and 65 are uncontested for the purpose of this motion.

**B. Contested Statements of Fact.**

2. The City applies the Sign Code as written. Ex. B at 6, Resp. to Int. No. 5. (City's Response to Plaintiffs' First Set of Interrogatories).

**Response**: Salina does not apply the sign code as written. **(1)** Salina doesn't regulate murals even though they fit the definition of "sign." Ex. A, Andrew Dep. 91:3; Ex. B, Driscoll Dep. 93:12-14. **(2)** Salina doesn't regulate displays calculated to attract the attention of the public even though they fit the definition of "sign." Ex. C, Andrew 30(b)(6) Dep. 13:17-20; Ex. A, Andrew Dep. 46:6-12, 46:13-19, 64:14-20, 69:23—70:1. **(3)** Salina distinguishes between murals and signs based on content. Ex. D, Def. Ans. to First Set of Interrog., Rog 5, 11; Ex. E, Herrs 30(b)(6) Dep. 88:21—89:22, 90:7-13; Ex. F, Comm. Tran. 5:23-25, 10:4-5, 22:24—24:4, 26:16-22; Ex. G, Schrage Dep. 35:23—36:10, 71:11-15, 80:24—81:10, 108:1-13, 110:8-13, 121:24—123:8, 124:9—125:8; Ex. H, City Commission Minutes at CITY000173; Ex. I, Art Center DRB Packet at 7; Ex. J, Talking Points; Ex. B, Driscoll Dep. 67:19-25, 68:13-18, 88:4-12, 98:20—100:13, 106:6-11, 121:3-5, 126:19—128:7; Ex. A, Andrew Dep. 54:18-22, 55:7-8, 86:11-23, 88:20—89:18, 172:11—173:20, 175:2-6, 176:14—178:3, 178:16-22, 179:20—180:10, 285:1-4; Ex. K, Sign Permit Submittal Procedure at CITY000661; Ex. C, Andrew 30(b)(6) Dep. 27:7-20, 58:24—59:6. **(4)** Salina distinguishes unregulated murals from regulated signs based on commercial messages. Ex. L, Schrage Email 11/8/23; Ex. J, Talking Points; Ex. M, Schrage Email 11/9/23 at CITY000221; Ex. O, Benson Dep. 82:9-17; Ex. F, Comm. Tran. 5:2-5, 5:23-25, 10:4-5, 22:24—24:4, 26:17-22, 27:3-6, 28:1-8, 28:16-21; Ex. G, Schrage Dep. 61:1-3, 61:18-23, 62:1-5, 85:20—87:19; Ex. N, Schrage Email 2/20/24; Ex. P, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6; Ex. A, Andrew Dep. 89:11—90:3, 170:7—171:20; Ex. B, Driscoll Dep. 155:6—156:12. **(5)** Salina created unwritten rules and exemptions to the mural-sign code regime. Ex. C, Andrew 30(b)(6) Dep. 53:7-

9, 69:1-6, 88:16-24, 91:10-24, 100:10-22; Ex. Q, Herrs Dep. 33:12-15, 68:6-11, 77:12-15, 81:11-16, 84:12-22, 101:14-21, 101:25—102:12; Ex. B, Driscoll Dep. 124:8—125:5; Ex. A, Andrew Dep. 22:21—23:4, 24:12-15, 33:22—34:6, 35:4-5, 104:9-14, 105:6-23, 113:9-15, 114:9-20, 115:7-13, 301:21-25, 311:13-20, 322:25—323:4; Ex. G, Schrage Dep. 98:25—99:9.

3. Sign is defined by Salina Code § 42-764 as: [undisputed code text removed]

**Response**: Plaintiffs admit that the Court may take judicial notice of the Salina City Code.[1] Salina's statement that Salina's Exhibit C contains all relevant sections of the Code is an argumentative legal opinion.

4. The purposes of the Sign Code, codified at Salina Code § 42-500, set forth the City's governmental interests in regulating signs: [undisputed code text removed]

**Response**: Plaintiffs admit the text of Salina City Code § 42-500. Defendant's statement that § 42-500 is "[t]he purpose of the Sign Code" and "set[s] forth the City's governmental interests in regulating signs" is an argumentative legal opinion.

6. Salina Code § 42-501 requires a sign permit to be obtained before a sign is constructed or painted. It provides: [undisputed code text removed]

**Response**: Plaintiffs admit the text of Salina City Code § 42-501. Defendant's statement purporting to describe § 42-501 is an argumentative legal opinion.

8. Building is defined in Salina Code § 42-637 as: [undisputed code text removed]

**Response**: Plaintiffs admit the text of Salina City Code § 42-673. Defendant's statement purporting to describe § 42-673 is an argumentative legal opinion.

9. The applicable size limitations of the Sign Code are set forth in § 42-521(4)(b). They provide: [undisputed code text removed]

**Response**: Plaintiffs admit the quoted text of Salina City Code § 42-521(4)(b) is accurate, but it is an incomplete quotation of § 42-521(4)(b), and it appears to have a scrivener's error, listing

[1] Available at https://library.municode.com/ks/salina/codes/code_of_ordinances

subsection (4) as subsection (1). Defendant's statement purporting to describe § 42-521(4)(b) is an argumentative legal opinion.

10. Salina Code § 1-11 articulates that intent: [undisputed code text removed]

**Response**: Plaintiffs admit the text of Salina City Code § 1-11. Defendant's statement purporting to describe the "intent" of § 1-11 is an argumentative legal opinion.

14. On November 3, 2023, Plaintiffs started painting the Cozy Sign. Ex. G at 2, Stipulated Fact v.

**Response**: The stipulated fact only speaks about the painting of "the display." Defendant's description of that display as "the Cozy Sign" is an argumentative legal opinion.

15. Plaintiffs did not seek a sign permit before constructing the Cozy Sign. Ex. H

**Response**: Plaintiffs admit they did not apply for a sign permit before painting the display because they were painting a mural. Ex. T, Howard Decl. ¶¶ 5-13. Plaintiffs deny the implication that painting a mural is "constructing" a sign.

16. Plaintiffs knew the City regulated signs, but did not review the sign regulations. Ex. H at 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5, 240:15-17; 241:4-15; Ex. I (Andrea Windholz Depo.) at 71:7-12.

**Response**: Salina's citations to Salina's Ex. H 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5 involve a 2021 certificate of compatibility application, not sign regulations. Mr. Howard's testimony at 240:15-17, 241:4-15 is that he did not understand the sign code. Ms. Windholz is not a plaintiff in this matter, and her deposition statement in Salina's Ex. I says nothing about her knowledge.

17. Plaintiffs have no intent to read the sign regulations. Ex. H at 240:15-17; 241:4-15.

**Response**: Salina's Ex. H at 240:15-17; 241:4-15 does not mention Plaintiffs' intent. Mr. Howard's testimony at 240:15-17, 241:4-15 is that he did not understand the sign code.

18. Plaintiffs have no regard for the City's reasonable, content-neutral regulations. Ex H at 190:24-25; 191:1-25; 192:1-9; 233:1-25; Ex. J (Colin Benson Depo.) at 57:23-25; 58:1-24.

**Objection**: Relevance. Plaintiffs are not obligated to hold Salina's regulations in "regard." Private citizens are free to make light of their government's actions.

**Response**: **(1)** At Salina's direction, Plaintiffs paused the mural, Doc. 16 ¶ 26, Ex. G, Schrage Dep. 127:24-25; Ex. B, Driscoll Dep. 63:9-10, 151:20—152:1-4; Ex. E, Herrs 30(b)(6) Dep. 85:7-25; **(2)** submitted a sign permit application, Ex. E, Herrs 30(b)(6) Dep., 111:1-3; Doc. 16 at ¶ 155; Ex. F, Comm. Tran. 7:17-23, 41:22-24; Ex. R, Sign Permit Application; **(3)** a certificate of compatibility application and fee, Ex. E, Herrs 30(b)(6) Dep. 111:4-7, 113:11-24; **(4)** and attended multiple meetings with city officials, Ex. Q, Herrs Dep. 23:10-16; Ex. O, Benson Dep. 79:8-13; Ex. S, Howard Dep. 176:9-12; Ex. G, Schrage Dep. 69:4-7; Ex. B, Driscoll Dep. 37:18-25. **(5)** Salina's description of the mural-sign code regime as "reasonable, content-neutral regulations" is an argumentative legal opinion.

19. On November 6, 2023, the City reviewed the Cozy Sign, which at the time was fully outlined and partially painted on the North wall of the Cozy Inn. Ex. K (Dustin Herrs 30(b)(6) Depo.) at 82:1-20, 85:7-21; Ex. L (Photo of Cozy Sign Plaintiffs' Bates 58); Ex. G at 2, Stipulated Fact No. vi (stipulating to Plaintiffs' Bates 58).

**Response**: The cited evidence doesn't say the mural was "fully outlined." Mr. Benson had not outlined the cockpits for the burger UFOs. Ex. O, Benson Dep. 139:15—140:9.

20. On November 6, 2023, the City informed Plaintiff, Mr. Howard, that the Cozy Sign was too large to qualify for a sign permit and asked him to pause the Cozy Sign. Ex. K at 110:2- 22, 85:7-21; Ex. H at 138:11-25, 139:4-18; Ex. J at 78:20-25, 79:1; 80:14-24.

**Response**: Plaintiffs admit that Salina officials asked Mr. Howard to halt work on the mural because it was Salina's *opinion* that the mural was a sign that was too big. Ex. S, Howard Dep. 139:10-18. Defendant's implication that the mural is in fact a sign that is too big is an argumentative legal opinion.

22. Before Mr. Howard even submitted a Sign Permit application, he knew the Cozy Sign, as proposed, was too large to qualify for a sign permit. Ex. H at 137:22-25, 138:1-25,139:1- 18,

140:2-21, 180:3-14, 181:4-12, 182:7-25, 183:1-13; Ex. M (Cozy Sign Permit Application); Ex. J at 78:20-25, 79:1; 80:14-24

**Response**: Plaintiffs admit that the cited evidence shows that Salina officials had communicated to Mr. Howard the City's *opinion* that the mural was a sign that was too big. Ex. S, Howard Dep. 139:10-18. Defendant's implication that the mural is in fact a sign that is too big under the mural-sign code regime is an argumentative legal opinion.

23. Not only did the City inform Mr. Howard that the Cozy Sign would not qualify for a sign permit within the 10-day period of § 42-502(b), but the City also understood that Mr. Howard agreed that his sign permit application (submitted on November 13, 2023) would be placed on hold. Ex. D at 229:4-24, 230:1-24, 231:1-25, 232:1-24.

**Response**: **(1)** Mr. Howard never agreed to his application being placed on-hold. Ex. T, Howard Dec. ¶ 26. **(2)** Salina officials testified that Mr. Howard never consented. Ex. A, Andrew Dep. 233:2-6 (Q: "And at any point after he submitted his application, did Mr. Howard consent to it being placed on hold?" A: "No."); *see also id.* 230:7-233:12. **(3)** Salina first informed Mr. Howard that his application was on-hold on February 8, 2024. Ex. U, On-Hold Letter at CITY000031 ("This letter is to *inform* you that … our office *will be placing* your … sign permit application on-hold") (emphasis added); Ex. V, Michelson Dep. 17:13-23 (on-hold letter sent to communicate on-hold status to applicant). **(4)** Salina can't even say when it put the application on-hold. Ex. A, Andrew Dep. 271:3-8 (seven days before it was submitted); *id.* 229:4-8, 267:21-25 (right after it was submitted); Ex. E, Herrs 30(b)(6) Dep. 112:25—113:1, 107:19-25 ("when it came in").

24. The City determined the Cozy Sign was a sign as defined by Salina Code § 42-764 and, more specifically, as "wall sign" as defined by Salina Code § 42-781. Ex. K at 82:10-20; Ex. B at 10, Resp. to Int. No. 11; Ex. D at 63:18-24, 64:1-3, 159:1-25, 160:1-10, 234:13-21, 346:10-16.

**Response**: Plaintiffs deny that Salina ever made a formal determination regarding Plaintiffs' application. *See* Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2.

25. The City interprets and applies Salina Code § 42-764 to require that subparagraphs (1), (2), and (3) therein be met for any display to be considered a "sign" that is subject to the

regulations of the Sign Code. The City has interpreted Salina Code § 42-764 consistently for decades. Ex. D at 48:8-16, 50:5-11, 51:6-11, 55:10-24; 62:16-24. Ex. N (Dean Andrew 30(b)(6) Depo.) at 11:14-25, 12:1.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: **(1)** Salina considers displays "affixed to the interior of a window" to be "sign" that is subject to the regulations of the mural-sign code regime even though it does not meet the requirements of § 42-764(3). Salina City Code § 42-504(9); Ex. C, Andrew 30(b)(6) Dep. 15:15-24. **(2)** Salina has not interpreted § 42-764 consistently, it treats displays inconsistently based on the content, speaker, or commercial nature of the display. Ex. D, Def. Ans. to First Set of Interrog., Rog 5, 11; Ex. E, Herrs 30(b)(6) Dep. 88:21—89:22, 90:7-13; Ex. F, Comm. Tran. 5:2-5, 5:23-25, 10:4-5, 22:24—24:4, 26:16-22, 27:3-6, 28:1-8, 28:16-21; Ex. G, Schrage Dep. 35:23—36:10, 61:1-3, 61:18-23, 62:1-5, 71:11-15, 80:24—81:10, 85:20—87:19, 98:25-99:9, 108:1-13, 109:1-14, 110:8-13, 121:24—123:8, 124:9—125:8; Ex. H, City Commission Minutes at CITY000173; Ex. I, Art Center DRB Packet at 7; Ex. J, Talking Points; Ex. B, Driscoll Dep. 67:19-25, 68:13-18, 88:4-12, 98:20—100:13, 106:6-11, 121:3-5, 124:8—125:5, 126:19—128:7, 129:2-20, 155:6—156:12; Ex. A, Andrew Dep. 22:21-23:4, 24:12-15, 33:22-34:6, 35:4-5, 54:18-22, 55:7-8, 86:11-23, 88:20—89:18, 89:11—90:3, 104:9-14, 105:6-23, 113:9-15, 114:9-20, 115:7-13, 170:7—171:20, 172:11—173:20, 175:2-6, 176:14—178:3, 178:16-22, 179:20—180:10, 210:17—211:6, 285:1-4, 301:21-25, 311:13-20; 322:25—323:4; Ex. K, Sign Permit Submittal Procedure at CITY000661; Ex. C, Andrew 30(b)(6) Dep. 27:7-20, 53:7-9, 58:24—59:6, 69:1-6, 88:16-24, 91:10-24, 100:10-22; Ex. L, Schrage Email 11/8/23; Ex. M, Schrage Email 11/9/23 at CITY000221; Ex. O, Benson Dep. 82:9-17; Ex. N, Schrage Email 2/20/24; Ex. P, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6; Ex. Q, Herrs Dep. 33:12-15, 68:6-11, 77:12-15, 81:11-16, 84:12-22, 101:14-21, 101:25-102:12.

26. Applying Salina Code § 42-764, the City determined that the Cozy Sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted

on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building." Ex. B at 9, Resp. to Int. 11.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: **(1)** Plaintiffs admit that this is a partial reproduction of Defendant's Response to Plaintiffs First Set of Interrogatories, Rog. 11. **(2)** Salina's statement is an argumentative legal opinion. **(3)** Plaintiffs deny that Salina ever made a formal determination regarding Plaintiffs' application. See Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2. **(4)** Plaintiffs deny that Salina considers whether a display is calculated to attract the attention of the public. Ex. C, Andrew 30(b)(6) Dep. 13:17-20; Ex. A, Andrew Dep. 64:14-20; 69:23—70:1; 46:13-19. **(5)** Plaintiffs deny that this is how Salina actually enforced the mural-sign code regime against The Cozy; Salina enforced the regime against the Plaintiffs because it perceived the mural's content as a commercial message pertaining to goods sold by The Cozy. Ex. L, Schrage Email 11/8/23; Ex. J, Talking Points; Ex. M, Schrage Email 11/9/23 at CITY000221; Ex. O, Benson Dep. 82:9-17; Ex. F, Comm. Tran. 5:2-5, 5:23-25, 10:4-5, 22:24—24:4, 26:17-22, 27:3-6, 28:1-8, 28:16-21; Ex. G, Schrage Dep. 61:1-3, 61:18-23, 62:1-5, 85:20—87:19; Ex. N, Schrage Email 2/20/24; Ex. P, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6; Ex. A, Andrew Dep. 89:11—90:3, 170:7—171:20; Ex. B, Driscoll Dep. 155:6—156:12. **(6)** The mural at The Cozy is artwork that tells a story about travel. Ex. T, Howard Dec. ¶¶ 11-17; Ex. S, Howard Dep. 105:9, 252:22—253:5, 253:10-18.

27. The Cozy Sign is used to announce, direct attention to, or advertise, and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them. Ex. B at 9, Resp. to Int. 11.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: See Response to paragraph 26.

28. The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a display is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event. The City determines whether a display is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window). The City determines whether display is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale. **Ex. B** at 6, Resp. to Int. 5.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: **(1)** Plaintiffs admit that this is a partial reproduction of Defendant's Response to Plaintiffs First Set of Interrogatories, Rog. 5. **(2)** See Response to paragraph 26.

30. The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing North Seventh Street. The building frontage occupies the entire property line. Thus, the building frontage of the Cozy Inn is 20.8 feet. The City rounded up, calculating the building frontage as 21 feet. Under Salina Code § 42-521(4)(b) the Cozy Inn had 63 square feet of allowable sign area. The City advised Mr. Howard if he wanted to erect the Cozy Sign he could reduce the size of the Cozy Sign down to the remaining 10 square feet, or remove existing signs to try to fit the sign within the allowable 63 square feet. Ex. K at 92:15-24, 93:1-16, 94:11-25, 96:3-25, 97:1-8, 98:1-13, 116:16-25, 117:1-2; Ex. E at 117:1-25, 118:19-25, 119:1-9.

**Objection**: Contains multiple alleged facts in a single numbered paragraph; hearsay; best evidence rule. City officials testified that they have never physically measured The Cozy Inn, its signs, or the mural. Ex. Q, Herrs Dep. 24:20-22. Instead, the cited measurements allegedly came

from City land records and computer software records, but no such records were produced as part of the evidentiary record. Ex. E, Herrs 30(b)(6) Dep. 93:17—94:1, 96:8-22.

**Response**: Plaintiffs admit that Salina officials testified to these measurements. Plaintiffs deny that any witness has personal knowledge of, or that any record evidence supports, these measurements. Ex. Q, Herrs Dep. 24:20-22; Ex. E, Herrs 30(b)(6) Dep. 93:17—94:1, 96:8-22.

31. The Cozy Sign occupies the entirety of the North wall of the Cozy Inn. Ex. E at 27:25, 28:1-4; Ex. Q (Photo of Cozy Sign at Plaintiffs' Bates 51); Ex. G at 2, Stipulated Fact vii (stipulating to Plaintiffs' Bates 51); Ex. J at 121:1 and 130:6-8.

**Response**: The mural does not occupy the entirety of the North wall, which includes a walk-up window, door, awning, and pre-existing signage. Salina officials testified that the window, door, awning, and existing signage on the North wall are not considered part of the mural and should have been subtracted from any calculation of the size of the mural. Ex. Q, Herrs Dep. 51: 20—52:18; Ex. A, Andrew Dep. 221:18—228:14.

32. Prior to constructing the Cozy Sign, the Cozy Inn had three other signs, with a total sign area of 52.88 square feet. At the time of constructing the Cozy Sign, the Cozy Inn had 10.12 square feet of allowable sign area remaining. Ex. E at 117:19-25, 118:25, 119:1-9.

**Objection**: Hearsay; best evidence rule. City officials testified that they did not physically measure The Cozy Inn, signs, or the mural. Ex. Q, Herrs Dep. 24:20-22.

**Response**: Plaintiffs admit that Salina officials stated these measurements at deposition. Plaintiffs deny that any witness has personal knowledge of these measurements or that any record evidence supports these measurements. Ex. Q, Herrs Dep. 24:20-22.

33. Using the dimensions of the North wall of the Cozy Inn, the City determined the Cozy Sign was approximately 528 square feet in area. Ex. K at 96:3-25, 97:1-8, 98:1-13.

**Objection**: Hearsay; best evidence rule. City officials testified that they have never physically measured The Cozy Inn or the mural. Ex. Q, Herrs Dep. 24:20-22. Instead, the cited measurements allegedly came from City land records and computer software records, but no such

records were produced as part of the evidentiary record. Ex. E, Herrs 30(b)(6) Dep. 93:17—94:1, 96:8-22.

**Response**: Plaintiffs admit that Salina officials stated these measurements at deposition. Plaintiffs deny that any witness has personal knowledge of these measurements or that any record evidence supports these measurements. Ex. Q, Herrs Dep. 24:20-22; Ex. E, Herrs 30(b)(6) Dep. 93:17—94:1, 96:8-22. Plaintiffs deny that Salina ever made a formal determination regarding Plaintiffs' application. See Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2.

34. Plaintiffs did not administratively appeal the City's determination that the Cozy Sign was a sign and therefore subject to the requirements of the Sign Code. Ex D at 234:11-21; Ex. C (Salina Code § 42-597).

**Response**: Plaintiffs deny the implication an appeal is required and further deny that Salina ever made a formal determination under Salina City Code §§ 42-502 and 42-596(c), thus preventing Plaintiffs from being able to administratively appeal under § 42-597. Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2.

38. According to Mr. Howard the arrow on the Cozy Sign directs people to the entrance of the Cozy Inn. Ex. H at 136:2-11.

**Response**: Salina City Code § 42-764 only refers to displays that "direct attention to," it does not include displays that "direct people to the entrance." Salina does not consider displays that direct the public to a location to be regulated signs. Ex. I, Art Center DRB Packet at 8 (unregulated mural "will direct the public to the gallery and educational activities within the Art Center building."); Ex. W, Defs. Amend. Resp. to Plts. First Set of Interrog., Rog. 8 (Salina doesn't consider the Salina Arts Center mural a sign).

39. Mr. Howard admitted he could "upsell" better to customers who came inside of the Cozy Inn. Ex. H at 41:13-15; 43:22-25, 44:1-4; 48:2-9.

**Response**: Plaintiffs deny this claim is supported by fact. Ex. S, Howard Dep. 40:17-25, 41:5-12, 41:16—42:8, 42:19—43:9, 45:9-17, 46:15-25; Ex. X, Windholz Dep. 33:3-16, 33:23—34:3, Ex. T, Howard Dec. ¶¶ 14-17.

40. The Cozy Sign advertises hamburger, chopped onions, pickles, ketchup, and mustard. The Cozy Sign directs attention to the front door of the Cozy Inn by way of an arrow that points to the front door of the Cozy Inn. The Cozy Sign announces the infamous onion smell by announcing, "Don't Fear the Small, the Fun is Inside." Ex. H at 76:1-14, 136:5-11, 142:20-25, 143:1-25, Ex. E at 82:23-25, 83:1, 115:3-10

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: The mural at The Cozy is artwork that tells a story about travel. It is not an announcement; it does not direct attention to anything other than itself (as all murals do); it is not an advertisement. Ex. T, Howard Dec. ¶¶ 11-17; Ex. S, Howard Dep. 105:9, 252:22—253:5, 253:10-18. Salina's contrary statements about the content of the mural are argumentative legal opinion. This statement misquotes the mural at The Cozy. Doc. 16 ¶ 23.

41. The City also reviewed the rendering of the Cozy Sign Mr. Howard submitted with the sign permit application, which Mr. Howard alleged was intended to be the final rendering of the Cozy Sign. The City confirmed the display that Mr. Howard intended to be the final rendering of the Cozy Sign was a sign under the Sign Code. Ex. K at 108:4-13, 127:22-25 128:1-22; Ex. D at 246:10-16; Ex. M; Ex. Q

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: **(1)** Plaintiffs deny that Salina ever made a formal determination regarding Plaintiffs' application. Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2. **(2)** There is "no basis to doubt" that Mr. Howard intends to finish the mural as depicted. Ex. A, Andrew Dep. 356:21—357:2; Ex. T, Howard Dec. ¶ 31-32.

42. The City, via its Zoning Administrator, reviewed industry specific publications in anticipation of the City of Salina's 2017 amendment to the Sign Code. The 2017 amendment, Ordinance Number 17-108882, was prompted by Reed v. Town of Gilbert (the City's Governing Body amended the Sign Code in order to ensure compliance with the First Amendment). The industry specific publications reviewed by the City addressed how signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics. Ex. A

**Objection**: Contains multiple alleged facts in a single numbered paragraph. To the extent Salina attempts to use the contents of the publications attached to Mr. Andrew's Affidavit to prove that "signs are a significant driver distraction and how sign regulations promote traffic safety and aesthetics" then it's objectionable hearsay.

**Response**: **(1)** The cited affidavit does not include any evidence that the Salina City Commission considered or was even aware of the publications attached to the affidavit. **(2)** Neither the official minutes nor the meeting documents published by Salina for the City Commission meetings where Ordinance Number 17-108882 was discussed give any indication that the City Commission ever considered the documents attached to Mr. Andrew's affidavit. Ex. Y, 4/17/17 Meeting Minutes; Ex. Z, 4/17/17 Meeting Documents; Ex. AA, 5/15/17 Meeting Minutes; Ex. BB, 5/15/17 Meeting Documents; Ex. CC, 6/26/17 Meeting Minutes; Ex. DD, 6/26/17 Meeting Documents; Ex. EE, 7/10/17 Meeting Minutes; Ex. FF, 7/10/17 Meeting Documents. **(3)** Salina is not aware of any evidence that the mural-sign code regime advances its alleged interests. Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 73:13—75:8; 76:19—77:10, 25:14-17, 77:23—78:10; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3, 168:9-25; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. **(4)** There is no evidence that signs present a traffic or pedestrian safety issue or harm aesthetics. Ex. GG, Taylor Dec., Rpt. at 12 (Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents."); *id.* at 13 (The "research [has] demonstrated that properly placed signs are not a safety hazard"); *id.* at 10 ("[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence."), *id.* at 15-18 ("no evidence" Salina's sign code "promotes an interest in aesthetics[.]"), *id.* at 6-10 ("signage should not be dismissed as clutter without evidence").

43. The City regulates signs in the aggregate. Ex. K at 62:1-2.

**Response**: This statement is an argumentative legal opinion to which no response is needed. This statement is unsupported by facts or evidence.

44. The City regulates the time, place, and manner of the display of signs. Ex. D at 127:1-2; Ex. K at 45:10-16.

**Response**: **(1)** This statement is an argumentative legal opinion. **(2)** This statement is unsupported by facts or evidence. **(3)** Salina regulates displays differently based on the content, speaker, or commercial nature of the display Ex. D, Def. Ans. to First Set of Interrog., Rog 5, 11; Ex. E, Herrs 30(b)(6) Dep. 88:21—89:22, 90:7-13; Ex. F, Comm. Tran. 5:2-5, 5:23-25, 10:4-5, 22:24—24:4, 26:16-22, 27:3-6, 28:1-8, 28:16-21; Ex. G, Schrage Dep. 35:23—36:10, 61:1-3, 61:18-23, 62:1-5, 71:11-15, 80:24—81:10, 85:20—87:19, 108:1-13, 109:1-14, 110:8-13, 121:24—123:8, 124:9—125:8; Ex. H, City Commission Minutes at CITY000173; Ex. I, Art Center DRB Packet at 7; Ex. J, Talking Points; Ex. B, Driscoll Dep. 67:19-25, 68:13-18, 88:4-12, 98:20—100:13, 106:6-11, 121:3-5, 126:19—128:7, 129:2-20, 155:6—156:12; Ex. A, Andrew Dep. 54:18-22, 55:7-8, 86:11-23, 88:20—90:3, 170:7—171:20, 172:11—173:20, 175:2-6, 176:14—178:3, 178:16-22, 179:20—180:10, 210:17—211:6, 285:1-4; Ex. K, Sign Permit Submittal Procedure at CITY000661; Ex. C, Andrew 30(b)(6) Dep. 27:7-20, 58:24—59:6; Ex. L, Schrage Email 11/8/23; Ex. M, Schrage Email 11/9/23 at CITY000221; Ex. O, Benson Dep. 82:9-17; Ex. N, Schrage Email 2/20/24; Ex. P, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6. **(4)** Salina is not aware of any evidence that the mural-sign code regime advances its alleged interests. Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 73:13—75:8; 76:19—77:10, 25:14-17, 77:23—78:10; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3, 168:9-25; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. **(5)** There is no evidence that the mural-sign code regime promotes aesthetics, property values, or traffic and pedestrian safety. Ex. GG, Taylor Dec., Rpt. at 12; *id.* at 13; *id.* at 10, *id.* at 15-18; *id.* at 6-10.

45. These time, place, and manner regulations limit the size, number, height and location of signs pursuant to the specific zoning district wherein the sign is located. Ex. K at 45:10-16, 71:12-16, 72:19-21; Ex. D at 127:1-2; Ex. R (Mark White Aff'd) at ¶ 6.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

46. Regulating the size, number, height, and location of signs helps to reduce clutter, thereby reducing distractions, keeping visual sight lines for vehicles and pedestrians clear, and ensuring signs remain effective while not holding the eye of viewer for too long. Ex. K at 71:12-23.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

47. The Sign Code seeks to protect the aesthetics of the community and quality of life, while reducing safety hazards that can result from sign clutter. Ex. E at 64:10-18.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

48. Eliminating the risk of sign wars--where in order to have more prominent signage businesses compete by erecting additional signs and signs that are larger than the surrounding signs cluttering the area--also protects the aesthetics and safety of the community. Ex. E at 60:6-24, 61:2-25, 62:1-18.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

49. Excessive amounts of "signage, both in terms of number of signs and size of signs" can become distracting and cause safety problems. Ex. E at 121:10-25.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

50. The Sign Code seeks a balance by allowing "ample amount of signage for each property" allowing "effective and attractive" signs "without becoming a safety concern." Ex. E at 121:23-25, 122:1-2.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: This statement is an argumentative legal opinion. This statement is unsupported by facts or evidence. See Response to paragraph 44.

52. In the C-4 District, the number of signs is limited to "four (4) signs per business." Ex. C (§ 42-521(4)(b)); Ex. D at 131:20-24.

**Response**: Plaintiffs admit that this statement correctly quotes a portion of § 42-521. Salina's mural-sign code regime allows more than four signs in the C-4 district based on written and unwritten exemptions. Salina City Code §§ 52-504, 42-505, 42-508, 42-525, 42-581; Ex. A, Andrew Dep. 22:21—23:4, 33:22—34:6, 35:4-5, 105:6-23, 114:11-20, 115:7-13, 301:21-25.

53. In the C-4 District, the size and number limitations are designed to prevent safety problems. Ex. E at 62:16-19.

**Response**: Salina is not aware of any evidence that the mural-sign code regime promotes safety. Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 73:13—75:8; 76:19—77:10, 25:14-17, 77:23—78:10; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3, 168:9-25; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. There is no evidence that the regime promotes traffic or pedestrian safety. Ex. GG, Taylor Dec., Rpt. at 12; id. at 13; id. at 10; id. at 6-10.

54. The C-4 district is a more pedestrian-oriented area where the buildings are shoulder to shoulder and share common walls. Ex. E at 17:7-21.

**Response**: This statement is unsupported by evidence. Much of the C-4 district consists of broad avenues and open spaces. Ex. HH, Cozy Photos at 49; Ex. II, Mural Photos at 82-83, 93, 95, 98, 120; Ex. JJ Photos at 85-86, 106, 113-115.

55. The Sign Code serves compelling and substantial urban planning purposes including traffic safety and aesthetics. The Sign Code directly and materially furthers its recited purposes, set forth in Salina Code § 42-500. The Sign Code is consistent in practice with the state of the art nationally for how sign regulations interact with decorative building features such as murals. To that end, it is consistent with twenty-one sign and mural regulations in Kansas and Oklahoma, which demonstrate a range of approaches to regulating signs while accommodating the

benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs. **Ex. R** at ¶ 6.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: **(1)** These statements are argumentative legal opinion. **(2)** Salina is not aware of any evidence that the mural-sign code regime advances its alleged interests. Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 73:13—75:8; 76:19—77:10, 25:14-17, 77:23—78:10, Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3, 168:9-25; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. **(3)** There is no evidence that the mural-sign code regime promotes aesthetics, property values, or traffic and pedestrian safety. Ex. GG, Taylor Dec., Rpt. at 12; *id.* at 13; *id.* at 10, *id.* at 15-18; *id.* at 6-10.

56. The restrictions in the Sign Code are reasonable, generally accepted regulations of the size, number, placement and design of signs. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter. The Sign Code keeps signs in scale with the building's context which furthers the City's aesthetic interests. This is especially important in the historic downtown C-4 district, where the 67% limitation on the total sign area on any building wall or street frontage protects aesthetics and architectural integrity. Ex. R at ¶ 6.

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: See Response to paragraph 55.

57. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas. Ex. R at ¶ 6(g).

**Objection**: Contains multiple alleged facts in a single numbered paragraph.

**Response**: These statements are argumentative legal opinion. There is no evidence that these terms and phrases are well understood. The definitions Mr. White cites differ from Salina

claimed definitions. *Compare* White's definition of "announce" and "advertise," Ex. KK, White Report at 18, *with* Salina's definitions, Ex. D, Def. Resp. to Plt. First Set of Interrogs., Rog 5.

58. The Cozy Inn communicates via Facebook, branded merchandise worn or used by their customers, community events, radio advertising, banner advertising at indoor football events, billboards, bumper stickers, and a sign similar to the Cozy Sign on the wall of Jenni's Liquors in a nearby town. Ex. I at 19:5-25, 20:1-25, 21:1-25, 22:1-2, 23:8-25, 24:1-25, 26:7-25, 27:1-2, 29:12-25, 30:1-25, 59:2-25, 60:1-19; Ex. H at 89:11-24, 150:8-24; 213:3-13, 221:25, 222:1-12; Ex. S (Photo from Stephen Howard Deposition Ex. Y).

**Objection**: Contains multiple alleged facts in a single numbered paragraph. Salina's Ex. S was disclosed after the deadline established in the Scheduling Order, warranting exclusion under Rule 37(c)(1). Plaintiffs objected previously, Ex. S, Howard Dep. 213:18-22, and object again.

**Response**: **(1)** Plaintiffs admit The Cozy Inn communicates some messages via Facebook, radio advertising, banner advertising at indoor football events, and billboards. **(2)** Branded merchandise or bumper stickers worn or used by their customers are the communications of the individual displaying them, not The Cozy Inn. Ex. A, Andrew Dep. 33:23—35:5 (individual displaying Kansas City Chiefs flag is expression of individual, not the Chiefs). **(3)** The mural at Jenni's Liquor is not considered a regulated sign by the City of Brookville, Kansas, Ex. S, Howard Dep. 223:4-19, and is a communication of Jenni's Liquor and its owners, not The Cozy Inn. **(4)** Any implication that these communications provide an alternative channel of communication is an argumentative legal opinion.

59. Charles Taylor admitted that prior to construction of the Cozy Sign, the Cozy Inn signs that were already in place were "conspicuous enough," and did in fact "brand the site." Ex. T at 177:20-23; 180:1-2 (Charles Taylor Depo.)

**Response**: Plaintiffs admit that the quotations from Professor Taylor are accurate. Plaintiffs deny that the purpose of the mural at The Cozy is to make The Cozy conspicuous or to brand the site. The mural at The Cozy is artwork that tells a story about travel. Ex. T, Howard Dec. ¶¶ 11-17; Ex. S, Howard Dep. 105:9, 252:22—253:5, 253:10-18.

60. Mr. Howard was upset about the City's determination that his display was a sign and that it was too large to qualify for a permit. Ex. I at 48:4-17.

**Response**: This statement is argumentative and unsupported by the evidence cited. Plaintiffs deny that Salina made a formal determination regarding Plaintiffs' application. Ex. U, On-Hold Letter, Ex. E, Herrs 30(b)(6) Dep. 109:24—110:2.

**C. Additional Statement of Facts.**

1. Salina is filled with dozens of murals. Ex. II, Mural Photos; Ex. JJ, Photos

2. Zoning Administrator Andrew testified that "[a]ccording to the rules of construction of our city code, or and and are interchangeable," Ex. A, Andrew Dep. 72:2-3, depending on the context, *id.* 72:18-19.

3. Salina's proffered expert, Mark White, is the author of a learned treatise, "*Content-Neutral Sign Codes After Reed And Austin*, (Sign Research Foundation 2022). Ex. NN, White Dep. 191:19-192:2; Ex. MM, *Content-Neutral Sign Codes After Reed and Austin*.

4. Salina has threatened to seek legal fees personally from Mr. Howard. Ex. S, Howard Dep. 250:16—251:7; Doc. 101, Amended Pretrial Order (APTO) at 19.

## Argument

### I. The Plaintiffs have standing.

The Plaintiffs want to finish their whimsical mural but can't. Salina's entire mural-sign code regime[2] stands in the way. Nonetheless, Salina's primary standing argument appears to focus on "redressability" and suggests that if the definition of a "sign" is theoretically severed from the code, the Plaintiffs still couldn't finish painting their full-sized display. Doc. 107 at 18-19. Redressability only requires that "a favorable judgment would meaningfully redress the alleged injury." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1098 (10th Cir. 2006). Contrary to Salina's arguments, the Plaintiffs have not just challenged the constitutionality of the definition of a "sign" under § 42-764. The Plaintiffs have requested a judgment declaring the *entire* mural-sign

[2] The mural-sign code regime includes the written sign code, the unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties.

code regime unconstitutional including the permit requirement, the size limitations, and Salina's unwritten policies and practices. The Plaintiffs clear the low redressability hurdle—a successful outcome would allow the Plaintiffs to finish their mural, and the requested relief would redress the Plaintiffs' constitutional injuries. *Aptive Envtl., LLC v. Town of Castle Rock, Colorado,* 959 F.3d 961, 978 (10th Cir. 2020) (enjoining enforcement of ordinance establishes redressability); *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1229 (10th Cir. 2005) (plaintiffs' injury "would be redressed by a judicial conclusion that the Ordinance is unconstitutional.").

Salina's suggestion that its severability ordinance deprives the Plaintiffs of standing is mistaken. The question of severability "is whether the act would have been passed without the objectional portion and if the statute would operate effectively to carry out the intention of the legislature with such portion stricken." *Clark v. City of Williamsburg, Kansas*, 388 F. Supp. 3d 1346, 1362 (D. Kan. 2019), *aff'd*, 844 F. App'x 4 (10th Cir. 2021) (cleaned up). If the "invalid portion" "is such an integral and inseparable part of the whole scheme and purpose of the law," it "may not be severed." *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1024 (1993) (cleaned up). Invalid language may not be severed if it would "effect[] the meaning of what remains," *Clark*, 388 F. Supp. 3d at 1362 (cleaned up), or would "change[] the scope of the Act," *Thompson*, 252 Kan. at 1024.

Salina only applies its permit and size regulations to displays it considers "signs." *Response to Statements of Fact* (*RSOF*) ¶ 2, Ex. A, Andrew Dep. 91:3 ("we don't regulate murals"); Ex. B, Driscoll Dep. 93:12-14 ("murals" are "a whole another thing[.]"). According to Salina, "the definition of 'sign'" is "the central issue of this case." Doc. 107 at 2. As such, the definition of a "sign" is plainly integral to the sign code, it's improbable Salina would have passed a sign code without defining "sign," severing "sign" from the code would fundamentally "effect[] the meaning of what remains," *Clark*, 388 F. Supp. 3d at 1362 (cleaned up), and would "change[] the scope of the Act," *Thompson*, 252 Kan. at 1024.

If the Plaintiffs were challenging a discrete provision of the mural-sign code regime, such as the exemptions for "noncommercial flags displayed on private property," § 42-504(1), or "memorial signs and tablets displayed on private property," § 42-504(5), then Salina's severability

might have some merit. Those provisions could be cleanly severed from the rest of the mural-sign code regime "without doing violence to legislative intent." *Clark*, 388 F. Supp. 3d at 1362. But eliminating the definition of the very thing that the mural-sign code regime regulates would fundamentally upend it. If there is no definition of a "sign," it would be impossible to conclude The Cozy's mural was indeed a "sign," that it required a "sign permit," and that was subject to the size limitations for "signs" in the C-4 district. The entire mural-sign code regime topples without a definition of a "sign," and therefore, it's not severable.

Salina's claim that severing "sign" from its code would mean that its size and permitting regulations would still apply to The Cozy's display is particularly confused. Doc. 107 at 19. The definition of a "sign" is the operative regulatory verbiage. According to Salina, if something is a "sign," it's regulated. If it's not a "sign," it's not regulated. If "sign" were stricken from the code, neither the permitting nor the size regulations would apply to any painted display at all. Salina makes that very point later in its memorandum. Doc. 107 at 22 ("Displays that fall outside of the definition of 'sign' are not signs and are therefore not regulated as such") (cleaned up).

What's more, severing the definition of "sign" would only strengthen the Plaintiffs' prior restraint and void for vagueness claims. Without *any* definition of a "sign," Salina officials would have unlimited discretion to decide when a mural is regulated and when it is not. Without *any* definition of "sign" there would not be any standards on what is regulated, much less the "narrow, objective standards" the First Amendment requires. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992). Without *any* definition of "sign," "regulated parties [couldn't] know what is required of them," and Salina officials would not have the "precision and guidance" to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way," *F.C.C. v Fox Television Stations, Inc.*, 567 U.S. 239, 253-54 (2012) (cleaned up).

Salina's severance argument is also based on an out-of-circuit case that has never been cited in-circuit for the idea that theoretically severing a statute *before* determining its constitutionality deprives a First Amendment litigant of standing. Doc. 107 at 19 (citing *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793 (8th Cir. 2006)).

Next, Salina suggests—without any legal citations—Plaintiffs can't challenge the "timing provisions" of the sign code because they "started painting without a permit," were "well-aware" they needed one, and because they "agreed to delayed processing" of it. Doc. 107 at 20. Plaintiffs did start painting without a permit, but that's because they thought they were painting an unregulated mural, not a regulated sign. *RSOF* ¶ 15. Salina instructed the Plaintiffs to apply for a permit; the Plaintiffs never "agreed to delayed processing" of it. *RSOF* ¶¶ 18, 23; Ex. T, Howard Dec. ¶ 26; Ex. A, Andrew Dep. 233:2-6. That Salina can't even say *when* it put the Plaintiffs' application on hold belies any notion there was an agreement. *RSOF* ¶ 23 (application put on hold *seven days before* it was submitted, right after it was submitted, and "when it came in"). Besides, applying for a permit isn't even a requirement. *See*, *e.g.*, *Ass'n of Cmty. Organizations for Reform Now, (ACORN) v. Municipality of Golden, Colo.*, 744 F.2d 739, 744 (10th Cir. 1984); *Koontz v. Watson*, 283 F. Supp. 3d 1007, 1018 (D. Kan. 2018).

The Plaintiffs "have standing to challenge those portions of the Code which provide the basic definitional structure for the terms used," "and which more generally define the scope of signs allowed." *Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369, 1379 (M.D. Fla. 2014). The Plaintiffs have standing to challenge Salina's unwritten definitions and policies that prevent them from finishing their mural. *See id*; *Aptive*, 959 F.3d at 979 (First Amendment applies to "city policies"); *NAACP v. City of Philadelphia*, 39 F. Supp. 3d 611, 616 (E.D. Pa. 2014) (standing exists to challenge "unwritten policy" that prevented speech), aff'd sub nom. *NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016).

In sum, the Plaintiffs have standing. They've suffered a constitutional injury, caused by the defendant, which would be redressed by an order granting Plaintiffs the requested relief. *Aptive,* 959 F.3d at 978; APTO 2.a.iv-v., 2.a.ix., 5.a-c.; Doc. 16 ¶¶ 306-315.

## II. Salina applies the definition of a "sign" differently from the code's text.

Salina interprets § 42-764's definition of a "sign" to include only subsections (1), (2), and (3). Doc. 107 at 27.

In doing so, Salina either removes entire sections of the definition, substitutes "and" for "or," or combines both approaches. Doc. 107 at 28 ("the definition of sign[s]" are "those displays (**and** 'any other figure[s] of similar character'")) (emphasis added); *Additional Statement of Facts* (*ASOF)* ¶ 2 (Salina uses "and" and "or" interchangeably). In any event, Salina now admits it *applies* the definition differently from the code's text. Doc. 107 at 26 (admitting definition of sign "is limited in application"). This is how Salina's interpretations look:


*Sign* is [redacted]

(1) [redacted] a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; and
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

*Sign* is any [redacted] display [redacted], [redacted] any other figure of similar character and which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; and
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

In either one, Salina's interpretation contradicts the "longstanding canons of statutory construction" that a court must construe a statute "so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant." *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698–99 (2022) (cleaned up). Salina's reading renders half of § 42-764 a nullity.

Despite this, Salina argues it should be allowed to effectively rewrite its code, otherwise it "would result in sign permits for displays *inside of buildings*." Doc. 107 at 27 (emphasis in original). However, the code plainly contemplates that permits *are* required for displays inside a building, as evidenced by the exemption for *indoor* window signs. § 42-504(9) (exemption for signs "affixed to the interior of a window").

Salina's assertion that its interpretations have been "consistent and reasonable" *see* Doc. 107 at 26, is directly contradicted by the record. *ASOF* ¶ 2 (using "and" and "or" interchangeably); *RSOF* ¶¶ 2 (ignoring the code's text); *RSOF* ¶¶ 2, 52 (inventing code exemptions).

Properly read, a "display that is calculated to attract the attention of the public" is a "sign." Subsections (1), (2), and (3) are catchalls for "any other figure of similar character." Doc. 16 ¶¶ 36-39. That reading provides meaning and effect to all of the code's text.

## III. Salina's mural-sign code regime violates the First Amendment.

### A. The mural-sign code regime is content- and speaker-based.

Salina's argument that the sign code is "content-neutral," that it "applies the Sign Code as written," and that it determined The Cozy's display was too big "based on objective content neutral standards," Doc. 107 at 20, 25, is not just legally incorrect, it's belied by the extensive factual record, nearly all of which Salina ignores.

As shown throughout the Plaintiffs' summary judgment memorandum, Salina applies its size and permitting requirements to displays it considers signs but doesn't apply them to displays it considers murals. Doc. 105 at 26-30. The difference between an unregulated mural and a regulated sign turns on its content and the speaker. If the display relates to the entity putting it up, is "part of a commercial transaction," contains a "commercial message," or if it "includes a message that pertains to the goods or services for sale," Salina considers it a regulated sign and applies its regulations. *RSOF* ¶¶ 2, 25-28, 44-50; *see also* Ex. J, Talking Points (a "distinction is commonly made between murals and art when compared to commercial speech"). Conversely, if the display's content shows something else, Salina doesn't apply its size and permitting regulations.

Because "[t]hese distinctions are based solely on the content of the [display] at issue," and because "the restrictions that apply depend on the 'communicative content' of the [display], like here," Salina's mural-sign code regime "is content-based." *Clark*, 388 F. Supp. 3d at 1359 (relying on *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)). *See also Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up) (regulation was content based because "it exempted works of art that in no way identified or specifically related to a product or service, but it applied to art that referenced a product or service" and "because it applied or did not apply as a result of content").[3]

[3]*See also Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278, 285 (D. Md. 2021) (size limit based on subject is content based); *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009) (application of code was content based because murals displayed "in conjunction with" a business were subject to size regulations, but murals showing "first responders" or "kids playing in the park" were

It's also content based under *Aptive,* where the Tenth Circuit rejected the argument that a commercial door-to-door solicitors' curfew was content neutral. 959 F.3d at 966, 970, 999. The curfew "*is* content-based," the Tenth Circuit held, because it "applies by distinguishing between the commercial and noncommercial content of the solicitors' speech," a "conclusion dictated by the Supreme Court's decision in *Discovery Network*. There, the Court struck down a law that banned commercial but not noncommercial newsracks. In so doing, the Court concluded that the regulation was not content-neutral because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech." *Id.* at 982 (internal quotes cleaned up, italics in original). The learned treatise authored by Salina's own retained expert demonstrates the regime is content based. *ASOF* ¶ 3; *see* Ex. MM at 9-10, 20-21 ("Tips to Comply with *Reed*" and "*Reed*'s Top 10 Takeaways").

The government's repeated citations to *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61 (2022) are flawed and don't help Salina. Doc. 107 at 2, 3, 21, 22. This case is nothing like that one. In *Austin*, billboard companies challenged an off-premises, "location-based and content-agnostic" regulation that didn't "single out any topic or subject matter for differential treatment," and there was "no evidence in the record that the City had applied the sign code provisions differently for different messages or speakers." *Id.* at 73-74, 76, 67 (cleaned up). This case isn't about billboards, and it doesn't involve off-premises, location-based regulations. Salina's repeated statements, actions, and testimony proves the regime is anything but content-agnostic, and even though all painted wall-displays are the same physical *thing* (paint on walls), Salina treats them differently depending on *what* the paint displays and *who* is painting it. Salina doesn't regulate the Mural at the Mill, *ASOF* ¶ 1; Ex. II, Mural Photos at 82, because of its content but does regulate The Cozy's

unregulated art); *Kerston v. City of Mandan,* 389 F. Supp. 3d 640, 642, 644, 646 (D.N.D. 2019) (city's claim that a bar's mural depicting mountains, cowboys, and the bar's name, was a regulated sign, not an unregulated mural was "[c]learly" a "regulation [that] is based on the content of the speech," and "is not content neutral"); *Morris v. City of New Orleans*, 399 F. Supp. 3d 624, 635, 636 (E.D. La. 2019) ("[U]ndeniably content based" that New Orleans considered a painting with "a non-commercial message" an unregulated a mural, but considered a painting with "a commercial message" a regulated "sign").

mural because of *what* it depicts and *who* painted it. In short, Salina overreads *Austin*. It didn't "nullify *Reed*'s protections," or "cast doubt on any" "precedents recognizing examples of topic or subject-matter discrimination as content based." *Austin*, 596 U.S. at 76.

At a more fundamental level, that Salina almost exclusively relies on billboard and other off-premise sign cases underscores the weakness of its position. Murals can't fall over, occupy land that could be put to other uses, block views, or feature flashing lights. Billboards have long been treated differently than murals. *See, e.g., Pagan v. Fruchey*, 492 F.3d 766, 774 (6th Cir. 2007) (*en banc*) (explaining that billboard case doesn't apply to case involving "for sale" signs on cars); *Cafe Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1285 (11th Cir. 2004) (the "law of billboards" is "a law unto itself"). Calling a mural a "sign" because of the content doesn't change the analysis: wall-paintings can't fall over, occupy land, or block views, or feature flashing lights.

Salina says it was "transparent about how it applied the Sign Code" to The Cozy's mural, Doc. 107 at 24-25, and indeed it was. Salina officials transparently (and repeatedly) admitted the code is, and was applied to The Cozy, in a content- and speaker-based manner. *RSOF* ¶¶ 2, 25, 26-28, 44-50; Ex. F, Comm. Tran. 10:4-5 (Salina applies regulations "all on the basis of a commercial message"). Salina's attempts at cleaning that up through its litigation positions aren't credible. For one instance, Salina says The Cozy's mural is a "sign" because it was a "display calculated to attract the attention of the public." Doc. 107 at 24. But Salina also says that's *not* how it interprets or applies the code. Doc. 107 at 26-27. Salina's own 30(b)(6) representative testified it ignores that part of the code as well. *RSOF* ¶¶ 2, 26; Ex. E, Andrew 30(b)(6) Dep. 13:17-20 ("Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public? A. No."); *see also* Ex. A, Andrew Dep. 64:14-15, 18-20; 69:23—70:1; 46:13-19.

Salina can't credibly explain *why* the mural at The Cozy is a regulated sign, but the Mural at the Mill isn't, even under its preferred reading of the code. Doc. 107 at 27; *ASOF* ¶ 1; Ex. II, Mural Photos at 82; *RSOF* ¶¶ 2, 25-28, 42, 44-50, 53, 55; Ex. C, Andrew 30(b)(6) Dep. 13:17-20; Ex. A, Andrew Dep. 64:14-20, 69:23—70:1, 46:6-19, 210:17—211:6; Ex. B, Driscoll Dep. 126:19—

128:7, 129:2-20; Ex. G, Schrage Dep. 108:1-13, 109:1-14; Ex. NN, White Dep. 120:10-17, 121:10-14, 125:7-12. The Mural at the Mill is a display, it "attract[s] the attention of the public," it "direct[s] attention to" itself, and it "direct[s] attention to" downtown Salina. Even though it's a "sign" as the code defines it in § 42-764, Salina considers it an unregulated mural. *RSOF* ¶¶ 2, 25, 44-50; Ex. B, Driscoll Dep. 126:19—128:7; Ex. G, Schrage Dep. 108:1-13. Besides, whether something is "used to announce, direct attention to, or advertise" is still content based because it "target[s] speech based on its communicative content," it "applies to particular speech because of the topic discussed or the idea or message expressed," it targets "specific subject matter," it "draws distinctions based on the message," "cannot be justified without reference to the content of the regulated speech," it "defin[e]s regulated speech by its function or purpose," and because it "disagree[s] with [certain] message[s]," *Reed,* 576 U.S. at 155, 163-64, 169 (cleaned up) and "turn[s] on whether the speech is commercial or not." *Aptive*, 959 F.3d at 982; *see also id.* at 983; *RSOF* ¶¶ 2, 25, 44-50; Ex. A, Andrew Dep. 285:1-4 (regulated sign defined by "function").

Salina's litigation positions and the undisputed factual record also demonstrate the mural-sign code regime is a speaker-based restriction. To start with, Salina admits it prohibits some painted displays but not others to "eliminat[e] the risk of sign wars" between "businesses." Doc. 107 at 31. What's more, a pizza shop could paint an exact replica of The Cozy's mural, but The Cozy can't. *RSOF* ¶¶ 2, 25-28, 44-50; Ex. F, Comm. Tran. 23:4—24:4, 26:16-22; *see also* Ex. G, Schrage Dep. 121:25—123:9, 123:16—125:8; Ex. B, Driscoll Dep. 106:6-11, 155:6—156:12; Ex. A, Andrew Dep. 24:12-15, 54:18—55:8, 172:11—173:20, 175:2-6, 177:5—178:3, 179:20—180:10 (more speaker-based examples). All of that "favor[s] some speakers over others" and "reflects a content preference." *Reed*, 567 U.S. at 170. Salina didn't move for summary judgment on the speaker-based theory. *See* Doc. 107. The Plaintiffs did. Doc. 105 at 2, 26, 29-30.[4]

"Both on its face and in its practical operation," Salina's mural-sign code regime "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health*

[4] The Plaintiffs have consistently alleged the regime is speaker based as well. *See* Doc. 16 ¶¶ 3, 32, 34, 192, 198, 199-200, 202-203, 211, 213-214, 229, 308; Doc. 31 at 1, 5, 8; Doc. 101 at 16, 18.

*Inc.*, 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination," *Reed*, 576 U.S. at 169. Because the undisputed factual record shows that Salina treated The Cozy's mural as a regulated sign, and not an unregulated mural, based on what it depicted and the identity of the speaker, strict scrutiny applies. Salina can't meet that heavy burden—indeed, it doesn't even try to. *See* Doc. 107.

**B. Salina's restrictions can't survive *any* form of heightened scrutiny.**

**1. Even if it's content neutral, the mural-sign code regime is unconstitutional.**

Salina argues that under a content neutral analysis, it doesn't need to produce any evidence. Doc. 107 at 29-30. That position is over-the-top and wrong. As Mr. Howard previously explained, the Tenth Circuit's content-neutral test is fact-intensive. Doc. 105 at 32-37. In *Brewer v. City of Albuquerque*, the city restricted pedestrian activities on the theory it "was necessary to address persistent and troubling pedestrian safety concerns stemming from high rates of vehicular accidents[.]" 18 F.4th 1205, 1209 (10th Cir. 2021). The city's 900 accident and police reports, statistical information regarding injuries and fatalities, anecdotes from city council, police officers, and expert testimony on traffic engineering and roadway design *still* wasn't enough to prove there was a real-life, non-speculative harm, or that the city's ordinance alleviated a non-speculative harm in a direct and material way. *Id.* at 1232, 1227, 1226. The Tenth Circuit even described that record as "largely evidence free" and "pauc[e]." *Id.* at 1245, 1238.

For Salina's evidence-free theory, and in keeping with its theme, Salina primarily relies on three billboard cases. Two of these are District of Colorado opinions involving the same plaintiffs, one of which was affirmed on appeal, but not for the reasons Salina says. Doc. 107 at 29-30. What Salina doesn't say is that on appeal, the Tenth Circuit cited *Brewer* and upheld the dismissal—not because the facts don't matter—but because the plaintiffs didn't properly allege the billboard regime failed intermediate scrutiny. In any event, none of the three cases apply here.

Salina says it doesn't need evidence because of *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981). Doc. 107 at 3, 28-29, 30. In *Metromedia*, the United States Supreme Court explained that billboards create "a unique set of problems" and expressed a billboard-specific

observation that "billboards are real and substantial hazards to traffic safety." 453 U.S. 490, 509-510 (1981). Still, the Supreme Court left open the possibility that the facts could lead to a different result. *Id.* at 509. Given the unique harms billboards pose, courts analyzing billboard-specific regulations have largely deferred to the Supreme Court's billboard-specific observations. Indeed, that's precisely what the District of Colorado did in *StreetMediaGroup, LLC v. Bd. of Cnty. Commissioners of Cnty. of Adams, State of Colorado*, No. 21-CV-1232-RMR-KLM, 2023 WL 5613018, at *3 (D. Colo. Mar. 30, 2023), one of the cases cited by Salina. Doc. 107 at 30.

Murals aren't billboards though. They can't fall over, block views, or occupy physical land. *Metromedia*'s billboard-specific observations don't apply here. In *Pagan*, for example, the government regulated "for sale" signs on cars and "argued that even in the absence of evidence of concrete harm, [courts] should defer to legislative judgments on matters of traffic safety and aesthetics" because of *Metromedia*. 492 F.3d at 774. The Sixth Circuit rejected the government's "theory" it need not provide evidence" and rejected the proposition that *Metromedia* applied. "*Metromedia* does not control the outcome of this case," it said. *Id.* at 774; *see also*, *Cafe Erotica*, 360 F.3d at 1285 (the "law of billboards" is "a law unto itself").

In the other *StreetMedia* case cited by Salina, the billboard companies argued that treating billboards "differently depending on whether the message was paid for or not" was unconstitutional under strict scrutiny. *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1247 (10th Cir. 2023). The Tenth Circuit upheld the dismissal, but not because the facts don't matter. As the Plaintiffs previously explained, Doc. 105 at 36-37, *StreetMedia* didn't turn the First Amendment analysis into a fact-free, government-deferential inquiry where Salina gets to restrict speech because it says so. Instead, the Tenth Circuit held that strict scrutiny didn't apply, cited *Brewer*, and explained that it was "skeptical" the regulatory regime could survive intermediate scrutiny, but because the billboard plaintiffs did "not allege with any specificity that the Act and rules fail to meet intermediate scrutiny," it "[t]hus conclude[d] that the district court properly dismissed" the claim. *Id.* at 1252. *StreetMedia* doesn't say that the facts don't matter. The dismissal wasn't upheld for the reasons Salina says.

Salina also relies on *Wag More Dogs, LLC., v. Cozart*, 680 F.3d 359 (4th Cir. 2012) for its "evidence doesn't matter" theory. Doc. 107 at 3. *Wag More Dogs* pre-dated *Reed* and the Fourth Circuit has abandoned it. *Cent. Radio Co. Inc. v. City of Norfolk, Va.* is instructive. There, the Fourth Circuit initially relied heavily on *Wag More Dogs* to uphold a sign code, 776 F.3d 229 (4th Cir. 2015), but the case was vacated and remanded post-*Reed,* 576 U.S. 1049 (2015). On remand, the Fourth Circuit reversed itself, holding the sign code unconstitutional without citing *Wag More Dogs*. 811 F.3d 625 (4th Cir. 2016). Even the law review cited by Salina recognized that *Wag More Dogs* was an outlier before *Reed*. Doc. 107 at 31. The article, written two years before *Reed*, characterized *Wag More Dogs* as the "minority approach" and was the "sole mural case" applying the minority view. Chistina Orlando, *Art or Signage?: The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo L. Rev. 867, 884, 886 (2013). In any event, *Wag More Dogs* was poorly reasoned, lacked limiting principles, and was contrary to the First Amendment, as the Fourth Circuit eventually recognized by abandoning it.

Salina's fact-free, "because I said so" theory of regulating *some* painted wall displays but not others isn't credible. Murals aren't hazardous, and neither are the murals that Salina says are signs. There is nothing in this record or the caselaw that says they are. Whether they're called a sign or a mural doesn't change things either. It's all just paint. Wall paintings can't fall over, block views, or occupy physical land; and they're not more or less dangerous because of their content.

Salina's other contention, that the "record is replete with evidence justifying how the Sign Code advances" its interests, can't be taken seriously. Doc. 107 at 32. The "evidence" consists of a law review article (that explains just how outlandish and unconstitutional it is to regulate murals differently based on their content), a blog post, and six pages from what appears to be a 2009 PowerPoint presentation on *digital signs* and *billboards*. Salina Ex. A ¶ 6.i-iii. None of that was considered by the City Commissioners either. Salina Ex. A ¶ 3 (documents were "in *my* file" and "considered *by me*" before the 2017 code amendment) (emphasis added); *see also RSOF* ¶ 42; Ex. Y, Z, AA, BB, CC, DD, EE, FF (commission minutes and documents show this "evidence" was not considered by City Commission).

Salina's proffered evidence doesn't explain why it regulates some painted displays but not others; and doesn't explain how regulating some painted displays, but not all painted displays, directly and materially advances its stated interests. The law review article in particular undercuts Salina's entire regulatory theory. *See, e.g.*, Orlando, *Art or Signage?*, 35 Cardozo L. Rev. at 870 (regulating commercial and noncommercial murals differently is "impermissible content-based regulation" and "stands in stark contrast to the current state of free speech law"); *id.* at 889 ("hardly seem[s] necessary, fair, or prudent," and would be "foolish and wasteful," to demand that a cupcake shop that sells coffee to remove a coffee cup mural); *id.* at 895 (includes quotation that "If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly"); *see also, id.* at 885-86. If the City Commissioners and other Salina officials *had actually read* and *considered* that law review article, The Cozy's UFO-themed mural would be finished by now. *RSOF* ¶¶ 2, 25-28, 44-50; Ex. F, Comm. Tran. 10:4-5 (Salina regulates "all on the basis of a commercial message"); Ex. Def. Ans. to First Set of Interrog., Rog 11 (The Cozy can't have burger-esque mural); *RSOF* ¶¶ 2, 25-28, 44-50; Ex. F, Comm. Tran. 23:4—24:4 (coffee shop can't have a coffee mural); *RSOF* ¶¶ 2, 25-28, 44-50; Ex. B, Driscoll Dep. 155:6—156:12 (taco shop can't have taco mural).

Salina doesn't have *any* evidence justifying its speech restrictions on safety grounds. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 73:13—74:15; 76:25—77:10, 25:14-17, 77:23—78:10; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. There is no evidence that the sign code has actually succeeded in those objectives, that a mural pertaining to a business is unsafe, that it would cause a traffic accident, or a pedestrian accident. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 25:14-17, 73:13—75:8, 76:19—77:10, 77:23—78:10 ; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3, 168:9-25; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12; Ex. GG, Taylor Dec., Rpt. at 12; *id.* at 13; *id.* at 10, *id.* at 15-18; *id.* at 6-10. There is no

evidence that a painted mural will fall off the wall, that burger-esque UFOs are more dangerous than flying pizza slices, that commercial art is more dangerous than non-commercial art, or that private art is more dangerous than public art. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. E, Herrs 30(b)(6) Dep. 25:14-17 Ex. NN, White Dep. 114:20—115:8, 115:22—116:11. There is no evidence The Cozy's mural has caused any safety issues at all. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. G, Schrage Dep. 126:15-25; Ex. B, Driscoll Dep, 167:16-22. Salina's lack of credible, real-world evidence supporting its theoretical safety interests is unsurprising: "[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." Ex. GG, Taylor Dec., Rpt. at 10-14. So, "while the City's" theoretical "interest in public safety" may be significant, "it is not enough for the City to use broad safety justifications to establish the Ordinance's necessity." *Brewer*, 18 F.4th at 1226 (cleaned up).

The government's reliance on *City of Ladue v. Gilleo*, 512 U.S. 43 (1994) is misplaced. Doc. 107 at 28. Again, unlike the physical yard signs at issue there, murals don't take up physical space and obstruct views, distract motorists, displace alternative uses for land, or pose other problems that legitimately call for regulation. *Id.* at 43. Besides, the City of Ladue lost.

Salina's theoretical interest in "aesthetics" is not supported by any studies, statistics, or credible evidence either. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) 76:19-23; Ex. G, Schrage Dep. 126:15—127:11; Ex. B, Driscoll Dep.167:16—168:3; Ex. NN, White Dep. 46:25—48:4, 123:7-22, 124:13-19, 125:7-12. There is *no evidence* that a mural pertaining to a business is not aesthetically pleasing. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. NN, White Dep. 123:7-22, 124:13-19, 125:7-12. In fact, the opposite is true. The public enjoys The Cozy's mural. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. B, Driscoll Dep. 168:9-25; Ex. T, Howard Dec. ¶ 29; *see also* Ex. F Comm. Tran. 32:2-5 (The Cozy's mural "pops."). Salina's lack of any credible evidence supporting its theoretical interests in aesthetics is unsurprising. The scientific evidence doesn't support it. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. GG, Taylor Dec., Rpt. at 15-18. Because there "is nothing in the record" to credibly "suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork," Salina's mural-sign code

regime is "unconstitutional insofar as it distinguishes between commercial and non-commercial artwork." *Morris*, 399 F. Supp. 3d at 637; *see also*, *Discovery Network*, 507 U.S. at 425 (commercial newsracks "no greater an eyesore"); *Neighborhood Enterprises*, 644 F.3d at 737-38 (aesthetics not narrowly tailored when exemptions are content-based); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) (city may not "promot[e] aesthetics" "by restricting speech depending upon the message expressed"); *Ficker* 553 F. Supp. 3d at 284-85 (sign code not narrowly tailored); *Reed,* 576 U.S. at 172 (same); *Bee's Auto,* 8 F. Supp. 3d at 1380.

Salina's "visual assault" on aesthetics argument and its reliance on *Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) is also misplaced. Doc. 107 at 28. That law banned posting signs on the government's *own* property to stop the build-up of temporary signs. *Id.* at 807. It didn't regulate aesthetics on private property, recognizing that "private property owners' esthetic concerns" would prevent the "visual assault" at issue in *Vincent*. *Id.* at 811. Indeed, regulating speech for "purely esthetic" reasons raises "serious First Amendment concerns." *Ward v. Rock Against Racism*, 491 U.S. 781, 793 (1989).

Salina doesn't have evidence for its claimed interest in "property values," that the code actually increases property values, or that The Cozy's mural impacts property values. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. LL, Def. Ans. To Second Set. Interrog. 1; Ex. E, Herrs 30(b)(6) Dep. 74:17—75:8; Ex. G, Schrage Dep. 127:8-11; Ex. B, Driscoll Dep.167:23—168:3; Ex. NN, White Dep. 46:25—48:4. To the extent Salina claims other interests, they're either not "substantial," or they're irrelevant, APTO 4.b.iii., and unsupported by actual evidence. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. GG, Taylor Dec., Rpt. at 12; *id.* at 13; *id.* at 10, *id.* at 15-18; *id.* at 6-10.

Just as in *Brewer*, "the City frames much of its narrow tailoring argument around" its proffered expert, attorney Mark White. 18 F.4th at 1229. Mr. White doesn't have any evidence that the government's "recited harms, specifically defined, are real and that the" mural-sign code regime "will in fact alleviate them in a direct and material way." *Brewer*, 18 F.4th at 1227 (cleaned up); *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. NN, White Dep. 46:25—48:4, 114:20—115:8, 115:22—116:18, 120:10-17, 121:10-14, 123:7-22, 124:13-19, 125:7-12. "Crucially," Mr. White's "opinions are

theoretical, and largely unmoored from any on-the-ground data" from Salina. *Brewer*, 18 F.4th at 1229. Indeed, Mr. White's "testimony exposes, rather than bolsters, the lack of tailoring at the heart of the Ordinance." *Id.* at 1230. Among the many reasons why, Mr. White's learned treatise demonstrates the regime is content based and can't survive any level of scrutiny. ASOF ¶ 3, *see* Ex. MM at 9-10, 20-21 (regime violates "Tips to Comply with *Reed*" and "*Reed's* Top 10 Takeaways"). "Thus," Mr. White's "generic and theoretical opinions do not aid the City's cause." *Brewer*, 18 F.4th at 1230. What's more, there is "no conclusive evidence of a link between signs and traffic accidents;" "properly placed signs are not a safety hazard;" "[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence;" there is "no evidence" that Salina's sign code "promotes an interest in aesthetics;" and there is no scientific or other evidentiary support undergirding any of Salina's stated interests either. *RSOF* ¶¶ 42, 44-50, 53, 55; Ex. GG, Taylor Dec., Rpt. at 12; *id.* at 13; *id.* at 10, *id.* at 15-18; *id.* at 6-10.

There's no evidence whatsoever that Salina considered less restrictive means. *Brewer*, 18 F.4th at 1221. Salina doesn't "leave open ample alternative channels of communication" either. *Id.* at 1220 (cleaned up). Salina's proposed alternative methods wouldn't allow the Plaintiffs to convey the intended message, would reach a different audience, or would be more expensive. That isn't a constitutionally adequate substitute. *See City of Ladue*, 512 U.S. at 56-57.

Because Salina remains willfully uninformed about what the mural is and the message it's conveying, Salina's proposed alternative channels of communication aren't adequate. The one-of-a-kind, Sci-Fi-themed mural tells a story about alien- and human-travelers. *RSOF* ¶¶ 26-28, 39, 40, 59 Ex. T, Howard Dec. ¶¶ 4-17; Ex. S, Howard Dep. 105:9, 252:22—253:5, 253:10-18. The visual artistry conveys the Plaintiffs' character. Id. The mural isn't selling hamburgers, and it's not intended to maximize profits. Id. The mural isn't an advertisement and Mr. Howard isn't trying to "brand the site" with it. Id. So, Salina's suggestion that The Cozy could just reduce the wall-sized mural to about the size of an ironing board and "advertise the hamburgers it sells" through "Facebook, branded merchandise," "banner advertising," "billboards," "bumper stickers," and "interviews" isn't constitutionally adequate. Doc. 107 at 4, 29. That's tantamount

to suggesting Andy Warhol, who wasn't advertising soup, could just advertise tomato soup, through the internet or bumper stickers. Besides, branded merchandise and bumper stickers are the speech of the individuals displaying them. Salina's suggestion that "radio advertising" is a constitutionally adequate alternative to the visual and artistic representation of aliens blasting The Cozy's wall with ketchup and mustard isn't credible. Doc 107 at 4, 29. It's true that Mr. Howard participates in "community events," Doc. 107 at 4, 29, but Salina hasn't explained how that is even a communication, much less a constitutionally adequate alternative to telling a story through a wall-painting. Likewise, Salina doesn't say how a different piece of art, at a different building owned by a different business, in a different city, with a different message, is a constitutionally adequate substitute for The Cozy's mural. Doc. 107 at 24, 29 (relying on "sign located at Jenni's Liquors"). It's self-evidently not.

Once completed, The Cozy's wall-sized mural would be permanently affixed, easily viewable at all times of the day, every day of the year, by anyone and everyone. Unlike "branded merchandise," "bumper stickers," and the like, the public wouldn't need to pay anyone to see it; and it wouldn't cost Mr. Howard additional money to produce it either. Shrinking the mural to about the size of an ironing board or yoga mat would make it incredibly difficult to see and would reach a much smaller audience. In short, given the First Amendment's purpose and history—protecting speech—Salina's proposed alternatives are not constitutionally adequate.

**2. Even under *Central Hudson*, the mural-sign code regime is unconstitutional.**

Salina fundamentally misunderstands what constitutes commercial speech. Doc. 107 at 36.[5] Salina never explains *why* it thinks The Cozy's mural constitutes commercial speech either. In a single sentence, it just says that it *is* commercial speech. Doc. 107 at 37.

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). In *Complete Angler*, the court explained that if a mural isn't "proposing commercial transactions," it isn't

[5] Salina's passing references to *Wag More Dogs* is mistaken, for the reasons above.

commercial speech, even *if it* "occasionally inspire[s]" commercial transactions. 607 F. Supp. 2d at 1332 (fish mural at a bait and tackle shop was not commercial speech). The Cozy's mural doesn't say "five burgers for a dollar," and it doesn't propose a commercial transaction. It's "artwork," "express[ive]," conveys Mr. Howard and The Cozy's "character," and tells a story about alien travelers visiting The Cozy by burger-esque UFOs. *RSOF* ¶¶ 26-28, 39, 40, 59; Ex. T, Howard Dec. ¶¶ 4-17; Ex. S, Howard Dep. 105:9, 252:22—253:5, 253:10-18; Doc. 105 at 31. As such, The Cozy's mural is not commercial speech. But even *if* this Court assumes The Cozy's mural is commercial speech and applies less-than-strict scrutiny,[6] Salina *still* isn't entitled to summary judgment.[7]

The commercial speech test isn't a fact-free, government-deferential inquiry. Doc. 105 at 32-35. *See also*, *Edenfield*, 507 U.S. at 771; *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 489–90 (1995); *Pagan*, 492 F.3d at 771 (rejecting government's "theory" it "need not provide evidence").

The Tenth Circuit requires Salina to prove that its stated interests are "substantial," that its restrictions advance its interests "in a direct and material way," and that its restrictions are "narrowly tailored." *Aptive*, 959 F.3d at 987–88, 982 (cleaned up). All of that requires *actual evidence*, which Salina doesn't have. 959 F.3d at 996 ("[c]onjectural harms and suppositions" are insufficient); *id.* at 995 ("asserted interests" in "the abstract" not enough); *id.* at 999 ("harms" must be "real and that its restriction will in fact alleviate them to a material degree") (cleaned up); *id.* at 990 (record requires "a concrete, nonspeculative harm").

In *Aptive*, the Tenth Circuit reviewed the evidentiary record after a bench trial on the town's solicitor curfew. 959 F.3d at 966. The town produced complaints about registered and

---

[6] It's the Plaintiffs' view that even if the mural is considered commercial speech, strict scrutiny should apply. Doc. 105 at 27 (distinguishing between commercial and noncommercial speech is content based); Doc. 105 at 30-31 (explaining that regulation of commercial speech that isn't content-neutral triggers strict scrutiny); Doc. 105 at 30 (explaining that providing less protection to commercial speech is inconsistent with the First Amendment).

[7] Salina is mistaken when it argues "as-applied commercial speech challenges are not justiciable." Doc. 107 at 36. *See*, *e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 777 (1993) (successful as-applied challenge to commercial speech restriction); *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 181 (1999) (same); *Miyoko's Kitchen v. Ross*, No. 20-CV-00893-RS, 2021 WL 4497867, at *5 (N.D. Cal. Aug. 10, 2021) (same).

unregistered solicitors, solicitors visiting homes after the curfew time, testimony from council members, town employees, the police chief, and its former mayor, statistical evidence, and much more. *Id*. at 990-992. That was not enough to satisfy the government's evidentiary burdens. *Id*. at 996.

Even assuming Salina's interests are substantial *in the abstract*—Salina "fails to carry its burden of demonstrating that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Aptive*, 959 F.3d at 989 (cleaned up). As shown in the content-neutral analysis above, and in the Plaintiffs' own summary judgment memorandum, Doc. 105 at 33-35, Salina's proffered evidence (a law review article that undercuts its argument, a blog post, six pages from what appears to be a 2009 PowerPoint presentation on digital signs and billboards, and opinion testimony from Mark White, who also authored a learned treatise undercutting Salina's arguments) isn't anything close to the evidence that Castle Rock produced, which still wasn't enough. There's no evidence supporting any of Salina's arguments, and there's no evidence Salina considered less restrictive means either. Salina's anecdotes about other sign codes, Doc. 107 at 32, is "woefully insufficient" as well, because there's no evidence supporting those codes either. *Aptive*, 959 F.3d at 993.

Salina can't credibly explain why it treats murals differently from signs, why flying pizza slices are safe and aesthetically pleasing but burger-esque UFOs aren't, or justify any of its content-based exemptions from the mural-sign code regime. Because Salina doesn't have *any* evidence of real-life, tangible harms, or evidence justifying its restrictions, or evidence that the regime directly and materially advances its alleged interests, or evidence that its restrictions are not over- or under-inclusive, or evidence that it considered less restrictive alternatives, this Court should not grant Salina summary judgment.

**IV. Salina's mural-sign code regime is an unconstitutional prior restraint.**

Salina says there's no prior restraint because The Cozy's mural "was too big to qualify for a sign permit," and "the City also understood and Mr. Howard agreed that his sign permit application" "would be held in abeyance." Doc. 107 at 33. The record demonstrates otherwise.

Salina told Mr. Howard to submit a permit application, and he did as he was told. *RSOF* ¶ 23. Salina officials admit Mr. Howard didn't consent to his application being placed on hold either. *RSOF* ¶ 23. Salina argues that it didn't "need to again inform Mr. Howard about what he already knew," that Salina "could not legally issue a sign permit," as though that matters in a prior restraint analysis. Doc. 107 at 34. It doesn't. At bottom, Salina's code says it needed to send a written denial within ten days, and Salina didn't do that, instead putting the application on-hold indefinitely. *RSOF* ¶ 23. That's an unconstitutional prior restraint. *See*, *e.g.*, *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 558-59 (1976); *Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1290 (10th Cir. 2002) (cleaned up); *see Utah Animal Rts. Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1259 (10th Cir. 2004).

Salina also seems to suggest that it doesn't need to provide "procedural safeguards regarding timing" because, it says, its code is content neutral. Doc. 107 at 32-33. It's not content neutral, for the reasons stated above. But even if it were, it's still considered an unconstitutional prior restraint where the government "enjoys unduly broad discretion in determining whether to grant or deny a permit[.]" *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002); *id.* (must be "adequate standards to guide the official's decision and render to so subject to effective judicial review"). As the record demonstrates though, there are no narrow, objective, or definite standards guiding Salina when it's determining whether a display is a regulated sign or an unregulated mural.[8] The Zoning Administrator can't definitively say whether a painting of a cow in a field of mustard plants, tomatoes, and onions, would be a sign or a mural, if painted on The Cozy's wall; or if "traditional science fiction" UFOs would be a sign or mural, if painted on The Cozy's wall. RSOF ¶ 2, 25, 44; Ex. A, Andrew Dep 176:22—177:3; 178:16-22.

Salina's admission that it has to "evaluate whether" a display makes "a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies," or "evaluate[s]

[8] Salina's suggestion that *Wag More Dogs* helps it is, again, mistaken, for the reasons above. *Wag More Dogs* was the minority view even before the sea change of *Reed*. Orlando, *Art or Signage*, 35 Cardozo L. Rev. at 884.

whether the display is meant to attract customers" or "encourage[s] a commercial transaction" helps prove the point. Doc. 107 at ¶ 28; *RSOF* ¶ 28. None of that constrains discretion or provides constitutionally adequate guidelines. Consider a coffee shop that paints a branch on its wall, in the surrealist style of Salvidor Dalí. Salina's code enforcer would need to look at the art, interpret it, divine its meaning, and decide whether the dream-like branch looked enough like a *coffee* branch for it to be considered a regulated sign. *See RSOF* ¶¶ 2, 25, 44; Ex. G, Schrage Depo. 122:25—123:8. There is no narrow, objective, or definite standards guiding Salina's code enforcer for making that determination. Finally, discretion is so unlimited, Salina puts applications "on-hold" in "the discretion of the reviewer if they feel like they're actively working with an applicant." Ex. A, Andrew 30(b)(6) Dep. 29:7-18.

Salina's constantly changing, undefined policies on when and how it applies its mural-sign code regime demonstrates the extent of its unbridled, unconstitutional discretion.

**V. Salina's mural-sign code regime is unconstitutionally void for vagueness.**

Salina says the "text" of its sign code "provides clear standards that ordinary people can understand" and "does not encourage arbitrary enforcement." Doc. 107 at 39. Because the code's key terms aren't defined and don't provide clear standards though, Salina is forced to explain *how* it (says it) applies the code, rather than pointing to what the code actually says. Doc. 107 at ¶ 28. Which, by the way, isn't even accurate. *RSOF* ¶¶ 26, 28; *ASOF* ¶ 2. The code is *so* vague, Salina even had to hire an expert to try and help explain what the words *could* mean. Doc. 107 at ¶ 57. Finally, in a last-ditch effort, Salina points to the *Wag More Dogs* district court opinion. But as shown above, *Wag More Dogs* was an outlier even when it was written, and the Fourth Circuit abandoned the principles of that case long ago. At bottom, the record demonstrates the code is a confusing, jumbled mess that does indeed encourage arbitrary enforcement. *See*, *e.g.*, *RSOF* ¶¶ 2, 25-28, 44-50. Left with little else, Salina says that the "overbreadth doctrine does not apply to commercial speech." Doc. 107 at 39 (citations omitted). The Cozy's mural isn't commercial speech though. *RSOF* ¶ 40. The Cozy isn't raising claims on behalf of others either. Finally, even if The Cozy's mural is commercial speech, the regime "must nonetheless be invalidated as

overbroad," because it "prohibits fully protected, non-commercial speech." *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 481 (1989). *RSOF* ¶¶ 2, 25, 44-50; Ex. A, Andrew Dep. 54:18—55:8 (explaining that a "Turn to Jesus" mural on a church is an advertisement and a regulated sign).

**Conclusion**

Salina's mural-sign code regime is plainly unconstitutional under *any form* of heightened First Amendment scrutiny, it's an unconstitutional prior restraint, and it's unconstitutionally vague. This Court should reject Salina's motion for summary judgment and grant the Plaintiffs' motion instead. *See* Doc. 105.

Dated: February 28, 2025.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on February 28, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

# Exhibit A
# Andrew Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**direct attention to or advertise?**

MS. JOKERST: Object to form.

A. A pictorial representation that had nothing to do with or no connection to a use or a business that is located on the premises where that pictorial representation is located.

BY MR. SHAW:

**Q. So I guess just for an example, would a picture of a cross be considered a pictorial representation?**

MS. JOKERST: Object --

A. A picture of a cross.

BY MR. SHAW:

**Q. Yes, or a painting, a image?**

A. Or a cross itself.

**Q. What does a cross itself mean? Do you mean like an actual physical --**

A. I'm talking about a physical cross. Most of our churches don't put up pictures of crosses. They put up crosses.

**Q. Okay. Well, if a church put up a cross, would that count as a pictorial representation or something else?**

A. It would count as a pictorial representation.

**Q. Okay. Would it also be considered a sign?**

A. It would be considered a symbol, not a sign.

**Q. Does a cross not typically convey a message about the building's religious affiliation?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. You may answer.**

A. Not exclusively. But primarily, churches of the Christian faith are the ones that are interested in placing a cross on their building or in another location on their property.

**Q. So if I understand a cross on a church is not considered a sign, just a symbol?**

A. It is something that our sign code does not count towards the sign area allocated to that church.

**Q. Why does it not count the cross?**

A. Because it's a symbol.

**Q. If you'll look at 42-764, does it not include symbol as part of the definition of emblem?**

A. It does.

**Q. So why are crosses not considered signs and only symbols?**

A. I didn't say they were not considered signs. I said they don't count towards a sign allocation for the church.

**Q. Okay. Why do they not count towards the sign allocation?**

A. Because our code says so.

**Q. Where does it say that?**

A. It doesn't say it in that section.

**Q. Do you know which section it says it in?**

A. It has been the longstanding interpretation for the City of Salina that those are symbols just as flags don't count towards a sign allocation for a property.

**Q. Well, why don't flags count towards the sign allocation?**

A. Because they're not included in the sign calculations.

**Q. But why are they not included in the sign allocations?**

A. Because there's no requirement to obtain a sign permit to erect a flag.

**Q. Why is there no requirement to obtain a sign permit to erect a flag?**

MS. JOKERST: Object to form.
A. We have not treated that as signage.
BY MR. SHAW:
**Q. Why not?**
A. Because as a general rule, flags are exempt from the sign permit requirement.
**Q. So all flags are exempt from the sign permit requirement?**
MS. JOKERST: Object to form.
A. Structurally, flags have been treated as exempt from obtaining a sign permit.
BY MR. SHAW:
**Q. I'm sorry, did you say structural flags?**
A. Structurally --
**Q. Okay.**
A. -- flags have been exempted from the sign code permit requirement.
**Q. So the McDonald's example I gave, flying a McDonald's flag would be exempt from the sign permit requirement?**
A. Structurally, yes.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. When you say structurally exempt, what does that mean?**

THE REPORTER: Thank you.
BY MR. SHAW:
**Q. Have you determined the difference between a commercial and non-commercial flag?**
A. Have I in my experience?
**Q. Well, yeah, I guess I can ask that question. Have you ever made that determination?**
A. No.
**Q. If a business were to fly a flag such as the McDonald's flag we discussed earlier, would that be exempt under the code?**
A. Not as subsection 1 is written.
**Q. Okay. So a business flag like the McDonald's flag would be regulated and require a sign permit. Is that correct?**
MS. JOKERST: Object to form.
A. I would just be speculating on that. Because in my 37 years, I've never seen a McDonald's or any commercial flag that has come before us.
BY MR. SHAW:
**Q. Okay. What about a -- well, let me ask you this. Have you ever seen a Kansas City Chiefs flag?**
A. I have. I drive by one.

**Q. Would those be considered commercial flags?**

A. No.

**Q. Why not?**

A. Because they are just expressing that property owner's support for their team.

**Q. Do you know if the Kansas City Chiefs are a commercial enterprise?**

MS. JOKERST: Object to form.

A. Well, I know that the Kansas City Chiefs is a sports franchise that desires to make money.

BY MR. SHAW:

**Q. Okay. Could those Chiefs flags be considered advertisements for the Chiefs?**

MS. JOKERST: Object to form.

A. Not in my opinion, no.

BY MR. SHAW:

**Q. So even though it is a commercial business displaying its logo, that is not an advertisement?**

MS. JOKERST: Object to form.

A. I would consider an individual owner who has a Chiefs flag to be displaying a non-commercial flag.

BY MR. SHAW:

**Q. Okay. Okay. Can we return to -- well, actually, let's stay here. Would the Chiefs flag be announcing the Kansas City Chiefs?**

A. It could be interpreted as announcing the Kansas City Chiefs.

**Q. Okay. Would the Chiefs flag be -- strike that. Can you please go back to the definition of sign. There we are. Do you see in subsection 3 where it states that the sign must be located inside -- or excuse me, is not located inside a building?**

A. That is one of the elements in the determination.

**Q. So are there any signs that are located inside a building?**

MS. JOKERST: Object to form.

A. The Tony's Pizza Events Center has a sign located inside its lobby.

BY MR. SHAW:

**Q. Okay. Is that a regulated sign?**

A. No.

**Q. Okay. Because it is inside. Is that --**

A. Because it's inside the building.

**Q. I see. If a sign is inside a building but clearly visible from the outside, would that**

**Q. Okay. Could a artwork viewable from the street direct attention?**

MS. JOKERST: Object to form.

A. It might attract attention.

BY MR. SHAW:

**Q. What is the difference between attracting and directing attention?**

A. Attracting attention might briefly pull your eyes off the road or off the sidewalk to see what it is. Directing attention is for something that someone wants you to read or look at for an extended period.

**Q. Are you familiar with the Mural at the Mill?**

A. I am.

**Q. Does that mural direct attention?**

A. No.

**Q. What does it do?**

A. It attracts your attention.

**Q. I see. Because the artist only intended someone to look at it briefly.**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is that what you're saying?**

MS. JOKERST: Same objection.

required a sign permit for.
**Q. Okay. And is that because it's an advertisement?**
A. It is announcing, directing attention to and advertising the Army Recruitment Center.
**Q. So it's doing all three?**
A. Yes.
**Q. Okay. What about a church or other house of worship? They put up a display saying services Sunday at 10 a.m. Is that a sign?**
A. Yes.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Is that because it is announcing?**
A. It is announcing to the public that they are worship -- place of worship and letting the public know when they meet.
**Q. Okay. What if that same church displayed a message that said turn to Jesus. Would that be a sign?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. Why is that?**
A. Well, you just described it as a -- they

would put up a structure, whether it was a banner or whether it's permanent sign, that would be something that is announcing, directing attention or advertising.

**Q. What would they be advertising?**

MS. JOKERST: Object to form.

A. They would be advertising their desire for the public to turn to Jesus.

BY MR. SHAW:

**Q. Okay. In subsection 3 where it says is not located inside of a building, what is considered a building under this section?**

A. A structure that meets the definition of building in the zoning ordinance.

**Q. Okay. Would you please turn to the section defining building?**

A. Appears to be 42-637.

**Q. All right. And does that define a building as any covered structure built for the support, shelter or enclosure of persons, animals, chattels or movable property of any kind and which is permanently affixed to the land?**

A. That is the definition that's in the zoning ordinance.

**Q. All right. What is the support, shelter**

**Q. Why is that?**

A. Because the definition says a wall sign is a sign, and a mural is not a sign.

**Q. What is a mural?**

MS. JOKERST: Object to form.

A. City of Salina does not have a definition for the term mural.

BY MR. SHAW:

**Q. Then how do you know it is not a sign?**

MS. JOKERST: Object to form.

A. A mural would not announce, direct attention to or advertise.

BY MR. SHAW:

**Q. Is a mural calculated to attract the attention of the public?**

MS. JOKERST: Object to form and foundation.

A. I think the word calculated goes to intent, and it's not my job to interpret somebody's intent.

BY MR. SHAW:

**Q. Is that not how the code uses the word calculated, though?**

MS. JOKERST: Object to form.

BY MR. SHAW:

language.

BY MR. SHAW:

**Q. What is the purpose then of having a section to cover things that aren't covered in the previous sections if you can't make the determination of what those things are?**

MS. JOKERST: Object to form.

A. I interpret it as a catch-all phrase.

BY MR. SHAW:

**Q. But is there anyway that you can determine what would fall within that catch-all?**

MS. JOKERST: Object to form.

A. There's probably different forms of expression that the code writers didn't or couldn't anticipate at the time it was written, so it was to catch all those.

BY MR. SHAW:

**Q. But does this catch-all require you to make a determination about intent?**

MS. JOKERST: Object to form.

A. No.

BY MR. SHAW:

**Q. How do you know if it's calculated to attract the attention?**

MS. JOKERST: Object to form.

A. I don't look at that.

BY MR. SHAW:

**Q. If you don't look at that, why is that word in here?**

A. You'll have to ask the person who drafted the definition.

THE REPORTER: Amanda, what was your objection?

MS. JOKERST: To form.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. I'm asking you because it is your job as zoning administrator to provide the city's definitive interpretations of this code.**

A. Then you give me a concrete example, and I'll make an interpretation.

**Q. I'm trying to understand what this section could ever apply to.**

A. It applies to signs.

**Q. I think this is defining signs. Is that not correct?**

MS. JOKERST: Object to form.

A. It is designed to inform the public and the people administering the code what the governing body wants to be regulated as a sign.

foundation.
A. According to the rules of construction of our city code, or and and are interchangeable, so I can't make that determination.
BY MR. SHAW:
**Q. Do you no where in the city code that is placed?**
A. In the rules of construction.
**Q. I see. So and and or are interchangeable?**
A. They can be, yes.
**Q. They can be or they are?**
A. Code says they can be.
**Q. How then is someone to know if it means and or or?**
MS. JOKERST: Object to form and foundation.
A. You have to look at the context in which its used.
MS. JOKERST:
BY MR. SHAW:
**Q. All right. In subsection 2 there, for instance, do you see the and after the semicolon?**
A. Yes.
**Q. Does that mean and or or?**

**to look like and get a determination from you about whether it qualifies as a painted wall sign or a mural?**

MS. JOKERST: Object to form.

A. It is very commonplace for people who want to erect something or have a pictorial representation or some graphic to come into our office and say this is what I'm looking to do. Does this fit within your code.

BY MR. SHAW:

**Q. All right. And how would you help that person determine if it was a mural or a painted wall sign?**

A. By looking at whether it announces, directs attention to or advertises.

**Q. So you would need to see a rendition or plan of what it is they plan to paint?**

A. Yes.

**Q. Okay. And depending on the content of that rendition, you would make the determination if it is a mural or a wall sign?**

MS. JOKERST: Object to form.

A. I would look at it.

BY MR. SHAW:

**Q. You would look at the content to**

**is so as to not regulate it?**

MS. JOKERST: Object to form.

A. I don't understand the question.

BY MR. SHAW:

**Q. All right. You said that the city does not regulate the content. But if you don't know what the content means, how do you ensure you are not regulating content?**

MS. JOKERST: Object to form.

A. I would look at the graphic representation of what that individual owner wanted to display on their wall and I would determine, one, whether it announces, directs attention to or advertises. And then the second thing we would do is we would look at the extent of the wall that it covers and determine if that area is allowed within the sign code in the district that they're located.

BY MR. SHAW:

**Q. So let's say a business paints or comes to you with a rendition wanting to paint on its wall, and it would cover the entire wall, a -- just text saying, you know, buy our product. How would you determine if that is a sign or a mural?**

MS. JOKERST: Object to form.

A. I would look at the rendering that they provided. And if it was words or numbers, I would determine whether those words or numbers announce, direct attention to or advertise the business or the products at that premises, and we would attempt to draw a rectangular box around those letters and calculate the square footage of the display to determine whether it was too large or not too large to be located as proposed.

BY MR. SHAW:

**Q. And let's say that same business came to you with a proposal to paint on the side of their building the Arrowhead logo of the Kansas City Chiefs and text, you know, let's go Chiefs. How would you determine if that were a sign or not?**

MS. JOKERST: Object to form.

A. I would determine whether those graphics announced or directed attention to or advertised.

BY MR. SHAW:

**Q. How would you do that?**

A. Well, in the specific context you gave me, I would interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs.

**Q. What if that property was a training**

**facility for the Kansas City Chiefs?**

A. Then it would be the same thing except it's also advertising and directing attention.

**Q. Okay. Now, let's say the text on this mural, the letters are very widely spaced. Would you draw a rectangle around the entire display or only around each letter to determine its area?**

MS. JOKERST: Object to form.

A. The entire display.

BY MR. SHAW:

**Q. Okay. Would you also draw that rectangle around any other emblems that are related to that mural?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. So in the example I gave before, you've got the Chiefs Arrowhead and then the let's go Chiefs. Would you draw one rectangle or two separate rectangles?**

MS. JOKERST: Object to form.

A. Are we talking about painted wall signs or are we talking about murals?

BY MR. SHAW:

**Q. Well, either way. How would you determine the size?**

MS. JOKERST: Object to form.
A. I wouldn't determine the size on a mural because we don't regulate murals. But I would determine that if I determined it to be a painted wall sign.
BY MR. SHAW:
**Q. All right. If you have determined it to be a painted wall sign, how would you determine the size of that mural?**
A. I would determine the size of the painted wall sign by following the instruction in Section 42-503 (a), and we would construct a rectangular box around the display.
**Q. But would you consider that to be one display that includes both the Chiefs Arrowhead and the text let's go Chiefs, or do you consider it two displays one of the Arrowhead and one of the wording of let's go Chiefs?**
A. I would consider it to be an integral display.
**Q. Okay. So include both. Is that what that would mean?**
A. I would include both --
MS. JOKERST: Object to form.
A. -- of those in the calculation.

listed the home team, the visitor's team, the time and score.

BY MR. SHAW:

**Q. Is a billboard something more than a structure with changeable copy?**

MS. JOKERST: Object to form and foundation.

A. A billboard is synonymous with the term off-premises or advertising sign. And if Kansas Wesleyan University sells advertising space to area business that are not located on the premises and that sign is oriented towards Cloud Street and not the stadium, then that side of the structure is not a scoreboard. It is a off-premise sign.

BY MR. SHAW:

**Q. What does the orientation have to do with the sign?**

A. The presumption in exempting a scoreboard is that a scoreboard --

MS. JOKERST: Can I -- did my objection get on there?

THE REPORTER: No. Can you give it to me, please.

MS. JOKERST: Object to form.

A. Can you repeat the question?

MR. SHAW: Can you read that back, please?

THE REPORTER: "What does the orientation have to do with the sign?"

MS. JOKERST: I said object to form.

A. The adopted exemption for scoreboards is based partially on the fact that the information they convey is directed to people that are in the stadium. And the determination for taking that scoreboard structure and saying that it's an off-premise sign is because the advertising is not oriented towards or directed towards the people within the stadium.

BY MR. SHAW:

**Q. If the advertising copy were placed on the side of that scoreboard facing the audience, would that be a scoreboard or an advertising sign?**

MS. JOKERST: Object to form.

A. It would be a scoreboard.

BY MR. SHAW:

**Q. Even with the advertising copy?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. So it is the orientation of the**

of time.

BY MR. SHAW:

**Q. Okay. Does this section apply to non-commercial signs as well?**

MS. JOKERST: Object to form.

A. It appears to refer to signs that advertise a bona fide business.

BY MR. SHAW:

**Q. Okay. So let's say, for instance, someone put up a, you know, Mitt Romney 2012 sign, and it's still up here in 2024. Is that sign considered abandoned?**

MS. JOKERST: Object to form.

A. It would be considered an election sign that was up seven days after the election.

BY MR. SHAW:

**Q. So you're not allowed to have any election signs seven days after an election?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. If I were a -- not me. If any property owner were a big Dwight Eisenhower fan and they just wanted to put up a paint on the side of their wall, you know, I like Ike, would that be**

**allowed?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Is I like Ike a campaign slogan from the Eisenhower campaign?**

MS. JOKERST: Object to form and foundation.

A. I don't know.

BY MR. SHAW:

**Q. Okay. Why would the I like Ike sign be allowed but not the Mitt Romney 2012 sign not -- let me rephrase that. Why is an I like Ike sign not considered a political sign seven days after an election?**

MS. JOKERST: Object to form.

A. Well, for one, Mr. Eisenhower is deceased, so he couldn't be running for any elective office. And it is simply an expression of whoever the sign holder is that they like Ike.

**Q. But why can't the Mitt Romney fan continue expressing their admiration for Mitt Romney?**

MS. JOKERST: Object to form and foundation.

A. If he wants to strike all portions from the sign that deal with voting for Mr. Romney or have an election date in it, then he can all the signs he wants that shows that he loves Mitt Romney.

BY MR. SHAW:

**Q. Okay. So if the Eisenhower fan painted vote Eisenhower 1952, would that be considered a political sign that can't be up more than 7 days?**

MS. JOKERST: Object to form and foundation.

A. I would not consider that an election sign.

BY MR. SHAW:

**Q. Why wouldn't you consider it an election sign?**

A. Common sense tells me it's not an election sign. It's not left over from some election.

**Q. What if the sign had been painted in 1952 and it was just still around?**

MS. JOKERST: Object to form.

A. I would consider it a historic sign.

BY MR. SHAW:

**Q. I see and what is a historic sign?**

**smell but its neighbor did have a smell?**
MS. JOKERST: Object to form.
A. Because the sign is still inviting customers to come in and partake of their product and notwithstanding the smell of the chicken farm.
BY MR. SHAW:
**Q. If The Cozy Inn was not a restaurant or -- let's do a different one. Let's say The Cozy Inn only did delivery and so customers would never come to the Cozy Inn location, would the phrase Don't Fear the Smell still be a sign?**
MS. JOKERST: Object to form.
A. That would require me to speculate.
BY MR. SHAW:
**Q. I'm asking you to state how you would interpret this code in that scenario?**
A. I think you're asking me to speculate without the full context.
**Q. The full context is that this is a building that delivers food to customers but customers never come to that building, and it has a mural saying Don't Fear the Smell. Would that be interpreted as a sign under the code?**
MS. JOKERST: Object to form.
A. I'd have to see what's on the rest of the

wall of the building.

BY MR. SHAW:

**Q. It's a white wall except for those words?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Would it be a sign in that situation?**

A. My first --

MS. JOKERST: Object to form.

A. My first inclination would be to consider that a sign.

BY MR. SHAW:

**Q. Why is that?**

A. Because there's nothing else on the wall of the building.

**Q. Why does the presence of other things on the wall of the building change the determination one way or another?**

MS. JOKERST: Object to form.

A. Well, it's not -- it's not a non-commercial message.

BY MR. SHAW:

**Q. If it's referencing the smell of its neighbor, would that be a non-commercial message?**

MS. JOKERST: Object to form.

A. Not necessarily.

BY MR. SHAW:
**Q. What message would that be?**
A. The Don't Fear the Smell message could still be an invitation to partake of their food.
**Q. Even if no one would ever come to this building?**
A. Even if no one would ever come there, because their food -- they're telling the public their food is not affected by the smell of the chicken farm.
**Q. I see. If the mural depicted pizzas, would that be considered a sign for the Cozy Inn?**
MS. JOKERST: Object to form.
A. What else is on the wall?
BY MR. SHAW:
**Q. It is the white wall of The Cozy Inn, and there's just a big pizza mural on it?**
MS. JOKERST: Object to form.
A. Well, I think the first thing I would do is to determine whether it is off-premise advertising for some other establishment in the downtown area.
BY MR. SHAW:
**Q. How would you determine that?**
A. By looking at the pizza and seeing if it

made reference to any of the existing establishments in Salina or the downtown area.

**Q. And if it's just a pepperoni pizza with no sort of logo or wordage on it, is that a sign or a mural under the code?**

MS. JOKERST: Object to form.

A. I don't have to determine whether it's a mural. I only have to determine whether it's a regulated wall sign.

BY MR. SHAW:

**Q. Okay. Would you determine that that is a regulated wall sign?**

MS. JOKERST: Object to form.

A. Again, you're asking me to speculate. But if it was in the context of a blank white wall with a pizza symbol on it that had no association with announcing or directing attention to or advertising The Cozy Inn business and did not advertise another nearby establishment, then it would not be a regulated wall sign.

BY MR. SHAW:

**Q. If that exact same painting were painted on the wall across town at a pizza joint, would that then be a sign?**

MS. JOKERST: Object to form.

**Q. I'm sorry. That was not what I intended to convey. What I'm asking is if that picture of a pizza, just a pepperoni pizza and nothing else was painted on the side of a pizza shop, would you determine that to be a sign?**

A. Yes.

MS. JOKERST: Object to form. Let me get my objection in.

BY MR. SHAW:

**Q. Why would you determine that as a sign?**

A. Because it announces, directs attention to and advertises to the public that that is an establishment that offers pizza to its customers.

**Q. What if a picture of a cup of coffee and a steaming coffee pot were painted on the side of The Cozy Inn with no words. Would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. I would have to know whether The Cozy Inn served coffee to its customers.

BY MR. SHAW:

**Q. If it did not serve coffee to its customers, would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. If it did not announce, direct attention

to or advertise a product or service that was available inside The Cozy Inn establishment, then just by itself, a steaming coffee pot or steaming cup of coffee would not be associated with that business.

BY MR. SHAW:

**Q. If The Cozy Inn did sell coffee, though, would that change your calculus?**

A. Yes.

MS. JOKERST: Object to form. Did you answer, Dean? I didn't hear.

A. I did answer yes to that question.

BY MR. SHAW:

**Q. If The Cozy Inn painted a mural of flying saucers attacking the building, would you determine that to be a sign?**

MS. JOKERST: Object to form.

A. I couldn't answer that question unless I saw a rendering of what they were -- what that looked like.

BY MR. SHAW:

**Q. Let's say it looked like a traditional science fiction movie of flying saucers with little green men attacking the building. Would you consider that to be a sign?**

MS. JOKERST: Object to form.
A. I'd have to see a rendering of what it looked like to make that determination.
BY MR. SHAW:
**Q. All right. What if there were just an airplane painted on the side of The Cozy Inn?**
MS. JOKERST: Object to form to the extent there's a question pending.
BY MR. SHAW:
**Q. Would that be a sign in your understanding?**
MS. JOKERST: Object to form.
A. There's no airline service or travel agency or anything associated inside that building, I wouldn't see the association between that graphic representation and The Cozy Inn business.
BY MR. SHAW:
**Q. Okay. What if there were a mural of baseball field with people playing baseball on the side of The Cozy Inn. Would you determine that to be a sign?**
MS. JOKERST: Object to form.
A. I would give the same answer as I would to the coffee pot and the airplane.

BY MR. SHAW:
**Q. Is that a no?**
A. I would not consider it to be a sign.
**Q. Okay. And with the airplane hypothetical, did you also say you would not determine that to be a sign. I think I may have missed that?**
MS. JOKERST: Object to form.
A. I said if an airplane was painted on the north wall of The Cozy Inn building, it's not a travel agency, there's no product or service associated with airline travel within, I would not consider that to be something that announces, directs attention to or advertises The Cozy Inn.
BY MR. SHAW:
**Q. If there were a mural of a -- with a landscape of a pasture with cows grazing and mustard plants, tomatoes and onions growing in the field, would that be considered a sign for the Cozy Inn?**
MS. JOKERST: Object to form.
A. I'd have to see a rendering.
MS. JOKERST: Hey, Mr. Shaw?
MR. SHAW: Yes.
MS. JOKERST: I'm assuming -- well, I

guess I don't know. How much longer and would now be a good time to take a short lunch break?

MR. SHAW: Give me maybe five minutes. I'm almost done with this line of questioning. Then we can take a short break -- or we could take a lunch break, not just a short break.

BY MR. SHAW:

**Q. Are you familiar with the artist Andy Warhol?**

A. I think I know who he is.

**Q. Can you turn to Exhibit 38. It should be almost the last exhibit. It should be the second to the last page in the binder?**

A. Oh, the very last.

**Q. That's it right there.**

A. Right there. Okay.

**Q. So what's marked there as Exhibit 38, have you ever seen that painting before?**

A. I have not.

**Q. Okay. If that painting were painted on the side of The Cozy Inn, would that be considered a sign?**

MS. JOKERST: Object to form.

A. I would give the same answer I did with the airplane. That does refer to a specific

product. It borderline could be considered an off-premise sign directing people to a product that is available in other locations in Salina. But just standing by itself, it does not announce or direct attention to or advertise The Cozy Inn.

BY MR. SHAW:

**Q. If The Cozy Inn sold tomato soup, would that change your calculus?**

MS. JOKERST: Object to form.

A. It would.

BY MR. SHAW:

**Q. Okay. Would that make you determine that this is a sign?**

MS. JOKERST: Object to form.

A. I would determine that it advertises a product that they are making available to their customers inside.

MR. SHAW: Okay. All right. We can break for lunch now.

(THEREUPON, a recess was taken.)

BY MR. SHAW:

**Q. Mr. Andrew, before we took our lunch break, I believe you had said that you had attended a meeting on Monday, November 6th of 2023 when you were first informed about the painting on**

**Q. Okay. So is it the official position of the City of Salina that Section 2-207 does not require a Certificate of Compatibility for painting anything other than a front facade?**

MS. JOKERST: Object to form.

A. That has been the determination and interpretation.

BY MR. SHAW:

**Q. If Mr. Howard had called up the Boom! festival and said, hey, I would love a Boom! mural to be painted on the side of my wall, would that have required a Certificate of Compatibility?**

MS. JOKERST: Object to form and foundation.

A. It depends on what the end result was.

BY MR. SHAW:

**Q. Let's say it was just a mural similar to the Mural at the Mill, children playing Ring Around the Rosie?**

MS. JOKERST: Object to form.

A. If it were identical to the mural that's on the south wall of the building at the corner of Ash and Santa Fe, which was a Boom! festival mural and you picked that mural up and moved it to the north wall of The Cozy Inn, we would treat that

exactly the same as we treated the mural that's on the south wall of that building.

BY MR. SHAW:

**Q. Is that to say you would not require a Certificate of Compatibility in that scenario?**

A. We would not.

**Q. Okay. Do you know someone by the name of Travis Young?**

A. I do.

**Q. Who is Travis Young?**

A. He works for Salina Vortex, and he is one of the organizers, original instigators of the Boom! festival.

**Q. So was he at that meeting you referenced earlier to discuss the Boom! festival?**

A. I was at one meeting when the Boom! festival was first getting started. He was present along with Eric Montoy.

**Q. Okay. Have you had any other conversations with Mr. Young?**

A. I had one e-mail correspondence with him related to downtown. I correspond with him regularly in the course of the business that he owns which is Salina Vortex.

**Q. So you correspond with him about that**

**existing Cozy Inn neon sign there?**
A. The box that I --
MS. JOKERST: Object to form.
A. -- drew didn't go that far in that direction.
BY MR. SHAW:
**Q. I'm saying not my hypothetical about Hollywood flying saucers. The image as it is right here, would you consider the entire wall to be a part of this mural?**
A. Our original determination made by the extent of the painted image on the north wall of the building went from the west wall to the east wall, and we did not attempt nor as zoning administrator do I think it's in any way feasible or practical to try to draw artificial rectangles around this display.
**Q. Okay. But The Cozy Inn neon sign that is there, it had 24 square feet already accounted for that area. Is that correct?**
A. That is correct.
**Q. So would that 24 square feet be double counted?**
MS. JOKERST: Object to form.
A. It would not be double counted, but it

would be not relevant.
BY MR. SHAW:
**Q. Why would it not be relevant?**
A. Because whether the end result is 512 square feet or 520 square feet or 540 square feet or whatever number is arrived at, the 24 square feet is immaterial to whether the image displayed on the north wall is too large for the property based on the sign code.
**Q. Well, let's just say The Cozy Inn had 300 feet of building frontage and we're still just trying to calculate size here. Should that 24 square feet for the neon sign be subtracted from the mural sign area?**
MS. JOKERST: Object to form.
A. It would be. It's already accounted for in existing signage. What we were calculating was how much additional signage can be installed beyond what is already existing. And this 24 square foot sign was already accounted for.
BY MR. SHAW:
**Q. When Mr. Herrs calculated the size of a mural in his analysis, did he subtract that 24 square feet from the size of the mural?**
MS. JOKERST: Object to form.

A. I didn't prepare it. He did. And I've seen different numbers. He started out at 540 and changed that to 528.

BY MR. SHAW:

**Q. Would he have been correct to subtract that sign from the mural sign area?**

MS. JOKERST: Object to form.

A. Yes, because it already exists.

BY MR. SHAW:

**Q. Would he have been incorrect if he didn't subtract that area?**

MS. JOKERST: Object to form.

A. He wouldn't necessarily be incorrect because it's all one integral display. But he did not take that into account because it's already account for as existing signage.

BY MR. SHAW:

**Q. I guess my concern here is, is that 24 square feet has been double counted, that if he includes that area within his rectangle for calculating the size of this mural and doesn't subtract 24 square feet from it, we are now double counting that 24 square feet. Do you understand?**

MS. JOKERST: Object to form.

A. I understand, but it's completely

irrelevant.
**Q. Why is that irrelevant?**
A. Because the magnitude between 60 square feet or 63 square feet and 500 plus square feet, a 24-square foot margin of error is immaterial.
**Q. Okay. I understand that conclusion if what you're just saying is that it wouldn't have changed the outcome. But I'm just trying to figure out what is the proper way to calculate the numbers?**
A. The proper way to calculate the numbers is to take the existing signage, we calculate the difference between the existing signage that already exists and the proposed signage and we see if the proposed signage will fit within that allocation. So if their allocation was that they can have 150 square feet of total sign area and they have 63, then they can -- their additional signage can be the difference between 63 and 150.
**Q. I understand. But if this signage has been double counted, the calculation would be incorrect. Is that true?**
MS. JOKERST: Object to form.
A. There is nobody on city staff, including me or Mr. Herrs or anybody, who is going to stand

on a number that you can say is exact. All we can say is that that sign is a magnitude above 63 square feet. And whether it's 540 in end result or 528 in end result or 512 square feet as an end result, the end result is the sign is too large for that property based on the current C-4 sign regulations.

BY MR. SHAW:

**Q. I understand that. My question isn't whether the city believes the sign is too big. My question is should that 24 square feet of signage been subtracted from the rectangle that was calculated by Mr. Herrs?**

MS. JOKERST: Object to form.

A. We did not calculate a rectangle. We tried to determine the total entire area of the north facing wall.

BY MR. SHAW:

**Q. Okay. Should that 24 square feet of existing signage have been subtracted from the total area of the existing wall?**

A. Who says it wasn't?

MS. JOKERST: Object to form.

A. How do you know it wasn't? You don't know it wasn't.

BY MR. SHAW:
**Q. I have asked Mr. Herrs and he said that it wasn't so...**
A. Then why are you asking me?
**Q. I want to know if Mr. Herrs calculated it correctly?**
A. If Mr. Herrs told you that he didn't include it, then that is not consistent with the way that we calculate sign area.
**Q. Okay. Should the square footage for the awning also have been subtracted?**
MS. JOKERST: Object to form.
A. The awning is an awning sign. Any awning that has a sign on it, the sign area on that awning is a sign and counts as a sign.
BY MR. SHAW:
**Q. Would you look at the picture? Is that the awning you're believing is the awning sign or is it the front awning?**
A. It's the front awning for which Mr. Howard got a Certificate of Compatibility in 2021.
**Q. Yes. What I'm asking is the awning in this picture, is that square footage consider a part of --**
A. It's not a sign. It's an awning.

**Q. I understand that. So you're saying it should not be subtracted?**

MS. JOKERST: Object to form.

A. It should be subtracted.

BY MR. SHAW:

**Q. Okay. It should be subtracted because it is not a sign. Is that what you're saying?**

A. Yes. It doesn't occupy much area. Again, it's not relevant to whether the sign is too large or not.

**Q. All right. Should the service window have been subtracted?**

MS. JOKERST: Object to form.

A. The service window does not form a part of the backdrop for the sign.

BY MR. SHAW:

**Q. So is that a yes it should have been subtracted?**

A. Yes, it would not be included in the calculation.

**Q. Okay. And the menu board sign there, should that also have been subtracted from the calculation?**

MS. JOKERST: Object to form.

A. If the space is already occupying the

wall, then yes.

BY MR. SHAW:

**Q. Okay. And that door there on the left, should that have also been subtracted for?**

A. No.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. The door should not have been subtracted?**

A. No.

**Q. Why is that?**

A. It's part of the backdrop of the sign.

**Q. Is that because some of it would be painted on the door?**

A. Yes.

**Q. Okay. Have the walls at The Cozy Inn been white for at least several decades?**

MS. JOKERST: Object to form.

A. They have been painted white for decades.

BY MR. SHAW:

**Q. Okay. Is that white paint that is still there considered a part of the mural?**

MS. JOKERST: Object to form.

A. I have already answered that question, and I've already said that it is non-sensical for us to take a display like this and try to create

artificial rectangles around it. We treated the entire north wall as part of the display area.

BY MR. SHAW:

**Q. Okay. After Mr. Howard submitted this application on November 13th or whenever he submitted it, what was done with this application by your department?**

A. It was placed on file and on hold.

**Q. What does it mean for it to be on hold?**

A. It means that we could not approve it, but we were going to try to continue to work with Mr. Howard to find a code-compliant code-based solution that might allow ultimately the sign to be installed.

**Q. Does the city code discuss procedures for placing a sign permit on hold?**

MS. JOKERST: Object to form.

A. It does not.

BY MR. SHAW:

**Q. So is placing a sign permit on hold just a unwritten practice?**

MS. JOKERST: Object to form.

A. It's not an unwritten practice. It's usually done in consultation with the applicant.

BY MR. SHAW:

BY MR. SHAW:

**Q. And at any point after he submitted his application, did Mr. Howard consent to it being placed on hold?**

MS. JOKERST: Object to form.

A. No. Because he already knew we couldn't approve it.

BY MR. SHAW:

**Q. Okay. But is that consent?**

MS. JOKERST: Object to form.

A. You tell me the difference between non-approval and denial and I'll answer your question.

BY MR. SHAW:

**Q. Well, a denial under the code triggers certain appeal rights. Is that correct?**

MS. JOKERST: Object to form.

A. What would he appeal?

BY MR. SHAW:

**Q. He could appeal to the Board of Zoning Appeals. Is that correct?**

MS. JOKERST: Object to form.

A. He could appeal to the Board of Zoning Appeals at any time.

BY MR. SHAW:

**Q. So your position is that he may appeal at**

**due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until our review of the sign regulations is complete. Is that sentence past tense or future tense?**

MS. JOKERST: Object to form.

A. I'm not sure I follow the question.

BY MR. SHAW:

**Q. Do you see where it says our office will be placing your Certificate of Compatibility application and sign permit application on hold?**

A. If I was writing it, it would say has been placed.

**Q. I see. Do you know why it was not written in that manner?**

MS. JOKERST: Object to form.

A. I do not have firsthand knowledge of that.

BY MR. SHAW:

**Q. When was the application placed on hold?**

A. When it was received.

**Q. So would that be November 13th, 2023?**

A. That would be the date it was received if that was in fact the date it was received.

department is involved with, including The Cozy Inn.

**Q. So just so I've got this straight, it's your position that The Cozy Inn's application was placed on hold on November 6th, 2023. Is that correct?**

MS. JOKERST: Object to form.

A. Yes. And we told Mr. Howard that we were going to work to try to come up with a code compliant solution that might ultimately end up with his permit being issued for his display and that that was going to take some amendments to our current sign code. And so we were trying to convey the message that we were going to continue to work with him as well as others in the community who had sign issues of their own.

BY MR. SHAW:

**Q. Does this letter make any reference to a determination made on November 6th?**

A. It does not.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Were you instructed to send this letter by Miss Driscoll?**

MS. JOKERST: Object to form.

**Q. What is the function of a sign?**
A. Function of a sign is to announce --
MS. JOKERST: Object to form.
A. -- direct attention to or advertise.
BY MR. SHAW:
**Q. And this mural directs the public to the gallery. Is that correct?**
MS. JOKERST: Object to form.
A. Not in my opinion.
BY MR. SHAW:
**Q. Okay. So then is the staff report incorrect?**
MS. JOKERST: Object to form.
A. I'm not saying it's incorrect. I don't think it's written to the detail that it needs to be for the nuance.
BY MR. SHAW:
**Q. Does the Design Review Board have anything other than the staff report to go on when they make these determinations?**
MS. JOKERST: Object to form.
A. They have the design guidelines.
BY MR. SHAW:
**Q. And what do the design guidelines say about murals that are similar in function to a**

sign or a historical sign.

**Q. Is it an abandoned sign?**

MS. JOKERST: Object to form -- no, I'm not going to object to that.

A. It is not an abandoned sign.

BY MR. SHAW:

**Q. What is it not an abandoned sign?**

A. Because it's a preexisting sign that was exposed when a building was demolished in 1986.

**Q. Earlier when we were discussing abandonment and non-conforming signs, you had stated that the only non-conforming sign that wasn't subject to abandonment was the theater marquee signs. Do you remember that?**

MS. JOKERST: Object to form.

A. I don't recall it exactly that way. I recall reviewing that code section.

BY MR. SHAW:

**Q. So why is this sign not subject to abandonment under 42-510?**

A. Because it was originally an internal sign on the wall of a enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall.

A. It was.
**Q. Is that Schlotzsky's located inside of a large shopping center?**
A. It's an outlot that's located in the Mid State Plaza addition.
**Q. Do you know how the frontage for that building was calculated?**
A. I do.
**Q. How was it calculated?**
A. It was calculated based off their 9th Street frontage and the mall ring road on the south.
**Q. I see. So it wasn't just the street frontage. It was the parking lot of the large shopping center which had a path for cars to drive. That was considered street frontage?**
A. No, that --
MS. JOKERST: Object to form.
A. That was considered to be a private street that provided access to Schlotzsky's.
BY MR. SHAW:
**Q. Even though there's parking in between Schlotzsky's and that private road?**
A. Yes.
**Q. Okay. Go quickly to Exhibit 39, please.**

**front of The Yard, is that 4th Street?**
A. That is 4th Street.
**Q. Is that a public street?**
A. It is a public street. It's a public right-of-way.
**Q. Okay. And is the mural visible from 4th Street?**
MS. JOKERST: Object to form.
A. I think from this angle I can see a corner of it.
BY MR. SHAW:
**Q. Okay.**
A. The part that's -- I don't know if that fence has mesh in it or not, if that's what obscuring it, but I can see the very corner.
**Q. Okay. On the previous page with the Bates No. 301, is that taken from the public sidewalks?**
MS. JOKERST: Object to form.
A. It looks like it's taken from the public sidewalk.
BY MR. SHAW:
**Q. Okay. And is the mural visible there?**
A. It is.
**Q. Okay. Is there anywhere in the Salina**

**City Code where it discusses the orientation of a sign?**

A. It does not. I searched in vain for it and insisted that it did, but it does not.

**Q. Okay. And apart from your attorneys, I don't want to know about anything you may have spoken to with them, did you speak to anyone else in preparation for today's deposition?**

A. No.

MR. SHAW: Okay. I have no further questions for you.

MS. JOKERST: I'm going to have some follow-up, but I want to take like a 10-minute break to review my notes. It should be pretty quick.

MR. SHAW: All right. So back at 5:50?

MS. JOKERST: 4?

MR. SHAW: Yeah, sorry, 4:50.

MS. JOKERST: 3:51 my time, 4:51 your time, yes.

(THEREUPON, a recess was taken.)

CROSS-EXAMINATION

BY MS. JOKERST:

**Q. Mr. Andrew, I'm going direct your attention to Exhibit No. 7. Can you pull that up?**

**that Steve Howard is lying in his application?**
MS. JOKERST: Object to form and foundation.
A. I don't even know what that means.
BY MR. SHAW:
**Q. Is it the position of the City of Salina that Steve Howard has altered the rendition he submitted to be different than what he originally planned?**
MS. JOKERST: Object to form.
A. I have no firsthand knowledge of that.
BY MR. SHAW:
**Q. Okay. Do you have any reason to believe that the imagery he submitted with his application is not the imagery he intended to have painted on his wall?**
MS. JOKERST: Object to form.
A. I don't know who prepared and submitted that.
BY MR. SHAW:
**Q. Okay. But do you have any reason to believe that Mr. Howard did not intend to have that imagery placed on his wall?**
A. There is no basis --
MS. JOKERST: Object to form.

A. -- to doubt what his ultimate intentions were.

BY MR. SHAW:

**Q. Okay. Does your department have a tape measure?**

A. It does.

**Q. Is a tape measure an acceptable way to measure a wall?**

A. Not a wall that's too tall to measure for the tape measure.

**Q. Do you know how tall The Cozy Inn is?**

A. It's been determined to be -- those walls are determined to be about 12 feet tall.

**Q. How long is your tape measure that the department has?**

A. Nine feet.

**Q. Okay. Does the department never need to measure anything more than 9 feet?**

A. We have other tools for measuring things that are tall. But Pictometry is an acceptable way to measure side wall heights, measure the heights of houses and other things.

**Q. Okay. Regarding the Certificate of Compatibility for Eccentricity, do you know if Mr. or Mrs. Mattison filed that certificate?**

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 14th day of October, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit B
# Driscoll Deposition Exhibits

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

LAUREN DRISCOLL,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:06 a.m. on the 10th day of September, 2024, at the law offices of Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**Q. Would you -- do you know if Crystal was talking to Brad Anderson by any chance about this issue?**
A. I --
MS. JOKERST: Object to form.
THE REPORTER: Your answer?
A. I do not know.
THE REPORTER: Thank you.
BY MR. MACROBERTS:
**Q. Did you meet with Steve about this issue?**
A. Yes. Not on that day.
**Q. When was the first time you met with Steve about the issue?**
A. It would have been the Thursday of that week. So Monday, Tuesday, Wednesday, Thursday we met with him.
**Q. When you say we, who was there?**
A. It was myself, Dustin Herrs, Mike Schrage, Steve Howard, the artist who had painted the wall, and then Mr. Howard had invited other people. There were -- I think there was -- they were just like concerned friends. I think there were three of them, like a husband and a wife and another person. And then Brad was there. I can't remember if Crystal was there.

This one assigns it a permit number, gives the location, and it is being put into the system for Planning staff it looks like to review and act on. So this would have -- probably the permit techs would have entered this in. So the permit technicians when the applications come in review for completeness, and then they put it in the digital system if it doesn't come in digitally. So, as I mentioned earlier, Mr. Howard dropped his off in paper. So the techs would have taken those and put them into LAMA.

**Q. Just to make sure I understand you, so a tech gets the application. They manually type it into the LAMA permit software?**

A. If the applicant dropped it off in paper.

**Q. Do you know -- do you see these regularly?**

A. No.

**Q. Have you ever seen one of these?**

A. I have seen them before but not this one per se.

**Q. Do you know why there's a permit summary for February 5th of 2024?**

A. No.

**Q. Is it typical for a permit to generate --**

there's a total allowed amount.

**Q. Did you initially think this was a mural or a sign?**

A. I mean it -- it's painted on a wall. It -- the question was we had to sit down and start to look at those pieces and just start to pull them together. I don't like to make an off-the-cuff determination. We sat down with code, pulled the definition, said, yep, it met those components. And then we looked at that location and did the math to show like not only is it a sign but its size does not fit this location.

**Q. On Sunday night when you received the text, it was still up in the air whether it was a sign or not, correct?**

A. Correct.

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. And what is -- what do you have to look at to figure out if it's a sign or not?**

A. Salina municipal code.

**Q. And you still have to look at what the artwork is, correct?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:
**Q. Why do you have to look at it?**
MS. JOKERST: Object to form.
A. Well, one, you're going to look at it for its time and place and manner characteristics as per code, right? And you're going look at it to see if it meets the definition of a sign which talks about announce, direct attention or advertise.
THE REPORTER: Talks about?
A. Announce, directs attention or advertise.
BY MR. MACROBERTS:
**Q. Are you able to do that with -- in other words, are you able to determine whether or not it announce, directs attention to or advertise without looking at the artwork?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. Is that why the permit process requires a picture or a rendering of what the artwork's going to look like?**
MS. JOKERST: Object to form and foundation.
A. Ask me that question one more time,

the commission that it's more than just a word or a picture, that all these pieces lay together.

BY MR. MACROBERTS:

**Q. So in order to make your coffee house/dove/peace hypothetical work, you would need to know what the artwork is on the outside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. We would have a rendering that was submitted that would describe what was going on the side of the building.

BY MR. MACROBERTS:

**Q. Or somebody did it without a permit you would have to look at the artwork?**

A. Yes.

MS. JOKERST: Object to form and foundation.

BY MR. MACROBERTS:

**Q. And you need to know what's going on on the inside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. In some cases, yes.

BY MR. MACROBERTS:

BY MR. MACROBERTS:
**Q. And what did you mean when you said so it's like if you can't say this one thing, do you identify the others?**
MS. JOKERST: Object to form.
A. That's what I kind of just said. Like we have a definition of sign. It either is that or it's not. If you want to talk about the things it's not, then you have to find rules for those things and we don't have rules for those things. So that may be something the commission wants. Right now, we deal with signs. If you want to talk about murals, then that's a whole another thing, but it's not on the books right now.
BY MR. MACROBERTS:
**Q. The regulation of murals is not on the books?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. Bad question. You don't regulate murals?**
A. Correct.
**Q. And maybe you've answered this so forgive me if you have. On page 25, you say sometimes saying something isn't something, maybe you need a**

**Q. Let's start with your memory and then we will -- I'm confident we have it. I just don't want to spend ten minutes digging through it.**

A. Okay.

**Q. So why is it?**

MS. JOKERST: Object to form.

A. So, from my memory, which, you know, is not always a great way to review code, you should always look at it every time, it basically indicates that, you know, if it's something attention grabbing, it talks about the myriad of forms, whether it's text, emblem, pictorial, and that if it is on the outside of a building, if it announces, directs attention and advertises and is affixed, is near in the ground or portable, however, it kind of gives a list of those, if it's got those features and those all lead into it being a sign.

BY MR. MACROBERTS:

**Q. I want to go back to your coffee house hypothetical. If Mr. Howard painted a coffee pot on the side of his wall with a picture of a dove and the word peace and it took up the entire wall, and assume he does not sell coffee, is that a sign?**

MS. JOKERST: Object to form.
A. So I want to make sure I'm understanding you. You're giving me a hypothetical where we have a wall -- okay. We're going to use the Cozy and there's a coffee pot painted on it, a dove and olive branch and the word peace?
BY MR. MACROBERTS:
**Q. Yes.**
A. And he doesn't sell --
**Q. Let's assume he does not sell coffee?**
A. -- coffee at all.
**Q. And he doesn't sell doves or --**
A. And it's not --
THE REPORTER: Hold on. Hold on. One at a time. Give me your question. Let's assume?
BY MR. MACROBERTS:
**Q. And he does not sell doves or olives.**
MS. JOKERST: Object to form.
A. I guess I would say I could answer your hypothetical, but I'm not the one who's going to make that final determination, right. That stuff would come in the office and I would work with our planning staff. So I could tell you that answer, but it still is also going to come down to Dean Andrew standing behind that determination as

Zoning administrator. So I can pontificate all that I want, but it's not -- I'm not making that determination.

BY MR. MACROBERTS:

**Q. Based upon your understanding of the code, keeping in mind what you told the city commission, is that artwork considered a sign that I just described to you?**

MS. JOKERST: Object to form and foundation.

A. I would question whether it's a sign and then work with my staff and our legal counsel to verify my interpretation.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol?**

A. Yes. He's a mid century artist.

**Q. Are you familiar with his Campbell's Soup artwork?**

A. Yes.

**Q. Assuming the Cozy Inn did not sell Campbell's Soup, if Mr. Howard painted an exact replica of Andy Warhol's Cambell's Soup can on the side and it took up the entire wall, based upon your understanding of the code, is that a sign?**

A. I am not comfortable making that --

just an airplane? What's the size of it? What's it say on the airplane? Is there text with the airplane? What's the size of the airplane? All those things feed into it being a sign.

BY MR. MACROBERTS:

**Q. No text. Just a big silver airplane?**

MS. JOKERST: Object to form and foundation.

A. There's no text. From the very limited information you've given me, it might not be a sign. But, again, I also am not the only person that would make that determination.

BY MR. MACROBERTS:

**Q. I think you've told me the other people who helped make that determination. Have you mentioned everyone who makes that determination?**

A. Yes.

**Q. Does Mr. Schrage have any input into that determination?**

A. No.

**Q. Did he have any input into whether or not the Cozy was deemed a sign?**

A. No. He was made aware of the situation as it evolved and as staff did its research, but he did not have influence on that decision.

department is a public building, and it's not asking you to come in and get a service or make any type of transaction. But I -- it's one that I don't think is cut and dry, and I think it would be worth a discussion with legal counsel.

BY MR. MACROBERTS:

**Q. Which, again --**

A. Yeah. But I'm --

**Q. Yeah, yeah. Okay.**

A. That's where I would go with that because it's not cut and dry.

**Q. And what -- help me understand what's not cut and dry about this?**

MS. JOKERST: Object to form.

A. Well, I think the fact that it's a public service. So I don't -- I'm not familiar with a case where that may come into advertising. So we would -- my thought is I would research more and see where that's been viewed in the past with other decisions.

BY MR. MACROBERTS:

**Q. So if that picture or those pictures are deemed advertising, then it's a sign?**

MS. JOKERST: Object to form.

A. That's one way you could look at it. I

**Q. If you could turn to Deposition Exhibit 82, please. Are you there?**
A. Yes, sir.
**Q. Do you recognize this?**
A. I do.
**Q. What is it?**
A. It's the side of the KU Medical School.
**Q. It's the city's -- is it the city's position that the artwork on Deposition Exhibit 82 is not a sign?**
MS. JOKERST: Object to form and foundation.
A. So I just want to make sure I'm understanding that the city's position is that is the sign.
BY MR. MACROBERTS:
**Q. And because the court reporter can't take that down, if you could describe what you did to me or I can do it and then you can tell me if I'm wrong.**
A. No, I'm happy to describe it. There's a large blue K and a large blue U and then below that School of Medicine, School of Nursing, a large Salina in black underlined and in blue University of Kansas in smaller letters with three

large lights over the top.

**Q. That was a good description. Is that the only part of the wall at Deposition Exhibit 82 that is considered a sign?**

A. Yes. That is the permitted sign area.

THE REPORTER: Can I have that objection again?

MS. JOKERST: Form and foundation.

THE REPORTER: Thank you.

BY MR. MACROBERTS:

**Q. The colorful display that is both to the bottom right of the KU and the left of the KU, it's the city's position that that is not a sign?**

MS. JOKERST: Object to form and foundation.

A. That is correct.

BY MR. MACROBERTS:

**Q. Does -- in your opinion as you're sitting here and as director, does the artwork to the left of KU attract attention?**

MS. JOKERST: I'll object to form.

A. So you're asking me if the artwork to the left attracts attention?

BY MR. MACROBERTS:

**Q. Um-hum, that's correct.**

A. It could.
**Q. Does it?**
A. For some people, yes.
**Q. How about --**
A. Yes.
**Q. And same with the artwork to the bottom right of the KU, that attracts attention, also, correct?**
A. Yes.
MS. JOKERST: Object to form.
MR. MACROBERTS: Do you mind if we have a two-minute break? I've just got to use the restroom again.
MS. JOKERST: Yeah. I'm okay with that.
MR. MACROBERTS: Let's go off the record for just a moment.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. All right. I think we're back on. Thank you. If I could get you to turn to Exhibit No. 73, please. There's a series of photographs.**
A. Okay.
**Q. And I think it ends at 82?**
A. Yes, I agree.
**Q. Do you recognize it?**

A. Yes, I recognize it.
**Q. What is it?**
A. It's a large painting on the grain silos here in town.
**Q. Is that commonly referred to as the Mural at the Mill?**
A. It is, yes.
**Q. Was that -- forgive me if you answered this already. Was that painted before or after you coming to Salina?**
A. It's been my time here.
**Q. Okay. And based upon your understanding of the city code, that's not a sign, correct?**
A. Correct, it is not a sign.
**Q. And no permit was applied for, and there was no problem with them not applying for a permit, right?**
MS. JOKERST: Object to form and foundation.
MR. MACROBERTS: I'll restate it because I asked two questions at once.
BY MR. MACROBERTS:
**Q. You're not aware of anyone applying for a permit for this?**
A. Correct. And a permit was not applied

for. A sign permit was not applied for.

**Q. Why is this not considered a sign based upon your understanding of the code?**

A. It doesn't meet the definition of a sign. So I mean we didn't review it. I didn't make this determination. But using the definition of a sign, this did not meet that definition.

**Q. Forgive me because I've tried finding this and I don't know. Hopefully, you do. Is that grain elevator operational at all?**

A. I don't think so.

**Q. Is anything happening inside the grain elevator?**

A. No.

**Q. If somebody were to operate that grain elevator as a business and in the business they charged an admittance fee and kids were playing on the inside of that, based upon your understanding of the code that would be a sign then, correct?**

MS. JOKERST: Object to form and foundation.

A. So they've turned it into something where kids are playing on the inside and that you're saying is my determination that automatically makes it a sign?

BY MR. MACROBERTS:
**Q. No. I'll ask it again. If an operator charged money for kids to come inside, pick a daycare or a recess zone, something like that, this Mural at the Mill would then be considered a sign under your understanding of the code, correct?**
MS. JOKERST: Object to form and foundation.
A. It would be enough to catch my attention that I would bring it to my staff and ask them to research and make that determination.
BY MR. MACROBERTS:
**Q. Is it fair to say that the reason it would raise questions because in your mind it would encourage a commercial transaction?**
MS. JOKERST: Object to form.
A. No. I would say it would be advertising something because the use of the building had changed.
BY MR. MACROBERTS:
**Q. All right. I'm asking you to please turn to Deposition Exhibit 76.**
A. Okay.
**Q. Do you know what this is a picture of?**

together and that whole strip. But I mean that's my initial assessment without being there and seeing more details. But from this picture, that would be my initial thoughts.

**Q. The permit that was issued was after you said the Cozy case. Is that in November of 2023 or is that in February of 2024?**

A. It probably would have been in November. We got several calls from people around town as soon as social media had chatter about the Cozy case. Suddenly, everybody wanted to turn everybody in. So we got inundated with several different signs around town that we weren't aware of and went through and dealt with those.

**Q. Were you overwhelmed with calls?**

A. No. I mean it was a handful, though and ones we didn't know. But I mean they kind of came in a barrage probably within that following week the city commission meeting.

**Q. As far as you were aware, did anybody complain about the Cozy's artwork?**

MS. JOKERST: Object to form.

A. As in issue a formal complaint? Like in writing or something?

BY MR. MACROBERTS:

**Q. Well, let's start with that. In terms of did anybody file a formal complaint against the Cozy or Mr. Howard because of the mural?**

A. No.

**Q. If you would please turn to Deposition Exhibit 75. Let's start with page 300. Do you know what that's a picture of?**

A. The Original Grande.

**Q. Is that the same with pages -- well, the rest of the deposition exhibit?**

A. It looks like it, yes.

**Q. Is it the city's position that the -- well, let me direct you to page, oh, man, 298.**

A. Okay.

**Q. The Feelin' Taco-tastic and Fuel Your Inner Fiesta, do you see those?**

A. I do.

**Q. Is it the city's position that those two displays are considered signs?**

A. Yes.

**Q. Why is that?**

A. Because they directly relate -- well, they meet the definition of the sign code as we've talked about several times. They attract attention. They -- they're specifically

apologizing for cutting you off. I thought the question was done.

A. So you saying there's just two doves painted there at the Mexican restaurant?

BY MR. MACROBERTS:

**Q. Where the -- yes, where the Feelin' Taco-tastic and Fuel Your Inner Fiesta is in this exhibit?**

A. I would go back to the definition of the sign code, but it would probably not be a sign. I don't know what else more is there, if there's text, if it's just a dove, I don't know what's on the other side, but if they've got dove tacos, but I'm really hoping they don't, but probably -- probably not.

**Q. All right. Let's assume no dove tacos and no text, just pictures of a dove?**

MS. JOKERST: Object to form.

A. By my interpretation of the definition sitting here at this table with what I know, are you announcing something with the dove? Not really. I mean I suppose you've initially grabbed attention, but you're not announcing anything relevant. You're directing attention to, is the dove pointing to something or flying toward

something, let's say it's not. So you're not directing attention to. And what are you advertising? We're not advertising any good or service. I mean they don't have a -- they're not selling doves with every meal. I mean they're truly not related from what I know in this hypothetical.

BY MR. MACROBERTS:

**Q. So it would not be a sign?**

A. Based on the hypothetical you gave me, I would not make that -- I would not think that's a sign.

**Q. You mentioned previously that you were, and I'm paraphrasing, considering amending the code before the Cozy Inn issue?**

A. Um-hum.

**Q. Is that a yes?**

MS. JOKERST: Object to form.

A. I'm sorry. Yes.

BY MR. MACROBERTS:

**Q. And when did that originally come onto your radar?**

A. Within 2023, 2022. Technology's changed a lot around signs, too, particularly with lighting and lumens and materials being used for

**the purpose section of the sign code?**

A. Um-hum.

**Q. Is that a yes?**

A. Yes.

**Q. Is that Deposition Exhibit page -- well, we'll reference it this way. At the top, it will say document 16-3, page 5 of 31 in blue.**

A. What does it say in the blue, I'm sorry?

**Q. How about this. Try to go to section 42-500 of the code.**

A. Okay. I'm there.

**Q. Do you mind if I look real fast?**

A. Um-hum.

**Q. This is what I was referencing.**

A. Oh, okay. Thank you.

**Q. Are you aware of any traffic accidents that have resulted from the display that's at the Cozy?**

A. I am not.

**Q. Are you aware of any pedestrian accidents that have resulted from the display at the Cozy?**

A. I am not.

**Q. Are you aware of the property values decreasing as a result of the display at the Cozy?**

A. I am not.

**Q. Are you aware of the local economy getting worse because of the display at the Cozy?**

A. I am not.

**Q. Previously, you had mentioned aesthetics. Do you remember that?**

A. Um-hum.

**Q. Is that a yes?**

A. I do.

**Q. The e-mails that we talked about that were sent to the signs e-mail address, do you remember those?**

A. I do.

**Q. Is it fair to say that those e-mails suggested that the mural was aesthetically pleasing?**

MS. JOKERST: Object to form.

A. Several of those do. I don't know about every one of them. But in general, yes, that is a sentiment.

BY MR. MACROBERTS:

**Q. In any of those e-mails that we talked about, is there anybody who thought the mural at the Cozy was aesthetically displeasing?**

MS. JOKERST: Object to form.

A. Of those e-mails, no.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

Sandra S. Biggs

______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit C
# Andrew 30(b)(6)
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

CORPORATE REPRESENTATIVE

DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**commercial location or can it be directing attention to a non-commercial location as well?**

A. It can direct attention to any particular location.

**Q. All right. And when the city determines if a display advertises, what methodology does the city use to make that determination?**

A. We look to see whether the visual display promotes or encourages some sort of product or service or invitation to enter into some form of commercial transaction or whether the visual display promotes a particular brand or a particular product.

**Q. Does the advertising have to be commercial in nature or can it be non-commercial?**

A. It does not have to be commercial.

**Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public?**

A. No.

**Q. Why doesn't the city determine that?**

A. Because in interpreting and applying Section 42-764, the city has interpreted that to be a catchall provision and to catch any type of display mechanism that's not mentioned in the

**Q. But is the fence a part of that structure?**

A. Can be.

**Q. If a window sign is located on the inside pane of the window, is that still considered inside the building?**

MS. JOKERST: Object to scope.

A. There is a separate definition and a separate regulation for a window sign. And by definition, a window sign can be one that's affixed to the inside of a building. That does not mean it's not a regulated sign in some circumstances.

BY MR. SHAW:

**Q. So there are signs then that are located inside of a building that are still considered regulated signs?**

MS. JOKERST: Object to form and to scope.

A. If you have a window sign and it's affixed to the inside of the building and it covers more than 33 percent of the total window area, it can be considered to be a regulated sign that counts towards your sign allowance.

BY MR. SHAW:

application, an inventory of any existing signs that are already on the property.

**Q. Will that maybe be called an elevation drawing, is that basically like a drawing of where the proposed sign would be on the property?**

A. No.

**Q. All right. What is the elevation drawing then?**

A. Elevation drawing is an -- a drawing prepared usually by a sign manufacturer that says this is the proposed sign, here's the materials it's made out of, this is its height and width and here is the information on whether it's designed to be illuminated or static. And it's a draw that depicts the appearance and the physical characteristics of that sign.

**Q. Would the elevation typically include the copy that will be placed on that sign if it is installed?**

A. Yes.

**Q. Okay. Is the copy required to be in the application?**

A. It is if you want us to measure the letters.

**Q. Is the city -- strike that. Does the**

that would be generated by the software.

**Q. Does that e-mail generated by the software include information about any right to appeal that goes along with that denial of a permit?**

A. Generally not.

**Q. What happens if no determination is made about what to do with a sign permit?**

A. Then the sign is considered to be on hold pending some other event or result.

**Q. And does the code have a provision for a permit being placed on hold?**

MS. JOKERST: Object to scope.

A. It is not specifically baked into the code, but it is within the discretion of the reviewer if they feel like they're actively working with an applicant that they will keep the application on hold.

BY MR. SHAW:

**Q. If a property owner wanted to paint a mural on their property but they were unsure if it would be considered a sign or not, could they bring a rendering of that mural to the city for a determination?**

A. Absolute --

A. No.
**Q. Why not?**
A. Because it's a non-conforming sign. As a non-conforming sign, the owner of the sign can maintain that sign. They just can't enlarge it or structurally modify it or expand it.
**Q. And has the city determined whether or not this sign is considered an abandoned sign?**
A. It is not considered an abandoned sign.
**Q. When did the city make that determination?**
A. Well, if it made that determination, it predated the abandoned sign code which I believe was adopted in 1990.
**Q. I'm confused by that. Before the code was adopted defining what an abandoned sign is, the city had determined it is not an abandoned sign?**
MS. JOKERST: I'll object to form.
A. This sign was inside a building. This sign's over a hundred years old and was inside a building. That building was torn down in 1985. That interior wall became an exterior wall when the building was removed to make way for the parking lot. So at that point in time when it

BY MR. SHAW:

**Q. So as long as a building is not vacant, a sign can't be abandoned?**

MS. JOKERST: Object to form.

A. The abandoned sign ordinance establishes time frames for certain parts, portions of signs or sign support structures to be removed. And the triggering for that is the date upon which the premises became vacant. If the premises is not vacant, there's no date to trigger that on.

BY MR. SHAW:

**Q. So even if the sign no longer advertises a bona fide business conducted, products sold or service provided, it isn't abandoned until the property has been vacated?**

MS. JOKERST: Object to form.

A. The time period the clock for removal starts when the premises is vacant.

BY MR. SHAW:

**Q. All right. We can move on to Exhibit 18. Are you familiar with Exhibit 18?**

A. It appears to be a photograph of Fire Station No. 2 on South Santa Fe.

**Q. Has the city made a determination about whether the mural at Fire Station No. 2 is**

that would be generated by the software.

**Q. Does that e-mail generated by the software include information about any right to appeal that goes along with that denial of a permit?**

A. Generally not.

**Q. What happens if no determination is made about what to do with a sign permit?**

A. Then the sign is considered to be on hold pending some other event or result.

**Q. And does the code have a provision for a permit being placed on hold?**

MS. JOKERST: Object to scope.

A. It is not specifically baked into the code, but it is within the discretion of the reviewer if they feel like they're actively working with an applicant that they will keep the application on hold.

BY MR. SHAW:

**Q. If a property owner wanted to paint a mural on their property but they were unsure if it would be considered a sign or not, could they bring a rendering of that mural to the city for a determination?**

A. Absolute --

**considered a sign?**

A. Yes.

**Q. What determination was made?**

A. The determination that it does not constitute a sign that announces, directs attention to or advertises.

**Q. What methodology did the city use to make that determination?**

A. It used the methodology found in Section 42-764 to determine whether the visual display on the front of the building announced or directed attention to or advertised. It does not announce or proclaim any fact, event, occurrence or entity, it does not direct attention to any specific location or opening or doorway or any physical location, and it does not advertise.

**Q. Does this mural depicted in the exhibit identify the building as a fire station?**

A. The city's position is that it does not. It could just as easily appear on a museum or library or anywhere else.

**Q. Does this mural pertain to the activities conducted at the fire station?**

MS. JOKERST: Object to form.

A. Not this fire station.

**Q. Where is that mural located?**
A. It's on the south wall of the Schlotzsky's sandwich shop.
**Q. And has the city determined that the mural depicted here is a sign?**
A. Yes.
**Q. When did the city make that determination?**
MS. JOKERST: Object to scope.
A. I can't tell you the exact time. I can tell you it was determined when the city became aware of it and went out and reviewed it. It determined it to be a regulated sign and contacted the owner of the business and the owner of the property to say that they needed to obtain a sign permit for that sign.
BY MR. SHAW:
**Q. What portions of this mural did the city consider to be triggering the sign code?**
MS. JOKERST: I'll object to form.
A. The city determined it to be a single composition and determined that the entire visual display was a sign.
BY MR. SHAW:
**Q. How did the city come to that**

**Q. And so each line of the pentagon was individually calculated as a separate sign?**

A. No.

MS. JOKERST: Object to scope.

A. You asked me how we calculated the area of it.

MS. JOKERST: Did we get my scope objection on the record here?

THE REPORTER: Yes.

MS. JOKERST: Okay.

A. All right. So I understood your question to be how the city calculated the size of that sign.

BY MR. SHAW:

**Q. Yes, that was the question.**

A. We drew a rectangle around The Yard and the bat, and we drew -- we measured the rectangle that forms the base of home plate, the rectangle that forms the left and right sides of home plate and the rectangles that form the point of the home plate, added those together and determined those to be what constituted the area of the sign. And the black -- entirely black backdrop of the paint wall was not considered to be part of the sign.

**Q. Okay. So if I understand you correctly,**

symbols.
BY MR. SHAW:
**Q. So for The Yard wall sign we were discussing, shouldn't there have been a single rectangle that encompassed the entire home base plate and the text saying The Yard?**
MS. JOKERST: Object to form and scope.
A. I do not believe so, no.
BY MR. SHAW:
**Q. So is it the city's position that each individual element of a painted wall sign may have a independent rectangle drawn around it and then all of those rectangles are added up to calculate the wall sign?**
MS. JOKERST: Object to form.
A. I'll let you calculate using your method and then I'll answer your question, because I don't understand what you're saying. Because what you're saying is exactly what we did.
BY MR. SHAW:
**Q. Yes, that's what I'm asking. It's the city's position that whenever there's a wall sign --**
A. Where it's practical.
**Q. Okay. Where it's practical?**

BY MR. SHAW:

**Q. What methodology did you utilize to determine that it was not practical to use this method for The Cozy Inn?**

MS. JOKERST: Object to scope and form.

A. A, it's a single composition and, B, there's no rectangles. It's not -- it all blends together.

BY MR. SHAW:

**Q. Why could you not draw individual rectangles around each burger and each element of the mural that is painted on the wall of The Cozy Inn?**

MS. JOKERST: Object to scope and form.

A. I don't think it's practical.

BY MR. SHAW:

**Q. Okay. And is that based on anything in the code or is that your determination as zoning administrator?**

MS. JOKERST: Object to form and scope.

A. That is my determination as a zoning administrator.

MS. JOKERST: Can we take a brief break to go off the record? I just want to get an official estimate on what we're doing for time

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

Sandra S. Biggs
______________________________
Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit D
# Defendant's Answers to Plaintiffs' First Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,** | ) | |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **City of Salina, Kansas,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES</u>**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g., Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

9. Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

## FIRST SET OF INTERROGATORIES

1. Please explain how the City first learned about the Plaintiffs' mural's existence.

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy sign that is the subject of this dispute ("Cozy Sign") as a mural or otherwise implies the Cozy sign is not a sign under the Salina Code of Ordinances ("Salina Code"), Chapter 42, Articles X ("Sign Code"). Subject to and without waiving this objection, the Cozy is located on a main street approximately one block from the City's offices. Due to the size and location of the sign, it is visible to passersby from the street. Brad Anderson noticed the Cozy Sign as he drove by the Cozy, and was the first City staff member to bring the sign to the City's attention.**

2. Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural and describe the extent of each official's involvement (i.e. whether the official directed Mr. Herrs to issue a citation against Plaintiffs).

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City further objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request as compound and seeks information regarding the "extent of each officials' involvement" that is not a discrete subpart of the initial interrogatory asking the City to identify the city officials who discussed the "enforcement of the" Sign Code against Plaintiffs' sign.**

**Subject to and without waiving these objections, the City responds to the first interrogatory contained in this request, that is "Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural" as follows: The City did not issue a notice of violation or citation to Plaintiffs regarding the Cozy Sign. The City determined the Cozy Sign was a sign under the Sign Code and therefore subject to the Sign Code and BID Code, evaluated the Cozy Sign under the Sign**

**Code and determined that the Cozy Sign was too big to qualify for a sign permit, and informed Mr. Howard of the same. The City staff members who discussed the evaluation of the Cozy Sign under the Sign Code with Dustin Herrs were Lauren Driscoll, Dean Andrew, and Mike Schrage.**

**Regarding the second interrogatory in this request, as to Ms. Driscoll's involvement with Mr. Herrs, while it is impossible to remember every detail of Ms. Driscoll's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Ms. Driscoll discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, follow-up and meeting with Mr. Howard and Mr. Benson, providing information to Mr. Howard regarding the applicability of the Sign Code to the Cozy sign, next steps regarding the Cozy Sign and sign permit application, and the agreement with Mr. Howard to pause the work on the Cozy Sign.**

**Regarding the third interrogatory in this request, as to Mr. Andrew's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Andrew's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Andrew discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, Mr. Howard's knowledge of the Sign Code and BID Code process, and next steps regarding the Cozy Sign.**

**Regarding the fourth interrogatory in this request, as to Mr. Schrage's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Schrage's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Schrage participated in discussions with Mr. Herrs, Mr. Andrew and Ms. Driscoll regarding the application of the Sign Code to the Cozy Sign, meeting with Mr. Howard and Mr. Benson, and next steps regarding the Cozy Sign.**

3. Please explain the changes the City believes Plaintiffs need to make to their mural in order to "turn this into a mural rather than a sign," as suggested by Vice Mayor Longbine at the November 13, 2023, Commission meeting, (Doc. 16 at ¶ 136.) and in the Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 8).

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City objects to this request to the extent it seeks information protected by the attorney-client or work product privileges as it relates to the Brief in Support of Defendant's Motion to Dismiss. The City further objects to this request as it seeks the City to explain or interpret the arguments made by the City's counsel in Doc. 27 to Plaintiffs. The City also objects to this request to the extent it misinterprets the argument in Doc. 27 at 8 as a suggestion. The City also objects as the request uses only an excerpt of Vice Mayor Longbine's statement and misinterprets the statement made by Vice Mayor**

**Longbine on November 13, 2023 as a suggestion. Mr. Longbine's full statement at the meeting was "So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign." The statement was phrased as a question, not a suggestion. That is because Mayor Longbine does not interpret or apply the Sign Code or BID Code on behalf of the City. The City will not respond to the request to the extent it seeks information "as suggested" by Vice Mayor Longbine or in the Brief in Support of Defendant's Motion to Dismiss.**

**Subject to and without waiving these objections, the City responds only to the non-objectionable portion of the request that asks "Please explain the changes the City believes Plaintiffs need to make to their mural in order to 'turn this into a mural rather than a sign.'" The City regulates signs as defined by Salina Code § 42-764. In order to remove the Cozy Sign from the applicability of the Sign Code regulations, Plaintiffs would have to change the Cozy Sign into a display that falls outside the definition of "sign" found at Salina Code § 42-764.**

**As the City does not know what changes Plaintiffs would be willing to consider (particularly considering Paragraph 29 of the Amended Complaint, which states, "Mr. Howard does not want to change, alter, or deviate from" the rendering shown in Paragraph 28 of the Amended Complaint), the City cannot (and does not) know all of the potential changes that could be made to the Cozy Sign that would take it outside of the scope of the definition of sign. It would be nearly impossible for the City to guess all of the changes that could be made to the Cozy Sign to turn it into a display outside the definition of sign. However, in general, Plaintiffs can change the Cozy Sign into a display that does not "announce, direct attention to, or advertise," which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(2) would no longer be met, or Plaintiffs could relocate the display to the inside of the Cozy building, which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(3) would no longer be met.**

4. Please identify every government interest served by regulating Plaintiffs' mural.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. Subject to and without waiving this objection, the purpose statement of the Sign Code, found at Salina Code § 42-500 (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXSI_DIV1GE_S42-500PU), sets forth the government interests served by regulating signs under the Sign Code. The City refers Plaintiffs to § 42-500 for a complete list of those interests. The Sign Code regulates all signs, not just the Cozy Sign and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. The government interests served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values.**

5. Please explain how the City determines if a mural is used to "announce, direct attention to, or advertise."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that cannot be found in the Salina Code. Subject to and without waiving this objection, the City applies the Sign Code as written. The City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to, in pertinent part, whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise."**

**The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event.**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window).**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall).**

6. Please explain how the City identifies "art" which is exempt from the mural- sign code regime. See (Doc. 16 at ¶¶ 62-65, 100, 115, 208, 216); (Doc. 16-2 at 4-6, 22-23, 28); (Doc. 16-4 at 6-7); (Doc. 27 at 9, 12).

**OBJECTION AND RESPONSE: The City objects to this requests to the extent it seeks information protected by the attorney-client, work product and anticipation of litigation**

**privileges respecting Defendant's Brief in Support of its Motion to Dismiss. The City further objects to this request to the extent it seeks the City to explain the arguments made by the City's counsel as set forth in Doc. 27 at 9 and 12. The City further objects to the extent the request incorporates allegations to the Amended Complaint as Plaintiffs made the allegations and no answer has been filed to determine whether the allegations are admitted or denied. Based on these objections, the City will only respond to the non-objectionable portion of the request "Please explain how the City identifies 'art' which is exempt from the mural-sign code regime."**

**The City objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or BID Code. Subject to and without waiving these objections, the Sign Code regulates "signs" as defined by § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code.**

**As to the term "art," the term "art" may be used from time to time as an imprecise short-hand for "not sign," but the term "art" is not included in the Sign Code and is not relevant to the determination of whether a display (whether it is artistic or not) is a "sign." This is because some artistic displays are also "signs," and some are not. To clarify, the artistic displays that are also signs are subject to regulation. The artistic displays that are not signs are just art, and because they are not also signs, they are not subject to regulation.**

**A "sign" under the sign code "is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.**

**Please see Response to Interrogatory No. 5 above for additional information responsive to this request.**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written. The City does not apply the**

**term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code. Displays that are not signs are not subject to the size limits of the Sign Code, and the City does not evaluate the size of such displays. Accordingly, the City does not have information about the location or sizes of displays that are not signs under the Sign Code. The City, does not have sufficient information to "identify" as requested. Moreover, "unregulated 'art'" (which the City interprets as displays that are not signs) cannot exceed the Sign Code's size restrictions because those restrictions only apply to regulated signs.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions that does not correspond to the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written, it does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**Pursuant to Request for Production No. 5, Defendant is producing citations issued within the last 5 years. Pursuant to F.R.C.P. 33(d), Defendant refers Plaintiffs to those documents produced in Defendant's forthcoming supplemental disclosure for information responsive to this request.**

9. Please explain how the City determines if a mural "pertains to the goods or services for sale." See Amended Complaint at ¶¶ 32, 44, 52-54, 64-65, 128.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving this objection, the City applies the Sign Code as written, it does not apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to**

**"announce, direct attention to, or advertise." Salina Code § 42-764 does not use the phrase "pertains to the goods or services for sale." Rather, Salina Code § 42-764 applies to a display if, among other things, it "announces, directs attention to, or advertises." One way to evaluate whether a display "advertises" is if it encourages the purchase of products or services, in that it pertains to or references the goods or services for sale.**

10. For any Request for Admission that you denied, please explain the reasons for your denial.

**OBJECTION: The City objects to this request to the extent it seeks to impose obligations outside the scope of, or different than, the Federal Rules of Civil Procedure. F.R.C.P. 36(4) requires a matter be admitted, or specifically deny the request or state in detail why the answering party cannot truthfully admit or deny it. Further, a denial must fairly respond to the substance of the matter.**

11. Please identify the factual basis for the claim made in your Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 2) that "Plaintiffs' display is obviously a sign".

**RESPONSE: The City refers Plaintiffs to the allegations in their Amended Complaint found at ¶¶ 15-29 for allegations showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. The City also refers Plaintiffs to the transcript attached as Exhibit A to Plaintiffs' Amended Complaint at 15:2-23 for additional facts showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. Plaintiffs sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building."**

**The Cozy Sign is a display calculated to attract the attention of the public, that is attached to or painted on a building. It is used to announce, direct attention to and advertise and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them.**

Respectfully submitted this 12th day of July , 2024.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin | Todd G. Messenger, | Amanda C. Jokerst |
| Bar Number 24170 | CO Bar Number 38783 | CO Bar Number 47241 |
| Attorney for Defendant City | Pro Hac Vice Attorney for | Pro Hac Vice Attorney for |

of Salina, Kansas
CLARK, MIZE &
LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email:
aomartin@cml-law.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
tmessenger@fwlaw.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
ajokerst@fwlaw.com

**VERIFICATION**

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

______________________________
Signature

Executed on July 12, 2024

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit E
# Herrs 30(b)(6)
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

some examples.
**Q. Okay.**
A. Not all inclusive, but those are some of the ideas.
**Q. Can a painted wall sign be unsecured?**
MS. JOKERST: Object to scope.
A. Probably not.
BY MR. SHAW:
**Q. Does the city have any records of the number of accidents caused by unsecured signs?**
MS. JOKERST: Object to scope.
A. I don't know.
BY MR. SHAW:
**Q. Can a painted wall sign be less secure than a painted mural?**
MS. JOKERST: I'll object to scope.
A. No.
BY MR. SHAW:
**Q. Okay. How does the city define the term clutter as used in this subsection?**
MS. JOKERST: Object to scope.
BY MR. SHAW:
**Q. Let me rephrase it then. What is a cluttered sign?**
MS. JOKERST: I'll object to form of the

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --

**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**

MS. JOKERST: Object to scope.

A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.

BY MR. SHAW:

**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

**fact, enhanced traffic safety?**
MS. JOKERST: Object to scope.
A. Yeah, I don't -- I don't know.
BY MR. SHAW:
**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**
MS. JOKERST: Object to scope.
A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.
BY MR. SHAW:
**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**
MS. JOKERST: Object to scope.
A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

after picture, like this is what the property values used to be. Here's what they are. I can tell you in the downtown area where we have had a lot of redevelopment that property values have gone up. We can certainly -- we could do a study as to what property values were five, ten years ago and what they are now. That exercise has not been completed but we could do that.

BY MR. SHAW:

**Q. Okay.**

A. And I'm sure it would show property values have gone up.

**Q. But the sign code in the business -- or in the downtown area, that was in effect before this increase in property value, correct?**

MS. JOKERST: Object to scope.

A. So the sign code in the downtown business -- or downtown Business Improvement District, you're asking if they predate the downtown or --

BY MR. SHAW:

**Q. You mentioned how in the past I think you said ten years or so the downtown has seen a lot of development, correct?**

A. Yes. Absolutely, yes.

**Q. And so what I'm asking is the sign code,**

**though, long predates that boom in development. Is that correct?**

MS. JOKERST: Object to scope.

A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.

BY MR. SHAW:

**Q. Okay. Section 42-500, when was that enacted?**

MS. JOKERST: Object to scope.

A. 2017.

BY MR. SHAW:

**Q. Was there a different purpose section in effect before 2017?**

MS. JOKERST: Object to scope.

A. I don't know. I didn't research that.

BY MR. SHAW:

**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the city aware of any facts that would**

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

**traffic safety?**
MS. JOKERST: Object to scope.
A. I didn't research that in preparation.
BY MR. SHAW:
**Q. Okay. And same question there for is the government aware of any facts showing that painted wall signs have a more detrimental affect on property values than paint murals?**
MS. JOKERST: Object to scope.
A. Yeah, I wasn't aware to research that particular topic, so I haven't prepared for that.
BY MR. SHAW:
**Q. All right. So we're mainly talking about the sign code here, Section 42-500 and subsequent sections here. I want to pivot now to the Business Improvement District regulations, so that's Section 2 -- I think like 201 of the city code?**
A. I don't have that one.
**Q. You don't have it?**
A. No, I don't.
**Q. Oh, okay. So --**
A. Which -- I guess where are we at because like I'm trying to figure out --
**Q. I'm talking about the BID code section**

**Q. And is this the e-mail you sent to the planning group that you're referring to right now?**

A. Yes.

**Q. Okay. So it was there on November 6th that Mr. Anderson informed Miss Driscoll?**

A. That's my understanding.

**Q. All right. And what action did the city take upon learning about the mural being painted at The Cozy Inn?**

A. I contacted Mr. Howard and invited him to come to my office to speak about it. He did. He accepted my invitation. He came to my office and we talked. I explained to him our concerns with the sign that he was in the process of painting on his north wall of The Cozy Inn property and explained to him the sign limitations that are in the C-4 district and how it appeared his sign was exceeding the maximum allowable sign area for the C-4 district.

**Q. And that was all on November 6th?**

A. That was on November 6th.

**Q. All right. When you first contacted Mr. Howard, had the city already determined that the mural at the Cozy Inn was a sign?**

A. Yes.

A. You could make the determination by walking up to it which I followed up with.

**Q. Fine. So I'll rephrase that. Could the city have made that determination without having seen the mural at the Cozy Inn, whether it's in a picture or in real life?**

A. I don't know.

**Q. I'm sorry. What was that?**

A. I'm not sure.

**Q. Okay.**

A. I mean we typically review signs by looking at the dimensions of the signs that are being proposed, and usually, its self-evident that it's a sign because it fits those attributes because of the character and elements of the sign which you have to look at to determine.

**Q. Just so I'm clear --**

A. Sure.

**Q. -- I'm not sure I was following.**

A. All right.

**Q. You have to be able to look at the potential sign to determine if it is a sign?**

A. Yes. You have to look at the character and elements of the sign.

**Q. Okay. Did the city determine that the**

**mural at the Cozy Inn announces something?**
A. Yes.
**Q. What did the city determine that it announced?**
A. It proclaims or declares to not fear the smell.
**Q. Okay. Was any other part of the mural determined to be an announcement?**
A. I mean The Fun is inside is making a proclamation of a sort, so that would be an announcement. It's announcing that there's burgers here because there's burgers on -- on the pictorials, representations of the sign.
**Q. Were any other elements of the mural considered an announcement by the city?**
A. I think those are the main ones that jump out at you anyway.
**Q. All right. Did the city determine that The Cozy mural directs attention to something?**
A. Yes. There's an arrow that points towards the pickup window and the entry door into the restaurant.
**Q. Okay. Did the city determine any element of the mural other than the arrow directed attention?**

A. Well, The Fun is inside directs you to inside, invites you inside and to go inside.

**Q. Okay. And did any other elements of the mural direct attention to something?**

A. Those would be the main ones I could think of.

**Q. Okay. And did the city determine that The Cozy mural advertises something?**

A. Yeah. So one of the products that they sell is burgers, and it has pictorial representations of burgers on the outside of the building.

**Q. Okay. Is any other element of the mural an advertisement in the city's estimation?**

MS. JOKERST: I'll object to form.

A. I mean the whole thing kind of works together as a cohesive composition for the sign -- for the sign as an advertisement, because there's a lot of burgers and there's a lot of ketchup and mustard.

BY MR. SHAW:

**Q. Okay. So then is it the city's position the entire mural is an advertisement?**

A. The city's position is the entire painting is a sign that has advertisement in it.

**calculate that approximation?**

A. The building has kind of -- well, what I would call -- what we would call a broken facade where it's got a flat roof and a facia that has different elevations to it because there's a parapet in the middle. What I did is I measured the height of the wall using Pictometry software which can get pretty close, at least for an estimation, it's good for that, where I can get the height of the wall of the lower parapet and the taller parapet. I think the lower parapet was like 11 feet and the top of the taller parapet was 13. So I took an average of like 12 feet, multiplied it by the length of the wall. And that gave me an estimate of how large that wall sign was.

**Q. Okay. Did you save that Pictometry analysis or file?**

A. No.

**Q. I don't know exactly how Pictometry works.**

A. No, I don't know if you can save but I didn't save.

**Q. All right. So there's no document showing that measurement?**

A. No.
**Q. Okay. At any point since then, has the city reevaluated whether the sign at The Cozy Inn or the painting at The Cozy Inn that we're fighting over here about whether or is or isn't a sign --**
A. Sure.
**Q. -- at any point has the city reevaluated whether or not that painting was too large for the C-4 zoning district?**
A. Well, we ran some -- a mental exercise to see if a text amendment could be approved to -- let me back up. The C-4 district allows for 3 square feet of sign area per lineal foot of building frontage. And The Cozy Inn is 20.8, nominally 21 feet of building frontage. So that comes out to nominally 63 total square foot of sign area that's allowed. We ran a scenario where if we were to propose a text amendment to allow a side wall to also be incorporated and function as a frontage of a building, even though it's not facing a street, would that provide sufficient square footage to allow the proposed Cozy Inn sign, and it was insufficient. That idea, that proposed text amendment would be insufficient for

**in this e-mail, you got those from the Pictometry software. Is that also correct?**

A. The height, the 12 feet is an estimate based on an average of the building. And the 20.8 is from the legal description. So, basically, the deed that shows the lot depth since the building is -- the building takes up the entire lot.

**Q. And that 44.4 feet measurement, how was that one taken?**

A. Yeah, I apologize. I said lot depth. The 20.8 is lot width and the 44.4 is the lot depth. And that's from the deed as well, from the legal description.

**Q. The 20.8 and the 44.4, those are both from the deed description?**

A. Um-hum. From the legal description of the property.

**Q. And 12 feet, you said that's from Pictometry?**

A. Yeah. It's an average estimate because it's got a broken facade or that has multiple heights to it.

**Q. Okay. Was any other measurement ever taken of The Cozy Inn?**

A. I think later on when we did a more

**painting would qualify as a sign under the code, it would need to see a rendition of the proposed painting?**

MS. JOKERST: Object to form and scope.

A. We would need to see a rendering of the proposed sign if it wasn't already there. I mean we'd have to see -- see it in some way to determine if the character and elements fit the definition of a sign.

BY MR. SHAW:

**Q. All right. If you could flip now to Exhibit 8.**

A. Are we done with 40? Keep it out or put it away.

**Q. You can keep it out.**

A. Okay.

**Q. We'll have to put it back.**

A. Sure. Okay. I'm at Exhibit 8.

**Q. Okay. Is Exhibit 8 a copy of a Sign Permit Application submitted by Mr. Howard on behalf of The Cozy Inn?**

A. Yes.

**Q. And what day did the city receive this application?**

A. It is dated 11/13/23 if that's the day we

different in this rendering than what's on the wall currently.

BY MR. SHAW:

**Q. What's on the wall currently is not complete, though. Is that correct?**

A. Correct. So that's why I don't know.

**Q. Okay. Is it the city's position that the mural depicted in that image does not depict burger-esque flying saucers piloting by aliens?**

A. The city's position is that we are indifferent to if it depicts burgers that are floating around, if they're being thrown around, if they're flying around, if they're being piloted by aliens or something, it doesn't matter to us.

**Q. All right. When that rendition was submitted to the city, did the city reevaluate whether or not the mural at the Cozy Inn was a sign?**

A. No.

**Q. Did the city grant this permit application?**

A. We put this permit application on hold and did not process it.

**Q. Okay. Just so I'm clear, by putting it on hold and not processing it, does that mean this**

**application was neither granted or denied?**

A. Correct. So when we met with Mr. Howard, we informed him, and when I say when we met with him, when we met with him on November -- I've got to get that, November 6 of 2023, we informed him that his proposed sign exceeded the sign maximum limitation in the C-4 district and that staff was unable to approve. And in talking with him about potential options, we expressed that we could potentially look at a text amend, and that was expressed at the meeting that we had with him later at the Smoky Hill Museum. And he seemed responsive to the idea of exploring a text amendment which would be a public process to potentially change the sign code to potentially allow signage like what Mr. Howard was proposing. And so we had -- even though we were not able to approve the sign and we informed Mr. Howard of that, we were open to trying to come up with a potential sign amendment that could allow something similar to what he was being -- what he was proposing.

**Q. So at that meeting, you mentioned at the Smoky Hill Museum?**

A. Um-hum.

**Q. Did the city tell Mr. Howard to submit a Sign Permit Application?**

A. Yes.

**Q. And at that same meeting, did the city tell Mr. Howard to submit a Certificate of Compatibility Application?**

A. Yes. So we wanted to have the sign application to know what his final vision was so that when we were working with the public we knew what the target was. Like this was his idea. We would have something real and applicable that when we were looking at potentially amending the sign code to apply it and say does this fit within the sign code, do we want it to fit in the sign code and to make sure that if we wanted this to be a permitted sign, when I say we, I mean the community at large because this would be a public conversation, what regulations would be appropriate and so that we had a target or a goal if this was something we wanted to permit to create our sign code around or our sign code amendment around.

**Q. So if I'm understanding, the city wanted to get his final, I guess, rendering so that they could have an idea of what his vision was which**

**would enable a code amendment to incorporate that vision? Is that what you're saying?**

A. Potentially. Yes. I mean that was going to be a public conversation. It wasn't going to be a decision by staff, but it was going to be a public conversation that we would have with a consultant that we had engaged in to go through this exercise to see if this is something that the city and the community wanted for the community in the downtown area or just anywhere in the community.

**Q. You just mentioned a consultant. Is that Wendy Moeller that you're referring to?**

A. Yes, that is correct.

**Q. Had she been retained on the date that that meeting at the Smoky Hill Museum took place?**

MS. JOKERST: Object to form and scope.

A. I do not believe so.

BY MR. SHAW:

**Q. Okay.**

A. She was hired at a later date with the understanding that Mr. Howard wanted to work through a public process of potentially looking at a sign code amendment that could allow his sign.

**Q. When was this application placed on hold?**

A. Well, when it came in, it was essentially put on hold because we couldn't approve it.

**Q. Okay. So the city placed it on hold immediately?**

A. Yes, because we could not approve it and we were looking at other solutions, potential solutions. City staff did not have the authority under the current sign code to permit the sign. And in order to permit the sign, it would require an amendment to the sign code.

**Q. So if you could turn to Exhibit -- give me one moment, Exhibit 9. Is Exhibit 9 a Certificate of Compatibility Application filed by The Cozy Inn?**

A. Yes.

**Q. And is it for a Certificate of Compatibility for the mural at the Cozy Inn?**

A. Yes.

MR. SHAW: We'll admit Exhibit 9.

BY MR. SHAW:

**Q. Was this submitted by Mr. Howard at the same time as the Sign Permit Application?**

A. It appears so. It has the same November 13th, 2023 date on it.

**Q. Okay. Was a -- I'm going to say DRB, but**

## CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

Sandra S. Biggs
________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS
STATE OF KANSAS
CERTIFIED SHORTHAND REPORTER

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 8 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*