**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 9 of 16, Pages 1-259**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit F
# Salina City Commission Transcript

Exhibit A

SALINA CITY COMMISSION MEETING

held on
November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 6 of 45


playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 20 of 45


minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 22 of 45


about a scaling of something or, you know,
how -- how a different change in rules would
look, you're going to need to kind of create
new visuals to go over with the group to say,
okay, well, that's what it looks like here,
that's what it looks like here and that's what
it looks like here in the C4.
Is that what you were hoping this
rule change would do? And so people are going
to have to see those visuals. And somebody
being able to produce those in a timely manner
is also part of kind of what helps move this
along, rather than staff in amongst phone
calls and other day-to-day things, trying to
produce those materials, plus research code,
plus rewrite and do all of those others
things.
MR. SCHRAGE: So we -- in what little
time we have had, we brainstormed a little bit
about, okay, what's unique about that
location. Could it be acceptable.
And I think the conversation was not
just absolute objection to it, but it then
quickly becomes, well, how do we write
something that that's acceptable but it

doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 27 of 45


definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 29 of 45


But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 30 of 45


location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 31 of 45


the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 35 of 45


right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 36 of 45


beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 37 of 45


know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 38 of 45


When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 39 of 45


have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 40 of 45


that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 41 of 45


and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 42 of 45


place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

Case 6:24-cv-01027-TC Document 108-6 Filed 02/28/25 Page 43 of 45


it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

# C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter

Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

# Exhibit G
# Schrage Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

MICHAEL SCHRAGE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:09 a.m. on the 11th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**Q. What else?**
A. I think that was it.
**Q. A printout of the codes and how they're interpreted. Is that what you said?**
A. For the purpose of having a conversation with Steve and his artist about how -- what the applicable code was relative to what he had started.
**Q. Did you -- and forgive me, you think you saw Dustin Herrs give that packet?**
A. Yeah, that's my recollection.
**Q. Okay. So going back to Deposition Exhibit 19, I just want to make sure I understand, the determination had already been made by November 8th that the artwork was a regulated sign?**
MS. JOKERST: Object to form and foundation.
A. Yeah. I would say my preliminary opinion based on what I saw was that it met the definition of a wall sign.
BY MR. MACROBERTS:
**Q. On the next sentence, what did you mean when you said while it aesthetically might look similar to murals in the downtown elsewhere, it**

**contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things?**

MS. JOKERST: Object to form.

A. So I was trying to boil down the applicable portion of the sign code definition and how it is that the Cozy sign met the definition of a sign by our code and then became subject to the applicable size limits.

BY MR. MACROBERTS:

**Q. And what part of the code were you trying to boil down?**

MS. JOKERST: Object to form.

A. All the content of the definition of a sign or at least parse out what was applicable in this case.

BY MR. MACROBERTS:

**Q. And what was your understanding of what was applicable on November 8th?**

A. Advertising --

MS. JOKERST: Object to form.

A. Advertising among -- I don't have the definition committed to memory but directing attention to and advertising.

**Q. Do you recall giving a media interview to KSN?**

A. Yes.

**Q. Have you reviewed -- did you see the version that was aired?**

MS. JOKERST: Object to form and foundation.

A. At the time.

BY MR. MACROBERTS:

**Q. If you would, please, turn to Deposition Exhibit 92.**

A. Okay.

**Q. I can't tell from my electronic version whether this is 304 or 305. But there's a quote that's attributed to you?**

A. Okay. There's one at the bottom -- starts at the bottom of 304 and rolls over to 305.

**Q. I'll read to you the quote. It includes a message that pertains to the good or services for sale and that makes it a sign and makes it subject to the sign code said Mike Schrage, Salina City Manager. Do you see where --**

A. Yes.

**Q. -- that is?**

A. Yeah.

**Q. You said that to the reporter?**
A. Yeah, I believe so.
**Q. There's no reason to think you didn't say that, right?**
A. Right.
**Q. Okay. If you could please turn to Deposition Exhibit 39.**
A. Okay.
**Q. What is -- and you might laugh at this question. What is a City Manager Update?**
MS. JOKERST: Object to form.
A. It's a document that I draft most weeks. I haven't been doing nearly as well lately. But just trying to summarize various things that come up to keep the city commission informed.
BY MR. MACROBERTS:
**Q. Is it typically a weekly summary?**
A. That's the goal. Yeah, that's the goal.
**Q. Did you author -- I know I'm already laughing at this question, but did you author the City Manager Update that's at Deposition Exhibit 39?**
A. Fair question. If I could get somebody else to, I would but, yes, I did.
**Q. Including the e-mail?**

**Q. Did you meet with Steve the day of the city commission meeting on November 13th?**

MS. JOKERST: Object to form.

A. Yes. On line 24, I said we met with Mr. Howard and his artist this morning, so I presume that November 13th was the date, and I met with him the morning of November 13th.

BY MR. MACROBERTS:

**Q. Part of why I'm asking this question, sometimes people say we and they're speaking about other people?**

A. Sure.

**Q. So --**

A. No. This reference is intended to include me.

**Q. On page 4, lines 13 through 15, you were telling the city commission you wanted to clarify a couple of things. And you told the city commission that, quote, the issue is not about the art. What did you mean by that?**

A. I was --

MS. JOKERST: Object to form.

A. I was trying to proactively respond to the accusations that were flying about the community that we had vetoed this particular

**Q. Based upon your understanding of the code, the display or the art does factor into whether it's deemed a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why is that?**

A. It's not about the art. It's about the definition of a sign.

**Q. And when you're talking about the definition of a sign, you need to look at the display to figure that out. Is that right?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. What are the -- so we're going to stick with page 4 for a little bit here. What are the examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated. What are those examples?**

A. Well, the one --

MS. JOKERST: Form and foundation. I've got to get my objection in.

station was conflating a lot of broad topics not applying our code.

BY MR. MACROBERTS:

**Q. So as you understand the city code, that display is a regulated sign?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. What did you mean when you said we do not regulate based on aesthetics?**

MS. JOKERST: Object to form.

A. Again, I was trying to confirm that we -- this was not an opinion of whether we like the aesthetic aspects of the sign. It was purely a question of is it a sign and does it meet our codes.

BY MR. MACROBERTS:

**Q. And I think later on you commented that the mural popped?**

MS. JOKERST: Object to form.

A. I did or a commissioner did. I've got to confirm that a commissioner did.

BY MR. MACROBERTS:

**Q. Later on you told the city commission, quote, and I would reiterate it's all on the basis**

**of a commercial message. Do you remember saying that?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. And that was truthful and accurate?**

MS. JOKERST: Object to form and foundation.

A. As it applied to my understanding of the Cozy sign, yes.

BY MR. MACROBERTS:

**Q. At some point, Ms. Driscoll, which you just referenced, talked about the coffee shop hypothetical. Do you remember that hypothetical?**

A. Yes.

**Q. Do you agree with that hypothetical as it relates to the Salina city code?**

MS. JOKERST: Object to form and foundation.

A. That's consistent with my understanding of the case in question, and I think it is illustrative of how we have an example that would -- we would have to parse our code to make a determination as she described.

BY MR. MACROBERTS:

foundation.
A. Among others, but yeah.
BY MR. MACROBERTS:
**Q. Is it popular?**
A. It's not unpopular. It's not widely popular but, yeah, it's appreciated by most.
**Q. As I understand it, it does generate enthusiasm and energy?**
A. Yeah. It generates conversation and tourism. It's not without its detractors.
MR. MACROBERTS: All right. I would like a two-minute break. We can go longer if somebody would like.
MS. JOKERST: Yeah, take five minutes. Two is a little long for me to go grab some water.
MR. MACROBERTS: Yep, sounds good.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. If you would please turn to Exhibit 93?**
A. Okay.
**Q. Do you recognize it?**
A. Yes.
**Q. Did you author it?**
A. Yeah.

**Q. Is Deposition Exhibit 93 the same as the electronic version?**

A. I believe so, yes.

**Q. And no reason to think it's not?**

A. No.

**Q. Do you know why you authored this e-mail?**

MS. JOKERST: Object to form.

A. I wasn't sure whether he was even aware of the conversation and that Boom! Salina might get caught up in the conversation. I was just trying to make him aware of what had taken place and where things stood.

BY MR. MACROBERTS:

**Q. Did you write this e-mail on your own initiative?**

A. Yes.

**Q. When you say he, who do you mean?**

A. I'm sorry. Do I say it in the e-mail or I just said it verbally?

**Q. As I heard your answer, you were saying he and I'm assuming --**

A. Oh, Travis Young, the recipient of the e-mail.

**Q. Why are you telling Travis what your intended response is?**

MS. JOKERST: Object to form.

A. He, as I mentioned earlier, is the organizer of Boom! Salina and they had been kind caught up -- that project had been caught up in the conversation. It's just good form to try to keep people informed.

BY MR. MACROBERTS:

**Q. You tell Travis that your intended response is to stress that we have been very mindful of the Reed v. Gilbert case as well as applicable case law regarding what constitutes commercial speech. What applicable case law constitutes commercial speech were you referencing?**

A. Those --

MS. JOKERST: Object to form.

A. Those examples that I shared earlier, general understanding of the various litigation that had gone on previously.

BY MR. MACROBERTS:

**Q. If you would, please turn to Deposition Exhibit 52. Do you know who authored Deposition Exhibit 52?**

A. Based on the letterhead, it appears that Dustin Michelson as well as the signature block.

A. Yes.
**Q. What is it?**
A. It's the batting -- or the -- I don't even know how to describe it but kind of an indoor athletic area for The Yard.
**Q. The Yard, are you familiar with The Yard?**
A. Yes.
**Q. What do they do on the inside of The Yard?**
A. Baseball, softball instruction.
**Q. If you look to the right where it says Salina, do you see the Royals crown vision --**
MS. JOKERST: Object to form and foundation.
BY MR. MACROBERTS:
**Q. -- board?**
A. Yes.
**Q. Is that what you understand that to be, the Royals crown vision board?**
A. I don't know if they have avoided trademark infringement enough, but it generally represents it, yes.
**Q. You've been to Royals games, right?**
A. Yeah.
**Q. Okay. As you are looking at the right**

**side, based upon your understanding of the city code, is that a sign?**
MS. JOKERST: Object to form and foundation.
A. No.
BY MR. MACROBERTS:
**Q. Why not?**
A. Interior -- inside versus outside orientation.
**Q. And help me understand why that matters under your understanding of the city code?**
MS. JOKERST: Object to form.
A. It's one of the provisions of our definition of a sign.
BY MR. MACROBERTS:
**Q. Is it your understanding that anything that is inside is unregulated?**
MS. JOKERST: Object to form and foundation.
A. No.
BY MR. MACROBERTS:
**Q. What is your understanding?**
A. If there's an outward orientation, if it's on the inside of a plate glass window, it's applied at the staff level, but it's not -- there

**Q. Based upon your understanding of the city code, is the display at Deposition Exhibit 73, and we'll just talk about page 80 because it's a little bit easier, does that constitute a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

MS. JOKERST: Object to form and foundation.

A. It doesn't meet any of the definitional elements of a sign by our code.

BY MR. MACROBERTS:

**Q. Does it bring people to Salina?**

MS. JOKERST: Object to form and foundation.

A. I believe so.

BY MR. MACROBERTS:

**Q. It's my -- correct me if I'm wrong, but it's my understanding that the inside of the grain elevator is defunct, right? There's nothing going on on the inside?**

A. Yeah, that's my understanding as well, yeah.

**Q. If a playground, an indoor playground was built inside of that grain silo today, based upon your understanding of the city code, would that be a sign?**

MS. JOKERST: Object to form and foundation.

A. I would seek legal counsel to answer that question.

BY MR. MACROBERTS:

**Q. Because you could not determine it on your own?**

MS. JOKERST: Object to form and foundation.

A. Correct.

BY MR. MACROBERTS:

**Q. If you would please turn to Deposition Exhibit 71. Do you recognize it?**

A. Hang on.

**Q. Sorry.**

A. Yes.

**Q. What is it?**

A. It is a graphical image on Fire Station No. 2.

**Q. Do you know if that's a painting or photographs or what is the display made of, if you**

**know?**
MS. JOKERST: Object to form.
A. It's a metal core board. I don't know what they call it exactly, but it's like a structural metal panel with this etched on it in some way.
BY MR. MACROBERTS:
**Q. Based upon your understanding of the city code, is that -- are the displays considered signs?**
MS. JOKERST: Object to form and foundation.
A. They could be, yes.
BY MR. MACROBERTS:
**Q. What about that makes it a sign or could be -- could make it a sign?**
MS. JOKERST: Object to form and foundation.
A. It -- I'm trying to think of the definition, but it's calling attention to the fire station. It may not be the exact wording in the definition but...
BY MR. MACROBERTS:
**Q. Do you know whether a permit or Certificate of Compatibility was applied for for**

guess that's the extent of it.
BY MR. MACROBERTS:
**Q. Do you know what goes on the inside of the building where that display is painted?**
A. It's a Land Title company.
**Q. Do you know who owns the Land Title company?**
A. Mike Hoppock.
**Q. At the time this was repainted, was Mr. Hoppock a city commissioner?**
A. Yes.
**Q. Did Mr. Hoppock apply for a permit?**
MS. JOKERST: Object to form and foundation.
A. I believe so, yes.
BY MR. MACROBERTS:
**Q. And did Mr. Hoppock go to the Design Review Board?**
A. I believe so, yes.
MS. JOKERST: Sorry. I wasn't sure if your question was finished. Object to form and foundation.
BY MR. MACROBERTS:
**Q. Going back to your -- or going back to Ms. Driscoll's coffee shop hypothetical and the**

**one that you referenced, based upon your understanding of the city code and thinking about the coffee shop hypothetical, if Mr. Howard painted an airplane on the side of his wall with no verbiage at all, was just a silver airplane, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

MS. JOKERST: Object to form and foundation.

A. It doesn't rise to the criteria specified in our sign code definition.

BY MR. MACROBERTS:

**Q. Is that because Mr. Howard does not sell airplanes on the inside of his business?**

MS. JOKERST: Object to form and foundation.

A. Not just airplanes but, yeah, no direct connection to his business and the depiction of an airplane.

BY MR. MACROBERTS:

**Q. On the coffee shop hypothetical, if a**

**coffee shop painted a dove on the side of its wall and instead of having an olive branch had painted a coffee branch, based upon your understanding of the code, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. I would seek legal counsel on that but, yes, I believe so.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol's works?**

A. Marilyn Monroe and the tomato cans maybe.

**Q. Yeah. On the tomato can, have you seen that one before?**

A. Quite sometime ago.

**Q. If Mr. Howard had painted an exact replica of Andy Warhol's Campbell's Soup can on the side of his wall, exact replica, would that be considered a sign under your understanding of the city code?**

MS. JOKERST: Object to form and foundation.

A. Applying on my understanding of the definitional criteria, no, I don't believe it would be a sign.

BY MR. MACROBERTS:
**Q. Why not?**
MS. JOKERST: Object to form and foundation.
A. I don't know that it advertises, calls attention to, directs anything pertaining -- as you've described it, anything that he does.
BY MR. MACROBERTS:
**Q. If Mr. Howard started selling Campbell's Soup inside, would that change the analysis for you?**
MS. JOKERST: Object to form and foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. If -- and forgive me. I think there's a grocery store. Is it called DG Grocery Store in town?**
A. Dollar General.
**Q. Okay. Let's just use as a hypothetical a grocery store. If a grocery store paints an exact replica of Andy Warhol's Campbell's Soup can on the side of its wall, would that be considered a sign under your understanding of the code?**
MS. JOKERST: Object to form and

foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. Why?**
MS. JOKERST: Object to form and foundation.
A. Directing attention to and advertising products that they sell.
MR. MACROBERTS: I think we are close if not maybe done. If I could get maybe five minutes just to double-check that I've asked everything I wanted to.
MS. JOKERST: Yeah, that works for me because I would like a little break, too. I might have a couple of questions here, so I can organize my thoughts.
MR. MACROBERTS: Can we go off the record just for a moment.
MS. JOKERST: Yeah.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. Was there one person who made the decision that the display at the Cozy was a sign or not?**
MS. JOKERST: Object to form.

A. Not to my -- I think it was a collective staff analysis and conclusion.
BY MR. MACROBERTS:
**Q. And for the collective staff analysis and conclusion, who do you mean?**
A. I presume -- certainly Lauren Driscoll and Dean Andrew, and then possibly their planning staff.
**Q. I'm sorry?**
A. Possibly additional planning staff.
**Q. Like who?**
A. Dustin Herrs, I don't even know if Gage Roberts was employed at that point, but we've got a couple planners.
**Q. Are you aware if there have been any traffic accidents as a result of the -- as a direct result of the display on the side of the Cozy?**
MS. JOKERST: Object to form.
A. No, I'm not.
BY MR. MACROBERTS:
**Q. Are you aware of any pedestrian accidents as a direct result of the display at the Cozy?**
MS. JOKERST: Object to form.
A. No, I'm not.

BY MR. MACROBERTS:
**Q. Is there any health hazard that you can think of as a direct result of the display at the Cozy?**
MS. JOKERST: Object to form.
A. Direct result, no.
BY MR. MACROBERTS:
**Q. Are you aware that property valuations have gone down as a direct result of the Cozy?**
MS. JOKERST: Object to form.
A. I'm not aware either way.
BY MR. MACROBERTS:
**Q. When you're out and about in the community, has the public been generally in favor of the Cozy's display?**
MS. JOKERST: Object to form and foundation.
A. It's been mixed.
BY MR. MACROBERTS:
**Q. Have you received any complaints about the Cozy's display?**
A. Complaints -- I've received critical feedback, criticism.
**Q. Formal complaints?**
A. No.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

# Exhibit H
# 11/13/23 Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**November 13, 2023**
**4:00 p.m.**

Vice-Mayor Longbine asked the Clerk for verification that notice had been sent for today's City Commission meeting. The Clerk replied yes.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. A roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Vice-Mayor Bill Longbine (presiding), Trent W. Davis, M.D., Greg Lenkiewicz, and Karl Ryan.

Also present: Mike Schrage, City Manager; Jacob Wood, Deputy City Manager; Shawn Henessee, Assistant City Manager; Greg Bengtson, City Attorney; and Nikki Goding, City Clerk.

**AWARDS AND PROCLAMATIONS**

(3.1) Proclamation of the month of November, 2023, as National Home Care and Hospice Month. Debra Bengston, President of Accessible Home Care and Gentiva Hospice, joined by Lyndsey Webb and Nikki Welsh, read the proclamation and discussed related activities.

**PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME**

None.

**CONSENT AGENDA**

(5.1) Award the bid for updated park trash receptacles in the amount of $147,895.10 and authorize the City Manager to authorize the purchase upon the fulfillment of all prerequisites under the purchasing policy.

(5.2) Award a quote for five (5) gas utility vehicles using cooperative purchasing in the amount of $68,011.76 and authorize the City Manager to authorize the purchase upon fulfillment of all prerequisites under the purchasing policy.

(5.3) Approve the minutes of the meeting of November 6, 2023.

23-0337 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve the consent agenda as presented. Aye: (4). Nay: (0). Motion carried.

**ADMINISTRATION**

(6.1) Approve Ordinance No. 23-11181 on second reading approving the execution of Amendment No. 1 to the Loan Agreement between the Kansas Department of Health and Environment and the City of Salina for the purpose of financing improvements to the Wastewater Treatment Plant (KWPCRF Project No. C20 2049 01).

Vice-Mayor Longbine stated Ordinance No. 23-11181 was passed on first reading on November 6, 2023. Since that time, no comments have been received.

Schrage
EXHIBIT NO. 33
APPINO & BIGGS

Consolidated-Salina EPN111155

I 23-0338 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Ordinance No. 23-11181 on second reading. A roll call vote was taken. Aye: (4). Nay: (0). Motion carried.

(6.2) Approve Ordinance No. 23-11182 on second reading approving the execution of a Loan Agreement between the City of Salina and the State of Kansas for the purpose of financing drinking water service lines inventories to account for any lead service lines (Kansas Water Supply Loan Fund Project No. 3185).

Vice-Mayor Longbine stated Ordinance No. 23-11182 was passed on first reading on November 6, 2023. Since that time, no comments have been received.

23-0339 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Ordinance No. 23-11182 on second reading. A roll call vote was taken. Aye: (4). Nay: (0). Motion carried.

(6.3) Authorize the City Manager to execute agreements with Fire Facilities, Inc. for the cost of materials in the amount of $35,836.00 and JTL Construction in an amount not to exceed $6,600.00 for labor associated with repairs to the City of Salina Fire Department Training Tower, for a total cost not to exceed $42,436.00.

Drew Sprague, Division Chief of Training for the Salina Fire Department, explained the request, fiscal impact, and action options.

A short discussion on the variance of pricing between bids was had, relating to travel expenses for recommended out-of-state repair contractors.

I 23-0340 Moved by Commissioner Ryan, seconded by Commissioner Davis, to authorize the City Manager to execute agreements with Fire Facilities, Inc. for the cost of materials and with JTL Construction for labor associated with repairs to the Training Tower, and to authorize the City Manager to reallocate the 2023 sub-CIP funds in the amount of $42,000 planned initially for bailout harnesses to Training Tower repairs. Aye: (4). Nay: (0). Motion carried.

(6.4) Award the low bid for construction of the new Sanitation equipment storage building.

Jim Kowach, Public Works Operations Manager, explained the request, fiscal impact, and action options.

The ensuing discussion focused mainly on the pros and cons of bonding versus paying up front in cash for the building construction and how the City will recoup funds from paying cash.

Mike McCall with M Squared Architects advised starting construction sooner rather than later as metal prices are set to rise again very soon.

E 23-0341 Moved by Commissioner Davis, seconded by Commissioner Ryan, to approve the target sanitation fund balance be increased from $500,000.00 to $750,000.00 and approve the low base bid and add-alternate 1 bid for the new Sanitation building and authorize the City Manager to execute a contract in the amount of $812,242.00 with Ponton Construction, Inc. from Salina, Kansas, funding out of cash reserves in the Sanitation Fund. Aye: (4). Nay: (0). Motion carried.

(6.5) Approve Charter Ordinance No. 43 on first reading exempting the City of Salina from certain parts of Chapter 308 (Senate Bill 508) of the Session Laws of 1937, as amended by Chapter 250 (Senate Bill 341) of the Session Laws of 1939, an act authorizing certain cities of the first class to convey certain property to the Board of Education of such city.

Shawn Henessee, Assistant City Manager, explained the request, fiscal impact, and action options.

A brief discussion on anecdotal history of the property was had among the City Commissioners and staff.

Greg Bengtson, City Attorney, highlighted that the residences bordering the land in question to the south are not part of this action.

23-0342 Moved by Commissioner Ryan, seconded by Commissioner Davis, to approve Charter Ordinance No. 43 on first reading. A two-thirds vote was necessary to advance the motion. Aye: (4). Nay: (0). Motion carried.

**DEVELOPMENT BUSINESS**

None.

**OTHER BUSINESS**

Commissioner Longbine asked for updates on a proposed Safe Haven baby box at the Salina Fire Department, for which Fire Chief Tony Sneidar provided an update.

City Manager Mike Schrage brought forward discussion on a mural being painted on the side of Cozy's Inn. There had been misunderstandings surrounding the mural as its content falls under sign provisions in the City Code rather than art, and City staff met with the owner of Cozy's to discuss options. After background details were provided by Lauren Driscoll, Director of Community and Development Services, the City Commission felt it may be in the best interest of those involved to bring in outside consultants who are experts in sign codes and art as advertisement to find a way forward that's amenable to the public while still respecting Supreme Court rulings and code provisions.

**CITIZENS FORUM**

Norman Mannel, Salina, Kansas, shared his thoughts on governments regulating private businesses.

Ken Reitz, Salina, Kansas, gave his feelings on artists and murals around town.

Johnny Keller, Salina, Kansas, made a point that the murals around Salina serve to bring people into the City, effectively working much the same as the Cozy's mural aims to bring in customers to their business. He wondered if there was a way to evaluate situations such as this one on a case-by-case basis.

**EXECUTIVE SESSION**

**ADJOURNMENT**

23-0343 Moved by Commissioner Ryan, seconded by Commissioner Davis, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (4). Nay: (0). Motion carried. The meeting adjourned at 5:44 p.m.

Michael L. Hoppock, Mayor

[SEAL]

ATTEST:

Nikki Goding, City Clerk

# Exhibit I
# Art Center DRB Packet

Historic Salina Downtown
Lee District

# DESIGN REVIEW BOARD

Exhibit C

LEE DISTRICT — SALINA DOWNTOWN INC.

**DESIGN REVIEW BOARD**
**4:00 P.M., Thursday, April 23, 2015**
**City Conference Room 107**
**City-County Building, 300 West Ash Street**

## AGENDA

1. Administration:
   A. Call to Order/Roll Call.
   B. Additions or corrections to the agenda.
   C. Review of Minutes for March 26, 2015 meeting.
   D. Introduction of guests.

2. New Business:

2A. The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review and receive public comments regarding a façade improvement project that has been planned for the Art Center's South Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the South Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

3. Other Business:

4. The next regular meeting, if scheduled, will be on May 14, 2015.

5. A motion to adjourn is in order.

Andrew
EXHIBIT NO. 12
APPINO & BIGGS

***An applicant or his representative is required to attend the hearing in order for the Design Review Board to take action on an application.***

City of Salina/Development Services — Planning Division — City-County Building — 300 W. Ash Street, Room 201
Salina, KS 67402-0736 — 785/309-5720 — FAX 785/309-5713 — email: john.burger@salina.org

***Design Review Board Members:*** Michael Trow – ***Chair***
Daniel Baffa, Larry Bunker, Maggie Gillam, Tina Lewis – Vice Chair

***Salina Downtown Inc.*** 120 West Ash Street PO Box 1065 Salina, Kansas 67401 785-825-0535
***Interim Executive Director:*** Penny Bettles Email: pbettles@salinadowntown.com

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion.

Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address, and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant, and/or citizens as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

Any person dissatisfied with a decision by the board to either grant or deny a certificate of compatibility may appeal the decision to the Board of City Commissioners by filing a written protest with the City Clerk on a form provided by that office. The notice of appeal must be filed within fourteen (14) calendar days after the conclusion of the public hearing. If you have any questions or concerns, please contact the Development Services Department in Room 201 of the City-County Building, 309-5720.

(7-16-14)

City of Salina

# Application for a Certificate of Compatibility
## Lee District - Design Review Board

*Please return the completed application to:*
**Development Services Department**
300 W. Ash, City-County Building, Room #201
Salina, KS 67402-0736
785-309-5720 FAX 785-309-5713
Email: john.burger@salina.org

*The City Planning Department:*

- *Provides technical assistance to the applicant*
- *Receives the completed application*
- *Provides a copy of the application to the SDI Office for input*
- *Schedules the Design Review Board hearing*
- *Presents the application to Design Review Board*

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. The applicant must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 242 S. Santa Fe Ave.
2. Name of Business Salina Art Center
3. Applicant's Name Salina Art Center (Bill North) 4. Applicant Ph. 827-1431
5. Applicant's Address same 6. Email bnorth@salinaartcenter.org

7. Property Owner Name (if different) ______
8. Property Owner Address ______ 9. Owner Ph. ______
9. Contractor/Architect Conrad Snider 10. Phone 316-288-8694
11. Contractor/Architect Address 310 W. Fourth, Newton, KS 12. Email conrad@southwind.net

13. What kind of work is proposed? (please check all that apply)
☐ Renovation or repair ☐ Demolition ☐ Sign or Canopy ☐ New Construction ☐ Paint
☒ Other, please describe Ceramic tile mural
14. Approximate cost of project (including labor and material) $18,250

**Please attach the following materials to the application:**

1. Representative color photographs showing the existing structure and the location for the proposed work.
2. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
3. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
4. Material samples or product specifications indicating color, form, profile and texture.
See also the attached *Guide to Completing a Certificate of Compatibility Application* for required submittal material for project types: new construction, renovation or repair, sign or canopy or demolition.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**
See attached

Applicant Signature: Bill North Date 4/10/2015

Property Owner Signature (if different): ______ Date ______

**For Staff Use:** **Application** DRPCS-1
Legal Description of Property LOTS 158 & 160 ON SANTA FE, ORIGINAL TOWN

Current Zoning C-4
Date Filed 4-10-15
Date of Publication NA
Property Owner Notice Sent 4-15-15
Date of Hearing 4-23-15
Current Use ART GALLERY/EDUCATION
Accepted by J BURGER
Building/Sign Permit No. NA
Heritage Commission Review (y/n) NO
Approval Notification Sent ______

Attachment, Salina Art Center, Application for a Certificate of Compatibility, Lee District, Design Review Board

The proposed project is a ceramic tile mural along the Art Center's Santa Fe Avenue façade. The specific location is the 12 x 23 ft. bay between the Art Center's original Santa Fe entrance and the current entrance. Ceramic artist Conrad Snider will create and install the mural. A three-time SculptureTour Salina exhibitor, Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be fired to Cone 10 (2,300 degrees Fahrenheit), which will vitrify the clay, making it resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with an epoxy grout.

The mural design will take into consideration the exterior of the building, including colors and surfaces of the brick, ceramic elements on the center pillar, and roof tiles. The space allowed for the tile mural is approximately 12 feet by 23 feet, for a total of 230 square feet (see attached photo).

Case 6:24-cv-01027-TC Document 108-9 Filed 02/28/25 Page 6 of 31

**STAFF REPORT**
**LEE DISTRICT DESIGN REVIEW BOARD**

Hearing Date: **April 23, 2015**

## ITEM

The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review a proposed façade improvement/art installation project that has been planned for the Art Center's Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

## BACKGROUND

Conrad Snider, a Newton, Kansas ceramic artist has been commissioned to create and install a mural comprised of handmade ceramic tiles that would be attached to the stucco wall in the Art Center façade. The art installation will become a permanent feature of the Art Center's Santa Fe façade. The mural will be comprised of sculptural elements existing on the exterior of the building, including the brick, terra cotta and the Spanish Tile roof. Mr. Snider's work is found throughout the state and includes the *Points of Contact* ceramic mural located in the Salina's First Presbyterian Church, and the *Woven* terra cotta figures in front of Salina's Municipal Court Building.

A Ceramic Workshop has been scheduled by the Salina Arts and Humanities Department under the Horizon Grants Program that will involve up to 12 participants of the community. Under the direction of the artist, Conrad Snider, participants will assist in the creation of a scale model of a ceramic tile mural for the exterior of the Art Center. The series of workshops at the Art Center Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Mr. Snider's permanent sculptural mural. The art installation would become an important feature of the Art Center's visual identity and downtown Salina's streetscape. The workshop is open to high school students and adults with no experience in ceramics required. A call for the Ceramics Workshop is attached to this report.

## PHYSICAL CHARACTERISTICS

Records indicate that the one-story storefront building on Lot 160, addressed as 240-241 S. Santa Fe was originally constructed of brick with a Mission Revival cornice and Spanish Tile roof in 1929. A one-story storefront building addressed as 236-238 S. Santa Fe was constructed on Lot 158 in 1946. The Knights Sporting Goods Company and various storefronts occupied 238 and 240 S. Santa Fe until 1987. A building permit was issued in August 11, 1987 to convert the space at 240-242 S. Santa Fe to the Salina Art Center at a cost of $237,000. The space was opened to the public on January 11, 1988. Architect Donnie Marrs enclosed the storefront facing Santa Fe with two bays, having arched stone surrounds, a building base and terra cotta tile columns.

The Art Center expanded into the space at 236-238 S. Santa Fe in 1992, establishing an open floor plan education wing that included additional gallery and work space, restrooms and storage. Jones-Gillam Architects designed an all glass storefront with a sculptured metal canopy on the Santa Fe façade and a covered courtyard at the rear of the building.

An artist in residence warehouse was established in a commercial space at 149 S. 4th Street in 2008. The space is occupied by an open work area and an apartment for Artist-in-Residence exhibitors at the Salina Art Center. This space is utilized as a workshop and for various activities and projects of the Art Center throughout the year.

## PROPOSAL

The proposed project would include the installation of a ceramic tile mural along the Art Center's Santa Fe façade. The work would be located in the northern one-half of the original Art Center building. The specific location is the 12 ft. by 23 ft. bay between the original Art Center entrance on the south and the education wing to the north. This area is delineated by the arched stone surround and the stone building base at the sidewalk.

Ceramic artist Conrad Snider will create and install the mural. Mr. Snider is a three-time Sculpture Tour Salina exhibitor and maintains a work studio in a renovated 1920's feed mill in Newton, Kansas. A summary description of Mr. Snider's work is maintained on his website, a copy of which is attached to this report.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be formed and fired in a kiln to vitrify the clay and make it water resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with epoxy grout to match the tile

The mural design will take into consideration work done at a Ceramic Workshop being sponsored by the Salina Arts and Humanities Horizon Program where a scaled prototype will be designed and constructed. The composition of the proposed mural will utilize the colors and surface textures of the brick, ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. The space allowed for the tile mural is approximately 12 feet by 23 feet, totaling 230 sq. ft. This blank stucco area on the Art Center façade has been utilized in the past for temporary art installations.

## STAFF ANALYSIS

Installation of public art does not require a Certificate of Compatibility however; a public hearing has been scheduled before the Lee District Design Review Board in order to receive comments on the compatibility of the art piece to submit as part of a grant application to the Façade Development Incentive Program (DIP) of Salina Downtown, Incorporated. The grant program is designed for large and small scale projects for new

construction, renovation of building facades and interiors of existing historic buildings. The program is designed primarily for façade improvements to the exteriors of buildings in the Lee District. The amount of any grant is contingent on the scale of the project and available funds. Non-profit Salina Downtown, Inc. partner businesses located in the Lee District boundary are eligible to apply for DIP funds.

The proposed project appears eligible for the DIP program as a façade renovation and restoration project. Work found to comply with the Salina Downtown Guidelines (contingent on Design Review Board approval) is an eligible use of funds.

> The Design Guidelines for Downtown Salina, 2008 contains the following Policies relating to Architectural Character:
>
> ***Building materials should be visually compatible with the predominate materials of the downtown area.***

The historical use of terra cotta and ceramic tile accents and trim is consistent throughout the Blocks of North and South Santa Fe. Evidence of this can be found at 117-119 S. Santa Fe and 111-125 East Iron Avenue, among others. It is integral to the Spanish Revival style of architecture used by Salina architects, such as Charles Shaver during the 1930's. Much of this is attributed to the influence of J. C. Nichols' development of the Country Club Plaza in Kansas City. The 200 Block of South Santa Fe West elevation contains several Spanish Revival style facades.

It appears that the mural design program will utilize the colors and surface textures of the brick, terra cotta and ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. This would appear to be consistent with the Design Guidelines.

**<u>REQUESTED ACTION</u>**

Similar to the addition of a new storefront, awning or other permanent improvement or renovation of an existing architectural element, it is appropriate for owners and residents potentially affected by such an activity in the Lee District to receive notice and an opportunity to be heard on the matter.

A public hearing was been scheduled for the Design Review Board to receive public comments and input about the mural design and installation. As a general rule, an art installation does not fall within the scope of authority of the DRB, however in this case the DRB is being asked to make a recommendation on this proposed art project for use with an application being made under the Façade Development Incentive Program of SDI.

The art installation is intended to be a permanent element similar in function to a sign or logogram that will direct the public to the gallery and educational activities within the Art Center building. It is also intended to enrich and engage members of the public visiting

or doing business within the Downtown area. Letters of notice were sent to surrounding property owners announcing this public hearing. Since the Lee District Design Review Board customarily reviews exterior improvements in the Lee District, it is appropriate for this Board to receive comments from the public at the hearing concerning the art installation as a requirement of the Façade Development Incentive Program. A description of the DIP Program is attached to this report.

A record of the proceedings and any verbal or written comments received will be provided to the Façade Development Incentive Program (DIP) Review Committee for their use in analyzing a potential grant award for this project. Grant awards are made during May and September of each calendar year.


Facade Improvement
Salina Art Center
242 S. Santa Fe Avenue
SALINA ART
CENTER
Santa Fe Ave
Request Area
Mulberry St
N
W
E
S

# CALL FOR
# CERAMIC WORKSHOP
# SALINA ART CENTER MURAL

Case 6:24-cv-01027-TC Document 108-9 Filed 02/28/25 Page 14 of 31

# CERAMIC WORKSHOP PARTICIPANTS NEEDED

Modeling Community: Salina Art Center Façade Mural Project

Limited to 12 participants - **SIGN UP TODAY!**

Under the direction of acclaimed ceramic artist Conrad Snider, participants will assist in creating a scale model of a ceramic tile mural for the exterior of the Art Center's Santa Fe Avenue façade. A series of workshops at the Art Center's Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Snider's permanent sculptural mural, which will become an important feature of the Art Center's visual identity and downtown Salina's streetscape.

This project was funded in part by the Horizons Grants Program of the Salina Arts and Humanities Foundation. Funding is provided by Horizons, a private donor group.

Three-time SculptureTour Salina exhibitor Conrad Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

**WHAT:** Ceramic mural workshop with Conrad Snider.

**WHO:** The workshop is open to high school students and adults. No experience with ceramics necessary.

**WHEN:** Wednesday, **April 22, 4-6 p.m.**; Thursday, **April 23, 4-7 p.m.**; and 3 sessions before May 6 (dates and times TBD on April 22).

**WHERE:** The Salina Art Center Warehouse, 149 S. 4th St.

**HOW:** Register online (http://goo.gl/QjqeDn), by email (info@salinaartcenter.org), or by phone (827-1431). Participation in the workshop is FREE OF CHARGE. Registration is on a first-come, first-served basis and limited to 12 participants. There will be a waiting list.

For more information, call 827-1431.

SALINA ARTS & HUMANITIES — Horizons Grants Program — SALINA art center




Salina Art Center, 242 S. Santa Fe, proposed mural site




Salina Art Center, 242 S. Santa Fe, proposed mural site



Sample Mural Design

# CONRAD SNIDER
# STUDIO WEBSITE



**Conrad Snider**
*Large Scale Ceramic Sculpture, Hand Made Tile Murals, and Wheel Thrown Vessels*

*Write to me here*

Visit Soldner Equipment

# Conrad Snider

Welcome to my website. Thank you for visiting and come back again, new photos are added periodically.

Here you will be able to visit my studio, see one-of-a-kind large scale ceramic sculptures and vessels, and see how the vessels are made.

Click on the images below to see other pieces. Scroll down to read about my work.



Figures



Tile Murals



Wheel Thrown Vessels



Public and Private Projects



Hand Built Vessels



Studio and Home

My work is all large scale and ranges from clay vessels, both thrown on the potter's wheel and hand built, to figurative pieces and hand-pounded tile murals. Each of these aspects is important to me and feeds a different part of my personality. When I work on a piece I try to let the clay speak, sharing its natural behaviors, sensuality, visual strength, and power. I want each piece to have its own individual presence.

The process from wet clay to a finished piece takes 6 months to a year, ending with the final glaze firing in a gas reduction kiln to 2300 degrees Fahrenheit. Some pieces will be fired multiple times to enhance the glazed surfaces and textures. The surfaces are equally important to the form for the overall effect of the piece. High fired clay is impervious to fingerprints, water, and paints, which allows tactile exploration to be as much a part of the viewers' experience as visual interpretation. These same attributes also make clay ideal for public art installations.

I make most of my pieces ahead and find homes for them later on. Most of my sales are to individuals, though I have done a number of public commissions, and have pieces in several Public and Corporate collections. Because each piece is personal to me, and they spend so much time in the studio, they become like my children. I want them to go to good homes where they will be appreciated for years to come.

Read more Resume

This page is currently being modified. Some links are not yet completed. Please bear with us and come back soon.

## Tile Murals

*Back to Home*



These tile wall murals are ideal for architectural accents and can be custom commissioned. Most of the tiles are made to fit on a one foot grid, including grout lines. These tiles are hand-pounded individually and fired to Cone 10, 2300 degrees Fahrenheit.



72" X 96"



72" X 96" X 5"



98" X 147"



72" X 96"



72" X 120"



72" x 96"

# SALINA DOWNTOWN, INC.
# DEVELOPMENT INCENTIVE PROGRAM

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects**

This grant program is designed for *large* scale projects for new construction, and for renovation of façades and interiors of existing historic buildings (see definition below) within the Lee District. Salina Downtown, Inc. recognizes that property owners and tenants may need assistance making costly improvements and enhancements to the exterior of their buildings and to the interior of historic buildings. This program is designed primarily for façade improvements and new construction. However, interior improvements to historical or locally historically significant buildings (50 years or older) may qualify. The amount of any grant is contingent on the scale of the project and available funds through the Development Incentive Program.

**ELIGIBILITY:** Property owners and/or tenants who are in good standing with the Lee District (service fees are current) are eligible to apply. However, non-profit Salina Downtown, Inc. partner businesses located within the Lee District boundary are also eligible to apply for DIP funds.

**AVAILABLE FUNDS**: $35,000 annually 2008-2010. Maximum single project award $15,000.

**MATCHING REQUIREMENT**: All applications are competitive and require a minimum cash only match of 1.5:1 private to Development Incentive Program (DIP) grant funds. In-kind contributions will NOT count towards the required match. This is a reimbursement program. Upon completion of the project the applicant is required to pay the full amount of the project up front and submit proof of paid bills before reimbursement will be made. (See Reimbursement Policy)

**ELIGIBLE USE OF FUNDS**: Projects may include but are not limited to:

- New building construction
- Building expansion
- Vacant building redevelopment
- Facade renovation and restoration (emphasis on removal of metal siding and metal awnings) and/or replacement with new coverings or roll-ups
- * Work complying with Salina Downtown Design Guidelines, contingent on Design Review Board approval
- Pressure cleaning
- Stucco: new or restoration
- Painting
- Window, Door or transom replacements or repairs.
- Re-pointing of mortar joints for brick or stone
- Awnings (including the removal/installation of old awnings and canopies)
- Alley entry way improvements
- Entry way tile in exterior doorways
- Interior code related work.
- Interior work to historical buildings or buildings deemed to be historically significant (50 years or older) and work preserves historical interior aspects of the building

**INELIGIBLE USE OF FUNDS:**

- Signage
- Projects with no minimum 1.5:1 match
- Projects outside the Lee District boundaries
- Any in-kind expenses including labor of property/business owners
- Roofing
- HVAC

Case 6:24-cv-01027-TC Document 108-9 Filed 02/28/25 Page 29 of 31

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**SELECTION CRITERIA:** All projects will be judged on their individual merits and components. The following criteria will serve as the basis of consideration:

- Ratio of matching funds minimum 1.5 private to 1 DIP. Additional consideration given to applicants providing more than the minimum match requirements.
- Projects creating new businesses and/or additional employment in downtown will receive additional consideration or priority.
- Project's adherence to Salina Downtown Design Guidelines
- Improvements to façade given priority
- Interior work may be included at the discretion of the review committee if the building is Historic or deemed historically significant (at least 50 years old) and the interior work preserves historic characteristics.

**APPROVAL:**

Applications are subject to review and approval by the DIP Review Committee with final approval of the Salina Downtown, Inc. Board of Directors. The DIP Grant Review Committee includes two members of the SDI Business Support and Recruitment Committee, one SDI Board member, one Design Review Board member and one member appointed by the Salina City Commission. Applications awarded DIP funding will officially be notified by letter.

**ADDITIONAL REQUIREMENTS**:

- Provide an architectural drawing or sketch
- Provide a five minute oral presentation to the application review committee.
- All projects awarded grants must be completed within one calendar year from the award letter date.
- Two professional contractor estimates of the cost of the intended improvements are required.
- Application must include a professional architectural design including color and material choices.
- All work must meet all City Building code requirements.
- All applicants are responsible for acquiring and completing all necessary city permits.
- Taxes and Lee District Fees must be current.
- Written approval of building owner, specifying work, must be included in application (if applicable).
- A contract must be signed between Salina Downtown, Inc. and applicant within three months of approval from SDI Board and prior to work commencing.
- The SDI office will be notified in advance of commencement of all work on the project
- Representatives of SDI will be allowed on the work site at all reasonable times.
- Environmental assessment must be completed
- Work must be completed within one year of signed Grant Reimbursement contract.

**APPLICATION DEADLINE:** Application forms are available from Salina Downtown, Inc. (SDI), PO Box 1065, 205 West Ash Street, Salina, Kansas 67401 and on line at www.salinadowntown.com. Completed applications are due at the SDI office by 12:00 noon the third Wednesday of April and August. Awards will be made twice annually in May and September. Applications awarded DIP funding will officially be notified by letter.

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**REIMBURSEMENT POLICY**

Successful applicants receive disbursement of DIP funds after completion of project, approval of work by a final City inspection, receipt of Certificate of Completion, and submittal of copies of paid invoices for approved expenses to the SDI Executive Director. To receive reimbursement, the property owner must sign an agreement to maintain the funded building improvements for a period of at least 3 years for a DIP Forgivable Loan Program for Major Projects ($3,500 and above). This agreement shall provide for a lien against the property in an amount equal to the reimbursement amount.

**REPAYMENT/GRANT FORGIVENESS POLICY**

For reimbursement totaling $3,500 and above, one third (33.3%) of said lien for improvements shall be forgiven annually on the anniversary date of the Certificate of Completion. Should the property be sold or refinanced prior to the full forgiveness of the lien, the remaining amount of the lien shall be paid to SDI upon sale, or closing of the refinancing Grant. The agreement shall be filed with Saline County Register of Deeds and transferred upon sale of the property.

# Exhibit J
# Schrage Talking Points

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 3:53:08 PM
**To:** mike@landtitlesalina.com
**Subject:** Cozy Inn Talking Points

Our intended message is

this question is not unique to Salina.

A distinction is commonly made between murals and art when compared to commercial speech.

We regulate the size of commercial signs through a permit process.

We were not contacted in advance and a permit was not applied for.

The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code.

We are willing to work with Mr. Howard

this is going to be a code revision and policy decision that will take some time.

We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
TDD: 785-309-5747
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 25
APPINO & BIGGS

# Exhibit K
# Sign Permit Submittal Procedures

City of Salina

DEVELOPMENT SERVICES DEPARTMENT
City-County Building ● 300 West Ash Street - Room 205 ● P.O. Box 736
Salina, Kansas 67402-0736
TELEPHONE (785) 309-5715 OR 309-5720 ● FAX (785) 309-5713
TDD (785) 309-5747 ● E-MAIL building.services@salina.org

# SIGN PERMIT SUBMITTAL PROCEDURE

**All Sign Permit Applications Shall Include:**

1. **Site Plan of Zoning Lot*** - Use a scale of at least one inch to 50' or less and show the location of all structures, existing signs on premises and proposed sign(s). Also show the location of all property lines, streets, driveways and parking areas. Set-back measurements to property lines of signs and buildings are to be shown.

2. **Shop Drawings** – Submit drawings of proposed sign(s) drawn in detail showing the height, dimensions, proposed copy and structural type of sign. If sign is double faced, indicate the distance between sign faces. Also, indicate if sign will be lighted internally, externally or have flashing, pulsating or moving lights or lights which create the illusion of movement.

3. **Inventory of Existing Signs** – Provide the information requested (number, square footage, type and height etc.**) on the attached "Inventory of Existing Signs" form.

4. **Completed Application Form***** - Failure to provide all requested information will in most cases cause a delay in the review of the sign permit application.

***Zoning Lots** - A parcel of land that is designated by its owner or developer, at the time of applying for a zoning certificate as a tract all of which is to be used, developed or built upon as a unit under single ownership. Typically Shopping Centers and Malls are considered one zoning lot. The total building frontage determines the total allowable sign square footage.

****Gross Sign Surface Area** – The gross surface area of a sign shall be the sum of all surface areas of all the sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

*****Sign Contractor Licensing Requirement** – No person shall engage in the business of sign hanging, installation, erection, maintenance or repair of signs within the corporate limits of the city without complying with the provisions of the Salina Code which requires that all sign contractors be licensed.

PLF – 012, Rev. 2-12

*"Our Mission is to encourage and promote safe, quality Development and construction in the City of Salina"*

## Classification of Signs by Function and Structural Type

**The following signs are classified by function:**

1. ***Advertising Sign*** – A sign, which directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located or to which it is affixed (off-premise sign).

2. ***Bulletin Board Sign*** – A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events of activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

3. ***Business Sign*** – A sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

4. ***Construction Sign*** – A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

5. ***Identification Sign*** – A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

6. ***Nameplate Sign*** – A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

7. ***Real Estate Sign*** – A sign pertaining to a sale or lease of the lot or tract of land on which the sign is located, or to the sale or lease of one or more structures, or a portion thereof located thereon.

**The following signs are classified by structural type:**

1. ***Awning, Canopy and Marquee Si***gn – A sign that is mounted or painted on, or attached to an awning, canopy or marquee. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

2. ***Decorative Sign*** - A sign or display fabricated of canvas, cloth, fabric, plastic, plywood, or other light, impermanent material and designed or intended to be displayed in connection with an event for a short time period.

3. ***Ground Sign*** – Any sign placed upon, or supported by, the ground independently of the principal building or structure on the property. Signs on accessory structures shall be considered ground signs.

4. ***Mobile Sign*** – A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

5. ***Pole Sign*** – A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level (10' if it is in the vision triangle).

6. ***Projecting Sign*** – A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

7. ***Roof Sign*** – A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

8. ***Wall Sign*** – A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

*"Our Mission is to encourage and promote safe, quality Development and construction in the City of Salina"*

# Exhibit L
# Schrage Email
# 11/8/23

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/8/2023 3:54:03 PM
**To:** Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC:** jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject:** Cozy Inn Wall Sign
**Attachments:** Cozy Inn Wall Sign.jpg

Schrage
EXHIBIT NO. 19
APPINO & BIGGS

Mayor Hoppock & City Commissioners:

If you aren't already aware, Cozy Inn has recently begun painting a *wall sign* on the south side of their building (see attached photo). While it aesthetically might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which include size limitations among other things.

There is considerable litigation surrounding the topic of art, free speech, commercial speech and disparate treatment of one sign in comparison to another. I know I sound like a broken record, but this is shaping up to become a city-wide precedent without further refinement of our applicable sign codes. Pick whatever example you like, but Applebee's could choose to paint the entirety of all four sides of their building as walls signs citing this as the precedent without further refinement of our codes. Another example is that more prominent brick walls along Santa Fe, Iron, Walnut, etc. could be utilized for commercial advertising signs painted on brick or otherwise.

Maybe we as a community are okay with that, but our current code doesn't reflect that and that is a difficult policy question to be deliberated on.

You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes.

Further addressing murals and the commercial speech question was already on Development Services' plan of work for 2024. Lauren Driscoll had already begun to identify consultants versed not only in the planning issues but the legal issues surrounding this topic.

With respect to Cozy Inn, we were not contacted in advance. Rather, we became aware as the painting was observed.

Staff has contacted them and asked them to pause. And, a meeting has been scheduled with them for Monday of next week.

The intended message is that we are willing to try to work with them to frame up the policy questions necessary for the community to decide whether they wish to permit wall signs such as theirs; trying to explain the significance and precedent setting nature of the question at hand; and explaining how their project is classified as a sign and not a mural. We fully anticipate likely responses of its already on social media and everyone loves it and what's the big deal reminiscent of the Toy Parade.

As much as we would like to resolve this quickly, that is just not a realistic expectation given the complexity of the topic, the outside assistance we are going to need and the policy review an adoption process that needs to take place.

In advance of the Monday meeting with staff, Mr. Howard has begun contacted City Commissioners and others. So, I am emailing to provide you with some background in advance. We will remain as customer service oriented as we can, but the crux of the issue is that they began painting a commercial wall sign without contacting us and we now find ourselves

playing catchup while trying to avoid being overly blunt saying it is prohibited by code and squarely placing blame with them.

In anticipation of the likely response that the Bull Durham sign on the Land Title building is commercial speech, it went through a DRB review and approval process based on its historical nature and it does not pertain to a product available for sale.

I would be happy to discuss this further if you have questions or are receiving additional feedback.

I will provide an update following Monday's meeting as well.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov


Don't Fear the Smell!
The Fun is inside!!
HAMBURGERS

# Exhibit M
# Schrage Email
# 11/9/23

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 5:17:40 PM
**To:** Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC:** jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject:** Cozy Inn Wall Sign #2
**Attachments:** Cozy Inn Code Summary.docx; APA-Ohio Sign Presentation 9-23.pdf; NH Article.pdf

Mayor Hoppock & City Commissioners:

Staff was in contact with Mr. Howard multiple times again today and thought that we had gained his understanding that we would meet with him on Monday to discuss the issue and options further. Lauren was recently contacted by KWCH requesting her to go on camera following their interview with Mr. Howard; she ultimately spoke with them by phone; we have been interviewed by Salina311 and we have seen social media posts indicating that Mr. Howard will be going on KSAL tomorrow morning.

Our intended message is that this question is not unique to Salina (see attached article). We regulate the size of commercial signs through a permit process. We were not contacted in advance (Mr. Howard asserts that it is a mural not a sign). The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code (see attached code summary). We are willing to work with Mr. Howard, but this is going to be a code revision and policy decision that will take some time. We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

IMPORTANT NOTE: Sharp Performance in the NE corner of 9th and Elm (north of the library) has a large wall sign that did not go through any type of permit process and has been unintentionally overlooked in terms of code enforcement.

I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown. He also indicated he does not do any kind of social media and he is trying to "go soft" in his interviews with the media suggesting he thinks we will be pleased with his comments.

Lauren has reached out to a consultant who is a planner and an attorney with a specialization in this topic who has assisted communities throughout the Midwest including Omaha. She will be submitting a proposal for our consideration. I have attached a slide show that she presented recently at a planning conference. I haven't attached the presentation as a proposes solution or an on-point discussion of our issue at hand. My primary points in attaching the presentation are that this is not unique to Salina, there are several legal considerations, it is very nuanced and complex and outside consulting would be very helpful if we want to quickly (a few months) develop a policy amendment that is similarly nuanced and takes in to account Salina specific feedback and direction.

Lauren is prepared to provide an overview of this issue during Other Business on Monday.

You are certainly welcome to contact me on my cell Friday and over the weekend.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Sincerely,

Mike Schrage
City Manager

Schrage
EXHIBIT NO. 26
APPINO & BIGGS

City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov

# The Cozy Inn Sign Analysis

**Sign Definitions**

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**C-4 Sign Regulations**

**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.
   c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height*. Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**<u>The Cozy Inn Information and Background</u>**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food "Hamburger Joint" in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.

The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building's exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**Existing Conditions**
Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

| | | |
|---|---|---|
| 1. | North facing wall sign: | 24.00 sq. ft. |
| 2. | 7th Street projection sign: | 24.00 sq. ft. |
| 3. | 7th Street awning sign: | 4.88 sq. ft. |
| | Total Sign Area: | 52.88 sq. ft. |

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**Proposed Hamburger Sign Analysis**
The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.




# FLAGS & MURALS OH MY!

CHALLENGING SIGN ISSUES POST-REED

2023 APA-Ohio State Conference

CITY000226

# AGENDA

How did we get here and what is going in the courts?



How can we deal with the tricky sign issues like flags, murals, and holiday decorations?



CITY000227

"It is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations."

*Granite State Outdoor Advertising, Inc. v. Clearwater*, 213 F. Supp. 2d 1312 (M.D. Fla. 2002).






© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

"Congress shall make no law . . . abridging the freedom of speech . . ."



© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Judicial Review of Speech Regulations




**Usually unconstitutional**


© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Reed v. City of Gilbert, Arizona

- SCOTUS, June 2015.
- Permit required for ALL signs but several exempted categories:
  - Political signs.
  - Ideological signs.
  - Temporary directional signs.
- "Some facial distinctions based on a message are obvious . . . Others are more subtle, defining regulated speech by its function or purpose."
- Content-based → strict scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# City of Austin, Texas v. Reagan National Advertising, LLC

- SCOTUS, April 2022.
- On-premises v. off-premises signs.
- Not content based.
- "Unlike the regulations at issue in *Reed*, the City's off-premises distinction requires an examination of speech only in service of drawing **neutral, location-based lines. It is agnostic as to content.**"
- Content neutral → Intermediate scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Norton Outdoor Advertising, Inc. v. Village of St. Bernard, Ohio

- S.D. Ohio, June 2022.
- Sign regulation distinguished between on-premises and off-premises signs.
- Village's safety and aesthetics goals were substantial government interests.
- The sign regulations are designed to "protect the safety and general welfare of the public who travel I-75 within the Village."
- In *City of Austin*, the Supreme Court concluded that on/off-premises distinctions are content-neutral.

Detail at 1:1 from center of the map.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000233

# LaCroix v. Town of Fort Myers Beach, Florida




- 11th Circuit 2022.
- "Laundry list" of prohibited signs, including "portable" signs.
- "There is no dispute that portable, handheld signs often convey **political, religious, or personal** messages."
- Highly protected speech.
- No alternative channels of communication.
- Content neutral, but still unconstitutional.


© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Willson v. City of Bel-Nor, Missouri

- E.D. Missouri, 2020.
- One yard sign and one flag per residence.
- No window or wall signs.
- Expansive definition of "sign."
- Overbroad and not narrowly tailored.
- Under the ordinance, all banned:
  - Christmas lights.
  - Happy birthday balloons on mailbox.
  - Security system sticker on window.
  - "Welcome Home" banner.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000235

# The bottom line.

- Categorizing types of speech can get you into trouble.
- Leave open “ample” channels of communication.
- Examine your sign laws: do they prohibit more than intended?

 © 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney client relationship.

# WENDY E. MOELLER, FAICP



**WENDY E. MOELLER, FAICP**

**Principal and Owner**

**Compass Point Planning**







1
2

CITY000237

# NOW WHAT?

You have the legal background, which is critical to understanding the risks…but now but?

Even with the legal restrictions, there is still a lot you can't do.

Keep in mind…

1. **There is no perfect sign code model.**
2. There is always going to be a little grey area.






CITY000238

# PERMANENT SIGNS

## THE EASY PART




**A permanent sign is a structure much like a fence, shed, or building – Establish the types allowed**

- Wall signs
- Projecting signs
- Monument signs
- Pole signs
- Window signs
- Awning signs
- Digital signs
- And so on...







14

CITY000239

# PERMANENT SIGNS

## THE EASY PART




**Set up the rules for height, area, location, lighting, materials, digital, etc.**

- All are forms of content neutral regulations
- All are going to be based on community policy




CITY000240

# PERMANENT SIGNS

## THE EASY PART

SCOTUS gave communities the ability to make on-premise versus off-premise distinction so easy to deal with billboards.

Prior to this, many communities simply dropped the distinction. If no signs were large enough to be billboards, then billboards are essentially prohibited







CITY000241

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

- No simple solution
- Art is a form of a message
- Some communities simply prohibit any painted wall sign, regardless of whether it would be considered art or a sign.






CITY000242

# PERMANENT SIGNS

## THE CHALLENGE - MURALS

**Some communities take a calculated risk of making a commercial vs. noncommercial message distinction.**

- Focus on the facades that can be painted
- Materials (paint or banners)
- % of coverage
- General design principles




CITY000243

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

**Some communities have a special design review.**

- Sometimes by a government-based board but others by an arts group/board
- The design criteria can be written in a content-neutral manner
- But happens when that group doesn't like the message?




CITY000244

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

**Keep in mind…**

- Art is in the eye of the beholder
- Most communities do not regulate how you paint a home
- Graffiti – Illegally placed art but not always terrible and sometimes encouraged



Noncommercial message on a residential garage door




"Graffiti" along the Donaukanal in Vienna

CITY000245

# PERMANENT SIGNS

## THE CHALLENGE - FLAGS ?

- Flags can be signs too…
- Many sign codes exempt US, State, and religious flags. **Don't do that!!**
- Focus on the support structure (poles/posts)
- At the most – commercial versus noncommercial distinction








CITY000246

# TEMPORARY SIGNS

## THE KIND OF EASY PART







Definitely temporary signs!

**Temporary signs are a little more challenging…**

- The entire structure is temporary or portable, and not intended to be a permanent installation.
- However, tough to place time limits on every temporary signs because some need longer time frames
  - Real estate signs?
  - Political/opinion signs – Free Speech is year-round!




Temporary Sign?

CITY000247

# TEMPORARY SIGNS

## THE EASY PART

**You can pick and choose what TYPES of temporary sign structures to allow or prohibit!**

- Yard Signs
- Banner Signs
- Feather Signs
- Air-Activated Graphics
- Balloon Signs
- Sidewalk Signs
- And so on...













CITY000248

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT ?

- Temporary signs are where the vast majority of content-based regulations are found.
- There is no easy solution – all approaches have pros and cons
- It is a matter or risk, and to some extent, the level of things you want to deal with in your job.













CITY000249

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT ?




### Door #1 – 100% Content-Neutral

- Safest bet from a legal standpoint
- Most communities establish the maximum number, size, and aggregate area of temporary signage allowed, as well as set the types
- Have to allow a reasonable amount of signage to accommodate all temporary sign and speech needs – There is no magic number.
- No matter how much signage you allow, it is very likely it will be an enforcement nightmare at elections.

TABLE <> TEMPORARY SIGN ALLOWANCES

| Zoning Districts | Residential | Nonresidential | |
|---|---|---|---|
| Time Limit | Unrestricted | Unrestricted | 30 Days per Quarter [1] |
| Maximum Number or Area per Lot | 40 Square Feet | 40 Square Feet | 20% of Permanent Building Signage Allowed or 36 Square Feet, whichever is Less |
| Maximum Sign Area per Sign | 6 Square Feet | 16 Square Feet | |
| Maximum Height | 4 Feet | 6 Feet | 6 Feet |
| Permitted Sign Types | Window or Yard | Banner, Sidewalk, or Yard | Banner, Feather, or Yard |
| Zoning Permit Required | No | No | No |

[1] A quarter shall be defined as evenly timed quarter of the calendar year (January to March, April to June, July to September, and October to December).

CITY000250

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT

### Door #2 – Commercial versus Noncommercial Distinction

- Slight legal risk because it is unclear if communities can make the distinction
- Cannot be more restrictive on the noncommercial message signs
- Cannot go beyond commercial versus noncommercial distinction
- Makes administration and enforcement easier, especially around elections

**Table 1163.13-1: Temporary Sign Allowances**

| Message | Non-Commercial Message | Commercial Message | | | |
|---|---|---|---|---|---|
| Zoning | All Districts | Residential Districts[1] | Nonresidential Districts | Nonresidential Districts | Nonresidential Districts (New Use)[2] |
| Time Limit | Unrestricted | Unrestricted | Unrestricted | 30 days, twice per year | 60 days |
| Maximum Number or Area per Lot | Unlimited | 2 signs | 12 sq. ft. per each 100 lineal feet of frontage | 64 sq. ft. | Equal to number of existing permanent signs |
| Maximum Area per Sign | 32 sq. ft. | 8 sq. ft. | 12 sq. ft. | 64 sq. ft. | Equal to area of permanent sign to be covered |
| Maximum Height | 4 ft. | 4 ft. | 6 ft. | 6 ft. | Equal to height of existing sign to be covered |
| Permitted Types | Yard, Window | Yard, Window | Yard, Banner | Yard, Banner, Vehicle[3] | Banner |
| Permit Required | No | No | No | Yes | Yes |

Note 1: Any conditionally permitted use located in a residential zoning district shall be permitted the same amount of temporary signs with a commercial message as allowed in nonresidential zoning districts.

Note 2: Regulations applicable to the establishment of a new use within an existing building where there is existing permanent sign to be covered by a temporary sign.

Note 3: Notwithstanding the provisions of *Section 1163.06.Q*, temporary signs may be permitted on vehicles (not trailers) that are operable, display current plates and registration and are parked in paved parking areas in a manner not obstructing traffic circulation.

CITY000251

# TEMPORARY SIGNS

## THE CHALLENGES

- **Obscenity**
    - Don't do it. You can try the "neighborly" way and ask for items to be removed but avoid governmental enforcement
- **Holiday celebrations**
    - Some communities maintain an exemption but that could still be considered content-based exemptions.
    - Other communities just avoid having regulations related to them.










CITY000252

# TEMPORARY SIGNS

## THE CHALLENGES ?

- **Human signs and vehicle signs**
  - A lot of communities just avoid regulations and hope for the best.
  - Some focus on location.
  - The toughest part is when is it intended to be a sign?













CITY000253




# QUESTIONS?

**Scott D. Phillips**
sphillips@fbtlaw.com
513.870.8206

**Wendy E. Moeller, FAICP**
wmoeller@compasspointplanning.com
513-543-8651

CITY000254


LEAVITT'S
COUNTRY
BAKERY
OPEN
NOW ACCEPTING
VISA

72°

TRENDING 24/7 streaming news Clear the Shelters Red Sox trades? Guide to College...

LOCAL

In-depth news coverage of the Greater Boston Area.

ART

# Pastry Mural Pits Bakery Against NH Town in Free Speech Suit

Where is the line between art, and advertising? The unresolved question is testing the direct democracy of a small New England town, where a painting of pastries has led to zoning dispute, a First Amendment lawsuit and a local vote

By **Kathy McCormack** and Robert F. Bukaty • Published April 18, 2023 • Updated on April 18, 2023 at 11:42 am

Bakery owner Sean Young was thrilled when high school art students covered the big blank wall over his doorway last spring with a painting of the sun shining over a mountain range made of sprinkle-covered chocolate and strawberry donuts, a blueberry muffin, a cinnamon roll and other pastries.

The display got rave reviews, and Young looked forward to collaborating with the school on more mural projects at his roadside bakery in Conway, New Hampshire.

Then the town zoning board got involved, deciding that the pastry painting was not so much art as advertising, and so could not remain as is because of its size. Faced with modifying or removing the mural, or possibly dealing with fines and criminal charges, Young sued, saying the town is violating his freedom of speech rights.

The painting could stay right where it is if it showed actual mountains, instead of pastries suggesting mountains, or if the building wasn't a bakery.

**Get Boston local news, weather forecasts, lifestyle and entertainment stories to your inbox. Sign up for NBC Boston's newsletters.**

"They said it would be art elsewhere," Young told The Associated Press in an interview. "It's just not art here."

"The town should not have the right to police art," he said.

The controversy has residents of this town of 10,000 grappling with big questions about creativity and liberty as it tries to preserve its rural character. Like other White Mountain communities that draw skiers, nature lovers and shoppers, Conway is under development pressure, making the sign dispute fraught with worries that any concession to commerce could change what they hold dear.

Many — including the zoning board members — applauded the students' colorful work, but said rules must be followed, even if they're old and outdated. At about 90 square feet (8.6 square meters), the mural is four times bigger than the sign code allows.

5:53
Here's a Sneak Peak of 'Life, Liberty and the Pursuit of New Hampshire' – Streaming Now on NBC10 Boston

Life, Liberty, and the Pursuit of New Hampshire follows a libertarian political migration known as the Free State Project. Twenty years ago, one man penned a manifesto encouraging 20,000 libertarians to sign a pledge and move to the Granite State for more freedom. Now "The Free State Project" is shaking up politics and communities in New Hampshire and growing in strength and numbers.

Following a longstanding democratic tradition of New England town meetings, residents deliberated how to define a sign before ultimately voting down changes last week. The local newspaper said the proposed wording wasn't clear. Ultimately, a judge may have to resolve what remains an open debate in town.

"Those kids put their heart in it," retiree Steve Downing said. He thinks the painting should stay.

"Everyone has to comply with the ordinance," said Charlie Birch, a former U.S. Forest Service worker. "And even though it was done by the students, which was well done, and I give them a lot of credit for it ... if you have the ordinance, 'One for all,' that's where we are. You can't really make any exceptions, otherwise everybody else will want the exception."

Art teacher Olivia Benish, who worked with three students on the project, apologized to the board in September for not doing "due diligence" to make sure the mural would comply. She didn't respond to requests for an interview. But she told the board members that there has to be a way to give students the opportunity to create positive public works of art "without upsetting the law and the powers that be," according to the town minutes.

The lawsuit Young filed in January argues that the town is unconstitutionally discriminating against him. He asked a judge to prevent the town from enforcing its sign code.

And now other businesses have been drawn into the controversy.

**More New Hampshire news**



APR 17

Trump Holding April Campaign Event in Manchester, NH



APR 17

Mass. Woman Arrested After Leading Police on Chase Through Several NH Towns



APR 12
Catalytic Converter Theft Ring That Sawed Thru Mass., NH Is Busted, Feds Say

Long before the pastry painting was installed, the town had allowed other murals at a local shopping center, but in December the town found that three of those artworks are, indeed, signs that violate size limits. They go before the zoning board on Wednesday.

Young, who is being represented by the Virginia-based Institute for Justice, asked for $1 in damages. Meanwhile, he's selling T-shirts as a high school art department fundraiser, saying "This is Art" with the artwork on the front, and "This is a Sign" of a roadside "Leavitt's Country Bakery" sign on the back.

"As Conway officials have confirmed, the town does not consider a painting to be a "sign" if it does not convey what town officials perceive to be a commercial message," the lawsuit says. "But the town's perception is that any mural depicting anything related to a business is a 'sign.' This is governmental discrimination based on the content of the speech" and the speaker's identity, it said.

The lawsuit says the town's sign definition is "incredibly broad," with no mention of murals in the code: A sign in Conway is "any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of any person or entity, or to communicate information of any kind to the public, whether commercial or noncommercial."

***Get updates on what's happening in Massachusetts to your inbox. Sign up for our News Headlines newsletter.***

Board member Luigi Bartolomeo said he thinks the pastry painting is art, not advertising. He read the definition out loud at the board's meeting in August, and said he agrees with a local attorney who called it "unconstitutionally vague."

"I think it's a very badly written piece of code here," said Bartolomeo, who recently retired. But Board Chairperson John Colbath said the board has to work with the ordinance, which was approved by voters, and that there is a process to change that.

"If they had done a seasonal mural on the wall — covered bridges and sunflowers and what have you — and it did not represent what your business is in, then it would be more likely to be a well-respected piece of art and not construed as a sign," Colbath said at the August meeting.

He said to Young, "I understand the art thing — and you look and you see a mountain — but the general public sees donuts on the front of the bakery."

"I think most of the people said it's art," Young responded.

In its denial of Young's appeals, the board concluded that the bakery won't be negatively affected without the display.

"This supposed distinction between murals and signs shouldn't matter," attorney Betsy Sanz of the Institute said in a news release. "After all, nothing in the First Amendment distinguishes between art and commercial signs — or commercial speech of any kind."

The town and Young agreed in February to pause court proceedings — and any potential fines or charges — pending a vote on a revised definition that would allow the painting to stay. But it failed in last week's elections, with 805 to 750 voting against it, according to the town clerk's office. The judge now wants to hear from both sides by May 10.

"We're ready to keep going," Young said.

Town Manager John Eastman declined an interview, referring questions to town lawyer Jason Dennis, who said he would soon meet with town officials to discuss next steps.

The Conway Daily Sun offered its analysis in an editorial last week: "Voters smartly concluded that the proposed new definition of signs would only further complicate enforcement. That said, it is not a stretch to conjecture that most voters are fine with the murals at Leavitt's Country Bakery and Settlers Green. We suggest the town figure out a way to back off enforcement until a clearer definition can be written, one that accommodates 'art.'"

Copyright AP - Associated Press

This article tagged under:

# Exhibit N
# Schrage Email
# 2/20/24

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 2/20/2024 10:23:56 AM
**To:** travis@vortexglobal.com
**Subject:** Cozy Inn Sign Code Lawsuit

Travis:

I am playing catchup to a federal lawsuit recently filed on behalf of The Cozy Inn equating their sign to the murals painted throughout the downtown. Apparently, it has hit the news media. I am in orientation training with the City Commission all day today. It is too soon to say if or how it might impact the Boom! Salina, but that is something will have to review. I will reach out to you further once we have had a chance to conduct our legal review and collect our thoughts a bit more.

My intended response is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation. I say all of that because we have felt confident of our policy and application this point, but it will now have to be litigated; I don't know how long that might take; and I don't know what that might mean about our code enforcement in the interim.

I will reach out just as soon as I know more and can discuss it further with you.
Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash Street, Room 202
Salina, KS 67402
Phone: 785-309-5700
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 93
APPINO & BIGGS

# Exhibit O
# Benson Deposition

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

COLIN BENSON,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:26 a.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

A. Yes.
**Q. Okay. Where was that meeting held?**
A. The Salina Arts Center, I believe, is what it's called. Salina Arts Center Museum.
**Q. Was it the Smoky Hill Museum?**
A. Smoky Hill Museum. There you go.
**Q. Okay. And who was at that meeting?**
A. Leslie Bishop, Brad Anderson, two city workers or city people that I do not remember, Michael -- Michael somebody with the -- he was the head of the permit. Mike, Michael something. And maybe one or two other people that I don't remember their names.
**Q. Was there someone from the city named Dustin Herrs there?**
A. What did you say?
**Q. Was there someone from the city named Dustin Herrs there?**
A. Dustin. Maybe.
**Q. Okay. Other than people from the city, who was in attendance at that meeting?**
A. Steve, myself and two other -- two other people that were sitting against the wall.
**Q. Okay. Was your dad there?**
A. Yeah, it was like I don't remember, but I

**were at that meeting?**
A. Yes.
**Q. Okay. What did you say?**
A. I don't believe it was a signage being put up. I believe it's a mural. It had nothing to do with what we were there for. And I was shut down pretty quick. So that was about all I had to say.
**Q. Okay. Did they explain to you at the Smoky Hill Museum, and by they I'm talking about representatives of the city, why they considered it a sign?**
A. Yes.
**Q. Okay. What did they tell you?**
A. The hamburgers are basically the same thing he sells and, therefore, it would be signage.
**Q. Okay. Prior to this meeting at Smoky Hill Museum, had you already heard that the city considered that display a sign?**
A. No.
**Q. Okay. So Steve didn't tell you the conversations -- did Steve talk to you about the conversations he'd had with the city prior to that meeting?**

A. Yes.
**Q. And there's no outline there of any depiction that could be considered a UFO driver of, is there?**
A. No.
**Q. Okay. One second. And on the big burger in the middle, there's no outline of a depiction of what could be a UFO driver there, right?**
A. No, there is not.
**Q. So I want to go back to. Actually --**
MS. JOKERST: Okay. I actually don't have any further questions.
RECROSS-EXAMINATION
BY MR. SHAW:
**Q. Was it your intention when this mural was finished to have cockpits and aliens on the burger UFOs?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. You may answer.**
A. Every single one.
**Q. Okay.**
A. I stated earlier that it was the mother ship, and it was going to have lights and everything. When you do transparent stuff, you

can't really add paint. I had a blue background on Jenni's which allowed the blue to come through the windows. This is all white, so I have to add it. And the last thing I do is add color.

**Q. Is was this the intention when you began painting the mural to have cockpits on all of the UFO burgers?**

MS. JOKERST: Object to form.

A. Yes.

MR. SHAW: I have no questions.

MS. JOKERST: I don't have any further follow-up.

So, Mr. Benson, you have the option to read your transcript and see if there are any errors in it from what you said versus what was included on the transcript. Typically, that would be something along the lines of you testified the light was green and the transcript says the light was red. You have the option to read that and mark whether or not there's any errors as you see them and state what they are and then sign the transcript, but you don't have to do that. If you want to do that, the court reporter can send you an electronic copy of the transcript so you can read and then swear and affirm and sign on that

# CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit P
# Plaintiffs' Amended Response to Defendant's First Set of Interrogatories

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas,**<br><br>Defendant. | Case No. No. 6:24-cv-01027<br><br>Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories; Verification |

**Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories**

Instructions

1. Pursuant to Fed.R.Civ.P. 26 and 33, Plaintiffs are required to answer the following discovery requests within thirty (30) days after service hereof.

2. In your answer or response, please restate each numbered Interrogatory prior to your response to that request.

3. Plaintiffs are required to make a reasonable and good faith effort to obtain the information requested by each interrogatory. If you are unable to answer or respond fully to any request, answer or respond to the extent possible and explain why you cannot answer or respond in full.

4. If you do not have enough personal knowledge to fully answer a request, say so, but make a reasonable and good faith effort to get the information by making inquiry within your organization.

5. In case of doubt as to the scope of a clause including "and," "or," "any," "all,"

"each" or "every," the intended meaning is inclusive rather than exclusive.

6. If you find the meaning of any term in these discovery requests to be unclear, then you should either request clarification or assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

7. These discovery requests are continuing in nature and you are requested to furnish amended or supplemental responses and additional documents in accordance with Fed.R.Civ.P. 26(e).

8. Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to promptly amend a prior response to a request if you learn that the prior response is in some material respect incomplete or incorrect and the additional or corrective information has not otherwise been made known to the defendant during the discovery process.

9. If you assert a privilege (*e.g.*, attorney-client privilege) as the reason for refusing to answer or respond or as the basis of an objection to any discovery request, state the specific grounds therefor, separately and specifically identify each individual discovery request as to which such privilege is claimed, and describe the facts upon which you base the assertion of privilege. If the claim of privilege involves a **Communication**, please identify each person present at that **Communication**. Please produce a privilege log identifying each document withheld or redacted pursuant to any alleged privilege.

10. Your answers to the Interrogatories must be verified, dated and signed.

## 1. DEFINITIONS

1. **"Communication"** or "**Communications**" refers to all means of exchanging information, whether verbal, on paper, or via any electronic means, including but not limited to all

inquiries, discussions, conferences, conversations, negotiations, agreements, interviews, telephone conversations, letters, correspondence, e-mail, text messages, SMS texts, iMessages, private electronic messaging apps, file sharing, and notes.

2. **"Document"** or "**Documents**" shall be defined in their broadest sense under Fed.R.Civ.P. 34, and they mean the original and all copies any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy of the following items, however produced or reproduced, including without limitation: writings, books, invoices, shipping forms, accounting records of any nature whatsoever, agreements, correspondence, SMS texts, iMessages, emails, memoranda, recordings, summaries or records of telephone conversations, summaries of records of personal conversations or interviews, diaries, calendars, day-timers, time sheets and other time records, letters, forecasts, graphs, notebooks, charts, plans, sketches, drawings, video and audio tapes, films, slides, photographs, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, summaries of investigations, opinions or reports of consultants, reprints and drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, and other data compilations, including those stored on computer drives, tapes, smartphones, smart watches, tablets, solid-state devices (whether fixed or removable), or internet-based file sharing, file storage, or backup services, from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The term "**Document**" shall include all drafts, as well as final versions of any **Document**.

3. "**Sign Code**" means the following provisions of the Salina Code of Ordinances:

(a) Chapter 42, Article X; (b) the definitions found in Chapter 42, Article XIV for words and phrases that are used in Chapter 42, Article X; (c) Section 42-581; (d) Section 42-596 to Section 42-597.1, inclusive; (e) Section 42-598 to Section 42-600, inclusive.

4. "**BID Code**" means Chapter 2, Article X of the Salina Code of Ordinances.

5. "**Cozy Sign**" or "**Plaintiffs' Sign**" means the sign that is the subject matter of this lawsuit, also identified as the display painted on the exterior wall of the Cozy Inn as shown in paragraphs 27 and 28 (the "completed rendition") of Plaintiffs' Amended Complaint.

6. "**Plaintiffs**," "**You**," or "**Your**" means the Plaintiffs identified in Civil Action No. 6:24-cv-01027-TC-ADM collectively, and individually, including Plaintiffs' representatives, attorneys, officers, directors, employees, agents, affiliates, and persons or entities acting or purporting to act on Plaintiffs' behalf.

7. "**Sign**" means a sign as defined in Salina Code of Ordinances § 42-764.

8. "**Person**" or "**Persons**" mean, where contextually appropriate, any individual, corporation, partnership, association, group or entity of any kind.

9. "**Related**" or "**Relating**" means supports, proves, evidences, describes, is associated with, provides background for, explains, concerns or regards.

10. The term "**Identify**" shall mean, where contextually appropriate:

A. With respect to a Person, the name, current or last known address and telephone number for such Person; or

B. With respect to a Document, the title, type (letter, memorandum, etc.), author, recipient and current or last known location of such Document.

11. Any reference to the singular shall include the plural, and references to the plural

shall include the singular.

**2. INTERROGATORIES**

6. In Plaintiffs' Amended Complaint [Dkt. No. 16], Plaintiffs allege at ¶ 210 that "This demonstrates Salina's antipathy toward content related to a business and commercial speech. This also demonstrates Salina's preference for content unrelated to a business and noncommercial speech." Please describe in detail the basis for this allegation including specific standards of the **Sign Code** or **BID Code** imposed by City staff and the factual basis supporting the allegation in ¶ 210 of the Amended Complaint.

ANSWER: As described in the Amended Complaint, Salina exempts murals from regulation under the mural-sign code regime if Salina considers the mural's content to be noncommercial or "art." Conversely, if Salina perceives the content of the mural to be commercial or to pertain to goods or services sold, then Salina regulates the mural as a sign under the mural-sign code regime. In short, Salina encourages and promotes murals with a noncommercial message while strictly regulating murals it believes have a commercial message. This reflects a preference for noncommercial speech and a hostility toward commercial speech. Examples of this preference for noncommercial speech include:

- The City Manager's statement that "It includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." Bates 0285-295.
- A City Commissioner's statement that "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Doc. 16-2 at pg. 22, ln. 24 – pg. 23, ln. 2.

- Ms. Driscoll's hypothetical comparing a mural of a dove to a mural of a coffee pot at a coffee house: "But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction. Where if we had a steaming cup of coffee and a coffee pot on the side, those are things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction." Doc. 16-2 pg. 23, ln. 19 – pg. 24, ln. 4.
- The City Manager's statement that "You know, as we -- as we looked at murals, we had some conversation about this very question.· And the first reaction was, well, if it includes lettering, or if it includes wording. But it really -- if the wording's not commercial in any way or doesn't have an·attachment to a commercial operation, that in·and of itself isn't a disqualifier." Doc. 16-2 pg. 26, ln. 23 – pg. 27, ln. 6.
- The City Manager's statement that "And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign." Doc. 16-2 pg. 28, ln. 15-21.
- The City Manager's statement that "The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place." Doc. 16-2 pg. 5, ln. 2-7.
- The City Manager's statement that "And there certainly is a misunderstanding between art and signs and commercial speech." Doc. 16-2 pg. 5, ln. 23-25.

- The City Manager's statement that "And I would reiterate, it's all on the basis of a commercial message." Doc. 16-2 pg. 10, ln. 4-5.
- The City Manager's email to the City Commission stating that "While it might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things." Bates CITY000261-262. The email later states "You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes."
- The City Manager's email to the City Commission stating that "We regulate the size of commercial signs through a permit process." Bates CITY000221-222.
- The City Manager's email to a City Commissioner listing the City's talking points on the Cozy's mural which states "A distinction is commonly made between murals and art when compared to commercial speech," and "We regulate the size of commercial signs through a permit process." Bates CITY000220.
- The email of Mr. Anderson explaining that "Work is done to ensure that the Boom mural content does not contain content that could be interpreted as a sign. This is done through SDI, the building owner, the artist, Boom representatives, and city of Salina Development Services." Bates CITY000352.
- The City Manager's email stating that "My intended response is to stress that we have

been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Bates CITY000218.

- Salina City Code § 42-504(1) exempts noncommercial flags from regulation, but not commercial flags.
- Salina City Code § 42-504(5) exempts memorial signs and tablets from regulation, but not commercial signs or tablets.
- Salina City Code § 42-504(9) exempts window signs that do not display an advertising message, but not window signs that display an advertising message.
- Salina City Code § 42-511 authorizes the substitution of any noncommercial copy in lieu of any other copy, but it does not authorize the substitution of commercial copy in lieu of any other copy.
- Salina City Code § 42-521(1) authorizes advertising signs in the C-4 zoning district if the signs advertise "special public events sponsored by governmental, philanthropic and nonprofit organizations," while prohibiting advertising signs that convey a commercial message.
- Salina City Code § 45-506(1) classifies an advertising sign, which is more heavily restricted than other signs, as "A sign displaying a commercial message that directs attention to" an off-premises business, while a sign that displays a noncommercial message that advertises a off-premises non-commercial entity is not considered an advertising sign.

**9. Identify** any **Sign**, display, mural or art on the Cozy Inn property which was erected, constructed or displayed in the past 10 years for the purpose of noncommercial speech.

ANSWER: The only displays on the exterior of The Cozy that communicated noncommercial content in the past five years that Plaintiffs are aware of are: 1) the mural on the wall of The Cozy that is the subject of this lawsuit; and 2) a display celebrating the anniversary of The Cozy which has been updated regularly throughout the years to reflect The Cozy's age.

17. Do **You** contend the **Sign Code** does not advance the City's interest in traffic safety? If so, please state all material facts supporting **Your** contention.

ANSWER: The burden of proof is on the Government to show that a restriction on speech satisfies the strict demands of the First Amendment. To date Defendant has not produced evidence as to how the sign code advances its claimed interests in traffic safety, and Plaintiffs are not aware of any such evidence.

Nevertheless, Plaintiffs believe that portions of the sign code may conceivably advance the City's claimed interest in traffic safety. For instance, Plaintiffs could imagine how regulating the construction standards of pole signs might lessen the likelihood of a poorly constructed sign falling in the road. However, Plaintiffs are not aware of any factual evidence that would support this possibility.

Other aspects of the sign code may harm traffic safety. When signs are restricted in size, this makes it more difficult for pedestrians and motorists to find their destination, resulting in drivers and pedestrians who are distracted and more likely to get in an accident that harms themselves or others. Large, distinctive signs, on the other hand, will enhance traffic safety by making it easy for pedestrians and motorists to identify their destination, allowing them to fully focus on traffic safety.

Plaintiffs contend that there is no factual reason to believe that regulating the size and content of murals painted on private property will enhance traffic safety. Plaintiffs contend that there is no factual reason to believe that murals containing a commercial message, or that pertain to goods or services for sale, or with content that "announces," "directs attention to," or "advertises" (however the government choses to define those terms) will decrease traffic safety any more than murals which contain a different message would. Indeed, it seems likely that some non-commercial murals containing a controversial political, religious, or social message (a swastika mural, a gay pride mural, a "defund the police" mural, a Satanists mural, etc.) would be far more likely to upset and distract pedestrians and motorists and decrease safety than a mural of burger-esque flying saucers.

Dated: October 4, 2024.

Kansas Justice Institute

By: Jeffrey Shaw, 29767

/s/ Jeffrey Shaw

Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Jeff@KansasJusticeInstitute.org
(913) 213-5121
Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br>Plaintiffs,<br>v.<br>**City of Salina, Kansas.**<br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verification |

**Verification**

I, Stephen Howard, have personal knowledge of myself, my activities, and my intentions, including those set out in Plaintiffs First Amended Answers to Defendant's First Set of Interrogatories. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Answers to Interrogatories are true to the best of my current knowledge, information, and belief.

Dated: 11-5, 2024.

[signature]
Stephen Howard, individually and
On behalf of Cozy Inn, Incorporated,
d/b/a The Cozy Inn

Galaxy S22

# Exhibit Q
# Herrs Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

planning staff.

**Q. So planning staff would be yourself, the two other planners and Dean Andrews?**

A. And Lauren.

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Miss Driscoll as well?**

A. Yeah.

**Q. Did you -- after calling Mr. Howard, did you then visit the Cozy Inn?**

A. No.

**Q. Okay. So you just talked to him on the phone?**

A. No. He came into my office. We met face to face in my office.

**Q. Okay. Got it. At that time, had it already been determined that the mural exceeded the size allotment for the Cozy Inn?**

A. No.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. All right. If I'm understanding this correctly, it had been determined that it was a sign, but it had not yet been determined that it**

**exceeded the size allotment?**

A. That is correct.

**Q. Okay. What criteria were used to determine that it was a sign?**

A. There were hamburgers. There was graphic imagery and symbols of hamburgers. There was text telling people not to fear the smell, and there was an arrow with some text inviting people to come inside. So there was clear advertising of their business operations.

**Q. Okay. So the planning team determined that the content of the mural was an advertisement?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. And because it was an advertisement, that's what classified it as a sign?**

A. Correct.

**Q. Okay. Did anyone ever go to the Cozy Inn and measure the size of the mural?**

A. No. What I did to determine a rough estimate is we have some digital software of imagery that is to scale. And so I can -- from that software, I can measure the height and width

potentially a modified sign code if a text amendment were created. Specifically, if text amendment were added that not only counted the exterior wall of the building that faced the street but also the wall that faced the parking lot. If a text amendment were made to allow that frontage facing the parking lot which is where the painted mural sign is, if that were to be part of the equation, would it be sufficiently large enough to allow the sign that Mr. Howard was painting.

**Q. As the code is currently written, would it allow using that side lot line in the calculation of frontage?**

A. No.

**Q. Okay. So it's only the, for lack of a better term, the frontage on the front of the building?**

A. Correct.

**Q. Okay.**

A. So this would require a text amendment, but we were trying to look at potential options for Mr. Howard.

**Q. All right. So if I am reading the equation down there correctly, is that saying that**

**you?**

A. Correct.

**Q. But it was removed from the final draft because, based on the pictures you had seen of it, that was inaccurate?**

A. Correct.

**Q. Does anything about this mural or this rendition of the hopefully completed mural change that assessment?**

MS. JOKERST: Object to form and foundation.

A. No. It looks like a hamburger sign.

BY MR. SHAW:

**Q. Okay. If you don't see it, you don't see it. I can't change that.**

**Did you subtract any area from the mural for the existing neon sign at the Cozy Inn that is on that wall?**

A. I don't believe I processed that permit.

**Q. Well, no. Let me rephrase. When you calculated the signage area in the analysis, Exhibit 8, did you subtract the square footage of that existing neon sign from the square footage you calculated for the mural?**

A. No, I did not. I was just coming up with

a estimate of the signage, not a very specific hard number.

**Q. Okay. So that was a -- for lack of a better terms, that was a ballpark figure. That was not an actual precise calculation?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Was there any subtraction of area for the service window?**

A. No.

**Q. Was there any subtraction of area for the door?**

A. No.

**Q. What about the menu board?**

A. No.

**Q. And the awning?**

A. No.

**Q. Okay. So, in Exhibit 8, do you see the current signage?**

A. Yes.

**Q. So the second sign listed there is 7th Street projecting sign, correct?**

A. Yes.

**Q. And that 24 square feet is what the size**

**drafting this letter?**
A. No.
**Q. Okay. But you were aware that this letter had been sent to Mr. Howard?**
A. Yes.
**Q. Okay. Are you familiar with a business called The Yard?**
A. Yes.
**Q. Okay. Do you know what line of business The Yard runs?**
A. Baseball training.
**Q. Okay. Can you open Exhibit 25, please?**
A. Please tell me other people struggle with this. I'm feeling kind of foolish here. Oh, it's a big one. That's why.
**Q. Yeah.**
A. Okay. With this being a large document, is there something specific you want me to look at?
**Q. Yeah. So just as you look at those first couple of pages there, can you identify what this document is?**
A. It appears to be a staff report for the demolition and renovation of existing buildings located at the northwest corner of 4th Street and

A. Correct.
BY MR. SHAW:
**Q. How are you saying building B has walls then?**
MS. JOKERST: Object to form.
A. If you are standing inside building B and you ran north as hard as you could, or even not as hard as you could, you would run into a wall.
BY MR. SHAW:
**Q. Can you look at the last picture? What does that picture depict?**
MS. JOKERST: Object to form and foundation.
A. It looks like the eastern fence boundary of building B.
BY MR. SHAW:
**Q. Does it show the southern wall of building A?**
A. Yes.
**Q. Does it show the northern extent of the roof of building B?**
A. Yes.
**Q. Are there several feet separating those two buildings?**
MS. JOKERST: Object to form and

**just say they owned that parking lot and they built a structure like this adjacent to the Cozy. Would that be -- would that transform the mural where it currently is to being inside of a building?**

A. I'd have to --

MS. JOKERST: Object to form and foundation.

A. I'd have to see the plans for that.

BY MR. SHAW:

**Q. I see. The murals depicted in Exhibit 32 here, do they depict baseball?**

A. Yes.

**Q. And I believe you testified that The Yard is a baseball training facility?**

A. Correct.

**Q. Does this mural announce The Yard?**

MS. JOKERST: Object to form and foundation.

A. (Pause).

BY MR. SHAW:

**Q. Are you thinking or --**

A. No, I am.

**Q. Okay.**

A. I'm just -- in what way?

MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Do you know if a Certificate of Compatibility was ever applied for this mural?**
MS. JOKERST: Object to form.
A. No.
BY MR. SHAW:
**Q. Do you know if a violation was ever -- or a citation was ever given to The Yard over this mural?**
MS. JOKERST: Object to form.
A. This sign is not in violation, because it is a sign oriented toward the inside of building B.
BY MR. SHAW:
**Q. Does the sign code use orientation at all in the regulation of signs?**
MS. JOKERST: Object to form.
A. That specific word?
BY MR. SHAW:
**Q. Yes.**
A. I don't know.
**Q. Does it use that concept?**
A. Yes.
**Q. Do you know where?**

BY MR. SHAW:
**Q. As well as the side wall that is depicted there.**
A. Okay. So as I recall, this property is zoned I-2 which doesn't --
THE REPORTER: I-2?
THE WITNESS: I-2.
THE REPORTER: Thank you.
A. Which is our light industrial zoning district and has different sign allowances and requirements and regulations than Mr. Howard's, for example. And one of the differences is there's not a limitation that I recall on the number of signs you can have. And so what was done is a rectangular box around the various elements and those were all added together into an aggregate.
BY MR. SHAW:
**Q. So you didn't do the entire mural, just the elements of the mural individually?**
A. Correct.
MS. JOKERST: Object to form and foundation.
BY MR. SHAW:
**Q. Did you perform a similar analysis at the**

**Cozy' mural where you took the different elements and calculated them individually?**

MS. JOKERST: Object to form and foundation.

A. No, because Cozy Inn was already up against their limit of the total signs they could have, and so I was trying to figure out a way to allow an additional sign. But I knew that if I did an analysis of all the different elements, one, it would be very, very difficult and, two, it would be unpermitable because the regulations have limits on number of signs in the C-4 district.

BY MR. SHAW:

**Q. If you had measured the Sharp mural as basically the whole wall, the rectangle the way you did with the Cozy, would it have been within the size limits for that district?**

MS. JOKERST: Object to form.

A. I don't know.

BY MR. SHAW:

**Q. Okay. How did you measure the frontage of this building?**

A. It has two frontages. It has frontages on 9th Street and the street to the east as well -- or excuse me, yeah, to the east.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit R
# Sign Permit Application

Community & Development Services
Planning Division
300 West Ash | Room 205 | PO Box 736
Salina, Kansas 67402-0736

City of Salina

PHONE | 785.309.5720
FAX | 785.309.5713
TDD | 785.309.5747
WEB | www.salina-ks.gov

# SIGN PERMIT APPLICATION

**Site plan, elevation drawings with dimensions, & shop drawings are required with this submittal**

108 N. 7th — Address Where Sign(s) is / are to be installed
The Cozy Inn — Name of Business

Steve Howard — Name of Business Owner
8822 S Sunnyside Rd — Mailing Address (if different than above)
67425 — Zip Code
785-462-1163 — Phone Number

west 44.4 ft of the S. 20.8 ft of lot 103 on 7th St located at 108 N. 7th St — Legal Description (attach separate page if necessary)

Steve Howard — Property Owner of Record
8822 S SunnySid Rd — Mailing Address
67425 — Zip Code
785-452-1163 — Phone Number

Same — Owner of ~~Sign~~ mural
Mailing Address
Zip Code
Phone Number

Colin Benson — Sign Installer / License #
117 S. Santa Fe — Mailing Address
67401 — Zip Code
X — Phone Number

## PROPOSED SIGN(S)

Class of Work: ☒ New ☒ Alteration Estimated Date of Installation: ______________

Illumination: ☐ Internal ☐ External ☐ Electronic Message Center ☒ None

Will any new electrical work be necessary? ☒ NO ☐ YES*- Electrical Contractor: ______________________

**If YES, **separate permit is required** and will be issued to the electrical contractor at the time the sign permit is issued*

Are there overhead power lines within 10 feet of proposed location of sign? ☒ NO ☐ YES

Type of **Proposed Sign(s)** – Indicate number of signs next to sign type:

☐ Pole ☐ Ground ☒ Wall ☐ Awning ☐ Canopy ☐ Marquee

☐ Projecting ☐ Roof ☐ Decorative ☒ Other (Describe): Mural exceeding ~~the~~ allowable space for mural/sign arg

## EXISTING SIGN(S)

☐ Check box if there are no **existing signs** at this address at time of sign permit application or if existing sign(s) will be removed to install new sign(s).

*If box is not checked, provide the information requested in the following table for each existing sign. Do not include signs or square footage of the sign(s) listed as proposed signs above or sign(s) that will be removed to install new sign(s).*

30(b)6
EXHIBIT NO. 8
APPINO & BIGGS

See Next Page >

City of Salina
Sign Permit Application | Page 2

**INVENTORY OF EXISTING SIGNS**

| Type of Sign (Pole, Ground, Wall, Etc.) | Description | Square Footage (Per Individual Sign) | Height (If Applicable) |
|---|---|---|---|
| X ~~Wall~~ | ~~See Attached~~ | ~~528 sq ft~~ | |
| | | | |
| Wall Sign | N. facing wall Sign | 24 sq ft | |
| Projection sign | 7th St Projection Sign | 24 sq ft | |
| Awning Sign | 7th St Awning Sign | 4.88 sq ft | |
| | | | |
| | | | |
| | | | |

Steve Howard
PRINTED Name of Applicant

The Cozy Inn
Applicant's Company / Employer Name

steveh@cozyburger.com
Applicant's Email Address

785-452-1153
Applicant's Phone Number

[signature]
SIGNATURE of Applicant

11-13-23
Date

**For Office Use Only Below Line**

Date Received: ____________ Sign Permit Number ____________

Is business part of a shopping center or zoning lot with multiple businesses? ☐ NO ☐ YES

| Zoning | Square Footage of Signs | Illumination Approved | SPECIAL CONDITIONS: |
|---|---|---|---|
| Historic District | New | Electrical Permit Required? | |
| B.I.D. | Existing | Contr. License Verified? | |
| Vision Triangle | Total | Proposed Set-back | |
| | Total Allowed | Required Set-back | |

| Approved for Issuance By | Date | Permit Fee | Receipt #, Staff Initials |
|---|---|---|---|
| | | | |

BLF-051, Rev. 10.2018

CITY000024

CITY000023


COZY INN
HAMBURGERS
BUY EM
Don't Fear the Smell!!
The Fun is inside!!

# Exhibit S
# Howard Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**buy a six-pack. Is that right?**
A. Yeah.
**Q. A 12 pack?**
A. Yeah.
**Q. A 18 pack?**
A. Yes. But that will be three bags of six.
**Q. Okay. Oh, okay. So there's not the bags or the sacks that you put them in, there's just six to a sack?**
A. If the math works out. If somebody orders 20, we may do four bags of five.
**Q. Okay. And that's what I was going to ask. So you can buy in any denomination?**
A. Yeah. One to however many you want.
**Q. Okay.**
A. Even numbers are the most popular.
**Q. Okay. Well, when someone comes in, do you usually recommend that they buy a six-pack?**
A. If I get them to stay inside and eat, then I'll look at you and I'll tell you you'll probably eat three, maybe four and I'll look at the husband or other person, I'll look at Aaron, you'll eat four, maybe five because you want to. You know, because you want to. Anyway, I just try to make it fun.

**Q. Okay. So when someone comes inside, you can talk to them and suggest how many they should have?**

A. Yes.

**Q. Okay. What about at the ordering window?**

A. It is -- at the walk-up window, it's not as personal because you don't get the feel of -- our entertaining is inside. You know, all of us talk with everybody, and the conversations are always appropriate. They are timely. Walk up -- if you use the walk-up window, you're just kind of missing the whole point.

**Q. Okay. Do you feel like you're able to upsell better for customers that come inside?**

A. Yes.

**Q. Okay. Does that increase your sales for customers that come inside?**

A. Not always.

**Q. Okay. But does it typically?**

A. No. Because the walk-up window can get every bit as busy as the inside. And if it's snowing, they're probably going to come inside to order and not the walk-up window which won't be very many because wintertime is slow.

**Q. Okay. Well, what about in the summer?**

A. Summertime's my busy season, and it's about half and half. I don't know, I guess, what...

**Q. Okay. So of your customers, approximately 50 percent use the walk-up window and 50 percent go inside?**

A. I don't have any numbers to prove, but just by experience, yeah, 50/50.

**Q. Okay. Do you ever track that? I know you said you don't have the numbers, but do you ever track that --**

A. No.

**Q. -- in your head?**

A. No.

**Q. No. So it's --**

A. I have a very simple cash register. It tells me how many transactions I do and that's it. Doesn't tell me window or inside.

**Q. Okay. But you said coming up to the walk-up window is impersonal?**

A. Yeah. You're missing the whole point of going to The Cozy Inn.

**Q. Okay. Well, tell me about. What's the whole point of going to The Cozy Inn?**

A. You go inside, you get tagged right away

by the onion smell. And that's the butt of all jokes with The Cozy. Hey, I went to -- you can't -- Aaron can't go to his friend and say, hey, I went to The Cozy Inn today. Did you go inside? No. That's not -- that's not -- that's enough. You can't brag to your friends if you don't go inside.

**Q. Okay.**

A. My opinion.

**Q. And is that because the onion smell in The Cozy is infamous?**

A. Yes.

**Q. Okay. And is the onion smell inside The Cozy distinctive?**

A. Yes.

**Q. And when someone -- let me see how I'm going to ask this. All right. So you had mentioned that -- well, let me ask you this. So the whole purpose or you said something like you want customers to come inside The Cozy, right?**

A. Yes.

**Q. Okay. And you want them to come inside of the Cozy because you want them to order food inside, correct?**

A. Yes.

**are sitting on the stools, are the people who are standing, is that quite crowded then when you have 12 people in there?**

A. Yeah.

**Q. Okay. Would that be very comfortable for those people to stand behind the stools against the wall?**

MR. SHAW: Objection to form.

A. The conversations go everywhere. The customers talk to the other customers who don't know them. Sometimes, for instance, I had a family from, I don't know, Indiana. Another family from Indiana same time. They're in the same neighborhood. They didn't know each other. They didn't know they were going to The Cozy Inn. As they're leaving, hey, we'll see you at the pool this summer. It's neat stuff.

BY MS. JOKERST:

**Q. Okay. But what I was asking, though, if someone is just having to stand behind the stool, is that comfortable for them?**

MR. SHAW: Objection to form.

A. I don't know. If you don't like standing, I guess you would.

BY MS. JOKERST:

**Q. Okay. Well, how many times have you had 12 to 15 people sitting in The Cozy congregating in there for longer than 30 minutes?**

A. Yesterday.

**Q. Okay. So --**

A. It was -- we get very, very, very busy. And most of -- well over 90 percent of my customers come off the interstate.

**Q. Okay. And you had mentioned something about, you know, you -- it's about so you have a greeter there, the person that's doing the customer interaction that it's about being fun and welcoming the customer, right?**

A. Yes.

**Q. Okay. Well, what types of things does the greeter do to make it fun?**

A. We've got to be entertainers. You know, whatever rolls off your tongue, great, you know. We say the same thing all day long every day. Sometimes it changes up a little bit. Where are you guys from? So we'll feed off that. You know, we talk about where they're from.

**Q. Okay. Do you invite them to purchase some of the merchandise that's for sale inside.**

A. No, they usually ask.

**Q. You don't remember what you talked about?**
A. No. It's been over a year ago.
**Q. Okay. Well, not quite a year ago, right, because that's October. It's October now. Well, you've said this painting was your heart and soul, right?**
A. In a way.
**Q. In a way. Okay.**
A. It's a story.
**Q. Okay. But it's important to you, right?**
A. Yes.
**Q. Okay. So weren't the conversations you had with Colin Benson about this painting, weren't those important?**
MR. SHAW: Objection to form.
A. Why would I think that I needed to remember that?
BY MS. JOKERST:
**Q. Well, usually when something is important it can be memorable. So that's why I was kind of asking you, you know, if these were important. Is there something that might refresh your recollection about the communications you had with Colin if they were in person versus text?**
A. No. My wife would tell people I'd forget

I don't know who called. I didn't receive the first phone call. I just called him back. Yes, it was Dustin, though.

**Q. Okay. So Dustin Herrs told you to stop?**

A. Yes.

**Q. Okay. And why did he tell you to stop?**

A. That's where you're going to lose me, all this sign stuff. I have no idea what code is and this and this and this. He lost me.

**Q. Okay. Did he tell you that the painting was a sign?**

A. His opinion.

**Q. Okay. But he told you that it was the city's opinion that the painting was a sign?**

A. Yes.

**Q. Okay. Did he tell you that the painting was too large to qualify for a sign permit?**

A. Something like that, yes.

**Q. Okay. And is that why you reached an agreement to stop work on the painting?**

MR. SHAW: Objection to form.

A. I thought I had to get permission. So I don't know if I paid my $35 permit fee that day or if even if it's that commission meeting night that I went. I don't remember.

**Hill Museum on November 13th?**
A. I don't remember.
**Q. You don't remember. But you do remember going to a meeting at the Smoky Hill Museum?**
A. Yes.
**Q. Okay. Do you remember who was at that meeting?**
A. Maybe.
**Q. Okay. There was city personnel at that meeting?**
A. Yeah. Lauren Driscoll, Mike Schrage and Brad Anderson, I believe.
**Q. Okay. And was Dustin Herrs there?**
A. I don't remember.
**Q. Okay. Other than city staff, were there other people present?**
A. There were.
**Q. Okay. Who else was present?**
A. My wife.
**Q. Okay.**
A. And Kris and Grant Johanson.
**Q. Okay. Kris and Grant?**
A. Um-hum. I think that's it.
**Q. Okay. Well, was Colin Benson there?**
A. Oh, yeah, he was right beside me.

**Q. Okay. Does Jenni's Liquor sell any food?**
A. No. Candy bars, snacks, sunflower seeds.
**Q. All right. And how long have you owned Jenni's Liquor?**
A. Maybe 2020.
**Q. Okay.**
A. Maybe 2021, June is when we took over, one of those years.
**Q. All right. And on the wall at Jenni's Liquor, you had a similar display painted. Is that right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. But it's not the exact same display, right?**
A. No.
**Q. Okay. So I want to direct your attention to Exhibit Y.**
MR. SHAW: I will object to the use of all these photos as they were not timely disclosed in accordance with the scheduling order.
MS. JOKERST: Okay. And I recall just note for the record on the purpose of this is that is our position they should have been disclosed

A. I've got a crazy mind.
**Q. Okay. It was your idea?**
A. Yes.
**Q. Okay. So did you talk to Colin Benson about it?**
A. After I asked the mayor if I could do that, the mayor of Brookville.
**Q. Oh so you asked the mayor of Brookville for --**
A. If I could paint a mural.
**Q. Okay. So you asked the mayor of Brookville whether or not you could paint that, and what did the mayor of Brookville say?**
A. You don't want to know, but, of course, he said yes.
**Q. Okay. Well, I don't want to know. Why don't I want to know?**
A. He goes I don't care what the fuck you do on your wall.
**Q. Okay. And so you decided that you were going to work with Colin again?**
A. Yes.
**Q. Okay. Did you call Colin up, did you text Colin? How did you get in touch with Colin?**
A. Probably called him.

A. Yes.
**Q. Okay.**
A. Not located.
**Q. Okay. And the painting, that consists of pictures, right?**
A. Yes.
**Q. And imagery?**
A. Yes.
**Q. Okay. And there are letters?**
A. Yes.
**Q. Words?**
A. Yes.
**Q. Okay. And it's attached to the wall, right?**
A. Yes.
**Q. Okay. Are you aware that the city has reserved it's right to collect it's legal fees if it prevails in this lawsuit?**
A. No.
**Q. You're not aware of that? Okay. Are you aware that the city can pursue you for those legal fees if it prevails in this lawsuit?**
A. I thought that that would be a possibility.
**Q. Okay. So you are aware that the city can**

**pursue you for those legal fees if it prevails?**
A. I don't know the law.
**Q. Okay.**
A. Anyway.
MS. JOKERST: Those are all the questions I have for today but just noting again that we're holding it open.
CROSS-EXAMINATION
BY MR. SHAW:
**Q. So, Mr. Howard, throughout this deposition, at various points you have made reference to your story. What do you -- what do you mean by your story?**
A. Somebody, a customer, don't know who, they asked me where my ships were coming from, and so that got me thinking. I've got to have a story behind this.
**Q. The customer asked where your ships were coming from just in general or --**
A. Yes.
**Q. -- what was the context of that?**
A. Over just the conversation. Well, where are your ships coming from.
**Q. Okay.**
A. And that got me thinking. I've got to

come up with a story.
**Q. And is that what made you want to create another mural at Jenni's Liquor?**
A. Yes.
**Q. Okay. Is there any other part of the story that you feel like expressing?**
A. No.
**Q. Okay. And how do you feel that you have been told you cannot complete the Mural at the Mill Cozy Inn?**
A. By voice and letter.
**Q. I'm sorry. I didn't hear you.**
A. I've been told and gotten a letter.
**Q. I mean how does it make you feel when you were told that you could not complete the mural?**
A. That I didn't have a voice.
**Q. Okay. Why did you decide you wanted to have a mural with burger-esque flying saucers?**
A. I'm into Wi-Fi -- Sci-Fi.
**Q. Okay. So you like science fiction?**
A. Yes.
**Q. All right. And so you just liked the idea have having a science fiction themed mural?**
A. A few years ago, I had a customer from Salina did a video of aliens landing on -- coming

to Salina in their ships. It's really cool. I think I might have sent it to you, Sam. And then they beam onto the roof of Cozy, and they beam down and then they beam up with burgers and then they fly away.

**Q. Okay. And is the Cozy a reference -- is the Cozy Inn mural a reference to travelers?**

A. Yes.

**Q. Okay. How does it refer to travelers?**

A. Okay. I have a map inside the store that people write in -- they pin where they're from or they have -- they write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here. Over 90 percent of my business are travelers. I don't know if I said that.

**Q. And the rendering that was attached to your sign permit application, is that what you desire for Mr. Benson to paint on the side of the wall if he's allowed to complete the mural?**

A. Yes.

MR. SHAW: Okay. I have no further

## CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 17th day of October, 2024.

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs

Sandra S. Biggs, C.C.R No. 0716

# Exhibit T
# Howard Declaration

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment |

**Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment**

I, Stephen Howard, have personal knowledge of myself, my activities and my intentions as set out in this Declaration. I verify under penalty of perjury under the laws of the United States of America the following concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Cozy Inn, Incorporated, d/b/a The Cozy Inn:

1. The Cozy Inn is small. The dining area is about 192 square feet, and only around 40 square feet are accessible to customers.

2. Inside, The Cozy displays historical pictures and articles, including underneath the countertop where customers sit.

3. The Cozy and I are proud of the murals in Salina.

4. In 2023, I decided that The Cozy's plain-white wall didn't reflect my personality or The Cozy's personality.

5. I wanted to participate in this part of Salina culture and I wanted to paint a mural on The Cozy's side wall.

6. My vision and dream for The Cozy's artwork came from the art all over town.

7. I hired Colin Benson to paint a story that would show my personality and The Cozy's personality.

8. I am a "Sci-Fi" fan and I liked the idea of having a science fiction themed mural at The Cozy.

9. Once completed, the UFO-themed mural will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard and will read "Don't Fear the Smell!! The Fun is Inside!!"

10. This is what the finished mural will look like.




11. The mural tells a "story" about travelers, both alien and human: I have a map of the United States inside the store that people can place a pin where they're from or foreign visitors can write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here.

12. The painting, which was partially inspired by a Sci-Fi video I thought was cool. It is expressive artwork and conveys my character and The Cozy's character.

13. The UFO-themed mural is my vision and dream for The Cozy Inn, and part of my heart and soul.

14. I didn't paint the mural to maximize profits.

15. I prefer when customers come inside to order, rather than use the walk-up window, because the walk-up window is not as personal, and the experience of our entertainment is inside. We talk with everybody. If you use the walk-up window, you're just kind of missing the whole point.

16. Because The Cozy only has 6 stools inside, and unlimited space outside, The Cozy is no better off, financially, if people come inside.

17. Having people come inside is more personal, more fun, more enjoyable for myself and the people who come inside, and it is better for Salina's reputation.

18. Colin Benson started painting The Cozy's mural on Friday, November 3, 2023.

19. On Monday, November 6, 2023, City Planner Dustin Herrs told me that I couldn't finish the display even though there had been no public complaints about it and only city officials took issue with the mural at The Cozy.

20. On the morning of November 13, 2023, Salina officials held a meeting with me and Mr. Benson.

21. Salina told me to submit a sign permit.

22. I submitted the completed sign permit application on November 13, 2023.

23. Salina did not respond to the application within the written code's 10-day deadline.

24. Salina failed to provide a written notice or statement of reasons of denial of the sign permit application.

25. I received a letter dated February 8, 2024, from Salina that put the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete."

26. I did not consent to Salina placing my application on-hold.

27. I am very passionate about my one-of-a-kind UFO-themed mural.

28. I was moved to tears at a City Commission meeting because Salina wouldn't let me finish my mural or explain myself at the Commission meeting.

29. I speak to countless customers a week and no one have ever told me they dislike my design for my UFO-themed mural. Many people have told me that they like the mural.

30. Not being able to finish the mural made me feel like I didn't have a voice.

31. I don't want to alter the mural's content as shown in the rendition shown above.

32. I want to finish what I started. I didn't get to finish my story. I want to paint my wall.

33. I will testify at trial or for other purposes consistent with the contents of this declaration.

Dated:____________________, 2025

______________________________
Stephen Howard, individually and on behalf of Cozy Inn, Incorporated, d/b/a The Cozy Inn

33. I will testify at trial or for other purposes consistent with the contents of this declaration.

Dated: 2-4, 2025

[signature]
Stephen Howard, individually and on behalf of Cozy Inn, Incorporated, d/b/a The Cozy Inn

Galaxy S22

# Exhibit U
# On-Hold Letter

DEVELOPMENT SERVICES
PLANNING AND COMMUNITY DEVELOPMENT
Dustin Michelson, Planner I
300 West Ash · P.O. Box 736
Salina, Kansas 67402-0736

City of Salina

TELEPHONE · (785) 309-5720
FAX · (785) 309-5713
TDD · (785) 309-5747
E-MAIL · dustin.michelson@salina.org
WEBSITE · www.salina-ks.gov

February 8, 2024

Steve Howard
The Cozy Inn
108 N. 7th Street
Salina, KS 67401

RE: Existing Painted Wall Sign/Mural at 108 N. 7th Street

Dear Mr. Howard:

We are in receipt of your Certificate of Compatibility application dated November 13, 2023 and your sign permit application (#23-2221-SIGN) dated November 15, 2023, submitted on behalf of The Cozy Inn, requesting approval of an existing painted wall sign/mural at 108 N. 7th Street. As discussed in previous conversations regarding this sign/mural, the total square footage of the signage installed at 108 N. 7th Street exceeds the maximum gross surface area allowed on this property per the C-4 zoning district sign regulations (Sec. 42-521). Additionally, 108 N. 7th Street is located in the Downtown Salina Business Improvement District Number 1, which requires a Certificate of Compatibility to be approved by the Downtown Design Review Board (DRB) before City Staff may issue a permit for any work to construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of any building or any other improvement to real property in the Salina Business Improvement District Number 1 (Sec. 2-207).

This letter is to inform you that the City is engaging in a comprehensive review of the City's sign regulations, which will include a review of the regulations pertaining to painted wall signs. As a result of this, and due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on-hold until our review of the sign regulations is complete. Once we have completed that code review process, Staff will then be able to facilitate a Certificate of Compatibility application to be considered by the DRB, as well as review your sign permit application in the context of any sign regulations that may be revised during our code review. Additionally, during this period, the City will withhold any further zoning enforcement actions regarding the existing signs at The Cozy Inn until City Staff is able to further review the sign permit application under any changes to the sign regulations that may come out of this comprehensive review.

As part of the City's review of the sign regulations, we'll be bringing in an outside consultant who is experienced in assisting municipalities with updates and revisions to their sign regulations, an important component of the process will involve gaining insight from community stakeholders about the existing regulations relating to murals and painted wall signs and potential updates to the codes. Our office is in the process of scheduling a stakeholder meeting for Friday, February 16, 2024, and we will follow up with specific details of the meeting in hopes that you are able to attend.

30(b)6
EXHIBIT NO. 11
APPINO & BIGGS

Thank you for your cooperation in this matter. If you have any questions, please contact me or Dean Andrew, Zoning Administrator, at (785) 309-5720.

Sincerely,

Dustin Michelson
Planner I

CC: Dean Andrew, Zoning Administrator

# Exhibit V
# Michelson
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

DUSTIN MICHELSON,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 5:08 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**where it says as a result of this and due to the unique nature of the existing signs at the Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until review of the sign regulation is complete?**

A. Yes.

**Q. Did Miss Driscoll tell you to place the applications on hold?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Do you know -- sorry. Were you going to say something?**

A. To clarify, I didn't place the permits on hold. This letter I was told to communicate what was happening.

**Q. Okay. So do you know who placed the applications on hold?**

A. No.

**Q. Okay. You were just told to communicate that to the applicant?**

A. Yes.

**Q. Okay. Do you know if the -- either the sign code or the building improvement district**

**CERTIFICATE**

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit W
# Defendant's Amended Response to First Set of Interrogatories

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

A

A A

A

A . 6 24- -01027- -A

.

.

**DEFENDANT'S A RESPONSES TO PLAINTIFF'S FIRST SET OF A**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Amended Responses to Plaintiff's First Set of Interrogatories. The selected responses are set forth below:

A B

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*9.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

A

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

B A

**Sign Code or BID Code as the "mural-sign code regime." Subject to and without**

. 42-

764.

42-764 .

.

A **cannot "identify" as requested.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

B A

B **Code as the "mural-sign code regime." Subject to and without objection, the City does not use or apply the term "mural" as defined by**

. 42-

764

.

-
- B
-
- B
- 1212
- 684 B
- 1017 .

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

- 2045 . .
- 1805 .
- B 650 . A
- B 1325 . .
- 301 . 9 .
- 701
- 662 . 9 .
- 736 A
- 708 . A
- 1212 .
- 1008 .
- 2360

Respectfully submitted this 23rd day of August, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

A

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing A A A A are true and correct as of this date based upon my present knowledge, information, and belief.

DocuSigned by:
6D0400503E2B494...
Signature

Executed on August 23, 2024

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2024, I caused the foregoing **DEFENDANT'S** A **RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit X
# Windholz
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
ANDREA WINDHOLZ,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 2:00 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**come into The Cozy is to make a sale?**

MR. SHAW: Objection to form.

A. We just -- we don't really -- we don't really look for people to come in and purchase anything. We want them to come in and see the history within Salina. Like we are one of Salina's oldest running businesses, one of Salina's oldest restaurants. We want people to come in and see our history. And then, also, we encourage them to shop downtown. We tell them all the time like we have an amazing ice cream shop right around the corner. We have really cute boutiques. We tell people all the time about our local brewery right around the corner from us. So we just -- we really want them to just come stop in and see what Salina has to offer.

BY MS. JOKERST:

**Q. When customers come into The Cozy, do you encourage them to buy a burger?**

A. If they come in and they're like -- kind of like, oh, we just ate, blah, blah, blah, and we're like how about if you guys -- I mean we'll give you a burger on us. You're here, you should try, see what we're all about, see what people talk about. We don't encourage them to purchase,

no. We like -- we will give a burger to them. We won't make them purchase it most of the time. Like we'll just give it to them to try.

**Q. Okay. But if everyone came into The Cozy and you gave them a free burger, how would that affect The Cozy's business?**

A. We don't offer it to everyone. If we're busy, busy and don't have time to do that, then we won't obviously offer it. But if they come in and they're like, oh, we're just looking. We'll be like okay. Well, let us know if we can get you anything. We obviously don't give a free burger to everyone that comes in. It's just like when we're slow and we're talking to people and they're like, oh, we just came in to look. And we're like okay. Well, you know, this is what we're about, whatnot. And they're like, oh, we just ate. And then we can offer it. If they turn it down, they turn it down. But if they would like a burger to munch on and we're not busy at all and there's no one in the store, we'll do it that way. But we don't give them to everyone.

**Q. Okay. I'm going to talk a little bit about the merchandise sales at The Cozy. How much merchandise on average does The Cozy sell each**

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs
_______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit Y
# 4/17/17 Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**April 17, 2017**
**4:00 p.m.**

The City Commission convened at 1:30 for Smoky Hill River Renewal Preliminary Design Discussion and at 3:45 p.m. for Citizens Forum.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. Roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Mayor Kaye J. Crawford (presiding), Commissioners Jon Blanchard, Trent Davis, Melissa Rose Hodges, and Karl Ryan.

Also present: Jason Gage, City Manager; Michael Schrage, Deputy City Manager; Greg Bengtson, City Attorney; and Shandi Wicks, City Clerk.

## AWARDS AND PROCLAMATIONS

(3.1) The day of April 22, 2017 as "Multiple Sclerosis Awareness Day" in the city of Salina. Brent Kirkhart introduced Jenna Farris and Ms. Farris read the proclamation. Mr. Kirkhart announced associated events. Commissioner Davis provided his thoughts on the MS Walk event in Salina and asked citizens that could not attend to please consider a donation to the cause.

(3.2) Presentation of Certificate of Commendation to three (3) civilians for life saving efforts from the Salina Fire Department.

Chief Royse provided information on the emergency incident and presented Dr. Lonnie Booker, Professor John Burchill and Rex Chapman a Certificate of Commendation for their life saving efforts during a medical emergency in December 2016. The Mayor and Commissioners thanked the civilians for their life saving efforts.

## CITIZENS FORUM

None.

## PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME

None.

## CONSENT AGENDA

(6.1) Approve the minutes of April 10, 2017.

(6.2) Approve Resolution No. 17-7445 appointing members to the Animal Control Advisory Board, Arts & Humanities Commission and the Library Board.

17-0099 Moved by Commissioner Davis, seconded by Commissioner Hodges, to approve the consent agenda as presented. Aye: (5). Nay: (0). Motion carried.

## ADMINISTRATION

(7.1) Second reading Ordinance No. 17-10880 changing the zoning district classification from PDD I-2 (Light Industrial Planned Development District) to I-2 (Light Industrial) on property located on the north side of Schilling Road east of Centennial Road.

Mayor Crawford noted that Ordinance No. 17-10880 was passed on first reading on April 10, 2017 and since that time no comments have been received.

17-0100 Moved by Commissioner Blanchard, seconded by Commissioner Davis, to adopt Ordinance No. 17-10880 changing the zoning district classification from PDD I-2 (Light Industrial Planned Development District) to I-2 (Light Industrial) on property located on the north side of Schilling Road east of Centennial Road on second reading. A roll call vote was taken. Aye: (5) Blanchard, Davis, Hodges, Ryan, Crawford. Nay: (0). Motion carried.

(7.2) Second reading Ordinance No. 17-10881 changing the zoning district classification from C-1 (Restricted Business) and R-3 (Multiple Family Residential) to H-M (Hospital Medical District) on property addressed as 523 South Santa Fe Avenue, 535 South Fifth Street and 537 South Fifth Street.

Mayor Crawford noted that Ordinance No. 17-10881 was passed on first reading on April 10, 2017 and since that time no comments have been received.

17-0101 Moved by Commissioner Hodges, seconded by Commissioner Ryan, to adopt Ordinance No. 17-10881 changing the zoning district classification from C-1 (Restricted Business) and R-3 (Multiple Family Residential) to H-M (Hospital Medical District) on property addressed as 523 South Santa Fe Avenue, 535 South Fifth Street and 537 South Fifth Street on second reading. A roll call vote was taken. Aye: (5) Blanchard, Davis, Hodges, Ryan, Crawford. Nay: (0). Motion carried.

(7.3) Request to authorize staff to prepare a Special Assessment Engineering Feasibility Report for Phase II of the Cedar Ridge Addition.

Dan Stack, City Engineer, explained the request, project location and action options.

Commissioner Blanchard asked how much staff time and expense would it cost the City of Salina for this request. Mr. Stack stated there would be a limited amount of staff time to complete the report.

Bob Haworth, Lee Haworth Construction President, provided additional information on the request.

Commissioner Blanchard asked how many linear feet this phase would be and if a market analysis had been completed for this project. Mr. Haworth stated he did not know what the linear feet was and he had not had a market analysis completed.

Commissioner Blanchard also asked how many lots in town with the identical lot size were currently available. Mr. Haworth stated he was not aware.

Commissioner Blanchard asked what the market saturation was for housing in town. Jason Gage, City Manager, stated there was not a current consultant report that would provide that information.

Commissioner Blanchard provided his thoughts on the request and growth management in the community.



DRAFT

Mayor Crawford asked how many lots were sold in the subdivision. Mr. Haworth stated 22 lots were sold. Commissioner Hodges asked how many lots were in Phase I. Mr. Haworth stated there were 25 lots.

Mr. Gage provided information on special assessments.

Michael Schrage, Deputy City Manager, stated the amount of special assessments per lot varied based on how the special assessments were set up.

Commissioner Davis provided his thoughts on the request.

A conversation ensued between the Commission and Mr. Gage regarding the special assessments and the housing study.

Commissioner Davis asked what the percentage was for the special assessments for Phase I. Mr. Haworth stated it was an 80/20 split.

Commissioner Blanchard provided his thoughts on the request. Mr. Gage stated the banks were hesitant to lend large amounts of money and special assessments were looked at for the financing of the properties.

Commissioner Blanchard continued to provide his thoughts on the request pertaining to developers and street maintenance within the subdivisions. Mr. Stack stated the streets within the subdivision were completed in 2005 and the microsurfacing of the streets typically happen every couple years after the streets were completed.

Commissioner Hodges provided her thoughts on the request and thought special assessment guidelines need to be created. Mr. Gage stated staff had been tasked with creating special assessment guidelines in the near future.

Randall Holm, 311 E. Crawford, stated the National Association of Realtors' current supply and demand was for $110,000 to $150,000 homes and continued to provide his thoughts on the request.

17-0102 Moved by Commissioner Davis, seconded by Commissioner Ryan, to authorize staff to prepare an engineering feasibility report and Resolution of Advisability for Phase II of the Cedar Ridge Addition for future consideration by the City Commission.

Mr. Gage asked staff how imperative it was to have the funding split. Mr. Stack stated staff would need that funding split in order to complete the report.

17-0103 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to amend the motion to authorize staff to prepare an engineering feasibility report and Resolution of Advisability for Phase II of the Cedar Ridge for future consideration by the City Commission using a 50/50 funding split.

A conversation ensued between the Commission and Mr. Gage regarding the funding split, special assessments and the housing study.

Mr. Gage stated staff could work on the calculation of the project and create the amenities checklist and bring it back to the Commission for future action. Commissioner Blanchard stated the amenities checklist should be considered separately.

Mayor Crawford restated the motion to amend the motion to authorize staff to prepare an engineering feasibility report and Resolution of Advisability for Phase II of the Cedar Ridge Addition for future consideration by the City Commission using a 50/50 funding split. Aye: (2). Nay: (3) Crawford, Davis and Ryan. Motion failed.



DRAFT

Mr. Gage asked if the funding split would be needed in order to create the feasibility report. Mr. Stack stated staff could prepare the feasibility report and bring it back for action giving options for the funding split.

Mr. Haworth provided his thoughts on the funding split. A conversation ensued between the Commission, Mr. Haworth and Mr. Gage regarding the funding split and use of special assessments.

Mr. Gage provided information on the creation of a special assessment policy. Commissioner Hodges asked how soon the policy could be completed. Mr. Gage stated with the other large projects if it did not entail a lot of research, staff could bring it back in 80 to 120 days.

Commissioner Blanchard stated he did not think there was anything staff could bring back to the Commission for special assessments, it would need to be done by the Commission. He continued to provide his thoughts on the request.

Mayor Crawford restated the original motion to authorize staff to prepare an engineering feasibility report and Resolution of Advisability for Phase II of the Cedar Ridge Addition for future consideration by the City Commission. Aye: (4). Nay: (1) Blanchard. Motion carried.

(7.4) Resolution No. 17-7446 expressing support for Flint Hills Holdings Group's application for Low Income Housing Tax Credit to redevelop Phase I of the Lee Buildings located at 254 North Santa Fe Avenue.

Michael Schrage, Deputy City Manager, explained the request, tax credit program and action options.

Matt Gillam, Overland Property Group, partnering with Tony Krsnich, Flint Hills Holdings, provided information on the development companies, the past projects the companies have completed and the request.

Commissioner Ryan asked when the Kansas Housing Resources Corporation application approval date would be. Mr. Gillam stated typically by the end of May to first of June.

Commissioner Davis asked if any cosmetic work would be completed on the breezeway or on the south building. Mr. Gillam stated the north building would be completed utilizing the tax credits but the south building would be left untouched until the next phase because the tax credits had to be used for the building listed on the application filed with the Kansas Housing Resources Corporation.

Commissioner Blanchard thanked Mr. Gillam and Mr. Krsnich for the request and stated he was in favor of the development and would back the request.

Judy Larson, 2130 E. Crawford, provided her thoughts on the request and the target audience. Mr. Krsnich provided additional information regarding affordable housing and the target income levels.

17-0104 Moved by Commissioner Hodges, seconded by Commissioner Davis, to adopt Resolution No. 17-7446 expressing support for Flint Hills Holdings Group's application for Low Income Housing Tax Credit to redevelop Phase I of the Lee Buildings located at 254 North Santa Fe Avenue. Aye: (5). Nay: (0). Motion carried.

(7.5) Consider the First Amendment to Agreement with Federal Signal Safety and Security Systems to address the discounted purchase of two (2) additional sirens and to accept the revised "preliminary" siren coverage map.

Jason Gage, City Manager, explained the amendment, coverage map revisions and action options.

Bernie Botson, Deputy Director of Saline County Emergency Management, stated the location of siren #12 would need to be moved closer to the Saline County Road and Bridge Department Building and staff would work with Federal Signal Safety and Security Systems.

Mr. Gage stated staff would need to look into finding a type of coverage for the landfill in the near future. He continued to state that the placement of a siren at the landfill would be difficult with the various cells and constant movement of equipment and work.

Commissioner Blanchard asked if the location of siren #12 would provide coverage to the unplatted land by the airport runway. Mr. Botson stated the buffer area would be out of the city limits far enough to cover the unplatted area.

Greg Bengtson, City Attorney, stated there were a few more details to include within the contract and asked for the Commission to approve the form of the first amendment to allow staff to fully complete the amendment.

Commissioner Davis asked if there would need to be an additional siren; would the cost be the same. Mr. Gage stated the amount could be included in the contract to ensure the cost would remain the same.

Randall Holm, 848 Custer, asked what type of decibel coverage would there be for the Salina Soccer Complex. Mr. Gage stated the active use coverage would be covered by the siren.

17-0105 Moved by Commissioner Davis, seconded by Commissioner Blanchard, to approve the form of the First Amendment to Agreement with Federal Signal Safety and Security Systems to address the discounted purchase of two (2) additional sirens and to accept the revised "preliminary" siren coverage map. Aye: (5). Nay: (0). Motion carried.

**DEVELOPMENT BUSINESS**

(8.1) Application No. Z16-6A, (filed by the Salina Planning Commission), requesting an amendment of Article X. Signs in Chapter 42 of the Salina Code.

(8.1a) First reading Ordinance No. 17-10882.

Dean Andrew, Director of Planning, explained the sign regulation changes, Planning Commission recommendation and action options.

Commissioner Davis asked if the 'for sale' sign had an 'open house' sign below it, would that count as one additional sign. Mr. Andrew stated yes, the 'for sale' sign would be one sign with the 'open house' sign considered as a second separate sign adding to the maximum number of signs permitted.

Commissioner Ryan asked if the mobile signs were permitted for commercial areas. Mr. Andrew stated yes, the mobile signs were permitted for commercial areas.

Commissioner Davis stated the signs located in the residential area could not be judged by

their content. Mr. Andrew stated that was correct. Commissioner Davis asked how staff could determine what constitutes the ability to have three (3) signs over two (2).

Aaron Martin, Legal Counsel, stated the base allocation for two (2) residential signs on a residential lot was typical but there could be placement of one (1) additional sign regardless of the content.

Jason Gage, City Manager, stated there would be complexity to enforcing the code for having three (3) signs in a residential lot over the typical two (2) sign limit.

A conversation ensued between the Commission and Mr. Andrew regarding the use of signs in residential lots.

Commissioner Blanchard asked if feather signs were held to the same square footage requirement as regular signs. Mr. Andrew stated it was virtually impossible to measure a feather flag so staff thought measuring the height of the flag would be the best option.

Commissioner Blanchard asked if bible school signs would be considered content neutral. Mr. Andrew stated it would be considered a non-commercial message sign.

Commissioner Blanchard asked if there were any restrictions to having two (2) 2 feet by 4 feet real estate signs side by side. Mr. Andrew stated there would be a limit to having one (1) real estate sign per lot. He continued to state that most real estate signs were five (5) square feet.

Michael Schrage, Deputy City Manager, stated if a house was on a corner lot, there could be two (2) real estate signs located on the property.

A conversation ensued between the Commission and Mr. Andrew regarding the number of allowable signs on a residential lot.

Commissioner Hodges provided her thoughts on signs within the residential areas.

Commissioner Davis asked if the building community were made aware of the change to not allow commercial signs in residential lots. Mr. Gage stated he was not sure if contractors were notified or asked but was sure the contractors would not be in favor of that change.

Mr. Martin continued to explain the legal regulations for commercial signs within residential areas.

A conversation ensued between the Commission, Mr. Martin, Mr. Gage and Mr. Schrage regarding the content neutral signs, signs within residential areas and conformance with the law.

Commissioner Hodges asked if there had been several citizen complaints for signs located in residential areas. Mr. Andrew stated the most complaints received were for signs in the right of way and large auction signs. He continued to state that there were not many complaints submitted by citizens for open house or garage sale signs.

Mr. Schrage stated that Commissioner Davis brought up a good point last week regarding security signs in residential lots. He continued to state that staff could draft that language within the ordinance between first and second reading.

Mr. Gage stated he was having a hard time differentiating between a permanent sign and a temporary sign. Mr. Martin stated there were differences between a permanent sign and a temporary sign.

Owen Freiburger, 937 Highland Avenue, Planning Commission Board Member and owner of NextHome Pro Realty, stated the Planning Commission did a lot of work and consideration on sign regulations. He continued by stating that he did not vote in favor of not allowing commercial signs in residential yards.

Randall Holm, Holmtown Realty, stated staff had commented that there had not been complaints on signs located on property for directional open house signs and continued to state that if the ordinance was passed it would further inhibit the rights of property owners. He continued to ask the City Commission to allow commercial signs and directional open house signs in residential areas.

Commissioner Blanchard asked if Mr. Holm was familiar with the Reed vs. Town of Gilbert court case. Mr. Holm stated he was aware of the case and it was based on first amendment rights.

Commissioner Blanchard asked who told him that city event signs were allowed in the right-of-way. Mr. Holm stated Mr. Andrew told him. Mr. Andrew stated official government signs and traffic control signs were allowed in the right-of-way.

Mr. Holm asked that the maximum temporary sign size be raised to 9 square feet.

Mr. Gage asked if Mr. Holm would support allowing any commercial and directional signs in residential areas and in the rights-of-ways. Mr. Holm stated yes he would totally support that.

Commissioner Davis asked if making an exception to allowing temporary commercial signs in residential areas could happen. Mr. Andrew stated everyone would need to be aware that making that change would allow all types of signs in residential areas.

Mr. Martin provided additional information regarding the content neutral signs and open house and real estate signs.

Mr. Gage asked if the Commission had any additional exceptions they wanted staff to look at. He continued to state the two (2) listed were commercial signs and security signs.

Commissioner Blanchard stated he would be apt to adopt the ordinance as is and in the future could amend it as needed.

Mayor Crawford stated she would agree with Commissioner Blanchard on adopting the ordinance as written today and amend in the future if needed.

Mr. Martin stated the ordinance was intended to bring the sign code in conformance with the law.

17-0106 Moved by Commissioner Blanchard, seconded by Commissioner Ryan, to pass Ordinance No. 17-10882 on first reading approving the proposed addition of Sections 42-500 and 42-511 and amendment of Sections 42-506, 42-507, and 42-508 of Article X Signs with the expectation that security signs will be addressed between first and second reading. Aye: (4). Nay: (1) Hodges. Motion carried.

**OTHER BUSINESS**

(9.1) Request for executive session (legal).

17-0107 Moved by Commissioner Davis, seconded by Commissioner Ryan, to recess into executive session for 60 minutes to discuss with legal counsel matters subject to the attorney-client privilege for the

reason that public discussion of those matters would waive the privilege and adversely affect the City's interest in the matters and reconvene at 8:35 p.m. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 7:35 p.m. and reconvened at 8:35 p.m. No action was taken.

17-0108 Moved by Commissioner Ryan, seconded by Commissioner Crawford, to extend the current executive session for an additional 50 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 8:35 p.m. and reconvened at 9:25 p.m. No action was taken.

17-0109 Moved by Commissioner Ryan, seconded by Commissioner Crawford, to extend the current executive session for an additional 10 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 9:25 p.m. and reconvened at 9:35 p.m. No action was taken.

**ADJOURNMENT**

17-0110 Moved by Commissioner Ryan, seconded by Commissioner Crawford, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (5). Nay: (0). Motion carried. The meeting adjourned at 9:35 p.m.

[SEAL] Kaye J. Crawford, Mayor

ATTEST:

Shandi Wicks, CMC, City Clerk

DRAFT

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 9 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*