**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 10 of 16, Pages 1-259**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit Z
# 4/17/17 Salina City Commission Meeting Documents

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: 8 | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: n/a |
|---|---|---|
| ITEM NO: 1 Page 1 | BY: Dean Andrew DA | FINAL APPROVAL: BY: |

**ITEM:** Ordinance No. 17-10882

Application #Z16-6A, filed by the Salina City Planning Commission, requesting an amendment of Article X. Signs in Chapter 42 by:

1. Adding a new Section 42-500 to set out the purpose of Salina's sign regulations;
2. Amending Section 42-506 pertaining to the classification and definition of various functional types of signs;
3. Amending Section 42-507 pertaining to the classification and definition of various structural types of signs;
4. Amending Section 42-508 pertaining to the placement and display of temporary signs, banners and feather flags; and
5. Adding a new Section 42-511 to add a substitution clause to allow noncommercial messages to be substituted for commercial messages without any additional permitting or approvals on any sign allowed under the sign regulations.

**BACKGROUND:**

Prior to 1988, the City of Salina had no specific regulations applicable to the use and placement of temporary and mobile signs. In August of 1988 the Planning Commission initiated a text amendment to Article X Signs by adding Section 42-508 specifying limitations on the use of temporary signs, including decorative business signs (banners, flags, balloons), advertising signs for special public events and mobile signs and by amending Section 42-502 to add a definition of mobile signs. The Planning Commission conducted two public hearings and received extensive input from the business community. At the conclusion of the September 20, 1988 hearing, the Planning Commission voted 6-2 to recommend approval of the proposed text amendment to the sign regulations.

As recommended by the Planning Commission, the amendments modified the City's sign regulations in three general areas.

**1. Decorative Business Signs**

The Planning Commission recommended that the use of decorative business signs, such as pennants, streamers, flags, balloons, etc. be made an authorized form of advertising signage but that these attention getting devices only be allowed to be displayed for no longer than 21 days and be allowed to be used by a business establishment for three (3) occasions per year.

Purpose / Justification: The purpose of the proposed amendment was to prevent these types of attention attracting devices from proliferating and becoming an unattractive presence along city streets. The Planning Commission believed that limited use could assist businesses in notifying customers of special events and sales while avoiding the visual impact of continuous use.

**2. Off-premise Advertising Signs for Public Events**

The Planning Commission recommended that no more than one (1) such sign not exceeding 32 sq. ft. be allowed on a zoning lot and that such signs be allowed to be set out seven (7) days in advance of the event and must be taken down within 24 hours after the conclusion of the event. [For example, the Central National Bank at Greeley and Ohio has been a popular location for advertising public events

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 2 | BY: Dean Andrew | FINAL APPROVAL: BY: |

held in Kenwood Park and at the Bicentennial Center.}
Purpose / Justification: The Planning Commission believed this provision was justified by the public purpose served by informing and directing participants to public events and civic activities sponsored by non-profit organizations.

**3. Mobile and Portable Signs**
At the time of the text amendment, mobile signs were allowed on a permanent, year round basis. The Planning Commission recommended that mobile signs only be allowed to be displayed up to 30 consecutive days on two occasions per year and that they not be permitted on the premises of an establishment that already had a pole sign or ground sign in the front yard.
Purpose / Justification: The purpose of this proposed amendment was to reduce driver distraction and improve the physical appearance of the community. The Planning Commission agreed with staff that mobile signs are usually placed near the street at the eye level of motorists and the presence of a large number of mobile signs intermixed with street oriented ground and pole signs could distract motorists and reduce the visibility of other motorists and pedestrians. In addition to traffic safety, the Planning Commission was concerned that the proliferation of mobile signs could create visual clutter along the city's streets. Staff pointed out that some Kansas communities prohibit mobile signs altogether for aesthetic reasons.

The Salina City Commission did not concur with the recommendations of the Planning Commission and returned the proposed text amendment back to the Planning Commission for reconsideration on October 17, 1988. The City Commission recommended that the time limit on temporary signs (banners, flags, inflatables) be eliminated and that mobile signs be allowed to be displayed four (4) times per year instead of two (2) for a total of up to 60 days.

**On October 18, 1988**, following further discussion of the matter, the Planning Commission agreed to accept the changes outlined by the City Commission with the exception of the time limit on the display of temporary signs (banners, flags, inflatables). The Planning Commission recommended that temporary signs be allowed on zoning lots up to four (4) events per year with a limitation of 30 days per event.

**On November 14, 1988**, the Salina City Commission adopted **Ordinance No. 88-9283** which placed time limits on off-premise advertising signs for special events and mobile signs but no time limits on the placement of on premise temporary signs.

Follow Up Action

On **September 25, 1996,** Planning staff presented a staff report and showed photos depicting the growing use of temporary decorative business signs at various locations throughout Salina. The types of signs included banners, flags, streamers and balloons as well as what are referred to as popsicle signs. These signs are typically made of vinyl or plastic and are relatively inexpensive and easy to install. A typical banner sign consists of a rectangular piece of plastic stretched between the posts in the front yard of a business. In the Zoning Ordinance, these signs are classified as decorative signs

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 3 | BY: Dean Andrew | FINAL APPROVAL: BY: |

and defined as follows:
Sec. 42-507(2) Decorative sign. A sign or display fabricated of canvas, cloth, fabric, plastic, plywood, or other light, impermanent material and designed or intended to be displayed in connection with an event for a short period of time.

Decorative signs are allowed in all commercial and industrial zoning districts but the ordinance did not specify the type of "event" or what is a "short period of time."

It was the Planning staff's belief that the increasing prevalence of these types of signs was detracting from the visual appearance of the community and worked against what the Planning Commission and City Commission were trying to accomplish through planned commercial districts and landscaping regulations, especially on the entryway corridors into the community. Staff posed two questions to the Planning Commission: (1) Does the Planning Commission share staff's concerns about the visual impact of unlimited placement of temporary signs, and (2) Does the Planning Commission wish to initiate and advertise for a public hearing to consider a text amendment to the sign regulations to address the use and placement of temporary signs. The Planning Commission answered in the affirmative and initiated a text amendment to Section 42-508.

The amendment to the sign regulations proposed by staff was made up of two components. First, temporary decorative signs placed over an existing sign face, at least 8 ft. above ground level or on a building or solid fence would be treated as any other sign. They would count toward the property's sign allocation but no permit would be required and there would be no time limit on their display. Secondly, temporary decorative signs (banners, flags, inflatables) placed in any other location such as the front yard would be limited to business grand openings and going out of business sales and would be limited to 21 days for such events. This text amendment was unanimously endorsed by the Planning Commission on November 20, 1996 and **Ordinance No. 96-9776** was unanimously approved by the City Commission on January 6, 1997. These limitations on temporary signs have been in force and effect unchanged since that time.

Feather Flags

Feather flags are recent advertising phenomena that only became widely used in the past 3-4 years. This advertising / attention getting phenomenon has been under study by communities across the country because most existing sign regulations don't define or address them. City staff has interpreted feather flags to be temporary signage and therefore subject to the limitations on temporary signs, flags, balloons and banners in the City's Sign Regulations. The Sign Regulations essentially limit the use of temporary and decorative signs to the grand opening of a new business. Exceptions for other types of special or promotional events are not provided for in the ordinance.

City staff has engaged in several citywide enforcement sweeps requesting that business and property owners take down the banners and feather flags they had placed on their property. Voluntary compliance with staff's request was generally good but many business owners expressed surprise that this form of signage was not permitted. Staff has also sought guidance and feedback from the

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| | | |
|---|---|---|
| AGENDA SECTION<br>NO: | ORIGINATING DEPARTMENT:<br>Community and Development Services<br>Planning Division | FISCAL APPROVAL:<br>BY: |
| ITEM<br>NO:<br>Page 4 | BY: Dean Andrew | FINAL APPROVAL:<br>BY: |

DATE 04/10/2017 TIME 4:00 P.M.

Planning Commission on this topic and the feedback staff received was that the Commission agreed with staff's interpretation of the Sign Regulations and staff's enforcement efforts and the Commission did not wish to initiate any sort of text amendment.

Nature of Current Application

Since this issue was last discussed with the Planning Commission, the U.S. Supreme Court rendered a decision in Reed vs. Town of Gilbert which found Gilbert, Arizona's temporary sign regulations to be invalid because they regulated temporary signs differently based on their content. Land use attorneys who have analyzed the Reed decision have recommended that municipalities carefully review their temporary sign regulations to ensure that they don't regulate temporary signs differently based on their content or message. Municipalities may regulate the number of signs, their location, their size, the length of time they may be up and the structural types of signs allowed or disallowed but the regulations must apply uniformly to all signs, regardless of their message or content. They also recommend that all sign regulations have a Purpose section articulating the public purpose for regulating signs, a Severability clause and a Substitution clause. Salina's sign regulations do not currently have any of these sections.

In addition to the Reed decision, staff has received written correspondence from several local business and property owners who believe that Salina's temporary sign regulations are overly restrictive and out of step with what is allowed in other Kansas communities (see attached letter).

The City Attorney has expressed an opinion that the City's current temporary sign regulations that treat temporary signs sponsored by governmental, philanthropic and non-profit organizations advertising public event differently than other temporary signs and limiting temporary signs to going out of business sales and not allowing them for other types of sales could be interpreted as content based regulations and may not be defensible.

The Planning Commission held a study session on sign regulation at their August 16, 2016 meeting and also discussed the regulation of temporary signs at their regular meeting. The Planning Commission was provided a copy of the written correspondence received from local business owners and a summary of what other Kansas communities allow in the way of temporary signage. Based on staff's recommendation and the advice of the City Attorney, the Planning Commission authorized the initiating of a text amendment to Article X Signs to add a *Purpose* section and *Severability clause* to the sign regulations and to amend Section 42-508 pertaining to the placement and display of temporary signs. The purpose of amending this section would be to create a level playing field for all forms of temporary signage based on size, location and appearance regardless of message or content.

Staff Comments and Analysis

Based on the advice of the City Attorney, staff believes that the provisions in Section 42-508 limiting freestanding temporary signs to grand opening events and allowing temporary signs that advertise

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 5 | BY: Dean Andrew | FINAL APPROVAL: BY: |

governmental and philanthropic events but no other events needs to be repealed from the temporary sign regulations and that broader, more content neutral provisions need to be drafted and adopted. The visual impact of these types of signs is the same regardless of their message, so staff believes the City needs to adopt a uniform set of standards and limitations applicable to all property throughout the city and applicable to all forms of temporary signage.

The term "temporary sign" can have two connotations. One relates to the durability of the materials signs are made out of. The term "temporary" refers to signs that are not constructed to be permanently affixed year round. The term "temporary" also refers to signs that are only allowed to be displayed for a limited duration (7-30 days) and not year round. At the August 16 meeting, Planning staff asked for some general guidance from Planning Commissioners and the consensus of the Planning Commission was:

1. Permits should not be required to erect temporary signs.
2. Temporary signs should have a time limit / duration on their display.
3. There should be a numerical limit on the number of temporary signs allowed per lot.
4. There should be size limits on temporary signs.
5. There should be height limits on temporary signs.
6. There should be spacing and setback requirements for temporary signs.

The Planning Commission's role in the text amendment process was to attempt to find a balance between allowing business and property owners to put up a reasonable amount of signage and maintaining the visual appearance of the community and its streetscapes while making any regulations as content neutral as possible.

The Planning Commission conducted a public hearing on staff's proposed amendments to the Temporary Sign regulations on **November 1, 2016** with a focus on decorative flags or feather flags. Input was received from several local business owners requesting that the number of events during which feather flags could be set out on a property be increased from 4 events to 6 times a year. There was discussion about whether the maximum flag height should be 13 ft. or 17 ft., whether the maximum number of flags allowed per street frontage should be 6 or 12 flags, whether they should be allowed for 4 or 6 promotional events per year and whether the display period should be 14 days or up to 30 days. Following comments from interested parties and discussion by Commission members, the Planning Commission reached a consensus on the following items:

- The maximum flag height should be 13 ft.
- The maximum number of flags allowed on a street frontage should be 6.
- The maximum number of display events should be 6 times per year.
- The maximum display period should be 30 days.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 6 | BY: Dean Andrew | FINAL APPROVAL: BY: |

- The maximum height for inflatable attention getting devices should be 20 ft.
- The placement of banners on stakes in the front yard area should continue to be disallowed.

At the Planning Commission's February 7, 2016 meeting the Planning Commission authorized staff to expand the scope of the text amendment to include changes to the terms and definitions in Section 42-506 pertaining to structural types of signs and Section 42-507 pertaining to functional types of signs. A *Substitution* clause (Section 42-511) was proposed instead of the *Severability* clause originally proposed.

As expanded, the proposed text amendment now includes new terms and definitions to substitute for or replace existing definitions in Section 42-506 and 42-507 in addition to recommended changes in Section 42-508 Temporary Signs. One of these is a proposed definition for "temporary signs" which is not currently defined in the Zoning Ordinance.

<u>Overview of Proposed Text Amendment</u>

On June 15, 2015, the U.S. Supreme Court struck down the Town of Gilbert, Arizona's sign code. The unanimous decision of the United States Supreme Court in Reed v. Town of Gilbert, Arizona 2015 said that, with few exceptions, sign regulations cannot vary based on the type of information a sign conveys. The Supreme Court found that the Town of Gilbert's temporary sign code unconstitutionally discriminated against a particular kind of content, in this case temporary directional signs erected by a church, and that the city did not have any legitimate governmental interest for doing so. These same restrictions were not placed on comparable types of signs.

With the exception of the sections dealing with feather flags and inflatable signs, the proposed sign ordinance text amendment responds to United States Supreme Court in Reed v. Town of Gilbert, Arizona 2015 which said that with few exceptions, sign regulations cannot vary based on the type of information a sign conveys. Currently, the City of Salina sign regulations vary by category – campaign signs, noncommercial opinion signs, real estate signs, general advertising signs, business identification signs, etc. – each defined by the type of information conveyed.

The intent of the proposed amendment is to maintain, as close as possible, the temporary sign allowance currently allowed in the various zoning districts. The proposed amendment would apply the existing physical characteristics (number, height, size, design characteristics, location, portability, and duration) to temporary signs without regard to the sign message or content, subject to limited content-based exceptions for certain legally defensible commercial categories of content.

The goal is to regulate temporary signs by their structural type instead of by their function. For example, Salina's sign regulations currently allow noncommercial opinion and political signs in residential districts. The proposal is to continue to allow them but to classify them as "temporary freestanding yard signs" instead of as political signs or noncommercial opinion signs. One of the guiding principles of the Reed case is that if City staff has to read the sign to determine if it is allowed then the City is drifting towards regulating signs based on their content.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 7 | BY: Dean Andrew | FINAL APPROVAL: BY: |

The first portion of the proposed text amendment proposes some clarifying amendments to the functional types of signs defined in Section 42-506 of the Sign Regulations by clarifying that advertising and business signs display "commercial messages." Under First Amendment legal doctrine commercial speech can be regulated at a different level than noncommercial speech. The proposed text amendment proposes to delete "noncommercial opinion signs" and "political signs" as functional types of signs, to add a definition of "open house sign" and to modify the definition of "real estate sign."

Under structural types of signs in Section 42-507, the term "decorative sign" is proposed to be deleted and replaced by a definition for "temporary sign." The definition of banner sign is proposed to be modified and new definitions are proposed for "feather flag," "inflatable sign" and "yard sign", all structural types of signs.

For the proposed changes to Section 42-508 staff proposed a base temporary sign allowance for each zoning lot and then a menu of options for additional signs based on events or activities taking place in the community (elections) or on the property (property for sale or lease, open houses, garage sales and construction activity). The City Commission still has the discretion to make the final decision in regard to the number, maximum size, maximum height and appearance characteristics of temporary signs that should be allowed in residential and nonresidential zoning districts.

There was general consensus among Planning Commissioners to allow each individual residential lot to have two (2) temporary signs not exceeding 8 sq. ft. in size regardless of content and to allow each nonresidential lot to have two (2) temporary signs up to 32 sq. ft. in size. Staff and the Planning Commission also discussed four (4) possible exceptions to the general prohibition on signs conveying commercial messages being placed in residential districts. The four (4) exceptions were as follows:

- Real Estate Signs

There was a general consensus to allow one (1) additional temporary sign not exceeding 8 sq. ft. in size for residential properties that are for sale or rent. There needs to be additional discussion about what the maximum sign size and height ought to be.

Possible Justification for Exception

Possible justifications for making this exception include the right of an individual homeowner to inform the public that their property is on the market. This is a marketing platform for property owners who don't have an alternative means to communicate that information. The U.S. Supreme Court has previously upheld a 1977 case that an outright ban on for sale signs is unconstitutional. The Court noted that persons who might not have access to certain real estate marketing information cannot be discriminated against when a physical sign invites all comers to a home for sale or rent.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 8 | Community and Development Services Planning Division BY: Dean Andrew | FINAL APPROVAL: BY: |

- Open House & Garage Sale Signs

There was a general consensus to allow one (1) additional temporary sign not exceeding 8 sq. ft. in size for residential properties conducting an open house or garage sale.

Possible Justification for Exception

Open house signs and garage sale signs are also neutral marketing platforms, and the same argument can be advanced that an individual homeowner should have the right to inform the public that they are invited to their property.

- Off-Site Open House/Garage Sale Signs

The Planning Commission was not supportive of allowing these commercial message signs to be placed off-site on another residential property. This exception is not included in the draft ordinance.

- Construction Signs

Staff's impression was that the Planning Commission had mixed feelings about construction signs being allowed on individual residential lots. Under staff's original proposal, placement would have been limited to the time period when construction activity is taking place on the property.

One possible justification for the exception is that it serves as a public purpose by informing neighboring property owners and the general public that construction activity is taking place on the property and who (what contractor) is involved with the activity. The Planning Commission ultimately decided this exception was not defensible and it is not included in the draft ordinance.

At the March 7 public hearing the City Attorney's office and City staff provided the Planning Commission with an overview of the legal and planning principles that formed the basis for the proposed text amendment. Staff also presented the proposed changes and options in matrix form so the Planning Commission could view the options for regulating the number and sign types allowed in residential and nonresidential districts as well as photographs depicting different temporary sign types.

Staff recommended that the Planning Commission review the recommended changes and the options for allowing additional temporary signs and that any legal questions Commissioners have be addressed by the City Attorney. Staff also recommended that based on the input received from Commissioners, staff would prepare a final draft for Planning Commission consideration at the Commission's March 21, 2017 meeting.

The Planning Commission voted to continue the public hearing to their March 21, 2017 meeting.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/10/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 9 | BY: Dean Andrew | FINAL APPROVAL: BY: |

Planning Commission Recommendation

The Planning Commission conducted a public hearing on this proposed text amendment at their **March 21, 2017** meeting. Following presentation of the staff report, comments from members of the public and comments and questions from Commissioners, the Planning Commission approved a motion (4-2) to recommend approval of the text amendment as drafted and presented by staff and the City Attorney's office, finding that:

1. The proposed amendment is consistent with the intent and purpose of the Zoning Ordinance; and
2. The proposed amendment will not adversely affect the orderly development of the City of Salina; and
3. The proposed amendment will not be detrimental to, or endanger the public health, safety or general welfare of the City of Salina.

COMMISSION ACTION

1. The City Commission could approve the proposed addition of Sections 42-500 and 42-511 and the amendment of Sections 42-506, 42-507 and 42-508 of Article X-Signs as recommended by the Planning Commission and approve Ordinance No. 17-10882 on first reading as drafted.
2. The City Commission could approve the proposed amendments and additions with any additions, deletions and/or modifications to the text that the Commission deems appropriate.
3. The City Commission could send this item back to the Planning Commission to work with staff on major changes to the proposed amendments.
4. The City Commission could maintain the status quo and decide that the proposed additions and changes to the City's sign regulations should not be made at this time. In this case, a motion should be made to deny the proposed text amendment and Ordinance No. 17-10882.

Staff Recommendation

Staff would recommend that the City Commission take whatever action it deems to be in the best interest of the public and community as to the maximum number and size of temporary signs that should be allowed to be placed on residential lots in the community.

Enclosures: Application
Summary of Recommended Changes
Excerpt of 11/1/16 and 3/21/17 PC minutes
Ordinance No. 17-10882

cc: Gary Stansberry and Randall Holm

City of Salina

Planning & Community Development

| Publication Date | February 14, 2017 | Application No. | Z 16-6A |
|---|---|---|---|
| Hearing Date | March 7, 2017 | Date Filed | February 7, 2017 |
| Filing Fee | | Receipt No. | |

# APPLICATION FOR AMENDMENT TO THE ZONING TEXT
# SALINA CITY PLANNING COMMISSION

The undersigned, being residents of the City of Salina, Kansas, do hereby apply to the Salina City Planning Commission for:

amendment of Article X. Signs in Chapter 42 by:

(1) Adding a new Section 42-500 to set out the purpose of the City of Salina's sign regulations.;

(2) Amending Section 42-506 pertaining to the classification and definition of various functional types of signs;

(3) Amending Section 42-507 pertaining to the classification and definition of various structural types of signs;

(4) Amending Section 42-508 pertaining to the placement and display of temporary signs, banners and feather flags;

(5) Adding a new Section 42-511 to add a substitution clause to allow noncommercial messages to be substituted for commercial messages without any additional permitting and approvals on any sign allowed under the sign regulations.

Applicant's Name (print) Salina City Planning Commission

Applicant(s) Signature Dean Andrew, Secretary Date 2/7/17

Attach additional signature sheets if necessary. Be sure to include name, address, phone and signature of each applicant on the additional sheets.

---

**If the applicant is to be represented by legal counsel or an authorized agent, please complete the following in order that correspondence and communications pertaining to this application may be forwarded to the authorized individual.**

Name of representative ______________________

Mailing Address, City, State, Zip ______________________

Telephone (Business) and E-Mail ______________________

PLF – 053. Application Zoning Text Amendment, Rev. 6-2008

July 25, 2016

Dean Andrews
City of Salina
Code Department
Salina, Kansas

RE: Outdoor Flag / Signage

As requested you will find below a letter of recommendations from the business community along with City Codes for temporary outdoor flags from both Hutchinson and Manhattan. We attach this as both cities allow for use of outdoor flags and banners.

**Outdoor Business Sign Recommendations:**

Temporary Sign Definition: Any outdoor sign constructed of cloth, fabric or other material that is not permanently attached to the ground, a building or other structure, used to call special attention to an activity, store hours, services provided, product or sale. Examples of such include banners, pennants, feather flags, sidewalk signs and inflatable's.

- Zoning Locations: Allowed in all C1, C2, C3, C4 and C5 zoning business districts.
- No. of Signs Permitted: *Based on Frontage (ie. 48' frontage no more than 3)*
- Sign Location: *Signs shall be placed on Private Property and all responsibility for Maintenance thereof shall fall to the property and/or business owner.*
- Size / Height of Flags: *4' height up to maximum of 17' height*
- Size / Max Sign Area: *No individual sign or combination of multiple signs shall exceed 200 square feet based on the perimeter dimension of the sign(s).*
- Time Limit: None - *With exception that at such time any temporary signage becomes unsightly, unmaintained, tattered, torn, broken or becomes a hazard, the sign shall be removed until maintenance or corrective action is taken.*

Below are a few of the many business supporting this recommendation.

| | | |
|---|---|---|
| Gary Stansberry<br>*Salina Blue* | Deb Schmid<br>*Pettle's Flowers* | Carolyn Berens<br>*1st Bank Kansas* |
| Jeff Wells<br>*American Family Insurance* | Mike Money<br>*Money Automotve* | Tim Sankey<br>*Sankey Auto* |
| Penny Bettles<br>*SDI-BID* | Dan Martin<br>*ISG Technology* | Tim Frederking<br>*City Wide Storage* |

**Summary of Proposed Changes**

**Temporary Sign Regulations**

Individual Residential Lots

- Up to two (2) yard signs – 8 sq. ft. in size and 6 ft. in height
- Property for sale or rent – one (1) addition sign per street frontage
- Garage Sale/Open House – one (1) additional sign per street frontage
- Election Period – up to four (4) additional yard signs per property
- Maximum number of yard signs at any one time – six (6) signs
- No sign permits required

Non-residential lots

- Up to two (2) temporary yard signs – 32 sq. ft. in size and 6 ft. in height
- Construction activity – Up to two (2) additional signs 32 sq. ft. in size and 6 ft. in height where a building permit has been issued for a construction site; must be removed 7 days after occupancy
- Election Period – up to four (4) additional signs per property
- No sign permits required

Feather Flags

- Two (2) flags allowed per 50 ft. of street frontage, not exceeding six (6) flags per street frontage
- Maximum height – 13 ft.
- Minimum setback – height of the flag and cannot be placed in public right-of-way
- Maximum display period – 30 days
- Number of Events per year – 6
- Must be securely anchored to ground and removed if tattered or torn

Inflatable Signs

- One (1) inflatable sign per lot
- Maximum height – 20 ft.
- Minimum setback – Height of sign
- Maximum display period – 14 days
- No of events per year – 4
- Must be removed if tattered or torn

Banners

- Banners set out on stakes, or tied to trees, in the front yard or public right-of-way are not permitted
- Banners must be attached to solid wall, solid fence or over a sign face, due to wind concerns.
- No permit required
- Count toward total sign allocation

Mobile/Portable Signs

- One (1) sign per lot
- May not exceed 32 sq. ft. in size
- Not allowed on properties with existing pole and/or ground signs
- Permit required
- May be displayed for up to 30 days
- Number of events per year – 4

SUMMARY MINUTES

SALINA CITY PLANNING COMMISSION
CITY COMMISSION ROOM
Tuesday, November 1, 2016
4:00 p.m.

MEMBERS PRESENT: Baffa, Baxa, Freiburger, Jackson, Lenkiewicz, Norlin, Storey, Mata (Youth Member)

MEMBERS ABSENT: Goode

STAFF PRESENT: Andrew, Burger, Herrs, Norris

Chairman Freiburger called the meeting to order at 4:00 p.m.

**CONSENT AGENDA**

(2.1) Approval of the Summary Minutes of the October 18, 2016 regular meeting.

The Summary Minutes of the October 18, 2016 regular meeting were approved as presented.

**PUBLIC HEARING ITEMS**

(3.1) Application #Z16-6, filed by the Salina City Planning Commission, requesting an amendment of Article X. Signs in Chapter 42 by:

1. Adding Section 42-500 to set out the purpose of the sign regulations;
2. Amending Section 42-508 pertaining to the placement and display of temporary signs; and
3. ~~Adding Section 42-511 to add a severability clause stating that the sign regulations as a whole shall remain valid and in force if an individual provision or section is determined to be invalid.~~

Mr. Andrew presented the staff report with visual graphics which are contained in the case file.

Commissioner Baffa referred to the proposed text amendment, section (2) b. and asked for clarification that the statement "Decorative flags shall not exceed thirteen (13) feet in height..." means without a permit.

Mr. Andrew replied that is correct; temporary flags would not require a sign permit.

Commissioner Baffa asked if it would be possible to require a permit for anything in excess of 13 ft. tall.

Mr. Andrew replied it is possible; however, we do not currently issue permits for any type of temporary sign.

Chairman Freiburger asked about the average size of feather flags.

Mr. Andrew replied catalogs show a number of varieties 17 ft. tall. He reminded Commissioners that feather flags are measured from the surface of the ground to the top of the flag. The flag currently displayed in front of the City-County building measures 17 ft. tall.

Commissioner Baxa expressed concern about time limits in terms of enforceability.

Chairman Freiburger stated we will have to rely on the honor system.

Mr. Andrew stated the City's Code Enforcement Officers are familiar with their assigned geographic areas and would likely notice something that exceeds the time limit; however, it is possible we would miss some without a permitting process in place.

Chairman Freiburger stated we need to have an answer for citizens who call to ask how long a feather flag can be displayed.

Commissioner Baxa restated his concern about enforcing a time limit if we don't know when the flag is put up.

Mr. Andrew stated the simplest enforcement mechanism is to prohibit feather flags. It is the simplest solution but may not be the best solution for the community. Some communities issue colored stickers with expiration dates to be displayed on feather flags; we don't want to require business owners to do that.

Commissioner Norlin agreed with Chairman Freiburger's prior statement that enforcement will require alert citizens to report violations in addition to City staff's efforts.

Commissioner Jackson agreed with Mr. Andrew that it would not be a good idea to require more paperwork for staff or business owners.

A brief discussion ensued regarding a height limit for feather flags. No conclusion was reached.

Chairman Freiburger asked if there were questions or comments from the public in attendance.

Gary Stansberry, 1014 Sunrise, stated he believes most of the proposed text amendment is workable. He stated 12-14 ft. is the standard / normal feather flag height; 18-20 ft. is the standard / normal inflatable height. He stated he would like to see four (4) events changed to six (6) events per year and the maximum number of flags changed from six (6) to 12 with a required minimum distance of 15-20 ft. between flags.

Mr. Andrew stated there are a few commercial sites in town with more than 500 ft. of frontage. If we allow two (2) flags for every 50 ft. of frontage, it would equal 20 flags. City staff is suggesting a maximum of six (6) flags; Mr. Stansberry is suggesting a maximum of 12.

A brief discussion ensued regarding examples of commercial sites with street frontages exceeding 500 ft., including Dillons at Ohio and Cloud Street, Central Mall and Mid-State Plaza at Magnolia and 9th Street.

Commissioner Norlin expressed concern about allowing too many flags on larger sites.

Mr. Stansberry stated he believes the number of events per year is a more important number.

Tim Sankey, 2036 E. North Street, stated Sankey Auto has frontage on Crawford, Roach and Prescott. He stated the City needs to have enforcement options for those business owners who will push the limits.

Chairman Freiburger asked Mr. Sankey if he would put up 12 feather flags on each side of his business.

Mr. Sankey replied no, probably not; it would be too cluttered and would become detrimental rather than an asset and at some point it would block the view. He stated he would most likely put flags on the Crawford frontage due to higher traffic counts. As related to number of events per year, he stated he can't imagine running any sale for 30 days. He is more interested in running 6 events than 4 but wouldn't run it for a full 30 days; it's not really a special if it runs that long.

Commissioner Baffa suggested 6 events per year for 14 day maximum duration.

Chairman Freiburger stated 30 days is the maximum; it doesn't mean the flags have to stay up that long.

Mr. Andrew stated another question posed by Mr. Martin of Salina Downtown, Inc. is whether feather flags can be used in the downtown area. This area falls under Chapter 35 and not Chapter 42. City staff will address this issue separately because Chapter 35 is within the City Commission's jurisdiction.

Commissioner Norlin stated he would like to hear from the public in attendance regarding the proposed 6 events per year for a maximum of 14 days each.

Mr. Stansberry stated a maximum duration of 14 days would not negatively impact his business but he cannot speak for banks, car dealerships, etc. who may want to advertise longer. He expressed support for a maximum duration of 30 days but stated 14 days and six (6) events per year is better than nothing.

Commissioner Baffa suggested offering both options to business owners – six (6) events per year for a maximum of 14 days each, and four (4) events per year for a maximum of 30 days each.

Mr. Andrew stated City staff would not be able to enforce that; the rules need to be the same for everyone.

Chairman Freiburger expressed support for six (6) events per year for a maximum of 14 days each.

Commissioner Norlin expressed support for six (6) events per year for a maximum of 30 days each.

Mr. Andrew stated from City staff's perspective, we will take much more notice of a flag in place longer than 30 days than for one in place longer than 14 days. As related to height, 17 ft. was provided as an example in a recent letter to business owners.

Mr. Sankey stated some businesses will need 30 days, such as a bank promoting a CD but those businesses won't likely be the same businesses who want to promote something six (6) times per year. He stated he doesn't want to use his business as the barometer for everyone else.

Mr. Andrew asked for feedback regarding the maximum flag height and the proposed language regarding inflatables.

Commissioner Norlin stated other than the suggestion to increase the maximum number of flags per street frontage to 12, he is comfortable with what is being proposed.

Commissioner Jackson asked if it would be more appropriate to deal with feather flags in terms of spacing rather than a maximum number.

Mr. Andrew replied we are proposing a hard cap because it is easier to enforce. If based on spacing only, we will still run into a situation where a business with 500 ft. of frontage could have too many flags. We could try to include a spacing requirement in addition to the "2 per 50 ft." and total maximum quantity. He asked if Commissioners are comfortable with a maximum of six (6) flags per street frontage.

Chairman Freiburger replied six (6) flags per frontage is adequate. As related to inflatables, he suggested shortening the duration as much as possible. He stated feather flags are decorative and can be attractive but inflatables can be anything and may not be attractive.

Commissioner Baxa asked about other types of flags, such as at the cemetery.

Mr. Andrew replied the City's sign code exempts flags for governmental entities from regulation. He stated the next step is to finalize the draft text amendment and turn it over to the City Attorney's office for legal review.

Commissioners Norlin and Jackson expressed support for a 13 ft. height limit.

Mr. Andrew stated another topic for discussion is whether to allow banners to be displayed on stakes as opposed to mounting them on buildings or solid fences. It is not presently permitted.

Chairman Freiburger referred to a visual graphic depicting a banner displayed on stakes at a local Taco Bell restaurant and asked why we don't just tell them that their sign is not permitted.

Mr. Andrew replied we can; banners on stakes are a form of signage that has not been permitted in Salina for many years. They tend to come loose and don't withstand sustained winds; however, we do allow them to be secured to a building or fence. He stated in addition to restaurants, banners are commonly used by churches to advertise community events. He asked if the Commission wants City staff to work on this as an allowable item.

Commissioners Baffa, Jackson, and Freiburger all replied no.

Commissioner Norlin stated he has seen banners displayed at churches and requiring banners to be displayed only on a building or fence presents a dilemma because some of the churches sit back quite a distance from the street.

Mr. Andrew stated a solution that has worked for others is to obtain a sign permit to construct a permanent structure in the desired location that banners can be secured to. Some churches have moved to electronic changeable copy signs.

Commissioner Baffa expressed concern about plywood structures constructed solely for the purpose of hanging banners.

Mr. Andrew replied a sign permit would be required and every property has a limit on the total amount of signage that can be displayed.

Commissioner Jackson expressed concern that a 4 ft. x 8 ft. plywood structure would appear unsightly between events.

Mr. Andrew stated there are 4 ft. x 8 ft. wood structures at Iron and Ohio and at Cloud and Ohio and there are periods of time when they are not used but they are maintained in good condition.

MOTION: Commissioner Jackson made a motion to postpone consideration of Application #Z16-6 to the November 15th meeting to allow staff and the City Attorney's office to finalize a formal public hearing draft for Planning Commission consideration.

SECOND: Commissioner Baffa

VOTE: Motion carried 7-0

(3.2) Application #Z16-7, filed by the Salina City Planning Commission, requesting a comprehensive review and amendment of Section 42-69, Wireless Communication Facilities, to bring Section 42-69 of the Salina Zoning Ordinance into conformance with state law.

Mr. Andrew presented the staff report with visual graphics which are contained in the case file.

Commissioner Norlin referred to section c.4. which reads as follows: "*An application to construct a lattice type tower anywhere within the city*" and asked if a lattice type tower would be automatically permitted under the new regulations.

Mr. Andrew replied no, it would require a public hearing with the Planning Commission for a recommendation to the governing body. It would have to be approved by the City Commission. Based on consultation with the FCC and legal counsel, City staff is not prepared to give up on review and approval of lattice, monopole and guyed towers. The State legislature says we can regulate aesthetics but we cannot have regulations that are unreasonable. We have not yet determined what that means.

Chairman Freiburger asked if there were questions or comments from the public in attendance; there being none, he closed the public hearing and brought this item back to the Commission for further discussion.

Commissioner Norlin asked if City staff anticipates that the City Commission will change the proposed text amendment language.

SUMMARY MINUTES

SALINA CITY PLANNING COMMISSION
CITY COMMISSION ROOM
Tuesday, March 21, 2017
4:00 p.m.

MEMBERS PRESENT: Baffa, Freiburger, Goode, Jackson, Norlin, Storey, Mata (Youth Member)

MEMBERS ABSENT: Baxa, Lenkiewicz

STAFF PRESENT: Andrew, Burger, Cline, Herrs, Martin

Chairman Freiburger called the meeting to order at 4:00 p.m.

**CONSENT AGENDA**

(2.1) The Summary Minutes of the March 7, 2017 regular meeting were approved as presented.

**PUBLIC HEARING ITEMS**

(3.1) Application #Z16-6A, filed by the Salina City Planning Commission, requesting an amendment of Article X. Signs in Chapter 42 by:

1. Adding a new Section 42-500 to set out the purpose of Salina's sign regulations;
2. Amending Section 42-506 pertaining to the classification and definition of various functional types of signs;
3. Amending Section 42-507 pertaining to the classification and definition of various structural types of signs;
4. Amending Section 42-508 pertaining to the placement and display of temporary signs, banners and feather flags; and
5. Adding a new Section 42-511 to add a substitution clause to allow noncommercial messages to be substituted for commercial messages without any additional permitting or approvals on any sign allowed under the sign regulations. (Continued from the March 7, 2017 meeting).

Mr. Andrew presented the staff report with visual graphics which are contained in the case file. As part of his report he stated that staff had gone out and inventoried and measured temporary signs in the community. A summary of our findings is as follows: (1) a typical vinyl yard sign is 3 sq ft. in area and 3 ft. tall, (2) a typical real estate sign

is 4-5 sq. ft. in area and 3-3 ½ sq. ft. tall, (3) a typical real estate swing sign is 6 sq. ft. in area and 5-6 ft. tall.

Commissioner Freiburger stated and Commissioner Norlin confirmed that the previously expressed consensus was to allow for temporary signs based on street frontage and not per lot.

Mr. Andrew confirmed that allowing signs based on frontage would allow a corner lot to have more signs than an interior lot and also asked for clarification from the Commission about the previously expressed consensus regarding off-site signage.

Mr. Andrew also asked for clarification from the Commission regarding construction signage.

Mr. Andrew requested that the Commission provide findings of facts for the record about the types of real estate signs they would recommend allowing on residential lots. Mr. Andrew stated that staff thinks that a maximum height of 4 feet would accommodate most yard signs in residential settings.

Commissioner Norlin asked if we have received any public input about the proposed square footage allowances in the draft ordinance/language.

Mr. Andrew responded that there hasn't been any public input on that matter.

Mr. Martin stated that staff has created a base line of the number of signs that each property owner could have on their lot; that base line is two and during a political campaign period the owner could have an additional four signs, regardless of content.

Martin reviewed the proposed language with a focus on subsection #2, commercial speech and the requirements to regulate commercial speech. He reviewed potential exceptions and suggested that the Commission consider each type of sign as they craft any exceptions including on-site real estate and garage sale signs.

Mr. Andrew directed the Commission's attention to the section of the proposed language about the height of the signs, the total sign area (square footage) and reviewed that language.

Mr. Andrew reviewed the options for consideration by the Planning Commission.

Commission Questions/Comments:

Commissioner Freiburger asked when the swing signs came into the discussion and said that if you only allow signs with a height of four feet or less that would not work for those types of signs.

Mr. Andrew stated we did discuss swing signs at the last meeting and also discussed the height and six feet was proposed all along and you probably would not need a maximum height of six feet unless you wished to allow for swing signs. No decision was made about that at the last meeting. Mr. Andrew stated that we proposed six feet in the draft language to allow for swing signs.

Commissioner Goode asked about how the size and height of swing signs is measured.

Mr. Andrew stated that we measure the height overall and consider the sign as a structure (showing the example sign and how the size would be measured). The largest sign found of this type (swing sign) was six feet in height and six square feet in size.

Commissioner Freiburger stated that they are usually 22 x 44 inches and said that we have signs in 200 markets from New York to Hawaii and he has not heard any comments or issues about the size of swing signs from any other cities.

Commissioner Norlin commented about construction signs. He stated that construction temporary signs might need to be limited and not included in the other sign categories that are allowed to have up to six signs on a lot.

Commissioner Jackson stated I thought we concluded at our last meeting that this exception could not really be justified.

Commissioner Freiburger asked about directional signs.

Mr. Andrew stated that staff looked at on-site and off-site directional signs and remembers that the Commission thought that off-site signs were difficult to justify.

Mr. Martin added that from a legal perspective the current version of the code does not allow any off-site variety of signs to be placed. The amendment being proposed maintains the status quo by not allowing off-site signs.

Commissioner Baffa asked about enforcement procedures.

Mr. Andrew said that staff often picks up illegal signs, brings them to the office, notifies the owners and allow them time to pick up their signs before discarding them. Sometimes we will go into the place of business and tal to the manager about the sign or banner.

Commissioner Goode asked about off-site signage and how we enforce that.

Mr. Andrew said that as proposed, an individual homeowner can have two temporary signs in their yard, not in the right of way, and that is permitted. The code language as presented today would allow a homeowner to place a sign, for example a garage sale sign, on his own property but not on other properties. Current regulations and enforcement of those regulations would allow staff to remove right of way signs but if an off-site sign is on private property staff would probably not remove those.

Commissioner Norlin asked if there could be a provision for neighbors to allow off-site signs to be on their property.

Mr. Martin stated that from a legal perspective, one of the issues you run into is when you prohibit signs and then add exceptions, you run the risk that those exceptions end up being under-inclusive and end up failing the original reason for the regulations. It is important to state findings of fact when making exceptions.

Commissioner Baffa stated that we can't regulate freedom of speech.

Mr. Martin stated that we can regulate the signs and can also regulate content but that it is very hard to do. We can regulate number of signs, heights, zoning districts, setbacks, etc. but how we regulate is the difficulty.

Commissioner Baffa asked if a neighbor wants to allow someone to put up a sign on his property and we don't allow that isn't that restricting freedom of speech.

Mr. Martin stated that we need to keep in mind that we can restrict commercial speech and the issues come up when you start making exceptions to that.

Commissioner Norlin stated he appreciates the legal perspective and understands that the exceptions need to be carefully considered.

Mr. Andrew stated that from the practical enforcement side of things it will be difficult to enforce if there are multiple exceptions, for example if you allow off-site signs on individual lots and if you allow those exceptions then you need to carefully consider all possible scenarios to avoid the slippery slope, legally and also with enforcement.

Public Comments/Questions:

Randall Holm – Holm Town Property, 311 E. Crawford – asked about the 8 sq. ft. maximum size of sign and asked if that the Planning Commission is talking about a 6 foot maximum.

Mr. Andrew answered saying that the draft ordinance proposes a maximum height of 6 feet and a maximum size of 8 square feet. What we reported was that we did not find any temporary sign that was that large (8 sq. ft.).

Mr. Holm stated that he thinks we should allow for 8 square foot signs.

Commissioner Norlin asked Holm if his signs are typically over 8 square feet.

Mr. Holm answered saying that often he is pushing up against 8 square feet.

Mr. Holm also asked how banners would be counted; like the run of 15 small triangle flags. How do you count those?

Mr. Andrew stated that those are not regulated signage. Those types of string pennants are not a regulated sign subject to sign regulations; they are considered attention getting devices.

Mr. Holm also stated that we should allow off-site signage/directional signage to direct a person to a property that is for sale. He would like the Commission to consider allowing this.

Mr. Holm stated that he understands that signage is not allowed in the right of way and asked why the City does it for River Festival and other events. He said he agrees that right of way sign placement is not a good thing, but when a property owner gives permission to place an off-site sign then he thinks it ought to be up to the individual property owner to allow that sign to be placed. He said he has a real problem when he sees selective enforcement of any City rule or regulation; it's not right.

Mr. Holm stated that he does not like to see too much government meddling in the rights of a property owner and asked the Commission to look at the big picture.

Commissioner Norlin stated that he agreed in general with Mr. Holm's comments. He clarified that signage that the city places in the right of way for events like the River Festival are allowed and serve the public good.

Mr. Holm stated that he is contacted by potential buyers because they follow the signs. Maybe if off-site signs are allowed you could require them to be removed immediately following the event. He stated that allowing signage to be off-site brings people who will buy.

Todd Welsh, Salina Homes, 221 S Morris Drive/300 S. 9th Street offered comments about the contractor's signs and feels that these should be allowed and thinks it does bring more business to the contractor. He suggested that perhaps the general contractor be allowed to place a sign but not allow all of the subs to place signs; that would limit the number of signs.

Mr. Welsh asked about the feather flags and asked if that had already been adopted.

Mr. Andrew stated that it is part of this overall amendment being considered but is not proposed to be allowed on residential lots.

Mr. Welsh said that he would suggest requiring a length of time in between placing feather flags so that someone doesn't place one for 30 days then take it down for one day and put it back up for another 30 days.

Mr. Welsh asked about subdivision signage and whether those would be allowed. Is there any consideration for allowing a larger sign based on the acreage of the subdivision?

Mr. Andrew stated that those types of signs (subdivision signs) are not currently in the classification of what we would consider temporary signs. Subdivision signs would be considered a permanent sign and would require a sign permit to be issued. Subdivision signs are often in place for several years so would not be temporary signage.

Mr. Welsh stated that he feels it a little frustrated when signs like the River Festival are put up but he is required to get a sign permit for his signs. He asked how this is going to be enforced and said that garage sale signs are still going to be put in the right of way all over town. If you're writing an ordinance he suggested that enforcement be

considered.

Commissioner Freiburger closed the public portion of the meeting.

Mr. Andrew stated that he wanted to clarify the different rules at play when talking about commercial speech versus non-commercial speech. A sign that directs someone to the River Festival or Farm Show is not a sign that proposes a sale or commercial transaction.

Mr. Andrew advised the Commission to consider the justifications for allowing certain types of off premises signage. He also asked them to consider other types of commercial messages on those signs. It would be very important for the Commission to articulate the reasons for allowing exceptions.

Commissioner Freiburger stated that he understands what Mr. Andrew is saying but does not feel we need to try to limit this more because it would amplify the process of taking away people's liberties.

Mr. Andrew stated that this proposed text amendment is much more liberal in many ways than the current sign code.

Commissioner Norlin stated that he is sympathetic to all contractors doing work and wishing to place signage on the property where they are working, but giving that opening to any contractor then opens the door to commercial speech. I am fine with eliminating the exception.

Commissioner Freiburger said that he agrees but feels that the homeowner will feel differently and think that they should be able to allow the signage on their property.

Commissioner Goode stated that she likes the idea of allowing a contractor to place signs during the time that they are doing work on the property.

Commissioner Freiburger stated that signage for open houses should be allowed off-premises.

Commissioner Freiburger stated that the objective today is to recommend approval, make additional changes, or ask for staff to bring back more information.

Mr. Andrew stated that if a majority of the Commission agrees to make allowances for

some of the exceptions discussed today then that would be a basis for continuing the item and asking for staff to perform additional research.

MOTION: Commissioner Norlin made a motion to recommend approval of Application #Z16-6A, amending Article X. Signs Chapter 42 of the Salina Municipal Code as drafted and presented.

SECOND: Commissioner Baffa

VOTE: Motion carried 4-2 (Freiburger/Goode)

Mr. Andrew stated that a study session is scheduled with the City Commission on April 3, 2017. After the study session the Planning Commission's recommendation will be considered for adoption on first reading by the Salina City Commission.

(3.2) Application #Z17-1, filed by DMA Architects on behalf of Salina Ortho Properties, requesting a change in zoning district classification from C-1 (Restricted Business) and R-3 (Multiple Family Residential) to H-M (Hospital Medical district) on property legally described as Lots 11, 12, 13, 14, 16 and 17, Block 1 in the Replat of Beebe's 2nd Addition to the City of Salina, Saline County, Kansas and the South Sixty-five (65) feet of the North Eighty (80) feet of the West One Hundred Twenty-Five (125) feet of Lot 5, Block 2 and Lot 6, and the South Five (5) feet of Lot 5, less the East One Hundred Eighteen (118) feet thereof, Block 2 in the Replat of Beebe's 2nd Addition to the City of Salina, Saline County, Kansas. The property that is the subject of this application is addressed as 523 South Santa Fe Avenue, 535 South 5th Street and 537 South Fifth Street.

Mr. Andrew presented the staff report with visual graphics which are contained in the case file.

Commissioner Norlin asked for clarification about the maps and why there is more than one map.

Mr. Andrew said that the notification areas were different so the maps were separated so that the correct property owners would be notified.

Commissioner Jackson also asked about the property across the street and said that it doesn't appear to be contiguous.

Mr. Andrew said that he is probably presenting the report in reverse order and clarified the maps by showing the Commission the Future Land Use Plan map showing all of

(Summary published in *The Salina Journal* on _______ ___, 2017.)
(Published on the City of Salina's website for a minimum of one week from _________ ___, 2017.)

**ORDINANCE NUMBER 17-10882**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare

and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).
(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or

names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Construction sign.* A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

(5) *Garage sale sign.* A temporary sign which advertises or announces a lawful garage sale on the property upon which the sign is located.

(6) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(7) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(8) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(9) *Open house sign.* A temporary sign which advertises or announces that the property upon which the sign is located is available for inspection by prospective buyers and that the owner of the property or the owner's agent is on the premises during the time the property is open for inspection.

(10) *Real estate sign.* A temporary sign which advertises the sale or lease of the real estate upon which the sign is located.

<u>Section 3.</u> **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.
(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.
(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.
(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.
(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.
(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.
(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.
(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.
(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.
(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.
(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.
(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.
(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:
(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.
(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.
(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), and subject to

the limitations set forth in subsection (d), additional yard signs shall be allowed on a property as follows:

(i) Four (4) additional yard signs may be placed and displayed on property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(ii) One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district when the property is being offered for sale or lease by the property owner or a licensed real estate agent.

(iii) One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district no earlier than two (2) days before and shall be removed no later than one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

(iv) Two (2) additional yard signs may be placed and displayed on property located in any A-1, A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, schools, churches, assisted living facilities and nursing homes when construction activities of any type are being actively performed on the property. These additional temporary signs may be displayed no earlier than the date on which a building permit is issued for the project and shall be removed no later than seven (7) days after a certificate of occupancy is issued for the project.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed thirty-two (32) square feet of sign area.

(3) No temporary sign shall be used as an advertising sign.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed eight (8) square feet of sign area.

(3) No temporary sign shall display a commercial message, except as follows:

(i) One (1) real estate sign may be displayed per street frontage on a property. A real estate sign shall be removed within seven (7) days of the sale or lease of the property that is advertised for sale or lease on such real estate sign.

(ii) One (1) open house sign may be displayed per street frontage on a property. An open house sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the open house concludes.

(iii) One (1) garage sale sign may be displayed per street frontage on a property. A garage sale sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the garage sale concludes.

(d) A person exercising the right to place temporary signs on a property as described in subsection (a) must limit the total number of temporary signs on the property at any one time to six (6) plus any additional temporary signs allowed on the property pursuant to subsections (e) and (f).

(e) In addition to the temporary signs allowed under subsections (a) and (b):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(f) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(g) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

<u>Section 5.</u> **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

**Section 6.** **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

**Section 7.** **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On April 24, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: April 17, 2017
Passed: April 24, 2017

______________________________
Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

______________________________
Shandi Wicks, CMC, City Clerk

Certification of Publication Summary:

______________________________
Greg A. Bengtson, Legal Counsel

# Exhibit AA
# 5/15/17
# Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**May 15, 2017**
**4:00 p.m.**

The City Commission convened at 2:30 for Salina Field House Qualified Active Low-Income Community Business, Inc. Board Meeting and at 3:45 p.m. for Citizens Forum.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. Roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Mayor Kaye J. Crawford (presiding), Commissioners Jon Blanchard, Trent Davis, Melissa Rose Hodges, and Karl Ryan.

Also present: Jason Gage, City Manager; Michael Schrage, Deputy City Manager; Greg Bengtson, City Attorney; and Allison Strait, Administrative Assistant III.

### AWARDS AND PROCLAMATIONS

(3.1) The day of May 15, 2017 as "Peace Officers' Memorial Day" and the week of May 14 – 20, 2017 as "National Police Week" in the city of Salina. Police Chief Brad Nelson read the proclamation and announced associated events.

(3.2) The week of May 15 – 19, 2017 as "Salina Head Start Week" in the city of Salina. Alaina Ryan, Administrative Assistant, read the proclamation and announced associated events.

Mayor Crawford added that she thought the building was beautiful and encouraged people to call and set up a tour of the Head Start facility.

### CITIZENS FORUM

Randall Holm, 311 E. Crawford, stated he would like the commissioners' phone numbers and email addresses to be published in the city reference page so that citizens can easily get in contact with them. Mr. Holm also asked what the maximum budget proposal was for the river renewal project and if it were to surpass the projected $1.3 million, would it go back to the voters for authorization.

Jason Gage, City Manager, stated the spending was clear, and would use private and federal dollars. He also added that there were multiple phases being planned.

### PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME

None.

### CONSENT AGENDA

(6.1) Approve the minutes of May 8, 2017.

(6.2) Approve Resolution No. 17-7454 authorizing a renewal of the certified local government agreement with the State Historic Preservation Officer allowing the Salina Heritage Commission to assume responsibility for performing National/State Register project review under the State Historic Preservation Act.

(6.3) Approve Resolution No. 17-7455 authorizing the Mayor to sign the I-135/I-70 Drug Task Force Agreement with the Board of County Commissioners of Saline County, Kansas, the Saline County Sheriff's Office and the Saline County Attorney's Office outlining the administration, staffing and equipping of the Task Force.

17-0127 Moved by Commissioner Davis, seconded by Commissioner Ryan, to approve the consent agenda items 6.1 and 6.2. Aye: (5). Nay: (0). Motion carried.

(6.3) Approve Resolution No. 17-7455 authorizing the Mayor to sign the I-135/I-70 Drug Task Force Agreement with the Board of County Commissioners of Saline County, Kansas, the Saline County Sheriff's Office and the Saline County Attorney's Office outlining the administration, staffing and equipping of the Task Force.

Mayor Crawford asked for clarification on the item.

Greg Bengtson, City Attorney stated the agreement included in the packet was a draft and there was a modified version of the agreement in Section 4, relating to the statutory context in which County Attorney's were required to conduct forfeiture hearings. He continued to state that the final version of the agreement was under review by the Saline County Attorney, and Saline County Sheriff's Office. Mr. Bengtson asked that the Commission approve the item allowing for minor non-substantive changes and stated if there were substantive changes staff would bring the item back to the Commission for approval.

Commissioner Davis asked if the Salina Police Department would place forfeited property into service, would their budget compensate the County Attorney's office. Captain Paul Forrester stated the compensation would come from forfeiture funds and the percentage of the face value would be paid to the County Attorney.

17-0128 Moved by Commissioner Hodges, seconded by Commissioner Davis, to approve Resolution No. 17-7455 authorizing the Mayor to sign the I-135/I-70 Drug Task Force Agreement with the Board of County Commissioners of Saline County, Kansas, the Saline County Sheriff's Office and the Saline County Attorney's Office outlining the administration, staffing and equipping of the Task Force, as amended. Aye: (5). Nay: (0). Motion carried.

ADMINISTRATION

(7.1) Second reading Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code.

Dean Andrew, Director of Planning, explained the information staff obtained from their research on the temporary construction signage, temporary directional signage for real estate open houses and garage sales. He also added that the item had been postponed from the last meeting and explained the recommended action and changes.

Commissioner Davis stated option 2 for off-site real estate, garage sale signs, and commercial in residential zones could not specify content of the signs.

Mr. Andrew added he hoped the idea behind the amendment is that due to time, place and manner restrictions it wouldn't be used by or be appealing to general advertising signs.

A conversation ensued between Aaron Martin, Clark, Mize & Linville, and Commissioner Davis regarding off-site signs.

Mr. Martin elaborated on the discussed research from the last meeting regarding commercial signs and discussed options available.



DRAFT

Commissioner Ryan stated there was substantial enough change to be referred back to the Planning Commission. Mr. Martin added that it would require a 2/3 majority vote for referral back to the Planning Commission to consider alternative recommendations.

Commissioner Blanchard asked if option 2 was adopted and challenged, would it be easily defendable. Mr. Martin stated, yes it was easily defendable.

Jason Gage, City Manager stated option 2 was completely content neutral and more restricted. He continued by discussing the time issue and spending more time on planning than regulation.

A conversation ensued between Mr. Gage, Commissioner Davis and Mike Schrage, Deputy City Manager, regarding the time restriction approach.

Commissioner Hodges thanked staff for their time and patience put into the ordinance and added that she did not believe this was a huge issue.

Commissioner Davis added that option 2 had potential to allow commercial signs in residential areas, where they were not wanted, leading to major contradiction within the policy. He then added he believed there was no reason to limit anything other than the number of signs.

Mr. Martin stated staff could structure it in a way that was comfortable recommending and that other communities were taking that approach.

Commissioner Blanchard concurred with Planning Commission's decision on option 2, stating it could be harmful to property values.

Commissioner Ryan added that he would like to see this go back to the Planning Commission.

Randall Holm, 311 E. Crawford, thanked commissioners and staff for their hard work and taking considerations from public. He continued to state the need for increasing the maximum sign footage and would like to see the commissioners be less restrictive with sign regulations.

Commissioner Blanchard asked if the placements of signs were legal or illegal in the right-of-way. Gary Hobbie, Director of Development Services stated that a majority of the signs were illegally placed in the right-of-way.

A conversation ensued between Commissioner Davis and Mr. Martin regarding the approval of the ordinance now and amending the sign code at a later date due to problematic issues.

Mr. Gage added that he felt there was a need to educate the public on what the right-of-way was and some of the issues that could arise.

17-0129 Moved by Commissioner Hodges, seconded by Commissioner Ryan to return to the Planning Commission with a request to review the legality of the options presented. Aye: (4). Nay: (1). Blanchard. Motion carried.

Commissioner Davis asked if the ordinance will have to go through first and second reading again. Mr. Martin stated yes.

(7.2) Authorize the Mayor to execute a contract with the Davenport Group (LAMA software) for purchase and implementation of new land management software for Development Services and multiple other City departments.

Gary Hobbie, Director of Development Services, explained the software, participating departments, fiscal impact and action options.

Aaron Martin, Clark, Mize & Linville, added his thoughts and explained the legal changes made to the contract.

A conversation ensued between Commissioner Blanchard and Mr. Martin regarding the value to waiving the changes.

Commissioner Hodges asked for clarification on the amount of the contract they were approving. Mr. Hobbie stated the contract was for $190,000.

Commissioner Davis asked if the total installation should be $163,000. Mr. Hobbie stated that was correct, it should be $163,000.

Commissioner Ryan asked if they could extend the contract. Mr. Hobbie stated they could extend it at any time.

Mr. Schrage added the scope of work was pretty sizable at this time and to save funds, they were going to work into it slowly and not take on too much at one time.

Mr. Hobbie stated that staff felt more comfortable with this company than the others that were reviewed. Mr. Schrage then added that they checked with other companies and this was the best fit for the needs of staff.

Commissioner Blanchard asked if they were able to text to report a nuisance. Mr. Hobbie explained they could text or send a picture through email and added that it can tell them the location and allow staff to respond back to let them know inspection had been completed.

A conversation ensued between Commissioner Blanchard and Mr. Hobbie regarding the texting and verification of nuisances out in the field.

17-0130 Moved by Commissioner Ryan, seconded by Commissioner Davis, to authorize the Mayor to execute a contact with the Davenport Group (LAMA software) for purchase and implementation of new land management software for Development Services and multiple other City departments in an amount not to exceed $190,000. Aye: (5). Nay: (0). Motion carried.

(7.3) Continuation of discussion of the topic of allowing or continuing to prohibit the concealed carry of firearms in the City-County Building.

Jason Gage, City Manager, provided information on the opinions of the public and city employees, fiscal impact and the unlawful discharge of firearms.

Commissioner Davis asked if the decision was made to install two security entrances, would the money be taken out of the general fund. Mr. Gage stated any incurred costs would most likely be out of general fund or sales tax, but did not know for sure at this point.

Commissioner Hodges added that she put out an online poll seeking citizen input and explained concerns of citizens. She added that the majority of citizens would prefer no guns be allowed in the City-County Building.

Mayor Crawford stated that she does not prefer guns in the building and doesn't think pulling signs down will make a difference regardless. She then added her thoughts on each option listed and stated the bullet proof window option was preferred.

Commissioner Davis explained his thoughts on citizens feeling the need to bring guns into the building.

Commissioner Hodges stated gunshot injury statistics and expressed the need to invest in equipment to keep weapons out of the City-County Building aside from the inconvenience and expense.

Commissioner Blanchard added that it was important to provide a safe and productive work environment and recommends providing safety measures necessary to prohibit conceal carry in the building.

Mayor Crawford stated her background in working in the building for 25 years and the use of the panic button. She stated things would happen regardless and was unsure of what to do regarding the conceal-carry issue.

Mr. Gage discussed the other options available, the issues of each option and his opinions on them and why this was such a difficult issue to vote on.

Mayor Crawford asked if the outlying buildings were included. Mr. Gage replied saying it was not an option due to the high cost of hiring extra staff.

Randall Holm, 311 E. Crawford, stated he respected the opinions of each commissioner and data that was provided. He explained the statistic regarding majority of attacks were in facilities that did not allow conceal-carry in their buildings and continued to state his concern regarding the liability for not allowing conceal-carry and that he believes it puts people more at risk.

17-0131 Moved by Commissioner Davis, seconded by Commissioner Hodges, to recommend to Building Authority to not allow conceal-carry in the City-County Building and allow expenses to secure number of entrances necessary. Aye: (3). Nay: (2). Ryan, Crawford. Motion carried.

Mayor Crawford suggested they keep only one door open during city commission meetings as well as continuing to have police present.

Mr. Gage added that it was impossible to protect against someone who was determined to carry out a shooting event no matter the security measure.

Mayor Crawford asked if each building was secure, what happened to evening meetings. Mr. Gage stated there were three (3) choices; accessible door, pay more, change scheduling of meetings, isolate to a specific area and restrict access.

(7.4) Discussion of Neighborhood Revitalization Plan amendment request.

Michael Schrage, Deputy City Manager, explained the requests received, fiscal impact and action options.

Commissioner Davis requested a five (5) minute recess at 6:47 p.m. The Commission returned at 6:54 p.m.

Mayor Crawford asked for verification on the agenda item being a discussion only. Mr. Schrage verified that staff was needing direction from the Commission on the item.

A conversation ensued between Commissioner Davis, Mr. Schrage and Jason Gage, City Manager, regarding the current plans for spending downtown and the downside for redevelopment for the property owner.

Commissioner Blanchard asked if the 95% over 15 years for the Lee Building was the

statutory limit. Mr. Schrage stated the municipality sets the formula and terms.

Commissioner Blanchard asked if there could be terms set to tailor the gap regarding the Foley request. Mr. Schrage stated they would need to treat it like a case by case and find out what the gap was to customize the percentage and term to fund their gap.

Mr. Gage added they don't advise doing that often due to having to amend the plan for each project.

A conversation ensued between Commissioner Blanchard and Mr. Schrage regarding amendments to the later requests.

A conversation ensued between Commissioner Blanchard and Mr. Gage regarding the redevelopment for 1300 E. Iron and the requirements.

17-0132 Moved be Commission Blanchard, seconded by Commissioner Hodges to amend the Neighborhood Revitalization Plan removing the portion of Neighborhood Revitalization Area that corresponds to the Downtown Tax Increment Financing District. Aye: (5) Nay: (0). Motion Carried.

17-0133 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to instruct staff to draft a plan amendment that specifically identifies the Lee Building project and provides for 95% property tax abatement over a 15 year term and provides specific justification for the project qualification.

Commissioner Blanchard asked for additional information on the request for $500,000 of direct financial support for the Lee Building request. Mr. Schrage responded by stating the $500,000 request would be brought back to the commission for future action.

17-0134 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to amend the motion to include possible heightened eligibility criteria to include provisions for affordable housing, significant blight mitigations, blight influence of the building on the neighborhood and community and historic building preservation.

Pat Beatty, Overland Property Group, 204 S. Santa Fe., provided his thoughts on the program, the benefits included and the Lee Building request.

Mayor Crawford restated the motion to amend the motion to include possible heightened eligibility criteria to include provisions for affordable housing, significant blight mitigations, blight influence of the building on the neighborhood and community and historic building preservation. Aye: (5). Nay: (0). Motion carried.

Commissioner Blanchard asked that staff look at the program and make suggestions to add other criteria. He continued to provide his thoughts on the program criteria.

Mr. Gage asked Commissioner Blanchard if his motion listing eligibility criteria pertained to the Lee Building request only. Commissioner Blanchard stated the motion was intended for the Lee Building request.

A conversation ensued between Mr. Gage, Mr. Schrage, Mr. Bengtson and Commissioner Blanchard regarding eligibility criteria for the program.

17-0135 Moved by Commissioner Ryan, seconded by Commissioner Hodges, to instruct staff and Foley Tractor to quantify the additional project cost associated with conformation with the applicable floodplain regulations as well as estimate the value of the tax rebates being requested for further consideration by the City Commission at the time the amended plan is presented for formal action.

Commissioner Blanchard asked if the floodplain worked for them. Lewis Erickson, Foley Industries, Park City, Kansas, stated that it did work for them and they had been working on it for some time.

A conversation ensued between Commissioner Blanchard and Mr. Schrage over the timing for eligibility and the steps needed.

Mr. Erickson continued to state the history of Foley Industries, their expectations for their plan and the benefit of allowing them to do so.

Mr. Gage asked if the company looked at the possibility of being eligible or using Internal Revenue Bonds (IRB). Mr. Erickson stated the majority of the company is retail so they do not qualify, but is interested for their other facility being built in Wichita. He then added the risk of their loan and the risks of developing in flood plains.

Mayor Crawford restated the motion to instruct staff and Foley Tractor to quantify the additional project cost associated with conformation with the applicable floodplain regulations as well as estimate the value of the tax rebates being requested for further consideration by the City Commission at the time the amended plan is presented for formal action. Aye: (5). Nay: (0). Motion carried.

A conversation ensued between Commissioner Blanchard and Mr. Schrage over the particular location being outside of the Neighborhood Revitalization Area (NRA) and where that line was.

Dean Andrew, Director of Planning, added that the boundary was Delaware and east of that was all zoned commercial as well as the property being discussed.

A conversation ensued between Mr. Andrew and Mr. Schrage regarding the property in question being zoned commercial and the conditional use permit obtained previously to create apartments.

Mayor Crawford asked why the Jo-Mar Dairy building was not listed on the historic list. Mr. Andrew stated that age wise, it did not qualify at the time and had not been nominated historically.

A conversation ensued between Commissioner Blanchard and Mr. Schrage regarding the amendment of boundaries of the NRA to include the areas in question.

Mr. Gage discussed that program and the incentives regarding property tax.

Brad Lancaster, Lancaster Construction, stated that his units were funded out of pocket and expressed the importance of the program to help with future redevelopments.

Commissioner Blanchard asked if the units were on one lot and were they on the south or east of the NRA line. Mr. Lancaster stated they were on one lot on the south.

A conversation ensued between Commissioner Blanchard and Mr. Schrage over the NRA boundaries being extended and the potential development in that area.

Mr. Lancaster added that their desire was to clean it up and make it more desirable.

Mr. Gage added his comments regarding the rezoning and the NRA, policies and property values.

Mr. Andrew explained examples of properties affected and what amending the map would do.

A conversation ensued between Commissioner Blanchard and Mr. Schrage regarding where they want to expand the boundaries to.

Mr. Hobbie stated the plan expired in 2018.

17-0136 Moved by Commissioner Blanchard, seconded by Commissioner Ryan, to have staff look at rectifying the comprehensive plan bounded by Gypsum Avenue, Indiana Avenue and Iron Avenue, not in the core Neighborhood Revitalization Area, and would result in only residential development being eligible for the rebate in that 2 block expansion to the east.

Commissioner Hodges asked for clarification on the motion before voting. Mr. Gage restated Mr. Schrage's motion.

A conversation ensued between Commissioner Blanchard, Commissioner Ryan and Commissioner Davis over future development areas and the lines between developed areas.

Commissioner Hodges stated she wants universally applied criteria, but understands each request is different and will have to go case by case.

Mayor Crawford restated the motion to have staff look at rectifying the comprehensive plan bounded by Gypsum Avenue, Indiana Avenue and Iron Avenue, not in the core Neighborhood Revitalization Area, and would result in only residential development being eligible for the rebate in that 2 block expansion to the east. Aye: (5). Nay: (0). Motion carried.

**DEVELOPMENT BUSINESS**

None.

**OTHER BUSINESS**

None.

**ADJOURNMENT**

17-0137 Moved by Commissioner Davis, seconded by Commissioner Ryan, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (5). Nay: (0). Motion carried. The meeting adjourned at 8:14 p.m.

[SEAL] Kaye J. Crawford, Mayor

ATTEST:

Shandi Wicks, CMC, City Clerk

DRAFT

# Exhibit BB
# 5/15/17 Salina City Commission Meeting Documents

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 5/15/2017 | 4:00 P.M |

| AGENDA SECTION NO: 7 | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: N/A |
|---|---|---|
| ITEM NO: 1 Page 1 | BY: Dean Andrew | FINAL APPROVAL: BY: [signature] |

**ITEM: Ordinance No. 17-10882**
Second reading Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code.

**BACKGROUND:**
Ordinance No. 17-10882 was passed on first reading on April 17, 2017. On April 24, 2017, the City Commission postponed second reading and directed the City's legal counsel to conduct additional research to confirm whether the City may lawfully except certain categories of signs from a general prohibition on the placement of temporary commercial signs in residential zoning districts. A copy of legal counsel's research memo is enclosed.

**COMMISSION ACTION:**

1. The City Commission could approve the proposed addition of Sections 42-500 and 42-511 and the amendment of Sections 42-506, 42-507 and 42-508 of Article X-Signs as recommended by the Planning Commission and approve Ordinance No. 17-10882 on second reading as drafted.
2. The City Commission could approve the proposed amendments and additions with any additions, deletions and/or modifications to the text that the Commission deems appropriate.
3. The City Commission could send this item back to the Planning Commission to work with staff on major changes to the proposed amendments.
4. The City Commission could maintain the status quo and decide that the proposed additions and changes to the City's sign regulations not be made at this time. In this case, a motion should be made to deny the proposed text amendment and Ordinance No. 17-10882.

Enclosures: Memo from City Legal Counsel
Original Staff Report dated April 17, 2017

# MEMORANDUM

TO: Salina City Commission

FROM: Aaron Martin and Greg Bengtson, Legal Counsel
Clark, Mize & Linville, Chartered

DATE: May 11, 2017

RE: Temporary commercial signs in residential zoning districts

---

On April 24, 2017, the City Commission directed City legal counsel to conduct additional research to confirm whether the City may lawfully except the following categories of signs from a general prohibition on the placement of temporary commercial signs in residential zoning districts:

| | |
|---|---|
| On-site: | real estate |
| | open house |
| | garage sale |
| Off-site: | real estate |
| | open house |
| | garage sale |
| Construction signs | |

The purpose of this memo is to provide a summary of our research findings and conclusions. Generally, excepting the proposed categories of commercial signs could be accomplished via two different approaches: (1) a content-based approach; and (2) a content-neutral approach. Each of the options is briefly summarized below.

**A. Option #1: Create specific content-based exceptions for real estate, open house, garage sale, and contractor signs.**

Content-based exceptions would be subject to intermediate scrutiny by a reviewing court. Research has confirmed that a content-based exception for on-site real estate signs is permissible, but additional content-based exceptions, particularly for contractor signs and off-site real estate, open house, and garage sale signs, present significant legal risk. Research did not reveal any authority to support the creation of content-based exceptions for these categories. Accordingly, Option #1 is not a viable approach and is not recommended.

**B. Option #2: Allow temporary signs in residential districts to display limited commercial messages, with allowances: (1) based on the occurrence of certain specified events; and/or (2) subject to time, place, and manner restrictions.**

Option #2 utilizes a content-neutral approach to allow the proposed categories of commercial signs in residential zoning districts. However, because Option #2 is content neutral, it has the potential unintended effect of allowing the placement of additional types of commercial messages in residential districts, so long as the messages are displayed during the allowed period

of time. The following is a summary of a potential content-neutral approach to allow the various types of commercial signage:

1. On-site real estate, open house, and garage sale signs:
   a. These signs could be categorized as *on-site business signs*.
   b. The City could allow the display of temporary on-site business signs in residential districts during a period relating to the time that the property is: (1) actively marketed for sale or lease; or (2) open to the public for an open house/garage sale.

2. Off-site real estate, open house, and garage sale signs:
   a. These signs could be categorized as *off-site advertising signs*.
   b. The City could allow [x] temporary off-site advertising signs per residential zoning lot. The City could impose additional time, place, and manner limitations, such as:
      i. Limit the display to a specified number of days, or limit the display to between certain hours;
      ii. Specify a minimum number of days that must elapse between successive placements; or
      iii. Impose more restrictive height, square footage, or spacing requirements than are imposed on non-commercial signs or on-site business signs.

3. Contractor signs:
   a. These signs could be characterized as *on-site business signs*.
   b. The City could allow [x] temporary on-site business sign[s] during a period relating to the time that the property is undergoing active construction.

If the City Commission wishes to allow the display in residential districts of certain categories of commercial signs, Option #2 is the recommended legal approach. Research has identified at least three other cities with a sign code that maintains the distinction between commercial and non-commercials signs in residential districts and creates content-neutral exceptions pursuant to some form of Option #2.[1] As discussed above, the legal benefits of Option #2 are accompanied by the potential unintended consequences of allowing the placement of additional commercial signage beyond real estate, open house, garage sale, and contractor signs.

**Additional Note:

Following the April 24, 2017 City Commission meeting, Aaron Martin spoke with Patrick Vogelsberg, Vice President of Governmental Affairs for the Kansas Association of REALTORS. Mr. Vogelsberg was not aware of any additional legal authorities with respect to Option #1 or the ability of the City to distinguish between commercial and non-commercial signs within residential districts. Mr. Vogelsberg had not seen the proposed sign ordinance, and he has been provided a copy with an invitation to provide any questions or concerns in advance of the May 15, 2017 City Commission meeting.

[1] *See, e.g.*, Minnetonka, Minnesota (Ordinance No. 2016-08); Saratoga, California (City Code Art. 15-30); and Grand Terrace, California (City Code Sec. 18.80.160).

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: 8 | ORIGINATING DEPARTMENT: | FISCAL APPROVAL: |
|---|---|---|
| | Community and Development Services Planning Division | BY: n/a |
| ITEM NO: Page 1 1 | BY: Dean Andrew DA | FINAL APPROVAL: BY: |

**ITEM:** Ordinance No. 17-10882
Application #Z16-6A, filed by the Salina City Planning Commission, requesting an amendment of Article X. Signs in Chapter 42 by:

1. Adding a new Section 42-500 to set out the purpose of Salina's sign regulations;
2. Amending Section 42-506 pertaining to the classification and definition of various functional types of signs;
3. Amending Section 42-507 pertaining to the classification and definition of various structural types of signs;
4. Amending Section 42-508 pertaining to the placement and display of temporary signs, banners and feather flags; and
5. Adding a new Section 42-511 to add a substitution clause to allow noncommercial messages to be substituted for commercial messages without any additional permitting or approvals on any sign allowed under the sign regulations.

**BACKGROUND:**
Prior to 1988, the City of Salina had no specific regulations applicable to the use and placement of temporary and mobile signs. In August of 1988 the Planning Commission initiated a text amendment to Article X Signs by adding Section 42-508 specifying limitations on the use of temporary signs, including decorative business signs (banners, flags, balloons), advertising signs for special public events and mobile signs and by amending Section 42-502 to add a definition of mobile signs. The Planning Commission conducted two public hearings and received extensive input from the business community. At the conclusion of the September 20, 1988 hearing, the Planning Commission voted 6-2 to recommend approval of the proposed text amendment to the sign regulations.

As recommended by the Planning Commission, the amendments modified the City's sign regulations in three general areas.

**1. Decorative Business Signs**
The Planning Commission recommended that the use of decorative business signs, such as pennants, streamers, flags, balloons, etc. be made an authorized form of advertising signage but that these attention getting devices only be allowed to be displayed for no longer than 21 days and be allowed to be used by a business establishment for three (3) occasions per year.
Purpose / Justification: The purpose of the proposed amendment was to prevent these types of attention attracting devices from proliferating and becoming an unattractive presence along city streets. The Planning Commission believed that limited use could assist businesses in notifying customers of special events and sales while avoiding the visual impact of continuous use.

**2. Off-premise Advertising Signs for Public Events**
The Planning Commission recommended that no more than one (1) such sign not exceeding 32 sq. ft. be allowed on a zoning lot and that such signs be allowed to be set out seven (7) days in advance of the event and must be taken down within 24 hours after the conclusion of the event. [For example, the Central National Bank at Greeley and Ohio has been a popular location for advertising public events

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 2 | BY: Dean Andrew | FINAL APPROVAL: BY: |

held in Kenwood Park and at the Bicentennial Center.]
Purpose / Justification: The Planning Commission believed this provision was justified by the public purpose served by informing and directing participants to public events and civic activities sponsored by non-profit organizations.

3. **Mobile and Portable Signs**
At the time of the text amendment, mobile signs were allowed on a permanent, year round basis. The Planning Commission recommended that mobile signs only be allowed to be displayed up to 30 consecutive days on two occasions per year and that they not be permitted on the premises of an establishment that already had a pole sign or ground sign in the front yard.
Purpose / Justification: The purpose of this proposed amendment was to reduce driver distraction and improve the physical appearance of the community. The Planning Commission agreed with staff that mobile signs are usually placed near the street at the eye level of motorists and the presence of a large number of mobile signs intermixed with street oriented ground and pole signs could distract motorists and reduce the visibility of other motorists and pedestrians. In addition to traffic safety, the Planning Commission was concerned that the proliferation of mobile signs could create visual clutter along the city's streets. Staff pointed out that some Kansas communities prohibit mobile signs altogether for aesthetic reasons.

The Salina City Commission did not concur with the recommendations of the Planning Commission and returned the proposed text amendment back to the Planning Commission for reconsideration on October 17, 1988. The City Commission recommended that the time limit on temporary signs (banners, flags, inflatables) be eliminated and that mobile signs be allowed to be displayed four (4) times per year instead of two (2) for a total of up to 60 days.

**On October 18, 1988**, following further discussion of the matter, the Planning Commission agreed to accept the changes outlined by the City Commission with the exception of the time limit on the display of temporary signs (banners, flags, inflatables). The Planning Commission recommended that temporary signs be allowed on zoning lots up to four (4) events per year with a limitation of 30 days per event.

**On November 14, 1988**, the Salina City Commission adopted **Ordinance No. 88-9283** which placed time limits on off-premise advertising signs for special events and mobile signs but no time limits on the placement of on premise temporary signs.

Follow Up Action

On **September 25, 1996,** Planning staff presented a staff report and showed photos depicting the growing use of temporary decorative business signs at various locations throughout Salina. The types of signs included banners, flags, streamers and balloons as well as what are referred to as popsicle signs. These signs are typically made of vinyl or plastic and are relatively inexpensive and easy to install. A typical banner sign consists of a rectangular piece of plastic stretched between the posts in the front yard of a business. In the Zoning Ordinance, these signs are classified as decorative signs

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 3 | BY: Dean Andrew | FINAL APPROVAL: BY: |

and defined as follows:
Sec. 42-507(2) Decorative sign. A sign or display fabricated of canvas, cloth, fabric, plastic, plywood, or other light, impermanent material and designed or intended to be displayed in connection with an event for a short period of time.

Decorative signs are allowed in all commercial and industrial zoning districts but the ordinance did not specify the type of "event" or what is a "short period of time."

It was the Planning staff's belief that the increasing prevalence of these types of signs was detracting from the visual appearance of the community and worked against what the Planning Commission and City Commission were trying to accomplish through planned commercial districts and landscaping regulations, especially on the entryway corridors into the community. Staff posed two questions to the Planning Commission: (1) Does the Planning Commission share staff's concerns about the visual impact of unlimited placement of temporary signs, and (2) Does the Planning Commission wish to initiate and advertise for a public hearing to consider a text amendment to the sign regulations to address the use and placement of temporary signs. The Planning Commission answered in the affirmative and initiated a text amendment to Section 42-508.

The amendment to the sign regulations proposed by staff was made up of two components. First, temporary decorative signs placed over an existing sign face, at least 8 ft. above ground level or on a building or solid fence would be treated as any other sign. They would count toward the property's sign allocation but no permit would be required and there would be no time limit on their display. Secondly, temporary decorative signs (banners, flags, inflatables) placed in any other location such as the front yard would be limited to business grand openings and going out of business sales and would be limited to 21 days for such events. This text amendment was unanimously endorsed by the Planning Commission on November 20, 1996 and **Ordinance No. 96-9776** was unanimously approved by the City Commission on January 6, 1997. These limitations on temporary signs have been in force and effect unchanged since that time.

<u>Feather Flags</u>

Feather flags are recent advertising phenomena that only became widely used in the past 3-4 years. This advertising / attention getting phenomenon has been under study by communities across the country because most existing sign regulations don't define or address them. City staff has interpreted feather flags to be temporary signage and therefore subject to the limitations on temporary signs, flags, balloons and banners in the City's Sign Regulations. The Sign Regulations essentially limit the use of temporary and decorative signs to the grand opening of a new business. Exceptions for other types of special or promotional events are not provided for in the ordinance.

City staff has engaged in several citywide enforcement sweeps requesting that business and property owners take down the banners and feather flags they had placed on their property. Voluntary compliance with staff's request was generally good but many business owners expressed surprise that this form of signage was not permitted. Staff has also sought guidance and feedback from the

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 4 | BY: Dean Andrew | FINAL APPROVAL: BY: |

Planning Commission on this topic and the feedback staff received was that the Commission agreed with staff's interpretation of the Sign Regulations and staff's enforcement efforts and the Commission did not wish to initiate any sort of text amendment.

Nature of Current Application

Since this issue was last discussed with the Planning Commission, the U.S. Supreme Court rendered a decision in Reed vs. Town of Gilbert which found Gilbert, Arizona's temporary sign regulations to be invalid because they regulated temporary signs differently based on their content. Land use attorneys who have analyzed the Reed decision have recommended that municipalities carefully review their temporary sign regulations to ensure that they don't regulate temporary signs differently based on their content or message. Municipalities may regulate the number of signs, their location, their size, the length of time they may be up and the structural types of signs allowed or disallowed but the regulations must apply uniformly to all signs, regardless of their message or content. They also recommend that all sign regulations have a Purpose section articulating the public purpose for regulating signs, a Severability clause and a Substitution clause. Salina's sign regulations do not currently have any of these sections.

In addition to the Reed decision, staff has received written correspondence from several local business and property owners who believe that Salina's temporary sign regulations are overly restrictive and out of step with what is allowed in other Kansas communities (see attached letter).

The City Attorney has expressed an opinion that the City's current temporary sign regulations that treat temporary signs sponsored by governmental, philanthropic and non-profit organizations advertising public event differently than other temporary signs and limiting temporary signs to going out of business sales and not allowing them for other types of sales could be interpreted as content based regulations and may not be defensible.

The Planning Commission held a study session on sign regulation at their August 16, 2016 meeting and also discussed the regulation of temporary signs at their regular meeting. The Planning Commission was provided a copy of the written correspondence received from local business owners and a summary of what other Kansas communities allow in the way of temporary signage. Based on staff's recommendation and the advice of the City Attorney, the Planning Commission authorized the initiating of a text amendment to Article X Signs to add a *Purpose* section and *Severability clause* to the sign regulations and to amend Section 42-508 pertaining to the placement and display of temporary signs. The purpose of amending this section would be to create a level playing field for all forms of temporary signage based on size, location and appearance regardless of message or content.

Staff Comments and Analysis

Based on the advice of the City Attorney, staff believes that the provisions in Section 42-508 limiting freestanding temporary signs to grand opening events and allowing temporary signs that advertise

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| | | |
|---|---|---|
| AGENDA SECTION<br>NO: | ORIGINATING DEPARTMENT:<br>Community and Development Services<br>Planning Division | FISCAL APPROVAL:<br>BY: |
| ITEM<br>NO:<br>Page 5 | BY: Dean Andrew | FINAL APPROVAL:<br>BY: |

governmental and philanthropic events but no other events needs to be repealed from the temporary sign regulations and that broader, more content neutral provisions need to be drafted and adopted. The visual impact of these types of signs is the same regardless of their message, so staff believes the City needs to adopt a uniform set of standards and limitations applicable to all property throughout the city and applicable to all forms of temporary signage.

The term "temporary sign" can have two connotations. One relates to the durability of the materials signs are made out of. The term "temporary" refers to signs that are not constructed to be permanently affixed year round. The term "temporary" also refers to signs that are only allowed to be displayed for a limited duration (7-30 days) and not year round. At the August 16 meeting, Planning staff asked for some general guidance from Planning Commissioners and the consensus of the Planning Commission was:

1. Permits should not be required to erect temporary signs.
2. Temporary signs should have a time limit / duration on their display.
3. There should be a numerical limit on the number of temporary signs allowed per lot.
4. There should be size limits on temporary signs.
5. There should be height limits on temporary signs.
6. There should be spacing and setback requirements for temporary signs.

The Planning Commission's role in the text amendment process was to attempt to find a balance between allowing business and property owners to put up a reasonable amount of signage and maintaining the visual appearance of the community and its streetscapes while making any regulations as content neutral as possible.

The Planning Commission conducted a public hearing on staff's proposed amendments to the Temporary Sign regulations on **November 1, 2016** with a focus on decorative flags or feather flags. Input was received from several local business owners requesting that the number of events during which feather flags could be set out on a property be increased from 4 events to 6 times a year. There was discussion about whether the maximum flag height should be 13 ft. or 17 ft., whether the maximum number of flags allowed per street frontage should be 6 or 12 flags, whether they should be allowed for 4 or 6 promotional events per year and whether the display period should be 14 days or up to 30 days. Following comments from interested parties and discussion by Commission members, the Planning Commission reached a consensus on the following items:

- The maximum flag height should be 13 ft.
- The maximum number of flags allowed on a street frontage should be 6.
- The maximum number of display events should be 6 times per year.
- The maximum display period should be 30 days.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 6 | BY: Dean Andrew | FINAL APPROVAL: BY: |

- The maximum height for inflatable attention getting devices should be 20 ft.
- The placement of banners on stakes in the front yard area should continue to be disallowed.

At the Planning Commission's February 7, 2016 meeting the Planning Commission authorized staff to expand the scope of the text amendment to include changes to the terms and definitions in Section 42-506 pertaining to structural types of signs and Section 42-507 pertaining to functional types of signs. A *Substitution* clause (Section 42-511) was proposed instead of the *Severability* clause originally proposed.

As expanded, the proposed text amendment now includes new terms and definitions to substitute for or replace existing definitions in Section 42-506 and 42-507 in addition to recommended changes in Section 42-508 Temporary Signs. One of these is a proposed definition for "temporary signs" which is not currently defined in the Zoning Ordinance.

<u>Overview of Proposed Text Amendment</u>

On June 15, 2015, the U.S. Supreme Court struck down the Town of Gilbert, Arizona's sign code. The unanimous decision of the United States Supreme Court in Reed v. Town of Gilbert, Arizona 2015 said that, with few exceptions, sign regulations cannot vary based on the type of information a sign conveys. The Supreme Court found that the Town of Gilbert's temporary sign code unconstitutionally discriminated against a particular kind of content, in this case temporary directional signs erected by a church, and that the city did not have any legitimate governmental interest for doing so. These same restrictions were not placed on comparable types of signs.

With the exception of the sections dealing with feather flags and inflatable signs, the proposed sign ordinance text amendment responds to United States Supreme Court in Reed v. Town of Gilbert, Arizona 2015 which said that with few exceptions, sign regulations cannot vary based on the type of information a sign conveys. Currently, the City of Salina sign regulations vary by category – campaign signs, noncommercial opinion signs, real estate signs, general advertising signs, business identification signs, etc. – each defined by the type of information conveyed.

The intent of the proposed amendment is to maintain, as close as possible, the temporary sign allowance currently allowed in the various zoning districts. The proposed amendment would apply the existing physical characteristics (number, height, size, design characteristics, location, portability, and duration) to temporary signs without regard to the sign message or content, subject to limited content-based exceptions for certain legally defensible commercial categories of content.

The goal is to regulate temporary signs by their structural type instead of by their function. For example, Salina's sign regulations currently allow noncommercial opinion and political signs in residential districts. The proposal is to continue to allow them but to classify them as "temporary freestanding yard signs" instead of as political signs or noncommercial opinion signs. One of the guiding principles of the Reed case is that if City staff has to read the sign to determine if it is allowed then the City is drifting towards regulating signs based on their content.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 7 | BY: Dean Andrew | FINAL APPROVAL: BY: |

The first portion of the proposed text amendment proposes some clarifying amendments to the functional types of signs defined in Section 42-506 of the Sign Regulations by clarifying that advertising and business signs display "commercial messages." Under First Amendment legal doctrine commercial speech can be regulated at a different level than noncommercial speech. The proposed text amendment proposes to delete "noncommercial opinion signs" and "political signs" as functional types of signs, to add a definition of "open house sign" and to modify the definition of "real estate sign."

Under structural types of signs in Section 42-507, the term "decorative sign" is proposed to be deleted and replaced by a definition for "temporary sign." The definition of banner sign is proposed to be modified and new definitions are proposed for "feather flag," "inflatable sign" and "yard sign", all structural types of signs.

For the proposed changes to Section 42-508 staff proposed a base temporary sign allowance for each zoning lot and then a menu of options for additional signs based on events or activities taking place in the community (elections) or on the property (property for sale or lease, open houses, garage sales and construction activity). The City Commission still has the discretion to make the final decision in regard to the number, maximum size, maximum height and appearance characteristics of temporary signs that should be allowed in residential and nonresidential zoning districts.

There was general consensus among Planning Commissioners to allow each individual residential lot to have two (2) temporary signs not exceeding 8 sq. ft. in size regardless of content and to allow each nonresidential lot to have two (2) temporary signs up to 32 sq. ft. in size. Staff and the Planning Commission also discussed four (4) possible exceptions to the general prohibition on signs conveying commercial messages being placed in residential districts. The four (4) exceptions were as follows:

- <u>Real Estate Signs</u>

There was a general consensus to allow one (1) additional temporary sign not exceeding 8 sq. ft. in size for residential properties that are for sale or rent. There needs to be additional discussion about what the maximum sign size and height ought to be.

<u>Possible Justification for Exception</u>

Possible justifications for making this exception include the right of an individual homeowner to inform the public that their property is on the market. This is a marketing platform for property owners who don't have an alternative means to communicate that information. The U.S. Supreme Court has previously upheld a 1977 case that an outright ban on for sale signs is unconstitutional. The Court noted that persons who might not have access to certain real estate marketing information cannot be discriminated against when a physical sign invites all comers to a home for sale or rent.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 8 | BY: Dean Andrew | FINAL APPROVAL: BY: |

- Open House & Garage Sale Signs

There was a general consensus to allow one (1) additional temporary sign not exceeding 8 sq. ft. in size for residential properties conducting an open house or garage sale.

Possible Justification for Exception

Open house signs and garage sale signs are also neutral marketing platforms, and the same argument can be advanced that an individual homeowner should have the right to inform the public that they are invited to their property.

- Off-Site Open House/Garage Sale Signs

The Planning Commission was not supportive of allowing these commercial message signs to be placed off-site on another residential property. This exception is not included in the draft ordinance.

- Construction Signs

Staff's impression was that the Planning Commission had mixed feelings about construction signs being allowed on individual residential lots. Under staff's original proposal, placement would have been limited to the time period when construction activity is taking place on the property.

One possible justification for the exception is that it serves as a public purpose by informing neighboring property owners and the general public that construction activity is taking place on the property and who (what contractor) is involved with the activity. The Planning Commission ultimately decided this exception was not defensible and it is not included in the draft ordinance.

At the March 7 public hearing the City Attorney's office and City staff provided the Planning Commission with an overview of the legal and planning principles that formed the basis for the proposed text amendment. Staff also presented the proposed changes and options in matrix form so the Planning Commission could view the options for regulating the number and sign types allowed in residential and nonresidential districts as well as photographs depicting different temporary sign types.

Staff recommended that the Planning Commission review the recommended changes and the options for allowing additional temporary signs and that any legal questions Commissioners have be addressed by the City Attorney. Staff also recommended that based on the input received from Commissioners, staff would prepare a final draft for Planning Commission consideration at the Commission's March 21, 2017 meeting.

The Planning Commission voted to continue the public hearing to their March 21, 2017 meeting.

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 04/17/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 9 | Community and Development Services Planning Division<br>BY: Dean Andrew | FINAL APPROVAL: BY: |

Planning Commission Recommendation

The Planning Commission conducted a public hearing on this proposed text amendment at their **March 21, 2017** meeting. Following presentation of the staff report, comments from members of the public and comments and questions from Commissioners, the Planning Commission approved a motion (4-2) to recommend approval of the text amendment as drafted and presented by staff and the City Attorney's office, finding that:

1. The proposed amendment is consistent with the intent and purpose of the Zoning Ordinance; and
2. The proposed amendment will not adversely affect the orderly development of the City of Salina; and
3. The proposed amendment will not be detrimental to, or endanger the public health, safety or general welfare of the City of Salina.

COMMISSION ACTION

1. The City Commission could approve the proposed addition of Sections 42-500 and 42-511 and the amendment of Sections 42-506, 42-507 and 42-508 of Article X-Signs as recommended by the Planning Commission and approve Ordinance No. 17-10882 on first reading as drafted.
2. The City Commission could approve the proposed amendments and additions with any additions, deletions and/or modifications to the text that the Commission deems appropriate.
3. The City Commission could send this item back to the Planning Commission to work with staff on major changes to the proposed amendments.
4. The City Commission could maintain the status quo and decide that the proposed additions and changes to the City's sign regulations should not be made at this time. In this case, a motion should be made to deny the proposed text amendment and Ordinance No. 17-10882.

Staff Recommendation

Staff would recommend that the City Commission take whatever action it deems to be in the best interest of the public and community as to the maximum number and size of temporary signs that should be allowed to be placed on residential lots in the community.

Enclosures: Application
Summary of Recommended Changes
Excerpt of 11/1/16 and 3/21/17 PC minutes
Ordinance No. 17-10882

cc: Gary Stansberry and Randall Holm

(Summary published in The Salina Journal on April ___, 2017)
(Published on the City of Salina's website for a minimum of one week from April ___, 2017 to May ____, 2017.)

**ORDINANCE NUMBER 17-10882**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert,* which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed* v. *Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1.** **New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2.** **Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Construction sign.* A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

(5) *Garage sale sign.* A temporary sign which advertises or announces a lawful garage sale on the property upon which the sign is located.

(6) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(7) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(8) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(9) *Open house sign.* A temporary sign which advertises or announces that the property upon which the sign is located is available for inspection by prospective buyers and that the owner of the property or the owner's agent is on the premises during the time the property is open for inspection.

(10) *Real estate sign.* A temporary sign which advertises the sale or lease of the real estate upon which the sign is located.

**Section 3.** **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**
The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), and subject to the limitations set forth in subsection (d), additional yard signs shall be allowed on a property as follows:

(i) Four (4) additional yard signs may be placed and displayed on property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(ii) One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district when the property is being offered for sale or lease by a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium.

(iii)One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district no earlier than two (2) days before and shall be removed no later than one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

(iv) Two (2) additional yard signs may be placed and displayed on property located in any A-1, A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, schools, churches, assisted living facilities and nursing homes when construction activities of any type are being actively performed on the property. These additional temporary signs may be displayed no earlier than the date on which a

building permit is issued for the project and shall be removed no later than seven (7) days after a certificate of occupancy is issued for the project.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed thirty-two (32) square feet of sign area.

(3) No temporary sign shall be used as an advertising sign.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed eight (8) square feet of sign area.

(3) No temporary sign shall display a commercial message, except as follows:

(i) One (1) real estate sign may be displayed per street frontage on a property. A real estate sign shall be removed within seven (7) days of the sale or lease of the property that is advertised for sale or lease on such real estate sign.

(ii) One (1) open house sign may be displayed per street frontage on a property. An open house sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the open house concludes.

(iii)One (1) garage sale sign may be displayed per street frontage on a property. A garage sale sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the garage sale concludes.

(d) A person exercising the right to place temporary signs on a property as described in subsection (a) must limit the total number of temporary signs on the property at any one time to six (6) plus any additional temporary signs allowed on the property pursuant to subsections (e) and (f).

(e) In addition to the temporary signs allowed under subsections (a) and (b):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive

days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(f) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(g) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

**Section 5.** **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

**Section 6.** **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

<u>**Section 7.**</u> **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On April 24, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: April 17, 2017
Passed: May 15, 2017

Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

Shandi Wicks, CMC, City Clerk

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel

# Exhibit CC
# 6/26/17 Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**June 26, 2017**
**4:00 p.m.**

The City Commission convened at 2:00 p.m. for Lower Smoky Hill Water Supply Access District Board Special Meeting and at 2:30 p.m. for Budget: Outside Agencies and at 3:45 p.m. for Citizens Forum.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. Roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Mayor Kaye J. Crawford (presiding), Commissioners Jon Blanchard, Trent Davis, Melissa Rose Hodges, and Karl Ryan.

Also present: Jason Gage, City Manager; Michael Schrage, Deputy City Manager; Greg Bengtson, City Attorney; and Shandi Wicks, City Clerk.

## AWARDS AND PROCLAMATIONS

None.

## CITIZENS FORUM

None.

## PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME

None.

## CONSENT AGENDA

(6.1) Approve the minutes of June 19, 2017.

(6.2) Approve Resolution No. 17-7465 expressing support for and authorizing staff to submit a grant application to the Dane G. Hansen Foundation for bicycle education, evaluation and encouragement under the health care objective for healthier communities.

17-0175 Moved by Commissioner Davis, seconded by Commissioner Ryan, to approve the consent agenda as presented. Aye: (5). Nay: (0). Motion carried.

## ADMINISTRATION

(7.1) Authorize preparation, distribution and public notice of final draft of revisions to the Salina Neighborhood Revitalization Plan.

Michael Schrage, Deputy City Manager, explained the current plan, requests submitted, possible changes to the plan and action options.

Commissioner Davis asked what the most important features in summary that merited adding the property on Delaware. Mr. Schrage stated from discussion at the last meeting, the property would add multi-family housing, be consistent with the comprehensive plan and matched other properties in the neighborhood.



DRAFT

17-0176 Moved by Commissioner Hodges, seconded by Commissioner Ryan, to direct staff to finalize the draft revisions to the Neighborhood Revitalization Plan, solicit the consent of the applicable taxing jurisdictions and publish notice of a public hearing before the City Commission for consideration of the proposed revisions to the Neighborhood Revitalization Plan. Aye: (5). Nay: (0). Motion carried.

(7.2) International Energy Conservation Code, Uniform Mechanical Code and International Residential Code.

(7.2a) First reading Ordinance No. 17-10890.

(7.2b) Declare a compelling public purpose exists to allow second reading on the same day.

(7.2c) Second reading Ordinance No. 17-10890.

Michael Schrage, Deputy City Manager, explained the background of the new building codes, the request submitted, and action options.

Jason Gage, City Manager, asked Mr. Schrage to review the additional information staff provided to the Commission and public pertaining to the current building codes in neighboring jurisdictions as of January 2016.

Mr. Gage stated that upon receiving the request, staff decided to bring the matter to the City Commission for consideration.

Commissioner Ryan asked what would happen to the developer and builder if the moratorium was passed. Mr. Gage stated if the moratorium was approved, the energy conservation code would not apply but if the moratorium was not approved, development would still be required to abide by the energy code.

Commissioner Hodges asked what would happen to the current projects that were in the process of being completed. Mr. Schrage stated the moratorium would require the submission of revised plans.

Commissioner Hodges stated it would be helpful for the Commission to understand why the developer or builder could not meet the 2012 Energy Conservation Code.

Commissioner Davis asked why the new building codes were delayed from going into effect in January of 2017. Mr. Schrage stated staff thought there were some developers and builders that were not fully aware of the January 1, 2017 effective date and there was some inability to submit plans by the submittal date for the building codes at that time.

A conversation ensued between the Commission, Mr. Gage and Mr. Schrage regarding the implementation of the new building codes and the input from the development community.

Mr. Gage stated the purpose of the energy conservation code was to limit the amount of future expenses and to be energy efficient.

Commissioner Blanchard asked for staff to describe processes used in the implementation of new building codes. Mr. Schrage stated the building official held approximately sixty (60) Building Advisory Board Sub-Committee meetings to allow for questions and issues to be raised at that time.

Jeff Gillam, Jones Gillam Renz Architects, stated the codes were very extensive and of the



DRAFT

neighboring competitive communities the Salina energy conservation code was the most extensive and most expensive. He continued to state that a majority of the jurisdictions that had adopted the energy conservation code had to adopt it with amendments. Mr. Gillam asked for the City Commission to vote in favor of the moratorium.

Donnie Marrs, DMA Architects, stated the codes were reviewed but never applied to a real building situation which adds to the cost of the new building. He continued by providing examples of the requirements within the energy code and asked the City Commission to vote in favor of the moratorium.

Brandon Hughes, Harbin Construction, stated if a project was over budget, the first thing that was looked at was the commissioning and lead approach.

Charles Renz, Jones Gillam Renz Architects, stated the 2012 Energy Conservation Code was not conducive for every situation and stated the amendments would be able to help in those situations.

James Hall, 1525 E. North Street, provided an example of a section within the structure code that added additional cost to the development and asked the Commission to listen to the developers.

Mr. Schrage stated if the Commission would like to continue with the 2012 Energy Conservation Code and would like additional conversation and reporting, staff would strongly ask for the moratorium to allow staff time to thoroughly work the review through the Building Advisory Board and bring it back to the City Commission for approval.

Mr. Jeff Gillam asked for a show of hands in the audience of those that were in favor of the moratorium. Multiple individuals in the audience raised their hands in favor of the moratorium.

Commissioner Blanchard asked why during the two (2) year process no one raised red flags on the issues of the codes. Mr. Jeff Gillam stated that developers and builders did raise red flags during the sub-committee meetings and none of those red flags were addressed.

Commissioner Blanchard asked Mr. Jeff Gillam if the architects had ran into using the 2012 Energy Conservation Code. Mr. Jeff Gillam stated the neighboring jurisdictions either did not have an energy conservation code or a lesser code with amendments and most of the projects his firm worked on were out of state.

A conversation ensued between Mr. Jeff Gillam and Commissioner Blanchard regarding the need for amendments to the code.

Commissioner Blanchard provided his thoughts on the moratorium and the process for implementing new codes.

A conversation ensued between the Commission on the amount of time for the moratorium and the implementation of a new energy code.

Commissioner Blanchard asked how many permits were currently submitted with the energy code. Mr. Schrage stated staff had conversations regarding that but he could not say how many there were.

Mr. Gage stated the current energy conservation code was in effect and in use today, the current ordinance before the Commission was to instill a moratorium. He also stated the implementation of the new energy code would be up to the City Commission.

Mr. Schrage stated if there were any permits issued using the 2012 Energy Conservation Code prior to the implementation of the moratorium, the applicant would have to submit revised plans for the projects.

Commissioner Blanchard asked how many permits may be submitted during the moratorium time period. Mr. Schrage stated it was hard to tell but approximately six (6).

Commissioner Blanchard stated the option was to go to the 2009 International Energy Conservation Code or keep the 2012 International Energy Conservation Code. Mr. Gage stated there was the possibility to use the 2009 International Energy Conservation Code with amendments or the 2012 International Energy Conservation Code with amendments.

Commissioner Blanchard asked if the 2009 International Energy Conservation Code was a better option, could the 2009 International Energy Conservation Code be approved today.

Commissioner Davis asked what he meant by amend the 2009 International Energy Conservation Code. Mr. Gage stated it would mean to make the code less restrictive.

Commissioner Davis provided his thoughts on the code and the moratorium.

Mr. Gage stated he would recommend allowing the Building Advisory Board the opportunity to address the question.

Commissioner Davis asked what would take place of the 2012 International Energy Conservation Code. Mr. Schrage stated there were currently energy provisions within the residential and building code that would still be required.

Mr. Bengtson stated nothing goes away by the moratorium ordinance, it provides a time out of enforcement by City staff on the energy code.

Commissioner Blanchard asked if the Building Advisory Board could have on their agenda the item for consideration and have the item back on the agenda for the City Commission on July 17th. Mr. Schrage stated staff could take the item to the Building Advisory Board along with copies of the Manhattan, Topeka and Kansas City code with amendments.

Mr. Gage stated the item did not have to go to the Building Advisory Board but staff felt it was an opportunity for them to review the item.

Commissioner Hodges asked if it made more sense to work on amendments to the 2012 International Energy Conservation Code. Mr. Schrage stated the International Energy Conservation Code had a COMAcheck software that the 2009 code would check but the 2012 would require additional work to review for a developer. Mr. Marrs questioned if there was anyone in staff that could review the energy code reports.

Commissioner Davis provided his thoughts on the implementation of the energy code.

A conversation ensued between Mr. Marrs and the Commission regarding the implementation of the energy code and the next step.

Ken Cool, Cool & Eitel Construction, stated the code book was not a law but was more of a guideline, provided his thoughts on the code and stated he attended several of the sub-committee meetings reviewing the new codes.

17-0177 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to send the item to the Building Advisory Board to adopt the 2009 International Energy Conservation Code with or without amendments and return the item with a written ordinance to the City Commission on July 17, 2017.

Commissioner Davis asked about the motion and it not addressing the moratorium. Commissioner Blanchard stated he felt there was a sense of urgency to look at the issues and run the process to get the issues resolved.

Commissioner Davis asked if the 2012 International Energy Conservation Code would need to be repealed. Mr. Bengtson stated the ordinance taking the action to adopt the 2009 International Energy Conservation Code would include the repeal of the current code.

Mayor Crawford restated the motion to send the item to the Building Advisory Board to adopt the 2009 International Energy Conservation Code with or without amendments and return the item with a written ordinance to the City Commission on July 17, 2017. Aye: (5). Nay: (0). Motion carried.

(7.3) Discussion and direction to staff regarding the operating model to offer concessions at the Salina Fieldhouse.

Jason Gage, City Manager, explained the Original Fieldhouse Food Service Model, In-House Concession option, the Private Concessionaire Operation option and action options.

Commissioner Davis asked if there were any plans for concessions at the two (2) events planned in July. Chris Cotten, Director of Parks & Recreation, stated the event organizer would be running the concession stand for the events. Commissioner Blanchard asked if there were any plans for the concession stand early on as the Commission was not aware of how the concession stand would be ran.

Commissioner Blanchard asked if sales tax would be collected. Mr. Gage stated yes, the City of Salina would collect the sales tax.

Commissioner Hodges asked Mr. Cotten which model he preferred. Mr. Cotten stated he preferred the City of Salina staff running the concession stand or the Tony's Pizza Event Center model.

Commissioner Blanchard asked how the Kenwood Cove concession stand was ran. Mr. Cotten stated the Kenwood Cove stand was contracted out.

Mayor Crawford provided her thoughts on the model.

Commissioner Blanchard provided his thoughts on what he would like to see.

Commissioner Davis provided his thoughts on the model he would prefer to see.

Mr. Gage stated if staff could keep the flexibility they would like to see, there would be an opportunity for a private concessionaire operation plan.

Commissioner Blanchard asked if there was an ability to hurt the number of tournaments at the facility with having a private concessionaire operation plan.

Commissioner Blanchard asked if there was an ability for staff with Tony's Pizza Event Center to negotiate concession stand funds. Mr. Gage stated Spectra could negotiate the funds from the concession stand with the renters.

Commissioner Hodges provided her thoughts on what she would like to see and per past experience on the food and drinks offered at other venues.

Jonathan Dong, Bowhead Support Group, stated it was a significant facility and felt it needed a reputable concession stand. He continued by stating there was a need for a

professional concession stand.

Commissioner Blanchard asked Mr. Dong what type of items his organization could provide. Mr. Dong stated there would be healthy options like salads, yogurt parfaits and fruit but would also include the typical concession food.

Commissioner Blanchard asked if Mr. Dong felt the healthy food options would harm the restaurants in the downtown area. Mr. Dong stated there would be times when families did not have time to leave the facility to go to a downtown restaurant.

Commissioner Blanchard asked if there was an opportunity for staff to get with Mr. Dong to review the options. Mr. Gage stated he felt there would be one or more concessionaires that would be able to handle the opportunity and felt there should be a request for proposals sent out.

Commissioner Davis asked what the minimum size tournament Mr. Dong felt the concession would be open for. Mr. Dong stated for the first year, the concession would be open for all events regardless the size.

Commissioner Davis asked if Mr. Dong would be comfortable with a contract serving larger events only. Mr. Dong stated that would not be what he would like to see, but he would be willing to do it.

Travis Scheele, Recreation Superintendent, stated staff was still working on scheduling tournaments and one of the first questions asked was how the concession stand would be handled.

Mr. Gage stated staff would like direction from the Commission.

Commissioner Ryan stated he felt the need to continue with the current model until more information is gained once the facility was open.

Commissioner Davis stated he would like to get the building open first and stated the need to share the concession responsibilities. Mr. Gage asked if Commissioner Davis was in favor of keeping the concession stand in house and exploring the options. Commissioner Davis stated he would prefer with keeping the concession stand in house at this time.

Commissioner Hodges stated she agreed with Commissioner Blanchard that she did not feel the City of Salina was in the food service business but would be willing to go with the in house concession stand to see how it goes.

Commissioner Blanchard stated he did not want to get into the food service business but felt there would be an operational shock of running the facility and any help from the private sector to manage the concession stand would help.

Mr. Gage asked if the Commission would like to revisit the idea in the first quarter of 2018. The Commission reached a consensus to revisit the item in the first quarter of 2018.

(7.4) Resolution No. 17-7464 authorizing the Mayor to execute an agreement with Burns & McDonnell Engineering Co., Inc. and CAS Constructors, LLC for Phase I of the South Well Field and Water Treatment Plant Improvement Project, Project No. 70019.

Martha Tasker, Director of Utilities, explained the project, fiscal impact and action options.

DRAFT

Aaron Martin, Legal Counsel, explained the summary of changes to the contract document.

Commissioner Blanchard asked for clarification on the summary of changes. Mr. Martin provided clarification on the changes.

Commissioner Blanchard asked if there was a source for public contact on the project. Ms. Tasker stated the public could contact staff at any time.

Jerry Duran, 5353 E Magnolia Road, stated he was not aware of the project other than what was in the newspaper and expressed his concerns on the project and wanted additional information on how the project could affect them.

Jason Gage, City Manager, stated staff could include them in the initial conversations to get the information needed to them.

17-0178 Moved by Commissioner Hodges, seconded by Commissioner Blanchard, to adopt Resolution No. 17-7464 authorizing the Mayor to enter into an agreement with Burns & McDonnell Engineering Company, Inc. and CAS Constructors, LLC as a Salina Joint Venture for Phase I of the South Well Field and Water Treatment Plant Improvement Project, Project No. 70019, with a not-to-exceed amount of $1,964,525. Aye: (5). Nay: (0). Motion carried.

(7.5) Amendment of Standard Traffic Ordinance – Fine for Seat Belt Violations.

(7.5a) First reading Ordinance No. 17-10891.

(7.5b) Declare a compelling public purpose exists to allow second reading on the same day.

(7.5c) Second reading Ordinance No. 17-10891.

Greg Bengtson, City Attorney, explained the amendment, effective date of change and action options.

Randall Holm, 848 Custer, provided his thoughts on the amendment and that the fine was a significant jump. Mr. Bengtson stated the fee was imposed by the State of Kansas.

17-0179 Moved by Commissioner Ryan, seconded by Commissioner Blanchard, to pass Ordinance No. 17-10891 amending Chapter 38, Article I of the Salina Code by adding new section 38-1a, amending 182.1 (Seat Belts) of the Standard Traffic Ordinance, as amended, which regulates traffic within the corporate limits of the City of Salina, Kansas on first reading. Aye: (5). Nay: (0). Motion carried.

17-0180 Moved by Commissioner Blanchard, seconded by Commissioner Ryan, to declare a compelling public purpose exists for second reading approval of Ordinance No. 17-10891 on the same day as the first reading. Aye: (5). Nay: (0). Motion carried.

17-0181 Moved by Commissioner Ryan, seconded by Commissioner Hodges, to adopt Ordinance No. 17-10891 amending Chapter 38, Article I of the Salina Code by adding new section 38-1a, amending 182.1 (Seat Belts) of the Standard Traffic Ordinance, as amended, which regulates traffic within the corporate limits of the City of Salina, Kansas on second reading. A roll call vote was taken. Aye: (5) Crawford, Davis, Hodges, Ryan, Blanchard. Nay: (0). Motion carried.

The Commission recessed for break at 6:50 p.m. and reconvened at 7:00 p.m.

**DEVELOPMENT BUSINESS**

(8.1) Application No. Z16-6A, (filed by Salina City Planning Commission), requesting an amendment to Article X. Signs in Chapter 42.

Dean Andrew, Director of Planning, explained the prior City Commission action, revised City Commission recommendation, ordinance options and action options.

Commissioner Davis asked if deciding to eliminate commercial signs in residential districts was allowed under the Supreme Court case. Aaron Martin, Legal Counsel, stated yes.

Commissioner Davis also asked if the Supreme Court case specified a house for sale sign had to say for sale. Mr. Martin stated there was not a specific case that addressed that but there was a level of scrutiny that would have to be addressed. He continued by stating the ordinance could include that the sign must include the language pertaining to a house for sale.

A conversation ensued between Commissioner Davis, Mr. Martin and Mr. Andrew regarding commercial signs in the residential district.

Commissioner Blanchard stated he was looking at the ordinance option #1, under Section 4, (a) iii (4) pertaining to temporary signs for construction activities and then Section 4 (c) iii (3) pertaining to signs on site and asked if a (4) could be added to Section 4 (c) iii to add a sign for construction activities and where the risk would come in. Mr. Martin stated the first section was pertaining to the quantity of signs not the text on the sign and it would be possible to add the language but he would suggest using the ordinance option #2.

Mr. Andrew shared with the Commission that Chris Rost was not able to attend but he did support ordinance option #2.

Mr. Martin stated there were three (3) variations of the ordinance in the packet, option #1 was the original ordinance that was approved in April and could be approved on second reading, option #2 and option #3 would have to be approved on first reading first.

Commissioner Hodges stated she preferred option #3 due to the ability to enforce the code.

Commissioner Ryan stated he agreed with Commissioner Hodges and preferred option #3.

Commissioner Davis provided his thoughts on the ordinance options.

A conversation ensued between the Commission and Mr. Andrew regarding the ordinance options.

Commissioner Davis asked about the size of home for sale signs. Mr. Andrew stated most signs were smaller than 5 square feet.

Michael Schrage, Deputy City Manager, stated the way the sign was measured for a code enforcement perspective was a box around the text.

A conversation ensued between the Commission, Mr. Schrage and Mr. Andrew regarding the size of signs and how they are measured.

17-0182 Moved by Commissioner Hodges, seconded by Commissioner Davis, among the three options presented I move to pass Ordinance No. 17-10882 Option # 3 on first reading allowing two (2) temporary signs to be placed on an individual residential property regardless of content and regardless of any activities or events taking place on the property, with up to four (4) additional signs allowed during election season.

Commissioner Davis asked if the number of signs could be amended to include alarm system signs. Commissioner Blanchard stated the option chosen would allow all signs regardless of the sign.

Commissioner Davis asked if Commissioner Blanchard would be in favor of limiting the number of commercial signs. Commissioner Blanchard stated yes, he would be in favor of limiting commercial signs. Mr. Gage stated the elimination of commercial signs would move you back into option #1 or option #2.

Commissioner Davis asked if making a distinction in option #3 was an option. Mr. Martin stated it would be an option to add additional language to the option.

Greg Bengtson, City Attorney, stated the motion would need to include the wording "among the three (3) options".

Jim Kowach, Director of Public Works, stated he was not sure if the Commission recalled but off-site signs were not mentioned in the ordinance version chosen. Mr. Martin stated the temporary signs allowed would include commercial or non-commercial signs.

Randall Holm, 848 Custer, stated there was a lot of work put into this matter and asked that the number of signs be increased to three (3) instead of two (2). Commissioner Davis asked the motion maker to change the number of signs from two (2) to three (3). Commissioner Hodges stated she felt she stuck her neck out enough voting for the option that she could not extend the number of signs.

Mayor Crawford restated the motion among the three options presented I move to pass Ordinance No. 17-10882 Option # 3 on first reading allowing two (2) temporary signs to be placed on an individual residential property regardless of content and regardless of any activities or events taking place on the property, with up to four (4) additional signs allowed during election season. Aye: (4). Nay: (1) Blanchard. Motion carried.

**OTHER BUSINESS**

Commissioner Blanchard stated Tim Horan wrote a story on Tony's Global and Tony's Pizza increasing wages for employees that will be in the newspaper tomorrow. He stated he would like to recognize Tony's Global and Schwan's.

(9.1) Request for executive session (legal/personnel).

17-0183 Moved by Commissioner Davis, seconded by Commissioner Ryan, to recess into executive session for 45 minutes to discuss with legal counsel matters subject to the attorney-client privilege for the reason that public discussion of those matters would waive the privilege and adversely affect the City's interest in the matters and reconvene at 8:25 p.m. Aye: (5). Nay: (0). Motion carried

17-0184 Moved by Commissioner Davis, seconded by Commissioner Hodges, to extend the current executive session for an additional 10 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 8:25 p.m. and reconvened at 8:35 p.m. No action was taken.

17-0185 Moved by Commissioner Davis, seconded by Commissioner Ryan, to extend the current executive session for an additional 5 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 8:35 p.m. and reconvened at 8:40 p.m. No action was taken.

17-0186 Moved by Commissioner Davis, seconded by Commissioner Ryan, to recess into executive session for 24 minutes for the purpose of discussing matters pertaining to non-elected City personnel for the reason that public discussion of the matter would violate the privacy rights of the non-elected personnel involved and reconvene at 9:04 p.m. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 8:40 p.m. and reconvened at 9:04 p.m. No action was taken.

**ADJOURNMENT**

17-0187 Moved by Commissioner Davis, seconded by Commissioner Hodges, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (5). Nay: (0). Motion carried. The meeting adjourned at 9:04 p.m.

[SEAL] Kaye J. Crawford, Mayor

ATTEST:

Shandi Wicks, CMC, City Clerk

DRAFT

# Exhibit DD
# 6/26/17 Salina City Commission Meeting Documents

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 06/26/2017 | 4:00 P.M. |

| | | |
|---|---|---|
| AGENDA SECTION NO: 8 | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: n/a |
| ITEM NO: 1 Page 1 | BY: Dean Andrew DA | FINAL APPROVAL: BY: MDS |

**ITEM: Consider Adoption of Ordinance No. 17-10882**

Application #Z16-6A, filed by the Salina City Planning Commission, requesting an amendment of Article X. Signs in Chapter 42 by:

1. Adding a new Section 42-500 to set out the purpose of Salina's sign regulations;
2. Amending Section 42-506 pertaining to the classification and definition of various functional types of signs;
3. Amending Section 42-507 pertaining to the classification and definition of various structural types of signs;
4. Amending Section 42-508 pertaining to the placement and display of temporary signs, banners and feather flags; and
5. Adding a new Section 42-511 to add a substitution clause to allow noncommercial messages to be substituted for commercial messages without any additional permitting or approvals on any sign allowed under the sign regulations.

(Returned by the City Commisson to the Planning Commission to consider additional exceptions to the general prohibition on the placement of temporary commercial signs in residential zoning districts).

Prior City Commission Action

Ordinance No. 17-10882 was approved on first reading on **April 17, 2017**. On April 24, 2017, the City Commission postponed second reading and directed the City's legal counsel to conduct additional research to confirm whether the City may lawfully except certain categories of signs from a general prohibition on the placement of temporary commercial signs in residential zoning districts. A copy of legal counsel's research memo is attached.

After reviewing legal counsel's research memo and additional Commission discussion, the City Commission voted to return this item to the Planning Commission for reconsideration of additional exceptions to the ordinance's general prohibition on the placement of temporary commercial signs in residential zoning districts at their **May 15, 2017** meeting. Specifically, the City Commission requested that the Planning Commission work with staff and legal counsel to develop language that would allow for off-site advertising signs (primarily off-site open house and garage sale signs) and on-site business signs (primarily contractor's signs) on individual residential lots.

This item was placed on the Planning Commission's June 6, 2017 meeting agenda. At the Planning Commision hearing staff explained the reasons this text amendment was sent back for reconsideration and further explained that in March the Planning Commission was looking at content based exceptions that were specific to off-site open house and garage sale signs and construction/contrator signs whereas now they were being asked to consider content neutral exceptions to allow limited off-site advertising and on-site business signs. The City's legal counsel, Aaron Martin, explained that these content neutral exceptions were more legally defensible but could have the unintended consequences of allowing other types of commercial message signs in

**CITY OF SALINA**

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 06/26/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 2 | BY: Dean Andrew | FINAL APPROVAL: BY: |

residential neighborhoods beyond just open house, garage sale and contractor's signs.

The Planning Commission reviewed and discussed several amendments prepared by the City's legal counsel. The amendments to Section 42-506, the Definitions setion, deleted the definition of garage sale, open house and real estate signs as functional sign types and modified the definition of advertising sign and business sign to include those sign types. The proposed amendments to Section 42-508, Temporary signs, banners and mobile signs, create an exception to the general prohibition on advertising signs in residential districts to allow one (1) temporary advertising sign up to 4 sq. ft. in area and 4 ft. in height to be placed on a residential lot from 6:00 a.m. Friday to 6:00 p.m. Sunday. The proposed amendment also creates an exception to the general prohibition on on-site business signs in residential districts to allow one (1) temporary business sign to be displayed on a property where construction activities of any type are being actively performed on the property. The sign would have to be removed no later than 30 days after cessation of construction activities. The business sign allowed during the construction activities would be subject to the general size and height requirements applicable to other temporary signs in residential districts.

The proposed amendment continues to allow the placement of on-site real estate, open house, and garage sale signs, but it does so in a content neutral manner by allowing on-site business signs during a specified time period related to the occurrence of these events on a property.

Revised Planning Commission Recommendation

Following presentation of the staff report and overview, and discussion and questions, the Planning Commission voted 8-0 to recommend approval of the proposed amendments to 42-506 and 42-508 to allow for additional temporary commercial sign exceptions to include off-site advertising signs and contractor signs as presented by City staff during the June 6, 2017 Planning Commission meeting.

The City Commission postponed consideration of the Planning Commission recommendation (Version 2) for one week at their June 19, 2017 meeting.

**COMMISSION ACTION:**

Staff has identified the following alternatives for the City Commission's consideration:

1. The City Commission could adopt Version No. 1 of Ordinance No. 17-10882 based on the Planning Commission's original March 21, 2017 recommendation. This version generally prohibits commercial signs in residential zoning districts, except for on-site signs when a property is for sale or lease or when an open house or garage sale is taking place on the property. Four (4) additional signs would be allowed during election season, and additional signs are allowed during the occurrence of real estate sales/open houses, and garage sales. (This version of Ordinance No. 17-10882 was approved on first reading on April 17, 2017).

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 06/26/2017 | 4:00 P.M. |

| AGENDA SECTION NO: | ORIGINATING DEPARTMENT: Community and Development Services Planning Division | FISCAL APPROVAL: BY: |
|---|---|---|
| ITEM NO: Page 3 | BY: Dean Andrew | FINAL APPROVAL: BY: |

2. The City Commisson could adopt Version No. 2 of Ordinance No. 17-10882. This version was drafted based upon the direction provided by the City Commission and was referred to and ultimately recommended by the Planning Commission on June 6, 2017. This version creates additional exceptions that allow one off-site advertising sign to be placed on a property from 6:00 a.m. Friday to 6:00 p.m. Sunday. Such signs are limited to 4 sq. ft. of sign area and 4 ft. in height. This version also allows the placement of one additional on-site business (construction/contractor) sign when construction activities are taking place on the property. Four (4) additional signs would be allowed during election season.

3. The City Commission could decline to distinguish between commercial and non-commercial speech for purposes of regulating temporary signs and adopt Version No. 3 of Ordinance No. 17-10882. This version would allow a two (2) temporary yard signs to be placed on an individual residential property regardless of content and regardless of any activities or events taking place on the property, with up to four (4) additional signs allowed during election season. As proposed, temporary yard signs on residential lots could not exceed six (6) ft. in height or eight (8) sq. ft. in area.

4. The City Commission could send this item back to the Planning Commission to work with staff on major changes to the proposed amendments.

5. The City Commission could maintain the status quo and decide that the proposed additions and changes to the City's sign regulations not be made at this time. In this case, a motion should be made to deny the proposed text amendment and Ordinance No. 17-10882.

All of these actions may be taken with a simply majority of three (3) votes, including any additions, deletions or modifications to the text the Commission desires to make.

Enclosures: Memo from City Legal Counsel
Ordinance No. 17-10882, Version #1
Ordinance No. 17-10882, Version #2
Ordinance No. 17-10882, Version #3

# MEMORANDUM

TO: Salina City Commission

FROM: Aaron Martin and Greg Bengtson, Legal Counsel
Clark, Mize & Linville, Chartered

DATE: May 11, 2017

RE: Temporary commercial signs in residential zoning districts

---

On April 24, 2017, the City Commission directed City legal counsel to conduct additional research to confirm whether the City may lawfully except the following categories of signs from a general prohibition on the placement of temporary commercial signs in residential zoning districts:

| | |
|---|---|
| On-site: | real estate |
| | open house |
| | garage sale |
| Off-site: | real estate |
| | open house |
| | garage sale |
| Construction signs | |

The purpose of this memo is to provide a summary of our research findings and conclusions. Generally, excepting the proposed categories of commercial signs could be accomplished via two different approaches: (1) a content-based approach; and (2) a content-neutral approach. Each of the options is briefly summarized below.

**A. Option #1: Create specific content-based exceptions for real estate, open house, garage sale, and contractor signs.**

Content-based exceptions would be subject to intermediate scrutiny by a reviewing court. Research has confirmed that a content-based exception for on-site real estate signs is permissible, but additional content-based exceptions, particularly for contractor signs and off-site real estate, open house, and garage sale signs, present significant legal risk. Research did not reveal any authority to support the creation of content-based exceptions for these categories. Accordingly, Option #1 is not a viable approach and is not recommended.

**B. Option #2: Allow temporary signs in residential districts to display limited commercial messages, with allowances: (1) based on the occurrence of certain specified events; and/or (2) subject to time, place, and manner restrictions.**

Option #2 utilizes a content-neutral approach to allow the proposed categories of commercial signs in residential zoning districts. However, because Option #2 is content neutral, it has the potential unintended effect of allowing the placement of additional types of commercial messages in residential districts, so long as the messages are displayed during the allowed period

of time. The following is a summary of a potential content-neutral approach to allow the various types of commercial signage:

1. On-site real estate, open house, and garage sale signs:
   a. These signs could be categorized as *on-site business signs*.
   b. The City could allow the display of temporary on-site business signs in residential districts during a period relating to the time that the property is: (1) actively marketed for sale or lease; or (2) open to the public for an open house/garage sale.

2. Off-site real estate, open house, and garage sale signs:
   a. These signs could be categorized as *off-site advertising signs*.
   b. The City could allow [x] temporary off-site advertising signs per residential zoning lot. The City could impose additional time, place, and manner limitations, such as:
      i. Limit the display to a specified number of days, or limit the display to between certain hours;
      ii. Specify a minimum number of days that must elapse between successive placements; or
      iii. Impose more restrictive height, square footage, or spacing requirements than are imposed on non-commercial signs or on-site business signs.

3. Contractor signs:
   a. These signs could be characterized as *on-site business signs*.
   b. The City could allow [x] temporary on-site business sign[s] during a period relating to the time that the property is undergoing active construction.

If the City Commission wishes to allow the display in residential districts of certain categories of commercial signs, Option #2 is the recommended legal approach. Research has identified at least three other cities with a sign code that maintains the distinction between commercial and non-commercials signs in residential districts and creates content-neutral exceptions pursuant to some form of Option #2.[1] As discussed above, the legal benefits of Option #2 are accompanied by the potential unintended consequences of allowing the placement of additional commercial signage beyond real estate, open house, garage sale, and contractor signs.

**Additional Note:

Following the April 24, 2017 City Commission meeting, Aaron Martin spoke with Patrick Vogelsberg, Vice President of Governmental Affairs for the Kansas Association of REALTORS. Mr. Vogelsberg was not aware of any additional legal authorities with respect to Option #1 or the ability of the City to distinguish between commercial and non-commercial signs within residential districts. Mr. Vogelsberg had not seen the proposed sign ordinance, and he has been provided a copy with an invitation to provide any questions or concerns in advance of the May 15, 2017 City Commission meeting.

---

[1] *See, e.g.*, Minnetonka, Minnesota (Ordinance No. 2016-08); Saratoga, California (City Code Art. 15-30); and Grand Terrace, California (City Code Sec. 18.80.160).

(Published on the City of Salina's website for a minimum of one week from May________, 2017.)

**ORDINANCE NUMBER 17-10882 – (1)**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed* v. *Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Construction sign.* A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

(5) *Garage sale sign.* A temporary sign which advertises or announces a lawful garage sale on the property upon which the sign is located.

(6) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(7) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(8) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(9) *Open house sign.* A temporary sign which advertises or announces that the property upon which the sign is located is available for inspection by prospective buyers and that the owner of the property or the owner's agent is on the premises during the time the property is open for inspection.

(10) *Real estate sign.* A temporary sign which advertises the sale or lease of the real estate upon which the sign is located.

<u>**Section 3.**</u> **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**
The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), and subject to the limitations set forth in subsection (d), additional yard signs shall be allowed on a property as follows:

(i) Four (4) additional yard signs may be placed and displayed on property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(ii) One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district when the property is being offered for sale or lease by a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium.

(iii)One (1) additional yard sign may be placed and displayed per street frontage on property in any zoning district no earlier than two (2) days before and shall be removed no later than one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

(iv) Two (2) additional yard signs may be placed and displayed on property located in any A-1, A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, schools, churches, assisted living facilities and nursing homes when construction activities of any type are being actively performed on the property. These additional temporary signs may be displayed no earlier than the date on which a

building permit is issued for the project and shall be removed no later than seven (7) days after a certificate of occupancy is issued for the project.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed thirty-two (32) square feet of sign area.

(3) No temporary sign shall be used as an advertising sign.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed eight (8) square feet of sign area.

(3) No temporary sign shall display a commercial message, except as follows:

(i) One (1) real estate sign may be displayed per street frontage on a property. A real estate sign shall be removed within seven (7) days of the sale or lease of the property that is advertised for sale or lease on such real estate sign.

(ii) One (1) open house sign may be displayed per street frontage on a property. An open house sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the open house concludes.

(iii) One (1) garage sale sign may be displayed per street frontage on a property. A garage sale sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the garage sale concludes.

(d) A person exercising the right to place temporary signs on a property as described in subsection (a) must limit the total number of temporary signs on the property at any one time to six (6) plus any additional temporary signs allowed on the property pursuant to subsections (e) and (f).

(e) In addition to the temporary signs allowed under subsections (a) and (b):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive

days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(f) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(g) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

<u>**Section 5.**</u> **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

<u>**Section 6.**</u> **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

<u>**Section 7.**</u> **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

> On April 24, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: April 17, 2017
Passed: May 15, 2017

______________________________
Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

DRAFT

______________________________
Jason Gage, City Manager

Certification of Publication Summary:

______________________________
Greg A. Bengtson, Legal Counsel

(Summary published in *The Salina Journal* on ~~May~~ ____________, 2017.)
(Published on the City of Salina's website for a minimum of one week from ~~May~~ ______________, 2017.)

ORDINANCE NUMBER 17-10882 (2)

Formatted: Left: 1", Bottom: 0.5", Header distance from edge: 0.5"

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

Formatted: Font: Italic

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare

DRAFT

and to comply with and satisfy the protectinns afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, product, service, activity or ~~entertainment~~event that is not conducted, sold, occurring, or offered ~~at a location~~on, or to the sale or lease of property other than, the premises on which the sign is located, or to which it is affixed (off-premise sign).

Formatted: Indent: Left: 0.5", Hanging: 0.3", Space After: 0 pt

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a, commodity or, product, service, activity, or event that is conducted, sold, occurring, offered or manufactured, or an entertainment offered on, or to the sale or lease of property, on the premises where the sign is located or to which it is affixed.

(4) *Construction sign.* A temporary sign indicating the names of architects, engineers, landscape architects, contractors, and similar artisans involved in the design and construction of a structure or project only during the construction period and only on the premises on which the construction is taking place.

(5)(3) *Garage sale sign.* A temporary sign which advertises or announces a lawful garage sale on the property upon which the sign is located.

(6)(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(7)(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(8)(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(9) *Open house sign.* A temporary sign which advertises or announces that the property upon which the sign is located is available for inspection by prospective buyers and that the owner of the property or the owner's agent is on the premises during the time the property is open for inspection.

(10) *Real estate sign.* A temporary sign which advertises the sale or lease of the real estate upon which the sign is located.

Formatted: Indent: Left: 0.5", Hanging: 0.3", Space After: 0.3 pt

Formatted: Indent: Left: 0.5", Hanging: 0.3", Space After: 0 pt

Formatted: Font color: Black

Formatted: Indent: Left: 0.5", Hanging: 0.3", Space After: 0.3 pt

__Section 3.__ **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

Formatted: Space After: 0 pt

Formatted: Indent: Left: 0.75", Hanging: 0.3", Space After: 0 pt

(5) *Feather flag*. A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.
(6) *Flashing sign*. A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.
(7) *Ground sign*. Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.
(8) *Illuminated sign*. Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.
(9) *Inflatable sign*. Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.
(10) *Mobile sign*. A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.
(11) *Pole sign*. A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.
(12) *Projecting sign*. A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.
(13) *Pylon sign*. A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.
(14) *Roof sign*. A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.
(15) *Rotating sign*. Any sign or portion of a sign which moves in a revolving or similar manner.
(16) *Temporary sign*. A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.
(17) *Wall sign*. A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.
(18) *Yard sign*. A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:
(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.
(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or

Formatted: Indent: Left: 0.75", Space After: 0 pt

banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), and subject to the limitations set forth in subsection (d), additional yard signs shall be allowed on a property in any zoning district as follows:

(i) Four (4) additional yard signs may be placed and displayed on a property ~~in any zoning district~~ for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(ii) One (1) additional yard sign may be placed and displayed per street frontage on a property ~~in any zoning district~~ when the property is being offered for sale or lease by ~~the property owner or~~ a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium. The additional temporary yard sign shall be removed within seven (7) days of the sale or lease of the property.

(iii) One (1) additional yard sign may be placed and displayed per street frontage on a property ~~in any zoning district~~ no earlier than two (2) days before and shall be removed no later than one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

(iv) ~~Two (2)~~ One (1) additional yard signs may be placed and displayed per street frontage on ~~property located in any A-1, A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, schools, churches, assisted living facilities and nursing homes~~ a property when construction activities of any type are being actively performed on the property. ~~These additional temporary signs may be displayed no earlier than the date on which a building permit is issued for the project and shall be removed no later than seven (7) days after a certificate of occupancy is issued for the project.~~ These additional temporary yard signs shall be removed no later than thirty (30) days after the cessation of the construction activities. In no event shall the additional signs be allowed for more than one-hundred eighty (180) consecutive days, with a minimum of sixty (60) days between each occurrence.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed thirty-two (32) square feet of sign area.

(3) No temporary sign shall be used as an advertising sign~~.~~, except as follows:

i. One (1) temporary advertising sign may be displayed during a period commencing at 6:00 a.m. on a Friday and ending at 6:00 p.m. on the immediately following Sunday; and

ii. Temporary advertising signs shall not exceed four (4) square feet of sign area or four (4) feet in height.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements:

Formatted: Indent: Left: 1.25", Space After: 0 pt

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

Formatted: Indent: Left: 0.5", Space After: 0 pt, Don't add space between paragraphs of the same style

Formatted: Indent: Left: 0.75", Space After: 0 pt, Don't add space between paragraphs of the same style

Formatted: Indent: Left: 0.5", Space After: 0 pt, Don't add space between paragraphs of the same style

(1) No temporary sign shall exceed six (6) feet in height.
(2) No temporary sign shall exceed eight (8) square feet of sign area.
(3) No temporary sign shall display a commercial message, except as follows:

Formatted: Indent: Left: 0.75", Space After: 0 pt, Don't add space between paragraphs of the same style

~~(i)~~i. One (1) ~~real estate~~ temporary business sign may be displayed per street frontage on a property. A ~~real estate~~ when the property is being offered for sale or lease by a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium. The temporary business sign shall be removed within seven (7) days of the sale or lease of the property ~~that is advertised for sale or lease on such real estate sign.~~ .

Formatted: Indent: Left: 1.25", Hanging: 0.25", Space After: 0 pt, Don't add space between paragraphs of the same style, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at: 1.63" + Indent at: 1.75"

Formatted: Highlight

~~(ii)~~ One (1) ~~open house sign may be displayed per street frontage on a property. An open house sign may be displayed no earlier than two (2) days before and shall be removed no later than one (1) day after the open house concludes.~~

ii. ~~One (1) garage sale~~temporary business sign may be displayed per street frontage on a property~~. A~~ during a period commencing two (2) days before and ending one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

~~(iii)~~iii. One (1) temporary business sign may be displayed per street frontage on a property when construction activities of any type are being actively performed on the property. The temporary business signs shall be removed no ~~earlier~~later than ~~two (2~~thirty (30) days ~~before and shall be removed no later than one (1) day~~ after the ~~garage sale concludes.~~ cessation of the construction activities. In no event shall the temporary business signs be displayed more than one-hundred eighty (180) consecutive days, with a minimum of sixty (60) days between each occurrence.

Formatted: Indent: Left: 1.25", Hanging: 0.25", Space After: 0 pt, Don't add space between paragraphs of the same style, Numbered + Level: 3 + Numbering Style: i, ii, iii, … + Start at: 1 + Alignment: Right + Aligned at: 1.63" + Indent at: 1.75"

Formatted: Highlight

Formatted: Highlight

Formatted: Highlight

iv. One (1) temporary advertising sign may be displayed on a property, subject to the following:

1. The temporary advertising sign may only be displayed between 6:00 a.m. on a Friday and 6:00 p.m. on the following Sunday; and
2. The temporary advertising sign shall not exceed four (4) square feet of sign area or four (4) feet in height.

(d) A person exercising the right to place temporary signs on a property as described in subsection (a) must limit the total number of temporary signs on the property at any one time to six (6) plus any additional temporary signs allowed on the property pursuant to subsections (e) and (f).

Formatted: Indent: Left: 0.5", Space After: 0 pt

(e) In addition to the temporary signs allowed under subsections (a) and (b):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

Formatted: Indent: Left: 0.75", Space After: 0 pt

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes

tattered, torn or damaged.

(f) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(g) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

Formatted: Indent: Left: 0.5", Space After: 0 pt

Formatted: Indent: Left: 0.75", Space After: 0 pt

Formatted: Indent: Left: 0.75", Space After: 0 pt

DRAFT

**Section 5.** **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

**Section 6.** **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

**Section 7.** **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On ________, ________, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and

amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: ~~April 17,~~__________, 2017

Passed: ~~May 15,~~__________, 2017

Formatted: Indent: Left: 0", First line: 0"

______________________________
Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

______________________________
~~Jason Gage~~Shandi Wicks, CMC, City ~~Manager~~Clerk

Certification of Publication Summary:

______________________________
Greg A. Bengtson, Legal Counsel

DRAFT

**TABLE 1**
**Summary of Numerical and Size Limitations on Temporary Signs in Residential Zoning Districts**

**General Rule:** Temporary signs may be displayed in residential zoning districts, provided the signs comply with the following:

| | |
|---|---|
| Sign type: | Yard sign |
| Numerical limit: | Two (2) signs per property |
| Maximum height: | Six (6) feet |
| Maximum sign area: | Eight (8) square feet |
| Maximum duration: | None |

**Additional signs allowed:** Additional yard signs not exceeding six (6) feet in height or eight (8) square feet of sign area may be displayed in connection with certain events and/or during certain times, as follows:

| Event | Additional Quantity | Earliest Display | Final Removal |
|---|---|---|---|
| Election involving candidates for a federal, state, or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. | Four (4) additional signs. | Forty-five (45) days prior to the election. | Seven (7) days after the election. |
| Property is being offered for sale or lease by the owner or a licensed real estate agent. | One (1) additional sign per street frontage on the property. | When the property is offered for sale or lease. | Within seven (7) days after the sale or lease of the property. |
| Property is opened to the public for a real estate open house or garage sale. | One (1) additional sign per street frontage on the property. | Two (2) days before the property is scheduled to be opened to the public for a real estate open house or garage sale. | One (1) day after the day the property is opened to the public for a real estate open house or garage sale. |
| Construction activities of any type are being performed on the property. | One (1) additional sign per street frontage on the property. | When construction activities commence. | Within thirty (30) days after the cessation of construction activities. In no event shall the additional sign be displayed more than 180 consecutive days, with a minimum of 60 days between each occurrence. |

**Maximum Number of Signs:** In no event shall more than six (6) temporary yard signs be displayed on a residential property at any time.

DRAFT

**TABLE 2**
**Commercial Signs in Residential Zoning Districts**

**General Rule:** Temporary signs in residential zoning districts may display any non-commercial messages. Commercial messages may not be displayed, unless an exception applies.

**Exceptions:** Commercial messages may be displayed in connection with certain events and/or during certain times, as follows:

| Event | Type of Sign | Number/Size | Earliest Display | Final Removal |
|---|---|---|---|---|
| Property is being offered for sale or lease by the owner or a licensed real estate agent. | Business sign | One (1) sign per street frontage on the property; not to exceed six (6) feet in height or eight (8) square feet of sign area. | When the property is offered for sale or lease. | Within seven (7) days of the sale or lease of the property. |
| Property is opened to the public for a real estate open house or garage sale. | Business sign | One (1) sign per street frontage on the property; not to exceed six (6) feet in height or eight (8) square feet of sign area. | Two (2) days before the property is scheduled to be opened to the public for a real estate open house or garage sale. | One (1) day after the day the property is opened to the public for a real estate open house or garage sale. |
| Construction activities of any type are being performed on the property. | Business sign | One (1) sign per street frontage on the property; not to exceed six (6) feet in height or eight (8) square feet of sign area. | When construction activities commence. | Within thirty (30) days after the cessation of construction activities. In no event shall the sign be displayed more than 180 consecutive days, with a minimum of 60 days between each occurrence. |
| N/A | Advertising sign | One (1) sign; not to exceed four (4) square feet in height or four (4) square feet of sign area. | 6:00 a.m. on a Friday. | 6:00 p.m. on the following Sunday. |

(Summary published in *The Salina Journal* on _____ . ___, 2017.)
(Published on the City of Salina's website for a minimum of one week from ________ ___, 2017.)

**ORDINANCE NUMBER 17-10882 (3)**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare

and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**

**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

<u>**Section 1.**</u> **New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**

This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

DRAFT

<u>**Section 2.**</u> **Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, ~~product,~~ service, activity or event that ~~is not~~entertainment conducted, sold, occurring, or offered ~~on, or to the sale or lease of property~~at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

**Comment [AOM1]:** The original language in this definition is being restored, because it is no longer necessary to accommodate off-site real estate signs through this definition.

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business, or profession conducted, or to a commodity, ~~product,~~ or service, ~~activity, or event that is conducted,~~ sold, ~~occurring,~~ offered or manufactured ~~on, or to the sale or lease of property,~~ or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Comment [AOM2]:** The original language in this definition is being restored, because it is no longer necessary to accommodate on-site real estate signs through this definition.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

__Section 3.__ **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

**Section 4. Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

~~(3)~~ In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), ~~and subject to the limitations set forth in subsection (d), additional yard signs shall be allowed on a property in any zoning district as follows:~~

~~(i)~~(3) Ffour (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is

Comment [AOM3]: This new language authorizes any message – commercial or noncommercial – to be displayed on temporary signs allowed under this subsection.

Formatted: Indent: Left: 0.75"

located. These additional temporary yard signs must be removed within seven (7) days following the election.

(ii) One (1) additional yard sign may be placed and displayed per street frontage on a property when the property is being offered for sale or lease by a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium. The additional temporary yard sign shall be removed within seven (7) days of the sale or lease of the property.

(iii) One (1) additional yard sign may be placed and displayed per street frontage on a property no earlier than two (2) days before and shall be removed no later than one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

(iv) One (1) additional yard sign may be placed and displayed per street frontage on a property when construction activities of any type are being actively performed on the property. These additional temporary yard signs shall be removed no later than thirty (30) days after the cessation of the construction activities. In no event shall the additional signs be allowed for more than one hundred eighty (180) consecutive days, with a minimum of sixty (60) days between each occurrence.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements: not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed thirty-two (32) square feet of sign area.

(3) No temporary sign shall be used as an advertising sign, except as follows:

i. One (1) temporary advertising sign may be displayed during a period commencing at 6:00 a.m. on a Friday and ending at 6:00 p.m. on the immediately following Sunday; and

ii. Temporary advertising signs shall not exceed four (4) square feet of sign area or four (4) feet in height.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall comply with the following requirements: not exceed six (6) feet in height or eight (8) square feet of sign area.

(1) No temporary sign shall exceed six (6) feet in height.

(2) No temporary sign shall exceed eight (8) square feet of sign area.

(3) No temporary sign shall display a commercial message, except as follows:

i. One (1) temporary business sign may be displayed per street frontage on a property when the property is being offered for sale or lease by a licensed real estate agent or by the owner through advertising in a local newspaper of general circulation or any other publicly available or viewable advertising medium. The temporary business sign shall be removed within seven (7) days of the sale or lease of the property.

ii. One (1) temporary business sign may be displayed per street frontage on a property during a period commencing two (2) days before and ending one (1) day after the day the property is opened to the public for a real estate open house or garage sale.

iii. One (1) temporary business sign may be displayed per street frontage on a property when construction activities of any type are being actively performed on the property. The temporary business signs shall be removed no later than thirty (30) days after the cessation of the construction activities. In no event shall the temporary business

**Comment [AOM4]:** Because any message is now allowed in commercial zoning districts, it is not necessary to have special restrictions for advertising signs, unless more restrictive rules are desired.

~~signs be displayed more than one hundred eighty (180) consecutive days, with a minimum of sixty (60) days between each occurrence.~~

ii. ~~One (1) temporary advertising sign may be displayed on a property, subject to the following:~~

1. ~~The temporary advertising sign may only be displayed between 6:00 a.m. on a Friday and 6:00 p.m. on the following Sunday; and~~
2. ~~The temporary advertising sign shall not exceed four (4) square feet of sign area or four (4) feet in height.~~

~~(d) A person exercising the right to place temporary signs on a property as described in subsection (a) must limit the total number of temporary signs on the property at any one time to six (6) plus any additional temporary signs allowed on the property pursuant to subsections (e) and (f).~~

**Comment [AOM5]:** Because any message is now allowed in residential zoning districts, it is not necessary to have a blanket prohibition on commercial messages.

**Comment [AOM6]:** The limitation on total temporary signs per property is not necessary, since no more than 6 temporary signs are authorized under revised subsection (a).

~~(e)~~(d) In addition to the temporary signs allowed under subsections (a) ~~and (b)~~:

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

~~(f)~~(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

~~(g)~~(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.
(2) Mobile signs shall not exceed thirty-two (32) square feet in area.
(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.
(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.
(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.
(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(h)(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

**Section 5.** **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

> **Section 42-511. Sign substitution.**
> The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

**Section 6.** **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

**Section 7.** **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On ______________, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: ______________, 2017
Passed: ______________, 2017

______________________
Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

______________________
Shandi Wicks, CMC, City Clerk

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel

DRAFT

# Exhibit EE
# 7/10/17 Salina City Commission Meeting Minutes

**CITY OF SALINA, KANSAS**
**REGULAR MEETING OF THE BOARD OF COMMISSIONERS**
**July 10, 2017**
**4:00 p.m.**

The City Commission convened at 2:30 for Budget: Fee Schedule/Review 2018 Budget/Review 2017 Revised Budget and at 3:45 p.m. for Citizens Forum.

The Regular Meeting of the Board of Commissioners was called to order at 4:00 p.m. in Room 107, City-County Building. Roll call was taken followed by the Pledge of Allegiance and a moment of silence.

Those present and comprising a quorum: Mayor Kaye J. Crawford (presiding), Commissioners Jon Blanchard, Trent Davis, Melissa Rose Hodges, and Karl Ryan.

Also present: Jason Gage, City Manager; Michael Schrage, Deputy City Manager; Greg Bengtson, City Attorney; and Allison Strait, Administrative Assistant III.

## AWARDS AND PROCLAMATIONS

None.

Mayor Crawford thanked Brad Anderson and Barb Goode for their hard work on the North Salina District Neighborhood Project.

Ms. Goode said it was a three year commitment and explained what they will be adding to improve the north side of Salina.

Mr. Anderson explained the funding received from Dane G. Hansen Foundation, the improvement plans and the benefits from improvements.

## CITIZENS FORUM

Phil Black, 118 E. Republic Ave., expressed his excitement for the Fieldhouse project and continued to state his concern for the food portion of the Fieldhouse. He went on to explain the importance of providing healthy options to the concessions.

Karen Shade, 111 Wisconsin, provided a poll of residents and whether they should allow fireworks in the City of Salina and added her concerns with it allowing them in City limits. She also added the statistics for complaints and tickets wrote out during the holiday and asked that they look into the unnecessary noises from the fireworks and how to reduce it in the coming years.

Commissioner Blanchard asked what the policy is from the Police Department as far as issuing warnings and tickets.

Jason Gage, City Manager, stated what he thought the policy was and added that it also depended on the nature of the complaint, but he would need to check with Chief Brad Nelson on an answer. He added that there were always going to be issues that come with the legalization of allowing fireworks, but didn't see that it was any worse than previous years.

## PUBLIC HEARINGS AND ITEMS SCHEDULED FOR A CERTAIN TIME

(5.1) Continuation of public hearing and report on Petition No. 4386, (filed by Lewis Erickson, on behalf of Foley Equipment Company), requesting the vacation of





DRAFT

KDOT acquired right-of-way west of the right-of-way line for North Ohio Street and vacation of the platted restricted access along the south side of the access road abutting Lot 1, Block 1 of the Replat of Foley Addition to the City of Salina, Saline County, Kansas. (continued from June 12, 2017 meeting).

Greg Bengtson suggested that the Mayor open the public hearing.

Mayor Crawford opened the public hearing.

Dean Andrew, Director of Planning, stated due to the need for continued discussions between Foley Equipment Company and the adjacent property owner to the north (HM Olathe, LLC) regarding the vacation requests, staff would request the public hearing on this item be continued for one (1) week to the July 17, 2017 City Commission meeting.

17-0188 Moved by Commissioner Ryan, seconded by Commissioner Hodges, to continue the public hearing requesting the vacation of KDOT acquired right-of-way west of the right-of-way line for North Ohio Street and vacation of the platted restricted access along the south side of the access road abutting Lot 1, Block 1 of the Replat of Foley Addition to the City of Salina, Saline County, Kansas to the July 17, 2017 meeting. Aye: (5). Nay: (0). Motion carried.

CONSENT AGENDA

(6.1) Approve the minutes of June 26, 2017.

(6.2) Approve Resolution No. 17-7462 authorizing an agreement with USD #305 assigning three uniform law enforcement officers to serve in the School Resource Officer program.

(6.3) Approve Resolution No. 17-7448 authorizing the Mayor to enter into an agreement for beverage, vending and advertising rights with Pepsi-Cola Bottling Company of Salina, Inc. at designated City of Salina facilities.

Commissioner Davis requested that Item 6.3 be removed from the consent agenda.

17-0189 Moved by Commissioner Hodges, seconded by Commissioner Ryan, to approve the consent agenda items 6.1 and 6.2. Aye: (5). Nay: (0). Motion carried.

(6.3) Approve Resolution No. 17-7448 authorizing the Mayor to enter into an agreement for beverage, vending and advertising rights with Pepsi-Cola Bottling Company of Salina, Inc. at designated City of Salina facilities.

Commissioner Davis asked about the proposal previously brought to the Commission and asked if this was an extension of what's currently done at Bill Burke or if it includes any new facilities. Aaron Martin, Legal Counsel, stated that the language in the original version included any new facilities, but this one only includes the specified five (5) locations in exhibit A.

Jason Gage, City Manager, added that the section dealing with vending machines included the specified locations only and any new locations would need to be a separate mutual agreement.

Commissioner Davis asked if another company wanted to offer another beverage, would they be able to. Mr. Cotten stated no, they would have to go through the Pepsi-Cola Bottling Company.

Commissioner Blanchard asked if the five (5) year contract was for both advertising and exclusive use. Mr. Cotten stated for the five (5) years it would be $16,250 for sponsorship only and did not include a rebate.

Commissioner Blanchard asked how they come up with that number. Mr. Cotton replied that Pepsi-Cola came up with the number.

Mr. Cotten stated that he asked that they reduce the amount of soft drinks and include more sports related drinks.

Commissioner Davis asked if a concessionaire would use the Pepsi-Cola menu board. Mr. Cotten stated that the menu board would be displayed as an option, but the pricing could change.

Commissioner Ryan asked who set the price for the concession items. Mr. Cotten replied that the concessionaire would set the price.

Karen Shade, 111 Wisconsin, stated her concerns for obesity in children in the United States and expressed the need for healthy options.

Mr. Gage stated that they have the ability to choose the healthy options and dictate what was in the machines. Commissioner Davis added that they may look into what the high schools were putting in their vending machines and the addiction risk at a young age.

Commissioner Blanchard stated his concern for the wholesale price listed and that it didn't match up. Mr. Cotten replied that it may be a typo and that he would look into it.

Commissioner Davis asked what the sizes were on the sodas. Mr. Cotten stated that the soda offered in the vending machines and at the concession stands would most likely be the 20 oz. bottles.

Commissioner Davis then asked if they were approving the contract with the typos. Mr. Martin replied that the prices were copied directly from the Mahaska proposal and he wouldn't speculate that it was a typo.

Mr. Gage suggested they double check the pricing and bring it back to the next meeting. Mr. Cotten added that he could check the pricing and if not approved at this meeting, they will open the Fieldhouse without any vending machines. Commissioner Davis stated he would like to get the pricing verified since it is a five (5) year contract.

17-0190 Moved by Commissioner Davis, seconded by Commissioner Hodges to postpone consideration of the contract with Pepsi-Cola Bottling Company of Salina, Inc. until the July 17, 2017 meeting to ascertain the price of the products being offered. Aye: (5), Nay: (0). Motion carried.

ADMINISTRATION

(7.1) Second reading Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code.

Mayor Crawford noted that Ordinance No. 17-10882 was passed on first reading on June 26, 2017 and since that time no comments have been received.

17-0191 Moved by Commissioner Hodges, seconded by Commissioner Ryan, to adopt Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code on second reading.

Davis asked the commission if three would be more reasonable than two. Commissioners

Blanchard, Hodges and Ryan agreed that two would work.

Jason Gage, City Manager, added that if they see a need to amend the ordinance later on, they have the ability to change it later.

Mayor Crawford restated the motion to adopt Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code on second reading. A roll call vote was taken. Aye: (5) Davis, Hodges, Ryan, Crawford. Nay: (1) Blanchard. Motion carried.

(7.2) Authorize sale of General Obligation Internal Improvement Bonds Series 2017-A and Temporary Notes Series 2017-1.

(7.2a) Receive report on bids received.

(7.2b) Second reading Ordinance No. 17-10886 authorizing the issuance and delivery of General Obligation Internal Improvement Bonds, Series 2017-A.

(7.2c) Resolution No. 17-7466 prescribing the form and details of and authorizing the delivery of General Obligation Internal Improvement Bonds, Series 2017-A.

(7.2d) Resolution No. 17-7467 authorizing and directing the sale and delivery of General Obligation Temporary Notes, Series 2017-1.

Cindy Beneke, Deputy Finance Director, explained the projects and introduced David Arteberry with George K. Baum and Company.

David Arteberry, George K. Baum and Company, explained the bond and temporary note financing, bids received fiscal impact and action options.

Mayor Crawford asked if they needed to be separate motions. Gina Riekhof, Gilmore and Bell P.C., stated it would be proper to do them in separate motions.

17-0192 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to adopt Ordinance No. 17-10886 authorizing the issuance and delivery of $9,390,000 principal amount of General Obligation Internal Improvement Bonds, Series 2017-A on second reading. A roll call vote was taken. Aye: (5) Blanchard, Davis, Hodges, Ryan, Crawford. Nay: (0). Motion carried.

17-0193 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to adopt Resolution No. 17-7466 prescribing the form and details of and authorizing the delivery of $9,390,000 principal amount of General Obligation Internal Improvement Bonds, Series 2017-A. Aye: (5). Nay: (0). Motion carried.

17-0194 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to adopt Resolution No. 17-7467 prescribing the form and details of and authorizing the delivery of $2,180,000 principal amount of General Obligation Temporary Notes, Series 2017-1.

(7.3) Approval of funds allocation to purchase bituminous pavement and contract pavement markings to address parking lot issues at Bill Burke Sports Complex.

Chris Cotten, Director of Parks & Recreation, explained the project, fund allocation and action options.

Commissioner Ryan asked what the other two projects were in the fund allocation. Mr. Cotten stated the storage unit and fences to other two fields were the other two projects and

explained they could use the storage elsewhere and fencing could stay as it was for now until they were budgeted in the future.

A conversation ensued between Commission Blanchard and Mr. Cotten over the parking issues and current designated parking.

Commissioner Blanchard asked how the labor was going to take place and was the $120,000 just materials or does that figure labor. Jim Kowach, Director of Public Works, stated the primary site will be cleared and leveled by the Streets Department, Parks and Recreation would remove trees and grind stumps and they would use existing gravel due to the high priority. He also added that it would be easy paving without traffic control.

Commissioner Blanchard then asked if the amount included everything getting done. Mr. Kowach replied that was correct.

A conversation ensued between Commissioner Blanchard, Mr. Kowach and Mr. Cotten about the layout and traffic flow of the new and current parking and the sidewalk layout.

Mayor Crawford added that she believed this was money well spent.

Commissioner Blanchard asked for the history of issues for the parking. Mr. Gage stated there were only a couple issues; the distance from the parking lot to the fields and total number of parking spaces being limited. He then added that it has always been an issue.

Commissioner Blanchard asked if we have adequate number of parking now. Mr. Cotten stated that it was originally built as recreation use facility only and has turned into tournament use. He then added the convenience of being able to quickly find a parking spot with the new parking lot layout.

Mike Schrage, Deputy City Manager, added that they were currently parking and staying all day with more tournaments, including buses taking up spots all day.

17-0195 Moved by Commissioner Hodges, seconded by Commissioner Davis, to approve the funds allocation in the amount of approximately $120,000 to purchase bituminous pavement and contract pavement markings to address parking lot issues at Bill Burke Sports Complex. Aye: (5). Nay: (0). Motion carried.

**DEVELOPMENT BUSINESS**

None.

**OTHER BUSINESS**

Commissioner Blanchard asked for an update on the Fieldhouse and where they were with it. Mr. Cotten stated they have a few small things to finish up but are otherwise ready to go.

Commissioner Hodges asked when the public could go in to get a glimpse of the new facility. Mr. Cotten stated that there is a Chamber of Commerce event after their first Fieldhouse event for chamber members only, but public should be able to get a view within the next week.

(9.1) Request for executive session (legal/personnel).

Greg Bengtson, City Attorney, stated the reason for the added subject and the legislative changes for the format on the executive session motions.

17-0196 Moved by Commissioner Davis, seconded by Commissioner Hodges, to recess into executive session for 60 minutes to discuss matters related to pending litigation, active contract negotiations, active negotiations related to acquisition of real estate and confidential communications with legal counsel pursuant to the attorney-client privileged communications with legal counsel exception and reconvene at 6:20 p.m. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 5:20 p.m. and reconvened at 6:20 p.m. No action was taken.

17-0197 Moved by Commissioner Ryan, seconded by Commissioner Hodges, to extend the current executive session for an additional 30 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 6:20 p.m. and reconvened at 6:50 p.m. No action was taken.

17-0198 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to extend the current executive session for an additional 15 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 6:50 p.m. and reconvened at 7:05 p.m. No action was taken.

17-0199 Moved by Commissioner Blanchard, seconded by Commissioner Hodges, to extend the current executive session for an additional 30 minutes. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 7:05 p.m. and reconvened at 7:35 p.m. No action was taken.

17-0200 Moved by Commissioner Ryan, seconded by Commissioner Hodges, to recess into executive session for 15 minutes to discuss a matter affecting the privacy interest of an employee pursuit to the non-elected personnel matter exception and reconvene at 8:00 p.m. Aye: (5). Nay: (0). Motion carried.

The City Commission recessed into executive session at 7:42 p.m. and reconvened at 8:00 p.m. No action was taken.

ADJOURNMENT

17-0201 Moved by Commissioner Blanchard, seconded by Commissioner Ryan, that the regular meeting of the Board of City Commissioners be adjourned. Aye: (5). Nay: (0). Motion carried. The meeting adjourned at 8:00 p.m.

[SEAL] Kaye J. Crawford, Mayor

ATTEST:

Shandi Wicks, CMC, City Clerk

DRAFT

# Exhibit FF
# 7/10/17 Salina City Commission Meeting Documents

# CITY OF SALINA

REQUEST FOR CITY COMMISSION ACTION

| DATE | TIME |
|---|---|
| 7/10/2017 | 4:00 P.M |

| | | |
|---|---|---|
| AGENDA SECTION NO: 7 | ORIGINATING DEPARTMENT:<br><br>FINANCE AND ADMINISTRATION<br>City Clerk's Office<br><br>BY: Shandi Wicks | FISCAL APPROVAL:<br>BY: N/A |
| ITEM NO: 1<br>Page 1 | | FINAL APPROVAL:<br>BY: JG |

**ITEM: Ordinance No. 17-10882**
Second reading Ordinance No. 17-10882 amending Article X. Signs in Chapter 42 of the Salina Code.

**BACKGROUND:**
Ordinance No. 17-10882 was passed on first reading on June 26, 2017. Since that time no comments have been received.

**RECOMMENDED ACTION:**
Approve on second reading Ordinance No. 17-10882.

(Summary published in *The Salina Journal* on July _____, 2017.)
(Published on the City of Salina's website for a minimum of one week from July ______ to July _____, 2017.)

Draft

**ORDINANCE NUMBER 17-10882**

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare

and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the



Draft

name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

**<u>Section 3.</u> Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**
The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.



Draft

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>**Section 4.**</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), four (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and

nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.

(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.

(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.

(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

**Section 5. New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

**Section 6. Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

**Section 7. Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On July 10, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: June 26, 2017
Passed: July 10, 2017

_______________________________
Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

_______________________________
Shandi Wicks, CMC, City Clerk

Certification of Publication Summary:

_______________________________
Greg A. Bengtson, Legal Counsel

Draft

# Exhibit GG Taylor Declaration and Report

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Charles R. Taylor, Ph.D. in Support of Plaintiffs' Motion for Summary Judgment |

**DECLARATION OF CHARLES R. TAYLOR, PH.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I, Charles R. Taylor, was retained to testify as an expert by Plaintiffs in this matter. I verify under penalty of perjury under the laws of the United States of America the following:

1. A true and accurate copy of my expert report is attached as Exhibit 1 to this Declaration.
2. A true and accurate copy of my curriculum vitae is attached as Exhibit 2 to this Declaration.
3. I will testify at trial or for other purposes consistent with the contents of the expert report and my curriculum vitae.

Dated: February 3, 2025

Charles R Taylor Ph.D.
Charles R. Taylor, Ph.D.

Taylor Declaration Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Civil Action Case No. 6:24-cv-01027-TC-ADM**

**Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,**
**Defendant.**

**Expert Report of Charles R. Taylor, Ph.D.**

**September 20, 2024**

**Summary of Expert Opinions of Dr. Charles R. Taylor**

I am the John A. Murphy Professor of Marketing at Villanova University. I am also Senior Research Fellow at the Center for Marketing and Consumer Insights at Villanova University. I am Past-President of the American Academy of Advertising and currently serve as the Editor in Chief of International Journal of Advertising, a leading journal in the area of consumer marketing. I also currently serve as Vice President of the Global Alliance of Marketing and Management Association. I received my Ph.D. in Marketing from Michigan State University. I am responsible for teaching marketing courses at both the undergraduate and graduate levels at Villanova and am expected to engage in ongoing academic research. I teach marketing courses regularly both in the classroom and in online formats. I am actively involved in several ongoing research projects and have published more than 100 articles in peer reviewed academic journals, in addition to several books and conference papers.

Since 1992, one of my primary research interests has been signage. I have conducted several research studies on this topic, including peer reviewed articles in leading journals including *Journal of Advertising*, *Journal of Advertising Research*, *Journal of Public Policy and Marketing* (3), *Journal of Consumer Marketing*, and *Journal of Macromarketing* as well as several peer reviewed conference papers. I have also served on the Executive Board of the Academic Advisory Council for Signage Research and Education, an organization for academics committed to the study of Signage and have held the office of Chairman of the Board (2021-2022) as well as Vice Chair and in other capacities.

I have given presentations on regulatory issues related to signage at conferences of the Transportation Research Board, the American Marketing Association, the Association of

Consumer Research (Transformative Consumer Research Conference), the European Advertising Association, the Outdoor Advertising Association of America, the International Sign Association, and the Signage Foundation. I have also provided testimony based on my research on signage to the U.S. House of Representatives Small Business Committee, the Texas State Senate, the Missouri State Senate, the Philadelphia Zoning Board, and the San Clemente City Council. Moreover, I was an expert informant for the Federal Highway Administration's Assessment/ Mediation of Outdoor Advertising issues in 2006 and was interviewed by the Federal Highway Administration in conjunction with fact finding on policy toward signage in 2010.

I am the lead-author of a book titled *On-Premise Signs as Storefront Marketing Devices and Systems* published by the U.S. Small Business Administration in conjunction with the Signage Foundation. On multiple occasions I have given presentations to industry professionals pertaining to research on signage, including groups such as the International Sign Association, the Signage Foundation for Communication Excellence, the Transportation Research Board, and at the National Signage Research and Education Conference. I have also served as an expert in several legal cases involving signage and issues related to aesthetics, traffic safety, and the value of signs (see Appendix).

I write a regular column for the Chief Marketing Officer (CMO) section of Forbes.com, focusing on consumer marketing issues. I frequently serve as a media commentator on consumer marketing issues and have provided commentary in outlets such as the Associated Press, the Wall Street Journal, the CBS Morning Show, Forbes.com, the New York Times, National Public Radio, CNBC, ESPN.com, Time Magazine, Fox, Reuters, Variety, and many others.

I was recently included in a list of the top 2% of scientists (rated in the top 1% of marketing

scholars) published by a group of researchers at Stanford University. I have received the Ivan Preston Award for lifetime achievement in advertising research, awarded by the American Academy of Advertising and the Flemming Hansen award for outstanding contribution to the field from the European Advertising Association. My research has received the Hans B. Thorelli award from the Journal of International Marketing, and the Charles Slater award for contribution to the discipline of macromarketing from the Journal of Macromarketing. My work has also won best paper awards at Journal of Advertising (2), the Journal of Consumer Affairs, and the Journal of Global Fashion Management.

I have also served regularly as a marketing consultant or expert witness for many firms and clients including General Motors, ADT Alarm Systems, Philip Morris USA, U.S. Smokeless Tobacco, Samsung, Comcast, Viacom, Live Nation, McCann Erickson, Clear Channel Communications, Star Storage, Lamar Outdoor, Magic Media, Inc., Walker Furniture, Eller Media, the Outdoor Advertising Association of America, the International Sign Association, and the Center for Information on Beverage Alcohol (United Kingdom), among others.

My extensive work and decades of experience in the field of signage places me in a unique position to evaluate the issues in the current case. My full curriculum vitae is attached to this report.

**Engagement:**

*Background*

I was retained to evaluate and render my expert opinions and observations concerning matters relevant to the case Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard v. City of Salina, Kansas (CASE NO. 6:24-cv-01027-TC-ADM). Plaintiffs' counsel has asked me to opine on issues

related to the amended sign ordinance adopted by Salina, Kansas. I am familiar with the facts in this case and have reviewed the relevant documents including the First Amended Complaint, the City of Salina's Sign Code, and Defendant's Response to Plaintiffs' First Set of Interrogatories.

At issue in the case is the City of Salina's action to stop Mr. Steve Howard, owner of Cozy Inn from allowing work on a mural painted by a local artist, Colin Benson, on the side of The Cozy Inn based on its Sign Code. The Cozy Inn is an institution in Salina that has been selling hamburgers for more than 100 years and has achieved an iconic status based on its longevity and winning multiple national awards for its burgers. It now serves more than 45,000 customers per year. The establishment itself is small, at 192 square feet.

Mr. Howard decided he wanted to present a whimsical mural on the side of the building that would include the phrase, "Don't fear the smell. The fun is inside!!" The mural depicts flying saucers that look like burgers and are shown "attacking" the Cozy Inn with a blast of ketchup and mustard. Mr. Benson began painting the mural on November 3. 2023, but a Salani representative ordered that the painting be stopped on November 6, stating that it was a regulated sign. Plaintiffs in the case argue that the Sign Code allows the city to arbitrarily choose which murals it allows and which it does not allow in a way that is unconstitutional based on the 1st and 14th Amendment.

I have specifically been asked to opine on assertions in the report of S. Mark White, AICP, a planner and attorney pertaining to his opinions that:

1. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration. Specifically:

   - Comprehensive plan implementation
   - Traffic safety
   - Aesthetics
   - Urban design and travel behavior
   - Public Health and Safety; and

In responding to Mr. White's above assertions, I have formed the following opinions:

1. **Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on:**

   i) **Comprehensive plan implementation;**
   ii) **Traffic safety;**
   iii) **Aesthetics**
   iv) **Urban design and travel behavior; or**
   v) **Public health and safety.**

I rely on research, studies, surveys and other evidence for my opinions. Should additional facts arise, I reserve the right to modify my opinions accordingly. I also rely on my background and learning derived from my academic career.

A copy of my curriculum vitae is attached at the end of this report. I am being compensated at a flat rate of $350 per hour in this case and to date have worked 30 hours on this matter. In the previous four years I have been deposed or testified in the following cases:

In the Matter of Certain Soft Projectile Devices, Components Thereof, Ammunition and Products Containing Same. (2023), United States International Trade Commission. Inv. No. 337-TA-1325. Wrote expert report. Deposed.

Guantanemera Cigars Company v. SMCI Holding, et al., United States District Court for the Southern District of Florida. Case No. 1:21-cv-21714-MORENO/GOODMAN. (2023) Wrote expert report. Testified.

ADT LLC v. Safe Home Security Inc et al., United States District Court for the Southern District of Florida. Miami Division. Case No. 1:20-cv-23918 (2022) Wrote expert report. Deposed.

Peloton Interactive, Inc., v. Icon Health & Fitness, United States District Court for the District of Delaware, Case No. 20-1535 (RGA), (2021) Wrote expert report. Deposed.

## OPINIONS

**1) Contrary to Mr. White's assertion, there is not support for the notion that City's Sign Code is supported by a compelling government interest based on: i) Comprehensive plan implementation; ii) Traffic safety; iii) Aesthetics; iv) Urban design and travel behavior; or v) Public health and safety.**

**i) Comprehensive plan implementation**

Mr. White cites from the Comprehensive plan itself that (p.5.), "(the comprehensive plan is the 'basis or guide for public action to insure a coordinated and harmonious development which will promote the health, safety, morals, order, convenience, prosperity, and general welfare." Yet, Mr. White does not provide evidence that the comprehensive plan is built on scientific evidence that these goals are actually achieved. Indeed, there is no compelling scientific evidence favoring the idea that regulating on-premise signs as prescribed in the plan promotes health and safety, and general welfare (see subsequent sections discussing aesthetics, traffic safety and public health and welfare). While it is true that a desire for shared community identity vs. the need to allow signage that differentiates businesses is often a point of tension in signage regulation, Mr. White's claims on these issues are not substantiated, and ignore important roles played by signage.

Mr. White states (p.4) that, "The Sign Code varies height, size, and design by zoning district. This is a state of the art, and generally accepted technique for controlling sign clutter…" He goes on to assert (pps. 4-5) that "Plaintiff's lawsuit would invite all businesses to completely ignore the Sign Code's area restrictions—at least if the sign is painted—and contribute to sign clutter." In referring to "sign clutter," Mr. White invokes a subjective term and fails to recognize the value of signage to businesses and to the community at large. Indeed, White's reference to "sign clutter" when referring to signs and in support of restrictive codes ignores the marketing

functions of signs—functions that are valuable both to businesses within the community and consumers alike.

In my book titled "On-Premise Signs as Storefront Marketing Devices" published by the U.S. Small Business Administration in cooperation with the Signage Foundation (Taylor, Claus and Claus 2005) four significant roles that on-premise signs play in the marketing program of firms are outlined. These roles are:

- Communicating the location of the business
- Reinforcing advertisements and other marketing variables as part of Integrated Marketing Communications (IMC)
- Branding the site
- Enhancing store image

These functions represent the major roles signage plays for retail businesses and should be taken into account in developing sign codes that contribute to the success of local businesses. In general, signage should not be dismissed as clutter without evidence of it being broadly perceived that way, and Mr. White's casual reference to "sign clutter" are indicative of a willingness to inhibit businesses based on a subjective view of aesthetics (the reasons why aesthetics do not represent a substantial government interest in this case are discussed in section 1-b of this report).

The aforementioned functions are now elaborated on as they collectively play a key role in the success or failure of a business and in informing consumers (Taylor, Sarkees, and Bang 2012).

***Communicating the location of the business***

Signs serve as important navigational tools that offer information that is aimed to orient individuals in a physical space or in a built environment at a fundamental level (Jourdan, Strauss

and Hunter 2017). As observed by several scholars, (Auffrey and Hildebrandt 2017; Calori and Vanden-Eynden 2015) for many businesses, the most basic function of an on-premise sign is to communicate the location of the business to customers. To serve this purpose effectively, the sign must be both visible to the viewer and conspicuous, meaning that it stands out within the environment in which it exists (Bullough 2018). Taylor and Sarkees (2016) find that for many businesses, the sign is the primary way in which consumers learn where a business is located. Visibility is important for consumers passing directly by the business so that both information on the location and what is sold can be communicated (Berman, Evans, and Chatterjee 2018) and also to induce impulse stops from passersby (Taylor, Sarkees, and Bang 2012). As a result, it is important for planners to acknowledge that on-premise signs do not represent "clutter."

***Branding the Site***

Signs play an important role in the differentiation of retail businesses. Academic studies that to identifying colors of business are positively perceived by consumers (Bellizzi and Hite 1992; Myers-Levy and Peracchio 1995), as are shapes (Veryzer and Hutchinson 1998), typefaces, and background design elements (Mandel and Johnson 2002) that often are a part of a store's signage and physical appearance. Exterior visual features interact and can affect consumer perceptions and positioning, and thereby brand to the site (Kopp and Langenderfer 2014). In this case, it is Mr. Howard's belief that the bare walls of the Cozy Inn did not reflect the establishment's brand personality and this was his motivation for wanting to have a mural painted. This rationale is consistent with marketing principles related to branding the site of a retailer.

As an example, gas stations are often owned by oil companies, superstores or convenience stores and the brand logo appears on pole signs and pumps. In such cases, the sign's visual appearance links the brand to the business' place of business. In conjunction with these associations, such as a good customer experience, lower prices, or other attributes become affixed to that location. When the exterior appearance and signage for the business is distinctive and memorable, this site branding can help increase desire for a product, decrease price sensitivity, and enhance memory, awareness, loyalty, and brand equity (Keller 2013; Taylor, Claus, and Claus 2005).

***Enhancing the Image of the Store or Business***

Academic research has long held that retailers need to work to develop and maintain a store image as part of their success (James, Durand, and Dreves 1976; Golden, Albaum, and Zimmer 1987; Bloch and Kamran-Disfani 2018). Signage now only draws attention to a business, but also communicates aspects of the store's atmosphere and image to the consumer (Berman, Evans, and Chatterjee 2018). For example, an elegant jewelry store may want to communicate a prestigious image via expensive and well-designed signage while having an elegant storefront. A convenience store, on the other hand, may want simpler signage that gets across a simple and more down to earth image.

***Signage and Integrated Marketing Communications (IMC)***

Signage is part of integrated marketing communications (IMC), which views marketing communications holistically (Kitchen et al. 2004; Muñoz-Leiva, Porcu, and Barrio-García 2015). The IMC concept emphasizes that all points of contact a company has with the consumer have an impact on consumer perceptions of a brand and, in turn, affect its value. In this way, people

perceive a company's brand as a result of synthesizing the bundle of messages they receive along with their own experience with the business (Belch and Belch 2018). In this way, impressions of the company are formed by advertising, the store's environment, pricing, and other marketing variables as well as signage (Taylor. Claus and Claus 2005). Signs can play a particularly important role by displaying a logo, symbol or brief message that reinforces other aspects of IMC and, in turn, aids in increasing retail traffic and sales.

Signage plays an important role in informing consumers and performing marketing functions that enhance a business' chance of being profitable and thriving. It is important that sign codes are reflective of this and that signs are not simply dismissed based on a subjective claim that they represent "clutter." While some in a community may perceive signage and competition among retailers to contribute to a community environment that is dynamic and easy to maneuver through, others may see signs as unappealing or clutter causing. This depends on the beholder. The marketing functions of signage should not simply be dismissed and referring to signage as "clutter" is problematic.

**ii) The City of Salina's Sign Code does not advance an interest in traffic safety. Evidence from prior research and literature clearly demonstrates that properly constructed and positioned on-premise signs do not represent a traffic safety hazard.**

The argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence. While this claim is sometimes made by critics of signage and public officials engaged in zoning debates, there is a multitude of evidence that indicates that signs that are readable and sufficiently large do not pose a threat to traffic safety (e.g., Schwab 1998; Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Continued research on measures that enhance readability and legibility of signage reinforces the notion that properly

regulated signage does not pose a threat to traffic safety (e.g., Garvey, et al., 2016; Garvey and Klena 2019; Garvey and Klena 2020).

As noted by Richard Schwab, former program manager of the Federal Highway Administration's (FHWA) research on highway visibility and night driving safety, it is only signs that are too small, poorly lit, or inappropriately placed (e.g., blocking a driver's view when making a turn) that might lead to traffic safety issues (c.f. Taylor, Claus and Claus, 2005). Moreover, in recent years, the Federal Highway Administration has gone on record stating that standardized billboards are not distracting to drivers, and, thus, not a traffic safety hazard. In general, the FHWA's reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents (Wachtel and Netherton 1980; FHWA 2001; Federal Register 2002; FHWA 2013).

Research evidence as well as common sense point out that signage that is readable and conspicuous avoids situations in which drivers strain to see signs, make quick lane changes across traffic to turn into a parking lot, or become frustrated because they missed a sign they did not see in time. In fact, a large volume of scientific evidence demonstrates that properly constructed and placed signage, meaning signs that are clearly visible and legible and do not block a driver's vision while making a turn, are not a traffic safety hazard. A recent study by Saha, Dumbaugh and Merlin (2020) reviewed prior literature and examined factors of the built environment on traffic safety did not include signage among the analyzed factors, indicative of extant research not showing on-premise signs as being linked to traffic safety.

Several authoritative sources have gone on record stating that signs are not a traffic safety hazard. In an independent study sponsored by the AAA Foundation for Traffic Safety Research,

researchers at the University of North Carolina Highway Safety Research Center explored the causes of approximately 284,000 automobile accidents occurring from 1995 to 1999 (Stutts et al., 2001). The study's goal was to identify sources of distractions for drivers and to determine their relative importance. The report concluded that signs are not significant distractions that lead to highway accidents (Stutts et al., 2001).

In addition, a monograph describing the results of a 100-Car naturalistic study conducted by the Virginia Polytechnic University's Transportation Institute and the National Highway Traffic Safety Administration in order to examine whether various aspects of the environment distracted drivers stated that the findings showed that "Short, brief glances away from the forward roadway for the purpose of scanning the driving environment are safe and actually decrease near-crash/crash risk." Consistent with this finding, the extant literature research suggests that when the difficulty of a driving task increases, drivers focus their attention on the driving task and ignore other stimuli, such as billboards and signs (Johnston and Cole 1976; Lee Olson and DeHart 2004). A University of Miami study on a large sample of individuals conducted in 1971 in which a driving task was simulated and subjects' eye movements were recorded demonstrated that the presence of signs did not have an adverse impact on traffic safety (Morrison and Dainoff 1971).

The Virginia Tech Transportation Institute also conducted a study specifically looking at the impact of billboards on driving behavior. The study found that under actual driving conditions driver performance, speed keeping, and lane maintenance were not measurably impaired by signage. This finding is consistent with earlier evidence that drivers remain attentive to the driving task when encountering signs and do not divert attention from the driving

task to the point where it might affect their safety (Schwab 1998). In a sense, when not directly relevant to the driver, signage becomes part of the background. When it is relevant, drivers have been shown to process the information while not being distracted from the driving function (Schwab 1998; Lee 2005).

A study by Hawkins et al. (2012) examined a large volume of sign and crash data in order to examine whether digital on-premise signs were linked to traffic accidents. The study used data from multiple states obtained from the Highway Safety Information System, which contains a comprehensive database of accident records. The authors concluded (p. viii) that, "The results of this study provide scientifically based data that indicate that the installation of digital on-premise signs does not lead to a statistically significant increase in crashes on major roads."

While a multitude of individual academic studies over the past sixty years have explicitly researched the issue of a possible link between signs and traffic accidents, no conclusive evidence has been found. Some classic studies of static billboards (e.g., Lauer and McGonigle 1955; Blanche 1965; Holahan 1977) show no correlation between billboards and traffic safety. Other studies that found a correlation did not control for numerous other factors that could be responsible for a correlation and, thus, cannot be used to infer a causal relationship (e.g., Rusch 1951; Faustman 1961; Madigan-Hyland 1963). Thus, reviews of academic research have concluded that no evidence exists that billboards cause traffic accidents. As on-premise signs that are properly placed and sized carry the same characteristics as billboards, the same conclusion can be safely applied.

Not only has research demonstrated that properly placed signs are not a safety hazard, but there is also considerable evidence that signs can actually enhance traffic safety (Signage

Sourcebook 2003). For example, well-designed and strategically placed finds can help to relieve boredom and "wake up" a driver or catch their attention when they are becoming tired or less alert (Taylor, Claus and Claus 2005). Additionally, a FHWA study showed that on-premise signs located at high traffic intersections increased traffic safety, provided they met FHWA standards for legibility, conspicuity, readability, and conspicuity (Cirillo et al. 1969). Collectively, these findings suggest that on-premise signs can actually enhance traffic safety by assisting in keeping drivers alert and in finding their way.

In addition to research from scientific academic studies not showing evidence of a link between signage and traffic safety, historic evidence from insurance companies and law enforcement agencies on causes of traffic accidents supports the notion that there is a lack of correlation between on-premise signs and traffic accidents. Indeed, a considerable number of studies from these types of agencies have found that an on-premise sign or billboard causing a traffic accident is an extremely rare event (Wachtel and Netherton 1980; FHWA 2001). Interestingly, there have been cases where signage deficiency has been an issue in tort cases, owing to traffic signs being too small. This is why the FHWA does not allow traffic signs below a certain size (Signage Sourcebook 2003).

In summary, years of research on the topic of traffic safety demonstrates that properly constructed signs not only are not a traffic safety hazard but may actually improve traffic safety in some instances. As such, the advancement of traffic safety is not a valid justification for the City of Salina's Sign Code.

**iii. The City of Salina's Sign Code does not advance a general interest in aesthetics. Aesthetics are inherently a matter of opinion, and prior research documents that public opinion toward signage is more positive than negative.**

Part of the rationale for City of Salina's Sign Code is that it advances the City's interest in aesthetics. In his report, Mr. White argues (p.7), "Sign clutter is considered unattractive by most planning professionals and the general public." However, Mr. White offers no evidence that the City of Salina's Sign Code actually promotes an interest in aesthetics, and extant evidence from public opinion polls conducted on the aesthetics of billboards and on-premise signage refutes this claim. Additionally, because of the widespread understanding for the need for on-premise signs (even states and municipalities that ban billboards allow on-premise signs), it stands to reason that public opinion towards on-premise signs would be at least as favorable as to billboards.

While it is true that aesthetics can be a point of tension in signage regulation with some people holding different viewpoints on what is visually pleasing (Auffrey et al. 2024), available research evidence on signage consistently documents that the general public is not opposed to either on-premise signs or billboards aesthetic grounds. Contrary to the assertions of industry critics such as Scenic America and other similar groups, public opinion toward on-premise signs is quite positive, and public opinion is actually more favorable than negative towards off-premise signs (billboards). An analysis of data collected by leading market firm Brand Spark for Better Homes and Gardens American Shopper study conducted by Dr. James Kellaris of the University of Cincinnati documents several aspects of public opinion toward on-premise signs (Kellaris 2013). The 2013 sample analyzed was representative of the U.S. at large and included 880 respondents.

One of the key findings of the Kellaris study is that only a small proportion of the public agree that "Smaller signs are generally more attractive than larger signs." In response to this question, only 14.1% of respondents in the 2013 study agreed, while more than twice as many (34.7%) disagreed and many more indicated that they were neutral (Kellaris 2013). This finding is in opposition to the idea that limitations on the size of signs would serve an aesthetic interest as more people indicate that they prefer larger vs. smaller signs on aesthetic grounds.

Another major finding of the Kellaris' analysis is that consumers strongly prefer a variety of signs in business districts to uniformity. In response to the statement that "Variety of signage design within a business district is interesting and appealing," nearly seven in ten (69.5%) agreed, while 26.9% were neutral and just 3.6% disagreed.

A large volume of public opinion polls also reinforces the idea that a majority of the public does not object to signage on aesthetic grounds. A review of fifty major studies conducted over the years, including studies by renowned organizations such as the U.S. Travel Data Center, Louis Harris Polling, University of Michigan Survey Research Center, University of Alabama, Virginia Commonwealth University, Penn, Schoen and Berland, Inc., and Arbitron, among others. Collectively, these studies included more than 16,000 observations that measured public opinion on a variety of issues related to billboards. The Taylor and Franke (2011) study found that only a minority (21%) of the public supports banning billboards in general. Taylor and Franke also found that across polls, 85% of Americans believed that billboards are useful to travelers, 80% believed that billboards create jobs, and 82.2% agree that billboards help businesses attract customers. Additionally, on average, over 83% of those surveyed agreed that billboards are informative. And a majority of those polled (58.2%) agree that billboards are interesting. When asked specifically

about aesthetic issues, the public was evenly split on whether billboards can harm scenic beauty (50.1%), while a minority of respondents agreed that billboards are ugly (43.2%) and annoying (27.8%).

These findings of public opinion toward billboards are indicative of the public at large not having a distaste for signs. As U.S. retailers use the on-premise sign as the basic link to the consumer in 98% of cases, whether to promote impulse purchases, help consumers remember the store and what it sells at its location for future reference, it is clear that consumers value the information conveyed on-premise signs (Signage Sourcebook 2003) . Consumers use on-premise signs for a variety of functions including finding a business, developing an impression of the store and its image and recollecting information stored in memory about the business (Taylor, Sarkees and Bang 2012; Kellaris 2013). There is also broad recognition that signs help businesses build traffic, increase sales, employ people, and allow businesses to contribute to the tax base of a community (Signage Sourcebook 2003; Taylor, Claus and Claus 2005). Moreover, on-premise signs are particularly important to small businesses (see Taylor, Sarkees and Bang (2012)), and the U.S. public broadly supports the right to open a small business.

Overall, public opinion polls on billboards are not supportive of the sweeping claim that signs have a negative impact on the appearance of the community. By substantial majorities, the general public recognizes that billboards create jobs, help businesses, and help consumers. While the public is split to some extent, public opinion on the aesthetics of signs is not negative, and a majority of the public believe that the "pros" of billboards outweigh the "cons."

It should also be noted that there is no evidence that the public generally dislikes painted signs. Academic research does not support the notion that the public likes painted signs any less

than other types of signs. Indeed, many urban communities, including Salina, have developed mural programs that include paintings on walls because they are viewed as aesthetically pleasing, evidence of a substantial segment of the public liking some forms of paintings on buildings (City of East Lansing 2015; City of Tacoma 2015; Prevention Institute 2015). Thus, the City of Salina's content based restriction on on-premise signs does not advance an aesthetic interest.

**iv) The City of Salina's Sign Code does not advance a general interest in urban design and travel behavior.**

In his report, Mr. White argues (p.8), "While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit." This quote is a central part of Mr. White's contention that the City of Salina's Sign Code advances a general interest in urban design and travel behavior. Yet, Mr. White offers no evidence that allowing painted murals or signs on the side of walls would have any impact on pedestrian vs. vehicular traffic, let alone create demand for land consumptive uses or decrease use of public transportation.

Indeed, it can be argued that the type of painting at issue in this case would be more likely to encourage viewing by pedestrians than motorists. A study conducted by Ewing et al. (2016) found that street art, including the presence of murals, was a factor that was positively correlated with pedestrian traffic. In general, it makes sense that wall paintings would be more likely to be closely viewed by pedestrians as they have time to take in the artwork, as opposed to motorists who are passing by, typically at significant rates of speed unless stopped at an intersection.

In terms of this case, claims that traffic patterns or land usage would be affected based on the content of a painting on the sides of building walls are unsubstantiated. Moreover, there is no scientific evidence that paintings on the side of buildings decrease traffic safety. There is no scientific support for, or reason to believe, that a painting on the side of a building depicting flying hamburgers vs. some other type of scene would make it less safe.

**v) The City of Salina's Sign Code does not advance a general interest in public health and safety.**

In his report, Mr. White makes the remarkable claim that signs are damaging to public health. Rather than citing valid academic research focused directly on any impact of signs, Mr. White instead references studies broadly focused on "sprawl," "community design," and "urban sprawl." None of the studies cited directly examine the impact of on-premise signs on incidence of people walking or exercising. The proposition that painted walls would lead people to a more sedentary lifestyle would require a very complex research design that is controlled for numerous other factors. Moreover, Mr. White's assertion that "Large signs are one characteristic of sprawling, automobile corridors. In the planning profession, the protection of public health is considered a compelling public interest. Restricting the size and number of signs, including the control of painted wall signs is directly related to this interest," is wholly unsupported by the studies he cites as they did not investigate the impact of signs in general, let alone "large signs."

It is also notable that Mr. White cites a study stating that public murals have been found to have positive impacts on public health. The idea that a difference in the classification of a message contained in the exact same painting (on-premise sign vs. mural) would make a differential impact on public health is wholly unsupported. Again, there is no scientific evidence available supporting

the notion that a painted wall depicting a dove versus a cup of coffee would have any impact on individuals' health.

In terms of "public health," the economic vitality of a community should also be considered as a factor in regulation, but economic impact is ignored. As alluded to earlier, signs play a key role in facilitating the success of a wide variety of businesses by informing consumers and allowing businesses to communicate messages. If inadequate commercial signage exists, this makes it difficult for a business to communicate with consumers, who in most cases are passing a business in an automobile, and the result is often underperformance of the business or even outright failure (U.S. Small Business Administration 2013). The retail sector accounts for sales of more than $7 trillion in 2022, according to new estimates from the U.S. Census Bureau's Annual Retail Trade Survey (U.S. Census Bureau 2024). Thus, it is clear that availability of signage to retail and service businesses is a key facilitating factor to the vitality success of the U.S. economy.

Managers of retail and service businesses are well aware of the sales impact of signage, as evidenced by a survey conducted by Taylor, Sarkees and Bang (2012). In this study, 85% of respondents (which included some non-profit organizations and professional services such as doctors in addition to conventional retailers) indicated that they would lose sales if they did not have an on-premise sign and among those businesses indicating that sales would be lost, and the average sales loss was reported to be 34.6%. This is representative of a very substantial economic impact on a community.

In summary, there is no evidence to support the notion that the City of Salina's Sign Code promotes a substantial interest in public health and safety.

9/20/2024
Date

Charles R. Taylor, Ph.D.
Charles R. Taylor, Ph.D.

## REFERENCES

Auffrey, Christopher and Henry Hildebrandt (2017), "Do Motorists See Business Signs? Maybe. Maybe Not. A Study of the Probability that Motorists View On-premise Signs," *Interdisciplinary Journal of Signage and Wayfinding*, 1(2), 100–115.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8 (1), 5-22.

Belch, George E. and Michael A. Belch (2018). *Advertising and promotion: An integrated marketing communications perspective*. McGraw Hill.

Bellizzi, Joseph A. and Robert E. Hite (1992). Environmental Color, Consumer Feelings, and Purchase Likelihood," *Psychology & Marketing*, *9*(5), 347–363.

Berman, Barry, Joel Evans, and Patrali Chaterjee (2018), *Retail Management: A Strategic Approach*. 13th ed. New York: MacMillan.

Blanche, Ernest E. (1965), "The Roadside Distraction," *Traffic Safety*, 65 (11), 24-25.

Bloch, Peter H. and O. Kamran-Disfani (2018). A Framework for Studying the Impact of Outdoor Atmospherics in Retailing," *AMS Review*, 8 (3/4), 195–213.

Bullough, John, (2017), Factors Affecting Sign Visibility, Conspicuity, and Legibility: Review and Annotated Bibliography. *Interdisciplinary Journal of Signage and Wayfinding*, *1*(2), 2–25.

Calori, Chris and David Vanden-Eynden (2015), *Signage and Wayfinding Design: A Complete Guide to Creating Environmental Graphic Design systems*. John Wiley and Sons.

Cirillo J.A., S.K. Dietz and R.L. Beatty (1969), *Analysis and Modeling of Relationships between Accidents and the Geometric and Traffic Characteristics of the Interstate System*. Washington: U.S. Printing Office/ Federal Highway Administration.

City of East Lansing (2015), "Urban Mural Project (Crack Art)," https://www.cityofeastlansing.com/411/Urban-Mural-Project-Crack-Art (accessed April 16, 2015).

City of Tacoma (2015), "City of Tacoma, Washington: Murals Project," http://www.cityoftacoma.org/cms/one.aspx?objectId=2026 (accessed April 17, 2015).

Ewing, Reid, Amir Hajrasouliha, Kathryn M. Neckerman, Marnie Purciel-Hill, and William Greene (2016), "Streetscape Features Related to Pedestrian Activity," *Journal of Planning Education and Research* 36 (1), 5-15.

Faustman, D. Jackson (1961), "Study of Relationship between Advertising Signs and Traffic Accidents on U.S. 40 between Vallejo and Davis."

Federal Highway Administration (2001), "Potential Safety Effects of Electronic Billboards on Driver Attention and Distraction," Washington, D.C.: FHWA.

Federal Highway Administration (2013), "Driver Visual Behavior in the Presence of Commercial Electronic Variable Message Signs," available at http://www.fhwa.dot.gov/real_estate/oac/visual_behavior_report/review/cevms2.pdf (accessed April 2, 2015).

Federal Register (2002), U.S. DOT/FHWA Notice of Amended Federal/ State Agreement, 67 (63), 15661-15662.

Garvey, Philip M., and M. Jennifer Klena (2019), "Recommended Mounting Heights for Freestanding On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 3 (1), 3-15.

Garvey, Philip M., and M. Jennifer Klena (2020), "Parallel-mounted On-premise Letter Height and Sign Size." *Interdisciplinary Journal of Signage and Wayfinding* 4, (1).

Golden, Linda L., Gerald Albaum and Mary Zimmer (1987), "The Numerical Comparative Scale: An Economical Format for Retail Image Measurement," *Journal of Retailing*, 63 (4), 393–410.

Hawkins Jr, H. Gene, P. Kuo, and D. J. Lord (2012), "Statistical Analysis of the Relationship Between On-premise Digital Signage and Traffic Safety," *Signage Foundation, Inc. & Texas Engineering Extension Service* (2012).

James, D. L., Richard Durand and Robert A. Dreves (1976), "Use of a Multi-attribute Attitude Model in a Store Image Study," *Journal of Retailing*, 52 (2), 23–32.

Johnston, A.W. and Barry L. Cole (1976), "Investigations of Distraction by Irrelevant Information," *Australian Road Research*, 6, 3-23.

Jourdan, Dawn, Eric Strauss and M. Hunter (2017), "Sign Code Development Process: Best Practices," *Interdisciplinary Journal of Signage and Wayfinding*, *3*(1), 1–2.

Keller, Kevin Lane, (2013) "The Brand Report Card," *Harvard Business Review*, 78 (January/February), 3-10.

Kellaris, James J. (2013). Additional insights from the BrandSpark / Better Homes and Gardens American Shopper StudyTM: A three-year longitudinal update. In *Signage as Advertising: Proceedings of the National Signage Research and Education Conference*, October 9–10, 2013, Cincinnati. Signage Foundation.

Kitchen, Philip J., Joanne Brignell, Tao Ki and Graham S. Jones (2004), "The Emergence of IMC: A Theoretical Perspective. *Journal of Advertising Research*, *44*(1), 19–30.

Kopp, Steve W. and Jeff Langenderfer (2014), "Protecting Appearance and Atmospherics: Trade Dress as a Component of Retail Strategy," *Journal of Public Policy & Marketing*, 33 (1), 34–48.

Lauer, A. and J.C. McGonagle (1955), "Do Roadsigns Affect Traffic Accidents," *Traffic Quarterly*, 9 (3), 322-329.

Lee, S. E., E. Olsen, and M. DeHart (2004), "Driving Performance in the Presence and Absence of Billboards," Foundation for Outdoor Advertising Research and Education.

Madigan-Hyland, Incorporated (1963), New *York State Thruway: Relationship between Accidents and the Presence of Advertising Devices*. New York City, 1963.

Mandel, Naomi and Eric J. Johnson (2002), "When Web Pages Influence Choice: Effect of Visual Primes on Experts and Novices," *Journal of Consumer Research*, 29 (2), 235–245.

Meyers-Levy, Joan and Laura A. Peracchio (1995). How the Use of Color in Advertising Affects Attitudes: The Influence of Processing Motivation and Cognitive Demands. *Journal of Consumer Research*, 22(2), 121–138.

Morrison, Bruce J. and Marvin J. Dainoff (1971), "Eye Movement Characteristics in Recall of Incidentally Presented Stimuli When Attention is Divided," Oxford, OH: University of Miami.
Prevention Institute (2015), "Philadelphia Mural Arts Program: Philadelphia, PA," http://www.preventioninstitute.org/component/sbxmapper/article/368.html (accessed April 17, 2015).

Muñoz-Leiva, Sergio, Lucia Porcu and Salvadore Barrio-García (2015), "Discovering Prominent Themes in Integrated Marketing Communication Research from 1991 to 2012: A Co-word analytic approach. *International Journal of Advertising*, 34 (4), 678–701.

Rusch, W. (1951), "Highway Accident Rates as Related to Roadside Business and Advertising," *Highway Research Board Bulletin*, 30.

Schwab, Richard N. (1998), *Safety and Human Factors: Design Considerations for On-Premise Commercial Signs*. Sherwood, OR and Alexandria, VA: The Signage Foundation for Communication Excellence Inc. and the International Sign Association.

Saha, Dibakar, Eric Dumbaugh, and Louis A. Merlin (2020), "A Conceptual Framework to Understand the Role of Built Environment on Traffic Safety," *Journal of Safety Research*, 75, 41-50.

Signage Sourcebook: A Signage Handbook (2003), Washington, DC: U.S. Small Business Administration.

Stutts, Jane C., Donald W. Reinfurt, Loren Staplin and Eric Rodgman (2001), "The Role of Driver Distraction in Traffic Accidents," Report prepared for AAA Foundation for Traffic Safety. Chapel Hill, NC: University of North Carolina Highway Research Center.

Taylor, Charles R., Susan Claus and Thomas Claus (2005), *On-Premise Signs as Storefront Marketing Devices and Systems*. Washington DC: U.S. Small Business Administration.

Taylor, Charles R. and George R. Franke (2011), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, Ed.). Heidelber, Germany: Gabler.

Taylor, Charles R., Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Taylor, Charles R. and Matthew Sarkees (2016). Do Bans on Illuminated On-premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses. *International Journal of Advertising*, 35(1), 61–73.

United States Census Bureau (2024), "U.S. Retail Sales Reach $7,040 Billion," (Jan 24), https://www.census.gov/newsroom/press-releases/2024/annual-retail-trade-survey.html#:~:text=JAN.,Retail%20Trade%20Survey%20(ARTS).

Veryzer, Robert W. and J. Wesley Hutchinson (1998), "The Influence of Unity and Prototypicality on Aesthetic Responses to New Product Designs,". *Journal of Consumer Research,* 24 (4), 374–394.

Wachtel, Jerry and Ross Netherton (1980), "Safety and Environmental Design Considerations in the Use of Commercial Electronic Variable-Message Signs," Report No. FHWA/RD-080/051. Washington: Federal Highway Administration.

Taylor Declaration Exhibit 2

# *Charles R. Taylor*

Villanova School of Business .
Department of Marketing
Villanova University
Villanova, PA 19085-1678

Phone: (610) 519-4386
Fax: (610) 519-5364
E-Mail: raymond.taylor@villanova.edu

## EDUCATION

| | |
|---|---|
| 1992 | Ph.D. in Marketing, Michigan State University, East Lansing, MI. |
| 1987 | M.B.A., Michigan State University, East Lansing, MI. |
| 1984 | B.G.S., University of Michigan, Ann Arbor, MI. |

## ACADEMIC EMPLOYMENT

| | |
|---|---|
| 2004- present | John A. Murphy Endowed Chair in Marketing, Villanova University and Senior Research Fellow, Center for Marketing and Public Policy Research |
| 2007 (Fall) | Visiting Distinguished Professor, Ludwig Maximilians University, Munich Germany |
| 2004-2016 | Professor, IIE & Global MBA Program, Korea University, Seoul, Korea |
| 2000 - Present | Professor of Marketing, Villanova University |
| 1998 - 1999 | Associate Professor of Marketing, Villanova University |
| 1992 - 1997 | Assistant Professor of Marketing, Villanova University<br>Courses Taught: Advertising (MBA), Branding (MBA), International Marketing (MBA and Undergraduate), Strategic Marketing Management (MBA), Principles of Marketing (Undergraduate). |
| 1988 - 1992 | Associate Instructor and Research Assistant, Michigan State University<br>Courses Taught: International Marketing, Marketing Strategy, Retailing |

## RESEARCH INTERESTS

Advertising, Branding, and Integrated Marketing Communications - Advertising effects research; Online product reviews; Super Bowl and big event advertising; Consumer behavior and decision making; Digital advertising; Branding and equity; Outdoor advertising and on-premise signage

Marketing and Public Policy Issues Related to Advertising and Consumer Behavior - Consumer decision making, Consumer privacy; Advertising regulation; Digital advertising effectiveness; commerce; Tobacco and alcohol marketing; Pharmaceutical marketing; Trademark issues.

Global Advertising and Marketing - Marketing and advertising in Asia and Europe; International marketing and public policy issues including: "Made in" labeling and its effects; Factors involved on foreign market entry mode choice; Methodological issues, including techniques for enhancing data equivalence, comparability, and reliability; Advertising effects in diverse cultures.

## INDUSTRY EXPERIENCE/ CONSULTING

Consulting clients have included Peloton, ADT Alarm Systems, LLC, General Motors, GNC Holdings, Inc., Next-Gen, Inc., Swedish Match, Inc., Philip Morris USA, Samsung Electronics, Swedish Match, Inc., Live Nation, Inc., Walker Furniture, McCann Erickson Worldwide, Clear Channel Communications, Infinity Broadcasting, ClubCom Media, Inc., Magic Media, Inc., Eller Media, Centre for Information on Beverage Alcohol (London), Lamar Outdoor, Interstate Outdoor, Craig Realty, Borden Park, L.P., Dechert L.L.P., Greenberg Trauig, L.L.P., Sussman Godfrey, L.L.P., Arnold and Porter L.L.P., Winston & Strawn, Brown Rudnick, L.L.P., Mattioni and Associates, The Rossbacher Firm, The International Sign Association, The Signage Foundation for Communication Excellence, M of Toms River, Outdoor Advertising Association of America, Missouri Outdoor Advertising Association, Texas Outdoor Advertising Association. Held positions with R.L. Polk and Company, and General Motors prior to entering academia.

## MEDIA COMMENTATOR

Commentator in numerous media outlet on advertising and other marketing and branding issues. Senior contributor for Forbes.com. Frequently quoted in outlets such as the Associated Press, MSNBC television, Fox television, NBC television, CBS television, Cheddar TV, CBS.com, ABC.com, Reuters, Forbes, Business Week, the Wall Street Journal, the New York Times, USA Today, Arirang Television, the Washington Post, the Philadelphia Inquirer, San Francisco Examiner, the Los Angeles Times, Advertising Age, Brandweek, Adweek, Variety, Mashable, Yahoo.com, Accesshollywood.com, Sportsillustrated.cnn.com, French Foreign Press Association, the Boston Globe, the Dallas Morning News, the New York Post, China Daily.com, and many others.

## INVITED SPEECHES

Presentations at several Universities and industry associations. Universities include Harvard, Columbia, Tuck School of Business (Dartmouth), Yonsei University, Korea University, University of Texas at Austin, Rutgers, University of Antwerp (Belgium), University of Amsterdam (Netherlands), University of Munich (Germany), King's College London, Harbin Institute of Technology (China), Seoul National University (Korea), University of Klagenfurt (Austria), University of Madrid (Spain), Masaryk University (Czech Republic), Shanghai Jiao Tong University, East China Normal University, Seoul National University, Ewha Women's University, and Changwon National University. Featured/keynote speaker at meetings of ICORIA (European Advertising Association), Emerging Markets Conference Board, ICAMA (Asian Marketing Association, China Advertising Association, the Korea Advertising Society, International Sign Association, Conference on Corporate and Marketing Communications, the Signage Foundation, Asia Pacific Law Students Association, the Outdoor Advertising Association of America, and the U.S. Transportation Research Board.

## REVIEWING AND EDITING

***Editor in Chief***

International Journal of Advertising (2008 – present, SSCI)

***Associate Editor***

Journal of Public Policy and Marketing (2006 – 2009, SSCI)

Journal of Advertising (2008 – 2009, SSCI)

***Editorial Review Board Member***:

Journal of Advertising (2003 – present, SSCI); Senior Advisory Board

Journal of Public Policy and Marketing (1997 – present, SSCI)

Journal of Advertising Research (2001-2004 and 2016-present SSCI)

International Journal of Advertising, (2006 – 2008. SSCI)

International Marketing Review, (2005-present, SSCI); Senior Advisory Board

Journal of Business Research (2000 – 2015, SSCI)

Journal of Current Issues and Research in Advertising (2001 - present)

Journal of Consumer Affairs (2002 – present, SSCI)

Psychology and Marketing (1994 – 2022, SSCI)

Journal of International Marketing (2000- present)

Advances in International Marketing (1996 - present)

Journal of Marketing Communications (2006 – present)

Journal of Marketing Theory and Practice (2007 – present); Senior Advisory Board

***Special Issue Editor**:*

European Journal of Marketing, The Janus Face of Customer Service (2020)

Journal of Advertising, Special Issue on Advertising Regulation and Self Regulation, (2008).

International Journal of Advertising, Special Issue on Advertising in Asia Pacific (2008)

Psychology and Marketing, Special Issues on E-Commerce and Mobile Commerce, with Doo Hee Lee (2008).

Advances in International Marketing, Cross-Cultural Buyer Behavior (2007).

Journal of Advertising, Special Issue on International Advertising (2005).

Advances in International Marketing, "New Directions in International Advertising Research," 2002.

Journal of Public Policy and Marketing, Section including best conference papers, 2001.

Psychology and Marketing, "Emerging Issues in Advertising," 2000.

Advances in International Marketing, Special issue on "Marketing in Asia Pacific," 1996.

Journal of Public Policy and Marketing, Section including best conference papers, 1996.

***Ad hoc reviewer:***

Journal of Marketing
Journal of Marketing Research
International Marketing Review
Journal of International Marketing
Journal of Interactive Marketing
Journal of Services Marketing
Journal of Macromarketing
Journal of Marketing Theory and Practice
Asian Journal of Communication
Sex Roles
Proposal reviewer for the Government of Hong Kong's Competitive Grant program and the United Kingdom's Economic and Social Research Council.

***Conference Organization***

Academic Excellent Chair, 2024 Global Marketing Conference, Seoul

Academic Excellence Chair, 2019, Global Fashion Management Conference, Paris

Academic Excellence Chair, 2018, Global Marketing Conference at Tokyo

Academic Excellence Chair, 2016 Global Marketing Conference at Hong Kong

Academic Excellence Chair, 2014 Global Marketing Conference at Singapore

Academic Excellence Chair, 2012 Global Marketing Conference at Seoul

Co-Chair, 2010 Global Marketing Conference at Tokyo

Co-Chair, 2008 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 2008 Global Marketing Conference, Shanghai Jiao Tong University, Shanghai, China.

Co-Chair, 2007 American Academy of Advertising Asia Pacific Conference, Korea University, Seoul, Korea

Co-Chair, 2006 Academy of Marketing Science Cultural Perspectives in Marketing Conference.

Co-Chair, 2003 American Academy of Advertising Conference

Co-Chair, 2001 American Academy of Advertising Conference

Co-Chair, 2001 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1996 American Marketing Association Marketing and Public Policy Conference

Co-Chair, 1992 Joint Conference of the American Marketing Association and Korean Marketing Association

***Reviewer for Annual Conferences***

American Academy of Advertising Annual Conference
American Marketing Association Summer Educators' Conference
American Marketing Association Winter Educators' Conference
American Marketing Association Public Policy and Marketing Conference
Academy for International Business Conference
Society for Marketing Advances Conference
Academy of Marketing Science Conference

## AWARDS AND HONORS

"Measuring Hard Sell and Soft Sell Advertising Appeals," Journal of Advertising, 39 (2), 5-20. Voted as one of the best 15 articles to appear in the 50 year history of Journal of Advertising (reprinted in 50th anniversary issue).

Listed in Research.com's Top Scientists in Business and Management (2022 and 2023).

Keynote Speaker, ICAMA Conference, Jeju, Korea (2022)

Outstanding Paper Award "The Future of Advertising Research: New Directions and Research Needs." Voted best paper to appear in Journal of Marketing Theory and Practice in 2021.

Keynote Speaker, Global Fashion Management Conference 2021

Emerging Markets Conference Board Distinguished Speaker, 2018 (Johannesburg, South Africa), 2019 (Delhi India), 2020 (Llujbiana, Slovenia), 2021 (Puebla, Mexico)

Keynote Speaker, Korean Marketing Association Annual Conference (2020)

Keynote Speaker, ICAMA Conference (2020)

Faculty Speaker, 2014, 2015, 2016, and 2017, Doctoral Consortium, International Conference on Research in Advertising (European Advertising Academy)

Faculty Speaker, 2008, 2011, 2016, and 2017 American Academy of Advertising Doctoral Consortium Emerging Scholars Symposium.

Flemming Hansen Award for Outstanding Lifetime Achievement to Advertising Research, presented by European Advertising Academy, 2017.

Ivan L. Preston Outstanding Contribution to Research Award (for outstanding lifetime contribution to advertising research, presented by American Academy of Advertising), 2012.

Best Paper Award "Measuring Soft-Sell Versus Hard-Sell Advertising Appeals," Selected as best paper to appear in *Journal of Advertising* in 2010.

Chairman of the Executive Board, Academic Advisory Council for Signage Research, 2019-2021 (served a Vice-Chair 2017-2019)

Villanova Outstanding Faculty Research Award 2009 (lifetime achievement)

President, American Academy of Advertising 2005.

Vice President, American Academy of Advertising, 2001.

**AWARDS AND HONORS (Cont.)**

Treasurer, American Academy of Advertising 2002-2003.

Chairman of the American Academy of Advertising's Research Committee, 1998-2000.

Best Paper Award, "Cigarette Advertising Bans' Effect on Consumption: A Meta Analysis," Journal of Advertising, Selected as best paper to appear in *Journal of Advertising* in 2008.

Best Paper Award, "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," Winner of Hans B. Thorelli Award for Best Paper that Advances International Marketing Theory and Thought in 1998, Journal of International Marketing.

Best Paper Award, "A Comparison of Alternative Paradigms for Describing Economic Development," - Winner of the Charles C. Slater award for the best paper to appear in Journal of Macromarketing in 1994

Best Paper Award, "A Review of the Effects of Cigarette Advertising Bans," 2006 *American Marketing Association Marketing and Public Policy Conference*, Long Beach, CA.

Best Conference Paper Award, "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective,"2012 Global Marketing Conference- Seoul.

Finalist, Best Paper Award, *Journal of Advertising*, 2006.

Outstanding Reviewer Award, *Journal of Advertising*, 2004.

Outstanding Reviewer Award, 1999 Society for Marketing Advances Conference.

Who's Who in the World; Who's Who in American Education; Who's Who in the East.

Fulbright Senior Specialist, 2001 (taught class at Masaryk University, Brno, Czech Republic)

Invited Speaker, Marketing and Public Policy Conference Doctoral Consortium, 2002, 2003, 2007, 2009.

Invited Speaker, Society for Marketing Advances Doctoral Consortium, 2002.

Member of Board of Directors, American Marketing Association Marketing and Society Special Interest Group 2000- 2003.

Winner of American Academy of Advertising Competitive Research Fellowship Award, 1994.

"The Effectiveness of Brand Differentiating Strategies in Korean Advertising," Chosen as Best Paper in Advertising Track at the International Academy of Business Disciplines Conference.

**AWARDS AND HONORS (Cont.)**

Richard D. Irwin Foundation Dissertation Fellowship, 1991.

American Marketing Doctoral Consortium Fellow, 1990, University of Florida.

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," chosen as Outstanding Paper in the Promotion Track at the 1989 Conference of the Southern Marketing Association.

Member of Beta Gamma Sigma, Michigan State University Chapter.

Member of Phi Beta Phi, Villanova University Chapter.

**CONGRESSIONAL TESTIMONY**

Charles R. Taylor (2003), "The Importance of the Availability of Billboards to Rural Businesses in America," Testimony to the U.S. House of Representatives Committee on Small Business, Subcommittee on Rural Enterprise, Agriculture and Technology, May 15, 2003.

**BOOKS/ EDITED VOLUMES**

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), *The SAGE Handbook of Marketing Ethics*, London: Sage.

Marc G. Weinberger, Charles S. Gulas, and Charles R. Taylor (2021), *Humor in Advertising. Classic Perspectives and New Insights*. London: Routledge.

Sukki Yoon, Yung-Kyun Choi, and Charles R. Taylor (2021), *Leveraged Marketing Communications: The Importance of Studying the Transfer of Object-to-Brand Associations*, London: Routledge.

Shu-Chuan Chu, Juran Kim, and Charles R. Taylor (2019), *Electronic Word of Mouth as a Promotional Technique: New Insights from Social Media*. London: Routledge.

Zotos, Yorgos C., Stacy Landreth Grau, and Charles R. Taylor (2018), *Current Research on Gender Issues in Advertising*, London: Routledge.

Marko Sarstedt, Manfred Schwaiger, and Charles R. Taylor (2011), *Measurement and Research Methods in International Marketing*, (S. Zou., Series Editor). London: Elsevier. (special issue of *Advances in International Marketing*).

John C. Kozup, Charles R. Taylor and Ronald Paul Hill (2008), *Proceedings of the 2008 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor and Doo-Hee Lee (2007), Cross-Cultural Buyer Behavior (special issue of *Advances in International Marketing*), London: Elsevier.

Charles R. Taylor, Doo Hee Lee, Robert King and Changjo Yoo (2007), *Proceedings of the 2007 American Academy of Advertising/ Korea Advertising Society Asia Pacific Conference*, Seoul: Dongguk University.

Charles R. Taylor, Susan Claus and Thomas Claus (2005), *The Marketing Functions of Signs: Understanding Signage and Its Impact on the Economy*, Washington: U.S. Small Business Administration.

Charles R. Taylor (2002), *New Directions in International Advertising*, (special issue of Advances in International Marketing). London: Elsevier Science.

Charles R. Taylor (2001), *Proceedings of the American Academy of Advertising Conference*. Villanova, PA: Villanova University.

Ronald Paul Hill and Charles R. Taylor (2001), Proceedings of the 2001 Marketing and Public Policy Conference, Chicago, IL: American Marketing Association.

**BOOKS/ EDITED VOLUMES**

Charles R. Taylor (1996), *Marketing in Asia Pacific: and Beyond*. Greenwich, CT: JAI Press.

Ronald Paul Hill and Charles R. Taylor (1996), *Proceedings of the 1996 Marketing and Public Policy Conference*. Chicago, IL: American Marketing Association.

Charles R. Taylor, S.W. Kopp, T. Nevett, and Stanley C. Hollander (1991), *Marketing History: It's Many Dimensions: Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*. East Lansing, MI: Michigan State University Press.

**REPRINTED ARTICLES**

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Charles R. Taylor and Shintaro Okazaki, "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," from *Journal of International Marketing* (2006).

International Marketing: Modern and Classic Papers (2008), Stanley J. Paliwoda and John K. Ryans (eds.), London, Edward Elgar. Matthew B. Myers, Roger J. Calantone, Thomas J. Page Jr. and Charles R. Taylor, "Academic Insights: An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," from *Journal of International Marketing* (2000).

Readings in Advertising, Society, and Consumer Culture (2007), Roxanne Hovland, Joyce Wolburg, and Eric Haley, Eds. CA: M.E. Sharpe, Inc.: Charles R. Taylor and Barbara B. Stern, "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," reprinted from *Journal of Advertising* (2006).

**BOOK REVIEWS**

Taylor, Charles R. (2003), "Review of *Cross-Cultural Survey Methods*," by Janet A. Harkness, Fons J.R. Van de Vijver, and Peter Ph. Mohler, Wiley-Interscience, *Journal of Marketing Research*, 40 (August), 246-247.

Taylor, Charles R. (1994), "Review of *New and Improved: The Story of Mass Marketing in America*," by Richard Tedlow, *Journal of Marketing*, 58 (3), 123-126.

**JOURNAL ARTICLES**

Taylor, Charles R., Benjamin Borenstein, and Aniruddha Pangarkar (2024), "What, No Logos? Why Some Minimalists Prefer Quiet Luxury," *Psychology & Marketing*, forthcoming.

Auffrey, Christopher, Matthew Isaac, Steven Kopp, Hannah Marriott, Aparna Sundar, Charles Taylor, and Franklin Velasco (2024), "A Stakeholder Approach to the Regulation of On-Premise Signs." *Interdisciplinary Journal of Signage and Wayfinding* 8(1), 5-22.

Milfeld, Tyler, Matthew Pittman and Charles R. Taylor (2024), "Green with Arrogance: Dominant Brands Benefit from Arrogant Appeals," *Journal of Current Issues & Research in Advertising*, 1–23. https://doi.org/10.1080/10641734.2024.2346711.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "The Use of Non-fungible Tokens (NFTs) as Promotional Devices to Build Brands: An Application of Lovemark Theory." *Journal of Global Fashion Marketing*, forthcoming.

Benjamin E. Borenstein and Charles R. Taylor (2024) "The Effects of Targeted Digital Advertising on Consumer Welfare," *Journal of Strategic Marketing*, 32(3), 317-332.

Rathee, Shelly, Charles R. Taylor and Akash Gupta (2024), "The Appeal of Blurred Imagery: Enhancing Advertising and Brand Attitudes for Luxury Goods," *Journal of Business Research*, 182, 114795.

Cho, Minjung, Eunju Ko, and Charles R. Taylor (2024), "Do Non-fungible Tokens Create Long-Term Value for Luxury Brands? The Effect of NFT Promotions on Customer Equity." *Computers in Human Behavior*, 108347, forthcoming.

Charles R. Taylor, Mahdi Rajabi, Shelly Rathee and Somayeh Zamani (2023) The Impact of Self-Identification with Global Consumer Culture on eWOM Generation: A Test of Global Consumer Culture Theory, *Journal of Marketing Communications*, 1-27. DOI: 10.1080/13527266.2023.2227646.

Tae-Hyun Baek, Jungkyeun Kim, Sukki Yoon, Yung Kyun Choi and Charles R. Taylor (2023), "The COVID-19 Threat and Luxury Advertising." *Journal of Consumer Behaviour*, 22(3), 582–596.

Chen Lou, Charles R. Taylor & Xuan Zhou (2023), "Influencer Marketing on Social Media: How Different Social Media Platforms Afford Influencer–Follower Relation and Drive Advertising Effectiveness," *Journal of Current Issues & Research in Advertising*, 44(1) 60-87.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2023), "Don't Touch the Merchandise! Factors Associated with Consumer Preference for Contact Free Shopping," *Journal of Business Research*, 154 (January), 113261.

**JOURNAL ARTICLES**

Marla Royne Stafford & Charles R. Taylor (2022), "Analyzing the Impact of the Leading Articles in the Journal of Advertising from Its First 50 Years: An Integrative Framework," *Journal of Advertising*, 51 (5), 624–642.

Biswajiti Parita, Charles R. Taylor and Abhishek Abhishek (2022), "Introducing Roadblock Advertising in the Digital Context: Does Paying to Limit Competing Messages Pay Off?" *Journal of Advertising Research*," 62 (3), 271-288.

Sophia Mueller, Sandra Diehl, Charles R. Taylor, Ralf Terlutter and Barbara Mueller (2022), "Do CSR Ads with Public Health Messages Pertaining to Covid-19 Actually Help Consumers, Advertisers, and Society? Insights from the United States and Germany" *Journal of Current Issues and Research in Advertising*, 43 (4), 337-359.

Charles R. Taylor (2022), "Academic Research on Signage: Research Directions to Add Value to Stakeholders," 6 (1) *Interdisciplinary Journal of Signage and Wayfinding*, 21-26.

Lars Bergkvist and Charles R. Taylor (2022), "Reviving and Improving Brand Awareness as a Construct in Advertising Research," *Journal of Advertising*, 51, 294-307.

Yuli Zhang, Hyokjin Kwak, Puzakova Marina, and Charles R. Taylor (2021), "Space between Products on Display: The Impact of Interspace on Consumer Estimation of Product Size," *Journal of the Academy of Marketing Science*, 49(6), 1109-1131.

Alexander Mafael, Sascha Raithel, Charles R. Taylor and David W. Stewart (2021), "Measuring the Role of Uniqueness and Consistency to Develop Effective Advertising," *Journal of Advertising*, 50(4), 494-504.

Aniruddah Pangarkar, Paurav Shukla, and Charles R. Taylor (2021), "Minimalism in Consumption: A Typology and Brand Engagement Strategies," *Journal of Business Research,* 127 (April), 167-178.

Charles R. Taylor and Les Carlson (2021), "The Future of Advertising: New Directions and Research Needs," *Journal of Marketing Theory and Practice*, 29(1), 51-62.

Sukki Yoon, Kacy Kim, Ashok K. Lawani, Patrick T. Vargas, and Charles R. Taylor (2021), "Culture and Health Persuasion," *Journal of Current Issues and Research in Advertising*, 42(1), 83-101.

Charles R. Taylor, Philip J. Kitchen, Matthew Sarkees and Christian Lolk (2020), "Addressing the Janus Face of Customer Service: A Typology of New Age Service Failures," *European Journal of Marketing*, 54 (10), 2295-2316.

Yoon-Na Cho and Charles R. Taylor (2020), "The Role of Ambiguity and Skepticism in the Effectiveness of Sustainability Labeling," *Journal of Business Research*, 120 (11) 379-388.

**JOURNAL ARTICLES**

Yuli Zheng, Hyokjin Kwak, Marina Puzakova, and Charles R. Taylor (2020), "When Distraction May Be a Good Thing: The Role of Distraction in Low-Fit Brand Extension Evaluations," *Psychology and Marketing*, 37 (4), 604-621.

Yoon-Na Cho, Yohan Kim and Charles R. Taylor (2020), "Does Feeling Guilt Facilitate "Green" Purchases: Insights on a Global Issue from a U.S. Consumer Survey," *Advances in International Marketing*, vol. 27, forthcoming.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee & Charles R. Taylor (2020) Can Premium Private Labels Compete with Luxury Brands: The Impact of Advertising on Perceived Luxuriousness, *International Journal of Advertising*, 39 (6), 761-782.

Charles R. Taylor, Alexander Mafael, Sascha Raithel, Carissa M. Anthony, and David W. Stewart (2019), "Portrayals of Minorities and Women in Super Bowl Advertising," *Journal of Consumer Affairs*, 51 (4), 1535–1572.

Shintaro Okazaki, Charles R. Taylor, Patrick Vargas, and Jorg Henseler, (2019) "Disasters, Hope, and Globalization: Exploring Self-identification with Global Consumer Culture in Japan," *International Marketing Review*, 36 (5), 726-747.

Eunju Ko, John P. Costello, and Charles R. Taylor (2019), "What is a Luxury Brand? A New Definition and Review of the Literature," *Journal of Business Research*, 99 (9), 405-413

Charles R. Taylor, Yoon-Na Cho, Carissa M. Anthony, and Danielle B. Smith. (2018), "Photoshopping of Models in Advertising: A Review of the Literature and Future Research Agenda." *Journal of Global Fashion Marketing* 9 (4), 379-398.

Aronte M. Bennett, John C. Kozup, and Charles R. Taylor (2018), "Country-of-Origin Effects and Consumer Evaluations of Ads within the Context of Economic Crises," *Journal of Current Issues and Research in Advertising*, 39 (1), 52-56.

Schirmer, Nadine A., Manfred Schwaiger, Charles R. Taylor, and John P. Costello (2018), "Consumer Response to Disclosures in Digitally Retouched Advertisements." *Journal of Public Policy & Marketing*, 37 (1), 131-141.

George R. Franke and Charles R. Taylor (2017), "Public Perceptions of Billboards: A Meta-Analysis," *Journal of Advertising*, 46 (3), 395-410.

Jieun Choi, Charles R. Taylor, and Doo-Hee Lee (2017), "Do Resonant Ads Resonate with Consumers? The Interaction of Wordplay, Regulatory Focus, and Need for Cognition and its Impact on Persuasion," *Journal of Advertising Research*, 57 (1), 82-93.

**JOURNAL ARTICLES**

Charles R. Taylor & John P. Costello (2017), "What Do We Know About Fashion Advertising? A Review of the Literature and Suggested Research Directions," *Journal of Global Fashion Marketing*, 7 (1), 1-20.

Lars Bergkvist and Charles R. Taylor (2016), "Leveraged Marketing Communications: A Framework for Explaining the Effects of Secondary Brand Associations," *Academy of Marketing Science Review*, 6 (3), 157–175.

Aronté M. Bennett, Stacey Menzel Baker, Samantha Cross, J.P. James, Gregory Bartholomew, Akon E. Ekpo, Geraldine Rosa Henderson, Martina Hutton, Apoorv Khare, Abhijit Roy, Tony Stovall and Charles Ray Taylor (2016), "Omission and Commission as Marketplace Trauma," *Journal of Public Policy and Marketing*, 35 (2), 280-291.

Charles R. Taylor and Matthew Sarkees (2016), "Do Bans on Illuminated On-Premise Signs Matter? Balancing Environmental Impact with the Impact on Businesses," *International Journal of Advertising*, 35 (1), 61-73

Sascha Raithel, Charles R. Taylor, and Stefan Hock (2016), "Are Super Bowl Ads a Super Waste of Money? Examining the Intermediary Roles of Customer-based Brand Equity and Customer Equity Effects," *Journal of Business Research*, 69 (9), 3788-3794.

Jieun Choi, Doo-Hee Lee and Charles R. Taylor (2016), "The Influence of Purchasing Context and Reversibility of Choice on Consumer Responses Toward Personalized Products and Standardized Products," *Psychological Reports*, 18 (2), 510-26

Charles R. Taylor and Shintaro Okazaki (2015), "Do Global Brands Use Similar Executional Styles Across Cultures? A Comparison of U.S. and Japanese Television Advertising," *Journal of Advertising*, 44 (3), 276-288.

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2015), "How Character Presence in Advergames Affects Brand Attitude and Game Performance: A Cross-cultural Comparison," *Journal of Consumer Behaviour*, 14 (6), 357-368.

Juran Kim, Charles R. Taylor, Kyung Hoon Kim, and Ki Hoon Lee (2015), "Measures of Perceived Sustainability," *Journal of Global Scholars of Marketing Science*," 25 (2), 182-193

Yung Kyun Choi and Charles R. Taylor (2014), "How Do 3-Dimensional Images Promote Products on the Internet?" *Journal of Business Research*, 67 (10), 2164-2170.

Johnny JiungYee Lee, Michael L. Capella, Charles R. Taylor, Mi (Meg) Luo and Colin B. Gabler (2014), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Journal of Business Research*, 67 (10), 2139–2146.

**JOURNAL ARTICLES**

Marina Puzakova, Hyokjin Kwak and Charles R. Taylor (2013), "The Role of Geography of Self in "Filling In" Brand Personality Traits: Consumer Inference of Unobservable Attributes," *Journal of Advertising*, 42 (1), 16-29.

Juran Kim, Ki Hoon Lee and Charles R. Taylor (2013), "Effects of Mobile Direct Experience on Perceived Interactivity and Attitude toward Smartphone Applications," *Journal of Global Scholars of Marketing Science*, 23 (3), 282-296.

Minsun Yeu, Hee-Sook Yoon, Charles R. Taylor and Doo-Hee Lee (2013), "Are Banner Advertisements in Online Games Effective," *Journal of Advertising*, 42 (2/3), 241-250.

Shintaro Okazaki and Charles R. Taylor (2013), "Social Media and International Advertising: Theoretical Challenges and Future Directions," *International Marketing Review*, 30 (1) 56-71.

Charles R. Taylor, Matthew Sarkees and Hae-Kyong Bang (2012), "Understanding the Value of On-Premise Signs as Marketing Devices to Businesses for Legal and Public Policy Purposes," *Journal of Public Policy and Marketing*, 31 (2), 185-194.

Sophie Hieke and Charles R. Taylor (2012), "A Critical Review of the Literature on Nutritional Labeling: Conceptual and Methodological Directions for Future Research," *Journal of Consumer Affairs*, 46 (1), 120-156.

Christian M. Ringle, Marko Sarstedt, Rainer Schlittgen and Charles R. Taylor (2012), "PLS Path Modelling and Evolutionary Segmentation," 66 (9), *Journal of Business Research*, 1318-1324.

Eunju Ko, Charles R. Taylor, Heewon Sung, Jooyeon Lee, Udo Wagner, David Martin-Consuegra Navarro, Fanghua Wang (2012), "Global Marketing Segmentation Usefulness in the Sportswear Industry," *Journal of Business Research*, (65) 11, 1565-1575.

John C. Kozup, Charles R. Taylor, Michael L. Capella, and Jeremy Kees (2012), "Sound Disclosures: Assessing When a Disclosure is Worthwhile," *Journal of Public Policy and Marketing*, 31 (2), 313-322.

Michael L. Capella, Charles R. Taylor and Jeremy Kees (2012), "Tobacco Harm Reduction Advertising in the Presence of a Government Mandated Warning" *Journal of Consumer Affairs*, 46 (2), 235-259.

Charles R. Taylor and C. Luke Bowen (2012), "New Developments for Measuring Return on Investment (ROI) for Internet Advertising: Building Toward a 'Brand Scorecard Approach," *Journal of Advertising and Promotion Research*, 1 (1), 9-38.

Charles R. Taylor, C. Luke Bowen, and Hae-Kyong Bang (2011), "The State of Methodological Practice in International Marketing Research," *Advances in International Marketing*, 22 (1), 143-167.

**JOURNAL ARTICLES**

John B. Ford, Barbara Mueller, and Charles R. Taylor (2011), "The Tension between Strategy and Execution: Challenges for International Advertising Research," *Journal of Advertising Research*, 51 (1), 27-41.

Sascha Raithel, Sebastian Scharf, Charles R Taylor, Manfred Schwaiger, Lorenz Zimmermann (2011), "Marketing Accountability: Applying Data Envelopment Analysis to Assess the Impact of Advertising Efficiency on Shareholder Value," *Advances in International Marketing*, 22 (1), 115-139.

Karen L. Becker-Olsen, Charles R. Taylor, Ronald Paul Hill, and Goksel Yalcinkaya (2011), "A Cross Cultural Look at Corporate Social Responsibility Marketing Communications in Mexico and the United States: Strategies for Global Brands," *Journal of International Marketing*, 19 (2) 30-44.

Hyun Joung Lee, Doo-Hee Lee, Charles R. Taylor, and Jong-Ho Lee (2011), Do Online Brand Communities Help Build and Maintain Relationships with Consumers? A Network Theory Approach," *Journal of Brand Management*, 19 (3), 213-227.

Hao Zhang, Eunju Ko, and Charles R. Taylor (2011)," Advertising Appeals Strategy: Moderating Effect on the Relationship between Innovation and Customer Equity Drivers in China," *Advances in International Marketing*, 22, 111–136.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Measuring Hard Sell and Soft Sell Advertising Appeals," *Journal of Advertising*, 39 (2), 5-20.

Schwaiger, Manfred, Marko Sarstedt and Charles R. Taylor (2010), "Art for the Sake of the Corporation: Audi, BMW Group, DaimlerChrysler, Montblanc, Siemens, and Volkswagen Help Explore the Effect of Sponsorship on Corporate Reputations," *Journal of Advertising Research*, 50 (1), 77-89.

Shintaro Okazaki, Barbara Mueller, and Charles R. Taylor (2010), "Global Consumer Culture Positioning: Testing Perceptions of Soft-Sell and Hard-Sell Advertising Appeals Between U.S. and Japanese Consumers," *Journal of International Marketing*, 18 (2), 20-34.

Herbert Jack Rotfeld and Charles R. Taylor (2009). "The Advertising Regulation and Self-Regulation Issues Ripped from the Headlines with (sometimes missed) Opportunities for Disciplined Multi-disciplinary Research," *Journal of Advertising*, 38 (4), 5-14.

Charles R. Taylor (2009), "Editorial: The Six Principles of Digital Advertising," *International Journal of Advertising*, 28 (3), 411-418.

Michael L. Capella, Charles R. Taylor, Randall C. Campbell, and Lance S. Longwell (2009), "Do Pharmaceutical Marketing Activities Raise Prices? Evidence from Five Major Therapeutic Classes," *Journal of Public Policy and Marketing*, 28 (2), 146-161.

## JOURNAL ARTICLES

Mary Anne Raymond, Jong Won Lim, Charles R. Taylor, and Roger Gomes (2009), “Hyundai Motor Company’s Paradigm for Success in World Markets,” *Journal for Global Business Development*, Volume 1 (9), 27 – 36.

Charles R. Taylor and Michael L. Capella (2008), “A Model of Harm Reduction in the Context of Marketing,” *Journal of Public Policy and Marketing*, 27 (2), 187-196.

Charles R. Taylor, Kyung Hoon Kim, Eunju Ko, Myung Hwan Park, Dong Ryul Kim and Hak Il Moon (2008), “Does Having a Market Orientation Lead to Higher Levels of Relationship Commitment and Business Performance for Industrial Robot Sales Engineers? Evidence from the Korean Robotics Industry,” *Industrial Marketing Management*, 37 (7), 825-832.

Doo-Hee Lee, Seunghee Im and Charles R. Taylor (2008), “Voluntary Self-Disclosure of Information on the Internet: A Multi-method Study of Motivations and Consequences of Disclosing Information on Blogs,” *Psychology and Marketing*, 25 (7) 692-710.

Michael L. Capella, Charles R. Taylor and Cynthia Webster (2008), “Cigarette Advertising Bans’ Effect on Consumption: A Meta Analysis,” *Journal of Advertising*, 37 (2), 7-18. (Selected as Best Paper to appear in *Journal of Advertising* in 2008)

Shintaro Okazaki and Charles R. Taylor (2008), “What is SMS Advertising and Why Do Multinationals Adopt It? An Empirical Study in European Markets,” *Journal of Business Research*, 61 (1), 4-12.

Beibei Dong, Shaoming Zou and Charles R. Taylor (2008), “Factors that Influence Multinational Corporations’ Control of Their Operations in Foreign Markets: An Empirical Investigation,” *Journal of International Marketing*, 16 (1), 98-119.

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Catherine D’Orazio (2008), “The Influence of Consumer Self-Disclosure on Web Sites on Advertising Response,” *Journal of Interactive Advertising*, 9 (1).

Shintaro Okazaki, Charles R. Taylor and Jonathan Doh (2008), Market Convergence and Advertising Standardization in the European Union, *Journal of World Business*, 43 (1), 384-400.

Eunju Ko, Charles R. Taylor, Udo Wagner, and Hyun-Ah Ji, (2008) "Relationships Among CEO Image, Corporate Image and Employment Brand Value in the Fashion Industry," *Journal of the Global Academy of Marketing Science*, 18 (4), 307-331.

Charles R. Taylor, Michael L. Capella, and John C. Kozup (2007), “Does DTC Advertising Provide Information or Create Market Power? Evidence from the U.S. and New Zealand,” *Advances in International Marketing*, 1-30.

**JOURNAL ARTICLES**

Eunju Ko, Eunyoung Kim, Charles R. Taylor, Kyung Hoon Kim, and Ie Jeong Kang (2007), "Cross-National Market Segmentation in the Fashion Industry: A Study of European, Korean, and US Consumers," *International Marketing Review*, 24 (5), 629-651 .

Manfred Schwaiger, Carsten Renhak, Charles R. Taylor and Hugh M. Cannon (2007), "Can Comparative Advertising be Effective in Germany? A Tale of Two Campaigns," *Journal of Advertising Research*, 47 (1), 2-13.

Stacy Landreth, Georgina Roselli and Charles R. Taylor (2007), "Where's Tamika Catchings? A Content Analysis of Female Athlete Endorsers in Magazine Advertisements," *Journal of Current Issues and Research in Advertising*, 29 (Spring), 55-65.

Koo Won Suh, Charles R. Taylor, and Doo Hee Lee (2007), "A Typology of the Marketing Communications Functions of Web Sites: A Cross-National Comparison, *Advances in International Marketing*, 18 (1), 271-292.

Steven W. Kopp, John C. Kozup, Tracy A. Suter, and Charles R. Taylor (2007), "Protecting the Global Brand in the European Union," *Journal of Euromarketing*, 17 (1), 23-34.

Charles R. Taylor, George R. Franke and Hae-Kyong Bang (2006), "Use and Effectiveness of Billboards: Perspectives from Selective-Perception Theory and Retail-Gravity Models," *Journal of Advertising*, 35 (Winter), 21-34.

Shintaro Okazaki, Charles R. Taylor and Shaoming Zou (2006), "Advertising Standardization's Positive Impact on the Bottom Line: A Model of When and How Standardization Improves Financial and Strategic Performance," *Journal of Advertising*, 35 (Fall), 17-33.

Charles R. Taylor and Shintaro Okazaki (2006), "Who Standardizes Advertising More Frequently and Why Do They Do So? A Comparison of U.S. and Japanese Subsidiaries' Advertising Practices in the European Union," *Journal of International Marketing*, 14 (1), 98-120.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "Asian Americans in Magazine Advertising: Portrayals of the "Model Minority" *Journal of Macromarketing*, 25 (2), 153-162.

Charles R. Taylor (2005), "How Excessive Restrictions on Signage Backfire," *Journal of Consumer Marketing*, 22 (6), 304-305.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Journal of Advertising*, 34 (Winter), 7-16.

Charles R. Taylor, Barry J. Babin and Kyung Hoon Kim (2005), "Marketing to Asian Americans: The Impact of Acculturation and Interpersonal Influence on Ethnocentric Consumer Preferences," *Journal of the Global Academy of Marketing Science*, 15 (3), 187-210.

**JOURNAL ARTICLES**

Hae-Kyong Bang, Mary Anne Raymond, Charles R. Taylor, and Young Sook Moon (2005), "A Comparison of Service Quality Dimensions Conveyed in Advertisements for Service Providers in the U.S. and Korea: A Content Analysis," *International Marketing Review*, 22 (3), 309-326.

Charles R. Taylor and P. Greg Bonner (2003), "Comment on American Media and the Smoking-related Behaviors of Asian Adolescents." *Journal of Advertising Research*, 43, (December), 419-430.

Shaoming Zou, Charles R. Taylor, and Er Fang (2003), "MNC Control over Foreign Market Ventures: Do Host Governments Still Play a Major Role?" *Advances in International Marketing*, 14, 35-48.

Charles R. Taylor and George R. Franke (2003), "Business Perceptions of Billboards in the U.S. Economy," *Journal of Advertising Research*, (June), 150-161.

Charles R. Taylor, Michael G. Walsh, and Christopher A. Lee (2003), "The Challenge Posed by Product Standards Disputes in International Trade: The U.S./EU Beef Controversy and a Proposed Framework for Resolving Standards Disputes," *Journal of Consumer Affairs*, 37 (1), 101-122.

Charles R. Taylor (2002), "What's Wrong with International Advertising Research?" *Journal of Advertising Research*, 42 (6), 48-54.

Charles R. Taylor and Michael G. Walsh (2002), "Legal Strategies for Protecting Brands From Genericide: Recent Trends in Evidence Weighted in Court Cases," *Journal of Public Policy & Marketing*, 21 (1), 160-167.

Charles R. Taylor, P. Greg Bonner, and Michael Dolezal (2002) "Advertising in the Czech Republic: Czech Perceptions of Effective Advertising and Advertising Clutter," *Advances in International Marketing*, 12, 137-149.

Charles R. Taylor and Chad Johnson (2002), "Research on Standardization vs. Specialization of Advertising in the 1990s: A Review and Directions for Further Research," *Advances in International Marketing*, 12, 45-66.

Charles R. Taylor, Kyung Hoon Kim, Dong Yul Kim, and Hak Il Moon (2002), "Antecedents of Brand Loyalty in South Korean Rice Market," *Journal of the Global Academy of Marketing Science*, 9 (1) 175-188.

Gregory E. Osland, Charles R. Taylor, and Shaoming Zou (2001), "Selecting International Modes of Entry and Expansion," *Marketing Intelligence and Planning*, 19 (3), 153-161.

Charles R. Taylor (2000), "Emerging Issues in Marketing," *Psychology and Marketing*, 17 (6), 441-448.

**JOURNAL ARTICLES**

Charles R. Taylor, George R. Franke and Michael L. Maynard (2000), "Attitudes Toward Direct Marketing and its Regulation: A Comparison of the United States and Japan," *Journal of Public Policy & Marketing*, 19 (2), 228-237.

Charles R. Taylor and Mary Anne Raymond (2000), "An Analysis of Product Category Restrictions in Advertising in Four East Asian Markets," *International Marketing Review*, 17 (3), 287-304.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (2000), "Foreign Market Entry Strategies of Japanese MNCs," *International Marketing Review*, 17 (2), 146-163.

Matthew B. Meyers, Roger J. Calantone, Thomas J. Page, Jr. and Charles R. Taylor (2000), "An Application of Multiple-Group Causal Models in Assessing Cross-Cultural Measurement Equivalence," *Journal of International Marketing*, 8 (4), 108-121.

Alan Shao, Mary Anne Raymond, and Charles R. Taylor (1999), "Shifting Advertising Appeals in Taiwan," *Journal of Advertising Research*, 39 (6), 61-69.

Michael Maynard and Charles R. Taylor, (1999), "Girlish Images Across Cultures: Analyzing Japanese vs. U.S. *Seventeen Magazine* Ads," *Journal of Advertising*, 28 (1), 39-48.

Charles R. Taylor and Glenn S. Omura (1999), "A Political Economy Interpretation of the Economic Growth and Subsequent Crisis in the Republic of Korea," *Journal of Global Focus*, 11 (4), 49-62.

Shaoming Zou, Charles R. Taylor, and Gregory E. Osland, (1998) "The EXPERF Scale: A Cross-National Generalized Export Performance Measure," *Journal of International Marketing*, 6(3), 37-58.

Charles R. Taylor, Shaoming Zou, and Gregory Osland (1998), "International Market Entry Mode Choice By U.S. and Japanese Firms: A Test of Transaction Cost Economics Theory," *Thunderbird International Business Review*, 40 (4), 389-412.

Charles R. Taylor and Hae-Kyong Bang (1997), "Portrayals of Latinos in Magazine Advertising," *Journalism and Mass Communication Quarterly*, 74 (2), 285-303.

Charles R. Taylor and Barbara B. Stern (1997), "Asian-Americans: Television Advertising and the 'Model Minority' Stereotype," *Journal of Advertising*, 26 (2), 1-15.

Charles R. Taylor, R. Dale Wilson, and Gordon E. Miracle (1997), "The Impact of Information Level Strategies on the Effectiveness of Korean vs. U.S. Television Commercials," *Journal of Advertising*, 26 (1), 1-18.

**JOURNAL ARTICLES**

Charles R. Taylor (1997), "A Technology Whose Time Has Come or The Same Old Litter on a Stick? An Analysis of Changeable Message Billboards," *Journal of Public Policy & Marketing*, 16 (Spring), 179-186.

Charles R. Taylor, Shaoming Zou and Aysegul Ozsomer (1996), "Advertising and Its Effect on Industrial Concentration: A Contingency Perspective," *Journal of Current Issues and Research in Advertising*, 18 (Spring), 35-44.

Charles R. Taylor and Gordon E. Miracle (1996), "Foreign Elements in Korean and U.S. Television Advertising," *Advances in International Marketing*, 7, 175-195.

Michael Maynard and Charles R. Taylor (1996), "A Comparative Analysis of Japanese and U.S. Attitudes toward Direct Marketing," *Journal of Direct Marketing*, 10 (1), 34-44.

Charles R. Taylor and Glenn S. Omura (1995), "Analyzing Economic Development in The Republic of Korea: An Evaluation of Paradigms of Marketing and Economic Development," *Journal of Macromarketing*, 15 (2), 66-91.

Charles R. Taylor, Ju Yung Lee, and Barbara B. Stern (1995), "Portrayals of African, Hispanic, and Asian Americans in Magazine Advertising," *American Behavioral Scientist*, 38 (4), 608-621.

Charles R. Taylor and Weih Chang (1995), "The History of Outdoor Advertising Regulation in the United States," *Journal of Macromarketing*, 15 (1), 47-59.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising." *Journal of Public Policy & Marketing*, 13 (2), 239-245.

Charles R. Taylor, Gordon E. Miracle, and R. Dale Wilson (1994), "The Impact of Brand Differentiating Messages on Effectiveness in Korean Advertising," *Journal of International Marketing*, 2 (4), 31-52.

Charles R. Taylor and John C. Taylor (1994) "Regulatory Issues in Outdoor Advertising: A Content Analysis of Billboards," *Journal of Public Policy & Marketing*, 13 (Spring), 97-107.

Steve W. Kopp and Charles R. Taylor (1994), "Games, Contests, Sweepstakes, and Lotteries: Prize Promotion and Public Policy," *Research in Marketing*, 12, (Fall), 151-166.

Charles R. Taylor and Glenn S. Omura (1994), "A Comparison of Alternative Paradigms for Describing Economic Development," *Journal of Macromarketing*, 14 (2), 6-20.

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1992), "Culture and Advertising Executions: A Comparison of Selected Characteristics of Japanese and US Television Commercials," *Journal of International Consumer Marketing*, 4 (4), 89-113.

**JOURNAL ARTICLES**

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1992) "Culture and Advertising Executions: A Comparison of Selected Characteristics of Korean and US Television Commercials," *International Marketing Review*, 9 (4), 5-17.

Jay L. Laughlin and Charles R. Taylor (1991), "An Approach to Industrial Market Segmentation," *Industrial Marketing Management*, 20 (2), 127-136.

Charles R. Taylor and Steve W. Kopp (1991), "Games, Contest, and Sweepstakes Run Afoul: A State of Legal Disorder," *Journal of Public Policy & Marketing*, 10 (1), 199-213.

**BOOK CHAPTERS**

Mueller, Sophia, Charles R. Taylor and Barbara Mueller (2022), "Managing Change Related to Consumer Privacy Laws: Targeting and Personal Data Use in a More Regulated Environment." In: Karmasin, M., Diehl, S., Koinig, I. (eds) Media and Change Management. Springer, Cham. https://doi.org/10.1007/978-3-030-86680-8_15

Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor (2021), "Introduction to Marketing Ethics," in Sage Handbook of Marketing Ethics, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 3-19.

Charles R Taylor and Mivena Pantequi (2021), "Religious and Cross-Cultural Perspectives on Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 43-57.

Christian Lolk and Charles R. Taylor (2021), "Pharmaceutical Marketing Ethics," in *Sage Handbook of Marketing Ethics*, Lynne Eagle, Stephan Dahl, Patrick DePelsmacker, and Charles R. Taylor, eds., 326-338.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2019), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in Advertising Theory, 2nd ed. (S. Rodgers and E. Thorson, eds.). New York: Routledge.

Charles R. Taylor (2018), "How Does Your Advertising Affect Consumers?" in Mapping Out Marketing: Navigating Lessons from the Ivory Trenches, Ronald Paul Hill, Catherine Mary Lamberton and Jennifer Swartz (eds.), London: Routledge.

Charles R. Taylor and John P. Costello (2017), "International Digital Advertising: Lessons from Around the World,"in *Digital Advertising: Theory and Research* (3rd ed.). Shelly Rodgers and Esther Thorson (eds.), New York: Routlege. 345-361.

Charles R. Taylor and John P. Costello (2017), "Corporate Social Responsibility and the Portrayal of Minority Groups in Advertising," in *Handbook of Integrated Corporate Social Responsibility Communication*. Sandra Diehl, et al. (eds.). Springer International Publishing, 361-375.

Charles R. Taylor, C. Luke Bowen and Hoin Ryu (2014), "Corporate Social Responsibility: A Look at Eastern Nations," in *Handbook of Marketing and Corporate Social Responsibility*. (Ronald P. Hill and Ryan Langan, eds.), 234-251.

Charles R. Taylor and John B. Ford (2014), "Research Methods for International Advertising Studies: A Practical Guide," in *The Handbook of International Advertising Research*, (Hong Cheng, ed.), New York: John Wiley and Sons, 32-47.

## BOOK CHAPTERS

Barbara Mueller and Charles R. Taylor (2013), "Convergence in Global Markets: The Great Standardization vs. Localization Debate is Finally Put to Rest," in *Media Convergence and Management*, Sandra Diehl and Matthias Karmasin (eds.), Springer, 89-106.

Charles R. Taylor (2013), "Seven Simple Rules to Better Customer Service," in *The Dominant Influence of Marketing in the 21st Century: The Marketing Leviathan*. (Philip Kitchen, ed.), New York: Palgrave McMillan.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in *Advertising and Society: An Introduction*. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor and C. Luke Bowen (2012), "Best Practices for Cross-Cultural Advertising Research: Are the Rules Being Followed?" in *Handbook of Research on International Advertising*. (Shintaro Okazaki, ed.). London: Edward Elgar.

Charles R. Taylor, Shintaro Okazaki, and Barbara Mueller, (2011), "Theory Advancement in International Advertising: Drawing on Theories from Strategic Management and International Business," in *Advertising Theory*, (S. Rodgers and E. Thorson, eds.). New York: Routledge.

Charles R. Taylor and George R. Franke (2011), "Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," in *Advances in Advertising Research* (Volume II): Breaking New Ground in Theory and Practice, (Shintaro Okazaki, ed.). Heidelber, Germany: Gabler.

Charles R. Taylor (2011), "The Role of Signage in Marketing: Outdoor Advertising, Out-of home Media, and On-Premise Signs," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, M.A. Belch, and G.E.Belch, eds.), West Sussex, UK: Wiley, 197-202.

Charles R. Taylor (2011), "Standardization/Adaptation of International Marketing Strategy," in *Wiley International Encyclopedia of Marketing: Advertising and Integrated Marketing Communications*, (J.N, Sheth, N.K. Malholtra, D.C. Bello, and D.A..Griffiths, eds.), West Sussex, UK: Wiley, 97-102.

Charles R. Taylor (2006), "The Future of International Advertising Research: Suggestions for Moving the Discipline Forward," *International Advertising and Communication: Current Insights and Empirical Findings*, (Sandra Diehl and Ralf Terlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 491-506.

Shintaro Okazaki and Charles R. Taylor (2006), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions, *International Advertising and Communication: Current Insights and Empirical Findings*,(Sandra Diehl and Ralf Turlutter (eds.), Frankfurt, Germany: Forschungsgruppe Konsum und Verhalten, 439-454.

**BOOK CHAPTERS**

Shaoming Zou, Charles R. Taylor, and S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," *Handbook of Marketing Research*, Subhash Jain, ed., Cornwall, UK: MPG Books, 134-147.

Michael L. Capella and Charles R. Taylor (2013), "Pharmaceutical DTC Advertising Provides Valuable Information to Health-care Consumers," in Advertising and Society: An Introduction. (Carol J. Pardun, ed.), 146-153.

Charles R. Taylor, Gordon E. Miracle, and Kyu Yeol Chang (1994), "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, Korean, and U.S. Television Advertising. _*Global and Multinational Advertising*, Basil Englis, ed., Hillsdale, NJ: Lawrence Erlbaum, 171-191.

**CONFERENCE PROCEEDINGS**

Cho, Minjung., Eunju Ko and Charles R. Taylor (2023) The Effect of NFT Marketing Activities on Customer Equity and Satisfaction Regarding Luxury Brands. Proceedings of the Global Marketing Conference, Seoul, Korea.

Charles R. Taylor (2023) "Major Research Needs and Common Pitfalls in Publishing Advertising and Society Research, Proceedings of the American Academy of Advertising, p.73.

Chen Lou, Charles R. Taylor and Xuan Zhou (2022), Context is the New King: The Role of Different Social Media Platforms in Influencer-Follower Relation and Influencer Advertising Effectiveness, Proceedings of the 2022 Annual Conference of the American Academy of Advertising, p.51.

Sophia Mueller, Charles R. Taylor, Barbara Mueller, Sandra Diehl and Ralf Terlutter (2021) Covid-19 Advertising: Are Corporate Social Responsibility Appeals Beneficial to Consumers? Proceedings of the International Conference on Research in Advertising.

Louisa Ha, Yang Yang, Liselot Hudders, Steffi De Jans, Chen Lou, Eva A. van Reijmersdal, Tatiana Domingues-Aguiar, Charles Ray Taylor, Yoon-Na Cho, and Mivena Panteqi (2021), The New Rich and Famous: The Status Quo of Research in Influence Advertising, Theoretical Implications and Opportunities. Proceedings of the Annual Conference of the American Academy of Advertising.

Dayun Jeong, Eunju Ko, and Charles R. Taylor (2020), "A New Perspective on Digital Well-Being and Distancing Behavior," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho, Mivena Panteqi, and Charles Taylor (2020), "Do Instagram Influencers Need to be Perfect? The Changing Role of Social Norms on the Effectiveness of Influencers," *Proceedings of the Global Marketing Conference*, Seoul, Korea.

Yoon-Na Cho and Charles R. Taylor, (2018), "The Role of Ambiguity in the Effectiveness of Sustainability Labeling," Proceedings of the 2018 Global Marketing Conference at Tokyo, 223-224

Bradley James Wilson, David Roca, Charles R. Taylor and Camilo Villegas (2018), "The Dark Side of the Cannes Awards: 'Truchos' or Fake Ads as Seen by Colombian Creative Agency Staff," *Proceedings of the 2018 ICORIA Conference*, Valencia, Spain.

Hyerinne Hahn, Jong-Ho Lee, Charles R. Taylor, and Jung Min Jang (2017), How Do the Characteristics of Premium Private Label Affect Perceived Luxuriousness? The Moderating Role of Change Seeking, Price Consciousness and Vulnerability. *Proceedings of the 2017 Mystique of Luxury Brands Conference*, Seoul, Korea.

Katharina Ninaus, Sandra Diehl, Charles R. Taylor and Ralf Terlutter (2017), "Always-On? Persuading Technology Users To Disconnect From Work: The Effects Of Message Frame, Regulatory Focus And Self Efficacy On The Effectiveness Of Health Messages," *Proceedings of the 2017 International Conference on Research in Advertisin*g, Ghent, Belgium.

Seoyoung Kim, Sungkyu Lee, Jong-Ho Lee, and Charles R. Taylor (2017), "Advertising's Influence on Perceived Luxuriousness of a Premium Private Label," *Proceedings of the Global Fashion Marketing Conference of the of Global Alliance of Marketing and Management Associations*. Vienna, Austria.

Nadine Schirmer, Manfred Schwaiger, Charles R. Taylor and John P. Costello. (2016), "Consumer Response to Disclaimers in Digitally Retouched Advertisements," Proceedings of 2016 Global Marketing Conference, Hong Kong. Seoul: Global Alliance of Management and Marketing Scholars.

Seoyoung Kim, Sungkyu Lee, Jong-Ho, and Charles R. Taylor (2016) "Drivers of Perceived Luxuriousness of a Premium Private Label Product," *Proceedings of 2016 Global Marketing Conference, Hong Kong*. Seoul: Global Alliance of Management and Marketing Scholars.

Charles R. Taylor (2016) "How Much Should Teaching be Adapted to Local Markets," Proceedings of the American Academy of Advertising Annual Conference, Seattle, WA. 184-185.

Charles R. Taylor, John P. Costello and Eunju Ko. (2015), The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," *Proceedings of the Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations*, Florence, Italy.

Antigone G. Kyrousi, Charles R. Taylor and George G. Panigyrakis (2015), "That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," *Proceedings of the 2015 International Conference on Research in Advertising*, London, England.

Sascha Raithel, Charles R. Taylor & Stefan (2014), "Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations*, 5(1).

Juran Kim, Charles R.Taylor, and Kyung Hoon Kim. (2014), "Measures of Perceived Sustainability," *Proceedings of the Global Marketing Conference of the Global Alliance of Marketing and Management Associations* 4(1).

Charles R. Taylor and Shintaro Okazaki (2013) "Culture and Advertising Executions Revisited," *Proceedings of the 2013 International Conference on Research in Advertising*, Zagreb, Croatia.

Taylor, Charles R. (2012), "The Future of Advertising is Solid as a BRIC," *Proceedings of the American Academy of Advertising Annual Conference*, Myrtle Beach, SC. "

Johnny Jiung Lee, Michael L. Capella, Charles R. Taylor, Mi Luo and Colin Gabler (2012), "The Financial Impact of Loyalty Programs in the Hotel Industry: A Social Exchange Theory Perspective," *Proceedings of the 2012 Global Marketing Conference at Seoul*.

Yung Kyun Choi and Charles R. Taylor (2012), "Persuasive Effects of 3D Advertising: Role of Product Type, Need for Touch, and Mental Imagery," *Proceedings of the 2012 Global Marketing Conference at Seoul.*

Yung Kyun Choi, Sukki Yoon, and Charles R. Taylor (2011), Spokes-character Effects in Advergaming: The Influence of Character Presence, Product Type, and National Culture on Consumers' Brand Evaluation and Performance," *Proceedings of the American Academy of Advertising Conference*, p.114

Charles R. Taylor and Michael L. Capella (2010), "Measuring the Effects of Marketing Smokeless Tobacco as Harm Reduction," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Seunghee Im, Doo-Hee Lee, Charles R. Taylor and Jinkyung Goo (2010), "Cultural Differences in Emotional Advertising," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Christian Ringle, Marko Sarstedt, Rainer Schlitginn, and Charles R. Taylor (2010) "Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," *Proceedings of the 2010 Global Marketing Conference at Tokyo.*

Charles R. Taylor (2010), "Public Opinion toward Digital Billboards in the United States: An Analysis of Recent Polls," *Proceedings of the 9th International Conference on Research in Advertising*, Madrid, Spain: European Academy of Advertising.

Sophie Hieke and Charles R. Taylor (2010), "An Empirical Study on the Effectiveness of Nutritional Labelling in Germany," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, 28-29.

Charles R. Taylor and Peter Neijens (2009). "Trends in European Advertising: Cross Media Campaigns, Advertising during Events, Brand Placement, Advertising Strategies in the New EU Member States and Emotional Brand Experiences," *Proceedings of the 2009 Conference of the American Academy of Advertising*, Cincinatti, Ohio.

Charles R. Taylor et al. (2008), "The View from Europe: Insights on Cutting Edge Issues in Europe." *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, forthcoming.

Charles R. Taylor, et al. (2008), "The Influence of Consumer's Self-Disclosure on Advertising Response." *Proceedings of the Global Marketing Conference*, Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Examination of Smart Clothing Attributes, Perceived Risk and Intention to Adopt between Two Cultural Groups." *Proceedings of the Global Marketing Conference*, Shanghai: Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2008), "Segmentation and Targeting Sportswear Consumers in Global Markets." *Proceedings of the Global Marketing Conference.* Shanghai: Korean Academy of Marketing Science.

Manfred Schwaiger, Marko Sarstedt, Charles R. Taylor (2008), "Long-Term Effects of Culture Sponsoring on Corporate Reputation – An Experimental Study". *Proceedings of the Global Marketing Conference*, Shanghai: Korean Academy of Marketing Science.

Michael L. Capella, Charles R. Taylor, and Randall Campbell (2008), "Does DTC Advertising Raise the Price of Sleeping Pills? The Impact of Pharmaceutical Advertising on Price Sensitivity," *Proceedings of the American Academy of Advertising Conference*, San Mateo, CA, 219-225.

Charles R. Taylor (2007), "Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go," *Proceedings of the 2007 Conference of the American Academy of Advertising.*

Koo-Won Suh, Doo-Hee Lee, and Charles R. Taylor (2007), "Dimensions of Advertising Creativity," Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University. Seoul: Korea Advertising Society.

Charles R. Taylor and Changjo Yoo (2007), "Special Session on Social Responsibility of Tobacco Firms." *Proceedings of the AAA/ KAS Asia Pacific Conference, Korea University*. Seoul: Korea Advertising Society.

Charles R. Taylor, et al. (2006), "Impact of Nationality and Fashion Lifestyle on Attitudes toward Advertising and Brand." *Proceedings of the Cultural Perspectives in Marketing Conference*, Academy of Marketing Science Korean Academy of Marketing Science.

Charles R. Taylor, et al. (2006), "Relationship between Marketing Orientation and Business Performance of Sales Engineers of Industrial Robots." *Proceedings of the Cultural Perspectives in Marketing Conference*, Academy of Marketing Science Korean Academy of Marketing Science.

Michael L. Capella and Charles R. Taylor (2006), "A Review of the Effect of Cigarette Advertising Bans," *Proceedings of the American Marketing Association's Marketing and Public Policy Conference*, Chicago: American Marketing Association, pps. 188-189.

Charles R. Taylor (2005), "Moving International Advertising Research Forward: A New Research Agenda," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, p.14.

Shintaro Okazaki and Charles R. Taylor (2005), "Antecedents and Consequences of Advertising Standardization: A Conceptual Model and Research Propositions," *Proceedings of the 4th International Conference on Research in Advertising*, Sandra Diehl. Ralf Terlutter, and Peter Weinberg (eds.), Saarbrucken, Germany: Saarland University, pps. 145-152.

Okazaki, Shintaro and Charles R. Taylor, (2005), "Understanding Advertising Standardization in an European Context: An Empirical Model", in Proceedings of the 34th European Marketing Academy (EMAC) Conference 2005 "Rejuvenating Marketing: Contamination, Innovation, Integration", Milan, Italy: Bocconi University.

Charles R. Taylor, Stacy Landreth and Hae-Kyong Bang (2005), "The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" *Proceedings of the 30th Annual Macromarketing Conference*, (Mark Peterson and Ronald Paul Hill, eds), p. 63.

Charles R. Taylor and Michael Walsh (2005), "What Does 'Made in the USA' Mean? A Review of Legislation and Litigation Pertaining to Country of Origin Claims," *Proceedings of the 2005 Marketing and Public Policy Conference*, forthcoming.

Charles R. Taylor and George R. Franke (2004), "An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," *Proceedings of the 2004 Marketing and Public Policy Conference*, 83-85.

Charles R. Taylor, (2003) "What's Wrong with International Advertising Research (and What's Right)," *Proceedings of the 2003 Conference of the American Academy of Advertising,* (Les Carlson, ed.), p.3.

Charles R. Taylor, (2003) "Meet the Editors: Journal of Advertising and Some Journals You Might Not Have Considered but Should," (special session) *Proceedings of the 2003 Conference of the American Academy of Advertising*, (Les Carlson, ed.), p.147.

Charles R. Taylor and Michael Walsh (2003), "Resolving Product Standards Disputes," portion of special session on "Challenges to Public Policy: Emerging Issues in International Markets," *Proceedings of the 2003 Marketing and Public Policy Conference*, p.59.

Garrett, Jason, Shaoming Zou, and Charles R. Taylor (2003), "International Advertising: A Review of the Empirical Research from 1990 to 2002," *Proceedings of the American Marketing Association Summer Educators' Conference,* Chicago, IL.

Shaoming Zou, Charles R. Taylor, S. Tamer Cavusgil (2003), "The Political Economy Explanation of International Market Entry Mode Choice: An Exploratory Study," The State of the Art Research in International Marketing, Subhash Jain, ed., University of Connecticut - CIBER.

Charles R. Taylor (2002), "Publishing Public Policy Research: Journals and Their Editors," *Proceedings of the 2002 Marketing and Public Policy Conference*, Chicago: American Marketing Association.

Mary Anne Raymond and Charles R. Taylor (2000) "Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan," *Proceedings of the 2000 Marketing and Public Policy Conference*, p.22-23.

Charles R. Taylor and Michael Maynard (1999), "Attitudes Toward Direct Marketing and Its Regulation: A Comparison of the U.S. and Japan," *Proceedings of the 1999 Marketing and Public Policy Conference*.

Charles R. Taylor and Michael Maynard (1999), "The Impact of a Culture's Communication Style on Attitudes Toward Direct Marketing: Comparing Japan and The United States" *Proceedings of the American Academy of Advertising Conference*, p.194-195.

Charles R. Taylor (1998), "Agency Perspectives on Cultural Factors Influencing Advertising in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.316.

Charles R. Taylor and Alan Shao (1998), "Advertising Strategies in Taiwan," *Proceedings of the 1998 Conference of the American Academy of Advertising*, p.315.

Mary Anne Raymond, Charles R. Taylor, and Alan Shao (1998), "Socio-Cultural Factors Understanding Restrictions and Regulations Affecting Advertising across Product Types in Taiwan," *Proceedings of the 1998 Marketing and Public Policy Conference,* p.67.

Michael B. Mazis and Charles R. Taylor (1998), "The Regulation of Advertising in Sensitive Product Categories: Global Perspectives," *Proceedings of the 1998 Marketing and Public Policy Conference,* p.64-65.

Charles R. Taylor and John C. Taylor, (1997) "The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," *Proceedings of the American Marketing Association Marketing Communications Conference,* p.56-58.

Charles R. Taylor and Barbara B. Stern, (1997), "Advertising Portrayals of Asian Americans:

The Asian American View," *Proceedings of the 1997 Conference of the American Academy of Advertising*, p.269-271.

Barbara B. Stern, Charles R. Taylor, Hae-Kyong Bang, Wei-Na Lee, and Hairong Li (1997), "Asian-Americans: Insights for Advertisers on Appealing to an Attractive, Yet Misunderstood Demographic Group," *Proceedings of the 1997 Conference of the American Academy of Advertising*, p.269.

Charles R. Taylor, Shaoming Zou, and Gregory E. Osland (1996), "International Market Entry Mode Choice by U.S. and Japanese MNCs: A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," *Proceedings of the 1996 American Marketing Association Summer Educators' Conference*, C. Droge and R. Calantone (eds.), p.402.

Charles R. Taylor (1996), "Televised Portrayals of Asian Americans," *Proceedings of the 1996 American Academy of Advertising Conference*, p.119-120.

Charles R. Taylor (1995), "Brand Differentiation and Advertising Effectiveness," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil, (eds.), p.302-321.

Charles R. Taylor and Gordon E. Miracle (1995), "Foreign Elements in Korean and U.S. Television Advertising," *Proceedings of the Joint Conference of the Korean Marketing Association and the American Marketing Association*, J.W. Lim and S.T. Cavusgil (eds.), p.93-94.

Charles R. Taylor and Thomas J. Page, Jr. (1994), "A Comparison of the Effectiveness of Brand Differentiating Messages in Korean and U.S. Television Advertising," *Proceedings of the Fourth Symposium on Cross-Cultural Consumer and Business Studies*, p.179-182.

Charles R. Taylor and Ju Yung Lee (1994), "Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," *Proceedings of the 1994 Marketing and Public Policy Conference*, p.158.

Charles R. Taylor, Doo Hee Lee, and Hae-Kyong Bang (1993), "Advertising Strategies in Korea and the United States," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.788-791.

Charles R. Taylor and Doo Hee Lee (1993), "A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," *Proceedings of the Decision Science Institute's International Conference*, Seoul, Korea, Byung S. Kang and Jong U. Choi (eds.), p.776-779.

Charles R. Taylor and Jay L. Laughlin (1993), "The Effectiveness of Brand Differentiating Strategies in Korean Advertising," *Proceedings of the International Academy of Business Disciplines Conference*, F. V. Mastrianna and Abass Alhahfaji (eds.), p.414-418.

Charles R. Taylor and Weih Chang (1993), “The History of Outdoor Advertising Regulation in the United States,” *Proceedings of the Sixth Conference on Historical Research in Marketing and Marketing Thought*, p.283-299

Charles R. Taylor and Glenn S. Omura (1992), "Back to the Political Economy Paradigm in the Study of Marketing in Economic Development: A Case Analysis of South Korea," in *Proceedings of the Macromarketing Seminar*, Breukelen, Netherlands, p.551-576.

Charles R. Taylor and Shaoming Zou, (1992) "Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," *Proceedings of the Conference of the American Academy of Advertising*, p.42-43.

Steven W. Kopp and Charles R. Taylor (1991), “Try Your Luck! A History of Prize Promotions!,” *Proceedings of the Fifth Conference on Historical Research in Marketing and Marketing Thought*, p.285-299

Gordon E. Miracle, Charles R. Taylor, and Kyu Yeol Chang (1990) "The Difficulty of Standardizing International Advertising: Some Propositions and Evidence from Japanese, U.S. and South Korea Television Advertising,” *Proceedings of the Advertising & Consumer Psychology Conference*, p.5.

Gordon E. Miracle, Kyu Yeol Chang, and Charles R. Taylor (1989) "Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference,* R.L. King (ed.), p.347-351.

Charles R. Taylor and John C. Taylor (1989), "Towards a General Theory of the Effects of Deregulation on Competitive Structure and Performance," *Positioning for the 1990s: Proceedings of the 1989 Southern Marketing Association Conference*, R.L. King (ed.), p.438-442.

John C. Taylor and Charles R. Taylor (1989), "Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of an Historical Context Approach,” *Proceedings of the Fourth Conference on Historical Research in Marketing and Marketing Thought*, T. Nevett, K. Whitney, and S. Hollander, (eds.), p.213-236.

## PRESENTATIONS

"Meet the Editors" American Marketing Association (February 2023).

"Building a Successful Academic Career: The Role of Research," Keynote presentation to the Business Association of Latin America (BALAS), Lisbon, Portugal. (August, 2022)

"How to Publish in Advertising Journals," Emerging Markets Conference Board, Lllujbiana, Slovenia. April (2022)

"New Issues in Advertising Research," Keynote Presentation to ICAMA Conference, Jeju, Korea. (October, 2023)

"Meet the Editors," International Conference on Research in Advertising, (June 2022).

"Meet the Editors," American Academy of Advertising Conference, (April 2022).

"Strategies for Publishing in Top Functional Area Journals," Keynote speech presented to Emerging Marketing Conference Board Annual Conference, Puebla, Mexico. (November 2021)

"Hot Topics in Advertising and Luxury Brand Research in 2021," Keynote speech presented to GAMMA Global Fashion Marketing Conference, Seoul, Korea. (November 2021).

"Meet the Editors," Society for Marketing Advances Conference, Orlando (November, 2021).

"Meet the Editors," International Conference on Research in Advertising, (June 2021).

"Meet the Editors," American Academy of Advertising Conference, (April 2021).

"Meet the Editors," Society for Marketing Advances Conference, New Orleans (November, 2020).

"Meet the Editors," Global Marketing Conference (GAMMA), Seoul, Korea, (virtual). (November, 2020).

"Developing an Effective Research Stream in Marketing," Keynote speech to 6th International AR & VR Conference, (virtual: Lisbon, Portugal), November 2020.

"Advertising in Emerging Markets," (2020) Keynote speech to ICAMA Conference, (virtual-Bangkok, Thailand).

"Key Trends in Advertising Research," (2020) Keynote speech to Korean Marketing Association, September 2020 (virtual- Seoul, Korea)

“The Future of Advertising in Emerging Markets,” Keynote session at the Emerging Markets Conference Board, May, 2020 (virtual- Llljubiana, Slovenia)

“Meet the Editors,” Society for Marketing Advances Conference, New Orleans (November, 2019).

“Meet the Editors.” Global Fashion Management Conference at Paris (July, 2019).

“Hot Topics in Advertising Research,” Keynote speech presented at Asian Advertising Summit, Singapore (June 2019).

“How to Be a Better Reviewer and Why You Should Care,” Presenter in panel session at the 2019 American Academy of Advertising Conference, Dallas, TX.

“Building a Successful Publishing Career.” Keynote speech presented at Business Association of Latin American Studies, Lima, Peru (April, 2019).

“Meet the Editors,” 2019 Annual Conference of the Emerging Markets Conference Board, “Driving Marketing Excellence through Experiences in Emerging Economies,” Delhi, India (January 2019)

“Big Event Advertising Effectiveness: Can it Still Impact Brands? Evidence from Super Bowl Advertising,” Keynote speech presented at the Asian Advertising Summit, Hong Kong Baptist University. Hong Kong (May, 2018).

“Super Bowl Advertising: Is it Effective in Brand Building?” Keynote speech presented at ICAMA Conference, Bangkok. Thailand (April 2018).

“Tips for Publishing Your Work and Building a Career,” Keynote speech at Emerging Marketing Conference Board conference, Johannesburg, South Africa (April, 2018).

“Technology Innovation and Advertising: Implications for Education and Research,” Special session panelist. American Academy of Advertising Annual Conference. New York, NY, (March, 2018).

“Meet the Editors,” Part of panel at 2018 ICORIA Conference, Ghent, Belgium (June, 2017).

“Strategies for Building a Career in Advertising Research,” Presented at Doctoral Consortium of American Academy of Advertising, Boston. Mass. (April, 2017)

“Consumer Response to Disclaimers in Digitally Retouched Advertisements,” Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"Drivers of Perceived Luxuriousness of a Premium Private Label Product," Presented at the 2016 Global Marketing Conference, Hong Kong. (July 2016)

"How Much Should Teaching be Adapted to Local Markets," Presented at the 2016 American Academy of Advertising Annual Conference, Seattle, WA. (April 2016)

"Meet the Editors" Panel at 2016 Global Marketing Conference at Hong Kong.

"Meet the Editors" International Conference on Research in Advertising. Doctoral Symposium, Llujbiana, Slovenia. (June 2016)

Global Branding Strategies," Yonsei University special lecture, (October 2016).

"Meet the Editors," Society for Marketing Advances Annual Conference (2015), San Antonio, TX. (November).

"Building a Research Agenda and Publishing in Top Advertising Journals," Doctoral Consortium of European Advertising Academy. London, England (July 2015).
"Meet the Editors," ICORIA Conference, London, England (July, 2015).

"Meet the Editors," Global Fashion Marketing Conference of GAMMA (June, 2015).

"The State of Knowledge on Luxury Brand Marketing: A Review of the Literature," Global Fashion Marketing Conference of Global Alliance of Marketing and Management Associations (June 2015).

"That Other Woman: The Evolved Mechanism of Female Competition and Advertising Portrayals of Women in Decorative Roles," ICORIA Conference, London, England, (July 2015).

"Are Super Bowl Ads a Super Waste of Money? The Intermediary Role of Customer Equity and Brand Equity on Stock Price." Presented at the 2014 Global Marketing Conference of the Global Alliance of Marketing and Management Associations.

"Culture and Advertising Executions Revisited," Presented at 2013 ICORIA Conference, Zagreb, Croatia.

"Meet the Editors," Presented at the 2012 ICORIA Conference, Stockholm, Sweden, (June, 2012).

"Cultural Differences in Emotional Advertising," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Meet the Editors." Presented as part of special session at the 2010 Global Marketing Conference at Tokyo (Semptember, 2010).

"Using Genetic Algorithm Segmentation in PLS Path Modeling: Addressing Heterogeneity Assumptions," Presented at the 2010 Global Marketing Conference at Tokyo. (September, 2010).

"Designing Effective Digital Advertising: Current State of Knowledge and Thoughts on Digital Advertising in China," Keynote session speaker at the First Annual Academic Symposium of the

Chinese Advertising Education Committee of the Chinese Association of Higher Education. (August, 2010).

"Meet the Editors," Presentation in Meet the Editors Panel at the 9th Conference on Research in Advertising, Madrid, Spain, (June 2010).

"Public Opinion Toward Digital Billboards in the United States: An Analysis of Recent Polls," Presented at the 9th International Conference on Research in Advertising, Madrid, Spain. (June, 2010).

"Publishing in the International Journal of Advertising," Presented in the Meet the Editors Session of the International Conference on Research in Advertising, hosted by European Advertising Academy, Klagenfurt, Austria (June 2009).

"Six Principles of Effective Digital Advertising," Presented at Dongguk University, Seoul, Korea, (May, 2009).

"Effective Advertising in New Media," Presented at Yonsei University, Seoul, Korea.

"Designing Effective Interactive Advertising." Presented at Ewha Womens' University, Seoul, Korea (May, 2009).

"Designing Effective Interactive Advertising," Presented to the Marketing Science Institute's Mobile Marketing Symposium, Cambridge, MA (December 2008).

"What Should I Do with This Review," Presented to 2008 American Academy of Advertising Emerging Scholar Symposium, San Mateo, CA.

"Principles of Interactive Advertising," Presented at the Autonomous University of Madrid, Spain, December 2008.

"Current Issues in Internet Advertising" Presented at Ludwig Maximillians University, Munich, Germany, October 2008.

Advertising and the Internet: Principles and Best Practices: Presented at University of Amsterdam, October 2008.

“Recent Trends in International Advertising Research: Current State of Knowledge and Where We Need to Go,” 2007 Conference of the American Academy of Advertising, Burlington, VT.

Key Trends in Advertising Research: Key Research Topics, Presented to the Korea Advertising Society, Seoul, Korea, August, 2007.

“The Marketing Functions of On-Premise Signs” Presented at the 2006 National Signage Research Symposium at the International Sign Association Conference, September, 2006, Las Vegas, Nevada.

“Portrayals of Asian Americans in Advertising.” (2006), Special presentation at the University of Texas at Austin.

“Smoke and Mirrors: Advertising and Tobacco” panelist in session at the National Center for Addiction and Substance Abuse (Columbia University) panel “Up in Smoke: Tobacco and American Youth,” moderated by Jackie Judd, (September 2006), New York.

“A Review of the Effect of Cigarette Advertising Bans,” American Marketing Association’s Marketing and Public Policy Conference, June, 2006, Long Beach, CA.

“Marketing Trends and the New Media: It’s Still All About the Brand,” Featured speech to ADKOR 2005, The 2005 Korea Advertising Congress. Organized by the Korean Federation of Advertising Agencies. Seoul, Korea, November 8, 2005.

“Hot Topics in U.S. Advertising,” Special Presentation to the Korean Advertising Society, Seoul Korea, July 6, 2005.

"Moving International Advertising Research Forward: A New Research Agenda," Presented at the 4th International Conference on Research in Advertising, June 2005, Saarbrucken, Germany: Saarland University, p.14 (keynote speaker).

"The Good, the Bad, and the Ugly of Media Portrayals of the 'Model Minority,'" (2005) Presented at the 30th Annual Marketing Conference, St. Petersburg, FL. (plenary session).

"On-Premise Signs as Storefront Marketing Devices and Systems," Presented at the 2005

National Signage Research Symposium at the International Sign Association Conference, May, 2005, Las Vegas, Nevada. (plenary session).

"Asian Americans in Advertising: Portrayals of the Model Minority," Presented to the 11th Asia Pacific Law Students Association Conference on Law and Public Policy, Harvard University, March 2005, Cambridge, MA.

"Advertising Standardization and its Impact on Financial and Strategic Performance: Evidence from Japanese and U.S. Subsidiaries Operating in the EU," Presented at the Korean Academy of Marketing Science Fall Meeting, November 2004, Jeonju, Korea.

"Deceptive Advertising and Corporate Responsibility: The Role of Self-Regulation," Presentation to the Philadelphia Advertising Club, Philadelphia, PA, November 2004.

"An Assessment of the Highway Beautification Act's Consistency with American Public Opinion," Presented at the 2004 Marketing and Public Policy Conference, Salt Lake City, Utah.

"Regulation of On-Premise and Off-Premise Signs: Perspectives from Three Research Studies," Presented to the Transportation Research Board Meeting, January, 2004, Washington, DC.

"Building a Career in Marketing and Public Policy Research," Presented at the Doctoral Consortium of the 2003 Marketing and Public Policy Conference," Washington, DC.

"Resolving Product Standards Disputes," Presented at the 2003 Marketing and Public Policy Conference, Washington, DC.
"The Impact of Sign Regulation on Marketing Activities and Business Valuation," Presented at the 1st National Signage Research Association, Las Vegas, NV.

"What's Wrong (and What's Right) with International Advertising Research," Presented at the 2003 meeting of the American Academy of Advertising, Broomfield, CO.

"A Survey of Alternatives to Billboards and 30 Years of Public Opinion towards Billboards," part of "Billboard Experts" panel, 2002 Outdoor Advertising Legal Seminar, Washington DC.

"Making Good Decisions Pertaining to Departmental, College, and External Service Early in an Academic Career," Presented to the Doctoral Consortium of the 2001 Conference of the Society from Marketing Advances, New Orleans, LA.

“Legal Restrictions on Advertising by Product Category in China, Japan, South Korea, and Taiwan,” Presented at the 2000 Marketing and Public Policy Conference, Washington, DC.

“Attitudes Toward Direct Marketing and its Regulation: A Comparison of the U.S. and Japan,” Presented at the 1999 meeting of the American Academy of Advertising, Albuquerque, NM.

“Advertising Strategies in Taiwan,” Presented at the 1998 meeting of the American Academy of Advertising, Lexington, KY.

“The Regulation of Advertising in Sensitive Product Categories: Global Perspectives,” Presented at the 1998 Marketing and Public Policy Conference, Washington, DC.

"Foreign Market Entry Mode Strategies of Japanese and U.S. Firms," Presented at the 1998 meeting of the Academy of Marketing Science, Norfolk, VA.

"The Information Content of Outdoor Advertisements: An Analysis of Retailers' Use of Institutional and Promotional Information Cues," Presented at the 1998 American Marketing Association Marketing Communications Conference, Dublin, Ireland.

"Advertising Portrayals of Asian Americans: The Asian American View," Presented at the 1997 Conference of the American Academy of Advertising, St. Louis, MO.

"A Cross-Cultural Assessment of the Transaction Cost Analysis Framework," Presented at the 1996 American Marketing Association Summer Educators' Conference, San Diego, CA.

"Regulatory Issues in Direct Marketing: A Comparison of the U.S. and Japan," Presented at the 1996 Marketing and Public Policy Conference, Arlington, VA.

"Televised Portrayals of Asian Americans," Presented at the 1996 American Academy of Advertising Conference, Vancouver.

"Brand Differentiation and Advertising Effectiveness," Presented at the 1995 Joint Conference of the American Marketing Association and the Korean Marketing Association.
"Magazine Portrayals of Ethnic Minorities," Presented at the 1995 Conference of the American Academy of Advertising, Tuscon, AZ.

"Culture's Consequences in Advertising: The Impact of Information Level Strategies on the Effectiveness of Korean and U.S. Advertising," Presented at the 1994 Conference of the American Academy of Advertising, Tuscon, AZ.

"Not in Vogue: Portrayals of Asian Americans in Magazine Advertising," Presented at the 1994 Marketing and Public Policy Conference, Arlington, VA.

"A Comparison of the Effectiveness of High Information Level Strategies in Korean and U.S. Advertising," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

"Advertising Strategies in Korea and the United States," Presented at the Decision Science Institute's 1993 International Conference, Seoul, Korea.

Guest Speaker on the Topic of, "Implications of Marketing and Public Relations for Parks and Recreation Programs," at Taegu University, Taegu, Korea.

"Litter on a Stick or the Lifeblood of Small Business: Regulatory Issues in Outdoor Advertising, presented at the 1993 Marketing and Public Policy Conference, East Lansing, MI.

"The History of Outdoor Advertising Regulation in the United States," Presented at the Sixth Conference on Historical Research in Marketing and Marketing Thought (April 1993).

"Journal Special Sections and the Advancement of Knowledge: A Product Life Cycle Case Study," Presented at the 1992 AMA Winter Educators Conference, San Antonio, TX.

"Advertising and its Effect on Industrial Concentration: The Case of the Soft Drink Industry," Presented at the 1992 Conference of the American Academy of Advertising, San Antonio, TX.

Guest speaker on the topic of, "Comparing Television Advertising in Korea and the United States," at the Korea University, Seoul, Korea (September, 1991).

"Retail Television Advertising: Is it Really Unsophisticated?" Presented at the Symposium on Patronage Behavior and Retail Strategy, Baton Rouge, LA (1991).

"Try Your Luck: A History of Prize Promotions in the United States," Presented at the Fifth Conference on Historical Research in Marketing and Marketing Thought, East Lansing, MI (May 1991).

"Relationships Between Cultural Variations and Differences in Japanese and US Television Advertising," Presented at the 1989 Southern Marketing Association Conference, New Orleans, LA.

"Marketing Related Public Policy Issues: The Role of Marketing Academicians and the Value of a Historical Context Approach," Presented at the Fourth Conference on Historical Research in Marketing and Marketing Thought, Charleston, SC (May, 1989).

Served as Panelist on the "Advertising in the 21st Century" session at the 1989 Southern Marketing Association Conference, New Orleans.

**EDITORIALS**

Charles R. Taylor (2024), "Understanding Podcast Advertising: The Need for More Research," *International Journal of Advertising* 43(6), 931-932.

Charles R. Taylor (2024), "Ad Skipping, The 'Ad Free Internet' and Privacy: A Call for Research," *International Journal of Advertising* 43(3), 403-404.

Charles R. Taylor (2023) "Sonic Branding as a Promotional Tool: A Concept Whose Time Has Come and a Call for Research," *International Journal of Advertising*, 42(8), 1239-1241.

Charles R. Taylor (2023) "Thoughts on Cross-cultural Advertising Research in 2023," *International Journal of Advertising*, 42(6), 969-971.

Charles R. Taylor (2023) "Non-fungible Tokens (NFTs) as Promotional Devices: Research Needs and Future Projections," *International Journal of Advertising*, 42(5), 799-800.

Charles R. Taylor (2023) "Digging Deeper on Diversity and Inclusion in Advertising Research: A Call to Action," *International Journal of Advertising*, 42(4), 639-640.

Charles R. Taylor (2023) Getting Sentimental About the Need for More Research on Nostalgia in Advertising," *International Journal of Advertising*, 42(3), 459-460.

Charles R. Taylor (2023) "New Thoughts on Advertising's Impact on Consumer Prices," International Journal of Advertising, 42(2), 261-262.]

Charles R. Taylor, Douglas C. West, Colin McDonald & Michael Waterson (2023) "Reflections on the *International Journal of Advertising* on the Journal's History and First 40 years, *International Journal of Advertising*, 42(1), 13-17.

Charles R. Taylor (2022), "Hitting the Mark with Active Agers: A Call for More Research on Older Consumers," *International Journal of Advertising*, 41(7), 1179-1180.

Charles R. Taylor (2022) "Future Needs in Gender and LGBT Advertising Portrayals," *International Journal of Advertising*, 41(6), 971-973.

Charles R. Taylor (2022) Advertising and Small Businesses: The Need for More Research, *International Journal of Advertising*, 41(4), 589-590.

Charles R. Taylor (2022), "Research on Advertising in the Metaverse: A Call to Action," *International Journal of Advertising*, 41(3), 383-384.

Charles R. Taylor (2021) "A Call for More Research on Authenticity in Corporate Social Responsibility Programs", *International Journal of Advertising*, 40(7), 969-971.

Charles R. Taylor (2021), "Generational Research and Advertising to Various Age Cohorts," *International Journal of Advertising*, 40(5), 683-685,

Charles R. Taylor (2021), Charting the Path Forward for the International Journal of Advertising, *International Journal of Advertising*, 40(2), 145-147.

Charles R. Taylor (2021), "On Hideki Matsuyama and the Need for More Study of Global Brand Equity," *International Journal of Advertising*, 40(3), 325-326.

Charles R. Taylor (2020) "The Urgent Need for More Research on Influencer Marketing,"*International Journal of Advertising*, 39(7), 889-891,

Charles R. Taylor (2020), "Advertising and Covid-19," *International Journal of Advertising*, 39(5), 587-589.

Charles R. Taylor (2020), "Common Mistakes Made in Submissions to Leading Advertising Journals," *International Journal of Advertising*, 39(3), 329-331.

Charles R. Taylor (2019) "What the Business Roundtable's Statement on the Purpose of a Corporation Means for the Study of Corporate Social Responsibility in Advertising, *International Journal of Advertising*, 38 (8), 1067-1069.

Charles R. Taylor (2019) Editorial: Artificial intelligence, Customized Communications, Privacy, and the General Data Protection Regulation (GDPR), *International Journal of Advertising*, 38 (5), 649-650,

Charles R. Taylor (2019), "Over the Top, Connected, Programmatic and Addressable Television! What Does It All Mean? Definitions and a Call for Research." *International Journal of Advertising*, 38 (3), 343–344

Charles R. Taylor (2019), "The International Journal of Advertising Now Welcomes 'Perspectives' Papers," *International Journal of Advertising*, 38 (2), 171-172,

Charles R. Taylor (2019), Taylor's theorem part II: advice for socially responsible advertisers, *International Journal of Advertising*, 38 (1), 1-4.

Charles R. Taylor (2018), "The New Era of Electronic Word of Mouth (eWOM): 'Be More Chill' Overrules the Critics," *International Journal of Advertising*, 37 (5), 849-851.

Charles R. Taylor (2018), "Global Consumer Culture and Advertising Research," *International Journal of Advertising*, 37 (4), 505-507.

Charles R. Taylor (2018), "Red Alert: On The Need for More Research on Corporate Social Responsibility Appeals in Advertising," *International Journal of Advertising*, 37 (3), 337-339.

Charles R. Taylor (2018), "Generational Research and Advertising to Millennials, *International Journal of Advertising*, 37 (2), 165-167.

Charles R. Taylor (2017), "How to Avoid Marketing Disasters: Back to the Basic Communications Model, but with Some Updates Illustrating the Importance of E-word-of-mouth Research," *International Journal of Advertising*, 36 (4), 515-519.

Charles R. Taylor (2017), "Where Has the Research on Client–agency Relationships gone? The Need for a Deeper Understanding of the Future of Account Management, International Journal of Advertising," 36 (3), 393-395.

Charles R. Taylor (2017), "Native Advertising: The Black Sheep of the Marketing Family," *International Journal of Advertising*, 36 (2), 207-209.

Charles R. Taylor (2017), "The Importance of Research by Cross-national Teams," *International Journal of Advertising*, 36 (1), 1-2

Charles R. Taylor (2016), "On to a New Year," International Journal of Advertising, 35 (6), 907-908.

Charles R. Taylor (2016), "How Much Does an NCAA Basketball Championship Matter: A Call for Research on the Public Relations Impact of Athletic Success," *International Journal of Advertising*, 35 (4), 617-621.

Charles R. Taylor (2016), "Advertising for Luxury and Fashion Goods: An Emerging Area," *International Journal of Advertising*, 35 (3), 389-390.

Charles R. Taylor (2016), "Some Interesting Findings about Super Bowl Advertising," *International Journal of Advertising*, 35 (2), 167-170.

Charles R. Taylor (2015), "The Imminent Return of the Advertising Jingle," *International Journal of Advertising*, 34 (5), 717-719.

Charles R. Taylor (2015), "A Call for More Research on 'Ggreen'or Environmental Advertising," *International Journal of Advertising*, 34 (4), 573-575.

Charles R. Taylor (2015), "On the New Era of Zipping and Zapping: The Need for Research on How Advertisers Deal with an Era of Time-shifted Television Program Viewing on a Variety of Devices," *International Journal of Advertising*, 34 (3), 403-405.

Charles R. Taylor (2015), "Creating Win–win Situations via Advertising: New Developments in

Digital Out-of-home Advertising," *International Journal of Advertising*, 34 (2), 177-180.
Charles R. Taylor (2015), "The International Journal of Advertising in 2015 and Beyond," *International Journal of Advertising*, 34 (1), 1-2.

Charles R. Taylor (2014), "Conducting State-of-the-art Cross-cultural Research," *International Journal of Advertising*, 33 (4), 627-631.
Charles R. Taylor (2014), "Should Tax Deductibility for Advertising be Eliminated? The Research Evidence says No," *International Journal of Advertising*, 33 (2),197-202.

Charles R. Taylor (2014), "Corporate Social Responsibility and Advertising: Does it Extend to Taking Stances on Social Issues?" *International Journal of Advertising*, 33 (1), 11-15.

Charles R. Taylor (2013), "Customised Communications: Relevance vs Privacy in Targeted Messaging," *International Journal of Advertising*, 32 (4), 483-485.

Charles R. Taylor (2013), "On the Economic Effects of Advertising – Evidence that Advertising = Information,". *International Journal of Advertising*, 32 (3), 339-342.

Charles R. Taylor (2013), "The Advertising Literature and the Role of the *International Journal of Advertising*," *International Journal of Advertising*, 32 (2), *179-182.*

Charles R. Taylor (2013), "Hot Topics in Advertising Research," *International Journal of Advertising*, 32 (1), 7-12.

Charles R. Taylor (2012), "Back to the Future: Some Topics We Should Not Forget About in Advertising research," *International Journal of Advertising*, 31(4), 699-702.

Charles R. Taylor (2012), "The London Olympics 2012: What Advertisers Should Watch," *International Journal of Advertising*, 31 (3), 459-464.

Charles R. Taylor (2012), "On Advertising in the BRICs and Other Emerging Markets," *International Journal of Advertising*, 31 (2), 227-230.

Charles R. Taylor (2011) Making Academic Research on Advertising More Managerially Relevant," *International Journal of Advertising*, 30 (5), 739-742.

Charles R. Taylor (2011), "New Directions for Research on Targeting Minority G*roups*," *International Journal of Advertising*, 30 (4), 553-558.

Charles R. Taylor (2011), "On Advertising Research that Makes an I*mpact*," *International Journal of Advertising*, 30 (3), 369-371.

Charles R. Taylor (2011), "On Puffery, Professor Preston, and the Societal Effects of Advertising," *International Journal of Advertising*, 30 (2), 201-204.

Charles R. Taylor (2010), "Campaigning for More Research on Political Advertising," *International Journal of Advertising*, 29 (5), 681-685.

Charles R. Taylor (2010), "Innovation in Traditional Media: Keeping Our 'Eyes On' An Innovative New Measurement System for Out of Home Advertising," *International Journal of Advertising*, 29 (4), 521-525.

Charles R. Taylor (2010) Measuring Return on Investment from Advertising: 'Holy Grail' or Necessary Tool? *International Journal of Advertising*, 29 (3), 345-348.

Charles R. Taylor (2010), "Integrated Marketing Communications in 2010 and Beyond," *International Journal of Advertising*, 29 (2), 161-164.

Charles R. Taylor (2010), "Toward Stronger Theory Development in International Advertising Research," *International Journal of Advertising*, 29 (1), 9-14.

Charles R. Taylor (2009), "Product Placement: A Hot Topic Gets Hotter," *International Journal of Advertising*, 28 (5), 753-756.

Charles R. Taylor (2009), "On the Need for Advertising and Public Policy Research," *International Journal of Advertising*, 28 (4), 601-604.

Charles R. Taylor (2009), "Looking Ahead: The Future of the International Journal of Advertising," *International Journal of Advertising*, 28 (2), 195-197.

**POPULAR BUSINESS PRESS COLUMNS**

Forbes Senior Contributor (Forbes.com) . Available at: https://www.forbes.com/sites/charlesrtaylor/?sh=2d8f63ac3bef

## REFERENCES

Available on request.

# Exhibit HH
# Cozy Photos


111 7th St


Don't Fear the Smell!
The Fun is inside!!
The COZY INN HAMBURGERS


No Cheese!!
All burgers served with onions!
NO SMOKING
REVIEW US
NOTICE

# Exhibit II
# Mural Photos




0082


KU
SCHOOL OF MEDICINE
SCHOOL OF NURSING
SALINA
The University of Kansas

0083



0088


MAJOR
LEAGUE
CITIZENS
Salina


A Famous
Trade Mark
Over
300,000,000 bags
sold last year
He Stands for thrift
RESERVED PARKING
10¢
GENUINE
"BULL" DURHAM
TOBACCO

0093




0095




0098



0099


Schlotzsky's
CINNABON
PEOPLE WHO LOVE TO EAT are always THE BEST PEOPLE
EVERY SATURDAY

0100




0103


The Stiefel Theatre For
the Performing Arts
STAGE
DOOR



0120




0123




0124




0300



0301

# Exhibit JJ
# Photos

Exhibit D

## Greater Downtown Artwork List

(Approximately 70 permanent and temporary pieces and 4 SculptureTour ballot boxes which contain all the current sculptures on display along Santa Fe)

**Santa Fe from South to North (Prescott to Elm)**

1. SW corner of Santa Fe and Prescott- Fish Tale, Gregory Johnson, purchased 2011 by Bank of Tescott. Bronze sculpture of boy with fishing pole.

2. Front of Tammy Walker Cancer Center-511 S. Santa Fe- Bronze sculpture of running girl. Private commission. Artwork inside the building includes four local artists commissioned to personalize and warm the space.



3. NW corner of South St. and Santa Fe (in front of the Temple) Mixed Media sculpture on pedestal by Jodie Bliss. "Picasso's Violin". 2018 People's Choice purchase by City of Salina. (First abstract or non-representational work selected in the 8th year of the program)

4. NE Corner of Santa Fe and Mulberry- "Off the Merry-Go-Round" by Jodie Bliss. Rearing horse sculpture in front of Starbucks. Private ScultpureTour purchase in 2019.

Conrad Snider, Newton, KS tile wall tile sculpture at the Salina Art Center (242 S. Santa Fe). Snider and community members collaborated on this mural. Impressions are from downtown architecture and prairie ecosystem. Snider did multiple sculptures and tile additions to the law enforcement center and municipal court buildings in the early phases of the public art program.

5. 200 block of S. Santa Fe- mid-block crosswalk has ballots for sculpture tour. Spillman Plaza mixed media sculpture, "Clarence the Catfish", the 2022 People's Choice award winner by Joe and Terry Malesky, Springfield, Missouri.

6. Spillman Plaza south facing wall across from Seraphim- Super Girl painted stencil on brick wall. Joe Lurato, New Jersey. (2022 Boom mural Festival)



7. Campbell Plaza-100 block- Large mural "Open Book", by Telmo-Miel for the 2022 Boom! Mural Festival. On the back of the Campbell Plaza Stage is the "Love Salina" mural by Salina artist Eric Montoy. Amelia Earhart mural by Logan Hicks and Jo Lurato on back wall of Prickly Pear during the 2022 Boom! Mural Festival, and red fox mural on back wall of Lauren Quinn floral shop by Brady Scott from Hutchinson, KS during 2022 Boom! (This plaza has been granted to Prickly Pear in license agreement, but City still has first-use rights for the stage)







*September 2023*



8. Across the street in Strand Plaza- large butterfly mural by Mantra. The mid-block crossing has SculptureTour ballots. Also an additional sculpture is in the seating area behind Barollo Grill. This was a Friends of SculptureTour purchase and donation. (The four downtown plazas were named for early founders or early business leaders.)



9. Behind 100 S. Santa Fe- native prairie mural by Mona Caron (2022 Boom Mural Festival) Directly north in the alley north of Iron Ave is a wall mural by the KC artist Gear.



10. Mid-block crosswalk in 100 N. block has sculpture tour ballots.

11. Arcade tunnel between 137 and 141 N. Santa Fe also has two paintings by the mural artist Gear. No title info at this time. (The Smoky Hill River Festival regularly commissions mural artists who create work that is placed elsewhere in the community. Schools, animal shelter, arcades, and other public spaces.)



Parking lot north of 141 N. Santa Fe- 67401 painted mural by Salina artists Robin and Julie Cates. City Lights Stage, mural by Dave Lowenstein, Lawrence, KS completed in June of 2022. Across the street on the north wall of the KU Medical School is a 2023 Boom mural by Add Fuel, a Portuguese artist.



12. 217 N. Santa Fe "Three Kinds of Sons", Acrylic and latex sprayed mural by Tony Sjoman, Manhattan, NY. (2022 Boom Mural Festival)

13. Mid-block crossing has SculptureTour ballots

14. 249 N. Santa Fe- "For the Love of Steel" motorcycle sculpture. Sonny Corbett, Salina Kansas. 2020 SculptureTour People's Choice purchase by the City of Salina. Sonny passed away a few months before his work was selected for the 2020-21 show. His friends submitted the work on his behalf. (Point out the reuse of historic Lee Buildings for apartments and commercial retail space. 53 apartments are complete and another 70 will commence soon. Ground floor space for restaurants, retail, or professional office space is also being developed.)

15. Approximately 341 N. Santa Fe- "Mural at the Mill" by Guido Van Helton. Completed in the fall of 2021. Privately funded project by the Salina Kanvas Project. (This was the first major mural project as part of the private Kanvas Project initiative. Based on a photo taken of kids playing Ring Around the Rosie. Mention that the same kids are featured on all sides of the building.) One block north on the east side of the street is a mural of a railroad worker by Chris Stain and a portrait of Martha Cooper by Joe Lurato. In the 500 block of N. Santa Fe on the west side of the street is a mural by PichiAvo from Valencia, Spain.

*September 2023*

**5th Street from Ash to Mulberry**

16. Mid-block west side parking lot. Steel and limestone untitled sculpture by Richie Bergen (harmonica). Friends of SculptureTour purchase as part of pre-tour workshop. Three-bladed steel sculpture "Silver Streaks" by Oklahoma artist Jim Stewart. SculptureTour purchase by Rotary Club gifted to the City.

17. Salina Field House- Perforated metal wall. Designed by Lawrence and Kansas City artist Jeremy Rockwell and fabricated by Zahner, Kansas City, MO Capital Improvement Project Public artwork. (CAD Committee formed a site committee that commissioned a designer to integrate art that also served as a sun block (functional purpose) as well as an aesthetic enhancement to the building.

18. In the 100 block of S. 5th St. at the west entrance of The Garage- large tire sculpture. Artist unknown. More sculpture on the 4th St. entrance of The Garage. A mural by Salina artist Eric Montoy is also featured on a west facing wall of the Garage. Directly across the street to the west in a parking lot behind Campbell Plaza is a mural by Mad C, a German artist from the 2023 Boom Mural Festival.

19. Behind the Stiefel Theatre is Artwork Alley. This is a pre-Festival event completed in May of 2022. with 9 murals by nine different artists. Left to right facing West: Ray Albarez (Saeb), Jeremy Fields (Sadat), Brady Scott, Darren Morawitz, Kamela Eaton, Anthony Parker (Amp), Hannah Scott, north wall "Symphony of Sunflowers" by Brady Scott who also curated the event, and the trash corral by Colin Benson and Chase Wheeler. A majority of funds for this project came from private sources and the Kansas Creative Arts Industries Commission Reimagined Spaces Grant. Additionally, the small figure by the Stiefel Theatre back door is by Joe Lurato. He has another pop-up just to the south in a niche across the alley. At the end of the alley at Walnut is another mural by Mindy Allen, Junction City, KS. On the back wall of the Stiefel Theatre is a 2023 Boom mural by California artist El Mac.



20. Approximately 215 S 5th. Large buffalo mural on wall at back of vacant lots. Artist unknown.

21. SE Corner of South Street and 5th Salina Water Treatment Plant- Public art installation. Found on Salina Arts & Humanities public art page. Artist/fabricator Kent Williams, Wichita, KS.

**Additional locations in the greater downtown area**

22. Corner of 7th and Elm St. Fire Station #1 Salina Firefighter Tribute Plaza. Artist: Bejamin Victor Custom bronze sculpture of a firefighter.

23. City/County/Library grounds. Butterfly Tree, 2021 People's Choice sculpture at South Library entrance; "Trifinity" bronze by Salinan, Richard Bergen in Caldwell Plaza, and "Wheat Harvest", by James Mages of Hays, KS wheat sculpture in the south drive of the government building. Inside the building is the bronze sculpture "Daughters of Peace", by Benjamin Victor, the 2015 People's Choice.

24. Salina Senior Center (across from "Trifinity" sculpture) on west side 9th St. "Farmer", 2013 People's Choice bronze statue by Lawrence Starck.

25. 211 W. Iron Ave (Smoky Hill Museum) "Patches"-a mixed media sculpture of a hippo by Dale Lewis. The 2018 People's Choice award winner.

26. 232 N. 3rd St is a mural by Pat Perry featuring a collection of images from Salina and Saline, County.

27. 805 The Midway (north side of complex) "We're Better Together" mural by Queen Andrea.

**Additional items of interest:**

- More than $250 million in public and private investment is taking place throughout the greater downtown in less than 10 years.
- Each of the four blocks of sidewalk downtown have a different art deco inspired design.
- The KU Med Center Salina held a nationwide competition to commission original work for the new medical school.
- The local school district recently included $120,000 (1%) of a school improvement bond project and integrated art in all 16 buildings in the district. They have an articulation agreement stating their intent to include art when they do capital projects.
- Eight new mural artists will be coming to Salina in the first week of October for Boom!
- Funds through Salina Arts & Humanities and Salina Downtown Inc. help provide support for businesses, artists, or performers to make the arts unavoidable throughout the community.
- Since SculptureTour began in 2011, there are now more than 50 pieces of art throughout the community in publicly visible spaces. (This is a private program)
- A new ACE District (Arts, Commerce, and Entertainment) was recently formed and encourages creative acts and more commerce outside of buildings throughout the greater downtown area.
- The Smoky Hill River renewal is underway which will include 7 miles of urban waterway and trails to be completed within the next 8 years. New plazas, artwork, and a restored river with boating and fishing is being developed.
- Salina is projecting $1 billion in capital projects citywide over the next 10 years.
- The first series of murals by Boom! artists intentionally developed content that reflected aspects of the people or geography of this place.

*September 2023*

**Resources for further study:**

Boom! Mural Festival

https://www.boomsalina.art/

Salina Arts & Humanities public art webpage:

https://www.salinaarts.com/public-art/

A page with links to multiple local and regional cultural arts offerings:

https://www.salinaarts.com/resources/

SculptureTour Salina website

https://www.sculpturetoursalina.net/

Salina Art Center

https://www.salinaartcenter.org/

Salina Community Theatre

https://salinatheatre.com/

Stiefel Theatre for the Performing Arts

https://www.stiefeltheatre.org/

Salina Symphony

https://www.salinasymphony.org/main/

Travel and Tourism information:

https://www.salinakansas.org/visit-salina.html


Ash ST
LEFT TURN
YIELD
ON GREEN
Mid-Kansas
TITLE CO.



0086


0101




0102



0104



0105



0106



HOLA
FROM VALENCIA TO SALINA
0107



0108



0110




0111



0112


HELLO FROM
67401
SALINA, KS



0114



0115


3923
0116



0117


JOE IURATO




0121



0122




01125

**CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 10 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

**CERTIFICATE OF DIGITAL SUBMISSION**

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*