**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 11 of 16, Pages 1-251**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

**TABLE OF CONTENTS**

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit KK
# White Declaration and Report

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**Cozy Inn, Incorporated,**
**d/b/a The Cozy Inn; Stephen Howard,**

**Plaintiffs,**

**v.**

**City of Salina, Kansas,**

**Defendant.**

**CIVIL ACTION**
**CASE NO. 6:24-cv-01027-TC-ADM**

**AFFIDAVIT OF MARK WHITE**

I, Steven Mark White, a retained expert for the City of Salina, Kansas in the above-entitled action, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts and opinions.

2. I was retained as an expert by the City of Salina in the above-entitled matter.

3. I authored an expert report dated August 16, 2024 and attached hereto as Affidavit Exhibit 1.

4. I make this Affidavit in support of the City's Motion for Summary Judgment.

5. The opinions contained in my expert report are my opinions that I intend to testify to at trial in this matter, are based on facts and data of the type reasonably relied on by experts in my field of urban planning and zoning, and are true to the best of my knowledge and opinion. All statements I have made in my expert report are incorporated into this Affidavit by reference.

6. Specifically, I intend to testify at trial in this matter to the following facts and opinions:

**EXHIBIT R**

a. The restrictions established in the City of Salina's sign code ("Sign Code") are reasonable, generally accepted regulations of the size, number, placement and design of signs.

b. The Sign Code serves several compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500):

    i. Comprehensive Plan implementation
    ii. Traffic safety
    iii. Aesthetics
    iv. Urban Design and travel behavior
    v. Public Health and Safety
    vi. Compromise

c. Based upon my review of the Sign Code, my knowledge, experience, and education in urban planning and zoning, and the facts and data of the type reasonably relied upon by experts in my field of urban planning and zoning, it is my opinion that the Sign Code directly and materially furthers its recited purposes.

d. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter.

e. In the C-4 district, where the Cozy Sign is located, the Sign Code allows 67% of the total sign area on any building wall or street frontage. This proportionality limitation protects aesthetics and architectural integrity.

f. Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. In reaching this conclusion I examined sign and mural regulations for twenty-one sign codes along with several in Kansas and Oklahoma where I was the principal consultant on the sign regulation drafts and Manhattan (KS), where I was part of the consulting team for the Development Code update. The sample codes I reviewed and cited in my expert report demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

g. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas.

Signed: *Steven Mark White*
Steven Mark White

STATE OF Florida )
) ss.
COUNTY OF Okaloosa )

Subscribed and sworn to before me by Steven Mark White on the 7th day of February, 2025. Type of ID produced: MO DL

Witness my hand and official seal. My commission expires: 06/13/2027

OZELLA MAE MOORE
Notary Public - State of Florida
Commission # HH 391605
Expires on June 13, 2027

*Ozella Mae Moore* OZELLA MAE MOORE
Notary Public

Notarized remotely online using communication technology via Proof.

# ANALYSIS OF SALINA SIGN CODE

---

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

**AFFIDAVIT EXHIBIT 1**

Contents

***Introduction*** — ***2***
***Basis of Opinions*** — ***3***
***Statement of Opinions*** — ***3***
***Compensation*** — ***20***
***Conclusions*** — ***21***
***Documents Reviewed*** — ***22***
***Exhibits*** — ***30***
***Resume and Qualifications*** — ***39***

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

## DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.




*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.
- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.
- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
    - ◊ A storefront
    - ◊ Display case
    - ◊ **<u>Public art</u>**
    - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer critical benefits to residents, such as improved public safety and well-being" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

**THE SIGN CODE IS REASONABLE IN SCOPE**

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.




*Figure 3 Salina Art Center Mural*




*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

---

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

**THE SIGN CODE IS NOT VAGUE**

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to ….."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

---

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.
- The variance will not adversely affect the rights of adjacent property owners or residents.
- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.
- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.
- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.



Digitally signed by Mark White
Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Case 6:24-cv-01027-TC Document 107-17 Filed 02/07/25 Page 27 of 48



Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C
https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions)
https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs)
https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119
https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art)
https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2
https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI; https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising) https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054; https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12; https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U)
https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024.
https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017.
https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, “Traditional Neighborhood Development-Will the Traffic Work?” American Society of Civil Engineers, (ASCE 1990);

Bookout, “Neotraditional Town Planning: Cars, Pedestrians & Transit,” Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, “Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, “Land-Use Mixing and Suburban Mobility,” Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

**Sign Code and Zoning Definitions (Selected Provisions)**

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**

*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

## RESUME AND QUALIFICATIONS

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

### BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

**SELECTED CITATIONS**

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

**SELECTED EXPERIENCE**

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

# Exhibit LL
# Defendant's Answers to Second Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES</u>**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville Chartered, hereby submits the following Responses to Plaintiffs' Second Set of Interrogatories:

**<u>OBJECTIONS</u>**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

3. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

4. Defendant's responses are based on a reasonable and diligent search for information

and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

5. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*6.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also* *Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

7. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**Second Set of Interrogatories**

1. Please identify the factual basis for the City's belief that "[t]he government interest served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998). Subject to and without waiving this objection, as the request states "factual**

**basis" and does not seek "all facts" Defendant interprets this to mean the material facts and will respond to this request with the material facts.**

**As explained in its prior response to Plaintiffs' first set of interrogatories, the Sign Code regulates all signs, not just the Cozy Sign, and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. As a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics.**

**The City's substantial interests are advanced by regulating signs (including wall signs like the Cozy Sign) because restrictions on the time, place and manner of the display of signs serve to limit the size, number, and location of signs on individual properties and in the larger community. By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions). Further, the character of the environment affects the quality of life and the property values in the City.**

**The facts and opinions set forth in Defendant's retained expert's report also support the factual basis that the Sign Code advances the City's interest in aesthetics, pedestrian and traffic safety, and property values. The City refers Plaintiffs to the Defendant's Expert Disclosure Statement. *See* F.R.C.P. 33(d).**

Respectfully submitted this 3rd day of September 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of September 2024, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** to be by electronic mail to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org;
sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit MM
# Content Neutral Sign Codes After Reed and Austin

SIGN RESEARCH FOUNDATION™




Photo by Joe Ravi CC-BY-SA 3.0

# CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN*

Mark White
EXHIBIT NO. 3
APPINO & BIGGS

Sign Research Foundation 2022 Analysis
Mark White, White & Smith, LLC

Published November 2022

# TABLE OF CONTENTS


| | |
|---|---|
| CONTENT-NEUTRAL SIGN CODES AFTER *REED* AND *AUSTIN* | 03 |
| WHAT ARE CONTENT-BASED REGULATIONS | 04 |
| WHAT LEGAL TEST APPLIES TO CONTENT-BASED | 06 |
| WHAT ARE CONTENT-NEUTRAL SIGN CODES? | 07 |
| TIPS TO COMPLY WITH *REED* | 09 |
| REGULATING SPECIFIC SIGN TYPES | 11 |
| TEMPORARY, INCIDENTAL AND YARD SIGNS | 11 |
| POLITICAL SIGNS | 12 |
| SPECIAL EVENT SIGNS | 13 |
| HUMAN SIGNS/SIGN WALKERS | 13 |
| COMMERCIAL SIGNS | 14 |
| ARTWORK AND MURALS | 14 |
| ON- VS. OFF-PREMISE SIGNS | 16 |
| PUBLIC FORUM | 19 |
| *REED*'S TOP 10 TAKEAWAYS | 20 |
| ABOUT THE AUTHOR | 21 |

# AFTER *REED* AND *AUSTIN*

Local governments throughout the United States regulate signs to promote aesthetics and traffic safety. These sign codes typically address the location, dimensions and physical design of signs. Sign regulations often classify signs based on what they say – i.e., their messages.

In 2015, the United States Supreme Court issued its seminal First Amendment decision in *Reed v. Town of Gilbert* that, for all practical purposes, rendered message categories unconstitutional. The *Reed* decision opens a number of grey areas in drafting sign regulations that lower courts have attempted to sort out. One questionable area was resolved nearly seven years after *Reed* to address the issue of on- versus off-premise signs, in *City of Austin vs. Reagan National Advertising.*

This article summarizes the state of the law, sorts through the practical issues in complying with content-neutrality, and offers pointers for local governments considering a sign code update.



# What are Content-Based Regulations?

To comply with *Reed*, sign regulations should be "content-neutral" – in other words, agnostic about the sign's message or who is expressing it. While content-neutrality is deceptively simple on its face, it raises practical issues in defining and implementing sign codes.

## Content-Neutral Sign Regulation: When a sign is regulated without regard to the message or the speaker.

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics.

While the First Amendment has permitting and language precision implications for sign codes, the *Reed* decision deals with the issue of message control. *Reed* holds that "content-based" regulations are subject to "strict scrutiny" in the courts. A "content-based" regulation controls the topic of communication, and in some instances the speaker. For, example, in *Reed* the Town of Gilbert, Arizona established a sign category known as a "Temporary Directional Signs Relating to a Qualifying Event," which were signs directing the public to a nonprofit group meeting (such as a church service at a school).

### *THE TEMPORARY DIRECTIONAL SIGN THAT STARTED IT ALL!*

When Pastor Clyde *Reed* wanted people to know where services for his Good News Community Church were located, he was relegated to using these kinds of small temporary directional signs to get the word out. The small church in Gilbert, Arizona, often rented different spaces in temporary locations, making visible and effective signage critical in directing the community. But the Town of Gilbert severely restricted the size, location, number and duration that temporary directional signs could be, especially compared to other signs with political and ideological messages. For example, political signs could be up to 32 square feet and displayed for up to 5 months, but Pastor *Reed*'s signs could only be up to 6 square feet and out for just 12 hours before the services, and taken down after 1 hour afterwards.

*Image Source: AZCentral.com (https://www.azcentral.com/story/news/local/gilbert/2015/01/12/gilbert-church-signs-supreme-court-arguments/21636837/)*



A temporary directional sign was limited to 6 square feet in area, could stay up 12 hours before and one 1 hour after an event, and only 4 temporary directional signs were allowed on public or private property. By contrast, other temporary sign categories such as "political signs" – defined as temporary signs designed to influence the public elections – were allowed 16 square feet in residential and 32 square feet in commercial districts, could stay up 60 days before a primary and 15 after a general election. The only difference between temporary directional signs and political signs is the kind of message they display.




| Display Time Before | Event | Display Time After |
|---|---|---|
| UNLIMITED | Ideological Sign | UNLIMITED |
| 4 1/2 MONTHS | Election | 15 DAYS |
| 30 DAYS | HOA Event | 48 HOURS |
| 16 HOURS | Real Estate Sale | 36 HOURS |
| 12 HOURS | Religious Event | 1 HOUR |

Therefore, the regulations are content-based, i.e., they turn on the sign's content (message), as opposed to its physical characteristics (such as whether it not it is erected on a freestanding pole or attached to a building). This is the case even if the regulations do not discriminate among viewpoints; simply controlling the type of message renders a regulation content-based even when it does not favor some viewpoints over others.

A sign regulation is content-based if the message displayed on a sign has a regulatory impact. Generally, if the zoning administrator has to read the sign to determine what regulations apply, the regulation is likely content-based – with the exception of the on-premise/off-premise distinction, as per *Austin*. Even if the regulation restricts or favors a category of speech for a benign reason (such as to allow churches to guide congregants to services in temporary locations), the regulation is still considered content-based. An innocuous justification cannot transform a content-based law into one that is content-neutral. In addition, the *Reed* decision intimated that content-neutral regulations that target or favor speakers is content-based if it impacts the message.

## What Legal Test Applies to Content-Based Regulations?

Content-based regulations are subject to "strict scrutiny" in the courts. This means several things: First, the regulation must serve a *compelling* government interest. A compelling interest is one that exceeds the substantial or legitimate interests supporting a conventional zoning regulation (such as a protecting property rights), and few interests are deemed compelling. Courts have held that aesthetics and traffic safety – the traditional interests that support sign regulations – are not sufficiently "compelling" to support content-based regulations. See *Clark v. City of Williamsburg,* 388 F.Supp. 1346 (D. Kan., 2019), *cert. denied,* 141 S.Ct. 2629, 209 L.Ed.2d 754 (2021) (citing *Quinly v. City of Prairie Village*, 446 F. Supp. 2d 1233, 1243-44 (D. Kan. 2006); *Outdoor Sys., Inc. v. City of Merriam*, 67 F. Supp. 2d 1258, 1269 (D. Kan. 1999); *Solantic, LLC v. City of Neptune Beach,* 410 F.3d 1250, 1268 (11th Cir. 2005). Second, the regulation must be narrowly tailored to that interest.

If other sign categories burden those interests more but are less restricted because of what they say, the restriction is not narrowly tailored. For example, in *Reed,* the Town limited the number and size of temporary directional signs to control clutter, but political signs were unlimited in number and had significantly larger sign allowances. Therefore, political signs were allowed to intrude on the Town's aesthetic interests to a greater extent than temporary directional signs based only on what they said. This was not narrowly tailored to the Town's aesthetic interests. Finally, the regulation is presumed unconstitutional, and the local government has the burden to prove that it meets the first two tests.



**Therefore, content-based regulations, or facially-content-neutral regulations justified in relation to content, rarely survive a constitutional challenge when subject to strict scrutiny.**

As noted in *Reed*, few sign codes are free of content-based provisions under the Court's content-neutrality standard, both for temporary signs and permanent signs. Every local jurisdiction that regulates signs in their community should review their ordinance and revise it in light of *Reed*, if necessary.

## What are Content-Neutral Sign Codes?

Content-neutral sign codes regulate signs by their temporal (i.e., whether a sign is temporary or permanent), locational (for example, whether a sign is freestanding or attached, or is in a commercial or residential zoning district), or physical (for example, whether a sign is digital or static) characteristics. In other words, a sign code that regulates only the "*time, place, and manner*" of signs is considered content-neutral. Content-neutral regulations are subject to intermediate, rather than strict, scrutiny. Courts also apply intermediate scrutiny to regulations that affect only commercial speech.



Intermediate scrutiny requires that a sign regulation is narrowly tailored to serve a *substantial* governmental interest and leave ample alternative avenues of communication. Some lower courts have found that aesthetics and traffic safety are not "compelling" interests under the strict scrutiny standard. However, aesthetics and traffic safety typically meet the "substantial government interest" standard and courts are more deferential in assessing whether those regulations are tailored sufficiently to meet their stated objectives than they are when strict scrutiny applies.

**Both the majority and concurring opinions in *Reed* summarized the types of regulations that are considered content-neutral.**

**Content-Neutral Regulations Include:**

1. MAXIMUM SIGN SIZE
2. MATERIALS
3. LIGHTING
4. MOVING PARTS
5. PORTABILITY
6. BANNING OR REGULATING SIGNS IN THE PUBLIC RIGHT-OF-WAY
7. LOCATIONS
8. DISTINGUISHING FREESTANDING AND ATTACHED SIGNS
9. DISTINGUISHING FIXED VERSUS CHANGEABLE ELECTRONIC SIGNS
10. REGULATING SIGNS DIFFERENTLY BY ZONING DISTRICT
11. TOTAL NUMBER OF SIGNS ALLOWED PER FRONTAGE OR AREA
12. TIME RESTRICTIONS ON ADVERTISING A ONE-TIME EVENT
13. GOVERNMENTAL SIGNS

Keep in mind that the regulatory matters listed here are content-neutral only if they are not triggered by the sign's message or user (a possible exception is government signs, which remains a grey area). For example, setting a maximum footcandle brightness for digital signs is, on its face, content-neutral. However, allowing digital signs only for gas prices or churches could be content-based.




Notably, the concurring opinion in *Reed* stated that regulating off-premise signs differently from on premise signs, a traditional element of local and state billboard regulation, is content-neutral. However, this did not preclude billboard operators from litigating against on-premise/off-premise distinctions in cities and states across the country over the next several years. The U.S. Supreme Court recently clarified that issue (see discussion of Off-Premise Sign Regulations, below).

## Tips to Comply with *Reed*

To comply with the principles announced in *Reed*, a sign code should establish three (3) broad sign categories based on their physical characteristics. These typically include freestanding signs, attached signs, and incidental signs.

### Three Sign Categories Based on Physical Characteristics

**FREESTANDING SIGNS**

Signs that are not attached to any other structure, ie. pole signs and monument signs.

**ATTACHED SIGNS**

Signs that are attached to a building or structure, ie. wall signs, window signs and murals.

**INCIDENTAL SIGNS**

Smaller signs that are physically subordinate to the principal freestanding or attached signs on the site, ie. directional signs, historic markers, temporary signs. (The sign code can break temporary signs into a separate category).

To ensure that a sign code is content-neutral, a community should begin by removing all references to the content of sign types, or sign messages that trigger permitting or related sign regulations. For example, a community could replace project identification sign categories with regulations for a single monument or pole sign for properties in a commercial zoning district. This replaces a message trigger (i.e., whether the sign identifies the site) with the physical parameters of the monument or pole sign. A possible exception is sign categories that directly relate to public safety issues. The majority opinion in *Reed* stated that "[a] sign ordinance narrowly tailored to the challenges of protecting the safety of pedestrians, drivers, and passengers--such as warning signs marking hazards on private property, signs directing traffic, or street numbers associated with private houses-well might survive strict scrutiny."

By contrast, all provisions in a sign code that refer to number, area, structure, location and lighting of signs are content-neutral and unaffected by *Reed* if those categories do not relate to what the sign says. However, keep in mind that other First Amendment requirements apply. For example, a content-neutral regulation that inadvertently chokes off too much speech (see discussion of yard signs below), or that gives a zoning administrator unlimited discretion to deny or condition a sign permit, can intrude on First Amendment rights even if the regulations are facially neutral. Therefore, even if the regulations are content-neutral, a community should make sure that sign allowances are not overbroad and consider how sign permits are processed.

**Sign codes should also include severability and substitution clauses.**

A severability clause is common to most zoning and land development codes and simply provides that if any part of the code is invalidated in court, the rest of the code remains valid. This is important because there are many grey areas in sign regulations, and both the U.S. Supreme Court and lower courts are still fleshing out the parameters of content-neutrality. A substitution clause simply allows a sign to substitute a noncommercial message on any sign that permits a commercial or another noncommercial message. For a truly content-neutral code, this may seem superfluous. However, this simply clarifies that a sign code regulates only the physical characteristics of the sign and not its message.



# Regulating Specific Sign Types

While *Reed's* principles are deceptively simple, there are unsettled issues in its application to specific sign types. These range from traditional temporary placards (such as political yard signs) to lighted projections on buildings. This section explores how the lower courts have treated various, common sign categories and how to address them in your sign codes.

# Temporary, Incidental and Yard Signs

Temporary signs are difficult to codify as they are traditionally identified by their message or function. For example, real estate signs relate to the sale of property, and political signs relate to an election. However, a community can regulate the time, place and manner of temporary signs if they are not called out by their message. For example, a sign code can regulate signs based on temporary materials (such as cloth, canvas, vinyl, cardboard, wallboard, or other temporary materials), or temporary types such as feather signs. In addition, the sign code can fold temporary signs into an overall allocation of incidental signs for a site, remaining agnostic about how those signs are used.




For temporary signs, the community should consider a flat time allocation, rather than one tied to specific events. For example, a city amended its sign code after *Reed* to cap the number of temporary signs on any property, with an allocation of 5 additional signs 45 days before and 14 days after an election. This allocation did not restrict the message of the additional signs. In an unreported federal district court opinion, the court ruled that this was impermissibly user-based even though it did not regulate the additional sign's message (www.ricardopacheco.com *et al. v. City of Baldwin Park,* No. 16-CV-09167-CAS, 2017 WL 2962772 (C.D. CA. July 10, 2017)). The court suggested that the community could, for example, allow additional signs for a limited number of times per year not tied to specific events. "For example, the City could authorize five additional signs of up to 12 square feet for 60 days one time per year at the time of the speaker's choosing."

Instead of defining signs by message or function, the sign code should establish overall allocations for incidental or temporary signs. How those signs are used - whether to sell the property, advertise their favorite political candidate, or to express an opinion - is up to the property owner. For example, the City of Indianapolis established a set of standards for "noncommercial opinion signs." After that was found to violate content-neutrality principles, the city replaced that with an overall allocation for yard signs. This was found consistent with content-neutrality requirements (*Geft Outdoor LLC v. Consolidated City of Indianapolis* (S.D. Ind. 2016)). As is mentioned above, however, the overall allocation of yard signs must allow a sufficient amount of speech even if it is content-neutral. Several federal court decisions have invalidated sign codes allowing only one or two yard signs as restricting too much speech, even when those restrictions are content-neutral (*Willson v. City of Bel-Nor* (E.D. Mo. 2020); *Arlington County Republican Committee v. Arlington County* (4th Cir. 1993)).

To avoid administrative and enforcement issues with having to identify whether a sign as "temporary" and enforcing time limits, communities can also fold temporary signs into an overall sign number allocation for incidental signs. If the community believes regulation of temporary signs is needed, it can require stickers that identify when the sign was placed to document compliance with any time restrictions.

A common issue with sign regulations written before *Reed* is regulations that limit flags to those with government or institutional symbols. This is content-based (*Willson v. City of Bel-Nor* (E.D. Mo. 2020)), and any definition of flags should include only their physical description with no limitation to government or other symbols.

## Political Signs

Political signs fall into two major categories, including traditional handheld political message signs (picketing, panhandling, "save the turtles") and campaign election signs. Sign codes are traditionally limited to the latter. Political signs are not only a content-based category, but political speech enjoys the highest level of protection in First Amendment case law. Therefore, sign regulation should never target political signs, but rather fold them into incidental and temporary sign allowances. For yard signs, it is advisable to allow additional incidental or temporary signs for a given number of days per year to allow for occasions (such as elections, holidays, or similar times) where additional signs are needed to accommodate speech.




[1]The City later amended its sign regulations to a content-neutral allocation of the number and area of temporary signs, which was upheld on appeal. *Baldwin Park Free Speech Coal. v. City of Baldwin Park,* No. 20-55244 (9th Cir. 2021).

An emerging issue is state preemption of state preemption of political sign regulations. Several states, such as Arizona and Kansas, limit how local governments can regulate political signs during election season. This preemption does not extend to signs that display other forms of speech. How should a local government comply with state law without itself engaging in unconstitutional discrimination between types of speech? At least one federal court case has ruled that the exemption of government signs or signs exempt from state regulation is not content-based (*Signs for Jesus v. Town of Pembroke* (D.N.H. 2017)). Because local governments typically cannot supersede state law, that type of exemption is not itself content-based but rather a recognition that the local government is powerless to supersede state law. In the context of panhandling, a federal district court found that a local regulation that did not incorporate a content-based exemption for solicitations by municipal employees such as firefighters was not content-based even where the city announced an intention to enforce the regulations consistent with state law (*Watkins v. City of Arlington* (N.D. Tex. 2015)).

# Special Event Signs

Some sign codes include special regulations or allowances for signs at special events. If those regulations do not require the signs to advertise the special event or something occurring there, it is arguably content-neutral. However, it is unclear whether that would constitute a user preference. Under the current state of the law, it is likely not to constitute a user preference if a special event itself does not restrict expressive conduct. *In Act Now to Stop War & End Racism Coal. v. Dist. of Columbia* (D.C. Cir. 2017), the court upheld a regulation allowing signs posted a public lamppost to remain for up to 180 days, but requiring signs for special events to be removed within 30 days. The court held the regulation was content-neutral because it only regulated where some speech may occur and did not distinguish between events by topic, and was narrowly tailored to the government's interest in controlling clutter. Another court, however, found that an exemption for special and civic event signs (including grand openings) was content-based because one must assess the communicative content of the sign to determine whether the exemption applies (*International Outdoor v. City of Troy* (E.D. Mich. 2017)). More recently, the U.S. Supreme Court in City of *Austin* v. *Reagan National Advertising* (discussed below) distinguished regulations that regulated special event signs generally (which are content-neutral) and those that regulate specific kinds of special events (which are content-based).

# Human Signs/Sign Walkers

Some sign codes attempt to regulate signs carried by persons, i.e., the stereotypical costumed Statue of Liberty advertising a tax preparer. Regulating hand-held signs or costumes does not necessarily trigger content concerns, but raises difficulties in distinguishing things like costumes that advertise (e.g., the omnipresent Statue of Liberty) from those that do not (for example, a Statue of Liberty costume designed to send a political message). This also raises difficulties in defining costuming and hand-held signs in a way that meets First Amendment tests for language precision. A pre-*Reed* decision invalidated sign walker regulations based on the *Central Hudson* test (*Kitsap County v. Mattress Outlet* (Wash. 2005)), and at least one state statute (Arizona) addresses sign walkers. Many post-*Reed* cases address panhandling, which does not directly involve a sign display but could involve the same principles of content-neutrality.



## Commercial Signs

It remains unclear whether strict scrutiny applies to sign regulations that affect only commercial signs. Sign regulations cannot preference commercial over noncommercial speech (*Metromedia v. City of San Diego* (U.S. 1981)). For regulations that affect only commercial speech, courts have traditionally applied a test announced in *Central Hudson Gas & Electric Corp. v. Pub. Serv. Comm'n* (1980) that asks (1) whether the speech concerns a lawful activity and is not misleading, (2) whether the government's interest is substantial, (3) whether the restriction directly and materially serves the asserted interest, and (4) whether the restriction is no more extensive than necessary. While this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive intermediate scrutiny. As is discussed below in the context of murals and billboards, communities are finding that limits on commercial signs may not survive judicial review if they wander beyond the sign's physical parameters.




## Artwork and Murals

Is artwork a sign? Can cities distinguish art and murals from commercial signs? Artwork (including murals) is expressive conduct protected by the First Amendment. Several cases have ruled that sign codes that either exempt (*Central Radio v. City of Norfolk* (4th Cir. 2016)) or regulate (*Kersten v. City of Mandan,* 389 F.Supp.3d 640 (D. N.D. 2019)) works of art or murals that did not display commercial messages are content-based. Before *Reed,* courts applied intermediate scrutiny to the regulation of commercial speech based on whether the message conveyed is tied solely to economic benefit of the business and serves no purpose beyond the commercial motive. In *Kersten,* the court ruled that design guidelines that prohibit murals with commercial messages but allow other murals that are not commercial is content-based and subject to strict scrutiny. See also *Complete Angler, LLC v. City of Clearwater* (M.D. Fla. 2009)(bait and tackle shop displaying aquatic mural was non-commercial speech, and exemptions for noncommercial works of art and holiday decorations were content-based). *In Morris v. City of New Orleans* (E.D. La. 2019), the city defined murals separately from signs and prohibited commercial advertising on them.

**A community who wants to regulate murals can consider the following options:**

- Remove restrictions that exempt or target artwork, along with limits on commercial advertising. The regulations could consider a restriction on text, if the message is not restricted (for example, limiting the text to the artists' signature).
- Consider mural subcategories based on their physical characteristics, such as a "wall sign" or "painted wall sign." An issue with this approach is that murals often occupy entire building walls, which exceed typical wall sign limits.
- Consider a review process for murals, such as an arts commission review, that examines the artistic quality of the mural. This approach should involve clear standards, time limits, and an express prohibition on considering the mural's content.

Applying intermediate scrutiny, the court invalidated the mural regulations, finding that "there is nothing in the record to suggest that commercial messages in artwork are more unsightly than non-commercial messages in artwork."

There is also an emerging issue as to whether artistic embellishments are protected. This could involve signs that are embedded in a building's architectural features, or regulating a sign's design elements (such as materials). *In Burns v. Town of Palm Beach* (11th Cir. 2021), the court rejected a First Amendment challenge to in architectural review commissions denial of a building permit to replace a traditional beachfront mansion with a much larger midcentury modern house. Over a strong dissent, the court declined to decide that architecture is expressive conduct. This leaves open common design controls for signs, such as requiring masonry or materials compatible with the principal building style for monument signs. However, if courts were to apply intermediate or strict scrutiny to those types of regulations, local governments would need to examine the basis and regulatory efficacy of sign design controls.



# On- vs. Off-Premise Signs:

Off-premise signs advertise products not located on the same premise as the sign, or direct people to off-premise locations. It is common for local sign regulations and state billboard regulations to distinguish on- from off-premise signs. The federal Highway Beautification Act of 1965 (23 U. S. C. § 131) conditions highway funding on outdoor sign regulation, while exempting on-premise signs (i.e., "signs … advertising the sale or lease of property upon which they are located" and "signs, displays, and devices . . . advertising activities conducted on the property on which they are located"). At least two-thirds of state highway beautification regulations and tens of thousands of local sign codes either ban off-premise signs, or subject them to spacing, permitting, and size requirements. Those regulations do not apply to signs that advertise or communicate a business or activity that occurs on the same premise.[2] In *Reed,* a concurring opinion characterized this type of regulation as content-neutral. This is consistent with Supreme Court precedent upholding off-premise sign regulation (*Metromedia, Inc. v. City of San Diego* (1981)).

**Both these signs are digital and advertise the same company, but communities are allowed to regulate them differently based on where they are located, according to the U.S. Supreme Court in *Austin* v. Reagan (2022).**




*Many communities, such as in Austin, TX, prohibit these kinds of digital off-premise signs, or billboards.*




*Many communities, such as in Austin, TX, allow these kinds of digital on-premise signs, or electronic message centers (EMCs), in the parlance of the on-premises sign industry.*

*Image Source: Daktronics*

[2]In response to concerns that off-premise classifications were content-based, after *Reed* several states revised their outdoor advertising statutes or regulations to replace the premises category with a category for signs that are erected for compensation. See Colorado Rev. Stat. § 43-1-403(1)( "Advertising devices" include signs "for which compensation is directly or indirectly paid or earned in exchange for its erection or existence by any person or entity"); Kentucky Rev. Stat. § 177.830(5)("advertising device" means a sign "[o]perated or owned by a person or entity who is earning compensation directly or indirectly from a third party or parties for the placement of a message on the device"); Tennessee Code Ann. § 54-21-102(18)("[o]utdoor advertising device" is "a sign that is operated or owned by a person or entity that is earning compensation directly or indirectly from a third party or parties for the placement of a message on the sign"). A federal district court found the Colorado legislation content-neutral in *StreetMediaGroup, LLC v. Stockinger*, No. No. 1:20-cv-03602-RBJ (D. Colo. 2021), because the state transportation department "need not be aware of a sign's content to determine whether compensation was received for its erection."

The United State Supreme Court recently confirmed that off-premise sign regulations subject to intermediate, not strict, scrutiny. In *City of Austin v. Reagan National Advertising,* 142 S.Ct. 1464 (U.S. 2022), the court considered a sign code that prohibited the digitization of off-premise signs. Plaintiffs claimed that off-premise sign categories are content-based because persons (especially regulators) have to read the signs to determine whether the message related to things occurring on-or-off the site. The U.S. Supreme Court rejected this argument, ruling that the distinction relates to the location of signs and is not inherently directed at the sign's message. Essentially, the court held that the need to read the sign is directed to its location rather than its message. Therefore, off-premise sign regulations that do not preference commercial over non-commercial speech are subject to intermediate rather than strict scrutiny.

While off-premise sign regulations are not presumed unconstitutional, they remain subject to First Amendment challenge. In drafting off-premise sign restrictions, local governments should consider the following:

1. ***Reed's* "Need to Read" Test Does Not Apply to Off-Premise Sign Regulations.** *Austin* reasons that conventional off-premise sign categories require "examination of speech only in service of drawing neutral, location-based lines" rather than controlling the sign's communicative content. However, central to its holding is that the off-premise category did not trigger a specific or substantive category of speech, such as political messages, ideological messages, or directional messages concerning specific events (*Austin*, at 8). Therefore, off-premise sign categories that regulate specific types of off-premise messages or users could implicate higher scrutiny and jeopardize the regulations in court (see paragraphs 3 and 5, below) because they affect the sign's topic, idea or message.

2. **Billboards versus Off-Premise Signs. While many billboards are off-premise signs, the two concepts are distinct.** A billboard is a physical category – typically, a large, freestanding panel sign. By comparison, an off-premise sign can occur in any configuration – including a billboard, a wall sign, or on digital copy. Communities can choose to regulate billboards as physical entities regardless of their message, removing the need to justify distinctions between off-premise commercial messages under intermediate scrutiny. For example, a sign code could define a "billboard" as a panel-type sign mounted on posts or steel frames (see, for example, Westminster, Colorado Sign Code § 11-11-16(D)), or as a freestanding smaller than typical bulletin specifications (672 square feet in area or 14 feet in height).

3. **Off-Premise Distinctions that Regulate Non-Commercial Messages May Trigger Strict Scrutiny.** The *Austin* opinion assumed that the sign regulations at issue regulated only commercial speech. Because non-commercial speech receives a higher degree of protection under the First Amendment, regulations that implicate non-commercial messages (such as political campaign or religious messages) will trigger strict scrutiny. However, regulations that affect any off-premise message – whether or not those messages are commercial in nature – will trigger only intermediate scrutiny.

4. **Limiting Off-Premise Regulations to Commercial Messages is Subject to Intermediate Scrutiny.** Both the majority opinion and dissent in *Austin* recognized that regulations targeting only commercial speech (i.e., advertising or directing customers to a business) are subject to intermediate, not strict, scrutiny (*Austin* at 10 [majority opinion], Thomas, dissenting, at 2, note 1).

[3] *Austin*'s sign regulations, as described in the majority opinion, did not exempt noncommercial speech. *Austin* at 5, note 3.

5 **Off-Premise Regulations that Regulate Commercial Messages Differently may Fail Intermediate Scrutiny.** It is one thing to regulate off-premise advertisements, and another to carve out special treatment for specific businesses. For example, some sign regulations have special permissions for off-premise real estate signs, hospital, or farms. Car dealerships, hospitals, bookstores, or other businesses do not qualify for those exemptions. What government interest justifies not allowing a car dealership to display a sign at an off-premise location while allow that permission for a homebuilder? Why would a general regulation or allowance for off-premise signs – coupled with size, spacing and design restrictions – not promote those interests as effectively? A local government with those categories would need to show how those distinctions are narrowly tailored to serve a significant government interest.

6 **Facially Content-Neutral Off-Premise Sign Regulations Trigger Strict Scrutiny if they have an Impermissible Purpose or Justification.** The majority opinion in *Austin* stated that an impermissible purpose could sink a content-neutral off-premise sign regulation, but gave no examples. One example could include, for example, a regulation that allows for billboards only during election season – where the regulation allows for any form of off-site message, but is designed to favor a particular form of speech (see www.ricardopacheco.com, *supra*).

In drafting off-premise sign regulations, the most conservative approach legally is to regulate only commercial speech (which triggers only intermediate scrutiny), and at least to ensure that the regulations do not explicitly or implicitly favor commercial over non-commercial speech. In addition, regulating only the billboard structure with no off-premise sign restriction is a viable approach legally, but also potentially exposes more locations to off-premise advertising. However, the *Austin* decision clarifies that none of these approaches (without more) will trigger strict scrutiny.







*Image Source: Watchfire*

# Public Forum

Local governments retain wider discretion over the display of their own signs and those on their own property than they do for private signs on private property. However, free speech protections apply when the government opens public property to private expression. In 2022, the U.S. Supreme Court addressed the issue of signs in the public forum. In *Shurtleff v. City of Boston,* No. 20–1800 (U.S., May 2, 2022), the City routinely allowed the display of flags on a flagpole at City Hall with no guidelines or control over who could display them or their content. The City denied the display of a religious flag based on concerns that it would violate the Establishment Clause by endorsing a set of religious beliefs. The City's lack of involvement in selecting flags for display at that location meant that the display was private (not public) speech. Therefore, denying permission to display the flag amounted to viewpoint discrimination in violation of the First Amendment. Local governments should exercise clear control over signs in public spaces where only government speech is allowed, and adopt content-neutral rules for permitted private displays (other than exempt government signs, such as traffic directional signs) in the public forum.



# *Reed's* Top 10 Takeaways

**The *Reed* decision changed the way communities and courts look at sign regulations, and its impact is still being felt (and litigated) across the nation. Local jurisdictions applying the content-neutrality principles of *Reed* to their sign code should consider the following:**

1. While the facts in *Reed* involve temporary signs, content-neutrality is not limited to temporary signs. The First Amendment protections at issue in *Reed* apply to any form of communicative content - whether the sign is a cardboard election sign in a yard, a large monument sign at the entry to a shopping center, or a mural subject to design review.

2. If a regulation affects the topic or message conveyed, the regulation is content-based and likely subject to strict scrutiny. This applies whether the regulation appears in a sign code, a zoning ordinance, design guidelines, or some other regulation.

3. A sign code should identify all signs (permanent or temporary) by their structure or design (such as the sign's materials, configuration, and presentation – i.e., whether or not it has changeable or digital copy, lighting, and similar visual features), rather than what they say.

4. Communities do not usually run into trouble simply because they regulate a sign's dimensional standards or design features. Instead, sign codes trigger strict scrutiny when they create either: (1) exemptions for preferred categories of speech, or (2) target categories of speech for regulation through their sign code.

5. Communities who want to specifically regulate temporary signs can continue to do so, but should base their regulations on the signs structure type (such as feather signs, windblown signs, or cardboard placards mounted on a metal frame) and uniform event triggers (such as 5 to 10 temporary signs along a frontage for up to 30 days four times a year).

6. Traditionally, courts have given more deference regulation of commercial content through intermediate scrutiny. However, some lower courts have started to apply strict scrutiny to commercial content categories and it is fair to say that the state of the law is unclear.

7. *Reed* does not require signs to be bigger, cluttered, brighter, or otherwise an obstacle to a community's aesthetic or traffic safety objectives. It simply advises communities to focus carefully on the physical characteristics of signs that they truly need to regulate, and to avoid interfering with a sign's message.

© SIGN RESEARCH FOUNDATION

**8** To control clutter and driver distraction, sign codes can use allocation-based systems that allow persons and property owners to allocate messages as they see fit within the parameters established by the sign code's dimensional standards.

**9** There are other First Amendment requirements and constitutional issues to consider, such as overbreadth, vagueness, and how long it takes to issue a sign permit. Those are beyond the purview of this article but remain important considerations.

**10** Distinctions between on- and off-premise signs are sufficient under *Austin*, if they do not involve other content-based categories (for example, allowing off-premise signs for some messages but not others).

**Communities applying these content-neutral principles can develop and implement sign codes that promote community character, traffic safety, and economic development.**

## About the Author:

Mark White is a senior partner with White & Smith, LLC – a multi-disciplinary law firm based in Kansas City and Charleston that specializes in zoning and sign code updates. White & Smith, LLC has led or participated in over 150 zoning and sign code updates in 36 states. Mr. White is a nationally-recognized expert on planning and law presents frequently on sign law and regulations at planning and law conferences, and has spearheaded numerous zoning and sign code updates. Mr. White has over forty publications appearing in books, law journals, and planning literature.

# IS YOUR COMMUNITY EXPLORING SIGN CODE CHANGES?

CONTACT
**signhelp@signs.org**
FOR COMPLIMENTARY ANSWERS

**PUBLISHED BY:**

SIGN RESEARCH FOUNDATION™

**WWW.SIGNRESEARCH.ORG**

© Sign Research Foundation

# Exhibit NN
# White Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**

MS. JOKERST: Object to form.

A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.

BY MR. MACROBERTS:

**Q. Did you include any disputed facts or any facts that could undermine your opinion?**

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. -- in your report?**

MS. JOKERST: Object to form.

A. Not that I recall.

MR. MACROBERTS: Can we take a five-minute break?

THE WITNESS: Yes. I was going to ask the same thing.

MR. MACROBERTS: Yeah.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, do you know whether the**

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

**code?**

MS. JOKERST: Object to form.

A. I am not aware that there were or were not studies specific to Salina's sign code.

BY MR. MACROBERTS:

**Q. So one way or the another, you're not aware?**

A. Correct.

MS. JOKERST: Object to form.

THE WITNESS: Sorry, Amanda. Go ahead. Amanda objected.

MR. MACROBERTS: It is noted. I am certain of that.

BY MR. MACROBERTS:

**Q. All right. So for purposes of your report, you used the word mural to mean, quote, an outdoor exhibit painted on a wall that does not fall with the sign code's parameters and that may include art but does not announce, direct attention to or advertise. You meant within. Is that right? Does not fall within the sign code's parameters?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. And for reference --**

**clutter contributes to decline and traffic safety and in the same paragraph write public art does not create this type of distraction. Do you see that?**

A. Yes.

**Q. You don't define what public art is in that, correct?**

MS. JOKERST: Object to form.

A. I do not have a footnote on that page that defines what public art is.

BY MR. MACROBERTS:

**Q. There's no citation in your report for the proposition that public art can't create clutter?**

MS. JOKERST: Object to form.

A. I don't think that there's any documents cited in the report that says that public art could never create clutter.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that establishes that private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Well, I don't have a definition of those two, but that said, I'm not aware of a report that

gets into the distinctions between those two and their impacts.

BY MR. MACROBERTS:

**Q. Are you aware of any studies that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Not off the top of my head, no.

BY MR. MACROBERTS:

**Q. Are there any cases that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. That you're aware of?**

A. Not that I'm aware of.

MR. MACROBERTS: It's 12:10, do you want to take a break.

THE WITNESS: Certainly.

MR. MACROBERTS: All right.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

**wall?**

MS. JOKERST: Object to form.

A. I'm not aware of anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Same with studies and case law. There are no studies in cases that would say that?**

A. I --

MS. JOKERST: Object to form.

A. Oh, go ahead.

MS. JOKERST: Just object to form.

BY MR. MACROBERTS:

**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**

MS. JOKERST: Object to form.

A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.

BY MR. MACROBERTS:

**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**

A. No.

**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**

MS. JOKERST: Object to form.

A. Not that I know of.

BY MR. MACROBERTS:

**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**

MS. JOKERST: Object to form.

A. I would have to know more about the business itself to assess its own land use impacts.

BY MR. MACROBERTS:

**Q. Not talking about land use impacts.**

A. It's a very generic term, daycare business.

**Q. Sure. Let's say that this mural is still at the mill and let's say a daycare business started operating inside the mill, compliant with the code, the kids are inside, they're not running out in the streets, things like that. Okay. Does the mural become dangerous simply because a business was operating inside of that that pertained to the mural?**

MS. JOKERST: Object to form.

A. Not that I know of.

MS. JOKERST: Sorry. Did I miss a question? I heard like a cough and then what sounded like maybe someone said why.

MR. MACROBERTS: No. There was no question.

MS. JOKERST: Oh, okay.

BY MR. MACROBERTS:

**Q. You testified in your report that aesthetics is a substantial and compelling interest, correct?**

A. Yes. I testified that it's either one.

were at issue in those cases.

**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**

A. No, I'm not aware of any -- any complaints that were filed.

**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**

MS. JOKERST: Object to form.

A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.

BY MR. MACROBERTS:

**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

**aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. I can't recall anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.

BY MR. MACROBERTS:

**Q. Well --**

A. So --

**Q. -- I appreciate that.**

A. Okay.

**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**

MS. JOKERST: Object to form.

A. To me personally, it is.

BY MR. MACROBERTS:

**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**

MS. JOKERST: Object to form.

A. I don't have a basis for saying that it would.

BY MR. MACROBERTS:

**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**

A. Yes.

**Q. Did you read the Cheng, 2023 study?**

A. Yes.

**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**

A. There is a statement in the study to that effect that I believe cites another study.

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**

MS. JOKERST: I'll object to form again. It's not a complete copy.

A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.

BY MR. MACROBERTS:

**Q. So as you're sitting --**

A. Without reading the whole report, I would not know.

**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**

A. Not off the top of my head.

**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**

A. Okay.

**Q. You agree that your publication is a reliable authority?**

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
MR. MACROBERTS: I have no other questions.
MS. JOKERST: I have some follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**
A. Um-hum.
**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**
A. Um-hum.

**CERTIFICATE**

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 4th day of November, 2024.

Sandra S. Biggs
_______________________

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

Sandra S. Biggs, C.C.R No. 0716

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Jeffrey Shaw in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment |

**Declaration of Jeffrey Shaw in Support of Plaintiffs' Response to Defendant's Motion for Summary Judgment**

I, Jeffrey Shaw, submit the following in support of Plaintiffs' Motion for Summary Judgment:

1. I am a citizen of the United States, a resident of Kansas, over the age of 18 years old, and fully competent to make this declaration. I knowingly and voluntarily make this declaration based on my personal knowledge. If called as a witness, I could and would testify competently under oath as to the facts set forth below.

2. I am an active member of the State Bar of Kansas in good standing. I am an attorney at the Kansas Justice Institute, and I represent the Plaintiffs in this case.

3. On August 2, 2024, the parties stipulated that the certified transcript of the November 13, 2023, Salina City Commission meeting (attached as Exhibit F of Plaintiffs' Response to Defendant's Motino for Summary Judgment and previously filed as Doc. 16-2) is an authentic transcript of the meeting.

4. On October 15, 2024, the parties stipulated to the authenticity of all documents produced by the City of Salina in response to Plaintiffs' First Request for Production of

Documents. Some of these documents, such as external emails to Salina officials were only authenticated as authentic copies of what the City received and had in its possession.

5. The photographs in Exhibit HH have all been authenticated through requests for admission, stipulation, or deposition testimony as authentic representations of The Cozy Inn.

6. The photographs Exhibit II and JJ have all been authenticated through requests for admission, stipulation, or deposition testimony as authentic representations of murals in Salina, Kansas.

7. Exhibits Y, Z, AA, BB, CC, DD, EE, and FF are true and accurate copies of Salina City Commission meeting minutes and document packets available to the public through the Salina website at https://www.salina-ks.gov/salina-city-commission, which were downloaded on February 20, 2025.

8. I declare under the penalty of perjury that the above is true and correct.

Dated: February 28, 2025

/s/ Jeffrey Shaw
Jeffrey Shaw

**Cozy Inn, Inc, et al. v. City of Salina, Kansas - Civil Action No. 6:24-cv-01027-TC-ADM**

**Plaintiffs' Response to Defendant's Motion for Summary Judgment – Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Andrew Deposition Excerpts |
| **Exhibit B** | Driscoll Deposition Excerpts |
| **Exhibit C** | Andrew 30(b)(6) Deposition Excerpts |
| **Exhibit D** | Defendant's Answers to Plaintiffs' First Set of Interrogatories |
| **Exhibit E** | Herrs 30(b)(6) Deposition Excerpts |
| **Exhibit F** | Salina City Commission Transcript |
| **Exhibit G** | Schrage Deposition Excerpts |
| **Exhibit H** | City Commission Minutes |
| **Exhibit I** | Art Center DRB Packet |
| **Exhibit J** | Talking Points |
| **Exhibit K** | Sign Permit Submittal Procedure |
| **Exhibit L** | Schrage Email 11/8/23 |
| **Exhibit M** | Schrage Email 11/9/23 |
| **Exhibit N** | Schrage Email 2/20/24 |
| **Exhibit O** | Benson Deposition Excerpts |
| **Exhibit P** | Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories |
| **Exhibit Q** | Herrs Deposition Excerpts |
| **Exhibit R** | Sign Permit Application |
| **Exhibit S** | Howard Deposition Excerpts |
| **Exhibit T** | Howard Declaration |
| **Exhibit U** | On-Hold Letter |
| **Exhibit V** | Michelson Deposition Excerpts |
| **Exhibit W** | Defendant's Amended Response to Plaintiffs' First Set of Interrogatories |
| **Exhibit X** | Windholz Deposition Excerpts |
| **Exhibit Y** | 4/17/17 Salina City Commission Meeting Minutes |
| **Exhibit Z** | 4/17/17 Salina City Commission Meeting Documents |
| **Exhibit AA** | 5/15/17 Salina City Commission Meeting Minutes |
| **Exhibit BB** | 5/15/17 Salina City Commission Meeting Documents |
| **Exhibit CC** | 6/26/17 Salina City Commission Meeting Minutes |
| **Exhibit DD** | 6/26/17 Salina City Commission Meeting Documents |
| **Exhibit EE** | 7/10/17 Salina City Commission Meeting Minutes |
| **Exhibit FF** | 7/10/17 Salina City Commission Meeting Documents |
| **Exhibit GG** | Taylor Declaration and Report |
| **Exhibit HH** | Cozy Photos |
| **Exhibit II** | Mural Photos |
| **Exhibit JJ** | Photos |
| **Exhibit KK** | White Declaration and Report |
| **Exhibit LL** | Defendant's Answers to Second Set of Interrogatories |
| **Exhibit MM** | Content-Neutral Sign Codes After Reed and Austin |
| **Exhibit NN** | White Deposition Excerpts |
| **Exhibit OO** | Shaw Declaration |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) |
| **Plaintiffs,** | ) **CIVIL ACTION** |
| | ) **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) |
| **City of Salina, Kansas,** | ) |
| **Defendant.** | ) |

**RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests that this Court deny Plaintiffs' Motion for Summary Judgment ("Motion"), and in support thereof states as follows:

## I. INTRODUCTION

Salina, like almost every other local government in the country, regulates signs in the interest of traffic safety, aesthetics, and property values. Salina's definition of sign includes displays[1] located outside of a building that is used to "announce," "direct attention to," or "advertise." As such, if a display does any one of these things, it is a sign that is subject to regulation. The Cozy Sign[2] falls squarely within the definition of "sign" because it is used for not just one (which would itself be sufficient), but all of these things.

[1] "Display" refers to "any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character."

[2] "Cozy Sign" refers to the sign that Plaintiffs started painting on the North wall of the Cozy Inn without a permit on November 3, 2023, which is the subject of this lawsuit.

The Sign Code (Salina Code ("S.C.") Ch. 42, Art. X, related definitions in Art. XIV, and S.C. §§ 1-11 and § 42-581) is not concerned with "art." There is no provision of the Sign Code that specifically exempt "murals" or "works of art." Mot. at 29. Put simply, regardless of whether it is also a "mural" or "art," if a display is "used to announce, direct attention to, or advertise," it is a sign. Conversely, if a display is not "used to announce, direct attention to, or advertise," then the Sign Code does not apply to it. This balance results in artistic architectural embellishments (including some murals, but also decorative fountains, gazebos, trellises, brick or tile patterns, and similar improvements that are designed to attract attention) not being subject to regulation under the Sign Code because they are not within the scope of the definition of "sign." Put simply, the definition puts bookends on the Sign Code, preventing it from being absurdly overinclusive.

In this context, Plaintiffs' contention that "[t]he distinction between regulated signs and unregulated murals isn't specified anywhere in the written code" is a red herring. Mot. at 1. The distinction is between "signs" and "not signs." If a display that is outside of a building is "unregulated" it is because the display is not "used to announce, direct attention to, or advertise."

The Motion asserts a content bias that does not exist. Based on its building frontage, The Cozy Inn (the "Cozy") may display up to 63 square feet of signage. The Cozy Inn already has about 53 square feet of permitted signs. Mr. Howard's alleged passion for telling his "story" has no constitutional significance, but if that passion is sincere, he could scale the painting down.

But the summary judgment record shows that this case is not about Plaintiffs' desire to tell a "story." Initially, Plaintiffs specifically hired Mr. Benson for "sign lettering." Over time, and with Mr. Benson's input, the project grew into the display that is at issue in this case—the entire North wall of The Cozy, turned into a sign that includes depictions of sliders and toppings that are offered for sale at The Cozy, along with an arrow pointing to the door of the establishment and

text that says, "Don't fear the smell, the fun is inside." The North wall of the Cozy is about 528 square feet in area, an area that is many multiples larger than the Sign Code allows.

Plaintiffs' passions and intentions are not germane. It does not matter whether the Cozy Sign is also a "mural," or "art," or even if it tells a "story." The City determined that the Cozy Sign is used to "announce," "direct attention to," and "advertise," and therefore the display is a regulated sign. Plaintiffs could have, but did not, administratively appeal the City's routine fact-finding determination in that regard. Instead, they brought this federal case. Despite a lengthy diatribe of so-called "undisputed facts" that suggests that the Cozy Sign does not "announce," "direct attention to," or "advertise," Plaintiffs have never sought to have their display excluded from the definition of "sign." Instead, they seek to take a constitutional wrecking ball to the Sign Code itself—a reasonable set of regulations that Plaintiffs admit they never actually read, and have no intention of ever reading. The Motion suggests that Plaintiffs simply refuse to acknowledge the "common ground" that "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc*., 452 U.S. 640, 647 (1981).

The City administered its content-neutral sign code to its letter. It did not violate Plaintiffs' civil rights. The Motion's characterization of the Cozy Sign as a "whimsical" "UFO-themed mural," and its persistent "whataboutism" in relation to displays that (unlike Plaintiffs' sign) are not "used to announce, direct attention to, or advertise" are both giant red herrings. The latter red herring is egregious when juxtaposed against the clear command that "an as-applied challenge tests the application of that restriction <u>to the facts of a plaintiff's concrete case</u>." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248 (2023) (emphasis added).

The question in this case is not whether the City got it right with respect to determining the Cozy Sign (or any other sign for that matter) is a sign. Plaintiffs did not raise that claim, and because they did not administratively appeal those issues, Plaintiffs are foreclosed from bringing them to this Court.[3] Additionally, even if administrative exhaustion did not apply, Plaintiffs do not seek declaratory judgment that the Cozy Sign is not a "sign" under the Sign Code.

Federal courts do not sit as super zoning boards of appeal. The City submits that Plaintiffs' have simply repackaged a routine dispute as a constitutional claim. The claims upon which the Plaintiffs seek summary judgment are entirely without merit, and their Motion for Summary Judgment should be denied. This is not a close case.

## II. RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

Few facts set out in the Motion's Statement of Facts ("SOF") are undisputed and material. In many cases, the statements misrepresent the summary judgment record. Further, the Motion fails to recite the most material of the "material facts," that is, the full text of the provisions of the Sign Code that are at issue in this case. The City responds to the SOF ("RSOF") as follows:

1-2. Undisputed, but not a material fact ("NMF").

3. Disputed. Continuing objection to Howard Declaration (Mot. Ex. A), as it seeks to improperly alter sworn deposition testimony. Mr. Howard wants customers to go inside the Cozy because he can "upsell" the customers and his purpose of having customers inside the Cozy is to sell products and merchandise. **Ex. 1** (Howard Dep.) at 41:12-15, 43:16-25, 44:1-10.

4. Undisputed. NMF.

5. Undisputed. NMF. It is a corporation. **Ex. 2** (Amended PTO) at 2, Stip. Fact i.

[3] Plaintiffs have also not raised claims regarding selective enforcement or equal protection and are barred from raising those issues for the first time on reply to a response to a Motion for Summary Judgment.

6. Disputed. Public art, which includes murals, is not prolific and does not represent a traffic safety or aesthetic issue. **Ex. 3** (Mark White Aff'd); **Ex. 4** (Herrs Dep.) at 41:19-25, 42:1-21, 26:10-21.

7. Disputed. Plaintiffs' exhibit does not support this SOF. The City provides limited administrative support concerning donations for Boom! that are made to the Greater Salina Community Foundation, but the City does not provide direct funding. **Ex. 5** (Anderson Dep.) at 23:2-11.

8. Undisputed. NMF.

9. Disputed. NMF. Mr. Howard told Mr. Benson that he wanted the words "Don't' Fear the Smell. The Fun is inside" painted on the wall of the Cozy, "along with a burger in the middle of it," but Mr. Howard testified he did not know why he included the burger and when he provided this idea to Mr. Benson he then told Mr. Benson "just look at that wall like a [tattoo] sleeve . . . just run with it." **Ex. 1** at 94:7-25, 95:7-19, 100:8-13; 126:3-25, 127:1-25.

10. Disputed due to how the term "mural" is used in the Motion. *See* RSOF ¶ 9.

11. Disputed due to how the term "art" is used in the Motion. *See* RSOF ¶ 9.

12. Disputed. NMF. *See* RSOF ¶¶ 9-11, supra.

13. Undisputed. NMF. To Mr. Howard's intent, see RSOF ¶¶ 9-11, supra.

14. Disputed as to the characterization of the Cozy Sign. Mr. Howard did not indicate to Mr. Benson that it was to be a spaceship. The initial renderings kept Mr. Howard's hamburger and wording, and added an onion ("That pic with arrow has the WOW factor just lean a slice of onion against it!! That will be perfect"). The additional imagery was added by Mr. Benson. The Cozy Sign design approved by Mr. Howard included hamburgers without any depiction of spaceships or alien pilots. RSOF ¶ 9; **Ex. 1** at 128:11-25, 129:1-25, 130:1-25, 131:1-25, 132:1-25,

133:1-25, 136:5-11, 146:8-25, 147:1-19; **Ex. 6 (**Howard Dep. Ex. V, Texts) at 5-7, 12 (Bates 339-41, 346); Additional Material Fact ("AMF") ¶ 3 *infra*.

15. Disputed. NMF. The image of the Cozy Sign at ECF 16, ¶ 28 (Amend. Complaint) is what Plaintiffs' alleged they intend to be the final rendering of the Cozy Sign. **Ex. 2** at p. 2, Stipulated Fact vii. This image is different than the Cozy Sign currently painted as it does not contain what Plaintiffs' have referred to as the "alien pilots" on the hamburgers. **Ex. 4** at 113:10-25, 114:1-4; **Ex. 2** at p. 2, Stipulated Fact vi.

16. Disputed. NMF. *See* RSOF ¶¶ 9-11, 14.

17. Disputed. NMF. *See* RSOF ¶¶ 9-11, 14.

18. Disputed. NMF. *See* RSOF ¶¶ 9-11, 14. The Cozy Sign is not one of kind. A similar sign is displayed on the wall of Jenni's Liquors, another business owned by Mr. Howard. **Ex. 1** at 213:1-13; 215:10-15; **Ex. 7** (Howard Dep. Ex. Y, Photos of Jenni's Liquor).

19. Disputed. NMF. Mr. Howard admitted he can upsell customers better when they are inside of the Cozy Inn. **Ex. 1** at 41:12-15. *See* also RSOF ¶ 14.

20. Disputed as the accuracy. NMF. Mr. Howard guessed that in the summertime, 50 percent of customers used the walk-up window. **Ex. 1** at 42:1-18.

21. Not disputed for purposes of this Motion. NMF.

22. Disputed. NMF. The Cozy is a for-profit business. **Ex. 2** at 2, Stipulated Fact i. The Cozy Sign is asking people to come inside the Cozy Inn to purchase something. Inside, Mr. Howard can upsell customers and tell them how much to order, and he wants customers to go inside and have fun so they want to come back and purchase more products. **Ex. 1** at 40:17-25, 41:1-4, 41:13-15, 43:16-25, 44:1-10, 46:9-25, 47:1-25, 48:1-9.

23. Disputed. NMF. *See* RSOF ¶ 22.

24. Disputed. NMF. *See* RSOF ¶ 22.

25. Disputed. NMF. *See* RSOF ¶ 22.

26. Undisputed.

27. Disputed. NMF. Mr. Benson did not state whether the Cozy Sign was complete. The referenced photo shows the Cozy Sign is fully outlined, and Mr. Benson had started painting in that outline with color. **Ex. 8** (Benson Dep.) at 46:5-25, 47:1-4, 115:4-13, 134:8-12; **Ex. 9** (Benson Dep. Ex. C) at 2.

28. Disputed in part. NMF. Mr. Anderson could not recall if he first saw the Cozy Sign driving by the Cozy Inn or on social media. He exchanged brief texts with a City employee alerting her of the Cozy Sign. **Ex. 5** at 40: 5-12, 42:5-22, 43:12-19; **Ex. 10** (Driscoll Dep.) at 34:12-25.

29. Undisputed.

30. Disputed in part. At the time of the initial determination, the Cozy Sign was completely outlined, and some parts had been painted. RSOF ¶ 27.

31. Undisputed.

32. Disputed as to context. The City determined the Cozy Sign is a sign and it exceeds the size allowance. **Ex. 11** (Andrew Dep.) at 159:19-22, 160:1-10, 188:17-25, 189:17-24.

33. Disputed. The City applied the definition of sign to determine that the Cozy Sign is a sign and that it exceeded the size allowance. **Ex. 11** at 159:19-22, 160:1-10, 188:17-25, 189:17-24; **Ex. 4** at 85:7-25, 86:1-25, 87:1-2; **Ex. 12** (City's Resp. to First Set of Interrog.) at No. 11.

34. Disputed. *See* AMF ¶ 2, 5, *infra*.

35. Disputed. *See* RSOF ¶ 34.

36. Disputed. *See* RSOF ¶¶ 34-35; Ex. _ Andrew Depo at 17:19-25, 18:1-11.

37. Disputed. *See* RSOF ¶¶ 34-36.

38. Disputed. *See* AMF ¶ 2, 5, infra.

39. Disputed. **Ex. 11** at 12:16-24; AMF ¶¶ 2, 5 infra.

40. Undisputed.

41. Disputed. The Sign Code does not include the term "mural." The term "art" may sometimes be used as an imprecise short-hand for "not a sign." **Ex. 12** at Nos. 5, 6; **Ex. 13** (Andrew 30(b)(6) Dep.) at 11:14-25, 12:1; **Ex. 14** (Schrage Dep.) at 52:19-15; AMF ¶¶ 2, 5, *infra*.

42. Disputed. *See* RSOF ¶ 41; **Ex. 11** at 87:17-23; **Ex. 4** at 29:6-7. There is nothing in the text of the Sign Code that identifies a particular "speaker." *See* AMF ¶ 2; Section III.B.7., *infra*.

43. Disputed in part. Mr. Schrage's correspondence occurred, but it referred to the Cozy Sign as a wall sign. *See* ECF 105-18, Pls.' Mot. Ex. R at 2.

44. Undisputed as to all time periods pertinent to this litigation.

45. Undisputed.

46. Undisputed. NMF.

47. Disputed as to "decision to regulate [mural] as a sign." NMF. AMF ¶¶ 3, 5, *infra*.

48. Undisputed, with clarification. NMF. Mr. Schrage's email was "trying to boil down for him the high points of where thing stood" and was "trying to refer to there's case law out there." **Ex 14** at 51:12-19, 52:8-17.

49. Undisputed. NMF.

50. Undisputed as to the timing and text of the memo. Disputed as to accuracy. The City regulates the size of all signs, whether their messages are commercial or non-commercial. **Ex. 13** at 13:14-16; **Ex. 15** (Herrs 30(b)(6) Dep.) at 106:9-15.

51-53. Undisputed. NMF.

54. Undisputed as to quoted testimony, but disputed as to accuracy. AMF ¶ 3, *infra*.

55. Disputed. The Cozy Sign was discussed at the meeting, but the quotations were taken from the summarized minutes and do not reflect what was said by Mr. Schrage. Mr. Schrage stated "And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge that signs can be artistic, some more artistic than others." **Ex. 16** (Nov. 13, 2023 Meeting Transcript) at 5:23-25, 6:1-2.

56. Undisputed, but not reflective of Summary Judgment record ("NRSJR"). Mr. Schrage testified he "was not trying to . . . parse it that far … I used the term commercial speech equating it to advertising and equating it to what I understood the intent of the Cozy sign to be." **Ex. 14** at 76:3-23.

57. Undisputed, but NRSJR. *See* RSOF ¶ 56.

58. Disputed. *See* RSOF ¶ 56.

59. Undisputed as to what Mr. Schrage said, but he explained this was based on his "understanding of the Cozy sign," in particular. He does not review sign permits, apply the Sign Code, or make such determinations. **Ex. 14** at 80:24-25, 81:1-10, 128:25, 129:1-12.

60. Disputed as to accuracy. Ms. Driscoll stated that the Cozy Sign was too large under the Sign Code. **Ex. 16** at 17:2-18. The phrase "mural-sign code regime" is an inappropriate and potentially pejorative description of the Sign Code.

61-62. Undisputed.

63. Undisputed. NMF.

64. Disputed. The quote is accurate, but it is so truncated it is NRSJR. Ms. Driscoll was discussing a hypothetical she recalled from a "Supreme Court case" and "it's one [she has] heard multiple times and it's easy to explain to somebody who's not knee deep in municipal code all the time" and "it was just a simple way to try and identify for the commission that it's more

than just a word or a picture, that all these pieces lay together." **Ex. 16** at 23:4-18; **Ex. 10** at 79:17-25, 80:1-4, 85:6-25, 86:1-9, 87:25-1-25, 88:1-2.

65. Disputed. *See* RSOF ¶ 64.

66. Disputed. *See* RSOF ¶ 64.

67. Disputed. NRSJR. Mr. Schrage stated "There certainly is a circumstance where [such a display] might not be a sign." **Ex. 16** at 26:16-22.

68. Disputed. Ms. Driscoll testified that when she made the statement "expressly related solely to the economic interest" she "was trying to connect and help the commission understand that one of the things we look for in signs, specifically related to our definition and is common in sign law and sign cases, is that where there is an economic relationship to what is being communicated, such as advertising, go buy something, purchase something, use that service." *See* RSOF ¶ 64; **Ex. 10** at 82:3-17.

69. Undisputed. NMF.

70. Disputed. NMF. NRSJR. **Ex. 16** at 28:5-8.

71-73. Undisputed. NMF.

74. Disputed. *See* RSOF ¶ 41, for reasoning and citations.

75. Disputed. The referenced pleading does not support this contention, which amounts to legal argument, not statement of fact. *See* RSOF ¶ 41; **Ex. 13** at 13:14-16, **Ex. 15** at 106:9-15. Motion SOF ¶ 168 strongly suggests that the Plaintiffs understand this. *See* Motion SOF ¶ 75.

76. Disputed. NRSJR. **Ex. 15** at 43:9-10 ("We can determine . . . ").

77. Disputed. NRSJR. *See* AMF ¶ 3, *infra*.

78. Disputed. NRSJR. *See* AMF ¶ 3, *infra*.

79. Disputed. NRSJR. *See* AMF ¶ 3, *infra*.

80. Disputed. Mr. Andrew was questioned with speculative, confusing hypotheticals regarding if the Cozy Inn were located next to a chicken farm, then asked whether it would be a sign if the Cozy Inn only did delivery. Noting he was without the "full context," Mr. Andrew stated "My first inclination would be to consider that a sign" because its "an invitation to partake of their food." **Ex. 11** at 166:21-25, 167:1-3, 170:7-25, 171:1-25, 172:1-4.

81. Disputed. NRSJR. The City does not regulate the content of a sign. In some instances, the City looks at the sign to determine if it's a sign. **Ex. 14** at 71:11-15; **Ex. 10** at 67:2-25, 68:1-9, 88:4-24; **Ex. 11** at 86:11-25, 87:1-23; *see also* Section III.B.5., *infra*.

82-83. Undisputed. NMF.

84. Disputed. NRSJR. Mr. Herrs answered "Yes. You have to look at the character and elements of the sign." **Ex. 4** at 88:23:24; *see also* Section III.B.5., *infra*.

85. Disputed. NRSJR. An elevation drawing identifies "the materials it's made out of" its "height and width" and whether it will be "illuminated or static" and "depicts the appearance and the physical characteristics of that sign." **Ex. 11** at 26:18-25, 27:1-16.

86. Disputed. NRSJR. Regarding the confusing and speculative hypotheticals, Ms. Driscoll responded "From the very limited information you've given me, it might not be a sign." Mr. Schrage does not apply the Sign Code. Mr. Andrew testified "if it was in the context of a blank white wall with a pizza symbol on it that had no association with announcing or directing attention to or advertising The Cozy Inn business and did not advertise a nearby establishment, then it would not be a regulated wall sign." **Ex. 11** at 173:14-20; **Ex. 10** at 106:6-20.

87. Disputed. NRSJR. *See* RSOF ¶ 86.

88. Undisputed. NMF.

89. Disputed. NMF. NRSJR. **Ex. 11** at 179:20-25, 180:1-17; **Ex. 14** at 123:10-125:8,

124:9-11, 132:3-20

90. Disputed. Mr. Schrage testified his answers were based on his understanding. **Ex. 14** at 123:23-25, 124:20-25, 125: 2-8, 132:3-20; **Ex. 10** at 106:6-20.

91. Disputed. NRSJR. Mr. Schrage, who does not evaluate whether displays are signs on behalf of the City testified "I would seek legal counsel on that, but yes, I believe so." **Ex. 14** at 122:25, 126:1-8; 132:3-20; **Ex. 10** at 106:6-20.

92. Undisputed for purposes of this Response. NMF. NRSJR.

93. Disputed. Ms. Driscoll testified she "would question whether it's a sign and then work with my staff and our legal counsel to verify my interpretation." **Ex. 10** at 100:11-13.

94. Disputed. NRSJR. Ms. Driscoll testified that Dean Andrew would typically provide that feedback, she then provided her answer and stated, "But if that were a question . . . that's something we would talk about with legal." **Ex. 10** at 114:15-18, 116:1-4.

95. Disputed. NRSJR. When a Commissioner asked if this "same painting" would be a sign if displayed on the other side of town, Mr. Schrage noted that could get into "off-premise signs," but he did not make a contention on behalf of the City. **Ex. 16** at 26:1-10.

96. Disputed. *See* AMF ¶ 3, *infra*.

97-101. Undisputed.

102. Disputed. The purpose of the meeting was to explain why the Cozy Sign was a sign, and why it was too large to qualify for a permit. **Ex. 8** at 80:8-25, 81:1-25, 82:9-13.

103. Undisputed (Salina asked Mr. Howard to submit a sign permit application).

104. Undisputed.

105. Disputed as to timing of response, undisputed as to 10-day deadline in § 42-502(b). On November 6, 2023, the City told Mr. Howard the Cozy Sign would not qualify for a sign permit.

**Ex. 4** at 112:24-25, 113:1-2.

106. Undisputed. The application was placed on hold. **Ex. 15** at 112:25, 113:1-10.

107. Disputed. The City provided Mr. Howard with the Cozy Inn Sign Analysis, which explained why the Cozy Sign was too large to qualify for a permit. **Ex. 8** at 80:21-25, 81:1-24; **Ex. 17** (Cozy Inn Sign Analysis, Benson Dep. Ex. G).

108. Disputed. The statement tends to misrepresent the understandings of the parties prior to the date of the letter. The application was placed on hold immediately upon receipt. **Ex. 15** at 112:25, 113:1-10.

109-112. Undisputed. NMF.

113. Disputed. NRSJR. Mr. Andrew testified that on November 13th the application was "placed on file and on hold," and that on "Monday the 6th" the City was "unable to issue a sign permit." Later, counsel asked a leading question including an incorrect date (November 6th) and confused the deponent. **Ex. 11** at 229:4-8, 230:12-17, 267:21-25, 271:3-16.

114-115. Undisputed.

116. Disputed. NMF. The testimony is paraphrased in a manner that misrepresents its actual import. Mr. Howard expressed interest in pursuing a code-based solution and the City thought they had an understanding from verbal conversations. **Ex. 1** at 210:15-25, 211:1-2; **Ex. 15** at 117:20-25, 118:1-17.

117. Disputed. NMF. NRSJR. Mr. Anderson referred to a "photo mural" at Fire Station No. 2. **Ex. 5** at 69:13-14. The referenced "mural" is not pertinent to the application of the Sign Code to the facts of plaintiffs' "concrete case." *See* Section I at p. 4, *supra*.

118. Disputed. NMF. The City has determined that the display at Fire Station No. 2 is not a sign because it is not used to announce, direct attention to, or advertise. **Ex. 13** at 58:24-25,

59:1-16; *see* RSOF ¶ 117, as to relevance.

119. Disputed. NMF. NRSJR. **Ex. 10** at 119:7-25, 120:1-25, 121:1-5; *see* RSOF ¶ 117.

120. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

121. Disputed. NMF. Mr. Andrew explained that the staff member who wrote the report did not "do a detailed analysis of how this relates to the three elements in the sign code definition," and the installation was not a sign. **Ex. 11** at 28310-25, 284:1-10; *see* RSOF ¶ 117.

122. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

123. Disputed. NMF. The owner of the project stated his opinion in the article that "This will help . . ." ECF 105-26, Mot. Ex. Z at 35 (Bates 271).

124. Disputed. NMF. The City has determined it is not a sign because it does not meet the definition of sign. **Ex. 10** at 127:1-25, 128:1-7; *see* RSOF ¶ 117, as to relevance.

125. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

126. Disputed. A change in use of the building would raise questions for Ms. Driscoll regarding whether it was advertising. **Ex. 10** at 129:2-20.

127. Undisputed. NMF. RSOF ¶ 91; *see* RSOF ¶ 117, as to relevance.

128. Disputed. NMF. AMF ¶ 3, *infra*; *see* RSOF ¶ 117, as to relevance.

129. Disputed. NMF. AMF ¶ 3, *infra*; *see* RSOF ¶ 117, as to relevance.

130. Disputed. NMF. AMF ¶ 3; *see* RSOF ¶128, ¶ 117, as to relevance. Signs that comply with size limitations are permitted. **Ex. 4** at 84:1-25, 85:1-5; **Ex.15** at 69:4-16; **Ex. 10** at 116:9-25; **Ex. 12** at No. 8.

131. Undisputed as to quotation, but Salina Code ("S.C.") § 42-503(a) is more complete. *See* AMF ¶ 2, *infra*.

132. Disputed. NMF. NRSJR. "The city for The Yard measured the smallest rectangular

figure that encompassed home plate and The Yard, period, end stop." **Ex. 13** at 93:9-14; *see* RSOF ¶ 117, as to relevance.

133. Disputed. NMF. *See* RSOF ¶ 132.

134. Disputed. NMF. **Ex. 4** at 101:1-14; *see* RSOF ¶ 117, as to relevance.

135. Disputed. NMF. **Ex. 13** at 62:1-25, 63:12-19; *see* RSOF ¶ 117, as to relevance.

136. Disputed. NMF. No matter how it is measured, the Cozy Sign exceeds the allowable sign area. **Ex. 11** at 223:5-25, 224:1-5; **Ex. 4** at 24:20-25, 25:1-25, 26:1-7.

137. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

138. Disputed. NMF. **Ex. 11** at 311:2-20; 92:22-24; 95:1-5.

139. Disputed. NMF. The Cozy Sign is so large that even if the City could consider that frontage, it is still too big to qualify for a sign permit. **Ex. 4** at 32:2-25, 33:1-25, 34:1-4; 117:9-18; **Ex. 11** at 92:22-24; 95:1-5.

140. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

141. Disputed. NMF. *See* RSOF ¶ 117, as to relevance.

142-143. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance for both paragraphs.

144. Disputed. NMF. The display is inside of a building—"building" defined in S.C. § 42-637. **Ex. 11** at 55:10-24; **Ex. 4** at 88:1-18, 89:2-13, 129:1-25, 130:1-25, 131:1-19; AMF ¶ 2, *infra*. *See* RSOF ¶ 117, as to relevance.

145. Disputed. NMF. *See* RSOF ¶ 144; *see* RSOF ¶ 117, as to relevance.

146. Undisputed. NMF. *See* RSOF ¶ 144.

147. Disputed. NMF. Unsupported in Plaintiffs' SOF. No deponent has identified or authenticated the Bike Tek mural, its location, or the disclosed photo at Mot. Ex. F at 16 (Bates 300) (ECF 105-6). *See also* RSOF ¶ 117, as to relevance.

148. Disputed. NMF. *See* RSOF ¶ 147.

149. Disputed as to "music studio" and "musical themed." NMF. **Ex. 5** at 62:1-24, 63:2-4; *see* RSOF ¶ 117, as to relevance.

150. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

151. Disputed. NMF. **Ex. 11** at 283:23-25, 284:1-10. *See* RSOF ¶ 117, as to relevance.

152. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

153. Undisputed. NMF. *See* Section I at p. 2, *supra*, as to relevance.

154. Undisputed.

155. Disputed. The display is a sign. **Ex. 19** (City's Resp. to RFAs) at Nos. 13-16.

156. Undisputed. NMF. S.C. § 42-510 does not apply. *See* RSOF ¶ 155; AMF ¶ 2, *infra*.

157. Undisputed. It is a nonconforming, preexisting sign. *See* RSOF ¶ 155; AMF ¶ 2, *infra*.

158. Disputed. It is a non-conforming, pre-existing sign. *See* RSOF ¶ 155.

159. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

160. Disputed. NMF. The website is operated by the Chamber of Commerce under contract with the City. **Ex. 13** at 76:2-12.

161. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

162. Disputed. NMF. The sign is exempt under S.C. § 42-504(2) as putting that information on the water tower protects the public health, safety, and welfare and serves as a wayfinding sign. **Ex. 13** at 77:1-6. *See* RSOF ¶ 160; *see also* RSOF ¶ 117, as to relevance.

163. Disputed. NMF. Scoreboards are exempted under the Sign Code and provide game-specific information. If the second side of the structure is used for advertising, it does not fall under the scoreboard exemption. **Ex. 11** at 103:1-25, 104:1-25, 105:1-13, 106:3-9; *see* RSOF ¶ 117, as

to relevance.

164. Disputed. NMF. *See* RSOF ¶ 163.

165. Disputed. NMF. *See* RSOF ¶ 163.

166. Disputed. NMF. *See* RSOF ¶ 163.

167. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

168. Disputed. NRSJR. The display is regulated because it is a structure outside of a building that is used to announce, direct attention to, or advertise. **Ex. 11** at 54:18-25, 55:1-8.

169. Disputed, NMF. NRSJR. Non-commercial flags are exempt from the Sign Code. **Ex. 11** at 32:1-25, 34:22-24. *See* RSOF ¶ 117, as to relevance.

170. Disputed, NMF. NRSJR. *See* RSOF ¶ 169; and RSOF ¶ 117, as to relevance.

171. Undisputed. NMF. *See* RSOF ¶ 117, as to relevance.

172. Disputed. NMF. NRSJR. Mr. Andrew testified that in addition to announcing, it would also direct attention and advertise the business. **Ex. 11** at 89:25, 90:1-3.

173. Disputed. NMF. NRSJR. **Ex. 11** at 113:1-25, 114:1-25, 115:1-25, 116:1-25, 117:1-25, 118:1.

174. Disputed. NMF. NRSJR. *See* RSOF ¶ 173.

175. Disputed. NMF. NRSJR. *See* RSOF ¶ 173.

176. Disputed. NMF. NRSJR. Salina Code provides the word "or" may be read as "and" and the word "and" as "or," where the sense requires it. S.C. §1-2(14); **Ex. 11** at 72:6-19; 75:1-19. This is not a material fact in part because the Cozy Sign is "used to announce, direct attention to," *and* "advertise." This manner of interpretation is common practice in a number of different legal contexts. Cf. § 22:5. Grammatical construction; punctuation, 2 Couch on Ins. § 22:5.

177. Disputed. NMF. NRSJR. *See* RSOF ¶ 176.

178. Disputed. NMF. NRSJR. Members of public could read the code themselves. **Ex. 11** at 81:17-24.

179. Undisputed. However, the purpose statement in S.C. § 42-500 sets forth a more complete list of the City's interests. **Ex. 12** at No. 4.

180. Undisputed as quoted, but NRSJR. The City also provided City staff testimony and expert testimony demonstrating how the Sign Code advances its stated interests. AMF ¶ 7, *infra*.

181. Disputed. *See* RSOF ¶ 180; AMF ¶ 7, *infra*.

182. Disputed. NRSJR. *See* AMF ¶ 7, *infra*.

183. Undisputed as quoted. NMF. Objection—Questioning exceeded scope of 30(b)(6) notice. **Ex. 15** at 74:2. Plaintiffs provide no authority for the proposition that before-and-after studies of the efficacy of sign codes is a constitutional requirement, and there is no controlling case law to support that proposition.

184. Disputed. NRSJR. *See* AMF ¶ 7, *infra*; **Ex. 15** at 71:9-25, 72:15-25-73:1-12 (discussing how the Sign Code protects pedestrian and traffic safety).

185. Disputed. NRSJR. *See* AMF ¶ 7, *infra*.

186. Disputed. AMF ¶ 7, *infra*.

187. Disputed. NRSJR. *See* AMF ¶ 7, *infra*.

188. Disputed. NRSJR. *See* AMF ¶ 7, *infra*.

189. Undisputed.

190-196. Undisputed. NMF.

197. Undisputed.

198. Disputed. NRSJR. The cited deposition text refers only to studies commissioned or conducted by Salina, and the SOF is not limited in like fashion. **Ex. 20** (White Dep.) at 46:25-

47:1-5.

199. Undisputed. NMF. *See* **Ex. 21** (Andrew Aff.) at ¶ 7 (explaining 2017 amendment).

200. Undisputed. NMF. Plaintiffs provide no authority for the proposition that peer-reviewed studies of the efficacy of sign codes in promoting a specific City's planning goals is a constitutional requirement, and there is no controlling case law to support that proposition.

201. Disputed. Mr. White studied the efficacy of the Sign Code. His conclusions are set out in his Affidavit and Expert Witness Report. **Ex. 3**; AMF ¶¶ 1, 7, *infra*.

202. Undisputed. NMF. The difference was not specified to the deponent.

203. Disputed. NMF. Mr. White testified that he was "not aware" of any study that was "that specific." **Ex. 20** at 115:22-25-116:5-11. Further, he testified that there are "tons of studies" regarding signs and traffic distractions. **Ex. 20** at 14:13-21, 133:5-10.

204. Disputed. NMF. NRSJR. **Ex. 20** at 124:6-11.

205. Undisputed.

206. Undisputed. NMF.

207. Disputed. NMF. NRSJR. **Ex. 20** at 120:2-17.

208. Disputed. NRSJR. **Ex. 20** at 123:7-14.

209. Undisputed. NMF.

210. Undisputed. NMF. The Sign Code provisions at issue in this case do not distinguish between commercial and noncommercial speech. RSOF ¶¶ 55, 56, 75.

211. Disputed. NMF. NRSJR. **Ex. 20** at 125:7-12. *See* RSOF ¶ 117, as to relevance.

212. Disputed. Publication is not a "learned treatise." It is a publication targeted at urban planners. **Ex. 20** at 65:17, 193:16-21.

213. Undisputed. NMF.

214. Disputed. Signs pull a driver's attention away from the road, create a safety hazards based on their potential to distract motorists, and are in one of the highest categories of distractions. **Ex. 4** at 41:19-25, 42:1-21, 26:10-21; **Ex. 15** at 77:12-21; **Ex. 22** (Stutts Report, Charles Taylor Dep. Ex. G) at 15-16, Table 6; **Ex. 20** at 124:19-21

215. Disputed. *See* RSOF ¶ 214.

216. Disputed. As articulated in Section IV(B)(8), *infra*, AMF ¶ 7, infra.

217. Disputed. See AMF ¶ 7, Section IV(B)(8) *infra*; **Ex. 20** at 124:19-21; **Ex. 3** (White Aff. Ex. 1 at 26-29 (citing to publications regarding traffic safety)).

218-221. Undisputed. NMF.

222-224. Undisputed.

225. Undisputed. NMF.

## III. ADDITIONAL MATERIAL FACTS

1. The Sign Code is a state of the art, generally accepted technique for controlling sign clutter. The terms and phrases used in the definition of sign, such as advertise and announce are well understood and in common use throughout the nation and in Kansas. Ex. __ (Mark White Aff'd at ¶ 6).

2. The full text of the definition of Sign is codified at S.C. § 42-764, and the full text of the definition of "building" is codified at S.C. § 42-637. **Ex. 18**.

3. City staff applied the Sign Code as written, and determined the Cozy Sign met the definition of Sign under the Sign Code as it is used to "announce," "direct attention to," and "advertise." City staff applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The Cozy Sign announces the Cozy and its infamous onion smell, directs attention to the entrance by way of an arrow that points to the front

door, and advertises the hamburger condiments, pickles, onions, ketchup, mustard for sale at the Cozy. **Ex. 1** at 94:7-25, 95:7-19, 100:8-13, 136:5-11; **Ex. 15** at 86:13-25, 89: 3-22, 90:7-25; **Ex. 11** at 159:19-22, 160:1-10; **Ex. 12** at Nos. 5, 11; **Ex. 4** at 47:4-12, 115: 3-10, 116:11-21.

4. Plaintiffs knew the City regulated signs, but did not read the Sign Code and have no intent to read the Sign Code. **Ex. 1** at 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5, 240:15-17; 241:4-15; **Ex. 23** (Andrea Windholz Dep.) at 71:7-12.

5. The City interprets and applies S.C. § 42-764 to require subparagraphs (1), (2), and (3) therein be met for any display to be considered a "sign." **Ex. 11** at 48:8-16, 50:5-11, 51:6-11, 55:10-24; 62:16-24; **Ex. 13** at 11:14-25, 12:1.

6. The Sign Code contains a content substitution clause at S.C. § 42-511. **Ex. 18**.

7. The Sign Code directly and materially furthers its recited purposes, set forth in S.C. § 42-500. **Ex. 3** at ¶ 6; **Ex. 24**; **Ex. 4** at 17:7-21, 60:6-24, 61:2-25, 62:1-18, 64:10-18, 121:10-25, 121:1-2, 121:23-25, 122:1-2.; **Ex. 15** at 20:10-25, 21:1, 26:1-21, 27:2-9, 27:17-25, 28:1-7, 37:2-25, 38:1-10, 45:10-16, 44:16-24, 45:1-3, 45:10-16, 47:15-25, 48:1-21 ("I think it protects property values," prevents "giant billboard" from going up in a residential neighborhood that "might impact the property values,"), 58:1-19, 62:1-2, 71:12-16, 72:19-21, 73:13-21, 73:3-11 ("the more signs you have . . . it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction."), 74:17-25, 75:1-8 ("we have had a lot of redevelopment" and "that property values have gone up,"), 76:54-7, 77:12-21 ("signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety."); **Ex. 11** at 127:1-2, 131:20-24; *see also* RSOF ¶ 182.

8. The City advised Mr. Howard if he wanted to erect the Cozy Sign he could reduce the size to the remaining 10 square feet, or remove existing signs to try to fit within allowable 63 square feet. **Ex. 15** at 92:15-24, 93:1-16. 94:11-25, 96:3-25, 97:1-8, 98:1-13, 116:16-25, 117:1-2.

9. The Cozy Inn has various platforms of communication. **Ex. 23** at 19:5-25, 20:1-25, 21:1-25, 22:1-2, 23:8-25, 24:1-25, 26:7-25, 27:1-2, 29:12-25, 30:1-25, 59:2-25, 60:1-19; **Ex. 1** at 89:11-24, 150:8-24; 213:3-13, 221:25, 222:1-12.

10. Plaintiffs did not administratively appeal the City's determination that the Cozy Sign was a sign and therefore subject to the requirements of the Sign Code. **Ex 11** at 234:11-21; **Ex. 18** (S.C. § 42-597).

11. The Salina Code has severability provisions at S.C. § 1-11. **Ex. 18**.

## IV. ARGUMENT

The Motion's contentions about the "idiosyncracies" of the City's so-called "mural-sign code regime" (Sign Code) offer more heat than light. In fact, though its specific numerical standards are reflective of the Salina Board of Commissioners' considered, proper legislative judgments regarding community aesthetics and the appropriate balance between the need for sign-based communication and the risk of sign clutter (to aesthetics, traffic and pedestrian safety, and property values). the Sign Code itself does not stand out as "idiosyncratic." Its regulatory methods (e.g., number of signs, area of signs proportionality of wall signs, and so forth) are state-of-the-art, industry-standard, and widely-used. Additional Material Fact ("AMF") ¶ 1.

For the purpose of identifying what the Sign Code regulates, the City defines "sign" in S.C. § 42-764. AMF ¶ 2. Its definition is based upon a long history and common understandings about what signs are. It is clear, it is content-neutral, and it was applied to the letter to the Cozy Sign. The U.S. Supreme Court recently detailed the historical backdrop of regulations that specifically

deal with signs. *See City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61, 65 (2022) (describing sign regulation as a "tradition" dating back more than 150 years—and observing that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite."). As S.C. § 42-764 demonstrates, the Sign Code does not parse topics, ideas, messages, or viewpoints. AMF ¶ 2. Indeed, it is a content-neutral regulation of *signs*—displays that are traditionally understood (and clearly defined in § 42-764) as displays that "are used to announce, direct attention to, or advertise."

### A. Plaintiffs' Opening Argument Deprives Them of Article III Standing.

The Motion strenuously argues that the Sign Code should be expanded to apply to all architectural embellishments and structures that include decoration and "attract attention," regardless of whether they are "used to announce, direct attention to, or advertise." That argument deprives them of standing. *See United States v. Texas*, 599 U.S. 670, 675 (2023) (U.S. Const., Art. III is confine judicial power to "'Cases' and 'Controversies.'" "[A] case or controversy can exist only if a plaintiff has standing. . . ."). "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *Id.* at 676. The element of redressability requires more than a "'merely speculative' showing that the court can grant relief to redress the plaintiff's injury." *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006); *Friends of the Earth, Inc. v Laidlaw Env. Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000). "[S]tanding concerns the court's subject-matter jurisdiction and may be raised at any time." *Bertels v. Farm Bureau Property & Casualty Ins. Co.*, 123 F.4th 1068, 1074 (10th Cir. 2024).

The Motion's opening argument is astounding because what necessarily follows from it is that Plaintiffs are without standing. The Motion insists, "*all* outdoor murals are regulated wall signs, and every wall sign is supposed to be subjected to the same size restrictions and permit

requirements." Put another way, The Motion demands that so-called "murals" (that is, painted displays that are not "used to announce, direct attention to, or advertise")—displays that Plaintiffs are "proud of," and allegedly want to keep in place—should join Plaintiffs' sign in the universe of regulated signs. RSOF ¶ 8. If the opening argument carries the day, the regulatory status of Plaintiffs' sign would not change, and Plaintiffs will be without redress. Moreover, if this Court finds that the phrase "used to announce, direct attention to, or advertise" renders the Sign Code unconstitutional, that phrase is severable, similarly leaving the Plaintiffs without redress. RSOF ¶ 11. Consequently, this Court should enter summary judgment against Plaintiffs. Mot. at 26.

**B. The Undisputed Material Facts Do Not Support Summary Judgment for Plaintiffs.**

**1. The Definition of "Sign" is Content Neutral.**

The full text of the definition of "sign" (Ex. 18, AMF ¶ 2) is the heart of this case. The definition is content-neutral on its face. Displays that are not located inside a building and "used to announce, direct attention to, or advertise" are signs. AMF ¶ 2. The definition is deeply rooted in an historical common-sense understanding about what signs are. That history is constitutionally significant. *Austin*, 596 U.S. at 75 ("'history and tradition of regulation'" are "relevant when considering the scope of the First Amendment."). Unlike the regulations at issue in *Reed*, the City's definition of sign does not parse protected speech into specific categories based on the topics, ideas, messages, subject matter, or viewpoints that the signs convey. *Cf.*, *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015). It does not even concern itself with whether a sign displays commercial or noncommercial speech. The definition of sign is "agnostic as to content." *Austin*, 596 U.S. at 69. The phrase "used to announce, direct attention to, or advertise," does not make the Sign Code "content based." *Cf. Austin*, 596 U.S. at 75 n.6 (noting with approval Justice Alito's concurring opinion in *Reed*, which observed that "'[r]ules imposing time restrictions on signs

advertising a one-time event,' which 'do not discriminate based on topic or subject,'" would be content neutral.). "The Court thus must determine which level of scrutiny applies to the manner in which the provisions actually regulate speech." *Id*. at 68 n.3. To that end, there is no rational construction of the Sign Code that would suggest that its application interferes with "democratic self-government and the search for truth." *Id*. at 70 n.4.

**2. The Motion's Interpretation of Salina Code § 42-764 is Nonsensical.**

The summary judgment record shows that before they started work on their sign, Plaintiffs were aware that the City had a Sign Code. AMF ¶ 4. Plaintiffs did not read the Sign Code, and Plaintiffs have no interest in what the Sign Code actually says. AMF ¶ 4. Similarly, the Motion is not concerned with what the Sign Code actually says. Indeed, the full text of the definition of "sign" is not set out anywhere in the Motion's 225 paragraph Statement of Facts or its numerous Exhibits. Instead of setting it out in full for objective review, the Motion slices and dices the text of the definition of sign, seasons it with absurdity, and ultimately misrepresents both what it says and how it has been consistently applied. AMF ¶ 5. According to the Motion, a display becomes a sign if it is "calculated to attract the attention of the public," no matter what it is used for, whether it is even a structure, and whether it is inside or outside of a building.

Under the Motion's fatally-flawed reasoning, the Sign Code applies to paintings hung inside a museum, flags hung inside a sports arena, "historical pictures and articles" displayed inside of The Cozy Inn, and even the televisions at the local sports bar. There is no legal or practical tradition of regulating any of these things as signs, and the summary judgment record does not suggest that the City ever applied its Sign Code that way. The Motion's concocted interpretation of the definition of sign flies in the face of well-established principles of statutory construction. *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir.1986) ("absent ambiguity or irrational result,

the literal language of a statute controls."); *Crane v. Commissioner*, 331 U.S. 1, 6 (1947) (words must be construed in their "ordinary, everyday sense."); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) (The court "must look to the particular . . . language at issue, as well as the language and design of the statute as a whole."); AMF 3. The Court must "choose the reasonable result over the 'absurd' one." *Robbins v. Chronister*, 435 F.3d 1238, 1241 (10th Cir. 2006).

The City interprets its Code in the commonsense manner in which it is written. AMF ¶¶ 2, 3, 5. That is, a display must be "(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building." AMF ¶¶ 2, 5. That is why the Cozy Sign is a "sign," and the "murals" in the City that are highlighted in the Motion that do not "announce, direct attention to, or advertise," are not.

**3. The Motion's Contentions Regarding Content Distinctions Are Illogical.**

The Sign Code does not distinguish between commercial and noncommercial speech. RSOF ¶ 50. It does, however, address displays that are used to "announce, . . . or advertise," whether the announcements are commercial or not. *Id.* Plaintiffs' "commercial message" announces and advertises—as essentially all commercial messages on signs do. Hence the discussions of commercial messages in the summary judgment record. RSOF ¶¶ 55, 56, 75, 203. Those discussions did not rewrite the text of the Sign Code. Only a duly adopted ordinance can do that.

The Motion's lengthy diatribe on commercial speech is another red herring. Indeed, the Motion directly concedes this point, arguing it is "undisputed," and "material" that if a "church . . . painted a mural saying, 'Turn to Jesus,' Salina would consider that a regulated sign because '[t]hey would be advertising their desire for the public to turn to Jesus." Mot. at ¶168, 27.

Moreover, to avoid any doubt on this point, the Sign Code includes a "content substitution clause." S.C. § 42-511; AMF ¶ 6. Plaintiffs' argument that the Sign Code distinguishes between commercial and noncommercial speech is specious, and without support in the summary judgment record.

**4. *Aptive* and *Discovery Network* Do Not Require Strict Scrutiny.**

The Motion cites *Aptive Envtl., LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020) and *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) in an attempt to cast the Sign Code as "content based" (and therefore subject to strict scrutiny) because it "applies by distinguishing between the commercial and noncommercial content of the solicitors' speech." Mot. at 27. But as detailed in Section 3., *supra*, the Sign Code makes no such distinctions. All of the statements cited in the Motion relating to commercial speech simply support the City's finding that the Cozy Sign is "used to announce, . . . or advertise." RSOF ¶¶ 55, 56, 75, 203.

But even if the Sign Code parsed speech based on whether it is commercial or noncommercial (which it does not), such a distinction is not "content based" in the manner that leads to strict scrutiny review. The Motion misrepresents *Aptive* and *Discovery Network* on this point. Neither case supports the application of strict scrutiny. To the contrary, both cases specifically applied the *Central Hudson* test for commercial speech regulations. *See Aptive*, 959 F.3d at 986; *Discovery Network*, 507 U.S. at 1510. The *Central Hudson* test is intermediate scrutiny. *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir. 2001).

**5. "Reading the Sign" Is Constitutionally Permissible.**

The Motion's "read the sign" argument was specifically and completely rejected in *Austin*:

> This Court's First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral.

> Most relevant here, the First Amendment allows for regulations of solicitation—that is, speech "requesting or seeking to obtain something" or "[a]n attempt or effort to gain business." To identify whether speech entails solicitation, one must read or hear it first.

*Austin*, 596 U.S. at 72. Likewise, the notion that "whether something is 'used to announce, direct attention to, or advertise' is . . . content based" cannot be squared with controlling precedent:

> [T]he Court has reasoned that restrictions on solicitation are not content based and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint. *Heffron* . . ., 452 U.S. [at] 649 . . . (1981).

*Id*. If "restrictions on solicitation" are "not content based," then it must follow that regulations of displays that are "used to announce, direct attention to, or advertise," are similarly not content based. Put another way, from a First Amendment perspective, a restriction on displays that are "used to announce, direct attention to, or advertise," is not substantively different from regulations of speech that is "requesting or seeking to obtain something." While a City official may need to "read the sign" in order to determine whether it "is used to announce, direct attention to, or advertise," there is no risk of discrimination based on "topic, subject matter, or viewpoint." There is no potential for the Sign Code to become "a means of suppressing a particular point of view."

The Motion urges this Court to be dismissive of *Austin*, suggesting that billboards have been treated differently. Mot. at 28 n.6. The Motion is wrong about that—cases about billboards and cases about other types of signs are decided using the same fundamental principles:

> Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise.

*City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994).

**6. *Complete Angler*, *Kerston*, and *Morris* Do Not Square with the Instant Case, and Are Not Persuasive.**

The Motion relies heavily on *Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009), *Kerston v. City of Mandan*, 389 F. Supp. 3d 640 (D. ND 2019), and *Morris v. City of New Orleans*, 399 F. Supp. 3d 624 (E.D. La. 2019), which are district court cases from outside of the Tenth Circuit. None of them are pertinent to this case, and due to their procedural postures, they are of little value. *Kerson* and *Complete Angler* were an *ex parte* temporary restraining order ("TRO") and a preliminary injunction, respectively. As such, they are not even binding on subsequent proceedings in the courts that decided them. *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

In *Complete Angler*, decided before *Austin*, the plaintiffs hired an artist to paint game fish on the wall of their bait shop. 607 F. Supp. 2d 1326 (M.D. Fla. 2009). The display contained "no text" and did not depict anything for sale in the bait shop. *Id*. at 1329. Clearwater exclude "'[a]rt work and/or architectural detail,'" from regulation, defining "art work" as "'. . . paintings . . . which do not identify a product or business and which are not displayed in conjunction with a commercial, for profit or nonprofit enterprise.'" *Id*. at 1331. Clearwater concluded that the painting was not "art work" because it was "displayed 'in conjunction with' a commercial enterprise," and further, argued that it was therefore commercial speech. *Id*. at 1332. The court disagreed, making a preliminary finding that the display was noncommercial speech and that Clearwater discriminated against plaintiffs' noncommercial speech based on its content. *Id*.

*Complete Angler* is inapposite. The Salina Sign Code does not define "art," and further, it is not concerned with whether a sign is "displayed 'in conjunction with' a commercial enterprise." In Salina, if a work of art on an outside building wall is "used to announce, direct attention to, or advertise," it is a sign. It does not matter whether the speaker is a commercial enterprise. It also does not matter whether the speech is commercial or noncommercial. Moreover, unlike the display

at issue in *Complete Angler*, the Cozy Sign advertises "goods or services for sale" and uses an arrow to direct attention to the order window and public entrance.

*Wag More Dogs,* is a close analog for the instant case. That case involved a business owner who tried to skirt a sign code with essentially the same arguments raised in the Motion. *See Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012) (still cited as good law by Fourth Circuit and reasoning right on par with *Austin*—a regulation is not content based when "officials must superficially evaluate a sign's content to determine the extent of applicable restrictions" at 368). In *Wag More Dogs*, a doggy day care facility painted a "mural" on an exterior wall that faced a public dog park, depicting "happy cartoon dogs, bones, and paw prints," some of which were from the business' logo. *Id*. Like Plaintiffs, Wag More Dogs argued that its "mural" was "noncommercial speech," not an "advertisement." *Id*. at 369. Unpersuaded, the Fourth Circuit held that the display was an advertisement because it "was meant to attract customers," it included dogs from the company's logo (which were "analogous to referencing a specific product"), and it sought to create goodwill with potential customers. *Id*. at 370. The summary judgment record in the instant case shows that the Cozy Sign is similarly designed "to attract customers," includes references to "a specific roduct," and seeks to "create goodwill with customers." It "advertises," and it is a therefore a sign.

In *Kersten v. City of Mandan*, decided before *Austin*, the regulations at issue parsed speech in several ways (including subjugating political speech), prohibiting "murals that (1) 'convey a commercial message,' (2) use words that are a 'dominant feature of the art,' or (3) have 'political messages.'" 389 F. Supp. 3d at 643. The *Kersten* Court did not specify the First Amendment test that it would apply. But more importantly, Salina's Sign Code is not at all like Mandan's. It is

unconcerned with whether messages are commercial or noncommercial, whether "words are a 'dominant feature,'" or whether "political messages" are depicted.

Finally, *Morris v. City of New Orleans*, decided before *Austin*, is a summary judgment order regarding the City of New Orleans' regulation of "the installation of artwork on all private property throughout the City . . . ." 399 F. Supp. 3d 624, 627 (E.D. La. 2019). New Orleans regulated both "signs" and "murals," with a distinction between the two based on whether the speech involved was commercial (in which case, the display was a "sign") or noncommercial. *Id.* at 634-35. For noncommercial speech, New Orleans went further and regulated the speech as a mural only if it was also "a work of art," a phrase that the New Orleans did not (and could not) define. *Id.* at 635. Like *Complete Angler* and *Kersten*, *Morris* is inapposite. Salina's Sign Code does not distinguish between commercial and noncommercial speech. Moreover, it does not concern itself with whether any particular display is "a work of art."

**7. The Sign Code Is Not a "Speaker Based" Regulation, and Incidental Effects on Some Speakers or Messages But Not Others Are Permissible.**

There is nothing in the text of the Sign Code that addresses who the "speaker" is. A content neutral regulation may have an "incidental effect on some speakers or messages but not others." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The summary judgment record demonstrates that the Sign Code's effects are incidental, and further, that the Sign Code does not single out any speaker or identifiable class of speakers for differential treatment.

The Motion misrepresents the significance of whether a regulation is "speaker based." "Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry." *Reed*, 576 U.S. at 170. Indeed, "laws favoring some speakers over others demand strict scrutiny," but only "when the legislature's speaker preference reflects a content preference," such as laws "limiting the content of newspapers, but only newspapers" or "the political speech of all

corporations." *Id*. The summary judgment record shows that the Sign Code is not speaker based, and there is no evidence at all of a "speaker preference" that "reflects a content preference."

**8. The *Central Hudson* Test Does Not Apply, But the Sign Code Easily Passes It.**

The Sign Code does not treat commercial speech and noncommercial speech differently. However, if this Court were to read a commercial/noncommercial speech distinction into the Sign Code, the *Central Hudson* test would apply because the Cozy Sign depicts commercial speech.

While it makes no difference under the Sign Code, to the extent this Court may consider it pertinent, the Cozy Sign displays commercial speech. "[S]peech may properly be characterized as commercial speech where, among other things, (1) it is concededly an advertisement, (2) it refers to a specific product, or (3) it is motivated by an economic interest in selling the product." *U.S. v. Wenger*, 427 F.3d 840, 847 (10th Cir. 2005). Only one of these factors must be present, and at a minimum, the Cozy Sign "refers to a specific product." The summary judgment record also demonstrates that the Cozy Sign is "concededly an advertisement," and "is motivated by an economic interest in selling the product." RSOF ¶¶ 3, 19, 22.

If the *Central Hudson* test were applicable, then the Sign Code "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) ("Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed."). The *Central Hudson* test is intermediate scrutiny applied to content neutral regulations, except that as-applied commercial speech challenges are not justiciable. *See U.S. v. Edge Broad. Co.*, 509 U.S. 418, 431 (1993); *Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021); *Leavitt*, 256 F.3d at 1066.

The Motion's assertion that the governmental interests articulated in S.C. § 42-500 are not "substantial" is downright erroneous. Aesthetics, traffic and pedestrian safety, and property values are well-established "substantial governmental interests" as a matter of law. *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 795, 805-06 (1984) (property values and community aesthetics); *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1251 (10th Cir. 2023) (aesthetics and traffic safety).

As a matter of law, the Sign Code directly advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values because it includes limitations upon the size, number, and placement of signs. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981); *Reed*, 576 U.S. at 173 (regulating size is a content-neutral option to "resolve problems with safety and aesthetics"); *Outdoor Sys., Inc. v. City of Lenexa*, 67 F. Supp. 2d 1231, 1238 (D. Kan. 1999). But even if this Court requires further evidence on this point, the summary judgment record includes that evidence. RSOF ¶¶ 3, 19, 22, 182, 184, 185, 186, 187; AMF ¶ 7; ECF 107 at 29-32 (City's Memo. in Support of MSJ).

Because Plaintiffs are not entitled to judgment as a matter of law, or alternatively, because there are disputed material facts as to how the Sign Code directly advances the City's substantial government interests, the Motion must be denied.

**9. The Commercial Speech Doctrine Is Settled Law.**

This is not a commercial speech case. Yet Plaintiffs seek to leverage this case to argue that the "commercial speech doctrine . . . contradicts the First Amendment's original public meaning, is prone to arbitrary application, is unfounded." Mot. at 31. Argument about the underpinnings of the commercial speech doctrine is out of place here. They are also specifically contrary to Supreme Court and Tenth Circuit precedent. *See, e.g.*, *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *Fox,*

492 U.S. at 481; *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980); *Brewer v. Albuquerque*, 18 F.4th 1205, 1252 (10th Cir. 2021).

**10. Strict Scrutiny Does Not Apply.**

The Sign Code is "agnostic as to content." *Austin*, 596 U.S. at 69. Because the Sign Code is content neutral, strict scrutiny does not apply. *Id.*

**11. Intermediate Scrutiny Applies, and the Sign Code Passes Intermediate Scrutiny.**

The Motion urges this Court to apply a stricter version of the intermediate scrutiny test than is justified in this case, citing to *Brewer* and *McCraw v. City of Oklahoma City*. *Brewer* and *McCraw* are about time, place, and manner restrictions in a traditional public forum. The *Brewer* Court described the heightened sensitivity in that context, observing that because the regulated speech took place in a traditional public forum:

> the City must "specifically define[ ]" that interest, lest our narrow tailoring analysis "more closely resemble[ ] the 'reasonably necessary' standard used in reviewing restrictions on speech" in nonpublic fora.

*Brewer*, 18 F.4th at 1226; *see also McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1065-66 (10th Cir. 2020) ("a court must identify whether the challenged restrictions affect a public or nonpublic forum; that determination dictates the extent to which the government can restrict First Amendment activities within the forum"). The Cozy Inn is private property. It is not a "traditional public forum," and therefore *Brewer* and *McCraw* are inapposite.

In the instant case, conventional intermediate scrutiny applies. It is a three-prong test of whether: (a) the City's articulated interests in aesthetics, traffic and pedestrian safety, and property values are substantial (b) the regulations advance at least one of those interests in a manner that "would be achieved less effectively absent the regulation"; and (c) the regulations leave open "ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791, 799.

The Court decides the first prong (whether the face of the Sign Code is content neutral) as a matter of law. *Austin*, 596 U.S. at 64, 76; *Harmon v. Norman*, 981 F.3d 1141, 1148 (10th Cir. 2020). The definition of "sign" that is the central issue of this case is agnostic as to content. It turns on whether a display is "used to announce, direct attention to, or advertise" and is "not located inside a building." Salina Code § 42-764. The Sign Code is not concerned with what is announced, to what attention is directed, or what is advertised.[4]

The face of the Sign Code is content neutral because it neither regulates based on the "topic discussed" or the "idea or message expressed," nor targets speech "based on its communicative content" or "viewpoint." *Austin*, 596 U.S. at 69 (quoting *Reed*, 576 U.S. at 163); *Taxpayers for Vincent*, 466 U.S. at 804; **Ex. 18** (S.C. §§ 42-764, 42-781). The text of the challenged definition of "sign" does not refer to content at all. It simply defines "sign" in a way that is consistent with common understandings, recognizing that unlike decorative architectural features that provide visual interest, signs are "used to announce, direct attention to, or advertise." S.C. § 42-764. Through the lens of the First Amendment, regulation of displays that are "used to announce, direct attention to, or advertise," is not different from regulation of speech that is "requesting or seeking to obtain something"—a distinction that is similarly content neutral. *See Austin*, 596 U.S. at 72.

Salina Code § 42-500 enumerates the City's government interests, which include aesthetics, traffic and pedestrian safety, and property values. As a matter of law, these interests are both substantial and justified without reference to the content of the regulated speech (content-neutral). *Taxpayers for Vincent*, 466 U.S. at 795, 805-06 (property values and community

---

[4] The definition of "sign" in Salina is substantially similar to the content neutral definition of sign before the Court in the *Austin* case. *Austin*, 596 U.S. at 1469. Similarly, KS ST 68-2232(p) (implementing the Highway Beautification Act), defines "sign" as "any outdoor sign structure, display, . . . or other thing which is designed, intended or used to advertise or inform . . . ." (emphasis added).

aesthetics); *Stockinger*, 79 F.4th at 1251 (aesthetics and traffic safety). Therefore, the Sign Code satisfies the first prong of the intermediate scrutiny test.

As a matter of law, the Sign Code advances the City's substantial government interests in community aesthetics, traffic and pedestrian safety, and property values because it includes limitations upon the size, number, and placement of signs. *See* Section IV(B)(8) *supra* for case citations. As the Court observed in *Metromedia*, it is not "speculative" that the substantial, content-neutral objectives of sign regulations would be achieved less effectively absent the regulations. *Id*. at 510-11. Therefore, the Sign Code satisfies the second prong of the intermediate scrutiny test.

Plaintiffs have "ample alternative channels for communication of the information." First, Plaintiffs could have painted the exact same sign, scaled to about 10 square feet, or if other signs were removed, about 63 square feet. AMF ¶ 8. Second, deposition testimony reveals that Plaintiffs communicate in many ways, including Facebook, branded merchandise worn or used by their customers, community events, radio advertising, interviews, banner advertising at indoor football events, billboards, bumper stickers, and a sign located at Jenni's Liquors in a nearby town. AMF ¶ 9. Therefore, the Sign Code satisfies the third prong of the intermediate scrutiny test.

There is no genuine dispute of material fact as to the content-neutrality of the Sign Code or intermediate scrutiny test that the First Amendment requires for such regulations. Because Plaintiffs are not entitled to judgment as a matter of law on these issues, the Motion must be denied.

**12. The Sign Code Is Not An Impermissible Prior Restraint.**

The Sign Code is not an impermissible prior restraint. Prior restraints are permissible if the permitting system includes "procedural safeguards that reduce the danger of suppressing constitutionally protected speech." *Se. Promotions, LTD v. Conrad*, 420 U.S. 546, 559 (1975). Prior restraints consist of two procedural safeguards: (1) timing and (2) limitations upon discretion.

Generally, a brief, specified time period for decision-making that allows for prompt judicial review is required. *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1253 (10th Cir. 2000). However, persuasive case law from the Ninth Circuit has found that procedural safeguards regarding timing "are not required for content-neutral time, place, and manner" regulations. *Epona v. Ventura*, 876 F.3d 1214, 1225 (9th Cir. 2017) (citing *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 322-23 (2002)). The prior restraint doctrine also requires limits on "the licensor's discretion." *Lakewood v. Plain Dealer Publ'g Co*., 486 U.S. 750, 758 (1988).

If it is applicable, the timing safeguard in S.C. § 42-502(b) says that a sign permit must be issued or refused within 10 days after receipt of an application, or within such further period as may be agreed to by the applicant. RSOF ¶ 105. That is both "brief" and "specified." In the instant case, the City asked Plaintiffs to stop the painting of the Cozy Sign within three days after Plaintiffs started the work (before Plaintiffs had applied for a permit). RSOF ¶¶ 26, 29, 104, 105. The City promptly told Plaintiffs that the Cozy Sign would not qualify for a permit because: (1) it was a sign; and (2) it was too big. RSOF ¶¶ 102, 105. Consequently, before Mr. Howard submitted his application, he knew that the Cozy Sign was too big to qualify for a sign permit. RSOF ¶¶ 102, 105. Additionally, the City and Mr. Howard agreed that his sign permit application would be held in abeyance. RSOF ¶ 116. That is an "agreement by the applicant." RSOF ¶¶ 105, 116. Regardless of that agreement, the First Amendment does not require the City to repeatedly inform Mr. Howard about what he already knew—the sign he had painted was too big for a permit. RSOF ¶¶ 105, 107. Holding the application was a courtesy, not a First Amendment violation.

Moreover, the Sign Code, on its face, does not promote arbitrary enforcement. It provides constitutionally sufficient standards to limit the City and its officials' discretion. Further, it contains numerous procedural safeguards including avenues for variances and appeals to resolve

issues with the City. AMF ¶ 10, RSOF ¶ 105. Ordinary people can determine whether a structure or display is attached to, painted on, or represented on a building (as defined in the Sign Code). AMF ¶¶ 3, 5. Ordinary people can determine whether a display is "used to announce, direct attention to, or advertise." *Id*. The summary judgment record demonstrates that the City applied the plain language and ordinary use of these words. AMF ¶¶ 3, 5.

The word "advertise" is widely used in defining "sign" for regulatory purposes. *See, e.g.*, n.5, *supra*, at 36. The Cozy Sign plainly "advertises." AMF ¶ 3. That is particularly clear since the advertisement pertains to or references "goods or services for sale." *Id*.; *Wag More Dogs*, 680 F.3d at 370. On its face and as-applied, the Sign Code constrains the discretion of the decision-maker and therefore does not constitute an impermissible prior restraint. Because the Plaintiffs are not entitled to judgment as a matter of law, or alternatively because material facts as to the interpretation of the Sign Code are disputed, the Motion must be denied.

**13. The Sign Code Is Not Unconstitutionally Vague.**

An ordinance is "unconstitutionally vague for one of two reasons: it either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'; or it 'authorizes or even encourages arbitrary and discriminatory enforcement.'" *Dr. John's, Inc. v. Roy*, 465 F.3d 1150, 1158 (10th Cir. 2006) (quotation omitted). The task of identifying business advertising, is a "very basic test" that is "not unconstitutionally standardless or vague . . . ." *Wag More Dogs*, 795 F. Supp. 2d at 390. The vagueness doctrine is not based on "the mere fact that close cases can be envisioned." *United States v. Williams*, 553 U.S. 285, 305 (2008). Indeed, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 U.S. at 794. "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has

been proved; but rather the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306. As such, the Motion's fixation on what may be close cases is not pertinent to the constitutional inquiry. The application of the Sign Code to the Cozy Sign is not a close case.

Ordinarily, "'[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'" Williams, 553 U.S. at 304 (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–495, n. 6 and 7 (1982)). Yet even if this challenge is available to Plaintiffs, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. AMF ¶¶ 1, 3, 5.

During depositions, both Howard and Windholz testified that they had not read the Sign Code and did not attempt to read the Sign Code. AMF ¶ 4. The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases identified by the Motion that are not used and not pertinent to the City's objective approach to identifying and regulating signs. AMF ¶1.

The Cozy Sign is clearly within the scope of the Sign Code, and Plaintiffs cannot be heard on their vagueness claim. But even if they could, the Sign Code provides clear standards that ordinary people can understand and, therefore, does not encourage arbitrary enforcement. The Sign Code is not impermissibly vague, and this Court must deny the Motion with regard to its vagueness arguments because Plaintiffs are not entitled to judgment as a matter of law.

## V. <u>CONCLUSION</u>

This Court should dismiss this case for lack of subject matter jurisdiction because Plaintiffs have presented an argument that demonstrates that they are without standing before this Court.

Alternatively, this Court should deny the Motion for Summary Judgment because it does not show that Plaintiffs are entitled to judgment as a matter of law on any of their claims.

Dated this 28th day of February, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2025, I caused the foregoing **RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**INDEX OF EXHIBITS TO DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Exhibit 1 – Howard Deposition

Exhibit 2 – Amended PreTrial Order

Exhibit 3 – White Affidavit

Exhibit 4 – Dustin Herrs Deposition

Exhibit 5 – Anderson Deposition

Exhibit 6 – Exhibit V to Howard Depo

Exhibit 7 – Exhibit Y to Howard Depo

Exhibit 8 – Benson Depo

Exhibit 9 – Exhibit C to Benson Depo

Exhibit 10 – Driscoll Depo

Exhibit 11 – Dean Andrew Depo

Exhibit 12 – Response to First Set of Interrogatories

Exhibit 13 – Dean Andrew Corporate (30(b)(6)) Depo

Exhibit 14 – Schrage Depo

Exhibit 15 – Dustin Herrs Corporate (30(b)(6)) Depo

Exhibit 16 – Meeting Transcript

Exhibit 17 – Sign Analysis

Exhibit 18 – Sign Code Excerpts

Exhibit 19 – Response to Requests for Admissions

Exhibit 20 – White Deposition

Exhibit 21 – Dean Andrew Affidavit

Exhibit 22 – Stutts Article

Exhibit 23 – Windholz Deposition

Exhibit 24 – Dustin Herrs Affidavit

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 1**

**buy a six-pack. Is that right?**
A. Yeah.
**Q. A 12 pack?**
A. Yeah.
**Q. A 18 pack?**
A. Yes. But that will be three bags of six.
**Q. Okay. Oh, okay. So there's not the bags or the sacks that you put them in, there's just six to a sack?**
A. If the math works out. If somebody orders 20, we may do four bags of five.
**Q. Okay. And that's what I was going to ask. So you can buy in any denomination?**
A. Yeah. One to however many you want.
**Q. Okay.**
A. Even numbers are the most popular.
**Q. Okay. Well, when someone comes in, do you usually recommend that they buy a six-pack?**
A. If I get them to stay inside and eat, then I'll look at you and I'll tell you you'll probably eat three, maybe four and I'll look at the husband or other person, I'll look at Aaron, you'll eat four, maybe five because you want to. You know, because you want to. Anyway, I just try to make it fun.

**Q. Okay. So when someone comes inside, you can talk to them and suggest how many they should have?**

A. Yes.

**Q. Okay. What about at the ordering window?**

A. It is -- at the walk-up window, it's not as personal because you don't get the feel of -- our entertaining is inside. You know, all of us talk with everybody, and the conversations are always appropriate. They are timely. Walk up -- if you use the walk-up window, you're just kind of missing the whole point.

**Q. Okay. Do you feel like you're able to upsell better for customers that come inside?**

A. Yes.

**Q. Okay. Does that increase your sales for customers that come inside?**

A. Not always.

**Q. Okay. But does it typically?**

A. No. Because the walk-up window can get every bit as busy as the inside. And if it's snowing, they're probably going to come inside to order and not the walk-up window which won't be very many because wintertime is slow.

**Q. Okay. Well, what about in the summer?**

A. Summertime's my busy season, and it's about half and half. I don't know, I guess, what...

**Q. Okay. So of your customers, approximately 50 percent use the walk-up window and 50 percent go inside?**

A. I don't have any numbers to prove, but just by experience, yeah, 50/50.

**Q. Okay. Do you ever track that? I know you said you don't have the numbers, but do you ever track that --**

A. No.

**Q. -- in your head?**

A. No.

**Q. No. So it's --**

A. I have a very simple cash register. It tells me how many transactions I do and that's it. Doesn't tell me window or inside.

**Q. Okay. But you said coming up to the walk-up window is impersonal?**

A. Yeah. You're missing the whole point of going to The Cozy Inn.

**Q. Okay. Well, tell me about. What's the whole point of going to The Cozy Inn?**

A. You go inside, you get tagged right away

by the onion smell. And that's the butt of all jokes with The Cozy. Hey, I went to -- you can't -- Aaron can't go to his friend and say, hey, I went to The Cozy Inn today. Did you go inside? No. That's not -- that's not -- that's enough. You can't brag to your friends if you don't go inside.

**Q. Okay.**

A. My opinion.

**Q. And is that because the onion smell in The Cozy is infamous?**

A. Yes.

**Q. Okay. And is the onion smell inside The Cozy distinctive?**

A. Yes.

**Q. And when someone -- let me see how I'm going to ask this. All right. So you had mentioned that -- well, let me ask you this. So the whole purpose or you said something like you want customers to come inside The Cozy, right?**

A. Yes.

**Q. Okay. And you want them to come inside of the Cozy because you want them to order food inside, correct?**

A. Yes.

**Q. Okay. So if someone came -- you're asking people to come inside The Cozy to purchase something, correct?**
A. Yes.
**Q. Okay. And I mean because it would be -- how would you as a business make money if people just came into The Cozy and just congregated there and didn't buy anything, right?**
A. Well, that would be a problem. I don't have very much room.
**Q. Okay. What's the square foot for the customers?**
A. Maybe 40 square feet.
**Q. 40 square feet where the customers can sit?**
A. Yeah. I have six stools.
**Q. Okay. And another than the six stools, is there really anyplace else for people to hang out inside The Cozy?**
A. Behind the stools against the wall.
**Q. Okay.**
A. I've fit 12 to 15 people in there before.
**Q. Okay.**
A. Some sitting and most standing.
**Q. Okay. So other than the six people who**

**Q. Okay. Well, how many times have you had 12 to 15 people sitting in The Cozy congregating in there for longer than 30 minutes?**

A. Yesterday.

**Q. Okay. So --**

A. It was -- we get very, very, very busy. And most of -- well over 90 percent of my customers come off the interstate.

**Q. Okay. And you had mentioned something about, you know, you -- it's about so you have a greeter there, the person that's doing the customer interaction that it's about being fun and welcoming the customer, right?**

A. Yes.

**Q. Okay. Well, what types of things does the greeter do to make it fun?**

A. We've got to be entertainers. You know, whatever rolls off your tongue, great, you know. We say the same thing all day long every day. Sometimes it changes up a little bit. Where are you guys from? So we'll feed off that. You know, we talk about where they're from.

**Q. Okay. Do you invite them to purchase some of the merchandise that's for sale inside.**

A. No, they usually ask.

**Q. Okay.**
A. Do you have shirts? Do you guys sell shirts, you know? We say, yeah, everything we sell is right behind you.
**Q. All right. And you said you have to be entertainers. What do you mean by that? Explain to me how they can be entertainers.**
A. The best -- it -- I don't know. I watch TV. I consider ourselves actors. I'm not acting now. This is what I do every day.
**Q. Okay. So you don't know what it means to be an entertainer but you want people at the cash register to be entertainers?**
MR. SHAW: Objection to form.
A. I don't know how to answer that.
BY MS. JOKERST:
**Q. Okay. So is it you want to be customer service oriented?**
A. Yes.
**Q. Okay. Do you want to make the customer happy?**
A. I want to be remembered.
**Q. Okay. Well, what do you mean by that, you want to be remembered?**
A. I want them to come back. They had such

a good time.

**Q. You want them to -- the entertainment piece is you want them to remember you or remember The Cozy so that they can come back?**

A. Yes.

**Q. Okay. And is that so when they come back they can then purchase more products from you?**

MR. SHAW: Objection to form.

A. Yeah.

BY MS. JOKERST:

**Q. Okay. Do you -- are you selling cupcakes at The Cozy?**

A. Not anymore.

**Q. Okay. But you were for a time?**

A. I was.

**Q. Okay. How did that come to be?**

A. I found a bakery, a baker out of Blue Skye Brewery and I was like, hey, would you want to make some for me. So she goes okay. And so she was -- I'd order cupcakes from her.

**Q. Okay. And was it -- I guess how was that set up? Did you -- you bought them from her and then you resold them at The Cozy?**

A. Yes.

**Q. Okay. So it was not -- you didn't like**

A. Yes.

**Q. And in 2021, you applied for a Certificate of Compatibility permit for an awning at The Cozy. Is that right?**

A. Yes.

**Q. Okay.**

A. As far as the date goes, I don't know. But, yes, I did do that.

**Q. It was 2021?**

A. Ish. I don't remember.

**Q. Okay. Well, why did you apply for a Certificate of Compatibility permit for the awning?**

A. Because I was told to.

**Q. Okay. Who told you that?**

A. I don't know.

**Q. You don't know who told you to apply for it?**

A. And then I was just going to put up a red awning to match what was going on beside me which they never ended up putting up their awnings anyway. And then I thought before that awning was made, I thought, man, that's wasted space. Put The Cozy Inn on it so people finally -- they know that they're there. And then that became a sign

to the city. So that's when somebody said, hey, you've got writing on it now. Now, you've got to do this.

**Q. Okay. So someone at the city told you to apply for the Certificate of Compatibility for the awning?**

A. Yes.

**Q. Okay. And then did you fill out that permit?**

A. That one I did, yes.

**Q. Okay. Was there another permit that you didn't fill out?**

A. No.

**Q. So I want to direct your attention to Exhibit H. You can flip there. Are you there?**

A. Yeah.

**Q. All right. So go ahead and take a look at this. You can see property, address, name of business. It says Cozy Inn. Top of that page says Certificate of Compatibility Application. At the bottom, it says property owner's signature and 4/27/21. Do you see that?**

MR. SHAW: Objection to form.

A. Where are you looking?

BY MS. JOKERST:

A. No.
**Q. Okay. And here it says that Design Review Board held a meeting on May 13th, 2021 to review Certificate of Compatibility Application No. CC21-6 filed by you on behalf of The Cozy Inn. Do you see that?**
A. Yes.
**Q. Okay. And -- all right. Go down to page 2, if you want to flip to page 2 at the top there. Okay. And do you see it says in approving this Certificate of Compatibility Application, the Design Review Board attached the following condition of approval. Do you see that?**
A. Yes.
**Q. Okay. So they approved this Certificate of Compatibility Application?**
MR. SHAW: Objection to form.
A. Are you waiting on an answer?
BY MS. JOKERST:
**Q. Yeah.**
A. What did you ask me?
**Q. I said so they did approve the Certificate of Compatibility Application for the awning, right?**
A. Yes.

MR. SHAW: Objection to form.
BY MS. JOKERST:
**Q. Okay. And underneath that, there's 1, 2, and then right under that it says because. Do you see that?**
A. Um-hum.
**Q. Okay. And it says because the proposed awning will contain lettering, including The Cozy Inn name, staff classifies this type of awning as a sign which requires a sign permit. Do you see that?**
A. Yes.
**Q. Okay. So when they approved this Certificate of Compatibility Application, they told you you needed to apply for a sign permit?**
MR. SHAW: Objection to form.
A. Apparently.
BY MS. JOKERST:
**Q. Okay. Well, it's right there.**
A. Yeah.
**Q. So did they tell you to apply for a sign permit?**
MR. SHAW: Objection to form.
A. Okay.
BY MS. JOKERST:

**Q. Well, that's a yes or no question. Did the city tell you to apply for a sign permit for the awning?**

MR. SHAW: Objection to form.

A. Yes.

BY MS. JOKERST:

**Q. Okay. Mr. Howard, you've -- The Cozy Inn has participated in community events throughout Salina, right?**

A. Yes.

**Q. Okay. And it's participated in some community events that are hosted by the city. Is that right?**

A. Probably.

**Q. Okay. Well, the Smoky Hill Museum, it has a street fair?**

A. Yes.

**Q. Are you familiar with that?**

A. Yes.

**Q. Okay. And then The Cozy Inn as part of that street fair held an eating contest?**

A. Yes.

**Q. Is that right?**

A. Yes.

**Q. Okay. And The Cozy Inn has been**

A. My mural.
**Q. Okay. Well, what specifically did you talk about?**
A. The wording I wanted. I wrote it on a piece of paper. I don't know if that's -- it didn't last very long.
**Q. You wrote down what you wanted the painting to say on a piece of paper?**
A. Yes.
**Q. Did you show that to Colin?**
A. Yes.
**Q. Okay. Do you still have?**
A. And he just kind of -- no.
**Q. No?**
A. He just took that and ran with it.
**Q. Okay. So you gave it to Colin?**
A. Either that or he looked at it and got the idea and threw it away.
**Q. Okay. What did you write down on that piece of paper?**
A. Don't Fear the Smell. The Fun is inside along with a burger in the middle of it.
**Q. Okay. Anything else?**
A. No.
**Q. Okay. And so why did you write down**

**Don't Fear the Smell, The Fun is inside?**

A. To just pointing out that by not going inside, the people aren't getting the true meaning.

**Q. Okay.**

A. They're not feeling their character.

**Q. And then why on that piece of paper did you include the burger?**

A. I don't know.

**Q. Well, was it to identify the product that's for sale at The Cozy?**

MR. SHAW: Objection to form.

A. I don't know.

BY MS. JOKERST:

**Q. Well, there's got to be a reason why you put that burger on that piece of paper to show to Colin, right?**

MR. SHAW: Objection to form.

A. I don't know.

BY MS. JOKERST:

**Q. Okay. Well, you weren't just doodling for fun. I mean you were showing Colin something that you wanted to pay him $500 to paint on your wall, right?**

MR. SHAW: Objection to form.

**were good to go with him?**
A. Yeah. I didn't know him.
**Q. You didn't know Colin before this?**
A. No.
**Q. Okay. Did he tell you a little bit about like his background when he came over and introduced himself?**
A. Yeah. He's a tattoo guy.
**Q. Okay.**
A. And he gave me a first rendering. And I go just look at that wall like a sleeve. I said if you want to run with something, just run with it. And that's how it got started.
**Q. Like a tattoo sleeve?**
A. Yeah.
**Q. Okay. Before -- or I guess when he stopped by, did he -- well, that first time, I'm talking about when he first stopped by, did he show you any paintings of things he's done in the past, any images, samples?**
A. Nope.
**Q. No. Did you check out his website or look him up and see what he's done in the past?**
A. No.
**Q. Okay. So you just trusted Colin?**

A. Yes.
BY MS. JOKERST:
**Q. Okay. All right. So did you say something to Rick Benson about the presentation of the onions on the painting?**
A. Probably.
**Q. Okay. And then he -- well, and then you heard from Colin Benson on October 31st went back to original with chopped onions. Heard through the Rick vine. Is that right?**
A. Yes.
**Q. Okay. All right. So I want you to scroll down to 346. It's the next page there on Exhibit V. Okay. And it looks like here Colin sent you another photo?**
A. Yes.
**Q. Okay. And was this another rendering of the proposed painting?**
A. Yes.
**Q. Okay. So this one looks a bit different from the one he sent you on October 31st, right?**
A. Yes.
**Q. Okay. There's a lot of stuff added to it?**
A. Yes.

**Q. Okay. So what changed between when he sent you these renderings that just had the burger and the Don't Fear the Smell, The Fun is inside to when he sent you this one?**

A. Probably after I told him to look at that like a sleeve.

**Q. Okay.**

A. Like a tattoo.

**Q. Okay. You talked to Colin?**

A. Um-hum.

**Q. And you told him to look at it like a sleeve?**

A. Yes. That was before this picture.

**Q. Okay. What did you mean when you told Colin to look at it like a sleeve?**

A. Like somebody's arm, arm tattoo.

**Q. Okay. Did you mean that you wanted more imagery on it?**

A. Yeah.

**Q. Okay. And so let's take a look at this. So this is the one, this photo rendering, right underneath it, Colin says it's the burger invasion. Over the top I know but fun. Do you see that?**

A. Yes.

Q. Okay. And then on the next page, 347, you stated -- I'll wait till you get there. Sorry. You stated I like it. Wife thinks it's too much. Do you see that?
A. Um-hum, yes.
Q. That's what you told Colin?
A. Yes.
Q. Okay. So you said that on October 31st to Colin, right?
A. Yes.
Q. Okay. So then on November 1st, you said let's go for it to Colin?
A. Yes.
Q. So what changed between October 31st and November 1st?
A. I don't know.
Q. Well, did something happen because you went from saying wife thinks it's too much to let's go for it?
A. Because I liked it. My wife didn't like it.
Q. Okay. So let's scroll back up to 346. And do you have the color copy of this exhibit now?
A. Yes.

Q. Okay. So I want you to take a look at this rendering. When you said on November 1st let's go for it, was this the rendering that you approved?
A. I guess, yes.
Q. Okay. So this rendering still has that burger in the center, right?
A. Yes.
Q. Okay. And it still has Don't Fear the Smell, The Fun is inside, right?
A. Yes.
Q. Okay. And it has the arrow. Do you see that?
A. Um-hum.
Q. Is that a yes?
A. Yes.
Q. Okay. And it has the little squiggly lines emanating from the burger?
A. Yes.
Q. Okay. But there's some added stuff in this one, right?
A. Yes.
Q. Okay. So would you say that this is similar to that original drawing that you gave Colin as it relates to that center imagery?

A. Yes.
**Q. Okay. But, now, there's more to it, right?**
A. To the wall?
**Q. To the wall.**
A. Yes.
**Q. More to the painting?**
A. Yes.
**Q. Okay. So this rendering has additional burgers on it, right?**
A. Spaceships, yes.
**Q. Well, I want you to take a look at this one, we're looking at 346. See down by the ordering window?**
A. Yeah.
**Q. That's a burger, right?**
A. Yes.
**Q. Okay. I want you to look to the left, far left on like the left side of the bench. Do you see that?**
A. Yes.
**Q. That's a burger, too, right?**
A. Soon to be a ship.
**Q. Well, it's -- what do you mean soon to be a ship?**

A. He just hadn't painted the aliens on it, yet.

**Q. Okay. Well, this is the rendering?**

A. It was one of them.

**Q. Well, this is the rendering that you approved?**

A. Right. There's another one after this.

**Q. Well, but this is the rendering that you approved?**

A. Yes.

**Q. Okay. And so when you look at that burger on the left by the bench, that's just a burger, right?**

A. Yes.

**Q. Okay. And I want you to look at the top. So the big burger in the middle. Go up above the Don't Fear the Smell and a little to the right. That's a burger, too, right?**

A. Yes.

**Q. Okay. And I want you to go back to that main big burger, up, so Don't Fear the Smell and to the left, that's a smaller burger to the top left of the big burger, right?**

A. Looks like it.

**Q. Okay. And I want you to go straight to**

**the right of the big burger. There's a smaller burger right next to it, right?**

A. Yes.

**Q. Okay. And now, are there images of pickles depicted in this rendering?**

A. Similar.

**Q. Well, what do you mean similar?**

A. I suppose they look like pickles.

**Q. Okay. Well, let's look at that big burger in the middle. That's a burger. I mean you said that. So what's that green thing in the middle, a pickle?**

A. Looks like it.

**Q. Okay. So that's a pickle in the middle of that burger?**

A. Yes.

**Q. Okay. And is there ketchup and mustard depicted on that burger?**

A. It's colors I chose.

**Q. Okay. Well, is it ketchup and mustard depicted on that burger?**

A. Ketchup is red. Mustard is yellow.

**Q. Okay. So it's ketchup and mustard depicted on that burger?**

MR. SHAW: Objection to form.

A. Yes.
BY MS. JOKERST:
**Q. And are those chopped onions depicted on that burger?**
A. Yes.
**Q. Okay. And is there imagery of splotches of ketchup throughout this rendering?**
A. Yes.
**Q. Okay. And is there imagery of splotches of mustard throughout this rendering?**
A. Yes.
**Q. Okay. And I want you to look to -- well, actually, no, let me do that. All right. Let's go to -- okay. Let's go back to 347. I just want to orient you on dates. All right. Are you there on 347?**
A. Yes.
**Q. Okay. So do you see where it says November 1st, you said let's go for it?**
A. Yes.
**Q. Okay. So that's when you approved the painting?**
A. Yes.
**Q. Okay. And then underneath that it says November 1st, 6:26 p.m., do you see that?**

BY MS. JOKERST:
**Q. All right. And I hate to flip you around here, but let's go back down to page 346?**
A. Okay.
**Q. All right. So I want to talk about the arrow. Why was the arrow included in the painting?**
A. Showing people where the front door is.
**Q. Okay. So it was directing people to the front door?**
A. Yes.
**Q. Okay. All right. So when did Colin start working on the painting on the side wall?**
A. I thought it was the 3rd.
**Q. November 3rd?**
A. November 3rd.
**Q. Okay. And before November 3rd, he came by to talk to you about the final draft of what he was going to paint on the wall?**
A. Yes.
**Q. Okay. And that's when he brought like the printout of it?**
A. Yes.
**Q. Okay. So you had agreed to pay Colin for the work, right?**

**Q. Okay. Well, there's no indication that it's anything other than a burger, right?**

MR. SHAW: Objection to form.

A. I didn't get to finish my story.

BY MS. JOKERST:

**Q. Okay.**

A. The mural.

**Q. All right. Well, Mr. Howard, that's the burger you drew up and sent to Colin and said this is what I want in that initial rendering, right?**

MR. SHAW: Objection to form.

A. I did not draw a burger. I drew a circle.

BY MS. JOKERST:

**Q. You drew a circle that was supposed to indicate a burger?**

A. Yeah.

**Q. Right?**

A. Yes.

**Q. Okay. And you didn't tell Colin, oh, this is the mothership, right?**

A. After the fact, after he started.

**Q. After he started?**

A. Yes.

**Q. Okay. But when you were doing the**

**design, you said I want a hamburger and I want Don't Fear the Smell, The Fun is inside, right?**

A. Right.

**Q. You didn't tell him I want a mothership, right?**

MR. SHAW: Objection to form.

A. It's the beginning of their story.

BY MS. JOKERST:

**Q. Okay. But what I'm asking you is when you originally gave that idea to Colin, you didn't tell him that you wanted that big hamburger to be a mothership, right?**

MR. SHAW: Objection to form.

A. Not yet.

BY MS. JOKERST:

**Q. Okay. So at the time you gave the initial idea to Colin, you did not tell him that you wanted the burger to be a mothership, right?**

A. Right.

**Q. Okay. And when you look at this photo on page 54, you said, well, not yet that there wouldn't be -- there's not an indication of an UFO on there. Where's the space between Don't Fear the Smell and the top of that burger --**

MR. SHAW: Objection to form.

**Q. Okay. All right. So is there -- we don't need to look at the exhibits anymore at this time. Is there a jingle about the infamous onion aroma at The Cozy?**

MR. SHAW: Objection to form.

A. On the radio?

BY MS. JOKERST:

**Q. On the radio. Okay. So do you do radio advertising for The Cozy?**

A. Yes.

**Q. Okay. And the radio advertising contains a jingle?**

A. Part of it.

**Q. Okay. And the jingle relates to the aroma, onion aroma emanating from The Cozy?**

A. No. My ads finish with mosey into The Cozy Inn.

**Q. Okay.**

A. It's a catchy jingle.

**Q. I'm sorry?**

A. It's a catchy jingle.

**Q. Okay. So your ads say mosey into the Cozy?**

A. Yeah.

**Q. Okay. So your radio --**

to. That's when I walked out. Open discussion. What part of that do I not know?

BY MS. JOKERST:

**Q. Okay. Well, they didn't say that you couldn't talk --**

A. Yes.

**Q. -- in that meeting, right?**

A. Yes. Because I asked that question. Can I talk before her? She was standing right there.

**Q. Yeah, but you said before Lauren. Did you ask if you could talk after Lauren?**

A. No.

**Q. Okay. You just left?**

A. I just left.

**Q. Okay. But after you met with the city at the Smoky Hill Museum, were you interested in pursuing a code-based solution which might include an amendment to the sign code that would have allowed the wall sign as you proposed it?**

MR. SHAW: Objection to form.

A. That's why I went to the commission meeting.

BY MS. JOKERST:

**Q. Okay. Because you were interested in a code-based solution?**

MR. SHAW: Objection to form.
A. I was.
BY MS. JOKERST:
**Q. Okay. Okay. And in that February 8th, 2024 letter, you were made aware in writing from the city that they were undergoing a potential code amendment with an outside consultant, right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. Did you ever ask the city when they expected to be done with that amendment?**
A. No.
**Q. Okay. Were you aware that the city was looking at finishing that amendment potentially around May of 2024?**
A. Yeah, I had gotten wind of that, yes.
**Q. Okay. And I don't want to know anything that your attorneys told you. But when you said you got wind from it, did you learn that for someone other than your attorney?**
A. Yes.
**Q. Okay. And who was that?**
A. I don't know. Somebody from the city.
**Q. Okay. Someone from the city told you**

**Q. Okay. Does Jenni's Liquor sell any food?**
A. No. Candy bars, snacks, sunflower seeds.
**Q. All right. And how long have you owned Jenni's Liquor?**
A. Maybe 2020.
**Q. Okay.**
A. Maybe 2021, June is when we took over, one of those years.
**Q. All right. And on the wall at Jenni's Liquor, you had a similar display painted. Is that right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. But it's not the exact same display, right?**
A. No.
**Q. Okay. So I want to direct your attention to Exhibit Y.**
MR. SHAW: I will object to the use of all these photos as they were not timely disclosed in accordance with the scheduling order.
MS. JOKERST: Okay. And I recall just note for the record on the purpose of this is that is our position they should have been disclosed

**Q. Where are they traveling?**
A. I don't know.
**Q. All right. And this is an accurate depiction of the painting that's on the wall at Jenni's Liquor?**
A. Say again.
**Q. Is this an accurate depiction of the painting that's on the wall at Jenni's Liquor?**
A. It's similar.
**Q. Okay. All right. I want to direct your attention to page 2. Okay. What is this photo of?**
A. That's a sign.
**Q. Okay. This it a sign for Jenni's Liquor?**
A. Yes.
**Q. Okay. Is that an accurate depiction of the sign for Jenni's Liquor?**
A. Similar.
**Q. Okay. Do you have any reason to dispute that this photo is not an accurate depiction of that Jenni's Liquor sign?**
A. Page 1?
**Q. No, page 2.**
A. Okay. What was your question?
**Q. Do you have any reason to dispute that**

**Q. Okay.**
A. -- can't figure things out like that.
**Q. So your wife responded to the question is this a Cozy reference and said yes, right?**
A. She's her own person.
**Q. Okay. But she responded and she said yes, right?**
A. Yes.
**Q. Okay. And that's because this painting is a reference to The Cozy wall sign, right?**
MR. SHAW: Objection to form.
A. Sure, if you look at it like that.
BY MS. JOKERST:
**Q. Okay. Well, your wife looked at it like that?**
MR. SHAW: Objection to form.
BY MS. JOKERST:
**Q. Right?**
A. I just had fun with it.
**Q. Okay. But I'm saying your wife looked at it that way, right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. And so do you also look at it that**

**way as a reference to The Cozy?**
A. It's a continuation of my story.
**Q. Okay. You're talking about your story as it relates to the painting at The Cozy?**
MR. SHAW: Objection to form.
A. The ships had to come from somewhere.
BY MS. JOKERST:
**Q. Okay. Well, that's a yes or no question. You're saying that it relates to your story as it relates to the painting that's at The Cozy, right?**
MR. SHAW: Objection to form.
A. Yes.
MS. JOKERST: All right. I will formally move to admit Exhibit Y into the deposition record.
MR. SHAW: We will renew our objection.
MS. JOKERST: Okay. And we can, again, just for the court reporter, that can be noted, and that does not affect that the entire exhibit will be included with the deposition testimony.
BY MS. JOKERST:
**Q. All right. So I want to talk to you a little bit about the painting that's on the wall at Jenni's Liquor. I mean how did that come into existence?**

**Rick Benson about the lawsuit?**

MR. SHAW: Objection to form.

A. Pretty much about everything.

BY MS. JOKERST:

**Q. Okay. Well, you told him that you thought the lawsuit was bullshit, right?**

MR. SHAW: Objection to form.

A. He thought it was.

BY MS. JOKERST:

**Q. Okay. Well, what part of the lawsuit do you think is bullshit?**

MR. SHAW: Objection to form.

A. None of it. None of it.

BY MS. JOKERST:

**Q. Okay. Well, you said that you don't understand the sign code, right?**

A. Right.

**Q. Okay. But then you told Rick Benson that this was bullshit?**

MR. SHAW: Objection to form.

A. I guess.

BY MS. JOKERST:

**Q. Okay. So what I'm trying to understand is when you were telling him this is bullshit, what's the this you were talking about?**

MR. SHAW: Objection to form.
A. That it went this far.
BY MS. JOKERST:
**Q. Okay. Have you read the Salina sign code?**
A. No.
**Q. Okay.**
A. I wouldn't understand it.
**Q. Okay. But you haven't even tried to read it?**
A. No.
**Q. Okay. And you don't care about reading it, do you?**
MR. SHAW: Objection to form.
A. No.
BY MS. JOKERST:
**Q. Okay. Have you spoken to anyone associated with Blacksmith Coffee about their sign on the Ohio Street building?**
A. I did.
**Q. Okay. Who did you talk to?**
A. I don't remember. Some girl.
**Q. Some girl. Was she a worker, an owner?**
A. I think a worker.
**Q. Okay. And how did you strike up a**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

COZY INN, INCORPORATED
d/b/a The Cozy Inn and
STEPHEN HOWARD,

Plaintiffs,

v. Case No. 24-1027-TC-ADM

CITY OF SALINA, KANSAS,

Defendant.

**AMENDED PRETRIAL ORDER**

On November 19 and December 4, 2024, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case, by phone. Plaintiffs Cozy Inn, Inc. d/b/a The Cozy Inn and Stephen Howard appeared through counsel Jeffrey Shaw and Samuel G. MacRoberts. Defendant City of Salina, Kansas, appeared through counsel Amanda C. Jokerst, Todd G. Messenger, and Aaron O. Martin. After the court entered the pretrial order (ECF 92), the parties notified the court that the City of Salina amended its BID Code and Design Guidelines, thereby mooting a portion of plaintiffs' claims. On the parties' request to amend the pretrial order to reflect these developments, the court now enters this amended pretrial order to supersede the previous version.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

**1. PRELIMINARY MATTERS.**

**a. Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331, 1343, 2201, 2202, and is not disputed.

**EXHIBIT 2**

**b.** **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by federal law interpreting the First and Fourteenth Amendments.

**2. STIPULATIONS.**

**a.** The following facts are stipulated:[1]

**i.** Cozy Inn, Incorporated d/b/a The Cozy Inn is a Kansas for-profit corporation registered and in good standing with the Secretary of State of Kansas.

**ii.** Steve Howard is the 90% shareholder of Cozy Inn, Incorporated. His daughter, Andrea Windholz, owns the remaining 10%.

**iii.** Cozy Inn, Incorporated owns and operates The Cozy Inn, a restaurant located in Salina, Kansas.

**iv.** Plaintiffs seek to paint a display on the exterior north wall of The Cozy Inn.

**v.** Plaintiffs started painting the display on November 3, 2023.

**vi.** The photos found at Plaintiffs Bates 50, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63 and 64 represent the unfinished display as currently painted on the north wall at The Cozy Inn.

**vii.** The City of Salina, Kansas (the "City") determined the display painted on the north wall of The Cozy Inn is a "sign" as defined by Salina Code § 42-764 and, more specifically, a "wall sign" as defined by Salina Code § 42-781. The City determined the sign was too large to qualify for a sign permit and that the display Plaintiffs intend to be the final display painted on the north wall at The Cozy Inn (Plaintiffs Bates 51) is a "sign" as defined

[1] The parties agree to further confer about factual stipulations and the admissibility of certain exhibits for trial after dispositive motions have been decided, as they believe the court's decision on summary judgment may eliminate the need for certain evidence and the parties may be able to further narrow the issues for trial. The parties will confer and file any additional stipulations no later than 2 weeks before trial is scheduled to commence.

by Salina Code § 42-764, and more specifically, a "wall sign" as defined by Salina Code § 42-781.

**viii.** The Cozy Inn is located within the C-4 zoning district and the Salina Downtown Business Improvement District No. 1.

**ix.** On November 6, 2023, the City asked Howard to stop painting the display.

**x.** On December 9, 2024, the Board of City Commissioners of the City of Salina ("Board") adopted Ordinance No. 24-11230, amending Salina Code Sections 2-206 through 2-211, and adding Section 2-212, pertaining to the Design Review Board (collectively, "Amended BID Code").

**xi.** On December 9, 2024, the Board adopted Resolution No. 24-8264, updating the Design Guidelines for Downtown Salina Business Improvement District No. 1 ("Updated Design Guidelines").

**xii.** Salina has determined that the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix), above, "involves only painting or repainting of a building wall" on a side elevation of the Cozy Inn building that is not a "storefront, primary façade, or secondary façade (as defined by the [Updated] Design Guidelines)," and does not "modify the color or finish of any character-defining features (as defined by the [Updated] Design Guidelines)."

**xiii.** Pursuant to the Amended BID Code Section 2-207(b)(4), a Certificate of Compatibility is not required for the display referred to in paragraphs (iv), (v), (vi), (vii), and (ix) above, and consequently DRB review is also not required.

**xiv.** For the purposes of this litigation, the Sign Code, Salina Code § 42-500, *et seq.*, is not affected by the Amended BID Code and the Updated Design Guidelines.

**xv.** In light of the amendments described in paragraphs (x) and (xi) above, the parties agree that the BID Code controversy is moot and therefore the BID Code is no longer at issue.

**b.** The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

**i.** Photos found at Plaintiffs' Bates 50, 51, 52, 53, 54, 57, 58, 59, 60, 61, 62, 63, 64.

3. **FACTUAL CONTENTIONS.**

**a. Plaintiffs' Factual Contentions.**[2]

Overview

Howard operates The Cozy Inn, a Salina landmark that has served sliders for more than 100 years. It is renowned for its "pungent onion-esque aroma." After observing the vibrant proliferation of murals throughout Salina, Howard commissioned a mural for the side of The Cozy Inn. The mural would feature burger-esque flying saucers attacking The Cozy Inn with blasts of ketchup and mustard and says "Don't Fear the Smell!! The Fun is Inside!!" After reviewing the mural's content, the City came to the conclusion that it pertained to the goods for sale at The Cozy Inn and was considered a regulated sign because it "announced, directed attention to, or advertised" The Cozy Inn. City officials ordered Howard to halt work on the mural and instructed him to file an application for a sign permit. When Howard filed the application, the City refused to either grant or deny the application but instead placed the application "on-hold." Plaintiffs allege violations of the Free Speech Clause of the First Amendment and the Void-for-Vagueness Doctrine of the Fourteenth Amendment.

Summary of the Facts

Around November of 2023, Howard hired a well-known, experienced muralist, Colin Benson, to paint a mural that reflected his and The Cozy Inn's personality as depicted below:

[2] The City objected to several sentences in Plaintiffs' factual contentions on the grounds that they misrepresent the discovery record and/or exceed the scope of the allegations in the Amended Complaint. The court overrules these objections. As the instructions on the court's Pretrial Order form explain, at this stage of the proceedings Plaintiffs need only set forth "a concise statement of the factual contentions that they believe support their respective theories of the case," so it is Plaintiffs' prerogative to frame their own factual contentions. Further, the allegations in the Amended Complaint provided the City with ample notice that Plaintiffs would be relying on these types of factual allegations to support their claims.




On or about November 6, 2023, City officials learned that Plaintiffs were painting a mural at The Cozy Inn. After reviewing the mural's substance, and without speaking with Howard, City officials concluded that the mural "announced, directed attention to, or advertised" The Cozy Inn, and thus the City believed it fit the definition of a sign under the City code. City officials then told Howard he could not finish the mural and instructed him to submit applications for a sign permit and a Certificate of Compatibility. Howard complied with this request on or about November 13, 2023. City code contains mandatory deadlines for the City to respond to applications, but the City failed to meet these deadlines. Instead, in a letter dated February 8, 2024, the City placed the applications "on-hold." City code does not authorize placing applications "on-hold."

The mural is not an advertisement. Instead, it is an artistic expression intended to tell a story about travel. "It's not a billboard; it's artwork," Howard said. "It's my expression. It's my character going on my wall. I want to paint my wall."

The City regulates signs—including their sizes—through its written sign code, its unwritten policies and practices, its Sign Permit requirement, its Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and its

concomitant enforcement penalties.[3] Plaintiffs describe this as the "mural-sign code regime." In response to this lawsuit, the City amended its BID code and Design Review Guidelines, and determined that a Certificate of Compatibility is not required. As a result, the BID code is no longer at issue in this matter, while the controversy over Salina's written sign code and its unwritten policies and practices remains in dispute.

The written sign code treats all outdoor murals as wall signs and purports to subject every wall sign to the same size restrictions because all murals are "displays calculated to attract the attention of the public." But that is not how it works in practice. If artwork "pertains" to a business, or if it's "part of a commercial transaction," the City considers it a regulated sign subject to its restrictive size limitations because of the content. But if the content doesn't pertain to the business, Salina considers the mural to be unregulated art that is exempt from the mural-sign code regime and can take up an entire wall. The difference between an unregulated mural and a regulated sign turns on the artwork's content. City officials have repeatedly admitted that they must review a display's contents to determine whether the display is a regulated sign or an unregulated mural.

The City determines whether a display is a regulated sign by reviewing the display for content that announces, directs attention to, or advertises. When asked to identify the factual basis for its assertion that Plaintiffs' mural "is obviously a sign," the City stated that "the Cozy Sign *contains* a tag line announcing the infamous smell of the Cozy, it *has* an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy *by depicting representations* of them." It is clear that the City

[3] Violations constitute misdemeanors, punishable by a fine with each day being considered a new offense.

reviewed the contents of the mural at The Cozy Inn and considers the mural to be a sign because of its content.

The City Manager explained that The Cozy Inn's mural "includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." The City's Director of Community and Development explained the unwritten policy to the City Council, saying that "[i]f a coffee house has a dove with an olive branch and it says the word 'peace' on the side of it, that – that's not a sign"; instead, the government treats it as an unregulated mural. But, the Director continued, "if we had a steaming cup of coffee and a coffee pot on the side," Salina would consider it a regulated wall sign. If that same "steaming cup of coffee" happened to be painted "on the other side of town unrelated to anything" there, the government confirmed that it would be unregulated. During depositions, City officials admitted The Cozy Inn could paint an airplane mural, or a pizza mural, and could even paint an exact replica of Andy Warhol's world-famous Campbell soup can—unless The Cozy Inn started offering travel agency services, sold pizzas, or started serving tomato soup. What's more, if a different business on the other side of town that had no relationship with The Cozy Inn or hamburgers were to paint the exact same mural that Plaintiffs painted, Salina would not consider it to be a regulated sign.

Much of the mural-sign code regime is ill defined and vague. The text of the zoning code (which includes the sign code) grants the zoning administrator the discretion to issue binding interpretations of the code. The City code allows the substitution of the conjunctive "and" with the disjunctive "or" and vice versa as "the sense requires it." Zoning Administrator Dean Andrew testified that he believes this gives him the unilateral discretion to substitute "and" for "or" at will. The phrases "pertains to the goods or services for sale," "art," "commercial speech," "mural," and much more is not anywhere in the City code. The City's use of these terms and its emphasis on

the commercial nature of goods or services for sale to distinguish between murals and signs—based on the artwork's content—is found only in the City's unwritten policies and practices.

Andrew uses this authority to implement numerous unwritten policies. For example, the City employs a different methodology of measuring the area of signs than the one written in the code if Andrew decides that it is "practical." As a result, for murals at The Yard and Sharp Performance, Andrew found it "practical" to measure the area of the mural by measuring individual elements of the mural, while excluding the background paint, while he found it to be "impractical" to measure the individual elements of The Cozy Inn mural and simply calculated the area of the entire wall, including the background paint. Andrew has utilized this discretion to determine that a mural painted on an exterior brick wall at The Yard is not considered a regulated sign because it is "inside" even though it is plainly not inside a building. Andrew testified that he ignores the portion of the sign code defining a "sign" regarding "displays calculated to attract the attention of the public." Yet the City, in response to an interrogatory, asserted that "The Cozy Sign is a display calculated to attract the attention of the public," without providing further explanation. Directly across the parking lot from The Cozy Inn's mural is a mural advertising Bull Durham Tobacco, but Andrew created an exemption to the mural-sign code regime out of whole cloth for the tobacco mural, while strictly applying the regime to The Cozy Inn. The City ignores the deadlines for responding to applications in the code if Andrew places the applications "on-hold," as happened to Plaintiffs' applications, which remain on hold.

The City's content-based discrimination is seen throughout the city. Salina exempts the following murals that are "signs" under the code from the size restrictions, and the permit regulations, because of their content: Fire Station #2; The Yard side mural; KU's School of Medicine; Salina Art Center; Mural at the Mill; and the water tower mural. The City considers

other murals to be signs but finds them to be compliant with the mural-sign code regime based on the City's unwritten policies and practices: Bull Durham; Sharp Performance; The Yard front mural; and Schlotzsky's. Dozens of other murals throughout Salina are exempt. The City is host to the Boom Salina Art & Mural Festival, which has painted murals all around Salina. The City even sponsors murals throughout town through the Salina Arts & Humanities Department. The murals throughout Salina are popular and tourist attractions, and Howard painted the mural at The Cozy Inn to be a part of this thriving cultural scene. No member of the public has complained about the mural at The Cozy Inn. However, numerous members of the public have complained about the City's decision to order The Cozy Inn to halt work on the mural.

Salina has not disclosed any evidence or factual basis to support the alleged purposes of the mural-sign code regime. There is no factual basis for the belief that regulated murals are more aesthetically displeasing than unregulated murals. There is no factual basis for the belief that regulated murals are more dangerous to pedestrians than unregulated murals. There is no factual basis for the belief that regulated murals create a greater danger of traffic accidents than unregulated murals. There is no factual basis for the belief that regulated murals are more likely to harm property values than unregulated murals. There is no factual basis to treat artwork differently based on its content. Plaintiffs' expert rebuttal witness, Charles Taylor, has demonstrated that the report of Defendant's proffered expert, Mark White, is not credible or reliable, and does not provide a factual basis for the mural-sign code regime.

b. **Defendant City of Salina's Factual Contentions.**[4]

<u>Overview</u>

The *Austin* court recognized sign regulation approvingly as a "tradition" dating back more than 150 years—and observed that during that time, such regulations have addressed "signs . . . that promote ideas, products, or services . . . [or] promote or identify things located onsite." The City has regulated signs in like fashion for about 58 years. The City's regulations are currently codified at Salina Code of Ordinances ("Salina Code"), Chapter 42, Article X ("Sign Code").

The definition of "Sign" in Salina Code § 42-764 is agnostic as to content. It turns on whether a display is used to "announce, direct attention to, or advertise" and is "not located inside a building." If a display is located outside of a building and is used to "announce, direct attention to, or advertise," then it is a "Sign" and subject to the Sign Code's size limitations. Displays that fall outside of the definition of "Sign" are not signs and are therefore not regulated as such.

Plaintiffs allege a different interpretation of the City's definition of "Sign." Under Plaintiffs' interpretation of § 42-764, a sign is *anything* that is "calculated to attract the attention of the public." Plaintiffs' interpretation is absurd, ignores the plain language of § 42-764, is not how the City interprets § 42-764, and is not how the City applied § 42-764 to The Cozy Inn sign. Plaintiffs' suggested interpretation would mean that all displays – including murals – are signs under the Sign Code.

Yet Plaintiffs' interpretation does not alter the content-neutrality analysis. The text of the Sign Code remains content-neutral. Even if Plaintiffs have the correct interpretation, they are

[4] Plaintiffs are currently unable to object to the City's factual contentions on the grounds that they exceed the scope of the pleadings because the City has not yet filed a pleading. If and when the City does so, Plaintiffs will raise any such objection at that time. Further, Plaintiffs object to the City's factual contentions on other grounds, but will raise those objections on summary judgment or at trial.

without relief that would address their alleged injury. Indeed, even if this Court adopts Plaintiffs' interpretation of "sign" and finds that all displays are regulated signs, the legal status of Plaintiffs' display would not change—it would still be a sign that is too large to qualify for a permit.

The sign code is concerned with what a display does, not what it says. The text of the sign code makes no reference to topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. While in some circumstances City officials may have to look at a display to determine if it is a Sign, a sign code is not content-based merely because it requires a reading of the sign to determine if a content-neutral regulation applies. Structurally, the Cozy Inn sign is a wall sign as defined in Salina Code § 42-781. Salina Code § 42-781 also makes no reference to content and is concerned with the physical structure of a sign; to be a wall sign, the display must also fit within the definition of Sign in § 42-764.

The Sign Code is Content-Neutral

On its face, the definition of "Sign" is not content-based. There are no unwritten policies and procedures. City officials, including the Zoning Administrator, do not have unbridled discretion. City officials, including the Zoning Administrator, follow the Sign Code provisions.

The purposes set forth in Salina Code § 42-500 are also content-neutral. As such, intermediate scrutiny applies, and the Sign Code is constitutional because: (1) the purposes articulated in Salina Code § 42-500 (particularly traffic safety, pedestrian safety, property values, and aesthetics) are substantial government interests; (2) the Sign Code is narrowly tailored to advance those interests because the interests are furthered more effectively under the Sign Code than in the absence of regulation; and (3) Plaintiffs have ample alternative channels of communication of their information. In fact, Plaintiffs can display the exact same sign in a smaller

size, Plaintiffs have other existing signs on the Cozy Inn premises that fit within the allowable sign area, and Plaintiffs already communicate information through a number of other channels including radio, billboards, and social media.[5]

In considering whether the Sign Code is content-based as-applied to the Cozy Inn, the Court only considers how the sign code was applied to the Plaintiffs' sign. No other display is germane to Plaintiffs' case. The City applied the definition of "Sign" as written to the Cozy Inn sign. The City outlined its application of the Sign Code to the Cozy Inn sign in a document entitled the "Cozy Inn Sign Analysis." The City provided this memorandum to Howard and explained why the Sign was too large to qualify for a sign permit. On November 13, 2023, City staff informed the City Commission why Howard's display was a "Sign" under the Sign Code. The deposition testimony of City staff also supports the City's position that it applied the definition of Sign as written to the Cozy Inn sign.

Plaintiffs appear to make the argument that the Sign Code represents a commercial speech regulation that is unconstitutional. The Sign Code is not a commercial speech regulation. However, assuming *arguendo* this Court finds the Sign Code distinguishes between "signs" and displays that are not signs based on whether the display is commercial speech or noncommercial speech, the commercial-noncommercial distinction is not a classification of speech that is content-based or otherwise implicates strict scrutiny. Commercial speech is subject to an intermediate standard of review (discussed above). The Sign Code does not favor commercial speech over noncommercial speech. Indeed, Plaintiffs' Amended Complaint concedes this at ¶ 210 ("This demonstrates Salina's antipathy toward content related to a business and commercial speech. This

---

[5] Although the City's purposes are substantial government interests as a matter of law and require no evidence, the City has disclosed evidence, including its expert report, that the Sign Code actually advances the City's interests.

also demonstrates Salina's preference for content unrelated to a business and noncommercial speech."). Interestingly, Plaintiffs complain that noncommercial speech is favored and simultaneously allege that their sign displays noncommercial speech. However, Plaintiffs do not request declaratory judgment that the Sign Code does not apply to their sign.

<u>The City Determined Howard's Display was a "Sign"</u>

Salina Code § 42-501 directs a property owner to obtain a sign permit before a sign is painted, constructed, erected, remodeled, relocated, or expanded. The sign permit application form identifies the information required to be submitted for review. Plaintiffs did not seek a sign permit before beginning construction of the wall sign. Plaintiffs knew the City regulated signs, but did not review the regulations. Plaintiffs testified that they have no intent to read the regulations. On November 3, 2023, Plaintiffs started painting the wall sign. On November 6, 2023, the City reviewed the wall sign that was fully outlined and partially painted on the wall. The City determined that Plaintiffs' display is a wall sign under Salina Code §§ 42-764 and 42-781.

The Cozy Inn wall sign announces (among other things, the infamous onion smells of The Cozy Inn that Howard admitted "tag" anyone who enters). It "directs attention to" by way of a large arrow that points to the building entrance and ordering window. The sign also advertises, by way of pictorial representations, the hamburgers and hamburger toppings (ketchup, mustard, pickles, onions) that are available for sale at The Cozy Inn. Salina Code § 42-521 provides the sign area and number limitations for signs in the C-4 district (where The Cozy Inn is located). Using the dimensions of The Cozy Inn north wall (which the City obtained from a prior application submitted by The Cozy Inn for an awning sign and software the City has to assist in measuring the height of buildings), and noting the sign occupied the entire north wall, the City determined The Cozy Inn sign was too large to qualify for a sign permit under the sign area limitations in § 42-521.

Given the existing sign inventory, the Cozy Inn had approximately 10 square feet of remaining sign allowance, but the wall sign was approximately 528 square feet in size.

On November 6, the City contacted Howard and asked him to pause the painting, advising him that the painting was a wall sign under the sign code, it needed a sign permit, and it was too big to qualify for a sign permit as proposed. Howard did not administratively appeal this determination. The City met with Howard again on November 13. At this meeting, the City provided Howard with the Cozy Inn Sign Analysis memorandum that outlined the specific provisions of the sign code the City applied to Howard's sign to determine it was a sign and that it was too large to qualify for a sign permit. Howard did not administratively appeal this determination either.

The City understood that Howard was upset by the City's determination, and the City wanted to work with him to see if a code-based solution could be reached. In doing so, the City explained to Howard that it was going to engage a sign consultant that would help the City evaluate if the Salina community was in favor of permitting wall signs as large as The Cozy Inn sign on the sides of smaller buildings, and if the City could amend the Sign Code in a content-neutral fashion while continuing to advance its content-neutral purposes. While uncertain if this was possible, the City wanted to try to work with Howard, and the City understood that Howard was interested in pursuing this option. The City did not have any official submission from Howard regarding the sign, so it invited him to submit a sign permit application.[6] Unbeknownst to the City, Howard had already contacted the Kansas Justice Institute on November 11, 2023 to ask about representation in this case.

[6] Howard submitted this application, which included a rendering of the proposed final wall-sign that was different than the wall sign painted on the side of the Cozy Inn. After a review of the allegedly final rendering, the City confirmed the display was a sign.

The Sign Code Is Not an Impermissible Prior Restraint

With respect to Plaintiffs' prior-restraint claim, the Sign Code, on its face, does not promote arbitrary enforcement because it provides sufficient standards to limit the City and its officials' discretion. The Sign Code has numerous procedural safeguards including avenues for variances and appeals to resolve issues with the City. Further, the standard in the Sign Code is whether the display:

> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.

City staff under the supervision of the zoning administrator are capable of determining whether the structure or display is attached to, painted on, or represented on a building or other structure or on the ground. City staff under the supervision of the zoning administrator are capable of determining whether a display announces, directs attention to, or advertises. The City has been interpreting the definition of sign consistently for decades. The City applies the plain language and ordinary use of the words and phrases "announce, direct attention to, or advertise." The word "advertise" – which the Cozy Inn sign does – is widely used in defining "sign" for regulatory purposes. It is particularly clear when, as here, the advertisements pertain to or reference "goods or services for sale." "Building" is also a defined term in the Salina Code, and City staff under the supervision of the zoning administrator are capable of determining when a display is not located inside of a building. These criteria are constitutionally sufficient.

Further, the Sign Code provides for a brief, specified period of time within which the City must issue or deny a sign permit. In this case, the City informed Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. In an effort to cooperate with Howard regarding a possible code-based solution, and understanding that he was interested

in pursuing this option, the City placed the Plaintiffs' application "on-hold" instead of outright denying it. This approach was intended to be collaborative and helpful, and while it was relatively novel, it was neither illegal nor unconstitutional. The City did not need to again inform Howard that the sign was too large for a sign permit. He already knew that, and indicated as much on the sign permit application.

<u>The Sign Code Is Not Unconstitutionally Vague</u>

As to Plaintiffs' vagueness claim, the Sign Code provides people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Its text provides clear standards that ordinary people can understand, and therefore does not encourage arbitrary and discriminatory enforcement. During depositions, both Howard and Windholz testified that they had not read the Sign Code, did not attempt to read the Sign Code, and do not intend to read the Sign Code.

The Sign Code does not regulate "murals." It regulates signs. As such, the Sign Code is not vague simply because it does not define mural or any number of other terms and phrases enumerated by Plaintiffs that are simply not pertinent to regulating signs. Other words and phrases that are used in the Sign Code need no definition and do not render the Sign Code vague as they have well-understood meanings.

**4. LEGAL CLAIMS AND DEFENSES.**

**a. Plaintiffs' Claims.**

**i.** <u>Violation of the First Amendment Free Speech Clause:</u> Salina's mural-sign code regime (which includes Salina's written sign code, § 42-500 et seq., Salina's unwritten policies and practices, Salina's Sign Permit requirement, and their concomitant enforcement penalties) violate Plaintiffs' First Amendment rights because, both on its face and as applied to the mural at The Cozy Inn, it is a content-based restriction on speech, a speaker-based restriction on speech, and a prior restraint of speech. The mural-sign code regime is unconstitutional under strict scrutiny, intermediate scrutiny, or rational basis review. Plaintiffs also contend, to preserve the issue for appellate review, that the "commercial speech"

doctrine is inconsistent with the First Amendment and should be overturned.

**ii.** Void-for-Vagueness Doctrine of the Fourteenth Amendment: the mural-sign code regime is void for vagueness under the Fourteenth Amendment. Salina's mural-sign code regime "is so standardless that it authorizes or encourages seriously discriminatory enforcement," in violation of the Due Process Clause. The mural-sign code regime is so vague "that regulated parties [do not] know what is required of them," and fails to provide the "precision and guidance" required to guarantee "that those enforcing the law do not act in an arbitrary or discriminatory way.

**b. Defendant the City's Defenses.**

The City asserts the following defenses:

**i.** Plaintiffs have not sought declaratory judgment from this Court to declare that their display is not a sign under the Sign Code, so Plaintiffs have not requested a declaration that will redress their asserted injuries.

**ii.** The Sign Code is content-neutral on its face and as applied to the Plaintiffs because the germane provisions of the Sign Code are not concerned with the idea, topic, subject, or viewpoint of the message displayed, the Sign Code is justified without reference to the content of the regulated speech, and the Sign Code was applied as it is written.

**iii.** The Sign Code passes intermediate scrutiny because it is narrowly tailored to advance the City's substantial interests of traffic safety, pedestrian safety, aesthetics, and property values, and it leaves open ample alternative channels because Plaintiffs can communicate the information with the exact same sign in a smaller size, with other existing signs on the Cozy Inn premises that fit within the allowable sign area, and through a number of other alternative channels.

**iv.** The Sign Code is not a prior restraint because it provides sufficient standards to limit the City and its officials' discretion, so it does not promote arbitrary enforcement.

**v.** The Sign Code is not a prior restraint because it provides for a brief, specified period of time within which the City must issue or deny a sign permit, and the City informed Mr. Howard within three days after he began painting the sign that it was too large to qualify for a sign permit. The unique circumstances of this case, in which the City attempted to collaborate with the Plaintiffs to achieve a legislative solution, do not transmogrify the Sign Code into an unconstitutional prior restraint.

**vi.** Plaintiffs may not seek relief on behalf of "others similarly situated."

**vii.** The Sign Code is not vague because it provides people of ordinary intelligence with a reasonable opportunity to understand what conduct is prohibited.

**viii.** The Sign Code is not vague because it provides narrow, objective, and definite standards that properly guide the City and its permitting officials.

**ix.** The "overbreadth" doctrine, which relates to vagueness, does not apply to commercial speech.

**5. DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiffs seek the following relief:

**a.** A declaratory judgment that the City's mural-sign code regime—which includes the City's written sign code, unwritten policies and practices, Sign Permit requirement, and its concomitant enforcement of penalties ("mural-sign code regime")—as written and enforced:

**i.** is an unconstitutional content-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**ii.** is an unconstitutional speaker-based restriction on speech, on its face and as applied to Plaintiffs and others similarly situated;

**iii.** (alternatively, if the mural-sign code regime is ruled to be content-neutral and speaker-neutral) fails to satisfy intermediate scrutiny, on its face and as applied to Plaintiffs and others similarly situated;

**iv.** is an unconstitutional prior restraint on speech, on its face and as applied to Plaintiffs and others similarly situated; and

**v.** is void for vagueness, on its face and as applied to Plaintiffs and others similarly situated.

**b.** A prospective permanent injunction enjoining the City, its officers, agents, employees, attorneys, servants, assigns, and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing the enforcement of the City's mural-sign code regime on its face and as applied to Plaintiffs and other similarly situated.

**c.** A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their mural in its current position on The Cozy Inn, or for completing the mural on The Cozy Inn.

**d.** Should plaintiffs prevail, they will seek their attorney fees and costs pursuant to 42 U.S.C. § 1988.

Defendant seeks the following relief:

**a.** Should the City prevail, it will seek its attorney fees and costs pursuant to 42 U.S.C. § 1988 on the grounds that Plaintiffs' case is frivolous, vexatious, harassing, and/or groundless.

**6. AMENDMENTS TO PLEADINGS.**

The parties do not anticipate any amendments to the pleadings. Should the Court deny the motion to dismiss in whole or in part, Defendant will file an answer to the amended complaint.

**7. DISCOVERY.**

Under the scheduling order and any amendments, all discovery was to have been completed by **October 18, 2024**. All discovery is complete.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

**8. MOTIONS.**

**a. Pending Motions.**

**i.** Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (ECF 26).

**ii.** Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White.

**iii.** Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702.

**b. Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

**i.** Plaintiffs intend to file a motion for summary judgment and any necessary motions in limine.

**ii.** Defendant intends to file a motion for summary judgment and any necessary motions in limine.

The original dispositive-motion deadline, as established in the scheduling order and any amendments, was vacated on December 17, 2024 (ECF 96). The dispositive-motion deadline is now re-set for **February 7, 2025**. The parties must follow the summary-judgment guidelines on the court's website:

https://ksd.uscourts.gov/sites/ksd/files/Summary-Judgment-Guidelines%202023.pdf

Principal briefs in support of, or in response to, summary judgment motions must not exceed 40 pages and replies must not exceed 15 pages. *See* D. KAN. RULE 7.1(d)(2). Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline. *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

**c.** **Motions Regarding Expert Testimony.** The parties have both filed motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, as of the filing deadline of **December 20, 2024**.

**9. TRIAL.**

The trial date was vacated on December 17, 2024. The trial date is re-set for **October 7, 2025, at 9:00 a.m., in Wichita, Kansas**. This case will be tried by the court sitting without a jury. Trial is expected to take approximately 2 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition

testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

10. **ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties have not participated in mediation. They currently believe the prospects for settlement of this case are poor and they do not believe that court-ordered ADR would be helpful.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

**IT IS SO ORDERED.**

Dated January 16, 2025, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF MARK WHITE**

I, Steven Mark White, a retained expert for the City of Salina, Kansas in the above-entitled action, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts and opinions.

2. I was retained as an expert by the City of Salina in the above-entitled matter.

3. I authored an expert report dated August 16, 2024 and attached hereto as Affidavit Exhibit 1.

4. I make this Affidavit in support of the City's Motion for Summary Judgment.

5. The opinions contained in my expert report are my opinions that I intend to testify to at trial in this matter, are based on facts and data of the type reasonably relied on by experts in my field of urban planning and zoning, and are true to the best of my knowledge and opinion. All statements I have made in my expert report are incorporated into this Affidavit by reference.

6. Specifically, I intend to testify at trial in this matter to the following facts and opinions:

**EXHIBIT 3**

a. The restrictions established in the City of Salina's sign code ("Sign Code") are reasonable, generally accepted regulations of the size, number, placement and design of signs.

b. The Sign Code serves several compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500):

    i. Comprehensive Plan implementation
    ii. Traffic safety
    iii. Aesthetics
    iv. Urban Design and travel behavior
    v. Public Health and Safety
    vi. Compromise

c. Based upon my review of the Sign Code, my knowledge, experience, and education in urban planning and zoning, and the facts and data of the type reasonably relied upon by experts in my field of urban planning and zoning, it is my opinion that the Sign Code directly and materially furthers its recited purposes.

d. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter.

e. In the C-4 district, where the Cozy Sign is located, the Sign Code allows 67% of the total sign area on any building wall or street frontage. This proportionality limitation protects aesthetics and architectural integrity.

f. Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. In reaching this conclusion I examined sign and mural regulations for twenty-one sign codes along with several in Kansas and Oklahoma where I was the principal consultant on the sign regulation drafts and Manhattan (KS), where I was part of the consulting team for the Development Code update. The sample codes I reviewed and cited in my expert report demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

g. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas.

Signed: Steven Mark White
Steven Mark White

STATE OF Florida )
) ss.
COUNTY OF Okaloosa )

Subscribed and sworn to before me by Steven Mark White on the 7th day of February, 2025. Type of ID produced: MO DL

Witness my hand and official seal. My commission expires: 06/13/2027

OZELLA MAE MOORE
Notary Public - State of Florida
Commission # HH 391605
Expires on June 13, 2027

Ozella Mae Moore OZELLA MAE MOORE
Notary Public

Notarized remotely online using communication technology via Proof.

# ANALYSIS OF SALINA SIGN CODE

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

**AFFIDAVIT EXHIBIT 1**

Contents

*Introduction* ______ *2*
*Basis of Opinions* ______ *3*
*Statement of Opinions* ______ *3*
*Compensation* ______ *20*
*Conclusions* ______ *21*
*Documents Reviewed* ______ *22*
*Exhibits* ______ *30*
*Resume and Qualifications* ______ *39*

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

---

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

## DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):




*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.
- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.
- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
  - ◊ A storefront
  - ◊ Display case
  - ◊ **<u>Public art</u>**
  - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

## URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

## PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

---

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

---

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer <u>critical</u> benefits to residents, such as improved <u>public safety</u> and <u>well-being</u>" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

### THE SIGN CODE IS REASONABLE IN SCOPE

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.




*Figure 3 Salina Art Center Mural*




*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

## THE SIGN CODE IS NOT VAGUE

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to ….."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

### SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

### THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.

S. Mark White Digitally signed by Mark White Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C
https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions)
https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage) https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs)
https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119
https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art)
https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2
https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U) https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024. https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017. https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, "Traditional Neighborhood Development-Will the Traffic Work?" American Society of Civil Engineers, (ASCE 1990);

Bookout, "Neotraditional Town Planning: Cars, Pedestrians & Transit," Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, "Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, "Land-Use Mixing and Suburban Mobility," Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**
*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**
*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**
*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

## RESUME AND QUALIFICATIONS

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

### BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

"The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities," Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

"Using Fees and Taxes to Promote Affordable Housing," Land Use Law & Zoning Digest (September 1991).

Co-Author, "Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America's Major Quality of Life Crisis," 24 Loyola Of Los Angeles Law Review 915 (June 1991).

"Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives," 6 J. Land Use & Envtl. L. 25 (Winter 1990)

### SELECTED CITATIONS

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

### SELECTED EXPERIENCE

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 11 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*