**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 12 of 16, Pages 1-252**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| **Volume 16, Pages 1-85** | | | | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**EXHIBIT 4**

Board of Zoning Appeals for a variance to have exceptional signage.

BY MR. SHAW:

**Q. Okay. All right. Let's kind of do the same thing with a Certificate of Compatibility application. That gets submitted. What happens next for the city?**

A. Yeah. So the Downtown Design Review Board is a board of appointed members, and so there's public hearings involved. We would do a public notification to the surrounding property owners of the nature of the Certificate of Compatibility request. We do a staff report that would then be sent to the members, and we would present that staff report at a DRB meeting and they would review the proposed signage for a Certificate of Compatibility based on the downtown design guidelines.

**Q. It's my understanding the Certificate of Compatibility is not just for signage. Is that correct?**

A. Correct.

**Q. Is it for kind of any external change to property?**

A. Yes.

**exceeded the size allotment?**
A. That is correct.
**Q. Okay. What criteria were used to determine that it was a sign?**
A. There were hamburgers. There was graphic imagery and symbols of hamburgers. There was text telling people not to fear the smell, and there was an arrow with some text inviting people to come inside. So there was clear advertising of their business operations.
**Q. Okay. So the planning team determined that the content of the mural was an advertisement?**
A. Correct.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. And because it was an advertisement, that's what classified it as a sign?**
A. Correct.
**Q. Okay. Did anyone ever go to the Cozy Inn and measure the size of the mural?**
A. No. What I did to determine a rough estimate is we have some digital software of imagery that is to scale. And so I can -- from that software, I can measure the height and width

of the building, or in this case the east/west dimension and the height of the building, and do a rough calculation on the size of the exterior wall that was being painted on.

**Q. What is the name of that software?**

A. Pictometry.

**Q. Pictometry?**

A. Um-hum.

**Q. And does that include coverage of the entire City of Salina?**

MS. JOKERST: Object to form.

A. I believe so.

BY MR. SHAW:

**Q. Okay. Is that generally how measurements are made when needed for planning staff?**

MS. JOKERST: Object to form and foundation.

A. Repeat that question.

BY MR. SHAW:

**Q. Is that typically how measurements are taken by planning staff when they're needed for processing a permit application?**

A. I wouldn't say typ --

MS. JOKERST: Object to form.

A. I wouldn't say typically. Because,

typically, we would have drawings and other submittal documents that would have some of the information we'd be looking for. In this case, it was a quick way to get a fairly accurate estimate, not -- it's not survey quality by any means. Just to see what kind of square footage is possibly being proposed.

BY MR. SHAW:

**Q. Okay. In the binder in front of you are some exhibits. If you could open it up to Exhibit 3, please, and you'll see there are little like stamps on them saying Exhibit 1, 2, 3.**

A. Okay. What was the exhibit again, please?

**Q. 3.**

A. Is that like a third of the way through or like --

**Q. It's -- the first two are very big and then --**

THE REPORTER: They stapled together each exhibit. What's stapled is all one.

THE WITNESS: Oh, thank you. That's helpful. Okay.

BY MR. SHAW:

**Q. Do you recognize this document?**

**the Pictometry to measure that?**

A. Correct.

**Q. All right. At the time you sent this, had it been determined that the sign -- well, had it been determined at this point that the mural was a sign?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. And had it been determined at this point that the mural exceeded the size requirements of the zoning code?**

A. The size --

MS. JOKERST: Object to form.

A. The size limitations of the zoning --

BY MR. SHAW:

**Q. Yes.**

A. Yes.

**Q. And that was a -- I believe you said before that was a collective decision of the planning team. Is that correct?**

MS. JOKERST: Object to form.

A. There seemed to be a consensus. It wasn't really debated.

BY MR. SHAW:

MS. JOKERST: Object to form.
THE REPORTER: Thank you.
THE WITNESS: Do I need to slow down? I'm sorry.
THE REPORTER: Yeah.
THE WITNESS: Okay.
THE REPORTER: She needs to get that in before you answer. And then you said correct?
THE WITNESS: Yes.
THE REPORTER: Thank you.
THE WITNESS: Sorry, Amanda.
THE REPORTER: If you just pause a second --
THE WITNESS: Gotcha. Sure.
THE REPORTER: -- and make sure she's not going to object.
BY MR. SHAW:
**Q. All right. Can you please move to Exhibit 4, please. Do you recognize this exhibit?**
A. Yes.
**Q. And what is this exhibit?**
A. This was an exhibit of some calculations that were run to see if there was a way in which we could potentially permit Mr. Howard's paint sign under the current sign code or under

potentially a modified sign code if a text amendment were created. Specifically, if text amendment were added that not only counted the exterior wall of the building that faced the street but also the wall that faced the parking lot. If a text amendment were made to allow that frontage facing the parking lot which is where the painted mural sign is, if that were to be part of the equation, would it be sufficiently large enough to allow the sign that Mr. Howard was painting.

**Q. As the code is currently written, would it allow using that side lot line in the calculation of frontage?**

A. No.

**Q. Okay. So it's only the, for lack of a better term, the frontage on the front of the building?**

A. Correct.

**Q. Okay.**

A. So this would require a text amendment, but we were trying to look at potential options for Mr. Howard.

**Q. All right. So if I am reading the equation down there correctly, is that saying that**

**if the text amendment were made, there would be 194.4 square feet allowed as opposed to the current 62.4?**

A. Correct.

**Q. Okay. And did Miss Driscoll request you or Mr. Andrew to run that calculation?**

A. I don't remember.

**Q. Okay. So please turn to Exhibit 5. Do you recognize this exhibit?**

A. Yes.

**Q. It is four pages long.**

A. Oh, thank you. That's good.

**Q. Three pages. I'm sorry.**

A. Okay.

**Q. Do you recognize this?**

A. Yes.

**Q. Okay. What is it?**

A. The document is an e-mail from myself to Miss Driscoll that has a Cozy Inn sign analysis attached to it.

**Q. Okay. And what was the purpose of the sign analysis that is attached?**

A. To show and document the existing signage and conditions that the Cozy Inn has in terms of their signage as well as the allowable sign area

form and foundation.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. So you do not believe it is possible that those are flying saucer hamburgers as Mr. Howard described them?**

MS. JOKERST: Object to form and foundation.

A. I see hamburgers with like bubbles on them.

BY MR. SHAW:

**Q. And if you use imagination, can you see how that might be a hamburger flying saucer?**

A. I see --

MS. JOKERST: Object to form and foundation.

A. I see hamburgers.

BY MR. SHAW:

**Q. Okay. So is there any artist who could ever paint a hamburger flying saucer that would make you see something other than hamburgers?**

MS. JOKERST: Object to form and foundation.

A. I don't know.

BY MR. SHAW:

**Q. Okay. If these are, in fact, hamburger flying saucers, does that change your analysis any?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. SHAW:

**Q. You initially included the description of them as flying saucer hamburgers, correct?**

A. I was reiterating what Mr. Howard indicated they were purporting to be.

**Q. Okay. And based on pictures you had seen of the incomplete mural, had you determined that that was an incorrect description?**

MS. JOKERST: Object to form and foundation.

A. When you say that, what are we referring to?

BY MR. SHAW:

**Q. The flying saucer hamburgers, that that was an incorrect description?**

A. Correct.

**Q. But you had not seen at that point the rendition of the -- what they would like the final artwork to look like?**

A. Don't Fear the Smell, The Fun is inside, it's a hamburger joint with hamburgers on it.
BY MR. SHAW:
**Q. Okay. Do you know what that yellow splash of paint we were just discussion is?**
A. A yellow splash of paint.
**Q. What is it supposed to represent in this mural?**
MS. JOKERST: Object to form.
A. With it being a hamburger joint, my presumption is that yellow is mustard and the red colored, gooey rendering is ketchup.
BY MR. SHAW:
**Q. Okay. Is it possible that those are blasts from the flying saucer hamburgers that are attacking the Cozy?**
MS. JOKERST: Object to form and foundation.
A. When you say blasts, what.
BY MR. SHAW:
**Q. Of lasers or plasma bolts. I don't know.**
MS. JOKERST: Object to form and foundation.
A. I don't know how to interpret that.
BY MR. SHAW:

A. Yes.
BY MR. SHAW:
**Q. On the page 319 there, does the article attribute quotes to you?**
A. Yes.
**Q. All right. Does the article attribute a quote to you saying that the purpose of the sign code is to aim to prevent sign wars between businesses?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Is that an accurate quote from you?**
MS. JOKERST: Object to form.
A. It's not the only -- the only characteristic or purpose of sign regulations.
BY MR. SHAW:
**Q. Okay.**
A. But it is --
**Q. It's --**
A. -- one factor.
**Q. I'm sorry for talking over you. Did you say it's a factor?**
A. Yes.
**Q. Okay. What is a sign war?**

MS. JOKERST: Object to form.
A. A sign war could be a scenario where you have a number of businesses along a corridor. And in order to become more prominent, they erect signs that are larger than the signs around them and so then -- or larger than the businesses around them. And the businesses around them in turn erect signs that are taller or larger than the original sign. And then more people have larger, bigger signs and additional signage, and it goes on to the point where the signage loses its effectiveness. You lose the trees for the forest, becomes confusing, becomes cluttered and there's so much signage that none of it is really effective any longer.
BY MR. SHAW:
**Q. I see. And is that a term used in the city code?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Is sign wars a term used in the city code?**
A. No. It was a term I use in an allegory form.
**Q. Okay. So you did use the term sign wars**

**when speaking to the reporter for this article, correct?**

A. Correct.

**Q. That is a correct quotation?**

A. Correct.

**Q. And you said you were using it as -- did you say it was an allegory or...**

A. In the example of the scenario I gave you, a description of the scenario I gave you.

**Q. All right. And so one of the aims of the sign code is to prevent these sign wars?**

MS. JOKERST: Object to form.

A. One of the aims is to protect both the aesthetic feel and quality of life of the community through it's aesthetics as well as making sure that you don't create any safety hazards which a lot of sign clutter and large amounts of signage could potentially result in.

BY MR. SHAW:

**Q. Do you think a mural can potentially result in safety hazards?**

MS. JOKERST: Object to form and foundation.

A. Which kind of mural?

BY MR. SHAW:

**Q. Okay. All right. There's another quote attributed to you in that next paragraph. Can you please review that?**

A. Yes.

**Q. Is that an accurate quotation?**

A. Yes.

**Q. And the sign wars quotation is also accurate?**

A. Yes.

**Q. Okay. Can you go to Exhibit 14, please. Are you familiar with what this document is?**

A. This looks like a sign permit in LAMA.

**Q. When it says at the top the date of 2/5/2024, do you know is that the date that LAMA says the permit was submitted or is that the just the date this was generated?**

MS. JOKERST: Object to form.

A. I have no idea.

BY MR. SHAW:

**Q. Okay. So when you look at this, does it have any field in there somewhere saying like assigned to, you know, Dustin Herrs, for instance?**

A. When I receive a sign permit for review in our LAMA database, it looks nothing like this from my seat. The window I see is nothing like

**Q. Do you know if a Certificate of Compatibility was ever applied for this mural?**

MS. JOKERST: Object to form.

A. No.

BY MR. SHAW:

**Q. Do you know if a violation was ever -- or a citation was ever given to The Yard over this mural?**

MS. JOKERST: Object to form.

A. This sign is not in violation, because it is a sign oriented toward the inside of building B.

BY MR. SHAW:

**Q. Does the sign code use orientation at all in the regulation of signs?**

MS. JOKERST: Object to form.

A. That specific word?

BY MR. SHAW:

**Q. Yes.**

A. I don't know.

**Q. Does it use that concept?**

A. Yes.

**Q. Do you know where?**

A. Possibly. I'd have to have the code to review it.

**Q. All right. Exhibit 1, so right at the front of your book.**

A. Okay. So under this sign definition, one of the characteristics of a sign would be not located inside a building.

**Q. Okay.**

A. So we exempted this from the sign code because of that.

**Q. All right. But that doesn't speak to the orientation of a sign, does it?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. And I may actually just clarify, first. Are you looking at Section 42-764 (3)?**

A. I am.

**Q. Okay. And does that refer to the orientation of the sign?**

A. It refers to its location.

**Q. But the location is whether it's inside of a building?**

A. Um-hum. And in this case, it was interpreted that building B was sandwiched between buildings A and C.

**Q. So is it the staff's opinion that buildings A, B and C are all one building?**

A. No, they are adjacent buildings.

**Q. So they're adjacent buildings. Which building is the mural in Exhibit 32 located inside of?**

A. The north wall of building B.

**Q. I see. So the north wall of building B is this brick wall several feet away from building B?**

A. They are --

MS. JOKERST: Object to form.

A. They are adjacent and connected.

BY MR. SHAW:

**Q. Do you know if the structure of building B actually touches building A?**

A. There are elements of B that touch building A, yes.

**Q. Is that element just netting?**

MS. JOKERST: Object to form.

A. I don't know.

BY MR. SHAW:

**Q. Can you turn to Exhibit 25 and specifically page 183 of Exhibit 25?**

MS. JOKERST: Did you say 183?

MR. SHAW: Yes, 183.

MS. JOKERST: Thank you.

BY MR. SHAW:
**Q. Are you there?**
A. I have it, yes.
**Q. Is this rendering depicting a gap between buildings A and B?**
MS. JOKERST: Object to form and foundation.
A. Building B appears to be adjacent to building A.
BY MR. SHAW:
**Q. When you say adjacent, what does that mean?**
A. Directly next to.
**Q. Okay. Does it mean touching?**
A. Like overlapping. They do touch.
**Q. Do the physical buildings touch?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Or I'll ask it this way. Do you see building B, does it depict where the pillars are?**
A. Yes.
**Q. Are any of those pillars touching building A?**
A. No. The vestibule appears to protrude into building B.

**Q. But when you say into building B, there's no wall there. Is that correct?**
A. There's a wall.
**Q. Of building B.**
A. The north wall of building B and the south wall of building A are the same wall.
**Q. Okay. But what I'm saying is building B is a roof structure supported by pillars, correct?**
A. Correct.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. It has no walls. Is that correct?**
MS. JOKERST: Object to form.
A. Building B shares a wall with building
A. It isn't supported --
BY MR. SHAW:
**Q. Why --**
A. By the same wall.
**Q. Why does staff described these as two different buildings then?**
MS. JOKERST: Object to form and foundation.
A. It's an independent structure.
BY MR. SHAW:
**Q. I agree it is an independent structure.**

**How is it inside a building then?**

MS. JOKERST: Object to form and foundation.

A. The south wall of building A has a sign that faces into building B.

BY MR. SHAW:

**Q. Well, I understand it faces towards building B.**

A. Yes.

**Q. But are they different buildings?**

MS. JOKERST: Object to form.

A. They are different buildings that share a common wall.

BY MR. SHAW:

**Q. Even though that wall is several feet away from building B, is open to the air, is open to rain, it is still the same wall?**

MS. JOKERST: Object to form and foundation and asked and answered. I think we need to move on. He's already answered all these questions multiple times.

MR. SHAW: I'm not seeing how this is inside of a building, and I'm not just not understanding it.

MS. JOKERST: Okay. My objection

**Q. What's there today, yeah. Are those little bubbles on the hamburgers outlined on that sign as it sits there today?**

A. No.

**Q. You attended the meeting with Mr. Howard at Smoky Hill Museum, right?**

A. Yes.

**Q. After that meeting, was it your understanding that Mr. Howard wanted to pursue a potential code amendment to see if that would alleviate any of his issues with getting a sign permit?**

A. That was my understanding.

**Q. And was the city willing to try to work with Mr. Howard in that regard?**

A. We had contacted a sign regulations specialist to engage in conversations with the community about potential text amendments to our sign code.

**Q. And can you flip back to Exhibit 12 page 3, I'm sorry. Hopefully you're still there.**

A. Yeah, I'm still there.

**Q. Okay. I want you to look at the large like burger in between the Don't Fear the Smell and The Fun is inside with the arrow. Do you see**

A. Okay. So as I recall, this property is zoned I-2 which doesn't --

THE REPORTER: I-2?

THE WITNESS: I-2.

THE REPORTER: Thank you.

A. Which is our light industrial zoning district and has different sign allowances and requirements and regulations than Mr. Howard's, for example. And one of the differences is there's not a limitation that I recall on the number of signs you can have. And so what was done is a rectangular box around the various elements and those were all added together into an aggregate.

BY MR. SHAW:

**Q. So you didn't do the entire mural, just the elements of the mural individually?**

A. Correct.

MS. JOKERST: Object to form and foundation.

BY MR. SHAW:

**Q. Did you perform a similar analysis at the Cozy' mural where you took the different elements and calculated them individually?**

MS. JOKERST: Object to form and

MR. SHAW: Okay. All right. I have no further questions for you.

MS. JOKERST: I have a couple follow-ups.

CROSS-EXAMINATION

BY MS. JOKERST:

**Q. Mr. Herrs, did you provide the Cozy Inn sign analysis to Mr. Howard?**

A. Yes, when we met at the Smoky Hill Museum. I believe I did if I remember correctly.

**Q. Did Mr. Howard ever propose an alternative measurement for his sign?**

A. I don't believe so.

**Q. And I want to turn your attention to Exhibit 3 if you can pull that up. Just let me know when you're there.**

A. I am there.

**Q. Okay. If you look about halfway down where it says I informed Steve that as it is currently written, do you see that?**

A. Yes.

**Q. Okay. And do you see the date there is November 6 of 2023?**

A. Yes.

**Q. So on November 6, 2023, did you tell Mr. Howard that the sign on the side of the Cozy would**

**not qualify for a sign permit as it was proposed?**

A. Yes.

**Q. If you can skip back to Exhibit 12 and that last photo, the rendering?**

A. Yes, I'm there.

**Q. Okay. As you sit here today and you look at this rendering, does that change your determination that this is a sign?**

A. No.

**Q. And earlier you talked about there were maybe some -- like I think you used the term bubbles in this rendering, like there was a little bubble on some of the hamburger depictions. Do you recall saying that?**

A. Yes.

**Q. Let me see. Actually, do we have a photo? Let me try to find an exhibit with a photo of this for you really quickly so I can refer you there. I thought I saw one in here. Well, do you recall what the outline on the Cozy looks like that you saw?**

A. Yes.

**Q. Okay.**

A. Are you talking about the existing -- what's there today?

**that?**
A. I do.
**Q. Do you see any other traditional burger condiments depicted in that area of the sign?**
A. Pickles, onions, ketchup, mustard.
**Q. And what about the sign as a whole? I guess look towards the right, just scan the whole thing. Do you see condiments throughout the sign?**
A. Yeah. I see ketchup and mustard and other pickles floating around.
**Q. And those little like white things, that big burger in the middle, you can kind of -- or, I'm sorry, towards the left in the middle, Don't Fear the Smell and The Fun is inside, and then you can kind of see it like on the one to the top right, those little white -- I don't know how to describe them, little white --**
A. Looks like team.
**Q. -- morsels?**
THE REPORTER: What did you say, Amanda?
MS. JOKERST: Morsels.
THE REPORTER: Thank you.
BY MR. SHAW:
**Q. Do you know what those are?**
A. No.

**Q. Okay. Don't Fear the Smell, do you know what smell the Cozy is infamous for?**

A. Primarily the onion odor.

**Q. Okay. Could those be -- I guess when you look at that, do you think that those could be onions?**

A. I mean I think the little white flakes, if you want to call them that, around the burger with the -- next to the pickles are probably onions.

**Q. And take a look again at that big burger in the middle in between Don't Fear the Smell and The Fun is inside, can you describe to me I guess what the condiments look like in that patty specifically?**

A. The yellow looks like mustard. The red looks like ketchup with pickles and onions in a patty there.

**Q. Does it look like the ketchup is like running off of the burger, so to speak?**

A. Yeah.

**Q. The if you could turn to Exhibit 8, the sign analysis, and specifically go to that last page, page 4, where it talks about existing conditions.**

A. Okay. I'm there.

**Q. Okay. Under that it says current allowable sign area, 63 square feet. Do you see that?**

A. I do.

**Q. Is that the allowable sign area in total for the Cozy?**

A. That is correct.

**Q. Okay. And then down on the proposed hamburger sign analysis, do you see there where it says the Cozy Inn is approximately -- or, I'm sorry, the proposed hamburger sign on the north wall of the Cozy Inn is approximately 528 square feet?**

A. Yes.

**Q. And is that the measurement that you took to determine how large that painted wall sign is?**

A. Yes.

**Q. And if you look at the current signage, it says total sign area, 52.88 square feet. Do you see that?**

A. I do.

**Q. Okay. Is that the total signage that the Cozy currently had not including this wall sign?**

A. That is correct.

same sign allowances as other people in downtown central business zoning district, which is our C-4 zoning district. People in the C-5 zoning district are allowed the same sign allowances as other people in the C-5 district. People in residential zoning districts are allowed to have the same sign allowances as other people in residential zoning districts of that same district.

**Q. And I want to speak specifically to sign clutter. How does regulating signs in the aggregate advance -- prevent sign clutter?**

MR. SHAW: Objection.

A. If signs are not regulated in the aggregate, you could have one sign that's larger than others. Then other people get larger signs. And if you get a whole bunch of signage, an excessive amount of signage both in terms of number of signs and size of signs, it can lose its effect and become distracting and potentially cause safety problems. It could also damage the aesthetic of the community, the quality of life of the community. And so the goal of the sign regulations is to permit and allow ample amount of signage for each property while still establishing

a balance that makes that signage effective and attractive without becoming a safety concern.

BY MS. JOKERST:

**Q. And I want to direct your attention to Exhibit 31, and specifically page 2, item 8?**

A. Okay. I'm on page -- or Exhibit 31.

**Q. Yep, Exhibit 31, page 2, item 8. It's on the top of that page.**

A. Okay. Sure.

**Q. The wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Do you see that?**

A. Yes.

**Q. Okay. So earlier Mr. Shaw was asking you questions about this and the application, and you said you thought that the application was related to a JRI sign that was in on the vestibule portion inside of The Yard. Do you recall that?**

A. I do.

**Q. Okay. Now, I want you to read No. 8.**

A. Um-hum.

**Q. Okay. So you're going to read that, the wall sign helps make the JRI Hospitality Field at The Yard more recognizable from 4th Street. Now, I want you to turn to Exhibit 32 and go to that**

**Q. Okay. And I want you to look at the top of this photo that's Bates marked 91 on Exhibit 32. Can you describe the structure that's at the top of that photo?**

A. When you say the top, are you talking about the roof structure of the field.

**Q. Yes. Yep. So is that a roof?**

A. Yes.

**Q. So is this infield area covered?**

A. Yes.

**Q. Is this infield area enclosed?**

A. It's covered. It's not enclosed because there's not walls all the way around it.

**Q. Okay. Well, let me ask you -- let's look at -- I want you to look at the top page, that 95. Do you see that page, that photo?**

A. Yes.

**Q. Is there a pubic entrance from the street? Can you just walk off the street into that infield building?**

A. In that sense, no.

**Q. Okay. So is there a structure that is enclosing the infield?**

A. Yes.

**Q. Okay. What is that structure?**

A. There's fencing and netting and a rooftop that encloses the structure, surrounds the structure.

**Q. And looking at the structure on 95, is that permanently affixed to the ground there?**

A. Yes.

**Q. Okay. And is this enclosure here on 95, is that intended to enclose people who are in that infield area?**

A. Yes, people and balls, baseballs, softballs.

**Q. All right. And let's go back down to that last page, I think it's 301, the last page, page 5 on Exhibit 32. And earlier you mentioned if you kind of look down like if you're looking straight down, it looks like there's a wall right there. Do you see that?**

A. I do.

**Q. Okay. And is that the vestibule?**

A. Vestibule, yes.

**Q. Vestibule. I hate that word.**

A. That's how you -- that's how you transition from building A to building B.

**Q. Got it. Okay. So is that touching building B?**

A. Yes.
**Q. Is that connected to building B?**
A. Yes.
**Q. And I want you to look at the grass, the turf there?**
A. Um-hum.
**Q. Do you see that turf on the infield?**
A. I do.
**Q. Okay. Is that touching that brick wall?**
A. Yes.
**Q. Okay. And I want you to look at this fence in the foreground. Do you see that fencing?**
A. I do.
**Q. Okay. Is this the fence that encloses the infield building?**
A. Yes.
**Q. Okay. Is that fence connected to the brick building?**
A. It is.
MS. JOKERST: All right. I don't have -- I don't have any other questions.
MR. SHAW: I have a few follow-up.
REDIRECT-EXAMINATION
BY MR. SHAW:
**Q. Do you know if there is, in fact, a sign**

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

LAWRENCE BRADLEY ANDERSON,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:01 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**EXHIBIT 5**

MS. JOKERST: Object to form.

A. Not -- I'll need to clarify this, but no direct funding from the city that I'm aware of was used to pay for any of the current murals from the first two years. We do provide staff time and/or administrative support for ancillary projects associated with the festival. So it might be staff time in administration, it might be underwriting the cost of a musician on a stage for a performance, but we didn't make direct contributions to the mural or to that project.

BY MR. SHAW:

**Q. Okay. When you say the festival, are you referring to the Boom! Salina mural festival?**

A. Yes, I am.

**Q. Okay. And is it your understanding that the Boom! festival is a project of the Salina Kanvas Project?**

A. Yes, I'm --

**Q. Okay.**

A. -- aware of that or assume that.

**Q. All right. I'll represent to you that the Boom! festival website list Salina Arts & Humanities and it lists for donors and partners. Is that a correct characterization in your eyes of**

appeared to me to follow the form and content and scale of what constituted a sign before I could consider it as art.

BY MR. SHAW:

**Q. All right. So once you first learned about the mural at the side of The Cozy, what did you do after that?**

A. I believe that I either -- I believe that I might have texted Lauren Driscoll in Development Services and/or Leslie Bishop who is the director of Salina Downtown, Incorporated, to see if they were aware of this work.

**Q. Okay. Can you turn to Exhibit 6, please?**

A. Yes.

**Q. Do you recognize this exhibit?**

A. Yes.

**Q. What is it?**

A. It is a photograph of the mural at The Cozy Inn process, and a text message that asked about the Design Review Board.

**Q. So where it says I'm guessing this didn't go through DRB, when you said Design Review Board, that's DRB?**

A. Yes.

**Q. Okay. Do you know who this was sent to?**

A. But I believe that I may have sent that.

**Q. Okay. Do you see at the top where it says Leslie?**

A. Yes.

**Q. Do you believe that that is referring to Leslie Bishop?**

A. Yes.

**Q. And what is Leslie Bishop's role?**

A. Leslie is the director of Salina Downtown, Incorporated.

**Q. Is that a part of the City of Salina?**

A. It is a Business Improvement District funded in part by the City of Salina I think. I can't describe specifically what it is. It is not a department of the city, but they operate with a separate board.

**Q. Got it. Do you know if Leslie is considered a city employee?**

MS. JOKERST: Object to form and foundation.

A. I am fairly confident she is not an employee of the City of Salina.

BY MR. SHAW:

**Q. Okay. But Exhibit 7 you believe to be a text chain between you and Leslie, although, as I**

**recall, you said you don't know who initiated it. Is that correct?**

A. Correct. I'm pretty sure that I initiated the inquiry.

**Q. Okay.**

A. The same we would on any other business that might have a mutual impact.

**Q. Got it. And so if Exhibit 7 is with Leslie Bishop, is it then fair to say that Exhibit 6 would be between you and Lauren Driscoll?**

A. Yes.

**Q. Okay. Why did you inform those two individuals?**

A. I informed Lauren because that -- she is the person responsible for the staff that we rely on to provide us feedback on projects that might be in violation of either a city code or to get guidance on proper procedures to follow, and so that was the reason I reached out to her.

I reached out to Leslie because we work closely, as some of the text flow indicated, on other ancillary projects, including Artwork Alley. Leslie was involved as the business liaison to the businesses where we were going to paint and/or to help keep area merchants informed of our use of

MS. JOKERST: Object to form.
A. The mural entitled Symphony of Sunflowers is located on the right side of the -- of the illustration and is parallel with the bottom frame of the photograph and the top.
BY MR. SHAW:
**Q. Okay.**
A. And it kind of contains five large sunflowers, leaves and some birds, I think.
**Q. All right. If you could go to Exhibit 28 which would be the last one in your binder.**
A. Okay.
**Q. Does this exhibit depict a larger photograph of Symphony of Sunflowers?**
A. Yes, it does.
**Q. And in addition to the sunflowers you described earlier, does it also contain music notes?**
A. Yes.
**Q. Okay. Do you know what building this mural is painted on?**
A. What do you mean by what building?
**Q. Do you know what goes on inside this building?**
MS. JOKERST: Object to form and

foundation.

A. I don't know specifically what happens inside that building. I know next door is a symphony rehearsal hall.

BY MR. SHAW:

**Q. Okay.**

A. And I've used the back of that building. We used it as a store room for our Artwork Alley paint storage, but I don't recall that I've ever been in that building.

**Q. Okay.**

A. I think there may be a studio of some kind, a music studio possibly, but I can't say for sure.

**Q. Okay. Do you know who owns that building?**

MS. JOKERST: Object to form and foundation.

A. I believe it's owned by Gus and Hannah Applequist.

BY MR. SHAW:

**Q. Who are they?**

A. Gus is a -- well, it was formally -- I don't know that he plays now, but he owns Fili Creative, a multi-media video production firm in

BY MR. SHAW:
**Q. Okay. All right. Let's move on to Exhibit 16.**
A. Okay. 16. Okay. This looks like a collection of screenshots from the Salina Arts & Humanities public art resource pages at our website.
**Q. Okay. And does this exhibit feature a specific piece of public art?**
A. It does.
**Q. And what piece of public art is that?**
MS. JOKERST: Object to form.
A. It references a photo mural at Fire Station No. 2.
BY MR. SHAW:
**Q. Okay. And is this one of the pieces of art that is like actually in the Salina Arts & Humanities Department's portfolio, I guess would be the word?**
MS. JOKERST: Form.
A. Yes.
BY MR. SHAW:
**Q. Okay. And so this was owned and funded by Salina Arts & Humanities?**
MS. JOKERST: Object to form.

Image # 872912431009990

Front Image

THE FACE OF THIS DOCUMENT HAS A COLORED BACKGROUND ON WHITE PAPER AND ORIGINAL DOCUMENT SECURITY SCREEN ON BACK WITH PADLOCK SECURITY ICON.

HAMBURGERS!

COZY INN INC.
8822 S. SUNNYSIDE RD
BROOKVILLE, KS 37425

FIRST BANK KANSAS
235 S. SANTA FE AVE.
SALINA, KS 67401

83-1465/1011

19377

11/19/2023

PAY TO THE ORDER OF Colin Benson $ **500.00

Five hundred and 00/100*************************************************************************************** DOLLARS

Colin Benson

MEMO

WHEN HEAT IS APPLIED IMAGE FADES

AUTHORIZED SIGNATURE MP

Security features included. Details on back.

[redacted] 3640⑈

Back Image

Padlock design is a certification mark of the Check Payment Systems Association

Warning: Absence of the following Security Features may indicate alteration

2023-11-22
121845
2055

CHECK HERE IF MOBILE DEPOSIT

DO NOT WRITE, STAMP, OR SIGN BELOW THIS LINE

ENDORSE HERE

X

Galaxy S22

EXHIBIT 6

EXHIBIT
V

12:14 ring ring 65%

Rick Ben...

Monday, Aug 19 • 3:32 PM

3:32 89° 85° 4G 65%

Posts Photos Videos

1d ·

**The Amazing Ex-Mayor...** is with **City of Salina, KS Government**. • Follow

Aug 11 ·

On Monday the City Commission will go into Executive Session with Special Legal Counsel to discuss Cozy Inn v City of Salina. There is the possibility that action will be taken following the closed door session. Translation: City Commission will huddle with their attorneys for about an hour, make their decision in private session, return to public meeting, have little to no discussion and make their decision public. (Of course they have already talked about this issue in their individual weekly private meetings with the city manager, so they might not need a full hour). There will be no opportunity for the public to know anything in depth or to make informed comments. Also, end of the meeting and after a long private

3:32 PM

Text...

12:15 64%

Rick Ben...

informed comments. Also, end of the
meeting and after a long private

3:32 PM

Last week

Anything become of it

Not to me

Sad!

3:37 PM

Text...

12:21 63%

Sam Wal...

Friday, Dec 29 • 5:30 PM

12:27 89%

Posts Photos




11 3 comments

Like Comment Send Share

Kris Hitchcock-Howard

15h ·

Andrea Windholz

Lmao Mommy

Tuesday, • 9:46 AM

Text...

12:34 ring ring 5G 61%

Colin Be...

Tuesday, Oct 24 • 11:44 AM

Texting with Colin (SMS/MMS

This is Colin btw




Text...

12:35 ring ring 61%

Colin Be...




Tuesday, Oct 24 • 4:08 PM

We are thinking leaning an onion slice on the bu[ ]er

Text...

12:35 ring ring 5G 61%

Colin Be...

That pic with arrow has the WOW factor just lean a slic of onion against it!! Tha will be perfect

👍

Wednesday, Oct 25 • 8:18 AM



Text...

12:35 61%

Colin Be...

Wednesday, Oct 25 • 8:18 AM




What about a cut onion

Wednesday, Oct 25 • 10:17 AM



Text...

12:35 ring ring 5G 61%

Colin Be...

Wednesday, Oct 25 • 10:17 AM




Love the one with the larger onion!!!

The ring

Text...

12:36 61%

Colin Be...

The ring?

Wednesday, Oct 25 • 12:20 PM

No other one

Tuesday, Oct 31 • 11:34 AM




Text...

12:36 ring ring • 5G 61%

Colin Be...

Should be a good week/end to get it done .went back to original with chopped onions. Heard through the Rick vine.

Text...

12:36 ring ring 5G 61%

Colin Be...




It's the burger invasion. Over the top I know , but fun!

Tuesday, ( 1 • 1:13 PM

Text...

12:36 ring ring 5G 61%

Colin Be...

Tuesday, Oct 31 • 1:13 PM

I like it!! Wife thinks it's too much

Wednesday, Nov 1 • 4:10 PM

Lets go for it!!!

Wednesday, Nov 1 • 6:26 PM

Ok, I'll swing in tomorrow to make we're on the

Text...

12:37 ring ring 5G 61%

Colin Be...

Ok, I'll swing in tomorrow to make sure we're on the same page. Thank you again for the opportunity , it will be so fun and ama[illegible]ng

Text...

12:37 60%

Colin Be...

Great!!!! I am excited!!

Monday, Nov 6 • 3:22 PM

Hey Steve, just seeing what's going on Dad told me this morning when I set up t t I proba should wait until I heard

Text...

12:37 ring ring • 5G 60%

Colin Be...

Hey Steve, just seeing what's going on Dad told me this morning when I set up that I probably should wait until I heard from yo[...]o find

Text...

12:38 ring ring 60%

Colin Be...

from you to find out what this permit BS is about. So just let me know. Thank you and have a good day.

Sta tuned....

Text...

12:38 ring ring • 5G 60%

Colin Be...

Tuesday, Nov 7 • 1:15 PM

What's up Steve sorry I was all riled up after talking with the committee of the arts Director. I didn't know it s

through them

so when you

get a minute

Text...

12:38 ring ring • 5G 60%

Colin Be...

Director. I didn't know it was through them so when you get a minute call me if you want.

Tuesday, Nov 7 • 8:42 PM

Finish the mural!!!! It's on me!...

Text...

12:39 ring ring • 5G 60%

Colin Be...

Tuesday, Nov 7 • 8:42 PM

Finish the mural!!!! It's on me!!!!!

https://youtu.be/ROxvT8KKdFw?si=hv4mKdfoepG-69ff

Text...

12:39 ring ring 5G 60%

Colin Be...

Should watch this

Wednesday, Nov 8 • 9:13 AM

Good stuff Yep loved that movie.

Wednesday, Nov 8 • 8:17 PM

So fin Doug

Text...

12:40 ring ring • 5G 60%

Colin Be...

So find Doug Rempp on FB read what he put on about the mural then read the comments especially Brad Johnson

Text...

12:40 60%

Colin Be...

Ÿep!!!!!!! He should unload his gun and back off!!!!

Lol a sign is removable what does he think a mural is. Wow what a bunch of shit

Sorry man

Text...


12:40
60%
Colin Be...
Lol a sign is removable what does he think a mural is. Wow what a bunch of shit
8:28 PM
Sorry man
Not y fault
Text...

12:40 ring ring 60%

Colin Be...

Not your fault this is so fuking ridiculous

Yes sir. The bigwigs are pissed off because it will be the coolest fucking [illegible]ural in town and will [illegible]

Text...

12:41 ring ring 59%

Colin Be...

Yes sir. The bigwigs are pissed off because it will be the coolest fucking mural in town and will get probably the most recogni[obscured]n and

they s

Text...

that money on

all these artist

12:41 ring ring 59%

Colin Be...

the most recognition and they spent all that money on all these artist outa country. I should change my name to Miguel.

WE are going to

Text...

12:41 ring ring 5G 59%

Colin Be...

Friday, Nov 10 • 12:38 PM




This was a nite shot that I colored up so the ladder is in it and the color is off a b[illegible].

Text...

12:42 59%

Colin Be...

Monday, Nov 13 • 8:20 AM

Hey Steve, which building is it?

Monday, Nov 13 • 9:54 AM

What was the short haired lady's name

Monday, Nov 20 • 9:59 AM

Text...

12:42 59%

Colin Be...

Monday, Nov 20 • 9:59 AM

I have a chk here at cozy f ya

Right on , I was gonna stop by and say hey anyway

Thursday, I 23 • 5:15 PM

Happ

Text...

thanksgiving to

Home

**The Cozy Inn**
November 5, 2023 ·

New art coming soon!




**Colin Benson**
November 5, 2023 ·

Oh u can smell the love I'm throwning down on the Cozy....

Like Comment Send Share

Most relevant

Write a comment...

**Jay Prater, CBM KAKE** · Follow
Sweet!
#iknowwhatyouhadforlunch
#scratchandsniff... See more
44w Like Reply Edited 2

View all 4 replies

**Kira Treffer**
Awesome mural! Can't wait to see the finish! The burgers are one of a kind! 😋
44w Like Reply 5

**Kim Bailey**
LET COZY INN PAINT/FINISH!!!! Est. just 2 short years after City! For 101 years, they have been a staple of our community. They attract business worldwide! Either grandfather them in or allow exemption!!!
43w Like Reply 9

View all 2 replies

**Blackberry Babe - Recipes by Michelle Goth** · Follow
I really hope you get to finish this!
43w Like Reply

**Josiah D D'Albini**
Earlier this year I stopped in on my way to a conference, and was using a work car. Took a few weeks for the smell to come out. One of the best smells there is!
44w Like Reply 18

**Mary Barnyard Mare Powell**
I LOVE IT! don't back down and keep the art up! Your place is an ICON and that art work is perfect!
43w Like Reply 3

**Sue Ellen Dawdy**
Young or old this place makes everyone smile. Warms the hearts of us old folk that love the nostalgia Burgers are the Bomb!! We love you Cozies!! 🍔 ❤️
43w Like Reply 3

**Steve Blosser**
A video I did a couple years back while out of town, hungry for a Cozy Burger...



43w Like Reply 2

The Cozy Inn replied · 6 Replies

**Roger Hill**
With Collin Benson doing the artwork, you know it's going to be awesome!!!

44w Like Reply 4

**Viki Leah Barrett**
This is great! My favorite burger place! Love the updates but please don't change the original burgers!

44w Like Reply

View 1 reply

**Luis Garcia**




44w Like Reply

**Eldora Russell Fox**
No doubt we followed that smell for blocks and had the best food ever. Start of the best birthday ever and I'm almost 60

44w Like Reply 2

**Jean Hebenstreit Stvartak**
Rooting for you guys! The city needs to get a grip...it's your building, a cool mural!

25w Like Reply

**Jamie Fulsom**
LOVE IT, City of Salina needs to pull their head out!

43w Like Reply 2

View 1 reply

**Curtis Martin**
The city needs to back off it's your building and I don't see what the problem is other than they need glasses to see with...
Best hamburger's in the world..
We stop in every time we are in town... Praying for you guys a great win..

25w Like Reply

**Kenneth Larson**
Always a dozen to go.

44w Like Reply 2

**Loretta Lynn Haley**
Mural is just getting started and I can already imagine how awesome it is going to look!!! Love those Cozy's!!🥰🥰

44w Like Reply

**Erica Mendoza**
**Garden City Area Chamber of Commerce**, we should make our town full of art 🎨 around the buildings like this?!

44w Like Reply Edited 2

View all 2 replies

**Joe Sierminski**
Awesome Mural, look great in SALINA! Thanks for serving our community!!!!!!

43w Like Reply 5

**Bill Tegtmeyer**
Can you add scratch and sniff smell-o-rama??

44w Like Reply 2

**Cheryl Higle**
Can't wait to see it finished. Love the burgers !!




44w Like Reply

**Mary Ann Myers**
LOVE! I grew up on Cozy Burgers!!😊

44w Like Reply

**Regina Silver-Troxell**
This is going to look great.

44w Like Reply

**Chris Hernandez**
There pretty good especially if you like hot soft onions. Alot like White Castle.

Joe Crick
You could not find a better artist for this. Way to go Colin!
44w Like Reply

Dawn Monasmith Brady
That is Awesome! One of my favorite places!
44w Like Reply

Darla Denning
I love it!!!!!!!
43w Like Reply

Denise Zeigler-Bisel
**Sandy Stegeman Grace Teresa Borthwick Suellentrop**, there ya go! Maybe just don't go inside, the window is great 😂😂
44w Like Reply

View all 2 replies

Mark Windholz
Oh wow! That's awesome.
44w Like Reply

Kyle Olson
That's soooo cool!
44w Like Reply

Sherrie Richards
We need to go to salina some time
44w Like Reply

Linda Dionne Gatton
That's great!
44w Like Reply

Top fan
Douglas A. Gilstrap
That looks great!!!
44w Like Reply

Gary Horner
Very cool
44w Like Reply

Haivyn Nelson
**Blake Green**
44w Like Reply

Scott Brown
That is fantastic!
44w Like Reply

Lloyd Kathy Jones
How exciting
44w Like Reply

Neal P. Knight
Can't wait to see it and eat a burger

Tim Souders
Can't share it
44w Like Reply

Lori Saferite Werner
I hope you get to finish!!
29w Like Reply

Shane Konzem
Going to look amazing.
44w Like Reply

Eric Nevils
👏👏👏👏👏👏👏
44w Like Reply

Mark Welchans
Nice cant wait to see it
44w Like Reply

Kelly Robb
**Kevin Robb Bill Robb**
44w Like Reply

Tayler Dawn
**Kim Monasmith-Pinkall**
44w Like Reply

Dianna Porter
**Ryan D Sopapilla**.
44w Like Reply

Heather Yost
**Charles Yost**
44w Like Reply

Edward Scott Rosson
**Margaret Claire**
44w Like Reply

Kara Bastian
**Boaz Pan**
44w Like Reply 2

Donna Cheswick Hines
💗💗💗
44w Like Reply

Kim Amador Berry
❤️🍔
43w Like Reply

Kathy Albertson Stimpson
Wonderful! So are the burgers!
44w Like Reply

Ryan Norman
Make sure any first timers don't mistake that yellow for cheese! Love it.
44w Like Reply 7

View 1 reply

Norton KS · Follow
Awesome
44w Like Reply

Serena Brummett
**Brian Brummett Alex Brummett**
44w Like Reply

Patrick Perez
City of Salina needs to stop harassing the Cozy, it's thier building, paint it how you see fit, I'd sign a petition to support the business against the City.
43w Like Reply Edited 2

David Lee Nelson
Stay strong!!!!
43w Like Reply

Ollie Dickson
Great 👍
44w Like Reply

Kris Smilko
Basically the local government trying to extort more money from a local business, is why this has stalled. Shame on the city of Salina.
42w Like Reply

Mary Barnyard Mare Powell
Practice Civil Disobedience and make that mural happen! You are ICONIC! That mural is PERFECT!
43w Like Reply 2

Shannon Powell
Have there been any updated on this art if they was able to continue with it or not?
31w Like Reply

Paula Marie Kelley
**Darien Allen Kelley**
44w Like Reply

Sherry Edson Sammons
The Yard



27w Like Reply

**Bruce Kesl**
Ooh that smell
Can't you smell that smell
Ooh that smell... **See more**

44w Like Reply

View 1 reply

**Doug Crisp**
LET THE COZY PAINT !!!

28w Like Reply

**Lanny Mong**
Did the city try; or did they stop this mural?



41w Like Reply

**Sherry Edson Sammons**
The Yard in downtown Salina is a great place for athletes to gain greater skills in baseball and softball. It is certainly an asset to Salina. They also have two very large murals depicting the sport that indicate and advertise their business. This is ... **See more**



27w Like Reply

**Jen Montenegro Day**
**Frank Waugh, CBM KAKE**

44w Like Reply

Sandy Gerber
PROJECT PAUSED AT THE COZY INN: Is this art or an advertisement? That question is at the crux of a controversy in Salina involving the city and a historic staple of its restaurant community. https://tinyurl.com/mv92c2ud

43w Like Reply

View all 2 replies

Kris Smilko
https://www.msn.com/.../cozy-inn-files.../ar-BB1iCiU0

28w Like Reply

Most relevant is selected, so some comments may have been filtered out.

2 of 2



Colin Benson
Jun 10 ·

3

Like Comment Share

EXHIBIT 7

EXHIBIT
Y

CITY001777


JENNI'S
Liquor
AREA 40
BROOKVILLE, KS
Jenni's Liquor
Jul 1 ·
Like
Comment
Share

CITY001778

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
COLIN BENSON,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:26 a.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

EXHIBIT 8

A. They are very busy at that window, and I set up prior, and there was just too many people to try to work.

**Q. Okay.**

A. So I tried to get over there basically when they were closing, late at night or obviously Sunday they close early, I believe.

**Q. Okay. So you would have -- when you said you would have drawn it out, would you have finished the outline at night?**

A. Drawn it out as put the design on the building without any paint.

**Q. Okay. Okay. So is that kind of like what you would do with a tattoo when you have like the purple like outline?**

A. Yes. Stencil.

**Q. Yes. Okay. So you would stencil out the entire display first. Is that right?**

A. Yes.

**Q. Okay. And then you would go in and start painting it?**

A. Yes.

**Q. Okay. So it looks like on November 5th of 2023, did you have the entire display already stenciled out on the wall?**

A. On the -- on the 5th, I did, obviously had it on the wall, yes.

**Q. Okay. And then you had started painting?**

A. Yes, on the 5th.

**Q. Okay. And so you're not exactly sure but maybe like a day or two before the 5th is when you would have started working on it?**

A. Being on a Sunday, like I said, they're very busy during the day, so it would have probably been the night before or maybe, you know, two days before --

**Q. Okay.**

A. -- is what I'm thinking.

**Q. Okay. So if this was the status of the sign on Sunday, November 5th, when was it estimated that you would have been finished with painting the entire display?**

A. I believe I gave Steve a week, like the following week I would have had it done.

**Q. Okay. So estimate, so if that was like the 5th and that was a Sunday, so by Sunday the 12th it would have been done?**

A. Yes.

**Q. Okay. Approximately?**

A. Yes, approximately. To put it exactly, I

think he might have showed up later, because it was like a closed door open door deal. Like they said it was closed door and then they allowed people to come in, if that makes sense.

**Q. Okay.**

A. So, yeah. So I believe he did walk in at the end.

**Q. Okay. And what was discussed at that meeting?**

A. There were sign permits put in front of us before I even got into the room or put on the table, and it was about why we didn't get a sign permit is what I remember.

**Q. Okay. So did the city inform you at that meeting that they considered the display a sign?**

A. Correct.

**Q. Did the city inform you at the meeting that the display was too large to qualify for a sign permit?**

A. Correct.

**Q. Okay. Did the city give you a handout that had like an analysis about the sign and the size?**

A. Yes, I believe so.

**Q. Okay.**

A. Of what he was able -- maybe they just told us of what he was able to do on the side of the building.

**Q. Okay. Let's take a look at Exhibit G in that binder. All right. Do you see that?**

A. Yes.

**Q. Is that something that you received?**

A. Yes, I believe this is -- this is part of that.

**Q. Okay. So you recognize this document?**

A. Yes.

**Q. Okay. And this document's entitled The Cozy Inn Sign Analysis?**

A. Yes.

**Q. Okay. And is this what you received from the city during that Smoky Hill Museum meeting?**

A. Yes.

MS. JOKERST: I will move to formally admit Exhibit G into the deposition record. All right.

BY MS. JOKERST:

**Q. So they gave this -- a copy to you. Did they also give a copy to Steve?**

A. I believe so.

**Q. Okay. Did you say anything while you**

**were at that meeting?**
A. Yes.
**Q. Okay. What did you say?**
A. I don't believe it was a signage being put up. I believe it's a mural. It had nothing to do with what we were there for. And I was shut down pretty quick. So that was about all I had to say.
**Q. Okay. Did they explain to you at the Smoky Hill Museum, and by they I'm talking about representatives of the city, why they considered it a sign?**
A. Yes.
**Q. Okay. What did they tell you?**
A. The hamburgers are basically the same thing he sells and, therefore, it would be signage.
**Q. Okay. Prior to this meeting at Smoky Hill Museum, had you already heard that the city considered that display a sign?**
A. No.
**Q. Okay. So Steve didn't tell you the conversations -- did Steve talk to you about the conversations he'd had with the city prior to that meeting?**

formally admit Exhibit B into the deposition record.

BY MS. JOKERST:

**Q. Let's have you look at Exhibit C. There's two pages there. I'll just have you flip through them. Okay. Are these -- what's in this document? Are these your Facebook posts?**

A. Yes. Those are Facebook posts that I put out there about the mural.

**Q. Okay. And are these true and accurate depictions of the post that you placed on Facebook?**

A. Absolute -- yes.

MS. JOKERST: Okay. I'll move to formally admit Exhibit C into the record, the deposition record.

BY MS. JOKERST:

**Q. Okay. So let's look at page 2. And we've talked about there before on the other exhibit. This one's a little more clearer, so we'll look at this one. This is your post from November 5th, 2023 and you said, oh, you can smell the love I'm throwing down on the Cozy?**

THE REPORTER: She's on C.

A. Oh, C. My bad.

A. Yes.
**Q. Is there any depiction of a UFO driver on that burger?**
A. No. And may I say something?
**Q. Not while -- not while there's a question pending.**
A. My bad, yeah.
**Q. Or there isn't a question pending. So do you have -- we talked about before, you started -- or by November 5th, you had completed the outline. You had stated that earlier?**
A. Yes.
**Q. Okay. And you had stopped painting the wall on November 6th, right?**
A. Yes.
**Q. Okay. So I want to turn your attention to Exhibit L, page 362?**
A. There we go. Yeah.
**Q. And at the top of that -- at the top of that page, do you see where it says November 10th, 12:38 p.m.?**
A. Yes.
**Q. Okay. So by November 10th, you had stopped painting on The Cozy wall, right?**
A. Yes.

5:19

Colin Benson

2 · 2 Shares

Like · Comment · Share

**Colin Benson**
Nov 9, 2023 ·

Thanks to everyone who has reached out about this mural project. There are laws set to keep others from doing whatever on walls and we know this now and that's great . the process will take care of this. Everyone needs to be on the same page instead of the bashing. Thank you all for the support.

150 · 15 Comments 2 Shares

Like · Comment · Share

**Colin Benson**
Nov 8, 2023 ·

Letting y'all know what's up with my new mural project at cozy's. and Doug Rempp said it for me.Unapproved artist lol.....

> **Doug Rempp**
> Nov 8, 2023 ·
>
> For those keeping track, nothing came out of today's meeting.
> ... See More



Home · Watch · Friends · Marketplace · Notifications · Menu

**EXHIBIT 9**

EXHIBIT
C
Benson Deposition

**CITY001781**

5:21

Colin Benson

**Colin Benson**
Nov 5, 2023 ·

Oh u can smell the love I'm throwning down on the Cozy....




370 54 Comments 74 Shares

Home Watch Friends Marketplace Notifications Menu

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
LAUREN DRISCOLL,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:06 a.m. on the 10th day of September, 2024, at the law offices of Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 10**

**Q. Why did you know you were going to have to talk about it?**

A. Because it's -- it was unknown. And so, clearly, a business owner, in this case Mr. Howard, had hired somebody to paint this wall, and it had just some indications that it was probably going to be a sign, but I didn't know. We had to look and -- but that was going to take, you know, reallocating staff time to look into this further and talk to the owner and kind of figure out where and what this was.

**Q. If you recall, do you know why -- what you meant by ughhhhh in Exhibit 9?**

A. Yeah. Ughhhhh, like it didn't go through the permitting process. It hasn't been seen by anybody. So that means it's an unknown which means I'm going to walk into something Monday morning where somebody's, in this case Mr. Howard, probably has purchased something or purchased services to have somebody do this work, and it may or may not work out. So but people usually when you're a regulator and you call somebody and you have to tell them, hey, hold up a minute, you may need a permit, it's not always something that makes them happy.

there's a total allowed amount.
**Q. Did you initially think this was a mural or a sign?**
A. I mean it -- it's painted on a wall. It -- the question was we had to sit down and start to look at those pieces and just start to pull them together. I don't like to make an off-the-cuff determination. We sat down with code, pulled the definition, said, yep, it met those components. And then we looked at that location and did the math to show like not only is it a sign but its size does not fit this location.
**Q. On Sunday night when you received the text, it was still up in the air whether it was a sign or not, correct?**
A. Correct.
MS. JOKERST: Object --
BY MR. MACROBERTS:
**Q. And what is -- what do you have to look at to figure out if it's a sign or not?**
A. Salina municipal code.
**Q. And you still have to look at what the artwork is, correct?**
MS. JOKERST: Object to form.
A. Yes.

BY MR. MACROBERTS:
**Q. Why do you have to look at it?**
MS. JOKERST: Object to form.
A. Well, one, you're going to look at it for its time and place and manner characteristics as per code, right? And you're going look at it to see if it meets the definition of a sign which talks about announce, direct attention or advertise.
THE REPORTER: Talks about?
A. Announce, directs attention or advertise.
BY MR. MACROBERTS:
**Q. Are you able to do that with -- in other words, are you able to determine whether or not it announce, directs attention to or advertise without looking at the artwork?**
MS. JOKERST: Object to form.
A. No.
BY MR. MACROBERTS:
**Q. Is that why the permit process requires a picture or a rendering of what the artwork's going to look like?**
MS. JOKERST: Object to form and foundation.
A. Ask me that question one more time,

anymore, because if for some reason this isn't allowed, I don't want you to go further and can we just halt -- have some information so that you're aware of how the rules would impact this artwork, this sign and then you can make some choices. So I just didn't want him going further and spending money or doing something that he may have to change or would choose not to go forward with. And because we didn't have any of that information, we needed a few minutes to get more information from him.

BY MR. MACROBERTS:

**Q. When you say a few minutes, is that just a --**

A. Yeah, I'm sorry. We needed a couple of days just to get that additional information.

**Q. When you gave the -- do you remember giving a coffee house hypothetical to the city commission?**

A. I do. Somewhere in here, yes.

**Q. And I just want to make sure that I'm not missing a case. In there you mentioned that it was a Supreme Court case. Do you remember that?**

A. I do.

**Q. Was that correct?**

A. I recalled that this had been an example used in a case. If I'm incorrect, I'm not an attorney and I do not specialize in Supreme Court law.

**Q. And you mentioned to the city commission expressly related solely to the economic interest to the speaker and the audience. Do you recall saying that?**

A. No. But I would like to be able to reference it if you can give me a page number and a line.

**Q. Let's go to page 23, please. And just let me know when you've...**

A. Yeah. In so many words, starting at line 4, I'm using that example talking about what really is advertising, which is part of our definition, is where, you know, you're encouraging a transaction by, you know, promoting a product, encouraging somebody to use a service, and that even just the image of those services or products can be part of advertising which is part of our definition of sign.

**Q. So if there is a painting or artwork that does not promote the business, that's not considered a sign?**

question again so I understand what you're after?

BY MR. MACROBERTS:

**Q. How do you determine expressly related solely to the economic interest to the speaker and the audience?**

MS. JOKERST: Object to form.

A. When I made this statement, it was trying to connect and help the commission understand that one of the things we look for in signs, specifically related to our definition and is common in sign law and sign cases, is that where there is an economic relationship to what is being communicated, such as advertising, go buy something, purchase something, use that service. If I had not articulated that clearly at that time, but that's what I was trying to explain to them.

BY MR. MACROBERTS:

**Q. How do you determine, though, whether or not artwork is expressly related solely to the economic interest to the speaker or the audience?**

MS. JOKERST: Object to form.

A. Well, I think taking this one piece, if we relate that to the Cozy, there were several things that went along with that in the

**Q. And that's how you interpret the code?**
MS. JOKERST: Object to form.
A. I interpret the code that advertising is one of the components of the sign code.
BY MR. MACROBERTS:
**Q. So let's go to your coffee house hypothetical. Do you remember it?**
A. I do.
**Q. Do you want to look at the transcript again?**
A. I have it in front of me.
**Q. Are you at that page?**
A. I am, page 23.
**Q. You're right. Help me understand why you presented or how you came up with the coffee house hypothetical?**
A. It's one I've seen multiple other places.
**Q. Where?**
A. Or multiple other readings to give an example of how what is happening inside of a building and what is happening on the outside of the building can be related and may affect signage.
**Q. Where did you read that?**
A. I don't know, someplace over the years.

**Q. Was it a planning conference, is it a case?**

A. It could have been any one of those, articles, cases. And sometimes some of these same hypotheticals come up in different variations, you know, it's at a conference in a session, it's also in an article, but it's one I've heard multiple times and it's easy to explain to somebody who's not knee deep in municipal code all the time.

**Q. So explain to me why under Salina city code why a coffee house that has a dove and an olive branch and says peace whether that's a sign or not?**

MS. JOKERST: Object to form and foundation.

A. You're asking me why that wouldn't be a sign?

BY MR. MACROBERTS:

**Q. On page 23 --**

A. Um-hum.

**Q. -- lines 13 through 18, you told the city commission if the coffee house has a dove with an olive branch and it says the word peace on the side of it, that's not a sign. Because even though the word peace is there, you're not selling**

**peace inside. I mean coffee may do that for some people. Because this is an easy example to explain to people, why is it under the Salina city code a coffee house with a dove and an olive branch and the word peace it's not a sign?**

A. It --

MS. JOKERST: Object to form and foundation.

A. It could be a sign in certain situations. But the example of the coffee is a simple one, and I was trying to illustrate to the city commission that a sign isn't always about text. It can be about image. It can be about text but trying to give an example of the coffee house doesn't sell peace, you know. Go team could be on the -- those are generic phrases or sayings that aren't necessarily encouraging you to go in and buy sports equipment. Now, if the coffee house was called, you know, peace coffee, it's probably a whole another story and we'll start to get into signage category. But it's not directing you -- we go back to the sign code definition. Is it -- is it advertising? Is it giving direction? Is it announce, direct attention or advertising? And so it was just a simple way to try and identify for

the commission that it's more than just a word or a picture, that all these pieces lay together.

BY MR. MACROBERTS:

**Q. So in order to make your coffee house/dove/peace hypothetical work, you would need to know what the artwork is on the outside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. We would have a rendering that was submitted that would describe what was going on the side of the building.

BY MR. MACROBERTS:

**Q. Or somebody did it without a permit you would have to look at the artwork?**

A. Yes.

MS. JOKERST: Object to form and foundation.

BY MR. MACROBERTS:

**Q. And you need to know what's going on on the inside of the building, right?**

MS. JOKERST: Object to form and foundation.

A. In some cases, yes.

BY MR. MACROBERTS:

Zoning administrator. So I can pontificate all that I want, but it's not -- I'm not making that determination.

BY MR. MACROBERTS:

**Q. Based upon your understanding of the code, keeping in mind what you told the city commission, is that artwork considered a sign that I just described to you?**

MS. JOKERST: Object to form and foundation.

A. I would question whether it's a sign and then work with my staff and our legal counsel to verify my interpretation.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol?**

A. Yes. He's a mid century artist.

**Q. Are you familiar with his Campbell's Soup artwork?**

A. Yes.

**Q. Assuming the Cozy Inn did not sell Campbell's Soup, if Mr. Howard painted an exact replica of Andy Warhol's Cambell's Soup can on the side and it took up the entire wall, based upon your understanding of the code, is that a sign?**

A. I am not comfortable making that --

just an airplane? What's the size of it? What's it say on the airplane? Is there text with the airplane? What's the size of the airplane? All those things feed into it being a sign.
BY MR. MACROBERTS:
**Q. No text. Just a big silver airplane?**
MS. JOKERST: Object to form and foundation.
A. There's no text. From the very limited information you've given me, it might not be a sign. But, again, I also am not the only person that would make that determination.
BY MR. MACROBERTS:
**Q. I think you've told me the other people who helped make that determination. Have you mentioned everyone who makes that determination?**
A. Yes.
**Q. Does Mr. Schrage have any input into that determination?**
A. No.
**Q. Did he have any input into whether or not the Cozy was deemed a sign?**
A. No. He was made aware of the situation as it evolved and as staff did its research, but he did not have influence on that decision.

A. Um-hum. Yes.

MS. JOKERST: Object to form and foundation.

A. Yes, they could have guitars or ukuleles.

BY MR. MACROBERTS:

**Q. This deposition exhibit page 119, a sign permit was not applied for for this artwork, was it?**

A. No, it was not.

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. And it's your -- is it your position that page 119 that artwork is not a sign?**

MS. JOKERST: Object to form.

A. I typically wouldn't take a position on this. Like it would normally come into Dean. He would review it and then give me feedback or if he even thought it needed to come to my attention.

BY MR. MACROBERTS:

**Q. As you're sitting here now --**

A. Okay.

**Q. -- knowing what you know, page 119, that artwork is not a sign, right?**

MS. JOKERST: Object.

THE WITNESS: Are you good, Amanda?

MS. JOKERST: Go.

A. Okay. I would have questions. I mean you're right, music can be performed with instruments, but, one, is it attracting your attention? Okay. It's something different. It's not part of the original wall. But is it directing you to something. The public can't get into that door. It's a stage door, and the front door is to access and make any kind of purchase on the other side of the building. So I don't know what it would be directing your attention to. Even if you tried to take the ukulele and kind of point it to something or guitar or whatever it is, they also don't sell instruments inside. They don't sell musical classes of any sort. She's also not playing the instrument which is usually what somebody would be doing with the instrument inside at a concert. And those are my first thoughts. There's no text that's, you know, saying anything or giving a direct message. Stage door, you're allowed in buildings to have, you know, egress type signage that denotes exits and stuff like that. And we have a minimal signage, a requirement, so that's -- that piece is allowed. So if we look at just the girl, the instrument and

the bird, at this glance of asking me in this situation, I don't think it would be a sign. But if that were a question, we -- you know, that's something we would talk about with legal.

BY MR. MACROBERTS:

**Q. Bear with me for a moment. If you could, please, turn to Deposition Exhibit 77.**

A. Okay. Okay.

**Q. Do you recognize this?**

A. Yes.

**Q. What is it?**

A. Schlotzsky's Deli.

**Q. Is it the city's position that Exhibit No. 77, the artwork on the left-hand side, is a sign?**

A. Yes.

MS. JOKERST: Object to form and foundation.

THE WITNESS: Sorry, Amanda.

A. Yes, it is a sign.

BY MR. MACROBERTS:

**Q. Why is it a sign?**

MS. JOKERST: Object to form and foundation.

A. Because they have a sign permit. No, it

was on the application. If they said, you know, it's 29 feet from here to here, they would have gone out and verified it's 25 feet and that the applicant's determination of what is front, sometimes what is rear, those things, depending on where the lot's situated, needs to be verified.

**Q. If you could turn to Deposition Exhibit 71, please. Are you familiar with Deposition Exhibit 71?**

A. Yes, I believe this is one of our fire stations.

**Q. Do you know what's on the side of the fire station?**

A. Well, I think this --

**Q. That's a bad question.**

A. Yeah.

**Q. Do you see artwork on Deposition Exhibit 71?**

MS. JOKERST: Object to form.

A. I see a series of black and white pictures on the front of the fire station.

BY MR. MACROBERTS:

**Q. Do you know what that depicts?**

A. This was installed before me, but I believe they're historical pictures of Salina

firefighters.

**Q. Based upon your understanding of the city code, this is not a sign?**

MS. JOKERST: Object to form and foundation.

A. I didn't make this determination, so and without knowing more about the sign and what it's depicting, I would also probably ask the question, the fire department isn't selling a service. So I mean that's a question I would have. But this determination was made before me, and I would assume city legal counsel had some input into that determination.

BY MR. MACROBERTS:

**Q. Which I don't want to know anything about. But I'm asking you as you're sitting here today based upon your understanding of the city code, is it fair to say that this is not a sign because the fire department is not selling services?**

MS. JOKERST: Object to form and foundation.

A. If the question was placed to me, I would question that it's not -- it's not directing you anywhere. It's not announcing anything. The fire

department is a public building, and it's not asking you to come in and get a service or make any type of transaction. But I -- it's one that I don't think is cut and dry, and I think it would be worth a discussion with legal counsel.

BY MR. MACROBERTS:

**Q. Which, again --**

A. Yeah. But I'm --

**Q. Yeah, yeah. Okay.**

A. That's where I would go with that because it's not cut and dry.

**Q. And what -- help me understand what's not cut and dry about this?**

MS. JOKERST: Object to form.

A. Well, I think the fact that it's a public service. So I don't -- I'm not familiar with a case where that may come into advertising. So we would -- my thought is I would research more and see where that's been viewed in the past with other decisions.

BY MR. MACROBERTS:

**Q. So if that picture or those pictures are deemed advertising, then it's a sign?**

MS. JOKERST: Object to form.

A. That's one way you could look at it. I

A. Yes, I recognize it.
**Q. What is it?**
A. It's a large painting on the grain silos here in town.
**Q. Is that commonly referred to as the Mural at the Mill?**
A. It is, yes.
**Q. Was that -- forgive me if you answered this already. Was that painted before or after you coming to Salina?**
A. It's been my time here.
**Q. Okay. And based upon your understanding of the city code, that's not a sign, correct?**
A. Correct, it is not a sign.
**Q. And no permit was applied for, and there was no problem with them not applying for a permit, right?**
MS. JOKERST: Object to form and foundation.
MR. MACROBERTS: I'll restate it because I asked two questions at once.
BY MR. MACROBERTS:
**Q. You're not aware of anyone applying for a permit for this?**
A. Correct. And a permit was not applied

for. A sign permit was not applied for.

**Q. Why is this not considered a sign based upon your understanding of the code?**

A. It doesn't meet the definition of a sign. So I mean we didn't review it. I didn't make this determination. But using the definition of a sign, this did not meet that definition.

**Q. Forgive me because I've tried finding this and I don't know. Hopefully, you do. Is that grain elevator operational at all?**

A. I don't think so.

**Q. Is anything happening inside the grain elevator?**

A. No.

**Q. If somebody were to operate that grain elevator as a business and in the business they charged an admittance fee and kids were playing on the inside of that, based upon your understanding of the code that would be a sign then, correct?**

MS. JOKERST: Object to form and foundation.

A. So they've turned it into something where kids are playing on the inside and that you're saying is my determination that automatically makes it a sign?

BY MR. MACROBERTS:

**Q. No. I'll ask it again. If an operator charged money for kids to come inside, pick a daycare or a recess zone, something like that, this Mural at the Mill would then be considered a sign under your understanding of the code, correct?**

MS. JOKERST: Object to form and foundation.

A. It would be enough to catch my attention that I would bring it to my staff and ask them to research and make that determination.

BY MR. MACROBERTS:

**Q. Is it fair to say that the reason it would raise questions because in your mind it would encourage a commercial transaction?**

MS. JOKERST: Object to form.

A. No. I would say it would be advertising something because the use of the building had changed.

BY MR. MACROBERTS:

**Q. All right. I'm asking you to please turn to Deposition Exhibit 76.**

A. Okay.

**Q. Do you know what this is a picture of?**

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**EXHIBIT 11**

permits, sign permits, site plans and various applications that we have that go to our four zoning boards.

**Q. To the four zoning what?**

A. Four zoning boards that we have. We have a Planning Commission, a Board of Zoning Appeals, a Downtown Design Review Board and a Heritage Commission.

**Q. Okay.**

A. And I am the secretary to each of those boards.

**Q. So whenever a application of some sort is submitted, I guess walk me through the process of how that application will be processed by the city.**

A. An application is submitted. It is reviewed by administrative staff first. Then it is reviewed by a planner. In some cases, if there's questions about it, the planner would refer it to me and I would review it to see if it's complete and has all the information attached to it that it would be needed to take it and schedule it for a hearing.

**Q. All right. So when you say administrative staff, who is the administrative**

zoning ordinance in cases where there's uniqueness or hardship to the applicant, or someone who is dissatisfied with the way that the zoning administrator has interpreted the ordinance can appeal that determination to the Board of Zoning Appeals.

**Q. I guess what I'm asking is if an applicant thinks one of the planners made the wrong determination, can they come to you first before going to the Board of Zoning Appeals?**

A. Absolutely.

**Q. Okay. How would they do this?**

A. By contacting me.

**Q. Okay. So just reaching out to you by phone or e-mail directly?**

A. Yes.

**Q. I think you said earlier it is one of your duties as zoning administrator to provide interpretations of the zoning code. Is that correct?**

A. Yes.

**Q. Are your interpretations of the zoning code the definitive interpretations for the City of Salina?**

A. They are for appeal purposes, yes.

**Q. Okay. In the binder in front of you, I have exhibits there. The one on the top, Exhibit 1, is an excerpt of the city code. It includes the sign code, the Building Improvement District code and certain other excerpts from the zoning code. If at any point you think there's a portion of the city code that's applicable to any of our discussions that isn't included in what I printed out there, let me know and we can look up the other provisions and print them out for you. But if you could, flip to Section 42-764. It's easier to take it out of the binder. You can go ahead and do that.**

A. When you speak of 42-764, is that something that is in the definition section?

**Q. Yes, it is.**

A. I have that in front of me.

**Q. All right. So do you see the first paragraph of Section 42-764? Is it defining what a sign is for purposes of the code?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. So when it comes to the definition of a sign, I want to just go through this definition so**

flags are regulated under our code.

**Q. So what is the physical difference between a feather flag and a exempt flag?**

A. A feather flag is usually a fancy face device. It is designed to be temporary. It's not permanently affixed to the ground like a governmental flag, and it is designed to be there for only a temporary period of time.

**Q. So if a McDonald's had one flagpole out in front of the building with an American flag and then below it a McDonald's flag that's exactly the same size, same construction, am I understanding correctly the American flag would be considered an exempt flag but the McDonald's flag would be considered a feather flag?**

MS. JOKERST: Object to form.

A. A feather flag is a structural type of sign.

BY MR. SHAW:

**Q. Okay. But so in that scenario I just gave, what is the difference between the McDonald's flag and the American flag?**

A. The difference is what is called out as an exemption in our code.

**Q. So the American flag is exempt, but the**

**McDonald's flag is not exempt?**

A. It's not just --

MS. JOKERST: Object to form.

A. It's not just the American flag.

BY MR. SHAW:

**Q. So any governmental flag?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Do they have to be existing governments?**

MS. JOKERST: Object to form.

A. The City of Salina has an official flag. You can fly that flag in front of the city county building. We have one today. They don't need a permit for that flag.

BY MR. SHAW:

**Q. Okay. I guess what I'm getting at is, is it only the American flag or the Kansas flag or the Salina City flag that are exempt or is it other types of governments?**

MS. JOKERST: Object to form.

A. The code says a flag for a governmental entity.

BY MR. SHAW:

**Q. Well, let's say someone wanted to fly a**

BY MR. SHAW:
**Q. Is that -- is that exemption listed in Section 42-504?**
A. I don't know.
**Q. Feel free to move to that section of the code, please. Are you at Section 42-504?**
A. Yes.
**Q. Okay. Do you see in subsection 1 where it says non-commercial flags displayed on private property?**
A. Yes, I do see that.
**Q. So is this the exemption that you were referring to earlier?**
A. Yes.
**Q. So under Section 42-504, 1, non-commercial flags are exempt from the regulations of the code. Is that correct?**
A. That is what section -- subsection 1 says.
**Q. Okay. And so any flag that isn't deemed a commercial flag would be exempt? Is that correct?**
A. Yes.
THE REPORTER: Did you make an objection?
MS. JOKERST: I did to form.

**Q. Would those be considered commercial flags?**

A. No.

**Q. Why not?**

A. Because they are just expressing that property owner's support for their team.

**Q. Do you know if the Kansas City Chiefs are a commercial enterprise?**

MS. JOKERST: Object to form.

A. Well, I know that the Kansas City Chiefs is a sports franchise that desires to make money.

BY MR. SHAW:

**Q. Okay. Could those Chiefs flags be considered advertisements for the Chiefs?**

MS. JOKERST: Object to form.

A. Not in my opinion, no.

BY MR. SHAW:

**Q. So even though it is a commercial business displaying its logo, that is not an advertisement?**

MS. JOKERST: Object to form.

A. I would consider an individual owner who has a Chiefs flag to be displaying a non-commercial flag.

BY MR. SHAW:

**correct?**
A. Yes.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. And after that, does it say or display calculated to attract the attention of the public?**
A. Yes.
**Q. Is the meaning of this section saying that any writing, pictorial representation, emblem, flag, banner, streamer, pendant, string of lights or display that is calculated to attract the attention of the public meets the definition of a sign?**
MS. JOKERST: Object to form.
A. That can't be read without reference to subsections 1, 2 and 3.
BY MR. SHAW:
**Q. Well, is there also an or after calculated to attract the attention of the public?**
A. Are you asking me if there's an or in front of it or after it.
**Q. Is there an or after calculated to attract the attention of the public?**
A. Yes.
**Q. So does that second or separate the any**

flag?

A. Flag, banner, streamer, pennant or string of lights.

BY MR. SHAW:

**Q. Okay. And such a display if it's calculated to attract the attention of the public would be a sign?**

MS. JOKERST: Object to form.

A. No, because, again, I can't make a determination without using subsections 1, 2 and 3.

BY MR. SHAW:

**Q. Why is the second or there, I guess?**

MS. JOKERST: Object to form.

A. You're speaking again to this or after the word public?

BY MR. SHAW:

**Q. Yes, that's correct?**

A. Well, if the code drafter was here, I would ask them, but my interpretation would be that it's somewhat redundant because display or any other figure seems to be somewhat repetitive.

**Q. Okay. So the display calculated to attract the attention of the public has to also be married with the three subsections?**

A. Yes.

**Q. So then a display would have to both attract the attention of the public and direct the attention of the public. Is that correct?**

A. No.

**Q. So a display that was only calculated to attract the attention of the public would be a sign?**

A. A display calculated to attract the attention of the public that was used to announce, direct attention to or advertise would be a sign.

**Q. Okay. So it would have to both attract the attention of the public and direct attention?**

A. That would be my interpretation.

**Q. Okay. And as I recall from what you said earlier, attract attention is a shorter duration than direct attention. Is that correct?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. And the term advertise here as used in subsection 2, can you define an advertisement as used here?**

A. I think I answered that question previously, but it is to promote what is going on

required a sign permit for.
**Q. Okay. And is that because it's an advertisement?**
A. It is announcing, directing attention to and advertising the Army Recruitment Center.
**Q. So it's doing all three?**
A. Yes.
**Q. Okay. What about a church or other house of worship? They put up a display saying services Sunday at 10 a.m. Is that a sign?**
A. Yes.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. Is that because it is announcing?**
A. It is announcing to the public that they are worship -- place of worship and letting the public know when they meet.
**Q. Okay. What if that same church displayed a message that said turn to Jesus. Would that be a sign?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. Why is that?**
A. Well, you just described it as a -- they

would put up a structure, whether it was a banner or whether it's permanent sign, that would be something that is announcing, directing attention or advertising.

**Q. What would they be advertising?**

MS. JOKERST: Object to form.

A. They would be advertising their desire for the public to turn to Jesus.

BY MR. SHAW:

**Q. Okay. In subsection 3 where it says is not located inside of a building, what is considered a building under this section?**

A. A structure that meets the definition of building in the zoning ordinance.

**Q. Okay. Would you please turn to the section defining building?**

A. Appears to be 42-637.

**Q. All right. And does that define a building as any covered structure built for the support, shelter or enclosure of persons, animals, chattels or movable property of any kind and which is permanently affixed to the land?**

A. That is the definition that's in the zoning ordinance.

**Q. All right. What is the support, shelter**

of sign as a structure.

BY MR. SHAW:

**Q. Okay.**

A. We're in the business of regulating structures, so a flag would be a structure.

**Q. Okay. Would an American flag be used to announce, direct attention to or advertise?**

MS. JOKERST: Object to form.

A. It is certainly announcing.

BY MR. SHAW:

**Q. Okay. Would it be announcing the United States?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Has the City of Salina's definition of a sign changed any as a result of this lawsuit?**

MS. JOKERST: Object to form and foundation and -- yeah, those are my two objections.

A. To the best of my knowledge, the city's definition of sign has been this way since 1966 and is unchanged.

BY MR. SHAW:

foundation.

A. According to the rules of construction of our city code, or and and are interchangeable, so I can't make that determination.

BY MR. SHAW:

**Q. Do you no where in the city code that is placed?**

A. In the rules of construction.

**Q. I see. So and and or are interchangeable?**

A. They can be, yes.

**Q. They can be or they are?**

A. Code says they can be.

**Q. How then is someone to know if it means and or or?**

MS. JOKERST: Object to form and foundation.

A. You have to look at the context in which its used.

MS. JOKERST:

BY MR. SHAW:

**Q. All right. In subsection 2 there, for instance, do you see the and after the semicolon?**

A. Yes.

**Q. Does that mean and or or?**

MR. MARTIN: Section 1-2.
MR. SHAW: Thank you.
BY MR. SHAW:
**Q. All right. For lack of any better way to do this, I'm just going to show you my computer real quick. Subsection 14 here of Section 1-2, is that what you were referring to in the rules of construction?**
A. Yes.
**Q. All right. And so with that now in front of you, how can you determine in the definition of a sign whether that is an and or an or?**
A. It is interpreted as to whether the sense requires it to make sense of the code section.
**Q. And how do you make sense of the code section such that you can make a definitive determination if it is an and or an or?**
MS. JOKERST: Object to form.
A. I look at how the code is constructed.
BY MR. SHAW:
**Q. So what about how the code is constructed makes you determine the usage of and and or in the definition of a sign?**
MS. JOKERST: Object to form.
A. Because none of the three could stand on

MR. SHAW: Required here.
THE REPORTER: And then your objection?
MS. JOKERST: Object to form.
THE REPORTER: Thank you. Sorry. Go ahead.
A. They used a series of commas followed by an or.
BY MR. SHAW:
**Q. Well, I understand that. But the code says and and or can be interchangeable. So how do you know that it means or and not and?**
MS. JOKERST: Object to form.
A. I didn't say that I know with certainty. I said that is the way I interpret the way it is drafted.
BY MR. SHAW:
**Q. Okay. Is there anyway a member of the public could know whether this means and or or without first getting your determination?**
MS. JOKERST: Object to form and foundation.
A. They could read it for themselves, and then they could contact the city to see how the city has historically interpreted it.
BY MR. SHAW:

**to look like and get a determination from you about whether it qualifies as a painted wall sign or a mural?**

MS. JOKERST: Object to form.

A. It is very commonplace for people who want to erect something or have a pictorial representation or some graphic to come into our office and say this is what I'm looking to do. Does this fit within your code.

BY MR. SHAW:

**Q. All right. And how would you help that person determine if it was a mural or a painted wall sign?**

A. By looking at whether it announces, directs attention to or advertises.

**Q. So you would need to see a rendition or plan of what it is they plan to paint?**

A. Yes.

**Q. Okay. And depending on the content of that rendition, you would make the determination if it is a mural or a wall sign?**

MS. JOKERST: Object to form.

A. I would look at it.

BY MR. SHAW:

**Q. You would look at the content to**

**determine if it is a wall sign or a mural?**

A. No. I would --

MS. JOKERST: Object to form.

A. I would look at the graphic representation.

BY MR. SHAW:

**Q. Was the graphic representation not just displaying the content they intend to paint on a wall?**

MS. JOKERST: Object to form.

A. I would look at their graphic representation.

BY MR. SHAW:

**Q. Well, what is the graphic representation?**

A. It is a rendering of what they propose to put on the wall.

**Q. Okay. What is in your mind the content of the mural?**

MS. JOKERST: Object to form and foundation.

A. City does not regulate content, so I with look at the graphic representation of their rendering.

BY MR. SHAW:

**Q. Well, how do you understand what content**

A. I would look at the rendering that they provided. And if it was words or numbers, I would determine whether those words or numbers announce, direct attention to or advertise the business or the products at that premises, and we would attempt to draw a rectangular box around those letters and calculate the square footage of the display to determine whether it was too large or not too large to be located as proposed.

BY MR. SHAW:

**Q. And let's say that same business came to you with a proposal to paint on the side of their building the Arrowhead logo of the Kansas City Chiefs and text, you know, let's go Chiefs. How would you determine if that were a sign or not?**

MS. JOKERST: Object to form.

A. I would determine whether those graphics announced or directed attention to or advertised.

BY MR. SHAW:

**Q. How would you do that?**

A. Well, in the specific context you gave me, I would interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs.

**Q. What if that property was a training**

**facility for the Kansas City Chiefs?**

A. Then it would be the same thing except it's also advertising and directing attention.

**Q. Okay. Now, let's say the text on this mural, the letters are very widely spaced. Would you draw a rectangle around the entire display or only around each letter to determine its area?**

MS. JOKERST: Object to form.

A. The entire display.

BY MR. SHAW:

**Q. Okay. Would you also draw that rectangle around any other emblems that are related to that mural?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. So in the example I gave before, you've got the Chiefs Arrowhead and then the let's go Chiefs. Would you draw one rectangle or two separate rectangles?**

MS. JOKERST: Object to form.

A. Are we talking about painted wall signs or are we talking about murals?

BY MR. SHAW:

**Q. Well, either way. How would you determine the size?**

BY MR. SHAW:

**Q. Okay. All right. Move down still in Section 42-503 to subsection H. Does it say on corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage?**

A. That's what it says.

**Q. Okay. Is a -- what is a through lot in your understanding of the code?**

MS. JOKERST: Object to form.

A. A through lot would be a lot, for example, on Schilling Road that has frontage on both Schilling Road and the street opposite so that that lot has two front yards.

BY MR. SHAW:

**Q. Okay. So would those two roads be parallel roads?**

A. They would be.

**Q. Okay. And for a corner lot, would that be where you've got two perpendicular roads?**

A. Yes.

**Q. Okay. Are alleyways considered a road under this definition for calculating frontage?**

A. They are not.

MS. JOKERST: Object.

**Q. Okay. What about private streets? Do frontage for private streets count?**

MS. JOKERST: Object to form.

A. A private street would be equivalent to a public street.

BY MR. SHAW:

**Q. Okay. What is the difference between an alley and a private street?**

MS. JOKERST: Object to form.

A. An alley is publically dedicated right-of-way.

BY MR. SHAW:

**Q. Okay. Okay. Can we move down to Section 42-504 again. We discussed non-commercial flags and window signs. So we can move down to other ones. The exemption in subsection 3, is that for signs attached to motor vehicles, buses or railroads?**

MS. JOKERST: Object to form.

A. We're in subsection I, 1, 2 and 3 or I'm not following where we are.

BY MR. SHAW:

**Q. No. This is 42-504, subsection 3. We were in 42-503 before. So if you're at subsection I, you still might be in 42-503.**

**between a scoreboard and a billboard?**

MS. JOKERST: Object to form and foundation.

A. I would do it the way we did it at Kansas Wesleyan's football stadium.

BY MR. SHAW:

**Q. What did you do with Kansas Wesleyan's football stadium?**

A. Kansas Wesleyan University, they put up a scoreboard. They got a building permit to put up their scoreboard. On the back of their scoreboard facing Cloud Street, they sold advertising to area businesses. We determined that that back side of the scoreboard was a off-premise advertising sign and required them to get a billboard permit for that.

**Q. Okay. But the reverse side of that was considered to be a scoreboard?**

A. Correct.

**Q. Okay. And so how did you determine the scoreboard aspect of it from the billboard aspect of it?**

MS. JOKERST: Object to form.

A. Because a scoreboard was simply a structure, and it had changeable copy on it that

listed the home team, the visitor's team, the time and score.

BY MR. SHAW:

**Q. Is a billboard something more than a structure with changeable copy?**

MS. JOKERST: Object to form and foundation.

A. A billboard is synonymous with the term off-premises or advertising sign. And if Kansas Wesleyan University sells advertising space to area business that are not located on the premises and that sign is oriented towards Cloud Street and not the stadium, then that side of the structure is not a scoreboard. It is a off-premise sign.

BY MR. SHAW:

**Q. What does the orientation have to do with the sign?**

A. The presumption in exempting a scoreboard is that a scoreboard --

MS. JOKERST: Can I -- did my objection get on there?

THE REPORTER: No. Can you give it to me, please.

MS. JOKERST: Object to form.

A. Can you repeat the question?

MR. SHAW: Can you read that back, please?

THE REPORTER: "What does the orientation have to do with the sign?"

MS. JOKERST: I said object to form.

A. The adopted exemption for scoreboards is based partially on the fact that the information they convey is directed to people that are in the stadium. And the determination for taking that scoreboard structure and saying that it's an off-premise sign is because the advertising is not oriented towards or directed towards the people within the stadium.

BY MR. SHAW:

**Q. If the advertising copy were placed on the side of that scoreboard facing the audience, would that be a scoreboard or an advertising sign?**

MS. JOKERST: Object to form.

A. It would be a scoreboard.

BY MR. SHAW:

**Q. Even with the advertising copy?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. So it is the orientation of the**

**sign as opposed to the copy displayed on the sign that makes it a scoreboard?**

A. It is not the orientation. It is the structure and its use. And if the structure at Kansas Wesleyan University was only a scoreboard oriented towards people in their stadium, it would be a scoreboard. The fact that they used it as a sign support structure for off-premise advertising made the back side of it a sign.

MS. JOKERST: And did -- did my objection get noted there.

THE REPORTER: No. Give it to me again, please?

MS. JOKERST: Object to form. Hey, Dean, can you just slow down just a little bit so I can get those in there?

BY MR. SHAW:

**Q. Is the scoreboard at Kansas Wesleyan a digital scoreboard?**

A. Yes.

**Q. I guess when I say that, I'm thinking the kind of like jumbo vision type thing you see at professional sports stadiums with basically a giant, you know, TV screen. Is that that kind of digital scoreboard?**

of time.

BY MR. SHAW:

**Q. Okay. Does this section apply to non-commercial signs as well?**

MS. JOKERST: Object to form.

A. It appears to refer to signs that advertise a bona fide business.

BY MR. SHAW:

**Q. Okay. So let's say, for instance, someone put up a, you know, Mitt Romney 2012 sign, and it's still up here in 2024. Is that sign considered abandoned?**

MS. JOKERST: Object to form.

A. It would be considered an election sign that was up seven days after the election.

BY MR. SHAW:

**Q. So you're not allowed to have any election signs seven days after an election?**

A. Correct.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. If I were a -- not me. If any property owner were a big Dwight Eisenhower fan and they just wanted to put up a paint on the side of their wall, you know, I like Ike, would that be**

**allowed?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Is I like Ike a campaign slogan from the Eisenhower campaign?**

MS. JOKERST: Object to form and foundation.

A. I don't know.

BY MR. SHAW:

**Q. Okay. Why would the I like Ike sign be allowed but not the Mitt Romney 2012 sign not -- let me rephrase that. Why is an I like Ike sign not considered a political sign seven days after an election?**

MS. JOKERST: Object to form.

A. Well, for one, Mr. Eisenhower is deceased, so he couldn't be running for any elective office. And it is simply an expression of whoever the sign holder is that they like Ike.

**Q. But why can't the Mitt Romney fan continue expressing their admiration for Mitt Romney?**

MS. JOKERST: Object to form and foundation.

A. If he wants to strike all portions from the sign that deal with voting for Mr. Romney or have an election date in it, then he can all the signs he wants that shows that he loves Mitt Romney.

BY MR. SHAW:

**Q. Okay. So if the Eisenhower fan painted vote Eisenhower 1952, would that be considered a political sign that can't be up more than 7 days?**

MS. JOKERST: Object to form and foundation.

A. I would not consider that an election sign.

BY MR. SHAW:

**Q. Why wouldn't you consider it an election sign?**

A. Common sense tells me it's not an election sign. It's not left over from some election.

**Q. What if the sign had been painted in 1952 and it was just still around?**

MS. JOKERST: Object to form.

A. I would consider it a historic sign.

BY MR. SHAW:

**Q. I see and what is a historic sign?**

MS. JOKERST: Object to form.
A. A historic sign is a sign that predates the sign codes that we have adopted. Then it would be preexisting.
BY MR. SHAW:
**Q. So is there a difference in your mind between a historic sign and a non-conforming sign?**
A. We actually have a defined term for historic sign, and you can get a sign designated as historic. I'm using historic in a generic sense. The precise word is preexisting.
**Q. Okay. So a sign that is preexisting cannot be abandoned. Is that what you're saying?**
A. A preexisting sign is not an abandoned sign under 42-510 of this code.
**Q. Even if the business that advertised is long out of business?**
A. That is correct.
**Q. Can you flip down to Section 42-581? Are you there, sir?**
A. Yes.
**Q. Okay. Can you read subsection A and let me know when you're done.**
A. I'd have to go back and see the context in which this appears. Okay. I've read

subsection
A.
**Q. All right. So does this section deal with non-conforming signs?**
A. It does. It was specifically targeted to address non-conforming signs in the downtown C-4 district. But it doesn't limit it to that, but that was the intent to address that.
**Q. All right. And is the concept of a non-conforming sign, is that something that is a sign that predates a certain date and doesn't comply with the provisions of the code?**
A. It is a sign that --
MS. JOKERST: Object to form.
A. Excuse me.
MS. JOKERST: Go ahead. I noted my objection.
A. It is a sign that predates the current code and in some aspect may be non-conforming as to size or setback or some other aspect.
BY MR. SHAW:
**Q. Okay. And as a general matter, if it is considered a non-conforming sign but it predates the designated date, it is allowed to remain?**
A. It is allowed to remain in place as long

as it's not expanded or modified or removed.

**Q. Okay. And what date does this statute give for the cutoff for it to be an authorized non-conforming sign?**

MS. JOKERST: Object to form.

A. It gives April 17th, 1990.

BY MR. SHAW:

**Q. All right. So is it your understanding then that any sign before April 17th, 1990 would be considered non-conforming?**

A. If it's --

MS. JOKERST: Object to form.

A. If it's a sign that's not permitted or which doesn't comply with the sign code.

BY MR. SHAW:

**Q. Okay. And if the sign is before 1990 but it advertises a business that has gone out of business, does it maintain its non-conforming status?**

MS. JOKERST: Object to form.

A. It depends on the origin of the sign, but it could be a preexisting non-conforming sign.

BY MR. SHAW:

**Q. So it would not be classified as an abandoned sign then?**

**Q. Had anyone determined on that day that the painting at The Cozy Inn was a sign?**

MS. JOKERST: Object to form.

A. All the actions that were taken from that staff meeting on were based on the possibility that it would be determined to be a sign.

BY MR. SHAW:

**Q. Was it, in fact, determined to be a sign?**

A. It was.

**Q. When was that decision made?**

MS. JOKERST: Object to form.

A. Sometime during that week.

BY MR. SHAW:

**Q. Who made that determination?**

A. Mr. Herrs made the initial determination, and then I concurred.

**Q. Why did you concur?**

A. Because I agreed with his determination.

**Q. Why did you agree with his determination?**

A. Because I determined that the graphic display announced, directed attention to and advertised the business which was The Cozy Inn.

**Q. And you determined that within the first week?**

A. Yes.

**Q. What specifically did you determine announced, direct attention to or advertised?**

A. I determined that the graphic displays of the burgers that were available for sale in the building, the ketchup, mustard packets and particularly the words associated with Don't Fear the Smell and The Fun is inside with an arrow pointing directly to the north pickup window constituted a display that announced, directed attention to and advertised The Cozy Inn business.

**Q. Did it -- did you determine it did all three of those, announced, direct attention to and advertised?**

A. I believe it does, yes.

**Q. Okay. What part of the painting announces The Cozy Inn?**

A. The burgers that are on display.

**Q. How do they announce The Cozy Inn?**

A. Because they depict the product that's available inside that building.

**Q. How do the painting on the side of The Cozy Inn direct attention?**

A. The words Don't Fear the Smell is associated with the unique odor that emanates from that building and from their product the onion

**Q. Okay.**

A. If the arrow was 5 feet tall and 20 feet long and filled in as a shape, that would be different than a single line which is much more difficult to calculate.

**Q. So if the mural on the side of The Cozy Inn didn't include hamburgers or an arrow and it just had the phrase Don't Fear the Smell, The Fun is inside, would you consider that to be a sign?**

A. Yes.

**Q. What part of that phrase makes it a sign in your view?**

A. Don't Fear the Smell and The Fun is inside.

**Q. Would either of those phrases on their own be considered a sign or is it only the combination of the two?**

MS. JOKERST: Object to form.

A. Either one.

BY MR. SHAW:

**Q. Okay. So if it just said Don't Fear the Smell, that would be a sign?**

A. Yes.

**Q. If The Cozy Inn happened to be located next to a chicken farm, let's say, would it still**

**be a sign?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Even if it was referring to the smell of the chickens?**

MS. JOKERST: Object to form.

A. Not my job to determine what it's referring to. My job's to determine whether it's a sign or not.

BY MR. SHAW:

**Q. But did you determine that the phrase Don't Fear the Smell is referring to The Cozy Inn?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. How did you make --**

THE REPORTER: Whoa, whoa, whoa. What's your answer? What was your answer, I'm sorry.

A. I hadn't answered it yet.

THE REPORTER: Okay.

BY MR. SHAW:

**Q. Did you determine that the phrase Don't Fear the Smell was a reference to the smell of The Cozy Inn?**

MS. JOKERST: Object to form.

**smell but its neighbor did have a smell?**

MS. JOKERST: Object to form.

A. Because the sign is still inviting customers to come in and partake of their product and notwithstanding the smell of the chicken farm.

BY MR. SHAW:

**Q. If The Cozy Inn was not a restaurant or -- let's do a different one. Let's say The Cozy Inn only did delivery and so customers would never come to the Cozy Inn location, would the phrase Don't Fear the Smell still be a sign?**

MS. JOKERST: Object to form.

A. That would require me to speculate.

BY MR. SHAW:

**Q. I'm asking you to state how you would interpret this code in that scenario?**

A. I think you're asking me to speculate without the full context.

**Q. The full context is that this is a building that delivers food to customers but customers never come to that building, and it has a mural saying Don't Fear the Smell. Would that be interpreted as a sign under the code?**

MS. JOKERST: Object to form.

A. I'd have to see what's on the rest of the

wall of the building.

BY MR. SHAW:

**Q. It's a white wall except for those words?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Would it be a sign in that situation?**

A. My first --

MS. JOKERST: Object to form.

A. My first inclination would be to consider that a sign.

BY MR. SHAW:

**Q. Why is that?**

A. Because there's nothing else on the wall of the building.

**Q. Why does the presence of other things on the wall of the building change the determination one way or another?**

MS. JOKERST: Object to form.

A. Well, it's not -- it's not a non-commercial message.

BY MR. SHAW:

**Q. If it's referencing the smell of its neighbor, would that be a non-commercial message?**

MS. JOKERST: Object to form.

A. Not necessarily.

BY MR. SHAW:

**Q. What message would that be?**

A. The Don't Fear the Smell message could still be an invitation to partake of their food.

**Q. Even if no one would ever come to this building?**

A. Even if no one would ever come there, because their food -- they're telling the public their food is not affected by the smell of the chicken farm.

**Q. I see. If the mural depicted pizzas, would that be considered a sign for the Cozy Inn?**

MS. JOKERST: Object to form.

A. What else is on the wall?

BY MR. SHAW:

**Q. It is the white wall of The Cozy Inn, and there's just a big pizza mural on it?**

MS. JOKERST: Object to form.

A. Well, I think the first thing I would do is to determine whether it is off-premise advertising for some other establishment in the downtown area.

BY MR. SHAW:

**Q. How would you determine that?**

A. By looking at the pizza and seeing if it

made reference to any of the existing establishments in Salina or the downtown area.

**Q. And if it's just a pepperoni pizza with no sort of logo or wordage on it, is that a sign or a mural under the code?**

MS. JOKERST: Object to form.

A. I don't have to determine whether it's a mural. I only have to determine whether it's a regulated wall sign.

BY MR. SHAW:

**Q. Okay. Would you determine that that is a regulated wall sign?**

MS. JOKERST: Object to form.

A. Again, you're asking me to speculate. But if it was in the context of a blank white wall with a pizza symbol on it that had no association with announcing or directing attention to or advertising The Cozy Inn business and did not advertise another nearby establishment, then it would not be a regulated wall sign.

BY MR. SHAW:

**Q. If that exact same painting were painted on the wall across town at a pizza joint, would that then be a sign?**

MS. JOKERST: Object to form.

guess I don't know. How much longer and would now be a good time to take a short lunch break?

MR. SHAW: Give me maybe five minutes. I'm almost done with this line of questioning. Then we can take a short break -- or we could take a lunch break, not just a short break.

BY MR. SHAW:

**Q. Are you familiar with the artist Andy Warhol?**

A. I think I know who he is.

**Q. Can you turn to Exhibit 38. It should be almost the last exhibit. It should be the second to the last page in the binder?**

A. Oh, the very last.

**Q. That's it right there.**

A. Right there. Okay.

**Q. So what's marked there as Exhibit 38, have you ever seen that painting before?**

A. I have not.

**Q. Okay. If that painting were painted on the side of The Cozy Inn, would that be considered a sign?**

MS. JOKERST: Object to form.

A. I would give the same answer I did with the airplane. That does refer to a specific

product. It borderline could be considered an off-premise sign directing people to a product that is available in other locations in Salina. But just standing by itself, it does not announce or direct attention to or advertise The Cozy Inn.

BY MR. SHAW:

**Q. If The Cozy Inn sold tomato soup, would that change your calculus?**

MS. JOKERST: Object to form.

A. It would.

BY MR. SHAW:

**Q. Okay. Would that make you determine that this is a sign?**

MS. JOKERST: Object to form.

A. I would determine that it advertises a product that they are making available to their customers inside.

MR. SHAW: Okay. All right. We can break for lunch now.

(THEREUPON, a recess was taken.)

BY MR. SHAW:

**Q. Mr. Andrew, before we took our lunch break, I believe you had said that you had attended a meeting on Monday, November 6th of 2023 when you were first informed about the painting on**

**Q. What are those ways you could calculate it without physically measuring?**

A. Well, there is the county appraiser's records. There's also our building permit records. And our building permit records give us the dimensions of the buildings that are on that address.

**Q. Are you familiar with a piece of software called Pictometry?**

A. I am.

**Q. Would Pictometry be a valid way of making these measurements?**

MS. JOKERST: Object to form.

A. Pictometry is never as good as either going over and measuring or having building plans.

BY MR. SHAW:

**Q. Okay. When this e-mail was sent, had a determination been made by the city that the painting on the side of The Cozy Inn would not be allowed by the city code?**

MS. JOKERST: Object to form.

A. A determination had been made that it would not be allowed by city code because it was too large based on the circumstances of the property.

BY MR. SHAW:
**Q. And so that would be on November 6th that determination had been made?**
A. Yes.
**Q. And that determination was made by Mr. Herrs?**
A. It was made by Mr. Herrs and concurred with by myself and Ms. Driscoll.
**Q. Do you know the date you concurred with that determination?**
A. It was concurred before this e-mail was sent out.
**Q. Okay. So did Mr. Herrs have a face-to-face conversation with you before he sent this e-mail?**
A. He did.
**Q. Okay. And in that face-to- face conversation, did he convey the substance of this e-mail to you?**
A. He conveyed what his measurements told him about the total area of the sign.
**Q. Okay.**
A. And that it was far too large for that C-4 district regulations would allow.
**Q. In that conversation you had with him,**

A. I didn't prepare it. He did. And I've seen different numbers. He started out at 540 and changed that to 528.

BY MR. SHAW:

**Q. Would he have been correct to subtract that sign from the mural sign area?**

MS. JOKERST: Object to form.

A. Yes, because it already exists.

BY MR. SHAW:

**Q. Would he have been incorrect if he didn't subtract that area?**

MS. JOKERST: Object to form.

A. He wouldn't necessarily be incorrect because it's all one integral display. But he did not take that into account because it's already account for as existing signage.

BY MR. SHAW:

**Q. I guess my concern here is, is that 24 square feet has been double counted, that if he includes that area within his rectangle for calculating the size of this mural and doesn't subtract 24 square feet from it, we are now double counting that 24 square feet. Do you understand?**

MS. JOKERST: Object to form.

A. I understand, but it's completely

irrelevant.

**Q. Why is that irrelevant?**

A. Because the magnitude between 60 square feet or 63 square feet and 500 plus square feet, a 24-square foot margin of error is immaterial.

**Q. Okay. I understand that conclusion if what you're just saying is that it wouldn't have changed the outcome. But I'm just trying to figure out what is the proper way to calculate the numbers?**

A. The proper way to calculate the numbers is to take the existing signage, we calculate the difference between the existing signage that already exists and the proposed signage and we see if the proposed signage will fit within that allocation. So if their allocation was that they can have 150 square feet of total sign area and they have 63, then they can -- their additional signage can be the difference between 63 and 150.

**Q. I understand. But if this signage has been double counted, the calculation would be incorrect. Is that true?**

MS. JOKERST: Object to form.

A. There is nobody on city staff, including me or Mr. Herrs or anybody, who is going to stand

artificial rectangles around it. We treated the entire north wall as part of the display area.

BY MR. SHAW:

**Q. Okay. After Mr. Howard submitted this application on November 13th or whenever he submitted it, what was done with this application by your department?**

A. It was placed on file and on hold.

**Q. What does it mean for it to be on hold?**

A. It means that we could not approve it, but we were going to try to continue to work with Mr. Howard to find a code-compliant code-based solution that might allow ultimately the sign to be installed.

**Q. Does the city code discuss procedures for placing a sign permit on hold?**

MS. JOKERST: Object to form.

A. It does not.

BY MR. SHAW:

**Q. So is placing a sign permit on hold just a unwritten practice?**

MS. JOKERST: Object to form.

A. It's not an unwritten practice. It's usually done in consultation with the applicant.

BY MR. SHAW:

**Q. Was this done in consultation with Mr. Howard?**

A. Absolutely.

**Q. Did Mr. Howard agree to having his permit being placed on hold?**

A. Yes.

**Q. When did he make that agreement?**

A. When he talked to Mr. Herrs.

**Q. Mr. Herrs told you that Steve Howard agreed to his application being played on hold?**

MS. JOKERST: Object to form.

A. Mr. Howard was informed on Monday the 6th that we were unable to issue a sign permit, and he was informed that we were going to continue to work with him on coming up with a code-compliant solution that might allow the sign to ultimately be installed.

BY MR. SHAW:

**Q. But he submitted this application after that date. Is that correct?**

A. That is correct.

**Q. And at any point after that, did Mr. Howard consent to his application being place on hold?**

MS. JOKERST: Object to form.

**any time even while an application is pending?**

A. Absolutely. It happens all the time.

**Q. I see. And does the code not set out that it is only by a final determination of the zoning administrator that the Board of Zoning Appeals gains jurisdiction?**

MS. JOKERST: Object to form.

A. What is your definition of a final determination?

BY MR. SHAW:

**Q. What is your definition of a final determination?**

A. My determination was on Monday November 6th, I had determined this to be a sign that required a sign permit. That was my determination. It didn't change. It didn't change under any of the additional information that we had. Mr. Howard, if he disagreed with my determination that it was a sign could have appealed my determination as being incorrect to the Board of Zoning Appeals.

**Q. I believe earlier you had said when a sign permit was denied, a letter is sent out to the applicant. Is that correct?**

A. I did not say that. I said when a sign

**due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until our review of the sign regulations is complete. Is that sentence past tense or future tense?**

MS. JOKERST: Object to form.

A. I'm not sure I follow the question.

BY MR. SHAW:

**Q. Do you see where it says our office will be placing your Certificate of Compatibility application and sign permit application on hold?**

A. If I was writing it, it would say has been placed.

**Q. I see. Do you know why it was not written in that manner?**

MS. JOKERST: Object to form.

A. I do not have firsthand knowledge of that.

BY MR. SHAW:

**Q. When was the application placed on hold?**

A. When it was received.

**Q. So would that be November 13th, 2023?**

A. That would be the date it was received if that was in fact the date it was received.

department is involved with, including The Cozy Inn.

**Q. So just so I've got this straight, it's your position that The Cozy Inn's application was placed on hold on November 6th, 2023. Is that correct?**

MS. JOKERST: Object to form.

A. Yes. And we told Mr. Howard that we were going to work to try to come up with a code compliant solution that might ultimately end up with his permit being issued for his display and that that was going to take some amendments to our current sign code. And so we were trying to convey the message that we were going to continue to work with him as well as others in the community who had sign issues of their own.

BY MR. SHAW:

**Q. Does this letter make any reference to a determination made on November 6th?**

A. It does not.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Were you instructed to send this letter by Miss Driscoll?**

MS. JOKERST: Object to form.

**Art Center building?**
A. Yes.
**Q. What does it mean to be similar in function to a sign?**
MS. JOKERST: Object to form and foundation.
A. Something that might be visually appealing or attract your eye.
BY MR. SHAW:
**Q. And when it says it will direct the public to the gallery, what does that mean?**
MS. JOKERST: Object to form and foundation.
A. That means it was written by a staff member that doesn't have all the full nuances.
BY MR. SHAW:
**Q. Are you saying the staff report is incorrect?**
MS. JOKERST: Object to form.
A. I'm not saying the staff report was incorrect.
BY MR. SHAW:
**Q. What does it mean then that the staff whoever wrote this doesn't understand the nuances?**
A. They did not, when they did their

analysis, they didn't do a detailed analysis of how this relates to the three elements in the sign code definition. They were rather loose in their language. I would agree that this art installation is similar to the function of a sign except we determined it was not a sign and it was not required to go to the Design Review Board. And the only reason it did was because the Art Center asked so they could obtain a Certificate of Compatibility for their facade grant application.

**Q. So your department determined that this mural was not a sign. Is that correct?**

MS. JOKERST: Object --

A. We determined that the mural was not a sign and that it was not required to be reviewed by the Design Review Board.

BY MR. SHAW:

**Q. Does this staff report say anywhere that it was determined that it was not a sign?**

MS. JOKERST: Object to form.

A. It says it's intended similar in function to a sign or logogram. If it was a sign, it would have resulted in a sign permit, but we did not issue a sign permit for this art installation.

BY MR. SHAW:

A. It was.

**Q. Is that Schlotzsky's located inside of a large shopping center?**

A. It's an outlot that's located in the Mid State Plaza addition.

**Q. Do you know how the frontage for that building was calculated?**

A. I do.

**Q. How was it calculated?**

A. It was calculated based off their 9th Street frontage and the mall ring road on the south.

**Q. I see. So it wasn't just the street frontage. It was the parking lot of the large shopping center which had a path for cars to drive. That was considered street frontage?**

A. No, that --

MS. JOKERST: Object to form.

A. That was considered to be a private street that provided access to Schlotzsky's.

BY MR. SHAW:

**Q. Even though there's parking in between Schlotzsky's and that private road?**

A. Yes.

**Q. Okay. Go quickly to Exhibit 39, please.**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

**EXHIBIT 12**

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g., Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

9. Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

**EXHIBIT B**

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

## FIRST SET OF INTERROGATORIES

1. Please explain how the City first learned about the Plaintiffs' mural's existence.

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy sign that is the subject of this dispute ("Cozy Sign") as a mural or otherwise implies the Cozy sign is not a sign under the Salina Code of Ordinances ("Salina Code"), Chapter 42, Articles X ("Sign Code"). Subject to and without waiving this objection, the Cozy is located on a main street approximately one block from the City's offices. Due to the size and location of the sign, it is visible to passersby from the street. Brad Anderson noticed the Cozy Sign as he drove by the Cozy, and was the first City staff member to bring the sign to the City's attention.**

2. Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural and describe the extent of each official's involvement (i.e. whether the official directed Mr. Herrs to issue a citation against Plaintiffs).

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City further objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request as compound and seeks information regarding the "extent of each officials' involvement" that is not a discrete subpart of the initial interrogatory asking the City to identify the city officials who discussed the "enforcement of the" Sign Code against Plaintiffs' sign.**

**Subject to and without waiving these objections, the City responds to the first interrogatory contained in this request, that is "Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural" as follows: The City did not issue a notice of violation or citation to Plaintiffs regarding the Cozy Sign. The City determined the Cozy Sign was a sign under the Sign Code and therefore subject to the Sign Code and BID Code, evaluated the Cozy Sign under the Sign**

**Code and determined that the Cozy Sign was too big to qualify for a sign permit, and informed Mr. Howard of the same. The City staff members who discussed the evaluation of the Cozy Sign under the Sign Code with Dustin Herrs were Lauren Driscoll, Dean Andrew, and Mike Schrage.**

**Regarding the second interrogatory in this request, as to Ms. Driscoll's involvement with Mr. Herrs, while it is impossible to remember every detail of Ms. Driscoll's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Ms. Driscoll discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, follow-up and meeting with Mr. Howard and Mr. Benson, providing information to Mr. Howard regarding the applicability of the Sign Code to the Cozy sign, next steps regarding the Cozy Sign and sign permit application, and the agreement with Mr. Howard to pause the work on the Cozy Sign.**

**Regarding the third interrogatory in this request, as to Mr. Andrew's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Andrew's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Andrew discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, Mr. Howard's knowledge of the Sign Code and BID Code process, and next steps regarding the Cozy Sign.**

**Regarding the fourth interrogatory in this request, as to Mr. Schrage's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Schrage's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Schrage participated in discussions with Mr. Herrs, Mr. Andrew and Ms. Driscoll regarding the application of the Sign Code to the Cozy Sign, meeting with Mr. Howard and Mr. Benson, and next steps regarding the Cozy Sign.**

3. Please explain the changes the City believes Plaintiffs need to make to their mural in order to "turn this into a mural rather than a sign," as suggested by Vice Mayor Longbine at the November 13, 2023, Commission meeting, (Doc. 16 at ¶ 136.) and in the Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 8).

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City objects to this request to the extent it seeks information protected by the attorney-client or work product privileges as it relates to the Brief in Support of Defendant's Motion to Dismiss. The City further objects to this request as it seeks the City to explain or interpret the arguments made by the City's counsel in Doc. 27 to Plaintiffs. The City also objects to this request to the extent it misinterprets the argument in Doc. 27 at 8 as a suggestion. The City also objects as the request uses only an excerpt of Vice Mayor Longbine's statement and misinterprets the statement made by Vice Mayor**

**Longbine on November 13, 2023 as a suggestion. Mr. Longbine's full statement at the meeting was "So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign." The statement was phrased as a question, not a suggestion. That is because Mayor Longbine does not interpret or apply the Sign Code or BID Code on behalf of the City. The City will not respond to the request to the extent it seeks information "as suggested" by Vice Mayor Longbine or in the Brief in Support of Defendant's Motion to Dismiss.**

**Subject to and without waiving these objections, the City responds only to the non-objectionable portion of the request that asks "Please explain the changes the City believes Plaintiffs need to make to their mural in order to 'turn this into a mural rather than a sign.'" The City regulates signs as defined by Salina Code § 42-764. In order to remove the Cozy Sign from the applicability of the Sign Code regulations, Plaintiffs would have to change the Cozy Sign into a display that falls outside the definition of "sign" found at Salina Code § 42-764.**

**As the City does not know what changes Plaintiffs would be willing to consider (particularly considering Paragraph 29 of the Amended Complaint, which states, "Mr. Howard does not want to change, alter, or deviate from" the rendering shown in Paragraph 28 of the Amended Complaint), the City cannot (and does not) know all of the potential changes that could be made to the Cozy Sign that would take it outside of the scope of the definition of sign. It would be nearly impossible for the City to guess all of the changes that could be made to the Cozy Sign to turn it into a display outside the definition of sign. However, in general, Plaintiffs can change the Cozy Sign into a display that does not "announce, direct attention to, or advertise," which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(2) would no longer be met, or Plaintiffs could relocate the display to the inside of the Cozy building, which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(3) would no longer be met.**

4. Please identify every government interest served by regulating Plaintiffs' mural.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. Subject to and without waiving this objection, the purpose statement of the Sign Code, found at Salina Code § 42-500 (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXSI_DIV1GE_S42-500PU), sets forth the government interests served by regulating signs under the Sign Code. The City refers Plaintiffs to § 42-500 for a complete list of those interests. The Sign Code regulates all signs, not just the Cozy Sign and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. The government interests served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values.**

5. Please explain how the City determines if a mural is used to "announce, direct attention to, or advertise."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that cannot be found in the Salina Code. Subject to and without waiving this objection, the City applies the Sign Code as written. The City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to, in pertinent part, whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise."**

**The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event.**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window).**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall).**

6. Please explain how the City identifies "art" which is exempt from the mural- sign code regime. See (Doc. 16 at ¶¶ 62-65, 100, 115, 208, 216); (Doc. 16-2 at 4-6, 22-23, 28); (Doc. 16-4 at 6-7); (Doc. 27 at 9, 12).

**OBJECTION AND RESPONSE: The City objects to this requests to the extent it seeks information protected by the attorney-client, work product and anticipation of litigation**

EXHIBIT B

**privileges respecting Defendant's Brief in Support of its Motion to Dismiss. The City further objects to this request to the extent it seeks the City to explain the arguments made by the City's counsel as set forth in Doc. 27 at 9 and 12. The City further objects to the extent the request incorporates allegations to the Amended Complaint as Plaintiffs made the allegations and no answer has been filed to determine whether the allegations are admitted or denied. Based on these objections, the City will only respond to the non-objectionable portion of the request "Please explain how the City identifies 'art' which is exempt from the mural-sign code regime."**

**The City objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or BID Code. Subject to and without waiving these objections, the Sign Code regulates "signs" as defined by § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code.**

**As to the term "art," the term "art" may be used from time to time as an imprecise short-hand for "not sign," but the term "art" is not included in the Sign Code and is not relevant to the determination of whether a display (whether it is artistic or not) is a "sign." This is because some artistic displays are also "signs," and some are not. To clarify, the artistic displays that are also signs are subject to regulation. The artistic displays that are not signs are just art, and because they are not also signs, they are not subject to regulation.**

**A "sign" under the sign code "is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.**

**Please see Response to Interrogatory No. 5 above for additional information responsive to this request.**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written. The City does not apply the**

EXHIBIT B

**term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code. Displays that are not signs are not subject to the size limits of the Sign Code, and the City does not evaluate the size of such displays. Accordingly, the City does not have information about the location or sizes of displays that are not signs under the Sign Code. The City, does not have sufficient information to "identify" as requested. Moreover, "unregulated 'art'" (which the City interprets as displays that are not signs) cannot exceed the Sign Code's size restrictions because those restrictions only apply to regulated signs.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions that does not correspond to the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written, it does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**Pursuant to Request for Production No. 5, Defendant is producing citations issued within the last 5 years. Pursuant to F.R.C.P. 33(d), Defendant refers Plaintiffs to those documents produced in Defendant's forthcoming supplemental disclosure for information responsive to this request.**

9. Please explain how the City determines if a mural "pertains to the goods or services for sale." See Amended Complaint at ¶¶ 32, 44, 52-54, 64-65, 128.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving this objection, the City applies the Sign Code as written, it does not apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to**

**"announce, direct attention to, or advertise." Salina Code § 42-764 does not use the phrase "pertains to the goods or services for sale." Rather, Salina Code § 42-764 applies to a display if, among other things, it "announces, directs attention to, or advertises." One way to evaluate whether a display "advertises" is if it encourages the purchase of products or services, in that it pertains to or references the goods or services for sale.**

10. For any Request for Admission that you denied, please explain the reasons for your denial.

**OBJECTION: The City objects to this request to the extent it seeks to impose obligations outside the scope of, or different than, the Federal Rules of Civil Procedure. F.R.C.P. 36(4) requires a matter be admitted, or specifically deny the request or state in detail why the answering party cannot truthfully admit or deny it. Further, a denial must fairly respond to the substance of the matter.**

11. Please identify the factual basis for the claim made in your Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 2) that "Plaintiffs' display is obviously a sign".

**RESPONSE: The City refers Plaintiffs to the allegations in their Amended Complaint found at ¶¶ 15-29 for allegations showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. The City also refers Plaintiffs to the transcript attached as Exhibit A to Plaintiffs' Amended Complaint at 15:2-23 for additional facts showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. Plaintiffs sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building."**

**The Cozy Sign is a display calculated to attract the attention of the public, that is attached to or painted on a building. It is used to announce, direct attention to and advertise and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them.**

Respectfully submitted this 12th day of July , 2024.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin | Todd G. Messenger, | Amanda C. Jokerst |
| Bar Number 24170 | CO Bar Number 38783 | CO Bar Number 47241 |
| Attorney for Defendant City | Pro Hac Vice Attorney for | Pro Hac Vice Attorney for |

**EXHIBIT B**

of Salina, Kansas
CLARK, MIZE &
LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email:
aomartin@cml-law.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
tmessenger@fwlaw.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
ajokerst@fwlaw.com

**EXHIBIT B**

# VERIFICATION

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

Signature

Executed on July 12, 2024

EXHIBIT B

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

CORPORATE REPRESENTATIVE

DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 13**

maybe rather than have him go through each one, is there anything in there that hasn't been disclosed by either party?

MS. JOKERST: No, I don't believe so.

MR. SHAW: Okay.

MS. JOKERST: Dean, you have what I sent you?

A. It is what you sent me. It includes the set of Interrogatories, the responses to those, the Requests For Admissions, the things that I was supposed to be questioned about under the topics list.

BY MR. SHAW:

**Q. All right. So we will start off kind of just discussing how the city defines a sign under the sign code. So if you can open the binder in Exhibit 1 there, we have excerpts of the code. Go to Section 42-764.**

A. The methodology in using something is a sign is determined whether it's a structure or part of a structure or portable display, whether it's either attached to the ground or painted onto a building or structure on the ground. And then we determined whether it announces, directs attention to or advertises. And then we confirm

whether it is inside or outside of a building.

**Q. Give me one second here. So when you, and when I say you, I mean the city, determine if a display is used to announce, what methodology does the city use to make that determination?**

A. We look to see whether it declares some fact or occurrence or event or some entity.

**Q. And does that announcement have to be of a commercial nature, or can it be any announcement?**

A. It could be any type of announcement.

**Q. Okay. And does the city need to review the proposed display in order to determine if it announces or not?**

A. Yes.

**Q. Okay. And when the city determines if a display directs attention to something, what methodology does the city use to make that determination?**

A. We look to see if there is something in the visual display that points to or directs attention to a particular location or position or something that's occurring in their building if there is one.

**Q. And does it have to direct attention to a**

**commercial location or can it be directing attention to a non-commercial location as well?**

A. It can direct attention to any particular location.

**Q. All right. And when the city determines if a display advertises, what methodology does the city use to make that determination?**

A. We look to see whether the visual display promotes or encourages some sort of product or service or invitation to enter into some form of commercial transaction or whether the visual display promotes a particular brand or a particular product.

**Q. Does the advertising have to be commercial in nature or can it be non-commercial?**

A. It does not have to be commercial.

**Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public?**

A. No.

**Q. Why doesn't the city determine that?**

A. Because in interpreting and applying Section 42-764, the city has interpreted that to be a catchall provision and to catch any type of display mechanism that's not mentioned in the

BY MR. SHAW:

**Q. So as long as a building is not vacant, a sign can't be abandoned?**

MS. JOKERST: Object to form.

A. The abandoned sign ordinance establishes time frames for certain parts, portions of signs or sign support structures to be removed. And the triggering for that is the date upon which the premises became vacant. If the premises is not vacant, there's no date to trigger that on.

BY MR. SHAW:

**Q. So even if the sign no longer advertises a bona fide business conducted, products sold or service provided, it isn't abandoned until the property has been vacated?**

MS. JOKERST: Object to form.

A. The time period the clock for removal starts when the premises is vacant.

BY MR. SHAW:

**Q. All right. We can move on to Exhibit 18. Are you familiar with Exhibit 18?**

A. It appears to be a photograph of Fire Station No. 2 on South Santa Fe.

**Q. Has the city made a determination about whether the mural at Fire Station No. 2 is**

**considered a sign?**

A. Yes.

**Q. What determination was made?**

A. The determination that it does not constitute a sign that announces, directs attention to or advertises.

**Q. What methodology did the city use to make that determination?**

A. It used the methodology found in Section 42-764 to determine whether the visual display on the front of the building announced or directed attention to or advertised. It does not announce or proclaim any fact, event, occurrence or entity, it does not direct attention to any specific location or opening or doorway or any physical location, and it does not advertise.

**Q. Does this mural depicted in the exhibit identify the building as a fire station?**

A. The city's position is that it does not. It could just as easily appear on a museum or library or anywhere else.

**Q. Does this mural pertain to the activities conducted at the fire station?**

MS. JOKERST: Object to form.

A. Not this fire station.

**Q. Okay. Has the city made a determination about whether this mural constitutes a sign under the sign code?**

MS. JOKERST: Object to form.

A. We have made a determination that the sign portion of this wall constitutes a sign under the sign code.

BY MR. SHAW:

**Q. When you say the sign portion, what are you referring to?**

A. The portion of the sign that we issued a sign permit for.

**Q. Can you describe the portion of this that was issued a sign permit in reference to the image?**

A. The portion that says KU, the portion that says School of Medicine, the portion that says School of Nursing, the portion that says Salina and the portion that says the University of Kansas which was installed on a blank wall.

**Q. Okay. And when -- when was the paint of this mural added to that wall?**

A. I don't know.

**Q. Okay. Was any determination ever made about whether or not the paint of that mural was a**

**part of that sign?**

A. It could not have been a part of the sign because it wasn't a single composition.

**Q. Is it possible to expand upon a sign after it has already been built by adding more elements to it?**

MS. JOKERST: Object to form and scope.

A. I believe it's theoretically possible that any original design for a sign can be modified or expanded on.

BY MR. SHAW:

**Q. Okay. Has the city ever determined whether the mural in this exhibit was an expansion or modification of the KU sign?**

A. The city has determined that only the portion for which a sign permit was issued is a regulated sign, and the remaining balance of the north wall of that building is not a regulated sign.

**Q. When was that determination made?**

MS. JOKERST: Object to scope.

A. I don't understand the question. I don't have any reason -- no one has any reason but the city to make that determination.

BY MR. SHAW:

**Q. Where is that mural located?**

A. It's on the south wall of the Schlotzsky's sandwich shop.

**Q. And has the city determined that the mural depicted here is a sign?**

A. Yes.

**Q. When did the city make that determination?**

MS. JOKERST: Object to scope.

A. I can't tell you the exact time. I can tell you it was determined when the city became aware of it and went out and reviewed it. It determined it to be a regulated sign and contacted the owner of the business and the owner of the property to say that they needed to obtain a sign permit for that sign.

BY MR. SHAW:

**Q. What portions of this mural did the city consider to be triggering the sign code?**

MS. JOKERST: I'll object to form.

A. The city determined it to be a single composition and determined that the entire visual display was a sign.

BY MR. SHAW:

**Q. How did the city come to that**

A. The City of Salina, city commission, believes that putting that information on the water tower protects the public health, safety and welfare. It also provides wayfinding by letting visitors know, one, that they're in Salina and, two, where they can find information about Salina.

BY MR. SHAW:

**Q. What facts does the city have that show that the Chamber of Commerce website promotes the public health, safety or welfare?**

MS. JOKERST: Object to form and scope.

A. Because attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public.

BY MR. SHAW:

**Q. Are traffic and wayfinding signs -- let me rephrase that. Can any sign that might be used by a driver as a landmark be considered an exempt sign under this section?**

MS. JOKERST: Object to form and scope.

A. This exemption refers to signs that are placed or authorized by the city. This sign was both placed and authorized by the city by which I mean the governing body of the city.

doesn't even make any sense.

BY MR. SHAW:

**Q. Well, does this say rectangle or rectangles?**

MS. JOKERST: Object to form.

A. It says all the letters, numbers or symbols.

BY MR. SHAW:

**Q. I'm asking does it read the area of the smallest rectangular figure or the area of the smallest rectangles?**

A. The city for The Yard measured the smallest rectangular figure that encompassed home plate and The Yard, period, end stop.

**Q. Well, you testified there were six rectangular figures that the city measured to calculate The Yard's area. Is that correct?**

MS. JOKERST: I'll object -- I'll object to scope as it relates to the calculation at The Yard.

A. I still don't understand the question. You end up with a total square footage. We used six independent areas to come up with a total square footage and a single rectangular area that encompassed all the letters, numbers and symbols.

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
MICHAEL SCHRAGE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:09 a.m. on the 11th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**EXHIBIT 14**

A. That's Commissioner Mike Hoppock.

**Q. Was he commissioner in November -- on November 9th of 2023?**

A. Can someone tell me who the mayor was? He was definitely -- we change mayors once a year. All of them, even though they are mayor, they're a commissioner. So he was a commissioner. I just -- I don't think he was mayor at the time.

**Q. Is there a reason you only e-mailed -- I'm sorry. Tell me his name again, last name?**

A. Hoppock, H O P P O C K.

**Q. Is there a reason you e- mailed Mr. Hoppock individually?**

MS. JOKERST: Object to form.

A. Likely, he -- likely, he was contacted, reached out to me and said here's what's going on, here's what I was asked. So I was trying to boil down for him the high points of where things stood.

BY MR. MACROBERTS:

**Q. As you're sitting here now, though, you don't recall whether or not Mr. Hoppock had called you and this was in response to that call?**

A. No. Not specifically. I mean the way the e-mail's written, I wouldn't just normally --

there would be some additional context that prompted the e-mail, but I can't tell you what that was.

**Q. As part of your job as city manager, do you have individual conversations with commissioners?**

A. Yes.

**Q. What is the distinction that is commonly made between murals and art when compared to commercial speech?**

MS. JOKERST: Object to form and foundation.

A. I was trying to refer to there's case law out there. This is -- it's an ongoing conversation or point of discussion about assertions that signs are art and, therefore, not subject to regulation.

BY MR. MACROBERTS:

**Q. Is there a difference between murals and art and commercial speech as you understand the city codes?**

MS. JOKERST: Object to form and foundation.

A. Our code as its written identifies what is a sign, and then anything else is not a sign.

**Q. Based upon your understanding of the code, the display or the art does factor into whether it's deemed a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why is that?**

A. It's not about the art. It's about the definition of a sign.

**Q. And when you're talking about the definition of a sign, you need to look at the display to figure that out. Is that right?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. What are the -- so we're going to stick with page 4 for a little bit here. What are the examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated. What are those examples?**

A. Well, the one --

MS. JOKERST: Form and foundation. I've got to get my objection in.

MR. MACROBERTS: Very well.
BY MR. MACROBERTS:
**Q. Do you see where it says the important distinction here relates to commercial speech and our ability to regulate commercial speech?**
A. Yes.
**Q. When you say our ability to regulate commercial speech, you're talking about the City of Salina, right?**
A. Yes.
MS. JOKERST: Object to form.
BY MR. MACROBERTS:
**Q. And it's your understanding that there is a distinction between commercial speech and other forms of speech?**
MS. JOKERST: Object to form.
A. I was not trying to respond to all forms of speech and parse it that far. I was trying to confirm for the city commission that there is a basis on which we can regulate signs. I used the term commercial speech equating it to advertising and equating it to what I understood the intent of the Cozy sign to be.
BY MR. MACROBERTS:
**Q. And the intent of the Cozy sign is that**

station was conflating a lot of broad topics not applying our code.
BY MR. MACROBERTS:
**Q. So as you understand the city code, that display is a regulated sign?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. What did you mean when you said we do not regulate based on aesthetics?**
MS. JOKERST: Object to form.
A. Again, I was trying to confirm that we -- this was not an opinion of whether we like the aesthetic aspects of the sign. It was purely a question of is it a sign and does it meet our codes.
BY MR. MACROBERTS:
**Q. And I think later on you commented that the mural popped?**
MS. JOKERST: Object to form.
A. I did or a commissioner did. I've got to confirm that a commissioner did.
BY MR. MACROBERTS:
**Q. Later on you told the city commission, quote, and I would reiterate it's all on the basis**

**of a commercial message. Do you remember saying that?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. And that was truthful and accurate?**

MS. JOKERST: Object to form and foundation.

A. As it applied to my understanding of the Cozy sign, yes.

BY MR. MACROBERTS:

**Q. At some point, Ms. Driscoll, which you just referenced, talked about the coffee shop hypothetical. Do you remember that hypothetical?**

A. Yes.

**Q. Do you agree with that hypothetical as it relates to the Salina city code?**

MS. JOKERST: Object to form and foundation.

A. That's consistent with my understanding of the case in question, and I think it is illustrative of how we have an example that would -- we would have to parse our code to make a determination as she described.

BY MR. MACROBERTS:

**one that you referenced, based upon your understanding of the city code and thinking about the coffee shop hypothetical, if Mr. Howard painted an airplane on the side of his wall with no verbiage at all, was just a silver airplane, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. No.

BY MR. MACROBERTS:

**Q. Why not?**

MS. JOKERST: Object to form and foundation.

A. It doesn't rise to the criteria specified in our sign code definition.

BY MR. MACROBERTS:

**Q. Is that because Mr. Howard does not sell airplanes on the inside of his business?**

MS. JOKERST: Object to form and foundation.

A. Not just airplanes but, yeah, no direct connection to his business and the depiction of an airplane.

BY MR. MACROBERTS:

**Q. On the coffee shop hypothetical, if a**

**coffee shop painted a dove on the side of its wall and instead of having an olive branch had painted a coffee branch, based upon your understanding of the code, would that be considered a sign?**

MS. JOKERST: Object to form and foundation.

A. I would seek legal counsel on that but, yes, I believe so.

BY MR. MACROBERTS:

**Q. Are you familiar with Andy Warhol's works?**

A. Marilyn Monroe and the tomato cans maybe.

**Q. Yeah. On the tomato can, have you seen that one before?**

A. Quite sometime ago.

**Q. If Mr. Howard had painted an exact replica of Andy Warhol's Campbell's Soup can on the side of his wall, exact replica, would that be considered a sign under your understanding of the city code?**

MS. JOKERST: Object to form and foundation.

A. Applying on my understanding of the definitional criteria, no, I don't believe it would be a sign.

BY MR. MACROBERTS:
**Q. Why not?**
MS. JOKERST: Object to form and foundation.
A. I don't know that it advertises, calls attention to, directs anything pertaining -- as you've described it, anything that he does.
BY MR. MACROBERTS:
**Q. If Mr. Howard started selling Campbell's Soup inside, would that change the analysis for you?**
MS. JOKERST: Object to form and foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. If -- and forgive me. I think there's a grocery store. Is it called DG Grocery Store in town?**
A. Dollar General.
**Q. Okay. Let's just use as a hypothetical a grocery store. If a grocery store paints an exact replica of Andy Warhol's Campbell's Soup can on the side of its wall, would that be considered a sign under your understanding of the code?**
MS. JOKERST: Object to form and

foundation.
A. Yes.
BY MR. MACROBERTS:
**Q. Why?**
MS. JOKERST: Object to form and foundation.
A. Directing attention to and advertising products that they sell.
MR. MACROBERTS: I think we are close if not maybe done. If I could get maybe five minutes just to double-check that I've asked everything I wanted to.
MS. JOKERST: Yeah, that works for me because I would like a little break, too. I might have a couple of questions here, so I can organize my thoughts.
MR. MACROBERTS: Can we go off the record just for a moment.
MS. JOKERST: Yeah.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. Was there one person who made the decision that the display at the Cozy was a sign or not?**
MS. JOKERST: Object to form.

A. Not to my -- I think it was a collective staff analysis and conclusion.
BY MR. MACROBERTS:
**Q. And for the collective staff analysis and conclusion, who do you mean?**
A. I presume -- certainly Lauren Driscoll and Dean Andrew, and then possibly their planning staff.
**Q. I'm sorry?**
A. Possibly additional planning staff.
**Q. Like who?**
A. Dustin Herrs, I don't even know if Gage Roberts was employed at that point, but we've got a couple planners.
**Q. Are you aware if there have been any traffic accidents as a result of the -- as a direct result of the display on the side of the Cozy?**
MS. JOKERST: Object to form.
A. No, I'm not.
BY MR. MACROBERTS:
**Q. Are you aware of any pedestrian accidents as a direct result of the display at the Cozy?**
MS. JOKERST: Object to form.
A. No, I'm not.

MR. MACROBERTS: That's all I have.
MS. JOKERST: I have a couple of follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. Okay. Mr. Schrage, earlier you mentioned something about a sign handout that was provided to Mr. Howard. Do you recall mentioning something about that?**
A. Yes.
**Q. Okay. What handout were you referring to?**
A. My recollection is a sign code analysis that was a summary of the applicable sign code and then staff's analysis of the Cozy zoning category, lot size, math, relative to the size what was being proposed.
**Q. Did you prepare that sign analysis?**
A. No.
**Q. All right. Do you -- in your position as city manager, do you apply the sign code?**
MR. MACROBERTS: I'm sorry. I just -- I didn't hear the question.
BY MS. JOKERST:
**Q. I said in your position as city manager,**

**do you apply the sign code?**
A. Not directly, no.
**Q. Okay. Do you review sign permit applications?**
A. No.
**Q. Do you review Certificate of Compatibility applications?**
A. No.
**Q. In your position as city manager, are you responsible for making determinations about what displays are signs?**
A. No.
**Q. In your position as city manager, are you responsible for -- actually, I'll take that back.**
**Earlier you were asked about a coffee house hypothetical. Do you recall being asked about that?**
A. Yes.
**Q. Okay. Do you know why Lauren provided that hypothetical at the city commission meeting?**
A. I believe it was based on a case that had been litigated.
**Q. Do you know if Lauren used that coffee house hypothetical to compare it to how Salina applies its sign code?**

uncertainty, we would seek legal advice.

BY MS. JOKERST:

**Q. Okay. So if you provided an opinion today that was different than a determination that was made by the Zoning administrator regarding whether or not one of the displays you were shown today was or was not a sign, who's opinion would prevail, your opinion or the Zoning administrator's opinion?**

MR. MACROBERTS: Objection. You can answer.

A. The Zoning administrator.

BY MS. JOKERST:

**Q. From the displays that you were asked questions about today, hypotheticals, whether or not something might or might not be a sign, in your position as city manager, did you make any determinations, official determinations about whether those displays were signs or not signs?**

A. No, I did not.

MS. JOKERST: Okay. I don't have any further questions.

MR. MACROBERTS: Neither do I.

MS. JOKERST: All right.

(THEREUPON, the deposition concluded at

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 15**

avenues for both commercial and non-commercial messages. So the City of Salina has what we would call a content neutral sign code where we have a substitution clause where if you have a commercial sign or a non-commercial sign, commercial message or non-commercial message, it doesn't matter. Like you can literally just swap them out because we don't -- we don't really concern ourselves with the content of those signs.

Now, the objectives and the balance, when we're talking about balance the public and the private objectives, some of the public objectives are making sure that we don't have signs that create a lot of clutter that might be distracting or a lot of clutter where it's difficult to discern messages of the signage because there's so much of it or clutter in the way that it blocks or impairs visibility for motorists or pedestrians along the street front. We also want to make sure that we don't have distractive signs, signs that are flashing or blinking or maybe are so large that they draw our attention longer than they should or they're illegible, you can't read them and so it draws our attention longer than it should and, therefore, creating potential traffic

hazards or safety hazards. We want to make sure that the public interest of having signs that are fully secured where they're not falling off of walls or falling off of poles and damaging persons or vehicles or property that that's really important. So there's certainly some public objectives that we want to protect, but we also want to balance that with the ability for property owners to share a message, to share either their ideas or their thoughts or their commercial business endeavors for signage. So having signage that is adequate and abundant in a way that they can reasonably share their messages while not becoming a hindrance to the public safety of the community. Because we're very concerned about the public health, safety and welfare of the community. And that's the reason behind a lot of these purposes that we have listed here 1 through 8.

**Q. Okay. Why does this section here or this subsection differentiate between commercial and non-commercial messages?**

A. Well, it doesn't. It notes that there are potential commercial and non-commercial messages. But in our view, in our mind in this

question on that one.

A. So the statement of this particular provision is unsecured clutter distracting and/or illegal -- or illegible signage. And so clutter typically is not a single sign. Clutter is having multiple signs and having many of them to the point where it becomes distracting or blocks vision.

BY MR. SHAW:

**Q. Is the city aware of any facts that cluttered signs are a danger to motorist s, pedestrians or property?**

A. I'm aware that traffic safety is a concern when it comes to regulating signage and that clutter can play into that because signs are specifically by their nature and what they are designed to pull your eye or attract your eye. They wouldn't function if they didn't. And by having -- the more signs you have, the more your eye is pulled away from either driving or walking and potentially creating a safety hazard.

**Q. Is the city aware of any traffic accidents that have been caused in the City of Salina by cluttered signage?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. How does the city determine the number of signs that constitute clutter?**

A. So each zoning district has a requirement on number of signs, how big the signs can be and where they can be located. And those requirements are designed to limit clutter so we don't have accidents.

**Q. Is the city aware of any published studies on traffic safety that support the numbers that are in the code of what constitutes clutter?**

MS. JOKERST: Object to scope.

A. I don't know. Sorry. I was prepared to answer the questions that were in the topics.

BY MR. SHAW:

**Q. Okay. I'm just trying to understand what the city's purpose as laid out in the code is.**

**Does the -- how does the city determine what constitutes a distracting sign?**

A. So what we do is we apply the code from each zoning district. So each zoning district has a number of signs that are allowed, the size of signs that are allowed, the location of any freestanding signs, what limitation there might be

on location as well as height. And those district regulations are designed to reduce any kind of distraction that there might be. There's also prohibitions on flashing signs or blinking signs or strobing, things of that nature, that might be distracting. So the code itself is designed to reduce distraction as much as possible.

**Q. Does the city have -- is the city aware of any facts showing that distracting signs are a danger to motorist, pedestrians or property?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Is the city aware of any accidents that have been caused by distracting signs in the City of Salina?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. How does the city determine what is an illegible sign?**

A. So if a sign is faded where it requires additional staring at it, looking at it to discern the sign or if it's like ripped or tattered or if it's -- if it's written in a way where -- it's

A. What do you mean by harm?

**Q. I mean does the city have -- is it aware of any facts showing that the painting on the side of The Cozy Inn has had a detrimental impact on the aesthetics of Salina?**

A. I think what I could say to that is that the downtown district specifically, since you asked about The Cozy Inn, has district regulations that are specifically designed to protect the character and bring forth a certain visual aesthetic in the downtown area that when the proper process is followed where a sign permit is submitted and reviewed and taken to the DRB and is reviewed by the DRB and meets all the policies within the downtown design guidelines and meets all the zoning requirements that those signs enhance the appearance of the aesthetic of the designed character of the downtown area. And that by going outside of those processes and having signage that doesn't meet the downtown requirement and doesn't -- hasn't gone and been reviewed by the downtown review board, it puts at risk intent of the C-4 district regulations that are intended to protect the aesthetic and the character of the downtown area, and it puts at risk the requirement

for downtown review board. Because if Cozy Inn doesn't have to follow those rules, why does anybody else? And then if everybody has signs that don't fit within those character of -- design character of the C-4 district and the downtown review board, then those requirements become null and void.

**Q. All right. What --**

A. And it changes the character of the downtown aesthetic.

**Q. What I'm trying to get at here is apart from the city's determination that the painting on the side of The Cozy Inn is not in compliance with the code, is there any additional facts that the city's aware of that would show that the painting at The Cozy Inn has harmed the aesthetics of the city?**

A. And what I'm saying is this isn't just about The Cozy Inn from our seat. This is about the community as a whole.

**Q. I understand that. But what I'm asking is, is there any factual reason to believe that this particular painting on the side of The Cozy Inn harms the aesthetics of the community apart from its non-compliance in the city's view with**

BY MR. SHAW:

**Q. Attract attention?**

A. Attract attention? I can't tell you the intention of each individual artist and what they intend.

**Q. Can the city determine the intention of any business that wants to put up a sign?**

MS. JOKERST: Object to scope.

A. We can determine that a sign is a sign by its character and elements.

BY MR. SHAW:

**Q. What do you mean by its character and elements?**

A. Does it have writings or pictorial images, representations, emblems, symbols that announce, direct attention to or advertise.

**Q. So by reviewing the potential sign for those elements being contained within it, that is how the city can determine if it is a sign?**

A. Yes.

MS. JOKERST: Object to form. Sorry. I'm trying to follow your question and I'm not trying to interrupt.

BY MR. SHAW:

**Q. All right. I'll try to rephrase this.**

**Does the city determine that a sign or a potential sign is, in fact, a sign by reviewing its content for elements that announce, direct attention to or advertise?**

MS. JOKERST: Object to form.

A. We determine whether or not a display is a sign by looking at the writings, the pictorial representations, the emblem, symbols and whether or not those work together to announce anything or make any proclamations, if they are identifying anything, if they're pointing towards anything or directing to anything or if they're advertising any products or services or highlight any brands or encouraging commerce of some kind.

BY MR. SHAW:

**Q. Okay. So in subsection 5 here, apart from the potential for distraction or for setting a city-wide precedent, is there any other way that a painted wall sign can cause property damage?**

A. Well, I think it could impact the aesthetic appearance. So if you had -- for instance, if you're in a residential district and you had somebody that wanted to put up a giant billboard that's a painted sign in between House A and House B, it could impact the aesthetic and the

character of that neighborhood. It could also impact property values. So there are examples of painted signs that could have negative impacts.

**Q. Okay. But so section 5 here, subsection 5 here, does the property damage that is discussed include aesthetic harms?**

A. Okay. Okay. I understand your question better now. You could also have multiple signs, I guess, that could create litter and clutter if you had a lot of painted signs. So I think -- I think it's -- I don't know that whether it's a painted sign or a non-painted sign it makes much of a difference according to our sign code. It's about the time, place and manner, where the signs, how many signs are there, how large are the signs, how tall are the signs.

**Q. Okay. But subsection 5 here, is that dealing with the aesthetics of signs?**

A. No. This is property damage, personal injury.

**Q. Okay. I guess at least I'll explain what I'm thinking when I read this.**

A. Okay.

**Q. When I think, okay, an improperly constructed sign that could cause property damage**

MS. JOKERST: Yep, that works.
MR. SHAW: So back at 10:30?
MS. JOKERST: Yes. 10:31?
MR. SHAW: Sure.
(THEREUPON, a recess was taken.)
BY MR. SHAW:
**Q. Is the city aware of any facts showing that the painting on the side of The Cozy Inn was improperly constructed?**
A. No.
**Q. Is the city aware of any facts that the -- that would show the painting on the side of The Cozy Inn is poorly maintained?**
A. No.
**Q. Okay. So in subsection 6, you see where it says protect property values, the local economy and quality of life by preserving and enhancing the appearance of the streetscape?**
A. Yes.
**Q. Is the city aware of any facts that the sign code has enhanced property values?**
A. I think it protects property values. And an example of that would be one I've already kind of presented where if you had a residential neighborhood and there was a empty lot between two

houses and somebody came in and put a giant billboard might impact the property values or the desire for people to want to live in that neighborhood.

In the downtown district where we have specific design guidelines for signs, there is a higher standard of development. And there has been in the last ten years transformative investment that's taken place in the millions if not hundreds of millions, kind of transformative investment. And part of those improvements, certainly anything that's on the exterior, front facade or signage gets reviewed by the DRB to make sure that the design fits within the design guidelines of the DRB and is of a certain character and quality that ensures that the property values in the downtown are kept up and that the economy in the downtown is strong because it becomes a desirable area with a perceived quality of life that people enjoy and it has an attractive streetscape appearance because of that.

**Q. Has the city done any sort of studies of property values within the city and how the sign code has impacted those property values?**

MS. JOKERST: Object to scope.

A. Yes.
**Q. All right. So is the -- does this Interrogatory read please identify every government interest served by regulating plaintiff's mural?**
A. Yes.
**Q. And do you see that last sentence there saying the government interests are served by regulating signs like The Cozy sign include aesthetics, pedestrian and traffic safety and property values?**
A. Yes.
**Q. Are there any other interests apart from those list right there that are served by regulating painted wall signs?**
A. I think that's a pretty good summary in that quality of life is kind of encompassed by those ideas. Like it's in there. If you have these things, you're improving quality of life.
**Q. Okay. So is quality of life then, I guess, an overarching interest in the city's view?**
A. Yes.
**Q. Okay.**
A. I mean if you look at these, I think public health, safety and welfare come to mind as

A. So we regulate signs in the aggregate across the entire community. And if we didn't, there would be a potential that you could have a lot more signs producing sign clutter which could enhance the aesthetic of the community. You can have signs that are very large and possibly distracting which could impact the aesthetics of the community.

**Q. Sorry. Let me stop you. I'm not asking about the sign code as a whole right now --**

A. Sure.

**Q. -- and how that may or may not enhances aesthetics. What I'm getting at is this. Interrogatory 4 here --**

A. Yes.

**Q. -- specifically claims that the interests served by regulating the specific types of signs like The Cozy sign include aesthetics. And so I'm asking what facts support that contention that regulating signs like The Cozy sign enhances aesthetics?**

A. Well, it says the sign code regulates all signs, and so that's what I was answering to. I guess I'm still not -- I'm sorry.

**Q. Right now, I'm focusing here on the last**

**district, is there any reason to believe that that change would be factually incorrect?**

MS. JOKERST: Object to form and scope.

A. That's very similar to earlier when you asked me if I think what is -- well, I don't remember the exact question. But I think it's -- yeah, that's something I couldn't answer.

BY MR. SHAW:

**Q. Okay. What facts does the government contend show that regulating signs like The Cozy sign enhances pedestrian safety?**

A. So if you have -- the idea is that the sign regulations are designed to, again, for each district limit the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter. We don't want a lot of sign clutter because that can become distracting. It could impair the visual sight lines for motor vehicles as well as pedestrians. Sign sizes, we want to limit them so they don't become a distraction. We don't want signs that hold the eye longer than they should. We want to make sure that signs are effective. Again, that comes down to clutter where if you have too many signs, it becomes --

**Q. I don't want to interrupt you, but is the city aware of any factual data showing its regulating the specific type of signs that The Cozy Inn has enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. You're asking if The Cozy Inn enhances traffic safety? Is that what you said?

BY MR. SHAW:

**Q. No. I'm asking is the city aware of any like factual data showing that regulating this type of sign enhances pedestrian safety?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Is the city aware of any -- let me rephrase. What facts does the city contend support the allegation that regulating signs like The Cozy sign enhances traffic safety?**

A. So our regulations, again, are designed to limit the number of signs, the location of signs, the size of signs so that businesses have opportunities or property owners, if they are not even businesses, have opportunities to have signs that give them opportunities to display and post those while at the same time limiting the number

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --

**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**

MS. JOKERST: Object to scope.

A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.

BY MR. SHAW:

**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

**fact, enhanced traffic safety?**
MS. JOKERST: Object to scope.
A. Yeah, I don't -- I don't know.
BY MR. SHAW:
**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**
MS. JOKERST: Object to scope.
A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.
BY MR. SHAW:
**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**
MS. JOKERST: Object to scope.
A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

after picture, like this is what the property values used to be. Here's what they are. I can tell you in the downtown area where we have had a lot of redevelopment that property values have gone up. We can certainly -- we could do a study as to what property values were five, ten years ago and what they are now. That exercise has not been completed but we could do that.

BY MR. SHAW:

**Q. Okay.**

A. And I'm sure it would show property values have gone up.

**Q. But the sign code in the business -- or in the downtown area, that was in effect before this increase in property value, correct?**

MS. JOKERST: Object to scope.

A. So the sign code in the downtown business -- or downtown Business Improvement District, you're asking if they predate the downtown or --

BY MR. SHAW:

**Q. You mentioned how in the past I think you said ten years or so the downtown has seen a lot of development, correct?**

A. Yes. Absolutely, yes.

**Q. And so what I'm asking is the sign code,**

**though, long predates that boom in development. Is that correct?**

MS. JOKERST: Object to scope.

A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.

BY MR. SHAW:

**Q. Okay. Section 42-500, when was that enacted?**

MS. JOKERST: Object to scope.

A. 2017.

BY MR. SHAW:

**Q. Was there a different purpose section in effect before 2017?**

MS. JOKERST: Object to scope.

A. I don't know. I didn't research that.

BY MR. SHAW:

**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the city aware of any facts that would**

**Q. When was that determination made?**
A. On the 6th of November.
**Q. And who made that determination?**
A. It was -- I assign it to a collective decision. We pulled up a photograph of it and --
**Q. Can I stop you real quick. When you say we pulled up, who is we?**
A. Sure. It would have been the planning staff that was in that meeting at the time which would have been Miss Driscoll, it would have been myself, it would have been Mr. Andrew and Mr. Michelson.
**Q. Okay. So go on. That group of people you just mentioned and you were at a meeting. You pulled up a picture of the kind of the mural. Then what happened?**
A. And we viewed it and it had met the definition of a sign. And we were all like we need to get ahold of Mr. Howard right away, make sure he's aware of this in case he wasn't aware of this, like we didn't want him to get the whole sign up and then that be a problem, so we wanted him to be aware of it as soon as possible since he was in the process of having the sign painted. So we contacted him right away just so that he

**mural at the Cozy Inn announces something?**

A. Yes.

**Q. What did the city determine that it announced?**

A. It proclaims or declares to not fear the smell.

**Q. Okay. Was any other part of the mural determined to be an announcement?**

A. I mean The Fun is inside is making a proclamation of a sort, so that would be an announcement. It's announcing that there's burgers here because there's burgers on -- on the pictorials, representations of the sign.

**Q. Were any other elements of the mural considered an announcement by the city?**

A. I think those are the main ones that jump out at you anyway.

**Q. All right. Did the city determine that The Cozy mural directs attention to something?**

A. Yes. There's an arrow that points towards the pickup window and the entry door into the restaurant.

**Q. Okay. Did the city determine any element of the mural other than the arrow directed attention?**

A. Well, The Fun is inside directs you to inside, invites you inside and to go inside.

**Q. Okay. And did any other elements of the mural direct attention to something?**

A. Those would be the main ones I could think of.

**Q. Okay. And did the city determine that The Cozy mural advertises something?**

A. Yeah. So one of the products that they sell is burgers, and it has pictorial representations of burgers on the outside of the building.

**Q. Okay. Is any other element of the mural an advertisement in the city's estimation?**

MS. JOKERST: I'll object to form.

A. I mean the whole thing kind of works together as a cohesive composition for the sign -- for the sign as an advertisement, because there's a lot of burgers and there's a lot of ketchup and mustard.

BY MR. SHAW:

**Q. Okay. So then is it the city's position the entire mural is an advertisement?**

A. The city's position is the entire painting is a sign that has advertisement in it.

**Q. Fun?**
A. Yeah.
**Q. Okay. And at any point, has the city reevaluated it's determination that the mural is a sign based on Mr. Howard's input?**
A. No.
**Q. Okay. So that determination that had been made even before speaking to Mr. Howard that it was a sign, that has never been reconsidered by the city. Is that correct?**
A. Correct.
**Q. Okay. Was Mr. Schrage involved in that determination?**
A. The determination, no.
**Q. Okay. When the city first contacted Mr. Howard, had a determination already been made that the mural was too large for the C-4 zoning district?**
MS. JOKERST: Object to form.
A. Yes. We had already -- when I talked -- when I spoke with him, I had already did an estimate, if you will, of the size of the sign, an approximation.
BY MR. SHAW:
**Q. Okay. How did that -- how do you**

**calculate that approximation?**

A. The building has kind of -- well, what I would call -- what we would call a broken facade where it's got a flat roof and a facia that has different elevations to it because there's a parapet in the middle. What I did is I measured the height of the wall using Pictometry software which can get pretty close, at least for an estimation, it's good for that, where I can get the height of the wall of the lower parapet and the taller parapet. I think the lower parapet was like 11 feet and the top of the taller parapet was 13. So I took an average of like 12 feet, multiplied it by the length of the wall. And that gave me an estimate of how large that wall sign was.

**Q. Okay. Did you save that Pictometry analysis or file?**

A. No.

**Q. I don't know exactly how Pictometry works.**

A. No, I don't know if you can save but I didn't save.

**Q. All right. So there's no document showing that measurement?**

A. No.

**Q. Okay. At any point since then, has the city reevaluated whether the sign at The Cozy Inn or the painting at The Cozy Inn that we're fighting over here about whether or is or isn't a sign --**

A. Sure.

**Q. -- at any point has the city reevaluated whether or not that painting was too large for the C-4 zoning district?**

A. Well, we ran some -- a mental exercise to see if a text amendment could be approved to -- let me back up. The C-4 district allows for 3 square feet of sign area per lineal foot of building frontage. And The Cozy Inn is 20.8, nominally 21 feet of building frontage. So that comes out to nominally 63 total square foot of sign area that's allowed. We ran a scenario where if we were to propose a text amendment to allow a side wall to also be incorporated and function as a frontage of a building, even though it's not facing a street, would that provide sufficient square footage to allow the proposed Cozy Inn sign, and it was insufficient. That idea, that proposed text amendment would be insufficient for

**in this e-mail, you got those from the Pictometry software. Is that also correct?**

A. The height, the 12 feet is an estimate based on an average of the building. And the 20.8 is from the legal description. So, basically, the deed that shows the lot depth since the building is -- the building takes up the entire lot.

**Q. And that 44.4 feet measurement, how was that one taken?**

A. Yeah, I apologize. I said lot depth. The 20.8 is lot width and the 44.4 is the lot depth. And that's from the deed as well, from the legal description.

**Q. The 20.8 and the 44.4, those are both from the deed description?**

A. Um-hum. From the legal description of the property.

**Q. And 12 feet, you said that's from Pictometry?**

A. Yeah. It's an average estimate because it's got a broken facade or that has multiple heights to it.

**Q. Okay. Was any other measurement ever taken of The Cozy Inn?**

A. I think later on when we did a more

thorough analysis, I think rather than taking average height, I measured the height and width using Pictometry of like three -- there's three different sections. I have three different heights of the building. So I measured more accurately the area of the wall. So I think in my later analysis, it's a similar approximation but it's more accurate.

**Q. All right. Discussing your analysis, I believe what you're talking about will be Exhibit 7, so a few pages down.**

A. I have Exhibit 7.

**Q. Is this the analysis you were just referring to?**

A. Yes.

MR. SHAW: Okay. We'll go ahead and admit Exhibit 7.

BY MR. SHAW:

**Q. So I'm trying to find here is there -- you said somewhere in here you did a different calculation than the one that was in the previous exhibit?**

A. Yeah. So the previous exhibit, the e-mail that we were just discussing which was -- I forgot the exhibit number already, 3 maybe.

**Q. Yes, 3.**

A. Had 540 square feet. This analysis says 528. I wanted to make clear that I measured it differently and that I believe this is more accurate --

**Q. Okay.**

A. -- than the other one. The previous one was more estimated. This one, I was measuring the height of the portion, the east portion that's lower. And there's a central portion that's taller, measured that separate. And then there's a west portion that's lower again, I measured that and then added them together.

**Q. All right. Did this analysis subtract any wall area for the existing signs on that facade of The Cozy Inn?**

A. It did not subtract the area of the existing signs on that side.

**Q. Okay. Did it subtract any area for the service window or door on that facade of The Cozy Inn?**

A. It did not.

**Q. Did it subtract for any of the other architectural features on that facade of The Cozy Inn?**

reviewed if those writings and pictorial representations announced anything, directed your attention towards anything or advertised anything.

BY MR. SHAW:

**Q. And could the city have determined that this painting was a sign without reviewing the content of the painting?**

MS. JOKERST: Object to form and scope.

A. The code that the City of Salina has is indifferent to speech in terms of non-commercial or commercial signage. So I don't know that it's a matter of what the content is but rather does it announce, does it direct attention to or does it advertise, any of those three. In this case, we have all three.

BY MR. SHAW:

**Q. If the content of the mural at the Cozy was just a painting of a pepperoni pizza and that is it, would that be considered a sign by the City of Salina?**

MS. JOKERST: Object to form and scope.

A. I'd have to see the sign. I'd have to see the proposal.

BY MR. SHAW:

**Q. Okay. So for the city to determine if a**

**would enable a code amendment to incorporate that vision? Is that what you're saying?**

A. Potentially. Yes. I mean that was going to be a public conversation. It wasn't going to be a decision by staff, but it was going to be a public conversation that we would have with a consultant that we had engaged in to go through this exercise to see if this is something that the city and the community wanted for the community in the downtown area or just anywhere in the community.

**Q. You just mentioned a consultant. Is that Wendy Moeller that you're referring to?**

A. Yes, that is correct.

**Q. Had she been retained on the date that that meeting at the Smoky Hill Museum took place?**

MS. JOKERST: Object to form and scope.

A. I do not believe so.

BY MR. SHAW:

**Q. Okay.**

A. She was hired at a later date with the understanding that Mr. Howard wanted to work through a public process of potentially looking at a sign code amendment that could allow his sign.

**Q. When was this application placed on hold?**

A. Well, when it came in, it was essentially put on hold because we couldn't approve it.

**Q. Okay. So the city placed it on hold immediately?**

A. Yes, because we could not approve it and we were looking at other solutions, potential solutions. City staff did not have the authority under the current sign code to permit the sign. And in order to permit the sign, it would require an amendment to the sign code.

**Q. So if you could turn to Exhibit -- give me one moment, Exhibit 9. Is Exhibit 9 a Certificate of Compatibility Application filed by The Cozy Inn?**

A. Yes.

**Q. And is it for a Certificate of Compatibility for the mural at the Cozy Inn?**

A. Yes.

MR. SHAW: We'll admit Exhibit 9.

BY MR. SHAW:

**Q. Was this submitted by Mr. Howard at the same time as the Sign Permit Application?**

A. It appears so. It has the same November 13th, 2023 date on it.

**Q. Okay. Was a -- I'm going to say DRB, but**

A. Yes.

**Q. Was The Cozy Inn ever provided with a written statement of the reasons of denial?**

MS. JOKERST: Object to form and scope.

A. The Cozy Inn was informed before the application was even applied for and the sign permit was applied for that the sign was -- did not conform to the C-4 regulations and is not something the staff had the authority to permit.

BY MR. SHAW:

**Q. Was that a written statement?**

A. It was not a written statement. It was a verbal statement in a meeting that I had with Mr. Howard on November 6th and then also at a later meeting that took place at the Smoky Hill Museum.

**Q. Was The Cozy Inn provided with any recommendations about potential changes to the project that might allow it to be approved?**

A. I did mention to Mr. Howard that he could reduce the signage -- the size of the signage to an area that would fit within the 63 total square feet that he had, that he could either reduce the proposed sign down to the remaining nominally 10 square feet that he has or he could remove some existing signs as well but reduce his total

signage down to the 63 square feet that he's allowed.

**Q. Was that -- you said that to him orally?**

A. Correct.

**Q. Okay. Was there any written --**

A. No.

**Q. -- statement of that to Mr. Howard?**

A. No. We did not record that. That was in our initial meeting.

**Q. All right. All right. Can we go back to Exhibit 11 which was Mr. Michelson's letter.**

A. I have Exhibit 11.

**Q. And so did this letter inform Mr. Howard that both his Sign Permit Application and Certificate of Compatibility Application had been placed on hold?**

A. Yes.

**Q. And when was this letter sent?**

A. February 8th, 2024.

**Q. Was any other written correspondence sent to Mr. Howard informing him that his applications were on hold?**

A. No. We thought we were of a common understanding from our verbal conversations that we were going through a comprehensive review of

the sign regulations to see if there was any appropriate text amendments that could be made to accommodate The Cozy Inn sign and that we were waiting for that process to come to its full completion before acting on his sign permit or his Certificate of Compatibility Application.

**Q. I can't remember if asked this already. So if I did, I apologize. Who made the determination to place these applications on hold?**

A. It was -- honestly, it was kind of just an assumption. Like nobody actually said we need to review this, because everyone knew that we couldn't approve it, and we'd already been in conversations about what can we do to accommodate and help Mr. Howard. And so we were of the mind of going down that track of how can we -- how can we possibly help Mr. Howard with his proposal.

**Q. Had the city before this date ever placed an application on hold?**

MS. JOKERST: Object to form and scope.

A. I think due to the nature of the situation where the sign was painted without a sign permit or before going to the DRB that we're in a unique situation where we are very reactionary to the situation, trying to help and

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 12 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*