**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 13 of 16, Pages 1-283**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 1 of 44


Exhibit A

SALINA CITY COMMISSION MEETING

held on
November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

**EXHIBIT 16**

APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 5 of 44


playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 6 of 44


that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 7 of 44


of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 9 of 44


ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 11 of 44


that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 12 of 44


get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 13 of 44


wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 16 of 44


zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 18 of 44


setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 19 of 44


minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 21 of 44


about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 22 of 44


doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 25 of 44


does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 30 of 44


the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 31 of 44


Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 32 of 44


estimation and it being a mural.
And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.
VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.
MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.
VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.
COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.
COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 34 of 44


right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 35 of 44


beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 36 of 44


know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 39 of 44


that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 41 of 44


place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 42 of 44


it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

Case 6:24-cv-01027-TC Document 109-17 Filed 02/28/25 Page 43 of 44


MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter

Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

# The Cozy Inn Sign Analysis

## Sign Definitions

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

## C-4 Sign Regulations

**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

**EXHIBIT 17**



*Document Prepared by the Community and Development Services Department on 11/09/2023*

EXHIBIT G Benson Deposition

CITY000001

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**<u>The Cozy Inn Information and Background</u>**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food “Hamburger Joint” in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.
The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building’s exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with

landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**<u>Existing Conditions</u>**
Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

1. North facing wall sign: 24.00 sq. ft.
2. 7th Street projection sign: 24.00 sq. ft.
3. 7th Street awning sign: 4.88 sq. ft.

   Total Sign Area: 52.88 sq. ft.

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**<u>Proposed Hamburger Sign Analysis</u>**
The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.

## Chapter 1 - GENERAL PROVISIONS

* * *

### Sec. 1-2. Definitions and rules of construction.

In the construction of this Code and of all ordinances, the following definitions and rules of construction shall be observed, unless they are inconsistent with the manifest intent of the board of commissioners or the context clearly requires otherwise:

* * *

(14) Or, and. The word "or" may be read as "and" and the word "and" as "or," where the sense requires it.

* * *

(Code 1966, § 1-2)

State law reference(s)—Rules of statutory construction, K.S.A. 77-201.

### Sec. 1-11. Severability.

If for any reason any chapter, article, section, subsection, sentence, clause or phrase of this Code or the application thereof to any person or circumstances, is declared to be unconstitutional or invalid or unenforceable, such decision shall not affect the validity of the remaining portions of this Code.

(Code 1966, § 1-9)

## Chapter 42 - ZONING REGULATIONS

* * *

## ARTICLE X. SIGNS

## DIVISION 1. GENERALLY

### Sec. 42-500. Purpose.

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882, § 1, 7-10-17)

### Sec. 42-501. Permits.

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

### Sec. 42-502. Zoning certificate (sign permit) required.

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

### Sec. 42-503. Sign standards.

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

* * *

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020, § 2, 12-2-19)

### Sec. 42-504. - Exemptions generally.

The following signs shall be exempt from the requirements of this article:

* * *

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

* * *

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020, § 2, 12-2-19)

### Sec. 42-505. Exemption from zoning certificate requirement.

The following signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the other requirements of this article and of the applicable district regulations;

(1) Illuminated nameplate signs not exceeding two (2) square feet in gross surface area accessory to a single-family or two-family dwelling;

(2) Illuminated identification signs not exceeding forty (40) square feet in gross surface area accessory to a multiple-family dwelling;

(3) Illuminated bulletin board signs not exceeding forty (40) square feet in gross surface area accessory to a church, school or public or nonprofit institution; subject to the provisions of section 42-503(d);

(4) Illuminated business signs when located on property used for agricultural purposes and pertaining to the sale of agricultural products produced on the premises.

(Code 1966, § 36-904)

* * *

### Sec. 42-507. Same—Structural types.

The following signs are classified as types:

* * *

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

* * *

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882, § 3, 7-10-17)

* * *

### Sec. 42-510. Abandoned signs.

Any sign which no longer advertises a bona fide business conducted, product sold or service provided shall be deemed to be abandoned and shall be removed at the expense of the owner. Sign panels shall be removed within ninety (90) days of the vacation of the premises or discontinuance of the advertised activity. Sign frames and poles shall be removed within one (1) year of vacation of the premises or discontinuance of the advertised activity unless new sign panels are installed advertising a bona fide activity. Provided however, an appeal for an extension of up to one (1) year for removal of sign frames and poles may be granted by the design review board or board of zoning appeals when found to be justified. The installation of new sign panels on the same sign frame and pole shall not require the issuance of a new sign permit. If however, a new permit shall be required then the sign shall comply with the provisions of this article.

(Ord. No. 90-9381, § 7, 5-14-90; Ord. No. 98-9897, § 1, 11-2-98)

### Sec. 42-511. Sign substitution.

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882, § 5, 7-10-17)

* * *

## *DIVISION 2. DISTRICT REGULATIONS*

* * *

### Sec. 42-521. C-3 and C-4 commercial districts.

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

* * *

(4) *Maximum gross surface area:*

* * *

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

* * *

## ARTICLE XII. - NONCONFORMING USES, BULK AND SIGNS

### Sec. 42-576. Applicability.

This article applies only to lots, buildings, structures, signs and nonbuilding uses in existence on February 14, 1977. The lawful use of any premises existing on February 14, 1977 may be continued as hereinafter provided although neither such use nor bulk conforms to this chapter.

(Code 1966, § 36-1100)

* * *

### Sec. 42-581. Nonconforming signs.

(a) *When deemed nonconforming; exception.* All existing signs which are not specifically permitted or which do not comply with all of the provisions of this chapter for the zoning district in which they are located as of April 17, 1990, shall be considered nonconforming signs. Provided, however, theatre marque signs in existence on April 17, 1990, and located in the C-4 district shall be deemed lawfully conforming signs, except for requirements pertaining to safety, structural integrity, and maintenance and shall not be subject to the abandonment requirements set forth in section 42-510.

(b) *Repairs and damage.* Nonconforming signs may not, after February 14, 1977, be enlarged, structurally altered or extended unless such sign shall be made to comply with all of the provisions of this chapter, except that normal repairs and repainting of nonconforming signs are permitted. When a permanent nonconforming sign is destroyed or damaged by any means to the extent of fifty (50) percent or more of its present day replacement value, it shall not thereafter be restored unless such sign shall be made to conform to all of the provisions of this chapter.

(c) *Removal of nonconforming signs.* Any sign that does not conform to the sign regulations for the zoning district in which it is located shall be removed in accordance with the following schedule:

(1) A sign having a total area of twenty-four (24) square feet or less which is located in any residential district shall be removed within two (2) years from the date such sign became nonconforming with respect to this chapter.

(2) All other signs located in any residential district shall be removed within four (4) years from the date such sign became nonconforming with respect to this chapter.

* * *

(Code 1966, § 36-1105; Ord. No. 90-9381, §§ 6, 9, 5-14-90)

* * *

## ARTICLE XIII. - ADMINISTRATIVE PROVISIONS

* * *

### Sec. 42-597. Board of zoning appeals.

(a) *Authorization*. The board of zoning appeals for the city is hereby established in accordance with K.S.A. 12-714.

(b) *Membership*. The board shall consist of seven (7) members who shall be appointed by the mayor with the approval of the board of city commissioners. All members shall be residents of the city. None of the members appointed shall hold any other elected or appointed office or position in the city government, except that one member shall be a member of the planning commission.

(c) *Power and duties*. The board shall have the power to:

(1) Hear and decide appeals where it is alleged there is an error in any order, requirement, decision or determination made by the zoning administrator in the enforcement of the zoning regulations. The board may reverse or may modify the order, requirement, decision or determination and to that end shall have all the powers of the administrative official from whom the appeal is taken.

(2) Authorize in specific cases a variance from the specific terms of these zoning regulations which shall not be contrary to the public interest where, due to special conditions, a literal enforcement of the provisions of the regulations will result in unnecessary hardship for the applicant. The board shall be limited to granting variances on matters including, but not limited to, building height, setbacks, lot size and lot coverage, as provided by the zoning regulations. A request for a variance may be granted after a public hearing upon a finding by the board that all of the following conditions have been met:

a. The variance requested arises from such condition which is unique to the property in question and which is not ordinarily found in the same zone or district, and is not created by an action or actions of the property owner or applicant.

b. The granting of the permit for variance will not adversely affect the rights of adjacent property owners or residents.

c. The strict application of the provisions of the zoning regulations from which the variance is requested will constitute an unnecessary hardship upon the property owner represented in the application.

d. The variance requested will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

e. Granting the variance desired will not be opposed to the general spirit and intent of the zoning regulations.

(3) In permitting a variance, the board may impose appropriate conditions and safeguards including, but not limited to, planting screens, fencing, construction commencement and completion dates, lighting, road access restrictions, parking requirements or any other requirement which the board deems appropriate under the circumstances, upon a finding that they are necessary to fulfill the purpose and intent of the zoning regulations.

(4) The board is not authorized to issue the following types of variances:

a. A variance which would allow a use not otherwise permitted in the zoning district.

b. A variance to a zoning ordinance definition.

c. A variance to expand or enlarge a nonconforming use.

d. A variance that would increase residential density above the maximum allowed in a zoning district.

e. A variance that would create a zero lot line setback.

f. A variance to the owner of a substandard lot where such lot was created in violation of the zoning regulations.

g. A variance that would increase the number of permitted signs on a zoning lot.

(d) *Commencement of proceeding before the board*.

(1) *Appeals*.

a. By whom: appeals to the board may be taken by any person aggrieved, or by any officer, department, or board of the city, or any governmental agency or body affected by any decision or interpretation of the zoning administrator. Such appeal shall be filed with the secretary of the board within thirty (30) days from the date of the decision by the zoning administrator, and such appeal shall specify, in writing, the grounds for appeal of the administrator's decision. The zoning administrator, when notified by the board of zoning appeals, shall transmit to the board all the papers constituting the record upon which the action appealed from was taken, within the time period established by the rules of the board.

b. Effect of appeal: an appeal stays all proceedings in furtherance of the action appealed from, including a permittee's right to proceed with development or other activities under a building permit, the issuance of which is a subject of the appeal.

(2) *Variances*. Any person may apply to the board for a variance by filing an application with the secretary of the board. The application shall include the following:

a. The name, address, telephone number and signature of the property owner and applicant.

b. The name and address of the architect, professional engineer or contractor, if any.

c. A site plan of the property showing the following:

1. Property lines of the subject property.

2. Size and location of existing structures and the distance between all existing and proposed structures on the property.

3. Setbacks for all existing and proposed structures on the property.

4. Any other dimension and/or information that may be relevant to the request.

d. A survey or verification that property and structure dimensions on the site plan are correct.

e. The names and addresses of the record owners of all property adjoining the property in question.

f. A narrative statement of how the statutory requirements in K.S.A. 12-715 are met.

(3) *Representation*. An applicant must appear in person at the public hearing, or be represented by an agent or attorney, in order for the board to act on the application.

(e) *Written decisions*. The board shall render its decision and findings in writing within thirty (30) days of the conclusion of the hearing. Decisions shall be filed in a public office designated by the board of commissioners and shall be a public record.

(f) *Dissatisfaction with the determination of the board*. Any person, official or governmental body dissatisfied with any order or determination of the board of zoning appeals may bring an action in district court to determine the reasonableness of any such order or determination.

(Code 1966, § 36-1201; Ord. No. 88-9244, § 1, 4-11-88)

* * *

## ARTICLE XIV. - DEFINITIONS

* * *

### Sec. 42-637. Building.

*Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.

(Code 1966, § 36-1301(21))

* * *

### Sec. 42-764. Sign.

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

* * *

### Sec. 42-781. Sign, wall.

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

* * *

### Sec. 42-783. Structure.

*Structure* is anything constructed or erected with a fixed location on the ground, or attached to something having a fixed location on the ground. Among other things, structures include buildings, walls, sheds, towers, and

bins. For purposes of this chapter, residential air conditioning condensation units and similar cooling system apparatus, or so-called "window" or "room" conditioners shall not be considered as structures.

(Code 1966, § 36-1301(164); Ord. No. 86-9119, § 5, 2-3-86; Ord. No. 87-9184, § 4, 5-11-87; Ord. No. 18-10939, § 2, 6-11-18

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION</u>**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses Plaintiff's Requests for Admission:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.



**EXHIBIT 19**

13. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 announces, directs attention to, or advertises.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT. The display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

14. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 exceeds the size limits for signs in the mural-sign code regime.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT. The display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

15. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 was completed without a sign permit.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT, the display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

16. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 was completed without a certificate of compatibility.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**about either; and (B) the genuineness of any described documents. This request does not comply with Rule 36. Admissibility is an issue to be addressed by the Court at trial. Further, evaluating admissibility requires more context as documents are admissible or not admissible for a host of reasons.**

204. Admit that the document depicted in Bates number 211-216 of the Plaintiffs' Supplemental Disclosures is an authentic copy of the Meeting Minutes for the meeting of the Salina Design Review Board meeting on January 14, 2021.

**RESPONSE: ADMIT.**

205. Admit that the document depicted in Bates number 211-216 of the Plaintiffs' Supplemental Disclosures is an admissible copy of the Meeting Minutes for the meeting of the Salina Design Review Board meeting on January 14, 2021.

**OBJECTION: The City objects to this request as improper. F.R.C.P. 36 provides that a party may serve on any other party a written request to admit the truth of any matters within the scope of Rule 26(b)(1) relating to (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents. This request does not comply with Rule 36. Admissibility is an issue to be addressed by the Court at trial. Further, evaluating admissibility requires more context as documents are admissible or not admissible for a host of reasons.**

Respectfully submitted this 12th day of July, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT 20**

**government entity in a First Amendment free speech case?**

A. Not that I can recall.

**Q. Of those five to ten cases, have you ever represented a governmental entity in a First Amendment free speech case?**

A. Not that I can recall.

**Q. Can you recall, other than this federal case down in Oklahoma, the last case you litigated as an attorney?**

A. Probably it was a case in North Carolina involving an adequate public facilities ordinance.

**Q. I didn't hear you.**

A. It was a case in North Carolina.

**Q. I didn't hear the -- what it was about.**

A. It involved an adequate public facilities ordinance.

**Q. Was that a constitutional challenge?**

A. No.

**Q. Is there a specific type of case of those five to ten cases that you have litigated?**

A. I wouldn't say there's any particular pattern other than they all involve land use and urban planning issues.

**Q. Were any of those five to ten cases**

**Q. What about legal cases? Did you cite legal cases that have the tendency to -- that could have the tendency to undermine your opinions?**

MS. JOKERST: Object to form.

A. Not that I'm aware of, but there could be statements in those cases that somebody could use as an argument against things that are in the report, I suppose.

BY MR. MACROBERTS:

**Q. Did you include any disputed facts or any facts that could undermine your opinion?**

MS. JOKERST: Object --

BY MR. MACROBERTS:

**Q. -- in your report?**

MS. JOKERST: Object to form.

A. Not that I recall.

MR. MACROBERTS: Can we take a five-minute break?

THE WITNESS: Yes. I was going to ask the same thing.

MR. MACROBERTS: Yeah.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, do you know whether the**

**City of Salina commissioned or conducted any studies before drafting any version of their sign code?**

MS. JOKERST: Object to form.

A. I am not aware of any.

BY MR. MACROBERTS:

**Q. Do you have any knowledge about why the sign code had been amended at any point?**

MS. JOKERST: Object to form.

A. No.

BY MR. MACROBERTS:

**Q. Are you aware of any peer reviewed studies that have analyzed the efficacy of Salina's sign code in promoting the goals, objectives and policies of the comprehensive plan?**

MS. JOKERST: Object to form.

A. I'm not aware of any peer reviewed studies specifically to -- specific to Salina's own sign code.

BY MR. MACROBERTS:

**Q. So then I was going go through each one. I appreciate you saying that. How about any studies at all. My previous question was peer reviewed studies. Are you aware of any studies that have analyzed the efficacy of Salina's sign**

**Deposition Exhibit 3, the article. What do you call that, an article, a publication? I just want to make sure we're on the same page. What is Exhibit 3?**

A. You can call it a publication.

**Q. That's a good word. All right. Let's go to the publication you authored, the title being Content Neutral Sign Codes After Reed and Austin. Do you have it in front of you?**

A. Yes.

**Q. You -- who was the intended audience for this publication?**

THE REPORTER: What was your objection, Amanda?

MS. JOKERST: To form.

THE REPORTER: Thank you.

A. Urban planners.

BY MR. MACROBERTS:

**Q. Do you stand by the analysis in the publication at Exhibit 3?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. In the area of content neutrality, it's important to know about the cases of Reed and**

gets into the distinctions between those two and their impacts.

BY MR. MACROBERTS:

**Q. Are you aware of any studies that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

A. Not off the top of my head, no.

BY MR. MACROBERTS:

**Q. Are there any cases that establish private art is more dangerous than public art?**

MS. JOKERST: Object to form.

BY MR. MACROBERTS:

**Q. That you're aware of?**

A. Not that I'm aware of.

MR. MACROBERTS: It's 12:10, do you want to take a break.

THE WITNESS: Certainly.

MR. MACROBERTS: All right.

(THEREUPON, a recess was taken.)

BY MR. MACROBERTS:

**Q. All right. Mark, are you -- are you aware of any evidence that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a**

**wall?**

MS. JOKERST: Object to form.

A. I'm not aware of anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any study or case law that establishes that commercial content painted on a wall is more dangerous than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Okay. Are you aware of any evidence that would establish that a burger-esque UFO mural is more dangerous than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Again, I can't think of anything that specific.

BY MR. MACROBERTS:

**Q. Same with studies and case law. There are no studies in cases that would say that?**

A. I --

MS. JOKERST: Object to form.

A. Oh, go ahead.

MS. JOKERST: Just object to form.

BY MR. MACROBERTS:

**Q. I want to go back to Deposition Exhibit 5, the photograph of the Mural at the Mill. Do you agree that the Mural at the Mill is not dangerous?**

MS. JOKERST: Object to form.

A. I don't have any data about the Mural in the Mill and its impacts on traffic safety.

BY MR. MACROBERTS:

**Q. Do you have any reason to believe that the Mural at the Mill display is dangerous?**

A. No.

**Q. Would the exact same mural become dangerous if a daycare business had it painted on their wall?**

MS. JOKERST: Object to form.

A. Not that I know of.

BY MR. MACROBERTS:

**Q. What about if a daycare business started operating inside the mill? Would the mural become dangerous once a daycare started operating inside?**

MS. JOKERST: Object to form.

A. I would have to know more about the business itself to assess its own land use impacts.

were at issue in those cases.

**Q. Are you aware of any complaints made about the display at The Cozy other than from city workers?**

A. No, I'm not aware of any -- any complaints that were filed.

**Q. Are you aware of any academic research that either does or does not support the notion that the public likes painted signs less than other types of painted displays?**

MS. JOKERST: Object to form.

A. I'm not aware of any studies that distinguish painting on a wall versus painting somewhere else.

BY MR. MACROBERTS:

**Q. What about the different types of paintings on a wall? Are you aware of any research that says one type of painting on a wall is more aesthetically pleasing than another type of painting on a wall?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence that would establish that a burger-esque UFO is less**

**aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. Not that I can recall.

BY MR. MACROBERTS:

**Q. Are you aware of any study that would establish that a burger-esque UFO mural is less aesthetically pleasing than a pizza-esque UFO mural?**

MS. JOKERST: Object to form.

A. I can't recall anything that specific.

BY MR. MACROBERTS:

**Q. Are you aware of any evidence, study or case that establishes that commercial content painted on a wall is less aesthetically pleasing than non-commercial content painted on a wall?**

MS. JOKERST: Object to form.

A. In terms of painting on a wall specifically, not specifically, but there are tons of studies on the traffic distraction factor associated with commercial signs.

BY MR. MACROBERTS:

**Q. Well --**

A. So --

**Q. -- I appreciate that.**

A. Okay.
**Q. Do you believe that the Mural at the Mill on Exhibit 5 is aesthetically pleasing?**
MS. JOKERST: Object to form.
A. To me personally, it is.
BY MR. MACROBERTS:
**Q. Does that mural become less aesthetically pleasing if a daycare business were being operated inside the mill?**
MS. JOKERST: Object to form.
A. I don't have a basis for saying that it would.
BY MR. MACROBERTS:
**Q. On page 8 of your report, you wrote neuroscience studies have demonstrated positive amplitude from persons viewing artwork as opposed to negative responses from viewing commercial symbols. Do you see that?**
A. Yes.
**Q. Did you read the Cheng, 2023 study?**
A. Yes.
**Q. Is it your opinion that that is what the Cheng, 2023 study, in fact, said?**
A. There is a statement in the study to that effect that I believe cites another study.

**studies between commercial content painted on a wall versus non-commercial content painted on a wall in the context of travel behavior?**

MS. JOKERST: Object to form.

A. There are studies, and I reference in the report, that talk about public art and how that shifted community behavior and its benefits. And there are studies that talk about the impacts of signs that are commercial on traffic safety. So from that context, yes.

BY MR. MACROBERTS:

**Q. But my question isn't about safety. It's about travel behavior. Because in your report you seem to draw a difference between safety and about behavior.**

MS. JOKERST: If that's a question, I'll object to form again.

A. Okay. I'm not aware of any studies that get into the difference between commercial and non-commercial in terms of travel behavior, especially for individual signs.

BY MR. MACROBERTS:

**Q. In a free speech case involving signs and murals, has any federal court held that urban sprawl is a compelling government interest?**

**Q. Do you see it's like on the left-hand side vertical in green?**

A. Yes.

**Q. And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?**

A. Yes.

MR. MACROBERTS: I'm sorry. I did not hear it.

THE REPORTER: She said, "And you put some, I guess, pointers here under the heading a community who wants to regulate murals can consider the following options?"

BY MS. JOKERST:

**Q. Mr. White, are these the -- are the options presented here in your article, do they represent the only way a local government can bring their sign code within constitutional bounds?**

A. No.

**Q. Okay. I want to direct your attention to the report which is that Exhibit 2? Is that what it's marked?**

A. Yes. Yes.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF DEAN ANDREW**

I, Dean Andrew, Zoning Administrator for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2. I am the City of Salina Zoning Administrator. I have held this position since 2009.

3. The City regulates signs pursuant to Chapter 42 Article X of the Salina Code of Ordinance, along with related definitions in Chapter 42 Article XIV.

4. The documents attached hereto as Affidavit Exhibit 1 are in my file as the Zoning Administrator and were considered by me in anticipation of the City of Salina's 2017 amendment to the sign code, set forth in Ordinance Number 17-10882.

5. Ordinance Number 17-10882 is attached hereto as Affidavit Exhibit 2.

6. Affidavit Exhibit 1 documents include:

**EXHIBIT 21**

i. The Cardozo Law Review article entitled "Art or Signage?: The Regulation of Outdoor Murals and the First Amendment" [bates stamped CITY000673-702].

ii. Rocky Mountain Sign Law Blog article entitled "San Diego's Motion for Summary Judgment Granted in Mural Case" [bates stamped CITY001510-511].

iii. Relevant pages of the APA National Planning Conference presentation on "Regulating Digital Signs and Billboards" [bates stamped CITY001585, 1600-01, 1615-17

7. As stated in Ordinance Number 17-10882, the *Reed v. Town of Gilbert* decision prompted the Governing Body of the City of Salina to amend Article X, Chapter 42 of the Salina Code (referred to as the "Sign Code") in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City.

Signed: Dean Andrew
Dean Andrew

STATE OF Kansas )
) ss.
COUNTY OF Saline )

Subscribed and sworn to before me by Dean Andrew on the 7th day of February, 2025.

Witness my hand and official seal. My commission expires: 4/29/2028

(Seal)
SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4/29/2028

Shandi L Wicks
Notary Public

# Regulating Digital Signs and Billboards (S606)

Sponsored by *Zoning Practice*

APA National Planning Conference
Tuesday, April 28, 2009

ANDREW AFFIDAVIT EX. 1

CITY001585

# Driver Distraction #1 Cause of Crashes

| Causal Category | Percentage of Drivers Contributing to Causation |
|---|---|
| Driver Distraction | 22.7 |
| Vehicle Speed | 18.7 |
| Alcohol Impairment | 18.2 |
| Perceptual Errors | 15.1 |
| Decision Errors | 10.1 |
| Incapacitation | 6.4 |
| Other | 8.8 |

Source: National Highway Traffic Safety Administration, 2001; 2006.

## Specific Distraction: % of Drivers

| | |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.4 |
| Other device in vehicle | 2.9 |
| Adjusting vehicle/temp | 2.8 |
| Eating or drinking | 1.7 |
| Dialing/using cell phone | 1.5 |
| Smoking | 0.9 |
| Other distraction | 25.9 |
| Unknown distraction | 8.6 |

# Goals and Purpose

- The statement of purpose includes promoting traffic safety and community aesthetics. We look to the legislative body's statement of intent.

# Narrow Tailoring

- Concord's interests in traffic safety and community aesthetics would be achieved less effectively without the prohibition.

# Need for Studies

- NJI argues that Concord must perform studies to uphold the ban. Concord was under no obligation to do such studies or put them into evidence.

Rocky Mountain Sign Law Blog

Regulatory, Best Practices and Other First Amendment News from Colorado's Leading Land Use Law Firm

# San Diego's Motion for Summary Judgment Granted in Mural Case

By Brian J. Connolly on May 1, 2017

In a **case that we reported on last year**, a federal district court in California granted summary judgment in favor of the City of San Diego in a case involving art murals.

Some of the facts of the case are reported in our prior post. The San Diego sign code exempts from permitting "[p]ainted graphics that are murals, mosaics, or any type of graphic arts that are painted on a wall or fence and do not contain copy, advertising symbols, lettering, trademarks, or other references to the premises, products or services that are provided on the premises where the graphics are located or any other premises." Otherwise, all signs visible from the right of way are required to obtain a permit, and signs on city-controlled property must obtain a permit as well. Messages on city-controlled property are limited to on-premises speech and "public interest" messages. As we previously noted, the plaintiff, a mural company, was granted approval to place two wall murals in San Diego, but

received a violation for the placement of a third mural. The plaintiff believes that the annual Comic-Con event was given special treatment by the city, because certain signs posted around the city during the event were not issued citations.

On the city's motion for summary judgment, the court treated the signs in question as commercial speech and analzyed the regulations under the *Central Hudson* test, finding that the regulations easily passed constitutional muster. In the court's view, the city had established that its interests in optimizing communication and aesthetics were substantial, and that the restrictions directly advanced these interests without going further than necessary. The court did not provide any analysis to support its conclusion that the speech in question was commercial. In response to the plaintiff's arguments that the mural exception undermined the city's asserted interests, the court disagreed. And consistent with other lower courts' recent holdings, the court rejected the plaintiff's argument that *Reed v. Town of Gilbert* had invalidated the on-premises/off-premises distinction.

Furthermore, responding to the plaintiff's claims that the San Diego sign code was unconstitutionally vague, the court, while noting that "the sign ordinance at issue is far from a paragon of clarity," found that the mural exception, public interest exception, and on-premises/off-premises distinction were sufficiently clear. The court also rejected the plaintiff's prior restraint, selective enforcement, due process, and intentional interference with prospective business advantage claims.

**ArchitectureArt, LLC v. City of San Diego, ___ F. Supp. 3d __, 2017 WL 1226913 (S.D. Cal. Jan. 6, 2017).**

# ART OR SIGNAGE?: THE REGULATION OF OUTDOOR MURALS AND THE FIRST AMENDMENT

*Christina Chloe Orlando*†

TABLE OF CONTENTS

INTRODUCTION .......... 868
I. BACKGROUND .......... 871
A. *Sign Regulation* .......... 871
1. Community Aesthetics and Traffic Safety .......... 872
2. Content Neutrality .......... 872
B. Metromedia, Inc. v. City of San Diego .......... 874
C. *Post-*Metromedia *Developments in Free Speech Law* .......... 876
II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION .......... 879
A. *Sources of Inconsistency in Mural Case Law* .......... 881
1. Defining Commercial Speech .......... 881
2. Analyzing Content Neutrality .......... 882
B. *Eliminating the Commercial/Noncommercial Speech Distinction* .......... 885
1. Constitutional Flaws .......... 885
2. Classifying Mural Speech .......... 889
3. Classifying Mural Art .......... 890
4. Murals as Art .......... 892
III. A MODEL FOR REGULATING OUTDOOR MURALS .......... 893
CONCLUSION .......... 896

† Senior Articles Editor, *Cardozo Law Review*. J.D. Candidate (May 2014), Benjamin N. Cardozo School of Law; A.B., Harvard University, 2011. Many thanks to Professor Stewart Sterk for suggesting this topic and providing invaluable guidance throughout the research and writing process.

## INTRODUCTION

Sally Business Owner runs a successful flower and gift shop in a vibrant suburban town. She sells a wide variety of flowers and related items, including vases and balloons. One day, after deciding that she wants to give her shop a makeover, Sally commissions a local artist to paint a tasteful mural of colorful flowers on the exterior wall of her building. The mural covers the entire wall. Sally believes the mural to be a beautiful piece of art[1] that the community will greatly enjoy. The following week, Sally receives a notice from Wanda Zoning Administrator. According to the notice, Sally's flower mural is in violation of the town sign ordinance that prohibits any outdoor "sign" from exceeding sixty square feet. Because Sally's mural contains flowers and the mural is painted on a commercial shop that sells flowers, the mural qualifies as "advertising" and falls under the ordinance's definition of "sign."[2] Wanda notes that if the mural contained anything other than flowers, such as panda bears or palm trees, it would be deemed art rather than signage. Wanda orders Sally to remove the mural, or else face a hefty fine. Sally is perplexed, and believes that the zoning board has intruded upon her right to free speech.

---

[1] The word "art," as used in this Note, indicates concrete works of visual art, such as paintings or sculptures. It does not include other art forms, such as films or productions of the performing arts.

[2] This hypothetical is based on an earlier version of Arlington County's zoning ordinance at issue in *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012), discussed *infra*. That version of the ordinance defined a "business sign" as a sign "identifying the products or services available on the premises or advertising a use conducted thereon." *See id.* at 362 (internal quotation marks omitted) (citing ARLINGTON COUNTY, VA., ZONING ORDINANCE § 34(G)). Arlington County's current zoning ordinance exempts certain works of visual art (including murals) from regulation as signage; to be exempted, artwork cannot include a "picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the wall is located." ARLINGTON COUNTY, VA., ZONING ORDINANCE § 13.2.3(C)(2)(e) (2013). In other words, the artwork cannot contain "commercial speech." Many municipalities throughout the country have substantially similar language in their sign ordinances. *See, e.g.*, TEMECULA, CAL., MUNICIPAL CODE § 17.28.050(U) (2013) (exempting works of art from sign regulations only if they do not convey a commercial message); ST. PETERSBURG, FLA., CITY CODE § 16.40.120.19 (2013) (defining artwork as "drawings, pictures, symbols, paintings . . . or sculpture, which does not in any way identify a product, service or business sold or available on the premises"); MARION COUNTY, IND., REV. CODE § 734-501(b) (2012) (defining a mural as "[a] design or representation painted, drawn or similarly applied on the exterior surface of a structure and which does not advertise a business, product, service, or activity"); MINNEAPOLIS, MINN., ZONING CODE § 520.160 (2013) (defining a mural as "[a] work of graphic art painted on a building wall, which contains no commercial advertising or logos, and which does not serve to advertise or promote any business, product, activity, service, interest or entertainment"); LAS VEGAS, NEV., ZONING CODE § 19.14.030(B)(4) (2010) (exempting works of art "that do not include a commercial message and are not symbolic of . . . commercial activities taking place on the premises on which the graphic is located").

Sally's belief is not unfounded. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."[3] This restriction extends to state and local government through the Due Process Clause of the Fourteenth Amendment[4] and plays a fundamental role in a municipality's regulation of outdoor signage.[5] While a municipality may place general time, place, and manner restrictions[6] on outdoor signage in order to preserve community aesthetics and ensure traffic safety, it may not discriminate against signage that promotes a certain viewpoint or contains certain content.[7]

The regulation of outdoor art murals[8] as signage is a recent phenomenon.[9] To date, only four courts have expressly analyzed the constitutionality of regulating mural art pursuant to the terms of a municipal sign ordinance.[10] Although mural law is still in its infancy, the convoluted status of the limited case law has led to "a war . . . a real

---

[3] U.S. CONST. amend. I.

[4] U.S. CONST. amend. XIV, § 1; *see* Gitlow v. New York, 268 U.S. 652, 666 (1925) ("[F]reedom of speech and of the press—which are protected by the First Amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."); Lovell v. City of Griffin, Ga., 303 U.S. 444, 450 (1938) ("It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the [Fourteenth] amendment.").

[5] For a general overview of the relationship between free speech law and outdoor signage, see DANIEL R. MANDELKER, FREE SPEECH LAW FOR ON PREMISE SIGNS (2012).

[6] *See generally* 16B C.J.S. *Constitutional Law* § 828 (2012) (defining this term and providing case examples illustrating its application).

[7] *See infra* Part I.A.

[8] This Note focuses solely on murals that are independently commissioned. Cities throughout the United States have programs that allow for, and encourage, the public display of outdoor murals. *See, e.g.*, CITY PHILA. MURAL ARTS PROGRAM, http://www.muralarts.org (last visited Oct. 27, 2013); *Mural Program*, BEAVERTON ARTS COMMISSION, http://www.beavertonarts.org/index.aspx?NID=122 (last visited Oct. 27, 2013); *Public Art Murals Program*, REGIONAL ARTS & CULTURE COUNCIL, http://www.racc.org/public-art/mural-program (last visited Oct. 27, 2013); *Public Art Program*, CITY PASADENA, http://www.ci.pasadena.ca.us/arts/public_art_program (last visited Oct. 27, 2013). These public art mural programs are designed, in part, to enhance local aesthetics and foster community appreciation of the arts. Because municipalities implement and control these programs, issuing mural design guidelines to ensure adherence to local zoning requirements, zoning violations are rarely a concern.

[9] *See* MANDELKER, *supra* note 5, at 69 ("Sign ordinances regulate a wide variety of [outdoor] signs, and some of the unique and/or specialized types of signs include digital signs, portable signs, . . . murals," and sculptures). For a brief overview of a dispute involving regulation of a "unique" type of sign, see Frederick Melo, *St. Paul City Council: Creative Kidstuff Wins Zoning Appeal for Sculptural Signs*, TWINCITIES.COM (Aug. 1, 2012, 12:01 AM), http://www.twincities.com/stpaul/ci_21213086/st-paul-city-council-creative-kidstuff-wins-zoning (discussing a dispute between a toy company and the city of St. Paul, Minnesota over whether two eighteen-foot-tall cat images were "sculptural art" or "signs").

[10] *See infra* Part II. The four cases were decided in 2009, 2010, 2011, and 2012.

fight around the country."[11] Indeed, disputes between zoning administrators and mural owners over whether a particular mural is "art" or "signage" have become increasingly common.[12] These disputes are complicated, in part, because a legitimate work of art may also serve signage functions, oftentimes unintentionally.[13] In these cases, should the fact that an art mural contains "commercial speech" subject it to a lesser degree of constitutional protection?

This Note attempts to fit outdoor mural regulation into the broader scheme of constitutional law generally, and billboard and signage law specifically. In doing so, this Note argues that a municipality, in enacting a sign ordinance, may not distinguish between murals containing commercial speech and those containing noncommercial speech. The application of this distinction not only constitutes impermissible content-based regulation, but it also stands in stark contrast to the current state of free speech law. As an alternative, this Note proposes that all murals, regardless of their content, be regulated pursuant to the same set of restrictions.

Part I of this Note provides background on the purposes and mechanics of outdoor sign regulation. It then explores the landmark Supreme Court case addressing constitutional issues inherent in such regulation, *Metromedia Inc. v. City of San Diego*,[14] and surveys modern, post-*Metromedia* developments within free speech law. Part II of this Note turns to a narrow area of sign regulation: the regulation of outdoor murals. It discusses sources of inconsistency in current mural case law, and sets forth various legal and policy-based arguments for why the

---

[11] Tom Jackman, *Arlington's Wag More Dogs Mural Is No More*, WASH. POST (Sept. 25, 2012, 8:18 PM), http://www.washingtonpost.com/blogs/the-state-of-nova/post/arlingtons-wag-more-dogs-mural-is-no-more/2012/09/25/ed180e82-074c-11e2-a10c-fa5a255a9258_blog.html ("There's a war going on, . . . a real fight around the country about these sign laws . . . We don't usually require people to consult government bureaucrats before they express themselves." (second ellipsis in original) (internal quotation marks omitted)).

[12] *See, e.g.*, *id.*; Karen Boros, *Tough Mural 'Advertising' Rules? Minneapolis Council Member Gary Schiff Wants to Loosen Them*, MINNPOST (July 20, 2012), http://www.minnpost.com/two-cities/2012/07/tough-mural-%E2%80%98advertising%E2%80%99-rules-minneapolis-council-member-gary-schiff-wants-loos; Melo, *supra* note 9; *see also infra* Part II and the cases discussed therein.

[13] Context is critical in determining whether a particular display is a work of art or signage. *See* Russ VerSteeg, *Iguanas, Toads and Toothbrushes: Land-Use Regulation of Art as Signage*, 25 GA. L. REV. 437, 469 (1991) ("The physical location of art can cause it to function as signage. A sculpture of Pegasus . . . is almost certainly a work of art when exhibited in an art museum. . . . [T]he same sculpture would function as a sign when placed in close proximity to a Mobil Oil gasoline station or perhaps Mobil's corporate offices. It functions as a sign because a reasonable person looking at the sculpture would recognize the connection between the image of a winged horse with the products and services of the Mobil Oil Corporation."); *see also* Shawn G. Rice, Comment, *Zoning Law: Architectural Appearance Ordinances and the First Amendment*, 76 MARQ. L. REV. 439, 453 (1993) ("The effect of the art on the viewing public is probably more important than the intent of the Presenter." (internal quotation marks omitted)).

[14] 453 U.S. 490 (1981).

distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation. Finally, Part III of this Note proposes a model for regulating outdoor murals whereby all murals, regardless of their content, are treated in the same manner. Such a model, Part III argues, best balances government regulatory interests with individual free speech interests, while offering a realistic solution for reducing mural disputes, mending interstate judicial conflict, and preserving judicial and municipal resources.

## I. BACKGROUND

### A. *Sign Regulation*

Outdoor signs come in different forms, shapes, and sizes.[15] They can be on-premise or off-premise, situated on private property or public property, and attached or detached to a building.[16] As a tangible medium of communication, outdoor signs contain both physical and constitutional dimensions.[17] Physical characteristics of signs include their size, height, shape, spacing, number, distance, and location.[18] The communicative features of signs, namely their content and messages, implicate their constitutional dimension.[19] The speech contained in signs is protected by the First and Fourteenth Amendments from unwarranted government regulation.[20]

---

15 *See generally* MANDELKER, *supra* note 5, at 69–88 (discussing a broad range of "specialized" on-premise signs, including digital signs, flags, freestanding signs, murals, portable signs, and time and temperature signs); Patricia E. Salkin, *Sign Regulation–Introduction*, 3 AM. LAW. ZONING § 26:1 (5th ed. 2013) (discussing the different types of signs and their functions).

16 Salkin, *supra* note 15.

17 *See* City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994) ("While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs." (citations omitted)); *see also* DEP'T OF STATE, N.Y. STATE, MUNICIPAL CONTROL OF SIGNS 2 (2006), *available at* http://www.dos.ny.gov/lg/publications/Municipal_Control_of_Signs.pdf.

18 DEP'T OF STATE, N.Y. STATE, *supra* note 17; MANDELKER, *supra* note 5, at 89.

19 DEP'T OF STATE, N.Y. STATE, *supra* note 17.

20 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 502 (1981) (plurality opinion) (noting that "the First and Fourteenth Amendments foreclose [an] interest in controlling the communicative aspects [of signs]"); DEP'T OF STATE, N.Y. STATE, *supra* note 17.

### 1. Community Aesthetics and Traffic Safety

Sign regulation, an exercise of a local government's police power, is warranted on the basis of two public purposes: community aesthetics and traffic safety.[21] In recent years, aesthetics has become the more common justification. In fact, the majority of courts today recognize that aesthetics alone is sufficient to justify constitutionally permissible sign control.[22] This stems, in part, from settled Supreme Court authority dictating that local government has the power to determine that a community is "beautiful."[23] In addition to aesthetics, municipalities enact sign ordinances to eliminate hazards to pedestrians and motorists brought about by distracting sign displays and to ensure clear visibility of traffic signs and signals.[24]

### 2. Content Neutrality

Regulations within a sign ordinance are characterized as either content-neutral or content-based.[25] This characterization is the single most crucial issue in evaluating the constitutionality of a sign ordinance.[26] Content-neutral regulations are those that restrict signage

---

[21] *See generally* AM. PLANNING ASS'N, PLANNING AND URBAN DESIGN STANDARDS 359 (2006); Alan Weinstein, *Legal Issues in the Regulation of On-Premise Signs*, *in* CONTEXT-SENSITIVE SIGNAGE DESIGN 119, 119–20 (Marya Morris et al. eds., 2001). Together, community aesthetics and traffic safety are often referred to as the "twin goals" of sign regulation. *See, e.g.*, *Metromedia*, 453 U.S. at 507; Interstate Outdoor Adver., L.P. v. Zoning Bd. of Mount Laurel, 706 F.3d 527, 529 (3rd Cir. 2013); Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 103 (2d Cir. 2010); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604, 611 (9th Cir. 1993).

[22] Stephanie L. Bunting, Note, *Unsightly Politics: Aesthetics, Sign Ordinances, and Homeowners' Speech in* City of Ladue v. Gilleo, 20 HARV. ENVTL. L. REV. 473, 480 (1996).

[23] Berman v. Parker, 348 U.S. 26, 33 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (citation omitted)).

[24] *See* AM. PLANNING ASS'N, *supra* note 21. Although little empirical data exists to confirm that sign control actually increases traffic safety, courts readily accept the justification. *See, e.g.*, *Metromedia*, 453 U.S. at 507–09. This is especially true in cases involving billboards, which "by their very nature . . . are designed to distract drivers." Major Media of Se., Inc. v. City of Raleigh, 621 F. Supp. 1446, 1451 (E.D.N.C. 1985).

[25] *See* MANDELKER, *supra* note 5, at 5, 12–14.

[26] *See* Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 S. CAL. L. REV. 49, 53 (2000) ("Today, virtually every free speech case turns on the application of the distinction between content-based and content-neutral laws."); Mark Tushnet, *The Supreme Court and Its First Amendment Constituency*, 44 HASTINGS L.J. 881, 882 (1993) ("Today the central organizing concept of First Amendment doctrine is the distinction between content-based regulations and content-neutral ones.").

without regard to the content of the speech contained in the signage.[27] The clearest examples of content-neutral regulations are general time, place, and manner restrictions.[28] For example, a sign ordinance may prohibit temporary signs from being posted for more than two months (time restriction); it may prohibit signs from being placed within fifteen feet of a road (place restriction); and it may require that all signs be limited in size to 200 square feet (manner restriction).[29] Content-neutral regulations, if challenged, are almost always upheld as constitutional.[30] These regulations are subject to a lenient, intermediate level of judicial scrutiny.[31] Under this standard, a municipality must demonstrate that the restrictions on speech further a substantial government interest, that the interest is unrelated to the suppression of speech, and that the restrictions are not significantly broader than necessary to further the interest or that ample alternative methods of communicating the message have been left open.[32] Courts routinely qualify community aesthetics and traffic safety as "substantial" government interests.[33]

By contrast, content-based regulations are those that restrict signage based on the message conveyed by the signage or the identity of the speaker displaying the signage.[34] An example of a content-based regulation is a sign ordinance that requires political signs to obtain a permit before being erected, but that exempts time and temperature signs from this permit requirement.[35] Content-based regulations are less favorable than content-neutral regulations, and are presumptively invalid.[36] While some content-based regulations of speech are permissible, the vast majority of these regulations, if challenged, are

---

27 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17.

28 *Id.* at 2–3.

29 *Id.*

30 Tushnet, *supra* note 26 ("Content-neutral regulations come to the Court with a strong presumption in their favor[.]").

31 *See* Weinstein, *supra* note 21, at 123.

32 *See* Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989). However, to satisfy intermediate scrutiny, municipal sign regulation "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798.

33 *See, e.g.*, Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08 (1981) (plurality opinion); Ballen v. City of Redmond, 466 F.3d 736, 742 (9th Cir. 2006).

34 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. Restrictions based on the identity of the speaker invoke the principle of "viewpoint neutrality." *See* Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004). This principle demands that the municipality not suppress speech "where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Id.*

35 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. This regulation is content-based because the municipality is subjecting one type of speech (that contained in political signs) to greater restrictions than another type of speech (that contained in time and temperature signs) based solely on the content of the message within the sign.

36 Tushnet, *supra* note 26 ("Virtually all content-based regulations will be invalidated [by the Supreme Court.]").

declared unconstitutional.[37] Content-based regulations are subject to the strictest level of constitutional scrutiny and will be sustained only if a municipality meets its burden of proving that the restrictions on speech advance a compelling state interest and are narrowly tailored to serve that interest.[38] Courts have routinely held that traffic safety and community aesthetics do not qualify as "compelling" state interests.[39]

### B. Metromedia, Inc. v. City of San Diego

Although municipalities have been regulating outdoor signage since the early twentieth century, it was not until 1981 that the Supreme Court first grappled with the free speech issues raised by sign regulations.[40] The sign ordinance at issue in *Metromedia, Inc. v. City of San Diego* imposed substantial limitations on the display of outdoor billboards.[41] Specifically, the ordinance permitted on-premise commercial advertising, but prohibited most other forms of commercial advertising and most noncommercial communications.[42] Noncommercial messages were permitted only if they fell into one of twelve specified exemptions, which included signs with religious symbols and signs depicting time and temperature.[43] Metromedia, a leader in the outdoor advertising business, sued the city, arguing that the ordinance violated the First Amendment and that the ordinance's threatened destruction of the outdoor billboard industry was constitutionally prohibited.[44]

In an opinion delivered by Justice White and joined by Justices Stewart, Marshall, and Powell, a plurality of the Court found that the San Diego ordinance unconstitutionally discriminated among types of speech based on content.[45] First, the plurality held that by allowing on-premise commercial signs but not on-premise noncommercial signs, the ordinance impermissibly privileged commercial speech over

37 *Id.* at 882 & n.4 (citing *Burson v. Freeman*, 504 U.S. 191 (1992), as a rare example of a decision upholding a content-based regulation); *see also* Weinstein, *supra* note 21, at 122.

38 Boos v. Barry, 485 U.S. 312, 321 (1988); *see* Weinstein, *supra* note 21, at 123.

39 *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 822–23 (1984); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1267–68 (11th Cir. 2005); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993), *aff'd*, 512 U.S. 43 (1994).

40 Sign regulation cases in the early twentieth century did not involve the free speech concerns of modern sign cases. Instead, these earlier cases primarily involved due process and equal protection challenges. *See, e.g.*, Packer Corp. v. Utah, 285 U.S. 105 (1932); St. Louis Poster Adver. Co. v. St. Louis, 249 U.S. 269 (1919); Thomas Cusack Co. v. City of Chi., 242 U.S. 526 (1917).

41 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 493 (1981) (plurality opinion).

42 *Id.* at 494–96.

43 *Id.* at 494–95.

44 *Id.* at 496–98.

45 *See id.* at 513–16, 521.

noncommercial speech.[46] The plurality noted that this approach was incompatible with then-recent First Amendment case law, which consistently afforded commercial speech less protection than noncommercial speech.[47] Second, the plurality held that by exempting only select categories of noncommercial signage, including religious and historical signs, from regulation, the ordinance impermissibly distinguished between various categories of noncommercial speech.[48] However, the plurality concluded that the ordinance's content-based distinctions within the category of commercial speech were permissible, because they directly advanced San Diego's aesthetic and safety interests.[49] In sum, the *Metromedia* plurality indicated that content-based distinctions within the category of commercial speech were permissible, but similar distinctions favoring commercial speech over noncommercial speech or favoring certain speech within the category of noncommercial speech were impermissible.

In a concurring opinion joined by Justice Blackman, Justice Brennan agreed with the plurality's conclusion that the San Diego ordinance was unconstitutional, but for a different reason.[50] Justice Brennan believed the ordinance to be in violation of the First Amendment because it had the practical effect of eliminating the billboard as a medium of communication within the city, and San Diego lacked a substantial government interest for the ban.[51] Perhaps most notable from Justice Brennan's opinion was his explicit rejection of the first basis for the plurality's holding—that is, that it was impermissible for a sign ordinance to favor commercial over noncommercial speech.[52] Justice Brennan seemed to suggest that content-based distinctions favoring noncommercial speech over commercial speech were the same as content-based distinctions within the category of noncommercial

---

46 *Id.* at 513.

47 *Id.* ("San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech. . . . [T]he city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.").

48 *See id.* at 514–15 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse . . . . Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.").

49 *Id.* at 507–12. The plurality's decision as to the regulation of commercial speech was expressly joined by Justice Stevens. *See id.* at 541 (Stevens, J., dissenting in part).

50 *See id.* at 521–40 (Brennan, J., concurring in the judgment).

51 *Id.* at 525–34 ("[T]he city has failed to show that its asserted interest in aesthetics is sufficiently substantial in the commercial and industrial areas of San Diego.").

52 *Id.* at 536 ("I cannot agree with the plurality's view that an ordinance totally banning commercial billboards but allowing noncommercial billboards would be constitutional. For me, such an ordinance raises First Amendment problems at least as serious as those raised by a total ban, for it gives city officials the right—before approving a billboard—to determine whether the proposed message is 'commercial' or 'noncommercial.'" (footnote omitted)).

speech or within the category of commercial speech.[53] This was especially true, Justice Brennan noted, because the distinction between the two forms of speech was usually "anything but clear."[54]

The three dissenting opinions—authored individually by Justice Stevens, Chief Justice Burger, and Justice Rehnquist—all rejected the plurality's views that the San Diego ordinance was content-based and that it resulted in an unconstitutional ban of an entire medium of communication.[55] Justice Stevens believed the prohibition of billboards to be a constitutionally permissible use of San Diego's police power.[56] Chief Justice Burger thought that the subject matter at hand, including protecting the safety and enhancing the environment of a city, was best left to local government.[57] Finally, Justice Rehnquist felt that a total prohibition on billboards within a community was justifiable on aesthetic grounds alone.[58]

*Metromedia* was a severely fractured decision, described by Justice Rehnquist as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn."[59] Nonetheless, the case remains the Supreme Court's leading authority on First Amendment issues in billboard and sign regulation. By approving a bifurcated approach to sign regulation based on whether the message of a sign is commercial or noncommercial in nature, the *Metromedia* plurality endorsed the distinction between commercial and noncommercial speech.[60] At the opposite end of the spectrum, Justice Brennan's concurrence strongly critiqued the distinction as content-based.[61] It is the latter view which has gained increasing popularity in Supreme Court case law.

### C. *Post-*Metromedia *Developments in Free Speech Law*

Modern Supreme Court cases indicate a trend in favor of elevating commercial speech to a similar constitutional status as noncommercial speech. Underlying this trend is the Court's demand for a stricter content-neutrality standard. In *City of Cincinnati v. Discovery Network,*

---

53 *Id.* at 534–40.

54 *Id.* at 536.

55 *See id.* at 540–55 (Stevens, J., dissenting in part); *id.* at 555–69 (Burger, C.J., dissenting); *id.* at 569–70 (Rehnquist, J., dissenting).

56 *Id.* at 542 (Stevens, J., dissenting in part) (answering affirmatively the plurality's question of "whether a city may entirely ban one medium of communication").

57 *Id.* at 569 (Burger, C.J., dissenting) ("The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution.").

58 *Id.* at 570 (Rehnquist, J., dissenting).

59 *Id.* at 569.

60 *See supra* text accompanying notes 45–49.

61 *See supra* notes 52–54 and accompanying text.

*Inc.*, the Court went as far as to hold that commercial speech must be regulated on par with noncommercial speech.[62] At issue in the case was a city ordinance which banned the dissemination of commercial handbills while allowing the dissemination of noncommercial handbills.[63] After commercial newsrack companies brought suit against the city on First Amendment grounds, the Court concluded that Cincinnati's categorical ban on commercial handbills attached too much importance to the distinction between commercial and noncommercial speech.[64] The Court observed that the city's noncommercial newsracks were just as damaging to community aesthetics as its commercial newsracks, and thus the ban on commercial handbills did not directly advance the city's purported aesthetic and safety interests.[65] For this reason, the Court held, in cases where neither commercial speech nor noncommercial speech is intrinsically more harmful to the public, the distinction between the two speech forms is impermissible.[66]

Three years later, the Court in *44 Liquormart, Inc. v. Rhode Island* invalidated a state law that banned the advertising of retail liquor prices.[67] The Court found that a complete prohibition on such commercial signage would not advance the substantial state interest in temperance.[68] Rather, Rhode Island's goal of promoting temperance would more likely be achieved by alternative forms of regulation that

---

[62] City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 430–31 (1993).

[63] *Id.* at 413 n.3 ("No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place." (quoting CINCINNATI, OHIO MUNICIPAL CODE § 714-23 (1992)) (internal quotation marks omitted)).

[64] *Id.* at 419 ("[T]he city's argument [regarding its aesthetic and safety interests] attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech.").

[65] *Id.* at 418 ("We accept the validity of the city's proposition, but consider [safety and community aesthetics] an insufficient justification for the discrimination against respondents' use of [commercial] newsracks that are no more harmful than the permitted [noncommercial] newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks.").

[66] *Id.* at 424 ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests [in community aesthetics and safety]."); *see also id.* at 437 (Blackmun, J., concurring) (noting that the valuable handbills at issue highlighted the "absurdity of treating all commercial speech as less valuable than all noncommercial speech," as it is "highly unlikely that according truthful, noncoercive commercial speech the full protection of the First Amendment will erode the level of that protection").

[67] 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516 (1996).

[68] *Id.* at 507 ("Thus, the State's own showing reveals that any connection between the ban and a significant change in alcohol consumption would be purely fortuitous. As is evident, any conclusion that elimination of the ban would significantly increase alcohol consumption would require us to engage in the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest.").

did not involve any restrictions on speech.[69] Critical to the Court's analysis was its view that commercial speech regulations are not all subject to a similar form of constitutional review simply because they target a similar category of expression.[70] The Court held that if a state regulates commercial speech to protect consumers from misleading or deceptive sales practices, then the traditional intermediate-scrutiny standard of review for regulations on commercial speech should apply.[71] However, if a state prohibits the dissemination of "truthful, nonmisleading commercial messages" for reasons unrelated to the preservation of a fair bargaining process, then a "special care" standard of review should apply.[72] The Court noted that the "typical reason" why commercial speech can be subject to greater government regulation than noncommercial speech is that a state has an interest in protecting its citizen consumers from harms that may result from commercial advertising.[73] Bans on speech that target truthful, nonmisleading commercial messages fail to advance this goal.[74]

*44 Liquormart* was the first case to question the soundness of the supposed "commonsense differences" used to justify affording less First Amendment protection to commercial speech than to noncommercial speech.[75] It announced "a standard reasonably close to strict scrutiny" that "would nearly equate the First Amendment status of commercial speech with that of noncommercial speech in cases involving . . . a content-based prohibition on communication."[76] Justice Thomas was perhaps the most overt when he opined that he did not see any "philosophical or historical basis" for affording less value to commercial speech than to noncommercial speech.[77] Echoing these sentiments, the Court most recently held in *Sorrell v. IMS Health Inc.* that content- and speaker-based restrictions on commercial speech should be subject to heightened scrutiny—a more stringent standard than the typical intermediate-scrutiny level of review for commercial speech.[78]

---

69 *See id.* (discussing alternative forms of regulation including higher prices by means of direct regulation or increased taxation and educational campaigns focused on the problems of drinking).

70 *Id.* at 501 ("The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them.").

71 *See id.*

72 *Id.* at 503–04; *see also id.* at 501 (noting that in these cases, "there is far less reason to depart from the rigorous review that the First Amendment generally demands").

73 *Id.* at 502 (citing Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993)).

74 *Id.* at 502–03.

75 *Id.* at 498–99; *see supra* text accompanying note 73.

76 Weinstein, *supra* note 21, at 128.

77 *44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring in part and concurring in the judgment).

78 131 S. Ct. 2653, 2664 (2011) (relying on *Discovery Network*, 507 U.S. 410, to support a heightened scrutiny standard).

In light of the continued elevation of commercial speech in modern Supreme Court case law, it is unclear whether the line between commercial and noncommercial speech remains an important or necessary distinction in sign regulation today. Modern commercial speech cases stand in stark contrast to the views espoused by the *Metromedia* plurality over three decades ago.[79] Although the *Metromedia* plurality endorsed the distinction between the two speech forms, it had done so relying on free speech cases from the 1970s, which supported a lower constitutional status for commercial speech.[80] The *Metromedia* Justices did not have *Discovery Network*, *44 Liquormart*, and *Sorrell* at their disposal in 1981. Moreover, in endorsing the different treatment of commercial and noncommercial speech, the *Metromedia* plurality emphasized the "common-sense" nature of the distinction between the two speech forms.[81] But in actuality, as Justice Brennan succinctly noted, the distinction was "anything but clear."[82] This statement holds even more true today, where modern advertising has further convoluted the status of the two speech forms.[83]

Part II of this Note argues that the distinction between commercial and noncommercial speech should be eliminated in at least one context: the regulation of outdoor murals.

## II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION

Outdoor murals—"painting[s] or other work[s] of art executed directly on a wall"[84]—are unique in that they can be classified as

---

79 *See supra* text accompanying notes 45–49.

80 *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505–06 (1981) (plurality opinion) (citing, for example, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), for the proposition that "commercial and noncommercial speech [are not equated] for First Amendment purposes"). At the time of the *Metromedia* decision, the commercial speech doctrine had been in existence for only six years.

81 *Id.* at 506 ("[W]e again recognize[] the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech.").

82 *Id.* at 536 (Brennan, J., concurring in the judgment). In fact, the Supreme Court recognized the difficulty with distinguishing between the two speech forms at the moment the commercial speech doctrine was born. *See Va. State Bd. of Pharmacy*, 425 U.S. at 787 (Rehnquist, J., dissenting) ("There are undoubted difficulties with an effort to draw a bright line between 'commercial speech' on the one hand and 'protected speech' on the other . . . .").

83 *See, e.g.*, Darrel Menthe, *Writing on the Wall: The Impending Demise of Modern Sign Regulation Under the First Amendment and State Constitutions*, 18 GEO. MASON U. C.R. L.J. 1, 26 (2007) (noting that "there is, arguably, a complete lack of a standard by which to evaluate [the] distinction" between these two forms of speech).

84 *Mural Definition*, OXFORD DICTIONARIES, http://oxforddictionaries.com/definition/english/mural?q=mural (last visited Oct. 27, 2013). This Note is limited in scope to outdoor murals located on private property. Murals located on government property face unique issues and are governed by different case law.

artwork, signage, or both, depending on their content and the municipality in which they reside. Most commonly, a municipality's sign ordinance will classify a mural as signage only when the mural contains "commercial speech."[85] For example, Arlington County's sign ordinance mandates that outdoor murals include "no picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the [mural] is located."[86] If a mural does include this prohibited commercial content, the county classifies the mural as signage and subjects it to all of the restrictions and requirements of the sign ordinance.[87] Conversely, if the mural contains solely "noncommercial speech," the county classifies the mural as a "work of visual art" and exempts the mural from the specifications of the sign ordinance.[88]

Disputes between mural owners and local zoning authorities over whether a particular outdoor mural qualifies as artwork or signage have become increasingly common in recent years.[89] Four of these disputes have made their way to court: *Complete Angler, LLC v. City of Clearwater, Florida*;[90] *City of Tipp City v. Dakin*;[91] *Neighborhood Enterprises, Inc. v. City of St. Louis*;[92] and *Wag More Dogs, Ltd. Liability Corp. v. Cozart*.[93] Decided respectively in 2009, 2010, 2011, and 2012, the four cases involve similar fact patterns; yet, the courts embarked on varied analyses and arrived at different holdings. Though the murals at issue in the first three cases were ultimately permitted to remain in place, the mural in the last of the four cases, *Wag More Dogs*, was ordered removed by the county.[94] The various inconsistencies among these four mural cases are predominantly attributable to two factors, neither of which is unique to mural case law, and both of which stem in

---

85 *See supra* note 2.

86 ARLINGTON, VA., ZONING ORDINANCE art. 13, § 13.2.3.C (2013), *available at* http://buildingarlington.s3.amazonaws.com/wp-content/uploads/2013/06/ACZO_Adopted-05-18-2013_op.pdf.

87 *See id.*

88 *See id.* Assuming, of course, that the other requirements for exemption are met. *Id.*

89 *See, e.g.*, *supra* notes 11–12. These disputes follow a typical pattern, reflected in the Sally/Wanda dispute from this Note's Introduction: The owner of a commercial shop commissions an artist to paint a mural on the exterior wall of her building. The owner believes the mural to be a work of art. "Artwork" is categorically exempted in the local sign ordinance from some or all of the stringent size and other restrictions placed on outdoor signage. A local zoning official believes the shop owner's mural falls outside the definition of "artwork," and is thus signage. Because the mural violates one or more of the restrictions in the sign ordinance, the zoning official orders its removal.

90 607 F. Supp. 2d 1326 (M.D. Fla. 2009).

91 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484.

92 644 F.3d 728 (8th Cir. 2011).

93 680 F.3d 359 (4th Cir. 2012).

94 For a discussion of the facts and holdings of these cases, see discussion *infra* Part II.A–B.

part from the divisive *Metromedia* decision, as well as post-*Metromedia* developments in free speech law.[95]

### A. *Sources of Inconsistency in Mural Case Law*

#### 1. Defining Commercial Speech

The first factor contributing to the inconsistency in mural case law is the manner in which courts define "commercial speech." Some courts have adopted very narrow definitions of commercial speech, such as "speech that does no more than propose a commercial transaction"[96] and "expression related solely to the economic interests of the speaker and its audience."[97] Other courts, by contrast, have recognized a broader definition of commercial speech as encompassing speech that "cannot be characterized merely as proposals to engage in commercial transactions."[98]

The two narrow definitions were used by the court in *Complete Angler* in holding that a marine-themed mural on the wall of a bait and tackle shop qualified as artwork rather than signage because the mural contained noncommercial speech.[99] The court reasoned that although the mural might occasionally inspire commercial activity, namely the purchase of bait and tackle from the mural owner's shop, the mural's function was not limited to this pursuit.[100] Rather, the mural also depicted a reflection of a local artist's impression of the environment

---

[95] For a discussion of the five opinions in the *Metromedia* decision, see *supra* Part I.B. For a discussion of post-*Metromedia* developments in free speech law, namely the commercial speech and content neutrality doctrines, see *supra* Part I.C.

[96] *See, e.g.*, United States v. United Foods, Inc., 533 U.S. 405, 409 (2001); *see also* Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) (providing same definition).

[97] *See, e.g.*, El Día, Inc. v. P.R. Dep't of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005) (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980)); Hoover v. Morales, 164 F.3d 221, 225 (5th Cir. 1998) (same).

[98] *See, e.g.*, Spirit Airlines, Inc. v. U.S. Dep't of Transp., 687 F.3d 403, 412–13 (D.C. Cir. 2012) (quoting another source) (internal quotation marks omitted); *Wag More Dogs*, 680 F.3d at 369–70 (quoting another source) (internal quotation marks omitted); *see also* IMS Health Inc. v. Sorrell, 630 F.3d 263, 274 (2d Cir. 2010), *aff'd*, 131 S. Ct. 2653 (2011); United States v. Wenger, 427 F.3d 840, 846–47 (10th Cir. 2005). All of these cases rely on *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983) (adopting a more liberal and comprehensive approach to defining commercial speech that looks to a combination of factors).

[99] Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009).

[100] *Id.*

surrounding the bait and tackle shop.[101] In this sense, the speech within the mural did "more than propose a commercial transaction."[102]

The Fourth Circuit in *Wag More Dogs* rejected this reasoning in favor of a broader definition of commercial speech.[103] The court easily could have found, similar to the court's finding in *Complete Angler*, that a dog-themed mural on the wall of a canine daycare center situated near a local dog park depicted an artist's reflection of the community's appreciation for dogs, and thus did more than simply propose a commercial transaction. Instead, the court stretched the definition of commercial speech to include speech beyond "the core notion of commercial speech."[104] The court held that the dog-themed imagery on the mural constituted commercial speech because the mural, which included cartoon dogs resembling the business's logo, was meant to attract potential customers from the nearby dog park, thus potentially economically benefiting the mural owner.[105]

### 2. Analyzing Content Neutrality

The second factor contributing to the inconsistency in mural case law is that courts are divided over the manner in which to analyze the content neutrality of a sign ordinance. While some courts have adopted a strict approach that looks solely at the language of the sign ordinance,[106] other courts have adopted a more liberal approach that looks to a municipality's asserted purpose for enacting a given regulation.[107]

---

101 *Id.*

102 Thus, it did not satisfy one of the narrow definitions of commercial speech: "speech that does no more than propose a commercial transaction." United States v. United Foods, Inc., 533 U.S. 405, 409 (2001).

103 *See Wag More Dogs*, 680 F.3d at 369–70 ("*Bolger* recognized a broader definition of commercial speech, encompassing speech that 'cannot be characterized merely as proposals to engage in commercial transactions.' . . . The three factors relied on by the Court in *Bolger* similarly counsel classifying Wag More Dogs' painting as commercial speech.").

104 *Id.* at 370.

105 *See id.*

106 *See, e.g.*, Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736–37 (8th Cir. 2011); Serv. Emps. Int'l Union, Local 5 v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010); Ballen v. City of Redmond, 466 F.3d 736, 742–44 (9th Cir. 2006); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1259–62 (11th Cir. 2005); Rappa v. New Castle Cnty., 18 F.3d 1043, 1053–54 (3d Cir. 1994); Nat'l Adver. Co. v. Town of Babylon, 900 F.2d 551, 556–57 (2d Cir. 1990).

107 *See, e.g.*, Asgeirsson v. Abbott, 696 F.3d 454, 460 n.6 (5th Cir. 2012); *Wag More Dogs*, 680 F.3d at 366–69; H.D.V.–Greektown, LLC v. City of Detroit, 568 F.3d 609, 621–23 (6th Cir. 2009); Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 183 (1st Cir. 1996); Scadron v. City of Des Plaines, 734 F. Supp. 1437, 1445-46 (N.D. Ill. 1990), *aff'd*, 989 F.2d 502 (7th Cir. 1993).

The strict approach to content neutrality is the majority approach in existing mural case law. Consider again the case of *Complete Angler*. At issue in the case was a marine-themed mural on the exterior wall of a bait and tackle shop.[108] The mural depicted sailfish, dolphins, and waterways.[109] Clearwater, a resort community, had a sign ordinance that prohibited various types of signs, required a permit and development review process for others, and exempted twenty-six categories of signs from review altogether.[110] One such exemption was made for artwork.[111] Believing the marine-themed mural to be commercial signage, the city issued plaintiffs a notice citing various violations of the sign ordinance and ordering the mural's removal.[112] The *Complete Angler* court held that Clearwater's application of its sign ordinance was content-based because a zoning official had to examine the content of the marine-themed mural in order to determine whether it was a sign or artwork.[113] After determining that the mural was a sign because it contained "commercial speech," the city then declined to extend protections that would have been extended to a mural containing alternative content, such as imagery of kids playing in a park.[114]

Following similar logic, the court in *Neighborhood Enterprises* held that the exemptions in St. Louis's sign ordinance were content-based because they made impermissible distinctions based solely on the content or message conveyed by a given sign.[115] St. Louis's sign ordinance exempted from regulation, among other things, "[w]orks of art which in no way identify a product."[116] Plaintiff, a critic of St. Louis's eminent domain practices, commissioned a mural on the wall of a building containing the words "End Eminent Domain Abuse" inside a red circle with a slash.[117] The city declared the mural an "illegal sign."[118]

---

108 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009).

109 *Id.* at 1328–29.

110 *Id.* at 1330–31.

111 *See id.* at 1331. The exemption defined artwork as "drawings, pictures, symbols, paintings or sculpture which do not identify a product or business and which are not displayed in conjunction with a commercial, for profit or nonprofit enterprise." *Id.* (citation omitted).

112 The city argued that the marine-themed mural was displayed "in conjunction with" plaintiffs' place of business, and thus was commercial speech, not artwork. *See id.* at 1332.

113 *Id.* at 1333 ("Yet in concluding that the [mural was] subject to the permit requirement or spatial constraints, [the city] necessarily examined [its] content and determined that [it was not] art work, a holiday decoration, or any other sign exempted under the Code.").

114 *See id.* at 1332–33.

115 Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736 (8th Cir. 2011) ("[T]he zoning code's definition of 'sign' is impermissibly content-based because . . . to determine whether a particular object qualifies as a 'sign' . . . and is therefore subject to the regulations, or is instead a 'non-sign' . . . or [is otherwise] exempt from the sign regulations . . . one must look at the *content* of the object." (citations omitted)).

116 *Id.* at 739.

117 *Id.* at 731 (internal quotation marks omitted).

118 *Id.* (internal quotation marks omitted). The design of the mural was similar to the design

In holding that the ordinance's exemptions to the definition of "sign" were content-based, the Eighth Circuit noted that a mural in the same location and with the same size and dimensions as plaintiff's mural would not be subject to regulation if it contained alternative content, such as a religious subject.[119] The court reasoned that treating one mural as signage and another as artwork based solely on the content of the murals was a clear example of a content-based regulation on speech.[120]

In contrast to the strict approach to content neutrality seen in *Complete Angler* and *Neighborhood Enterprises* is the more liberal approach reflected in *Wag More Dogs*. This latter approach is the minority approach in existing mural case law. At issue in *Wag More Dogs* was Arlington County's sign ordinance, which, similar to St. Louis's, included various exemptions from the definition of "sign."[121] One such exemption was made for "decorative art," which was left wholly unregulated.[122] After determining that plaintiff's dog-themed mural qualified as signage rather than an exempt work of decorative art because it contained "commercial speech," the county zoning administrator subjected the mural to restrictions placed on signage that the mural would not have been subjected to had it contained alternative content.[123] Nonetheless, the Fourth Circuit held that the sign ordinance was content-neutral, both facially and as applied.[124] The court gave significant weight to the government's purpose in enacting the regulations, observing that Arlington County adopted the sign ordinance to regulate land use, not to prohibit a particular disfavored message.[125]

that the Missouri Eminent Domain Abuse Coalition, an organization with whom the plaintiff co-missioned the mural, used in its advertising and marketing materials. *See id.*

119 *See id.* at 736–37.

120 *Id.* at 737. The court refused to accept St. Louis's justification for enacting these content-based regulations on speech. *See id.* This disregard for government intent is one of the defining features of the "strict" approach to content neutrality. *See* cases cited *supra* note 106 and accompanying text.

121 *See* Brief of Appellant at 2, Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359 (4th Cir. 2012) (No. 11-1226), 2011 WL 2534178, at *2.

122 *Id.* (internal quotation marks omitted).

123 *See Wag More Dogs*, 680 F.3d at 369–70 (noting that plaintiff's mural would have been allowed to remain had it contained "noncommercial messages" but holding that the mural contained commercial speech).

124 *Id.* ("Deeming the Sign Ordinance content neutral, we now readily conclude that it satisfies intermediate scrutiny. . . . As applied to Wag More Dogs, the Sign Ordinance's regulation of commercial speech satisfies intermediate scrutiny.").

125 *Id.* at 368 ("On this score, then, the Sign Ordinance's content neutrality is incandescent.").

### B. *Eliminating the Commercial/Noncommercial Speech Distinction*

The aforementioned inconsistencies in mural case law can be significantly reduced by eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation. Regulating all murals, regardless of their content, in the same manner would render moot the first source of inconsistency (that is, the definition of commercial speech) while appealing to the majority, and better, judicial approach for the second source of inconsistency (that is, how to analyze the content neutrality of a sign ordinance). Moreover, it would reflect a more modern regulatory regime that appeals to recent advances in the commercial speech and content neutrality doctrines. This section elaborates on these points and sets forth additional legal and policy-based arguments for regulating all murals, regardless of the speech they contain, in an equal fashion.

#### 1. Constitutional Flaws

The principal reason why the distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation is that the distinction, when applied, constitutes a content-based regulation of speech. Explained simply, if a zoning official subjects one mural to stringent outdoor signage restrictions because the mural contains commercial speech, but exempts another mural from these restrictions because the latter mural contains noncommercial speech, this difference in treatment is a content-based regulation of speech.

The courts in three of the four mural cases—*Complete Angler*, *Neighborhood Enterprises*, and *Tipp City*—would support this view. Each of these courts embraced the stricter approach to evaluating the content neutrality of a sign ordinance.[126] This approach is the better approach in that it is more in line with modern Supreme Court case law, which indicates a desire for a stricter content-neutrality standard.[127] In *Discovery Network*, for instance, the Court embraced a strict approach to content neutrality in holding that Cincinnati's sign ordinance was content-based because a government official had to look at the content of the papers in a given newsrack in order to determine whether the

---

126 *See supra* Part II.A.2.

127 Brian J. Connolly, Note, *Environmental Aesthetics and Free Speech: Toward a Consistent Content Neutrality Standard for Outdoor Sign Regulation*, 2 MICH. J. ENVTL. & ADMIN. L. 185, 209 (2012) ("[S]ince *Metromedia*, there has been a gradual increase in the degree of content neutrality required of governmental regulations of speech. This gradual increase suggests that, to comply with the Supreme Court's recent statements on content neutrality, the content neutrality requirement in sign regulation should be more stringent . . . .").

newsrack was subject to the ordinance's ban.[128] The Court specifically rejected a content-neutrality analysis that looks to a government's justification for a given regulation, especially when that justification is the "naked assertion" that commercial speech has low value.[129] Similarly, the Court in *Sorrell* found that because the statute in question would require a government enforcement authority to examine the content of marketing materials before determining whether the protected information was being used for marketing or for some other purpose, the regulation of commercial speech was content-based.[130]

Not only does the strict approach to content neutrality embrace modern, post-*Metromedia* Supreme Court precedent, but this approach also avoids the reliance on community aesthetics and traffic safety as justifications for distinguishing between commercial and noncommercial speech. These justifications are successfully utilized only in those cases where a more liberal content-neutrality standard is applied (and thus, where sign ordinances are more likely to be upheld as content-neutral), because content-neutral ordinances need only satisfy a test of intermediate scrutiny where community aesthetics and traffic safety qualify as substantial government interests.[131] The problem with relying on community aesthetics and traffic safety, the so-called "twin goals" of sign regulation,[132] to justify the commercial/noncommercial speech distinction as applied to outdoor murals is that maintaining the distinction fails to advance either goal. At best, the distinction has a neutral effect on these goals. At worst, the distinction may be detrimental to these goals.

Consider *Wag More Dogs*, the sole mural case to embrace the more liberal content-neutrality standard.[133] After Arlington County's zoning administrator ordered plaintiff business owner to remove the dog-themed mural on the wall of her canine daycare shop because its

---

128 City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993) ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'"). For a more detailed discussion of *Discovery Network*, see *supra* Part I.C.

129 *See Discovery Network*, 507 U.S. at 429–30.

130 Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2663–64 (2011) ("Given the legislature's expressed statement of purpose, it is apparent that [the statute] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."). In embracing a strict approach to content neutrality, the *Sorrell* Court relied on *Discovery Network*. *See id.* at 2664 (citing *Discovery Network*, 507 U.S. at 418, to support the proposition that heightened judicial scrutiny is warranted when content-based restrictions are placed on commercial speech).

131 Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989); *see also supra* Part I.A.2 (explaining the differences between content-based and content-neutral regulations within sign ordinances).

132 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507 (1981) (plurality opinion); *see also supra* Part I.A.1 (discussing these two justifications for sign regulation).

133 *See supra* notes 121–25 and accompanying text.

imagery allegedly constituted commercial speech,[134] plaintiff commissioned two artists to paint a new mural in its place.[135] The replacement mural depicted large bird-like creatures nesting in tires hanging from a tree.[136] While the community adored the "attractive," original mural, deeming it a welcome and fitting addition to the nearby dog park,[137] many local residents expressed their dislike of the replacement mural.[138]

Perhaps most concerning with this case is that the Fourth Circuit relied entirely on the twin goals of sign regulation in holding that Arlington County's sign ordinance satisfied intermediate scrutiny.[139] Focusing heavily on the intent of Arlington County in enacting the ordinance, the court held that the ordinance was content-neutral because it "serve[d] purposes unrelated to the content of expression," "even if it ha[d] an incidental effect on some speakers or messages but not others."[140] Because the content-neutral ordinance advanced substantial government interests—the furtherance of traffic safety and the enhancement of aesthetics within the county—the court found that it satisfied intermediate scrutiny.[141] The failure of the ordinance to actually further either of these interests highlights a flaw in this minority approach to evaluating the content neutrality of a sign ordinance. Under the stricter, majority approach, Arlington County's ordinance would have been deemed content-based and subject to a strict scrutiny

---

134 *See supra* notes 103–05 and accompanying text. Arlington County's zoning administrator provided plaintiff with the following instructions:

> For the mural to NOT be considered a sign, it may depict anything you like EXCEPT something to do with dogs, bones, paw prints, pets, people walking their dogs, etc. In other [words], the mural [cannot] show anything that has any relationship with your business. If it does, then it becomes a sign.

Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 363 (4th Cir. 2012).

135 *See* Arin Greenwood, *Wag More Dogs Gets New Mural From Itinerant Artists Rob Fogle And Zack Weaver (PHOTOS)*, HUFFINGTON POST (Oct. 16 2012, 1:55 PM), http://www.huffingtonpost.com/2012/10/16/wag-more-dogs-mural-rob-fogle-zack-weaver_n_1962184.html.

136 For photos of the replacement mural, see *id.*

137 Wag More Dogs, LLC v. Artman, 795 F. Supp. 2d 377, 392 (E.D. Va. 2011) ("As murals go, Wag More Dogs' is a relatively attractive one, and . . . many patrons of the nearby local dog park quite enjoy it."), *aff'd*, 680 F.3d 359 (4th Cir. 2012).

138 *See, e.g.*, *New Dog Park Mural . . . Improved??*, TWO DOG TALES (Oct. 15, 2012), http://twodogtales.wordpress.com/2012/10/15/new-dog-park-mural-improved ("[I]t's a shame the cute dogs had to go. They were much more appropriate for the space, and didn't elicit the comments overheard the past few days at the park, which generally [began] with, "What the heck ARE those things?").

139 *See Wag More Dogs*, 680 F.3d at 368–69.

140 *Id.* at 368 (acknowledging that Arlington had differentiated between different types of speech).

141 *Id.* at 369 ("[W]e now readily conclude that [the sign ordinance] satisfies intermediate scrutiny. . . . Arlington enacted the . . . [o]rdinance to, in part, promote traffic safety and enhance the County's aesthetics. Both are substantial government interests.").

analysis, under which traffic safety and community aesthetics are not compelling justifications.[142]

In a similar case from Arlington County (which did not make its way to court), the owner of a head shop that sold various paraphernalia, including pipes, hookahs, and cigars, commissioned an artist to paint a mural on the side of his building to beautify the block.[143] The finished artwork depicted a man holding a smoke-exuding cigar.[144] Upon investigating the mural, the county zoning administrator noted: "[T]he cigar must go; then the mural can stay. Without the cigar, it is not a sign . . . ."[145] Smokey Shope's owner decided to paint over the cigar, converting it into a blue whale.[146] The new mural was identical in all respects to the original mural, except that it contained a whale instead of a cigar.[147] Yet, replacing the "commercial speech" with "noncommercial speech" did absolutely nothing to enhance Arlington County's aesthetics or traffic safety. Rather, it seemed only to enforce the meaninglessness of distinguishing between the two speech forms.[148]

Outside of Arlington County, at least one court has commented on the failure of the distinction between commercial and noncommercial speech to enhance the twin goals of sign regulation. In *North Olmstead Chamber of Commerce v. City of North Olmsted*, the court addressed a sign ordinance which permitted noncommercial art murals, but banned murals with commercial messages, such as corporate products or logos.[149] The court held that these restrictions on commercial speech were content-based and unconstitutional.[150] The sign ordinance lacked "rationality" because the city failed to provide evidence that the restrictions directly and materially contributed to traffic safety and

142 *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 823 (1984) ("But a governmental interest in aesthetics cannot be regarded as sufficiently compelling to justify a restriction of speech based on an assertion that the content of the speech is, in itself, aesthetically displeasing."); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993) (holding that the city's interest in eliminating aesthetic, safety, and property value problems associated with signs was not sufficiently compelling), *aff'd*, 512 U.S. 43 (1994).

143 *See County to Head Shop: Cigar Mural Has Got to Go*, ARLNOW (Aug. 21, 2012, 1:50 PM), http://www.arlnow.com/2012/08/21/county-to-head-shop-cigar-mural-has-to-go.

144 For a photo of the mural, see *id.*

145 *Id.* According to the logic of the zoning administrator, if a mural painted on a cigar shop contains a cigar, the mural is a sign. If the cigar is converted into a whale, the mural transforms into a work of art. *See* Taylor Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, WASH. EXAMINER (Sept. 26, 2012, 4:30 PM), http://washingtonexaminer.com/when-a-cigar-becomes-a-whale-a-sign-becomes-art/article/2509136#.UORv1InjkoZ.

146 Holland, *supra* note 145.

147 For photos of the original and replacement murals, see *id.*

148 As the Smokey Shope store manager observed, "It doesn't make a lot of sense, but the county made us do it." *Id.*

149 86 F. Supp. 2d 755, 767 & n.7 (N.D. Ohio 2000).

150 *Id.* at 773 ("The City's content-based regulations on commercial speech are unconstitutional.").

community aesthetics.[151] Murals housing commercial content, the court reasoned, were no more distracting or less aesthetically pleasing than noncommercial murals.[152] As such, it was senseless to distinguish between the two speech forms.[153]

### 2. Classifying Mural Speech

Perhaps one of the reasons why maintaining the distinction between commercial and noncommercial speech in the context of outdoor mural regulation seems futile is that classifying mural speech is a transitory determination that has the potential to change overnight.

Consider the following hypothetical: The exterior wall of a local mom-and-pop cupcake shop features a lively mural with large cups of coffee in honor of the shop owner's favorite morning beverage. The mural has been on the building for five years, and is accepted and relished by the community as a lovely work of art. One day, the owner decides to start selling coffee at her cupcake shop. Although this decision converts the mural's coffee imagery from noncommercial to commercial speech, it would hardly seem necessary, fair, or prudent for the town to demand its removal after years of community enjoyment. Moreover, in light of the frequent product turnover within commercial establishments, a municipality would have to constantly reevaluate the products sold inside every building upon which is displayed an outdoor mural. This would be a foolish and wasteful use of government time and resources.

Further complications arise in cases where a given business sells a wide variety of products or services. The process of classifying mural speech is more conducive to businesses that sell only one key product or provide only one key service. Businesses such as gift shops or grocery stores, which may sell thousands of products, are placed at an unfair disadvantage if the distinction between commercial and noncommercial speech remains in place. Does a flower mural on the side of a gift shop, where fresh flowers comprise less than one percent of the store's total

---

151 *See id.* at 772–73 ("In fact, many of the City's content-based restrictions *completely fail* to contribute to safety and aesthetics and seem to be *unrelated to these goals*." (emphasis added)).

152 *Id.* at 768, 772 ("It is also not evident why a mural may contain content that may be very distracting (such as sexually explicit but not obscene art) or aesthetically displeasing, but may not contain words, corporate products, or corporate images. Surely a mural containing the 'golden arches' of McDonalds is not more distracting than Botticelli's 'Venus' or more aesthetically displeasing than some modern works of art that may be reproduced on the side of a wall. . . . Signs with content other than identifying a business are not somehow safer. Nor is the content . . . more aesthetically pleasing.").

153 *See id.* at 771 (noting that making content-based distinctions among signs, including distinctions based on whether they contained commercial or noncommercial speech, did not further North Olmsted's goals "in any meaningful way").

inventory, contain commercial speech? Should a mural featuring fruits and vegetables on the wall of a Whole Foods Market—which also sells dairy, meat, grains, beverages, and even body care products and eating utensils—be considered signage, when the same mural outside of a butcher shop would be considered art? What if that same mural has been intact for fifteen years and has become a neighborhood landmark, as it has in the city of St. Paul, Minneapolis?[154] Eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation avoids these inevitable difficulties that arise when classifying mural speech.

### 3. Classifying Mural Art

Similar to the difficulties with classifying mural speech, it is likewise difficult to classify mural art. Maintaining the distinction between commercial and noncommercial speech only further complicates this matter. The current framework leaves unbridled discretion in government enforcement authorities to arbitrarily decide when, in their subjective opinions, a mural qualifies as a work of art or signage.[155] It is this broad discretion that Justice Brennan feared in his *Metromedia* concurrence when he noted the danger of permitting a government unit to decide whether a given outdoor display contains commercial or noncommercial speech.[156] This concern is especially strong in the context of regulating outdoor murals. The definition of art and the determination of whether something qualifies as art have long been the subject of vigorous debate, even among artists themselves.[157]

Courts too have certainly struggled with the determination of whether a given mural is art or signage. The court in *Tipp City*, for

---

154 For a photo of the Whole Foods mural, see Curtis Gilbert, *Cities Debate Art vs. Advertising*, MPRNEWS (Aug. 1, 2012), http://minnesota.publicradio.org/display/web/2012/08/01/business/art-versus-advertising-in-twin-cities.

155 *See* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 VA. L. REV. 627, 653 (1990) ("[T]he commercial speech doctrine . . . . gives government a powerful weapon to suppress or control speech by classifying it as merely commercial. If you think carefully enough, you can find a commercial aspect to almost any[thing] . . . .").

156 *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 536–37 (1981) (Brennan, J., concurring in the judgment) ("Because making such determinations would entail a substantial exercise of discretion by a city's officials, it presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech.").

157 David Leichtman & Avani Bhatt, *Federal Courts and the Communicative Value of Visual Art: Is an Intended Message Required for Strong Protection of Rights Under the First Amendment?*, FED. LAW., Sept. 2011, at 25, 25 ("Federal courts addressing the question of the appropriate level of First Amendment protection for art have sometimes agreed that the key to protection is the communicative value of the work at issue. Others—in both law and other disciplines—have argued, however, that to qualify as art, the work must carry some component that is aesthetically pleasing, lest a mere circle painted on a canvas be considered art.").

example, was vocal in its discomfort with classifying the mad scientist mural at issue as commercial signage.[158] The court emphasized that the "inherent difficulty" with the classification was due, in part, to the lack of a clear distinction between commercial and noncommercial speech.[159] Stressing that the issue was "a close one," the *Tipp City* court avoided making a determination of its own.[160] Instead, it adopted the reasoning of the trial court, which had concluded that the mural was a sign, not art.[161] The hesitation scattered throughout the *Tipp City* court's discussion of classifying the mad scientist mural—a classification that hinged entirely on the distinction between commercial and noncommercial speech—is evidence of the arbitrariness of this distinction as it pertains to outdoor mural regulation.[162]

A related issue arises when multiple murals within a given municipality are regulated under the same terms of a local sign ordinance but are subjected to different treatment. The court in *Complete Angler* critiqued this discriminatory practice within the city of Clearwater. Although the city had declared plaintiffs' marine-themed mural an illegal sign, it had allowed other businesses in the city to display murals that contained similar degrees of relatedness to their business.[163] For instance, it had permitted a mural on a daycare center depicting children running through a field and a mural on a seafood restaurant containing various images of marine life.[164]

Of course, zoning officials are not entirely to blame for this disparate treatment. Murals painted on commercial buildings contain varying degrees of relatedness to the business inside, and thus, when a municipality must determine whether a mural is art or signage, the process of line-drawing becomes unbearably difficult—and consequently, quite haphazard.[165] Treating all outdoor murals the same,

---

[158] City of Tipp City v. Dakin, 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484, at ¶ 31 ("Despite the straightforward nature of the issue, determining whether the appellants' mural constitutes commercial speech is not without difficulty.").

[159] *Id.* ¶ 32 ("'The distinction between commercial and non-commercial speech was never obvious, and sophisticated advertising techniques can blur the lines even more.'" (quoting Menthe, *supra* note 83, at 6)).

[160] *Id.* ¶ 33.

[161] *See id.* This was likely a showing of deference to the trial court.

[162] *See, e.g.*, *id.* n.3 ("Assuming, arguendo, that we are wrong and that the appellants' mural is noncommercial speech, we note that the outcome in this case would remain the same. Our ultimate conclusion . . . is that Tipp City's sign ordinance cannot be enforced against the appellants' mural."); *supra* notes 158–59.

[163] *See* Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d. 1326, 1334 (M.D. Fla. 2009).

[164] *Id.*

[165] How close does the relationship have to be between the imagery contained in a mural and the business on whose wall the mural resides? Consider another case arising out of the city of Clearwater, Florida: An Egyptian-themed restaurant commissioned an artist to paint a mural depicting a repeating pattern of hieroglyphics over the entire front exterior wall of the building. The finished artwork was "eye-catching and appealing." But Clearwater, whose sign code

regardless of whether they contain commercial or noncommercial speech, would eliminate this inconsistency within a single municipality.

#### 4. Murals as Art

Lastly, eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation would restore all murals to their traditional status as artwork. Since its origination more than 30,000 years ago, mural art throughout history has been employed as a means of conveying artistic expression.[166] Mural art is a unique form of communication that is distinct from (and serves purposes different than) billboards, the prototype of commercial signage. Municipalities have used outdoor art murals, but not billboards, as a means of revitalizing urban communities.[167] Murals offer strong aesthetic pleasure in place of, or at least amongst, community blight, and they contribute to the cultural identity of a neighborhood.[168] By contrast, billboards generally clutter communities and elicit negative emotions from residents and tourists alike.[169] Treating murals housing commercial speech the same as those containing noncommercial speech would embrace the notion that all murals, no matter what their content,

---

forbids murals on commercial buildings if the mural relates to what the business is selling, declared the mural an illegal sign. Although the restaurant owner ultimately won the dispute on appeal, this case illustrates the danger of making broad determinations that jeopardize free speech interests. *See* Diane Steinle, *Murals Rules Create A Muddled Sign Code*, ST. PETERSBURG TIMES, Jan. 25, 2009, at 2.

166 For a discussion of the historical and artistic importance of public mural art, see Christian Ehret, *Mural Rights: Establishing Standing for Communities Under American Moral Rights Laws*, 10 U. PITT. J. TECH. L. & POL'Y 3 (2010).

167 *See id.* (noting that art allows "communities [to] take[] advantage of low cost, unused property and [attract] positive attention from outsiders"); Dana Cole, *Mural Project Gets Council's Green Light*, BENSONNEWS-SUN.COM (July 9, 2013, 6:00 PM), http://www.bensonnews-sun.com/news/article_d579d91c-e8e8-11e2-853d-001a4bcf887a.html (noting the success of mural projects in revitalizing communities, and indicating the intent of Benson, Arizona to launch a community-wide mural project to "make Benson a destination town for all tourists rather than a pass-through for travelers").

168 For example, Lake Placid, a small Florida town with a population of 2,000, is now known as the "Town of Murals." The community had a business district that was on the verge of collapse until the mid-1990s, when the town decided to paint murals on dilapidated buildings. Mural artists have since painted historical scenes, landscapes, and pictures of Lake Placid people and wildlife. Tourists travel from all over the world to see the beautiful paintings. *See* Steinle, *supra* note 165 (observing that "[e]ven the trash receptacles have been transformed by murals").

169 *See, e.g.*, Ballen v. City of Redmond, 466 F.3d 736, 744 (9th Cir. 2006) (defining billboards as "fixed, permanent structures that are . . . intrusive to community aesthetics"); Armin P. Langheinrich, *Letter: Ugly Highway Billboards Damage State's Image, Beauty*, DESERET NEWS (May 9, 2012, 12:00 AM), http://www.deseretnews.com/article/765574661/Ugly-highway-billboards-damage-states-image-beauty.html ("Because of [the abundance of ugly billboards all over the state of Utah], some labeled us as a third-world-country state. . . . This is . . . a big, ugly mess that distracts from the beauty of the state . . . .").

can contribute to society in a way that billboards and other commercial signage cannot.[170]

## III. A MODEL FOR REGULATING OUTDOOR MURALS

In light of the legal and policy-based reasons for eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation,[171] this Note proposes a model whereby all murals, regardless of their content, are regulated in the same manner. Under this model, municipalities would be able to regulate murals as they please in a content-neutral manner. Business owners interested in painting a mural on the exterior wall of their building would have sufficient notice of any time, place, and manner restrictions by which they must abide. If implemented correctly, this model would eliminate the number of disputes between mural owners and zoning administrators over whether a particular mural is artwork or signage.

The method of defining what exactly constitutes a "mural" is a process that would need to be undertaken by each individual municipality. For example, a mural could be defined as "[a] hand-produced work of visual art which is tiled or painted by hand directly upon, or affixed directly to an exterior wall of a building."[172] Notably absent from this definition is any mention of commercial or noncommercial speech. Once a definition is established, a municipality would then need to decide how it would like to regulate all outdoor

---

170 Moreover, it would embrace the Supreme Court's oft-repeated view that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981) (plurality opinion) (internal quotation marks omitted); *see also* Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

171 *See infra* Part II.B.

172 This is the definition currently being used by the city of Portland, Oregon. *See* PORTLAND, OR., CITY CODE & CHARTER tit. 4, ch. 4.12.020(J) (2013), *available at* http://www.portlandonline.com/auditor/index.cfm?c=50808&a=257808; *see also id.* at ch. 4.10.010 ("The purpose of this Title and the policy of the City of Portland is to permit and encourage original art murals on a content-neutral basis on certain terms and conditions. Original art murals comprise a unique medium of expression which serves the public interest. Original art murals have purposes distinct from signs and confer different benefits. Such purposes and benefits include: improved aesthetics; avenues for original artistic expression; public access to original works of art; community participation in the creation of original works of art; community building through the presence of and identification with original works of art; and a reduction in the incidence of graffiti and other crime. Murals can increase community identity and foster a sense of place and enclosure if they are located at heights and scales visible to pedestrians, are retained for longer periods of time and include a neighborhood process for discussion.").

murals within its jurisdiction. Again, this process should be individualized to reflect the unique identity of each municipality.

Some municipalities may choose to exempt all murals from all forms of regulation. More likely, municipalities will choose to impose at least some restrictions on outdoor art. Bearing in mind aesthetic and traffic safety goals, as well as general community demands, each municipality should strive to create content-neutral time, place, and manner restrictions that are equally applicable to all outdoor murals. For instance, a municipality could require that all murals be less than 200 square feet (manner restriction), contain less than three percent text (manner restriction), be located on a commercial building at least fifty feet from a main highway (place restriction), and remain intact for a minimum of two years (time restriction). These restrictions would apply to all murals—those containing noncommercial speech, commercial speech, or a hybrid of both.

One potential concern with implementing such a regulatory model is that muralists would be inhibited in their artistic pursuits, at least in those municipalities which impose more stringent time, place, and manner restrictions on outdoor signage. A muralist who is otherwise accustomed to painting 600-square-foot murals may feel frustrated that he is now limited to painting murals one-third the size. Although one may be sympathetic to a muralist's concern, it is an insufficient basis for maintaining the content-based distinction between commercial and noncommercial murals. If an artist desires to paint large-scale murals, he can do so in a municipality that welcomes such murals. Just like most other facets of government regulation, every municipality will differ in the value it places on art. Fortunately, many, if not most, municipalities appreciate the value of outdoor murals. This appreciation is reflected in sign ordinances which "exempt" murals and similar works of art from the more stringent requirements placed on other forms of signage.[173] Of course, many of these ordinances maintain the distinction between commercial and noncommercial murals that this Note argues should be eliminated.[174] However, at least two cities are on the cusp of eliminating this distinction.

Minneapolis and St. Paul, Minnesota's two largest cities, are considering revisions to their sign ordinances that would relax the definition of "mural" to allow for imagery of products sold within the building on which a mural resides. In Minneapolis, council member Gary Schiff has been vocal in his desire to subject all murals, regardless of their content, to the same regulations.[175] Minneapolis's current sign ordinance bans all murals that "advertise or promote any business,

---

173 *See supra* note 2.
174 *See id.*
175 *See* Boros, *supra* note 12; Gilbert, *supra* note 154.

product, activity, service, interest or entertainment" (that is, murals that contain "commercial speech").[176] Calling the distinction between commercial and noncommercial speech as contained in murals "silly," Schiff has called for a more reasonable definition that better responds to community needs and wishes.[177] Similar considerations for change are being voiced in St. Paul, a city that has long encouraged the creation of murals and other forms of artwork to "enliven" the city and "improve visual interest."[178]

Another possible concern with implementing a model that regulates all outdoor murals in the same manner is that municipalities risk corporate entities transferring their advertising campaigns from billboards to murals, which would now be permitted to house even the most overt commercial speech.[179] This concern is strongest in those jurisdictions that ban billboards, such as Los Angeles.[180] This concern, however, can be eliminated by carefully constructing content-neutral time, place, and manner restrictions that would make traditional forms of corporate advertising impossible.

---

[176] Gilbert, *supra* note 154 (internal quotation marks omitted).

[177] *See id.* ("I think ever since Andy Warhol painted a Campbell's Soup can, there's been a blurring between American iconography and advertising, and we need a change . . . . If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly and this needs to be fixed." (internal quotation marks omitted)); Boros, *supra* note 12 ("You are not allowed to show any products that you sell in your mural, or your mural is deemed advertising . . . It's really gotten silly, and the enforcement and destruction of murals has got to stop." (internal quotation marks omitted)).

[178] *See* CITY SAINT PAUL, CENTRAL CORRIDOR DEVELOPMENT STRATEGY 66 (2007), *available at* http://www.stpaul.gov/DocumentCenter/Home/View/4772 ("Blank walls create harsh pedestrian environments by limiting activity, removing a sense of connection between the building and the street and limiting 'eyes on the street.' Where the reconfiguration and reopening of blank walls is not possible, an opportunity exists to enliven the street and improve visual interest through the creation of a mural or other form of artwork."); *see also* Melo, *supra* note 9.

[179] Various mural advertising companies are already in existence, so businesses would have no shortage of artists willing to paint their commercial murals. *See, e.g.*, ALT TERRAIN, http://www.altterrain.com/graffiti_advertising.htm (last visited Oct. 27, 2013) (noting that they work with street artists to "assist agencies in creating unique art-advertising outdoor painted billboard murals"); COLOSSAL, http://colossalmedia.com/about (last visited Oct. 27, 2013) (touting themselves as "the largest hand paint mural and outdoor advertising company in the world"); *see also* Kim Bhasin, *17 Awesome Graffiti Ads From Around the World*, BUS. INSIDER (Oct. 20, 2011, 10:54 AM), http://www.businessinsider.com/graffiti-mural-guerrilla-advertising-2011-10?op=1 (describing how brands are increasingly using graffiti and murals in urban areas to "amp up their marketing").

[180] An earlier version of Los Angeles's sign ordinance exempted artwork from sign regulation. Specifically, it made all signs viewed mainly from a freeway illegal, with the exception of artwork. In an attempt to draw the line between art and advertising, murals with less than three percent text were allowed so long as they were first approved by the city. Patrick Media Group (PMG), one of Los Angeles's largest billboard companies at the time, painted a fifty-foot-tall mural in defiance of the sign ordinance. PMG insisted the mural was art. The city ultimately rejected PMG's argument, ordering it to remove the mural or face six months in jail or a $1,000 fine. *See* Kelly David, *Art or Advertising?: Controversy Over Oversize L.A. Murals Looms Large*, L.A. TIMES, Sept. 2, 1995, at D1.

## CONCLUSION

Sign ordinances throughout the nation continue to jeopardize the artistic expression of property owners who commission murals to be painted on their buildings. The continued reliance of municipalities on the outdated and content-based distinction between commercial and noncommercial speech has led to arbitrary enforcement of sign ordinances. Moreover, the inconsistent approaches taken by courts in their judicial review of these sign ordinances has resulted in art murals being subjected to different treatment based solely on the legal jurisdiction in which they reside. Even more concerning, the free speech rights of mural owners are being exposed to this same disparate treatment.

This Note argued in favor of a regulatory model whereby outdoor murals are divorced from the commercial/noncommercial speech distinction. Eliminating this distinction in the context of mural regulation renders moot the issue of how to define commercial speech. Moreover, it significantly diminishes the splitting effect of the contrasting judicial approaches to content neutrality. Altogether, such a model strikes the best balance between maintaining government regulatory power, preserving judicial resources, and safeguarding individual free speech.

(Summary published in *The Salina Journal* on July 14, 2017.)
(Published on the City of Salina's website for a minimum of one week from July 11 to July 25, 2017.)

Consolidated-Salina EPN111155

## ORDINANCE NUMBER 17-10882

AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**ANDREW AFFIDAVIT EX. 2**

Consolidated-Salina EPN11155

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

Consolidated-Salina EPN11155

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

**Section 3. Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

Consolidated-Salina EPN11155

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

Section 4. **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

Consolidated-Salina EPN111155

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), four (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

Consolidated-Salina EPN111155

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.
(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.
(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.
(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

Section 5. **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

Section 6. **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

Section 7. **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On July 10, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: June 26, 2017
Passed: July 10, 2017

Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

Consolidated-Salina EPN111155

Jason A. Gage, City Manager

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/247981075

# The Role of Driver Distraction in Traffic Crashes

**Article** · January 2001

CITATIONS
504

READS
2,459

**4 authors**, including:


Jane S Stutts
University of North Carolina at Chapel Hill
**54** PUBLICATIONS **3,703** CITATIONS

SEE PROFILE


Eric A Rodgman
University of North Carolina at Chapel Hill
**24** PUBLICATIONS **2,397** CITATIONS

SEE PROFILE

**EXHIBIT 22**

EXHIBIT
EX G
Charles R. Taylor, Ph...
11.13.2024

All content following this page was uploaded by Eric A Rodgman on 13 January 2015.

The user has requested enhancement of the downloaded file.

# THE ROLE OF DRIVER DISTRACTION IN TRAFFIC CRASHES



Prepared by
Jane C. Stutts, Ph.D.
Donald W. Reinfurt, Ph.D.
Loren Staplin, Ph.D.
Eric A. Rodgman, B.S.
University of North Carolina
Highway Safety Research Center
Chapel Hill, NC

Prepared for
**AAA Foundation for Traffic Safety**
1440 New York Avenue, N.W., Suite 201
Washington, DC 20005
202/638-5944
www.aaafoundation.org

May 2001

Cover Photos
**Top row**: Kristin Oguntoyinbo/UNC Highway Safety Research Center
**Bottom**: J. Scott Osberg/AAA Foundation for Traffic Safety

# TABLE OF CONTENTS

LIST OF TABLES ....... ii

LIST OF FIGURES ....... iii

FOREWORD ....... 1

ACKNOWLEDGMENTS ....... 2

EXECUTIVE SUMMARY ....... 3

INTRODUCTION ....... 6

CDS DATA ANALYSIS ....... 7

- Driver Factors ....... 13
- Other Factors Impacting Driver Distraction ....... 19
  - Roadway Factors ....... 19
  - Environmental and Vehicle Factors ....... 21
  - Crash Factors ....... 23

CDS NARRATIVE ANALYSIS ....... 25

NORTH CAROLINA NARRATIVE ANALYSIS ....... 30

SUMMARY AND CONCLUSIONS ....... 34

REFERENCES ....... 38

APPENDIX A. CDS Driver Inattention/Distraction Variables ....... 39

APPENDIX B. Supporting Graphs ....... 43

APPENDIX C. Sample CDS Narrative Printout ....... 57

APPENDIX D. Sample NC Narrative Printout ....... 59

# LIST OF TABLES:

Table 1: Driver attention status based on the unweighted CDS data ........................8

Table 2: Driver attention status based on the weighted CDS data ............................9

Table 3: Yearly trends in specific driving distractions based on weighted CDS data ..........................................................................11

Table 4: Distribution of driver attention status within categories of driver age ..........................................................................13

Table 5: Distribution of driver age within categories of driver attention status ..........................................................................15

Table 6: Distribution of specific driver distractions within categories of driver age ..........................................................................16

Table 7: Distribution of driver attention status for males and females ....................17

Table 8: Distribution of specific driver distractions for males and females ............18

Table 9: Roadway effects on driver attention status .............................................20

Table 10: Roadway effects on specific nature of driver distraction ..........................21

Table 11: Environmental and vehicle effects on driver attention status.................... 22

Table 12: Environmental and vehicle effects on specific nature of driver distraction ..........................................................................23

Table 13: Effects of crash characteristics on driver attention status ........................24

Table 14: Effects of crash characteristics on specific nature of driver distraction ..........................................................................25

Table 15. Analysis of narrative data from 1997 and 1998 CDS data files ............26-27

Table 16. Results of Narrative Key Word Search for Driver Distraction Cases on 1998 N.C. Crash File...............................30-31

Table 17. Results of More Restricted Narrative Key Word Search for Driver Distraction Cases on 1994 North Carolina Crash File ..............................32

# LIST OF FIGURES:

Figure 1: Overall distribution of driver attention status ......................................10
Figure 2: Overall distribution of specific driver distractions .................................12
Figure 3: Percentage of drivers identified as distracted by age group..................14
Figure 4: Age distribution of drivers identified as distracted ...............................14
Figure 5: Distribution of specific driver distractions for males and females ..........17
Figure 6: Growth in cell phone use as measured by millions of subscribers........35
Figure B.1: Effect of number of travel lanes on driver attention status ....................44
Figure B.2: Effect of number of travel lanes on specific driver distraction .............44
Figure B.3: Effect of speed limit on driver attention status .....................................45
Figure B.4: Effect of speed limit on specific driver distraction .................................45
Figure B.5: Effect of road grade on driver attention status .....................................46
Figure B.6: Effect of road grade on specific driver distraction.................................46
Figure B.7: Effect of intersection status on driver attention status .........................47
Figure B.8: Effect of intersection status on specific driver distraction .....................47
Figure B.9: Effect of light condition on driver attention status .................................48
Figure B.10: Effect of light condition on specific driver distraction ...........................48
Figure B.11: Effect of weather condition on driver attention status ...........................49
Figure B.12: Effect of weather condition on specific driver distraction .....................49
Figure B.13: Effect of vehicle type on driver attention status ...................................50
Figure B.14: Effect of vehicle type on specific driver distraction ...............................50
Figure B.15: Effect of other occupants in vehicle on driver attention status ..............51
Figure B.16: Effect of other occupants in vehicle on specific driver distraction ........51
Figure B.17: Effect of number of vehicles on driver attention status .........................52
Figure B.18: Effect of number of vehicles on specific driver distraction ....................52
Figure B.19: Effect of pre-crash vehicle maneuver on driver attention status...........53
Figure B.20: Effect of pre-crash vehicle maneuver on specific driver distraction ......53
Figure B.21: Effect of region of impact on driver attention status .............................54
Figure B.22: Effect of region of impact on specific driver distraction.........................54
Figure B.23: Effect of driver injury on driver attention status.....................................55
Figure B.24: Effect of driver injury on specific driver distraction ...............................55

# FOREWORD

This study was funded by the AAA Foundation for Traffic Safety. Founded in 1947, the AAA Foundation is a not-for-profit, publicly supported charitable research and educational organization dedicated to saving lives and reducing injuries by preventing traffic crashes.

This peer-reviewed report documents the relative reported frequency of serious crashes caused by various forms of driver distraction. It should be of interest to legislators, licensing agencies, law enforcement, and traffic safety organizations. It is available in published paper format and as an electronic file on the AAA Foundation for Traffic Safety's web site at http://www.aaafoundation.org.

Funding for this study was provided by voluntary contributions from the American Automobile Association and its affiliated motor clubs; from individual AAA members; and from AAA club-affiliated insurance companies.

This publication is distributed at no charge as a public service. It may not be resold or used for commercial purposes without explicit written permission from the AAA Foundation for Traffic Safety. It may, however, be copied in whole or in part and distributed at no charge via any medium, provided that the AAA Foundation is given appropriate credit as the source of the material.

The opinions, findings, and conclusions expressed in this publication are those of the authors and are not necessarily those of the AAA Foundation or of any individual who peer-reviewed the report. The AAA Foundation for Traffic Safety assumes no liability for the use or misuse of any information, opinions, findings, or conclusions contained in this report.

© 2001, AAA Foundation for Traffic Safety

# ACKNOWLEDGMENTS

The authors express appreciation to the AAA Foundation for Traffic Safety for their financial support of this project, and especially to David Willis and Scott Osberg for their helpful guidance and input. We would also like to thank Neil Lerner, Robert Scopatz, and Jing Wang for their thoughtful review and comments on the draft report. Anna Waller at the UNC School of Medicine provided valuable assistance to the narrative analysis portions of the project, and Mike Bowling with the UNC Survey Research Unit provided timely assistance with the statistical analyses.

# EXECUTIVE SUMMARY

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration estimates that at least 25% of police-reported crashes involve some form of driver inattention. Driver distraction is one form of inattention and is a factor in over half of these crashes. Distraction occurs when a driver "is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compels or induces the driver's shifting attention away from the driving task." The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or "lost in thought."

The AAA Foundation for Traffic Safety awarded a contract to the University of North Carolina Highway Safety Research Center to conduct research on the role of driver distraction in traffic crashes. The goal of the project is to identify the major sources of distraction to drivers and the relative importance of the distractions as potential causes of crashes. This report presents the results of Phase I of the project. Included is a descriptive analysis of five years of the National Accident Sampling System (NASS) Crashworthiness Data System (CDS) data, along with an analysis of narratives for two years for both CDS and North Carolina data. The descriptive analyses and the narrative analysis were done to provide input for developing a more comprehensive taxonomy of driver distractions; the taxonomy will guide future field data collection efforts.

The CDS is an annual probability sample of approximately 5,000 police-reported crashes involving at least one passenger vehicle that has been towed from the crash scene. Data are collected by trained, professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, as well as from available medical records. Beginning in 1995, a variable for coding the "Driver's Distraction/Inattention to Driving" was added to the CDS. The variable contains codes for attentive, looked but did not see, and sleepy, along with more than a dozen specific distractions (eating or drinking, other occupants, moving object in vehicle, talking on cellular phone, etc.).

For the current analyses two variables were defined – one identifying the attention status of the driver (attentive, distracted, looked but did not see, sleepy/asleep, or unknown), and the second the specific distracting event for those drivers identified as distracted. The CDS driver distraction data is vehicle rather than crash oriented and consequently it underestimates the role of distraction in actual crashes.

For the overall 1995-1999 CDS data, 48.6% of the drivers were identified as attentive at the time of their crash; 8.3% were identified as distracted, 5.4% as "looked but did not see," and 1.8% as sleepy or asleep. The remaining 35.9% were coded either as unknown or no driver present. This high percentage of drivers with unknown attention status has the effect of diluting the percentages in the other categories. Without the unknowns, the percentage of drivers identified as distracted increases to 12.9%. The percentage of actual *crashes* involving driver distraction would be still higher.

**The specific sources of distraction among distracted drivers were:**

| Specific Distraction | % of Drivers |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette, CD | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.3 |
| Other device/object brought into vehicle | 2.9 |
| Adjusting vehicle/climate controls | 2.8 |
| Eating or drinking | 1.7 |
| Using/dialing cell phone | 1.5 |
| Smoking related | 0.9 |
| Other distraction | 25.6 |
| Unknown distraction | 8.6 |
| | 100.0 |

Percentages for the different types of distractions should be viewed as preliminary estimates that are likely biased by differential underreporting. These are research results that will be useful in building a broader understanding of driver distraction. The percentages for the different types of distractions should not be used to guide policy development.

Young drivers (under 20 years of age) were the most likely to be involved in distraction-related crashes. In addition, certain types of distractions were more prominent in certain age groups, for example, adjusting the radio, cassette or CD among the under 20-year-olds; other occupants (e.g., young children) among 20-29 year-olds; and outside objects and events among those age 65 and older. Variations by driver sex were less pronounced, although males were slightly more likely than females to be categorized as distracted at the time of their crash.

In addition to these driver factors, a number of roadway, environmental, vehicle, and crash characteristic variables were also examined to determine their relationship to driver distraction. Although these results were less conclusive, they nevertheless underscore the importance of taking into account specific contextual factors in collecting and analyzing driver distraction data. A few illustrative examples include the higher proportion of adjusting radio/cassette/CD events occurring in nighttime crashes, the higher proportion of moving object in vehicle events occurring in crashes on non-level grade roadways, and the higher proportion of other occupant distractions occurring at intersection crashes.

To obtain further insight into the specific events falling into each of the identified CDS categories, two years of narrative CDS data were reviewed. In addition, a computerized search was made of two years of North Carolina police-reported crash narratives. Both activities proved helpful in developing a more complete taxonomy of events distracting drivers.

When interpreting the results of this Phase I analysis, it is important to keep in mind both the purpose for which it was conducted, and the limita-

tions inherent in the data. The primary purpose of the analysis was to provide input for the development of a more comprehensive taxonomy of driver distractions and to understand important contextual variables. The data limitations are considerable and include potential underreporting of distracted driving in general as well as differential underreporting of specific distracting events.

These results suggest that demographic and situational factors are related to driver distraction. Additional research is needed to quantify the frequency and intensity of different driver distractions and to understand how other variables affect distractability and willingness to engage in distracting behaviors. As roads grow more congested and the demands on drivers increase, it seems likely that new in-vehicle technologies will add even more potential distracters.

# INTRODUCTION

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration (NHTSA) estimates that approximately 25% of police-reported crashes involve some form of driver inattention – the driver is distracted, asleep or fatigued, or otherwise "lost in thought" (Wang, Knipling and Goodman, 1996; Ranney, Mazzae, Garrott and Goodman, 2000). Estimates from other sources are as high as 35-50% (Sussman, Bishop, Madnick and Walter, 1995; NHTSA, 1997).

The AAA Foundation for Traffic Safety (AAAFTS) is committed to educating the public about issues affecting safety on the roadway. A contract was awarded to the University of North Carolina Highway Safety Research Center to conduct research on "The Role of Driver Distraction in Traffic Crashes." The goal of the project is to identify the major sources of distraction to drivers and the relative importance of different types of distractions in causing crashes. The project involves a number of distinct yet interrelated tasks, including: analysis of crash data from the NASS Crashworthiness Data System (CDS) data file; analysis of narrative data from CDS and North Carolina crash reports; and collection and analysis of field data to determine the prevalence and implications of selected driving distractions in real-world driving.

This report documents the work carried out to date on the project, focusing on the CDS and North Carolina data analyses.

AAAFTS has chosen to focus its efforts specifically on driver distraction, rather than the broader category of driver inattention. It defines distraction as "when a driver is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compelled or tended to induce the driver's shifting attention away from the driving task." The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or "lost in thought."

Safety problems related to driver inattention and distraction are expected to escalate in the future as more technologies become available for use in personal vehicles. During the summer of 2000, NHTSA hosted an Internet Forum on the safety implications of driver distraction when using in-vehicle technologies including cell phones, in-vehicle navigation systems, night vision systems, and wireless Internet (Llaneras, 2000). The Forum attracted broad international participation from both the public and private sectors.

While cellular telephones and other in-vehicle technologies have been the focus of considerable research within the highway safety community, much less attention has been given to identifying other, non-technological, distractions within the vehicle and their potential role in causing crashes.

The last in-depth crash causation research was sponsored by NHTSA and conducted at Indiana University during the mid-1970s (Treat, Tumbas, McDonald et al., 1979). This study, frequently referred to as the Indiana Tri-Level Study because of the three levels of crash investigation employed, examined the human, environmental, and vehicular factors in traffic crashes.

Study results identified human factors as probable causes in 93% of the investigated crashes, environmental factors as probable causes in 34%, and vehicular factors as probable causes in 13%. Internal distraction was cited as a causal factor in 9% of the crashes and driver inattention in an additional 15%. No information was reported on the frequency of external distractions.

## CDS DATA ANALYSIS

The National Highway Traffic Safety Administration initiated the Crashworthiness Data System (CDS) in 1988. It is intended to complement the General Estimates System (GES) data, which is based entirely on information derived from police crash reports. The CDS collects much more detailed information on an annual probability sample of approximately 5,000 police-reported traffic crashes involving at least one passenger vehicle that has been towed from the crash scene. The CDS employs trained professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, and from available medical records.

The CDS captures information on passenger vehicles, which includes automobiles, pickup trucks, light vans, and sport utility vehicles, and on a few non-passenger vehicles whose air bag may have deployed in the crash. These vehicle types comprise 93% of all crash-involved vehicles and are the target of the current investigation. Only passenger vehicles damaged seriously enough to require towing from the crash scene are included in the CDS; about a fourth of all police-reported crashes involve vehicles this seriously damaged. This towaway selection criterion has the advantage of limiting the sample to those crashes that have the most serious consequences in terms of injury and/or property damage: nearly half of the drivers of vehicles reported in the CDS are injured, compared to a third of drivers in the GES. This criterion also standardizes the reporting threshold across states rather than requiring investigators to estimate the cost of vehicle repairs or to make other subjective judgments about whether a vehicle should be included in the sample.

Both the focus on passenger vehicles and the restriction to more serious crashes make the CDS a potentially useful source of data for the current project. The primary reason for using the CDS, however, is the level of detail contained for each reported crash, including a variable describing the attention status of the driver – "Driver's Distraction/Inattention to Driving" (see Appendix A). The variable was added to the data collection protocol beginning in 1995. In addition to specific driver distraction and inattention codes, it includes optional narrative information that gives a fuller picture of an identified distraction and can be used to record new and unspecified distractions.

The current analysis is based on 1995-1999 CDS data obtained from the NHTSA National Center for Statistics and Analysis. For this analysis two variables were created from the original "Driver's Distraction/Inattention to Driving" variable shown in Appendix A.

**DRIVER ATTENTION STATUS has five categories:**

1. Attentive
2. Distracted
3. Looked but didn't see
4. Sleepy or fell asleep
5. Unknown or no driver

**DRIVER DISTRACTION has 13 categories:**

1. Eating or drinking
2. Outside person, object or event
3. Adjusting radio, cassette, or CD
4. Other occupants in vehicle
5. Moving object in vehicle
6. Smoking related
7. Talking or listening on cellular phone
8. Dialing cellular phone
9. Using device/object brought into vehicle
10. Using device/controls integral to vehicle
11. Adjusting climate controls
12. Other distraction
13. Unknown distraction

Table 1. Driver attention status based on the unweighted CDS data[1]

| Driver Attention Status | 1995 | 1996 | 1997 | 1998 | 1999 | Total |
|---|---|---|---|---|---|---|
| Attentive | 3030 (46.5)[2] | 3204 (48.0) | 2451 (37.8) | 2877 (44.5) | 2598 (42.2) | 14160 (43.8) |
| Distracted | 557 (8.6) | 476 (7.1) | 393 (6.1) | 468 (7.2) | 486 (7.9) | 2380 (7.4) |
| **Looked but didn t see** | **347 (5.3)** | **347 (5.2)** | **288 (4.4)** | **275 (4.3)** | **305 (5.0)** | **1562 (4.8)** |
| Sleepy or fell asleep | 188 (2.9) | 195 (2.9) | 113 (1.7) | 151 (2.3) | 150 (2.4) | 797 (2.5) |
| Unknown/no driver | 2390 (36.7) | 2457 (36.8) | 3247 (50.0) | 2691 (41.6) | 2619 (42.5) | 13404 (41.5) |
| TOTAL | 6512 | 6679 | 6492 | 6462 | 6158 | 32303 |

[1] The unweighted data includes some special study cases (e.g., redesigned air bag and truck underride) that are not included in the weighted tables that follow.
[2] Column percent

**Table 1** shows the recorded attention status of drivers on the unweighted (or raw) data files. The information in Table 1 is vehicle, not crash, oriented. In other words, there is one record for each vehicle that was towed from the crash scene.

For these unweighted data files involving approximately 6,500 vehicles/drivers annually, instances of driver distraction are coded for 7.4% of the overall sample. It should also be noted, however, that the attention status of the driver just prior to the crash is reported as unknown (or no driver present) in a large proportion of the vehicles (41.5%), despite the in-depth nature of the crash investigations.[1]

**Table 2** presents the same percentage distributions of driver attention status, but based on the weighted CDS data files; instead of 6,500 crash-involved vehicles per year, the table reflects an average of 3.4 million crash-involved vehicles annually. The weighting factor assigned to a given case is determined by (1) the probability of the primary sampling unit being selected, (2) the probability of the particular police agency being selected, and (3) the probability of the crash being selected for that day. The weighted frequencies reflect the same sampling base as the unweighted frequencies — passenger vehicles involved in towaway crashes. However, the frequencies are extrapolated to represent the total population of such crash-involved vehicles in the U.S.

Table 2. Driver attention status based on the weighted CDS data (column percents and standard errors)

| Driver Attention Status | 1995 (N=3.4 M) | 1996 (N=3.5 M) | 1997 (N=3.7 M) | 1998 (N=3.3 M) | 1999 (N=3.2M) | Overall (N=17.1 M) |
|---|---|---|---|---|---|---|
| Attentive | 50.9[1] (3.1)[2] | 54.4 (3.7) | 40.4 (5.2) | 51.0 (3.6) | 46.9 (2.0) | 48.6 (2.7) |
| **Distracted** | **9.6 (1.1)** | **8.0 (0.8)** | **4.9 (1.1)** | **11.1 (1.4)** | **8.2 (1.2)** | **8.3 (0.6)** |
| Looked but didn t see | 6.4 (1.3) | 5.7 (0.9) | 3.9 (0.9) | 4.4 (1.4) | 6.8 (0.8) | 5.4 (0.7) |
| Sleepy or fell asleep | 2.0 (0.8) | 2.5 (0.8) | 0.9 (0.3) | 1.2 (0.3) | 2.3 (0.8) | 1.8 (0.4) |
| Unknown/no driver | 31.1 (1.8) | 29.4 (2.9) | 49.9 (6.1) | 32.3 (3.5) | 35.9 (2.7) | 35.9 (2.8) |

[1]Column percent
[2]Standard error

With the weighting factors in place, the percentage of vehicles involving a distracted driver increases to 8.3%, and the percentage of unknown or no driver cases drops to 35.9%. Although this table only shows the percentage distributions, the overall projected numbers of vehicles can be calculated by multiplying the percentages by the sample sizes shown at the top of the table. For example, 8.3% of 17.1 million vehicles/drivers is 1.4 million cases over the 5-year study period, or an annual average of 284,000 distracted

[1] The percentage of unknown cases was especially high in 1997, due to fewer occupant interviews and vehicle inspections being conducted while data collection procedures were being converted to a new electronic system.

drivers in towed vehicles.

Having such a large proportion of unknown cases in the data dilutes the overall proportion of drivers identified as distracted at the time of their crash. Also, the fact that the percentage of unknown cases varies widely across years (from 29 to almost 50%) makes it difficult to draw comparisons in the percentage of distraction cases occurring from one year to the next. If one assumes that the unknown cases are distributed like the known cases[2], the overall percentage of crash-involved vehicles with distracted drivers is 12.9%. The yearly percentages are 13.9% for 1995, 11.3% for 1996, 9.9% for 1997, 16.5% for 1998, and 12.7% for 1999.

Because the CDS are weighted sample data, each of the percentage estimates presented in Table 2 has a corresponding standard error. Percentage estimates and standard errors were calculated using SUDAAN, a statistical software package that handles multi-level and multi-year sample data (Shah, Barnwell, and Bieler, 1997). By multiplying the standard error by 1.96 and then adding and subtracting this number from the estimate, one can obtain upper and lower 95% confidence limits for each of the estimates.

**Figure 1** shows the overall estimates of driver attention status contained in Table 2 along with their associated 95% confidence intervals. Based on the data, we can conclude with 95% certainty that, if *all* towaway crashes in the U.S. were examined following the CDS protocol, 7.1% to 9.4% of the drivers in those vehicles would be identified as distracted. An additional 30.4% to 41.5% would have unknown or not applicable attention status.

As was described earlier, the CDS data also contains more detailed




Figure 1. Overall distribution of driver attention status based on the weighted 1995-1999 CDS data.

[2] Analyses showed unknown cases to be similar to known cases with respect to driver age, gender, and other important variables. However, unknown cases were more likely to occur at nighttime, and were less likely to involve occupants other than the driver.

Table 3. Yearly trends in specific driving distractions based on weighted CDS data (column percents and standard errors)

| Driver Distraction | 1995 (N=322K) | 1996 (N=279K) | 1997 (N=182K) | 1998 (N=371K) | 1999 (N=265) | Overall (N=1,420K) |
|---|---|---|---|---|---|---|
| Outside person, object, event | 28.1[1] (6.9)[2] | 35.1 (4.7) | 35.4 (6.4) | 19.8 (5.5) | 34.3 (4.1) | 29.4 (2.4) |
| Adjusting radio/cassette/CD | 14.1 (1.6) | 4.7 (1.5) | 0.4 (0.3) | 23.5 (12.5) | 5.7 (2.4) | 11.4 (3.7) |
| Other occupant | 11.8 (1.7) | 12.8 (4.3) | 10.6 (5.6) | 7.5 (2.4) | 12.7 (3.0) | 10.9 (1.7) |
| Moving object in vehicle | 3.5 (2.5) | 6.2 (3.1) | 2.5 (1.0) | 2.2 (1.0) | 7.6 (4.0) | 4.3 (1.6) |
| Other device/object | ---[3] | 2.6 (1.1) | 4.1 (2.5) | 5.3 (3.2) | 2.7 (1.2) | 2.9 (0.8) |
| Vehicle/climate controls[4] | 4.1 (1.2) | 1.6 (0.9) | 3.4 (1.0) | 2.4 (1.4) | 2.7 (0.8) | 2.8 (0.6) |
| Eating, drinking | 1.8 (0.6) | 1.3 (0.5) | 0.3 (0.2) | 1.6 (0.7) | 3.3 (1.8) | 1.7 (0.3) |
| Using/dialing cell phone[5] | 1.2 (0.6) | 2.8 (1.7) | 3.5 (1.4) | 0.3 (0.1) | 0.8 (0.7) | 1.5 (0.5) |
| Smoking related | 1.6 (0.9) | 0.5 (0.4) | 1.6 (0.5) | 0.01 (0.01) | 1.2 (0.7) | 0.9 (0.2) |
| Other distraction | 17.1 (6.0) | 19.7 (3.0) | 35.0 (7.2) | 35.3 (9.4) | 21.9 (5.7) | 25.6 (3.1) |
| Unknown distraction | 16.7 (7.5) | 12.9 (3.1) | 3.0 (2.0) | 2.1 (0.9) | 7.2 (2.3) | 8.6 (2.7) |

[1] Column percent
[2] Standard error
[3] Variable not available in 1995
[4] Combination of using device/controls integral to vehicle and adjusting climate controls
[5] Combination of talking or listening on cellular phone and dialing cellular phone

information on the specific nature of distracting events. This information is summarized in **Table 3**, again based on the weighted data. The total number of projected crash-involved vehicles with distracted drivers is shown at the top of each column, and the percentage distribution by type of distraction is given below, along with their standard errors. Percentages in each column total 100%. Two of the distraction categories represent combined categories from the original list of 13: “Using device/controls integral to vehicle” and “adjusting climate controls” have been combined into a single “vehicle/climate control” category, and “talking or listening on cellular phone” and “dialing cellular phone” have been combined into “using/dialing cell phone.” This was done because of very small numbers of raw cases for the adjusting climate controls and dialing cell phone categories.

Based on the Table 3 results, the most frequently reported source of distraction for drivers of vehicles in towaway crashes is outside persons, objects, or events (29.4%), followed by adjusting the radio, cassette or CD (11.4%), and other occupants in vehicle (10.9%). All other identified distractions – moving objects in vehicle, objects brought into the vehicle, adjusting vehicle or climate controls, eating and drinking, using a cellular phone, and smoking – each

account for only 1% to 4% of the total. In addition, there is a large category of "other" distracting events (25.6%) and "unknown" distractions (8.6%). More detailed information on the specific types of events is included in the section on the CDS Narrative Analysis and Table 15 later in this document.

It should be noted that there is large year-to-year variability in the generated percentages. This is true even for some categories (such as adjusting the radio, cassette or CD player) that are based on relatively large annual counts. In addition, the weighting process substantially alters some of the percentages. Consequently, the results contained in this report are primarily based on the combined, five-year weighted data.

**Figure 2** is similar to Figure 1, and shows the overall estimates for the




Figure 2. Overall distribution of specific driver distractions based on the weighted 1995-1999 CDS data.

various distractions and their 95% confidence intervals. In many cases the confidence intervals are quite large, a reflection of the heavily weighted data. Nevertheless, outside distractions; distractions involving a radio, CD or tape player; and distractions by other occupants in the vehicle generally stand out as most important.

The remainder of this section presents tables based on the overall weighted CDS data, examining the impact on driver distraction of various driver, roadway, environmental, vehicle, and crash characteristics. In describing these tables, we have not limited ourselves to only those results that are statistically significant. In part, this is because each table presents many possible comparisons. In addition, some results, even though not statistically significant (such as those pertaining to cell phones or other specific

Table 4. Distribution of driver attention status within categories of driver age based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | AGE | | | | |
|---|---|---|---|---|---|
| | <20 | 20-29 | 30-49 | 50-64 | 65+ |
| Attentive | 48.6 [1] (2.7) [2] | 47.4 (2.9) | 50.7 (2.8) | 53.6 (5.1) | 47.8 (3.9) |
| **Distracted** | **11.7 (1.9)** | **7.6 (0.7)** | **8.0 (0.9)** | **7.5 (0.8)** | **7.9 (1.4)** |
| Looked but didn t see | 5.4 (0.7) | 4.6 (1.2) | 4.2 (1.0) | 4.4 (0.9) | 16.5 (2.8) |
| Sleepy or fell asleep | 1.7 (0.5) | 1.9 (0.6) | 1.9 (0.6) | 2.0 (0.6) | 1.1 (0.3) |
| Unknown/no driver | 32.6 (2.8) | 38.6 (3.3) | 35.2 (3.3) | 32.6 (4.4) | 26.7 (2.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Column percent
[2] Standard error

distractions based on small sample sizes), may still have important research implications. In many instances significance can be determined by a quick comparison of the confidence intervals shown in the figure accompanying a table. For readers interested in more detailed comparisons, having standard errors included in the tables allows this flexibility.

## Driver Factors

**Table 4** presents information on driver attention status by the age of the driver. The table shows that drivers under age 20 were more likely than older drivers to be identified as distracted at the time of their crash: 11.7% of drivers under age 20 were found to be distracted, compared to 8.0% or less for each of the other age groups. When the “unknown” cases are subtracted from the totals, the percentage of young drivers identified as distracted climbs to 17.3%. The proportion of distracted drivers was fairly consistent across all age groups above the youngest. These same results are shown graphically in **Figure 3**. From the graph, it is easy to see that while the youngest age group is more likely to be identified as distracted, this difference is not statistically significant since its confidence interval overlaps with those of the other categories.

In contrast, it is the oldest age group of drivers, those age 65 and above, who stand out with regard to the two other forms of driver inattention identified in Table 4: “looked but didn’t see” and “sleepy or fell asleep.” Drivers age 65 and older were three to four times more likely to have “looked but didn’t see,” and almost half as likely to have been sleepy or asleep prior




Figure 3. Percentage of drivers identified as distracted by age group.




Figure 4. Age distribution of drivers identified as distracted.

Table 5. Distribution of driver age within categories of driver attention status based on weighted 1995-1999 CDS data (row percents and standard errors)

| Driver Attention Status | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Attentive | 16.6 [1] (0.9) [2] | 28.7 (1.6) | 36.4 (1.7) | 10.8 (0.8) | 7.6 (0.6) |
| **Distracted** | **23.3 (3.1)** | **26.9 (1.9)** | **33.7 (3.5)** | **8.8 (1.0)** | **7.3 (1.1)** |
| Looked but didn t see | 16.5 (1.8) | 24.9 (3.1) | 27.3 (5.1) | 8.0 (1.9) | 23.4 (4.8) |
| Sleepy or fell asleep | 16.3 (3.3) | 31.5 (4.8) | 36.7 (5.5) | 10.8 (4.7) | 4.7 (1.8) |
| Unknown/no driver | 15.8 (1.4) | 33.2 (1.8) | 35.8 (1.2) | 9.3 (1.0) | 6.0 (0.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Row percent
[2] Standard error

to crashing.

**Table 5** and **Figure 4** examine driver age from a different perspective, by presenting row percents rather than column percents. The question of interest here is, “What is the age distribution of drivers involved in distraction crashes, compared to other types of crashes?” Here we can see that half (50.2%) of drivers involved in distraction crashes are under 30 years of age and 83.9% are under 50. While this is a relatively youthful population of drivers, it is not too different from the overall age distribution of drivers involved in crashes serious enough to require towing from the scene. Meanwhile, drivers age 50 and above are involved in only 16.1% of distraction crashes.

**Table 6** provides more detailed information on the specific types of distractions for the various age groupings of drivers. Drivers under age 20 were much more likely than older drivers to have been distracted while adjusting a radio, cassette, or CD player. For drivers in the 20-29 year age group, other occupants were especially likely to be a source of distraction,

**Table 6**. Distribution of specific driver distractions within categories of driver age based on weighted 1995-1999 CDS data
(column percents and standard errors)

| Driver Distraction | AGE | | | | |
|---|---|---|---|---|---|
| | <20 | 20-29 | 30-49 | 50-64 | 65+ |
| Outside person, object, event | 27.0 [1]<br>(5.9) [2] | 29.0<br>(4.3) | 27.5<br>(2.1) | 33.3<br>(9.2) | 42.8<br>(13.5) |
| Adjusting radio/cassette/CD | 28.9<br>(12.1) | 7.9<br>(3.3) | 7.3<br>(3.3) | 0.6<br>(0.4) | 0.2<br>(0.2) |
| Other occupant | 10.7<br>(2.0) | 17.8<br>(4.7) | 9.8<br>(2.4) | 1.5<br>(1.0) | 2.6<br>(1.0) |
| Moving object in vehicle | 5.0<br>(4.4) | 2.4<br>(0.9) | 6.5<br>(4.1) | 3.6<br>(2.1) | 0.1<br>(0.1) |
| Other device/object | 1.3<br>(0.6) | 2.7<br>(0.9) | 4.2<br>(1.6) | 4.4<br>(3.2) | 1.4<br>(1.0) |
| Vehicle/climate controls | 3.1<br>(1.5) | 2.1<br>(0.5) | 3.3<br>(1.2) | 3.4<br>(2.0) | 1.8<br>(1.7) |
| Eating, drinking | 1.1<br>(0.5) | 1.4<br>(0.6) | 1.1<br>(0.4) | 7.9<br>(2.1) | 0.5<br>(0.6) |
| Using/dialing cell phone | 0.1<br>(0.1) | 0.7<br>(0.4) | 3.3<br>(1.2) | 0.1<br>(0.1) | 2.3<br>(2.1) |
| Smoking related | 0.9<br>(0.4) | 1.1<br>(0.3) | 1.0<br>(0.5) | 0.3<br>(0.3) | 0.0<br>(0.0) |
| Other distraction | 19.4<br>(4.2) | 22.6<br>(4.5) | 25.7<br>(3.1) | 34.5<br>(6.0) | 45.0<br>(11.7) |
| Unknown distraction | 2.5<br>(0.6) | 12.4<br>(2.9) | 10.5<br>(3.8) | 10.3<br>(6.0) | 3.2<br>(1.5) |
| OVERALL | 23.0 | 26.8 | 34.0 | 9.2 | 7.1 |

[1] Column percent
[2] Standard error

while for those ages 30-49, dialing and using a cell phone was more frequently cited (although still only a small percentage of the cases overall). Drivers ages 50-64 were overrepresented with respect to eating and drinking distractions, while those ages 65 and older were more likely to have been distracted by objects and events outside the vehicle (other vehicles, signs, animals, etc.) and by other (unspecified) distractions.

With regard to driver sex, males were slightly more likely than females to be involved in crashes involving driver distraction, but the difference was not statistically significant (**Table 7**). The specific types of distractions were also similar for male and female drivers (**Table 8** and **Figure 5**). Overall, 63% of the distracted drivers were male and 37% were female (compared to 56% and 44%, respectively, for all drivers in the CDS database).

It should again be emphasized that these percentages are vehicle or

Table 7. Distribution of driver attention status for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | Male | Female |
|---|---|---|
| Attentive | 46.6 [1] (3.1) [2] | 52.6 (2.7) |
| **Distracted** | **8.8 (0.7)** | **7.8 (0.6)** |
| Looked but didn t see | 4.9 (0.6) | 6.2 (1.0) |
| Sleepy or fell asleep | 2.7 (0.8) | 0.7 (0.1) |
| Unknown/no driver | 37.0 (2.8) | 32.8 (3.3) |
| OVERALL | 56.2 | 43.8 |

[1] Column percent
[2] Standard error




Figure 5. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data.

Table 8. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Distraction | Male | Female |
|---|---|---|
| Outside person, object, event | 28.9[1] (3.7)[2] | 30.5 (2.7) |
| Adjusting radio/cassette/CD | 10.3 (2.4) | 13.1 (8.4) |
| Other occupant | 11.2 (2.4) | 10.6 (2.0) |
| Moving object in vehicle | 4.2 (2.5) | 4.7 (2.0) |
| Other device/object | 2.2 (0.9) | 4.1 (1.7) |
| Vehicle/climate controls | 2.3 (0.9) | 3.6 (1.3) |
| Eating, drinking | 2.0 (0.7) | 1.3 (0.6) |
| Using/dialing cell phone | 1.7 (0.5) | 1.2 (0.7) |
| Smoking related | 0.9 (0.2) | 0.9 (0.4) |
| Other distraction | 28.3 (3.1) | 22.0 (4.1) |
| Unknown distraction | 8.0 (3.1) | 8.1 (2.9) |
| OVERALL | 63.1 | 36.9 |

[1] Column percent
[2] Standard error

driver oriented, rather than crash oriented. To the extent that young and/or male drivers are more likely to be "at fault" in their collisions, one might also anticipate higher incidences of distracted or inattentive driving. The percentages also underestimate the importance of distraction as a contributing factor to *crashes*. This is because it is unlikely that more than one of the drivers involved in two (or more) vehicle crashes is distracted at the time of the crash: if 10 out of 100 two-vehicle crashes are caused by distracted drivers, then 10% of the crashes involve a distracted driver, but only 5% (10 out of 200) of the vehicles had distracted drivers.

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
ANDREA WINDHOLZ,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 2:00 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

EXHIBIT 23

A. Yes.

**Q. Do you handle any of the ordering for the meat?**

A. Sometimes if my dad is unavailable.

**Q. Okay. All right. And then I understand you handle the advertising for The Cozy. Is that right?**

A. Most of the time. Sometimes my dad will do it, but a lot of times I will just because I'm more tech savvy and whatnot. I run The Cozy Inn Facebook page.

**Q. Okay. And that's what I was going to ask, too. So what social media accounts does The Cozy have an account for?**

A. That I run is just Coz -- is just the Facebook page. If there's other ones out there, it's not from me.

**Q. Okay. So you don't run a Cozy Inn Instagram account?**

A. Huh-uh.

**Q. Okay. And what do you do as part of handling The Cozy Inn Facebook page? What does that involve?**

A. I'll post on there that we're hiring. I'll make posts of like if we're going to close

early for a holiday. Or for like when we had the really bad storm a few months ago, I posted on there that we were closing for the day to let our employees clean up their debris. It's pretty much there just to update customers. And also, like when we do fun things like with The Cozy Inn eating contest, I live streamed on there for that. It's just there to like stay with customers and keep them informed and keep them with The Cozy Inn.

**Q. Okay. Do you also handle the purchasing of Cozy merchandise?**

A. I do the ordering, yes.

**Q. Okay. And what does that entail?**

A. So I'll go through the shirts and I'll see which ones we're running low on, and I'll do the order for that. And if we're running low on like our hats or koozies, I'll decide -- like here in the next couple weeks, I'll be doing a hoodie order. So like I'll just go -- I'll go on -- I'll e-mail Messenger and tell them what sizes and colors of hoodies I want. And I'll change the colors of koozies up. I pretty much have free range on what I bring in as long as it's not like an astronomical price.

**Q. Okay. Do you help determine what designs go on the T-shirts?**

A. For the most part, yes.

**Q. Okay. And how do you determine what designs go on the T-shirts?**

A. We don't really change it up. We really keep it the same. But we did like any new shirts, new styles, my dad will tell me what he wants and I'll kind of do like a little draw-up of it and be like is this what you're envisioning. And he'll tell me yes or no or maybe do this or whatever. Then I'll take that into Messenger, and I'll talk to their designer there and we'll come up with the actual design that would go onto something.

**Q. Okay. Is Messenger, is that the vendor that you use?**

A. Yes.

**Q. Okay. And I assume they're just like a merchandise vendor. They screen print on T-shirts or hats?**

MR. SHAW: Objection to form.

A. Yes. They do the printing on the shirts. And then they have Salina Embroidery works with them and they embroider like our hats and stuff

like that. And then we get our koozies and stuff printed from Messenger as well.

BY MS. JOKERST:

**Q. Okay. So when's like the last time you guys have updated a T-shirt design?**

A. From my knowledge, I think my dad kept everything the same even when he bought it.

**Q. Okay.**

A. I'm not sure if he came up with any of the designs. I really -- I honestly don't know. I was nine.

**Q. Okay.**

A. So I'm assuming -- I mean, obviously, the logo itself stayed the same, but the designs on the shirts, I don't know if he came up with them or if they were already like that when he bought it.

**Q. Okay. Or than ordering merchandise, what do you do in your role -- let me reask that. Other than handling the Facebook account and ordering merchandise, what do you do in your role as handling the advertising for The Cozy?**

A. I -- I pretty much just kind of pay attention to what Salina, Downtown Salina is doing. And if we're able to participate, then I

will bring that up to dad. Or I will e-mail Chamber of Commerce maybe and kind of see what we could do to be a part of it. We just like to stay with the times of Downtown Salina and keep with just our name out there, letting them know that we're a part of Salina and we love being part of Downtown Salina. Like it's so much fun.

**Q. Okay. Do you also coordinate radio advertisement?**

A. Yes. I talk on the radio, yes.

**Q. Okay. You talk on the radio?**

A. Um-hum.

**Q. When you say that, do you do like radio interviews or do you have like a recording of yourself for a part of an advertisement?**

A. I have talked on the radio before, like answered -- like interview.

**Q. Okay.**

A. And then right now it's just a recording.

**Q. Okay. What does the recording say?**

A. It's pretty much saying football season is here and school's back in session, so let Cozy's help you with your tailgating and, you know, late night dinner needs. I think that's what one says. And the other one, I cannot recall

what it says. I recorded it a couple months ago.

**Q. Okay.**

A. A month ago.

**Q. And do either of these recordings have like a jingle that says mosey on in to The Cozy?**

A. Yes.

**Q. Okay. Do they both have it?**

A. Yes. I think each one has a different part of the jingle, but they both have it.

**Q. Okay. Does the jingle say more than mosey on in to The Cozy?**

A. It -- yeah. So for the most part, it says that -- I honestly haven't heard the entire jingle in a very long time, so I could not tell you. But I know that like the beginning of it's just like really upbeat and like -- yeah. It says it at the beginning, at the end. And in the middle, I cannot tell you what it says. I'm sorry.

**Q. Okay. So as part of like the radio advertisement, you record the audio. Do you also coordinate with the radio station regarding when the ads will air?**

A. They try to -- they kind of tell me like we're going to air it a little bit more during

envelope, and that way my dad knows to take it home and pay it. If I take it out, then we could lose it.

**Q. Okay. Do you -- does The Cozy have like an advertising plan?**

A. Could I ask what you mean by that?

**Q. Yeah. Do you or do you and your dad, I guess, get together and set out what kind of advertising you're planning to do for The Cozy?**

A. Oh, yeah. We will sit there and we'll talk at Cozy's or something. Like, hey, I heard this was going on. Do you want to do something for it? Or there's like indoor football. We always advertise there. We do a lot for them and whatnot. And then so, yeah, we just -- we keep our eye out for things that we're able to get our name out there with and do that. We do a lot of -- yeah, a lot of the just local advertisements and whatnot.

**Q. Okay. For indoor football, is that the Salina Liberty team?**

A. Um-hum, yes.

**Q. Yes. Okay. And what kind of advertising do you do with them?**

A. We have like a banner that they hang in

there, and we also throw burgers into the stands at the football games.

**Q. Okay. Do you launch them in one of those little machines?**

A. I wish. No. It's -- they hand throw it.

**Q. Okay.**

A. As hard they I can.

**Q. Okay. So what does the banner say that you hang? And I'm assuming you hang that banner in the stadium?**

A. Yes. It's just our logo.

**Q. Okay.**

A. Like it's just the red logo, and then it says since 1922, like literally, whatever you see on line for our logo is what the banner is.

**Q. Okay. So is it the red like neon sign logo?**

A. Yes.

**Q. Okay. Anything else like that that you do? I don't know if you have any other sports teams there, soccer teams, anything local to the area where you advertise with a specific organization or event?**

A. Not that I know of, no.

**Q. Okay. And then you participate in**

wear. It's just something that sets us a little different and makes it look a little nicer and put together.

**Q. Okay. So I know you said that you sit down and talk with your dad about what kind of advertising you want to do. Do you write out a plan for the year? Is there anything that you put on paper about that?**

A. No.

**Q. Okay. Do you do any TV commercials?**

A. No.

**Q. Do you buy any billboards?**

A. Yes.

**Q. Okay. Tell me about that.**

A. We have three of them. One when you're coming from I have to think of my direction, east to west, there's one. And that one I think is just -- it has like the four original workers that we have framed in Cozy's, and then it just has like something that says what we are and what we do and that we're like the best burger joint in Kansas voted by U.S.A. Today. And there's two coming from west to east. One of them is just like the one on the east side. And then the other one is closer to Salina. It says you're

almost there and it's pretty much the gist of it.

**Q. Okay. And when you're talking about east and west, are you referring to spaces that are off of I-70?**

A. Yes.

**Q. Okay. So the one that says you're almost there, is it just lettering or is there other images on that billboard?**

A. I think that one has the four original workers on it as well. I haven't been from -- I haven't been from Hays to Salina in a little bit, so I cannot remember. But that one is like you're almost there, and has like the four original workers I think and then our logo and then where to exit.

**Q. Okay. And what about the last one? Does that also just have the logo on it or what's on that one?**

A. The one that's also on the west side?

**Q. Um-hum, yes.**

A. Okay. That one I think is the one that says like best burger joint in Kansas, has our logo and then where to exit -- or where to exit off of to go to.

**Q. Okay. And were you responsible for**

BY MS. JOKERST:

**Q. Have you ever worked at Jenni's Liquor?**

A. No.

**Q. Do you help out with the Jenni's Liquor Facebook page?**

A. Yes.

**Q. Okay. Do you run that Facebook page?**

A. Yes.

**Q. Do your parents pay you for that service?**

A. No.

**Q. And are you familiar with the burger display that was painted on the wall at Jenni's Liquors?**

MR. SHAW: Objection to form.

A. I am aware of it, yes.

BY MS. JOKERST:

**Q. Okay. How are you familiar with that display?**

A. I just know the concept of it. I've seen it a couple times, but I haven't been out there and really looked at it.

**Q. Okay. How do you know the concept of it?**

A. They told me it.

**Q. Okay. Who is they?**

A. My parents.

**Q. Okay. And when did they tell you about that display?**

A. I don't remember. I don't even remember when they finished it.

**Q. Approximately like the summer of 2024?**

A. I'm sure once they figured out that they were going to do it I knew about it, but I don't remember when I first found out about it.

**Q. Okay. And what did your parents tell you about that display?**

MR. SHAW: Objection to form.

A. They were just going to tell -- they were just trying to tie it to Jenni's -- tie what's painted on Jenni's to Cozy's just because it's both of my parents' restaurants -- or restaurants. I guess Jenni's isn't a restaurant. It's a liquor store. But it's both their businesses, both their businesses, so they were just trying to tie them together.

BY MS. JOKERST:

**Q. All right. And so you haven't gone out there to view it in person?**

A. Huh-uh. If I've gone out there, it wasn't to look at that. It would be my dad took something of mine. Like the last time I was out

questions.

MR. SHAW: Sounds good.

MS. JOKERST: All right. We'll go off the record.

(THEREUPON, a recess was taken.)

BY MS. JOKERST:

**Q. Okay. Miss Windholz, have you ever read the Salina sign code?**

A. No.

**Q. Have you ever attempted to read the Salina sign code?**

A. No.

**Q. And did you have any discussions with your dad about the design of the painted display on the north wall at The Cozy?**

A. No.

**Q. You said that at some point you saw a rendering of the design of the display on the north wall at The Cozy. Is that right?**

A. I saw like what it's supposed to look like finished.

**Q. Okay. And when did you see that rendering?**

A. I don't remember.

**Q. Okay. Did you see that rendering before**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF DUSTIN HERRS**

I, Dustin Herrs, a City Planner II for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2. I am a City Planner II for the City of Salina. I have been a City Planner for the City of Salina since April 2006.

3. I have an undergraduate degree in Geography from Fort Hays State University.

4. I have a Master's degree in Regional and Community Planning, which I received from Kansas State University.

5. I am certified by the American Institute of Certified Planners ("AICP").

6. My AICP certification requires 32 continuing education credit hours every two years.

7. Some of the continuing education credit hours I have taken as part of my certification are related to planning law classes and include education on sign regulations.

**EXHIBIT 24**

Signed: Dustin Herrs
Dustin Herrs

STATE OF Kansas )
) ss.
COUNTY OF Saline )

Subscribed and sworn to before me by Dustin Herrs on the 7 day of February, 2025.

Witness my hand and official seal. My commission expires: 4/29/2028

(Seal)

SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4/29/2028

Shandi L Wicks
Notary Public

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits. |

**Plaintiffs' Motion to Correct or Supplement**
**Plaintiffs' Memorandum in Support of their Motion for Summary Judgment**

1. Plaintiffs have discovered an error in their Memorandum in Support of their Motion for Summary Judgment, Doc. 105, and seek now to correct and supplement the record.

2. In paragraphs 180 and 181 of the statement of facts, Plaintiffs cited to and quoted Defendant's Answers to Plaintiffs' Second Set of Interrogatories. Unfortunately, Plaintiffs labeled this as Ex. DD, instead of Ex. MM. Ex. DD refers to Defendant's Amended Response to First Set of Interrogatories. Due to this mistake, Plaintiffs failed to list Ex. MM on the Index of Exhibits and did not file Ex. MM as an attachment to Doc. 105.

3. Plaintiffs file this motion to correct paragraphs 180 and 181 to change the citation to Ex. MM. No other changes are needed to the Memorandum in Support of Plaintiffs' Motion for Summary Judgment. Plaintiffs also seek to supplement the record by attaching Ex. MM and a Corrected Index of Exhibits as attachments to this motion.

4. After discovering this error on February 25, 2025, Plaintiffs immediately informed Defendant of the error and of Plaintiffs intention to correct the record. Defendant does not object to this correction. Defendant filed its Response to Plaintiffs Motion for Summary Judgment on February 28, 2025.

Dated: March 5, 2025.

Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on March 5, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants, including to: Aaron O. Martin, Todd G. Messenger, and Amanda C. Jokerst.

/s/ Jeffrey Shaw
Jeffrey Shaw

# Exhibit MM Defendant's Answers to Second Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville Chartered, hereby submits the following Responses to Plaintiffs' Second Set of Interrogatories:

**OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

3. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

4. Defendant's responses are based on a reasonable and diligent search for information

and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

5. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*6.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also* *Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

7. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**Second Set of Interrogatories**

1. Please identify the factual basis for the City's belief that "[t]he government interest served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See, e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998). Subject to and without waiving this objection, as the request states "factual**

**basis" and does not seek "all facts" Defendant interprets this to mean the material facts and will respond to this request with the material facts.**

**As explained in its prior response to Plaintiffs' first set of interrogatories, the Sign Code regulates all signs, not just the Cozy Sign, and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. As a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics.**

**The City's substantial interests are advanced by regulating signs (including wall signs like the Cozy Sign) because restrictions on the time, place and manner of the display of signs serve to limit the size, number, and location of signs on individual properties and in the larger community. By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions). Further, the character of the environment affects the quality of life and the property values in the City.**

**The facts and opinions set forth in Defendant's retained expert's report also support the factual basis that the Sign Code advances the City's interest in aesthetics, pedestrian and traffic safety, and property values. The City refers Plaintiffs to the Defendant's Expert Disclosure Statement. *See* F.R.C.P. 33(d).**

Respectfully submitted this 3rd day of September 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of September 2024, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** to be by electronic mail to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org;
sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

**Cozy Inn, Inc, et al. v. City of Salina, Kansas - Civil Action No. 6:24-cv-01027-TC-ADM**

**Plaintiffs' Motion for Summary Judgment – Corrected Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Howard Declaration |
| **Exhibit B** | Cozy Photos |
| **Exhibit C** | Cozy Proclamation |
| **Exhibit D** | Howard Deposition |
| **Exhibit E** | Commission Transcript |
| **Exhibit F** | Mural Photos |
| **Exhibit G** | Anderson Deposition |
| **Exhibit H** | Windholz Deposition |
| **Exhibit I** | Schrage Email 11/9/23 |
| **Exhibit J** | Benson Deposition |
| **Exhibit K** | Blase Deposition |
| **Exhibit L** | Schrage Deposition |
| **Exhibit M** | Driscoll Deposition |
| **Exhibit N** | Herrs 30(b)(6) Deposition |
| **Exhibit O** | Herrs Deposition |
| **Exhibit P** | Andrew Deposition |
| **Exhibit Q** | Andrew 30(b)(6) Deposition |
| **Exhibit R** | Schrage Email 11/8/23 |
| **Exhibit S** | Talking Points |
| **Exhibit T** | City Commission Minutes |
| **Exhibit U** | Schrage Email 2/20/24 |
| **Exhibit V** | Art Center DRB Packet |
| **Exhibit W** | Sign Permit Submittal Procedures |
| **Exhibit X** | Defendant's Response to First Set of Interrogatories |
| **Exhibit Y** | Sign Permit Application |
| **Exhibit Z** | News Articles |
| **Exhibit AA** | On-Hold Letter |
| **Exhibit BB** | Michelson Deposition |
| **Exhibit CC** | Yard DRB Packet |
| **Exhibit DD** | Defendant's Amended Response to First Set of Interrogatories |
| **Exhibit EE** | Public Emails |
| **Exhibit FF** | White Deposition |
| **Exhibit GG** | Content Neutral Sign Codes |
| **Exhibit HH** | Taylor Declaration & Report |
| **Exhibit II** | Taylor Deposition |
| **Exhibit JJ** | Plaintiffs' First Amended Response to First Set of Interrogatories |
| **Exhibit KK** | Photos of Murals Around Salina |
| **Exhibit LL** | Shaw Declaration |
| **Exhibit MM** | Defendant's Answers to Second Set of Interrogatories |

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-Z; Index of Exhibits; Certificate of Service.<br><br>Oral Argument Requested. |

**Plaintiffs' Reply in Support of Motion for Summary Judgment**

Steve Howard wants to finish painting a whimsical mural on the side of the iconic business he owns, The Cozy Inn, but can't. Salina's entire mural-sign code regime stands in the way.[1]

Because Salina's outdated and idiosyncratic regime is content- and speaker-based under *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015), this Court should apply strict scrutiny, grant the Plaintiffs' motion for summary judgment, and reject Salina's. Doc. 105 at 26-30; Doc. 108 at 24-28. Even *if* the regime is content neutral or a regulation of commercial speech, Salina *still* loses under either *Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021) (content neutral analysis) or *Aptive Envtl., LLC v. Town of Castle Rock, Colorado,* 959 F.3d 961 (10th Cir. 2020) (commercial speech analysis). Doc. 105 at 32-37; Doc. 108 at 28-37. Salina doesn't have any *actual evidence* of an *actual problem*; it doesn't have evidence justifying any of its restrictions on speech; it doesn't have evidence that the regime is properly tailored; it doesn't have evidence that it considered less restrictive means; and it doesn't have evidence that it leaves open alternative channels of communication. Doc. 105 at 32-37; Doc. 108 at 28-37. Indeed, Salina's argument that "radio advertising" is a constitutionally adequate alternative to a *mural* demonstrates that point. Doc. 108

[1] The mural-sign code regime includes the written sign code, the unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties.

at 34-35. Likewise, the regime is an unconstitutional prior restraint, Doc. 105 at 37-39; Doc. 108 at 37-39, and unconstitutionally vague, Doc. 105 at 39-40; Doc. 108 at 39-40.

The Cozy's one-of-a-kind, UFO-themed mural is safe, and the public adores it. This Court should grant the Plaintiffs' motion and reject Salina's so Mr. Howard can finish painting it.

## Facts

Facts asserted in a motion for summary judgment are "deemed admitted" unless they are "specifically controverted." Local Rule 56.1(a). The nonmoving party can't just claim a fact is controverted. Instead, it must "refer with particularity to those portions of the record upon which the opposing party relies." L.R. 56.1(b)(1). If the nonmoving party wants to introduce additional facts, it must do so by way of an individualized, numbered statement of additional facts. L.R. 56.1(b)(2). Salina has not complied with the Local Rules. In a number of instances, Salina *says* a fact is controverted but then cites to other parts of the record that don't actually controvert the *Plaintiffs' Statement of Facts* (*PSOF*), or it introduces new facts unrelated to the fact asserted by the Plaintiffs, or it makes argumentative legal conclusions. Because none of that is proper, in those instances, the Plaintiffs' facts should be deemed admitted. [2]

### A. Nonresponsive and improper introduction of facts.

Many of the *Responses by Salina to Plaintiffs' Statement of Facts* (*RSOF*) are nonresponsive and improperly introduce facts unrelated to the Plaintiffs' statement of fact. For example, in *PSOF* ¶ 6, the Plaintiffs stated that "[i]n Salina, murals are prolific" and then cited to the record evidence. Salina responded with "Public art, which includes murals, is not prolific and does not represent a traffic safety or aesthetic issue." *RSOF* ¶ 6, Doc. 109 at 5. Salina's "public art" reference is nonresponsive. The Plaintiffs didn't allege public art was prolific. Salina didn't cite any evidence contravening the assertion that "murals are prolific" either. Instead of responding to Plaintiffs' statement that *murals* are prolific, Salina introduced evidence about whether *public art* is a traffic hazard or aesthetically unappealing. The following *RSOF*s claim to controvert the

[2] *See Dartez v. Peters*, No. 15-03255-EFM-DJW, 2017 WL 2774670, at *9 (D. Kan. June 27, 2017); *McDonald v. Raytheon Aircraft Corp.*, 959 F. Supp. 1415, 1416 n.1 (D. Kan. 1997) (responses deemed uncontroverted as they were "nonresponsive because they offer additional facts and/or legal arguments and conclusions").

Plaintiffs' asserted facts, but are both nonresponsive and improperly introduce new facts: 3, 6, 9-19, 22-25, 27, 30, 33-39, 41, 510, 59, 60, 64-68, 70, 74, 76-79, 81, 86-87, 96, 105, 107-108, 116, 128-130, 132-133, 158, 163, 180-182, 184-188, 199, 201, 203, 210, 214-215.

**B. "Controverted" facts that aren't actually controverted by the record.**

Salina claims the following *PSOF*s are disputed, but its citations just add a few lines of deposition testimony that do not controvert any fact: 7, 20, 32-39, 42, 50, 54-60, 64-68, 70, 74-81, 84-87, 89-91, 93-95, 102, 105, 116-119, 121-123, 126, 132-136, 138-139, 141, 144-145, 149, 151, 155, 160, 162-166, 168-170, 172-178, 182, 184-188, 198, 204, 206-208, 211-212.

**C. Argumentative legal conclusions.**

Many of Salina's *RSOF*s are improper argumentative legal conclusions rather than contradictions of fact. In *PSOF* ¶ 117 for example, the Plaintiffs stated that "Salina has a firefighter mural at Fire Station #2"and then cited to the record evidence. Salina responded by arguing that "[t]he referenced 'mural' is not pertinent to the application of the Sign Code to the facts of plaintiffs' 'concrete case.' *See* Section I at p.4, *supra.*" But Section I of Salina's brief is neither a statement of additional facts nor a contradiction of a statement of facts. It's Salina's legal brief outlining their legal arguments. Salina makes similar argumentative legal conclusions dozens of times, all of which is improper. *See RSOF* ¶¶ 42, 60, 75, 81, 84, 117-122, 124-125, 127-130, 132-135, 137, 140-153, 155-159, 161-167, 169, 170-171, 176-177, 183, 200, 211-212, 216-217.

**D. Miscellaneous issues.**

In *RSOF* ¶ 3, Salina objects to Plaintiffs' Ex. A, Doc. 105-1, a declaration from Mr. Howard, because it allegedly alters sworn deposition testimony. Salina's objection is not appropriate because it fails to specify which of the declaration's 33 paragraphs allegedly alter sworn deposition testimony. What's more, Salina's claim that Mr. Howard wants customers to go inside The Cozy so he can "upsell" them is not supported by the factual record. Ex. B, Howard Dep. 40:17-25, 41:5-12, 41:16—42:8, 42:19—43:9, 45:9-17, 46:15-25; Ex. J, Windholz Dep. 33:3-16, 33:23—34:3. Even if a particular paragraph of Mr. Howard's declaration did contradict sworn testimony, Salina would need to identify which particular paragraph was objectionable.

Salina is disputing that Mr. Howard wants to finish the mural as depicted in *PSOF* ¶ 15, which depicts alien-piloted burger-esque flying saucers attacking The Cozy with blasts of ketchup and mustard. *RSOF* ¶ 15. The record does not support this position. Salina's own Zoning Administrator testified that "[t]here is no basis to doubt" that Mr. Howard intended to have the rendition depicted in *PSOF* ¶ 15 painted on the wall of The Cozy. Ex. E, Andrew Dep. 356:6—357:2; *see also* Ex. F, Herrs 30(b)(6) Dep. 91:17-21. Mr. Howard, Mr. Benson (the muralist), and Ms. Blase (an employee at The Cozy) all testified, consistently, that the mural will depict flying saucers. Ex. B, Howard Dep. 130:9—131:2, 145:24, 253:10-19; Ex. C, Benson Dep. 25:12; 135:3-5; 137:6-7; 139:15-21; Ex. D, Blase Dep. 14:2-4.

Despite all of that, Salina suggests that because there were preliminary drafts of the project that didn't include aliens, and because the unfinished mural doesn't *yet* have them, the final version won't. *See RSOF* ¶¶ 9-18, 27, 30 (referencing earlier drafts and uncompleted work); *RSOF* ¶ 15 (what is "currently painted" doesn't "contain what Plaintiffs' have referred to as the 'alien pilots'"). Mr. Benson and Mr. Howard each testified that the process was collaborative, and the plans evolved over time, eventually culminating in the rendition at *PSOF* ¶ 15. Ex. B, Howard Dep. 100:10-13, 127:1-19, 253:20-24; Ex. C, Benson Dep. 128:2—129:5, 129:13—131:7. *See also* Ex. AA, Taylor Dep. 183:18—184:11. The reason the mural as "currently painted" doesn't have aliens is because Salina stopped the project. Ex. C, Benson Dep. 137:1-14, 139:15—140:9.

The government contends that the "design approved by Mr. Howard included hamburgers without any depiction of spaceships or alien pilots." *RSOF* ¶ 14 (citing to Salina Exhibit 6 at 12) (*see also* Doc. 109-7). Below is the rendition that Salina says is "without any depiction of spaceships or alien pilots." Not only is that *not* the final rendition (as explained above), but there are also two burger-esque UFOs with clearly visible cockpits and alien pilots near the awning:



In *RSOF* ¶ 55, Salina improperly tries to dispute the accuracy of its own official minutes, which were drafted by Salina and approved by a unanimous vote of the City Commission.

In *RSOF* ¶¶ 108 and 116, Salina disputes that it placed Mr. Howard's sign permit application "on-hold" and contends that Mr. Howard gave his consent to this. The facts show Mr. Howard never agreed to his application being placed on-hold. Ex. A, Howard Dec. ¶ 26. Salina officials testified that Mr. Howard never consented. Ex. E, Andrew Dep. 233:2-6 (Q: "And at any point after he submitted his application, did Mr. Howard consent to it being placed on hold?" A: "No."); *see also id.* 230:7-233:12. Salina first informed Mr. Howard that his application was on-hold on February 8, 2024. Ex. G, On-Hold Letter at CITY000031 ("This letter is to *inform* you that … our office *will be placing* your … sign permit application on-hold") (emphasis added); Ex. H, Michelson Dep. 17:13-23 (on-hold letter sent to communicate on-hold status to applicant).

In *RSOF* ¶ 121, Salina disputes the accuracy of its own staff report in Plaintiffs' Ex. K, Art Center DRB Packet, based on Mr. Andrew's testimony, but Mr. Andrew testified that the report was correct. Ex. E, Andrew Dep. 283:17-21, 285:11-14.

In *RSOF* ¶¶ 147-148, Salina disputes that Mr. Benson painted bike themed murals for a bike store, Bike Tek, which Salina has never enforced the mural-sign code regime against. Salina contends that the photograph, Plaintiffs' Ex. L, Mural Photos at 300, has not been properly authenticated. Even if this is true, the deposition testimony of Mr. Benson and Salina's interrogatory responses still provide ample evidentiary support for *PSOF* ¶¶ 147-148. Ex. C, Benson Dep. 69:9-16, Ex. M, Def. Amend. Ans. to First Set of Interrog., Rog. 8.

In *RSOF* ¶¶ 155-158, Salina denied that the Bull Durham Tobacco mural is considered an abandoned sign under § 42-510, which must be removed because it no longer advertises a *bona fide* business. Instead, Salina contends the mural is exempt from regulation as a preexisting nonconforming sign. But the Zoning Administrator testified that a lawful nonconforming sign is still subject to abandonment under § 42-510 if it no longer advertises a *bona fide* business. Ex. E, Andrew Dep. 121:22—123:5. The record evidence shows that instead of enforcing § 42-510, Salina created an unwritten exemption "[b]ecause it was originally an internal sign on the wall of an

enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall." Ex. E, Andrew Dep. 301:21-25.

Salina objects to *PSOF* ¶ 183 on the grounds that it exceeded the scope of the 30(b)(6) notice, Doc. 80-1, and that Plaintiffs have not provided "authority for that proposition that before-and-after studies of the efficacy of sign codes is a constitutional requirement." *RSOF* ¶ 183. Plaintiffs noticed the 30(b)(6) topic of "The facts supporting the government's contention that its application of the mural-sign code regime promotes the following claimed government interests, both in general and as applied to The Cozy's mural: Traffic Safety." Doc. 80-1 at 1. Plaintiffs asked the 30(b)(6) witness "Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?" Ex. F, Herrs 30(b)(6) Dep. 73:13-16. The witness answered by claiming that a before-and-after study would be required: "I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate." Ex. F, Herrs 30(b)(6) Dep. 73:18-21. The witness opened this door and Plaintiffs just asked the logical follow-up question of whether Salina was aware of any such study by any municipality. Ex. F, Herrs 30(b)(6) Dep. 73:23—74:3.

Salina disputes that its expert's publication, *Content-Neutral Sign Codes After Reed and Austin*, is a "learned treatise" on the grounds it was targeted at urban planners. *See RSOF* ¶ 212, Under FRE 803(18)(B), a publication is considered a learned treatise if it "is established as a reliable authority by the expert's admission or testimony," FRE 803(18)(B), which Mr. White did here. Ex. N, White Dep. 191:19—192:2.

**E. The Plaintiffs' objections.**

The Plaintiffs object to Salina's *RSOF* ¶¶ 136 and 139, which argue that Plaintiffs' mural is too big. This is hearsay and violates the best evidence rule. Salina officials testified that they have never physically measured The Cozy Inn, its signs, or the mural. Ex. I, Herrs Dep. 24:20-22. Instead, the cited measurements allegedly came from Salina land records and software records, but no such records are in the evidentiary record. Ex. F, Herrs 30(b)(6) Dep. 93:17—94:1, 96:8-22.

**F. The Plaintiffs' responses to Salina's Additional Statement of Facts.**

1. **Objection**: Contains multiple statements of fact.

**Response**: Argumentative legal opinion. Not supported by fact or evidence.

2. **Response**: Plaintiffs admit the text of §§ 42-764 and 42-637. Defendant's commentary on the code is argumentative legal opinion.

3. **Objection**: Contains multiple statements of fact.

**Response**: This is not in fact how Salina applied the code against The Cozy. Salina applied the regime against The Cozy because Salina believed it communicated a commercial message. Ex. O, Schrage Email 11/8/23; Ex. P, Talking Points; Ex. Q, Schrage Email 11/9/23 at CITY000221; Ex. C, Benson Dep. 82:9-17; Ex. R, Comm. Tran. 5:2-5, 5:23-25, 10:4-5, 22:24—24:4, 26:17-22, 27:3-6, 28:1-8, 28:16-21; Ex. S, Schrage Dep. 61:1-3, 61:18-23, 62:1-5, 85:20—87:19; Ex. T, Schrage Email 2/20/24; Ex. U, Plts.' First Amend. Resp. to First Set of Interrog., Rog. 6; Ex. E, Andrew Dep. 89:11—90:3, 170:7—171:20; Ex. V, Driscoll Dep. 155:6—156:12.

4. **Objection**: Contains multiple statements of fact.

**Response**: Salina's citations to Salina's Ex. 1, Doc. 109-2, 82:2-25, 83:1-3, 87:2-25, 88:1-25, 89:1-5 involve a 2021 certificate of compatibility application, not sign regulations. Mr. Howard's testimony at 240:15-17, 241:4-15 is that he did not understand the sign code and does not mention Plaintiffs' intent. Ms. Windholz is not a plaintiff in this matter, and her deposition statement in Salina's Ex. 23, Doc. 109-24, says nothing about her knowledge or intent.

5. **Response**: Salina considers a display "affixed to the interior of a window" to be a "sign" that is subject to the regulations of the mural-sign code regime even though it does not meet the requirements of § 42-764(3). Salina Code § 42-504(9); Ex. W, Andrew 30(b)(6) Dep. 15:15-24. Salina does not consider the mural at The Yard, Ex. L, Mural Photos at 91, 123, 124, 301, to be a sign because Salina claims it is inside a building. Photographs show it is painted on the exterior brick wall of Building A and adjacent to Building B, the covered baseball field. Ex. X, Yard DRB Packet at 0166, 183.

6. **Response**: Plaintiffs admit the text of § 42-511. Defendant's commentary on § 42-511 is argumentative legal opinion.

7. **Objection**: Contains multiple statements of fact; argumentative legal opinion.

**Response**: This additional statement of fact contradicts the testimony of Salina's 30(b)(6) representative and its answers to interrogatories. *See* Ex. F, Herrs 30(b)(6) Dep. 73:13-21, 73:23—74:3, 74:5-15, 74:17—75:8, 76:19-23, 76:25—77:10, 25:14-17, 77:23—78:10; Ex. Y Def. Ans. to Second Set of Interrog., Rog 1.

8. **Response**: Salina's Ex. 15, Doc. 109-16 at 92:15-24, 93:1-16, 94:11-25, 96:3-25, 97:1-8, 98:1-13, do not support this contention.

9. **Response**: (1) Plaintiffs admit The Cozy Inn communicates some messages via Facebook, radio advertising, banner advertising at indoor football events, and billboards. (2) Branded merchandise or bumper stickers worn or used by their customers are the communications of the individual displaying them, not The Cozy Inn. Ex. E, Andrew Dep. 33:23—35:5. (3) The mural at Jenni's Liquor is a communication of Jenni's Liquor and its owners, not The Cozy Inn. (4) Any implication that these communications provide an alternative channel of communication is an argumentative legal opinion.

10. **Response**: Plaintiffs deny the implication an appeal is required and deny that Salina ever made a formal determination under Salina Code §§ 42-502 and 42-596(c), preventing an appeal under § 42-597. Ex. G, On-Hold Letter, Ex. F, Herrs 30(b)(6) Dep. 109:24—110:2.

11. **Response**: Plaintiffs admit the text of § 1-11. Defendant's commentary on § 1-11 is argumentative legal opinion.

## Reply Argument

### I. The Plaintiffs have standing.

Salina insinuates that Mr. Howard should have administratively appealed *something* to *someone* but doesn't say *what* should have been appealed, or *to whom* the appeal should have been made. Salina doesn't cite any cases for that proposition either. Doc. 109 at 3, 4. The criticism is unfounded. To the extent it's a legal argument, it's incorrect. Mr. Howard didn't need to exhaust

administrative remedies before bringing this § 1983 suit. *See, e.g., Porter v. Nussle*, 534 U.S. 516, 523 (2002); *Dennis v. Higgins*, 498 U.S. 439, 454 (1991); *Patsy v. Bd. of Regents of State of Fla.,* 457 U.S. 496, 502 (1982). Besides, under Kansas law, Salina's administrative bodies can't declare the mural sign-code regime unconstitutional, which is the relief Mr. Howard seeks. *See, e.g., Kansas Bldg. Indus. Workers Comp. Fund v. State*, 49 Kan. App. 2d 354, 381-383 (2013), *aff'd*, 302 Kan. 656, (2015).

Salina also contends that the Plaintiffs lack standing because in its view, what Mr. Howard *really* wants is to force the dozens of unregulated murals around town to join the "universe of regulated signs." Doc. 109 at 23. Salina misconstrues the relief Mr. Howard seeks. The Plaintiffs are seeking a declaratory judgment that Salina's mural sign-code regime is unconstitutionally content- and speaker-based, unconstitutionally vague, and that it is unconstitutional prior restraint. Doc. 16; Doc. 101. The Plaintiffs are seeking injunctive relief that would enjoin Salina from enforcing its unconstitutional regime against *the Plaintiffs*. This Court is perfectly capable of crafting such narrow relief.

Salina also suggests that this Court may not redress the Plaintiffs' injury because the Court could just sever the phrase "used to announce, direct attention to, or advertise" from the written definition of a "sign." Yet Salina itself insists that "[t]he full text of the definition of 'sign' is the heart of this case." Doc. 109 at 24. The crux of Salina's argument is that the phrase "used to announce, direct attention to, or advertise," is the key language of the sign code, and that it is "nonsensical" to try to define a sign without this phrase. Doc. 109 at 25-26. A court may not sever "such an integral and inseparable part of the whole scheme and purpose of the law," *Thompson v. KFB Ins. Co.*, 252 Kan. 1010, 1024 (1993) (cleaned up), because this would "change[] the scope of the Act," *id.*, and would "effect[] the meaning of what remains," *Clark v. City of Williamsburg, Kansas*, 388 F. Supp. 3d 1346, 1362 (D. Kan. 2019), *aff'd*, 844 F. App'x 4 (10th Cir. 2021) (cleaned up). *See also* Doc. 108 at 18-22.

## II. *City of Austin* did not overrule *Reed*.

Salina overreads *City of Austin v. Reagan Nat'l Advert.*, 596 U.S. 61 (2022). The Court did not "completely reject[]" its "read the sign" analysis. Doc. 109 at 27. Instead, the Court explained that an "examination of speech *only* in service of drawing neutral, location-based lines" doesn't make it "*automatically* content based." *Id.* at 69 (emphasis added). Austin's "location-based and content-agnostic" regulations didn't "single out any topic or subject matter for differential treatment," and there was "no evidence in the record that the City had applied the sign code provisions differently for different messages or speakers." *Id.* at 73-74, 76, 67 (cleaned up). *This* regime and *this* record are far different from *Austin*. This case isn't about billboards, and it doesn't involve off-premises, location-based regulations. Salina's repeated statements, actions, and testimony proves the regime is anything but content-agnostic, and even though all painted wall-displays are the same physical *thing* (paint on walls), Salina treats them differently depending on *what* the paint displays and *who* is painting it. Salina's code enforcers need to look at the art, interpret it, divine its meaning, and "evaluate whether" it makes "a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies," or "evaluate[s] whether the display is meant to attract customers" or "encourage[s] a commercial transaction," and the like. Ex. Z, Def. Rep. to First Set of Ingerrogs, Rog 5. For a city that *says* it's agnostic about the content of a display, Salina spends a lot of time and energy disputing the content of The Cozy's mural. *RSOF* ¶¶ 9-18, 27, 30. Salina even questioned Mr. Howard's expert about the scientific accuracy of depicting spaceships without any visible means of propulsion. Ex. AA, Taylor Dep. 183:18—184:11.

What's more, the *Austin* majority cabined its own holdings, explaining that it didn't "nullify *Reed*'s protections," or "cast doubt on any" "precedents recognizing examples of topic or subject-matter discrimination as content based." *Austin*, 596 U.S. at 76. Salina's mural-sign code regime is content based because it "target[s] speech based on its communicative content," it "applies to particular speech because of the topic discussed or the idea or message expressed," it targets "specific subject matter," it "draws distinctions based on the message," "cannot be

justified without reference to the content of the regulated speech," it "defin[e]s regulated speech by its function or purpose," and because it "disagree[s] with [certain] message[s]." *Reed,* 576 U.S. at 155, 163-64, 169 (cleaned up). In short, this case is controlled by *Reed*, not *Austin*.

**III. Private property does not receive lesser protection than the traditional public forum.**

Salina claims there is a "stricter version of the intermediate scrutiny test" that applies in a traditional public forum, and a different "conventional intermediate scrutiny" test that applies to private property. Doc. 109 at 34. Salina argues that because *Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021), and *McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020), involved traditional public fora, the stricter version applied there, but shouldn't apply here. Doc. 109 at 34. Because The Cozy is "private property," Salina implies that the more permissive test for nonpublic fora should apply. Doc. 109 at 34 (citing nonpublic fora standard). This confuses private property with a "nonpublic forum."

The distinction between a traditional public forum and a nonpublic forum is entirely about the "extent to which the government can control access" to *government* property. *Brewer*, 18 F.4th at 1219 (describing forum analysis) (cleaned up). Both a traditional public forum and a nonpublic forum involve *government-owned property* that the *government itself* is managing. Greater restrictions are allowed in a nonpublic forum, where the government may restrict public access, including prisons, military bases, and a school district's internal mail system. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). The caselaw involving government restrictions of speech in a nonpublic forum is simply irrelevant to restrictions on private property.

Salina confuses the issue further by implying that the "stricter version of intermediate scrutiny" for the traditional public forum applied in *Brewer* and *McCraw* was distinct from the "conventional intermediate scrutiny" that was applied in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). Doc. 109 at 34. But *Ward* was about speech restrictions in a traditional public forum as well. *Id.* at 791. What's more, *Brewer* and *McCraw* relied on, interpreted, and applied *Ward*. Finally, in *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), where the Supreme Court held that public utility poles were a nonpublic forum, *id.* at 814-15, the Court

recognized that private property was not the same thing as nonpublic forum, and private property wasn't regulated the same way because "private property owners' esthetic concerns will keep the posting of signs on their property within reasonable bounds," *id.* at 811.

**IV. Governmental interests must be substantial in fact, not just in the abstract.**

Salina insists its alleged interests in aesthetics, property values, traffic safety, and pedestrian safety are "substantial governmental interest[s] as a matter of law," and it is "downright erroneous" for the Plaintiffs to question those interests. Doc. 109 at 33. Salina misapprehends the difference between an interest that may be substantial *in the abstract* and an interest that is substantial *in fact*. Traffic safety may well be a *theoretically* substantial interest, but whether there is *actually* a substantial traffic safety issue is a question of fact. *Brewer*, 18 F.4th at 1238 ("significant government interests" in traffic and pedestrian safety must be "real and not speculative."); *Aptive*, 959 F.3d at 995–96 (substantial interest "in the abstract" does not "justify any regulation simply through talismanic invocation of that interest."). Salina has not provided any evidence that murals, even murals Salina considers signs, *in fact* pose any threat to aesthetics, property values, traffic safety, or pedestrian safety. As a result, Salina lacks a substantial government interest in regulating murals.

**V. This Court can review the evidence of the proliferation of murals in Salina.**

Salina suggests that because the Plaintiffs are mounting an as-applied claim, this Court should ignore the Plaintiffs' references to the dozens of unregulated murals around town, including the Mural at the Mill. Salina doesn't develop this argument, it just highlights one sentence from *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), that says "an as-applied challenge tests the application of that restriction to the facts of a plaintiffs' concrete case." Doc. 109 at 3. That Salina wants to keep this Court from considering that evidence is unsurprising. Even though all painted wall-displays are the same physical *thing* (paint on walls), the evidence shows that Salina treats them differently depending on *what* the paint displays and *who* is painting it. The Mural at the Mill isn't regulated, but the mural at The Cozy is, all because of *what* it depicts and *who* painted it. That evidence, along with dozens of other examples around town, disproves

Salina's argument that it did not apply its code in a content- or speaker-based way; and likewise, it disproves Salina's argument that it "administered" the "code to its letter." Doc. 109 at 3. So, when Salina *says* it applies its code in a content-neutral way, it's perfectly reasonable for this Court to see what Salina has *actually done*. *See Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326, 1334 (M.D. Fla. 2009) (discussing the abundance of unregulated murals in city). It also demonstrates the mural-sign code regime is based on a long history of unwritten policies and practices. *See id*. Furthermore, in as-applied claims, courts are *supposed* to look to the facts of the case, *not* ignore them. A finding that a law is not facially content based "does not end the First Amendment inquiry." *Austin,* 596 U.S. at 76. Instead, a court must then analyze whether a facially content-neutral law is in fact content based. *Id.* It is therefore appropriate to examine the evidence of other murals in Salina when considering if the city's sign code violates the First Amendment. *See id*; *Complete Angler,* 607 F. Supp. 2d at 1334.

Consideration of the proliferation of unregulated murals throughout Salina is also appropriate in the Plaintiffs' facial claims. For one instance, if Salina is indeed enforcing the code "to its letter" as it says, the dozens of unregulated murals show the "letter" of the code is *in fact* facially content- and speaker-based.

Moreover, the "distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and dispositions in every case involving a constitutional challenge." *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (cleaned up); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) (in a facial challenge, there is "no one test that applies"). The facial and as-applied "label is not what matters," because "facial challenges and as-applied challenges can overlap conceptually." *Supreme Ct. of N. M.*, 839 F.3d at 907 (cleaned up). "Indeed, the line between facial and as-applied relief is a fluid one, and many constitutional challenges may occupy an intermediate position on the spectrum between purely as-applied relief and complete facial invalidation." *Id.* at 908. The same substantive legal standards apply regardless. *Doe*, 667 F.3d at 1127–28. Put simply, the distinction between an as-applied and facial challenge is not about what evidence can be

considered, or what substantive test will apply, but "goes to the breadth of the remedy employed by the Court" instead. *Doe*, 667 F.3d at 1124 (cleaned up); *see Sup. Ct. of N.M.*, 839 F.3d at 917.

At bottom, the Plaintiffs are referencing the dozens of unregulated murals around town, which includes the Mural at the Mill, to show that either Salina applies its code in content- and speaker-based manner, or the code is facially content- and speaker based. Either way, it's proper for this Court to consider them.

**VI. The mural-sign code regime is an unconstitutional prior restraint.**

Salina argues that the regime is not an unconstitutional prior restraint because "Mr. Howard agreed that his sign permit application would be held in abeyance." Doc. 109 at 37. Mr. Howard never consented to his sign permit application being placed "on-hold." *PSOF* ¶ 116; Ex. A, Howard Dec. ¶ 26. The Zoning Administrator testified that Mr. Howard never consented. Ex. E, Andrew Dep. 233:2-6. Salina puts applications "on-hold" when in "the discretion of the reviewer if they feel like they're actively working with an applicant." Ex. W, Andrew 30(b)(6) Dep. 29:7-18. Salina first informed Mr. Howard that his application was on-hold months after the 10-day deadline of § 42-502 passed. Ex. G, On-Hold Letter at CITY000031 ("This letter is to *inform* you that … our office will be *placing* your … sign permit application on-hold") (emphasis added); Ex. H, Michelson Dep. 17:13-23 (letter communicated on-hold status to applicant). Besides, Salina's own statement of facts don't support the contention Mr. Howard agreed. *See* Def. Doc. 107 at 10, *Defendant's SOF* ¶ 23 ("the City also *understood* that Mr. Howard agreed that his sign permit application (submitted on November 13, 2023) would be placed on hold.") (emphasis added); Doc. 109 at 113 *RSOF* ¶ 116 ("the City *thought* they had an understanding from verbal conversations.") (emphasis added). It's plainly evident, based on the factual record, that Salina knows Mr. Howard never consented to Salina's decision to place his application "on-hold." Salina's regime is an unconstitutional prior restraint.

**VII. The mural-sign code regime is unconstitutionally vague.**

The vagueness of Salina's mural-sign code regime can be seen by simply looking at the murals Salina has allowed around town and reading Salina's claimed justifications for exempting

them. The mural at The Yard is painted on the external brick wall of a building, adjacent to a covered baseball field. It is not inside the covered baseball field. Yet Salina insists that the code is malleable enough to say that it is inside the covered baseball field. See Ex. L, Mural Photos at 91, 123, 124, 301.









The mural-sign code regime is also vague enough for Salina to determine that the Bull Durham Tobacco mural, which clearly meets the definition of an abandoned sign in § 42-510, is not an abandoned sign because it was, allegedly, an indoor sign at some point in the distant past. Ex. L, Mural Photos at 93.




The written code does not contain any exemption for displays that were formerly indoors but are now outdoors. The vagueness of this code unconstitutionally "authorizes or encourages seriously discriminatory enforcement." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

**Conclusion**

This Court should grant the Plaintiffs' motion for summary judgment and reject Salina's. *See* Docs. 105, 108.

Dated: March 14, 2025.

Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on March 14, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants.

/s/ Jeffrey Shaw
Jeffrey Shaw

# Exhibit A
# Howard Declaration

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No.<br><br>Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment |

**Declaration of Stephen Howard in Support of Plaintiffs' Motion for Summary Judgment**

I, Stephen Howard, have personal knowledge of myself, my activities and my intentions as set out in this Declaration. I verify under penalty of perjury under the laws of the United States of America the following concerning myself, my activities, and my intentions are true and correct, as are the factual statements concerning Cozy Inn, Incorporated, d/b/a The Cozy Inn:

1. The Cozy Inn is small. The dining area is about 192 square feet, and only around 40 square feet are accessible to customers.

2. Inside, The Cozy displays historical pictures and articles, including underneath the countertop where customers sit.

3. The Cozy and I are proud of the murals in Salina.

4. In 2023, I decided that The Cozy's plain-white wall didn't reflect my personality or The Cozy's personality.

5. I wanted to participate in this part of Salina culture and I wanted to paint a mural on The Cozy's side wall.

6. My vision and dream for The Cozy's artwork came from the art all over town.

7. I hired Colin Benson to paint a story that would show my personality and The Cozy's personality.

8. I am a "Sci-Fi" fan and I liked the idea of having a science fiction themed mural at The Cozy.

9. Once completed, the UFO-themed mural will include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard and will read "Don't Fear the Smell!! The Fun is Inside!!"

10. This is what the finished mural will look like.




11. The mural tells a "story" about travelers, both alien and human: I have a map of the United States inside the store that people can place a pin where they're from or foreign visitors can write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here.

12. The painting, which was partially inspired by a Sci-Fi video I thought was cool. It is expressive artwork and conveys my character and The Cozy's character.

13. The UFO-themed mural is my vision and dream for The Cozy Inn, and part of my heart and soul.

14. I didn't paint the mural to maximize profits.

15. I prefer when customers come inside to order, rather than use the walk-up window, because the walk-up window is not as personal, and the experience of our entertainment is inside. We talk with everybody. If you use the walk-up window, you're just kind of missing the whole point.

16. Because The Cozy only has 6 stools inside, and unlimited space outside, The Cozy is no better off, financially, if people come inside.

17. Having people come inside is more personal, more fun, more enjoyable for myself and the people who come inside, and it is better for Salina's reputation.

18. Colin Benson started painting The Cozy's mural on Friday, November 3, 2023.

19. On Monday, November 6, 2023, City Planner Dustin Herrs told me that I couldn't finish the display even though there had been no public complaints about it and only city officials took issue with the mural at The Cozy.

20. On the morning of November 13, 2023, Salina officials held a meeting with me and Mr. Benson.

21. Salina told me to submit a sign permit.

22. I submitted the completed sign permit application on November 13, 2023.

23. Salina did not respond to the application within the written code's 10-day deadline.

24. Salina failed to provide a written notice or statement of reasons of denial of the sign permit application.

25. I received a letter dated February 8, 2024, from Salina that put the application "requesting approval of an existing painted wall sign/mural" "on-hold until our review of the sign regulations is complete."

26. I did not consent to Salina placing my application on-hold.

27. I am very passionate about my one-of-a-kind UFO-themed mural.

28. I was moved to tears at a City Commission meeting because Salina wouldn't let me finish my mural or explain myself at the Commission meeting.

29. I speak to countless customers a week and no one have ever told me they dislike my design for my UFO-themed mural. Many people have told me that they like the mural.

30. Not being able to finish the mural made me feel like I didn't have a voice.

31. I don't want to alter the mural's content as shown in the rendition shown above.

32. I want to finish what I started. I didn't get to finish my story. I want to paint my wall.

33. I will testify at trial or for other purposes consistent with the contents of this declaration.

Dated:____________________, 2025

______________________________
Stephen Howard, individually and on behalf of Cozy Inn, Incorporated, d/b/a The Cozy Inn

33. I will testify at trial or for other purposes consistent with the contents of this declaration.

Dated: 2-4, 2025

Stephen Howard, individually and on behalf of Cozy Inn, Incorporated, d/b/a The Cozy Inn

Galaxy S22

# Exhibit B
# Howard Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**buy a six-pack. Is that right?**
A. Yeah.
**Q. A 12 pack?**
A. Yeah.
**Q. A 18 pack?**
A. Yes. But that will be three bags of six.
**Q. Okay. Oh, okay. So there's not the bags or the sacks that you put them in, there's just six to a sack?**
A. If the math works out. If somebody orders 20, we may do four bags of five.
**Q. Okay. And that's what I was going to ask. So you can buy in any denomination?**
A. Yeah. One to however many you want.
**Q. Okay.**
A. Even numbers are the most popular.
**Q. Okay. Well, when someone comes in, do you usually recommend that they buy a six-pack?**
A. If I get them to stay inside and eat, then I'll look at you and I'll tell you you'll probably eat three, maybe four and I'll look at the husband or other person, I'll look at Aaron, you'll eat four, maybe five because you want to. You know, because you want to. Anyway, I just try to make it fun.

**Q. Okay. So when someone comes inside, you can talk to them and suggest how many they should have?**

A. Yes.

**Q. Okay. What about at the ordering window?**

A. It is -- at the walk-up window, it's not as personal because you don't get the feel of -- our entertaining is inside. You know, all of us talk with everybody, and the conversations are always appropriate. They are timely. Walk up -- if you use the walk-up window, you're just kind of missing the whole point.

**Q. Okay. Do you feel like you're able to upsell better for customers that come inside?**

A. Yes.

**Q. Okay. Does that increase your sales for customers that come inside?**

A. Not always.

**Q. Okay. But does it typically?**

A. No. Because the walk-up window can get every bit as busy as the inside. And if it's snowing, they're probably going to come inside to order and not the walk-up window which won't be very many because wintertime is slow.

**Q. Okay. Well, what about in the summer?**

A. Summertime's my busy season, and it's about half and half. I don't know, I guess, what...

**Q. Okay. So of your customers, approximately 50 percent use the walk-up window and 50 percent go inside?**

A. I don't have any numbers to prove, but just by experience, yeah, 50/50.

**Q. Okay. Do you ever track that? I know you said you don't have the numbers, but do you ever track that --**

A. No.

**Q. -- in your head?**

A. No.

**Q. No. So it's --**

A. I have a very simple cash register. It tells me how many transactions I do and that's it. Doesn't tell me window or inside.

**Q. Okay. But you said coming up to the walk-up window is impersonal?**

A. Yeah. You're missing the whole point of going to The Cozy Inn.

**Q. Okay. Well, tell me about. What's the whole point of going to The Cozy Inn?**

A. You go inside, you get tagged right away

by the onion smell. And that's the butt of all jokes with The Cozy. Hey, I went to -- you can't -- Aaron can't go to his friend and say, hey, I went to The Cozy Inn today. Did you go inside? No. That's not -- that's not -- that's enough. You can't brag to your friends if you don't go inside.

**Q. Okay.**

A. My opinion.

**Q. And is that because the onion smell in The Cozy is infamous?**

A. Yes.

**Q. Okay. And is the onion smell inside The Cozy distinctive?**

A. Yes.

**Q. And when someone -- let me see how I'm going to ask this. All right. So you had mentioned that -- well, let me ask you this. So the whole purpose or you said something like you want customers to come inside The Cozy, right?**

A. Yes.

**Q. Okay. And you want them to come inside of the Cozy because you want them to order food inside, correct?**

A. Yes.

**are sitting on the stools, are the people who are standing, is that quite crowded then when you have 12 people in there?**

A. Yeah.

**Q. Okay. Would that be very comfortable for those people to stand behind the stools against the wall?**

MR. SHAW: Objection to form.

A. The conversations go everywhere. The customers talk to the other customers who don't know them. Sometimes, for instance, I had a family from, I don't know, Indiana. Another family from Indiana same time. They're in the same neighborhood. They didn't know each other. They didn't know they were going to The Cozy Inn. As they're leaving, hey, we'll see you at the pool this summer. It's neat stuff.

BY MS. JOKERST:

**Q. Okay. But what I was asking, though, if someone is just having to stand behind the stool, is that comfortable for them?**

MR. SHAW: Objection to form.

A. I don't know. If you don't like standing, I guess you would.

BY MS. JOKERST:

**Q. Okay. Well, how many times have you had 12 to 15 people sitting in The Cozy congregating in there for longer than 30 minutes?**

A. Yesterday.

**Q. Okay. So --**

A. It was -- we get very, very, very busy. And most of -- well over 90 percent of my customers come off the interstate.

**Q. Okay. And you had mentioned something about, you know, you -- it's about so you have a greeter there, the person that's doing the customer interaction that it's about being fun and welcoming the customer, right?**

A. Yes.

**Q. Okay. Well, what types of things does the greeter do to make it fun?**

A. We've got to be entertainers. You know, whatever rolls off your tongue, great, you know. We say the same thing all day long every day. Sometimes it changes up a little bit. Where are you guys from? So we'll feed off that. You know, we talk about where they're from.

**Q. Okay. Do you invite them to purchase some of the merchandise that's for sale inside.**

A. No, they usually ask.

**were good to go with him?**

A. Yeah. I didn't know him.

**Q. You didn't know Colin before this?**

A. No.

**Q. Okay. Did he tell you a little bit about like his background when he came over and introduced himself?**

A. Yeah. He's a tattoo guy.

**Q. Okay.**

A. And he gave me a first rendering. And I go just look at that wall like a sleeve. I said if you want to run with something, just run with it. And that's how it got started.

**Q. Like a tattoo sleeve?**

A. Yeah.

**Q. Okay. Before -- or I guess when he stopped by, did he -- well, that first time, I'm talking about when he first stopped by, did he show you any paintings of things he's done in the past, any images, samples?**

A. Nope.

**Q. No. Did you check out his website or look him up and see what he's done in the past?**

A. No.

**Q. Okay. So you just trusted Colin?**

**Q. Okay. So what changed between when he sent you these renderings that just had the burger and the Don't Fear the Smell, The Fun is inside to when he sent you this one?**

A. Probably after I told him to look at that like a sleeve.

**Q. Okay.**

A. Like a tattoo.

**Q. Okay. You talked to Colin?**

A. Um-hum.

**Q. And you told him to look at it like a sleeve?**

A. Yes. That was before this picture.

**Q. Okay. What did you mean when you told Colin to look at it like a sleeve?**

A. Like somebody's arm, arm tattoo.

**Q. Okay. Did you mean that you wanted more imagery on it?**

A. Yeah.

**Q. Okay. And so let's take a look at this. So this is the one, this photo rendering, right underneath it, Colin says it's the burger invasion. Over the top I know but fun. Do you see that?**

A. Yes.

A. Yes.

**Q. Okay. But, now, there's more to it, right?**

A. To the wall?

**Q. To the wall.**

A. Yes.

**Q. More to the painting?**

A. Yes.

**Q. Okay. So this rendering has additional burgers on it, right?**

A. Spaceships, yes.

**Q. Well, I want you to take a look at this one, we're looking at 346. See down by the ordering window?**

A. Yeah.

**Q. That's a burger, right?**

A. Yes.

**Q. Okay. I want you to look to the left, far left on like the left side of the bench. Do you see that?**

A. Yes.

**Q. That's a burger, too, right?**

A. Soon to be a ship.

**Q. Well, it's -- what do you mean soon to be a ship?**

A. He just hadn't painted the aliens on it, yet.

**Q. Okay. Well, this is the rendering?**

A. It was one of them.

**Q. Well, this is the rendering that you approved?**

A. Right. There's another one after this.

**Q. Well, but this is the rendering that you approved?**

A. Yes.

**Q. Okay. And so when you look at that burger on the left by the bench, that's just a burger, right?**

A. Yes.

**Q. Okay. And I want you to look at the top. So the big burger in the middle. Go up above the Don't Fear the Smell and a little to the right. That's a burger, too, right?**

A. Yes.

**Q. Okay. And I want you to go back to that main big burger, up, so Don't Fear the Smell and to the left, that's a smaller burger to the top left of the big burger, right?**

A. Looks like it.

**Q. Okay. And I want you to go straight to**

was taken on.

**Q. Okay. Well, I don't know, either, because I'll represent to you that this was disclosed by you in this case, by your attorneys. So I can't tell you specifically. But when you look at this, does this look like what the painting looks like on your wall right now?**

A. I don't know. I see it every day, but I don't know.

**Q. Okay. Well, is there a more up-to-date photo of what the wall looks like right now?**

A. Not in my possession.

**Q. Okay. All right. So let's stay on the photo on page 54 of Exhibit S. Okay. The big burger in the middle. There's no UFO or alien depiction on that, right?**

A. Right.

**Q. Okay.**

A. Not yet.

**Q. Not yet, but there's never been a rendering that shows an alien depicted on that one, right?**

MR. SHAW: Objection to form.

A. That's the mothership.

BY MS. JOKERST:

to Salina in their ships. It's really cool. I think I might have sent it to you, Sam. And then they beam onto the roof of Cozy, and they beam down and then they beam up with burgers and then they fly away.

**Q. Okay. And is the Cozy a reference -- is the Cozy Inn mural a reference to travelers?**

A. Yes.

**Q. Okay. How does it refer to travelers?**

A. Okay. I have a map inside the store that people write in -- they pin where they're from or they have -- they write in marker what country they're from. And they're excited. They've traveled sometimes hundreds of miles, sometimes thousands of miles. They're excited. They're finally here. Well, guess what, even aliens like Cozy's. They traveled light years to get here. Over 90 percent of my business are travelers. I don't know if I said that.

**Q. And the rendering that was attached to your sign permit application, is that what you desire for Mr. Benson to paint on the side of the wall if he's allowed to complete the mural?**

A. Yes.

MR. SHAW: Okay. I have no further

## CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 17th day of October, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit C
# Benson Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
COLIN BENSON,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:26 a.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**Q. -- and we're good. I don't expect you to have, you know, absolute perfect memory of everything that was said. But okay. So that's helpful. So you added the burger. Do you know if -- I mean kind of thinking back on this looking at these photos that you initially sent Steve, can you recall if Steve was the one who told you he wanted the burger --**

A. No.

**Q. -- and the lettering?**

A. No. This -- the burger invasion is all me. I created the whole burger invasion. He told me his story of the burgers coming from Saline, you know, and everything. After that, I took it on my note to do the whole wall.

**Q. Okay.**

A. This was not his -- he was not wanting to do anything like that at first.

**Q. Okay. And what I'm talking about now, though, are these initial photos. So I don't think, and I'm looking at this, it doesn't appear to me that this was referred to, these initial, and I'm looking at like page 1 and 2, the photo renderings that were sent there that were initially referred to as the burger invasion. Is**

A. Yeah.
**Q. They reached out to you. And did you fly back from -- or travel back from Denver to Salina to do that?**
A. Yes.
**Q. Okay. All right. So we've got Sharp Performance, Cozy, Riverfest. Anything else in Salina?**
A. Bike Tek.
**Q. What's that?**
A. Bike. Yeah, Bike Tek.
**Q. Bike Tek?**
A. Um-hum.
**Q. Okay. What did you do there?**
A. Pedals on one side and cranks on the other.
**Q. Okay. And was that on the outside of the building?**
A. Absolutely.
**Q. Okay. All right. For Bike Tek, did they -- did they also just reach out to you by word of mouth or how did they get in touch with you?**
A. I've known the owner since a kid -- since I was a kid.
**Q. Okay. So they already knew that you**

**were at that meeting?**

A. Yes.

**Q. Okay. What did you say?**

A. I don't believe it was a signage being put up. I believe it's a mural. It had nothing to do with what we were there for. And I was shut down pretty quick. So that was about all I had to say.

**Q. Okay. Did they explain to you at the Smoky Hill Museum, and by they I'm talking about representatives of the city, why they considered it a sign?**

A. Yes.

**Q. Okay. What did they tell you?**

A. The hamburgers are basically the same thing he sells and, therefore, it would be signage.

**Q. Okay. Prior to this meeting at Smoky Hill Museum, had you already heard that the city considered that display a sign?**

A. No.

**Q. Okay. So Steve didn't tell you the conversations -- did Steve talk to you about the conversations he'd had with the city prior to that meeting?**

BY MR. SHAW:

**Q. Earlier, you had mentioned a couple times about the murals telling Steve's story. Do you recall that?**

A. Yes.

**Q. What did Steve tell you, I guess, was his story that he wanted to try to convey?**

A. They were coming from Saline planet. He had this whole little, you know -- little story about the burger invasion coming from was it planet Saline and something else. It has Brookville to do with it, where he lives. So he's got this little, you know, invasion story. And I was just trying to read, you know, what he had. And so that's what I meant by -- you know, or where I was going with it, you know.

**Q. Did he tell you that story before you drew up the burger invasion?**

A. Yes. He --

MS. JOKERST: Object to form.

MR. SHAW: I will finish the question.

MS. JOKERST: Okay. Well, he started answering so --

MR. SHAW: Yes, I know.

BY MR. SHAW:

**Q. Did he tell you that story before he drew up the rendition of the burger invasion that you sent to him?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Can you go to Exhibit L. That will be the text chain we've been discussing.**
A. Yeah.
**Q. So if you could go to the one marked looks like 348 -- actually, 346. Sorry.**
A. 346. There you go.
**Q. So do you see the picture that you sent to Steve --**
A. Yes.
**Q. -- with a rendition of the burger invasion?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. That rendition only shows roughly half, two-thirds of The Cozy building, correct?**
MS. JOKERST: Object to form.
A. There is -- there's more added. There's definitely more to the building past that sign for

sure.

BY MR. SHAW:

**Q. Yeah. It was a bad question. It doesn't show the entire Cozy wall?**

A. It does not show the entire building.

**Q. And had you and Steve decided to have the mural cover the entire building?**

A. Yes.

**Q. Okay. And so this rendition that's here on this page, that wasn't the complete, I guess, vision of what the mural would look like. Is that correct?**

A. Correct.

MS. JOKERST: Object to form. Did we get my objection on the record.

THE REPORTER: Yes. You might pause just a little bit before you answer, because we've got that lag.

THE WITNESS: Oh.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. And was the intention for all of the burgers in the mural to all be UFOs?**

A. Yes.

MS. JOKERST: Object to form.

A. Yes.
BY MR. SHAW:
**Q. And was it your plan that all of the burgers would have little cockpits on them with aliens piloting the burger UFOs?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Okay. Do you remember when we discussed the meeting that took place at the Smoky Hill Museum with yourself and Mr. Howard and some city officials?**
A. Yes.
**Q. I believe you said like when you walked in, they had applications of some sort already distributed?**
A. Yes.
**Q. Was that to say they had forms to fill out for sign permit?**
MS. JOKERST: Object to form.
A. Yes.
BY MR. SHAW:
**Q. Do you recall if city officials told Steve he needs to fill out a sign permit application?**

**Q. Okay. So why did you send this rendering to Mr. Howard?**
A. This is -- this is the ending of all of it. The mothership is the big burger, and basically the lights weren't done on that. But this is the end rendering of all the spaceship burgers on the whole building.
**Q. Okay. But this is different than the rendering that you started painting on the building, right?**
A. No.
**Q. Well, you told me that you had outlined everything by the 5th, right?**
A. On that section. I wasn't able to do the whole building.
**Q. Okay. On that section --**
A. Yeah, I started doing the section.
**Q. Okay. But you're talking about the section on the left, right?**
A. Yeah, the big burger, yes.
**Q. Yeah. Okay. So let's take a look at Exhibit F. Okay. Go ahead and take -- there's four photos there. Do you recognize these photos?**
A. Absolutely.
**Q. Okay. What are they?**

**Q. Okay. That's painted in, right?**
A. Partial.
**Q. Okay. Well what -- what's not painted in there?**
A. The meat, the pickles, pretty much none of the top because that -- the cockpits are all see through, so I have to paint everything before I can do a see through cockpit on top of it because it's transparent. Therefore, if I would paint through transparency, it wouldn't be transparent. So I would paint the burger first. Then I add the cool details and stuff afterwards as kind of the rendering of the very last Exhibit N.
**Q. Okay. Well, aren't the cockpits at Jenni's Liquor, those are transparent, right?**
A. Yeah.
**Q. Okay. So then why were those outlined in the painting at Jenni's Liquor? So let's take a look at that. I want you to take a look at Exhibit I.**
A. I used the background color as they're see through.
**Q. Okay. But I want you to look at Exhibit I. That stencil is complete, right?**

A. Yes.
**Q. And there's no outline there of any depiction that could be considered a UFO driver of, is there?**
A. No.
**Q. Okay. One second. And on the big burger in the middle, there's no outline of a depiction of what could be a UFO driver there, right?**
A. No, there is not.
**Q. So I want to go back to. Actually --**
MS. JOKERST: Okay. I actually don't have any further questions.
RECROSS-EXAMINATION
BY MR. SHAW:
**Q. Was it your intention when this mural was finished to have cockpits and aliens on the burger UFOs?**
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. You may answer.**
A. Every single one.
**Q. Okay.**
A. I stated earlier that it was the mother ship, and it was going to have lights and everything. When you do transparent stuff, you

can't really add paint. I had a blue background on Jenni's which allowed the blue to come through the windows. This is all white, so I have to add it. And the last thing I do is add color.

**Q. Is was this the intention when you began painting the mural to have cockpits on all of the UFO burgers?**

MS. JOKERST: Object to form.

A. Yes.

MR. SHAW: I have no questions.

MS. JOKERST: I don't have any further follow-up.

So, Mr. Benson, you have the option to read your transcript and see if there are any errors in it from what you said versus what was included on the transcript. Typically, that would be something along the lines of you testified the light was green and the transcript says the light was red. You have the option to read that and mark whether or not there's any errors as you see them and state what they are and then sign the transcript, but you don't have to do that. If you want to do that, the court reporter can send you an electronic copy of the transcript so you can read and then swear and affirm and sign on that

**CERTIFICATE**

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs
_________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit D
# Blase Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

JESSICA BLASE,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 3:56 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

A. Um-hum.

**Q. Okay. And what did he tell you that it was supposed to depict?**

A. Spaceships that looked like hamburgers.

**Q. Okay. When you talked to Colin about the painting, was there anyone else around?**

A. Not that I can remember.

**Q. Okay. Prior to Colin starting the painting, did he -- I understand that he came into The Cozy to talk to Steve about the display. Were you around when Colin was in The Cozy talking to Steve?**

A. I was there at work, yes.

**Q. Okay. Did you hear what they were talking about?**

A. No. They were mainly in the back. I was busy working.

**Q. Okay. Okay. And then at some point, did someone from the city call The Cozy?**

A. Someone did call, yes.

**Q. Okay.**

A. I don't know -- I can't remember his name. I know it was a male. He called, asked if Steve was at work. I said he wasn't. He said that he needed to call him ASAP and to not paint

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit E
# Andrew Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

THE REPORTER: Thank you.
BY MR. SHAW:
**Q. Have you determined the difference between a commercial and non-commercial flag?**
A. Have I in my experience?
**Q. Well, yeah, I guess I can ask that question. Have you ever made that determination?**
A. No.
**Q. If a business were to fly a flag such as the McDonald's flag we discussed earlier, would that be exempt under the code?**
A. Not as subsection 1 is written.
**Q. Okay. So a business flag like the McDonald's flag would be regulated and require a sign permit. Is that correct?**
MS. JOKERST: Object to form.
A. I would just be speculating on that. Because in my 37 years, I've never seen a McDonald's or any commercial flag that has come before us.
BY MR. SHAW:
**Q. Okay. What about a -- well, let me ask you this. Have you ever seen a Kansas City Chiefs flag?**
A. I have. I drive by one.

**Q. Would those be considered commercial flags?**

A. No.

**Q. Why not?**

A. Because they are just expressing that property owner's support for their team.

**Q. Do you know if the Kansas City Chiefs are a commercial enterprise?**

MS. JOKERST: Object to form.

A. Well, I know that the Kansas City Chiefs is a sports franchise that desires to make money.

BY MR. SHAW:

**Q. Okay. Could those Chiefs flags be considered advertisements for the Chiefs?**

MS. JOKERST: Object to form.

A. Not in my opinion, no.

BY MR. SHAW:

**Q. So even though it is a commercial business displaying its logo, that is not an advertisement?**

MS. JOKERST: Object to form.

A. I would consider an individual owner who has a Chiefs flag to be displaying a non-commercial flag.

BY MR. SHAW:

**Q. Okay. Okay. Can we return to -- well, actually, let's stay here. Would the Chiefs flag be announcing the Kansas City Chiefs?**

A. It could be interpreted as announcing the Kansas City Chiefs.

**Q. Okay. Would the Chiefs flag be -- strike that. Can you please go back to the definition of sign. There we are. Do you see in subsection 3 where it states that the sign must be located inside -- or excuse me, is not located inside a building?**

A. That is one of the elements in the determination.

**Q. So are there any signs that are located inside a building?**

MS. JOKERST: Object to form.

A. The Tony's Pizza Events Center has a sign located inside its lobby.

BY MR. SHAW:

**Q. Okay. Is that a regulated sign?**

A. No.

**Q. Okay. Because it is inside. Is that --**

A. Because it's inside the building.

**Q. I see. If a sign is inside a building but clearly visible from the outside, would that**

A. I would look at the rendering that they provided. And if it was words or numbers, I would determine whether those words or numbers announce, direct attention to or advertise the business or the products at that premises, and we would attempt to draw a rectangular box around those letters and calculate the square footage of the display to determine whether it was too large or not too large to be located as proposed.

BY MR. SHAW:

**Q. And let's say that same business came to you with a proposal to paint on the side of their building the Arrowhead logo of the Kansas City Chiefs and text, you know, let's go Chiefs. How would you determine if that were a sign or not?**

MS. JOKERST: Object to form.

A. I would determine whether those graphics announced or directed attention to or advertised.

BY MR. SHAW:

**Q. How would you do that?**

A. Well, in the specific context you gave me, I would interpret that to say that it is announcing that that property owner supports the Kansas City Chiefs.

**Q. What if that property was a training**

**facility for the Kansas City Chiefs?**

A. Then it would be the same thing except it's also advertising and directing attention.

**Q. Okay. Now, let's say the text on this mural, the letters are very widely spaced. Would you draw a rectangle around the entire display or only around each letter to determine its area?**

MS. JOKERST: Object to form.

A. The entire display.

BY MR. SHAW:

**Q. Okay. Would you also draw that rectangle around any other emblems that are related to that mural?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. So in the example I gave before, you've got the Chiefs Arrowhead and then the let's go Chiefs. Would you draw one rectangle or two separate rectangles?**

MS. JOKERST: Object to form.

A. Are we talking about painted wall signs or are we talking about murals?

BY MR. SHAW:

**Q. Well, either way. How would you determine the size?**

clear that it was not an abandoned sign notwithstanding that the Fox Theater was no longer open.

**Q. But is it also your position that all non-conforming signs which predate 1990 are not subject to the abandonment requirements of Section 425-510?**

MS. JOKERST: Object to form.

A. The purpose of this section is to deal with signs downtown that may have been conforming when they were put up but when the C-4 district sign regulations were comprehensively rewritten and amended in 1990 became non-conforming. And the idea was those signs may not be permitted under the new code and they may not comply with all the provisions of the new code, but they are considered to be non-conforming which means they don't have to be removed. Non-conforming and abandoned, are not -- they are not synonymous.

BY MR. SHAW:

**Q. I understand they're not synonymous. What I'm asking is, is it possible for a non-conforming sign to ever be abandoned?**

MS. JOKERST: Object to form.

A. If a non-conforming sign advertises a

business that is no longer in place at that location, then that would be considered an abandoned sign. If it advertises a hotel and the hotel closes, it doesn't matter whether it was a conforming sign or non-conforming sign.

BY MR. SHAW:

**Q. Okay. So if I understand correctly, the only non-conforming sign that is not subject to abandonment is the theater marquee sign on I forgot the name of the theater you mentioned earlier. But is that correct?**

A. Yes. That --

MS. JOKERST: Object to form.

A. That section refers to one and only one sign, the Fox Theater marquee sign on the Fox Theater which was closed, and that was considered to be an important part of the theater. And notwithstanding that it was closed, there was a legislative decision made that it will not be considered subject to the abandonment clause.

BY MR. SHAW:

**Q. Okay. But all other signs could potentially be subject to the abandonment clause?**

A. Whether conforming or preexisting non-conforming --

**Q. All right.**

A. -- if the business is no longer in operation, if the bank is closed and the bank that doesn't exist have signs up, those can be directed to be removed.

**Q. What about --**

MS. JOKERST: Was my objection noted prior to that response.

THE REPORTER: No.

MS. JOKERST: Okay. Well, I objected to form.

THE REPORTER: Thank you.

BY MR. SHAW:

**Q. What about a off-premises advertising sign? Would it be subject to the abandonment clause?**

MS. JOKERST: Object to form.

A. Conceivably, but I doubt very much whether we would -- we would not require the structure to be removed.

BY MR. SHAW:

**Q. If the off-premises advertising sign were a painted wall sign for a defunct business, would that be considered an abandoned sign?**

MS. JOKERST: Object to form.

**smell but its neighbor did have a smell?**
MS. JOKERST: Object to form.
A. Because the sign is still inviting customers to come in and partake of their product and notwithstanding the smell of the chicken farm.
BY MR. SHAW:
**Q. If The Cozy Inn was not a restaurant or -- let's do a different one. Let's say The Cozy Inn only did delivery and so customers would never come to the Cozy Inn location, would the phrase Don't Fear the Smell still be a sign?**
MS. JOKERST: Object to form.
A. That would require me to speculate.
BY MR. SHAW:
**Q. I'm asking you to state how you would interpret this code in that scenario?**
A. I think you're asking me to speculate without the full context.
**Q. The full context is that this is a building that delivers food to customers but customers never come to that building, and it has a mural saying Don't Fear the Smell. Would that be interpreted as a sign under the code?**
MS. JOKERST: Object to form.
A. I'd have to see what's on the rest of the

wall of the building.

BY MR. SHAW:

**Q. It's a white wall except for those words?**

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Would it be a sign in that situation?**

A. My first --

MS. JOKERST: Object to form.

A. My first inclination would be to consider that a sign.

BY MR. SHAW:

**Q. Why is that?**

A. Because there's nothing else on the wall of the building.

**Q. Why does the presence of other things on the wall of the building change the determination one way or another?**

MS. JOKERST: Object to form.

A. Well, it's not -- it's not a non-commercial message.

BY MR. SHAW:

**Q. If it's referencing the smell of its neighbor, would that be a non-commercial message?**

MS. JOKERST: Object to form.

A. Not necessarily.

**Q. Was this done in consultation with Mr. Howard?**

A. Absolutely.

**Q. Did Mr. Howard agree to having his permit being placed on hold?**

A. Yes.

**Q. When did he make that agreement?**

A. When he talked to Mr. Herrs.

**Q. Mr. Herrs told you that Steve Howard agreed to his application being played on hold?**

MS. JOKERST: Object to form.

A. Mr. Howard was informed on Monday the 6th that we were unable to issue a sign permit, and he was informed that we were going to continue to work with him on coming up with a code-compliant solution that might allow the sign to ultimately be installed.

BY MR. SHAW:

**Q. But he submitted this application after that date. Is that correct?**

A. That is correct.

**Q. And at any point after that, did Mr. Howard consent to his application being place on hold?**

MS. JOKERST: Object to form.

A. Mr. Howard had knowledge that we were not able to approve his sign permit application.

BY MR. SHAW:

**Q. I asked if he consented to his application being placed on hold?**

A. What's your definition of consent?

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Agreeing he would let you place his application on hold?**

A. That's not a definition. What is your definition of consent? Mr. Herrs talked to Mr. Howard face-to-face, handed him information face-to-face and told him face-to-face that we are unable to issue a sign permit for the sign as currently proposed under the current sign code. How is that not communication.

**Q. I'm asking if Mr. Howard consented to his application being placed on hold?**

A. What form would that consent take?

**Q. Saying I agree that you can take my application and place it on hold. Did he ever say anything along those lines to you or Mr. Herrs?**

MS. JOKERST: Object to form and foundation.

A. I guess I'll refer back to Mr. Herrs' e-mail of his conversation with him.

BY MR. SHAW:

**Q. Are you referring to Exhibit 3?**

A. Exhibit 3.

**Q. So what in this e-mail do you believe expresses Mr. Howard's consent that an application he had not yet submitted be placed on hold?**

MS. JOKERST: Object to form.

A. Mr. Herrs said that in his conversation with Mr. Howard he had asked the artist to stop work on the sign until staff had had a chance to talk more about if there are any possible text amendments that might be appropriate. And we kept Mr. Howard informed of that, that we couldn't approve it in its present form but that we would continue to explore options and work towards seeing if there was a code-based solution that would allow the sign to ultimately be installed.

BY MR. SHAW:

**Q. And a week passed between when Mr. Herrs spoke with Mr. Howard and when Mr. Howard submitted his application. Is that correct?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:
**Q. And at any point after he submitted his application, did Mr. Howard consent to it being placed on hold?**
MS. JOKERST: Object to form.
A. No. Because he already knew we couldn't approve it.
BY MR. SHAW:
**Q. Okay. But is that consent?**
MS. JOKERST: Object to form.
A. You tell me the difference between non-approval and denial and I'll answer your question.
BY MR. SHAW:
**Q. Well, a denial under the code triggers certain appeal rights. Is that correct?**
MS. JOKERST: Object to form.
A. What would he appeal?
BY MR. SHAW:
**Q. He could appeal to the Board of Zoning Appeals. Is that correct?**
MS. JOKERST: Object to form.
A. He could appeal to the Board of Zoning Appeals at any time.
BY MR. SHAW:
**Q. So your position is that he may appeal at**

**Art Center building?**

A. Yes.

**Q. What does it mean to be similar in function to a sign?**

MS. JOKERST: Object to form and foundation.

A. Something that might be visually appealing or attract your eye.

BY MR. SHAW:

**Q. And when it says it will direct the public to the gallery, what does that mean?**

MS. JOKERST: Object to form and foundation.

A. That means it was written by a staff member that doesn't have all the full nuances.

BY MR. SHAW:

**Q. Are you saying the staff report is incorrect?**

MS. JOKERST: Object to form.

A. I'm not saying the staff report was incorrect.

BY MR. SHAW:

**Q. What does it mean then that the staff whoever wrote this doesn't understand the nuances?**

A. They did not, when they did their

**Q. What is the function of a sign?**

A. Function of a sign is to announce --

MS. JOKERST: Object to form.

A. -- direct attention to or advertise.

BY MR. SHAW:

**Q. And this mural directs the public to the gallery. Is that correct?**

MS. JOKERST: Object to form.

A. Not in my opinion.

BY MR. SHAW:

**Q. Okay. So then is the staff report incorrect?**

MS. JOKERST: Object to form.

A. I'm not saying it's incorrect. I don't think it's written to the detail that it needs to be for the nuance.

BY MR. SHAW:

**Q. Does the Design Review Board have anything other than the staff report to go on when they make these determinations?**

MS. JOKERST: Object to form.

A. They have the design guidelines.

BY MR. SHAW:

**Q. And what do the design guidelines say about murals that are similar in function to a**

sign or a historical sign.

**Q. Is it an abandoned sign?**

MS. JOKERST: Object to form -- no, I'm not going to object to that.

A. It is not an abandoned sign.

BY MR. SHAW:

**Q. What is it not an abandoned sign?**

A. Because it's a preexisting sign that was exposed when a building was demolished in 1986.

**Q. Earlier when we were discussing abandonment and non-conforming signs, you had stated that the only non-conforming sign that wasn't subject to abandonment was the theater marquee signs. Do you remember that?**

MS. JOKERST: Object to form.

A. I don't recall it exactly that way. I recall reviewing that code section.

BY MR. SHAW:

**Q. So why is this sign not subject to abandonment under 42-510?**

A. Because it was originally an internal sign on the wall of a enclosed building that it was exposed to daylight in 1986 when the building that occupied that site was torn down turning the interior wall into an exterior wall.

**that Steve Howard is lying in his application?**

MS. JOKERST: Object to form and foundation.

A. I don't even know what that means.

BY MR. SHAW:

**Q. Is it the position of the City of Salina that Steve Howard has altered the rendition he submitted to be different than what he originally planned?**

MS. JOKERST: Object to form.

A. I have no firsthand knowledge of that.

BY MR. SHAW:

**Q. Okay. Do you have any reason to believe that the imagery he submitted with his application is not the imagery he intended to have painted on his wall?**

MS. JOKERST: Object to form.

A. I don't know who prepared and submitted that.

BY MR. SHAW:

**Q. Okay. But do you have any reason to believe that Mr. Howard did not intend to have that imagery placed on his wall?**

A. There is no basis --

MS. JOKERST: Object to form.

A. -- to doubt what his ultimate intentions were.

BY MR. SHAW:

**Q. Okay. Does your department have a tape measure?**

A. It does.

**Q. Is a tape measure an acceptable way to measure a wall?**

A. Not a wall that's too tall to measure for the tape measure.

**Q. Do you know how tall The Cozy Inn is?**

A. It's been determined to be -- those walls are determined to be about 12 feet tall.

**Q. How long is your tape measure that the department has?**

A. Nine feet.

**Q. Okay. Does the department never need to measure anything more than 9 feet?**

A. We have other tools for measuring things that are tall. But Pictometry is an acceptable way to measure side wall heights, measure the heights of houses and other things.

**Q. Okay. Regarding the Certificate of Compatibility for Eccentricity, do you know if Mr. or Mrs. Mattison filed that certificate?**

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 14th day of October, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit F
# Herrs 30(b)(6)
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

some examples.

**Q. Okay.**

A. Not all inclusive, but those are some of the ideas.

**Q. Can a painted wall sign be unsecured?**

MS. JOKERST: Object to scope.

A. Probably not.

BY MR. SHAW:

**Q. Does the city have any records of the number of accidents caused by unsecured signs?**

MS. JOKERST: Object to scope.

A. I don't know.

BY MR. SHAW:

**Q. Can a painted wall sign be less secure than a painted mural?**

MS. JOKERST: I'll object to scope.

A. No.

BY MR. SHAW:

**Q. Okay. How does the city define the term clutter as used in this subsection?**

MS. JOKERST: Object to scope.

BY MR. SHAW:

**Q. Let me rephrase it then. What is a cluttered sign?**

MS. JOKERST: I'll object to form of the

of signs so that you don't have sign clutter that can become distracting. It doesn't make it hard to read the signs because the more signs you have, the more information there is, sometimes the harder it is to really soak in information that you're trying to and it can become distracting when you're focusing on signs rather than driving or walking. And by limiting the number of signs, you reduce clutter. By limiting the size of signs, you limit signs that might be a distraction. By limiting or prohibiting, rather, like blinking, flashing, strobing kind of signs --

**Q. Hold on. Let me stop you. Is the city aware of any facts showing that the sign code, in fact, enhances traffic safety, has succeeded in its objective?**

MS. JOKERST: Object to scope.

A. I don't know how you would even do a study like that if you have these design standards, because you wouldn't have a before and after picture to evaluate.

BY MR. SHAW:

**Q. Is the city aware of any other municipality that has conducted any sort of before and after of its sign code to show if it has, in**

**fact, enhanced traffic safety?**
MS. JOKERST: Object to scope.
A. Yeah, I don't -- I don't know.
BY MR. SHAW:
**Q. Okay. And in a similar vein, is the government aware of any facts that would show that the sign code has, in fact, succeeded in enhancing pedestrian safety?**
MS. JOKERST: Object to scope.
A. I think just like with the traffic safety question, you'd have to have a before and after. So you'd have to have -- and since we have the sign code that we've consistently administered, you don't really have a before and after picture. You just have what we have.
BY MR. SHAW:
**Q. Okay. And does the government or is the government aware of any facts showing that the sign code has succeeded in promoting property values?**
MS. JOKERST: Object to scope.
A. Since the sign code regulations have been administered consistently since their inception which has been a very long time, I don't -- again, you won't -- there's no way to have a before and

after picture, like this is what the property values used to be. Here's what they are. I can tell you in the downtown area where we have had a lot of redevelopment that property values have gone up. We can certainly -- we could do a study as to what property values were five, ten years ago and what they are now. That exercise has not been completed but we could do that.

BY MR. SHAW:

**Q. Okay.**

A. And I'm sure it would show property values have gone up.

**Q. But the sign code in the business -- or in the downtown area, that was in effect before this increase in property value, correct?**

MS. JOKERST: Object to scope.

A. So the sign code in the downtown business -- or downtown Business Improvement District, you're asking if they predate the downtown or --

BY MR. SHAW:

**Q. You mentioned how in the past I think you said ten years or so the downtown has seen a lot of development, correct?**

A. Yes. Absolutely, yes.

**Q. And so what I'm asking is the sign code,**

**though, long predates that boom in development. Is that correct?**

MS. JOKERST: Object to scope.

A. It does. And it predate -- the BID is not as old as the sign code, but it also predates the recent reinvestment, but I do think it contributes to it.

BY MR. SHAW:

**Q. Okay. Section 42-500, when was that enacted?**

MS. JOKERST: Object to scope.

A. 2017.

BY MR. SHAW:

**Q. Was there a different purpose section in effect before 2017?**

MS. JOKERST: Object to scope.

A. I don't know. I didn't research that.

BY MR. SHAW:

**Q. Okay. Is the city aware of any facts showing that painted wall signs are more harmful to aesthetics than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the city aware of any facts that would**

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

**traffic safety?**
MS. JOKERST: Object to scope.
A. I didn't research that in preparation.
BY MR. SHAW:
**Q. Okay. And same question there for is the government aware of any facts showing that painted wall signs have a more detrimental affect on property values than paint murals?**
MS. JOKERST: Object to scope.
A. Yeah, I wasn't aware to research that particular topic, so I haven't prepared for that.
BY MR. SHAW:
**Q. All right. So we're mainly talking about the sign code here, Section 42-500 and subsequent sections here. I want to pivot now to the Business Improvement District regulations, so that's Section 2 -- I think like 201 of the city code?**
A. I don't have that one.
**Q. You don't have it?**
A. No, I don't.
**Q. Oh, okay. So --**
A. Which -- I guess where are we at because like I'm trying to figure out --
**Q. I'm talking about the BID code section**

**Q. Okay. And how did the city reach that conclusion?**

A. When you look at the sign, there's a -- I don't know, I guess I would call it a unified composition where you have a lot of burgers floating or flying or moving around or being thrown around or something, and there's -- there's mustard and ketchup that seems to be moving throughout the spacing for some reason and it's all kind of one scene.

**Q. So you said on the -- sometime on the 6th you spoke with Mr. Howard. Is that correct?**

A. Correct.

**Q. Did Mr. Howard explain to you what his intention for the mural was?**

A. Yes.

**Q. What did he say his intention was?**

A. He was -- he said the painting that he was working on having painted was a image of -- or a painting of flying saucer hamburgers flying around.

**Q. Did he tell you anything else about the intent of the mural?**

A. He thought it was fun. That he thought it was fun.

**calculate that approximation?**

A. The building has kind of -- well, what I would call -- what we would call a broken facade where it's got a flat roof and a facia that has different elevations to it because there's a parapet in the middle. What I did is I measured the height of the wall using Pictometry software which can get pretty close, at least for an estimation, it's good for that, where I can get the height of the wall of the lower parapet and the taller parapet. I think the lower parapet was like 11 feet and the top of the taller parapet was 13. So I took an average of like 12 feet, multiplied it by the length of the wall. And that gave me an estimate of how large that wall sign was.

**Q. Okay. Did you save that Pictometry analysis or file?**

A. No.

**Q. I don't know exactly how Pictometry works.**

A. No, I don't know if you can save but I didn't save.

**Q. All right. So there's no document showing that measurement?**

A. No.

**Q. Okay. At any point since then, has the city reevaluated whether the sign at The Cozy Inn or the painting at The Cozy Inn that we're fighting over here about whether or is or isn't a sign --**

A. Sure.

**Q. -- at any point has the city reevaluated whether or not that painting was too large for the C-4 zoning district?**

A. Well, we ran some -- a mental exercise to see if a text amendment could be approved to -- let me back up. The C-4 district allows for 3 square feet of sign area per lineal foot of building frontage. And The Cozy Inn is 20.8, nominally 21 feet of building frontage. So that comes out to nominally 63 total square foot of sign area that's allowed. We ran a scenario where if we were to propose a text amendment to allow a side wall to also be incorporated and function as a frontage of a building, even though it's not facing a street, would that provide sufficient square footage to allow the proposed Cozy Inn sign, and it was insufficient. That idea, that proposed text amendment would be insufficient for

**in this e-mail, you got those from the Pictometry software. Is that also correct?**

A. The height, the 12 feet is an estimate based on an average of the building. And the 20.8 is from the legal description. So, basically, the deed that shows the lot depth since the building is -- the building takes up the entire lot.

**Q. And that 44.4 feet measurement, how was that one taken?**

A. Yeah, I apologize. I said lot depth. The 20.8 is lot width and the 44.4 is the lot depth. And that's from the deed as well, from the legal description.

**Q. The 20.8 and the 44.4, those are both from the deed description?**

A. Um-hum. From the legal description of the property.

**Q. And 12 feet, you said that's from Pictometry?**

A. Yeah. It's an average estimate because it's got a broken facade or that has multiple heights to it.

**Q. Okay. Was any other measurement ever taken of The Cozy Inn?**

A. I think later on when we did a more

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit G
# On-Hold Letter

DEVELOPMENT SERVICES
PLANNING AND COMMUNITY DEVELOPMENT
Dustin Michelson, Planner I
300 West Ash · P.O. Box 736
Salina, Kansas 67402-0736

City of Salina

TELEPHONE · (785) 309-5720
FAX · (785) 309-5713
TDD · (785) 309-5747
E-MAIL · dustin.michelson@salina.org
WEBSITE · www.salina-ks.gov

February 8, 2024

Steve Howard
The Cozy Inn
108 N. 7th Street
Salina, KS 67401

RE: Existing Painted Wall Sign/Mural at 108 N. 7th Street

Dear Mr. Howard:

We are in receipt of your Certificate of Compatibility application dated November 13, 2023 and your sign permit application (#23-2221-SIGN) dated November 15, 2023, submitted on behalf of The Cozy Inn, requesting approval of an existing painted wall sign/mural at 108 N. 7th Street. As discussed in previous conversations regarding this sign/mural, the total square footage of the signage installed at 108 N. 7th Street exceeds the maximum gross surface area allowed on this property per the C-4 zoning district sign regulations (Sec. 42-521). Additionally, 108 N. 7th Street is located in the Downtown Salina Business Improvement District Number 1, which requires a Certificate of Compatibility to be approved by the Downtown Design Review Board (DRB) before City Staff may issue a permit for any work to construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of any building or any other improvement to real property in the Salina Business Improvement District Number 1 (Sec. 2-207).

This letter is to inform you that the City is engaging in a comprehensive review of the City's sign regulations, which will include a review of the regulations pertaining to painted wall signs. As a result of this, and due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on-hold until our review of the sign regulations is complete. Once we have completed that code review process, Staff will then be able to facilitate a Certificate of Compatibility application to be considered by the DRB, as well as review your sign permit application in the context of any sign regulations that may be revised during our code review. Additionally, during this period, the City will withhold any further zoning enforcement actions regarding the existing signs at The Cozy Inn until City Staff is able to further review the sign permit application under any changes to the sign regulations that may come out of this comprehensive review.

As part of the City's review of the sign regulations, we'll be bringing in an outside consultant who is experienced in assisting municipalities with updates and revisions to their sign regulations, an important component of the process will involve gaining insight from community stakeholders about the existing regulations relating to murals and painted wall signs and potential updates to the codes. Our office is in the process of scheduling a stakeholder meeting for Friday, February 16, 2024, and we will follow up with specific details of the meeting in hopes that you are able to attend.

30(b)6
EXHIBIT NO. 11
APPINO & BIGGS

Thank you for your cooperation in this matter. If you have any questions, please contact me or Dean Andrew, Zoning Administrator, at (785) 309-5720.

Sincerely,

Dustin Michelson
Planner I

CC: Dean Andrew, Zoning Administrator

# Exhibit H
# Michelson
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DUSTIN MICHELSON,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 5:08 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**where it says as a result of this and due to the unique nature of the existing signs at the Cozy Inn, our office will be placing your Certificate of Compatibility application and your sign permit application on hold until review of the sign regulation is complete?**

A. Yes.

**Q. Did Miss Driscoll tell you to place the applications on hold?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Do you know -- sorry. Were you going to say something?**

A. To clarify, I didn't place the permits on hold. This letter I was told to communicate what was happening.

**Q. Okay. So do you know who placed the applications on hold?**

A. No.

**Q. Okay. You were just told to communicate that to the applicant?**

A. Yes.

**Q. Okay. Do you know if the -- either the sign code or the building improvement district**

**CERTIFICATE**

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs
_____________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit I
# Herrs Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.
.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**exceeded the size allotment?**
A. That is correct.
**Q. Okay. What criteria were used to determine that it was a sign?**
A. There were hamburgers. There was graphic imagery and symbols of hamburgers. There was text telling people not to fear the smell, and there was an arrow with some text inviting people to come inside. So there was clear advertising of their business operations.
**Q. Okay. So the planning team determined that the content of the mural was an advertisement?**
A. Correct.
MS. JOKERST: Object to form.
BY MR. SHAW:
**Q. And because it was an advertisement, that's what classified it as a sign?**
A. Correct.
**Q. Okay. Did anyone ever go to the Cozy Inn and measure the size of the mural?**
A. No. What I did to determine a rough estimate is we have some digital software of imagery that is to scale. And so I can -- from that software, I can measure the height and width

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 20th day of September, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

# Exhibit J
# Windholz
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
ANDREA WINDHOLZ,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 2:00 p.m. on the 10th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**come into The Cozy is to make a sale?**

MR. SHAW: Objection to form.

A. We just -- we don't really -- we don't really look for people to come in and purchase anything. We want them to come in and see the history within Salina. Like we are one of Salina's oldest running businesses, one of Salina's oldest restaurants. We want people to come in and see our history. And then, also, we encourage them to shop downtown. We tell them all the time like we have an amazing ice cream shop right around the corner. We have really cute boutiques. We tell people all the time about our local brewery right around the corner from us. So we just -- we really want them to just come stop in and see what Salina has to offer.

BY MS. JOKERST:

**Q. When customers come into The Cozy, do you encourage them to buy a burger?**

A. If they come in and they're like -- kind of like, oh, we just ate, blah, blah, blah, and we're like how about if you guys -- I mean we'll give you a burger on us. You're here, you should try, see what we're all about, see what people talk about. We don't encourage them to purchase,

no. We like -- we will give a burger to them. We won't make them purchase it most of the time. Like we'll just give it to them to try.

**Q. Okay. But if everyone came into The Cozy and you gave them a free burger, how would that affect The Cozy's business?**

A. We don't offer it to everyone. If we're busy, busy and don't have time to do that, then we won't obviously offer it. But if they come in and they're like, oh, we're just looking. We'll be like okay. Well, let us know if we can get you anything. We obviously don't give a free burger to everyone that comes in. It's just like when we're slow and we're talking to people and they're like, oh, we just came in to look. And we're like okay. Well, you know, this is what we're about, whatnot. And they're like, oh, we just ate. And then we can offer it. If they turn it down, they turn it down. But if they would like a burger to munch on and we're not busy at all and there's no one in the store, we'll do it that way. But we don't give them to everyone.

**Q. Okay. I'm going to talk a little bit about the merchandise sales at The Cozy. How much merchandise on average does The Cozy sell each**

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 21st day of October, 2024.

Sandra S. Biggs

______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 13 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*