**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 14 of 16, Pages 1-270**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

# TABLE OF CONTENTS

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

# Exhibit K
# Art Center DRB Packet

Historic Salina Downtown Lee District

# DESIGN REVIEW BOARD

Exhibit C

LEE DISTRICT SALINA DOWNTOWN INC.

DESIGN REVIEW BOARD
4:00 P.M., Thursday, April 23, 2015
City Conference Room 107
City-County Building, 300 West Ash Street

## AGENDA

1. Administration:
   A. Call to Order/Roll Call.
   B. Additions or corrections to the agenda.
   C. Review of Minutes for March 26, 2015 meeting.
   D. Introduction of guests.

2. New Business:

2A. The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review and receive public comments regarding a façade improvement project that has been planned for the Art Center's South Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the South Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

3. Other Business:

4. The next regular meeting, if scheduled, will be on May 14, 2015.

5. A motion to adjourn is in order.

Andrew
EXHIBIT NO. 12
APPINO & BIGGS

***An applicant or his representative is required to attend the hearing in order for the Design Review Board to take action on an application.***

City of Salina/Development Services Salina, KS 67402-0736 | Planning Division 785/309-5720 | City-County Building FAX 785/309-5713 | 300 W. Ash Street, Room 201 email: john.burger@salina.org

***Design Review Board Members:*** Michael Trow – ***Chair***
Daniel Baffa, Larry Bunker, Maggie Gillam, Tina Lewis – Vice Chair

***Salina Downtown Inc.*** 120 West Ash Street PO Box 1065 Salina, Kansas 67401 785-825-0535
***Interim Executive Director:*** Penny Bettles Email: pbettles@salinadowntown.com

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion.

Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address, and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant, and/or citizens as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

Any person dissatisfied with a decision by the board to either grant or deny a certificate of compatibility may appeal the decision to the Board of City Commissioners by filing a written protest with the City Clerk on a form provided by that office. The notice of appeal must be filed within fourteen (14) calendar days after the conclusion of the public hearing. If you have any questions or concerns, please contact the Development Services Department in Room 201 of the City-County Building, 309-5720.

(7-16-14)

City of Salina

# Application for a Certificate of Compatibility
## Lee District - Design Review Board

*Please return the completed application to:*
**Development Services Department**
300 W. Ash, City-County Building, Room #201
Salina, KS 67402-0736
785-309-5720 FAX 785-309-5713
Email: john.burger@salina.org

*The City Planning Department:*

- *Provides technical assistance to the applicant*
- *Receives the completed application*
- *Provides a copy of the application to the SDI Office for input*
- *Schedules the Design Review Board hearing*
- *Presents the application to Design Review Board*

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. The applicant must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 242 S. Santa Fe Ave.
2. Name of Business Salina Art Center
3. Applicant's Name Salina Art Center (Bill North) 4. Applicant Ph. 827-1431
5. Applicant's Address same 6. Email bnorth@salinaartcenter.org

7. Property Owner Name (if different)
8. Property Owner Address 9. Owner Ph.
9. Contractor/Architect Conrad Snider 10. Phone 316-288-8694
11. Contractor/Architect Address 310 W. Fourth, Newton, KS 12. Email conrad@southwind.net

13. What kind of work is proposed? (please check all that apply)
☐ Renovation or repair ☐ Demolition ☐ Sign or Canopy ☐ New Construction ☐ Paint
☒ Other, please describe Ceramic tile mural
14. Approximate cost of project (including labor and material) $18,250

**Please attach the following materials to the application:**

1. Representative color photographs showing the existing structure and the location for the proposed work.
2. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
3. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
4. Material samples or product specifications indicating color, form, profile and texture.
See also the attached *Guide to Completing a Certificate of Compatibility Application* for required submittal material for project types: new construction, renovation or repair, sign or canopy or demolition.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**
See attached

Applicant Signature: Bill North Date 4/10/2015

Property Owner Signature (if different): Date

**For Staff Use:** **Application** DRB15-1
Legal Description of Property LOTS 158 & 160 ON SANTA FE, ORIGINAL TOWN

| | |
|---|---|
| Current Zoning C-4 | Current Use ART GALLERY/EDUCATION |
| Date Filed 4-10-15 | Accepted by J BURGER |
| Date of Publication NA | Building/Sign Permit No. NA |
| Property Owner Notice Sent 4-15-15 | Heritage Commission Review (y/n) NO |
| Date of Hearing 4-23-15 | Approval Notification Sent |

Attachment, Salina Art Center, Application for a Certificate of Compatibility, Lee District, Design Review Board

The proposed project is a ceramic tile mural along the Art Center's Santa Fe Avenue façade. The specific location is the 12 x 23 ft. bay between the Art Center's original Santa Fe entrance and the current entrance. Ceramic artist Conrad Snider will create and install the mural. A three-time SculptureTour Salina exhibitor, Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be fired to Cone 10 (2,300 degrees Fahrenheit), which will vitrify the clay, making it resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with an epoxy grout.

The mural design will take into consideration the exterior of the building, including colors and surfaces of the brick, ceramic elements on the center pillar, and roof tiles. The space allowed for the tile mural is approximately 12 feet by 23 feet, for a total of 230 square feet (see attached photo).

**STAFF REPORT**
**LEE DISTRICT DESIGN REVIEW BOARD**

Hearing Date: **April 23, 2015**

## ITEM

The Salina Art Center, 242 S. Santa Fe Avenue, has requested a meeting of the Design Review Board to review a proposed façade improvement/art installation project that has been planned for the Art Center's Santa Fe Avenue façade. A ceramic tile mural has been commissioned for an area within a 12 ft. x 23 ft. building bay on the Santa Fe façade. It will be located between the original Art Center entrance and the north education wing. The Art Center property is legally described as Lots 158 & 160 on Santa Fe Avenue in the Original Town of Salina, and is addressed as 242 S. Santa Fe.

## BACKGROUND

Conrad Snider, a Newton, Kansas ceramic artist has been commissioned to create and install a mural comprised of handmade ceramic tiles that would be attached to the stucco wall in the Art Center façade. The art installation will become a permanent feature of the Art Center's Santa Fe façade. The mural will be comprised of sculptural elements existing on the exterior of the building, including the brick, terra cotta and the Spanish Tile roof. Mr. Snider's work is found throughout the state and includes the *Points of Contact* ceramic mural located in the Salina's First Presbyterian Church, and the *Woven* terra cotta figures in front of Salina's Municipal Court Building.

A Ceramic Workshop has been scheduled by the Salina Arts and Humanities Department under the Horizon Grants Program that will involve up to 12 participants of the community. Under the direction of the artist, Conrad Snider, participants will assist in the creation of a scale model of a ceramic tile mural for the exterior of the Art Center. The series of workshops at the Art Center Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Mr. Snider's permanent sculptural mural. The art installation would become an important feature of the Art Center's visual identity and downtown Salina's streetscape. The workshop is open to high school students and adults with no experience in ceramics required. A call for the Ceramics Workshop is attached to this report.

## PHYSICAL CHARACTERISTICS

Records indicate that the one-story storefront building on Lot 160, addressed as 240-241 S. Santa Fe was originally constructed of brick with a Mission Revival cornice and Spanish Tile roof in 1929. A one-story storefront building addressed as 236-238 S. Santa Fe was constructed on Lot 158 in 1946. The Knights Sporting Goods Company and various storefronts occupied 238 and 240 S. Santa Fe until 1987. A building permit was issued in August 11, 1987 to convert the space at 240-242 S. Santa Fe to the Salina Art Center at a cost of $237,000. The space was opened to the public on January 11, 1988. Architect Donnie Marrs enclosed the storefront facing Santa Fe with two bays, having arched stone surrounds, a building base and terra cotta tile columns.

The Art Center expanded into the space at 236-238 S. Santa Fe in 1992, establishing an open floor plan education wing that included additional gallery and work space, restrooms and storage. Jones-Gillam Architects designed an all glass storefront with a sculptured metal canopy on the Santa Fe façade and a covered courtyard at the rear of the building.

An artist in residence warehouse was established in a commercial space at 149 S. 4th Street in 2008. The space is occupied by an open work area and an apartment for Artist-in-Residence exhibitors at the Salina Art Center. This space is utilized as a workshop and for various activities and projects of the Art Center throughout the year.

## PROPOSAL

The proposed project would include the installation of a ceramic tile mural along the Art Center's Santa Fe façade. The work would be located in the northern one-half of the original Art Center building. The specific location is the 12 ft. by 23 ft. bay between the original Art Center entrance on the south and the education wing to the north. This area is delineated by the arched stone surround and the stone building base at the sidewalk.

Ceramic artist Conrad Snider will create and install the mural. Mr. Snider is a three-time Sculpture Tour Salina exhibitor and maintains a work studio in a renovated 1920's feed mill in Newton, Kansas. A summary description of Mr. Snider's work is maintained on his website, a copy of which is attached to this report.

The mural will be constructed of handmade ceramic tiles between one-half inch and two inches thick. The tiles will be formed and fired in a kiln to vitrify the clay and make it water resistant to water penetration and damage from freeze/thaw cycles. The tiles will be attached to one-half inch thick concrete backer board with tile mortar. Grout lines will be filled with epoxy grout to match the tile

The mural design will take into consideration work done at a Ceramic Workshop being sponsored by the Salina Arts and Humanities Horizon Program where a scaled prototype will be designed and constructed. The composition of the proposed mural will utilize the colors and surface textures of the brick, ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. The space allowed for the tile mural is approximately 12 feet by 23 feet, totaling 230 sq. ft. This blank stucco area on the Art Center façade has been utilized in the past for temporary art installations.

## STAFF ANALYSIS

Installation of public art does not require a Certificate of Compatibility however; a public hearing has been scheduled before the Lee District Design Review Board in order to receive comments on the compatibility of the art piece to submit as part of a grant application to the Façade Development Incentive Program (DIP) of Salina Downtown, Incorporated. The grant program is designed for large and small scale projects for new

Case 6:24-cv-01027-TC Document 112-11 Filed 03/14/25 Page 8 of 31



construction, renovation of building facades and interiors of existing historic buildings. The program is designed primarily for façade improvements to the exteriors of buildings in the Lee District. The amount of any grant is contingent on the scale of the project and available funds. Non-profit Salina Downtown, Inc. partner businesses located in the Lee District boundary are eligible to apply for DIP funds.

The proposed project appears eligible for the DIP program as a façade renovation and restoration project. Work found to comply with the Salina Downtown Guidelines (contingent on Design Review Board approval) is an eligible use of funds.

> The Design Guidelines for Downtown Salina, 2008 contains the following Policies relating to Architectural Character:
>
> ***Building materials should be visually compatible with the predominate materials of the downtown area.***

The historical use of terra cotta and ceramic tile accents and trim is consistent throughout the Blocks of North and South Santa Fe. Evidence of this can be found at 117-119 S. Santa Fe and 111-125 East Iron Avenue, among others. It is integral to the Spanish Revival style of architecture used by Salina architects, such as Charles Shaver during the 1930's. Much of this is attributed to the influence of J. C. Nichols' development of the Country Club Plaza in Kansas City. The 200 Block of South Santa Fe West elevation contains several Spanish Revival style facades.

It appears that the mural design program will utilize the colors and surface textures of the brick, terra cotta and ceramic elements on the terra cotta pillars and Spanish Tiles found on the Art Center building south gallery wing and cornice. This would appear to be consistent with the Design Guidelines.

**REQUESTED ACTION**

Similar to the addition of a new storefront, awning or other permanent improvement or renovation of an existing architectural element, it is appropriate for owners and residents potentially affected by such an activity in the Lee District to receive notice and an opportunity to be heard on the matter.

A public hearing was been scheduled for the Design Review Board to receive public comments and input about the mural design and installation. As a general rule, an art installation does not fall within the scope of authority of the DRB, however in this case the DRB is being asked to make a recommendation on this proposed art project for use with an application being made under the Façade Development Incentive Program of SDI.

The art installation is intended to be a permanent element similar in function to a sign or logogram that will direct the public to the gallery and educational activities within the Art Center building. It is also intended to enrich and engage members of the public visiting

or doing business within the Downtown area. Letters of notice were sent to surrounding property owners announcing this public hearing. Since the Lee District Design Review Board customarily reviews exterior improvements in the Lee District, it is appropriate for this Board to receive comments from the public at the hearing concerning the art installation as a requirement of the Façade Development Incentive Program. A description of the DIP Program is attached to this report.

A record of the proceedings and any verbal or written comments received will be provided to the Façade Development Incentive Program (DIP) Review Committee for their use in analyzing a potential grant award for this project. Grant awards are made during May and September of each calendar year.


Facade Improvement
Salina Art Center
242 S. Santa Fe Avenue
SALINA ART CENTER
Request Area
Santa Fe Ave
Mulberry St
N
W
E
S

# CALL FOR
# CERAMIC WORKSHOP
# SALINA ART CENTER MURAL

Case 6:24-cv-01027-TC Document 112-11 Filed 03/14/25 Page 14 of 31

# CERAMIC WORKSHOP PARTICIPANTS NEEDED

Modeling Community: Salina Art Center Façade Mural Project

Limited to 12 participants - **SIGN UP TODAY!**

Under the direction of acclaimed ceramic artist Conrad Snider, participants will assist in creating a scale model of a ceramic tile mural for the exterior of the Art Center's Santa Fe Avenue façade. A series of workshops at the Art Center's Warehouse will engage participants in the development of the model's design and fabrication. The completed model will serve as the basis for Snider's permanent sculptural mural, which will become an important feature of the Art Center's visual identity and downtown Salina's streetscape.

This project was funded in part by the Horizons Grants Program of the Salina Arts and Humanities Foundation. Funding is provided by Horizons, a private donor group.

Three-time SculptureTour Salina exhibitor Conrad Snider maintains a studio in a renovated 1920s feed mill in Newton, Kansas. His commissioned work can be found throughout the state and includes his mural *Points of Contact* (First Presbyterian Church, Salina) and *Woven*, the large-scale figural group in front of the City of Salina Municipal Court Building.

**WHAT:** Ceramic mural workshop with Conrad Snider.

**WHO:** The workshop is open to high school students and adults. No experience with ceramics necessary.

**WHEN:** Wednesday, **April 22, 4-6 p.m.**; Thursday, **April 23, 4-7 p.m.**; and 3 sessions before May 6 (dates and times TBD on April 22).

**WHERE:** The Salina Art Center Warehouse, 149 S. 4th St.

**HOW:** Register online (http://goo.gl/QjqeDn), by email (info@salinaartcenter.org), or by phone (827-1431). Participation in the workshop is FREE OF CHARGE. Registration is on a first-come, first-served basis and limited to 12 participants. There will be a waiting list.

For more information, call 827-1431.

SALINA ARTS & HUMANITIES Horizons Grants Program

SALINA art center




Salina Art Center, 242 S. Santa Fe, proposed mural site




Salina Art Center, 242 S. Santa Fe, proposed mural site



Sample Mural Design

Case 6:24-cv-01027-TC Document 112-11 Filed 03/14/25 Page 22 of 31

# CONRAD SNIDER STUDIO WEBSITE



Conrad Snider
Large Scale Ceramic Sculpture, Hand Made Tile Murals, and Wheel Thrown Vessels

Write to me here

Visit Soldner Equipment

# Conrad Snider

Welcome to my website. Thank you for visiting and come back again, new photos are added periodically.

Here you will be able to visit my studio, see one-of-a-kind large scale ceramic sculptures and vessels, and see how the vessels are made.

Click on the images below to see other pieces. Scroll down to read about my work.



Figures



Tile Murals



Wheel Thrown Vessels



Public and Private Projects



Hand Built Vessels



Studio and Home

My work is all large scale and ranges from clay vessels, both thrown on the potter's wheel and hand built, to figurative pieces and hand-pounded tile murals. Each of these aspects is important to me and feeds a different part of my personality. When I work on a piece I try to let the clay speak, sharing its natural behaviors, sensuality, visual strength, and power. I want each piece to have its own individual presence.

The process from wet clay to a finished piece takes 6 months to a year, ending with the final glaze firing in a gas reduction kiln to 2300 degrees Fahrenheit. Some pieces will be fired multiple times to enhance the glazed surfaces and textures. The surfaces are equally important to the form for the overall effect of the piece. High fired clay is impervious to fingerprints, water, and paints, which allows tactile exploration to be as much a part of the viewers' experience as visual interpretation. These same attributes also make clay ideal for public art installations.

I make most of my pieces ahead and find homes for them later on. Most of my sales are to individuals, though I have done a number of public commissions, and have pieces in several Public and Corporate collections. Because each piece is personal to me, and they spend so much time in the studio, they become like my children. I want them to go to good homes where they will be appreciated for years to come.

Read more Resume

This page is currently being modified. Some links are not yet completed. Please bear with us and come back soon.

# Tile Murals

These tile wall murals are ideal for architectural accents and can be custom commissioned. Most of the tiles are made to fit on a one foot grid, including grout lines. These tiles are hand-pounded individually and fired to Cone 10, 2300 degrees Fahrenheit.

*Back to Home*





72" X 96"



72" X 96" X 5"



98" X 147"



72" X 96"



72" X 120"



72" x 96"

# SALINA DOWNTOWN, INC.
# DEVELOPMENT INCENTIVE PROGRAM

Case 6:24-cv-01027-TC Document 112-11 Filed 03/14/25 Page 28 of 31

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects**

This grant program is designed for *large* scale projects for new construction, and for renovation of façades and interiors of existing historic buildings (see definition below) within the Lee District. Salina Downtown, Inc. recognizes that property owners and tenants may need assistance making costly improvements and enhancements to the exterior of their buildings and to the interior of historic buildings. This program is designed primarily for façade improvements and new construction. However, interior improvements to historical or locally historically significant buildings (50 years or older) may qualify. The amount of any grant is contingent on the scale of the project and available funds through the Development Incentive Program.

**ELIGIBILITY:** Property owners and/or tenants who are in good standing with the Lee District (service fees are current) are eligible to apply. However, non-profit Salina Downtown, Inc. partner businesses located within the Lee District boundary are also eligible to apply for DIP funds.

**AVAILABLE FUNDS**: $35,000 annually 2008-2010. Maximum single project award $15,000.

**MATCHING REQUIREMENT**: All applications are competitive and require a minimum cash only match of 1.5:1 private to Development Incentive Program (DIP) grant funds. In-kind contributions will NOT count towards the required match. This is a reimbursement program. Upon completion of the project the applicant is required to pay the full amount of the project up front and submit proof of paid bills before reimbursement will be made. (See Reimbursement Policy)

**ELIGIBLE USE OF FUNDS**: Projects may include but are not limited to:

- New building construction
- Building expansion
- Vacant building redevelopment
- Facade renovation and restoration (emphasis on removal of metal siding and metal awnings) and/or replacement with new coverings or roll-ups
- Work complying with Salina Downtown Design Guidelines, contingent on Design Review Board approval
- Pressure cleaning
- Stucco: new or restoration
- Painting
- Window, Door or transom replacements or repairs.
- Re-pointing of mortar joints for brick or stone
- Awnings (including the removal/installation of old awnings and canopies)
- Alley entry way improvements
- Entry way tile in exterior doorways
- Interior code related work.
- Interior work to historical buildings or buildings deemed to be historically significant (50 years or older) and work preserves historical interior aspects of the building

**INELIGIBLE USE OF FUNDS:**

- Signage
- Projects with no minimum 1.5:1 match
- Projects outside the Lee District boundaries
- Any in-kind expenses including labor of property/business owners
- Roofing
- HVAC

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**SELECTION CRITERIA:** All projects will be judged on their individual merits and components. The following criteria will serve as the basis of consideration:

- Ratio of matching funds minimum 1.5 private to 1 DIP. Additional consideration given to applicants providing more than the minimum match requirements.
- Projects creating new businesses and/or additional employment in downtown will receive additional consideration or priority.
- Project's adherence to Salina Downtown Design Guidelines
- Improvements to façade given priority
- Interior work may be included at the discretion of the review committee if the building is Historic or deemed historically significant (at least 50 years old) and the interior work preserves historic characteristics.

**APPROVAL:**

Applications are subject to review and approval by the DIP Review Committee with final approval of the Salina Downtown, Inc. Board of Directors. The DIP Grant Review Committee includes two members of the SDI Business Support and Recruitment Committee, one SDI Board member, one Design Review Board member and one member appointed by the Salina City Commission. Applications awarded DIP funding will officially be notified by letter.

**ADDITIONAL REQUIREMENTS:**

- Provide an architectural drawing or sketch
- Provide a five minute oral presentation to the application review committee.
- All projects awarded grants must be completed within one calendar year from the award letter date.
- Two professional contractor estimates of the cost of the intended improvements are required.
- Application must include a professional architectural design including color and material choices.
- All work must meet all City Building code requirements.
- All applicants are responsible for acquiring and completing all necessary city permits.
- Taxes and Lee District Fees must be current.
- Written approval of building owner, specifying work, must be included in application (if applicable).
- A contract must be signed between Salina Downtown, Inc. and applicant within three months of approval from SDI Board and prior to work commencing.
- The SDI office will be notified in advance of commencement of all work on the project
- Representatives of SDI will be allowed on the work site at all reasonable times.
- Environmental assessment must be completed
- Work must be completed within one year of signed Grant Reimbursement contract.

**APPLICATION DEADLINE:** Application forms are available from Salina Downtown, Inc. (SDI), PO Box 1065, 205 West Ash Street, Salina, Kansas 67401 and on line at www.salinadowntown.com. Completed applications are due at the SDI office by 12:00 noon the third Wednesday of April and August. Awards will be made twice annually in May and September. Applications awarded DIP funding will officially be notified by letter.

**Salina Downtown, Inc.**
**DEVELOPMENT INCENTIVE PROGRAMS**

**Forgivable Loan Program for Major Projects (continued)**

**REIMBURSEMENT POLICY**

Successful applicants receive disbursement of DIP funds after completion of project, approval of work by a final City inspection, receipt of Certificate of Completion, and submittal of copies of paid invoices for approved expenses to the SDI Executive Director. To receive reimbursement, the property owner must sign an agreement to maintain the funded building improvements for a period of at least 3 years for a DIP Forgivable Loan Program for Major Projects ($3,500 and above). This agreement shall provide for a lien against the property in an amount equal to the reimbursement amount.

**REPAYMENT/GRANT FORGIVENESS POLICY**

For reimbursement totaling $3,500 and above, one third (33.3%) of said lien for improvements shall be forgiven annually on the anniversary date of the Certificate of Completion. Should the property be sold or refinanced prior to the full forgiveness of the lien, the remaining amount of the lien shall be paid to SDI upon sale, or closing of the refinancing Grant. The agreement shall be filed with Saline County Register of Deeds and transferred upon sale of the property.

# Exhibit L
# Mural Photos




0082


KU
SCHOOL OF MEDICINE
SCHOOL OF NURSING
SALINA
The University of Kansas

0083



0088


MAJOR LEAGUE CITIZENS
Salina


A Famous
Trade Mark
Over
300,000,000 bags
sold last year
He Stands for thrift
RESERVED PARKING
10¢
GENUINE
"BULL" DURHAM
TOBACCO
Thos Cusack Co.

0093




0095




0098




Schlotzsky's
CINNABON
PEOPLE WHO LOVE TO EAT are always THE BEST PEOPLE
TIME TO PUT ON your EATIN' SOCKS
EVERY SATURDAY

0100




0103


The Stiefel Theatre For the Performing Arts
STAGE DOOR
0119



0120




0123




0124




0300



0301

# Exhibit M
# Defendant's Amended Response to First Set of Interrogatories

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) |
| **Plaintiffs,** | ) **CIVIL ACTION** |
| | ) **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) |
| **City of Salina, Kansas,** | ) |
| **Defendant.** | ) |

## DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Amended Responses to Plaintiff's First Set of Interrogatories. The selected responses are set forth below:

## GENERAL OBJECTIONS

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*9.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

## FIRST SET OF INTERROGATORIES

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." Subject to and without waiving this objection, the City does not apply the term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code and it is not regulated under § 42-764 and the accompanying size limitations. The City does not have the necessary information regarding the size or measurements of such displays or the size and measurements of the location of such displays to make a determination regarding whether the size of such a display would exceed the size limits of the Sign Code. Accordingly, it cannot "identify" as requested.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." Subject to and without waiving this objection, the City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**The City has identified the following signs that it has determined exceed the applicable size limits of the Sign Code:**

- **The Cozy Sign**
- **Blacksmith Coffee Sign**
- **Original Grande Sign**
- **Library Bar Sign**
- **Temporary Sign at 1212 S Marymount Rd**
- **Temporary Sign at 684 Briarcliff Rd**
- **Temporary Sign at 1017 E. Magnolia Rd**

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

- **Temporary Sign at 2045 E. Crawford St.**
- **Temporary Sign at 1805 Lewis St.**
- **Banner Sign at 650 E. Crawford Ave**
- **Banner Sign at 1325 E. Cloud St.**
- **Wall Sign at 301 N. 9th St.**
- **Temporary sign at 701 Holly Ln**
- **Temporary sign at 662 S. 9th St.**
- **Temporary sign at 736 McAdams Rd**
- **Temporary sign at 708 W. Crawford Ave**
- **Temporary sign at 1212 S. Marymount Rd**
- **Temporary sign at 1008 E Elm St.**
- **Temporary sign at 2360 River Trail Rd**

Respectfully submitted this 23rd day of August, 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

# VERIFICATION

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S AMENDED RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

DocuSigned by:
6D0400503E2B494...

Signature

Executed on August 23, 2024

Docusign Envelope ID: B55F9D97-7461-4809-A313-98DFC354E264

CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August, 2024, I caused the foregoing **DEFENDANT'S AMENDED RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit N
# White Deposition
# Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.
.

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**

MS. JOKERST: I'll object to form again. It's not a complete copy.

A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.

BY MR. MACROBERTS:

**Q. So as you're sitting --**

A. Without reading the whole report, I would not know.

**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**

A. Not off the top of my head.

**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**

A. Okay.

**Q. You agree that your publication is a reliable authority?**

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
MR. MACROBERTS: I have no other questions.
MS. JOKERST: I have some follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**
A. Um-hum.
**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**
A. Um-hum.

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 4th day of November, 2024.

Sandra S. Biggs
______________________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit O
# Schrage Email
# 11/8/23

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/8/2023 3:54:03 PM
**To:** Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC:** jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject:** Cozy Inn Wall Sign
**Attachments:** Cozy Inn Wall Sign.jpg

Schrage
EXHIBIT NO. 19
APPINO & BIGGS

Mayor Hoppock & City Commissioners:

If you aren't already aware, Cozy Inn has recently begun painting a *wall sign* on the south side of their building (see attached photo). While it aesthetically might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which include size limitations among other things.

There is considerable litigation surrounding the topic of art, free speech, commercial speech and disparate treatment of one sign in comparison to another. I know I sound like a broken record, but this is shaping up to become a city-wide precedent without further refinement of our applicable sign codes. Pick whatever example you like, but Applebee's could choose to paint the entirety of all four sides of their building as walls signs citing this as the precedent without further refinement of our codes. Another example is that more prominent brick walls along Santa Fe, Iron, Walnut, etc. could be utilized for commercial advertising signs painted on brick or otherwise.

Maybe we as a community are okay with that, but our current code doesn't reflect that and that is a difficult policy question to be deliberated on.

You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes.

Further addressing murals and the commercial speech question was already on Development Services' plan of work for 2024. Lauren Driscoll had already begun to identify consultants versed not only in the planning issues but the legal issues surrounding this topic.

With respect to Cozy Inn, we were not contacted in advance. Rather, we became aware as the painting was observed.

Staff has contacted them and asked them to pause. And, a meeting has been scheduled with them for Monday of next week.

The intended message is that we are willing to try to work with them to frame up the policy questions necessary for the community to decide whether they wish to permit wall signs such as theirs; trying to explain the significance and precedent setting nature of the question at hand; and explaining how their project is classified as a sign and not a mural. We fully anticipate likely responses of its already on social media and everyone loves it and what's the big deal reminiscent of the Toy Parade.

As much as we would like to resolve this quickly, that is just not a realistic expectation given the complexity of the topic, the outside assistance we are going to need and the policy review an adoption process that needs to take place.

In advance of the Monday meeting with staff, Mr. Howard has begun contacted City Commissioners and others. So, I am emailing to provide you with some background in advance. We will remain as customer service oriented as we can, but the crux of the issue is that they began painting a commercial wall sign without contacting us and we now find ourselves

playing catchup while trying to avoid being overly blunt saying it is prohibited by code and squarely placing blame with them.

In anticipation of the likely response that the Bull Durham sign on the Land Title building is commercial speech, it went through a DRB review and approval process based on its historical nature and it does not pertain to a product available for sale.

I would be happy to discuss this further if you have questions or are receiving additional feedback.

I will provide an update following Monday's meeting as well.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov


Don't Fear the Smell!
The Fun is inside!!
HAMBURGERS

# Exhibit P
# Schrage Talking Points

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 3:53:08 PM
**To:** mike@landtitlesalina.com
**Subject:** Cozy Inn Talking Points

Our intended message is

this question is not unique to Salina.

A distinction is commonly made between murals and art when compared to commercial speech.

We regulate the size of commercial signs through a permit process.

We were not contacted in advance and a permit was not applied for.

The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code.

We are willing to work with Mr. Howard

this is going to be a code revision and policy decision that will take some time.

We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
TDD: 785-309-5747
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 25
APPINO & BIGGS

# Exhibit Q
# Schrage Email
# 11/9/23

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 11/9/2023 5:17:40 PM
**To:** Bill.Longbine@salina.org; greglenkiewicz@gmail.com; mike@landtitlesalina.com; karlryan@ryanmortuary.com; twdavis22@gmail.com
**CC:** jacob.wood@salina.org; Shawn.Henessee@salina.org
**Subject:** Cozy Inn Wall Sign #2
**Attachments:** Cozy Inn Code Summary.docx; APA-Ohio Sign Presentation 9-23.pdf; NH Article.pdf

Mayor Hoppock & City Commissioners:

Staff was in contact with Mr. Howard multiple times again today and thought that we had gained his understanding that we would meet with him on Monday to discuss the issue and options further. Lauren was recently contacted by KWCH requesting her to go on camera following their interview with Mr. Howard; she ultimately spoke with them by phone; we have been interviewed by Salina311 and we have seen social media posts indicating that Mr. Howard will be going on KSAL tomorrow morning.

Our intended message is that this question is not unique to Salina (see attached article). We regulate the size of commercial signs through a permit process. We were not contacted in advance (Mr. Howard asserts that it is a mural not a sign). The proposed sign covers the majority of the wall of his building and far exceeds the size limits currently allowed by our code (see attached code summary). We are willing to work with Mr. Howard, but this is going to be a code revision and policy decision that will take some time. We have scheduled a meeting with Mr. Howard to start those conversations Monday of next week.

IMPORTANT NOTE: Sharp Performance in the NE corner of 9th and Elm (north of the library) has a large wall sign that did not go through any type of permit process and has been unintentionally overlooked in terms of code enforcement.

I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown. He also indicated he does not do any kind of social media and he is trying to "go soft" in his interviews with the media suggesting he thinks we will be pleased with his comments.

Lauren has reached out to a consultant who is a planner and an attorney with a specialization in this topic who has assisted communities throughout the Midwest including Omaha. She will be submitting a proposal for our consideration. I have attached a slide show that she presented recently at a planning conference. I haven't attached the presentation as a proposes solution or an on-point discussion of our issue at hand. My primary points in attaching the presentation are that this is not unique to Salina, there are several legal considerations, it is very nuanced and complex and outside consulting would be very helpful if we want to quickly (a few months) develop a policy amendment that is similarly nuanced and takes in to account Salina specific feedback and direction.

Lauren is prepared to provide an overview of this issue during Other Business on Monday.

You are certainly welcome to contact me on my cell Friday and over the weekend.

***As is our standard advice to the Governing Body related to avoiding interactive communications, this message is intended to share information of general interest to the Governing Body. I have included all Commissioners on this email distribution list to be sure they have the same information. Please, do not initiate interactive communications amongst Commissioners since that would be a violation of the Kansas Open Meetings Act.***

Sincerely,

Mike Schrage
City Manager

Schrage
EXHIBIT NO. 26
APPINO & BIGGS

City of Salina, Kansas
300 West Ash, Room 202
P.O. Box 736
Salina, KS 67402-0736

Phone: 785-309-5700
Fax: 785-309-5711
TDD: 785-309-5747
Website: www.salina-ks.gov

# The Cozy Inn Sign Analysis

**Sign Definitions**

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**C-4 Sign Regulations**

**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.
   c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height*. Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**<u>The Cozy Inn Information and Background</u>**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food “Hamburger Joint” in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.

The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building’s exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**Existing Conditions**
Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

| | | |
|---|---|---|
| 1. | North facing wall sign: | 24.00 sq. ft. |
| 2. | 7th Street projection sign: | 24.00 sq. ft. |
| 3. | 7th Street awning sign: | 4.88 sq. ft. |
| | Total Sign Area: | 52.88 sq. ft. |

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**Proposed Hamburger Sign Analysis**
The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.




# FLAGS & MURALS OH MY!

CHALLENGING SIGN ISSUES POST-REED

2023 APA-Ohio State Conference

CITY000226

# AGENDA

How did we get here and what is going in the courts?



How can we deal with the tricky sign issues like flags, murals, and holiday decorations?



CITY000227

"It is truly a Herculean task to wade through the mire of First Amendment opinions to ascertain the state of the law relating to sign regulations."

*Granite State Outdoor Advertising, Inc. v. Clearwater*, 213 F. Supp. 2d 1312 (M.D. Fla. 2002).






© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

"Congress shall make no law . . . abridging the freedom of speech . . ."

frostbrowntodd.com

© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000229

# Judicial Review of Speech Regulations




⚠ **Usually unconstitutional**



© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# Reed v. City of Gilbert, Arizona

- SCOTUS, June 2015.
- Permit required for ALL signs but several exempted categories:
  - Political signs.
  - Ideological signs.
  - Temporary directional signs.
- "Some facial distinctions based on a message are obvious . . . Others are more subtle, defining regulated speech by its function or purpose."
- Content-based → strict scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

# City of Austin, Texas v. Reagan National Advertising, LLC

- SCOTUS, April 2022.
- On-premises v. off-premises signs.
- Not content based.
- "Unlike the regulations at issue in *Reed*, the City's off-premises distinction requires an examination of speech only in service of drawing **neutral, location-based lines. It is agnostic as to content.**"
- Content neutral → Intermediate scrutiny.








© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000232

# Norton Outdoor Advertising, Inc. v. Village of St. Bernard, Ohio

- S.D. Ohio, June 2022.
- Sign regulation distinguished between on-premises and off-premises signs.
- Village's safety and aesthetics goals were substantial government interests.
- The sign regulations are designed to "protect the safety and general welfare of the public who travel I-75 within the Village."
- In *City of Austin*, the Supreme Court concluded that on/off-premises distinctions are content-neutral.

Detail at 1:1 from center of the map.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000233

# LaCroix v. Town of Fort Myers Beach, Florida




- 11th Circuit 2022.
- "Laundry list" of prohibited signs, including "portable" signs.
- "There is no dispute that portable, handheld signs often convey **political, religious, or personal** messages."
- Highly protected speech.
- No alternative channels of communication.
- Content neutral, but still unconstitutional.


© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000234

# Willson v. City of Bel-Nor, Missouri

- E.D. Missouri, 2020.
- One yard sign and one flag per residence.
- No window or wall signs.
- Expansive definition of "sign."
- Overbroad and not narrowly tailored.
- Under the ordinance, all banned:
  - Christmas lights.
  - Happy birthday balloons on mailbox.
  - Security system sticker on window.
  - "Welcome Home" banner.





© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000235

# The bottom line.

- Categorizing types of speech can get you into trouble.
- Leave open "ample" channels of communication.
- Examine your sign laws: do they prohibit more than intended?

frostbrowntodd.com

© 2021 Frost Brown Todd LLC. All rights reserved. ADVERTISING MATERIAL. These materials are not legal advice and transmission or receipt of this information does not create an attorney-client relationship.

CITY000236

# WENDY E. MOELLER, FAICP



WENDY E. MOELLER, FAICP

Principal and Owner

Compass Point Planning







1
2

CITY000237

# NOW WHAT?

You have the legal background, which is critical to understanding the risks…but now but?

Even with the legal restrictions, there is still a lot you can't do.

Keep in mind…

1. **There is no perfect sign code model.**
2. There is always going to be a little grey area.



# PERMANENT SIGNS

## THE EASY PART




**A permanent sign is a structure much like a fence, shed, or building – Establish the types allowed**

- Wall signs
- Projecting signs
- Monument signs
- Pole signs
- Window signs
- Awning signs
- Digital signs
- And so on...









CITY000239

# PERMANENT SIGNS

## THE EASY PART




**Set up the rules for height, area, location, lighting, materials, digital, etc.**

- All are forms of content neutral regulations
- All are going to be based on community policy




CITY000240

# PERMANENT SIGNS

## THE EASY PART

SCOTUS gave communities the ability to make on-premise versus off-premise distinction so easy to deal with billboards.

Prior to this, many communities simply dropped the distinction. If no signs were large enough to be billboards, then billboards are essentially prohibited







CITY000241

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

- No simple solution
- Art is a form of a message
- Some communities simply prohibit any painted wall sign, regardless of whether it would be considered art or a sign.






CITY000242

# PERMANENT SIGNS

## THE CHALLENGE - MURALS

**Some communities take a calculated risk of making a commercial vs. noncommercial message distinction.**

- Focus on the facades that can be painted
- Materials (paint or banners)
- % of coverage
- General design principles




CITY000243

# PERMANENT SIGNS

## THE CHALLENGE - MURALS

**Some communities have a special design review.**

- Sometimes by a government-based board but others by an arts group/board
- The design criteria can be written in a content-neutral manner
- But happens when that group doesn't like the message?




CITY000244

# PERMANENT SIGNS

## THE CHALLENGE - MURALS ?

**Keep in mind…**

- Art is in the eye of the beholder
- Most communities do not regulate how you paint a home
- Graffiti – Illegally placed art but not always terrible and sometimes encouraged



Noncommercial message on a residential garage door




"Graffiti" along the Donaukanal in Vienna

CITY000245

# PERMANENT SIGNS

## THE CHALLENGE - FLAGS ?

- Flags can be signs too…
- Many sign codes exempt US, State, and religious flags. **Don't do that!!**
- Focus on the support structure (poles/posts)
- At the most – commercial versus noncommercial distinction








CITY000246

# TEMPORARY SIGNS

## THE KIND OF EASY PART







Definitely temporary signs!

**Temporary signs are a little more challenging…**

- The entire structure is temporary or portable, and not intended to be a permanent installation.
- However, tough to place time limits on every temporary signs because some need longer time frames
  - Real estate signs?
  - Political/opinion signs – Free Speech is year-round!




Temporary Sign?

CITY000247

# TEMPORARY SIGNS

## THE EASY PART

**You can pick and choose what TYPES of temporary sign structures to allow or prohibit!**

- Yard Signs
- Banner Signs
- Feather Signs
- Air-Activated Graphics
- Balloon Signs
- Sidewalk Signs
- And so on...













CITY000248

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT

- Temporary signs are where the vast majority of content-based regulations are found.
- There is no easy solution – all approaches have pros and cons
- It is a matter or risk, and to some extent, the level of things you want to deal with in your job.












CITY000249

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT ?




### Door #1 – 100% Content-Neutral

- Safest bet from a legal standpoint
- Most communities establish the maximum number, size, and aggregate area of temporary signage allowed, as well as set the types
- Have to allow a reasonable amount of signage to accommodate all temporary sign and speech needs – There is no magic number.
- No matter how much signage you allow, it is very likely it will be an enforcement nightmare at elections.

TABLE <> TEMPORARY SIGN ALLOWANCES

| Zoning Districts | Residential | Nonresidential | |
|---|---|---|---|
| Time Limit | Unrestricted | Unrestricted | 30 Days per Quarter [1] |
| Maximum Number or Area per Lot | 40 Square Feet | 40 Square Feet | 20% of Permanent Building Signage Allowed or 36 Square Feet, whichever is Less |
| Maximum Sign Area per Sign | 6 Square Feet | 16 Square Feet | |
| Maximum Height | 4 Feet | 6 Feet | 6 Feet |
| Permitted Sign Types | Window or Yard | Banner, Sidewalk, or Yard | Banner, Feather, or Yard |
| Zoning Permit Required | No | No | No |

[1] A quarter shall be defined as evenly timed quarter of the calendar year (January to March, April to June, July to September, and October to December).

CITY000250

# TEMPORARY SIGNS

## THE CHALLENGE - CONTENT ?

### Door #2 – Commercial versus Noncommercial Distinction

- Slight legal risk because it is unclear if communities can make the distinction
- Cannot be more restrictive on the noncommercial message signs
- Cannot go beyond commercial versus noncommercial distinction
- Makes administration and enforcement easier, especially around elections

**Table 1163.13-1: Temporary Sign Allowances**

| Message | Non-Commercial Message | Commercial Message | | | |
|---|---|---|---|---|---|
| Zoning | All Districts | Residential Districts[1] | Nonresidential Districts | Nonresidential Districts | Nonresidential Districts (New Use)[2] |
| Time Limit | Unrestricted | Unrestricted | Unrestricted | 30 days, twice per year | 60 days |
| Maximum Number or Area per Lot | Unlimited | 2 signs | 12 sq. ft. per each 100 lineal feet of frontage | 64 sq. ft. | Equal to number of existing permanent signs |
| Maximum Area per Sign | 32 sq. ft. | 8 sq. ft. | 12 sq. ft. | 64 sq. ft. | Equal to area of permanent sign to be covered |
| Maximum Height | 4 ft. | 4 ft. | 6 ft. | 6 ft. | Equal to height of existing sign to be covered |
| Permitted Types | Yard, Window | Yard, Window | Yard, Banner | Yard, Banner, Vehicle[3] | Banner |
| Permit Required | No | No | No | Yes | Yes |

Note 1: Any conditionally permitted use located in a residential zoning district shall be permitted the same amount of temporary signs with a commercial message as allowed in nonresidential zoning districts.

Note 2: Regulations applicable to the establishment of a new use within an existing building where there is existing permanent sign to be covered by a temporary sign.

Note 3: Notwithstanding the provisions of *Section 1163.06.Q*, temporary signs may be permitted on vehicles (not trailers) that are operable, display current plates and registration and are parked in paved parking areas in a manner not obstructing traffic circulation.

CITY000251

# TEMPORARY SIGNS

## THE CHALLENGES

- **Obscenity**
  - Don't do it. You can try the "neighborly" way and ask for items to be removed but avoid governmental enforcement
- **Holiday celebrations**
  - Some communities maintain an exemption but that could still be considered content-based exemptions.
  - Other communities just avoid having regulations related to them.










CITY000252

# TEMPORARY SIGNS

## THE CHALLENGES ?

- **Human signs and vehicle signs**
  - A lot of communities just avoid regulations and hope for the best.
  - Some focus on location.
  - The toughest part is when is it intended to be a sign?




CITY000253




# QUESTIONS?

**Scott D. Phillips**
sphillips@fbtlaw.com
513.870.8206

**Wendy E. Moeller, FAICP**
wmoeller@compasspointplanning.com
513-543-8651

CITY000254


LEAVITT'S
COUNTRY
BAKERY
OPEN
NOW
ACCEPTING
VISA

72°

TRENDING 24/7 streaming news Clear the Shelters Red Sox trades? Guide to College...

LOCAL

In-depth news coverage of the Greater Boston Area.

ART

# Pastry Mural Pits Bakery Against NH Town in Free Speech Suit

Where is the line between art, and advertising? The unresolved question is testing the direct democracy of a small New England town, where a painting of pastries has led to zoning dispute, a First Amendment lawsuit and a local vote

By **Kathy McCormack** and Robert F. Bukaty • Published April 18, 2023 • Updated on April 18, 2023 at 11:42 am

Bakery owner Sean Young was thrilled when high school art students covered the big blank wall over his doorway last spring with a painting of the sun shining over a mountain range made of sprinkle-covered chocolate and strawberry donuts, a blueberry muffin, a cinnamon roll and other pastries.

The display got rave reviews, and Young looked forward to collaborating with the school on more mural projects at his roadside bakery in Conway, New Hampshire.

Then the town zoning board got involved, deciding that the pastry painting was not so much art as advertising, and so could not remain as is because of its size. Faced with modifying or removing the mural, or possibly dealing with fines and criminal charges, Young sued, saying the town is violating his freedom of speech rights.

The painting could stay right where it is if it showed actual mountains, instead of pastries suggesting mountains, or if the building wasn't a bakery.

> ***Get Boston local news, weather forecasts, lifestyle and entertainment stories to your inbox. Sign up for NBC Boston's newsletters.***

"They said it would be art elsewhere," Young told The Associated Press in an interview. "It's just not art here."

"The town should not have the right to police art," he said.

The controversy has residents of this town of 10,000 grappling with big questions about creativity and liberty as it tries to preserve its rural character. Like other White Mountain communities that draw skiers, nature lovers and shoppers, Conway is under development pressure, making the sign dispute fraught with worries that any concession to commerce could change what they hold dear.

Many — including the zoning board members — applauded the students' colorful work, but said rules must be followed, even if they're old and outdated. At about 90 square feet (8.6 square meters), the mural is four times bigger than the sign code allows.

5:53

**Here's a Sneak Peak of 'Life, Liberty and the Pursuit of New Hampshire' – Streaming Now on NBC10 Boston**

Life, Liberty, and the Pursuit of New Hampshire follows a libertarian political migration known as the Free State Project. Twenty years ago, one man penned a manifesto encouraging 20,000 libertarians to sign a pledge and move to the Granite State for more freedom. Now "The Free State Project" is shaking up politics and communities in New Hampshire and growing in strength and numbers.

Following a longstanding democratic tradition of New England town meetings, residents deliberated how to define a sign before ultimately voting down changes last week. The local newspaper said the proposed wording wasn't clear. Ultimately, a judge may have to resolve what remains an open debate in town.

"Those kids put their heart in it," retiree Steve Downing said. He thinks the painting should stay.

"Everyone has to comply with the ordinance," said Charlie Birch, a former U.S. Forest Service worker. "And even though it was done by the students, which was well done, and I give them a lot of credit for it ... if you have the ordinance, 'One for all,' that's where we are. You can't really make any exceptions, otherwise everybody else will want the exception."

Art teacher Olivia Benish, who worked with three students on the project, apologized to the board in September for not doing "due diligence" to make sure the mural would comply. She didn't respond to requests for an interview. But she told the board members that there has to be a way to give students the opportunity to create positive public works of art "without upsetting the law and the powers that be," according to the town minutes.

The lawsuit Young filed in January argues that the town is unconstitutionally discriminating against him. He asked a judge to prevent the town from enforcing its sign code.

And now other businesses have been drawn into the controversy.

**More New Hampshire news**



**APR 17**

Trump Holding April Campaign Event in Manchester, NH



**APR 17**

Mass. Woman Arrested After Leading Police on Chase Through Several NH Towns



**APR 12**
Catalytic Converter Theft Ring That Sawed Thru Mass., NH Is Busted, Feds Say

Long before the pastry painting was installed, the town had allowed other murals at a local shopping center, but in December the town found that three of those artworks are, indeed, signs that violate size limits. They go before the zoning board on Wednesday.

Young, who is being represented by the Virginia-based Institute for Justice, asked for $1 in damages. Meanwhile, he's selling T-shirts as a high school art department fundraiser, saying "This is Art" with the artwork on the front, and "This is a Sign" of a roadside "Leavitt's Country Bakery" sign on the back.

"As Conway officials have confirmed, the town does not consider a painting to be a "sign" if it does not convey what town officials perceive to be a commercial message," the lawsuit says. "But the town's perception is that any mural depicting anything related to a business is a 'sign.' This is governmental discrimination based on the content of the speech" and the speaker's identity, it said.

The lawsuit says the town's sign definition is "incredibly broad," with no mention of murals in the code: A sign in Conway is "any device, fixture, placard, structure or attachment thereto that uses color, form, graphic, illumination, symbol, or writing to advertise, announce the purpose of, or identify the purpose of any person or entity, or to communicate information of any kind to the public, whether commercial or noncommercial."

***Get updates on what's happening in Massachusetts to your inbox. Sign up for our News Headlines newsletter.***

Board member Luigi Bartolomeo said he thinks the pastry painting is art, not advertising. He read the definition out loud at the board's meeting in August, and said he agrees with a local attorney who called it "unconstitutionally vague."

"I think it's a very badly written piece of code here," said Bartolomeo, who recently retired. But Board Chairperson John Colbath said the board has to work with the ordinance, which was approved by voters, and that there is a process to change that.

"If they had done a seasonal mural on the wall — covered bridges and sunflowers and what have you — and it did not represent what your business is in, then it would be more likely to be a well-respected piece of art and not construed as a sign," Colbath said at the August meeting.

He said to Young, "I understand the art thing — and you look and you see a mountain — but the general public sees donuts on the front of the bakery."

"I think most of the people said it's art," Young responded.

In its denial of Young's appeals, the board concluded that the bakery won't be negatively affected without the display.

"This supposed distinction between murals and signs shouldn't matter," attorney Betsy Sanz of the Institute said in a news release. "After all, nothing in the First Amendment distinguishes between art and commercial signs — or commercial speech of any kind."

The town and Young agreed in February to pause court proceedings — and any potential fines or charges — pending a vote on a revised definition that would allow the painting to stay. But it failed in last week's elections, with 805 to 750 voting against it, according to the town clerk's office. The judge now wants to hear from both sides by May 10.

"We're ready to keep going," Young said.

Town Manager John Eastman declined an interview, referring questions to town lawyer Jason Dennis, who said he would soon meet with town officials to discuss next steps.

The Conway Daily Sun offered its analysis in an editorial last week: "Voters smartly concluded that the proposed new definition of signs would only further complicate enforcement. That said, it is not a stretch to conjecture that most voters are fine with the murals at Leavitt's Country Bakery and Settlers Green. We suggest the town figure out a way to back off enforcement until a clearer definition can be written, one that accommodates 'art.'"

Copyright AP - Associated Press

This article tagged under:

# Exhibit R
# City Commission Meeting Transcript

Exhibit A

SALINA CITY COMMISSION MEETING

held on
November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 5 of 45


same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 11 of 45


situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 17 of 45


zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 19 of 45


setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 22 of 45


about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 27 of 45


definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 28 of 45


well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 29 of 45


But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 32 of 45


Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 37 of 45


know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 38 of 45


When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 39 of 45


have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 43 of 45


it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

Case 6:24-cv-01027-TC Document 112-18 Filed 03/14/25 Page 44 of 45


MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter

Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

# Exhibit S
# Schrage Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
MICHAEL SCHRAGE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:09 a.m. on the 11th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.
.

**Q. Do you recall giving a media interview to KSN?**
A. Yes.
**Q. Have you reviewed -- did you see the version that was aired?**
MS. JOKERST: Object to form and foundation.
A. At the time.
BY MR. MACROBERTS:
**Q. If you would, please, turn to Deposition Exhibit 92.**
A. Okay.
**Q. I can't tell from my electronic version whether this is 304 or 305. But there's a quote that's attributed to you?**
A. Okay. There's one at the bottom -- starts at the bottom of 304 and rolls over to 305.
**Q. I'll read to you the quote. It includes a message that pertains to the good or services for sale and that makes it a sign and makes it subject to the sign code said Mike Schrage, Salina City Manager. Do you see where --**
A. Yes.
**Q. -- that is?**
A. Yeah.

**Q. You said that to the reporter?**
A. Yeah, I believe so.
**Q. There's no reason to think you didn't say that, right?**
A. Right.
**Q. Okay. If you could please turn to Deposition Exhibit 39.**
A. Okay.
**Q. What is -- and you might laugh at this question. What is a City Manager Update?**
MS. JOKERST: Object to form.
A. It's a document that I draft most weeks. I haven't been doing nearly as well lately. But just trying to summarize various things that come up to keep the city commission informed.
BY MR. MACROBERTS:
**Q. Is it typically a weekly summary?**
A. That's the goal. Yeah, that's the goal.
**Q. Did you author -- I know I'm already laughing at this question, but did you author the City Manager Update that's at Deposition Exhibit 39?**
A. Fair question. If I could get somebody else to, I would but, yes, I did.
**Q. Including the e-mail?**

foundation.
A. Among others, but yeah.
BY MR. MACROBERTS:
**Q. Is it popular?**
A. It's not unpopular. It's not widely popular but, yeah, it's appreciated by most.
**Q. As I understand it, it does generate enthusiasm and energy?**
A. Yeah. It generates conversation and tourism. It's not without its detractors.
MR. MACROBERTS: All right. I would like a two-minute break. We can go longer if somebody would like.
MS. JOKERST: Yeah, take five minutes. Two is a little long for me to go grab some water.
MR. MACROBERTS: Yep, sounds good.
(THEREUPON, a recess was taken.)
BY MR. MACROBERTS:
**Q. If you would please turn to Exhibit 93?**
A. Okay.
**Q. Do you recognize it?**
A. Yes.
**Q. Did you author it?**
A. Yeah.

**Q. Is Deposition Exhibit 93 the same as the electronic version?**
A. I believe so, yes.
**Q. And no reason to think it's not?**
A. No.
**Q. Do you know why you authored this e-mail?**
MS. JOKERST: Object to form.
A. I wasn't sure whether he was even aware of the conversation and that Boom! Salina might get caught up in the conversation. I was just trying to make him aware of what had taken place and where things stood.
BY MR. MACROBERTS:
**Q. Did you write this e-mail on your own initiative?**
A. Yes.
**Q. When you say he, who do you mean?**
A. I'm sorry. Do I say it in the e-mail or I just said it verbally?
**Q. As I heard your answer, you were saying he and I'm assuming --**
A. Oh, Travis Young, the recipient of the e-mail.
**Q. Why are you telling Travis what your intended response is?**

MS. JOKERST: Object to form.
A. He, as I mentioned earlier, is the organizer of Boom! Salina and they had been kind caught up -- that project had been caught up in the conversation. It's just good form to try to keep people informed.
BY MR. MACROBERTS:
**Q. You tell Travis that your intended response is to stress that we have been very mindful of the Reed v. Gilbert case as well as applicable case law regarding what constitutes commercial speech. What applicable case law constitutes commercial speech were you referencing?**
A. Those --
MS. JOKERST: Object to form.
A. Those examples that I shared earlier, general understanding of the various litigation that had gone on previously.
BY MR. MACROBERTS:
**Q. If you would, please turn to Deposition Exhibit 52. Do you know who authored Deposition Exhibit 52?**
A. Based on the letterhead, it appears that Dustin Michelson as well as the signature block.

# CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

Sandra S. Biggs
____________________________________

SANDRA S. BIGGS CERTIFIED SHORTHAND REPORTER STATE OF KANSAS

Sandra S. Biggs, C.C.R No. 0716

# Exhibit T
# Schrage Email
# 2/20/24

Message

**From:** mike.schrage@salina.org [mike.schrage@salina.org]
**Sent:** 2/20/2024 10:23:56 AM
**To:** travis@vortexglobal.com
**Subject:** Cozy Inn Sign Code Lawsuit

Travis:

I am playing catchup to a federal lawsuit recently filed on behalf of The Cozy Inn equating their sign to the murals painted throughout the downtown. Apparently, it has hit the news media. I am in orientation training with the City Commission all day today. It is too soon to say if or how it might impact the Boom! Salina, but that is something will have to review. I will reach out to you further once we have had a chance to conduct our legal review and collect our thoughts a bit more.

My intended response is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation. I say all of that because we have felt confident of our policy and application this point, but it will now have to be litigated; I don't know how long that might take; and I don't know what that might mean about our code enforcement in the interim.

I will reach out just as soon as I know more and can discuss it further with you.
Mike Schrage
City Manager
City of Salina, Kansas
300 West Ash Street, Room 202
Salina, KS 67402
Phone: 785-309-5700
Website: www.salina-ks.gov

Schrage
EXHIBIT NO. 93
APPINO & BIGGS

# Exhibit U
# Plaintiffs' First Amended Response to First Set of Interrogatories

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas,**<br><br>Defendant. | Case No. No. 6:24-cv-01027<br><br>Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories; Verification |

**Plaintiffs' First Amended Response to Defendant's First Set of Interrogatories**

Instructions

**1.** Pursuant to Fed.R.Civ.P. 26 and 33, Plaintiffs are required to answer the following discovery requests within thirty (30) days after service hereof.

**2.** In your answer or response, please restate each numbered Interrogatory prior to your response to that request.

**3.** Plaintiffs are required to make a reasonable and good faith effort to obtain the information requested by each interrogatory. If you are unable to answer or respond fully to any request, answer or respond to the extent possible and explain why you cannot answer or respond in full.

**4.** If you do not have enough personal knowledge to fully answer a request, say so, but make a reasonable and good faith effort to get the information by making inquiry within your organization.

**5.** In case of doubt as to the scope of a clause including "and," "or," "any," "all,"

"each" or "every," the intended meaning is inclusive rather than exclusive.

**6.** If you find the meaning of any term in these discovery requests to be unclear, then you should either request clarification or assume a reasonable meaning, state what that assumed meaning is, and answer the request on the basis of that assumed meaning.

**7.** These discovery requests are continuing in nature and you are requested to furnish amended or supplemental responses and additional documents in accordance with Fed.R.Civ.P. 26(e).

**8.** Pursuant to Fed.R.Civ.P. 26(e), you are under a duty to promptly amend a prior response to a request if you learn that the prior response is in some material respect incomplete or incorrect and the additional or corrective information has not otherwise been made known to the defendant during the discovery process.

**9.** If you assert a privilege (*e.g.*, attorney-client privilege) as the reason for refusing to answer or respond or as the basis of an objection to any discovery request, state the specific grounds therefor, separately and specifically identify each individual discovery request as to which such privilege is claimed, and describe the facts upon which you base the assertion of privilege. If the claim of privilege involves a **Communication**, please identify each person present at that **Communication**. Please produce a privilege log identifying each document withheld or redacted pursuant to any alleged privilege.

**10.** Your answers to the Interrogatories must be verified, dated and signed.

## 1. DEFINITIONS

**1.** **"Communication"** or "**Communications**" refers to all means of exchanging information, whether verbal, on paper, or via any electronic means, including but not limited to all

inquiries, discussions, conferences, conversations, negotiations, agreements, interviews, telephone conversations, letters, correspondence, e-mail, text messages, SMS texts, iMessages, private electronic messaging apps, file sharing, and notes.

**2.** **"Document"** or "**Documents**" shall be defined in their broadest sense under Fed.R.Civ.P. 34, and they mean the original and all copies any writing and each original, or a copy in the absence of the original, and every copy bearing notes or markings not present on the original or copy of the following items, however produced or reproduced, including without limitation: writings, books, invoices, shipping forms, accounting records of any nature whatsoever, agreements, correspondence, SMS texts, iMessages, emails, memoranda, recordings, summaries or records of telephone conversations, summaries of records of personal conversations or interviews, diaries, calendars, day-timers, time sheets and other time records, letters, forecasts, graphs, notebooks, charts, plans, sketches, drawings, video and audio tapes, films, slides, photographs, photo-records, microfilms, tape recordings, minutes or records of meetings or conferences, expressions or statements of policy, lists of persons attending meetings or conferences, summaries of investigations, opinions or reports of consultants, reprints and drafts of any documents, working papers, indices, original or preliminary notes, computer printouts, and other data compilations, including those stored on computer drives, tapes, smartphones, smart watches, tablets, solid-state devices (whether fixed or removable), or internet-based file sharing, file storage, or backup services, from which information can be obtained or translated, if necessary, through detection devices into reasonably usable form. The term "**Document**" shall include all drafts, as well as final versions of any **Document**.

**3.** "**Sign Code**" means the following provisions of the Salina Code of Ordinances:

(a) Chapter 42, Article X; (b) the definitions found in Chapter 42, Article XIV for words and phrases that are used in Chapter 42, Article X; (c) Section 42-581; (d) Section 42-596 to Section 42-597.1, inclusive; (e) Section 42-598 to Section 42-600, inclusive.

**4.** "**BID Code**" means Chapter 2, Article X of the Salina Code of Ordinances.

**5.** "**Cozy Sign**" or "**Plaintiffs' Sign**" means the sign that is the subject matter of this lawsuit, also identified as the display painted on the exterior wall of the Cozy Inn as shown in paragraphs 27 and 28 (the "completed rendition") of Plaintiffs' Amended Complaint.

**6.** "**Plaintiffs**," "**You**," or "**Your**" means the Plaintiffs identified in Civil Action No. 6:24-cv-01027-TC-ADM collectively, and individually, including Plaintiffs' representatives, attorneys, officers, directors, employees, agents, affiliates, and persons or entities acting or purporting to act on Plaintiffs' behalf.

**7.** "**Sign**" means a sign as defined in Salina Code of Ordinances § 42-764.

**8.** "**Person**" or "**Persons**" mean, where contextually appropriate, any individual, corporation, partnership, association, group or entity of any kind.

**9.** "**Related**" or "**Relating**" means supports, proves, evidences, describes, is associated with, provides background for, explains, concerns or regards.

**10.** The term "**Identify**" shall mean, where contextually appropriate:

**A.** With respect to a Person, the name, current or last known address and telephone number for such Person; or

**B.** With respect to a Document, the title, type (letter, memorandum, etc.), author, recipient and current or last known location of such Document.

**11.** Any reference to the singular shall include the plural, and references to the plural

shall include the singular.

**2. INTERROGATORIES**

6. In Plaintiffs' Amended Complaint [Dkt. No. 16], Plaintiffs allege at ¶ 210 that "This demonstrates Salina's antipathy toward content related to a business and commercial speech. This also demonstrates Salina's preference for content unrelated to a business and noncommercial speech." Please describe in detail the basis for this allegation including specific standards of the **Sign Code** or **BID Code** imposed by City staff and the factual basis supporting the allegation in ¶ 210 of the Amended Complaint.

ANSWER: As described in the Amended Complaint, Salina exempts murals from regulation under the mural-sign code regime if Salina considers the mural's content to be noncommercial or "art." Conversely, if Salina perceives the content of the mural to be commercial or to pertain to goods or services sold, then Salina regulates the mural as a sign under the mural-sign code regime. In short, Salina encourages and promotes murals with a noncommercial message while strictly regulating murals it believes have a commercial message. This reflects a preference for noncommercial speech and a hostility toward commercial speech. Examples of this preference for noncommercial speech include:

- The City Manager's statement that "It includes a message that pertains to the goods or services for sale, and that makes it a sign and makes it subject to the sign code." Bates 0285-295.
- A City Commissioner's statement that "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." Doc. 16-2 at pg. 22, ln. 24 – pg. 23, ln. 2.

- Ms. Driscoll's hypothetical comparing a mural of a dove to a mural of a coffee pot at a coffee house: "But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction. Where if we had a steaming cup of coffee and a coffee pot on the side, those are things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction." Doc. 16-2 pg. 23, ln. 19 – pg. 24, ln. 4.
- The City Manager's statement that "You know, as we -- as we looked at murals, we had some conversation about this very question.· And the first reaction was, well, if it includes lettering, or if it includes wording. But it really -- if the wording's not commercial in any way or doesn't have an·attachment to a commercial operation, that in·and of itself isn't a disqualifier." Doc. 16-2 pg. 26, ln. 23 – pg. 27, ln. 6.
- The City Manager's statement that "And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign." Doc. 16-2 pg. 28, ln. 15-21.
- The City Manager's statement that "The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place." Doc. 16-2 pg. 5, ln. 2-7.
- The City Manager's statement that "And there certainly is a misunderstanding between art and signs and commercial speech." Doc. 16-2 pg. 5, ln. 23-25.

- The City Manager's statement that "And I would reiterate, it's all on the basis of a commercial message." Doc. 16-2 pg. 10, ln. 4-5.
- The City Manager's email to the City Commission stating that "While it might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes which includes size limitations among other things." Bates CITY000261-262. The email later states "You may recall that similar questions came up last year related to attempts to classify signs as murals and trying to leverage the various murals installed or proposed to be installed in the downtown. Our immediate solution was to coordinate closely with Boom Salina to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes."
- The City Manager's email to the City Commission stating that "We regulate the size of commercial signs through a permit process." Bates CITY000221-222.
- The City Manager's email to a City Commissioner listing the City's talking points on the Cozy's mural which states "A distinction is commonly made between murals and art when compared to commercial speech," and "We regulate the size of commercial signs through a permit process." Bates CITY000220.
- The email of Mr. Anderson explaining that "Work is done to ensure that the Boom mural content does not contain content that could be interpreted as a sign. This is done through SDI, the building owner, the artist, Boom representatives, and city of Salina Development Services." Bates CITY000352.
- The City Manager's email stating that "My intended response is to stress that we have

been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." Bates CITY000218.

- Salina City Code § 42-504(1) exempts noncommercial flags from regulation, but not commercial flags.
- Salina City Code § 42-504(5) exempts memorial signs and tablets from regulation, but not commercial signs or tablets.
- Salina City Code § 42-504(9) exempts window signs that do not display an advertising message, but not window signs that display an advertising message.
- Salina City Code § 42-511 authorizes the substitution of any noncommercial copy in lieu of any other copy, but it does not authorize the substitution of commercial copy in lieu of any other copy.
- Salina City Code § 42-521(1) authorizes advertising signs in the C-4 zoning district if the signs advertise "special public events sponsored by governmental, philanthropic and nonprofit organizations," while prohibiting advertising signs that convey a commercial message.
- Salina City Code § 45-506(1) classifies an advertising sign, which is more heavily restricted than other signs, as "A sign displaying a commercial message that directs attention to" an off-premises business, while a sign that displays a noncommercial message that advertises a off-premises non-commercial entity is not considered an advertising sign.

**9. Identify** any **Sign**, display, mural or art on the Cozy Inn property which was erected, constructed or displayed in the past 10 years for the purpose of noncommercial speech.

ANSWER: The only displays on the exterior of The Cozy that communicated noncommercial content in the past five years that Plaintiffs are aware of are: 1) the mural on the wall of The Cozy that is the subject of this lawsuit; and 2) a display celebrating the anniversary of The Cozy which has been updated regularly throughout the years to reflect The Cozy's age.

17. Do **You** contend the **Sign Code** does not advance the City's interest in traffic safety? If so, please state all material facts supporting **Your** contention.

ANSWER: The burden of proof is on the Government to show that a restriction on speech satisfies the strict demands of the First Amendment. To date Defendant has not produced evidence as to how the sign code advances its claimed interests in traffic safety, and Plaintiffs are not aware of any such evidence.

Nevertheless, Plaintiffs believe that portions of the sign code may conceivably advance the City's claimed interest in traffic safety. For instance, Plaintiffs could imagine how regulating the construction standards of pole signs might lessen the likelihood of a poorly constructed sign falling in the road. However, Plaintiffs are not aware of any factual evidence that would support this possibility.

Other aspects of the sign code may harm traffic safety. When signs are restricted in size, this makes it more difficult for pedestrians and motorists to find their destination, resulting in drivers and pedestrians who are distracted and more likely to get in an accident that harms themselves or others. Large, distinctive signs, on the other hand, will enhance traffic safety by making it easy for pedestrians and motorists to identify their destination, allowing them to fully focus on traffic safety.

Plaintiffs contend that there is no factual reason to believe that regulating the size and content of murals painted on private property will enhance traffic safety. Plaintiffs contend that there is no factual reason to believe that murals containing a commercial message, or that pertain to goods or services for sale, or with content that "announces," "directs attention to," or "advertises" (however the government choses to define those terms) will decrease traffic safety any more than murals which contain a different message would. Indeed, it seems likely that some non-commercial murals containing a controversial political, religious, or social message (a swastika mural, a gay pride mural, a "defund the police" mural, a Satanists mural, etc.) would be far more likely to upset and distract pedestrians and motorists and decrease safety than a mural of burger-esque flying saucers.

Dated: October 4, 2024.

Kansas Justice Institute

By: Jeffrey Shaw, 29767

/s/ Jeffrey Shaw

Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
Jeff@KansasJusticeInstitute.org
(913) 213-5121
Attorney for Plaintiffs

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Verification |

**Verification**

I, Stephen Howard, have personal knowledge of myself, my activities, and my intentions, including those set out in Plaintiffs First Amended Answers to Defendant's First Set of Interrogatories. I verify under penalty of perjury under the laws of the United States of America that the factual statements in the Answers to Interrogatories are true to the best of my current knowledge, information, and belief.

Dated: 11-5, 2024.

Stephen Howard, individually and
On behalf of Cozy Inn, Incorporated,
d/b/a The Cozy Inn

Galaxy S22

# Exhibit V
# Driscoll Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
LAUREN DRISCOLL,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:06 a.m. on the 10th day of September, 2024, at the law offices of Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

apologizing for cutting you off. I thought the question was done.

A. So you saying there's just two doves painted there at the Mexican restaurant?

BY MR. MACROBERTS:

**Q. Where the -- yes, where the Feelin' Taco-tastic and Fuel Your Inner Fiesta is in this exhibit?**

A. I would go back to the definition of the sign code, but it would probably not be a sign. I don't know what else more is there, if there's text, if it's just a dove, I don't know what's on the other side, but if they've got dove tacos, but I'm really hoping they don't, but probably -- probably not.

**Q. All right. Let's assume no dove tacos and no text, just pictures of a dove?**

MS. JOKERST: Object to form.

A. By my interpretation of the definition sitting here at this table with what I know, are you announcing something with the dove? Not really. I mean I suppose you've initially grabbed attention, but you're not announcing anything relevant. You're directing attention to, is the dove pointing to something or flying toward

something, let's say it's not. So you're not directing attention to. And what are you advertising? We're not advertising any good or service. I mean they don't have a -- they're not selling doves with every meal. I mean they're truly not related from what I know in this hypothetical.

BY MR. MACROBERTS:

**Q. So it would not be a sign?**

A. Based on the hypothetical you gave me, I would not make that -- I would not think that's a sign.

**Q. You mentioned previously that you were, and I'm paraphrasing, considering amending the code before the Cozy Inn issue?**

A. Um-hum.

**Q. Is that a yes?**

MS. JOKERST: Object to form.

A. I'm sorry. Yes.

BY MR. MACROBERTS:

**Q. And when did that originally come onto your radar?**

A. Within 2023, 2022. Technology's changed a lot around signs, too, particularly with lighting and lumens and materials being used for

# CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 19th day of September, 2024.

Sandra S. Biggs
______________________

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS
STATE OF KANSAS
CERTIFIED SHORTHAND REPORTER

# Exhibit W
# Andrew 30(b)(6)
# Deposition Excerpts

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.
.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,
.
vs. Civil Action No. 6:24-cv-01027-TC-ADM
.
CITY OF SALINA, KANSAS,
Defendant.
.
.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.
.

**Q. But is the fence a part of that structure?**

A. Can be.

**Q. If a window sign is located on the inside pane of the window, is that still considered inside the building?**

MS. JOKERST: Object to scope.

A. There is a separate definition and a separate regulation for a window sign. And by definition, a window sign can be one that's affixed to the inside of a building. That does not mean it's not a regulated sign in some circumstances.

BY MR. SHAW:

**Q. So there are signs then that are located inside of a building that are still considered regulated signs?**

MS. JOKERST: Object to form and to scope.

A. If you have a window sign and it's affixed to the inside of the building and it covers more than 33 percent of the total window area, it can be considered to be a regulated sign that counts towards your sign allowance.

BY MR. SHAW:

that would be generated by the software.

**Q. Does that e-mail generated by the software include information about any right to appeal that goes along with that denial of a permit?**

A. Generally not.

**Q. What happens if no determination is made about what to do with a sign permit?**

A. Then the sign is considered to be on hold pending some other event or result.

**Q. And does the code have a provision for a permit being placed on hold?**

MS. JOKERST: Object to scope.

A. It is not specifically baked into the code, but it is within the discretion of the reviewer if they feel like they're actively working with an applicant that they will keep the application on hold.

BY MR. SHAW:

**Q. If a property owner wanted to paint a mural on their property but they were unsure if it would be considered a sign or not, could they bring a rendering of that mural to the city for a determination?**

A. Absolute --

CERTIFICATE

STATE OF KANSAS

COUNTY OF SHAWNEE

I, Sandra S. Biggs, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 13th day of November, 2024.

Sandra S. Biggs

Sandra S. Biggs, C.C.R No. 0716

SANDRA S. BIGGS STATE OF KANSAS CERTIFIED SHORTHAND REPORTER

# Exhibit X
# Yard DRB
# Packet

City of Salina

## BUSINESS IMPROVEMENT DISTRICT NO. 1
## DESIGN REVIEW BOARD

Design Review Board meetings will take place via Zoom until further notice. You can view the meetings at the City of Salina YouTube channel, https://www.youtube.com/cityofSalinaKansas

To participate in the meetings, citizens will need to use the Zoom link – https://us02web.zoom.us/j/82053180567

If citizens wish to speak, either during the public forum or when the Chair requests public comment on an item, citizens must raise their hand so that the meeting host can allow them to speak.

Citizens can also send written comments or questions to Design Review Board Members vie email at plangroup@salina.org

In order for the Board Members to have an opportunity to review comments in advance of the meeting, please email your comments or questions by 12:00 p.m. Thursday, prior to the 4:00 p.m. meeting.

Herrs
EXHIBIT NO. 25
APPINO & BIGGS

City of Salina

SALINA DOWNTOWN

# MEETING AGENDA

**DESIGN REVIEW BOARD**
MEETING VIA ZOOM
Thursday, January 14, 2021
4:00 P.M.

1. **CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION**
   (1.1) Call to Order
   (1.2) Roll Call
   (1.3) Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

2. **APPROVAL OF MINUTES**
   (2.1) Approval of the minutes of the regular meeting held on November 12, 2020.

3. **NEW BUSINESS**

   **Public Hearing Items**

   (3.1) Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

   **Administrative Items**
   None

   **Preliminary Discussion Items**
   None

4. **UNFINISHED OR OTHER BUSINESS**
   None

5. **PUBLIC FORUM**

6. **ADJOURNMENT**

**Record of this Meeting**
This public meeting will be recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive meeting packets by email, subscribe to *Email Notifications* at http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.

City of Salina

## ADDRESSING THE DESIGN REVIEW BOARD

The public is invited to speak to the Design Review Board during the public hearing portion of any item under discussion and during the Public Forum. Please raise your hand and after receiving recognition from the Chairman, approach the front, state your name, address and purpose for speaking.

Generally, the order of presentation after introduction of an item by the Chairman will be:

1. Determination if the applicant or his/her representative is present.
2. Brief presentation by the staff.
3. Comments by the applicant.
4. Comments by interested citizens.
5. Additional comments by the applicant and/or citizens, as appropriate.
6. Closing of public comment portion of hearing by Chairman.
7. Design Review Board discussion and action.

If an application is approved by the Design Review Board, a Certificate of Compatibility will be forwarded to the City Building Services Division and will allow a building/sign or demolition permit to be issued for that work. Any applicant may appeal a decision of the Board to the Salina City Commission. A protest or appeal must be filed with the City Clerk no later than fourteen (14) days following the Board's decision. Should you wish to file a protest or appeal on any application, forms may be obtained from the City Clerk's Office, Room 206, City-County Building, 309-5735. If you have any questions or concerns, please contact the Community and Development Services Department, Room 205 of the City-County Building, 309-5720.

City of Salina

SALINA DOWNTOWN

# MEETING MINUTES

**DESIGN REVIEW BOARD**
CITY-COUNTY BUILDING, ROOM 107
THURSDAY, NOVEMBER 12, 2020
4:00 P.M.

## 1. CALL TO ORDER / ROLL CALL / KOMA CONFIRMATION

(1.1) Call to Order

Chair Martens called the meeting to order at 4:00 p.m.

(1.2) Roll Call

**Board Members Present:**
Gary Martens (Chair), Katherine Kitchen, Jennifer Noonan

**Board Members Absent:**
Haley Helzer

**City Staff Present:**
Dean Andrew, Zoning Administrator; Dustin Herrs, Assistant Planner

Mr. Andrew informed the Board that Vice-Chair Mukesh Patel has resigned from the Board.

(1.3) Chair requests staff confirmation that Kansas Open Meeting Act required notice has been properly provided.

Mr. Andrew confirmed that the packet was posted and the required notice of today's meeting was provided.

## 2. APPROVAL OF MINUTES

(2.1) Approval of the Minutes of the October 29, 2020 special meeting.

A motion was made to approve the minutes of the October 29, 2020 special meeting by Board Member Kitchen, seconded by Board Member Noonan and carried by vote.

## 3. NEW BUSINESS

**Public Hearing Items**

(3.1) Application #CC20-13, filed by Guy Walker on behalf of Blue Beacon International, Inc. requesting the approval of a Certificate of Compatibility to allow the construction of two new metal canopies and the installation of a new projecting sign

on the National Bank of America Building at the southwest corner of Santa Fe and Iron. The subject property is legally described as Lot 110 on Santa Fe Avenue in the Original Town (now City) of Salina, Saline County, Kansas and is addressed as 100 S. Santa Fe Avenue.

Mr. Andrew presented the staff report with visual graphics which are contained in today's meeting packet.

Chair Martens asked the Board if there were questions for staff.

Chair Martens asked for Mr. Andrew to clarify that the 52 sq. ft. sign exceeds the size limitations in C-4.

Mr. Andrew stated that because the sign exceeds 48 sq. ft., staff would not be able to issue a sign permit even with the Board's approval of the location and design. He continued that the applicant will need to reduce the size of the sign to the allowable size.

Chair Martens clarified that if the applicant wants the sign to be 52 sq. ft. they would have to go before the Board of Zoning Appeals or apply for a text amendment which Mr. Andrew confirmed.

Board Member Kitchen asked what staff's concern was for the wrapping of the pillars.

Mr. Andrew stated that in staff's experience with National Register properties and the Secretary of Interior's Standards for Rehabilitation, applicants are discouraged from covering up original materials. He continued that staff could have misinterpreted the application but the concern is that the Downtown Guidelines and the Secretary of Interior's Standards for Rehabilitation discourage covering up or obscuring original façade materials. He continued that if it was limestone today and then wrapped in metal cladding, it would be covering original materials. He stated that if it was already covered, then it would not be covering just replacing.

Chair Martens invited the applicant to address the Commission.

Guy Walker, 500 Graves Boulevard, stated that the building was built in the 1920's and did not have the glass storefront, but a stone facade. He stated that it was renovated in the 1960's which changed the building. He stated that the two columns have metal on them now and because they are exposed now with this construction, they are visible.

Ben Moore, architect for the representative, stated that the existing metal of the canopies matches those wrapped columns. He stated that they have looked at replacing the deteriorated metal in a complimentary fashion with a prefabricated color of charcoal gray.

Mr. Walker returned to the microphone and stated that the sign square footage can be reduced to 48 sq. ft. to conform with the size limitation.

Mr. Andrew asked for the applicant to provide an update on National and State Historic Tax Credits.

Mr. Walker stated that the review is still pending. He stated that they submitted this project as an amendment to their application. He stated that they will not be doing anything that would impact their tax credits because they need those to reimburse some of the costs from interior renovations.

Mr. Moore returned to the microphone and stated that their preservation consultant is working with the state on the review now.

Mr. Walker returned to the microphone and stated that the preservation consultant is well versed in what the State will accept. He stated that she gave them advice on what the State will agree with or decline. He stated that this is not a major change and the color change is just to update the storefront.

Mr. Walker stated that the renderings show a blue colored text for the UMB sign on the north canopy and asked Mr. Andrew if they would have to come back before the Board to change that text color to white.

Mr. Andrew stated that staff could approve that administratively through the sign permit application and it would not have to go back before the Board.

Mr. Andrew stated historically staff refers to this building as the National Bank of America Building although it is now occupied by UMB Bank.

Mr. Walker stated that the reason they are trying to name the building the Hoffman Building is to give the building a full identity instead of just for one specific tenant and the Hoffman family was one of the families connected to the National Bank of America building.

Chair Martens asked the Board if there were other questions for the applicant's representative. There were none.

Mr. Andrew stated that staff just wanted to call attention to the different aspects impacting historic properties because there is a higher level of scrutiny when National and State Register buildings are being looked at. He stated that if the applicant is using a preservation consultant then they are in good hands.

Chair Martens confirmed there were no comments or questions from members of the public, closed the public hearing and brought the item to the Board for discussion and action.

| | |
|---|---|
| MOTION: | Board Member Kitchen made a motion to approve Application #CC20-13 with the conditions listed in the staff report and that the projected sign be reduced to 48 sq. ft. and that if any major changes were made that the application be brought back before the Board for review. |
| SECOND: | Board Member Noonan |
| VOTE: | Motion passed 3-0. |

Mr. Andrew stated that they will provide the applicant with a letter describing the actions taken by the Board today and what the next steps to take are.

**Administrative Items**
None

**Preliminary Discussion Items**
None

**4. UNFINISHED OR OTHER BUSINESS**

The next regularly scheduled meeting of the Design Review Board is on December 10, 2020. Mr. Andrew stated that there are no applications filed at this time and that staff will notify the Board if the meeting will be held.

Mr. Andrew stated that staff will work with Salina Downtown Inc. and Penny Bettles to get interested citizens to submit an EOI if they are interested in joining the Design Review Board.

Board Member Kitchen asked if there are any specific openings on the Board or if the positions were for Community At Large members.

Mr. Andrew stated there is one spot available for a Design Professional, filling the spot of Maggie Gillam's whose term expired in August. He continued that there is another opening for a property owner but believes that Board Member Helzer may qualify for that position. He stated that they will work with Salina Downtown Inc.to help find interested citizens.

**5. PUBLIC FORUM**
None

**6. ADJOURNMENT**

A motion was made to adjourn the meeting by Board Member Noonan, seconded by Board Member Kitchen and carried by vote.

The meeting adjourned at 4:32 p.m.

______________________________
Gary Martens, Chair

ATTEST:

______________________________
Dean Andrew, Secretary

**Record of this Meeting**

This public meeting was recorded by Salina Media Connection and available to view online free of charge at http://www.salinatv.org/index.php/city-of-salina. To receive future meeting packets by email, subscribe to *Email Notifications* at: http://www.salina-ks.gov/content/18160/23455/23473/default.aspx. Meeting DVDs and paper copies of meeting packets are available upon request (retrieval and/or duplication fees may apply). Please contact the Community and Development Services Department at building.services@salina.org or by phone at 785.309.5715 to request these open public records.

# Application for a Certificate of Compatibility
# Business Improvement District - Design Review Board

PLF-039 Certificate of Compatibility

*Please return the completed application to:*
**Development Services Department**
300 W. Ash, City-County Building, Room #205
Salina, KS 67402-0736
785-309-5720 FAX 785-309-5713
Email: john.burger@salina.org

*The City Planning Division:*
- *Provides technical assistance to the applicant*
- *Receives the completed application*
- *Provides a copy of the application to the SDI Office for input*
- *Schedules the Design Review Board hearing*
- *Presents the application to Design Review Board*
- *Provides notice of approval to applicant*

***Please see the Schedule for Design Review Board hearings for the deadline for submissions. An applicant or his representative must attend the review hearing in order for the item to be considered at that meeting.***

**Applicant Please Complete the Following:**

1. Property Address 211 E. Walnut & 138 S. 4th
2. Name of Business The Yard
3. Applicant's Name Jacob Wilson 4. Applicant Ph. 785-342-7545
5. Applicant's Address 210 E. Walnut 6. Email jacob@restorebuilds.com
7. Property Owner Name (if different) Restore Construction
8. Property Owner Address 210 E. Walnut 9. Owner Ph. 785-342-7545
9. Contractor/Architect Restore Construction 10. Phone
11. Contractor/Architect Address 12. Email jacob@restorebuilds.com

13. What kind of work is proposed? (please check all that apply)
☒ Renovation or repair ☒ Demolition ☒ Sign or Canopy ☐ New Construction ☐ Paint
☐ Other, please describe

14. Approximate cost of project (including labor and material) $ 250,000.00

**Please attach the following materials to the application:**

1. ***Please include Certificate of Compatibility Application Fee of $35.00 payable to the "City of Salina".***
2. Representative color photographs showing existing structure(s) and the location for the proposed work.
3. Small-scale projects must include a floor plan that shows the existing structure and location of the proposed work.
4. For larger or complex projects, provide architectural drawings such as site plan, floor plans, elevations, wall sections and/or detail drawings.
5. Material samples or product specifications indicating color, form, profile and texture.

**Briefly describe the nature of the proposed work, the condition of existing materials, the replacement/new materials and/or the method of rehabilitation (attach additional sheets if necessary):**

Renovation of 138 S. 4th for new business "The Yard". It will be a baseball & softball academy for youth kids. Demolition of metal building and construction of a new outdoor turf covered field. New siding & roof to corner building. New metal signage on 138 S. 4th.

Applicant Signature: [signature] Date 12/4/20

Property Owner Signature (if different): Date

**For Staff Use:** **Application No. #CC** 20-14

Legal Description of Property Lot 130, Lot 132, Lot 134, Lot 136 and Lot 138 on Fourth Street in the Original Town of Salina

Current Zoning C-4 Current Use Vacant contractor's office

Date Filed December 7, 2020 Accepted by DA

Date of Publication N/A Building/Sign Permit No.

Property Owner Notice Sent January 6, 2021 Heritage Commission Review (y/n)

Date of Hearing January 14, 2021 Approval Notification Sent

0165

**STAFF REPORT**
**BUSINESS IMPROVEMENT DISTRICT**
**DESIGN REVIEW BOARD**

Application: **#CC20-14** Hearing Date: **<u>January 14, 2021</u>**

**ITEM 3.1**

Application #CC20-14, filed by Jacob Wilson on behalf of Restore Construction, LLC requesting the approval of a Certificate of Compatibility to allow the demolition and renovation of the existing buildings located at the northwest corner of Fourth Street and Walnut Street. The subject property is legally described as Lot 130, 132, 134, 136 and 138 on Fourth Street in the Original Town (now City) of Salina, Saline County, Kansas and addressed as 211 E. Walnut Street / 138 S. Fourth Street.

**BACKGROUND**

The existing buildings at the northwest corner of Fourth and Walnut Streets in downtown Salina addressed as 211 East Walnut Street were constructed in 1929 for a lumber yard operation. In the 1960s the buildings were occupied by a heating and air contractor and later briefly as a solar energy product facility. From 1987 to the present this property was used as a construction warehouse for Bill Medina Construction.

There is a separate brick building on the property that is part of a 3 bay building facing South Fourth Street. The north two bays of this building are being incorporated into the Car Museum. The southernmost bay was leased by Medina Construction to Images Recycling and later to Prairieland Market. Prairieland Market has relocated to the building at the northeast corner of Fourth and Walnut Streets. This building is separately addressed as 138 S. Fourth Street.

**PROJECT PROPOSAL**

Fourth and Walnut, LLC (Guy and Katie Gross and Jacob Wilson and Bob Moeller) has purchased the former Medina Construction property at the northwest corner of Fourth and Walnut with plans to convert the property into a baseball training facility to be known as "The Yard". They plan to demolish the one large, white Morton building in the center of the lot to allow room for a turf infield area with a steel structure above it with netting inside the complex. In the brick building on the far north end they plan to have indoor batting cages (five to seven cages), restrooms, a pro shop, and a storage room. The building on the southeast corner of the lot is proposed to be dedicated for indoor pitching with five (5) lanes. Their hope for this facility is to allow Salina and surrounding area youth baseball / softball teams to use this facility and practice year-round. The facility is proposed to be set up as membership-based with a foundation being created to assist youth that might not be able to afford the use of the facility.

Fourth and Walnut, LLC plans to do the work and open the facility in phases. The brick building on the north (Building A) that would house indoor batting cages, would be completed first. The pitching building on the southeast corner of the Lot (Building C)

would be completed second. The outdoor structure (Building B) and turf infield would be completed last.

This proposed project involves three (3) elements that require review and approval by the Design Review Board:

(1) Demolition of an existing warehouse building
(2) Modifications to the exterior of two existing buildings
(3) New infill construction between two buildings facing Fourth Street.

The applicant has submitted a site plan, floor plan, black and white elevation drawings and some color renderings but the elevation drawings are lacking detail about exterior façade materials and colors.

The project developers and their architect met with the City's Development Review Team (DRT) on **September 30, 2020** to go over their conceptual plans for the baseball training facility. Planning staff informed the owners and their architect that an indoor/outdoor recreational facility is not listed as a permitted use in the Central Business District and requested that they submit a detailed narrative explaining how the use would operate to allow the Zoning Administrator to make an Administrative Interpretation as to whether the operating characteristics of this facility would be sufficiently similar to a YMCA so as to make it a permitted use in the C-4 district. Planning staff also informed the project representatives that a Certificate of Compatibility would have to be applied for and approved by the Downtown Design Review Board prior to the demolition of any buildings and prior to the issuance of a building permit for work involving exterior modifications or new construction.

Work is underway on the site but no Certificates of Compatibility or building permits have been approved or issued by the City. A demolition permit was issued in error by Building Services staff in October without approval of a Certificate of Compatibility and the center warehouse building has been removed from the site. This error was made by staff and not the applicant or their contractor.

**DESIGN GUIDELINES**

The Design Review Board is authorized to grant a Certificate of Compatibility if, upon a vote of a majority of its members, the project is found to comply with the Policies and Guidelines contained in the Design Guidelines for Downtown Salina, 2008.

**The Design Guidelines make the following recommendations in regard to Demolition:**

6.2 Demolition should be considered if a building, object, or structure:

a) Does not contribute to the historical or architectural character of the District, and

b) Detracts from and does not have the potential to contribute to the importance of the District, and

c) Its removal and the proposed site restoration plan, including any plans for new construction on the site, will result in a more positive, appropriate visual effect on the District

**The Design Guidelines make the following recommendations in regard to Alterations and New Construction.**

In regard to Building Mass, Scale and Form: A building should appear similar in scale to traditional commercial facades.

A.1 Develop a primary façade that is in scale and aligns with surrounding traditional buildings.

A.4 A building should maintain the alignment of horizontal elements along the block.

Window sills, moldings, and cornices are among those elements that may be seen to align.

A.6 Rectangular forms should be dominant on commercial facades.

The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

A.7 Use flat roof lines as the dominant roof form.

In regard to Architectural Character: New materials should be appropriate to the scale, durability, color and texture of the predominate materials in the area.

B.1 Building materials should be visually compatible with the predominate materials of the downtown area.

Buildings should be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

B.2 Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level.

Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

B.4 Orient the primary entrance of a building toward the street.

A building should have a clearly defined primary entrance. For most buildings, this should be a recessed entryway.

**The Design Guidelines make the following recommendations in regard to building additions:** Minimize the visual aspects of an addition.

E.1 An addition should be compatible in scale, material and character with the main building.

An addition should relate to the building in mass, scale and form. It should be designed to remain subordinate to the main structure.

**The Design Guidelines make the following recommendations in regard to color:** Use colors to create a coordinated color scheme for a building.

C.1 Use color schemes that are simple.

The use of contrasting colors to highlight architectural details and upper facades is encouraged.

**STAFF ANALYSIS**

In September, a demolition permit for the white metal building in the center of the site was applied for by Diehl Enterprises on behalf of Restore Construction but no Certificate of Compatibility application was submitted for the demolition request. City staff erroneously issued a demolition permit to Diehl Enterprises on October 26, 2020 without DRB approval and the building has been removed from the site.

Section 2-207 of the Salina Business Improvement District Design Review Board reads as follows:

Sec. 2-207. – Certificate of compatibility.

a) No person shall perform or cause to be performed any work to:

(1) Construct; demolish; or change the existing exterior design, material, color, texture, finish, or appearance of **any building or any other improvement to real property in the Salina Business Improvement District Number 1;** or

(2) Introduce, change, substitute, or remove any physical feature affecting the appearance of real property in the Salina Business Improvement District Number 1;

**without first applying for and obtaining a certificate of compatibility,** subject only to the exclusions outlined in subsection (b).

b) A certificate of compatibility shall not be required:

(1) If the work includes only routine maintenance and results in no change to the existing design, material, color, texture, finish, or appearance of a building or other improvement to real property; or

(2) If circumstances warrant authorization of emergency repairs of a pre-approved nature and scope, in the sole discretion of the building official.

c) If the work requiring a certificate of compatibility requires any other type of permit, the permit shall not be issued unless a certificate of compatibility has been issued for the work.

Because no Certificate of Compatibility was approved, the October 26, 2020 demolition permit was not valid and the DRB needs to take action on this Certificate of Compatibility request to retroactively validate the permit.

In staff's opinion, this metal building met the criteria for demolition in the Downtown Design Guidelines. It was not a historically or architecturally significant building and its presence interfered with the owner's plans for redeveloping the project. However, it is ultimately up to the Board to decide whether the request to demolish this building was justified in this case and findings can be made to support its removal.

<u>Proposed Replacement Construction</u>

Fourth and Walnut, LLC is proposing to renovate the north building (Building A) and the south building (Building C) and to build a new metal structure between them (Building B) that would cover a turf practice infield. A building permit application and plans (site plan, floor plan and building elevations) have been submitted but the elevation drawings are lacking in detail.

Different drawings show different window sizes and styles and different exterior colors. None of the drawings clearly indicate what the exterior building material and roof materials would be, particularly on the south building which is already being renovated. The Board is supposed to review the applicant's plans to determine whether the proposed building design and materials will be compatible with the Fourth Street streetscape and the predominate building materials in the downtown area. In staff's view additional information is needed to make that determination.

Staff would request that the applicant and/or their architect provide additional information at the meeting about:

Building A – The proposed exterior building and roof material and whether the exterior color will be changed or continue to match the exterior masonry of the Car Museum to the north.

Building B – The proposed color of the metal roof and fencing.

Building C – The proposed exterior building and roof materials and the proposed exterior color of the building.

Some of the work that has occurred on this property has gotten ahead of the City's review processes. It is staff's hope that all proposed exterior improvements on this property that require review and action by the DRB can be addressed at the January 14, 2021 meeting.

Zoning Issues

The proposed baseball training facility is an indoor / outdoor recreation facility and is located on property that is part of the C-4 (Central Business) district. Neither indoor or outdoor recreation facilities are specifically listed as permitted uses in the C-4 district however, YMCA-type facilities are.

Section 42-302(79) of the C-4 district regulations lists YMCA, YWCA, and other similar organizations as a permitted use in the C-4 zoning district. Section 42-302(80) of the C-4 district regulations permits any use not specifically listed as a permitted use, if the Zoning Administrator determines under Section 42-596(a) that the characteristics or specific attributes of the use are sufficiently in common with a permitted use.

Like the Salina Fieldhouse project the Zoning Administrator has determined that the characteristics and attributes of this proposed baseball training facility are sufficiently in common with a YMCA, which would be a permitted use of the subject property. There fore this facility is permitted in the C-4 district.

Section 42-306(2) of the C-4 district use limitations states that *"All business, service, storage and display of goods shall be conducted within a completely enclosed building."* The Zoning Administrator has determined that the covered infield area is sufficiently enclosed by roof and fencing to conform with this requirement.

Addressing

The tax parcel / zoning lot at the northwest corner of Fourth and Walnut Street is currently addressed as 211 East Walnut Street. The brick building at the north edge of the property has had a separate address of 138 South Fourth Street. Because the proposed baseball training facility would have its main entrance facing Fourth Street,

the City's Fire Marshal is recommending that the current owners request an address assignment change from 211 East Walnut Street to a Fourth Street address.

Signage

Staff has identified only one proposed wall sign on the elevation drawings submitted with this Certificate of Compatibility application. If the Board wishes to approve the painted "THE YARD" wall sign as part of this application it needs to make sure it makes reference to the wall sign in any motion approving a Certificate of Compatibility.

## SUGGESTED FINDINGS

Staff believes that the following potential findings may be incorporated to support the approval of the following project components:

Demolition Request

1. The existing metal warehouse structure because of its physical condition and location detracts from and does not contribute to the architectural character of the downtown area.

2. The removal of the existing structure and the proposed baseball training facility and associated parking lot will result in a more positive, appropriate visual effect on the Fourth Street corridor.

Proposed Exterior Modifications / New Construction

1. The building design and materials will be compatible with the predominate materials along Fourth Street of the downtown area.

2. The design of the building exterior will be compatible with the traditional commercial context while retaining a contemporary appearance that does not imitate an older building style.

3. The building will have a clearly defined primary entrance and street level entrances and features that will be pedestrian friendly.

4. Construction of a curb line and sidewalk would enhance the Fourth Street streetscape.

5. The satellite parking lot will contain landscape plantings and buffers that will reduce the impact of the lot on neighboring residential properties.

**ALTERNATIVES – DEMOLITION REQUEST**

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1 Retroactively approve a Certificate of Compatibility for the demolition of the metal structure based upon staff's suggested findings that the demolition conforms with the Design Guidelines for Downtown Salina.

Option 2 Approve the proposed demolition of the requested structure based upon staff's suggested findings subject to any conditions identified and approved by a majority of Design Review Board members.

Option 3 Postpone consideration of the application, in order to obtain additional information concerning the proposal. The date of the future meeting must be included in the motion.

Option 4 Deny the demolition request as presented, upon making findings that would support the denial of the request and provide further direction to the applicant and staff.

If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Office of City Clerk within fourteen (14) days following the Design Review Board's decision.

**STAFF RECOMMENDATION**

Staff would recommend Option No. 1. Under this option, the Board would be authorizing the post-demolition issuance of the demolition permit for the identified metal structure.

**ALTERNATIVES – EXTERIOR MODIFICATIONS**

Following any additional information presented at the meeting and discussion, the Design Review Board would appear to have the following options in consideration of this application:

Option 1 Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, including or excluding the proposed wall sign, based upon staff's suggested findings that the proposed new construction will conform to the Design Guidelines for Downtown Salina.

Option 2 Approve the Certificate of Compatibility for the proposed baseball training facility and accessory parking lot, based upon staff's suggested findings,

subject to any conditions or revisions to the plans identified and approved by a majority of Design Review Board members.

Option 3 Postpone consideration of the application in order to obtain additional design details and information about the proposed exterior changes. The date of the future meeting must be included in the motion.

Option 4 Deny the application as presented, upon making findings that would support the denial of the proposed project.

If the Design Review Board should deny the application or attach conditions not agreeable to the applicant, an appeal of that decision to the Salina City Commission may be filed with the Development Services Department within fourteen (14) days following the Design Review Board's decision.

**STAFF RECOMMENDATION**

If the applicant and their architect provide the additional requested information to the satisfaction of the Board, staff would recommend Option No. 2. If no additional information is provided about exterior materials and colors, staff would recommend Option No. 3.

If the Board wishes to approve the proposed exterior improvements, staff would recommend that the Design Review Board attach the following conditions to their approval of the requested Certificate of Compatibility under Option No. 2.

1. Development of the site shall substantially conform to the site plan, floor plans and exterior elevation drawings presented to and reviewed by the Board.

2. That if there are any significant changes to the project as approved, Development Services staff will be notified to determine whether additional staff or DRB review will be required.




1 inch = 200 feet

# 211 E. Walnut Street




Business Improvement District Boundaries
City of Salina
HOSPITAL / MILL DISTRICT
SANTA FE DISTRICT
EMPLOYMENT DISTRICT
HOSPITAL / MILL DISTRICT
Elm St
Park St
Ash St
State St
Iron Ave
Walnut St
Mulberry St
South St
Morrison Ave
Washington St
Prescott Ave
Center St
Johnstown Ave
Gypsum Ave
Park Pl
Oakdale Dr
Oakdale Ave
Kenwood Park Dr
Ymca Dr
Guernsey Dr
University Pl
Santa Fe Ave
Front St
2nd St
3rd St
5th St
7th St
8th St
9th St
10th St
11th St
12th St
13th St
Highland Ave
Putnam Ave
Baker St
Charles St
0 250 500 1,000 1,500 2,000 Feet

0177


ELM ST
PARK ST
11 TH ST
3 RD ST
2 ND ST
FRONT ST
C-4
ASH ST
12 TH ST
STATE ST
JOHNSTOWN AV
11 TH ST
3 RD ST
IRON AV
2 ND ST
FRONT ST
11 TH ST
10 TH ST
5 TH ST
C-4
GYPSUM AV
WALNUT ST
WALNUT ST
C-4
PARK PL
11 TH ST
9 TH ST
8 TH ST
7 TH ST
SANTA FE AV
4 TH ST
3 RD ST
2 ND ST
FRONT ST
OAKDALE DR
MULBERRY ST
C-4
SOUTH ST
11 TH ST
10 TH ST
PUTNAM AV
MORRISON AV
CENTER ST
WASHINGTON ST
10 TH ST
FRONT ST
PRESCOTT AV
N
W
E
S

0178

# Attachment

Project Site Plan


REMOVE FENCE
EXISTING BUILDING TO REMAIN
REMOVE LEAN-TO STRUCTURE
REMOVE WOOD STAIR/LANDING
REMOVE STRUCTURE
REMOVE RETAINING WALL AND FENCE
REMOVE FENCE
REMOVE CONC. PAVING
EXISTING BUILDING TO REMAIN
0180
ARCHITECTURAL DEMOLITION SITE PLAN
1" = 20'-0"


PROVIDE ADA CO
LANDING AT DOOR
SLOPE MAX)
CONNECT TO
EXIST. SIDEWALK
BUILDING A
(EXISTING)
2' - 0"
1' - 0"
115' - 0"
4' - 0"
5' - 0"
120' - 0"
NEW TURF FIELD
BUILDING B
(NEW)
RUN DOWNSPOUTS UNDER
SIDEWALK AND THROUGH
FACE OF CURB (TYP.)
DROP-OFF / PICK-UP
NEW CURB & GUTTER
4TH ST
"VAN ACCESSIBLE"
H.C. PARKING SIGN
NEW FENCE
77' - 11 195/256"
8' - 6"
TYP. STALL WIDTH
LANDSCAPE
AREA
BUILDING C
(EXISTING)
18' - 0"
25' - 5"
18' - 0"
0'
10'
20'
40'
ARCHITECTURAL SITE PLAN
1" = 20'-0"
2
A0.00
NORTH
EXISTING DRIVEWAY
ENTRANCE
WALNUT ST
NEW CURB AND GUTTER
AT REMOVED DRIVE
NEW SIDEWALK

0181

# Attachment

Floor Plan


ANDERSON KNIGHT ARCHITECTS
785.539.0905
Salina Baseball Academy
138 S 4th St.
Salina, KS 67401
G2.01
CODE FOOTPRINT
BUILDING A
BUILDING B
BUILDING C
0183

# Attachment

Proposed

Building Elevations




1 A1.02 EAST ELEVATION - BUILDING A
1/8" = 1'-0"




4 A1.02 WEST ELEVATION - BUILDING A
1/8" = 1'-0"




3 A1.02 SOUTH ELEVATION - BUILDING A
1/8" = 1'-0"



3 A1.04 EAST ELEVATION - BUILDING B
1/8" = 1'-0"



4 A1.04 WEST ELEVATION - BUILDING B
1/8" = 1'-0"



1 A1.04 SOUTH ELEVATION - BUILDING B
1/8" = 1'-0"



1 A1.05 ELEVATION - EAST
1/8" = 1'-0"

**BUILDING C**



2 A1.05 ELEVATION - SOUTH
1/8" = 1'-0"




3 A1.05 ELEVATION - WEST
1/8" = 1'-0"




0188




0189

# Attachment

Street Views




0191




0192


0193




0194

# Attachment

Demolition

Design Guidelines

# Chapter 6. Guidelines for Demolition

## Essential Principles

Demolition is defined as the complete or partial tearing down or removal of a building, object, or structure from the Lee District.

**Generally, the demolition of a building, which contributes historically or architecturally to the character and significance of the district is unsuitable and should be avoided.**

Should the Design Review Board deem a proposed demolition appropriate, such demolition should proceed only when an immediate reuse is planned for the property, unless it has been considered a safety hazard. The proposed design of new construction should be submitted to, and reviewed by, the DRB in conjunction with the submission and review of the proposed demolition.

## Guidelines for Proposed Demolition

Demolition should only be considered under any of the following conditions:

1. If the City Building Official has ordered demolition for the public safety because of an unsafe or dangerous condition which constitutes an emergency;
2. If a building, object, or structure: a) does not contribute to the historical or architectural character and b) detracts from and does not have the potential to contribute to the importance of the District and c) its removal and the proposed new construction will result in a more positive, appropriate visual effect on the District.

Demolition should not be considered under any of the following conditions:

1. If a building, object, or structure is of such architectural or historical significance that its removal would be detrimental to the public interest and the objectives of the District;
2. If a building, object, or structure is of such architectural or historic character that it could not be reproduced without great difficulty and expense
3. If its proposed reuse, or new construction would make a less positive visual contribution to the District, would disrupt the character of the District, or would be visually incompatible; or
4. If the demolition of a building, object, or structure would negatively impact the character, streetscape, or other buildings, objects, or structures in the District.

# Attachment

Façade

Design Guidelines

## Chapter 4. Alterations and New Construction

While the Lee District has historic character, it is also a dynamic neighborhood in which existing buildings are altered and new buildings are constructed. Infill construction is encouraged on open lots in the District.

The design of a new building should not necessarily imitate historic buildings, but should be compatible with them. Creativity in design is especially encouraged when it also is compatible with the design objectives of the downtown.

New buildings should reinforce the basic character-defining features of the district. Such features include the way in which a building is located on its site, the manner in which it faces the street, its materials and the general alignment of architectural elements and details along a block. Arranging these design variables to be similar to those in the area creates visual compatibility.

The principal façade (front) and street related elevations of proposed new buildings will be more carefully reviewed than other facades. New construction facades should be consistent with the existing District buildings in terms of height, scale, rhythm, and other design characteristics.

New construction should not appear old. The intent of Lee district is not to "freeze" an area in time, but rather to encourage new buildings which fit contextually within the district. New construction should not attempt to replicate the old or to introduce a false "historic" appearance. For most new construction projects, the best approach is to **HARMONIZE** with and reinforce the context of existing buildings. The purpose of the design guidelines is to encourage new buildings that complement the best of the existing environment.

The dominant character should be pedestrian-friendly with an active street edge. New buildings should include the following key design aspects to help maintain that established District character:

- Buildings aligned at the sidewalk edge;
- Two-story traditional commercial buildings (some buildings reach greater heights);
- Masonry construction dominates;
- Transparent ground floor with smaller windows into predominantly solid upper floors;
- Flat-roof (low slope) buildings;
- Additions are compatible in size, form, materials, and design;
- Maintain traditional mass, size, form, and building materials;
- To design commercial buildings with storefront elements similar to those seen traditionally (e.g., recessed entry, display windows, bulkhead, transom windows, storefront cornices, upper cornices, and vertically oriented upper-story windows)
- To promote friendly, walkable streets.



Building materials should be compatible with materials of exiting buildings.

## Policy: A building should appear similar in scale to traditional commercial buildings

### A. Building Mass, Scale and Form

Building heights generally vary in the Lee District from one to four stories, yet there is a strong sense of similarity in scale. A variety in building heights is appropriate; however, the dominant scale of two stories should be maintained. New construction should blend in the streetscape and not stand out. Buildings used as infill should be similar in height to adjacent buildings, and of a height of no more than 15 feet higher than the tallest adjacent building, and should not overpower the character of the District. The infill buildings should line up with existing setbacks, reinforce the established horizontal lines of the elevations, and maintain the rhythm in the single lot widths of new buildings.

1. **Maintain the established building scale in height.**

- Develop a primary façade that is in scale and aligns with surrounding traditional buildings.
- Consider stepping the mass of a tall building down to a lower height as it approaches surrounding buildings.

2. **Buildings should appear similar in width to those historically in the block.**

- Facades of large buildings should reflect the 25 ft. storefront bays to be in scale to traditional buildings.
- When a larger building is divided into bays, these should be expressed three-dimensionally throughout the entire building façade.

3. **Floor-to-floor heights should appear to be similar to those seen in adjacent buildings.**

- In particular, those windows in a building should appear similar in height to those seen in adjacent buildings.

4. **A building should maintain the alignment of horizontal elements along the block.**

- This alignment occurs because many of the buildings are similar in height.
- Window sills, moldings, and cornices are among those elements that may be seen to align.

5. **Where appropriate, consider dividing larger buildings into bays that are similar in scale to buildings seen historically.**

- If a larger building is divided into bays these should be expressed three dimensionally, throughout the entire building.
- When considering a tall structure, the alignment of building elements is particularly important. Although a new building may tower above the surrounding buildings, the first stories should visually relate to the surrounding historic context.

One of the most prominent unifying elements of a downtown district is the similarity in building form. Commercial buildings are simple rectangular solids, deeper than they are wide. This characteristic is important and should be continued.

6. **Rectangular forms should be dominant on commercial facades.**

- Rectangular forms should be vertically oriented.
- The façade should appear as predominantly flat, with any decorative elements and projecting or setback "articulations" appearing to be subordinate to the dominant form.

7. **Use flat roof lines as the dominant roof form.**

- Parapets of side facades should step down towards the rear of the building.

**Policy: Building materials should be visually compatible with the predominate materials of the downtown area**

## B. Architectural Character

New materials should be appropriate to the scale, durability, color, and texture of the predominate materials in the area.

**1. Material should appear similar to those used traditionally.**

- Brick was the traditional material and is preferred.
- Wood and metal were used for windows, door and storefront surrounds and should be continued.
- New materials will be considered on a case-by-case basis. If used, they should appear similar to those used traditionally and should be detailed to provide human scale.
- New materials should have a demonstrated durability. Some new materials are susceptible to weather and do not last as long as brick.
- Existing metal should be maintained. If it needs to be stripped, use a chemical paint designed for that purpose, not dry grit blasting.
- Preserve cast iron by maintaining and restoring original cast iron columns and pilasters. Do not conceal or obscure original cast iron columns or pilasters.
- When it is necessary to replace brick, it should match in color and size to the original, if at all possible.
- Unless necessary to protect the surface, masonry should be left unpainted.
- Previously painted surfaces should be repainted rather than chemically cleaned. Repoint mortar, if necessary, before painting brick.
- Sometimes missing details and appropriate materials can be recreated with a one-dimensional paint scheme.
- Brick and other masonry should not be coated with silicone-based water sealants. Water sealants or water repellents generally have the effect of keeping interior moisture from evaporating through the walls and thereby damaging the brick and mortar.
- Masonry should not be covered with stucco, wood siding, aluminum or other artificial materials.

It is important that buildings be compatible with the surrounding traditional commercial context, however new buildings should not imitate older building styles.

**2. Maintain the distinction between the street level and upper floors.**

- The first floor of the primary façade should be predominantly transparent glass, not tinted.
- A minimum of sixty-five percent of a street level façade of all buildings (except civic and institutional) should be windows, doors, display areas, or similar architectural features.
- Consider using storefronts, decorative surfaces or other features that provide visual interest to pedestrians. Avoid large expanses of featureless wall surface at the street level. These will discourage pedestrian activity in the District.
- Upper floors should be perceived as more opaque than the lower floors.
- Express the traditional distinction in floor heights between street levels through detailing, material, and fenestrations. The presence of a belt course is an important feature.

**3. Upper-story windows with vertical emphasis are encouraged.**

- A typical, upper-story window is twice as tall as it is wide. Upper story windows should relate to historic window proportions.
- Windows, lintels, and their trim elements should align with those on adjacent historic buildings.

## Policy: Building materials should be visually compatible with the predominate materials of the downtown area (continued)

**4. Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be a recessed entryway.
- Original entrances should be maintained, restored, or replaced (do not enclose, cover, or alter) including the design, material, depth, and placement.
- Aluminum replacement doors and storefronts should be made compatible by painting a dark color.
- Do not use doors decorated with molding, cross bucks, or window grills. Do not use solid wood doors in storefronts, unless original.
- If original design of a door is unknown, replace with a plain wood door with plain glazing (glass area), as opposed to solid wood doors, decorative doors, or any kind of period reproduction door.
- New entrance openings should not be added to storefronts. If an additional entrance is required by codes, place it on the rear or side façade and not on the main façade.
- Doors added to storefronts should be replaced with doors to match the original in design and materials.

**5. Maintain all aspects of the storefront (including doors, windows, and details) when possible.**

- Preserve existing original storefronts elements (windows, transoms, lintels, sills, hoods, bulkheads, cornices, and parapets) by maintaining or restoring, do not remove or alter. It is better to repair than replace deteriorated storefront features. Covering or removing significant elements such as transoms, panels below store windows, or original doors results in a substantial loss of historic character.
- Use a traditional storefront arrangement with features, materials, and proportions typical of similar structures of the same (not earlier or later) architectural style or period when the original design and features can not be determined. Storefront material should be simple.
- Do not allow storefront design to stray out of its natural place within the façade. Generally, there should be more glass and fewer walls at the storefront level, balanced by more walls and less glass on the upper façade.
- Display windows which are new, should match the original in location, design, size, configuration, and materials.
- Display windows which are missing and the original design is unknown, should be replaced with traditionally scaled windows. Traditionally scaled windows have large glass lights and few structural divisions to maintain a traditional transparent storefront appearance. If aluminum frame windows are used, utilize dark anodized or baked enamel finishes.
- When replacing missing or damaged features and based on historic evidence such as photographs or "ghosts" marking or cornice locations or through newspaper or photographic research, base new building features from a similar building of the same design, use simple (but to scale) decoration.
- Windows which are not original should not be added.
- Windows should be repaired rather than replaced, but if replacement is necessary the replacement windows should fill the entire original opening and duplicate the original pattern, including dimensions, number and arrangements of lights in each sash, materials, and detailing. If aluminum framed windows are used, use dark anodized or baked enamel finishes.

## Policy: Building materials should be visually compatible with the predominate materials of the downtown area (continued)

- Storm windows should be painted to match the color of the window sash and window shape should be duplicated. It may be desirable, on the front of building, to install storm windows inside where they will not be seen. Storm windows use full view or sash proportionate, blind stop type of wood or aluminum with anodized or baked-on enamel finish.
- New display windows should match the original in location, design, size, configuration and materials.
- New windows should not have snapon or flush muntins. True divided muntins are preferred over these types of muntins. Properly sized muntins permanently attached to windows are acceptable.
- Decorative glass windows which are original should be preserved in their original location, size, and design and with their original materials and glass pattern.
- On the interior, should the building's ceiling interfere with the transom space, recess ceiling space slightly away from the transom, or paint rear (interior) of the transom black.
- Windows can not be blocked or filled in.

### 6. Roofs, Cornices, & Gutters

Roofs should be retained in their original shape and pitch, with original features, and, if possible, with original roof materials.

- New roofs covered with modern rolled composition, asphalt materials, or rubber membrane are appropriate. The installation of a higher pitched roof to improve water runoff is acceptable as long as the new roof is not visible on the primary elevation and is constructed below the roof parapet wall.
- Do not use mansard roof with wooden shingles.
- Metal flashing should be used with new roof materials extending along the brick walls to protect against leaks.
- Buildings with flat roofs should have cornices or decorative bands to "cap" the façade.
- Replacement gutters and downspouts should not result in the removal of significant architectural features on the building.
- Gutters and downspouts either of boxed or built-in type should be repaired rather than replaced if possible.

### 7. Foundations

- Preserve (maintain or restore, not enclose or alter) original foundation materials and design -- whether solid or pier, brick, stucco or stone, etc.
- Foundations should not be concealed with concrete block, plywood panels, corrugated metal, or other non-original materials.

## Policy: The street level of a building should be pedestrian friendly.

The Lee District should continue to develop as a pedestrian-oriented environment. Streets, sidewalks, and alleys should encourage walking, sitting and other outdoor activities. Buildings also should be visually interesting to invite exploration by pedestrians.

Existing pedestrian routes should be enhanced. A building should express human scale through material and forms that were used traditionally. This is important because buildings are experienced at close proximity by the pedestrian.

**8. Develop the ground floor level to encourage pedestrian activity.**

- A storefront should be used on the primary façade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
  - ◊A storefront
  - ◊Display case
  - ◊Public art
  - ◊Landscaping
  - ◊Decorative wall surfaces.
- Include traditional elements such as display windows, bulkheads and transoms on commercial storefront.
- Avoid a blank wall or vacant lot appearance.



Storefront has been redeveloped and is pedestrian friendly.

## Policy: Minimize the visual impact of balconies and roof decks as seen from the street.

Roof gardens, decks, and accessory structures can visually impact the design integrity of the building on which they are located, their visual impacts should be minimized.

**9. Set activities back such that they are not visible from the sidewalk across the street.**

- This includes potted plants, umbrellas, and tables.
- Roof terrace railings and furniture should be placed well behind the parapet.

**10. Avoid clutter on roofs that will be visible from the public's view.**

- Mechanical equipment shall not be visible from the public's view.

**11. A roof garden, deck, or accessory structure should be compatible with the building on which it is located.**

- This includes design, materials, scale, proportion, and color.
- A roof garden, deck, or accessory structure should not damage, destroy, or overshadow the character-defining features of the building on which it is located.

**Policy: Use colors to create a coordinated color scheme for a building.**

## C. Color

Downtown buildings contain a variety of colors in elements such as upper facades, storefronts, sign, and awnings. The introduction and use of colors should not restricted but it is encouraged that colors complement each building and its neighbors. There is **not** a specific color pallet for the Lee District.

**A. The façade should "read" as a single composition.**

- Paint colors on storefronts, trim, and upper-story openings should be related to the overall color of the building as should added elements such as signs and awnings.
- In many cases these will be colors that complement or harmonize with the overall brick colors found on upper facades.

**B. Use color schemes that are simple.**

- Using one base color for the building is preferred.
- Using only one or two accent colors is also encouraged, although precedent does exist for using more than two colors in some situations.
- The use of contrasting colors to highlight architectural details or storefronts and upper facades is encouraged.

**Policy: Maintain the line of building fronts in the block.**

## D. Site Planning

Structures in the Lee District should contribute to a "strong wall" along the street. A new building should align at the front lot line and be built out to the full width of the parcel, to the side lot lines.

**1. Maintain or enhance the alignment of buildings at the sidewalk edge.**

- Locate the front building wall at the sidewalk line when feasible.
- Where a building does set back from the sidewalk, use landscape elements to define the sidewalk edge.

**2. Orient the primary entrance of a building toward the street.**

- A building should have a clearly defined primary entrance. For most commercial buildings, this should be recessed entryway.
- A secondary public entrance to commercial spaces is also encouraged on a large building.

**3. Rear entrances and side elevations.**

- Preserve original windows, doors, and architectural detailing on rear and side elevations.
- Rear and side entrances can be enhanced by adding simple signage, awnings, and lighting that is related to those of the front elevation.
- New windows and doors may be added when needed if in keeping with the size, design, materials, proportions, and location of the originals. Follow guidelines for windows and doors for new openings on the rear and side elevations.
- Locate any necessary exterior staircases, balconies, elevator shafts, and additions on rear elevations, whenever possible.



Maintain the alignment of buildings at the sidewalk edge.

**Policy: Minimize the visual aspects of an addition.**

## E. Additions

There are three different types of additions that may be constructed. The ground-level addition is the first way to do an addition that involves expanding the footprint of the structure. This addition should be to the rear or side of a building where it will have the least impact on the character of a building.

The next option of constructing an addition is to the roof that can be simple and set back from the front of the building. Materials, window sizes, and alignment of trim elements on the addition should be compatible to those of the existing structure.

The third option is to design an addition within the wall plane of the existing building, which should be considered on a case-by-case basis. This is difficult and requires care to respect the relationship of the building to the street. Such an addition should provide a visual distinction between the existing building and its addition which can be done with the use of a storefront cornice element or a subtle change in building materials.

1. **An addition should be compatible in scale, material, and character with the main building.**

- An addition should relate to the building in mass, scale, and form. It should be designed to remain subordinate to the main structure.
- An addition to the front of a building is inappropriate.

2. **An addition may be made to the roof of a building if it does the following:**

- An addition should be set back from the primary façade, to preserve the perception of the historic scale of the building.
- Its design should be modest in character, so it will not attract attention from the historic façade.
- The addition should be distinguished as new, albeit in a subtle way.

3. **In limited circumstances, an addition may be made to the roof of a building and not be set back from character-defining facades, if it does the following:**

- An addition should be distinguished from the existing building. A change in material or a decorative band can be considered to accomplish this.
- An addition should maintain the alignment of storefront elements, molding, cornices, and upper-story windows that exist on the main part of the building.
- The addition should also be compatible in scale, texture, and materials with the original.

4. **An addition should not damage or obscure architecturally important features.**

- Loss or alteration of a cornice line should be avoided, for example.
- Additions should respond architecturally to adjacent buildings in general and to the building they are a part of in particular. They should blend in by using similar materials, shape, and rhythm and proportion of openings.
- If the original building is architecturally significant, the addition should take a respectful "back seat". The addition should not overpower the original. An addition may be taller than the original building if site consideration and design still allow the old building to remain dominant.
- In general, additions should follow the basic guidelines for new construction. They should appear contemporary but in context with the original. They addition should be sympathetic but not imitative in design.

# Attachment

Newspaper

Article

SALINA JOURNAL

# Holm Auto Good News: Championships are won at practice

**By Randy Mathews, Special to The Salina Journal**

Posted Nov 24, 2020 at 11:01 AM

For Salina dentist Guy Gross, the creation of a baseball and softball training facility has become a personal mission, as well as one more exciting project in the ongoing transformation of downtown Salina.

"This is something that I've seen as a need in our community for a long time," Gross said. "I've been coaching baseball and raising kids and seeing that there is just not a great place to go practice, especially in the winter."

Gross said The Salina Fieldhouse, a multipurpose recreational center that opened at 140 N. Fifth in 2017, is a great facility, but it isn't always set up for baseball or softball, as it is sometimes configured for basketball or volleyball courts instead.

Other area coaches share his concern about the need for a dedicated training facility. They believe not having one available puts local and area baseball and softball players at a distinct disadvantage, not only in developing their individual skills, but also when trying to compete in tournaments in other cities where teams have better access to such facilities.

"We'd go around the state or to other parts of the country and we'd compete against these teams from communities where they already have academies and facilities where kids are able to prepare and compete year-round, and we found that we have some awesome players from Salina but we weren't able to keep developing them as much as these other academies were," Gross said. "Sometimes we could see that we were falling behind because our kids may not be getting as much exposure or opportunities for scholarships."

So Gross and his wife and fellow dentist Kate Gross decided to build The Yard, a state-of-the-art, 20,000-square-foot baseball and softball training complex currently under construction at 158 S. Fourth, just south of where the American Classics Auto Museum will be located.

"We wanted to create a top-notch place for baseball and softball training that could happen year-round," Gross said. "If there are kids in our community who want to become great ballplayers and potentially have a shot at going on to college or beyond to play, we wanted them to have all the resources around them to be able to do so."

Under the umbrella of the Salina Baseball Academy, the concept for The Yard quickly took shape. Encompassing three separate but interconnected facilities, the complex will provide a wide range of training opportunities utilizing the latest in sports technology.

Two existing brick buildings — one at the northwest corner of Fourth and Walnut and the other about mid-block to the north — are being extensively renovated and will house a regulation pitching "bull pen" and batting cages, respectively. In between, in a space formerly occupied by an office building/warehouse and parking lot, a 115-foot by 120-foot outdoor turf infield will meet both high school and collegiate specifications. The covered infield will feature a tall roof structure and will be sloped and netted. Lighting will make it possible to use the infield after dark and portable heaters will allow for limited wintertime use.

Gross expects the two indoor facilities to be opened by the end of December. The outdoor infield should follow later in the winter or early spring. Architectural and engineering work is nearly completed, and groundbreaking is set to begin soon. The Salina Baseball Academy and Restore Properties are partners on the property acquisition and Restore's Jake Wilson and Gross are co-managing the project. Restore is handling most of the contracting work.

Meanwhile work is already well underway on the buildings housing the pitching and batting facilities. The Yard's head coach and director of operations Brian Guyett provided an overview of the planned set-up during a recent tour. Guyett, a native of Anaheim, Calif., came to Kansas by way of the Seattle area to play baseball at Bethany College, where he was a starting pitcher. He said for him, The Yard is like a dream that is coming true. He will oversee a team of local and area baseball and softball youth to manage The Yard, staff its operation and maintain the facility.

Guyett said the pitching "bullpen" in the south building will feature five lanes of pitching mounds set up across the north side. Pitching will be from north to south. Pitchers can bring their own catchers but that isn't necessary for bullpen sessions, as there will be targets to aim at. Windows will provide natural light and the space will be turfed, so the pitching mounds can be lifted to allow for ground ball practice. Nets will be installed but will not extend all the way around, so batting practice is not permitted in that building.

Batting will be the focus of the second building further north. Guyett said the space can be configured for up to eight batting cages, in a variety of sizes. Nets are mounted to tracks in the ceiling, allowing them to be opened to create a 50-foot by 50-foot square for ground ball practice.

Both Gross and Guyett are excited about the high-tech amenities that the pitching and batting facilities will offer.

In the pitching bullpen, a camera and sensor-based system called Rapsodo will provide pitchers with a variety of metrics, including spin ratio and miles per hour. A screen at the opposite end will display ball movement, showing where a pitch starts its trajectory and where it ends.

In the batting cage building, a similar system called HitTrax can be custom-set to match the layout of any stadium, even those that are home to Major League Baseball teams. Two HitTrax systems will be available for use.

Four batting cages will also have a Hack Attack pitching machine that can be set to accurately throw curveballs, sliders, knuckleballs or fastballs so batters can become more adept at hitting different kinds of pitches. Guyett said many professional and Division One college baseball teams use the Hack Attack system.

"What it allows us to do is have competitive hitting leagues in the wintertime, so that the players can not only practice in the winter, they can compete. Normally in Kansas, that's not possible," Gross said.

The Yard will also offer other services to help baseball and softball players improve. Guyett is developing training programs and will offer individual pitching and batting lessons, and he and Gross intend to schedule camps designed to enhance specific skill sets.

"Camps are a big part of it," Guyett said. "We are planning on doing full groups but also specialized camps, including some that are just for infielders, or just for outfielders. We'd like to have a catching camp and a pitching camp; maybe take an entire day and just work with middle infielders — second basemen and short stops."

"We'll have camps for kids of all ages and we'll have different specific track or training programs for kids that are a little older," Gross said.

The Yard won't just focus on players. Gross and Guyett both intend to offer help to baseball and softball coaches as well.

"We want to coach the coaches so their teams are well prepared to play ball," Gross said.

Guyett is developing a website, theyardsalina.com, where players and coaches can sign up for lessons, book practice times or purchase memberships. The site also details the facility's wide variety of services and programs.

"We already have a lot of coaches interested in having a membership to it," Gross said. "In addition to supporting the coaches at Kansas Wesleyan University, we've talked to the local and area high school coaches. We want to make it so that they have the resources available to develop their athletes."

Gross said he and Kate believe The Yard will not only be a great thing for the community, it will also provide an additional piece to the ongoing rebuilding of downtown Salina.

"We loved the idea of putting it right down there where there's already families going for other sports, for dance, for twirling, for yoga, for shopping and restaurants," he said.

Guyett said hearing from former players he has coached or trained is what he most enjoys, and what excites him about this new opportunity.

"The kids are great," he said. "It's fun to see them succeed. Every year I'll get a text message, 'Hey, I hit my first home run,' or 'Thank you for all you've done. I just pitched a heck of a ball game.' So that's what keeps me going is seeing the success these kids can have if they put their mind to it and work hard."

# Exhibit Y
# Defendant's Answers to Second Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C. and Clark, Mize & Linville Chartered, hereby submits the following Responses to Plaintiffs' Second Set of Interrogatories:

**OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

3. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

4. Defendant's responses are based on a reasonable and diligent search for information

and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

5. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

*6.* Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also* *Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

7. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**Second Set of Interrogatories**

1. Please identify the factual basis for the City's belief that "[t]he government interest served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998). Subject to and without waiving this objection, as the request states "factual**

**basis" and does not seek "all facts" Defendant interprets this to mean the material facts and will respond to this request with the material facts.**

**As explained in its prior response to Plaintiffs' first set of interrogatories, the Sign Code regulates all signs, not just the Cozy Sign, and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. As a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics.**

**The City's substantial interests are advanced by regulating signs (including wall signs like the Cozy Sign) because restrictions on the time, place and manner of the display of signs serve to limit the size, number, and location of signs on individual properties and in the larger community. By limiting sign clutter more effectively than it would be limited in the absence of regulation, the Sign Code maintains and enhances the character of the community and the visual environment, reduces the potential for obstructed views, helps keep rights-of-way clear, and reduces pedestrian and motorist distraction (improving both pedestrian and traffic safety, in part by avoiding vehicular-pedestrian collisions). Further, the character of the environment affects the quality of life and the property values in the City.**

**The facts and opinions set forth in Defendant's retained expert's report also support the factual basis that the Sign Code advances the City's interest in aesthetics, pedestrian and traffic safety, and property values. The City refers Plaintiffs to the Defendant's Expert Disclosure Statement. *See* F.R.C.P. 33(d).**

Respectfully submitted this 3rd day of September 2024.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of September 2024, I caused the foregoing **DEFENDANT'S RESPONSE TO PLAINTIFFS' SECOND SET OF INTERROGATORIES** to be by electronic mail to all counsel of record as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org;
sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit Z Defendant's Response to First Set of Interrogatories

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses to Plaintiff's First Set of Interrogatories:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Pursuant to the stipulation set forth in the Scheduling Order (Dkt. 29) at p. 6, Defendant objects to the production of any privilege log requiring Defendant to log documents or communications created on or after February 19, 2024 that are subject to the attorney-client, work product, and anticipation of litigation privileges.

3. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure

of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.

4. Defendant objects to each discovery request to the extent that it seeks to require Defendant to disclose public documents that are equally available to all parties.

5. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

6. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

7. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

8. Defendant objects to each request to the extent it requires Defendant to provide a narrative account of its case or inquire beyond material facts supporting specific factual matters raised in the pleadings. *See*, *e.g.*, *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) and *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 404 (D. Kan. 1998).

9. Defendant objects to the extent the burden of deriving the answer from business records is substantially the same for Plaintiffs as it is for Defendant. *See* F.R.C.P. 33(d); *see also*

*Linnebur v. United Telephone Ass'n, Inc.*, 2011 WL 3490022, *5 n.46 (D. Kan. Aug. 10, 2011).

10. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**FIRST SET OF INTERROGATORIES**

1. Please explain how the City first learned about the Plaintiffs' mural's existence.

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy sign that is the subject of this dispute ("Cozy Sign") as a mural or otherwise implies the Cozy sign is not a sign under the Salina Code of Ordinances ("Salina Code"), Chapter 42, Articles X ("Sign Code"). Subject to and without waiving this objection, the Cozy is located on a main street approximately one block from the City's offices. Due to the size and location of the sign, it is visible to passersby from the street. Brad Anderson noticed the Cozy Sign as he drove by the Cozy, and was the first City staff member to bring the sign to the City's attention.**

2. Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural and describe the extent of each official's involvement (i.e. whether the official directed Mr. Herrs to issue a citation against Plaintiffs).

**OBJECTION AND RESPONSE: The City objects to this discovery request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City further objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request as compound and seeks information regarding the "extent of each officials' involvement" that is not a discrete subpart of the initial interrogatory asking the City to identify the city officials who discussed the "enforcement of the" Sign Code against Plaintiffs' sign.**

**Subject to and without waiving these objections, the City responds to the first interrogatory contained in this request, that is "Please identify the city officials who discussed with Dustin Herrs the enforcement of the mural-sign code regime against the Plaintiffs' mural" as follows: The City did not issue a notice of violation or citation to Plaintiffs regarding the Cozy Sign. The City determined the Cozy Sign was a sign under the Sign Code and therefore subject to the Sign Code and BID Code, evaluated the Cozy Sign under the Sign**

**Code and determined that the Cozy Sign was too big to qualify for a sign permit, and informed Mr. Howard of the same. The City staff members who discussed the evaluation of the Cozy Sign under the Sign Code with Dustin Herrs were Lauren Driscoll, Dean Andrew, and Mike Schrage.**

**Regarding the second interrogatory in this request, as to Ms. Driscoll's involvement with Mr. Herrs, while it is impossible to remember every detail of Ms. Driscoll's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Ms. Driscoll discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, follow-up and meeting with Mr. Howard and Mr. Benson, providing information to Mr. Howard regarding the applicability of the Sign Code to the Cozy sign, next steps regarding the Cozy Sign and sign permit application, and the agreement with Mr. Howard to pause the work on the Cozy Sign.**

**Regarding the third interrogatory in this request, as to Mr. Andrew's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Andrew's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Andrew discussed the application of the Sign Code, the size limits of the Sign Code in relation to the size of the Cozy Sign and Cozy property, Mr. Howard's knowledge of the Sign Code and BID Code process, and next steps regarding the Cozy Sign.**

**Regarding the fourth interrogatory in this request, as to Mr. Schrage's involvement with Mr. Herrs, while it is impossible to remember every detail of Mr. Schrage's involvement with Mr. Herrs and more details may come to light as discovery in this matter is ongoing, in general Mr. Schrage participated in discussions with Mr. Herrs, Mr. Andrew and Ms. Driscoll regarding the application of the Sign Code to the Cozy Sign, meeting with Mr. Howard and Mr. Benson, and next steps regarding the Cozy Sign.**

3. Please explain the changes the City believes Plaintiffs need to make to their mural in order to "turn this into a mural rather than a sign," as suggested by Vice Mayor Longbine at the November 13, 2023, Commission meeting, (Doc. 16 at ¶ 136.) and in the Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 8).

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. The City objects to this request to the extent it seeks information protected by the attorney-client or work product privileges as it relates to the Brief in Support of Defendant's Motion to Dismiss. The City further objects to this request as it seeks the City to explain or interpret the arguments made by the City's counsel in Doc. 27 to Plaintiffs. The City also objects to this request to the extent it misinterprets the argument in Doc. 27 at 8 as a suggestion. The City also objects as the request uses only an excerpt of Vice Mayor Longbine's statement and misinterprets the statement made by Vice Mayor**

**Longbine on November 13, 2023 as a suggestion. Mr. Longbine's full statement at the meeting was "So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign." The statement was phrased as a question, not a suggestion. That is because Mayor Longbine does not interpret or apply the Sign Code or BID Code on behalf of the City. The City will not respond to the request to the extent it seeks information "as suggested" by Vice Mayor Longbine or in the Brief in Support of Defendant's Motion to Dismiss.**

**Subject to and without waiving these objections, the City responds only to the non-objectionable portion of the request that asks "Please explain the changes the City believes Plaintiffs need to make to their mural in order to 'turn this into a mural rather than a sign.'" The City regulates signs as defined by Salina Code § 42-764. In order to remove the Cozy Sign from the applicability of the Sign Code regulations, Plaintiffs would have to change the Cozy Sign into a display that falls outside the definition of "sign" found at Salina Code § 42-764.**

**As the City does not know what changes Plaintiffs would be willing to consider (particularly considering Paragraph 29 of the Amended Complaint, which states, "Mr. Howard does not want to change, alter, or deviate from" the rendering shown in Paragraph 28 of the Amended Complaint), the City cannot (and does not) know all of the potential changes that could be made to the Cozy Sign that would take it outside of the scope of the definition of sign. It would be nearly impossible for the City to guess all of the changes that could be made to the Cozy Sign to turn it into a display outside the definition of sign. However, in general, Plaintiffs can change the Cozy Sign into a display that does not "announce, direct attention to, or advertise," which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(2) would no longer be met, or Plaintiffs could relocate the display to the inside of the Cozy building, which would remove the display from the scope of the definition of "sign" because the criterion in Salina Code § 42-764(3) would no longer be met.**

4. Please identify every government interest served by regulating Plaintiffs' mural.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Cozy Sign as a mural or otherwise implies the Cozy Sign is not a sign under the Sign Code. Subject to and without waiving this objection, the purpose statement of the Sign Code, found at Salina Code § 42-500 (https://library.municode.com/ks/salina/codes/code_of_ordinances?nodeId=CH42ZORE_ARTXSI_DIV1GE_S42-500PU), sets forth the government interests served by regulating signs under the Sign Code. The City refers Plaintiffs to § 42-500 for a complete list of those interests. The Sign Code regulates all signs, not just the Cozy Sign and the government interests are served by the regulation of all signs (by addressing both their individual and cumulative impacts), not just the Cozy Sign. The government interests served by regulating signs like the Cozy Sign include aesthetics, pedestrian and traffic safety, and property values.**

5. Please explain how the City determines if a mural is used to "announce, direct attention to, or advertise."

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that cannot be found in the Salina Code. Subject to and without waiving this objection, the City applies the Sign Code as written. The City does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to, in pertinent part, whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise."**

**The City applies the plain language and ordinary use of the words and phrases "announce," "direct attention to," and "advertise." The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce" by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event.**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "direct attention to" by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window).**

**The City determines whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "advertise" by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, "sliders, 5 for $5.00"); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall).**

6. Please explain how the City identifies "art" which is exempt from the mural- sign code regime. See (Doc. 16 at ¶¶ 62-65, 100, 115, 208, 216); (Doc. 16-2 at 4-6, 22-23, 28); (Doc. 16-4 at 6-7); (Doc. 27 at 9, 12).

**OBJECTION AND RESPONSE: The City objects to this requests to the extent it seeks information protected by the attorney-client, work product and anticipation of litigation**

**privileges respecting Defendant's Brief in Support of its Motion to Dismiss. The City further objects to this request to the extent it seeks the City to explain the arguments made by the City's counsel as set forth in Doc. 27 at 9 and 12. The City further objects to the extent the request incorporates allegations to the Amended Complaint as Plaintiffs made the allegations and no answer has been filed to determine whether the allegations are admitted or denied. Based on these objections, the City will only respond to the non-objectionable portion of the request "Please explain how the City identifies 'art' which is exempt from the mural-sign code regime."**

**The City objects to the use of the phrase "mural-sign code regime" to refer to the Sign Code or BID Code. Subject to and without waiving these objections, the Sign Code regulates "signs" as defined by § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code.**

**As to the term "art," the term "art" may be used from time to time as an imprecise short-hand for "not sign," but the term "art" is not included in the Sign Code and is not relevant to the determination of whether a display (whether it is artistic or not) is a "sign." This is because some artistic displays are also "signs," and some are not. To clarify, the artistic displays that are also signs are subject to regulation. The artistic displays that are not signs are just art, and because they are not also signs, they are not subject to regulation.**

**A "sign" under the sign code "is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building.**

**Please see Response to Interrogatory No. 5 above for additional information responsive to this request.**

7. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are unregulated "art" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written. The City does not apply the**

**term mural as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by Salina Code § 42-764. If a display is not a sign it does not fall within the scope of the Sign Code. Displays that are not signs are not subject to the size limits of the Sign Code, and the City does not evaluate the size of such displays. Accordingly, the City does not have information about the location or sizes of displays that are not signs under the Sign Code. The City, does not have sufficient information to "identify" as requested. Moreover, "unregulated 'art'" (which the City interprets as displays that are not signs) cannot exceed the Sign Code's size restrictions because those restrictions only apply to regulated signs.**

8. Please identify any murals that exceed the mural-sign code regime's size restrictions which the Defendant has determined are regulated "signs" within the last 5 years.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to the Sign Code or BID Code as the "mural-sign code regime." The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions that does not correspond to the Sign Code or BID Code. Subject to and without waiving these objections, the City applies the Sign Code as written, it does not use or apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to "announce, direct attention to, or advertise." The Sign Code regulates signs as defined by § 42-764, and if a display is a sign within the Sign Code it is subject to the size limits of the Sign Code.**

**Pursuant to Request for Production No. 5, Defendant is producing citations issued within the last 5 years. Pursuant to F.R.C.P. 33(d), Defendant refers Plaintiffs to those documents produced in Defendant's forthcoming supplemental disclosure for information responsive to this request.**

9. Please explain how the City determines if a mural "pertains to the goods or services for sale." See Amended Complaint at ¶¶ 32, 44, 52-54, 64-65, 128.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a definition of "mural" in Plaintiffs' Terms and Definitions as that definition is not in the Sign Code or BID Code. Subject to and without waiving this objection, the City applies the Sign Code as written, it does not apply the term "mural" as defined by Plaintiffs in their Terms and Definitions. The Sign Code definition found in Salina Code § 42-764 refers to whether a "writing," "pictorial representation," "emblem," "flag, banner, streamer pennant, string of lights, or display," or "any other figure of similar character" is used to**

**"announce, direct attention to, or advertise." Salina Code § 42-764 does not use the phrase "pertains to the goods or services for sale." Rather, Salina Code § 42-764 applies to a display if, among other things, it "announces, directs attention to, or advertises." One way to evaluate whether a display "advertises" is if it encourages the purchase of products or services, in that it pertains to or references the goods or services for sale.**

10. For any Request for Admission that you denied, please explain the reasons for your denial.

**OBJECTION: The City objects to this request to the extent it seeks to impose obligations outside the scope of, or different than, the Federal Rules of Civil Procedure. F.R.C.P. 36(4) requires a matter be admitted, or specifically deny the request or state in detail why the answering party cannot truthfully admit or deny it. Further, a denial must fairly respond to the substance of the matter.**

11. Please identify the factual basis for the claim made in your Brief in Support of Defendant's Motion to Dismiss (Doc. 27 at 2) that "Plaintiffs' display is obviously a sign".

**RESPONSE: The City refers Plaintiffs to the allegations in their Amended Complaint found at ¶¶ 15-29 for allegations showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. The City also refers Plaintiffs to the transcript attached as Exhibit A to Plaintiffs' Amended Complaint at 15:2-23 for additional facts showing Plaintiffs' display is a sign pursuant to Salina Code § 42-764. Plaintiffs sign is a "writing" "pictorial representation" "emblem" "flag, banner, streamer pennant, string of lights, or display calculated to attract the attention of the public" or "any other figure of similar character" that is "a structure or any part therefor, or a portable display, or is attached to, painted on, or in any manner represented on a building or other structure or on the ground," that "is used to announce, direct attention to, or advertise, and is not located inside a building."**

**The Cozy Sign is a display calculated to attract the attention of the public, that is attached to or painted on a building. It is used to announce, direct attention to and advertise and it is not located inside of a building. Specifically, the Cozy Sign contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them.**

Respectfully submitted this 12th day of July , 2024.

| s/ Aaron O. Martin | s/ Todd G. Messenger | s/ Amanda C. Jokerst |
|---|---|---|
| Aaron O. Martin | Todd G. Messenger, | Amanda C. Jokerst |
| Bar Number 24170 | CO Bar Number 38783 | CO Bar Number 47241 |
| Attorney for Defendant City | Pro Hac Vice Attorney for | Pro Hac Vice Attorney for |

of Salina, Kansas
CLARK, MIZE &
LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email:
aomartin@cml-law.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
tmessenger@fwlaw.com

Defendant City of Salina,
Kansas
Fairfield and Woods, P.C.
1801 California St.,
Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email:
ajokerst@fwlaw.com

**VERIFICATION**

I, Mike Schrage, as City Manager for the City of Salina, Kansas, declare that the foregoing responses to the interrogatories contained in the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFFS' FIRST SET OF DISCOVERY TO PLAINTIFFS** are true and correct as of this date based upon my present knowledge, information, and belief.

Signature

Executed on July 12, 2024

CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2024, I caused the foregoing **DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** to be served on the following parties by electronic mail as follows:

Jeffrey Shaw.
Samuel G. MacRoberts
Kansas Justice Institute
12980 Metcalf Avenue, Suite 130
Overland Park, KS 66213
Telephone: 913-213-5121; 913-213-5018
E-mail: jeff@kansasjusticeinstitute.org; sam.macroberts@kansasjusticeinstitute.org

*Attorneys for Plaintiffs*

*/s/ Amanda C. Jokerst*
Amanda C. Jokerst

# Exhibit AA
# Taylor Deposition Excerpts

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn;<br>Stephen Howard,<br><br>Plaintiffs,<br><br>-vs.-<br><br>City of Salina, Kansas,<br><br>Defendants. | :CIVIL ACTION<br>:CASE NO.<br>:<br>:6:24-cv-01027-TC-ADM |

NOVEMBER 13, 2024

ZOOM VIDEOCONFERENCE DEPOSITION OF CHARLES R. TAYLOR, Ph.D., held via remote teleconference hosted by U.S. Legal Support, located at 1818 Market Street, Suite 1400, Philadelphia, Pennsylvania, on Wednesday, November 13, 2024, at 10:05 a.m., before Michelle Keys, a Stenographer and Notary Public of the Commonwealth of Pennsylvania.

BY MR. MESSENGER:
Q. Okay. And you testified that you think that the -- the ketchup coming out of this burger, or perhaps the mustard, could be some sort of propellant; is that right?
MR. SHAW: Objection to form and scope.
THE WITNESS: It's consistent with what the artist was quoted as saying.
BY MR. MESSENGER:
Q. Did the artist not -- I'm sorry.
The artist was quoted as saying what?
A. Was quoted as saying that -- that ketchup and mustard was -- was coming from the flying saucer.
Q. As a propellant?
A. I don't think he used those words "as a propellant."
Q. How does the spaceship fly, Dr. Taylor?
MR. SHAW: Objection to form and scope.
THE WITNESS: I mean, I -- I don't know. I mean, it's all -- it's in the middle -- it's in the middle of the building, suggesting it's in the air, I guess.

BY MR. MESSENGER:
Q. But no -- no visible sense of propulsion here?
MR. SHAW: Objection to form and scope.
THE WITNESS: No, I don't see a visible, you know, method of propulsion. But I do -- I do know what the author said -- what the artist said he intended, and I think that's probably the best possible source.
BY MR. MESSENGER:
Q. Let's look at the burger image on the lower left-hand corner.
Does that look like a burger to you, fully rendered?
MR. SHAW: Objection to scope.
THE WITNESS: I can't see it very well. It's not very big.
BY MR. MESSENGER:
Q. Okay. Let's zoom in on it. We can do that.
A. I mean, again, it looks like a combination; burger and flying saucer to me.
Q. So is that a bun on the top and the bottom?
MR. SHAW: Objection to scope.

CERTIFICATE

I HEREBY CERTIFY that the proceedings, evidence, and objections are contained fully and accurately in the stenographic notes taken by me upon the deposition of CHARLES R. TAYLOR, Ph.D., taken on NOVEMBER 13, 2024, and that this is a true and correct transcript of same.

I FURTHER CERTIFY that I am neither attorney nor counsel for, not related to nor employed by any of the parties to the action in which this deposition was taken; further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

Michelle Keys
Stenographer
and Notary Public

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

**Cozy Inn, Inc, et al. v. City of Salina, Kansas - Civil Action No. 6:24-cv-01027-TC-ADM**

**Plaintiffs' Reply in Support of Motion for Summary Judgment – Index of Exhibits**

| Exhibit | Title |
|---|---|
| **Exhibit A** | Howard Declaration |
| **Exhibit B** | Howard Deposition |
| **Exhibit C** | Benson Deposition |
| **Exhibit D** | Blase Deposition |
| **Exhibit E** | Andrew Deposition |
| **Exhibit F** | Herrs 30(b)(6) Deposition |
| **Exhibit G** | On-Hold Letter |
| **Exhibit H** | Michelson Deposition |
| **Exhibit I** | Herrs Deposition |
| **Exhibit J** | Windholz Deposition |
| **Exhibit K** | Art Center DRB Packet |
| **Exhibit L** | Mural Photos |
| **Exhibit M** | Defendant's Amended Answers to First Set of Interrogatories |
| **Exhibit N** | White Deposition |
| **Exhibit O** | Schrage Email 11/8/23 |
| **Exhibit P** | Talking Points |
| **Exhibit Q** | Schrage Email 11/9/23 |
| **Exhibit R** | City Commission Transcript |
| **Exhibit S** | Schrage Deposition |
| **Exhibit T** | Schrage Email 2/20/24 |
| **Exhibit U** | Plaintiffs' First Amended Response to First Set of Interrogatories |
| **Exhibit V** | Driscoll Deposition |
| **Exhibit W** | Andrew 30(b)(6) Deposition |
| **Exhibit X** | Yard DRB Packet |
| **Exhibit Y** | Defendant's Answer to Second Set of Interrogatories |
| **Exhibit Z** | Defendant's Response to First Set of Interrogatories |
| **Exhibit AA** | Taylor Deposition |

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 14 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*
Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*