**CASE NO. 25-3225**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

Cozy Inn, Incorporated,
d/b/a The Cozy Inn, *et al*.

Plaintiffs-Appellees,

v.

City of Salina, Kansas

Defendant-Appellant.

---

On Appeal from the United States District Court
For the District of Kansas
The Honorable Judge Toby Crouse
D.C. No. 6:24-cv-01027-TC

---

**APPENDIX OF APPELLANT CITY OF SALINA, KANSAS**
**Volume 15 of 16, Pages 1-271**

---

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
Fairfield and Woods, P.C.
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com
*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*

Date: February 23, 2026

**TABLE OF CONTENTS**

D.C. No. 6:24-cv-01027-TC (D. Kan): Relevant Docket Entries


| Volume No. | Page No. | Doc No. | Title of Pleading | Filer | Date of Filing |
|---|---|---|---|---|---|
| **Volume 1, Pages 1- 292** | | | | | |
| Volume 1 | 7 | | Civil Docket Sheet for Case No. 24-cv-01027-TC | | |
| Volume 1 | 26 | 16 | Verified Amended Complaint for Declaratory Judgment and Injunctive Relief; Designation of Place of Trial; Verification; Exhibits A-D | Plaintiffs | 04/10/24 |
| Volume 1 | 177 | 26 | Defendant's Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) | Defendant | 05/09/24 |
| Volume 1 | 180 | 27 | Brief in Support of Defendant's Motion to Dismiss | Defendant | 05/09/24 |
| Volume 1 | 195 | 31 | Plaintiffs' Opposition to Defendant's Motion to Dismiss | Plaintiffs | 05/30/24 |
| Volume 1 | 211 | 33 | Reply Brief in Support of Defendant's Motion to Dismiss | Defendant | 06/13/24 |
| Volume 1 | 216 | 97 to 97-4 | Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White; Index of Exhibits; Exhibits A-C | Plaintiffs | 12/20/24 |
| **Volume 2, Pages 1-275** | | | | | |
| Volume 2 | 7 | 97-5 to 97-7 | Exhibits D-F to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White | Plaintiffs | 12/20/24 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 2 | 57 | 98 | Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert Pursuant to F.R.E. 702 with Exhibits | Defendant | 12/20/24 |
| Volume 2 | 183 | 99 to 99-5 | Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert; Index of Exhibits; Exhibits A-D | Plaintiffs | 01/10/25 |
| **Volume 3, Pages 1-288** | | | | | |
| Volume 3 | 7 | 99-6 to 99-10 | Exhibits E-I to Plaintiffs' Response to Defendant's Motion to Exclude Plaintiffs' Rebuttal Expert | Plaintiffs | 01/10/25 |
| Volume 3 | 80 | 100 | Defendant's Response to Plaintiffs' Motion to Strike or Exclude Opinions of Attorney Mark White with Exhibits | Defendant | 01/10/25 |
| Volume 3 | 104 | 101 | Amended Pretrial Order | Court | 01/16/25 |
| Volume 3 | 125 | 102 | Plaintiffs' Reply Brief; Index of Exhibits; Exhibit A; Certificate of Service | Plaintiffs | 01/24/25 |
| Volume 3 | 133 | 103 | Defendant's Reply in Support of its Motion to Exclude (ECF 98) with Exhibits | Defendant | 01/24/25 |
| Volume 3 | 286 | 104 | Plaintiffs' Motion for Summary Judgment; Request for Oral Argument; Certificate of Service | Plaintiffs | 02/07/25 |
| **Volume 4, Pages 1-262** | | | | | |
| Volume 4 | 7 | 105 to 105-12 | Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibits A-L | Plaintiffs | 02/07/25 |
| **Volume 5, Pages 1-275** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 5 | 7 | 105-13 to 105-28 | Exhibits M-BB to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 6, Pages 1-220** | | | | | |
| Volume 6 | 7 | 105-29 to 105-36 | Exhibits CC-JJ and Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| **Volume 7, Pages 1-278** | | | | | |
| Volume 7 | 7 | 105-37 to 105-39 | Exhibits KK-LL; Index of Exhibits to Plaintiffs' Memorandum in Support of their Motion for Summary Judgment | Plaintiffs | 02/07/25 |
| Volume 7 | 37 | 106 | Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 7 | 40 | 107 to 107-11 | Brief in Support of Defendant's Motion for Summary Judgment; Index of Exhibits; Exhibits A-J | Defendant | 02/07/25 |
| **Volume 8, Pages 1-266** | | | | | |
| Volume 8 | 7 | 107-12 to 107-21 | Exhibits K-T to Defendant's Motion for Summary Judgment | Defendant | 02/07/25 |
| Volume 8 | 91 | 108 to 108-5 | Plaintiffs' Response to Salina's Motion for Summary Judgment; Exhibits A-E | Plaintiffs | 02/28/25 |
| **Volume 9, Pages 1-259** | | | | | |
| Volume 9 | 7 | 108-6 to 108-25 | Exhibits F-Y of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 10, Pages 1-259** | | | | | |
| Volume 10 | 7 | 108-26 to 108-36 | Exhibits Z-JJ of Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| **Volume 11, Pages 1-251** | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| Volume 11 | 7 | 108-37 to 108-42 | Exhibits KK-OO and Index of Exhibits to Plaintiffs' Response to Salina's Motion for Summary Judgment | Plaintiffs | 02/28/25 |
| Volume 11 | 103 | 109 to 109-4 | Response to Plaintiffs' Motion for Summary Judgment; Index of Exhibits and Exhibits 1-3 | Defendant | 02/28/25 |
| **Volume 12, Pages 1-252** | | | | | |
| Volume 12 | 7 | 109-5 to 109-16 | Exhibits 4-15 to Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| **Volume 13, Pages 1-283** | | | | | |
| Volume 13 | 7 | 109-17 to 109-25 | Exhibits 16-24 of Response to Plaintiffs' Motion for Summary Judgment | Defendant | 02/28/25 |
| Volume 13 | 168 | 110 | Plaintiffs' Motion to Correct or Supplement Plaintiffs' Memorandum in Support of their Motion for Summary Judgment; Exhibit MM; Corrected Index of Exhibits | Plaintiffs | 03/05/25 |
| Volume 13 | 176 | 112 to 112-10 | Plaintiffs' Reply in Support of Motion for Summary Judgment; Exhibits A-J | Plaintiffs | 03/14/25 |
| **Volume 14, Pages 1-270** | | | | | |
| Volume 14 | 7 | 112-11 to 112-28 | Exhibits K-AA of Plaintiffs' Reply in Support of Motion for Summary Judgment; Index of Exhibits | Plaintiffs | 03/14/25 |
| **Volume 15, Pages 1-271** | | | | | |
| Volume 15 | 7 | 113 | Defendant's Reply in Support of Motion for Summary Judgment with Exhibits; Index of Exhibits | Defendant | 03/14/25 |

| | | | | | |
|---|---|---|---|---|---|
| Volume 15 | 245 | 114 | Defendant's Motion to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment (ECF 109) with Exhibit | Defendant | 03/28/25 |
| Volume 15 | 262 | 117 | Plaintiffs' Notice of Supplemental Authority; Certificate of Service | Plaintiffs | 05/30/25 |
| Volume 15 | 264 | 118 | Response to Plaintiffs' Notice of Supplemental Authority | Defendant | 06/04/25 |
| Volume 15 | 267 | 119 | Order (Regarding Defendant's Motion to Dismiss) | Court | 06/20/25 |
| Volume 15 | 269 | 120 | Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service | Plaintiffs | 06/30/25 |
| | | | **Volume 16, Pages 1-85** | | |
| Volume 16 | 7 | 121 | Answer to Verified Amended Complaint for Declaratory Judgment and Injunctive Relief | Defendant | 07/07/25 |
| Volume 16 | 47 | 136 | Memorandum and Order (Regarding Motions for Summary Judgment and Motions to Exclude Expert Testimony) | Court | 11/19/25 |
| Volume 16 | 82 | 139 | Notice of Appeal | Defendant | 12/18/25 |
| Volume 16 | 84 | 148 | Judgment in a Civil Case | Court | 01/07/26 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,** | **)** |
| **d/b/a The Cozy Inn; Stephen Howard,** | **)** |
| | **)** |
| **Plaintiffs,** | **) CIVIL ACTION** |
| | **) CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | **)** |
| | **)** |
| **City of Salina, Kansas,** | **)** |
| | **)** |
| **Defendant.** | **)** |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests that this Court grant the City's Motion for Summary Judgment ("Motion"), and in support thereof Replies as follows:

## I. INTRODUCTION

This Court should enter summary judgment for the City and against Plaintiffs on all counts of the Complaint or dismiss the Complaint for want of subject-matter jurisdiction. In the alternative, the Court should dismiss this matter because Plaintiffs have failed to state any claim. *See* City's Mot. to Dismiss (ECF 26); Brief in Support of City's Mot. to Dismiss (ECF 27).

Plaintiffs' shotgun approach to this case produces self-inflicted wounds. On the one hand, Plaintiffs strenuously complain that it is unfair to regulate the Cozy Sign as a "sign" while other displays[1] that are not signs (as they are not "used to announce, direct attention to, or advertise," and which Plaintiffs describe as "murals") are not also regulated. Yet Plaintiffs' dissatisfaction in

[1] In the interest of brevity the City uses "display" to refer to "any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character."

this regard does not relate to any of their causes of action—there is no equal protection claim before this Court, and none of the First Amendment tests identified by Plaintiffs are concerned with such things. On the other hand, Plaintiffs complain that the Cozy Sign should not be regulated because it is just a "story about travel," and therefore not "used to announce, direct attention to, or advertise." ECF 108 at 12 ¶ 40. That alleged story is irrelevant. Regardless of any tale Plaintiffs may contend that it tells, the Cozy Sign is obviously "used to announce, direct attention to," *and* "advertise"—so it is subject to the sign code. ECF 108 at 1 (photo), 2 (A), 5 ¶19 and 12, ¶ 40; ECF 107 at 13, ¶¶ 35-37. Plaintiffs do not seek declaratory judgment to the contrary.

In sum, Plaintiffs' claims are entirely without merit, and on this record Plaintiffs also lack standing to bring them. The definition of "sign" is content neutral (and constitutional), and so are the City's permit requirements and size limitations. While Plaintiffs raise the specter of "unwritten policies and practices," the Cozy Sign is clearly "used to announce, direct attention to, or advertise," and nothing that the City has said or done is inconsistent with the application of that definition to the letter. The Court should dismiss the case or enter summary judgment for the City.

## II. RESPONSE TO ADDITIONAL FACTS

1. Disputed. Not a Material Fact. The exhibits cited include photos of signs that require permits (ECF 108-35 at 7, 10, 11, 16), pre-existing non-conforming signs (ECF 108-35 at 6), or displays that are located inside of a building (ECF 108-35 at 5, 14, 15, 17). **Ex. A** (City's Resp. to RFA) at No. 13, 21, 26; **Ex. B** (Dustin Herrs Dep.) at 75:1-24, 129:1-25, 130:1-11; **Ex. C** (Dean Andrew (30)(b)(6) Dep.) at 69:1-23, 67:4-14; **Ex. D** (Dean Andrew Dep.) at 304:20-25.

2. Disputed. Not reflective of summary judgment record. **Ex. D** at 72:2-19, 75:10-14.

3. Disputed. Mr. White did not refer to it as a learned treatise. It was a promotional publication targeted to the sign industry. **Ex. E** (Mark White Dep.) at 31:8-13, 191:19-192:1-2.

4. Disputed. The City has not threatened anything. ECF 101 at 18-19.

## III. ARGUMENT

### A. Plaintiffs Lack Standing

Article III jurisdiction is a requirement that subsists through all stages of federal judicial proceedings. *Lewis v. Cont'l Bank Corp*., 494 U.S. 472, 477 (1990). "'The party invoking federal jurisdiction bears the burden of establishing' standing . . . ." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 411-12 (2013) (quotation omitted). Plaintiffs seek to "upend" the sign code. ECF 108 at 21. That drastic step would be "fundamental," and would do "violence to legislative intent." *Outdoor Systems, Inc. v. City of Lenexa, Kan*., 67 F. Supp. 2d 1231, 1241 (D. Kan. 1999) (citation omitted). Even if the Court found that individual words or phrases were problematic (which it should not), "[c]onstitutional litigation is not a game of gotcha . . . where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr v. American Ass'n of Political Consultants, Inc.*, 591 U.S. 610, 627 (2020). The challenged phrase "used to announce, direct attention to, or advertise," if problematic, would be a "discrete constitutional flaw" that cannot be used to "take down the whole, otherwise constitutional statute." *American Ass'n of Political Consultants*, 591 U.S. at 627. If this Court determines that the application of the Sign Code cannot constitutionally be limited to those displays that are "used to announce, direct attention to, or advertise," then the Court should sever some or all of that phrase and leave the rest of the definition (and the sign code) intact.

Alternatively, if the Court were to reconstruct the definition of sign as Plaintiffs suggest, the challenged language would no longer be at issue. ECF 108 at 23. Either way, the result is the same—the Cozy Sign is still a "regulated sign." Even the fallacious argument diagramming the City's alleged interpretations (the City has used the term "display" as shorthand for 46 words at

the beginning of the definition of sign, *see* n.1, *supra*) does not change that outcome. *Id*. Plaintiffs cannot meet the redressability requirement and therefore, even if the challenged language is severed or made inapplicable by way of grammatical reconstruction, the Sign Code still applies to the Cozy Sign. ECF 108 at 2 (A); ECF 107 at 17, ¶¶ 61, 63. As to purported "unwritten definitions and policies," Plaintiffs have not articulated any that independently prevent them "from finishing their mural," so standing to challenge "unwritten definitions and policies" is not established either. In sum, Plaintiffs have not carried their burden regarding standing. Federal courts do not decide "academic questions." *Wyoming v. U.S. Dept. of Interior*, 587 F.3d 1245, 1247 (10th Cir. 2009).

**B. The Sign Code is Content-Neutral on its Face**

The Sign Code is facially content neutral. The core of this case is whether the definition of sign, which involves whether a regulation of displays "used to announce, direct attention to, or advertise" that are "not located inside a building" is content neutral on its face. **Ex. F** (Salina Code Excerpts) at 5. The material fact on this point is undisputed: "sign" is defined by Salina Code ("S.C.") § 42-764. ECF 108 at 3, ¶ 3.; **Ex. F** at 5. This question of law is answered by the referenced text. *See City of Austin v. Reagan Nat'l Adv. of Austin, LLC*, 596 U.S. 61, 64, 76 (2022); *Harmon v. City of Norman, Okla.*, 981 F.3d 1141, 1148 (10th Cir. 2020). S.C. § 42-764 does not "single[] out specific subject matter for differential treatment." *Austin*, 596 U.S. at 69 (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 169 (2015)); ECF 108 at 3, ¶ 3, **Ex. F** at 5. The *Reed* Court struck down a very different sort of regulation—one that singled out topics such as "ideological signs" and "political signs" into "23 different categories." *Id*. at 69-70. In stark contrast to the regulations struck down in *Reed*, the Sign Code's text does not reference topics, ideas, messages, or viewpoints regarding what is announced, the objects or locations to which attention may be directed, or the contents of any advertisement. ECF 108 at 3, ¶ 3, Ex. F at 5. The Complaint does not contain any

allegations that the Sign Code regulates displays based on the City's disagreement with a message, thus there can be no fact to dispute in this regard. ECF 16.

The Response distorts the law and the facts in its content-based argument. The string cite that the Response offers at page 32 to advance this "content based" theory is a wild goose chase, and the cases therein simply cannot bear the weight that Plaintiffs put on them. First, whether Plaintiffs' speech is commercial or not is not germane to the Sign Code. The closest question is whether the speech is "advertising," which could be either commercial or non-commercial. Second, none of the string cited cases support the contention that a commercial versus non-commercial distinction, alone, requires strict scrutiny. Indeed, all of the cited cases that dealt with commercial speech applied intermediate scrutiny as articulated in *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n of N.Y.*, 447 U.S. 557 (1980).[2] Those that addressed non-commercial speech applied strict scrutiny only where non-commercial speech was regulated based on specific ideas or topics.[3] None of the string-cited cases are relevant, let alone supportive of the contention that the Sign Code is unconstitutional. ECF 108 at 32.

### C. The Sign Code is Content-Neutral As-Applied

The City applied the facially content neutral Sign Code, by its letter, to the Cozy Sign. As-applied challenges "test the application" of the regulation "to the facts of a plaintiff's concrete case." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1248-49 (10th Cir. 2023). It is undisputed the City prepared The Cozy Inn Sign Analysis and provided it to Mr. Howard on

---

[2] *Morris v. City of New Orleans*, 399 F. Supp. 3d 624, 638 (E.D. La. 2019); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993).

[3] *Reed*, 576 U.S. 155 (2015), *Ficker v. Talbot Cty., Md.*, 553 F. Supp. 3d 278 (D. Md. 2021) (political signs); *Neighborhood Enterprises, Inc. v. City of St. Louis*, 644 F.3d 728, 731 (8th Cir. 2011) (political message); *Dimmit v. City of Clearwater*, 985 F.2d 1565 (11th Cir. 1993) (U.S. Flags); *Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369 (M.D. Fla. 2014) (non-commercial classifications)

November 13, 2023. ECF 108 at 2 (A); ECF 107 at 12, ¶ 29; **Ex. G** (The Cozy Inn Sign Analysis). The Response does not dispute the text of S.C. §§ 42-764, 42-781, the quoted text of § 42-521(4)(b) (setting forth the size limits in C-4 district), or that the Cozy Sign is in the C-4 district. ECF 108 at 2 (A); ECF 107 at 7-8, ¶ 5; **Ex. F**. The Cozy Inn Sign Analysis demonstrates element by element how the City applied the Sign Code to the Cozy Sign. **Ex. G**.

The Response handpicks statements made by City staff who do not apply the Sign Code and ignores City staff testimony from the same transcript showing the City interpreted the Sign Code as written and applied it to the Cozy Sign to the letter. **Ex. H** (November 13, 2023 Meeting Tran.) at 15:1-25 ("If you look at our definition of a sign. . .); *compare* ECF 108 at 2, ¶ 2 (citing to "Comm. Tran."). The commercial message of the Cozy Sign is germane only because it is an indicium that the Cozy Sign is "used to . . . advertise." ECF 108 at 24. Thus, it falls within the purview of S.C. § 42-764, just as a non-commercial advertisement would. **Ex. D** at 54:18-55:8.

**D. There Is No Independent "Speaker Based" Claim**

The City moved for summary judgment on "all claims." ECF 107 at 23, 40. There is no independent cause of action that a regulation is unconstitutional because it is "speaker-based." Section 4.B. of the Motion (ECF 107) sets out why the Sign Code is content neutral on its face and as-applied. That subsumes—and negates—Plaintiffs' so-called "speaker-based" argument, which is simply a prong of the analysis into whether a regulation is content based. *Reed*, 576 U.S. at 170 ("Characterizing a distinction as speaker based is only the beginning—not the end—of the inquiry."). The inquiry into whether a regulation is speaker based is part of the determination of whether a regulation is "justified without reference to the content of the regulated speech," or was "adopted by the government because of disagreement with the message [the speech] conveys," *Reed*, 576 U.S. at 164. The summary judgment record does not contain any evidence (or purported

facts) that the government disagrees with the message the Cozy seeks to convey, because Plaintiffs did not make any allegations in that regard. ECF 16. As such, there is no disputed material fact. The Response's "speaker-based" analysis is a collection of hypotheticals involving made-up speakers in situations that are not before the Court, and there is no common ground among those speakers from which the court could reasonably infer a "content preference."

**E. The Sign Code Passes Intermediate Scrutiny on Its Face and As-Applied**

Because the Sign Code is content neutral, the three prong "intermediate scrutiny" test applies. *Ward v. Rock Against Racism*, 491 U.S. 781, 797, 799 (1989). Prong 1: The text of S.C. § 42-500, entitled "*Purpose*," is undisputed. ECF 108 at 4, ¶ 4, **Ex. F** at 1. S.C. § 42-500 states in pertinent part that Article 42 "promotes the public health, safety and welfare of the community through a comprehensive system of . . . sign standards and requirements drawn to . . . "improve *pedestrian and traffic safety*," "protect the *aesthetic* appearance of the city's natural and building environment" and "protect *property values*." (emphasis added). As a matter of law, the City's interests in aesthetics, traffic safety, and property values are substantial, content neutral government interests. *Stockinger*, 79 F.4th at 1251; *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 795, 805, 807-08, 817.

Prong 2: The Court decides as a matter of law whether the Sign Code "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. It is undisputed the City regulates the size, number, and location of signs. ECF 108 at 3, ¶ 3 (admitted to text of S.C. § 42-764), at 3, ¶ 9 (admitted to text of S.C. § 42-521(4)(b) that allows "[i]n the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage"), at 16, ¶ 52 (admitted as to text of S.C. § 42-521 that states "four (4) signs per business" in C-4 district), at 9, ¶ 30 ("Plaintiffs admit that Salina officials testified to these

measurements" which showed the Cozy had 63 square feet of allowable sign area), at 10, ¶ 32 ("Plaintiffs admit that Salina officials stated these measurements at deposition" which showed the Cozy had 10.12 square feet of allowable sign area remaining), and at 2 (A) (ECF 107 at 12, ¶ 29 (The Cozy Inn Sign Analysis was provided to Mr. Howard); **Ex. G**. "[W]hen a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal." *Hill v. Colorado*, 530 U.S 703, 726 (2000).

Time, place, and manner restrictions, like the City's size, number, and location regulations, *per force* address the "distinct safety and esthetic challenges" posed by signs. *Austin*, 596 U.S. at 64, 71, 75. In fact, in *Reed*, the court held "that a city might reasonably view the general regulation of *signs* as necessary because *signs* 'take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation.'" *Reed*, 576 U.S. at 173 (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994)) (emphasis added). *Reed* recognized that "regulating size" was one "content-neutral option[] available" to effectively "resolve problems with safety and aesthetics." *Id*. at 173, 174-75 (Alito, J. concurring, noting that municipalities can enact "rules that would not be content based" such as "rules restricting the total number of signs allowed per mile of roadway.")).

Prong 3: It is undisputed that Plaintiffs have ample alternative channels to communicate the information. ECF 108 at 18, ¶ 59 ("Plaintiffs admit that the quotations from Professor Taylor are accurate"—"Charles Taylor admitted that prior to construction of the Cozy Sign, the Cozy Inn signs that were already in place were 'conspicuous enough' and did in fact 'brand the site'"), 9, ¶ 30 ("Plaintiffs admit that Salina officials testified to these measurements"—measurements showed the Cozy had 63 square feet of allowable sign area), and at 10, ¶ 32 ("Plaintiffs admit that Salina

officials stated these measurements at deposition" which showed the Cozy had 10.12 square feet of sign area remaining); at 10, ¶ 31 (admitting to "existing signage on the North wall"), and 10, ¶ 32 (no record citation to refute ECF 107 at 13, ¶ 32 that Cozy had three other signs, D. Kan. Rule 56.1(b)(1)). "Plaintiffs admit The Cozy Inn communicates some messages via Facebook, radio advertising, banner advertising at indoor football events, and billboards . . . [branded] merchandise or bumper stickers" and a "mural at Jenni's Liquor" which is a "communication of Jenni's Liquor and its owners." ECF 108 at 18, ¶ 18 (Mr. Howard owns Jenni's Liquor and the "mural" is a reference to the Cozy Sign. **Ex. I** (Stephen Howard Dep.) at 11:17-25, 12:1-3, 221:3-25, 222:1-12.

Here, the Court decides as a matter of law whether the alternative modes of communication do not threaten Plaintiffs' ability to "communicate effectively." *Taxpayers for Vincent*, 466 U.S. at 812. "The First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981). The Sign Code regulates signs, but it does not prohibit them. It is undisputed that Plaintiffs can communicate their message and comply with the Sign Code if they reduce the size of the Cozy Sign. *See Harmon*, 981 F.3d at 1149; 9, ¶ 30, 10, ¶¶ 31-32; **Ex. G**. The Sign Code therefore passes intermediate scrutiny.

### F. Though Inapplicable, the Sign Code Passes *Aptive's* Evidentiary Demands

The Sign Code does not treat commercial speech and non-commercial speech differently. Because the Cozy Sign is commercial speech to which the Sign Code applies, it does not transmogrify the Sign Code into a commercial speech regulation. The Response struggles to comprehend what constitutes commercial speech, yet the standard is ubiquitous. It is an advertisement that refers to a particular product, whose speaker has an economic motivation. *Bolger v. Youngs Drug Prod. Corp.*, 463 U.S. 60, 66-67 (1983). This standard is easy to apply here

where it is undisputed that the Cozy Sign depicts burgers, states "Don't Fear the Smell!," and the "Cozy sells hamburgers. . . [and] the smell of onions is distinct to the Cozy Inn." ECF 108 at 5 at ¶ 19 ("burger UFOs"), at 1 (photo), and at 2 (A); ECF 107 at 13, ¶¶ 35-37.

Even if the *Central Hudson* commercial speech test were applicable, then the Sign Code "need only be tailored in a reasonable manner to serve a substantial state interest in order to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993). Here, the text of S.C. § 42-500 is undisputed, and states Article 42 seeks to "improve pedestrian and traffic safety," "protect the aesthetic appearance," and "protect property values." ECF 108 at 4, ¶ 4; **Ex. F** at 1. As discussed in Section III(D), *supra*, these are substantial government interests as a matter of law.

Plaintiffs contend, relying on an oral solicitation case, that the City must prove with evidence the Sign Code actually advances its stated interest. ECF 108 at 28. The Response discounts the *Metromedia* Court's approach to the issue by citing *Aptive and Pagan v. Fruchey,* 492 F.3d 766 (6th Cir. 2007), cases that were not supported by an extensive record of "common-sense judgments of local lawmakers." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 509 (1981). Yet, even if *Aptive* applies, the City satisfies its evidentiary requirement. *Aptive Environmental, LLC v. Town of Castle Rock*, 959 F.3d 961, 989 (10th Cir. 2020).

Moreover, the Supreme Court "has permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Aptive*, 959 F.3d at 989. "When evaluating whether a municipality has put forward sufficient anecdotes, history, or common sense to demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree . . . we evaluate the evidence in light of the cases where those categories of evidence have previously been invoked."

*Id*. (quotations omitted). At least 34 other municipalities across the United States utilize the phrase "announce, direct attention to, or advertise" in their definitions of sign.[4] **Ex. J** (Municipal Code Citations). That history and tradition matters—and supports upholding S.C. § 42-764. *See Austin*, 596 U.S. at 75.

Moreover, the Supreme Court has observed that all signs, not just billboards, share a common thread that is the mix of speech and structure and pose unique problems that must be addressed through regulation. *Reed*, 576 U.S. at 173; *Ladue*, 512 U.S. at 48; *Taxpayers for Vincent*, 466 U.S. at 806-07. Under the *Aptive* standard, the City can rely on the "common sense" judgment of the governing body, the not less than 34 other local governments that use essentially the same approach, and the voluminous Supreme Court precedent finding that time, place and manner restrictions (like size, number, and location) effectively address the harms presented by signs and advance interests in aesthetics, traffic safety, and property values. *Reed*, 576 U.S. at 173; *Ladue*, 512 U.S. at 48; *Taxpayers for Vincent*, 466 U.S. at 806-08; *Metromedia*, 453 U.S. at 509.

Even still, there is sufficient evidence in the summary judgment record that regulation of the size, number, and placement of signs promotes the City's stated objectives. *See* pp. 11-12, *infra*. It is undisputed that City Planner Dustin Herrs is certified by the American Institute of Certified Planners ("AICP"), that AICP requires continuing education credits, including those addressing sign regulations. ECF 108 at 2 (A); ECF 107 at 9, ¶¶ 11-12. Mr. Herrs testified that the Sign Code advances its stated interests, by "for each district limit[ing] the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter . . . that can become distracting . . . signs by their definition attract your eye in a way to announce, direct attention to or

---

[4] The City requests that pursuant to Federal Rule of Evidence 201, the Court take judicial notice of the municipal ordinance provisions cited in **Ex. J** (with hyperlinks to municipal codes). *North Mill Street, LLC v. City of Aspen*, 6 F.4th 1216, 1221 n.3 (10th Cir. 2021)

advertise does change the character of a sign in relationship to or contrasted to a mural . . . that could have impacts on traffic safety . . . an excessive amount of signage both in terms of number of signs and size of signs, it can . . . become distracting and potentially cause safety problems. It could also damage the aesthetic of the community." **Ex. B** at 121:10-25; **Ex. K** (Dustin Herrs 30(b)(6) Dep.) at 71:9-25, 77:12-21. While the Response claims it disputes Mr. Herrs' quoted testimony, it does not provide record citation that directly refutes these statements. ECF 108 at 14-15, ¶¶ 44-49; ECF 107 at 14-15, ¶¶ 44-49. Rather, it cites generalizations by Charles Taylor, which are rebutted by the Stutts report cited by Dr. Taylor. **Ex. L** (Stutts Report) at 15-16, Table 6 (signs are in one of the highest categories of distraction).

Additionally, industry specific publications, reviewed by Zoning Administrator Dean Andrew, show the City was aware of the history and consensus of how municipalities regulate signs in a content-neutral manner, and set forth anecdotes, history, and common sense to support why the City regulates signs in the manner it does, and how the Sign Code advances its stated interest. **Ex. M** (Dean Andrew Aff.). Testimony from Mark White further evidences the Sign Code is in line with the history, consensus, and common sense of sign regulations as the Sign Code is consistent in practice with the state of the art nationally for how sign regulations interact with decorative building features such as murals. **Ex. M** (Mark White Aff.). Mr. White's report shows the Sign Code falls within the consensus of 21 sign and mural regulations in Kansas and Oklahoma, and the publications cited therein further attest to the history, consensus, and common sense of the Sign Code. **Ex. M**.

The City does not have to prove that regulating any one sign (e.g., the Cozy Sign) actually advances the purposes of the Sign Code. *See U.S. v. Edge Broadcasting*, 509 U.S. 418, 431 (1993) ("the State was entitled to protect its interest by applying a prophylactic rule to those circumstances

generally; we declined to require the State to go further and to prove that the state interests supporting the rule actually were advanced by applying the rule in [a] particular case."). The Sign Code applies in the aggregate, and in that capacity advances the articulated interests.

*Brewer* and *McCraw* do not change the result—they are about time, place, and manner restrictions in a traditional public forum. Both decisions describe the heightened sensitivity that is needed in the public forum context. *Brewer v. City of Albuquerque* 18 F.4th 1205, 1226 (10th Cir. 2021); *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1065-66 (10th Cir. 2020). The Cozy Inn is private property. It is not a "traditional public forum," and therefore *Brewer* and *McCraw* are inapposite. Conventional intermediate scrutiny applies.

Additionally, there is no as-applied challenge for commercial speech regulations. The Response cites *Edenfeld v. Fane* to the contrary, but *Fane* has not been good law on that point for more than three decades. *See U.S. v. Edge Broadcasting Co*., 509 U.S. 418, 431 (1993) (addressing *Fane*, stating plainly that the Court "did not suggest that Fane could challenge the regulation on commercial speech as applied only to himself or his own acts of solicitation."). *Greater New Orleans Broad. Ass'n, Inc. v. United States*, decided in 1999, does not change that result. That case was an extension of *Edge Broadcasting*, and related to a class of speakers (an association of broadcasters and its members), not (as in the instant case) as-applied to one individual speaker. *See Greater New Orleans Broad. Ass'n v. U.S.*, 527 U.S. 173, 176, 180 (1999).

**G. The Sign Code Is Not an Unconstitutional Prior Restraint**

It is undisputed S.C. § 42-502(b) requires a sign permit be issued or refused within ten (10) days after the receipt of an application or within such further period as may be agreed to by the applicant. ECF 108 at 2 (A); ECF 107 at 8, ¶ 7. This meets the constitutional requirements on its face. As applied, it is undisputed the City informed Mr. Howard the Cozy Sign was a sign and was

too big for a permit within the 10-day period—before he even submitted the sign permit application. It is undisputed Mr. Howard started painting the Cozy Sign (or as the Response notes "the display") on November 3, 2023, and that three days later, the City told Mr. Howard to stop painting the Cozy Sign "because it was [the City's] *opinion* that the mural was a sign that was too big." ECF 108 at 4, ¶ 14 and 5, ¶20. It is undisputed the City prepared The Cozy Inn Sign Analysis and gave it to Mr. Howard on November 13, 2023. ECF 108 at 2 (A); ECF 107 at 12, ¶ 29; **Ex. G**. It is undisputed that before Mr. Howard submitted the application, "officials had communicated to Mr. Howard the City's *opinion* that the mural was a sign that was too big." ECF 108 at 5-6, ¶ 22.

Regarding the safeguard of limiting the "licensor's discretion," "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward*, 491 at 793-95 (upholding standards that were "undoubtedly flexible" and required "considerable discretion" of the officials implementing them.") The task of identifying business advertising, is a "very basic test" that is "not unconstitutionally standardless or vague . . . ." *Wag More Dogs LLC v. Artman*, 795 F. Supp. 2d 377 (E.D. Va. 2011), *aff'd*, 680 F. 3d 359 (4th Cir. 2012) (still cited as good law by Fourth Circuit and reasoning right on par with *Austin*—in holding (at 368) that—a regulation is not content based when "officials must superficially evaluate a sign's content to determine the extent of applicable restrictions.").

Here, it is undisputed that the text of S.C. § 42-764 provides that one standard in determining a Sign is whether the display (among other possible things) "advertises." ECF 108 at 3, ¶ 3; **Ex. F** at 5. That standard is constitutionally sufficient. *See Austin,* 596 U.S. at 64-65. The Cozy Sign plainly advertises. *See* Section I, *supra*. It is undisputed that the text of S.C. § 42-764 has additional standards of "announce, direct attention to," and "not located inside a building." ECF 108 at 3, ¶ 3; **Ex. F** at 5. The text of S.C. § 42-637, which defines building, is undisputed.

ECF 108 at 3, ¶ 8. On their face and as-applied, the criteria of the Sign Code do not constitute an impermissible prior restraint. Summary judgment in favor of the City is proper.

**H. *The Sign Code is Not Unconstitutionally Vague***

While "[t]here is little doubt that imagination can conjure up hypothetical cases in which the meaning of these terms will be in nice question . . . because we are [c]ondemned to the use of words, we can never expect mathematical certainty from our language." *Hill,* 530 U.S. at 733 (quotations omitted). Legislators are not held to "an unattainable standard" and "[d]ictionary definitions and old-fashioned common sense" can aid the vagueness inquiry. *Fusaro v. Howard*, 19 F.4th 357, 371-72 (4th Cir. 2021) (citing *Wag More Dogs*, 680 F. 3d at 359).

It is undisputed that the text of S.C. § 42-764 sets forth "used to announce, direct attention to, or advertise" and "not located inside a building." ECF 108 at 3, ¶ 3; **Ex. F** at 5. The text of S.C. § 42-637, which defines building, is undisputed. ECF 108 at 3, ¶ 8. While the Response disputes that Mr. Howard did not read the Sign Code, the deposition cited in the Response states—"Q: Okay. Have you read the Salina sign code? A: No. Q: Okay. And you don't care about reading it, do you. A: No." ECF 108 at 4, ¶ 16-17, (Howard's testimony at 241:4-15). With the use of good old-fashioned common sense, and dictionary definitions if needed, people of ordinary intelligence, who read the definition, have a reasonable opportunity to understand what conduct the Sign Code prohibits. These clear standards do not encourage arbitrary and discriminatory enforcement and summary judgment for the City is proper.

## IV. CONCLUSION

This Court should dismiss this case for lack of subject matter jurisdiction. Alternatively, this Court should grant the City's Motion for Summary Judgment on all claims.

Dated this 14th day of March, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2025, I caused the foregoing **DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| | ) | **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**INDEX OF EXHIBITS TO DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Exhibit A – City's Response to Requests for Admissions

Exhibit B – Dustin Herrs Deposition Transcript Excerpts

Exhibit C – Dean Andrew 30(b)(6) Corp. Deposition Transcript Excerpts

Exhibit D – Dean Andrew Deposition Transcript Excerpts

Exhibit E – Mark White Deposition Transcript Excerpts

Exhibit F – Relevant Salina Code Excerpts

Exhibit G – The Cozy Inn Sign Analysis

Exhibit H – City Commission Meeting Transcript

Exhibit I – Stephen Howard Deposition Transcript Excerpts

Exhibit J – Other Jurisdiction Municipal Code Citations

Exhibit K – Dustin Herrs 30(b)(6) Corp. Deposition Transcript Excerpts

Exhibit L – Stutts Report

Exhibit M – Dean Andrew Affidavit

Exhibit N – Mark White Affidavit

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION<br>CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**<u>DEFENDANT'S RESPONSES TO PLAINTIFF'S REQUESTS FOR ADMISSION</u>**

Defendant City of Salina, Kansas ("the City"), by and through its attorneys Fairfield and Woods, P. C., hereby submits the following Responses Plaintiff's Requests for Admission:

**GENERAL OBJECTIONS**

1. Defendant objects to Plaintiffs' terms and definitions to the extent they attempt to impose obligations beyond the scope of the Federal Rules of Civil Procedure.

2. Defendant objects to each discovery request to the extent it seeks the disclosure of documents or information protected from discovery by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege or immunity. Any inadvertent disclosure of any privileged communication or documents shall not constitute a waiver of the applicable privilege, and Defendant reserves the right to seek return of all copies of any privileged communication.



**EXHIBIT A**

3. Defendant objects to each discovery request to the extent it is vague, ambiguous, overly broad, unduly burdensome and oppressive, irrelevant to the claim or defense of any party, or otherwise not proportional to the needs of the case. F.R.C.P. 26(b)(1).

4. Defendant objects to each discovery request to the extent it contains multiple, discrete subparts. *See* F.R.C.P. 33(a)(1).

5. Defendant's responses are based on a reasonable and diligent search for information and are made to the best of its present knowledge, information, and belief. Because discovery in this matter is ongoing, Defendant reserves its right, consistent with Federal Rule of Civil Procedure 26(e), to supplement its Responses with additional or different information that further investigation or discovery may reveal.

6. The foregoing General Objections apply to and are incorporated into each and every specific Response below, whether or not expressly incorporated by reference. The repetition or omission of any General Objection in the Responses below should not be construed to mean that other applicable General Objections are not being asserted.

**FIRST REQUESTS FOR ADMISSION**

**Requests for Admission Relating to The Cozy's Mural**

1. Admit that the City exempts murals from the mural-sign code regime if the mural's content does not pertain to goods or services being sold.

**OBJECTION AND RESPONSE: The City objects to the use of the phrase "mural-sign code regime" to refer to Salina Municipal Code ("Salina Code"), Chapter 42, Articles X ("Sign Code") or to Salina Code, Chapter 2, Article X ("BID Code"). The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving these objections, DENIED.**

13. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 announces, directs attention to, or advertises.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT. The display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

14. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 exceeds the size limits for signs in the mural-sign code regime.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT. The display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

15. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 was completed without a sign permit.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**Subject to and without waiving this objection, ADMIT, the display qualifies as a pre-existing non-conforming sign under Salina Code § 42-581, which allows the sign to be maintained at its current size. *See* Salina Code § 42-581(b).**

16. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0093 was completed without a certificate of compatibility.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code.**

**DENIED. The display shown in bates number 0095, identified by the words "The Yard" does not exceed the size limits of the Sign Code.**

21. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0095 was completed without a sign permit.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the display on the brick, front façade of the building in bates number 0095.**

**ADMIT. The sign was approved for a Certificate of Compatibility, and the City instructed the applicant to apply for a sign permit.**

22. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0095 was completed without a certificate of compatibility.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the display on the brick, front façade of the building that reads, "THE YARD" and depicts a shape that resembles a home plate, in bates number 0095.**

**DENIED. The applicant applied for a certificate of compatibility and the application was approved.**

23. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0095 has never been cited by the City for violating the mural-sign code regime before November 3, 2023.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the display on the brick, front façade of the building that reads, "THE YARD" and depicts a shape that resembles a home plate, in bates number 0095.**

**ADMIT.**

24. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0100 pertains to goods or services sold.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the**

**Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the multicolor display on the lower portion of bates number 0100, on what appears to be a wing wall that extends from the building.**

**ADMIT.**

25. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0100 announces, directs attention to, or advertises.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the multicolor display on the lower portion of bates number 0100, on what appears to be a wing wall that extends from the building.**

**ADMIT.**

26. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0100 exceeds the size limits for signs in the mural-sign code regime.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the multicolor display on the lower portion of bates number 0100, on what appears to be a wing wall that extends from the building.**

**DENIED. The sign does not exceed the size limits under the Sign Code and the sign has a sign permit.**

27. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0100 was completed without a sign permit.

**OBJECTION AND RESPONSE: The City objects to this request to the extent it refers to a mural as defined by Plaintiffs in their Terms and Definitions, a definition that is not in the Salina Code. Subject to and without waiving this objection, the City responds to this request to the extent it is referring to the multicolor display on the lower portion of bates number 0100, on what appears to be a wing wall that extends from the building.**

**ADMIT. The sign was completed without a sign permit, however, a sign permit was subsequently issued.**

28. Admit that the mural depicted in Plaintiffs' Initial Disclosures, bates number 0100 was completed without a certificate of compatibility.

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 1:00 p.m. on the 12th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.



EXHIBIT B

**Q. Do you recognize those photographs?**
A. I do.
**Q. Do those photographs depict The Yard?**
A. Those photographs are murals inside or facing the inside of building -- building B, if I remember right from the site plan. Yes, building B.
**Q. What building are those murals painted on?**
MS. JOKERST: Object to form and foundation.
A. They are painted on the south side of building A and facing inward to building B.
BY MR. SHAW:
**Q. Okay. Are they inside of building B?**
A. Yes.
MS. JOKERST: Object to form and foundation, but you can answer.
A. Yes.
BY MR. SHAW:
**Q. How are they inside of building B?**
A. So the north edge of building B is the south wall of building A.
**Q. Would you look at the first photo, No. 95 at the bottom. You're saying that the south wall**

same sign allowances as other people in downtown central business zoning district, which is our C-4 zoning district. People in the C-5 zoning district are allowed the same sign allowances as other people in the C-5 district. People in residential zoning districts are allowed to have the same sign allowances as other people in residential zoning districts of that same district.

**Q. And I want to speak specifically to sign clutter. How does regulating signs in the aggregate advance -- prevent sign clutter?**

MR. SHAW: Objection.

A. If signs are not regulated in the aggregate, you could have one sign that's larger than others. Then other people get larger signs. And if you get a whole bunch of signage, an excessive amount of signage both in terms of number of signs and size of signs, it can lose its effect and become distracting and potentially cause safety problems. It could also damage the aesthetic of the community, the quality of life of the community. And so the goal of the sign regulations is to permit and allow ample amount of signage for each property while still establishing

**Q. Okay. And I want you to look at the top of this photo that's Bates marked 91 on Exhibit 32. Can you describe the structure that's at the top of that photo?**

A. When you say the top, are you talking about the roof structure of the field.

**Q. Yes. Yep. So is that a roof?**

A. Yes.

**Q. So is this infield area covered?**

A. Yes.

**Q. Is this infield area enclosed?**

A. It's covered. It's not enclosed because there's not walls all the way around it.

**Q. Okay. Well, let me ask you -- let's look at -- I want you to look at the top page, that 95. Do you see that page, that photo?**

A. Yes.

**Q. Is there a pubic entrance from the street? Can you just walk off the street into that infield building?**

A. In that sense, no.

**Q. Okay. So is there a structure that is enclosing the infield?**

A. Yes.

**Q. Okay. What is that structure?**

A. There's fencing and netting and a rooftop that encloses the structure, surrounds the structure.

**Q. And looking at the structure on 95, is that permanently affixed to the ground there?**

A. Yes.

**Q. Okay. And is this enclosure here on 95, is that intended to enclose people who are in that infield area?**

A. Yes, people and balls, baseballs, softballs.

**Q. All right. And let's go back down to that last page, I think it's 301, the last page, page 5 on Exhibit 32. And earlier you mentioned if you kind of look down like if you're looking straight down, it looks like there's a wall right there. Do you see that?**

A. I do.

**Q. Okay. And is that the vestibule?**

A. Vestibule, yes.

**Q. Vestibule. I hate that word.**

A. That's how you -- that's how you transition from building A to building B.

**Q. Got it. Okay. So is that touching building B?**

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT C**

**Exhibit 22. Are you familiar with the images in Exhibit 22?**
A. I am.
**Q. Do these images depict a former business known as Original Grande?**
A. It does.
**Q. Has the city made a determination about whether the murals depicted in these images constitute a sign?**
A. We have.
**Q. And what determination did the city make?**
A. The city made a determination that this and the companion on that wall are regulated signs.
**Q. And what methodology did the city use to make that determination?**
A. We determined that they were outside of a building, they were attached to a physical structure and they announced, directed attention to and advertised.
**Q. What about the murals announced, directed attention to or advertised?**
MS. JOKERST: Object to form.
A. They declare a fact or an occurrence or an event or an entity that is occupying that

**Q. Where is that mural located?**
A. It's on the south wall of the Schlotzsky's sandwich shop.
**Q. And has the city determined that the mural depicted here is a sign?**
A. Yes.
**Q. When did the city make that determination?**
MS. JOKERST: Object to scope.
A. I can't tell you the exact time. I can tell you it was determined when the city became aware of it and went out and reviewed it. It determined it to be a regulated sign and contacted the owner of the business and the owner of the property to say that they needed to obtain a sign permit for that sign.
BY MR. SHAW:
**Q. What portions of this mural did the city consider to be triggering the sign code?**
MS. JOKERST: I'll object to form.
A. The city determined it to be a single composition and determined that the entire visual display was a sign.
BY MR. SHAW:
**Q. How did the city come to that**

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:02 a.m. on the 30th day of September, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

.

**EXHIBIT D**

required a sign permit for.

**Q. Okay. And is that because it's an advertisement?**

A. It is announcing, directing attention to and advertising the Army Recruitment Center.

**Q. So it's doing all three?**

A. Yes.

**Q. Okay. What about a church or other house of worship? They put up a display saying services Sunday at 10 a.m. Is that a sign?**

A. Yes.

MS. JOKERST: Object to form.

BY MR. SHAW:

**Q. Is that because it is announcing?**

A. It is announcing to the public that they are worship -- place of worship and letting the public know when they meet.

**Q. Okay. What if that same church displayed a message that said turn to Jesus. Would that be a sign?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. SHAW:

**Q. Okay. Why is that?**

A. Well, you just described it as a -- they

would put up a structure, whether it was a banner or whether it's permanent sign, that would be something that is announcing, directing attention or advertising.

**Q. What would they be advertising?**

MS. JOKERST: Object to form.

A. They would be advertising their desire for the public to turn to Jesus.

BY MR. SHAW:

**Q. Okay. In subsection 3 where it says is not located inside of a building, what is considered a building under this section?**

A. A structure that meets the definition of building in the zoning ordinance.

**Q. Okay. Would you please turn to the section defining building?**

A. Appears to be 42-637.

**Q. All right. And does that define a building as any covered structure built for the support, shelter or enclosure of persons, animals, chattels or movable property of any kind and which is permanently affixed to the land?**

A. That is the definition that's in the zoning ordinance.

**Q. All right. What is the support, shelter**

foundation.

A. According to the rules of construction of our city code, or and and are interchangeable, so I can't make that determination.

BY MR. SHAW:

**Q. Do you no where in the city code that is placed?**

A. In the rules of construction.

**Q. I see. So and and or are interchangeable?**

A. They can be, yes.

**Q. They can be or they are?**

A. Code says they can be.

**Q. How then is someone to know if it means and or or?**

MS. JOKERST: Object to form and foundation.

A. You have to look at the context in which its used.

MS. JOKERST:

BY MR. SHAW:

**Q. All right. In subsection 2 there, for instance, do you see the and after the semicolon?**

A. Yes.

**Q. Does that mean and or or?**

MR. MARTIN: Section 1-2.
MR. SHAW: Thank you.
BY MR. SHAW:
**Q. All right. For lack of any better way to do this, I'm just going to show you my computer real quick. Subsection 14 here of Section 1-2, is that what you were referring to in the rules of construction?**
A. Yes.
**Q. All right. And so with that now in front of you, how can you determine in the definition of a sign whether that is an and or an or?**
A. It is interpreted as to whether the sense requires it to make sense of the code section.
**Q. And how do you make sense of the code section such that you can make a definitive determination if it is an and or an or?**
MS. JOKERST: Object to form.
A. I look at how the code is constructed.
BY MR. SHAW:
**Q. So what about how the code is constructed makes you determine the usage of and and or in the definition of a sign?**
MS. JOKERST: Object to form.
A. Because none of the three could stand on

**operations in 1984, the existing signage is in violation of Section 42-510 of the Salina City Code and must be removed?**

A. I do.

**Q. Why was the signage that this letter is referring to considered abandoned under 42-510?**

A. Because this building was formally occupied by the Treasure Chest Antique Shop which is no longer occupying the premises.

**Q. But the Bull Durham mural that we just looked at is not abandoned because it is a off-premise sign. Is that the position of the city?**

MS. JOKERST: Object to form.

A. It was not ever associated with a business that sold that product at that location.

BY MR. SHAW:

**Q. I see. Please go to Exhibit 17. Are you familiar with that image?**

A. Yes.

**Q. Is that depicting a business known as Sharp Performance?**

A. It is.

**Q. The mural that is depicted there, do you know if a sign permit was ever obtained for that?**

A. There was.

.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF

MARK WHITE,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 31st day of October, 2024, at Kansas Justice Institute, 12980 Metcalf Avenue, Suite 130, in the City of Overland Park, County of Johnson, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

**EXHIBIT E**

**Q. How about anybody from your firm?**

A. No.

**Q. Were you involved in drafting any of Salina's codes?**

A. No.

**Q. How about anyone from your firm?**

A. No.

**Q. After reviewing your report, I see that there are some selective publications that you have authored. Did you write an article for the Sign Research Foundation in 2022?**

MS. JOKERST: Object to form.

A. Yes.

BY MR. MACROBERTS:

**Q. In your report, you said it's prepared by S. Mark White. Do you also go by Mark White?**

A. Yes.

**Q. I have in the packet Exhibit 3, if you could take a look at it.**

A. Okay.

**Q. I'm assuming you wrote this, but did you write or author Exhibit No. 3?**

A. Yes.

**Q. Have you -- did you review any of the exhibits attached to the complaint in preparation**

**about the limitations. So my question to you is do you agree that there weren't control groups for this?**

MS. JOKERST: I'll object to form again. It's not a complete copy.

A. Yes. And I don't know because I don't know what the context of control groups is. They may have discussed that earlier. There may be different kinds of control groups. I just don't know.

BY MR. MACROBERTS:

**Q. So as you're sitting --**

A. Without reading the whole report, I would not know.

**Q. Got it. As you're sitting here right now, though, do you know whether that asphalt art report had control groups or not?**

A. Not off the top of my head.

**Q. We're going to go back to the report, and I think this is going to be fast. We're going to go back to your publication, not report, publication, Exhibit No. 3.**

A. Okay.

**Q. You agree that your publication is a reliable authority?**

MS. JOKERST: Object to form.
A. Yes.
BY MR. MACROBERTS:
**Q. All right. On page 14, you wrote while this does not require a compelling interest, the local government has the burden of proof, and bans on speech that target truthful, non-misleading commercial messages are unlikely to survive immediate scrutiny. Do you see that?**
A. Yes.
**Q. Did I read that correctly?**
A. Yes.
MR. MACROBERTS: I have no other questions.
MS. JOKERST: I have some follow-up.
CROSS-EXAMINATION
BY MS. JOKERST:
**Q. All right. We'll actually just stay here, Mr. White, on Exhibit 3.**
A. Um-hum.
**Q. And you were asked a little bit about -- I'm looking here, the pointers. There was some pointers on this. I'm trying to find the page here. So page 15.**
A. Um-hum.

## Sec. 42-500. Purpose.

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882, § 1, 7-10-17)



**EXHIBIT F**

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

## Sec. 42-521. C-3 and C-4 commercial districts.

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

### Sec. 42-637. Building.

*Building* is any covered structure built for the support, shelter or enclosure of persons, animals, chattels or moveable property of any kind, and which is permanently affixed to the land.

(Code 1966, § 36-1301(21))

## Sec. 42-764. Sign.

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

# The Cozy Inn Sign Analysis

**<u>Sign Definitions</u>**

**Sec. 42-764. Sign.**

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
(2) Is used to announce, direct attention to, or advertise; and
(3) Is not located inside a building.

**Sec. 42-768. Sign, business.**

*Business sign* is a sign which directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

**Sec. 42-781. Sign, wall.**

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

**<u>C-4 Sign Regulations</u>**

**Sec. 42-521. C-4 commercial districts.**

The following sign regulations shall apply in the C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:
   a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.
   b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

**EXHIBIT G**



*Document Prepared by the Community and Development Services Department on 11/09/2023*

EXHIBIT
G
Benson Deposition

**CITY000001**

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height.* Ground/pole signs may not exceed thirty (30) feet in height above grade. Projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

**<u>The Cozy Inn Information and Background</u>**

The subject property is legally described as the West 44.4 feet of the South 20.8 feet of Lot 103 on Seventh Street in the Original Town (now City) of Salina and addressed as 108 North 7th Street.

The subject property is owned by Steven Howard, he is also the owner and proprietor of the business within the building known as The Cozy Inn. The Cozy Inn Restaurant was one of the earliest known prototypes for a fast food “Hamburger Joint” in the State. The small diner-type restaurant has operated continuously from this location since opening in 1922. The utilitarian commercial building is one story and constructed of masonry with a white-painted stucco finish. Its most recognizable feature is a trademark red neon sign that hangs above the front façade on North 7th Street. The original 1922 interior, with grill, bar and five stools remains relatively intact. The restaurant and its simple hamburger and soda fare have gained notoriety over the years and have become a community icon.
The Cozy Inn occupies a property that is 20.8 feet in width and 44.4 feet in depth facing N. 7th Street. The property lines coincide with the building’s exterior walls. The restaurant is bounded on the south by the old Public Utilities Building, at 110-120 W. Iron, and on the north and east by a six foot walkway and City Parking Lot 6A. The parking lot with

landscaping, lighting and service areas was constructed by the City in 1986 as part of the Downtown Revitalization project.

In 2003, the DRB approved a Certificate of Compatibility (5-0) for the design and location of the new walk-up window, awning, signs, lighting and bench. Because the off-premise seating area would occur on public property, the DRB could only make recommendations regarding the proposed seating area. Other locations for the seating area where also evaluated. The DRB voted (5-0) to recommend to that a License Agreement be approved with The Cozy Inn to allow an outdoor seating area along N. 7th Street. The Salina City Commission approved a License Agreement with The Cozy Inn on **August 11, 2003** which authorized The Cozy Inn to utilize the 50 ft. planter area along the east side of North 7th Street as an outdoor seating area.

In 2022, the DRB approved a Certificate of Compatibility (5-0) for the installation of a new awning on the west façade of the Cozy Inn building. The awning included a 4.88 sq. ft. sign on it.

**Existing Conditions**

Current Allowable Sign Area: 21 ft. x 3 sq. ft. = 63 sq. ft. of allowable sign area and four (4) total signs allowed.

Current Signage:

1. North facing wall sign: 24.00 sq. ft.
2. 7th Street projection sign: 24.00 sq. ft.
3. 7th Street awning sign: 4.88 sq. ft.

Total Sign Area: 52.88 sq. ft.

The Cozy Inn has the ability to install a fourth (their limit is 4) sign with no more than 10.12 sq. ft. of area.

**Proposed Hamburger Sign Analysis**

The proposed hamburger sign on the north wall of The Cozy Inn is approximately 528 sq. ft. This would put The Cozy Inn in noncompliance as it would have approximately 581 sq. ft. of total sign area which is 518 sq. ft. over the allowable sign area.

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 1 of 44


Exhibit A

SALINA CITY COMMISSION MEETING

held on

November 13, 2023

Excerpt Transcribed by

AVANELLE L. SULLIVAN

for Dolginoff & Associates, a
Registered Professional Reporter
Certified in Kansas and Missouri.

**EXHIBIT H**

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 2 of 44


APPEARANCES

CITY MANAGER:
Mike Schrage

VICE MAYOR:
Bill Longbine

CITY ATTORNEY:
Greg Bengtson

CITY COMMISSIONERS:

Greg Lenkiewicz
Trent W. Davis, MD
Karl Ryan

DIRECTOR OF COMMUNITY AND
DEVELOPMENT SERVICES:

Lauren Driscoll

(ph) indicates a phonetic spelling.

[sic] indicates the text is as stated.

Quoted text is as stated by the speaker.

(The excerpt of the proceedings commenced.)

VICE MAYOR LONGBINE: That brings us to Citizens Forum.

MR. SCHRAGE: If I may -- I need to make sure my microphone is on.

VICE MAYOR LONGBINE: Oh, you have other business?

MR. SCHRAGE: Right.

VICE MAYOR LONGBINE: I was going to skip that.

MR. SCHRAGE: So I have a -- I would like to give you some background on an issue that I'm sure you're aware of that became a topic of conversation over the last week. And that is the Cozy Inn artwork and mural/sign that's been initiated on the -- I guess it would be the north side of their building. So I have some background information for you.

I would tell you that I think staff made first contact with Mr. Howard, who's here on -- the owner and operator of Cozy's is here. Made first contact with him last week and then we met with Mr. Howard and his artist this morning and kind of walked through the

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 4 of 44


same information that I'm going so share with you at this point.

So -- and it started by acknowledging -- and I understand it's become an emotional issue for some and has been a hot topic of conversation in social media and the radio.

I want to give Mr. Howard credit. He's adamant that that wasn't his doing, that wasn't his initiation, that wasn't his intent. But it did start, you know, kind of a community conversation.

So I want to clarify a couple of things right off the top. The issue is not about the art. The issue is not about the artist. I think there were some comments made that the artist hadn't been approved or the art hadn't been approved. And that's really not what -- what's at play here.

I would tell you as well that there are examples of very similar issues as it relates to what constitutes art, what constitutes a sign, how does free speech get involved, how can signs and art be regulated.

That is a difficult issue that's

playing itself out coast to coast, so not necessarily unique to Salina. The important distinction here relates to commercial speech and our ability to regulate commercial speech or signs and then specifically how we do that by way of our -- the codes that we have in place.

I won't go into great detail, but there's a U.S. Supreme Court case that provided us clear direction, provided the nation clear direction, that sign regulation has to be content neutral. And I think some of you are on the planning commission, and the city commission as we worked our way through that a couple years ago trying to modify our code to be sure that we met that content neutral requirement. So.

And that's important in that we don't get to look at a sign and what it says and what it looks like. We just need to have codes that apply across the board, regardless of any specific content parameters. And so --

And there certainly is a misunderstanding between art and signs and commercial speech. And I would acknowledge

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 6 of 44


that signs can be artistic, some more artistic than others. This one in particular is very artistic in terms of kind of the theme and where it's headed with the image.

So despite all the emotion and kind of the confusion surrounding it, we do not regulate based on content, aesthetics, the particular business in question nor social media or a petition process. We just have to administer based on the codes that are in effect.

Our codes in this particular case have been in effect since 1966. It doesn't mean that they can't be changed, but the codes that we currently have, have been in effect since 1966 and we regulate based on size.

So by zoning category, that then dictates, kind of, the mathematical formula that gets applied that then determines the maximum size of signs in total, not just an individual sign, but kind of the aggregate size of those signs that's allowed.

And I am going to call on Lauren Driscoll to walk you through the specifics as it relates to Cozy's. And so that, then, kind

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 7 of 44


of sets size limits in proportion to the building or more specifically the building frontage.

So in this particular case, Cozy currently has three permitted signs, and they use up 84 percent of their allowable space by our current code. The proposed sign, in combination with those other three signs, would put them at about nine times the allowable size. So it really becomes a function of the size of that artwork and signage relative to our current code provisions.

In terms of possible next steps, we discussed these with Mr. Howard and his artist. First and foremost is submitting a sign application, so we have the specifics of what they intend and we can take a look at that relative to the code.

But we do know just from what's on the sign and the renderings that have been shared, it's going to be more than just submitting an application for approval. We do have a disconnect between what they intend and what our code currently allows.

A couple of other options that are just generally available in the zoning code are applying for a variance or proposing a code amendment. We discussed the variance process, and there is a statutory set of criteria that the board of zoning adjustment has to reach findings on all five of them, that they're met.

And that makes it a little -- makes it problematic in terms of this particular instance. It has to be unique and -- there has to be something unique in terms of an insurmountable challenge or something that the code might not have taken into account. There has to be an undue hardship -- some of those standards are pretty high bars.

And we told Mr. Howard, we are not saying you can't apply for a variance. We're not saying what the outcome might be. But knowing what we know about kind of that criteria and our history, it doesn't seem likely that a variance would be granted.

In fact, staff shared that our only knowledge of a sign variance that has been approved relates to a location where the

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 9 of 44


ground falls off so quickly from the roadway, that it had to be allowed to be taller than the code might have allowed just to get in a normal scale relative to the driving surface.

The other option, the code amendment, we have a process whereby someone can make application or request a code amendment. Looking at it in first blush, probably to accommodate what's being -- what Mr. Howard desires, we need to increase the allowable square footage nine to 10 times what our code currently says or we would need to come up with some allowance to cover an entire -- a wall pretty much in its entirety or possibly even all four sides of the building in its entirety.

And that starts to get very customized, very detailed. And the key factor there is, it has to be applicable across the board. We can't -- we're not in a position to create a carve-out specific to a particular business.

And so whatever we come up with would need to allow the proposed sign. It would need to apply equally to others in a similar

situation, again, regardless of its content, regardless of its aesthetics, regardless of the specific business.

And I would reiterate, it's all on the basis of a commercial message. So while we may have one sign that feels much more artistic than another, these size limits could just be pricing and a more typical business sign text than kind of an art -- artistic flair.

I don't -- I think it's lost on you; that's a pretty significant policy decision. It's going to take some work. We will -- we're prepared to staff that through in terms of code drafting, running it through the necessary committees for recommendation. But then it ultimately would end up back at the city commission level for consideration of an amendment to our code.

As I said, we're -- we're definitely willing to do that. It won't be quick. I think there is a lot that we might be able to learn from other communities, and if they've been able to find a creative way to come up with codes that kind of address the balance

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 11 of 44


that we're trying to strike here.

Part of the conversation will be while -- while it may be acceptable in this particular location, does it open it up for other locations. And so we would need to provide -- spend some time kind of looking at all the possible scenarios so that the planning commission and the city commission have a good understanding of what that code change might allow.

And so we have learned -- had some contacts and planning. And we'd already identified the need to take a look at this and had it on our plan of work for 2024. It wasn't necessarily on the plan of work for the coming week or before year end, but she is aware of some planners that specialize in this. Reached out to one of them last week to try to see if we can expedite some of that conversation.

We're hoping to have a proposal back in the next week or two. But the preliminary conversation -- Lauren can speak to this better than I can -- is their schedule is such that their -- even if we engaged them and can

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 12 of 44


get something in place, it's probably a couple months out before they're able to, you know, work on our specific project.

The last thing that I would say -- then I want to turn it over to Lauren, and then I know Mr. Howard is here as well -- is part of the conversation we had with the artist and Mr. Howard this morning was last week, staff's contact with him was not intended to be enforcement, per se, with a violation citation, but just agree to pause on proceeding with the project until we can sort through the codes, until we can have the conversation we had this morning.

I think that's still a possibility. The artist indicated this morning their preference was, they washed the building in preparation for painting. They don't necessarily want to leave it half finished. And if it's going to take into the spring before they have an answer, their preference is to paint it white and just prep it to start over again.

So. That's certainly probably the cleanest way from a code standpoint. But that

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 13 of 44


wasn't something that we said that they necessarily had to do.

With that, what I'd like to do is give Lauren an opportunity to walk you through the math and the code provision specific to the Cozy sign as a little bit of background.

MR. HOWARD: Can I just say --

MR. LONGBINE: Well, now, let Ms. Driscoll -- let Ms. Driscoll bring the code.

MS. DRISCOLL: Are you sure?

VICE MAYOR LONGBINE: Yeah. No, you don't need to leave, Mr. Howard. We just got procedure here.

MR. HOWARD: Okay.

VICE MAYOR LONGBINE: Go ahead, Lauren.

MS. DRISCOLL: Jacob, if you wouldn't mind popping that analysis up. Staff learned about the sign late on Sunday night, contacted Mr. Howard Monday morning and just asked if we could have -- if he could pause in -- in the creation of his sign so that we could get a chance to look at it.

Without an application, we had no measurements, things like that. Needed a

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 14 of 44


chance to look at it. And could already see on social media a lot of people had already seen it, loved it, wanted more of it.

So we also looked and needed a little time to research to see if there are any exceptions to -- somebody asked us if really, you know, institutional-type buildings get an exception to sign codes. How -- how do you give that kind of variance. Did some research -- that's why we asked for the pause so that we could meet with him this morning.

MR. SCHRAGE: Sorry to interrupt, but just to clarify. Sunday -- not yesterday --

MS. DRISCOLL: Correct.

MR. SCHRAGE: -- Sunday, the week prior.

MS. DRISCOLL: Right. Sunday before. But without a lot of details, staff needed just a little time to do some research, which is what we had asked him and he said that that was fine.

As part of some of that research, also quick -- did a side analysis. This is typically something we would do when we would get a new sign permit in the door. In this

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 15 of 44


case the question is, is it a sign.

If you look at our definition of a sign, a sign is anything in writing including letters, words and numbers -- there are letters involved in this application -- or in this particular sign -- pictoral representation. This includes illustrations or decorations; that is also part of this sign.

And these are calculated to attract the attention of the public or any figures, similar in character which, one, could include being painted on -- so they are painted on to the wall; two, used to announce, direct attention to or advertise something. It's welcoming you to come into the building -- that's part of the sign -- and is not located inside the building. It is of course on the exterior side wall of the structure.

So from that pure definition, this starts to tick all the boxes that make it a sign, before we even get into a discussion of commercial speech, noncommercial speech.

When we look at sign regulation, we go to the sign code, which is in the city

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 16 of 44


zoning code, Chapter 42. And then we look at what zone the property falls into.

So I've gotten quite a few calls over the last few days of people asking, well, what about that one? What about that sign? What about that sign?

Well, they're in different zoning districts. So the rules are going to be different for those.

This particular property is in C4, which is the central business district downtown. And beyond things that are typical to any zoning district, identifying functional types of signs, structural permits, numbers of signs, most notable by most people when it comes to signage is the maximum gross surface area. So how big can the sign be.

We also do a collective surface area. So you can have a couple smaller signs that could equal that full surface area amount of signage. So, for instance, in the downtown, you can have 3 square feet of signage for every foot of frontage.

Well, the Cozy building is a very little building. It only has 20.8 feet -- so

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 17 of 44


let's round it up to 21 -- even to 21 linear feet of frontage. So if we take 21 times 3, you get 63 square feet.

So by the time we take their north facing wall sign, which is 24 square feet, their 7th Street projecting sign, which is 24 square feet and then their 7th Street awning sign, which is another 4.88 square feet, you get 52.88 square feet, leaving us just over 10 square feet of remaining surface area of signage allowed for the building.

In Cozy'a situation, if you take the sign that's on the side of the building and you do the square footage analysis on that, it's approximately 528 square feet, which is significantly greater than the allotted amount in the C4 district. So that's really the challenge here.

And I would love to say from the staff perspective, if there was one line that I could change and make this simple, I really would. But one of the things that makes the downtown unique is there's kind of a domino effect; right? We have a lot of different shaped buildings. We have very limited or no

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 18 of 44


setbacks in many situations.

So how the buildings work together, the scale of messaging, of signage, really does matter in that environment. Plus the C4 is also very pedestrian focused.

Where, for instance, you know, driving down 9th Street, that's not a pedestrian environment. But everything in the C4 is scaled for both car and people. So that also has to do with some of our sign regulations and kind of how they came to be.

So we did have this conversation with Mr. Howard this morning. We kind of saw this coming, the excitement of all the art with Boom Festival has gotten people looking at blank walls differently. But that doesn't necessarily change the definition of a sign.

Even if we changed our definition, we still have to be mindful of kind of what the Supreme Court decisions have done to reflect that sign code and how murals and signs can exist cohesively in a community.

And it takes a bigger, broader conversation. So we had planned to start that this spring knowing we had a lot of creative

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 19 of 44


minds wanting to share, but also wanting to get everybody on the same page of what the outcome would look like.

In reaching out to specialists -- and I will say, if we could do this in-house right now, I would. But this is a very unique and specialized area of code. It also, in order to do it in a time efficient manner, you kind of need to -- this needs to be your -- your thing.

It's kind of like when you hire a specialist, a subject-matter expert to do something. They can do it quicker than other people. You know, that's -- that's their system or that's the tool that they always work on.

And we want this done in a timely manner. Clearly it's kind of come to a precipice where people are noticing this. And I do think bringing a subject matter expert in -- a couple of them that I've talked to said, you know, two, three months they could have a good public process that lets everybody have a chance to speak on this, to find code that will work in the community and get

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 20 of 44


something to bring forward to you all.

So I think that's pretty reasonable. I'm hoping they can start January, February at the latest. But I do think that this is a situation in which it would be reasonable to get somebody who could really kind of help us move this along in addition to everything else we got going on.

MR. SCHRAGE: And if I could add one thing to that. In addition to being the subject matter expert, I think this a really good example where it's going to take some creativity on our part. It's going to take some balancing of considerations.

And someone that's been in these similar conversations in multiple communities and facilitated, you know, kind of public discussions about that I think can add a lot of value versus us just kind of working in a vacuum trying to figure this out from scratch.

MS. DRISCOLL: Well, and they're going to have to turn visual materials around quickly. I mean, in amongst everything that's coming in and out of the office every day, somebody stopping, and every time we talk

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 21 of 44


about a scaling of something or, you know, how -- how a different change in rules would look, you're going to need to kind of create new visuals to go over with the group to say, okay, well, that's what it looks like here, that's what it looks like here and that's what it looks like here in the C4.

Is that what you were hoping this rule change would do? And so people are going to have to see those visuals. And somebody being able to produce those in a timely manner is also part of kind of what helps move this along, rather than staff in amongst phone calls and other day-to-day things, trying to produce those materials, plus research code, plus rewrite and do all of those others things.

MR. SCHRAGE: So we -- in what little time we have had, we brainstormed a little bit about, okay, what's unique about that location. Could it be acceptable.

And I think the conversation was not just absolute objection to it, but it then quickly becomes, well, how do we write something that that's acceptable but it

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 22 of 44


doesn't expand beyond what the community might have in mind for other building faces in the downtown.

I think we can get there. But I do think an outside subject matter expert could certainly help us.

COMMISSIONER RYAN: Well, I would agree you're taking the right approach to dive in, given the proliferation of mural art everywhere -- and it seems Salina is really interested in that, we're kind of ahead of things in trying to develop that.

But I'm -- yeah, I would be anxious to hear what the better brains are doing with that. Because I can understand the city's point of view of --

I mean, if this code is as old as 1966, it deserves to be reviewed in this modern concept. Because I can see dividing a signage like this -- I mean, look at any Apple ad in the world that -- it's very much art but still a portion of it communicates the commercial message.

I could see much of the mural part be considered art, and then focus on the actual

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 23 of 44


portion that's the message as the commercial aspect. So a fine line there between artistic minds and people that administer code, so.

MS. DRISCOLL: And I think representation is one thing also that you'll see when you read case law about this is, expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction when the -- I'm going to use the coffee house for instance. This is actually from a Supreme Court case.

If the coffee house has a dove with an olive branch and it says the word "peace" on the side of it, that -- that's not a sign. Because even though the word "peace" is there, you're not selling peace inside. I mean, coffee may do that for some people.

But in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction.

Where if we had a steaming cup of coffee and a coffee pot on the side, those are

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 24 of 44


things that draw you in to the use of that building. Even without a word, that illustration can suggest that commercial transaction.

There's actually case law example of a mural, which is actually a sign, of a bunch of puppies playing in a field. It's across from a dog park. And the mural happens to be on a building that is a doggy day care. Never said a word. But it's dogs; they do doggy day care. That was deemed commercial signage.

VICE MAYOR LONGBINE: I think it's -- go ahead.

COMMISSIONER RYAN: I'm sorry. I was just kind of following up on my -- are there communities that have public boards or entities that decide what's an artistic aspect and what would be a commercial? I mean, that seems very hard to me to distinguish in given instances.

MS. DRISCOLL: I do. I think that is one of the biggest challenges. I think part of what we have to focus on is really location, size, and scale of signage and work from there, rather than what is the content or

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 25 of 44


does it look like art, does it feel like art. Because that's definitely where we get into the trouble zone. And that's definitely where, you know, cities that try to regulate to that messaging side of things typically end up getting sued.

MR. SCHRAGE: Yeah. You probably recall time, place, and manner is a typical refrain of, well, you can relate. And then Reed v Gilbert is another U.S. Supreme Court case that very clearly makes it known that you're not supposed to regulate based on content. So.

MS. DRISCOLL: But the other option is we may end up having to have a process for the murals. So it's like if you can't say this is one thing, do you identify the others? I mean, that's part of the conversation I think needs to be had.

Sometimes saying something isn't something -- maybe you need a process to identify what something is. So. I think there's some different things we have to look at.

COMMISSIONER DAVIS: Just from a

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 26 of 44


definition standpoint, if this same painting was, let's say, on the side of one of the grain elevators, downtown, away from where it is now, would it -- then be considered commercial -- commercial signage?

MR. SCHRAGE: And the reason I laugh, is now we're into off-premise signs. There are -- there is signage that's not on a -- at the actual business location that directs attention elsewhere.

COMMISSIONER DAVIS: Yeah, I kind of remember that discussion from --

MR. SCHRAGE: So --

COMMISSIONER DAVIS: Okay. I'll withdraw that question.

MR. SCHRAGE: But it -- you know, there's a lot of what-ifs. There certainly is a circumstance where a steaming cup of coffee on the side of a coffee house is a sign and a steaming cup of coffee on the other side of town unrelated to anything going on might not be a sign.

You know, as we -- as we looked at murals, we had some conversation about this very question. And the first reaction was,

well, if it includes lettering, or if it includes wording.

But it really -- if the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier.

COMMISSIONER DAVIS: Case in point being the Target logo. You know, some of the buildings, they don't even put the word "Target" on it.

MR. SCHRAGE: Right.

COMMISSIONER DAVIS: They just have --

MR. SCHRAGE: Well, Lauren's made the example in prior conversations, the gas pump and the different icons that you see on directional signs on the side of the interstate. No words, but it's still conveying a message.

VICE MAYOR LONGBINE: Well, I think if this had been anything other than a 101-year old historic institution, it wouldn't be an issue.

And, you know, I'm sorry Mr. Howard wouldn't stay and join the conversation here.

But I really believe if he intended to get in on the whole mural trend -- and it is -- you pointed out well the distinction between art and murals and commercial sign.

So I guess my thoughts all along as I've studied this issue is what would it take for him to turn this into a mural rather than a sign.

MR. SCHRAGE: So as I prepared my overview, I shared it with legal counsel to just make sure I wasn't saying anything incorrectly. And as might be expected, they responded two to three levels deeper in terms of legal analysis and court cases.

And I say all that because we end -- that ends up being a legal question of, if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign.

And then the added difficulty is -- and there's examples in court cases of this as well -- as soon as you start that treatment, whatever it might be, for one intended

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 29 of 44


location or purpose, then the expectation is, I'm the same as them. I deserve the same treatment.

And that's the precedent-setting nature that we have to really pay attention to as we revise the code.

COMMISSIONER DAVIS: Then I think the other flip side of that is, you know -- and I do -- I did drive by and it's a really nice drawing. But we don't spend our time regulating things that we like. Our codes make us be impartial when we have to deal with things that we don't like.

And if everybody in town liked it, we'd probably push it through and -- but the next time -- you know, this may be a poor example to use. But, you know, if a sexually explicit supply store wanted to come by and they had, you know, pictures of their paraphernalia on the side of the building, judging from comments during our last election, a lot of folks would be upset over that.

Or if we had same-sex couples, you know, with a rainbow picture on the side of

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 30 of 44


the building saying, you know, Salina, friendly to the LGBTQ community, folks -- you know, we'd have folks coming up on the other side saying, well, how can you allow that? I mean, that's clearly a sign.

So, you know, whatever we do, it's got to be something that will stand the test, no matter who's coming up to the podium. And it makes it more difficult -- I think it's a beautiful sign, but.

And I've said it before, we have rules for a reason. There are times -- you know, if a rule always has to be overridden or we give exceptions, then there's probably something wrong with the rule.

But we even need to look at finding a way to change the rule. But, again, you know, you have to understand that someone else that you don't like may come by and use that same -- same rule.

MR. SCHRAGE: All right. So building on that hypothetical just a little bit, without additional clarification, allowing one building to have 100 percent of the side wall as a sign, we -- you could do your frontage on

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 31 of 44


Santa Fe, a hundred percent a sign.

I don't think that's the intent. And that's -- those are the kind of things that when we make a code amendment, we need to parse out so that we don't have unintended consequences.

COMMISSIONER DAVIS: And, you know, if we wanted to have a sign frontage district, you know, where the front of every building had to be a sign, you know, so it looked like you weren't going into a store but you were going into a sign, we could do that. I mean, what is it -- which city in Texas is Weird -- Austin?

MR. SCHRAGE: Keep Austin Weird.

COMMISSIONER DAVIS: Austin and Portland would probably take objection to us stealing their fun. But, again, that just has to be the nature of that particular district.

MR. SCHRAGE: It's not lost on staff, this is a result of the enthusiasm and the energy that is the mural festival. And speaking with Mr. Howard, I'm confident that he viewed it as his mural and didn't make a distinction between it being a sign in our

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 32 of 44


estimation and it being a mural.

And I have vague knowledge to the artist, that -- his artwork is high energy. You know, it -- it pops. We just got to find a way to balance that with the sign code.

VICE MAYOR LONGBINE: Well, I think we should be able to work through this without bringing in outside consultants. It shouldn't be that complicated.

MR. SCHRAGE: I don't -- you might find us bringing a consultant in on this one.

VICE MAYOR LONGBINE: I do agree with Commissioner Davis' point, though, that, you know, we got these ordinances and regulations and we need to be consistent. You know, someone could put something very derogatory or offensive to society as a whole, and that's why we have these ordinances.

COMMISSIONER DAVIS: And I guess even then we can't prevent. All we can do is regulate the size of the sign.

COMMISSIONER LENKIEWICZ: It's a bit of a quandry. And I -- coming back to the subject matter, expert -- I mean, you mentioned -- I'm sorry. I did not mean to do

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 33 of 44


that to you. But it sounds like it will expedite the situation, which is what we want to see happen.

I mean, I can't speak for the other members of the Commission, but I'm getting a general sensibility of we want to work with this business owner. We want to figure out if there is any middle ground, which sounds very questionable at this point. We'd like to get there.

But, you know, for the general public, this sensibility that we're just up here, you know, thumbs up, thumbs down and, you know, this is art, this is not art, I mean, it's a lot more complicated than that.

And, unfortunately, we find ourselves in a situation where I think we all appreciate the art. But we are bound by -- by laws that we -- you know, we're a governing body and that we -- we're -- we can't just arbitrarily decide, yes, this rule we're not going to enforce, and, you know, this rule we're going to apply, and there's the sense of fairness and uniformity to how we do things.

And it's really not a good spot to be

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 34 of 44


right now, to be honest. I don't like this. And it reminds me a lot of my law enforcement years, a lot of similarities. But unfortunately, that's part of our job and it's going to take time. And hopefully we find some middle ground.

But the concept of private property rights and, hey, this is something I own and I want to do what I will with it. That's not lost on me either, as a -- as a business owner. I get it. It's just we are -- we're in a bit of a quandary, I'll say it again.

COMMISSIONER DAVIS: If we had a different set of rules for downtown or if we called it an arts district or whatever, we would not be able to have a separate board decide the artistic merits. It would still -- you'd still have to have a regulation -- not necessarily worded like this, but it would still be you either fit or you don't.

MR. SCHRAGE: We do have a design review board that applies some architectural and aesthetic standards within -- in that district. But that's about as far as I'm comfortable going without some legal advice

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 35 of 44


beyond that.

It certainly isn't -- as Commissioner Lenkiewicz pointed out, it's not thumbs up, thumb down on the particular art. It's --

COMMISSIONER DAVIS: Just the structure and appearance of the building.

MR. SCHRAGE: -- some broader guidance and is it within that guidance.

MS. DRISCOLL: Well, boards and commissions make their decisions based on the criteria that's outlined in code. So when they make a decision, you have to be able to tie findings back to that.

So the body finds that as per this section of code, it did not meet it. The body finds it did meet that section of code. So it's never really arbitrary, right, when the board reviews things. I mean, there is criteria which they make the decision to.

So when we say, like, can we have a board that decides if it's art or not art, that's a great example of can you really find that criteria. That's where we stick to time, place, and manner.

The board can decide, is that, you

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 36 of 44


know, the right size for that space. Is that the right material for that space.

When we get into downtowns, we start talking about, you know, historic materials, historic architecture. And that's kind of a unique line that we walk in our downtown. We're not a purist when it comes to historical integrity like some downtowns which is -- that's -- we have a lot of cool stuff going on, which means we can bring some other things in. But you still have to be mindful, of some of those components.

So those are things that can be part of that decision. But as far as kind of content or, you know, the flavor of the message, I mean, outside of outright profanity -- Mr. Bengtson?

MR. BENGTSON: Well, if I may, Vice Mayor and commissioners, to all the points being made, most of what a municipality or city regulates is subject to a relative -- relatively simple test of whether there is a nexus between the regulation and a legitimate public purpose. Most of the code is subject to that sort of test.

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 37 of 44


When you get into First Amendment regulation, anything that is protected by First Amendment, it gets more specific. The Supreme Court has told us now when you are evaluating anything in the commercial speech category, it undergoes what is called an intermediary -- intermediate scrutiny level.

It's higher than that just rational nexus. There has to be a specific public purpose. It has to be narrowly tailored to meet that. That's the type of analysis that under -- that -- or critique that anything that you do that regulates commercial speech would undergo if challenged.

Now, we know also, however, that when you're looking at art as a form of expression that has been determined to be protected under the First Amendment, that undergoes what is called a strict scrutiny. It's a higher level test. So that's the sort of distinctions that Ms. Driscoll is speaking of.

And I think the only other point I would make, to your point Vice Mayor, understand I'm not sure if your thought was related to cost or time or whatever it might

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 38 of 44


have been. But the only thing I would say, we are in an area where we, as your local general counsel recognize, particularly with both the speed and accuracy with which we would like to address this, that at least from the legal standpoint, I think there are efficiencies even in terms of cost of having the specialized expert handling those sorts of questions rather than you all having to wonder if we've figured that out or not.

So, you know, I think there are efficiencies. And I know from Ms. Driscoll's work at state and national levels, she has reason to be familiar with folks who are expert in these areas. And from our standpoint as legal counsel, we welcome that sort of expertise on such a -- such an important set of issues.

VICE MAYOR LONGBINE: What's the commission's thoughts on that? Bring a consultant in?

COMMISSIONER RYAN: No. I'm completely on board with a consultant, yeah. I think that there are people that have been following this law for periods of time and

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 39 of 44


that it's important that we have their wisdom and experience. And I'm sure it will be much cheaper than us, you know, plowing a new road.

I mean, I have a lot of confidence in our staff in figuring any kind of problem out and providing remedies. But it looks like we'll get much quicker answers if we buy some expertise.

COMMISSIONER DAVIS: I agree. And that doesn't mean that creative minds in town can't still work up some other solutions.

MS. DRISCOLL: Oh, definitely. And, I mean, one of the things that takes a little time vers, you know, me sitting in my office just going one line at a time, is that we need public process. I mean, there are definitely a group of stakeholders here. They're artists. They're downtown business owners. They're downtown building owners. There's nondowntown businesses and buildings.

So, I mean, this is -- this is something that we're seeing not just downtown but in the other areas. And I think to have time to have conversations with those folks and ask, you know, how are these rules feeling

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 40 of 44


and fitting as we've changed as a community over the last few years is an important part of that process. So definitely getting those creative minds to the table.

VICE MAYOR LONGBINE: Well, I did learn a lot from the PowerPoint presentation that was forwarded to us and things I hadn't thought of. So this is a learning experience for all of us, I think.

MS. DRISCOLL: And it's -- to Greg's point, it's also like an ever-changing field. I mean, every time somebody gets sued, a different city, that's a different interpretation of that case law.

So that's the other thing is having somebody who's doing this day in and day out, following and applying those things. And there's a -- I will say from 20-some years of experience, there's a difference between having read it and read somebody else's code, then trying to borrow pieces of that and put that into your own, vers somebody who has applied this in other places and can kind of come in and say, well, here's several different examples; how do they apply to your

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 41 of 44


place, which can -- can be very helpful.

And sometimes just a new set of eyes to see things differently than we have before.

VICE MAYOR LONGBINE: Well, I hope patience can prevail. This really did take off. And I want to remind people, this had nothing to do with the city collecting permit fees.

MS. DRISCOLL: No. And I have -- I will say we have not issued a violation notice. We simply called and asked for a brief pause so we could research and asked for a meeting. That is the sum total of it.

This morning we met with the business owner like we would any other business owner in town, wanted to talk through these things, and came in willing to talk about how the code could be different.

Still haven't issued a violation notice. Haven't -- haven't done any of those things. Had a normal conversation.

In fact, as I was coming down the stairs, Mr. Howard did drop off his permit along with his application fee. We'll use that to kind of be in the system, work through

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 42 of 44


it to see, you know, if he'd like to move forward with that. But at least that's on record.

And as we go forward with the ordinance changes, if he'd like to wait and see how that applies, we can do that as well.

VICE MAYOR LONGBINE: Well, I hope citizens realize that a lot has been put into this already. And we want to see it work out and be successful. I think I can speak for a lot of citizens that we'd just like it to be worked out. So.

UNIDENTIFIED SPEAKER: I think we're doing great things here in town. And I look forward to the collaborative aspect of this. Certainly, our value set here in Salina as midwesterners is different than Seattle or in Florida or D.C. So I think it's important we have this -- conversations and do what's right for our place here.

MS. DRISCOLL: Hm-hmm.

VICE MAYOR LONGBINE: Anything else?

MR. SCHRAGE: That was longer than I expected but good conversation.

VICE MAYOR LONGBINE: It was.

Case 6:24-cv-01027-TC Document 113-9 Filed 03/14/25 Page 43 of 44


MR. SCHRAGE: So we'll keep moving forward.

VICE MAYOR LONGBINE: Yes, it was. Okay. That will bring us to Citizen's Forum.

Anything that's not on the agenda, welcome to come and share and keep your comments three minutes.

(The excerpt of the proceedings concluded.)

C E R T I F I C A T E

I, Avanelle L. Sullivan, a Certified Shorthand Reporter of the State of Kansas, do hereby certify that I appeared at the time and place first hereinbefore set forth, that I took down in shorthand the entire proceedings had at said time and place, and that the foregoing constitutes a true, correct, and complete transcript of my said shorthand notes.

Witness my hand and seal this 16th day of November, 2023.

Avanelle Sullivan
State of Kansas
Certified Shorthand Reporter



Avanelle L. Sullivan
Certified Shorthand Reporter
State of Kansas

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
STEPHEN HOWARD,

taken on behalf of the Defendant, pursuant to Notice to Take Deposition, beginning at 9:07 a.m. on the 7th day of October, 2024, at the law office of Clark, Mize & Linville, 129 South 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.



EXHIBIT I

A. Holthaus.
**Q. Holthaus?**
A. Yes. H O L T H A U S.
**Q. Okay.**
A. And his brother-in-law, Greg Boyle.
**Q. Greg Boyle?**
A. Yes.
**Q. Okay. So were Max and Greg the owners of The Cozy right before you?**
A. Yes.
**Q. Okay. And so you knew them from your work at the country club?**
A. Yes.
**Q. They talked to you but about potentially buying The Cozy?**
A. Yes.
**Q. Okay. So you bought The Cozy in 2007. Do you currently own any other businesses?**
A. I do.
**Q. Okay. What are those businesses?**
A. It's a liquor store called Jenni's Liquor in Brookville, Kansas.
**Q. And are there any other businesses other than the Jenni's Liquor?**
A. No. It's too much.

**Q. And when did you become the owner of Jenni's Liquor?**

A. 2020 maybe.

**Q. And do you own Jenni's Liquor with any other -- any other person?**

A. My wife.

**Q. Okay. And what is the corporate form of The Cozy? Is that a corporation?**

A. It's an S corporation.

**Q. Okay. And when did you initially form the S corporation? Was that at the time you bought The Cozy?**

A. I think so.

**Q. And currently, how many shareholders are there of the Cozy?**

A. Two.

**Q. Is it you and your daughter?**

A. Yes.

MR. SHAW: Objection to form.

BY MS. JOKERST:

**Q. Okay. And it's your daughter Andrea Windholz?**

A. Yes.

**Q. Okay. And was she -- let me ask that a different way. And I apologize. You might be**

**Q. Okay.**
A. -- can't figure things out like that.
**Q. So your wife responded to the question is this a Cozy reference and said yes, right?**
A. She's her own person.
**Q. Okay. But she responded and she said yes, right?**
A. Yes.
**Q. Okay. And that's because this painting is a reference to The Cozy wall sign, right?**
MR. SHAW: Objection to form.
A. Sure, if you look at it like that.
BY MS. JOKERST:
**Q. Okay. Well, your wife looked at it like that?**
MR. SHAW: Objection to form.
BY MS. JOKERST:
**Q. Right?**
A. I just had fun with it.
**Q. Okay. But I'm saying your wife looked at it that way, right?**
MR. SHAW: Objection to form.
A. Yes.
BY MS. JOKERST:
**Q. Okay. And so do you also look at it that**

**way as a reference to The Cozy?**
A. It's a continuation of my story.
**Q. Okay. You're talking about your story as it relates to the painting at The Cozy?**
MR. SHAW: Objection to form.
A. The ships had to come from somewhere.
BY MS. JOKERST:
**Q. Okay. Well, that's a yes or no question. You're saying that it relates to your story as it relates to the painting that's at The Cozy, right?**
MR. SHAW: Objection to form.
A. Yes.
MS. JOKERST: All right. I will formally move to admit Exhibit Y into the deposition record.
MR. SHAW: We will renew our objection.
MS. JOKERST: Okay. And we can, again, just for the court reporter, that can be noted, and that does not affect that the entire exhibit will be included with the deposition testimony.
BY MS. JOKERST:
**Q. All right. So I want to talk to you a little bit about the painting that's on the wall at Jenni's Liquor. I mean how did that come into existence?**

Exhibit

1. **New York, New York**
   Zoning Resolution § 12-10.
   Words in the text or tables of this Resolution which are italicized shall be interpreted in accordance with the provisions set forth in this Section.
   * * *
   **Sign.** A "sign" is any writing (including letter, word or numeral), pictorial representation (including illustration or decoration), emblem (including device, symbol or trademark), flag, (including banner or pennant) or any other figure of similar character, that:
   (a) is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure;
   (b) is used to announce, direct attention to or advertise; and
   (c) is visible from outside a building. A sign shall include writing, representation or other figures of similar character, within a building, only when illuminated and located in a window.
   However, non-illuminated signs containing solely non-commercial copy with a total surface area not exceeding 12 square feet on any zoning lot, including memorial tablets or signs displayed for the direction or convenience of the public, shall not be subject to the provisions of this Resolution.

   https://zr.planning.nyc.gov/article-i/chapter-2/12-10

2. **Cincinnati, Ohio**
   § 1427-03-S1. - Sign.
   "Sign" means a writing or display, including a word or numeral; pictorial representation, including illustration or decoration; emblem, including device, symbol or trademark; flag, including banner, pennant, mural, or painting; or other figures of similar character that:
   (a) Is a structure or part thereof, or is attached to, painted on, or in other manner represented on a building or other structure, and
   (b) Is used to announce, direct attention to, or advertise, and
   (c) Is visible from outside a building.

   https://library.municode.com/oh/cincinnati/codes/code_of_ordinances?nodeId=TIXIZOCOCI_CH1427SIRE_S1427-03-S1SI

**EXHIBIT J**

3. **Champaign, Illinois**

Sec. 37-401. - Definitions—S.

*Searchlight, sign* shall mean a searchlight which is used to announce, direct attention to, or advertise a business.

*Sign* shall mean any writing including a word or numeral; pictorial representation including illustration, emblem including device, symbol, or trademark; flag including banner or pennant; or any figure of similar character which has the effect of announcing, directing attention to, or advertising, and which is a structure or part thereof, or is attached to, painted on, or in any manner represented on a building, structure, or parcel of land. This definition shall not include the following:

(1) Outdoor advertising sign structure or signs displayed thereon.

(2) Writings, representations, or other figures of similar character within a building unless it is a flashing sign or signs with lights.

(3) Non-pictorial color treatments on the surface of a building which do not include writing or other direct forms of advertising.

https://library.municode.com/il/champaign/codes/code_of_ordinances?nodeId=MUCO_CH37ZO_ARTVIIISI_DIV1GE_S37-401DE

4. **Villa Park, Illinois**

8.12.1. - Definitions

A. Sign: Any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public or any other figure of similar character that:

1. Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; and

2. Is used to announce, direct attention to, or advertise; and

3. Is located outside of a building, or if inside a building, is designed primarily to be visible from outside the building.

https://library.municode.com/il/villa_park/codes/code_of_ordinances?nodeId=MUCO_APXCBAZOOR_ART8SI_8.12.1DE

5. **Millersburg, Oregon**
   3.06.020 - Definitions.
   For the purposes of this Chapter, the following definitions shall apply:
   * * *
   Sign: Any writing, including letter, word, or numeral; pictorial presentation, including illustration or decoration; emblem, symbol or trademark; banner or pennant; or any other device, figure, or similar thing which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building, structure, or device; and is used to announce, direct attention to, or advertise; and is visible from any public right-of-way.

   https://library.municode.com/or/millersburg/codes/development_code?nodeId=DEVELOPMENT_CODE_ARTIIIGEPR_CH3.06SI_3.06.020DE

6. **Keizer, Oregon**
   Sec. 2.308.02. - Definitions.
   For the purposes of this section, the following definitions shall apply:
   * * *
   *Sign*. Any writing, including letter, word, or numeral; pictorial presentation, including mural, illustration or decoration; emblem, including device, symbol, logo or trademark; flag, including banner or pennant; or any other device, figure or similar thing which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or structure or device; and is used to announce, direct attention to, or advertise; and is visible from any public right-of-way.

   https://library.municode.com/or/keizer/codes/code_of_ordinances?nodeId=PTIICOOR_APXADECO_2.308SI_S2.308.02DE

7. **South Palm Beach, Florida**
   Sec. 26-466. - Definitions.
   * * *
   Sign means any writing, including letters, words, or numerals; statuary; pictorial representation, including illustrations or decorations; emblem, including any device, symbol, or trademark; flag, including a banner or pennant; or any other figure of similar character, which is a structure or any part thereof, or is attached, painted on, or in any other manner represented on a building or other structure, and shall include any sign placed upon a vehicle used to announce, direct attention to,

or advertise, and is visible from outside a building. The term "sign" shall include writing, representation, or other figures of similar character within a building and located in a window. See also specific signs defined in this section.

https://library.municode.com/fl/south_palm_beach/codes/code_of_ordinances?nodeId=PTIICOOR_CH26LADE_ARTIVZODI_DIV6SUDIRE_SDIVSI_S26-466DE

8. **Pana, Illinois**

Sec. 25-200. - Definitions.

Sign shall mean any writing including a word or numeral; pictorial representation including illustration, emblem including device, symbol, or trademark; flag including banner or pennant; or any figure of similar character which is used to announce, direct attention to, or advertise, and which is a structure or part thereof, or is attached to, painted on, or in any manner represented on a building or other structure. This definition shall not include the following:

(1) Outdoor advertising sign structure or signs displayed thereon.

(2) Writings, representations, or other figures of similar character within a building unless it is a flashing sign or signs with lights.

(3) Nonpictorial color treatments on the surface of a building which do not include writing or other direct forms of advertising.

https://library.municode.com/il/pana/codes/code_of_ordinances?nodeId=COOR_CH25ZORE_ARTIVSI_DIV1GE_S25-200DE

9. **Derby, Kansas**

Section 701

SIGN: Any writing including letters, words or numeral(s), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar charter which:

1. Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground, and

2. Is used to announce, direct attention to, or advertise, and

3. Is not located inside a building.

https://library.municode.com/ks/derby/codes/municipal_code?nodeId=APXBZORE_ART7SI_701DE

**10. Wauconda, Illinois**

Sec. 155.002. - Definitions.

Sign. Any writing (including letter, word, or numeral), pictorial representation (including illustration or decoration), emblem (including device, symbol, or trademark), flag (including banner or pennant), or any other figure of a similar character, that:

(1) Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is visible from outside a building.

https://library.municode.com/il/wauconda/codes/code_of_ordinances?nodeId=TITXVLAUS_CH155ZOCO_GEPR_S155.002DE

**11. Whittier, California**

18.72.020 - Definitions.

In addition to the definitions contained in Chapters 18.06 and 18.76, the following words and phrases have the meanings set out in this section, unless it is apparent from the context that another meaning is intended:

* * *

55. "Sign/sign structure/display" means any writing (including letter, word, or numeral), pictorial presentation (including illustration or decoration), emblem (including device, symbol or trademark), flag (including banner or pennant) or any other device, figure, or similar character which:

A. Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building, other structure or device; and

B. Is used to announce, direct attention to, or advertise; and

C. Is visible from the outside of a building.

https://library.municode.com/ca/whittier/codes/code_of_ordinances?nodeId=TIT18ZO_DIVIISI_CH18.72EMSI_18.72.020DE

**12. Savoy, Illinois**

15.24.040 - Definitions.

* * *

"Sign" includes any writing including a word or numeral; pictorial representation including illustration; emblem including device, symbol, or trademark; flag including banner or pennant, but not including official United States or state flags; or any figure of similar character which is used to announce, direct attention to, or advertise and which is a structure or part thereof, or is attached to, painted on, or in any manner represented on a building or other structure. This definition shall not include outdoor advertising sign structures or signs displayed thereon.

https://library.municode.com/il/savoy/codes/code_of_ordinances?nodeId=TIT15BUCO_CH15.24SI_15.24.040DE

**13. Panguitch, Utah**

17.08.010 Definitions And Rules

Unless the context requires otherwise, the following definitions shall be used in the interpretation and construction of this title. * * *

* * *

"Sign" means any writing, pictorial representation, symbol, banner or any other figure of similar character of whatever material which is used to identify, announce, direct attention to or advertise, which is placed on the ground, on any bush, tree, rock, wall, post, fence, building, structure, vehicle, or any place whatsoever and which is visible from outside a building. The term "placed" shall include constructing, erecting, posting, painting, printing, tacking, nailing, gluing, sticking, carving, stringing, or otherwise fastening, affixing or making visible in any manner whatsoever.

https://panguitch.municipalcodeonline.com/book?type=ordinances#name=17.08.010_Definitions_And_Rules

**14. Grand Terrace, California**

18.80.040 - Definitions.

A. The following words and phrases have the meanings set forth herein, unless it is apparent from the context that another meaning is intended:

64. "Sign" means any writing (including letter, word, or numeral), pictorial presentation (including illustration or decoration), emblem (including device, symbol or trademark), flag (including banner or pennant) or any other device, figure, or similar character which:

a. Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building, other structure or device;

b. Is used to announce, direct attention to, or advertise; and
c. Is visible from the outside of a building.

https://library.municode.com/ca/grand_terrace/codes/municipal_code?nodeId=TIT18ZO_CH18.80SI_18.80.040DE

**15. Cosmopolis, Washington**

18.52.140 - Signs.

* * *

(1) Definitions. For the purpose of this section, certain terms shall be construed as specified in this section:

* * *

(J) "Sign" means any writing, including letter, word or numeral; pictorial representation, including illustration or decoration; emblem, including device, symbol or trademark; flag, including banner or pennant, but excluding governmental flags; or any other figure of similar character which:
(i) Is a structure of any part thereof or is attached to, painted on, or in any other manner represented on a building or other structures; and
(ii) Is used to announce, direct attention to, or advertise; or
(iii) Is visible from outside a building. A sign includes writing, representation, or other figure of similar character within a building and located in a window.

https://library.municode.com/wa/cosmopolis/codes/code_of_ordinances?nodeId=TIT18ZO_CH18.52SPUSRE_18.52.140SI

**16. Minersville, Utah**

Sec. 28-6. - Definitions.

* * *

Sign means any writing, pictorial representation, symbol, banner, or any other figure of similar character of whatever material which is used to identify, announce, direct attention to or advertise, which is placed on the ground, on any bush, tree, rock, wall, post, fence, building, structure, vehicle, or any place whatsoever and which is visible from outside a building. The term "placed" shall include constructing, erecting, posting, painting, printing, tacking, nailing, gluing, sticking, carving, stringing, or otherwise fastening, affixing, or making visible in any manner whatsoever.

https://library.municode.com/ut/minersville/codes/code_of_ordinances?nodeId=COOR_CH28ZO_ARTIINGE_S28-6DE

**17. Glenview, Illinois**

Sec. 98-4. - Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

* * *

Sign means any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols or trademarks), flag, banner, streamer, pennant, string of lights or display calculated to attract the attention of the public, or any other figure of similar character which is:

(1) A structure, or any part thereof, or a portable display, or is attached to, painted on or in any other manner represented on a building or other structure or on the ground;

(2) Used to announce, direct attention to or advertise; and

(3) Not located inside a building.

Holiday related lighting or structures shall not constitute signage when displayed in accordance with section 98-217(7).

https://library.municode.com/il/glenview/codes/code_of_ordinances?nodeId=MUCO_CH98ZO_ARTIINGE_S98-4DE

**18. Appomattox, Virginia**

Sec. 36-1. - Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

* * *

Sign means any writing (including letter, work or numeral), pictorial representation (including illustration or decoration), emblem (including device, symbol, logo, or trademark) or any other figure or graphic of similar character for the purpose of communicating information to the public which is:

(1) Attached to a structure, painted on or in any other manner represented on a building, other structures or natural object;

(2) Used to announce, direct attention to, or advertise;

(3) Visible from the outside of a building; a sign shall include writing, pictorial representation, emblem or any other figure of similar character within a building when located less than 12 inches away from the inside face of an exterior windowpane, and located less than 12 inches away from the inside of an exterior window pane; and
(4) Accessory to the permitted uses in the zoning district.

https://library.municode.com/va/appomattox/codes/code_of_ordinances?nodeId=PTIICOOR_CH36ZO_ARTIINGE_S36-1DE

**19. South Bay, Florida**
[ARTICLE] IV. - DEFINITIONS
[Sec. 4.1. - Established.]
For the purpose of this ordinance, certain words and terms are defined as follows:
* * *
Sign: Any writing (including letter, word, or numeral), pictorial representation (including illustration or decoration), emblem (including device, symbol, or trademark), flag (including banner or pennant), or any other figure of similar character which is a structure of any part thereof, or is attached, painted on, or in any other manner represented on a building or other structure, and shall include any sign placed upon a vehicle used to announce, direct attention to, or advertise and is visible from outside a building. A sign shall include writing, representation, or other figure of similar character within a building and located in a window. * * *

https://library.municode.com/fl/south_bay/codes/code_of_ordinances?nodeId=PTIICOOR_APXAZO_ARTIVDE_S4.1ES

**20. Junction City, Kansas**
SECTION 400.030: - DEFINITIONS
The following definitions shall be used in the construction and interpretation of these Regulations:
* * *
*SIGN*: Any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

1. Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground, and
2. Is used to announce, direct attention to, or advertise, and
3. Is not located inside a building.

https://library.municode.com/ks/junction_city/codes/code_of_ordinances?nodeId=COOR_TITIVLAUS_CH400ZOENPR_ARTITINTPUEF_S400.030DE

**21. Cullman, Alabama**

Sec. 62-23. - Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

* * *

*Sign* means any structure or part thereof which is used to announce, direct attention to or advertise.

https://library.municode.com/al/cullman/codes/code_of_ordinances?nodeId=COOR_CH62ZO_ARTIIDE_S62-23DE

**22. Round Lake Park, Illinois**

17.1 - RULES AND DEFINITIONS

* * *

Sign. Any writing (including letter, words or numerals, pictorial representation (including illustrations or decorations) emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

A. Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground.
B. Is used to announce, direct attention to, or advertise, and,
C. Is not located inside a building.

https://library.municode.com/il/round_lake_park/codes/municipal_code?nodeId=CD_ORD_APXAZO_ARTICLEXVRUDE_17.1RUDE

**23. Gervais, Oregon**

17.16.020 - Definitions.
The following words and phrases, when used in this title, shall have the meanings set forth in this chapter, except in those instances where the context clearly indicates a different meaning.
* * *
"Sign" means any writing, including letter, word, or numeral; pictorial presentation, including mural, illustration or decoration; emblem, including device, symbol or trademark; flag, including banner or pennant; or any other device, figure or similar thing which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building, structure or device; and is used to announce, direct attention to, or advertise; and is visible from any public right-of-way. Sign does not include house numbers.

https://library.municode.com/or/gervais/codes/code_of_ordinances?nodeId=TIT17DE_DIVIGEORPR_CH17.16DE_17.16.020DE

**24. Fredonia, Kansas**

2-102. - Definitions.
The following definitions shall be used in the interpretation and construction of these regulations:
* * *
**SIGN:** Any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols or trademarks), flag, banner, streamer, pennant, string of lights or display calculated to attract the attention of the public or any other figure of similar character which:
a. Is a structure or any part thereof or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
b. Is used to announce, direct attention to, or advertise; and
c. Is not located inside a building.

https://library.municode.com/ks/fredonia/codes/code_of_ordinances?nodeId=PTIICOOR_APXAZORE_ART2INCODE_2-102DE

**25. Bolingbrook, Illinois**

Sec. 54-2. - Definitions.

The following words, terms and phrases, when used in this chapter, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:
* * *
*Sign* means any writing (including letter, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights (including other similar linear lighting), or display calculated to attract the attention of the public, or any other figure of similar character which:
(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building, window or other structure or on the ground; and
(2) Is used to announce, direct attention to, or advertise.

https://library.municode.com/il/bolingbrook/codes/code_of_ordinances?nodeId=COOR_CH54ZO_ARTIINGE_S54-2DE

**26. Warsaw, Virginia**

5-3. - Definitions.

Sign: Any writing (including letter, word or numeral); pictorial representation (including illustration or decoration); emblem (including device, symbol, or trademark); flag (including banner or pennant); or any other figure of similar character, which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure, and is used to announce, direct attention to, or advertise.

https://library.municode.com/va/warsaw/codes/code_of_ordinances?nodeId=PTIICOOR_APXADEMAOR_ART5DE_5-3DE

**27. Carlton, Oregon**

17.12.020 - Definitions.

The following words and phrases, when used in this title, shall have the meanings set forth in this section, except in those instances where the context clearly indicates a different meaning.
* * *
"Sign" means any writing, including letter, word, or numeral; pictorial presentation, including mural, illustration or decoration; emblem, including device, symbol or trademark; flag, including banner or pennant; or any other device, figure or similar

thing which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or structure or device; and is used to announce, direct attention to, or advertise; and is visible from any public right-of-way. Sign does not include house numbers.

https://library.municode.com/or/carlton/codes/code_of_ordinances?nodeId=TIT17DECO_DIVIGEPR_CH17.12DE_17.12.020DE

**28. Port St. Lucie, Florida**

Sec. 153.01. - Definitions.

* * *

(C) Defined terms:

* * *

SIGN. Any writing (including letter, word, or numerical), pictorial presentation (including illustration or decoration), emblem (including device, symbol, or logo), flag (including banner or pennant), or any other figure of similar character, that;

(1) is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure;

(2) is used to announce, direct attention to, or advertise; and

(3) is visible from outside a building.

A sign includes writing, representation, or other figures of similar character, within a building not attached to a window and can be viewed through a glassed wall of a building.

https://library.municode.com/fl/port_st._lucie/codes/code_of_ordinances?nodeId=TITXVLAUS_CH153DE_S153.01DE

**29. Panama City, Florida**

Sec. 116-3. - Defined terms.

Sign. Any writing (including letter, word, or numeral), pictorial presentation (including illustration or decoration), emblem (including device, symbol, or trademark), flag (including banner or pennant), or any other figure of similar character, that:

(1) Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is visible from outside a building.

A sign includes writing, representation, or other figures of similar character, within a building, only when illuminated and located in a window.

https://library.municode.com/fl/panama_city/codes/code_of_ordinances?nodeId=SPBUNLADECO_CH116DE_S116-3DETE

**30. Millersburg, Oregon**

1.02.020 - Definitions.

The following words and phrases, when used in this Code, shall have the meanings ascribed to them in this Chapter, except in those instances where the context clearly indicates a different meaning.

* * *

Sign (Sign). Any writing, including letter, word, or numeral; pictorial presentation, including illustration or decoration; emblem, symbol, or trademark; banner or pennant; or any other device, figure, or similar thing which is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building, structure, or device; and is used to announce, direct attention to, or advertise; and is visible from any City or County public right-of-way.

https://library.municode.com/or/millersburg/codes/development_code?nodeId=DEVELOPMENT_CODE_ARTIPUSC_CH1.02DE_1.02.020DE

31. Lynchburg, Virginia

Sec. 35.2-113. - Definitions.

The following terms shall have the meanings established in this section unless specifically modified by provisions of the applicable section of the Zoning Ordinance.

* * *

315. Sign: Any writing (including letter, word or numeral), pictorial representation (including illustration or decoration), emblem (including device, symbol, logo, or trademark) or any other figure or graphic of similar character for the purpose of communicating information to the public which is:

1. Attached to or painted on a structure, or in any other manner represented on a building, other structure or motor vehicle;
2. Used to announce, direct attention to, or advertise;
3. Visible from the outside of a building. A sign shall include writing, pictorial representation, emblem or any other figure of similar character within a building

when located less than twelve inches away from the inside face of an exterior window pane; and

4. Accessory to the permitted uses in the zoning district.

https://library.municode.com/va/lynchburg/codes/code_of_ordinances?nodeId=CH35.2ZOOR_ARTXIDE_S35.2-113DE

**32. Beckley, West Virginia**

Sec. 15-3. - Definitions.

For the purposes of this chapter, the following words and phrases shall have the meanings respectively ascribed to them within this section. * * *

* * *

*Sign:* Any writing (including letter, word, or numeral), pictorial presentation (including illustration or decoration), emblem (including device, symbol, or trademark), flag (including banner or pennant), or any other figure of similar character, that:

(1) Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure (such as a card, cloth, paper, metal, painted glass, wood, plaster, stone, billboard, marquee, canopy, awning, tree, wall, bush, post, fence, building, etc.);

(2) Is used to announce, direct attention to, or advertise; and

(3) Is visible from outside a building.

A sign includes writing, representation, or other figures of similar character, within a building, only when illuminated and located in a window. (Refer to sign regulations in section 16-301 et seq.)

https://library.municode.com/wv/beckley/codes/code_of_ordinances?nodeId=PTIITHCO_CH15ZO_ARTIINGE_S15-3DE

**33. Metro Government of Nashville and Davidson County, Tennessee**

17.04.060 - Definitions of general terms.

* * *

B. General Terms.

* * *

"Sign" means any writing (including letter, work or numeral), pictorial representation (including illustration or decoration); emblem (including device, symbol or trademark); flag (including banner or pennant); inflatable structure; or any other figure of similar character, which is a structure or any part thereof, or is attached to,

painted on, or in any other manner represented on a building or other structure; and is used to announce, direct attention to, or advise.

https://library.municode.com/tn/metro_government_of_nashville_and_davidson_county/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.04GEPRDE_17.04.060DEGETE

**34. Orange, California**

§ 17.04.038 "S" Definitions.

"Sign" means any writing (including letter, word, or numeral), pictorial presentation (including illustration or decoration), emblem (including device, symbol, or trademark), flag (including banner or pennant), or any other device, figure or similar character which:

1. Is a structure or any part thereof, or is attached to, painted on, or in any other manner represented on a building or other structure or device; and
2. Is used to announce, direct attention to or advertise; and
3. Is visible from outside the building or structure.

https://ecode360.com/43566749

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DUSTIN HERRS,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 9:27 a.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.



EXHIBIT K

**district, is there any reason to believe that that change would be factually incorrect?**

MS. JOKERST: Object to form and scope.

A. That's very similar to earlier when you asked me if I think what is -- well, I don't remember the exact question. But I think it's -- yeah, that's something I couldn't answer.

BY MR. SHAW:

**Q. Okay. What facts does the government contend show that regulating signs like The Cozy sign enhances pedestrian safety?**

A. So if you have -- the idea is that the sign regulations are designed to, again, for each district limit the size of signs, the number of signs, the height of signs, the location of signs in order to reduce clutter. We don't want a lot of sign clutter because that can become distracting. It could impair the visual sight lines for motor vehicles as well as pedestrians. Sign sizes, we want to limit them so they don't become a distraction. We don't want signs that hold the eye longer than they should. We want to make sure that signs are effective. Again, that comes down to clutter where if you have too many signs, it becomes --

**show that painted wall signs are more detrimental to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. Any specific studies or like...

BY MR. SHAW:

**Q. Any facts that would show that a painted wall sign is more detrimental to traffic -- to pedestrian safety than painted murals?**

MS. JOKERST: Object to scope.

A. No.

BY MR. SHAW:

**Q. Is the government aware of any facts that would show that painted wall signs are more detrimental to traffic safety than painted murals?**

MS. JOKERST: Object to scope.

A. I think the fact that signs by their definition attract your eye in a way to announce, direct attention to or advertise does change the character of a sign in relationship to or contrasted to a mural, a painted mural and that that could have impacts on traffic safety.

BY MR. SHAW:

**Q. So you say it could have impacts on traffic safety. Is the city aware of any facts showing that it, in fact, does have impacts on**

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/247981075

# The Role of Driver Distraction in Traffic Crashes

**Article** · January 2001

CITATIONS
504

READS
2,459

**4 authors**, including:



Jane S Stutts
University of North Carolina at Chapel Hill
**54** PUBLICATIONS **3,703** CITATIONS
SEE PROFILE



Eric A Rodgman
University of North Carolina at Chapel Hill
**24** PUBLICATIONS **2,397** CITATIONS
SEE PROFILE

**EXHIBIT L**

EXHIBIT
EX G
Charles R. Taylor, Ph...
11.13.2024

All content following this page was uploaded by Eric A Rodgman on 13 January 2015.

The user has requested enhancement of the downloaded file.

# THE ROLE OF DRIVER DISTRACTION IN TRAFFIC CRASHES



Prepared by
Jane C. Stutts, Ph.D.
Donald W. Reinfurt, Ph.D.
Loren Staplin, Ph.D.
Eric A. Rodgman, B.S.
University of North Carolina
Highway Safety Research Center
Chapel Hill, NC

Prepared for
**AAA Foundation for Traffic Safety**
1440 New York Avenue, N.W., Suite 201
Washington, DC 20005
202/638-5944
www.aaafoundation.org

May 2001

Cover Photos
**Top row**: Kristin Oguntoyinbo/UNC Highway Safety Research Center
**Bottom**: J. Scott Osberg/AAA Foundation for Traffic Safety

# TABLE OF CONTENTS

LIST OF TABLES ..... ii

LIST OF FIGURES ..... iii

FOREWORD ..... 1

ACKNOWLEDGMENTS ..... 2

EXECUTIVE SUMMARY ..... 3

INTRODUCTION ..... 6

CDS DATA ANALYSIS ..... 7

- Driver Factors ..... 13
- Other Factors Impacting Driver Distraction ..... 19
  - Roadway Factors ..... 19
  - Environmental and Vehicle Factors ..... 21
  - Crash Factors ..... 23

CDS NARRATIVE ANALYSIS ..... 25

NORTH CAROLINA NARRATIVE ANALYSIS ..... 30

SUMMARY AND CONCLUSIONS ..... 34

REFERENCES ..... 38

APPENDIX A. CDS Driver Inattention/Distraction Variables ..... 39

APPENDIX B. Supporting Graphs ..... 43

APPENDIX C. Sample CDS Narrative Printout ..... 57

APPENDIX D. Sample NC Narrative Printout ..... 59

# LIST OF TABLES:

Table 1: Driver attention status based on the unweighted CDS data ........................8

Table 2: Driver attention status based on the weighted CDS data ............................9

Table 3: Yearly trends in specific driving distractions based on weighted CDS data ......................................................................................11

Table 4: Distribution of driver attention status within categories of driver age ............................................................................13

Table 5: Distribution of driver age within categories of driver attention status ..................................................................................15

Table 6: Distribution of specific driver distractions within categories of driver age ............................................................................16

Table 7: Distribution of driver attention status for males and females ....................17

Table 8: Distribution of specific driver distractions for males and females ............18

Table 9: Roadway effects on driver attention status .............................................20

Table 10: Roadway effects on specific nature of driver distraction ..........................21

Table 11: Environmental and vehicle effects on driver attention status.................... 22

Table 12: Environmental and vehicle effects on specific nature of driver distraction ..........................................................................23

Table 13: Effects of crash characteristics on driver attention status ........................24

Table 14: Effects of crash characteristics on specific nature of driver distraction ..........................................................................25

Table 15. Analysis of narrative data from 1997 and 1998 CDS data files ............26-27

Table 16. Results of Narrative Key Word Search for Driver Distraction Cases on 1998 N.C. Crash File................................30-31

Table 17. Results of More Restricted Narrative Key Word Search for Driver Distraction Cases on 1994 North Carolina Crash File ..............................32

# LIST OF FIGURES:


Figure 1: Overall distribution of driver attention status ....10
Figure 2: Overall distribution of specific driver distractions ....12
Figure 3: Percentage of drivers identified as distracted by age group....14
Figure 4: Age distribution of drivers identified as distracted ....14
Figure 5: Distribution of specific driver distractions for males and females ....17
Figure 6: Growth in cell phone use as measured by millions of subscribers....35
Figure B.1: Effect of number of travel lanes on driver attention status ....44
Figure B.2: Effect of number of travel lanes on specific driver distraction ....44
Figure B.3: Effect of speed limit on driver attention status ....45
Figure B.4: Effect of speed limit on specific driver distraction ....45
Figure B.5: Effect of road grade on driver attention status ....46
Figure B.6: Effect of road grade on specific driver distraction ....46
Figure B.7: Effect of intersection status on driver attention status ....47
Figure B.8: Effect of intersection status on specific driver distraction ....47
Figure B.9: Effect of light condition on driver attention status ....48
Figure B.10: Effect of light condition on specific driver distraction ....48
Figure B.11: Effect of weather condition on driver attention status ....49
Figure B.12: Effect of weather condition on specific driver distraction ....49
Figure B.13: Effect of vehicle type on driver attention status ....50
Figure B.14: Effect of vehicle type on specific driver distraction ....50
Figure B.15: Effect of other occupants in vehicle on driver attention status ....51
Figure B.16: Effect of other occupants in vehicle on specific driver distraction ....51
Figure B.17: Effect of number of vehicles on driver attention status ....52
Figure B.18: Effect of number of vehicles on specific driver distraction ....52
Figure B.19: Effect of pre-crash vehicle maneuver on driver attention status....53
Figure B.20: Effect of pre-crash vehicle maneuver on specific driver distraction ....53
Figure B.21: Effect of region of impact on driver attention status ....54
Figure B.22: Effect of region of impact on specific driver distraction....54
Figure B.23: Effect of driver injury on driver attention status....55
Figure B.24: Effect of driver injury on specific driver distraction ....55

# FOREWORD

This study was funded by the AAA Foundation for Traffic Safety. Founded in 1947, the AAA Foundation is a not-for-profit, publicly supported charitable research and educational organization dedicated to saving lives and reducing injuries by preventing traffic crashes.

This peer-reviewed report documents the relative reported frequency of serious crashes caused by various forms of driver distraction. It should be of interest to legislators, licensing agencies, law enforcement, and traffic safety organizations. It is available in published paper format and as an electronic file on the AAA Foundation for Traffic Safety's web site at http://www.aaafoundation.org.

Funding for this study was provided by voluntary contributions from the American Automobile Association and its affiliated motor clubs; from individual AAA members; and from AAA club-affiliated insurance companies.

This publication is distributed at no charge as a public service. It may not be resold or used for commercial purposes without explicit written permission from the AAA Foundation for Traffic Safety. It may, however, be copied in whole or in part and distributed at no charge via any medium, provided that the AAA Foundation is given appropriate credit as the source of the material.

The opinions, findings, and conclusions expressed in this publication are those of the authors and are not necessarily those of the AAA Foundation or of any individual who peer-reviewed the report. The AAA Foundation for Traffic Safety assumes no liability for the use or misuse of any information, opinions, findings, or conclusions contained in this report.

© 2001, AAA Foundation for Traffic Safety

# ACKNOWLEDGMENTS

The authors express appreciation to the AAA Foundation for Traffic Safety for their financial support of this project, and especially to David Willis and Scott Osberg for their helpful guidance and input. We would also like to thank Neil Lerner, Robert Scopatz, and Jing Wang for their thoughtful review and comments on the draft report. Anna Waller at the UNC School of Medicine provided valuable assistance to the narrative analysis portions of the project, and Mike Bowling with the UNC Survey Research Unit provided timely assistance with the statistical analyses.

# EXECUTIVE SUMMARY

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration estimates that at least 25% of police-reported crashes involve some form of driver inattention. Driver distraction is one form of inattention and is a factor in over half of these crashes. Distraction occurs when a driver "is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compels or induces the driver's shifting attention away from the driving task." The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or "lost in thought."

The AAA Foundation for Traffic Safety awarded a contract to the University of North Carolina Highway Safety Research Center to conduct research on the role of driver distraction in traffic crashes. The goal of the project is to identify the major sources of distraction to drivers and the relative importance of the distractions as potential causes of crashes. This report presents the results of Phase I of the project. Included is a descriptive analysis of five years of the National Accident Sampling System (NASS) Crashworthiness Data System (CDS) data, along with an analysis of narratives for two years for both CDS and North Carolina data. The descriptive analyses and the narrative analysis were done to provide input for developing a more comprehensive taxonomy of driver distractions; the taxonomy will guide future field data collection efforts.

The CDS is an annual probability sample of approximately 5,000 police-reported crashes involving at least one passenger vehicle that has been towed from the crash scene. Data are collected by trained, professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, as well as from available medical records. Beginning in 1995, a variable for coding the "Driver's Distraction/Inattention to Driving" was added to the CDS. The variable contains codes for attentive, looked but did not see, and sleepy, along with more than a dozen specific distractions (eating or drinking, other occupants, moving object in vehicle, talking on cellular phone, etc.).

For the current analyses two variables were defined – one identifying the attention status of the driver (attentive, distracted, looked but did not see, sleepy/asleep, or unknown), and the second the specific distracting event for those drivers identified as distracted. The CDS driver distraction data is vehicle rather than crash oriented and consequently it underestimates the role of distraction in actual crashes.

For the overall 1995-1999 CDS data, 48.6% of the drivers were identified as attentive at the time of their crash; 8.3% were identified as distracted, 5.4% as "looked but did not see," and 1.8% as sleepy or asleep. The remaining 35.9% were coded either as unknown or no driver present. This high percentage of drivers with unknown attention status has the effect of diluting the percentages in the other categories. Without the unknowns, the percentage of drivers identified as distracted increases to 12.9%. The percentage of actual *crashes* involving driver distraction would be still higher.

**The specific sources of distraction among distracted drivers were:**

| **Specific Distraction** | **% of Drivers** |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette, CD | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.3 |
| Other device/object brought into vehicle | 2.9 |
| Adjusting vehicle/climate controls | 2.8 |
| Eating or drinking | 1.7 |
| Using/dialing cell phone | 1.5 |
| Smoking related | 0.9 |
| Other distraction | 25.6 |
| Unknown distraction | 8.6 |
| | 100.0 |

Percentages for the different types of distractions should be viewed as preliminary estimates that are likely biased by differential underreporting. These are research results that will be useful in building a broader understanding of driver distraction. The percentages for the different types of distractions should not be used to guide policy development.

Young drivers (under 20 years of age) were the most likely to be involved in distraction-related crashes. In addition, certain types of distractions were more prominent in certain age groups, for example, adjusting the radio, cassette or CD among the under 20-year-olds; other occupants (e.g., young children) among 20-29 year-olds; and outside objects and events among those age 65 and older. Variations by driver sex were less pronounced, although males were slightly more likely than females to be categorized as distracted at the time of their crash.

In addition to these driver factors, a number of roadway, environmental, vehicle, and crash characteristic variables were also examined to determine their relationship to driver distraction. Although these results were less conclusive, they nevertheless underscore the importance of taking into account specific contextual factors in collecting and analyzing driver distraction data. A few illustrative examples include the higher proportion of adjusting radio/cassette/CD events occurring in nighttime crashes, the higher proportion of moving object in vehicle events occurring in crashes on non-level grade roadways, and the higher proportion of other occupant distractions occurring at intersection crashes.

To obtain further insight into the specific events falling into each of the identified CDS categories, two years of narrative CDS data were reviewed. In addition, a computerized search was made of two years of North Carolina police-reported crash narratives. Both activities proved helpful in developing a more complete taxonomy of events distracting drivers.

When interpreting the results of this Phase I analysis, it is important to keep in mind both the purpose for which it was conducted, and the limita-

tions inherent in the data. The primary purpose of the analysis was to provide input for the development of a more comprehensive taxonomy of driver distractions and to understand important contextual variables. The data limitations are considerable and include potential underreporting of distracted driving in general as well as differential underreporting of specific distracting events.

These results suggest that demographic and situational factors are related to driver distraction. Additional research is needed to quantify the frequency and intensity of different driver distractions and to understand how other variables affect distractability and willingness to engage in distracting behaviors. As roads grow more congested and the demands on drivers increase, it seems likely that new in-vehicle technologies will add even more potential distracters.

# INTRODUCTION

Driver inattention is a major contributor to highway crashes. The National Highway Traffic Safety Administration (NHTSA) estimates that approximately 25% of police-reported crashes involve some form of driver inattention – the driver is distracted, asleep or fatigued, or otherwise "lost in thought" (Wang, Knipling and Goodman, 1996; Ranney, Mazzae, Garrott and Goodman, 2000). Estimates from other sources are as high as 35-50% (Sussman, Bishop, Madnick and Walter, 1995; NHTSA, 1997).

The AAA Foundation for Traffic Safety (AAAFTS) is committed to educating the public about issues affecting safety on the roadway. A contract was awarded to the University of North Carolina Highway Safety Research Center to conduct research on "The Role of Driver Distraction in Traffic Crashes." The goal of the project is to identify the major sources of distraction to drivers and the relative importance of different types of distractions in causing crashes. The project involves a number of distinct yet interrelated tasks, including: analysis of crash data from the NASS Crashworthiness Data System (CDS) data file; analysis of narrative data from CDS and North Carolina crash reports; and collection and analysis of field data to determine the prevalence and implications of selected driving distractions in real-world driving.

This report documents the work carried out to date on the project, focusing on the CDS and North Carolina data analyses.

AAAFTS has chosen to focus its efforts specifically on driver distraction, rather than the broader category of driver inattention. It defines distraction as "when a driver is delayed in the recognition of information needed to safely accomplish the driving task because some event, activity, object, or person within or outside the vehicle compelled or tended to induce the driver's shifting attention away from the driving task." The presence of a triggering event distinguishes a distracted driver from one who is simply inattentive or "lost in thought."

Safety problems related to driver inattention and distraction are expected to escalate in the future as more technologies become available for use in personal vehicles. During the summer of 2000, NHTSA hosted an Internet Forum on the safety implications of driver distraction when using in-vehicle technologies including cell phones, in-vehicle navigation systems, night vision systems, and wireless Internet (Llaneras, 2000). The Forum attracted broad international participation from both the public and private sectors.

While cellular telephones and other in-vehicle technologies have been the focus of considerable research within the highway safety community, much less attention has been given to identifying other, non-technological, distractions within the vehicle and their potential role in causing crashes.

The last in-depth crash causation research was sponsored by NHTSA and conducted at Indiana University during the mid-1970s (Treat, Tumbas, McDonald et al., 1979). This study, frequently referred to as the Indiana Tri-Level Study because of the three levels of crash investigation employed, examined the human, environmental, and vehicular factors in traffic crashes.

Study results identified human factors as probable causes in 93% of the investigated crashes, environmental factors as probable causes in 34%, and vehicular factors as probable causes in 13%. Internal distraction was cited as a causal factor in 9% of the crashes and driver inattention in an additional 15%. No information was reported on the frequency of external distractions.

## CDS DATA ANALYSIS

The National Highway Traffic Safety Administration initiated the Crashworthiness Data System (CDS) in 1988. It is intended to complement the General Estimates System (GES) data, which is based entirely on information derived from police crash reports. The CDS collects much more detailed information on an annual probability sample of approximately 5,000 police-reported traffic crashes involving at least one passenger vehicle that has been towed from the crash scene. The CDS employs trained professional crash investigation teams that collect information at the scene of the crash, from an examination of the crash-involved vehicles, directly from interviews with the crash victims and other witnesses, and from available medical records.

The CDS captures information on passenger vehicles, which includes automobiles, pickup trucks, light vans, and sport utility vehicles, and on a few non-passenger vehicles whose air bag may have deployed in the crash. These vehicle types comprise 93% of all crash-involved vehicles and are the target of the current investigation. Only passenger vehicles damaged seriously enough to require towing from the crash scene are included in the CDS; about a fourth of all police-reported crashes involve vehicles this seriously damaged. This towaway selection criterion has the advantage of limiting the sample to those crashes that have the most serious consequences in terms of injury and/or property damage: nearly half of the drivers of vehicles reported in the CDS are injured, compared to a third of drivers in the GES. This criterion also standardizes the reporting threshold across states rather than requiring investigators to estimate the cost of vehicle repairs or to make other subjective judgments about whether a vehicle should be included in the sample.

Both the focus on passenger vehicles and the restriction to more serious crashes make the CDS a potentially useful source of data for the current project. The primary reason for using the CDS, however, is the level of detail contained for each reported crash, including a variable describing the attention status of the driver – “Driver’s Distraction/Inattention to Driving” (see Appendix A). The variable was added to the data collection protocol beginning in 1995. In addition to specific driver distraction and inattention codes, it includes optional narrative information that gives a fuller picture of an identified distraction and can be used to record new and unspecified distractions.

The current analysis is based on 1995-1999 CDS data obtained from the NHTSA National Center for Statistics and Analysis. For this analysis two variables were created from the original “Driver’s Distraction/Inattention to Driving” variable shown in Appendix A.

**DRIVER ATTENTION STATUS has five categories:**

1. Attentive
2. Distracted
3. Looked but didn't see
4. Sleepy or fell asleep
5. Unknown or no driver

**DRIVER DISTRACTION has 13 categories:**

1. Eating or drinking
2. Outside person, object or event
3. Adjusting radio, cassette, or CD
4. Other occupants in vehicle
5. Moving object in vehicle
6. Smoking related
7. Talking or listening on cellular phone
8. Dialing cellular phone
9. Using device/object brought into vehicle
10. Using device/controls integral to vehicle
11. Adjusting climate controls
12. Other distraction
13. Unknown distraction

Table 1. Driver attention status based on the unweighted CDS data[1]

| Driver Attention Status | 1995 | 1996 | 1997 | 1998 | 1999 | Total |
|---|---|---|---|---|---|---|
| Attentive | 3030<br>(46.5)[2] | 3204<br>(48.0) | 2451<br>(37.8) | 2877<br>(44.5) | 2598<br>(42.2) | 14160<br>(43.8) |
| Distracted | 557<br>(8.6) | 476<br>(7.1) | 393<br>(6.1) | 468<br>(7.2) | 486<br>(7.9) | 2380<br>(7.4) |
| **Looked but didn t see** | **347<br>(5.3)** | **347<br>(5.2)** | **288<br>(4.4)** | **275<br>(4.3)** | **305<br>(5.0)** | **1562<br>(4.8)** |
| Sleepy or fell asleep | 188<br>(2.9) | 195<br>(2.9) | 113<br>(1.7) | 151<br>(2.3) | 150<br>(2.4) | 797<br>(2.5) |
| Unknown/no driver | 2390<br>(36.7) | 2457<br>(36.8) | 3247<br>(50.0) | 2691<br>(41.6) | 2619<br>(42.5) | 13404<br>(41.5) |
| TOTAL | 6512 | 6679 | 6492 | 6462 | 6158 | 32303 |

[1] The unweighted data includes some special study cases (e.g., redesigned air bag and truck underride) that are not included in the weighted tables that follow.
[2] Column percent

**Table 1** shows the recorded attention status of drivers on the unweighted (or raw) data files. The information in Table 1 is vehicle, not crash, oriented. In other words, there is one record for each vehicle that was towed from the crash scene.

For these unweighted data files involving approximately 6,500 vehicles/drivers annually, instances of driver distraction are coded for 7.4% of the overall sample. It should also be noted, however, that the attention status of the driver just prior to the crash is reported as unknown (or no driver present) in a large proportion of the vehicles (41.5%), despite the in-depth nature of the crash investigations.[1]

**Table 2** presents the same percentage distributions of driver attention status, but based on the weighted CDS data files; instead of 6,500 crash-involved vehicles per year, the table reflects an average of 3.4 million crash-involved vehicles annually. The weighting factor assigned to a given case is determined by (1) the probability of the primary sampling unit being selected, (2) the probability of the particular police agency being selected, and (3) the

Table 2. Driver attention status based on the weighted CDS data (column percents and standard errors)

| Driver Attention Status | 1995 (N=3.4 M) | 1996 (N=3.5 M) | 1997 (N=3.7 M) | 1998 (N=3.3 M) | 1999 (N=3.2M) | Overall (N=17.1 M) |
|---|---|---|---|---|---|---|
| Attentive | 50.9[1] (3.1)[2] | 54.4 (3.7) | 40.4 (5.2) | 51.0 (3.6) | 46.9 (2.0) | 48.6 (2.7) |
| **Distracted** | **9.6 (1.1)** | **8.0 (0.8)** | **4.9 (1.1)** | **11.1 (1.4)** | **8.2 (1.2)** | **8.3 (0.6)** |
| Looked but didn t see | 6.4 (1.3) | 5.7 (0.9) | 3.9 (0.9) | 4.4 (1.4) | 6.8 (0.8) | 5.4 (0.7) |
| Sleepy or fell asleep | 2.0 (0.8) | 2.5 (0.8) | 0.9 (0.3) | 1.2 (0.3) | 2.3 (0.8) | 1.8 (0.4) |
| Unknown/no driver | 31.1 (1.8) | 29.4 (2.9) | 49.9 (6.1) | 32.3 (3.5) | 35.9 (2.7) | 35.9 (2.8) |

[1]Column percent
[2]Standard error

probability of the crash being selected for that day. The weighted frequencies reflect the same sampling base as the unweighted frequencies — passenger vehicles involved in towaway crashes. However, the frequencies are extrapolated to represent the total population of such crash-involved vehicles in the U.S.

With the weighting factors in place, the percentage of vehicles involving a distracted driver increases to 8.3%, and the percentage of unknown or no driver cases drops to 35.9%. Although this table only shows the percentage distributions, the overall projected numbers of vehicles can be calculated by multiplying the percentages by the sample sizes shown at the top of the table. For example, 8.3% of 17.1 million vehicles/drivers is 1.4 million cases over the 5-year study period, or an annual average of 284,000 distracted

[1] The percentage of unknown cases was especially high in 1997, due to fewer occupant interviews and vehicle inspections being conducted while data collection procedures were being converted to a new electronic system.

drivers in towed vehicles.

Having such a large proportion of unknown cases in the data dilutes the overall proportion of drivers identified as distracted at the time of their crash. Also, the fact that the percentage of unknown cases varies widely across years (from 29 to almost 50%) makes it difficult to draw comparisons in the percentage of distraction cases occurring from one year to the next. If one assumes that the unknown cases are distributed like the known cases[2], the overall percentage of crash-involved vehicles with distracted drivers is 12.9%. The yearly percentages are 13.9% for 1995, 11.3% for 1996, 9.9% for 1997, 16.5% for 1998, and 12.7% for 1999.

Because the CDS are weighted sample data, each of the percentage estimates presented in Table 2 has a corresponding standard error. Percentage estimates and standard errors were calculated using SUDAAN, a statistical software package that handles multi-level and multi-year sample data (Shah, Barnwell, and Bieler, 1997). By multiplying the standard error by 1.96 and then adding and subtracting this number from the estimate, one can obtain upper and lower 95% confidence limits for each of the estimates.

**Figure 1** shows the overall estimates of driver attention status contained in Table 2 along with their associated 95% confidence intervals. Based on the data, we can conclude with 95% certainty that, if *all* towaway crashes in the U.S. were examined following the CDS protocol, 7.1% to 9.4% of the drivers in those vehicles would be identified as distracted. An additional 30.4% to 41.5% would have unknown or not applicable attention status.

As was described earlier, the CDS data also contains more detailed




Figure 1. Overall distribution of driver attention status based on the weighted 1995-1999 CDS data.

[2] Analyses showed unknown cases to be similar to known cases with respect to driver age, gender, and other important variables. However, unknown cases were more likely to occur at nighttime, and were less likely to involve occupants other than the driver.

Table 3. Yearly trends in specific driving distractions based on weighted CDS data (column percents and standard errors)

| Driver Distraction | 1995 (N=322K) | 1996 (N=279K) | 1997 (N=182K) | 1998 (N=371K) | 1999 (N=265) | Overall (N=1,420K) |
|---|---|---|---|---|---|---|
| Outside person, object, event | 28.1[1] (6.9)[2] | 35.1 (4.7) | 35.4 (6.4) | 19.8 (5.5) | 34.3 (4.1) | 29.4 (2.4) |
| Adjusting radio/cassette/CD | 14.1 (1.6) | 4.7 (1.5) | 0.4 (0.3) | 23.5 (12.5) | 5.7 (2.4) | 11.4 (3.7) |
| Other occupant | 11.8 (1.7) | 12.8 (4.3) | 10.6 (5.6) | 7.5 (2.4) | 12.7 (3.0) | 10.9 (1.7) |
| Moving object in vehicle | 3.5 (2.5) | 6.2 (3.1) | 2.5 (1.0) | 2.2 (1.0) | 7.6 (4.0) | 4.3 (1.6) |
| Other device/object | ---[3] | 2.6 (1.1) | 4.1 (2.5) | 5.3 (3.2) | 2.7 (1.2) | 2.9 (0.8) |
| Vehicle/climate controls[4] | 4.1 (1.2) | 1.6 (0.9) | 3.4 (1.0) | 2.4 (1.4) | 2.7 (0.8) | 2.8 (0.6) |
| Eating, drinking | 1.8 (0.6) | 1.3 (0.5) | 0.3 (0.2) | 1.6 (0.7) | 3.3 (1.8) | 1.7 (0.3) |
| Using/dialing cell phone[5] | 1.2 (0.6) | 2.8 (1.7) | 3.5 (1.4) | 0.3 (0.1) | 0.8 (0.7) | 1.5 (0.5) |
| Smoking related | 1.6 (0.9) | 0.5 (0.4) | 1.6 (0.5) | 0.01 (0.01) | 1.2 (0.7) | 0.9 (0.2) |
| Other distraction | 17.1 (6.0) | 19.7 (3.0) | 35.0 (7.2) | 35.3 (9.4) | 21.9 (5.7) | 25.6 (3.1) |
| Unknown distraction | 16.7 (7.5) | 12.9 (3.1) | 3.0 (2.0) | 2.1 (0.9) | 7.2 (2.3) | 8.6 (2.7) |

[1] Column percent
[2] Standard error
[3] Variable not available in 1995
[4] Combination of using device/controls integral to vehicle and adjusting climate controls
[5] Combination of talking or listening on cellular phone and dialing cellular phone

information on the specific nature of distracting events. This information is summarized in **Table 3**, again based on the weighted data. The total number of projected crash-involved vehicles with distracted drivers is shown at the top of each column, and the percentage distribution by type of distraction is given below, along with their standard errors. Percentages in each column total 100%. Two of the distraction categories represent combined categories from the original list of 13: “Using device/controls integral to vehicle” and “adjusting climate controls” have been combined into a single “vehicle/climate control” category, and “talking or listening on cellular phone” and “dialing cellular phone” have been combined into “using/dialing cell phone.” This was done because of very small numbers of raw cases for the adjusting climate controls and dialing cell phone categories.

Based on the Table 3 results, the most frequently reported source of distraction for drivers of vehicles in towaway crashes is outside persons, objects, or events (29.4%), followed by adjusting the radio, cassette or CD (11.4%), and other occupants in vehicle (10.9%). All other identified distractions – moving objects in vehicle, objects brought into the vehicle, adjusting vehicle or climate controls, eating and drinking, using a cellular phone, and smoking – each

account for only 1% to 4% of the total. In addition, there is a large category of "other" distracting events (25.6%) and "unknown" distractions (8.6%). More detailed information on the specific types of events is included in the section on the CDS Narrative Analysis and Table 15 later in this document.

It should be noted that there is large year-to-year variability in the generated percentages. This is true even for some categories (such as adjusting the radio, cassette or CD player) that are based on relatively large annual counts. In addition, the weighting process substantially alters some of the percentages. Consequently, the results contained in this report are primarily based on the combined, five-year weighted data.

**Figure 2** is similar to Figure 1, and shows the overall estimates for the




Figure 2. Overall distribution of specific driver distractions based on the weighted 1995-1999 CDS data.

various distractions and their 95% confidence intervals. In many cases the confidence intervals are quite large, a reflection of the heavily weighted data. Nevertheless, outside distractions; distractions involving a radio, CD or tape player; and distractions by other occupants in the vehicle generally stand out as most important.

The remainder of this section presents tables based on the overall weighted CDS data, examining the impact on driver distraction of various driver, roadway, environmental, vehicle, and crash characteristics. In describing these tables, we have not limited ourselves to only those results that are statistically significant. In part, this is because each table presents many possible comparisons. In addition, some results, even though not statistically significant (such as those pertaining to cell phones or other specific

Table 4. Distribution of driver attention status within categories of driver age based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Attentive | 48.6 [1] (2.7) [2] | 47.4 (2.9) | 50.7 (2.8) | 53.6 (5.1) | 47.8 (3.9) |
| **Distracted** | **11.7 (1.9)** | **7.6 (0.7)** | **8.0 (0.9)** | **7.5 (0.8)** | **7.9 (1.4)** |
| Looked but didn t see | 5.4 (0.7) | 4.6 (1.2) | 4.2 (1.0) | 4.4 (0.9) | 16.5 (2.8) |
| Sleepy or fell asleep | 1.7 (0.5) | 1.9 (0.6) | 1.9 (0.6) | 2.0 (0.6) | 1.1 (0.3) |
| Unknown/no driver | 32.6 (2.8) | 38.6 (3.3) | 35.2 (3.3) | 32.6 (4.4) | 26.7 (2.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Column percent
[2] Standard error

distractions based on small sample sizes), may still have important research implications. In many instances significance can be determined by a quick comparison of the confidence intervals shown in the figure accompanying a table. For readers interested in more detailed comparisons, having standard errors included in the tables allows this flexibility.

## Driver Factors

**Table 4** presents information on driver attention status by the age of the driver. The table shows that drivers under age 20 were more likely than older drivers to be identified as distracted at the time of their crash: 11.7% of drivers under age 20 were found to be distracted, compared to 8.0% or less for each of the other age groups. When the “unknown” cases are subtracted from the totals, the percentage of young drivers identified as distracted climbs to 17.3%. The proportion of distracted drivers was fairly consistent across all age groups above the youngest. These same results are shown graphically in **Figure 3**. From the graph, it is easy to see that while the youngest age group is more likely to be identified as distracted, this difference is not statistically significant since its confidence interval overlaps with those of the other categories.

In contrast, it is the oldest age group of drivers, those age 65 and above, who stand out with regard to the two other forms of driver inattention identified in Table 4: “looked but didn’t see” and “sleepy or fell asleep.” Drivers age 65 and older were three to four times more likely to have “looked but didn’t see,” and almost half as likely to have been sleepy or asleep prior




Figure 3. Percentage of drivers identified as distracted by age group.




Figure 4. Age distribution of drivers identified as distracted.

Table 5. Distribution of driver age within categories of driver attention status based on weighted 1995-1999 CDS data (row percents and standard errors)

| Driver Attention Status | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Attentive | 16.6 [1] (0.9) [2] | 28.7 (1.6) | 36.4 (1.7) | 10.8 (0.8) | 7.6 (0.6) |
| **Distracted** | **23.3 (3.1)** | **26.9 (1.9)** | **33.7 (3.5)** | **8.8 (1.0)** | **7.3 (1.1)** |
| Looked but didn t see | 16.5 (1.8) | 24.9 (3.1) | 27.3 (5.1) | 8.0 (1.9) | 23.4 (4.8) |
| Sleepy or fell asleep | 16.3 (3.3) | 31.5 (4.8) | 36.7 (5.5) | 10.8 (4.7) | 4.7 (1.8) |
| Unknown/no driver | 15.8 (1.4) | 33.2 (1.8) | 35.8 (1.2) | 9.3 (1.0) | 6.0 (0.6) |
| OVERALL | 16.9 | 29.9 | 35.4 | 9.9 | 7.8 |

[1] Row percent
[2] Standard error

to crashing.

**Table 5** and **Figure 4** examine driver age from a different perspective, by presenting row percents rather than column percents. The question of interest here is, “What is the age distribution of drivers involved in distraction crashes, compared to other types of crashes?” Here we can see that half (50.2%) of drivers involved in distraction crashes are under 30 years of age and 83.9% are under 50. While this is a relatively youthful population of drivers, it is not too different from the overall age distribution of drivers involved in crashes serious enough to require towing from the scene. Meanwhile, drivers age 50 and above are involved in only 16.1% of distraction crashes.

**Table 6** provides more detailed information on the specific types of distractions for the various age groupings of drivers. Drivers under age 20 were much more likely than older drivers to have been distracted while adjusting a radio, cassette, or CD player. For drivers in the 20-29 year age group, other occupants were especially likely to be a source of distraction,

**Table 6**. Distribution of specific driver distractions within categories of driver age based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Distraction | AGE <20 | 20-29 | 30-49 | 50-64 | 65+ |
|---|---|---|---|---|---|
| Outside person, object, event | 27.0[1] (5.9)[2] | 29.0 (4.3) | 27.5 (2.1) | 33.3 (9.2) | 42.8 (13.5) |
| Adjusting radio/cassette/CD | 28.9 (12.1) | 7.9 (3.3) | 7.3 (3.3) | 0.6 (0.4) | 0.2 (0.2) |
| Other occupant | 10.7 (2.0) | 17.8 (4.7) | 9.8 (2.4) | 1.5 (1.0) | 2.6 (1.0) |
| Moving object in vehicle | 5.0 (4.4) | 2.4 (0.9) | 6.5 (4.1) | 3.6 (2.1) | 0.1 (0.1) |
| Other device/object | 1.3 (0.6) | 2.7 (0.9) | 4.2 (1.6) | 4.4 (3.2) | 1.4 (1.0) |
| Vehicle/climate controls | 3.1 (1.5) | 2.1 (0.5) | 3.3 (1.2) | 3.4 (2.0) | 1.8 (1.7) |
| Eating, drinking | 1.1 (0.5) | 1.4 (0.6) | 1.1 (0.4) | 7.9 (2.1) | 0.5 (0.6) |
| Using/dialing cell phone | 0.1 (0.1) | 0.7 (0.4) | 3.3 (1.2) | 0.1 (0.1) | 2.3 (2.1) |
| Smoking related | 0.9 (0.4) | 1.1 (0.3) | 1.0 (0.5) | 0.3 (0.3) | 0.0 (0.0) |
| Other distraction | 19.4 (4.2) | 22.6 (4.5) | 25.7 (3.1) | 34.5 (6.0) | 45.0 (11.7) |
| Unknown distraction | 2.5 (0.6) | 12.4 (2.9) | 10.5 (3.8) | 10.3 (6.0) | 3.2 (1.5) |
| OVERALL | 23.0 | 26.8 | 34.0 | 9.2 | 7.1 |

[1] Column percent
[2] Standard error

while for those ages 30-49, dialing and using a cell phone was more frequently cited (although still only a small percentage of the cases overall). Drivers ages 50-64 were overrepresented with respect to eating and drinking distractions, while those ages 65 and older were more likely to have been distracted by objects and events outside the vehicle (other vehicles, signs, animals, etc.) and by other (unspecified) distractions.

With regard to driver sex, males were slightly more likely than females to be involved in crashes involving driver distraction, but the difference was not statistically significant (**Table 7**). The specific types of distractions were also similar for male and female drivers (**Table 8** and **Figure 5**). Overall, 63% of the distracted drivers were male and 37% were female (compared to 56% and 44%, respectively, for all drivers in the CDS database).

It should again be emphasized that these percentages are vehicle or

Table 7. Distribution of driver attention status for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Attention Status | Male | Female |
|---|---|---|
| Attentive | 46.6 [1] (3.1) [2] | 52.6 (2.7) |
| **Distracted** | **8.8 (0.7)** | **7.8 (0.6)** |
| Looked but didn t see | 4.9 (0.6) | 6.2 (1.0) |
| Sleepy or fell asleep | 2.7 (0.8) | 0.7 (0.1) |
| Unknown/no driver | 37.0 (2.8) | 32.8 (3.3) |
| OVERALL | 56.2 | 43.8 |

[1] Column percent
[2] Standard error




Figure 5. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data.

Table 8. Distribution of specific driver distractions for males and females based on weighted 1995-1999 CDS data (column percents and standard errors)

| Driver Distraction | Male | Female |
|---|---|---|
| Outside person, object, event | 28.9[1] (3.7)[2] | 30.5 (2.7) |
| Adjusting radio/cassette/CD | 10.3 (2.4) | 13.1 (8.4) |
| Other occupant | 11.2 (2.4) | 10.6 (2.0) |
| Moving object in vehicle | 4.2 (2.5) | 4.7 (2.0) |
| Other device/object | 2.2 (0.9) | 4.1 (1.7) |
| Vehicle/climate controls | 2.3 (0.9) | 3.6 (1.3) |
| Eating, drinking | 2.0 (0.7) | 1.3 (0.6) |
| Using/dialing cell phone | 1.7 (0.5) | 1.2 (0.7) |
| Smoking related | 0.9 (0.2) | 0.9 (0.4) |
| Other distraction | 28.3 (3.1) | 22.0 (4.1) |
| Unknown distraction | 8.0 (3.1) | 8.1 (2.9) |
| OVERALL | 63.1 | 36.9 |

[1] Column percent
[2] Standard error

driver oriented, rather than crash oriented. To the extent that young and/or male drivers are more likely to be "at fault" in their collisions, one might also anticipate higher incidences of distracted or inattentive driving. The percentages also underestimate the importance of distraction as a contributing factor to *crashes*. This is because it is unlikely that more than one of the drivers involved in two (or more) vehicle crashes is distracted at the time of the crash: if 10 out of 100 two-vehicle crashes are caused by distracted drivers, then 10% of the crashes involve a distracted driver, but only 5% (10 out of 200) of the vehicles had distracted drivers.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,<br>d/b/a The Cozy Inn; Stephen Howard,** | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION<br>CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) | |
| **City of Salina, Kansas,** | ) | |
| **Defendant.** | ) | |

**AFFIDAVIT OF DEAN ANDREW**

I, Dean Andrew, Zoning Administrator for the City of Salina, Kansas, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts set forth in this Affidavit, and, if called as a witness, I could testify competently to them.

2. I am the City of Salina Zoning Administrator. I have held this position since 2009.

3. The City regulates signs pursuant to Chapter 42 Article X of the Salina Code of Ordinance, along with related definitions in Chapter 42 Article XIV.

4. The documents attached hereto as Affidavit Exhibit 1 are in my file as the Zoning Administrator and were considered by me in anticipation of the City of Salina's 2017 amendment to the sign code, set forth in Ordinance Number 17-10882.

5. Ordinance Number 17-10882 is attached hereto as Affidavit Exhibit 2.

6. Affidavit Exhibit 1 documents include:

**EXHIBIT M**

i. The Cardozo Law Review article entitled "Art or Signage?: The Regulation of Outdoor Murals and the First Amendment" [bates stamped CITY000673-702].

ii. Rocky Mountain Sign Law Blog article entitled "San Diego's Motion for Summary Judgment Granted in Mural Case" [bates stamped CITY001510-511].

iii. Relevant pages of the APA National Planning Conference presentation on "Regulating Digital Signs and Billboards" [bates stamped CITY001585, 1600-01, 1615-17

7. As stated in Ordinance Number 17-10882, the *Reed v. Town of Gilbert* decision prompted the Governing Body of the City of Salina to amend Article X, Chapter 42 of the Salina Code (referred to as the "Sign Code") in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City.

Signed: Dean Andrew
Dean Andrew

STATE OF Kansas )
) ss.
COUNTY OF Saline )

Subscribed and sworn to before me by Dean Andrew on the 7th day of February, 2025.

Witness my hand and official seal. My commission expires: 4/29/2028

(Seal)
SHANDI L. WICKS
Notary Public - State of Kansas
My Appt. Expires 4/29/2028

Shandi L Wicks
Notary Public

# Regulating Digital Signs and Billboards (S606)

Sponsored by *Zoning Practice*

APA National Planning Conference
Tuesday, April 28, 2009

**ANDREW AFFIDAVIT EX. 1**

**CITY001585**

# Driver Distraction #1 Cause of Crashes

| Causal Category | Percentage of Drivers Contributing to Causation |
|---|---|
| Driver Distraction | 22.7 |
| Vehicle Speed | 18.7 |
| Alcohol Impairment | 18.2 |
| Perceptual Errors | 15.1 |
| Decision Errors | 10.1 |
| Incapacitation | 6.4 |
| Other | 8.8 |

Source: National Highway Traffic Safety Administration, 2001; 2006.

# Specific Distraction: % of Drivers

| | |
|---|---|
| Outside person, object or event | 29.4 |
| Adjusting radio, cassette | 11.4 |
| Other occupant in vehicle | 10.9 |
| Moving object in vehicle | 4.4 |
| Other device in vehicle | 2.9 |
| Adjusting vehicle/temp | 2.8 |
| Eating or drinking | 1.7 |
| Dialing/using cell phone | 1.5 |
| Smoking | 0.9 |
| Other distraction | 25.9 |
| Unknown distraction | 8.6 |

# Goals and Purpose

- The statement of purpose includes promoting traffic safety and community aesthetics. We look to the legislative body's statement of intent.

# Narrow Tailoring

- Concord's interests in traffic safety and community aesthetics would be achieved less effectively without the prohibition.

# Need for Studies

- NJI argues that Concord must perform studies to uphold the ban. Concord was under no obligation to do such studies or put them into evidence.

Rocky Mountain Sign Law Blog

Regulatory, Best Practices and Other First Amendment News from Colorado's Leading Land Use Law Firm

# San Diego's Motion for Summary Judgment Granted in Mural Case

By Brian J. Connolly on May 1, 2017

In a **case that we reported on last year**, a federal district court in California granted summary judgment in favor of the City of San Diego in a case involving art murals.

Some of the facts of the case are reported in our prior post. The San Diego sign code exempts from permitting "[p]ainted graphics that are murals, mosaics, or any type of graphic arts that are painted on a wall or fence and do not contain copy, advertising symbols, lettering, trademarks, or other references to the premises, products or services that are provided on the premises where the graphics are located or any other premises." Otherwise, all signs visible from the right of way are required to obtain a permit, and signs on city-controlled property must obtain a permit as well. Messages on city-controlled property are limited to on-premises speech and "public interest" messages. As we previously noted, the plaintiff, a mural company, was granted approval to place two wall murals in San Diego, but

received a violation for the placement of a third mural. The plaintiff believes that the annual Comic-Con event was given special treatment by the city, because certain signs posted around the city during the event were not issued citations.

On the city's motion for summary judgment, the court treated the signs in question as commercial speech and analzyed the regulations under the *Central Hudson* test, finding that the regulations easily passed constitutional muster. In the court's view, the city had established that its interests in optimizing communication and aesthetics were substantial, and that the restrictions directly advanced these interests without going further than necessary. The court did not provide any analysis to support its conclusion that the speech in question was commercial. In response to the plaintiff's arguments that the mural exception undermined the city's asserted interests, the court disagreed. And consistent with other lower courts' recent holdings, the court rejected the plaintiff's argument that *Reed v. Town of Gilbert* had invalidated the on-premises/off-premises distinction.

Furthermore, responding to the plaintiff's claims that the San Diego sign code was unconstitutionally vague, the court, while noting that "the sign ordinance at issue is far from a paragon of clarity," found that the mural exception, public interest exception, and on-premises/off-premises distinction were sufficiently clear. The court also rejected the plaintiff's prior restraint, selective enforcement, due process, and intentional interference with prospective business advantage claims.

**ArchitectureArt, LLC v. City of San Diego, ___ F. Supp. 3d __, 2017 WL 1226913 (S.D. Cal. Jan. 6, 2017).**

OTTENJOHNSON
ROBINSON NEFF + RAGONETTI PC

# ART OR SIGNAGE?: THE REGULATION OF OUTDOOR MURALS AND THE FIRST AMENDMENT

*Christina Chloe Orlando*†

TABLE OF CONTENTS


INTRODUCTION ....868

I. BACKGROUND ....871
- A. *Sign Regulation* ....871
  - 1. Community Aesthetics and Traffic Safety ....872
  - 2. Content Neutrality ....872
- B. Metromedia, Inc. v. City of San Diego ....874
- C. *Post-*Metromedia *Developments in Free Speech Law* ....876

II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION ....879
- A. *Sources of Inconsistency in Mural Case Law* ....881
  - 1. Defining Commercial Speech ....881
  - 2. Analyzing Content Neutrality ....882
- B. *Eliminating the Commercial/Noncommercial Speech Distinction* ....885
  - 1. Constitutional Flaws ....885
  - 2. Classifying Mural Speech ....889
  - 3. Classifying Mural Art ....890
  - 4. Murals as Art ....892

III. A MODEL FOR REGULATING OUTDOOR MURALS ....893

CONCLUSION ....896


† Senior Articles Editor, *Cardozo Law Review*. J.D. Candidate (May 2014), Benjamin N. Cardozo School of Law; A.B., Harvard University, 2011. Many thanks to Professor Stewart Sterk for suggesting this topic and providing invaluable guidance throughout the research and writing process.

## INTRODUCTION

Sally Business Owner runs a successful flower and gift shop in a vibrant suburban town. She sells a wide variety of flowers and related items, including vases and balloons. One day, after deciding that she wants to give her shop a makeover, Sally commissions a local artist to paint a tasteful mural of colorful flowers on the exterior wall of her building. The mural covers the entire wall. Sally believes the mural to be a beautiful piece of art[1] that the community will greatly enjoy. The following week, Sally receives a notice from Wanda Zoning Administrator. According to the notice, Sally's flower mural is in violation of the town sign ordinance that prohibits any outdoor "sign" from exceeding sixty square feet. Because Sally's mural contains flowers and the mural is painted on a commercial shop that sells flowers, the mural qualifies as "advertising" and falls under the ordinance's definition of "sign."[2] Wanda notes that if the mural contained anything other than flowers, such as panda bears or palm trees, it would be deemed art rather than signage. Wanda orders Sally to remove the mural, or else face a hefty fine. Sally is perplexed, and believes that the zoning board has intruded upon her right to free speech.

---

1 The word "art," as used in this Note, indicates concrete works of visual art, such as paintings or sculptures. It does not include other art forms, such as films or productions of the performing arts.

2 This hypothetical is based on an earlier version of Arlington County's zoning ordinance at issue in *Wag More Dogs, Ltd. Liab. Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012), discussed *infra*. That version of the ordinance defined a "business sign" as a sign "identifying the products or services available on the premises or advertising a use conducted thereon." *See id.* at 362 (internal quotation marks omitted) (citing ARLINGTON COUNTY, VA., ZONING ORDINANCE § 34(G)). Arlington County's current zoning ordinance exempts certain works of visual art (including murals) from regulation as signage; to be exempted, artwork cannot include a "picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the wall is located." ARLINGTON COUNTY, VA., ZONING ORDINANCE § 13.2.3(C)(2)(e) (2013). In other words, the artwork cannot contain "commercial speech." Many municipalities throughout the country have substantially similar language in their sign ordinances. *See, e.g.*, TEMECULA, CAL., MUNICIPAL CODE § 17.28.050(U) (2013) (exempting works of art from sign regulations only if they do not convey a commercial message); ST. PETERSBURG, FLA., CITY CODE § 16.40.120.19 (2013) (defining artwork as "drawings, pictures, symbols, paintings . . . or sculpture, which does not in any way identify a product, service or business sold or available on the premises"); MARION COUNTY, IND., REV. CODE § 734-501(b) (2012) (defining a mural as "[a] design or representation painted, drawn or similarly applied on the exterior surface of a structure and which does not advertise a business, product, service, or activity"); MINNEAPOLIS, MINN., ZONING CODE § 520.160 (2013) (defining a mural as "[a] work of graphic art painted on a building wall, which contains no commercial advertising or logos, and which does not serve to advertise or promote any business, product, activity, service, interest or entertainment"); LAS VEGAS, NEV., ZONING CODE § 19.14.030(B)(4) (2010) (exempting works of art "that do not include a commercial message and are not symbolic of . . . commercial activities taking place on the premises on which the graphic is located").

Sally's belief is not unfounded. The First Amendment to the U.S. Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . . ."[3] This restriction extends to state and local government through the Due Process Clause of the Fourteenth Amendment[4] and plays a fundamental role in a municipality's regulation of outdoor signage.[5] While a municipality may place general time, place, and manner restrictions[6] on outdoor signage in order to preserve community aesthetics and ensure traffic safety, it may not discriminate against signage that promotes a certain viewpoint or contains certain content.[7]

The regulation of outdoor art murals[8] as signage is a recent phenomenon.[9] To date, only four courts have expressly analyzed the constitutionality of regulating mural art pursuant to the terms of a municipal sign ordinance.[10] Although mural law is still in its infancy, the convoluted status of the limited case law has led to "a war . . . a real

---

[3] U.S. CONST. amend. I.

[4] U.S. CONST. amend. XIV, § 1; *see* Gitlow v. New York, 268 U.S. 652, 666 (1925) ("[F]reedom of speech and of the press—which are protected by the First Amendment from abridgement by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."); Lovell v. City of Griffin, Ga., 303 U.S. 444, 450 (1938) ("It is also well settled that municipal ordinances adopted under state authority constitute state action and are within the prohibition of the [Fourteenth] amendment.").

[5] For a general overview of the relationship between free speech law and outdoor signage, see DANIEL R. MANDELKER, FREE SPEECH LAW FOR ON PREMISE SIGNS (2012).

[6] *See generally* 16B C.J.S. *Constitutional Law* § 828 (2012) (defining this term and providing case examples illustrating its application).

[7] *See infra* Part I.A.

[8] This Note focuses solely on murals that are independently commissioned. Cities throughout the United States have programs that allow for, and encourage, the public display of outdoor murals. *See, e.g.*, CITY PHILA. MURAL ARTS PROGRAM, http://www.muralarts.org (last visited Oct. 27, 2013); *Mural Program*, BEAVERTON ARTS COMMISSION, http://www.beavertonarts.org/index.aspx?NID=122 (last visited Oct. 27, 2013); *Public Art Murals Program*, REGIONAL ARTS & CULTURE COUNCIL, http://www.racc.org/public-art/mural-program (last visited Oct. 27, 2013); *Public Art Program*, CITY PASADENA, http://www.ci.pasadena.ca.us/arts/public_art_program (last visited Oct. 27, 2013). These public art mural programs are designed, in part, to enhance local aesthetics and foster community appreciation of the arts. Because municipalities implement and control these programs, issuing mural design guidelines to ensure adherence to local zoning requirements, zoning violations are rarely a concern.

[9] *See* MANDELKER, *supra* note 5, at 69 ("Sign ordinances regulate a wide variety of [outdoor] signs, and some of the unique and/or specialized types of signs include digital signs, portable signs, . . . murals," and sculptures). For a brief overview of a dispute involving regulation of a "unique" type of sign, see Frederick Melo, *St. Paul City Council: Creative Kidstuff Wins Zoning Appeal for Sculptural Signs*, TWINCITIES.COM (Aug. 1, 2012, 12:01 AM), http://www.twincities.com/stpaul/ci_21213086/st-paul-city-council-creative-kidstuff-wins-zoning (discussing a dispute between a toy company and the city of St. Paul, Minnesota over whether two eighteen-foot-tall cat images were "sculptural art" or "signs").

[10] *See infra* Part II. The four cases were decided in 2009, 2010, 2011, and 2012.

fight around the country."[11] Indeed, disputes between zoning administrators and mural owners over whether a particular mural is "art" or "signage" have become increasingly common.[12] These disputes are complicated, in part, because a legitimate work of art may also serve signage functions, oftentimes unintentionally.[13] In these cases, should the fact that an art mural contains "commercial speech" subject it to a lesser degree of constitutional protection?

This Note attempts to fit outdoor mural regulation into the broader scheme of constitutional law generally, and billboard and signage law specifically. In doing so, this Note argues that a municipality, in enacting a sign ordinance, may not distinguish between murals containing commercial speech and those containing noncommercial speech. The application of this distinction not only constitutes impermissible content-based regulation, but it also stands in stark contrast to the current state of free speech law. As an alternative, this Note proposes that all murals, regardless of their content, be regulated pursuant to the same set of restrictions.

Part I of this Note provides background on the purposes and mechanics of outdoor sign regulation. It then explores the landmark Supreme Court case addressing constitutional issues inherent in such regulation, *Metromedia Inc. v. City of San Diego*,[14] and surveys modern, post-*Metromedia* developments within free speech law. Part II of this Note turns to a narrow area of sign regulation: the regulation of outdoor murals. It discusses sources of inconsistency in current mural case law, and sets forth various legal and policy-based arguments for why the

---

[11] Tom Jackman, *Arlington's Wag More Dogs Mural Is No More*, WASH. POST (Sept. 25, 2012, 8:18 PM), http://www.washingtonpost.com/blogs/the-state-of-nova/post/arlingtons-wag-more-dogs-mural-is-no-more/2012/09/25/ed180e82-074c-11e2-a10c-fa5a255a9258_blog.html ("There's a war going on, . . . a real fight around the country about these sign laws . . . We don't usually require people to consult government bureaucrats before they express themselves." (second ellipsis in original) (internal quotation marks omitted)).

[12] *See, e.g.*, *id.*; Karen Boros, *Tough Mural 'Advertising' Rules? Minneapolis Council Member Gary Schiff Wants to Loosen Them*, MINNPOST (July 20, 2012), http://www.minnpost.com/two-cities/2012/07/tough-mural-%E2%80%98advertising%E2%80%99-rules-minneapolis-council-member-gary-schiff-wants-loos; Melo, *supra* note 9; *see also infra* Part II and the cases discussed therein.

[13] Context is critical in determining whether a particular display is a work of art or signage. *See* Russ VerSteeg, *Iguanas, Toads and Toothbrushes: Land-Use Regulation of Art as Signage*, 25 GA. L. REV. 437, 469 (1991) ("The physical location of art can cause it to function as signage. A sculpture of Pegasus . . . is almost certainly a work of art when exhibited in an art museum. . . . [T]he same sculpture would function as a sign when placed in close proximity to a Mobil Oil gasoline station or perhaps Mobil's corporate offices. It functions as a sign because a reasonable person looking at the sculpture would recognize the connection between the image of a winged horse with the products and services of the Mobil Oil Corporation."); *see also* Shawn G. Rice, Comment, *Zoning Law: Architectural Appearance Ordinances and the First Amendment*, 76 MARQ. L. REV. 439, 453 (1993) ("The effect of the art on the viewing public is probably more important than the intent of the Presenter." (internal quotation marks omitted)).

[14] 453 U.S. 490 (1981).

distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation. Finally, Part III of this Note proposes a model for regulating outdoor murals whereby all murals, regardless of their content, are treated in the same manner. Such a model, Part III argues, best balances government regulatory interests with individual free speech interests, while offering a realistic solution for reducing mural disputes, mending interstate judicial conflict, and preserving judicial and municipal resources.

## I. BACKGROUND

### A. *Sign Regulation*

Outdoor signs come in different forms, shapes, and sizes.[15] They can be on-premise or off-premise, situated on private property or public property, and attached or detached to a building.[16] As a tangible medium of communication, outdoor signs contain both physical and constitutional dimensions.[17] Physical characteristics of signs include their size, height, shape, spacing, number, distance, and location.[18] The communicative features of signs, namely their content and messages, implicate their constitutional dimension.[19] The speech contained in signs is protected by the First and Fourteenth Amendments from unwarranted government regulation.[20]

[15] *See generally* MANDELKER, *supra* note 5, at 69–88 (discussing a broad range of "specialized" on-premise signs, including digital signs, flags, freestanding signs, murals, portable signs, and time and temperature signs); Patricia E. Salkin, *Sign Regulation–Introduction*, 3 AM. LAW. ZONING § 26:1 (5th ed. 2013) (discussing the different types of signs and their functions).

[16] Salkin, *supra* note 15.

[17] *See* City of Ladue v. Gilleo, 512 U.S. 43, 48 (1994) ("While signs are a form of expression protected by the Free Speech Clause, they pose distinctive problems that are subject to municipalities' police powers. Unlike oral speech, signs take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation. It is common ground that governments may regulate the physical characteristics of signs—just as they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise. However, because regulation of a medium inevitably affects communication itself, it is not surprising that we have had occasion to review the constitutionality of municipal ordinances prohibiting the display of certain outdoor signs." (citations omitted)); *see also* DEP'T OF STATE, N.Y. STATE, MUNICIPAL CONTROL OF SIGNS 2 (2006), *available at* http://www.dos.ny.gov/lg/publications/Municipal_Control_of_Signs.pdf.

[18] DEP'T OF STATE, N.Y. STATE, *supra* note 17; MANDELKER, *supra* note 5, at 89.

[19] DEP'T OF STATE, N.Y. STATE, *supra* note 17.

[20] Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 502 (1981) (plurality opinion) (noting that "the First and Fourteenth Amendments foreclose [an] interest in controlling the communicative aspects [of signs]"); DEP'T OF STATE, N.Y. STATE, *supra* note 17.

### 1. Community Aesthetics and Traffic Safety

Sign regulation, an exercise of a local government's police power, is warranted on the basis of two public purposes: community aesthetics and traffic safety.[21] In recent years, aesthetics has become the more common justification. In fact, the majority of courts today recognize that aesthetics alone is sufficient to justify constitutionally permissible sign control.[22] This stems, in part, from settled Supreme Court authority dictating that local government has the power to determine that a community is "beautiful."[23] In addition to aesthetics, municipalities enact sign ordinances to eliminate hazards to pedestrians and motorists brought about by distracting sign displays and to ensure clear visibility of traffic signs and signals.[24]

### 2. Content Neutrality

Regulations within a sign ordinance are characterized as either content-neutral or content-based.[25] This characterization is the single most crucial issue in evaluating the constitutionality of a sign ordinance.[26] Content-neutral regulations are those that restrict signage

---

21 *See generally* AM. PLANNING ASS'N, PLANNING AND URBAN DESIGN STANDARDS 359 (2006); Alan Weinstein, *Legal Issues in the Regulation of On-Premise Signs*, *in* CONTEXT-SENSITIVE SIGNAGE DESIGN 119, 119–20 (Marya Morris et al. eds., 2001). Together, community aesthetics and traffic safety are often referred to as the "twin goals" of sign regulation. *See, e.g.*, *Metromedia*, 453 U.S. at 507; Interstate Outdoor Adver., L.P. v. Zoning Bd. of Mount Laurel, 706 F.3d 527, 529 (3rd Cir. 2013); Clear Channel Outdoor, Inc. v. City of New York, 594 F.3d 94, 103 (2d Cir. 2010); Outdoor Sys., Inc. v. City of Mesa, 997 F.2d 604, 611 (9th Cir. 1993).

22 Stephanie L. Bunting, Note, *Unsightly Politics: Aesthetics, Sign Ordinances, and Homeowners' Speech in* City of Ladue v. Gilleo, 20 HARV. ENVTL. L. REV. 473, 480 (1996).

23 Berman v. Parker, 348 U.S. 26, 33 (1954) ("The concept of the public welfare is broad and inclusive. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled." (citation omitted)).

24 *See* AM. PLANNING ASS'N, *supra* note 21. Although little empirical data exists to confirm that sign control actually increases traffic safety, courts readily accept the justification. *See, e.g.*, *Metromedia*, 453 U.S. at 507–09. This is especially true in cases involving billboards, which "by their very nature . . . are designed to distract drivers." Major Media of Se., Inc. v. City of Raleigh, 621 F. Supp. 1446, 1451 (E.D.N.C. 1985).

25 *See* MANDELKER, *supra* note 5, at 5, 12–14.

26 *See* Erwin Chemerinsky, *Content Neutrality as a Central Problem of Freedom of Speech: Problems in the Supreme Court's Application*, 74 S. CAL. L. REV. 49, 53 (2000) ("Today, virtually every free speech case turns on the application of the distinction between content-based and content-neutral laws."); Mark Tushnet, *The Supreme Court and Its First Amendment Constituency*, 44 HASTINGS L.J. 881, 882 (1993) ("Today the central organizing concept of First Amendment doctrine is the distinction between content-based regulations and content-neutral ones.").

without regard to the content of the speech contained in the signage.[27] The clearest examples of content-neutral regulations are general time, place, and manner restrictions.[28] For example, a sign ordinance may prohibit temporary signs from being posted for more than two months (time restriction); it may prohibit signs from being placed within fifteen feet of a road (place restriction); and it may require that all signs be limited in size to 200 square feet (manner restriction).[29] Content-neutral regulations, if challenged, are almost always upheld as constitutional.[30] These regulations are subject to a lenient, intermediate level of judicial scrutiny.[31] Under this standard, a municipality must demonstrate that the restrictions on speech further a substantial government interest, that the interest is unrelated to the suppression of speech, and that the restrictions are not significantly broader than necessary to further the interest or that ample alternative methods of communicating the message have been left open.[32] Courts routinely qualify community aesthetics and traffic safety as "substantial" government interests.[33]

By contrast, content-based regulations are those that restrict signage based on the message conveyed by the signage or the identity of the speaker displaying the signage.[34] An example of a content-based regulation is a sign ordinance that requires political signs to obtain a permit before being erected, but that exempts time and temperature signs from this permit requirement.[35] Content-based regulations are less favorable than content-neutral regulations, and are presumptively invalid.[36] While some content-based regulations of speech are permissible, the vast majority of these regulations, if challenged, are

---

27 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17.

28 *Id.* at 2–3.

29 *Id.*

30 Tushnet, *supra* note 26 ("Content-neutral regulations come to the Court with a strong presumption in their favor[.]").

31 *See* Weinstein, *supra* note 21, at 123.

32 *See* Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989). However, to satisfy intermediate scrutiny, municipal sign regulation "need not be the least restrictive or least intrusive means of doing so." *Id.* at 798.

33 *See, e.g.*, Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507–08 (1981) (plurality opinion); Ballen v. City of Redmond, 466 F.3d 736, 742 (9th Cir. 2006).

34 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. Restrictions based on the identity of the speaker invoke the principle of "viewpoint neutrality." *See* Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 82 (1st Cir. 2004). This principle demands that the municipality not suppress speech "where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Id.*

35 *See* DEP'T OF STATE, N.Y. STATE, *supra* note 17, at 3. This regulation is content-based because the municipality is subjecting one type of speech (that contained in political signs) to greater restrictions than another type of speech (that contained in time and temperature signs) based solely on the content of the message within the sign.

36 Tushnet, *supra* note 26 ("Virtually all content-based regulations will be invalidated [by the Supreme Court.]").

declared unconstitutional.[37] Content-based regulations are subject to the strictest level of constitutional scrutiny and will be sustained only if a municipality meets its burden of proving that the restrictions on speech advance a compelling state interest and are narrowly tailored to serve that interest.[38] Courts have routinely held that traffic safety and community aesthetics do not qualify as "compelling" state interests.[39]

### B. Metromedia, Inc. v. City of San Diego

Although municipalities have been regulating outdoor signage since the early twentieth century, it was not until 1981 that the Supreme Court first grappled with the free speech issues raised by sign regulations.[40] The sign ordinance at issue in *Metromedia, Inc. v. City of San Diego* imposed substantial limitations on the display of outdoor billboards.[41] Specifically, the ordinance permitted on-premise commercial advertising, but prohibited most other forms of commercial advertising and most noncommercial communications.[42] Noncommercial messages were permitted only if they fell into one of twelve specified exemptions, which included signs with religious symbols and signs depicting time and temperature.[43] Metromedia, a leader in the outdoor advertising business, sued the city, arguing that the ordinance violated the First Amendment and that the ordinance's threatened destruction of the outdoor billboard industry was constitutionally prohibited.[44]

In an opinion delivered by Justice White and joined by Justices Stewart, Marshall, and Powell, a plurality of the Court found that the San Diego ordinance unconstitutionally discriminated among types of speech based on content.[45] First, the plurality held that by allowing on-premise commercial signs but not on-premise noncommercial signs, the ordinance impermissibly privileged commercial speech over

37 *Id.* at 882 & n.4 (citing *Burson v. Freeman*, 504 U.S. 191 (1992), as a rare example of a decision upholding a content-based regulation); *see also* Weinstein, *supra* note 21, at 122.

38 Boos v. Barry, 485 U.S. 312, 321 (1988); *see* Weinstein, *supra* note 21, at 123.

39 *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 822–23 (1984); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1267–68 (11th Cir. 2005); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993), *aff'd*, 512 U.S. 43 (1994).

40 Sign regulation cases in the early twentieth century did not involve the free speech concerns of modern sign cases. Instead, these earlier cases primarily involved due process and equal protection challenges. *See, e.g.*, Packer Corp. v. Utah, 285 U.S. 105 (1932); St. Louis Poster Adver. Co. v. St. Louis, 249 U.S. 269 (1919); Thomas Cusack Co. v. City of Chi., 242 U.S. 526 (1917).

41 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 493 (1981) (plurality opinion).

42 *Id.* at 494–96.

43 *Id.* at 494–95.

44 *Id.* at 496–98.

45 *See id.* at 513–16, 521.

noncommercial speech.[46] The plurality noted that this approach was incompatible with then-recent First Amendment case law, which consistently afforded commercial speech less protection than noncommercial speech.[47] Second, the plurality held that by exempting only select categories of noncommercial signage, including religious and historical signs, from regulation, the ordinance impermissibly distinguished between various categories of noncommercial speech.[48] However, the plurality concluded that the ordinance's content-based distinctions within the category of commercial speech were permissible, because they directly advanced San Diego's aesthetic and safety interests.[49] In sum, the *Metromedia* plurality indicated that content-based distinctions within the category of commercial speech were permissible, but similar distinctions favoring commercial speech over noncommercial speech or favoring certain speech within the category of noncommercial speech were impermissible.

In a concurring opinion joined by Justice Blackman, Justice Brennan agreed with the plurality's conclusion that the San Diego ordinance was unconstitutional, but for a different reason.[50] Justice Brennan believed the ordinance to be in violation of the First Amendment because it had the practical effect of eliminating the billboard as a medium of communication within the city, and San Diego lacked a substantial government interest for the ban.[51] Perhaps most notable from Justice Brennan's opinion was his explicit rejection of the first basis for the plurality's holding—that is, that it was impermissible for a sign ordinance to favor commercial over noncommercial speech.[52] Justice Brennan seemed to suggest that content-based distinctions favoring noncommercial speech over commercial speech were the same as content-based distinctions within the category of noncommercial

---

46 *Id.* at 513.

47 *Id.* ("San Diego effectively inverts this judgment, by affording a greater degree of protection to commercial than to noncommercial speech. . . . [T]he city may not conclude that the communication of commercial information concerning goods and services connected with a particular site is of greater value than the communication of noncommercial messages.").

48 *See id.* at 514–15 ("With respect to noncommercial speech, the city may not choose the appropriate subjects for public discourse . . . . Because some noncommercial messages may be conveyed on billboards throughout the commercial and industrial zones, San Diego must similarly allow billboards conveying other noncommercial messages throughout those zones.").

49 *Id.* at 507–12. The plurality's decision as to the regulation of commercial speech was expressly joined by Justice Stevens. *See id.* at 541 (Stevens, J., dissenting in part).

50 *See id.* at 521–40 (Brennan, J., concurring in the judgment).

51 *Id.* at 525–34 ("[T]he city has failed to show that its asserted interest in aesthetics is sufficiently substantial in the commercial and industrial areas of San Diego.").

52 *Id.* at 536 ("I cannot agree with the plurality's view that an ordinance totally banning commercial billboards but allowing noncommercial billboards would be constitutional. For me, such an ordinance raises First Amendment problems at least as serious as those raised by a total ban, for it gives city officials the right—before approving a billboard—to determine whether the proposed message is 'commercial' or 'noncommercial.'" (footnote omitted)).

speech or within the category of commercial speech.[53] This was especially true, Justice Brennan noted, because the distinction between the two forms of speech was usually "anything but clear."[54]

The three dissenting opinions—authored individually by Justice Stevens, Chief Justice Burger, and Justice Rehnquist—all rejected the plurality's views that the San Diego ordinance was content-based and that it resulted in an unconstitutional ban of an entire medium of communication.[55] Justice Stevens believed the prohibition of billboards to be a constitutionally permissible use of San Diego's police power.[56] Chief Justice Burger thought that the subject matter at hand, including protecting the safety and enhancing the environment of a city, was best left to local government.[57] Finally, Justice Rehnquist felt that a total prohibition on billboards within a community was justifiable on aesthetic grounds alone.[58]

*Metromedia* was a severely fractured decision, described by Justice Rehnquist as a "virtual Tower of Babel, from which no definitive principles can be clearly drawn."[59] Nonetheless, the case remains the Supreme Court's leading authority on First Amendment issues in billboard and sign regulation. By approving a bifurcated approach to sign regulation based on whether the message of a sign is commercial or noncommercial in nature, the *Metromedia* plurality endorsed the distinction between commercial and noncommercial speech.[60] At the opposite end of the spectrum, Justice Brennan's concurrence strongly critiqued the distinction as content-based.[61] It is the latter view which has gained increasing popularity in Supreme Court case law.

### C. *Post-*Metromedia *Developments in Free Speech Law*

Modern Supreme Court cases indicate a trend in favor of elevating commercial speech to a similar constitutional status as noncommercial speech. Underlying this trend is the Court's demand for a stricter content-neutrality standard. In *City of Cincinnati v. Discovery Network,*

---

53 *Id.* at 534–40.

54 *Id.* at 536.

55 *See id.* at 540–55 (Stevens, J., dissenting in part); *id.* at 555–69 (Burger, C.J., dissenting); *id.* at 569–70 (Rehnquist, J., dissenting).

56 *Id.* at 542 (Stevens, J., dissenting in part) (answering affirmatively the plurality's question of "whether a city may entirely ban one medium of communication").

57 *Id.* at 569 (Burger, C.J., dissenting) ("The Court today leaves the modern metropolis with a series of Hobson's choices and rejects basic concepts of federalism by denying to every community the important powers reserved to the people and the States by the Constitution.").

58 *Id.* at 570 (Rehnquist, J., dissenting).

59 *Id.* at 569.

60 *See supra* text accompanying notes 45–49.

61 *See supra* notes 52–54 and accompanying text.

*Inc.*, the Court went as far as to hold that commercial speech must be regulated on par with noncommercial speech.[62] At issue in the case was a city ordinance which banned the dissemination of commercial handbills while allowing the dissemination of noncommercial handbills.[63] After commercial newsrack companies brought suit against the city on First Amendment grounds, the Court concluded that Cincinnati's categorical ban on commercial handbills attached too much importance to the distinction between commercial and noncommercial speech.[64] The Court observed that the city's noncommercial newsracks were just as damaging to community aesthetics as its commercial newsracks, and thus the ban on commercial handbills did not directly advance the city's purported aesthetic and safety interests.[65] For this reason, the Court held, in cases where neither commercial speech nor noncommercial speech is intrinsically more harmful to the public, the distinction between the two speech forms is impermissible.[66]

Three years later, the Court in *44 Liquormart, Inc. v. Rhode Island* invalidated a state law that banned the advertising of retail liquor prices.[67] The Court found that a complete prohibition on such commercial signage would not advance the substantial state interest in temperance.[68] Rather, Rhode Island's goal of promoting temperance would more likely be achieved by alternative forms of regulation that

---

[62] City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 430–31 (1993).

[63] *Id.* at 413 n.3 ("No person shall throw or deposit any commercial or non-commercial handbill in or upon any sidewalk, street or other public place within the city. Nor shall any person hand out or distribute or sell any commercial handbill in any public place." (quoting CINCINNATI, OHIO MUNICIPAL CODE § 714-23 (1992)) (internal quotation marks omitted)).

[64] *Id.* at 419 ("[T]he city's argument [regarding its aesthetic and safety interests] attaches more importance to the distinction between commercial and noncommercial speech than our cases warrant and seriously underestimates the value of commercial speech.").

[65] *Id.* at 418 ("We accept the validity of the city's proposition, but consider [safety and community aesthetics] an insufficient justification for the discrimination against respondents' use of [commercial] newsracks that are no more harmful than the permitted [noncommercial] newsracks, and have only a minimal impact on the overall number of newsracks on the city's sidewalks.").

[66] *Id.* at 424 ("Not only does Cincinnati's categorical ban on commercial newsracks place too much importance on the distinction between commercial and noncommercial speech, but in this case, the distinction bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests [in community aesthetics and safety]."); *see also id.* at 437 (Blackmun, J., concurring) (noting that the valuable handbills at issue highlighted the "absurdity of treating all commercial speech as less valuable than all noncommercial speech," as it is "highly unlikely that according truthful, noncoercive commercial speech the full protection of the First Amendment will erode the level of that protection").

[67] 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 516 (1996).

[68] *Id.* at 507 ("Thus, the State's own showing reveals that any connection between the ban and a significant change in alcohol consumption would be purely fortuitous. As is evident, any conclusion that elimination of the ban would significantly increase alcohol consumption would require us to engage in the sort of 'speculation or conjecture' that is an unacceptable means of demonstrating that a restriction on commercial speech directly advances the State's asserted interest.").

did not involve any restrictions on speech.[69] Critical to the Court's analysis was its view that commercial speech regulations are not all subject to a similar form of constitutional review simply because they target a similar category of expression.[70] The Court held that if a state regulates commercial speech to protect consumers from misleading or deceptive sales practices, then the traditional intermediate-scrutiny standard of review for regulations on commercial speech should apply.[71] However, if a state prohibits the dissemination of "truthful, nonmisleading commercial messages" for reasons unrelated to the preservation of a fair bargaining process, then a "special care" standard of review should apply.[72] The Court noted that the "typical reason" why commercial speech can be subject to greater government regulation than noncommercial speech is that a state has an interest in protecting its citizen consumers from harms that may result from commercial advertising.[73] Bans on speech that target truthful, nonmisleading commercial messages fail to advance this goal.[74]

*44 Liquormart* was the first case to question the soundness of the supposed "commonsense differences" used to justify affording less First Amendment protection to commercial speech than to noncommercial speech.[75] It announced "a standard reasonably close to strict scrutiny" that "would nearly equate the First Amendment status of commercial speech with that of noncommercial speech in cases involving . . . a content-based prohibition on communication."[76] Justice Thomas was perhaps the most overt when he opined that he did not see any "philosophical or historical basis" for affording less value to commercial speech than to noncommercial speech.[77] Echoing these sentiments, the Court most recently held in *Sorrell v. IMS Health Inc.* that content- and speaker-based restrictions on commercial speech should be subject to heightened scrutiny—a more stringent standard than the typical intermediate-scrutiny level of review for commercial speech.[78]

---

69 *See id.* (discussing alternative forms of regulation including higher prices by means of direct regulation or increased taxation and educational campaigns focused on the problems of drinking).

70 *Id.* at 501 ("The mere fact that messages propose commercial transactions does not in and of itself dictate the constitutional analysis that should apply to decisions to suppress them.").

71 *See id.*

72 *Id.* at 503–04; *see also id.* at 501 (noting that in these cases, "there is far less reason to depart from the rigorous review that the First Amendment generally demands").

73 *Id.* at 502 (citing Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 426 (1993)).

74 *Id.* at 502–03.

75 *Id.* at 498–99; *see supra* text accompanying note 73.

76 Weinstein, *supra* note 21, at 128.

77 *44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring in part and concurring in the judgment).

78 131 S. Ct. 2653, 2664 (2011) (relying on *Discovery Network*, 507 U.S. 410, to support a heightened scrutiny standard).

In light of the continued elevation of commercial speech in modern Supreme Court case law, it is unclear whether the line between commercial and noncommercial speech remains an important or necessary distinction in sign regulation today. Modern commercial speech cases stand in stark contrast to the views espoused by the *Metromedia* plurality over three decades ago.[79] Although the *Metromedia* plurality endorsed the distinction between the two speech forms, it had done so relying on free speech cases from the 1970s, which supported a lower constitutional status for commercial speech.[80] The *Metromedia* Justices did not have *Discovery Network*, *44 Liquormart*, and *Sorrell* at their disposal in 1981. Moreover, in endorsing the different treatment of commercial and noncommercial speech, the *Metromedia* plurality emphasized the "common-sense" nature of the distinction between the two speech forms.[81] But in actuality, as Justice Brennan succinctly noted, the distinction was "anything but clear."[82] This statement holds even more true today, where modern advertising has further convoluted the status of the two speech forms.[83]

Part II of this Note argues that the distinction between commercial and noncommercial speech should be eliminated in at least one context: the regulation of outdoor murals.

## II. OUTDOOR MURAL REGULATION: REEXAMINING THE COMMERCIAL/NONCOMMERCIAL SPEECH DISTINCTION

Outdoor murals—"painting[s] or other work[s] of art executed directly on a wall"[84]—are unique in that they can be classified as

---

79 *See supra* text accompanying notes 45–49.

80 *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 505–06 (1981) (plurality opinion) (citing, for example, *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), for the proposition that "commercial and noncommercial speech [are not equated] for First Amendment purposes"). At the time of the *Metromedia* decision, the commercial speech doctrine had been in existence for only six years.

81 *Id.* at 506 ("[W]e again recognize[] the common-sense and legal distinction between speech proposing a commercial transaction and other varieties of speech.").

82 *Id.* at 536 (Brennan, J., concurring in the judgment). In fact, the Supreme Court recognized the difficulty with distinguishing between the two speech forms at the moment the commercial speech doctrine was born. *See Va. State Bd. of Pharmacy*, 425 U.S. at 787 (Rehnquist, J., dissenting) ("There are undoubted difficulties with an effort to draw a bright line between 'commercial speech' on the one hand and 'protected speech' on the other . . . .").

83 *See, e.g.*, Darrel Menthe, *Writing on the Wall: The Impending Demise of Modern Sign Regulation Under the First Amendment and State Constitutions*, 18 GEO. MASON U. C.R. L.J. 1, 26 (2007) (noting that "there is, arguably, a complete lack of a standard by which to evaluate [the] distinction" between these two forms of speech).

84 *Mural Definition*, OXFORD DICTIONARIES, http://oxforddictionaries.com/definition/english/mural?q=mural (last visited Oct. 27, 2013). This Note is limited in scope to outdoor murals located on private property. Murals located on government property face unique issues and are governed by different case law.

artwork, signage, or both, depending on their content and the municipality in which they reside. Most commonly, a municipality's sign ordinance will classify a mural as signage only when the mural contains "commercial speech."[85] For example, Arlington County's sign ordinance mandates that outdoor murals include "no picture, symbol or device of any kind that relates to a commercial business, product or service offered on the premises where the [mural] is located."[86] If a mural does include this prohibited commercial content, the county classifies the mural as signage and subjects it to all of the restrictions and requirements of the sign ordinance.[87] Conversely, if the mural contains solely "noncommercial speech," the county classifies the mural as a "work of visual art" and exempts the mural from the specifications of the sign ordinance.[88]

Disputes between mural owners and local zoning authorities over whether a particular outdoor mural qualifies as artwork or signage have become increasingly common in recent years.[89] Four of these disputes have made their way to court: *Complete Angler, LLC v. City of Clearwater, Florida*;[90] *City of Tipp City v. Dakin*;[91] *Neighborhood Enterprises, Inc. v. City of St. Louis*;[92] and *Wag More Dogs, Ltd. Liability Corp. v. Cozart*.[93] Decided respectively in 2009, 2010, 2011, and 2012, the four cases involve similar fact patterns; yet, the courts embarked on varied analyses and arrived at different holdings. Though the murals at issue in the first three cases were ultimately permitted to remain in place, the mural in the last of the four cases, *Wag More Dogs*, was ordered removed by the county.[94] The various inconsistencies among these four mural cases are predominantly attributable to two factors, neither of which is unique to mural case law, and both of which stem in

---

85 *See supra* note 2.

86 ARLINGTON, VA., ZONING ORDINANCE art. 13, § 13.2.3.C (2013), *available at* http://buildingarlington.s3.amazonaws.com/wp-content/uploads/2013/06/ACZO_Adopted-05-18-2013_op.pdf.

87 *See id.*

88 *See id.* Assuming, of course, that the other requirements for exemption are met. *Id.*

89 *See, e.g.*, *supra* notes 11–12. These disputes follow a typical pattern, reflected in the Sally/Wanda dispute from this Note's Introduction: The owner of a commercial shop commissions an artist to paint a mural on the exterior wall of her building. The owner believes the mural to be a work of art. "Artwork" is categorically exempted in the local sign ordinance from some or all of the stringent size and other restrictions placed on outdoor signage. A local zoning official believes the shop owner's mural falls outside the definition of "artwork," and is thus signage. Because the mural violates one or more of the restrictions in the sign ordinance, the zoning official orders its removal.

90 607 F. Supp. 2d 1326 (M.D. Fla. 2009).

91 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484.

92 644 F.3d 728 (8th Cir. 2011).

93 680 F.3d 359 (4th Cir. 2012).

94 For a discussion of the facts and holdings of these cases, see discussion *infra* Part II.A–B.

part from the divisive *Metromedia* decision, as well as post-*Metromedia* developments in free speech law.[95]

### A. *Sources of Inconsistency in Mural Case Law*

#### 1. Defining Commercial Speech

The first factor contributing to the inconsistency in mural case law is the manner in which courts define "commercial speech." Some courts have adopted very narrow definitions of commercial speech, such as "speech that does no more than propose a commercial transaction"[96] and "expression related solely to the economic interests of the speaker and its audience."[97] Other courts, by contrast, have recognized a broader definition of commercial speech as encompassing speech that "cannot be characterized merely as proposals to engage in commercial transactions."[98]

The two narrow definitions were used by the court in *Complete Angler* in holding that a marine-themed mural on the wall of a bait and tackle shop qualified as artwork rather than signage because the mural contained noncommercial speech.[99] The court reasoned that although the mural might occasionally inspire commercial activity, namely the purchase of bait and tackle from the mural owner's shop, the mural's function was not limited to this pursuit.[100] Rather, the mural also depicted a reflection of a local artist's impression of the environment

---

95 For a discussion of the five opinions in the *Metromedia* decision, see *supra* Part I.B. For a discussion of post-*Metromedia* developments in free speech law, namely the commercial speech and content neutrality doctrines, see *supra* Part I.C.

96 *See, e.g.*, United States v. United Foods, Inc., 533 U.S. 405, 409 (2001); *see also* Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 958 (9th Cir. 2012) (providing same definition).

97 *See, e.g.*, El Día, Inc. v. P.R. Dep't of Consumer Affairs, 413 F.3d 110, 115 (1st Cir. 2005) (quoting Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 561 (1980)); Hoover v. Morales, 164 F.3d 221, 225 (5th Cir. 1998) (same).

98 *See, e.g.*, Spirit Airlines, Inc. v. U.S. Dep't of Transp., 687 F.3d 403, 412–13 (D.C. Cir. 2012) (quoting another source) (internal quotation marks omitted); *Wag More Dogs*, 680 F.3d at 369–70 (quoting another source) (internal quotation marks omitted); *see also* IMS Health Inc. v. Sorrell, 630 F.3d 263, 274 (2d Cir. 2010), *aff'd*, 131 S. Ct. 2653 (2011); United States v. Wenger, 427 F.3d 840, 846–47 (10th Cir. 2005). All of these cases rely on *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–67 (1983) (adopting a more liberal and comprehensive approach to defining commercial speech that looks to a combination of factors).

99 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009).

100 *Id.*

surrounding the bait and tackle shop.[101] In this sense, the speech within the mural did "more than propose a commercial transaction."[102]

The Fourth Circuit in *Wag More Dogs* rejected this reasoning in favor of a broader definition of commercial speech.[103] The court easily could have found, similar to the court's finding in *Complete Angler*, that a dog-themed mural on the wall of a canine daycare center situated near a local dog park depicted an artist's reflection of the community's appreciation for dogs, and thus did more than simply propose a commercial transaction. Instead, the court stretched the definition of commercial speech to include speech beyond "the core notion of commercial speech."[104] The court held that the dog-themed imagery on the mural constituted commercial speech because the mural, which included cartoon dogs resembling the business's logo, was meant to attract potential customers from the nearby dog park, thus potentially economically benefiting the mural owner.[105]

### 2. Analyzing Content Neutrality

The second factor contributing to the inconsistency in mural case law is that courts are divided over the manner in which to analyze the content neutrality of a sign ordinance. While some courts have adopted a strict approach that looks solely at the language of the sign ordinance,[106] other courts have adopted a more liberal approach that looks to a municipality's asserted purpose for enacting a given regulation.[107]

---

101 *Id.*

102 Thus, it did not satisfy one of the narrow definitions of commercial speech: "speech that does no more than propose a commercial transaction." United States v. United Foods, Inc., 533 U.S. 405, 409 (2001).

103 *See Wag More Dogs*, 680 F.3d at 369–70 ("*Bolger* recognized a broader definition of commercial speech, encompassing speech that 'cannot be characterized merely as proposals to engage in commercial transactions.' . . . The three factors relied on by the Court in *Bolger* similarly counsel classifying Wag More Dogs' painting as commercial speech.").

104 *Id.* at 370.

105 *See id.*

106 *See, e.g.*, Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736–37 (8th Cir. 2011); Serv. Emps. Int'l Union, Local 5 v. City of Houston, 595 F.3d 588, 596 (5th Cir. 2010); Ballen v. City of Redmond, 466 F.3d 736, 742–44 (9th Cir. 2006); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1259–62 (11th Cir. 2005); Rappa v. New Castle Cnty., 18 F.3d 1043, 1053–54 (3d Cir. 1994); Nat'l Adver. Co. v. Town of Babylon, 900 F.2d 551, 556–57 (2d Cir. 1990).

107 *See, e.g.*, Asgeirsson v. Abbott, 696 F.3d 454, 460 n.6 (5th Cir. 2012); *Wag More Dogs*, 680 F.3d at 366–69; H.D.V.-Greektown, LLC v. City of Detroit, 568 F.3d 609, 621–23 (6th Cir. 2009); Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 100 F.3d 175, 183 (1st Cir. 1996); Scadron v. City of Des Plaines, 734 F. Supp. 1437, 1445-46 (N.D. Ill. 1990), *aff'd*, 989 F.2d 502 (7th Cir. 1993).

The strict approach to content neutrality is the majority approach in existing mural case law. Consider again the case of *Complete Angler*. At issue in the case was a marine-themed mural on the exterior wall of a bait and tackle shop.[108] The mural depicted sailfish, dolphins, and waterways.[109] Clearwater, a resort community, had a sign ordinance that prohibited various types of signs, required a permit and development review process for others, and exempted twenty-six categories of signs from review altogether.[110] One such exemption was made for artwork.[111] Believing the marine-themed mural to be commercial signage, the city issued plaintiffs a notice citing various violations of the sign ordinance and ordering the mural's removal.[112] The *Complete Angler* court held that Clearwater's application of its sign ordinance was content-based because a zoning official had to examine the content of the marine-themed mural in order to determine whether it was a sign or artwork.[113] After determining that the mural was a sign because it contained "commercial speech," the city then declined to extend protections that would have been extended to a mural containing alternative content, such as imagery of kids playing in a park.[114]

Following similar logic, the court in *Neighborhood Enterprises* held that the exemptions in St. Louis's sign ordinance were content-based because they made impermissible distinctions based solely on the content or message conveyed by a given sign.[115] St. Louis's sign ordinance exempted from regulation, among other things, "[w]orks of art which in no way identify a product."[116] Plaintiff, a critic of St. Louis's eminent domain practices, commissioned a mural on the wall of a building containing the words "End Eminent Domain Abuse" inside a red circle with a slash.[117] The city declared the mural an "illegal sign."[118]

108 Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009).
109 *Id.* at 1328–29.
110 *Id.* at 1330–31.
111 *See id.* at 1331. The exemption defined artwork as "drawings, pictures, symbols, paintings or sculpture which do not identify a product or business and which are not displayed in conjunction with a commercial, for profit or nonprofit enterprise." *Id.* (citation omitted).
112 The city argued that the marine-themed mural was displayed "in conjunction with" plaintiffs' place of business, and thus was commercial speech, not artwork. *See id.* at 1332.
113 *Id.* at 1333 ("Yet in concluding that the [mural was] subject to the permit requirement or spatial constraints, [the city] necessarily examined [its] content and determined that [it was not] art work, a holiday decoration, or any other sign exempted under the Code.").
114 *See id.* at 1332–33.
115 Neighborhood Enters., Inc. v. City of St. Louis, 644 F.3d 728, 736 (8th Cir. 2011) ("[T]he zoning code's definition of 'sign' is impermissibly content-based because . . . to determine whether a particular object qualifies as a 'sign' . . . and is therefore subject to the regulations, or is instead a 'non-sign' . . . or [is otherwise] exempt from the sign regulations . . . one must look at the *content* of the object." (citations omitted)).
116 *Id.* at 739.
117 *Id.* at 731 (internal quotation marks omitted).
118 *Id.* (internal quotation marks omitted). The design of the mural was similar to the design

In holding that the ordinance's exemptions to the definition of "sign" were content-based, the Eighth Circuit noted that a mural in the same location and with the same size and dimensions as plaintiff's mural would not be subject to regulation if it contained alternative content, such as a religious subject.[119] The court reasoned that treating one mural as signage and another as artwork based solely on the content of the murals was a clear example of a content-based regulation on speech.[120]

In contrast to the strict approach to content neutrality seen in *Complete Angler* and *Neighborhood Enterprises* is the more liberal approach reflected in *Wag More Dogs*. This latter approach is the minority approach in existing mural case law. At issue in *Wag More Dogs* was Arlington County's sign ordinance, which, similar to St. Louis's, included various exemptions from the definition of "sign."[121] One such exemption was made for "decorative art," which was left wholly unregulated.[122] After determining that plaintiff's dog-themed mural qualified as signage rather than an exempt work of decorative art because it contained "commercial speech," the county zoning administrator subjected the mural to restrictions placed on signage that the mural would not have been subjected to had it contained alternative content.[123] Nonetheless, the Fourth Circuit held that the sign ordinance was content-neutral, both facially and as applied.[124] The court gave significant weight to the government's purpose in enacting the regulations, observing that Arlington County adopted the sign ordinance to regulate land use, not to prohibit a particular disfavored message.[125]

---

that the Missouri Eminent Domain Abuse Coalition, an organization with whom the plaintiff co-missioned the mural, used in its advertising and marketing materials. *See id.*

119 *See id.* at 736–37.

120 *Id.* at 737. The court refused to accept St. Louis's justification for enacting these content-based regulations on speech. *See id.* This disregard for government intent is one of the defining features of the "strict" approach to content neutrality. *See* cases cited *supra* note 106 and accompanying text.

121 *See* Brief of Appellant at 2, Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359 (4th Cir. 2012) (No. 11-1226), 2011 WL 2534178, at *2.

122 *Id.* (internal quotation marks omitted).

123 *See Wag More Dogs*, 680 F.3d at 369–70 (noting that plaintiff's mural would have been allowed to remain had it contained "noncommercial messages" but holding that the mural contained commercial speech).

124 *Id.* ("Deeming the Sign Ordinance content neutral, we now readily conclude that it satisfies intermediate scrutiny. . . . As applied to Wag More Dogs, the Sign Ordinance's regulation of commercial speech satisfies intermediate scrutiny.").

125 *Id.* at 368 ("On this score, then, the Sign Ordinance's content neutrality is incandescent.").

### B. *Eliminating the Commercial/Noncommercial Speech Distinction*

The aforementioned inconsistencies in mural case law can be significantly reduced by eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation. Regulating all murals, regardless of their content, in the same manner would render moot the first source of inconsistency (that is, the definition of commercial speech) while appealing to the majority, and better, judicial approach for the second source of inconsistency (that is, how to analyze the content neutrality of a sign ordinance). Moreover, it would reflect a more modern regulatory regime that appeals to recent advances in the commercial speech and content neutrality doctrines. This section elaborates on these points and sets forth additional legal and policy-based arguments for regulating all murals, regardless of the speech they contain, in an equal fashion.

#### 1. Constitutional Flaws

The principal reason why the distinction between commercial and noncommercial speech should be eliminated in the context of outdoor mural regulation is that the distinction, when applied, constitutes a content-based regulation of speech. Explained simply, if a zoning official subjects one mural to stringent outdoor signage restrictions because the mural contains commercial speech, but exempts another mural from these restrictions because the latter mural contains noncommercial speech, this difference in treatment is a content-based regulation of speech.

The courts in three of the four mural cases—*Complete Angler*, *Neighborhood Enterprises*, and *Tipp City*—would support this view. Each of these courts embraced the stricter approach to evaluating the content neutrality of a sign ordinance.[126] This approach is the better approach in that it is more in line with modern Supreme Court case law, which indicates a desire for a stricter content-neutrality standard.[127] In *Discovery Network*, for instance, the Court embraced a strict approach to content neutrality in holding that Cincinnati's sign ordinance was content-based because a government official had to look at the content of the papers in a given newsrack in order to determine whether the

---

[126] *See supra* Part II.A.2.

[127] Brian J. Connolly, Note, *Environmental Aesthetics and Free Speech: Toward a Consistent Content Neutrality Standard for Outdoor Sign Regulation*, 2 MICH. J. ENVTL. & ADMIN. L. 185, 209 (2012) ("[S]ince *Metromedia*, there has been a gradual increase in the degree of content neutrality required of governmental regulations of speech. This gradual increase suggests that, to comply with the Supreme Court's recent statements on content neutrality, the content neutrality requirement in sign regulation should be more stringent . . . .").

newsrack was subject to the ordinance's ban.[128] The Court specifically rejected a content-neutrality analysis that looks to a government's justification for a given regulation, especially when that justification is the "naked assertion" that commercial speech has low value.[129] Similarly, the Court in *Sorrell* found that because the statute in question would require a government enforcement authority to examine the content of marketing materials before determining whether the protected information was being used for marketing or for some other purpose, the regulation of commercial speech was content-based.[130]

Not only does the strict approach to content neutrality embrace modern, post-*Metromedia* Supreme Court precedent, but this approach also avoids the reliance on community aesthetics and traffic safety as justifications for distinguishing between commercial and noncommercial speech. These justifications are successfully utilized only in those cases where a more liberal content-neutrality standard is applied (and thus, where sign ordinances are more likely to be upheld as content-neutral), because content-neutral ordinances need only satisfy a test of intermediate scrutiny where community aesthetics and traffic safety qualify as substantial government interests.[131] The problem with relying on community aesthetics and traffic safety, the so-called "twin goals" of sign regulation,[132] to justify the commercial/noncommercial speech distinction as applied to outdoor murals is that maintaining the distinction fails to advance either goal. At best, the distinction has a neutral effect on these goals. At worst, the distinction may be detrimental to these goals.

Consider *Wag More Dogs*, the sole mural case to embrace the more liberal content-neutrality standard.[133] After Arlington County's zoning administrator ordered plaintiff business owner to remove the dog-themed mural on the wall of her canine daycare shop because its

---

128 City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 429 (1993) ("Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'"). For a more detailed discussion of *Discovery Network*, see *supra* Part I.C.

129 *See Discovery Network*, 507 U.S. at 429–30.

130 Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2663–64 (2011) ("Given the legislature's expressed statement of purpose, it is apparent that [the statute] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."). In embracing a strict approach to content neutrality, the *Sorrell* Court relied on *Discovery Network*. *See id.* at 2664 (citing *Discovery Network*, 507 U.S. at 418, to support the proposition that heightened judicial scrutiny is warranted when content-based restrictions are placed on commercial speech).

131 Ward v. Rock Against Racism, 491 U.S. 781, 798–99 (1989); *see also supra* Part I.A.2 (explaining the differences between content-based and content-neutral regulations within sign ordinances).

132 Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 507 (1981) (plurality opinion); *see also supra* Part I.A.1 (discussing these two justifications for sign regulation).

133 *See supra* notes 121–25 and accompanying text.

imagery allegedly constituted commercial speech,[134] plaintiff commissioned two artists to paint a new mural in its place.[135] The replacement mural depicted large bird-like creatures nesting in tires hanging from a tree.[136] While the community adored the "attractive," original mural, deeming it a welcome and fitting addition to the nearby dog park,[137] many local residents expressed their dislike of the replacement mural.[138]

Perhaps most concerning with this case is that the Fourth Circuit relied entirely on the twin goals of sign regulation in holding that Arlington County's sign ordinance satisfied intermediate scrutiny.[139] Focusing heavily on the intent of Arlington County in enacting the ordinance, the court held that the ordinance was content-neutral because it "serve[d] purposes unrelated to the content of expression," "even if it ha[d] an incidental effect on some speakers or messages but not others."[140] Because the content-neutral ordinance advanced substantial government interests—the furtherance of traffic safety and the enhancement of aesthetics within the county—the court found that it satisfied intermediate scrutiny.[141] The failure of the ordinance to actually further either of these interests highlights a flaw in this minority approach to evaluating the content neutrality of a sign ordinance. Under the stricter, majority approach, Arlington County's ordinance would have been deemed content-based and subject to a strict scrutiny

---

134 *See supra* notes 103–05 and accompanying text. Arlington County's zoning administrator provided plaintiff with the following instructions:

> For the mural to NOT be considered a sign, it may depict anything you like EXCEPT something to do with dogs, bones, paw prints, pets, people walking their dogs, etc. In other [words], the mural [cannot] show anything that has any relationship with your business. If it does, then it becomes a sign.

Wag More Dogs, Ltd. Liab. Corp. v. Cozart, 680 F.3d 359, 363 (4th Cir. 2012).

135 *See* Arin Greenwood, *Wag More Dogs Gets New Mural From Itinerant Artists Rob Fogle And Zack Weaver (PHOTOS)*, HUFFINGTON POST (Oct. 16 2012, 1:55 PM), http://www.huffingtonpost.com/2012/10/16/wag-more-dogs-mural-rob-fogle-zack-weaver_n_1962184.html.

136 For photos of the replacement mural, see *id.*

137 Wag More Dogs, LLC v. Artman, 795 F. Supp. 2d 377, 392 (E.D. Va. 2011) ("As murals go, Wag More Dogs' is a relatively attractive one, and . . . many patrons of the nearby local dog park quite enjoy it."), *aff'd*, 680 F.3d 359 (4th Cir. 2012).

138 *See, e.g.*, *New Dog Park Mural . . . Improved??*, TWO DOG TALES (Oct. 15, 2012), http://twodogtales.wordpress.com/2012/10/15/new-dog-park-mural-improved ("[I]t's a shame the cute dogs had to go. They were much more appropriate for the space, and didn't elicit the comments overheard the past few days at the park, which generally [began] with, "What the heck ARE those things?").

139 *See Wag More Dogs*, 680 F.3d at 368–69.

140 *Id.* at 368 (acknowledging that Arlington had differentiated between different types of speech).

141 *Id.* at 369 ("[W]e now readily conclude that [the sign ordinance] satisfies intermediate scrutiny. . . . Arlington enacted the . . . [o]rdinance to, in part, promote traffic safety and enhance the County's aesthetics. Both are substantial government interests.").

analysis, under which traffic safety and community aesthetics are not compelling justifications.[142]

In a similar case from Arlington County (which did not make its way to court), the owner of a head shop that sold various paraphernalia, including pipes, hookahs, and cigars, commissioned an artist to paint a mural on the side of his building to beautify the block.[143] The finished artwork depicted a man holding a smoke-exuding cigar.[144] Upon investigating the mural, the county zoning administrator noted: "[T]he cigar must go; then the mural can stay. Without the cigar, it is not a sign . . . ."[145] Smokey Shope's owner decided to paint over the cigar, converting it into a blue whale.[146] The new mural was identical in all respects to the original mural, except that it contained a whale instead of a cigar.[147] Yet, replacing the "commercial speech" with "noncommercial speech" did absolutely nothing to enhance Arlington County's aesthetics or traffic safety. Rather, it seemed only to enforce the meaninglessness of distinguishing between the two speech forms.[148]

Outside of Arlington County, at least one court has commented on the failure of the distinction between commercial and noncommercial speech to enhance the twin goals of sign regulation. In *North Olmstead Chamber of Commerce v. City of North Olmsted*, the court addressed a sign ordinance which permitted noncommercial art murals, but banned murals with commercial messages, such as corporate products or logos.[149] The court held that these restrictions on commercial speech were content-based and unconstitutional.[150] The sign ordinance lacked "rationality" because the city failed to provide evidence that the restrictions directly and materially contributed to traffic safety and

---

142 *See, e.g.*, Members of City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789, 823 (1984) ("But a governmental interest in aesthetics cannot be regarded as sufficiently compelling to justify a restriction of speech based on an assertion that the content of the speech is, in itself, aesthetically displeasing."); Gilleo v. City of Ladue, 986 F.2d 1180, 1183–84 (8th Cir. 1993) (holding that the city's interest in eliminating aesthetic, safety, and property value problems associated with signs was not sufficiently compelling), *aff'd*, 512 U.S. 43 (1994).

143 *See County to Head Shop: Cigar Mural Has Got to Go*, ARLNOW (Aug. 21, 2012, 1:50 PM), http://www.arlnow.com/2012/08/21/county-to-head-shop-cigar-mural-has-to-go.

144 For a photo of the mural, see *id.*

145 *Id.* According to the logic of the zoning administrator, if a mural painted on a cigar shop contains a cigar, the mural is a sign. If the cigar is converted into a whale, the mural transforms into a work of art. *See* Taylor Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, WASH. EXAMINER (Sept. 26, 2012, 4:30 PM), http://washingtonexaminer.com/when-a-cigar-becomes-a-whale-a-sign-becomes-art/article/2509136#.UORv1InjkoZ.

146 Holland, *supra* note 145.

147 For photos of the original and replacement murals, see *id.*

148 As the Smokey Shope store manager observed, "It doesn't make a lot of sense, but the county made us do it." *Id.*

149 86 F. Supp. 2d 755, 767 & n.7 (N.D. Ohio 2000).

150 *Id.* at 773 ("The City's content-based regulations on commercial speech are unconstitutional.").

community aesthetics.[151] Murals housing commercial content, the court reasoned, were no more distracting or less aesthetically pleasing than noncommercial murals.[152] As such, it was senseless to distinguish between the two speech forms.[153]

### 2. Classifying Mural Speech

Perhaps one of the reasons why maintaining the distinction between commercial and noncommercial speech in the context of outdoor mural regulation seems futile is that classifying mural speech is a transitory determination that has the potential to change overnight.

Consider the following hypothetical: The exterior wall of a local mom-and-pop cupcake shop features a lively mural with large cups of coffee in honor of the shop owner's favorite morning beverage. The mural has been on the building for five years, and is accepted and relished by the community as a lovely work of art. One day, the owner decides to start selling coffee at her cupcake shop. Although this decision converts the mural's coffee imagery from noncommercial to commercial speech, it would hardly seem necessary, fair, or prudent for the town to demand its removal after years of community enjoyment. Moreover, in light of the frequent product turnover within commercial establishments, a municipality would have to constantly reevaluate the products sold inside every building upon which is displayed an outdoor mural. This would be a foolish and wasteful use of government time and resources.

Further complications arise in cases where a given business sells a wide variety of products or services. The process of classifying mural speech is more conducive to businesses that sell only one key product or provide only one key service. Businesses such as gift shops or grocery stores, which may sell thousands of products, are placed at an unfair disadvantage if the distinction between commercial and noncommercial speech remains in place. Does a flower mural on the side of a gift shop, where fresh flowers comprise less than one percent of the store's total

---

[151] *See id.* at 772–73 ("In fact, many of the City's content-based restrictions *completely fail* to contribute to safety and aesthetics and seem to be *unrelated to these goals*." (emphasis added)).

[152] *Id.* at 768, 772 ("It is also not evident why a mural may contain content that may be very distracting (such as sexually explicit but not obscene art) or aesthetically displeasing, but may not contain words, corporate products, or corporate images. Surely a mural containing the 'golden arches' of McDonalds is not more distracting than Botticelli's 'Venus' or more aesthetically displeasing than some modern works of art that may be reproduced on the side of a wall. . . . Signs with content other than identifying a business are not somehow safer. Nor is the content . . . more aesthetically pleasing.").

[153] *See id.* at 771 (noting that making content-based distinctions among signs, including distinctions based on whether they contained commercial or noncommercial speech, did not further North Olmsted's goals "in any meaningful way").

inventory, contain commercial speech? Should a mural featuring fruits and vegetables on the wall of a Whole Foods Market—which also sells dairy, meat, grains, beverages, and even body care products and eating utensils—be considered signage, when the same mural outside of a butcher shop would be considered art? What if that same mural has been intact for fifteen years and has become a neighborhood landmark, as it has in the city of St. Paul, Minneapolis?[154] Eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation avoids these inevitable difficulties that arise when classifying mural speech.

### 3. Classifying Mural Art

Similar to the difficulties with classifying mural speech, it is likewise difficult to classify mural art. Maintaining the distinction between commercial and noncommercial speech only further complicates this matter. The current framework leaves unbridled discretion in government enforcement authorities to arbitrarily decide when, in their subjective opinions, a mural qualifies as a work of art or signage.[155] It is this broad discretion that Justice Brennan feared in his *Metromedia* concurrence when he noted the danger of permitting a government unit to decide whether a given outdoor display contains commercial or noncommercial speech.[156] This concern is especially strong in the context of regulating outdoor murals. The definition of art and the determination of whether something qualifies as art have long been the subject of vigorous debate, even among artists themselves.[157]

Courts too have certainly struggled with the determination of whether a given mural is art or signage. The court in *Tipp City*, for

---

[154] For a photo of the Whole Foods mural, see Curtis Gilbert, *Cities Debate Art vs. Advertising*, MPRNEWS (Aug. 1, 2012), http://minnesota.publicradio.org/display/web/2012/08/01/business/art-versus-advertising-in-twin-cities.

[155] *See* Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 VA. L. REV. 627, 653 (1990) ("[T]he commercial speech doctrine . . . . gives government a powerful weapon to suppress or control speech by classifying it as merely commercial. If you think carefully enough, you can find a commercial aspect to almost any[thing] . . . .").

[156] *See* Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 536–37 (1981) (Brennan, J., concurring in the judgment) ("Because making such determinations would entail a substantial exercise of discretion by a city's officials, it presents a real danger of curtailing noncommercial speech in the guise of regulating commercial speech.").

[157] David Leichtman & Avani Bhatt, *Federal Courts and the Communicative Value of Visual Art: Is an Intended Message Required for Strong Protection of Rights Under the First Amendment?*, FED. LAW., Sept. 2011, at 25, 25 ("Federal courts addressing the question of the appropriate level of First Amendment protection for art have sometimes agreed that the key to protection is the communicative value of the work at issue. Others—in both law and other disciplines—have argued, however, that to qualify as art, the work must carry some component that is aesthetically pleasing, lest a mere circle painted on a canvas be considered art.").

example, was vocal in its discomfort with classifying the mad scientist mural at issue as commercial signage.[158] The court emphasized that the "inherent difficulty" with the classification was due, in part, to the lack of a clear distinction between commercial and noncommercial speech.[159] Stressing that the issue was "a close one," the *Tipp City* court avoided making a determination of its own.[160] Instead, it adopted the reasoning of the trial court, which had concluded that the mural was a sign, not art.[161] The hesitation scattered throughout the *Tipp City* court's discussion of classifying the mad scientist mural—a classification that hinged entirely on the distinction between commercial and noncommercial speech—is evidence of the arbitrariness of this distinction as it pertains to outdoor mural regulation.[162]

A related issue arises when multiple murals within a given municipality are regulated under the same terms of a local sign ordinance but are subjected to different treatment. The court in *Complete Angler* critiqued this discriminatory practice within the city of Clearwater. Although the city had declared plaintiffs' marine-themed mural an illegal sign, it had allowed other businesses in the city to display murals that contained similar degrees of relatedness to their business.[163] For instance, it had permitted a mural on a daycare center depicting children running through a field and a mural on a seafood restaurant containing various images of marine life.[164]

Of course, zoning officials are not entirely to blame for this disparate treatment. Murals painted on commercial buildings contain varying degrees of relatedness to the business inside, and thus, when a municipality must determine whether a mural is art or signage, the process of line-drawing becomes unbearably difficult—and consequently, quite haphazard.[165] Treating all outdoor murals the same,

---

158 City of Tipp City v. Dakin, 186 Ohio App. 3d 558, 2010-Ohio-1013, 929 N.E.2d 484, at ¶ 31 ("Despite the straightforward nature of the issue, determining whether the appellants' mural constitutes commercial speech is not without difficulty.").

159 *Id.* ¶ 32 ("'The distinction between commercial and non-commercial speech was never obvious, and sophisticated advertising techniques can blur the lines even more.'" (quoting Menthe, *supra* note 83, at 6)).

160 *Id.* ¶ 33.

161 *See id.* This was likely a showing of deference to the trial court.

162 *See, e.g.*, *id.* n.3 ("Assuming, arguendo, that we are wrong and that the appellants' mural is noncommercial speech, we note that the outcome in this case would remain the same. Our ultimate conclusion . . . is that Tipp City's sign ordinance cannot be enforced against the appellants' mural."); *supra* notes 158–59.

163 *See* Complete Angler, LLC v. City of Clearwater, Fla., 607 F. Supp. 2d. 1326, 1334 (M.D. Fla. 2009).

164 *Id.*

165 How close does the relationship have to be between the imagery contained in a mural and the business on whose wall the mural resides? Consider another case arising out of the city of Clearwater, Florida: An Egyptian-themed restaurant commissioned an artist to paint a mural depicting a repeating pattern of hieroglyphics over the entire front exterior wall of the building. The finished artwork was "eye-catching and appealing." But Clearwater, whose sign code

regardless of whether they contain commercial or noncommercial speech, would eliminate this inconsistency within a single municipality.

#### 4. Murals as Art

Lastly, eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation would restore all murals to their traditional status as artwork. Since its origination more than 30,000 years ago, mural art throughout history has been employed as a means of conveying artistic expression.[166] Mural art is a unique form of communication that is distinct from (and serves purposes different than) billboards, the prototype of commercial signage. Municipalities have used outdoor art murals, but not billboards, as a means of revitalizing urban communities.[167] Murals offer strong aesthetic pleasure in place of, or at least amongst, community blight, and they contribute to the cultural identity of a neighborhood.[168] By contrast, billboards generally clutter communities and elicit negative emotions from residents and tourists alike.[169] Treating murals housing commercial speech the same as those containing noncommercial speech would embrace the notion that all murals, no matter what their content,

---

forbids murals on commercial buildings if the mural relates to what the business is selling, declared the mural an illegal sign. Although the restaurant owner ultimately won the dispute on appeal, this case illustrates the danger of making broad determinations that jeopardize free speech interests. *See* Diane Steinle, *Murals Rules Create A Muddled Sign Code*, ST. PETERSBURG TIMES, Jan. 25, 2009, at 2.

166 For a discussion of the historical and artistic importance of public mural art, see Christian Ehret, *Mural Rights: Establishing Standing for Communities Under American Moral Rights Laws*, 10 U. PITT. J. TECH. L. & POL'Y 3 (2010).

167 *See id.* (noting that art allows "communities [to] take[] advantage of low cost, unused property and [attract] positive attention from outsiders"); Dana Cole, *Mural Project Gets Council's Green Light*, BENSONNEWS-SUN.COM (July 9, 2013, 6:00 PM), http://www.bensonnews-sun.com/news/article_d579d91c-e8e8-11e2-853d-001a4bcf887a.html (noting the success of mural projects in revitalizing communities, and indicating the intent of Benson, Arizona to launch a community-wide mural project to "make Benson a destination town for all tourists rather than a pass-through for travelers").

168 For example, Lake Placid, a small Florida town with a population of 2,000, is now known as the "Town of Murals." The community had a business district that was on the verge of collapse until the mid-1990s, when the town decided to paint murals on dilapidated buildings. Mural artists have since painted historical scenes, landscapes, and pictures of Lake Placid people and wildlife. Tourists travel from all over the world to see the beautiful paintings. *See* Steinle, *supra* note 165 (observing that "[e]ven the trash receptacles have been transformed by murals").

169 *See, e.g.*, Ballen v. City of Redmond, 466 F.3d 736, 744 (9th Cir. 2006) (defining billboards as "fixed, permanent structures that are . . . intrusive to community aesthetics"); Armin P. Langheinrich, *Letter: Ugly Highway Billboards Damage State's Image, Beauty*, DESERET NEWS (May 9, 2012, 12:00 AM), http://www.deseretnews.com/article/765574661/Ugly-highway-billboards-damage-states-image-beauty.html ("Because of [the abundance of ugly billboards all over the state of Utah], some labeled us as a third-world-country state. . . . This is . . . a big, ugly mess that distracts from the beauty of the state . . . .").

can contribute to society in a way that billboards and other commercial signage cannot.[170]

## III. A MODEL FOR REGULATING OUTDOOR MURALS

In light of the legal and policy-based reasons for eliminating the distinction between commercial and noncommercial speech in the context of outdoor mural regulation,[171] this Note proposes a model whereby all murals, regardless of their content, are regulated in the same manner. Under this model, municipalities would be able to regulate murals as they please in a content-neutral manner. Business owners interested in painting a mural on the exterior wall of their building would have sufficient notice of any time, place, and manner restrictions by which they must abide. If implemented correctly, this model would eliminate the number of disputes between mural owners and zoning administrators over whether a particular mural is artwork or signage.

The method of defining what exactly constitutes a "mural" is a process that would need to be undertaken by each individual municipality. For example, a mural could be defined as "[a] hand-produced work of visual art which is tiled or painted by hand directly upon, or affixed directly to an exterior wall of a building."[172] Notably absent from this definition is any mention of commercial or noncommercial speech. Once a definition is established, a municipality would then need to decide how it would like to regulate all outdoor

170 Moreover, it would embrace the Supreme Court's oft-repeated view that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing natures, values, abuses and dangers of each method." Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 501 (1981) (plurality opinion) (internal quotation marks omitted); *see also* Se. Promotions, Ltd. v. Conrad, 420 U.S. 546, 557 (1975) ("Each medium of expression, of course, must be assessed for First Amendment purposes by standards suited to it, for each may present its own problems.").

171 *See infra* Part II.B.

172 This is the definition currently being used by the city of Portland, Oregon. *See* PORTLAND, OR., CITY CODE & CHARTER tit. 4, ch. 4.12.020(J) (2013), *available at* http://www.portlandonline.com/auditor/index.cfm?c=50808&a=257808; *see also id.* at ch. 4.10.010 ("The purpose of this Title and the policy of the City of Portland is to permit and encourage original art murals on a content-neutral basis on certain terms and conditions. Original art murals comprise a unique medium of expression which serves the public interest. Original art murals have purposes distinct from signs and confer different benefits. Such purposes and benefits include: improved aesthetics; avenues for original artistic expression; public access to original works of art; community participation in the creation of original works of art; community building through the presence of and identification with original works of art; and a reduction in the incidence of graffiti and other crime. Murals can increase community identity and foster a sense of place and enclosure if they are located at heights and scales visible to pedestrians, are retained for longer periods of time and include a neighborhood process for discussion.").

murals within its jurisdiction. Again, this process should be individualized to reflect the unique identity of each municipality.

Some municipalities may choose to exempt all murals from all forms of regulation. More likely, municipalities will choose to impose at least some restrictions on outdoor art. Bearing in mind aesthetic and traffic safety goals, as well as general community demands, each municipality should strive to create content-neutral time, place, and manner restrictions that are equally applicable to all outdoor murals. For instance, a municipality could require that all murals be less than 200 square feet (manner restriction), contain less than three percent text (manner restriction), be located on a commercial building at least fifty feet from a main highway (place restriction), and remain intact for a minimum of two years (time restriction). These restrictions would apply to all murals—those containing noncommercial speech, commercial speech, or a hybrid of both.

One potential concern with implementing such a regulatory model is that muralists would be inhibited in their artistic pursuits, at least in those municipalities which impose more stringent time, place, and manner restrictions on outdoor signage. A muralist who is otherwise accustomed to painting 600-square-foot murals may feel frustrated that he is now limited to painting murals one-third the size. Although one may be sympathetic to a muralist's concern, it is an insufficient basis for maintaining the content-based distinction between commercial and noncommercial murals. If an artist desires to paint large-scale murals, he can do so in a municipality that welcomes such murals. Just like most other facets of government regulation, every municipality will differ in the value it places on art. Fortunately, many, if not most, municipalities appreciate the value of outdoor murals. This appreciation is reflected in sign ordinances which "exempt" murals and similar works of art from the more stringent requirements placed on other forms of signage.[173] Of course, many of these ordinances maintain the distinction between commercial and noncommercial murals that this Note argues should be eliminated.[174] However, at least two cities are on the cusp of eliminating this distinction.

Minneapolis and St. Paul, Minnesota's two largest cities, are considering revisions to their sign ordinances that would relax the definition of "mural" to allow for imagery of products sold within the building on which a mural resides. In Minneapolis, council member Gary Schiff has been vocal in his desire to subject all murals, regardless of their content, to the same regulations.[175] Minneapolis's current sign ordinance bans all murals that "advertise or promote any business,

173 *See supra* note 2.
174 *See id.*
175 *See* Boros, *supra* note 12; Gilbert, *supra* note 154.

product, activity, service, interest or entertainment" (that is, murals that contain "commercial speech").[176] Calling the distinction between commercial and noncommercial speech as contained in murals "silly," Schiff has called for a more reasonable definition that better responds to community needs and wishes.[177] Similar considerations for change are being voiced in St. Paul, a city that has long encouraged the creation of murals and other forms of artwork to "enliven" the city and "improve visual interest."[178]

Another possible concern with implementing a model that regulates all outdoor murals in the same manner is that municipalities risk corporate entities transferring their advertising campaigns from billboards to murals, which would now be permitted to house even the most overt commercial speech.[179] This concern is strongest in those jurisdictions that ban billboards, such as Los Angeles.[180] This concern, however, can be eliminated by carefully constructing content-neutral time, place, and manner restrictions that would make traditional forms of corporate advertising impossible.

---

176 Gilbert, *supra* note 154 (internal quotation marks omitted).

177 *See id.* ("I think ever since Andy Warhol painted a Campbell's Soup can, there's been a blurring between American iconography and advertising, and we need a change . . . . If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly and this needs to be fixed." (internal quotation marks omitted)); Boros, *supra* note 12 ("You are not allowed to show any products that you sell in your mural, or your mural is deemed advertising . . . It's really gotten silly, and the enforcement and destruction of murals has got to stop." (internal quotation marks omitted)).

178 *See* CITY SAINT PAUL, CENTRAL CORRIDOR DEVELOPMENT STRATEGY 66 (2007), *available at* http://www.stpaul.gov/DocumentCenter/Home/View/4772 ("Blank walls create harsh pedestrian environments by limiting activity, removing a sense of connection between the building and the street and limiting 'eyes on the street.' Where the reconfiguration and reopening of blank walls is not possible, an opportunity exists to enliven the street and improve visual interest through the creation of a mural or other form of artwork."); *see also* Melo, *supra* note 9.

179 Various mural advertising companies are already in existence, so businesses would have no shortage of artists willing to paint their commercial murals. *See, e.g.*, ALT TERRAIN, http://www.altterrain.com/graffiti_advertising.htm (last visited Oct. 27, 2013) (noting that they work with street artists to "assist agencies in creating unique art-advertising outdoor painted billboard murals"); COLOSSAL, http://colossalmedia.com/about (last visited Oct. 27, 2013) (touting themselves as "the largest hand paint mural and outdoor advertising company in the world"); *see also* Kim Bhasin, *17 Awesome Graffiti Ads From Around the World*, BUS. INSIDER (Oct. 20, 2011, 10:54 AM), http://www.businessinsider.com/graffiti-mural-guerrilla-advertising-2011-10?op=1 (describing how brands are increasingly using graffiti and murals in urban areas to "amp up their marketing").

180 An earlier version of Los Angeles's sign ordinance exempted artwork from sign regulation. Specifically, it made all signs viewed mainly from a freeway illegal, with the exception of artwork. In an attempt to draw the line between art and advertising, murals with less than three percent text were allowed so long as they were first approved by the city. Patrick Media Group (PMG), one of Los Angeles's largest billboard companies at the time, painted a fifty-foot-tall mural in defiance of the sign ordinance. PMG insisted the mural was art. The city ultimately rejected PMG's argument, ordering it to remove the mural or face six months in jail or a $1,000 fine. *See* Kelly David, *Art or Advertising?: Controversy Over Oversize L.A. Murals Looms Large*, L.A. TIMES, Sept. 2, 1995, at D1.

## CONCLUSION

Sign ordinances throughout the nation continue to jeopardize the artistic expression of property owners who commission murals to be painted on their buildings. The continued reliance of municipalities on the outdated and content-based distinction between commercial and noncommercial speech has led to arbitrary enforcement of sign ordinances. Moreover, the inconsistent approaches taken by courts in their judicial review of these sign ordinances has resulted in art murals being subjected to different treatment based solely on the legal jurisdiction in which they reside. Even more concerning, the free speech rights of mural owners are being exposed to this same disparate treatment.

This Note argued in favor of a regulatory model whereby outdoor murals are divorced from the commercial/noncommercial speech distinction. Eliminating this distinction in the context of mural regulation renders moot the issue of how to define commercial speech. Moreover, it significantly diminishes the splitting effect of the contrasting judicial approaches to content neutrality. Altogether, such a model strikes the best balance between maintaining government regulatory power, preserving judicial resources, and safeguarding individual free speech.

(Summary published in *The Salina Journal* on July 14, 2017.)
(Published on the City of Salina's website for a minimum of one week from July 11 to July 25, 2017.)

Consolidated-Salina EPN111155

## ORDINANCE NUMBER 17-10882

**AN ORDINANCE ADDING NEW SECTIONS 42-500 AND 42-511 TO THE SALINA CODE PERTAINING TO THE PURPOSE OF THE CITY OF SALINA'S SIGN REGULATIONS AND ALLOWING THE SUBSTITUTION OF NONCOMMERCIAL MESSAGES ON ANY PERMITTED SIGN; AND AMENDING SALINA CODE SECTIONS 42-506, 42-507, AND 42-508 PERTAINING TO THE REGULATION OF SIGNS WITHIN THE CITY OF SALINA, AND REPEALING THE EXISTING SECTIONS.**

**WHEREAS,** Article X, Chapter 42 of the Salina Code regulates the placement of signs within the City of Salina ("City");

**WHEREAS,** the Governing Body finds that the number, size, height, lighting, design, location, portability, changing frequency, and other physical characteristics of temporary signs within the City directly affect the public health, safety, and welfare;

**WHEREAS,** the City, pursuant to its police power, has the authority to take appropriate action to address concerns regarding traffic safety and aesthetics, as they relate to temporary signs;

**WHEREAS,** the Governing Body recognizes that signs constitute speech protected by the First Amendment to the United States Constitution and that its regulation of temporary signs must be consistent with those protections; and

**WHEREAS,** on June 18, 2015, the United States Supreme Court issued its decision in the case of *Reed v. Town of Gilbert*, which imposed new standards under the First Amendment to the United States Constitution with respect to determining the content-neutrality of municipal sign regulations;

**WHEREAS,** the *Reed v. Town of Gilbert* decision prompts the Governing Body to amend Article X, Chapter 42 of the Salina Code in order to ensure compliance with the First Amendment and to update and clarify sign regulation and enforcement generally within the City;

**WHEREAS,** the City has a substantial interest in regulating temporary signs in the manner set forth in this ordinance, and the regulations adopted and amended in this ordinance further the City's substantial interests in traffic safety and aesthetics, as well as those additional substantial interests set forth in the purpose statement adopted by this ordinance; and

**WHEREAS,** this ordinance adds a message substitution provision to the Salina Code, allowing any sign permitted under the provisions of Article X, Chapter 42 of the Salina Code to display, or be substituted with, any noncommercial message, so that the City's regulations satisfy the constitutional mandate that it not restrict noncommercial signage to a greater degree than commercial signage;

**WHEREAS,** the Governing Body finds that a proliferation of temporary signs in the public right-of-way detracts from the aesthetic quality of the streets and sidewalks, interferes with traffic safety and pedestrian access to public sidewalks and streets, and obstructs the entrance to businesses and residences; therefore warranting the prohibition of all forms of temporary signage within the public right-of-way;

**ANDREW AFFIDAVIT EX. 2**

Consolidated-Salina EPN11155

**WHEREAS,** the Governing Body finds and determines that following amendments to Article X, Chapter 42 of the Salina Code are necessary and desirable to protect the public health, safety, and welfare and to comply with and satisfy the protections afforded speech by the First Amendment to the United States Constitution, **SO NOW THEREFORE,**
**BE IT ORDAINED** by the Governing Body of the City of Salina, Kansas:

**Section 1. New Section.** The Salina Code is amended by adding a section to be numbered 42-500 which section reads as follows:

**Sec. 42-500. Purpose.**
This Article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

1. Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the Comprehensive Plan;

2. Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

3. Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

4. Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

5. Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

6. Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

7. Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

8. Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

9. Enhance the city's ability to maintain its public rights-of-way.

**Section 2. Amendment.** Section 42-506 of the Salina Code is amended to read as follows:

**Sec. 42-506. Classification of signs--Functional types.**
The following signs are classified by function:
(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location

Consolidated-Salina EPN11155

other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

<u>**Section 3.**</u> **Amendment.** Section 42-507 of the Salina Code is amended to read as follows:

**Sec. 42-507. Same--Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

Consolidated-Salina EPN11155

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

<u>Section 4.</u> **Amendment.** Section 42-508 of the Salina Code is amended to read as follows:

**Sec. 42-508. Temporary signs, banner signs, and mobile signs.**

(a) The following temporary signs shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, and shall be allowed to display any commercial or noncommercial message on a property with the owner's consent in addition to any other signs allowed under this article and the applicable district regulations:

(1) Two (2) yard signs may be placed and displayed on an individual residential lot in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district.

(2) Two (2) freestanding temporary signs of any type except feather flags, inflatable signs or banners may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities and nursing homes.

Consolidated-Salina EPN11155

(3) In addition to the temporary signs allowed under subsections (a)(1) and (a)(2), four (4) additional yard signs may be placed and displayed on a property in any zoning district for a period up to forty-five (45) days prior to an election involving candidates for a federal, state or local election that represent the district in which the property is located or involving an issue on the ballot of an election within the district where the property is located. These additional temporary yard signs must be removed within seven (7) days following the election.

(b) On property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district, or on property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or thirty-two (32) square feet of sign area.

(c) On property located in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, other than property occupied by multi-family apartments, assisted living facilities and nursing homes, temporary signs allowed under subsection (a) shall not exceed six (6) feet in height or eight (8) square feet of sign area.

(d) In addition to the temporary signs allowed under subsection (a):

(1) Feather flags may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. Two (2) feather flags for every fifty (50) feet of street frontage, not exceeding a total of six (6) flags per street frontage, may be displayed on a property for a period not exceeding thirty (30) consecutive days for up to six (6) events in a calendar year. Feather flags shall not exceed thirteen (13) feet in height, shall be set back from any adjoining street a distance equal to its height, shall be securely anchored to the ground, and must be removed by the owner if the flag becomes tattered, torn or damaged.

(2) One (1) inflatable sign may be placed and displayed on property located in any A-1, U, H-M, P, C-1, C-2, C-3, C-4, C-5, C-6, C-7, I-1, I-2 or I-3 zoning district and on property occupied by multi-family apartments, assisted living facilities or nursing homes. An inflatable sign may be displayed for a period not exceeding fourteen (14) consecutive days for up to four (4) events in a calendar year. An inflatable sign shall not exceed twenty (20) feet in height, shall be securely anchored to the ground, shall be set back from any adjoining street a distance equal to its height, and must be removed by the owner if the inflatable device becomes tattered, torn or damaged.

(e) Banners placed over an existing sign face, placed at least eight (8) feet above ground level on existing poles or other supports which serve another primary purpose or placed on an existing building, canopy, solid fence, or other structure located behind the front yard setback line shall be exempt from the zoning certificate (sign permit) requirements of section 42-502, but shall comply with all of the requirements of this article and the applicable district regulations.

(f) Mobile signs may be permitted upon issuance of a zoning certificate (sign permit) and when in compliance with all of the other requirements of this article, the applicable district regulations, and the following provisions:

(1) Only one (1) mobile sign shall be allowed on a zoning lot.

(2) Mobile signs shall not exceed thirty-two (32) square feet in area.

(3) Mobile signs shall not be placed within twenty-five (25) feet of an existing pole sign or ground sign, within fifty (50) feet of another mobile sign or within the clear vision triangle of any street or driveway.

(4) Mobile signs shall not be placed on the premises of an establishment which has an existing pole sign or ground sign located in the front yard.

Consolidated-Salina EPN11155

(5) Mobile sign permits shall be valid for not more than thirty (30) days. Each establishment may be issued not more than four (4) permits during a calendar year for a combined total of sixty (60) days.
(6) Mobile signs shall be of rigid construction and anchored or weighted to prevent movement or overturning by wind.
(7) Electrical lines shall not lie on the ground where vehicular or pedestrian traffic is permitted. Use of aboveground extension cords is prohibited. All wiring shall comply with the electrical code of the city.
(8) Use of red, yellow, or green external lighting shall be prohibited. Any light shall be constant in intensity or color at all times.

(g) No sign authorized under this section 42-508 shall be placed or displayed within the public right-of-way.

Section 5. **New Section.** The Salina Code is amended by adding a section to be numbered 42-511 which section reads as follows:

**Section 42-511. Sign substitution.**
The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

Section 6. **Repealer.** Existing Salina Code Sections 42-506, 42-507, and 42-508 are repealed.

Section 7. **Effective.** This ordinance shall be in full force and effect from and after its adoption and publication once in the official city newspaper by the following summary:

Ordinance No. 17-10882 Summary

On July 10, 2017, the City Commission passed Ordinance No. 17-10882. The Ordinance adds new Sections 42-500 and 42-511 to the Salina Code pertaining to the purpose of the sign regulations and allowing the substitution of noncommercial copy on any permitted sign and amends Salina Code Sections 42-506, 42-507, and 42-508 pertaining to the regulation of signs and repeals the existing sections. A complete copy of the Ordinance can be found at www.salina-ks.gov or in the office of the City Clerk, 300 W. Ash, free of charge. This summary is certified by the City's legal counsel.

Introduced: June 26, 2017
Passed: July 10, 2017

Kaye J. Crawford, Mayor

[SEAL]
ATTEST:

Consolidated-Salina EPN111155

Jason A. Gage, City Manager

Certification of Publication Summary:

Greg A. Bengtson, Legal Counsel

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | ) | **CIVIL ACTION**<br>**CASE NO. 6:24-cv-01027-TC-ADM** |

**AFFIDAVIT OF MARK WHITE**

I, Steven Mark White, a retained expert for the City of Salina, Kansas in the above-entitled action, being first duly sworn, declare under penalty of perjury as follows:

1. I am over 18 years of age and have personal knowledge of the following facts and opinions.

2. I was retained as an expert by the City of Salina in the above-entitled matter.

3. I authored an expert report dated August 16, 2024 and attached hereto as Affidavit Exhibit 1.

4. I make this Affidavit in support of the City's Motion for Summary Judgment.

5. The opinions contained in my expert report are my opinions that I intend to testify to at trial in this matter, are based on facts and data of the type reasonably relied on by experts in my field of urban planning and zoning, and are true to the best of my knowledge and opinion. All statements I have made in my expert report are incorporated into this Affidavit by reference.

6. Specifically, I intend to testify at trial in this matter to the following facts and opinions:

**EXHIBIT N**

a. The restrictions established in the City of Salina's sign code ("Sign Code") are reasonable, generally accepted regulations of the size, number, placement and design of signs.

b. The Sign Code serves several compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500):

   i. Comprehensive Plan implementation
   ii. Traffic safety
   iii. Aesthetics
   iv. Urban Design and travel behavior
   v. Public Health and Safety
   vi. Compromise

c. Based upon my review of the Sign Code, my knowledge, experience, and education in urban planning and zoning, and the facts and data of the type reasonably relied upon by experts in my field of urban planning and zoning, it is my opinion that the Sign Code directly and materially furthers its recited purposes.

d. The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter.

e. In the C-4 district, where the Cozy Sign is located, the Sign Code allows 67% of the total sign area on any building wall or street frontage. This proportionality limitation protects aesthetics and architectural integrity.

f. Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. In reaching this conclusion I examined sign and mural regulations for twenty-one sign codes along with several in Kansas and Oklahoma where I was the principal consultant on the sign regulation drafts and Manhattan (KS), where I was part of the consulting team for the Development Code update. The sample codes I reviewed and cited in my expert report demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

g. The terms and phrases used in the definition of sign in the Sign Code, such as advertise and announce, are well understood and in common use in sign regulations throughout the nation and in Kansas.

Signed: Steven Mark White
Steven Mark White

STATE OF Florida )
) ss.
COUNTY OF Okaloosa )

Subscribed and sworn to before me by Steven Mark White on the 7th day of February, 2025. Type of ID produced: MO DL

Witness my hand and official seal. My commission expires: 06/13/2027

NOTARY PUBLIC • STATE OF FLORIDA
OZELLA MAE MOORE
Notary Public - State of Florida
Commission # HH 391605
Expires on June 13, 2027

Ozella Mae Moore OZELLA MAE MOORE
Notary Public

Notarized remotely online using communication technology via Proof.

# ANALYSIS OF SALINA SIGN CODE

---

PREPARED BY:
S. MARK WHITE, AICP

*Cozy Inn Incorporated v. City of Salina*, Case 6:24-cv-01027
(United States District Court, District of Kansas)

WHITE & SMITH, LLC
200 NE MISSOURI ROAD, SUITE 200
LEE'S SUMMIT, MO 64086
PHONE (816) 221-8700
MWHITE@PLANNINGANDLAW.COM
WWW.PLANNINGANDLAW.COM

**AFFIDAVIT EXHIBIT 1**

Contents

*Introduction* 2
*Basis of Opinions* 3
*Statement of Opinions* 3
*Compensation* 20
*Conclusions* 21
*Documents Reviewed* 22
*Exhibits* 30
*Resume and Qualifications* 39

## INTRODUCTION

The City of Salina has adopted a comprehensive set of regulations to control signs within its city limits (the "Sign Code").[1] Plaintiff wants to paint a wall sign on the side of its building that exceeds the size limits of the City's Sign Code. After plaintiff was informed that its proposed painted wall sign exceeded the Sign Code's maximum sign size limits, he challenged the Sign Code as a violation of the First and Fourteenth Amendments to the United States Constitution. The complaint states that the following claimed aspects of the city's Sign Code violate the United States Constitutions because, among other things:

1. The City regulates displays that announce, direct attention to or advertise, but does not regulate artistic displays (such as murals) that do not announce, direct attention to or advertise), under the Sign Code. The plaintiff claims that this is not narrowly tailored to, and does not directly or materially further, a substantial, important, or compelling government interest, in violation of plaintiff's free speech rights under the First Amendment, and

2. The Sign Code does not define various terms, such as "mural" or "commercial speech."

Plaintiff's Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024)("Complaint") would suggest that this case is about its proposed wall sign. It is not. If plaintiff prevails, Salina becomes exposed to proliferation of painted wall signs that exceeds the existing sign parameters its Sign Code. Those metrics are designed to ensure that the City and its Downtown – described in its Comprehensive Plan as the "heart of the community" – is attractive, safe, and economically strong. And the Sign Code stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs. Instead of working with the community to determine a way forward for painted wall signs with some artistic features, the Plaintiff is seeking ad-hoc relief from a federal district

[1] For purposes of this report, the term "Sign Code" refers to Chapter 42, Article X of the Salina Code. These are shown in the Exhibits to this report beginning on page 14.

court. This not only exposes the City to a flurry of painted signs, but it also threatens to undermine the culture of creativity that has resulted in well-known murals[2] – which would now become subject to wall sign limitations.

It is my opinion as a professional urban planner that the allegations by plaintiff are incorrect to the extent that they relate to content neutrality and the purposes advanced by the Sign Code. It is my opinion that the Salina Sign Code furthers substantial, content neutral interests in urban planning, and that it provides legitimate and well-established tools to control the size, shape, and design of signs.

## BASIS OF OPINIONS

I have a Masters in Urban and Regional Planning and have practiced as a professional planner for thirty-four (34) years. I am a member of the American Institute of Certified Planners (AICP) with extensive planning experience throughout the nation. The conclusions set out under "Statement of Opinions," below, are based upon my professional experience and judgment, review of technical literature relating to the field of urban planning, review of technical literature relating to the field of signs, and review of the documents, pleadings and other materials for this lawsuit. I have reviewed the materials listed under "Documents Reviewed", page 22, below.

## STATEMENT OF OPINIONS

Based on my professional experience and judgment, and my review of the applicable documents and data below, it is my opinion and professional conclusion that:

1. The Sign Code establishes time, place and manner metrics that are not content-based.
2. The Sign Code is supported by substantial and compelling interests in the area of urban planning and code administration.
3. The Sign Code directly and materially furthers its recited purposes.
4. The Sign Code is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals.
5. The Sign Code is not vague.
6. The restrictions established in the Sign Code are reasonable, generally accepted regulations of the size, shape, placement, and design of signs.
7. The Sign Code has numerous procedural safeguards.

[2] For purposes of this report, a "mural" means an outdoor exhibit painted on a wall that does not fall with the Sign Code's parameters and that may include art, but does not announce, direct attention to, or advertise.

## DESCRIPTION OF SIGN CODE

The Sign Code is codified at Chapter 42, Article X of the City Code (see Sign Code and Zoning Definitions (Selected Provisions) beginning on page 30). The Sign Code is a conventional sign method for regulating signs, and has been in effect for more than 58 years with periodic amendments (see history notes to Sign Code). The Sign Code includes a comprehensive purpose statement (Salina Code § 42-500).[3] A comprehensive set of definitions embraces virtually every sign category available on the market, and for which sign permit applications are requested in most cities (Salina Code Chapter 42, Article XIV, §§ 42-764 to -781). The sign that is the subject of this lawsuit is a painted "wall sign" as defined by Salina Code § 42-781, as it is painted on and supported by a building wall, and does not project from the building's surface.[4]

Administrative provisions include permitting, fees and inspections, which are normally necessary to enforce the ordinance (Salina Code §§ 42-501 [sign permits], 42-502 [zoning certificate], 42-596 [enforcement and inspections], and 42-598 [fees]). Exceptions from the regulations or permitting requirements relate to small scale signs, signs oriented to indoor locations (such as scoreboards), government signs needed for public safety (Salina Code § 42-504, -505). These are typical exceptions in sign codes.

In addition to the Zoning Regulations, the Salina Code requires a certificate of compatibility approved by the Design Review Board (DRB) of the Salina Business Improvement District (BID) for changes to buildings (Salina Code § 2-207), in order to protect the architectural character of Salina's Downtown. Full review by the DRB is required for wall signs that exceed two (2) square feet (such as Plaintiff's proposed wall sign) and exterior repainting of buildings (Salina Code § 2-209; Lee District Design Review Board, Design Guidelines for Downtown Salina (January 2, 2008)[Certificate of Compatibility Design Matrix]).

The Zoning Regulations also permit variances from sign standards (Salina Code § 42-597 [board of zoning appeals]; 42-597.1 [administrative variance]). Because it is impossible to write an ordinance that addresses every conceivable situation and site configuration, variances are a long-established technique to create flexibility in the administration of zoning and similar land use restrictions and ensuring equitable treatment of property owners (Morris, 2000, at 142-43).

The Sign Code varies sign height, size and design by zoning district. This is a state of the art, and generally accepted, technique for controlling sign clutter (see Mandelker, 2015, at 52 [appropriate proportions for wall graphics]; Mandelker, 2004, and Mandelker, 1988; Weinstein, at 5). Plaintiff's property lies within the C-4 (Central Business) zoning district. Within the C-4 district, the Sign Code limits signs other than ground, pole or projecting signs to three (3) square feet of sign area for each lineal foot of building frontage (Sign Code § 42-521(4)). Because the existing building frontage is 21 lineal feet, plaintiff is allowed 63 square feet in total sign area (Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023)). Plaintiff's proposed sign is 528 square feet, or 8 times the total allowable sign area. The total sign area is based on the location and structural characteristics of signs, and not their content. Plaintiff's lawsuit would invite all businesses

---

[3] The plaintiffs do not challenge the constitutionality of § 42-500.

[4] Section 42-781 (Sign, wall) reads: "Wall sign is a sign fastened to or <u>painted</u> on a <u>wall</u> of a <u>building</u> or structure in such a manner that the <u>wall becomes merely the supporting structure or forms the background surface</u>, and which does <u>not project more than twelve (12) inches</u> from such building." (emphasis added)

to completely ignore the Sign Code's area restrictions – at least if the sign is painted – and contribute to sign clutter.

**SUBSTANTIAL AND COMPELLING INTERESTS UNDERLIE THE SIGN CODE**

The Sign Code serves a number of compelling and substantial urban planning purposes. These include the following, all of which are reflected in the Sign Code's statement of purpose (§ 42-500, page 30):

- Comprehensive Plan implementation (see page 5)
- Traffic safety (see page 7)
- Aesthetics (see page 7)
- Urban Design and travel behavior (see page 8)
- Public Health and Safety (see page 8), and
- Compromise (see page 9).

Each of these purposes are addressed in turn below.

COMPREHENSIVE PLAN IMPLEMENTATION

In 2010, the City adopted a Comprehensive Plan for development (Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010). A comprehensive plan is a statement of the City's overall land use policies. The comprehensive plan is an extremely important document. It "is atop the hierarchy of local government law regulating land-use" and acts as a "constitution for all future development." *Concerned Citizens of Calaveras County*, 166 Cal. App. 3d 90, 212 Cal. Rptr. 273, 276-77 (Cal. App. 3 Dist. 1985) (citing *O'Loane v. O'Rourke*, 231 Cal. App. 2d 774, 42 Cal. Rptr. 283 (1965); *Machado v. Musgrove*, 519 So.2d 629, 632 (Fla.App. 1987), *rev. denied*, 529 So.2d 694 (Fla. 1988) (comprehensive plan is the constitution of land development regulation)); Kansas Statutes Annotated § 12-747(c) (the comprehensive plan is the "basis or guide for public action to insure a coordinated and harmonious development or redevelopment which will best promote the health, safety, morals, order, convenience, prosperity and general welfare"). Comprehensive plans constitute "the general outline of projected development," while zoning is a regulatory tool designed to implement the plan. Haar, "*In Accordance With A Comprehensive Plan*", 68 HARV. L. REV. 1154, 1156 (1955). As such, they are used for the following purposes:

1. Establishing a vision for the community; and
2. Establishing policy guidelines; and
3. Providing sources of information; and
4. Enhancing the legal basis for zoning decisions.

The Salina Comprehensive Plan establishes a number of important policies relating to urban design, including specific policies that include Plaintiff's property. Downtown is the physical and social heart of Salina (Downtown Plan, at 2-77). The Downtown Future Land Use Category includes the C-4 zoning district, and Plaintiff's property is part of the downtown core (Comprehensive Plan, at 2-11, 2-77). This is the City's primary pedestrian district, and "requires higher levels of visual interest and amenities to attract residents and visitors" (Comprehensive Plan, at 2-64). In addition to redevelopment and infill, economic vitality and residential growth, the plan provides for arts and cultural institutions as an anchor for future growth (Comprehensive Plan, at 2-79), with Policy DT.4 providing to "[w]ork with the Community Art and Design Program to create a Downtown Arts Master Plan" (Comprehensive Plan, at 2-93). Downtown economic development policies provide for public art – along with other arts and cultural uses – as a way to draw people there (Comprehensive Plan, at 2-99). Several implementation policies specifically reference public art (Comprehensive Plan, at 3-31):




*Figure 1 Downtown District Map (Salina Comprehensive Plan, at 2-79)*

- DT.5-1 Work with the Community Art and Design Program to plan for the incorporation of public art displays and street art downtown.
- DT.5-2 Incorporate performance art to enhance a sense of place. Identify public / private partnerships and programs to support the installation of art in Downtown.
- DT.5-3 Enhance the downtown arcades with installation of public art, including light and sound.

Appropriate sign restrictions are critical to implementing these policies.[5] Downtown is pedestrian oriented, and is characterized by very unique urban design features. Suburban style signage that is designed for highly trafficked roadway corridors is inappropriate for this location (see Weinstein, at 5). Wall signs that are out of scale to the buildings to which they are applied are inappropriate for an urban, tourist-oriented location such as the Downtown. The unregulated proliferation of this type of sign is harmful to aesthetics and detrimental to the character of the district.

By contrast, the BID's Downtown Design Guidelines (page 30) recognize public art as a tool to maintain a pedestrian friendly environment. The policies relating to alterations and new construction establish a policy that "[t]he street level of a building should be pedestrian friendly," with the following (emphasis added):

"8. Develop the ground floor level to encourage pedestrian activity.

- A storefront should be used on the primary facade of a building.
- On a secondary facades, alternative methods of creating pedestrian interest should be utilized. Consider the following:
    - ◊ A storefront
    - ◊ Display case
    - ◊ **<u>Public art</u>**
    - ◊ Landscaping"

TRAFFIC SAFETY

Sign clutter contributes to a decline in traffic safety. Scenic America, *Warning Signs: Billboards, Signs and Traffic Safety* (1996). The proliferation of signs that could result from unregulated painted wall signs can distract motorists and contribute to traffic accidents. Because traffic accidents can cause serious bodily harm and even death, traffic safety is a critical government interest. In my experience and professional judgment, traffic safety is an important basis for sign regulations, and reasonable restrictions on the height, spacing, location, and size of signs promote traffic safety.

Public art does not create this type of distraction. In fact, communities have used public art as a tool to provide wayfinding and markings that reduce traffic accidents and collisions with pedestrians. *Cf.* Schwartz, 2022 (asphalt art positively correlated with improved safety).

AESTHETICS

Sign clutter is considered unattractive by most planning professionals and the general public. The use of reasonable sign regulations to promote aesthetics is well-established and is accepted practice in the planning profession. Mandelker, 2015, at 97-98; *Georgia Outdoor Advertising, Inc. v. City*

---

[5] The Comprehensive Plan also recognizes sign standards in other contexts, such as a proposed Urban Industrial Overlay District (page 2-101).

*of Waynesville*, 833 F.2d 43, 47 (4th Cir. 1987)("It requires neither elaboration nor citation to say that an ordinance regulating billboards is likely to advance the objective of enhancing the beauty of a city, and that no less intrusive method would adequately protect the city's interest."); *City of Belleville v. Kesler*, 428 N.E.2d 617, 101 Ill.App.3d 710, 57 Ill.Dec. 67 (1981).

In my professional experience, a proliferation of unregulated painted wall signs would generate many complaints from the general public with regard to their visual characteristics. These can compete with existing wall signs and other signs the compete for attention, and have a tendency to dominate the streetscape.[6] The planning literature associates the cacophony of multiple signs along street frontages with a decline in community aesthetics. In the Downtown district in particular, a proliferation of large painted signs would be inconsistent with the existing built form of the district, the policies and objectives of the City's Comprehensive Plan, and the Downtown Design Guidelines.

By contrast, public art (including murals) – which the Sign Code does not regulate – is explicitly designed for beautification, fostering civic engagement, and improving quality of life (McMaster University, 2022). Neuroscience studies have demonstrated positive amplitude from persons viewing artwork, as opposed to negative responses from viewing commercial symbols (Cheng, 2023; Scholarly Community Encyclopedia, 2023).

## URBAN DESIGN AND TRAVEL BEHAVIOR

Building design has an impact on travel behavior. The setback and building orientation of commercial structures, in a pedestrian-friendly context like Downtown Salina, encourages pedestrian travel and discourages vehicular trips by nearby residents. Shallow setbacks with small, pedestrian oriented signs are characteristic of an urban environment. Large front setbacks, along with automobile-oriented signs such as pole signs and roof signs, are more characteristic of a suburban environment. While Salina's Downtown is a pedestrian oriented district, a proliferation of oversized painted wall signs along with other inappropriate intrusions into the district would encourage shifts in travel behavior internal to the district. This would, in turn, create pressure for further intrusions, create demand for land consumptive uses such as parking, and discourage the use of public transit.

City policies strongly encourage walkability in the design of new development and structures in Salina. See Salina Comprehensive Plan at 2-11 to -13 (downtown, community center and neighborhood center policies), 2-63 to -65 (pedestrian network and supporting land use policies), 3-6 Policy LU.2-3d, 3-10 Policy GD.1-2. Adherence to these policies is critical in areas such as Downtown, which is already characterized by pedestrian supportive site design and building design. Allowing large painted signs and other forms of automobile-oriented signs in the district would pose a threat to the character of the district, and degrade public health and safety within the district.

## PUBLIC HEALTH AND SAFETY

There is a growing body of evidence that urban sprawl, characterized by low density development, deep front setbacks, and automobile-oriented development patterns, has a real and substantial impact on public health. See documents cited under "Sprawl and Public Health," page 28. This is manifested in several ways. First, development design characteristics that are automobile oriented discourage non-vehicular travel modes such as walking. The result is a more sedentary

[6] The *Design Guidelines for Downtown Salina* defines "streetscape" as "[t]he distinguishing character of a particular street as created by its width, degree of curvature, paving materials, design of the street furniture, and forms of surrounding buildings.."

lifestyle, which creates health problems associated with the lack of exercise. Second, increases in traffic congestion resulting from more automobile-oriented development are associated with increases in traffic accidents. Large signs are one characteristic of sprawling, automobile-oriented corridors. In the planning profession, the protection of public health is considered a compelling interest. Restricting the size and number of signs, including the control of painted wall signs, is directly related to this interest.

By contrast, public art murals have significant positive impacts on placemaking, society, culture, economy, sustainability, wellbeing, and education (Cheung et al., 2021). In addition, evidence suggests that public murals are associated with a decrease in crime (Can More Art Equal Less Crime?, 2024).

COMPROMISE

Recognizing the impacts of signs does not require a community to eliminate them. Appropriately scaled signs are needed for all types of communication – from election messages to business identification. Therefore, it is important for communities to strike a balance that allows signs to communicate messages without generating clutter or safety issues. A feature of Salina's Sign Code that is not mentioned in the Complaint is the spirit of compromise. See Sign Code § 42-500(2)(a purpose of the Sign Code is to "[b]alance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages"). As the foregoing discussion demonstrates, the city has strong public interest in imposing restrictions on signs, especially in the Downtown area. However, the Sign Code also recognizes the needs of businesses there. Accordingly, the Sign Code includes a number of flexible regulations, contains procedural alternatives, and permits a number of different sign categories throughout the Sign Code and in the C-4 (Central Business) district. In crafting any sign code, the City walks a tightrope between those who would completely ban signs or sign categories, and those who want to deregulate sign type, spacing and size. This Sign Code resolves this tension by coupling its height, size, spacing and locational restrictions with permission to construct an ample variety of signs throughout the city, including provisions for painted wall signs in many locations (including C-4).

## THE SIGN CODE FURTHERS ITS STATED INTERESTS

WALL SIGN RESTRICTIONS

Sign codes, including the wall sign restrictions in Salina's Sign Code, directly further the interests listed above. The Sign Code limits, but does not completely eliminate, painted wall signs. This allows a person, business or property owner to install wall signs, so long as they fit the building's context. Limiting wall sign size keeps the sign from overwhelming a façade, and limiting the number of signs prohibits clutter (Bishop, 1989, at 7-8). Therefore, most sign codes (including model codes) limit the size and number of wall signs (Weinstein, 2000, at 32; Kelly, 1989, at 6-7).[7] By limiting clutter, the Sign Code avoids driver distractions, and keeps signs from competing for attention with other signs on the façade.

[7] The Salina Sign Code does not directly limit the number of wall signs. Instead, it limits all signs per business, which includes both wall and freestanding (ground or pole) signs in the C-4 district (§ 42-521(3)). Kelly recommends a limit on freestanding signs, but only a limit on wall sign area (not the number of wall signs) (Kelly, 1989, at 6-7). Salina's approach is flexible because it allows the business to choose how to allocate its signs within the total sign limit. In this case, Plaintiff's proposed sign does not increase the number of wall signs, but it exceeds the maximum sign area.

Limiting wall sign size also promotes aesthetics. While the Sign Code does not directly control the sign's design, it does limit sign size and the number of signs. This keeps the sign in scale with the building's context, which furthers aesthetics by avoiding unsightly clutter (McMahon, 2022). The proliferation of franchise design can degrade aesthetics and local character, while sign controls can simplify the display of information (improving traffic safety) and protect the unique design of pedestrian-friendly environments such as Salina's Downtown Core (Fleming, at 71-72). As with most sign regulations, including the recommendations in model codes, it is reasonable for the City to adjust its sign metrics by zoning districts in a way that protects the area's character (Weinstein, at 5).

Controlling painted wall signs promotes public health and safety. Painted wall signs can consist of text or drawings. Another type of outdoor display that is analogous to in design is graffiti (Understanding the First Amendment Limitations on Government Regulation of Artwork, 2017). Graffiti is a drawing or painting on a wall that is typically placed without the property owner's consent and is considered a public safety issue (Morgan & Louis, 2009; Zelinka, at 160). Graffiti can lead to urban disinvestment, is recognized as criminal behavior, and is often used by criminal gangs to communicate with each other (*State v. Sanchez*, 298 P.3d 1138 (Kan. App. 2013)). Graffiti creates clutter when it proliferates and can dramatically change the character of a neighborhood or district. Salina requires property owners to restore building surfaces that are defaced by graffiti in its Property Maintenance Code (Salina Code § 31-101.6).[8] Requiring a painted wall sign to comply with the number, size and permitting requirements of the Sign Code ensures that neither strangers nor the property owner can create painted signs without public oversight.

Controlling the number of signs, including wall signs, promotes the conspicuity or visibility of individual signs (Morris et al., at 9). As the number of signs increases, the readability of each sign diminishes (Garvey et al., 2004, at 10; McMahon, 2022). This can create traffic safety issues, because it then takes motorist vision off the road, lengthens the time it takes for them to scan information, and creates potential conflicts with cars and pedestrians (Morris et al. at 18). The visual complexity also competes with traffic control signs (Morris et al., at 10). One model sign code proposes a limit on items of information in signs (Morris et al., at 21-22; Mandelker, 2015, at 64). On Plaintiff's building wall, the proposed wall sign would add numerous items of information (including two lines of text and multiple images) to the items already displayed on the wall.

ACCOMODATING ARTISTIC MURALS

Promoting art – as distinct from signs that announce, direct attention to, or advertise – has a long history in government projects. From the 1850s through the New Deal, the federal government has sponsored art in new government buildings and projects (Federal Management Regulation: Art in Architecture. 87 Fed. Reg. 5711, 5712; 41 CFR Part 102-77). The New Deal's Section of Fine Arts developed a requirement that for allocating 1% of total building construction cost for the building's embellishment (87 Fed. Reg. at 5712), and the Works Progress Administration's program resulted in numerous murals throughout the United States and Kansas (New Deal Art During the Great Depression). General Services Administration (GSA) started the Fine Arts in New Federal Buildings

[8] Salina Code § 31-6 defines "graffiti" as "[a]ny letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind visible to the public from a public place that is drawn, painted, chiseled, scratched, or etched on a commercial building or residential building, or any portion thereof, including fencing, that is not consented to by the owner of the commercial building or residential building. There shall be a rebuttable presumption that such letter, word, name, number, symbol, slogan, message, drawing, picture, writing or other mark of any kind is not consented to by the owner. Such presumption may be rebutted by the owner informing the city that the owner consents to the marking and intends that it remain on the building."

(now Art in Architecture) program, which has become a model for state and local governments (*id.*). There are over 350 local percent for art programs in the United States today (Jenkins, 2021). This has resulted in the following public benefits that also apply to local governments (87 Fed. Reg. at 5712):

- Enhancing the civic meaning of Federal architecture and showcasing the vibrancy of American visual arts.
- Creating a lasting cultural legacy.
- Improving the environment for conducting business in the buildings.
- Promoting equity by increasing access for artists of different backgrounds and art styles to participate in the design of buildings.

Artistic murals promote the public safety objectives listed above, therefore justifying their exclusion from the Sign Code. Murals and public art can replace and deter graffiti and are sometimes used (at least in part) for this purpose, consistent with Crime Prevention Through Environmental Design (CPTED) principles (Craw et al., 2006; Portland Police; Zelinka, at 119, 155, 162). Mural programs are actively used as a way promote public safety and deter disinvestment by:

- providing creative outlets and career opportunities for populations at risk for crime or displacement,
- promoting creative placemaking, which provides a sense of well-being and sense of place,
- promoting a sense of community through collective maintenance of outdoor public art,
- reversing the "broken windows" phenomenon by reducing vandalism, littering, robbery, and drug use,
- deterring crime and the perception of crime,
- reducing targets for graffiti and tagging,
- cultural development,
- youth development,
- public-private partnerships, such as collaborations with businesses improvement districts (BIDs),
- blight mitigation, and
- tourism.

Treskon et al., 2018; Benefits of Murals, accessed 2024; Abatement and Alternatives, accessed 2024; Treskon & Esthappan, 2018; Esthappan, 2018; Parolek, 2014; Sakip, 2016; Young, 2022). "Although public art can be aesthetically valuable, case studies and research have demonstrated that public art can offer critical benefits to residents, such as improved public safety and well-being" (Young,

2022)(emphasis added). Public art (such as artistic murals) can also promote mental and physical health (Young, 2022; Tanguy & Kumar, 2019).

In addition to the public safety benefits listed above, murals are an effecting tool to prevent graffiti, because it discourages tagging (i.e., painting the surface in a way to achieve notoriety) (Project for Public Spaces, 2008). As is discussed above, graffiti is associated with crime. Not regulating murals through the Sign Code encourages their use in Downtown. Applying the stricter size and permitting standards of the Sign Code would not further the City's objectives to provide the public safety, placemaking, and beautification benefits of public art murals.

Salina's Sign Code is consistent, in practice, with the state of the art nationally for how sign regulations interact with decorative building features such as murals. The author examined sign and mural regulations for twenty-one (21) sign codes referenced in the literature, along with several in Kansas and Oklahoma where the author was the principal consultant on the sign regulation drafts (Oklahoma City, Olathe, Overland Park, Shawnee) and Manhattan, where the author was part of the consulting team for the Development Code update. These codes are cited in "Code Samples" on page 23 of this report.

*Table 1 Sample Sign Regulations*

| Community | State | Description |
|---|---|---|
| Arlington | VA | Works of art and murals not showing commercial business, product or service offered on the premises exempt from sign regulations |
| Beaverton | OR | Public art exempt from sign code, and requires City acquisition |
| Boise | ID | Sign permit not required for murals that do not contain advertising |
| Fort Collins | CO | Mural cannot depict commercial product brand name or symbolic logo |
| Ithaca | NY | No compensation for display of art murals, which are not considered signs. |
| Lake Placid | FL | Murals exempt from sign regulations if they are original artwork |
| Las Vegas | NV | Mural without advertising exempt from sign regulations |
| Los Angeles | CA | Mural without advertising exempt from sign regulations |
| Manhattan | KS | Art without advertising exempt from sign regulations |
| Marion County | IN | Art without advertising exempt from sign regulations |
| Minneapolis | MN | Murals (hand-painted, hand-tiled, or digitally printed work of visual art ) exempt from sign regulations |
| Oklahoma City | OK | Murals permitted in all districts, with words, text, logos, emblems, trademarks or numbers up to the wall sign limit |
| Olathe | KS | Murals not mentioned, but murals occur pursuant to a public arts plan |
| Overland Park | KS | Excludes artwork approved as part of design |
| Pasadena | CA | Sign regulations do not mention murals, but public art incentivized through bonuses. |
| Philadelphia | PA | Zoning Code silent about murals, outdoor advertising exempts non-commercial murals; mural program in effect |
| Portland | OR | Exempts public art (city improvements) and original mural art |
| Salem | OR | Public art exempt from sign code, and requires City acquisition |
| Shawnee | KS | Treats murals same as painted wall signs; not allowed in most districts |
| St. Petersburg | FL | Art without advertising exempt from sign regulations. Requires certificate of appropriateness on historic buildings or in historic districts. |
| Temecula | CA | Art without advertising exempt from sign regulations |

These codes demonstrate a range of approaches to regulating signs while accommodating the benefits of murals. As the Ithaca Zoning Ordinance states: "[a]rt murals have different purposes and benefits than signs and are not signs" (§ 270-250). Las Vegas exempts murals without commercial elements because they are "[w]orks of art or decorative architectural graphics." Overland Park exempts artwork approved as an integral building feature as part of the site plan review process. Fifty-seven percent (57%) of the codes listed above explicitly provide that murals do not include commercial advertising. In addition, several model sign codes have similar provisions (Montgomery County, § 5.L, at 77; League of Oregon Cities, at 15; Pocono Mountain Chamber of Commerce, at 1-21 [works of art that do not any commercial messages are permitted if they comply with general standards for signs]; Southeastern Wisconsin Regional Planning Commission, at 2; see Moeller, at 15 [treating advertising murals and building wraps as a specific sign category]; Bertucci, at 29 [exempting public art, including original art murals]). This is because murals are integral to buildings, are not designed to direct attention to a place, and as such do not function as signs.

Several of the codes listed above – including two in Kansas (Olathe and Overland Park) – do not address murals as part of their sign regulations. However, those communities accommodate murals through public arts plans and separate programs. This is on point with Salina's approach, where murals are treated as integral to buildings and a decorative element of structures.

## OVERSIZED WALL SIGN PROLIFERATION

The Complaint seeks a loophole for wall sign regulations that include painted images and text. Controlling painted wall signs is an important way to control sign clutter. When a sign is left unregulated, there is a significant risk – as shown by the experience in other communities – that the City would experience proliferation of large, painted wall signs (Hathaway, 2010). In fact, the Sign Code would allow a smaller version of Plaintiff's sign if it adjusted the total, cumulative sign area on its building to fit the Sign Code's allowance for wall signs. If plaintiff prevails, other businesses will have an individual economic incentive to install painted wall signs that exceed the Sign Code's maximum area standards, simply by painting images along with text. The result could undermine the aesthetic, character, and traffic safety justifications that undergird the C-4 district sign restrictions. This exposes the City to the unregulated proliferation of these signs, as occurred in Los Angeles following initial adverse court decisions overturning its supergraphics regulations which were later reversed on appeal (Hathaway, 2010) (see Figure 2, below).[9]

[9] See description in *Vanguard Outdoor LLC v. City of Los Angeles*, 648 F.3d 737, 738 (9th Cir. 2011): "This case was one of many 'copycat' lawsuits filed after this Court in *World Wide Rush* enjoyed [sic] the City's enforcement of its ban on offsite and supergraphic signs as an invalid prior restraint on speech under the First Amendment and enjoined enforcement of the City's Freeway Facing Sign Ban as a fatally underinclusive restriction on commercial speech. See [*World Wide Rush, LLC v. City of Los Angeles*, 606 F.3d 676, 683–84 (9th Cir. 2010)]. After that decision, "well-travelled thoroughfares that contained any sort of sizable building were soon pockmarked with Supergraphic Signs." *World Wide Rush, LLC v. City of Los Angeles*, 605 F.Supp.2d 1088, 1092 (C.D.Cal.2009), *rev'd*, 606 F.3d at 689."




*Figure 2 Supergraphics in Los Angeles*

**THE SIGN CODE IS REASONABLE IN SCOPE**

The Complaint alleges that the Sign Code is, among other things, vague because it does not define "mural." However, the Sign Code does not regulate "murals" because artistic murals are not signs. The Sign Code only regulates signs – not all forms of expression involving outdoor display such as license plates, T-shirts, handheld signs,[10] or public art. It neither carves out public art for special treatment, nor does it regulate public art.




*Figure 3 Salina Art Center Mural*




*Figure 4 Painted Wall Sign*

As defined by Salina's Zoning Code, "signs" are outdoor displays that are "used to announce, direct attention to, or advertise" (Salina City Code § 42-764). This definition plainly does not cover public art, such as artistic murals, statues, sculptures, or architecture. For example, Ithaca, New York's Zoning Ordinance defines "art mural" as a "one-of-a-kind work of visual art that is hand-painted, hand-tiled or digitally printed directly on, or affixed directly to, an exterior wall of a building" (Ithaca Zoning Ordinance § 270-5). In addition, public artwork – such as a mural – is a building embellishment and not a sign. This is why some sign codes simply exempt building embellishments and murals from sign regulation, or provide additional area for embellishments. See Arlington County Zoning Ordinance Art. 13, § 13.2.3.D (architectural embellishments not a sign); Lake Placid Code § 154-5 ("sign" not include building embellishments); Las Vegas Unified

[10] In addition, the Sign Code (§ 42-504(4)) exempts "onsite handheld signs," but makes no reference to "offsite" handheld signs.

Development Code § 19.06.140.G.3.b.IV (embellishment may increase sign area up to 20%). While public art (as do public spaces such parks, or buildings with architectural significance) can attract people to a place (Cheng, 2023; Scholarly Community Encyclopedia, 2023), it does not direct people to a place.

The signs that Salina regulates are a specific medium of communication, and not a specific type of message. The Complaint would effectively subject all forms of outdoor display to the City's Sign Code. Home builders applying a change of materials to a wall plane would need to comply with the Sign Code. And, muralists creating original outdoor art would need to ensure that the display falls within the Sign Code's overall sign area restrictions. In fact, this would apply not only to displays created by artists, but also to decorative patterns (see Complaint, par. 90 [University of Kansas School of Medicine and School of Nursing wall patterns]; Complaint, par. 96 [Salina Art Center has a ceramic tile mural]).

## THE SIGN CODE IS NOT VAGUE

Plaintiff claims that the Sign Code is vague because it does not define "mural," "pictorial representation," "display," "calculated to attract the attention of the public," "figure or similar character," "announce," "direct attention to," "advertise," "pertains to," "goods or services sold," "art," "commercial speech," or "noncommercial speech." Many of these terms are simply not used in the Sign Code, and others relate to terms that simply do not appear in the Sign Code and are not needed.

Plaintiff points to several words and phrases embedded in the definition of "sign" that it claims are vague. Salina Code (§ 42-764) defines "sign" as:

> "…. any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure or similar character which:
>
> (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;
>
> (2) Is used to announce, direct attention to, or advertise; and
>
> (3) Is not located inside a building."

The term "**pictorial representation**" has a well-understood dictionary meaning. Merriam-Webster Dictionary online defines "pictorial" as "of or relating to a painter, a painting, or the painting or drawing of pictures….of, relating to, or consisting of pictures… illustrated by pictures… consisting of or displaying the characteristics of pictographs….suggesting or conveying visual images" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/pictorial). "Representation" means "one that represents: such as…an artistic likeness or image" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/representation). Therefore, the images of hamburgers on Plaintiff's proposed wall sign are "pictorial representations" – i.e., they present a likeness of hamburgers and condiments served in its restaurant, which are painted pictures or visual images. In addition, the Sign Code buttresses this term by providing examples in a parenthetical. Other sign codes use similar language in their sign definitions. Lake Placid Code § 154-5.

Similarly, a "**display**" means "a setting or presentation of something in open view… an eye-catching arrangement by which something is exhibited…. type, composition, or printing designed to catch the eye" (Merriam-Webster online, https://www.merriam-webster.com/dictionary/display). The Los Angeles, Manhattan, Salem and Temecula codes listed below use the term "display" with no further definition. Plaintiff's sign is a presentation or composition, consisting of both text and pictures. With Plaintiff's wall sign exceeding its permitted allowance by 518 square feet (Cozy Inn Sign Analysis) – and nearly 10 times its existing sign area – it is clear that Plaintiff wants its sign to catch the eye. In fact, the sign invites the reader inside the building, where the Plaintiff's products are sold.

"**Calculated to attract the attention of the public**" or its equivalent is a commonly used – but rarely defined – phrase in sign codes. The sign codes discussed in "The Sign Code Furthers Its Stated Interests" above illustrate this, as do several model sign codes. Sign codes commonly use "attract the attention" or similar language. Los Angeles Planning and Zoning Code § 14.4.20 ("sign" means "[a]ny whole or part of a display board, wall, screen or object, used to announce, declare, demonstrate, display or otherwise present a message and attract the attention of the public"); Manhattan Development Code ("sign" means any object, device, display, … used to advertise, identify, display, direct or attract attention to ….."); Beaverton Development Code Chapter 90 (sign defined as "[a]ny lettered or pictorial device designed to inform or attract attention"; "attract attention" is not defined); Minneapolis Code of Ordinances § 565.200 ("[a] structure, … announcement, …used for direction, information, identification, attraction, or to advertise or promote any business, product, activity, service, interest or entertainment."); Oklahoma City Municipal Code § 59-16119 ("sign" is "[a] structure or device…used or intended to be used to attract attention."); Olathe Unified Development Ordinance § 18.90 (a sign is "Any framed, bracketed, free-formed, or engraved surface … which is sufficiently visible to persons not located on the lot where such device is located to attract the attention of such persons or to communicate information to them."); Overland Park Municipal Code § 18.440.200 ("sign" means "[a]ny surface or object which is used to display or which is fabricated to create words, numerals, figures, devices, designs, trademarks or logos, and which is sufficiently visible to persons located outside of any building to attract the attention of such persons or to communicate information to them."); Pasadena Municipal Code § 17.48.170 ("sign" means "[a] device, fixture, surface, or structure of any kind… for the purpose of advertising, identifying or calling visual attention to…."); Philadelphia Zoning Code § 14-203 ("sign" is "[a] name, identification, description, emblem, device, or structure .. that directs attention to …."); Portland City Code § 32.20.020.YY ("sign" is "[m]aterials placed or constructed, or light projected, that …. is used to inform or attract the attention of the public."); Salem City Code § 900.005 ("sign" means "[a]ny structure, board, poster, placard, or device which contains or comprises a display designed, used, or intended to attract the attention of the public"); Shawnee Municipal Code Chapter 17.05 Appendix ("sign" is a "visual display of an object or device … that is intended to communicate, advertise, identify, announce, direct, inform, or attract attention"); St. Petersburg City Code § 16.40.120.4 ("sign" means "[a]ny device, fixture, placard, structure or representation that uses any color, form, graphic, illumination, or writing to advertise, attract attention, announce the existence of, or identify the purpose of a person, entity, product or service or to communicate information of any kind to the public"); Temecula Municipal Code § 17.34.010 ("sign" means "[a]ny object, device, display or structure, … used to identify, display, direct or attract attention …."). Similarly, sign codes often refer to attracting the attention of the "public," which is not defined. Arlington County Zoning Ordinance § 18.2 (sign defined as "[a]ny word, numeral, figure, … used to direct, identify, or inform the public…"); see also Portland City Code and St. Petersburg City Code,

above. None of those codes define "attract attention" or "public." And, "attract," "attention" and "public" all have defined dictionary meanings.[11]

"**Advertise**" also has a well-understood meaning, and is often embedded in sign regulations with no further definition. Ithaca Zoning Ordinance § 270-5 (sign is "[a] device for visual communication publicly displayed to identify, advertise, and/or convey information"); Marion County Rev. Code § 744-902 (sign is "[a]ny structure, fixture, placard, announcement, declaration, device, demonstration or insignia used for direction, information, identification or to advertise or promote any business, product, goods, activity, services or any interests."); see also Lake Placid, Minneapolis, Pasadena, Shawnee and St. Petersburg codes cited above. Merriam-Webster online defines "advertise" as "to make the public aware of (something or someone) especially by means of a published or broadcast notice" or "to present (something or oneself) to the public in a way that is intended to attract customers" (https://www.merriam-webster.com/dictionary/advertise).

The Las Vegas Unified Development Code (§ 19.18.020) uses three of the terms listed above, including "**announce**" ("sign" is "[a]ny device, fixture, placard, structure or other medium, including its structure and component parts, that uses any color, form, graphic, illumination, symbol or writing to advertise,[12] announce the purpose of, or identify the purpose of a person or entity, or to communicate information of any kind to the public"). The Lake Placid, Los Angeles, Shawnee, and St. Petersburg regulations listed above also use the term "announce." Merriam-Webster online defines "announce" as "to make known publicly" (https://www.merriam-webster.com/dictionary/announce).

The terms "commercial speech" and "noncommercial speech" do not appear in the Sign Code. The Sign Code does use the terms "commercial" and "noncommercial" in relation to "messages" or "copy," which have well-understood meanings. Of the sign codes reviewed above, only Arlington County, Las Vegas and Oklahoma City define "commercial message" or "copy" and "noncommercial message" or "copy." In addition, well-known model sign codes use these terms without a definition (Mandelker, 2015, at 71-72). This is because the common law meaning of "commercial" refers to proposing a commercial transaction (i.e., selling items), while "noncommercial" refers to speech that is entitled to full protection under the free speech clauses of the federal and state constitutions (Mandelker, 2015, at 134-35 notes 2, 18).

As this discussion shows, the supposed vague terms and phrases are well understood and in common use in sign regulations throughout the nation and in Kansas. In addition, these terms are defined – and in a free, online dictionary used in court decisions (including 10th Circuit Court of Appeals decisions). See *United States v. Lesh*, 23-1074 (10th Cir. 2024) (citing to Merriam-Webster online dictionary). If Plaintiff is really confused about these terms, there is a free and easily accessible resource to resolve that confusion.

---

[11] Merriam-Webster online has the following definitions: "Attract" means "to draw by appeal to natural or excited interest, emotion, or aesthetic sense (https://www.merriam-webster.com/dictionary/attract, using "attract attention" as an example). "Attention" means "the act or state of applying the mind to something" (https://www.merriam-webster.com/dictionary/attention). Public means "a place accessible or visible to the public —usually used in the phrase in public" or "the people as a whole" (https://www.merriam-webster.com/dictionary/public).

[12] The Las Vegas Code does define "advertising" as "[a]ny writing, painting, display, emblem, drawing, sign or other device designed, used, or intended for display or any type of publicity for the purpose of making anything known or attracting attention to a place, product, goods, services, idea or statement." This uses several of the undefined but generally accepted terms listed above, with no further definition.

"Mural" and "art" are not used in the Sign Code. The Sign Code simply does not regulate these building features, so there is no need to use them. Similarly, the terms and phrases "pertains to" and "goods or services sold" appear nowhere in the Sign Code. It is pointless for the Sign Code to define terms not used in the body of the code, or in other definitions.

## SALINA'S SIGN RESTRICTIONS ARE REASONABLE

Plaintiff's building is located in the C-4 (Central Business) zoning district. Sign Code § 42-521 regulates signs in this district, allowing all of the functional categories listed in the Sign Code (§ 42-506) and 16 of the 18 structural categories (§ 42-507).

For the C-4 district, the Sign Code allows four (4) signs per business (§ 42-521(3)), and up to three (3) square feet of sign area per lineal foot of building frontage with up to 67 percent of the total sign area on any building wall or street frontage (§ 42-521(4)b). This is a very flexible system, giving the business the choice to allocate its sign across the building walls as it sees fit, subject to the cumulative sign area. A maximum number of signs prevents clutter, but does not necessarily prevent customers from locating a site (Mandelker 2015, at 100). With these flexible standards, Plaintiff still has room for an additional sign of up to 10 square feet (The Cozy Inn Sign Analysis, page 3). Therefore, Plaintiff has ample opportunity to provide additional advertising and messaging on its building, without overwhelming the scale of the building or site.

While the Plaintiff's proposed sign significantly exceeds allowable sign size, allowing 67 percent of the cumulative sign area on a wall protects aesthetics and architectural integrity. Typical problems with signs, including wall signs, including context and scale with surroundings, incompatibility with the architecture of buildings to which they are attached, and overwhelming building architecture through location, shape, and color (Morris et al., at 47). To ensure that the wall and signs attached to it are correctly proportioned, experts recommend a maximum display area of 40-60% of the signable area[13] of a wall, with the lower figure applicable to pedestrian-oriented districts such as Salina's Downtown Core (Mandelker, 2015, at 52; Jourdan et. al. at 38 [recommending a maximum of 50% wall coverage]). Salina's Sign Code is a more generous standard – allowing up to 67% of the total sign allowance on one wall. Unfortunately, Plaintiff's proposed wall sign exceeds even this allowance.

## THE SIGN CODE HAS NUMEROUS PROCEDURAL SAFEGUARDS

As is described in the Description of Sign Code (page 4), the Sign Code has an administrative permitting process, along with avenues such as variances and appeals to resolve issues with the City. And the Downtown BID's certificate of compatibility process includes a flexible, case-by-case review procedure to assess how signs fit into the City's historic, walkable downtown. This type of case-by-case review is a common process for reviewing changes to buildings for architectural compatibility, so that they become individually significant, fit into their historic context, and are properly maintained (Burns).

The zoning regulations also allow for a variance or an appeal to the Board of Zoning Appeals (Sign Code § 42-597). A variance allows the Board of Zoning Appeals to adjust the sign size, subject to the statutory variance criteria. This section allows the Board of Zoning Appeals to grant a variance if:

[13] "Signable area" is the "continuous portion of a building unbroken by doors or windows (Mandelker 2015, at 52).

- The request arises from a condition unique to the property in question and not ordinarily found in the C-4 district, and is not created by an action or actions of the property owner.

- The variance will not adversely affect the rights of adjacent property owners or residents.

- Strict application of the Sign Code will constitute an unnecessary hardship upon the property owner represented in the application.

- The variance will not adversely affect the public health, safety, morals, order, convenience, prosperity, or general welfare.

- The variance desired is not opposed to the general spirit and intent of the zoning regulations.

The zoning regulations prohibit variances that would increase the allowable number of signs on a zoning lot (Salina Code § 42-597(c)(4)g), but that is not the case here. City staff determined that Plaintiff may install an additional sign (The Cozy Inn Sign Analysis, page 3), so the Plaintiff would need to request additional sign area.[14]

Plaintiff could also appeal the City's decision to require a sign permit (Salina Code § 42-597(c)(1)). If Plaintiff believes that the City improperly determined that its proposed wall sign is subject to the Sign Code and not an unregulated wall decoration, it could make that case to the Board of Zoning Appeals. If the Board of Zoning Appeals finds that decision erroneous, it could reverse the decision or make any decision that the Zoning Administrator could have made pursuant to Sign Code § 42-502, including issuance of a zoning certificate (sign permit).

## COMPENSATION

Mr. White's compensation for preparing this report is $350 per hour.

[14] The zoning regulations also have a process for administrative variances by the Zoning Administrator if the sign does not exceed 15% of the City's requirements. This avenue is not available, unless the applicant reduced its sign size to 11.5 feet (15% over its remaining available sign area).

## CONCLUSIONS

For the foregoing reasons, Salina's Sign Code furthers compelling and substantial public purposes, and is calibrated to accomplishing those purposes. The Sign Code does not extend its reach to decorative and artistic building elements such as artistic murals, as that is not the Sign Code's mission. The City promotes the aesthetics and public safety benefits of murals – which are not shared by wall signs – through its regulatory program that achieves the design and character of its historic Downtown. The Sign Code presents a reasonable, workable system of regulation, and is also accompanied by procedural safeguards that protect both property owners and the general public.

Dated this 16th day of August, 2024.



Digitally signed by Mark White
Date: 2024.08.16 14:38:29 -05'00'

S. Mark White

## DOCUMENTS REVIEWED

American Planning Association. *Commercial Design Guidelines*. Planning Advisory Service Reference Packet, Compiled March 2000.

Bishop, Kirk. *Designing Urban Corridors*. American Planning Association, Planning Advisory Report No. 418, 1989.

Fleming, Ronald Lee. *Saving Face: How Corporate Franchise Design Can Respect Community Identity (revised edition)*. American Planning Association, Planning Advisory Report No. 503/504, February 2002.

Hinshaw, Mark. *Design Review*. American Planning Association, Planning Advisory Report No. 454, 1995

Kelly, Eric and Rasco, Gary. *Sign Regulation for Small and Midsize Communities: A Planners Guide and a Model Ordinance*. American Planning Association, Planning Advisory Report No. 419, 1989.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 580, 2015.

Mandelker, Daniel. *Street Graphics and the Law*. American Planning Association, Planning Advisory Report No. 527, 2004.

Mandelker, Daniel and Ewald, William. *Street Graphics and the Law*. American Planning Association, 1988.

McMahon, Ed. *Main Spotlight: Sign Regulation*. Main Street America: May 25, 2022. https://mainstreet.org/the-latest/news/main-spotlight-sign-regulation

Moeller, Wendy. *Best Practices in Regulating Temporary Signs (Updated with Reed v. Town of Gilbert Supreme Court)*. Sign Research Foundation, 2015. https://signresearch.org/best-practices-in-regulating-temporary-signs/

Morris, Marya; Hinshaw, Mark L.; Mace, Douglas; and Weinstein, Alan. *Context-Sensitive Sign Design*. American Planning Association, 2000.

Salina Code, Chapter 2, Article VII (Salina Arts and Humanities Commission), and X (Salina Business Improvement District Design Review Board), online at municode.com.

Salina Code, Chapter 31 (Property Maintenance Code), online at municode.com.

Salina Code, Chapter 42 (Zoning Regulations), Article X (Sign Code), online at municode.com.

Salina Community and Development Services Department, *The Cozy Inn Sign Analysis* (November 9, 2023). Bates No. CITY000001-CITY000003

Salina, Kansas *Comprehensive Plan*, adopted September 20, 2010

Sign Permit Application (November 13, 2023). Bates No. CITY000020-CITY000024

Tunnard, Christopher and Puskarev, Boris. *Man-Made America: Chaos or Control?* New Haven, CT: Yale University, 1964.

U.S. Small Business Administration and Signage Foundation for Communication Excellence. *The Signage Sourcebook : A Signage Handbook*. Washington, D.C., 2003.

Verified Amended Complaint for Declaratory Judgment and Injunctive Relief (April 10, 2024).

**CODE SAMPLES**

Arlington, Virginia: Zoning Ordinance Art. 13, § 13.2.3.C
https://www.arlingtonva.us/files/sharedassets/public/v/1/building/documents/codes-and-ordinances/aczo_effective_5.21.2024.pdf

Beaverton, Oregon: Development Code § 60.40.10.4 (public art exempt from sign regulations), Beaverton Code § 2.03.245 (Public Art) - https://online.encodeplus.com/regs/beaverton-or/doc-viewer.aspx?secid=278#secid-278; https://beaverton.municipal.codes/BC/2.03.245

Boise, Idaho: Development Code 11-04-012 (Signs) and 11-06-03 (Definitions), at https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-68585 and https://codelibrary.amlegal.com/codes/boise_id/latest/boise/0-0-0-70319; Artist Designed Mural Guidelines https://www.cityofboise.org/media/17663/mural-guidelines.pdf - Bates No. CITY000663 - CITY000669

Ithaca, New York: Ithaca Zoning Ordinance Art. XXX, § 270-264 et seq., -5 (definitions)
https://ecode360.com/IT1944

Ithaca, New York: Town of Ithaca Zoning Ordinance (at https://ecode360.com/IT1944 on 2024-08-08), Article XXX (Art Murals).

Lake Placid, Florida: Lake Placide Code § 154-15 (Signs); ; 154-5 (Definitions and Word Usage)
https://library.municode.com/fl/lake_placid/codes/code_of_ordinances?nodeId=CH154ZO_ARTIIISURE_S154-15SI;

Las Vegas, Nevada: Unified Development Code § 19.08.120.B.2.d (Commercial-Industrial District signs); 19.06.140.E.2.d (Residential District Signs)
https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-397; https://online.encodeplus.com/regs/lasvegas-nv/doc-viewer.aspx#secid-383

Los Angeles, California: Planning and Zoning Code 14.4.20; Administrative Code 22.119
https://codelibrary.amlegal.com/codes/los_angeles/latest/lapz/0-0-0-24134; https://codelibrary.amlegal.com/codes/los_angeles/latest/laac/0-0-0-48276 - Bates No. CITY000731 - CITY000738

Manhattan, Kansas: Development Code § 26-7D-1.B.2.a (exempts art)
https://online.encodeplus.com/regs/manhattan-udo/doc-viewer.aspx?secid=1480#secid-1480

Marion County, Indiana: Rev. Code § 744-902 (defining mural, art), -903.F.2
https://library.municode.com/in/indianapolis_-

_marion_county/codes/code_of_ordinances?nodeId=TITIIIPUHEWE_CH744DEST_ARTIX2018RESIRE

Minneapolis Minnesota: Code of Ordinances 560.60(a)(8)(exempting murals); 565.140 (defining murals)
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH560SI_ARTIGEPR_560.60EXSI;
https://library.municode.com/mn/minneapolis/codes/code_of_ordinances?nodeId=MICOOR_TIT20ZOCO_CH565DE_565.140DEBEM

Oklahoma City, Oklahoma: Municipal Code § 59-16112 Murals
https://online.encodeplus.com/regs/oklahomacity-ok-sr/doc-viewer.aspx?secid=2211#secid-2211

Olathe, Kansas: 2020 Call for Street Mural Artists (https://www.olatheks.gov/home/showpublisheddocument/16903/637260979291600000); 2020 Downtown Olathe Street Mural (June 22, 2020)(https://www.olatheks.gov/Home/Components/News/News/2910/); Meridith McKinley, Via Partnership, and James Martin, Public Art Master Plan ()(https://www.olatheks.org/home/showdocument?id=12151).

Olathe, Kansas: Unified Development Ordinance § 18.50.190 (Signs)
https://olathe.municipal.codes/UDO/18.50.190

Overland Park, Kansas: Public Art Master Plan (2021)(https://drive.google.com/file/d/1A9-v1C8fj8M9ucRWybVnYoBYom2Jajn9/view?usp=sharing).

Overland Park, Kansas: Unified Development Ordinance § 18.440.030.H (Signs Not Requiring Permits) https://online.encodeplus.com/regs/overlandpark-ks/doc-viewer.aspx#secid-6159

Pasadena, California: Municipal Code Chapter 17.48 Signs
https://library.municode.com/ca/pasadena/codes/code_of_ordinances?nodeId=TIT17ZOCO_ART4SIPLGEDEST_CH17.48SI

Philadelphia, Pennsylvania: Zoning Code Chapter 14-900 (signs); 9-602 (outdoor advertising)
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-294054;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-287568;
https://codelibrary.amlegal.com/codes/philadelphia/latest/philadelphia_pa/0-0-0-276624

Portland, Oregon: City Code § 32.12.020.I, -J (sign code exemptions); Chapter 5.74 (public art); Title 4 (original art murals) https://www.portland.gov/code/32/12;
https://www.portland.gov/code/5/74; https://www.portland.gov/code/4

Shawnee, Kansas: Municipal Code 17.05.070.H Attached Signs
https://library.municode.com/ks/shawnee/codes/code_of_ordinances?nodeId=CD_TIT17ZO_CH17.05SICO

St. Petersburg, Florida: City Code § 16.40.120.19
https://library.municode.com/fl/st._petersburg/codes/code_of_ordinances?nodeId=PTIISTPECO_CH16LADERE_S16.40.120SICO

Temecula, California: Municipal Code § 17.28.050(U) https://ecode360.com/42692992#42692992

**MODEL CODES**

Montgomery County (Pennsylvania) Planning Commission. *Model Sign Ordinance*. 2014. https://planningpa.org/wp-content/uploads/Model-Sign-Plan.pdf

Bertucci, Andrew D. and Crawford, Richard B. *Model Code for Regulation of On-Premise Signs*. United States Sign Council, 2016. https://usscfoundation.org/wp-content/uploads/2018/03/USSC-Model-On-Premise-Sign-Code-2018.pdf

Jourdan, Dawn, Esq., Ph.D.; Hawkins, Gene; Abrams, Robin; Winson-Geideman, Kimberly. *A Legal and Technical Exploration of On-Premise Sign Regulation: An Evidence Based Model Sign Code*. Urban Design Associates. https://signresearch.org/a-legal-and-technical-exploration-of-on-premise-sign-regulation-an-evidence-based-sign-code/

League of Oregon Cities. Model Sign Code. March 2018, Last reviewed by LOC attorneys January 2024. https://www.orcities.org/application/files/9117/1398/0823/ModelSignOrdinance.pdf

Pocono Mountain Chamber of Commerce, Committee on Signage Improvement. *Model Sign Ordinance*. November 14, 2000.

Southeastern Wisconsin Regional Planning Commission. *SEWRPC Model Zoning Ordinance Regulations for Signs*. April 8, 2017. https://www.sewrpc.org/SEWRPCFiles/CommunityAssistance/ModelOrdinances/ModelSignOrdinance.pdf

Weinstein, Alan C. *A Framework for On-Premise Sign Regulations*. The Signage Foundation, March 2009.

**RESOURCES RELATED TO PUBLIC ART**

Abatement and Alternatives. CRP Bay Area, accessed August 10, 2024, at https://crpbayarea.org/policy/abatement/

*Art in Architecture*. 41 CFR Part 102-77 (up to date as of 8/09/2024), at https://www.ecfr.gov/current/title-41/subtitle-C/chapter-102/subchapter-C/part-102-77

*Benefits of Murals*. CRP Bay Area, accessed August 10, 2024, at http://crpbayarea.org/painting/benefits-of-murals/.

Burns, Leigh (Director, Fox Theatre Institute). *Historic Preservation Considerations for Murals* (2019), at https://gaarts.org/wp-content/uploads/2019/12/Historic-Preservation-Murals.pdf – Bates No. CITY000670 - CITY000671

Cheng Y, Chen J, Li J, Li L, Hou G, Xiao X. Research on the Preference of Public Art Design in Urban Landscapes: Evidence from an Event-Related Potential Study. *Land*. 2023; 12(10):1883. https://doi.org/10.3390/land12101883

Cheung, M., Smith, N., & Craven, O. (2021). The Impacts of Public Art on Cities, Places and People's Lives. *The Journal of Arts Management, Law, and Society*, 52(1), 37–50. https://doi.org/10.1080/10632921.2021.1942361

City Club of Portland (Portland, Or.), "City Club of Portland Report: Billboard Regulation in Portland" (1996). City Club of Portland, Paper 479. http://pdxscholar.library.pdx.edu/oscdl_cityclub/479

Esthappan, Sino. *Art Beyond Bars: A Case Study of the People's Paper Co-op in Philadelphia, Pennsylvania*. Urban Institute: September 2018. https://www.urban.org/research/publication/art-beyond-bars-case-study-peoples-paper-co-op-philadelphia-pennsylvania

*Federal Management Regulation; Art in Architecture*. 87 Fed. Reg. 5711 (February 2, 2022), at https://www.federalregister.gov/documents/2022/02/02/2022-02158/federal-management-regulation-art-in-architecture

Garvey, Philip M; Thompson-Kuhn, Beverly; and Pietrucha, Martin T. *Sign Visibility: Research And Traffic Safety Overview*. United States Sign Council, 2004.

Hathaway, Dennis. *Public Art Murals: Can Portland Model Solve Legal Dilemma in Los Angeles?* Banbillboardblight.org. June 7, 2010. Bates No. CITY000704 - CITY000706.

Jenkins, David. *Public Art and the Law: A Primer*. Center for Art Law, June 18, 2021. https://itsartlaw.org/2021/06/18/public-art-and-the-law-a-primer/

Kansas State Historic Preservation Office (SHPO) Guidance for the Installation of Downtown Murals – Bates No. CITY000756

McMaster University, *Public art and its impact on our lives* (June 15, 2022), at https://www.mcmasteroptimalaging.org/blog/detail/blog/2022/06/15/public-art-and-its-impact-on-our-lives.

Mural Creation Best Practices - CITY000739 - CITY000755

New Deal Art During the Great Depression, 2006, at http://www.wpamurals.org/.

O'Connor, De-"coding" the Visual Landscape: Municipal Sign Ordinances, Murals, and the First Amendment, 59 *Municipal Lawyer* No. 1, at 6 (January/February 2018). Bates No. CITY000708 - CITY000714

Orlando, *Art or Signage? The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo Law Rev. 867 (2013). Bates No. CITY000673 - CITY000702

Parolek, Dan. The Power of Public Art: How Murals Beautify Cities and Build Communities. Opticos Design, at https://opticosdesign.com/blog/the-power-of-public-art-murals/.

Public Art Design in Urban Landscapes, Scholarly Community Encyclopedia, at https://encyclopedia.pub/entry/50240 (updated October 15, 2023).

Tanguy, M., and V. Kumar. 2019. "Measuring the Extent to Which Londoners Are Willing to Pay for PublicArt in Their City." *Technological Forecasting and Social Change* 142:301–11. https://www.sciencedirect.com/science/article/abs/pii/S0040162518318249?via%3Dihub .

Treskon, Mark; Esthappan Sino; Okeke, Cameron; and Vásquez-Noriega, Carla. *Creative Placemaking and Community Safety: Synthesizing Cross-Cutting Themes*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/creative-placemaking-and-community-safety-synthesizing-cross-cutting-themes

*Understanding the First Amendment Limitations on Government Regulation of Artwork*. American Bar Association (January 2, 2017) (https://www.americanbar.org/groups/state_local_government/publications/state_local_law_news/2016-17/winter/understanding_first_amendment_limitations_government_regulation_artwork/). Bates No. CITY000716 - CITY000730

Young, Caitlin. *How Public Art Can Improve Quality of Life and Advance Equity*. Urban Institute: November 16, 2022. https://housingmatters.urban.org/articles/how-public-art-can-improve-quality-life-and-advance-equity

**RESOURCES RELATING TO PUBLIC AND TRAFFIC SAFETY**

Beijer, D. D., Smiley, A., and Eizenman, M. "Observed Driver Glance Behavior at Roadside Advertising." Transportation Research Record No. 1899 (2004).

Cairney, P., and Gunatillake, T. *Roadside Advertising Signs—A Review of the Literature and Recommendations for Policy*. ARRB Transport Research, Royal Automobile Club of Victoria, 2009.

Can More Art Equal Less Crime? *Omnia*. April 11, 2024. https://omnia.sas.upenn.edu/story/graduate-student-maya-moritz-researching-link-mural-art-less-crime

Craw, P. J., Leland, L. S., Bussell, M. G., Munday, S. J., & Walsh, K. (2006). The Mural as Graffiti Deterrence. *Environment and Behavior*, 38(3), 422-434. https://doi.org/10.1177/0013916505281580

Morgan, Anthony & Louis, Erin. Key issues in graffiti. Research in Practice Summary Paper No. 06, December 2009. https://www.researchgate.net/publication/324895655_Key_issues_in_graffiti#fullTextFileContent

Portland Police [Maine], *Graffiti Prevention*, at https://www.portlandmaine.gov/474/Graffiti-Prevention.

Project for Public Spaces. *Graffiti Primer*. December 31, 2008. https://www.pps.org/article/graffitiprimer

Ross, Catherine. *Exploring the Ways Arts and Culture Intersect with Public Safety: Identifying Current Practice and Opportunities for Further Inquiry*. Urban Institute: April 2016. https://www.urban.org/sites/default/files/publication/79271/2000725-Examining-the-Ways-Arts-and-Culture-Intersect-with-Public-Safety.pdf

Sakip, Siti & Bahaluddin, Azrul & Hassan, Khalilah. (2016). The Effect of Mural on Personal Crime and Fear of Crime. *Procedia - Social and Behavioral Sciences*. 234. 407-415. 10.1016/j.sbspro.2016.10.258. https://www.sciencedirect.com/science/article/pii/S1877042816315129

Scenic America. *Warning Signs: Billboards, Signs and Traffic Safety*. 1996.

Schwartz, Sam. *Asphalt Art Safety Study: Historical Crash Analysis and Observational Behavior Assessment at Asphalt Art Sites*. Bloomberg Philanthropies: April 2022.

Treskon, Mark & Esthappan, Sino. *Empowering Young People to Make Their Place: A Case Study of the Marcus Garvey Clubhouse in Brownsville, Brooklyn*. Urban Institute: September 25, 2018. https://www.urban.org/research/publication/empowering-young-people-make-their-place-case-study-marcus-garvey-clubhouse-brownsville-brooklyn

Weisel, Deborah Lamm. *Graffiti*. Center for Problem-Oriented Policing, Problem-Oriented Guides for Police, Problem-Specific Guides Series No. 9, Revised 2013. https://popcenter.asu.edu/sites/default/files/graffiti.pdf

Zelinka, Al and Brennan, Dean. *Safescape: Creating Safer, More Livable Communities Through Planning and Design*. American Planning Association, 2001.

**RESOURCES RELATING TO SPRAWL AND PUBLIC HEALTH**

Barbara A. McCann and Reid Ewing. *Measuring the Health Effects of Sprawl: A National Analysis of Physical Activity, Obesity and Chronic Disease*. Smart Growth America and Surface Transportation Policy Project, September 2003.

Georgia Institute of Technology Research News, "Tipping The Scales For Smart Growth: SMARTRAQ Demonstrates How Community Design Affects Travel Behavior, Air Quality And Health" (May 31, 2004).

Reid Ewing, Tom Schmid, Richard Killingsworth, Amy Zlot, Stephen Raudenbush, "Relationship Between Urban Sprawl and Physical Activity, Obesity, and Morbidity," 18 American Journal of Health Promotion 47 (September/October 2003).

**RESOURCES RELATING TO DESIGN / TRAVEL BEHAVIOR**

1000 Friends of Oregon, Making Land Use Transportation Air Quality Connections, The Pedestrian Environment, Vol. 4A (Dec. 1993)(at www.bts.gov/ntl/docs/tped.html)

Kulash, "Traditional Neighborhood Development-Will the Traffic Work?" American Society of Civil Engineers, (ASCE 1990);

Bookout, "Neotraditional Town Planning: Cars, Pedestrians & Transit," Urban Land (Feb. 1992), at 10, 15.

Cervero & Kockelman, "Travel Demand and the 3Ds: Density, Diversity, and Design, Transportation Resource-D, Vol. 2, No. 3 (1997)

Cervero, "Land-Use Mixing and Suburban Mobility," Transportation Quarterly (1988)

Colorado/Wyoming Section Technical Committee, "Trip Generation for Mixed Use Developments," ITE Journal 57, 2 (1987): 27-32)

Crane, "Cars and Drivers in the New Suburbs: Linking Access to Travel in Neo-traditional Planning," 62 APA Journal 51 (Winter 1996);

Friedman, Gordon & Peers, "Effect of Neo-traditional Neighborhood Design on Travel Characteristics," Transportation Research Record 1466: 63-70 (1993)

Holtzclaw, "Using Residential Patterns and Transit to Decrease Auto Dependence and Costs" (1994)

JHK & Associates. Transportation-Related Land Use. Strategies to Minimize Motor Vehicle Emissions: An Indirect Source Research Study, Final Report. Sacramento: California Air Resources Board, June 1995.

Kulash, Anglin, & Marks, Traditional Neighborhood Development: Will the Traffic Work?, Development 21 (July/Aug. ), 21-24

Moudon & Hess, et al., Effects Of Site Design On Pedestrian Travel In Mixed-Use, Medium-Density Environments (May 1997, Report No. WA-RD 432.1);

Kitamura, Mokhtarian, Laidet, "Micro Analysis of Land Use and Travel in Five Neighborhoods in San Francisco" (Institute of Transportation Studies, University of California at Davis, Nov. 1994).

Parsons, Brinckerhoff Quade and Douglas, Inc., Cambridge Systematics, Inc., and Calthorpe Associates. 1993. *Building Orientation: A Supplement to The Pedestrian Environment: Volume 4B*. Portland, OR: 1000 Friends of Oregon. (online at http://ntl.bts.gov/DOCS/bob.html)

Frank & Pivo, *Relationships between Land Use and Travel Behavior in the Puget Sound Region*. Washington State Transportation Center, 1994.

United States Environmental Protection Agency. *Our Built and Natural Environments*. EPA 231-R-01-002, January 2001.

## EXHIBITS

### Sign Code and Zoning Definitions (Selected Provisions)

**Chapter 42 Zoning Regulations**

ARTICLE X. SIGNS

*DIVISION 1. GENERALLY*

**Sec. 42-500. Purpose.**

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882 , § 1, 7-10-17)

**Sec. 42-501. Permits.**

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**Sec. 42-502. Zoning certificate (sign permit) required.**

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

(c) A zoning certificate (sign permit) shall become null and void four (4) months after the date on which it is issued unless within such four-month period, construction, building, moving, remodeling or reconstruction of a structure or sign is commenced or a use is commenced.

(Code 1966, § 36-901)

**Sec. 42-503. Sign standards.**

(a) The gross surface area of a sign shall be the sum of all surface areas of all sign faces, except that for signs designed as double faced signs, with both faces parallel and the distance between the faces does not exceed two (2) feet, then only one (1) face of the sign shall be considered in determining the gross surface area. When two (2) or more signs are located on a zoning lot, the gross surface area of all signs on the lot shall not exceed the maximum allowable for the district regulations. For computing the area of any wall sign which consists of letters, numbers and symbols mounted or painted on a wall, the area shall be deemed to be the area of the smallest rectangular figure which can encompass all of the letters, numbers or symbols.

(b) Sign height shall be measured from ground level at the base of or below the sign to the highest element of the sign.

(c) All signs must conform to the regulations and design standards of the building code of the city and all wiring of all electrical signs must conform to the electrical code of the city.

(d) Illuminated signs shall be shaded wherever necessary to avoid direct casting of light upon property located in any residential district or upon any public street or park. Any illuminated sign located on a lot adjacent to or across the street from any residential district, which sign is visible from such residential district, shall be illuminated only during business hours or between the hours of 7:00 a.m. and 10:00 p.m.

(e) Electronic changeable copy signs.

(1) Electronic changeable copy signs shall be permitted: (i) in residential districts subject to the limitations of Section 42-517(7); (ii) in U districts subject to the limitations of Section 42-518(9); (iii) in P districts subject to the limitations in Section 42-518.2(7); (iv) in H-M districts; (v) in the C-1, C-2, C-3, C-5, C-6 and C-7 commercial districts; and (vi) in the I-2 and I-3 industrial districts. No electronic changeable copy signs shall be permitted in the C-4 district, except on theatres listed on a historic register. Applications for electronic changeable copy signs for historic theatres shall be reviewed and approved by the Heritage Commission. Electronic changeable copy signs shall comprise only a portion of the overall theatre marquee or sign design package for the theatre.

(2) All electronic changeable copy signs must be equipped with a photo cell dimmer or some other automatic dimmer control that automatically adjusts for day and night brightness. The sign owner or sign installer shall provide written certification from the equipment

manufacturer that the sign is so equipped. No electronic changeable copy sign shall exceed a brightness level of three-tenths (0.3) foot-candle above ambient light as measured using a foot candle meter at a preset distance depending on sign size. The measuring distance shall be determined using the following equation: the product of the square root of the sign copy area times one hundred (100). Text and moving pictorial images shall be permitted; however, blinking, flashing, rotating, revolving, spinning or fluttering lighting or graphic animation is not allowed. Transitions between messages must fade, scroll or reveal. No signs with moving parts, revolving beacons, strobe lights or signs which emit an audible sound, shall be permitted in any district.

(f) No sign shall block any required accessway or window.

(g) No sign shall be attached to a tree or utility pole whether on public or private property.

(h) On corner and through lots, each lot line that abuts a street or highway shall be considered a separate street frontage.

(i) No metal sign shall be located within eight (8) feet vertically and four (4) feet horizontally of electric wires or conductors in free air carrying more than forty-eight (48) volts, whether or not such wires or conductors are insulated or otherwise protected.

(j) No sign shall be maintained at any location where by reason of its position, size, shape or color it may obstruct, impair, obscure, interfere with the view of, or be confused with any traffic-control sign, signal or device, or where it may interfere with, mislead or confuse traffic.

(k) No sign shall be located in any vision triangle formed by the curb lines of any two (2) intersecting streets, except signs mounted ten (10) feet or more above the ground whose supports do not constitute an obstruction. See also section 42-81.

(l) No sign shall be permitted to be located in the public-right-of-way in any zoning district, except for the following:

(1) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare.

(2) Projecting signs within the C-4 (central business) zoning district, provided that no such sign may project over the public right-of-way more than half the width of the abutting public sidewalk or alley. Any sign so extending must be a minimum of ten (10) feet above grade.

(3) Movable A-frame and sandwich board signs within the C-4 (central business) zoning district complying with section 35-40.2 of the Salina Code.

(4) Neighborhood entry signs placed and displayed in any RS, R, R-1, R-2, R-2.5, R-3 or MH residential zoning district, if authorized by the city pursuant to a written license agreement

which shall specify the message content, size, placement, illumination, design, and material to be used.

(5) Vertical banners attached to light or utility poles in any zoning district, if authorized by the governing body pursuant to a banner program.

(6) Decorative flags within the Salina Business Improvement District No. 1, if authorized by the governing body pursuant to a decorative flag program.

(7) Temporary signs placed and displayed in the unpaved public right-of-way for a city street, in any zoning district, during the period prior to an election, in accordance with the requirements set forth in subsection 42-508(d).

(8) Signs authorized by the city to be permanently affixed on bus benches in the public right-of-way at bus stops located on arterial streets. Signs affixed to bus benches must face toward the adjacent public street. If signs are placed on bus benches by a private contractor pursuant to an agreement between the city and such contractor, the agreement shall be in writing and shall specify the allowable message content, size, placement, illumination, design, and material for each of the signs, so as to minimize the visual impacts of such signs on the general public and surrounding properties.

(m) All signs which are more than four (4) feet above grade shall be securely fastened so as to prevent movement.

(n) Any time a sign is removed from its structural support, except for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, the structural support shall be removed within twenty-four (24) hours, provided further, that if a sign removed for the purposes of maintenance, repair, replacement, repainting or cleaning, or due to an act of God, if not reinstalled within thirty (30) days of the removal, then the structural support shall be removed within twenty-four (24) hours.

(Code 1966, § 36-901; Ord. No. 80-8821, § 1, 11-24-80; Ord. No. 81-8857, § 1, 6-22-81; Ord. No. 90-9381, §§ 1, 9, 5-14-90; Ord. No. 06-10337, § 1, 7-10-06; Ord. No. 19-10990 , § 1, 1-14-19; Ord. No. 19-11020 , § 1, 12-2-19)

**Sec. 42-504. Exemptions generally.**

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020 , § 2, 12-2-19)

Editor's note(s)—Ord. No. 04-10218, adopted § 42-504, combining former §§ 42-504, 8-386, and 8-387.

….

**Sec. 42-506. Classification of signs—Functional types.**

The following signs are classified by function:

(1) *Advertising sign.* A sign displaying a commercial message that directs attention to a business, commodity, service or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(2) *Bulletin board sign.* A sign that indicates the name of an institution or organization on whose premises it is located and which contains the name of the institution or organization, the name or names of persons connected with it, and announcements of persons, events or activities appearing or occurring at the institution. Such signs may also present a greeting or similar message.

(3) *Business sign.* A sign displaying a commercial message that directs attention to a business or profession conducted, or to a commodity or service sold, offered or manufactured, or an entertainment offered, on the premises where the sign is located or to which it is affixed.

(4) *Identification sign.* A sign having the name and address of a building, business, development or establishment. Such signs may be wholly or partly devoted to a readily recognized symbol.

(5) *Menu board sign.* An on-site sign designed and used for the display of menu items and pictures and/or prices of menu items.

(6) *Nameplate sign.* A sign giving the name and/or address of the owner or occupant of a building or premises on which it is located, and where applicable, a professional status.

(Code 1966, 36-905; Ord. No. 04-10218, § 1, 10-11-04; Ord. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 2, 7-10-17)

Editor's note(s)—Ord. No. 04-10218 adopted § 42-506, combining §§ 8-385 and former 42-506.

**Sec. 42-507. Same—Structural types.**

The following signs are classified as types:

(1) *Awning, canopy and marquee sign.* A sign that is mounted or painted on, or attached to, an awning, canopy or marquee that is otherwise permitted by this chapter. No such sign shall project more than twenty-four (24) inches above, below, or twelve (12) inches beyond the physical dimensions of the awning, canopy or marquee, and a minimum of eight (8) feet of clearance shall be provided above grade.

(2) *Banner sign.* A temporary sign composed of cloth, canvas, plastic, fabric, or similar light-weight, non-rigid material that is mounted to a wall, canopy, or solid fence with cord, rope, cable, or a similar method.

(3) *Changeable copy sign.* Any sign on which message copy can be changed through the use of attachable letters and numerals or by electronic switching of lamps, light emitting devices, or illuminated tubes. This includes public message displays or any sign which features automatic switching such as time and temperature signs.

(4) *Electronic changeable copy sign/Computer-operated electronic message signs.* A sign containing a computer or digital software generated message or other automated or remote method of changing copy.

(5) *Feather flag.* A temporary, freestanding, vertical sign, also referred to as a teardrop flag, swooper flag or wind flag, consisting of a loose polyknit or other semi-rigid membrane sign face that flutters in the wind from a pole or staff attached to, anchored or placed into the ground.

(6) *Flashing sign.* A sign which contains an intermittent or flashing, pulsating, blinking or traveling light source which includes signs that give the illusion of intermittent or flashing light by means of animation, or an externally mounted intermittent light source.

(7) *Ground sign.* Any sign placed upon or supported by, and permanently affixed to, the ground independently of the principal building or any accessory structure on the property.

(8) *Illuminated sign.* Any sign which is directly lighted by any electrical light source, internal or external, regardless of technology.

(9) *Inflatable sign.* Any sign made of flexible material enlarged, activated or inflated by inserted air or gas, which floats, is tethered in the air, or is located on the ground or on a building.

(10) *Mobile sign.* A sign that is not permanently affixed to the ground or a building and is designed or constructed to be easily moved from one (1) location to another, including signs mounted upon or designed to be mounted on a trailer, even if the sign has had its wheels removed.

(11) *Pole sign.* A sign that is mounted on a freestanding pole, the bottom edge of which sign is six (6) feet or more above ground level.

(12) *Projecting sign.* A sign that is wholly or partly dependent upon a building for support and which projects more than twelve (12) inches from such building.

(13) *Pylon sign.* A freestanding sign, other than a pole sign, permanently fixed to the ground by shafts, posts or other supports wrapped with an aesthetic veneer, but not having the appearance of a solid base.

(14) *Roof sign.* A sign erected, constructed and maintained wholly upon or projecting above any portion of the roof of a building or having the roof as the principal means of support. A mansard shall be considered part of the wall of the building.

(15) *Rotating sign.* Any sign or portion of a sign which moves in a revolving or similar manner.

(16) *Temporary sign.* A sign that is to be displayed for a short period of time and not designed or constructed for permanent display, including but not limited to yard signs, banners, flags, balloons, feather flags, and inflatable signs. Temporary signs shall not include mobile signs.

(17) *Wall sign.* A sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(18) *Yard sign.* A temporary, freestanding sign made of lightweight or nondurable materials such as paper, cardboard, canvas, fabric, wood, metal, or vinyl that is supported by a frame, pole, or other support structure placed directly in the ground without foundation or other anchor. Yard signs shall not include banner signs.

(Ord. No. 88-9283, § 1, 11-14-88; Ord. No. 90-9381, §§ 3, 9, 5-14-90; Ord. No. 07-10396, § 1, 7-9-07; Ord. No. 17-10882 , § 3, 7-10-17)

….

**Sec. 42-509. Maintenance and safety.**

All signs, including attendant braces, supports, guys and anchors, shall be kept in a safe and sound structural condition and maintained in a presentable state of appearance. Defective parts shall be repaired or replaced and display surfaces shall be kept neatly painted or posted and readable at all times. Every sign and its immediate surroundings shall be maintained in a clean and sanitary condition and free of all offensive substances, rubbish and weeds. All maintenance required is the responsibility of the owner of the sign. Where ownership cannot be determined, the property owner is responsible for the maintenance of the sign. If the zoning administrator shall find that any sign is unsafe, insecure, has been abandoned, or has been erected or is being maintained in violation of the article, he shall give written notice to the owner thereof to repair, alter or remove the sign so as to comply with the standards herein set forth.

(Ord. No. 90-9381, § 4, 5-14-90)

….

**Sec. 42-511. Sign substitution.**

The owner of any sign which is otherwise allowed by this article may substitute noncommercial copy in lieu of any other commercial or noncommercial copy. This substitution of copy may be made without any additional approval or permitting. The purpose of this provision is to prevent any inadvertent favoring of any

particular commercial or noncommercial message over any other noncommercial message. This provision prevails over any more specific provision to the contrary.

(Ord. No. 17-10882 , § 5, 7-10-17)

…

*DIVISION 2. DISTRICT REGULATIONS*

**Sec. 42-521. C-3 and C-4 commercial districts.**

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

(1) *Functional types permitted.* Any type listed in section 42-506, except that advertising signs for other than special public events sponsored by governmental, philanthropic and nonprofit organizations shall be prohibited in the C-4 district and district and advertising signs other than computerized electronic message displays shall be prohibited in the C-3 district.

(2) *Structural types permitted.* Any type listed in section 42-507, except that mobile signs and roof signs shall be prohibited in the C-4 district.

(3) *Number of signs permitted.* No maximum limitation in the C-3 district. In the C-4 district, four (4) signs per business with a maximum of ten (10) signs per zoning lot; provided, however, the following additional restrictions shall apply:

a. No more than one (1) projecting sign or ground/pole sign shall be allowed per street frontage.

b. Ground/pole signs shall be allowed only on zoning lots without buildings or those with buildings having a front yard setback of ten (10) feet or more.

c. Ground/pole signs and projecting signs shall not be allowed in combination along the same street frontage.

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

| Building Frontage | Projecting Signs* | Ground/Pole Signs |
|---|---|---|
| 25 feet or less | 30 sq. ft. | 45 sq. ft. |
| 26—50 feet | 36 sq. ft. | 54 sq. ft. |

| | | |
|---|---|---|
| 51 feet or more | 48 sq. ft. | 72 sq. ft. |

*The maximum area for a projecting sign on a building wall without street frontage shall be four (4) square feet.

(5) *Maximum height*. In the C-3 and C-4 districts, ground/pole signs may not exceed thirty (30) feet in height above grade. In the C-4 district, projecting or wall signs may not project above the lowest point of the roof of the structure to which it is attached.

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

….

ARTICLE XIV. DEFINITIONS

….

**Sec. 42-764. Sign.**
*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**Sec. 42-765. Sign, advertising.**
*Advertising sign* is a sign which directs attention to a business, commodity, service, or entertainment conducted, sold, or offered at a location other than the premises on which the sign is located, or to which it is affixed (off-premise sign).

(Code 1966, § 36-1301(146))

….

**Sec. 42-781. Sign, wall.**
*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

## RESUME AND QUALIFICATIONS

# Curriculum Vitae
# S. Mark White

200 NE Missouri Road, Suite 200
Lee's Summit, Missouri 64081
Phone: 816-221-8700
Email: mwhite@planningandlaw.com

### BACKGROUND

S. Mark White is a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems. He has 30 years of experience representing clients at every level from city, state and local governments, as well as major private developers, many of whom are involved in environmental permitting proceedings and takings litigation.

Mr. White is a former partner of Freilich, Leitner & Carlisle. He received his Bachelor of Arts degree, magna cum laude, in History and Political Science from Bethany College in Lindsborg, Kansas, and holds a Juris Doctor and Master of Regional Planning from the University of North Carolina at Chapel Hill. While in law school, Mr. White was a Research Editor for the North Carolina Journal of International Law and Commercial Regulation, and worked at the Department of City and Regional Planning as a Research Assistant in the Center of Urban and Regional Studies. He is a former President of the board of directors of the nonprofit community development group Westside Housing Organization, and is a member of the North Carolina and Missouri Bars, the American Institute of Certified Planners, and the American Planning Association. Recently, Mr. White was a member of the leadership team for the City of Lee's Summit, Missouri's Livable Streets Committee. This resulted in adoption of the Kansas City region's first Complete Streets resolution.

Mr. White's articles have appeared in a variety of notable publications, including the American Planning Association's *Planning Advisory Service*, the American Bar Association's *Urban Lawyer*, the International Municipal Attorneys Association's *Municipal Lawyer*, and the United Kingdom's *Transport Policy*.

Mr. White is a frequent speaker at the national meetings of the American Planning Association, the American Center for National and International Law, the Congress for the New Urbanism, the University of Wisconsin, and various other professional organizations. He is an adjunct professor at the University of Kansas Department of Urban Planning.

**Education**

Bachelor of Arts, magna cum laude, History/Political Science (Bethany College, Lindsborg, Kansas)

Juris Doctor/Master of Regional Planning (University of North Carolina at Chapel Hill)

Member, Lee's Summit Land Clearance and Redevelopment Authority

**Work Experience**

Partner & Associate, Freilich, Leitner & Carlisle (Kansas City, MO) 1990-2005

Partner, White & Smith, LLC Planning & Law Group (Kansas City, MO & Charleston, SC), 2005-present







*Mr. White is co-author and contributor to several recent national publications on new urbanism, sustainability, and zoning and development codes.*

**SELECTED HONORS, AWARDS AND PUBLICATIONS**

*Content-Neutral Sign Codes after Reed and Austin* (Sign Research Foundation, November 2022)

Co-Author, *A Cross-Sector Approach to Removing Legal and Policy Barriers to Opioid Agonist Treatment*., The Network for Public Health Law (December 2020)

"Coding to Avoid the Takings Trap," Zoning Practice (May 2019)

"Parking and Property Rights," Planning & Law (Spring 2019)

"The Takings Denominator in Zoning Lot Merger Cases: *Murr v. Wisconsin*," Planning & Law (Spring 2018)

"Legal Issues with Form Based Codes (Part 2)," The Commissioner (October 2016)

"Legal Issues with Form Based Codes (Part 1)," The Commissioner (August 2016)

"Planned Unit Developments and Master Planned Communities," The Commissioner (Feb. 2015)

"Aligning Development Codes with the Law," Zoning Practice (November 2014)

"Nonconformities (Part 2) – Dealing with Uses," PlannersWeb (October 4, 2013)

"Nonconformities (Part 1) – Dealing with Uses," PlannersWeb (October 4, 2013)

"The Consistency Doctrine," Quicknotes (April 2013)

"Public Notice and the Planning Commission," The Commissioner (Winter 2013)

Reviewer, Callies, Barclay, & Tappendorf, Development by Agreement: Tool Kit for Land Developers and Local Governments (American Bar Association, 2012)

"The Rise of Form-Based Codes," The Commissioner (Winter 2012)

"Bringing Codes into the 21st Century," The Commissioner (Fall 2011)

Co-Author, A 21st Century Land Development Code (American Planning Association, 2008).

Contributor, A Legal Guide to Urban and Sustainable Development for Planners, Developers and Architects (Wiley, 2008)

Reviewer and Contributor, Planning and Urban Design Standards (American Planning Association, 2006).

"Writing Defensible Codes," The Commissioner (Winter 2006)

"Unified Development Codes," Municipal Lawyer (July/August 2006)

"Development Codes for Built Out Communities," Zoning Practice (Aug. 2006)

"Classifying and Defining Uses and Building Forms: Land-Use Coding for Zoning Regulations," Zoning Practice (September 2005)

Contributor, Codifying the New Urbanism (American Planning Association, Planning Advisory Service Report No. 526, 2004).

Contributor, Planning for Street Connectivity (American Planning Association, Planning Advisory Service Report No. 515, 2003).

"Regulation of Concentrated Animal Feeding Operations: The Legal Context," Land Use Law & Zoning Digest (February 2000)

The Zoning and Real Estate Implications of Transit-Oriented Development, Transit Cooperative Research Program (TCRP) Legal Research Digest, No. 12 (January 1999).

"Neotraditional Development: A Legal Analysis," 49 Land Use Law & Zoning Digest, No. 8 at 3 (August 1997).

Adequate Public Facilities Ordinances and Transportation Management (American Planning Association, Planning Advisory Service Report No. 465, August 1996).

State and Regional Roles in Transportation and Land Use (with Freilich), American Planning Association, Planning Advisory Service Report no. 462/463, March 1996).

"State and Federal Planning Legislation and Manufactured Housing: New Opportunities for Affordable, Single-Family Shelter," 28 The Urban Lawyer 263 (Spring 1996).

Contributing Researcher and Writer, Model Subdivision Regulations, by Freilich & Schultz (American Planning Association, 1995).

Co-Author, "The Interaction of Land Use Planning and Transportation Management: Lessons from the American Experience," Transport Policy (U.K.) (March 1994).

Affordable Housing: Decent Shelter Is a Fundamental Right (with Jim Hecimovich), in Planning and Community Equity (APA's Planners Press October 1994).

Affordable Housing: Proactive and Reactive Planning Strategies (American Planning Association, Planning Advisory Service Report No. 441, 1992).

“The Use of Zoning and Other Local Controls for Siting Solid and Hazardous Waste Facilities,” Natural Resources and Environment, 7:3-45 (with Shortlidge, N.R.).

“Using Fees and Taxes to Promote Affordable Housing,” Land Use Law & Zoning Digest (September 1991).

Co-Author, “Transportation Congestion and Growth Management: Comprehensive Approaches to Resolving America’s Major Quality of Life Crisis,” 24 Loyola Of Los Angeles Law Review 915 (June 1991).

“Development Fees and Exemptions For Affordable Housing: Tailoring Regulations To Achieve Multiple Public Objectives,” 6 J. Land Use & Envtl. L. 25 (Winter 1990)

**SELECTED CITATIONS**

Court decisions, books, agency publications, and other important resources that have cited publications authored by Mr. White include:

- *Town of Rhine v. Bizzell*, 311 Wis.2d 1, 751 N.W.2d 780 (2008)
- *Bahl v. City of Asbury*, 656 N.W.2d 336 (Ia. 2002)
- Danielle Arigoni. *Affordable Housing and Smart Growth: Making the Connection*. National Neighborhood Coalition, 2001. http://www.smartgrowthamerica.org/affordable_housing.pdf.
- Tim Iglesias & Rochelle E. Lent. *The Legal Guide to Affordable Housing Development*. American Bar Association, 2006.

**SELECTED EXPERIENCE**

| Client | Project | Year(s) |
|---|---|---|
| **Albuquerque, New Mexico** | Planned Growth Strategy - study and planning policies designed to encourage Smart Growth at a regional scale | 1998-2002 |
| | Mixed Use Zones – Form Based Code; Growth Management and Adequate Public Facilities Standards | 2005-2007 |
| | Volcano Heights Charrette and Planning Study | 2004-2005 |
| **Aquila, Inc.** | Expert witness testimony - siting of peaking and transmission facilities and testimony before Missouri Public Utility Commission | 2006 |
| **Arlington, Texas** | Zoning and Subdivision Regulations update (with Clarion Associates) | 2008-2011 |
| **Aspen, Colorado** | Land Use Code amendments | 2006-2008, 2016-2017 |
| **Atlanta Regional Commission** | Plan 2040 Implementation Study | 2010 |
| **Boulder, Colorado** | Housing excise tax | 1989 |
| **Cabarrus County, North Carolina** | Adequate Public Facilities Ordinance | 2005-2007 |

| Client | Project | Year(s) |
|---|---|---|
| **Carbondale / Roaring Fork Valley community coalition** | Regional housing Mitigation study, with linkage and inclusionary zoning regulations. | 1999 |
| **Catawba County, North Carolina** | Unified Development Ordinance | 2004-2006 |
| **Centennial, Colorado** | Land Development Code rewrite (with Kendig Keast Collaborative) | 2008-2009 |
| **Chapel Hill, North Carolina** | Land Management Ordinance<br>Inclusionary Zoning Ordinance | 2000-2002<br>2007 |
| **Charlotte, North Carolina** | Smart Growth audit | 1999-2000 |
| **Charleston County, South Carolina** | Land Development Code update | 2004-2006 |
| | Greenways Master Plan | 2005-2006 |
| **Cincinnati, Ohio** | Land Development Code | 2011-2014 |
| **Cole County, Missouri** | Zoning Regulations | 2011-2014 |
| **Collier County, Florida** | Impact fee deferral program for affordable housing<br>Land Development Regulations update<br>Master Mobility Plan | 2005<br>2007-2013 |
| **Concord / Cabarrus County, North Carolina** | Unified Development Ordinance | 1996– 1999 |
| **Cumberland Region Tomorrow (Nashville, Tennessee)** | Regional Plan Implementation Toolbox including economic development, affordable housing, environmental protection, transportation/land use, and rebuilding urban core with model codes | 2005-2006 |
| **Davidson, North Carolina** | Adequate Public Facilities Ordinance designed for Smart Growth regulations | 1998-2000 |
| **Douglas County, Colorado** | Concurrency Management Regulations | 1995 |
| **Dunedin, Florida** | Land Development Regulations analysis (with HDR, Inc.) | 2006-2007 |
| **Enid, Oklahoma** | Comprehensive Plan and Zoning Ordinance updates | 2003-2004 |
| **Frederick, Maryland** | Carroll Creek Overlay District (form-based code for a riverwalk district)<br>Land Management Code | 2004-2005 |
| **Gainesville, Florida** | Update of the Comprehensive Plan and Land Development Code for mixed use and community design. | 2009-2010 |
| | Study of regulatory options for homeless shelters and social services, and Religious Land Use and Institutionalized Persons Act (RLUIPA) compliance. | 2010 |
| **Galveston, Texas** | Land Development Regulations (Subconsultant to Kendig-Keast Collaborative) | 2011-2013 |
| **Gwinnett County, Georgia** | Comprehensive Plan update (Subconsultant to PB Americas) | 2007-2008 |
| **Hillsborough County (Tampa), Florida** | Community Design Regulations including Traditional Neighborhood Development, Pedestrian and Transit-Oriented Development | 1999-2002 |
| **Hilton Head, South Carolina** | Wetlands Protection, Non-Residential Growth Management and Traffic Congestion Management Ordinances | 1992 |
| **Huntersville, North Carolina** | Adequate public facilities ordinance | 2006-2007 |
| **Jacksonville, North Carolina** | Growth Plan and plan implementation | 2005-2007 |
| **Irving, Texas** | Development Ordinances rewrite (with Clarion Associates) | 2008-2009 |
| **Kansas City, Missouri** | Study of development processes | 2010 |
| **Lafayette, Louisiana** | Comprehensive Plan & Unified Development Ordinance | 2012-present |

| Client | Project | Year(s) |
|---|---|---|
| | (Subconsultant to Wallace, Roberts & Todd) (*PlanLafayette* adopted June 2014, UDO adopted May 2015) | |
| **Lake Lotawana, Missouri** | General Counsel, land use issues | 2005-2011 |
| **Lebanon, Tennessee** | Zoning Ordinance update (with Parsons Brinkerhoff) | 2007-2010 |
| **Lee's Summit, Missouri** | Sign Regulations | 2011-2012 |
| **Linn County, Missouri** | Health Ordinance for Concentrated Animal Feeding Operations and successfully legal defense in Missouri Western District Court of Appeals | 1994-1995 |
| **Lincoln County, Nevada** | Development agreement review and assistance with zoning regulations. | 2008-2010 |
| **Livingston County, Missouri** | Special counsel for land use issues, including various zoning updates, zoning ordinance rewrite, subdivision regulations, and legal defense | 1993-present |
| **Los Angeles, California** | Zoning Code update (recode:LA) (subconsultant to Code Studio) | 2013-2017 |
| **Loudoun County, Virginia** | Zoning regulations, including employment and mixed-used districts, for an airport and transit-oriented corridor north of Dulles International Airport. | 2012-2014 |
| **Madison, Wisconsin** | Zoning Regulations update (subconsultant to Cunningham Architects) | 2008-2009 |
| **Marion County (Missouri) Health Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006-2007 |
| **Memphis, Tennessee** | Downtown Memphis Sign Code and Design Guidelines (Subconsultant to Winter & Company) | 2011-2013 |
| **Missouri Advisory Commission on Regulatory Barriers to Affordable Housing** | General counsel to state agency on issues dealing with zoning and land development regulations and their effect on affordable housing. | 1996 |
| **Monroe County, Florida** | Concurrency Management Ordinance | 1992 |
| **Nashua, New Hampshire** | Land Development Code | 2002 - 2003 |
| **New Castle County, Delaware** | Unified Development Code updates and Guiding Principles for development | 2014-2019 |
| | Sewer impact fees | 2005 |
| **Nodaway County (Missouri) Heath Department** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 2006 |
| **North Augusta, South Carolina** | Development Code and transportation corridor regulations | 2001-2005 |
| **Nye County, Nevada** | Impact fee ordinance, land use consulting and development agreement negotiations | 2005-2011 |
| **Olathe, Kansas** | Unified Development Ordinance | 2011-2014 |
| **Osage Beach, Missouri** | Entertainment and Tavern Zoning Regulations | 1995 |
| **Overland Park, Kansas** | Unified Development Ordinance update | 2015-present |
| **Panama City Beach, Florida** | Form Based Code study (with Planning Works, LLC)<br>Sign Regulations | 2008-2010 |
| **Pickerington, Ohio** | Impact fee regulations | 2005-2006 |
| **Pierce County, Washington** | Countywide Planning Policies and Urban Growth Areas | 1991-1993 |
| **Platte County, Missouri** | Health ordinance regulating concentrated animal feeding operations (CAFOs) | 1998-2001 |
| **Ponce Inlet, Florida** | Land Development Regulations update, including coastal waterfront urban design regulations. | 2010-2011 |
| **Prince Georges County,** | Zoning and Subdivision Regulations Comprehensive Amendment<br>Zoning Ordinance Study including: | 2014-2016, 2009-2010<br>2004-2005 |

| Client | Project | Year(s) |
|---|---|---|
| Maryland | Master plan amendment procedures | |
| | Rural Tier study and implementing regulations including transfer of development rights, conservation subdivisions, and right to farm ordinance | |
| | Permit streamlining study | 2006-2007 |
| Pulaski County (Little Rock), Arkansas | Watershed zoning regulations | 2009-2011 |
| Queen Creek, Arizona | Zoning Ordinance, Adequate Public Facilities Ordinance, and Impact Fee Ordinance / Manual | 1998-2000 |
| Raleigh, North Carolina | Comprehensive Plan Update (subconsultant to HNTB Corporation) | 2007-2009 |
| Roanoke, Virginia | Zoning Ordinance with urban design standards | 2002-2004 |
| San Antonio, Texas | Unified Development Code including Smart Growth principles, Use Patterns, infill development incentives, maximum parking ratios, transfer of development rights, and liveable street design | 1999-2001 *(winner of Texas American Planning Association award)* |
| | Expert witness testimony, Borden Park v. City of San Antonio (sign regulations) | 2005 |
| San Diego, California | General Plan Guidelines for Future Development and Growth Management Implementation | 1990 |
| Sparks, Nevada | Zoning Code update (scheduled for adoption August 2015) | 2013-present |
| St. Petersburg, Florida | Land Development Regulations | 2002 - 2004 |
| Spokane Regional Transportation Commission | Regional concurrency study | 2006-2007 |
| Suffolk, Virginia | Smart Growth Management/ Unified Development Ordinance | 1998-1999 |
| Summit County, Utah | Snyderville Basin Development Code Ordinance, Zoning Ordinance, and Administrative Regulations | 1992-1994 |
| | Housing Element to General Plan | |
| Sunnyvale, Texas | Assistance with expert witness testimony in Fair Housing Act litigation | 1993-1998 |
| Topeka, Kansas | Unified Development Code | 2006-2009 |
| Unified Government of Kansas City-Wyandotte County, Kansas | Narrow lot zoning regulations and traditional neighborhood development update (subconsultant to 180° Urban Design + Architecture) | 2007 |
| | Sign Code Update | 2015-2016 |
| | Zoning and Subdivision Regulations Update | 2017-2020 |
| Union County, North Carolina | Adequate public facilities ordinance | 2006-2010 |
| | Litigation defense | |
| Washington, DC | Zoning Regulations Reengineering Study (Office of Zoning) | 2007-2008 |
| | Zoning Best Practices Study (Office of Planning) | |
| Whiteside County, Illinois | Zoning Ordinance / Subdivision Regulations update (subconsultant to MSA) | 2013-2014 |
| Winchester, Virginia | Form-Based Code (subconsultant to PB PlaceMaking) | 2011 |

## EXPERT WITNESS TRIALS AND DEPOSITIONS

Mr. White has not testified as an expert witness in the past four (4) years.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,** | ) |
| **d/b/a The Cozy Inn; Stephen Howard,** | ) |
| | ) |
| **Plaintiffs,** | ) **CIVIL ACTION** |
| | ) **CASE NO. 6:24-cv-01027-TC-ADM** |
| **v.** | ) |
| | ) |
| **City of Salina, Kansas,** | ) |
| | ) |
| **Defendant.** | ) |

**DEFENDANT'S MOTION TO CORRECT OR SUPPLEMENT DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [ECF 109]**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, respectfully requests to Correct or Supplement Defendant's Response to Plaintiffs' Motion for Summary Judgment [ECF 109], and in support thereof states as follows:

1. The City has discovered errors in its Response to Plaintiffs' Motion for Summary Judgment [ECF 109], and now seeks to correct and supplement the record.

2. As Exhibits to the Response, the City included the deposition transcript of Dean Andrew (Exhibit 11) and of Dean Andrew's 30(b)(6) deposition (Exhibit 13). Unfortunately, in two instances the City cited to Exhibit 11, when the reference was to Exhibit 13.

   a. In Response to Statement of Fact Paragraph 39, the City cited to Exhibit 11 at 12:16-24. This citation should be to Exhibit 13 at 12:16-24.

   b. In Response to Statement of Fact Paragraph 85, the City cited to Exhibit 11 at 26:18-25, 27:1-16. This citation should be to Exhibit 13 at 26:18-25, 27:1-16.

3. The City seeks to correct the record, identifying the Exhibit citation in Response to Statement of Fact Paragraphs 39 and 85 as Exhibit 13. Additionally, the City seeks to supplement

Exhibit 13 to include pages 26 and 27 of the deposition transcript.

4. In Response to Statement of Fact Paragraph 160, the City cited to Exhibit 13 at 76:2-12. Upon review, the City noticed that page 76 of the deposition transcript was not included in Exhibit 13. The City seeks to correct and supplement the record by adding page 76 of the deposition transcript to Exhibit 13.

5. Finally, in Additional Material Fact No. 1, the City cited to "Mark White Aff'd at ¶ 6" but unfortunately did not identify it as Exhibit 3, as noted in the Index of Exhibits. The City seeks to correct and supplement the record to identify the exhibit citation in Additional Material Fact No. 1 as Exhibit 3 (Mark White Affidavit).

6. The City seeks to also supplement the record by attaching to this motion an updated Exhibit 13, with the additional deposition pages as noted herein.

7. After discovering these errors, the City informed Plaintiffs' counsel of its intent to correct and supplement the record. Plaintiffs do not object to the correction. The City filed its Response to Plaintiffs' Motion for Summary Judgment on February 28, 2025.

Dated this 28th day of March, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 28 2025, I caused the foregoing **DEFENDANT'S MOTION TO CORRECT OR SUPPLEMENT DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [ECF 109]** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

.

.

COZY INN, INCORPORATED, d/b/a
THE COZY INN; STEPHEN HOWARD,
Plaintiffs,

.

vs. Civil Action No. 6:24-cv-01027-TC-ADM

.

CITY OF SALINA, KANSAS,
Defendant.

.

.

DEPOSITION OF
CORPORATE REPRESENTATIVE
DEAN ANDREW,

taken on behalf of the Plaintiffs, pursuant to Notice to Take Deposition, beginning at 2:10 p.m. on the 30th day of October, 2024, at Clark, Mize & Linville, 129 S. 8th Street, in the City of Salina, County of Saline, and State of Kansas, before Sandra S. Biggs, Kansas CCR No. 0716.

.

maybe rather than have him go through each one, is there anything in there that hasn't been disclosed by either party?

MS. JOKERST: No, I don't believe so.

MR. SHAW: Okay.

MS. JOKERST: Dean, you have what I sent you?

A. It is what you sent me. It includes the set of Interrogatories, the responses to those, the Requests For Admissions, the things that I was supposed to be questioned about under the topics list.

BY MR. SHAW:

**Q. All right. So we will start off kind of just discussing how the city defines a sign under the sign code. So if you can open the binder in Exhibit 1 there, we have excerpts of the code. Go to Section 42-764.**

A. The methodology in using something is a sign is determined whether it's a structure or part of a structure or portable display, whether it's either attached to the ground or painted onto a building or structure on the ground. And then we determined whether it announces, directs attention to or advertises. And then we confirm

whether it is inside or outside of a building.

**Q. Give me one second here. So when you, and when I say you, I mean the city, determine if a display is used to announce, what methodology does the city use to make that determination?**

A. We look to see whether it declares some fact or occurrence or event or some entity.

**Q. And does that announcement have to be of a commercial nature, or can it be any announcement?**

A. It could be any type of announcement.

**Q. Okay. And does the city need to review the proposed display in order to determine if it announces or not?**

A. Yes.

**Q. Okay. And when the city determines if a display directs attention to something, what methodology does the city use to make that determination?**

A. We look to see if there is something in the visual display that points to or directs attention to a particular location or position or something that's occurring in their building if there is one.

**Q. And does it have to direct attention to a**

**commercial location or can it be directing attention to a non-commercial location as well?**

A. It can direct attention to any particular location.

**Q. All right. And when the city determines if a display advertises, what methodology does the city use to make that determination?**

A. We look to see whether the visual display promotes or encourages some sort of product or service or invitation to enter into some form of commercial transaction or whether the visual display promotes a particular brand or a particular product.

**Q. Does the advertising have to be commercial in nature or can it be non-commercial?**

A. It does not have to be commercial.

**Q. When determining if a display is a sign, does the city determine if the display is calculated to attract the attention of the public?**

A. No.

**Q. Why doesn't the city determine that?**

A. Because in interpreting and applying Section 42-764, the city has interpreted that to be a catchall provision and to catch any type of display mechanism that's not mentioned in the

we present to the Downtown Design Review Board. So they are aware of the building's history and what distinguishing original qualities or historical material or distinctive architectural features that individual building possesses.

**Q. Are you familiar with the Kansas Business Improvement District Act?**

A. I am not.

**Q. Okay. If a property owner wants to install a sign, what is the process for obtaining a sign permit from the city?**

A. The business or property owner would generally go to a licensed sign contractor or sign installer and ask them to submit a Sign Permit Application for the sign installation on their behalf. A property or business owner can also apply on their own.

**Q. What is required to be submitted with a Sign Permit Application?**

A. A completed Sign Permit Application and identification of the signs that are proposed to be installed, what type of sign, whether it's pole, ground or wall and attach an elevation drawing showing the type of sign that it is and its dimensions and also, as part of that

application, an inventory of any existing signs that are already on the property.

**Q. Will that maybe be called an elevation drawing, is that basically like a drawing of where the proposed sign would be on the property?**

A. No.

**Q. All right. What is the elevation drawing then?**

A. Elevation drawing is an -- a drawing prepared usually by a sign manufacturer that says this is the proposed sign, here's the materials it's made out of, this is its height and width and here is the information on whether it's designed to be illuminated or static. And it's a draw that depicts the appearance and the physical characteristics of that sign.

**Q. Would the elevation typically include the copy that will be placed on that sign if it is installed?**

A. Yes.

**Q. Okay. Is the copy required to be in the application?**

A. It is if you want us to measure the letters.

**Q. Is the city -- strike that. Does the**

BY MR. SHAW:

**Q. So as long as a building is not vacant, a sign can't be abandoned?**

MS. JOKERST: Object to form.

A. The abandoned sign ordinance establishes time frames for certain parts, portions of signs or sign support structures to be removed. And the triggering for that is the date upon which the premises became vacant. If the premises is not vacant, there's no date to trigger that on.

BY MR. SHAW:

**Q. So even if the sign no longer advertises a bona fide business conducted, products sold or service provided, it isn't abandoned until the property has been vacated?**

MS. JOKERST: Object to form.

A. The time period the clock for removal starts when the premises is vacant.

BY MR. SHAW:

**Q. All right. We can move on to Exhibit 18. Are you familiar with Exhibit 18?**

A. It appears to be a photograph of Fire Station No. 2 on South Santa Fe.

**Q. Has the city made a determination about whether the mural at Fire Station No. 2 is**

**considered a sign?**

A. Yes.

**Q. What determination was made?**

A. The determination that it does not constitute a sign that announces, directs attention to or advertises.

**Q. What methodology did the city use to make that determination?**

A. It used the methodology found in Section 42-764 to determine whether the visual display on the front of the building announced or directed attention to or advertised. It does not announce or proclaim any fact, event, occurrence or entity, it does not direct attention to any specific location or opening or doorway or any physical location, and it does not advertise.

**Q. Does this mural depicted in the exhibit identify the building as a fire station?**

A. The city's position is that it does not. It could just as easily appear on a museum or library or anywhere else.

**Q. Does this mural pertain to the activities conducted at the fire station?**

MS. JOKERST: Object to form.

A. Not this fire station.

**Q. Okay. Has the city made a determination about whether this mural constitutes a sign under the sign code?**

MS. JOKERST: Object to form.

A. We have made a determination that the sign portion of this wall constitutes a sign under the sign code.

BY MR. SHAW:

**Q. When you say the sign portion, what are you referring to?**

A. The portion of the sign that we issued a sign permit for.

**Q. Can you describe the portion of this that was issued a sign permit in reference to the image?**

A. The portion that says KU, the portion that says School of Medicine, the portion that says School of Nursing, the portion that says Salina and the portion that says the University of Kansas which was installed on a blank wall.

**Q. Okay. And when -- when was the paint of this mural added to that wall?**

A. I don't know.

**Q. Okay. Was any determination ever made about whether or not the paint of that mural was a**

**part of that sign?**
A. It could not have been a part of the sign because it wasn't a single composition.
**Q. Is it possible to expand upon a sign after it has already been built by adding more elements to it?**
MS. JOKERST: Object to form and scope.
A. I believe it's theoretically possible that any original design for a sign can be modified or expanded on.
BY MR. SHAW:
**Q. Okay. Has the city ever determined whether the mural in this exhibit was an expansion or modification of the KU sign?**
A. The city has determined that only the portion for which a sign permit was issued is a regulated sign, and the remaining balance of the north wall of that building is not a regulated sign.
**Q. When was that determination made?**
MS. JOKERST: Object to scope.
A. I don't understand the question. I don't have any reason -- no one has any reason but the city to make that determination.
BY MR. SHAW:

**Q. Where is that mural located?**
A. It's on the south wall of the Schlotzsky's sandwich shop.
**Q. And has the city determined that the mural depicted here is a sign?**
A. Yes.
**Q. When did the city make that determination?**
MS. JOKERST: Object to scope.
A. I can't tell you the exact time. I can tell you it was determined when the city became aware of it and went out and reviewed it. It determined it to be a regulated sign and contacted the owner of the business and the owner of the property to say that they needed to obtain a sign permit for that sign.
BY MR. SHAW:
**Q. What portions of this mural did the city consider to be triggering the sign code?**
MS. JOKERST: I'll object to form.
A. The city determined it to be a single composition and determined that the entire visual display was a sign.
BY MR. SHAW:
**Q. How did the city come to that**

BY MR. SHAW:

**Q. Is the website Visit Salina.org owned by the Salina Chamber of Commerce?**

MS. JOKERST: Object to form and scope.

A. It's operated by the Convention and Visitors Bureau.

BY MR. SHAW:

**Q. And who runs the Convention and Visitors Bureau?**

MS. JOKERST: Object to form and scope.

A. Chamber of Commerce does that under contract with the city.

BY MR. SHAW:

**Q. So the city has contracted with the Chamber of Commerce to run -- I'm sorry, was it the Visitors and Convention Bureau?**

A. Convention and Visitors Bureau.

**Q. Okay. And Visit Salina.org is run by the Chamber of Commerce. Is that correct?**

A. Yes.

MS. JOKERST: Object to scope and form.

BY MR. SHAW:

**Q. All right. Does the Chamber of Commerce website protect public health?**

MS. JOKERST: Object to scope and form.

A. The City of Salina, city commission, believes that putting that information on the water tower protects the public health, safety and welfare. It also provides wayfinding by letting visitors know, one, that they're in Salina and, two, where they can find information about Salina.

BY MR. SHAW:

**Q. What facts does the city have that show that the Chamber of Commerce website promotes the public health, safety or welfare?**

MS. JOKERST: Object to form and scope.

A. Because attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public.

BY MR. SHAW:

**Q. Are traffic and wayfinding signs -- let me rephrase that. Can any sign that might be used by a driver as a landmark be considered an exempt sign under this section?**

MS. JOKERST: Object to form and scope.

A. This exemption refers to signs that are placed or authorized by the city. This sign was both placed and authorized by the city by which I mean the governing body of the city.

doesn't even make any sense.

BY MR. SHAW:

**Q. Well, does this say rectangle or rectangles?**

MS. JOKERST: Object to form.

A. It says all the letters, numbers or symbols.

BY MR. SHAW:

**Q. I'm asking does it read the area of the smallest rectangular figure or the area of the smallest rectangles?**

A. The city for The Yard measured the smallest rectangular figure that encompassed home plate and The Yard, period, end stop.

**Q. Well, you testified there were six rectangular figures that the city measured to calculate The Yard's area. Is that correct?**

MS. JOKERST: I'll object -- I'll object to scope as it relates to the calculation at The Yard.

A. I still don't understand the question. You end up with a total square footage. We used six independent areas to come up with a total square footage and a single rectangular area that encompassed all the letters, numbers and symbols.

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Notice of Supplemental Authority; Certificate of Service. |

**Plaintiffs' Notice of Supplemental Authority**

In *Young v. Town of Conway*, No. 23-CV-00070-JL, 2025 WL 1445702 (D.N.H. May 20, 2025), issued after briefing closed, the court declared a town's mural-sign code regime unconstitutional as applied to a local bakery who painted a muffin-mountain display. Plaintiffs supplement their summary judgment briefs under Local Rule 7.1(f) at Doc. 105 at 32-37, Doc. 108 at 28-36, and Doc. 112 at 1, 12-14, with the below.

In *Young*, the government prohibited a bakery from displaying "a mountain landscape" mural "depicting baked goods, with a sun shining over them in multi-colored rays. The sun's rays match[ed]—in shape, color, theme and 'sunburst' configuration—the bakery's dormer, displayed directly below, which also includes the bakery's logo: its name and a picture of a pie." *Id.* at *2.

Like here, if town officials perceived the display as "conveying a message in any way related to business," they deemed it a regulated sign subject to size limitations. *Id.* at *3. But if the town decided it wasn't a sign, the code's limitations wouldn't apply. *Id.*

Like here, the town deemed the mural a regulated sign because it "represents what you're doing as the business;" "it represents the product that's being sold;" "[w]hat makes it a sign is the pastries;" and if the mural depicted the "'New England Scenic Mount Washington Valley'" or "'covered bridges and sunflowers and what have you,'" it wouldn't be a sign. *Id.* at *4.

The town argued the regime promoted safety by limiting driver distractions. *Id.* at *14. That argument failed: "There is no basis to assume a sign depicting baked goods would have a different effect on safety than a sign depicting mountains (or anything else)." *Id.* Nor could aesthetics justify the regime since the town "would allow the Leavitt's display if it was located on different premises, or if it had slightly different content." *Id.*

The court held that because "the town's enforcement against Leavitt's bakery **has no rational connection to any of its stated interests**," and "**would not pass any level of scrutiny,"** it declared it unconstitutional. *Id.* at *15 (emphasis added), *1 (emphasis added).

Dated: May 30, 2025.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
sam@kansasjusticeinstitute.org
(913) 213-5018
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on May 30, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Cozy Inn, Incorporated,**<br>**d/b/a The Cozy Inn; Stephen Howard,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**City of Salina, Kansas,**<br><br>**Defendant.** | )<br>)<br>)<br>) **CIVIL ACTION**<br>) **CASE NO. 6:24-cv-01027-TC-ADM**<br>)<br>)<br>)<br>)<br>) |

**RESPONSE TO PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY**

Defendant, City of Salina, Kansas ("City"), by and through its attorneys Fairfield and Woods, P.C. and Clark, Mize & Linville, Chartered, responds to Plaintiffs' Notice of Supplemental Authority ("Notice") supplementing ECF 109 at 28-31, 34-36 as follows:

*Young v. Conway*, No. 23-CV-00070-JL, 2025 WL 1445702 (D.N.H. May 20, 2025), is neither pertinent nor significant, as required under D. Kan. Rule 7.1(f). Plaintiffs' Notice misstates *Young's* holding. In *Young*, "plaintiffs [made] no facial challenge to Conway's sign code." *Id.* at *1.

> "So the court here does not rule that the sign code is unlawful or unconstitutional as written. Neither does it rule that Conway could not lawfully regulate the Leavitt's display, or that the display does not violate the sign code *as written*. Nor does the court rule that the Leavitt's display is not commercial speech (as it certainly appears to be), [or] that municipalities may not regulate commercial signage like the display at issue here . . . The court rules only that Conway's application of its sign code . . . to the Leavitt's sign in the particular manner it employed in this case, does not withstand any level of constitutional scrutiny." *Id.*

The *Young* court specifically called out that its "holding . . . is narrow and limited to the record." *Id.* at *16.

Still, the Court observed, "Conway's sign code is at least arguably content-neutral" because, consistent with *Austin*, reading a sign to determine "only" if it depicts "products sold inside of the building it sits on" does not concern a "'substantive message.'" *Id.* at *8, *12 (also finding the display was commercial speech because it "identif[ied] to consumers [products] of the bakery" and "serves to propose a commercial transaction.").

Conway's code regulates "displays that 'communicate *information of any kind to the public, whether commercial or noncommercial*,'' but Conway applied it only if "the display depicts products sold (or activities conducted) on the premises." *Id.* at *8, *11. Consequently, the Court found that the relationship between the text of Conway's code and its application was "deeply irrational," "*analytically* incorrect," and "analytically unsupportable." *Id.* at *3, *4, *15.

Dated this 4th day of June, 2025.

s/ Aaron O. Martin
Aaron O. Martin
Bar Number 24170
Attorney for Defendant City of Salina, Kansas
CLARK, MIZE & LINVILLE, CHARTERED
P.O. Box 380
Salina, KS 67402-0380
Tel. (785) 823-6325
Fax: (785) 823-1868
Email: aomartin@cml-law.com

s/ Todd G. Messenger
Todd G. Messenger,
CO Bar Number 38783
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: tmessenger@fwlaw.com

s/ Amanda C. Jokerst
Amanda C. Jokerst
CO Bar Number 47241
Pro Hac Vice Attorney for Defendant City of Salina, Kansas
Fairfield and Woods, P.C.
1801 California St., Ste. 2600
Denver, CO 80202
Tel. (303) 830-2400
Fax: (303) 830-1033
Email: ajokerst@fwlaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on June 4, 2025, I caused the foregoing **RESPONSE TO PLAINTIFFS'NOTICE OF SUPPLEMENTAL AUTHORITY** to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record including: Jeffrey Shaw and Samuel G. MacRoberts

s/ Aaron O. Martin
Aaron O. Martin

**In the United States District Court**
**for the District of Kansas**

---

Case No. 24-cv-01027-TC

---

COZY INN, INC., ET AL.,

*Plaintiffs*

v.

SALINA, KANSAS, CITY OF,

*Defendant*

---

## ORDER

Stephen Howard and the restaurant he owns—Cozy Inn, Incorporated—sued the City of Salina, Kansas after a city official directed Howard to stop painting a display on the side of the Cozy Inn. Doc. 16. Invoking 42 U.S.C. § 1983, Plaintiffs allege that Salina violated the First Amendment by imposing a content-based restriction on their expression that was not narrowly tailored to serve a compelling state interest and by imposing an unconstitutional prior restraint on Plaintiffs' expression through the city's permit requirement. *See id.* at ¶¶ 184–281. Plaintiffs also allege that Salina's sign code is impermissibly vague in violation of the Fourteenth Amendment. *Id.* at ¶¶ 282–305. Plaintiffs' claims are broad, encompassing what they call Salina's entire "mural-sign code regime," which includes "Salina's written sign code, Salina's unwritten policies and practices, Salina's Sign Permit requirement, Salina's Downtown Salina Business Improvement District review process, the Certificate of Compatibility requirement, and it's concomitant enforcement penalties." *Id.* at ¶ 12. Salina thereafter moved to dismiss, Doc. 26, and that motion is fully briefed, Docs. 31& 33.

After the briefing on that motion was concluded, the state of affairs changed. For instance, the parties' first pretrial order was entered in December 2024. Doc. 92. That order set out the parties' factual assertions, claims, and defenses. *See generally id.* According to the pretrial order, Plaintiffs sought a declaratory judgment that would find all of Salina's written and unwritten regulations that apply to signs

unconstitutional, as well as a permanent injunction enjoining Salina from enforcing them against "Plaintiffs and other similarly situated." *Id.* at 17–18.

A month later, an amended pretrial order was entered. Doc. 101. It indicated that Salina had amended its Business Improvement District Code, which included the review process and the certificate of compatibility requirement that Plaintiffs challenged in their Amended Complaint. Doc. 101 at ¶ 2.a.x–2.a.xv. As a result, Plaintiffs' challenges to those parts of Salina's sign-regulation process were moot, changing the breadth of Plaintiffs' claims. Doc. 101 at 1, 3. After the amended pretrial order was entered, both parties moved for summary judgment. Docs. 104 & 106.

In light of this state of affairs, denying the motion to dismiss without prejudice and addressing the current arguments in the pending summary judgment motions is appropriate. Not only has the underlying policy been modified, but some of the claims initially subject to the motion to dismiss have been superseded by the initial and amended pretrial orders. *Washington v. Unified Gov't of Wyandotte Cnty.*, 847 F.3d 1192, 1202–03 (10th Cir. 2017) (quoting *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir. 1965)) ("The pre-trial order supersedes the pleadings and becomes the governing pattern of the lawsuit."). As a result, the motion to dismiss includes arguments made moot by the changed circumstances, but all of the arguments concerning the remaining claims that were originally addressed in the motion to dismiss have been adequately addressed by the parties' summary judgment pleadings. Addressing these arguments in light of the evidence will best address the parties' respective positions. *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016); *In re Kozeny*, 236 F.3d 615, 620 (10th Cir. 2000) (noting district courts "have the inherent authority to manage their dockets and courtrooms with a view toward the efficient and expedient resolution of cases").

As a result, Salina's motion to dismiss, Doc. 26, is denied without prejudice. The parties' motions for summary judgment, Docs. 104 & 106, and their motions to exclude expert testimony, Docs. 97 & 98, will be decided in the ordinary course.

It is so ordered.

Date: June 20, 2025

s/ Toby Crouse
Toby Crouse
United States District Judge

In the United States District Court
for the
District of Kansas

| | |
|---|---|
| **Cozy Inn, Incorporated, d/b/a The Cozy Inn; Stephen Howard.**<br><br>Plaintiffs,<br><br>v.<br><br>**City of Salina, Kansas.**<br><br>Defendant. | Civil Action No. 6:24-cv-01027-TC-ADM<br><br>Plaintiffs' Notice Regarding Non-Party Injunctive Relief; Certificate of Service. |

**Plaintiffs' Notice Regarding Non-Party Injunctive Relief**

In *Trump v. CASA, Inc.*, issued after briefing closed, the United States Supreme Court found that universal injunctions applying to non-parties "likely exceed the equitable authority that Congress has granted to federal courts." No. 24A884, 2025 WL 1773631, at *4 (U.S. June 27, 2025).

In light of the Court's holding in *Trump v. CASA*, and in the interest of efficiency and economy, the Plaintiffs withdraw their request for injunctive relief for "other[s] similarly situated." *See* Doc. 16 at ¶ 312; *see also*, Doc. 101 at ¶ 5.b. All other requested relief remains unchanged.

Dated: June 30, 2025.

Kansas Justice Institute

/s/ Jeffrey Shaw
Samuel G. MacRoberts, 22781
Jeffrey Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
jeff@kansasjusticeinstitute.org
(913) 213-5121
Attorneys for Plaintiffs

**Certificate of Service**

The undersigned certifies that on June 30, 2025, the above document(s) were filed using the CM/ECF system, which will send notification of such filing to all participants.

/s/ Jeffrey Shaw
Jeffrey Shaw

## CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2026, I electronically filed the foregoing **APPENDIX OF APPELLANT CITY OF SALINA, KANSAS, Volume 15 of 16,** with the Clerk of the Tenth Circuit Court of Appeals using the CM/ECF system and was served on the following counsel of record for the parties in this case:

Samuel G. MacRoberts
Jeffrey Shaw
Sam@KansasJusticeInstitute.org
Jeff@KansasJusticeInstitute.org

## CERTIFICATE OF DIGITAL SUBMISSION

**Privacy Redaction Certification:** No privacy redactions were required.

**Paper Copy Certification:** If required to file additional hard copies, that the ECF submission is an exact copy of those documents.

**Virus Scan Certification:** The digital form of this document submitted to the Court was scanned for viruses using SentinelOne, Version 25.1.4.434, and according to the program the document is virus free.

Fairfield and Woods, P.C.

*s/ Todd Messenger*

Todd G. Messenger
Amanda C. Jokerst
Lee Katherine Goldstein
1801 California Street, Suite 2600
Denver, Colorado 80202
Tel: (303) 830-2400
Email: tmessenger@fwlaw.com
ajokerst@fwlaw.com
lgoldstein@fwlaw.com

*Attorneys for Defendant-Appellant*
*City of Salina, Kansas*