No. 25-3225

# In the United States Court of Appeals
# For the Tenth Circuit

Cozy Inn, Incorporated, d/b/a/ The Cozy Inn,
Stephen Howard
*Plaintiffs-Appellees*

*v.*

City of Salina, Kansas
*Defendant-Appellant*

**Response Brief of Plaintiffs-Appellees**

Appeal from the United States District Court
For the District of Kansas
The Honorable Toby Crouse, United States District Judge
Case No. 6:24-cv-01027-TC

**Oral Argument Requested**

Kansas Justice Institute
Samuel G. MacRoberts, 22781
Jeffrey S. Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
(913) 213-5018
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org

*Counsel of Record for Plaintiffs-Appellees*

## Table of Contents

Table of Contents ........ i

Table of Authorities ........ iii

Glossary ........ vi

Statement of Prior or Related Appeals ........ vii

Statement of the Issues ........ 1

Statement of the Case ........ 2

A. The Cozy Inn and its whimsical UFO-themed mural. ........ 2

B. Salina orders The Cozy to stop painting its whimsical UFO-themed mural. ........ 5

C. Salina's mural-sign code regime distinguishes unregulated murals from regulated signs based on content. ........ 6

D. Salina orders The Cozy to stop painting the mural because of its content. ........ 7

E. Salina's officials admit the mural-sign code regime is content based. 11

F. Salina places Mr. Howard's sign permit application on hold, indefinitely. ........ 13

G. Salina's content-based discrimination is plainly evident ........ 14

H. Salina cannot explain how its mural-sign code regime advances its interests. ........ 20

I. Proceedings below. ........ 23

Summary of the Argument ........ 27

Argument ........ 30

I. The district court correctly held that Salina's mural-sign code regime, which distinguishes unregulated murals from regulated signs based on what the display depicts, violates the First Amendment. ........ 30

A. Salina's mural-sign distinction is content- and speaker-based. Strict scrutiny should apply, which Salina cannot satisfy. ........ 31

B. Salina's mural-sign distinction fails intermediate scrutiny. ........ 40

1. Salina must produce evidence that its restrictions advance, and are tailored to, its interests. ........ 41

2. Salina did not produce evidence that its restrictions advance, and are tailored to, its interests. ........ 45

C. Salina's mural-sign code regime fails whether strict or intermediate scrutiny applies. Salina has no evidence for its unconstitutional mural-sign distinction. ........ 52

II. The district court correctly held that Salina's actions were an unconstitutional prior restraint. ........ 53

Conclusion ........ 55

Statement Regarding Oral Argument ........ 55

Certificate of Service ........ 56

Certificate of Compliance ........ 57

Certificate of Electronic Submission ........ 58

Addendum ........ 59

Relevant Ordinances ........ 60

District Court Order and Judgment ........ 65

## Table of Authorities

### Cases

*Aptive Envtl., LLC v. Town of Castle Rock, Colorado*, 959 F.3d 961 (10th Cir. 2020) .......... 25, 36, 39, 42, 44, 45

*Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369 (M.D. Fla. 2014), *aff'd* (Sept. 3, 2015) .......... 36, 48

*Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021) .. 24, 30, 40, 41, 42, 44, 47, 49, 50, 51, 52

*Café Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274 (11th Cir. 2004) .......... 43

*Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625 (4th Cir. 2016) .......... 35

*City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022) .......... 37, 38

*City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993) .......... 36, 37, 48

*City of Ladue v. Gilleo*, 512 U.S. 43 (1994) .......... 42, 43, 51

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) .......... 53, 54

*Clark v. City of Williamsburg, Kansas*, 388 F. Supp. 3d 1346 (D. Kan. 2019), *aff'd*, 844 F. App'x 4 (10th Cir. 2021) .......... 35, 37

*Complete Angler, LLC v. City of Clearwater, Fla.*, 607 F. Supp. 2d 1326 (M.D. Fla. 2009) .......... 34, 37, 42

*Cozy Inn, Inc. v. City of Salina, Kansas*, No. 24-CV-01027-TC, 2025 WL 3223806 (D. Kan. Nov. 19, 2025) .......... 25

*Dimmitt v. City of Clearwater*, 985 F.2d 1565 (11th Cir. 1993) .......... 48

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .......... 52

*Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278 (D. Md. 2021) .......... 36

*Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123 (1992) .......... 53

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) .................................................53

*Kerston v. City of Mandan*, 389 F. Supp. 3d 640 (D.N.D. 2019) .............................34

*Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ................................42, 44

*Lovell v. City of Griffin*, 303 U.S. 444 (1938).........................................................53

*Lytle v. City of Haysville, Kan.*, 138 F.3d 857 (10th Cir. 1998) ................................30

*McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020) ........24, 40, 41, 52

*Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) ...............................42, 43

*Morris v. City of New Orleans*, 399 F. Supp. 3d 624 (E.D. La. 2019) ........... 36, 42, 48

*Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728 (8th Cir. 2011) 35, 37, 39, 48

*Norton v. City of Springfield, Ill.*, 806 F.3d 411 (7th Cir. 2015)................................37

*Pagan v. Fruchey*, 492 F.3d 766 (6th Cir. 2007) (en banc) .....................................43

*Quinly v. City of Prairie Vill., Kan.*, 446 F. Supp. 2d 1233 (D. Kan. 2006) .............37

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) ..................... 31, 35, 37, 38, 39, 48

*Saia v. New York*, 334 U.S. 558 (1948)......................................................................53

*Shuttlesworth v. City of Birmingham*, 394 U.S. 147 (1969).......................................53

*Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005) .................35

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) .......................................................39

*StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023) .................. 44

*United States v. Supreme Ct. of New Mexico*, 839 F.3d 888 (10th Cir. 2016) ............52

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .........................................40, 44

*Young v. Town of Conway, New Hampshire*, 783 F. Supp. 3d 588 (D.N.H. 2025).......................................................................................................40, 45

### Statutes and Ordinances

42 U.S.C. § 1983 .......... 23

S.M.C. § 42-501 .......... 5

S.M.C. § 42-502 .......... 5

S.M.C. § 42-504 .......... 19

S.M.C. § 42-510 .......... 19

S.M.C. § 42-516 .......... 5

S.M.C. § 42-764 .......... vi, 6, 19, 31

### Other Authorities

Christina C. Orlando, *Art or Signage?: The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo L. Rev. 867 (2013) .......... 36, 46

### Constitutional Provisions

U.S. Const. amend. I .......... 23, 29, 30, 45, 52

U.S. Const. amend. XIV .......... 23

## Glossary

| | |
|---|---|
| **Mural-Sign Code Regime** | The mural-sign code regime refers to Salina's distinctions between murals and signs, which includes Salina's written sign code, Salina's unwritten policies and practices, its permitting requirement, size restrictions, and concomitant enforcement penalties. 1 App. 28, 31, 64; 3 App. 107-108, 119; 4 App. 12 n.2; 8 App. 109 n.2; 13 App. 176 n.2. |
| **"Sign"** | The written definition of "sign," located at S.M.C. § 42-764: Any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which: (1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground; (2) Is used to announce, direct attention to, or advertise; and (3) Is not located inside a building. |
| **S.M.C.** | Salina Municipal Code |
| **The Cozy or The Cozy Inn** | Plaintiff Cozy Inn, Incorporated, d/b/a/ The Cozy Inn |
| **Written Sign Code or Code** | Salina's Municipal Code |

## Statement of Prior or Related Appeals

None.

## Statement of the Issues

I. The district court correctly held that Salina's mural-sign code regime, which distinguishes unregulated murals from regulated signs based on what the display depicts, violates the First Amendment.

II. The district court correctly held that Salina's actions were an unconstitutional prior restraint.

## Statement of the Case

### A. The Cozy Inn and its whimsical UFO-themed mural.

Stephen Howard owns The Cozy Inn, a downtown Salina "institution" and "landmark" that has served sliders for more than 100 years. 1 App. 28.[1] Mr. Howard bought the iconic restaurant in 2007 after spending more than a decade as a maintenance worker at the local school district. 4 App. 65-67; 3 App. 105.

In Salina, murals are prolific. 4 App. 102, 106, 130-145, 148-150; 7 App. 7-33. They adorn everything from grain elevators to the local fire station, from theatres to alleyways, and beyond. 4 App. 148-150, 158.




*4 App. 130.*



*4 App. 132.*




*4 App. 140.*



*4 App. 137.*



*4 App. 141.*

[1] The appendix is cited by volume and page: [Volume] App. [Page].




7 App. 20.




7 App. 27.




7 App. 23.

Salina also hosts an annual mural festival, provides support to a project that funds murals, and funds murals on its own property. 4 App. 102, 106, 148-150; 7 App. 7-33.

Mr. Howard wanted to participate in Salina's mural scene, to "join[] in on the mural activity taking place downtown," and take part in the "proliferation of mural art." 4 App. 49, 54, 71, 73, 75, 102, 106, 115, 153-54, 165-66, 169; 7 App. 7-33.

So, in 2023, Mr. Howard hired a local artist, Colin Benson, to paint a mural on The Cozy's wall that tells a story about aliens and human travelers visiting The Cozy. 4 App. 49-50, 72, 74, 76, 81-82, 153, 211-214, 220-222, 226.

The UFO-themed mural is Mr. Howard's "vision" and "dream," which came from the "art all over town," and is part of Mr. Howard's "heart and soul." 4 App. 49-50, 74, 81-82, 153. The mural reflects his, and The Cozy's, personality. 4 App. 49, 54, 71, 75.

Once completed, the whimsical UFO-themed mural will show aliens piloting hamburger-esque flying saucers attacking The Cozy with blasts of ketchup and mustard. There will be a big-burger-mothership, spaceship burgers with see-through cockpits, and it will read "Don't Fear the Smell! The Fun is Inside!!" 1 App. 30; 4 App. 49-51, 76-77, 81-82, 211, 220-222, 226.




*1 App. 30; 4 App. 50.*

The mural "pops," the public adores it, and there have been no complaints about it from the public. 4 App. 51, 116, 152, 260; 5 App. 39-40, 44; 6 App. 69-87. Other than its content, The Cozy's mural is no different from the dozens of other murals around town: paint on a wall. *E.g.*, 4 App. 129-145, 155-157, 159, 215; 5 App. 76; 7 App. 7-33.

The Cozy has a walk-up window and a dining area outside. 4 App. 69. For Mr. Howard, the walk-up window is "not as personal" and if "you use the walk-up window, you're just kind of missing the whole point" of The Cozy. 4 App. 68. It is

more personal, fun, and enjoyable if people come inside, but The Cozy is no better off financially if that happens. 4 App. 50-51.

### B. Salina orders The Cozy to stop painting its whimsical UFO-themed mural.

Two days after Mr. Benson started painting the mural, he posted an incomplete picture of it on social media. "[A] lot of people had already seen [the mural], loved it, and wanted more of it." 4 App. 98, 55, 80, 219, 232-233, 240. That same day, Salina officials saw the social media post, texted each other about the mural, and informed City Manager Mike Schrage about it later that evening.[2] 4 App. 151-152, 231.

The following day, Salina officials ordered The Cozy to stop painting the mural. 4 App. 98, 151-52, 231-233, 240; 5 App. 54. Even though Salina had not received any complaints about it, the officials had collectively determined the unfinished display was a regulated sign. 4 App. 152, 260; 5 App. 18, 39-40, 54-55, 69. For displays that Salina deems regulated signs, the written sign code imposes size limits, S.M.C. §§ 42-516–524, and permit requirements, S.M.C. §§ 42-501, 502. Because Salina considers The Cozy's mural a regulated sign, it claims the display is "about nine times the allowable size." 4 App. 91.

[2] The City Manager oversees all city personnel. 4 App. 230. At that time, City Manager Schrage had spent 18 years either as the Deputy City Manager or City Manager. *Id.*

### C. Salina's mural-sign code regime distinguishes unregulated murals from regulated signs based on content.[3]

Salina's written sign code has remained largely the same since 1966. 1 App. 138. Under its text, "any writing," "pictorial representation," "emblem," "flag," "banner," "streamer," "pennant," "string of lights," or "display calculated to attract the attention of the public" is considered a regulated "sign." S.M.C. § 42-764.

A "sign" also includes "any other figure of similar character" to the above types of signs which (1) is a part of or attached to a structure, (2) is used to announce, direct attention to, or advertise, and (3) is not located inside a building. S.M.C. § 42-764.

The written definition of "sign" is all encompassing. Under its text, all murals are signs, and every sign is supposed to be subjected to the same size restrictions, since they are a "writing," "pictorial representation," "emblem," or "display" that is "calculated to attract the attention of the public." S.M.C. § 42-764.

Despite the code's text, Salina does not regulate displays it considers murals. 5 App. 22, 102. Salina says that murals are a type of art and are therefore not considered a sign subject to regulation. 5 App. 22, 90, 93, 102, 138. Salina uses "art" as "an imprecise short-hand for 'not sign.'" 5 App. 207-208. Salina needs "to see a

---

[3] The mural-sign code regime refers to that which the Plaintiffs challenged in the district court, Salina's distinctions between murals and signs, which includes Salina's written sign code, Salina's unwritten policies and practices, its permitting requirement, size restrictions, and concomitant enforcement penalties. 1 App. 28, 31, 64; 3 App. 119-120; 4 App. 12 n.2; 8 App. 109 n.2; 13 App. 176 n.2.

rendering" to determine if a proposed mural is a regulated sign or unregulated "art." 5 App. 126.

Salina admits that it cannot determine whether a display is a mural or sign unless it "look[s] at the character and elements" of the display, 5 App. 56, admitted that it must "be able to look at the potential sign to determine if it's a sign," 5 App. 56, and officials consistently testified they must review a display's content to determine whether it is a regulated sign, 4 App. 242; 5 App. 16-17, 21, 98-100, 113-115. Salina requires the submission of a "shop drawing" and the display's "proposed copy" as part of its permitting process. 5 App. 139, 199.

Salina's written sign code does not define murals and does not distinguish between murals and signs. 1 App. 115-141; 5 App. 207, 210. In practice, Salina officials ignore portions of the code and distinguish between murals and signs based on an unwritten policy of reviewing the display's content and the speaker's identity. 4 App. 94, 243-244; 5 App. 56, 207, 210. For instance, Salina ignores the phrase "display" that is "calculated to attract the attention of the public," 5 App. 90, 93-95, 138, and instead evaluates the extent to which the content of the mural relates to the building it is painted on.

### D. Salina orders The Cozy to stop painting the mural because of its content.

City Manager Schrage wrote a memo to the City Commissioners about The Cozy's mural. 5 App. 151. Although the mural "aesthetically might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning

codes which include size limitations among other things." 5 App. 151; 4 App. 234-235. And over the years, officials had "coordinate[d] closely with [the annual mural festival] to confirm that none of their murals would intentionally or unintentionally include commercial speech subject to our sign codes." 5 App. 151.

After receiving intense media coverage and public commentary about Salina's decision to stop The Cozy's mural, City Manager Schrage circulated a "talking points memo" explaining that "[a] distinction is commonly made between murals and art when compared to commercial speech," and "[w]e regulate the size of commercial signs through a permit process." 5 App. 155; *see also* 5 App. 12, 218-229.

City Manager Schrage then called Mr. Howard to "calm things down," avoid a "social media fire storm," and "have the conversation to be at our level." 4 App. 236. He then wrote another memo to the City Commissioners explaining that Salina "regulate[s] the size of commercial signs through a permit process." 4 App. 169. He continued, "I recently spoke with Mr. Howard. As expected, he views it as a mural and feels he was just joining in on the mural activity taking place in the downtown." 4 App. 169.

Days later, Salina officials met with Mr. Howard and Mr. Benson. 4 App. 79, 216, 241; 5 App. 11. Mr. Benson told them that his work was art and that he did not "believe it was a signage being put up," but he "was shut down pretty quick." 4 App. 218. The officials told Mr. Benson the artwork was deemed a sign because "the hamburgers are basically the same thing [The Cozy] sells, and therefore, it would be signage." 4 App. 218.

Later that afternoon, City Manager Schrage and the Director of Community Development Services, Lauren Driscoll, discussed The Cozy's mural at a City Commission meeting.[4] City Manager Schrage started by explaining that "[t]here had been misunderstandings surrounding the mural as its content falls under sign provisions in the City Code rather than art[.]" 5 App. 161 (city minutes). "The important distinction here," he continued, "relates to commercial speech and our ability to regulate commercial speech or signs," and that "there certainly is a misunderstanding between art and signs and commercial speech." 4 App. 89. He explained that the distinction between an unregulated mural and a regulated sign is based on whether the display contains a commercial or non-commercial message. 4 App. 111-112. "[I]f the wording's not commercial in any way or doesn't have an attachment to a commercial operation, that in and of itself isn't a disqualifier," 4 App. 111, and "if there are no words but it's still, you know, related to the business activity of the building, I think there's case law out there that says that's still a commercial message and it's still a sign," 4 App. 112. "I would reiterate," he emphasized, "it's all on the basis of a commercial message." 4 App. 94, 243-244.

Director Driscoll confirmed that Mr. Howard could not finish the mural under the mural-sign code regime, 4 App. 101, and then "walk[ed] [the Commissioners] through the specifics as it relates to Cozy's." 4 App. 90. She used a coffee house example to explain how the regime works. "If a coffee house has a dove with an olive

[4] Director Driscoll oversees code compliance, zoning, and permitting, including sign permits, 5 App. 9. She was part of the "collective" who decided The Cozy's display was a regulated sign, not an unregulated mural. 5 App. 18, 54-55, 69.

branch and it says the word 'peace' on the side of it, that – that's not a sign." 4 App. 107. That is because "in general, the dove, the olive branch, the peace are not part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction." 4 App. 107. In contrast, a display at the same coffee house that "had a steaming cup of coffee and a coffee pot on the side," would be considered a regulated sign because "[e]ven without a word, that illustration can suggest that commercial transaction." 4 App. 107-108. City Manager Schrage elaborated, explaining that if the same "steaming cup of coffee" were to be painted "on the other side of town unrelated to anything," it would not be considered a regulated sign. 4 App. 110, 244-245. Director Driscoll concluded by stressing that the difference between an unregulated mural and a regulated sign is whether the display is "expressly related solely to the economic interest, to the speaker and the audience, or speech that possesses commercial transaction[.]" 4 App. 107.

During the presentation, one City Commissioner said, "I could see much of the mural part be considered art, and then focus on the actual portion that's the message as the commercial aspect." 4 App. 106-107. Another said, "you pointed out well the distinction between art and murals and commercial sign," and then asked, "what would it take for [Mr. Howard] to turn this into a mural rather than a sign." 4 App. 112.

After the City Commission meeting, City Manager Schrage explained to news reporters that if a display "includes a message that pertains to the goods or services for sale," "that makes it a sign and makes it subject to the sign code." 4 App. 238-239; 5 App. 255. He also told the organizer of the annual mural festival that his

"intended response" to The Cozy's lawsuit "is to stress that we have been very mindful of the Reed v Gilbert case as well as applicable case law regarding what constitutes commercial speech subject to sign code regulation." 5 App. 166; *see also* 4 App. 246-248.

**E. Salina's officials admit the mural-sign code regime is content based.**

Consistent with City Manager Schrage's and Director Driscoll's explanations at the City Commission meeting, Salina officials testified The Cozy can display a wall-sized airplane mural unless it sold airplanes or travel services. Then it would become a regulated sign. 4 App. 254-255; 5 App. 26, 114-115. A mural consisting of "a blank white wall with a pizza symbol" at The Cozy would not be regulated, 5 App. 110-111, while the same display on a pizza shop would be deemed a regulated sign, 5 App. 112. And if The Cozy's UFO-themed mural were painted on a different business, it would not be considered a regulated sign, so long as they did not sell burgers. 4 App. 110.

Salina contends that a mural is a regulated sign if the display's content "is used to 'announce, direct attention to, or advertise.'" 5 App. 207. And the Zoning Administrator explained that the "function" of a regulated sign is to announce, direct attention to, or advertise through its content. 8 App. 181.

Mr. Howard could paint a wall-sized mural replicating one of Andy Warhol's famous Campbell's soup cans unless The Cozy started selling Campbell's soup. 4 App. 256-257; 5 App. 116-117. And Mr. Warhol's soup cans would be considered a

regulated sign, not an unregulated mural, if it were painted on a grocery store's wall. 4 App. 257-258.

If a coffee shop painted a dove and an olive branch on its wall, it would be considered an unregulated mural. But if the display contained a dove and a coffee branch, it would be considered a regulated sign. 4 App. 255-256. If a taco shop painted a dove on its wall, that would not be regulated, unless it sold "dove tacos" or sold doves. 5 App. 41-42.

Consistent with its content-based regulatory approach, Salina considers The Cozy's mural a sign because the content shows "pictorial representations of burgers," 5 App. 58; it "proclaims or declares to not fear the smell," and "I mean, The Fun is inside is making a proclamation of a sort," 5 App. 57, and because it considers the arrow to be "directing attention," 5 App. 57. Even if customers did not go inside The Cozy, the phrase "don't fear the smell" is still considered a regulated sign because "it's not a non-commercial message."5 App. 109.

Also consistent with that regulatory approach, the Zoning Administrator testified that he could not determine whether a display at The Cozy depicting little green men piloting traditional, non-burger flying saucers would be considered a mural or a sign, because he would "have to see a rendering of what it looked like to make that determination." 5 App. 113-114. Similarly, he would "have to see a rendering" to know whether a display at The Cozy depicting a pasture with cows and mustard plants, tomatoes, and onions growing in a field would be a mural or a sign. 5 App. 115.

Salina admits it decides whether a mural "is used to 'announce' by evaluating whether the display makes a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies, a business, product, or event." 5 App. 207. Salina also admits it determines whether a mural "is used to 'direct attention to' by evaluating whether the display indicates, points to, points out, or specifies a location (in general, like a particular property, or specifically, like a building entrance or pickup window)." 5 App. 207.

Salina says it determines whether a mural "is used to 'advertise' by evaluating whether the display is meant to attract customers, encourage a commercial transaction, offer products or services in exchange for consideration (e.g., a display that says, 'sliders, 5 for $5.00'); call attention to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale (e.g., the depiction of hamburger on the Cozy building wall)." 5 App. 207.

Salina says that The Cozy's mural is a sign is because it "contains a tag line announcing the infamous smells of the Cozy, it has an arrow directing attention to the building entrance and ordering window, and it advertises the hamburgers and toppings available for sale at the Cozy by depicting representations of them." 5 App. 210.

### F. Salina places Mr. Howard's sign permit application on hold, indefinitely.

When Mr. Howard arrived at the November 13, 2023, meeting with Salina officials, "[t]here were sign permits put in front of us before I even got into the

room" "and [the meeting] was about why we didn't get a sign permit." 4 App. 217. Salina told Mr. Howard to submit a sign permit application. 4 App. 91; 5 App. 62. Mr. Howard followed Salina's instructions and submitted the application that afternoon. 4 App. 125; 5 App. 14, 215-217.

Salina did not respond within the written code's 10-day deadline, S.M.C. § 42-502(b); 4 App. 51; 5 App. 60-61, 266, and neither granted nor denied the permit, 4 App. 51; 5 App. 60-61, 65. Instead, in a letter dated February 8, 2024, Salina put the application "requesting approval of an existing painted wall sign/mural" "on-hold[.]" 5 App. 266.

Salina officials gave conflicting testimony about when it decided to place The Cozy's application on hold. 5 App. 15, 59, 63-64, 120, 122-125, 270, 272. Salina has placed other sign permit applications on hold. 5 App. 273. Mr. Howard never consented to Salina placing his application on hold. 4 App. 51; 5 App. 121. The application remains on hold as of this filing, 864 days later.

### G. Salina's content-based discrimination is plainly evident.

Salina's firefighter mural (below) is not considered a regulated sign, even though it pertains to, and identifies, the activities of the fire station. 4 App. 158; 5 App. 141-142.



*4 App. 137.*

The Mural at the Mill (below) depicts children playing ring-around-the-rosie. 4 App. 130, 132, 159.




*4 App. 130.*




*4 App. 132.*

That mural "bolster[s] business opportunities and support[s] the amazing institutions we already have here in Salina." 5 App. 252. Because of its content, Salina does not consider it a regulated sign. 4 App. 251; 5 App. 35-37. And it would not be considered a regulated sign if placed on The Cozy's wall. 5 App. 118-119. But if an indoor playground or daycare began operating on the property where Mural at the Mill is located, it would change Salina's analysis. 5 App. 38.

Salina does not consider the murals from the annual mural festival to be signs, because Salina confirmed that their content did not "intentionally or unintentionally include commercial speech subject to our sign codes." 5 App. 151.

Around Salina, there are dozens of murals that have been exempted from regulation because of their content. 7 App. 8-33.



*7 App. 21.*




*7 App. 25.*



*7 App. 30.*

The record is replete with examples of Salina's unwritten policies.

Salina has not enforced the mural-sign code regime against a bike shop with bike-themed murals (right). 4 App. 215; 6 App. 65-66.




*4 App. 144.*

Or against a music studio next to the Salina Symphony rehearsal hall that has a music-themed mural, titled Symphony of Sunflowers (below right). 4 App. 155-157.



*4 App. 141.*

Salina uses its unwritten policies to create ad-hoc exemptions for other murals. 4 App. 249-250; 5 App. 33-35, 75, 78, 129, 131-132, 146-147.

The Yard is a baseball facility with a baseball mural on the side of one of its buildings. 5 App. 71, 74.



*4 App. 133.*

Before this litigation, Salina said that The Yard consisted of three distinct buildings. 6 App. 17-18, 34. During this litigation, Salina claimed that The Yard was just one building. 11 App. 117 ¶¶ 141, 144, 145. It then said the mural was *inside a building* because it was "oriented" toward the covered practice field, and therefore not a regulated sign. 4 App. 249-250; 5 App. 75, 131-132. The orientation of a sign is not mentioned anywhere in the code. 5 App. 132.

The mural is not inside a building:



*4 App. 145.*

Salina has an unwritten method for measuring the size of signs—that contradicts the written code, 5 App. 147—that it utilized for the murals at The Yard, 4 App. 135; 5 App. 146, Sharp Performance, 4 App. 139; 5 App. 78, and K.U., 4 App. 131; 5 App. 33-34. But Salina did not use that approach for the mural at The Cozy. 5 App. 78-79, 148.

The display at the Salina Art Center was deemed exempt from regulation even though Salina believes it is "similar in function to a sign" and "will direct the public." 5 App. 174. That is because Salina considers it an unregulated "art installation," rather than a regulated sign. 4 App. 136; 5 App. 174; 6 App. 65-66. But again, Salina has no definition of "art," other than "not sign." 5 App. 207-208.

This mural is just across the parking lot from The Cozy:




*4 App. 134.*

A current city commissioner owns the mural. 4 App. 134; 5 App. 128. Under S.M.C. § 42-510, any sign "which no longer advertises a bona fide business conducted, product sold or service provided" is abandoned and must be removed. Even though Bull Durham Tobacco is no longer a bona fide business, Salina does not consider this mural to be abandoned. 5 App. 140. Instead, Salina exempted the mural under an unwritten policy. 5 App. 127.

Salina owns a water tower with a display that says "Visit Salina.org, Right Place, Right Reason, Right Now." 5 App. 144. That website belongs to the Salina Chamber of Commerce, a private organization. 5 App. 145. Under S.M.C. § 42-504(2), government signs placed "for the protection of the public health, safety, and general welfare" are exempt from regulation. But Salina created a rule that the Chamber of Commerce website qualifies for this government public safety exemption because "attracting visitors and tourists to the city is their mission, and attracting visitors to the City of Salina protects the public health, safety and general welfare of the public." 5 App. 145.

Even though S.M.C. § 42-764 includes "symbols" in its "sign" definition, a cross on a church's wall is not regulated, under Salina's unwritten policy, since it "would be considered a symbol, not a sign." 5 App. 84-86. Conversely, a "Turn to Jesus" painting would be a regulated sign because "[t]hey would be advertising their desire for the public to turn to Jesus." 5 App. 91-92.

The Zoning Administrator interprets a mural depicting the Kansas City Chief's logo and the phrase "Let's Go Chiefs!" "to say that it is announcing that that property owner supports the Kansas City Chiefs." 5 App. 100. On the other

hand, if the Chiefs had a training facility in Salina with the exact same mural, the Zoning Administrator would consider it to be "advertising and directing attention," which is a sign. 5 App. 100-101.

The Zoning Administrator testified that "[a]ccording to the rules of construction of our city code, or and and are interchangeable," if Salina thinks the context warrants it. 5 App. 96-97. And if someone wanted to know whether "or" means "and" or vice versa, "then they could contact the city to see how the city has historically interpreted it." 5 App. 97.

### H. Salina cannot explain how its mural-sign code regime advances its interests.

Salina's asserted interests in the regime include aesthetics, traffic and pedestrian safety, and property values. 5 App. 206. When asked for the factual basis supporting its purported interests, Salina stated that "[a]s a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics." 11 App. 58-59. Salina referenced an expert report, but ultimately, did not provide any factual basis for any of its purported interests. 11 App. 58-59.

Salina is not aware of any facts showing:

- that its sign code enhances traffic safety or has succeeded in its objectives. 5 App. 49-50.
- that its sign code has enhanced traffic safety, 5 App. 49-50, enhanced pedestrian safety, 5 App. 50, or promotes property values, 5 App. 50-51.

- that painted wall signs are more harmful to aesthetics than painted murals. 5 App. 51.
- that painted wall signs are more detrimental to pedestrian or traffic safety than painted murals. 5 App. 48, 51-53.

Salina officials are not aware of any traffic or pedestrian accidents that have resulted from The Cozy's display, 4 App. 259; 5 App. 43, or that The Cozy's display harmed property values or the economy, 4 App. 260; 5 App. 43-44.

Salina lacks evidence that The Cozy's display harms aesthetics. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-139, 141-142, 144-147; 11 App. 58-59. City Manager Schrage believes the display is "high energy" and "pops." 4 App. 116. Salina received numerous emails from the public suggesting The Cozy's display *enhanced* community aesthetics. 5 App. 44; 6 App. 70-87.

Salina retained attorney Mark White as an expert witness. 6 App. 90. Mr. White is not aware of any studies:

- that were conducted before Salina drafted any version of its sign code, 6 App. 91-92, and he does not have any knowledge about why the sign code had been amended, 6 App. 92.
- that have analyzed the efficacy of the sign code in promoting the goals, objectives, and policies of Salina's comprehensive plan. 6 App. 92-93.

Mr. White is not aware of any studies or evidence:

- that establishes that private art is more dangerous than public art. 6 App. 94-95.

- that commercial content painted on a wall is more dangerous than non-commercial content. 6 App. 95-96.
- that burger-esque UFOs are more dangerous than pizza-esque UFOs. 6 App. 96.

Mr. White admits the Mural at the Mill is not dangerous, 6 App. 97, and testified that he does not think it would become dangerous if a daycare business started operating inside the building, 6 App. 98. Likewise, the painting would not become dangerous if it were painted on a daycare wall. 6 App. 97.

Mr. White is not aware of any research or studies showing that the public would find painted signs less pleasing than other painted displays, 6 App. 99, or that one type of wall painting is more aesthetically pleasing than another type, 6 App. 99. Nor is Mr. White aware of any evidence proving that commercial content painted on a wall is less aesthetically pleasing than non-commercial content. 6 App. 100. Mr. White admits the Mural at the Mill is aesthetically pleasing and concedes the mural would not become less aesthetically pleasing at a daycare. 6 App. 101.

Mr. White is the author of a learned treatise, *Content-Neutral Sign Codes After Reed And Austin*, which demonstrates the regime is content based and does not pass *any* level of scrutiny. 6 App. 102-103; *see* 6 App. 114-115, 125-126 (regime violates "Tips to Comply with *Reed*" and "*Reed*'s Top 10 Takeaways"); 6 App. 111 (regulation is "content-based if the message displayed" "has a regulatory impact").

Mr. White's opinions were based on Salina's circular definition of "art" as "not a sign," and his report and testimony are "devoid of any explanation or opinion

indicating how or why a display that references a business's product is any more harmful to safety, aesthetics, or health than a display that references anything else." 16 App. 73.

The Plaintiffs retained Charles Taylor as a rebuttal expert. 6 App. 206. Dr. Taylor's report and testimony show that the Federal Highway Administration's "reviews of signage and traffic safety have found no conclusive evidence of a link between signs and traffic accidents." 6 App. 140. The research has demonstrated that properly placed signs are *not* a safety hazard and that the assumption that signs constitute a traffic safety hazard is not supported by scientific evidence. 6 App. 139-143. Nor is there any scientific or evidentiary support for the idea that Salina's sign code "promotes an interest in aesthetics," 6 App. 144-147, or advances its stated interests, 6 App. 130-154.

### I. Proceedings below.

The Plaintiffs filed a civil rights lawsuit against Salina under 42 U.S.C. § 1983, and later, an amended complaint. 1 App. 26-66. The Plaintiffs sought a declaratory judgment that Salina's mural-sign code regime violates the First Amendment and the Fourteenth Amendment, both facially and as-applied.[5] 1 App. 63-65; *see* 3 App. 119-121. The Plaintiffs also sought injunctive relief.[6] 1 App. 63-65.

---

[5] The district court denied the Plaintiffs' Fourteenth Amendment claim, 16 App. 79, which the Plaintiffs have not appealed.

[6] The district court denied the request because there was no reason to suggest Salina would not comply with the judgment. 16 App. 81. The Plaintiffs have not appealed that ruling.

In the amended complaint and everywhere else, the Plaintiffs challenged more than Salina's written definition of a "sign." The Plaintiffs challenged Salina's mural-sign code regime. The mural-sign code regime referred to Salina's distinctions between murals and signs, which included Salina's written sign code, its unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties. 1 App. 28, 31, 64; 3 App. 107-109, 119-121; 4 App. 12 n.2; 8 App. 109 n.2; 13 App. 176 n.2.[7]

The parties filed cross-motions for summary judgment. 3 App. 286-287; 4 App. 7-47; 7 App. 37-79.[8] The Plaintiffs argued the mural-sign code regime was content- and speaker-based, and therefore strict scrutiny should apply. 4 App. 32-36; *see also*, 3 App. 119-120. And the Plaintiffs also argued strict scrutiny should apply even if the mural was considered commercial speech. 4 App. 33, 36-37; 8 App. 115, 126 n.6.

The Plaintiffs further argued that even *if* the regime was content neutral, the mural sign-code regime still violated the First Amendment, citing *Brewer v. City of Albuquerque*, 18 F.4th 1205 (10th Cir. 2021) and *McCraw v. City of Oklahoma City*, 973 F.3d 1057 (10th Cir. 2020). 4 App. 41-43; 8 App. 118-125.

---

[7] Plaintiffs challenged Salina's Business Improvement District Code (BID), which required approval to make aesthetic changes. During the lawsuit Salina amended the BID Code, which mooted the issue. 3 App. 106.

[8] Both parties filed unsuccessful *Daubert* motions, 1 App. 216-292–2 App. 7-56; 2 App. 57-119, neither of which have been appealed.

The Plaintiffs argued the mural was not commercial speech. 1 App. 56-57. But even if it were, the regime still violated the First Amendment under *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961 (10th Cir. 2020). 4 App. 38-41; 8 App. 125-127. And finally, if the Plaintiffs did not prevail because of the application of the commercial speech doctrine, the Plaintiffs argued that the commercial speech doctrine is inconsistent with the First Amendment and should be overturned. 1 App. 57; 3 App. 119-120; 4 App. 37 n.10.

For its other claim, the Plaintiffs argued that the mural-sign code regime was an unconstitutional prior restraint because it placed unbridled discretion in the hands of officials, and because Salina placed The Cozy's sign permit application "on-hold" indefinitely. 4 App. 43-45; 8 App. 127-129.

Salina argued it did not need to present evidence that its restrictions were tailored to its stated interests in aesthetics, property values, and traffic or pedestrian safety; and even if evidence were required, it had satisfied its evidentiary burden. 7 App. 68-71. Salina also argued that Mr. Howard had consented to his sign permit application being placed "on-hold" indefinitely. 7 App. 71-74.

The district court granted the Plaintiffs' summary judgment on their First Amendment claim. 16 App. 74.[9] The district court did not decide whether the regime was content- or speaker-based because "Salina's regulations fail[ed] even accepting that intermediate scrutiny applies." 16 App. 68.

---

[9] The corresponding case citation is *Cozy Inn, Inc. v. City of Salina, Kansas*, No. 24-CV-01027-TC, 2025 WL 3223806 (D. Kan. Nov. 19, 2025).

The district court also held that placing the Plaintiffs' sign permit application on hold indefinitely was an unconstitutional prior restraint. 16 App. 75-77. The district court did not decide whether the mural-sign code regime placed unbridled discretion in the hands of city officials. 16 App. 75 n.6.

## Summary of the Argument

This case involves aliens shooting a wall with ketchup and mustard, from UFOs that look too much like hamburgers. In Salina, Kansas, *that* kind of mural is against the law.

Under Salina's mural-sign code regime, the difference between an unregulated mural and a regulated sign turns on the artwork's content. If the artwork pertains to the entity putting it up, Salina calls it a regulated sign and applies its size limitations and permitting requirements. But if the artwork is *not* related to the entity, it is considered an unregulated mural. Under the city's written code, "sign" is broadly defined and all encompassing; mural is not defined at all.

There are murals *everywhere* in Salina.



*7 App. 26.*




*7 App. 33.*



*7 App. 15.*



*4 App. 139.*

Stephen Howard owns the iconic burger restaurant, The Cozy Inn. Mr. Howard wanted to take part in Salina's mural scene, so he started painting a whimsical, UFO-themed mural on The Cozy's side wall. Once finished, it will show a big burger-esque-mothership and smaller burger-esque UFOs blasting the wall with ketchup and mustard.




*1 App. 30; 4 App. 50.*

Because The Cozy sells sliders (with ketchup, mustard, and onions), Salina deemed the painting a regulated sign and ordered Mr. Howard to stop painting it. But if Mr. Howard changed the content to depict pizza-esque UFOs shooting pizza sauce instead, he could. Since he does not sell pizza, that would be an unregulated mural.

Under Salina's content-based regime, Mr. Howard could paint a wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), unless he started selling soup; a church can display a cross, but not a wall-sized "Turn to Jesus" painting; a coffee shop could paint a wall-sized olive tree mural, but not one depicting a coffee tree; and a taco shop could paint a wall-sized mural of a dove, unless it started selling "dove tacos."

Except for their content, all of those things are the same thing: paint on a wall. But there is no evidence or caselaw that supports regulating *some* painted displays but not others based on what is displayed, or that Salina's distinctions between murals and signs advance, or are tailored to, its stated interests in aesthetics, traffic and pedestrian safety, and property values. It is not as though a painted display is more likely to fall off a wall, or cause car wrecks, because it pertains to a business, for instance.

Salina's mural-sign code regime violates the First Amendment even if intermediate scrutiny applies. And because of that, the district court did not err when it granted the Plaintiffs' motion for summary judgment and denied Salina's.

The district court correctly held that Salina engaged in a prior restraint as well. After Salina officials told Mr. Howard to stop painting, they instructed him to apply for a sign permit. He did as he was told. Salina put the permit "on hold," where it remains to this day, 864 days later. "That deep freeze is the exact situation that the prior-restraint doctrine forbids." 16 App. 76.

## Argument

*Standard of Appellate Review*

This Court's "special standard of de novo review" applies, which requires "an independent examination of the whole record in order to ensure that the judgment protects the right of free expression." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1227, 1216 (10th Cir. 2021) (cleaned up). This Court may affirm "on grounds other than those relied on by the district court." *Lytle v. City of Haysville, Kan.*, 138 F.3d 857, 862 (10th Cir. 1998) (cleaned up).

### I. The district court correctly held that Salina's mural-sign code regime, which distinguishes unregulated murals from regulated signs based on what the display depicts, violates the First Amendment.

The extensive factual record demonstrates that Salina's mural-sign code regime, which distinguishes between unregulated murals and regulated signs, is content- and speaker-based. Strict scrutiny should apply, which Salina cannot satisfy.

But in any event, "Salina's regulations fail even accepting that intermediate scrutiny applies." 16 App. 68. Every painted display is the same thing: paint on a wall. There is *no* evidence, caselaw, or anecdote that supports regulating *some* painted wall displays but not others, or that Salina's mural-sign distinction directly advances or is properly tailored to its stated interests. The district court correctly held that that "Salina imposes an unconstitutional distinction between murals and signs," 16 App. 79, and that Salina did not satisfy its "burden to demonstrate that its distinction between signs and murals is narrowly tailored," 16 App. 70.

### A. Salina's mural-sign distinction is content- and speaker-based. Strict scrutiny should apply, which Salina cannot satisfy.

The district court held that Salina's restrictions on painted displays failed even if intermediate scrutiny applied and consequently did not decide whether the mural-sign code regime was content- or speaker-based. 16 App. 67-69. But the evidence demonstrates that it is, and therefore strict scrutiny should apply.

Salina's mural-sign code regime "target[s] speech based on its communicative content," "applies to particular speech because of the topic discussed or the idea or message expressed," and it targets "specific subject matter." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163, 169 (2015). It also draws "distinctions based on the message," cannot be justified "without reference to the content of the regulated speech," defines "regulated speech by its function or purpose," and because Salina "disagree[s] with [certain] message[s]." *Id.* at 163, 164 (cleaned up).

Salina's definition of "sign" is all encompassing. *See* S.M.C. § 42-764. Under its plain text, all murals are regulated wall signs, and every wall sign is supposed to be subjected to the same size restrictions and permitting requirements. A mural is a "sign" because it is a "pictorial representation," or a "display" that is "calculated to attract the attention of the public;" or alternatively, because a mural "directs attention" to itself or the building on which it is located. *See* S.M.C. § 42-764. Given a mural's nature, how can it *not* be a "pictorial representation" or "display" that is "calculated to attract the attention of the public?"

But for decades, Salina did not apply its size limitations and permitting requirements to the displays it considered murals—the things Salina encourages and

prefers. 5 App. 102 ("we don't regulate murals"); 5 App. 22 (murals are "a whole another thing").

The difference between an unregulated mural and a regulated sign turns on the display's content or the owner's identity. If it relates to the entity displaying it, is "part of a commercial transaction," 4 App. 107, contains a "commercial message," 4 App. 94, 106, 112, 234-235, 243-244; 5 App. 151, or if it "includes a message that pertains to the goods or services for sale," 4 App. 238-239; 5 App. 152, 207, 254-256, Salina regulates it as a sign.

Conversely, Salina does not regulate displays with any other content. As City Manager Schrage explained it, a "distinction" is "commonly made" when it comes to "murals and art" and "commercial speech." 5 App. 155.

Consistent with its decades-long, content-based regulatory approach, Salina officials had no qualms admitting they regulated Mr. Howard's display because of its content, saying it was "all on the basis of a commercial message," 4 App. 94; the mural's "content falls under sign provisions in the City Code rather than art," 5 App. 161; the display is considered "signage" because "the hamburgers are basically the same thing [Mr. Howard] sells," 4 App. 218; although the mural "aesthetically might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign subject to the applicable zoning codes," 5 App. 151; and even if there were no words on the mural, "it's still a sign" because it "related to the business activity of the building," 4 App. 112. *See also* 4 App. 89, 110-112; 5 App. 56-58, 207, 210; 6 App. 213-216.

Because the regime is content based—and because Salina disagrees with certain content—Mr. Howard *can* paint a wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962), an airplane mural, or flying pizza slices, but he *cannot* paint a wall-sized display depicting aliens piloting UFO-themed burgers blasting the wall with ketchup and mustard. *That* is a content-based bridge too far. And it is precisely *because* the regime is content based that a city commissioner wanted to know "what it would take for [Mr. Howard] to turn" the UFO-themed display "into a mural." 4 App. 112.

The Mural at the Mill (right) encapsulates Salina's content-based regulatory approach. It is a display, it "attract[s] the attention of the public," it "direct[s] attention to" itself, and it "direct[s] attention to" downtown Salina. Even though it fits the code's definition of "sign," Salina considers it an unregulated mural because of its content. 4 App. 251; 5 App. 35-38. And under that content-based approach, if the Mural at the Mill were painted on a daycare's wall, it would be a regulated sign, not an unregulated mural—because it depicts children playing. *See* 5 App. 35-38.



*4 App. 132.*




*4 App. 130.*

The record is replete with examples of Salina's content-based restrictions. *See* 5 App. 91-92 (church's Turn-to-Jesus mural would be

prohibited); 4 App. 255-256 (coffee shop's coffee branch mural would be prohibited); 5 App. 41-42 (taco shop's dove mural would be prohibited if it sold "dove tacos"); 5 App. 105-107 (Eisenhower mural allowed, Romney mural prohibited); 4 App. 107-108, 255-256 (coffee house example at the City Commission meeting).

Two closely analogous mural cases demonstrate that Salina's regime is content based. In *Kerston v. City of Mandan,* owners of a western bar painted a mural depicting mountains, cowboys, and the bar's name, which Mandan claimed was a regulated sign, not an unregulated mural. 389 F. Supp. 3d 640, 642, 644 (D.N.D. 2019). "Clearly, the regulation is based on the content of the speech, and thus is not content neutral." *Id.* at 646.

In *Complete Angler, LLC v. City of Clearwater, Fla.*, a bait and tackle shop painted a fish mural. 607 F. Supp. 2d 1326, 1329 (M.D. Fla. 2009). Clearwater's regulatory regime was content based because murals displayed "in conjunction with" a business were subjected to size regulations, but murals showing "first responders" or "kids playing" were unregulated artwork. *Id.* at 1331, 1333-34.

Just like Clearwater's content-based regime, Salina's content-based regime considers murals showing fire fighters and children playing as unregulated art, rather than regulated signs. 4 App. 158; 5 App. 141-142; 4 App. 251; 5 App. 35-37.



*4 App. 130.*



*4 App. 137.*

The learned treatise authored by Salina's expert witness underscores that the regime is content based. In *Content-Neutral Sign Codes After Reed And Austin*, Mr. White explains that a regulation is content based if the message "has a regulatory impact" "[e]ven if the regulation restricts or favors a category of speech for a benign reason," and that "[s]imply controlling the type of message renders a regulation content-based even when it does not favor some viewpoints over others." 6 App. 111.

On this record, Salina's regime is content based because it "exempted works of art that in no way identified or specifically related to a product or service, but it applied to art that reference a product or service," and "it applied or did not apply as a result of content." *Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016) (cleaned up).

Moreover, because Salina's mural-sign "distinctions are based solely on the content of the [display] at issue," and the "restrictions that apply depend on the 'communicative content' of the [display]," the mural-sign code regime "is content-based." *Clark v. City of Williamsburg, Kansas*, 388 F. Supp. 3d 1346, 1359 (D. Kan. 2019), *aff'd*, 844 F. App'x 4 (10th Cir. 2021) (relying on *Reed*, 576 U.S. at 163). *See also, Neighborhood Enters., Inc. v. City of St. Louis*, 644 F.3d 728, 736 (8th Cir. 2011) ("the zoning code's definition of sign is impermissibly content-based because the message conveyed determines whether the speech is subject to the restriction") (cleaned up); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1266 (11th Cir. 2005) (regulating some signs while exempting others "based on the nature of the messages they seek to convey" is "undeniably" content based); *id.* (allowing some messages to be displayed more prominently than others "constitutes content-based

regulation"); *Ficker v. Talbot Cnty., Maryland*, 553 F. Supp. 3d 278, 285 (D. Md. 2021) (size limit based on subject is content based); *Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369, 1381 (M.D. Fla. 2014), *aff'd* (Sept. 3, 2015) ("undeniably a content-based restriction" to apply permitting, setback, and numerical limitations based on the message).

Even though Salina has disavowed the application of the commercial speech doctrine here, the regime is also content based because its regulations apply (or do not apply) based on the *perceived* commercial content of the message displayed.[10]

In *Aptive Envtl., LLC v. Town of Castle Rock, Colorado*, a solicitors' curfew was content based because it applied by distinguishing between commercial and non-commercial content. 959 F.3d 961, 982 (10th Cir. 2020) (relying on *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993)). *See also Morris v. City of New Orleans*, 399 F. Supp. 3d 624, 635-636 (E.D. La. 2019) ("[U]ndeniably" "content based" that a painting with "a non-commercial message" was deemed an unregulated mural but a painting with "a commercial message" was deemed a regulated "sign"); Christina C. Orlando, *Art or Signage?: The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo L. Rev. 867, 870 (2013) (regulating

---

[10] Salina does not challenge the district court's finding that it "expressly reject[ed] the notion that this case involves a regulation on commercial speech," 16 App. 72, and it does not brief the commercial speech doctrine on appeal. Except to say, incorrectly, "the *Central Hudson* commercial speech test" is "stricter tha[n] the 'intermediate scrutiny' test at issue in the instant case." Govt's Brief at 37.

commercial and non-commercial murals differently is "impermissible content-based regulation" and "stands in stark contrast to the current state of free speech law").

The regime is also content based because, as the record establishes, Salina has to "read the sign," or in this case, closely examine a display's content to determine whether its restrictions apply. 4 App. 242; 5 App. 16-17, 21, 56, 98-100, 113-115, 126, 139, 199. Indeed, Salina admits that enforcement decisions require code inspectors to "evaluat[e] whether" a display makes "a declaration about a fact, occurrence, or intention or proclaims or gives notice of, or identifies," or "evaluate[s] whether the display is meant to attract customers" or "encourage[s] a commercial transaction." 5 App. 207.

Accordingly, if a coffee shop paints a branch on its wall, the enforcement officer would need to look at the display, interpret it, divine its meaning, and decide whether the branch looked enough like a *coffee* branch for it to be considered a regulated sign. All of that demonstrates the regime is content based. *Reed*, 576 U.S. at 162; *Discovery Network, Inc.*, 507 U.S. at 413-414 (regulation was content based because the government examined the content to determine if it applied); *Norton v. City of Springfield, Ill.*, 806 F.3d 411, 412-413 (7th Cir. 2015); *Neighborhood Enterprises,* 644 F.3d at 736; *Complete Angler,* 607 F. Supp. 2d at 1333; *Clark*, 388 F. Supp. 3d at 1358; *Quinly v. City of Prairie Vill., Kan.*, 446 F. Supp. 2d 1233, 1239 (D. Kan. 2006).

The longstanding "read the sign" analysis was not rejected in *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61 (2022), despite Salina's suggestion in the district court. In *Austin*, the Court explained that an "examination

of speech *only* in service of drawing neutral, location-based lines" does not make it "*automatically* content based." *Id.* at 69 (emphasis added). But unlike here, Austin's "location-based and content-agnostic" regulations did not "single out any topic or subject matter for differential treatment," and there was "no evidence in the record that the City had applied the sign code provisions differently for different messages or speakers." *Id.* at 67, 71, 73-74, 76 (cleaned up).

*This* regime and *this* record are plainly different from *Austin*. This case does not involve billboards, it does not involve off-premises, location-based regulations, and virtually everyone associated with Salina has demonstrated that the regime is anything but content agnostic. Indeed, Salina's preoccupation with content explains why it disputed the content of Mr. Howard's mural, including questioning his expert about the scientific accuracy of depicting spaceships without any "visible sense of propulsion." 14 Vol. 266-267. Finally, *Austin* cabined its own holding, explaining that it did not "nullify *Reed*'s protections," or "cast doubt on any" "precedents recognizing examples of topic or subject-matter discrimination as content based." *Austin*, 596 U.S. at 76.

Salina's mural-sign code regime is content- *and* speaker-based. Salina admits it prohibits some painted displays but not others to "eliminat[e] the risk of sign wars" between "businesses." 7 App. 70. A pizza shop could paint an exact replica of The Cozy's mural, but The Cozy cannot; and The Cozy can paint pizza slices, but a pizza shop cannot. 5 App. 110-112. *See also* 4 App. 107-108, 110, 254-258; 5 App. 26, 41-42, 85-86, 91-92, 114-117 (more examples). That "favor[s] some speakers over others" and "reflects a content preference." *Reed*, 567 U.S. at 170.

Even under Salina's preferred (and flawed) reading of its sign code, whether something is "used to announce, direct attention to, or advertise," is *still* content based because it targets speech based on its content and subject matter; applies because of the topic or subject matter; draws distinctions based on the message; cannot be justified without referencing content; defines regulated speech by its function or purpose; because it disagrees with certain messages, *Reed,* 576 U.S. at 163-64, 169, and "turn[s] on whether the speech" is perceived as "commercial or not." *See Aptive*, 959 F.3d at 982; *see also id.* at 983; *Neighborhood Enters., Inc.*, 644 F.3d at 736 (the "definition of sign is impermissibly content-based because the message conveyed determines whether the speech is subject to the restriction") (cleaned up); 8 App. 181 (regulated sign defined by "function").

In sum, the mural-sign code regime, which distinguishes unregulated murals from regulated signs based on what is displayed, is content based.[11] "Both on its face and in its practical operation," Salina's mural-sign code regime "imposes a burden based on the content of speech and the identity of the speaker," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011), and is "a paradigmatic example of content-based discrimination," *Reed*, 576 U.S. at 169. Therefore, strict scrutiny applies. Salina cannot satisfy that heavy burden. It does not even try to; and besides, that it cannot

---

[11] Even if Salina treats all murals pertaining to businesses the same, it is still a "content-based" regulation because it is a "regulation targeted at specific subject matter" "even if it does not discriminate among viewpoints within that subject matter." *Reed*, 576 U.S. at 169.

survive intermediate scrutiny (below) necessarily means it cannot satisfy the heavier burden here.

### B. Salina's mural-sign distinction fails intermediate scrutiny.

The district court correctly held that "Salina's mural-sign distinction does not survive intermediate scrutiny." 16 App. 69. Salina did not produce any credible evidence of any real-life harms it claims the mural-sign distinction is meant to address, or evidence that regulating some displays as "signs" while not regulating other "murals" directly furthers Salina's purported interests, or evidence that such a distinction is narrowly tailored, leaves open ample alternative channels of communication, or that Salina considered less-restrictive means to achieve its goals. *McCraw v. City of Oklahoma City*, 973 F.3d 1057, 1071-1072 (10th Cir. 2020) (describing and applying content-neutral test from *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)); *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1209, 1220-1221, 1224-1225, 1227, 1246 (10th Cir. 2021) (same).

A virtually identical case drives the point home. In *Young v. Town of Conway, New Hampshire*, 783 F. Supp. 3d 588 (D.N.H. 2025), the town deemed a bakery's depiction of muffin-esque mountains a regulated sign because it featured goods sold on the premises. But if it had depicted "covered bridges and sunflowers," or a scenic valley, (or, one presumes, burger-esque UFOs) it would be considered an unregulated mural. *Id.* at 596. That was unconstitutional because it has "no rational connection to any of [the government's] stated interests," and "would not pass *any* level of scrutiny." *Id.* at 610, 592 (emphasis added).

### 1. Salina must produce evidence that its restrictions advance, and are tailored to, its interests.

Salina insists, just as it did below, that "*any* restriction" of displays is "narrowly tailored as a matter of law." 16 App. 70; 13 App. 173 ("As a matter of law, sign regulations, like the Sign Code, advance government interests in traffic safety, pedestrian safety, property values, and aesthetics"); *see* Govt's Brief at 33-39, 27-29.

Salina is wrong. The content-neutral analysis is not a fact-free inquiry where governments get to restrict speech *just because*. *See, e.g., McCraw*, 973 F.3d at 1071-1072.

Consider *Brewer v. City of Albuquerque*, as well, where this Court explained that governments need *concrete evidence* justifying their First Amendment restrictions. The "burden falls on the City to show that its recited harms, specifically defined, are real and that the Ordinance will in fact alleviate them in a direct and material way—and if the City is unable to demonstrate that the Ordinance provides more than ineffective or remote support for the City's stated purpose, or sufficiently serves those public interests in a direct and effective i.e., material way, then we are constrained to conclude that the Ordinance is not narrowly tailored and, consequently, contravenes the First Amendment." 18 F.4th at 1227 (cleaned up); *id.* at 1221 (government required to consider less restrictive means); *id.* at 1220 (government must leave open ample alternative channels of communication).

There, Albuquerque introduced into evidence 900 accident and police reports, statistical information regarding injuries and fatalities, anecdotes from city council members, police officers, and expert testimony on traffic engineering and

roadway design. *Id.* at 1232. That *still* was not enough to prove there was a real, non-speculative harm, or that the ordinance alleviated a harm in a direct and material way. *Id.* at 1226-1227. This Court described that record as "largely evidence free" and "pauc[e]." *Id.* at 1245, 1238.

Salina's "because we say so" theory of regulating *some* painted displays, but not others, is grounded in a misunderstanding about the difference between an interest that may be substantial *in the abstract* and an interest that is substantial *in fact*. *See Brewer*, 18 F.4th at 1238 ("significant government interests" must be "real and not speculative."); *Aptive*, 959 F.3d at 995-996 (substantial interest "in the abstract" does not "justify any regulation simply through talismanic invocation of that interest."); *Complete Angler*, 607 F. Supp. 2d at 1334 ("abstract notions will not suffice"); *Morris*, 399 F. Supp. 3d at 637 ("blindly intoning" theoretical interests insufficient).

But Salina's "we don't need facts" theory *also* rests on misreadings of *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981) (plurality opinion), *City of Ladue v. Gilleo*, 512 U.S. 43 (1994), and *Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984), none of which involved painted displays.

In *Metromedia*, the plurality explained that *billboards*—not painted murals—create "a unique set of problems" and held that the billboard-specific record in that case showed that billboards could impact traffic safety. 453 U.S. at 509-510. Still, the plurality left open the possibility that different facts could lead to a different result. *Id.* at 509.

But painted displays are nothing at all like billboards, whether they are called "murals" or "signs." And there is no evidence, caselaw, or accumulated judgments in the record that suggest murals create unique problems, or that they pose any safety hazards at all. Quite the opposite, in fact. *See* 6 App. 128-154.

Salina drastically overreads *Metromedia*, just like the city did in *Pagan v. Fruchey*, 492 F.3d 766 (6th Cir. 2007) (en banc). There, the government regulated "for sale" signs on cars and "argued that" under *Metromedia*, "even in the absence of evidence of concrete harm, [courts] should defer to legislative judgments on matters of traffic safety and aesthetics." *Pagan*, 492 F.3d at 774. The Sixth Circuit rejected the government's "theory" that it "need not provide evidence" *and* rejected the proposition that *Metromedia* applied. *Id.* at 776. "*Metromedia* does not control the outcome of this case." *Id.* at 774; *see also*, *Café Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1285 (11th Cir. 2004) (the "law of billboards" is "a law unto itself"). Here, the district court was correct: "Salina has not shown that the narrow situation presented in *Metromedia* applies[.]" 16 App. 72.

The government's reliance on *Ladue* is equally misplaced. A mural is not the same as a *physical* sign—paint cannot fall over, obstruct views, displace physical land use, or take up space like physical signs; and the expert evidence demonstrates a mural does not distract motorists. 6 App. 139-143. Simply calling a mural a sign, like here, does not change the analysis; and besides, the Supreme Court rejected Ladue's fact-free invocation of traffic hazards, aesthetics, and property values, and recognized that property owners "have strong incentives to keep their own property values up and to prevent 'visual clutter.'" *Ladue*, 512 U.S. at 58.

*Taxpayers for Vincent* does not help Salina either. Unlike Salina's regulation of murals on private property, Los Angeles banned people from posting temporary signs on *city* property to stop their build-up. 466 U.S. at 807. The concerns about the "visual assault" of temporary signs on government property, such as streetlights, were not the same for private property, the Court recognized, because of the "private property owners'" own "esthetic concerns." *Id.* at 811.

That Salina considers *some* murals to be visually-assaulting but not others, even though they "aesthetically might look similar to murals in the downtown," 5 App. 151, and even though the only difference is their content, proves the regime is content based. In fact, regulating speech for "purely esthetic" reasons raises "serious First Amendment concerns." *Ward*, 491 U.S. at 793.

Salina cites, but does not analyze, *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023). But that case shows that the facts *do matter*. There, the billboard companies argued that treating billboards "differently depending on whether the message was paid for or not" was unconstitutional under strict scrutiny. *Id.* at 1247. This Court affirmed the dismissal, but not because the facts were irrelevant. Instead, this Court held that strict scrutiny did not apply, cited *Brewer*, and explained that it was "skeptical" that the regulatory regime could survive fact-intensive intermediate scrutiny, but the billboard plaintiffs did "not allege with any specificity that the Act and rules fail to meet intermediate scrutiny." *Id.* at 1252.

Finally, Salina says that because other cities use a similar definition of a sign, it does not need to "re-invent this well-defined wheel." Govt's Brief at 39. That same argument was correctly rejected in *Aptive*. That "other cities have similar

ordinances cannot, standing alone," give this Court "any basis to infer" that Salina's mural-sign distinctions advance, and are properly tailored to, its stated interests. *Aptive*, 959 F.3d 994-95. Those other ordinances "could very well be grounded on the same sort of inadequate" evidence as Salina's, for instance. *Id.* at 996. Or those municipalities could be misreading or misapplying their code like Salina does, or violating the First Amendment like Salina is. *E.g.*, *Young*, 783 F. Supp. 3d at 591, 610.[12]

Salina has not "identified an established line of cases to support its judgment" that the displays it considers signs "are more detrimental to the city's interests" than the displays it considers murals. 16 App. 72. All of "that is a problem for [Salina and] means it has not carried its burden of proof." *Aptive*, 959 F.3d at 995.

**2. Salina did not produce evidence that its restrictions advance, and are tailored to, its interests.**

Salina does not have *any* evidence that the displays it considers signs "are more detrimental to the city's interests" than the displays it considers murals. *See* 16 App. 72. Or that its restrictions are properly tailored. What Salina did produce "actually undermines [its] position[s]." 16 App. 72.

The first category of evidence consists of written publications: a law review article, a blog post, and six pages from a presentation on digital signs and billboards. 7 App. 84-121. "[T]hat information provides no explanation or insight into how

[12] City Manager Schrage was aware of that lawsuit, the media coverage surrounding it, and informed the Commissioners and others about it. 4 App. 169, 203-208.

Salina differentiates between murals and signs." *See* 16 App. 72. And there is *no* evidence that the City Commissioners saw or considered the publications when they amended the code. 9 App 251-258; 10 App 7-133 (absent in the official minutes and agendas); 7 App. 82 (Zoning Administrator kept them in *his* files).

The law review article actually *undercuts* Salina's distinction between murals and signs. *See, e.g.*, Christina C. Orlando, *Art or Signage?: The Regulation of Outdoor Murals and the First Amendment*, 35 Cardozo L. Rev. 867 (2013); 7 App. 95 (regulating commercial and non-commercial murals differently is "impermissible content-based regulation" and "stands in stark contrast to the current state of free speech law"); 7 App. 114 ("hardly seem[s] necessary, fair, or prudent," and would be "foolish and wasteful," to demand a shop that sells coffee to remove a coffee mural); 7 App. 120 (includes anecdotes that "If you can't even paint some grapes on the side of a wine store, then we've gone to the land of silly" and "[i]t's really gotten silly" if "[y]ou are not allowed to show any products that you sell in your mural, or your mural is deemed advertising[.]"); *see also,* 7 App. 110-111. The blog post involves an out-of-district case, with an entirely different fact pattern. 7 App 90-91. And the six pages from an undated presentation about *digital signs* and *billboards*, 7 App. 84-89, "suggests the general notion" that regulating signs can promote certain interests, but "provides no explanation or insight into how Salina differentiates between murals and signs," 16 App. 72.

The second category of evidence consists of testimony by city officials. Their testimony "actually undermines Salina's position[s]." 16 App. 72. Indeed, the common thread among the officials' testimony is their "explanation[s]" were

"entirely circular" and depended on whether "the sign is deemed a mural, which is not regulated, or a sign, which is[.]" *See* 16 App. 72.

There is *no* evidence that a painted mural will fall off the wall, that burger-esque UFOs are more dangerous than traditional UFOs or flying pizza slices, that commercial art is more dangerous than non-commercial art, or that private art is more dangerous than public art. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-148; 11 App. 58-59. Just saying it out loud demonstrates the absurdity of Salina's argument.

There is *no* evidence that murals pertaining to businesses are unsafe, or that they would cause traffic or pedestrian accidents. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 139-143; 11 App. 58-59. There is *no* evidence that The Cozy's mural has caused any safety issues. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 139-143; 11 App. 58-59.

Salina does not have *any* evidence justifying its restrictions on safety grounds. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 139-143; 11 App. 58-59. Further, "[t]he argument that signs" "constitute a traffic safety hazard is not supported by scientific evidence." 6 App. 139.

So, "while the City's" stated "interest in public safety" may be significant, "it is not enough for the City to use broad safety justifications to establish the Ordinance's necessity." *Brewer*, 18 F.4th at 1226 (cleaned up).

Salina's stated interest in aesthetics is not supported by any studies, statistics, or credible evidence either. 4 App. 259-260; 5 App. 43-44, 51; 6 App. 91-101, 144-148; 11 App. 58-59.

There is *no evidence* that murals pertaining to businesses are not aesthetically pleasing. 4 App. 51, 259-260; 5 App. 43-44, 51; 6 App. 91-101, 144-148; 11 App. 58-59. In fact, the opposite is true, the public *likes* The Cozy's mural. 4 App. 259-260; 5 App. 43-44; 6 App. 91-101; *see also* 4 App. 116 (The Cozy's mural "pops."). The scientific evidence does not support regulating painted displays differently because of their content either. *See* 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-148; 11 App. 58-59.

That Salina differentiates murals from signs on aesthetic grounds demonstrates the regime is unconstitutional. *Discovery Network*, 507 U.S. at 425 (distinguishing between newsracks is unconstitutional because the regulated newsracks are "no greater an eyesore"); *Neighborhood Enterprises*, 644 F.3d at 737-38 (aesthetics not narrowly tailored when exemptions are content based); *Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1570 (11th Cir. 1993) (city may not "promot[e] aesthetics" "by restricting speech depending upon the message expressed"); *Reed,* 576 U.S. at 172 (sign code not narrowly tailored); *Ficker* 553 F. Supp. 3d at 284-85 (same); *Bee's Auto,* 8 F. Supp. 3d at 1382; *Morris*, 399 F. Supp. 3d at 637 (nothing suggests certain messages in artwork are more unsightly than others).

Salina does not have any evidence for its stated interest in property values, that the regime actually increases property values, or that The Cozy's mural impacts property values. 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-148; 11 App. 58-59.

Salina's first "two categories of evidence" "indicate *no* connection between [its] interests and its mural sign distinction." 16 App. 73.

For its "final category of evidence," Salina cites its expert witness. 16 App. 73. Just as in *Brewer*, "the City frames much of its narrow tailoring argument around" its expert. 18 F.4th at 1229. Also as in *Brewer*, Mr. White's testimony does not demonstrate Salina's "recited harms, specifically defined, are real and that" Salina's distinctions between murals and signs "will in fact alleviate them in a direct and material way." *Brewer*, 18 F.4th at 1227 (cleaned up); 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-148; 11 App. 58-59.

Indeed, Mr. White's "testimony exposes, rather than bolsters, the lack of tailoring" in this case. *Brewer*, 18 F.4th at 1230.

To start with, Mr. White's learned treatise demonstrates the regime is content based and cannot survive any level of scrutiny. 6 App. 102-103; 6 App. 114-115, 125-126 (regime violates "Tips to Comply with *Reed*" and "*Reed's* Top 10 Takeaways").

Moreover, Mr. White's "opinion not only accepts Salina's circular definition of art as true but depends on it for support. In other words, White's opinions rely on the assumption that the definition of public art, in all of the studies he relies on, is based on *where* a given display is located." 16 App. 73.[13] Indeed, "White's report is devoid of any explanation or opinion indicating how or why a display that references a business's product is any more harmful to safety, aesthetics, or health than a display that references anything else." 16 App. 73 (citing *Brewer*, 18 F4th at 1229).

[13] 1 App. 222 (explaining Mr. White used circular definitions like Salina does); 1 App. 236 n.2, 243 (circular definitions). None of the reports or studies Mr. White cited distinguish regulated signs from unregulated murals like he, or Salina, does. 1 App. 281 (transcript); 1 App. 234-254 (report).

Mr. White's testimony does not support the idea that the displays Salina considers signs "are more detrimental to the city's interests" than the displays it considers murals, 16 App. 72, or that Salina's restrictions are properly tailored. Mr. White's testimony demonstrated exactly the opposite point. 6 App. 94-101; 6 App. 97-98, 101 (Mural at the Mill is aesthetically pleasing and not dangerous and does not become less pleasing or more dangerous if painted at a daycare). Mr. White's "generic and theoretical opinions do not aid the City's cause." *Brewer*, 18 F.4th at 1230.

Besides, there is "no conclusive evidence of a link between signs and traffic accidents," 6 App. 140; "properly placed signs are not a safety hazard," 6 App. 142; "[t]he argument that signs are distracting to motorists and constitute a traffic safety hazard is not supported by scientific evidence," 6 App. 139; there is "no evidence" that Salina's sign code "promotes an interest in aesthetics," 6 App. 144; and there is no scientific or other evidentiary support undergirding *any* of Salina's stated interests either, *see* 4 App. 259-260; 5 App. 43-44, 48-53; 6 App. 91-101, 135-149; 11 App. 58-59.

Salina did not satisfy its heavy First Amendment burden "of showing *either* that its recited harms" "are real and non-speculative, or that the [mural-sign code regime] alleviates these or any other harms invoked by the City in a direct and material way." *Brewer*, 18 F.4th at 1227-1228.

There is no evidence that Salina even nominally considered less restrictive means either. *Brewer*, 18 F.4th at 1221. And the record demonstrates that Salina's proposed alternative channels of communication would not allow the Plaintiffs to

convey the intended message, would reach a different audience, or would be more expensive, all of which are inadequate. *See Ladue*, 512 U.S. at 56-57; *Brewer*, 18 F.4th at 1220.

The Sci-Fi-themed mural tells a story about alien- and human-travelers. 4 App. 49-51, 74, 81-82. The visual artistry conveys the Plaintiffs' character. *Id.* While it is true that the Plaintiffs advertise elsewhere, *see* Govt's Brief at 30-31, the mural is not selling hamburgers, it is not intended to maximize profits, it is not a commercial advertisement, and Mr. Howard is not trying to "brand the site" with it. 4 App. 49-51, 74, 81-82; 9 App. 209-214, 247-248. Salina argues that it is good enough that the Plaintiffs can "communicate" "some messages on Facebook, radio advertising, banner advertising at indoor football events, and billboards." Govt's Brief at 30-31. But that is tantamount to suggesting that Andy Warhol could just advertise tomato soup through the internet or bumper stickers, even though he was not advertising soup. Besides, branded merchandise and bumper stickers are the speech of the individuals displaying them, not the Plaintiffs' speech. Finally, the idea that "radio advertising" is a constitutionally adequate alternative to a mural is absurd.

Once completed, Mr. Howard's mural would be permanently affixed, easily viewable by the public, at all times of the day, every day. Unlike "branded merchandise," "bumper stickers," and the like, the public will not need to pay to see it; and it would not cost Mr. Howard additional money to reproduce it either. Shrinking the mural would make it incredibly difficult to see. Salina's proposed alternatives are not constitutionally adequate.

### C. Salina's mural-sign code regime fails whether strict or intermediate scrutiny applies. Salina has no evidence for its unconstitutional mural-sign distinction.

The district court correctly held that "Salina imposes an unconstitutional distinction between murals and signs," 16 App. 79, that "Salina's regulations fail even accepting that intermediate scrutiny applies," 16 App. 68, and that Salina's "mural-sign distinction is unconstitutional on its face," 16 App. 79.

In every instance Salina distinguishes between murals and signs based on what they depict. The Plaintiffs brought both facial and as-applied claims to challenge that practice and, as this Court has repeatedly held, the same substantive First Amendment standards apply regardless of the type of relief sought. *United States v. Supreme Ct. of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (the "label is not what matters"); *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127-1128 (10th Cir. 2012).

Under those standards, Salina's mural-sign distinction is content based and therefore, strict scrutiny should apply. But even if the distinction were content neutral, it still fails under this Court's analysis in both *McCraw* and *Brewer*. That is because Salina presented *no* credible evidence of any real-life harms it claims the mural-sign distinction is meant to address, no credible evidence that regulating some displays as "signs" while not regulating others as "murals" directly furthers Salina's purported interests, and no evidence that such a distinction is narrowly tailored, leaves open ample alternative channels of communication, or that Salina considered less-restrictive means to achieve its goals. As a result, Salina's regulation fails under *any* level of First Amendment scrutiny.

## II. The district court correctly held that Salina's actions were an unconstitutional prior restraint.

Murals do not require permits, signs do. But Salina does not have any "narrow, objective, and definite standards" to differentiate signs from murals, rather it requires the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (cleaned up),[14] and the regime gives "unbridled discretion" to its officials, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225-26 (1990) (plurality opinion).

Salina *says* it distinguishes murals from signs by evaluating whether their content is "used to announce, direct attention to, or advertise." But that test is malleable, open-ended, and there is no way to decide whether the regulations apply (or do not apply) without reviewing the display's content, exercising judgment about the content, and forming an opinion about the content.

Salina's lack of objective criteria, and unbridled discretion, is exemplified by the decades of uneven enforcement *and* Salina's inability to say whether some displays would be regulated signs or unregulated murals. The Zoning Administrator, for instance, could not decide whether a more traditional looking UFO mural, or a mural depicting cows grazing in fields of mustard plants, tomatoes, and onions, would be considered a regulated sign if placed on The Cozy's wall, without looking at renderings. 5 App. 113-115. Salina officials cannot even agree whether its firefighter display is a mural or a sign, 4 App. 137, 158, 253-253; 5 App. 32, 141-142,

---

[14] *See also Saia v. New York*, 334 U.S. 558, 560 (1948); *Lovell v. City of Griffin*, 303 U.S. 444, 450-451 (1938); *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150-151 (1969); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769-770 (1988).

or determine whether other displays are signs or murals without seeking legal advice, 4 App. 140, 252-253; 5 App. 23-25, 27-32. And even though the display at the Salina Art Center is "similar in function to a sign" and "direct[s] the public," 5 App. 174, Salina deemed it an unregulated "art installation." 4 App. 136; 5 App. 174; 6 App. 65-66. All of that demonstrates that judgment must be exercised, and opinions must be formed—the hallmarks of unconstitutional prior restraint.

That Salina unilaterally placed Mr. Howard's sign permit application on hold instead of responding within ten days as the code requires (just as it has done to other businesses), further proves a prior restraint. Indeed, that is exactly the kind of "deep freeze" that "the prior-restraint doctrine forbids." 16 App. 76 (citing *Lakewood*, 486 U.S. at 771-72). The application remains on hold.

The argument that Mr. Howard consented to this deep freeze is unsupported by the record. The testimony "emphasized that city officials *informed* Howard that they were placing his application on hold," 16 App. 77, *not* that Mr. Howard consented.

The deep freeze was so pervasive, Salina tries to recharacterize it as something that "furthers, rather than constricts, free speech." Govt's Brief at 54. But preventing Mr. Howard from finishing the mural, ordering him to apply for a permit, and then sitting on the application for more than 864 days does *not* further speech.

Salina did not overcome the "heavy presumption against" its prior restraint. *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000). The district court rightly found that Salina's actions were an unconstitutional prior restraint.

## Conclusion

This Court should hold that Salina's distinctions between unregulated murals and regulated signs are content- and speaker-based, apply strict scrutiny, and affirm the district court's judgment on other grounds. Alternatively, the judgment should be affirmed because Salina's mural-sign code regime fails intermediate scrutiny.

This Court should also hold that Salina engaged in an unconstitutional prior restraint, either because it suppressed expression or because officials wield unbridled discretion.

## Statement Regarding Oral Argument

The constitutional issues on appeal are complex and nuanced. The interchange of oral argument would assist this Court in deciding them. The Plaintiffs request 20 minutes per side.

Kansas Justice Institute

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts, 22781
Jeffrey S. Shaw, 29767
12980 Metcalf Avenue, Suite 130
Overland Park, Kansas 66213
(913) 213-5018
sam@kansasjusticeinstitute.org
jeff@kansasjusticeinstitute.org

*Counsel of Record for Plaintiffs-Appellees*

## Certificate of Service

I certify that on March 25, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

## Certificate of Compliance

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(g)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 12,949 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface, Equity Text A size-14 font, using Microsoft Word in Microsoft 365.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

## Certificate of Electronic Submission

I certify that: all required privacy redactions have been made under Tenth Circuit Rule 25.5; if required to file additional hard copies, that the CM/ECF submission is an exact copy of these documents; and the digital submissions have been scanned for viruses by Microsoft Defender, last updated 3/25/26 at 8:11 a.m., and according to the program, they are free of viruses.

/s/ Samuel G. MacRoberts
Samuel G. MacRoberts

# Addendum

## Relevant Ordinances

**S.M.C. § 42-500 - Purpose.**

Sec. 42-500. – Purpose.

This article promotes the public health, safety and welfare of the community through a comprehensive system of reasonable, effective, consistent, content-neutral and nondiscriminatory sign standards and requirements, narrowly drawn to:

(1) Ensure that all signs installed in the city are compatible with the character and visual environment of the community and promote the goals, objectives and policies of the comprehensive plan;

(2) Balance public and private objectives by allowing adequate avenues for both commercial and non-commercial messages;

(3) Improve pedestrian and traffic safety by promoting the free flow of traffic and the protection of pedestrians and motorists from injury and property damage caused by, or which may be fully or partially attributable to, unsecured, cluttered, distracting, and/or illegible signage;

(4) Protect the aesthetic appearance of the city's natural and built environment for its citizens and visitors;

(5) Prevent property damage, personal injury, and litter caused by signs that are improperly constructed or poorly maintained;

(6) Protect property values, the local economy, and quality of life by preserving and enhancing the appearance of the streetscape; and

(7) Provide for the placement of temporary signs in limited circumstances, without regard to the communicative content of the sign.

(8) Provide consistent design standards that enable the fair and consistent enforcement of these sign regulations.

(9) Enhance the city's ability to maintain its public rights-of-way.

(Ord. No. 17-10882, § 1, 7-10-17)

**S.M.C. § 42-501 – Permit Requirement.**

Sec. 42-501. – Permits.

No sign, except for normal repair and for signs listed in sections 42-504 and 42-505, shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article.

(Code 1966, § 36-900)

**S.M.C. § 42-502 – Permit Requirement.**

Sec. 42-502. – Zoning certificate (sign permit) required.

(a) The zoning certificate (sign permit) must be obtained from the office of the zoning administrator.

(b) A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

. . .

(Code 1966, § 36-901)

**S.M.C. § 42-504 – Sign code exemptions.**

Sec. 42-504. - Exemptions generally.

The following signs shall be exempt from the requirements of this article:

(1) Noncommercial flags displayed on private property;

(2) Signs placed or authorized by the city, county, state, or federal government for the protection of the public health, safety, and general welfare, including, but not limited to, the following:

a. Emergency and warning signs necessary for public safety;

b. Traffic and wayfinding signs;

c. Signs showing the location of public facilities including public and private hospitals and emergency medical services; and

d. Any sign, posting, notice, or similar sign placed by or required by a governmental agency in carrying out its responsibilities to protect the public health, safety, and general welfare;

(3) Signs placed in or attached to a motor vehicle, bus, or railroad car that is regularly used for purposes other than the display of signs;

(4) Onsite handheld signs;

(5) Memorial signs and tablets displayed on private property;

(6) Address numerals and other signs required to be maintained by law or governmental order, rule or regulation, provided that the content and size of the signs does not exceed the requirements of such law, order, rule or regulation;

(7) Small signs, not exceeding five (5) square feet in area, displayed on private property for the convenience of the public, including signs to identify entrance and exit drives, parking areas, one-way drives, restrooms, freight entrances, and the like;

(8) Scoreboards in athletic stadiums;

(9) Window signs affixed to the interior of a window that do not display an advertising message or cover more than thirty-three (33) percent of the total window area on a single wall.

(Code 1966, § 36-903; Ord. No. 90-9381, §§ 2, 9, 5-14-90; Ord. No. 04-10218, § 1, 10-11-04; Ord. No. 19-11020, § 2, 12-2-19)

**S.M.C. § 42-521 – Size Restrictions**

Sec. 42-521. - C-3 and C-4 commercial districts.

The following sign regulations shall apply in the C-3 shopping center and C-4 central business districts:

. . .

(4) *Maximum gross surface area:*

a. In the C-3 district, four (4) square feet of sign area for each lineal foot of building frontage; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage.

b. In the C-4 district, three (3) square feet of sign area for each lineal foot of building frontage for allowable signage other than a ground/pole sign or a projecting sign; where no building frontage exists, one (1) square foot of sign area for each lineal foot of street frontage. Irrespective of building or street frontage, no property or zoning lot shall be restricted to less than thirty-six (36) square feet of sign area. No more than sixty-seven (67) percent of allowable sign area may be displayed on any building wall or street frontage. In regards to projecting signs and ground/ pole signs, the following maximum area limitations shall apply:

. . .

(Ord. No. 90-9381, §§ 5, 9, 5-14-90; Ord. No. 07-10425, § 1, 12-03-07)

**S.M.C. § 42-599 – Violations and Penalties.**

Sec. 42-599. – Violations and Penalties.

. . .

(c) *Penalties*. Any person, firm, or corporation who shall violate any of the provisions of these regulations or fail to comply with any order or regulation, or who shall build in violation of any specifications or plans submitted and approved, or any certificate or permit issued thereunder, shall, for each and every violation and noncompliance respectively be deemed guilty of a misdemeanor. Upon conviction thereof, the person, firm, or corporation shall be fined in a sum of not less than fifty dollars ($50.00) nor more than five hundred dollars ($500.00) for each offense. Each and every day a violation is permitted to exist after notification thereof shall be deemed a separate offense.

. . .

(Code 1966, § 36-1203; Ord. No. 88-9245, § 1, 4-11-88)

**S.M.C. § 42-764 – Definition of sign.**

Sec. 42-764. – Sign.

*Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure or on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

(Code 1966, § 36-1301(145))

**S.M.C. § 42-781 – Definition of wall sign.**

Sec. 42-781. – Sign, wall.

*Wall sign* is a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building.

(Code 1966, § 36-1301(162))

# District Court Order and Judgment

**In the United States District Court
for the District of Kansas**

---

Case No. 24-cv-01027-TC

---

COZY INN, INCORPORATED, ET AL.,

*Plaintiffs*

v.

CITY OF SALINA, KANSAS,

*Defendant*

---

**MEMORANDUM AND ORDER**

Plaintiffs Cozy Inn, Incorporated and its owner Stephen Howard sued the City of Salina, Kansas for constitutional violations after the City stopped Howard from painting a display on the side of the building that housed his restaurant. Doc. 16; *see also* 42 U.S.C. § 1983. All parties moved for summary judgment, Docs. 104 & 106, and to exclude the other's expert testimony, Docs. 97 & 98. For the following reasons, each party's motion for summary judgment is granted in part and denied in part, and each party's motion to exclude expert testimony is denied.

**I**

**A**

Each motion has a different standard that governs resolution. The following describes each applicable standard.

**1.** As noted, the parties challenge the admissibility of each other's experts. The admissibility of expert testimony is guided by Federal Rule of Evidence 702. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). To fulfill its gatekeeping role, a trial court must ensure that the expert is qualified and that his or her testimony is both reliable and

relevant. *Id.* at 1180–81. "Rule 702 requires an expert witness to be qualified by 'knowledge, skill, experience, training, or education.'" *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021). Testimony is reliable if "it is based on sufficient data, sound methods, and the facts of the case." *See Roe*, 42 F.4th at 1181 (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). It is relevant if it helps the trier of fact "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020).

**2.** Both parties contend that they are entitled to summary judgment. Summary judgment is proper under the Federal Rules of Civil Procedure when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" when it is necessary to resolve a claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). And disputes over material facts are "genuine" if the competing evidence would permit a reasonable jury to decide the issue in either party's favor. *Id.* Disputes—even hotly contested ones—over facts that are not essential to the claims are irrelevant. *Brown v. Perez*, 835 F.3d 1223, 1233 (10th Cir. 2016). Indeed, belaboring such disputes undermines the efficiency Rule 56 seeks to promote. *Adler*, 144 F.3d at 670.

At the summary judgment stage, material facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671; *see also* D. Kan. R. 56.1(a)–(c). To determine whether a genuine dispute exists, the court views all evidence, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *See Allen v. Muskogee, Okla.*, 119 F.3d 837, 839–40 (10th Cir. 1997). That said, the nonmoving party cannot create a genuine factual dispute by making allegations that are purely conclusory, *Adler*, 144 F.3d at 671–72, 674, or unsupported by the record. *See Scott v. Harris*, 550 U.S. 372, 378–81 (2007).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues as to those dispositive matters remain for trial. *Celotex*, 477 U.S. at 324; *Savant Homes*, 809 F.3d at 1137.

**B**

The facts are not in dispute and, as a result, are not construed in either party's favor. In particular, the parties either agree completely as to the material facts or, to the extent there is a disagreement, the purported dispute is unsupported by the cited record. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 758 n.5 (10th Cir. 2021) (noting that the facts are construed in the light most favorable to the non-movant only "insofar as there are material disputes of fact").

**1.** Plaintiff Stephen Howard owns Cozy Inn, Inc., a local and storied hamburger restaurant in downtown Salina, Kansas. Doc. 105 at ¶ 1; *see also* KWCH Staff, *Salina's Cozy Inn Celebrating 100 Years in Business*, 12News (Mar. 11, 2022, 9:33 PM), https://www.kwch.com/2022/03/12/salinas-cozy-inn-celebrating-100-years-business/.[1] Howard hired an artist to paint a display on the exterior wall of the building he owns that houses Cozy Inn. Doc. 105 at ¶¶ 9–12. That wall was previously plain white. *Id.* at ¶ 9. Howard intends for the display, once completed, to "include whimsical hamburger-esque flying saucers piloted by aliens attacking The Cozy with blasts of ketchup and mustard." *Id.* at ¶ 14. It will read: "Don't Fear the Smell!! The Fun is Inside!!" *Id.* And a painted arrow will point to the building's entrance and the ordering window on the exterior wall. *Id.* at ¶ 15; Doc. 108 at ¶ 27.

Howard wanted Cozy Inn's display to be part of the "proliferation of mural art" in Salina. Doc. 105 at ¶ 6 (quoting Doc. 105-5 at 23). He described the various murals throughout the city and said he "wanted to participate in this 'part of Salina culture.'" *Id.* at ¶ 10. Many of the murals Howard describes are seemingly similar to the one Howard wants to complete at Cozy Inn. *See id.* at ¶ 129. For example, an abandoned grain elevator in Salina features a mural that "depicts children playing ring-around-the rosie." *Id.* at ¶ 122. A baseball training facility features a large mural on one of its exterior walls that shows baseball players during a baseball game with phrases like "Outta the Park!" and "Good Game!" Doc. 105-6 at 5. And a music-related business has a mural on its exterior walls called "Symphony of Sunflowers" that

---

[1] All references to the parties' briefs are to the page numbers assigned by CM/ECF.

covers the exterior walls with paintings of music notes and sunflowers. Doc. 105 at ¶ 149.

The artist Howard hired, Colin Benson, began painting the display on Friday, November 3, 2023. Doc. 105 at ¶ 26. Three days later, however, Salina officials informed him that they believed the display was too large to be permitted under the City's sign code. Doc. 107 at 10, ¶ 20. Then, because the officials determined that the display was a sign subject to the sign code's regulations, they told Howard that the display would be too large to qualify for a sign permit and directed him to pause work on the display. *Id.* The display is a sign, according to Salina, because it "pertains to or references the goods or services for sale." Doc. 105 at ¶ 100. In particular, Salina's position is that the display "advertises hamburger, chopped onions, pickles, ketchup, and mustard" by depicting those images as part of the display. Doc. 107 at 13–14, ¶ 40. The parties' subsequent interactions are detailed more fully below, but it is first necessary to understand the relevant portions of the Salina sign code.

**2.** Salina's written sign code and the way city officials interpret it demonstrate that outdoor displays in Salina fall into one of two categories: murals (or art) and signs. Doc. 105 at ¶ 37 (noting that murals are not regulated); *id.* at ¶ 154 (noting that Salina uses the word "art" as "an imprecise short-hand for 'not sign'"). Murals are a type of art, so they are not regulated by Salina's sign code. *Id.* at ¶ 37. That means there are no restrictions on their size or how many may be displayed on a given property, and it is not necessary to obtain a permit before painting a mural on the exterior wall of a building. *See id.* Signs, however, are subject to regulation. Doc. 107 at 6, ¶ 1. If an outdoor display is deemed a sign as that term is defined by the sign code, it must comply with the restrictions set forth in the code. *Id.*

The sign code expressly defines what constitutes a sign. Doc. 107 at 6, ¶ 3; Salina, Kan., Code of Ordinances ch. 42, art. X, § 42-502 (2023) [hereinafter Salina Code]. It provides:

> *Sign* is any writing (including letters, words or numerals), pictorial representation (including illustrations or decorations), emblem (including devices, symbols, or trademarks), flag, banner, streamer, pennant, string of lights, or display calculated to attract the attention of the public, or any other figure of similar character which:

(1) Is a structure or any part thereof, or a portable display, or is attached to, painted on, or in any other manner represented on a building or other structure on the ground;

(2) Is used to announce, direct attention to, or advertise; and

(3) Is not located inside a building.

The sign code also defines specific types of signs. Relevant here is the definition of wall sign: "a sign fastened to or painted on a wall of a building or structure in such a manner that the wall becomes merely the supporting structure or forms the background surface, and which does not project more than twelve (12) inches from such building." Doc. 107 at 7–8, ¶ 5; Salina Code § 42-781.

In addition, the sign code expressly sets forth its purposes. Doc. 107 at 6–7, ¶ 4; Salina Code § 42-500. Among others, those purposes include improving pedestrian and traffic safety, protecting the city's aesthetic appearance, preventing property damage, and protecting property values. Doc. 107 at 6–7, ¶ 4; Salina Code § 42-500(3)–(5).

An individual or business that wants to paint or otherwise construct a sign must first obtain a permit. Doc. 107 at 8, ¶ 6; Salina Code § 42-501. Specifically, the sign code provides:

> No sign . . . shall be painted, constructed, erected, remodeled, relocated or expanded until a zoning certificate (sign permit) for such sign has been obtained pursuant to the procedure set forth in this article . . . . A zoning certificate (sign permit) shall be either issued or refused by the zoning administrator within ten (10) days after the receipt of an application therefore or within such further period as may be agreed to by the applicant. No zoning certificate for any sign shall be issued unless the sign complies with the regulations of this article.

Doc. 107 at 8, ¶¶ 6–7; Salina Code § 42-501. But, as noted, no permit need be sought or obtained to construct a mural. Doc. 105 at ¶ 37. The permit requirement applies only to displays that Salina deems as signs. *Id.*

Appellate Case: 25-3225 Document: 17 Date Filed: 03/23/2026 Page: 52

Displays that meet the definition of sign must comply with certain size limits, too. Doc. 107 at 8–9, ¶ 9; Salina Code § 42-521(4)(b). The sign code allows for a certain amount of a property's surface area to be devoted to signage, depending on which zone of the city the property is located. Doc. 107 at 8–9, ¶ 9; Salina Code § 42-521(4)(b). Salina will not issue a permit for a sign to be painted or otherwise erected if the sign would be larger than the amount of surface area the property is authorized to use for signage, whether that be on its own or in combination with the signs that are already on the property. Doc. 107 at 8, ¶ 7.

**3.** The aforementioned portions of Salina's sign code provide the context for what happened once city officials noticed the display. Benson had started painting the display on a Friday, and by the end of the weekend, Brad Anderson, a Salina employee, noticed it both on social media and in person. Doc. 105 at ¶ 28; Doc. 109 at 7, ¶ 28; Doc. 109-6 at 3–5. He texted two other city officials about the display, informing them that it was being painted and doubting that it had been approved through the sign-permit process. Doc. 109-6 at 3–5. It remained "up in the air" on Sunday whether city officials would consider the display a regulated sign or an unregulated mural. Doc. 105-13 at 10.

The next day, four city officials met to answer that question. Doc. 105 at ¶ 29. Those individuals included Lauren Driscoll, Salina's Director of Community and Development Services, Dean Andrew, the city's Planning and Zoning Administrator, and two city planners, Dustin Herrs and Dustin Michelson. Doc. 105-14 at 10; Doc. 107-5 at 2–3. They looked at a photograph of Benson's efforts, compared it to the sign code's definition, and determined collectively that the display was a sign that was subject to regulation under the code. Doc. 105 at ¶ 30; Doc. 105-14 at 10–11. They also concluded that the size of the display likely exceeded the surface area that Cozy Inn had remaining for signage by nine times the allowed amount, according to calculations Herrs made using a digital software. Doc. 105 at ¶ 32; Doc. 107-12 at 11–12.

City officials explained their decision to Howard at two separate meetings in November 2023. Doc. 107 at 10, ¶ 20; *id.* at 12, ¶ 29. They reasoned that the display was a sign subject to regulation because "the hamburgers are basically the same thing [Howard] sells, and therefore, it would be signage." Doc. 105 at ¶ 54 (quoting Doc. 105-10 at 10).

Over the following days and weeks, Salina's officials provided more insight into how they determined that the display was a sign. They provided this information through written memoranda and public remarks to the city commissioners, as well as statements to the media. Doc. 105 at ¶¶ 43, 55, 60, 72. In each remark, the officials focused on the fact that the display depicted the same food products sold at Cozy Inn. For example, City Manager Michael Schrage explained in a memo: "While [the display] might look similar to murals in the downtown and elsewhere, it contains a commercial message promoting a business and its product which makes it a wall sign . . . ." Doc. 105-18 at 2; Doc. 105 at ¶ 45; *see also* Doc. 105-5 at 11 ("And I would reiterate, it's all on the basis of a commercial message."). Director of Community and Development Services, Lauren Driscoll, further elaborated on Schrage's explanation. Doc. 105 at ¶ 63. In particular, she explained that the distinction between murals and signs turns on whether the display depicts images that are "part of a commercial transaction that would take place in that building or draw you to that building for a commercial transaction." Doc. 105-5 at 24. Driscoll illustrated her point with an example. Doc. 105 at ¶ 65. She said that if a coffee house painted a display depicting a dove with an olive branch and the word "peace," then the display would not be a sign because it would not depict anything sold inside of the coffee house. Doc. 105-5 at 24; Doc. 105 at ¶¶ 64–66. In contrast, a display at the same coffee house would be a sign if it depicted "a steaming cup of coffee and a coffee pot on the side" because "that illustration can suggest that commercial transaction." Doc. 105-5 at 24–25; Doc. 105 at ¶¶ 64–66.

There is a dispute as to whether this distinction between murals and signs derives from the text of the sign code. The plaintiffs state that it is an extratextual requirement unsupported by the text of Salina's sign code. Doc. 108 at 7–8. In contrast, Salina asserts that it is an interpretation of the word "advertise," which appears in the definition of sign. *Id.* At the time that Driscoll and Schrage made their comments to the city commissioners and the public, they did not indicate that the mural-sign distinction is connected to the word "advertise." Later, however, Salina produced deposition testimony from various officials and answers to interrogatories asserting that its determination relied on the text of the sign code—specifically, the sub-section of the definition of sign noting that signs "announce, direct attention to, or *advertise*." Doc. 107 at 11, 13–14, at ¶¶ 27, 40 (emphasis added). So, according to Salina, a display is used to advertise if it "is meant to attract customers, encourage a commercial transaction . . . [or] call attention

to a brand, products, or services in order to encourage the purchase of products or services, in that it pertains to or references the goods or services for sale." Doc. 105-24 at 7.

Salina also stated that it concluded the display was a sign because it "contains a tag line *announcing* the infamous smells of the Cozy" and because "it has an arrow *directing attention to* the building entrance and ordering window." Doc. 107 at 11, ¶ 27 (emphasis added). Howard and Cozy Inn deny that this is how Salina enforced its sign code against their display. Doc. 108 at 7–8, ¶ 26. They claim that Salina considered their display a sign solely "because it perceived the . . . content as a commercial message pertaining to goods sold by The Cozy" contrary to the sign code's text. *Id.*

**4.** Because city officials determined the display was a sign, they told Howard to submit a sign-permit application. Doc. 105 at ¶ 103; Doc. 105-14 at 17. Howard submitted an application on November 13, 2023. Doc. 105 at ¶ 104 (citing Doc. 105-25); Doc. 105-14 at 19. Salina neither granted nor denied Howard's application. Doc. 106 at ¶ 106. Instead, it put the application on hold. *Id.* City Planner Dustin Herrs believed that city officials had a common understanding with Howard that a decision would not be made regarding his permit application until the officials conducted "a comprehensive review of the sign regulations to see if there were any appropriate text amendments that could be made to accommodate The Cozy Inn sign." Doc. 109-16 at 36–37. But Howard did not share this understanding. Doc. 108 at 6, ¶ 23 (citing Doc. 108-20 at ¶ 26). Howard agrees that city officials informed him of his application's on-hold status, but he disputes that he agreed to that decision. *Id.*

In February 2024, three months after submitting his permit application, Howard received a letter regarding the application from another city planner, Dustin Michelson. Doc. 105-27. The parties did not identify any other discussions between Howard and Salina during those three months. Michelson's letter stated, in relevant part:

> This letter is to inform you that the City is engaging in a comprehensive review of the City's sign regulations, which will include a review of the regulations pertaining to painted wall signs. As a result of this, and due to the unique nature of the existing signs at The Cozy Inn, our office will be placing your . . . sign permit application on-hold until our review of the sign regulations is

Appellate Case: 25-3225 Document: 17 Date Filed: 03/25/2026 Page: 85


> complete. Once we have completed that code review process, Staff will then be able to . . . review your sign permit application in the context of any sign regulations that may be revised during our code review.

Doc. 105-27 at 2. Two weeks after receiving Michelson's letter, Howard and Cozy Inn filed this federal lawsuit against the City of Salina. Doc. 1.

### C

Broadly speaking, Howard and Cozy Inn allege two constitutional violations.[2] Doc. 101 at ¶ 4.a. First, they allege that Salina's sign code, along with the unwritten practices Salina uses to enforce it, violates the First Amendment's Free Speech Clause on its face and as applied to the plaintiffs' display. *Id.* at ¶ 4.a.i. That claim has two facets. In one, the plaintiffs assert that Salina's differentiation between regulated signs and unregulated murals is a content-based distinction that cannot survive strict scrutiny. *Id.* In the other, they allege that Salina's sign code and the way Salina applies it created an unconstitutional prior restraint on their speech. *Id.* Second, Howard and Cozy Inn allege that Salina's sign code is impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause. *Id.* at ¶ 4.a.ii.

Howard and Cozy Inn seek two types of relief. Doc. 101 at ¶ 5. They first seek a declaratory judgment that Salina's written sign code, its unwritten policies and practices, its sign-permit requirement, and its enforcement mechanisms are an impermissible content-based restriction on speech, an unlawful prior restraint on speech, and that they are unconstitutionally vague. *Id.* at ¶ 5.a. The plaintiffs alternatively seek a declaration that the sign policies fail to satisfy intermediate scrutiny, assuming they are found to be content-neutral restrictions on

---

[2] Howard and Cozy Inn initially challenged an additional portion of Salina's sign regulations. Doc. 92 at 8–9. Specifically, they claimed that Salina's Business Improvement District Code, which required downtown businesses to obtain approval before making exterior aesthetic changes to their buildings, was unconstitutional. *Id.*; Doc. 16 at ¶ 59. While this lawsuit was pending, however, Salina amended the Business Improvement District Code and determined that, as amended, it did not apply to Howard and Cozy Inn's proposed display. Doc. 101 at 1. As a result, the parties agreed that the plaintiffs' claims involving the Business Improvement District Code were rendered moot by the subsequent amendments to that code. Doc. 101 at ¶ 2.a.xv.

speech. *Id.* at ¶ 5.a.iii. And the plaintiffs seek permanent injunctive relief enjoining Salina and its officials from enforcing the entire sign code and any associated practices against them if they complete their unfinished display.[3] *Id.* at ¶ 5.a.b–c.

There are four pending motions. Docs. 97, 98, 104, 106. Each party moves to exclude expert testimony. Docs. 97 & 98. Each party also seeks judgment in their favor on both claims. Docs. 105 & 107. Finally, Salina argues that Howard and Cozy Inn lack standing to bring their claims. Doc. 107 at 18–20.

**II**

Both parties seek summary judgment. As noted below, each motion for summary judgment is granted in part and denied in part. Specifically, Howard and Cozy Inn have standing, and they have shown that they are entitled to judgment as a matter of law on their First Amendment content-discrimination and prior-restraint claims. But Salina has shown that its sign ordinance is not impermissibly vague, warranting summary judgment in Salina's favor on the plaintiffs' Fourteenth Amendment claim.

**A**

Salina's motion for summary judgment relies on its expert witness, Mark White. Howard and Cozy Inn have filed a motion to exclude White's expert testimony.[4] Doc. 97.

White seeks to offer seven opinions. Doc. 97-3 at 3. First, White states that Salina's sign code "establishes time, place and manner metrics that are not content-based." *Id.* His second opinion is that Salina's

---

[3] Howard and Cozy Inn initially sought a permanent injunction that would enjoin Salina and its officials from enforcing the sign code against not only the two plaintiffs, but those similarly situated to them. Doc. 101 at ¶ 5.b. They voluntarily withdrew that request, claiming *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), precludes injunctions that would apply to entities that are not parties to this suit. Doc. 102 at 1.

[4] Howard and Cozy Inn identified a rebuttal expert, Dr. Charles Taylor. Salina moved to exclude his testimony. Doc. 98. Because Taylor's expert report was not necessary to resolve the parties' summary judgment motions, Salina's motion is denied as moot.

sign code "is supported by substantial and compelling interests in the area of urban planning and code administration." *Id.* Next, White asserts that the sign code "directly and materially furthers its recited purposes," "is not vague," and "has numerous procedural safeguards." *Id.* He then opines that the sign code "is reasonable in scope in that it targets issues related to wall signs, without unnecessarily expanding its reach to artistic murals." *Id.* And finally, White says that the restrictions in Salina's sign code "are reasonable, generally accepted regulations of the size, shape, placement, and design of signs." *Id.*

Howard and Cozy Inn move to exclude White as an expert at trial. Doc. 97. First, they argue that White's opinions invade the province of the factfinder by applying the law to the facts and making impermissible legal conclusions. *Id.* at 3–7. Second, they argue that White's opinions are unreliable because they "are based on inappropriate speculation and conjecture" and because they contradict a treatise that White authored. *Id.* at 7–14. Salina, as the proponent of White's testimony, bears the burden of establishing its admissibility by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009). It has done so here, and, as a result, the plaintiffs' motion to exclude is denied.

**1.** Howard and Cozy Inn first challenge White's seven opinions as impermissible legal opinions. Doc. 97 at 3–7. Specifically, they rely on the principle that an "expert may not state his or her opinion as to legal standards nor may he or she state legal conclusions drawn by applying the law to the facts." *Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1342–43 (10th Cir. 2017) (quoting *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1328 (10th Cir. 1998)).

It is true that White's opinions largely mirror the legal standards that the issues in this lawsuit turn on. But it is unnecessary to entirely exclude White as an expert witness because the parties requested a bench trial. Doc. 101 at 20–21. The concern that the plaintiffs raise typically arises in cases that will be tried by a jury because it is important to ensure that experts do not "go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility." *United States v. Hill*, 749 F.3d 1250, 1260 (10th Cir. 2014). That concern is absent when the trial judge is the finder of facts: Courts are able to identify and ignore an expert's testimony if and when the expert opines on what the law is or attempts to apply the law to the facts of the specific case. *Att'y Gen. of Okla. v. Tyson Foods, Inc.*, 565 F.3d 769, 780

(10th Cir. 2009) (noting that "a judge conducting a bench trial maintains greater leeway in admitting questionable evidence, weighing its persuasive value upon presentation").

The plaintiffs have not identified any authority excluding testimony as an impermissible legal conclusion in a bench trial. As a result, exclusion is not necessary because, to the extent White's testimony states impermissible legal conclusions, it can be ignored. *See id.*

**2.** So, too, with the plaintiffs' reliability challenge. In essence, Howard and Cozy Inn argue that White's opinions are unreliable because they are not based on sufficient facts and data, and they contradict conclusions White made in a treatise he authored. Doc. 97 at 7–14. Not so.

First, White's opinions are based on reliable facts and data. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). White bases his opinions on the knowledge and experience he has gained as "a planner and attorney recognized as an expert in zoning and subdivision law, form-based zoning and New Urbanism, land use and takings litigation, housing, development of comprehensive growth management plans, and implementation systems." Doc. 97-3 at 39. That is sufficiently reliable. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2005) (holding that a fire investigator's expert opinion on the cause of a fire was reliable when it was based on his experience and knowledge). White also explained how he formed his opinions. He reviewed Salina's sign code, its comprehensive plan, its purported interests, and other municipalities' sign codes. *See generally* Doc. 97-3. This gave White sufficient facts and data on which he could rely to opine on the connection between Salina's sign code and its proffered justification for its speech restrictions. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243–44 (10th Cir. 2000) (finding the district court did not abuse its discretion in admitting expert's testimony where expert testified based on review of case-specific data like depositions and discovery material).

Second, White used reliable methods to evaluate the data he gathered through his experience and reach conclusions based on it. He applied what he knows about urban planning and zoning regulations to arrive at conclusions that logically follow from that knowledge and experience. For example, White examined Salina's sign code and comprehensive plan to explain the city's purported justifications for its sign

regulations are traffic safety, aesthetics, and public health. Doc. 97-3 at 5–9. Then, he reviewed several studies and reports regarding the impact that signs and public art can have on those interests. *Id.* And he concluded, relying on that data and his expertise, that Salina's sign regulations serve the purposes they are intended to serve. *Id.* That is what experts do. Fed. R. Evid. 702 advisory committee's note (2023); *Tudor v. Se. Okla. State Univ.*, 13 F.4th 1019, 1030–31 (10th Cir. 2021) (explaining that an expert may testify about opinions that rely on subjective opinions supported by general standards in the expert's field). And, more importantly, it is sufficient to establish reliability. *Bitler*, 400 F.3d at 1235 (finding expert conclusions based on experience and knowledge reliable).

Salina's contention that White's opinions in this case differ from what he has previously said does not compel a different result. *Contra* Doc. 97 at 2. That his views may be seen as evolving or inconsistent goes to the weight, not the admissibility, of his testimony. *Ingersoll-Rand*, 214 F.3d at 1244. And, like the plaintiffs' challenge to White's opinions as impermissible legal conclusions, "the usual concerns regarding unreliable expert testimony reaching a jury obviously do not arise when a district court is conducting a bench trial." *Att'y Gen. of Okla.*, 565 F.3d at 779. As a result, exclusion is unnecessary.

**B**

The next issue is Salina's contention that Howard and Cozy Inn lack standing to bring this suit. Doc. 107 at 18–20. It fails because the plaintiffs have shown that they suffered an injury-in-fact that is fairly traceable to Salina's actions and likely to be redressed by a favorable decision.

**1**

"Article III confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2, cl. 1.); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). "For there to be a case or controversy under Article III, the plaintiff must have . . . standing." *TransUnion*, 594 U.S. at 423. "Regardless of the stage of litigation at which [federal courts evaluate] standing, the standing inquiry remains focused on whether the party invoking jurisdiction had a sufficient stake in the outcome when the suit was filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1162 (10th Cir. 2023). Plaintiffs "must demonstrate standing

separately for each form of relief sought." *WildEarth Guardians v. Pub/Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Serv. (TOC), Inc.*, 528 U.S. 167, 185 (2000)) (internal quotation marks omitted).

Standing requires a plaintiff to have "suffered an injury in fact" that is "fairly traceable to the challenged action of the defendant" and is likely to be "redressed by a favorable decision." *Laufer v. Looper*, 22 F.4th 871, 876 (10th Cir. 2022) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). "These requirements ensure that 'the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction.'" *Looper*, 22 F.4th at 876 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).

The injury in fact must be "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (cleaned up). For an injury to be concrete, it must be "real" rather than "abstract," but not necessarily "tangible." *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190–91 (10th Cir. 2021). In other words, "it must actually exist." *Spokeo*, 578 U.S. at 340. And "[a] statutory violation does not necessarily establish injury in fact." *Looper*, 22 F.4th at 876 (explaining that *Spokeo* and *TransUnion* recently clarified that fact). "For an injury to be particularized, it 'must affect the plaintiff in a personal and individual way.'" *Id.* (quoting *Lujan*, 504 U.S. at 560 n.1); *see also Spokeo*, 578 U.S. at 339. "[A]ctual or imminent [means] that the injury must have already occurred or be likely to occur soon." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024). And "[a]n alleged future injury is sufficiently imminent 'if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur.'" *Looper*, 22 F.4th at 876 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

As to causation, the plaintiff must show that "its injury is 'fairly traceable to the challenged action'" of the defendant. *Rocky Mountain Peace & Just. Ctr. v. U.S. Fish & Wildlife Serv.*, 40 F.4th 1133, 1152 (10th Cir. 2022) (quoting *Friends of the Earth*, 528 U.S. at 180). For Article III purposes, that means "proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact." *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1156 (10th Cir. 2005). To make that showing, "plaintiffs bear the burden of pleading and proving concrete facts showing that the defendant's *actual action* has caused the [harm or a]

substantial risk of harm." *Rocky Mountain Peace & Just. Ctr.*, 40 F.4th at 1152 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)) (quotation marks omitted).

Regarding redressability, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Atlas Biologicals, Inc. v. Kutrubes*, 50 F.4th 1307, 1325 (10th Cir. 2022) (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted). In other words, "a party must show that a favorable court judgment is likely to relieve the party's injury." *WildEarth*, 690 F.3d at 1182 (quoting *City of Hugo v. Nichols (Two Cases)*, 656 F.3d 1251, 1264 (10th Cir. 2011)). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *WildEarth*, 690 F.3d at 1182 (quoting *Nova Health Sys.*, 416 F.3d at 1158).

And finally, when assessing standing, federal courts are not to "open the door to merits considerations at the jurisdictional stage." *Smith v. Albany Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 121 F.4th 1374, 1378 (10th Cir. 2024) (internal quotation marks omitted). Thus, "[f]or purposes of standing, [courts] must assume the Plaintiffs' claim has legal validity." *COPE v. Kan. State Bd. of Educ.*, 821 F.3d 1215, 1220 (10th Cir. 2016) (quoting *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092–93 (10th Cir. 2006) (en banc)). In other words, "standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422 U.S. 490, 500 (1975).

**2**

Salina makes two standing arguments. Doc. 107 at 18–20. One applies only to the plaintiffs' prior-restraint claim: Salina argues that Howard agreed his permit application could be held in abeyance, so neither he nor Cozy Inn was injured. *Id.* at 20. The other focuses on redressability, asserting there is no relationship between the injury suffered and the judicial relief that the plaintiffs request. *Id.* at 18–20. Neither has merit.

**a**

Salina's argument that the plaintiffs consented to the prior restraint fails. The plaintiffs want to finish painting the display on the exterior wall of the building housing Cozy Inn. Doc. 105 at ¶ 223. They cannot do that because Salina placed Howard's permit application on hold

instead of issuing a permit or formally denying his application. Doc. 106 at ¶ 106. As a result, the plaintiffs have suffered—and continue to suffer—an injury-in-fact traceable to Salina's indefinite hold of Howard's permit application. *See Utah Animal Rights Coal. v. Salt Lake City Corp.*, 371 F.3d 1248, 1256 (10th Cir. 2004) (explaining that receiving a permit application decision later than the timeframe that the applicant was entitled to is sufficient for Article III standing).

This result does not change simply because Salina officials believe Howard agreed to the open-ended delay. For one, Salina has not supported its assertion that a permit applicant may consent to an indefinite delay in the processing of his or her permit application such that he or she foregoes standing to challenge a prior restraint on expression. *See Rios v. Ziglar*, 398 F.3d 1201, 1209 (10th Cir. 2005) (rejecting a novel factual theory that was not supported by legal authority). But even if that theory is viable, it fails for lack of factual support. The record is devoid of any evidence suggesting that Howard consented to an indefinite delay of his permit application. *Contra* Doc. 107 at 20.

To support its position, Salina points to deposition testimony from various city officials who talked to Howard about his permit application. *Id.* (citing Doc. 107 at ¶¶ 20, 22, 23, 29). Yet no portion of Salina's cited testimony suggests that Howard agreed to the processing delay. For example, the testimony provides that Howard "was informed . . . that the sign . . . is not something the staff had the authority to permit," Doc. 107-12 at 16, that "Howard had knowledge that [Salina was] not able to approve his sign permit application," Doc. 107-5 at 17, and that a city official told Howard "face-to-face that [Salina was] unable to issue a sign permit for the sign as currently proposed under the current sign code," *id.* This evidence does not indicate that Howard *consented* to the open-ended hold. *Sanchez v. Guzman*, 105 F.4th 1285, 1296–97 (10th Cir. 2024) (explaining that a party must support its version of the facts with evidence in the record that supports those facts). Nor has Salina established that Howard's knowledge that his permit application would be denied could deprive him of standing to challenge the permit requirement on its face or as applied to him. *See Dr. John's, Inc. v. City of Roy*, 465 F.3d 1150, 1156 (10th Cir. 2006) (finding plaintiffs had standing to challenge a licensing requirement because the city indicated its intent to enforce the requirement even though the plaintiffs did not actually apply for a license).

**b**

Salina next argues the plaintiffs lack standing because it believes that a judgment in the plaintiffs' favor will not redress the plaintiffs' asserted injuries. Doc. 107 at 18–20. In particular, it claims that an unchallenged provision of the sign code—specifically, Salina's regulations on how much signage a business may display—will preclude the plaintiffs from completing their display even if Salina's current construction of the word "sign" is unconstitutional. *Id.* at 19 ("What remains will be unchallenged, objective numerical size limits that are clearly constitutional.").

Salina's argument fails because a judgment in Howard and Cozy Inn's favor will meaningfully redress their injuries. When Salina stopped the plaintiffs from completing their display, it relied on three separate but interconnected parts of its sign code and/or its unwritten construction of the code. The first is the unwritten distinction that Salina applies between unregulated murals and regulated signs based on whether a given display pertains to the goods or services sold on site. Doc. 105 at ¶ 100; Doc. 107 at 13–14, ¶ 40. The second is the sign code's permit requirement, which only requires a permit to be issued for displays that qualify as a sign. Doc. 107 at 10, ¶ 20. And the third is the sign code's restriction on how much outdoor signage a particular business or entity may display on its premises, which again, applies to signs but not murals. Doc. 105 at ¶ 32; Doc. 107-12 at 11–12. According to the plaintiffs, those regulations are unconstitutional. If the plaintiffs prevail, Salina will be enjoined from enforcing any of these regulations. *See Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1229 (10th Cir. 2005) (finding that the plaintiffs had standing to challenge an ordinance requiring them to submit to fingerprinting and a bond requirement because they faced "a credible threat of prosecution or other consequences following from the statute's enforcement"); *Initiative & Referendum Inst.*, 450 F.3d at 1092–93 (noting that the legal validity of a plaintiff's claim must be accepted at the standing phase). That is sufficient for Article III standing. *Aptive Env't, LLC v. Town of Castle Rock*, 959 F.3d 961, 978 (10th Cir. 2020) (explaining that enjoining a government entity from enforcing an unconstitutional ordinance redresses injuries caused by the ordinance).

In essence, Salina argues that it could subsequently choose to expand its interpretation of the word "sign" to encompass *both* murals and signs, which would remove the allegedly unlawful mural-sign distinction that the plaintiffs oppose, while still precluding the plaintiffs' display. Doc. 107 at 19–20. This argument misses the mark. Salina

cannot avoid the plaintiffs' constitutional challenge by stating that it could, hypothetically, redefine "sign" to encompass more displays than it does now. The plaintiffs are challenging Salina's current definition of sign, which is the very definition stopping them from finishing their display. As a result, declaratory or injunctive relief precluding Salina from enforcing that interpretation would redress the plaintiffs' injury. *We the Patriots, Inc. v. Grisham*, 119 F.4th 1253, 1257 (10th Cir. 2024) ("The critical question, then, is whether our present grant of relief would have some real-world, not theoretical, effect."); *Consumer Data Indus. Ass'n v. King*, 678 F.3d 898, 902 (10th Cir. 2012) (explaining that even if the injured party "would not be out of the woods, a favorable decision would relieve their problem 'to some extent,' which is all the law requires").

The authority Salina cited fails to support its position. Salina relies on three cases in which a plaintiff alleged that a portion of a local government's sign ordinance violated the First and/or Fourteenth Amendments. Doc. 107 at 19 (citing *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 800–01 (8th Cir. 2006), then citing *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 892–93 (9th Cir. 2007), and then citing *Harp Advert. Ill., Inc. v. Vill. of Chi. Ridge*, 9 F.3d 1290, 1292 (7th Cir. 1993)). In each, the plaintiff challenged a discrete provision of the sign code that could be severed from the code if it were held to be unconstitutional. *Advantage Media, L.L.C.*, 456 F.3d at 800–01 (explaining that the plaintiff challenged multiple provisions of a sign ordinance that could easily be severed from the others); *Get Outdoors II, LLC*, 506 F.3d at 892 (same); *Harp Advert.*, 9 F.3d at 1292 (explaining that other provisions of the sign code were constitutionally valid even if the one challenged was not). Moreover, each of those sign codes included a separate and valid provision that the plaintiff did not challenge, which would prevent the plaintiffs from displaying the signs they wanted to erect or otherwise display regardless of whether the challenged provisions were constitutional or not. *See, e.g.*, *Harp Advert.*, 9 F.3d at 1292. As a result, a favorable judgment for the plaintiffs in those cases would not have put them any closer to erecting their displays. *Advantage Media, L.L.C.*, 456 F.3d at 802 ("[E]ven in victory it would be 'no closer' to erecting its billboards or obtaining damages than when litigation began."). They would simply be subject to regulation under a different and concededly valid provision of the code. *See id.*

Appellate Case: 25-3225 Document: 11 Date Filed: 12/23/2025 Page: 65


That is not the case here. Howard and Cozy Inn's challenge includes the sign code's size restrictions, which is the same portion of the sign code that Salina says is a separate and unchallenged provision precluding the plaintiffs from completing their display. *See* Doc. 107 at 19. As a result, unlike the cases Salina cited, there is no scenario under the summary judgment record in which the sign code's size restrictions could be enforced against the plaintiffs' display without referencing the way Salina interprets and applies its definition of sign. *See Bishop v. Smith*, 760 F.3d 1070, 1077–78 (10th Cir. 2014) (holding that a statute the plaintiff did not challenge could not defeat redressability where there was no scenario in which the statute could be enforced if the challenged state constitutional amendment were found unconstitutional).

That the plaintiffs have standing to challenge specific provisions of the sign code does not mean they have standing to challenge the entirety of the code. Howard and Cozy Inn are challenging "the written sign code, the unwritten policies and practices, the permit requirement, the size restrictions, and the concomitant enforcement penalties." Doc. 106 at 6 n.2. The record, however, does not support such a broad challenge to Salina's sign regulations. *See Essence, Inc. v. City of Fed. Heights*, 285 F.3d 1272, 1281–82 (10th Cir. 2002) (holding that a plaintiff lacked standing to challenge portions of an ordinance where there were no facts suggesting that portion would be applied to the plaintiff). As a result, the plaintiffs' claims are construed as to only challenge the parts of the sign code that Salina enforced or expressed an intent to enforce against them: the distinction between regulated signs and unregulated murals, the size restrictions applicable to signs, and the permit requirement. Doc. 109 at ¶ 3; Doc. 105 at ¶ 32.

**C**

Howard and Cozy Inn's primary argument is that Salina's sign code violates the First Amendment's Free Speech Clause. Doc. 105 at 26–39. That clause prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. Outdoor displays, including signs, "are a form of expression protected by the Free Speech Clause." *City of Ladue v. Gilleo*, 512 U.S. 43, 48–49 (1994). Yet municipalities "have regulated outdoor advertisements for well over a century." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 65 (2022). Municipalities both enact sign regulations that carry penalties for non-compliance, and they often require individuals or entities to obtain a permit before they may display certain types of signs. *See id.* at 64–66. These types of regulation

make sense: "Unlike oral speech, signs take up space and may obstruct views, distract motorists . . . and pose other problems that legitimately call for regulation." *City of Ladue*, 512 U.S. at 48. The need for regulation, however, does not authorize local governments "to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Nor does it allow local governments to create permit-approval schemes giving unbridled discretion to government officials regarding which messages may be displayed, when and how a permit decision may be reviewed, and how long government officials may take to issue a decision regarding a permit application. *Dr. John's*, 465 F.3d at 1161; *Utah Animal Rights Coal.*, 371 F.3d at 1258.

These principles set the stage for the plaintiffs' free-speech arguments. They bring two types of First Amendment claims. Doc. 101 at ¶ 4.a.i. In one, they assert that Salina engages in content discrimination by applying its sign code to speech based on the topic or subject matter of the speech in a way that cannot survive strict scrutiny. *Id.* The other claim asserts that Salina's permit requirement is an impermissible prior restraint on the plaintiffs' speech. *Id.*

The plaintiffs' First Amendment claims are facial and as-applied challenges. Doc. 101 at ¶ 4.a.i. A successful facial challenge requires a plaintiff to "establish that no set of circumstances exists under which the ordinance would be valid," "that the ordinance lacks any plainly legitimate sweep," "or that it is overbroad because a substantial number of its applications are unconstitutional, judged in relation to its plainly legitimate sweep." *Harmon v. City of Norman*, 61 F.4th 779, 795 (10th Cir. 2023) (alterations omitted). In contrast, "an as-applied challenge tests the application of that restriction to the facts of a plaintiff's concrete case." *iMatter Utah v. Njord*, 774 F.3d 1258, 1264 (10th Cir. 2014) (quoting *Colo. Right to Life Comm. v. Coffman*, 498 F.3d 1137, 1146 (10th Cir. 2007)). But "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1124 (10th Cir. 2012) (quoting *Citizens United v. FEC*, 558 U.S. 310 (2010)). The label a plaintiff places on his or her challenge does not control which standard must be satisfied, rather the distinction "goes to the breadth of the remedy employed." *Id.*

**1**

First, Howard and Cozy Inn contend that Salina imposes an impermissible content-based restriction on expression—both on its face and as applied to their display. Doc. 101 at ¶ 4.a.i. The crux of the plaintiffs' argument is Salina's alleged distinction between murals and signs based on the notion that a display is a sign if it pertains to a good or service sold on the same premises.

That distinction—between a mural and a sign—is facially unconstitutional, according to the plaintiffs, because it turns on the subject matter of the display. Doc. 105 at 26–30. And they state that Salina unconstitutionally applied the distinction to their display because Salina has seemingly allowed other businesses to erect displays pertaining to the goods or services they sell—such as a baseball training facility's mural reflecting baseball games and a music store's mural promoting music—without requiring those displays to meet the regulations set forth in the city's sign code by claiming they were murals. Doc. 105 at 28–30; *see Wells v. City and County of Denver*, 257 F.3d 1132, 1151 (10th Cir. 2001) (noting that an as-applied content-discrimination challenge may consider evidence regarding whether the policy is or has been "enforced in a uniform, non-discriminatory manner, without regard to content or viewpoint"); *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984) ("To create an exception for appellees' political speech and not these other types of speech might create a risk of engaging in constitutionally forbidden content discrimination.").

The plaintiffs' claim can be taken in two steps. The first requires categorizing the type of regulation that the plaintiffs challenge. Based on that categorization, the second step is evaluating whether Salina's regulations survive the applicable level of scrutiny.

**a**

There are three potential categories of speech regulation that could describe Salina's mural-sign distinction. Those are content-neutral regulations, content-based regulations, and one unique type of content-based regulations—ones that distinguish only between commercial and non-commercial speech. The constitutional framework differs depending on which type of regulation is at issue.

For example, Salina argues that the framework governing content-neutral regulations applies. Doc. 107 at 20. A regulation is content neutral and subject to intermediate scrutiny if it "does not draw content-based distinctions on its face" and "is 'justified without reference to the content of the regulated speech.'" *Evans v. Sandy City*, 944 F.3d 847, 854 (10th Cir. 2019) (quoting *McCullen v. Coakley*, 573 U.S. 464, 479 (2014), and then quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The plaintiffs, however, argue that the framework governing content-based regulations applies. Doc. 105 at 26. Content-based regulations—regulations that apply "because of the topic discussed or the idea or message expressed"—are presumptively unconstitutional and must survive strict scrutiny to be lawful. *Reed*, 576 U.S. at 163; *Street-MediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1249 (10th Cir. 2023). And both parties make alternative arguments under the commercial-speech framework. Doc. 105 at 30–35; Doc. 107 at 35–38. Regulations that impose more stringent restrictions on commercial speech than they do on non-commercial speech are content-based regulations, but they are subject to "a form of intermediate standard of review" instead of strict scrutiny. *Aptive Env't*, 959 F.3d at 987 (internal quotation marks omitted); *Mainstream Mktg. Servs., Inc. v. F.T.C.*, 358 F.3d 1228, 1236–37 (10th Cir. 2004).

The parties vigorously dispute which category encompasses the challenged sign regulations. But it is not necessary to determine whether Salina's regulations are content based or content neutral. That is because Salina's regulations fail even accepting that intermediate scrutiny applies because the regulations are content-neutral

regulations.[5] *See McCraw v. City of Okla. City*, 973 F.3d 1057, 1070–71 (10th Cir. 2020) (taking this approach).

**b**

Salina's mural-sign distinction does not survive intermediate scrutiny. The intermediate-scrutiny standard turns on whether a restriction on speech "is narrowly tailored to achieving significant government

---

[5] Legal and factual uncertainty support this approach. For one, the facts of this case fall between two Supreme Court cases that reached opposite conclusions. *Compare Reed v. Town of Gilbert*, 576 U.S. 155, 164–65 (2015) (finding that a sign regulation was content based because it regulated signs differently based on their subject matter by imposing heightened restrictions on signs that directed individuals to events while treating signs that communicated other messages more favorably), *with City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71–72 (2022) (noting that a sign regulation that only regulated off-premises billboards was content neutral because it was "based solely on whether it is located on the same premises as the thing being discussed or not"); *see also StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1250 (10th Cir. 2023) (grappling with the "arguable tension" between *Reed* and *City of Austin* before finding that an ordinance regulating billboards based on whether they were paid for was content neutral under *City of Austin*). Adding to this uncertainty, the Tenth Circuit has not indicated in what situations evidence of arbitrary or discriminatory enforcement suggests a content-based regulation. *Wells v. City and County of Denver*, 257 F.3d 1132, 1156 (Briscoe, J., dissenting) (identifying evidence that the city arbitrarily enforced an exception to its speech restrictions but noting that the majority did not find the evidence presented sufficient to consider the city's policy one that regulated based on content).

For another, the parties agree only that Salina regulated the plaintiffs' display because it pertains to the food products Cozy Inn sells. Doc. 105 at ¶ 100. They dispute whether the policy is rooted in the text of Salina's sign code, whether Salina has consistently applied the policy, and whether the other language in the sign code defining signs as displays that "announce" or "direct attention to" are independent reasons Salina relied on to regulate the plaintiffs' display. *See* Doc. 108 at 7–8, ¶ 26. Although there are clear reasons to believe that Salina's alleged distinction between a mural and a sign lacks a textual basis, that its application of this alleged distinction has been inconsistently applied, and that the proffered concern about commercial direction was not the motivating factor for the action, those conclusions need not be reached to resolve this case. The reason is because, even assuming that it imposed a content-neutral restriction on the plaintiffs' display, Salina's regulation cannot survive intermediate scrutiny.

interests, and that [it] leaves open ample alternative channels of communication." *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021); *StreetMediaGroup*, 79 F.4th at 1252. In this context, "narrow tailoring requires that the chosen means do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *StreetMediaGroup*, 79 F.4th at 1252 (quoting *Ward*, 491 U.S. at 799. The government carries the burden to show that its regulation is narrowly tailored to serve significant interests. *Doe*, 667 F.3d at 1133; *VoteAmerica v. Schwab*, 121 F.4th 822, 852 (10th Cir. 2024) ("The government has the burden of persuasion in this inquiry.").

Salina proffers four governmental interests for its sign regulations. They include aesthetics, traffic and pedestrian safety, and property values. Doc. 107 at 27. According to Salina, its sign regulations are narrowly tailored to those four interests because the regulations serve to limit the size, number, height, and location of signs. *Id.* at 28. Assuming without deciding that Salina has set forth substantial interests, Salina has not met its burden to demonstrate that its distinction between signs and murals is narrowly tailored to promoting the city's aesthetics, safety, or property values. *See StreetMediaGroup*, 79 F.4th at 1252 (describing this requirement); *Reed*, 576 U.S. at 171 (assuming interests were compelling because they were not properly tailored under the applicable standard).

**i**

As an initial matter, the parties dispute what evidence would suffice for a governmental entity like Salina to meet its burden to show that a sign regulation is narrowly tailored to the interests of aesthetics, property values, and traffic or pedestrian safety. *Compare* Doc. 107 at 29–30, *with* Doc. 108 at 28–35. Specifically, they disagree as to whether the government must present evidence to show that a government restriction of displays on private property is narrowly tailored to its aesthetic and safety interests, or whether *any* restriction of such displays is narrowly tailored as a matter of law. *Id.* The Tenth Circuit's most recent articulation of the intermediate-scrutiny standard in the context of a speech regulation restricting displays on private property states: "In this context, narrow tailoring requires that the chosen means do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *StreetMediaGroup*, 79 F.4th at 1252 (quoting *Ward* , 491 U.S. at 799). This standard, regardless of what type of speech restriction is at issue, requires the government to show that

its "recited harms are real" or that its regulations "will in fact alleviate these harms in a direct and material way." *McCraw*, 973 F.3d at 1071.

To determine whether a municipality has produced sufficient evidence to meet this burden, it is necessary to "evaluate that evidence 'in light of the cases where those categories of evidence have previously been invoked.'" *McCraw*, 973 F.3d at 1073 (quoting *Aptive Envt'l*, 959 F.3d at 989). In cases involving speech restrictions on private property, evidence like expert testimony, research studies, and the experiences of other cities may suffice so long as the evidence that "the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51 (1986) (relying on testimony, research, and cases analyzing other cities' experiences to hold that the city's restriction on adult theaters was narrowly tailored to its interest in safety); *see also Abilene Retail No. 30, Inc. v. Bd. of Comm'rs of Dickinson Cnty., Kan.*, 492 F.3d 1164, 1167 (10th Cir. 2007) (requiring the county to justify that it reasonably relied on studies analyzing similar problems in surrounding communities to support its zoning ordinance). This standard does not set "a high bar," but it still requires municipalities to produce evidence that "fairly support[s] the municipality's rationale for its ordinance." *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–39 (2002).

Relying on *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), Salina promotes a different standard. Doc. 107 at 29–30. In that case, the Supreme Court applied the commercial-speech test to uphold an ordinance that allowed businesses to erect on-site billboard advertisements but prohibited off-site billboard advertisements. *Metromedia*, 453 U.S. at 500–12. The Supreme Court did not require the city to present evidence showing that off-site advertising was peculiarly dangerous or aesthetically harmful as compared to on-site advertising because the city's judgment to value "one kind of commercial speech—onsite advertising—more than another kind of commercial speech—offsite advertising" reflected a reasonable judgment "by the city that the former interest, but not the latter, is stronger than the city's interests in traffic safety and esthetics." *Id.* at 512. The Tenth Circuit has clarified that the situation in *Metromedia* is a narrow one applicable to commercial-speech cases "where [a court] can defer to the legislature on the basis of precedent which already has established that the legislature's chosen means directly advances the asserted ends." *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1550 (10th Cir. 1991).

Salina has not shown that the narrow situation presented in *Metromedia* applies here. For one, Salina expressly rejects the notion that this case involves a regulation on commercial speech. Doc. 107 at 35. For another, Salina has not identified an "established line of cases" to support its judgment that displays pertaining to the goods or services sold on the same premises as the display are more detrimental to the city's interests than displays depicting something else. *See Adolph Coors Co.*, 944 F.2d at 1550. As a result, Salina must present evidence showing that its regulations do not "burden substantially more speech than is necessary to further [its] legitimate interests." *Evans*, 944 F.3d at 858.

**ii**

In its attempt to show a connection between the regulation and its interests, Salina points to three categories of evidence. Doc. 107 at 30–31. This evidence includes the testimony from city officials, industry-specific publications, and expert testimony. *Id.*; *see Brewer*, 18 F.4th at 1225–26 (noting that a city must present specific evidence that a challenged regulation is narrowly tailored to achieve the interests it asserts).

This evidence actually undermines Salina's position. For example, Salina relies on City Planner Dustin Herr's deposition testimony where he states that the sign regulations are designed to reduce sign clutter and distraction by limiting the size, number, height, and location of signs throughout the city. Doc. 107-6 at 10. Herr did not, however, address or explain why displays that (allegedly) do not pertain to the services or goods a business sells—for example, a commercial baseball training facility promoting engagement in baseball, or a music store promoting the engagement in playing music—would have any different impact on those interests than signs like Cozy's hamburger scheme might. *See McCraw*, 973 F.3d at 1075 (finding a restriction unlawful where there was no evidence that the city considered the correlation between the restriction it imposed and the problems it identified). Instead, his explanation is entirely circular; it depends on his characterization of whether the sign is deemed a mural, which is not regulated, or a sign, which is regulated and must obtain approval.

So, too, with the publications Salina cites. One publication, for example, suggests the general notion that regulating signs promotes safety and community aesthetics. Doc. 107-2 at 7. But again, that information provides no explanation or insight into how Salina differentiates between murals and signs. *See StreetMediaGroup*, 79 F.4th at 1252 (affirming dismissal because the plaintiff's complaint did not

sufficiently state a claim but stating it was "skeptical that paid-for signs are more distracting and damaging to aesthetics" under intermediate scrutiny).

The final category of evidence that Salina cites is expert testimony. Unlike the other two categories of evidence, which indicate *no* connection between Salina's interests and its mural-sign distinction, Salina's expert, Mark White, recognizes the needed connection. In particular, White states that the sign code "stops where it needs to, by not sweeping decorative building elements such as murals that display public art into the same regulatory system that applies to signs." Doc. 97-3 at 2. Relying on various studies, White opines that public art may actually improve traffic, aesthetics, and public health—unlike signs, which cause harm in those areas. *Id.* at 7–12. But in reaching this opinion, White's opinion not only accepts Salina's circular definition of art as true but depends on it for support. In other words, White's opinions rely on the assumption that the definition of public art, in all of the studies he relies on, is based on *where* a given display is located. But White's report is devoid of any explanation or opinion indicating how or why a display that references a business's product is any more harmful to safety, aesthetics, or health than a display that references anything else. *See Brewer*, 18 F.4th at 1229 (finding expert testimony insufficient to satisfy the narrow tailoring requirement when the expert's opinions lent "minimal support to the notion that the Ordinance does not burden substantially more speech than necessary, or that it alleviates non-speculative harms in a direct and material way"). Nor does he explain, for example, why a baseball training facility's baseball mural or a music store's mural depicting musical notes avoids such harms. This is insufficient to justify Salina's restrictions on the plaintiffs' speech. *See Edenfield v. Fane*, 507 U.S. 761, 771 (1993) (finding that a local government's ban on commercial solicitation was not narrowly tailored to the government's interest because the only evidence to support it was an affidavit containing "nothing more than a series of conclusory statements").

Other cases that have explored municipal regulations similar to the one Salina imposed have reached a similar result. In *Young v. Town of Conway*,783 F. Supp. 3d 588 (D.N.H. 2025), for example, the court found that a town's regulation against displays that feature the goods or services sold on the same premises as the display was not sufficiently connected between the town's interests and its enforcement against a bakery because there was no evidence that "a sign depicting baked

goods would have a different effect on safety than a sign depicting mountains (or anything else)." *Young*, 783 F. Supp. 3d at 608. That rule makes sense. It would seem illogical to argue that a hamburger-based display on a building housing a hamburger restaurant implicates interests requiring prohibition whereas that same display across the street on a building housing another business, perhaps a pizza restaurant, implicates none of those concerns.

* * *

This result does not undermine the authority that cities have to implement solutions to the problems that it encounters. As the Supreme Court has long recognized, the "First Amendment does not require a city, before enacting . . . an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities." *City of Renton*, 475 U.S. at 51. Nor does Salina need to wait for actual safety or aesthetic problems to occur before it can justify its regulations. *See Brewer*, 18 F.4th at 1243; *Evans*, 944 F.3d at 858. But the First Amendment requires that a municipality like Salina justify its solution to a given problem with some evidence that its regulations are connected to the interests they purport to serve. *See Brewer*, 18 F.4th at 1227 (finding a city ordinance unconstitutional because there was "little evidence of non-speculative harms or interests that the Ordinance's restrictions alleviate in a direct and material way"). As explained above, the uncontested facts demonstrate that Salina has presented no evidence connecting its solution—distinguishing between signs that pertain to the goods and services sold on-site and murals that do not—to its stated interests. As a result, the plaintiffs' motion for summary judgment on their First Amendment content-discrimination claim is granted, and Salina's motion is denied.

**2**

Second, Howard and Cozy Inn assert that Salina's permit requirement for a sign is a prior restraint that the First Amendment prohibits. Doc. 105 at 37. A prior restraint on speech, which occurs when the government must approve speech before it occurs, bears "a heavy presumption against its constitutional validity." *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1250 (10th Cir. 2000). To be constitutionally valid, prior restraints must encompass certain safeguards. *Essence*, 285 F.3d at 1289–90. In particular, prior restraints, such as permit requirements, cannot give "the decisionmaker unlimited time to decide on matters affecting the license; otherwise, there is the 'risk of indefinitely

suppressing speech.'" *Id.* (citation omitted). Howard and Cozy Inn contend that Salina violated these principles when it placed their permit application on an indefinite hold without formally approving or denying it.[6] *Id.*

Prior restraints must provide a clearly specified and brief time period in which speech may be restricted while government officials process a permit application. *Am. Target*, 199 F.3d at 1253. Salina's permit requirement allows the zoning administrator ten days to issue or refuse a permit "or within such further period as may be agreed to by the applicant." Salina Code § 42-502(b). On its face, this ten-day period satisfies the First Amendment. *See Am. Target*, 199 F.3d at 1253–54 (holding that a ten-day period restricting speech during administrative processing of a permit was constitutional). As applied to the plaintiffs, however, the result is different. *See City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 784 (2004) (reiterating that a facially valid prior restraint that provided a sufficient system of review could be challenged in the future by litigants who were denied licenses to "raise special problems of undue delay in individual cases as the ordinance is applied").

The uncontested facts establish that instead of making a formal determination, Salina set Howard's permit application aside indefinitely. Doc. 105 at ¶ 113. This exact situation, where city officials disregard a facially constitutional timeframe regarding one particular permit application, has not been addressed by binding authority. As a result, it is necessary to turn to the Supreme Court's and the Tenth Circuit's reasoning for striking down ordinances that lacked a prior-restraint deadline even on their face.

---

[6] Howard and Cozy Inn also assert that Salina's permit requirement is an unconstitutional prior restraint because it vests unbridled discretion in the government officials charged with the responsibility of granting or denying the permit. Doc. 105 at 37. That argument focuses on Salina's distinction between regulated signs and unregulated murals. In light of the conclusion that such a distinction is unconstitutional because it fails to survive intermediate scrutiny, *see supra* Section II.C.1, it is not necessary to address the plaintiffs' argument that the same distinction is an unconstitutional prior restraint. *See Am. Target*, 199 F.3d at 1250 n.2 (declining to consider a prior restraint claim that fell outside of the ordinary context of a licensing or zoning scheme after finding that the challenged provision was an unconstitutional burden upon free speech on other grounds).

The Supreme Court has repeatedly struck down ordinances as impermissible prior restraints because the ordinance failed to "place limits on the time within which the decisionmaker must issue the license." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 226 (1990) (collecting cases). In particular, it reasons that a "scheme that fails to set reasonable time limits on the decisionmaker creates the risk of indefinitely suppressing permissible speech." *Id.; accord Dr. John's*, 465 F.3d at 1163–64 ("[T]he concern evidenced by prior restraint cases is that a party will have to refrain from speaking while it waits for a decision from the licensing authority."). The problem that those prior-restraint cases identify is that "each day of delay in acting on the application was a day in which the speaker was forced to be silent." *Utah Animal Rights Coal.*, 371 F.3d at 1259.

A permitting scheme without a deadline is not always unlawful. The Tenth Circuit has upheld permitting or licensing requirements that did not include a timing safeguard, but it did so because those schemes did not suppress or restrict the applicants' speech while they waited for the government's decision. For example, in *Utah Animal Rights Coalition*, the Tenth Circuit upheld a local government's delay in deciding a permit application because the application covered expression that was set to occur at a future event would not occur until after a decision was issued. *Id.* at 1259; *see also Dr. John's*, 465 F.3d at 1163 (similarly distinguishing a licensing scheme in which a business needed not wait to operate while waiting for a permit application to be decided).

Salina's actions are unconstitutional prior restraints because they forbade additional expressions while awaiting government approval. By putting Howard's application on hold, Salina has indefinitely suppressed his and Cozy Inn's expression. That deep freeze is the exact situation that the prior-restraint doctrine forbids. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 771–72 (1988) (explaining that a policy lacking a time frame for review violates the First Amendment by allowing for indefinite delay of a permit application). Despite the ordinance's ten-day requirement, Howard's permit application has been on hold since November 2023. Doc. 105 at ¶¶ 106, 113. Allowing such indefinite holds—especially when the city's ordinance requires a timely decision—would mean that nothing in the ordinance's application would prevent city officials "from encouraging some views and discouraging others," *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 133 (1992), which is exactly what the plaintiffs argue has happened here.

Salina's sole argument to the contrary—that Howard agreed to the open-ended delay—has already been rejected as factually unsupported. As explained above, the record evidence contradicts Salina's assertion that Howard consented to Salina placing his permit application on hold. *See infra* Section II.A. One deposition is particularly illustrative. Salina's Planning and Zoning Administrator, Dean Andrew, repeatedly stressed in his deposition that Howard agreed to the hold. Doc. 107-5 at 16–17. He was asked how he know that Howard agreed, and each time he emphasized that city officials *informed* Howard that they were placing his application on hold. For example, in one of his responses, he stated: "Mr. Howard was informed on Monday the 6th that we were unable to issue a sign permit, and he was informed that we were going to continue to work with him on coming up with a code-compliant solution that might allow the sign to ultimately be installed." *Id.* at 16. Another time, Andrew was explicitly asked how he defined Howard's consent to the hold. He responded: "Mr. Herrs talked to Mr. Howard face-to-face, handed him information face-to-face and told him face-to-face that we are unable to issue a sign permit for the sign as currently proposed under the current sign code." *Id.* at 17. Salina has not provided any evidence that would lead a reasonable juror to conclude that Howard had any agency in Salina's determination, much less that he voluntarily agreed to an indefinite hold of his permit application. As a result, Salina has not introduced evidence sufficient to rebut the plaintiffs' showing that Salina applied an unconstitutional prior restraint to their expression. And because Salina has not presented evidence that would create a genuine fact issue, the plaintiffs' motion for summary judgment on their prior restraint claim is granted, and Salina's motion on this claim is denied.

### D

Howard and Cozy Inn's final claim is that Salina's sign policies are unconstitutionally vague in violation of the Fourteenth Amendment. Doc. 105 at 39–40. A policy is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1233 (10th Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The regulations at issue are not so vague as to offend the Fourteenth Amendment.

The plaintiffs urge that the sign code fails to define key terms, thereby encouraging arbitrary enforcement. Doc. 105 at 40. They point

to five phrases or terms: "mural," "art," "pertains to," "commercial speech," and "advertise." *Id.* Of those five terms or phrases, only one actually appears in Salina's sign code. Four of them are not alleged to be in the pertinent policy language—"mural," "art," "pertains to," and "commercial speech." They are merely phrases that Salina officials have used to describe or explain the city's sign regulations. *See, e.g.*, Doc. 105-5 at 29 (distinguishing "art and murals" from "sign[s]" at a Salina City Commission Meeting); Doc. 105-24 at 8 (noting in Salina's interrogatory answers that "the term 'art' may be used from time to time as an imprecise short-hand for 'not sign'"); Doc. 105-12 at 11 (discussing Salina City Manager's comment to a reporter stating that a sign "pertains to" the goods or services for sale); Doc. 105-5 at 6 (stating at a City Commission Meeting that the "important distinction here relates to commercial speech"). That language outside the four corners of the policy—while perhaps indicative of the First Amendment concerns involving arbitrary enforcement—cannot be considered in a vagueness inquiry. *StreetMediaGroup*, 79 F.4th at 1254 (explaining that inconsistent or isolated statements by city officials are not part of the vagueness inquiry).

The word "advertise," however, does appear in the text of the code. But that term is not vague; it can be understood by a person of ordinary intelligence. S*treetMediaGroup*, 79 F.4th at 1254 (finding that the term "advertising devices" is not impermissibly vague); *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 602–03 (W.D. Tex. 2025) (collecting cases holding that the word "advertise" is commonly understood and not impermissibly vague). And even though it is not defined in the sign code, advertise may be readily defined in a way that provides city officials with sufficient standards to enforce its requirement. *Advertise*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/advertise (last visited Nov. 18, 2025) (defining advertise as "to make the public aware of (something or someone) especially by means of a published or broadcast notice"); *See McCraw*, 973 F.3d at 1081–82 (using dictionary definitions to illustrate that an ordinance was not impermissibly vague because its definition is commonly understood).

The plaintiffs attempt to make a vagueness challenge based on the alleged arbitrary enforcement that has occurred. Doc. 105 at 40. That is insufficient. Just because arbitrary or discriminatory enforcement may have occurred does not mean that the sign code was so vague as to encourage that enforcement. S*treetMediaGroup*, 79 F.4th at 1254. Nor

is it relevant that Salina appears to enforce its sign code against fewer displays than what its plain text could or should cover. *Id.* The proper vehicle for such arguments is a selective enforcement challenge, not a vagueness one. *Id.* The plaintiffs did not make a selective enforcement argument. Again, no factual disputes need resolution to find that the plaintiffs' vagueness claim fails. As a result, Salina's summary judgment motion on the plaintiffs' Fourteenth Amendment claim is granted, and the plaintiffs' motion is denied.

**E**

Because Howard and Cozy Inn succeeded on their First Amendment claims, it is necessary to determine whether they are entitled to relief. They ask for declaratory relief finding Salina's sign regulations unconstitutional, and they seek to enjoin Salina and its officials from enforcing the challenged regulations. Doc. 101 at ¶¶ 5.b–5.c. The plaintiffs have justified only their request for a declaratory judgment.

**1.** The Declaratory Judgment Act authorizes federal courts to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). The Act "is remedial and does not itself confer jurisdiction on federal courts." *Rector v. City and County of Denver*, 348 F.3d 935, 946 (10th Cir. 2003) (citing *Wyoming v. United States*, 279 F.3d 1214, 1225 (10th Cir. 2002)). But where the party seeking declaratory relief has satisfied the requirements for a federal court to exercise subject-matter jurisdiction over a case, district courts enjoy "unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136–37 (2007) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)).

The plaintiffs have justified their request for declaratory relief. They demonstrated that Salina imposes an unconstitutional distinction between murals and signs. Because the definition of sign is unlawful, Salina cannot make any determination as to whether a display is a mural or sign without violating the First Amendment. *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615–16 (2021) (explaining that the application of an unconstitutional distinction is itself a First Amendment injury). As a result, a declaratory judgment that Salina's mural-sign distinction is unconstitutional on its face is appropriate. The plaintiffs have also supported their request for a declaratory judgment finding that Salina imposed an unconstitutional prior restraint as applied to their speech. By applying that restraint, Salina has subjected the plaintiffs to a constitutional harm since it put Howard's permit application

on indefinite hold. Declaratory relief to address that harm is warranted. *See Lippoldt v. Cole*, 468 F.3d 1204, 1217 (10th Cir. 2006) (noting that district courts may grant declaratory relief for past constitutional violations "which will in turn affect the parties' current rights or future behavior").

**2.** The same cannot be said about Howard and Cozy Inn's request for a permanent injunction. The plaintiffs request broad relief, which they describe as follows:

> b. A prospective permanent injunction enjoining the City, its officers, agents, employees, attorneys, servants, assigns, and all those in active concert or participation who receive, through personal service or otherwise, actual notice of this Court's order, from enforcing or directing the enforcement of the City's mural-sign code regime on its face and as applied to Plaintiffs . . . .
>
> * * *
>
> c. A permanent injunction prohibiting Defendant from taking any enforcement or other action against Plaintiffs for displaying their mural in its current position on The Cozy Inn, or for completing the mural on The Cozy Inn.

Doc. 101 at ¶¶ 5.b–5.c.

Success on the merits is not enough to support a request for injunctive relief. A plaintiff must also show "irreparable harm unless the injunction is issued," that "the threatened injury outweighs the harm that the injunction may cause the opposing party," and that "the injunction, if issued, will not adversely affect the public interest." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007) (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003)). Permanent injunctions "must be narrowly tailored to remedy the harm shown." *Garrison v. Baker Hughes Oilfield Ops., Inc.*, 287 F.3d 955, 961–62 (10th Cir. 2002). Additionally, the Tenth Circuit has cautioned that federal courts "must be cautious about issuing an injunction against a municipality." *Signature Props. Int'l Ltd. P'ship v. City of Edmond*, 310 F.3d 1258, 1269 (10th Cir. 2002). That is because "when a party seeks injunctive relief in federal court against a state or local government or governmental entity, concerns of federalism counsel

respect for the 'integrity and function' of those bodies." *Id.* (citations omitted). And where a plaintiff requests both declaratory and injunctive relief regarding an unconstitutional ordinance, declaratory relief is generally sufficient where there is "no proof that [the defendant] would not . . . acquiesce in the decision . . . holding the challenged ordinance unconstitutional." *Poe v. Gerstein*, 417 U.S. 281, 281 (1974) (quoting *Douglas v. City of Jeannette*, 319 U.S. 157, 165 (1943)); *accord WildEarth Guardians v. Conner*, 920 F.3d 1245, 1261 (10th Cir. 2019).

Howard and Cozy Inn have not provided any argument or pointed to any evidence suggesting why a permanent injunction is necessary to ensure that Salina complies with the declaratory judgments issued against it. Accordingly, the plaintiffs' request for a permanent injunction is denied. *See Millard v. Camper*, 971 F.3d 1174, 1180 n.8 (10th Cir. 2020) (affirming the district court's grant of declaratory judgment but denial of permanent injunctive relief because the plaintiffs did not submit any evidence "to establish the requisite factors other than success on the merits").

**III**

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment, Doc. 104, and Salina's Motion for Summary Judgment, Doc. 106, are GRANTED in part and DENIED in part, and both Motions to Exclude Expert Testimony, Docs. 97 & 98, are DENIED.

It is so ordered.

Date: November 19, 2025

s/ Toby Crouse
Toby Crouse
United States District Judge

Appellate Case: 25-3225 Document: 11-7 Date Filed: 03/23/2026 Page: 84


**In the United States District Court**
**for the District of Kansas**

---

Case No. 24-cv-01027-TC

---

COZY INN, INCORPORATED, D/B/A
THE COZY INN,
STEPHEN HOWARD,

*Plaintiffs*

v.

CITY OF SALINA, KANSAS,

*Defendant*

---

**JUDGMENT IN A CIVIL CASE**

☐ Jury Verdict. This action came before the Court for a jury trial. The issues have been tried and the jury has rendered its verdict.

☒ Decision by the Court. This action came before the Court. The issues have been considered and a decision has been rendered.

**Pursuant to the Court's Memorandum and Order filed on November 19, 2025, Doc. 136, and modified by a telephone conference held on January 6, 2026, the Court finds in favor of plaintiffs Cozy Inn, Inc., d/b/a, The Cozy Inn and Stephen Howard on Claims 1 and 2 and in favor of Defendant City of Salina, Kansas on Claim 3.**

Date: January 7, 2026

SKYLER B. O'HARA
CLERK OF THE DISTRICT COURT

By: s/ Traci Anderson
Deputy Clerk