No. 25-3225

# In the United States Court of Appeals for the Tenth Circuit

COZY INN, INCORPORATED, ET AL., Plaintiffs-Appellees,

*v.*

CITY OF SALINA, KANSAS, Defendant-Appellant.

On Appeal from the United States District Court
for the District of Kansas, Case No. 6:24-cv-01027-TC
(Hon. Toby Crouse)

## BRIEF OF THE INSTITUTE FOR JUSTICE AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

Robert Frommer
Elizabeth (Betsy) Sanz
INSTITUTE FOR JUSTICE
 901 N. Glebe Road, Suite 900
 Arlington, VA 22203
 (703) 682-9320
 rfrommer@ij.org
 bsanz@ij.org

Riley Grace Borden
INSTITUTE FOR JUSTICE
 600 University St., Suite 2710
 Seattle, WA 98101
 (206) 957-1300
 rgborden@ij.org

*Counsel for Amicus Curiae Institute for Justice*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

STATEMENT OF *AMICUS CURIAE* ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................1

ARGUMENT ....................................................................................3

I.    *Reed* remains the lodestar in First Amendment content-based speech analysis.............................................................3

    A.    *Reed* synthesized inconsistent lines of First Amendment jurisprudence that flummoxed courts for decades. ......................................................................4

    B.    *Austin* is a narrow carveout from *Reed* particular to one mode of communication: billboards................................9

    C.    This Court has applied, and should continue to apply, *Austin* narrowly: as a limited clarification of *Reed* with respect to billboards. ..........................................15

II.   The government must always justify its restrictions on speech with evidence, and the district court correctly found Salina's evidence lacking. ..........................................18

    A.    The government must always justify its restrictions on speech with evidence..........................................19

    B.    The district court correctly found Salina's evidence lacking. ...............................................................22

CONCLUSION ...............................................................................30

-ii-

CERTIFICATE OF COMPLIANCE........................................................32

CERTIFICATE OF DIGITAL SUBMISSION ........................................33

CERTIFICATE OF SERVICE...............................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*303 Creative, LLC v. Elenis,*
  600 U.S. 570 (2023) ...................................................................22

*Adams Outdoor Advert. Ltd. P'ship v. City of Madison,*
  56 F.4th 1111 (7th Cir. 2023)......................................................10

*Adolph Coors Co. v. Brady,*
  944 F.2d 1543 (10th Cir. 1991) ..................................................29

*Ark. Writers' Project, Inc. v. Ragland,*
  481 U.S. 221 (1987) .....................................................................5

*Bartnicki v. Vopper,*
  532 U.S. 514 (2001) .....................................................................6

*Brewer v. City of Albuquerque,*
  18 F.4th 1205 (10th Cir. 2021)...............................................23, 27

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,*
  447 U.S. 557 (1980) ...................................................................19

*Cent. Radio Co. v. City of Norfolk,*
  811 F.3d 625 (4th Cir. 2016) ........................................................1

*City of Austin v. Reagan National Advertising of Austin, LLC,*
  596 U.S. 61 (2022) ............................................................. *passim*

*City of Cincinnati v. Discovery Network Inc.,*
  507 U.S. 410 (1993) ...............................................................24-25

*Combined Communications Corp. v. City of Bridgeton,*
  939 S.W.2d 460 (Mo. Ct. App. 1996) .........................................13

*Consol. Edison Co. of N.Y., Inc. v. Pub. Serv. Comm'n,*
   447 U.S. 530 (1980) ..............................................................................4-5

*Cozy Inn, Inc. v. City of Salina,*
   2025 WL 3223806 (D. Kan. Nov. 19, 2025)...................................18-19

*Davenport v. Washington Educ. Ass'n,*
   551 U.S. 177 (2007) ................................................................................17

*Edenfield v. Fane,*
   507 U.S. 761 (1993) ................................................................ 19, 21, 23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
   546 U.S. 418 (2006) ...............................................................................19

*H. C. Williams Co. v. Town of Southampton,*
   45 N.Y.2d 922, 383 N.E.2d 876 (1978)................................................14

*Hill v. Colorado,*
   530 U.S. 703 (2000) ..................................................................................7

*Hines v. Pardue,*
   117 F.4th 769 (5th Cir. 2024)...............................................................11

*Holder v. Humanitarian Law Project,*
   561 U.S. 1 (2010) ......................................................................................6

*Ind. Dep't of Transp. v. FMG Indianapolis, LLC,*
   167 N.E.3d 321 (Ind. Ct. App.),
   *aff'd on reh'g,* 171 N.E.3d 1070 (Ind. Ct. App. 2021) ........................13

*Junior Sports Mags. Inc. v. Bonta,*
   80 F.4th 1109 (9th Cir. 2023)...............................................................20

*Kersten v. City of Mandan,*
   389 F. Supp. 3d 640 (D.N.D. 2019) ........................................................1

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ........................................................................ 1, 24

*Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ............................................................. 14

*Metromedia, Inc. v. City of San Diego*,
   453 U.S. 490 (1981) ........................................................... *passim*

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977) ............................................................... 20

*Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*,
   99 F.4th 840 (6th Cir. 2024) .................................................. 10

*Packer Corp. v. Utah*,
   285 U.S. 105 (1932) ................................................................ 14

*Police Dep't of Chi. v. Mosley*,
   408 U.S. 92 (1972) ................................................................... 4

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ........................................................... *passim*

*Reno v. ACLU*,
   521 U.S. 844 (1997) ................................................................ 20

*Road Space Media, LLC v. City of Birmingham*,
   2023 WL 2617397 (N.D. Ala. Mar. 23, 2023) ...................................... 10

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................ 19

*StreetMediaGroup, LLC v. Stockinger*,
   79 F.4th 1243 (10th Cir. 2023) ............................................... *passim*

*Suffolk Outdoor Advert. Co. v. Hulse,*
  56 A.D.2d 365, 393 N.Y.S.2d 416,
  *modified*, 43 N.Y.2d 483, 373 N.E.2d 263 (1977)..................................14

*Suffolk Outdoor Advertising Co. v. Hulse,*
  439 U.S. 808 (1978) ...............................................................14

*Turner Broad. Sys., Inc. v. FCC,*
  512 U.S. 622 (1994) .........................................................8, 19

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ...............................................................20

*Upsolve, Inc. v. James,*
  155 F.4th 133 (2d Cir. 2025) ...............................................11

*Veterans Guardian VA Claim Consulting LLC v. Platkin,*
  133 F.4th 213 (3d Cir. 2025) ...............................................11

*Vidal v. Elster,*
  602 U.S. 286 (2024) ...............................................................17

*VoteAmerica v. Schwab,*
  121 F.4th 822 (10th Cir. 2024).........................................15-17

*Wag More Dogs, LLC v. Cozart,*
  680 F.3d 359 (4th Cir. 2012) ...........................................1, 7

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989).............................................................2, 5

*Young v. Town of Conway,*
  783 F. Supp. 3d 588 (D.N.H. 2025) .........................1, 3, 29-30

**STATUTES**

23 U.S.C. § 131 ....................................................................................12-13

Ky. Rev. Stat. §§ 177.830 *et seq.* ..........................................................13

Mo. Rev. Stat. §§ 226.500–.600 ...............................................................13

Tenn. Code Ann. §§ 54-21-101 *et seq.* ...................................................13

**OTHER AUTHORITIES**

Br. of Def.-Appellee,
  2024 WL 2747044 (May 24, 2024) .......................................................11

Colorado Outdoor Advertising Act of 1971 ............................................13

Enrique Armijo,
  *The Content-Discrimination Two-Step Post-*Reed *and* Austin,
  2022 Cato Sup. Ct. Rev. 141 ..............................................................15

Indiana "Billboard Act" of 1990 .............................................................13

Indiana Highway Advertising Control Act of 1967 ...............................13

## STATEMENT OF *AMICUS CURIAE*

The Institute for Justice is a nonprofit, public interest law firm dedicated to defending the essential foundations of a free society: freedom of speech, property rights, economic liberty, and educational choice. As part of its mission to defend the freedom of speech, the Institute has challenged laws across the country that regulate expression, including, recently, a government's content-based enforcement of its sign code to a mural in *Young v. Town of Conway,* 783 F. Supp. 3d 588 (D.N.H. 2025). *See also Cent. Radio Co. v. City of Norfolk,* 811 F.3d 625 (4th Cir. 2016); *Kersten v. City of Mandan*, 389 F. Supp. 3d 640 (D.N.D. 2019); *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012). The Institute has also submitted amicus briefs to the Supreme Court on the same First Amendment principles at issue in this case. *See, e.g.*, *McCullen v. Coakley*, 573 U.S. 464 (2014); *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Supreme Court's decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), established that when a law regulates speech differently based on the subject-matter of that speech (that is, its content), the

-1-

government needs to satisfy strict scrutiny, the highest burden available for speech restrictions. *Reed* was a long overdue clarification of First Amendment analysis that followed many years of confusion created by the Court's decision in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989), during which time some courts relied on government purpose alone to determine whether a speech restriction was subject to strict or intermediate scrutiny.

But seven years after *Reed*, the Court's decision in *City of Austin v. Reagan National Advertising of Austin, LLC*, 596 U.S. 61 (2022), again began to muddy the waters. There, the Supreme Court held that the City of Austin's sign ordinance, which distinguished between on-premises and off-premises signs, was content-neutral. Like *Ward* before it, *Austin* is sowing confusion in the lower courts. Yet the best reading of *Austin* is that it merely carves out a narrow exception to *Reed* for regulations that are akin to time, place, and manner rules that regulate a specific kind of sign: billboards. Any suggestion that *Austin* somehow re-empowers officials to pick and choose between messages conflicts with *Reed* and is incorrect.

Regardless of where the Court comes down on the content-based question, this is still a First Amendment claim. Under *all* the tiers of scrutiny that can apply in First Amendment cases, the government carries the burden of persuasion, which it must satisfy using real evidence. There is simply no line of precedent relevant to murals that blesses a deviation from this requirement. The District of New Hampshire endorsed that view in *Young v. Town of Conway*, 783 F. Supp. 3d 588 (D.N.H. 2025), where it invalidated a mural-sign distinction after Conway was unable to explain why the displays it regulated implicated its safety and aesthetic interests to any greater degree than the displays it exempted. The same is true here: the record evidence Salina presented failed to satisfy its burden, no matter whether strict scrutiny or any other lesser standard of scrutiny applies. The Court, therefore, should affirm.

## ARGUMENT

### I. *Reed* remains the lodestar in First Amendment content-based speech analysis.

Freedom of speech means not giving the government the power to pick and choose which messages can be displayed. Such restrictions typically have been judged under the most demanding standard. In Subsection A, amicus charts the Supreme Court's history of content-

based restrictions, how errant language in one case confused the issue, and how the Court's decision in *Reed v. Town of Gilbert* corrected course. In Subsection B, amicus explains how *City of Austin v. Reagan National Advertising of Austin, LLC*, created a narrow carveout from *Reed* for one form of communication: billboards. And in Subsection C, amicus explains how this case presents an opportunity for the Tenth Circuit to ensure that *Austin* does not sow further confusion. By following its already accurate reading of *Reed* and *Austin* in *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243 (10th Cir. 2023), this Court can harmonize the two cases in a way that strengthens First Amendment values.

### A.  *Reed* synthesized inconsistent lines of First Amendment jurisprudence that flummoxed courts for decades.

If you need to inspect the message that speech conveys to determine how to regulate that speech, you're regulating based on content. For years, the Supreme Court used this straightforward test to determine whether a regulation is content-based and thus subject to strict scrutiny. *See, e.g.*, *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95, 99 (1972) (holding law content-based because it required officials to scrutinize protest to determine if it involved a labor dispute); *Consol. Edison Co. of N.Y., Inc.*

-4-

*v. Pub. Serv. Comm'n*, 447 U.S. 530, 536–37 (1980) (holding that New York Public Service Commission's suppression of controversial bill inserts about general public matters was content-based and suppressed discussion of an entire topic); *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987) (holding that sales-tax exemption for certain categories of publications was content-based despite "no evidence of an improper censorial motive").

Then came *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). That case dealt with a New York rule that required the use of city-provided sound equipment and engineering services at concerts performed in a Central Park bandshell. *Id.* at 787. The Court determined that the rule simply limited the time, place, and manner of the speech and was content-neutral. *Id.* at 803. But in doing so the Court used language arising from the "secondary effects" doctrine—first developed to address regulations of adult-themed businesses—to explain that the "government's purpose [in enacting a speech regulation] is the controlling consideration." *Ward*, 491 U.S. at 791. The Court could have held that the regulation—which applied regardless of what was performed—was content-neutral under *Mosley*'s traditional inquiry. Instead, the Court

focused on legislative purpose. That errant language in *Ward* injected a second test for content-neutrality, one that turned on the government's motivations.

*Ward* effected a sea change in First Amendment jurisprudence. The Court had now modeled two tests: the Court's traditional test that asked, like in *Mosley*, "Is the speech restriction triggered by the message conveyed?"; and the Court's purpose-based test, which asked, like in *Ward*, "Did the government enact the law to squelch speech, or was it furthering some non-speech-related interest?" The years following *Ward* saw the Court sometimes applying one, sometimes applying the other, without explaining that *both* tests are ways to determine whether a law is content-based and therefore subject to strict scrutiny. *Compare Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (deeming law to be content-based because whether speech of plaintiffs was prohibited "depends on what they say"), *with Bartnicki v. Vopper*, 532 U.S. 514, 526 (2001) (holding law prohibiting intentional disclosure of intercepted communications to be content-neutral under *Ward* because its purpose was to protect "the privacy of wire, electronic, and oral communications" rather than to suppress speech).

As a result, some lower courts began to view *Ward*'s focus on legislative purpose not just as one way to determine if a law is content-based, but the *only* way. The result was large-scale inconsistency in the treatment of First Amendment rights. Some courts continued to apply the traditional test, some only *Ward*'s purpose-based; and where only that latter test was applied, courts declared speech restrictions that were facially discriminatory—treating one message differently than another—to be content-neutral. *See*, *e.g.*, *Hill v. Colorado*, 530 U.S. 703, 720 (2000) (finding that examining speech to determine if it was "protest, education, or counseling" did not make the statute content-based); *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 369 (4th Cir. 2012) (finding a facially discriminatory classification of speech in a sign code to be content-neutral because the government's professed purpose was maintaining traffic safety rather than suppressing speech).

The Court needed to clarify the standard, and in 2015 it did just that in *Reed*. 576 U.S. 155. There, a municipal sign code was written to treat different signs differently based on the content of the messages the signs conveyed. *Id*. at 159. In striking down the law, the Court clarified the test for determining whether a law is content- or speaker-based and

therefore subject to strict scrutiny under the First Amendment. First, the traditional test: a law is content-based if it distinguishes between topic, idea, or message. *Id.* at 163. That is, if the government is inspecting the message to determine whether it is subject to regulation, the law is content-based. Courts must engage in this analysis "*before* turning to the law's justification or purpose." *Id.* at 166. Then, if the law does not facially distinguish between messages, the purpose-based test: if the restriction "cannot be 'justified without reference to the content of the regulated speech,' or [if it was] adopted by the government 'because of disagreement with the message [the speech] conveys,'" it is nevertheless content-based. *Id.* at 164.[1]

The Supreme Court's two-part test in *Reed* is the baseline approach for determining whether a speech restriction is content-based or content-neutral and, therefore, by what standard the restriction should be reviewed. By looking at the government's actions separately from its

---

[1] *Reed* also explains that speaker-based laws—speech restrictions that apply to some speakers and not others—also trigger strict scrutiny. *Id.* at 170. Specifically, a law which "favor[s] some speakers over others" is subject to strict scrutiny "when the [lawmaker's] speaker preference reflects a content preference." *Id.* (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)).

motive, that two-part test protects First Amendment freedoms. As the next section shows, the Court's subsequent decision in *City of Austin v. Reagan National Advertising of Austin, LLC* is best viewed as a narrow exception to that general rule, not a call to return to the confusion that plagued lower courts for decades.

**B.    *Austin* is a narrow carveout from *Reed* particular to one mode of communication: billboards.**

*City of Austin v. Reagan National Advertising of Austin, LLC* was the Court's first major decision touching on First Amendment content-based analysis after its decision in *Reed*. 596 U.S. 61 (2022). The mode of speech at issue in *Austin* was billboards, arguably the most controversial mode of speech generally, and certainly the most controversial type of signage, one which "creates a unique set of problems." *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 502 (1981) (plurality opinion). Like many jurisdictions, the city of Austin treated billboards differently based on location. *Austin*, 596 U.S. at 67. Specifically, the city's code subjected off-premises signs to greater restrictions than on-premises signs.[2] *Id*. at 66. The Court determined the restrictions were content-neutral and akin

---

[2] Some billboards could not be modified or digitized while some could. *Austin*, 576 U.S. at 66.

to time, place and manner restrictions, even though the messages on the billboards had to be read in order to determine whether the billboards were on-premises or off-premises signs. *Id.* at 69.

Since *Austin* came down, courts have naturally applied it when faced with First Amendment challenges to restrictions on billboards. Some of those restrictions have been upheld under *Austin*, some have not. *See, e.g.*, *Road Space Media, LLC v. City of Birmingham*, 2023 WL 2617397, at *10 (N.D. Ala. Mar. 23, 2023) (upholding a "cap-and-replace" provision in the city code which required new billboards only to replace old billboards as content-neutral); *Adams Outdoor Advert. Ltd. P'ship v. City of Madison*, 56 F.4th 1111 (7th Cir. 2023) (upholding restriction distinguishing between signs relating to on-premises and off-premises products, services, or locations as content-neutral); *Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*, 99 F.4th 840, 843, 848–850 (6th Cir. 2024) (holding a restriction on billboards to be content-based and striking it down under strict scrutiny when the restriction exempted "public service signs" from the definition of "outdoor advertising sign" and "d[id] not simply differentiate between on- and off-premises signs").

However, because the outcome in *Austin* seemingly differs from *Reed* in that *Austin* holds a sign ordinance to be content-neutral when it treats certain billboards differently from other billboards, and because of a few instances of errant language reminiscent of *Ward*, *Austin* has quickly become the government's first resort for justifying speech-restrictive laws far beyond the billboard context. *See, e.g.*, *Hines v. Pardue*, 117 F.4th 769, 787 (5th Cir. 2024) (Ramirez, J., concurring) (discussing Texas's contention that a regulation restricting a veterinarian's online consultations with pet owners was content-neutral under *Austin*); *Veterans Guardian VA Claim Consulting LLC v. Platkin*, 133 F.4th 213, 221 (3d Cir. 2025) (disapproving New Jersey's argument that its law banning charging a fee for advice on how to claim veterans benefits was content-neutral because the state did not intend to suppress disfavored ideas, which the state had argued relying on *Austin*, *see* Br. of Def.-Appellee, 2024 WL 2747044, at *15–16 (May 24, 2024)); *Upsolve, Inc. v. James*, 155 F.4th 133, 142–43 (2d Cir. 2025) (finding that a law restricting the speech of a therapist was content-neutral after "the Supreme Court [in *Austin*] clarified that 'restrictions on speech may

require some evaluation of the speech and nonetheless remain content neutral'").

For these reasons, it is critical that courts understand *Austin* for what it is: "not [a] nullif[ication of] *Reed*'s protections" or a "resuscitat[ion]" of the Court's pre-*Reed* jurisprudence, *Austin*, 596 U.S. at 76, and not a regression to the purpose-only test of *Ward* discussed above. Instead, it should be read as an *affirmation* of *Reed* with a narrow carveout for one mode of communication: billboards.[3]

We know that, at bottom, *Austin* is about billboards for several reasons. First, like many sign codes across the country, Austin's code distinguished between off-premises and on-premises signs, *Austin*, 596 U.S. at 66, and such distinctions "proliferated following the enactment of the [federal] Highway Beautification Act of 1965," *id.* at 65. *See* 23 U.S.C. § 131. Courts understand that the HBA was aimed "primarily [at] billboards." *StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1247 (10th Cir. 2023). And that understanding makes sense: the HBA targets

---

[3] Indeed, this carveout was nascent in *Reed*. "[C]ontent-based distinctions . . . must satisfy strict scrutiny. This does not mean, however, that municipalities are powerless to enact and enforce reasonable sign regulations," including "[r]ules distinguishing between on-premises and off-premises signs." *Reed*, 576 U.S. at 175 (Alito, J., concurring).

the "erection and maintenance of outdoor advertising signs, displays, and devices" located "six hundred and sixty feet" from a highway and "visible from the main traveled way of the [highway] system," 23 U.S.C. § 131(a)–(b)—parameters that would rarely include any type of sign but a billboard. Second, state statutes that were an inspiration to, and inspired by, the federal Act were also clearly aimed primarily at billboards, reflecting substantively the same language.[4] Indeed, many of those state laws were bluntly titled, and referred to by courts, as "billboard" laws.[5] Third, every sign case that *Austin* cites as precedent for its upholding of

---

[4] *See, e.g.*, the Colorado Outdoor Advertising Act of 1971, enacted "[f]ollowing the requirements of the Beautification Act," *StreetMediaGroup*, 79 F.4th at 1247; the Indiana Highway Advertising Control Act of 1967, "adopted [to] accommodate [federal] HBA requirements," "the purpose of which, in large measure, was to remove billboards along the interstate highway system," *Ind. Dep't of Transp. v. FMG Indianapolis, LLC*, 167 N.E.3d 321, 325 (Ind. Ct. App.), *aff'd on reh'g*, 171 N.E.3d 1070 (Ind. Ct. App. 2021);

[5] *See, e.g.*, the "Kentucky Billboard Act of 1960," Ky. Rev. Stat. §§ 177.830 *et seq.*; Tennessee's "Billboard Regulation and Control Act of 1972," Tenn. Code Ann. §§ 54-21-101 *et seq.*; the "Missouri Billboards Act" discussed in *Combined Communications Corp. v. City of Bridgeton*, 939 S.W.2d 460, 462 (Mo. Ct. App. 1996) (citing Mo. Rev. Stat. §§ 226.500–.600); the Indiana "Billboard Act" of 1990 (replacing its Highway Advertising Control Act), as discussed in *FMG Indianapolis*, 167 N.E.3d at 325.

the city's on-/off-premises distinction is, like *Austin*, a billboard case.[6] *See Austin*, 596 U.S. at 73. Finally, the facts and holdings of *Austin* read narrowly as billboard-specific. To be sure, location-based distinctions do get made—governments may define content-neutral time, place, and manner restrictions for some modes of speech, such as requiring the use of city-provided sound equipment and services to control volume levels of the concerts at issue in *Ward*. But the "unbroken tradition of on-/off-premises distinctions" at issue in *Austin* is quite specific to billboards. *Id.* at 75. Thus, we know that *Austin* is primarily about billboards.

And as the Supreme Court has made clear, "the law of billboards" "is 'a law unto itself.'" *Metromedia*, 453 U.S. at 501. Courts should be on their guard lest *Austin* "crack[s] open a door that *Reed* was right to shut," and courts backslide into an "unwelcome return to judicial considerations

---

[6] The Court cites *Suffolk Outdoor Advertising Co. v. Hulse*, 439 U.S. 808 (1978) as a case it "summarily dismissed . . . 'for want of a substantial federal question' where a state court had approved of an on-/off-premises distinction[.]" *Austin*, 596 U.S. at 73. That was a billboard case. *See Suffolk Outdoor Advert. Co. v. Hulse*, 56 A.D.2d 365, 393 N.Y.S.2d 416 (1977), *modified*, 43 N.Y.2d 483, 373 N.E.2d 263 (1977), *and rev'd sub nom. H. C. Williams Co. v. Town of Southampton*, 45 N.Y.2d 922, 383 N.E.2d 876 (1978). The sign in *Metromedia* was also a billboard. As was the sign in *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984). Even the very earliest case the Court cites was a billboard case. *See Packer Corp. v. Utah*, 285 U.S. 105, 107 (1932).

of government purpose and intent behind regulations that facially and intentionally distinguish among types of speech," "giv[ing] governments that seek to punish speech they do not like more opportunities to do so." Enrique Armijo, *The Content-Discrimination Two-Step Post-*Reed *and* Austin, 2022 Cato Sup. Ct. Rev. 141, 142–43.

> ### C.    This Court has applied, and should continue to apply, *Austin* narrowly: as a limited clarification of *Reed* with respect to billboards.

This Court's own treatment of *Austin* offers a useful case study, having now relied on *Austin* twice for content-based analysis. *See StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1250 (10th Cir. 2023); *VoteAmerica v. Schwab*, 121 F.4th 822, 850 (10th Cir. 2024). The first was a case analyzing a provision of a billboard-targeted law: Colorado's baby HBA. *StreetMediaGroup*, 79 F.4th at 1247. Instead of an on-/off-premises distinction as in *Austin*, in *StreetMediaGroup* it was a paid/unpaid distinction. *Id.* Though this Court recognized an "arguable tension" between *Reed* and *Austin*, it ultimately determined the distinction was content-neutral based on facts that tacked very closely with the facts of *Austin* specific to billboards: "[r]egardless of the message or content on the sign, only for-compensation signs visible from a state

-15-

highway trigger the regulation." *Id*. at 1250. This is an application of *Austin* that respects *Reed*'s central teaching—that a law is "content based if [it] applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 596 U.S. at 163—while modestly applying the core principle of *Austin* inside the billboard context.

But this Court's next reliance on *Austin* was far more afield. The issue in *VoteAmerica* concerned "Kansas restrictions on private parties partially filling out mail-ballot applications before they are sent to registered voters." 121 F.4th at 826–27. Groups who wanted to mail ballots with some information already filled out based on voter rolls sued, arguing that the law "prohibit[ed] certain content on its face: the information necessary to complete any portion of an advance mail ballot application." *Id*. at 850. This Court agreed with the plaintiffs that the prohibition was facially content-based. App. Vol. 16, 67. Nevertheless, it decided to scrutinize the law using intermediate scrutiny. To justify that lower standard of review, the panel contorted existing precedents. First, it reached for cases involving trademarks and other forms of government-subsidized-speech, even though the Supreme Court has been clear that in those situations the fear "that content-based distinctions will

impermissibly interfere with the marketplace of ideas is sometimes attenuated . . . ." *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 188–89 (2007); *see also Vidal v. Elster*, 602 U.S. 286, 300 (2024) (holding that strict scrutiny was not required because of "the uniquely content-based nature of trademark regulation and the longstanding coexistence of trademark regulation with the First Amendment"). It then reached for *Austin*, finding that the regulation was "of a type that should be subjected only to intermediate scrutiny, absent a showing of an improper purpose or justification for the statutory prohibition." *VoteAmerica*, 121 F.4th at 834.

Setting aside the danger of applying *Davenport* to a case involving no government-subsidized speech, and *Vidal* to a case involving no trademarks, *VoteAmerica*'s treatment of *Austin* represents just the kind of risk described above. It mistakenly casts *Austin* as repudiating *Reed*'s central holding that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive" because "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 165–66. This Court should not repeat *VoteAmerica*'s mistake here. Instead, it should take the

opportunity that this case presents to clarify that *Austin* does not represent a regression to a pre-*Reed* world where, particularly under *Ward*, "a government's purpose is relevant even when a law is content based on its face." *Reed* at 166. Because, as *Reed* put it, "[t]hat is incorrect." *Id.*

## II.    The government must always justify its restrictions on speech with evidence, and the district court correctly found Salina's evidence lacking.

Much of the disagreement between the parties turns on whether Salina's mural-sign distinction operates as a content-based or content-neutral speech restriction. Salina's determination that Cozy Inn's mural was a sign turned on the mural's message and what the Town perceived it to convey. *Cozy Inn, Inc. v. City of Salina*, 2025 WL 3223806, at \*4 (D. Kan. Nov. 19, 2025). As Plaintiffs argue, *id.* at \*11–12, and as courts around the country have recognized, picking and choosing only certain messages for regulation is a classic content-based restriction, which would trigger strict scrutiny. By contrast, Salina claims that its mural-sign distinction should only be subject to intermediate scrutiny. *Id.* at \*13. But as explained in Subsection A, below, the First Amendment requires the government to prove its case no matter which level of

-18-

scrutiny attaches. Either way, Salina had to justify its restriction with evidence. And as Subsection B shows, Salina failed to meet that burden, much like the Town of Conway, New Hampshire, failed in defending a nearly identical mural-sign distinction.

### A. The government must always justify its restrictions on speech with evidence.

As the district court rightly recognized, the government must *always* justify its restrictions on speech. *Id.* at *16. While there are different tiers of First Amendment scrutiny that impose different substantive burdens on the government, under any of them the government carries the burden of persuasion. It has the burden when strict scrutiny applies. *See Reed v. Town of Gilbert*, 576 U.S. 155, 172 (2015). It has the burden when intermediate scrutiny applies. *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664–65 (1994). It has the burden when the restriction is on commercial speech. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571–72 (2011); *Edenfield v. Fane*, 507 U.S. 761, 770 (1993); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566–71 (1980). And the government carries this burden at every stage of the proceedings. *See, e.g., Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (holding

government has the burden at the preliminary injunction stage); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000) (discussing government's burden at the trial stage).

Under binding Supreme Court precedent, the process proceeds as follows. A plaintiff only has the initial burden of showing that the government's actions have impinged or restricted the plaintiff's protected speech. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). Once the plaintiff makes that preliminary showing, the burden shifts and "the [g]overnment bears the burden of proving the constitutionality of its actions." *Playboy Ent. Grp.*, 529 U.S. at 816. This is a "heavy burden," requiring evidence. *Reno v. ACLU*, 521 U.S. 844, 855, 879 (1997).

No one likes to carry a heavy burden, and governments are no different. They commonly suggest that they need not produce anything more than common sense to justify speech restrictions. *See, e.g., Junior Sports Mags. Inc. v. Bonta*, 80 F.4th 1109, 1118 (9th Cir. 2023) (rejecting California's evidence-free reliance on "common sense" for a ban on truthful advertising about firearms and finding that "the First Amendment requires more than fact-free inferences to justify

-20-

governmental infringement on speech"). Courts are thus continually tempted to relieve the government of its burden of both persuasion and proof. But the erosion of these principles is dangerous. The Supreme Court has repeatedly held that the government's First Amendment "burden is not satisfied by mere speculation or conjecture; rather, [it] must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71 (discussing evidence required in a challenge to a restriction on commercial speech).

As the next section shows, the district court was right to require Salina to prove how its mural-sign distinction directly advanced the town's purported interests in a narrowly tailored manner. Salina could not put forward *any* evidence showing how the displays it regulates as "signs" implicate its safety and aesthetic interests in any different way than the unregulated "murals" throughout town. Given that failure, this Court should affirm the district court's holding, not excuse Salina from its evidentiary responsibilities.

### B.    The district court correctly found Salina's evidence lacking.

Here, there can be no dispute that Cozy Inn made its preliminary showing. Its UFO mural is speech, protected by the First Amendment. *See 303 Creative, LLC v. Elenis*, 600 U.S. 570, 587 (2023) ("All manner of speech—from 'pictures, films, paintings, drawings, and engravings,' to 'oral utterance and the printed word'—qualify for the First Amendment's protections[.]"). The speech at issue is art; it is a mural. And Salina ordered Cozy Inn to stop painting its mural at the risk of fines. It did this pursuant to Salina's mural-sign distinction, which regulates certain displays as "signs" based on what they depict and who put them up.

Because Cozy Inn made its initial showing, the burden shifted to Salina to justify its actions. Although the parties quibbled about the level of scrutiny required, the district court cut through that knot. Rather than resolve whether the restriction is content-based or neutral, it held that Salina's mural-sign distinction failed even the lower intermediate scrutiny standard. App. Vol. 16, 68–69. Under that standard, Salina had to submit competent evidence to show how its regulating of some displays as "signs," while exempting of other displays as "murals," directly furthered its purported interests in a narrowly tailored manner, and left

-22-

open ample alternative avenues of communication for Cozy Inn and other speakers. *Brewer v. City of Albuquerque*, 18 F.4th 1205, 1220 (10th Cir. 2021) (evaluating content-neutral restriction and holding that "the City must show that the Ordinance is narrowly tailored to achieving significant government interests, and that the Ordinance leaves open ample alternative channels of communication").

In the district court's view, Salina utterly failed to make that evidentiary showing. App. Vol. 16, 72–73. The town submitted three main categories of evidence: testimony from city officials, industry publications, and expert testimony. *Id.* Under binding Supreme Court precedent, that evidence had to "demonstrate that the harms [Salina] recites are real and that its restriction will in fact alleviate them[.]" *Edenfield*, 507 U.S. at 770–71. Instead, that evidence all went to the government's interests in its sign code generally, interests that Cozy Inn never challenged; none of the evidence explained how Salina's mural-sign distinction furthered those interests, let alone in a narrowly tailored manner. The City Planner for Salina explained, for instance, that the town's sign restrictions were meant to reduce distractions and clutter. *Id.* at 72. But he "did not, however, address or explain why displays that (allegedly) do

not pertain to the services or goods a business sells . . . would have any different impact on those interests than signs like Cozy's hamburger scheme might." *Id.* The same was true, said the district court, of Salina's industry publications: although they described why towns may want to regulate signs generally, they "provide[d] no explanation or insight into how Salina differentiates between murals and signs" or why the former were less damaging to the town's safety and aesthetics than the latter. *Id.* And while Salina submitted expert testimony to support their mural-sign distinction, the district court found it wanting given that was "devoid of any explanation or opinion indicating how or why a display that refer-ences a business's product is any more harmful to safety, aesthetics, or health than a display that references anything else." *Id.* at 73. *See also McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (holding that the govern-ment "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals").

The district court's conclusions align with precedent from both the Supreme Court and the Tenth Circuit. In *City of Cincinnati v. Discovery Network, Inc.*, the city banned newsracks for "commercial handbills" but not "newspapers." 507 U.S. 410, 414–15 (1993). And when the city was

sued by Discovery Network, it, like Salina here, argued that its handbill-newspaper distinction was merely a content-neutral time, place, and manner regulation. *Id*. at 418. Yet the Supreme Court rejected that argument, finding that "whether any particular newsrack [fell] within the ban [was] determined by the content of the publication resting inside that newsrack," and "the very basis for the regulation [was] the difference in content between ordinary newspapers and commercial speech." *Id*. at 429.

That was fatal to Cincinnati, which had claimed the distinction furthered its interests in "safety and esthetics." *Id*. at 418. The Court found that, given those general interests, Cincinnati's distinction was illogical. *Id*. at 424. Newsracks dispensing commercial handbills were "no more harmful than permitted newsracks," *id*. at 418, and "no greater an eyesore," either, *id*. at 425. Cincinnati also tried to claim that its primary concern was the total number of newsracks on its streets—just as Salina claims its real concern is about the cumulative effect of signage. *Id*. at 426. The Court recognized that all newsracks, regardless of whether they contained commercial or noncommercial publications, were "equally at fault" for that. *Id*. But in response to that supposed concern, Cincinnati

had not "limited the number of newsracks; it ha[d] limited (to zero) the number of newsracks *distributing commercial publications.*" *Id.* at 429 (emphasis in original). Because Cincinnati had "no justification . . . other than the city's naked assertion that commercial speech has 'low value,'" *id.*, the Court held the regulation could not "be squared with the dictates of the First Amendment," *id.* at 431.

Salina tries to resist the clear implication of *Discovery Network* for this case. Its mural-sign distinction regulates only a subset of displays based on what they depict, virtually identical to Cincinnati's content-based distinction between newsracks containing newspapers versus commercial handbills. Knowing it cannot prove that Cozy Inn's display raises greater safety or aesthetic concerns than the unregulated murals that are on display through Salina, it now claims that the district court erred by requiring it to demonstrate with evidence that its mural-sign distinction directly furthered its purported interests in a narrowly tailored manner. It instead argues that, pursuant to the Supreme Court's plurality opinion in *Metromedia,* 453 U.S. at 508–13, the district court should have accepted as a matter of law that Salina's mural-sign

distinction furthers the town's purported interests. Opening Brief at 33–36.

Salina's reliance on *Metromedia* fails for two reasons. First, it conflicts with this Court's decisions, most notably *Brewer v. City of Albuquerque*, which concerned an ordinance preventing pedestrians from standing near roadway entrances and exits. 18 F.4th 1205, 1209 (10th Cir. 2021). The district court struck down the ordinance on narrow tailoring grounds, finding that the city failed to produce any concrete evidence that its ordinance was actually narrowly tailored to further its safety goals. Albuquerque appealed, arguing (just as Salina does here) that the district court erred by putting too heavy an evidentiary burden on it. *Id.* at 1217–18. But this Court rejected Albuquerque's overture, recognizing that the government "bears the burden of producing concrete evidence"—in "some form"—"to show that its proposed restriction will actually achieve its asserted interest without burdening substantially more speech than necessary." *Id.* at 1214–15. And after an independent review of the record, the Court affirmed, holding that the record contained "little evidence of non-speculative harms or interests that the Ordinance's restrictions alleviate in a direct and material way." *Id.* at

-27-

1227. Evidence is the expectation in First Amendment cases, not the exception.

Second, Salina's points about *Metromedia* ignore the world of difference between that case and this one. There, the Supreme Court held that San Diego did not need to independently introduce evidence showing that its on-/off-premises sign restrictions furthered its purported safety and aesthetics interests. 453 U.S. at 508–13. That holding should be understood in its context: billboards. *See generally* Part I.B., *supra.* It was in *Metromedia* itself that the Court described the law of billboards as "a law unto itself." *Metromedia*, 453 U.S. at 501. And the practical reality is that certain harms from billboards are ubiquitously accepted.[7] Therefore, in the billboard context, the quantum of required evidence might be lighter. Regardless, the government should not be permitted to rely on *Metromedia* elsewhere. As the Tenth Circuit has recognized, relieving the government of its independent evidentiary burden is appropriate only where there is an established line of "precedent which already has

---

[7] But even so, certain speech distinctions might not address those harms. *See, e.g., StreetMediaGroup, LLC v. Stockinger*, 79 F.4th 1243, 1252 (10th Cir. 2023) ("[W]e are skeptical that paid-for signs are more distracting and damaging to aesthetics[.]").

established that the legislature's chosen means directly advances the asserted ends." *Adolph Coors Co. v. Brady*, 944 F.2d 1543, 1550 (10th Cir. 1991).

And there is no such line of precedent here. Unlike a prohibition on shining spotlights directly at drivers, for instance, Salina's mural-sign distinction is highly unusual. And the only recent litigation concerning a nearly identical restriction shows why the district court was correct. In *Young v. Town of Conway*, high-school students painted a pastry-inspired depiction of the White Mountains on a local donut shop. 783 F. Supp. 3d 588, 592–93 (D.N.H. 2025). After Conway officials looked at the display's content, they said it was a sign because it depicted items like those sold inside the bakery. *Id.* at 595–96. But those same officials said that if the display instead showed real mountains or covered bridges, or if it were moved to another (non-bakery) location, it would be an unregulated mural. *Id.* Evidence showed that Conway had used its own "mural-sign" distinction for years. *Id.* at 597–98.

But at trial, Conway officials could not explain how a mural composed of donuts was a greater safety or aesthetic threat than a mural composed of actual mountains. *Id.* at 608. They readily admitted under

oath there was "no basis to assume a sign depicting baked goods would have a different effect on safety than a sign depicting mountains (or anything else)." *Id*. Likewise, the trial evidence showed that "ZBA members made clear to Young that the [bakery's] display could depict essentially *anything* other than baked goods and go unregulated." *Id*. at 609. Accordingly, the court ruled that Conway's enforcement "against Leavitt's bakery has no rational connection to any of its stated interests," and that the town's application of its mural-sign distinction "to the Leavitt's display, is unconstitutional." *Id*. at 610.

Far from a settled line of precedent, *Young* demonstrates that Salina's mural-sign distinction is highly unusual and that similar restrictions have been found lacking. This Court should therefore put Salina to its full evidentiary burden. And because the evidence Salina adduced fails to show any principled reason to treat Cozy Inn's burger display any different than the unregulated murals that can be seen throughout town, it should affirm.

## CONCLUSION

For the foregoing reasons, this Court should affirm and hold that Salina's mural-sign distinction violates the First Amendment.

Dated: April 1, 2026.

Respectfully submitted,

s/ Robert Frommer
Robert Frommer
Elizabeth (Betsy) Sanz
INSTITUTE FOR JUSTICE
  901 N. Glebe Road, Suite 900
  Arlington, VA 22203
  (703) 682-9320
  rfrommer@ij.org
  bsanz@ij.org

Riley Grace Borden
INSTITUTE FOR JUSTICE
  600 University St., Suite 2710
  Seattle, WA 98101
  (206) 957-1300
  rgborden@ij.org

*Counsel for Amicus Curiae*
*Institute for Justice*

-31-

## CERTIFICATE OF COMPLIANCE

1.    This document complies with Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,140 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated: April 1, 2026.                    s/ Robert Frommer
                                         Robert Frommer
                                         INSTITUTE FOR JUSTICE
                                          901 N. Glebe Road, Suite 900
                                          Arlington, VA 22203
                                          (703) 682-9320
                                          rfrommer@ij.org

# CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing:

1.    All required privacy redactions have been made per 10th Cir. R. 25.5;

2.    If required to file additional hard copies, that the ECF submission is an exact copy of those documents;

3.    The digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Bitdefender Endpoint Security Tools, version 8.26.4.628, last updated April 1, 2026, and according to the program are free of viruses.

Dated: April 1, 2026.            s/ Robert Frommer
                                Robert Frommer
                                INSTITUTE FOR JUSTICE
                                  901 N. Glebe Road, Suite 900
                                  Arlington, VA 22203
                                  (703) 682-9320
                                  rfrommer@ij.org

# CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2026, I electronically filed a copy of the foregoing brief with the Clerk of the United States Court of Appeals for the Tenth Circuit using the Court's appellate CM/ECF system. I further certify that all participants are registered CM/ECF users who will be served by the appellate CM/ECF system.

Dated: April 1, 2026.

s/ Robert Frommer
Robert Frommer
INSTITUTE FOR JUSTICE
  901 N. Glebe Road, Suite 900
  Arlington, VA 22203
  (703) 682-9320
  rfrommer@ij.org