No. 25-3225

# IN THE UNITED STATES COURT OF APPEALS FOR THE TENTH CIRCUIT

COZY INN, INC., *et al.*,

*Plaintiffs-Appellees*,

v.

CITY OF SALINA, KANSAS,

*Defendant-Appellant*.

On Appeal from the United States District Court for the District of Kansas, No. 6:24-cv-01027 (Crouse, J.)

# BRIEF OF NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC. AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES AND IN FAVOR OF AFFIRMANCE

J. Michael Connolly
Paul R. Draper
CONSOVOY MCCARTHY PLLC
ANTONIN SCALIA LAW SCHOOL
FREE SPEECH CLINIC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
paul@consovoymccarthy.com

March 31, 2026

*Counsel for NFIB*

## TABLE OF CONTENTS

Table of Authorities ii

Introduction & Interest of Amicus Curiae 1

Summary of Argument 2

Argument 4

I. Murals benefit residents and small businesses alike. 4

II. Artistic expression does not lose its First Amendment protection merely because it is adjacent to commercial activity. 10

III. Complying with speech regulations like Salina's sign code is especially burdensome for small businesses, including NFIB's members. 17

Conclusion 21

Certificate of Compliance 22

Certificate of Service 22

# TABLE OF AUTHORITIES

## Cases

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ........ 4, 14, 16

*Andy Warhol Found. v. Goldsmith*,
598 U.S. 508 (2023) ........ 14

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........ 3, 11, 15

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........ 3, 11, 13

*Candy Lab Inc. v. Milwaukee County*,
266 F. Supp. 3d 1139 (E.D. Wis. 2017) ........ 13

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........ 3, 15-16

*Cinevision Corp. v. City of Burbank*,
745 F.2d 560 (9th Cir. 1984) ........ 13

*Citizens United v. FEC*,
558 U.S. 310 (2010) ........ 19-20

*Cohen v. California*,
403 U.S. 15 (1971) ........ 13

*Complete Angler, LLC v. City of Clearwater*,
607 F. Supp. 2d 1326 (M.D. Fla. 2009) ........ 15

*Ent. Software Ass'n v. Hatch*,
443 F. Supp. 2d 1065 (D. Minn. 2006) ........ 12

*FCC v. Fox Television Studios*,
567 U.S. 239 (2012) ........ 21

*Joseph Burstyn, Inc. v. Wilson*,
343 U.S. 495 (1952) ........ 11, 20

*Kaplan v. California*,
413 U.S. 115 (1973) ........ 3, 10

*Lorillard Tobacco Co. v. Reilly*,
533 U.S. 525 (2001) ........ 16

*LS3, LLC v. United States*,
168 Fed. Cl. 722 (2023) ........ 18

*McConnell v. FEC*,
540 U.S. 93 (2003) .......... 4, 18

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973) .......... 14

*Reno v. ACLU*,
521 U.S. 844 (1997) .......... 20-21

*Riley v. Nat'l Fed'n of the Blind of N.C.*,
487 U.S. 781 (1988) .......... 11, 14

*Rosenberger v. University of Virginia*,
515 U.S. 819 (1995) .......... 12

*Southeastern Promotions, Ltd. v. Conrad*,
420 U.S. 546 (1975) .......... 13

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 3, 12

*United States v. United Foods*,
533 U.S. 405 (2001) .......... 14

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*,
425 U.S. 748 (1976) .......... 11

**Other Authorities**

*8 Applications for Wall Murals in Marketing*, Taylor Corp. (Aug. 7, 2024), perma.cc/R7LV-NWS9 .......... 7

Altschuler, *America's Mural Magic: How Street Art Can Transform Communities and Help Businesses*, Forbes (Mar. 23, 2020), tinyurl.com/2vdehmcs .......... 5, 7, 19

Bookman, *Judge Rules Conway Pastry Painting Can Stay: Town's Argument Crumbles*, NHPR (May 20, 2025), perma.cc/6PJQ-WLTS .......... 8

*California Small Businesses Challenge Law Restricting Employer Free Speech*, NFIB (Jan. 26, 2026), perma.cc/PC4W-TLLC .......... 1

*Case Studies of Art in Public Spaces: How Community Murals Changed Urban Landscapes and Social Engagement*, SocialTargeter (Feb. 10, 2026), perma.cc/W4ZZ-9UNX .......... 5

Gesare, *The Role of Public Art in Community Identity and Urban Development*, 3 Int'l J. of Arts, Recreation, & Sports 15 (2024) .......... 5-6

Greaney, *The Power of the Urban Canvas: Paint, Politics, and Mural Art Policy*, 18 New Engl. J. Pub. Pol'y 7 (2002) .......... 16

Hochman, *New Research from Philly's Mural Arts Institute Proves Public Art Has a Huge Civic Impact*, Broad St. Rev. (Nov. 24, 2025), perma.cc/VY74-LFV9 ........................ 6

Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, Wash. Exam'r (Sept. 26, 2012), perma.cc/F8MS-KRB8 .................................................................. 10

Jeong et al., *The Role of Public Murals in Street Vitality*, 165 Cities: Int'l J. Urban Pol'y & Planning 106085 (2025), perma.cc/APD5-3NM2 ........................................... 6

Kramer, *Arlington Dog Mural To Be Painted Over*, Inst. for Just. (Sept. 26, 2012), tinyurl.com/mubhtxsx ....................................................................................... 10

Meir, *Small Business Murals Project Elevates Local Businesses Through Art*, Rocket Cmty. Fund (Oct. 14, 2021), perma.cc/2VWM-LYLE ............................................... 6

*Mural Arts Philadelphia: Blatt Tire*, Pub. Art Archive (archived Mar. 24, 2026), perma.cc/YK3S-BJG8 .................................................................................. 8

*Mural Arts Philadelphia: Santander Bank Mural Project*, Pub. Art Archive (archived Mar. 24, 2026), perma.cc/YD7J-KQP8 ........................................................ 8

*Mural Painting Art: An Underrated Marketing Strategy*, Am. Guerilla Mktg. (Oct. 12, 2023), perma.cc/L23S-U4MP ................................................................ 7, 18

*New Dog Park Mural … Improved??*, Two Dog Tales (Oct. 15, 2012), perma.cc/2M5X-R43T .......................................................................................................... 8

*New Study: Legal Pitfalls Dent Small Business Owners' Bottom Line*, LegalShield (May 19, 2025), perma.cc/NS65-XW7U ........................................................... 4, 18-19

*NFIB Files Briefs in Critical Small Business Cases*, NFIB (updated Feb. 4, 2026), perma.cc/G989-BG4G .................................................................................. 1

*NFIB Urges U.S. Court of Appeals to Uphold First Amendment Rights of Small Business Owners*, NFIB (Mar. 19, 2025), perma.cc/ES9R-VDET ........................................ 1

Nuri et al., *Artistic Expressions as Vehicles of Cultural Memory: Bridging Identity, Heritage, and International Understanding*, 12 J. Ethnic & Cultural Studies 258 (2025) ........................ 5

Patel, *Role of Public Art in Community Development*, 4 Am. J. Arts, Soc. & Human. Stud. 47 (2024) ............................................................................................ 6

*Report Details the Deep Community Involvement of Small Businesses*, NFIB (Nov. 21, 2024), perma.cc/EP7C-Z6JM .................................................................................. 1

*Small Companies, Big Burdens: The Compliance Cost Crisis*, Qlutch (May 26, 2025), perma.cc/XRJ3-HU65 ................................................................................ 19

Stoller, *North American Cities Have Gone Mural Mad*, Forbes (Aug. 21, 2024), tinyurl.com/4879s3fm ....................................................................................... 7

Swanek, *A Majority of Small Businesses Say Regulations Hinder Growth*, U.S. Chamber of Com. (Dec. 16, 2024), perma.cc/Q5GS-YYGM ........ 17

*Understanding the First Amendment Limitations on Government Regulation of Artwork*, Am. Bar Ass'n (Jan. 2, 2017), tinyurl.com/y9by6849 ........ 9

Wade et al., *Small Business Problems & Priorities*, NFIB Research Center, (11th ed. 2024), hperma.cc/AF29-TF6W ........ 17

## INTRODUCTION & INTEREST OF AMICUS CURIAE

The National Federation of Independent Business, Inc. (NFIB) is the nation's leading small business advocacy organization, representing hundreds of thousands of small and independent small businesses across the United States.[*] Founded in 1943, NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents the interests of its members in Washington, D.C., and all 50 state capitals. NFIB regularly participates as amicus curiae in cases of importance to small businesses, including cases involving the constitutional limits on government regulation of business activity, *see NFIB Files Briefs in Critical Small Business Cases*, NFIB (updated Feb. 4, 2026), perma.cc/G989-BG4G, and cases involving the speech rights of small business owners, *e.g.*, *California Small Businesses Challenge Law Restricting Employer Free Speech*, NFIB (Jan. 26, 2026), perma.cc/PC4W-TLLC; *NFIB Urges U.S. Court of Appeals to Uphold First Amendment Rights of Small Business Owners*, NFIB (Mar. 19, 2025), perma.cc/ES9R-VDET.

NFIB's members operate in virtually every industry and in communities of every size. And the "involvement of small businesses with their communities goes much deeper than just being the economic engine of a city or town." *Report Details the Deep Community Involvement of Small Businesses*, NFIB (Nov. 21, 2024), perma.cc/EP7C-Z6JM.

---

[*] No counsel for a party authored this brief in whole or in part, and no person other than NFIB, its members, or its counsel made a monetary contribution to its preparation or submission.

Small businesses aren't just places to transact business; they are places to gather and they are forums for expression, both by the businesses themselves and by community members.

Small businesses frequently communicate through visual expression displayed on or near their buildings, including murals and other forms of public-facing artwork. Murals on storefronts can celebrate local history and reflect neighborhood character. And they have proven material benefits for the surrounding neighborhoods: they increase foot traffic, improve safety, boost property values, and draw customers for the business itself. Put simply, these murals are a mutually beneficial way for small businesses to engage with their community. Regulations like the City of Salina's sign code, which prohibits such murals if they include depictions of a business's products or services, threaten the First Amendment rights of small business owners throughout the country.

The district court correctly held that Salina's sign code (1) is not justified by any of the city's purported interests in aesthetics, traffic and pedestrian safety, or property values and (2) acts as an improper prior restraint on Cozy Inn's speech. *See* Order (D. Kan. Dkt. 136) at 24-30. This Court should affirm that decision. Public artwork is an important medium for constitutionally protected speech. That is no less true when the speaker is a place of business or when the artwork is adjacent to commercial activity.

## SUMMARY OF ARGUMENT

Murals and other kinds of public artwork are an effective way for small businesses to contribute to the character of their town, honor local history, and attract

people to their stores. In other words, murals benefit businesses and residents alike. When a neighborhood has more public artwork, it also has more foot traffic, decreased crime, higher property values, more tourism, and a healthier local economy. That's why small businesses across America use murals—in addition to or instead of traditional advertising campaigns—to connect with customers. These murals blend the business's brand with local history and character to create unique and enduring works of art.

The First Amendment plainly protects such expression. *See Kaplan v. California*, 413 U.S. 115, 119-20 (1973) ("First Amendment protection" extends to visual expression like "pictures, films, paintings, drawings, and engravings."). And, though Salina wishes to prohibit murals that depict a business's product, artistic expression does not lose constitutional protection merely because it is commercially adjacent. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983). Indeed, as the Supreme Court has warned, any effort to distinguish between supposedly genuine artistic works and mere advertisements simply invites subjective censorship by regulators and thereby runs afoul of the First Amendment. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011); *United States v. Stevens*, 559 U.S. 460, 470 (2010).

Nor are such murals subject to the narrow and questionable commercial speech doctrine, which allows regulation of speech only when that speech does nothing more than propose a commercial transaction and is designed chiefly to protect consumers from deceptive or coercive sales techniques. *See Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980); *id.* at 573 (Blackmun, J., concurring); *44*

*Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 517 (1996) (Scalia, J., concurring) (questioning the doctrine); *id.* at 522 (Thomas, J., concurring) (same) ("I do not see a philosophical or historical basis for asserting that 'commercial speech' is of 'lower value' than 'noncommercial' speech."). Put simply, any law that prohibits a mural just because it was created by a particular small business is subject to—and fails—strict scrutiny.

Unfortunately, laws prohibiting murals that reflect commercial activity are not uncommon in American towns. And the burden of complying with such laws falls especially hard on small businesses, who often lack the financial resources and manpower that their larger competitors enjoy. *See New Study: Legal Pitfalls Dent Small Business Owners' Bottom Line*, LegalShield (May 19, 2025), perma.cc/NS65-XW7U. Unsure whether their speech will be allowed by local regulations—and worried about incurring liability if local officials decide their speech *does* violate the law—many small businesses simply refrain from speaking altogether. *See McConnell v. FEC*, 540 U.S. 93, 332 (2003) ("[R]egulations" create "major disincentives for speech," especially for "smaller entities that often have the most difficulty bearing the costs of compliance."). This Court should restore confidence to small business owners and hold that expressive works of art like Cozy Inn's proposed mural are squarely protected by the First Amendment.

## ARGUMENT

### I. Murals benefit residents and small businesses alike.

Murals are an enduring form of public artwork that reflect a shared local identity, boost the local economy, and improve public safety. Recognizing their benefit to the

community, small businesses use murals to contribute to local culture while simultaneously drawing customers to their stores, benefitting everyone and hurting no one. Salina's sign code—which strips murals and other public artwork of First Amendment protection simply because they are adjacent to commercial activity—disregards the distinctive civic and cultural role that murals play in American towns and risks suppressing an important medium of community expression.

Murals "can be the source of civic pride, public artistry, and outdoor engagement." Altschuler, *America's Mural Magic: How Street Art Can Transform Communities and Help Businesses*, Forbes (Mar. 23, 2020), tinyurl.com/2vdehmcs. They "significantly enhanc[e] community identity and urban development by reflecting cultural and historical narratives, fostering social cohesion, and encouraging civic engagement." Gesare, *The Role of Public Art in Community Identity and Urban Development*, 3 Int'l J. of Arts, Recreation, & Sports 15, 15 (2024). Public artwork, in other words, is a "vivid and accessible" representation of shared local values and memories. Nuri et al., *Artistic Expressions as Vehicles of Cultural Memory: Bridging Identity, Heritage, and International Understanding*, 12 J. Ethnic & Cultural Studies 258, 259 (2025).

And of course, murals can add to the aesthetic value of surrounding neighborhoods. They can breathe life into previously neglected spaces and "transform urban canvases into vibrant expressions of identity and purpose." *Case Studies of Art in Public Spaces: How Community Murals Changed Urban Landscapes and Social Engagement*, SocialTargeter (Feb. 10, 2026), perma.cc/W4ZZ-9UNX. Murals are also a long-lasting form of

public art, often remaining for years. They foster local character and create enduring "bonds between local artist and small business owner, residents and customers." Meir, *Small Business Murals Project Elevates Local Businesses Through Art*, Rocket Cmty. Fund (Oct. 14, 2021), perma.cc/2VWM-LYLE.

Public artwork has material benefits as well, creating safer and livelier public spaces. Indeed, one study found that the average daily foot traffic in city blocks with murals was "2.5 times higher than" foot traffic in non-mural blocks. Jeong et al., *The Role of Public Murals in Street Vitality*, 165 Cities: Int'l J. Urban Pol'y & Planning 106085, at 7 (2025), perma.cc/APD5-3NM2. And when pedestrian activity goes up, crime goes down. In Philadelphia, for example, in neighborhoods with murals, "total daytime crime dropped by an average of 42 percent, with a 40 percent drop in property crime at night." Hochman, *New Research from Philly's Mural Arts Institute Proves Public Art Has a Huge Civic Impact*, Broad St. Rev. (Nov. 24, 2025), perma.cc/VY74-LFV9. These improvements, moreover, are not short-lived: After murals went up in Philadelphia, crime dropped "for as long as seven years." *Id.*

The local economy benefits too. When businesses place artwork on their buildings or in other public locations, surrounding property values rise. *See* Gesare, *supra*, at 17. Murals also increase tourism and draw in new customers for local businesses. *See* Patel, *Role of Public Art in Community Development*, 4 Am. J. Arts, Soc. & Human. Stud. 47, 49 (2024). One widely cited industry study, for example, found that murals generate 42% more visual attention than traditional advertising and that 64% of customers are

more likely to visit a business with a mural. *See 8 Applications for Wall Murals in Marketing*, Taylor Corp. (Aug. 7, 2024), perma.cc/R7LV-NWS9. In one California town, local businesses experienced as much as a "50% increase" in revenue after a series of murals were added to the main street. Altschuler, *America's Mural Magic: How Street Art Can Transform Communities and Help Businesses*, Forbes (March 23, 2020), tinyurl.com/2vdehmcs. For small businesses, then, "[s]trategically placed" murals are an "investment" in the local community and themselves. *Id.*

No wonder, then, that businesses today are increasingly using murals to connect with local residents and potential customers. "There are no official statistics, but the total number of murals in North American cities has undoubtedly skyrocketed in recent years." Stoller, *North American Cities Have Gone Mural Mad*, Forbes (Aug. 21, 2024), tinyurl.com/4879s3fm.

In addition to the community benefits mentioned above, these murals have several advantages over traditional advertisements. They create "cultural landmarks," giving a "human touch to the brand." *Mural Painting Art: An Underrated Marketing Strategy*, Am. Guerilla Mktg. (Oct. 12, 2023), perma.cc/L23S-U4MP. And they don't just provide information about a product; instead, they are an opportunity for businesses to develop and communicate an identity and "brand philosophy." *Id.* Plus, because murals are usually long-term fixtures, they provide aesthetic consistency for the surrounding space and reduce advertising costs relative to cyclical and short-term advertising campaigns. Consider a few representative examples:



**Figure 1:** Local high school students painted a mural of donuts and other pastries over Leavitt's Country Bakery in Conway, NH. After the local zoning board deemed the mural a commercial sign and ordered it removed, a federal judge ruled that the mural was protected by the First Amendment. *See* Bookman, *Judge Rules Conway Pastry Painting Can Stay: Town's Argument Crumbles*, NHPR (May 20, 2025), perma.cc/6PJQ-WLTS.




**Figure 2:** This mural at the Blatt Tire shop in Philadelphia "depicts a stylized, historic view of the auto shop upon which it is painted and the automotive repairs going on inside." The mural was "one of the early murals created by the Philadelphia Anti-Graffiti Network." *See Mural Arts Philadelphia: Blatt Tire*, Pub. Art Archive (archived Mar. 24, 2026), perma.cc/YK3S-BJG8.




**Figure 3:** This mural on the side of a dog grooming business and next to a dog park in Arlington, VA, depicts playful images of dogs and bones. After the city decided that the mural was in fact an unlawful advertisement, the business was forced to cover it up with a new image, much to the chagrin of local residents. *See New Dog Park Mural … Improved??*, Two Dog Tales (Oct. 15, 2012), perma.cc/2M5X-R43T.




**Figure 4:** This mural on the side of a Santander Bank in Philadelphia honors local Puerto Rican culture. It celebrates "the strength, pride, joy and resilience found in the community." *See Mural Arts Philadelphia: Santander Bank Mural Project*, Pub. Art Archive (archived Mar. 24, 2026), perma.cc/YD7J-KQP8.

Importantly, as the above images demonstrate, for murals and other kinds of local artwork "the medium *is* commonly the message." *Understanding the First Amendment Limitations on Government Regulation of Artwork*, Am. Bar Ass'n (Jan. 2, 2017),

tinyurl.com/y9by6849 (emphasis added). Traditional advertisements or signs usually rely on written messages, and the same information "could theoretically be conveyed regardless of the height, size, location, color, materials, or brightness of the sign structure." *Id.* But visual "artwork is different," and "[i]n many cases, the size, orientation, color, or materials comprising the work are of critical importance to the piece's communicative intent." *Id.* As a result, local government regulations that dictate the placement, content, and format of such artwork risk distorting—or silencing—the message expressed.

Even Salina acknowledges the benefits of public-facing artwork. *See* Salina Br. (CA10 Dkt. 18) at 5 ("decorative elements (including murals) tend to enhance aesthetics, property values, and traffic and pedestrian safety"). Rather than encourage all such artwork, though, the city arbitrarily limits the definition of permissible "public art" to exclude works of art that, like the murals in the images above, incorporate a local business's identity or its products. On the city's view, "public art" includes all "artistic displays in public view" *except* those artistic displays "that are … 'used to announce, direct attention to, or advertise.'" Salina Mot. to Stay Judgment (CA10 Dkt. 20) at 6 n.5. But as the district court found, that arbitrary distinction does *nothing* to promote the city's stated interests. *See* Order at 27 (Salina's evidence is "devoid of any explanation or opinion indicating how or why a display that references a business's product is any more harmful to safety, aesthetics, or health than a display that references anything else").

## II. Artistic expression does not lose its First Amendment protection merely because it is adjacent to commercial activity.

Salina's sign code deprives the city's residents of many of the benefits associated with murals and other public artwork because it prohibits the creation of such art whenever it is "used to announce, direct attention to, or advertise." Order at 5. In other words, it strips the artwork of First Amendment protection when the artwork is associated with commercial activity.

Unfortunately, Salina is not alone in prohibiting expressive artwork that happens to reflect small business activity. Other cities enforce similar regulations. In Arlington, VA, for example, a dog grooming business was forced to cover its "playful mural of cartoon dogs and bones" (shown in Figure 3 above) "with an entirely new image that in no way has anything to do with [the] business." Kramer, *Arlington Dog Mural To Be Painted Over*, Inst. for Just. (Sept. 26, 2012), tinyurl.com/mubhtxsx. Another Arlington business, a smoke shop with a "mural of a man smoking a cigar," had to "have a blue whale painted over the cigar" so that it "no longer qualifie[d] as a sign promoting the shop," though the revised mural "didn't make a lot of sense." Holland, *When a Cigar Becomes a Whale, a Sign Becomes Art*, Wash. Exam'r (Sept. 26, 2012), perma.cc/F8MS-KRB8.

But the Constitution protects speech in *all* forms. That includes visual imagery like murals, "paintings, drawings, and engravings." *Kaplan*, 413 U.S. at 119-20. It includes artistic expression that is "designed to entertain as well as to inform." *Joseph*

*Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952); *Brown*, 564 U.S. at 790 ("[W]e have long recognized that it is difficult to distinguish politics from entertainment, and dangerous to try."). And it includes commercially motivated speech. *See Bolger*, 463 U.S. at 66-68. The Cozy Inn mural and other public artwork sponsored by small businesses fall squarely within this tradition of artistic expression protected by the First Amendment.

**1.** Salina's sign code flouts this basic principle. The First Amendment does not permit the government to downgrade expressive content just because it appears on the wall of a business or relates to a commercial activity. *See Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 795-96, 801 (1988) (speech that is "inextricably intertwined with otherwise fully protected speech" does not lose its protected status just because the speaker has a "financial motivation for speaking"). To the contrary, "protection under the First Amendment" applies even when the speaker's "interest is a purely economic one." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 762 (1976). There is "no requirement that, in order to avail themselves of First Amendment protection," speakers must address "general" topics beyond their "immediate" commercial interests. *Id.* at 762-63. So long as the medium "communicate[s] ideas" or "messages," that "suffices to confer First Amendment protection." *Brown*, 564 U.S. at 790.

In other words, the fact that Cozy's mural depicts hamburger-shaped alien spaceships that resemble the store's product is of no consequence. *See Bolger*, 463 U.S. at 66 ("The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are [unprotected] commercial speech."). First

Amendment protection applies all the same, and any effort to regulate or prohibit such murals based on who pays for them (e.g., a small business) or what they depict (e.g., the business's products) must satisfy strict scrutiny. *See Rosenberger v. University of Virginia*, 515 U.S. 819, 828 (1995) ("[T]he government may not regulate speech based on its substantive content" and "may not favor one speaker over another.").

**2.** Nor does the First Amendment permit local governments to assess artistic worth as a precondition for constitutional protection. Governments may not deem a mural less aesthetically valuable, and therefore less deserving of First Amendment protection, because it incorporates a small business's products. Indeed, the Supreme Court has specifically warned against the "startling and dangerous" notion that "[w]hether a given category of speech enjoys First Amendment protection depends upon" a regulator's subjective judgment regarding the relative "value of the speech" balanced "against its societal costs." *Stevens*, 559 U.S. at 470 (cleaned up). Simply put, outside of only a few historically recognized categories like "obscenity," there is "no facet of First Amendment jurisprudence" that "permits the Court, let alone the State, to evaluate the worth of protected speech." *Ent. Software Ass'n v. Hatch*, 443 F. Supp. 2d 1065, 1072 (D. Minn. 2006).

Courts, moreover, are trained in the law, not art, so they are ill-equipped to enforce subjective aesthetic standards. That is why federal courts have consistently declined to allow governments to enforce speech regulations based on such subjective judgments. "Under our Constitution, esthetic and moral judgments about art and

literature are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority." *Brown*, 564 U.S. at 790 (cleaned up). "[T]he task of courts is not to act as critics." *Candy Lab Inc. v. Milwaukee County*, 266 F. Supp. 3d 1139, 1146 (E.D. Wis. 2017).

Asking city officials to determine the primary value, purpose, or "use" of a piece of art, as Salina's sign code does, invites the kind of discretionary censorship that the First Amendment forbids. *See* Order at 5 (Salina's sign code prohibits artwork when city officials determine the artwork is "used" for commercial purposes). "[S]ubjective, amorphous standards" invite "unbridled discretion." *Cinevision Corp. v. City of Burbank*, 745 F.2d 560, 575 (9th Cir. 1984). As such, the Supreme Court has warned against speech codes that give local officials authority to selectively prohibit expression without "precise and clear standards." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). "[T]he danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Id.*

The First Amendment does not authorize local governments like Salina to decide that some murals are artistically valuable while others are not. It certainly does not authorize governments to decide that the *same* mural—say, a mural depicting burger-shaped alien vessels—is "art" when it is placed on a community center but merely a "sign" when it is painted on the side of a burger shop. "One man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 25 (1971). Likewise, one person's sign is another's mural. And judges are not permitted or required to "assess the aesthetic character of"

a mural or "speculate about the purpose an artist may have in mind when working on a particular project." *Andy Warhol Found. v. Goldsmith*, 598 U.S. 508, 554 (2023) (Gorsuch, J., concurring).

**3.** The commercial speech doctrine does not save Salina's sign code either. Commercial speech is "defined as speech that does *no more* than propose a commercial transaction." *United States v. United Foods*, 533 U.S. 405, 409 (2001) (emphasis added). Such speech is still entitled to First Amendment protection, though courts have given governments greater leeway to regulate purely commercial speech. *Id.* But Cozy's proposed mural and others like it do much more than propose a commercial transaction. As such, they lie outside the bounds of the narrow and questionable commercial speech doctrine. *See 44 Liquormart*, 517 U.S. at 522 (Thomas, J., concurring) (questioning the doctrine's "philosophical" and "historical basis").

In other contexts, the Supreme Court has already recognized that not all speech related to a transaction is necessarily commercial. "[C]haritable solicitations," for example, "'involve a variety of speech interests … that are within the protection of the First Amendment'" and "therefore have not been dealt with as 'purely commercial speech'" even though their chief aim is to induce a financial transaction. *Riley*, 487 U.S. at 787-88. Similarly, newspaper advertisements promoting a political view are not commercial speech just because the speaker paid to place the advertisement and the newspaper printed the advertisement in exchange for payment. *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 384-85 (1973). At bottom, speech falls within the

commercial speech carveout only if it is "related solely to the economic interests of the speaker and its audience." *Central Hudson*, 447 U.S. at 561.

Murals like Cozy's do not fit within that narrow category. Unlike pure commercial speech, murals express viewpoints and inspire emotions beyond that of conventional advertisements that merely propose a commercial transaction. The fact that a *business* commissions a mural or includes its product in the artwork does not deprive the artwork of its expressive value, nor diminish its cultural and aesthetic contributions. *See Bolger*, 463 U.S. at 66-67 (Neither "the reference to a specific product" nor "the fact that [a business] has an economic motivation" turns otherwise protected speech "into commercial speech."). Of course, Cozy's burger mural may entice onlookers to purchase a meal from the store. But the fact that the mural *also* encourages a commercial transaction does not deprive it of its artistic value or expressive quality. Courts examining similar pieces of art have said exactly that. *E.g.*, *Complete Angler, LLC v. City of Clearwater*, 607 F. Supp. 2d 1326, 1332 (M.D. Fla. 2009) ("Although the Painting may occasionally inspire the purchase of bait and tackle from the Angler, the Painting is not limited to merely proposing commercial transactions."); *Bolger*, 463 U.S. at 66 ("The mere fact that these pamphlets are conceded to be advertisements clearly does not compel the conclusion that they are commercial speech.").

In any event, even if Cozy's mural were subject to the commercial speech doctrine, that would not allow Salina to prohibit the mural altogether. Again, the commercial speech doctrine is designed to "protect consumers from fraudulent, misleading, or

coercive sales techniques." *Central Hudson*, 447 U.S. at 573 (Blackmun, J., concurring). It does not give regulators carte blanche to choose which commercial speech they will allow and which speech they will disallow, even for altruistic reasons like preserving aesthetic character or maintaining traffic safety. Indeed, the Supreme Court has rejected the notion that the commercial speech doctrine allows governments to regulate speech for any reason *other* than preventing deception in economic transactions. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996) (plurality opinion) ("[W]hen a State entirely prohibits" speech "for reasons unrelated to the preservation of a fair bargaining process, there is far less reason to depart from the rigorous review that the First Amendment generally demands."); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 577 (2001) (Thomas, J., concurring in part) (Governments may not use the commercial speech doctrine "to limit the content of commercial speech" for other reasons.).

Ensuring that the commercial speech doctrine remains confined to its proper place is especially important in today's marketplace, where advertisements often blend traditional product placement with artistic expression. *See supra* 7-9. Small and large businesses alike use murals and other artistic branding to honor local culture and community history while developing relationships with their customers. *See generally* Greaney, *The Power of the Urban Canvas: Paint, Politics, and Mural Art Policy*, 18 New Engl. J. Pub. Pol'y 7 (2002) (detailing the history and results of public mural efforts in Boston, Los Angeles, and Philadelphia). Unlike traditional advertising campaigns that simply pitch a product, these messages are not inherently tied to a commercial transaction.

Applying commercial speech rules to such artwork stretches the doctrine beyond its consumer-protection rationale and ignores the nature of modern advertisement.

## III. Complying with speech regulations like Salina's sign code is especially burdensome for small businesses, including NFIB's members.

Navigating the arbitrary distinction that Salina's sign code makes between an unregulated mural and a regulated sign imposes especially heavy burdens on small businesses and independent artists who lack the sophisticated compliance infrastructure and legal resources available to larger corporations. For many small businesses, the administrative costs associated with compliance and the possibility of liability in the event of *non*-compliance lead them to refrain from speech altogether, even if they believe their speech would be lawful.

While large organizations typically maintain internal legal departments or dedicated compliance teams tasked with reviewing regulations and advising decisionmakers on potential violations, small businesses often operate with minimal administrative staff and have limited access to legal compliance expertise. Proving the point, NFIB members rank "unreasonable government regulations" as one of the biggest problems facing small businesses. Wade et al., *Small Business Problems & Priorities*, NFIB Research Center, at 4, 9, 18 (11th ed. 2024), hperma.cc/AF29-TF6W. And "51% of small businesses say navigating regulatory compliance requirements is negatively impacting their growth." Swanek, *A Majority of Small Businesses Say Regulations Hinder Growth*, U.S. Chamber of Com. (Dec. 16, 2024), perma.cc/Q5GS-YYGM. The "expectation on small businesses

to be responsible for" compliance with detailed regulations "strains companies that are often already overworked and understaffed." *LS3, LLC v. United States*, 168 Fed. Cl. 722, 737 (2023). And although the burden of compliance exists for all kinds of regulation, the Supreme Court has recognized that it poses a particular danger in the speech context. *See McConnell*, 540 U.S. at 332 (Regulations can "create major disincentives for speech, with the effect falling most heavily on smaller entities that often have the most difficulty bearing the costs of compliance.").

Large corporations, moreover, are often repeat players and therefore have a greater incentive to invest in compliance measures. Indeed, many large corporations like Coca-Cola, Nike, and Airbnb have undertaken large-scale mural campaigns across multiple cities. *See Mural Painting Art: An Underrated Marketing Strategy*, Am. Guerilla Mktg. (Oct. 12, 2023), perma.cc/L23S-U4MP. But small businesses that may create only a single piece of art cannot easily absorb the delay of a protracted permitting process, the cost of legal consultation, or the risk that a completed work will later be deemed prohibited. Faced with that uncertainty, artists may narrow their message or abandon the project altogether.

Relevant statistics demonstrate the unique burden that small businesses face. A recent survey of hundreds of small businesses across the United States found that, because they lack permanent legal counsel, "[n]early one in five small businesses lost over $5,000 to preventable legal issues last year." *New Study: Legal Pitfalls Dent Small Business Owners' Bottom Line*, LegalShield (May 19, 2025), perma.cc/NS65-XW7U. The same

survey found that "61% of small businesses worry about accidentally violating laws or regulations," "40% missed revenue opportunities due to legal uncertainties," and a quarter "considered closing their business due to legal challenges." *Id.* Large corporations are usually able to reduce compliance costs through economies of scale. *See Small Companies, Big Burdens: The Compliance Cost Crisis*, Qlutch (May 26, 2025), perma.cc/XRJ3-HU65 ("[S]mall businesses pay 47% more per employee than large firms for regulatory compliance."). But for small businesses, legal uncertainty exposes them to enforcement risks and deters them from engaging in lawful activities—including constitutionally protected speech—whose regulatory status is unclear.

These compliance costs directly impact a small business's willingness to sponsor murals or other public artwork. Many will prefer to avoid the hassle of government regulation and simply leave their public spaces bare. Indeed, "[l]ong public processes for art curation" can "cost more to curate than the art itself, which results in few new pieces of art." Altschuler, *America's Mural Magic: How Street Art Can Transform Communities and Help Businesses*, Forbes (March 23, 2020), tinyurl.com/2vdehmcs. That means missed opportunity not only for businesses, but for "communities, residents," and "tourists." *Id.*; *cf. Citizens United v. FEC*, 558 U.S. 310, 335-36 (2010) ("'[M]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.'").

The burdens of compliance are especially great when, as here, the regulatory scheme requires government approval *before* speech occurs. *See* Order at 28-31 (explaining why Salina's sign code is an impermissible prior restraint on speech). Even if Salina's sign code does not explicitly require prior approval before painting a mural, "the complexity of the" code and the understandable desire to "avoid" the costs of running afoul of the code mean that, as "a practical matter," Salina businesses must ask the city for permission before they create a mural that reflects their business's unique identity. *Citizens United*, 558 U.S. at 335. But the Supreme Court "recognized many years ago that" laws "requir[ing] that permission to communicate ideas be obtained in advance from state officials who judge the content of the words and pictures sought to be communicated" are "a form of infringement upon freedom of expression to be especially condemned." *Burstyn,* , 343 U.S. at 503.

And the danger of censorship is heightened even more when the regulation at issue is vague or depends on the discretion of the local authorities. Salina's sign code, under which the distinction between a piece of art and a mere sign turns on local officials' determination about a particular mural's "use" or artistic merit, certainly falls into this category. *See supra* 12-14. Such laws have a particularly dangerous "chilling effect on free speech" because their vague and standardless terms threaten to "censo[r] speech that, in fact, falls *outside* the statute's scope." *Reno v. ACLU*, 521 U.S. 844, 872, 874 (1997) (emphasis added). Because they cannot predict how regulators will apply the law, potential speakers will choose to remain silent even if their messages arguably

"would be entitled to constitutional protection." *Id.* at 874; *see also FCC v. Fox Television Studios*, 567 U.S. 239, 253 (2012) (Speech-regulating laws may be held void if they do not give sufficient notice of what is proscribed or if they encourage discriminatory enforcement.). In this case, for example, Salina officials seemingly offered no less than three different explanations, on no less than three separate occasions, for their decision to prohibit Cozy's mural. *See* Order at 6-8.

## CONCLUSION

Small businesses and the neighborhoods they inhabit should not be deprived of the benefits of expressive public artwork simply because those works of art happen to *also* benefit the business's sales. This Court should affirm the judgment below.

Dated: March 31, 2026

Respectfully submitted,

*/s/ J. Michael Connolly*

J. Michael Connolly
Paul R. Draper
CONSOVOY MCCARTHY PLLC
ANTONIN SCALIA LAW SCHOOL
FREE SPEECH CLINIC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
paul@consovoymccarthy.com

*Counsel for NFIB*

## CERTIFICATE OF COMPLIANCE

This brief complies with FRAP 29(5) & 32(a)(7)(B) because it contains 5,288 words, excluding the parts that can be excluded. This brief also complies with FRAP 32(a)(5)-(6) and 10th Circuit Rule 32(a) because it is prepared in a proportionally spaced face using 14-point Garamond font.

## CERTIFICATE OF SERVICE

On March 31, 2026, I e-filed this brief with the Court, which will email everyone requiring notice.

Dated: March 31, 2026

*/s/ J. Michael Connolly*
Counsel for NFIB