No. 25-3225

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

---

Cozy Inn, Incorporated, d/b/a/ The Cozy Inn, et al.,

*Plaintiffs – Appellees*,

v.

City of Salina, Kansas,

*Defendant – Appellant*.

---

On Appeal from the United States District Court
for the District of Kansas
The Honorable Toby Crouse, District Judge
No. 6:24-cv-01027-TC

---

# BRIEF OF PACIFIC LEGAL FOUNDATION AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLEES

---

JEREMY TALCOTT
AMY L. PEIKOFF
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
JTalcott@pacificlegal.org
APeikoff@pacificlegal.org

*Counsel for Amicus Curiae*
*Pacific Legal Foundation*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

STATEMENT OF IDENTITY AND INTEREST ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 5

I. Salina's Mural-Sign Regime Is an Unconstitutional Content- and Speaker-Based Restriction That Cannot Be Saved by an Appeal to Aesthetic Regulation ..... 5

A. The assumption that business owners lack authentic artistic voice is elitist and constitutionally impermissible ..... 5

B. Aesthetic regulations should meet demanding criteria that Salina's regime fails entirely ..... 7

II. The Commercial/Non-Commercial Speech Distinction Is Without Basis, Unworkable, Inconsistent with First Amendment Values, and Increasingly Disfavored ..... 14

A. The doctrine was created without constitutional basis, and its two principal justifications have never been vindicated ..... 14

B. The commercial/non-commercial distinction is unworkable in application to intermingled expressive and commercial activity ..... 17

C. The distinction is inconsistent with the core values the First Amendment is designed to protect ..... 20

D. The distinction is increasingly disfavored in the courts ..... 22

III. Strict Scrutiny or Robust Intermediate Scrutiny Applies, and Salina Fails Either Standard ..... 25

CONCLUSION ..... 33

CERTIFICATE OF COMPLIANCE ..... 36

CERTIFICATE OF SERVICE ..... 37

CERTIFICATE OF ELECTRONIC SUBMISSION ..... 38

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ArchitectureArt, LLC v. City of San Diego*,
231 F. Supp. 3d 828 (S.D. Cal. 2017),
*aff'd*, 745 F. App'x 37 (9th Cir. 2018) .......... 11

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .......... 10

*Board of Trustees of State University of New York v. Fox*,
492 U.S. 469 (1989) .......... 23

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) .......... 1

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980) .......... *passim*

*Citizens United v. Federal Election Comm'n*,
558 U.S. 310 (2010) .......... 14–15

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .......... 10

*Cozy Inn, Inc. v. City of Salina*,
No. 24-cv-01027-TC, 2025 WL 3223806
(D. Kan. Nov. 19, 2025) .......... 26–28

*Edenfield v. Fane*,
507 U.S. 761 (1993) .......... 23

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*,
551 U.S. 449 (2007) .......... 14

*Knick v. Twp. of Scott*,
588 U.S. 180 (2019) .......... 1

*Koontz v. St. Johns River Water Mgmt. Dist.*,
570 U.S. 595 (2013) .......... 1

*Metromedia, Inc. v. City of San Diego*,
453 U.S. 490 (1981) .......... *passim*

*Nike, Inc. v. Kasky*,
539 U.S. 654 (2003) .......... 18

*Nollan v. California Coastal Comm'n*,
483 U.S. 825 (1987) .......... 1

*Payne v. Tennessee*,
501 U.S. 808 (1991) .......... 15

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .......... 25

*Sackett v. E.P.A.*,
566 U.S. 120 (2012) .......... 1

*Sackett v. E.P.A.*,
598 U.S. 651 (2023) .......... 1

*Schad v. Borough of Mount Ephraim*,
452 U.S. 61 (1981) .......... 10

*Seider v. City of Malibu*,
No. 2:20-cv-08781-SPG-MRW, 2023 WL 6192715
(C.D. Cal. May 2, 2023) .......... 2

*Sheetz v. Cnty. of El Dorado*,
601 U.S. 267 (2024) .......... 1

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 24–25, 32

*Tyler v. Hennepin Cnty.*,
598 U.S. 631 (2023) .......... 1

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) .......... 1

*United States v. Stevens*,
559 U.S. 460 (2010) .......... 7

*Valentine v. Chrestensen*,
316 U.S. 52 (1942) .......... 14–15

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) .......... 32

*Wilkins v. United States*,
598 U.S. 152 (2023) .......... 1

*Wooley v. Maynard*,
430 U.S. 705 (1977) .......... 6

*Young v. Town of Conway*,
783 F. Supp. 3d 588 (D.N.H. 2025) .......... 28

**U.S. Constitution**

U.S. Const. amend. I .......... *passim*

**Rule of Court**

Fed. R. App. P. 29(a)(4)(E) .......... 1

**Other Authorities**

Costonis, John J., *Law and Aesthetics: A Critique and a Reformulation of the Dilemmas*,
80 Mich. L. Rev. 355 (1982) .......... 3

Kozinski, Alex & Banner, Stuart, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627 (1990) .......... 4, 16

La Fetra, Deborah J., *Kick It Up a Notch: First Amendment Protection for Commercial Speech*,
54 Case W. Res. L. Rev. 1205 (2004) .......... 4, 18–22

Order Granting Plaintiffs' Motion for a Temporary Restraining Order, *Nemhauser v. City of Mount Dora*,
No. 5:18-cv-87-JSM-PRL (M.D. Fla. Feb. 21, 2018),
https://pacificlegal.org/wp-content/uploads/pdf/nemhauser-v-city-of-mount-dora/Nemhauser-Order-Granting-TRO.pdf .......... 2

"PETSMART," Ben Lapidus (Official Music Video),
https://youtu.be/wBmmtReZPtc?si=M9E8gV_-kCvq6bLl .......... 19

Stern, Nat, *The Stubborn Survival of the* Central Hudson *Test for Commercial Speech*,
45 Seattle U. L. Rev. 647 (2022) .......... 4

"Thank you for your interest in Astronomer," Astronomer,
https://youtu.be/vich2C-Tl7Q?si=tl8yM9b9M2pKGGLv .......... 19

Warhol, Andy, *Campbell's Soup Cans* (1962) .......... 6, 19

"We have ANSWERS. No more screaming, you're scaring the pets," PetSmart, https://youtube.com/shorts/Q22Y9G4S90k?si=35YTXr3odGAl8yTb ........................................................................................ 19

## STATEMENT OF IDENTITY AND INTEREST

Since 1973, Pacific Legal Foundation (PLF),[1] widely regarded as the most experienced and successful nonprofit legal organization of its kind, has advanced the principles of individual rights and limited government—in state and federal courts—advocating for the views of thousands of supporters nationwide. In particular, PLF is known for its defense of private property rights, including in *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267 (2024); *Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023); *Sackett v. E.P.A.*, 598 U.S. 651 (2023); *Wilkins v. United States*, 598 U.S. 152 (2023); *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021); *Knick v. Twp. of Scott*, 588 U.S. 180 (2019); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016); *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013); *Sackett v. E.P.A.*, 566 U.S. 120 (2012); and *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987).

[1] In accordance with Fed. R. App. P. 29(a)(4)(E), amicus PLF states that no party's counsel authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparation or submitting this brief, and no person—other than PLF, its members, or its counsel—contributed money that was intended to fund preparation or submitting this brief.

PLF is experienced in cases involving expressive uses of private property. *See, e.g.*, *Nemhauser v. City of Mount Dora*, No. 5:13-cv-87-JSM-PRL (M.D. Fla. Feb. 21, 2018), https://pacificlegal.org/wp-content/uploads/pdf/nemhauser-v-city-of-mount-dora/Nemhauser-Order-Granting-TRO.pdf (order granting temporary restraining order against city enforcing sign code against "Starry Night" mural painted on plaintiff's home; settlement with city followed); *Seider v. City of Malibu*, No. 2:20-cv-08781-SPG-MRW, 2023 WL 6192715, at *7 (C.D. Cal. May 2, 2023) (denying motion to dismiss on a pre-enforcement First Amendment claim involving a permit for a desired sign on private property). PLF is interested in this case because it involves an unconstitutional content- and speaker-based constraint on an owner's expressive use of his private property. PLF writes in support of Plaintiffs-Appellees.

## SUMMARY OF ARGUMENT

The City of Salina has drawn a line between regulated "*signs*" and unregulated "*murals*" based on a single criterion: whether the subject matter of the artwork relates to the business operating in the building on which it is painted. This content-based distinction is unconstitutional for two fundamental reasons.

First, government regulation of expression is too often based on the constitutionally impermissible assumption that business owners lack authentic artistic voice. It discriminates not only on the basis of subject matter, but also on the basis of the speaker's identity. Accordingly, to survive constitutional scrutiny, regulation for aesthetic purposes should satisfy demanding criteria. It should articulate clear standards and have a coherent structure. It should be administered consistently. It should restrict expression only as necessary, and its justification should be grounded in broadly shared community sentiment. Salina's regime wholly fails these criteria. Legal scholarship identifying the recurring conceptual errors in aesthetic regulation—the *sensory fallacy* that beauty is objectively ascertainable, the *formalistic fallacy* that visual form is separable from expressive content, and the *semantic fallacy* that aesthetic categories have determinate meaning—illuminates precisely why Salina's subject-matter test cannot function as a genuine, defensible aesthetic standard. John J. Costonis, *Law and Aesthetics: A Critique and a Reformulation of the Dilemmas*, 80 Mich. L. Rev. 355 (1982).

Second, the commercial/non-commercial speech distinction that underlies Salina's regime is without basis, analytically unworkable,

inconsistent with the core values the First Amendment was designed to protect, and increasingly disfavored in the courts. The doctrine was constructed without constitutional basis in 1942 and its two principal justifications—verifiability and durability—have never survived scrutiny. Alex Kozinski & Stuart Banner, *Who's Afraid of Commercial Speech?*, 76 Va. L. Rev. 627 (1990). As the category of intermingled commercial and non-commercial expression has expanded—product placement, corporate advocacy, artistic collaboration with commercial sponsors—the line has become both functionally meaningless and constitutionally unjustifiable. Deborah J. La Fetra, *Kick It Up a Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004). It's not surprising that courts have increasingly frowned upon the distinction, granting commercial speech more protection by means of a robust application of the *Central Hudson* test. Nat Stern, *The Stubborn Survival of the* Central Hudson *Test for Commercial Speech*, 45 Seattle U. L. Rev. 647, 668 (2022).

Strict scrutiny or, at a minimum, a robust form of intermediate scrutiny should apply to Salina's mural-sign code regime. As the district

court found, the City has failed to meet even the latter standard. This Court should affirm.

## ARGUMENT

### I. Salina's Mural-Sign Regime Is an Unconstitutional Content- and Speaker-Based Restriction That Cannot Be Saved by an Appeal to Aesthetic Regulation

#### A. The assumption that business owners lack authentic artistic voice is elitist and constitutionally impermissible

Underlying Salina's position is a value judgment that permeates much of commercial speech doctrine: that people who stand to profit from their subject matter are somehow less capable of authentic expression than those with no financial stake in it. This view—that commercial content is ipso facto crass, tasteless, or lacking in aesthetic value—is both empirically unfounded and constitutionally impermissible.

Consider the facts of this case. Stephen Howard has dedicated his life to The Cozy Inn, an establishment so beloved, it is described as iconic in Salina. His passion for the subject matter of his work is not diminished by the fact that it has also sustained a livelihood for him and others. If anything, his intimate knowledge of and investment in the hamburger—gained through nearly two decades of work as manager and co-owner—gives him unique insight and authenticity as a patron and commissioner

of art celebrating that subject. The discovery concession illustrates the absurdity of Salina's position: a wall-sized replica of Andy Warhol's *Campbell's Soup Cans* (1962) would be permissible as fine art, but a hamburger mural painted on behalf of a man who has spent years devoted to delivering award-winning hamburgers becomes regulated "signage." Response Brief of Plaintiff-Appellees at 11–12 (citation omitted). Similarly, "[i]f a coffee shop painted a dove and an olive branch on its wall, it would be considered an unregulated mural. But if the display contained a dove and a coffee branch, it would be considered a regulated sign." *Id.* at 12 (citation omitted). The distinction tracks neither artistic merit nor any cognizable community harm. It tracks only the City's preference for who may speak and what they may say about a given subject.

A speaker's choice to communicate about his or her own life, work, and values is close to the core of the freedom the First Amendment protects. *See Wooley v. Maynard*, 430 U.S. 705, 714–15 (1977). The business owner who commissions a mural depicting his establishment's warmth, history, or character is making an expressive choice about who he is and what he values. Salina's code says this choice is suspect—that

self-expression about one's own enterprise is less protected than self-expression about anything else. The Constitution does not permit government to make that judgment. *See*, *e.g.*, *United States v. Stevens*, 559 U.S. 460, 468 (2010).

### B. Aesthetic regulations should meet demanding criteria that Salina's regime fails entirely

Salina characterizes its mural-sign code as a neutral regulation justified largely on aesthetic grounds—a reasonable effort to preserve the City's visual character. *See* Opening Brief of Appellant City of Salina, Kansas, *passim* (mentioning "aesthetics" frequently throughout the brief and supporting materials). But aesthetic justifications do not dissolve the content-based character of a law, and in any event Salina's regime fails even the criteria that courts have developed for evaluating bona fide aesthetic regulation. Before applying those criteria, it is worth understanding the conceptual errors that make Salina's particular approach constitutionally unworkable from the ground up.

That courts have often readily accepted aesthetic justifications without demanding rigorous support is itself part of the problem. As Professor Costonis observes, modern aesthetic regulation cases "appear to express the … sentiment that beauty is an absolute social good whose

pursuit by government requires no justification by reference to some identifiable value beyond itself." Costonis, *supra*, at 392. When beauty is treated as self-evidently worth pursuing, the constitutional inquiry collapses: a city need only assert that a restriction serves aesthetics and courts defer. The content-based character of the regulation is then obscured behind a facade of civic beautification. Salina's invocation of aesthetics follows this pattern exactly. But the premise that courts may simply take the aesthetic value of a regulatory distinction as given—without requiring the city to explain what visual quality is promoted, why the commercial/non-commercial line advances it, or how the two categories differ in any respect that bears on community appearance—is precisely what Costonis's framework is designed to correct.

Professor Costonis's examination of aesthetic regulation identifies three recurring conceptual errors that arise when regulators mistake aesthetic preference for aesthetic standard. Costonis, *supra*, at 397–409. The first is the *sensory fallacy*—the premise that aesthetic judgments rest on objective, verifiable sensory facts rather than on the subjective, culturally situated preferences, values, and beliefs of the observer. *Id.* at 397–401. The second is the *formalistic fallacy*—the error of treating

visual form as separable from expressive content when the two are in fact inseparable; a sign's message is partly constituted by its visual character, and vice versa. *Id.* at 401–07. The third is the *semantic fallacy*—the use of aesthetic labels ("*attractive,*" "*harmonious,*" "*commercial*") as though they have determinate meaning when they are, in practice, containers for whatever the regulator wishes to pour into them. *Id.* at 408–09.

Salina's mural-sign code commits all three errors simultaneously. The premise that a mural depicting a business's stock-in-trade is aesthetically inferior to a mural depicting a pastoral scene is the sensory fallacy in action—it assumes that official taste can distinguish the beautiful from the commercial as a matter of objective fact. The premise that The Cozy's message can be stripped from its artistic form—so that the image is regulated while the artistry is not—is the formalistic fallacy. And the use of the category "sign" to capture artwork that merely relates to a business is the semantic fallacy: the word does real definitional work only by smuggling in an undisclosed aesthetic judgment about what kinds of art belong on commercial premises.

These conceptual errors manifest as concrete legal failures under the criteria cities must satisfy for any aesthetic regulation to survive

constitutional review. Those criteria require: (1) clear standards; (2) internally coherent structure; (3) rational and consistent administration; (4) no needless restriction of expression; and (5) a "cogen[t] ... claim that the regulated activity's offensiveness poses a genuine threat to community stability." Costonis, *supra*, at 455 (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61 (1981)). Salina's regime fails each criterion in turn.

First, the regime lacks clear standards. City officials have admitted they cannot determine whether a given work is a regulated sign or an unregulated mural without first seeing the finished artwork and assessing how its content relates to the on-site business. *See* Response Brief of Plaintiffs-Appellees at 7, 10, 12 (citations omitted). That is not a standard—it is standardless discretion. When a business owner must submit to the unpredictable judgment of a city official about whether a painting "feels" commercial, the code provides no guidance to the regulated, the regulator, or a reviewing court. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 42 (1999) (noting the fair notice requirement's purpose is to enable the ordinary citizen to conform his or her conduct to the law); *see also, Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) ("Free

speech may not be so inhibited [so as to cause individuals to] ... restrict[] their conduct to that which is unquestionably safe.”).

Second, the code lacks internally coherent structure. Salina’s sign code does not mention murals at all. The mural-sign distinction has been constructed entirely through ad-hoc enforcement, without any codified criteria specifying what transforms a work of art into a regulated sign. Business owners cannot determine in advance which side of the line their proposed artwork will fall on. Salina invokes *ArchitectureArt, LLC v. City of San Diego*, 231 F. Supp. 3d 828 (S.D. Cal. 2017), *aff’d*, 745 F. App’x 37 (9th Cir. 2018), as authority that a mural/sign distinction can survive constitutional review. However, unlike Salina’s mural-sign code regime, in which the sign code itself contains no language specifying what qualifies as an unregulated mural, in *ArchitectureArt*, San Diego’s ordinance contains language describing the characteristics of the graphics that are exempt from the city’s sign regulations. *Id.* at 835.

Third, the regime has been administered inconsistently. The record documents arbitrary enforcement in at least two instances. Response Brief of Plaintiffs-Appellees at 16 (citations omitted). Inconsistency is unsurprising given the absence of clear standards: officials must

inevitably rely on personal aesthetic or other normative preferences when the code provides little or no guidance. This is precisely the *discretion problem* that Costonis identifies as a central constitutional defect: where the line between protected and regulated speech is drawn by reference to subject matter and enforced by officials who retain broad interpretive authority, the conditions for viewpoint discrimination and selective enforcement are present regardless of the facial neutrality of the code. Costonis, *supra*, at 439.

Fourth, the restriction needlessly burdens expression. Stephen Howard sought only to commission an artist to paint a mural on the side of his own building—a mural depicting hamburger-esque UFOs, which an artist could paint freely on almost any other building in the city. The mural-sign code regime adds nothing to Salina community aesthetics; it simply silences a speaker whose passion for his subject matter happens to be expressed through his chosen livelihood.

Fifth, Salina cannot credibly claim that a hamburger-esque UFO-themed mural poses any threat to community stability. In *Metromedia*, San Diego enacted its billboard ordinance in direct response to documented community concern: "its purpose was 'to eliminate hazards

to pedestrians and motorists brought about by distracting sign displays' and 'to preserve and improve the appearance of the City.'" *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 493 (1981) (citation omitted). That ordinance addressed a problem the community had identified and demanded be remedied. Here, the record shows the opposite: community members responded to The Cozy's mural with compliments, not complaints. Response Brief of Plaintiffs-Appellees at 12–13. Salina has offered no evidence that painted murals depicting business-related content harm anyone. Costonis distinguishes between the *visual-beauty rationale* for aesthetic regulation—a nakedly subjective preference for certain appearances—and the more defensible *stability-identity rationale*, which recognizes a community's legitimate interest in preserving its visual character and sense of place. Costonis, *supra*, at 406–24. But even stability-identity regulation must be grounded in articulable, objective criteria that constrain official discretion. *See id.* at 434. Salina's subject-matter test is a visual-beauty rationale thinly disguised: it tells us only that city officials prefer murals that do not advertise, without explaining what visual qualities are sought or avoided.

## II. The Commercial/Non-Commercial Speech Distinction Is Without Basis, Unworkable, Inconsistent with First Amendment Values, and Increasingly Disfavored

### A. The doctrine was created without constitutional basis, and its two principal justifications have never been vindicated

The commercial speech doctrine was born, as Alex Kozinski and Stuart Banner have documented, "*out of thin air*." Kozinski & Banner, *supra*, at 627. In *Valentine v. Chrestensen*, 316 U.S. 52 (1942), the Court issued a terse per curiam opinion—devoid of reasoning, historical analysis, or citation to prior authority—announcing that purely commercial advertising enjoyed no First Amendment protection. Kozinski & Banner, *supra*, at 628. The opinion cited nothing for that proposition because there was nothing to cite; it was simply asserted. *Id.* (citing *Valentine*, 316 U.S. at 54). The doctrine later acquired two post-hoc justifications, neither of which survives scrutiny.

That absence of historical grounding is not merely a scholarly observation—it has constitutional significance. The Supreme Court has characterized similar categorical exclusions from First Amendment protection as "significant departure[s] from ancient First Amendment principles." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 319 (2010) (citing *Federal Election Comm'n v. Wisconsin Right to Life,*

*Inc.*, 551 U.S. 449, 490 (2007) (Scalia, J., concurring in part and concurring in judgment)). In *Citizens United*, the Court relied expressly on "original meaning" to reject a speaker-based restriction, concluding that "there is no support for the view that the Amendment's original meaning would permit suppressing" speech of a disfavored kind. *Id.* at 366. *Valentine*'s commercial/non-commercial line is precisely such a categorical restriction—and like the restriction struck down in *Citizens United*, it finds no anchor in the First Amendment's text or in Founding-era understanding. As Justice Scalia framed the defect in another case, the errant rule had "no basis in constitutional text, in historical practice, or in logic." *Payne v. Tennessee*, 501 U.S. 808, 834 (1991) (Scalia, J., concurring). The same indictment fits *Valentine*: the opinion offered no text, no history, no logic—only an *ipse dixit*. Stare decisis does not require courts to perpetuate such errors. This Court "has never felt constrained to follow precedent when governing decisions are unworkable or badly reasoned." *Id.* at 827 (majority opinion).

The first post-hoc justification offered for the commercial/non-commercial distinction is *objective verifiability*: commercial speech is supposedly more susceptible to verification than political or artistic

speech, and therefore less deserving of protection against government correction. Kozinski & Banner, *supra*, at 634–37 (citing, e.g., *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562 (1980)). But a great deal of commercial speech is entirely unverifiable—advertisements for experiences, for self-image, for the feeling of driving a sports car or wearing a luxury watch convey no facts that can be confirmed or refuted. *Id.* at 636. A mural depicting the iconic hospitality of an historic Salina establishment conveys an invitation to an experience; it is no more "verifiable" than a poem.

The second justification offered is *durability*: commercial speech is supposedly more resilient than political speech because the profit motive ensures that businesses will continue to speak even in the face of some regulation. *Id.* at 637–39. Salina appears to be leaning on this rationale when noting that The Cozy has found alternative ways to get its message out after it was ordered to stop painting its mural. Opening Brief of Appellant City of Salina, Kansas at 30–31. The Supreme Court's introduction of this premise appears not in the body of *Central Hudson,* but rather in a footnote: the Court observed in passing that commercial speech may be "hardier" than other expression. 447 U.S. at 564 n.6. A

rationale for diminished constitutional protection that could not earn its place in the body of the opinion provides thin support for the doctrinal structure built upon it. But the reasoning is constitutionally backwards in any event. It would justify suppressing any speech by any well-funded speaker, because well-funded speakers can absorb regulation. Moreover, the durability rationale cannot explain why, for example, the same image painted by a wealthy artist and a struggling entrepreneur should receive different constitutional protection.

### B. The commercial/non-commercial distinction is unworkable in application to intermingled expressive and commercial activity

The commercial/non-commercial line is genuinely unworkable in cases like this one, involving artistic expression by individuals who have economic ties to their subject matter. Kozinski and Banner illustrated the doctrine's incoherence in 1990 with cases no court could satisfactorily resolve: the Diet Pepsi advertisement featuring a celebrity actor—commercial speech about a soft drink, or entertainment? A music video that prominently features a product—commercial speech or artistic expression? A tobacco company's "*Bill of Rights*" advertising campaign—commercial speech about cigarettes, or political speech about liberty?

Kozinski & Banner, *supra*, at 641–43. The doctrine provides no principled answer to any of these questions because the line it purports to draw does not exist.

La Fetra provides updated examples in the wake of *Nike, Inc. v. Kasky*, 539 U.S. 654 (2003), in which the Court confronted the threshold question whether Nike's public statements about its overseas labor practices were commercial or non-commercial speech and ultimately dismissed the writ of certiorari without resolving it—a vivid illustration of the doctrine's intractability. La Fetra, *supra*, at 1207–10.

Modern commercial expression spans the full range: product placement in films, corporate-sponsored community events, celebrity testimonials, "stealth marketing" conducted through social media, visual artists who paint recognizable brand logos, food critics who praise restaurants, chefs who write memoirs about their kitchens. La Fetra, *supra*, at 1211. Two recent examples illustrate the continuing evolution of the problem. First, in a move that many public relations professionals heralded as genius, Astronomer, a company which found itself in the midst of a public relations crisis when its CEO and a company employee who was not his wife were caught on a "kiss cam" during a Coldplay

concert, hired Coldplay's lead singer's ex-wife, Gwenyth Paltrow, "on a very temporary basis," to record a video making light of the attention the company received.[2] Second, musician-comedian Ben Lapidus released a video in which he demands that pet-supply retailer PetSmart explain the meaning of its logo.[3] After the video went viral, ensuring publicity for his upcoming album (to be released on the day this brief is due to be filed), PetSmart published a series of responses, cashing in (pun intended) on the publicity.[4] In each of these instances, the speaker has both expressive and commercial interests in the communication. Drawing a clean line between the two is not merely difficult—it is arbitrary. The *Central Hudson* test "cannot adequately protect intermingled speech" because it was designed for a world of purely commercial or purely non-commercial communications that simply does not exist. La Fetra, *supra*, at 1208.

The discovery record in this case proves the point. Salina admitted that Mr. Howard could paint an exact wall-sized replica of Andy Warhol's

---

[2] "Thank you for your interest in Astronomer," https://youtu.be/vich2C-Tl7Q?si=tl8yM9b9M2pKGGLv.

[3] "PETSMART," https://youtu.be/wBmmtReZPtc?si=M9E8gV_-kCvq6bLl.

[4] *See*, *e.g.*, "We have ANSWERS. No more screaming, you're scaring the pets," https://youtube.com/shorts/Q22Y9G4S90k?si=35YTXr3odGAl8yTb.

*Campbell's Soup Cans*—unless and until he started selling soup. Response Brief of Plaintiffs-Appellees at 28. At that moment, the same artwork, painted on the same wall, conveying the same artistic content, becomes a regulated sign. The distinction tracks no principled aesthetic criterion whatsoever. It tracks only the speaker's identity and his commercial relationship to the subject matter. That is speaker-based discrimination in its purest form: Salina permits non-commercial establishments to commission murals of hamburgers, coffee branches, and soup cans, while forbidding the business owners who know those subjects most intimately from doing the same.

### C. The distinction is inconsistent with the core values the First Amendment was designed to protect

Beyond its technical unworkability, the commercial/non-commercial distinction is in tension with the foundational purposes of the First Amendment. Three core values—the pursuit of truth in the marketplace of ideas, the provision of a check on other sources of power, and the protection of individual autonomy and self-realization—all counsel in favor of robust protection for commercial speech. La Fetra, *supra*, at 1220.

On the pursuit of truth: consumers benefit from accurate, informed speech about products and services. Suppressing business-related expression impoverishes the marketplace of ideas by excluding the voices of those with firsthand, hard-won knowledge of their subject matter. Writes La Fetra, "The simple fact that all sides of a debate can participate is 'likely to spur expression's thoroughness, thought-fulness, and breadth of distribution.'" La Fetra, *supra*, at 1226 (citation omitted). Stephen Howard knows more about hamburgers than almost anyone in Salina. Silencing his mural does not improve the City's aesthetic landscape—it removes a knowledgeable and passionate voice from it. Moreover, to reprise the above example: were Howard to have a Campbell's soup can painted on the side of his building instead of hamburger-esque UFOs, the mural might escape regulation under Salina's mural-sign code regime. Response Brief of Plaintiffs-Appellees at 28. But it would also mislead, hindering the pursuit of truth.

On checking concentrated power: when individuals cannot or are reluctant to enter a debate dominated by media megacorporations and government, corporations and other commercial speakers can provide an alternative perspective. La Fetra, *supra*, at 1222. And should one be

concerned about the accumulation of power by commercial speakers themselves, the prevalence of boycotts as a form of counter-speech to corporate communications demonstrates that consumers are fully capable of evaluating commercial expression critically and responding accordingly. *Id.* at 1224–26. Viewers of The Cozy's mural can think for themselves; they don't need the City of Salina's "protection."

On autonomy and self-realization: by permitting a layperson to paint a wall-sized, hamburger-esque UFO-themed mural while forbidding Stephen Howard from doing the same, Salina has not protected community aesthetics. It has merely infantilized those it purports to protect and, what is worse, it has silenced a speaker it views as insufficiently artistic by virtue of his commercial passion for his subject. Permitting such restrictions "assumes that consumers are unable to separate the wheat from the chaff." La Fetra, *supra*, at 1223. A business owner's choice to commission a mural expressing his establishment's identity and values is an exercise of the same dignitary interest in self-presentation that the First Amendment has always protected most jealously. *See id.* at 1236–39.

### D. The distinction is increasingly disfavored in the courts

The trajectory of Supreme Court jurisprudence has moved steadily toward stronger protection for commercial speech in recognition of exactly the problems with the distinction described above. As one commentator has observed, a quarter-century of muscular enforcement of *Central Hudson*'s fourth prong has "wrenched the test from its original moorings" and effectively transformed it into something closely resembling strict scrutiny. Stern, *supra,* at 668.

The evidentiary demands *Central Hudson* imposes are more stringent than they first appear. Professor Nat Stern documents how the doctrine's fourth prong—requiring that the restriction be "no more extensive than necessary"—has been applied with increasing rigor over four decades, to the point where "it is difficult to distinguish [*Central Hudson*'s] demanding application ... from the strict-scrutiny test that the Court declines to apply." Stern, *supra*, at 671. Even the "gentler" version of the test, drawing on *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469 (1989), and *Edenfield v. Fane*, 507 U.S. 761 (1993), requires at minimum that the government demonstrate that the regulated harms are "real" and that the restriction "in fact alleviate[s]

these harms to a material degree." Stern, *supra*, at 658 (quoting *Edenfield*, 507 U.S. at 771). Moreover, there is no version of *Central Hudson* under which a government may point to a bare regulatory distinction, as Salina does here, and declare that the distinction itself proves its justification.

The convergence between rigorous *Central Hudson* review and strict scrutiny is not merely descriptive—it is structural. As Stern explains, "[t]o require that a restriction on commercial speech be 'not more extensive than is necessary to serve [the government's] interest' bears more than a passing resemblance to other formulations that the Court has invoked to apply a heightened level of review." Stern, *supra*, at 675–76 (citing *Central Hudson*, 447 U.S. at 566). The Supreme Court's decision in *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564 (2011), is notable in this regard. There, the Court applied what it described as "heightened scrutiny": to a Vermont statute restricting the sale and use of pharmacy records based on the content and purpose of the intended use. Even though the regulated speech was commercial in character, the Court held that the law "imposes burdens based on the content of speech and the identity of the speaker," *id.* at 565, and subjected it to demands more

rigorous than the baseline *Central Hudson* framework. Salina's mural-sign distinction is both content-based, because it turns on what a display depicts, and speaker-based, because it turns on the commercial relationship between the speaker and the depicted subject. Under *Sorrell*, that combination triggers searching judicial review regardless of whether this Court chooses to apply the full strict-scrutiny framework of *Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

## III. Strict Scrutiny or Robust Intermediate Scrutiny Applies, and Salina Fails Either Standard

Regardless of the viability of the commercial speech doctrine more generally, at least where, as here, a city distinguishes regulated signs from unregulated murals for a purported aesthetic purpose, and the distinction turns on the commercial content of the artwork, either strict scrutiny or the most demanding available form of intermediate scrutiny should apply.

If strict scrutiny applies, *see* Response of Plaintiffs-Appellees at 31–39, Salina's restriction clearly fails. The City has produced no evidence that a hamburger-esque UFO-themed mural on The Cozy is more harmful to the visual character of Salina, Kansas, than would be the same image painted on a building owned by someone who has never sold

a hamburger in his life. The community's overwhelmingly complimentary response to the mural in its incomplete form, *id.* at 12–13, forecloses the government's argument.

Even under *Central Hudson*'s intermediate scrutiny, rigorously applied, Salina's mural-sign code regime fails. That test requires that when speech (1) concerns lawful activity and is not misleading, a restriction on that speech must (2) serve a substantial government interest; (3) directly and materially advance that interest; and (4) be no more extensive than necessary. *Central Hudson*, 447 U.S. at 566. The City stumbles at every step after the first.

Given Salina's mural-sign code regime's stated aesthetic purpose, Costonis's five-factor framework helps illuminate the *Central Hudson* analysis. A valid aesthetic regulation must: (1) articulate its purposes clearly; (2) demonstrate a rational relationship between the regulation and those purposes; (3) rest on community-wide standards rather than official preference; (4) include procedural safeguards against arbitrary application; and (5) limit official discretion through objective criteria. Costonis, *supra*, at 455. Salina's mural-sign code satisfies none of these requirements. Its purpose is stated in terms of visual character, *Cozy Inn,*

*Inc. v. City of Salina*, No. 24-cv-01027-TC, 2025 WL 3223806, at *3 (D. Kan. Nov. 19, 2025) (citation omitted), but its operative mechanism is a content-based subject-matter test. It rests on no articulable community-wide aesthetic standard. It provides no criteria by which an applicant could determine in advance whether a proposed mural will qualify as a protected "mural" or a regulated "sign." And it vests in municipal officials unconstrained discretion to resolve that question based on nothing more than a judgment about whether the artwork's message is sufficiently detached from the property owner's business.

The district court's factual findings confirm what Costonis's framework predicts. Salina offered two witnesses to justify its mural-sign distinction: its planning director, Dustin Herr, and an outside aesthetics expert. Neither provided any evidence that murals and signs affect aesthetics, safety, or property values differently in ways that would justify treating them differently under law. The district court found Herr's testimony "entirely circular": he assumed the validity of the mural-sign distinction and then concluded the distinction was valid. *Id.* at *15. When pressed to identify any empirical basis for the proposition that commercial murals affect community aesthetics, traffic safety, or

Salina's other stated interests differently than non-commercial murals, he could not. The City's outside expert, Mark White, fared no better, because that expert's aesthetic analysis also depended on accepting as a premise the very conclusion the government needed to prove—the validity of the mural-sign distinction. *Id.*

The City's own enforcement decisions underscore the circularity. When Howard sought a permit for his mural, city officials told him that "hamburgers are basically the same thing [Howard] sells, therefore, it would be signage." *Id.* at *4. That admission reveals the regime's operating principle: the determination of what counts as a regulated "sign" depends entirely on evaluating the content of the proposed speech. A hamburger-esque image is allowed or prohibited not based on its size, brightness, placement, or any objective characteristic bearing on aesthetics or safety—but solely based on whether the hamburger depicted has commercial significance to the owner of the building. The content of what is depicted determines the regulatory outcome, yet Salina offered no evidence that content, in this sense, correlates with any of the harms it invokes.

This evidentiary failure is not an isolated deficiency—it is the characteristic failure of mural-sign code regimes. As the district court noted, *id.* at *16, a parallel federal court decision, *Young v. Town of Conway*, 783 F. Supp. 3d 588 (D.N.H. 2025), reached the same result on materially similar facts. Where, as in both cases, the government's evidence amounts to "this distinction is valid because we drew it," no court applying *Central Hudson* in good faith can sustain the restriction.

The City's asserted interest in aesthetic harmony thus cannot satisfy *Central Hudson*'s directness requirement because the code does not regulate aesthetics. It regulates *subject matter*. A mural depicting hamburger-esque UFOs may be identical in size, color, placement, and visual complexity to a mural depicting a mountain landscape—but only the former requires a permit. If the genuine interest were visual harmony, the regulation would track visual characteristics. Because it tracks content instead, the fit between the regulation and the asserted interest is not direct or substantial; it is nonexistent. Salina's heavy reliance on *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981)—a case arising from large, illuminated roadside billboards that generated documented evidence of traffic hazards—is misplaced in a case about a

painted mural on the side of a restaurant. There is no evidence in the record that business-themed wall murals in Salina endanger pedestrians, reduce property values, or offend the community's aesthetic sensibilities. If anything, the evidence is to the contrary.

Four features of *Metromedia* confirm how far Salina's reliance on it overreaches. First, the plurality's deference to governmental judgments was medium-specific: the Court deferred to "the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." 453 U.S. at 509. That deference rested on decades of legislative action and judicial review directed specifically at large outdoor advertising structures. No comparable body of accumulated experience exists for painted wall murals. Salina cannot borrow the evidentiary deference *Metromedia* extended to a medium with a documented regulatory history and extend it to a medium that has none. Second, the *Metromedia* plurality itself cautioned that aesthetic judgments "are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose." *Id.* at 510. That warning appears in the

very case Salina relies upon, and it demands the searching scrutiny that Salina's subject-matter test cannot survive. Third, *Metromedia*'s aesthetic harm finding was grounded in the physical character of billboard structures, not in the content of messages. The plurality found that billboards "by their very nature, wherever located and however constructed, can be perceived as an 'esthetic harm.'" *Id.* (citations omitted). The harm the Court recognized was structural—arising from the dominating, intrusive physical presence of large permanent advertising displays—not from what those displays depicted. Salina's objection is the inverse: it has no concern with the physical character of Mr. Howard's wall, only with the content of the image painted on it. That is a categorically different regulatory problem from the one *Metromedia* addressed, and *Metromedia*'s aesthetic rationale cannot be stretched to cover it. Fourth, and most pointedly, *Metromedia* supports Mr. Howard's right to speak. The plurality upheld San Diego's ordinance's onsite advertising exception precisely because "a commercial enterprise—as well as the interested public—has a stronger interest in identifying its place of business and advertising the products or services available there." *Id.* at 512. Mr. Howard is doing exactly what *Metromedia*

recognized as warranting protection: speaking about his own business, at his own premises, to his own community. Salina cannot invoke *Metromedia* to prohibit the very activity *Metromedia* identified as deserving of the City's own concession.

In addition, Salina's suggestion that The Cozy has found "other ways" to spread its message, Opening Brief of Appellant City of Salina, Kansas at 30–31, is not a narrowly tailored means analysis. It is an admission that the restriction is unnecessary. The First Amendment does not permit government to suppress one medium of expression simply because the speaker retains access to others.

Finally, Salina also invokes *Ward v. Rock Against Racism*'s "aggregate" principle, arguing that narrow tailoring requires only that the regulation promote the government's interests more effectively than the absence of regulation would, evaluated across the scheme as a whole rather than in individual applications. 491 U.S. 781, 801 (1989). But *Ward*'s aggregate principle does not authorize a city to create categorical, speaker-based distinctions that systematically favor one class of speakers over another and then escape review by labeling the resulting inequality a "content-neutral" aggregate effect. Where a regulation,

evaluated as a whole, distinguishes between commercial and non-commercial speakers based on the expressive content of their displays, the "aggregate" framing cannot launder that structural disparity into neutrality. *Sorrell*, 564 U.S. at 564–65, independently establishes that speaker-based distinctions are subject to heightened scrutiny regardless of the government's stated purpose. Evaluating Salina's mural-sign code regime in the aggregate does not make the commercial/non-commercial speaker distinction disappear—it simply confirms that the distinction operates systematically and deliberately across the entire regulatory scheme. Moreover, it is doubtful that, even in the aggregate, Salina's mural-sign distinction promotes its stated interests.

## CONCLUSION

The City of Salina has told Stephen Howard that he may not paint a hamburger-esque UFO-themed mural on the side of his building because hamburgers are what he sells. It has told him that were he a stranger to the hamburger—had no passion for it, no investment in it, no livelihood derived from it—he would be free to paint the same image on his property. That inversion of common sense is also an insult to the Constitution. The commercial speech doctrine originated in a per curiam

opinion lacking reasoning or precedent; it persists due to post-hoc justifications that have never been vindicated. Such foundations are too weak to bear the constitutional weight Salina asks this Court to place upon it, particularly where the distinction between commercial and non-commercial speech is drawn in service of an aesthetic purpose. The First Amendment does not permit government to silence speakers because of who they are and what they do for a living. Prohibiting a mural from being painted simply because its subject matter is connected to the business located in the building on which it's painted is not only unconstitutional, it also discourages the very sort of entrepreneur we as Americans have traditionally celebrated and want to see more of: those who are passionate about the products or services they offer.

The district court correctly held that Salina's mural-sign distinction cannot survive even intermediate scrutiny: Salina's own expert testimony was circular, no evidence connected the commercial/non-commercial distinction to any real harm, and *Central Hudson*'s direct-advancement requirement demands more than bare assertion. For all the above reasons, this Court should affirm.

DATED: April 1, 2026.

Respectfully submitted,

s/ Jeremy Talcott

JEREMY TALCOTT
AMY L. PEIKOFF
PACIFIC LEGAL FOUNDATION
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
JTalcott@pacificlegal.org
APeikoff@pacificlegal.org

*Counsel for Amicus Curiae*
*Pacific Legal Foundation*

## CERTIFICATE OF COMPLIANCE

I certify this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and 10th Cir. R. 32(B), this brief contains 6,492 words.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 10th Cir. R. 32(A) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Century Schoolbook font.

DATED: April 1, 2026.

s/ Jeremy Talcott
JEREMY TALCOTT

## CERTIFICATE OF SERVICE

I certify that on April 1, 2026, I electronically filed this amicus brief with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

s/ Jeremy Talcott
JEREMY TALCOTT

**CERTIFICATE OF ELECTRONIC SUBMISSION**

I certify that: all required privacy redactions have been made under Tenth Circuit Rule 25.5; if required to file additional hard copies, that the CM/ECF submission is an exact copy of these documents; and the digital submissions have been scanned for viruses by CrowdStrike Falcon Sensor, and according to the program, they are free of viruses.

s/ Jeremy Talcott
JEREMY TALCOTT