**Case No. 25-3225**

**UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

COZY INN, INCORPORATED, D/B/A THE COZY INN, et al.

Plaintiffs-Appellees,

v.

CITY OF SALINA, KANSAS.

Defendant-Appellant.

Appeal from the United States District Court for the District of Kansas
Case No. 6:24-cv-01027-TC, Hon. Toby Crouse, presiding

# BRIEF AMICI CURIAE OF GOLDWATER INSTITUTE AND MANHATTAN INSTITUTE IN SUPPORT OF APPELLEES AND REVERSAL

Ilya Shapiro
Trevor Burrus
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute.org

Timothy Sandefur
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Amici Curiae*

## Corporate Disclosure Statement

Pursuant to Federal Rule of Appellate Procedure 26.1, Goldwater Institute, a nonprofit corporation organized under the laws of Arizona, and Manhattan Institute, a nonprofit corporation organized under the laws of New York, state that they have no parent companies, subsidiaries, or affiliates that have issued shares to the public.

## Rule 29(a) Statement

Counsel for all parties received timely notice of the intent to file the brief. The Defendant/Appellants declined consent, and amici have therefore moved for leave to file. The Goldwater Institute's counsel authored this brief in its entirety. No party or party's counsel contributed money that was intended to fund preparing or submitting it, and no other person—other than the amici, their members, or their counsel—contributed money that was intended to fund preparing or submitting it.

## TABLE OF CONTENTS

Corporate Disclosure Statement ........................................................................ i

Rule 29(a) Statement ........................................................................................ i

Table of Contents ............................................................................................ ii

Table of Authorities ........................................................................................ iii

Glossary .......................................................................................................... vi

Interest of Amici Curiae .................................................................................. 1

Introduction and Summary of Argument ......................................................... 2

Argument .......................................................................................................... 4

I. The City's Discrimination Based on Commercial Motive is Fatal to this Case ........................................................................................................ 4

II. "Commercial Speech "doctrine cannot justify Salina's arbitrary rules .......... 14

Conclusion ...................................................................................................... 21

Certificate of Compliance ............................................................................... 22

Certificate of Service ....................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*ACLU v. Mukasey*, 534 F.3d 181 (3d Cir. 2008) .......... 14

*Bates v. Oregon Health Auth.*, 559 P.3d 924 (Or. App. 2024), *review allowed*, 373 Or. 284 (Mar. 6, 2025) .......... 1

*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015) .......... 14

*City of Austin v. Reagan National Advertising of Austin, LLC,* 596 U.S. 61 (2022) .......... 13

*Coleman v. City of Mesa*, 284 P.3d 863 (Ariz. 2012) .......... 1

*Cressman v. Thompson*, 798 F.3d 938 (10th Cir. 2015) .......... 10

*Hays Cnty. Guardian v. Supple*, 969 F.2d 111 (5th Cir. 1992) .......... 4

*Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180 (9th Cir. 2001) .......... 18, 19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) .......... 7, 10

*IMDb.com Inc. v. Becerra*, 962 F.3d 1111 (9th Cir. 2020) .......... 14

*Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014) .......... 19

*Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) .......... 5

*Kansas v. U.S. Dep't of Educ.*, No. 24-3097, 2025 WL 1914861 (10th Cir. Mar. 13, 2025) .......... 2

*Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859 (7th Cir. 2019), *cert. denied,* 589 U.S. 1252 (2020) .......... 1

*Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894 (9th Cir. 2002) .......... 18

*Montgomery v. Montgomery*, 60 S.W.3d 524 (Ky. 2001) .......... 6

*Morris v. Mun. Ct.*, 652 P.2d 51 (Cal. 1982) .......... 13

*Murphy v. Matheson*, 742 F.2d 564 (10th Cir. 1984) ..........6

*Mutual Film Corp. v. Industrial Commission of Ohio*, 236 U.S. 230 (1915)..........14

*O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024) ..........2

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels*., 413 U.S. 376 (1973)..........5, 6

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) .......... 3, 13, 21

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ..........14

*Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1670 (2022)..........1

*Sorrell v. IMS Health Inc.,* 564 U.S. 552 (2011) .......... 3, 4, 5, 6, 12, 13

*Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024)..........2

*Thomas v. Bright,* 937 F.3d 721 (6th Cir. 2019), *cert. denied,* 141 S. Ct. 194 (2020) ..........1

*United States v. Wenger*, 427 F.3d 840 (10th Cir. 2005)..........18

*Valentine v. Chrestensen*, 316 U.S. 52 (1942)..........14

*Wag More Dogs LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012).......... 17, 18

**Regulations**

Salina City Code § 42-764 ..........9

**Other Authorities**

*About Andrea*, SuperFreshDesign.com..........11

Adam Arenson, *"Bob's Big Boy 'Burgers With Culture" in Phoenix,* AdamArenson.com (Nov. 5, 2012)..........20

Alphonse Marie Mucha, *Biscuits Champagne Lefèvre-Utile* (1896) ..........7

Andy Warhol, *The Philosophy of Andy Warhol* (1975) ..........16

Deborah J. La Fetra, *Kick It Up a Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004) ....................................14

*Elder Pliny's Chapters on the History of Art* (K. Jex-Blake, trans., 1896) ............15

Gareth Harris, *Pompeii Fresco May Show Pizza's 2,000 Year-Old Ancestor, Archaeologist Says*, The Art Newspaper (June 28, 2023) ....................................15

Genevieve Walker, *The Restaurant Mural Revival is Upon Us,* Elle Décor (May 25, 2025) ..........................................................................................................19

Jared Blanchard & Adi Dynar, *Heed Reed: Goldwater Institute's Guideposts for Amending City Sign Codes* (Goldwater Inst. 2016) ..........................................1, 2

Lisa Jardine, *Worldly Goods: A New History of the Renaissance* (1996) .................8

Lorinda Munson Bryant, *American Pictures and Their Painters* (1917) ...............20

Maddy Terril, *Riverside Café Mural Restored with Faces of the People Who Keep it Running*, KAKE.com (Dec. 4, 2025) ...............................................................20

*Maxfield Parrish: The Advertisements* (Michael Jay Goldberg, ed., 1998) .............7

Sarah Cascone, *Georgia O'Keeffe Once Painted Hawaii-Inspired Ads for Dole Foods—and Now They're Coming to New York*, Artnet.com (Jan. 24, 2018) .......8

Thomas Dacosta Kaufmann, *Arcimboldo: Visual Jokes, Natural History, and Still-Life Painting* (2009) ..........................................................................................16

Timothy Sandefur, *The Permission Society* (2016) ..................................................2

# GLOSSARY

GI The Goldwater Institute

MI The Manhattan Institute

## INTEREST OF AMICI CURIAE

The Goldwater Institute ("GI") is a nonpartisan public policy and research foundation dedicated to the principles of limited government, economic freedom, and individual responsibility. Through its Scharf-Norton Center for Constitutional Litigation, GI litigates and files amicus briefs to advance its mission. Among GI's priorities is to protect and promote the right of businesses to express themselves on an equal basis with other kinds of speech. To that end, GI has represented parties (*see, e.g., Bates v. Oregon Health Auth*., 559 P.3d 924 (Or. App. 2024), *review allowed*, 373 Or. 284 (Mar. 6, 2025); *Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859 (7th Cir. 2019), *cert. denied,* 589 U.S. 1252 (2020); *Coleman v. City of Mesa*, 284 P.3d 863 (Ariz. 2012)), and appeared as amicus (*see, e.g., Thomas v. Bright,* 937 F.3d 721 (6th Cir. 2019), *cert. denied,* 141 S. Ct. 194 (2020), in cases challenging restrictions on the free speech rights of businesses. GI attorneys appeared in this Court in defense of free speech in *Rio Grande Found. v. City of Santa Fe*, 7 F.4th 956 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 1670 (2022).

GI scholars have also published extensively on the legal issues raised by restrictions on this right. *See, e.g.,* Jared Blanchard & Adi Dynar, *Heed Reed:*

*Goldwater Institute's Guideposts for Amending City Sign Codes* (Goldwater Inst. 2016)[1]; Timothy Sandefur, *The Permission Society* ch. 3 (2016).

MI is a nonprofit public policy research foundation whose mission is to develop and disseminate new ideas that foster greater economic choice, individual responsibility, and human flourishing. MI has long produced scholarship and filed briefs supporting a robust First Amendment. *See, e.g., O'Connor-Ratcliff v. Garnier*, 601 U.S. 205 (2024); *Speech First, Inc. v. Shrum*, 92 F.4th 947 (10th Cir. 2024); *Kansas v. U.S. Dep't of Educ.*, No. 24-3097, 2025 WL 1914861 (10th Cir. Mar. 13, 2025).

Amici believe their legal experience and policy expertise will aid this Court in considering this appeal.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The District Court was right that the City's effort to distinguish murals from signs—under a City code that defines signs as including "pictorial representation[s] (including illustrations or decorations)"—is irrational and indefensible. Whatever else content-neutrality may mean, it cannot mean that the government can treat pictorial representations differently based on whether they are intended to "announce," "direct attention to," or "advertise." To do *that* means

[1] https://www.goldwaterinstitute.org/wp-content/uploads/2016/04/Heed-Reed-downloadable-PDF.pdf.

making the law impose different burdens based on communicative content—which means the law isn't content-neutral. *See Reed v. Town of Gilbert*, 576 U.S. 155, 162 (2015) (if "an enforcement officer would have to read the sign to determine what provisions of the Sign Code applied to it," the Code is not content-neutral).

But Salina's code is unconstitutional for at least two additional reasons. First, it discriminates based on the *speaker's commercial motivation*. In *Sorrell v. IMS Health Inc.,* 564 U.S. 552, 567 (2011), the Supreme Court made clear that the First Amendment forbids the government from discriminating against speech based on the fact that it "results from an economic motive." As the City's concessions below make clear, motive alone appears to be the factor on which it differentiates between permissible signs, such as those promoting music or baseball,[2] and prohibited signs, such as the one promoting hamburgers.

Second, even if the mural is characterized as "commercial speech," the City's attempt to distinguish Cozy Inn's hamburger mural from "public art" is arbitrary, impracticable, and, again, ultimately content-based. Even assuming the former is entitled to less constitutional protection than the latter, the City's failure to draw a principled distinction between "commercial" and "public" expression is still fatal here. When expression blends commercial and non-commercial elements, the result is to *increase* the degree of protection that courts afford that

[2] https://kansasmurals.com/directory/the-yard-mural-salina/.

speech. *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 120 (5th Cir. 1992). And Cozy Inn's mural undeniably blends a commercial aspect (inviting the public to buy burgers) with non-commercial elements (creating an inviting spirit of whimsy and fun). The City's arbitrary choice to allow murals (indeed, celebrate and highlight them) if they say some things but not others—based on nothing more than the fact that the latter includes some reference to trade—is unconstitutional. Salina may regulate visual expression only by applying *neutral* time, place, and manner restrictions, not by picking and choosing between what it considers worthy and unworthy forms of expression.

## ARGUMENT

### I. The City's Discrimination Based on Commercial Motive is Fatal to this Case.

Not only may the government not treat speech with disfavor based on its content, it also cannot do so based on the commercial *motive of the speaker*—at least, not without triggering strict (not intermediate) scrutiny.

In *Sorrell, supra,* the Supreme Court declared a Vermont statute unconstitutional which prohibited pharmacies from disclosing information about drug prescriptions to pharmaceutical companies (who used the information for marketing). 564 U.S. at 557. That law allowed the sale of such information to buyers who wanted to use it for "educational communications," but prohibited it from being sold to entities that wanted to use it for "marketing" reasons. *Id.* at

564. "The statute thus disfavors marketing," the Court said, "that is, speech with a particular content. More than that, the statute disfavors specific speakers, namely pharmaceutical manufacturers. As a result of these content- and speaker-based rules, detailers cannot obtain prescriber-identifying information, even though the information may be purchased or acquired by other speakers with diverse purposes and viewpoints." *Id*. *See also Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels*., 413 U.S. 376, 385 (1973) ("If a newspaper's profit motive were determinative, all aspects of its operations … would be subject to regulation if it could be established that they were conducted with a view toward increased sales. Such a basis for regulation clearly would be incompatible with the First Amendment.").

This discrimination against commercial speakers was a forbidden burden on speech because it prohibited communication based on "the identity of the speaker"—that is, it discriminated against those who engaged in communication "from an economic motive." *Sorrell*, 564 U.S. at 567. But speech uttered for economic reasons is not for that reason less protected by the Constitution; after all, "a great deal of vital expression" results from commercial motives. *Id.* Movies, for example, are doubtless typically produced for this reason, but they're now recognized as fully protected speech. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 499-501 (1952). Music videos, too, are produced from economic motives—

being essentially advertisements for commercially available musical recordings—but they're fully protected by the First Amendment. *Montgomery v. Montgomery*, 60 S.W.3d 524, 529 (Ky. 2001),

This explains why courts applying the commercial speech doctrine have confined it to situations that involve speech that "does '*no more* than propose a commercial transaction.'" *Murphy v. Matheson*, 742 F.2d 564, 568 n.4 (10th Cir. 1984) (quoting *Pittsburgh Press Co.*, 413 U.S. at 385 (emphasis added)). This "no more" element is critical. As discussed in detail in Section II below, the commercial speech doctrine was never intended to apply to forms of expression that embrace other values, including aesthetic ones, that are fully protected by the First Amendment.

The City's brief makes no mention of Sorrell. Instead, it asserts instead that its sign regulations are neutral because they "make[] no reference to topics, ideas, messages, or viewpoints." Appellant's Opening Brief at 24. But the restriction in *Sorrell* also made no reference to those things. It was nevertheless unconstitutional, because it treated speech differently based on the speaker's motive. A communication for *non*-commercial purposes was allowed, but the exact same communication was prohibited if done for commercial reasons. *See* 564 U.S. at 564 ("detailers cannot obtain prescriber-identifying information, even though the information may be purchased or acquired by other speakers….

Detailers are likewise barred from using the information for marketing, even though the information may be used by a wide range of other speakers."). That fact alone meant the Vermont statute was "a specific, content-based burden on protected expression." *Id.* at 565.

The prohibition on discrimination against speech motivated by economic purposes is relevant here because much of what easily qualifies as constitutionally protected art has been produced for a commercial motive.[3] For example, Maxfield Parrish produced ads for the Edison-Mazda electric light company, Crane's Chocolates, Colgate toothpaste, and Jell-O—all of which are today recognized as bona fide artworks. *See generally Maxfield Parrish: The Advertisements* (Michael Jay Goldberg, ed., 1998). Alphonse Mucha produced numerous paintings as ads for the Lèfevre-Utile Biscuit Company in the 1890s, at least one of which now hangs in the National Gallery of Art.[4] Georgia O'Keeffe's paintings *Hibiscus with Plumeria* (1939), *Pineapple Bud* (1939), and *Waterfall No. I, 'Iao Valley, Maui* (1939), are rightly regarded as artistic treasures—they were the focus just a few years ago of a special exhibit at the New York Botanical Garden—yet they were painted on commission for the Dole Foods Company to use in its advertisements.

---

[3] Paintings, like other art, are "unquestionably" protected by the First Amendment. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995).

[4] *See* Alphonse Marie Mucha, *Biscuits Champagne Lefèvre-Utile* (1896), https://www.muchafoundation.org/en/gallery/browse-works/object/41.

*See* Sarah Cascone, *Georgia O'Keeffe Once Painted Hawaii-Inspired Ads for Dole Foods—and Now They're Coming to New York*, Artnet.com (Jan. 24, 2018).[5]

Historian Lisa Jardine has even argued that many of what are now considered Renaissance masterpieces were actually painted as, effectively, commercial advertisements. *See Worldly Goods: A New History of the Renaissance* 19 (1996) ("works of art which today we admire for their sheer representational virtuosity were … at once sources of aesthetic delight and properties in commercial transactions between purchasers, seeking ostentatiously to advertise their power and wealth."). Some artists, notably including Andy Warhol and Banksy,[6] have gone even further, and regarded commercial motive as *itself* an *element* of their art—that is, the meaning of their oeuvre depends inescapably on the transactional element of the artist-viewer relationship or the art market in general. Consequently, the mere fact that Cozy Inn's mural was produced from a commercial motive cannot justify relegating it to a less-protected category of expression.

[5] https://news.artnet.com/art-world/georgia-okeeffe-hawaii-paintings-1205534.

[6] The fact that both Warhol and Banksy painted murals is noteworthy. Warhol's *Thirteen Most Wanted Men* (1964), produced for the 1964 World's Fair, was destroyed before being displayed.

Nevertheless, Salina's code distinguishes between "signs" (restricted) and "art" (not restricted), and the grounds for that distinction is the commercial motivation of the speaker.

The City claims this isn't true. It says it distinguishes between signs and art because signs (which the City's sign code says *can* include pictorial representations, illustrations, and decorations) are "used to announce, direct attention to, or advertise." *See* Salina City Code Section 42-764.[7] According to the City, this is the real distinction, and drawing the line here doesn't trigger First Amendment concerns.

But that argument can't work. For one thing, with the exception perhaps of camouflage patterns, *all* pictorial representations, illustrations, etc., are meant to "direct attention" to *something* (at least to themselves). Michael Toombs's mural on Monroe Street in Topeka, which memorializes *Brown v. Board of Education*, is designed to "draw attention" to the history of the *Brown* case. Mindy Allen's mural depicting antique cars on the side of the Midwest Dream Car Collection building in Manhattan, Kansas, "draws attention to" and "advertises" the car museum. Joan Miro's mural *Personages Oiseaux* in Wichita "announces" and

---

[7] The Code is silent as *to what* such attention must be "directed," or *why*, to qualify as a sign. But as discussed below, it's quite clear that the City only considers something a sign if it "directs attention" for an economic motive.

"directs attention to" more abstract ideas.[8] Whatever it may be, pictures "direct attention to" things.

This is worth emphasizing, because the City encourages and justly celebrates its many lovely murals (while nonetheless discriminating against Cozy Inn's mural) even though these are plainly intended to *direct attention* and *advertise*. It even holds an annual "Street Art & Mural Festival," and hosts a website[9] with pictures of the many murals around town—including everything from Drew Merritt's (untitled) mural depicting rodeo cowboys, to John Matos's *Crash One*, with its cartoonish adventure theme. But all of these *direct attention to* things and *announce* things. So the "direct attention to" principle cannot actually be the distinguishing feature of "signs." Instead, the real difference is economic motive.

Take, for instance, *We're Better Together*, a mural painted in Salina in 2023 and featured on the City's website.[10] It consists of the attention-grabbing words "We're Better Together." Its creator, Andrea von Bujdoss, emphasizes on her website that her graffiti-inspired style and "super bright color palettes" are inspired by the world of "advertising," and thus are intended to catch viewers' notice.

---

[8] As the *Hurley* Court emphasized, the fact that an artwork cannot be literally transliterated into a "narrow, succinctly articulable message" has no bearing on whether it's constitutionally protected. 515 U.S. at 569. Art that expresses ineffable aesthetic "messages," including sensations, emotions, or moods, are also protected. *Cressman v. Thompson*, 798 F.3d 938, 952, 955 (10th Cir. 2015).

[9] https://www.boomsalina.art/.

[10] https://www.boomsalina.art/2023.

*We're Better Together* is also situated in a public park, where it is plainly intended to "announce" something.[11] What does it announce? The idea of community togetherness and unity.

Or consider Drew Merritt's rodeo mural on Santa Fe Avenue. The City says on its website that this striking painting "invites viewers to imagine the stor[y]" behind the painting.[12] That's just another way of saying it *directs viewers' attention* to the western cowboy heritage.

Curtis Hylton's mural depicting a meadowlark and sunflowers, on the side of a restaurant on Walnut Street, is another good example.[13] Stunning as it is, it certainly announces, directs attention, and advertises. What does it announce and advertise? The beauty of Kansas's birds and flowers. Hylton says so in his artistic statement: a "connection to nature," he writes, can help "people do better physically and emotionally." Therefore "one of [his] goals" is "to … *remind* people of how beautiful and beneficial nature and all its wonders can be … [and] *teach* children [and] adults to appreciate and connect with the outdoors."[14] In other words, the mural is intended to "advertise" (remind) and "direct attention" (teach).

---

[11] *About Andrea*, SuperFreshDesign.com, https://www.superfreshdesign.com/about.
[12] https://www.boomsalina.art/#.
[13] https://www.boomsalina.art/2024.
[14] Curtis Hylton, *About,* https://www.curtis-hylton.com/new-page-4 (emphasis added).

The *only* difference between Cozy Inn's mural and these murals—which the City considers art, exempt from the Sign Code's burdens—is the fact that the former is meant to direct attention *to a commercial entity*, where the latter are meant to direct attention to other things: *togetherness,* or *heritage,* or *the natural world*. But for the City to make that distinction simply *is* discrimination against commercial motivation in speech—and that's just what *Sorrell* forbids. The First Amendment doesn't let the City burden messages that "direct attention" to things it doesn't like, while encouraging messages that "direct attention" to things it prefers.[15]

The City's brief makes the conclusory assertion that "murals are not 'used to announce, direct attention to, or advertise.'" Appellant's Opening Brief at 11. Yet in the next paragraph it says that murals "may contain 'illustrations or decorations' that attract attention." *Id.* The distinction between *attracting* attention and *directing* attention is too fine for First Amendment law—it certainly would be a content-based distinction—but there's no need to resolve that, because it's clear that the murals the City allows *do* direct attention. Consider *Snap Em All, Marty*, a 2023 Mural by Joe Iurato, located on a building beside railroad tracks on Santa Fe Avenue in Salina.[16] That mural depicts a person with a camera taking pictures of

---

[15] The City can, of course, express *its own* opinions about this, and other things, but that's a different matter than its burdens on, or favors to, private speakers.
[16] https://www.travelks.com/listing/snap-em-all-marty-mural/64296/.

the passing trains. It obviously "directs attention to" (or "attracts attention to") the passing trains.

In sum, "it is immaterial whether an activity which enjoys First Amendment protection is carried on for profit." *Morris v. Mun. Ct.*, 652 P.2d 51, 60 (Cal. 1982). Yet Salina burdens speech based exclusively on its commercial motivation. A sign that "draws attention to" the natural world or that "draws attention to" community togetherness is given preferential legal treatment over a sign that "draws attention to" a fun burger joint. That difference in treatment triggers strict scrutiny under *Sorrell,* 564 U.S. at 563-64.

And it fails that scrutiny. On one hand, this differential treatment makes the Sign Code "hopelessly underinclusive," because the City imposes burdens on paintings that "are 'no greater an eyesore'" than those that the City allows, *Reed*, 576 U.S. at 171-72 (citation omitted)—while, on the other hand, this discrimination also makes the sign code *over*inclusive, because in addition to whatever legitimate interests it may serve, it also burdens innocuous speech like Cozy Inn's—speech that is no more distracting or unartistic than that which the City allows.[17] Such a combination of over-inclusiveness and under-inclusiveness

---

[17] *City of Austin v. Reagan National Advertising of Austin, LLC,* 596 U.S. 61 (2022), is not to the contrary. There, the Court addressed rules that treated signs differently "based solely on whether it is located on the same premises as the thing being discussed or not." *Id.* at 71. But Cozy Inn's mural *is* located on the same

is a sure-fire indicator of a First Amendment violation. *See, e.g., Cahaly v. Larosa*, 796 F.3d 399, 406 (4th Cir. 2015); *IMDb.com Inc. v. Becerra*, 962 F.3d 1111, 1119 (9th Cir. 2020); *ACLU v. Mukasey*, 534 F.3d 181, 193 (3d Cir. 2008).

## II. "Commercial speech" doctrine[18] cannot justify Salina's arbitrary rules.

Cozy Inn has economic motives for its speech, and hopes its mural will draw the attention of potential customers. But that doesn't lower the applicable constitutional protection. When speech combines commercial and non-commercial elements, the level of judicial scrutiny that applies is *increased*, not reduced. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795-96 (1988) ("we do not believe that … speech retains its commercial character when it is

---

premises as the thing being discussed—which is not true of, say, Curis Hylton's mural of a bird, or (one assumes) David Zinn's mural of a space alien.

[18] Appellee is entirely correct that "commercial speech" doctrine is contrary to the text and history of the First Amendment, and is ultimately self-contradictory and indefensible. *See generally* Deborah J. La Fetra, *Kick It Up a Notch: First Amendment Protection for Commercial Speech*, 54 Case W. Res. L. Rev. 1205 (2004). The doctrine originated by historical accident when the Supreme Court erroneously concluded in *Valentine v. Chrestensen*, 316 U.S. 52 (1942), that advertising flyers are not constitutionally protected expression. *Valentine* cited no constitutional text, legal precedents, or history, in reaching that conclusion, which is plainly incorrect. Like *Mutual Film Corp. v. Industrial Commission of Ohio*, 236 U.S. 230, 244 (1915)—which held that movies, of all things, aren't protected by the First Amendment because "the exhibition of moving pictures is a business, pure and simple"—the *Valentine* case offered virtually no rationale for its ruling, and simply decreed by *ipse dixit* that "purely commercial advertising" is outside First Amendment boundaries. *Valentine*'s reasoning, if it can be called that, is now—like that offered in *Mutual Film Corp.*—wholly obsolete. Obviously, however, this Court is bound by existing Supreme Court precedents.

inextricably intertwined with otherwise fully protected speech. Our lodestars in deciding what level of scrutiny to apply to a compelled statement must be the nature of the speech taken as a whole and the effect of the compelled statement thereon."); *Supple*, 969 F.2d at 120 ("commercial speech was inextricably linked to the newspaper's non-commercial speech, making the whole paper non-commercial."). And there can be no denying that Cozy Inn's mural combines commercial and non-commercial (aesthetic) elements.

On a commercial level, the mural encourages people to buy hamburgers. On an aesthetic level, it expresses a message of whimsy and science-fiction adventure. The latter cannot be waved off as somehow less aesthetically worthy than the murals Salina proudly allows. Depictions of food are certainly not "unartistic." The muralist Zeuxis, in the 4th Century B.C., was celebrated for his paintings of food, which were said to be so realistic that birds pecked at his pictures of grapes, thinking them real. *See Elder Pliny's Chapters on the History of Art* 111 (K. Jex-Blake, trans., 1896). Murals depicting food in ancient Roman cities are now highly prized, including an extraordinary fresco in Pompeii that depicts something like a precursor to pizza. *See* Gareth Harris, *Pompeii Fresco May Show Pizza's 2,000 Year-Old Ancestor, Archaeologist Says*, The Art Newspaper (June 28, 2023).[19]

[19] https://www.theartnewspaper.com/2023/06/28/pompeii-fresco-may-show-pizzas-2000-year-old-ancestor-archaeologist-says.

The sixteenth-century painter Giuseppe Arcimboldo painted humorous portraits of people with their faces made up entirely of fruits and vegetables. *See* Thomas Dacosta Kaufmann, *Arcimboldo: Visual Jokes, Natural History, and Still-Life Painting* (2009). And, of course, food still-lifes by Caravaggio, Cezanne, and Wayne Thiebaud are honored artistic landmarks. Art doesn't cease to be art just because it "directs attention" to food.

Nor does it cease to be art just because it's intended as humor. Is there a principled difference between Cozy Inn's mural and, say, Thiebaud's painting *Folsom Street Fair Cake* (2013), or Claes Oldenberg's sculpture *Spoonbridge and Cherry* (1988)? All three are "whimsical." The *only* distinction is that the former is intended to "direct attention to" a commercial entity, and the latter "direct attention to" other things.[20] Much art is silly, and many artists aim to express silliness or fun. Painters such as Arcimboldo, Murakami, Ryan Henry Ward, and

[20] Some artists would dispute even this, arguing that Theibaud's painting *is* intended to propose a commercial transaction—namely, the purchase of the artwork itself. This is a common theme in the work of artists such as Banksy, whose 2018 *Girl with a Balloon* was designed to self-destruct as soon as it was purchased, to express mixed feelings about the market for art works. Warhol was even more emphatic about the point that art is itself a commercial object and cannot be distinguished from "true art" in any meaningful way. *See* Andy Warhol, *The Philosophy of Andy Warhol* 92 (1975) ("Business art is the step that comes after Art…. Being good in business is the most fascinating kind of art. During the hippie era people put down the idea of business—they'd say 'Money is bad,' and 'Working is bad,' but making money is art and working is art and good business is the best art.")

John Cerney are just a few examples. The City itself permitted, and celebrates on its website, a whimsical science-fiction mural called *Sluggo's Impromptu Spa Day* by David Zinn,[21] which portrays a space alien resting in a pool of water.

Indeed, even the theme of "silly science fiction food preparation" cannot be dismissed as somehow less than art, or less deserving of constitutional protection. Such works as the films *Batteries Not Included* (1987), or *Willie Wonka and the Chocolate Factory* (1971), or the novel Douglas Adams's *The Restaurant at the End of the Universe* (1980), all focus on things, but they are unquestionably artistic, and entitled to full constitutional protection.

So, again, the sole distinction between Cozy Inn's mural and such undeniably protected artworks as these is that the former direct attention *for business purposes*—i.e., that it has an economic motive. And drawing the line there triggers strict scrutiny because it is not content- or identity- or motive-neutral.

Contrast the Ordinance here with that at issue in *Wag More Dogs LLC v. Cozart*, 680 F.3d 359 (4th Cir. 2012). The ordinance in *Cozart* was upheld because it "[did] not privilege" one kind of display over another. *Id.* at 368. On the contrary, it explicitly treated all types of signage or imagery the same. *See id.* That meant the plaintiff "could display its painting if it were no larger than sixty square feet," which was the maximum size allowed. *Id.* at 369. Here, however,

[21] https://www.boomsalina.art/2024.

Cozy Inn's right to its display is not being restricted solely based on size or other content-neutral and speaker-neural factors, but on whether (in the City's judgment) it "directs attention" to Cozy Inn's commercial undertakings. That's obviously not the kind of neutrality that was present in *Wag More Dogs*, and that the Constitution mandates.

"Commercial speech is that which 'does *no more* than propose a commercial transaction.'" *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (emphasis added, citation omitted). Speech by a business that *does* do more than that is *not* "commercial speech." *See Mattel, Inc. v. MCA Recs., Inc.*, 296 F.3d 894, 906 (9th Cir. 2002). And Cozy Inn's mural plainly does more. It conveys a sense of fun and atmosphere, and fits in with the City's own reputation for murals. It therefore falls outside the "commercial speech" doctrine.

The speech in *Mattel* also did more than merely propose a transaction. That case concerned the song "Barbie Girl" by Aqua, which Mattel claimed infringed on its intellectual property in the doll. Because the relevant laws permitted use of intellectual property for non-commercial fair use, the court had to address whether the song was commercial or non-commercial speech. *Id.* at 906. The court found it was non-commercial because it "lampoons the Barbie image and comments humorously on the cultural values Aqua claims she represents." *Id*. at 907. The speech in *Hoffman v. Capital Cities/ABC Inc.*, 255 F.3d 1180 (9th Cir. 2001), was

also non-commercial; that case involved images of celebrities that a magazine published with alterations, and the court said it was not "commercial" speech because it blended commercial and non-commercial elements: "Viewed in context, the article as a whole is a combination of fashion photography, humor, and visual and verbal editorial comment on classic films and famous actors. Any commercial aspects are 'inextricably entwined' with expressive elements, and so they cannot be separated out 'from the fully protected whole.'" *Id*. at 1185 (citation omitted).[22]

The same is true here. The mural combines images of humor and excitement to achieve an aesthetic purpose. This is common in the restaurant business, which frequently seeks not merely to sell food, but to create an atmosphere—whether it be romantic and serious or lighthearted and funny. *See* Genevieve Walker, *The Restaurant Mural Revival is Upon Us,* Elle Décor (May 25, 2025)[23] ("These one-of-a-kind, site-specific works add something to a space that no replica, or digitally crafted work, ever could."). For example, the Riverside Café in Wichita has for 80 years featured a landmark outdoor mural that depicts pleasure and good times in the restaurant, and establishes a mood for patrons.

---

[22] In *Jordan v. Jewel Food Stores*, 743 F.3d 509 (7th Cir. 2014), the Seventh Circuit split with the Ninth and held that speech that combines commercial and non-commercial elements does not receive full protection. This Court has not addressed the question. For reasons given above, the Ninth Circuit has the better of the argument.

[23] https://www.elledecor.com/design-decorate/a64854681/hand-painted-mural-restaurant-trend/.

Maddy Terril, *Riverside Café Mural Restored with Faces of the People Who Keep it Running*, KAKE.com (Dec. 4, 2025).[24] And the mural on the F-Mart Asian Grocery Store in Lawrence, entitled *Cloudy with a Chance of Boba*,[25] depicts soy sauce, tea, rice, and other Asian foods in a joyful, cartoony style intended to suggest the fun and enjoyment of Asian foodstuffs. The mural on the side of Bucks & Brews Restaurant in Baxter Springs, which depicts Route 66 going through a small town, is also meant to establish an ambiance of pride in small town America.[26] Restaurants have often commissioned famous artists for this purpose, as when Big Boy restaurants hired Millard Sheets to decorate the interiors and exteriors of their restaurants with Southwestern themes to create an atmosphere, *see* Adam Arenson, *"Bob's Big Boy 'Burgers With Culture" in Phoenix,* AdamArenson.com (Nov. 5, 2012),[27] or when the New York's Hotel Knickerbocker hired Maxfield Parrish to paint a giant fairy-tale mural for its restaurant. Lorinda Munson Bryant, *American Pictures and Their Painters* 257 (1917).

---

[24] https://www.kake.com/home/riverside-cafe-mural-restored-with-faces-of-the-people-who-keep-it-running/article_38619826-21a3-4c9e-aa9a-7165ea86a730.html.

[25] https://kansasmurals.com/directory/cloudy-with-a-chance-of-boba-mural/.

[26] https://kansasmurals.com/directory/bricks-brews-woodfire-grill-pub/.

[27] https://adamarenson.com/home-savings-and-millard-sheets/bobs-big-boy-burgers-with-culture-in-phoenix/.

Cozy Inn's mural easily fits within this longstanding tradition. It helps create an atmosphere of lightheartedness and excitement appropriate for a restaurant of this type. And it does so through exactly the means that the City's other murals—such as *We're Better Together*, or Curtis Hylton's meadowlark-and-sunflower mural—do. Salina, of course, "cannot claim that placing strict limits on [some murals] is necessary to beautify the Town while at the same time allowing unlimited numbers of other [murals] that create the same problem." *Reed*, 576 U.S. at 172. That arbitrariness cannot be justified by appeal to the commercial speech doctrine.

## CONCLUSION

The decision below should be *affirmed.*

**RESPECTFULLY SUBMITTED** this 1st day of April 2026 by:

Ilya Shapiro
Trevor Burrus
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 10017
(212) 599-7000
ishapiro@manhattan.institute.org

/s/ *Timothy Sandefur*
Timothy Sandefur
Scharf-Norton Center for
Constitutional Litigation at the
GOLDWATER INSTITUTE
500 E. Coronado Rd.
Phoenix, Arizona 85004
(602) 462-5000
litigation@goldwaterinstitute.org

*Attorneys for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

I hereby certify that with respect to the foregoing:

(1) This document complies with the type-volume limit of Fed. R. App. P. 32(g)(1) and 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) this document contains 4776 words,

(2) all required privacy redactions have been made per 10th Cir. R. 25.5;

(3) if required to file additional hardcopies, that the ECF submission is an exact copy of those documents;

(4) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, and according to the program are free from viruses.

/s/ *Timothy Sandefur*
Timothy Sandefur

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of April 2026, the foregoing Amici Brief was filed and served on all counsel of record via the ECF system.

/s/ *Timothy Sandefur*
Timothy Sandefur