Fairfield & Woods P.C.

Todd G. Messenger
(303) 894-4469
tmessenger@fwlaw.com

August 19, 2026

Christopher M. Wolpert
Clerk of the Court for the United States Court of Appeals for the 10th Circuit
Byron White U.S. Courthouse
1823 Stout Street, Denver, CO 80257

**Re: Case No. 25-3225**
**Cozy Inn, Incorporated, *et al.* v. City of Salina, Kansas**
**Notice of Supplemental Authority**

Dear Mr. Wolpert:

Pursuant to Fed. R. App. P. 28(j), the undersigned counsel for the Defendant-Appellant City of Salina, Kansas respectfully submits this notice of supplemental authority.

After briefing on Case No. 25-3225 was complete, the Tenth Circuit decided *Spiehs v. Morgan*, No. 25-3174, 2026 WL 2091027 (10th Cir. July 21, 2026). *Spiehs* examined "restrictions on free speech in public forums," and applied the intermediate scrutiny test that is at issue in the instant case. *Spiehs*, 2026 WL 2091027 at *3; Opening Brief [Doc. 18] at 17.

*Spiehs* supports Salina's Opening Brief as follows:

In Doc. 18 at pages 41-43 and 47-53, Salina argues its definition of "sign" is "narrowly tailored," and that "precedent and experience" and "common sense and legislative deference" support that proposition. The *Spiehs* opinion rests exclusively upon precedent and common sense in concluding that a speech restriction was narrowly tailored: "the government can preserve an environment for reading and study by preventing outside distractions involving protestors and signs." *Id.* at *7-8. The *Spiehs* opinion did not require the government to present "sufficient evidence" [Doc. 18 at 49] to meet its evidentiary burden. Instead, it applied the rule that a "restriction is narrowly tailored if it promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Id.* at *8 (internal quotations omitted).

Fairfield & Woods P.C.



On pages 38-39, Salina argues that regulating just those displays that are "used to announce, direct attention to, or advertise," is content-neutral. The *Spiehs* Court held that regulating just that speech that involves "holding or carrying signs, protesting, using expressive conduct or speech, distributing literature, acting as a public speaker, panhandling, and requesting signatures/donations/contributions" is content-neutral. *Id*. at *1, 4-5.

On pages 42-43, 48-50, 53, and 58, Salina argues its regulations apply in the aggregate to address the "overall harm," and that it does not have to prove that any particular sign causes harm. *Spiehs* supports this argument, acknowledging "the [l]ibrary is not confined to prohibiting behavior that is actually disruptive," noting that "a library's policy requiring shoes was narrowly tailored even if the plaintiff's bare feet hadn't disrupted the library." *Id*. at *8.

Sincerely,

FAIRFIELD AND WOODS, P.C.

Todd Messenger

TGM:ds

cc: Samuel G. MacRoberts, Esq.; Jeffrey Shaw, Esq.; Amy Peikoff, Esq.; Jeremy Talcott, Esq.; Timothy Sandefur, Esq.; John B. Bursch, Esq.; James A. Campbell, Esq.; Christine N. Marsden, Esq.; Robert Frommer, Esq.; Elizabeth (Betsy) Sanz, Esq.; Riley Grace Borden, Esq.; Brendan J. Philbin, Esq.; J. Michael Connolly, Esq.; and Paul R. Draper, Esq.

Enclosure: *Spiehs v. Morgan*, No. 25-3174, 2026 WL 2091027 (10th Cir. July 21, 2026)

2026 WL 2091027
Only the Westlaw citation is currently available.
United States Court of Appeals, Tenth Circuit.

Justin SPIEHS, Plaintiff - Appellant,
v.
Kathleen MORGAN; Board of Directors of the Free Public Library of the City of Lawrence, Kansas; Marc Veloz; Sara Mathews; Heather Kearns; Karen Allen; Lauren Taylor; Tristan Star; Polli Kenn, Defendants - Appellees.

No. 25-3174
|
FILED July 21, 2026

**Synopsis**

**Background:** Library patron brought action against city and library employees alleging that library's policies prohibiting signs and protests violated First Amendment free speech rights, equal protection, procedural due process, and constituted retaliation for protected speech. The United States District Court for the District of Kansas, Julie A. Robinson, Senior District Judge, 2025 WL 2531844, granted summary judgment to all defendants. Library patron appealed.

**Holdings:** The Court of Appeals, Bacharach, Circuit Judge, held that:

patron lacked standing to bring claims for declaratory and injunctive relief;

library's policy prohibiting signs and protests was neutral as to both content and purpose;

policy did not violate First Amendment;

library did not violate patron's equal protection rights; and

library did not remove patron from library in retaliation for exercising his First Amendment rights.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS (D.C. No. 5:24-CV-04016-JAR)**

**Attorneys and Law Firms**

Linus L. Baker of Stilwell, Kansas, for Plaintiff-Appellant.

Samuel A. Green (Katherine E. Sittenauer with him on the brief), Fisher, Patterson, Sayler & Smith, L.L.P., Topeka, Kansas, for Defendants-Appellees.

Before TYMKOVICH, MURPHY, BACHARACH, Circuit Judges.

**Opinion**

BACHARACH, Circuit Judge.

***1** This case involves the constitutionality of restrictions on free speech in public forums. Forums can be public based on tradition or designation. *Wells v. City & Cnty. of Denver*, 257 F.3d 1132, 1145 (10th Cir. 2001). When a forum is designated as public, the government can impose restrictions on speech if they're narrowly tailored to serve a significant governmental interest. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1130–31 (10th Cir. 2012). For example, cities may designate a library as a public forum and adopt narrowly tailored restrictions with a purpose to provide a place to read and study free of distractions. *Id.* at 1128–29. Does that purpose allow a city to prohibit the display of signs inside the library? We answer *yes* because the signs could disturb library patrons who are reading or studying.

**Background**

On multiple occasions, Justin Spiehs visited a public library in Lawrence, Kansas, and displayed signs. The staff found that these displays violated the library's policies and told Mr. Spiehs either to remove his signs or to leave. Mr. Spiehs sued the City of Lawrence

and library employees, challenging the restriction on signs as a denial of free speech and equal protection, deprivation of procedural due process, and retaliation for protected speech.

**1. The library's policies prohibit disruptive behavior and regulate free speech.**

In 2023, the library had a policy on behavior, which stated: "The Library is committed to providing a safe and respectful environment for all its users. Behavior that disturbs others' use of the library, creates an unsafe environment, impedes the work of library staff, or creates a risk of damage to library property is not permitted." Appellant's App'x vol. 1, at 112.

In November 2024, the library enacted a policy on free speech that said

- "[t]he Library is a limited public forum dedicated to the peaceful study and enjoyment of visitors free from disturbance and unauthorized free speech activities by others,"
- "[t]he Library will not permit free speech activities inside the Library that would interfere with study and enjoyment of visitors of the Library," and
- " '[f]ree speech activities' include, but are not limited to: holding or carrying signs, protesting, using expressive conduct or speech, distributing literature, acting as a public speaker, panhandling, and requesting signatures/donations/contributions."

Appellant's App'x vol. 1, at 126.

**2. Staff enforce the policies on free speech against Mr. Spiehs.**

Throughout 2023 and 2024, library staff told Mr. Spiehs that he was violating the policy on free speech.

The first incident stemmed from a meeting where staff adopted the policy on free speech. After the meeting, Mr. Spiehs stood in the library with Mr. Michael Eravi. Mr. Spiehs held a sign stating: "Free speech died here, ask me how." A staff member asked Mr. Spiehs to put away his sign, and he declined. Mr. Eravi later displayed a printed copy of the library's new policy. Police officers came, and Mr. Spiehs and Mr. Eravi left.

***2** The next day, Mr. Spiehs stood in the library, wearing a shirt that stated: "Free speech died here, ask me how." Mr. Spiehs then displayed a sign with the same message. Staff told Mr. Spiehs that he couldn't display the sign, and Mr. Spiehs refused to put it away. The police came, and Mr. Spiehs left.

Five days later, Mr. Spiehs entered the library and displayed a big blank poster. Staff called the police, who talked to Mr. Spiehs, and he left.

Eight days later, Mr. Spiehs and Mr. Eravi entered the library with flags. Mr. Eravi wore his flag draped around his neck like a scarf, while Mr. Spiehs held up a flag that read, "Don't tread on me." Mr. Spiehs was asked to leave; Mr. Eravi wasn't.

Staff eventually suspended Mr. Spiehs from the library for a week and then for three months.

**Standard of Review**

After Mr. Spiehs sued, the district court granted summary judgment to all defendants. On appeal, we conduct de novo review based on the standard that governed in district court. *Sawyers v. Norton*, 962 F.3d 1270, 1282 (10th Cir. 2020). Under this standard, we view the evidence in the light most favorable to Mr. Spiehs, resolving factual disputes and reasonable inferences in his favor. *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 461 (10th Cir. 2013).[1] Through this view of the evidence, we consider whether the defendants showed a right to judgment as a matter of law and the absence of a genuine dispute of material fact. *Id.*

**Claims for Declaratory and Injunctive Relief**

In district court, Mr. Spiehs sought declaratory and injunctive relief based on policies

- that hadn't been applied to him (policies on displaying exhibits, reserving rooms, and allowing patrons to post messages on a community bulletin board), and
- that had been applied to him (policies on behavior and free speech).

In seeking summary judgment, the defendants argued that Mr. Spiehs lacked standing to challenge the policies that hadn't been applied. The district court credited this argument. For the policies that hadn't been applied to Mr. Spiehs, the court concluded that he lacked standing on the claims of declaratory and injunctive relief, reasoning that

- Mr. Spiehs needed to establish standing by showing a continuing injury or an immediate threat of injury and
- the record hadn't shown chilling of his speech.

On appeal, Mr. Spiehs abandons his claims against the policies that weren't applied to him. He instead pursues his challenge involving the policies that were applied. We reject this challenge.

"Standing on a chilled-speech claim requires both subjective and objective deterrence." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1164 (10th Cir. 2023). *Subjective deterrence* exists when the law deters the plaintiff from speaking. *Id.* *Objective deterrence* requires a showing that "the challenged law would plausibly deter a reasonable person in the plaintiff's position." *Id.*[2]

***3** Mr. Spiehs hasn't shown subjective deterrence. To the contrary, he asserts that he "intends to return to the [l]ibrary communicating in the same manner described in these events." Appellant's Opening Br. at 19. Absent an allegation of subjective deterrence, Mr. Spiehs lacks standing on his claims of declaratory and injunctive relief as to the policies that the staff applied.

## Claims for Damages

### 1. Claims Under the First Amendment

Mr. Spiehs also defends his claims for damages, arguing that the library's policies on behavior and free speech are unconstitutional on their face and as applied.

#### a. The library is a designated public forum.

The limits on expressive activity turn on the nature of the forum. *Verlo v. Martinez*, 820 F.3d 1113, 1129 (10th Cir. 2016). Three types of forums exist:

1. a traditional public forum,
2. a designated public forum, and
3. a nonpublic forum.

*Id.*

A *traditional public forum* is a place, like a street or a park, that has customarily remained open to the public for assembly and debate. *Id.* A *designated public forum* is "government property that has not traditionally been regarded as a public forum [but which] is intentionally opened up for that purpose." *Id.* at 1141 (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009)). A *nonpublic forum* is government property that isn't traditionally a public forum or designated as a forum for public discourse. *Verlo*, 820 F.3d at 1129.

Mr. Spiehs characterizes the library as a designated public forum. The defendants agree, but classify the library as a *designated public forum for a limited purpose*. For that classification, the defendants cite *Doe v. City of Albuquerque*, 667 F.3d 1111, 1128 (10th Cir. 2012). There we held that public libraries are designated public forums. *Id.* at 1128. Although libraries are open to certain forms of expressive activity—such as receiving information and "reading, writing or quiet contemplation"—they are not designated for other communications like speeches or debate. *Id.* at 1128–29. But in *Doe*, we didn't create a separate category of *designated public forums for a limited purpose*.

The district court assumed that the library had been a designated public forum.[3] We assume for the sake of argument that this designation was correct. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012) (concluding that "the City's public libraries constitute designated public fora"); *Hawkins v. City & Cnty of Denver*, 170 F.3d 1281, 1287 (10th Cir. 1999) ("Examples of designated public fora include ... public libraries.").

The nature of the forum dictates how we review restrictions on speech. In a designated public forum,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the government can impose "reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). These restrictions are valid when they

- are content-neutral,
- are narrowly tailored to serve a significant governmental interest, and
- leave open ample alternative channels for communication.

*Id.* Applying these factors, we conclude that the library's policies are reasonable as to the time, place, and manner of speech.

**b. The policy on free speech is neutral as to content.**

***4** Mr. Spiehs claimed that the policy on free speech discriminated based on content.

**i. Facial Claim**

A restriction on speech is facially discriminatory when it "applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69, 142 S.Ct. 1464, 212 L.Ed.2d 418 (2022) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015)). Even if the restriction is facially neutral as to the content, the restriction may be content-based if the purpose is discriminatory. *Id.* at 76, 142 S.Ct. 1464. The library's policy on free speech is neutral as to both content and purpose.

The library said nothing about the content of speech inside the library. To the contrary, the library banned all displays of signs regardless of what they said. *See, e.g.*, *id.* (concluding that regulations on signs were content neutral because applicability of the regulations wasn't affected by the content of the signs); *Hill v. Colorado,* 530 U.S. 703, 725, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (concluding that a statute regulating speech near health care facilities was content neutral because it "applie[d] to all 'protest,' to all 'counseling,' and to all demonstrators" regardless of subject matter or viewpoint).

Mr. Spiehs claims that a prohibition on *protesting* turns on content because protesting inherently involves "negative speech." Oral Argument at 1:34–1:43, 13:00–13:08. But we held in *Verlo v. Martinez* that an order was content-neutral when it restricted "demonstrating," "picketing," and "protesting." 820 F.3d 1113, 1134 (10th Cir. 2016).[4] The Supreme Court has also regarded restrictions on *protesting* and *demonstrating* as content-neutral. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 725, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (protesting); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 98, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (picketing); *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 366–67 n. 3, 117 S.Ct. 855, 137 L.Ed.2d 1 (1997) (demonstrating); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762–64, 114 S.Ct. 2516, 129 L.Ed.2d 593 (1994) (demonstrating).

Because the free speech policy doesn't facially regulate content, we consider the library's purpose in restricting protests and displays of signs. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69, 142 S.Ct. 1464 (2022); *see also* *Reed v. Town of Gilbert*, 576 U.S. 155, 167, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015) (stating that consideration of a governmental motive "applies only if a statute is content neutral"). The inquiry turns on whether the city's restrictions on speech served as a pretext for content discrimination. *City of Austin*, 596 U.S. at 74, 142 S.Ct. 1464. A policy is content-neutral if it serves purposes unrelated to the content even if the policy were to incidentally affect some speakers. *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746 (1989). To be content-neutral, the regulation must be "justified without reference to the content of the regulated speech." *Id.* at 791–92, 109 S.Ct. 2746 (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)).

***5** The "very purpose" of a public library is to protect the patrons' access to information "through reading, writing, and quiet contemplation." *Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012) (quoting *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1264 (3d Cir. 1992)). The library's policy is designed to carry out this purpose by preserving and maintaining an atmosphere consistent with reading, receiving information, and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

study without "singl[ing] out any topic or subject matter for differential treatment." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 71, 142 S.Ct. 1464 (2022).

The policy is content-neutral if it retains the character of the forum and avoids disruption. *See Ward v. Rock Against Racism,* 491 U.S. 781, 792, 109 S.Ct. 2746 (1989) (stating that guidelines on amplification of sound are content-neutral when controlling noise levels, retaining the character of the venue, and avoiding undue intrusion). The library's policies protect the government's interest in maintaining the character of the library as a quiet environment; the content of the speech is immaterial.[5]

The library's justifications for implementing the policies are valid and unrelated to the content of expression. The policies are thus content-neutral on their face.

**ii. As Applied Claim**

Mr. Spiehs also asserts an as applied claim, citing three episodes to prove discrimination based on content:

1. November 26, 2024: A shirt reading "Free Speech Died Here" was allowed; the same words were banned when they were on paper.

2. December 1, 2024: A sign criticizing the library was allowed; a blank cardboard wasn't.

3. December 9, 2024: An LGBTQ-themed flag was allowed; a "Don't Tread on Me" flag was not.

**a. For these incidents, enforcement was neutral as to content.**

**(i) November 26, 2024**

Mr. Spiehs wore a shirt saying "Free speech died here, ask me how" and carried a sign with the same message. Initially, Mr. Spiehs stood silently and held the sign folded up. At this point, no one approached him.



Video Exh. D at 08:34

Eventually, Mr. Spiehs unfolded the sign and displayed it.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 




*Id.* at 20:43

A staff member approached Mr. Spiehs and read him the policy on free speech, explaining that he couldn't display signs inside the library. Mr. Spiehs refused to go or put the sign away. So police officers came and asked Mr. Spiehs to leave, explaining that the library prohibits users from holding signs.

The policy on free speech is content-neutral with respect to this incident because signs are prohibited regardless of what they say. The staff let Mr. Spiehs stand while wearing a shirt with an expressive message and interrupted only when he held up a sign. The content of the sign thus had no bearing on the policy or its application to Mr. Spiehs.

**(ii) December 1, 2024**

***6** A companion of Mr. Spiehs, Mr. David Basten, entered the library while carrying a paper sign saying “The public library should be defunded for constitutional violations!”




Video Exh. G at 00:03

The staff told Mr. Basten that he could display signs outside the library, but not inside. Mr. Basten balked, and staff warned him that the police could be called to escort him outside. Mr. Basten refused to go.

Mr. Spiehs also entered the library, carrying a blank poster.




Video Exh. F at 18:51

The police arrived and told Mr. Spiehs that they had been called for “protestors in the library.” When asked if the call had mentioned Mr. Spiehs, the police responded *no* and said that the call had referred to “protestors.”

Staff applied the policy in a way that was neutral as to the content of the speech. Staff intervened when Mr. Basten protested and wielded a sign. Mr. Spiehs's blank

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

sign had no content, but the policy prohibited display of signs irrespective of their content.[6]

Mr. Spiehs elsewhere conceded that enforcement of the policy against a blank sign would be content-neutral. In his opening brief, for example, he acknowledged that the confrontation involving blank paper shows that library staff "criminalize[d] expression by *appearance* alone, without regard to actual content." Appellant's Opening Br. at 31 (emphasis in original).

While conceding that the policy targeted speech based on its appearance rather than content, Mr. Spiehs argues that staff disallowed the blank sign based on the possibility that it "might become expressive." Appellant's Opening Br. at 31. For this argument, he asserts that staff prohibited him from carrying a blank poster because he might write a message on it.[7] This assertion rests on speculation and lacks support: There's no evidence that staff disallowed the blank sign because of the possibility that Mr. Spiehs would write on it.

**(iii) December 9, 2024**

Mr. Spiehs entered the library and stood while showing a flag that said "Don't Tread on Me."



Video Exh. M at 03:12

Mr. Michael Eravi, a companion of Mr. Spiehs, simultaneously stood with a flag draped around his shoulders.



Video Exh. L at 08:06

Staff told Mr. Spiehs that

- he couldn't display his flag and
- Mr. Eravi wasn't violating the library policy because of how he was displaying the flag.

This incident didn't appear in the final pretrial order.[8] And "[c]laims, issues, defenses, or theories of damages not included in the pretrial order are waived." *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006). So Mr. Spiehs waived reliance on this incident to show discrimination based on content.

He not only waived reliance on this incident, but also lacked proof of content discrimination. The policy prohibits "holding or carrying signs" and "protesting," but doesn't say what users can wear in the library. So Mr. Eravi could wear his flag as a scarf even though Mr. Spiehs couldn't display his flag as a sign. Staff explained the difference, telling Mr. Eravi that

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

- Mr. Spiehs' conduct "could probably [qualify as] either" holding a sign or protesting and
- Mr. Eravi couldn't hold the flag like Mr. Spiehs was.

Given the policy and staff's explanation, the incident didn't suggest discrimination based on content.

**b. The policies on behavior and free speech are narrowly tailored to serve a significant governmental interest.**

**(i) The policies serve a significant governmental interest.**

For a designated public forum like a library, a content-neutral restriction must serve a significant governmental interest. *See* p. ——, above. The governmental interest here is significant: protecting the purpose of designating the property as public. *United States v. Kokinda*, 497 U.S. 720, 738–39, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (Kennedy, J., concurring).

A public library is "a place dedicated to quiet, to knowledge, and to beauty." *Brown v. Louisiana,* 383 U.S. 131, 142, 86 S.Ct. 719, 15 L.Ed.2d 637 (1966), *quoted with approval in Doe v. City of Albuquerque,* 667 F.3d 1111, 1129 (10th Cir. 2012).[9] The government thus has a substantial interest in preserving an environment conducive to reading and study. *See Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1263 (3d Cir. 1992) ("Prohibiting disruptive behavior is perhaps the clearest and most direct way to achieve maximum Library use."). Preservation of that environment could justify restrictions on expression. *See, e.g.*, *id.* at 1247 (concluding that a public library can prohibit activities that may disturb others); *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 591 (6th Cir. 2003) (concluding that a public library can restrict use to preserve the space as a place for quiet reading, study, and contemplation). For example, the government can preserve an environment for reading and study by preventing outside distractions involving protestors and signs.

**(ii) The policies are narrowly tailored.**

***8** The restriction must be narrowly tailored to avoid those distractions. *Doe*, 667 F.3d at 1133. The restriction is narrowly tailored if it "promotes a substantial governmental interest that would be achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–99, 109 S.Ct. 2746 (1989) (quoting *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985)). But a restriction may be narrowly tailored even when other alternatives would be less burdensome. *Id.* at 797, 109 S.Ct. 2746.

The city narrowly tailored its policies on behavior and free speech by prohibiting users from protesting and carrying signs. Mr. Spiehs argues that the policies sweep too broadly because signs don't disrupt users. But "the [l]ibrary is not confined to prohibiting behavior that is actually disruptive." *Kreimer v. Bureau of Police Morristown*, 958 F.2d 1242, 1264 n.28 (3d Cir. 1992); *see also Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 593 (6th Cir. 2003) (holding that a library's policy requiring shoes was narrowly tailored even if the plaintiff's bare feet hadn't disrupted the library).

Granted, a wholesale ban on all speech may go too far in preserving the nature of some designated public forums. For example, an airport can't ban every form of speech. *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 570–71, 575, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987). But the library didn't ban all speech: Patrons could still read, seek permission to display messages, wear clothes with expressive messages, and post messages on a community bulletin board. The library simply restricted speech that could distract library patrons from reading or studying. These restrictions were narrowly tailored to protect the significant public interest in preserving a quiet environment for reading and study.

**(iii) Ample other channels of communication remained.**

Even if the policy were otherwise narrowly tailored, the library needed to preserve ample other channels of expression. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1135 (10th Cir. 2012). The library did

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

that. For example, people could still protest right outside the library. And inside the library, users could wear clothing with expressive messages, post messages on a community bulletin board, seek permission to display messages, and reserve rooms where individuals could speak freely and carry signs.[10] In these ways, the library allowed ample other channels of communication.

**c. The challenge to the behavior policy lacks merit.**

On appeal, Mr. Spiehs also challenges the policy on behavior, which prohibited disruption to users of the library: "The Library is committed to providing a safe and respectful environment for all its users. Behavior that disturbs' others' use of the library ... is not permitted." Appellant's App'x vol. 1, at 112. Mr. Spiehs characterizes this language as a *heckler's veto* by restricting speech to avoid potential disturbances.

***9** He appears to frame this argument as a facial challenge because he doesn't rely on any incidents involving reliance on the behavior policy. But in district court, Mr. Spiehs framed this argument as an applied challenge. Appellant's App'x vol. 2, at 29 ("As to Dr. Spiehs' claims regarding this [behavior] policy, it is as applied."). And in the final pretrial order, Mr. Spiehs' only facial challenge involves his claims for declaratory and injunctive relief; and he lacks standing on these claims. *See* pp. —— – ——, above. So Mr. Spiehs has waived this facial challenge.

Irrespective of the waiver though, the defendants would be entitled to summary judgment on this claim because speech was curtailed regardless of the content of the message; the library's director and deputy director said under oath that staff considered the display of signs as disruptive to patrons who had come to read and study, and Mr. Spiehs didn't present any contrary evidence. Appellant's App'x vol. 1, at 108, 114–15.

Given this undisputed purpose, the behavior policy didn't facially limit speech based on content and Mr. Spiehs doesn't identify any instances where staff applied the behavior policy based on what his signs said. So the district court didn't err in granting summary judgment to the defendants on this claim.

**d. Mr. Spiehs lacks standing for a vagueness challenge.**

Mr. Spiehs also asserts a vagueness challenge. Although this claim was included in the pretrial order, it appeared only as part of the request for declaratory and injunctive relief. Because Mr. Spiehs lacks standing for this claim, we lack jurisdiction over the vagueness challenge. *See* pp. —— – ——, above.

**2. Claim for Denial of Equal Protection**

**a. Staff didn't treat Mr. Spiehs differently from other similarly situated patrons.**

Mr. Spiehs also claims a denial of equal protection because staff targeted him for special treatment. For this claim, Mr. Spiehs needed to show that

- he was intentionally treated differently from others similarly situated in every material respect and

- no rational basis existed for the different treatment.

*Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011).

The district court granted summary judgment to the defendants on this claim, reasoning that Mr. Spiehs was not similarly situated to the favored individuals. Mr. Spiehs challenges this ruling based on

- the incident on November 25, 2024, involving paper signs and

- the incident on December 9, 2024, involving flags.

**i. November 25, 2024**

In the first incident, Mr. Spiehs held a piece of 11 x 16 inch paper that said "Free Speech Died Here Ask Me How."[11]




Video Exh. B at 37:07

Mr. Eravi stood nearby, filming and holding the policy on free speech.



Video Exh. A at 24:44

A staff member approached Mr. Spiehs and told him that he was violating the policy. Mr. Spiehs refused to leave, and the employee left. Mr. Eravi then unfolded the library's policy and displayed it.



Video Exh. A at 29:40

There is no evidence that a staff member saw Mr. Eravi displaying the policy.[12]

The police came and told both men that the policy prohibited signs, but both men refused to leave. The staff member returned and told Mr. Spiehs to leave. Mr. Eravi asked why he didn't need to leave, and the employee said: “To my knowledge you don't have a sign.” Video Exh. A at 01:22:08–01:22:14.

The district court concluded that the men weren't similarly situated because Mr. Spiehs’ piece of paper was bigger than Mr. Eravi's. Mr. Spiehs downplays this difference, and we can assume for the sake of argument

that the size of the paper doesn't matter. Irrespective of how big the paper was, however, the men weren't similarly situated: The staff member saw Mr. Spiehs displaying a sign and didn't see Mr. Eravi displaying anything. The staff member made this difference clear when he explained that he hadn't seen Mr. Eravi holding a sign. So Mr. Spiehs and Mr. Eravi weren't similarly situated.

**ii. December 9, 2024**

Mr. Spiehs also relies on an incident where he displayed a flag bearing a message. *See* pp. —— – ——, above. This reliance is misguided because

- Mr. Spiehs waived the claim and
- he wasn't similarly situated with anyone treated more favorably.

Mr. Spiehs waived the claim because the final pretrial order had omitted any allegations about a denial of equal protection in this incident. *See Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006); *see also* p. ——, above.

But the claim would fail anyway. Mr. Spiehs argues that Mr. Eravi wasn't asked to leave, but he was wearing the flag rather than displaying it. This difference matters because the library's policy doesn't address clothes bearing expressive messages. *See* pp. ——, ——, above. Given the silence about clothing, staff interpreted the policy to allow Mr. Eravi to wear a flag around his neck as a scarf. So the staff told Mr. Eravi that he didn't seem to be violating the policy. Given the policy and its application, Mr. Spiehs and Mr. Eravi weren't similarly situated.

This claim is therefore waived and invalid.

**3. Claims for Denial of Due Process**

Mr. Spiehs also argues that staff members deprived him of procedural due process by suspending him from the library without notice or a chance to respond. Mr. Spiehs faults the district court for failing to consider this claim. But Mr. Spiehs waived this claim by omitting it in the final pretrial order. *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006); *see also* p. ——, above.

**4. Retaliation Claims**

Mr. Spiehs also claims retaliation. For this claim, he needed to show that

- he was engaged in constitutionally protected activity,
- the defendants' actions caused an injury that would chill a person of ordinary firmness from engaging in the protected activity, and
- ***11** the defendants' actions were substantially motivated as a response to his protected conduct.

*VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1173 (10th Cir. 2021).

The district court properly concluded that Mr. Spiehs had failed at the first step because his displays of signs weren't constitutionally protected. As explained above, the library's restrictions were narrowly tailored to serve a significant governmental interest. *See* pp. —— – ——, above. So Mr. Spiehs' violations of the restrictions weren't constitutionally protected. *See* pp. —— – ——, above. Absent a protected activity, the defendants couldn't incur liability for retaliation. *See Fenn v. City of Truth or Consequences*, 983 F.3d 1143, 1148 (10th Cir. 2020) (concluding that the plaintiff had failed to adequately allege retaliation when the forum wasn't the type of place where the government would need to allow protests or picketing).

**Conclusion**

Mr. Spiehs lacked standing to seek declaratory and injunctive relief. For the policies that weren't applied to him, he didn't suffer an injury in fact. For the policies that were applied to him, he didn't show that he had been subjectively chilled.

The claims for damages are invalid. For example, the policies on free speech and behavior didn't violate the First Amendment because the restrictions were content-neutral and were narrowly tailored to serve a significant governmental interest.

The claims involving equal protection also fail because Mr. Spiehs wasn't similarly situated to anyone

obtaining better treatment. Staff didn't see Mr. Eravi display any papers, and he wore his flag as a scarf rather than display it.

The claim involving procedural due process didn't appear in the final pretrial order.

Finally, the retaliation claim fails because Mr. Spiehs didn't engage in a constitutionally protected activity.

We therefore affirm the district court's grant of summary judgment to the defendants.

**All Citations**

--- F.4th ----, 2026 WL 2091027

Footnotes

1 Mr. Spiehs submitted videos when responding to summary judgment, and he argues that the district court disregarded the videos. He's mistaken. The district court stated that Mr. Spiehs hadn't cited the record when asserting that "the dialogue from the video specifically stated Library staff said it was the words and message on Dr. Spiehs' sign." Appellant's App'x vol. 2, at 91 n.26 (quoting Appellant's App'x vol. 2, at 7). That statement does not indicate that the court disregarded the videos.

2 Mr. Spiehs suggests in one sentence that we shouldn't require subjective deterrence when the plaintiff faces a credible threat of future prosecution. Appellant's Opening Br. at 4. But he doesn't elaborate on this suggestion. So we don't consider it. *See Kellogg v. Watts Guerra LLP,* 41 F.4th 1246, 1262 (10th Cir. 2022) (holding that a single sentence in an appellate brief is insufficient to raise an argument).

3 On appeal, Mr. Spiehs argues that (1) the district court incorrectly classified the library as a nonpublic forum and (2) this classification tainted the subsequent rulings. That argument is misplaced. The court said that it relied on the parties' agreed characterization of the library as a designated public forum; the court didn't treat the library as a nonpublic forum.

4 In oral argument, Mr. Spiehs said that *Verlo* was distinguishable because it involved a courthouse rather than a library. Oral Argument at 13:09–13:40. But in *Verlo*, we assumed that the area surrounding the courthouse was a public forum. And a designated public forum, like the library, is "bound by the same standards as apply in a traditional public forum." *Id.* at 1129. So we're bound by *Verlo*.

5 Mr. Spiehs argues that the policy on speech discriminates against viewpoints by prohibiting only the display of "signs or blank paper critical of its gender-identity" while permitting "equally disruptive conversation." Appellant's Opening Br. at 54. But "blank paper" isn't "critical" of anything. And Mr. Spiehs conflates the policies on free speech and behavior: The policy on speech prohibits displays of any sign regardless of whether it's supporting or opposing something, and the behavior policy regulates speech only when it's disruptive. Neither policy discriminates based on viewpoint.

6 Mr. Spiehs argues that library staff called the police about him, but he lacks any supporting evidence. In a letter to the Clerk, Mr. Spiehs argues that in the pertinent video, police "state on camera that the library called about Spiehs and that no call had been made regarding Basten's conduct 90 minutes earlier." This argument misrepresents what occurred. In the video (18:09 to 18:23), Mr. Spiehs asks the police officer: "Are you saying you got called in for me? What was the call for?" The officer responds: "We got called for protestors in the library." The video doesn't contain any statements by police about a call involving Mr. Spiehs.

7 This speculation leads Mr. Spiehs to protest the lack of a limiting principle because this logic could cause the staff to ban closed books because "they might be opened," folded newspapers because "they might be displayed," or even "hands" because "they might gesture." Appellant's Opening Br. at 32.

8 In oral argument, counsel for Mr. Spiehs stated that the final pretrial order had included this incident.

Appellate Case: 25-3225 Document: 104 Date Filed: 08/19/2026 Page: 15

9 Mr. Spiehs acknowledges that “[p]ublic libraries are ... ‘dedicated to the communication of ideas through quiet, contemplative activity.’ ” Appellant's Opening Br. at 49 (quoting *Doe*, 667 F.3d at 1128).

10 Mr. Spiehs argues that this part of the policy reflects viewpoint discrimination by allowing “ ‘designated partners’ and internal groups” to “engage in identical conduct” based on their “identity and relationship with the government.” Appellant's Opening Br. at 25. He has misinterpreted the policy on free speech. This policy allows anyone to apply to reserve a room in order to engage in free speech. Appellant's App'x vol. 1, at 207–08. The term *designated partner* refers simply to a person or organization affiliated with the sponsor that reserved the room. *Id.* at 205.

11 Mr. Spiehs provides a different account of the incident, stating that

- he and Mr. Eravi silently displayed paper signs in the main reading area,
- Mr. Eravi's message praised the inclusivity of the library's gender programming and Mr. Spiehs' message criticized the programming, and
- staff expelled only Mr. Spiehs.

But the video unmistakably contradicts this account. *See* *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) (“To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony.”).

12 Mr. Spiehs concedes: “At 26:10, staff leave to call police. At 26:57, Eravi holds a sheet of paper in the same manner as Spiehs.” Plaintiff's Letter of Supp. Auth. (Mar. 25, 2026). Mr. Eravi began to hold the sheet of paper only after staff had left.

End of Document

© 2026 Thomson Reuters. No claim to original U.S. Government Works.